# EXHIBIT

# B

*[handwritten: 2051 -17814 F]*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

*[stamp box: Docket ... 01-15-03 ... Case Attorney Case]*

BRIAN PATRICK HERLIHY }
     Appellant, }

}

}

}

}

CASE NO.  2000-2753-CFA

}

}

}

v.          }

APPEAL DOCKET 1D02-4788
VOLUME  II

}

}

}

STATE OF FLORIDA }
      Appellee, }

*[vertical stamp: ATTORNEY GENERAL'S OFFICE CRIMINAL APPEALS TALLAHASSEE / 2003 JAN 13 PM 2:08 / RECEIVED]*

# RECORD

## HONORABLE MARTHA ANN LOTT
### TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE ROBERT A.
BUTTERWORTH
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

Created on 1/3/03

IN THE CIRCUIT COURT
OF THE EIGHTH
JUDICIAL CIRCUIT, IN
AND FOR ALACHUA
COUNTY, FLORIDA

BRIAN PATRICK HERLIHY

Appellant

vs.

CASE NO.2000-2753-CFA

APPEAL NO. 1D02-4788

STATE OF FLORIDA
Appellee

| INDEX INSTRUMENT | DATE FILED | PAGE NO. |
|---|---|---|
| DOCKET LINES | | |
| EVIDENCE LIST | | |
| **VOLUME I** | | |
| ARREST | 08-11-2000 | 1-3 |
| FIRST APPEARANCE ORDER | 08-11-2000 | 4 |
| SEALED ENVELOPE SAID TO CONTAIN COPIES OF APPLICATION & AFFIDAVIT FOR SEARCH WARRANT | 08-16-2000 | 5 |
| NOTICEOF APPEARANCE OF COUNSEL | 08-22-2000 | 6 |
| STIPULATION FOR SUBSTITUTION OF COUNSEL | 08-25-2000 | 7 |
| STATE OF FLORIDA IN THE CIRCUIT COURT EIGHTH JUDICIAL CIRCUIT INDICTMENT FOR FIRST DEGREE MURDER TRUE BILL | 08-29-2000 | 8-9 |

Created on 1/3/03

| | | |
|---|---|---|
| ORDER ALLOWING SUBSTITUTION OF COUNSEL | 08-29-2000 | 10 |
| MOTION TO WITHDRAW | 08-30-2000 | 11 |
| WRITTEN PLEA OF NOT GUILTY, DEMAND FOR DISCOVERY AND DEMAND FOR JURY TRIAL | 08-30-2000 | 12 |
| FIRST APPEARANCE ORDER | 08-21-2000 | 13 |
| ORDER GRANTING MOTION TO WITHDRAW | 08-31-2000 | 14 |
| MOTION TO SET BOND | 09-29-2000 | 15-18 |
| STIPULATION FOR BOND | 10-13-2000 | 19-20 |
| ORDER SETTING BOND | 10-13-2000 | 21-22 |
| CASH APPEARANCE BOND (SEE FRONT AND BACK) | 10-17-2000 | 23-24 |
| MOTION TO CONTINUE CASE MANAGEMENT CONFERENCE AND MOTION TO EXCUSE THE DEFENDANT | 11-09-2000 | 25-26 |
| ORDER GRANTING DEFENDANT'S MOTION FOR CONTINUANCE AND EXCUSING DEFENDANT FROM CASE MANAGEMENT  CONFERENCE ON NOVEMBER 20,2000 | 11-15-2000 | 27 |
| MOTION TO REVOKE BOND | 05-14-2001 | 28-29 |
| COPIES OF COMPLAINT AFFIDAVIT FROM BROWARD COUNTY | 05-13-2001 | 30-35 |
| ORDER REVOKING BOND AND DIRECTING CLERK TO ISSUE CAPIAS | 05-14-2001 | 36 |
| BOND INFORMATION | 05-16-2001 | 37 |
| FIRST APPEARANCE ORDER | 06-06-2001 | 38-41 |
| CASH APPEARANCE BOND | 06-13-2001 | 41A |
| COPIES OF COMPLAINT AFFIDAVIT FROM BROWARD COUNTY, FLORIDA | 07-18-2001 | 42-58 |
| SECOND MOTION TO REVOKE BOND | 07-20-2001 | 59-61 |
| SECOND MOTION TO REVOKE BOND HEARING | 07-20-2001 | 62 |

| | | |
|---|---|---|
| ORDER REVOKING CASH BOND AND DIRECTING THE ISSUANCE OF CAPIAS | 07-20-2001 | 63 |
| MOTION TO CONTINUE | 07-26-2001 | 64-66 |
| MOTION TO SET ASIDE BOND ESTREATURE | 10-21-2001 | 67-68 |
| ORDER GRANTING MOTION TO SET ASIDE BOND ESTREATURE | 10-26-2001 | 69-70 |
| BOND INFORMATION | 10-29-2001 | 71 |
| COPY OF VOUCHER CHECK PAYABLE TO LOIS HERLIHY (BOND REIMBURSEMENT | 11-02-2001 | 72 |
| UNOPPOSED MOTION TO CONTINUE TRIAL | 11-06-2001 | 73-74 |
| ORDER GRANTING DEFENDANT'S MOTION TO CONTINUE | 11-30-2001 | 75-76 |
| MOTION FOR COURT ORDER ALLOWING DEFENDANT TO GET COPIE S OF CHILD PROTECTION TEAM RECORDS | 01-22-2002 | 77 |
| UNOPPOSED MOTION TO CONTINUE TRIAL | 02-01-2002 | 78-79 |
| AMENDED FIRST APPEARANCE ORDER AS TO BAIL, WITH ATTACHED FIRST APPEARANCE ORDER AND ALACHUA COUNTY WARRANT/CAPIAS MITTIMUS | 03-15-2002 | 80-84 |
| MOTION TO REINSTATE PREVIOUS BOND | 03-27-2002 | 85-86 |
| MOTION FOR ORDER ALLOWING ISSUANCE OF SUBPOENAS DUCES TECUM FOR EMPLOYMENT AND EDUCATIONAL RECORDS OF DEFENDANT | 04-16-2002 | 87-88 |
| MOTION TO CONTINUE TRIAL TERM | 06-26-2002 | 89 |
| MOTION TO CONTINUE CAUSE | 06-26-2002 | 90 |
| ADDENDUM TO MOTION TO CONTINUE CAUSE | 06-28-2002 | 91 |
| ORDER GRANTING DEFENDANT'S MOTION FOR COURT ORDER ALLOWING CHILD PROTECTION TEAM TO TURN OVER COPIES OF RECORDS | 08-26-2002 | 92 |

Created on 1/3/03

| | | |
|---|---|---|
| DEFENDANT'S MOTION IN LIMINE | 09-03-2002 | 93-97 |
| STATE'S PROPOSED JURY INSTRUCTION REGARDING DEMONSTRATION EVIDENCE | 09-04-2002 | 98 |
| REQUEST TO ADJOURN TRIAL AT OR NEAR 5:00 P.M. ON WEDNESDAY, SEPTEMBER 11,2002 AND WEDNESDAY, SEPTEMBER 18, 2002 | 09-04-2002 | 99 |
| STIPULATION ON ADMISSION OF MEDICAL RECORDS AND REPORTS | 09-05-2002 | 100 |
| STIPULATION ON ADMISSION OF 911 CALL INTO EVIDENCE | 09-05-2002 | 101 |
| MOTION FOR RECONSIDERATION OF ADMISSIBILITY OF TESTIMONY OF DEPUTY CATHY LONG | 09-06-2002 | 102-130 |
| ENVELOPE SAID TO CONTAIN JURORS' NOTES FROM JURY SELECTION | 09-09-2002 | 131 |
| ENVELOPE SAID TO CONTAIN JURORS' NOTES FROM JURY SELLECTION | 09-09-2002 | 132 |
| ENVELOPE SAID TO CONTAIN JURORS' NOTES FROM JURY SELECTION | 09-09-2002 | 133 |
| DEFENDANT'S MOTION FOR REHEARING AND A DEMAND FOR A RICH ARDSON INQUIRY ON THE ISSUE OF THE ADMISSIBILITY OF A COMPACT DISC PURPORTING TO SHOW A DEMONSTRATION OF SBS (SHAKEN BABY SYNDROME) | 09-09-2002 | 134-135 |
| DECORUM ORDER AS TO MEDIA | 09-09-2002 | 136 |
| ORDER DENYING MOTION FOR RECONSIDERATION OF ADMISSIBILITY OF TESTIMONY OF DEPUTY CATHY LONG | 09-09-2002 | 137 |
| DEFENDANT'S RESPONSE IN OPPOSITION TO STATE'S MOTION FOR RECONSIDERATION OF ADMISSIBILITY OF TESTIMONY OF DEPUTY CLERK KATHY LONG | 09-09-2002 | 138-143 |
| ORDER GRANTING MOTION FOR RELEASE OF EVIDENCE | 09-10-2002 | 144 |

| | | |
|---|---|---|
| STATE'S PROPOSED JURY INSTRUCTION REGARDING DEMONSTRATION EVIDENCE | 09-10-2002 | 145 |
| MOTION FOR REHEARING ON THE ISSUE OF WHETHER THE DEFENSE OR THE STATE OF FLORIDA OPENED THE DOOR SO AS TO CAUSE THE ADMISSIBILITY OF CERTAIN EVIDENCE | 09-20-2002 | 146-147 |
| INSTRUCTION TO JURY REGARDING WITNESS TESTIFYING OUT OF ORDER | 09-20-2002 | 148 |
| 2.02 (a) WHEN THERE ARE LESSER INCLUDED CRIMES OR ATTEMPTS REGARDING EVIDENCE | 09-24-2002 | 149-151 |
| JURY INSTRUCTIONS | 09-25-2002 | 152-169 |
| VERDICT | 09-25-2002 | 170 |
| MOTION FOR RE-HEARING ON ISSUE OF ADMISSIBILITY OF COMPACT DISC PRESENTATION | 09-25-2002 | 171 |

## VOLUME 11

| | | |
|---|---|---|
| DEFENDANT'S MOTION FOR SANCTIONS AGAINST STATE FOR WITHHOLDING CRITICAL TESTIMONY, DEMAND FOR RICHARDSON HEARING , AND MOTION FOR MISTRIAL | 09-25-2002 | 172-218 |
| MOTION TO REOPEN DEFENDANT'S CASE AND ALLOW PREVIOUSLY LISTED STATE WITNESSES TO TESTIFY | 09-25-2002 | 219-220 |
| MOTION FOR NEW TRIAL | 10-03-2002 | 221-222 |
| ORDER DENYING MOTION FOR NEW TRIAL | 10-29-2002 | 223 |
| REALTIME TRANSCRIPT PROCEEDINGS: MOTION TO DISMISS INDICTMENT, HELD ON 09-05-2002 | 11-08-2002 | 224-267 |
| DECORUM ORDER AS TO MEDIA | 11-08-2002 | 268-272 |
| AMENDED DECORUM ORDER AS TO MEDIA | 11-08-2002 | 273-275 |
| SEALED ENVELOPE SAID TO CONTAIN PSI REPORT | 11-08-2002 | 276 |

Created on 1/3/03

| | | |
|---|---|---|
| PHOTOGRAPH OF THE CHILD | 11-08-2002 | 277 |
| ORDER REQUIRING TRANSCRIPTION OF TRIAL TESTIMONY | 11-08-2002 | 278 |
| JUDGEMENT | 11-08-2002 | 279 |
| AMENDED JUDGEMENT AS TO CRIME | 11-08-2002 | 280 |
| SENTENCE AS TO COUNT 1 , AND OTHER PROVISIONS | 11-08-2002 | 282-282 |
| FINGERPRINTS OF DEFENDANT | 11-08-2002 | 283 |
| ORDER ESTABLISHING MONETARY SUMS | 11-08-2002 | 284-285 |
| CRIMINAL CODE SCORESHEET | 11-08-2002 | 286-287 |
| CIVIL RESTITUTION LIEN ORDER | 11-08-2002 | 288 |
| STATE OF FLORIDA UNIFORM COMMITMENT TO CUSTODY OF DEPARTMENT OF CORRECTIONS | 11-13-2002 | 289 |
| MOTION FOR SUPERSEDEAS BOND | 11-15-2002 | 290-293 |
| APPLICATION FOR APPOINTMENT OF PUBLIC DEFENDER/AFFIDAVIT OF INDIGENCY AND RELEASE OF FINANCIAL INFORMATION | 11-22-2002 | 294 |
| INFORMATION RECEIVED FROM COMMONWEALTH OF PENNSYLVANIA RE: DEFENDANT BRIAN PATRICK HERLIHY | 11-22-2002 | 295-299 |
| INFORMATION RECEIVED FROM COMMONWEALTH OF PENNSYLVANIA RE: DEFENDANT BRIAN PATRICK HERLIHY | 11-22-2002 | 300-304 |
| NOTICE OF APPEAL | 11-22-2002 | 305- |
| DESIGNATION TO REPORTER AND REPORTER'S ACKNOWLEDGEMENT | 11-22-2002 | 306-308 |
| DIRECTIONS TO THE CLERK | 11-22-2002 | 309 |
| STATEMENT OF JUDICIAL ACTS TO BE REVIEWED | 11-22-2002 | 310-312 |

Created on 1/3/03

DESIGNATION OF PUBLIC DEFENDER, SECOND
JUDICIAL CIRCUIT, FOR THE HANDLING OF
APPEAL                                          11-22-2002              313

ORDER FINDING DEFENDANT INDIGENT AND
APPOINTING PUBLIC DEFENDER OF THE
EIGHTH JUDICIAL CIRCUIT FOR HANDLING OF
APPEAL                                          12-04-2002              314-315

AMENDED NOTICE OF APPEAL                        12-30-2002              316

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                          CASE NO:   2000-2753-CFA
      Plaintiff,                                      2000-2660-CFA

vs.

                                           FILED IN OPEN COURT
BRIAN HERLIHY,                                 9-25         2002
      Defendant.                             _____
_____/                      D.C.

DEFENDANT'S MOTION FOR SANCTIONS AGAINST STATE
FOR WITHHOLDING CRITICAL TESTIMONY,
DEMAND FOR RICHARDSON HEARING, AND MOTION FOR MISTRIAL

COMES NOW the Defendant, **Brian Herlihy,** by and through his undersigned attorney, and

files this motion pursuant to Florida Rule of Criminal Procedure 3.220, and in support thereof states

that:

1.   Dr. Lawrence Levine was listed as an expert witness by the State. His written report was
     provided to the Defendant, and he was deposed by the Defendant prior to trial.

2.   On September 17, 2002, Dr. Levine testified during the State's case-in-chief that the
     medical examination and photographs at the time of the incident revealed displacement
     and cracking of the retinal portion of the alleged victim's eyeballs.

3.   The above-described condition was not mentioned in Dr. Levine's report, nor did he
     mention it during his deposition.

4.   The State's direct examination makes it apparent that the State knew, or should have
     known, of this testimony prior to the time of trial, but did not notify Defense Counsel
     thereof.

5.   "Florida Rule of Criminal Procedure 3.220 imposes an affirmative and continuing duty
     on the state to disclose to the defense certain information within the state's possession,
     including the results of scientific tests. . . ." McArthur v. State, 671 So.2d 867, 869 (Fla.
     4th DCA 1996); Raffone v. State, 483 So.2d 761 (Fla. 4th DCA 1986), citing Odoms v.

State v. Herlihy
Case No.: 2000-2753-CFA / 2000-2660-CFA
Motion For Sanctions, etc.
Page 2

State, 431 So.2d 1041 (Fla. 4th DCA 1983) ("[S]tate, to avoid trial by ambush, has an affirmative duty to furnish *full* discovery.") (emphasis in original).

6.  "[F]urnishing misleading and inaccurate discovery is tantamount to providing no discovery at all. . . . [A] defendant is entitled to rely on the accuracy of the information disclosed by the prosecution pursuant to a discovery request under rule 3.200." McArthur at 870.

7.  Failure of Defense Counsel to inquire into every possibility does not relieve the State of its obligation to disclose what it knows and what it intends to present at trial. Raffone at 764 (Fla. 4th DCA 1986) ("In sum, although it is true the seized drugs were available for testing by the defendants, there was no reason for them to do so. The initial report did not suggest incomplete testing, and more to the point, we believe that the defense is entitled to rely on the accuracy of the of such reports."), also citing Lavigne v. State, 349 So.2d 178 (Fla. 1st DCA 1977) ("[D]efendant had no reason to interview/depose witness absent the information not disclosed by state."); Tetrault v. Fairchild, 799 So.2d 226, 229 (Fla. 5th DCA 2001) ("The dissent finds that it was the defense's own fault that it did not discover Dr. Gordon's new role because it failed to depose him. This is a strained notion of imputed knowledge. . . . By permitting Dr. Gordon to testify at trial in a new undisclosed capacity, the judge rendered the trial unfair."), also citing Office Depot, Inc. v. Miller, 584 So.2d 587 (Fla. 4th DCA 1991) ("Failure to disclose . . . expert's changed opinion. . . required a new trial.").

8.  A Richardson hearing is required where, as here, the state has not fully complied with discovery. Raffone at 764 ("Since it is clear that the state disclosed one set of results in the lab report and then attempted to prove something else at trial, we hold that the trial court was *required* to conduct a Richardson inquiry. Its failure to do so constitutes

State v. Herlihy
Case No.: 2000-2753-CFA / 2000-2660-CFA
Motion For Sanctions, etc.
Page 3

reversible error.") (emphasis added). This is true regardless of the intent, or lack thereof,

of the State. McArthur at 870.

9.      "[O]nly if the . . . court can say beyond a reasonable doubt that the defense was not

procedurally prejudiced by the discovery violation can the error be considered harmless."

Id.; Moreover, "'harmless error' is a more difficult case to make when the testimony is

not that of a fact witness, but instead is expert testimony," Tetrault at 228

10.     The State's failure or refusal to disclose the testimony, reports, and/or changed opinion

of Dr. Levine has deprived the Defendant of his rights to due process, confrontation, a

fair trial, and effective assistance of counsel, in violation of the constitutions of the State

of Florida and the United States of America, as amended.

     **WHEREFORE**, the Defendant, **Brian Herlihy,** respectfully requests that this Honorable

Court enter an order declaring a mistrial in the above-styled cause. In the alternative, it is requested

that a Richardson hearing be conducted, and that appropriate sanctions be levied against the State

as a result of the findings thereof.

## CERTIFICATE OF SERVICE

     **I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished
by hand-delivery to Jeanne Singer, Esquire, State Attorney's Office, P.O. Box 1437, Gainesville,
FL 32602 on this 3rd day of September, 2002.

                         **LAW OFFICES OF GROLAND & ASSOCIATES,P.A.**

                         FoR   **Gordon H. Groland, Esquire**
                               Florida Bar # 137259
                               **John H. Tedder, Esquire**
                               Florida Bar #0398616
                               Post Office Box 2848
                               Gainesville, FL  32602
                               Phone: (352) 373-4669 / 373-2885 Fax

Service: Get by LEXSEE®
Citation: 671 So. 2d 867,AT 870

671 So. 2d 867, *; 1996 Fla. App. LEXIS 3853, **;
21 Fla. L. Weekly D 921

ALLEN MCARTHUR, Appellant, v. STATE OF FLORIDA, Appellee.

CASE No. 94-2866.

COURT OF APPEAL OF FLORIDA, FOURTH DISTRICT

671 So. 2d 867; 1996 Fla. App. LEXIS 3853; 21 Fla. L. Weekly D 921

April 17, 1996, Filed

**SUBSEQUENT HISTORY: [**1]** Released for Publication May 3, 1996.

**PRIOR HISTORY:** Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; Larry Schack, Judge. L.T. Case No. 93-2033-CF.

**DISPOSITION:** Affirmed in part, reversed in part and remanded.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant sought review of a decision from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County (Florida) that denied appellant's motion for mistrial due to discovery misconduct and upheld a verdict that found appellant guilty of sexual and aggravated battery and false imprisonment.

**OVERVIEW:** Appellant was charged with sexual battery, aggravated battery, and false imprisonment. The defense was given a lab report from prosecution which indicated that none of the victim's clothes were torn, the fact of which, appellant's counsel exploited at trial to disprove to allegations of forced sex against victim. Later in the trial, prosecution informed appellant's counsel that it planned to introduce a torn pair of shorts and the police mistakenly took appellant's shorts instead of victim's. The trial court determined that admission of the shorts into evidence was not prejudicial and denied appellant's mistrial motion. Appellant was convicted by jury on all charges. The court reversed and remanded as to the sexual battery conviction because the prosecution had an affirmative duty to disclose the information; and the eleventh hour presentation of victim's actual shorts was prejudicial.

**OUTCOME:** The court reversed and remanded as to appellant's sexual battery conviction. The court held that the eleventh hour presentation of evidence was prejudicial; and the prosecution had an affirmative duty to disclose the information.

**CORE TERMS:** discovery violation, discovery, prejudiced, torn, defense counsel, procedurally, mistrial, tested, lab, reasonable possibility, harmless, seized, physical evidence, opening statement, sexual battery, prosecutor, accuracy, custody, night, clothes, pair, beyond a reasonable doubt, materially different, state provided, new evidence, crime lab, supplemental, midst, aggravated battery, false imprisonment

### CORE CONCEPTS - ◆ Hide Concepts

📄 Criminal Law & Procedure : Discovery & Inspection : Discovery by Defendant : Reports of Examinations & Tests
📄 Criminal Law & Procedure : Discovery & Inspection : Discovery by Defendant : Tangible Objects
⚖ Fla. R. Crim. P. 3.220 imposes an affirmative and continuing duty on the state to disclose to the defense certain information within the state's possession, including the results of scientific tests

and any tangible evidence that the state intends to introduce at trial.

📖 Criminal Law & Procedure : Discovery & Inspection : Discovery Misconduct
⚓ Furnishing misleading and inaccurate discovery is tantamount to providing no discovery at all and may constitute a violation of the discovery rules.

📖 Criminal Law & Procedure : Discovery & Inspection : Discovery by Defendant : Reports of Examinations & Tests
📖 Criminal Law & Procedure : Discovery & Inspection : Discovery Misconduct
⚓ A defendant is entitled to rely on the accuracy of the information disclosed by the prosecution pursuant to a discovery request under Fla. R. Crim. P. 3.200.

📖 Criminal Law & Procedure : Discovery & Inspection : Discovery Misconduct
⚓ In determining whether a Richardson violation is harmless, the appellate court must consider whether there is a reasonable possibility that the discovery violation procedurally prejudiced the defense. As used in this context, the defense is procedurally prejudiced if there is a reasonable possibility that the defendant's trial preparation or strategy would have been materially different had the violation not occurred. Trial preparation or strategy should be considered materially different if it could have reasonably benefited the defendant. In making this determination, every conceivable course of action must be considered.

📖 Criminal Law & Procedure : Discovery & Inspection : Discovery Misconduct
⚓ If the reviewing court finds that there is a reasonable possibility that the discovery violation prejudiced the defense or if the record is insufficient to determine that the defense was not materially affected, the error must be considered harmful. In other words, only if the appellate court can say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless.

📖 Criminal Law & Procedure : Pretrial Motions : Double Jeopardy : Attachment of Double Jeopardy Protection
📖 Criminal Law & Procedure : Trials : Motions for Mistrial
⚓ Where a mistrial is declared upon the defendant's motion or with his consent, jeopardy does not attach and the defendant may be retried.

**COUNSEL:** Jeffrey H. Garland of Kirschner & Garland, P.A., Fort Pierce, for appellant.

Robert A. Butterworth, Attorney General, Tallahassee, and Don M. Rogers, Assistant Attorney General, West Palm Beach, for appellee.

**JUDGES:** STEVENSON, J. POLEN and SHAHOOD, JJ., concur.

**OPINIONBY:** STEVENSON

**OPINION:**

  [*868] STEVENSON, J.

Appellant, Allen McArthur, was tried by jury and convicted of sexual battery, aggravated battery, and false imprisonment. We reverse the sexual battery conviction because of the state's mid-trial disclosure of physical evidence which materially undermined, and procedurally prejudiced, the appellant's trial strategy.

The events and testimony at trial may be briefly summarized. Appellant and the victim, Carrie McKee, had an on-and-off romantic relationship for close to one year. On the night in question, McKee testified that after she and appellant spent a night of bowling and heavy drinking, she went to appellant's home [**2] where he later refused to let her leave, physically beat her, and then forced himself upon her sexually. Appellant's defense at trial was consent. During opening statement, defense counsel told the

jury that the evidence would show there was no struggle between appellant and McKee. Armed with a lab report from the state which indicated that none of the victim's clothes were torn, defense counsel pointed out to the jury that although McKee told the police that appellant tore off her clothes, the physical evidence would show that none of her clothes were torn.

On the second day of trial, the prosecutor told defense counsel that a pair of shorts, torn at the zipper and allegedly worn by the victim on the night in question, would be offered into evidence. The prosecutor informed the defense that the victim was prepared to testify that when the police gathered the physical evidence, they took appellant's shorts instead of her shorts. Appellant's shorts were then improperly labeled as if they were the victim's. McKee would testify that her shorts had never been handed over to the authorities.

Because the police had the wrong pair of shorts, the lab reports supplied by the state during **[\*\*3]** discovery indicated that the victim's clothing were not torn or stretched. Appellant does not contest the state's assertions that it was unaware that the wrong pair of shorts had been tested, and that the problem was brought to defense counsel's attention as soon as the state became aware of it.

When the state attempted to have the shorts produced by McKee introduced into evidence, appellant requested that the trial court conduct a Richardson hearing n1 and made a motion for a mistrial. In response, the trial court inquired into the surrounding circumstances of the alleged discovery violation. Thereafter, the court determined that a discovery violation did not occur because "there was actual knowledge by the Defense of the existence of the piece of evidence." Alternatively, the trial court determined that even if there was a "technical violation," it was inadvertent, trivial, and did not have a prejudicial affect on appellant's ability to prepare for trial. The trial court allowed the **[\*869]** shorts into evidence, and denied appellant's motion for mistrial.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Richardson v. State, 246 So. 2d 771 (Fla. 1971).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[\*\*4]**

We disagree with the trial court's conclusion that because appellant knew of the existence of the shorts, there was no discovery violation by the state. Although appellant knew the shorts "existed," he had no reason to know that he had been misguided by the state, and that the police did not have the proper shorts in custody. Both the state and the defense knew that the shorts existed, but they were all under the belief that the police had the proper shorts in their custody and had tested them. During argument on this issue at trial, the prosecutor remarked: "Even law enforcement themselves were under the impression that they had her shorts . . . As far as we were concerned, we had her shorts in evidence." In view of the fact that the state affirmatively led appellant to believe that it had the victim's shorts in its custody and that the shorts were not torn, we cannot conclude that no discovery violation occurred simply because appellant knew that the evidence "existed."

Nevertheless, we must still determine if the state breached any of its obligations imposed by the applicable discovery rules under the circumstances of this case. Florida Rule of Criminal Procedure 3.220 imposes **[\*\*5]** an affirmative and continuing duty on the state to disclose to the defense certain information within the state's possession, including the results of scientific tests and any tangible evidence that the state intends to introduce at trial. n2 Raffone v. State, 483 So. 2d 761, 764 (Fla. 4th DCA), cause dismissed, 491 So. 2d 281 (Fla. 1986), although not directly on point, is helpful to our analysis as to whether a discovery violation occurred in the instant case. In Raffone, the defendants were tried on various drug related charges. Pursuant to a demand for discovery, the state supplied a crime lab analysis of various items that had been seized from the defendants' joint residence. The report listed seventeen items and indicated that three of those items tested positive for the presence of illegal drugs. 483 So. 2d at 762. On the first day of trial, the state provided a supplemental analysis which indicated that a fourth item among the seventeen seized from the residence had been tested and revealed the presence of 52 grams of cocaine. Although the initial tests had been performed eleven months prior to trial, the supplemental analysis was conducted the day before the **[\*\*6]** trial began. Id.

n2 The state is charged with constructive possession of all information and evidence in the hands of its agents, including police officers. See Gorham v. State, 597 So. 2d 782 (Fla. 1992).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

During the second day of trial, the state called the crime lab chemist and began to question him about the newly-tested evidence. Defense counsel objected and moved for a mistrial. In so doing, defense counsel claimed that the defense had relied on the report as written, and that now, in the midst of trial, the state was attempting to present new evidence of drug trafficking. Defense counsel explained how the new evidence impacted on the defense strategy which had been planned after receipt of the first report. Id. The trial court, without holding a Richardson inquiry, determined that the defendant had not been prejudiced and ordered the trial to proceed. 483 So. 2d at 763.

On appeal, this court held that the facts demonstrated a discovery violation and that the trial court erred in failing to **[\*\*7]** conduct a Richardson inquiry. In finding that a discovery violation occurred, Judge Hurley, writing for the majority, stated:

> The facts demonstrate a clear discovery violation. The state lulled the defense into believing that it would prove one thing and then, at trial, it set out to prove another. The initial lab report which was the only such report issued prior to trial, indicated that all of the listed items had been tested and that only three had produced positive results.
> \* \* \*
> Although it is true that the seized drugs were available for testing by the defendants, there was no reason for them to do so. The initial report did not suggest incomplete testing, and more to the point, we believe that the defense is entitled to rely on the accuracy of such reports.
> \* \* \*
> **[\*870]** Since it is clear that the state disclosed one set of results in the lab report and then attempted to prove something else at trial, we hold that the trial court was required to conduct a Richardson inquiry.

Id. at 763-65 (footnote omitted).

We believe that Raffone stands for the prudent principle that ⴕfurnishing misleading and **[\*\*8]** inaccurate discovery is tantamount to providing no discovery at all and may constitute a violation of the discovery rules. In the instant case, as in Raffone, the state provided discovery to appellant, but that discovery was incomplete and misleading. As the court held in Raffone, ⴕa defendant is entitled to rely on the accuracy of the information disclosed by the prosecution pursuant to a discovery request under rule 3.200.

Although we agree with the trial court that the violation was unintentional, we cannot agree that it was trivial or harmless. Our supreme court offered appellate courts the following guidance in determining whether an unsanctioned discovery violation constitutes harmless error:

> ⴕ
> In determining whether a Richardson violation is harmless, the appellate court must consider whether there is a reasonable possibility that the discovery violation procedurally prejudiced the defense. As used in this context, the defense is procedurally prejudiced if there is a reasonable possibility that the defendant's trial preparation or strategy would have been materially different had the violation not occurred. Trial preparation or strategy should be considered **[\*\*9]** materially different if it could have reasonably benefited the defendant. In making this determination, every conceivable course of action must be considered. ⴕIf the reviewing court finds that there is a reasonable possibility that the discovery violation prejudiced the defense or if the record is insufficient to determine that the defense was not materially affected, the error must be considered harmful. In other

words, only if the appellate court can say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless.

State v. Schopp, 653 So. 2d 1016, 1020-21 (Fla. 1995).

In the instant case, appellant had already made his opening statement and had built his entire defense around the victim's alleged consent and his belief that the shorts which were going to be presented at trial were not torn in any way. He constructed this opening statement based upon the erroneous lab report which had been provided to him by the prosecution. Appellant had every right to rely upon the accuracy of the declaration in the report that the victim's shorts had been tested. The failure of defense counsel to live [**10] up to his assurance that McKee's clothing had not been torn could have dealt a fatal blow to the credibility of the consent defense in the eyes of the jury. The eleventh hour presentation of the victim's actual shorts in the midst of trial was so pregnant with the potential for prejudice to the defense that we cannot say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation in this case.

Accordingly, we find that the trial court abused its discretion in failing to either exclude the evidence or in the alternative, grant appellant's motion for a mistrial. n3 We reverse appellant's conviction and sentence for sexual battery and remand for a new trial on that charge. We have examined the issues raised by appellant in relation to the aggravated battery and false imprisonment charges but find no error.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 We note that where a mistrial is declared upon the defendant's motion or with his consent, jeopardy does not attach and the defendant may be retried. Oregon v. Kennedy, 456 U.S. 667, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982); Rutherford v. State, 545 So. 2d 853 (Fla.), cert. denied, 493 U.S. 945, 110 S. Ct. 353, 107 L. Ed. 2d 341 (1989). Such is the situation here, where there is no showing of intentional prosecutorial misconduct.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [**11]

Affirmed in part, reversed in part and remanded.

POLEN and SHAHOOD, JJ., concur.

Service: **Get by LEXSEE®**
Citation: **671 So. 2d 867,AT 870**
View: Full
Date/Time: Wednesday, September 18, 2002 - 10:47 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*483 So. 2d 761, *; 1986 Fla. App. LEXIS 6154, **;*
*11 Fla. L. Weekly 342*

SALVATORE JAMES RAFFONE, Appellant v. STATE OF FLORIDA, Appellee; JOYCE K. KNIGHTON,
Appellant v. STATE OF FLORIDA, Appellee

Nos. 83-2312, 83-2313

Court of Appeals of Florida, Fourth District

483 So. 2d 761; 1986 Fla. App. LEXIS 6154; 11 Fla. L. Weekly 342

February 5, 1986

**SUBSEQUENT HISTORY:** [**1]

Rehearing and/or Certification Denied March 19, 1986.

**PRIOR HISTORY:**

Consolidated appeals from the Circuit Court for Broward County; Frank A. Orlando, Judge.

**DISPOSITION:** Reversed and remanded.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendants appealed an order of the Circuit Court for Broward County
(Florida), which convicted them of various drug charges.

**OVERVIEW:** During defendants' trial on drug charges, the state gave defendants a supplemental
test report that had not been produced in discovery. Defendants objected when the state began
to question a witness about the report. The trial court ordered the trial to proceed without
conducting a Richardson inquiry, which was a hearing to determine whether the discovery
violation was inadvertent or wilful, trivial or substantial, and what its effect was, if any, upon
defendants' ability to properly prepare for trial. The court held that the facts demonstrated a clear
discovery violation because the state's initial report led defendants to believe that all the evidence
had been tested. The court reversed because the argument over the report did not meet the
requirements for conducting a Richardson inquiry, because the trial court found that there was no
violation, and did not conduct the required inquiry.

**OUTCOME:** The court reversed defendants' drug charges because the trial court's failure to
conduct the required inquiry into the state's discovery violation was reversible error.

**CORE TERMS:** tested, discovery violation, prosecutor, cocaine, discovery, defense counsel, trafficking,
lab, supplemental report, new evidence, handed, crime lab, introduce, mistrial, testing, seized,
reversible error, defense strategy, grams of cocaine, plastic, supplemental, preserved, planned,
sidebar, depose, bag, prior to trial, convicted, chemist, grams

## CORE CONCEPTS - ◆ Hide Concepts

📄 Criminal Law & Procedure : Discovery & Inspection : Discovery Misconduct

⚖ Fla. R. Crim. P. 3.220 imposes an affirmative and continuing duty on the state to disclose to
defense counsel certain information within the state's possession or control, including reports or
statements of experts made in connection with the particular case, including results of physical
or mental examinations and of scientific tests, experiments or comparisons.

📖 Criminal Law & Procedure : Discovery & Inspection : Discovery Misconduct

🦋 A Richardson hearing is designed to ferret out procedural prejudice occasioned by a party's discovery violation. In ascertaining whether this type of prejudice exists in a given case, the trial court must first decide whether the discovery violation prevented the aggrieved party from properly preparing for trial. Failure to conduct a full Richardson hearing is per se reversible error.

