# EXHIBIT

# D

*202-1.1781*
*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY                              }
            Appellant,   }
                    }   CASE NUMBER   2000-2753-CFA
                    }
                    }   APPEAL NUMBER 1D02-4788
v.                                                }
                    }   VOLUME IV
                    }
STATE OF FLORIDA                                  }
          Appellee,   }

Dock~ *CA*
05 - 14 - 2003
*Circuit Attorney Copied*

## TRANSCRIPT
## RECORD

### HONORABLE MARTHA ANN LOTT
#### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

2003 MAY 12 PM 2: 41
CLERK'S OFFICE
CRIMINAL APPEALS
TALLAHASSEE
RECEIVED

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

202-1-17814  1

F

IN THE CIRCUIT COURT OF FLORIDA
EIGHTH JUDICAL CIRCUIT
IN AND FOR ALACHUA COUNTY

CASE NO: 01-2000-CF-2753-A

TRANSCRIPT ON APPEAL
VOLUME I
(Pages 1 - 107)

STATE OF FLORIDA

vs.

BRIAN PATRICK HERLIHY,

                Defendant.

_____/

Volume IV

1D02-4788

Docket CH
05-14-2003
Criminal Attorney
General

Proceedings:           Jury trial

Before:                The Honorable Martha Ann Lott,
                       Circuit Judge

Date:                  September 10, 2002

Time:                  9:00 a.m.

Place:                 Courtroom 4-A
                       Alachua County Courthouse
                       Gainesville, Florida

Reporter:              Stacey K. Bryant,RPR
                       Judicial Court Reporter

APPEARANCES:

     Jeanne Singer, Assistant State Attorney
     Stephen Pennypacker, Assistant State Attorney
     120 W. University Avenue
     Gainesville, Florida 32608
        Appearing on behalf of the State of Florida

     Gordon Groland, Esquire
     John Tedder, Esquire
     Post Office Box 2848
     Gainesville, Florida 32602
       Attorneys for defendant

1          INDEX TO PROCEEDINGS

2

3     PRELIMINARY MOTIONS: ............................. 3

4

5     INVOCATION OF THE RULE: .......................... 6

6

7     SWEARING IN OF THE JURY: ......................... 8

8

9     OPENING ARGUMENTS:

10    BY MR. PENNYPACKER: ............................. 15
      BY MR. TEDDER: .................................. 27
11

12    STATE'S CASE:

13

14                    DORIS BRIDWELL,

15    DIRECT EXAMINATION BY SINGER: ................... 56
      CROSS-EXAMINATION BY GROLAND: ................... 79
16    REDIRECT-EXAMINATION BY SINGER: ................. 96

17

18                    YANTZ ENOCH,

19    DIRECT EXAMINATION BY PENNYPACKER: .............. 98

20

21                    INDEX TO EXHIBITS

22

23    STATE'S EXHIBIT NO. 1......MARKED IN EVIDENCE...... 4

24    STATE'S COMPOSITE NO. 2....MARKED IN EVIDENCE......75

25

                    Stacey K. Bryant, RPR
                    Judicial Court Reporter

P R O C E E D I N G S

(Out of the presence of the jury:)

MS. SINGER:  Your Honor, before we get started we need to indicate to the Court --

MR. TEDDER:  Your Honor, Mr. Herlihy's not present.

MS. SINGER:  I see the clerk has also gotten memo pads, but you did ask for bound, spiral bound notebooks, and we did provide those as well.

THE COURT:  Either one.  The defense can select whether or not you want to use the clerk's pads -- We can still seal them for the most part -- or whether or not you want to go with the state's spiral bound notebooks.

MR. GROLAND:  What is that, just yellow pads?

THE CLERK:  Yeah.

MR. GROLAND:  That's fine.

THE COURT:  Good enough.  If the defendant will turn them over to the clerk, then I'll ask the clerk to distribute them and you have pens there.  Thank you very much, Ms. Singer.

THE CLERK:  We have two sets of pens.

THE COURT:  Excellent.  All right.

Anything else the state needs to address?

MS. SINGER:  I'm trying to think, your Honor.

```
 1          THE COURT:  I'm sorry, I can't hear you.  You

 2    turned your back.

 3          MS. SINGER:  I'm trying to think a moment.  I

 4    believe we probably -- Oh, I do have one other thing,

 5    your Honor.  Based upon stipulation of counsel, copies

 6    have already been provided to Mr. Groland on behalf of

 7    the defendant.  The records from Shands Teaching

 8    Hospital have been previously stipulated into evidence

 9    and I would like to go ahead now and provide the Court

10    with a copy, the clerk with a copy that should be

11    marked as Exhibit 1 into evidence.  And the reason why

12    we're providing the Court with a copy is so that if

13    there's any need for the Court to refer to certain

14    pages, the Court will have it available as a copy, as a

15    tool.

16          THE COURT:  Any objection to it being marked in

17    evidence at this time, Mr. Groland?

18          MR. GROLAND:  No objection.

19          (State's Exhibit No. 1 was received in evidence.)

20          MS. SINGER:  As well, your Honor, I would like the

21    record to reflect that with the exception of the bed

22    frame, mattress, and box spring, the remainder of the

23    evidence that has been held by the Gainesville Police

24    Department in this case has been deposited with the

25    state in this courtroom and is located at the left,
```

1    rear of the courtroom at this time.  And Mr. Groland

2    has witnessed the signature for me to allow Ms. Mynelle

3    LaPoint and her folks from the Gainesville Police

4    Department to be excused, since we're not arguing about

5    the chain of custody on these items.

6         THE COURT:  Is that correct?

7         MR. GROLAND:  That's correct.

8         MS. SINGER:  The items will remain in the court

9    pending these proceedings instead of having to be

10   transported to and from every day.

11        THE COURT:  And, of course, the courtroom will be

12   secured at all times.

13        MS. SINGER:  I don't believe from the state

14   there's anything else.  The defense may have some other

15   matters that need to be put on the record before we

16   start.

17        The state would be invoking the rule, Your Honor.

18        THE COURT:  All right.  I assume that because of

19   the number of witnesses in this trial and the number of

20   days that all of your witnesses are not here, is there

21   any objection to me instructing both the state and the

22   defense to advise your own witnesses that the rule has

23   been invoked and that they may not discuss the case and

24   all the ramifications of the rule being invoked, or do

25   you want me to instruct those witnesses as they arrive?

1    I believe either one would be legal and I'll do which

2    ever one the attorneys wish.

3        MR. GROLAND:  I'm fine with each side telling

4    their own witnesses.

5        MS. SINGER:  Your Honor, the witnesses that are

6    present today, I would ask that they come before the

7    Court and allow the Court to instruct them.  For some

8    reason it seems to be more empowering.

9        THE COURT:  That's fine.  Bring them in.  And I

10   will be glad to repeat this on any day that either the

11   state or the defense requests it.

12       MS. SINGER:  Before we get started, I need to

13   speak to a pretrial witness about a pretrial ruling.

14   That witness won't be called right away, so I think

15   we'll have a break, before I get to this we'll have a

16   break.  It would be pretrial rules regarding statements

17   that can't be made that would be included in the

18   proffer and the state would need to proffer those

19   statements.

20       THE COURT:  You all can hold up right there.  I

21   just need you close enough so I can advise you that the

22   rule has been invoked and you have been named as

23   witnesses in this case.  What that means is you must

24   not discuss the case or your testimony with anyone

25   other than Ms. Singer, or Mr. Pennypacker, or

1    Mr. Tedder, or Mr. Groland.  If any of the attorneys

2    come outside to speak with you, you must make sure that

3    you're away from anybody else, so that the conversation

4    is completely private.

5         Are these additional witnesses that are coming in?

6         MS. SINGER:  No.

7         THE COURT:  Okay.  Good enough.  Thank you all.

8    You can have a seat outside.  You'll be called in one

9    at a time to testify.

10        MS. SINGER:  May I have one more moment, your

11   Honor, with Ms. Legall and then we can get started?

12        THE COURT:  Yes.

13        MS. SINGER:  Your Honor, Mr. Enoch and Ms.

14   Bridwell, and Mr. Brillo with the Child Protection

15   Team.  Your Honor, if you could just do that again for

16   these other three witnesses I'd appreciate it.

17        THE COURT:  While I'm doing that, why don't you go

18   ahead and speak to your witness?

19        MR. SINGER:  That would be Ms. Bridwell, Madam

20   Court Reporter, Mr. Enoch, and Mr. John Brillo.  Thank

21   you very much.

22        We are ready, your Honor, at this time.

23        THE COURT:  All right.  Is the defense ready?

24        MR. GROLAND:  Yes, we are.

25        THE COURT:  All right.  And I believe you told me

1    yesterday Mr. Pennypacker and Mr. Tedder are going to

2    do the opening statements; is that correct?

3         MR. PENNYPACKER:  That's correct, your Honor.

4         THE COURT:  All right.  Good enough.  Go ahead and

5    bring the jury in.

6         MR. GROLAND:  Your Honor, does it matter to the

7    Court where the jurors sit?

8         THE COURT:  No, it does not.  Okay.

9         (Before the jury:)

10         THE COURT:  Ladies and gentlemen, would you stand

11    up one more time?  You were not sworn yesterday, I

12    believe.  So if you'll stand up, you'll be sworn in at

13    this time.

14         (The jury was duly sworn by the clerk.)

15         THE COURT:  Good morning, ladies and gentlemen.  I

16    want to thank you for appearing right on time.  I know

17    you got out of here late last night and probably had to

18    rush to get everything taken care of and get back here

19    this morning, but this will allow us to get the trial

20    started right on time and move forward in a schedule

21    that I hope will accommodate all of you, as well as the

22    attorneys and Mr. Herlihy over the course of this two

23    weeks.

24        You have been selected and sworn as the jury to

25    try the case of the State of Florida vs. Brian Herlihy.

1 This is a criminal case.  Mr. Herlihy is charged with

2 the offense of first degree murder.  The definition of

3 the elements of that crime will be explained to you

4 later.

5  It is your solemn responsibility to determine if

6 the state has proved its accusation beyond a reasonable

7 doubt against Mr. Herlihy.

8  Your verdict must be based solely on the evidence

9 or the lack of evidence and the law.

10  The information or indictment with the charge in

11 this case is not evidence and is not to be considered

12 by you as any proof of guilt.

13  It is the judge's responsibility to decide which

14 laws apply to this case and to explain those laws to

15 you.  It is your responsibility to decide what the

16 facts of this case may be and to apply the law to those

17 facts.  Thus, the province of the jury and the province

18 of the Court are well defined and they do not overlap.

19 This is one of the fundamental principles of our system

20 of justice.

21  Before proceeding further it may be helpful to you

22 if you understand how the trial will be conducted.  At

23 the beginning of the trial the attorneys will have an

24 opportunity, if they wish, to make an opening

25 statement.  The opening statement gives the attorneys a

1   chance to tell you what evidence they believe will be

2   presented during the trial.

3        What the lawyers say is not evidence and you are

4   not to consider it as such.

5        Following the opening statements, witnesses will

6   be called to testify under oath.  They will be examined

7   and cross-examined by the attorneys.  Documents and

8   other exhibits also may be produced as evidence.

9        After the evidence has been presented, the

10  attorneys will have the opportunity to make their final

11  argument.  Following the argument by the attorneys, the

12  Court will instruct you on the law applicable to the

13  case.  After the instructions are given, you will then

14  retire to consider your verdict.

15       You should not form any definite or fixed opinion

16  on the merits of the case until you have heard all the

17  evidence, the argument of the lawyers, and the

18  instructions on the law by the judge.  Until that time

19  you should not discuss the case among yourselves.

20       During the course of the trial we will take

21  recesses during which you will be permitted to separate

22  and go about your personal affairs.  That's in the

23  evening.  During the day I will expect all of you to

24  stay together, although if some issue arises and some

25  essential errand comes up, we'll try to give you room

1   to take care of that at lunch, for instance, if that's

2   absolutely necessary.

3       During the recesses you will not discuss the case

4   with anyone nor permit anyone to say anything to you or

5   in your presence about the case.  If anyone attempts to

6   say anything to you or in your presence about this

7   case, tell them that you are on the jury trying the

8   case and tell them to stop.  If they persist, leave at

9   once and report the matter immediately to the Bailiff,

10  who will advise me.

11      The case must be tried by you solely on the

12  evidence presented during the trial in your presence,

13  in the presence of the defendant, the attorneys, and

14  the judge.  Jurors must not conduct any investigation

15  of their own.  Accordingly, you must not visit any of

16  the places described in the evidence; you must not read

17  nor listen to any reports about the case; and, you must

18  not discuss this case with any person; and, you must

19  not speak with the attorneys, the witnesses, or the

20  defendant about any subject until your deliberations

21  are finished.

22      In every criminal proceeding the defendant has the

23  absolute right to remain silent.  At no time is it the

24  duty of a defendant to prove his innocence.  From the

25  exercise of a defendant's right to remain silent, a

1    jury is not permitted to draw any inference of guilt.

2    And the fact that a defendant did not take the witness

3    stand must not influence your verdict in any manner

4    whatsoever.

5        The attorneys are trained in the rules of evidence

6    and trial procedure and it is their duty to make any

7    objections they feel are proper.  When an objection is

8    made, you should not speculate on the reason why it is

9    made.  Likewise, when an objection is sustained or

10   upheld by me, you must not speculate on what might have

11   occurred had the objection not been sustained, nor what

12   a witness might have said if he or she had been

13   permitted to answer.

14        Now, some additional instructions I want to give

15   you include:  This is a big courtroom and if at any

16   time you cannot hear a witness or see an exhibit, if

17   you'll raise your hand, I'll make sure that they speak

18   up.  Likewise, if the temperature becomes too hot or

19   too cold or there is anything else going on that is in

20   any way distracting to you and you're not able to focus

21   on the evidence that is being presented, let me know

22   and I'll take care of it.

23        We will take recesses at least every hour and a

24   half, but if at any time anybody needs to take a recess

25   in addition to that, again, if you'll just raise your

1    hand and signal me, we'll take a recess just as quickly

2    as we can.  I try not to interrupt the testimony of any

3    one witness, but some cases do involve very lengthy

4    testimony by individual witnesses.  If it's gonna go

5    for hours, for instance, then, of course, we will

6    recess during an individual witness' testimony as

7    needed.

8         All right.  With those instructions is the state

9    ready to proceed?

10        MS. SINGER:  Is the Court going to instruct as to

11   the note taking?  I realize we won't be doing that in

12   opening, but after opening?

