# EXHIBIT

# E

*202-1-17814*
*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY                    }
                    Appellant,           }
                                         }         CASE NUMBER    2000-2753-CFA
                                         }
                                         }
                                         }         APPEAL NUMBER 1D02-4788
                                         }
v.                                       }
                                         }         VOLUME V
                                         }
                                         }
                                         }
STATE OF FLORIDA                         }
                    Appellee,            }

## TRANSCRIPT
## RECORD

### HONORABLE MARTHA ANN LOTT
ACTING TRIAL JUDGE

### APPEAL FROM THE CIRCUIT COURT
### 8th JUDICIAL CIRCUIT FOR
### ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

I:\USERS\YMC\Word\YVONNE\Circuit Criminal Documents\COV-SH.TRANS.FEL.doc

108

202-1-17814

1      IN THE CIRCUIT COURT OF FLORIDA
       EIGHTH JUDICIAL CIRCUIT
2      IN AND FOR ALACHUA COUNTY

3      CASE NO. 01-2000-CF-002753-A

4  THE STATE OF FLORIDA

5  vs.                          Volume V

6  BRIAN PATRICK HERLIHY,
                                1D02-4788
7          DEFENDANT.

8  _____/

                              Docket CH
9
                              05-14-2003
10         TRANSCRIPT ON APPEAL      Circuit Attorney
           PAGES 108 - 310              Copied
11           VOLUME II

12

13  PROCEEDINGS:        JURY TRIAL
    BEFORE:             THE HONORABLE MARTHA ANN LOTT,
14                      CIRCUIT JUDGE
    DATE:               SEPTEMBER 10TH, 2002
15  TIME:               1:16 P.M.
    PLACE:              COURTROOM 4A
16                      ALACHUA COUNTY COURTHOUSE
                        GAINESVILLE, FLORIDA
17
    APPEARANCES:
18
        JEANNE SINGER, ESQUIRE
19      and
        STEPHEN H. PENNYPACKER, ESQUIRE
20      120 WEST UNIVERSITY AVENUE
        GAINESVILLE, FLORIDA 32601
21      ATTORNEY FOR THE STATE OF FLORIDA

22      GORDON H. GROLAND, ESQUIRE
        and
23      JOHN TEDDER, ESQUIRE
        500 EAST UNIVERSITY AVENUE, SUITES B&C
24      GAINESVILLE, FLORIDA 32601
        ATTORNEY FOR THE DEFENDANT

25

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1                              INDEX VOLUME II

2                                  WITNESSES

3    DR. JOHN HELLRUNG
       Direct Examination by Mr. Pennypacker..........Page    111
4      Cross-Examination by Mr. Groland...............Page    133
       Redirect Examination by Mr. Pennypacker........Page    141
5
     JOHN ROBERT QUIRELLO, JR.
6      Direct Examination by Mr. Pennypacker..........Page    143
       Cross-Examination by Mr. Groland...............Page    159
7      Redirect Examination by Mr. Pennypacker........Page    188

8    CRYSTAL DAWN QUIRELLO
       Direct Examination by Ms. Singer...............Page    191
9      Cross-Examination by Mr. Groland...............Page    253
       Redirect Examination by Ms. Singer.............Page    305
10

11                                 EXHIBITS

12   STATE'S EXHIBITS

13   No.   3 - Photocopied growth chart.................Page    131

14   No.   4 - Photocopied growth chart.................Page    131

15   No.   5 - Original growth chart...................Page    131

16   No.   6 - Receipt................................Page    237

17   No.   7 - Receipt................................Page    237

18   No.   8 - Onesie................................Page    250

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              (Whereupon, the following proceedings were held,

3     the defendant and counsel being present.)

4              MS. SINGER:  Your Honor, may I approach the bench

5         with Mr. Groland?

6              THE COURT:  Does this need to be on the record?

7              MS. SINGER:  I don't think so at this point.  If

8         Mr. Groland believes so --

9              (A sidebar discussion was held off the record and

10    without the court reporter:)

11             THE COURT:  Let the bailiff know when your witness

12        is ready.

13             MS. SINGER:  Yes.

14             (A recess was taken from 1:09 until 1:16.)

15             MS. SINGER:  Your Honor, we want to go ahead and

16        call the next witness.

17             THE COURT:  All right.  Go ahead and bring the jury

18        back in.

19             (The jury entered the courtroom.)

20             THE COURT:  All right.  Mr. Pennypacker, you can go

21        ahead and call your next witness.

22             MS. SINGER:  We'd call John Hellrung.

23             THE CLERK:  Please raise your right hand.

24             (The witness is duly sworn by the clerk.)

25             THE CLERK:  You may be seated.

1                          JOHN HELLRUNG,

2    Called as a witness herein, having been first duly sworn, was

3    examined and testified as follows:

4                          DIRECT EXAMINATION

5    BY MR. PENNYPACKER:

6         Q    Would you state your name, please?

7         A    John Hellrung.

8         Q    What is your occupation?

9         A    I'm a pediatrician.

10        Q    Where are you a pediatrician?

11        A    At Pediatric Associates of Gainesville.

12        Q    What is your educational background?

13        A    I graduated from the University of Florida with a

14   bachelor's of science and University of South Florida with a

15   medical degree.

16        Q    When did you graduate from the University of South

17   Florida with a medical degree?

18        A    1974.

19        Q    Did you do any residencies or any post medical

20   degree and training?

21        A    Yes, sir.  I did internship at Tampa General

22   Hospital and a residency at the University of Florida.

23        Q    What area of specialty did you do your residency

24   in?

25        A    In pediatrics.

1        Q    Are you licensed in the State of Florida?

2        A    Yes.

3        Q    Are you board certified in any area or any

4    capacity?

5        A    I'm board certified in pediatrics.

6        Q    You mentioned that you are now a pediatrician.

7    Have you practiced any other type of medicine?

8        A    No.

9        Q    How long have you been practicing pediatrics in

10   Gainesville?

11       A    Twenty-two years.

12       Q    Have you ever been qualified as an expert witness

13   before?

14       A    No.

15            MR. PENNYPACKER:  Your Honor, I tender Dr. Hellrung

16       as expert in the area of pediatric medicine and he will

17       offer opinion testimony in that area.

18            THE COURT:  Any objection?

19            MR. TEDDER:  No, ma'am.

20            THE COURT:  Good enough.  Dr. Hellrung will be

21       allowed to give his opinion in regard to the area of

22       pediatrics.

23   BY MR. PENNYPACKER:

24       Q    Dr. Hellrung, did you have a patient by the name of

25   Robbie Quirello?

```
 1        A     Yes, I did.

 2        Q     When was the first time that you saw

 3        A     I saw        on the 22nd of March in the nursery at

 4   Alachua County General Hospital.

 5        Q     22nd of March of what year, please?

 6        A     2000.

 7        Q     What date was that in relation to his birth?

 8        A     I believe, I believe that was his date of birth.

 9        Q     Is it normal for a pediatrician to see a patient

10   immediately after birth?

11        A     Yes, it is.

12        Q     Was there anything unusual about        as far as

13   his circumstances?

14        A     No.  His birth was relatively unremarkable with the

15   exception of prematurity.

16        Q     What is the normal period of gestation for a human

17   infant?

18        A     Forty weeks.

19        Q     What period of gestation did Robbie have before he

20   was born?

21        A     Thirty-six weeks.

22        Q     Would that mean he was about one month premature?

23        A     That's correct.

24        Q     When you examine a newborn infant, what do you look

25   for?
```

1      A      The examination basically encompasses the general

2  behavior and alertness of the child and then focuses on every

3  organ system, from the head to toe.

4      Q      Did you do that in this case?

5      A      Yes, I did.

6      Q      What was the result of your examination of

7            ꓛ on March 22nd of 2000?

8      A      His exam was relatively unremarkable.  The only

9  areas that were noted were basically slight swelling over the

10 clavicle, which is the collarbone.

11     Q      What might that indicate?

12     A      It was fairly subtle and sometimes that indicates

13 just going through the birth canal -- sometimes it could

14 indicate a fracture of the collarbone from going through the

15 birth canal.

16     Q      Did you make an effort to determine why there was

17 swelling over the clavicle at the time of the initial newborn

18 exam?

19     A      No.  There is no therapy for broken collarbones,

20 and so an X-ray doesn't really help you in terms of the care

21 of the child.

22     Q      If it were a broken collarbone, what is the normal

23 course for that injury?  How does it heal?

24     A      Generally you will feel either a crinkly feeling, a

25 crackling of the bone, or just a slight swelling over the

1   clavicle, which then, as the weeks go on, becomes a firm lump

2   like a firm bump over the bone.

3        Q    How common is that?

4        A    One in 85 births.

5        Q    What is an Apgar score?

6        A    That's a score to indicate the general appearance

7   of the newborn, which is done at one and five minutes of

8   life.

9        Q    Do you know what      s Apgar scores were?

10       A    I don't have the sheet that tells those scores in

11  my records, no.

12       Q    What would the range of a general score be?

13       A    Generally between zero and ten with ten being the

14  best score and zero being the worst.

15       Q    What would scores of eight and nine indicate to

16  you?

17       A    Those are excellent scores; any score over about

18  six is considered normal.

19       Q    You mentioned that Apgar scores are done in one and

20  five minutes after birth.  How are those actually done?  Who

21  does that?

22       A    They are usually done by either the doctor present

23  at delivery, or more commonly by the nurse that is present

24  tending to the baby.  The scores are based on five different

25  parameters; each parameter is worth zero to two points and

1  those parameters are things like heart rate, breathing rate,

2  muscle tone, cry, and color.

3      Q    In the normal course of your examination of a

4  newborn infant, would you review the Apgar scores before you

5  did the actual exam of the child?

6      A    Yes.

7      Q    Can you say in this case that you looked at the

8  Apgar scores?

9      A    I always look at the Apgar scores.

10      Q    And if there had been anything unusual about the

11  Apgar scores for ____ e would you have you noted that in your

12  chart?

13      A    Yes.

14      Q    Is there any notation in your chart that there was

15  something unusual about his Apgar scores?

16      A    No.

17      Q    Apart from the swollen clavicle or swelling over

18  the clavicle, is there anything else that's remarkable about

19  the examination of _____ _____    just after his birth on

20  March 22nd of 2000?

21      A    Nothing unusual other than that.

22      Q    Did you see him after his discharge from the

23  hospital?

24      A    Yes.

25      Q    When would the next time that you saw

1        ___ have been?

2        A           : next visit to our office with me or with

3    any provider?

4        Q    Well, did you see him in any place after

5    March 22nd; did you do any procedures on him or see him?

6        A    My next visit with          was on April the 5th of

7    2000.

8        Q    Was he circumcised?

9        A    Yes.

10       Q    And do you know when that was done?

11       A    That was done on March 23rd.

12       Q    Do you know who did that?

13       A    I did that.

14       Q    So you did see him on March 22nd and saw him again

15   on March 23rd?

16       A    I thought you said had I seen him outside of the

17   hospital; that was in the hospital.

18       Q    I'm sorry.  When you saw him on March 23rd in the

19   hospital, how was he, what was his condition?

20       A    The notes indicate that he was fine, his color was

21   pink, he was active and alert, and the circumcision went

22   without any problems.

23       Q    Did you ever note anything on March 22nd or

24   March 23rd that would have indicated to you that he was

25   suffering from any kind of neurological deficit?

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1     A     No.

2     Q     Do you look for that when you examine a child of

3   that age?

4     A     Yes.

5     Q     What do you look for?

6     A     Basically differences in behavior of the baby.

7   Either a baby who's extremely lethargic and won't eat

8   properly, or a baby who is extremely irritable, cannot be

9   consoled.  You look for neurological findings, like if the

10   baby has any signs of increased tone or decreased tone, and

11   then we would feel the fontanelle, the baby's soft spot to

12   make sure it's not full or depressed and check all the baby's

13   reflexes, the startle reflex, the sucking reflex, those kinds

14   of things.

15     Q     What is the fontanelle?

16     A     That's the soft spot on top of the baby's head.

17     Q     Do you know what a subdural hematoma is?

18     A     Yes, I do.

19     Q     Is it possible for a child to suffer a subdural

20   hematoma at birth?

21     A     Yes, it is.

22     Q     How common is that?

23     A     That is extremely uncommon.

24     Q     If that had occurred to ____ _____ ), what would

25   you have expected to see in his examination or his behavior

1    on March 22nd and March 23rd?

2         A    I would have expected to see a baby who was acting

3    irregularly or very lethargic or very inconsolable; a baby

4    who would most likely have a bulging fontanelle, a bulging

5    soft spot indicating increased pressure in the brain;

6    possibly seizures, which are not uncommon with the subdural

7    hematoma at birth.

8         Q    What is a subdural hematoma?

9         A    A collection of blood underneath the lining of the

10   brain.

11        Q    What might cause that?

12        A    It could be caused by birth trauma.  Years ago when

13   babies were hard to get out and they were very large babies

14   and forceps were used to pull their heads out, there could

15   rarely be subdural hematoma from the birth process.

16        Q    Within a reasonable degree of medical certainty, is

17   it your opinion that              did not have a subdural

18   hematoma at the time of his birth?

19        A    Yes.

20        Q    Your opinion is that he did not have a subdural

21   hematoma?

22        A    My opinion is he did not have a subdural hematoma.

23        Q    Were his height and weight within normal limits at

24   the time of birth, given the fact he was born four weeks

25   premature?

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1      A     Yes.  His weight was -- the average weight for a

2  36-week child is 5 pounds 8 ounces.  His weight was 5 pounds

3  and 14 ounces the morning that I examined him.

4      Q     You mentioned that you didn't see him again until

5  April.  Did he come to your office after being discharged

6  from the hospital?

7      A     Yes.

8      Q     And who saw him at that time?

9      A     He was seen by my nurse practitioner, Jessica

10 Manning.

11     Q     What was the purpose of that visit?

12     A     We see the babies in the first week of life because

13 it's the most common time that you may be able to find

14 feeding problems, find jaundice, find heart murmurs, things

15 like that, that may not show up immediately after birth.

16     Q     Is there anything about the nurse practitioner's

17 examination on March 24th that was out of the ordinary or

18 unusual?

19     A     Her examination was totally unremarkable, with the

20 exception of a note that says questionable clavicle fracture

21 left.  On her assessment, at the end of her visit, it said

22 mild edema over left clavicle, which is the same thing I

23 felt.

24     Q     Between March 22nd and March 24th this child really

25 had not changed; he was still healthy?

1      A     Yes.  This visit was March 27th of 2000.

2      Q     I'm sorry.  When was he seen again?

3      A     April the 5th of 2000.

4      Q     Who saw him on that date?

5      A     I did.

6      Q     Was he measured as far as his weight, height, head

7   circumference and those things?

8      A     Yes, he was.

9      Q     And what were the results of those measurements?

10     A     Those measurements were all consistent with a

11   growing baby.  He had gained one ounce per day, which is what

12   we like to see in a newborn, since his last visit.  And his

13   height and his head circumference were unremarkable.

14     Q     Would you have done a neurological exam on him at

15   that time?

16     A     Yes.

17     Q     What would that consist of?

18     A     Generally looking a baby's muscle tone, his

19   reflexes, his head size.

20     Q     Did you note anything unusual on that examination

21   on April 5th?

22     A     No.

23     Q     If the child had suffered a subdural hematoma at

24   birth on March 22nd, would you have seen some neurological

25   deficit or some evidence of that subdural hematoma on

1   April 5th of 2000?

2       A    I would expect that we would have seen evidence of

3   increased pressure in the baby's head.

4       Q    Did you see any such evidence?

5       A    No.

6       Q    Is there anything else unusual about the

7   examination on April 5th of 2000, anything unusual?

8       A    The exam was totally unremarkable.

9       Q    When was the next time your office had contact

10  regarding Robbie?

11      A    On April 13th there was a call about spitting up

12  formula.

13      Q    How was that call resolved?

14      A    The grandmother wanted to know if the spitting up

15  was due to the iron in the formula, and we thought it was

16  not, and the formulas were switched around to see if the baby

17  would do better on a different formula.

18      Q    Was there any other consultation in that phone call

19  on April 13th, anything else that was discussed as far as

20  this kid?

21      A    No.

22      Q    Was           seen on April 13th?

23      A    No.

24      Q    When was the next in-person contact with F        and

25  your office?

1       A       April 17th.

2       Q       Did he come in to the office for a visit on that

3       day?

4       A       Yes.

5       Q       What was the purpose of that visit?

6       A       He was seen because of no bowel movement in three

7       days.

8       Q       And what can cause that?

9       A       Infrequent stooling in a four week old could be

10      caused either by breastfeeding alone, which can cause

11      infrequent stools after an initial period of very frequent

12      stools, or it could be caused by decreased amount of intake,

13      not getting enough calories.

14      Q       Can it be caused by a subdural hematoma?

15      A       No.

16      Q       Was there anything else about this examination on

17      that date that was remarkable?

18      A       My nurse practitioner, Pat Gruber, saw him on that

19      day and other than on the physical exam it looked like

20      everything was unremarkable.  Her impression was poor

21      breastfeeding, just nibbles at the breast.  Mom to pump her

22      breast and give a supplement after breastfeeding.

23      Q       When was he seen again by your office?

24      A       Two days later on 4/19/2000.

25      Q       And what was the purpose for that visit?

1    A    That was a weight check to see if the supplemental

2    feedings would help his weight gain.

3    Q    I'm sorry.  I could not hear you.

4    A    It was a weight check to see if the supplemental

5    feedings would help his weight gain.

6    Q    What was the result of that check on April 19th of

7    2000?

8    A    In two days he gained eight ounces and we would

9    assume he would have gained two ounces under normal

10   situations, so our impression was that the supplemental

11   feedings were what he needed to bring his weight back to what

12   it should be.

13   Q    Was there anything else noted during the visit on

14   April 19th?

15   A    He was simply weighed and was not examined at that

16   point.  That was a nurse visit.

17   Q    When's the next contact with your office?

18   A    He was weighed again one week later by the nurses

19   and at that time he was stooling once a day and having

20   frequent wet diapers, feeding very frequently, and his weight

21   was up nine ounces in seven days, which is again very

22   appropriate.

23   Q    Is it typical for a premature baby to begin to

24   catch up as far as his chronological age in terms of height

25   and weight as they get older?

1          A     Yes.

2          Q     Would you expect them at some point to be within

3     the normal range for a child who has been through a full

4     gestation?

5          A     Yes.

6          Q     Did it appear that Robbie was headed in that

7     direction?

8          A     It did.

9          Q     When was the next visit to your office?

10         A     On May the 9th of 2000, when he was six weeks old.

11         Q     What was done during that visit?

12         A     On that visit he was weighed and measured and his

13    growth was plotted out on our growth curves.  Questions were

14    raised about his feeding and his development and a physical

15    examination was performed by Jessica Manning.

16         Q     How did he plot out in terms of the growth curve?

17         A     He was on the average line for length; slightly

18    below the average line for weight; and slightly above the

19    average line for head size.  It was within the white normal

20    area of our curve for all three parameters.

21         Q     Were all of those values consistent with a child of

22    his age and his premature birth?

23         A     Yes.

24         Q     Would you have done a neurological exam during that

25    visit?

1      A     The nurse practitioner commented on several

2   neurological parameters of the baby on that visit.

3      Q     What did she find?

4      A     She found a baby whose head circumference was

5   within the normal parameters of 75th percentile, normal being

6   5th to 95th.  Soft spot that was soft and flat.  She noted

7   that his tracking with his eyes was not consistent, following

8   an object more than a hundred degrees, and noted that the

9   baby had tight hip flexors.  Patellar reflexes, which is the

10  hammer with the knee reflex, were within normal limits at

11  plus three.  And the baby had otherwise unremarkable exam

12  with the exception of she wrote poor head and neck control

13  when prone and when sitting.  But no flaccid muscles or

14  decreased tone.

15     Q     You mentioned the degree range of the eye tracking.

16  Was that within normal limits for a child of his

17  chronological age, given the prematurity?

18     A     Given the prematurity, it is.

19     Q     As far as the poor head and neck control, what is

20  that attributed to?

21     A     Could be attributed both to a prematurity.  It's

22  very common in premature babies, that their tone is decreased

23  as compared to term babies; or it could be an early sign of a

24  neurological problem.

25     Q     What was recommended as far as the neck muscles at

1  | this time?

2  |     A    It was recommended to keep Robbie on his tummy more

3  | often during the waking hours.  We see more babies now that

4  | have problems with, like this, because we are recommending

5  | babies sleep on their backs, and so they don't develop as

6  | much neck muscle tone when they're on their tummies as they

7  | used to when they were laying on their tummies all the time.

8  | So we suggested tummy time to help that.

9  |     Q    Why is it more common for people today to have

10 | their children sleep on their backs?

11 |     A    To prevent sudden infant death syndrome.

12 |     Q    And is it believed that sleeping on their back can

13 | keep that from happening?

14 |     A    Can decrease the chances of that happening.

15 |     Q    When was the next visit?

16 |     A    On April -- when was the last visit we just

17 | discussed?

18 |     Q    We just talked about May 9th.

19 |     A    I'm sorry, May 9th.  Then the next one would have

20 | been on June the 6th.

21 |     Q    Who saw Robbie on that day?

22 |     A    I saw Robbie then.

23 |     Q    What did you find upon your examination of the

24 | child?

25 |     A    My -- I did an extensive neurological exam on

1    Robbie because of my practitioner's questions at her

2    two-month checkup.  He was scheduled to see me for a

3    neurological assessment.  He, at that time, was moving around

4    normally, had startled very easily, which is appropriate for

5    a two month old baby.  Liked his bath.  He was not

6    excessively stiff.  He was watching a mobile above his

7    crib well.  He was smiling spontaneously.  And his

8    neurological exam basically revealed a fairly normal exam

9    with the exception of somewhat decreased muscle tone in the

10   shoulders and the neck.

11        Q    What do you attribute that to?

12        A    As we previously discussed, it could be a normal

13   event from a premature baby who is catching up, or it could

14   be a sign of a neurological issue.

15        Q    Did you weigh him and measure him on that day?

16        A    He was weighed and his weight was appropriate for

17   his age.

18        Q    Anything else remarkable about that visit?

19        A    No.

20        Q    When was he seen again?

21        A    He was seen at four months by Pat Gruber, my nurse

22   practitioner, and that was on July 19th of 2000.

23        Q    Was he weighed and measured then?

24        A    Yes.

25        Q    And where was he at that point, as far as his

1  height and weight?

2      A    At that point his height was on the 75th

3  percentile.  His weight was on the 80th percentile, and his

4  head size was on the 85th or 90th percentile.

5      Q    Is this a child that's catching up in terms of

6  prematurity?

7      A    Yes, he's already bigger than average for a baby

8  who was not premature at that age.

9      Q    Would a child of this age be able to roll over from

10 his stomach to his back?

11     A    The average child should be able to roll over from

12 stomach to back.

13     Q    Do you have a notation in your chart as to whether

14 or not Robbie was able to roll over from his stomach to his

15 back?

16     A    Yes, he was.

17     Q    Back to his stomach?

18     A    That question wasn't asked.  That's not appropriate

19 for a four month old.

20     Q    Four month old, you would not expect a child who

21 wasn't premature at four months to be able roll from his back

22 to his stomach?

23     A    That's correct.

24     Q    What about four and a half?

25     A    I would not expect him to do that either.

1    Q    Did you see any signs that he had any neurological

2    impairment on July 19th?

3    A    I didn't examine him on July 19th but the nurse

4    practitioner's note does not imply any abnormalities.

5    Q    Is it routine for there to be some complaints

6    during a child's first couple of months of difficulty with

7    formulas?

8    A    Yes, that's very common.

9    Q    From your testimony to this point, I understand

10   there's really just one complaint and that was resolved

11   quickly with the change in formula; is that right?

12   A    That's correct.

13   Q    Is it fairly common to have, in the first few

14   months of life, a child who has trouble feeding, as far as

15   breast formula and formula at the same time, or transferring

16   from one to the other?

17   A    Feeding problems are very common in newborns,

18   especially in premature babies.

19   Q    Was there anything unusual about Robbie in terms of

20   issues with the formula and issues with his feeding?

21   A    Not out of the ordinary.

22   MR. PENNYPACKER:  May I approach the witness, Your

23   Honor?

24   THE COURT:  Yes.

25   BY MR. PENNYPACKER:

131

1        Q    Dr. Hellrung, I'm showing you two photocopies that

2   look to be copies of the growth charts for Robbie Quirello.

3   Can you compare those to your charts and tell me whether or

4   not those are copies of those growth charts?

5        A    Yes, they are.

6             MR. PENNYPACKER:  Your Honor, I would like to move

7        these in as State's 3 and 4, I believe they are now.

8             THE COURT:  Any objection?

9             MR. GROLAND:  No objection to that.

10            THE COURT:  They'll be admitted as State's Number 3

11       and 4 in evidence.

12            (State's Exhibit Nos. 3 and 4 were moved and

13   admitted into evidence.)

14   BY MR. PENNYPACKER:

15       Q    Dr. Hellrung, would it be possible for us to take

16   that original chart and put that into evidence and return it

17   to you later?

18       A    That would be fine.

19            MR. PENNYPACKER:  Your Honor, I'd like to move that

20       in then as State's Number 5.

21            MR. GROLAND:  No objection.

22            THE COURT:  Without objection it will be admitted

23       as the State's Number 5 in evidence.

