# EXHIBIT

# F

21-2

*202·1-178/4*

*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY   }
                  Appellant,   }

                        }

                        }

v.   }

                        }

STATE OF FLORIDA   }

                  Appellee,   }

CASE NUMBER   2000-2753-CFA

APPEAL NUMBER 1D02-4788

VOLUME VI

Docket (4

**D5-14-2003**

Florida Attorney
General

# TRANSCRIPT
# RECORD

### HONORABLE MARTHA ANN LOTT
#### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

2003 MAY 12   PM 2:42

GENERAL'S OFFICE
CRIMINAL APPEALS
TALLAHASSEE

RECEIVED

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

I:\USERS\YMC\Word\YVONNE\Circuit Criminal Documents\COV-SH.TRANS.FEL.doc

*do2-1-17814*

F

1      IN THE CIRCUIT COURT OF FLORIDA
       EIGHTH JUDICIAL CIRCUIT
2      IN AND FOR ALACHUA COUNTY

3      CASE NO. 01-2000-CF-002753-A

4  THE STATE OF FLORIDA

5  vs.

*Volume VI*

6  BRIAN PATRICK HERLIHY,

*1002-4788*

7              DEFENDANT.

8  _____/

9

*05-14-2003*

10             TRANSCRIPT ON APPEAL
                PAGES 311 - 435
11                 VOLUME III

12

13  PROCEEDINGS:        JURY TRIAL
    BEFORE:             THE HONORABLE MARTHA ANN LOTT,
14                      CIRCUIT JUDGE
    DATE:               SEPTEMBER 11TH, 2002
15  TIME:               9:07 A.M.
    PLACE:              COURTROOM 4A
16                      ALACHUA COUNTY COURTHOUSE
                        GAINESVILLE, FLORIDA

17

18  APPEARANCES:

19      JEANNE SINGER, ESQUIRE
        and
        STEPHEN H. PENNYPACKER, ESQUIRE
20      120 WEST UNIVERSITY AVENUE
        GAINESVILLE, FLORIDA 32601
21      ATTORNEY FOR THE STATE OF FLORIDA

22      GORDON H. GROLAND, ESQUIRE
        and
23      JOHN TEDDER, ESQUIRE
        500 EAST UNIVERSITY AVENUE, SUITES B&C
24      GAINESVILLE, FLORIDA 32601
        ATTORNEY FOR THE DEFENDANT

25

1                          INDEX VOLUME III

2                              WITNESSES

3    DR. HARVEY G. ROHLWING

4       Direct Examination by Mr. Pennypacker..........Page    317

5       Voir Dire Examination by Mr. Tedder............Page    319

6       Continued Direct Examination by Mr. Pennypacker.Page    327

7       Cross-Examination by Mr. Tedder................Page    334

8       Redirect Examination by Mr. Pennypacker........Page    364

9

10   DR. RICHARD M. KREINEST

11      Direct Examination by Ms. Singer...............Page    373

12      Cross-Examination by Mr. Tedder................Page    399

13      Redirect Examination by Ms. Singer.............Page    407

14

15   RICHARD EARL DAVIS, SR.

16      Direct Examination by Ms. Singer...............Page    413

17      Cross-Examination by Mr. Groland...............Page    426

18      Redirect Examination by Ms. Singer.............Page    433

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              (Whereupon, the following proceedings were held,

3       the defendant and counsel being present.)

4              THE COURT:  State ready to proceed?

5              MS. SINGER:  Your Honor, we have one matter to

6       present before the jury comes in, if we might.  Today we

7       intend on introducing the 911 call tape that has been

8       previously stipulated to by both the state and defense

9       as admissible in the case.  The defense initially did a

10      transcript of that tape, which the state reviewed and

11      made some very small changes, which we provided the

12      transcript to counsel for the defendant, and we would be

13      asking that copies of this transcript be provided to the

14      jury at the same time that the tape is played so that

15      they're able to follow along both aurally,

16      A-U-R-A-L-L-Y, with their ears and visually by seeing

17      the same at the same time.

18             MR. GROLAND:  Our position on that is, this is not

19      a tape that is hard to understand.  This is a tape that

20      speaks for itself.  You can hear exactly what everybody

21      is saying, what Mr. Herlihy was saying on the tape.

22      They don't need to have a second way of analyzing what

23      is said.  I would say a transcript might be appropriate

24      if the circumstances are such that the tape is inaudible

25      or subject to different interpretations in several

1   places, then a transcript might be appropriate.  Here

2   what he says is articulated in such a way that anybody

3   listening to it can understand.  And if the Court's

4   going to make a ruling on this, the tape is only about

5   seven or eight minutes, I would ask the Court to listen

6   to the tape and make a determination on that one way or

7   the other.

8         THE COURT:  I have listened to it, as you recall.

9         MR. GROLAND:  Yes.

10         THE COURT:  And in an abundance of caution, the

11   burden being on the state, in order not to overemphasize

12   certain evidence, I'm going to acquiesce to the

13   defense's request that there be no written transcript

14   provided in addition to the tape itself.

15         MS. SINGER:  I will advise the Court that there are

16   two other -- actually one other tape that has two other

17   taped statements on it that we will be presenting to the

18   Court later in the week.  If the Court will allow me the

19   same opportunity to reargue, and the Court will have to

20   listen to those tapes, we'll get a copy of that tape to

21   you.

22         THE COURT:  You will not be allowed to reargue it

23   unless you advise me in advance so that we can do this

24   type of legal argument prior to 9:00 when we're supposed

25   to start so we don't have the jury waiting.

315

1    MS. SINGER:  May the state provide the Court with a

2    copy of the other two taped statements, because if the

3    ruling is that those tapes are in fact, not the word

4    legible, but audible, then I will not even ask to

5    proceed.  But if the Court believes that there is a

6    problem with understanding on the tapes, and if the

7    transcript might be appropriate in those cases, then I

8    will be making the same argument.  I don't need to make

9    it again, I just need the Court to tell me whether the

10   Court would even consider, if the tapes are not audible,

11   the use of the transcripts.

12   THE COURT:  As soon as you set that or advise me in

13   advance, we will address that, and I'm not going to

14   address is it further this morning.

15   MS. SINGER:  Okay.

16   THE COURT:  Anything else that could not have been

17   raised prior to 9:00 that we must address before the

18   jury comes in?

19   MS. SINGER:  Not from the state, Your Honor.

20   MR. GROLAND:  No, ma'am.

21   THE COURT:  Go ahead and bring the jury in.

22   (The jury entered the courtroom.)

23   THE COURT:  Good morning, ladies and gentlemen, and

24   everyone in the courtroom.  Before we begin the trial

25   today, I want to give everyone an opportunity to

1  acknowledge for a moment the history of this country, of

2  course, the events that occurred one year ago today, and

3  the future that this country holds for all of us and for

4  our children and grandchildren.  So if you wish to take

5  the opportunity to stand and acknowledge with a moment

6  of silence, please do so.

7          (Pause in the proceedings.)

8          THE COURT:  Thank you.  All right.  Now, as we have

9  always done in this country, we acknowledge what is and

10  we move forward.  And we'll move forward again with our

11  responsibilities today.  I thank you all for being here

12  and for your participation in every aspect of it.

13          Mr. Pennypacker or Ms. Singer, go ahead and call

14  your next witness.

15          MR. PENNYPACKER:  Call Harvey Rohlwing.

16          (The witness enters the courtroom.)

17          THE CLERK:  Please raise your right hand.

18          (The witness was duly sworn by the clerk.)

19          THE CLERK:  You may be seated.

20  WHEREUPON:

21                    DR. HARVEY G. ROHLWING,

22  called as a witness herein, having been first duly sworn, was

23  examined and testified as follows:

24                    DIRECT EXAMINATION

25  BY MR. PENNYPACKER:

317

1    Q    Would you state your name, please?

2    A    Harvey George Rohlwing.

3    Q    What is your occupation?

4    A    Physician.

5    Q    What is your educational background?

6    A    I -- where do you want to start?

7    Q    Start with your undergraduate and work your way up

8  through your residency.

9    A    I went to the University of Florida, got a degree

10  in electrical engineering, undergraduate; did some graduate

11  work and then went to the College of Medicine, University of

12  Florida, and got a medical degree in 1977.

13    Q    After medical school did you do a residency?

14    A    I did.

15    Q    In what area?

16    A    In medicine, internal medicine.

17    Q    Was that also the University of Florida or was that

18  some other --

19    A    No, that was at Presbyterian Hospital in Denver.

20    Q    Did you do any training following your residency in

21  internal medicine?

22    A    No.

23    Q    Are you a licensed physician in the State of

24  Florida?

25    A    Yes, I am.

1      Q      Are you board certified in any area or specialty?

2      A      I'm board certified in emergency medicine.

3      Q      Where have you worked since finishing your

4  residency?

5      A      I worked for 12 or 13 years in Crystal River

6  primarily, and some other -- I worked for a multi-hospital

7  group, so I worked primarily in Crystal River and a number of

8  other hospitals around the state and some out of state.  I

9  left there in the early '90s and worked primarily at North

10  Florida Regional Hospital in Gainesville for four to five

11  years; and then went to Shands at University of Florida, I

12  guess, about six years ago.

13      Q      Are you currently employed by Shands at the

14  University of Florida?

15      A      By the University of Florida, yes.

16      Q      And what position do you hold now?

17      A      Clinical assistant professor in emergency medicine.

18      Q      Have you ever been qualified as an expert witness

19  before?

20      A      Yes, I have.

21      Q      Approximately how many times?

22      A      Two or three.

23      Q      Have you testified in trials before?

24      A      Yes, I think once as an expert.

25              MR. PENNYPACKER:  Your Honor, I tender Dr. Rohlwing

319

1    as an expert in the area of emergency medicine and

2    request he be allowed to give opinion testimony.

3         MR. TEDDER:  We object, Your Honor.

4         THE COURT:  What?

5         MR. TEDDER:  We object.

6         THE COURT:  You do object.  Would you like to voir

7    dire the witness?

8         MR. TEDDER:  Out of the presence of the jury, yes,

9    ma'am.

10        THE COURT:  We're going to take a recess.  Is there

11   coffee in the jury room?

12        THE BAILIFF:  Yes, ma'am.

13        THE COURT:  Please make yourself comfortable in the

14   jury room.  We'll be back with you as soon as possible.

15        (The jury exited the courtroom.)

16        THE COURT:  All right.  Mr. Tedder, go ahead.

17                  VOIR DIRE EXAMINATION

18   BY MR. TEDDER:

19   Q    Dr. Rohlwing, you indicated you've testified as an

20   expert two or three times in the past?

21   A    Yes.

22   Q    And what areas were you allowed to testify as an

23   expert in?

24   A    I'm not sure that they were all cases that I was

25   called as an actual witness.  I was qualified several times

1   as an expert, so I'm not sure what constituted expert

2   testimony and what was factual testimony.  One was an elder

3   abuse case; one was a malpractice case against another

4   physician.

5       Q    So you've testified in one criminal case as an

6   expert and one civil case as an expert; is that correct?

7       A    Yes.

8       Q    And the criminal case that you testified in as an

9   expert, what were you sworn in as an expert of?

10      A    Emergency medicine.

11      Q    Emergency room medicine?

12      A    Yes.

13      Q    Have you ever testified as an expert in the theory

14  of shaken baby syndrome?

15      A    No.

16      Q    Have you ever read any studies on the theory of

17  shaken baby syndrome?

18      A    Nothing other than the emergency medicine

19  literature that comes out periodically.  I've not researched

20  that topic.

21      Q    I'm sorry?

22      A    I've not researched that topic, no.

23      Q    Are you familiar with any studies that have tried

24  to clinically determine whether or not the theory known as

25  shaken baby can actually happen?

```
 1        A    No.

 2        Q    Are you familiar at all with a study done by a

 3   Dr. Anne Duhaime and some other physicians back in 1987?

 4        A    No, I'm not.

 5        Q    Were you aware that at that time a series of a

 6   group of doctors --

 7             THE COURT:  Mr. Tedder, let me interrupt you just

 8        long enough to find out from the state if they were

 9        intending to offer any opinions from Dr. Rohlwing in

10        regards to shaken baby syndrome.

11             MR. PENNYPACKER:  Not as to the theory of shaken

12        baby or the mechanics behind it, Your Honor, but simply

13        as to what he found when he examined the child and what

14        the potential cause may have been.

15             THE COURT:  And based upon your discovery and

16        preparation of this case, do you intend to elicit from

17        this witness anything that's going to reference shaken

18        baby syndrome?

19             MR. PENNYPACKER:  That is going to be part of his

20        testimony.

21             THE COURT:  Good enough.  Go ahead, Mr. Tedder.

22   BY MR. TEDDER:

23        Q    Dr. Rohlwing, in your examination of this baby, how

24   many times did you see Robbie Quirello, how many times did

25   you see the baby in this case?
```

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1    A    Once.

2    Q    One time.  How much time did you spend with him?

3    A    Probably a half an hour.

4    Q    And exactly what did you do to examine him?

5         THE COURT:  Mr. Tedder --

6    A    I'm not sure what you mean by what did I do.

7         THE COURT:  Hold on just a second.

8         Mr. Tedder, you may voir dire this witness in

9    regard to his area of expertise, but as to the factual

10   steps that were taken in this case, this is not

11   cross-examination, and it's not discovery.  So limit

12   your voir dire to those areas that have to do with

13   whether or not I'm going to accept this witness as an

14   expert in emergency medicine and what areas he's going

15   to be allowed to give his opinion on.

16        MR. TEDDER:  All right.

17   BY MR. TEDDER:

18   Q    As to emergency medicine, exactly -- did you see --

19   you saw something that in your opinion you believe could be

20   evidence of shaken baby, is that true, you've testified?

21   A    Yes.

22   Q    And what exactly -- you saw, what, retinal

23   hemorrhaging and the CAT scans?

24   A    Bilateral retinal hemorrhaging.  I did not look at

25   the CAT scans themselves.  I got a report from the

1    radiologist who --

2         Q    Have you ever conducted any neurosurgery?

3         A    No.

4         Q    Are you familiar with an article published in

5    the -- I recognize it's difficult to read everything that's

6    published -- an article that was published in the Journal of

7    Neurosurgery dealing with retinal hemorrhaging?

8         A    No.

9         Q    Are you familiar with the fact that retinal

10   hemorrhaging can be caused by brain enlargement that cuts

11   off venous drainage to the eyes?

12            MR. PENNYPACKER:  Your Honor, I'm going to object

13        again.  I don't think this goes to whether or not he's

14        qualified.  I think this goes in the area of

15        cross-examination.

16            THE COURT:  I'm going to allow this question.

17   BY MR. TEDDER:

18        Q    Are you familiar with that?

19        A    I'm not familiar with that article.  It doesn't

20   surprise me that retinal hemorrhage can result from other

21   mechanisms that were produced, either the same mechanism of

22   injury as shaking a head, or from other things that increase

23   venous pressure.

24        Q    What if any scientific studies you would rely on in

25   forming your expert opinion?

324

1        A     None.

2        Q     None?  So is your expert opinion formed based upon

3    basically on anecdotal reports?

4              MR. PENNYPACKER:  Your Honor, again, I don't think

5         this goes to his credibility or -- it goes to

6         credibility but not to whether or not he's an expert in

7         the area of emergency medicine.

8              THE WITNESS:  It would be --

9              THE COURT:  Excuse me.  Wait just a second.  I

10        can't tell that this question, the way you have framed

11        it, has anything to do with his qualifications as an

12        expert in the area of emergency medicine.  So you may

13        want to rephrase it.

14   BY MR. TEDDER:

15        Q    What about your training as an emergency room

16   physician allows you to form an expert opinion as to what

17   happened to this baby?

18        A     I don't think I'm an expert in shaken baby

19   syndrome, and I don't purport to be.  I was practicing

20   emergency medicine and I'm testifying based on that and my

21   experience as an emergency physician.

22        Q    And your finding was that the shaken baby syndrome

23   may apply in this case but you would defer to others as to

24   whether or not it actually did?

25        A     Yes.

1      MR. TEDDER:  Your Honor, for him to be allowed, I

2   mean --

3      THE COURT:  Yes, Mr. Tedder.

4      MR. TEDDER:  I don't have any other questions.

5      THE COURT:  Okay.  And your argument that

6   Dr. Rohlwing is not an expert in emergency medicine is

7   what?

8      MR. TEDDER:  He may be an expert in emergency

9   medicine.  He should not be allowed to offer an opinion

10  as to shaken baby.  He just testified he's not an expert

11  in shaken baby.  He just said that.  He doesn't know any

12  studies that verify it.  He may be an expert in

13  emergency room treatment.  If I need to go to the

14  emergency room, I'll be delighted or probably would be

15  delighted to see Dr. Rohlwing there to take care of me.

