# EXHIBIT

# G

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

*2O2-1-17814*

*F*

BRIAN PATRICK HERLIHY  }
          Appellant,  }

                 }        CASE NUMBER   2000-2753-CFA

                 }

                 }        APPEAL NUMBER 1D02-4788

v.                 }

                 }        VOLUME VII

                 }        Dock⸋ *CH*

                 }

STATE OF FLORIDA  }        *D 5-14-2003*

          Appellee,  }        ⸋Atto⸋
                             Gener⸋

## TRANSCRIPT
## RECORD

### HONORABLE MARTHA ANN LOTT
#### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

α02·1-17814 436

F

1          IN THE CIRCUIT COURT OF FLORIDA
           EIGHTH JUDICAL CIRCUIT
2          IN AND FOR ALACHUA COUNTY

3              CASE NO: 01-2000-CF-2753-A

4          TRANSCRIPT ON APPEAL
               VOLUME IV
5            (Pages 436 - 568)

6  STATE OF FLORIDA

7  vs.                          Volume VII

8  BRIAN PATRICK HERLIHY,       1D02-4788

9          Defendant.
                                Docket CH
10  _____/
                                05-14-2003
11  Proceedings:        Jury trial
                                DUCA STOOG
                                OMER
12  Before:             The Honorable Martha Ann Lott,
                        Circuit Judge
13
   Date:                September 11, 2002
14
   Time:                1:00 p.m.
15
   Place:               Courtroom 4-A
16                       Alachua County Courthouse
                         Gainesville, Florida
17
   Reporter:            Stacey K. Bryant,RPR
18                       Judicial Court Reporter

19  APPEARANCES:

20      Jeanne Singer, Assistant State Attorney
        Stephen Pennypacker, Assistant State Attorney
21      120 W. University Avenue
        Gainesville, Florida 32608
22         Appearing on behalf of the State of Florida

23      Gordon Groland, Esquire
        John Tedder, Esquire
24      Post Office Box 2848
        Gainesville, Florida 32602
25         Attorneys for defendant

Stacey K. Bryant, RPR
Judicial Court Reporter

INDEX TO PROCEEDINGS

911 TAPE PLAYED FOR JURY: ........................ 441

STATE'S CASE:

KENNETH JOHNSON,

DIRECT EXAMINATION BY SINGER: .................... 448
CROSS-EXAMINATION BY TEDDER: ..................... 467

DENNIS MEREDITH,

DIRECT EXAMINATION BY SINGER: .................... 473
CROSS-EXAMINATION BY TEDDER: ..................... 478
REDIRECT-EXAMINATION BY SINGER: .................. 497
RECROSS-EXAMINATION BY TEDDER: ................... 498
FURTHER REDIRECT-EXAMINATION BY SINGER: .......... 506

THOMAS WHITLEY,

DIRECT EXAMINATION BY SINGER: .................... 507
CROSS-EXAMINATION BY TEDDER: ..................... 516

ORLANDO ALVAREZ,

DIRECT EXAMINATION BY SINGER: .................... 539
CROSS-EXAMINATION BY TEDDER: ..................... 547

RUSSELL VALENTINE,

DIRECT EXAMINATION BY SINGER: .................... 559
CROSS-EXAMINATION BY TEDDER: ..................... 563

INDEX TO EXHIBITS

STATE'S EXHIBIT NO. 9........MARKED IN EVIDENCE... 448

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1                    P R O C E E D I N G S

 2                         *  *  *  *  *

 3          (Outside the presence of the jury:)

 4          THE COURT:  All right.  Is the state ready to

 5     continue at this time?

 6          MS. SINGER:  We are, your Honor.

 7          THE COURT:  And is the defense ready to continue?

 8          MR. TEDDER:  Yes, ma'am.

 9          THE COURT:  And are all the jurors ready?

10          MR. BAILIFF:  Yes.

11          THE COURT:  You can go ahead and bring the jury

12     in.

13          MS. SINGER:  Your Honor, we noted at lunch that

14     the jurors were not instructed as to reading the

15     newspaper this morning.  Could we possibly do that,

16     because the Court didn't do that on a daily basis?

17          THE COURT:  I'm not gonna do that at this time.

18     We can address that at the end of the day as to how

19     that needs to be done and whether or not it needs to be

20     done on a daily basis.