📖 Criminal Law & Procedure : Discovery & Inspection : Discovery Misconduct

🦋 A Richardson hearing is an indispensable prerequisite to determining the admissibility of undisclosed evidence. The rule has as its purpose the prevention of chicanery and legal gymnastics, and requires that the trial court's inquiry include such questions as 1) whether the violation was inadvertent or wilful; 2) whether the violation was trivial or substantial; and 3) most importantly, what effect, if any, did it have upon the ability of the other party to properly prepare for trial. In addition, such an inquiry should also determine 1) whether there are reasonable means available to avoid prejudice to the defendant and 2) what sanctions, if any, including the possible exclusion of the evidence, should be imposed as a result of the violation.

**COUNSEL:** Robert L. Bogen of Braverman & Holmes, Fort Lauderdale, for Appellant-Salvatore James Raffone.

Richard L. Jorandby, Public Defender and Tatjana Ostapoff, Assistant Public Defender, West Palm Beach, for Appellant-Joyce K. Knighton.

Jim Smith, Attorney General, Tallahassee, Robert S. Jaegers and Richard G. Bartmon, Assistant Attorneys General, West Palm Beach, for Appellee.

**JUDGES:** Downey and Letts, JJ., concur.

**OPINIONBY:** HURLEY

**OPINION:** [*762] Defendants, convicted of various drug charges, assert that the trial court erred by failing to conduct a *Richardson* n1 inquiry. We agree and reverse. n2

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 246 So.2d 771 (Fla. 1971).

n2 This court, on its own motion, consolidated the cases for disposition.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Pursuant to a demand for discovery, the state tendered a crime lab analysis of various items which had been seized from [**2] the defendants' residence. The report listed seventeen separate items and, immediately below, stated:

An examination conducted on the above mentioned items revealed the presence of hashish, herein defined as the resin extracted from the plant, Cannabis, in item #1, revealed the presence of diazepam in item #7, and revealed the presence of cocaine (85.4 grams) in item #15.

On the first day of trial, during a sidebar conference involving an unrelated topic, the prosecutor handed a supplemental crime lab analysis report to defense counsel and to the court. The supplemental report indicated that Item #13 ("Contents of glass jar, suspect cocaine.") had been tested and revealed the presence of 52.0 grams of cocaine. Although the initial tests had been performed eleven

months prior to trial, the supplemental analysis was conducted the day before the trial began. The significance of the new finding was that it provided evidence which, by itself, would support a trafficking charge. ( Section 893.135(1)(b)(1), Florida Statutes (1985), requires twenty-eight grams or more to support a trafficking charge.) More importantly, the new evidence was found *inside* the residence. **[\*\*3]** This fact substantially weakened the defendants' planned defense of lack of constructive possession. The previously disclosed item #15 ("Plastic bag with 2 other plastic bags containing suspect cocaine.") had been found in a briefcase in the attic over the garage. This formed the basis for the defense strategy that the defendants did not know about nor have control over the cocaine.

When the prosecutor handed over the new report, he stated, "I'm not introducing it in evidence, just providing it." The prosecutor further noted that he had just received the report, but he did not indicate when he had first become aware that an additional analysis was to be performed.

On the second day of trial, the state called the crime lab chemist and, during direct examination, began to question him about the newly-tested evidence. Counsel for both defendants immediately objected and moved for a mistrial. Defense counsel argued that, according to the obvious implication of the first report they received, the only item tested which revealed cocaine was Item #15. They claimed that they had relied on the report as written and that now, in the midst of trial, the state was attempting to present new **[\*\*4]** evidence of drug trafficking. They explained how the new evidence impacted on the defense strategy which had been planned after receipt of the first report. Additionally, defense counsel complained that the state had misrepresented its intentions during the previous day's sidebar conference.

The prosecutor countered that the substances seized had been available for independent inspection at all times prior to trial. In response to the accusation that he had broken his promise not to introduce evidence of the recently-tested cocaine, the prosecutor explained that he meant he would not attempt to introduce the actual report into evidence, but that he never promised not to introduce other evidence about the new analysis. During this exchange, the state's chemist spoke up and offered an explanation for the language in his first report.

**[\*763]** THE WITNESS: That's not the -- That is just the way we word it. The only items that are tested -- we can't write our report -- it would be too long if we wrote every item tested and said negative, number 6, negative, number 7, negative, number 9. We only write down the ones that are tested and come up positive. Some of the items could **[\*\*5]** have been tested. In this case they weren't.

* * *

The only items that were tested in this case are the ones listed on the lab report.

The trial court, after listening to the above discussion, said: "You have got your objections on the record. I don't think you have been prejudiced." The court then, without conducting a *Richardson* inquiry, ordered the trial to proceed. Both defendants were convicted of the trafficking charge in addition to other charges.

☞Florida Rule of Criminal Procedure 3.220 imposes an affirmative and continuing duty on the state to disclose to defense counsel certain information within the state's possession or control, including:

Reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons.

Rule 3.220(a)(1)(x), Fla.R.Crim.P.; *see also Odoms v. State, 431 So.2d 1041 (Fla. 4th DCA 1983)*

(Hurley, J., concurring) (state, to avoid trial by ambush, has an affirmative duty to furnish *full* discovery) (emphasis in original).

In *Richardson v. State*, 246 So.2d 771 (Fla. 1971), the Florida Supreme Court **[\*\*6]** established the ground rules to be followed when it appears the state has violated its discovery obligations. It said the trial court, upon learning of the violation, must conduct an inquiry into all of the surrounding circumstances. *Richardson*, 246 So.2d at 775. "A *Richardson* hearing is designed to ferret out procedural prejudice occasioned by a party's discovery violation. In ascertaining whether this type of prejudice exists in a given case, the trial court must first decide whether the discovery violation prevented the aggrieved party from properly preparing for trial. *Peterson v. State*, 465 So.2d 1349, 1351 (Fla. 5th DCA 1985); *see also Smith v. State*, 372 So.2d 86 (Fla. 1979). Failure to conduct a full *Richardson* hearing is per se reversible error. *Cumbie v. State*, 345 So.2d 1061 (Fla. 1977); *Hall v. State*, 477 So.2d 572 (Fla. 4th DCA 1985). n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 In *Hall v. State, supra*, which is presently pending before the Supreme Court, this court asked, as a question of great public importance, whether the harmless error rule could be applied to a trial court's failure to conduct a *Richardson* inquiry.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[\*\*7]**

This court, in *Donahue v. State*, 464 So.2d 609 (Fla. 4th DCA 1985), acknowledged that "a *Richardson* hearing is an indispensable prerequisite to determining the admissibility of undisclosed evidence." In *Donahue*, we said the rule established in *Richardson* has as its purpose the prevention of chicanery and "legal gymnastics," and reiterated as mandatory the requirement that the trial court's inquiry "include such questions as

   1) whether the violation was inadvertent or wilful;

   2) whether the violation was trivial or substantial; and

   3) most importantly, what effect, if any, did it have upon the ability of the (other party) to properly prepare for trial."

*Donahue v. State, supra*, at 611.
In addition, "such an inquiry should also determine 1) whether there are reasonable means available to avoid prejudice to the defendant and 2) what sanctions, if any, including the possible exclusion of the evidence, should be imposed as a result of the violation." *Brey v. State*, 382 So.2d 395 (Fla. 4th DCA 1980).

In the case at bar, the facts demonstrate a clear discovery violation. The state lulled the defense into believing that it would prove one thing **[\*\*8]** and then, at trial, **[\*764]** it set out to prove another. n4 The initial lab report, which was the only such report issued prior to trial, indicated that all of the listed items had been tested and that only three had produced positive results. There is no indication in the record that either defendant had any knowledge that, in fact, only the three items had been tested. The first hint of new, independent evidence to support the trafficking charge came when the state, after the trial had begun, provided a supplemental report, barely hours old, stating that another item had been tested and that it revealed the presence of 52.0 grams of cocaine. Even then, the prosecutor stated, in carefully selected words, that he would not seek to introduce "it" into evidence.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 Cf. *Carter v. State*, 485 So.2d 1292 (Fla. 4th DCA 1986).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

On appeal, the state asserts three grounds for an affirmance. First, it claims that the issue was not preserved for appellate review because the defendants moved for a mistrial instead **[\*\*9]** of objecting because of a discovery violation. This argument is without merit. While the defendants did not recite particular magic words, the manner in which they brought the matter to the trial court's attention was more than sufficient to apprise the court of the nature of their complaint. Also, other courts have proceeded to address Richardson-hearing issues which were apparently preserved by a motion for a mistrial. See, e.g., Torres v. State, 474 So.2d 335 (Fla. 3d DCA 1985); Matheson v. State, 468 So.2d 1011 (Fla. 4th DCA 1985).

The state's second argument, that no discovery violation occurred, is unpersuasive. It contends that a defendant cannot claim prejudice as a result of his own failure to obtain information which could have been obtained through reasonable and diligent discovery procedures. E.g., State v. Counce, 392 So.2d 1029 (Fla. 4th DCA 1981). The corollary proposition, however, which is more appropriate here, is that a claim of prejudice is not barred where reasonable diligence would not have led to discovery of the evidence. See Lavigne v. State, 349 So.2d 178 (Fla. 1st DCA 1977) (state failed to provide defendant with substance of oral statement **[\*\*10]** by him, and failed to notify him that a witness it intended to call was present when statement was made; state's subsequent argument, that no discovery violation occurred because defendant knew of witness and failed to depose him, was rejected, as defendant had no reason to interview/depose witness absent the information not disclosed by state); Witmer v. State, 394 So.2d 1096 (Fla. 1st DCA 1981) (state failed to list rebuttal witness and then, in good faith, initially told defendant it would not call witness; held, even though defendant independently knew of witness and probable substance of testimony, state committed discovery violation requiring full Richardson hearing). In the case at bar, the language of the lab report would not have put a reasonable person on notice that some items remained untested. Furthermore, the prosecutor's comment at the time when the supplemental report was handed to defense counsel was misleading.

In sum, although it is true the seized drugs were available for testing by the defendants, there was no reason for them to do so. The initial report did not suggest incomplete testing, and more to the point, we believe that the defense is entitled **[\*\*11]** to rely on the accuracy of such reports. Finally, the error was compounded by the manner in which the state disclosed the subsequent test.

The state's third response is that the exchange which took place after the defense objection satisfied the Richardson requirements. Again, the state's contention is not borne out by the record. The sole thrust of the discussion centered on whether there had been a discovery violation. After hearing respective counsel, the trial court ruled that the drugs had been available for testing for a substantial period of time and, therefore, the court said there was no prejudice. In other words, finding no violation the court saw no need to conduct a Richardson inquiry.

**[\*765]** Since it is clear that the state disclosed one set of results in the lab report and then attempted to prove something else at trial, we hold that the trial court was required to conduct a Richardson inquiry. Its failure to do so constitutes reversible error. Accordingly, the judgment and conviction are reversed and the cause is remanded for a new trial.

REVERSED AND REMANDED.

DOWNEY and LETTS, JJ., concur.

Service: **Get by LEXSEE®**
Citation: **483 So. 2d 761,AT 764**
View: Full
Date/Time: Wednesday, September 18, 2002 - 11:10 AM EDT

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

. Source: L· ·al > / . . . / > FL Federal and ... e Cases ⓘ
 Terms: **3.220 and ambush or surprise** (Edit Search)

 ↙ Select for FOCUS™ or Delivery
 ☐

*799 So. 2d 226, \*; 2001 Fla. App. LEXIS 10393, \*\*;*
*26 Fla. L. Weekly D 1854*

TINA M. TETRAULT and ARTHUR T. TETRAULT, Appellants, v. JAMES A. FAIRCHILD, Appellee.

CASE NO. 5D00-1336, 5D00-1641

COURT OF APPEAL OF FLORIDA, FIFTH DISTRICT

799 So. 2d 226; 2001 Fla. App. LEXIS 10393; 26 Fla. L. Weekly D 1854

July 24, 2001, Opinion Filed

**SUBSEQUENT HISTORY:** [\*\*1] Rehearing Denied November 13, 2001. Released for Publication November 30, 2001.

**PRIOR HISTORY:** Appeal from the Circuit Court for Brevard County, Vincent G. Torpy, Jr., Judge.

**DISPOSITION:** REVERSED and REMANDED for a new trial.

### CASE SUMMARY

**PROCEDURAL POSTURE:** The victim sued the driver for injuries he sustained in an automobile accident. The Circuit Court for Brevard County (Florida) entered judgment in the victim's favor. The driver appealed.

**OVERVIEW:** The parties were involved in an accident and the victim was taken to a hospital. An emergency room radiologist conducted x-rays and noted they reflected no visible injury. The victim subsequently began treatment with a chiropractor, a neurologist, an orthopedic surgeon, and another radiologist. The general consensus was that two MRIs revealed the victim was suffering from a bulging lumbar disc. The victim sued the driver for his injuries, claiming his condition was brought about by the accident. The emergency room radiologist was disclosed as a potential witness regarding the victim's care and treatment after the accident. At trial, the emergency room radiologist was used to give his evaluation of the two MRIs and testified the victim had suffered a herniated disc caused by the accident. Thereafter, the trial court entered judgment in the victim's favor. On appeal, the court held it was reversible error to allow the emergency room radiologist to testify as to causation where he had not be disclosed as a witness in that capacity during discovery and noted the trial court should have allowed the driver a continuance.

**OUTCOME:** The judgment of the trial court was reversed and remanded for a new trial.

**CORE TERMS:** multiplier, radiologist, doctor, contingency, deposition, disc, reasonable fee, discovery, contingency fee, x-ray, undisclosed, surprise, interrogatory, causation, lodestar, emergency room, bulging, expert testimony, new trial, disclosure, continuance, herniated, depose, bulge, reasonableness, cap, hourly rate, herniation, radiology, required to pay

### CORE CONCEPTS - ◆ Hide Concepts

📄 Civil Procedure : Appeals : Standards of Review : Harmless & Invited Errors
✦ While the erroneous omission of cumulative evidence can be harmless, harmless error is a more difficult case to make when the testimony is not that of a fact witness, but instead is expert testimony.

**COUNSEL:** Richard A. Sherman and Rosemary B. Wilder, of Law Office of Richard A. Sherman, P.A., Fort Lauderdale, and Theresa K. Clark, of Law Office of Patricia E. Garagozlo, Melbourne, for Appellants.

James I. Knudson and Jerry D. McGreal of Knudson & McGreal, P.A., Rockledge, and Edna L. Caruso, of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, for Appellee.

**JUDGES:** GRIFFIN, J., concurs. HARRIS, J., concurs and concurs specially, with opinion. SAWAYA, J., dissents, with opinion.

**OPINION: [\*226]**

**PER CURIAM**

Tina Tetrault, while driving a vehicle owned by herself and her husband, collided with a vehicle driven by James Fairchild, causing him injury. Fairchild sued and prevailed. We reverse.

 [\*227] Dr. Gordon was the radiologist assigned to the emergency room that received the plaintiff on November 13, 1996. While being evaluated in the emergency room, x-rays were ordered and these were examined on the day of the accident by Dr. Gordon, who wrote a report opining that these [\*\*2] x-rays reflected no visible injury. That was the extent of his involvement with the plaintiff. Plaintiff was given Darvaset and Valium for pain in the emergency room and released.

Plaintiff subsequently began treatment with Dr. Seconi, a chiropractor. Dr. Seconi referred the plaintiff to Dr. Prusinski, a neurologist, who performed a 1996 MRI and whose report reflected only "bulging discs." The plaintiff continued treatment with Dr. Seconi through the end of 1997. In October 1999, the plaintiff began to experience increased pain and began to treat with an orthopaedic surgeon, Dr. Hanna. Dr. Hanna ordered a new MRI, which was performed in October 1999. The radiologist, Dr. Shapiro, found "No significant interval change" since the 1996 MRI and diagnosed a "bulging disc with a tear in the posterior annular fibers."

Approximately three months before the second MRI was taken, the trial court entered its order setting various trial preparation cut-off dates and scheduling the trial for January 24, 2000. Disclosure of expert witnesses was required by October 15, 1999, and discovery was to be completed by January 10. The defendant took an up-dated deposition of the plaintiff on November [\*\*3] 29 and, at that time, learned of the plaintiff's recent and on-going treatment with Dr. Hanna and Dr. Shapiro. Previously, on September 21, 1999, the plaintiff responded to expert interrogatories identifying the various physicians and experts expected to testify. Rather than answer the interrogatories as posed, the restated answers created aggregate responses. The only one appearing to apply remotely to Dr. Gordon is the following:

> Doctors shall testify to their care and treatment of Plaintiff. Dr. Prusinski, Dr. Seconi, and Dr. Fornus will also testify that plaintiff has sustained a permanent impairment as a result of the injuries sustained in the incident which is the subject matter of this lawsuit. They shall also testify as to the causation of the injuries for which they treated plaintiff. Further, they will testify as to diagnosis, prognosis and necessity for further follow-up care. [Emphasis supplied.]

The defendant appeals the court's refusal to allow the defense a continuance in order to obtain a neuroradiologist to evaluate the 1996 and 1999 MRIs and critique the opinions of the current treating physicians concerning the plaintiff's condition.

The [\*\*4] testimony of Dr. Gordon was critical to plaintiff's case. Shortly before the trial, Dr. Gordon was contacted by plaintiff's counsel, was given the 1996 and 1999 MRIs and was asked to give an

opinion concerning the injury th▓ lepicted. From the date of the plain▓, accident until trial, Dr. Gordon was indicated as nothing more than the post-accident emergency room x-ray-reading radiologist who had written a report reporting no injury. Nothing in the answers to expert interrogatories and nothing learned by the defendant through the taking of the plaintiff's deposition could have reasonably put the defense on notice that Dr. Gordon would be called to testify as an expert radiologist to give his evaluation of the two subsequent MRIs and render opinions based on them that the plaintiff had suffered a herniated disc caused by the accident.

The plaintiff urges that the reference in the answer to expert interrogatories that Dr. Gordon would testify as to **[*228]** "causation" was sufficient because "certainly causation encompasses interpreting the MRIs." It is disappointing to see counsel make such an argument. The only other argument to be made is that the expert testimony of Dr. Gordon was harmless **[**5]** because it was "merely cumulative" to Dr. Shapiro's report. ☞While the erroneous omission of cumulative evidence can be harmless, "harmless error" is a more difficult case to make when the testimony is not that of a fact witness, but instead is expert testimony. Dr. Gordon was called by the plaintiff not to testify to his "care and treatment" of plaintiff but to render an opinion as a neuroradiologist based upon his review of MRIs supplied to him in plaintiff's counsel's office as to whether MRIs showed a herniated disc. It was reversible error to allow Dr. Gordon to offer expert testimony based on the October 1996 and October 1999 MRIs. See _Suarez-Burgos v. Morhaim, 745 So. 2d 368 (Fla. 4th DCA 1999), rev. denied, 767 So. 2d 461 (Fla. 2000)._

**REVERSED and REMANDED for a new trial.**

**GRIFFIN, J., concurs.**

**HARRIS, J., concurs and concurs specially, with opinion.**

**SAWAYA, J., dissents, with opinion.**

**CONCURBY:** HARRIS

**CONCUR:**

**HARRIS, J., concurring and concurring specially: Case No. 5D00-1336, 5D00-1641**

While recognizing that the reasonable exercise of discretion by a trial judge must be upheld, such principle is inapplicable **[**6]** to this case. The primary obligation of any trial court, indeed its most basic responsibility, is to conduct a fair trial. It has no discretion to do otherwise. A ruling by the trial court which denies either party a fair trial cannot be excused based on the proposition that a trial court has exercised its broad discretion. If you disagree with this point, you need read no further.

For those of you remaining, let us consider the facts of this case which made this trial so unfair that reversal is the only remedy.

This action was proceeding to trial on the basis of a soft tissue injury. Indeed, Dr. Gordon, the radiologist who examined the x-rays taken of plaintiff at the emergency room, filed a report furnished to the defense indicating no visible injuries. Subsequently, Dr. Prusinski, at the request of plaintiff, performed the 1996 MRI and reported (this report was also furnished to the defense) that the MRI reflected only "bulging discs." Based on these reports indicating less serious injury, the defense chose not to depose either doctor. Instead, the defense retained Dr. Seig, an orthopedist, to conduct an IME.

The trial court set trial for January 24, 2000, and required **[**7]** that all expert witnesses be listed by October 15, 1999. After that time, and unknown to the defense, the plaintiff had a second MRI performed by Dr. Shapiro. And after that time, Dr. Shapiro, a radiologist, filed his report based on the new MRI finding not only a bulging disc but also "a tear in the posterior annular fibers." And after that time, Dr. Gordon was retained to examine the new MRI and found a herniated disc. Without seeking court approval to amend the witness list, plaintiff added Dr. Hanna, who had referred the plaintiff to Dr. Shapiro, and Dr. Golovac, a "pain expert," to their list. But no mention was made that Dr. Gordon who had previously been disclosed only as having read the emergency room x-rays and as having

found no visible injury would not be offered in a new capacity, based on his reading of the new MRI, to testify to a herniated disc. Dr. Gordon's new involvement was not revealed until his trial testimony.

**[*229]** The dissent finds that it was the defense's own fault that it did not discover Dr. Gordon's new role because it failed to depose him. This is a strained notion of imputed knowledge. Lawyers should not be encouraged to take unnecessary depositions **[**8]** which tend only to run up the costs of an already expensive legal system. A deposition of Dr. Gordon shortly after the accident would have revealed that he read the x-rays and found no visible evidence of an injury. Since this was revealed by the report furnished to the defense, why depose Dr. Gordon? Further, a deposition of Dr. Gordon at any time before the running of the time in which experts could be added by either party would have revealed the same testimony. By permitting Dr. Gordon to testify at trial in a new undisclosed capacity, the judge rendered the trial unfair. See _Colonnell v. Mitchels,_ 317 So. 2d 799 (Fla. 2d DCA 1975) (The purpose of requiring that physical examinations and discovery be completed by the time of pretrial conference is to avoid **surprise** at trial. A medical witness changed his opinion based upon a physical examination that took place after the discovery cut-off. A new trial was ordered because of the **surprise** to the other side when the witness was permitted to testify to his changed opinion at trial.); see also _Office Depot, Inc. v. Miller,_ 584 So. 2d 587 (Fla. 4th DCA 1991) (Failure to disclose to plaintiff the **[**9]** defense expert's changed opinion that there was no causal relationship between the accident and the injury after he previously opined that there was required a new trial.).

Here, it was not the defense which violated the court's pretrial order by listing witnesses after the time had run. And it was not the defense which disclosed a witness as having a limited and benign involvement in the case and then, after the running of the period in which to name experts, engaged that witness in a more lethal role. The courts should not permit trial by **ambush** regardless of which party is riding blithely through the pass.

But there is another ruling by the court which had an even greater effect on the fairness of the trial. When the defense learned of the new MRI shortly before trial and saw the new experts the plaintiff belatedly added to its witness list, it moved to strike the new witnesses as being listed too late (the defense was ignorant of Dr. Gordon's new role). The court denied the motion to strike the newly added witnesses which, under the circumstances, was appropriate. But then the defense, accepting this ruling, asked the court for the opportunity to have its own radiologist examine **[**10]** the new MRI so that it could properly respond to the new witnesses and the new MRI concerning the new issue now being introduced into the trial. But the court, based on plaintiff's argument that since the defense already had Dr. Seig, the orthopedist who had conducted the IME, it was entitled to no other experts, denied the motion.

The unfairness of this ruling and the prejudice it caused became apparent during plaintiff's cross-examination of Dr. Seig and plaintiff's closing argument. As predicted by the defense in moving for the opportunity to present its own radiologist, plaintiff's counsel was able to get Dr. Seig to admit that a radiologist is better equipped by training and experience to render opinions based on MRIs than is an orthopedist. Dr. Seig was further forced to admit that in his own practice he often relied on the opinions of radiologists relating to MRIs. This led to plaintiff's closing remark:

Well it makes about as much sense to rely on a Dr. Seig interpretation, a guy that is in court all of the time as an orthopedic doctor with no training in **[*230]** radiology on this type of MRI film, to say we should take and value his opinion above that of a board certified radiologist. **[**11]**

The finding of the greater injury was preordained by the court's denial of the defense motion to be able to reasonably respond to new witnesses whose testimony was based on a new MRI which introduced a new issue and which the court belatedly permitted to be added shortly before trial. This made the trial unfair and this is beyond a court's discretion.

Although this reversal for a new trial necessarily vitiates the attorney's fee also at issue in this case, because the issue may present itself again at the new trial, further discussion, even if not binding on the trial court, might be of some assistance to the court on remand. n1 Neither the following nor footnote 1 should be considered as a criticism of the trial judge who was bound by existing appellate opinions. But some of the following discussion may be beneficial to the court at the new trial. In any event, it will advance the discussion started by Judge Schwartz and continued by Judge Casanueva that

the application of the attorney's s multiplier to offer of judgment ca. s inconsistent with reason, fairness, and the very statute involved.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 I also disagree with _Dungan v. Ford_, 632 So. 2d 159 (Fla. 1st DCA 1994), which was relied on in denying the defense the opportunity to challenge the reasonableness of some of the services performed by Dr. Seconi who, in attempting to support the reasonableness of his charges, testified that his treatment was both reasonable and necessary. There are two components to a reasonable fee -- a reasonable rate applied to justifiable services. By denying the defense the right to challenge the justification for the services, the court denied it the opportunity to challenge the reasonableness of the fee. While it is true that one is responsible also for the medical malpractice of a doctor whose services are required because of his negligence, he has never been required to pay the doctor for that privilege. Here, Dr. Seconi was not alleged by the plaintiff to be guilty of malpractice. Instead, the doctor was called as a witness to relate injuries to the accident and to testify as to the reasonableness of his charges for the purpose of assessing them against the defendant. As a witness, the good doctor is not immune from challenge. If the jury believes that the doctor provided unnecessary treatment either because of incompetence or in order to pad his bill, the jury may choose to disbelieve the doctor's testimony on other points as well. This is called impeachment and the truth cannot be found without it. One might reasonably ask, as between the plaintiff and the defendant, who should pay for the unjustified services. The answer is neither.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[\*\*12]**

What is a "reasonable attorney's fee" under the provisions of section 768.79, Florida Statutes, when an offer of judgment is not accepted and the offeror prevails by more than 25%? Is an attorney's fee multiplier ever appropriate when fees are awarded under the authority of an offer of judgment statute? n2 If so, may a multiplier be used to further enhance a lodestar which is itself greater than the agreed upon contingency fee? n3 The supreme **[\*231]** court has not yet answered these questions in the context of an offer of judgment case.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 We have given mixed, if not conflicting, signals. In _Garrett v. Mohammed_, 686 So. 2d 629 (Fla. 5th DCA 1996), we held that a multiplier may apply in offer of judgment cases. However, in _Strahan v. Gauldin_, 756 So. 2d 158, (Fla. 5th DCA 2000), _rev. granted_, (Table No. SC00-1155) (Fla. Feb. 2, 2001), and _Internal Medicine Specialists, P.A. v. Figueroa_, 781 So. 2d 1117 (Fla. 5th DCA 2001), we held that although multipliers may theoretically apply in offer of judgment cases, as a practical matter, if it can ever be justified by proof it will be extremely difficult to do so. **[\*\*13]**

n3 The supreme court in _Standard Guaranty Insurance Co. v. Quanstrom_, 555 So. 2d 828 (Fla. 1990), emphasized that there are two "caps" on the amount of attorney's fees that can be awarded even under the malpractice statute then in effect. One cap is the amount agreed to by the parties. The other cap is on the amount of the multiplier so that the awarded fee "would not be significantly different in amount than it would be absent the statutory provision." The first cap limited the fee to the parties' agreement; the second cap was to insure in so far as reasonably possible that the awarded fee would reimburse plaintiff for the fee he obligated himself to pay his attorney.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

In this case, plaintiff made an offer of judgment of $ 10,000 (policy limits) and recovered judgment in the amount of $ 159,158.22 (after PIP benefits were reduced) and was awarded $ 235,800 in attorney's fees when the court multiplied by two (2) a figure based on 393 hours reasonably expended at a reasonable hourly rate of $ 300.

In _Florida Patient's Compensation Fund v. Rowe_, 472 So. 2d 1145 (Fla. 1985), **[\*\*14]** the court initiated in Florida the concept of the contingency fee multiplier. _Rowe_ held that a lawyer working under a contingency arrangement should be able to charge more as a "reasonable fee" than one who is guaranteed payment for his services because the lawyer working on a contingency will not always win.

This argument has historically been used to justify a contingency fee which greatly exceeds what would otherwise be a reasonable fee determined on the basis of the number of hours spent times a reasonable hourly rate. The purpose of the *Rowe* multiplier is to give the plaintiff's attorney, insofar as reasonably possible, the benefit of his contingency fee arrangements in order to encourage lawyers to continue to take cases on a contingency basis and thus better provide access to the court. But the mechanical application of the multiplier in all cases, particularly when applied in offer of judgment cases, will sometimes, as it did herein, create an excessive fee which might bring the court into the disrepute which concerned the *Rowe* court. In *Standard Guaranty Insurance Co. v. Quanstrom*, 555 So. 2d 828 (Fla. 1990), the supreme court cautioned against **[\*\*15]** the mechanical application of the multiplier. The *Rowe* court recognized that attorney's fees must be determined on a case by case basis and that, because the paying party did not participate in the fee contract, the contingency fee arrangement, while it must be considered, may not be the sole basis of the fee award.

The *Rowe* court, in establishing the multiplier in Florida, was aware that by multiplying an otherwise reasonable fee (again, the two components: justifiable time charged at a reasonable rate) by as much as three times depending on the likelihood of success when the case was taken, an extraordinarily high fee could be reached. It therefore limited such fee, in any event, to the amount agreed upon by the contracting parties. In other words, the amount that the lawyer would agree to accept and the amount that the client would agree to pay for the representation was the maximum limit of the *Rowe* reasonable fee.

Under *Rowe*, it was contemplated that the multiplier would only be employed if the lodestar was less than the lawyer would receive under his contingency arrangement. For example, assume a 40% contingency fee and a recovery of $ 100,000. If the **[\*\*16]** lawyer expended fifty hours at a reasonable hourly rate of $ 300, his lodestar fee would be $ 15,000, well less than his contingency fee. Assume a multiplier of 3 was justified, his "reasonable fee" would be $ 45,000. But since the parties agreed to a fee of only $ 40,000, *Rowe* limited the defendant to that amount. Assuming the lawyer spent only ten hours at the same reasonable hourly rate, even with the maximum multiplier, his fee would be only **[\*232]** $ 9,000 and, under *Rowe*, he would be limited to this amount. Hence, the court was willing to go only so far in protecting a contingency fee, recognizing that even a contingency fee under some circumstances might be excessive.

What if the parties' contract, as is common since *Rowe*, provides that plaintiff will pay a contingency portion of the recovery or the amount awarded by the court, whichever is greater? It is stating the obvious to say that this is a sham agreement. The only time a court will set the attorney's fee for plaintiff's attorney is when the defendant must pay it. Hence, the agreement actually means that while plaintiff has agreed to pay a set percentage on contingency, if the court elects to award more from **[\*\*17]** the defendant, the plaintiff will pass it on to his lawyer. n4 What would happen, do you think, if the lawyer, believing he had performed well in a case in which there had been no offer, asked the court to award him 40% against his client instead of the one third to which he had agreed? Perhaps we'll never know the answer.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 In fact, that is precisely what the client agreed to in this case: "If any suit brought on my behalf entitles me to have the defendant pay my attorney's fees, then I agree to pay [my attorneys] those fees as determined by the court or the above contingency, whichever is greater."

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The supreme court in *Kaufman v. MacDonald*, 557 So. 2d 572 (Fla. 1990), did answer affirmatively the certified question in a medical malpractice action concerning whether the trial court could award a fee with a multiplier which exceeded the contingency amount if the agreement provided that plaintiff would pay the fee awarded by the court if such fee was greater than the contingency. n5 The facts **[\*\*18]** set out in *Kaufman* (and in the district court's opinion which certified the question) makes an analysis impossible. *Kaufman* did not indicate that it was receding from the principle set out in *Rowe* that the amount that plaintiff agreed to pay would determine the maximum "reasonable" fee. Did the *Kaufman* court assume that this alternative fee agreement really was intended to bind the plaintiff to pay whatever fee the court set or did it mean that the plaintiff and his lawyer can now "authorize" the court

to assess against the defendant are greater than the plaintiff would be willing to pay for the same services? Is a fee for representing plaintiff reasonable when assessed against the defendant if the plaintiff would not be required to pay it himself? n6 There's nothing magic about getting the plaintiff to agree that defendant should pay an excessive fee. Is a boiler plate provision, one not intended to impose a fee greater than the contingency agreed to by plaintiff, sufficient to satisfy *Kaufman* if the awarded fee is more than a reasonable plaintiff would be willing to pay based on his understanding with his counsel?

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 This was in the nature of a trick question because, under *Rowe*, the court could never award more than the plaintiff himself agreed to pay. Since plaintiff by this alternative fee agreement never intends to himself pay more than his contingency under any circumstance, under the reasoning of *Rowe* the limitation remains the same. **[**19]**

n6 The attorney's fee provision under section 768.69 was not intended to punish the non- accepting party for refusing to accept the offer. It was simply intended to reimburse the other party for the cost of additional attorney's fees required because of the failure to accept a reasonable offer. It was not intended to increase the lawyer's fees from what he would have otherwise received. "There clearly was no intent on the part of the legislature to increase the amount of attorney's fees in this type action [prevailing party case] for the prevailing party's counsel." *Quanstrom, 555 So. 2d at 831.* It was certainly not the intent of the legislature to do so in offer of judgment cases.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

**[*233]** There is a further problem with recognizing the new boiler plate provision as really binding the plaintiff to pay the court awarded fee. Suppose the awarded fee is $ 100,000 which amounts to the total assets recoverable from the defendant. To literally enforce the parties' agreement would legitimize the definition of fee attributed to George M. Palmer: "A contingency fee is an arrangement in which **[**20]** if you lose, your lawyer gets nothing - and if you win - you get nothing." And that may have been the result in this case. Here, the defendants were saddled with a total judgment of almost $ 400,000 with insurance coverage of $ 10,000. Rejecting an offer of judgment is not the equivalent of winning a bad-faith settlement claim. n7 And while their insurance company must provide the insureds a defense, it is not required to pay plaintiff's attorney fees assessed against defendants. *See Meyer v. Alexandre, 772 So. 2d 627 (Fla. 4th DCA 2000).* Therefore, under plaintiff's fee agreement, he must recover over $ 235,800 from the defendants before he is entitled to a dime. n8 Clearly the parties did not intend that plaintiff would pay any sum awarded by the court and, under *Rowe* at least, the defendant should not be required to pay as a reasonable fee more than the parties themselves would agree is reasonable if plaintiff had to pay it. Since the purpose of the multiplier is to help assure that the lawyer will obtain the benefit of his fee negotiated with his client, how can it ever be justified, except to punish the defendant, to apply the multiplier to a lodestar which **[**21]** already exceeds the lawyer's agreed fee?

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n7 And there is no assurance that a subsequent bad-faith claim will be successful. As the supreme court stated in *Vest v. Travelers Insurance Co., 753 So. 2d 1270, 1275 (Fla. 2000):*

The insurer has a right to deny claims that it in good faith believes are not owed on a policy. Even when it is later determined by a court or arbitration that the insurer's denial was mistaken, there is no cause of action if that denial was in good faith. Good-faith or bad-faith decisions depend upon various attendant circumstances and usually are issues of fact to be determined by a fact-finder.

n8 Does this present a problem under Rule 4-1.5, Rules of Professional Conduct?