13        THE COURT:  Thank you.  Yes, I will take care of

14   that right now.

15        I'm going to ask the clerk to distribute these

16   notebooks to you and as I explained to you yesterday

17   you will be allowed to take notes.  Please do not feel

18   like you need to take notes or you're required to take

19   notes.  It's just that some people focus better if they

20   write while they're listening and some people just

21   prefer to listen.  It's totally up to you.  And as I

22   said earlier, these notes are purely for your own use

23   and benefit.  You don't need to write, you're not

24   required and certainly it would be impossible to write

25   down everything that happens in the trial.  So even if

1   you wish to take notes, do not feel like you should be

2   overly encumbered by that use.

3        Each notebook will be assigned, of course, to each

4   of you individually and I'll ask that you write your

5   name on the front of the notebook.  And also you'll be

6   writing your name or your name will be on the sealed

7   envelope every night so there won't be any confusion.

8        Once you begin your deliberations, as I indicated

9   yesterday, you will be able to reference your notes if

10  you choose to.  And, of course, again, you're totally

11  not required to.  That's an option.  Some people may

12  take a lot of notes.  Some people may take no notes.

13  The fact that notes are available to you should not

14  influence your deliberations.  You may use them just

15  like any other memory or focus for discussion.  But you

16  must not rely upon the notes of another person.  You

17  must each individually rely upon your own recollections

18  and conclusions about the evidence.

19        Having said that, of course, you certainly may

20  discuss each other's notes if that is in any way

21  helpful to you.  So the bottom line is, what I mean to

22  tell you in regard to notes is, this is to facilitate

23  you, not to lock you in, in any manner whatsoever.  So

24  use it as a support tool and not as any kind of control

25  mechanism of any sort.

1       All right.  If you'll hand out the notebooks and

2    the pens, Mr. Clerk.  Thank you.

3       Good enough.  Is the state now ready to proceed?

4       MR. PENNYPACKER:  Yes, ma'am.

5       THE COURT:  Is the defense now ready to proceed?

6       MR. TEDDER:  Yes, ma'am.

7       THE COURT:  Mr. Pennypacker, go ahead.

8       OPENING STATEMENT ON BEHALF OF THE STATE:

9       MR. PENNYPACKER:  May it please the Court,

10   Mr. Groland, Mr. Tedder.

11      Good morning, ladies and gentlemen.  This case is

12   about a four and a half month old baby,

13              You're gonna hear evidence that      ⟩ died

14   on August 2nd of 2000 as a result of the actions of

15   that man, Brian Herlihy.  You're gonna hear in evidence

16   that    ____ was born on March 22nd, 2000 and that he

17   was the son of John and Crystal          .

18      You're gonna hear from Robbie's great grandmother,

19   Doris Bridwell, that while the parents were working,

20   she cared for Robbie most of his young life.  She will

21   tell you that Robbie was a healthy baby and that he was

22   progressing normally.

23      You're gonna hear from  _____ _ grandfather,

24   Richard Davis, his mother, Crystal, his father, John,

25   and his pediatrician, Dr. Hellrung, that _____ was

1   never lethargic and he was never anxious.  From the

2   time of his birth until the morning of August 2nd, 2000

3   he was full of life.

4       Although they were enjoying their new role as

5   parents, you're gonna hear that not long after

6   birth, unfortunately John and Crystal        , were

7   having some trouble in their young marriage.  You're

8   going to hear that as a result of these troubles,

9   Crystal began a relationship with the defendant without

10  her husband, John's, knowledge.

11      Crystal will tell you that on the morning of

12  August 2nd, 2000 she planned to go to Cedar Key with

13      John is gonna tell you that despite the

14  problems in their marriage, he and Crystal had been

15  together the night before, that they believed they had

16  worked out their problems and that they were planning

17  on buying a house together.

18      Crystal will tell you that on the morning of

19  August 2nd she stopped by her husband's place of

20  employment at Airborne Express so that John could see

21  his son before she left for Cedar Key.  You're going to

22  hear from John and Yantz Enoch, one of John's

23  coworkers, that at 9:00 a.m, on August 2nd of 2000

24  little    ___ was smiling and playful.  He was dressed

25  in a special jump suit and John and Crystal were

1    showing him off.

2         Crystal will tell you that after leaving Airborne

3    Express she went to Brian Herlihy's apartment.  I will

4    tell you now that Crystal has given different versions

5    of why she went to the defendant's apartment.  At one

6    time she said she went there to tell Brian that she and

7    John were staying together.  At another time she said

8    she went there to ask Brian to go to Cedar Key with her

9    and Robbie.  Although she gave different versions of

10   why she went to the defendant's apartment, one thing

11   remains certain, when she arrived at Brian Herlihy's

12   shortly after 9:00 a.m., _____ _____ was perfectly

13   fine, there was absolutely nothing wrong with him.

14        Crystal        will tell you when she got to

15   Brian's apartment, Brian was outside washing his dogs.

16   She will tell you that she then left        alone with

17   Brian so she could go run some quick errands.  She's

18   gonna tell you that when she left       in his care,

19   in Brian's care for a few minutes after 9 o'clock, the

20   child was happy and healthy.

21        Crystal will tell you that she left Brian's

22   apartment in the Tumbling Creek area off of Depot

23   Avenue and went two places.  She went to get gas at the

24   Chevron station on Archer Road and she went to the Suds

25   and Duds in Butler's Plaza to pick up the defendant's

1    laundry.  You're going to be shown a receipt that she

2    finished pumping gas at the Chevron about 9:25 a.m.

3    that morning.

4         Tragically what happened during the 15 to 20

5    minutes she left  ____   alone with Brian Herlihy is why

6    we are here today.  You're gonna hear evidence that

7    during the few minutes Crystal left ι_____. with Brian

8    Herlihy, ___    suffered from violent shaking which

9    ultimately resulted in his death.  He went from a

10   happy, healthy infant to a baby with fatal neurological

11   damage.  It was while       was alone with the

12   defendant that this fatal injury occurred.

13        You're gonna hear that at 9:34 a.m. Mr. Herlihy

14   called 911 and he was asking for help because

15   was having trouble breathing.  You're gonna hear that

16   when the paramedics got there, they found      ι ashen

17   in appearance, barely breathing, but with a pulse.  The

18   paramedics attempted to assist       with his

19   breathing by putting a tube down his throat.  They

20   rushed him to Shands just a few minutes from the

21   defendant's apartment.

22        You're gonna hear that      was first seen in

23   the emergency room at Shands at 10:00 a.m.  There's

24   going to be many doctors that are gonna testify in this

25   case.  The doctors that treated      will tell you

1   that by the time       got to Shands, he had already

2   suffered such trauma to his brain and eyes that it

3   looked very grim as to whether he would survive.

4       Dr. Rowling, the emergency room physician, did an

5   exam and saw retinal hemorrhages in         eyes and

6   immediately ordered further testing.

7       Dr. Anne Dickison was the head of the pediatric

8   intensive care unit at Shands in August of 2000.  She's

9   gonna tell you that she's a board certified doctor, in

10  not one, but four areas:  Adult critical care,

11  pediatric critical care, pediatrics, and

12  anesthesiology.  She's gonna tell you after examining

13  ___   and hearing what had happened to him, it was

14  clear to her that he was suffering from shaken baby

15  syndrome or shaken impact syndrome.

16      You're gonna hear a lot of testimony about what

17  shaken baby syndrome means and how it is caused, not

18  just from Dr. Dickison, but from Dr. Bernard Maria, who

19  was then the head of pediatric neurology at Shands.

20  These doctors will tell you of the acute nature of the

21  injuries       suffered they had to have occurred

22  during a very narrow window of time just before he

23  arrived at the hospital.  These doctors will tell you

24  that Robbie's condition in the hospital was very grave

25  and that after deteriorating for eight days, he died.

1          Finally you're gonna hear from two pathologists,

2     Dr. William Hamilton and Dr. Steven Nelson.

3     Dr. Hamilton has been the medical examiner for this

4     area for over 20 years.  Dr. Nelson is the medical

5     examiner for the Bartow area.  He's a specialist in

6     neuropathology, the study of the brain after death.

7          You're gonna hear from Dr. Hamilton that he sent

8     the entire brain of      to Dr. Nelson for him to

9     examine it microscopically to determine the cause of

10    death.  Both Mr. Hamilton and Dr. Nelson will tell you

11    that what they found from doing an autopsy of

12         . confirmed what the doctors who treated him had

13    suspected.

14        Dr. Nelson looked at          brain under a

15    microscope.  He will tell you he saw cortical

16    contusions inside the brain, which are consistent with

17    head trauma and that they occur when a baby is shaken.

18             died from shaken baby syndrome, from having

19    his brain jostled around inside his head from violent

20    shaking.  The doctors are gonna explain to you exactly

21    what happens when a baby is shaken.  They will tell you

22    infants four and a half months old do not have strong

23    neck muscles and that their heads are

24    disproportionately large compared to their bodies.

25    Doctors will tell you that a baby's head has a little

1   extra room inside.  This is so the baby's brain has a

2   place to go when the child is born.  As the child goes

3   through the mother's pelvis, the head gets compressed

4   and there could be damage to the baby's brain.  So the

5   head has room inside to move.

6       The doctors will tell you that a baby's brain has

7   a large vein or an artery that runs across the top of

8   the brain, that there are little veins attached to that

9   artery.  Those are called bridging veins.  Those veins

10  connect the large vein to the brain tissue inside the

11  baby's head.  When the baby is shaken violently, these

12  little veins tear and they start to bleed.  The doctors

13  will tell you that this blood has no place to go inside

14  the skull, so it fills up the empty spaces in the

15  skull.

16      The brain can also get bruised, what we call

17  contusions, like Dr. Nelson saw when he did the

18  microscopic exam.  You're gonna hear about the parts of

19  the head inside the skull.  The doctors will tell you

20  that there's several layers between your skull and your

21  brain.  You will hear that underneath your skull is a

22  rubbery covering called the dura.  There's a space

23  between the dura and the skull.  The doctors will also

24  tell you that underneath the dura there's a filmy

25  covering to the brain called the arachnoid and there's

1    also a space between the brain and the arachnoid.

2         This is confusing.  You're not gonna understand

3    this at this point, but you will understand it by the

4    time this trial is over.

5         When the baby is shaken, the doctors will tell you

6    that the brain jostles around inside the skull like

7    jello in a bowl.  They will tell you that as the brain

8    jostles back and forth, the veins inside the head tear

9    and as a result the blood leaks into the subdural

10   space.  The bleeding in the subdural space is called a

11   subdural hematoma.  You're gonna hear a lot about

12   subdural hematomas.  You're gonna hear about acute

13   subdural hematomas, which is what took place in this

14   case.

15        You're gonna hear about chronic subdural

16   hematomas, which is a hematoma that existed before.

17   You're going to learn what causes the subdural

18   hematomas, and you're going to learn how the body

19   responds to them, what happens inside your head when

20   you have a subdural hematoma.

21        You're also gonna hear when a baby is violently

22   shaken, or when a baby is thrown or placed violently on

23   a surface, even a surface like a bed mattress, another

24   injury can occur inside the head.  The violent shaking

25   can cause bleeding in the back of the eyes where the

1    retinas are located.

2         You're gonna hear from Dr. Lawrence Levine.  He's

3    a pediatric ophthalmologist at Shands.  He saw _____

4    after he was admitted.  Dr. Levine is a specialist in

5    treating children with problems in their eyes.  He's

6    gonna explain to you how shaking a baby too hard can

7    cause retinal hemorrhages.  He will describe how the

8    eyes respond to this shaking.  He's gonna show you some

9    pictures that he took of          eyes, or that he had

10   taken of       eyes, and he's gonna tell you what he

11   saw in    _ _ _ eyes and what must have caused it.

12        He will tell you that when coupled with acute

13   subdural hematomas, subdural hematomas that occur

14   immediately, retinal hemorrhages like he saw in both of

15   Robbie's eyes are consistent with shaken baby syndrome.

16        The doctors that treated        the doctors who

17   saw him immediately after he was injured, the doctors

18   who touched him, the doctors who examined him, the

19   doctors who looked in his eyes, the doctors who cared

20   for him, are gonna tell you that when they examined

21        ' - after 10:00 a.m. on the morning of August 2nd,

22   2000, it was clear to them that        had suffered a

23   traumatic insult to his brain within the few minutes to

24   an hour before he got to Shands.  This was not an

25   accident.

1          You'll also be hearing testimony from law

2     enforcement officers.  There's going to be testimony,

3     photographs, and physical items describing the area

4     where the baby,        , was injured.  There's going to

5     be a number of law enforcement officers, some from the

6     patrol division, others serving as investigators are

7     gonna tell you what they learned in the course of their

8     investigation.

9          You're gonna hear that the defendant made several

10    statements regarding how        was hurt.  You're gonna

11    hear in his own words the 911 call where his first

12    explanation for the injuries is given.  That's gonna be

13    followed by a number of other explanations, each one

14    becoming more expansive, each containing additional

15    details culminating in an admission that in response to

16         crying, the defendant swung him and plopped him

17    on the bed in a manner and with enough force that his

18    head bounced.  It was then that the baby became quiet.

19    He looked dazed.  It was then the defendant knew that

20    the child was significantly injured.

21         The injury was so significant that the defendant

22    believed that he had injured       neck.  You're

23    gonna hear that the defendant admitted he was rough

24    with        , but after he bounced him on the bed, he

25    walked away knowing that the child was critically hurt,

1    but hoping that when he came back the child would be

2    better.  That hope was quashed when he returned to find

3        barely alive.

4        Pay close attention to the many different

5    explanations given by the defendant for what occurred

6    to        on August 2nd, 2000.  These statements will

7    become very important as you listen to the medical

8    experts explain the mechanism of shaken baby syndrome.

9    The explanations do not fit the shaken baby syndrome.

10       The Judge told you that you're gonna hear later

11   what the elements are for first degree murder.  There

12   are two ways we can prove first degree murder.  One is

13   by showing premeditation, meaning there was a plan to

14   kill someone.  That is not the theory that we are going

15   under in this case.  Premeditation is not where we are

16   headed.

17       The second way you can prove first degree murder

18   is the way we are going in this case.  That's called

19   felony murder.  In order to be able to prove that, we

20   have to show that Mr. Herlihy committed a felony and

21   that as a result of that felony    died.  The

22   felony that we're gonna prove is aggravated child

23   abuse.