24            (State's Exhibit No. 5 was moved and admitted into

25   evidence.)

```
 1   BY MR. PENNYPACKER:

 2        Q    Dr. Hellrung, did you ever receive any emergency

 3   calls regarding any injury to Robbie Quirello?

 4        A    The only call I received was a call after he had

 5   been admitted to the Shands Hospital and I don't recall who

 6   even notified me.  This was several years ago.

 7        Q    That would have been after August 2nd of 2000 when

 8   he was admitted?

 9        A    Yes.

10        Q    Did you ever see, or anyone in your office see any

11   evidence of any bruising or edema or any other signs of

12   physical injury to this child?

13        A    No.

14        Q    Did you ever receive, or anyone in your office

15   receive any reports of any injuries to the baby that would

16   have been caused by himself, whether it would be scratching

17   or anything else that he had done to himself?

18        A    No.

19        Q    Do you have an opinion within a reasonable degree

20   of medical certainty as to whether Robbie Quirello was

21   suffering from a chronic subdural hematoma at any time during

22   this period?

23             MR. TEDDER:  Your Honor, that's been asked and

24        answered.

25             MR. GROLAND:  Objection.
```

133

```
 1              THE COURT:  The objection is overruled.  Go ahead.

 2              MR. PENNYPACKER:  Did you get my question, Doctor,

 3      or do you want me to repeat it?

 4              THE WITNESS:  Could you repeat it, please?

 5              MR. PENNYPACKER:  Sure.

 6  BY MR. PENNYPACKER:

 7      Q    Do you have a opinion, within a reasonable degree

 8  of medical certainty, as to whether or not Robbie Quirello

 9  was suffering from a chronic subdural hematoma at any time

10  during your care?

11      A    I don't believe he was.

12              MR. PENNYPACKER:  That's all the questions I have.

13              THE COURT:  Any cross-examination, Mr. Groland?  Go

14      ahead.

15                       CROSS-EXAMINATION

16  BY MR. GROLAND:

17      Q    Hello.

18              The reason why you say you don't believe he

19  suffered from a chronic subdural hematoma at birth is you

20  didn't see any neurological signs --

21      A    That's correct.

22      Q    -- during your time with the child?

23      A    Yes.

24      Q    However, you indicated on direct examination from

25  Mr. Pennypacker that indeed there were some things that might
```

1   have been an early sign of neurological problems,

2   specifically the low muscle tone in the shoulder area and

3   neck area; is that correct?

4       A    That's correct.

5       Q    And you didn't check with a CAT scan or an X-ray

6   whether or not this child had any problems; is that correct

7   also?

8       A    That's correct.

9       Q    Are you aware that there are three state

10  radiologists in this case that have examined the CAT scan and

11  have determined that there was indeed a chronic subdural

12  hematoma?

13          MS. SINGER:  I'm going to lodge an objection as a

14      misstatement of the testimony that would be offered by

15      the radiologists.

16          THE COURT:  The objection is sustained.

17  BY MR. GROLAND:

18      Q    Are you aware that the radiologists in this case

19  have found evidence of earlier generations of hematoma in

20  this child's brain before August 2nd?

21      A    I was not aware of that prior to the case.

22      Q    Have you talked to the case detective, Helen

23  Legall?

24      A    Helen called me -- a female detective called me, I

25  can't remember if it was Helen or not, called me after the

1   fact, asking for the records.

2        Q    Do you recall whether or not that was between the

3   time the child went into the hospital and before the child

4   passed away, or after the child passed away?

5        A    I don't recall.

6        Q    Do you recall in that conversation having any

7   discussion with a detective about evidence of an older

8   hematoma in that child's brain?

9        A    No, I don't.

10       Q    She did not bring it up?

11       A    No, I don't recall.

12       Q    Are you aware now or were you aware at any time

13  that the mother of this child was in a car accident of such

14  an extent to cause her to be hospitalized during her seventh

15  month carrying this child?

16       A    I was not aware of that while I was caring for

17  Robbie.

18       Q    She never told you about that?

19       A    Not that I can remember.

20       Q    Did anyone ever tell you that after this accident

21  and while she was hospitalized she was complaining of severe

22  stomach cramps?

23       A    No.

24       Q    You indicated that a seizure is not an uncommon

25  event with a subdural hematoma, did you not?

1      A     Yes.

2      Q     And is there a flip side of that, could we also say

3  that, in fact, when one has a subdural hematoma we don't

4  necessarily have seizures?

5      A     Not always.

6      Q     Okay.  It is possible then for somebody, including

7  a child, to have a chronic subdural hematoma without having a

8  seizure?

9      A     That's correct.

10     Q     And, in fact, it's possible for a child to have a

11  subdural hematoma of some size or intensity without anything

12  manifesting itself with the child's behavior?

13     A     I would say that could happen.

14     Q     That could?

15     A     It could happen.

16     Q     It could.  I mean, is it fair to say you're aware

17  of instances where a child has had a seizure, the child has

18  perhaps died, and then an autopsy or a CAT scan or some

19  investigation has been done and has shown that up to that

20  point there was a chronic subdural hematoma?

21     A     No, I've never seen that.

22     Q     Are you saying that cannot be the case?

23     A     I'm not an expert in that field.

24     Q     If you stated, Dr. Hellrung, in response to the

25  state's questioning about whether or not there was any

1   evidence of a chronic subdural hematoma in your opinion and

2   you said no, because there were no neurological signs, my

3   question is, what I'm missing here is, in fact, there were

4   neurological deficit signs that you've testified about,

5   correct?

6       A     There were signs that could indicate, like I had

7   previously stated, either a premature baby normally catching

8   up to his neurological abilities, or a neurological deficit.

9       Q     Could you at any point during the time you were

10  this child's physician rule out a neurological deficit?

11      A     Yes.  I could rule, for the most part rule it out

12  at the four-month checkup when the checkup was completely

13  normal, the head was growing normally, and the baby's

14  development was normal.

15      Q     Were the neck muscles still underdeveloped at that

16  point?

17      A     No, there was no evidence of that at the four-month

18  checkup.

19      Q     Are you saying there was no evidence of that or no

20  notation one way or the other in the file?

21      A     The notation was that the neurological exam was

22  normal.

23      Q     Was there a part of the record that addressed

24  specifically the underdeveloped neck muscles?

25      A     Not at the four-month checkup, but there was a note

1   that the child could roll over and prop up, which meant the

2   neck muscle strength was probably very good.

3        Q    You did not do the four-month checkup?

4        A    No.

5        Q    Did you ever talk -- was it Pat Gruber that did it?

6        A    Yes.

7        Q    Talk to Pat about, specifically about the neck

8   muscles, whether or not she actually examined for how that

9   was progressing?

10       A    No.

11       Q    There is a notation in your file that at one point

12  the child was spitting up and had been spitting up

13  frequently?

14       A    Yes.

15       Q    And there's a notation about feeding problems and I

16  think we've already discussed that.  Did you have any

17  information at any time about the kind of delivery that

18  Crystal had, specifically whether or not it was a difficult

19  delivery, whether it was a breech baby, whether it was

20  Caesarian, any information?

21       A    That information probably would have been available

22  at the baby's birth in the obstetric records.

23       Q    Did you have any information in your records

24  indicating that the baby was a brow up baby with a problem

25  with the clavicle and the umbilical cord wrapped around his

1    neck?

2        A    I probably did.  I don't have that in my chart and

3    I don't recall.  It's been a long time since that happened,

4    but I review those records routinely before I examine the

5    baby.

6        Q    Are you aware of any instances of subdural

7    hematoma, chronic subdural hematoma, that occurred at birth,

8    but not being evident neurologically at a later date?  Can it

9    clear up by itself at some point?

10       A    Can a chronic subdural hematoma clear up by itself?

11       Q    Yes.

12       A    I believe it could resorb, but, again, I'm not a

13   neurosurgeon.

14       Q    Would it be fair to say then that it is possible

15   for a chronic subdural hematoma which occurred at birth not

16   to be evident neurologically for any given period of time?

17       A    I think that would be unlikely because the subdural

18   hematoma would cause increased pressure in the head, and we

19   had no signs that that was apparent with the soft fontanelle

20   and the normal head size.

21       Q    However, isn't a subdural hematoma something that

22   is continuously being absorbed into the system?

23       A    Slowly, that's correct.

24       Q    And does it necessarily have to flare up or can it

25   be absorbed over a continuous period of time?

```
 1        A    It can be absorbed over a continuous period of
 2   time.
 3        Q    Without flaring up and causing a problem or causing
 4   a seizure?
 5        A    I would think so.
 6             MR. GROLAND:  May I just have a moment, Your Honor?
 7             (Pause in the proceedings.)
 8   BY MR. GROLAND:
 9        Q    Dr. Hellrung, do you agree that one of the reasons
10   why a subdural hematoma that occurs at birth might not show
11   up immediately because a baby's skull is not joined together
12   but rather is, I hate to use the word constructed, but is, is
13   together in such a way that it can expand as the baby grows?
14        A    The first thing that expands in a baby's head is
15   the soft spot.
16        Q    Okay.  But can you tell us how the skull in a baby
17   is joined together with different pieces of the skull?
18        A    There are four major bones in the skull that are
19   connected by an area we call suture lines, and these are
20   lines that connect these four layers.  The suture lines are
21   generally, for the most part, able to expand thereby allowing
22   for brain growth.
23        Q    So that is something that is typical in a baby but
24   would not be typical in a grown adult where it's all
25   together?
```

1      A      That's correct.

2      Q      So that a subdural hematoma in an adult may

3  manifest itself more quickly than in a child which has some

4  room for the skull to expand; is that correct?

5      A      If the child's skull expanded we would expect the

6  child's head circumference to grow out of proportions to the

7  child's body.

8      Q      Wouldn't that depend on the size of the subdural

9  hematoma?

10      A      The larger the subdural hematoma, the greater the

11  pressure in the head.

12      Q      And the smaller, the less?

13      A      That's correct.

14          MR. GROLAND:  No further questions.

15          THE COURT:  Any redirect?

16                    REDIRECT EXAMINATION

17  BY MR. PENNYPACKER:

18      Q      Dr. Hellrung, you didn't ask for a CAT scan to be

19  done on Robbie, did you?

20      A      No.

21      Q      Why did you not do it?

22      A      I felt he had no signs of increased pressure in his

23  head.

24      Q      Would the signs of increased pressure have been the

25  bulging fontanelle, the soft spot on top of his head?

1      A    Yes.

2      Q    You or anyone in your office ever see any swelling

3   in the fontanelle of Robbie Quirello?

4      A    No, his head size or soft spot was always noted as

5   soft and flat.

6      Q    And soft and flat meaning there's no swelling of

7   the intracranial pressure?

8      A    Right.  Soft and flat meaning that's a normal

9   finding.

10     Q    If the nurse practitioner had found anything

11  abnormal in her neurological evaluation would she have put

12  that in the chart?

13     A    Yes, I would think.  I can't speak for her, but she

14  normally does.

15     Q    How frequently are babies born face up?

16     A    I'm not aware of the numbers.

17     Q    Should we ask an obstetrician that question?

18     A    Yes, that's before they get to me.

19     Q    How frequently are babies born with an umbilical

20  cord wrapped around their neck?

21     A    I'm also not aware of that, it's fairly infrequent.

22     Q    Ask an obstetrician that question too?

23     A    Yes.

24          MR. PENNYPACKER:  That's all.

25          MR. GROLAND:  Nothing further.

1      THE COURT:  All right.  May Dr. Hellrung be

2  released?  Does he need to remain available?

3      MS. SINGER:  We have no objection to him being

4  released.

5      MR. GROLAND:  No objection.

6      THE COURT:  Dr. Hellrung, you are released from the

7  subpoena.  Thank you very much.

8      Go ahead and call your next witness.

9      MR. PENNYPACKER:  Call John Quirello.

10      THE CLERK:  Please raise your right hand.

11      (The witness is duly sworn by the clerk.)

12      THE CLERK:  You may be seated.

13                 JOHN ROBERT QUIRELLO,

14  Called as a witness herein, having been first duly sworn, was

15  examined and testified as follows:

16                 DIRECT EXAMINATION

17  BY MR. PENNYPACKER:

18      Q    Would you state your name, please?

19      A    John Robert Quirello, Jr.

20      Q    Where do you currently reside, Mr. Quirello?

21      A    598 Dunbar Circle in Winter Springs, Florida.

22      Q    Where do you work?

23      A    Celebration Golf Club for Disney.

24      Q    What are your duties at Celebration Golf Club?

25      A    I'm a golf professional.

1      Q    Have you ever been convicted of a felony?

2      A    Yes, I have.

3      Q    How many times?

4      A    Once.

5      Q    Were you married to Crystal Quirello?

6      A    Yes, I was.

7      Q    When were you married?

8      A    Married in April of '99.

9      Q    And do you recall where you were married?

10     A    We were married in Jacksonville.

11     Q    How soon after you got married did Crystal become

12 pregnant?

13     A    Within two to three months.

14     Q    And what was the name of the child that was born

15 during the marriage?

16     A    Robert Benjamin.

17     Q    Do you know what his date of birth was?

18     A    It was March 22nd.

19     Q    Were you there during Robbie's birth?

20     A    Yes, I was.

21     Q    Was the birth difficult for Crystal?

22     A    Yeah, at times, because he was a little bit

23 premature.

24     Q    What did you see during the birth that led you to

25 believe that perhaps it was a little difficult for Crystal?

145

1       A       The amount of pain she was having to go through,

2   had a hard time getting him out.   The doctor had to kind of

3   wedge him out.   He ended up breaking his collarbone through

4   the delivery.

5       Q       Where did you and Crystal live when Robbie was

6   first born?

7       A       Just off of Archer Road, 110th Terrace.

8       Q       Were you both you and Crystal working at that time?

9       A       Yes, we were.

10      Q       Where were you working then?

11      A       I was relief general manager of Airborne Express.

12      Q       Where was Crystal working?

13      A       She was working for Civitan Blood Center.

14      Q       Were both of you working during the day primarily?

15      A       Mostly during the day, yes.

16      Q       Who took care of Robbie while you were both at

17  work?

18      A       My grandmother.

19      Q       How was Robbie's health during the first few months

20  of his life?

21      A       First couple of weeks we had a hard time finding a

22  formula that he was agreeable with, but he, after that, once

23  we finally found something that he liked, he was a little

24  picky, but after that he ate normally, behaved normally, and

25  was a very enjoyable, happy kid.

1      Q      Did he laugh?

2      A      All the time.

3      Q      Did he smile?

4      A      Just about all the time.

5      Q      Was he able to move his arms and legs?

6      A      Yes, he was.

7      Q      Was he able to follow objects with his eyes?

8      A      Yes, he was.

9      Q      Did you attend any of the pediatric visits?

10     A      I was at the final visit that we had with

11  Dr. Hellrung before the accident.

12     Q      Were you aware of any delay in the development of

13  his neck muscles?

14     A      Yes, I was.  Because of Robbie's condition of being

15  premature, he was a little bit behind in developing his neck

16  muscles, so the doctor gave us some exercises to work with

17  him on, which were helping.

18     Q      How could you see him improve as far as his neck

19  muscles?

20     A      Within probably a about a week, a few days to a

21  week after the visit with Dr. Hellrung, Robbie was able to,

22  you know, push himself.  I would play with him on the couch

23  and he would push himself up and lift his head and kind of

24  look at me and laugh and then kind of fall back down and

25  repeat that on a couple of different occasions.

1    Q    During his life did he ever seem lethargic to you

2    in any way?

3    A    No, sir.

4    Q    Did he cry frequently?

5    A    Hardly ever.  He hardly ever cried unless he was

6    hungry, that was about the only time.  He was very well

7    behaved.

8    Q    How was his appetite for most of his life?

9    A    He had a good sized appetite.

10    Q    Did there come a time when you and Crystal were

11    having trouble in your marriage?

12    A    Yes, sir, there did.

13    Q    And what were the problems that the two of you were

14    having?

15    A    To my knowledge, the problems that we were having

16    was she didn't think that I was spending enough time at home

17    between my work schedule and my golf practice schedule on the

18    weekends.

19    Q    At that point in your life were you trying to

20    become a golf professional?

21    A    Yes, sir.

22    Q    Did there come a point in you and Crystal's

23    relationship where the two of you separated?

24    A    Yes, sir.

25    Q    Approximately when was that?

1          A     Either July 4th or 5th.

2          Q     Of what year?

3          A     It was 2000, I believe.

4          Q     What happened on July 4th or 5th of 2000 that

5    caused you to separate?

6          A     I had been out that morning playing in a golf

7    tournament at the Gainesville Country Club and when I got

8    home she was extremely upset because she was with Robbie all

9    day and I wasn't there to help take care of him.

10         Q     What happened after she became upset?

11         A     It led to an argument and then her threatening to

12   leave, which I grabbed Robbie and took him over to my mom's

13   house to where he didn't have to be around the argument.  By

14   the time I come back, she had already packed up a bag and

15   some of his stuff and was getting ready to leave.

16         Q     Did law enforcement get involved on that day?

17         A     Yes, sir.  She was in a, kind of a state of mind

18   that I didn't feel comfortable letting her drive with Robbie

19   in the car, because I was afraid that as angry as she was

20   that she might get in an accident and I didn't want him to

21   get hurt.  So I refused to allow her to take Robbie that

22   night and had him at my mom's house to where she couldn't get

23   over there to take him.  So she eventually called Alachua

24   County Sheriff's Department.  When they came out there they

25   pretty much told her the same thing, that she could not take

```
 1   Robbie without my permission.  After about half an hour or so

 2   after the sheriff left, Crystal calmed down enough to where

 3   we were able to talk and I could calm her down.  And after

 4   that I ended up letting her take Robbie that night once she

 5   calmed down.

 6        Q    After that July 4th or July 5th did you and Crystal

 7   live apart for some period of time?

 8        A    For a few weeks, yes.

 9        Q    During both the time prior to July 4th and 5th and

10   after July 4th and 5th, who primarily took care of Robbie

11   during the day?

12        A    My grandmother still.  I would go and pick him up

13   in the mornings and take him back to my grandmother's and

14   spend time with him when I got home from work and take him

15   back to Crystal at night.

16        Q    Who is your grandmother?

17        A    Doris Bridwell.

18        Q    Did you and Crystal attempt to work out your

19   problems after July 4th and 5th?

20        A    Yes, sir, we did.  After a couple of weeks going by

21   we agreed to start looking for a new house together and

22   trying to get on with our lives.

23        Q    Did you begin to live together again after

24   July 4th?

25        A    Yes, sir, we did.
```

1      Q      Prior to August 1st, August 2nd of 2000, how long

2  had you been living together?

3      A      She had been back for probably about a week and a

4  half or so.

5      Q      Did you stay together the night of August 1st of

6  2000?

7      A      Yes, sir, I believe so.

8      Q      Did Robbie stay with you that night?

9      A      Yes, sir.

10      Q      On the morning of August 2nd of 2000, did you get

11  up and go to work?

12      A      Yes, sir.

13      Q      And where were you working then?

14      A      At Airborne Express.

15      Q      Did you see Robbie before you left to go to work?

16      A      Yes, sir.  I made it a point to usually get up

17  early in the mornings to where I could spend some time

18  playing with him before I got ready for work.

19      Q      Were you able to do that on that morning?

20      A      Yes, sir.

21      Q      How was Robbie that morning?

22      A      Laughing, extremely laughing.  He was, we were

23  playing a little tickle game on the couch like we always did

24  where I would sit him in my lap and take his hands and tickle

25  him with his own hands and he was just giggling and laughing,

1   and then I fed him and then got ready for work.

2       Q    Anything unusual about his behavior on that

3   morning?

4       A    No, sir.

5       Q    Did you see Robbie again after you went to work?

6       A    Yeah, at approximately, probably around 8:30, 8:45,

7   we were waiting on our freight to come in and Crystal had

8   brought him by to see me and spend some time with me.

9       Q    Where was that, at the job?

10      A    That was at my jobsite, yes.

11      Q    Who else was present during that time?

12      A    Yantz Enoch, one of my best friends and coworkers,

13  was there, and a lady named Carol who worked, actually worked

14  for Airborne at the time was also there.

15      Q    What did you do with Robbie during that time at

16  Airborne Express?

17      A    We had him on the front counter.  We had a little

18  bell up there that customers would ring to let us know

19  somebody was there, and I had him sitting down on the counter

20  playing with the bell.  And he would ring the bell and kind

21  get a little laugh out of it, and Yantz and I were playing

22  around with him and ticking him a little bit.

23      Q    How long was he there that night?

24      A    Probably ten to 15 minutes at the most.

25      Q    Do you remember what he was wearing?

1    A    Yes, sir.  He was wearing a ESPN Sports Zone

2  outfit; that was the reason why Crystal brought him by

3  because he had grown into it so fast.  It was probably a few

4  months away from where he should have been, but she was very

5  happy that it actually fit him, so she wanted to make sure

6  that I saw it.

7    Q    Did you have any interaction with Crystal at that

8  point?

9    A    Yeah, as I walked her out to the car we had talked

10  about what she was planning on doing that day.  She informed

11  me that she wanted to go to Cedar Key with Robbie.  And we

12  discussed that I didn't think that was such a good idea

13  because it was a long trip with him being in the back seat of

14  her car and I didn't think that would be a good idea.  And

15  the conclusion came that she said she was just going to run

16  some errands and go back to the house.

17    Q    Did Crystal leave your place of employment with

18  Robbie at that time?

19    A    Yes, sir.

20    Q    And how was Robbie when he left?

21    A    He was laughing.  I gave him a kiss before I put

22  him in his car seat and kind of tickled him under his chin

23  and he kind of giggled at me.

24    Q    Approximately what time was that?

25    A    Little bit before 9:00, maybe a little bit after.

1    Our truck came in about ten after that day, it was right

2    after they left.

3        Q    Did you learn that later that morning Robbie had

4    been hurt?

5        A    Yes, sir.

6        Q    How did you learn that?

7        A    The first call I got was from Crystal.

8        Q    Did you receive any other communication regarding

9    that?

10       A    Yes, sir.  After Crystal called and told me what

11   happened, I hung up the phone and got in my car and was on my

12   way to the hospital when my friend, Yantz, who just out, you

13   know, pretty much blind luck happened to be there waiting to

14   get his finger looked at in the same emergency room, called.

15   He called me immediately to let me know I needed to get down

16   there.

17       Q    About what time did you get the calls to go to the

18   hospital?

19       A    Maybe around 10:00.  I'm not exactly sure of the

20   time, but it couldn't have been maybe an hour or so

21   afterwards, after she had left.

22       Q    Did you go to the hospital?

23       A    Yes.

24       Q    Which hospital was that?

25       A    It was Shands.

154

1    Q    Where did you go when you got to Shands?

2    A    I went, parked my car in the parking garage out by

3    the emergency room and walked straight to the emergency room.

4    Q    What happened when you got in the emergency room?

5    A    Before I got into the emergency room, Crystal

6    stopped me on my way in to talk to me and tell me her story

7    about what had happened at the time.  And after that I kind

8    of just went straight to the emergency room and straight up

9    to see my son.

10    Q    Where did you go up to see your son?

11    A    The neonatal intensive care unit.  I'm not sure

12    which floor it was on.

13    Q    Did you talk to anybody else while you were in the

14    neonatal intensive care unit?

15    A    Before they let me in to see Robbie, I guess they

16    were preparing him, I believe the gentleman's name was Kevin,

17    who was one of the staff psychologists there, pulled me in to

18    explain to me what to expect, and to let me know, to kind of

19    bring me into light on what really happened that day.

20    Q    Was Crystal present during that conversation?

21    A    Yes, sir, she was.

22    Q    Did you have conversations with Crystal about what

23    had happened to Robbie since you had seen him at Airborne

24    Express?

25    A    Yeah, the conversation that I had was that she was

1    on her way home and Robbie had aspirated on the side of the

2    road and that she had called 911 to have an ambulance come

3    and they were taking him to the hospital.

4        Q    Did she give you any other version of what had

5    happened to Robbie that morning?

6        A    Not at that time.  Eventually the psychologist or

7    the counselor that we were talking to talked her into telling

8    me the truth, and that was that she had left Robbie --

9            MR. TEDDER:  Objection, hearsay.

10            THE COURT:  Objection is sustained.

11            MS. SINGER:  May we approach?

12            THE COURT:  Yes.

13            (A sidebar discussion was held:)

14            MS. SINGER:  Is it my understanding then that you

15        do not want to cover this in this part of the

16        examination, which is what you were going to use for

17        impeachment purposes, or will you be bringing

18        Mr. Quirello back next week?

19            MR. TEDDER:  I'm not bringing him back, but this is

20        hearsay.

21            MS. SINGER:  Correct.  It's the impeachment that

22        you wanted, but if you don't want to cover it and you're

23        bringing him back --

24            MR. GROLAND:  No.  As to everything that has been

25        testified so far we're in agreement, but his statement

1    as to what she said about Brian Herlihy has nothing to
2    do with our agreement.
3         MS. SINGER:  I thought you wanted to have her tell
4    all of the stories that she told.  That's fine.  I'm
5    satisfied with that answer and we'll proceed with that
6    being a hearsay objection and we'll move on.  I
7    misunderstood.
8         MR. GROLAND:  No, Jeanne, ma'am.  We ready for a
9    break, Your Honor?
10        THE COURT:  No.
11        MR. GROLAND:  Okay.  Our understanding -- can we go
12   off the record?
13        THE COURT:  No.
14        MS. SINGER:  No.
15        MR. TEDDER:  I'll say this, I won't object any
16   more.  I don't know what kind of agreements y'all have
17   regarding this testimony.
18        MR. GROLAND:  What you're saying is that everything
19   that Crystal said to him and their other people at the
20   hospital should come in.  I'm fine with that.  Let's
21   just go on.
22        THE COURT:  Objection withdrawn?
23        MS. SINGER:  In other words, John can testify to
24   what Crystal told him.
25        (The sidebar discussion was concluded.)