16  However, for him to be allowed to offer an opinion to

17  this jury that this child suffered from shaken baby is a

18  problem.  He's not an expert in shaken baby.  He's an

19  expert as to what he saw --

20     THE COURT:  I understand that this may be a very

21  exciting case for you, but we're not to closing argument

22  yet.

23     MR. TEDDER:  I'm sorry, Your Honor.  I am excited

24  about the case and I apologize.  It's hard for me to

25  contain myself.

```
 1          THE COURT:  Mr. Pennypacker, any response?

 2          MR. PENNYPACKER:  I think he is qualified as an

 3     expert in the area of emergency medicine.  I think he's

 4     qualified based on his education and training as to the

 5     diagnosis that he came up with when he examined this

 6     child.

 7          THE COURT:  And the diagnosis was what, Doctor?

 8          THE WITNESS:  My diagnosis was multiple

 9     intracranial hemorrages and bilateral retinal

10     hemorrhages consistent with shaken baby.

11          MR. TEDDER:  His diagnosis, I agree with everything

12     in his diagnosis except for the last three words,

13     consistent -- four words, consistent with shaken baby

14     syndrome.

15          THE COURT:  And, of course, you'll be allowed to

16     cross-examine him in that area.  I am going find

17     Dr. Rohlwing to be an expert and he will be allowed to

18     give his opinion in regard to the area of emergency

19     medicine.

20          Anything else we need to put on the record before

21     the jury comes back in?

22          MR. TEDDER:  Will he be allowed to offer his

23     testimony as to shaken baby?

24          THE COURT:  Consistent with what he just said,

25     consistent with the fact that as he just testified he
```

1    does not consider himself to be an expert in the area of

2    shaken baby and subject to cross-examination, yes.

3         MR. TEDDER:  We would object to that ruling, Your

4    Honor.

5         THE COURT:  Good enough.  Anything else we need to

6    put on the record?

7         MR. PENNYPACKER:  No, ma'am.

8         MR. TEDDER:  No, ma'am.

9         THE COURT:  Bring the jury out.

10        (The jury entered the courtroom.)

11        THE COURT:  Ladies and gentlemen, Dr. Rohlwing has

12    been qualified in the area of emergency medicine and

13    will be allowed to give opinion testimony in that area.

14        Go ahead, Mr. Pennypacker.

15   BY MR. PENNYPACKER:

16        Q    Dr. Rohlwing, were you working at Shands Hospital

17   on August 2nd of 2000?

18        A    Yes, I was.

19        Q    In which area of the hospital were you working at

20   that time?

21        A    In the emergency room.

22        Q    Did you see or have contact with a patient by the

23   name of Robbie Quirello or Robert Quirello on that day?

24        A    I did.

25        Q    Approximately what time did Robert Quirello arrive

1   at the emergency room?

2        A    According to the emergency treatment record, at

3   9:59 in the morning.

4        Q    How was he brought to the hospital?

5        A    By EMS.

6        Q    Did you examine him upon his arrival?

7        A    I did.

8        Q    What was his condition?

9        A    Critical.  He was essentially comatose, although

10  responsive, when I saw him, to physical stimulus.  He was

11  attempting to breath on his own.  And actually, when -- he

12  had an endotracheal tube in place when he was brought in by

13  EMS.  As I was attempting to visualize and confirm placement,

14  he gagged, coughed, and began crying until we removed the

15  tube, because it was obviously out at that moment.  He did

16  move all extremities somewhat to painful stimuli but

17  otherwise was not awakened and responding.

18       Q    You mentioned that he was crying.  Is that an

19  indication to you that the endotracheal tube is not properly

20  inserted?

21       A    Yes.  He would not be able to make crying sounds if

22  the tube was going through the vocal cords as it's supposed

23  to do.

24       Q    Dr. Rohlwing, can you speak up just a little bit,

25  I'm having a little bit of trouble hearing you down here?

1      A     He would not be able to make crying sounds if the

2  endotracheal tube passed through the vocal cords.

3      Q     Was there any sign of external trauma?

4      A     None other than those from attempted treatment.  He

5  had an interosseous needle site in his lower leg; and, of

6  course, the endotracheal tube, but no other external signs of

7  injury.

8      Q     Was there anything unusual about the pupils of his

9  eyes?

10      A     Yes, his pupils initially were unequal.  The left

11  one was considerably larger than the right one.  They were

12  both somewhat dilated and sluggish to react.

13      Q     Sluggish to react to what?

14      A     To light.

15      Q     What does that indicate to you as far as his

16  condition?

17      A     That raised some suspicion that this was not just

18  from lack of oxygen.  I would expect that the pupils may be

19  dilated and sluggish to react as a result of lack of oxygen

20  for a period of time but they're usually not unequal.  I

21  would expect them to be equal.  The fact that they were

22  unequal raised some suspicion that there may be some lesion

23  or some pathology in his brain.

24      Q     Would that be something neurological?

25      A     Yes.

330

1      Q     Did you do a more specialized exam of his eyes?

2      A     Yes, I did a funduscopic exam, which is using a

3   scope to look into the back of the eyes.

4      Q     What did you see when you did the funduscopic exam?

5      A     I saw patchy hemorrhages scattered throughout both

6   retinal fields.

7      Q     Explain what that means, please.

8      A     It means he had multiple areas of bleeding into the

9   retinal tissue from broken blood vessels.

10      Q     What does bilateral mean?

11      A     On both eyes.

12      Q     What causes bilateral retinal hemorrhages?

13      A     Well, the most common cause that I'm aware of is

14   shaken baby syndrome.

15           MR. TEDDER:  Object, ask to strike.

16           THE COURT:  Overruled.

17   BY MR. PENNYPACKER:

18      Q     Did you already order any additional tests?

19      A     At that time, I ordered a, we ordered the usual

20   blood tests, laboratory tests.  At that time I ordered a CT

21   scan of his brain.

22      Q     What is a CT scan?

23      A     A computerized tomography.  It's a special X-ray

24   study that essentially creates detailed imagines in cross

25   sections through whatever body part you're looking at, in

1   this case the head.

2        Q    And why did you order this CT scan in this case?

3        A    To look for any intracranial or any brain lesions

4   or abnormality.

5        Q    What time was the child taken for the CT scan?

6        A    At 10:25, according to the nursing flow sheet.

7        Q    What is a brain lesion?

8        A    Any abnormalities in the brain; it can be a

9   hemorrhage, blot clot, tumor, other structural lesions that

10  might account for the findings.  In this case we were looking

11  for possibly bleeding or hemorrhage.

12       Q    Where did the child go after the CAT scan was

13  finished?

14       A    My note indicated that our desire was to take him

15  directly from the scanner up to the pediatric intensive care

16  unit, but the nurse's note would indicate that he came back

17  for, briefly to the emergency department and then was taken

18  to the pediatric intensive care unit.

19       Q    Was there any additional treatment or examination

20  of him in the emergency department before he went to the

21  pediatric intensive care unit?

22       A    Not by me.

23       Q    Was anyone from the family present in the emergency

24  room?

25       A    Yes, as I recall the child's mother arrived at some

1    point during our resuscitation of the child.

2         Q     Did you have a conversation with her?

3         A     I had a brief conversation.

4         Q     What did you tell her?

5         A     I told her that her child was alive but in very

6    critical condition and that we weren't sure exactly what the

7    cause of the problem was at that point, that he would need to

8    be admitted to the pediatric intensive care unit.

9         Q     Approximately what time was it when you saw the

10   retinal hemorrhaging in his eyes?

11        A     Five or ten minutes after he came into the

12   emergency department.

13        Q     If he came in at 9:59 that would have been 10:04,

14   10:09, 10:10?

15        A     Shortly after 10:00, yeah.

16        Q     Was that prior to the computer tomography exam?

17        A     Yes.

18        Q     Did you make a preliminary diagnosis as to what

19   caused the child's injuries?

20        A     My findings were consistent with shaken baby.  And

21   the CT scan revealed, according to the radiologist, I did not

22   look at the scan myself, but on the report I received from

23   the radiologist, the CT scan revealed multiple intracranial

24   or cerebral hemorrhages.

25        Q     Did you call to request that the child protection

1   team be notified?

2       A    I contacted the social worker who is on duty in the

3   emergency department, and to my knowledge she's probably the

4   one who contacted CPT.

5       Q    In order to make the finding that the multiple

6   intracranial hemorrhages and the retinal hemorrhages were

7   consistent with shaken baby syndrome, what compilation of

8   injuries led you to come to that conclusion?

9       A    Multiple hemorrhages in those areas, primarily

10  retina and the brain.

11      Q    Did you see the child again after he went to the

12  pediatric intensive care unit?

13      A    No, I did not.

14      Q    Did you have any further involvement in the

15  treatment of this child?

16      A    No, I did not.

17          MR. PENNYPACKER:  Your Honor, what I'd like to do

18      is to have Dr. Rohlwing check the medical record chart

19      and make sure his notes are contained within the record

20      that has already been placed into evidence if I could.

21          THE COURT:  Go ahead.

22          MR. PENNYPACKER:  May I approach the witness, Your

23      Honor?

24          Dr. Rohlwing, if you could check the chart and make

25      sure it contains your records and the nursing records

```
 1            from the time that you treated the child.

 2                  THE WITNESS:  Yes, it does.

 3                  MR. PENNYPACKER:  That's all the questions I have,

 4            Judge.

 5                  THE COURT:  Mr. Tedder, Mr. Groland.

 6                        CROSS-EXAMINATION

 7   BY MR. TEDDER:

 8       Q    May it please the Court, ladies and gentlemen of

 9   the jury.

10            Good morning, Dr. Rohlwing.

11       A    Good morning.

12       Q    Dr. Rohlwing, you've been qualified as an expert in

13   the field of emergency room medicine, correct?

14       A    That's correct.

15       Q    And that's the only thing you're qualified to

16   testify about, is it not?

17       A    That's correct.

18       Q    In fact, you've only previously been qualified as

19   expert twice in the past; isn't that correct?

20       A    Right.

21       Q    One time was in a civil case, correct?

22       A    Yes.

23       Q    A civil case in which someone was suing another

24   doctor about malpractice?

25       A    Right.
```

1      Q    And the other time was in a criminal case when

2   someone was accused of injuring an elderly person in some way

3   or fashion?

4      A    That's correct.

5      Q    So you've never ever testified as an expert in

6   shaken baby syndrome, have you?

7      A    No.

8      Q    In fact, the theory known as shaken baby syndrome

9   is something that you are not an expert in at all, are you?

10      A    No.

11      Q    In fact, you've never researched it at all, have

12   you?

13      A    No, I haven't.

14      Q    You haven't done any looking in any studies

15   whatsoever that have ever been done with regard to shaken

16   baby, have you?

17      A    No, I've not.

18      Q    Would it surprise you, Doctor, that -- I know that

19   you're a doctor, and I presume you try to stay current on the

20   literature in your expert, field of expertise, correct?

21      A    Yes.

22      Q    And so you probably don't read much journals

23   regarding neuropathology or neurosurgery, do you?

24      A    No, I don't.

25      Q    So you would not be familiar with anything

1    published in the journals of neurosurgery, would you?

2        A    No.

3        Q    And the theory of shaken baby syndrome deals

4    entirely with damage to the brain, does it not?

5        A    Correct.

6        Q    So someone who's an expert in neuroscience or

7    neuropathology would be much better qualified to give an

8    opinion as to something like that, wouldn't they?

9        A    Without a doubt.

10       Q    Now, I believe you testified a moment ago that when

11   the baby came in, you initially saw Robbie, that he was

12   improperly intubated; isn't that correct?

13       A    At that moment.

14       Q    Because the tube that the EMTs had placed into him

15   was not beyond the vocal chords, therefore, it was not into

16   the passageway that it needed to get in order to provide

17   oxygen to the baby; isn't that true?

18       A    That is correct.

19       Q    And that's why the baby was able to cry, because he

20   was not properly intubated, correct?

21       A    Correct.

22       Q    Now, at that point in time you don't know how long

23   the tube had been improperly in place, do you?

24       A    No.

25       Q    You were aware, were you not, Doctor, that when the

1    EMTs arrived to the scene, initially went to this baby, that

2    he was not breathing?

3         A    That was in the report, yes.

4         Q    And would you or would you not agree that when

5    someone doesn't breathe, within a very short period of time

6    it is doing critical damage to your brain?

7         A    Correct.

8         Q    And you're aware the cause of death in this case

9    was anoxia, correct?

10        A    I am not aware of the cause of death.

11        Q    Is it true or is it not true that anoxia is

12   depravation of oxygen to the brain?

13        A    That is true.

14        Q    So if the brain doesn't get enough oxygen, you're

15   going to die?

16        A    Correct.

17        Q    And you don't know when you first saw Robbie

18   Quirello that day how long that baby had not received any

19   oxygen, do you?

20        A    No.

21        Q    Were you aware that the -- Doctor, that the baby

22   had vomited that day?

23        A    There was report of some vomit on the bed at the

24   scene.

25        Q    And were you aware that when the EMTs arrived on

338

```
 1   the scene they had to clear his passageway in order to try to

 2   get air into this baby?

 3        A    Yes.

 4        Q    And would you agree, or wouldn't you agree, that if

 5   you're vomiting and you choke on your own vomit and it blocks

 6   your throat and your nose, that you can't breath?

 7        A    Correct.

 8        Q    Now, when the baby arrived at the hospital, he was

 9   having a seizure, was he not?

10        A    No.

11        Q    He was not having a seizure?

12        A    He was not seizing upon arrival at the hospital.

13        Q    Isn't it true that he received seizure medication

14   at the hospital?

15        A    Not in the emergency room, that I'm aware of.  Let

16   me review the record here.  No, we did not give him seizure

17   medication.  I would presume that was done in the pediatric

18   intensive care unit.  I didn't witness a seizure and I didn't

19   treat him for a seizure.

20        Q    Okay.  Now, you indicated that before, excuse me,

21   before you sent the baby off to have a CAT scan done, you

22   examined his eyes?

23        A    Yes.

24        Q    And you did a gross physical examination of the

25   baby externally, correct?
```

1      A      Yes.

2      Q      When you looked at Robbie Quirello, you saw

3  absolutely no evidence of any kind of trauma to his body

4  whatsoever, did you?

5      A      No.

6      Q      There was no bruising on him?

7      A      No.

8      Q      You saw no evidence of any broken bones?

9      A      No.

10      Q      You saw no evidence of any cuts or blunt trauma to

11  the outside of the body?

12      A      No, I didn't.

13      Q      You didn't see places where his head had obviously

14  been hit against a hard object or anything like that?

15      A      No.

16      Q      In fact, the only evidence of any injury that you

17  saw -- obviously the baby was comatose, right?

18      A      Yes.

19      Q      So that's clearly a very serious situation to begin

20  with.  But the only evidence you saw of any injury to this

21  baby was by looking at his eyes, correct?

22      A      Correct.

23      Q      And you used an instrument to look at his eyes?

24      A      Yes.

25      Q      And you peered into his eyes and you saw retinal

1   hemorrhaging, correct?

2        A    Yes.

3        Q    You did not see any hemorrhaging in the vitreous

4   matter, did you?

5        A    Not that I can determine.  I'm not an eye

6   specialist.  That's a little more difficult finding.

7        Q    And you did not do an autopsy on this baby, did

8   you?

9        A    No, I did not.

10       Q    Now, based on that observation and that alone, you

11  began to conclude that this was shaken baby, correct?

12       A    No, I'm not sure I made any conclusions.  The fact

13  that his pupils were unequal and he had the retinal

14  hemorrhages made me concerned that there might be some other

15  injury to the brain, and that's why we ordered a CT scan.

16       Q    You ordered a CT scan, correct?

17       A    Correct.

18       Q    And when you got the results of the CAT scan back,

19  you learned that not only was there acute subdural hematoma

20  but there was evidence of chronic subdural hematoma?

21       A    The initial report from the attending radiologist

22  was that it appeared there were multiple hematomas of varying

23  age.  That's the report I got.

24       Q    You knew by that, varying age meant that whatever

25  they observed in the CAT scan had, may have occurred that day

1    but there was evidence in the CAT scan that had previously

2    occurred in this child?

3        A    That was the report, yes.

4        Q    You didn't observe the CAT scan yourself?

5        A    No, I did not.

6        Q    So one of the doctors who observed it was

7    Dr. Quisling?

8        A    I don't know, I don't remember who it was.

9        Q    Dr. Agee, do you remember that?

10       A    I would be guessing.

11       Q    Okay.  Well, we don't want you to guess.

12       A    I presume it was Dr. Agee but I don't remember.

13       Q    We don't want an expert witness to guess.

14            Now, would it surprise you when Dr. Quisling found,

15   from looking at the CAT scan, that 65 percent of the blood

16   that was in the subdural space was chronic and 35 percent was

17   acute, by his estimation?