21          MS. SINGER:  Okay.  Thank you.

22          THE COURT:  Bottom line is, if either the state or

23     defense requests it at the beginning of each morning, I

24     have no objection to doing it.  Whether or not we --

25          MS. SINGER:  I didn't request it this morning.  I
```

1     don't think Mr. Groland did.

2         MR. GROLAND:  What was the question?  I'm sorry.

3         MS. SINGER:  Whether we wanted to inquire as to

4     whether anybody read the newspaper or watched T.V.

5         MR. TEDDER:  I think we should inquire as to it.

6     There was an article in the Gainesville Sun today.  I

7     don't think there was anything on the T.V. yesterday or

8     this morning.

9         MR. GROLAND:  There was I heard.

10        MR. PENNYPACKER:  I heard it was on television

11    this morning.

12        MR. GROLAND:  All right.  We'll request it.

13        THE COURT:  All right.

14        (Before the jury:)

15        THE COURT:  The jurors are present and in the jury

16    box.

17        Ladies and gentlemen, the state and the defense

18    have both asked that I inquire of the entire panel

19    whether or not anyone has read any news reports over

20    the last couple of days or heard anything on the news

21    regarding this case or whether anyone has attempted to

22    contact you.  Has anybody got any information of that

23    sort that you need to let us know about?

24        Good enough.  I'll probably ask you the question

25    everyday, just so the record is clear in that regard.

1          All right.

2          MS. SINGER:  Your Honor, at this time, pursuant to

3     stipulation from both the state and the defense, the

4     state would be playing the 911 tape for the jury that

5     has -- after I play it I would like to mark the tape

6     and have it entered into evidence as the state's next

7     numbered exhibit.

8          THE COURT:  All right.  Any objection?

9          MR. GROLAND:  No objection.

10         THE COURT:  Good enough.  Go ahead, Ms. Singer.

11         MS. SINGER:  If the Court will allow me a moment,

12    I did not adjust this if there were jurors here.  I did

13    not adjust the sound, so if you'll allow me a moment to

14    adjust the sound.

15         THE COURT:  All right.

16         MS. SINGER:  If the Court does not hear it, I'll

17    adjust the sound.

18         THE COURT:  That's fine.  I've already heard the

19    tape.  I don't need to hear it so long as all the

20    jurors can hear.

21         MR. TEDDER:  Your Honor, we would ask the court

22    reporter to take it down to the best of her ability,

23    please.

24         THE COURT:  All right.

25         (TAPE PLAYED:)

1          "This is Communications, Marilyn Gaines for the

2    Gainesville Police Department.  I'm recording from a

3    digital recording on August 2nd, 2000.  I'm starting

4    this tape display time at 09:34 a.m. hours, with an

5    incoming 911 call, taken by Diamond Smith, at

6    the Gainesville Police Department in reference to state

7    attorney case number 2000-2753, C. Charles, F. Foxtrot,

8    A. Alpha. Gainesville Police Department case number

9    13656, State vs. Brian Herlihy.  Spelling the last name

10    H-E-R-L-I-H-Y.

11          OPERATOR:  911.  What is your emergency?

12          HERLIHY:  Yes, my girlfriend's three-month-old

13    son.  I was in the shower.  I came out.  I found him

14    face down and he is not really breathing too well.

15    He's three months old.

16          OPERATOR:  Sir, calm down, calm down, and talk to

17    me.

18          HERLIHY:  Okay.

19          OPERATOR:  What's your address?  What's your

20    address?

21          HERLIHY:  1015 Southwest 9th Street.  She's not

22    here; she went to go get some gas.  We were going to

23    Cedar Key today.

24          OPERATOR:  Right.  Sir, that's not important right

25    now.  Stay with me.  Let's talk about what's going on

1    where you're at.

2        HERLIHY:  You don't understand.  I'm in the

3    medical field.  This shouldn't have happened.

4        OPERATOR:  Sir, what's going on with the child

5    right now?

6        HERLIHY:  All right.  He's breathing, but it's

7    very slow and his eyes are closed.  I'm helping him

8    with his breath.  I don't -- He's just not responsive

9    to me right now.  I came in, he was stuck between the

10   bed.

11       OPERATOR:  Sir, sir, listen to me.  Stay with me

12   on the line.  I'm going to transfer you over to CVC.

13       HERLIHY:  Okay.  Thanks.

14       OPERATOR:  What apartment are you in, sir?

15       HERLIHY:  A-21 eight.

16       OPERATOR:  A-21.

17       HERLIHY:  A, as in apple.  21.

18       OPERATOR:  CDC.  This is a transfer call.  Call

19   number 420.  Caller, go ahead.

20       HERLIHY:  Hello?  My girlfriend's three-month-old

21   child.  I came out of the shower and he was stuck

22   between the headboard and the bed.

23       OPERATOR:  What is stuck?  The child?

24       HERLIHY:  The child was.  He's on his back now.

25   I'm trying to give him CPR because he's not really

1        responding.

2            OPERATOR:  Is he breathing?

3            HERLIHY:  Yeah, he's slowly breathing.  He's got a

4        heartbeat.  He's very peaked.

5            OPERATOR:  If he is breathing, do not do CPR.

6            HERLIHY:  Right.  I understand.  I understand.

7        I'm in the medical field.  I never seen this happen

8        with a child before.

9            OPERATOR:  Okay.  So is he having trouble

10        breathing right now?

11            HERLIHY:  He's breathing.  He's not breathing

12        regularly right now.  His eyes are not opening.  There

13        we go.  Hold on.

14            OPERATOR:  Listen to me carefully okay.  I want

15        you to put your ear down by his mouth and nose and see

16        if you can hear or feel anything coming out.

17            HERLIHY:  He's doing it, it's very slow.

18            OPERATOR:  Okay.  But there is air coming out?

19            HERLIHY:  He's not even taking -- hold on.

20            OPERATOR:  Listen to me, sir.  Sir?

21            HERLIHY:  Yes, ma'am?

22            OPERATOR:  Listen to me carefully.  Put your ear

23        down by his mouth and nose and see if you can feel or

24        hear any air coming out of his mouth.  Do it now.

25            HERLIHY:  No.

1       OPERATOR:  No air at all?

2       HERLIHY:  No, but I hear his little heart going.

3       OPERATOR:  Okay, but no air and coming out at all.

4       HERLIHY:  He's gurgling.

5       OPERATOR:  Okay.  I'm going to give you

6  instructions for CPR.  How old is the child?

7       HERLIHY:  He's three months old.  Hold on.  He

8  just took a breath.

9       OPERATOR:  Three months old?

10      HERLIHY:  He took a breath through his mouth and

11  he's gurgling.

12      OPERATOR:  Okay.  Listen carefully.  I'm going to

13  tell you how to help the baby.

14      HERLIHY:  Okay.

15      OPERATOR:  Are you with him right now?

16      HERLIHY:  I'm right next to him.  I won't leave

17  his side.

18      OPERATOR:  Okay.  Lay him flat on his back, on the

19  floor.

20      HERLIHY:  He's flat on his back.  Yes, ma'am.

21      OPERATOR:  Remove any pillows.

22      HERLIHY:  Okay.  No pillows.  I'm going to put him

23  on the floor.  He's very flaccid, operator.  God, I

24  can't believe this is happening.

25      OPERATOR:  Okay.  Remove any pillows from behind

1       his head.

2           HERLIHY:  Right.  I just have him flat on the

3       floor.

4           OPERATOR:  Place your hand under his neck --

5           HERLIHY:  Okay.

6           OPERATOR:  Okay?  -- and shoulders and hold the

7       head back.

8           HERLIHY:  All right.  He's got something out of

9       his nose.

10          OPERATOR:  Okay.  I want to you get a cloth and

11      clean out his mouth.

12          HERLIHY:  All right.  What I'm doing is I've got

13      him laid to the side 'cause he's draining out all these

14      white fluids.  I think it's formula because he had a

15      bottle.

16          OPERATOR:  Turn his head to the side.

17          HERLIHY:  I have it.

18          OPERATOR:  Clean out his mouth and nose.  Do it

19      now.  Okay?

20          HERLIHY:  Okay.  My God, this is all I need.

21          OPERATOR:  Okay.  I want to you check him again

22      and see if he's coughing.

23          HERLIHY:  He's coughing.  He's coughing.  His

24      color doesn't look that great, but he's coughing.

25          OPERATOR:  Okay.  Listen to me carefully.  I need

1    you to follow my instructions specifically.

2         HERLIHY:  Okay.

3         OPERATOR:  Put your ear next to his mouth and see

4    if you can feel or hear any breathing.

5         HERLIHY:  No.

6         OPERATOR:  Can you see his chest rise?

7         HERLIHY:  No.

8         OPERATOR:  Okay.  I'm gonna tell you how to give

9    him mouth to mouth.  Okay?

10        HERLIHY:  All right. He's got something coming out

11   of his nose.  It looks like it's blood.  I don't know.

12        OPERATOR:  Okay.  Turn his head to the side again

13   and clear out his mouth and nose.

14        HERLIHY:  He's still.  Ma'am, it's still coming

15   through his nose.

16        OPERATOR:  Okay.  Do you have a clean cloth?

17        HERLIHY:  I have a cloth right here.  Rescue is at

18   my from door.

19        OPERATOR:  They're at the door?  Go and let them

20   in now.

21        HERLIHY:  I'm not leaving his side.

22        OPERATOR:  Have somebody let them in now.

23        HERLIHY:  I'm here by myself.

24        OPERATOR:  Okay.  Go let them in.

25        HERLIHY:  Guys, hello?  Over here.  A-21.  Come

1    on.  I got a three month old.  This is all I need.

2    I've worked rescue.

3         OPERATOR:  Okay.  Sir, are the rescue inside the

4    house now?

5         HERLIHY:  No, they were going to the wrong damn

6    building.

7         OPERATOR:  Okay.  We are going to continue CPR

8    until they get in the house.

9         HERLIHY:  I don't need this today.

10         OPERATOR:  Sir, listen to me.  Hello?

11         HERLIHY:  Yes, ma'am.

12         OPERATOR:  Okay.  I need you to go back to the

13    baby.

14         HERLIHY:  I'm with him right now.

15         OPERATOR:  Okay.  We're gonna try mouth to mouth

16    again.  Okay?

17         HERLIHY:  Okay.  They are just walking in the door

18    right now.  I'm going to go ahead and leave them with

19    him.

20         OPERATOR:  Are they with him now?

21         HERLIHY:  Right next to me, yeah.

22         OPERATOR:  They're with the baby?  You hang up the

23    phone and go with them.

24         HERLIHY:  Okay."

25         MS. SINGER:  Your Honor, at this time I would like

1  to have this marked, after I rewind it, as the next

2  numbered exhibit as state's in evidence.  Mr. Clerk,

3  what number would that be?

4          THE CLERK:  Exhibit 9, Your Honor.

5          THE COURT:  No objection?

6          MR. GROLAND:  No objection.

7          MS. SINGER:  I'm looking at the tape to see if

8  there is anything written on it.  May I have a moment

9  to do that?

10          THE COURT:  State's Number 9 in evidence.

11          (State's Exhibit No. 9 was received in evidence.)

12          MS. SINGER:  We'll show this to Mr. Groland so he

13  can see what's written on the front.

14          Mr. Groland shows no objection to the tape.

15          Your Honor, the state would call as it's next

16  witness Ken Johnson from Gainesville Fire Rescue.  He

17  is outside.  Kenneth Johnson.

18          MR. GROLAND:  Your Honor, may I approach

19  Ms. Singer for a second?

20          THE COURT:  Yes.

21                  KENNETH JOHNSON,

22  having been produced and first duly sworn, testified as

23  follows:

24          MS. SINGER:  May I proceed, your Honor?

25          THE COURT:  Go ahead.

1          MS. SINGER:  One moment, please.

2                   DIRECT EXAMINATION

3    BY MS. SINGER:

4      Q    Mr. Johnson, please speak loud enough for everyone

5    to hear.  The courtroom does have some sound difficulties.

6    If you would state your full name, please?

7      A    Kenneth Andrew Johnson.

8      Q    Your profession or occupation?

9      A    I am a driver operator/paramedic of the

10   Gainesville Fire Rescue Department.

11     Q    And as a driver paramedic for Gainesville Fire

12   Rescue, do you drive an ambulance or do you drive a fire

13   truck?

14     A    I drive fire apparatus.

15     Q    How long have you been so employed?

16     A    I've been employed with Gainesville Fire

17   Department since January of 1990.

18     Q    Before that did you have any other experience as a

19   firefighter?

20     A    I worked as firefighter paramedic for Alachua

21   County for two-and-a-half years prior to that.  And I worked

22   as an EMT for a year with Levy County Emergency Services

23   before that.

24     Q    What certifications do you hold in order to

25   practice the work that you do?

1    A    I first got certified as an emergency medical

2 technician back in 1985 and two years later received

3 paramedic certification from the State of Florida.

4    Q    1987 approximately you were a certified paramedic?

5    A    Correct.

6    Q    And do you have to receive specialized training in

7 order to obtain both of these certifications?

8    A    Yes, ma'am.  The emergency medical technician

9 training requires one semester of intensive training at

10 community college level school.  It's full-time.  The

11 paramedic certification is a two-year program, full-time.

12    Q    So in all you have three years of specialized

13 training in these areas?

14    A    The EMT training actually counts toward the

15 paramedic training, so it's effectively two years of

16 training.

17    Q    And you, of course, have been practicing in this

18 field since 1987 over -- you're heading on 15 years now in

19 this kind of work?

20    A    In 1985 I initiated work in the field with City of

21 Newberry Fire Department and it was immediately after that

22 that I became EMT certified.  So it's been in the field

23 since 1985.

24    Q    Now, I'm gonna take you back to August 2nd of the

25 year 2000.  Were you employed with Gainesville Fire Rescue

1    at that time?

2         A    Yes, ma'am.  I was employed as a firefighter

3    paramedic at the time.

4         Q    Do you recall a call that came down requiring

5    medical aid to the location of 1015 Southwest 9th Street,

6    Gainesville, Florida, Apartment A-21?

7         A    Yes, ma'am.

8         Q    Did you, in fact, report to that particular

9    location?

10        A    I did respond to that location with my company.

11        Q    Do you recall what time approximately you were

12   able to respond to that location?

13        A    We were called during our vehicle check in the

14   morning, which typically occurs between 9:00 and 10 o'clock

15   in the morning, yes, ma'am.

16             MS. SINGER:  If I may have a moment, your Honor?

17   BY MS. SINGER:

18        Q    When you are called to a particular call for

19   Gainesville Fire Rescue, is there a record made of the time

20   that you are dispatched and the time that you arrive?

21        A    Yes, ma'am.  The dispatch center is a separate

22   entity from the Gainesville Fire Rescue and they have

23   records stored on computer.

24        Q    All right.  Would it aid you in refreshing your

25   recollection as to the time you were dispatched and the time

1   you arrived if you were able to review those records?

2        A    As to the specific times, yes, ma'am.  I do have a

3   copy of my report with me, if I can access it.

4        Q    Yes, unless there's an objection on the part of

5   the -- Mr. Tedder, I think you could look at that.

6             MR. TEDDER:  No objection, your Honor.

7             THE COURT:  All right.

8   BY MS. SINGER:

9        Q    Mr. Johnson, you can feel free to take a look at

10  your report for the time so that the jury can find out when

11  you were dispatched and when you arrived.

12       A    Okay.

13       Q    What time were you dispatched to the Tumbling

14  Creek apartments, which is the address I gave you, 1015

15  Southwest 9th Street, Gainesville, Florida?

16       A    The unit I was assigned to is Quint 1, out of the

17  fire station over on South Main Street.  We were dispatched

18  at 0937 and 15 seconds.

19       Q    Do you know when you arrived at the designated

20  spot?

21       A    Our arrival was at 0943 and 44 seconds.

22       Q    All right.  Now, when you got to the Tumbling

23  Creek apartments, apartment A-21, were there any other

24  emergency services or law enforcement vehicles there upon

25  your arrival, to your recollection?

1      A      There was an ambulance already on the scene.  They

2   were actually, according to the records, they were on scene

3   prior to our actually leaving to go to the call.  On our

4   arrival we arrived at the same time as the district chief

5   from Alachua County and the Alachua County bicycle response

6   team.  We arrived at the same time together.

7      Q      Now, is this within Alachua County, this address?

8      A      Yes, ma'am, it is within the city of Gainesville

9   as well.

10     Q      Now, just a little lesson for everybody that's

11  listening to your testimony.  You're from the Gainesville

12  Fire Rescue and there were county folks on the scene in the

13  ambulance.  Can you explain to the jury how in Gainesville,

14  in the city, responses are made to emergency calls for

15  medical attention?

16     A      Within the city of Gainesville we respond to

17  what's called a two-tier dual response system.  Alachua

18  County Fire Rescue provides the ambulance, which is the

19  transport medical services for moving patients from a scene

20  to the hospitals.  Gainesville Fire Rescue respond, what we

21  call first response.  We have all the capabilities of the

22  ambulance, all the medications, all the equipment, all the

23  training that the ambulances have.  We just don't have the

24  transport capability.  Due to the larger number of fire

25  apparatus in the given area as compared to the number of

1    ambulances and fire apparatus, most often we'll arrive at

2    the scene first as the closer unit.

3        Q    And so you both have responsibilities to provide

4    care and treatment to a patient when you get a call like

5    this?

6        A    Absolutely.

7        Q    And, in fact, did you begin your job as a

8    paramedic after you arrived at the Tumbling Creek apartment

9    A-21?

10       A    Actually, our response -- part of our training and

11   part of our preparation for dealing with the patient is

12   information that's provided to us while still en route,

13   while we're going to the call.  So, essentially, my

14   treatment preparations were, were actually beginning prior

15   to arrival.

16       Q    How did the dispatch come down to you?  What were

17   you told about the potential patient that you were gonna

18   come see?

19       A    The dispatch came in as a cardiac arrest.

20       Q    And were you told how old the patient was?

21       A    I believe it was just pediatric.

22       Q    Meaning child?

23       A    Child, correct.

24       Q    So you knew you were going to a child cardiac

25   arrest call?

1        A      We knew that's what we were paged to.  We also

2    know from experience that what we are paged to is not

3    necessarily exactly what we will find.  But that degree of

4    severity was certainly anticipatory.

5        Q      Is that -- is there a certain level put on

6    pediatric patients or pediatric cardiac arrest patients?

7        A      There's not a greater degree in the dispatch

8    protocols.  All medical emergencies are treated as priority

9    one calls, which immediately respond to the nearest first

10   response unit and the nearest first transport ambulance.

11   The degree of change is in our mental attitudes, as opposed

12   to being called to somebody with a sore foot, which does

13   happen, as opposed to being called to an incident where they

14   tell you up front this is a critical incident, which cardiac

15.  arrest certainly is.

16       Q      You were heading there knowing this was a serious

17   call?

18       A      Correct.

19       Q      Is that basically what you're telling us or

20   significant call?

21       A      Correct.

22       Q      When you got there did you go into apartment A-21?

23       A      I did make access to the apartment.

24       Q      Were other people already in the apartment by that

25   time?

1    A    There were two people off of the ambulance that
2    were on scene and there was a number of other personnel,
3    people standing outside.  I do not remember who
4    specifically.
5        Q    Did you begin assisting in the patient's care at
6    that time?
7        A    I went in.  I found the patient and the ambulance
8    personnel were in a bedroom and between the bed and the
9    wall, which there was still some space there for them to
10   work with, but knowing we had more people coming in, I moved
11   the bed some to make a little more room.
12       Q    And did you actually provide service and care to
13   the patient while you were there?
14       A    Yes, ma'am.
15       Q    Was this child ever identified to you?  Did you
16   ever get a name or --
17       A    We --
18       Q    -- or other identification of this baby?
19       A    We got the name after the fact.
20       Q    Okay.  What name were you given to the name of the
21   patient?
22       A    Robert Quirello.
23       Q    Quirello, Q-U-I-R-E-L-L-O?
24       A    That is correct.
25       Q    All right.  Can you tell the jury what type of

1    medical attention was provided to Robbie Quirello by the

2    emergency medical technicians and paramedics who were on

3    scene that day?

4         A    On my arrival the patient was intubated, which is

5    a procedure where a tube is inserted through the mouth into

6    the trachea, which is the tube that leads to the lungs.  We

7    use this for patients that are unconscious, unresponsive,

8    and unable to protect their own airway to keep them from

9    suffocating due to lack of their own ability to breathe.

10        Q    When that tube was, did you say applied, or

11   inserted, would that be the right term?

12        A    Inserted, yes, ma'am.

13        Q    Was Robbie Quirello breathing?

14        A    I was advised by the medic unit that the patient

15   was in complete respiratory arrest, not cardiac arrest.

16   Respiratory arrest means that there is no effort to breathe

17   at all.

18        Q    So a tube is inserted so that the baby is provided

19   with the oxygen?

20        A    We breathe for the baby.  We breathe for a patient

21   when we intubate.  We insert the tube then we use what's

22   called a bag valve mask.

23        Q    A what?

24        A    A bag, valve mask.  The abbreviation is BVM.  It's

25   like a balloon and we attach it to the end of the tube, you

1   squeeze it to force air down through the tube into the

2   lungs, and as you let go, it reinflates itself and the

3   exhalation of the patient breathing out is directed away

4   from the bag, and fresh air and oxygen is brought in to the

5   rear of the bag.

6       Q    Did you do that in this case?

7       A    Yes, ma'am.

8       Q    Was the bag then used for Robbie, so he could

9   breathe?

10      A    Yes, ma'am.

11      Q    And who would be the person who is actually

12  bagging this child?  Who would be assigned that job?

13      A    That job will oftentimes change hands during the

14  course of an emergency because this is that, an actual CPR,

15  some of the more labor-intensive aspects of our job dealing

16  with patient care.  At the time it was being done by Alachua

17  County Fire Rescue paramedics that were on scene.

18      Q    And you witnessed that?

19      A    I did witness that, yes, ma'am.

20      Q    And did you at any time witness anyone other than

21  certified medical personnel providing care?

22      A    No, ma'am.

23      Q    Mr. Johnson, other than seeing the intubation -- I

24  know I interrupted you -- what other rescue efforts were

25  made at the time that you were attending to the patient

1    for -- at the apartment?

2         A    Several attempts made at establishing intravenous

3    access, starting IV's to provide fluids, but more to provide

4    an access route for medication.

5         Q    Tell us what those attempts were?

6         A    There was two attempts made by district chief that

7    arrived at the same time we did.

8         Q    His name is?

9         A    I do not know.

10        Q    This would be from county?

11        A    This was a county district chief, correct.

12        Q    All right.

13        A    That person made two attempts at accessing IV's in

14    a bone of the lower leg.

15        Q    Why would you choose to access a bone to give an

16    IV?

17        A    In pediatric patients that's often preferable.

18    The bone, the tibia, which is a forebone in the lower leg,

19    typical of other bones is very porous.  So medications,

20    fluids that we put in, into the anterior of the bone, gets

21    out into the system very quickly.

22        Q    Do you have to puncture the child's skin or make

23    some kind of cut in order to insert this particular line

24    that you have described to give medications?

25        A    Yes, ma'am.

1    Q    And I know you may be a little graphic here, but I

2    think we need to explain to the jury what you do, to do

3    that?

4    A    Okay.  The procedure involves -- well, the earlier

5    kits, which is what I believe was used at this incident,

6    involves making a tiny incision just below the topmost

7    trochanter of the bone, which is an incision right below

8    your knee.  You make a tiny incision and then you take the

9    needle of the interosseous needle and you basically screw it

10   into the bone until you feel it break into the interior.  At

11   that point the -- it is locked down in place and the

12   intravenous line is attached to the rear of the needle.

13   Q    Once that's done, then there is a way for a line

14   for medicine and fluids?

15   A    Yes.

16   Q    Other than those two things, were there any other

17   specific procedures done on Robbie there at the apartment?

18   A    Yes, ma'am.  The first two attempts at

19   interosseous, or the IO needles in the legs both failed.

20   Oftentimes because you're dealing with a small bone, it's

21   possible to go right out the backside of the bone which

22   makes that route much less effective in terms of delivering

23   fluids and medications.

24        After that was failed by the individuals there, I

25   went to establish an IV in the back of a hand, which is a

1  much more difficult access route.  We had two people

2  working, one on each hand.

3       Q    Because of his size and the size of his veins?

4       A    It's difficult due to size the size of the veins.

5  Most people you can see veins.  What's called the

6  antecubital area, which is the middle of the elbow on the

7  inside, and the back of the arm is favorable and the back of

8  the hand where the veins are readily seen.  On children, and

9  very overweight people, those veins are much harder to

10 access, particularly in children, it's primarily because of

11 size.

12      Q    Did you eventually, were you able eventually to

13 attach a line that was suitable for the IO, as you

14 described?

15      A    Well, we did not use the IOs in the legs.  We did

16 establish an intravenous access through one of the hands.

17      Q    And what did you do next?

18      A    At that point we hook up fluids to enable us to

19 deliver medication, which we did not.  We did not need it.

20 By the time we got this, we were already en route to the

21 hospital and the patient was actually improving in our care.

22      Q    All right.  Did you -- were you present when the

23 child was removed from the apartment and placed in an

24 ambulance?

25      A    Yes, ma'am.

1     Q     Did you have anything to do with having the child

2     moved from the apartment and placed in the ambulance?

3     A     I helped package the child.  We use what's called

4     a papoose, which is a short board, just about

5     two-and-a-half, three feet long.  And it comes with its own

6     wrappings, a Velcro wrapping, which is very effective in

7     young children to hold them in place.  The board is useful

8     typically in trauma situations where you have to protect the

9     spine and the head, to maintain alignment, to keep them from

10    moving; but, it's always very useful in situations where we

11    need to anticipate cardiac arrest.

12           When you have a patient in the back of a unit, or

13    even on a bed or a floor, you can have a soft surface

14    underneath them and when you're doing CPR, cardiopulmonary

15    resuscitation, and pressing on the chest, you don't want a

16    soft surface underneath them.  So we use the board to

17    provide the support from underneath.

18    Q     Was there anything about his removal from the

19    apartment that indicated to you that he was additionally

20    traumatized getting from where he was on the floor of the

21    apartment to the ambulance.  Did you drop him?  Was there

22    anything that happened that was unusual or extraordinary in

23    your transporting him from the apartment?

24    A     No, ma'am, not that I remember.

25    Q     He gets into the ambulance and you are actually

1    providing care to him on the trip from Tumbling Creek to the

2    hospital?

3         A    Yes, ma'am.

4         Q    And just to familiarize the jury where Tumbling

5    Creek is, where is Tumbling Creek in relation to the P.K.

6    Yonge Laboratory School?

7         A    It is immediately east of P.K. Yonge school on --

8         Q    Depot?

9         A    Yeah, that's it.  Thank you.  Depot Avenue.  Ninth

10   Street is accessed off of Depot Avenue.  That's a very

11   difficult turn for large apparatus.

12        Q    When -- Now, you left your fire truck to go in

13   this ambulance, correct?  So on your way back you're

14   traveling in an ambulance?

15        A    Correct.

16        Q    And you're heading to Shands Teaching Hospital

17   emergency room?

18        A    Yes, ma'am.

19        Q    Which would be on Southwest Archer Road?

20        A    Correct.

21        Q    How much time do you believe you, and the baby,

22   and the driver were in the ambulance before you made it to

23   the emergency room?

24        A    If I may access my report?

25        Q    Yes.

1      A     We loaded for transport at 9:54 and 15 seconds.

2   9:55 we left the scene to go to the hospital.  And 9:56 and

3   38 seconds we were on scene at the hospital.

4      Q     And at that time, as the paramedic handling the

5   baby's care, what do you do when you get to the emergency

6   room?

7      A     At the emergency room we have to get all the

8   equipment that we're using onto the stretcher.  The IV, the

9   fluids that we're providing, the bags, EKG monitor that's

10  hooked up to the patient.  We have to make sure it's all on

11  stretcher, and the back of the unit, it's not on the

12  stretcher due to space considerations, but we need to carry

13  all that equipment from the rear of the ambulance into the

14  emergency room with us so that the patient is never detached

15  from the equipment.

16     Q     Was the patient breathing via the bag throughout

17  the trip from the Tumbling Creek to the hospital?

18     A     We were breathing the patient with the bag, yes,

19  ma'am.  But it became a supplement.  During the course of

20  our care the patient began to spontaneously attempt to

21  breathe.

22     Q     All right.  So he was trying to breathe himself,

23  is that what you're saying?

24     A     Yes, ma'am.

25     Q     All right.  So you're helping him breathe then at

1  that point?

2       A    Yes, ma'am.

3       Q    You weren't breathing for him?  Let me get that

4  straightened out.

5       A    A little of both.

6       Q    A little of both, okay.

7       A    The baby, the patient's efforts at breathing by

8  himself was not sufficient to sustain its own life.  So our

9  breathing for him at a faster rate than his natural attempts

10 was necessary.

11      Q    All right.  And his heart was going?

12      A    His heart was satisfactory at the time.

13      Q    All right.  And then do you deliver him to someone

14 when you get to the emergency room?  Once you put everything

15 on this piece of equipment to carry him in, who do you

16 deliver him to?

17      A    We as paramedics, are required to deliver patient

18 care directly to a physician.  We're not allowed to transfer

19 care to anybody of less certification than ourselves.

20      Q    All right.  And I guess that means the nursing

21 staff would be less certification?

22      A    Nursing staff is actually a similar certification

23 level.  Many of them are actually, have a higher level of

24 certification.  A lot of nurses have paramedic certification

25 as well, but we are required to deliver our care to a

1  physician.

2      Q    Did you do that in this case?

3      A    Yes, ma'am.

4      Q    And that would have been the emergency room

5  physician at the Shands hospital?

6      A    Yes, ma'am.

7      Q    Once that occurs -- by the way, on the way in, did

8  you notice anything about the baby when you brought the baby

9  in there?

10     A    The patient was completely unresponsive to our

11 stimulus, our trying to move him, trying to get responses on

12 our initial care.  During the course of our treatments, the

13 patient began to respond some, and by the time we got to the

14 emergency room, when we were actually wheeling from the back

15 of the ambulance to the doors of the emergency room, the

16 baby audiblized (sic) for the first time.  It tried to cry.

17 And that felt good.

18     Q    And then you turn it over to the physician?

19     A    Yes, ma'am.

20     Q    And from there your job is done?

21     A    Not completely done.  We have to write our reports

22 to document everything that we did.  So --

23         MS. SINGER:  I have no further -- One moment, your

24     Honor.

25         (Pause in the proceedings.)

1          MS. SINGER:  I believe that would be the end of my

2    direct-examination, your Honor.

3          THE COURT:  All right.  Any cross-examination?

4          MR. TEDDER:  May it please the Court?  Ladies and

5    gentlemen of the jury.

6                       CROSS-EXAMINATION

7    BY MR. TEDDER:

8     Q     Good afternoon.  Officer Johnson, is that the way

9    I should refer to you, sir?

10    A     Paramedic, I'm not an officer yet.

11    Q     Okay.  So Mr. Johnson is okay?

12    A     That's fine.

13    Q     I don't want to disrespect your uniform.  Okay.

14          I just have a couple of questions.  You indicated

15    that when the baby got to the hospital, that he began to

16    make some efforts towards what sounded like crying?

17    A     Yes.  Yes, sir.

18    Q     And the physician that took over was Dr. Rohlwing?

19    A     I do not remember specifically what physician took

20    over.

21    Q     Do you recall that the physician had the tube,

22    intubation tube, removed at that time when the baby began to

23    cry, because the baby was --

24    A     We were -- we were told by the nursing staff and

25    the physician there that they felt that if the baby was

1   crying to the point that you could hear it, that it meant to

2   them that the patient was not intubated correctly, that the

3   tube had changed place.

4       Q    Right.  So somehow or another between the time

5   that -- you indicated when you initially -- did you actually

6   put the tube in or did someone else?

7       A    Somebody else did.  It was done on my arrival.  It

8   was already done.

9       Q    Isn't it true that you folks placed the tube into,

10  and you begin, that you then, as you begin to pump in air,

11  how ever you do it, that you then check to hear if air is

12  actually reaching the lungs?

13      A    Yes, sir.  It's called auscultation.  You have to

14  verify by checking lung sounds on both sides and the

15  abdomen.

16      Q    So that would have been done at the scene?

17      A    It was done numerous times during the course of

18  our care.

19      Q    Okay.  When you got to the scene, the baby was not

20  breathing at all; is that correct?

21      A    That's correct.

22      Q    The baby still had a pulse; is that correct?

23      A    That is correct.

24      Q    And when you got to the scene, isn't it true that

25  you folks had to basically suction fluid out of the baby's

1    mouth and throat, things like that?

2         A    Yes, sir.

3         Q    And did you actually do that or did another

4    officer do that, another person do that?

5         A    I believe I did the suctioning.

6         Q    And the amount that was suctioned out, that was

7    not collected or measured?

8         A    I'm sorry.  Say that again, please?

9         Q    The substance that was suctioned out of the baby's

10   mouth and throat, that then becomes what you refer to as bio

11   hazard material; isn't that true?

12        A    Yes, sir.

13        Q    And it is disposed of, correct?  It is not saved?

14        A    It is disposed of, yes, sir.

15        Q    So it was never turned over to anyone to analyze

16   as to what it was, or the volume of it, or anything such as

17   that; is that true?

18        A    That is correct.

19        Q    Now, you indicated that you, you all tried to put

20   into place interosseous tubes into each of the baby's shins?

21        A    That is correct.

22        Q    Correct me.  I believe I heard you indicate that

23   neither one of those actually were successful in getting to

24   whatever part of the bone marrow that you want to get to?

25        A    That is correct.

1    Q    Is that when you're trying to put a needle into

2    the bone marrow in order to be able to put medicine or

3    treating fluids into the patient?

4    A    Yes.

5    Q    So you actually then began to try to put an

6    intravenous line into the baby's hand, correct?

7    A    We were successful with one of the hands, yes,

8    sir.

9    Q    Other than putting saline solution in, you didn't

10   use any other supports of medication, did you?

11   A    Nothing other than saline solution, no, sir.

12   Q    The time that you actually, the call was actually

13   received by Gainesville Fire Rescue at 9:35 a.m; isn't that

14   correct?

15   A    The call was received, yes, sir.  It's received at

16   the dispatch center at 9:35 and engine one was dispatched at

17   9:35 and 32 seconds.

18   Q    All right.  And then the vehicle actually departed

19   at 9:40 a.m.; is that correct?

20   A    Okay.  That would be a separate unit.  What

21   happened was engine one was dispatched, which was one of our

22   units.  For reasons I'm not aware of at this time, it was

23   decided that quint one, the unit that I was assigned to, was

24   a closer unit, would be able to respond in a more timely

25   manner.  So we were dispatched roughly two minutes later at