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

There are several reasons why the multiplier should not be applied in offer of judgment situations. n9 First, as judge **[*234]** Schwartz noted in *Gonzalez v. Veloso, 731 So. 2d 63 (Fla. 3d DCA 1999),* it is

illogical. To apply the multiplier offer of judgment cases assumes that lawyer **[\*\*22]** at the outset of the case will commit himself to a contingency fee arrangement in the hope that the defendant will subsequently turn down a reasonable offer so that he can claim up to two-and-a-half times a reasonable fee.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n9 I[]n response to questioning from the Bench as to why the contingency multiplier should be applied in offer of judgment cases, appellee's counsel's only response was that other appellate courts (and this one) had so held. Because we are not bound by other appellate courts (and we can change precedent of this court by en banc review), this was, at least to me, an insufficient answer. I am not nearly as concerned with what other courts have ruled as I am with why they so ruled. Lawyers must be able to compare and distinguish, to support and justify. The reason most commonly relied on by the other courts in holding the contingency multiplier applicable to offer of judgment cases is that by referring to the supreme court guidelines, the legislature authorized consideration of the contingency factor (hence the contingency multiplier) in setting the "reasonable fee." The problem with this position, I submit, is that the legislature minimized its general reference to the supreme court guidelines by emphasizing that the court must rely on additional, offer of judgment specific factors in determining an appropriate fee under section 768.79. These additional factors have not been considered by the supreme court in any of its prevailing party cases. If you view the offer of judgment provision relating to fees in its entirety, it seems clear that the legislature did not contemplate a contingency fee multiplier. Such a multiplier is inconsistent with the policy encompassed within section 768.79(7)(b) which is to determine the amount of the fee based on the merits of the case, the number and nature of the offers made, the closeness of the questions of law and fact, whether information was withheld so that a proper evaluation of the case could not be made, whether the action was a test case presenting questions of far reaching importance, and the amount of additional delay and costs caused by the rejection of the offer. The legislative reference to the supreme court guidelines was merely to assist the court in determining a reasonable hourly rate which determination might take into account the contingency nature of the fee contract for the additional services required after the rejection of the offer which would then be subject to modification based on application of the mandated legislatively specified factors. This differs from the fee provision considered in *Rowe* which, perhaps in part because of *Rowe*, was repealed and a new attorney's fee provision substituted which has adopted the offer of judgment standard. *See* § 766.209(2), Fla. Stat. (2000). Under the statutory provision considered in *Rowe*, there were no additional, specific factors to consider. As much as I respect the other courts which have found to the contrary, because I disagree with their why, I do not find their what persuasive.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[\*\*23]**

A second reason for denying application of the multiplier in offer of judgment cases is the *Quanstrom* limitation: the market conditions must be shown to require it. In other words, it must be proved that but for the multiplier, plaintiff could not have obtained competent counsel in the area. Plaintiff's counsel attempted to make this showing by himself testifying that he would not have taken the case without the multiplier. Since the test is whether plaintiff would have had substantial difficulty in obtaining a competent counsel within the area to take the case without the multiplier, whether plaintiff's counsel would have taken the case only on that basis is immaterial. The question is whether other competent counsel would have done so. Plaintiff attempted to answer this question by putting on another member of the plaintiff's bar to testify that based on his conversations with several of his friends who do this type practice, his "expert" opinion is that plaintiff could not have obtained competent counsel in the area to sue a defendant insured by the insurance company involved in this action n10 without the multiplier. Was this sufficient to satisfy the *Quanstrom* requirement? **[\*\*24]** If so, does it not mean that every time this insurer is involved, the multiplier must be applied? How about other insurance companies who have a reputation for not settling cases easily? *Quanstrom* made it clear that multipliers should not be applied in run of the mill cases. If this type testimony is permitted to satisfy *Quanstrom,* then it can justify applying the multiplier in all negligence cases.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n10 This is indeed an interesting proposition. The plaintiffs' bar claims a right to a higher fee because

the defendants' insurance carrier routinely asserts its right to access to courts. The fact that the plaintiffs' bar urges application of the multiplier because this insurance company claims the right to trial by jury is understandable; that the position obtained judicial acceptance is not.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Is this really the kind of testimony which can be offered by "experts?" Can one personal injury lawyer really predict what other personal injury lawyers will do in any given case? How do we explain all those lawyers **[\*\*25]** who took this kind of case on contingency before the enactment of section 768.69? Are we to believe that if the legislature repeals section 768.69 (as it might well do) lawyers will suddenly stop taking contingency fee cases such as this one? Section 90.703, Florida Statutes, provides that expert testimony may be received only if it can be applied to evidence at trial. Plaintiff never testified that he had any difficulty in obtaining a lawyer. The first lawyer he went to took **[\*235]** the case. What evidence did the expert's testimony relate to?

A third reason for denying application of the multiplier in offer of judgment cases was well developed by Judge Casanueva in his dissent in _Pirelli Armstrong Tire Corp. v. Jensen_, 752 So. 2d 1275 (Fla. 2d DCA 2000). Judge Casanueva based his opinion on equal protection guarantees. It can just as well be argued that to apply the multiplier in offer of judgment cases is contrary to clear legislative intent. The legislature in section 768.79 carefully crafted a party neutral fee provision to encourage settlement by assessing identical risks against each party if an offer is improperly rejected. By applying **[\*\*26]** the multiplier (applicable only to plaintiffs), the courts will have destroyed the neutrality intended by the legislature and will have given great advantage to plaintiff: "If I lose, I must pay your reasonable fee; if you lose, you must pay up to two-and-a-half times my reasonable fee." The supreme court emphasized that the "criteria and factors" utilized in setting a reasonable attorney's fee "must be consistent with the purpose of the fee-authorizing statute or rule." _Quanstrom_, 555 So. 2d at 834. Granting a multiplier for only one of the parties would not be consistent with the purpose of the offer of judgment statute which is to put both parties on the same footing when reasonably evaluating the case. n11

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n11 The fact that imposition of a contingency multiplier is inconsistent with the offer of judgment case is apparent from looking at _Rowe_ and comparing it with sections 768.79(7)(b)1 and 3. Under _Rowe_, the amount of the multiplier increases as plaintiff's likelihood of success decreases. A fair reading of the statute, however, indicates that the apparent lack of merit of the claim and the closeness of the issue should decrease the amount of fee awarded, not increase it.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[\*\*27]**

A fourth reason why the multiplier was unjustified in this case is that the lodestar determined herein (based on justifiable hours spent at a reasonable rate) was $ 117,800 and is sufficient without a multiplier to encourage attorneys to take similar cases. In other words, the policy reason justifying the multiplier is not present in this case. The lodestar alone was substantially more than twice the amount the lawyer would have received under his contingency fee contract. The legislation authorized assessing against the one who improvidently rejects an offer "a reasonable fee." A fee which exceeds that amount simply is unauthorized by the statute and should not be approved by the court. If courts are not reasonable in assessing attorney's fees, the legislature may well remove our authority to do so. To impose a multiplier when the lodestar already exceeds the contingency fee is to ignore the first seven criteria set forth in _Rowe_ and to make the eighth criteria (whether the fee is contingent) the sole basis for the greater fee and risks making the court an "instrument of enforcement, as against third parties, of excessive fee contracts." _See Rowe_, 472 So. 2d at 1151. **[\*\*28]**

A fifth reason, similar to the fourth reason, is the _Rowe_ limitation mentioned earlier. It is inconceivable that the plaintiff would ever agree to pay or that the attorney could reasonably expect his client to pay a fee of $ 235,800 to collect a judgment of $ 159,158.22. And yet if the contingency fee arrangement is supplanted by the fee awarded by the court, he has done just that. To require the defendant in an offer of judgment case to pay more than the parties really intended that plaintiff would pay if he were responsible for the fee does not establish a reasonable fee for plaintiff; it imposes a punitive award

against the defendant.

**DISSENTBY:** SAWAYA

**DISSENT:**

SAWAYA, J., dissenting. Case Nos. 5D00-1336 & 5D00-1641

I respectfully dissent.

 **[\*236]**  The instant case is neither a case where the plaintiff's radiologist was an undisclosed, **surprise** witness nor is it a case where the trial judge conducted a "trial by **ambush**." Rather, the record reveals that the defendants failed to engage in discovery prior to the discovery deadline established by the trial court that would have allowed them to obtain the information they now so bitterly complain they did not have prior to trial. Now the  **[\*\*29]**  defendants use their failure as an excuse to avoid an adverse judgment and, unfortunately for the plaintiff, they have succeeded.

### The Plaintiff's Radiologist Was Not An Undisclosed, Surprise Witness

The majority contends that Dr. Gordon was an undisclosed. **surprise** witness because the Answer to expert interrogatory filed by the plaintiff limited Dr. Gordon's testimony to the care and treatment of the plaintiff, which was confined to his examination of the x-rays taken shortly after the accident. The majority also contends that the plaintiff's November 1999 deposition failed to put the defendants on notice that he would offer testimony regarding subsequent MRIs performed on the plaintiff and the injuries the MRIs revealed.

The procedural history of this case belies the notion that the defendants were surprised by the testimony of Dr. Gordon at trial. The record reveals that this case involved a rear-end collision caused by the defendants and that the primary dispute between the parties was whether the plaintiff's injuries were caused by the accident, as the plaintiff contended, or whether, as the defendants contended, they were caused by natural degenerative processes.

Proximate  **[\*\*30]**  causation, which was the only liability issue submitted to the jury, necessarily requires a determination of the specific injury before an opinion can be rendered as to what caused it. See McCain v. Florida Power Corp., 593 So. 2d 500, 502 (Fla. 1992). The record clearly establishes that Dr. Gordon had been listed numerous times throughout the course of this litigation as the plaintiff's expert in radiology. A radiologist is a medical doctor who examines and interprets diagnostic tests such as x-rays and MRIs and renders opinions regarding injuries or other medical conditions revealed by those tests.

After the plaintiff began to experience additional medical problems which led him to Dr. Hanna for treatment during the latter part of 1999, an MRI was performed and a report issued by Dr. Shapiro comparing the 1999 MRI with a previous MRI performed in 1996. Dr. Gordon was asked to review the MRIs "several weeks" before trial, well within the discovery period established by the trial court. The defendants received a copy of Dr. Shapiro's report on December 28, 1999, almost two weeks before the January 10, 2000 discovery cutoff date. On January 18, the defendants filed  **[\*\*31]**  a motion for continuance strenuously arguing that they needed the additional time to retain their own radiologist (a neuroradiologist) to render an opinion at trial regarding the MRIs.

Thus the defendants knew that Dr. Gordon had been continuously listed as the plaintiff's expert in radiology; they obtained a copy of the 1999 MRI report disclosing the plaintiff's injuries; and they knew the key issue being litigated was whether the accident caused the plaintiff's injuries. Given this knowledge and the defendants' strongly-held view regarding the importance (to them) of having a radiologist review the MRI and render an opinion at trial with regard to the cause of the plaintiff's injuries, I find it incredulous that the defendants would argue that they were surprised that the plaintiff's radiologist, Dr. Gordon, would do likewise. In my view, to say otherwise attributes to the defendants' lawyers a degree of naivete,  **[\*237]**  gullibility, and ignorance of trial procedure in personal injury cases that is not supported by the record. I firmly believe that the defendants expected the plaintiff's radiologist to testify at trial regarding these issues when they received the MRI report,

and that **[\*\*32]** is why they wanted their own radiologist to counter testimony they inevitably saw coming. Moreover, if the defendants had any doubts about this, they, having ample time prior to the discovery cut-off date established by the court and even more time prior to the trial, could have inquired of the plaintiff whether Dr. Gordon was going to offer such an opinion and then depose him. In my view they failed to do so at their own risk.

The majority and concurring opinions emphasize that the report of the 1996 MRI shows "bulging discs"; the report of Dr. Shapiro regarding the 1999 MRI shows "a bulging disc with a tear in the posterior annular fibers"; and that Dr. Gordon testified that the MRIs showed "herniated discs." However, according to the doctors who testified, whether a disc condition is labeled a "bulge" or a "herniation" is often a matter of semantics. The doctors testified that whether an injury is called a "bulging disc" or a "herniated disc" depends on the doctor who examines the MRI because some might call a disc protrusion a "bulge" while others might refer to the same protrusion as a "herniation." Even Dr. Seig, the defendants' expert witness, after admitting that the **[\*\*33]** MRIs showed "bulges" which he said were normal, testified that other doctors might call those very same bulges "herniations." Specifically, Dr. Seig, in describing the difference between "bulges" and "herniations," explained that two doctors could look at the same MRI and describe the same injury using "different words" and admitted that the line between characterizing a disc as having a bulge or a herniation is arbitrary.

Semantics aside, the significant finding reflected in the 1999 MRI, when compared to the 1996 MRI, is that there had been no significant change in the plaintiff's condition since the 1996 MRI was performed. This establishes that the injuries suffered by the plaintiff were not caused by natural degenerative processes, but were the result of the accident caused by the defendants. This fact contradicts the testimony of the defendants' expert witness, Dr. Seig, who essentially testified that the plaintiff's injuries were caused by degenerative processes. Thus the need for Dr. Gordon's testimony, given the fact that the central issue in dispute between the parties was causation, was triggered by the 1999 MRI.

The majority and concurring opinions contend that the plaintiff **[\*\*34]** failed to disclose in his Answer to Expert Interrogatories and the deposition of the plaintiff taken in November 1999 that Dr. Gordon would testify regarding the MRIs and the injuries they revealed. However, the plaintiff could not have revealed this in his Answer to Expert Interrogatories because the 1999 MRI did not exist at the time he answered the inquiry. The plaintiff answered the expert interrogatories on September 9, 1999, several weeks before he started experiencing the medical problems that led him to seek the subsequent medical treatment that eventually led to the MRI. That MRI was performed in October 1999.

Regarding the deposition, I have read the transcript of that inquiry which took place in November 1999, and it consists of thirty-six pages taken over the period of one hour. The vast majority of the questions asked by the defendants concerned the plaintiff's work history, activities, and performance. The plaintiff was never asked whether he had any other MRIs performed since the last one taken in 1996 **[\*238]** or whether he had retained any experts to render opinions regarding a comparison of the 1996 and subsequent MRI. Thus the reason that the defendants learned nothing **[\*\*35]** from the deposition that would put them on notice that Dr. Gordon would offer expert testimony regarding the MRIs is because they never asked.

Under the Florida Rules of Civil Procedure, with one exception not relevant to these proceedings, n1 there is no continuing duty to supplement discovery requests including answers to expert interrogatories. Binger v. King Pest Control, 401 So. 2d 1310, 1312 n.4 (Fla. 1981) ("There is no continuing duty of disclosure under Florida's Rules of Civil Procedure, as there is under our criminal rules. See Fla. R. Crim. P. **3.220**(f)."). Moreover, there is no prohibition that I know of that prevents expert witnesses from continuing to obtain new or supplemental information regarding their opinions that might necessitate formulating new opinions during the preparation for their testimony at trial. See e.g., Davis v. Pfund, 479 So. 2d 230 (Fla. 3d DCA 1985), rev. denied, 491 So. 2d 280 (Fla. 1986).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Rule 1.360(b), Florida Rules of Civil Procedure, requires disclosure of substantial changes or reversal of opinion contained in an original report prepared by a physician who performs an independent medical examination under the rule.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[\*\*36]**

The majority contends that the answer given by the plaintiff to the expert interrogatory limited Dr. Gordon's testimony to the care and treatment of the plaintiff and his examination of the x-rays. The majority then adopts a rule which states that "when a party converts a treating physician into an expert to testify on matters unrelated to his care of the patient, the other side should be notified." As explained seriatim, I do not believe that this rule applies to the instant case. n2

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Assuming the applicability of the rule to the instant case, the conversion element of the rule makes little sense. For example, the majority holds that it was error to permit Dr. Gordon, who had been disclosed as an expert in radiology from the beginning of the litigation, to testify because he prepared an opinion for trial purposes after his care of the plaintiff ended, which was not disclosed by the plaintiff, because the defendants never requested it. Nevertheless, Dr. Golovac, who was not added as a witness until December 29, 1999, long after the disclosure deadline of October 15, was permitted to testify because he had not been "converted" from a treating physician even though his opinion had not been disclosed because the defendants did not request that one either. The most interesting aspect of this is that Dr. Golovac also testified to a comparison of the two MRIs and rendered the same opinion as Dr. Gordon. Yet it was permissible for Dr. Golovac to testify, but reversible error to allow Dr. Gordon to testify.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[\*\*37]**

It must first be determined whether the plaintiff's answer states that Dr. Gordon's testimony would be limited to "care and treatment" as the majority contends or whether, as the plaintiff argues, the answer states that the doctors will also testify to causation of the plaintiff's injuries. The majority contends that its interpretation of the answer is correct because Dr. Gordon originally examined the x-rays which revealed no injuries and, therefore, he could offer no testimony regarding causation. To me, this makes no sense because, as I have previously explained, causation of the plaintiff's injuries was the central liability issue in this case. Thus the plaintiff listed the witnesses whose testimony would be offered to prove the issues in the case, and for the defendants to now imply that they had no idea after they received the 1999 MRI report that Dr. Gordon would be asked to review the MRI and testify to the injuries it revealed is disingenuous. Moreover, this argument was made to the trial court and the trial court rejected the notion that Dr. Gordon **[\*239]** was limited to testifying about care and treatment based on the x-ray.

The majority opinion states that Dr. Gordon had been **[\*\*38]** "identified as nothing more than the post-accident emergency room x-ray-reading radiologist who had written a report reporting no injury." However, Dr. Gordon was listed as the plaintiff's expert in radiology numerous times. I have found nothing in the record which indicates that the plaintiff ever informed the defendants that Dr. Gordon's testimony would be limited to the x-rays, that the plaintiff would not undergo further diagnostic testing, or that Dr. Gordon would not be asked to review subsequent diagnostic tests and render an opinion based thereon.

The defendants argued to the trial court and in these proceedings that they were prejudiced because they did not have the opportunity to retain their own radiologist to review the MRIs and counter Dr. Gordon's testimony. I find this argument unpersuasive because the defendants had retained Dr. Seig as their medical expert early in the litigation and they consistently listed him on their expert witness list. Dr. Seig conducted the defendants' IME and rendered an opinion regarding the findings from the 1996 MRI in his report. Dr. Seig, an orthopedic surgeon, was described by plaintiff's counsel as a "highly skilled witness," and the **[\*\*39]** record reveals that he is an experienced trial witness with exceptional credentials and qualifications. I reviewed his trial testimony and he did testify regarding both MRIs and rendered an opinion that there was little if any difference between the two and that the plaintiff's injuries were caused by natural degenerative causes rather than the accident.

Moreover, after the defendants discovered the existence of the 1999 MRI (they knew about the 1996 MRI since the beginning of the litigation), they made no effort to obtain the services of a radiologist

despite the fact that they had an ... e time prior to trial to do so. Therefo... this is not a case, as the concurring opinion suggests, where the trial court, after refusing to strike the plaintiff's witnesses, refused to allow the defendants to have a radiologist of their choosing testify about the 1999 MRI. Rather than make an effort to retain a radiologist and ask permission of the trial court to allow him or her to testify, the defendants, who now so bitterly claim prejudice, did nothing more than file a second motion for continuance on January 18, 2000, only six days before the commencement date of the trial and almost three weeks **[\*\*40]** after they discovered the existence of the 1999 MRI, complaining that they needed another continuance.

Additionally, the defendants' motion to strike, emphasized in the concurring opinion, was an ore tenus motion made at the conclusion of the hearing on their motion for continuance after the trial court asked defendants' counsel whether she had attempted to depose the doctors, or whether she had moved to strike them. After answering "No," defense counsel then made the oral motion to strike, which was promptly denied by the trial court. In my view, the oral motion to strike was nothing more than an afterthought prompted by questioning from the court.

The majority cannot point to any rule of civil procedure or court order relating to discovery that the plaintiff has violated to warrant reversal. Moreover, in my opinion, the two cases it cites are distinguishable from the instant case. The decision in Suarez-Burgos v. Morhaim, 745 So. 2d 368 (Fla. 4th DCA 1999), rev. denied, 767 So. 2d 461 (Fla. 2000) involved a doctor who conducted an independent medical examination of the injured plaintiff pursuant to Florida Rule of Civil Procedure 1.160. The **[\*\*41]** doctor initially rendered a report that did not disclose his opinion that the injury was not caused by the accident, and then **[\*240]** attempted to testify at trial and relay this opinion without having previously disclosed it in clear violation of the rule. In Department of Health & Rehabilitative Services v. J.B., 675 So. 2d 241 (Fla. 4th DCA 1996), the plaintiff's attorney represented to the defendant and to the court that he would not introduce a life care plan at trial, and subsequently attempted to introduce such a plan at trial.

## The Trial Court Did Not Abuse Its Discretion

The decisions in Morhaim and J.B. hold that the decision whether to allow an undisclosed witness to testify should be governed by the standard adopted in Binger. Thus assuming that Dr. Gordon was an undisclosed **surprise** witness as the majority finds, the issue that must be addressed and resolved is whether the trial court abused its discretion in allowing Dr. Gordon to testify pursuant to the standard adopted in Binger, where the Florida Supreme Court held that trial judges

should be guided largely by a determination as to whether use of the undisclosed witness will **[\*\*42]** prejudice the objecting party. Prejudice in this sense refers to the **surprise** in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court's exercise of discretion are: (i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case (or other cases). If after considering these factors, and any others that are relevant, the trial court concludes that use of the undisclosed witness will not substantially endanger the fairness of the proceeding, the pretrial order mandating disclosure should be modified and the witness should be allowed to testify.

401 So. 2d at 1314 (footnotes omitted). The decision in Binger also applies to cases where a party fails to properly disclose a new opinion or a change of opinion. See J.B. The majority did not apply this analysis to the instant case. However, since this is the standard that the Florida Supreme Court **[\*\*43]** says should be applied, I will apply it.

In order to show prejudice under Binger, the defendants have to show that they were surprised by the testimony of Dr. Gordon. The courts generally agree that a party cannot claim **surprise** if it knows, or has the means available to it to know, what testimony will be introduced against it at trial. Pascual v. Dozier, 771 So. 2d 552, 554 (Fla. 2000) ("However, plaintiff failed to conduct any discovery of either

IME doctor. Based on this record, we cannot agree with plaintiff's claim of **surprise** that the IME doctors intended to testify regarding the cause, reasonableness and necessity of her medical treatment."); see also <u>Tomlinson-McKenzie v. Prince, 718 So. 2d 394, 396 (Fla. 4th DCA 1998)</u> ("Further, an objecting party may not, having closed its eyes to the existence of evidence prior to trial, claim that the admission of that evidence would disrupt the orderly and efficient trial of the case."); <u>Bowen v. Manuel, 144 So. 2d 341, 343 (Fla. 2d DCA 1962)</u> (holding that one who knows, or has full means of knowing, what evidence or contentions are likely to be introduced against him is not entitled **[\*\*44]** to claim **surprise**). I have previously discussed why I believe the defendants were not surprised by the testimony of Dr. Gordon. I also feel the defendants had the means available to them to know what testimony the 1999 MRI report would be introduced against them because they had ample time after they received the 1999 MRI report to discover Dr. Gordon's testimony, and they failed to do so.

**[\*241]** In addition, the other factors set out in Binger militate strongly against the exclusion of Dr. Gordon's testimony. There was no finding that the plaintiff failed to answer the interrogatory or questions in the deposition in bad faith. The record reflects that the plaintiff advised the defendants that he would cooperate if the defendants wanted to take Dr. Gordon's deposition, but the defendants never attempted to do so. I consider the defendants' argument to be a clear example of a party, "having closed its eyes to the existence of evidence prior to trial, claiming that the admission of that evidence would disrupt the orderly and efficient trial of the case," and I soundly reject it. See <u>Tomlinson-McKenzie, 718 So. 2d at 396.</u>

Applying the Binger standard, this court held in <u>Utica Mutual Insurance Co. v. Pennsylvania National Mutual Casualty Insurance Co., 639 So. 2d 41</u> **[\*\*45]** (Fla. 5th DCA), rev. dismissed, <u>649 So. 2d 234 (Fla. 1994),</u> that the admission of expert testimony of a witness in an insurance dispute was not an abuse of discretion, despite the late notice by the party offering the testimony, where the opposing party was afforded the opportunity to depose the witness *the night before the trial* and declined to do so. If this court did not find an abuse of discretion in Utica Mutual because the undisclosed expert witness could be made available for deposition the night before trial, surely no prejudice can be established by defendants under the facts and circumstances of the instant case.

Moreover, the courts consistently agree that a trial court should exercise extreme caution and only exclude the testimony of a witness under the most compelling of circumstances. Pascual; <u>Louisville Scrap Material Co. v. Petroleum Packers, Inc., 566 So. 2d 277, 278 (Fla. 2d DCA 1990)</u> ("Excluding the testimony of a witness is a drastic remedy and should be invoked only under the most compelling circumstances.") (citation omitted); Davis; <u>First Republic Corp. of America v. Hayes, 431 So. 2d 624, 626</u> **[\*\*46]** (Fla. 3d DCA), rev. denied, <u>441 So. 2d 632 (Fla. 1983);</u> see also <u>Tomlinson-McKenzie, 718 So. 2d at 396</u> ("'Excluding the testimony of a witness is a harsh remedy which should be invoked sparingly.'") (quoting <u>Aguila-Rojas v. City Mgmt. Group Corp., 606 So. 2d 765, 766 (Fla. 3d DCA 1992); Conde v. Marlu Nav. Co., Ltd., 495 So. 2d 847 (Fla. 3d DCA 1986).</u> In my view, the instant case does not present the sort of compelling circumstances that would have required the exclusion of Dr. Gordon's testimony.

## Conclusion

I am of the view that if epigrams are to be used in judicial opinions, they should fit the facts of the case. Although I generally do not bother to respond to them, I have admittedly succumbed to the irresistible temptation to respond to the concurring opinion which asserts that the defendants were ambushed as they went "blithely through the pass." In my view, it is more accurate to conclude that the defendants embarked upon a journey down an unfamiliar road without asking directions from anyone; took a wrong turn and proceeded over a cliff; and, as they descended to the ravine, loudly proclaimed their **[\*\*47]** misfortune to be the fault of those who did not volunteer to guide them along the way.

In Binger, the court held that the concept of disclosure of witnesses and evidence is not without its limit when it stated:

> Nothing in this concept of trial practice requires that one party disclose his case to the other in full. We are dealing only with an exchange of witnesses' names. It remains the

Case 1:02-cv-00058-MP-GRJ   Document 21-8   Filed 03/23/11   Page 38 of 155

· obligation of each attorney to learn through interrogatories, depositions or any other means he selects; the nature of the testimony which will be offered and the extent to which he intends to meet or deal with it at trial. **[*242]** Negligence in discovery is not an issue in this case.

Binger, 401 So. 2d at 1313 n.7. Although negligence in discovery was not an issue in Binger, I believe it is an issue in the instant case. The defendants made a conscious decision not to discover what testimony Dr. Gordon would offer after they received the 1999 MRI report. The only effort the defendants made was to file their second motion for continuance six days before trial. Moreover, the defendants never took any doctor's deposition, not even the depositions of Drs. Hanna and Golovac **[**48]** after they were revealed in the plaintiff's last deposition taken in November 1999. The record reveals that defendants did precious little to prepare this case for trial and they proceeded at their own risk.

The defendants' negligence caused the plaintiff's injuries and they now attempt to use their negligent discovery as an excuse to take away the plaintiff's verdict rendered by the jury to compensate him for those injuries. I believe it is time for the defendants' negligence to stop.

Source:  Legal > / . . . / > FL Federal and State Cases ⓘ
Terms:  3.220 and ambush or surprise (Edit Search)
View:  Full
Date/Time:  Wednesday, September 18, 2002 - 11:19 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Search Advisor Case Results available for Graduate Document 21-8  Filed 03/22/11  Page 39 of 155 Page 1 of 18

Topic: All Topics > Criminal Law & Procedure > Discovery & Inspection > Discovery Misconduct -  FL Criminal Cases ⓘ
Terms: misleading or inaccurate (Edit Search)

⟜ Select for FOCUS™ or Delivery

☐

*819 So. 2d 705, \*; 2002 Fla. LEXIS 1096, \*\*;*
*27 Fla. L. Weekly S 505*

ALLEN WARD COX, Appellant, vs. STATE OF FLORIDA, Appellee.

No. SC00-1751

SUPREME COURT OF FLORIDA

819 So. 2d 705; 2002 Fla. LEXIS 1096; 27 Fla. L. Weekly S 505

May 23, 2002, Decided

**SUBSEQUENT HISTORY:** [\*\*1] Rehearing Denied July 23, 2002. Released for Publication July 23, 2002.

**PRIOR HISTORY:** An Appeal from the Circuit Court in and for Lake County, T. Michael Johnson, Judge - Case No. 9-249-CF-A-MJ.

**DISPOSITION:** Affirmed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant appealed his conviction by the Circuit Court in and for Lake County (Florida) of first-degree murder and a sentence of death. The charges resulted from a chain of events within the correctional institute that culminated in a victim's death and an assault upon another victim. The trial court found four aggravating circumstances. While it found no statutory mitigating factors, it found numerous nonstatutory mitigators.

**OVERVIEW:** Defendant discovered that someone had broken into his personal footlocker and stolen approximately $ 500. Upon making this discovery, he indicated that when he discovered who had stolen from him, he would stab and kill that person, and that he did not care about the consequences. A discovery violation occurred due to an investigator's nondisclosure. However, the State's discovery violation was inadvertent and the defense was not procedurally prejudiced by the violation. Where during cross-examination by the defense, a witness informed the jury that defendant was serving two life sentences, the information did not vitiate the entire trial. The trial court properly gave the jury a proper curative instruction and proceeded with the trial. The State was entitled to decline an offer to stipulate and present evidence concerning the prior felonies. The prosecutorial misrepresentation of the law was harmless error. The trial court received sufficient evidence to conclude that the instant murder was cold, calculated, and premeditated. In comparison with other decisions upholding the imposition of the death penalty, the sentence given defendant was not disproportionate.

**OUTCOME:** The judgment of the trial court was affirmed.

**CORE TERMS:** murder, aggravator, slight, mitigator, death penalty, discovery violation, sentence, pretense, prosecutor, mistrial, weapon, mitigation, felony, inmate, cruel, wound, aggravating circumstance, deposition, mitigating circumstances, additionally, atrocious, childhood, cold, nonstatutory, sentencing, moral justification, calculated, killing, mitigating circumstance, penalty phase

📄 Criminal Law & Procedure : Appeals : Standards of Review : Harmless & Invited Errors
📄 Criminal Law & Procedure : Discovery & Inspection : Discovery Misconduct
📄 Criminal Law & Procedure : Appeals : Standards of Review : Abuse of Discretion

⬧ If a trial court holds a Richardson hearing in response to an appellant's motion for a mistrial, its decision is subject to reversal only upon a showing that it abused its discretion. However, where the State commits a discovery violation, the standard for deeming the violation harmless is extraordinarily high. A defendant is presumed to be procedurally prejudiced if there is a reasonable probability that the defendant's trial preparation or strategy would have been materially different had the violation not occurred. Indeed, only if the appellate court can say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless.

📁 Criminal Law & Procedure : Discovery & Inspection : Discovery by Defendant
⬧    See Fla. R. Crim. P. 3.220(b)(1)(C).

📄 Criminal Law & Procedure : Discovery & Inspection : Discovery Misconduct
⬧ If no prejudice results from the State's discovery violation, the trial court does not abuse its discretion in refusing to grant a mistrial.

📄 Criminal Law & Procedure : Appeals : Standards of Review : Abuse of Discretion
⬧ Discretion is abused only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.

📄 Criminal Law & Procedure : Trials : Motions for Mistrial
⬧ A motion for mistrial is addressed to the sound discretion of the trial judge and the power to declare a mistrial and discharge the jury should be exercised with great care and should be done only in cases of absolute necessity.

📄 Criminal Law & Procedure : Trials : Motions for Mistrial
📄 Criminal Law & Procedure : Appeals : Standards of Review : Abuse of Discretion
⬧ A trial court's ruling on a motion for mistrial is subject to an abuse of discretion standard of review.

📄 Criminal Law & Procedure : Appeals : Standards of Review : Harmless & Invited Errors
⬧ Under Florida law, a party may not invite error and then be heard to complain of that error on appeal.

📄 Criminal Law & Procedure : Sentencing : Imposition : Evidence
⬧ Any relevant evidence as to the defendant's character or the circumstances of the crime is admissible during capital sentencing proceedings.

📄 Criminal Law & Procedure : Sentencing : Imposition : Evidence
⬧ As admission of evidence is within the discretion of the trial court and will not be reversed unless there has been a clear abuse of that discretion, there is no basis to reverse the ruling of a court admitting testimonial evidence of an appellant's prior violent felonies at trial if the evidence was not emphasized to the level of rendering the prior offenses a central feature of the penalty phase.

📄 Criminal Law & Procedure : Sentencing : Capital Punishment : Aggravating Circumstances
📄 Criminal Law & Procedure : Sentencing : Capital Punishment : Mitigating Circumstances
⬧ A jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors. Additionally, Florida statutory law details the role of a penalty phase jury, which directs the jury panel to determine the proper sentence without precise direction regarding the weighing of aggravating and mitigating factors in the process.

📄 Criminal Law & Procedure : Sentencing : Capital Punishment : Aggravating Circumstances

📄 Criminal Law & Procedure : Sentencing : Capital Punishment : Mitigating Circumstances
⬥ See Fla. Stat. ch. 921.141(2) (2001).

📖 Criminal Law & Procedure : Appeals : Prosecutorial Misconduct
⬥ In the context of a prosecutor's statements, fundamental error reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.

📖 Criminal Law & Procedure : Sentencing : Capital Punishment : Mitigating Circumstances
⬥ There are circumstances where a mitigating circumstance may be found to be supported by the record, but given no weight.

📖 Criminal Law & Procedure : Appeals : Standards of Review : Substantial Evidence Review
⬥ It is not the appellate court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt, that is the trial court's job. Rather, the appellate court's task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.

📖 Criminal Law & Procedure : Sentencing : Capital Punishment : Aggravating Circumstances
⬥ The aggravating circumstance of cold, calculating, and premeditated, requires proof of the following elements: (1) the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage; (2) that the defendant had a careful plan or prearranged design; (3) that the defendant exhibited heightened premeditation; and (4) the defendant had no pretense of moral or legal justification.

📖 Criminal Law & Procedure : Sentencing : Capital Punishment : Mitigating Circumstances
📖 Criminal Law & Procedure : Appeals : Standards of Review : Abuse of Discretion
⬥ Deciding the weight to be given a mitigating circumstance is within the trial court's discretion, and its decision is subject to the abuse-of-discretion standard. The trial judge is in the best position to judge, and the appellate court will not second-guess the judge's decision.

📖 Criminal Law & Procedure : Sentencing : Appeals
📖 Criminal Law & Procedure : Sentencing : Capital Punishment : Mitigating Circumstances
⬥ Mere disagreement with the force to be given mitigating evidence is an insufficient basis for challenging a sentence.

📖 Criminal Law & Procedure : Sentencing : Capital Punishment : Mitigating Circumstances
⬥ Florida law does not require that a proffered mitigating circumstance have any specific nexus to a defendant's actions for the mitigator to be given weight.

📖 Criminal Law & Procedure : Sentencing : Capital Punishment : Mitigating Circumstances
⬥ If the record contains competent, substantial evidence to support the trial court's rejection of mitigating circumstances, the trial court's refusal to grant the mitigators any weight is not improper.