24       Aggravated child abuse can be proven by a couple

25   of ways.  One is to show malicious punishment.  You're

1    gonna hear some evidence of malicious punishment.

2    Another way is to show that Mr. Herlihy intended to

3    cause injury to the child by some act or that he did an

4    act that reasonably could have caused that injury and

5    that as a result of that          died.

6         Again, this is felony murder.  It's not

7    premeditated murder.  If we can prove the aggravated

8    battery and prove the child died, that's first degree

9    murder in Florida.

10        In jury selection yesterday you heard that the

11   state has the burden to prove that Brian Herlihy

12   committed this offense.  We have that burden beyond a

13   reasonable doubt.  At the end of this case Judge Lott

14   is gonna instruct on that burden.  She's also gonna

15   instruct you that when you consider this case, you need

16   to use your common sense.  You were chosen as jurors

17   because of your common sense.  You don't leave that

18   outside when you come inside this courtroom.

19        In order to use your common sense in this case you

20   must listen carefully.  Your job as jurors is gonna be

21   tedious at times.  I'm telling you when you listen to

22   these doctors go on for several days about this chronic

23   subdural and acute subdural hematomas, you're going to

24   be overwhelmed.  It's going to be like sitting in med

25   school for a week, but it's very very important that

1   you understand this.

2        Pay close attention to the medical testimony, the

3   law enforcement testimony, the lay witness testimony is

4   going to be essential to you in finding that the

5   defendant committed the crime for which he is charged.

6   The evidence and your common sense are going to point

7   to one finding:  Brian Herlihy committed aggravated

8   child abuse which resulted in the death of    ___

9            Under the laws of Florida, as I said, this

10  constitutes murder in the first degree.

11       As he sits here at this moment, as we said

12  yesterday, Mr. Herlihy is not guilty.  He's presumed

13  innocent.  As representatives of the people of the

14  State of Florida, Ms. Singer and I have the burden

15  under the Florida and United States Constitution to

16  prove that he is guilty.  We accept that challenge.

17       At the close of the evidence in this case we're

18  confident that we will have met that burden and you're

19  going to return a verdict of guilty as charged.

20       Thank you.

21       THE COURT:  Mr. Tedder.

22       OPENING STATEMENT ON BEHALF OF THE DEFENDANT:

23       MR. TEDDER:  Good morning, ladies and gentlemen.

24  May it please the Court, Mr. Pennypacker, and

25  Ms. Singer.  Good morning again.

1          Ladies and gentlemen, you have been selected and

2     sworn to be jurors in this case in the State of Florida

3     vs. Brian Herlihy, wherein the state has accused him of

4     first degree murder, and as they already announced,

5     they are proceeding under a theory of felony murder

6     wherein they must prove beyond a reasonable doubt that,

7     in fact, aggravated child abuse occurred and that

8     caused the death of .

9          We submit to you that the evidence in this case is

10    going to show that that, in fact, did not happen in

11    this case and at the end of this case we're going to be

12    asking you to find Mr. Herlihy not guilty.

13         You must decide in this case whether what has

14    happened here was a brutal murder, or a horrible

15    accident.  You must decide whether the defendant

16    senselessly shook the baby as the state claims, or was

17    there a series of events beyond the control of

18    Mr. Herlihy, unknown to Mr. Herlihy, unknown to

19    Ms.          .  unknown to any of the caretakers,

20    unknown, a series of events that were unknown that led

21    to what happened that caused his death.

22         We would suggest we believe the evidence in this

23    case is going to show that this was an accident and

24    that there are three factors that support that.  Number

25    one, the evidence is going to show that Brian Herlihy

1       was nothing but a caring caretaker of this baby.

2       You're going to hear from the mother's own mouth that

3       she met Mr. Herlihy at her place of employment, that he

4       befriended her, that she began to see him, she began to

5       cheat on her husband and that, in fact, she began to

6       contemplate divorcing her husband.

7           And she will testify, I believe the evidence is

8       going to show, that she began to leave the baby with

9       Brian because she liked him.  And she liked the way

10      Brian took care of the baby.  She absolutely never saw

11      anything that ever caused her any concern, whatsoever,

12      with how Brian took care of this baby, nothing.  She

13      liked the way he was willing to change his diaper.  She

14      liked -- just like he was his own child.  She liked

15      that he was willing to change the diaper, the way he

16      was willing to feed the baby, the way he was going to

17      watch after the baby, the way he was willing to play

18      with the baby.  He was willing to pay attention to the

19      baby.  She felt as though he paid much better attention

20      to the baby than her husband did, the father of the

21      child.

22          In fact, she was annoyed that he gave her so

23      little, the husband gave her so little help with the

24      baby.  He was always out playing golf.  In fact, I

25      believe you're going to learn the evidence is that

1    today Mr. Qu         they are now divorced, and he's a

2    golf pro.  And, in fact, he's got a tournament to play

3    at somewhere.

4         Number two, there's a medical explanation for why

5    this baby died that is completely and totally separate

6    from the theory the state is advancing to you, and

7    gonna ask you people to swallow, the shaken baby

8    syndrome.

9         That explanation is that this baby had a chronic

10   subdural hematoma.  You're gonna hear from -- I believe

11   almost every doctor is gonna testify this baby had

12   chronic and acute subdural hematomas.  And you're gonna

13   learn the dura is a covering of the brain, and subdural

14   means underneath the dura, and chronic means old, and

15   acute means recent, and that you're gonna learn that

16   this chronic subdural hematoma can re-bleed

17   spontaneously, and that if it re-bleeds spontaneously,

18   that will put blood on the brain, and that was

19   bilateral on both sides of the skull, that it can

20   re-bleed.

21        If it does that, blood on the brain irritates the

22   brain, can cause a seizure.  And if someone seizes,

23   they quit breathing.  If you quit breathing, you don't

24   get oxygen to your brain and that is all the evidence

25   is gonna show that, in fact, this baby had a seizure

1    and was not breathing.  You're gonna learn that the

2    cause of death was anoxia, which is lack of oxygen to

3    the brain.

4         There is also evidence that the baby was vomiting

5    and that when the EMT's arrived on the scene to treat

6    the baby, they had to clear the passageways of the

7    baby's mouth and nose in order to get oxygen into the

8    baby because the baby was not breathing.

9         When they got there the baby was not breathing.

10   It had a pulse.  As the state alluded to, the baby's

11   skin color at that time was gray.  They cleared the

12   passageways with some sort of an instrument, I've

13   forgotten what it's called, and began to infuse air

14   into the baby.  And the baby began to regain some color

15   and was still alive.  But I believe our expert is gonna

16   agree that by the time the EMT's arrived, this baby was

17   already critically injured and was probably fatally

18   injured already because of what had happened.

19        Third, the theory of shaken baby, as the state is

20   gonna ask you folks to swallow, is -- defies the laws

21   of physics.  And you're gonna hear from Dr. Uscinski

22   and Dr. Plunkett, the two doctors we've hired and we're

23   gonna bring in, that they think this defies the laws of

24   physics.  And the reason for that is -- and

25   Dr. Uscinski will explain it to you in terms you'll

1   understand.  When I listen to Dr. Uscinski I

2   understand.

3       You're going to learn that basic laws of Newtonian

4   physics, force equals mass times acceleration, and that

5   the force required to do the damage to the brain that

6   the state is alleging in this case, mainly tearing of

7   the bridging veins in the dura, cannot be achieved by

8   violently shaking the child.  And that if you did

9   violently shake a child in the manner in which the

10  state is alleging, you would cause the child's neck to

11  break first before you created any damage to the

12  bridging veins.  You need some sort of an intentional

13  violent impact in order to create the force needed.

14  And the evidence is going to show that there was

15  absolutely no evidence of any trauma whatsoever to

16                  on the outside of his body.

17      You're gonna see photographs of the baby that

18  show, autopsy photographs that we talked about

19  yesterday, and you're gonna see some discoloration on

20  the baby's skin.  The evidence is gonna show that none

21  of that was in any way related to anything they're

22  accusing Mr. Herlihy of; it was due to the treatment

23  which the EMT's and the hospital tried to provide to

24  the baby and due to natural discoloration that occurs

25  once someone passes away.

1          All three of these facts, the fact that there was

2     no evidence except that Brian was a loving caretaker,

3     that there was a logical, reasonable medical

4     explanation for what happened, and that the theory of

5     shaken baby defies the laws of physics, all three go

6     hand in hand.  They don't disclude (sic) any of them.

7     They're all together.  They all fit together.  You must

8     decide was this a murder, or was this a series of

9     events that led to a tragic death of a baby.

10         You're going to learn about a month before Crystal

11    gave birth to this baby she was in a car wreck and she

12    was hospitalized.  This caused premature labor.  She

13    was treated and released.

14         About a month or so later, maybe two months later,

15    she gave birth to       ɘ.       ɘ was born about a

16    month premature.  You're gonna learn that the birth was

17    a difficult birth, that the baby was born face up

18    rather than face down, and you're gonna learn that they

19    prefer, although it doesn't have to be done that way,

20    it's generally easier for the child to pass through the

21    birth canal if the baby is born face down.  And as

22    Dr. Stewart was the doctor that delivered the child, he

23    will be able to explain that to you.  The baby was born

24    face up and the baby was born with a broken clavicle.

25         You're going to learn that, several of the doctors

1    are going to tell you that it's well known that a child

2    can suffer a subdural hematoma during childbirth and

3    you're going to learn that if you have a subdural

4    hematoma that does not immediately present with

5    symptoms; in other words, those kinds of symptoms that

6    appeared the day this baby became ill and was put in

7    the hospital, mainly seizing and not breathing, that it

8    will go on undetected.  Because the baby had a

9    difficult birth, it's very possible the baby was born

10   with a chronic -- with a subdural hematoma that was not

11   discovered at the time of birth and simply existed.

12   And Dr. Uscinski and Dr. Plunkett will explain to you

13   how, the dynamics of that physiology.

14        You're gonna learn some months later after the

15   baby was born, as I said, she met Brian.  She began to

16   see him behind her husband's back.  She and her husband

17   were having marital difficulties.  You'll learn the

18   deputies were called out to their residence on one or

19   two occasions to deal with problems they were having;

20   that the baby had a number of different caretakers,

21   some of whom had some concerns over Crystal's care of

22   the baby.  You're going to learn, as I said, that

23   Crystal thought Mr. Herlihy was very good with Robbie,

24   changed the diapers, fed the baby, played with the baby

25   more so than dad did.

1    You'll also learn the baby once demonstrated

2    projectile vomiting, had some bleeding in one of his

3    eyes, and these things could possibly show child abuse.

4    You'll also learn that retinal hemorrhaging can occur

5    during childbirth.

6    You're gonna learn that Mr. Quirello, the father,

7    once saw Crystal throw the baby down on the bed in a

8    rough manner.  You're gonna learn that the father says

9    that she lies about everything, lies about lots of

10   different things.  The other family members don't trust

11   her either.

12   On the day in question, August 2nd, 2000, you're

13   gonna learn as the state has said, Crystal went by to

14   see her dad, the father of the baby, to show him that

15   .e had finally grown big enough to wear an outfit

16   that they had bought, an ESPN outfit, and she told him

17   she was gonna take the baby to Cedar Key.  She didn't

18   mention that she was gonna try and go with Brian.

19   Then she went by to see Brian.  She was feeding

20   _ when she got there out of a bottle.  Brian was

21   in the process of giving two Rottweiler puppies he had

22   a bath.  She wanted to go to Cedar Key.  He wasn't

23   particularly interested in going.  She took his truck

24   to fill it up with gasoline and left Robbie with Brian.

25   Brian fed the baby, put the baby on the bed, thought

1    the baby was secure on the bed with pillows that he had

2    put around the baby.

3         When she came back 30 minutes later, the emergency

4    medical technicians were there.  Brian was absolutely

5    frantic.  Needless to say, she became frantic, and the

6    baby was critically injured, hurt for some reason.

7         You're gonna hear the 911 tape wherein Brian when

8    he came out of the bathroom saw that this baby had

9    somehow or another become wedged between a metal

10   baseboard of the bed and mattress of the bed and that

11   the baby was vomiting and aspirating.  And so he pulled

12   the baby out and tried to see what was going on, tried

13   to help the baby, called 911.  You're gonna hear Brian

14   Herlihy's hysteria as he says on the tape repeatedly

15   what had happened and what was going on.

16        He said then what he says every time he talked to

17   the police and what he's gonna tell you folks when he

18   testifies in this trial, that he put the baby on the

19   bed, he played with the baby, he turned on the fan.  He

20   thought the baby was happy.  He went into the bathroom

21   to take a shower.  There was no warm water.  So he went

22   to the restroom, came out and saw       in the state

23   he was in.  Needless to say he became very frantic.

24   You're gonna hear his hysteria on the 911 tape.  When

25   you listen to it, you're gonna hear it.

1    He tried to revive the baby.  As I said earlier

2    you're going to hear -- the EMT's are going to tell you

3    when they arrived the baby was not breathing, but they

4    had a pulse.  They pumped air into the child, the color

5    improved a little bit.  Needless to say, they took the

6    baby to the hospital, obviously.

7        When they got to the hospital, the emergency room

8    people talked to Brian, talked to Crystal, and wanted

9    to get an idea what was going on.  You're gonna learn

10   Crystal initially told the people at the emergency room

11   that the baby began to show these symptoms as she drove

12   around in her car and the baby had this problem,

13   something went on.  Later it was learned that that was

14   not the truth.  That, in fact, this incident had

15   happened when she left the baby in Brian's custody and

16   she learned, she basically admitted that she was more

17   concerned with her husband finding out she had been

18   cheating on him, than in giving the emergency room

19   technicians an accurate picture of what she knew.

20       You're gonna learn from one of the doctors that he

21   told her they felt this baby needed to be admitted to

22   the pediatric intensive care unit and that she did not

23   want that to happen.  She wanted the baby to go home

24   with her that day, and that the doctor was astonished

25   that she could be thinking their judgment is not what

1   she should immediately agree with.

2       You'll learn that she basically told the doctor

3   that she was afraid if the baby was admitted to the

4   intensive care unit, that this would mess up her

5   chances of gaining custody of the child because of the

6   divorce she had pending.  Well, there was no divorce

7   pending, number one; and, number two, the doctor was

8   astonished that any thought like that could possibly

9   cross her mind at the time.

10      You're gonna learn the police approached Brian

11  Herlihy at the hospital and that he was extremely

12  upset, that he was crying.  They approached him and

13  they wanted to talk to him.  They told him they just

14  wanted to get details on what had happened since he was

15  the last person with the baby before this all began.