1          MR. GROLAND:  Withdraw the objection.

2          THE COURT:  Thank you, Mr. Groland.

3          Go ahead, Mr. Pennypacker.

4  BY MR. PENNYPACKER:

5      Q    I'll try to get us back to where we were,

6  Mr. Quirello.

7      A    Okay.

8      Q    I understood that Crystal told you initially in the

9  presence of Mr. Putansu that the child had aspirated on milk

10  while she was driving.  And I believe I asked you did she

11  give any other version of the events that took place that

12  morning?  That was the question I asked you, wasn't it?

13     A    Yes, sir.  The next story that I was told was that

14  she had left Robbie with a friend to go and run an errand and

15  that when she came back that the fire trucks had already been

16  in the parking lot of the building, but she didn't know how

17  he got hurt.

18     Q    Were you able to spend time with Robbie that day?

19     A    Yes.  After they had gotten him prepared and with

20  the tubes and everything, they allowed us to go and visit

21  with him.

22     Q    Were you able to spend time with him over the

23  course of the next week?

24     A    Yes, sir, every day.

25     Q    Did he ever regain consciousness?

1        A    No, sir.

2        Q    Were you ever able to interact with him as you had

3    prior to August 2nd?

4        A    No, sir, I was never able to talk to him again.

5        Q    Other than what you saw as far as the end result on

6    August 2nd of 2000, did Robbie ever suffer any injuries or

7    falls to your knowledge?

8        A    No, sir.

9        Q    Did he ever hurt his head in any way?

10       A    Not to my knowledge.

11       Q    Were there ever any times where Robbie would cry

12   and just not stop crying and couldn't be consoled?

13       A    Only time he ever had that, he was colicky one

14   night because he was cutting teeth and after about a half an

15   hour of me being up with him, he went right back to sleep.

16   He just wasn't that kind of baby.

17            MR. PENNYPACKER:  May I have a moment, your Honor?

18            THE COURT:  Yes.

19   BY MR. PENNYPACKER:

20       Q    John, before August 1st, on the weekend of Saturday

21   and Sunday, which would have been July 30th and 31st, did

22   Robbie go out of town for any reason?

23       A    I believe he was said to have spent some time at

24   his grandparents in Jacksonville.

25       Q    Do you know how he got there?

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1        A    I'm sorry?

2        Q    Do you know how he got there?

3        A    Crystal drove him over and then her and I went and

4    picked him up.

5        Q    Do you know which day it was that you picked him

6    up?

7        A    We picked him up on Sunday, I believe.

8        Q    You picked him up, did you notice anything unusual

9    about him?

10       A    No, sir, not at all.

11            MR. PENNYPACKER:  That's all.  Thank you.

12            THE COURT:  Mr. Groland.

13            MR. GROLAND:  Thank you.

14                        CROSS-EXAMINATION

15   BY MR. GROLAND:

16       Q    Can I call you John too?

17       A    Yes, sir.

18       Q    John, you're leaving somewhere today, you catching

19   a plane today?

20       A    Yes, sir.

21       Q    Where are you going?

22       A    St. Louis, Missouri.

23       Q    For what reason?

24       A    For a golf tournament.

25       Q    That's going to take you into next week?

1       A    Yes, sir.  I come back Sunday, late Sunday night,

2  early Monday morning.

3       Q    Planning to come back here?

4       A    Coming back to Gainesville and then Orlando.  I'll

5  be back in the state for the whole week.

6       Q    And that's because you have a golf tournament, a

7  previous business commitment?

8       A    This week, yes, sir.

9       Q    Okay.  You moved from Alachua County to Orlando

10 when?

11      A    Probably about a month after Robbie passed away.

12      Q    And you've lived there since?

13      A    Yes, sir.

14      Q    And is that where Crystal lives now?

15      A    I don't know where she lives now.  I know that she

16 did live there for some time.

17      Q    After the baby passed away, did you and Crystal

18 make an attempt to get back together?

19      A    Yes, sir.  I did everything in my power to try and

20 save our marriage.

21      Q    Didn't work?

22      A    No, sir, it didn't.

23      Q    How long after the baby passed away --

24           MS. SINGER:  I'm going to just lodge an objection

25      as to relevance on behalf of the baby's mother.

1          THE COURT:  Untimely.

2          MS. SINGER:  I'm talking about the next question.

3          THE COURT:  Oh, we haven't heard the next question.

4          MS. SINGER:  How soon after the baby's death, how

5     soon after the baby's death.

6          THE COURT:  Hold on, Mr. Quirello, to answer the

7     question.  I need to hear the entire question to see if

8     there's an objection, so don't answer yet.

9          Mr. Groland, what's the question?

10         MR. GROLAND:  How long after the baby passed away

11    did you and Crystal attempt to get your marriage back

12    together?

13         THE COURT:  The objection as to relevancy is

14    sustained.

15    BY MR. GROLAND:

16    Q    Did you and Crystal live together after the baby

17    passed away?

18    A    I was kind of splitting times with -- I lived at my

19    father's house, but I was staying at her and her sister's

20    house on occasion.

21    Q    Where was she staying?

22         MS. SINGER:  Once again, Your Honor, I think that

23    this is irrelevant --

24         THE COURT:  Objection is sustained.

25         MS. SINGER:  -- if it's after the baby's death.

```
 1   BY MR. GROLAND:

 2        Q     Have you been in touch with Crystal recently?

 3        A     Probably the last time I talked to her was about

 4   three or four weeks ago.

 5        Q     Did you talk about this case?

 6        A     We talked about the deposition and when the trial

 7   was going to be starting because I don't think she had gotten

 8   any information on that yet.

 9        Q     How long have you been divorced?

10        A     We've been divorced almost a year and a half, about

11   a year and four months, five months.

12        Q     Do you remember what month it was?

13        A     I believe we got divorced in March of 2001.

14        Q     Was there ever a divorce lawsuit pending before

15   August 2nd, 2000, as between the two of you?

16        A     Not that I know of.

17        Q     Do you know if Crystal is employed now?

18        A     No, sir, I don't.

19              MS. SINGER:  Your Honor, I once again lodge a

20        relevance objection.

21              THE COURT:  Sustained.

22   BY MR. GROLAND:

23        Q     All right.  Then let's go directly to August of

24   2000.  You were married the year before?

25        A     Yes, sir.
```

1    Q    Would it be correct to say that your marriage was

2    somewhat troubled right from the start?

3    A    A couple of weeks into it we had some difficulties

4    with her trying to find a job and bills were starting to come

5    in and she had went out and gotten a new car and things like

6    that without having a really, a steady well paying job at the

7    time.  That was really it until Robbie, we found out she was

8    pregnant.

9    Q    Was Robbie a planned baby?

10    A    No, sir, he wasn't.

11    Q    Difficult question, but I want to ask you this:

12    Was there talk about an abortion after she got pregnant?

13    A    No, sir.

14         MS. SINGER:  I'm going to lodge an objection, Your

15    Honor.

16         THE COURT:  Sustained.

17    BY MR. GROLAND:

18    Q    Was the biggest problem with Crystal early on where

19    she was living in proximity to your family?

20    A    From her side maybe.  I think it was just more of a

21    maturity level was the biggest, you know, problem that we had

22    in our marriage.

23    Q    How many times were the police called out while you

24    and Crystal lived in Archer?

25    A    While we lived in Archer, twice.

1    Q    And one time was on July 4th?

2    A    Yes, sir.  The other time was whenever she went to

3   claim her things after the funeral.  I guess -- I wasn't even

4   there at that time, but there was a dispute between her and

5   my grandmother that day, so Crystal had the police called.

6    Q    That would have been after August 2nd?

7    A    That was the day of the funeral, yes.

8    Q    And the last time the police were there was about a

9   month earlier?

10   A    Yes, sir.

11   Q    You were there when the police came out?

12   A    On July 4th, yes.

13   Q    Was there an incident involving you and Crystal and

14   her having a knife?

15   A    There was, yes.

16   Q    She tried to attack you with a knife?

17   A    Yes, sir.

18   Q    When was this?

19   A    This was probably a week after she had left.  She

20   was staying in a friend of hers apartment by herself and we

21   had an argument about her coming back.  And she just, you

22   know, I told her that Robbie needed to be in better care.

23   And when she heard that she got very upset, grabbed a knife

24   out of the kitchen and at first, like, came towards me with

25   it, and then tried to hurt herself with it.  And I restrained

1      her and took the knife away from her until she calmed down.

2          Q     Did she say she was going to hurt herself?

3          A     She did.

4          Q     What did she say?

5          A     She said that she was tired of being around and

6      everybody would be happier if she was just gone.

7          Q     Was there an incident in July where she got so

8      angry that she punched a wall and injured her hand?

9          A     Yes, sir, there was.

10         Q     She had to go to the hospital?

11         A     I believe she went to the emergency room, yes.

12         Q     There were actually two times in July that she went

13     to the hospital with an injury.  Do you know about the second

14     time?

15         A     I do now; I didn't at the time, no.

16         Q     What was the incident about regarding the time that

17     she punched the wall and hurt her hand?  What was that all

18     about?

19         A     That was the same day.  She was pitching a fit and

20     when I tried to restrain her to get the knife out of her

21     hand, she bit me on my chest and my arm, so I let her go.  As

22     I let her go she went to run towards the door and as she was

23     running down the door she punched the wall in the apartment.

24         Q     Did she break her hand?

25         A     I think that she fractured a bone in her hand, a

1    bone or two.

2         Q    Where was Robbie when this was going on?

3         A    Robbie was laying in the couch when that happened.

4         Q    Right there in the same room?

5         A    One room away, yes.

6         Q    When she left in July did she take Robbie's crib

7    with her when she left?

8         A    The day that she left, I don't believe so, no.

9         Q    Did she ever come back and get the crib at any

10   time?

11        A    Not to my knowledge.

12        Q    In fact, wasn't she gone for most of the month of

13   July?

14        A    Yeah, I believe three weeks.

15        Q    Do you, yourself, now know where she slept with

16   Robbie during that period of time?

17        A    Yes, I found out after everything that had happened

18   with my son that she was staying with Mr. Herlihy.

19        Q    Did she tell you that?

20        A    Not at first.  I believe Kevin was the first one to

21   explain where Robbie was found and then Crystal finally

22   admitted to what was going on.

23        Q    Did Crystal tell you that she was staying with

24   Brian Herlihy the whole three-week period of time in July?

25        A    No, she never told me that.

1      Q     Did you ever ask her about that?

2      A     I asked her if she had been staying there.  She

3   said that yes, a few nights that she had.

4      Q     Do you know where else she was staying during that

5   time?

6      A     She was staying at an apartment in Greenwich Green.

7      Q     Whose apartment was that?

8      A     A friend of hers from work.  I don't remember her

9   name.

10      Q     Do you know the circumstances of her staying there;

11   in other words, did she, was she subleasing an apartment or?

12      A     From what I was told, I guess the girl and her

13   boyfriend or husband were moving and they still had a couple

14   of months left on their lease, so they were allowing her to

15   stay there until the lease was up.

16      Q     This incident involving a knife, would you describe

17   it as Crystal going into a rage?

18          MS. SINGER:  I'm going to object, Your Honor, calls

19       for speculation, improper opinion testimony.

20          THE COURT:  Overruled.

21          THE WITNESS:  I would say she was pretty angry.  I

22       don't really, can't really classify it as rage, but she

23       had lost her temper.

24   BY MR. GROLAND:

25      Q     Have you previously described it as going into a

1    rage?

2         A    Yes, I did.

3         Q    I think you said that the night before this tragedy

4    on August 2nd that Crystal stayed with you at the house?

5         A    Yes, she was with me.

6         Q    And she'd been there for how long, sir?

7         A    Probably the week prior to that.

8         Q    Were the two of you making some real concrete plans

9    about trying to get your marriage back together during that

10   period of time?

11        A    Yes, sir.  We had gone and signed papers on, to

12   purchase some land and were getting ready to finalize a deal

13   on a house.

14        Q    You're now aware, are you not, that she was, during

15   the same period of time, still seeing Brian Herlihy?

16        A    Yes, I am.

17        Q    Are you now aware that during that same period of

18   time she applied for a truck loan for him with a bank here in

19   town?

20        A    No, sir, I did not know that.

21        Q    After she moved out on July 4th, do you recall,

22   John, how long it was before you saw Crystal and Robbie

23   again?

24        A    It was, I believe, two days before I finally got

25   hold of her to make arrangements for Robbie to be taken care

```
 1   of.

 2        Q    A lot of different people over the four-month

 3   period of time actually looked after Robbie besides yourself

 4   and Crystal; is that true?

 5        A    Couple of people.  I don't really know a whole lot

 6   that had him, nobody had him overnight other than her family.

 7        Q    Well, just --

 8        A    That I know of.

 9        Q    I'm talking about family members actually.

10        A    Right.

11        Q    I'm not aware of anybody -- you're not aware of

12   anybody outside of the family that watched Robbie?

13        A    No, sir.

14        Q    Her dad and her stepmother up in Jacksonville?

15        A    Yes, sir.

16        Q    And her two sisters, Dana and Michelle?

17        A    I know Michelle had taken care of him.  I don't

18   know about Dana.

19        Q    Dana lives in Orlando, does she not?

20        A    Yes, she does.

21        Q    You're not aware of Dana watching Robbie on one or

22   two occasions?

23        A    Alone?  Not alone.

24        Q    Without Crystal being there?

25        A    Not that I knew of.  I knew that she had been
```

1   around Robbie and helped take care of Robbie.  I never knew

2   of her being alone with Robbie.

3        Q    And your grandmother, Doris Bridwell, watched

4   Robbie most of the time --

5        A    Yes, sir.

6        Q    -- during the week?

7             When was the first time you yourself talked to

8   Detective Legall in this case?  Do you remember the date?

9        A    I believe it was the day after the injury.  I

10  wasn't too sure.  I can't remember if I saw her or if it was

11  another detective the day of, because it was all kind of a

12  blur, everything that was going on.

13       Q    The detective that I think you're alluding to, you

14  spoke to at the hospital; is that correct?

15       A    Yes, sir.

16       Q    I don't believe that was Helen Legall.  Do you

17  remember talking to her at the Gainesville Police Department

18  in August, and I believe it was August 15th?

19       A    Yes, sir, I do.

20       Q    Was that the first time that you had you met that

21  lady and talked to her about this case?

22       A    It was the first time that I had met her.  I had

23  talked to her on the phone on a couple of occasions.

24       Q    Is that the only time you've sat down with

25  Detective Legall and discussed the more specific details of

1   this case on the 15th?

2       A    I think that was the first time that I got a full

3   overview of the case, yes.

4       Q    Did you learn from her on that occasion that she

5   had information about a prior brain injury that the doctors

6   at Shands had seen in his CAT scan?

7       A    Yes, sir.

8       Q    You had that discussion with her?

9       A    Yes, sir.

10      Q    Did you tell her that you believed it might have

11  something to do with the serious car accident that Crystal

12  was in during the seventh month that she carried Robbie?

13      A    That could have had something to do with it, but we

14  weren't really sure.

15      Q    Did you believe that that might have something to

16  do with it?

17      A    I believe that there were several things that could

18  have been responsible for it.

19      Q    Such as?

20      A    The birth, with how rough it was, was one thing

21  that I thought could have happened.  Of course, the car

22  accident with the seat belt coming right across.  There was a

23  time when he was kind of, Crystal had just kind of plopped

24  him down on a bed, but I didn't really think that had too

25  much to do with it because he was kind of laughing and

1   giggling when that happened, but --

2       Q    Let's talk about that for a second.  When did you

3   see Crystal plop him down on a bed?

4       A    This was a few days before the 4th of July, I

5   believe.  It was, I think it was the Saturday before, which

6   was the 2nd I believe.

7       Q    Was she angry at you at that time?

8       A    She was -- I don't know that it was -- we weren't

9   in an argument.  I think she was angry at something that my

10  mom had said to her and she had Robbie in her arms, took him

11  into the bedroom and kind of just, you know, sat him down a

12  little bit rough on the bed, which I went in to check on him

13  to make sure he was okay.  And at the time it didn't even

14  cross my mind that anything was wrong because he was just

15  kind of laughing.

16      Q    As she flopped him down on the bed, did she support

17  his head?

18      A    No, sir.  She kind of set him down on his rear end

19  and he just fell backwards.

20      Q    The car accident in February?

21      A    Yes, sir.

22      Q    Was that about a -- let's see, was it in January or

23  February?

24      A    I believe it was either end of January or early

25  February.  I'm not exactly sure of the dates, but I know it

```
 1    was close to that.

 2          Q     It was about a month before Robbie was born?

 3          A     Little over a month, maybe about five or six weeks.

 4          Q     That car accident happened where?

 5          A     On 34th Street over, she was on her way over to my

 6    work that night.

 7          Q     And what is your understanding as to what occurred?

 8                MS. SINGER:  I'm going to lodge an objection,

 9          beyond the scope of this witness to answer.  I don't

10          think he was present for the accident.

11                THE COURT:  The objection is sustained on the basis

12          of hearsay.

13                THE WITNESS:  Just with by what I was told by the

14          officer investigating I guess the road was a little --

15                MS. SINGER:  I'm going to lodge an objection.

16                THE COURT:  You can't say what the officer said.

17          Just wait for the next question.

18                Go ahead, Mr. Groland.

19    BY MR. GROLAND:

20          Q     Did you go to the scene?

21          A     Yes, sir.

22          Q     What did you see there?  Describe what you saw of

23    her vehicle and the other vehicle that was involved.

24          A     It appeared to me that she had rear-ended a car

25    that was making a turn in front of her.
```

1    Q    Was there substantial damage to her vehicle?

2    A    Yes, sir.  The front end was pretty badly damaged.

3    Q    Was she taken to the hospital?

4    A    Yes, sir, she was.

5    Q    And did she complain to you about any problems with

6  pain that she was having?

7    A    She was pretty sore, I believe her back, legs and

8  arm.  And I do know that she spent a few days after that in

9  my grandmother's care because the doctors didn't want her to

10  be left alone.

11    Q    Did she explain to you about having severe stomach

12  cramps after the accident, cramps?

13    A    She didn't complain to me about stomach cramps.

14    Q    You indicated that she was wearing a seat belt?

15    A    Yes, sir.

16    Q    Complain to you about any injuries from the seat

17  belt?

18    A    No, sir.

19    Q    Did she, in fact, stay in the hospital four or five

20  days?

21    A    It was three or four days.  I'm not exactly sure

22  how long she was in there.

23    Q    Was there a belief at this time that she was going

24  to deliver?

25    A    There was that -- they had cautioned us that it

175

1    could happen because of the trauma to her stomach.

2        Q    Was she in another car accident while she was

3    married to you?

4            MS. SINGER:  I'm going to lodge an objection, Your

5        Honor.  I think this was --

6            THE COURT:  Objection is sustained.

7    BY MR. GROLAND:

8        Q    Was she in another car accident while she was

9    pregnant?

10       A    Not to my knowledge.

11       Q    On the morning of August 2nd when she came to your

12   job, were you expecting her that morning?

13       A    No, sir, I wasn't.

14       Q    Had she previously discussed with you her plan to

15   go to Cedar Key?

16       A    She had mentioned it the day before, which I

17   objected to, and I thought we had settled that.

18       Q    In fact, you left that discussion with her the day

19   before with the understanding that she was not going to go?

20       A    That's correct.

21       Q    When she came out to your job on the morning of

22   August the 2nd, did you again have another discussion with

23   her about Cedar Key?

24       A    Yes, sir, I did.

25       Q    What did she tell you that morning about her plans?

1    A    She said that she just wanted to take Robbie over

2  there and have lunch and spend some time looking in the

3  shops.  And I told her that I didn't -- mostly I expressed my

4  disconcern (sic) with it, telling her that I did not believe

5  it was a good idea to have him in the back of the car all

6  day; it was too hot outside.

7    Q    Did you also tell her that the car was in such a

8  mechanical condition that it might not even make the trip?

9    A    That was another concern, because it, you know, it

10  was running a little bit rough at the time.  She hadn't had

11  the oil changed in a while, and, you know, I was kind of

12  concerned about that.  My main concern was that the car would

13  break down or something would happen on the way out there and

14  Robbie would be stuck in the car and the heat, because, I

15  mean, once again, it was August and it was pretty hot.

16    Q    Did you express that to her?

17    A    Yes, I did.

18    Q    Did she leave that discussion with you with the

19  statement:  Okay, we're not going?

20    A    Yes.  She said that she would just go ahead and run

21  a few errands in town and then back to the house later on.

22    Q    You have since found out that she lied to you about

23  that statement?

24    A    Yes, sir.

25    Q    And then she left with Robbie and the next time you

1    saw Robbie was at the hospital?

2        A    Yes, sir.

3        Q    The ESPN outfit that Robbie was wearing that day

4    was a blue outfit?

5        A    White and blue and had some red in it also.

6        Q    Did it have any spit up on it when you saw Robbie

7    that morning?

8        A    No, sir, it didn't.

9        Q    Was that the first time that Robbie had worn that

10   outfit, to your knowledge?

11       A    To my knowledge, yes.

12       Q    And then sometime later you get a phone call from

13   her, sometime later that morning?

14       A    Yes, sir.

15       Q    And your estimate as to how much time later is an

16   hour?

17       A    Approximately an hour to hour and a half, maybe.

18       Q    What time do you think she left your job that

19   morning?

20       A    Best guess is probably around 9:00, maybe five

21   minutes after.

22       Q    So you're thinking it was 10:00, 10:30 when you got

23   the call?

24       A    Yes, sir.

25       Q    Tell me exactly what you remember she said to you

1   in that phone call.

2       A      She told me that there had been an accident and

3   that Robbie had to be taken to the hospital, but not to

4   worry, that he had just aspirated on some milk and that the

5   paramedics came and I needed to come to Shands.

6       Q      Can you describe for us how she sounded on the

7   phone?

8       A      She was in tears and sounded very panicked.

9       Q      Did she tell you where she was calling from?

10      A      No, sir, she didn't.

11      Q      Did you ask her?

12      A      No, sir.  I just -- I was in a hurry to get to the

13  hospital.

14      Q      Do you know what phone she called you on?

15      A      No, sir, I don't.

16      Q      Did she actually tell you that it was a car

17  accident?  I heard you say accident.

18      A      No.  She said that he aspirated and that, you know,

19  accidentally on some milk.

20      Q      She told you that he choked on his own vomit?

21      A      I guess that's what aspirated meant.

22      Q      Did she use the word aspirated?

23      A      Yes, she did.

24      Q      You've since found out the only thing truthful

25  about what she told you that indeed the baby was at Shands?

1    A    Yes, sir.

2    Q    When you get -- how long does it take you to get to

3    the hospital?

4    A    That day it took me about six, seven minutes.

5    Q    And you park your car in the parking garage?

6    A    Yes, sir.

7    Q    And before you even go in, you see her?

8    A    She caught me on my way in; apparently she had seen

9    a friend of mine, Yantz, inside the emergency room on the

10   phone and realized he was on the phone with me, so she caught

11   me on my way into the emergency room.

12   Q    Wasn't she actually coming out of the parking lot?

13   A    I found out later that she was coming out of the

14   parking lot.

15   Q    At that time when Robbie was in the hospital, he

16   was in critical condition in PICU?

17   A    That's correct.

18   Q    Do you know what she was doing in the parking lot?

19   A    I didn't know at the time.  I found out later that

20   she had taken Mr. Herlihy back to his apartment.

21   Q    What you're saying is that she had taken

22   Mr. Herlihy back?

23   A    That's what I was told, yes.

24   Q    Are you sure you weren't told that she actually

25   went by herself in Mr. Herlihy's vehicle?

1     A     No, I did not know that.

2     Q     Who told you that she went back to Mr. Herlihy's

3  apartment?

4     A     She did, later on.

5     Q     Did she ever tell you why she left the baby in

6  critical condition at the hospital and went back to

7  Mr. Herlihy's apartment that morning?

8     A     At that time I really didn't care to hear why.

9     Q     When you first saw her and Yantz Enoch was in the

10  area, did she tell you:  Don't believe anything that Yantz

11  tells you?

12     A     Yes.

13     Q     And your response to that was?

14     A     Get out of my way.  I want to see my son.

15     Q     And then when you go into the hospital, John, you

16  meet with some medical people and some counselors?

17     A     Yes, sir.

18     Q     Was Crystal right there with you from that point

19  on?

20     A     Yes, sir, from the time we met with Kevin until we

21  were allowed to go back and see my son.

22     Q     Did she ever, during that period of time, just tell

23  you where she had just been, anything mentioned about that?

24     A     No.  That didn't come up until probably maybe a

25  month or so after everything had happened.  That was pretty

1   much when I found out the truth about what happened that day

2   and how she left Robbie.  It was the falling apart point of

3   our marriage.

4        Q    Did she herself tell you when you talked to her

5   about a month later that she and Brian Herlihy went back to

6   Brian's apartment?

7        A    That's what she told me.

8        Q    So who's the first person at the hospital, John,

9   that you speak to about what is going on?

10       A    I believe his name was Kevin.

11       Q    Kevin Putansu?

12       A    Yes.

13       Q    And Crystal is there with you and she's talking to

14  him as well?

15       A    Yes, we are in his office.

16       Q    Is she telling him some lies?

17       A    Yes, sir.

18       Q    What is she telling Kevin?

19       A    Basically the same story that she told me, that she

20  was on her way back to the house and that Robbie aspirated on

21  some milk in the back seat of the car.