18            MS. SINGER:  I'm going to lodge an objection.  I

19       don't think that's evidence.

20            THE COURT:  The objection is sustained.

21   BY MR. TEDDER:

22       Q    Now, you're aware, are you not, that a subdural

23   hematoma can be caused during the birth of a child?

24       A    Yes.

25       Q    So this child was four and a half months old when

1  he came to the hospital, correct?

2      A    Yes.

3      Q    And you're aware, are you not, that a subdural

4  hematoma is gradually reabsorbed by the body as part of the

5  healing process?

6      A    Yes.

7      Q    That the subdural hematoma can in fact

8  spontaneously rebleed; isn't that true?

9      A    Yes.

10     Q    And so, in fact, a subdural hematoma that is

11  pre-existing can spontaneously rebleed for any or no reason

12  at all; isn't that true?

13     A    Yes.

14     Q    So we don't need, in order for this baby's chronic

15  subdural hematoma to begin to rebleed, it's not necessary

16  that anything external happened to the child; isn't that

17  true?

18         MS. SINGER:  I'm going to lodge an objection.  The

19     question presumes chronic subdural hematoma, and there's

20     no evidence in the record.  It's an improper

21     hypothetical.

22         THE COURT:  Your objection is overruled.  Go ahead.

23         MR. TEDDER:  Thank you.

24  BY MR. TEDDER:

25     Q    So it's your understanding of this, not being an

1  expert of course in shaken baby, the theory of shaken baby,

2  but you understand and you know that a chronic subdural can

3  spontaneously rebleed for no reason at all?

4      A    Yes.

5      Q    Now, if a person has a subdural hematoma and if

6  that subdural hematoma begins to bleed -- the dura is

7  obviously the surrounding of the brain, correct?

8      A    That's correct.

9      Q    And so if it bleeds in the subdural space, that is

10  between the dura and the brain, correct?

11      A    That's correct.

12      Q    And there's arachnoid membrane and I believe the

13  pia before you get to the actual brain, correct?

14      A    That's correct.

15      Q    Now, if you bleed in the subdural space, that is

16  going to cause irritation of the brain, will it not?

17      A    Yes, it will.

18      Q    And irritation to the brain can cause a seizure,

19  can it not?

20      A    Yes.

21      Q    So, now, we agree, Doctor, also that a lack of

22  oxygen to the brain can cause it to bleed?

23      A    That I am not familiar with, just the lack of

24  oxygen causing --

25      Q    Yes.

1        A     -- hemorrhage?

2        Q     Yes.

3        A     I'm not familiar with that.

4        Q     You would defer to a neurosurgeon on that?

5        A     Neuropathologist or neurosurgeon, yes.

6        Q     Now, you're aware, are you not, of the Apgar tests

7   that are done when a baby is newborn?

8        A     Yes.

9        Q     And that the A in Apgar stands for activity or

10   muscle tone?

11       A     Yes.

12       Q     That the P stands for pulse?

13       A     Correct.

14       Q     That the G stands for grimace?

15       A     Yes.

16       Q     That the A stands for acrocyanosis?

17       A     Correct.

18       Q     And that the R stands for respiration?

19       A     Correct.

20       Q     Now, this Apgar test is given to every newborn

21   immediately on birth, is it not?

22       A     It's an observation, and, yes, it's recorded at the

23   time of birth and at a period thereafter.

24       Q     In fact, when a baby is born, isn't it true that

25   the first thing that is done is that the baby is either held

1  upside down so that his breathing passages can drain of any

2  fluid that may be in there, or, and maybe in addition to, the

3  baby is placed down and various suction devices are used to

4  clear his nose, his throat, his or her nose and throat, to

5  make sure the child can breathe?

6      A    It's customary.

7      Q    Well, it's not just customary, it's done in every

8  case, every birth, correct?

9      A    When possible, yes.

10     Q    Well, isn't the most important thing to make sure

11 when a child is born that the child is able to breathe?

12     A    That the airway is clear.  Obviously there are

13 natural child births probably where that doesn't occur and

14 the children do fine, but the medical standard would be to

15 suction the airway when possible.

16     Q    Right, immediately.  I remember seeing my children

17 born and saw that happen --

18         MR. PENNYPACKER:  Your Honor, I'd object to

19     Mr. Tedder testifying.

20         THE COURT:  Mr. Tedder, the objection is sustained.

21         MR. TEDDER:  Yes, I withdraw the comment and

22     apologize for that.

23 BY MR. TEDDER:

24     Q    Now, Doctor, the Apgar test, do you agree or

25 disagree that those five observations that are made are made

1   to determine whether or not the child is properly receiving

2   oxygen and breathing; is that or is that not true?

3          MS. SINGER:  Your Honor, I'm going to lodge an

4      objection.  This is going beyond the scope of direct

5      examination, number one; and I'm not sure that these

6      questions are relevant as to what this witness

7      testified.

8          MR. TEDDER:  Your Honor, they offered him --

9          THE COURT:  The objection is overruled, you may

10     continue, Mr. Tedder, so long as you're not going to

11     testify.

12         MR. TEDDER:  I promise not to testify again.

13  BY MR. TEDDER:

14     Q    Dr. Rohlwing, the activity that's done as part of

15  Apgar -- let me rephrase the last question.

16         Would you agree that those five examinations are

17  done primarily to determine whether or not a child is

18  breathing as he or she should on birth?

19     A    It's not just breathing.  It's to score the, the

20  viability and vigor of the newborn.  And, again, this is

21  getting a little beyond my area, that's really more a matter

22  of OB/GYN.  I'm familiar with the Apgar.  I don't do a lot of

23  deliveries.  In fact, I haven't done one in many years.  So

24  I'm certainly not an expert on what the Apgar, how the Apgar

25  came about or exactly what the specifics are, other than it

1   is a measure of the vigor of the newborn.

2        Q    Are you familiar with Virginia Apgar?

3        A    No.

4        Q    So you don't know the person who came up with this,

5   those observations?

6        A    No.

7        Q    So you're not familiar with the way Apgars are

8   scored; is that correct?

9        A    I'm familiar with the way they're scored.

10       Q    So then you're familiar that under activity, that

11  each of the five is scored on a zero to two basis, correct?

12       A    Yes.

13       Q    And that for activity that is basically measuring

14  muscle tone, correct?

15       A    Correct.

16       Q    And zero means the child is limp?

17       A    That's correct.

18       Q    A one means flexation of the extremities, of the

19  legs or the arms, correct?

20       A    Yes.

21       Q    And two means motion of the child?

22       A    Right.

23       Q    Obviously, a two would be the best score for a

24  child, correct?

25       A    That's correct.

1    Q    Now, as to pulse, a zero means no pulse, correct?

2    A    Right.

3    Q    One means below 100 per minute?

4    A    That sounds right.

5    Q    And two is over 100?

6    A    That's correct.

7    Q    Now, as to grimace, a zero is no response, correct?

8    A    Yes.

9    Q    And a one is a grimace, correct?

10   A    Yes.

11   Q    And two is a cough or a sneeze, correct?

12   A    Yes, or cry.

13   Q    And the grimace test is done by basically tickling

14   the baby, correct?

15   A    Correct.

16   Q    Then as to the acrocyanosis test, that is basically

17   looking at the baby's color, is it not?

18   A    Yes.

19   Q    And acro means peripheral, correct?

20   A    Yes.

21   Q    And cyanosis refers to blue, correct?

22   A    Blue coloration, yes.

23   Q    And zero under the acrocyanosis test means that the

24   baby is either blue or pale on birth, correct?

25   A    Yes.

1     Q     One means baby is either pink and has extremities

2  that are blue, correct?

3     A     Correct.

4     Q     And a two means the baby is completely pink?

5     A     Yes.

6     Q     And respirations, a zero means they're absent in

7  respiration?

8     A     Right.

9     Q     And one means slow respiration?

10     A     That's correct.

11     Q     Two means good or crying, correct?

12     A     Correct.

13     Q     Now, Doctor, after you observed Robbie Quirello

14  that day, you contacted somebody who then contacted the CPT,

15  the child protection team, as far as you know?

16     A     I notified the social worker who is either in the

17  emergency department or available to the emergency

18  department.

19     Q     And you're familiar in the State of Florida we have

20  what's called mandated reporting of suspected child abuse?

21     A     Yes.

22     Q     And you're familiar that if you report what you

23  believe may or may not be child abuse in good faith, you're

24  totally immune from any liability; isn't that correct?

25     A     Yes.

1      Q    However, I'm sure you're also aware that if you

2  don't report what is possibly child abuse, you're subject to

3  prosecution as a criminal; isn't that true?

4            MR. PENNYPACKER:  Your Honor, I'm going to object.

5        This is beyond this witness' scope.  He's not a lawyer.

6            THE COURT:  Sustained.

7            THE WITNESS:  To my -- I'm sorry, I answered it.

8            MR. TEDDER:  Your Honor, he's been offered as an

9        expert by the state.  I think I should be able to

10       cross-examine him on his knowledge as to what would

11       happen if he didn't report this.

12           THE COURT:  I understand that that's what you

13       believe, Mr. Tedder, but the objection has been

14       sustained.

15  BY MR. TEDDER:

16     Q    Dr. Rohlwing, you indicated that after you

17  initially observed Robbie Quirello you spoke to the mother,

18  Crystal Quirello, correct?

19     A    Yes.

20     Q    And in fact she had a rather unusual response when

21  you told her that the child needed to be placed in pediatric

22  intensive care unit, did she not?

23           MR. PENNYPACKER:  Objection, hearsay.

24           MR. TEDDER:  He's an expert.  He's testified to

25       hearsay the whole testimony.

1          MR. GROLAND:  Your Honor, can we approach?

2          THE COURT:  Just a second.  I need for you to

3     approach the bench and this does not need to be on the

4     record at this time.

5          (A sidebar discussion was held off the record:)

6          THE COURT:  Go ahead and continue, Mr. Tedder.

7          MR. TEDDER:  Thank you, Your Honor.

8  BY MR. TEDDER:

9      Q    I believe, Doctor, you testified previously that

10 when you met with Crystal Quirello you told her we're not

11 sure of the cause of the problem, however, the child is

12 critical?

13     A    As I recall.

14     Q    And she had a reaction to that, correct?  Don't

15 tell me what it was.  She had a reaction to that, correct?

16     A    Yes.

17     Q    Now, Doctor, would you agree that living tissue has

18 an injury to it -- excuse me, has injury threshold?

19     A    Yes.

20     Q    So that, excuse me, different people obviously are

21 different, correct?

22     A    Yes.

23     Q    Some people cut more easily than others, correct?

24     A    Yes.

25     Q    And bones break more easily in some folks than

1    others, correct?

2         A    That would be correct.

3         Q    And are you aware of any scientific studies that

4    have been done to test or determine injury thresholds in the

5    brain?

6         A    No, I'm not.

7         Q    So you're not aware of any tests like that.  And

8    this is a brain injury that you've been allowed to testify

9    to, correct?

10        A    Correct.

11        Q    Now, is your understanding of shaken baby that

12   somehow a child's brain can be injured and yet the neck is

13   not injured?

14        A    That is --

15        Q    The theory?

16        A    -- the usual -- yeah, the usual finding and the

17   theory.

18        Q    Okay.  And, in fact, in this particular case, did

19   you ever request that Robbie Quirello be sent to have an MRI

20   done of his neck?

21        A    No.

22        Q    And you didn't do that because you didn't think it

23   was important or you turned the case over to some other

24   doctor in the hospital?

25        A    Turned the child over to the pediatrics

1   neurosurgeon.

2       Q     Turned it over to Dr. Dickinson, do you know if

3   that was the doctor?

4       A     I don't recall who it was.

5       Q     Would you agree, sir, that an MRI could determine

6   whether or not there was injury to the brain stem?

7       A     MRI is fairly sensitive at looking at the

8   infrastructures, including the brain stem, yes.

9       Q     And you're aware, are you not, or are you familiar

10  with the theory of shaken baby that the damage to the brain

11  is in the dura section of the brain?

12      A     Is in the dura?

13      Q     Yes, the bridging between the, the bridging

14  arteries between the --

15      A     Subdural and epidural areas.

16      Q     Yes.  Of the dura?

17      A     Likely, yes.

18      Q     Would you agree, would you not, that a microscopic

19  examination of the dura would be very helpful in determining

20  what happened to this baby?

21          MS. SINGER:  I'm going to lodge an objection, that

22      is not for this witness to answer.

23          THE COURT:  Well, Dr. Rohlwing can determine

24      whether or not it's within his area of expertise or not.

25          Now, Doctor, if you're able to answer that, you

1        may.   If it is outside your area of expertise, then

2        you'll so indicate.

3            THE WITNESS:  That's outside.

4            MR. TEDDER:  Fair enough, Doctor.

5  BY MR. TEDDER:

6      Q    Are you familiar -- you indicated earlier that the

7  only thing you were aware of as to what could cause retinal

8  hemorrhaging was, I believe, the theory of shaken baby; is

9  that correct?

10     A    That is the most common cause that I'm aware of.

11     Q    Are you aware that a seizure can cause that?

12     A    No, I'm not.

13     Q    Are you aware that a car accident can cause that or

14  not?

15     A    I'm not aware of cases where that has been shown.

16  It doesn't surprise me that it might.

17     Q    Are you aware that people who do bungee jumping

18  have had retinal hemorrhaging?

19     A    Again, I'm not aware of that, but it wouldn't

20  surprise me.

21     Q    And are you aware or were you -- did you become

22  aware that this baby's brain had swollen and enlarged inside

23  the skull?

24     A    No, I wasn't aware of that.

25     Q    You were unaware of that.  Would you agree or not

1   agree that subdural bleeding would cause irritation -- I

2   think you already agreed with that, correct?

3        A    Yes.

4        Q    And one of the responses the brain has to

5   irritation is to swell; isn't that true?

6        A    That's true.

7        Q    In fact, most tissue, if it's damaged, swells?

8        A    Yes.

9        Q    And would you agree that the venous drainage from

10  the eyes, the vein that drains blood from the eyeballs comes

11  out of the back of the eye, buried in the same space as the

12  retina where the optic nerve is?

13       A    Yes.

14       Q    And would you agree or not agree that arteries, the

15  tissue that arteries are made of is stronger than the tissue

16  that veins are made of, correct?

17       A    Correct.

18       Q    And wouldn't you agree that swelling of the brain

19  would occlude the venous drainage from the eyes?

20       A    Yes, it can.

21       Q    Thus causing the retinal hemorrhages, would you

22  agree with that?

23       A    That would seem reasonable.

24            MR. TEDDER:  I don't have any other questions, Your

25       Honor.

1           MR. GROLAND:  Your Honor, can we just have one

2      moment.

3           THE COURT:  Yes.

4           MR. TEDDER:  I'm sorry, I forgot.

5    BY MR. TEDDER:

6      Q    I think you've already testified that you did an

7    external gross examination of the child?

8      A    Yes.

9      Q    Isn't it true you saw absolutely no bruising or

10   evidence of any fingers on the chest area of the child?

11     A    No, I did not.

12     Q    No redness, nothing around the ribcage on either

13   the chest or the back of the child, correct?

14     A    No.

15     Q    You would have noted that in the report if you

16   would have seen that kind of injury, would you not?

17     A    Yes.

18          MR. TEDDER:  Thank you, Doctor.

19          THE COURT:  Before you conduct your redirect, we're

20      going to have to address the legal issue that was

21      raised.  Ladies and gentlemen, I'm going to have to ask

22      you to step back in the jury room in a few minutes.  We

23      will take a recess to allow those of you who want to

24      smoke, we'll do that shortly this morning.  But right

25      now if you'll just step into the jury room.

1          (The jury exited the courtroom.)

2          THE COURT:  All right.  Now, Mr. Tedder, you had

3     wanted to ask the doctor regarding a statement made by

4     Crystal Quirello.  And if you want to put that argument

5     on the record, the state had objected.

6          MR. TEDDER:  Yes, ma'am.  I was trying to make some

7     notes as to what the doctor's testimony was.  Your

8     Honor, I don't recall what the testimony of Ms. Quirello

9     was yesterday, Crystal Quirello was yesterday.  In fact,

10    I don't recall was probably the line she used most

11    often.  But I do know that Mr. Groland tried to question

12    her about her reaction to Dr. Rohlwing telling her that

13    the baby was critically ill and that they wanted to

14    admit the baby into the pediatric intensive care unit.