```
1    9:37.

2         Q    Okay.  And you actually departed at 9:40?

3         A    Yes, sir.

4         Q    Okay.  And you actually arrived at the patient's

5    location at 9:43, correct?

6         A    Yes, sir.

7         Q    You made contact with the baby at 9:44?

8         A    Yes, sir.

9         Q    And I believe you testified earlier that seven

10   minutes after you made contact with the child you were able

11   to begin to give -- the baby began to breathe slightly on

12   his own, correct?

13        A    I believe that would be correct.

14        Q    So that would be approximately 9:51 a.m. the

15   patient began to breathe slightly on his own; is that

16   correct?

17        A    These records indicate at 9:50 the patient had

18   spontaneous attempts at roughly five per minute.

19        Q    Okay.  So let's make it 9:50 then.  So that means

20   from -- the call came in at 9:35.  9:50, you're talking

21   about 15 minutes, at least 15 minutes that this baby may

22   have gone without breathing; is that true?

23        A    For 15 minutes the baby went without assisted

24   breathing.

25        Q    So as far as you know, went for 15 minutes without
```

1    breathing at all?

2        A    No spontaneous attempts by them, correct.   We were

3    providing breathing assistance prior to.

4        Q    Yes.   Okay.   Okay.   So you're indicating that as

5    soon as you arrived with the patient, you began to provide

6    assisted breathing to the baby?

7        A    The assisted breathing was provided prior to our

8    arrival by the Alachua County ambulance personnel that were

9    already on scene.

10       Q    So somebody else was already there when you got

11   there?

12       A    That is correct.

13       Q    Do you know who those people were, what their

14   names were?

15       A    No, I do not, but I know that there's two

16   gentlemen outside.

17       Q    Okay.

18            MR. TEDDER:   Thank you.   I don't have any more

19       questions.

20            THE COURT:   Any redirect?

21            MS. SINGER:   None, your Honor.   May this witness

22       be excused from the subpoena and the rule?   And I think

23       he's just gonna go back to work with Mr. Tedder's

24       permission.

25            MR. TEDDER:   I have no objection.

1      THE COURT:  All right.  Mr. Johnson, you are

2    released from your subpoena and the rule.  If you have

3    any reason to want to watch any portion of the rest of

4    the trial, you're free to do so.  Thank you very much.

5      MR. TEDDER:  Your Honor, I keep forgetting the

6    answer to that question.  I'm sorry.  I was merely

7    referring to releasing the subpoena, not the rule.  I

8    would ask that he be kept under the rule throughout the

9    trial.

10      THE COURT:  Okay.  I take back the last part.

11    Mr. Johnson, you're free to leave the courthouse, but

12    you can't come back in and watch any portion of the

13    trial.  Thank you very much.

14      THE WITNESS:  Thank you.

15      THE COURT:  Go ahead and call your next witness.

16      MS. SINGER:  Dennis Meredith.

17                DENNIS MEREDITH,

18   having been produced and first duly sworn, testified as

19   follows:

20      MS. SINGER:  May I proceed, your Honor?

21      THE COURT:  Yes.

22                DIRECT EXAMINATION

23   BY MS. SINGER:

24      Q    Mr. Meredith, if you would please state your full

25   name?

1      A      Dennis H. Meredith.

2      Q      What is your occupation or profession, sir?

3      A      Right now I'm custodian of a private school.

4      Q      Taking you back to August 2nd of the year 2000,

5 what was your occupation or profession?

6      A      I was a driver operator for the City of

7 Gainesville Fire Department.

8      Q      How long have you been the driver operator for the

9 City of Gainesville?

10     A      At that point it was 30 years and I just retired

11 with 31, and seven months.

12     Q      So you are now retired from the Gainesville Fire

13 Department?

14     A      Yes, ma'am.

15     Q      All right.  What certifications did you hold when

16 you were a firefighter for the City of Gainesville?

17     A      City driver operator, plus certified work at the

18 airport fire station, and EMT.

19     Q      So you are also an emergency medical technician;

20 is that correct?

21     A      Yes, ma'am.

22     Q      You went through the educational training required

23 to obtain that particular certification?

24     A      Yes, ma'am.

25     Q      Along with, I guess, fire school for the fire

1    department?

2        A    Uh-huh.

3        Q    I'm going to take you back now to August 2nd of

4    the year 2000.  Do you recall being called to the Tumbling

5    Creek apartments, 1015 Southwest 9th Street, apartment A-21,

6    I believe.  Let me get that correct.  Do you remember being

7    called to that apartment?

8        A    Yes, ma'am.  I was riding as a lieutenant that

9    day.

10       Q    Pardon?

11       A    I was riding as a lieutenant that day.

12       Q    What does that mean "riding as a lieutenant"?

13       A    In charge of the crew.

14       Q    Do you ride in a separate vehicle from them, or do

15   ride in the fire truck?

16       A    In the same fire truck, just sitting in the right,

17   passenger seat.

18       Q    And when you got -- Who was on that truck with

19   you?

20       A    Myself, Ken Johnson, Bill Blair, and Steve Hesson.

21       Q    And as lieutenant, you're supervising them?

22       A    Yes, ma'am.

23       Q    When you -- Did you enter the apartment to see the

24   patient who was injured or needed the help of the

25   Gainesville Fire Rescue?

1      A    Yes, ma'am.

2      Q    In your position as lieutenant, would you render

3  direct care to that patient, or do you stand back and allow

4  the folks on your truck to do whatever they need to do to

5  render care?

6      A    I would help assist Ken Johnson, who is our

7  paramedic.  The other three of us were just EMT's that day,

8  but when we arrived on the scene I think there was maybe

9  four or five county paramedics already there.  So just Ken

10  Johnson worked on the child.  We just assist them with

11  drugs, whatever they needed.

12     Q    All right.  Now, during the course of your being

13  at this particular scene, did you come into contact with a

14  man later identified to you has Brian Herlihy?

15     A    Yes, ma'am, I did.

16     Q    Do you see that person here today?

17     A    Yes, ma'am, he's over there.

18     Q    Would you tell me what he's wearing and where he's

19  sitting, just for the record?

20     A    Today, blue jacket, blue-and-white-striped shirt

21  and it looks like red and maybe blue tie.

22         MS. SINGER:  Would the record reflect the witness

23     has identified the defendant?

24         THE COURT:  It will so reflect.

25  BY MS. SINGER:

1      Q    Mr. Meredith, did you have occasion to speak with

2   Mr. Herlihy about what had occurred to the baby, who was the

3   patient that day?

4      A    Yes, ma'am.

5      Q    And what did Brian Herlihy tell you about how the

6   baby was injured?

7      A    He stated to me after we was there for a few

8   minutes that he was taking a shower and he came out and

9   looked and the baby was at the end of the bed with its head

10  caught between the mattress and the rails in the bed.

11     Q    Did he tell you how long he had been in the

12  shower?

13     A    I don't really remember, ma'am, if he did or not.

14     Q    Did he tell you whether he had already taken the

15  shower or had he -- or that he had not yet taken a shower?

16     A    He said he had taken a shower and got out.

17     Q    Did you know what his physical appearance was back

18  at that time you were speaking with him?

19     A    Yes, ma'am.

20     Q    Could you describe for me the clothing he was

21  wearing?

22     A    At that point he was wearing pants and socks and

23  that was all.

24     Q    Did he have a shirt on?

25     A    No.

1      Q    Did you notice anything about his physical

2  appearance, other than the pants and socks?

3      A    Yes, ma'am.  From his waist up, which I could see

4  because there was no clothing on him, there was no moisture

5  anywhere on his body.  His hair was dry, and I just kind of

6  thought it was unusual at the time, but didn't put it all

7  together.

8      Q    Did you make any report to anyone about this,

9  Mr. Meredith?

10     A    No, ma'am.

11           MS. SINGER:  No further questions, your Honor.

12           THE COURT:  Any questions?

13           MR. TEDDER:  Yes, ma'am.

14           THE COURT:  Okay.

15                    CROSS-EXAMINATION

16  BY MR. TEDDER:

17     Q    Good afternoon, Mr. Meredith.

18     A    Good afternoon.

19     Q    You were, at the time of this incident you were

20  employed with Gainesville Fire Rescue Department?

21     A    Yes, sir.

22     Q    You indicated you worked there for 30 years?

23     A    Yes, sir.

24     Q    You're a lieutenant?

25     A    I'm driver operator, but if the lieutenant is off

1   sick, or for some reason gone, they'll bump the driver up to

2   take that position, and then the senior firefighter moves up

3   to be driver.

4       Q    So now you're retired?

5       A    Yes, sir.

6       Q    But you're still working, you say?

7       A    Yes, sir.

8       Q    And you're not -- that's the only reason you're no

9   longer working for Gainesville Fire Rescue, it's your own

10  choice, you chose to retire?

11      A    Yes, sir, after 31 years and seven months.  That's

12  the reason.

13      Q    Now, you indicated when you got there, there were

14  already some folks there treating the baby?

15      A    Yes, sir, Alachua County Fire Rescue.

16      Q    You don't know how much sooner they got there

17  before you; is that true?

18      A    By the run reports that the paramedics had worked

19  up, approximately four or five minutes, I believe.

20      Q    All right.  But you're not sure, correct?

21      A    Not without looking at the report itself, which

22  would be accurate.

23      Q    When you got there and you guys went upstairs to

24  the apartment, before you went upstairs, didn't you see some

25  of the folks who had already gotten there before you

1    downstairs, or were they already upstairs?

2        A     The transport unit I believe was already upstairs

3    working the child.  The district chief had just pulled up as

4    we came in, and we went up with him.

5        Q     So you indicated other folks were actually

6    treating the patient.  You did not help treat the baby?

7        A     Oh, no, sir, I did not.

8        Q     And did you observe the baby?

9        A     Briefly from about the waist down because there

10   was like five guys working on the child and I couldn't see

11   him.

12       Q     Now, it's fair to say when you got there inside

13   the apartment there were -- It's not a big apartment, true,

14   small place?

15       A     Two rooms probably, three room, something like

16   that.

17       Q     This baby was on a bedroom floor; isn't that true?

18       A     Yes, sir.

19       Q     And the size of the bedroom floor was considerably

20   smaller than this room; isn't that true?

21       A     Yes, sir.

22       Q     All right.  It was a room maybe ten by ten square

23   feet, something like that?

24       A     I guess it would be bigger than that, but without

25   measuring I wouldn't know -- twelve by fifteen, something

1  like that.

2      Q    Standard bedroom?

3      A    Yes, sir.

4      Q    Not big?

5      A    Not a 30 by 30, nothing like that, no.

6      Q    And so there were at least half a dozen EMT's in

7  the room, true?

8      A    Yes, sir.

9      Q    Surrounding this baby?  Treating this baby,

10  correct?

11      A    Uh-huh.

12      Q    That's a yes?  I know you meant yes, but for the

13  record you need to say yes.

14      A    Yes, sir.

15      Q    Okay.  Needless to say, the report that you folks

16  had was for a respiratory arrest, correct?

17      A    Yes, sir.

18      Q    Which is obviously a very serious situation,

19  correct?

20      A    Yes, sir.

21      Q    It means the patient is not breathing, correct?

22      A    Right.

23      Q    Life threatening situation, correct?

24      A    Right.

25      Q    Extremely important, right?

1    A    Right.

2    Q    So needless to say, all of you are working as hard

3    as you can, as fast as you can to try and save this child's

4    life; isn't that true?

5    A    They were, but I was just standing back out of the

6    crowd.  They were working the child.  I wasn't.  I never did

7    anything to the child.  I'm just standing in the doorway,

8    watching.

9    Q    Don't you get an adrenaline rush when you're

10    called out to something like this?

11    A    Oh, yes, sir.

12    Q    This is like you've heard police work compared to

13    hours of boredom broken up by moments of absolute terror?

14    A    Uh-huh.

15    Q    Or just, you're on-the-job driving around, maybe

16    parked someplace, you never know when a call is gonna come

17    in; isn't that true?

18    A    Right.

19    Q    It comes in and maybe somebody stubbed their toe,

20    wants a ride to the hospital, or it may be something serious

21    like this respiratory arrest.  You got to get there, you may

22    possibly have somebody that's gonna die?

23    A    Right.

24    Q    So to put it mildly, isn't it fair to say that the

25    overall mood in this room was utter and extreme excitement?

1     A    After that many years I wouldn't know if you use

2  the word excitement.  You're concerned more because it's a

3  youth, than if it was an adult.  You don't want anybody to

4  die, but you get a little more worked up if it's a child.

5     Q    All right.  So you care more if it's a baby than

6  you would if it was somebody my age; is that fair to say?

7     A    I do.

8     Q    Okay.  Fair enough.  All right.

9         Now, needless to say, you testified today you came

10  in contact with Mr. Herlihy that day?

11     A    Yes, sir.

12     Q    And you already testified you didn't do a report

13  that day?

14     A    That's right, because it was an EMS run.

15     Q    Okay.  EMS run.  You didn't go back and make any

16  notes, did you?

17     A    No, sir.

18     Q    You didn't dictate a report?  You didn't make any

19  personal notes or nothing about what happened that day;

20  isn't that true?

21     A    That's true.

22     Q    Even though you knew this was a very serious

23  situation, right?

24     A    Right.  I discussed it with the crew.  Just let it

25  go at that.

1     Q    Now, isn't it -- when you encountered Mr. Herlihy

2  he was absolutely frantic; isn't that true?

3     A    Yes, sir.

4     Q    He was hysterical; isn't that true?

5     A    Yes, sir.

6     Q    And you didn't tape-record what he said, did you?

7     A    No, sir.

8     Q    He spoke with you briefly, isn't that fair to say?

9     A    Maybe up to five minutes or more.

10     Q    And he repeatedly kept telling you he didn't know

11  what happened, isn't that true, other than the fact that he

12  found the baby wedged between the mattress and the rail, the

13  footboard; isn't that true?

14     A    True.

15     Q    That's what he said, that's the only thing he

16  said, isn't it?

17     A    He said he got out of the shower and found the

18  baby there.

19     Q    Now, isn't it true that what he really said was he

20  came out of the shower and found the baby in that position;

21  isn't that what he said?

22     A    It could be.  He just said he was taking a

23  shower and he just got out and checked on the baby and found

24  him like that.

25     Q    Was it impossible, isn't it at all possible that

1  what he indicated to you is that he intended to go in there

2  and take a shower, never did take a shower, came out of the

3  shower, and the baby was in distress and in this situation?

4       A    No, sir.  I don't believe so.

5       Q    You don't think so?

6       A    No.  I believe the way he said it, he had taken a

7  shower and he got out from the shower is what he told me.

8  He had taken a shower, he said he got out and found the

9  baby.

10      Q    That's what you believe he said.

11           Now, did you ever examine the bed at all that day?

12      A    I looked at it.  I won't say I examined it.

13      Q    All right.  Did you observe anything that looked

14  like vomit on the floor in the bedroom?

15      A    No, sir, none.

16      Q    You didn't see it, or did you examine it and not

17  find it?  There was really no way for you to have gone to

18  the bed and looked for it?

19      A    We went back up after the transport left, and the

20  ones that's left on the scene, we have to go up and pick up

21  all the sharps, anything like that, and you have to raise up

22  the bedspread, and look around, see if there's any needles

23  or anything, and I did not see anything.

24      Q    You didn't see any vomit on the floor?

25      A    No, sir.