📁 Criminal Law & Procedure : Sentencing : Capital Punishment
⬥ It is well settled that the appellate court conducts its proportionality review in capital cases by performing a comprehensive analysis in which it determines whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby providing for uniformity in the application of the sentence.

📖 Criminal Law & Procedure : Sentencing : Capital Punishment : Aggravating Circumstances
⬥ Since all of the possible aggravating factors are detailed in section Fla. Stat. ch. 921.141(5) (2001), there is no reason to require the State to notify defendants of the aggravating factors it intends to prove.

📁 Criminal Law & Procedure : Sentencing : Capital Punishment
⬆ In the context of the death penalty, there is no merit to the burden shifting claim.

**COUNSEL:** James B. Gibson, Public Defender, and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida, for Appellant.

Robert A. Butterworth, Attorney General, and Stephen D. Ake, Assistant Attorney General, Tampa, Florida, for Appellee.

**JUDGES:** WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, and LEWIS, JJ., concur. QUINCE, J., dissents.

**OPINION: [*709]**

PER CURIAM.

We have on appeal a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

Background

On February 5, 1999, a grand jury indicted Appellant, Allen Ward Cox, for premeditated murder and battery which occurred in a detention facility. n1 The charges against Cox resulted from a chain of events within the Lake Correctional Institute ("LCI") that culminated in the death of Thomas Baker and an assault upon Lawrence Wood. At trial, the State presented the testimony of numerous corrections officers and inmates regarding the **[**2]** circumstances surrounding the murder of Baker, who was also a LCI inmate. On December 20, 1998, the appellant discovered that someone had broken into his personal footlocker and stolen approximately $ 500. Upon making this discovery, Cox walked out onto the balcony of his dorm and announced that he would give fifty dollars to anyone willing to identify the thief. He also indicated that when he discovered who had stolen from him, he would stab and kill that person, and that he did not care about the consequences.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Because the appellant pled guilty to the battery charge prior to his trial and raises no claims regarding the charge or related sentence, we do not discuss it further.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

During the prison's lunch period on December 21, the appellant called Baker over to him, and then hit him with his fists to knock him down. During the attack, the victim continuously attempted to break free from Cox, and also denied stealing from him multiple times. At a lull in the beating, the appellant said, "This ain't good enough, **[**3]** " and stabbed Baker with an icepick-shaped shank n2 three times. After the stabbing, Appellant walked away stating, "It ain't over, I've got one more . . . to get." He then walked behind the prison pump house and hid the shiv in a pipe. Cox proceeded from the pump house to his dorm, where he encountered Donny Cox (unrelated to the appellant). There, Appellant questioned him about his stolen money and told him that if Cox had his money, he would kill him also. Following this exchange, the appellant returned to his cell, where he next attacked his cellmate, Lawrence Wood, advising him that Wood was "lucky I put it up, or I'd get [you]."

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 A "shank" or "shiv" is a homemade knife.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

While the appellant was returning to his cell, the stabbing victim fled the attack scene and ran to corrections officers in a nearby building. The officers present at the time testified at trial that Baker had

blood coming from his mouth, and that he was hysterically complaining that his lungs were filling with blood. Baker also responded **[\*\*4]** to the prison officials' questions regarding who had attacked him by saying, "Big Al, Echo dorm, quad three." Although the corrections officers attempted to expedite emergency treatment of the victim by placing him on a stretcher and carrying him on foot to the prison medical center, Baker died before arriving at the hospital.

Doctor Janet Pillow testified that upon her autopsy of the victim, she found that the victim had been stabbed three times. Two of the wounds inflicted were shallow punctures of the lower torso, but the fatal wound had entered the victim's back and traveled through the chest cavity, between **[\*710]** two ribs, and finally pierced the lungs and aorta. She testified that a conscious person with this wound would suffer from "air hunger," and would be aware of the "serious danger of dying." She described the wound as being approximately 17.5 centimeters deep, although only two millimeters wide. Doctor Pillow verified that the shank found by the pump house was consistent with the victim's injuries, despite the fact that the wound was deeper than the length of the weapon. She attributed the discrepancy between the length of the weapon and the depth of the wound to the elasticity **[\*\*5]** of human tissue.

The appellant also testified, contending that all of the previous witnesses were correct, except that they had not seen what truly happened when he, Baker, and Vincent Maynard, a third inmate, were close together. According to Cox, it was he who had in fact dodged Baker and Maynard's attempts to stab him, and it was Maynard who actually stabbed Baker in the back accidentally. In Cox's version of the events, he had only struck the victim because he was defending himself from both of the other attacking men. Following the conclusion of the guilt phase testimony and argument, the jury deliberated, apparently rejected the view of the evidence offered by Cox, and found the appellant guilty of first-degree murder.

After hearing the penalty phase testimony presented by both the defense and the prosecution, the jury deliberated and recommended a sentence of death by a vote of ten to two. Following a Spencer, 615 So. 2d 688 n3 hearing, the trial court followed the jury's recommendation and sentenced Cox to death, finding four aggravating circumstances. n4 While the court found no statutory mitigating factors, it found and considered numerous nonstatutory mitigators. n5 **[\*711]** On appeal, **[\*\*6]** Cox raises ten claims n6 --we address each in turn.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 Spencer v. State, 615 So. 2d 688 (Fla. 1993).

n4 The trial court found the following aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment; (2) the defendant was previously convicted of a felony involving the use or threat of violence; (3) the capital felony was especially heinous, atrocious, or cruel; and (4) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

n5 The trial court found the following mitigators: (1) severe domestic violence in Cox's childhood home--slight weight; (2) Cox's mother was very cruel and unpredictable--slight weight; (3) Cox's mother was very cruel to the children--slight weight; (4) frequently absent father who failed to protect Cox from mother's physical abuse--slight weight; (5) Cox's mother was emotionally unstable--slight weight; (6) Cox was forced to haul firewood as a small child until he dropped from physical exhaustion--slight weight; (7) Cox's parents divorced and remarried only to divorce again--some weight; (8) Cox has no happy memories from his childhood--slight weight; (9) Cox's mother abandoned him when he was eleven years old, forcing his father to send him to his grandmother's house for her to raise--some weight; (10) Cox was the frequent victim of inconsistent and unpredictable patterns of discipline as a child--no separate weight; (11) Cox's mother failed to demonstrate any maternal affection--no additional weight; (12) Cox grew up feeling unwanted, unloved, and worthless--no additional weight; (13) Cox is able to form friendships--slight weight; (14) Cox suffers from dysthymic disorder, a chronic depressive disorder unrelated to substance abuse; the disorder is amenable to treatment--slight weight; (15) Appellant has been diagnosed additionally with adjustment disorder with depression; major depressive disorder; recurrent and severe; anti-social personality; alcohol dependence; and mixed personality disorder--slight weight; (16) Cox has been on antidepressant medication since 1991-

-no additional weight; (17) Cox suffers from severe depression--no additional weight; (18) Cox attempted suicide once in his youth and still has suicidal thoughts--slight weight; (19) Cox demonstrates brain impairment possibly from a head injury or a congenital birth defect or both--slight weight; (20) Cox's early childhood left him with feelings of hopelessness, insecurity, rejection, and inadequacy--no additional weight; (21) Cox was severely injured in a motorcycle accident when he was sixteen rendering him unconscious--no additional weight; (22) Cox suffers from very rigid and repetitive thinking--no additional weight; (23) Cox is alienated and isolated and is distrustful of others--little weight; (24) Cox suffers from a severely impaired spectrum of emotional responses--slight weight; (25) as a result of his childhood, Cox has no sense of moral development--no additional weight; (26) Cox's mental illness could have been treated and controlled with medication or counseling or both--no additional weight; (27) at the time of the offense, Cox's ability to exercise good judgment was impaired--no additional weight; (28) Cox behaved well throughout these court proceedings--some weight; (29) Cox's moral development was similar to a retarded person--no additional weight; (30) Cox is able to function and grow in prison--some weight; (31) Cox is loved by his family--slight weight; and (32) Cox is a human being--no additional weight. **[\*\*7]**

n6 The appellant asserts that (1) the trial court erred in denying the appellant's motion for a mistrial based upon a discovery violation; (2) the trial court erred in denying the appellant's motion for a mistrial following a witness's unknowing testimonial violation of the court's order in limine; (3) the trial court erred in ordering the appellant's penalty phase mental health expert to turn over her notes and testing materials to the State prior to trial; (4) the trial court erred in refusing to accept the appellant's offer to stipulate to his prior violent felony convictions; (5) the prosecutor's misstatements of the law and allegedly improper argument amounted to fundamental error; (6) the trial court erred by instructing the jury on and in finding that the murder was especially heinous, atrocious, or cruel ("HAC"); (7) the trial court erred by instructing the jury on and in finding that the murder was committed in a cold, calculated, and premeditated manner, without any pretense of legal or moral justification ("CCP"); (8) the trial court erred by failing to consider all available mitigating evidence and in giving little weight to valid mitigation; (9) the death penalty is not proportional in the instant case; and (10) Florida's death penalty scheme violates the Florida and United States constitutions.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

**[\*\*8]**

Discussion

I. Discovery Violation

At trial, Inspector Cornelius Faulk of the Florida Department of Corrections testified regarding his investigation of Baker's murder. He relayed to the jury his investigatory methods, and during his description of an interview with the appellant, he said that Cox told him, "I heard you found a weapon." The substance of the conversation was important to Inspector Faulk because until the time of this statement, Cox had been in administrative confinement. Despite being isolated, Cox detailed for Faulk exactly where the weapon had been hidden--a description that matched the location where the suspected murder weapon had been discovered by corrections officers. On cross-examination, the defense asked Faulk why the "I heard you found a weapon" quote was not included in his investigation notes, and had not been disclosed to the defense during his deposition. n7 The defense then moved for a mistrial based upon this discovery violation, a <u>Richardson, 246 So. 2d 771 n8</u> inquiry was held, and the court denied the motion.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n7 Indeed, when Faulk was deposed before trial, he replied to the question "was there any evidence to indicate that Cox knew that the knife had been found?" by saying, "Not that I know of." **[\*\*9]**

n8 <u>Richardson v. State, 246 So. 2d 771 (Fla. 1971).</u>

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The appellant asserts that the State's failure to turn this statement over to the defense prior to trial was certainly a violation of Florida Rule of Criminal Procedure 3.220 (b)(1)(C), and that this misconduct prejudiced the defense because the defense **[\*712]** theory "embraced the shank found in the pipe" as a weapon belonging to Cox that could not possibly have caused the death of Baker. Additionally, Cox asserts that the introduction of the statement enabled the State to undermine this theory of defense by arguing that Cox had heard about the shorter weapon and wanted to encourage the investigators to focus on it, but had actually killed Baker with a different, longer knife.

☞As the trial court held a Richardson, 246 So. 2d 771 hearing in response to the appellant's motion for a mistrial, its decision is subject to reversal only upon a showing that it abused its discretion. See State v. Tascarella, 580 So. 2d 154, 157 (Fla. 1991). However, where the State commits a discovery violation, the standard for deeming the violation **[\*\*10]** harmless is extraordinarily high. A defendant is presumed to be procedurally prejudiced "if there is a reasonable probability that the defendant's trial preparation or strategy would have been materially different had the violation not occurred." Pomeranz v. State, 703 So. 2d 465, 468 (Fla. 1997) (quoting State v. Schopp, 653 So. 2d 1016, 1020 (Fla. 1995)). Indeed, "only if the appellate court can say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless." Id.

During the Richardson,246 So. 2d 771 hearing, both attorneys questioned Faulk about why he had neither included the statement in his investigatory journal nor disclosed the statement during his deposition. Faulk advised the court that he had not made his notes on the conversation until after Cox had left the room, and that he thought the substance of the conversation which addressed the description of the weapon provided by Cox (which was included in his notes) was more important than any statement Cox may have used to simply initiate the conversation. The trial court concluded that no discovery violation had occurred, **[\*\*11]** and even if one had occurred, it was inadvertent.

Clearly, under Rule of Criminal Procedure 3.220(b)(1)(C), the State was obligated to disclose the substance of this oral statement to the defense. See Fla. R. Crim. P. 3.220(b)(1)(C) ☞("The prosecutor shall . . . disclose to the defendant . . . the substance of any oral statements made by the defendant . . . ."). Thus, we must conclude that a discovery violation occurred here. It is just as plain, however, that the State's discovery violation here was inadvertent. The State turned over all of Faulk's investigatory materials to the defense, and Faulk's somewhat confusing deposition statements were likely the result of a misunderstanding of the term "evidence," as the context of the particular questions demonstrated. The State explained to the trial court that Faulk probably interpreted the term with reference to physical evidence beyond the substance of the appellant's statements. Since Inspector Faulk was not aware of physical evidence or anything else independent of Cox's oral statement, his deposition answers were not intended to be evasive or **misleading.** The investigatory materials contained the entirety of Cox's description **[\*\*12]** of the knife--the most important component of Cox's statements to Faulk--and only omitted the appellant's conversation-opening remark.

Although we conclude that an inadvertent discovery violation occurred here, an examination of the record reveals that the defense was not procedurally prejudiced by the discovery violation. The appellant asserts that since the State did not disclose the statement, the defense "embraced the shank found in the pipe." Thus, introducing this statement at trial allowed the State to "shift away from the theory that the found knife was absolutely **[\*713]** the actual murder weapon," and argue that the defendant had possibly used a different weapon to murder Baker. While this theory of prejudice to the defense may be plausible in principle, the appellant's rendition of what actually occurred at trial is not supported by the record. During Cox's trial, the State consistently asserted that Cox killed Baker with the weapon that had been found by the prison pump house. n9 Since the appellant's theory of defending himself was just as viable after Inspector Faulk's testimony as it was prior to the introduction of this evidence, and Cox described and consistently claimed a **[\*\*13]** relationship to the discovered shiv, we can confidently "ascertain beyond a reasonable doubt that [the State's discovery violation] did not materially hinder the defendant's trial preparation." Pender v. State, 700 So. 2d 664, 666 (Fla. 1997).

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 The State maintained this strategy during the trial, but did not comment on an isolated occasion in the middle of its closing argument that "somebody who is capable of orchestrating perjury, is also capable

of planting a decoy knife." This sentence fragment is the only comment that could be construed as the State wavering from its central theory of the case.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

⚓As no prejudice resulted from the State's discovery violation, the trial court did not abuse its discretion in refusing to grant a mistrial. See Trease v. State, 768 So. 2d 1050, 1053 n.2 (Fla. 2000) ⚓ ("Discretion is abused only 'when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] **[\*\*14]** would take the view adopted by the trial court.'") (quoting Huff v. State, 569 So. 2d 1247, 1249 (Fla. 1990)). Thus, we find the appellant's arguments here meritless.

II. Violation of the Order in Limine

In preparation for the testimony of the witnesses to the appellant's "reward announcement," the trial court granted a defense motion in limine to preclude the State from introducing any evidence of the appellant's statement during his proclamation that he did not care about the consequences of killing the thief, because he was already serving two life sentences. To ensure compliance with the order, the court instructed the State to inform all of its witnesses of the ruling, and the court also did so before each of them testified. All of the State's witnesses complied with the order.

During the defense case-in-chief, the appellant's attorneys elicited the testimony of Vincent Maynard, another LCI inmate. After an initial period of neutral direct examination, the defense began to explicitly attempt to blame Maynard for the death of the victim. The defense proffered reverse Williams n10 rule evidence of Maynard's prior crimes, and started to question him in **[\*\*15]** an openly hostile manner, resulting in an argumentative exchange of questions and answers between the examining attorney and witness. Not long after direct examination in the presence of the jury commenced, Maynard responded to a wholly unrelated but hostile line of questioning by saying, "Sir, he has two life sentences already." The defense moved for a mistrial, however, the court denied this motion and gave the following curative instruction:

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n10 Williams v. State, 110 So. 2d 654 (Fla. 1959).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Ladies and gentlemen, you are instructed that the sentence that Mr. Cox was serving at Lake Correctional Institution is not relevant to this case in any way. He has never been convicted nor is he serving any sentence for homicide or any type of murder.

**[\*714]** The appellant contends that this situation is similar to the circumstances addressed by the Fourth and First District Courts of Appeal in Bozeman v. State, 698 So. 2d 629 (Fla. 4th DCA 1997), and Thomas v. State, 701 So. 2d 891 (Fla. 1st DCA 1997). **[\*\*16]** In each of these cases, a witness for the State was wrongfully allowed to relay to the jury that the defendant was housed in a portion of the correctional facility "reserved for the more violent inmates." Thomas, 701 So. 2d at 892 (internal quotation marks omitted); see also Bozeman, 698 So. 2d at 630 (witness told the jury that the defendant was housed in a "special management unit" where the "worst behaved . . . violent . . . inmates" resided). As the juries in those cases were extraordinarily likely to infer from such testimony that the defendants had committed the acts of violence of which they were accused, each court of appeal reversed the defendant's conviction and remanded for a new trial. See Bozeman, 698 So. 2d at 632; Thomas, 701 So. 2d at 893.

A close reading of Bozeman, 698 So. 2d 629 and Thomas, 701 So. 2d 891, however, reveals that the information related to the jury in both cases was critical to the prosecution's factual theories, because both of the defendants were accused of attacking someone and both asserted at trial that they were only defending themselves. See Bozeman, 698 So. 2d at 630; Thomas, 701 So. 2d at 892. **[\*\*17]** The fact of being housed in a particular section was used to enhance a predisposition for violence. In the instant case, the fact that Cox was serving two life sentences was certainly not critical to the

State's case, and was not related to its theories--the jury already knew that he was an inmate at the Lake Correctional Institution where the events occurred. Additionally, defense counsel knew and assumed the risks of argumentatively questioning an openly hostile witness, and chose to do so in an extraordinarily combative manner. While the defense may have been chagrined that the jury was informed that the appellant was serving two life sentences due to the defense strategy, this information did not "vitiate the entire trial." Duest v. State, 462 So. 2d 446, 448 (Fla. 1985). Therefore, a mistrial was not proper. See id.; Ferguson v. State, 417 So. 2d 639, 641 (Fla. 1982) ✦("A motion for mistrial is addressed to the sound discretion of the trial judge and the power to declare a mistrial and discharge the jury should be exercised with great care and should be done only in cases of absolute necessity."). The trial court properly addressed the situation **[\*\*18]** presented by giving the jury a proper curative instruction and proceeding with the trial. See Jackson v. State, 702 So. 2d 607 (Fla. 5th DCA 1997); Riley v. State, 367 So. 2d 1091, 1092 (Fla. 3rd DCA 1979). As the trial court did not abuse its discretion by denying the defense's motion for a mistrial here, see Goodwin v. State, 751 So. 2d 537, 546 (Fla. 1999) ✦("a trial court's ruling on a motion for mistrial is subject to an abuse of discretion standard of review"), we deem this claim meritless.

III. Pretrial Orders Regarding Mental Health Expert

Prior to trial, the defense failed to give timely notice of its intent to present expert testimony of mental mitigation. Defense counsel subsequently moved to extend the time allowed under Florida Rule of Criminal Procedure 3.202 to provide this information to the State, and the State acquiesced to this request, provided that the defense would turn over the expert's report and a copy of her notes and test results prior to her scheduled deposition. n11 The trial court memorialized the **[\*715]** agreement in an order dated February 23, 2000.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n11 Specifically, the following exchange occurred:

Mr. Gross (State's Attorney): We're ready to make an announcement as to that last motion, your Honor, which I think would get you off the bench.

The Court: Extension of time?

Mr. Gross: Yes, sir. We don't have any objection to the extension of time under the circumstances. All we would ask is that we have a report from this doctor by a week from tomorrow, which would be the 25th, and a copy of all of her notes and all of her records.

The Court: Any problem with that?

Mr. Gross: We're hoping to depose her the following Wednesday after that deadline, your Honor, so that only gives us a few days.

Mr. Stone (defense counsel): I don't think that's going to be any complication, if I'm not in Kentucky all week.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[\*\*19]**

On February 28, 2000, the State informed the trial court that Dr. McMahon (the defense expert) had not turned over any of the information due the State prior to her deposition. After a brief discussion, the parties agreed that Dr. McMahon would turn over the materials to the State's expert witness. After Dr. McMahon's deposition, the State notified the trial court that she had indicated that she did not plan to prepare a written report unless ordered to do so. At this point, the defense objected to the entire procedure. The State responded by reminding the court of the prior agreement and the fact that the objection was moot because Dr. McMahon's deposition had already taken place. The court denied the State's motion, but signed an order requiring McMahon to turn over her notes and testing materials.

It is plain to this Court that it was the intention of both parties that Dr. McMahon turn over her materials to the State and be deposed prior to trial. Certainly, any objection to this procedure was

waived by the defense team's agreement to provide the materials on behalf of its client. Under Florida law, "[a] party may not invite error and then be heard to complain of that error **[\*\*20]** on appeal." Pope v. State, 441 So. 2d 1073, 1076 (Fla. 1983). Here, the "error" asserted by the appellant was not only invited, it was fully discussed, agreed to, and officially sanctioned by the trial court in two orders. At this late stage in the proceedings, the appellant certainly cannot assert that the trial court prejudiced his case by approving the arrangement between his lawyers and the State. We deny relief based upon this claim.

IV. Stipulation to Prior Violent Felony Convictions

At the outset of the penalty phase, the defense renewed its offer to stipulate to the previous violent felony and under sentence of imprisonment aggravators, but the court ruled that the State was entitled to decline the offer and present evidence concerning the prior felonies. The State then elicited testimony from Mary Louise Hamilton and Michael Bishop, both of whom were working at a convenience store the appellant robbed in 1980. Next, Judith and Earl Turner testified regarding the appellant's burglary of their home, during which he attacked the couple as they slept, covering Mrs. Turner's face with his hand while striking Mr. Turner in the head with a three-hole punch. **[\*\*21]**

Finally, the State presented Bonnie Primeau to testify with regard to a sexual assault perpetrated upon her in 1989. During the attack, she was dragged out of a convenience store, pushed over a wall (resulting in her leg being broken), endured Cox's unsuccessful attempts to orally and anally rape her, and was then vaginally raped by Cox. Our examination of the record reveals that each of these witnesses tersely **[\*716]** related the crimes committed against them, and each was able to do so without any emotional display.

Appellant asserts that the introduction of this evidence was contrary to the holding of Old Chief v. United States, 519 U.S. 172, 136 L. Ed. 2d 574, 117 S. Ct. 644 (1997), and resulted in a deprivation of his rights to due process and a fair trial. Both Old Chief, 519 U.S. 172 and this Court's decision implementing Old Chief, 519 U.S. 172 in Florida, Brown v. State, 719 So. 2d 882 (Fla. 1998), make their holdings clear:

When requested by a defendant in a felon-in-possession of a firearm case, the trial court must approve a stipulation whereby the parties acknowledge that the defendant is, without further elaboration, a prior convicted felon.

Id. at 889. **[\*\*22]** The United States Supreme Court decision turned on the Court's conclusion that in cases where "the point at issue is a defendant's legal status," the probative value of live testimony describing the defendant's prior felony is outweighed by the risk of unfair prejudice such evidence also carries. See Old Chief, 519 U.S. at 185-92. While both opinions addressed broader issues in the form of dicta, this Court explicitly limited its holding to felon-in-possession of a firearm cases. See Brown, 719 So. 2d at 889.

It is clear that this Court has not construed Old Chief, 519 U.S. 172 to have established a rule of law that those found guilty of first-degree murder may simply stipulate to prior violent felony convictions and thereby prohibit the State from introducing any evidence thereof whatsoever. In Elledge v. State, 706 So. 2d 1340 (Fla. 1997), a case decided eight months after the Supreme Court's Old Chief, 519 U.S.172 decision, we stated:

Elledge next asserts that the trial court erred in allowing the state to introduce the details of two prior violent felony convictions . . . because he offered to stipulate to their validity. This issue has been decided **[\*\*23]** adversely to Elledge. We likewise find from our review of the record that the details of the two prior homicides did not become a feature of the case. Thus, we find no error.

Id. at 1344 (citations omitted); see also Rhodes v. State, 547 So. 2d 1201 (Fla. 1989); Tompkins v. State, 502 So. 2d 415 (Fla. 1986).

We have consistently stated that "any relevant evidence as to the defendant's character or the circumstances of the crime is admissible [during capital] sentencing" proceedings. Stano v. State, 473 So. 2d 1282, 1286 (Fla. 1985); see also Rhodes, 547 So. 2d at 1204 ("Testimony concerning the

events which resulted in the [prior] conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence."); § 921.141(1), Fla. Stat. (2001) ("In the [capital sentencing] proceeding, evidence may be presented as to any matter that the court deems relevant to . . . the character of the defendant . . . . "). Thus, the holdings of Old Chief, 519 U.S. 172 and **[\*\*24]** Brown, 719 So. 2d 882 are not properly analogized to this capital sentencing proceeding, where "the point at issue" is much more than just the defendant's "legal status."

☞As "admission of evidence is within the discretion of the trial court and will not be reversed unless there has been a clear abuse of that discretion," Ray v. State, 755 So. 2d 604, 610 (Fla. 2000), there is no basis to reverse the ruling of the court below admitting testimonial evidence of the appellant's prior violent felonies at trial. This evidence was not emphasized to the level of rendering the prior offenses **[\*717]** a central feature of the penalty phase. n12 See Rodriguez v. State, 753 So. 2d 29, 44-45 (Fla. 2000); Finney v. State, 660 So. 2d 674, 683 (Fla. 1995). Therefore, we affirm the trial court's decision allowing the admission of this evidence.

- - - - - - - - - - - - - - - - - - Footnotes- - - - - - - - - - - - - - - - - -

n12 The record reflects each witness's simply relating Cox's crimes against him or her. No emotional displays or breakdowns occurred.

- - - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - - -

V. Prosecution's **[\*\*25]** Misstatements of Law and Improper Argument

Misstatements of Law

During jury selection, the prosecutor misstated Florida law by advising the prospective jurors that if "the evidence in aggravation outweighs the evidence in mitigation, the law says that you must recommend that Mr. Cox die." (Emphasis supplied.) The substance of this statement was repeated five times to the jury, four times during voir dire and once during closing argument. It is unmistakable that these statements are improper characterizations of Florida law regarding the weighing of mitigators and aggravators, as we have declared many times that ☞"a jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors." Henyard v. State, 689 So. 2d 239, 249-50 (Fla. 1996); see also Gregg v. Georgia, 428 U.S. 153, 203, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976) (holding that a jury can dispense mercy, even where the death penalty is deserved); Alvord v. State, 322 So. 2d 533, 540 (Fla. 1975). Additionally, Florida statutory law details the role of a penalty phase jury, which directs the jury panel to determine the proper **[\*\*26]** sentence without precise direction regarding the weighing of aggravating and mitigating factors in the process:

After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:

☞(a) Whether sufficient aggravating circumstances exist . . .

(b) Whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist; and

(c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.

§ 921.141(2), Fla. Stat. (2001). The defense in this case did not, however, object to the State's mischaracterization of the law at any time.

Despite the lucidity of the law here, and the unavoidable conclusion that the prosecution's comments during Cox's trial were error, we hold that no fundamental error occurred in the instant case. ☞Fundamental error "reaches down into the validity of the trial itself to the extent that a verdict of

guilty could not have been obtained without the assistance of the alleged error." Kilgore v. State, 688 So. 2d 895, 898 (Fla. 1996) (quoting State v. Delva, 575 So. 2d 643, 644-45 (Fla. 1991)). **[\*\*27]** During voir dire, the prosecutor made the following additional statement:

Well, maybe I'm being a little too simplistic here. What the law says is that you need to weigh the evidence against and weigh it in the other direction, and depending upon which way it balances out, that is supposed to decide your recommendation. You're supposed to make your recommendation based on the weight. It's not worded that way, but that's a short rendition.

Also, the trial court did not repeat the prosecutor's misstatements of the law during its instruction of the jury--indeed, the **[\*718]** trial court's instructions properly informed the jury of its role under Florida law. Thus, the prosecutorial misrepresentation of the law was harmless error, and certainly does not constitute fundamental error. See Henyard, 689 So. 2d at 250 (holding that three of precisely the same prosecutorial misstatements of the law, when accompanied by correct jury instruction on the matter, were harmless error).

The State's Closing Argument

The appellant also asserts that the State presented improper argument on two occasions during its final penalty phase summation. First, Cox identifies the following **[\*\*28]** statement as improper: "I stand before you again today on behalf of the decent law-abiding people of this community and this state, whom I represent." Referring this Court to King v. State, 623 So. 2d 486 (Fla. 1993), Cox argues that this statement "intended to and [did] inject elements of emotion and fear into the jury's deliberations," and as such, was "far outside the scope of proper argument." Id. at 488 (quoting Garron v. State, 528 So. 2d 353, 359 (Fla. 1988)).

The appellant asserts that this statement fits into the category of a wrongful "message to the community" argument. See Campbell v. State, 679 So. 2d 720, 724-25 (Fla. 1996); Bertolotti v. State, 476 So. 2d 130, 133 (Fla. 1985). In Campbell, 679 So. 2d 720, the prosecutor stated: "The death penalty is a message sent to a number of members of our society who choose not to follow the law." 679 So. 2d at 724. In Bertolotti, 476 So. 2d 130, the statement was: "Anything less in this case would only confirm what we see running around on the bumper stickers of these cars, and that is that only the victim gets the death penalty." 476 So. 2d at 133 n.3. **[\*\*29]** In holding that this type of argument is impermissible, this Court deemed it an "obvious appeal to the emotions and fears of the jurors." Id. at 133. The statement made by the prosecutor during Cox's trial proceeding, however, is not this type of intolerable argument. Here, the State Attorney only stated whom he represented--albeit in a somewhat grandiose manner. He certainly did not make any "message to the community" argument.

Finally, the appellant argues that when the prosecutor addressed Cox's traumatic childhood by asking that the jury "put that in its proper context, it happened more than twenty-five years before the defendant decided to kill Thomas Baker," he "improperly denigrated valid mitigating evidence." In Brooks v. State, 762 So. 2d 879 (Fla. 2000), this Court held:

The prosecutor's characterization of the mitigating circumstances as "flimsy," "phantom," and repeatedly characterizing such circumstances as "excuses," was clearly an improper denigration of the case offered by Brooks and Brown in mitigation.

Id. at 904. Certainly, evidence of Cox's traumatic childhood is valid mitigation, see Nibert v. State, 574 So. 2d 1059, 1062 (Fla. 1990); **[\*\*30]** however, the prosecutor here did not denigrate or otherwise disparage this mitigation with the statement cited by the appellant. This comment was designed to convey the concept that while the mitigator may be valid, perhaps its weight should be somewhat discounted because of the passage of time and the lack of an evidentiary nexus to the defendant. This is a valid argument. See Trease v. State, 768 So. 2d 1050, 1055 (Fla. 2000) (holding that "there are circumstances where a mitigating circumstance may be found to be supported by the record, but given no weight").

As the prosecutorial comments noted by the appellant do not, either individually or cumulatively, amount to fundamental error, **[\*719]** we decline to disturb the holding of the court below.

VI. Heinous, Atrocious, or Cruel Aggravating Factor

The appellant contends that the murder of Thomas Baker was a simple "single stab wound murder." Accordingly, he argues that the evidence introduced at Cox's trial does not support the finding of the heinous, atrocious, or cruel aggravating factor. Since the appellant did not intend to cause his victim excessive pain or mental anguish, did not torture Baker prior to his **[\*\*31]** death, and merely stabbed him in the back during an attack, Cox urges this Court to hold that there is insufficient evidence supporting the trial court's finding of this aggravator.

The function of this Court when it is reviewing aggravating factors on appeal is well settled:

⊼It is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt--that is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.

Alston v. State, 723 So. 2d 148, 160 (Fla. 1998) (quoting Willacy v. State, 696 So. 2d 693, 695 (Fla. 1997). Thus, the analysis of this claim must begin with the trial court's sentencing order. In its order, the trial court specifically found that the victim, who according to the witnesses was obviously scared, was kicking and trying to get away, and he repeatedly pleaded that he had not taken Cox's money or broken into the locker. Unfortunately, the victim's plaintive appeal **[\*\*32]** fell on deaf ears and the homicidal attack continued for several minutes, during which Mr. Baker curled up in the fetal position.

Additionally, the trial court found that immediately prior to his death, the victim was in great distress, scared, and hysterical. . . . He was conscious throughout this ordeal for at least fifteen minutes, during which time he constantly experienced difficulty breathing and expressed great fear and apprehension.

Finally, the court discussed the law it was applying in the following portion of its order:

Numerous stab wounds will support this aggravator, see Pittman v. State, 646 So. 2d 167 (Fla. 1994), as will circumstances where the victim drowned in his own blood and has a substantial period of time to consider his demise . . . just like Mr. Baker. See Cummings[-El] v. State, 684 So. 2d 729 (Fla. 1996); Cole v. State, 701 So. 2d 845 (Fla. 1997); Lusk v. State, 446 So. 2d 1038 (Fla. 1984).

The State has proven this aggravating circumstance beyond and to the exclusion of every reasonable doubt and it is entitled to great weight.

This Court must now evaluate the trial court's **[\*\*33]** sentencing order and the record on appeal to make certain that the correct law was applied below, and that evidence sufficient to support application of the heinous, atrocious, or cruel aggravating factor is present in the record. See Alston, 723 So. 2d at 160.

The trial court was certainly not mistaken in finding that the victim's lungs filling up with blood due to the attack and his concomitant awareness of his impending death supported application of HAC in the instant case. Indeed, this Court's decision in Cummings-El v. State, 684 So. 2d 729 (Fla. 1996), is particularly **[\*720]** instructive. In holding that the HAC aggravator was properly applied, we stated:

Good [the victim] sustained numerous stab wounds . . . and the medical examiner testified that her death was caused by her lungs filling up with blood--she drowned in her own blood. Eyewitnesses said Good was conscious for several minutes after the stabbing and asked what was taking the paramedics so long. Good had a substantial period of time in which to contemplate her impending doom.

Id. at 731. In another evaluation of the propriety of the HAC aggravator, this Court reviewed **[\*\*34]** the following sentencing order and found that the aggravating circumstance had been properly applied:

After being stabbed . . . Ms. Minas must have been aware of what was happening to her, and must have known she was going to die. The killing was not done quickly or painlessly. She lingered for at

least ten minutes while she ble... ..o death. She suffered pain and fear, ...he while feeling helpless and alone . . . .

Jimenez v. State, 703 So. 2d 437, 441 (Fla. 1997). Obviously, a victim's suffering and awareness of his or her impending death certainly supports the finding of the heinous, atrocious, or cruel aggravating circumstance where there is a merciless attack and beating as occurred here.

The appellant's primary contention here is that "it is well-settled that the aggravator does not apply unless it is clear that the defendant intended to cause unnecessary and prolonged suffering." This declaration, however, is incorrect. Indeed, in Guzman v. State, 721 So. 2d 1155 (Fla. 1998), this Court held:

The intention of the killer to inflict pain on the victim is not a necessary element of the [HAC] aggravator. As previously noted, the HAC aggravator [**35] may be applied to torturous murders where the killer was utterly indifferent to the suffering of another.

Id. at 1160; see also Bowles v. State, 804 So. 2d 1173, 1177 (Fla. 2001) (citing Guzman, 721 So. 2d 1155 for the proposition that "there is no necessary intent element to [the] HAC aggravating circumstance"); Hitchcock v. State, 755 So. 2d 638, 644 (Fla. 2000) (same). The appellant's contention that the trial court did not apply the correct rule of law here is without merit. Here we are faced with a torturous murder and a total indifference to the human suffering of the victim.