16      You're gonna learn that when the EMT's left the

17  apartment, Brian's apartment, that two police officers,

18  two or three actually, walked into the apartment

19  without any permission to look around to see, look for

20  signs of foul play.  They saw no signs of foul play,

21  however, they did see a spot on the carpet that

22  appeared to be a milky-like substance, which we believe

23  may have been vomit from            ).  They found

24  no evidence of foul play, nothing else.

25      They noticed there was a gap between the end of

1   the bed and the mattress of the bed, approximately

2   six inches.  The police asked Brian to come to

3   Gainesville Police Department to be questioned.  He was

4   told he was not a suspect in anything and yet the

5   police have already looked through his apartment and

6   they've already posted -- you're gonna learn they

7   posted a guard outside the apartment to secure the

8   scene the morning of this incident.  So while they told

9   Brian:  Oh, you're not a suspect, they were actively

10  pursuing him as a suspect.  They had tunnel vision on

11  him, they were looking to Brian and Brian only as the

12  cause.

13       He signed this consent to search his apartment at

14  1 o'clock in the afternoon and signed a consent to

15  search his truck at 2:55 p.m. in the afternoon.  On

16  both of those forms it says anything that is found can

17  be used against him in a criminal prosecution.  Nothing

18  was found in either the search of the apartment or in

19  the search of a vehicle.

20       He was asked if he'll talk to them.  He said:

21  Sure, I'll be happy to talk to you, tell you what I

22  know about the situation.  It happens those are

23  probably not his actual words, he was extremely upset.

24  They talked to him for about three hours.  A variety of

25  detectives spoke to him, primarily Detective Helen

1    Legall, and I believe there were about four or five

2    other detectives involved and they were rotating in.

3    For three hours he talked to them and told them

4    repeatedly what he's gonna tell you folks.  He went in

5    the bathroom, he came out, the baby was pinned, the

6    baby was in trouble.  He knew it.  He called 911.  He

7    repeatedly denied shaking the child in any way, shape,

8    manner, or form.

9        Did they tape record this conversation?  Not a

10   lick.  Three hours worth of conversation, none of it's

11   on tape.  Why?  Well, I guess Detective Legall didn't

12   think it was important enough, so she just didn't tape

13   record this conversation that she had with a person who

14   was a suspect in this case.

15       After that interview, Detective Legall decided to

16   read Brian his Miranda warning, telling him he had the

17   right to remain silent, anything he said could and

18   would be used against him in a court of law, and he had

19   the right to have an attorney.  Brian signed the

20   consent, signed the waiver of Miranda, and then what

21   did Brian do?  Brian talked to them some more, talked

22   to them for another 25 minutes or so.  That was put on

23   tape.  What did he say?  The same thing he had been

24   saying before.

25       You'll learn during the course of that

1    interrogation, the one that's off tape, Mr. Herlihy was

2    accused of being a liar, that profanity was directed

3    towards him by some of the police officers.

4         After that taped statement, Brian then offered to

5    show the police what happened and what he observed at

6    the apartment, and he went back to the apartment with

7    the police.  They brought along a video camera.  They

8    brought along a doll and Brian showed them what he had

9    observed when he came out of the bathroom.

10   Unfortunately what he showed them was not recorded

11   because for some reason the video camera didn't work.

12   So none of that again is recorded, although he offered

13   as best he could to try and tell them what happened.

14   Again, he told them the same thing he said all along

15   and he'll tell you in this trial.

16        He was released.  The next day Detective Legall

17   decided to arrest him for aggravated child abuse.  I

18   believe her testimony is gonna be because he was the

19   last one with the baby.  Therefore, he's the one they

20   should arrest.  She never talked to Crystal Q        to

21   find out anything she might know before charging Brian.

22   She never talked with the father.  She never talked

23   with anyone else.

24        Now, approximately six days later, Detective

25   Legall is gonna learn that ⁻      had a pre-existing

1    medical condition from the radiologist at Shands.

2    Dr. Agee, Dr. Quisling, they had done a CAT scan the

3    day the baby was admitted, twice, another one on August

4    3rd, and another one on August the 4th.  All of those

5    CAT scans, they read them, and all of them showed them

6    that this baby had a chronic subdural hematoma, as well

7    as acute subdural hematoma.  Detective Legall never

8    investigated what the significance of that was or

9    anything such as that.  She never asked Crystal whether

10   the baby had had any prior injuries that could explain

11   the chronic subdural hematoma.  She never investigated

12   the birth.  She never spoke to any of the doctors about

13   the significance of it.  She never spoke to any of the

14   caregivers (sic).  She never looked into any possible

15   explanation for the chronic subdural hematoma.

16       What's the significance of that?  Well, you're

17   gonna learn subdural hematoma, as I said, can occur as

18   a result of birth.  If they don't cause immediate

19   symptoms, they go unnoticed, that they can

20   spontaneously re-bleed.  If they do re-bleed

21   spontaneously, that causes blood to be on the brain,

22   which causes someone to have a seizure and that no new

23   trauma is required to cause this to happen.

24       Emergency room people basically leapt to a

25   conclusion that this was the theory shaken baby.

```
 1        Dr. Dickison said in her -- I believe is gonna state
 2        that since there was chronic subdural coupled with
 3        retinal hemorrhaging and no reasonable explanation for
 4        how this could happen, it had to be shaken baby.  She
 5        describes this as multi-generational chronic subdural.
 6        Multi-generational, obviously meaning it's happened
 7        several times.  So they knew this injury did exist
 8        prior to the day in question.
 9         She's gonna testify she saw absolutely no evidence
10        of trauma to the child's body.  She doesn't believe
11        that brain swelling can include venous drainage.
12        You're going to learn that Dr. Uscinski and Dr.
13        Plunkett and I believe some of the other doctors are
14        going to agree when you get blood on the brain, it
15        causes irritation, causes the brain to swell, and
16        you're gonna learn that this baby had a swollen brain.
17        When the brain swells it can occlude or block what's
18        called venous drainage from your eyes and that venous
19        drainage is directly or in the very proximal position
20        of your optic nerve and the retina, that when the brain
21        swells and the venous and the drainage of the blood
22        from the eyes is cut off, when that happens it causes
23        the blood veins, arteries inside the eye, inside the
24        brain to rupture, and that's what Dr. Uscinski and
25        Dr. Plunkett will explain to you in great detail.
```

1        Dr. Dickison admitted that this baby was having a

2    seizure upon being admitted to the hospital.  In fact,

3    I believe       was given seizure medication

4    throughout his hospitalization.  She does not believe

5    the lack of oxygen can cause bleeding on the brain;

6    however, our doctors will tell you it certainly can.

7    She did agree that a subdural that begins to re-bleed

8    can have a mass effect on the brain, which is pressure

9    on the brain, that the re-bleeding in the chronic

10   subdural causes pressure on the brain.

11       She also indicated she did not think it was

12   necessary to look at the brain stem, felt like that

13   would be a waste of money, that when they were doing

14   CAT scans, and they could have done an MRI on the brain

15   stem to determine whether or not there was any damage

16   to the brain stem, which would directly correlate any

17   violent shaking of this baby's neck, she didn't think

18   it was worth spending thousands of dollars to do

19   something like that.  And yet the brain stem, you'll

20   learn, logically if you're doing what the state claims

21   happened here, logic only dictates that there would be

22   evidence of damage to the brain stem.  Either it's

23   damage that you can see grossly, which means just

24   looking at it with your eyes, or microscopic.

25       You're gonna hear testimony from Beth Talaga,

1    child protection team nurse, she draws the same

2    conclusion based on the same thing.  She cannot explain

3    and I don't know if -- I would submit to you that none

4    of their witnesses will be able to explain how you can

5    shake a baby, injure the brain, and not, yet not injure

6    the neck.  They describe to us that the neck of a baby

7    is somehow more plastic, somehow different than an

8    adult's neck.  The evidence is clear that babies' heads

9    are proportionately bigger than their trunk than an

10   adult is and there are doctors, I believe some of them

11   will admit, in whiplash injury there's very rarely

12   evidence of injury to the brain, but always evidence of

13   injury to the neck, and it's the same thing.

14        They agree, Ms. Talaga is going to agree that

15   blood on the brain can cause a seizure, that subdurals

16   can re-bleed.  She also agreed that a child's neck

17   could probably be injured if you do not support the

18   head, but is not sure.  That was in response to a

19   question regarding holding an infant and supporting a

20   child's head and why would you do that, to prevent a

21   neck injury.  And yet you can shake it, cause damage to

22   the brain, and not a neck injury.

23        You're gonna hear from Dr. Maria, the pediatric

24   neurologist who examined the child that tests to

25   determine brain activity, review of the CAT scans, saw

1 chronic, bilateral, both sides, subdural hematoma, both

2 sides, and acute.  Knew of the retinal hemorrhaging,

3 knew the history included shaken baby.  One of the

4 tests that he did that concludes that this baby was

5 suffering, was a cortical thumb that he described.

6 Dr. Uscinski is going to explain to you that what

7 Dr. Maria observed that day is normal for a child of

8 this age, and not symptomatic of damage to a child.

9 Dr. Uscinski is also going to explain to you that the

10 Babinski response, which Dr. Maria did, was normal.

11 Dr. Uscinski is a neurosurgeon that is going to explain

12 to you in detail all these things I'm talking about.

13  You're gonna hear Dr. Maria say that the shaking

14 of a baby will injure the brain, but not the neck.

15 Again that defies the laws of physics.

16  You're gonna hear from Dr. Hamilton, who is the

17 person who did the autopsy on this baby.  He said he

18 saw evidence -- or no evidence of chronic subdural

19 hematoma, sent the brain off to Dr. Nelson to do a

20 microscopic exam, but did not preserve the brain stem,

21 did not preserve the dura.  The most critical piece of

22 evidence that the state had in their possession was the

23 dura.  And what did Dr. Hamilton do?  Well, he said he

24 directed one of his associates to send the dura to

25 Dr. Nelson for a forensic pathologic examination.  It

1    was not done.  The dura was buried with      , dura

2    being the very portion of the baby's head wherein the

3    bridging veins are.  The bridging veins that they're

4    gonna have you believe were torn by violent shaking was

5    never examined microscopically.  So you've got one

6    doctor who is gonna say:  Well, I didn't see any

7    chronic subdural hematomas.  I meant to have it sent

8    off for a second opinion by Dr. Nelson, but we didn't

9    do it.  They destroyed key evidence, the bridging veins

10   in the dura, never examined either grossly or

11   microscopically by anyone.

12       You're gonna hear from Dr. Levine, pediatric

13   ophthalmologist, who looked at the baby, looked at the

14   eyes with some sort of scope, saw retinal bleeding, has

15   testified that he saw vitreous -- bleeding in the

16   vitreous matter, which is the liquid stuff behind your

17   eyes, between your eyes and the retina, and concluded

18   this was consistent with shaken baby.

19       You're gonna hear from Dr. Bell, who is another

20   forensic pathologist, to whom the eyes were sent for

21   gross and microscopic examination.  Dr. Bell examined

22   these eyes and he saw evidence of retinal hemorrhaging.

23   He saw absolutely no evidence of bleeding in the

24   vitreous matter.  He also saw evidence of old bleeding

25   in the retina, bleeding that could have been at least a

1   week old or older.

2       Dr. Nelson was the forensic pathologist who took

3   the brain, had the slides prepared, examined the brain

4   microscopically.  He's the forensic pathologist that

5   Dr. Hamilton had meant to send the dura off to, but

6   forgot.  He agrees, Dr. Nelson agrees that bleeding can

7   cause seizures, that he found both subarachnoid

8   bleeding and subdural bleeding, subarachnoid meaning

9   another layer protecting the brain just below the dura,

10  I believe.  He found in his findings that there was a

11  lack of oxygen to the brain, that this brain had

12  swollen.  As far as Dr. Hamilton's autopsy and whether

13  or not it was complete, his response was, quote:  We

14  can always strive for more completeness, end quote.  He

15  said he would certainly have liked to have examined the

16  dura since it was the focal point of this case, but was

17  unable to because it was destroyed or buried.

18      He also indicated that he would need to see the

19  dura matter in order to see evidence of any shearing of

20  the bridging veins.  Again, as the state has alluded

21  to, we have a big vein coming on the top of your skull

22  from, I guess, your heart and Dr. Uscinski and all the

23  other doctors can explain it to you.  And then there

24  are bridging veins, tiny, little, bridging veins that

25  allow the blood to get into your brain, because your

1    brain like any other part of your body, is living

2    tissue.  It has to have blood or else it will die.

3    These bridging veins is what allows the main highway of

4    blood, if you will, to get into the brain.  Well, those

5    bridging veins are in the dura and the dura was not

6    examined microscopically.  So Dr. Nelson cannot say

7    whether or not there was any tearing there.  That's the

8    whole essence of shaken baby is the tearing of the

9    bridging veins.

10        Dr. Nelson also indicated that it would have been

11   helpful to examine the cervical cord, because if there

12   was damage to the cervical cord through shaking, it

13   could be examined, it could be noticed, possibly

14   grossly, and certainly microscopically if it existed.

15   That was not sent to him either.

16        He agreed that, said he saw no tears in the brain

17   itself, the tissue of the brain itself.  And he agreed

18   that brain swelling can cause retinal bleeding,

19   which -- Dr. Nelson is one of their doctors, the

20   state's doctors, and he's candidly gonna tell you that

21   swelling of the brain can cause retinal hemorrhaging.

22   Again, that's what other doctors, Drs. Uscinski and

23   Plunkett are gonna tell you that if your brain swells,

24   it cuts off the venous drainage as they call it, from

25   your eyes where blood is flowing back out, cuts it off,

1    and causes bleeding in the retina, which is, there

2    are -- all these people who are gonna testify about

3    shaken baby are gonna say that you've got the subdural

4    hematoma coupled with the retinal hemorrhaging, that

5    those two things can only happen one way.  And if

6    you've got both those things in a baby, you got shaken

7    baby.  And yet none of them can answer why under

8    Newtonian laws of physics you can shake a baby as they

9    claim and cause this brain injury, no neck injury.

10   None can explain it to you.

11        Now, you're gonna hear from Dr. Plunkett, who is a

12   board certified forensic pathologist from Minnesota.