22       Q    Does she then change her story and say she was at a

23  friend's house?

24       A    Yes, she did.

25       Q    Does she indicate, and as you think back to what

```
 1   she said, does she indicate that the friend was somebody

 2   other than Brian Herlihy?

 3       A    Yes, she did.  She now, I believe now -- Kevin

 4   actually had to lead her into that story.

 5       Q    So she was, did she ever identify this other friend

 6   other than Brian Herlihy?

 7       A    I really can't remember if she did or not.

 8       Q    Do you remember if it was a male or female friend?

 9       A    I believe it was a female friend of hers from work

10   is what she was trying to tell me.

11       Q    And as she's telling you these things -- Kevin

12   Putansu, he's a counselor?

13       A    Yes, sir.

14       Q    Is he encouraging her to, Hey, let's get the story

15   straight here and tell the truth?

16       A    He kept telling Crystal:  And now, Crystal, you

17   know that's not what really happened.  Crystal, you know that

18   that's not possible.  And finally, she broke down with what

19   later was known as, I guess, some of the truth.

20       Q    Did she tell the truth then and there in Kevin's

21   office, or was the truth told at a later point in time at the

22   hospital?

23       A    The whole story didn't come out until a later point

24   at the hospital when the cops were asking the questions, I

25   guess.
```

1    Q    And then after -- did anybody else meet with the

2    two of you, you, Crystal, and Kevin, anyone else in that

3    room?

4    A    I can't really remember.

5    Q    Do you remember a doctor, a lady doctor, her name

6    is Anne Dickinson?

7    A    Yes, I do remember her.

8    Q    Do you remember her telling Crystal that --

9         MR. PENNYPACKER:  Your Honor, I'm going to object

10   to Dr. Dickinson's statements.  That's hearsay.

11        THE COURT:  Sustained.

12        MR. GROLAND:  Well, Your Honor, may I just?

13        THE COURT:  You can confer with the state if you

14   wish to.

15        MR. GROLAND:  Thank you.

16        (Pause in the proceedings.)

17   BY MR. GROLAND:

18   Q    I'll ask it this way.  Is there a discussion with a

19   doctor there, and Crystal, and you?

20   A    There were several doctors that sat down with us.

21   Q    Specifically I'm talking about the lady doctor,

22   Dr. Dickinson?

23   A    Okay.

24   Q    After the doctor talks to you and to Crystal then

25   and there about Robbie, does Crystal make a statement to this

1  doctor about that she wants to take the baby home?

2      A    I believe so.

3      Q    Okay.

4      A    In a panic she said that she just wanted to take

5  Robbie home.

6      Q    We're going to move to another area briefly.  After

7  Robbie came home from the hospital, did he lose some

8  noticeable amount of weight over the first couple of days?

9      A    Yes, he did.  He lost a couple, a pound or so in

10  the hospital because he was having trouble breastfeeding, and

11  then another pound or so once we got home, before he started

12  getting into the formula that he liked.

13     Q    After she got out of the hospital, Crystal,

14  following the car accident, did she actually have to be

15  rehospitalized on another occasion for that same accident?

16     A    I can't remember if it was for the same accident or

17  if it was a premature labor situation where she had started

18  having contractions.

19     Q    Do you know about a red mark on Robbie's eye in

20  July that, touch of blood in the corner of his eye?

21     A    I know about a scratch on the skin in the corner of

22  his eye.  I didn't know about a red mark in the eye.

23     Q    You don't know about a red mark on the actual eye?

24     A    No, sir.

25     Q    Do you know, were you aware of Crystal's reputation

```
1    for truth and veracity?

2         A    Yes, sir.

3         Q    What it is?

4         A    Not very good.  She's not exactly known as an

5    honest person.  Before we got married it was mostly just with

6    her family, then after that it extended towards myself.

7         Q    How would you describe her temperament, does she

8    have a short fuse?

9         A    I would say so, yes.

10        Q    Have you seen what you would describe as erratic

11   behavior?

12        A    At times.

13        Q    Did things change noticeably with Crystal after

14   Robbie was born, as far as how she reacted with the family or

15   interacted with the family?

16        A    Yes, it did.

17        Q    Why would you say that occurred, if you know, if

18   you have an opinion?

19        A    Robbie was gathering the bulk of the attention.  I

20   think that was a sore spot with her.

21        Q    She was no longer the center of attention?

22        A    Yes, sir.

23             MR. GROLAND:  No further questions.

24             THE COURT:  Any redirect?

25             MR. PENNYPACKER:  Your Honor, can we take a break?
```

1         THE COURT:  Yes.  Ladies and gentlemen, we're going

2     to take a 15-minute recess.  If you'll step into the

3     jury room, please.

4         (The jury exited the courtroom.)

5         THE COURT:  All right.  I'll ask that the courtroom

6     be cleared for the recess.

7         (A recess was taken.)

8         THE COURT:  Do we have all the jurors back?

9         THE BAILIFF:  Yes, Your Honor.

10        THE COURT:  State ready to proceed?

11        MR. PENNYPACKER:  Yes, ma'am.

12        THE COURT:  Defense ready?

13        MR. GROLAND:  Your Honor, can we approach?

14        THE COURT:  The answer then would be no?

15        MR. GROLAND:  The answer would be no.

16        THE COURT:  You're not ready for the jury to come

17    in?

18        MR. TEDDER:  Yes, ma'am, that's correct.

19        THE COURT:  Okay.  Good.  Not ready for the jury?

20        MR. TEDDER:  Your Honor, I was concerned about the

21    stipulation to allow Dr. Hellrung's chart into evidence

22    in it's entirety.  Mr. Groland indicates to me there's

23    some letters in there, some other things.

24        THE COURT:  Is this what you're talking about?

25        MR. TEDDER:  No, ma'am.

1        MS. SINGER:  No, it's this here that I'm looking at

2    now to see what --

3        MR. GROLAND:  Your Honor, just as we're putting it

4    in, Mr. Pennypacker and I had a conversation that we may

5    want to take a closer look at that before it goes to the

6    jury.  There's some letters in there from me to the

7    doctor and if we can just -- we don't have to do it now.

8    Ms. Singer.

9        MS. SINGER:  I have no objection to the extraction

10   of Mr. Groland's letters, along with any other

11   correspondence and just allow the chart, the actual

12   medical chart in.  There's a lot of correspondence

13   that's legal in nature.  I have no objection to that

14   being extracted.  If the Court will allow us after

15   6:00 P.M. to go through, I believe we can stipulate to

16   the appropriate extraction of the --

17       THE COURT:  And that chart has been admitted into

18   evidence but has not been published to the jury?

19       MS. SINGER:  Correct.

20       THE COURT:  We'll address it at 6:00 P.M.

21       MS. SINGER:  All right.

22       MR. GROLAND:  Thank you.

23       THE COURT:  Anything else we need to address before

24   the jury comes back in?

25       MR. GROLAND:  No.

```
 1              THE COURT:  Good enough.  Bring the jury in.

 2              THE BAILIFF:  Yes, Your Honor.

 3              (The jury entered the courtroom.)

 4                      REDIRECT EXAMINATION

 5   BY MR. PENNYPACKER:

 6        Q    Mr. Quirello, you were asked about an accident with

 7   you and Crystal in which a knife was involved.  Did you call

 8   the police at that time?

 9        A    No, sir, I didn't.

10        Q    Did you feel threatened at that time?

11              MR. GROLAND:  Your Honor, I'm going to object.  I

12         think it's leading.

13              THE COURT:  Overruled.

14              THE WITNESS:  At first I did feel threatened until

15         I realized that she was more trying to hurt herself

16         instead of me.

17   BY MR. PENNYPACKER:

18        Q    You mentioned that on July 4th there was a time

19   when Crystal was upset and that she took Robbie back in the

20   bedroom and I believe you used the words "she plopped him

21   down on the bed".  Did his eyes glaze over at that time?

22        A    No, sir.

23        Q    Did he have any trouble breathing?

24              MR. TEDDER:  Objection, leading.

25              THE COURT:  Overruled.
```

1    BY MR. PENNYPACKER:

2        Q    Did he have any trouble breathing?

3        A    No, sir.

4        Q    Did you call a doctor or take him to a doctor?

5        A    No, sir, there was no need to.

6        Q    Did you call 911?

7        A    No, sir.

8        Q    How was he when you went in the room to check on

9    him?

10       A    He was laying on his back laughing and giggling.

11       Q    When you were in the hospital on October 2 of 2000

12   (sic) and you were just talking to Crystal, you mentioned

13   that she was panicked.  I believe that was the word you used

14   as far as her demeanor.  How was she acting during the time

15   that you were discussing this incident, or what took place in

16   the presence of Mr. Putansu?

17       A    She was very nervous, I guess, would be the best

18   way to describe it.

19       Q    After you finished talking to Mr. Putansu, where

20   did Crystal go?

21       A    Straight into Robbie's room once we were allowed.

22       Q    How long did she remain in Robbie's room?

23       A    It had to be at least until shift change.  She

24   hardly ever left his bedside through the whole thing.

25       Q    You were asked about a red spot on Robbie's eye.  I

1   believe you indicated there was a scratch on an eyelid; is

2   that correct?

3       A    Just to the left corner to his eye around the

4   orbit.

5       Q    Was it on the skin of his eye?

6       A    Yes, sir, it was.

7            MR. PENNYPACKER:  That's all.

8            THE COURT:  All right.  May Mr. Quirello be

9       released from subpoena at this time?

10           MR. GROLAND:  Yes.

11           THE COURT:  Mr. Quirello, thank you.  You're free

12      to leave the courthouse and the state can call the next

13      witness.

14           MS. SINGER:  State would call Crystal Quirello,

15      Your Honor.

16           You need to step up, Ms. Quirello.

17           THE CLERK:  Please raise your right hand.

18           (The witness is duly sworn by the clerk.)

19           THE CLERK:  You may be seated.

20           MS. SINGER:  May I proceed, Your Honor?

21           THE COURT:  Yes.

22                     CRYSTAL DAWN QUIRELLO,

23   Called as a witness herein, having been first duly sworn, was

24   examined and testified as follows:

25                     DIRECT EXAMINATION

1   BY MS. SINGER:

2       Q    Crystal, you need to speak loud enough for

3   everybody down this row to hear you.

4       A    Yes, ma'am.

5       Q    If I tell you to speak up it's because I can't hear

6   you, I'm losing my hearing, so that means you're definitely

7   not talking loud enough.

8            I want you to say your full name.

9       A    Crystal Dawn Quirello.

10      Q    Where do you live, Crystal?

11      A    13112 4-A Road, Plymouth, Indiana, 46563.

12      Q    And what is your date of birth?

13      A    8/26 of '79.

14      Q    How old are you now?

15      A    Just turned 23.

16      Q    How far did you get in school, Crystal?

17      A    Graduated high school.

18      Q    Are you attending any school now?

19      A    Yes, ma'am.

20      Q    And where are you going to school now?

21      A    Indiana University.

22      Q    What is the name of your father?

23      A    Richard E. Davis, Senior.

24      Q    What is the name of your mother?

25      A    Tammy Lee Davis.

1      Q    Is that your natural mother or your stepmom?

2      A    Stepmother.

3      Q    What is the name of your natural mother?

4      A    Brenda Joyce Davis.

5      Q    And where is she now?

6      A    She's deceased.

7      Q    Robert Quirello, who is he?

8      A    That was my son.

9      Q    And what did you, what name did you call him?

10     A    Robbie.

11     Q    Are you currently married?

12     A    No, ma'am.

13     Q    Have you been married?

14     A    Excuse me?

15     Q    Have you been married?

16     A    To John Quirello.

17     Q    And do you remember when you got married?

18     A    April 15th.

19     Q    What year did you get married in?

20     A    I believe it was 1999.

21     Q    1999?  I'm sorry, I didn't hear you.

22     A    Yes, ma'am.  Sorry.

23     Q    How long did you know John before you got married?

24     A    About six months.

25     Q    And where did you meet him?

1    A    At Airborne Express.

2    Q    And where were you working when you met John?

3    A    Airborne Express.

4    Q    Where was the Airborne Express where you met him?

5    A    It was out by the airport in Jacksonville.

6    Q    John was working in Jacksonville at this time?

7    A    Yes, ma'am.

8    Q    And how old were you when you first met John?

9    A    I believe I was 19.

10   Q    What were you doing for Airborne?

11   A    I was working as a courier.

12   Q    And how long after you met John did you marry him?

13   A    Six months.

14   Q    Where were you married?

15   A    Jacksonville, Florida.

16   Q    Name of the place?

17   A    Normandy Park Baptist Church.

18   Q    And when you were married did you move to

19   Gainesville, Florida?

20   A    Yes, ma'am.

21   Q    Approximately when did you move to Gainesville,

22   Florida?

23   A    Right after we got married, when we got off our

24   honeymoon.

25   Q    Where exactly did you move to, Crystal?

1      A      We lived on my mother-in-law's property in

2    Gainesville, Archer, Florida.

3      Q      What was the name of your mother-in-law?

4      A      Kathleen Morriston.

5      Q      The property that you lived on, could you describe

6    that for the jury so they can understand how you were living

7    when you and John first came to Gainesville or Archer?

8      A      Yes, ma'am.  It was a large lot and we lived in a

9    module home, and they lived to the left of us, Kathleen

10   Morriston and her mother, Doris Bridwell.

11     Q      What did you call Doris Bridwell?

12     A      Meem.

13     Q      And why did you call her Meem?

14     A      That's what everybody else called her in the

15   family.

16     Q      How did you refer to Kathleen Morrison?

17     A      A lot of times I called her mom.

18     Q      And why did you do that?

19     A      Because that's my mother-in-law.

20     Q      Could you describe your early marriage to John for

21   the jury so they can get a picture of how you and John were

22   doing when you first got married?

23     A      We had our troubles at times, but it was a pretty

24   good marriage in the beginning.

25     Q      When did troubles begin to develop in the family

1   between you and John?

2       A     Probably going to say about the time that we found

3   out we were pregnant.

4       Q     And when was that, do you remember when you found

5   out you were pregnant with Robbie?

6       A     It was probably about three months into the

7   marriage because when I found out I was a month and a half

8   along already.

9       Q     Were you working at that time, Crystal, when you

10  found out you were pregnant?

11      A     Yes, ma'am.

12      Q     Where had you been working at that time?

13      A     Lifestyle Community Blood Center.

14      Q     And what were you doing for them?

15      A     I was a certified phlebotomist.

16      Q     Is this also known as Civitan Blood Center?

17      A     Yes, ma'am.

18      Q     And where was that located, where was the business

19  or the place where you went to work daily?

20      A     I don't know the exact address, but it's down by

21  the AAA on 13th Street.

22      Q     And you were working there full time?

23      A     Yes, ma'am.

24      Q     What kind of hours did you have at the Civitan?

25      A     They rotated throughout the week.

1    Q    So did you always work daytime hours or did

2    sometimes you work into the evening or on weekends?

3    A    In the beginning I worked daytime hours, then I got

4    a promotion to the apheresis department and my hours went a

5    lot of times in the evening.

6    Q    And was it soon after that that you found out you

7    were pregnant with Robbie?

8    A    Little ways after, yes, ma'am.

9    Q    How was the relationship between you and John when

10   you discovered that Robbie was coming onboard as part of the

11   family?

12   A    It was a little chaotic at first.

13   Q    Why was that?

14   A    I guess we were both scared and trying to, we just

15   got married and trying to start our family and get situated

16   with things.

17   Q    Was there any interaction between you and your

18   mother-in-law that caused problems in the family?

19   A    Yes, ma'am.

20   Q    What was happening there?

21   A    A lot of times she would tell us what we could or

22   could not do or -- our financial played a big part in it.

23   Q    Could you give an example to the jury what you mean

24   by telling me what you could and couldn't do?

25   A    She would get upset a lot of times if we went to

1   McDonald's or Burger King because that was money that we

2   really didn't have and she would get upset about that.

3       Q    Did you ever tell John that you were having

4   difficulty with your mother-in-law?

5       A    Yes, ma'am, I did.

6       Q    Was that a cause of a problem between you and he?

7       A    Yes, ma'am.

8       Q    Now, when you found out that you were pregnant,

9   could you tell us how your pregnancy was in the beginning

10  when you first found out, how you were feeling?

11      A    I had morning sickness a lot.

12      Q    Were you prescribed any kind of medication to deal

13  with that?

14      A    Yes, ma'am.

15      Q    And what kind of medication were you given?

16      A    Phenergan.

17      Q    Who was your obstetrician, who was treating you?

18      A    Dr. Kreinest.

19      Q    And did you see him on a regular basis?

20      A    Yes, ma'am.

21      Q    Did you have any other physical problems, other

22  than having the morning sickness, did you have any other

23  physical problems during your pregnancy?

24      A    No, ma'am.

25      Q    Did there come a time when you had an automobile

1    accident here in Gainesville, Florida?

2        A    Yes, ma'am.

3        Q    About when in time was it that you had the

4    automobile accident?

5        A    I believe the date was January the 10th, 1999 -- or

6    2000, sorry.

7        Q    2000.  So Robbie was due.  Do you remember what

8    your due date for Robbie was, when you were expecting, when

9    you were thinking of when he was supposed come, what they

10   told you the date he was supposed to come?

11       A    I can't remember the exact date, but it was April.

12       Q    And January 10th you had an automobile accident?

13       A    Yes, ma'am.

14       Q    Describe to the jury what happened in the

15   automobile accident.

16       A    It just got finished raining and the roads were

17   still real wet.  I was on the way to go see my husband, John,

18   at work, and a car had slid on the brakes and I didn't apply

19   my brake fast enough and I slid into the back end of a car.

20       Q    What kind of damage did your car sustain?

21       A    Mostly the front end of it was damaged pretty bad.

22       Q    Was it to where you had to have it towed?

23       A    Yes, ma'am.

24       Q    And how about you -- was there anyone else in the

25   car besides yourself?

1          A      No, ma'am.

2          Q      Are you seat belted?

3          A      Yes, ma'am.

4          Q      Was there any other, was there, was there injury to

5    yourself as a result of that collision?

6          A      I had hit the steering wheel but not really hard.

7          Q      As a result of that were you taken to the hospital?

8          A      Yes, ma'am.

9          Q      And why did they take you to the hospital?

10         A      Because I had some slight cramping.

11         Q      And did you report that to the EMS, the people who

12   came to the accident scene?

13         A      Yes, ma'am.

14         Q      And by that time you were seven months, eight

15   months pregnant?  Pardon me, six or seven, between six and

16   seven months pregnant?

17         A      Yes, ma'am.

18         Q      What hospital did they take you to, do you

19   remember?

20         A      It was AGH.

21         Q      Alachua General Hospital?

22         A      Yes, ma'am.

23         Q      Were you admitted into the hospital?

24         A      Yes, ma'am.

25         Q      And how long did you stay?

1     A     I'm going to say between three to four days, maybe

2   a week.

3     Q     And during the time that you were admitted to the

4   hospital, what kind of treatment did you receive?

5     A     I don't really recall the treatments.  I know I was

6   hooked up to fetal monitors the majority of the time.

7     Q     Was there any concern expressed that the baby could

8   come early as a result of the collision?

9     A     They suspected, yes.

10    Q     And what kind of room were you put in?

11    A     It was the regular labor delivery room, suite.

12    Q     About how long did you stay?

13    A     In the hospital?

14    Q     Yes, ma'am.

15    A     It was close to a week.

16    Q     And why were you released?

17    A     Because everything was looking good and they

18  thought that everything was going to be fine.

19    Q     How soon after that automobile accident was Robbie

20  born?

21    A     He was born in March 22nd.

22    Q     Now, did you get, did you have another time where

23  you went into the hospital with what's considered or called

24  preterm labor?

25    A     On and off, yes, ma'am.

1    Q    What happened, Crystal, tell the jury when you were

2  admitted for preterm labor?

3    A    I was preterm labor with Robbie and so periodically

4  when I went in for my checkups he would send me home on

5  routine bed rest until released.

6    Q    And was Robbie born early?

7    A    Yes, ma'am.

8    Q    Describe the birth for us, Crystal.

9    A    The birth, it seemed like a long labor, long.  I

10  had Robbie and he seemed to be a fine, healthy little boy.

11  His umbilical cord was around his neck, but it wasn't tight,

12  so they were able to flip it over with no damage.

13    Q    And did he have any injury as a result of his

14  birth?

15    A    They mentioned a broken clavicle bone, but they

16  weren't for sure if it was due to me having him or if it was

17  done shortly after birth.

18    Q    And do you know whether or not you were born with a

19  broken clavicle?

20    A    Yes, ma'am, I was.

21    Q    Once the baby was born was he seen by your

22  pediatrician?

23    A    On a regular basis, yes, ma'am.

24    Q    Who was your pediatrician?

25    A    Dr. Hellrung.

1      Q     Did you take him to see Dr. Hellrung?

2      A     Yes, ma'am.

3      Q     First of all, do you know if Dr. Hellrung saw him

4    in the hospital?

5      A     Yes, ma'am, he did.

6      Q     And was he circumcised, was Robbie circumcised?

7      A     Yes, ma'am, he was.

8      Q     With your permission?

9      A     Yes, ma'am.

10     Q     And Dr. Hellrung make any mention to you of any

11   concerns he had regarding Robbie's health when he was in the

12   hospital?

13     A     Dr. Hellrung said he was a healthy, little baby

14   boy.

15     Q     And then after that did you take Robbie in for

16   routine visits?

17     A     Yes, ma'am.

18     Q     And did there come a time when you were instructed

19   that Robbie needed to exercise his neck muscles?

20     A     Yes, ma'am, we were.

21     Q     Could you tell who was with you that day when you

22   went in for the examination?

23     A     I believe it was Kathleen Morriston, which was my

24   mother-in-law.

25     Q     And what did Dr. Hellrung tell you you needed to do

1    with Robbie to strengthen his neck muscles?

2         A    He told us that we needed to, on a daily basis,

3    have him try to hold his neck up to strengthen it with us

4    supporting it so he can gain strength in his neck.

5         Q    And was that done?

6         A    Yes, ma'am.

7         Q    Now, who -- how long after you gave birth to Robbie

8    did you go back to work?

9         A    About two weeks later.

10        Q    And did you arrange for child care before you came

11   back to work?

12        A    Yes, ma'am.

13        Q    Who was going to do your child care for you, attend

14   to Robbie while you were at work?

15        A    Doris Bridwell.

16        Q    That would have been Meem?

17        A    Meem.

18        Q    Who was primarily responsible in your family,

19   between you and John, to get the baby ready and delivered to

20   Meem, or Doris, each day when you were going to work?

21        A    I was.

22        Q    Did you do that on a routine basis?

23        A    Yes, ma'am.

24        Q    Was there any time that you ever picked up -- who

25   routinely picked up Robbie after work?

1     A     I did the majority of the times.

2     Q     Were there times when John would also pick up the

3  baby?

4     A     Very few, but yes.

5     Q     Were you back living on the property, the Morriston

6  property when you brought Robbie back home from the hospital?

7     A     Yes, ma'am.

8     Q     Did you try breastfeeding?

9     A     Yes, ma'am.

10    Q     And was there some difficulty with that?

11    A     Yes, ma'am.

12    Q     And did you report that to Dr. Hellrung, the

13  pediatrician?

14    A     I don't remember if it was reported to Dr. Hellrung

15  but the nurses that were there during delivery were well

16  aware of it.

17    Q     And were you given a formula or a supplement to

18  help with the feeding of Robbie?

19    A     Yes, ma'am.

20    Q     And how did he do once he got on the formula that

21  was comfortable for him?

22    A     He did pretty well.

23    Q     Did you ever note any injuries on Robbie after you

24  picked Robbie up from Doris's home?

25    A     No, ma'am.

1      Q     Did he appear to be well kept, clean, fed?

2      A     Yeah.

3      Q     How was his demeanor when you would pick him up

4   from Doris's home?

5      A     He was normally excited and kind of smiling and he

6   would give us little goos.

7      Q     When you would take Robbie for his medical visits

8   were you ever advised on how he was progressing?

9      A     Yes, ma'am.

10     Q     What were you told?

11     A     That he was growing the way he should be and

12  putting on the weight that he should be -- actually putting a

13  little bit more than what he should have.

14     Q     Did you ever mistreat Robbie?

15     A     No, ma'am.

16     Q     And did you ever witness anyone mistreating Robbie?

17     A     No, ma'am.

18     Q     Did you ever suspect anyone of mistreating Robbie

19  outside of your presence, such as Doris, or Kathleen, or your

20  parents, or John?

21     A     No, ma'am.

22         MS. SINGER:  Your Honor, there is a part of the

23         testimony that I'm going to go into at this point that I

24         would ask for a brief proffer.  I could proffer the

25         facts at sidebar if the Court would -- and then if the

1   Court requires the actual testimony, we can excuse the

2   jury.

3          THE COURT:  If you'll come -- we'll just leave it

4   on the record, as long as we're just going to do it by

5   way of statements.

6          MS. SINGER:  Right.  If the Court wants it by way

7   of testimony as a proffer, then we can excuse the jury.

8          THE COURT:  Does this need to be on the record?

9          MS. SINGER:  No.

10         Maybe we should.  I think we should.

11         (A sidebar discussion was held:)

12         MS. SINGER:  I'm going now into the area where she

13  met Brian Herlihy at the Civitan and how she began a

14  relationship with him.  There is one statement that is

15  relevant to what was stated on opening with the defense

16  and that was that the argument in defense opening was

17  that Crystal just allowed Brian to care for the baby

18  without a reason, that she didn't have a reason.  Brian

19  told her at the time they first met that he was a

20  pediatric nurse on the pediatric floor at Shands, and

21  she believed that he was a nurse on the pediatric floor

22  of Shands when they first met, and continued to believe

23  that until after that basically came to light that he

24  was not but, in fact, was working at Wal-Mart on

25  August 2nd.

1      Now, I know that they are going to object to that

2      because of the issues that have come up for pretrial and

3      I wanted to either offer that proffer by way of

4      testimony so the Court can rule on their objection, or

5      if the Court is comfortable hearing argument now on

6      relevance, I can make argument.