15    And I do know that Dr. Rohlwing previously testified in

16    a deposition that Crystal's reaction was that she wanted

17    to take the child home and she may have even said that,

18    she mentioned something about the divorce proceeding,

19    I'm not sure.  I can read you what she did previously

20    say.

21         THE COURT:  What she previously said is not

22    relevant at this point in this trial.

23         MR. TEDDER:  Yes, ma'am.

24         THE COURT:  I believe what you're referring to is

25    yesterday when asked that, about that interaction, my

1   recollection, having heard it for the first time, not

2   having been subject to the deposition testimony as all

3   of you have been, is that she said I don't recall.

4        MR. TEDDER:  That may be, I don't recall.  The

5   court reporter can read it back.

6        THE COURT:  The question would then be is this a

7   proper time to impeach that witness by statements that

8   were recalled having been made to this witness.

9        And the state's argument, as I understand it, which

10  of course I'll need you to put on the record again, is

11  that it's not the proper time for impeachment and the

12  proper predicate has not been laid.

13       Do you want to respond to that or do you want them

14  to put their argument fully on the record before you

15  respond?

16       MR. TEDDER:  Well, I think I can put the predicate

17  on that he spoke to the mother and that he recalls, if

18  he does, what she told him about what they felt was

19  necessary for this child.  I would think that would be

20  enough of a predicate, if the doctor testifies that he

21  knows or remembers what she told him in response to him

22  telling her this child needed to be admitted to the

23  hospital.  As far as other than that, I mean, to me

24  it's -- I have nothing else to say.

25       MS. SINGER:  Are we going do that proffer then, and

1    have him answer so we can have a record of what he

2    remembers, first of all, before we even get to the next

3    step?

4        THE COURT:  If you wish to.

5        MS. SINGER:  I think we need to do that, that is if

6    Mr. Tedder wants to ask him, if he wants to lay that

7    predicate.  Our first objection was hearsay objection.

8    Now we're moving to the next step, which is he plans on

9    impeaching Crystal Quirello with this witness.  And I

10   can't tell the Court verbatim what she said to that

11   question and her answer.  So I will allow him to lay the

12   proffer on what Dr. Rohlwing remembers, so then we can

13   discuss whether that's sufficient and go from there.

14   Because I don't even know if he knows an answer to this

15   question.  While we have the jury out, we might as well

16   put it on the record.

17       THE COURT:  Mr. Tedder, you want to ask the

18   question?

19  BY MR. TEDDER:

20       Q    Going back to your contact with Crystal Quirello on

21  August the 2nd of 2000, do you remember meeting the mother of

22  this baby?

23       A    Yes.

24       Q    And what do you recall telling the mother of this

25  baby?

1          THE COURT:  You already asked that question and I'm

2      sure Dr. Rohlwing remembers that.

3          THE WITNESS:  Right.

4  BY MR. TEDDER:

5      Q    What was her response when you told her that this

6  baby needed to be admitted to the pediatric intensive care

7  unit?

8      A    Well, her response was a little unusual.  Of

9  course, you have to realize the context.  Most people are

10  somewhat in shock when they're told that their child is

11  critically ill.  But she didn't seem to understand the

12  severity of the situation.  I told her that he was critically

13  ill, was alive but not awake and would need to be admitted to

14  the intensive care unit, she indicated that she didn't want

15  him admitted to the hospital at all.  And I tried to ask her

16  why, and she said that she was in the middle of the divorce

17  and it would cause problems with that.  Again, I don't, you

18  know, I don't assign any motive to that.  I think she may

19  have just been in shock and not understood what was going on,

20  but it struck me as a little unusual.

21      Q    As a physician, you tell somebody a patient needs

22  to be admitted, especially a mother or parent of a child,

23  don't they go along with with your recommendation

24  immediately?

25      A    Yes.  She did, I mean, she didn't refuse, but she

1   just said that she didn't want him admitted.

2       Q    Because of a pending divorce?

3       A    She made some mention of that.

4       Q    And she figured she could lose custody of the

5   child?

6       A    I don't think she mentioned that.

7       Q    Do you recall anything else she said in response to

8   your advice?

9       A    No.  Again, it was a brief conversation and then

10  the social workers kind of took over from there.

11          MR. GROLAND:  Your Honor, may I ask the doctor one

12      question?

13          THE COURT:  Yes.

14  BY MR. GROLAND:

15      Q    Did you actually let Crystal into the ER to spend

16  five or ten minutes with the child?

17      A    She was already in the ER in another area when I

18  went out and talked with her.

19      Q    Did you -- I guess the question is, did you bring

20  her over to the child?

21      A    I didn't, and I don't recall whether someone took

22  her in to the child while the child was in the emergency

23  room.

24          MR. GROLAND:  Thank you, Doctor.

25          MS. SINGER:  The state's position is because I

1    don't know what Crystal said in response to the

2    question, that Dr. Rohlwing would have to be called as a

3    defense witness for impeachment purposes, and that that

4    is not in the scope of -- was not within the scope of

5    the direct examination.  So that would be our only

6    objection.  I can't object to the fact that it may be

7    possible impeachment, because unless we go back and look

8    on the realtime transcript to see how she answered that

9    question, I can't hazard a guess.  I don't have a

10    specific quote.

11        THE COURT:  Mr. Tedder, in regard to the objection

12    that the impeachment, though it may be proper, would be

13    untimely since this is not your case in chief, what's

14    your response?

15        MR. TEDDER:  My response, Your Honor, is that this

16    gentleman is a professional.  He's taken time from his

17    career to come down here and testify.  If we want to

18    drag him back down here again, if the Court rules that

19    way, then if we decide that's necessary, we will.  But

20    just for expediency purposes, it would seem to me to

21    allow the doctor to go ahead and testify to this,

22    admittedly, I mean, it's -- technically if the state

23    wants to keep it out and have us bring him back down

24    here, we'll do it if we feel like it's necessary.

25        THE COURT:  So your response would be that the

1     state is technically correct according to the rules of

2     evidence, which I must comply with, absent a

3     stipulation, this is not proper impeachment at this

4     time?

5          MR. TEDDER:  I think that's correct, Judge.  If the

6     state doesn't want to stipulate, if they want to cause

7     Dr. Rohlwing to come back, we'll do it if we feel it is

8     necessary.

9          THE COURT:  You want Dr. Rohlwing to come back.

10    Obviously he can and will if he's under subpoena, or you

11    want to acquiesce that it come out of order?

12         MS. SINGER:  I'm not acquiescing that it come out

13    of order, Your Honor.

14         THE COURT:  Dr. Rohlwing, you may well have to come

15    back, but we'll do the best we can to accommodate your

16    schedule.

17         Anything else that needs to be covered outside the

18    presence of the jury before we go back to redirect?

19         MR. TEDDER:  Not that I'm aware of.

20         MR. GROLAND:  Just if I may get a way to get in

21    touch with you, Doctor.  This is off -- well, is there a

22    quick way we can call you?

23         THE WITNESS:  My home phone.

24         MR. GROLAND:  May I just sidebar with him, Your

25    Honor, so he doesn't have to --

1          THE COURT:  Yes.

2          (A discussion was held off the record.)

3          MR. GROLAND:  Thank you.

4          THE COURT:  It won't be that quick because it will

5     be sometime next week at the earliest.

6          MR. GROLAND:  Thank you, Your Honor.

7          THE COURT:  I'm going to, to accommodate

8     Dr. Rohlwing to the extent that we're able to, go ahead

9     and bring the jury back in, let you conclude your

10    redirect, and then we'll take a recess for everybody.

11         Bring the jury back in.

12         (The jury entered the courtroom.)

13         THE COURT:  For clarification, Mr. Tedder,

14    Mr. Groland, you had no further questions at this time;

15    is that right?

16         MR. TEDDER:  Yes, ma'am, that's correct.

17                    REDIRECT EXAMINATION

18  BY MR. PENNYPACKER:

19    Q    Dr. Rohlwing, what was your role on the day of

20  August 2nd as far as the treatment of this child in the

21  emergency room?

22    A    I was the attending emergency physician.

23    Q    And as far as his overall treatment, what part did

24  you play in the course of this stay in the hospital?

25    A    I supervised and provided the care while he was in

1    the emergency department, which was a little over an hour.

2        Q    After you made the initial examination, the

3    funduscopic exam, learned the CAT scan results, you then

4    turned him over to a different service; is that correct?

5        A    Actually, the transition occurs in the emergency

6    department.  We would have called the pediatric intensive

7    care unit team shortly after arrival or maybe even before

8    arrival.  And often they will come down to the emergency room

9    and start evaluating.  They assume full responsibility,

10   obviously, when the child goes upstairs.  We're responsible

11   while still in the emergency department.  But a lot of times

12   we're both kind of working simultaneously.  So I don't know

13   whether anyone from the PI team was down in the emergency

14   department during the care of this child or not.  I certainly

15   had no contact or responsibility after he left the

16   department.

17       Q    Mr. Tedder asked you about the CAT scan results and

18   the opinion of the radiologist that there were

19   multi-generations of varying ages as far as blood in this

20   child's brain.  Does that indicate to you that there's, with

21   certainty, a chronic --

22           MR. TEDDER:  Objection, leading.

23           THE COURT:  Overruled.

24   BY MR. TEDDER:

25   BY MR. PENNYPACKER:

1      Q     Does that indicate to you with certainty that there

2  is a chronic subdural hematoma present?

3      A     No.

4            MR. TEDDER:  You know what, actually testifying

5      beyond what he's been sworn in as an expert.

6            THE COURT:  Overruled.  Doctor, if a question is

7      asked that is beyond your expertise, you can simply

8      indicate that it is.  If it is within your area of

9      expertise, you may answer.

10  BY MR. PENNYPACKER:

11     Q     Do you know what a hydroma is?

12     A     Yes.

13     Q     What's a hydroma?

14     A     A collection of fluid in or around the brain.

15     Q     What can be the cause of a hydroma?

16     A     That's beyond my area of expertise.

17     Q     Do you know how the body responds to a subdural

18  hematoma?

19     A     I'm not sure I understand that question.

20     Q     A human suffers a subdural hematoma inside their

21  head.  What does the head do in response to that?

22     A     Several things.  The accumulation of blood in the

23  subdural space puts pressure on the brain, and that pressure

24  directly causes some dysfunction, either in the area

25  immediately adjacent in the brain, or enough pressure that

1    causes the brain to push beyond the base of the skull.

2         Q    How does the body attempt to heal the subdural

3    hematoma?

4         A    The blood breaks down and there's an inflammatory

5    response.  The blood and blood products are eventually

6    absorbed, just like they would be elsewhere.

7         Q    Do you know how long that process typically takes?

8         A    No.

9         Q    Do you know what remains if anything after that

10   healing process has occurred inside the brain?  If it's

11   outside your area, it's outside your area.

12        A    That's outside my area.

13        Q    Do you know what a neomembrane is?

14        A    No.

15        Q    Do you know whether subsequent to the healing

16   process of a subdural hematoma that there may be formation of

17   a neomembrane around what does remain?

18        A    That's outside my area.  I'm vaguely familiar with

19   a lot of the stuff you're talking about but that's way

20   outside my area of expertise.

21        Q    If this child had suffered a subdural hematoma at

22   the time of birth, would you have expected the body to have

23   completed the healing process well before this child reaches

24   you on August 2nd?

25        A    Again, outside of my area.

1    Q    Fair enough.  You mentioned an intracortical lesion

2  as far as the results of the CAT scan, you remember that?

3    A    I believe I mentioned that as one of the things

4  that I was concerned about.  I don't recall being told the

5  specific locations of the various hematomas.  The verbal

6  report I got was that there were multiple hemorrhages or

7  hematomas of varying age.  That was about as specific as it

8  got.

9    Q    Intracortical is not in the subdural space; is that

10  correct?

11    A    Intracortical in the brain tissue itself.

12    Q    So it would not be associated with the subdural

13  hematoma as far as where the blood comes from; is that right?

14    A    Correct.

15    Q    Do you know what would be called an intracortical

16  lesion?

17    A    Again, any type of trauma would be at least in my

18  in my field, because I see trauma victims most commonly and

19  not other more neurosurgical problems, any kind of trauma

20  that breaks or disrupts the blood vessel.

21    Q    Could it be the result of blunt head trauma?

22    A    It could.

23    Q    What is blunt head trauma?

24    A    A blow to the head.

25    Q    Is there a distinction between blunt head trauma

1   and sharp head trauma?

2        A     By sharp, you mean penetrating?

3        Q     Yes, sir.

4        A     Yeah.  We usually distinguish between blunt head

5   trauma, which is a blow without penetration of the skull and

6   penetrating trauma which has penetration.

7        Q     Was there any evidence of a sharp head trauma on

8   Robbie Quirello?

9        A     Not on my examination.

10       Q     You were asked whether anoxia causes bleeding.  Do

11  you understand that anoxia means depravation of oxygen; is

12  that correct?

13       A     That's correct.

14       Q     And your answer was that depravation of oxygen

15  doesn't cause bleeding; is that right?

16       A     No, I'm not aware of it causing bleeding.  It

17  causes tissue damage certainly.

18       Q     It wouldn't cause a subdural hematoma, would it?

19       A     That, again, is outside of my area of expertise.

20       Q     Apgar scores, you were asked about the five

21  criteria.  You are not an obstetrician; is that correct?

22       A     No, I'm not.

23       Q     You did seem to know how they're scored as far as

24  the range?

25       A     I'm familiar with them.  We deal with them when you

1   go through training and do a rotation on obstetrics.  And we

2   score them when we have the inadvertent delivery in the

3   emergency department, but that's fortunately not real often.

4       Q    Given Mr. Tedder's recitation of how an Apgar score

5   is administered, by my math, the best score a child could get

6   would be a ten, if he got a two or she got a two on each of

7   the five categories for a total of ten; is that right?

8       A    That's correct.

9       Q    If the child got an eight or a nine on an Apgar

10  score, would you find that that child is healthy?

11      A    Yeah, my understanding is eight or nine would be a

12  pretty healthy child.

13      Q    You were asked whether a motor vehicle accident

14  could cause retinal hemorrhaging and I believe you said that

15  is a possibility; is that right?

16      A    My understanding of the mechanism of retinal

17  hemorrhage is tearing of the blood vessels.  I would think

18  that that could occur from a motor vehicle accident, anything

19  that causes sudden forceful movements of the head.

20      Q    Do you see motor vehicle accidents every day in the

21  emergency room?

22      A    Yes.

23      Q    How often do you see retinal hemorrhages in motor

24  vehicle accident victims?

25      A    None that I have seen.

1    Q    Ever?

2    A    Not that I recall.

3    Q    How many motor vehicle accident victims have you

4   seen in your career as an emergency room physician?

5    A    Can't count, I see them every day.

6    Q    Thousands?

7    A    Thousands.

8    Q    You've seen thousands of motor vehicle victims and

9   never seen retinal hemorrhaging; is that correct?

10    A    Not that I recall.

11    Q    Do you know whether Robbie Quirello was in an

12   automobile accident on the morning of August 2nd?

13    A    No, I don't.

14    Q    Do you know whether Robbie Quirello was bungee

15   jumping on August 2nd?

16    A    No, I don't.

17        MR. PENNYPACKER:  That's all the questions I have.

18        THE COURT:  May Dr. Rohlwing be released at this

19        time, subject to recall?

20        MR. TEDDER:  Your Honor, no -- yes, I agree.

21        THE COURT:  Dr. Rohlwing, you are free to leave the

22        courthouse at this time.  As I indicated earlier, you

23        are subject to be recalled as a witness later in the

24        trial and, of course, we'll let you know.

25        THE WITNESS:  Thank you.

1          THE COURT:  Thank you.

2          We are going to take a recess at this time, ladies

3      and gentlemen.  And I'll ask the bailiff if you can

4      provide escort to the ones who may want to go outside.

5      And we'll be in recess for 15 minutes.

6          (The jury exited the courtroom and a recess was

7   taken.)

8          THE COURT:  Mr. Pennypacker, is the state ready?

9          MR. PENNYPACKER:  I'll get my next witness.

10         THE COURT:  Is the defense ready?

11         MR. TEDDER:  Yes, ma'am.

12         THE COURT:  Go ahead and bring the jury in.

13         THE BAILIFF:  Yes, Your Honor.

14         (The jury entered the courtroom.)

15         THE COURT:  Ms. Singer, go ahead and call your next

16     witness.

17         MS. SINGER:  Dr. Richard Kreinest.

18         (The witness is duly sworn by the clerk.)

19         THE CLERK:  You may be seated.

20   WHEREUPON:

21             DR. RICHARD M. KREINEST,

22   called as a witness herein, having been first duly sworn, was

23   examined and testified as follows:

24                 DIRECT EXAMINATION

25   BY MS. SINGER:

1       Q     Dr. Kreinest, if you would state your full name,

2   please, and spell your last name for the record.