```
 1        Q    Would it surprise you that there was a fairly

 2   large ring of white substance, liquid substance on the

 3   bedroom floor carpet?

 4        A    Over where they worked the child?

 5        Q    Somewhere on the floor.  I wasn't there.  You were

 6   there.  You didn't see it, did you?

 7        A    I looked around the bed.  I did not look where

 8   they worked the child.  I think Bill was in that area,

 9   working.

10        Q    So you specifically looked around the floor of the

11   room trying to find any objects that may have been left and

12   never noticed that there was this substance on the floor; is

13   that right?

14        A    Where I was at, right.

15             MR. TEDDER:  I don't have any further questions.

16             MS. SINGER:  Your Honor, before I do my redirect I

17        would like to approach the bench for a sidebar.

18             THE COURT:  Does it need to be on the record?

19             MR. TEDDER:  Yes.

20             MS. SINGER:  Yes.

21             THE COURT:  All right.  Madam Court Reporter.

22             MR. TEDDER:  We may have some more questions.

23             MS. SINGER:  Do you?  Then I want to do the

24        sidebar after their questions are through.

25             MR. TEDDER:  That is it.
```

1      MS. SINGER:  I think it's only fair to the state

2   that if they're not through with their questions, we

3   should wait.

4      THE COURT:  Okay.  Madam Court Reporter, set up

5   back down there.  No reason for you to set up here.

6   BY MR. TEDDER:

7      Q   Mr. Meredith, you indicated you observed, did

8   observe the bed that day?

9      A   Yes.

10     Q   Did you observe, in fact, that there was some

11  pillows on the bed?  Did you make note of that?

12     A   Yes, there were some.

13     Q   Did you make note of the fact that there were some

14  pillows down between the end of the bed and the rail of the

15  bed?

16     A   I do not remember anything there.

17     Q   It was obvious to you when you got there that

18  somebody else had moved the bed; isn't that true?

19     A   Nobody moved till we got there, I believe.  Ken

20  Johnson moved it first, I think, over, by what appeared,

21  then Bill grabbed it and threw it the rest of the way to get

22  it out of the way.

23     MR. TEDDER:  I don't think we have any others.  Do

24  we have any questions?

25     MR. GROLAND:  No.

1        MR. TEDDER:  Sidebar.

2        (Sidebar conference:)

3        MS. SINGER:  Your Honor, at this time the state is

4    going to ask that we be allowed to ask this witness the

5    other statements that Brian Herlihy made to him that

6    day.  Specifically he was asked in cross-examination

7    whether Brian Herlihy was hysterical and panicked.  And

8    then he was asked in a leading nature:  That's the only

9    thing he said to you?  We can read it on the record.

10   I'm sure we have realtime transcript.

11       That was the only thing that was said to him.  And

12   we would like to be able to, as we did yesterday, and

13   ask.  This witness is aware of the fact that there were

14   other statements made.

15       MR. GROLAND:  I think we need to excuse the jury

16   for this.  This is not subject to a sidebar.  We need

17   to have the jury out.

18       (The sidebar conference was concluded.)

19       THE COURT:  All right.  Ladies and gentlemen, I'm

20   going to ask you to step into the jury room for about

21   15 minutes.

22       (Outside the presence of the jury:)

23       THE COURT:  Go ahead.  Ms. Singer.

24       MS. SINGER:  Your Honor, the state will be asking

25   that additional statements that this witness can give

1   to the jury which, includes that Mr. Herlihy was kind

2   of blaming himself for all of this.  He said:  You

3   know, something about I have been trained in CPR from

4   the Orlando Fire Department.  I should be able to save

5   my own child.  I can save other children, but I can't

6   save my own child.  He was just ranting on and on and

7   on.

8        THE COURT:  Hold on just a second.  Let's just

9   make sure that both doors are closed.  Go ahead.

10       MS. SINGER:  The state would, on

11   redirect-examination, wish to inquire, based upon the

12   door opening on cross-examination when Mr. Tedder, by

13   leading, did ask this witness:  A) how long the

14   conversation took place, which I think the witness

15   answered up to about five minutes.  He was hysterical

16   and panicked.  He repeatedly told you what happened.

17   And then he asked this question, which I believe opens

18   the door, and that's the only thing he said.

19       And this witness was instructed by me, pursuant to

20   a pretrial order, not to respond to that because of a

21   pretrial order that he was not to say anything about

22   prior fire fighting or EMT.  But I believe that I

23   should be able to, on redirect, have him at least

24   provide the jury with the fact that during this

25   five-minute conversation there were other things said

1    directly related to the care of this child which I have

2    read to the Court, which I believe will be the

3    proffered statement of this witness.

4         MR. GROLAND:  Judge, if I can -- Your Honor,

5    excuse me, because I'm the one that entered into the

6    stipulation with the state.

7         With all due respect to Ms. Singer, she is

8    absolutely, categorically wrong about what our

9    understanding was.  We have a specific agreement, and

10   it's in the record the day we had our hearing on the

11   motions in limine, if we opened the door during our

12   direct-examination of the defendant, then they could

13   bring in witnesses on rebuttal to say that the

14   defendant claimed to have training about this or

15   training about that.

16        First of all, our position is he didn't open the

17   door by saying that's all.  Did he say anything else?

18   I asked Ms. Singer when we started with the first

19   paramedic:  Have your witnesses been admonished to stay

20   away from a particular area?  With all due respect,

21   Mr. Tedder didn't open the door by saying:  Is that all

22   he said?  The jury has no idea whether he said anything

23   more or didn't say anything more.

24        Our agreement with the state, Ms. Singer, and

25   correct me if I'm wrong, is that we opened the door --

1    if we opened the door at all when Mr. Herlihy takes the

2    stand and says something, that is not part of our

3    agreement and our understanding.

4         MS. SINGER:  I'm going to rely on the Court's

5    ruling.

6         THE COURT:  Yes.  It doesn't, in reality, matter

7    what you have agreed to because my ruling was very

8    specific.  And the ruling very specifically was if you

9    open the door on cross or in your case in chief, and,

10   in fact, unless you have some argument that you did not

11   ask him the question is that all he said, then, in

12   fact, you have opened the door.

13        MR. TEDDER:  Your Honor, what the question was

14   referring to was, is that all he said with respect to

15   what happened.  And I should have added those four

16   words.  That's what I'm doing.  We're certainly not

17   implying anything else.  And I think that this is

18   just -- the state's just -- I would ask not to open the

19   door for heaven's sake.

20        And that's my mistake.  If you want to hold it

21   against me, do so.  But Mr. Herlihy shouldn't be

22   punished because I forgot to add four words to this

23   witness, knowing full well in the pretrial order we

24   were not to get into this business about what he may or

25   may not have said about being an EMT, or paramedic, or

1    whatever.  That was not what I was getting into when I

2    was cross-examining this witness and was asking about

3    what he said about what happened.  Because all he said

4    about what happened is the baby was between the bed and

5    the end of the bed.

6         THE COURT:  Mr. Tedder, I have no doubt that the

7    opening of the door was inadvertent on your part, but

8    the bottom line is, you have done so, and the state is

9    going to be allowed to inquire as to what other

10   statements the defendant may have said to this witness.

11        Is there anything else you need to put on the

12   record in regard to this?

13        MR. TEDDER:  We object, your Honor, and move for a

14   mistrial based on my inadvertent opening the door.

15        THE COURT:  Motion for mistrial is denied.

16        MS. SINGER:  Does the Court wish to see the

17   realtime record of the question?

18        THE COURT:  No, there's no dispute in regard to

19   the question.

20        MR. TEDDER:  Well, I would like to hear what the

21   court reporter has to add, if we're gonna go this far.

22   I want to see what she has.

23        MS. SINGER:  Only so that we're sure before we go

24   here.  I know she's, they're doing realtime here.  I

25   think she can call it up.  I think he said that's all

1    he said, isn't that correct?

2        MR. PENNYPACKER:  It's the word only.

3        MS. SINGER:  Pardon?

4        MR. PENNYPACKER:  It's the word only.

5        MS. SINGER:  That's my recollection and I know we

6    have a reporter here.

7        MR. GROLAND:  Your Honor, can I ask a question of

8    the Court?

9        THE COURT:  Well, she can't look for it while

10   you're asking questions.  So just hold up a minute.

11       (Question read back.)

12       MR. TEDDER:  See, your Honor, it's clear the line

13   of questioning I was referring to is simply to what he

14   said happened to the baby.  The state is stretching

15   this in order to try to get this other stuff in.  I

16   don't see what probative value it has anyway, but other

17   than they want to do everything they can to make

18   Mr. Herlihy look bad.

19       But it's clear the line -- The jury is certainly

20   not going to think I was implying anything else other

21   than what was clearly the line of questioning there.  I

22   was asking the witness what he said about what happened

23   to the baby when he came out of the bathroom or the

24   shower.  How are you going to interpret it?

25       THE COURT:  I have ruled.  The question and answer

1     have been verified.  The state will be allowed to

2     inquire as to what other statements the defendant made

3     to this witness.

4          Is there anything else we need to put on the

5     record before the jury comes back in?  I did tell them

6     that they would have 15 minutes.

7          MS. SINGER:  We need to tell Mr. Meredith it's

8     okay to answer the question.

9          THE COURT:  I think since Mr. Meredith has been

10    here through the entire discussion and ruling that he

11    is clear now that you are simply to answer whatever

12    question is put to him.  There will be no restrictions

13    based on any pretrial ruling.

14         MR. TEDDER:  This doesn't change to any other

15    witness.

16         THE COURT:  We may have to address this on a

17    witness-by-witness basis since now the door has been

18    opened in regard to two witnesses specifically.  But,

19    we don't have to address that yet.  Now, we're gonna

20    take about a five-minute recess at this point.

21         (Recess taken.)

22         MR. GROLAND:  Your Honor, there is another issue

23    that came up during the recess that we might as well

24    address now.

25         THE COURT:  Good.

1          MR. GROLAND:  Out in the hallway I told Ms. Singer

2     that my position is, despite my feelings about the

3     ruling, that that ruling about opening the door applies

4     to this witness only and no other witness.  If it

5     happens again, then we'll have to deal with that

6     witness.  Ms. Singer indicated she wasn't sure whether

7     it applied to all the witnesses and we opened the whole

8     thing up and we both decided it would be best if we had

9     a ruling before we get into that.

10         MS. SINGER:  And I have sent Mr. Fleck -- I have

11    spoken briefly with Mr. Fleck who believes that once

12    the door is open, it is opened.  And he has gone on to

13    the library now to do some research as to that.

14         We have this witness and my next witness, I can

15    tell the Court, did not speak with Mr. Herlihy, so

16    there would not be any issue of that with the next

17    witness.

18         But then, after that, we do have a number of

19    witnesses that spoke with Mr. Herlihy where similar

20    statements were made shortly after the baby was taken

21    to the emergency room.  And so at that point I think

22    the issue will come on again, and we will need -- I

23    would like to make argument on the issue knowing that

24    Mr. Fleck now is looking at that.

25         Mr. Fleck's background was in defense and his

1    position was, off of his general knowledge, that once

2    the door is opened, the state has the right to go

3    forward, but I want to make sure of that with case law,

4    and that would be my argument obviously.  And, of

5    course, the Court can rule now if the Court deems it's

6    appropriate.

7            MR. GROLAND:  Does the Court --

8            THE COURT:  Well, the fact that Mr. Fleck has had

9    broad experience is very helpful, but his position now

10   is that he works for the state.

11           MR. GROLAND:  If the Court has an inclination or a

12   feeling then the Court can rule now.  If we've got a

13   real issue here then certainly we would like to have

14   the opportunity to develop some research as well.

15           MS. SINGER:  We can do a proffer on each witness.

16   I don't mind doing that.

17           MR. GROLAND:  Except we know the area we're

18   talking about here and I don't know that we need a

19   specific witness to get up and say:  Well, yes --

20           THE COURT:  I don't believe I'm going to listen to

21   a proffer as to each witness.  I will allow both the

22   state and the defense to basically re-argue the motion

23   in limine based upon the new circumstances that have

24   been created, and I will do that after Mr. Meredith

25   finishes, and after your next witness, during another

1    recess.

2          MS. SINGER:  Okay.  Then I'm gonna ask

3    Mr. Pennypacker to go outside also and see if we can

4    hunt up someone else to do research for us, if the

5    Court will allow him to be excused for that reason?

6          THE COURT:  Certainly.  I only need for the state

7    and defense to have one lawyer in here.  You all can

8    decide how many you want in here.

9          MS. SINGER:  Right.

10         THE COURT:  All right.  Would you bring the jury

11   back in, please?

12         (Before the jury:)

13         THE COURT:  All right.  Go ahead, Ms. Singer.

14         MS. SINGER:  Yes.

15                    REDIRECT EXAMINATION

16   BY MS. SINGER:

17   Q    Mr. Meredith, brief redirect examination.

18         You were asked on cross-examination how long a

19   conversation you had with Mr. Herlihy in this case.  Do you

20   remember that question?

21   A    Yes, ma'am.

22   Q    And your approximate amount of time for the

23   conversation was how long?

24   A    Approximately five, maybe ten minutes, at the

25   most.

1    Q    During that time frame did he make any other

2    statements to you?

3    A    Yes, ma'am, he did.

4    Q    And what was it that he said to you?

5    A    He kept repeatedly repeating that he was a trained

6    firefighter; that he could save children, but he couldn't

7    save his own.  He indicated to me that he was an Orlando

8    firefighter and he kept repeating the same thing.  That was

9    the reason I asked him to come into the living room area

10   because he was creating a scene where the child was at, and

11   they couldn't hear and talk.  He just kept repeating that he

12   was a trained firefighter and he couldn't save his own

13   child.  He could save other children.

14             MS. SINGER:  No further questions, your Honor.

15             MR. GROLAND:  I just have a few, if I may on this?

16             THE COURT:  On those statements.  Go ahead.

17             MR. GROLAND:  Thank you.

18                     RECROSS-EXAMINATION

19   BY MR. GROLAND:

20   Q    I think Mr. Tedder asked you if you prepared a

21   written report in this case, yourself, and you indicated you

22   did not?

23   A    Correct, sir.

24   Q    Did you, a few years ago when this all happened,

25   generate any handwritten notes?

1        A     No, sir.

2        Q     Did you rely on any written document to refresh

3    your recollection today as to what Mr. Herlihy said to you

4    two years ago, any written document?

5        A     Yes.  The sworn affidavit.  I read it, but it

6    didn't really refresh.  I remembered what his conversation

7    was.

8        Q     Okay.  So the answer to the question is you have

9    relied on no written document to refresh your recollection

10   about what you just testified to Mr. Herlihy said; is that

11   right?

12       A     Correct.

13       Q     How is it -- Can you tell us -- Strike that.

14             Have you met with the state attorney's office

15   before your testimony here today?

16       A     At the sworn affidavit we did, and that was down

17   the street, not at the state attorney's office.

18       Q     Okay.  Have you met with the state attorney's

19   office for a trial preparation in this case before today?

20       A     Before today, no, sir.

21       Q     When was the last time -- Go ahead.

22       A     I went up with our crew to the state attorney's

23   office for -- Steve Hesson, one of the other gentlemen, to

24   do a sworn affidavit, but I did not have to go up there.

25       Q     Okay.  When was that, sir?

1        A     About a month ago.

2        Q     Okay.  And did you meet with anybody either from

3   the Gainesville Police Department or the state attorney's

4   office and discuss this case?

5        A     No, sir.  They sent us back because they was

6   running like two hours late.  So we didn't do anything.

7        Q     Have you discussed this case and your testimony

8   with anybody over the last two years?

9        A     Yes.

10       Q     Who and when?

11       A     My wife, last night.

12       Q     Okay.  What official, if any, have you discussed

13  this case with over the last two years?

14       A     Any officials?  No.

15       Q     Okay.  So you've not discussed this case with

16  anybody from the Gainesville Police Department or the state

17  attorney's office, correct?

18       A     Gainesville Police or state attorney?  Not since

19  we did the sworn affidavit.  You know, that day I told them,

20  you know, when we went in and did that.

21       Q     Okay.

22       A     You talking about from that point on or from the

23  incident?

24       Q     When is the sworn affidavit that you're talking

25  about?  What's the date?

```
 1        A     Oh, just a minute.  Well, February the 22nd.

 2              MS. SINGER:  What year?

 3   BY MR. GROLAND:

 4        Q     What year, sir?

 5        A     I'm trying to find it.  Just a second, please.

 6              I do not see the year.

 7        Q     Okay.  Well, take a look.  It looks like a couple

 8   pages?

 9        A     Yes, sir.

10        Q     Well, take a look at it more closely and see if

11   you can figure out what year it is, please.

12        A     Twelfth day of, well, this says 12th day of

13   August, 2002, witnessed by hand.  Maybe that is when they

14   sent it out.  Would you like to come look at it?

15        Q     Well, yeah, I may in a second.

16        A .   Okay.

17        Q     What is that affidavit for?  What is that?  Is

18   that about this case?