Likewise, we conclude that the trial court had competent, substantial evidence before it that supports its finding the heinous, atrocious, or cruel aggravator. Dr. Pillow, a forensic pathologist, testified that a person with the victim's wounds would be in acute pain, and that he would feel his "lungs fill up with blood or [feel] air hunger or [have] a problem breathing," while he was still conscious. Brack Johnson, Susan Parker, and Joseph McBrayer, the corrections officers who attended to Baker following the attack, testified that he was "struggling and [**36] obviously in great pain," knew that his lungs were filling up with blood, and "was very scared, hysterical." An inmate witness testified that Baker said, "Ms. Parker, please don't let me die." Finally, the numerous inmate witnesses to the killing all testified that Cox was absolutely merciless in his beating and stabbing of the victim. n13 We conclude that the court below applied the correct law, and had substantial evidence before it supporting the heinous, atrocious, or cruel aggravating factor. The aggravator was properly applied here.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n13 Two of the witnesses to the killing even testified that some of the spectators to the fight urged Cox not to stab him any more, but he continued to do so.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

[*721] VII. Cold, Calculated, and Premeditated Aggravator

The appellant argues that the cold, calculated, and premeditated aggravator does not apply here because Cox committed murder while in the throes of an anger-filled period of his life. As he killed the victim in a fit of rage in front of 200 inmates, he contends [**37] that this murder was anything but cold, calculated, and premeditated. Also, Appellant asserts that he had a pretense of legal or moral justification, because he was reacting to the burglary of his cell and footlocker.

As an initial matter, it is clear from the record that the trial court applied the correct rule of law. In its sentencing order, the court stated:

In Jackson v. State, 648 So. 2d 85 (Fla. 1994), the Florida Supreme Court found the standard jury instruction on the cold, calculated, and premeditated aggravator (CCP) unconstitutional and reiterated that this aggravating circumstance required proof of the following elements: (1) the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage; (2) that the defendant had a careful plan or prearranged design; (3) that the defendant exhibited

heightened premeditation; and (.) the defendant had no pretense of moral or legal justification.

As we continue to enunciate the same requirements for CCP, see, e.g., Rodriguez v. State, 753 So. 2d 29, 46 (Fla. 2000), the trial court undoubtedly applied the correct rule of law here. **[\*\*38]**

It is just as clear that the appellant's claim regarding an absence of evidentiary support for the trial court's finding of the CCP aggravator is without merit. At trial, the State presented numerous witnesses to show that Cox carefully engaged in a course of action that would allow him to catch and punish the person or people who had burglarized his personal footlocker. First, witnesses testified that upon discovering that he had been victimized, Cox announced that he would give fifty dollars to anyone willing to tell him who the thief was. During the announcement, Cox also stated that when he found the thief, he would "stab," "stick," or "kill" him. Following his announcement to the dorm, Cox procured a shank, confronted the victim, and stabbed him to death. Afterwards, the appellant stated, "I've got one more of you . . . to get," proceeded to his cell, and attacked his cellmate, Lawrence Woods, saying, "You're lucky I put it up, or I'd get [you] too." It is clear that the trial court received sufficient evidence to conclude that the instant murder was cold, calculated, and premeditated. See Alston, 723 So. 2d at 160.

The appellant claims that the trial court **[\*\*39]** erred in finding that "nothing about his asserted 'pretense' [of a moral justification for the murder] rebuts the otherwise cold and calculating nature of this homicide." Cox argues that because he had been the victim of a burglary, and wanted revenge, he "certainly had a pretense of moral or legal justification." In support of this argument, the appellant points to this Court's opinions in Christian v. State, 550 So. 2d 450 (Fla. 1989), and Banda v. State, 536 So. 2d 221 (Fla. 1988). These two cases, however, are easily distinguished. In both, this Court held that the defendant had a pretense of legal or moral justification because he had been seriously threatened by the victim and felt that he had to go on the offensive in order to safeguard his own health. See Christian, 550 So. 2d at 452 ("The record is replete with unrebutted evidence of the victim's threats of violence to Christian and his apparent inclination to fulfill them."); Banda, 536 So. 2d at 225 ("The victim was a violent **[\*722]** man and had made threats against appellant."). Since there is no evidence in the instant case that the appellant was threatened **[\*\*40]** by his victim, and he outweighed Baker by approximately one hundred pounds, these cases are distinguishable.

This case is factually similar to the circumstances addressed in Williamson v. State, 511 So. 2d 289 (Fla. 1987). There, this Court held that since there was "no evidence of any threatening acts by Drew [the victim] prior to the murder," the defendant's claim of a pretense of legal or moral justification failed. Id. at 293. n14 For precisely the same reason, the appellant's claim must fail. The record contains no threat to Cox, real or perceived, from the victim. Thus, we affirm both the trial court's instructions to the jury on, and its finding of, the CCP aggravating circumstance.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n14 This Court's opinions in Zakrzewski v. State, 717 So. 2d 488 (Fla. 1998), and Hill v. State, 688 So. 2d 901 (Fla. 1996), also provide examples of "pretenses" deemed insufficient. See Zakrzewski, 717 So. 2d at 492 (killing one's own family to save them from having to go through a divorce does not constitute a pretense of legal or moral justification); Hill, 688 So. 2d at 907 (killing people to prevent them from performing legal abortions is not a valid pretense of legal or moral justification).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

**[\*\*41]**

VIII. Mitigating Circumstances

At the outset, it is important to note Kearse v. State, 770 So. 2d 1119 (Fla. 2000), wherein this Court held:

"Deciding the weight to be given a mitigating circumstance is within the trial court's discretion, and its decision is subject to the abuse-of-discretion standard. . . . The trial judge is in the best position to judge . . . and this Court will not second-guess the judge's decision . . . .

Id. at 1133. Additionally, "there are circumstances where a mitigating circumstance may be found to be supported by the record, but given no weight." Trease v. State, 768 So. 2d 1050, 1055 (Fla. 2000).

The appellant argues that the trial court improperly assigned certain mitigating circumstances either slight or no weight, based upon a misapplication of the law. First, the appellant argues that the trial court did not assign sufficient weight to the mitigating nature of his childhood. The trial court assigned, at the most, slight weight, because:

Mr. Cox only lived in his parents' home until he was approximately ten years old and his father was not present during some of this time. At age ten [**42] or eleven, Mr. Cox went to live with his grandmother, who was a very loving, comforting, and supporting influence in Mr. Cox's life. Hazel Cox, Mr. Cox's grandmother, provided Mr. Cox with a good life. She took him to church and taught him right from wrong. Furthermore, although Mr. Cox did witness some of the domestic violence that occurred between his parents, so did his siblings and they have not committed crimes over a 20-year span of time.

Cox asserts that this holding is similar to the result condemned by this Court in Nibert v. State, 574 So. 2d 1059 (Fla. 1990). There, the trial court "dismissed" evidence of physical and psychological abuse during the defendant's youth, giving it no weight. See id. at 1062. This Court deemed this unacceptable, stating:

The fact that a defendant had suffered through more than a decade of psychological and physical abuse during the defendant's formative childhood and adolescent years is in no way diminished by the fact that the abuse has finally come to an end. . . . Nibert reasonably proved this nonstatutory mitigating circumstance, [*723] and there is no competent, substantial evidence to support the trial court's [**43] refusal to consider it.

Id. The difference between the instant case and Nibert, 574 So. 2d 1059, however, is that the trial court here acted well within the bounds of its discretion in considering the proffered mitigators and assigning slight weight to certain of them. As ☂"mere disagreement with the force to be given [mitigating evidence] is an insufficient basis for challenging a sentence," Porter v. State, 429 So. 2d 293, 296 (Fla. 1983) (quoting Quince v. State, 414 So. 2d 185, 187 (Fla. 1982)), this portion of the appellant's claim must fail.

The appellant also argues that the trial court wrongfully required a "nexus" between mitigating circumstances and the murder, before they would be assigned any weight. Clearly, ☂Florida law does not require that a proffered mitigating circumstance have any specific nexus to a defendant's actions for the mitigator to be given weight. However, an examination of the record and sentencing order reveals that the trial court did not enforce a nexus requirement; it simply attempted to place the appellant's mitigation evidence in context. n15 The trial court's holdings regarding certain of the appellant's proffered [**44] mitigators resulted from an absolute dearth of evidence contained in the record supporting the notion that the cited mitigators are relevant to the defendant in the instant case. ☂As the record "contains competent, substantial evidence to support the trial court's rejection of these mitigating circumstances," Kight v. State, 512 So. 2d 922, 933 (Fla. 1987), the trial court's refusal to grant these four mitigators any weight was not improper.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n15 For example, the trial court addressed a proffered mitigating circumstance by stating:

While the evidence supports the existence of his heightened anxiety in dealing with other people, the evidence does not support any conclusions or even speculations as to how it contributed to Mr. Cox's decisions and actions that led to Thomas Baker's death. . . . Thus, while established by Dr. McMahon's opinion, the court declines to afford any weight to this circumstance.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

☂

IX. Proportionality and Sufficiency of the Evidence

It is well settled that this Court **[\*\*45]** conducts its proportionality review in capital cases by performing "a comprehensive analysis in which it determines whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby providing for uniformity in the application of the sentence." Rose v. State, 787 So. 2d 786, 804 (Fla. 2001). We conclude that in comparison with other decisions of this Court upholding the imposition of the death penalty, the sentence given Mr. Cox is not disproportionate.

The instant murder was a carefully planned, conscienceless act that fully deserves the application of the CCP and HAC aggravating factors. This Court has made it clear that these factors are "two of the most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999). Additionally, the trial court properly applied the prior conviction for violent felonies and the under a sentence of imprisonment aggravators. In mitigation, the trial court found thirty-two nonstatutory mitigating factors, nineteen of which it accorded "slight" or "little" to "some" weight. n16

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n16 The trial court accorded only three of the mitigators "some" weight: (1) Cox's parents divorced and remarried only to divorce again; (2) Cox's mother abandoned him when he was eleven years old; (3) Cox behaved during the trial proceedings.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[\*\*46]**

The pitiless murder perpetrated by the appellant can certainly be characterized as **[\*724]** "one of the most aggravated and least mitigated murders" before this Court. Kramer v. State, 619 So. 2d 274, 278 (Fla. 1993). In the past, we have deemed the death penalty the appropriate punishment in cases where less aggravation and more mitigation existed. See Rose v. State, 787 So. 2d 786 (Fla. 2001) (upholding the death penalty where four aggravators--murder committed while on probation, prior violent felony, murder committed during a kidnapping, and HAC--and seven nonstatutory mitigators properly applied); Mansfield v. State, 758 So. 2d 636 (Fla. 2000) (death penalty deemed proportional where HAC and crime committed during the commission of a sexual battery aggravators found, and five nonstatutory mitigating circumstances found); Way v. State, 760 So. 2d 903 (Fla. 2000) (death penalty proportional where trial court found prior violent felony, murder committed during the commission of a felony, HAC, and CCP aggravators; two statutory mitigators; and seven nonstatutory mitigating circumstances); Sliney v. State, 699 So. 2d 662 (Fla. 1997) **[\*\*47]** (finding the death penalty proportional where the murder occurred during a robbery and murder was committed to avoid arrest, two statutory mitigators existed, and a number of nonstatutory mitigators applied). Thus, the death sentence is proportional here.

While not challenged by the appellant, it is clear that the evidence introduced in the instant case was sufficient for the jury to have found beyond a reasonable doubt that Allen Cox murdered Thomas Baker. Multiple witnesses provided the facts which corroborated the State's theory that Cox became angry that he had been made the victim of a theft, tracked down a person he thought was involved in the theft, and killed him. The only contradictory evidence introduced at trial was the testimony of the appellant himself. We find that sufficient evidence exists in support of the jury's decision finding Cox guilty of first-degree murder.

X. Constitutionality of the Florida Death Penalty

The appellant asserts that the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), requires this Court to engage in a wholesale reevaluation of the Florida death **[\*\*48]** penalty scheme. He argues that Florida's death penalty scheme is unconstitutional because it does not require notice to the defendant by the State of the aggravating circumstances it plans to pursue at trial, does not require specific jury findings regarding sentencing factors, permits a non-unanimous recommendation of death, and improperly shifts the

burden and standard of proof during the penalty phase.

The appellant's claim, however, was resolved by this Court in Mills v. Moore, 786 So. 2d 532 (Fla. 2001). n17 Therein, we held:

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n17 We note that the United States Supreme Court has granted certiorari in State v. Ring, 200 Ariz. 267, 25 P.3d 1139 (Ariz. 2001), cert. granted, 122 S. Ct. 865 (2002). However, unless and until the United States Supreme Court recedes from Walton v. Arizona, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), and Proffitt v. Florida, 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976), we see no need to revisit our Mills, 786 So. 2d 532 decision and will follow precedent.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[\*\*49]**

The majority opinion in Apprendi, 530 U.S. 466 forecloses Mills' claim because Apprendi preserves the constitutionality of capital sentencing schemes like Florida's. Therefore, on its face, Apprendi is inapplicable to this case.

Id. at 537. Additionally, all of the individual facets of Cox's claim have previously been rejected. This Court has held that ✦since all of the possible aggravating factors are detailed in section 921.141(5) of the **[\*725]** Florida Statutes, "there is no reason to require the State to notify defendants of the aggravating factors it intends to prove." Vining v. State, 637 So. 2d 921, 927 (Fla. 1994); see also Mann v. Moore, 794 So. 2d 595, 599 (Fla. 2001). We have also rejected the assertions that the trial jury constitutionally must make specific written findings, and its verdict recommending the death penalty must be unanimous. See Randolph v. State, 562 So. 2d 331, 339 (Fla. 1990); Mann, 794 So. 2d at 599. Finally, this Court "has repeatedly held that ✦there is no merit to the burden shifting claim." Freeman v. State, 761 So. 2d 1055, 1067 (Fla. 2000); **[\*\*50]** see also Shellito v. State, 701 So. 2d 837, 842-43 (Fla. 1997). Based upon the fact that all of the arguments presented by the appellant here have previously been decided adversely to his assertions, we decline to overturn the result reached below and affirm.

Conclusion

In accordance with the above analysis, we hold that the appellant has not presented any legal basis upon which we may set aside his judgment or sentence of death. We affirm the decision of the court below.

It is so ordered.

WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, and LEWIS, JJ., concur.

QUINCE, J., dissents.

Topic: All Topics > Criminal Law & Procedure > Discovery & Inspection > Discovery Misconduct - FL Criminal Cases ⓘ
Terms: misleading or inaccurate (Edit Search)
View: Full
Date/Time: Wednesday, September 18, 2002 - 10:51 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

**STATE OF FLORIDA,**
   **Plaintiff,**

**CASE NO:   2000-2753-CFA**

vs.

**BRIAN HERLIHY,**
   **Defendant.**

_____/

:ILED IN OPEN COURT
___9-25___ 2002
Steve Donaho
D.C.

## MOTION TO REOPEN DEFENDANT'S CASE AND ALLOW
## PREVIOUSLY LISTED STATE WITNESSES TO TESTIFY

**COMES NOW,** the Defendant, BRIAN HERLIHY, by and through undersigned

counsel, and files this Motion to Reopen Defendant's Case and Allow Previously Listed

State Witnesses to Tesify, and in support thereof would state:

1.    This court has previously ruled that Lawrence Levine, M.D. was uncooperative

      during the taking of his deposition, and the Defense would further argue that he

      was less than forthcoming, lacking in candor, and refused to provide information

      that he had made two findings that were not included within his medical report

      furnished to the State, thereafter to the Defense.  This Court ruled that the

      Defense may be permitted to reopen its case on Monday, September 23, 2002,

      and would hear argument at that time on this issue.

2.    The Defense has received information from Michael Bell, M.D. and Sanders

      Duboby, M.D., both previously listed State witnesses, that upon examination of

      the victim's eyes, which were sent to them in South Florida, these two physicians

      (who are both board certified opthalmologists and pathologists) found no

      evidence of a "crack" in either eye upon examination of same, and further they

indicated that the "white spots" observed in the photographs examined by Dr. Levine could have come from any number of sources, including intercranial pressure.

3.      The State has agreed that if the Court permits these witnesses to testify, they can testify before the jury by telephone.

**WHEREFORE**, the Defendant, BRIAN HERLIHY, respectfully requests this Honorable Court to allow the Defense to reopen it's case and present these two witnesses for testimony.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via hand delivery to Jeanne Singer, Esquire, Assistant State Attorney, P.O. Box 1437, Gainesville, FL 32602, on this 23rd day of September, 2002.

**LAW OFFICES OF GROLAND & ASSOCIATES,P.A.**

**Gordon H. Groland, Esquire**
Florida Bar # 137259
**John H. Tedder, Esquire**
Florida Bar #0398616
Post Office Box 2848
Gainesville, FL  32602
Phone: (352) 373-4669 / 373-2885 Fax

0000220

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                                    CASE NO:    2000-2753-CFA
         Plaintiff,

vs.

BRIAN HERLIHY,
         Defendant.
_____/

## MOTION FOR NEW TRIAL

COMES NOW the Defendant, **BRIAN HERLIHY,** by and through his undersigned

attorney, and  pursuant to Rule 3.580, 3.590, and 3.600, Fla.R.Crim.P., and moves this Honorable

Court for a new trial in this cause and as grounds states as follows:

1.   The Defendant was charged by indictment with first degree murder.  On September

     25, 2002, a jury returned a verdict finding the Defendant guilty of manslaughter by

     culpable negligence.

2.   That verdict is contrary to the law in that no evidence was presented at trial which

     would show that the Defendant acted in a way which could be legally sufficient to

     prove the elements of the crime of culpable negligence.

3.   The verdict is contrary to the weight of the evidence.

4.   The Office of the State Attorney violated both the Brady Rule of due process of law,

     and Rule 3.220, Florida Rules of Criminal Procedure, by failing to timely disclose

     material information that might negate the Defendant's guilt, to wit, failing to disclose

     evidence known to the State in the form of the destruction of physical evidence

     following the autopsy and also failing to disclose other evidence relating to an alleged

     cut to the victim's eye, thereby prejudicing substantial rights of the Defendant, Brian

     Herlihy.

State v. Brian Herlihy
Motion For New Trial
Page 2

5.  Further, the Trial Court erred in it's decision, as a matter of law, during the trial, that
the Defense had "opened the door" during the cross examination of Crystal
and during the cross examination of paramedic Donald Meredith, and then allowing
the State to question said witnesses as to untruthful statements allegedly made by the
Defendant, thereby prejudicing substantial rights of the Defendant, Brian Herlihy.

6.  Further, based upon all of the above and foregoing, appropriate jury instructions,
either limiting or cautionary instructions, should have been given to the jury as
requested by the Defense.  Failure to so instruct the jury prejudiced substantial rights
of the Defendant, Brian Herlihy.

**WHEREFORE**, the Defendant, **BRIAN HERLIHY,** requests that this Honorable Court
enter an Order granting the Defendant a new trial in this cause, or in the alternative, a Judgment of
Acquittal.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished
by hand-delivery to JEANNE SINGER, ESQUIRE, State Attorney's Office, P.O. Box 1437,
Gainesville, FL 32602 on this 3rd day of October, 2002.

**LAW OFFICES OF GORDON H.
GROLAND & ASSOCIATES, P.A.**

**Gordon H. Groland, Esquire**
Florida Bar # 137259
Post Office Box 2848
Gainesville, FL  32602
Phone: (352) 373-4669
Fax: (352) 373-2885

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN
AND FOR ALACHUA COUNTY,
FLORIDA

STATE OF FLORIDA,

       Plaintiff,

vs.

                                 CASE NO.    01-2000-CF-2753-A
                                 DIVISION:   II

BRIAN HERLIHY,

       Defendant(s).

_____//

## ORDER DENYING MOTION FOR NEW TRIAL

THIS CAUSE having come before the Court on the Defendant's Motion for New Trial, it

is hereby;

ORDERED AND ADJUDGED that the Defendant's Motion for New Trial is hereby

*DENIED.*

ORDERED in Chambers at Gainesville, Alachua County, Florida this 29 day of October, 2002.

MARTHA ANN LOTT
CIRCUIT JUDGE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished on this 29 day
of October 2002, to the following:

Jeanne Singer, Esquire
Chief Asst State Attorney

Gordon Groland, Esquire
Attorney for Defendant

Judicial Assistant

1

REALTIME TRANSCRIPT
CASE NO: 2000-2753-CFA

STATE OF FLORIDA

vs.

BRIAN PATRICK HERLIHY,

          Defendant.

_____/

FILED IN OPEN COURT
11-8-2002
S. Hilliard
D.C.

| | |
|---|---|
| Proceedings: | Motion to Dismiss Indictment |
| Before: | The Honorable Martha Ann Lott, Circuit Judge |
| Date: | September 5, 2002 |
| Place: | Courtroom 4-A Alachua County Courthouse Gainesville, Florida |
| Reporter: | Stacey K. Bryant Registered Professional Reporter |

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1                      DISCLAIMER

 2            UNCERTIFIED REALTIME TRANSCRIPT

 3

 4      The Stenographic notes taken in this proceeding are

 5  being translated instantaneously into their English

 6  equivalent through an automated process called realtime

 7  translation.  The realtime draft is unedited and uncertified

 8  and may contain untranslated stenographic symbols, an

 9  occasional reporter's note, a misspelled proper name and/or

10  nonsensical word combinations.  All such entries will be

11  corrected on the final certified transcript.

12

13      The above-listed limitations may be due to the realtime

14  software program and/or time constraints placed on this

15  reporter in providing this unedited, noncertified realtime

16  transcript.

17

18      Due to the need to correct entries prior to

19  certification, you agree to use this realtime draft only for

20  the purpose of augmenting counsel's notes and not to use or

21  cite it in any court proceeding.

22

23

24

25
```

Stacey K. Bryant, RPR
Judicial Court Reporter



```
 1                P R O C E E D I N G S

 2                      *  *  *  *  *

 3          THE COURT:  We have a brief matter to take up

 4     before we start many motions in Mr. Herlihy's case and

 5     that is Mr. Cooper.  Does the jail have Mr. Cooper

 6     here?

 7          JAIL PERSONNEL:  We thought we were gonna do him

 8     first, your Honor.  We can get him.

 9          THE COURT:  Where is he, downstairs?

10          JAIL PERSONNEL:  Yes, your Honor.

11          THE COURT:  You don't care which order they go in?

12          JAIL PERSONNEL:  No, your Honor.

13          THE COURT:  Then we'll just do these first.

14     That's fine.

15          MR. GROLAND:  Your Honor, may I just ask the court

16     a question?  I know that your Honor said before we

17     adjourned yesterday that you wanted some written

18     argument if we wanted to do that.  Later when I got

19     back to my office I found out that we had set this for

20     this morning.  So I would ask the court for permission

21     to take five or seven minutes just to sum up factually

22     what we were able to elicit yesterday on my two motions

23     to suppress.

24          THE COURT:  No.  I don't need a summation.  I

25     heard it just yesterday.  I have it very clearly in my
```



```
1    mind.

2         On the other hand, if we complete all these other

3    motions in time, I'll be glad to hear your argument

4    instead of reading a written argument.  Neither the

5    state or the defense is required to argue.  Obviously I

6    want to make sure that you have sufficient information

7    on the record.  But bottom line, I feel personally

8    confident that I can makeup your arguments for you.

9    Now I'm willing to hear them, but I don't need them in

10   order to make a ruling.

11        MR. GROLAND:  For the record I would like if you

12   do have the time indeed, I would like to just take

13   about five or seven minutes to sum up.

14        THE COURT:  I'm not gonna listen to the facts

15   again, but I'll be glad to listen to your argument if

16   we have time.

17        MR. GROLAND:  Okay.

18        THE COURT:  Good enough.

19        MS. SINGER:  I just want to ask if the court got

20   the hand delivery yesterday?

21        THE COURT:  Yes.  I have a huge hand delivery.

22        MS. SINGER:  I just want to make sure.  It was

23   late coming.

24        THE COURT:  All right.  Now we still have a long

25   list of motions.  I obviously have no investment in
```

1   what order we take them.  Does either the state or the

2   defense have any request in what order we take them?

3        MR. GROLAND:  We've got two other pending.

4   They've got I think some eight other motions, some of

5   which we agree to.

6        THE COURT:  Okay.

7        MS. SINGER:  I think the most important motion,

8   Judge, that would be a motion that I think we need to

9   spend the most time on, is Mr. Groland and

10  Mr. Herlihy's motion to dismiss the indictment because

11  obviously if that's a motion that's granted at this

12  time, all the other motions don't need to be heard

13  today.

14        THE COURT:  Okay.  Mr. Groland, would you mind

15  taking that one first?

16        MR. GROLAND:  Let me just say this, your Honor, we

17  did not learn this information about the evidence being

18  destroyed until just this past Friday.  We can't tell

19  from the face of the autopsy report from Dr. Hamilton

20  that that occurred.  We didn't know it until we took

21  his deposition.

22        We have filed this motion, but our feeling is that

23  the court, in order to make a fully informed decision

24  on this, needs to have some input from our pathologist

25  as to how significant this piece of evidence that is no



```
 1        longer available is.  And what I would propose to the
 2        court since he is out of state and is not gonna be here
 3        until the middle of the trial and we cannot hear this
 4        motion during the middle of trial, it has to be done
 5        before we select a jury, is that we just arrange for --
 6        and this is not gonna have to be a one hour telephone
 7        conference with him, but we arrange for a time to have
 8        right before jury selection when Dr. Plunkett can be
 9        available on the phone and can just inform the court as
10        to what our position is about the destruction of this
11        evidence.
12             THE COURT:  Let me ask both the state and defense
13        how long you anticipate this jury selection taking?
14             MS. SINGER:  One day.
15             THE COURT:  Well, when you say one day, are you
16        talking about eight hours, 12 hours?
17             MR. TETTER:  Judge, I think it could take more
18        than one day.  I would like to hope we could in one
19        day, but --
20             THE COURT:  It's gonna be one day even if it takes
21        us 'till midnight.  Let me clear that one up for you.
22             MR. TETTER:  Well, one of the biggest concerns I
23        have, Judge, is of course how much any of the potential
24        jurors may have known about this case through pretrial
25        publicity.  There hasn't been much lately.  I know
```

1    there was a lot initially.

2         What more concerns me is what if anything these

3    potential jurors know or opinions they may have about

4    the diagnosis commonly known as shaken baby syndrome

5    and I think we may very well have to individual voir

6    dire on some of those folks.

7         THE COURT:  You may request individual voir dire

8    is what you mean.

9         MR. TETTER:  Yes, ma'am, may request it.  All I'm

10   saying is, I would hate to have somebody get up and

11   start spewing forth what they think about shaken baby

12   syndrome to a room full of folks and taint the whole

13   jury panel.

14         THE COURT:  I understand.  Of course we will make

15   sure that that does not happen.  It may or may not

16   require individual voir die.

17         I'll tell you this:  As I just said, voir dire in

18   this case is going to take one day and we will start as

19   early as we can on Monday and we will go as late as we

20   need to on Monday.  This case is allocated for two

21   weeks for trial, which of course affects also the

22   state's motion to call one of their witnesses at a time

23   certain.  But this case is not gonna be dragged out.

24   We will go as late as we need to on a daily basis in

25   order to make sure that this case is tried in two



1    weeks.  So be prepared for that.

2         MR. TETTER:  I think we should be able to get it

3    done in two weeks.

4         THE COURT:  There will be no gaps in the

5    presentation of testimony.  We're not gonna recess the

6    trial for hours or days waiting for the next witness.

7         MR. TETTER:  Well, Judge, we have two witnesses

8    who are out of state and we're making every effort to

9    get them here.  One of them is from Virginia, a

10   neuropathologist, is gonna charge an extremely heavy

11   fee and we need to be certain -- We told him we're

12   gonna call him on September the 18th.  We hope that

13   will be agreeable with the court.

14        THE COURT:  What day is the 18th?

15        MR. TETTER:  That's Wednesday the second week.

16   Monday, that day is a holiday.  So the state has

17   indicated they're planning on calling their out of

18   state witness on that Tuesday.

19        THE COURT:  That's what they're hoping for, but I

20   think that motion --

21        MS. SINGER:  Your Honor, we actually have -- we

22   have actually delineated the witnesses.  We have 47

23   witnesses and we will be well into the Tuesday of the

24   17th with our case in chief unquestionably.  We will be

25   well into that.  I've given them minimum amounts of

```
 1        time not counting the cross-examination that they're

 2        gonna do and I've got a number of witnesses to get us

 3        through to that day.

 4             THE COURT:  Right.  Having tried cases of this

 5        nature before, as have all of you, I know full well the

 6        complications of out of state witnesses and I know full

 7        well that many things that happen in a trial cannot be

 8        anticipated down to the minute, much less down to the

 9        hour.  And what I'm telling you is, the case will not

10        be delayed while we're waiting for a witness that you

11        told they could come late.

12             So, however you need to arrange it so that your

13        witnesses are available, the case is scheduled for

14        trial for two weeks and a subpoena is good for the term

15        of the trial as you all know and that's the basis on

16        which we'll proceed.

17             MS. SINGER:  Your Honor, we're not working on

18        Saturday, Sunday or Monday?

19             THE COURT:  We are not working on Saturday, Sunday

20        or Monday.

21             MS. SINGER:  Because we could get him there then

22        if we were going to have the jury work those days.  But

23        he's scheduled for the Tuesday morning and I'm sure we

24        will be -- I'm almost positive we're gonna be well into

25        the Tuesday for trial with other witnesses as well.  So
```

1    I feel confident that we're in good shape with that.

2         THE COURT:  Okay.  Good enough.  Your motion's

3    denied.  Just schedule him specially.

4         And for the record, the motion to set that doctor

5    specially was insufficient in the grounds stated to

6    schedule him on that date because at the very least, he

7    could fly in on Friday morning and testify Friday

8    afternoon if necessary.

9         MS. SINGER:  Okay.  That's fine.

10        THE COURT:  All right.

11        MS. SINGER:  I do want to address the issue of the

12   motion to dismiss, Mr. Groland's request that we

13   continue it for some other time.

14        First of all, although we did get the motion in

15   writing yesterday morning, the state is prepared to

16   argue that motion today.  It is a pretrial motion that

17   would be subject to appeal.  The state does not want to

18   waive any rights to appeal on that motion.  We believe

19   that it is groundless and that the court would be able

20   to have sufficient information today to make a ruling

21   on it.

22        If it's going to become an evidentiary hearing and

23   we're going to call Dr. Plunkett, then is the court

24   going to then require us to call the number of

25   witnesses we have to contest Dr. Plunkett, which really



1      forms the basis of our argument that we're discussing a

2      factual issue here, not the destruction of evidence?

3          THE COURT:  We're going to hear that motion today

4      and I'm going to allow the defense to proffer what

5      testimony would be offered if that expert witness were

6      called at that motion hearing.

7          MS. SINGER:  May the state also proffer what it's

8      witnesses would say?

9          THE COURT:  Yes.

10         MR. GROLAND:  We can proffer what our doctor would

11     say?

12         THE COURT:  Yes.  Now in that regard as the state

13     says, since this is an order that the state would have

14     the right to appeal if the motion is granted, then

15     that -- basically that one has to be heard first and we

16     might as well proceed with it.

17         MR. TETTER:  Your Honor, I have not had a chance

18     to talk to our pathologist about this evidence,

19     Dr. Plunkett.  I tried to call him and have been unable

20     to reach him.  He goes to various states.  I just

21     haven't been able to reach him.  So I don't know

22     exactly what he would say.  I would not be in a

23     position to proffer this.  As I said, we were totally

24     unaware of this evidence until last Friday.

25         THE COURT:  Why don't you just tell me what you do

1    have then.

2         MR. TETTER:  I will.  Yesterday, your Honor, we

3    did depose Dr. Stephen Nelson, who is the state's

4    neuropathologist by telephone.  Mr. Pennypacker was

5    there.  I don't recall exactly what he said obviously,

6    but I do recall him saying that the fact the dura of

7    this child was not saved and presented to him for

8    further examination.  It was a very significant piece

9    of evidence that he would have liked to have had

10   because he knew going into that examination of the

11   child's brain, that a major issue in this case was

12   whether or not there were pre-existing chronic subdural

13   hematomas.

14        And I have a also talked to another expert of

15   ours, Dr. Uscinski, who is a neuropathologist --

16        MS. SINGER:  He's a neurosurgeon.

17        MR. TETTER:  Neurosurgeon, excuse me.  And he

18   testified it would be very easy to destroy the evidence

19   of a chronic subdural hematoma if the skull was not

20   opened properly and that is very significant.  When he

21   left, he said, I'll leave that to Dr. Plunkett as far

22   as what significance not having the dura preserved for

23   further examination was.

24        I mean, that's all I can tell you now.  I wish I

25   had a transcript of what Dr. Nelson said, but he's



1  their state's witness and he thought it was pretty

2  significant, and please correct me if I'm wrong,

3  Mr. Pennypacker.

4      MR. PENNYPACKER:  He thought it was significant,

5  but he also said that's not the cause of death.  It

6  wouldn't change his opinion one way or another whether

7  he had access to that dura or not.

8      MR. GROLAND:  Clearly that's not the cause of

9  death.  It has to do with what happened on August 2nd

10  whether or not a prior hematoma rebled, caused a

11  seizure and that caused the event to occur.  Clearly

12  the cause of death is anoxia, deprivation of oxygen.

13  That's certainly not in dispute.

14      Your Honor, just so the court knows, the way that

15  Mr. Tetter and I have divided this up, is he's

16  basically addressing all of the medical in the case and

17  I'm doing the lay witnesses, police officers.  I just

18  wanted your Honor to know that.

19      THE COURT:  Good.  That will help me because of

20  course in trial rather than list everybody's name to

21  the extent that I have information or the ability to, I

22  try to call the name of the lawyer who's gonna come

23  forward and that might save a little confusion with the

24  jury.  Of course we'll work that out as we go along,

25  but thanks for that clarification.

1        Anything else the state wants to say by way of a

2    proffer or argument as to that motion?

3        MS. SINGER:  Yes, your Honor.  I have a number of

4    cases and I don't know -- Are you -- You're standing

5    just on your written motion and you're ready to hear

6    the state's argument?

7        THE COURT:  They've offered me everything they

8    have at this time.

9        MS. SINGER:  Yes, your Honor.  I do have a number

10   of items I would like to present and proffer first.  I

11   would like to proffer a copy of the deposition of

12   Bernie Maria, M.D.  Before I make my legal argument,

13   your Honor, if I might, I'm specifically citing in the

14   deposition page 114 -- Pardon me, your Honor.  Wrong

15   page number.  Yes, it was 114.  114 and through the end

16   of that examination where I asked Dr. Bernie Maria, who

17   for the court's information, is the pediatric

18   neurologist who actually treated    _ ____    who is

19   now the head of pediatrics for the University of

20   Missouri College of Medicine and who has rendered an

21   opinion in this case that this child suffered from a

22   brain injury that occurred between 9:00 -- I'm going to

23   give an estimate of time, between 9 o'clock and 10

24   o'clock when the child was in the hospital and that

25   this was not the result of an older injury.



1      And when I asked him about the pathologist, he did

2    read the CT scans.  When I asked him about the

3    pathologist, he -- My question was, If the pathologist

4    did not see evidence of a hygroma or chronic subdural

5    hematoma, would that in any way change the mechanics of

6    injury in this case?  The answer was, No.  Would the

7    fact that the pathologist did not see hygroma or

8    chronic subdural hematoma support your opinion or

9    conclusion that what appears to be hygroma on the CT

10   scans is in fact something other than that, because if

11   it was a hygroma, it would not have increased in size

12   as you have noted in your testimony.  His answer was,

13   Yes.

14      I'm going to proffer the entire deposition, your

15   Honor, because I understand that what I'm citing to you

16   now doesn't make sense unless you read what his opinion

17   is, which is earlier in the deposition.  But I do want

18   to make this part of the record at this time.

19      Also I want to make a part of the record the

20   deposition of William Hamilton.  I know Mr. Pennypacker

21   now is looking for page and line as to specifics in

22   that deposition.

23      But I would advise the court that Dr. Hamilton did

24   state on the deposition that he followed the standard

25   procedures in his autopsy and in my argument I will be

1   providing the court with the administrative rules

2   regarding body parts in autopsy and Dr. Hamilton laid

3   out for the defense in his deposition that he did

4   follow the rules, that it is not essential to save the

5   dura.  It would have been nice to save the dura.  He

6   intended to save the dura.

7        Inadvertently, by accident, there's no showing

8   whatsoever of bad faith, the dura was buried with the

9   child and given back to the family.  And when I show

10  you the administrative rules, I would like to explain

11  to the court what the obligations of the medical

12  examiner are.  Once the autopsy is completed they have

13  a duty to return the body parts to the next of kin for

14  appropriate disposition in this case, burial.

15       His testimony, and we will proffer this deposition

16  to the court and make it part of the record, is that

17  there was no intent on his part.  There was no bad

18  faith.  He was not directed to dispose of this piece of

19  dura.  He believed it was going to be put into an area

20  where he was going to send it to a neuropathologist for

21  examination.  He believed it was.  It was not.  He

22  indicated that that was inadvertent error and certainly

23  not something intentional.

24       That's an important point factually that the court

25  has to have and I relate to the court the case law that

000259

```
1        applies in this case.