13   He's conducted over 2000 autopsies and he's gonna tell

14   you how an autopsy should be done.  He certainly felt

15   that Dr. Hamilton's autopsy lacked a considerable

16   amount that should have been done.  He's extremely

17   concerned that there was no sampling of the dura for

18   him to examine.  He will tell you a lack of oxygen can

19   cause re-bleeding, and he will disagree with the theory

20   of shaken baby as you're going to be presented in this

21   trial.

22        He relied on the records that he received from the

23   doctors who worked down here.  He will tell you that

24   this baby, as I've said, had a chronic subdural

25   hematoma.  He's unsure if that was caused by the

1    seizure or if it happened the other way around.  He

2    will tell you that being trapped, as the baby was, as

3    Mr. Herlihy's gonna tell you, may -- or would not have

4    caused the chronic subdural, but it may very well have

5    aggravated a pre-existing injury and caused it to

6    bleed.  He also will tell you that a lack of oxygen can

7    cause new bleeding.  Again, we have evidence this baby

8    was vomiting.  If the baby was vomiting and choked,

9    caused it not to be able to breathe, which can cause

10   re-bleeding in the brain.

11        He also will tell you that retinal bleeding now is

12   more highly correlated with sudden increases in

13   intracranial pressure.  Again, retinal bleeding caused

14   by the brain swelling.

15        He will tell you that swelling due to brain

16   swelling or volume, excuse me, that if you have the

17   brain swelling, it can be caused by the volume of the

18   blood in the chronic subdural, or it can caused by

19   other matters.  He's gonna go on to tell you that you

20   cannot cause subdural hemorrhaging by shaking, as I

21   have said, and that he believes the initial injury of

22   the chronic subdural was at least two to three weeks

23   old.  He is also gonna tell you re-bleeding of chronic

24   subdurals is the natural history of subdural hematomas.

25        Again, Dr. Uscinski is gonna testify.  He's --

1      Basically, he's gonna tell you how he became involved

2      in investigating shaken baby.  Basically, what

3      Dr. Uscinski does is he is a neurosurgeon, that's what

4      he does.  He operates on people's brains on a daily,

5      almost a daily basis, certainly on a weekly basis.  I

6      have no idea how many operations he's done.  I'm sure

7      he can give us a rough estimate.

8          I believe he's gonna tell you that a few years

9      back a child was brought to him for examination of

10     suspected child abuse and he took a look at the baby,

11     examined the brain and said:  No, this is not child

12     abuse.  This child had an existing chronic subdural

13     hematoma, that that chronic subdural hematoma began to

14     bleed, and that is what has caused the symptoms that

15     you're seeing here.  And then began to investigate all

16     the literature on shaken baby, and researched, and

17     researched, and researched it, and was horrified to

18     learn that there really is no scientific basis for

19     what's being advanced as shaken baby, and he'll go into

20     as much detail as we care to provide about this.

21         He's gonna tell you in this case the victim died

22     of anoxia, the baby died of anoxia, that he vomited and

23     aspirated, and so on, and so forth, that there was

24     evidence of re-bleeding in  _____, that there was

25     re-bleeding that can irritate the brain, as I said,

1    which can then cause a seizure.  It can cause the

2    victim to not be able to breathe.  Again, the cause of

3    death in this case was anoxia or lack of oxygen to the

4    brain.

5         He's gonna tell you that brain edema or brain

6    swelling can cause venous occlusion, again, the cutting

7    off of drainage of blood from the eyes which leads to

8    retinal hemorrhaging.  And again, he will tell you in

9    detail the bridging veins are in the dura, which as

10    I've already said is gone.

11         You're also going to hear from Brian Herlihy.

12    Mr. Herlihy is gonna tell you what he has told everyone

13    from Day One, what he said on the 911 tape, what he

14    said repeatedly over the course of a three-hour

15    interview that was not taped, what he said over the

16    course of a 20-minute interview that was taped, what he

17    said over the course of an interview that was not

18    properly video-recorded that day on the day this

19    incident happened.  He was left with the baby, that he

20    fed the baby, that he thought the baby was happy, and

21    that he put the baby on the bed.  He went in to take a

22    shower, there was no hot water.  He came out after

23    going to the restroom and the baby was in this position

24    at the end of the bed between the bedposts and the bed.

25    He then, of course, panicked, called 911, asked for

1   help and got it.  That is what he has said from the

2   very beginning and has testified to in this case, of

3   course, in much more detail.  There is absolutely no

4   evidence whatsoever that Mr. Herlihy ever maliciously

5   punished ˜               in any way, shape, or form.

6   In fact, it's just the opposite.  Mr. Herlihy cared a

7   great deal for              .

8        There is absolutely no evidence that he

9   intentionally caused any injury to            ____.

10  Again, Mr. Herlihy loved this baby, cared greatly for

11  this baby.  The state's burden is to prove that he

12  intentionally inflicted injury to this baby, or

13  intentionally punished this baby, or in some way caused

14  aggravated child abuse, which then led to the death of

15

16       Ladies and gentlemen, you're going to be hearing a

17  lot of testimony, a lot of testimony, a lot of it will

18  be quite complicated, but we're asking each of you to

19  be as patient as you can and to listen as carefully as

20  you can.  At the end of this case, ladies and

21  gentlemen, I submit to you that the evidence in this

22  case is gonna show you that the only logical verdict in

23  this case is a verdict of not guilty.

24       Thank you very much.

25       THE COURT:  All right.  Ladies and gentlemen,

1    before we even call the first witness we'll go ahead

2    and take a recess so that we won't be cutting up the

3    testimony too much.  So if you'll retire to the jury

4    room for about 15 minutes and then we will reconvene.

5    Court will be in recess for 15 minutes.

6         (Recess at 10:19 a.m, to 10:38 a.m.)

7         MS. SINGER:  Your Honor, before the jury comes

8    back, my next witness will be authenticating

9    photographs of baby        At the time that we had

10   our initial hearings, the Court said that I could

11   select two of the four mobile pictures.  I did that and

12   I've shown them to Mr. Tedder and Mr. Groland.

13   Mr. Groland would like to add one of the additional

14   mobile pictures.  And so instead of having him have to

15   do a predicate, I will do -- because I'm fine with

16   putting five mobile pictures in -- I will do all the

17   mobile pictures, that -- the one that he wants along

18   with the two that I've selected.

19        THE COURT:  Is that correct, Mr. Groland?

20        MR. GROLAND:  Yes, your Honor.

21        THE COURT:  Good enough.

22        All right, state ready to proceed?

23        MS. SINGER:  Yes.

24        THE COURT:  Defense ready to proceed?

25        MR. GROLAND:  Yes.

1          THE COURT:  Tell the jury to come on out.

2          (Before the jury:)

3          THE COURT:  All right.  Ms. Singer, go ahead and

4     call your first witness.

5          MS. SINGER:  The state would call Doris Bridwell,

6     B-R-I-D-W-E-L-L.  Ms. Bridwell, if you'll take the

7     witness stand.

8                    DORIS BRIDWELL,

9     having been produced and first duly sworn, testified as

10    follows:

11         MS. SINGER:  May it please the Court?

12         THE COURT:  Go ahead.

13         MS. SINGER:  Mr. Groland, Mr. Tedder.

14                  DIRECT EXAMINATION

15    BY MS. SINGER:

16    Q     Ms. Bridwell, you'll need to speak loud enough for

17    me to hear and all the way here.  Will you be able to do

18    that for me?

19    A     I think I will.

20    Q     All right.  And there's water; I know you

21    requested water and a cup.  If you would like to pour

22    yourself a cup right there, that will be fine.

23    A     Thank you.

24    Q     Ms. Bridwell, you need to state your full name.

25    A     Doris Marie Bridwell.

1      Q    Your address, Ms. Bridwell?

2      A    9661 Northwest 110th Circle, Chiefland.

3      Q    Is that in Levy County, Florida now?

4      A    Yes.

5      Q    Now, Ms. Bridwell, this isn't a very polite

6 question, but I need to ask you how old you are?

7      A    I'm 67.

8      Q    Now, how long have you lived out in Chiefland?

9      A    We've been there about a year and a half.

10     Q    And before that where did you live?

11     A    We lived twenty-five years in Archer.

12     Q    Was that in Alachua County, Florida?

13     A    Yes.

14     Q    When you say "we," who lives with you?

15     A    We had seven acres.  At the time my husband was

16 living and Kathy lived, too, and her children to the front

17 of it and we had a home to the back of it.

18     Q    Okay.  Now, when did your husband pass,

19 Ms. Bridwell?

20     A    Five, it will be five years this October.

21     Q    And how many children do you have?

22     A    I have two.

23     Q    And their names are?

24     A    Herbert Benjamin Bridwell, Jr., and Kathleen Marie

25 Morriston.

```
 1        Q     And when your husband passed, did someone move in

 2   with you?

 3        A     Kathy did.

 4        Q     Kathy Morriston?

 5        A     Yes.

 6        Q     And does Kathy Morriston have any children?

 7        A     She has two.

 8        Q     And their names are?

 9        A     John Robert Quirello, Jr., and Melissa Marie

10   Quirello.

11        Q     And does she have or did she have any

12   grandchildren?  Did Kathy have grandchildren which would be

13   your great grandchildren?

14        A     Just

15        Q     That would be            -- ?

16        A     Correct.

17        Q     Is that the child we're here in court about today?

18        A

19        Q     Now, you said that there were two houses on the

20   property that you lived on when you lived in Archer?

21        A     Uh-huh.

22        Q     Now, I want you to describe that for the jury so

23   they can get an understanding of how the houses were

24   situated.

25        A     Okay.  When you would come into the property,
```

1    Kathy's home, or which later John and Crystal lived in, was

2    to the front and my home is to the back.

3        Q    Now, was Kathy's home where John and Crystal later

4    resided?

5        A    Correct.

6        Q    Was that a modular home?

7        A    It was, yes.  It was three bedrooms,

8    two-and-a-half bath.

9        Q    And your house, what kind of house did you have?

10       A    The same type.

11       Q    Now, I'm gonna take you back now to March of 2000.

12       A    Okay.

13       Q    All right.  At that time was your grandson John

14   Quirello Jr.; is that right?

15       A    Uh-huh.

16       Q    Was he married?

17       A    Yes.

18       Q    And who was he married to?

19       A    Crystal.

20       Q    And how long had they been married approximately

21   by March 2000 when the baby was born?

22       A    Probably 11, 12 months.

23       Q    And were you -- did you follow both John and

24   Crystal during the pregnancy?

25       A    Yes, I did.

1       Q      And were you present when the baby was born?

2       A      Yes, I was.

3       Q      When I ask about being present, Ms. Bridwell, were

4  you actually at labor and delivery with Crystal?

5       A      I was actually in the room and saw Robbie being

6  born.

7       Q      Do you know what day he was born?

8       A      March 22nd.

9       Q      And that was in the year 2000?

10      A      Correct.

11      Q      Was there any time during the course of the birth

12 that doctors or emergency folks needed to come in and tend

13 to Robbie?

14      A      No.

15      Q      Was there anything about the birth that you were

16 advised was unusual regarding Robbie's condition?

17             MR. GROLAND:  Objection, your Honor, that calls

18      for an expert opinion.

19             THE COURT:  Sustained.

20 BY MS. SINGER:

21      Q      From what you actually witnessed, Ms. Bridwell,

22 was there anything that suggested to you that the birth was

23 complicated in any way?

24      A      Only that he was born face up.  That's the only

25 thing.

1    Q    And at that time once the baby was born, how soon

2  thereafter did Crystal come home with the baby?

3    A    Two days.

4    Q    Do you know whether or not __   ə came on his due

5  date?

6    A    No.        was premature.

7    Q    Approximately how many weeks premature was he?

8    A    Approximately four.

9    Q    And when he was brought home, was he brought home

10  to the Archer property where you and Kathy lived in one

11  house and John and Crystal lived in the other house?

12    A    Yes.

13    Q    Was there any special in-home medical care

14  required for   ___ə when he came home?

15    A    No.

16    Q    Did there come a time, Ms. Bridwell, when you

17  became a primary caretaker for baby _____

18    A    Yes.

19    Q    When did that happen, Ms. Bridwell?

20    A    When Crystal returned to work.

21    Q    About how many weeks after the baby was born did

22  Crystal return to work to your knowledge?

23    A    To my knowledge about two weeks.

24    Q    And do you work outside of the home?

25    A    No.

1    Q    Are you retired at this time?

2    A    Uh-huh.

3    Q    Does your daughter, Kathy, work outside the home?

4    A    Yes.

5    Q    Where does she work?

6    A    Nationwide Insurance.

7    Q    And so you were available to take care of the baby

8    during the daytime hours when Crystal was working?

9    A    Yes.

10   Q    Where was John working at that time?

11   A    Airborne Express.

12   Q    And he also was working routine hours?

13   A    Yes.

14   Q    How would you describe your job taking care of

15

16   A    Very pleasant.  I enjoyed it very much.

17   Q    Were you required to do anything else other than

18   take care of the baby?

19   A    No.

20   Q    Did you call in any other persons to take care of

21   the baby when you were responsible for him?

22   A    No.

23   Q    Did you routinely take care of the baby from

24   March 22nd through the date of his admission into Shands

25   teaching hospital on August the 2nd?

1          A     Yes, I did.

2          Q     On those days when Crystal was not working, were

3     there times when you would still take care of the baby even

4     when Crystal was not working?

5          A     Maybe two, three times, that's it.

6          Q     And were there times when John was not working and

7     Crystal was working where John might have taken care of the

8     baby?

9          A     If he got home earlier than she did, he would.

10         Q     So he would pick up the baby?

11         A     He would come over and play with him and about the

12    time she got home, he would go home.

13         Q     Could you for the jury, Ms. Bridwell, outline a

14    routine day with you and

15         A     Well, he came over early in the morning and I fed

16    him and I bathed him and I talked to him all day long, and

17    played with him. And he was just a very good baby.

18         Q     When you say he was a very good baby, the jury

19    needs to know what his behaviors were like.  You need to

20    describe what you mean by that when you say he was a very

21    good baby.

22         A     Okay.  He would only cry when he was hungry.  He

23    was not sick a day.  They had -- The only thing I can

24    remember as being a problem, she had a little trouble

25    getting his formula right for him.

1    Q    Now, you need to tell us what that means, trouble

2 getting the formula right.

3    A    When he was first born, he was on mother's milk

4 and then with a supplement, and the supplement didn't hold

5 well with him all the time.

6    Q    Okay.  What would happen when it wouldn't hold

7 well?

8    A    Well, he would spit up and he would be hungry

9 sooner than he should be.