7          THE COURT:  It's my belief, unless we go back to

8      the word-for-word transcript in opening statement, that

9      although that issue may be opened through this witness,

10     it would only be opened during cross-examination.  If,

11     in fact, it is, then of course your redirect --

12         MS. SINGER:  Would allow for it.

13         THE COURT:  -- would allow for it.

14         MS. SINGER:  Stay away from those issues until

15     redirect or, of course, I can use it in rebuttal if I

16     need it, until Mr. Herlihy has testified.

17         MR. GROLAND:  We're not going to go into it now?

18         MS. SINGER:  No.  And I will, if I interrupt my

19     witness when she starts to answer something, which I

20     don't think -- I've already instructed her, but if she

21     didn't get it, I will probably be rude.

22         MR. GROLAND:  Okay.

23         THE COURT:  It will be the first time if that

24     happens.

25         (The sidebar discussion was concluded.)

1    BY MS. SINGER:

2       Q    Crystal, after Robbie was born did you continue to

3    have problems in your marriage?

4       A    Yes, ma'am.

5       Q    And what kind of problems were you having in your

6    marriage after Robbie was born?

7       A    Lot of it still had to do with my mother-in-law.

8       Q    Did you ever voice your complaints to John after

9    Robbie was born?

10      A    Yes, ma'am.

11      Q    Did you have arguments with John?

12      A    Yes, ma'am.

13      Q    Did there come a time after you gave birth to

14   Robbie that you connected with a person by the name of Brian

15   Herlihy?

16      A    Yes, ma'am.

17      Q    Do you see that person here today?

18      A    Yes, ma'am.

19      Q    Where is he sitting and what is he wearing, please,

20   so the record can reflect that we're talking about the same

21   person?

22      A    He's sitting on the left-hand side in between

23   Groland and his assistant.

24           MS. SINGER:  May the record reflect the witness has

25           identified the defendant, Your Honor?

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1           THE COURT:  It will so reflect.

2    BY MS. SINGER:

3       Q    Had you met Brian Herlihy, the defendant in this

4    case, before you gave birth to Robbie?

5       A    Yes, ma'am.

6       Q    And how, under what circumstances did you meet him?

7    Where would you have met him?

8       A    At Civitan, at my job.

9       Q    Did he work there or was he a donor?

10      A    He was a donor.

11      Q    After the baby was born did you have contact with

12   Brian Herlihy?

13      A    Yes, ma'am.

14      Q    And about how old was Robbie when you first started

15   having personal contact with the defendant?

16      A    I don't recall his age at the time.

17      Q    How long had you been back to work, approximately,

18   when you began having contact with Brian Herlihy?

19      A    I'm going to say probably about three to four

20   weeks.

21      Q    So that would have, estimating here, been Robbie

22   being about six weeks old?

23      A    Yes, ma'am.

24      Q    Does that sound about right?

25      A    About right, yes, ma'am.

1    Q    That's just an estimate; we're not holding you to

2    it.

3    A    Yes, ma'am.

4    Q    Did you, during the time that you first started

5    talking with Brian Herlihy, tell him that you were having

6    problems in your relationship with John?

7    A    He had overheard it in a conversation.

8    Q    After he found out that you were having problems

9    with your relationship with John, did you and he strike up a

10   personal relationship?

11   A    Not at first, but yes, ma'am.

12   Q    Did that relationship move into a sexual

13   relationship?

14   A    Yes, ma'am.

15   Q    We're going to talk about that and we're going to

16   go over it piece by piece, Crystal.

17   A    Okay.

18   Q    Okay?  But before we do that, I have to ask you

19   this question:  Did you ever tell John that you had been

20   developing this personal relationship with the defendant?

21   A    No, ma'am.

22   Q    And why did you never tell John that you were

23   developing this personal relationship with the defendant?

24   A    Because I wanted to save my marriage at the same

25   time too.

1      Q    So Brian knew about John, but John didn't know

2   about Brian?

3      A    Yes, ma'am.

4      Q    When we asked about the personal relationship, how

5   soon after -- let me ask you this:  How frequently would you

6   and the defendant, Brian Herlihy, talk with each other from

7   the time you started up the personal relationship, about six

8   weeks after Robbie's death (sic), until the time that it

9   became an intimate relationship?

10     A    I don't recall.

11     Q    Was it more than daily contact or less than daily

12  contact?

13     A    I believe it's less than daily contact.

14     Q    Did there come a time in your relationship with

15  John where you moved out of the residence?

16     A    Yes, ma'am, I did.

17     Q    When was that?

18     A    I believe it was around July 4th.

19     Q    Was it the July 4th holiday?

20     A    Yes, ma'am.

21     Q    Were the police called to the house at that time?

22     A    Yes, ma'am.

23     Q    Had you had, had you arranged to have a place to

24  stay when you were moving out of John's home, or John's and

25  your home?

1      A     Not at the time, no.

2      Q     So where did you go when you left John's residence

3   during the holiday weekend?

4      A     Stayed at Brian Herlihy's house.

5      Q     At that time was your relationship intimate, were

6   you having sex with Brian at that time?

7      A     I wasn't at the time, no.

8      Q     Was it sometime after that that you and he began a

9   sexual relationship?

10     A     Yes, ma'am.

11     Q     When you left the house, when you left your marital

12  home, the home that you and John were living in on the

13  weekend, who did you take with you?

14     A     Took Robbie.

15     Q     Where did Robbie stay when you went to the

16  defendant's home?

17     A     He stayed with me.

18     Q     Where did he sleep in the defendant's home?

19     A     He slept with me.

20     Q     And where did you sleep?

21     A     I slept in the bed.

22     Q     And who else was in the bed with y'all?

23     A     Robbie.

24     Q     Robbie and who?

25     A     Brian.

```
1     Q    Where did Robbie sleep?
2          MR. GROLAND:  Objection, Your Honor, asked and
3     answered.
4          MS. SINGER:  I mean in the positioning of the bed.
5          THE COURT:  Overruled.
6          MS. SINGER:  I'll restate, Your Honor.
7  BY MS. SINGER:
8     Q    In the positioning of the bed, Crystal, where did
9  Robbie sleep?  We have Brian in the bed, we have you in the
10 bed, we have Robbie in the bed.  Where did Robbie sleep?
11    A    In between us.
12    Q    During the time that you would have stayed at
13 Brian's home, is that where Robbie slept?
14    A    Yes, ma'am.
15    Q    Did you, how long did you stay at the defendant's
16 home and live at the defendant's home?
17    A    I believe it was no more than two or three days.
18    Q    Where did you go from there?
19    A    I got an apartment at Greenwich Apartments.
20    Q    And how did you get that apartment?
21    A    Through an acquaintance at work.
22    Q    And how long did you stay in that apartment?
23    A    I don't recall at that time.
24    Q    Was it a matter of months or a matter of weeks?
25    A    Probably a matter of weeks.
```

1      Q      Where did Robbie sleep when you were staying at the

2    Greenwich apartment?

3      A      Slept with me.

4      Q      That would be in a bed?

5      A      Yes, ma'am.

6      Q      Was Robbie in your care during that time --

7      A      Yes, ma'am.

8      Q      -- when you were living at Greenwich?

9             When you were going to work, where did Robbie go to

10   be cared for?

11     A      Certain days he went to Doris's and certain days he

12   went to Brian's.

13     Q      And did you deliver him to Doris's house?  Would

14   you be the one to deliver him to Doris's house when you would

15   be going to work?

16     A      Yes, ma'am.

17     Q      Were there times when John would pick up the baby

18   and take him to Doris's house?

19     A      I don't recall if he did or not.

20     Q      And now there were other times when Brian took care

21   of Robbie?

22     A      Yes, ma'am.

23     Q      Where would it be, Crystal, that you would have the

24   defendant, Brian Herlihy, take care of the baby?

25     A      At his home.

1          Q      And why is it that you would bring the baby to

2     Brian?

3          A      Because I trusted him.

4          Q      We're not going to go into specifics; we're going

5     to move on from there.

6          A      Yes, ma'am.

7          Q      All right.  When the defendant would have Robbie,

8     do you know whether or not he ever took Robbie anywhere?

9          A      Not to my knowledge, no.

10         Q      About how many times do you believe that you had

11    left Robbie in the defendant's care?

12         A      I'm not for sure.

13         Q      Can you give an estimate for the jury?

14         A      Probably going to say five.

15         Q      Five times?

16         A      Maybe a little bit more, little bit less.

17         Q      Were there any particular hours?  Did you ever keep

18    him the whole day -- did he keep him for the whole day or was

19    it just several hours of the day, or how was it that he would

20    take care of Robbie?

21         A      It would normally just be at the time that I was at

22    work.

23         Q      Would that be a full eight hour day or would there

24    be times when he would be delivered only for a few hours?

25         A      Most the times it was eight hour days.  I believe

1   there was one occasion where it was only a few hours.

2       Q    Did there ever come a time when you lied to Brian,

3   the defendant in this case, about where Robbie was when you

4   had delivered Robbie to Doris's house to be cared for?

5       A    Yes, ma'am.

6       Q    Do you remember when in time that was that you told

7   Brian a lie about where Robbie was?

8       A    Yes, ma'am.

9       Q    When was that?

10      A    I don't remember the time that it was.  I told him

11  that Robbie --

12      Q    You need to speak up because I can't hear you.

13      A    Sorry.  I don't remember the time that it was, but

14  I remember telling Brian that he went to Silver Springs with

15  a family member.

16      Q    And why is it that you told Brian that Robbie had

17  gone to stay with a family member in Silver Springs?

18      A    Because Brian would get really upset if he didn't

19  have Robbie for the day.

20      Q    Do you have a family member in Silver Springs?

21      A    No, ma'am.

22      Q    Was there a reason why you were starting to bring

23  your baby back to Doris Bridwell for care?

24      A    Most the time was because they requested Robbie to

25  be there that day.

1    Q    Was there ongoing conversations between you and

2  John during this period of time from July 4th to the two or

3  three weeks that you were living in Greenwich, was there a

4  period of time when you and John were trying to reconcile

5  your relationship?

6    A    Yes, ma'am.

7    Q    You need to describe that for the jury, please.

8  Tell us what you were doing.

9    A    John would come over pretty much every night at my

10  apartment and we were in the process of buying a home.

11    Q    And did you have a fight with John one night at the

12  apartment?

13    A    I don't recall if I -- I know we've had a lot of

14  disagreements, but I don't recall fighting with him there.

15    Q    Do you ever remember a time when you and --

16         MR. GROLAND:  Objection, Your Honor, leading.

17         THE COURT:  Overruled.

18  BY MS. SINGER:

19    Q    Do you remember any kind of contact with John where

20  you threatened to hurt yourself because of the difficulty you

21  were having in your relationship with John?

22    A    No, ma'am.

23    Q    While you were allowing the defendant to care for

24  Robbie, did you have baby items in his home?

25    A    Yes, ma'am.

1      Q      What kind of things did you have over there?

2      A      I had an extra diaper bag with diapers and some

3   wipes in there.   I believe I had a few bottles of formula and

4   a change of clothes.

5      Q      Did you have, did Brian ever purchase clothes or

6   items for the baby?

7      A      Yes, ma'am.

8      Q      And tell the jury what he purchased for the child.

9      A      He had purchased a pair of shoes, K-Swiss.

10      Q      And did you give him a gift in return for that?

11      A      Yes, ma'am, I did.

12      Q      What kind of gift did you give him?

13      A      I had gave him a teddy bear with a thank you note.

14      Q      What feelings did you have for the defendant, Brian

15   Herlihy, during this time period when you were separated from

16   your husband?

17      A      They were mixed feelings.   I thought it was love,

18   but it wasn't.

19      Q      Did you ever tell Brian that that's how you felt

20   about him?

21      A      I don't remember.

22      Q      Was there of a time when you and Brian discussed

23   breaking up?

24      A      I don't remember that either.

25      Q      Let's talk about the weekend before the Wednesday

1    of August the 2nd.  Can you go there in your mind?  That was

2    the weekend of June (sic) 29th and June 30th of the year

3    2000.  Are you there Crystal?  Do you remember where you were

4    that weekend?

5         A    That was in June?

6         Q    No.  I said June?  I'm sorry.

7         A    July.

8         Q    July 29th and July 30th.  I apologize, you're

9    correct.

10        A    Yes, ma'am.

11        Q    And where were you that weekend?

12        A    I was at my father's house.

13        Q    Who was with you?

14        A    John and Robbie.

15        Q    Had you returned to John to live with him and

16   Robbie as a family on the Morrison property before you went

17   to Jacksonville the weekend of July 30th?

18        A    I believe so, yes.

19        Q    And what was the purpose of going to Jacksonville

20   the weekend of July 30th?

21        A    It was my father's birthday.

22        Q    And your father's name is?

23        A    Richard Davis.

24        Q    What did you all do that weekend?

25        A    I don't remember what we did on the Saturday, but I

1  know we went to church Sunday morning and I believe we went

2  Sunday evening, and then we all went out and celebrated his

3  birthday at Applebee's.

4      Q    Where was that Applebee's located?

5      A    On 103rd Street in Jacksonville, Florida.

6      Q    Who was at this celebration for your father's

7  birthday?

8      A    Me, John, Robbie, my stepmother, some really good

9  friends of my dad, Joel and Mikey Allen, and I don't recall

10 who else was at Applebee's.

11     Q    And can you describe for us how Robbie was taken

12 care of during the time period that you were at Applebee's

13 with your family and friends celebrating your dad's birthday?

14     A    Yes, ma'am.  He was in good care.  He was laughing

15 and making his little sounds like usual with a smile on his

16 face.

17     Q    What kind of sounds did he make?

18     A    A lot of times it was gooing and he acted like he

19 tried to laugh a little bit.

20     Q    Who was responsible for him during his birthday

21 party?  Who had, who took care of him or had him most of this

22 time?

23     A    My dad and my stepmom.

24     Q    Now, your dad and your stepmom had taken care of

25 Robbie before and had him for the weekend or had him for

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1    visits before; is that correct?

2        A    Yes, ma'am.

3        Q    How would he get up to Jacksonville to visit with

4    his grandparents?

5        A    Me and John had met my stepmom halfway and then she

6    took him on to my dad's.

7        Q    Was there of a time when your sister came and

8    picked him up?

9        A    Yes, ma'am.

10       Q    Whenever your son would go to visit his

11   grandparents, or his aunt, your sister, did he ever come home

12   with any bruises or any kind of injuries that concerned you?

13       A    No, ma'am.

14       Q    Did you ever see anything on his person that

15   suggested he had been abused or mistreated in the care of

16   your parents --

17       A    No, ma'am.

18       Q    -- or your sister?

19       A    (Shakes head.)

20       Q    Now, we're going to Monday, July 31st.  Did you go

21   to work that day, Crystal?

22       A    I don't remember.

23       Q    Did you have contact with Brian Herlihy that day?

24       A    I don't remember.

25       Q    By the week of July 31st, starting the Monday, was

1  Robbie rolling?

2      A    No, ma'am.

3      Q    What he was doing?

4      A    He had probably be able to do a half a roll, but he

5  could never do a consistent roll.

6      Q    You need to describe what that means by just

7  talking about body parts and how you would see him act so the

8  jury can get a picture of what you were seeing of Robbie

9  during that time period.

10     A    If you would lay Robbie down on the floor, or the

11  couch, or the bed, and sit there and watch him, he would kick

12  his legs so hard that he would get himself turned halfway

13  over and then you would have to finish the roll, get him

14  rolled over.

15     Q    Would this be on his chest facing down on the bed

16  that he would be pushing himself up?

17     A    On his chest he would kind of wiggle his fanny a

18  little bit and get halfway over.  But if he was on his back

19  he would try to kick his leg over the other one to get turned

20  over.

21     Q    Was he able to roll from his chest laying on the

22  bed to his back?

23     A    Halfway.

24     Q    Was he able to roll from his face looking up to the

25  ceiling face up?

1       A     Halfway.

2       Q     On Tuesday, August 1st, next day of that week, do

3  you remember where Robbie was staying at that point?

4       A     No, ma'am.

5       Q     You were staying with John?

6       A     I believe so, yes.

7       Q     Where would have Robbie been staying during those

8  two weekdays that you were working, who would have been

9  taking care of him?

10      A     I'm not for sure but it was probably Doris

11 Bridwell.

12      Q     Why is it that you can't remember that, Crystal?

13      A     I, I, I just, I don't remember.  A lot of time has

14 passed and there's quite a few things that I can't remember.

15      Q     Do you remember that on the evening of August 1st

16 you had some plans with John?

17      A     Yes, ma'am.

18      Q     And what were those plans?

19      A     We're supposed to go look at some property.

20      Q     Do you know where Robbie was when you and John were

21 going to go ahead and go and look at some property?

22      A     I believe he was with me.

23      Q     What -- did there come a time when he was at

24 Doris's house while you were with John?

25      A     Yes, ma'am.

1      Q    It was pretty routine for you to take the baby to

2   Doris's if you and John needed to run errands or be with

3   yourselves?

4      A    Yes, ma'am.

5      Q    Do business?

6           Now, let's move to August 2nd.  The night of August

7   the 1st, where did you stay?

8      A    I stayed at John's.

9      Q    And who else was there besides you and John?

10      A    And Robbie.

11      Q    Was there anything about Robbie's demeanor or

12   actions that caused you any alarm or concern the evening of

13   August 1st, the day, the night before the day that he was

14   critically injured?

15      A    No, ma'am.

16      Q    Do you remember getting Robbie ready the next

17   morning?

18      A    Yes, ma'am.

19      Q    Were you working that day or were you off that day?

20      A    I was off that day.

21      Q    And had you had a discussion with John about going

22   to Cedar Key?

23      A    Yes, ma'am.

24      Q    What did you tell John about going to Cedar Key?

25      A    That me and Robbie were going to spend the day

1    there.

2         Q    What was his thoughts on that?

3         A    He didn't want us to go at first but he finally

4    gave in.

5         Q    Why was it that he didn't want y'all to go at

6    first?

7         A    He was real funny about me putting Robbie in an

8    automobile with just me.

9         Q    Because you had a car accident?

10        A    Yes, ma'am.

11        Q    You had all the safety implements, all the safety

12   equipment for the baby to travel in the vehicle, did you not?

13        A    Yes, ma'am.

14        Q    Did you have plans to go to Cedar Key with anyone

15   else that day?

16        A    Yes, ma'am.

17        Q    And who was it that you had planned to go to Cedar

18   Key with that day?

19        A    Brian Herlihy.

20        Q    Did you tell John that you were going to go with

21   the defendant, Brian Herlihy?

22        A    No, ma'am.

23        Q    And why was it that you didn't tell John?

24        A    I didn't want to let him know.

25        Q    And there was a reason?

1        A      Yes, ma'am.  I didn't want him to find out that I

2    was seeing somebody else.

3        Q      How did you dress Robbie that morning?

4        A      Put him in a little blue onesie that had ESPN on

5    it, with white socks, and I believe he had his little

6    K-Swisses on.

7        Q      And why is it that you dressed him that way?

8        A      Because when I purchased the outfit when he was in

9    premie clothes and we thought it was really cute.  We were

10   excited because he just got to the point where he was able to

11   fit into it.

12       Q      Where did you go after you dressed Robbie?

13       A      Airborne Express.

14       Q      Where it Airborne Express, where is it located in

15   Gainesville?

16       A      I believe it's off of 34th Street.

17       Q      Is that by the post office, Southwest 34th Street?

18       A      Yes, ma'am.

19       Q      And you went there from Archer?

20       A      Yes, ma'am.

21       Q      And how would you have you traveled to get there

22   from Archer?

23       A      In my car.

24       Q      And what road would you have taken?

25       A      Archer Road to 34th.

```
 1        Q    And then you went to Airborne Express.  Who was
 2   there when you got to Airborne Express?
 3        A    My husband John and his best friend, Yantz.
 4        Q    Was there anyone else there that you can remember?
 5        A    Secretary, but I didn't really see her at all.
 6        Q    When you got there do you know about what time you
 7   got there, Crystal?
 8        A    I don't recall.
 9        Q    When you got there, how was the baby?
10        A    He was excited, gooing, smiling.
11        Q    How did he do when he was seeing the folks at
12   Airborne Express?
13        A    I believe he had a smile on his face and he was
14   gooing because his daddy was playing with him.
15        Q    Had you taken him to Airborne Express before to
16   show him off?
17        A    I think we did when we first brought him home.
18        Q    About how long did you stay there?
19        A    I don't recall the exact time.
20        Q    Few minutes or a few hours?
21        A    Few minutes.
22        Q    Was there any change in Robbie's behavior from the
23   time that you first got to Airborne Express to the time you
24   were putting him back in the car to leave Airborne Express?
25        A    No, ma'am.
```

```
 1        Q    Was there any discussion between you and John about

 2   where you were going to be heading off for the rest of the

 3   day?

 4        A    I just told him that we were going to go to Cedar

 5   Key and that we would try to be home early.

 6        Q    Did he express to you whether or not he still

 7   continued to not be in favor of that trip?

 8        A    I don't think so.

 9        Q    Did you ever tell John that you were going with

10   someone else?

11        A    No, ma'am.

12        Q    From Airborne Express on Southwest 34th Street,

13   where did you go?

14        A    Brian Herlihy's.

15        Q    And do you remember where he lived?

16        A    Not exactly, no, ma'am.

17        Q    Is it in Alachua County?

18        A    I believe so, yes.

19        Q    Where is it located in respect to P.K. Yonge Lab

20   School, do you know where P.K. Yonge Lab School is?

21        A    No, ma'am.

22        Q    You went to Brian Herlihy's residence?

23        A    Yes, ma'am.

24        Q    And what did you see when you got to the residence?

25        A    He was outside.
```

1      Q    What was he doing?

2      A    I don't remember exactly what he was doing.   I

3  think he was messing with his truck at the time.

4      Q    What happened when you got there?

5      A    We spoke for a little bit outside.

6      Q    And what was the discussion about?

7      A    Whether or not he was going to go to Cedar Key.

8      Q    What did he say?

9      A    That he didn't think he was going to go.

10     Q    Did you indicate whether you would be going whether

11  he went or not?

12     A    Yes, ma'am, I did.

13     Q    And was there a decision made on what vehicle you

14  were going to use?

15     A    Yes, ma'am.

16     Q    And what was the decision on the vehicle?

17     A    That I can use the truck.

18     Q    Whose truck?

19     A    Brian Herlihy's.

20     Q    And why is it that you were allowed to use his

21  truck as opposed to using your vehicle?

22     A    I believe it had to do with something because his

23  vehicle was more reliable.

24     Q    Do you remember that?

25     A    Vaguely, yes, ma'am.

1    Q    Was there a car seat available for Robbie in Brian

2 Herlihy's truck?

3    A    The one out of my car.

4    Q    You would have taken that seat and put it in the

5 truck?

6    A    Yes, ma'am.

7    Q    Before you were going to leave for Cedar Key, were

8 there some errands that had to be run?

9    A    Yes, ma'am.

10    Q    Tell us about that.

11    A    I left Robbie in Brian's care and took the truck,

12 put gas in it, and then I ran to the laundromat for him and

13 picked up some dry cleaning for him.

14    Q    Okay.  Was there a discussion -- before we get to

15 what you did, was there a discussion between you and Brian

16 about doing some errands?

17    A    Yes, ma'am.

18    Q    What was the discussion between the two of you

19 about doing some errands?

20    A    He had asked if I would pick up the laundry as I

21 was gassing up the truck.

22    Q    Did he ask you to do anything else while you were

23 at the laundromat?

24    A    Yes, ma'am.

25    Q    What else?

1    Q    And are both of these documents in the same or

2    similar condition to when you got them from the gas station

3    and from Suds 'N Duds?

4    A    Yes, ma'am.

5         MS. SINGER:  Your Honor, at this time I would ask

6         that they be marked into evidence, State's Exhibit A, to

7         be the next numbered exhibit in evidence; State's

8         Exhibit B being the next number.

9         MR. GROLAND:  No objection.

10        THE COURT:  This will be 6 and 7 in evidence for

11        the state.

12        MS. SINGER:  Your Honor, I'm going to wait to

13        publish until the end of my direct if that would be all

14        right with the Court.

15        (State's Exhibit Nos. 6 and 7 were moved and

16   admitted into in evidence.)

17   BY MS. SINGER:

18   Q    You went to the gas station.  You went to get the

19   laundry, which you picked up.  You come back to the

20   apartment.  What do you see when you get there?

21   A    Bunch of fire trucks, paramedics, and police bikes.

22   Q    And where do you go when you see the fire trucks

23   and the paramedics?