3       A     Richard M. Kreinest, K-R-E-I-N-E-S-T.

4       Q     And your employment or profession, sir?

5       A     I'm an obstetrician/gynecologist.

6       Q     Where is your practice located?

7       A     In the Ayers Medical Plaza, and we practice at

8   Shands Alachua General Hospital.

9       Q     Could you please outline for us your undergraduate

10  and graduate education?

11      A     I did my premedical studies at Xavier University in

12  Cincinnati and I went to medical school at the University of

13  Cincinnati.  I did my residency at Wright State University

14  and at Wright-Patterson Air Force Base in Dayton, Ohio.

15      Q     Were you in the military at the time that you

16  obtained your medical degree?

17      A     The military, I went through medical school on

18  what's called an HPSP scholarship where the military paid my

19  way through medical school and then I did my residency.  So I

20  was on active duty with the military during my residency.

21      Q     Where did you do your residency?

22      A     At Wright State University, which was affiliated

23  with Wright-Patterson Air Force Base in Dayton.

24      Q     Where is that, in Dayton, Ohio?

25      A     Dayton, Ohio.

1    Q    Do you have any specialized training, are you -- do
2  you have a specialization in medicine?

3    A    I'm board certified in obstetrics and gynecology.
4  I'm not, I do not have a fellowship, which would be more
5  specialized training in one of the areas.

6    Q    What is obstetrics and gynecology?

7    A    Obstetrics and gynecology deals with care of female
8  patients, basically total care with all types of
9  gynecological disease.  And the obstetrical portion of it
10 deals with dealing with pregnancy, maternal care, including
11 prenatal counseling and antenatal care, which is during the
12 pregnancy, and postpartum care, which is after delivery.

13   Q    Do you deliver babies?

14   A    Yes, I do.

15   Q    Now, when did you start practicing as an
16 obstetrician?

17   A    I finished my, completed my residency in 1986.  And
18 for the next four years I was the chief of OB at Homestead
19 Air Force Base in Homestead, Florida.

20   Q    And OB would be obstetrics?

21   A    Yes.

22   Q    And so you've been basically practicing obstetrics
23 since 1986?

24   A    Correct.

25   Q    Are you able to give us an estimate of how many

1   babies you have attended?

2        A      Probably in the range of 3,000.

3        Q      Do you presently hold any position with Shands AGH

4   or Shands Hospital here in Gainesville, Florida?

5        A      I'm presently the chief of staff at Shands at the

6   University of Florida and Shands at AGH.

7        Q      Have you ever testified in a court of law regarding

8   obstetrics or gynecology?

9        A      Yes, once in the military.

10       Q      Were you qualified as an expert to offer opinions

11  in those areas?

12       A      Yes.

13            MS. SINGER:  At this time, Your Honor, I would

14       tender Dr. Kreinest as an expert in the area of

15       obstetrics and gynecology for the purpose of giving

16       opinions regarding the obstetrical care of Crystal

17       Quirello in this case.

18            MR. TEDDER:  For that limited purpose, we have no

19       objection.

20            THE COURT:  Good enough.  I do find Dr. Kreinest to

21       be able to offer opinion testimony in the areas of

22       obstetrics and gynecology.

23  BY MS. SINGER:

24       Q      Do you know a person by the name of Crystal

25  Quirello?

1        A    Yes, as a patient.

2        Q    When did she first come to see you -- and I know,

3    Dr. Kreinest, you brought a chart with you.  Did you bring

4    Crystal Quirello's chart with you?

5        A    Yes, I did.

6        Q    Will you need that to refer to specific dates and

7    times?

8        A    Possibly some of them.

9        Q    Feel free to refer to that and tell us you are at

10   the time you are.

11       A    Okay.

12       Q    When did she first come to see you?

13       A    I first saw her August 31st of 1999.

14       Q    And at that time did she believe that she was

15   pregnant?

16       A    Yes, she had been seen at the crisis pregnancy

17   center at that time, and we had an arrangement that we

18   volunteered to do free ultrasounds for them on patients who

19   have a need of that.  So when I saw her, it was for a brief

20   visit and an ultrasound examination.

21       Q    When she first came to see you, were you able to

22   determine how long she had been pregnant?

23       A    There was a fetal sack with a fetal pole with a

24   heartbeat, and she was in the range of seven to eight weeks.

25       Q    Would you calculate when her due date was at that

1   time?

2       A    We just basically at that ultrasound do a rough

3   estimate of the due date, and it was mid April.  But we wait

4   on specific dating until a later ultrasound, a more detailed

5   ultrasound.

6       Q    Now, that particular ultrasound, was there anything

7   unusual in that ultrasound that suggested to you that Crystal

8   Quirello was heading towards an abnormal pregnancy?

9       A    No.  I mean, at that time it was just a life

10  affirming ultrasound that basically determined that there was

11  fetal pole and a fetal heartbeat in the uterus.

12      Q    Did she then become your obstetrical patient?

13      A    Yes, she did.

14      Q    As your obstetrical patient, did you routinely

15  examine her, and of course by examining her, the baby in

16  utero?

17      A    Yes, we did.

18      Q    When I say "in utero" we're talking about the baby

19  when he or she is inside of mom, right?

20      A    Correct.

21      Q    Could you outline for us first what your routine

22  visitation schedule is for a mom that's getting ready to have

23  a baby?

24      A    Well, the first visit will usually be with a nurse

25  educator who goes over their history and any medical problems

1  that could influence the pregnancy.  The initial lab work is

2  usually done at that time.

3          The next visit is usually for the physical

4  examination where the initial complete physical examination

5  is done.

6          And after that, usually they're seen approximately

7  every four weeks for the first 28 weeks of pregnancy, then

8  every two weeks until 36 weeks, and then every week during

9  the last month of pregnancy before the due date.

10     Q    Are there some blood tests that are run early on in

11 the pregnancy?

12     A    Basically there's a number of tests we do, you

13 know, obviously checking the blood count.  We check the RH

14 status of the mother.  We check, you know, certainly do the

15 pap smear.  Those are obviously screened for any types of

16 infection, gonorrhea, chlamydia, that could influence the

17 pregnancy.  Then subsequent to that, usually at 16 weeks,

18 there's a test called a alpha-fetoprotein test or a triple

19 test that we offer to everyone.  It's a screening test that

20 basically screens for things, neuro tube defects, spina

21 bifida and down syndrome.

22     Q    Let's talk about the HR test first.  Was she given

23 an HR test, was Crystal Quirello?

24     A    Yes, she was.

25     Q    And was there a finding as to --

1    A    Basically it's just a determination of her blood

2  type, and she was RH negative.  And at that time an antibody

3  screen is done and the antibodies were also negative.

4    Q    Would the RH negative test in any way affect the

5  baby's development?

6    A    No.  The blood type, unless there was antibodies

7  that she would have, would not affect the baby's development.

8  The purpose of that test is to prevent, if this baby would

9  have a positive type blood, there's medications we can use

10  later on in the pregnancy and after birth to prevent the

11  development of antibodies, which could possibly affect

12  subsequent pregnancies.

13    Q    When you say subsequent pregnancy, you're talking

14  about the next time?

15    A    The next time she would become pregnant.

16    Q    Now, the alpha-fetoprotein test that you run, was

17  that test performed?

18    A    Yes, it was.

19    Q    And was there anything, any indication that there

20  was any spina bifida or you said neuro tube --

21    A    Neuro tube defect is the whole gamut of spina

22  bifida, basically an abnormality of the spinal cord

23  development, which includes spina bifida and a number of

24  other conditions.

25    Q    Was there a finding as to whether or not this baby

1    was susceptible to that or had a proclivity for that?

2         A    The screening test was negative.

3         Q    And then the third was down syndrome?

4         A    Yes, the test also will give you an assessment of

5    down syndrome risk.

6         Q    We need to tell the jury what down syndrome is.

7         A    Down syndrome is chromosomal abnormality.  Some

8    people basically refer to it as trisomy 21, where instead of

9    getting two of those chromosomes, there's three, and it can

10   have many manifestations.  Basically there's morphological

11   abnormalities that can occur from it, and usually some degree

12   of mental retardation, which can vary widely.

13        Q    When you said "morphological," what does that mean?

14        A    Bascially abnormalities of appearance, low set

15   ears, different changes in the hands, and differences in the

16   chest, you know, some of these can be extremely obvious and

17   others can be very subtle, but there's a certain -- it's

18   basically a syndrome where there's a certain number of

19   changes that are associated with that condition.

20        Q    So there's a constellation of signs and symptoms --

21        A    Yes.

22        Q    -- when you say syndrome?

23        A    Yes.

24        Q    And how did the blood test show this baby, was this

25   baby going to be a down syndrome baby?

1          A     Well, basically this is a screening test.

2          Q     Yes.

3          A     And by a screening test, it checks certain

4     parameters in the blood that, you know, through computer

5     models we know can be altered if there is a child with down

6     syndrome or neuro tube defects.  As a matter of fact, if the

7     tests were positive, all it would indicate is that her

8     chances of having one of these problems are higher than we

9     would expect based on her age.  It doesn't indicate that

10    there's a problem.  The vast majority of people, even with a

11    positive screen, are normal or have normal babies.  It just

12    means that you have to do more specific testing for whatever

13    condition is indicated.

14         Q     And in this particular case, how was her, how was

15    the result for the down syndrome testing?

16         A     Well, the screening test was negative.  And the

17    screening tests are purposely set to be wide enough that it

18    does not miss any true abnormalities.

19         Q     So they may call it abnormal when in fact it's

20    normal rather than calling something normal?

21         A     Basically the screening test may be abnormal, but

22    that is not a confirmation that there is a true problem.  It

23    just indicates that more specific testing may be necessary,

24    such as amniocentesis.

25         Q     In this case hers was negative?

1      A    The test was negative and there was no indication

2   for any further testing.

3      Q    Do you do, in the course of your examination of

4   your patients, a physical evaluation of the status of the

5   baby when you see your patient?

6      A    Every visit there's an evaluation of the fetal

7   heartbeat once it becomes audible.  And there's measurement

8   of the growth of the uterus, which usually corresponds with

9   how the fetus is growing.  So those are the basic tools we

10  use during routine visits, and then obviously there's

11  ultrasound examinations done also.

12     Q    You did do another ultrasound on the 29th of

13  November of 1999, is that correct?

14     A    That's correct.

15     Q    Or somewhere around that time?

16     A    That's correct.

17     Q    And is there a certain age that you do this

18  ultrasound, this would be how many weeks?

19     A    Well, the ideal time to do it is between 16 and 20

20  weeks; number one, for dating purposes.  If you get further

21  along in the pregnancy, it's not as accurate as far as dating

22  the pregnancy, but also we like to wait until 20 weeks

23  because the fetus is developed enough that we screen for any

24  possibly abnormality.  The spine is looked at, heart looked

25  at, brain looked at, and any any problem that would develop

1    could be, you know, possibly picked up at that point, or if

2    there's some subtle changes, a decision made to repeat the

3    ultrasound if there's any question.

4        Q    And how were the findings --

5        A    The ultrasound --

6        Q    -- on 11/29/99 --

7        A    -- was completely --

8            THE COURT:  Let her finish the question.

9    BY MS. SINGER:

10       Q    Let me finish my question.  On 11/29/99, would you

11   tell us what your findings were?

12       A    The findings at that ultrasound was that the dates

13   were accurate, she was 20 weeks and one day by that

14   ultrasound examination, which would give her due date of the

15   16th of April.  The baby was one fetus.  The baby was in the

16   transverse presentation, meaning laying sideways in the

17   uterus, which is not uncommon at all the baby at that stage

18   of pregnancy.  It can be any position.  The baby was a male

19   by our determination.  The placenta was normal, it was

20   posterior.  There was no evidence of placenta praevia or any

21   abnormality of placenta.  The amniotic fluid, we always look

22   at the fluid around the baby, and that was normal.  The

23   heart, the bladder, the stomach, the kidneys, the

24   extremities, the spine, the ventricles, which are in the

25   brain, all appeared to be normal.

1       Q   Now, according to the chart that you gave us,

2  Doctor, Crystal Quirello did complain of nausea and vomiting

3  throughout her pregnancy.  She called it morning sickness.

4  Are you familiar with this particular complaint or

5  complaints?

6       A   Yes, I am.

7       Q   And how frequently do you hear of pregnant women

8  making these complaints?

9       A   Probably the vast majority of women have some

10  nausea to some extent.  It varys widely.  Some people require

11  hospitalization and even feeding through tubes if it's

12  severe.  That's certainly unusual.  So it runs the gamut.

13  But some nausea and some vomiting, especially early in the

14  pregnancy, is extremely common.

15      Q   Do you see nausea and vomiting throughout the

16  pregnancy in some cases?

17      A   Many women have it on occasion throughout the

18  pregnancy.

19      Q   And the nausea and vomiting that the mom suffers,

20  does that in any way affect the fetus?

21      A   We have no evidence that that -- unless the,

22  certainly, the mother would become malnourished or the baby

23  won't have sufficient protein and that, but certainly we --

24  just the nausea and the vomiting should not affect the fetus.

25      Q   And do you have any notes in your chart that

1    Crystal Quirello so suffered with nausea and vomiting that

2    the fetus was in any way affected?

3        A    I have notes that says that she obviously had some

4    nausea and vomiting, but certainly there's no evidence from

5    the record that there was certainly at any time any problems

6    with the baby.

7        Q    Now, what treatment do you render when a mom

8    complains or potential mom complains of nausea and vomiting?

9        A    Well, there's different ways to handle it.  Usually

10   the first step is to discuss diet, you know, certainly

11   dietary factors and how people eat can affect it.  We

12   recommend eating more frequently in smaller amounts,

13   basically ingesting things that do not cause nausea for that

14   particular person.  And then medications can be used if they

15   are vomiting to the extent that they're unable to keep even

16   fluids down.

17       Q    In this particular case, Ms. Quirello was

18   prescribed a prescription of Phenergan?

19       A    Correct.

20       Q    Are you familiar with that particular prescription?

21       A    Yes, I am.

22       Q    And did you prescribe it for her?

23       A    Yes.

24       Q    For these symptoms?

25       A    Yes.

1       Q     And what is it Phenergan?

2       A     Phenergan is a medication that acts as an

3    anti-medic.  There is any number of different medications.

4    Phenergan has probably been the one that's been used the

5    longest.  And, you know, with pregnancy we're obviously very

6    conscious of medications that are used and it's the one that

7    we have the most information on as far as use during

8    pregnancy.

9       Q     For the safety of the fetus?

10      A     For safety of the fetus, yes.

11      Q     And is this routine for you to make this

12   prescription, doctor?

13      A     It's very common if there's significant nausea and

14   vomiting.

15      Q     It's also reported in your chart that on or about

16   January 10th of the year 2000, Ms. Quirello was in an

17   automobile accident and she was admitted to Alachua General

18   Hospital, Shands at Alachua General Hospital.  Are you aware

19   of that?

20      A     Yes, I am.

21      Q     And did you see her in the hospital when she was

22   admitted?

23      A     Yes, I did.

24      Q     Were there any tests or examinations done to

25   determine whether or not the baby was healthy at that time?

1        A    Yes.  I mean, our major concern any time there is

2    an automobile accident is the mother and fetus in determining

3    that neither of them have any significant problems.  So

4    certainly the mother was examined.  With any type of

5    accident, fall, trauma, we worry more of a placental problem,

6    you know, things like abruption of the placenta where the

7    placenta would separate.  Testing was done.  There's a test

8    called the fetal DAT that is done that can give you an idea

9    if that's a problem.  All those tests were negative.  And

10   then in addition to that, the fetus was monitored throughout

11   her the stay in the hospital to assure that the fetus is

12   doing well and that there's no evidence of any decelerations

13   or problems with the baby.

14       Q    Just so that we're clear about the placenta, why is

15   that so significant to you at this stage in the baby's

16   development, injury to the placenta?

17       A    Well, basically all the nutrition and everything

18   comes through the placenta, and the oxygen supply comes

19   through the placenta.  If the placenta separates from the

20   wall of the uterus, the placenta isn't receiving the adequate

21   blood supply from the mother and the fetus doesn't get the

22   adequate supply of blood and the fetus can die in utero.

23       Q    And you have her testing for that was negative?

24       A    Right, all testing indicated no problems with the

25   placenta and no problems with the fetus.

1     Q    Now, I understand that later in time after that

2  particular automobile accident, Ms. Quirello did complain of

3  having what she described as preterm contractions.  Could you

4  tell the jury what preterm contractions are?