19        A     Yes, sir.

20        Q     For what purpose was that affidavit prepared?

21        A     Just a sworn statement, to my knowledge, that was

22   it, for what happened that day.

23        Q     Who is that affidavit submitted to?  I'm trying to

24   find out what it is.  I don't understand what you're saying?

25              MS. SINGER:  It's this --
```

1          MR. GROLAND:  Excuse me.

2          THE WITNESS:  She was -- she has a copy.

3    BY MR. GROLAND:

4      Q    Are you talking about a deposition?

5      A    Yes, sir.

6      Q    So you're saying you read over your deposition?

7      A    About an hour ago.

8      Q    So you read it over today?

9      A    Yes, sir.

10     Q    When is that deposition of you taken?

11         MS. SINGER:  February 22nd, 2001.

12   BY MR. GROLAND:

13     Q    February 2001?

14     A    Okay.

15     Q    Is that right?

16     A    That's what it says on the front page.  I didn't

17   know if that was the exact, what you're looking for.

18         MR. GROLAND:  May I have a moment, your Honor?

19         THE COURT:  Yes.

20   BY MR. GROLAND:

21     Q    Has anybody who is involved in this case, either

22   with the state attorney's office or the Gainesville Police

23   Department, indicated to you at anytime that the shower,

24   whether he was in the shower, or out of the shower, whether

25   that was an issue in this case?

1    A    No, sir.

2    Q    So just what you're saying is on your own you have

3  testified that he said he just came out of the shower and

4  you happened to notice that his hair was dry.  You made that

5  observation independent of anybody telling you that that was

6  an issue?

7    A    Correct.  His whole body from waist up, his hair

8  and everything, yes, sir.

9    Q    Okay.  Were there reports generated by your

10  agency, anybody else on your truck, for this incident on

11  August 2nd?

12    A    Yes, sir, Ken Johnson the paramedic.

13    Q    And did you tell Ken Johnson about your

14  interaction with Brian Herlihy and did he include it in his

15  report?

16          MS. SINGER:  Your Honor, I think we need to

17      approach the bench right now.

18          THE COURT:  Yes, I agree.

19          (Sidebar conference outside the hearing of the

20      jury:)

21          THE COURT:  Wait a minute.  First of all, there is

22      no such thing as recross-examination, unless on

23      redirect a new area is opened.  Based upon the pretrial

24      ruling and upon the ruling during the recess and what

25      was addressed by the state in the form of statements

1    that Mr. Herlihy made in regard to his training and

2    experience, that is the very part on which I authorized

3    you to recross this witness.

4        Now you're going back over the entire testimony,

5    including the reports and depositions.  Those were not

6    new areas addressed by the state.

7        MR. GROLAND:  With all due respect, your Honor,

8    I'm looking for whether in those reports what

9    depositions he indicated in his testimony.  I'm not

10    going off of his testimony that he made before this

11    issue came up.  What I'm talking about is whether or

12    not this information that he just testified to is

13    included in any of his reports.

14        THE COURT:  Those are not your questions.

15        MS. SINGER:  Yes, his question was whether or not

16    he told Ken Johnson; and, in fact, that information was

17    available to Ken Johnson.  But Kenneth Johnson was

18    instructed not to go into that area of testimony unless

19    the door was opened and he was told by the Court he

20    could, which, at the time, that testimony was not

21    broached on cross-examination.  And Kenneth Johnson

22    followed the law, followed the rule of the Court.

23        If we're going to ask this witness whether Kenneth

24    Johnson knew that information, I think the state has a

25    right then, once again the door opens, because now the

1  state has a right to have Kenneth Johnson available to

2  provide information he knows about what Brian Herlihy

3  related.  And that's why I'm a little bit angry.

4      MR. GROLAND:  Okay.  Judge, I was getting at

5  whether his testimony -- he said he didn't prepare a

6  report.  What I was trying to elicit from him is

7  whether or not his testimony about this area was

8  communicated to anybody else and put in that person's

9  report from him.  It's the same area.  I'm not trying

10 to expand it.  I'm not trying to get into anything that

11 any other --

12     THE COURT:  You are expanding it, and you may have

13 already expanded it to the point that the state's going

14 to be able to recall Mr. Johnson.

15     MR. GROLAND:  The state can recall.

16     THE COURT:  I have not ruled on that yet, but I'm

17 telling you that as I have already told you twice, you

18 are examining in the area that you were on in cross.

19 You may continue the recross and then this witness may

20 be excused and I will address later whether or not you

21 have already opened the door to Mr. Johnson being

22 re-called.  If you will restrict your question to

23 inquiry about these statements and, that are now being

24 admitted, you would be on much safer grounds.  Of

25 course, you're free to do it any way you want to.

```
 1              MR. GROLAND:  I understand.

 2              (The sidebar conference was concluded.)

 3              MR. GROLAND:  I have no further questions.

 4              THE COURT:  All right.  Thank you.

 5              MS. SINGER:  I just have brief redirect on that

 6         cross, your Honor.

 7                   FURTHER REDIRECT-EXAMINATION

 8    BY MS. SINGER:

 9         Q    Mr. Meredith, it's my understanding that you gave

10    a deposition on this case on February 22nd of 2001?

11         A    Yes, ma'am.

12         Q    Mr. Groland, counsel for Mr. Herlihy was there,

13    the man who was just asking you questions?