2             The -- I would like to start now with -- Oh, and I

3        also have one other deposition, your Honor.  That is

4        Ann Dickison.  Ann Dickison is a several times board

5        certified physician who was an attending physician to

6        the child.  She's certified in anesthesiology,

7        emergency room medicine, pediatrics and pediatric

8        intensive care, I believe.  Is that correct, Mr.

9        Pennypacker?

10            MR. PENNYPACKER:  Adult critical care, pediatric

11       critical care, anesthesiology and pediatrics.

12            MS. SINGER:  She also attended to the child.  She

13       was actually the treating physician.  She made her

14       diagnosis and rendered her opinion based on the CT

15       scans that were provided to her by Dr. Quisling and

16       Agee and her opinion is not -- her opinion is based on

17       the fact that she was aware or believed there were

18       hygroma, although at the time of autopsy no hygroma was

19       seen and I think this is important to show that it

20       doesn't matter whether there was hygroma or there were

21       not hygroma, whether or not the dura was saved or not

22       saved because in either event the experts for the state

23       will be presenting testimony in this case to say their

24       opinion does not rest on the findings of hygroma

25       pathologically.  I would like to offer this up as well.
```



1          And I have one other matter and I guess we have to

2     do it by proffer because we do not have a copy of the

3     deposition, but Mr. Pennypacker did attend Dr. Nelson's

4     deposition yesterday.  Is there anything else,

5     Mr. Pennypacker, as far as his deposition that you

6     think we need to proffer for the record understanding

7     that the deposition will be transcribed Friday and that

8     if the court needs that as part of the record we can

9     provide it?

10         MR. PENNYPACKER:  Dr. Stephen Nelson is the

11    medical examiner for District Eight, I believe, and he

12    is also a board certified neuropathologist.  He was

13    sent the brain by Dr. Hamilton.  In his examination of

14    that brain microscopically he found evidence of

15    cortical cerebral contusions, which he says indicates

16    blunt force trauma.  That is completely inconsistent

17    with the defense's theory of, we believe, of a chronic

18    subdural hematoma.

19         He also found blood in the subarachnoid space,

20    which is inconsistent of the chronic subdural hematoma.

21    His opinion was that the death was caused by blunt

22    force trauma, which is also inconsistent with defense's

23    theory.  When asked about the dura previously, he said

24    he would like to have had it, but that it didn't impede

25    or change his opinion in any way; meaning that he was



1    able to determine the cause of death with the specimen

2    that he had and that he does not accept the defense's

3    theory of how this child died.

4         THE COURT:  Anything else from the state?

5         MS. SINGER:  Yes.  There was only one other part.

6    We will be tendering Dr. Hamilton's deposition, but I

7    do want to relate to the court that I believe if I

8    remember correctly when I asked the court to rely on

9    it's own reading, but I believe that Dr. Hamilton was

10   asked at deposition whether or not in the past he has

11   been told that radiologists have seen something and

12   when he's opened up the body, it isn't what he actually

13   sees when he does the autopsy.  I believe that he does

14   say that that has happened in the past.

15        So the mere fact as alleged in the motion that

16   radiologists may be seeing and making interpretations

17   of a view from the outside, that mere fact alone does

18   not make that a conclusive finding.  In fact, a

19   pathologist, the one who actually goes inside the body,

20   examines the organs and makes a record of that, that

21   person is in the best position to be able to make that

22   finding and I want the court to be aware of that.

23        I believe it's in the deposition.  If it is not, I

24   can tender that by affidavit, your Honor.  But I think

25   it was in the deposition.  Mr. Pennypacker is looking

1      for that.

2          In any event, I would like to start with my legal

3      argument if I may at this point.  The motion alleges

4      and I think the court's probably aware of this, that

5      the state has failed to disclose essentially

6      exculpatory evidence and that we have destroyed

7      potentially exculpatory evidence and the state would

8      vehemently disagree with that allegation.

9          The defense has offered no evidence at all to

10     support the fact that this was potentially exculpatory

11     evidence.  The fact that their expert said that they

12     would like to have looked at the dura does not make

13     that exculpatory evidence.  In fact, as I've indicated

14     through the factual basis provided earlier, our

15     witnesses do not find that as a factor in their

16     diagnoses.

17         The only evidence that's been adduced is that the

18     brain was examined, including the dura, that there was

19     no evidence of subdural -- chronic subdural hematoma on

20     the dura and that the medical examiner pursuant to

21     rules which I will now provide to the court, recorded

22     his findings by both written report, by documenting

23     in -- by photographs and he completed the entire

24     autopsy by documenting, by photographs and by written

25     report the entire body.  The reason why I say that this



1    is important in my later argument, the entire body was

2    documented in writing and by photographs as to the

3    relevant parts.

4         Those photographs were made available to defense

5    counsel very early on in this case.  The discovery

6    answers that are in the file will show those

7    photographs were provided.  Those photographs were

8    available for viewing by their experts.  In fact copies

9    were sent to their experts.  Copies were also sent to

10   or provided to Dr. Nelson.

11        The medical examiner has a statute and rules that

12   are very specific as to body parts that I would like to

13   read to the court.  The rules that were in fact

14   followed in this case by Dr. Hamilton to --

15        THE COURT:  I don't believe you need to read them.

16   Why don't you just file them since you have them in

17   writing.

18        MS. SINGER:  All right.  I have marked the

19   relevant part on the evidentiary aspect and if I could

20   put that in the record.  It says, Evidentiary aspects

21   of retained body parts shall be preserved by

22   documentation by writing, photography, radiography or

23   other indirect means or by retention of tissue samples.

24   Body parts themselves shall not be retained as evidence

25   for legal proceedings.

1        So in fact Dr. Hamilton followed -- This is a

2    marked copy.  I'll give you an unmarked copy, your

3    Honor, so you can read the whole thing.  And

4    Mr. Tetter, I'll just leave your pile here.

5        Dr. Hamilton in no way did anything intentionally

6    or in bad faith to destroy this matter.  In fact, the

7    dura is not routinely saved.  He did in fact make a

8    record as required by law.  The photographs have been

9    provided to the defense.  So there is no showing here

10   that any evidence was destroyed intentionally or not

11   provided to the defense.

12       It's important when you think of the argument here

13   that Dr. Hamilton did not preserve the lungs and the

14   experts for the defense -- one of the experts for the

15   defense suggests that the baby died of aspiration or

16   anoxia due to aspiration.  They could argue today that

17   we should have put the lungs back so this doctor could

18   have examined them to make sure that this child did or

19   did not have pneumonia.

20       He did not preserve the heart.  If an expert came

21   in here and said, We don't believe Dr. Hamilton's

22   testimony that there was not a bullet in his heart when

23   he looked at the heart, then we would have had to have

24   the heart then to have their expert examine it?  I say,

25   no.



1      He didn't preserve the spine.  If their argument

2   was going to be --

3      THE COURT:  There are many parts of the body that

4   he didn't preserve.  Got it.

5      MS. SINGER:  Right, he didn't preserve.  He has no

6   requirement to preserve them.  He did make the record

7   and he is subject to cross-examination and there are

8   photographs for their experts to examine.  If there's

9   an issue of the dura and they believe their expert can

10  testify that that's an essential part and it raises a

11  reasonable doubt, that's fine.  But they have an

12  ability to cross-examine this witness.

13      MR. PENNYPACKER:  Your Honor, I have the page

14  cites from Dr. Hamilton's deposition if you want me to

15  read you what he said.  In answer to a question about

16  medical examiners and radiologists and different

17  findings, he said on page 48 beginning with line 24 and

18  continuing to the top of page 49, So correct me if I'm

19  wrong about this and here comes the question, are you

20  saying that not only did you make a mistake in this

21  case, but they may have made a mistake also?

22      The answer was, I think that is a limitation of

23  the technique.  You know, I think anyone who has been

24  doing autopsies for awhile has done an autopsy and seen

25  that things were not as they were originally

1    interpreted by the radiologist.  I don't think that

2    radiology has completely replaced anatomic pathology

3    yet.

4         And then later on on page 61 when he's asked if he

5    sees any evidence of the chronic subdural hematoma, he

6    says, this is the answer to a question, If you found

7    what you believe to be evidence of chronic subdural

8    hematomas, how would you describe their adherence?

9    Answer, it would be tightly adherent to the dura and

10   encapsulated completely.  Question, And you saw none of

11   that?  Answer, None.  He said in his own testimony it

12   wasn't there.

13        MS. SINGER:  Your Honor, this purported evidence

14   under the case law has to be shown to be exculpatory or

15   otherwise material to the defense.  At best the

16   evidence as alleged in the motion without any real

17   support factually, at best this purported evidence may

18   only have been useful to the defense and actually might

19   be more inculpatory than exculpatory.

20        The defendant is required here to show bad faith

21   on the part of Dr. Hamilton and there is absolutely no

22   showing that bad faith is here and they will not be

23   able to make a showing as you can see from

24   Dr. Hamilton's deposition that there was bad faith.

25        The defendant is stacking multiple inferences in

```
 1          his allegations to postulate that the preservation of

 2          this body part was required for further examination,

 3          but yet defendant has shown no prejudice, for his

 4          witnesses will continue to testify as they have in

 5          their depositions that their mechanism of injury is

 6          totally different from what the state's witnesses are.

 7               It doesn't matter basically.  The bottom line is,

 8          that doesn't matter.  At best the defendant is saying

 9          contrary to the attending pathologist's report,

10          contrary to the neuropathologist's report for the

11          state, contrary to the clinicians, that there's a

12          possibility that further examination of the dura over

13          and above what has already been viewed through

14          photographs and through written reports and through

15          whatever slides and other objects that they viewed,

16          that there's a possibility that this may have helped

17          the defense in it's presentation of it's experts'

18          opinion as to mechanism of injury.  They don't allege

19          and don't show and they don't offer any testimony that

20          in any case this is material or exculpatory.

21               Your Honor, in the cases and there are a number of

22          them, the cases require a two prong test for the

23          finding that the indictment should be dismissed.  The

24          first is that the court must make a finding that the

25          evidence itself is exculpatory in nature, which the
```

1    court knows our position on that.  I think I voiced it

2    enough already.  And the second is that the defendant

3    must make a showing of bad faith.

4        There are numbers of cases going all the way to

5    the landmark case of Arizona vs. Young blood at 488

6    U.S. 109, 1988, a Supreme Court case.  There are a

7    number of cases in Florida, and I'm gonna give the

8    court copies of them to read, that have ruled that all

9    sorts of different kinds of evidence including evidence

10   that has been maintained and then later destroyed by

11   medical examiners, did not constitute exculpatory

12   evidence and without a showing, if they did in fact

13   constitute exculpatory evidence, the defense must show

14   bad faith before there would be a dismissal of the

15   indictment or information.

16        I start first with a Florida Supreme Court case of

17   King vs. state, 808 So.2d 1237, where Mr. King was

18   alleging that the state destroyed vaginal swabbings and

19   a rectal swab which would have been exculpatory because

20   had they been tested for DNA, he would have been

21   vindicated, he would have been shown not to be the

22   person who sexually abused the particular deceased.

23   The court in that case held that there was no showing

24   of bad faith, the swabs were destroyed inadvertently.

25        The court can take a look at this case, but





1     specifically the medical examiner's office did not

2     preserve the swabs after the time period required under

3     the law that I gave you under the rules.  The medical

4     examiner under the rules is only required to keep

5     specimens for one year after the case had gone to trial

6     before DNA was a possible means to make identification.

7     The medical examiner's office destroyed the swabs.  He

8     came back later on appeal of his death sentence and

9     said, you know, Now I want them tested.  Medical

10    examiner said, We don't have them anymore.  Totally

11    inadvertent.  No showing of bad faith.  They discussed

12    that in this case.

13         The court ruled that there was no bad faith, that

14    it's not -- it was not intentionally exculpatory

15    information in the court's mind at the time the

16    decision was made and that the defendant's request for

17    dismissal based on that ground was not upheld.

18         I have State vs. Thomas where the -- that's a

19    Second DCA case from 2002 and I'm sorry, but -- it was

20    August 28th, 2002.  So I only have the Lexus cite.  I

21    can get the cite for the court later if we need it.

22    The state contended that the circuit court should not

23    have dismissed charges against Thomas after it was

24    disclosed that a videotape of Thomas' alleged

25    transaction with undercover agents had been misplaced.

1        The Second District Court of Appeals agreed and

2    said, The loss or destruction of evidence that is only

3    potentially useful to the defense violates due process

4    only if the defendant can show bad faith on the part of

5    the state.

6        I'll make this packet, your Honor, just go through

7    each of them for you if that's okay and just hand it to

8    you unless the court wishes to look at them as I talk.

9        Next is State vs. Daniels and Medico.  This is a

10   Fourth DCA case from 1997, 699 So.2d 837.  In this

11   case, once again, this was a record of a drug

12   transaction.  The court held that unless the defense

13   shows bad faith on the part of the state, dismissal is

14   not warranted.

15       State vs. Erwin, Fifth DCA case, September 20th,

16   1996, 686 So.2d 688.  Here this was a DUI case with

17   vials of blood or, pardon me, it may have been vials of

18   blood.  It was blood.  They collected two vials.  One

19   was tested.  Blood alcohol level was gained.  The

20   second one was contaminated.  It broke and could not be

21   tested.

22       Arguments were made that that second vial was

23   supposed to be available to the defense to do their own

24   tests and that it was potentially exculpatory.  The

25   court ruled there's no duty upon the state or it's

1    agents to collect two vials for analysis, just as

2    there's no duty for the medical examiner to hold the

3    dura.

4        He examined the dura and did what he was legally

5    responsible to do under the law and there is no due

6    process violation if the state's analysis necessarily

7    consumes the entire content of the vials, citing Howser

8    vs. State.  And if there was a possibility the second

9    vial contain exculpatory evidence, the appellee was

10   required to show bad faith upon the part of the state

11   in destroying the evidence.

12       I think that's important because, once again, I'm

13   saying that the medical examiner did what he was

14   supposed to do.  He didn't keep the whole body.  It

15   would have been nice for their experts to examine the

16   whole body, but we also have a competing public

17   interest, competing state interest and it's a

18   compelling state interest and that is to the victims,

19   the family, the survivors to put to rest their child.

20       So there's competing interest here and I think the

21   law specifically allows pathologists to examine and

22   make a report and we rest on their conclusions and

23   they're subject to cross-examination.

24       State -- Did I say Erwin?  Yes, I gave you Erwin

25   vs. state.  Merk vs. State, it's a Supreme Court case



1    decided in 1995 at 664 So.2d 939.  What happened in

2    Merk vs. State is, Mr. Merk murdered someone and the

3    body was found and there was evidence collected at the

4    crime scene and the evidence technician failed to keep

5    as evidence a pair of khaki pants that were located

6    during the search of a vehicle abandoned by Mr. Merk

7    and his companion after the murder.

8         The witness testified that he had examined those

9    khaki pants and saw nothing of evidentiary value upon

10   his examination, and so therefore he did not take them

11   into evidence.

12        Later Merk argued that those pants would have

13   shown that his codefendant had blood on those pants and

14   he would have been able to have those pants and have

15   them examined by their expert to show that in fact his

16   codefendant was the murderer, not Merk.  The court

17   said, no.  The court said, unless you show, there is

18   simply no showing that Detective Nester acted in bad

19   faith in deciding not to preserve pants which had no

20   blood stains, which is very analogous to this.

21        I can read it this way:  There's simply no showing

22   that Dr. Hamilton acted in bad faith in deciding not to

23   preserve a dura that did not have any evidence on it.

24   Do you see where I'm going there, Judge?

25        THE COURT:  Totally.

1    MS. SINGER:  Moreover, Merk has to stack multiple

2    inferences in order to postulate that the pants were

3    either material or exculpatory.  Doesn't do that in

4    this case.  Does not show bad faith in this case.  The

5    Supreme Court says, no dismissal.

6    MR. GROLAND:  Ms. Singer, do you have copies of

7    those?

8    MS. SINGER:  Everything I'm making a pile.  Do you

9    want them all now?

10   MR. GROLAND:  Please.

11   MS. SINGER:  I'm making a pile for you.

12   MR. GROLAND:  Thank you.

13   MS. SINGER:  State cites now Kelly vs. State,

14   another Supreme Court of Florida opinion, 969 So.2d

15   754.  Judge, I think you'll see I'm going down from the

16   2002's all the way down to when Youngblood was decided

17   in 1986 and I'm gonna tell the court that I've got a

18   few more left.  I didn't copy all of them, but I copied

19   ones that I believe were salient to this case.  There

20   are a number of cases on this issue.

21   Kelly vs. State, here Mr. Kelly was charged with

22   murder.  He was convicted and he was given the death

23   sentence and he argued that the state's destruction of

24   the material evidence prior to his trial deprived him

25   of his constitutional rights.  The court concluded that



1        the state had not been negligent in causing destruction

2        of evidence and further held that the evidence in

3        question did not prejudice Kelly's case.

4            What was destroyed was, and I want to make sure I

5        get this correct -- what happened was, in this case the

6        victim's death had been closed for many years.  It was

7        what we call a cold case, Judge.  And once there was

8        evidence gleaned that Mr. Kelly may have been the

9        perpetrator, the case was reopened and the state found

10       that much of the evidence had either been deteriorated,

11       lost or otherwise gone, the physical evidence that had

12       been collected.

13           There was a finding at a hearing and the court

14       concluded a hearing that there was no showing that the

15       state had been -- had acted in bad faith or that the

16       state was otherwise negligent.  It was just that this

17       case had been aged and that that's what happens,

18       evidence deteriorates.

19           Kelly argued then on his appeal to the Supreme

20       Court that certain crime scene evidence was destroyed

21       which was not encompassed within the court's earlier

22       ruling, and that had that evidence been available, he

23       would have been found not guilty, that it was in fact

24       exculpatory evidence.

25           The court did not agree with that.  It's a very

1    brief opinion on that ground because there were other

2    grounds he raised as well, but the court cites a number

3    of cases including Youngblood, unless the defendant

4    shows bad faith on the part of appellee's failure to

5    preserve potentially useful evidence, does not

6    constitute denial of due process.

7        I apologize for the underlining on this one,

8    Judge.  I was in a rush and I don't like to write on my

9    copies to the court, but I did on that one.

10       The next case is a Fourth DCA case, State vs.

11   Robinson, cited at 552 So.2d 943.  This is a case where

12   defendant argued the destruction of photographic

13   lineups that were used by persons who later identified

14   him.  He was unable to view the lineup to see whether

15   or not there was any prejudice associated with how the

16   lineup was set up.  He argued that that was potentially

17   exculpatory evidence and that as a result the case

18   should be dismissed.

19       The court ruled that the destruction of the lineup

20   was inadvertent.  The witness had testified that he had

21   thrown the lineups away, that he did not have any

22   intention at that time -- no one had been identified on

23   several of the outlines, so he just threw them away.

24       The court said based on Arizona vs. Youngblood

25   that unless the criminal defendant can show bad faith,

1    which they did not in that case, dismissal is not an

2    appropriate remedy.

3         And then I have a copy and I didn't make a copy

4    for you of Arizona vs. Youngblood, but I have a copy of

5    Arizona vs. Youngblood, which is what all these cases

6    are based on.

7         In that case, Judge, the victim in that case in

8    the case that went up to the Supreme Court of the

9    United States, was a young boy who had been molested,

10   sodomized and when he -- after the report, he was taken

11   to a hospital where a sexual assault kit was collected.

12   That sexual assault kit should have been refrigerated.

13   It was not.  So the evidence, whatever there might have

14   been in that case, was deteriorated to such an extent

15   that it could not be examined and tested.

16        The defendant, who was later identified and

17   convicted of the offense, argued that that -- that

18   there was potential evidence in that sexual assault kit

19   that could have been exculpatory in nature and thus the

20   failure to properly preserve it was sufficient to

21   require a dismissal of his charges and the U.S. Supreme

22   Court said and that's what the basis of all these cases

23   are, that Mr. Youngblood failed to show any bad faith

24   on the part of the law enforcement officials, that in

25   fact the destruction of the evidence was inadvertent

1     and negligent at the very best and that in fact he

2     would not be entitled to dismissal in the case.

3          This is really the case that forms the basis of

4     all the other cases that I've given to the court and I

5     would go ahead and give the remainder to the court.  I

6     think I handed the rules to the court already, did I

7     not?

8          THE COURT:  Yes.  Thank you.

9          MS. SINGER:  I just want to make sure I covered

10    everything and if I could just speak to Mr. Pennypacker

11    and make sure that he has nothing that he wishes to

12    add.

13         THE COURT:  Okay.

14         MS. SINGER:  The bottom line here, is that there

15    has been absolutely no showing that this is potentially

16    exculpatory evidence.  What's at the very least being

17    shown is that there's a contest between experts as to

18    what's important and that occurs in almost every case

19    where there's expert opinion.

20         The issue here really isn't whether or not the

21    dura's been preserved.  That's a smoke screen for the

22    true issue, and that is, who is the jury going to deem

23    credible.  They have a lot of argument to make, they

24    have a lot of opportunity in cross-examination to

25    question Dr. Hamilton's examination of the brain and



1    how he handled this particular case and that's great

2    fodder for the jury argument and he will be able to do

3    that.

4        But this is really not a destruction of evidence

5    issue.  This is an attempt to try to make something a

6    destruction of evidence issue when there is no proof

7    whatsoever that there is any kind of potential

8    exculpatory nature to this dura, this body part that

9    otherwise under the law is required to go with the body

10   at burial.

11       If I may have one moment to check with

12   Mr. Pennypacker.  Mr. Pennypacker, do you have anything

13   you want to add at this time?

14       MR. PENNYPACKER:  No.  I just want to make sure

15   that -- We need to put in a copy of Dr. Hamilton's

16   testimony.

17       MS. SINGER:  Yes.  At this time, your Honor, I

18   would like to present that to the court with the

19   records that you already have of the transcripts.

20       THE COURT:  All right.  Anything else from the

21   state?

22       MS. SINGER:  No, ma'am.

23       THE COURT:  Anything else from the defense?

24       MR. TETTER:  Your Honor, we would like to also --

25   We don't have copies available here today, but we can

1      get them to you today and proffer and offer into

2      evidence the deposition transcripts of Dr. Agee, Dr?

3      Quisling, Dr. Plunkett and Dr. Uscinski.

4         Dr. Agee and Dr. Quisling are the two radiologists

5      at Shands who examined CAT scans of the baby in

6      question in this case.  Both of them found that there

7      was evidence from the CAT scans of chronic subdural

8      hematoma as well as evidence of recent acute subdural

9      hematoma.

10        Those CAT scans were relied on in analysis that

11     Dr. Dickison made, who was the pediatric doctor at the

12     scene.  They were also relied on by their CPT nurse,

13     Beth Tologa, as well as the CPT doctor, Dr. Rogers.

14        Everything in this case leading up to the death of

15     the child focused on the fact that everyone believed

16     there were chronic subdural hematomas and acute

17     subdural hematomas that had bled, caused a problem with

18     the brain, which caused the baby to die.

19        There is also evidence that the baby was not

20     breathing at the scene when the paramedics arrived at

21     the scene.  The evidence was the baby was not breathing

22     at all.  Again, the cause of death in this case was

23     lack of oxygen to the brain.

24        Also the doctors in the state's case, all of them

25     do conclude that this baby suffered from the thing



1    known as shaken baby syndrome, all say that he had

2    evidence of the chronic subdural hematomas, coupled

3    with retinal hemorrhaging and that was the coup de

4    grace.  Add both those two things together, the only

5    thing you could have was shaken baby syndrome.

6         Dr. Nelson yesterday, the state's

7    neuropathologist, said during the deposition that

8    subdural or rather -- excuse me -- retinal hemorrhaging

9    is not necessarily associated exclusively with shaken

10   baby syndrome.  So their own experts are gonna

11   contradict everything else their experts have been

12   saying and relying on in reaching their conclusions.

13        So if the court will allow it, we would at least

14   like to submit those four additional depositions.

15   They're all pretty lengthy, so it's a lot for the court

16   to look at.

17        As I said a moment ago, all these witnesses

18   considered the evidence regarding the dura and the dura

19   is what everyone focused on going into the autopsy.

20   Dr. Hamilton was aware from having read the previous

21   reports that everybody suspected shaken baby syndrome.

22   He opens it up.  He testified he didn't see anything.

23   We don't know whether he missed it or what or whether

24   he destroyed it inadvertently.  We don't know.  It's

25   not preserved.



1          Now can we -- Obviously we can't prove it's

2    exculpatory because it's not here.  It's destroyed.  We

3    don't know what, if anything, it would have shown.  It

4    may have been inculpatory.  We don't know what was on

5    that dura.  Its been destroyed.  The only thing we know

6    is what Dr. Hamilton testified that he saw.

7          Again, they indicated -- the state indicated in

8    their argument that our experts were gonna say that the

9    baby aspirated.  Well, their witnesses are going to say

10   the same thing.  I mean, this baby was not breathing

11   when the EMT's arrived on the scene.  He had seizures

12   in the emergency room.  Everything -- Their own

13   evidence is all consistent with the fact this baby quit

14   breathing.

15         Now what caused the baby to quit breathing?  We're

16   not sure, but there is evidence on the 911 tape you

17   heard yesterday, you could hear Mr. Herlihy screaming

18   frantically, There's stuff coming out of his nose.

19   There's stuff coming out of his mouth.  They were

20   directing him to try to clean out the trachea or rather

21   clean out the mouth and stuff like that and then to

22   begin -- try to provide aid to the baby.

23         And the EMT's, when you hear their testimony at

24   trial, they're going to say they used some sort of an

25   instrument to suck out aspirant from the baby's throat

1    and mouth and then they began to pump oxygen into the

2    baby to try to revive him.  So there is ample evidence

3    that that did in fact happen in this case.

4         The argument which Ms. Singer made about not

5    preserving other body parts is, I would submit, silly,

6    but the whole case centered around what happened to

7    this child's head and what happened to his neck, which

8    is another body part that was not preserved and anotner

9    body part that Dr. Nelson indicated he would have liked

10   to have looked at yesterday, specifically the portion

11   coming out of the brain, going into the neck, he would

12   have liked to have seen it because he indicated in

13   deposition that had a baby been violently shaken, there

14   could have been evidence of that in this particular

15   body part.  That was not preserved as well.

16        Obviously the state's case law all says we've got

17   to show prejudice.  Well, we can't show prejudice here

18   because the evidence has been destroyed.  Even if the

19   evidence existed, we may not be able to show prejudice.

20   I'll acknowledge that.  But we had no opportunity

21   whatsoever.

22        As far as bad faith on the part of Dr. Hamilton, I

23   can only say this, Judge:  We took his deposition and

24   he said, You know, I intended to send that dura off,

25   and he laughed about it and I can't remember exactly

1    how it came up, but he laughed and he said, Oh, yeah, I

2    forgot to send it.  I intended to send it, but I just

3    didn't send it.  Can I show bad faith?  I don't know.

4    I don't know Dr. Hamilton well enough to do that.

5        But I will say this, your Honor, that Dr. Hamilton

6    knew going into that autopsy that the critical portion

7    of this child's brain and skull that needed to be

8    examined involved the dura and it was destroyed for

9    whatever reason.

10       I think Mr. Groland may have something to add.

11       MR. GROLAND:  Briefly, your Honor just to

12   follow-up.  Dr. Hamilton did testify that before he did

13   the autopsy, it was indicated in our motion, he knew

14   from having read the radiologists' reports that they

15   made a finding that they observed in the CAT scans over

16   a period of three days chronic old subdural hematoma.

17       So going into the autopsy he knew indeed that the

18   dura was an important area to either preserve or

19   examine closely, but at least preserve.  And I will

20   point out to the court it's not even noted in his

21   autopsy report that he did not preserve the dura or did

22   not take slides of the dura.

23       Now this was known to him from the very beginning

24   and at the same time it was known to the state and

25   Dr. Hamilton that there was an issue as to whether or



1    not there was an old injury to this child's brain.  We

2    did not know and I don't know when the State Attorney's

3    Office knew, but we did not know that that area that

4    we've all been focusing on for years in this case was

5    not preserved until we took the doctor's deposition and

6    that's why we're at this point right now with this

7    motion at this late stage.

8         He didn't note it in his report.  He admitted in

9    his deposition that he had a conversation with the

10   other pathologist, Dr. Nelson, the fact that he forgot

11   and did indeed make a mistake and should have saved the

12   dura, but did not.  He knew about it.  He knew it was

13   important and whether or not he passed that on to the

14   state and they knew a year ago or two years ago, I

15   don't know.

16        Let me just say briefly about the several cases

17   that they've cited.  One is Milton Thomas and in Thomas

18   they make reference to the Brady case and a case with

19   which all of us are familiar.

20        They cited a portion of Brady saying, Suppression

21   by the prosecution of evidence favorable to the accused

22   violates due process where the evidence is material

23   either to guilt or to punishment regardless of the good

24   or bad faith.

25        We're not saying in our motion, we're not arguing



1    that what we have here is a bad faith situation, which

2    is what the state was focusing on when they made their

3    argument.

4        Arizona vs. Youngblood, which is a case that we

5    provided to the court yesterday through the clerk and

6    the case that we rely on, goes on to say and it

7    somewhat waters down Brady, Youngblood says, The loss

8    or destruction of evidence that is only potentially

9    useful to the defense, violates due process only if the

10   defendant can show bad faith.

11       We're not saying it is potentially exculpatory.

12   We're saying it is exculpatory and a close reading of

13   Youngblood will show that the holding in Brady about

14   destroying evidence favorable to the accused still

15   stands.  We're saying that our doctors who weren't able

16   to be here today and testify would say that that is

17   exculpatory evidence given what they know in this case

18   having examined the records and having viewed the CAT

19   scans.

20       So our position is that we don't have to show bad

21   faith.  We have to show that it is exculpatory as

22   opposed to potentially exculpatory and the only way we

23   can do that is through the testimony of our witnesses

24   who I would just proffer to the court they would take

25   the position that it is exculpatory given the facts of



44

1        this case and given the medical records that they've

2        examined.  Because of that, we don't have to show bad

3        faith.  I think that to some degree distinguishes our

4        position from what state thinks our position is.

5        That's all.

6             THE COURT:  Good enough.  The motion to dismiss

7        the indictment, of course having been filed by the

8        defense, the burden is on the defense to carry that

9        motion and there is an insufficient showing that the

10       evidence destroyed is exculpatory, material or that

11       there was any bad faith.  Therefore, the motion to

12       dismiss the indictment is denied.

13            MR. TETTER:  Your Honor, we just lodge an

14       objection for the record.

15            THE COURT:  Yes, sir.

16                      *  *  *  *  *

17

18

19

20

21

22

23

24

25

IN THE CIRCUIT COURT, EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,

    Plaintiff,

-vs-

Brian Herlihy ,

    Defendant.

CASE NO.   00-2153-CFA
00-2660-CFA

FILED IN OPEN COURT
11-8-2002
S Hilliard
D.C.

## DECORUM ORDER AS TO MEDIA

    It is **ORDERED AND ADJUDGED** that media representatives will comply with the directives of this order so as not to disrupt the courtroom proceedings as follows:

    1. Media personnel shall remain in the gallery seating during the jury selection, trial or hearing.

    2. Gainesville Sun

is/are the only media who has/have requested and has/have been authorized to bring a

    ☑ still camera and/or

    ☐ video camera

into the courtroom for jury selection, trial or hearing. No unauthorized media will be allowed to bring a camera into the courtroom.

    3. Only ☑ one still camera and/or

    ☐ one video camera

will be allowed in the courtroom. No flashes will be allowed. The still photographer and/or videographer must remain in the gallery. No disrupted movement will be allowed. If the case is set for trial, no photographs or video of the jury will be allowed.

    4. No interviews related to this trial/hearing will be conducted inside the courthouse. Before, during or after the trial/hearing.

    **DONE AND ORDERED** in Chambers, this 7th day of November , 2002.

Martha Ann Lott
Circuit Judge

11-7-02
KR

cc: Asst. State Attorney - by fax 331-6153
Defense Attorney - by fax 373-2885
Security - interoffice
Barbara Dawicke, Senior Deputy Court Administrator - interoffice
Media - by fax 338-3128

000208



## EIGHTH JUDICIAL CIRCUIT OF FLORIDA

Chambers of
**Martha Ann Lott**
Circuit Judge

Alachua County Courthouse
Gainesville, Florida 32601
(352) 374-3646
Fax No. (352) 381-0121

Kim Parramore
Judicial Assistant

# M E M O R A N D U M

TO: Jeanne Singer, Esq, Gordon Groland, Esq., GV Sun

FAX #: 331-6153          373-2885          338-3128

FROM:  ☐  Martha Ann Lott, Circuit Judge

       ☑  Kim Parramore, Judicial Assistant

DATE: 11-7-02

TIME: 2:39 pm

RE: State v. Herlihy

I am transmitting a total of __2__ pages including this cover letter. If you do not receive all the pages, please call back as soon as possible.

TELEPHONE: 352-374-3646          FAX MACHINE: 352-381-0121

COMMENTS:

Decorum Order - (Attached)

000269



TRANSMISSION VERIFICATION REPORT

TIME : 11/07/2002 14:30

| | |
|---|---|
| DATE.TIME | 11/07 14:29 |
| FAX NO./NAME | 93376153 |
| DURATION | 00:00:53 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

Gvoland

TRANSMISSION VERIFICATION REPORT

TIME : 11/07/2002 14:32

| | |
|---|---|
| DATE,TIME | 11/07 14:31 |
| FAX NO./NAME | 93732085 |
| DURATION | 00:00:53 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

0000271

GW Sun

TRANSMISSION VERIFICATION REPORT

TIME : 11/07/2002 14:36

| | |
|---|---|
| DATE,TIME | 11/07 14:35 |
| FAX NO./NAME | 93383128 |
| DURATION | 00:00:53 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

0000272

IN THE CIRCUIT COURT, EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,

Plaintiff,

-vs-

Brian Herlihy,

Defendant.

CASE NO. 00-2153-CFA
00-2060-CFA

FILED IN OPEN COURT
11-8, 2002
S. Hilliard
D.C.

**Amended**

<u>DECORUM ORDER AS TO MEDIA</u>

It is **ORDERED AND ADJUDGED** that media representatives will comply with the directives

of this order so as not to disrupt the courtroom proceedings as follows:

1. Media personnel shall remain in the gallery seating during the jury selection, trial or hearing.

2. **Gainesville Sun & TV 20**

is/are the only media who has/have requested and has/have been authorized to bring a

☑ still camera and/or

☑ video camera

into the courtroom for jury selection, trial or hearing. No unauthorized media will be allowed to bring

a camera into the courtroom.

3. Only ☑ one still camera and/or

☑ one video camera

will be allowed in the courtroom. No flashes will be allowed. The still photographer and/or videographer

must remain in the gallery. No disrupted movement will be allowed. If the case is set for trial, no

photographs or video of the jury will be allowed.

4. No interviews related to this trial/hearing will be conducted inside the courthouse. Before,

during or after the trial/hearing.

**DONE AND ORDERED** in Chambers, this 7th day of November, 2002.

11-7-02

Martha Ann Lott
Circuit Judge

cc:   Asst. State Attorney - by fax 337-6153
Defense Attorney - by fax 313-2885
Security - interoffice
Barbara Dawicke, Senior Deputy Court Administrator - interoffice
Media - by fax GV Sun 338-3128
TV20 371-0747

000273