10   Q    All right.

11   A    And we quickly got him on another formula and he

12 was fine.

13   Q    Did there come a time towards the end of his life

14 where he actually was starting to eat some solid food like

15 the bananas and --

16   A    Three meals a day he ate, uh-huh.

17   Q    Did you see any loss of appetite in        through

18 the time that you cared for him?

19   A    No.

20   Q    Did you ever see any unconsolable fussing, where

21 no matter what you did he was unable to be consoled and

22 calmed?

23   A    No.

24   Q    There was a time, Ms. Bridwell, when there was a

25 scratch on           that was noted by you, I believe, as

1    caretaker?

2        A    I thought it might be a scratch.  It was tiny,

3    tiny on his left lower part of his eye and it was gone

4    probably the next day.

5        Q    Was there anything about his fingernails that you

6    were noting at the same time of the scratch?

7        A    Well, we did trim his fingernails, yes.

8        Q    Had he scratched his face at any other times with

9    his hands that you're aware of?

10       A    No.

11       Q    Had you seen any bruising, cutting, lacerations,

12   or any indications in the time that you cared for

13   that suggested to you that he had suffered any injuries?

14       A    No.

15       Q    Now when you say you bathed him, did you bathe him

16   every day?

17       A    Everyday that he was with me.

18       Q    Describe your bath with        for the jury,

19   please.

20       A    It was kind of fun time.  If he was fussy, all I

21   had to do was shampoo his hair and he would start laughing.

22   And after we got his bath, we, I would rub him down with

23   baby lotion.  He got a massage everyday.

24       Q    And was there anything about his body then while

25   you were examining it that caused you any concern

1   whatsoever?

2       A       No.

3       Q       And you viewed his body everyday?

4       A       Everyday that I had him.

5       Q       Except for several times that Crystal had him?

6       A       That's it.

7       Q       Now, did Crystal work the weekends?

8       A       Crystal's work could be any time.

9       Q       So you would have the child even on the weekends

10  as well as during the week?

11      A       Sometimes.

12      Q       When you weren't watching the child, did you see

13  him being on the same property with Crystal and John?

14      A       Coming and going.

15      Q       Ms. Bridwell, did you have an opportunity to go to

16  Robbie's pediatrician when he was being checked out for his

17  routine baby check, checkups?

18      A       I did not see his pediatrician.  I drove her and

19          to the office, went in the waiting room.

20      Q       Were there ever any times during the course of

21          life that he was ever taken into the emergency room

22  or urgent care for any reason?

23      A       Not to my knowledge.

24      Q       Were you present when he received his routine

25  immunizations?

1    A    I was not present.

2    Q    Were you placed -- Was        placed in your care

3  immediately after the child received his immunizations?

4    A    Yes.

5    Q    Could you tell the jury how      ? handled those

6  immunizations?

7    A    Better than any baby I've ever been around.  He

8  still had his little smiley band-aids on and you could pick

9  him up.  He didn't cry.  He wasn't sore.

10   Q    Did he exhibit any symptoms such as fever or any

11 other problems as a result of immunizations?

12   A    No.

13   Q    Now, Ms. Bridwell, while he was in your care, do

14 you recall having any experience where he was injured while

15 you were taking care of him?

16   A    No.

17   Q    There was a time when you were advised that

18 Robbie's neck muscles were not developing as quickly as a

19 child who was not premature; is that correct?

20   A    That's correct.

21   Q    Tell the jury what you were advised about that and

22 what you needed to do?

23        MR. TEDDER:  Objection, hearsay.

24        THE COURT:  The objection is sustained.  She can

25     testify as to what she did.

```
 1            MS. SINGER:  Yes.
 2    BY MS. SINGER:
 3        Q    You don't need to tell us what you were told about
 4    it --
 5        A    I see.
 6        Q    -- but what you did in response to it?
 7        A    Okay.  We would -- I would take a towel and roll
 8    it and put it right on his chest and put him on his stomach,
 9    which would cause him to raise his head and that's what we
10    did.
11        Q    Was that an exercise of some kind?
12        A    Kind of.
13        Q    And how frequently would you do that?
14        A    Oh, maybe three times, four times a day.
15        Q    Did you see any results from that?
16        A    He was getting much stronger.
17        Q    And throughout the time period that you cared for
18    him, Ms. Bridwell, from March, actually maybe April 1st,
19    which would be two weeks after his birth, to the time that
20    he died on April -- August 2nd of year 2000, describe for us
21    what progression you saw in his development?
22        A    He started to gain weight.  He started noticing
23    things.  He was thriving.
24        Q    Did you see any developmental milestones regarding
25    his facial expressions during that time period?
```

1    **A**    He would laugh and he would look at his hands.  He

2    would watch his mobile, watch it go all the way around.

3    **Q**    How would he react with other people, like his dad

4    and his mom?

5    **A**    Fine, fine.

6    **Q**    You know during your time caring for    ' '-  did

7    there ever come a time when law enforcement had been called

8    out to the property where both you and Crystal and John

9    lived?

10    **A**    Yes.

11    **Q**    And were you present during any of the discussions

12    between law enforcement and Crystal and John         during

13    that time period?

14    **A**    I was for a short while and I took the baby into

15    the back bedroom so he wouldn't be exposed to it.

16    **Q**    All right.  And were they having marital problems?

17    **A**    I suppose.

18    **Q**    Do you have any independent knowledge of that,

19    Ms. Bridwell?

20    **A**    I do not.

21    **Q**    Did you get involved in them, the marital problems

22    at all?

23    **A**    I did not.

24    **Q**    Do you know who called the police at that time?

25    **A**    Crystal did.

1    Q    And what resulted from that?

2    A    Well, they came to the house and questioned both

3    of them and then she went back home.  John went back home.

4    Q    When you cared for the baby, were there occasions

5    where your daughter, Kathy Morriston, also cared for the

6    child?

7    A    Yes.

8    Q    Was she always in your presence when she cared for

9    the child?

10   A    Yes.

11   Q    Did she ever care for the child alone, to your

12   knowledge?

13   A    I can't remember her ever doing that.  She would

14   come right home from work and play with him.

15   Q    Now, your daughter is very ill right now?

16   A    Yes, she is.

17   Q    What is she suffering from?

18   A    Cancer and she's suffering from chemotherapy

19   treatments.

20   Q    And how would you describe her physical being

21   today?

22   A    Oh, it's terrible, absolutely.  I have never seen

23   her so sick.

24   Q    Now, when was the very last time you saw ]

25   A    I saw      : the night before this happened to him

1    the next morning.

2         Q    Had you taken care of him that day?

3         A    Yes, I had.

4         Q    And had you done your routine care of         on

5    that day?

6         A    Yes.

7         Q    Did that include bathing ⌐

8         A    Yes, I bathed him.

9         Q    Was there anything that indicated to you that

10        ⌐ had been injured on that day?

11        A    No.

12        Q    The scratch on the eye that you saw earlier?

13        A    It was gone.

14        Q    It was gone.  Who had dropped         off that day?

15        A    Usually Crystal brought him over because John went

16   to work earlier than she did.

17        Q    So -- and we're talking about the day being

18   August 1st?

19        A    Oh, no.  John did.

20        Q    All right.  Did you see -- You did not see

21   on August 2nd until after he was hospitalized, correct?

22        A    Correct.

23        Q    But on August 1st John would have dropped him off?

24        A    Uh-huh.

25        Q    About what time does the baby usually come to the

1   house?

2       A    Oh, goodness, it varied, but before noon.

3       Q    And what was his demeanor like, what was

4   demeanor like that day August the 1st?

5       A    He was, in my opinion, just fine.

6       Q    What was he doing?  What kinds of things were you

7   seeing him do at that time?

8       A    He was paying a lot more attention to me when I

9   was holding him.  And we had flowers on the couch.  He was

10  trying to pick the flowers off the couch and the little

11  house dresses that I wore, he would pick at the flowers.

12      Q    You mean on the print of the material?

13      A    Right.

14      Q    On the print of the material he would be looking

15  at that?

16      A    (Nods head.)

17      Q    And how would you describe his alertness during

18  the day of August the 1st?

19      A    He was alert.

20      Q    What facial expressions did you witness on that

21  day?

22      A              smiled a lot if you talked to him and

23  played with him.

24      Q    What was his attitude like during his bath time?

25      A    Fun time.

1  Q And do you recall anything about his sleeping

2 pattern on August the 1st that gave you any concern?

3  A No, I do not.

4  Q What I mean by that is, was there any, anything

5 unusual about the number of hours he slept that day?

6  A Some days he took short naps and a few days he

7 took long naps.

8  Q Was there anything unusual on the 1st that

9 suggested to you that he was sleeping for a longer time than

10 usual?

11  A I cannot remember.

12  Q Do you recall who picked him up that day?

13  A Oh, goodness, they were going to sign property.

14 They were looking for property and they were gonna sign and

15 I don't recall, but I had him that evening also.

16  Q Was there anything about his demeanor during the

17 evening that suggested to you that he was lethargic or --

18   MR. TEDDER:  Objection, leading.

19   THE COURT:  Overruled.

20 BY MS. SINGER:

21  Q -- anything?

22  A Nothing.

23  Q And who was the "they" that you were referring to

24 were gonna sign some property?

25  A John and Crystal.

1      Q      And they were together at that time?

2      A      That's right.

3      Q      Do you know what property they were planning on

4   purchasing?

5      A      It was not very far.  It was Lear's Acres or

6   something like that, the name of it.

7      Q      Now, that was the last time you saw

8   healthy?

9      A      Yes.

10     Q      And when was the next time you saw

11     A      I saw        the next afternoon as soon as John

12   called us.

13     Q      And that was, where did you go?

14     A      Shands intensive care.

15     Q      And how long did        survive, do you know,

16   after the 2nd of August?

17     A      It seems to me like        died on the 10th, I

18   think.  I can't remember sometimes.

19     Q      All right.  Did he ever -- was he ever conscious

20   when you saw him at the hospital?

21     A      No.

22            MS. SINGER:  May I approach the witness, your

23     Honor?

24            THE COURT:  Yes.

25   BY MS. SINGER:

Stacey K. Bryant, RPR
Judicial Court Reporter

1      Q    Ms. Bridwell, I'm going to show you some pictures.

2  There are seven pictures here.  I want you to look at each

3  of them and then I'll ask you a question about the pictures

4  as a packet.

5      A    Okay.  I think I can say that he's very alert and

6  happy.

7      Q    Yes.  Do these pictures reasonably and accurately

8  depict Robbie from the time he was approximately seven weeks

9  of age to late July of the year 2000?

10     A    Yes.

11         MS. SINGER:  At this time, your Honor, I would

12      like to enter these seven photographs as a composite

13      Exhibit 2 into evidence.  I believe the medical records

14      are 1 into evidence.

15         MR. GROLAND:  No objection.

16         THE COURT:  All right.  These photographs will be

17      admitted as a Composite Exhibit Number 2 in evidence

18      for the state.

19         (Composite Exhibit No. 2 was received in

20      evidence.)

21         MS. SINGER:  If we can just take a moment to have

22      them marked.  I do want to ask her questions about

23      them.

24  BY MS. SINGER:

25      Q    Ms. Bridwell, I'm going to show you what's been

1    previously marked as 2-A into evidence and ask you if you

2    can tell the jury what this picture shows us?

3        A    Okay.  It shows John holding        and R

4    looking right up at his daddy.

5        Q    Do you remember when that particular photograph

6    was taken or the approximate time that photograph was taken?

7        A    He was seven weeks old, he was taken that day to

8    have his photograph taken at Sears.  He has the same little

9    outfit on and --

10       Q    I want you to talk to me here so they can hear

11   you.

12       A    And this was taken in John and Crystal's house.

13       Q    He was having his professional photographs taken

14   on that day?

15       A    That day.

16       Q    That was before you all went to Sears to have the

17   pictures taken?

18       A    This was after, I think.  I can't be sure.

19       Q    This is John, your grandson, in this picture?

20       A    Correct.

21       Q    I'm gonna show you now State's B into evidence and

22   tell me whether or not you recognize that and if you can

23   tell the jury what that picture shows us?

24       A    He's sitting in his little bouncing chair, very

25   content.

1     Q    That is          in that picture as well?

2     A    This is

3     Q    And this one also 2-C into evidence?

4     A    This one is the day he found his little hands and

5 he's looking at them, chubby little cheeks.

6     Q    Now, it appears that he was in the same outfit in

7 B and C?

8     A    Yes.

9     Q    Were those pictures taken on the same day?

10    A    Yes.

11    Q    I'm going to show you now 2-D, 2-E, and 2-F into

12 evidence.  Were those three pictures taken on the same day?

13        Well, excuse me.  I should -- I should just give

14 you 2-F and 2-E.  Were those two pictures taken on the same

15 day?

16    A    These two were, uh-huh.

17    Q    What do those pictures show us, Ms. Bridwell?

18    A    He's watching his little mobile and he has a real

19 broad laugh in one of them and both of them he's watching it

20 very contently (sic).

21    Q    Did you notice that he would do this on a routine

22 basis?

23    A    Yes.

24    Q    I show you 2-D as well, Ms. Bridwell.  What does

25 that show?

```
 1        A    The same.

 2        Q    That was taken on a different day?

 3        A    Uh-huh, yeah, it was.

 4        Q    And he's doing what in that picture?

 5        A    He's watching the little bears go round and round.

 6        Q    And one last picture, Ms. Bridwell.  This is

 7   State's 2-G into evidence.  Do you remember this particular

 8   photograph?

 9        A    Yes, that's when I was bathing him.

10        Q    And did you take that picture?

11        A    I believe his grandmother, Kathy, took this

12   picture.

13        Q    And you were actually doing the bathing at that

14   time?

15        A    Yes.

16        Q    And is that the last picture you have of him in

17   the bath?

18        A    Yes.

19             MS. SINGER:  Your Honor, at this time I would like

20        to publish to the jury.

21             THE COURT:  Go ahead.

22   BY MS. SINGER:

23        Q    Ms. Bridwell, was  _____ rolling?

24        A    No, he was not.

25        Q    Did you ever see        roll?
```

1    A    Never.

2    Q    How much of that behavior did you ever witness

3  Robbie doing?

4    A    What behavior?

5    Q    Trying to roll or rolling?

6    A    Oh, I witnessed him lifting his head and turning

7  it from side to side, but that's it.

8    Q    Were there any exercises that you were given to

9  help him strengthen?