24   A    Upstairs to Brian's apartment.

25   Q    And what do you see when you get to Brian's

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

```
 1   apartment.  Is the door open or closed?

 2        A    I believe it was open.

 3        Q    And where did you go when you went in?

 4        A    I walked in and saw Brian sitting on the couch and

 5   I went back to the back where I saw the paramedics standing.

 6        Q    And what were you told, Crystal, when you saw the

 7   paramedics standing -- did anybody tell you anything about

 8   what they were doing up there?

 9             MR. GROLAND:  Objection, Your Honor.

10             THE COURT:  Sustained.

11   BY MS. SINGER:

12        Q    In response to what you were told, what did you do?

13        A    I asked the paramedics what was going on and I

14   looked at Brian and I asked him what had happened.

15        Q    Now, could you get to Robbie at this time?

16        A    No, ma'am.

17        Q    Where was Robbie located?

18        A    Brian's bedroom.

19        Q    Where was he in Brian's bedroom?

20        A    I believe he was on the floor.

21        Q    How many people were around him?

22        A    There was a lot; I can't give a number.

23        Q    And you asked Brian what was going on?

24        A    Yes, ma'am.

25        Q    And what did he tell you?
```

```
 1        A     That Robbie had aspirated on his milk.

 2        Q     Did he give you any more detail than that at that

 3   point?

 4        A     No, ma'am.

 5        Q     Were you given any information from the paramedics

 6   as to the status of the child?

 7        A     They said that he was doing okay at that point and

 8   they were going to take him to Shands.

 9              MS. SINGER:  Your Honor, may I approach the witness

10        for a moment?

11              THE COURT:  Yes.

12   BY MS. SINGER:

13        Q     Where did they say they were going to take him?

14        A     To Shands.

15        Q     Were you to travel with him in the ambulance or

16   were you to go separate from them, from the ambulance?

17        A     Separate.

18        Q     While you were in the house did Brian say anything

19   more to you other than that Robbie had aspirated on his milk?

20        A     I don't remember.

21        Q     Who was going to go with you to Shands?

22        A     Brian did.

23        Q     And how soon after the ambulance left did you and

24   the defendant leave to go to Shands?

25        A     Right after.
```

1     Q     About how long did it take you to get to the
2   hospital?

3     A     Maybe three minutes.

4     Q     Were you there before the ambulance?

5     A     No.

6     Q     Where did you go once you got to the hospital?

7     A     Into the admissions part of the ER.

8     Q     Were you able to see the baby there?

9     A     No.

10    Q     Did you speak with any of the medical personnel who
11  were there?

12    A     Not at first, no.

13    Q     Were you given any report on the status of the
14  child when you got into the emergency room that morning?

15    A     Not at first, no.

16    Q     Once you got to the emergency room, did you ever
17  get to go back and see the baby?

18    A     Not for a while.

19    Q     About how long was it that you were able to -- did
20  you see the baby at all in the emergency department or was it
21  only when you got to the pediatric intensive care unit that
22  you could see the baby?

23    A     Caught a glimpse of him while he was in the ER, but
24  not very good, and I didn't really get to see him until he
25  got up to pediatrics.

1      Q    Did you see anyone else in the emergency room,

2   Crystal, that you recognized?

3      A    Yes, ma'am.

4      Q    Who did you see?

5      A.   Yantz.

6      Q    And did you have a conversation with Yantz?

7      A    I don't recall, no.

8      Q    Did you attempt to contact John about the baby

9   being in the emergency room?

10     A    Yes, I did.

11     Q    How did you attempt to contact him?

12     A    I called him at his job and had them dispatch him.

13     Q    At the time that you had John dispatched did you

14   know the status of the baby?

15     A    No, ma'am.

16     Q    Were you led to believe that the baby was doing

17   okay?

18          MR. GROLAND:  Objection, Your Honor.  I think that

19     is leading.

20          THE COURT:  Sustained.

21          MS. SINGER:  Your Honor, I'd like to argue that it

22     goes to her state of mind on her actions after.

23          THE COURT:  You can ask her about her state of

24     mind.

25   BY MS. SINGER:

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

```
 1        Q     What was your state of mind regarding the condition

 2   of the baby when you were in the emergency room, Crystal?

 3        A     I was really upset, kind of confused with what was

 4   going on.

 5        Q     Where did you believe Robbie was going to go that

 6   evening when he was in the emergency room?

 7        A     I thought he was going to go home with us.

 8        Q     Were you told anything different from that --

 9              MR. GROLAND:   Objection, Your Honor.

10              MS. SINGER:   -- when you were in the emergency

11        room?

12              THE COURT:   Objection is sustained.

13   BY MS. SINGER:

14        Q     Did there come a time when you asked emergency room

15   personnel whether they would need items in the diaper bag,

16   baby's diaper bag?

17        A     Yes, ma'am.

18        Q     Why is it that you asked questions about the baby's

19   diaper bag?

20        A     Because I thought that he was going to be able to

21   go home.

22        Q     And what did you ask members of the emergency room

23   staff?

24        A     That, if he was going to be okay or not.

25        Q     I can't hear you.
```

1       A    Sorry.  I asked if he was going to be okay.

2       Q    Did you ask whether or not you needed to do
3  anything for the baby?

4       A    I just asked if I needed to go get his diaper bag.

5       Q    What did they say?

6       A    That said that was fine.

7       Q    Where was the diaper bag located?

8       A    Back at Brian's apartment.

9       Q    How were you to get back to Brian's apartment to
10 get the diaper bag?

11      A    I took Brian's truck back and exchanged his truck
12 to my car.

13      Q    Where was the defendant at that time?

14      A    Don't know.

15      Q    Pardon?

16      A    I don't know.

17      Q    Did he ever go back to the apartment with you to
18 your knowledge?

19      A    No.

20      Q    Pardon me.  Let me straighten that out.  I know
21 it's getting late.

22           Did he ever go back to the apartment with you?

23      A    No, ma'am.

24      Q    Do you know whether or not he ever went back to the
25 apartment?

1      A      No, ma'am.

2      Q      Once you got the diaper bag, did you return to

3   Shands Teaching Hospital?

4      A      Yes, ma'am.

5      Q      And at that time were you given an update on your

6   baby's condition?

7      A      Not right when I got there, no.

8      Q      How long did it take you to get to the apartment,

9   get the diaper bag, and come back?

10      A      Maybe five minutes.

11      Q      Once you got back did you have contact with law

12   enforcement personnel?

13      A      Briefly, yes.

14      Q      And what was that about, do you recall?

15      A      I don't recall.  I think it was a routine that they

16   call, got called to any child coming into the ER.

17      Q      Were you and Brian together at that time?

18      A      When I came back from Brian's?

19      Q      Yes?

20      A      No, ma'am.

21      Q      Did there come a time when you were interviewed by

22   Alan Coleman, who was an investigator with the Gainesville

23   Police Department?

24      A      I believe so, yes.

25      Q      Was that before or after John got to the hospital?

1    A    After.

2    Q    How soon after you got back with the diaper bag did

3  you meet up with John?

4    A    Maybe 15, 20 minutes, at the most.

5    Q    Did you have an opportunity to meet a man named

6  Kevin Putansu?

7    A    Yes, I did.

8    Q    Did you meet him first and have John meet him or

9  did the two of you meet him together?

10    A    I believe we met him together.

11    Q    Where was he located?  Was he in the emergency room

12  or some other part of the hospital?

13    A    Pediatrics.

14    Q    The intensive care unit?

15    A    Yes, ma'am.

16    Q    Did he bring both of you into his office?

17    A    Yes, ma'am.

18    Q    And for what purpose did he bring both of you into

19  his office?

20    A    To try to clarify what was going on.

21    Q    Had you told Kevin Putansu about the fact that you

22  were having a relationship with Brian Herlihy, the defendant

23  in this case?

24    A    I don't know if it was me that had told him, or if

25  he heard from somebody else.

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

```
 1        Q     But he was aware of it?

 2        A     Yes, ma'am.

 3        Q     And who would, who else would have known about it

 4   in the hospital that would have made him aware?

 5        A     I'm not for sure.

 6        Q     Had you told nursing staff or hospital staff that

 7   Brian Herlihy was your boyfriend, not your husband?

 8        A     No, ma'am, I don't believe so.

 9        Q     But somehow he got that information?

10        A     Yes, ma'am.

11        Q     Did he have a sit-down with you and John in his

12   office?

13        A     Yes, ma'am.

14        Q     Was it behind closed doors?

15        A     Yes, ma'am.

16        Q     And at that time were you questioned about your

17   relationship with the defendant, Brian Herlihy?

18        A     Yes, ma'am.

19        Q     Was that the first time you ever told John about

20   the defendant?

21        A     Yes, ma'am.

22        Q     Were you completely truthful when you were

23   questioned about it?

24        A     Not at first, no.

25        Q     What did you say, what did you first tell him
```

```
 1   happened with the baby?
 2       A    That Robbie was in my car and he aspirated on his
 3   milk.
 4       Q    Why was it that you told John and Kevin that that's
 5   how the baby was injured?
 6       A    Because I was scared.
 7       Q    And why did you use the term "aspirated on milk"?
 8       A    Because that's the term that Brian Herlihy used
 9   with me.
10       Q    So you integrated that into your explanation to
11   Kevin and to John?
12       A    Yes, ma'am.
13       Q    What did Kevin say when you said that, gave that
14   explanation?
15       A    About the aspiration?
16       Q    Yes.
17            MR. TEDDER:  Objection.
18            THE COURT:  Sustained.
19            MS. SINGER:  Sustained.  I know.  I know better.
20   BY MS. SINGER:
21       Q    What did you say in response, Crystal?  You can't
22   tell me what Kevin said, but after Kevin confronted you about
23   that story, what did you tell him in response?
24       A    I believe that Robbie was in my care, he aspirated
25   in my car, and it was shortly after that I told John that he
```

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1    was in Brian's care.

2        Q    Was it at that time that you told John in Kevin's

3    presence that, in fact, the baby was with the defendant,

4    Brian Herlihy, when he was injured?

5        A    Yes, ma'am.

6        Q    Was that the first time John had ever heard that to

7    your knowledge?

8        A    I'm not for sure.

9        Q    Did you pick up, was the baby in his onesie when he

10   was being transported to the hospital by EMS to your

11   knowledge?

12       A    No, ma'am.

13       Q    And do you know where the onesie was?

14       A    No, ma'am.

15       Q    Did you later go back to the defendant's apartment

16   to obtain the onesie?

17       A    I believe so.  I picked it up with the diaper bag.

18       Q    When you brought the baby to Brian was the onesie

19   clean?

20       A    Yes, ma'am.

21       Q    Was there any evidence or any showing of any kind

22   of milk or spit up or anything on the onesie when you turned

23   the baby over to Brian?

24       A    No, ma'am.

25            MS. SINGER:  Your Honor, if I may approach the

1    counsel for the defense?

2          May I approach the clerk, Your Honor?

3          THE COURT:  Yes.

4          MS. SINGER:  Your Honor, allow it to remain in its

5    bag, ask that the bag be marked and we can store it in

6    the bag.  I'd like it marked as the next lettered

7    exhibit for identification.

8          THE CLERK:  It would be C, Your Honor.

9          THE COURT:  Thank you.  There's no objection; is

10   that correct?

11         MR. TEDDER:  Yes, ma'am.  Mr. Groland, she asked if

12   there was any objection.

13         MR. GROLAND:  There's no objection, Your Honor.

14   BY MS. SINGER:

15   Q    Crystal, I'm going to show you what's been marked C

16   for identification.  Take a good look at it and tell me

17   whether or not you recognize it?

18   A    Yes, ma'am.

19   Q    And what is it?

20   A    The onesie that he had on when I left him at

21   Brian's.

22   Q    Now, is it in the same or similar condition to the

23   last time you saw it?

24   A    No, ma'am.

25   Q    And what is different about it from the last time

```
1          A     To file a complaint on one of the clerks.

2          Q     And do you remember what that was about?

3                MR. GROLAND:  Objection, Your Honor, it's not

4          relevant.

5                THE COURT:  Unless you want to argue that at the

6          bench, then the objection is going to be sustained.

7                MS. SINGER:  All right.  I'll pass it over for now.

8                THE COURT:  Objection sustained.

9                MS. SINGER:  As long as the witness is subject to

10         recall at some other time, if it becomes relevant, which

11         I feel it may be.

12    BY MS. SINGER:

13         Q     Once you had the discussion was it out by the truck

14    that all this discussion took place?

15         A     I believe so, yes.

16         Q     You had stuff with you.  What did you have, you had

17    the baby with you, were you carrying the baby?

18         A     I carried him out of the car, yes, ma'am.

19         Q     And I mean physically carry the baby or did you

20    carry the baby in the carrier?

21         A     I was physically carrying him.

22         Q     What else did you take out of the vehicle?

23         A     A diaper bag that I used.

24         Q     What did that diaper bag look like?

25         A     It was navy blue with white teddy bears on it.
```

```
 1        Q    Once the discussion about Cedar Key and the errands
 2   was had, where did you go?
 3        A    We walked upstairs.
 4        Q    Who is we?
 5        A    Me and Brian, and I had Robbie.
 6        Q    And why would you have walked upstairs?
 7        A    To set his diaper bag down.
 8        Q    What was upstairs in the apartment?  I mean, we're
 9   outside of the apartment.  Why are we walking up some stairs?
10        A    I don't recall the exact reason.
11        Q    Did he live on the top floor of the apartment
12   building or on the bottom floor of the apartment building?
13        A    Top floor.
14        Q    Was his entire apartment on the second floor of the
15   building?
16        A    Yes, ma'am.
17        Q    To get to his apartment you would have to take
18   stairs?
19        A    Yes, ma'am.
20        Q    Did you do that?
21        A    Yes, ma'am.
22        Q    Where was Brian?
23        A    He walked up with us.
24        Q    And what did you do when you got upstairs?
25        A    I don't really recall.  I don't think I went in the
```

```
 1   house all the way.  I think I just walked to the doorstep and

 2   dropped the diaper bag off.  I don't really remember.

 3        Q    About how much time do you believe you were up

 4   there, up by the apartment door before you turned around to

 5   leave to go run errands and get the gas?

 6        A    Maybe five, ten minutes.

 7        Q    What discussions were you having at that time?

 8        A    That he was going to let me know if he was going to

 9   go to Cedar Key or not when I got back.

10        Q    What did you do with Robbie before you left?

11        A    Gave him to Brian.

12        Q    Did you hand him over to Brian hand to hand?

13        A    Yes, ma'am.

14        Q    Did you ever go into the bedroom that morning?

15        A    I don't remember that.

16        Q    Had you fed Robbie that morning?

17        A    Yes, ma'am.

18        Q    And where did you first feed Robbie that morning?

19        A    I fed him before we left the house.

20        Q    And approximately how much did you feed him that

21   morning?

22        A    About four ounces.

23        Q    And this would be formula?

24        A    Yes, ma'am.

25        Q    Do you remember whether or not you were going to
```

1    feed Robbie again at the defendant's home?

2        A    Yes, ma'am, he needed to finish the rest of his

3    bottle.

4        Q    How many ounces is in the bottle?

5        A    We would normally give him an eight-ounce bottle

6    and break it up in four-ounce increments.

7        Q    Did you ever tell Mr. Herlihy to give Robbie the

8    bottle?

9        A    I believe so, yes.

10       Q    How was Robbie's demeanor when you handed him off

11   to the defendant?

12       A    He seemed to be fine.

13       Q    Was he crying?

14       A    No, ma'am.

15       Q    Was there anything that indicated to you that he

16   was unhappy in any way, dirty, needed changing, anything like

17   that?

18       A    No, ma'am.

19       Q    Smelled good?

20       A    Yeah.

21       Q    Sounded good?

22       A    Yeah.

23       Q    When you last saw Robbie in the care of Brian

24   Herlihy, was there anything whatsoever on his onesie that you

25   had dressed him in?

1      A    No, ma'am.

2      Q    He was clean?

3      A    Yes, ma'am.

4      Q    Once you left, Crystal, where did you go?

5      A    I went --

6      Q    Take us place by place.

7      A    I don't remember the name of the gas station, but

8  it was the gas station right there on the right after you

9  left Brian's home, put gas in the truck, then I left and went

10 to Suds 'N Duds and picked up his laundry and then came back

11 to the apartment.

12     Q    Where is Suds 'N Duds located?

13     A    It's down on Archer Road by, I believe there's a

14 Publix there and I think Wal-Mart is not too far from there.

15     Q    So you went to Suds 'N Duds.  How did you pay for

16 the laundry?

17     A    My debit card.

18     Q    How did you pay for the gasoline?

19     A    My debit card.

20     Q    About how long, if you are able to estimate, do you

21 believe you were away from Robbie to run these errands?

22     A    I estimated 25 minutes.

23          MS. SINGER:  Let the record reflect that we're

24     showing some items to the defense counsel.

25          I'd like to have these marked for identification,

1       Your Honor.

2              THE COURT:  Yes.  Mr. Clerk, what numbers would

3       they be, or letters would they be for identification at

4       this point?

5              THE CLERK:  A and B.

6              THE COURT:  A and B?  All right, then they may be

7       marked for the record then.

8              MS. SINGER:  May I approach the witness?

9              THE COURT:  Go ahead.

10   BY MS. SINGER:

11      Q    Crystal, I'm going to show you what's been marked

12   State's Exhibit B for identification and have you look at

13   this and tell me whether you recognize that?

14      A    Yes, ma'am.

15      Q    What is that?

16      A    That's the gas receipt.

17      Q    From the purchase of gas that you made on the 2nd

18   of August --

19      A    Yes, ma'am.

20      Q    -- year 2000?

21              I'm going to show you now what's been marked as

22   State's A for identification.  Do you recognize that?

23      A    Yes, ma'am.

24      Q    And what is that?

25      A    That was my receipt from Suds 'N Duds.

1   you saw it?

2       A    All these spots on it and up through here.

3       Q    Other than that, is it, in fact, the onesie that

4   Robbie was wearing at the time you turned the baby over to

5   Brian Herlihy?

6       A    Yes, ma'am.

7            MS. SINGER:  At this time, Your Honor, I'd like to

8       enter this into evidence as the next numbered exhibit

9       for the state.

10           THE COURT:  Any objection?

11           MR. TEDDER:  No objection, I don't believe, your

12      Honor.

13           MR. GROLAND:  No objection.

14           THE COURT:  Good enough.  It will be admitted as

15      the numbered --

16           THE CLERK:  State's Exhibit 8.

17           THE COURT:  Number 8 in evidence.

18           (State's Exhibit No. 8 was moved and admitted into

19   evidence.)

20           THE COURT:  Do you wish to publish this before the

21      jury?

22           MS. SINGER:  Your Honor, may I simply publish by

23      demonstrating by walking close by?

24           THE COURT:  Yes.

25           MS. SINGER:  Could we have an instruction to the

1    jury that they would be able to view this all at

2    deliberation.

3         THE COURT:  Any objection to an instruction at this

4    time as to the evidence during deliberation?

5         MR. GROLAND:  Your Honor, I have a problem with my

6    hearing.  Can I approach?

7         THE COURT:  Yes.

8         MS. SINGER:  I just wanted a brief instruction that

9    the evidence will be available at time of deliberation.

10        MR. GROLAND:  That's fine.

11        THE COURT:  Ladies and gentlemen, during your

12   deliberations, as far as I know, all of the items that

13   will be admitted into evidence will be available for

14   your inspection during deliberations.

15        (State's Exhibit 8 was published to the jury.)

16        MS. SINGER:  Thank you, Your Honor.

17   BY MS. SINGER:

18        Q    Crystal, you told John and the doctors a lot of

19   different stories about what happened to Robbie that day,

20   correct?

21        A    Yes.

22        Q    None of them were the truth, were they?

23        A    No, ma'am.

24        Q    And why was that?

25        A    Because I was scared.

```
1        Q     What were you scared of?

2        A     John finding out the truth and getting real upset

3   with me.

4        Q     What did you think would happen if John would found

5   ot the truth?

6        A     We would divorce.

7        Q     Did you want that?

8        A     No, ma'am.

9        Q     Did it happen?

10       A     Yes, ma'am.

11       Q     Had you ever done anything to harm Robbie Quirello,

12   your son?

13       A     No, ma'am.

14       Q     Is there any part of your testimony today, Crystal,

15   that is not the truth about what happened on August 2nd?

16             MR. TEDDER:  Objection, improper bolstering.

17             THE COURT:  Sustained.

18   BY MS. SINGER:

19       Q     Do you want to add anything about what happened on

20   August 2nd, year 2000, when you had turned the baby over to

21   Brian Herlihy that you have not told the jury here today?

22       A     No, ma'am.

23             MS. SINGER:  One moment, Your Honor.

24             (Pause in the proceedings.)

25             MS. SINGER:  No further questions at this time,
```

```
1     Your Honor.

2              THE COURT:  Mr. Groland, go ahead.

3              MR. GROLAND:  Thank you, Your Honor.

4              MS. SINGER:  I did want to publish the receipt

5     and -- the two receipts, but we can do that after the

6     cross-examination, Your Honor, if that's okay; otherwise

7     I guess I need to do it in my case, take a moment to

8     publish those receipts.

9              THE COURT:  Mr. Groland, want to hold up a second?

10             MS. SINGER:  Hold on and let me publish those

11     receipts.

12             (State's Exhibit Nos. 6 and 7 were published to the

13     jury.)

14             THE COURT:  Go ahead, Mr. Groland.

15                         CROSS-EXAMINATION

16     BY MR. GROLAND:

17     Q    Crystal, Ms. Singer asked you does this look

18     different than the last time you saw it and you said yes, it

19     does.  It didn't have any stains on it; is that correct?

20     A    Yes, sir.

21     Q    In fact, that's not quite accurate, is it?  You saw

22     it like this when you brought it to Detective Legall on

23     August 25th; isn't that true?

24     A    I didn't recognize the stains on it at the time.

25     Q    I'm sorry, I can't hear you.
```

1      A      I did not recognize the stains on it at the time.

2      Q      So what you're saying is it looks different today

3  in court than it did when you, yourself, delivered it to

4  Detective Legall at the Gainesville Police Department on

5  August 25th?

6      A      Yes, sir.

7      Q      And I'm not going to take it out and I don't want

8  to upset you any more than you are.  Tell us how it looks

9  different than when you delivered it to the detective.

10     A      The stains are on it unlike when I -- it was on

11 Robbie and when I passed Robbie over to Brian; the stains

12 were not on it.

13     Q      What I'm getting at, Crystal, is you're saying it

14 looks different today than it did when you took it to the

15 police on August 25th; is that what you're saying?

16     A      Yes, sir.

17     Q      All right.  Do you know how that happened?

18     A      No, sir.

19     Q      And where had this onesie been between August the

20 2nd and August 25th when you took it to the police?

21     A      I believe it was at Brian's apartment.

22     Q      And when did you go to Brian's apartment and

23 retrieve this before you gave it to the police?

24     A      I don't recall.

25     Q      You went back to Brian's apartment, didn't you,

1    after he was arrested?

2         A    Yes, sir.  I don't know if he was arrested at the

3    time or not.

4         Q    You know he was arrested the next day after Robbie

5    went in?

6         A    Yes, sir.

7         Q    Wasn't he in jail when you went back to his

8    apartment and got this?

9         A    Yes, sir.

10        Q    And what else did you do in the apartment when you

11   went back and retrieved this onesie?

12        A    Nothing else.

13        Q    And when did you do that, what date, or how many

14   days after Robbie went into the hospital did you go into

15   Brian's apartment and get this?

16        A    I don't recall.

17        Q    And did you keep it for a number of days before you

18   actually brought it to the police department?

19        A    I don't believe so, no.

20        Q    You don't remember?

21        A    No, sir.

22        Q    Do you remember if you went into Brian's apartment

23   on August 25th, which is the same day you brought it to Helen

24   Legall?

25        A    I don't know, sir.

1    Q    You don't know?

2    A    No, sir.

3    Q    How did you get into Brian's apartment?

4    A    I had a spare key that he had given me.

5    Q    And that's after the police removed his bed; isn't

6    that correct?

7    A    I believe so, yes.

8    Q    So when you went in there on the 25th, that's after

9    the police had gone in and removed whatever they'd taken; is

10   that correct?

11   A    Yes, sir.

12   Q    Did you ask anybody's permission to go in on

13   whatever date you went into Brian's apartment with the key

14   you had?

15   A    No, sir.

16   Q    And what was the very specific reason that you went

17   into his apartment on whatever date it was that you went in?

18   A    I was going to go pick up some belongings.

19   Q    And that's actually the second time that you were

20   in the apartment after you and Brian and the baby left to

21   bring Robbie to the hospital that day on the 2nd, right?

22   A    Yes, sir.

23   Q    Is there another time in addition to the two we're

24   just talking about?

25   A    I don't believe so, no.

1     Q    Did anybody go with you to Brian's apartment when

2   you picked this up?

3     A    No, sir.

4     Q    Had Detective Legall been asking you to see if you

5   could find the onesie and bring it to her?

6     A    I don't remember, no.

7     Q    Why did you bring it to her?

8     A    Because that was the last thing that he was in.

9     Q    Did it have any stains on it at all when you

10  retrieved it from Brian's apartment?

11     A    Yes, sir.

12     Q    Yes?

13     A    Yes, sir.

14     Q    And those stains are no longer on here but you're

15  saying there are different stains on here now?

16     A    The stains that are on there now is from the milk,

17  I believe.

18     Q    I'm sorry, Crystal, I really can't hear you.

19     A    I believe it's the stains that are on there from

20  the milk that were on there now.  When I picked it up to take

21  it to Detective Legall, I just grabbed that and really didn't

22  pay attention to it.

23     Q    When you gave that to Detective Legall, did you

24  tell her that you had just recently gone into that apartment

25  and retrieved that item for her?

1       A       Could you repeat that, please?

2       Q       When you gave that to the detective at the

3    Gainesville Police Department did you at the same time tell

4    her:  I just went into the Brian's apartment with the key

5    that I had kept and I got this for you?

6       A       Yes, sir.

7       Q       I'm sorry?

8       A       Yes, sir.

9       Q       You did.  Did she tell you you shouldn't be going

10   back into Brian's apartment?