5     A    Preterm contractions are basically contractions

6  that occur before 36 weeks.  A full pregnancy to the due date

7  is 40 weeks.  We do consider term 36 weeks.  So they are

8  contractions that occur before 36 weeks.

9     Q    And if a mom was to come, a potential mom was to

10  come in and complain earlier than 36 weeks of contractions,

11  would that be a concern to you as her obstetrician?

12     A    Yes, it would.

13     Q    Please tell us why that would be a concern to you.

14     A    Well, obviously we have great concerns regarding

15  preterm delivery.  You know, fetal lung development is

16  something that is an ongoing process and babies that are born

17  too early can have significant respiratory problems.  So we

18  obviously want to prevent that preterm delivery.  And it's

19  very difficult sometimes to determine whether or not the

20  contractions are really leading to cervical change, but if

21  there's any evidence of significant contractions we'll

22  usually do whatever we can to stop those and prevent those

23  and try to prevent any preterm delivery.

24     Q    Now, would that mean that you would monitor the mom

25  more frequently than you would if there were no preterm

1  contractions?

2      A    Yes.   If we're concerned about preterm labor, we

3  monitor the mother more closely and usually recommend

4  bedrest, and sometimes medications are used if there are

5  contractions, and certainly the cervix is checked and they're

6  followed very closely.

7      Q    Did you do that in this case, did you monitor her

8  more frequently after the complaint of preterm contractions?

9      A    Yes.   After the, on when she came in from the

10  automobile accident, during that hospitalization there was

11  some uterine irritability.   She did receive a medication

12  called Terbutaline, which relaxes the muscle of the uterus

13  and prevents contractions.

14      Q    And what is the reputation for that particular

15  prescription affecting the actual fetus?

16      A    It's been used for at least 20 years and there's no

17  evidence that it results in any significant harm to the

18  fetus.

19      Q    Basically it relaxes the muscles?

20      A    Of the uterus, correct.

21      Q    And did you also perform or have another sonogram

22  done, I believe, on the 14th of March of the year 2000?

23      A    Yes, we did another ultrasound just to further

24  evaluate -- usually if there's any complication of the

25  pregnancy, where it's preterm contractions or anything that

1    we're following closely, we'll repeat the ultrasound to make

2    sure everything looks okay.  And on the 14th of March, we did

3    another ultrasound to evaluate the fetus.

4        Q    And you could tell the jury how or what you found

5    in examining the ultrasound that was done on the 14th of

6    March 2000?

7        A    At that time the ultrasound showed that the baby

8    weighed about five pounds three ounces, so basically

9    appropriate growth for that stage of the pregnancy.  The baby

10   was now in the vertex presentation, meaning the head was

11   down.  There was normal breathing, normal activity, normal

12   heartbeat.  The fluid was slightly decreased, it was 9.9,

13   which is an evaluation of the amount of fluid.  Ten or above

14   is the normal range, so it was just slightly lower than the

15   normal range.

16       Q    What does that tell you, if anything?

17       A    It basically is something that we keep an eye on

18   because certainly a severe decrease in fluid would indicate

19   that the baby possibly is not getting enough placental flow,

20   and a severe lack of fluid meaning -- I said hers was 9.9 --

21   in the five range we would consider delivery even if it is

22   early.

23       Q    When you said his head was down -- and his name is

24   Robbie, so I'm going to call him Robbie.

25       A    Okay.

1    Q    When Robbie's head is down, what does that mean

2    physiologically?  I know this may sound simple, but I'm not

3    sure how much the jury understands about the birth process.

4    Just tell us what that means.

5    A    Well, the baby can be in various presentations.

6    And certainly delivery when the head comes first, which is

7    when the head is down, vertex presentation, is what occurs in

8    90-some percent of cases, and that's certainly the way we

9    want to do deliveries.  The other possibilities are if the

10   baby was breech, where, you know, the buttocks or the back or

11   the legs are coming first.  And certainly that's a more

12   difficult way for the baby to deliver.  And in most cases we

13   would probably recommend if the baby stayed in that position

14   doing a cesarean section.

15   Q    In this case then was Robbie in the position, the

16   optimal position?

17   A    The baby was head down and in the vertex

18   presentation.

19   Q    Are you familiar with the fact that Robbie was born

20   about eight days later, on the 22nd of March 2000?

21   A    Yes.

22   Q    Were you present for his delivery?

23   A    No, I was not.

24   Q    Let me go back to the ultrasound for a minute.  Was

25   there anything about the ultrasound that suggested to you

1    that Robbie was in any way abnormally developed?

2         A    No.

3         Q    You were not present for the actual delivery,

4    correct?

5         A    No, I was not.

6         Q    Would you explain to the jury how you go about in

7    your practice regarding delivery of babies?

8         A    Well, there's another physician and myself, and

9    obviously it's very difficult to be on call 24 hours a day,

10   seven days a week.  So usually we will deliver all our own

11   patients during the day and, you know, the early evening

12   hours.  But we have a call schedule where we alternate nights

13   in the evenings.  So basically, you know, if I am on call, I

14   will deliver his patients and mine and vise versa.

15        Q    And what is your partner's name?

16        A    Dr. David Stuart.

17        Q    Was he on call that particular night?

18        A    Yes, he was.

19        Q    That evening of the 22nd of March?

20        A    Yes, he was.

21        Q    And do you know whether or not he actually

22   delivered Robbie?

23        A    Yes, he did.

24        Q    According to the records, the chart, was Robbie

25   born head down or head first?

1      A     Yes.

2      Q     And he was born -- could you tell us whether he was

3   born face up or face down?

4      A     I don't have the hospital record in front of me,

5   but what I recall reading is that the baby was born with face

6   up.

7      Q     What does face up mean?

8      A     It probably, in most cases it doesn't mean

9   anything, you know, there's different ways that the baby's

10  head comes through the pelvis.  Sometimes it's side,

11  sometimes the face is down, sometimes the face is up.  The

12  way the bones line up, meaning the mother's pelvis and the

13  baby's head, sometimes it's a little more difficult to

14  negotiate the pelvis when the face is up, but usually there

15  is not a major problem.  In most cases you don't know it

16  until the baby's head delivers.

17     Q     How frequently do you have a face up delivery as

18  opposed to a face down delivery, are you able to give us a

19  number on that?

20     A     It's not terribly uncommon but it's certainly not

21  the most frequent occurrence.  I would say in the

22  neighborhood of three to five percent.

23     Q     And does that cause you any concern as the

24  obstetrician that the baby is coming face up rather than face

25  down?

1      A    No, not at long as the labor progresses normally

2    and it doesn't cause me any tremendous concern.

3      Q    In reviewing the chart on the delivery of Robbie

4    Quirello, was there anything that suggested to you that the

5    delivery was anything other than normal?

6      A    No, nothing in reviewing the record of the

7    delivery.

8      Q    There was also an indication that the umbilical --

9    and I may be pronouncing that incorrectly, and I apologize --

10   the umbilical cord may have been wrapped around Robbie's neck

11   and was lifted at the time that he was delivered?

12     A    Correct.

13     Q    How frequently do you lift an umbilical cord during

14   the birth of a child?

15     A    It actually occurs very frequently, probably 15 to

16   20 percent of deliveries at least.  Really it's not the cord

17   around the neck, it's how tight the cord is around the neck.

18   Certainly an extremely tight cord around the neck would,

19   there would be evidence of that during labor from the fetal

20   monitoring.  Just a cord around the neck is extremely common.

21     Q    Was there any evidence of the umbilical cord being

22   tightly wrapped around Robbie's neck from the fetal

23   monitoring that was done in this case?

24     A    I haven't reviewed all the monitoring.  Certainly

25   Dr. Stuart could address that better than I could.  But from

1    the information I have, I do not feel that there was any,

2    there's certainly no notation that there was any problems

3    with the fetal monitoring.

4        Q    There is also a note that the baby may have been

5    born with a broken clavicle.  Have you seen babies born with

6    broken clavicles or where a clavicle, broken clavicle has

7    been diagnosed after birth?

8        A    Yes, I have.

9        Q    How frequently does that occur?

10       A    You know, it's hard for me to give a percentage but

11   it's not terribly uncommon.  The clavicle is a very fragile

12   bone and when delivery of the shoulders occur, sometimes

13   depending on the position of the fetus, there can be subtle

14   fractures of the clavicle that, you know, frequently aren't

15   picked up unless on examination the pediatrician feels

16   something that would indicate a fracture and an X-ray is

17   done.

18       Q    How significant is a broken clavicle in the

19   delivery of a baby, from your perspective?

20       A    Obviously --

21       Q    Is it life threatening for the baby?

22       A    Certainly not, no.

23       Q    There's also a note in the post-partum -- let me go

24   back now.

25            After the baby is born, and I know you were not

1    present for the delivery, but do you see Ms. Quirello after

2    the child is born for post-partum examination?

3        A    Yes.  If there's any problems in the first six

4    weeks after delivery, they call us for those, and then we

5    routinely see them at approximately five to six weeks after

6    delivery to make sure that everything is normal.

7        Q    There is a note in your chart that there was some

8    concern that Robbie was having some difficulty latching onto

9    mom's breast.  That particular kind of complaint, how

10   frequently do you hear of that in your port-partum

11   examination of a patient?

12       A    That's an extremely common complaint, you know,

13   probably I think that if someone's breast fed before, they

14   realize that it's not just putting the baby in the vicinity

15   of the breast and everything goes fine.  We have lactation

16   consultants that that's all they deal with to help with

17   problems like that.  So the fact that the baby was having

18   difficulty latching on could have something to do with the

19   mother, the breast, the technique, the fetus, all sorts of

20   different possibilities, but it's extremely common.

21       Q    When you say you have lactation consultants, what

22   are lactation consultants?

23       A    Basically they're nurses who have expertise or

24   specialized training in breastfeeding and the technique of

25   breastfeeding and dealing with problems regarding

1    breastfeeding.

2        Q    Did not surprise you at all that Crystal may have

3    reported to you that she was having some difficulty with

4    breastfeeding?

5        A    No.

6        Q    I think you saw Crystal Quirello more than one time

7    after the baby was born.  Could you check your chart and see

8    if that's correct?

9        A    Yes, I saw her for a post-partum visit on the 9th

10   of May, and at that time she was breastfeeding and we

11   discussed other birth control options when she decided to

12   stop breastfeeding.  We prescribed a birth control pill that

13   some people refer to as the mini pill.  Others call it the

14   progesterone only pill.  Basically it's a pill that doesn't

15   affect milk supply, so we will usually use that while a

16   mother is breastfeeding.  So we saw her on the 9th of May for

17   that routine visit.

18           And then we saw her back on the 29th of June.  At

19   that time she had stopped breastfeeding and we decided after

20   discussing all potential methods of contraception that she

21   was going to go with the Depo-Provera shot.

22       Q    Now, during any of the visits after the baby was

23   born, did she report to you any concerns regarding the baby's

24   health or development?

25       A    No.  From my notes she had no complaints and the

1    baby was doing well by her report.

2        Q    Overall based upon your personal care and treatment

3    of Crystal Quirello, your review of the birth and your chart

4    records, do you have an opinion based upon a reasonable

5    degree of medical certainty on whether or not the baby's

6    prenatal course was normal or abnormal?

7        A    From all the information I have, there was a normal

8    course of the fetus and there was no evidence of any

9    complications.

10       Q    Do you have an opinion as to whether or not his

11   birth was abnormal?

12       A    From reviewing the records, it certainly -- I see

13   no evidence that there was any significant complications

14   during child birth.

15           MS. SINGER:  No further questions.  One moment,

16       Your Honor, let me ask Mr. Pennypacker if he has

17       anything.

18           THE COURT:  All right.

19           (Pause in the proceedings.)

20           MS. SINGER:  No further questions of this witness,

21       Your Honor.

22           THE COURT:  Any questions from the defense?

23           MR. TEDDER:  Yes, ma'am.

24                    CROSS-EXAMINATION

25   BY MR. TEDDER:

1      Q      Good morning.

2      A      Good morning.

3      Q      I just have a few questions.

4             You would agree, would you not, that birth can be

5      traumatic?

6      A      I would call birth a natural process but there are

7      circumstances where it could be more traumatic than others,

8      certainly.

9      Q      So you agree that it has potential to be traumatic,

10     correct?

11     A      Yes.

12     Q      And, in fact, the baby's skull is not fully formed

13     when he is born, isn't that correct?  In other words, the

14     bones that are in the skull are not --

15     A      They're not fused, which is actually a benefit --

16     Q      Correct.

17     A      -- at child birth.

18     Q      To allow the child to be able to fit through the

19     birth canal?

20     A      Correct.

21     Q      And, in fact, if the bones were fused when the

22     child was born, it would probably kill the child, correct?

23     A      It could have potential complications.  It would

24     probably result in difficulty delivering vaginally.

25     Q      And isn't it true that since the baby's skull is

1    not fused, that the bones themselves move around when the

2    baby is being born and comes through the birth canal?

3         A    There can be some what we call molding.

4         Q    So it's moving around some, yes or no?

5         A    There can be -- yes.

6         Q    Now, you indicated that from your looking at the

7    charts, this baby was born -- it was a brow birth, correct?

8         A    I don't believe so.  I think it was a face up

9    presentation.

10        Q    Face up presentation, okay.

11        A    But, you know, you'd have to discuss that with the

12   physician who did the actual delivery.

13        Q    It's preferable for the baby to be born face down,

14   isn't that correct, it's easier for the child to negotiate

15   the birth canal face down?

16        A    It's hard for me to say whether one is preferable

17   or not.  Really basically if the occiput is posterier, which

18   is the back of the head down or sunny side up, facing up,

19   it's a more difficult way to negotiate the pelvis and

20   sometimes there's more difficulty with the pushing phase and

21   it's prolonged and there's an increased risk of basically the

22   vertex not coming through the pelvis.

23        Q    So then the answer is, the short answer is yes,

24   it's preferable for the child to be born face down?

25        A    Yes.

1    Q    So that those things you just mentioned do not

2  occur, correct?

3    A    Correct, we would prefer to deliver the baby

4  vaginally, yes.

5    Q    And while you say that it's fairly common, 15 to

6  20 percent of the time a baby is delivered with the umbilical

7  cord wrapped around its next, obviously that's not

8  preferable, isn't that true, that's not something you would

9  want to have happen; isn't that correct?

10   A    I basically don't want the baby to have any

11  problems with oxygen supply, which is determined by the

12  monitoring.  And, you know, if a cord is around the neck or

13  the shoulder and not having any impact on the flow of blood

14  and the flow of oxygen, then it's really something that's of

15  no consequence.  Certainly if it is impacting oxygenation,

16  then it is something we would prefer not to happen.

17   Q    Once again then, Doctor, the short answer is yes,

18  you would prefer for a child not to be born with the

19  umbilical cord wrapped around his or her neck, that's

20  preferable, yes or no?

21   A    I would say that would be preferable.

22   Q    Of course.  And the fact that you indicate that

23  children are frequently born with broken clavicles -- that's

24  my mistake.  You did not say frequently, you said that it's

25  not uncommon for a child to be born with a broken clavicle,

1   correct?

2       A     Correct.  I couldn't give you a percentage.

3       Q     Because in fact a child born with a broken clavicle

4   a lot of times it's not noticed at birth, correct?

5       A     Frequently it's not picked up until the baby is

6   thoroughly examined later.

7       Q     The first thing that happens once the baby is born

8   is the folks on hand, the nurses primarily, I would assume,

9   ensure the baby's breathing passages are free and clear,

10  correct?

11      A     They basically assess the baby completely.  And the

12  respiratory status is, certainly, and the heart rate are the

13  two main factors they look at initially.

14      Q     To make sure the baby is breating properly and has

15  the proper heart rate, correct?

16      A     Correct.

17      Q     Is that the Apgar test?

18      A     There's a test that they look at differnt

19  parameters, including the color, the tone, the reflexes, the

20  heart rate, and the respiratory effort.

21      Q     And before they do that, they actually use such a

22  device to clear the nostrils and the throat area to make sure

23  the baby doesn't have any liquid inside the breathing

24  passage, correct?

25      A     Well, in most cases the obstetrician at delivery

1   will use a bulb to remove any mucus or secretions initially.

2   And whether the nurses suction or not after that really

3   depends on if there's any need to.

4       Q    So the doctor himself, him or herself does that

5   right away then?

6       A    Yes.

7       Q    That's very important to be done immediately,

8   correct?

9       A    It depends on the situation.  There are many babies

10  that have a large amount of mucus and it's something that is

11  important to do.  So, yes, it is something that -- we like to

12  make sure the passages and the oropharynx, the mouth, and

13  nose are clear.