14         A    I believe he was.  I'm not 100 percent.

15         Q    And I was present, was I not?

16         A    Yes, I remember you there.

17         Q    And it was in the office down the street?

18         A    Yes, ma'am.

19         Q    It was not in the state attorney's office?

20         A    No, ma'am, it was not.

21         Q    And you were sworn to tell the truth at that time?

22         A    Yes, ma'am.

23         Q    Do you have independent recollection of this case?

24         A    Yes.

25              MS. SINGER:  No further questions, your Honor.
```

1          THE COURT:  All right.  May Mr. Meredith be

2     released at this time?

3          MS. SINGER:  I have no objection.

4          MR. GROLAND:  No objection.

5          THE COURT:  Mr. Meredith, thank you.  You're free

6     to leave the courthouse.

7          (Witness excused.)

8          THE COURT:  Go ahead and call your next witness.

9          MS. SINGER:  Thomas Whitley.

10                    THOMAS WHITLEY,

11   having been produced and first duly sworn, testified as

12   follows:

13          MS. SINGER:  May it please the Court?

14          THE COURT:  Go ahead.

15          MS. SINGER:  I need one moment, your Honor, just

16     to get my notes on Mr. Whitley.

17          I have them, ma'am.  I will begin.

18                    DIRECT EXAMINATION

19   BY MS. SINGER:

20     Q    Mr. Whitley, would you state your full name

21   please?

22     A    My name is Thomas Whitley.

23     Q    Go ahead and pour your water first before we get

24   started, because you'll need that.

25          Mr. Whitley, what is your occupation and

1    profession, sir?

2         A    I'm a paramedic attendant for Alachua County Fire

3    Rescue.

4         Q    And how long have you worked for Alachua County

5    Fire Rescue?

6         A    Approximately four years.

7         Q    What certifications do you hold in order to

8    perform your duties as a paramedic?

9         A    I'm sorry?

10        Q    What professional certifications do you hold to

11   perform your job as a paramedic?

12        A    I hold a paramedic license, an ACLS license and a

13   CPR provider certification.

14        Q    What is an ACLS license?

15        A    ACLS is advanced cardiac life support.  It enables

16   me to, basically, work a cardiac arrest.  Basically, what

17   you see on ER, or something like that, whenever you intubate

18   the patient, shock them, and --

19        Q    Have you received training to obtain these

20   certifications?

21        A    Yes, ma'am.

22        Q    What kind of training did you receive to receive

23   these certifications?

24        A    A paramedic license takes approximately two years

25   of study.  We go through all sorts of anatomy and physiology

1    classes, chemistry, microbiology, and there's a lot of

2    clinical hours.

3        Q    Are you also a firefighter?

4        A    No, ma'am.  I'm not a firefighter.

5        Q    So your position would be -- What type of vehicle

6    would you be assigned to?

7        A    I'm assigned to the transport vehicle.  I take the

8    patients to the hospital or in layman's terms, an ambulance.

9        Q    That's right.  I want to know what you're gonna

10   call a transport vehicle, but those of us that see you on

11   the road, you're that big red truck?

12       A    Yes, the ambulance.

13       Q    I'm gonna take you back now to August 2nd, the

14   year 2000, a little over two years ago.  Were you employed

15   with Alachua County Rescue at that time?

16       A    I was.

17       Q    And were you holding the position of paramedic at

18   that time?

19       A    Yes, I was.

20       Q    Did you hold any other positions with them at that

21   time or was that your title?

22       A    My title since I've been employed with the Alachua

23   County Fire Rescue has been paramedic attendant.

24       Q    Were you called, or were you dispatched, to a call

25   at 1015 Southwest 9th Street, Gainesville, Florida, that's

1    known as Tumbling Creek apartments?

2         A    Yes, ma'am.

3         Q    Did you respond to that call?

4         A    Yes, ma'am.

5         Q    Were you driving or were you in the truck and

6    someone else driving?

7         A    My partner was driving.

8         Q    And who was your partner that day?

9         A    Russell Valentine.

10        Q    Do you know, without looking at your records, what

11   time it was you were dispatched to that call?

12        A    I want to say 9:35.

13        Q    I do have your records, sir.  Would it help you if

14   I provided you with the records?

15        A    Yes.

16             MS. SINGER:  All right.  Your Honor, if I may

17        allow the witness to refresh his recollection with the

18        Alachua County Fire Rescue records?

19             THE COURT:  Any objection.

20             MR. GROLAND:  Let me just see which one you have.

21             MS. SINGER:  They were provided to both

22        Mr. Groland and Mr. Tedder, and I'm not entering them

23        into evidence.  I'm just using them to refresh his

24        recollection as to times.

25             Do we need to mark for refreshing recollection,

1    your Honor, or simply use them to refresh.

2         THE COURT:  He can use them to refresh his

3    recollection.

4         MS. SINGER:  All right.

5    BY MS. SINGER:

6    Q    I'm just going to show you, Mr. Whitley, what's

7    been entitled Alachua County Fire Rescue EMS incident

8    report.  Will this help you refresh your recollection as to

9    the specific times you arrived and you treated this patient?

10   A    Yes, it would.  The dispatch times are all on

11   here, I think.

12   Q    All right.  I'm gonna go ahead and let you look at

13   that and tell me what time you all were dispatched.

14   A    They dispatched our unit to get to the Tumbling

15   Creek apartments.  The call was received at 9:35.  It was

16   dispatched at 9:35.  We also went responding at 9:35 and

17   then we arrived on scene two minutes later at 9:37.

18   Q    9:37.  Were you able to find the apartment or did

19   someone indicate to you where the apartment was located?

20   A    We went right to it.

21   Q    All right.  And did you enter the apartment?

22   A    Yes.

23   Q    Did you find the patient?

24   A    Yes.

25   Q    Where was the patient located, if you can

1  remember?

2      A    The patient was lying on the floor of a back

3  bedroom.

4      Q    And at that time did you begin to provide medical

5  treatment to that patient?

6      A    Yes.

7      Q    Before we move on about this, do you now know the

8  name of the patient that you treated, or do you not know the

9  name of the patient you treated?

10     A    I do know the name of the patient.

11     Q    And what was the name of the patient?

12     A    Robert Quirello.

13     Q    Quirello, Q-U-I-R-E-L-L-O?

14     A    Yes.

15     Q    All right.  And just so the jury understands we're

16 talking about the same person here, is this an adult, a

17 child?

18     A    I believe it was a four-month-old, male child of

19 Caucasian descent.

20     Q    Okay.  So you got there and your job was to do

21 what when you reached the child?

22     A    My job is to take care of the patient at all

23 means.

24     Q    Were you the first paramedic to actually attend to

25 this child?

1    A    Yes, I was.

2    Q    There were others that came after you, correct?

3    A    Yes.

4    Q    But you were the initial paramedic?

5    A    Yes, ma'am.

6    Q    What was the first thing you did when you got to

7    the baby?

8    A    To see if the baby was conscious and to see if

9    they were breathing.  The baby was unconscious.  It was not

10   breathing.  So the first thing that I need to do as a

11   paramedic is to establish an airway.

12   Q    Did you do that?

13   A    Yes, ma'am.

14   Q    And once you establish the airway, how do you get

15   the child to begin breathing?

16   A    What we did was, the first thing we did, it had

17   some white, kind of like a milky, white fluid in its mouth.

18   We suctioned that fluid from its mouth and we intubated the

19   patient; basically being, intubation is taking kind of, like

20   a straw, basically, and placing it in your windpipe or

21   trachea so that we can put this bag onto that straw and

22   provide 100 percent oxygen into your lungs.

23   Q    And did you do that for Robert Quirello?

24   A    Yes, we did.

25   Q    And once you did that, was he then beginning to

514

1  breathe?

2      A    Yes, he was -- he came, his saturations, his

3  oxygen saturations were in the low eighties.  I don't know

4  -- 84 percent is what we got at first.  After --

5      Q    What time was it that you noted that it was at

6  84 percent?

7      A    Approximately 9:40, two minutes after we got

8  there.

9      Q    All right.  And did it get higher than that?

10     A    Once we intubated the patient his saturations came

11 up to 100 percent.

12     Q    All right.  And I understand there was some other

13 procedures that were attempted on the child while he was

14 still at the residence; is that correct?

15     A    Yes.

16     Q    And we did get into very detailed testimony about

17 that.  Were there attempts at obtaining intravenous and

18 interosseous lines in the child?

19     A    Right.

20     Q    Did the baby ever regain consciousness in your

21 presence?

22     A    Yes, ma'am.  Whenever we arrived at the hospital

23 the baby did start to cry or kind of move around a little

24 bit.  Still never really opened its eyes or regained

25 consciousness fully, but it was starting to show signs of

1    life.

2        Q    Now, was there a suggestion to you that he was

3    breathing on his own at some point during the time that he

4    was in the custody of Alachua County?  And I understand that

5    Gainesville Fire Rescue was also traveling with you at that

6    time.

7        A    Towards the end -- you can, whenever you're

8    bagging the patient, you can feel, whenever the child or

9    person would take a breath.  He was starting to regain some

10   spontaneous respirations, very few or subnormal, but he was

11   starting to regain some spontaneous respirations.

12       Q    So when you turned him over to the emergency room

13   personnel he was breathing, but not as spontaneously as a

14   person who is not injured?

15       A    He would still need mechanical ventilation to

16   breath.

17       Q    Now.  I believe we have one other question for you

18   sir, before -- oh, yes, my last question.

19           During the time frame where you initially

20   intubated the baby and attached this equipment to bag the

21   baby, to the time that the baby was transferred to the

22   emergency department for their care, was the baby ever

23   bagged by anyone other than a licensed paramedic or someone

24   from the Gainesville Fire Rescue or Alachua County Fire

25   Rescue?

1    A    No ma'am.

2         MS. SINGER:  I have no further questions of this

3    witness, your Honor.

4         THE COURT:  All right.  Mr. Tedder?

5         MR. TEDDER:  Yes, ma'am.

6                        CROSS-EXAMINATION

7  BY MR. TEDDER:

8    Q    Good afternoon, sir.

9    A    Hello.

10   Q    When you arrived on the scene, isn't it true

11 Mr. Herlihy yelled out to you:  Hey, over here, and waived

12 to you from the porch.  Isn't that true?

13   A    I believe he did come out to the top of the

14 stairs.

15   Q    Okay.  And then you immediately went up there as

16 quickly as you could; isn't that correct?

17   A    Yes.

18   Q    It takes a little bit of time to get your

19 equipment out of the truck and run up there, right?

20   A    Usually we're up inside within one to two minutes.

21   Q    All right.  Now, isn't it true that you had to go

22 back out to your vehicle to get some equipment once you got

23 up to the apartment?

24   A    I do not recall.

25   Q    You aren't sure you had to go back out to get the

1    right size ET tube?

2        A    No, sir, not that I recall.

3        Q    Not that you recall?

4        A    No.   We carry an IV and airway bag along with a

5    cardiac monitor that has all different sizes.

6        Q    Okay.   When you saw the baby initially, he was

7    unconscious and not breathing; correct?

8        A    Yes, sir.

9        Q    And he was ashen gray in color?

10       A    Yes, sir.

11       Q    So you knew it was a very serious situation,

12   obviously?

13       A    Yes.

14       Q    And you saw absolutely no evidence whatsoever of

15   any trauma to this baby?

16       A    There was no outside signs of trauma.

17       Q    Okay.

18            MR. TEDDER:  I don't have any other questions.

19            THE COURT:  All right.  Any redirect?

20            MS. SINGER:  No redirect of this witness.

21            THE COURT:  All right.  Thank you.  May

22   Mr. Whitley be released from the subpoena?

23            MS. SINGER:  I have no objection.

24            MR. GROLAND:  No objection.

25            THE COURT:  All right, Mr. Whitley.  Thank you.

1      You're free to leave the courthouse.

2           I'm gonna take a 15-minute recess at this time.

3      Allow those of you who are inclined to --

4           MS. SINGER:  Your Honor, I think I need to make an

5      announcement about the parking.  I understand that

6      because of the ceremonies tonight the Gainesville

7      Police Department is intending to clear some areas of

8      parking, and folks need to move their vehicle by a

9      certain point or they will be moved by the Gainesville

10     Police Department.  And I know many of our witnesses

11     went to take care of their cars, and I just wanted to

12     let the jury know if they need to be involved with that

13     at all.

14          THE COURT:  That doesn't include the parking

15     garage, does it?

16          MS. SINGER:  I don't know where they're parked.

17     That's why I mentioned it.

18          THE COURT:  Because all the jurors are parked in

19     the parking garage; is that right?  Good enough.  If

20     you'll arrange escort for those individuals.  If you

21     all will step back into the jury room.

22          (Out of the presence of the jury:)

23          THE COURT:  Ladies and gentlemen, three of the

24     jurors are going to be coming through.

25          All right.  I'm gonna allow the state and defense

1    to argue, at this time, the motion in limine, both from

2    the original perspective and from the perspective of

3    the changes that have occurred during the course of

4    trial, and the change in rulings made during the course

5    of the trial.

6          MR. GROLAND:  Can I just have a second?  I think

7    Mr. Tedder thought we were in recess and he walked out.

8          THE COURT:  All right.  We need to find

9    Mr. Tedder, yes.

10         MS. SINGER:  Your Honor, are we gonna argue now

11    because I know -- never mind.

12         THE COURT:  Does either the state or the defense

13    have close at hand a copy of the original motion in

14    limine regarding false statements made by Mr. Herlihy,

15    or allegedly false statements made by Mr. Herlihy

16    regarding his training, and experience, and employment

17    history?

18         MS. SINGER:  I have it right here, your Honor.

19         MR. GROLAND:  The original is not in the court

20    file, your Honor.

21         THE COURT:  I'm sure it is, but we have multiple

22    volumes and I thought you might be able to access it

23    more quickly than I could.

24         MR. GROLAND:  Ours has, I think it has some notes

25    on there.

1          THE COURT:  Okay.  It was filed September the 3rd,

2     if you don't want me to have this.

3          MR. GROLAND:  I don't mind at all.

4          THE COURT:  I'll give it right back.  Just let me

5     refresh my recollection as to the exact --

6          All right.  I'm looking specifically at

7     paragraphs, or, excuse me, Roman numeral one and Roman

8     numeral four, and, Mr. Clerk, this is what it looks

9     like.

10          Now, any argument that the state or defense wants

11     to begin with in regard to all of these issues?  Go

12     ahead.

13          MR. GROLAND:  Your Honor, if I can just start

14     with -- from the beginning.  I think it will just give

15     us all some clarity.  It started yesterday with Crystal

16     Quirello.  I would like to remind the Court with regard

17     to opening the door that we had an issue yesterday.

18          THE COURT:  I'm sorry.  You're gonna have to stop,

19     and if you don't mind, would you ask the jurors to

20     close that door so that they're secluded and I'll be

21     able to hear Mr. Groland.

22          All right.  Go ahead.

23          MR. GROLAND:  What happened yesterday is the

24     state, on direct-examination of Crystal, asked Crystal

25     the question:  Why did you leave Robbie with Brian?

1   And her answer was:  I trusted him.  Then they moved on

2   to something else.  Then came my turn at

3   cross-examination and at the end of my hour-and-a-half

4   cross-examination I asked Crystal the question:  Did

5   you ever have any reason to suspect -- this is

6   paraphrasing it -- that Brian had ever injured the

7   baby?  No.  I trusted him.  Objection, your Honor, the

8   door's open.  And we had a sidebar and the Court ruled

9   that I opened the door when that same testimony came

10   out of the same witness on direct from the state.

11       The Court made it's ruling and we had to accept

12   the ruling.  Today Mr. Tedder is questioning a fireman

13   about specific statements that are now in the record

14   that this fireman says that Mr. Herlihy made at the

15   time.  Mr. Tedder's last question was:  Is that all he

16   said?  Perhaps it would have been clearer if he had

17   said is that all he said about that?  So what should

18   have been added parenthetically was not added, but

19   that's what, I think, was clear to the witness.

20       THE COURT:  Do you have the jurors back?

21       MR. BAILIFF:  Yes, ma'am.

22       THE COURT:  All three of them?

23       MR. BAILIFF:  Yes, ma'am.

24       THE COURT:  You can come on through.  Wait just a

25   second, Mr. Groland.

1           MR. GROLAND:  Continue?

2           THE COURT:  Yes, you may continue.

3           MR. GROLAND:  Is that all he said and he should

4      have added "about that" but he didn't.  I think it was

5      clear to the jury and clear to the witness exactly what

6      Mr. Tedder was alluding to.

7           In fact, the jury has no way of knowing and never

8      would have known that something else came out of

9      Mr. Herlihy's mouth about some other irrelevant

10     information that is evidence of a prior bad act, namely

11     lying.  They have no way of knowing that that man knew

12     about it, or we knew about it, or it was a subject of a

13     motion in limine.  So I don't think he opened the door

14     at that time at all.  Nor do I think when I was

15     cross-examining the witness about his new testimony,

16     when Mr. Herlihy said he was a paramedic and the Court

17     allowed me to cross-examine him, I asked him:  Did you

18     do a report?  No, I didn't do a report.  Did you make

19     any notes?  No, I didn't make any notes.  How is it

20     that you could remember this kind of a statement after

21     two full years?  I just remember it.  Did you speak to

22     anybody in the state attorney's office or with the

23     Gainesville Police Department about this?  Did you --

24     Didn't make a report.  Did someone else make a report?

25     Did you tell anybody else about this statement and did

1    they include it in their report?

2         And again, I'm talking about his specific

3    statement that he claims that Brian Herlihy made on

4    August the 2nd.  Not been anybody else's statement.  I

5    don't think I opened the door there either.  I was just

6    inquiring as to the reliability of the information that

7    he testified to by asking him did he write it down, or

8    if he didn't write it down, did he communicate it to

9    someone else and did that person write it down?

10        I don't think we opened the door, your Honor.

11   With respect to the Court, I know the Court has already

12   made a ruling, but, certainly, we're not at a point now

13   where the door is opened about all of this stuff that

14   we've already had a pretrial ruling on, such that

15   the -- the whole trial changes now.

16        I don't think that either Mr. Tedder or myself

17   have overstepped in any way, have violated any of the

18   Court's orders about opening the door, or have even

19   really, sincerely, in my perspective, gotten that

20   close.  We've done our best, our level best, to stay

21   clear of opening the door.

22        And I really -- I was under the impression and the

23   Court corrected me earlier that what Ms. Singer and I

24   have talked about for the last six months about this is

25   that the door would be opened through Mr. Herlihy.  I

1      do now understand and recognize that the Court' ruling

2      went to other witnesses as well.  And I just forgot

3      about that for the moment.  And I apologize for that.

4           I don't think we opened the door and I certainly

5      don't think that we should make a bad situation worse

6      by allowing every single witness to testify about these

7      instances of fabrication on the part of my client,

8      because a) it's not relevant; b) it's -- actually it

9      violates the Williams Rule, because even though it's

10     not a crime, it's evidence of a prior bad act.  And

11     there has been no Williams Rule notice.  And what we

12     want to show the jury is that he lied about some

13     irrelevant matter that is not the subject of this

14     litigation.  And I think it's gonna greatly prejudice

15     the jury against my client, and I don't think we'll be

16     able to get a fair trial.

17          MR. TEDDER:  Your Honor, can I add one thing to

18     that and that is that if we were trying to present a

19     defense that Mr. Herlihy had training in medicine, or

20     EMT practice, or whatever, and therefore he could never

21     have been the cause of this baby's injury, or could

22     have known how to prevent it, or this or that, it would

23     be different.  It doesn't -- we're not advancing that

24     defense.  That's what I thought the whole purpose of

25     the pretrial motion was part, and in addition to what

1      Mr. Groland said.

2           MS. SINGER:  Your Honor, first of all, I want to

3      rely on the record as to what the questions were, both

4      to Crystal Quirello, and Dennis Meredith.  I don't

5      agree that Mr. Groland's rendition of those questions

6      are accurate, not that, I'm not casting any aspersions,

7      but they were paraphrasing.  He can't remember the

8      verbatim.  And I believe we had them available when the

9      rulings were made.  I just want to put that on the

10     record first.

11          Secondly, there is a point where it becomes unfair

12     to the state when cross-examination steps over the

13     line, where there is a suggestion that there are

14     lengthy discussions with the defendant that are not

15     written down, yet the jury is not entitled to know

16     there were conversations and statements made that may,

17     in fact, be relevant in this case, and we can

18     cross-examine and make the witness look like he can't

19     remember, he doesn't know, he doesn't make a report,

20     and we can embarrass that witness.  And then, because

21     the witness is under a ruling that he can't discuss a

22     part of the conversation that he remembers quite

23     accurately, recalls quite accurately, and may, in fact,

24     be very relevant to what Mr. Herlihy did that

25     particular day or didn't do.

1    One of the issues in this case is whether or not

2    Mr. Herlihy does, in fact, have knowledge of this

3    child; does, in fact, have a predisposition to rescuing

4    people; and did, in fact, intentionally injure this

5    child with the intent to show his girlfriend, Crystal

6    Quirello, what a better man he was than Crystal

7    Quirello's father, than Robbie Quirello's father,

8    caused injury to Robbie Quirello with the intent to

9    rescue that child from that injury, become the hero to

10   Crystal Quirello, so she would choose him over the

11   father of the child in this case.  And, in fact, that

12   could be perhaps an argument that could be made to this

13   jury with the statements that Mr. Herlihy made, the

14   fire memorabilia and regalia and the position he's

15   taken representing himself as a pediatric nurse to this

16   woman when he meets her and attempts to hook up with

17   her.

18        Now, I have been very, very careful.  There are

19   many witnesses who heard what Mr. Herlihy said.  I

20   followed the Court's instruction.  I did not open the

21   door.  I did not go into that area and I think that

22   once the defendant opens the door, that the state

23   should be entitled to present that testimony to the

24   jury.  And that's why I've taken this position every

25   time you've approach the bench.  And I've been very

1    careful.

2        As to the comment about Kenneth Johnson, when we

3    asked about whether he had done a report and told

4    anyone, and I've already instructed the witness that

5    he's not allowed to say everything he knows about the

6    case, I think that's also an indication that the door's

7    been opened and that the state should be able to

8    explain it.

9        We're gonna hear on closing what the state didn't

10   do, what the government didn't do, what the paramedics

11   didn't do, and our hands are tied because of pretrial

12   rules.

13       I don't have the case law, but we have people

14   looking right now as to what it means when the door is

15   open.  And I do want to have an opportunity to have

16   that reviewed by the Court.  I'll do whatever the Court

17   says.  I was ready not to go into any of this and the

18   Court knows that.  But it's unfair to tell a witness

19   not to say something and then get the question on the

20   defense and have them, their hands tied and their lips

21   locked.

22       THE COURT:  All right.  Yes, sir.

23       MR. GROLAND:  My understanding of opening the door

24   is going into a prohibited area, for whatever reason,

25   and letting the jury know some of it, and then that's

1    what it's all about.  The door is open.  They've heard

2    -- they've seen, they've gotten a peek and now you're

3    stuck with the rest of it, because here it comes.

4        We don't have that here either with -- I keep on

5    going back to Crystal, but I don't think we have it

6    with her, nor do we have it with the two firefighters.

7    They don't have a clue, didn't have a clue that there

8    were any other statements.

9        All we were doing was exercising our right to

10   cross-examine witnesses as to their memory and

11   recollection of what they had already testified to,

12   your Honor.  I don't believe we have opened the door.

13       THE COURT:  Okay.  Now, in reality, although the

14   case law would be very helpful, my ruling right now is

15   based upon the same logic and argument as it was

16   pretrial.  And so it's very clear to me and very

17   simple.  And that is:  The pretrial ruling was based

18   upon a motion made by defense that there are certain

19   facts in this case that, although there is no dispute

20   in regard to the fact that there are witnesses who

21   could testify to these facts, they would not be

22   relevant, and would be prejudicial to the defendant.

23   And it was the Court's ruling that, yes, in fact, the

24   testimony that Mr. Herlihy is alleged to have lied

25   repeatedly about a number of different subjects, could

1    well be prejudicial to him, and would not necessarily

2    be relevant to the state's case, unless the defense

3    opens the door as to Mr. Herlihy's credibility and

4    trustworthiness.  Which is, in fact, what the defense

5    has inadvertently done by trying to imply that, in

6    fact, Crystal had good reason to trust him.

7         When you open the door as to Crystal's trust in

8    him, then you open the door to the state addressing the

9    fact that she trusted him, not only because of what she

10   saw, but also because of what he specifically said to

11   her.  And that is why the state was then allowed to go

12   back over the entire basis for her trust.

13        Likewise, with the witness then called by the

14   state in regard to statements made by Mr. Herlihy, the

15   defense was clearly asking this witness:  Was any other

16   statement made?  Asking that the jury conclude that the

17   statements made by Mr. Herlihy were, in fact, complete

18   and they could rely upon his explanation as to what

19   happened; bringing into, again, the issue of his

20   credibility in regard to his explanation.

21        If he is lying about peripheral facts, he may or

22   may not be lying about the circumstances surrounding

23   the injury to the child.  And the jury is entitled to

24   have all that information once you open the door.  That

25   is the basis for the ruling.

1          Therefore, the state was entitled to readdress

2      that issue as to what complete statements were made by

3      Mr. Herlihy, as to the one witness, who, I guess, was

4      Mr. Meredith.

5          MS. SINGER:  Meredith, yes.

6          THE COURT:  Now, the issue as to any other

7      witnesses that may be called by the state in their case

8      in chief is the only thing I'm addressing at this time.

9      I do not know what other statements additional

10     witnesses may be able to offer.  And I do not know

11     whether or not, other than the one witness that's been

12     referenced that has knowledge of these same statements,

13     if the state requests to recall Mr. Johnson.  I'll

14     address that in a minute.  But I don't know if the

15     state has additional witnesses who can confirm any of

16     the statements that have already been brought into

17     evidence.  And, if so, they will be allowed to ask

18     those questions of those witnesses.

19         On the other hand, if we're talking about other

20     areas of inquiry, where I have sustained or granted the

21     defendant's motion in limine, I'm not, at this time,

22     ruling that any other door has been opened, except

23     those doors that I ruled on in the middle of trial and

24     have further explained to you.

25         So if there is any other area that the state

1    either believes the defense has opened the door to, or

2    the defense wants to reargue, I'll be glad to hear it,

3    not as to these I've just reheard, but any other.

4    Because there are five Roman numerals in this motion --

5    excuse me, six.

6         MR. GROLAND:  Yes.

7         THE COURT:  Excuse me, there are nine Roman

8    numerals in this motion in limine.  And we have

9    addressed, as far as I can see on review, two of them

10   at this point.

11        MR. GROLAND:  Well, I don't think this -- what

12   we're doing now applies to any of the others, but I'm

13   not sure.  Can I just make one comment, observation?

14        THE COURT:  No, no.  We don't need comment.

15   That's not going to be helpful to the appellate courts

16   and I've already ruled.  But, if there is any citation

17   you need to put on the record or any new argument you

18   need to make for purposes of a possible appeal, of

19   course, you can do that.

20        MR. GROLAND:  I do need to make just an additional

21   argument.

22        Your Honor, we, as to Crystal, we did not open the

23   door as to trust.  We never once used that word.  She

24   used it first in response to a state's question and

25   then she used it in response to my question.

1            I asked her if she had ever seen any anger,

2      aggression, frustratedness, (sic) anything on the part

3      of Brian Herlihy that would lead her to believe that he

4      was unsafe with -- the child was unsafe with him.  And

5      then I followed with:  Did you have any reason to be

6      suspicious of him?  Her answer was:  I trusted him.

7            We did not raise the issue of trust.  She did

8      and/or the state did.  That's all I have to say about

9      that.  We didn't raise it.  We were talking about what

10     she saw him do, how she saw him interact with the baby.

11     I especially stayed away with anything that Brian had

12     said to her that helped build a sense of well being

13     about Brian being with the baby.  I specifically

14     questioned her about what she saw Brian do with the

15     baby, feeding the baby, playing with the baby,

16     interacting with the baby, and whether or not there was

17     anything about that that caused her any concern.  I

18     stayed away from what Brian had said to her.  She's the

19     one that said "trust", both in response to the state's

20     question, and, in response to my question, and, most

21     respectfully, I don't believe I opened the door.

22           THE COURT:  I understand that, Mr. Groland.  You

23     made that statement repeatedly.  However, I agree with

24     Ms. Singer that the best reference in regard to how and

25     if the defense opened the door, must be the record

1   itself.  And the record itself will clarify whether or

2   not, after that sequence of questions, you, in fact,

3   asked Crystal Quirello, Is that why you trusted him?

4        MR. GROLAND:  Absolutely did.  I'm 100 percent

5   sure of that, but the only problem is we can't unring

6   that bell.

7        THE COURT:  That's correct.  All right.  Now --

8        MS. SINGER:  In other words, we're re-arguing this

9   entire motion in limine?

10       THE COURT:  Not necessarily.

11       MS. SINGER:  I didn't understand the Court's

12   ruling, because, of course, we are in opposition to the

13   ruling on paragraph nine, and would love to reargue

14   that, but I don't think this is the time or place for

15   that.

16       THE COURT:  Unless you see some basis, some new

17   basis that has occurred as a result of how the trial

18   was progressing, no, you're not invited to re-argue it.

19       MS. SINGER:  May I confer with counsel for a

20   moment?

21       THE COURT:  Yes.

22       MR. GROLAND:  Your Honor, if the Court finds, if

23   we can get a --

24       THE COURT:  Wait just a minute.  Wait just a

25   minute.  Ms. Singer has the floor.

1      MS. SINGER:  Would we be precluded as the case

2   goes on from asking the Court to reconsider evidentiary

3   rulings as more witnesses testify, your Honor, or is

4   now the time that I have to make my argument as to --

5      THE COURT:  You're not foreclosed, so long as your

6   request to be revisited is based upon what has actually

7   happened in the trial, as opposed to the pretrial

8   rulings prior to the door being opened.

9      MR. PENNYPACKER:  Can I ask a clarification

10   question?

11      THE COURT:  Yes.

12      MR. PENNYPACKER:  If I understand your ruling,

13   then the statement to Crystal that he was a PICU nurse

14   can be referenced by witnesses that have not yet

15   testified?  The statement to the paramedic that --

16      THE COURT:  Hold on.  No.

17      MR. PENNYPACKER:  All right.

18      THE COURT:  Because any statement made to Crystal

19   referenced by another witness would be objectionable as

20   to being hearsay.

21      MS. SINGER:  No.  Well, Mr. Herlihy told other

22   people he was a PICU nurse as well.

23      MR. GROLAND:  Still hearsay.

24      THE COURT:  No.  I have not ruled that.  The door

25   was opened as to Crystal Quirello, because the line of

1    inquiry was as to her basis for trusting him with the

2    baby.  That does not mean that any lie he ever told was

3    relevant, or that that particular lie is relevant as to

4    any other witness necessarily.  So it does not carry

5    forward.  It would have to be re-argued.

6        MR. GROLAND:  Your Honor, I have never been surer

7    of anything that I've ever said to any judge, and if

8    the record, the record that we will get overnight from

9    the clerk shows that, indeed, I never used the word

10   "trust", and what I represented was accurate, will your

11   Honor at least take another look at it?  I know we

12   can't, as I said, unring the bell, but perhaps we can

13   look at it again and decide what to do.

14       THE COURT:  Throughout my entire jurisdiction over

15   this case, if you have any basis to re-argue any issue

16   on some new area, of course, I will allow it.  But I'm

17   certainly not going to assume that there might be and

18   then --

19       MR. GROLAND:  I know.

20       THE COURT:  That was kind of a --

21       MR. GROLAND:  I fully understand.

22       MR. PENNYPACKER:  Your Honor, when you announced

23   your ruling, I understood you to say that if there were

24   witnesses that had knowledge about the statements that

25   have already come in, to the witnesses that have

1   already come in, Mr. Herlihy said that we could address

2   that.  Are you now saying that we cannot do that?  I

3   don't want to ring a bell that hasn't been rung.

4        THE COURT:  You can address that.  That does not

5   mean you can elicit that testimony.

6        The issue regarding statements made to

7   Mr. Meredith, and then reported to Ken Johnson has been

8   opened by Mr. Groland saying to Mr. Meredith:  Did you

9   tell anybody else that, or did anybody else put that in

10   their report?  That is the only extension that has been

11   brought to my awareness at this point.

12        So, no, I'm not ruling that anything has changed.

13   And you must address it on a statement-by-statement

14   basis and a witness-by-witness basis, and that's why I

15   have given both the state an opportunity to address the

16   entire motion in limine at this time, not because I

17   have ruled on anything other than what we have

18   specifically addressed.

19        MR. PENNYPACKER:  I understand, Judge.  Thank you

20   for the clarification.

21        THE COURT:  Mr. Groland, this is your copy.  I'll

22   hand it back.

23        MS. SINGER:  Your Honor, I'm going to need a

24   moment for my next witness, to instruct that witness

25   regarding the ruling at this time.

1          THE COURT:  Yes.  And the court reporter will need

2     a break also.  So we'll be in recess.

3          Madam Court Reporter, will 12 minutes be

4     sufficient?  We'll be in recess until 4 o'clock.

5          (Recess.)

6          (Outside the presence of the jury:)

7          THE COURT:  All right.  Now, the next witness the

8     state is going to call is Officer Orlando Alvarez who

9     was the first responding officer who did speak with

10    Mr. Herlihy.  Officer Alvarez is in the courtroom right

11    now.  I know the jury is not present and I would like

12    the record to reflect that.

13         MS. SINGER:  There are several statements that

14    Mr. Herlihy made to Officer Alvarez that I have

15    instructed this witness not to say during my

16    direct-examination pursuant to the original court order

17    and pursuant to what I believe is the court order at

18    this point.

19         I don't know if the Court wants to hear what those

20    statements are now, but I'm going to be back up to the

21    bench if the door is open.  And I've instructed Officer

22    Alvarez if he gets a question on cross that requires

23    him to comment on these statements, he's going to ask

24    the Court for direction, and that if that's okay with

25    the Court and if Officer Alvarez understands the

1    directions here, and I'm giving those directions, but I

2    think he needs to hear that from the Court.

3        MR. GROLAND:  I'm fine with that.

4        THE COURT:  Okay.  That seems very reasonable to

5    the extent that we can anticipate what might possibly

6    happen.  And I will -- Where is Mr. Alvarez?

7        There you are.  Thank you.  These are the

8    instructions.  You are to abide by the pretrial

9    instructions that Ms. Singer gave you before you came

10   into the courtroom.  However, if the defense on

11   cross-examination asks you a question that you believe

12   would truthfully require you to reveal something that

13   you have been directed not to respond to, you may turn

14   to me and say:  Your Honor, I need some direction from

15   the Court.

16       Now, what I want to caution you against is

17   throwing something in that where it might not be

18   required, but had there not been a pretrial ruling

19   might have been something that you would have offered.

20   Don't do that.

21       THE WITNESS:  I understand.

22       THE COURT:  Okay.  Good enough.  Now you may come

23   forward if you will and we'll go ahead and bring the

24   jury in.

25       (Before the jury:)