```
**********************
***   TX REPORT   ***
**********************


TRANSMISSION OK

TX/RX NO              4652
CONNECTION TEL                   93376153
SUBADDRESS
CONNECTION ID
ST. TIME              11/07 17:51
USAGE T               00'59
PGS. SENT               2
RESULT                OK
```

```
*********************
***   TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO            4651
CONNECTION TEL              9p371 0747
SUBADDRESS
CONNECTION ID       WCJB TV
ST. TIME            11/07 17:50
USAGE T             00'36
PGS. SENT             1
RESULT              OK
```

Brian Herlihy
01-2000-CF-2753-A
PSI

FILED IN OPEN COURT
11-8, 2002
S. Hilliard
D.C.

276



# IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
# IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                            Case No. 00-2660CFA
                                                           00-2753CFA
            *Plaintiff,*

vs.                                                 Judge Lott

BRIAN HERLIHY,

            *Defendant*

## ORDER REQUIRING TRANSCRIPTION OF TRIAL TESTIMONY

THIS CAUSE having come on to be heard upon Motion of the State for a transcript of trial testimony, it is

ORDERED AND ADJUDGED that the direct and cross examination, of the September 17, 2002, trial testimony of defense expert, Dr. John Plunkett, be transcribed and provided to the Eleventh Judicial Circuit, Miami-Dade County, Florida, and same will be responsible for any costs accrued therefrom.

DONE AND ORDERED at Alachua County, Florida, this the ___2 1___ day of ___O A___, 2002.

                                          _____
                                          Lott
                                          CIRCUIT JUDGE

Copies to - TAmmy Forrest,
            Asst. St. Atty -
            Miami, Fl.

            Court Reporting Dept.

IN THE CIRCUIT COURT OF THE EIGHTH
JUDICIAL CIRCUIT IN AND FOR
ALACHUA COUNTY, FLORIDA

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 1884015 1 PG
2002 NOV 14 08:23 AM BK 2552 PG 1195
J. K. "BUDDY" IRBY
CLERK OF CIRCUIT COURT
ALACHUA COUNTY,FLORIDA
CLERK2  Receipt#115791

__ Probation Violator
__ Community Control Violator

State of Florida

vs Brian Herlihy
Defendant

91-2000-CF-2753-A

Division:   II

JUDGMENT

The defendant, Brian Herlihy, being personally before this
court represented by Gordon Greland, the attorney of
record, and the state represented by Jeanne Singer
and having
[X] been tried and found guilty by jury/by court of the following crime(s)
[_] entered a plea of guilty to the following crime(s)
[_] entered a plea of nolo contendere to the following crime(s)

| Count | Crime | Offense Statute Number(s) | Degree of Crime |
|-------|-------|---------------------------|-----------------|
| I | Manslaughter | 782.07(4) | 2F |
| ----- | ------------------------- | --------------- | ----- |
| ----- | ------------------------- | --------------- | ----- |
| ----- | ------------------------- | --------------- | ----- |

[X] and no cause being shown why the defendant should not be adjudicated
    guilty, IT IS ORDERED THAT the defendant is hereby ADJUDICATED GUILTY
    of the above crime(s).
[_] and having been convicted or found guilty of, or having entered a plea
    of nolo contendere or guilty, regardless of adjudication, to attempts
    or offenses relating to sexual battery (Ch. 794), lewd and lascivious
    conduct (Ch. 800), or murder (F.S. 782.04), aggravated battery
    (F.S. 784.045), car jacking (F.S. 812.133), or home invasion robbery
    (F.S. 812.135), or any other offense specified in Section 943.325,
    the Defendant shall be required to submit to blood specimens.
[_] and good cause being shown; IT IS ORDERED THAT ADJUDICATION OF GUILT
    BE WITHHELD.

DONE AND ORDERED in Open Court in Gainesville, Alachua County, Florida
this _8_ day of _Nov.__,2002.

MARTHA ANN LOTT

Judge of the Circuit Court

Filed in Open Court _11-8-2002__ by _S.Hilliard____ D.C.

I HEREBY CERTIFY THAT A COPY OF THIS Judgment was furnished by U.S. Mail
and/or hand delivery at the addresses of record to counsel for the state
and defense/defendant pro se this _12th___ day of _November___, 2002.

BY Deputy Clerk: _____

0000279

IN THE CIRCUIT COURT OF THE EIGHTH
JUDICIAL CIRCUIT IN AND FOR
ALACHUA COUNTY, FLORIDA

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 1884014 1 PG
2002 NOV 14 08:23 AM BK 2552 PG 1194
J. K. "BUDDY" IRBY
CLERK OF CIRCUIT COURT
ALACHUA COUNTY, FLORIDA
CLERK2  Receipt#115791

__ Probation Violator
__ Community Control Violator

State of Florida

vs __Brian Herlihy_____          01-2000-CF-2753-A
Defendant                              Division:  II

        Amended JUDGMENT as to Crime

        The defendant, __Brian Herlihy____, being personally before this
court represented by __Gordon Groland_____, the attorney of
record, and the state represented by _____Isaac Singer_____
and having
[X] been tried and found guilty by jury/by court of the following crime(s)
[_] entered a plea of guilty to the following crime(s)
[_] entered a plea of nolo contendere to the following crime(s)

| Count | Crime | Offense Statute Number(s) | Degree of Crime |
|-------|-------|---------------------------|-----------------|
| I | Manslaughter (Lesser Included Offense) | 782.07(1) | 2F |
| ----- | --------------------------- | --------------- | ----- |
| ----- | --------------------------- | --------------- | ----- |
| ----- | --------------------------- | --------------- | ----- |

[X] and no cause being shown why the defendant should not be adjudicated
    guilty, IT IS ORDERED THAT the defendant is hereby ADJUDICATED GUILTY
    of the above crime(s).
[_] and having been convicted or found guilty of, or having entered a plea
    of nolo contendere or guilty, regardless of adjudication, to attempts
    or offenses relating to sexual battery (Ch. 794), lewd and lascivious
    conduct (Ch. 800), or murder (F.S. 782.04), aggravated battery
    (F.S. 784.045), car jacking (F.S. 812.133), or home invasion robbery
    (F.S. 812.135), or any other offense specified in Section 943.325,
    the Defendant shall be required to submit to blood specimens.
[_] and good cause being shown; IT IS ORDERED THAT ADJUDICATION OF GUILT
    BE WITHHELD.

DONE AND ORDERED in Open Court in Gainesville, Alachua County, Florida
this 8__ day of __Nov, 2002.

                                        MARTHA ANN LOTT
                                        Judge of the Circuit Court

Filed in Open Court _____ by _____ D.C.

I HEREBY CERTIFY THAT A COPY OF THIS Judgment was furnished by U.S. Mail
and/or hand delivery at the addresses of record to counsel for the state
and defense/defendant pro se this __12___ day of __November___, 2002.

BY Deputy Clerk: ___Blaker_____                    0000280

Defendant: Brian Herlihy                              01-2000-CF-2753-A
                                SENTENCE        Division: II
                            (As to Count I )

        The defendant, being personally before this court, accompanied by the
defendant's attorney of record, Gordon Groland
and having been adjudicated guilty herein, and the court having given the
defendant an opportunity to be heard and to offer matters in mitigation of
sentence, and to show cause why the defendant should not be sentenced as
provided by law, and no cause being shown,

(Check one if applicable)
[X]     and the court having on (date) 9-25-2002 deferred imposition
        of sentence until this date
[_]     and the court having previously entered a judgment in this case on
        (date) _____ now resentences the defendant
[_]     and the court having placed the defendant on probation/community
        control and having subsequently revoked the defendant's
        probation/community control

It is the sentence of the court that:
[_]     The defendant pay a fine of $_____, pursuant to section 775.083,
        Florida Statutes, plus $_____, as the 5% surcharge required by
        section 960.25, Florida Statutes.
[X]     The defendant is hereby committed to the custody of the
        Department of Corrections.
[_]     The defendant is hereby committed to the custody of the
        Alachua County Department of Corrections.
[_]     The defendant is sentenced as a youthful offender in accordance with
        section 958.04, Florida Statutes.

To be imprisoned (check one; unmarked sections are inapplicable)
[_]     For a term of natural life.
[X]     For a term of __15 years__.
[_]     Said SENTENCE SUSPENDED for a period of _____
        subject to conditions set forth in this order.

If "split" sentence complete the appropriate paragraph
[_]     Followed by a period of _____ on probation/community control
        under the supervision of the Department of Corrections according to
        the terms and conditions of supervision set forth in a separate order
        entered herein.
[_]     However, after serving a period of _____ imprisonment in
        _____ the balance of the sentence shall be suspended
        and the defendant shall be placed on probation/community control for
        a period of _____ under supervision of the Department of
        Corrections according to the terms and conditions of
        probation/community control set forth in a separate order entered
        herein.

In the event the defendant is ordered to serve additional split sentence,
all incarceration portions shall be satisfied before the defendant begins
service of the supervision terms.

[X]     Jail Credit - It is further ordered that the defendant shall be
        allowed a total of 347 days as credit for time incarcerated before
        imposition of this sentence.

Consecutive/Concurrent as to Other Counts - It is further ordered that the
sentence imposed for this count shall run (check one) ____ consecutive to

Defendant: Brian O'Herlihy                     Case Number: 01-2000-CF-2753-A

## OTHER PROVISIONS

[_] Retention of Jurisdiction - The court retains jurisdiction over the defendant pursuant to section 947.16(3), Florida Statutes (1983).

Consecutive/Concurrent as to Other Convictions - It is further ordered that the composite term of all sentences imposed for the counts specified in this order shall run (check one) __ consecutive to __ concurrent with (check one) the following:
    [_] any active sentence being served.
    [_] specific sentences: _____

_____

_____

    In the event the above sentence is to the Department of Corrections, the Sheriff of Alachua County, Florida, is hereby ordered and directed to deliver the defendant to the Department of Corrections at the facility designated by the department together with a copy of this judgment and sentence and any other documents specified by Florida Statute.

    The defendant in open court was advised of the right to appeal from this sentence by filing notice of appeal within 30 days from this date with the clerk of this court and the defendant's right to the assistance of counsel in taking the appeal at the expense of the state on showing of indigence.

    In imposing the above sentence, the Court further orders: _____

_____

_____

    In imposing the above sentence, the Court further recommends: _____

_____

_____

    If a bail bond is in effect and has not been forfeited, the bond is hereby cancelled and the surety is discharged from liability on such bond. If the bond is a blanket bond covering multiple cases, the surety is discharged from this case only and the bond shall remain viable and intact to secure the defendant's appearance in pending cases. Such cancellation and release of liability shall also apply to any bonds in effect and not forfeited in those cases listed below as a nolle prosequi.

DONE AND ORDERED in open Court in Gainesville, Alachua County, Florida this __8__ day of __Nov.__, 2002

                                          _____
                                          Judge of the Circuit Court
                                          MARTHA ANN LOTT

I HEREBY CERTIFY THAT A COPY OF THIS Judgment was furnished by U.S. Mail and/or hand delivery at the addresses of record to counsel for the state and defense/defendant pro se this __12__ day of __November__, 2002. BY Deputy Clerk: _____

IN AND FOR ALACHUA COUNTY, FLORIDA,

STATE OF FLORIDA,

Case No. 01-2000-CF-2753-A

vs

Criminal Division: II

Brian Herliby

FINGERPRINTS OF DEFENDANT



| Right Thumb | Right Index | Right Middle | Right Ring | Right Little |
|---|---|---|---|---|

| Left Thumb | Left Index | Left Middle | Left Ring | Left Little |
|---|---|---|---|---|

Fingerprints taken by: NAME _____

TITLE _Deputy Sheriff_____

    I HEREBY CERTIFY that the above and foregoing are the fingerprints
of the defendant _Brian Herliby_____, and that they
were placed thereon by the defendant in my presence in Open Court this
_8_ day of _Nov___, 2002.

_____
Judge of the Circuit Court
MARTHA ANN LOTT

Filed in Open Court _11-8-2002____ by S. Hilliard_ D.C.

0000283

IN AND FOR ALACHUA COUNTY, FLORIDA
Criminal Division: II

STATE OF FLORIDA,

Brian Healthy
vs

Case NO. 01-2000-CF-2753-A

ORDER ESTABLISHING MONETARY SUMS

The defendant shall pay the following sums if checked:

1 - MANDATORY COSTS (Priority #1)

[X] a. $    262.00    Felony Costs pursuant to Laws of FL 94-444,
                      F.S. 938.03; 938.01(1), 938.05(1), 938.19 & CO 97-7,
                      and 938.17 & CO 97-6.

[_] b. $    112.00    Misdemeanor Costs pursuant to Laws of FL 94-444,
                      F.S. 938.03; 938.01(1), 938.05(1), 938.19 & CC 97-7,
                      and 938.17 & CO 97-6.

[_] c. $    262.00    Misdemeanor - DUI pursuant to Laws of FL 94-444,
                      F.S. 938.03; 938.05, 938.13(1)(a), 938.07, 938.19 &
                      CO 97-7, 938.17 & CC 97-6. & 938.01(1).

[_] d. $    397.00    Felony - DUI pursuant to Laws of FL 94-444,
                      F.S. 938.03; 938.05, 938.07, 938.19 & CO 97-7, 938.17
                      & CO 97-6. & 938.01(1).

[_] e. $     20.00    Victim Handicapped/Elderly pursuant to F.S. 938.09(1).

[_] f. $_____    +10% of fine - Victim handicapped/Elderly pursuant to
                      F.S. 938.11(1).

[_] g. $_____    Reimbursement (Sex Crimes) pursuant to
                      F.S. 943.325(8)(a).

[_] h. $_____    Exam (Sex Crimes) pursuant to F.S. 960.28 & 415.507.

[_] i. $     40.00    Attorney Application Fee pursuant to F.S. 27.52.

[_] j. DEFENDANT DISCHARGED WITHOUT PAYMENT OF MANDATORY COSTS, F.S. 939.05.

[_] k. PREVIOUSLY ORDERED MONETARY SUMS REDUCED TO CIVIL JUDGMENT.

[_] l. PAY PREVIOUSLY ORDERED MONETARY SUMS.

2 - RESTITUTION (Priority #2)

[_] a. The Court reserves jurisdiction for the imposition of payment
       requirements. A hearing is scheduled for _____
       at _____ AM/PM.

[_] b. $_____    See attached Civil Restitution Lien Order, which is
                      incorporated herein by reference, or as may be
                      determined at hearing, after notice, within 60 days.
                      [Number of Liens _____]

3 - FINES (Priority #3)

[_] a. $_____Total Fine _____ pursuant to F.S. 775.083; + 5% surcharge
                      _____ pursuant to F.S. 938.04.

[_] b. $_____Total Fine _____ (Result of injury/death) pursuant to
                      F.S. 775.0835(1); + 5% surcharge _____ pursuant to
                      F.S. 938.04.

[_] c. $_____Total DUI fine _____ pursuant to F.S. 316.193;
                      + 5% surcharge _____ pursuant to F.S. 938.04.

[_] d. $     20.00    Crime Stopper, (in addition to all fines), pursuant
                      F.S. 938.06(1).

[_] e. _____    Driver's License Suspension/Revocation(DUI), pursuant
                      to F.S. 322.29(2)(a).

[_] f. $_____    County Alcohol & Drug Abuse Trust Fund pursuant to
                      F.S. 938.21 or 938.23 and County Ordinance 94-29.

[_] g. $_____    Trafficking in Cannabis/Cocaine pursuant to
                      F.S. 893.135.

[_] h. _____    Driver's License Suspension/Revocation (Drug Offenses)
                      pursuant to F.S. 322.055(1)(2).

Brian Herlihy

Case No. 01-2002-CF-2753-A - page 2   ORDER ESTABLISHING MONETARY SUMS

4 - DISCRETIONARY COSTS (Priority #4)

[_] a. $_____    Public Defender costs and fees _____ total hours
                     expended, as ordered in the attached Order Awarding
                     Attorney's Fees and Costs of Defense which is
                     incorporated herein by reference, F.S. 938.29.

[_] b. $_____    Costs of Investigation and Prosecution, which is
                     incorporated herein by reference, or as may be
                     determined at hearing, after notice, within 60 days,
                     F.S. 938.27 & 948.03. See attached Order.

[✓] c. $    2.00     Criminal Justice education & Training pursuant to
                     F.S. 938.15 & CC 82-3.

[_] d. $  100.00     Florida Crimes Lab (FDLE Lab) pursuant to F.S. 938.25.

[_] e. $_____    Medical Costs in County Jail pursuant to F.S. 951.032
                     & 943.03.

[_] f.     50.00     Misdemeanor Probation Clerk's fee pursuant to
                     F.S. 948.09(1)(b).

[✓] g.     50.00     Court Facilities Assessment pursuant to
                     F.S. 939.18 (Up to $150.00).

[_] h. $_____    State Attorney Worthless Check Fees pursuant to
                     F.S. 832.08(5)(a)(b)(c) (if requested).

5 - TOTAL SUMS ORDERED SHALL BE PAID AS FOLLOWS:

[_] a. Through defendant's probation officer in equal monthly installments
       in an amount sufficient to pay the total sum in full three months
       before the end of the probationary period.

[✓] b. Through the Clerk of Court in full.~~on or before the complaining~~
       ~~court date given to defendant by separate notice.~~

[_] c. Civil judgement(s) shall be entered for the ordered sums.

    The foregoing costs are in addition to any costs of supervision the
court may have ordered in separate order of probation.

DONE AND ORDERED in Open Court in Gainesville, Alachua County, Florida
this __8__ day of __Nov.____, 2002.

                                        _____
                                        Judge of the Circuit Court
                                        MARTHA ANN LOTT

Filed in Open Court __11-8-2002__ by __S.Hilliard___ D.C.

Copies to: State Attorney, Defense Counsel, Probation and Parole

Attachments (if applicable): Order Awarding Costs of Investigation and
     Prosecution; Order Awarding Attorney's Fees and Costs of Defense;
     Civil Restitution Lien Order

# RULE 3.992(a) CRIMINAL PUNISHMENT CODE SCORESHEET

| 1. DATE OF SENTENCE | 2. PREPARER'S NAME ☐ DC ☒ SAO | 3. COUNTY | 4. SENTENCING JUDGE |
|---|---|---|---|
| 11-8-2002 | | ALACHUA | MARTHA ANN LOTT |

| 5. NAME (LAST, FIRST, M.I.) | 6. DOB | 8. RACE | 10. PRIMARY OFF. DATE | 12. |
|---|---|---|---|---|
| HERLIHY, BRIAN P. | 10-11-70 | ☐B ☒W ☐OTHER | 8-10-2000 | PLEA ☐ |
| | 7. DC# | 9. GENDER | 11. PRIMARY DOCKET # | TRIAL ☒ |
| | | ☒M ☐F | 2000-2753 CFA | |

**I.**

**PRIMARY OFFENSE:** If Qualifier, please check ___A ___S ___C ___R (A=Attempt, S=Solicitation, C=Conspiracy, R=Reclassification)

| FELONY DEGREE | F.S.# | DESCRIPTION | OFFENSE LEVEL | POINTS |
|---|---|---|---|---|
| 2F | 782.07(1) | Manslaughter | 7 | |

(Level - Points: 1=4, 2=10, 3=16, 4=22, 5=28, 6=36, 7=56, 6=74, 9=92, 10=116)

Prior capital felony triples Primary Offense points ☐

I. **56**

**II.**

**ADDITIONAL OFFENSE(S):** Supplemental page attached ☐

| DOCKET# | FEL/MM DEGREE | F.S.# | OFFENSE LEVEL | QUALIFY A S C R | COUNTS | POINTS | TOTAL |
|---|---|---|---|---|---|---|---|
| ___/ | ___/ | ___/ | ___ | ☐☐☐☐ | ___ X | ___ = | ___ |
| Description | | | | | | | |
| ___/ | ___/ | ___/ | ___ | ☐☐☐☐ | ___ X | ___ = | ___ |
| Description | | | | | | | |
| ___/ | ___/ | ___/ | ___ | ☐☐☐☐ | ___ X | ___ = | ___ |
| Description | | | | | | | |

(Level - Points: M=0.2, 1=0.7, 2=1.2, 3=2.4, 4=3.6, 5=5.4, 6=18, 7=28, 6=37, 9=46, 10=58)

Prior capital felony triples Additional Offense points ☐          Supplemental page points _____

II. **0**

**III.**

**VICTIM INJURY:**

| | | Number | Total | | | Number | Total |
|---|---|---|---|---|---|---|---|
| 2ⁿᵈ Degree Murder | 240 X | ___ | = ___ | Slight | 4 X | ___ | = ___ |
| Death | 120 X | 1 | = 120 | Sex Penetration | 80 X | ___ | = ___ |
| Severe | 40 X | ___ | = ___ | Sex Contact | 40 X | ___ | = ___ |
| Moderate | 18 X | ___ | = ___ | | | | |

III. **120**

**IV.**

**PRIOR RECORD:** Supplemental page attached ☐

| FEL/MM DEGREE | F.S # | OFFENSE LEVEL | QUALIFY A S C R | DESCRIPTION | NUMBER | POINTS | TOTAL |
|---|---|---|---|---|---|---|---|
| MM / | 322.34 / | MM / | ☐☐☐☐ | Traffic DWLSR / | 5 X | .2 = | 1.0 |
| MM / | 877.03 / | MM / | ☐☐☐☐ | Disorderly Conduct / | 1 X | .2 = | .2 |
| ___/ | ___/ | ___/ | ☐☐☐☐ | ___/ | ___ X | ___ = | ___ |
| ___/ | ___/ | ___/ | ☐☐☐☐ | ___/ | ___ X | ___ = | ___ |
| ___/ | ___/ | ___/ | ☐☐☐☐ | ___/ | ___ X | ___ = | ___ |
| ___/ | ___/ | ___/ | ☐☐☐☐ | ___/ | ___ X | ___ = | ___ |

(Level - Points: M=0.2, 1=0.5, 2=0.8, 3=1.6, 4=2.4, 5=3.6, 6=9, 7=14, 6=19, 9=23, 10=29)

Supplemental page points_____

IV. **1.2**

IN OPEN COURT
11-8-2002
S. HAMES
DC

Page 1 Subtotal: **177.2**

Page 1 Subtotal _ *177.2*

V.   Legal Status violation = 4 Points                                                V. *4.0*

VI.  Community Sanction violation before the court for sentencing                     VI._____
     6 points  x each successive violation OR
     New felony conviction  = 12 points x each successive violation

VII. Firearm/Semi-Automatic or Machine Gun = 18 or 25 Points                          VII._____

VIII. Prior Serious Felony = 30 Points                                                VIII._____

Subtotal Sentence Points  *181.2*

IX.  Enhancements (only if the primary offense qualifies for enhancement)

| Law Enforcement Protection | Drug Trafficking | Grand Theft Motor Vehicle | Street Gang | Domestic Violence (offenses committed on or after 10-1-97) |
|---|---|---|---|---|
| ___ x 1.5 ___ x 2.0 ___ x 2.5 | ___ x 1.5 | ___ x 1.5 | ___ x 1.5 | ___ x 1.5 |

Enhanced Subtotal Sentence Points  IX._____

TOTAL SENTENCE POINTS  *181.2*

## SENTENCE COMPUTATION

If total sentence points are less than or equal to 44, the lowest permissible sentence is any <u>non-state prison sanction</u>.

If total sentence points are greater than 44:

*181.2* minus 28 = *153.2* x .75 = *114.9*  ( *9.57 years* )
total sentence points                         lowest permissible prison
                                              sentence in months

The maximum sentence is up to the statutory maximum for the primary and any additional offenses as provided in s. 775.082, F.S., unless the lowest permissible sentence under the code, exceeds the statutory maximum. Such sentences may be imposed concurrently or consecutively. If total sentence points are greater than or equal to 363, a life sentence may be imposed.

*15 years*
maximum sentence
in years

## TOTAL SENTENCE IMPOSED

|  | Years | Months | Days |
|---|---|---|---|
| ☒ State Prison  ☐ Life | 15 | _____ | _____ |
| ☐ County Jail  ☐ Time Served | _____ | _____ | _____ |
| ☐ Community Control | _____ | _____ | _____ |
| ☐ Probation | _____ | _____ | _____ |

Please check if sentenced as  ☐ habitual offender,  ☐ habitual violent offender,  ☐ violent career criminal,  ☐ prison releasee reoffender, or a ☐ mandatory minimum applies.

☐ Mitigated Departure ☐ Plea Bargain

Other Reason _____

JUDGE'S SIGNATURE

MARTHA ANN LOTT                          0000287

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA.
CRIMINAL DIVISION _II_

STATE OF FLORIDA

VS.                                              CASE NO. 2000 - 2753 CFA

BRIAN PATRICK HERLIHY                    FILED IN OPEN COURT
                                              11-8 - 2002
Defendant SS#_____-_/-_____         S. Hilliard
                                                D.C.

---

## CIVIL RESTITUTION LIEN ORDER

By appropriate notation, the following provisions apply to the sentence imposed in this section:

◻   Restitution is not ordered as it is not applicable.

◻   Restitution is not ordered due to the financial resources of the defendant.

◻   Restitution is not ordered due to _____

◻   Due to the financial resources of the defendant, restitution of a portion of the damages is ordered as prescribed below.

◻   Restitution is ordered as prescribed below.

◻   Restitution is ordered for the following victim. (Victim refers to the aggrieved party, aggrieved party's estate, or aggrieved party's next of kin if the aggrieved party is dece a result of the offense. In lieu of the victim's address and phone number, the address and phone number of the prosecuting attorney, victim's attorney or victim advocate m used.)

| Name of victim | Victim Social Security No. | Name of attorney or advocate if applic |
|---|---|---|
| Address: | | |
| City, State, Zip Code: | | |
| Phone Number: | | |

◻   The sum of $_____ for medical and related services and devices relating to physical, psychiatric and psychological care, including non-medical care and treatment rendered in accordance with a recognized method of healing.

◻   The sum of $_____ for necessary physical and occupational therapy and rehabilitation.

◻   The sum of $_____ to reimburse the victim for income lost as a result of the offense.

◻   The sum of $_____ for necessary funeral and related services if the offense resulted in bodily injury resulting in the death of the victim.

◻   The sum of $_____ for damages resulting from the offense.

◻   The sum of $_____ for _____

It is further ordered that the defendant fulfill restitution obligations in the following manner:

◻   Total monetary restitution is determined to be $_____ to be paid at a rate of $_____ per (check one) ____ month ____ week ____ other (specify) _____ and is to be paid through the (check one) ____ clerk of the circuit court, ____ to the victim's designee, or through the Department of Corrections, with an additional 4% fee of $_____ for handling, processing and forwarding said restitution to the victim(s).

◻   The Victim is awarded from the Defendant the sum of $_____, together with interest pursuant to §775.089(5), §960.294(5) and §55.03, for which let execution issue.

☒   This Order shall constitute the Restitution Order under Florida Statutes §775.089 and §944.17, subject to being modified after the evidentiary hearing scheduled on the _ day of _To_ _Be Set_, 200__ at _____. The Defendant further waives/does not waive his presence at the above hearing.

☒   The Court reserves and retains jurisdiction as to restitution.

DONE AND ORDERED, at Gainesville, Alachua County, Florida, this **8** day of _November_, 200**2**

Certified Copy:      Victim
Copies:               Probation / File / State / Defense
                      Court Cost Containment

# STATE OF FLORIDA
## UNIFORM COMMITMENT TO CUSTODY
## OF DEPARTMENT OF CORRECTIONS

The Circuit Court of the Eighth Judicial Circuit, Alachua County, Florida in the **FALL** term, 2002, in the case number:                                    **01-2000-CF-2753-A**

### STATE  OF  FLORIDA

### VS

### BRIAN  PATRICK  HERLIHY
Defendant

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA, TO THE SHERIFF OF SAID COUNTY AND THE DEPARTMENT OF CORRECTIONS OF SAID STATE, GREETINGS:**

The above named defendant having been duly charged with the offense specified herein in the above styled Court, and he having been duly convicted and adjudged guilty of and sentenced for said offense by said Court, as appears from the attached certified copies of Information/Indictment, Judgement and Sentence, and Felony Disposition and Sentence Data from which are hereby made parts hereof;

Now, therefore, this is to command you, the said Sheriff, to take and keep and within a reasonable time after receiving this commitment, safely deliver the said defendant, together with any pertinent investigation report prepared in this case, into the custody of the Department of Corrections of the State of Florida; furthermore, this is to command you, Secretary, Regional Directors, Superintendents, and other officials, to keep and safely imprison the said defendant for the term of said sentence in the institution in the state correctional system to which you, the said Department of Corrections, may cause the said defendant to be conveyed or thereafter transferred. These presents shall be your authority for the same. Herein fail not.

**WITNESS** the **HONORABLE   MARTHA ANN LOTT**
JUDGE, of  said Court also **J.K. "Buddy" Irby,** Clerk and
Seal thereof this day November 13, 2002.

J.K."Buddy" Irby, Clerk of the Circuit Court,

By _____  *BBaker* _____
Deputy Clerk

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                              CASE NO:    2000-2753-CFA
    Plaintiff,

vs.

BRIAN P. HERLIHY,
    Defendant.
_____ _____/

## MOTION FOR SUPERSEDEAS BOND

    COMES NOW the Defendant, **BRIAN P. HERLIHY,** and respectfully moves this Honorable Court for an Order granting this Motion for Supersedeas Bond, pursuant to Rules 9.140(g) and 9.310(a), Fla.R.Appellate.P., and the Defendant says as follows:

    1.    On November 8, 2002, the Defendant, **BRIAN P. HERLIHY,** was adjudicated guilty of manslaughter and sentenced to 15 years in the Florida Department of Corrections.

    2.    This sentencing followed a jury verdict after a 2 week trial which jury verdict was had on September 25, 2002.

    3.    The crime which the Defendant was convicted of is not barred by statute from the relief sought herein in the form of a Supersedeas bond.

    4.    The Defendant, **BRIAN P. HERLIHY,** has not previously been convicted of any felony.

    5.    The Defendant, **BRIAN P. HERLIHY,** will be filing a Notice of Appeal pursuant to his conviction in this cause and will assign as error rulings on various pre-trial motions and other judicial rulings before and during the trial in question. The Defendant, **BRIAN P. HERLIHY,** would respectfully state that the Trial Court erred in various rulings and these rulings are ripe for review by the 1st District Court of Appeal.

    6.    The Defendant will appeal the jury verdict in this case and that appeal will be pursued in good faith, on grounds not frivolous, but fairly debatable, on issues as stated below:

        a.    The denial of the Defendant's Motion to Suppress Statements;

        b.    The denial of the Defendant's Motion to Suppress Evidence;

0000290

State v. Brian Herlihy
Motion For Supersedeas Bond
Page 2

c.      The denial of portions of the Defendant's multi-issue Motion in Limine;

d.      The denial of the Defendant's Motion to Dismiss the Indictment;

e.      The denial of the Defendant's Motion to Strike Testimony about and the use of a compact disc purporting to show how an incident of "shaken baby syndrome" occurs;

f.      The granting of the State's pre-trial Motion for Ruling on the Admissibility of Certain Photographs;

g.      The granting of the State's pre-trial Motion Allowing the Jury to take Handwritten Notes During the Trial;

h.      The granting of the State's Motion for Permission to Utilize a Demonstrative Aid without establishing a sufficient predicate for same;

i.      The denial of the Defendant's Motion for Sanctions against the State for Withholding Critical Testimony, the denial of the Defendant's Demand for a Richardson Hearing, and the denial of the Defendant's Motion for Mistrial;

j.      The denial of the Defendant's Motion for Judgement of Acquittal;

k.      The Trial Courts ruling that the defense during cross-examination had "opened the door" to testimony which the Court permitted the jury to hear and consider as relates to cross-examination of Crystal

l.      The Trial Courts ruling that the defense during cross-examination of firefighter Dennis Meredith had "opened the door" to testimony that the court allowed the jury to hear and consider, and that testimony was prejudicial to Defendant and adversely impacted his right to a fair trial;

m.      The Trial Courts ruling that Dr. Ronald Uscinski not be allowed to testify as to Putscher's Retinopathy as being "beyond his area of expertise";

State v. Brian Herlihy
Motion For Supersedeas Bond
Page 3

n.  The Trial Courts ruling that Dr. Maria, Dr. Dickison, Dr. Levine, Dr. Hamilton, and other medical witnesses were allowed to testify that ⸱ had suffered fatal injuries which were "consistent" with the theory known as "shaken baby syndrome", when such testimony was "beyond their area of expertise";

o.  The denial of these motion's for mistrial made when the Court ruled that the defense had "opened the door" during the testimony of Crystal .... and Dennis Meredith;

p.  The denial of the defense Motion for Mistrial during State's closing argument due to improper argument being presented to the jury, and which in effect attempted to shift the burden of proof to the Defendant, and improper "Golden Rule" argument, among other things;

q.  The denial of the Defendant's Renewed Motion for Judgement of Acquittal;

r.  The Trial Courts denial of the Defendant's Motion in Limine regarding State witnesses being allowed to testify as to injuries which had as being "consistent with shaken baby syndrome";

s.  The Trial Courts ruling that if Brian Herlihy took the stand in his own defense he would be subject to cross-examination about any and all statements which he might have made, despite the marginal, if any, relevancy to the case in chief, specifically about being a Navy Seal, and/or a paramedic, and/or any other occupation or profession as well as his level of education, which Brian Herlihy in fact had fabricated in conversations with various individuals. Said ruling effectively denied the Defendant, **BRIAN P. HERLIHY**, his right to testify in his own defense, and thereby

State v. Brian Herlihy
Motion For Supersedeas Bond
Page 4

           severely undermined his defense and his case in chief;

    t.    Other rulings made by the trial court will also be raised on appeal;

7.    The Defendant is not a flight risk, has never had a failure to appear, has friends and other local attachments to this community, nor is there reason to believe that the Defendant would remove himself from the jurisdiction of the Court should he be admitted to bail.

8.    Other grounds will be argued at the Motion Hearing set on this Motion.