10    A    The one with the towel under his chest, yes.

11    Q    And what purpose was that for?

12    A    That was to strengthen his neck.

13    Q    Was there ever a time in your presence that

14  rolled or turned from his, from laying on his chest to his

15  back?

16    A    Never.

17    Q    Was there ever a time when        was laying on

18  his back that he would be looking up to the ceiling where he

19  then rolled to his chest?

20    A    Never.

21    MS. SINGER:  No further questions, your Honor.

22    THE COURT:  Mr. Groland.

23    MR. GROLAND:  Yes, ma'am.  May it please the

24    Court, Ms. Singer, Mr. Pennypacker.

25                    CROSS-EXAMINATION

1    BY MR. GROLAND:

2        Q    Ms. Bridwell, do you know when each of those

3    pictures were taken?

4        A    I do not know the exact date each was taken.

5        Q    Do you know where each of those pictures were

6    taken?

7        A    Yes, I can probably tell by looking at the

8    surroundings.

9        Q    Okay.  Do you know who took each of those

10   pictures?

11       A    I do not know exactly.

12       Q    Okay.  So it would be fair to say that you were

13   not present when those pictures were actually taken?

14       A    I don't know if that's a true statement either.  I

15   was around.

16       Q    The picture that you said depicted      ₂ looking

17   at his hand --

18       A    Uh-huh.

19       Q    -- do you know what date that was taken or what

20   month?

21       A    It was between the end of June and July.  I took

22   that picture.

23       Q    Okay.  There's a picture of the baby -- I don't

24   know what number it is.  Maybe we'll take a look -- sort of

25   on his side.  He's rolled over to his side.  Do you know

1   when that was taken?

2       A     The only thing I can do is give you a frame of

3   about a month there.

4       Q     Okay.

5       A     But he wasn't turned over, he was just looking.

6   His face was turned.

7       Q     I'm showing you 2-D, State's exhibit in evidence.

8   This picture here, he's kind of on his side looking?

9       A     His face is turned with one arm this way.

10      Q     Okay.  All right.  And this was taken sometime in

11  July you think?

12      A     Probably, probably.

13      Q     Okay.  So you were not present when this one was

14  taken?

15      A     That is at my house.  So I was probably there

16  somewhere.

17      Q     Okay.  Do you remember who took that photo?

18      A     No.  There's been a lot happened since then.

19      Q     Okay.  I think you indicated that     e rarely

20  cried, is that --

21      A     He rarely cried.

22      Q     Did he ever have any fits of crying that you

23  recall?

24      A     No.  If he cried you could feed him and he was

25  perfectly happy.

1    Q    And, in fact, he cried when he was hungry and that

2    was about it, wouldn't that be correct?

3    A    That's correct.

4    Q    And I think you were talking earlier about even

5    when he went to the doctor's office to get some shots, did

6    you indicate to the jury that even when he got his shots he

7    did not cry?

8    A    No, no.  When he got his shots he cried.

9    Q    Okay.

10   A    But the next day when they're usually cranky and

11   sore, he was fine.

12   Q    Okay.  You were the baby -- you were the primary

13   baby-sitter?

14   A    Right.

15   Q    And from the time, from the time that Crystal came

16   home until the baby went into the hospital, you were the

17   baby-sitter --

18   A    Right.

19   Q    -- five, six days a week?

20   A    Probably unless she was off for a weekend or

21   something.

22   Q    Okay.  Now, I think you indicated earlier that

23   there were several occasions when you were baby-sitting for

24        at your house, but Crystal wasn't at work?  She was

25   somewhere else?

1      A      I can't say for sure that because I didn't follow
2  her or see her.
3      Q      Okay.  Were you aware of any time that you had to
4  watch the baby that Crystal was not at work?
5      A      I was aware of one day when she was going to the
6  doctor for herself.
7      Q      Okay.  She actually went to the doctor one time in
8  August for an injury to her hand?
9      A      I don't know about that.
10     Q      Do you know about her punching the wall in the
11 house in July and having to go to the emergency room?
12     A      No, I do not.
13     Q      All right.  And your daughter, Kathleen Morriston,
14 is John Ç          mom?
15     A      Correct.
16     Q      Were the police out to the property on several
17 occasions during Robbie's lifetime?
18     A      Two occasions.
19     Q      We talked about one earlier when Ms. Singer was
20 asking you some questions.  Do you remember what the other
21 occasion was about?
22     A      Yes.  That day I didn't remember when you asked
23 me, but one occasion was before          was hurt.  It was
24 around the 4th of July holiday.
25     Q      Okay.

1        A     The next occasion was after . ˙ ˙ ; had passed.

2        Q     Okay.  So what your testimony is, is that you

3   recall just one occasion that the police were out there

4   during   ˙ - - -   -- during the time ˙      was at home?

5        A     Right.

6        Q     And the 4th of July is about the time you recall

7   it being?

8        A     About the time what?

9        Q     That you recall it being?

10       A     The first visit from the police, yes.

11       Q     In fact, isn't that when Crystal actually left the

12   property and moved out with the baby?

13       A     She left several times that evening, back and

14   forth, back and forth.

15       Q     Okay.  Isn't that the time that she left and

16   actually stayed away?

17       A     I do not know for sure.

18       Q     Okay.  I'm not gonna ask how old you were because

19   I heard.  Can you tell me a little about how your health is,

20   how your health --

21       A     My health was good then.  My health has been

22   terrible since.  I had a quadruple bypass and then after I

23   ·got home for a week, I had a stint, and it's just gone down

24   from there.

25       Q     Okay.  You've been ill with heart problems for a

1  while?

2      A    No.  I became ill, the doctor sent me right across

3  the street to the hospital.

4      Q    Do you know the lead detective in this case, Helen

5  Legall?

6      A    I do not know her.  I met her today.

7      Q    Okay.  And it is true, is it not, that while this

8  case was under investigation you never spoke to her at

9  anytime?

10      A    No.

11      Q    Did your daughter, Kathleen, assist you in taking

12  care of Robbie in the house?

13      A    Well, if she was there, she would play with him,

14  or hold him, or fix his bottle.

15      Q    Now, I think you indicated to Ms. Singer that a

16  typical day would be Crystal bringing the baby over to you

17  and the first thing you would do would be to bathe the baby?

18      A    No.  I would feed him and play with him a little

19  bit, and then bathe him.

20      Q    Okay.  Did you bathe him every time that she

21  brought him over?

22      A    Yes, I did.

23      Q    Do you know why Crystal didn't bathe her baby?

24      A    I didn't ask her because I enjoyed bathing him.

25      Q    Were you aware of other people that Crystal had

1    utilized to care for ____ between March and August of

2    2000?

3         A    I was aware of family.

4         Q    Okay.  Let me just see if I got it right.  Her

5    father, Richard Davis, watched after    ; sometimes?

6         A    Sometimes.

7         Q    He lives in Jacksonville?

8         A    Yes.

9         Q    And his wife, Tammy Davis?

10        A    Yes.

11        Q    And I think Crystal has two sisters, does she not,

12   Michelle?

13        A    And Dana.

14        Q    And Dana.  And it is your understanding, is it

15   not, that from time to time both Michelle and Dana also

16   watched the baby?

17        A    I think it was their enjoyment is what I heard.

18        Q    I'm sorry?

19        A    They're enjoyment of watching.  They didn't have

20   to watch him.  They enjoyed it.

21        Q    Oh, I know.  Okay.  But they did, in fact, care

22   for Robbie from time to time?

23        A    Yes.

24        Q    Outside of Crystal's presence?

25        A    I suppose.

1      Q     Okay.  Do you know about the sisters actually

2  helping to take        from this area to Jacksonville, to

3  Richard Davis, her father?

4      A     Yes.

5      Q     Tell us about that, what you know about that.

6      A     Now, this is hearsay.

7           MS. SINGER:  I'm going to object then.

8           THE COURT:  Sustained.

9           MR. GROLAND:  Well, I'm asking you not how you

10      knew, because not asking who told her.  I'm asking what

11      she knows, your Honor.

12           MS. SINGER:  I'm going to say --

13           THE COURT:  The objection has been sustained.

14  BY MR. GROLAND:

15      Q     Where does Michelle, Crystal's sister, live?

16      A     If I can remember right she lives in Middleburg.

17      Q     What about Dana, her other sister?

18      A     Dana lives in Orlando.

19      Q     Okay.  Do you know why Crystal would have Dana in

20  Orlando watch _____ under what circumstances?

21           MS. SINGER:  I'm going to once again object.  It

22      calls for a hearsay answer.

23           THE COURT:  Sustained.

24  BY MR. GROLAND:

25      Q     I think you -- We sort of left off halfway through

```
 1   my question and your answer about taking care of         on a

 2   typical day.  Come over, you would feed him, you would bathe

 3   him, and what else would you do?

 4        A     Play with him.  I would change diapers, put him to

 5   bed.

 6        Q     Did you ever take him out of the house?

 7        A     Yes, we had walks out of the house.

 8        Q     Did you ever go anywhere?

 9        A     We went to the doctor.

10        Q     Okay.  When you went to the doctor with Robbie,

11   that's the pediatrician, Dr. Hellrung?

12        A     I went to my doctor and took        with me.

13        Q     So sometimes you went in your vehicle with

14        A     One time to the doctor.

15        Q     Did you take       out on the seven acres?

16        A     Oh, yes.

17        Q     And am I correct that you didn't use a stroller?

18        A     You couldn't.  We just had grass.  We didn't have

19   concrete.

20        Q     So when you walked around the property with him,

21   you actually carried him?

22        A     Uh-huh.

23        Q     Did you do that everyday?

24        A     Not everyday.  We had a large porch and we were on

25   the porch a lot and he was watching the birds, and the
```

1    trees, and --

2       Q    Would you agree that Crystal and John had problems

3    pretty much throughout their marriage?

4       A    I couldn't tell you that because I was in their

5    house one time.

6       Q    Ms. Singer asked you about whether or not you

7    observed anything that you consider to be unusual when you

8    were there for the delivery.  Do you recall that question?

9       A    Yes.

10       Q    And I think you said that the only thing you

11    remember is that he was born face up?

12       A    Right.

13       Q    He was also born one month premature?

14       A    Correct.

15       Q    And was he not also born with the umbilical cord

16    around his neck?

17       A    Yes.

18       Q    Was he also not born -- Strike that question.

19             Did he have a broken clavicle?

20       A    Yes.

21       Q    So there were several things about the delivery

22    that you now remember?

23       A    The cord, I mean they just flipped it off

24    immediately.

25       Q    Okay.  There was an article in the newspaper

1    where --

2              MS. SINGER:  I'm going to go ahead and lodge an

3        objection and ask for a proffer, your Honor.

4              THE COURT:  Approach the bench.

5              (Sidebar conference:)

6              THE COURT:  I can't imagine how you can ask this

7        question, so you must have a good reason.

8              MR. GROLAND:  I'll ask her about the details of

9        the article.  There was an article in the newspaper

10       where her daughter was quoted and I want to ask her

11       whether or not this article upset the family.  And then

12       I'm gonna go as far as the testimony.  I'll ask her

13       more specific questions.  I'm not gonna ask her

14       anything about what was written.  I'm just gonna ask

15       her the family's reaction to the article.

16             THE COURT:  That's relevant how?

17             MR. GROLAND:  Well, she says it talks about

18       suspecting there was child abuse.  I don't know if I'm

19       gonna be able to get it in at a later date.  I want to

20       from this witness at least elicit that the family was

21       upset with the daughter for saying things like

22       suspicion about child abuse in the family.

23             THE COURT:  You object to that basis?

24             MS. SINGER:  Absolutely.  It's totally irrelevant

25       about what was in the newspaper article after the fact

1   and what conclusions could have been derived from that

2   article.  I don't see any relevance whatsoever.

3       THE COURT:  Okay.  The objection is sustained.

4   However, when you get to your case if there is an

5   opening for it to come in, of course, we'll visit the

6   issue whether you can recall this witness and ask her.

7       MR. GROLAND:  Okay.

8       Your Honor, when we have a sidebar like this, do

9   you want my client to come up here and join us?

10  Mr. Tedder and I just had a little disagreement about

11  that.

12      THE COURT:  Well, you and Mr. Tedder need to get

13  in alignment.  Obviously anytime you believe your

14  client needs to come up, that's fine.  If the state

15  feels like we're addressing an issue that the defendant

16  needs to be present I'm gonna ask that we do that, but

17  if everybody agrees he does not need to be present,

18  that's fine.

19      MS. SINGER:  I don't think he needs to be present

20  for this issue, your Honor.

21      MR. GROLAND:  Okay.

22      THE COURT:  Go ahead, Mr. Groland.

23      (Sidebar concluded.)

24  BY MR. GROLAND:

25      Q    Was there a time that the police came out to the

1    property because Crystal was locked out of the house?

2        A    Yes.

3        Q    Okay.  And it had more to do than her just not

4    having a key?

5            MS. SINGER:  I'm going to lodge an objection as to

6        frame of time.  I would like to know if that can be

7        identified before we go further with the questioning,

8        your Honor.

9            THE COURT:  The objection as to vagueness is

10        sustained.  If you would rephrase the question,

11        Mr. Groland.

12    BY MR. GROLAND:

13        Q    During a time that        was with us, did the

14    police come out to the house because she was locked out of

15    her house?

16        A    No.

17        Q    Okay.  Are you sure about that?

18        A    I'm positive about that.

19        Q    Was there a time when Crystal was kept from seeing

20    the baby while the baby was in your house?

21        A    Yes.

22        Q    And she wanted -- I'm sorry -- that she wanted to

23    see or have the baby and you and your daughter would not let

24    her have the baby?

25        A    That was the night of the July incident and she

```
 1   was going back and forth, back and forth in her car.  And I
 2   didn't feel that she was in the shape to have        right
 3   then.  Later on that night when she calmed down she got
 4    . . . .
 5       Q    Okay.  So she wanted to leave with        and you
 6   all told her she could leave, but she couldn't take
 7       A    I did.
 8       Q    Okay.  Now, talking just briefly about the injury
 9   that you observed in      s eye, that was some bleeding in
10   his eye that you saw?
11       A    A tiny little dot.
12       Q    Of bleeding?
13       A    Of blood, I think.  It was red.
14       Q    I think you said you thought he scratched himself?
15       A    I think that's what happened.
16       Q    But you did not see that happen?
17       A    No.
18       Q    It would be correct to say you don't know how it
19   happened?
20       A    Correct.
21       Q    Do you know what projectile vomiting is?
22       A    Yes, I do.
23       Q    There was an occasion when        actually did
24   have projectile vomiting; isn't that true?
25       A    One time with apple juice.
```

1      Q      Okay.  He actually spit up?

2      A      Yes.

3      Q      Wasn't that around the same time that he had the

4   red blood spot in his eye?