11      A       Yes, she did.

12      Q       You did have that conversation with her?

13      A       Yes, I did.

14      Q       And you're sure of that?

15      A       Yes, sir.

16      Q       And what did you do with the key, did you give her

17   the key?

18      A       Yes, sir.

19      Q       And is that when you also -- strike that.

20              Crystal, the dry cleaning that you picked up that

21   morning for Brian?

22      A       Yes, sir.

23      Q       That was what some blankets -- what did you

24   actually pick up for him from Suds 'N Duds?

25      A       I really don't remember what cleaning it was.

1    Q    Have you ever told anybody that you and Brian

2  Herlihy left the hospital together and drove back to the

3  apartment while the baby was there?

4         MS. SINGER:  I'm going to lodge an objection to the

5     form of the question.  If this is impeachment, I think

6     we need to lay a better predicate.

7         THE COURT:  The objection is overruled.  Go ahead.

8  BY MR. GROLAND:

9    Q    Do you understand the question?

10   A    Repeat it, please.

11   Q    Have you ever told anybody that after Robbie was in

12 the hospital that morning, you and Brian Herlihy together

13 went back to his apartment?

14   A    No, sir.

15   Q    You specifically did not tell your husband John

16 Quirello that at any time?

17   A    No, sir.

18   Q    When your husband got to the hospital that morning

19 did you tell him at any time, Don't believe what Yantz Enoch

20 tells you?

21   A    I don't believe so, no.

22   Q    Have you talked to your husband today?  Your

23 ex-husband, I'm sorry.

24   A    This morning, yes.

25   Q    Before today when was the last time you spoke to

1    John?

2         A    I don't really remember.  I believe it was sometime

3    last week.

4         Q    You talked on the phone?

5         A    Yes, sir.

6         Q    You said on your direct examination in response to

7    a question by Ms. Singer that you remember meeting John in

8    the hospital about 15 or 20 minutes after you got back from

9    Brian Herlihy's apartment.  Do you remember that?

10        A    I believe so, yes.

11        Q    You just said that today?

12        A    Yes, sir.

13        Q    Do you remember where in the hospital you and John

14   first met?

15        A    It was outside, I believe.

16        Q    John indicates that he saw you coming out of the

17   parking garage and that's when he met you; is that correct?

18        A    I met him around the parking garage because I saw

19   him pull up, yes.

20        Q    You were just coming back from Brian Herlihy's

21   apartment and John got there, right?

22        A    No, sir.

23        Q    What were you doing coming out of the parking

24   garage at that point?

25        A    I was waiting for John to pull up.

1    Q    You said, in response to some questions by

2   Ms. Singer, that you had told some stories that were not true

3   to Kevin and at the hospital, namely that the baby had

4   aspirated while in the car with you and then you told the

5   truth about that it happened at Brian Herlihy's apartment?

6    A    Yes, sir.

7    Q    Those are the only two stories that you told at

8   that point to people at the hospital?

9    A    I don't recall.

10    Q    Do you remember telling a third story and that is

11   that the baby was actually over at some girlfriend's house

12   and that's where the incident occurred?

13    A    No, sir.

14    Q    You did not say that?

15    A    No, sir.

16    Q    Did I hear you say that regarding Robbie's clavicle

17   that you were told by doctors that they were not sure if that

18   happen before or after his birth?

19    A    Correct.

20    Q    Who told you, and under what circumstances were you

21   told, that the injury to his clavicle may have happened after

22   his birth?

23    A    Could you repeat that, please?

24    Q    Who told you, which doctor, if it was a doctor,

25   told you that the injury to Robbie's clavicle may have

1    happened after Robbie's birth?

2           MS. SINGER:  I'm going to object, hearsay, Your

3       Honor.

4           THE COURT:  Sustained.

5           MR. GROLAND:  Your Honor, she testified --

6           THE COURT:  The objection is sustained.

7           MR. GROLAND:  Okay.

8    BY MR. GROLAND:

9       Q    You were asked the question about when John found

10   out about Brian Herlihy and you said, I believe, that he

11   found out that day at the hospital?

12      A    Yes, sir.

13      Q    Is that how it was?

14      A    Yes, sir.

15      Q    Page 65.  Do you remember giving a deposition in

16   this case on June 20th, 2002?

17          MS. SINGER:  Your Honor, if I could review Page 65

18      first?  I believe it may call for a hearsay answer.

19          THE COURT:  Also you need to give a copy of the

20      deposition to the witness.

21          MR. GROLAND:  Line 13.  Do you remember this

22      question?

23          THE COURT:  Wait a minute.  Do you have a copy of

24      the deposition for the witness?

25          MR. GROLAND:  Oh.

1    BY MR. GROLAND:

2        Q    Do you remember this question by me:  Do you

3    remember your husband finding out that day that you were

4    having a relationship with Brian Herlihy?

5             Question:  Did he find out that day?

6             Your answer:  John kind of knew beforehand.

7             Did you say that then?

8        A    Yes, sir, because he was receiving phone calls at

9    work.

10       Q    So the answer to the question then is he knew

11   beforehand?

12       A    He suspected, but he did not know for sure, no.

13       Q    Your testimony earlier this afternoon was that John

14   said it was okay to go to Cedar Key with Robbie, that he

15   finally gave in?

16       A    Yes, sir.

17       Q    Are you sure that he didn't tell you not to go,

18   your car wasn't safe to go, and that he didn't want the baby

19   riding around in the back of the car on a trip that long?

20       A    I don't remember that, no.

21       Q    You don't remember?

22       A    No, sir.

23       Q    Do you remember telling your husband after you left

24   his work that:  Okay, I'm not going to go.  I'm going to go

25   do some errands and I'm going to go home?

1    Q    And they did not have those kinds of things at the

2    pediatric care unit at the hospital?

3    A    I'm sure they did.

4    Q    And you're telling this jury that they told you to

5    go home, that it was okay to go home?

6    A    They told me that I can run and pick up his diaper

7    bag, yes.

8    Q    And at that point you knew John was on his way;

9    isn't that correct?

10   A    Yes, sir.

11   Q    And, Crystal, isn't it true that you went back to

12   Brian's apartment to change vehicles, to take his Ford

13   Explorer back, leave it there, and get your vehicle and come

14   to the hospital?

15   A    Yes, sir, I picked up my car.

16   Q    And isn't that the reason why you went back there,

17   because you didn't want John to know that your car was

18   somewhere else?  Isn't that the truth?

19   A    No, sir.

20   Q    It's not the truth?

21        MR. GROLAND:  Mark this for identification.

22        MS. SINGER:  Can I see it please?

23        THE COURT:  Show it to the state.

24        MR. GROLAND:  I'm going to mark three photographs.

25        THE COURT:  No objection, is that correct?

```
 1              MS. SINGER:  No objection to having them marked for
 2        identification.
 3              THE COURT:  Good enough.  Go ahead and mark them
 4        for identification as A, B, and C for the defense.
 5   BY MR. GROLAND:
 6        Q     Crystal, let me show you three photographs, Defense
 7   Exhibit A, B, and C for identification, and ask you if you'd
 8   take a look at those, please, and tell me if you recognize
 9   what is depicted in these photographs.
10              Do you recognize, is that the inside of Brian's
11   apartment?
12        A     I believe so, yes.
13        Q     I'm sorry?
14        A     Yes, sir.
15        Q     And do you see a bag of what looks like dry
16   cleaning on the bed?
17        A     Yes, sir.
18        Q     And that, in fact, is the dry cleaning that you
19   picked up that morning from Suds 'N Duds; isn't that correct?
20        A     I believe so, yes, sir.
21        Q     And when did you put that in the apartment?
22        A     I don't remember taking it into the apartment.
23        Q     Ever?
24        A     No, sir.
25        Q     Can you tell me again what type of work you're
```

1   doing now?

2        A    I'm currently working at a hospital in Indiana.

3        Q    And what do you do there?

4        A    Certified phlebotomist.

5        Q    How long have you been working there?

6        A    Right at a month.

7        Q    Have you been employed during the last two years

8   other than this job?

9        A    Yes, sir.

10       Q    Where?

11       A    Yes, sir.

12       Q    I said where.

13       A    Sorry.  I was assistant manager at Cer-Tech

14   Biologicals in Orlando, Florida.

15       Q    Where is that and when did you work there?

16       A    I don't recall the exact dates, but sometime now.

17   It was in Orlando though.

18       Q    Do you recall when we met for me to take your

19   deposition in June I asked you when was the last time before

20   that you had spoken to Helen Legall?

21       A    Vaguely, yes, sir.

22       Q    Do you remember when that was?

23       A    I believe it was in March.

24       Q    Of this year?

25       A    Yes, sir.

1    Q    Did you talk about the details of the case at all

2 or did she reinterview you, or did you just check in with her

3 to see what the status of the case was?

4    A    I just checked in to see what the status of the

5 case was.

6    Q    Did you have any conversation with her at that time

7 about anything, about the earlier injuries to the child's

8 brain?

9    A    No, sir.

10    Q    She didn't ask you about that?

11    A    No, sir.

12    Q    Have you ever had a discussion with her about the

13 findings of the radiologist who saw an earlier injury in the

14 CAT scan?

15    A    I don't believe so.

16    Q    Do you remember talking to Helen in her office

17 after the baby was in the hospital?

18    A    I'm not for sure.

19    Q    The same Detective Legall that you talked to in

20 March, did you have an in-depth conversation with her about

21 her investigation of this case?

22    A    Could you repeat that, please?

23    Q    The same lady we're talking about, the same person,

24 Helen Legall, did you, back in August when this all happened,

25 did you have a lengthy conversation with her at any time?

```
1        A     I believe so, yes.

2        Q     That was in her office?

3        A     I don't recall where it was at.

4        Q     You don't remember?

5        A     No, sir.

6        Q     Do you remember how long you talked to her?

7        A     No, sir, I don't.

8        Q     Had you, before June of this year when I took your

9   deposition, talked to anybody about the CAT scan showing a

10  prior injury?

11       A     It was mentioned to me long after Robbie had passed

12  but I don't recall who had brought it up.

13       Q     Someone mentioned it to you?

14       A     Yes, sir.

15       Q     You remember who it was?

16       A     No, sir, I do not.

17       Q     So is your answer you don't recall the name of any

18  person you have ever discussed it with?

19       A     No, sir.

20       Q     Have you ever discussed it with anybody in your

21  family that you now recall?

22       A     I asked about it, yes.

23       Q     Who did you discuss it with?

24       A     I asked my father if he knew anything about it.

25       Q     When did you have that conversation with your dad?
```

1    A    We've had it on and off.

2    Q    Tell me about this conversation you had about this

3  specific area?

4         MS. SINGER:  I'm going to lodge an objection.

5         Calls for hearsay, possibly, and also I question the

6         relevancy.

7         THE COURT:  The objection is sustained.

8  BY MR. GROLAND:

9    Q    You told us today, and you told me before, that

10  during your pregnancy you did have a difficult time?

11   A    I was sick all the time, yes.

12   Q    Would you say 90 percent of the time you were sick?

13   A    Yes, sir.

14   Q    And in bed?

15   A    On and off bed rest, yes.

16   Q    If you were sick 90 -- when I say and in bed, I

17  guess I mean were you in bed 90 percent of the time during

18  your pregnancy?

19   A    No, sir.

20   Q    What percentage of your time would you say during

21  your pregnancy you were so sick that you were unable to work?

22   A    I'm not for sure.

23   Q    Is it true that several times during your pregnancy

24  you were so sick that you were actually losing weight instead

25  of gaining weight?

```
 1        A    Yes, sir.

 2        Q    You have previously described the delivery as being

 3   a breech delivery; is that correct?

 4        A    I don't recall.

 5        Q    Do you know what a breech delivery is?

 6        A    I believe it's where the child is turned around.

 7        Q    Was Robbie turned around during the delivery?

 8        A    I don't think he was turned around fully, no.

 9        Q    Do you remember this question --

10             MS. SINGER:  Page please, line.

11             MR. GROLAND:  I'm sorry?

12             MS. SINGER:  Page and line.

13   BY MR. GROLAND:

14        Q    June 20th depo, pardon me, Page 14, Line 11.

15   Remember this question -- do you want to see it?

16        A    Yes, sir, please.

17        Q    Question, Line 11:  Okay.  Did you have a difficult

18   delivery?  It's been reported to me you told some people that

19   you had a quote, unquote, difficult delivery.  That was the

20   question.

21             Your answer: If I recall, he was turned around and

22   they had to face him the proper way, and he had the umbilical

23   cord wrapped around his neck, not tight, but it was wrapped.

24   So that was the only complication that the doctor ran into.

25             My question:  When the baby is turned around, is
```

```
1    that a breech baby?

2            Answer:  Yes, sir.

3        A    Yes, sir.

4        Q    Was that your understanding that the baby was

5    breech?

6        A    I don't think he was fully breeched but they did

7    have to reposition him the proper way.

8        Q    Crystal, is it true that when you were a youngster

9    you, yourself, aspirated, lost consciousness, and your father

10   had to give you CPR?

11           MS. SINGER:  I'm going to go ahead and lodge an

12       objection as to the relevance to that question.

13           THE COURT:  Sustained.

14   BY MR. GROLAND:

15       Q    You mentioned something about yourself being born

16   with a broken collarbone?

17       A    Yes, sir.

18       Q    Do you think that there is some correlation there

19   that this is something genetic as opposed to something

20   happening during or after the delivery?

21           MS. SINGER:  Before you answer I'm going to lodge

22       an objection.  Beyond the scope of this witness to

23       answer, she's not an expert, and it's irrelevant.

24           MR. GROLAND:  She asked the question.

25           THE COURT:  The objection is sustained.
```

1  BY MR. GROLAND:

2      Q    Let's talk for a minute about the car accident.  Do

3  you remember the date?  You said it was July -- I'm sorry,

4  January?

5      A    I believe it was January the 10th.

6      Q    2000?

7      A    Yes, sir.

8      Q    So that you would have been in your sixth month or

9  fifth month?

10     A    Around that.

11     Q    The baby was due to be born in April, around

12  April 20th.  Does that sound about right?

13     A    Yes, sir.

14     Q    In fact, Robbie was born on March 22nd?

15     A    Correct.

16     Q    That was during the eighth month and this accident

17 happened two months before that, so the accident was during

18 your sixth month of carrying your child?

19     A    Yes, sir.

20     Q    You were taken by ambulance to the hospital?

21     A    Yes, sir.

22     Q    The car was towed from the scene?

23     A    I believe so, yes.

24     Q    You had your seat belt on across your tummy?

25     A    Yes, sir.

```
 1        Q    I think I recall you told Ms. Singer that you had

 2   slight stomach pains?

 3        A    Yes, sir.

 4        Q    Have you previously described it at any time as

 5   severe stomach cramping?

 6        A    I don't believe so, no.

 7        Q    Page 18, Line 7.  Do you remember this question and

 8   your answer:  Did you report any injuries to the police?  I

 9   mean, is the accident report going to indicate that you

10   complained of pain?

11             Your answer:  The only pain that I complained of

12   was having severe stomach cramping at the time.

13        A    I had some cramping, yes.

14        Q    I'm sorry?

15        A    I had some cramping, yes.

16        Q    Did you have severe cramping at the time?

17        A    I don't remember at this point, no.

18        Q    You don't remember now?

19        A    No, sir.

20        Q    Did you remember back in June when I took your

21   deposition?

22        A    Yes, sir.

23        Q    Did you remember in June of this year better than

24   you're remembering now in September of this year?

25        A    Yes, sir.
```

1    Q    Did you ever have cramping like that before at any

2  time during your pregnancy, any -- in terms of the severity

3  of the cramping, was that as bad as it ever was?

4    A    I believe so, yes.

5    Q    Did you think the child was injured at that time?

6    A    I wasn't for sure.

7    Q    Did you think it was either you or the child that

8  had an injury?

9    A    Yes, sir.

10   Q    Which hospital did you go to, Crystal?

11   A    AGH.

12   Q    You stayed in the hospital for how long?

13   A    About a week.

14   Q    And Robbie was born about four weeks later.  I'm

15  sorry, my mistake about two months later?

16   A    Yes, sir.

17   Q    And did you go back to the hospital again for

18  severe cramping before Ronnie (sic) was born?

19   A    I don't recall.

20   Q    Did you go back to the hospital for any reason

21  during that period of time?

22   A    Periodic checkups.

23   Q    Did you ever go back to the hospital and get

24  readmitted for observation during that period of time?

25   A    I don't remember.

1      Q    And after you got out of the hospital in January

2   you went home and stayed in bed for a while?

3      A    Yes, sir.

4      Q    Did you ever go back to work?

5      A    Yes, sir.

6      Q    How long did you stay home in bed?

7      A    I don't remember.

8      Q    Is it true, Crystal, that you believed that the

9   fact that Robbie was born one month prematurely was due to

10  the heavy impact accident that you were in?  Did you ever

11  tell anybody that?

12     A    I don't recall, no.

13     Q    Do you remember telling Detective Legall that, what

14  I just said, that the reason for Robbie's being born

15  prematurely was because of this accident?

16     A    I don't remember that.

17     Q    When you were in the hospital following this

18  accident, in fact, didn't you and other people think you were

19  going to deliver then and there?

20     A    They suspected, yes.

21     Q    Did you ever tell Detective Legall about this

22  accident?

23     A    I don't remember conversations that me and

24  Detective Legall has had.

25     Q    The what?

1      A    I don't remember conversations that me and

2  Detective Legall has had.

3      Q    Do you remember how many times you visited with

4  Dr. Hellrung, your baby's pediatrician?

5      A    I can't give you exact times but it was every time

6  the baby was due to go in.

7      Q    Did you ever learn from him about the baby's

8  underdeveloped neck muscles?

9      A    Yes, sir.

10     Q    Did he tell you about any special way to treat

11 Robbie because of his concern about that?

12     A    Yes, sir.

13     Q    Tell me what he told you about how to handle

14 Robbie.

15     A    To handle with extra care.

16     Q    Did he tell you anything abut that being related to

17 neurological problems that he suspected?

18     A    I don't remember.

19     Q    You don't remember that?

20     A    No, sir.

21     Q    Did you say that you and John had marital problems

22 throughout your marriage?

23     A    On and off, yes.

24     Q    During the month of July of 2000, before Robbie got

25 this injury, did you one time when you were angry in general

1    throw Robbie on the bed?

2         A    No, sir.

3         Q    During your marriage to John, the police came out

4    several times?

5         A    Yes, sir.

6         Q    Did you try to attack John once with a knife?

7         A    No, sir.

8         Q    Did you threaten to John with knife in hand that

9    you were going to end your own life?

10        A    No, sir, I did not.

11        Q    How many times would you say the police came out to

12   your house in Archer where you lived with your husband?

13        A    I don't know the exact count.  I would say less

14   than five.

15        Q    Five times?

16        A    Less than that.

17             MS. SINGER:  I'm going to object to the restatement

18        of the testimony when she said less than five.  I'm

19        objecting to the attorney's restatement.

20   BY MR. GROLAND:

21        Q    Less than five times?

22        A    Yes, sir.

23        Q    Could it have been as many as five?

24        A    Yes, sir.

25        Q    And on those five, we're talking about five

1    occasions, while Robbie was, after Robbie was born; is that

2    correct?

3         A    I don't remember if they were before or after that.

4              THE COURT:  Mr. Groland, we're going to need to

5         take a recess unless you have a couple more questions.

6              MR. GROLAND:  I'm going to be a few more minutes.

7              THE COURT:  Why don't we go ahead and recess now

8         rather than push the court reporter much longer, or the

9         jury.  We're going to take a 15-minute recess.

10             The courtroom will be cleared during the recess.

11             MS. SINGER:  Can we discuss a logistical matter

12        after the jury is out?

13             THE COURT:  Yes.

14             (The jury exited the courtroom.)

15             (A discussion was held off the record.)

16             (A recess was taken from 5:20 until 5:38.)

17             THE COURT:  Are we ready to continue?

18             MS. SINGER:  Yes.  And while we have the jury out,

19        I believe Mr. Groland and I did review the medical

20        records of Dr. Hellrung.  We clipped together a portion

21        of records that we agreed did not need to be admitted

22        into evidence.  I will -- I think it's legal

23        correspondence, subpoenas, and letters that Mr. Groland

24        wrote to Dr. Hellrung.  I would ask the Court to allow

25        me to take custody of those records upon stipulation of

1   counsel and I will hold onto those records if there's

2   ever an issue about them, but I believe that there will

3   not be.

4        THE COURT:  Is that your request, Mr. Groland?

5        MR. GROLAND:  That's fine.

6        THE COURT:  Is that your request?  Because what

7   you're both asking me to do at this time is remove items

8   that have been admitted into evidence, so unless the

9   defense is specifically requesting it, I'm not going to

10  do it.

11       MR. GROLAND:  Yes, it's a joint request.  We both

12  should have looked more carefully at the exhibit before

13  it went in and we didn't.  And we're in total agreement

14  that what's in there now should go into evidence.

15       MS. SINGER:  If you want, I'd like to have

16  Mr. Herlihy agree that that's okay with him.

17       MR. GROLAND:  Okay.  I'll just tell him what we're

18  doing.

19       I told you regarding about Dr. Hellrung's file

20  we're taking some items out that relate to legal matters

21  and you're in agreement that we can do that?

22       THE DEFENDANT:  Yes, sir.

23       THE COURT:  Good enough.  They'll be removed.

24       MS. SINGER:  And I will take custody of them, Your

25  Honor.

281

```
 1              THE COURT:  Ready to bring the jury back in?  Yes,
 2         bring the jury back in.
 3              (The jury entered the courtroom.)
 4              THE COURT:  You can have a seat.  Go ahead,
 5         Mr. Groland.
 6    BY MR. GROLAND:
 7         Q    Crystal, the accident that we have been talking
 8    about, did the air bag in your vehicle deploy at the time of
 9    that accident?
10         A    I don't remember if it did or not, sir.
11         Q    Did you have an air bag in that vehicle?
12         A    Yes, sir.
13         Q    Would it be fair to say that there was always a
14    problem between you and your mother-in-law during your
15    marriage, Kathleen Morriston?
16         A    Not a constant problem, no.
17         Q    Tell me about the time you got locked out of your
18    house and the police had to come out.
19         A    Me and John were in an argument and they took
20    Robbie over to his mother's house and locked the doors so I
21    could not get in to take Robbie.
22         Q    Do you know why they wouldn't let you in to take
23    Robbie?
24         A    Because they were afraid that I was going to leave
25    the property with Robbie.
```

1     Q    Do you know why they were concerned about that,

2   leaving the property with Robbie?

3     A    Because I stated that I was going to leave.

4     Q    I'm trying to understand what you mean.  Did you

5   say you were going to leave and leave town and go away, or

6   you were just going to leave the property?

7     A    I was going to leave the property and take Robbie

8   with me.

9     Q    Did they express to you, or do you have any idea

10  why they were worried about you taking Robbie with you at

11  that --

12         MS. SINGER:  I'm going to lodge an objection.

13    Calls for a hearsay answer.

14         THE COURT:  Sustained.

15  BY MR. GROLAND:

16    Q    What was going on?  What was going on there with

17  the family, and you, and your mother-in-law, and the baby?

18    A    The night that the cops were called out and they

19  locked Robbie in?

20    Q    Yes.

21    A    I don't recall the exact argument.  I know a lot of

22  things that it was, played a part of the argument, it was no

23  one specific thing when we were in the argument.

24    Q    How was it left -- well, strike that.

25         Did the police come out?

1      A      Yes, sir.

2      Q      And what did the police do when they came out?

3      A      I believe they just filed a report.

4      Q      Did the police let you back into your house?

5      A      They did not let me back into Kathleen Morriston's

6   house, but they did get Robbie back out from the, unlocked

7   the door, yes.

8      Q      Didn't they get a key from Doris Bridwell and let

9   you into your own house with the key?

10      A      Into the house that I was living in?

11      Q      Yeah, well, the only place you were locked out was

12   their house, not your own house?

13      A      Correct.

14      Q      Was there ever a time when you were locked out of

15   your house on that property?

16      A      I don't believe so, no.

17      Q      So you don't remember a time that the police came

18   out regarding a time you were locked out of your own house?

19      A      I don't remember the time that I was locked out of

20   my house, no, but I remember Doris and Kathleen's house, yes.

21      Q      Was there more than one occasion when they kept you

22   away from Robbie?

23      A      Not to my knowledge, no.

24      Q      Do you remember when this was that they had Robbie

25   in the house and wouldn't let you get to Robbie?

1      A     It was around July 4th when I left.

2      Q     Was it that same day that you left?

3      A     It was either that night or the next morning, yes.

4      Q     Did you and John have a physical fight at that

5  time?

6      A     Physical as meaning?

7      Q     Physical, hitting, punching, biting, weapons?

8      A     No, sir.

9      Q     Did you bite him in the shoulder?

10     A     I don't recall that, no.

11     Q     There was a time in July, was there not, when you

12 got so angry that you punched a wall and had to go to the

13 hospital?

14     A     I don't remember that, no.

15     Q     You don't remember that?  Did you injure your hand

16 about that time in July?

17     A     I don't remember that.

18     Q     Did you go to the hospital on two occasions in July

19 for an injury to something on your body?

20     A     I don't remember that, no.

21           MR. GROLAND:  May I, Your Honor, may I have two

22     sets of hospital records marked for identification?