14      Q    So, again, the short answer is yes, you try to get

15  the breathing passages clean, cleared as quickly as possible

16  following the birth?

17      A    Correct.

18      Q    Because you agree, do you not, that absence of

19  oxygen to the brain for a period of four to five minutes can

20  cause irreversible brain damage, do you not agree with that?

21      A    I agree that the absence of oxygen -- I think the

22  time frame is, you know, something that I'm -- at least five

23  minutes, I would say, is something that could cause

24  significant brain problems.

25      Q    Now, you agree, do you not, that a child can suffer

1    a subdural hematoma on birth?

2         A    I've never seen a subdural hematoma at birth.

3         Q    You agree, do you not, that it can happen; yes or

4    no?

5         A    Well, basically if there's severe trauma to the

6    skull, it can conceivably happen, but in a normal child birth

7    situation I would think that that would be extremely

8    unlikely.

9         Q    Do you recall giving a deposition in this case,

10   Dr. Kreinest?

11        A    Yes, I do.

12        Q    Do you remember this series of questions and

13   answers?

14             MS. SINGER:  Could I have the page and line, sir,

15        please?

16             MR. TEDDER:  Page 12, Line 13.

17             THE COURT:  Do you have a copy of the deposition

18        for the doctor?

19             MR. TEDDER:  I don't have an extra copy.  Do you

20        have an extra copy?

21             MS. SINGER:  No, sir.

22             MR. TEDDER:  No?

23             MS. SINGER:  I do not have a copy.

24             MR. TEDDER:  Do you want me to show him this?

25             THE COURT:  Yes.

1          MS. SINGER:  Actually, I do have an extra copy.

2      Excuse me, Mr. Tedder, I do have an extra copy now that

3      I think about it.

4          If I can approach the witness, Your Honor.

5          THE WITNESS:  I think --

6  BY MR. TEDDER:

7      Q    Without answering the question, have you had a

8  chance to refresh your memory?

9      A    Well, I think we're talking about --

10     Q    Yes or no, sir, yes or no, did you have a chance to

11 read this?

12     A    Yes, I did.

13         THE COURT:  Hold on a second, let --

14         MS. SINGER:  Excuse me, Mr. Tedder.

15         THE COURT:  -- Ms. Singer give him a copy of the

16     deposition.

17         MS. SINGER:  May I approach the witness?

18         MR. TEDDER:  Well, he already refreshed his memory.

19         THE COURT:  Hold on.  I said give a copy of the

20     deposition to the witness.

21         MS. SINGER:  I don't know what page he cited.

22         THE COURT:  Now, Mr. Tedder, if you'll go back and

23     indicate the page and line and then reask your question.

24 BY MR. TEDDER:

25     Q    Dr. Kreinest, on Page 12, Line 13, you've had an

1    opportunity to review that, correct?

2        A    Yes, I have.

3        Q    And do you recall this question:  Can a subdural

4    hematoma result from a birth?

5             Your answer:  Hematomas can result from a birth.

6    There is usually significant symptoms at the time of the

7    birth if that occurs.

8             Is that what you said back then?

9        A    That is what I said, but --

10       Q    Now, you're saying that usually there are

11   significant symptoms if a subdural hematoma is caused at

12   birth; is that correct?

13       A    My response was a hematoma could occur.  I didn't

14   say a subdural.  I mean, there's many different types of

15   hematomas at many different locations.  Certainly

16   intraventricular hemorrhage is something that can occur at

17   birth.  But subdural hematoma is something that probably

18   would be best if you asked a neurologist or a --

19       Q    Neurosurgeon?

20       A    A neonatologist who deals with those type of

21   problems.

22       Q    Or a neurosurgeon?

23       A    Certainly a neurosurgeon would be aware of those

24   types of situations.

25            MR. TEDDER:  I have no further questions.  Let me

1    me ask Mr. Groland.

2              (Pause in the proceedings.)

3              MR. TEDDER:  Your Honor, I have nothing further.

4              THE COURT:  Ms. Singer?

5                      REDIRECT EXAMINATION

6    BY MS. SINGER:

7         Q    Dr. Kreinest, you were asked about the skull not

8    being fused, and you were asked about the bones moving and

9    you said, yes, the bones mold?

10        A    Correct.

11        Q    What is molding?

12        A    Basically as the vertex, the head of the baby,

13   negotiates the pelvis, there is some movement we call molding

14   where there -- and that's, we feel, why there is not fusion

15   of the skull bones, so there can allow for that moving to

16   allow the vertex to negotiate the pelvis.

17        Q    To get the head to go through the canal to be born,

18   the skull bones themselves mold into place so that they can

19   flow through the canal?

20        A    Basically there can be some shifting of the bones

21   to allow for the vertex to come through the pelvis.

22        Q    And is that a natural way --

23        A    Yes.

24        Q    -- that people are born?

25        A    Yes.

1      Q    Now, you mentioned that -- well, Mr. Tedder

2    mentioned on cross-examination that there are assessments

3    that are done after the baby is born; is that right?

4      A    Correct.

5      Q    And is that assessment called the Apgar assessment?

6      A    Yes, it is.

7      Q    An Apgar score of eight or nine, what does that

8    tell you about the status of the child?

9      A    That tells us that it's -- and it's on a scale of

10   one to ten, and we do an assessment at one minute, and we do

11   an assessment at five minutes; and a ten is a perfect score.

12   Usually there's a little bit of alteration in the color and

13   that initially, so a ten score is relatively uncommon.  So an

14   eight, nine would tell me that the baby is fine, that the

15   neurological reflex, color, heart rate, respiratory effort

16   are all normal.

17     Q    You were also asked about a part of your deposition

18   where you were asked regarding whether or not hematomas can

19   result from a birth.  Could you explain to the jury why it's

20   important for you to differentiate from subdural hematomas

21   and other hematomas that may occur in birth?

22         MR. TEDDER:  I would object to that question.  That

23         question was already deferred to a neuropathologist or

24         neurosurgeon.  It's beyond the area of his expertise.

25         THE COURT:  The objection is overruled.  Doctor, if

1     it is within your area of expertise and you can answer,

2     you may.  If it's outside your area of expertise, just

3     indicate it that way.

4          THE WITNESS:  Certainly hematomas can occur.  I

5     think it's important to know that there are different

6     types of hematomas.  And one of the problems that we

7     worry about most significantly with a newborn is what's

8     called a intraventricular hemorrhage where there's

9     bleeding in the ventricles, which are inside the brain.

10         A subdural hematoma occurs under the dura, which is

11    on the, under the outer skull bone of the brain, and

12    that is something that I have never seen occur.

13         I would suspect --

14         MR. TEDDER:  Your Honor, I object.  He's testifying

15    beyond what he was allowed and sworn to as an expert.

16         THE COURT:  The objection is noted and overruled.

17    BY MS. SINGER:

18    Q    You may continue.

19    A    I've never seen that occur but certainly there are

20    people that are more expert in this area than I am.

21    Certainly talking as the obstetrician, once the delivery is

22    complete, the pediatrician and the pediatric nurses take care

23    of the baby.  Certainly a neonatologist, a neonatal

24    neurologist or a neonatal neurosurgeon would probably be

25    better to able to give a thorough answer to that question.

1    Q    Would you expect to see some neurological signs on

2    the baby if there was some significant trauma at birth?

3    A    I would suspect that there would be evidence of

4    problems during the neonatal period.

5    Q    And would you expect to see a lower Apgar score if

6    there was significant trauma at birth?

7    A    Most likely.

8         MS. SINGER:  If I may have one moment, Your Honor.

9         THE COURT:  All right.

10   BY MS. SINGER:

11   Q    Are you provided in your records, Dr. Kreinest, the

12   delivery information summary or delivery summary?

13   A    I don't have the hospital notes and that's where

14   the delivery summary or record of the delivery would be.

15        MS. SINGER:  If I may approach the witness, Your

16        Honor.  I'd like to have this marked as the next

17        lettered exhibit for identification.

18        THE COURT:  Any objection?  Have you shown it to

19        defense?

20        MR. GROLAND:  You're just having it marked?

21        MS. SINGER:  For identification.

22        MR. GROLAND:  Okay.

23        MS. SINGER:  Mr. Tedder.

24        THE CLERK:  State's Exhibit D, Your Honor.

25        THE COURT:  All right.  Thank you.

1   BY MS. SINGER:

2       Q    I'd like to show you what's been marked State's

3   Exhibit D, and tell me whether or not that appears to be the

4   delivery summary for Robbie Quirello -- or excuse me, Baby

5   Boy Quirello when he was born on the 22nd of March year 2000.

6       A    Yes, it does.

7       Q    And does it reveal to you what his Apgar scores

8   were at time of delivery, one minute, and then I guess five

9   minutes, correct?

10      A    The one minute score was eight, with the two off.

11  There's five different things that are looked at and each of

12  them has a value of zero, one or two, and it had two off for

13  color, meaning all the others were a two, which is completely

14  normal.

15      Q    What were the ones that he scored two on, please,

16  for the jury?

17      A    The heart rate, meaning that it was a normal heart

18  rate; the respiratory effort, meaning the baby was breathing

19  normally at the time; the tone, which is the muscle tone and

20  that; and then irritability, which is an evaluation of reflex

21  or response to stimuli.

22      Q    And he was two on all of those?

23      A    Correct.

24      Q    For both the one minute and the five minute?

25      A    Correct.

1    Q    And he was what on the last?

2    A    On the last, the color was noted to be one at that

3    time.

4    Q    And when you talk about color, are you talking

5    about actual skin color?

6    A    Basically, yes, the color of the skin, certainly

7    whether it's pale, pink, blue.

8    Q    How did he score after five minutes on color?

9    A    The five minute score was one, which means that

10   it's a relatively appropriate color at that point.

11        MS. SINGER:  Thank you, sir.  If I may have one

12        moment, Your Honor.

13        THE COURT:  All right.

14        MS. SINGER:  No further questions, Your Honor.

15        MR. TEDDER:  May I ask a few more questions, Judge?

16        THE COURT:  There's nothing that's been reopened on

17        redirect.  You may call this witness on your own if you

18        need to.  I'm going to release Dr. Kreinest at this time

19        from the courthouse.

20        Doctor, you will be subject to potential recall.

21        We will of course accommodate your schedule to the

22        extent we're able to and we'll let you know.  We'll need

23        information about how you can be contacted.

24        THE WITNESS:  Okay.

25        THE COURT:  Thank you.  State, go ahead and call

1        your next witness.

2               MS. SINGER:  Richard Davis.

3               (The witness enters the courtroom and is duly sworn

4   by the clerk.)

5               MS. SINGER:  Your Honor, if I may have one moment,

6        I do need to locate something before I proceed.

7               THE COURT:  Yes.

8   WHEREUPON:

9                    RICHARD EARL DAVIS, SR.,

10  called as a witness herein, having been first duly sworn, was

11  examined and testified as follows:

12                    DIRECT EXAMINATION

13  BY MS. SINGER:

14      Q    Mr. Davis, if you would, state your full name and

15  your occupation for the record?

16      A    Richard Earl Davis, Senior, Florida Highway Patrol

17  homicide investigator, traffic homicide.

18      Q    And where do you live, sir?

19      A    I live in Jacksonville, Florida.

20      Q    And how long have you lived there?

21      A    Near all my life.

22      Q    Are you married?

23      A    Yes, I am.

24      Q    Who are you married to?

25      A    Tammy Lee Davis.

1    Q    Do you have any children?

2    A    Yes, I do.

3    Q    How many children do you have?

4    A    I have five.

5    Q    Is Crystal Quirello one of your children?

6    A    Yes, she is.

7    Q    Who are the other children?

8    A    I have a son, Richard Davis, Junior, Michelle

9  Davis, which is by the mother of Crystal; and then I have of

10  the mother of Crystal's, I raised her two kids from a

11  previous marriage that she had.

12   Q    And do you and Tammy have any children together?

13   A    We do not.

14   Q    Do you have stepchildren in your home?

15   A    I do.

16   Q    How many stepchildren do you have in your home?

17   A    I have one and one that's since left, so it's a

18  total of seven kids rather than the five if you count all the

19  recent marriage kids.

20   Q    Now Crystal's mom, what was her name?

21   A    Brenda Davis.

22   Q    And is she still alive?

23   A    She's deceased.

24   Q    When did she pass away?

25   A    She passed away March the 25th, 1996, of cancer.

```
 1        Q     And it was after her mom was deceased that you

 2   married Tammy Davis?

 3        A     Yes, it was.

 4              MS. SINGER:  Your Honor, may I have one moment?

 5              THE COURT:  Yes.

 6   BY MS. SINGER:

 7        Q     How are you related to Robbie Quirello?

 8        A     My grandson.

 9        Q     And who was Robbie's dad?

10        A     Johnny Quirello.

11        Q     And who is Robbie's mom?

12        A     Crystal Davis, Crystal Quirello now.

13        Q     Do you recall your daughter's pregnancy?

14        A     Very much so.

15        Q     Were you present at your daughter's wedding?

16        A     Yes, I was.

17        Q     And how soon after your daughter and Mr. Quirello,

18   John Quirello married was Robbie born?

19        A     About 13 months.

20        Q     Before Robbie was born, were you aware of any

21   marital problems between John and Crystal?

22        A     Yes, ma'am, some did develop.

23        Q     And did you get involved in those problems?

24        A     I tried to stay out of them.

25        Q     How frequently during your daughter's pregnancy
```

1 would you visit with Crystal and John or Crystal?

2     A    As much as possible.

3     Q    How would you describe your relationship with your

4 daughter?

5     A    Very good.

6     Q    How frequently would you -- can you give me on a

7 monthly basis about how many times a month you would see

8 Crystal, Crystal and John together?

9     A    Usually on the weekends, three or four weekends out

10 of the month.

11     Q    Did they come up and visit you or did you come down

12 here to visit them?

13     A    Both.

14     Q    Was there a time when they lived in Jacksonville

15 together?

16     A    Yes, there was.

17     Q    And when was it in the marriage that they moved to

18 Gainesville, the Archer area?

19     A    When John got transferred down here with his job.

20     Q    Was the baby born at that time?

21     A    Yes, it was.

22     Q    Now, were you present for the delivery of Robbie?

23     A    Yes, I was.

24     Q    Were you in the delivery room with your daughter

25 and your son-in-law and other members of the family?

1    A    I was behind the closet, but I was there.

2    Q    Did you witness Robbie's birth?

3    A    Yes, I did.

4    Q    Was there anything that you saw during the course

5    of Robbie's birth that indicated to you that he was in any

6    kind of distress or required any special or extraordinary

7    treatment?

8    A    None whatsoever.

9    Q    Do you know how long Crystal stayed in the hospital

10   after Robbie was born?

11   A    Two to three days.

12   Q    Do you know what day Robbie was born on?

13   A    Yes, I do.

14   Q    What day was he born?

15   A    March the 22nd, year 2000.

16   Q    Year 2000?

17        Once Robbie was born, how frequently would you

18   visit with Crystal and Robbie or Crystal, John and Robbie?

19   A    As much as I could, as much as my job would allow

20   me to.

21   Q    Right after the birth, Mr. Davis, do you recall

22   whether or not you visited with the family on a more frequent

23   basis?

24   A    Yes, I did.

25   Q    Tell us what you remember in terms of your

1   visitations early on in Robbie's life.

2        A    I was very happy.

3        Q    Did you watch as Robbie developed and grew?

4        A    I did.

5        Q    Now, you have been involved in raising five

6   children, is that right, of your own?  I understand the first

7   two were your wife's from a previous marriage, Brenda's from

8   a previous marriage, you raised those children?

9        A    Yes, I did.

10        Q    You raised your own, you and Brenda together?

11        A    Yes, I did.

12        Q    And then you've been involved in your stepchildren?

13        A    I have a 16 year old at home now.

14        Q    And have you also been involved in the caring or

15   the caretaking of grandchildren?

16        A    Yes, I have.

17        Q    Other than Robbie, have you had other

18   grandchildren?

19        A    Yes, I have.

20        Q    How many grandchildren do you have?

21        A    Total of four -- five, we just had a new one, so

22   let's go ahead and add the fifth one.

23        Q    Congratulations.  In the course of the many years

24   that you've had contact with the children, have you noted or

25   watched as children have progressed through certain

1  developmental landmarks?

2       A    Yes, I have.

3       Q    Had you been watching Robbie's development?

4       A    Yes, I have.

5       Q    And would you describe his demeanor for us as he

6  was growing, what kind of baby was he?

7       A    Very happy baby.  I always, I always look at him,

8  he had that cocky little smile and happy eyes.

9       Q    And how frequently would you say, once the baby was

10 born, that you actually visited with your grandson along with

11 your daughter and your son-in-law?