```
 1              THE COURT:  Ms. Singer, you may call in the next
 2       witness and swear this witness in, please.
 3              MS. SINGER:  The state is calling Orlando Alvarez.
 4                      ORLANDO ALVAREZ,
 5    having been produced and first duly sworn, testified as
 6    follows:
 7              MS. SINGER:  May I proceed, Your Honor?
 8              THE COURT:  Yes.
 9                      DIRECT EXAMINATION
10    BY MS. SINGER:
11       Q    Mr. Alvarez, if you would state your full name and
12    spell your last name for the record.
13       A    Orlando Alvarez, A-L-V-A-R-E-Z.
14       Q    What is your employment or profession, sir?
15       A    I'm a police officer for the City of Gainesville.
16       Q    How long have you been so employed?
17       A    Almost eight years.
18       Q    Before that did you work at any other department?
19       A    Yes, I did.
20       Q    Where did you work, sir?
21       A    Broward County Sheriff's Office.
22       Q    How long did you work for them?
23       A    Five years.
24       Q    Now, I see you're in uniform today.  What division
25    are you assigned?
```

```
 1        A     Currently I'm a school resource officer.

 2        Q     Back on August 2nd, 2000, where were you assigned?

 3        A     I was in patrol bureau.

 4        Q     And as a patrol officer for the City of

 5   Gainesville Police Department, would you be in uniform?

 6        A     Yes, ma'am.

 7        Q     Would you drive a marked police car?

 8        A     Yes.

 9        Q     At that time were you working in the morning or

10   the daytime hours of August 2nd, the year 2000?

11        A     Yes, I was.

12        Q     And do you recall being called at approximately

13   9:52 a.m. to a residence located at the Tumbling Creek

14   apartments at 1015 Southwest 9th Street, apartment A-21?

15             MR. GROLAND:  Objection, your Honor, leading.  I

16        just don't want it to continue.  I mean, at this point

17        I'm not really concerned about it, but this is the

18        beginning of leading questions so we do pose an

19        objection.

20             THE COURT:  The objection is overruled since these

21        are preliminary in nature at this time.  Of course, you

22        may, at any point that testimony is being offered that

23        you need to re-raise that motion, you should do so.

24   BY MS. SINGER:

25        Q     Were you called to that apartment, sir?
```

1      A      Yes, I was.

2      Q      And do you recall what the call was that

3  dispatched you there?

4      A      Yes.

5      Q      What was the call, sir?

6      A      The signal that was provided to us was a signal

7  31, which means it's a medical emergency.  And,

8  specifically, dispatch told me it was in reference to a

9  deceased pediatric patient.

10     Q      Okay.  Now, you need to speak up loud enough for

11  me to hear you.  And I'm gonna move my podium back to make

12  you speak all the way down here.

13     A      Okay.  I'm sorry.

14     Q      I'm sorry.  I didn't hear you.  I'm sure they did,

15  but I need to ask what was the dispatch?

16     A      The police signal that was given out was a signal

17  31, which is medical emergency.  And dispatch specifically

18  stated that it involved a deceased pediatric patient.

19     Q      Were you told anything en route other than that?

20     A      Before I arrived on scene, dispatch informed me

21  that they had resuscitated the child and it was being

22  transported to Shands.

23     Q      When you arrived at the Tumbling Creek apartments

24  at A-21, was the child still at the apartment?

25     A      No.

1      Q      Were there other emergency rescue folks at the
2   apartment when you arrived?

3      A      Yes, there was.

4      Q      Did anyone else from the Gainesville Police
5   Department come on scene after you arrived?

6      A      Shortly after I arrived, Sergeant Valerie Dawson
7   arrived.

8      Q      Is she also in the uniform patrol division?

9      A      Yes.

10     Q      Was she at that time?

11     A      Yes.

12     Q      Once you arrived, was there any other persons
13   other than emergency personnel on the outside of the
14   apartment that you were aware of?

15     A      No.

16     Q      Did you, in fact, go into the apartment, A-21?

17     A      Yes, I did.

18     Q      Can you tell the jury why it was that you entered
19   the apartment A-21?

20     A      We wanted to make sure there was no signs of foul
21   play in the apartment, as well as anybody else, other than
22   emergency personnel.

23     Q      Did you do a walk-through of the apartment?

24     A      Yes, I did.

25     Q      Would you describe for us what, if anything, you

1    saw upon the walk-through of the apartment?

2            MR. TEDDER:  Your Honor, we object to this based

3        on the pretrial motion.

4            THE COURT:  Overruled.

5            You may proceed Mr. Witness -- Mr. Alvarez.

6            THE WITNESS:  Nothing out of the ordinary.  We did

7        not find anything that would result in foul play.  The

8        only thing I recall was a white liquid substance on the

9        carpet in the bedroom.

10   BY MS. SINGER:

11       Q    Did you move anything or touch anything when you

12   walked through the apartment?

13       A    No.

14       Q    Did Valerie Dawson, in your presence, move

15   anything or touch anything when she walked through the

16   apartment with you?

17       A    In my presence, no.

18       Q    Did you both then leave that apartment?

19       A    Yes.

20       Q    Did there come a time when you were called to

21   Shands Teaching Hospital on this very same case?

22       A    Yes.

23       Q    Did you travel to Shands Teaching Hospital?

24       A    Yes.

25       Q    Do you know approximately what time it was that

544

```
 1    you got to the hospital?
 2         A    A little bit before -- after 10:00 o'clock.  I'm
 3    not sure exactly what time I went and I arrived at Shands.
 4         Q    Were you given direction on what your tasks were
 5    at Shands?
 6         A    Yes.
 7         Q    Did you, at Shands, come into contact with the
 8    defendant, Brian Herlihy?
 9         A    Yes, I did.
10         Q    Do you see him here today?
11         A    Yes, I do.
12         Q    Would you tell us what he's wearing and where he's
13    seated, please?
14         A    The burgundy tie, light blue shirt, in the center
15    of the two gentlemen over here on the left.
16              MS. SINGER:  May the record reflect the witness
17         has also identified the defendant, your Honor?
18              THE COURT:  It will so reflect.
19    BY MS. SINGER:
20         Q    Did you have an opportunity to speak with
21    Mr. Herlihy at that time?
22         A    Yes.
23         Q    Was he under arrest when you had contact with him?
24         A    No.
25         Q    Was he a suspect in a criminal investigation at
```

545

1    that time?

2         A    No.

3         Q    Did you advise him of his Miranda rights at that

4    time?

5         A    No.

6         Q    What was the purpose in speaking with Mr. Herlihy

7    at that time?

8         A    To obtain a general understanding as to what had

9    happened.

10        Q    Did you have an opportunity to speak with

11   Mr. Herlihy about what had happened to the baby that

12   morning?

13        A    Yes.

14        Q    And was he able to tell you anything about --

15   First of all, what was his demeanor?  How was he acting when

16   you spoke with him?

17        A    He was distraught, concerned about the well-being

18   of the child, concerned about how it was doing, if I had any

19   information I could provide him.

20        Q    Were you able to ask him questions regarding what

21   had occurred in the apartment earlier that day?

22        A    Yes.

23        Q    What did he tell you about his plans for that day?

24        A    He told me that he had plans to spend the day at

25   Cedar Key.



1    Q    Was he traveling to Cedar Key with anyone else?

2    A    Yes.

3    Q    Would that have been Crystal Quirello, the mother

4    of the child?

5    A    That's correct.

6    Q    And did he tell you where Ms. Quirello was at the

7    time that the baby was found?

8    A    He informed me that she had gone to fuel up the

9    vehicle.

10    Q    Did he tell you what he did while Ms. Quirello was

11    fueling up the vehicle?

12    A    Yes, he did.

13    Q    What did he tell you he did?

14    A    He told me that he had fed the baby a bottle of

15    formula, placed the child on the bed, and jumped into the

16    shower.

17    Q    Did he tell you how he placed the baby on the bed?

18    A    Face down.

19    Q    Did he tell you -- was his words "jumped into the

20    shower"?

21    A    Yes.

22    Q    Did he tell you how long he was in the shower?

23    A    No.  He didn't give me a time frame.

24    Q    Did he tell you what occurred, or what he did

25    while he was in the shower?

1    A     He said that while in the shower he detected or

2    noticed that it was kind of quiet in the bedroom, and then

3    he got out of the shower and found the child wedged between

4    the mattress and the bed frame with it's feet up.

5          MS. SINGER:  One moment, your Honor.  I have no

6          further questions of this witness at this time.

7          THE COURT:  All right.  Mr. Groland?

8                    CROSS-EXAMINATION

9    BY MR. GROLAND:

10   Q     Did you ask him how you can hear anything if

11   you're in the shower with the shower on?

12   A     No, I did not.

13   Q     Did you follow-up with anything when he said that

14   to you?

15   A     No.

16   Q     Were you taking notes as he talked to you or did

17   you write this down afterwards?

18   A     No, this was afterwards when I was completing my

19   report.

20   Q     Okay.  Did he tell you that when he came out of

21   the bathroom, or the shower, or the toilet room, that he

22   found the baby face down, with his feet up, wedged in the

23   bed?

24   A     No.  He just told me he found the baby wedged

25   between the mattress and the frame with his feet up.

1    Q    Are you sure he didn't tell you the baby was face

2 down when he came out?

3    A    No, I'm certain.

4    Q    When he told you that he testified he placed the

5 baby face down, did you query him about that?

6    A    No.

7    Q    When you went into the apartment after first

8 getting there, I take it you had somebody with you besides

9 Sergeant Dawson?

10    A    The training officer.

11    Q    Yeah.

12    A    The trainee, yes.

13    Q    His name is Robert King?

14    A    That's correct.

15    Q    He was with you all the way; he was in your car,

16 he arrived with you?

17    A    That's correct.

18    Q    He went with you upstairs and into the apartment?

19    A    Actually, honestly, I don't remember if he went

20 into the apartment with me.  He was with me when we arrived

21 on scene and went into the apartment.

22    Q    Sergeant Dawson was with you when you walked

23 around the apartment?

24    A    Yes, that's correct.

25    Q    And you didn't have, obviously didn't have a

549