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by hand-delivery to JEANNE SINGER, ESQUIRE, State Attorney's Office, P.O. Box 1437, Gainesville, FL 32602 on this 15th day of November, 2002.

LAW OFFICES OF GORDON H.
GROLAND & ASSOCIATES, P.A.

**Gordon H. Groland, Esquire**
Florida Bar # 137259
Post Office Box 2848
Gainesville, FL  32602
Phone: (352) 373-4669
Fax: (352) 373-2885

STATE OF FLORIDA

vs.

Name: **BRIAN HERLIHY**

Address: 17401 NW 10th STREET

Pembroke Pines, FL.

Phone Number: 954-442-1826

_____
Defendant

DOB: 10/11/70

SSN: . _ . _

IN THE CIRCUIT/COUNTY COURT OF THE EIGHTH JUDICIAL CIRCUIT IN AND FOR ALACHUA COUNTY, FLORIDA

01-2000-CF-2753-A

CASE NUMBER: _____

## APPLICATION FOR APPOINTMENT OF PUBLIC DEFENDER/ AFFIDAVIT OF INDIGENCY AND RELEASE OF FINANCIAL INFORMATION

***I understand that a public defender is not a free lawyer,*** and that a $40.00 application fee is to be paid to the clerk of the court, as ordered by the court and is due upon filing of this affidavit or within seven (7) days thereafter. If not paid within seven (7) days the application fee shall be assessed at sentencing or at the final disposition of this case, as directed by the court. I understand that a judgment & lien may be imposed against all of my real or personal property owned or after acquired, in favor of Alachua County, Florida, for an amount which shall constitute the reasonable minimum value of legal services and costs rendered on my behalf by the public defender. I also understand that if I am found to be not guilty or my case is dismissed that I will not be responsible for attorney fees.

### AFFIDAVIT OF INDIGENCY

***I, being first duly sworn, state under oath and penalty of perjury*** that the above and following statements regarding age, marital status, dependents, bail, financial status and release of information is true and correct. I hereby authorize Alachua County or the State of Florida to make inquiry to any employer, creditor, banking or financial institution, utility company and credit bureau (s) regarding my financial matters and further authorize the release of any information and documentation relating to same. I also agree to report any change in my financial status to the court or indigence examiner.

I AM PRESENTLY:   IN JAIL: (YES) NO   AMOUNT OF BAIL: $ _____   ROR: YES (NO)

MARITAL STATUS: **S**   NUMBER OF DEPENDENTS: **0**   EMPLOYED BY: **None**

EMPLOYERS ADDRESS: _____   NET INCOME WEEKLY $_____ BIWEEKLY $_____ MONTHLY $_____

PUBLIC ASSISTANCE: AFDC $_____   SSI $_____   FOOD STAMPS $_____   CASH OWNED: $_____

BANK NAME: **None**   REAL ESTATE(owned\interest in\expectancy of an interest) $ **None**

VALUE OF PERSONAL PROPERTY: (cars, motorcycle, boat, stocks, bonds, notes, etc.) $ **None**

MONTHLY LIABILITIES: (rent, utilities, loans, support payments, etc.) $ **None**

I understand that the court will only make a preliminary determination of indigency pending the outcome of an investigation by the indigence examiner into my financial background.

_____
(Affiant)

Subscribed and sworn to me this _____ day of _____ 1999. Affiant is personally known(  )

or has produced (  ) _____ as identification.

_____  _____  _____  _____
Judge   Deputy Clerk   Corrections Officer   Notary Public

### ORDER ADJUDGING INDIGENCY

The above named defendant now being before this court, having made application/affidavit to determine indigency, pursuant to Sec. 27.52, Florida Statutes and said application having been reviewed, it is therefore:

ORDERED ADJUDGED AND DECREED that this court makes a preliminary determination of;
(  ) INDIGENCY   (  ) NOT INDIGENT

IT IS FURTHER ORDERED that the PUBLIC DEFENDER be (  ) APPOINTED   (  ) NOT APPOINTED

DONE AND ORDERED this **21** day of **Nov 2002** _____
(Circuit\County Judge)

Copies furnished:  Clerk    Indigence Examiner    Public Defender    Defendant

FILED IN OPEN COURT
**11-22** **2002**
**S.Hilliad** D.C.

0000294

9603201

**COMMONWEALTH OF PENNSYLVANIA**

vs

BRIAN PATRICK HERLIHY

AKA _____

_____

1   M1   B

9-28-95      Offense Date

9-29-95      Date Filed

4-4-96    Pre-trial Date

3-27-96    180th Day

_____ F.A.

Judge _____

A.D.A. _____

Deft. _____

Reporter _____

Minute Clerk _____

CC No. _____9603201_____

SS # _____ D.O.B. 10-11-70

Actor's Race WHITE _____ Sex MALE

O.T.N. No. _____E4968191_____

B.C.I. No. _____

NOTICE: SEE ATTACHED SHEET CASE TO BE JOINED PURSUANT TO RULE 1127

Count __ : TERRORISTIC THREATS  (Section 2706)

Count __ : SIMPLE ASSAULT  (Section 2701)

1 Count: HARASSMENT  (Section 2709)

RECEIVED
96 APR 17 AM 8:51
CLERK OF COURTS
ALLEGHENY COUNTY

AND NOW, ___APR 24 1996___  ARREST WARRANT ISSUED

_____  MINUTE CLERK

FILED IN OPEN COURT
11-22-2002
S. O. U.

FROM THE RECORDS
ATTEST   11-20-02
JAL

_____
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS
COUNTY OF ALLEGHENY
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA

VS.

BRIAN PATRICK HERLIHY

Criminal Action No:   CC 9603201

The District Attorney of Allegheny County by this information
charges that on (or about) September 25, 1995 in the said County
of Allegheny BRIAN PATRICK HERLIHY hereinafter called actor, did
commit the crime or crimes indicated herein, that is:

Count 1                 TERRORISTIC THREATS              Misdemeanor 1

The actor threatened to commit the violent crime of criminal
homicide, with intent to terrorize Christine Cicarella, in
violation of Section 2706 of the Pennsylvania Crimes Code, Act of
December 6, 1972, 18 Pa. C.S. §2706.

Count 2                 SIMPLE ASSAULT                   Misdemeanor 2

The actor attempted to cause or intentionally, knowingly or
recklessly caused bodily injury to Christine Cicarella, that is to
say the actor grabbed and choked the victim, in violation of
Section 2701(a)(1) of the Pennsylvania Crimes Code, Act of
December 6, 1972, 18 Pa. C.S. §2701(a)(1).

1 Count                    HARASSMENT AND STALKING              Summary

The actor, with intent to harass, annoy or alarm Christine
Cicarella, struck, shoved, kicked, or otherwise subjected him or
her to physical contact, or attempted or threatened to do the
same; or followed that person in or about a public place or
places; or engaged in a course of conduct or repeatedly committed
acts which alarmed or seriously annoyed such other person and
which served no legitimate purpose, in violation of Section
2709(a) of the Pennsylvania Crimes Code, Act of December 6, 1972,
18 Pa. C.S. §2709(a).


All of which is against the Act of Assembly and the peace and
dignity of the Commonwealth of Pennsylvania.


                                  Attorney for the Commonwealth


FROM THE RECORDS
ATTEST   11-20-0 2
                    jA L
CLERK OF COURTS

CRIMINAL COMPLAINT   (POLICE)

| DOCKET NUMBER | YEAR | TYPE | NUMBER |
|---|---|---|---|
| CR 164 | | | |

Complaint N___ers if Other Participants

GIGI SULLIVAN
**DISTRICT JUSTICE**
MAGISTERIAL DISTRICT NO. 05-3-03
425 PITTSBURGH STREET
SPRINGDALE, PA 15144

0139674 **C**

| INCIDENT NUMBER | UCR NO. | OTN |
|---|---|---|
| | | E 496819-1 |

*CC 9603201*

**COMMONWEALTH OF PENNSYLVANIA**
DEFENDANT:   **VS.**

, Robert L. Scott
*(Name of Affiant)*

of Cheswick Borough Police Dept.
*( Identify department or agency represented and political subdivision )*

| NAME AND ADDRESS | LAST | FIRST | M. |
|---|---|---|---|
| | Herlihy | Brian | Patrick |
| R.S.A. | 511 W. Patterson Ave. | | |
| AKA | Connellsville Pa | | |
| | 15425 | | |
| | SS# 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 | | |

do hereby state:

(1) ☒ I accuse the above named defendant, who lives at the address set forth above or,
   ☐ I accuse an individual whose name is unknown to me but who is described as_____

   ☐ his nickname or popular designation is unknown to me and, therefore, I have designated him herein as John Doe;
   with violating the penal laws of the Commonwealth of Pennsylvania at Cheswick Borough *(Place Political Subdivision)*   488 *(Code)*

   _____ in _Allegheny_____ County on or about _28 September 95   9:25 PM_

   Participants were *(if there were participants, place their names here, repeating the name of above defendant):*

(2)   The acts committed by the accused were: (A) CC 2701 SIMPLE ASSAULT: The actor unlawfully did
   then and there attempt to cause and did intentionally, knowingly and recklessly cause
   bodily injury to the person of Christine Cicarella.

   CC 2706 TERRORISTIC THREATS: The actor did unlawfully threaten to commit a certain crime
   of violence, to wit: The crime of terroristic threats with intent to terrorize one
   Christine Cicarella or in reckless disregard of the risk of causing terror and inconven-
   ience.

   CC 2709 HARRASSMENT: The actor with intent to harass, annoy, or alarm another, to wit:
   One Brian Patrick Herlihy unlawfully did strike, shove, kick or otherwise subject the
   Christine Cicarella to physical contact, or did attempt or threaten to do the same.

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly,
or in violation of 2701/2706/2709 and 1733 *(Sub-section)* of the Act of Penna. Crimes Code *(Section)*

or the _____ Ordinance of _____ .
   *( Political Sub-division )*

(3)   I ask that a warrant of arrest or a summons be issued and that the accused be required to answer the
   charges I have made.

(4)   I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or
   information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes
   Code (18 Pa. C. S. § 4904) relating to unsworn falsification to authorities.

   _____September 29, 1995_____, 19 _95_   *Robert L. Scott*
   *(Signature of Complainant)*

AND NOW, on this date _September 29, 1995_, I certify the complaint has been properly completed and
verified, and that there is probable cause for the issuance of process.

06-3-03
*( Magisterial District )*

(SEAL)

*(Issuing Authority)*



**ARREST WARRANT**          **ARREST WARRANT**

JUDGE'S CHAMBERS
COURT OF COMMON PLEAS
PITTSBURGH, PENNSYLVANIA 15219


I command you, Sheriff of Allegheny or any person authorized to execute a warrant of arrest to apprehend.

   BRIAN PATRICK HERLIHY

Lodge said person in the Allegheny County Jail, and bring said person before the Court to answer the charge(s) of:

      TERRORISTIC THREATS
      SIMPLE ASSAULT
      HARASSMENT



**THIS SHALL SERVE AS YOUR LEGAL WARRANT.**

Date Issued: 04/24/96
Reason Warrant Issued: BOND FORFEIT-PRELIMINARY HEARING
Authority: JUDGE CERCONE
Minute Clerk: GINNY DEMKO
Nationwide:    Surrounding States:    Pennsylvania only: X

CC No.: 9603201      OTN No.: E4968191      BCI No.:

Last Known Address:                          Sex: MALE
   511 E PATTERSON AV                        Race: WHITE
                                             Birth Date: 10/11/70
   CONNELLSVILLE PA 15425                    Height:
                                             Weight:
Police Agency Filing Original Complaint:     Eyes:
   Cheswick                                  Hair:
                                             SSN.

ADDITIONAL DEFENDANT WARRANT INFORMATION:


                              By the Court
                              DAVID S. CERCONE
                              Administrative Judge

ADDITIONAL PERSONAL DESCRIPTOR (N.C.I.C. USE ONLY)
 Alias
 OFFENSE CODE _____   SID No. _____   FBI No. _____
 POB _____   OLS _____   OLN _____   OLY _____
 Additional DOB _____
 Additional SOC _____
 MISC _____
 D.A. _____        C.A. _____
 Custody Ori.

9603212

COMMONWEALTH OF PENNSYLVANIA

vs

BRIAN PATRICK HERLIHY

AKA _____

_____

2   M1   B _____

9-22-95 _____ Offense Date

9-29-95 _____ Date Filed

4-4-96 Pre-trial Date

3-27-96 _____ 180th Day

_____ F.A.

Judge _____

A.D.A. _____

Deft. _____

Reporter _____

Minute Clerk _____

CC No. _____ 9603212 _____

SS # _____ D.O.B. 10-11-70

Actor's Race WHITE _____ Sex MALE

O.T.N. No. _____ E4968202 _____

B.C.I. No. _____

NOTICE: SEE ATTACHED SHEET CASE TO BE JOINED PURSUANT TO RULE 1127

Count 1    UNLAWFUL RESTRAINT   (Section 2902)

Count 2    FALSE IMPRISONMENT   (Section 2903)

96 APR 16  AM 8: 23
RECEIVED
CLERK OF COURTS
ALLEGHENY COUNTY

AND NOW, _____ APR 17 1996 _____ 19 ___  ARREST WARRANT ISSUED

_____  MINUTE CLERK

IN OPEN COURT
11-22-2002
S. Hull
D.C.

FROM THE RECORDS
ATTEST    9-07
11-2-002

_____
CLERK OF COURTS

0000300

IN THE COURT OF COMMON PLEAS
COUNTY OF ALLEGHENY
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA

VS.

BRIAN PATRICK HERLIHY

Criminal Action No:  CC 9603212

The District Attorney of Allegheny County by this information
charges that on (or about) September 22, 1995 in the said County
of Allegheny BRIAN PATRICK HERLIHY hereinafter called actor, did
commit the crime or crimes indicated herein, that is:

Count 1                 UNLAWFUL RESTRAINT          Misdemeanor 1

The actor knowingly and unlawfully restrained another person,
namely, Christine Cicarella, in circumstances exposing the said
other person to risk of serious bodily injury, in violation of
Section 2902 of the Pennsylvania Crimes Code, Act of December 6,
1972, 18 Pa C.S. §2902.

Count 2                 FALSE IMPRISONMENT          Misdemeanor 2

The actor knowingly and unlawfully restrained another person,
namely, Christine Cicarella, as to interfere substantially with
the liberty of said other person, in violation of Section 2903 of
the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa.
C.S. §2903.

FROM THE RECORDS
ATTEST
CLERK OF COURTS

Page 1 of 2

All of which is against the Act of Assembly and the peace and
dignity of the Commonwealth of Pennsylvania.

_____
Attorney for the Commonwealth

FROM THE RECORDS
ATTEST

CLERK OF COURTS

CRIMINAL COMPLAINT

**NUMBER**

CR-165-

Complaint Number if Other Participants

**KRIX** GIGI SULLIVAN
DISTRICT JUSTICE

MAGISTERIAL DISTRICT NO. 05-3-03

425 PITTSBURGH ST
SPRINGDALE, PA 15144

0150854**C**

INCIDENT NUMBER  UCR NO.  OTN
E 496820-2

OC 9603212

COMMONWEALTH OF PENNSYLVANIA

DEFENDANT:  VS.
LAST  FIRST  M.

I, _Capt. J.T. Naviglia Jr._

( Name of Affiant )

of _Springdale Boro Police Dept._

( Identify department or agency represented and political subdivision)

NAME
AND
ADDRESS

R.S.A.

A.K.A

Herlihy  Brian  Patrick
311 E Patterson Ave.
Connelsville Pa 15425

do hereby state:

(1) ☒  I accuse the above named defendant, who lives at the address set forth above or,

☐  I accuse an individual whose name is unknown to me but who is described as_____

☐ his nickname or popular designation is unknown to me and, therefore, I have designated him herein as John Doe,
with violating the penal laws of the Commonwealth of Pennsylvania at_____Springdale Borough_____

( Place-Political Subdivision )  ( Code )

in _Allegheny_ County on or about _Sept. 22, 1995_

Participants were (if there were participants, place their names here, repeating the name of above defendant):

(2)  The acts committed by the accused were (A)

C.C. 2902 (A)(1) Unlawful Restraint- Actor unlawfully and knowingly did restrain
one Christine Cicarella in a circumstance exposing her to the risk of serious
dily injury, that is to say assault.

C.C. 2903 (A) False Imprisonment- Actor unlawfully did knowingly restrain one
ristine Cicarella unlawfully, so as to interfere substantially with her libility

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly,
or in violation of ▨2902 a.1/ 2903▨ and ▨▨ of the Act of ▨Pa. Crimes Code▨

( Section )  ( Sub-section )

or the ▨▨ Ordinance of ▨▨.

( Political Sub-division )

(3)  I ask that a warrant of arrest or a summons be issued and that the accused be required to answer the
charges I have made.

(4)  I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or
information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes
Code (18 Pa. C. S. § 4904) relating to unsworn falsification to authorities.

SEPTEMBER 29 , 19 95  _Joseph J. Naviglia Jr._

( Signature of Complainant )

AND NOW, on this date  SEPTEMBER 29  19 95 , I certify the complaint has been properly completed and
verified, and that there is probable cause for the issuance of process.

06-3-03

( Magisterial District )  ( Issuing Authority )  (SEAL)



| **ARREST WARRANT** | JUDGE'S CHAMBERS<br>**COURT OF COMMON PLEAS**<br>PITTSBURGH,PENNSYLVANIA 15219 | **ARREST WARRANT** |

I command you, Sheriff of Allegheny or any person authorized to execute a warrant of arrest to apprehend.

    BRIAN PATRICK HERLIHY

Lodge said person in the Allegheny County Jail, and bring said person before the Court to answer the charge(s) of:

    UNLAWFUL RESTRAINT
    FALSE IMPRISONMENT

**THIS SHALL SERVE AS YOUR LEGAL WARRANT.**

Date Issued: 04/17/96
Reason Warrant Issued: BOND FORFEIT-PRELIMINARY HEARING
Authority: JUDGE CERCONE
Minute Clerk: GINNY DEMKO
Nationwide:    Surrounding States:    Pennsylvania only: X

CC No.: 9603212      OTN No.: E4968202      BCI No.:

Last Known Address:                          Sex: MALE
  511 E PATTERSON AV                         Race: WHITE
                                  Birth Date: 10/11/70
  CONNELLSVILLE PA 15425                      Height:
                                   Weight:
Police Agency Filing Original Complaint:     Eyes:
  Springdale                                 Hair:
                                   SSN.

ADDITIONAL DEFENDANT WARRANT INFORMATION:

                                          By the Court
                                     **DAVID S. CERCONE**
                                     Administrative Judge

| ADDITIONAL PERSONAL DESCRIPTOR (N.C.I.C. USE ONLY) | | |
|---|---|---|
| Alias | | |
| OFFENSE CODE | SID No. | FBI No. |
| POB | OLS | OLN | OLY |
| Additional DOB | | |
| Additional SOC | | |
| MISC | | |
| D.A. | C.A. | |
| Custody Ori. | | |

# IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
# IN AND FOR ALACHUA COUNTY, FLORIDA

BRIAN PATRICK HERLIHY,                         CASE NO:   2000-2753-CFA
          Defendant/Appellant,

vs.

STATE OF FLORIDA,
          Plaintiff/Appellee.

                                              FILED IN OPEN COURT
_____/             11- 22, 2002
                                              S. Hilliard
                                                             D.C.

## NOTICE OF APPEAL

NOTICE IS GIVEN that BRIAN PATRICK HERLIHY, Defendant/Appellant, takes and

enters his appeal to the First District Court of Appeal of Florida.  The Defendant/Appellant was

charged by Indictment with First Degree Murder.  The Defendant/Appellant was found guilty at jury

trial on September 25, 2002 of the lessor charge of Manslaughter.  The Defendant/Appellant was

adjudicated guilty and sentenced to fifteen (15) years Department of Corrections, three hundred forty

seven (347) days credit time served.

          Signed this 22 day of November, 2002.

                                   LAW OFFICES OF GORDON H.
                                   GROLAND & ASSOCIATES, P.A.


                                   _____
                                   Gordon H. Groland, Esquire
                                   Florida Bar # 137259
                                   Post Office Box 2848
                                   Gainesville, FL 32602
                                   Phone: (352) 373-4669
                                   Fax: (352) 373-2885

## CERTIFICATE OF SERVICE

          I HEREBY CERTIFY that a copy of the foregoing has been furnished via U.S. Mail and/or Hand
Delivery to the State Attorney's Office, P.O. Box 1437, Gainesville, FL 32602, the Office of the Attorney
General, Criminal Appeals Division, The Capitol, Tallahassee, FL 32399-1050, the Public Defender's
Office, 301 S Monroe Street, Suite 401, Tallahassee, FL 32301, and via Hand Delivery to the
Defendant/Appellant, Brian Patrick Herlihy on this 22 day of November, 2002.


                                   _____
                                   Gordon H. Groland, Esquire

## IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
## IN AND FOR ALACHUA COUNTY, FLORIDA

**BRIAN PATRICK HERLIHY,**
        **Defendant/Appellant,**

**CASE NO:    2000-2753-CFA**

vs.

**STATE OF FLORIDA,**
        **Plaintiff/Appellee.**

FILED IN OPEN COURT
11 - 22, 2002
S. Hilliard
                    D.C.

_____/

## DESIGNATION TO REPORTER AND REPORTER'S ACKNOWLEDMENT

### 1. DESIGNATION

COMES NOW, the Defendant/Appellant and pursuant to Florida Appellate Rule 9.140(d), respectfully designates to the Official Court Reporter to transcribe an original and three (3) copies of the following portions of the proceedings to be used in this appeal:

1.    The pre-trial motions held before Judge Lott on September 4, 2002 and September 5, 2002.

2.    The jury trial held before Judge Lott on September 9, 2002 through September 25, 2002 including all Motions heard before or after voir dire, but excluding voir dire.

3.    All Motions for Judgment of Acquittal held before Judge Lott.

4.    The sentencing hearing held before Judge Lott on November 8, 2002.

5.    The Motion hearing for Supersedeous Bond held on November 22, 2002.

The Court reporter is directed to file the original and three (3) copies with the Clerk of the lower tribunal.

Signed this 22 day of November, 2002.

                            LAW OFFICES OF GORDON H.
                            GROLAND & ASSOCIATES, P.A.

                            _____
                            **Gordon H. Groland, Esquire**
                            Florida Bar # 137259
                            Post Office Box 2848
                            Gainesville, FL  32602
                            Phone: (352) 373-4669/(352) 373-2885 (f)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished via U.S. Mail and/or Hand Delivery to the State Attorney's Office, P.O. Box 1437, Gainesville, FL 32602, the Office of the Official Court Reporter, 201 E. University Avenue, Gainesville, FL 32601, the Office of the Attorney General, Criminal Appeals Division, The Capitol, Tallahassee, FL 32399-1050, the Public Defender's Office, 301 S Monroe Street, Suite 401, Tallahassee, FL 32301, and via Hand Delivery to the Defendant/Appellant, Brian Patrick Herlihy on this ꞋＺＺday of November, 2002.

Gordon H. Groland, Esquire

## II.  REPORTER'S ACKNOWLEDGMENT

1.      The foregoing designation was served on _____, 20____, and

        received on _____, 20____.

2.      Satisfactory arrangements have (   ) have not (   ) been made for payment of the

        transcript cost.  These financial arrangements were completed on _____.

3.      Number of trial or hearing days: _____.

4.      Estimated number of transcript pages: _____.

5.      Transcript will be completed on _____, or an extension of

        time is needed until _____.


DATE: _____                    _____
                                       Official Court Reporter

### CERTIFICATE OF SERVICE

        I HEREBY CERTIFY that a copy of this acknowledgment (with counsels designation attached)
has been furnished this ____ day of _____, 20____, to the Clerk, First District Court of
Appeals, 301 Martin Luther King, Jr. Boulevard, Tallahassee, FL 32399-1850, and to the State Attorney's
Office, P.O. Box 1437, Gainesville, FL 32602, , the Office of the Attorney General, Criminal Appeals
Division, The Capitol, Tallahassee, FL 32399-1050, the Public Defender's Office, 301 S Monroe Street,
Suite 401, Tallahassee, FL 32301, and Gordon H. Groland, Esquire, P.O. Box 2848, Gainesville, FL
32602.


                                       _____
                                       Official Court Reporter

## IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
## IN AND FOR ALACHUA COUNTY, FLORIDA

**BRIAN PATRICK HERLIHY,**
**Defendant/Appellant,**

CASE NO:   2000-2753-CFA

vs.

**STATE OF FLORIDA,**
**Plaintiff/Appellee.**
_____/

FILED IN OPEN COURT
11-22-2002
S. Hilliard
D.C.

## DIRECTIONS TO THE CLERK

The Clerk of the above styled Court is directed to prepare and transmit to the Appellate Court a Record on Appeal in the above-styled cause, in accordance with the applicable provisions of the Florida Appellate Rules and in accordance with the mandates of Florida Rules of Appellate Procedure 9.200(a)(1).

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished via U.S. Mail and/or Hand Delivery to the State Attorney's Office, P.O. Box 1437, Gainesville, FL 32602, the Office of the Attorney General, Criminal Appeals Division, The Capitol, Tallahassee, FL 32399-1050, and the Public Defender's Office, 301 S Monroe Street, Suite 401, Tallahassee, FL 32301, on this 22 day of November, 2002.

LAW OFFICES OF GORDON H.
GROLAND & ASSOCIATES, P.A.

Gordon H. Groland, Esquire
Florida Bar # 137259
Post Office Box 2848
Gainesville, FL 32602
Phone: (352) 373-4669
Fax: (352) 373-2885

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

BRIAN PATRICK HERLIHY,                          CASE NO:    2000-2753-CFA
    Defendant/Appellant,

vs.

STATE OF FLORIDA,
    Plaintiff/Appellee.

                            /

FILED IN OPEN COURT
  11 . 22 . 2002
S. Hilliard
          D.C.

## STATEMENT OF JUDICIAL ACTS TO BE REVIEWED

COMES NOW, the Defendant/Appellant, by his undersigned counsel, and pursuant to

Fla.R.App.P. 9.140(d), designates as judicial acts to be reviewed the following:

1.     The denial of the Defendant's Motion to Suppress Statements;

2.     The denial of the Defendant's Motion to Suppress Evidence;

3.     The denial of portions of the Defendant's multi-issue Motion in Limine;

4.     The denial of the Defendant's Motion to Dismiss the Indictment;

5.     The denial of the Defendant's Motion to Strike Testimony about and the use of a compact
       disc purporting to show how an incident of "shaken baby syndrome" occurs;

6.     The granting of the State's pre-trial Motion for Ruling on the Admissibility of Certain
       Photographs;

7.     The granting of the State's pre-trial Motion Allowing the Jury to take Handwritten Notes
       During the Trial;

8.     The granting of the State's Motion for Permission to Utilize a Demonstrative Aid without
       establishing a sufficient predicate for same;

9.     The denial of the Defendant's Motion for Sanctions against the State for Withholding
       Critical Testimony, the denial of the Defendant's Demand for a Richardson Hearing, and
       the denial of the Defendant's Motion for Mistrial;

10.     The denial of the Defendant's Motion for Judgement of Acquittal;

11.     The Trial Court's ruling that the defense during cross-examination had "opened the door" to testimony which the Court permitted the jury to hear and consider as relates to cross-examination of Crystal Quirello;

12.     The Trial Court's ruling that the defense during cross-examination of firefighter Dennis Meredith had "opened the door" to testimony that the court allowed the jury to hear and consider, and that testimony was prejudicial to Defendant and adversely impacted his right to a fair trial;

13.     The Trial Court's ruling that Dr. Ronald Uscinski not be allowed to testify as to Putscher's Retinopathy as being "beyond his area of expertise";

14.     The Trial Courts ruling that Dr. Maria, Dr. Dickison, Dr. Levine, Dr. Hamilton, and other medical witnesses were allowed to testify that _____ had suffered fatal injuries which were "consistent" with the theory known as "shaken baby syndrome", when such testimony was "beyond their area of expertise";

15.     The denial of these motion's for mistrial made when the Court ruled that the defense had "opened the door" during the testimony of Crystal ___ and Dennis Meredith;

16.     The denial of the defense Motion for Mistrial during State's closing argument due to improper argument being presented to the jury, and which in effect attempted to shift the burden of proof to the Defendant, and improper "Golden Rule" argument, among other things;

17.     The denial of the Defendant's Renewed Motion for Judgement of Acquittal;

18.     The Trial Courts denial of the Defendant's Motion in Limine regarding State witnesses being allowed to testify as to injuries which _____ had as being "consistent with shaken baby syndrome";

19.     The Trial Courts ruling that if Brian Herlihy took the stand in his own defense he would be subject to cross-examination about any and all statements which he might have made, despite the marginal, if any, relevancy to the case in chief, specifically about being a Navy

000311

Seal, and/or a paramedic, and/or any other occupation or profession as well as his level of education, which Brian Herlihy in fact had fabricated in conversations with various individuals. Said ruling effectively denied the Defendant, **BRIAN P. HERLIHY**, his right to testify in his own defense, and thereby severely undermined his defense and his case in chief.

20.    The denial of the Defendant's Motion for Supersedeas Bond.

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished via U.S. Mail and/or Hand Delivery to the State Attorney's Office, P.O. Box 1437, Gainesville, FL 32602, the Office of the Attorney General, Criminal Appeals Division, The Capitol, Tallahassee, FL 32399-1050, the Public Defender's Office, 301 S Monroe Street, Suite 401, Tallahassee, FL 32301, and by Hand Delivery to the Defendant/Appellant on this 2²  day of ___*November*___, 2002.

**LAW OFFICES OF GORDON H.**
**GROLAND & ASSOCIATES, P.A.**

**Gordon H. Groland, Esquire**
Florida Bar # 137259
Post Office Box 2848
Gainesville, FL  32602
Phone: (352) 373-4669
Fax: (352) 373-2885

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

BRIAN PATRICK HERLIHY,                          CASE NO:    2000-2753-CFA
    Defendant/Appellant,

vs.

STATE OF FLORIDA,
    Plaintiff/Appellee.

                          /

*FILED IN OPEN COURT*
*11-22-2002*
*S. Hilliard*
*D.C.*

## DESIGNATION OF PUBLIC DEFENDER,
## SECOND JUDICIAL CIRCUIT, FOR THE HANDLING OF APPEAL

Pursuant to Section 27.51(4) of the Florida Statutes, the undersigned has requested the

Appellate Office of the Public Defender, Second Judicial Circuit, 301 South Monroe Street, Suite

401, Tallahassee, FL 32301, to handle the above-styled cause for appeal to the District Court of

Appeal, First District, State of Florida. Notice is hereby given that henceforth all correspondence and

copies of pleadings in this cause should be served on the Public Defender in the Second Judicial

Circuit.

DATED this 22-day of November, 2002.

                              LAW OFFICES OF GORDON H.
                              GROLAND & ASSOCIATES, P.A.

                              Gordon H. Groland, Esquire
                              Florida Bar # 137259
                              Post Office Box 2848
                              Gainesville, FL 32602
                              Phone: (352) 373-4669
                              Fax: (352) 373-2885

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished via U.S. Mail and/or Hand
Delivery to the State Attorney's Office, P.O. Box 1437, Gainesville, FL 32602, the Office of the Attorney
General, Criminal Appeals Division, The Capitol, Tallahassee, FL 32399-1050, the Public Defender's Office,
301 S Monroe Street, Suite 401, Tallahassee, FL 32301, and by Hand Delivery to the
Defendant/Appellant on this 22 day of _____, 2002.

                              Gordon H. Groland, Esquire

01-2000-2753CFA

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,

        Plaintiff,

                                    CASE NO: 01-200-2753-CFA

v.

BRIAN PATRICK HERLIHY,

        Defendant.

_____/

**ORDER FINDING DEFENDANT INDIGENT AND APPOINTING PUBLIC DEFENDER OF THE EIGHTH JUDICIAL CIRCUIT FOR HANDLING OF APPEAL**

**THIS CAUSE** comes before the Court upon a Notice of Appeal and on November 22, 2002 the ore tenus request of the defendant to appoint the Office of the Public Defender for the purposes of the appeal. Thus, it is

**ADJUDGED**

1) that the defendant is insolvent, and

2) the Public Defender, Eighth Judicial Circuit, should handle the above-styled cause for appeal in the First District Court of Appeal of Florida.

**ORDERED** in chambers on December 3, 2002.

MARTHA ANN LOTT, CIRCUIT JUDGE

1

0000314

## CERTIFICATE OF SERVICE

I CERTIFY that a true and correct copy of the foregoing has been mailed on December 3, 2002 to:

Jon S. Wheeler
Clerk of the Court
First District Court of Appeal of Florida
301 Martin Luther King, Jr. Blvd.
Tallahassee, FL 32399-1850

Public Defender's Office
Eighth Judicial Circuit

Attorney General's Office
Criminal Appeals
The Capitol
Tallahassee, FL 32399-1925

Gordon Groland, Esquire
P.O. Box 2848
Gainesville, FL 32602

Judicial Assistant

2

0000315

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

CASE NO.: 2000-2753-CFA

BRIAN PATRICK HERLIHY,
    Defendant/Appellant,

vs.

STATE OF FLORIDA
    Plaintiff/Appellee.
_____/

## AMENDED NOTICE OF APPEAL

NOTICE IS GIVEN that BRIAN PATRICK HERLIHY, Defendant/Appellant, takes and

enters his appeal to the First District Court of Appeal of Florida. The Defendant/Appellant was

charged by Indictment with First Degree Murder. The Defendant/Appellant was found guilty at

jury trial on September 25, 2002 of the lessor charge of Manslaughter. The Defendant/Appellant

was adjudicated guilty and sentenced to fifteen (15) years Department of Corrections, three

hundred forty seven (347) days credit time served on November 8, 2002.

I HEREBY CERTIFY that a copy of the foregoing has been furnished via U.S. Mail to

Honorable Richard E. Doran, Attorney General's Office, Criminal Appeals Division, The Capitol,

Tallahassee, FL 32399-1050, Gordon Groland, PO Box 2848, Gainesville, FL 32602 and Brian

Herlihy, Alachua County Detention Center, 3333 NE 39th Avenue, Gainesville, FL 32609 on this

2 day of December, 2002.

Respectfully submitted,

John J. Kearns, 151604
Deputy Public Defender
Post Office Box 2820
Gainesville, FL 32602
(352) 338-7386

STATE OF FLORIDA

COUNTY OF ALACHUA

I, J.K. "Buddy" Irby, Clerk of the Circuit Court for the County of Alachua, State of Florida, do hereby certify that the foregoing pages 1-316 contain a true transcript of the judgment and sentence in the case of BRIAN P. HERLIHY v. STATE OF FLORIDA and a correct recital and copy of all such papers and proceedings in this cause as appears from the records and files of my office that have been directed to be included in said record pursuant to <u>Fla. R. App.p. 9.200.</u>

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Court this January 3, 2003.



J.K. "Buddy" Irby
Clerk of the Circuit Court
Alachua County, Florida

By _Shelley J. Carr_
Shelley J. Carr
Deputy Clerk

MC\WORD\YVONNE\CIRCUIT CRIMINAL DOCUMENTS\CERT-PG.FEL.DOC