5      A      Yes.

6      Q      Did you speak to Crystal about either of those two

7   things, either the red spot or the blood spot in

8   eye or the projectile vomiting?

9      A      I cannot remember, because he didn't usually vomit

10  or spit up and I thought he was just warm and drank it too

11  fast.

12     Q      Going back to my question about getting locked out

13  of the house and needing a key and the police coming out.

14  Do you recall in your deposition on August 13th, 2002, page

15  16, do you remember when I spoke to you at the State

16  Attorney's Office?

17     A      It sounds --

18     Q      Do you remember this question, question line 18:

19            When she --

20            Question:  Who was wanting?

21            Answer:  Crystal was wanting to get in the house

22  and they told...

23            You stopped there.

24            My question:  Why did she want to get in the house

25  where she lived?

1           Answer:  Well, she did not have a key.  I had a

2   key and I let her in.  I gave it to the policeman and he let

3   her in.

4           Do you remember telling me that?

5       A   Yes, I do.

6       Q   Okay.  So there was a time when she was locked out

7   and the police were involved with getting her in?

8       A   There was a time.

9       Q   Okay.  Crystal has a brother?

10      A   I think she has two half brothers.

11      Q   Okay.  And does one of the brothers live in Silver

12  Springs?

13      A   I wouldn't know that.  I don't know.

14      Q   Okay.  Do you have any information as to whether

15  or not Crystal's brother who lives in Silver Springs ever

16  watched         by himself?

17          MS. SINGER:  Objection.

18      A   I wouldn't know.

19          MS. SINGER:  That's fine, your Honor.  I withdraw

20      my objection.

21  BY MR. GROLAND:

22      Q   Ms. Singer asked you about          neck muscles?

23      A   Yes.

24      Q   Was it your understanding that          neck

25  muscles were under-developed for a child of his age?

```
 1        A    It was my understanding that because he was

 2   premature he was slower to develop.

 3             MR. GROLAND:  May I just have a moment, your

 4        Honor?

 5             THE COURT:  Uh-huh.

 6             MR. GROLAND:  No further questions.

 7             MS. SINGER:  Brief redirect, your Honor.

 8             THE COURT:  Go ahead.

 9                       REDIRECT EXAMINATION

10   BY MS. SINGER:

11        Q    Ms. Bridwell, you were asked about an incident

12   where        had drank some apple juice?

13        A    Yes.

14        Q    Was that during the daytime hours?

15        A    Yes.

16        Q    What was the temperature like during that time

17   period?

18        A    It was warm.

19        Q    What happened -- first of all, how quickly did he

20   drink that?

21        A    He just drank it right down.  He was thirsty, I

22   suppose, and it just came back up.

23        Q    Was that the only time that        had ever

24   vomited in that way?

25        A    Yes.
```

1    Q    And did that give you any concern or had you ever

2   seen that happen with other children you had cared for?

3    A    I had seen it happen.

4    Q    Did you believe that you needed to take him for

5   any kind of medical treatment as a result of that?

6    A    No, I didn't, because he was fine afterwards.

7    Q    And did      e appear to in any way show any kind

8   of pain or indication of discomfort regarding that --

9         MR. TEDDER:  Objection, leading.

10        THE COURT:  Overruled.

11  BY MS. SINGER:

12   Q    -- regarding that scratch that you saw on his eye?

13   A    No.

14        MS. SINGER:  One moment, your Honor.

15        No further questions of this witness.  Your Honor,

16   we would ask unless there's further cross-examination

17   that Ms. Bridwell be excused from the rule.

18        MR. GROLAND:  No problem.  That's fine.

19        THE COURT:  All right.  Ms. Bridwell, you've been

20   excused from the rule.  What that means is that if you

21   wish to remain in the courtroom during any portion of

22   the remaining portion of the trial, you're free to do

23   so.  Thank you very much.  You may step down.

24        MR. GROLAND:  Your Honor, I misheard.  I thought

25   you were gonna say excused from the subpoena.

1        MS. SINGER:  I said excused from the rule.

2        MR. GROLAND:  Yeah, I misheard that.

3        THE COURT:  All right.  And you were agreeing to

4    release from the subpoena?

5        MR. GROLAND:  Yes, your Honor.

6        THE COURT:  You're released from the subpoena,

7    which means you're free to leave the courthouse, but

8    you can't stay in the courtroom.

9        THE WITNESS:  All right.

10        MS. SINGER:  State would call its next witness.

11        THE COURT:  Yes.  Go ahead.

12        MR. PENNYPACKER:  State would call Yantz Enoch.

13    Come on up, right up to the witness stand here, sir.

14                    YANTZ ENOCH,

15    having been produced and first duly sworn, testified as

16    follows:

17                 DIRECT-EXAMINATION

18    BY MR. PENNYPACKER:

19        Q    Would you state your name, please?

20        A    Yantz Enoch.

21        THE COURT:  You're gonna have to speak up, please,

22    Mr. Enoch, so all the jurors can hear you.

23        THE WITNESS:  Yantz Enoch.

24    BY MR. PENNYPACKER:

25        Q    Where do you work, Mr. Enoch?

1     A    Airborne Express.

2     Q    How long have you worked there?

3     A    Four years.

4     Q    Were you working there in August of 2000?

5     A    Yes.

6     Q    Who was your boss at that time, do you recall?

7     A    John Q.         was the supervisor.  He's not the

8 owner.

9     Q    How long did you know Mr. Q       prior to August

10 of 2000?

11     A    Right at two years.

12     Q    Did you know him before you worked at Airborne

13 Express?

14     A    No, I didn't.

15     Q    Were you personal friends with Mr. Q

16 outside of work?

17     A    It was growing to be right before the incident, it

18 was growing to be.

19     Q    Did you know his wife, Crystal?

20     A    Only through him.

21     Q    Had you ever socialized with the two of them

22 outside of work?

23     A    More of John.  Basically Crystal just whenever she

24 brought the baby by or just dropping by his job to say

25 hello, or drop off some lunch or something like that.  So I

1    don't know how you could answer that one.

2         Q     You answered it.

3         A     Okay.

4         Q     Do you have any children of your own?

5         A     Yes.

6         Q     How many children do you have?

7         A     Three.

8         Q     How old are those children now?

9         A     Thirteen, ten, and seven.

10        Q     Have you ever cared for your children by yourself?

11        A     Weekends, if you want to count that, on the

12   weekends and stuff.  But not for a long period of time

13   without, you know, their mother.

14        Q     Are you familiar with how a normal four-month-old

15   baby acts?

16        A     Pretty much, pretty much.

17        Q     Prior to August 2nd of 2000 had you ever seen

18        _ _____ ?

19        A     Yes.

20        Q     About how many times?

21        A     Maybe, I would say at least five.

22        Q     Where did you see him?

23        A     Twice out to the -- Well, no.  Once to their home

24   and then the rest of the time would be when Crystal was

25   bringing him by the job for, you know, fellow employees to

1    see him and so forth and so on.  She would be on her way to

2    the doctor's appointment or just off that particular day and

3    thought she would drop in to say hello to John, so about

4    four or five times.

5        Q    How much time did you spend with him during these

6    visits?

7        A    I would say the most time was the day of the

8    incident when I actually held him, played with him for a

9    little bit.  We got a little free time before the actual

10   start of our day at work came about.  I'd say for the most

11   part maybe ten minutes or something like that.

12       Q    Did he seem healthy to you?

13       A    Yes.

14       Q    Did he appear to have any problems at all?  Was he

15   lethargic, or fussy, or anything like that?

16           MR. TEDDER:  Objection, your Honor.  It's improper

17       opinion evidence.

18           THE COURT:  Overruled.

19   BY MR. PENNYPACKER:

20       Q    Did you hear my question?

21       A    No, he didn't.  He was responding well and I could

22   tell that he was responding to me due to the -- he wasn't

23   basically laughing when I picked him up, but as I picked him

24   up and went to playing with him he kind of responded with a

25   smile and a little baby giggle if you want to say that.  It

1    didn't seem like anything was wrong with him at all.  Seemed

2    like a pretty healthy baby.

3        Q    When you interacted with him on August 2nd, was he

4    healthy and happy?

5        A    Yes.

6        Q    How did he come to work that day?  Who brought him

7    there?

8        A    Crystal brought him to work.  He's clean, you

9    know, didn't have any odors, smelling.  He wasn't smelling.

10   Clean, just like a perfect, normal, healthy baby.

11       Q    And who took him away from Airborne Express that

12   day?

13       A    Crystal.

14       Q    Do you recall about what time it was that she came

15   there?

16       A    It's been about two years, but I would say around

17   8:30ish, or 9:00ish, somewhere in that hour.  Exact time I

18   couldn't really tell you, but it was early morning.

19       Q    And she stayed about ten minutes, is that what you

20   said?

21       A    That's about the length of the time that I was

22   there, you know, in the presence of her and the baby and

23   John.  She may have been there probably 30 minutes all

24   together a total visit.

25       Q    Where did you go that morning other than Airborne

1    Express?

2        A    I went to Shands due to I had accidentally shut my

3    finger in one of the freight containers and I went to Shands

4    to get it treated and that's where I ran into her at.

5        Q    When you say "her" who are you talking about?

6        A    Crystal.  I'm sorry.

7        Q    About what time was that?

8        A    I would say approximately an hour and a half after

9    she left, maybe two hours at the most.

10       Q    So that would have been about 10:30, 11:00 in the

11   morning at Shands?

12       A    Somewhere around in there.

13       Q    Did you talk to Crystal at that time?

14       A    For a brief moment when I walked in the emergency

15   room and I had already signed in waiting to get treated and

16   I was just kind of standing around because my finger was

17   really throbbing.  I couldn't really sit down.  And she came

18   walking out of, I guess the back part where they get treated

19   or whatever.  And when she first came through the door, I

20   was, like, you know, that's Crystal.  She didn't acknowledge

21   me right at the point and then after she came on in the

22   waiting room, then I was like:  You know, what -- what you

23   doing here?  And then she kind of just burst out into tears

24   and said that she was up there with --

25       Q    Don't tell me what she said.  Don't tell me what

1    she said.

2         A    Okay.  She's like ..... up here for --

3              MR. TEDDER:  Objection.

4              THE COURT:  Mr. Enoch, you can't repeat what she

5         said.  So just wait for the next question.

6              THE WITNESS:  Oh, okay.  Okay.  I'm sorry.

7    BY MR. PENNYPACKER:

8         Q    That's fine.  Was anyone else with her at that

9    time?

10        A    No, she was by herself.  Sorry.

11        Q    What did you do after seeing Crystal in the

12   emergency room?

13        A    After we talked, after I kind of find out what was

14   going on, then I called John.

15        Q    Okay.

16        A    He was still at work.

17        Q    What did you tell John?

18        A    I told him you need to come down here because your

19   son's in the hospital.  And then he asked me, you know, what

20   for?

21             MR. TEDDER:  Objection.

22             THE COURT:  Okay.  The objection is sustained.

23        You can't repeat what he said.

24             THE WITNESS:  Okay.

25             THE COURT:  Go ahead, Mr. Pennypacker, ask your

1    next question.

2  BY MR. PENNYPACKER:

3    Q    Did you stay at Shands until John got down there?

4    A    Yes.

5    Q    Did you ever see    __ in the hospital that day?

6    A    No, I didn't.

7    MR. PENNYPACKER:  Could I have just a moment, your

8  Honor.

9    That's all the questions.

10    THE COURT:  Any questions?

11    MR. GROLAND:  We have no questions, your Honor.

12    THE COURT:  All right.  May Mr. Enoch be released

13  from his subpoena?

14    MS. SINGER:  Yes.

15    THE COURT:  Any objection?

16    MR. GROLAND:  No objection.

17    THE COURT:  Mr. Enoch, thank you very much.

18  You're free to leave the courthouse.

19    MS. SINGER:  Your Honor, the next witness that we

20  have is going to be very lengthy.  Does the Court wish

21  us to start now or do the break for lunch now and start

22  at 1:00 o'clock.

23    THE COURT:  Ladies and gentlemen, I think it's

24  gonna be more comfortable for you in the long range if

25  we go ahead and break for lunch early and then you'll

1   be able to hear the witness in their entirety, whomever

2   they may be.

3        So I'll let you step into the jury room and we'll

4   have the -- do you have the envelopes for the notebooks

5   right now, Mr. Clerk?

6        THE CLERK:  Not yet.

7        THE COURT:  See if we can get them up here.  If

8   you wish to, you can just leave your notebooks right

9   there in the seats.  The courtroom will be locked, so

10  they'll be safe there.  And then the Bailiff after

11  you've had a minute in the jury room will escort you to

12  lunch.

13       (Outside the presence and hearing of the jury:)

14       MR. TEDDER:  Your Honor?

15       THE COURT:  Yes.

16       MR. TEDDER:  I was going to say we need to

17  obviously make a special effort to see that these

18  people go back to their correct chairs where their

19  notebooks are at.

20       THE COURT:  Certainly, but they have their names

21  on their notebooks.  As I said, the courtroom will be

22  secured at all times.  Of course, no attorneys or

23  observers will be able to come back in during the lunch

24  hour.  We'll be in recess until 1 o'clock and --

25  Anything else that we need to address?

1   MS. SINGER:  No.  But I do have for defense

2   counsel and for the Court proposed jury instructions

3   and I would like to present it to everyone now in case

4   they want to take a look at them at this time.

5   THE COURT:  That will be fine.

6   MS. SINGER:  We may have some changes and may need

7   to add to that.  We're starting back at 1:00.

8   THE COURT:  Yes.  Of course, with this many jurors

9   it may take them a little bit longer, but the Court

10  will be in session beginning at 1 o'clock.  If we have

11  to wait for the jurors, we'll wait on them.

12  I'll ask that the Bailiff and the Clerk make sure

13  that the courtroom remains secure during the recess.

14  MR. BAILIFF:  Yes, ma'am.

15  MS. SINGER:  Your Honor, if I may be excused

16  briefly just to tell the witnesses that the jurors are

17  gonna come through so they know that.

18  THE COURT:  All right.  I'll ask that all the

19  observers and attorneys leave the room so that the

20  Bailiff can secure the courtroom.

21  (Luncheon recess.)

22  *  *  *  *  *

23

24

25