23           THE COURT:  Yes.

24           MR. GROLAND:  Thank you.

25           THE COURT:  I think that would be C and D; is that

```
 1        correct?

 2               THE CLERK:  Yes, Your Honor.

 3               THE COURT:  Thank you.

 4               THE CLERK:  No, sorry, D and E.

 5               THE COURT:  Thank you.

 6               MR. GROLAND:  Your Honor, may I approach the

 7        witness?

 8               THE COURT:  Yes.

 9    BY MR. GROLAND:

10        Q    Crystal, let me show you what's been marked as

11    Defense Exhibit D and E for identification only.  First let

12    me show you D.  Would you take a look at that and just tell

13    me, you don't have to read from it, but just tell me if that

14    refreshes your memory as to what I just asked you about and

15    you said you don't recall?

16        A    I don't remember this incident, no.

17        Q    Let me show you Defense Exhibit E.  If you'd take a

18    look at that and tell me if that refreshes your recollection

19    as to my question about going into the hospital on two

20    occasions in July of 2000?

21        A    I don't remember this one either, sir, sorry.

22               (Pause in the proceedings.)

23    BY MR. GROLAND:

24        Q    Crystal, would you say you have a short fuse and a

25    temper?
```

1          A     No, sir.

2          Q     No.  And Robbie was a good baby, did not cry, did

3     not fuss, was happy?

4          A     Yes, sir, the only time he cried is when he wanted

5     to be held or fed.

6          Q     The morning that you left the baby with Brian, he

7     certainly was in a good mood, and laughing, and gooing, and

8     not crying; is that correct?

9          A     Correct.

10         Q     And you had just fed him half a bottle of formula

11    before leaving the baby with Brian Herlihy?

12         A     Correct.

13         Q     And actually, as you left, Brian was feeding him

14    the other half of the bottle is that correct?

15         A     I don't remember if he was feeding him at that time

16    but I did mention that he needed to give the rest of the

17    bottle to Robbie, yes.

18         Q     Now, between the time that Robbie was born on

19    March 22nd and August 2nd, there were a number of people that

20    actually watched Robbie for you outside of your presence; is

21    that correct?

22         A     Could you repeat that, please?

23         Q     Besides Doris Bridwell, there were actually other

24    people who actually cared for Robbie, baby-sat for him,

25    watched over him when you were either doing something else or

287

```
 1    at work or -- is that true?

 2         A    Yes, sir.

 3         Q    And besides yourself and your husband, which is

 4    two?

 5         A    Correct.

 6         Q    Brian Herlihy, which is three, Doris Bridwell is

 7    four, Kathleen Morriston is five?

 8         A    Correct.

 9         Q    Your dad, Richard Davis, is six?

10         A    Correct.

11         Q    Your dad's wife, who was your stepmother, Tammy

12    Davis?

13         A    Yes, sir.

14         Q    Is seven.  And you have a sister, Michelle, she

15    also watched Robbie?

16         A    Correct.

17         Q    And you also have a sister, Dana, who lives in

18    Orlando, I believe?

19         A    Well, that's her permanent residence but she is a

20    traveling nurse now.

21         Q    At the time she lived in Orlando?

22         A    Yes, sir.

23         Q    And she also, on occasion, watched Robbie when you

24    were somewhere else?

25         A    No, sir, not my sister Dana, no.
```

```
1        Q    Just Michelle?

2        A    Yes, sir.

3        Q    Can you think of anyone else besides the people we

4   have just discussed that watched Robbie for you on occasion?

5        A    No, sir, just my dear, loved ones.

6        Q    Did you tell your husband John Quirello that you

7   lived with Brian Herlihy the whole month of July of 2000?

8        A    No, sir.

9        Q    You have a brother who lives in Silver Springs?

10       A    No, sir.

11       Q    Did you tell Brian you had a brother who lived in

12  Silver Springs?

13       A    Yes, sir.

14       Q    Do you have a brother?

15       A    Yes, sir.

16       Q    Did you tell Brian one day that he asked about the

17  baby that the baby had been with your brother in Silver

18  Springs?

19       A    Yes, sir.

20       Q    That was a lie also?

21       A    Correct.

22       Q    Brian wanted to be around the baby as much as he

23  could?

24       A    Correct.

25       Q    To your knowledge, has Detective Legall in this
```

289

1   case ever talked to your sister, Michelle?

2        A    Not to my knowledge.

3        Q    And Michelle was involved with watching Robbie

4   sometimes when Robbie went up to Jacksonville to stay with

5   your dad over the weekend, correct?

6        A    A few times, yes.

7        Q    Didn't the baby go up there once a month for about

8   four months?

9        A    I don't remember how often it was.

10       Q    Well, how often was it, do you know?

11       A    I don't remember.

12       Q    And when Robbie went up to see your dad, you didn't

13  drive him up there.  You met your sister somewhere and she

14  took him up there?

15       A    Yes, sir.

16       Q    Do you remember about how many times this happened

17  during Robbie's life?

18       A    No, sir.

19       Q    Was it more than once?

20       A    More than once, yes.

21       Q    And why wouldn't you take Robbie all the way to

22  your dad's?  I mean, why did Michelle get involved and do

23  some of the driving?

24       A    Normally I would have to go right to work and she

25  agreed to meet halfway because it was kind of close for both

1    of us.

2         Q    Do you know if Michelle ever watched Robbie at her

3    house before taking him from you to your dad's?

4         A    I don't know.

5         Q    When Robbie would go to see your dad over the

6    weekend, where would you be?

7         A    I believe on a few occasions I was with Robbie.

8         Q    With who?

9         A    With Robbie there at my dad's.

10        Q    I guess it must have been my question.  When Robbie

11   would go see your dad and stay with him over the weekend,

12   where would you be?

13        A    The majority of the time I was with Robbie.

14        Q    Do you understand my question, Crystal, there were

15   some times I think that you told us where Robbie went up to

16   Jacksonville -- your dad lives in Jacksonville, right?

17        A    Correct.

18        Q    Robbie went up there and stayed up there for the

19   weekend.  Are you saying you went up there also?

20        A    All with the exception of one time, I believe.

21        Q    So why would your sister Michelle be involved in

22   driving Robbie up there several times if you were going up

23   there yourself?

24        A    Because my sister would come and get him for a day.

25        Q    So Robbie would actually stay then with Michelle at

1   her house?

2       A    I don't know if he stayed with Michelle or if they

3   went to my dad's.  I don't know.

4       Q    Wouldn't you find out where Robbie was going

5   beforehand?

6       A    Well, he was with people that I loved and trusted

7   and know they wouldn't harm him.

8       Q    So you didn't even bother to prepare an itinerary

9   as to what Robbie was going to do when Robbie went off to

10  your sister's?

11      A    No.

12      Q    What about your dad's wife, Tammy Davis, do you

13  know how many times she watched Robbie and took care of

14  Robbie outside of the presence of your dad?

15      A    No.

16      Q    You don't know?

17      A    No.

18      Q    Do you know if your dad and/or his wife ever took

19  Robbie out of the house to do various things?

20      A    No, sir, I do not.

21      Q    You don't know if they ever took Robbie out of the

22  house?

23      A    No, sir, I do not.

24      Q    When did you first start dating Brian Herlihy?

25      A    I don't recall the date.

1      Q    Do you recall the month?

2      A    No, sir, I do not.

3      Q    Do you recall where you went on your first date

4 with Brian Herlihy?

5      A    I don't believe we had dates.

6      Q    You would just go to his apartment?

7      A    Yes, sir.

8      Q    Do I recall you saying during your direct

9 examination that when you moved in with Brian Herlihy on July

10 4th, with Robbie for several days, up to that point you had

11 not been intimate with him?

12      A    Yes, sir.

13      Q    That's true?

14      A    Could you repeat that, please?

15      Q    I'll ask it a different way.  When were you first

16 sexually intimate with Brian Herlihy?

17      A    It was not until after I moved in with Brian.

18        MR. GROLAND:  I think it was me.

19 BY MR. GROLAND:

20      Q    When was that?

21      A    When I moved in with Brian.

22      Q    So what you're saying is in July is the first time

23 you had sexual relations with Brian Herlihy?

24      A    Yes, sir.

25      Q    Were you dating him in June?

1          A     I don't know if you would call it dating, a

2     personal relationship, I guess.

3          Q     Were you going to his apartment?

4          A     Yes, sir.

5          Q     Where -- and you don't remember where you went or

6     what you did the first time you went out with him?

7          A     He met me at the mall, but that was not considered

8     a date.

9          Q     In fact, the time you were at the mall you were

10    with Robbie, weren't you?

11         A     Yes.

12         Q     Where did you go alone with Brian Herlihy the first

13    time you had a date with him?

14         A     I don't recall.

15         Q     The first time you and Brian Herlihy talked -- am I

16    correct that you actually called him on the phone?

17         A     I don't recall.

18         Q     Do you remember, Crystal, telling Helen Legall that

19    one of your coworkers at Civitan told you that Brian Herlihy

20    wanted to quote "hook up with you" and then you called him on

21    the phone?

22         A     No, sir, I do not remember that.

23         Q     Did you tell the police some lies at the beginning

24    of this case?

25         A     Yes, sir.

1    Q    Do you remember what lie specifically you told to

2    the police?

3    A    No, sir.

4    Q    The times that you had sexual relations with Brian,

5    were they always at his apartment?

6    A    Yes, sir.

7    Q    Did you stay there for three days?

8    A    Two to three days, yes.

9    Q    In July?

10   A    Yes.

11   Q    And then for a couple of weeks after that you moved

12   into another apartment at where?

13   A    Greenwich.

14   Q    And you saw Brian during that period of time, did

15   you not?

16   A    Yes, sir.

17   Q    And did you have sex with him in that apartment

18   also?

19   A    Not in my apartment, no.

20   Q    You would go back to his apartment?

21   A    Yes, sir.

22   Q    Would Robbie go with you?

23   A    Yes, sir.

24   Q    And why would you have to go back to Brian's

25   apartment and not have relations with him in your own

1    apartment where you stayed?

2        A    We just always went to Brian's apartment.

3        Q    Was there a time when the three of you, you and

4    Brian and Robbie, were sleeping in the bed and the baby

5    almost slipped off the bed and got wedged in?

6        A    No, sir.

7        Q    No?

8        A    No, sir.

9        Q    When you left home on July 4th did you bring

10   Robbie's crib with you?

11       A    No, sir.

12       Q    Robbie did not sleep in a crib for the whole month

13   of July 2000?

14       A    No, sir.

15       Q    Were you paying rent at this apartment?

16       A    No, sir.

17       Q    Were you seeing both John, your husband, and your

18   boyfriend, Brian Herlihy, at the same time during the month

19   of July?

20       A    Yes, sir.

21       Q    And at the same time you were dating Brian during

22   that month you were in the process of trying to get back with

23   your husband, John?

24       A    Yes, sir.

25       Q    And this is about the time that you and John were

1    signing some papers on a piece of property and a trailer that

2    you were both hoping to buy together?

3        A    Yes, sir.

4        Q    And this is also about the same time that you and

5    Brian went out together and were looking for an apartment for

6    you, isn't it?

7        A    I don't remember both of us going out to look for

8    an apartment, no.

9        Q    Do you remember talking to Detective Legall in the

10   Gainesville Police Department on August the 9th and telling

11   her that you and Brian met at Suds 'N Duds in two vehicles

12   and went out together looking for an apartment for you?

13       A    I don't remember that, sir.

14       Q    And do you remember telling her that you went in

15   two vehicles and the baby actually went with Brian in his

16   vehicle, not in your vehicle?

17       A    No, sir, I do not remember that.

18       Q    And is this the same period of time when you

19   applied for a loan with your bank for a truck that you told

20   Brian you wanted to buy for him?

21       A    I don't remember that either, sir.

22       Q    You're telling us that that didn't happen or you

23   don't remember?

24       A    I don't remember that ever happening, no.

25       Q    Would it be fair to say that Brian was always good

287

1    with the baby?

2         A    I trusted him, yes.

3         Q    And, in fact, during this period of time Brian

4    played more with Robbie than John did?

5         A    I would say so, yes.

6         Q    Did Brian ever do anything that caused you to feel

7    concerned about Brian being alone with the baby?

8         A    Not in my presence, no.

9         Q    What did you say, not in your presence?

10        A    Yes, sir.  No.

11        Q    Did you hear about him doing anything from anybody

12   else during that time?

13        A    No, sir.

14        Q    Did you ever, when Brian was with Robbie, ever see

15   anything like anger or aggression or lack of patience or

16   frustration on Brian Herlihy's part toward Robbie?

17        A    No, sir.

18        Q    Changed the diapers?

19        A    Yes, sir.

20        Q    Fed Robbie?

21        A    Yes, sir.

22        Q    Bought him presents?

23        A    Excuse me?

24        Q    Bought him presents?

25        A    Yes, sir.

1    Q    Bought him clothing?

2    A    Shoes.

3    Q    Played with him as much as he could?

4    A    Yes, sir.

5    Q    And didn't you personally feel that he loved the

6  baby?

7    A    Yes, sir.

8    Q    At some point you went with Detective Legall to the

9  state attorney's office and spoke to a prosecutor in this

10 case; isn't that true?

11   A    I don't remember that.

12   Q    You don't remember that?

13   A    No, sir.

14   Q    Do you know anything about Robbie having red

15 blotches on his head, his chest, and his neck, and his back

16 that morning before you took him to Brian's apartment?

17   A    Not that morning, no.

18   Q    What about -- when, tell me when that was.

19   A    I don't remember when it was but he did have them

20 at one point from heat rash.

21   Q    Was there a time in July when Robbie had a red

22 blood mark on his eye?

23   A    I don't remember that.

24   Q    How many times did Robbie sleep with you and Brian

25 in the same bed?

1      A      I'm not for sure.

2      Q      Every time you stayed overnight at Brian's

3   apartment did Robbie stay with you?

4      A      Yes, sir.

5      Q      Brian didn't want to go to Cedar Key that day;

6   isn't that correct?

7      A      He wasn't sure if he was going to go or not, no.

8      Q      He wanted to stay home with his dogs?

9      A      I don't know.

10     Q      You don't remember?

11     A      No, sir.

12     Q      He had two puppies, didn't he?

13     A      Yes, sir.

14     Q      In fact, when you pulled up that morning he was

15  outside washing the dogs, wasn't he?

16     A      I'm not sure if he was washing the dogs or not.

17     Q      And when you told Brian that you wanted to go to

18  Cedar Key, it was his idea and his suggestion, was it not,

19  that you take his vehicle, correct?

20     A      Yes, sir.

21     Q      And that's because he wanted you and your son to

22  drive out there in a safer vehicle; isn't that correct?

23     A      I believe that had something to do with it, yes.

24     Q      When you came into the apartment and the paramedics

25  were there and you saw Brian, he was extremely upset, was he

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1    not, and crying?

2         A    He was crying, yes.

3         Q    Have you ever listened to the 911 tape, Crystal?

4         A    No, sir.

5         Q    When you got to the hospital you certainly had

6    occasion to observe Brian's demeanor, the way he was acting,

7    didn't you?

8         A    Not -- I don't really recall that.

9         Q    Isn't it true that you have said that he looked to

10   be very upset and very remorseful?

11        A    Yes, sir, he did.

12        Q    Do you remember meeting with a doctor -- strike

13   that.

14             Do you remember telling a doctor at the hospital,

15   after he told you the baby would have to go into PICU, that

16   you would rather take the baby home because this was going to

17   mess things up with your divorce?

18        A    I don't remember that.

19        Q    You didn't have a pending divorce at that time, did

20   you?

21        A    No, sir.

22        Q    Did you tell people at the hospital that morning

23   that you were in the process of divorcing John and were

24   afraid that he would get custody of Robbie?

25        A    No, sir, I don't remember saying that.

1    Q    You don't?

2    A    No, sir.

3    Q    When you went back to Brian's apartment was there a

4    policeman there standing guard?

5    A    No, sir.

6    Q    How did you get in there that time, that morning?

7    A    When I went back to get the diaper bag?

8    Q    Yes.

9    A    I believe the door was unlocked.

10   Q    And who drove to the hospital, you or Brian?

11   A    I believe Brian did.

12   Q    And how did you end up with the keys to his

13   vehicle?

14   A    I believe he gave them to me.

15   Q    Did you ask him for the keys?

16   A    I don't remember that.

17   Q    Did you tell any police officer that you were going

18   back to the apartment that morning?

19   A    No, sir.

20   Q    When you went back to the apartment that morning it

21   is true, is it not, that it looked different than when you

22   left with Brian to go to the hospital?

23   A    Yes, sir.

24   Q    In fact, you told that to Detective Legall, having

25   went, it looked different, things were different and things

1    had been moved?

2         A    Yes, sir.

3         Q    Do you know who moved those things?

4         A    No, sir, I do not.

5         Q    Were there pillows on the bed?

6         A    I don't remember.

7         Q    Why did you switch vehicles?

8         A    To take my car back to the hospital.

9         Q    Well, why didn't you take Brian's Explorer back to

10   him?

11        A    I'd left the Explorer at his apartment because I

12   was under the impression that I was going to be able to take

13   Robbie home.

14        Q    Who was it that told you that Robbie was going to

15   go home that night?

16             MR. PENNYPACKER:  Objection, hearsay, Judge.

17             THE COURT:  Sustained.

18             MR. GROLAND:  Judge, I just asked her for the name

19        of the person.  She said she was told something and

20        that --

21             THE COURT:  The objection was sustained.

22   BY MR. GROLAND:

23        Q    What else did you do besides switch vehicles and

24   get the diaper bag when you were there that first time?

25        A    I believe that was it.

```
1     Q     And you never went back to his apartment until that
2   next time that we talked about earlier?
3     A     Correct.
4     Q     Do you remember if that next time was before or
5   after you talked to Detective Helen Legall for an extended
6   period of time about her investigation?
7     A     No, sir, I do not.
8     Q     You don't?  Wouldn't it be fair to say that if it
9   was before, then you would have given her the onesie at that
10  time?
11    A     Yes, sir.
12    Q     I'm the one that told you the date, August 25th, as
13  to the date that you delivered that.
14    A     Yes, sir.
15    Q     I got that from the police report.  Do you contest
16  that it was about three weeks after Robbie went into the
17  hospital that you brought that onesie back to the Gainesville
18  Police Department?
19    A     No, sir, I do not remember.
20    Q     And in the diaper bag that you were going to get, I
21  think we touched on it briefly, there was just diapers, no
22  special medicine or anything in there that you had to have
23  out of that diaper bag?
24    A     No, sir.
25    Q     Crystal, it is true, is it not, that at no time
```

1    during your relationship with Brian Herlihy when he was

2    around you and Robbie and alone with Robbie did you have any

3    suspicion at all that he might want to injure your son?

4         A    No, sir, I trusted him.

5              MR. GROLAND:  May I just have a moment, Your Honor?

6              THE COURT:  Yes.

7              (Pause in the proceedings.)

8              MR. GROLAND:  No further questions.

9              THE COURT:  Any redirect?

10             MS. SINGER:  I want to approach the bench for a

11   moment.

12             THE COURT:  Does this need to be on the record?

13             MS. SINGER:  Yes.

14             (A sidebar discussion was held:)

15             MS. SINGER:  I want to argue that I can ask Crystal

16   Quirello why she trusted him based upon the question:

17   You had no suspicion at all that he might want to injure

18   your son?  And her answer:  No, sir, I trusted him.  At

19   this the door has been opened for me to ask why could

20   you trust him.

21             MR. GROLAND:  Absolutely not.  That was her

22   response.  She could have said she trusted him, she saw

23   nothing, I was very careful not to open the door.  She

24   articulated it that way so that we could be standing

25   here talking about this.  All she had to do was say no,

1    I had no suspicion and I was very careful.  I asked my

2    question in such a way that I didn't get into anything

3    that he may have told you instead the things I talked

4    about with her on cross-examination were her

5    observations of Brian or the baby during the whole time

6    he was with the baby over that, whatever period of time

7    it was.  I did not ask her anything about what Brian had

8    told her that caused her to either trust him or distrust

9    him.  It was all based upon what she saw of Brian and

10   the baby.  I don't think I opened the door at all.

11          MS. SINGER:  The --

12          THE COURT:  Here's what you'll have to do.  You may

13   ask her if her trust was based on anything other than

14   what she observed.

15          MS. SINGER:  I know what the answer to that is

16   going to be.

17          (The sidebar discussion was concluded.)

18                  REDIRECT EXAMINATION

19   BY MS. SINGER:

20       Q    Crystal, Mr. Groland asked you whether you had any

21   suspicion at all that Brian Herlihy might want to injure your

22   son.  You answered, No, sir, I trusted him.  Were there any

23   other reasons other than what you may have witnessed

24   regarding how Brian handled the baby that caused you to trust

25   him?

1       A    Yes, ma'am.

2            MS. SINGER:  Your Honor, at this time I'm going to

3       ask the following question:  What were those reasons?

4            MR. TEDDER:  Objection, Your Honor.

5            THE COURT:  Yes, sir, noted.  Overruled.

6  BY MS. SINGER:

7       Q    Why was it that you trusted him?

8       A    He told me that he was a pediatric nurse at Shands

9  Hospital, an RN.

10      Q    The photographs that you were shown marked Defense

11 Exhibits A, B, and C, where you identified the laundry?

12      A    Yes, ma'am.

13      Q    Whose truck did you take to go to the laundry?

14      A    I took Brian Herlihy's truck.

15      Q    You took his Explorer?

16      A    Yes, ma'am.

17      Q    And when you collected the laundry, where did you

18 put it?

19      A    When I got it back from the dry cleaners?

20      Q    Yes.

21      A    I believe I left it in the truck when I noticed

22 that the paramedics and police cars, or the police bikes were

23 outside.

24      Q    And when you went back to the apartment later that

25 day you exchanged the Explorer, the truck, for your own car?

1          MR. GROLAND:  Objection, leading.

2          THE COURT:  Sustained.

3   BY MS. SINGER:

4      Q    When you went back to the apartment that day what

5   did you do with the truck that you had, the Explorer?

6      A    I left his Explorer at the apartment.

7      Q    And what car or vehicle did you take from the

8   apartment?

9      A    My car.

10     Q    When Robbie would visit with your dad and your

11  stepmom in Jacksonville, was there any time that you got

12  Robbie back from your parents where you saw any kind of

13  injury on Robbie?

14     A    Never.

15     Q    How about when your sister took him for the day?

16     A    Never.

17     Q    Any indication that he was injured?

18     A    Never.

19     Q    Now, you were asked whether or not you saw Brian

20  show any anger or frustration towards Robbie?

21     A    Correct.

22     Q    Did Brian ever express any anger or frustration

23  regarding the father of Robbie, John Quirello?

24         MR. GROLAND:  Objection, irrelevant.

25         THE COURT:  Sustained.

1    BY MS. SINGER:

2        Q    Were there ever any discussions between you and

3    Brian Herlihy regarding Robbie staying with Brian?

4        A    Can you repeat that, please?

5        Q    Did you and Brian ever have any discussions or

6    argument about Robbie staying with Brian rather than going

7    with other family members?

8        A    Yes.  He would always get upset if Robbie couldn't

9    stay with him.

10       Q    Or Doris Bridwell.

11            Did Brian ever tell you that you, and he, and

12   Robbie made a family?

13       A    I don't remember that statement.

14            MS. SINGER:  No further questions, Your Honor.

15            MR. GROLAND:  Just one or two.

16            THE COURT:  You'll have to approach the bench and

17        tell me what new areas this opens to question further

18        on.

19            (A sidebar discussion was held off the record and

20   without the court reporter.)

21            THE COURT:  Good enough.  May this witness now be

22        released from the subpoena or remain available?

23            MS. SINGER:  Remain under subpoena.

24            THE COURT:  You need to remain available.  You

25        don't have to stay in the courthouse every day because

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1   of the length of the trial, but you need to make sure

2   that both the state and defense have a phone number

3   where you can be reached so they can let you know when

4   you might need to come back, if you need to testify

5   again.

6           THE WITNESS:  Yes, ma'am.  Thank you, Your Honor.

7           THE COURT:  You may step down.

8           We are, of course, going to recess for the evening

9   at this point.  Now, I'm going to ask the clerk to bring

10  to you the envelopes so that you can secure your

11  notebooks.  They will be locked in the evidence cabinet

12  and protected, of course, overnight and you'll have

13  access to them first thing in the morning.

14          (Pause in the proceedings.)

15          THE COURT:  Yes.

16          UNIDENTIFIED JUROR:  Would there be a problem with

17  bringing a pillow in?  The seat is killing me.

18          THE COURT:  That's fine.

19          I do want to make this announcement:  The

20  information I got at the last break and has just been

21  confirmed that the polls are going to be opened for an

22  extra two hours in case everybody didn't get to vote.

23  Anybody in the courtroom might want that information.

24          We'll see y'all about 8:50 in the morning.

25          MR. GROLAND:  May we have another admonition about

1    the media?

2         THE COURT:  I'm going to remind you:  Do not watch

3    local news.  As you saw, there was a reporter here

4    earlier.  Restrict your TV to the national news and I

5    think you'll be in good shape.  Thank you very much.

6         MR. TEDDER:  And the newspapers, Your Honor.

7         THE COURT:  No newspaper except the sports page and

8    home page.

9         I want to make sure that the state goes outside and

10   make sure that the witnesses are clearing the area and

11   not --

12        (The jury exited the courtroom.)

13        THE COURT:  Anything else we need to put on the

14   record before we recess for the evening?

15        MS. SINGER:  Not for the state.

16        MR. GROLAND:  Not from the defense.

17        THE COURT:  Good enough.  Court is adjourned until

18   8:45.

19        (The trial was recessed at 6:28 P.M. to the

20   following day, September 11, 2002, at 9:00 A.M.)

21

22

23

24

25