12      A    Three to four times a month.

13      Q    Now, would they come down to -- would they come, I

14 don't want to say up, did they go north to visit you would

15 you come south to visit them or was there a combination of

16 visits?

17      A    Sometimes my wife would meet them halfway and we

18 would abduct the child for the weekend.

19      Q    You would abduct the child for the weekend?  Tell

20 the jury what you mean by that.

21      A    We would take care of it for the weekend at our

22 house.

23      Q    And why would you do that, Mr. Davis?

24      A    Because I didn't want to make the mistake with this

25 one that I made with some of my other grandkids.

1      Q      Not having sufficient contact with them?

2      A      Not taking the time, due to job or whatever, to be

3   involved in their growth, and I wasn't going to make that

4   mistake with this one.

5      Q      Did you have enjoyable times with Robbie when he

6   would stay with you for the weekends?

7      A      Some of the happiest times of my life, yes.

8      Q      And did you note whether or not he had suffered any

9   injuries when you would bring him home and take care of him

10  for those weekends?

11     A      No, never.

12     Q      Did you ever see any bruising or signs of injury on

13  Robbie at any time that you had him in your custody?

14     A      Never.

15     Q      Did you actually witness his bathing, witness his

16  changing, actually examine him?

17     A      When my wife would bath him in the sink, yes, and

18  the answer to the question is yes.

19     Q      Was there any indication to you that he was unable

20  to make eye contact with you or focus on you?

21     A      No, none whatsoever.

22     Q      As he was growing and developing, did you see him

23  actually increase his ability to focus?

24     A      I remember when I'd be in my uniform and he would

25  focus on my trinkets, my glasses.  Very, very, very happy

1   child, very observant child, and I never noticed anything out

2   of the ordinary.

3       Q      Did you ever notice that he was lethargic, had

4   difficulty staying awake?

5       A      No, I did not.

6       Q      Did you ever notice any loss of appetite or

7   fussiness?

8       A      No, I did not.

9       Q      Was there ever a time when he was inconsolable when

10  he was in your care?  I don't know if you understand what I

11  mean by inconsolable, but when he was crying and there was

12  nothing you or Tammy or your daughters who may have been with

13  you during that time period could do to keep him from crying?

14      A      Never.

15             MS. SINGER:  If I might have one more minute.  If I

16      may approach the witness, Your Honor.

17  BY MS. SINGER:

18      Q      Mr. Davis, I have to talk to you about the last

19  time you saw Robbie.

20      A      I know it.

21      Q      When was the last time that you saw Robbie?

22      A      The day before my birthday, July the 30th.

23      Q      Is that the year 2000?

24      A      Yes, it was.

25      Q      And how come you remember that so clearly?

1      A    It was my birthday and I demanded that they come up

2    to see me on my birthday.  That's what I wanted, to see the

3    baby that day, and John and Crystal brought him up.

4      Q    How was he before you actually had your birthday

5    celebration, were you around him that day?

6      A    I didn't turn him loose.

7      Q    When you say you didn't turn him loose, what does

8    that mean, did you actually have him in your hands for that

9    period?

10     A    Well, we went to a restaurant in Jacksonville and I

11   held him and played with him.

12     Q    How was his appearance, how was he clothed, how did

13   he smell, you know, how did he look to you?

14     A    He was a happy, happy, happy eyes, happy baby,

15   little cocky smile, and very normal, very normal, very happy,

16   but not as happy as I was.

17     Q    Was he able to hold his head up at that time when

18   you saw him on the 30th of July?

19     A    Yes, he was.

20     Q    Was he able to focus on his hands or other objects?

21     A    Very observant.

22     Q    Did you see any marks, bruises, cuts, scrapes, or

23   any suggestion to you that he had been abused in any way?

24     A    No, I never saw a mark on that child.  I never saw

25   anything that would make me be concerned about his

1   well-being.

2       Q    Was there anything about your last visit with

3   Robbie on the 30th of July that suggested to you that he was

4   in any way suffering from any kind of illness or injury?

5       A    That child was not suffering from anything.

6       Q    I have to show you some photographs, Mr. Davis.

7       A    (Witness nods head.)

8           MS. SINGER:  May I approach the witness?

9           THE COURT:  Yes.

10          (Pause in the proceedings.)

11          MS. SINGER:  Your Honor, it's my understanding that

12      Mr. Groland on behalf of Mr. Herlihy agrees that the

13      child who we are discussing today, who is deceased, who

14      died on August 10th, year 2000, is in fact Robert

15      Quirello, the child who is the grandson of Richard

16      Davis, so that we do not need to make a family

17      identification of the deceased through the use of a

18      photograph at this time.

19          MR. GROLAND:  So stipulated.

20          MS. SINGER:  In other words, so that I'm clear,

21      Mr. Groland, all of the information on the autopsy we

22      agree is Robert Quirello, that that baby that was

23      autopsied was in fact Robert Quirello?

24          MR. GROLAND:  Yes, indeed.

25          MS. SINGER:  No need to approach the witness with

1          this photograph then, Your Honor.

2              THE COURT:  All right.

3              MS. SINGER:  I do want to show him the live

4          photographs, however, if I might.

5     BY MS. SINGER:

6          Q    Mr. Davis, I will be showing you some photographs.

7     These have previously been marked into evidence as Composite

8     Exhibit 2 for the state, and I just want to go through them

9     with you and ask you whether or not you recognize these

10    photographs?

11         A    Yes, I do.

12         Q    All right.  And who do these photographs portray?

13         A    That is my grandson.

14         Q    And let me show you 2(a) and tell you -- do you

15    recall seeing Robbie with his dad?

16         A    Yes, I do.

17         Q    And does that picture fairly and accurately depict

18    how Robbie related to his dad?

19         A    Yes, it is.

20         Q    And did he in fact relate the same with you when

21    you would hold him?

22         A    Just like that.

23         Q    Let me go ahead and show you B and C, and tell me

24    whether or not you ever saw Robbie when he appeared in that

25    manner in those pictures?

1      A     Yes, I did.

2      Q     And I'd like to show you now D, E and F, and tell

3   me whether or not you've seen Robbie focussing on the mobile

4   or focussing on something similar to that when you've had

5   custody of him or had him in your care?

6      A     Yes, and I have a lot of more pictures like that if

7   you'd like to see them.

8      Q     My last one would be G.  Now, you described a

9   quirky little smile.  Does photograph G depict that for the

10  jury --

11     A     Yes, it does.

12     Q     -- if they were to look at that picture?

13     A     Yes, it does.  That's how I remember him.

14           MS. SINGER:  If I may have one moment.

15  BY MS. SINGER:

16     Q     Mr. Davis, did you see this baby while he was in

17  the care of your daughter Crystal?

18     A     Yes, I did.

19     Q     Did you at any time ever see Crystal in any way

20  abuse this child?

21     A     No, I did not.

22     Q     How would you describe how she handled the child in

23  your presence?

24     A     She loved that child with all her heart.

25     Q     How was her care and treatment of the child, her

1    actual physical care and treatment of the child?

2        A    Good.

3        Q    Have you ever seen John handling the child as well

4    when they would be visiting with you?

5        A    Yes, I did.

6        Q    And did you ever see any abuse on his part in

7    handling the child?

8        A    No, I did not.

9        Q    And how would you describe how he physically cared

10   for the child when he was in your presence?

11       A    He loved that child very much and he was just, he

12   was great with him.

13           MS. SINGER:   One moment, Your Honor.   No further

14       questions of this witness, Your Honor.

15           THE COURT:   Mr. Groland.

16           MR. GROLAND:   Thank you.

17                    CROSS-EXAMINATION

18   BY MR. GROLAND:

19       Q    Mr. Davis, I just have a few questions.   We won't

20   be too long.

21           About how many times would you say you and Tammy

22   actually took care of Robbie up in Jacksonville?

23       A    I'd say on the weekends probably maybe two, three.

24   It could have possibly been part when they would come up that

25   they would go off and we would take care of him, but not for

1    the whole weekend.

2        Q    So do I understand you to say that for the four

3    months that Robbie was with us, you saw him just about three,

4    possibly four weekends a month for the whole four months?

5        A    I would say that would be close to correct, yes,

6    sir.

7        Q    And on how many of those occasions would Crystal

8    actually leave Robbie to stay with you, either bring her

9    up -- I'm sorry, bring him up herself or have Michelle or

10   somebody else bring the baby to you and your wife?

11       A    Well, I remember two times that Tammy went to

12   Sonny's in Starke and picked him up and brought him back,

13   they met halfway.  And I remember one time that John had a

14   golf tournament or something in Jacksonville that we kept him

15   for a partial weekend.

16       Q    So you remember about three, could have been maybe

17   a couple more times during the four months?

18       A    That we kept him for the weekend or most of the

19   weekend, yes, sir.

20       Q    And your two stepchildren that live with you, what

21   are their names and how old are they?

22       A    There's only one that lives with me now, and that's

23   Natalie, and she's 16 years old, a female.

24       Q    Back in 2000, Natalie was 14 and the other

25   stepchild was how old?

1      A    I had one that was drafted to the Milwaukee

2  Brewers, my oldest stepson, Tammy's son, and he was gone out

3  of high school to the Milwaukee Brewers.

4      Q    Was he living with you during the year 2000 in

5  Jacksonville?

6      A    He was not, he was with the Milwaukee Brewers.

7      Q    It's true that Robbie was not a crier at all, was

8  he?

9      A    I did not hear him cry a lot, no.

10     Q    I mean, that's what his grandmother has -- his

11  great grandmother has testified to and so has Crystal.

12  You're in agreement with that then?

13     A    He couldn't take a smile off his face long enough

14  to cry.

15     Q    The car accident that Crystal was in in January of

16  2000, you're familiar with the details, are you not, of that

17  accident?

18     A    Some of the details, yes, sir.

19     Q    It was investigated by Florida Highway Patrol, your

20  agency?

21     A    I believe it probably was.

22     Q    Do you know whether or not the air bag in that

23  accident deployed?

24     MS. SINGER:  I'm going to lodge an objection.  It's

25     going to call for a hearsay answer.  I don't believe

1          that --

2                THE COURT:   The objection is sustained.

3     BY MR. GROLAND:

4          Q     Did you see the car after the accident?

5          A     I did not.

6          Q     Did you see an accident report?

7          A     I did not.

8          Q     Was there another car wreck that Crystal was in

9     around this time or just before that time that you have

10    previously told me about?

11         A     There was one that took place in Jacksonville

12    before she was married, yes, sir.

13         Q     We don't have to go into that.

14               Going back to August of 2000, correct me if I'm

15    wrong on this, you told me, had you not, that the CAT scan

16    had revealed an earlier injury?

17               MR. PENNYPACKER:   Object to the hearsay.

18               THE COURT:   Sustained.

19               MR. GROLAND:   Your Honor, it's not coming in for

20          the truth.   If I may approach.

21               THE COURT:   Come up to the bench.   This does not

22          need to be on the record yet.

23               (A sidebar discussion was held off the record.)

24    BY MR. GROLAND:

25         Q     Mr. Davis, during the early stages of the police

1    investigation you talked to Detective Helen Legall, did you

2    not?

3         A    I did.

4         Q    Did you tell her that you had been told by doctors

5    at the hospital that they found from the CAT scan that the

6    baby had an earlier or an older brain injury?

7         A    On the day before Robbie's death when they were

8    talking about whether to discontinue life support --

9              MR. PENNYPACKER:  Your Honor, this is not

10        responsive to the question.

11             THE WITNESS:  -- I was told of --

12             MR. PENNYPACKER:  Mr. Davis, hold up.

13             THE COURT:  Mr. Davis, the objection has been

14        lodged and I'm sustaining the objection.

15             Would you repeat the question?

16   BY MR. GROLAND:

17        Q    The question is:  Did you communicate with

18   Detective Legall on the phone that you had been told by

19   doctors at the hospital that in evaluating the CAT scan they

20   found evidence of an older brain injury?

21        A    Not on the phone and not to her.  I don't recall

22   saying that to her.  I was told by doctors at the hospital --

23             MR. PENNYPACKER:  Your Honor, object, he's answered

24        the question.

25             THE COURT:  The objection is sustained.  Do you

1      have another question?

2   BY MR. GROLAND:

3      Q    Are you saying you don't recall telling that to her

4   or that you did not say that to her?

5      A    I don't recall whether she told me or I told her or

6   how it was found out.  I don't know.

7      Q    Would it be fair to say that you remember talking

8   to her about that?

9      A    About a previous injury?

10     Q    Yes.

11     A    I remember it coming up but I don't remember what

12  the circumstances were.

13     Q    Let me ask you this:  Do you remember wondering

14  aloud with her whether or not the earlier car accident that

15  Crystal was in could have caused that older brain injury?

16          MS. SINGER:  I'm going to lodge an objection to the

17      relevancy of that.

18          THE COURT:  The objection is sustained.

19  BY MR. GROLAND:

20     Q    Were you personally aware of any police

21  intervention between Crystal and John after the baby was

22  born?

23     A    Personally, no.

24     Q    Did you ever get a telephone call about that?

25          MS. SINGER:  I'm going to lodge an objection

1      because the answer is going to call for hearsay.

2            MR. GROLAND:  I'm not asking, Your Honor, what the

3      conversation was.  I'm asking him if he got a phone

4      call.

5            THE COURT:  The objection is sustained.

6   BY MR. GROLAND:

7      Q    You've testified that during the time that you've

8   spent with Robbie you noticed no signs of anything at all, I

9   guess is one way of saying it; is that correct?

10     A    That is correct.

11     Q    Were you aware or are you aware that his

12  pediatrician had found some subtle neurological deficits

13  during the examination of Robbie over a period of time?

14     A    This was not relayed to me, no.

15     Q    Were you aware that he had some concerns about

16  Robbie's underdeveloped neck muscles?

17     A    No, I was not.

18     Q    In the several times that you watched over Robbie,

19  did Crystal ever give you special instructions as to how to

20  handle Robbie because of his neck muscle problem?

21     A    She never told me nothing, no, sir, about that.

22     Q    Did Crystal ever instruct you on giving --

23           MS. SINGER:  I'm going to just lodge an objection

24      here that the questions are framed to require hearsay

25      answers.

```
 1              THE COURT:  The objection is sustained.
 2  BY MR. GROLAND:
 3     Q    Did you ever give Robbie any exercises -- let me
 4  strike that and ask it a different way.
 5              Was there ever any exercises that you and/or your
 6  wife worked with Robbie with to strengthen his neck muscles?
 7     A    I wasn't aware that he had a neck problem, no, sir.
 8              MR. GROLAND:  I think I'm finished.  May I just
 9     check?
10              THE COURT:  Yes.
11              MR. GROLAND:  No further questions.
12              MS. SINGER:  One follow up, Your Honor.
13                    REDIRECT EXAMINATION
14  BY MS. SINGER:
15     Q    Did you, Mr. Davis, see anything personally that
16  suggested to you that he had a neck problem?
17     A    There was nothing wrong with that child.
18              MS. SINGER:  No further questions, Your Honor.
19              THE COURT:  All right.  May Mr. Davis be released
20     or does he need to remain available?
21              MS. SINGER:  I'd ask that he be released and I'd
22     ask that he also be released from the rule unless
23     Mr. Groland has an objection to that.
24              MR. GROLAND:  I have no problem with him being
25     released from the subpoena.  As far as the rule, let me
```

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1    discuss that with my co-counsel here and I'll give you a

2    answer after lunch.

3         MS. SINGER:  Thank you.

4         THE COURT:  Mr. Davis, you are released from your

5    subpoena, you're free to leave the courthouse.

6         THE WITNESS:  Thank you, Your Honor.  Thank you,

7    ladies and gentlemen of the jury.

8         MS. SINGER:  Your Honor, I think this may be a good

9    time to take a lunch break, unless the Court wants to

10   proceed.  We do have witnesses outside if you want us

11   to.

12        THE COURT:  No, we're going to recess for lunch.

13   Thank you.

14        Ladies and gentlemen, I'll ask that you go ahead

15   for the lunch hour and put your notebooks in your

16   envelopes, which I believe the clerk has available for

17   you, and we'll lock them in the evidence locker here.

18   And then you'll be escorted to lunch.

19        (The jury exited the courtroom.)

20        THE COURT:  We will reconvene at 1:15 with the

21   attorneys.  The trial will begin again at 1:30.  And the

22   courtroom will need to be secured during that time

23   frame.

24        MR. PENNYPACKER:  Your Honor, if we could have just

25   a moment to go outside and come back in, we want to talk

1          to our witnesses and come back in and get our personal

2      belongings.   Thank you.

3               (The trial was recessed at 12:09 to be resumed

4  after lunch at 1:15.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25