```
 1    search warrant.  Did you have anybody's consent to go in
 2    there?
 3         A    From the owner of the apartment, no.  It was
 4    Sergeant Dawson's call.
 5         Q    And you went in there specifically to look for
 6    signs of foul play, as you testified?
 7         A    Yes, sir.
 8         Q    You saw none?
 9         A    That's correct.
10         Q    And from there you went directly to the hospital?
11         A    Yes.
12         Q    Do you know what a CAD report is?
13         A    I'm sorry?
14         Q    Do you know what a CAD report is, CAD?  It's from
15    communications?
16         A    Oh, communications, CAD.  I'm sorry.
17         Q    Have you ever seen a CAD report that was prepared
18    by communications in connection with this case?
19         A    No.
20         Q    When you say you got a report of a deceased child,
21    are you sure you didn't get a report of a child with a
22    problem not breathing and not conscious?
23         A    I wrote deceased pediatric patient because that's
24    normally terminology that I wouldn't use.  So I know I had
25    to have heard it.
```

1    Q    Okay.  Do I hear you saying that that is the
2    terminology you normally would use, but you cannot
3    specifically recall that that's what you were told by the
4    dispatcher?
5    A    No.  I'm saying that the words "deceased pediatric
6    patient" are words that I wouldn't use to describe the call.
7    Q    Okay.
8    A    So it must have been words that I had heard from
9    dispatch when I got the call.
10   Q    Has anybody told you that anybody thought the baby
11   was deceased that day, on the 2nd of August?
12   A    No.
13   Q    Okay.  Is that the extent of your involvement in
14   this case, what you've already testified to?
15           MS. SINGER:  Your Honor, I think we need to
16       approach the bench.
17           MR. GROLAND:  Your Honor --
18           THE COURT:  Hold on.  Yes, you may approach the
19       bench.  I need the court reporter up here.
20           (Sidebar conference:)
21           MR. GROLAND:  I ask you, Jeanne, to speak quietly.
22           MS. SINGER:  Yes.  I'm sorry.  I may have a
23       problem with my hearing as well, and I apologize if I'm
24       too loud.  I apologize about that.  I'm trying my best.
25           That question there is a lot more involvement that

1    this man had regarding an interview with Brian Herlihy.

2    Much of it is one of things that this Court has told me

3    or instructed him not to get into.  That's a very

4    open-ended question and I'm putting that witness in

5    this same position that those other witnesses were put

6    in.  And I want to make sure that the Court understands

7    my position on this.

8        He talked to Brian Herlihy for a lengthy period of

9    time where Brian Herlihy told him that he was a

10   paramedic, that he helped resuscitate and provided

11   ventilation for this baby, that he stated that he was

12   giving CPR, able to resuscitate the infant, and that he

13   had the baby transported.  He advised that the liquid

14   on the carpet was baby formula from the infant.  And

15   then later in the day he has contact with Mr. Herlihy

16   outside of the ICU and continued conversation with him.

17       Now, if we want to get into that, I'm not into it,

18   but I think that question may derive those answers.

19       MR. GROLAND:  Judge, I mean, I can't be foreclosed

20   from doing a cross-examination.  He asked did Brian

21   Herlihy say anything else?  I asked him, I asked him:

22   Is that the extent of his involvement?  In fact, he had

23   more involvement in this case, went back to the

24   hospital and met with the detectives in this case.

25       THE COURT:  So you know that the answer is going

1    to be a no?

2        MR. GROLAND:  No, the answer to the question is:

3    Yes, I had more involvement.

4        THE COURT:  Your question was:  Is that the extent

5    of your involvement to which he will answer no?

6        MR. GROLAND:  No, I would expect him to answer --

7    Okay.  I see what you're saying.  What I want to get

8    from him, he did more in this case.

9        THE COURT:  You just accused Ms. Singer of being

10    too loud and now we're getting too loud.  I --

11        MR. GROLAND:  I'm sorry.  I wanted to get into the

12    fact he did more in this case.  He went back to the

13    office.  12:30 met with the detectives and the doctors.

14    I did not ask him what else.

15     My client said, I stayed away from that, Judge.

16    I've got to be able to do my cross-examination -- my

17    job.  He did more in this case.

18        THE COURT:  So that you know the answer to this

19    question is going to be no, and then?

20        MR. GROLAND:  Then I was gonna ask him, in fact,

21    did you go back to the hospital at 12:30 and meet with

22    the detectives, and nurses, and counselors?  And I was

23    gonna go into that area, Judge.  I mean, if that's

24    opening the door, then I'm in the wrong business.  I

25    mean, I wanted to go into another area with him.  I

1    didn't even ask him the first question about his

2    interview with my client. I didn't even ask him a

3    single question about that.

4         THE COURT:  All right.  You may continue your

5    cross-examination, and then I will address the state's

6    concerns before you do your redirect.

7         MS. SINGER:  Thank you.

8  BY MR. GROLAND:

9    Q    You did have more involvement in this case than

10  what we've already talked about.  You did go back to the

11  hospital again?

12   A    Yes, I did.

13   Q    And at the hospital, in fact, you met with

14  detectives, and doctors, and had a discussion; is that

15  correct?

16   A    That's correct.

17   Q    Okay.  And what time was that that you had this

18  meeting at the hospital with those individuals?

19   A    That was afternoon.  Twelve noon.

20   Q    All right.  Was Brian Herlihy still there at the

21  hospital?

22   A    Yes.

23   Q    Do you know where he was relative to where you all

24  were?

25   A    No, I don't.

1        Q    Okay.  How do you know he was still there at the

2   hospital?

3        A    When I first got called back, the second time I

4   was called back, I initially made contact with him and then

5   met with the personnel at the hospital.

6        Q    Okay.  Where was he when you came back?

7        A    I think it was still down in the ER area.

8        Q    Could you see him outside on the curb, outside the

9   ER?

10       A    Not that I can remember, no.

11       Q    Okay.  All right.

12            Did you go anywhere with him?

13       A    No.

14       Q    Were you present with Brian when he was contacted

15  between 12:30 and 1 o'clock by detectives and then taken to

16  the Gainesville Police Department?

17       A    No.

18       Q    You had nothing to do with that?

19       A    That's correct.

20       Q    Did you have anything to do with him signing a

21  consent form to search his apartment?

22       A    No, I did not.

23       Q    Did you participate in this meeting or did you

24  just listen?

25       A    Listened.

1          MR. GROLAND:  That's all I have, your Honor.

2          THE COURT:  I need for you to approach the bench

3     again.

4          (Sidebar conference:)

5          THE COURT:  The additional testimony you wish to

6     elicit has to do with what Brian Herlihy told this

7     witness actually happened on that day?

8          MS. SINGER:  Yes.  Yes, ma'am.  Can I bring the

9     report to you so I can give you the proffered

10    testimony?

11         MR. GROLAND:  But, your Honor, isn't that a part

12    of the pretrial rulings that we already had?

13         THE COURT:  No, no.  Any statement the defendant

14    made about what actually happened is not subject to

15    pretrial ruling.

16         MR. GROLAND:  He already testified as to what

17    happened.  What Ms. Singer is seeking to elicit is

18    statements that he made about the subject matter prior

19    employment, things of that nature.

20         MS. SINGER:  I don't agree with that.  I don't

21    agree with that.  Let him finish, but I don't agree

22    with that, and I would like to be able to tell the

23    Court.

24         MR. GROLAND:  Ms. Singer's questioning about what

25    he said about the incident, about the baby being wedged

1     in the bed stayed away from that completely, stayed

2     away from statements.  The initial statements that I

3     believe the state is seeking to introduce have to do

4     with those matters that are already addressed in our

5     pretrial motion, and has to do with statements that are

6     not true that he made about his prior experience, and I

7     have absolutely not opened the door to with this

8     witness.

9         MS. SINGER:  Statements specifically are Herlihy

10    advised he's a trained paramedic, wherein he states

11    that he, to Alachua County Fire Rescue, are you able to

12    resuscitate the infant and have him transported?

13         THE COURT:  Okay.  The statements that Mr. Herlihy

14    made about what happened, i.e, that he and medical

15    services were able to resuscitate this baby and have

16    the baby transported, those have to do with the event

17    on this day and are admissible.  The other thing, the

18    door opened through this witness as to any statement

19    Mr. Herlihy may have made about his training, no door

20    was open.

21         MR. GROLAND:  In addition to this, what they're

22    asking now is beyond the scope of my cross-examination,

23    and should be excluded.  They had their chance at the

24    witness.  Then I cross-examined and stayed away exactly

25    from everything Mr. Herlihy said.  They're seeking to

1    go back and elicit more information.  I think that's

2    improper.  It's beyond the scope.

3         THE COURT:  I understand.  I've ruled.

4         Anything else you're going to do other than this?

5         MS. SINGER:  That's it.

6         THE COURT:  I would suggest that we simply ask

7    Mr. Alvarez to come right here and get this

8    instruction.

9         MR. GROLAND:  I'm sorry, Judge, I just didn't hear

10   that.

11        MS. SINGER:  She's gonna have Mr. Alvarez come to

12   the bench to be instructed that's how he can answer

13   that question.

14        MR. GROLAND:  Which question?

15        MS. SINGER:  The additional statement that Herlihy

16   said that he asked if Alachua County Fire Rescue were

17   able to resuscitate the infant and have him

18   transported.

19        You know, Judge, I'm gonna leave it alone.

20        MR. GROLAND:  Good.

21        MS. SINGER:  I'm gonna leave it alone if that's

22   okay with the Court, rather than try to --

23        THE COURT:  I understand.  Go ahead.

24        (The sidebar conference was concluded.)

25        MS. SINGER:  Based upon the Court's ruling, I am

1    going to --

2        MR. GROLAND:  We have no further questions.

3        MS. SINGER:  You have no further questions.  And I

4    don't have any other questions of this witness.

5        THE COURT:  Good enough.

6        MS. SINGER:  May be subject to recall at another

7    time, depending on other rulings of the Court.  So I

8    would ask that he remain under the rule, but he can be

9    released to go about his business this evening.

10       THE COURT:  Mr. Alvarez, you are released from the

11   courthouse.  You are still subject to the subpoena for

12   trial.  The rule, of course, remains in place.  You may

13   not discuss this case or your testimony.  I just want

14   to let you know we may need to call you back.

15       THE WITNESS:  I understand.  Okay.

16       THE COURT:  Go ahead and call your next witness.

17       MS. SINGER:  Your Honor, since we're getting very

18   close to 5:00, can I check to see who my short

19   witnesses are out there?

20       THE COURT:  Yes, that would be helpful.

21       MS. SINGER:  All right.  I just need a second.

22       I just need to go outside and look to see who I

23   have.

24       THE COURT:  As I did tell you, ladies and

25   gentlemen, we're going to recess at 5:00 o'clock today.

1          MS. SINGER:  This would be Russell Valentine, your

2     Honor.

3          State would call Russell Valentine.

4                    RUSSELL VALENTINE,

5     having been produced and first duly sworn, testified as

6     follows:

7          MS. SINGER:  May it will please the Court?

8          THE COURT:  Yes, go ahead.

9                    DIRECT EXAMINATION

10    BY MS. SINGER:

11        Q    Mr. Valentine, would you state your full name,

12    please?

13        A    Russell James Valentine.

14        Q    Your occupation or profession?

15        A    Firefighter paramedic.

16        Q    Were you so employed back on August 2nd, 2000?

17        A    I was a firefighter/EMT.

18        Q    And what department do you work for?

19        A    Alachua County Fire Rescue.

20        Q    Were you working for them as well back then?

21        A    Yes, ma'am.

22        Q    And how long at all have you worked for Alachua

23    County Fire Rescue?

24        A    Approximately four-and-a-half to five years.

25        Q    Are you a little nervous?

1        A      Yes, ma'am.

2        Q      All right.  I don't blame you, but I just wanted

3   to make sure we got that out.

4        A      Okay.

5        Q      I'm going to take you back to August 2nd of the

6   year 2000.  Who was your partner that day?

7        A      Tom Whitley.

8        Q      And what was your job that day with Mr. Whitley?

9        A      I was driving the ambulance.

10       Q      What was Mr. Whitley's job?

11       A      He was the attendant paramedic on the ambulance.

12       Q      And do you remember being called to an apartment

13  known as the Tumbling Creek apartments located at, I always

14  have to look at a piece of paper for the address, 1015

15  Southwest 9th Street, apartment A-21?

16       A      Yes.

17       Q      And were you dispatched there on a call for a baby

18  that was, that needed medical help?

19       A      Yes.

20       Q      Okay.  We have already talked with a number of

21  people about what was done medically, and I want to talk to

22  you about a very small part of your role.

23              First of all, when you got there, had the

24  firefighters from Gainesville Fire Rescue already gotten

25  there, or were you there before them?

1       A    We were there before them.

2       Q    And did you get called up, do you remember being

3  called up to the apartment by someone?

4       A    Yes.  Someone stepped out of the doorway to the

5  apartment and just directed us in that direction.

6       Q    And did you see where the child was located?

7       A    Yes.

8       Q    Where was the child located?

9       A    We made our way into the apartment.  We went down

10  a small hallway into a bedroom and the baby was on the floor

11  of the bedroom.

12       Q    Did you have occasion to come in contact with a

13  person that was later identified, may not have been

14  identified, but a person in the apartment?

15       A    Yes.

16       Q    Do you see that person here today?

17       A    I'm not sure.  I don't remember.  I remember there

18  being a person.  I don't remember that person.

19       Q    Were there any other persons there other than the

20  one person?

21       A    Not at that time.

22       Q    And was that a male or female person?

23       A    A male person.

24       Q    And where was he located when you first came in

25  contact with him?

562

1      A      Other than stepping out of the apartment, when we

2  made our way into the apartment, he was in the bedroom with

3  the child.

4      Q      Did you ask that person what had occurred to the

5  child?

6      A      I did not, but I believe that Tom did.

7      Q      And what did that person tell you about how the

8  baby had been injured, or how the baby had come to the

9  position he was in on the floor of the bedroom?

10             MR. TEDDER:  Your Honor, I'm gonna object unless

11         he can identify the person who made the statement.

12             MS. SINGER:  Your Honor, I believe that

13         identification has been made by others who were present

14         and have offered testimony as to identification in this

15         case.

16             THE COURT:  The objection is overruled.

17             THE WITNESS:  I believe he stated that the child

18         had became entrapped between a mattress and a bed

19         frame.

20  BY MS. SINGER:

21      Q      Did he tell you where he was at the time that the

22  baby had been trapped between the mattress and the bed

23  frame?

24      A      In the shower.

25      Q      Did he tell you how long he had been in the

1    shower?

2        A     He did not.

3              MS. SINGER:  No further questions, your Honor.

4              THE COURT:  All right.  Any cross-examination?

5                       CROSS-EXAMINATION

6    BY MR. TEDDER:

7        Q     Now, Mr. Valentine, as to what you were told

8    specifically as to the shower, as to Mr. Herlihy taking or

9    not taking a shower, isn't it true that he told you as to

10   whether or not -- isn't it true you're not sure whether he

11   told you he was in the shower or was not in the shower?

12       A     I stated in the deposition I believe those words.

13   I did not have the piece of paper in front of me that I had

14   written.  On reviewing the paper I had written, the patient,

15   or the person had stated that they were taking a shower.

16   They had taken a shower.

17       Q     However, isn't it true as to whether or not he

18   told you he had taken a shower or not, that you did observe

19   while being in the room that the shower -- there was no

20   steam in the shower?

21       A     There was no steam that I can recall coming from

22   the shower.  I did not physically look at the shower.

23       Q     Isn't it true as to what you were doing at the

24   scene, at the time you were much more focused on caring for

25   the baby?

1       A     That's true.

2       Q     And, isn't it true, when you got there the baby's

3   color was gray-blue?

4       A     Yes.

5       Q     And that you had only been a paramedic about two

6   months before this incident happened?

7       A     A paramedic, yes.  I'd been an EMT a couple years

8   before that.

9       Q     And isn't it true that you observed the baby had

10  vomited?

11      A     It looked as if there was vomit around the mouth,

12  white vomit, possibly.

13      Q     Did you observe any other EMT's suction the mouth

14  to get vomit out?

15      A     Yes.

16      Q     So then the baby was not breathing when you

17  arrived?

18      A     The baby was not breathing.

19      Q     And, isn't it true, that Mr. Herlihy was frantic

20  about the baby's condition?

21      A     Yes.

22            MR. TEDDER:  I don't have any other questions,

23       your Honor.

24            THE COURT:  Any redirect?

25            MS. SINGER:  No redirect.  May this witness be

1    excused from his subpoena at this time?

2         MR. GROLAND:  Yes.

3         THE COURT:  Mr. Valentine, you're released from

4    the subpoena and free to leave the courthouse.  Thank

5    you very much.

6         MS. SINGER:  I only have very long witnesses from

7    now on.

8         THE COURT:  Good enough.  Since I held the jury

9    late the first two nights, we'll recess a little bit

10   early tonight.  I'm sure that will totally make up for

11   it.

12        And if you have any personal property in the jury

13   room, you may collect it.  Of course, if you'll secure

14   your notebooks as you did last night, and with the same

15   instructions that you are to avoid local news and any

16   comments by anyone that might have information about

17   the case.  And we'll see you tomorrow morning at 8:50.

18   Thank you very much.

19        MS. SINGER:  Your Honor, while the jury is heading

20   home, can I go ahead and excuse the witnesses so

21   there's no problem?

22        MR. GROLAND:  Your Honor, may I approach?

23        THE COURT:  Yes.

24        (Outside the presence of the jury:)

25        THE COURT:  All right.  Court will be adjourned

1    until 8:50 tomorrow morning.

2         MR. PENNYPACKER:  Do you want us here early for

3    any reason, or what we have been doing the last two

4    days is fine?

5         THE COURT:  What you have been doing the last two

6    days is fine, except that this morning after 9 o'clock

7    you raised pretrial motions that, as I instructed

8    earlier they must be addressed prior to 9 o'clock.

9         So if there are pretrial motions that you intend

10   to raise, you must let me know before I come on the

11   bench and the jury is supposed to come in.  I assume

12   there are none that you would address tomorrow morning.

13        MR. PENNYPACKER:  I would like to think so, your

14   Honor.  I don't know for sure.  If there were an issue

15   that we wanted to discuss with you before the jury

16   came, should we come to your office or chambers at

17   8:30, something like that?

18        THE COURT:  No.  I've got a doctor's appointment

19   actually before court tomorrow morning, so if there is

20   anything we need to address before the jury comes in,

21   we need to do it now.

22        MR. PENNYPACKER:  Let me ask Ms. Singer.

23        (Pause in the proceedings.)

24        MR. PENNYPACKER:  Your Honor, I advised Ms. Singer

25   that the Court would like to know from us now if there

1    is anything we intended to bring to your attention

2    before Court would begin tomorrow, and I don't think

3    she's had an opportunity to answer that question.  I

4    did not tell her you have a doctor's appointment, so

5    you would not be able to do that.  So you requested if

6    we have anything, we address it today.

7          MS. SINGER:  We're okay for tomorrow as far as I

8    know.

9          THE COURT:  Thank you very much.

10         Yes, sir?

11         MR. GROLAND:  Your Honor, regarding an issue I

12   raised pretrial, I believe, on the predicate regarding

13   authenticity of the CD presentation.  I did find some

14   case law.

15         THE COURT:  I'm sorry, authenticity of what?

16         MR. GROLAND:  The predicate regarding the

17   authenticity of the CD demonstration.

18         THE COURT:  CD demonstration.

19         MR. GROLAND:  I do have some case law that I would

20   like to give to the Court and some to the state.  I'm

21   not sure when we're gonna get to that.  But, in case

22   it's tomorrow, I would like to leave these cases.

23         THE COURT:  I've already ruled on that, so I'm not

24   sure why we would get to it then.

25         MR. GROLAND:  I do remember your Honor saying if

1  we have some case law, I do remember you saying bring

2  it tomorrow.  Whatever day it was, I didn't bring it

3  that next day because I didn't have it.  I just got it

4  today from my clerk.  I think it's worth reading

5  because it does discuss -- this is a Florida case and

6  there are a couple of out-of-state cases regarding, I

7  think, one instance of this very same presentation.

8      THE COURT:  So at this point, what you would have

9  to do is, in reality, request a rehearing if you have

10  found, in fact, case law that would convince you that

11  I'm wrong that I would want to know that before you

12  appeal the ruling.

13      MR. GROLAND:  Okay.

14      THE COURT:  But, if it falls within the

15  discretionary category or subject to interpretation,

16  then I've already ruled, and that case law will only be

17  used by you on appeal.

18      MR. GROLAND:  I'll do what's right.

19      THE COURT:  Good enough.  Court's adjourned until

20  8:50 in the morning.

21                  *  *  *  *  *

22

23

24

25