# EXHIBIT
# H

*α02-1-17814*
*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY }
           Appellant, }
                  }

CASE NUMBER   2000-2753-CFA

                  }
                  }

APPEAL NUMBER 1D02-4788

v.                  }

VOLUME VIII

                  }
                  }

STATE OF FLORIDA }
           Appellee, }

Deck— CA
05-14-2003
Gen'l Attorney General

2003 MAY 12   PH 2:42
ATTORNEY GENERAL'S OFFICE
CRIMINAL APPEALS
TALLAHASSEE
RECEIVED

# TRANSCRIPT
# RECORD

## HONORABLE MARTHA ANN LOTT
### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

202-1-17814  569

F

1          IN THE CIRCUIT COURT OF FLORIDA
           EIGHTH JUDICAL CIRCUIT
2          IN AND FOR ALACHUA COUNTY

3          CASE NO: 01-2000-CF-2753-A

4          TRANSCRIPT ON APPEAL
              VOLUME V
5          (Pages 569 - 674)

6   STATE OF FLORIDA

7   vs.                          Volume VIII

8   BRIAN PATRICK HERLIHY,       1002 - 4788

9          Defendant.                 Dock— 64

10  _____/         05-14-2003

11  Proceedings:        Jury trial

12  Before:             The Honorable Martha Ann Lott,
                        Circuit Judge
13

14  Date:               September 12, 2002

    Time:               9:00 a.m.
15

    Place:              Courtroom 4-A
16                      Alachua County Courthouse
                        Gainesville, Florida
17

18  Reporter:           Stacey K. Bryant, RPR
                        Judicial Court Reporter

19  APPEARANCES:

20      Jeanne Singer, Assistant State Attorney
        Stephen Pennypacker, Assistant State Attorney
21      120 W. University Avenue
        Gainesville, Florida 32608
22        Appearing on behalf of the State of Florida

23      Gordon Groland, Esquire
        John Tedder, Esquire
24      Post Office Box 2848
        Gainesville, Florida 32602
25        Attorneys for defendant

                    Stacey K. Bryant, RPR
                    Judicial Court Reporter

1              INDEX TO PROCEEDINGS

2

3    PRELIMINARY MOTIONS: ............................ 571

4

5    STATE'S CASE:

6

7                   DR. ANNE DICKISON,

8    DIRECT EXAMINATION BY PENNYPACKER: .............. 586

9

10

11

12              INDEX TO EXHIBITS

13

14   STATE'S EXHIBIT E....MARKED FOR IDENTIFICATION... 591

15   STATE'S EXHIBIT NO. 10...MARKED IN EVIDENCE...... 593

16

17

18

19

20

21

22

23

24

25

```
1                      P R O C E E D I N G S

2                          *   *   *   *   *

3             (Out of the presence of the jury:)

4             THE COURT:  Anything to put on the record before

5         the jury comes in?

6             MR. GROLAND:  Yes, your Honor.  Yesterday I asked

7         the Court about a rehearing on certain matters and your

8         Honor asked me to put it in the form of a written

9         motion.  Two things I have done:  One is with regard to

10        the compact disk presentation, we don't need to do it

11        now, I just want to call it to the Court's attention, I

12        have filed a motion.  I attached the case law to that

13        motion.  Three cases are from out of the State of

14        Florida.  The top case in terms of the pile of four is

15        the Florida case and we can address that later.

16            The only other matter is that I have filed for a

17        rehearing or a continuing hearing on the issue of

18        whether or not the door was opened, and if so, by whom.

19        That motion is in front of the Court and I would like

20        to just briefly be heard on that now that we do have

21        the realtime transcript available with all of my

22        cross-examination and a portion of the state's direct

23        examination.  So if I could be heard briefly on that?

24            THE COURT:  Go ahead.

25            MR. GROLAND:  Thank you.  Your Honor, yesterday at
```

the end of the day we got a copy of an excerpt from

Ms. Singer's direct examination of Crystal and it

indicates that I was correct in my representation to

the Court that the first time the word trust came up,

came from the state and the state's witness.

Specifically the question by Ms. Singer to Crystal was,

"And why is it that you would bring the baby to Brian?"

Her answer was, "Because I trusted him."  And the

question then was, "We're not gonna go there.  We're

not gonna go into specifics.  We're gonna move on from

there," which leads me to believe that that was an area

they had discussed beforehand and I'm certain that

Ms. Singer admonished the witness that certain areas

were not to be gone into.

Then I cross-examined her and I quickly this

morning went and read through the cross and I first see

the word trust on page 45 and it's not from me.  It's

in response to a question that has nothing to do with

trust.  On page 45, on line 11 I asked Crystal, "Would

it be fair to say that Brian was always good with the

baby?"  And it called for a yes or no answer.  She

could have just said yes.  She said, "I trusted him,

yes."  She editorialized on her own.

Then I go down on line 17 and I say, "Did Brian

ever do anything that caused you to be concerned about

1    Brian being alone with the baby?"  She said, "No, not

2    in my presence."  So I'm staying away specifically from

3    anything Brian may have said.  And my question on page

4    25 -- I'm sorry -- on that same page 45, line 25 is,

5    "Did you ever when Brian was with the baby, ever see,"

6    and again I'm staying away from his conversation,

7    "Anything like anger, aggression or lack of patience,

8    frustration on Brian Herlihy's part?  No, sir."

9          And I end up at the end of my cross-examination

10   with this question, page 52, line ten, "Crystal, it is

11   true, is it not, that at no time during your

12   relationship with Brian Herlihy when he was around you

13   and Robbie, and alone with Robbie, did you have any

14   suspicion at all that he might want to injure the

15   baby?"  It calls for a yes or no answer.  If there was

16   to be further explanation, that would be something that

17   the state would have to pick up on on redirect.  Her

18   answer is, "No."  Again she editorializes and fills in

19   where she wants to, "I trusted him."

20          I didn't ask for why.  I asked for a yes or no

21   answer.  The state then gets up and claims that I

22   opened the door.  With all due respect, I don't believe

23   I opened the door.  I believe if anybody opened the

24   door, if it was opened, and I'm not sure that it was

25   even opened, but if it was opened, it was opened either

1   by the state or by the state's witness, not by the

2   defense.

3        I have ordered and I cannot address at this time

4   because it's not available, the realtime testimony of

5   paramedic Meredith and that will be available later

6   today.

7        Your Honor, I'm not even sure what I'm asking the

8   Court to do because I don't know if a mistrial is in

9   order, I don't know if a limine instruction is in

10  order, but I most strenuously and most respectfully say

11  to you, the Court, that I didn't open the door, that I

12  didn't intend to open the door.  If it was opened, and

13  I'm not even sure that it was, it was done because

14  Crystal Quirello wanted to get out that word, I trusted

15  him, so that there would be a follow-up to that, Why

16  did you trust him?  Because he told me such and such.

17       I think the transcript bears out that what I say

18  is correct and accurate on that point and I would ask

19  the Court to reconsider and revisit the issue and if

20  indeed the Court finds as we are claiming the Court

21  should hopefully find that it was error, that it was

22  incorrect to allow the state to come back and get into

23  that area because the Court felt at that time when your

24  Honor thought that I was the first one to use the word

25  trust, opened the door, then we got to decide what

1  we're gonna do and perhaps we will be satisfied with

2  some kind of limine instruction at this point and that

3  will be a decision if we get to that and we'll make

4  with the client and have him decide.

5  THE COURT:  All right.  State want to respond?

6  MR. GROLAND:  Thank you.

7  MS. SINGER:  Your Honor, I'm not prepared to

8  respond with any case law today, but I'm gonna rely on

9  the record.  She was specifically told when I talked to

10  her not to go there.  And then the question -- there's

11  a line of questions, but last question where he asks,

12  "When he was around you and Robbie, and alone with

13  Robbie, did you have any suspicion at all that he might

14  want to injure your son?"  I think her answer is

15  obviously an appropriate answer.  It was not staged,

16  she was not prepped to give that answer.  She answered

17  honestly and truthfully, "No, sir, I trusted him."

18  And once he asked, When he was around you and when

19  he was alone with Robbie, alone with Robbie when he

20  wasn't around Crystal, once he asked that, he opens the

21  door because she let him be alone with Robbie because

22  he told her he was a PICU nurse and she would have to

23  lie.  She would have to lie.

24  THE COURT:  Hold on.  The bottom line is, I

25  appreciate you all putting your concerns on the record

1    and I have ruled as we moved along and prior to trial

2    and as Mr. Groland pointed out, he's not sure at this

3    point what relief, if any, he even requests.  Your

4    argument is clear.  You do have the transcript.  If and

5    when you get to the point where you make a specific

6    request that I make some ruling or decision, of course

7    I'll be glad to do that.

8        MR. GROLAND:  Can I just have a moment with my

9    client right now?

10       THE COURT:  Yes.

11       (Brief pause.)

12       MR. GROLAND:  Your Honor, the consensus here is

13   that if the Court feels it is appropriate, we would ask

14   as to the issue of Crystal's testimony for a limine

15   instruction to the jury to specifically disregard that.

16   They don't have to know why, they don't have to know

17   that it was anybody's fault in particular.  We are

18   satisfied if the Court will tell them that small

19   portion of the testimony should be excluded from the

20   record and not a part of their deliberations.

21       THE COURT:  Having made the motion, then we will

22   review the transcript at the lunch recess and I will

23   rule right before the jury comes back in after lunch.

24       MR. GROLAND:  Thank you.

25       MS. SINGER:  May I ask one question in

1    clarification?

2        THE COURT:  Yes.

3        MS. SINGER:  Is the Court reconsidering the ruling

4    because that's what Mr. Groland is asking for?  He's

5    asking for a limine instruction to disregard the

6    testimony, not a limine instruction to use it for some

7    limited purpose.  So I'm confused here.

8        THE COURT:  Mr. Groland has requested that I

9    review the transcript and make a determination as to

10   whether or not the state -- excuse me -- the defense

11   did in fact open the door.  And upon reviewing the

12   transcript, if I find that my ruling was incorrect,

13   error being something that the appellate courts would

14   have to decide, then he is requesting a limine

15   instruction.  So that's where we stand at this point.

16       MS. SINGER:  And I don't need to make any further

17   argument on it.  I rest with the Court's decision on

18   that.

19       THE COURT:  Fine.  Good enough.

20       MR. PENNYPACKER:  Your Honor, before the jury

21   comes in, I would like to go back and revisit the

22   motion as to the computer image because the next

23   witness is the witness that's gonna utilize that and I

24   don't want to have to stop in the middle of it.

25       MR. GROLAND:  Steve, I'm sorry.  Did I hear you

1        say you're gonna use it now?

2            MR. PENNYPACKER:  Yes.  I can tell the Court that

3        I am prepared to lay the predicate.  This is required

4        by one case cited by the defense, the Pierce case,

5        which is a State of Florida case.  It lists the four

6        criteria the court must have in order to allow computer

7        animation in.  I think you've already ruled on a couple

8        of those criteria.

9            The first criteria is that opinion evidence must

10       be helpful for the trier of fact.  I think clearly the

11       testimony is going to be Dr. Anne Dickison, who was the

12       attending physician in the pediatric intensive care

13       unit, clearly her opinion is gonna be relevant to the

14       trier of fact.

15           Second element is the witness must be qualified as

16       an expert.  My expectation is that she will be

17       qualified as an expert witness.

18           Third element is that the opinion evidence must be

19       applied to the evidence offered at trial.  That opinion

20       testimony is going to be relevant to the evidence

21       offered at trial as far as shaken baby syndrome.

22           The fourth element is that pursuant to section

23       90.403, the evidence, although technically relevant,

24       must not present a substantial danger of unfair

25       prejudice that outweighs it's probative value.

1          You have already reviewed the computer animation.

2     There is no audio with it.  Dr. Dickison will explain

3     it to the jury.  I think you've already made a finding

4     that it's not prejudicial.  It's prejudicial value, if

5     there is any, is outweighed by the present value.

6          THE COURT:  All right.

7          MR. GROLAND:  And our position is that indeed

8     there is some criteria.  We didn't go through all four

9     of them and we didn't have the case law available,

10    neither the state, nor the defense.  But as to the

11    unfair prejudice that outweighs the probative value,

12    our position is that part that actually has a computer

13    generated image of a baby where there is shaking going

14    on with a certain degree of force that we have no way

15    of knowing is identical to force that they're

16    suggesting was used in this case was more than, less

17    than, whether it was -- the baby was -- if the baby was

18    shook at all, whether it was shook that way or shook

19    this way, I think that portion of the presentation

20    should be eliminated all together because all it shows

21    is an act of shaking that we have no way of knowing

22    applies to the facts of this case.

23          I would concede that as to the other parts that

24    depict the brain and depict the dura and show where

25    the -- What do you call those veins?

1    MR. TEDDER:  Bridging veins.

2    MR. GROLAND:  -- where the bridging veins are

3    connected, I think that might -- I've got to agree in

4    some respects might be helpful.  But that part that

5    actually shows movement of a computer generated baby

6    being shaken by someone with a certain amount of force,

7    I think that part of it should not be shown to the jury

8    because it's misleading and prejudicial.

9    THE COURT:  All right.  Now the demonstration that

10   has previously been reviewed by the Court may be

11   utilized by an expert witness to explain the theory of

12   shaken baby syndrome.  It, of course, cannot be used as

13   a demonstration of what happened in this case.

14   MR. PENNYPACKER:  Your Honor, the distinction in

15   the cases that have been cited by defense is between an

16   animation and a simulation.  This is not a simulation.

17   I would also point out that in one of the cases cited

18   by the defense, the case from Colorado, used a computer

19   animation of shaken baby and it was admitted.  So

20   they're presenting to you case law that supports the

21   admission of this demonstrative aid.

22   THE COURT:  Are you clear on my ruling?

23   MR. PENNYPACKER:  Yes, ma'am.

24   THE COURT:  Does that consist of what you intend

25   to elicit from this witness?

1        MR. PENNYPACKER:  Yes, ma'am.

2        THE COURT:  Good enough.  Anything else we need to

3   put on the record before the jury comes in?

4        MR. TEDDER:  I think the state had prepared a

5   proposed instruction regarding this cartoon they're

6   gonna play for the jury explaining what it is and what

7   it's worth.

8        MS. SINGER:  Your Honor, I'm just going to lodge

9   an objection to the characterization that this

10   demonstration is a cartoon.  I understand that tempers

11   may be a little bit flared here this morning, but if

12   we're gonna start out this way, I would argue that that

13   is not appropriate even knowing that the jury is not

14   present.

15        MR. TEDDER:  Well, whatever, computer generated.

16        THE COURT:  I would have to look up the definition

17   of cartoon to determine whether or not it's actually

18   derogatory.  Animation certainly sounds to be more

19   technically correct, but I don't have any basis to

20   conclude that cartoon means anything other than

21   animation without looking at the dictionary.  Now --

22        MR. PENNYPACKER:  The issue is a limine

23   instruction, your Honor.  If the Court is so inclined,

24   I would simply ask you that you tell the jury, This is

25   an animation, not a simulation.  This was not prepared

1    to demonstrate to you what exactly Mr. Herlihy did to

2    Robbie Quirello.

3        THE COURT:  Do you have a proposed written

4    instruction?

5        MR. PENNYPACKER:  No, I don't.

6        MS. SINGER:  I think I did.  Did I give you one,

7    John?  I don't have a copy.  Do you have it with you?

8        MR. TEDDER:  I'm trying to remember where I put

9    it.

10        MS. SINGER:  All right.

11        THE COURT:  It is not in the proposed jury

12    instructions?

13        MS. SINGER:  It was not.  I prepared it specially.

14    If you give me a moment, I may be able to locate it in

15    my motion file.  Otherwise, if you would call Marilyn

16    Sincar (phonetic), it's on her computer.  It's called

17    the proposed jury instruction for demonstrative aid.  I

18    did prepare one, your Honor.  If the Court will give me

19    a moment, I may be able to locate it.  I couldn't

20    locate it yesterday.

21        THE COURT:  Tomorrow we will begin at 8 o'clock so

22    that all of these legal issues that keep arising while

23    the jury's out can be addressed before the jury comes

24    in at 9:00.

25        MS. SINGER:  I do have it.

1          THE COURT: Okay.  Good.

2          MS. SINGER:  Let me make sure Mr. Tedder thinks

3     that that's the one that he saw.

4          MR. TEDDER:  That is the one that we were provided

5     earlier, your Honor.

6          THE COURT:  Mr. Groland?

7          MR. GROLAND:  Well, if the Court is inclined to

8     give that particular instruction, we would ask that it

9     be read before the jury ever sees the presentation.

10         THE COURT:  This is not the instruction that I

11    would propose.  If the state and the defense stipulate

12    to this instruction, then I will give it.

13         MR. TEDDER:  What would you propose, your Honor?

14         THE COURT:  I would propose that if I give an

15    instruction at this time, that it say that the computer

16    demonstration, if we use the word demonstration as

17    opposed to animation, is meant to aid you in

18    understanding the testimony of this expert in

19    explaining the theory of shaken baby syndrome.

20         MS. SINGER:  Your Honor, we contest the term

21    theory of shaken baby syndrome.  Our physicians call it

22    a diagnosis.  Do we need to use the word theory?

23         THE COURT:  I don't know because I haven't heard

24    -- I have not heard the experts to the contrary.  If

25    there is a scientific dispute about diagnosis versus

584

1      theory, then it would be unreasonably prejudicial to

2      the defense to call it a diagnosis by the Court.  You

3      can call it a diagnosis.  You can call it a theory.

4      But as soon as I pick one or the other --

5            MS. SINGER:  Let's not call it anything.  Just

6      don't put theory.  Just put shaken baby syndrome in

7      there.

8            MR. TEDDER:  No.  That's calling it a diagnosis.

9      We want theory, your Honor.  That's what it is.  It is

10     a theory.  It is unproven.

11           THE COURT:  Mr. Tedder, that may or may not be

12     correct, but having never heard any evidence to that

13     affect, I certainly cannot agree with you at this

14     point.

15           MR. TEDDER:  I understand, Judge, and we probably

16     should have had a Frye hearing before this trial ever

17     began.

18           THE COURT:  All right.  Would the state and

19     defense agree with this:  The state is about to use a

20     computer animation.  It is meant to aid you in

21     understanding the opinion testimony in this case and

22     the animation itself is not evidence?

23           MS. SINGER:  That's fine with the state.

24           MR. GROLAND:  That's fine, your Honor.

25           THE COURT:  Good enough.

1    MR. PENNYPACKER:  So I'm clear, your Honor, the

2    point in Dr. Dickison's testimony that we intend to

3    utilize the animation, I should stop and allow you to

4    read the instruction before it's shown, correct?

5        THE COURT:  Yes.  Okay.

6        MR. TEDDER:  Your Honor, we also -- I don't know

7    if you want us to do this before the jury comes in.  As

8    to Dr. Dickison, we certainly are not going to agree

9    she is an expert as to the theory of shaken baby.

10       THE COURT:  I had anticipated that.  However,

11   unless you want me to rule on that at this moment --

12       MR. TEDDER:  Well, as far as rather than having

13   the jury brought in and have us voir dire her on that

14   and then have you rule, do it before then.

15       THE COURT:  Based upon the nature of the voir dire

16   up to this point, I'm not intending to remove the jury

17   for you to voir dire each and every medical expert as

18   to areas that are not apparent at this point to require

19   removal of the jury.  It's the same issue over and over

20   and over.  It is something that is completely subject

21   to direct and cross-examination and these are areas

22   that are completely subject to the determination of the

23   jury as to which facts they believe and which expert's

24   opinion they believe.  Now if there's anything about an

25   individual doctor that makes you actually believe I'm

1    going to find them to be unqualified as an M.D., then

2    please bring that to my attention.

3         MR. TEDDER:  She's a doctor, there's no doubt

4    about that.  I'm just saying she's not an expert on

5    shaken baby, that's all.

6         THE COURT:  You'll be allowed to voir dire the

7    witness if you object and it will be of course in the

8    presence of the jury as I've indicated.  Anything else?

9         MR. PENNYPACKER:  No, your Honor.

10        THE COURT:  All right.  Bring in the jury.  Go

11   ahead and call your witness.

12        MS. SINGER:  Anne Dickison.

13        (Before the jury:)

14        THE COURT:  Good morning, ladies and gentlemen.

15   Mr. Pennypacker, you can proceed with your next

16   witness.  Please swear in the witness.

17                    ANNE DICKISON,

18   having been produced and first duly sworn, testified as

19   follows:

20                 DIRECT EXAMINATION

21   BY MR. PENNYPACKER:

22   Q    Would you state your name, please?

23   A    Anne Elizabeth Dickison.

24   Q    What is your occupation?

25   A    I am a physician, a pediatrician,

1    anesthesiologist, and intensive care specialist, and I teach
2    medical school.

3        Q    What is your educational background, Dr. Dickison?
4        A    I have a bachelor's degree from Carlton College in
5    philosophy and religion, followed by a nursing degree from
6    Columbia University in New York City, followed by some
7    graduate work in theology and nutrition, followed by a
8    chemical engineering degree from Rice University in Houston,
9    Texas, followed by medical school at the University of
10   Michigan for four years.

11        But because I was far advanced, I spent the fourth
12   year of medical school as an intern in emergency medicine.
13   After that, I did two years of pediatrics residency at the
14   Children's Hospital of Philadelphia and graduated, completed
15   that course, but always intended to be a pediatric
16   intensivist.  So I went back to do an anesthesia residency.
17   I did that at Salt Lake City, Utah, University of Utah
18   because I loved river running.  I worked summers as a river
19   runner while I went to school in the winters.

20        After the completion of the anesthesia residency,
21   I had an interest in specializing in pediatric anesthesia
22   and cardiac anesthesia.  So I did a fellowship in critical
23   care medicine in pediatric anesthesia back at the Children's
24   Hospital of Philadelphia, and I did a subset of cardiac
25   anesthesia in that.

1        Q     Are you board certified in any particular areas of

2   medicine?

3        A     Yes.   I'm board certified in four areas and I was

4   board eligible in emergency medicine at the time that it

5   came out.   The four areas where I passed my boards are

6   pediatrics and I took the orals or I took the writtens in

7   1984 and passed the orals soon after that.   And I am board

8   certified in anesthesiology having passed both the writtens

9   and the orals on time.   I'm also board certified in adult

10  critical care medicine through the American Board of

11  Anesthesiology and in pediatric critical care medicine

12  through the American Board of Pediatrics, and I recertified

13  seven years after original certification as is required now.

14       Q     Are you licensed to practice medicine in any

15  states?

16       A     Yes, in six states.   In order of acquiring these

17  licenses it was Pennsylvania, Utah, New Mexico, New

18  Hampshire, Florida, Illinois, and they're all active and

19  unrestricted.

20       Q     What has been your employment history since

21  completing your fourth residency?

22       A     My initial job was as a per diem.   It was while I

23  was completing my fellowship and I worked as a per diem

24  neonatologist and emergency room physician at Children's

25  Hospital of Philadelphia and at the Hospital University of

1  Pennsylvania and Pensy Hospital, Pennsylvania Hospital in

2  Philadelphia.

3          My first permanent job was as an assistant

4  professor of anesthesiology in pediatrics and co-director of

5  the pediatric intensive care unit at the University of New

6  Mexico Hospital in Albuquerque.  I was there for three and a

7  half years.  And then I did a six month research fellowship

8  at Lovelace Medical Research Foundation, which is where the

9  Right Stuff was filmed about the astronauts going up into

10  space.

11          And after that fun interval, I went back for my

12  second permanent long lasting job as an assistant professor

13  of anesthesiology and pediatrics, critical care medicine,

14  and the director of the pediatric intensive care unit at

15  Dartmouth Hitchcock Medical Center, Dartmouth Medical School

16  in Lebanon, New Hampshire.  In that capacity I was the

17  founder and director of the tri-state medical transport

18  system for children.

19          Then after I was there six years, I was recruited

20  to the University of Florida because of my combination

21  interests of anesthesiology and pediatric critical care

22  medicine.  I was recruited here to be part of a staff of

23  pediatric intensivists at Shands Teaching Hospital at the

24  University of Florida and I've been here, have been here for

25  the last six years.

1    Q    What is a pediatric intensivist?

2    A    It's a pediatrician who specializes in critically

3    ill or critically injured children.  The difference between

4    a general pediatrician and a pediatric intensivist is that

5    we are more focused on life threatening and life saving

6    techniques; so ventilator management, pharmacology, acute

7    interventions, surgical procedures, monitoring, close

8    observation and intimate knowledge of the things that can

9    make children critically ill or injured.  A general

10   pediatrician concentrates more on growth, development,

11   childhood diseases, immunizations and advice to parents

12   about raising children.

13   Q    Do you have any publications in your fields?

14   A    Yes, a number of publications.

15   Q    Have you made any presentations or symposia in

16   your career?

17   A    Yes, hundreds of them.  I have about 30 pages in

18   my CV of presentations that I've made.

19   Q    Have you ever been qualified as an expert witness

20   before?

21   A    I'm qualified, but I've never testified as an

22   expert witness before because I have a little bit of a bias

23   that for an academic physician, this is not a very pure

24   thing to do.

25        MR. PENNYPACKER:  May I approach the clerk, your

1          Honor?

2                    THE COURT:  Yes.

3                    MR. PENNYPACKER:  I have Dr. Dickison's curriculum

4          vitae.  I ask that it be marked as an exhibit for

5          identification.

6                    THE COURT:  If you'll mark it for identification,

7          please.

8                    THE CLERK:  State Exhibit E, your Honor.

9                    THE COURT:  Exhibit E for identification.  Thank

10         you.

11                   (State's Exhibit E was marked for identification.)

12                   MR. PENNYPACKER:  May I approach the witness, your

13         Honor?

14                   THE COURT:  Go ahead.

15    BY MR. PENNYPACKER:

16         Q    Dr. Dickison, I'm showing you a document marked

17    State's Exhibit E for identification.  Can you identify

18    that?

19         A    Yes.  This is my current curriculum vitae.

20         Q    What's in it?

21         A    The first page is my correspondence address, my

22    current medical licensure, my board certifications.

23              Second page is educational and previous

24    professional experience.

25              The third page is past academic appointments and

1    editorial boards that I have been part of.

2            Next page is post graduate awards and honors and

3    volunteer or adjunctive professional activities.

4            Next page is professional societies that I belong

5    to and the role that I've played in them as a member of

6    board of directors or the chair of certain committees.

7            The page after that is hospital committees which

8    are active right now and additional adjunctive activities,

9    volunteer activities.

10            And then from page eight on are listed by year

11    presentations I've been invited to do on a local, national,

12    regional or international basis, and that goes up to page 25

13    where I start listing publications, books, monographs, book

14    chapters, symposia.

15            There are four pages of symposia.  There are

16    abstracts after that in there and there are some others like

17    handbooks that I have written or coauthored, handbooks on

18    pediatric intensive care, pediatric anesthesia or pediatric

19    cardiac anesthesia.

20            Finally we end up with my specialty interests of

21    raising birds and river running.

22            MR. PENNYPACKER:  Thank you.  Your Honor, I would

23        like to move this in as the state's next numbered

24        exhibit.

25            MR. TEDDER:  It's irrelevant evidence, your Honor.

1    I object.

2         THE COURT:  The objection is overruled, but noted

3    for the record.  It will be admitted into evidence as

4    State's No. what?

5         THE CLERK:  Ten, your Honor.

6         THE COURT:  No. 10 in evidence.

7         (State's Exhibit No. 10 was received in evidence.)

8         MR. PENNYPACKER:  Your Honor, I tender

9    Dr. Dickison as an expert in the area of pediatric

10   critical care.

11        THE COURT:  Any objection?

12        MR. TEDDER:  Not in that limited area, no, ma'am.

13        THE COURT:  Good enough.  The doctor may give her

14   opinion in the area of pediatric critical care.

15 BY MR. PENNYPACKER:

16   Q    Dr. Dickison, were you working at Shands Hospital

17 on August 2nd of 2000?

18   A    Yes.  I was the attending physician in the

19 pediatric intensive care unit.

20   Q    What is an attending physician?

21   A    An attending physician is the top dog on service.

22 I'm responsible, the ultimate responsibility for the care of

23 the patients in the pediatric intensive care unit.  And for

24 this I do direct patient care, I supervise fellows.  The

25 heirarchy goes; on the bottom are the medical students, and

1   then above the medical students are the residents, residents

2   in pediatrics, residents in anesthesia, residents in

3   emergency medicine or family practice, or any other

4   residents that go through.

5          Then on top of that are fellows.  Fellows have

6   already completed their residency in pediatrics or

7   anesthesia or some other discipline, and they're now

8   learning over a three year period additional skills to

9   specialize in critical care medicine.

10         So I was supervising two fellows that were

11   rotating through in that month and supervising a team, which

12   consists of the medical personnel as well as a social

13   worker, a pharmacology advocate, and the nursing team in the

14   pediatric intensive care unit.  I also interacted as the

15   point person with other medical specialists, the surgeons

16   that come through the intensive care unit, the emergency

17   room personnel, the consultants like radiology consultants,

18   cardiac consultants or pulmonary consultants.  So I become

19   the point person for communications and for making

20   decisions.

21     Q    What type of patients end up in the pediatric

22   intensive care unit?

23     A    Patients that have immediate threat to life or to

24   limb who warrant close observation or actual intervention in

25   whatever disease process or injury process that they are

1   experiencing in order to save their lives or sustain their

2   lives or to substitute with technology what their bodies

3   have stopped doing by themselves.

4      Q    Do you receive patients from the emergency room?

5      A    Yes.

6      Q    Is there a point in which a child that has come

7   through the emergency room becomes your responsibility as

8   opposed to the emergency room's responsibility?

9      A    The official time is when the child rolls through

10  the portals of the intensive care unit and care is signed

11  off from the emergency room staff and admitting orders are

12  written in the pediatric intensive care unit, that's the

13  formal time when obligation starts and stops.

14         But informally there's much more of an overlap

15  because there's a dialogue that takes place between the

16  emergency room and the pediatric intensive care and many of

17  the initial decisions are joint management decisions.

18     Q    On August 2nd of 2000 did you treat a child named

19  Robbie Quirello?

20     A    Yes.

21     Q    When did you first become aware that Robbie would

22  be your patient?

23     A    I was conducting rounds in the pediatric intensive

24  care unit with the team that was there and the fellow,

25  Dr. Ikram Haque, received a phone call from the emergency

1   room to give the team a heads up that they had had a call

2   from the emergency medical services that a baby was on it's

3   way in in full arrest, which is a very scary thing to hear

4   because full arrest means there's no heartbeat, no blood

5   pressure, no breathing, and the child is for all intents and

6   purposes dead.

7       Q    What time, approximately, did you get this first

8   communication that you might be seeing this patient?

9       A    About 9 -- 9:20, 9:15.

10      Q    What was your service asked to do with regard to

11  treatment of Robbie Quirello when he first came to the

12  hospital?

13      A    Because it sounded desperate, the way we

14  interpreted what we were asked to do was be there when he

15  arrived in case we need to put in a breathing tube or a

16  chest tube or some life threatening intervention that

17  requires extra skill and to conduct CPR, cardiopulmonary

18  resuscitation.  We weren't exactly asked to go down and

19  receive him, but that's what we proceeded to do.

20          Because I -- there were other sick patients in the

21  unit, I asked the fellow and the medical resident, pediatric

22  resident to who would be receiving the patient and taking

23  care of the patient if he survived his time in the emergency

24  room, I asked them to go down and be available when the baby

25  rolled through the door and then to let me know what we were

1  dealing with, if the baby was going to be admitted to the
2  intensive care unit.

3     Q    Who was the pediatric fellow that you asked to go
4  down to the emergency room?

5     A    Dr. Haque, Ikram Haque.

6     Q    Did he in fact go down there?

7     A    Yes.  He and the pediatric resident, senior
8  resident by the name of Brian Coleman, went down together
9  carrying the resuscitation box and anticipating that either
10 the baby was going to be dead on arrival or that they were
11 going to have to get involved with active resuscitation.

12    Q    Did you stay in communication with Dr. Haque after
13 he had gone down to the emergency room?

14    A    Yes.  I continued finishing up rounds.  We
15 accelerated the end of rounds and concentrated just on the
16 most immediate pressing problems of the patients still in
17 the intensive care unit.  And as I was finishing, I got a
18 call from the emergency room from Dr. Haque saying --

19         MR. TEDDER:  Objection, hearsay.

20         THE COURT:  Sustained.

21 BY MR. PENNYPACKER:

22    Q    After you received a telephone call from
23 Dr. Haque, what did you do?

24    A    I'm not sure how to answer this because what I did
25 was dependant on the information that he gave me from the

1   emergency room.

2       Q    All right.  Did you have a conversation with

3   Dr. Haque?

4       A    Yes, I did.

5       Q    What did you tell him?

6       A    I told him that if the baby were making voices,

7   making a noise around the endotracheal tube, that it was

8   clear that the endotracheal tube, the breathing tube that is

9   supposed to go into the baby's windpipe and through the

10  vocal cords, that it was clear that if the vocal cords were

11  making a noise, that the breathing tube was not where it was

12  supposed to be and that if the baby was pink and waving his

13  arms and legs and crying, it sounded as if the breathing

14  tube could be and should be removed.

15       So I authorized Dr. Haque to say the intensive

16  care opinion was that we should remove the breathing tube

17  that was in place and if it needed to be put back in, which

18  would be a judgment by the emergency room personnel, then we

19  would put it back in in the right hole.

20       Q    Were tests ordered for Robbie Quirello while he

21  was in the emergency room?

22       A    Yes.  The emergency room physician or physicians

23  did a routine panel.  Anytime a baby or anytime a person

24  comes in, but in particular a baby comes in with a history

25  of having been in dire straits, you do a panel of tests to

1   get a handle on what it is that put them in such bad

2   trouble.

3            So they did a complete blood count, they did a set

4   of electrolytes, which are the chemicals in the blood which

5   can get out of balance, they did some renal studies, BUN and

6   creatinine, they did an EKG, heart wave test, and they

7   requested a baby gram and a lateral neck and a CAT scan of

8   the head.

9        Q    Let's go back a little bit.

10       A    Oh, and they did a blood gas and a lactic acid.

11       Q    What is a renal scan?

12       A    A renal scan?

13       Q    You mentioned renal.  What is renal?

14       A    Oh, renal is the medical word for kidneys.  I

15   don't know why they don't just call it a kidney scan, but

16   it's a test of chemicals in the blood that are normally

17   excreted by functioning kidneys.  And if the kidneys aren't

18   working, then these chemicals build up and have a high level

19   in the blood.

20       Q    To explain what a couple of tests were for, why

21   was the baby gram ordered?

22       A    Baby gram is sort of a surveillance x-ray of the

23   chest, the head, the chest and the abdomen, and it can look

24   for such obvious problems -- it can be a surveillance for

25   obvious problems like a ruptured bowel where blood -- where

1    gas patterns in the belly are not normal gas patterns.  It

2    shows the sign of escaped air or rupture of the bowel.  And

3    it can look for blood in the chest or it can look for

4    collapsed lungs or a widened mediastinum.  Mediastinum is

5    the center part of the chest that contains the heart and big

6    blood vessels.  So if any of the big blood vessels are

7    ruptured or leaking, the mediastinum fills up with blood and

8    it looks very big on x-ray.  You can look for broken ribs.

9    You can get an idea of where the windpipe is and if anything

10   is pushing the windpipe to one side or the other.  You can

11   get an idea whether or not there is any dislocation of the

12   neck or abnormal appearance of the neck.

13       Q    Where were you when the child finished all of

14   these tests?

15       A    I had several additional calls from the emergency

16   room and then Dr. Haque and Dr. Coleman came up to join me

17   in the pod, which is the room that the baby was assigned to.

18   The intensive care unit has four pod rooms, each with six

19   beds, and the baby was assigned to go to pod three.  So the

20   nurses had set up his bed there and a medical student,

21   Dr. Coleman, Dr. Haque, the nurse that was involved and I

22   were sitting at the central table, which is next to the

23   laboratory machine, next to the telephone, waiting for the

24   baby to come up from radiology.

25       Q    Did the baby make it to PICU?

1    A    He did make it to PICU, but before he made it, we

2  had a call from radiology saying that he was on his way up

3  and that we should be alert to what they had seen.

4    Q    What time did he actually get to your floor?

5    A    The nurse's notes chalked, brought him in at

6  10:15.

7    Q    What was his condition as he came to the pediatric

8  intensive care unit?

9    A    Well, our first view of him was he was being

10  pushed in a rolling, open bassinet, one of those little

11  plastic jobs, and it was covered with a bath blanket.  So

12  all you could see was the monitor at the foot of the bed and

13  the bath blanket.  But what was startling about this, was

14  the male attendant who was pushing him was alarmed.  You

15  could see his facial expression that he was concerned about

16  the baby and he was moving very quickly and he said, I've

17  got trouble here.

18            MR. TEDDER:  Objection.

19            THE COURT:  The objection is sustained.

20  BY MR. PENNYPACKER:

21    Q    What did you do after you saw the baby?

22    A    After I saw the baby and the alarm on the person

23  pushing him, I went -- ran over to the bassinet and ripped

24  off the bath blanket and looked down at what we were dealing

25  with and I saw a baby who was seizing, was very stiff.  He

1   was so stiff you could pick him up by a leg and he would

2   stay stiff.  He was trying to cry.  He was intermittently

3   ah, ah, like this, but his breathing was not a normal

4   pattern.  It was a jerky pattern and his color was gray and

5   ashen and mottled.  It was just the way babies look when

6   they are very very distressed.

7           His eyes were open, but they were kind of rolled

8   back and they weren't convergent.  Normally your eyes travel

9   together.  You look to the right and both eyes go to the

10  right or you look to the left and both eyes go to the left.

11  But his eye -- one eye pointed up right and one eye pointed

12  up left and they were kind of rolled back.  He was obviously

13  from his color and from the way he was breathing and the way

14  he was kind of gurgling on his tongue or gasping on his

15  tongue, it was clear that he needed some immediate

16  intervention.

17          So I scooped up the baby, which detached him, took

18  him off the monitor that he was on and carried him in my own

19  arms quickly over to the bed while the nurses put a

20  resuscitation board on the bed anticipating that we were

21  about to have to do cardiopulmonary resuscitation on him.

22          So I put him down on the bed and the nurses very

23  quickly put on EKG pads while Dr. Haque was listening to his

24  chest and I was -- I took the Ambu bag, it's a bag that you

25  can squeeze and push air into somebody's lungs.  It's

1    connected up to oxygen.  So I put the Ambu bag on the baby's

2    face and began to blow oxygen into his face.

3          Now he was breathing.  He was breathing very hard,

4    but it wasn't a normal breathing and his biggest problem was

5    that he was seizing and his tongue was stiff.  So he wasn't

6    passing air in and out of his mouth or his nose very

7    effectively.

8          As soon as I applied some jaw thrusts or a

9    maneuver that anesthesiologists use to support the airway,

10   which is open up the mouth, make sure the tongue is sticking

11   out and not falling in the back of the throat and then I

12   applied pressurized oxygen to the baby's face, he turned

13   pinker.  He still seized, but he turned pinker and his

14   profusion, which profusion is circulation, the circulation

15   was terrible on him.  He was all mottled and his hands and

16   feet were cold.  He looked gray.  He looked ashen.  So his

17   color turned pink, but his profusion stayed awful looking.

18   Q    After you were able to get his color better and to

19   have the profusion increased, did you conduct an examination

20   of him at that time?

21   A    Well, while this was all going on, your eyes

22   automatically do an evaluation.  They're -- Babies aren't

23   very big, so you can get an impression just by a sweep of

24   your eyes over him.  So immediately I was able to see that

25   his eye exam was not right.  His eyes were going up and out.

1    They were rolled back and he -- the pupils just didn't look

2    right.  They didn't have the normal red reflex.

3           You know how when you take a flash picture of

4    somebody you get red eye?  Well, you can get an impression

5    of red eye when flourescent lights beam down on pupils and

6    he didn't have what he should have had, which was the

7    appearance of red eyes.  So immediately while the initial

8    resuscitation was going on, I recognized that something was

9    wrong inside his eyes.

10           I could also see that his arms and legs were

11   moving and were not obviously broken.  I could see that his

12   belly was not distended.  I could see that his -- He had a

13   diaper on, but very quickly I removed the diaper to see what

14   it looked like down there and to be able to feel his femoral

15   pulses.  I could see that he had normal genitals and that

16   there were no sign of trauma there.

17           I could see that his head was a normal -- He was a

18   beautiful baby.  His head was nicely shaped and that the

19   fontanel, the soft spot on the top of the head, was visibly

20   a little rounded, but when you felt it, it was still fairly

21   soft.

22      Q    Did you notice anything about his legs where there

23   had been some kind of a seizure going on?

24      A    Yes.  After we put in the breathing tube, which

25   was the next order of business because it was clear he was

1  going to need further resuscitation or attempts at

2  resuscitation, after the flurry of putting in the lines took

3  place, we -- I did a very careful physical exam on him

4  looking specifically for any signs of trauma all over his

5  whole body, his front, his back, his head, his genitals.  I

6  looked for any signs of sexual abuse.  The only thing that I

7  found was that he had had an intraosseous attempt in his

8  left -- just below his knee on the outside.  There was a

9  hole there and a little bit of bruising there.

10        And he had a suggestion of swelling over the

11  vertex, left occipital part of his skull, which is where my

12  hand is right now.  There wasn't any black and blue spot

13  there, but there was some swelling over that particular

14  area.

15     Q    Did you notice any bruises anywhere on his head?

16     A    Not black and blue spots except for right in this

17  part of the forehead, the prominence of the forehead, there

18  was a very small area that looked like an old bruise.  It

19  didn't look like a new bruise.  It looked like a dissolving,

20  very faint, brownish, brownish, grayish bruise.  And he

21  had -- His eyelids were also striking in the sense that they

22  had a fine web of capillaries in the eyelids themselves.

23  There was pronounced redness in the eyelids themselves,

24  which I was -- I was uncertain about how to interpret that.

25        I looked very carefully for signs of

1  strangulation, whether or not there was any black and blue

2  marks on the neck.  There were no black and blue marks on

3  the neck.  There was no crunchiness of the neck.  I opened

4  the mouth and looked inside the mouth for signs of broken

5  blood vessels.

6           Sometimes when there's strangulation, the blood

7  vessels in the eyes break in the conjunctivae, which is the

8  film over the eyes that turns red if you get a foreign body

9  in your eye.  Sometimes with strangulation or cutting off of

10 the venous supply to the head, these little tiny blood

11 vessels will break and it causes something called petechia.

12 So I looked in his mouth.  I looked in the back of his

13 throat.  I looked inside his eyelids for signs of petechia

14 and I didn't see any.

15      Q    You mentioned that you examined the fontanel.

16 Were you able to make a determination as to whether or not

17 at that time he had any increased intracranial pressure?

18      A    He was certainly at risk for increased

19 intracranial pressure, so I was looking specifically for the

20 signs that we see of increased intracranial pressure.  One

21 is how tense the fontanel is.  The fontanel is where there

22 are no -- A baby is born with some sliding bones in his

23 skull.  The bones are not fused together.  They're separated

24 by cartilage.  This is an intentional part of the design of

25 getting born.  It's so the bones can overlap as the baby

1    passes through the birth canal.  So these bones don't get a

2    firm attachment to each other until well into the first year

3    of life.

4            The fontanel is the corner where four big bones

5    join together and it leaves a sort of diamond shaped area

6    right on the top of the head.  If there's pressure in the

7    brain, it will push up on the dura.  Dura is a Latin word

8    that means hard and it's a hard, fibrous sheath that covers

9    the brain that lies underneath the skull.  So the fontanel

10   is consisted of brain, and then dura, and then some fat, and

11   then some skin and hair.  So it's a very sensitive way of

12   seeing what the pressure in the brain is.

13           Normally in a resting state the fontanel is flat

14   and soft.  If the baby is dehydrated, the fontanel will sink

15   down because the water in the brain is less than it should

16   be.  If the baby is crying or having a bowel movement, that

17   increases the venous pressure in the system, so the fontanel

18   will pop up a little bit.  And that's about what Robbie's

19   was doing.  It was popping up a little bit, but it wasn't

20   rock hard at that point.

21           If there is a lot of pressure inside the brain,

22   next thing that happens is that the pressure, the brain

23   pressure pushes out on the dura and the dura pushes out on

24   the skull until the skull can't give anymore.  So the bones

25   of the skull start to separate the way they had done when he

1   would be passing through the birth canal, and the fontanel

2   stretches and stretches and stretches until it can't stretch

3   anymore.  So you can see it on the top of the head like a

4   muffin top and when you push on it, it doesn't dent in.

5   It's no longer soft.  It's very firm, firmer than a hard

6   boiled egg.  It's firm like a peach is firm and that's what

7   I was looking for.

8          The time he came into the unit, Robbie had a

9   little visible protrusion, but it was still soft and

10  depressable.  Also when somebody has an increased

11  intracranial pressure or increased pressure inside the head

12  for whatever reason, their heart rate gets abnormal.  It

13  usually goes down, the blood pressure goes up, the eyes do a

14  motion that's called sunsetting where they look down.  So

15  all you can see is the colored part of the eye like a sun on

16  a horizon.  And then there are abnormalities of the

17  breathing pattern that progress on.

18          So it's called Cushing's triad or the three

19  different elements that you see physically when somebody has

20  increased intracranial pressure, is low heart rate, high

21  blood pressure, and abnormal breathing pattern.  And Robbie,

22  at the time of admission, did not show these signs.

23      Q    Would you say that he did not have increased

24  intracranial pressure at that time?

25      A    He did not have significantly increased

1    intracranial pressure at that time.

2        Q    After this examination and what you've done to him

3    immediately as he comes into the pediatric intensive care

4    unit, is he stabilized at that point?

5        A    Sort of.  We knew that we were in for a very rocky

6    road with an uncertain recovery.  But after the breathing

7    tube was put in by Dr. Haque and an arterial line -- An

8    arterial line is an IV that goes into an artery.  The artery

9    is a blood vessel that comes from the heart that carries

10   oxygenated blood and has a pulse to it.

11            So an arterial line is a pressure transducer.

12   It's an IV that sticks right into the artery, stays turned

13   on all the time and it measures the pressure that's

14   generated by each heart contraction.  It measures the blood

15   pressure second to second and it also acts like a spigot.

16   You can turn on the IV and because the blood is under

17   pressure, you can get a blood sample very easily without

18   having to stick somebody or put a tourniquet on or bother

19   them.  It's a painless way of getting blood samples that are

20   very accurate blood samples and getting the blood samples

21   quickly.

22            So we put in the breathing tube, we put in the

23   arterial line, we put in a big venous line because we might

24   need to give him blood emergently or might need to give him

25   fluids or medications emergently.  So we prepared him for

1    the eventuality that things were going to go downhill.  So

2    that's what I would say.  And he was stable.  He was stably

3    unstable.

4        Q    Were you making preparations for the worst to

5    happen?

6        A    Yes.

7        Q    Did you give him any drugs at that time?

8        A    In order to make it easier for the ventilator to

9    work and easier to put in the breathing tube and safer to

10   put in the breathing tube, we gave him two medications for

11   the purpose of putting in the breathing tube.  The first

12   one, veceronium, is a drug that causes the muscles to not

13   work.  It paralyzes the muscles for a temporary period of

14   time, about a half an hour period of time.  Robbie was so

15   stiff and his tongue was so abnormal that we needed to cause

16   him to relax in order to be able to put in the breathing

17   tube without traumatizing him.

18            And the second drug that we used was penothal.

19   Penothal is an anesthetic agent.  It makes you lose

20   consciousness.  It lowers your brain pressure if you're

21   having a problem of high brain pressure and it's particular

22   use in this case is that it's an antiseizure medication.  It

23   belongs to the barbiturate class and the barbiturates are

24   anticonvulsants or antiseizure medications and Robbie was

25   seizing.  Seizing is bad for the brain, it's bad for the

1   airway, it's bad for the blood pressure, it uses up oxygen

2   that doesn't need to be used up.  So we wanted to stop the

3   seizures and that's why we used the penothal.

4        Q    Did you remain in the PICU at that time?

5        A    When the breathing -- once the breathing tube was

6   in and I could see that he was getting good oxygen, he had

7   acceptable blood pressure, and he wasn't about to have a

8   cardiac arrest, I grabbed the medical student and the

9   pediatric resident and literally ran down to -- I called the

10  neurosurgical fellow on call and said, We have this

11  situation.  I think we have a very significant bleed in the

12  brain right now.  Meet me down in radiology to look at the

13  scans.

14            So part of the team went running down to radiology

15  where we met first with the pediatric radiologist to look at

16  the scans, and then went over to the neuroradiologist to

17  look at the scans.

18       Q    Based upon your meeting with those radiologists

19  and your review of the scans, did you ask for anything else

20  to be done at that time?  Did you review any other scans

21  that had already been done?

22       A    Yes.  We reviewed the chest x-ray that had already

23  been done and the lateral neck that had already been done

24  and those were -- they were basically normal.  There was no

25  evidence of aspiration, there was no evidence of chest

612

1    trauma, there was no widened mediastinum.  It didn't look

2    like our problem was in the chest.  It looked like the

3    problem was in the head.

4         Q    What did the CAT scans show?

5         A    There was a very glaring, very obvious appearance

6    of fresh blood and the fresh blood was on both sides of the

7    brain and in both the front part and a little bit in the

8    back part.  So it was in different locations on the brain.

9    And the fresh blood looked to be in two different

10   compartments.  It looked like it was -- there was some above

11   the dura, this hard coating to the top of the brain, and it

12   looked like there was some below the dura.

13        In addition to the blood that was below the dura,

14   there were several on both sides of the brain, clear areas

15   where there shouldn't have been any clear areas.  And these

16   clear areas were surrounded by a membrane, so you could

17   distinctly see where the clear areas were.

18        The significance of clear on a CAT scan or an MRI,

19   either one, is that it's a water density.  Blood shows up as

20   a bright white.  Fresh blood shows up as a bright white.

21   Aging blood shows up as a gray.  And spinal fluid or clear

22   fluid shows up as a dark gray or a black sort of appearance.

23   So in the front part of Robbie's brain on both sides were

24   collections of clear fluid called hygromas.

25        It was also remarkable that on the scan you could

1    see both of the ventricles.  There's a system of spinal
2    fluid inside the brain that are called ventricles and these
3    are bags, irregularly shaped bags on both the right and the
4    left side that collect the spinal fluid and circulate the
5    spinal fluid all around the brain and down into the spinal
6    cord and then back up to the brain.  The purpose of the
7    spinal fluid is to cushion the brain and to be a bath to
8    carry away bad stuff, to keep the cells hydrated, moistened.
9           Well, it was very important that we saw the
10   presence of ventricles, all of them, all of them wide open,
11   none of them plugged up, none of them the source of the
12   problem that Robbie was dealing with, and no blood within
13   the ventricles themselves.
14          We could also see that the midline division, which
15   is made up of double layers of dura, the midline position is
16   called falx, F-A-L-X, and this is a Latin word for sickle
17   because it looks exactly like a sickle.  It's a half moon
18   shape of very tough, fibrous material that exactly divides
19   the halves of the brain.  If there is big pressure on one
20   side of the brain and not big pressure on the other side of
21   the brain, it will squish up.  The brain that's injured will
22   squish up against the falx and you can see this on the CAT
23   scan because there will be a bulging of the affected side of
24   the brain into the nonaffected side of the brain.
25          It's one of the signs of a subdural under pressure

1    or an epidural under pressure or direct blunt trauma to the

2    brain which has caused brain swelling on one side.  So it's

3    a pressure measurement and there was no evidence of mass

4    affect or a midline shift.

5             Another important --

6             MR. TEDDER:  Your Honor, I object to the narrative

7        testimony here.

8             THE COURT:  The objection is overruled.  You can

9        go ahead.

10             THE WITNESS:  Another important aspect of -- Let's

11        see, where was I?  I was talking about the ventricles

12        were open, mass affect -- Oh, another important thing

13        to determine if there's pressure in the brain is, as

14        the brain itself swells up, it loses some of it's

15        geography on the surface.

16             The whole surface of the brain is made up of a

17        very complex series of hills and valleys.  The more

18        swelling in the brain, the more the valleys are

19        flattened out and the closer the brain gets to the

20        dura, the surface of the dura, which is very smooth.

21             So if a brain swelling is under pressure, you'll

22        see compromised little, tiny ventricles or no

23        ventricles at all and you'll see a flat surface.  This

24        was not the case in Robbie's initial CT or even in the

25        one that was done later on that day.  There was no

1          radiographic evidence of increased intracranial

2          pressure.

3     BY MR. PENNYPACKER:

4          Q     Based upon the review of the CAT scans, did you

5     consider whether or not surgery was an appropriate

6     intervention for Robbie at that time?

7          A     Yes.  That was the immediate concern.  If there

8     had been ongoing rapid bleeding, as in an epidural hematoma

9     or bleeding above the epidural, he would need to have a

10    release of the pressure through an operation.  Or if the

11    ventricles, these collections of fluids had been plugged up

12    and they were the source of pressure, then a drain would

13    need to be put into the ventricles to bypass the blood.  Or

14    if there had been a collapse in the skull, a depressed skull

15    fracture or a sharp bone that had been poked into the brain

16    itself, it would need to be removed and the brain area would

17    need to be cleaned off and this would be a reason for

18    surgery.

19          So the reason I had taken the neurosurgical fellow

20    down there and the reason it was so vitally important to

21    find out what was on the scan, was because once the

22    catastrophe has happened, you don't have very much time to

23    intervene before irreparable damage can take place.

24          Q     Dr. Dickison, what is an MRI?

25          A     It stands for magnetic resonance imaging and it's

1   a very fancy, relatively new generation technique, which was

2   actually funded by the Beatles interestingly in history, but

3   this is a technique where the baby or the individual is

4   inserted into a very very high powered magnet.  It looks

5   like a giant doughnut and it is an incredibly high powered

6   magnet.

7           Now magnets can organize matter, especially water

8   in a certain orientation and it can generate very high

9   quality images of the same things that we see on the CAT

10  scan, but the resolution is much better.  An MRI takes

11  between 45 minutes and one and a half hours to do.  It

12  involves putting the patient into the middle of this huge

13  doughnut apparatus where you can't see the patient and

14  because it's made out of magnetic material, nothing magnetic

15  can go into the room.  You can't take a magnetic pen, you

16  can't take a bar, a clip in the hair.  Underwire bras can be

17  pulled towards the magnet.  You can't take a penile

18  prosthesis in there.

19          I'm doing some humorous things, but there are some

20  very not humorous things that we ordinarily have in the

21  intensive care unit that are important to the care of a

22  baby, such as the infusion pumps that are giving them

23  medications.  Those have ferro magnetic materials in them

24  and if you took one of these infusion pumps into the MRI, it

25  would fly across the room and stick on the MRI.

1          In fact, about two years ago a six year old little
2    boy who had had a craniotomy, a brain surgery in Canada --
3          MR. TEDDER:  Your Honor, I object to this
4      testimony.  It's irrelevant talking about another
5      patient, another case, another time.
6          THE COURT:  All right.  The objection is
7      sustained.  You need to rephrase the question.
8          THE WITNESS:  Okay.
9    BY MR. PENNYPACKER:
10         Q     Did you request an MRI for Robbie?
11         A     No, I didn't, because we -- it was not medically
12   necessary, it poses risks to him, it takes him away from the
13   monitoring, puts him in a dark place where he can't be seen
14   and confines him there for up to an hour.  It involves
15   pushing him down from the pediatric intensive care unit,
16   which is on the second floor, out through the emergency
17   room, across the street, into a whole separate building,
18   exposes him to cold and it's a -- even though it gives a
19   very nice image, it didn't tell us anything whatsoever that
20   would alter our course of treatment for him or give a clue
21   to his diagnosis.
22         Q     Are MRI's expensive?
23         A     Yes, they are.  The minimum doing of them is about
24   a thousand dollars and the radiologist's interpretation of
25   them is on top of that.  It's about another thousand

1   dollars.  Plus you're paying for the time of the transport

2   individuals, plus you're using up equipment that he wouldn't

3   have to use if -- like the transport ventilator, a normal

4   ventilator -- a baby ventilator can't go into the MRI, so

5   you have to charge the patient for another type of

6   ventilator, different type of infusion pumps, different

7   monitoring.  It's -- Overall it costs about $5,000.

8       Q    Was the cost a factor to you in making a decision

9   whether or not to request an MRI?

10      A    Absolutely not.  The factor that was most

11  determining to me was I knew what we were dealing with.  I

12  knew it was not a surgical emergency and since I do the

13  anesthesia for MRI's all the time, I was very aware of the

14  risk that it posed to Robbie and didn't think he needed to

15  undergo this risk.

16      Q    If you had put Robbie in the MRI and he had

17  another seizure or cardiac arrest, could he have died?

18      A    Yes.

19      Q    You mentioned that there were a series of blood

20  tests ordered in the emergency room.  Were any of those

21  tests relevant to you in terms of deciding whether or not

22  there had been a period of possible oxygen deprivation just

23  prior to Robbie coming to the hospital?

24      A    Yes.  As I mentioned, there's a surveillance panel

25  that is done when a child arrives in bad straits.  It's a

1    blood count and it's a set of electrolytes and it's the

2    kidney function tests.  But most importantly in the

3    surveillance is a blood gas.

4         A blood gas is a sample of blood that comes from

5    an artery.  So it comes directly from the heart and lungs.

6    It's circulating blood, rapidly circulating blood and in it

7    you can look at the amount of carbon dioxide that -- The

8    lungs have a function of bringing in oxygen and breathing

9    out carbon dioxide.  So you can look at the level of carbon

10   dioxide in the blood gas and look at the level of oxygen in

11   the blood gas and look at the level of acid in the blood

12   gas.

13        Now acid is a very important concept.  The buildup

14   of acid is a very important concept.  The body is geared to

15   regulate it's blood Ph between very narrow ranges.  The

16   normal range is between 7.35 and 7.45.  It -- The body can

17   adjust it's amount of acid or how it buffers acid by

18   breathing fast because carbon dioxide is related to acid.

19   Acid breaks down to carbon dioxide and water.  So if the

20   body perceives that it's got too much carbon dioxide on

21   board, then the brain says, okay lungs, breathe fast and

22   breathe hard and breathe off extra carbon dioxide so that

23   you are combatting and neutralizing this excess amount of

24   acid.

25        The acid is usually a byproduct of intermediate

1    metabolism, which is a big mouthful.  It means that when
2    faced with a situation of no oxygen, there is some backup
3    systems about how the cell is gonna continue living.  The
4    cell is the individual components of various tissues.  The
5    cell would like to have oxygen, but if it doesn't have
6    oxygen, its got some alternate methods of generating energy
7    and carrying on the business of being a cell.
8            These alternate methods kick out excess acid, they
9    kick out lactic acid, they can kick out some ketones, they
10   can kick out other types of acid, but the bottom line is,
11   that the acid level in the blood rises.  In the blood gas
12   you can see if there has been an exposure to a situation of
13   too much acid in the blood.
14           Another way of measuring whether or not there's
15   been a period of time of no oxygen metabolism, an aerobic
16   metabolism, is to look at one of the most common byproducts
17   of this alternate method of keeping the cell running, and
18   that's lactate.  That was another part of the screening
19   test.
20      Q    What did the test results that Robbie Quirello
21   had, what were the results and your interpretation as far as
22   whether or not he had a period where he didn't have enough
23   oxygen?
24      A    In the emergency room his initial blood gas had a
25   Ph of 7.35, which is the low end of the normal range of Ph.

1    It had a partial pressure of carbon dioxide of 35 and normal

2    is 40.  So his brain was telling his lungs to do it, to

3    breathe hard and breathe fast and try to neutralize that

4    little bit of acid and his lungs were behaving.  This was

5    not a lung failure.  This was an acid production state that

6    it was dealing with of perturbing of the normal state of

7    acid balance.

8            He had an oxygen, on supplemental oxygen, and then

9    a partial pressure of oxygen of 196, as I recall, and

10   normal, yours and mine is somewhere between 90 and 100.  So

11   he had twice the normal amount of oxygen breathing some

12   supplemental oxygen through a mask.

13           So what we had here was a mild degree of metabolic

14   acidosis, meaning it's produced by the cells as an alternate

15   method of getting energy for the cells and very good

16   breathing, excellent lung function.  No evidence of low

17   oxygen, no evidence of respiratory failure or accumulation

18   of carbon dioxide.  It was essentially a normal, only mildly

19   abnormal blood gas, very reassuring.

20       Q    What time were those blood gases logged?

21       A    They were logged in to the laboratory at 12

22   minutes after 10:00.  I don't know what time they were taken

23   before that.

24       Q    What is ischemia?

25       A    Ischemia is deprivation of circulation, inadequate

1   circulation to go to a tissue.  Circulation is important not

2   just for the delivery of oxygen, but there's delivery of

3   other things that go to the individual cells.  There's

4   delivery of sugar, for example, and there's delivery of

5   appropriate chemicals.  The sodium and potassium and calcium

6   and magnesium are all the other chemicals that are in our

7   normal bath of cells.

8          So the circulation delivers that and then takes it

9   away on the venous side.  It comes from the heart, goes

10  through the lungs, and it's delivered out there on the

11  arterial side.  And then after its bathed the cells, it's

12  gathered backup and returned to the system for recycling

13  through the venous system.

14     Q    Did you test for this in Robbie?

15     A    Ischemia is when not enough delivery is made or

16  something chokes up the return.  So, yes, we looked

17  specifically for ischemia because it's ischemia rather than

18  oxygen deficiency alone which is gonna cause cell damage,

19  brain damage, or heart damage, or intestine damage, or

20  fingers and toes damage.

21     Q    What is hypoxia?

22     A    Hypoxia is, at a tissue level there isn't enough

23  oxygen.  Hypoxemia is, there isn't enough measured oxygen in

24  the circulating blood.

25     Q    What is anoxia?

1    A    Anoxia means the person has been put into a total

2 no oxygen availability situation either by suffocation or by

3 being put, say, in the trunk of a car or refrigerator that

4 has been closed so the oxygen is used up, or there's

5 complete cessation of effort of breathing.  And after the

6 body has used up the available oxygen, there's no more

7 oxygen to give.

8    Q    Were Robbie's blood gas levels consistent with

9 having suffered from hypoxia or anoxia?

10   A    No.  The blood gas -- The acid in the blood gas

11 was a little low suggesting that he had a significant event

12 that was either low oxygen or low circulation, but was

13 probably low circulation.  More likely low circulation

14 rather than low oxygen.

15   Q    What does acidotic mean?

16   A    An accumulation of acid in the blood that exceeds

17 the measurement of 7.45 Ph.

18   Q    And did Robbie have acid above that level?

19   A    Yes, he did have elevated acid, but his lungs were

20 working so normally and so well, he was able to exhale off

21 or compensate for his situation of a little bit of excess

22 acid.

23   Q    Were the blood gas results that were obtained at

24 10:12 a.m. consistent with Robbie having actually been in

25 full arrest between the times of 9:20 a.m. and 9:34 a.m.?

1    A    Full arrest means there is no heartbeat, no blood

2  pressure, no breathing, no exchange of oxygen.  It means the

3  person is essentially completely dead.  In order to have

4  this wonderful of a blood gas with a history of having been

5  essentially dead in the nearby time period, you have to

6  speculate -- you have to explain that by saying he had a

7  miraculous and incredibly good resuscitation.  He had CPR,

8  he had breathing tubes, somebody took over the course of

9  breathing, somebody cleared out his airway, that he had to

10  have been extraordinarily well resuscitated.  Otherwise he

11  didn't have it.  He was not in full arrest at the time that

12  this happened.

13    Q    Is the fact that his endotracheal tube was not

14  properly inserted, didn't appear to be properly inserted at

15  the time he got to the emergency room, indicate to you that

16  he had been properly resuscitated?

17    A    No.  The fact that he was pink, crying, waving his

18  arms and legs, not needing a breathing tube, breathing very

19  well despite the presence of a breathing tube that was not

20  in his windpipe, says that he did not -- that his initial

21  event was not a respiratory event or a cardiac event.  He

22  didn't resuscitate himself.

23    Q    What is the body's response to an oxygen delivery

24  that is not working the way it should be?

25    A    Again that has to do with the change of

1    metabolism.  When oxygen delivery does not work, is not

2    adequate or outstrips the needs, then alternate methods of

3    metabolism are brought into play and alternate chemicals are

4    called out.  The body has a stress response.  Sugar is

5    elevated, blood pressure is elevated, adrenaline gets pumped

6    out.  A lot of things change in a stress response.

7         Q    What is shunting?

8         A    When the stress response kicks in, when the

9    adrenaline, adrenaline surge or epinephrine surge kicks in,

10   all the blood vessels in the body work together to shunt the

11   blood away from the more disposable tissues, to the more

12   vital tissues, and the brain is by far and away the most

13   vital tissue.  So the body begins to sacrifice the less

14   vital tissues.

15        The circulation to the intestines clamps down.  So

16   blood stops going to the intestines.  And then the

17   circulation of the kidneys clamps down.  So not much blood

18   goes to the kidneys.  Instead it's being shunted to the head

19   or redirected to the head.  And the longer the stress state

20   goes on and the more dire the situation is, the more the

21   outside circulation just completely clamps down so that the

22   overall appearance is gray, ashen, no profusion, and all the

23   heart circulation is directed to the head.

24        So the brain has preference.  It has priority over

25   circulation.  The intestines lose out, the kidneys take a

1   hit, the liver stops circulating in the same way that it

2   normally circulates and you can have liver damage, the heart

3   stops circulating in the normal way and you can have heart

4   damage.

5        Q    Were the blood gases and blood test results that

6   were obtained in the emergency room consistent with all of

7   those organs having been deprived of oxygen for any period

8   of time?

9        A    No.

10       Q    Was there a test for cardiac enzymes?

11       A    Yes.  After we got back to the intensive care unit

12   and put in the arterial line, the first set of tests that we

13   did measured cardiac enzymes and other surveillance of the

14   organs, liver function tests, kidney function tests,

15   pancreatic function tests, and just it was a surveillance to

16   see if there had been an ischemic hit on any of those

17   organs.

18            In particular, we were looking at the cardiac

19   enzymes because the heart is preserved second to the brain.

20   So if there is something that's affected the brain as badly

21   as Robbie's head was affected, we wanted to see if the heart

22   was as well affected.

23            The results came back rather surprising in the

24   sense that he had this devastating head injury, a terrible

25   situation with his head, but no evidence whatsoever of liver

1  injury, no evidence of deprived circulation to his

2  intestine, no bleeding in his intestines, no problems with

3  his blood clotting, no congestion in his lungs, no problems

4  with his lungs developing a reaction to a period of low

5  profusion, no problems with circulation to the tips of his

6  fingers and toes.  He maintained profusion to all of those.

7  No problems with sluffing of the gut.

8          The only thing outside of his brain that showed

9  any transient passing elevation of injury, cellular injury,

10  was he had slightly elevated cardiac enzymes and an

11  elevation of a substance called triponin I.  Triponin I is

12  an ingredient in heart muscle inards.  It's one of the

13  constituents of the heart muscle itself.  Enzymes come

14  from -- are chemicals that are facilitators that come from

15  inside cells.  They don't live in the bloodstream.  They

16  live inside of cells.

17          So if there are enzymes that normally live in the

18  liver cell and the liver cell is hurt, it releases the

19  enzymes out into the bloodstream and you can measure them.

20  Well, he had some cardiac enzymes that were elevated.  These

21  cardiac enzymes are not specific for heart.  They can come

22  from other muscles like arm muscle or leg muscle, but the

23  ratio of the heart muscle, heart enzymes to the muscle

24  enzymes was a little elevated.  Now this can be --

25      Q    What does that indicate to you if there's elevated

1    cardiac enzymes?

2         A    It suggests that there had been a myocardial

3    injury of some fashion.  Now since all the rest of his

4    organs didn't show any sign of an ischemic hit or an oxygen

5    deprivation hit, that leaves trauma, trauma or poisoning.

6    And trauma as would happen with shaking the baby or as would

7    happen with CPR or a direct blow to the chest, is a

8    possibility for why Robbie's cardiac enzymes were slightly

9    elevated and the triponin was initially high.

10             The fact that it would have resolved itself,

11   rather showed a trend to the better the following day, said

12   that the situation happened the morning of August 12th and

13   did not -- was not a continuing process.

14        Q    Is that August 2nd, not August 12th?

15        A    Pardon me?

16        Q    You said August 12th.

17        A    Oh, 2nd.

18        Q    Was there evidence that there had been some

19   circulation downtime that was consistent with a four or five

20   minute period?

21        A    No.  Only the mild acidosis.

22        Q    Is there medical evidence that he did not have a

23   downtime four or five minutes of circulation?

24        A    Yes, there's ample evidence.

25        Q    What was that?

1      A    Again it was the sparing of all the other organs

2    that would have shown -- they would have been the canaries

3    in the mine.  If he had had a downtime with no circulation,

4    he should have had intestinal injury, he should have had

5    liver injury, he should have had kidney compromise or at

6    least blood in his urine and he had none of these.

7          So the conclusion is, he did not have a

8    significant period of downtime like a cardiac arrest or a

9    total loss of airway that resulted in his catastrophic

10   presentation to the emergency room.

11     Q    Did you examine Robbie's eyes?

12     A    Yes, I did.

13     Q    What did you see?

14     A    I -- The first thing I noticed is that they were

15   pointing the wrong directions.  And the second thing I

16   noticed is that the pupils were different sizes one from the

17   other.  This is significant because it suggests that there's

18   something wrong on one side of the brain that is different

19   than on the other side of the brain.  The third thing I

20   noticed was just a sort of gestalt, that the reflection in

21   his eyes was not right.  This is the red reflex, was just

22   not right.

23          Then after the dust had settled and we got the

24   breathing tube in and he was relatively stable, I looked in

25   his eyes with an ophthalmoscope, which is a specialized

1    instrument that magnifies the back of the eyes and you can

2    set it so that you have several different degrees of

3    magnification.  You can look all around in the back of the

4    eyes.

5           So I used the ophthalmoscope to look in Robbie's

6    eyes and found that I couldn't see the back of his eyes

7    because the inside of his eyes were so full of blood.  I

8    couldn't see the optic nerve, I couldn't see the blood

9    vessels and the retina, I couldn't see the retina or the

10   macula or any of the structures that you normally see in the

11   back of the eye.

12        Q    What is that called?

13        A    Retinal hemorrhage.  That's a vitreal hemorrhage.

14   It's when the bleeding is on the inside of the gooey part of

15   the eyeball and obscures the distance between the back of

16   the lens and the retina.  Now in the front of the eye, there

17   was no signs of problem.

18        Q    Were you made aware of how Robbie may have been

19   injured?

20        A    Yes.  I interviewed Robbie's mother at the time of

21   admission and I was given an explanation of the ways that he

22   was thought to be injured.  I was given some stories about

23   how he could have become the way he was.

24        Q    Are you familiar with the term shaken baby

25   syndrome?

1     A    Yes.

2     Q    What are the three elements in order to make a

3  diagnosis of shaken baby syndrome?  What do you have to see?

4     A    You have to see an unexplained, sudden brain

5  injury, retinal hemorrhages, and the third component is a

6  story that is suspicious and does not fit the mechanism of

7  injury.

8     Q    Did you see brain injury in robbery?

9     A    Yes, serious brain injury.

10     Q    Did you see retinal hemorrhages?

11     A    Yes.

12     Q    Was the story that you were given, did it match

13  this mechanism of injury?

14     A    None of the stories I was given matched the

15  mechanism of injury.

16     Q    Do we have a computer animation that would assist

17  you in explaining the mechanisms of shaken baby syndrome to

18  the jury?

19     A    Yes.

20     Q    Would it assist you in explaining how Robbie was

21  injured?

22     A    Yes.

23          MR. PENNYPACKER:  Your Honor, at this time I would

24          like to show this or take a break, whatever the Court's

25          pleasure is.

1          MR. TEDDER:  I object to the animation being

2     shown, your Honor.

3          THE COURT:  Based upon the fact that we have been

4     going an hour, we'll go ahead and take a 15 minute

5     recess.

6          (Out of the presence of the jury:)

7          THE COURT:  The court will be cleared during the

8     recess.

9          MR. PENNYPACKER:  Your Honor, may we have

10    permission to set this up?

11         THE COURT:  What?

12         MR. PENNYPACKER:  May we have permission to set

13    this up?

14         MR. TEDDER:  Your Honor, may I come back in after

15    I go to the restroom?  I mean, I'm trying to work.  I'm

16    barred from the courtroom.  I'm an attorney.  I'm not

17    gonna mess with the evidence.

18         THE COURT:  Mr. Tedder, as you well know, the rule

19    about securing the courtroom is to ensure your client

20    gets a fair trial.  Now I can't go on the record and

21    qualify individuals based upon me knowing they're good

22    guys.  The appellate courts have no way to do that.

23    The only way to determine who has authority to secure

24    the courtroom can be about position, not personality or

25    persons.  Therefore, the only individuals who can take

1    responsibility for securing the courtroom would include

2    the bailiff, the clerk or the judge.

3        Now so long as either a bailiff, a clerk or a

4    judge is in the courtroom, then of course the attorney

5    can be present and the court reporter can be present.

6    It doesn't have anything to do with me thinking any of

7    you are gonna tamper with the evidence or the

8    notebooks.  It has to do with having the record be

9    clear in case there is a need for the appellate courts

10    to try to anticipate what was going on in court.

11        MR. TEDDER:  You answered my question, Judge, as

12    long as I can get back in the court with a bailiff.

13        THE COURT:  The bailiff of course has to take

14    responsibility for the jury and I am gonna ask if you

15    have enough personnel, you escort the smokers.  Good

16    enough.  Mr. Clerk, I know you need to take a break

17    also, but if you can get someone to cover, that's fine.

18    Otherwise, I'll ask that all persons vacate the

19    courtroom.

20        (Recess 10:45 - 10:59.)

21        THE COURT:  Yes, ma'am, Doctor, you can come on

22    up.  Now is there anything we need to put on the record

23    before the jury comes back in?

24        MR. GROLAND:  Not for the defense.

25        MR. TEDDER:  Well, I want to say, your Honor, once

1    again we object to these computer generated images

2    being presented to the jury and we also object and ask

3    to strike the comment the Doctor made regarding her

4    analysis of shaken baby in this case that was

5    previously offered.

6         THE COURT:  Okay.  The motion to strike is denied.

7    The objection is denied again.  I do have one concern.

8    I'm not sure that we can address it in advance, but

9    since I am alerted to it, I might as well advise both

10   the state and defense about it.  The last thing that

11   you said was, Will this animation assist you in

12   explaining shaken baby to the jury and to explain what

13   happened to Robbie.

14        MR. PENNYPACKER:  Does your Honor want to give a

15   limine instruction before we show it?

16        THE COURT:  I am and then, of course, I need to

17   know how far you're going to go because this

18   demonstration cannot be used according to the rulings

19   that have been made up to this point to say these

20   events happened to Robbie as a demonstration of what

21   happened to Robbie.  This animation can be used as an

22   explanation of shaken baby syndrome and then, of

23   course, the diagnosis can be made, but --

24        MR. PENNYPACKER:  I don't expect that Dr. Dickison

25   is going to say this is exactly what happened to Robbie

1   until later.  She is not gonna say this is what

2   happened to Robbie here, here, here and here, but we

3   are gonna, after we finish with the animation, going to

4   explain.

5           MR. GROLAND:  Your Honor, you also did indicate

6   that defense can voir dire as to her knowledge of

7   shaken baby syndrome before she offers an opinion based

8   upon what she knows about this case and with the

9   assistance of that presentation.  So I don't know when

10  the appropriate time the Court feels is --

11          THE COURT:  No, that was not the ruling.  The

12  ruling was that if you have any objection to this

13  Doctor giving opinion testimony, that you would have

14  the opportunity to voir dire her prior to her being

15  qualified to give expert opinion.  That opportunity has

16  passed.

17          MR. GROLAND:  Your Honor, I believe Mr. Tedder

18  said that we have no objection because she's a

19  pediatric physician and an anesthesiologist and board

20  certified in two other areas.  We did not object to

21  that.  Mr. Tedder did not object to that.  But as to

22  her being able with those board certifications to give

23  an opinion -- she's not even a radiologist -- on shaken

24  baby syndrome, we certainly believe that we reserved

25  the right to object to that and the Court did say

1      something about voir dire when we get to that point.   I

2      don't believe we've actually gotten to that point where

3      the state has asked her that question.   That's why I'm

4      bringing it up at this point.

5           THE COURT:   Well, once an expert is qualified in

6      an area, then the expert tells us whether or not shaken

7      baby syndrome falls within that area.   And if this

8      doctor testifies that this falls within her area of

9      expertise, then you are limited to cross-examination.

10     You have no opportunity to voir dire her at this point.

11          MR. GROLAND:   Okay.

12          THE COURT:   Anything else we can put on the

13     record?

14          MR. PENNYPACKER:   Are you gonna read the limine

15     instruction before she comes down to actually run

16     through the animation?

17          THE COURT:   And you're ready to start the

18     animation now?

19          MR. PENNYPACKER:   Yes, ma'am.

20          THE COURT:   So, yes, I'm gonna read the

21     instruction to the jury.

22          MS. SINGER:   Before the jury comes back, just so

23     Dr. Dickison understands the ruling about the

24     animation, Dr. Dickison, you cannot relate this

25     animation to your patient.   You can only use it to

1 further educate the jury on the diagnosis of shaken

2 baby syndrome.  Understand that?

3  THE WITNESS:  Yes.

4  MS. SINGER:  So all of your answers and your

5 comments must be general in nature and not specific to

6 this case.  Are you able to do that?

7  THE WITNESS:  Yes.

8  MS. SINGER:  Is that correct, your Honor?  Is that

9 the ruling?

10  THE COURT:  That's not the way I would have worded

11 it, but I believe the Doctor's clear.

12  MS. SINGER:  All right.

13  THE COURT:  This is medical education and then

14 there's a diagnosis that she did in the hospital.

15  MS. SINGER:  Correct.

16  THE COURT:  All right.  Go ahead and bring the

17 jury back in.

18  (Before the jury:)

19  THE COURT:  Members of the jury, the state is

20 about to use a computer animation.  It is meant to aid

21 you in understanding the opinion testimony in this

22 case.  The animation itself is not evidence and is not

23 to be considered by you as any evidence in this case.

24 With that, Mr. Pennypacker, you can proceed.

25 BY MR. PENNYPACKER:

1    Q    Dr. Dickison, can you come down, please, and

2  present the animation for us?

3    A    This is a computer graphic.  Maybe it's a computer

4  graphic.

5         MR. TEDDER:  Again we object to this, your Honor.

6         THE COURT:  Mr. Tedder, the record acknowledges an

7    ongoing objection.

8         MR. TEDDER:  Thank you.

9         MR. GROLAND:  Your Honor, may I get closer?

10        THE COURT:  Yes.  And I think it might help if you

11   dim the lights a little bit.  If you'll turn these

12   lights off over the jury, I think they'll be able to

13   see it.  Now can everybody see?  You want a chair,

14   Ms. Perry?  Do you want a chair?  She doesn't want it.

15        A JUROR:  Your Honor, may I stand back there?

16        THE COURT:  Yes, sir.  Kind of close.

17        A JUROR:  Yes, ma'am.

18        THE COURT:  Go ahead.

19        THE WITNESS:  This is a computer animation that's

20   made of stylized graphics to show some of the physics

21   that are involved in shaken baby syndrome.  I'm gonna

22   go through it slowly and bring out points of anatomy

23   that I think are important to the evolution of injury

24   as we understand it.

25        This is a series of pictures of a doll.  The doll

1    was chosen because it has a head mass of a baby

2    relative to the body size.  It is mounted on a spring

3    neck that is intended to have the same flexibility of

4    the neck of a human child, but of course this is not a

5    human child because it would be inhumane to recreate

6    this with a human child.

7        So notice as we're going through the series of

8    things that happen with the shake, the head starts in

9    an upright position here.  Then as the push is towards

10   that direction, the head comes towards the body.  It

11   goes into a flexed position.  The more the push is in

12   that direction, the more the force, the clue force is

13   towards flexion.  Then when the body is pulled, and

14   it's usually pulled by the arms as opposed to the

15   chest, but when the body is pulled, the head has a lag

16   time and goes from a flex into a hyperextension.  And

17   from there we go back to the push.  It goes from

18   hyperextension back to a flexion.

19       So in the course of a shake, there's a push, a

20   pull, a push, a pull, and the head takes exactly the

21   opposite direction to the force that's being pushed.

22   So if the push is away, the force on the head is

23   towards and it's around -- notice it's pivoting around

24   the neck.  So it's a rotational force rather than a

25   straight back and forth force like one would see with a

1 woodpecker holding it's head straight and aiming it's

2 force straight into a piece of wood.  This is

3 rotational and it's back and forth and it has angular

4 momentum involved in the physics generation.

5   Now this is a picture of a baby that's about two

6 years old.  Notice that the head is still relatively

7 big to the rest of the baby.  That's because about a

8 third of the size of the mass of a four month old is

9 made up of head.  This is a schematic of a brain within

10 the skull.  Here are the ears, there's the nose, and

11 there's the other ear.  This is one side of the brain,

12 that's the other side of the brain, and this is the

13 brain stem.  This is not very close to real.  It's a

14 stylized image, because in real life the ears are

15 tethered to the brain.  They're connected.  And the

16 nose, with the olfactory bulbs, is tethered to the

17 front part of the brain and the brain stem is tied in

18 with all it's evolving nerves into the spinal cord and

19 into the edge of the brain stem area and posterior

20 falx.

21   What is fairly realistic about this stylized image

22 of a brain, is that it's divided in the middle and it

23 has a venous drainage pathway on the top of it.  On

24 this side of the brain, this cerebral hemisphere, there

25 are little tiny feeding veins to that canal that drains

1    venous blood, and on this side there are little tiny

2    venous drainage pathways.  Also the surface of the

3    brain is very irregular, the peaks and valleys, and

4    there's some grooves in the brain that are significant

5    because they conform to grooves in the skull and

6    pathways of nerves.

7        Again I'm calling attention to this structure

8    right here, which is called the superior sagittal

9    sinus.  Oh, it's gonna illustrate.  That's brain, this

10   is skull.  And remember the baby's skull is not one big

11   bowl.  It is made up of several different bones that

12   are joined together with cartilage and lose connective

13   tissue.  So it's a very mobile sort of skull.  And

14   dura, dura again is the hard, fibrous covering

15   underneath the skull, but on top of the brain.  And the

16   dura actually goes all the way down to the middle of

17   the brain and forms the falx on each side, F-A-L-X,

18   which was the thing that looks like a sickle that

19   divides the two cerebral hemispheres one from another

20   so they don't communicate.

21       Underneath the dura, sub means under, like

22   submarine, so underneath the dura, but on top of the

23   brain, there is a space and it's called the subdural

24   space.  There is actually another membrane on top of

25   the brain, another two membranes on the top of the

1  brain, one of which is called an arachnoid.  As we know

2  from arachnaphobia, arachnoid means spider and this is

3  a very spidery-like, filamentous material.  And then

4  underneath the arachnoid is the pia, P-I-A, which is

5  the film, very easy to break, that's over the brain

6  surface itself.

7       So the subdural space is a space that exists

8  between the hard dura and the top of the arachnoid.

9  Then the subarachnoid space, which I will draw a little

10  bit later, is between the arachnoid and the brain

11  matter itself, or between the top of the arachnoid and

12  the pia matter.

13       Okay.  So that's the orientation there.  They call

14  this the central vein, but the medical word for it is

15  the superior sagittal sinus.  Superior means it's on

16  top of the head.  Sagittal means that it goes from the

17  front part of the nose, back to the pointy part of the

18  occiput or back to the back part of the head.  The

19  sagittal section of something is cutting something in

20  this direction.  A coronal section is cutting it like

21  it's a crown or a coronal.  So coronal sutures and

22  sagittal sutures.

23       Well, right underneath the sagittal suture; suture

24  is the joining together of the bones, is the sagittal

25  sinus, which is the giant canal that drains blood.  All

1      these superficial bridging veins drain into that suture

2      or that canal of blood and go from the front of the

3      head to the back of the head.

4           These little bridging veins pass over the subdural

5      space.  They exist in a subdural space.  They start in

6      a deeper layer, but they penetrate through the pia, the

7      arachnoid, into the subdural space, and they join up

8      with the -- they pierce through the falx and join up

9      with this big canal.

10          Now the big canal is not a blood vessel like we

11     normally think of blood vessels, which are a pipe or an

12     elastic, empty structure.  This is actually triangular

13     because it's made by the sides of the falx, sides of

14     the dura on either side coming down to join in the

15     middle, and then there's a separate covering on top of

16     it.  So the little bridging veins pierce through the

17     falx and then pierce into, enter into the canal

18     drainage pathway.  That's on the top of the brain

19     running sagittal.

20          And this is how it looks from the backside.  Now

21     it goes into here and there's also, not illustrated

22     here, an interior drainage pathway called inferior

23     sagittal sinus, and a straight sinus, which is right

24     from the midbrain back to here.  This is a very

25     important area.  This is the confluence of all these

644

1    canals that drain the superficial veins. And once they

2    get into this confluence, they go down a drain pipe.

3    They go down the transfer sinuses and poke through the

4    base of the skull and drain off into the internal

5    jugular veins. So this is a vital structure.

6        Next. Oh, this is a magnification of bridging

7    veins and there are bridging veins on either side of

8    the dura. So if a bridging vein on this side rips,

9    there will be bleeding on this half of the brain. And

10   if there is a ripping of bridging veins on that side of

11   the dura, there will be subdural bleeding on that side

12   of the brain. So that's a very important point.

13       Now we see here magnification of how many

14   different points? We're not just talking about a

15   couple of veins. We're talking about hundreds of veins

16   feeding in, bridging veins feeding into the superior

17   sagittal suture and they're also feeding into the

18   inferior sagittal suture and several of the other

19   drainage sutures, which are canals that go into the

20   confluence.

21       This is the animation that shows what happens when

22   the brain is shaken. Keep your eye on the motion.

23   It's a rocking motion. It's an angular momentum

24   motion. It's like very firm jello that goes back and

25   forth.

645

1        This again is the orientation, the front

2    orientation.  And as that goes back and forth, those

3    little tiny bridging veins on each side are ruptured

4    and they bleed into the subdural space.  This is venous

5    blood that bleeds into the subdural space.  Arteries

6    aren't in the subdural space.  And as they bleed more

7    and more, the blood that is formed along the falx in

8    the deep part of the brain along the inferior sagittal

9    suture track up in the subdural space and spread out

10   over the convexities of the top of the head.  They

11   spread into the peaks and valleys until they get so

12   much volume that they have reached a state of

13   equilibrium.  The volume they have is pressing out with

14   an equal amount of pressure from the skull or from the

15   brain pressing in, so they are contained in sort of a

16   lake in the subdural space.

17        Blood, an accumulation of blood is called a

18   hematoma.  Oma means body and hema is the Greek word

19   for blood.  So it's a body of blood or a lake of blood

20   that is collected in the space that's underneath the

21   dura, but on top of the brain.

22        Another thing I want to bring to your attention is

23   the presence of nerves.  Now the brain is not just a

24   bag of jello.  Its got some structures within it.  And

25   this collection of nerves is concentrated.  This is

1       going down the brain stem into the spinal cord.  It's

2       like a bunch of flowers, a packet of posies that have

3       branches on the top part of them or a bundle of

4       fiberoptic fibers like you've seen the decorator lights

5       that have the spray and at the tip of each light,

6       there's a little pinpoint light that you can look at

7       because electricity, which is generated down here, will

8       get transmitted up there and show out as pinpoints of

9       light at the top of these bundles.

10          You can also liken this series of nerves to

11      telephone wires, good old microscopic telephone wires.

12      They're insulated.  They're insulated with a protein

13      called myelin.  It's a fat protein.  So all the way

14      around them it's insulated.  And then when it gets up

15      here to the branching points, to the part where the

16      thinking part of the brain is, the insulation thins out

17      and the caliber thins out and right up here is where

18      the difference is between brain matter or the thinking

19      part of the brain and white matter, which is the

20      insulated part of the brain.

21          Well, as you know from telephone wires, anything

22      that is --

23          MR. TEDDER:  Objection, your Honor, telephone

24      wires have nothing to do with this.

25          THE COURT:  Overruled.

1          THE WITNESS:  As you know from telephone wires,

2     anything which is insulated has a greater diameter and

3     it has a greater capacity to withstand stresses.

4     However, if the stress is enough to shear this or to

5     put torque on this or to stretch the insulation, there

6     may be a crack in the insulation or a disruption of the

7     actual wire.  So with motion that goes back and forth

8     around this pivot of the midbrain and the brain stem

9     here, there are forces being exerted on the part of the

10    wire that is a smaller caliber and has the potential of

11    breaking.  This is not of the consistency of jello.

12    This is stiffer stuff.  It's somewhere between a small

13    filament of fish line and cooked spaghetti, so it can

14    break.  When it does break, there can be microscopic

15    pieces of blood or evidence of blood or little pinpoint

16    hemorrhages, but most importantly you get a short

17    circuit and the lights at the top don't work anymore

18    when there is a short circuit.

19         Okay.  I think that was the end of this animation.

20    I had wanted to review a little bit more about what the

21    difference between a subdural, subarachnoid, and

22    epidural bleeding is.

23         MR. TEDDER:  Your Honor, I would object to this.

24    She said she's finished with the animation.  It's time

25    for another question, your Honor.

1          THE COURT:  The objection is overruled.

2          MS. SINGER:  Your Honor, may our computer person

3     come and move the item?

4          THE COURT:  Yes.  Doctor, you want to sit down?

5     Would that be --

6          THE WITNESS:  Sure.

7          MS. SINGER:  Thank you, your Honor.

8     BY MR. PENNYPACKER:

9     Q     Dr. Dickison, when you have this violent shaking

10    motion back and forth, how come the child's neck doesn't

11    break?

12    A     Well, the neck of a baby is very very elastic.  It

13    doesn't have firm cartilage, it doesn't have firm bones, and

14    it's designed to allow a lot of movement in there.  So there

15    is trauma to the spinal cord area and there is trauma to the

16    brain stem, but the forces right there are not magnified by

17    the -- farther out into the brain.  That's the pivot part

18    rather than the bopping back and forth part.  The forces are

19    less that apply to the baby's neck than they are at the

20    surface of the brain or higher up in the brain.  So

21    basically the answer is, the neck is very flexible.

22    Q     Does the shaking motion cause any damage or can it

23    cause damage to the eyes?

24    A     Yes, it can.

25    Q     How does that happen?

1       A       I would need to go into the anatomy of the eye.

2               MR. TEDDER:  I'll object to this.  She's not an

3       ophthalmologist, your Honor.

4               THE COURT:  Overruled.

5   BY MR. PENNYPACKER:

6       Q       Would it assist you to draw that?

7       A       It would assist me to draw that or point to a

8   picture that somebody else who is a better artist would draw

9   that.

10      Q       Why don't we let you draw it.

11      A       Okay.

12              MR. PENNYPACKER:  Your Honor, we have a pad that

13      we would like to set up and use so she can draw that.

14              THE COURT:  All right.  I think it may be easier

15      if you can move the easle right into the center here

16      close to where Mr. Pennypacker is standing.  That way I

17      believe all the jurors will be able to see it.

18              THE WITNESS:  I brought some colored pens.

19              MR. TEDDER:  Your Honor, can we move over here so

20      we can watch this?

21              THE COURT:  Yes, sir.

22              MR. TEDDER:  Come on, Brian.

23              THE COURT:  Mr. Tedder, you need to stay back in

24      this area, though.  That would be fine.

25              THE WITNESS:  I had brought all sorts of colored

1    pens.  Traditionally red is for blood supply and blue

2    is for vein supply and I sort of ran out of other

3    colors.  Maybe I'll have that black one back.

4         MR. PENNYPACKER:  I don't think it's black.  It's

5    blue.

6         THE WITNESS:  Okay.  Fine.  Maybe one blue is

7    different than the other blue.  We'll start -- This is

8    gonna be a picture of the eye according to Anne

9    Dickison, acknowledged artist.  Okay.  This is the

10   orbit.  It's made out of bone.  The eyeball is in the

11   back of the orbit.  This is all fat here.  This stalk

12   is an optic nerve.  The optic nerve bulges into the

13   back of the eyeball.

14        In the middle of the optic nerve there is a

15   retinal vein and a retinal artery.  There is -- The

16   retinal artery spreads out and it goes upwards.  It

17   forms a sort of a cup.  Its got several branches on the

18   inside of it like that.  So when you do an

19   ophthalmologic exam, you're looking with that

20   ophthalmoscope, you can see four separate branches of

21   arteries and you can tell the difference between an

22   artery and a vein just by looking at it, by the

23   diameter and by the appearance of the edge wall.

24        Well, these arteries actually form a capillary

25   network all along the back of the eye.  That capillary

1    network passes through the nourishment and turns into

2    veins.  So in the back of the eye, this is the tough,

3    white part of the eye called the sclera.  There is the

4    optic nerve and there's the sclera over here.  Now I'm

5    not gonna fill in the network to there because it gets

6    sticky and confusing.

7         Then there is a venous path that comes down here,

8    penetrates and it goes out that way.  That's superior

9    or up.  And it goes out to the forehead.  And then

10   there is a venous pathway comes down here.  It comes

11   out and it continues out to facial.  Here's the facial

12   and the maxillary artery and vein.  You can feel them

13   on the outside of the face.  So it comes out.  And

14   there's several other penetrating blood vessels here

15   that join up into a big blood vessel and drain out of

16   the eye into two veins.

17        All right.  Now that all takes place underneath.

18   Now let me get another color, no, two colors.  There is

19   a layer in the back of the eye that's part of the

20   retina, one of the layers of the retina.  These veins

21   go through the back of that.  And then on top of this

22   layer, there are another two.  The yellow and the green

23   are layers of the retina.  It's all on the inside of

24   the eye.

25        Now up here where I sort of cut off the eyeball,

1    here is the lens and the lens is held together with

2    little muscles and ligaments and nerves.  And over

3    here, if you had a contact lens, it would be about the

4    size of a Frisbee over here.  So it's covering up the

5    whole front of the eye.  And you can't see -- normally

6    you can't see into the eye.  This is vitreous, this is

7    lens, and then there's a little -- where the best part

8    of the vision is, there's a little dent back here.

9    It's called the macula.  It's a dent with more cones

10   and rods.  So this is where your best vision is, not

11   the optic nerve.

12        Well, several things happen with an impact that

13   comes from behind or goes from front in.  First is, you

14   can put a stretch on this optic nerve.  You can stretch

15   it out that way and cut off both the arterial or venous

16   side, or you can compress it back this way and cut off

17   both the arterial and the venous side.

18        The difference between the arterial blood pressure

19   and the venous blood pressure is related to the blood

20   pressure that your body sees compared to how much

21   resistence there is to draining it off back through

22   this central retinal vein.

23        The central retinal vein, which travels through

24   the middle of the optic nerve, goes into a network of

25   veins called the corpus callosum.  It doesn't have any

1    valves.  It's entirely pressure driven and it drains

2    immediately down through the internal carotids that

3    would come through the internal jugulars and into the

4    chest.  There's no valves, there's no stoppage.  It's

5    pressure driven.

6         What regulates the blood flow from the optic

7    artery through the central optic artery, central

8    retinal artery in there is the blood pressure that gets

9    through the brain into the eye.  So it has to circulate

10   through from the heart, up through the carotids, in

11   through the brain, and get from the internal carotid

12   artery out here to the end of the eye.

13        If you have a stroke or have brain pressure that's

14   way too high, it will cut off this arterial supply and

15   you will have a sudden total loss of vision, but you

16   don't have bleeding.  You have a stroke.  You have a

17   situation where a curtain falls in front of your eyes

18   or you have a TIA.  I don't know if any are familiar

19   with that term of transient ischemic attack.

20        If the pressure had cut off the circulation of

21   this optic artery where any bleeding would take place,

22   if it takes place at all, is right around the optic

23   artery, optic nerve itself, not out here.

24        Another mechanism that is postulated for how you

25   can get retinal hemorrhages, how you can get bleeding

1    into the vitreous as well as into these layers of the

2    retina, is any force that disrupts this tangle of

3    capillaries up here.  The forces are accelerant.  If

4    you hit somebody from behind and there's a momentum or

5    an inertia, fat won't accelerate at the same speed as

6    vitreous, which is the consistency of a Jujubee.  It's

7    very stiff, barely depressable.  It is the amount of

8    tension if you push on your own eyelid, that's the

9    pressure that is inserted by vitreous.

10       So vitreous accelerates slower as you're pushing

11   on it this way, but once its got a momentum going, mass

12   times velocity, then it keeps going farther and faster

13   and as it accelerates, it puts a traction on this layer

14   of the retina and tears this little layer right in

15   here, this network of capillaries.  And then as it goes

16   backwards, again you over -- you reverse the direction,

17   you overcome inertia and you push back this way.  So

18   now you have a compression of the vitreous compressing

19   against the more compressable fat and you cause more

20   torque in this area.

21       So retinal hemorrhages happen when you disrupt

22   this capillary network or when you do something that

23   actually severs or interrupts the junction between the

24   central retinal artery and vein.  If you just say it's

25   a venous congestion clogging up the venous pathways,

1       that doesn't fly.  Doesn't fly because if this happens

2       in the head, there's still this alternate escape hatch.

3       Any pressure that builds up that gets into the eye,

4       that builds up any blood, that gets into the eye

5       through the arterial path, will follow the path of

6       least resistance to get out of the eye and that will be

7       the external pathways.

8            This way when you see somebody bearing down, their

9       face gets red and their eyes kind of bulge out, or if

10      you see a victim of strangulation, what you will see is

11      very very bloodshot eyes, in particular subconjuntival

12      hemorrhages.  You'll see the hemorrhage up in front,

13      not in back.

14           Now how you get vitreal hemorrhages is more

15      trauma.  It is a reflection of greater force and you've

16      not only pulled the retina away from the capillary bed,

17      you've torn it.  So now bleeding can get through this

18      layer of retina into the vitreous.

19           Well, that's the anatomy of the eye.  I was

20      wanting to show anatomy -- Where is Mr. Pennypacker?

21           MR. PENNYPACKER:  Right here.

22           THE WITNESS:  Should I go right into the dura?

23           MR. PENNYPACKER:  Not yet.

24           THE WITNESS:  Do I go back?

25  BY MR. PENNYPACKER:

1      Q     Dr. Dickison, as to what you just illustrated as

2  far as how retinal hemorrhages can occur from the

3  acceleration and deceleration, is that what you saw when you

4  looked in Robbie Querillo's eyes?

5      A     Yes.  I saw the worst retinal hemorrhages, vitreal

6  hemorrhages I've ever seen in my life of more than 300.

7      Q     You mentioned what the three elements of the

8  constellation that you have to have in order to make a

9  diagnosis of shaken baby syndrome.  Could you review what

10 that was?

11     A     Sudden alteration in brain function, dramatic

12 alteration of brain function or bleeding in the brain, plus

13 retinal hemorrhages, plus a story that doesn't match the

14 circumstances, doesn't match the physical findings.

15     Q     If you were told that this child had been wedged

16 between the end of a bed and the mattress and his feet were

17 sticking up in the air, would that be consistent with what

18 you saw as far as the brain injury and the retinal

19 hemorrhages in this child?

20     A     No, and neither would be consistent with the laws

21 of physics.

22     Q     Would plopping Robbie down on a bed and having his

23 head bounce off the bed be of sufficient force to cause the

24 intracranial contusions that you saw on the CAT scans?

25     A     Yes.

1    Q    Is this what might be known as shaken impact

2  syndrome?

3    A    Yes.

4    Q    The brain damage, the retinal hemorrhages, the

5  other injuries that you saw inside Robbie's skull, could

6  that have been caused by a re-bleed of a subdural hematoma?

7    A    No.

8    Q    Would it help you to illustrate to the jury why

9  that is in Robbie's case by drawing a diagram?

10   A    Yes.  I'm gonna show two projections of a head;

11  one where he is looking straight ahead and another where he

12  is looking sideways.  This is the baby's head looking

13  straight ahead and that's the baby's head -- Well, he looks

14  sort of like ET.  Sorry.

15       All right.  Now straight ahead we'll pretend the

16  blue on the outside is skull.  Now remember it's not

17  perfectly round by any means.  In fact, the bottom of the

18  brain pan is a very irregular tray that has lots of nerves

19  coming in and out and it's divided into three distinct

20  sections and several subsections.  In the middle of this is

21  the brain stem and the midbrain.

22       Okay.  On the -- Here's the ears and the ears are

23  kind of anchored with acoustical nerves and other nerves.

24  And also the brain pan, the bone, is right in there.  Now

25  underneath there are three different layers of bone, the

1    superficial layer, the porous layer, and then the hard

2    surface underneath the layer of bone.  So this is the layer

3    of bone, and then right underneath that there is dura.  Dura

4    is that hard, fibrous stuff.

5              Okay.  Then on the bottom part of this there is a

6    tent that comes up.  It has an opening for the midbrain and

7    goes over here.  And underneath this tent in the back, there

8    is the cerebellum.  That's a bad looking cerebellum.

9    They're actually joined together, but there's two lobes of

10   the cerebellum.  So if we're looking at that, that's the

11   cerebellum, here's the brain, brain stem as it comes up, and

12   the midbrain brain stem that comes down.  The brain stem has

13   various nerves that come out and the tent on the side view

14   goes over the top of the cerebellum on either side.  That's

15   called the tentorium.

16             So we have a hard, fibrous falx, and then we have

17   the tentorium, which separates the cerebral hemispheres from

18   the cerebellum, and then there's two other chambers in

19   there.

20             There are arteries.  The red is the artery again.

21   The middle meningeal -- Let me go back to the layers.  I

22   need more colors.  Okay.  So the green is the dura.  Then

23   under the dura is the arachnoid and it's spidery.  And then

24   underneath that is the brain itself.

25             Now these spaces are greatly exaggerated.  This is

1    the dura.  So blood that accumulates in the dura between --

2    say it, the blood leaks out of the sagittal sinus, it's

3    going to go between the dura and the subarachnoid.  So it

4    will spread out here.  Remember, it can't cross over to the

5    other side.  When you see it on a radiograph or an MRI, you

6    will see a puddle in a specific area.  This is the subdura.

7         Now if the bleeding comes from an artery, there

8    are no arteries in the subdural space, only the bridging

9    veins.  So if an artery gets nabbed say right here and it

10   begins to exert bleeding, it's brisk bleeding because it's

11   arterial bleeding, but the bleeding will be confined to this

12   space.  That's an epidural hematoma.  That's arterial.

13   Babies don't tend to get arterial and they don't tend to get

14   epidural hematomas.

15        MR. TEDDER:  Object to that, your Honor.  That's

16   speculation.

17        THE COURT:  Overruled.

18        THE WITNESS:  Where's Mr. Pennypacker?  Should I

19   answer that?

20        MR. PENNYPACKER:  You did and your answer was

21   allowed to stand.

22        THE WITNESS:  Pardon me?

23        MR. PENNYPACKER:  You can keep going.

24        THE WITNESS:  Okay.  That is not speculation.

25        MR. TEDDER:  Objection, your Honor, the comment by

1      the witness.  Also she's testifying way beyond her area

2      of expertise.  She's testifying as a neurosurgeon.

3      She's not.

4           THE COURT:  The objection is overruled, Mr.

5      Tedder.  You'll be allowed to cross-examine.

6           THE WITNESS:  The third type of hematoma or third

7      place a hematoma can develop is underneath the

8      arachnoid area.  The green is the dura, next came the

9      arachnoid, and then comes the surface of the brain.

10          So if an arterial or venous source, but usually

11     it's arterial, breaks, you get a bleed in there that

12     begins to push the brain in.  Okay.  This is

13     subarachnoid and that's arterial.

14          Okay.  Then the final place of bleeding is if you

15     disrupt any of those structures that go from the center

16     part of the brain out to the surface, you can get

17     little dots of bleeding, or if you tear another vein up

18     here, you can get interparencimal or inside the brain

19     substance bleeding.  And you can also get injuries here

20     and injuries in the capsule and injuries along the

21     falx.

22          Now here in the venous, there's the big sagittal

23     sinus that goes on top of that.  Sinus just means

24     canal.  Then we have on this side of the dura, we have

25     an inferior venous.  Along here we have some more

1    sinuses.  Over there we have some more sinuses and we

2    have several places where the sinuses abut right next

3    to the stiff stuff.  So the places of bleeding that

4    happen with accelerant and decelerated forces are along

5    here, along the falx, along the underside of the falx

6    and the midbrain, and associated with the top of the

7    sinuses where the bridging veins are.

8        Well, I'm not terribly pleased with my artwork,

9    but I think the things that I want to convey and bring

10   home to you is that there are three, four separate

11   places to look for blood and the mechanism of injury

12   that causes the bleeding in those places is different.

13       The subdural is venous bleeding.  It is low

14   pressure.  It tends to happen at the top and the front

15   of the brain and right as the bridging veins dive into

16   the complex.

17       The second place is epidural.  It's arterial.

18   It's on the outside of the dura.  It presents with an

19   emergency because if this is not drained, it will

20   continue to accumulate, squish the brain over, move the

21   midlines over and it will create a mass effect and

22   torque on the midbrain.

23       Third place is underneath the arachnoid itself.

24   So it's an arterial bleed.  It expands in.  It pushes

25   the brain in and you do get mass effect from that.

1          And the fourth place is the little places where

2      axons are disrupted within the surface of the brain

3      itself.

4  BY MR. PENNYPACKER:

5      Q    Dr. Dickison, if Robbie had a chronic subdural

6  hematoma, where would the blood have been and what would you

7  see if it began to bleed again?

8      A    It would be -- the subdurals take place between

9  the dura and the arachnoid.  The dura and the surface of the

10  brain is confined in the lake.  As the bleeding matures or

11  as the bruise matures, a membrane, a clot may form over the

12  surface of it and then the body is called out to mop it up,

13  absorb the different blood products.  So it will start to

14  resolve the density in here, but you may still see a

15  membrane.  You may see on the x-ray a line or a linear

16  structure.

17          Re-bleeding happens at the membrane area.  And so

18  it's usually an extension of the preexisting area of

19  hematoma.  Now the older the hematoma gets, the more mop up

20  goes on, the more cleaning up the blood elements and the

21  less vascular the structure is.

22          When the structure where the bleed was is entirely

23  empty of blood products, all that remains is spinal fluid,

24  clear stuff and some fibrous material.  It doesn't have

25  blood vessels, it doesn't have blood products, it does not

1    bleed.  The name for this structure is a hygroma.  Hydro

2    like hydroelectric or hy is Greek for water and groma or oma

3    again is body.  So it's a body of water or a sack of water

4    that is located where a subdural used to be.

5         Q    Is that consistent with what you saw on the CAT

6    scans on August 2nd?

7         A    Yes.  On the CAT scans there was evidence of

8    bleeding on both sides of the brain, both the front of the

9    brain and the back of the brain.  There was a subdural,

10   there was an epidural, and there was evidence of

11   subarachnoid bleeding.  So he had -- And as time evolved,

12   there was evidence of bleeding down in the deeper structures

13   as well.  So he had four mechanisms of injury.

14        Q    With the exception of the subdural bleeding, could

15   the other four or the other three sites of bleeding have

16   been caused by re-bleed from a chronic subdural hematoma?

17        A    No.

18        Q    If Robbie had suffered a subdural hematoma at

19   birth, which was four and a half months earlier than

20   August 2nd, how long would it have taken his little body to

21   mop that up?

22        A    About a week.  There are a few case reports where

23   it lasts two to three weeks where blood is still present in

24   the subdural space three weeks after birth.  But it is

25   unheard of to have a subdural that occurred because of birth

1    trauma to still be there at four months of age.

2        Q    Could the injuries that he presented with in the

3    emergency room on August 2nd of 2000 been caused by a

4    re-bleed of a chronic subdural hematoma?

5        A    No.

6        Q    You discussed earlier about --

7             MR. GROLAND:  Can we sit down?

8             THE COURT:  If you don't need the diagram anymore.

9             THE WITNESS:  Do you need me to draw some more?

10            MR. PENNYPACKER:  I don't think so.

11            THE COURT:  If you do, you can come back down.

12   BY MR. PENNYPACKER:

13       Q    Was there anything wrong with the conjuntivae in

14   Robbie's eyes?

15       A    No.  They were remarkably clear.  They were free

16   of jaundice, free of subconjuntival hemorrhage, meaning

17   underneath the thin film that makes tears, there was no

18   collection of blood.  Subconjuntival hemorrhage is what you

19   usually see if there's strangulation or occlusion of venous

20   drainage.

21       Q    If the conjuntivae had been occluded, what would

22   you have seen in Robbie's eyes?

23       A    You would see very bloodshot eyes or scleral

24   hemorrhages or subconjuntival hemorrhages.  You would see

25   petechia or those little tiny burst blood vessels.  You

1    would probably see discolored eyelids.  You may end up

2    seeing bleeding into the skin right around the eye because

3    the venous obstruction takes place outside of the eye as

4    well as inside of the eye.

5        Q    If Robbie had been plopped down on the bed and his

6    head bounced off the bed sufficient to cause the injuries

7    that you saw inside his brain or on the CAT scans or that

8    you saw based upon your physical exam, would that have

9    caused him to vomit?

10       A    Yes.  Babies vomit on general principle.  You

11   bother them, they vomit.  But additionally, anytime there's

12   a brain injury, people vomit.  It's a response to brain

13   injury.

14       Q    Was there any evidence during the course of

15   Robbie's stay at Shands of any aspiration?

16       A    No.

17       Q    When you were discussing the subdural hematoma and

18   the blood that is underneath the dura but above the

19   arachnoid, can that blood get onto the surface of the brain?

20       A    Only if there's an interruption in the arachnoid,

21   a tear in it, a blood vessel that is uprooted, entirely

22   uprooted so it leaves a hole.

23       Q    If there were just a chronic subdural hematoma

24   that had re-bled, would you expect there to be blood

25   touching his brain surface?

1      A      No.

2      Q      If there had been a chronic subdural hematoma with

3  only blood between the dura and the arachnoid, would you

4  have expected him to seize from that condition?

5      A      There is a mild possibility, but not a high

6  probability.  Blood is very very irritating particularly to

7  the surface of the brain.  So it is blood in contact with

8  the brain that is more likely to cause a seizure.

9              MR. PENNYPACKER:  Your Honor, I have about 20 or

10             30 more minutes worth of questions.  I wonder if you

11             want to take a lunch break now or keep going.

12             THE COURT:  Keep going.

13  BY MR. PENNYPACKER:

14     Q      Dr. Dickison, what was the course of Robbie's

15  treatment following the morning of August the 2nd and up

16  until August 10th of 2000?

17     A      What was the course of his treatment?

18     Q      What did you do with him after that moment?

19     A      Our major problem was that he was continuing to

20  seize and we tried a variety of medications to interrupt the

21  seizure cycle.  The more a person seizes, the more acidotic

22  byproducts are made and more oxygen is used up and substrate

23  is used up.  So seizures can cause damage all by themselves.

24             We also transfused him trying to optimize his

25  oxygen delivery.  Oxygen rides around on red blood cells.

1    That's how it's delivered to the tissues that are needed.

2    And to give him the best fighting chance of having survival

3    with the injured brain cells, we wanted to optimize the

4    amount of oxygen that could be delivered.  So he got

5    transfused.

6         We also sedated him because agitation and

7    stiffening and bearing down are all factors that increase

8    brain pressure.  The goal of management is to minimize any

9    sudden increases of brain pressure.  So we didn't want him

10   screaming, we didn't want him straining, we didn't want him

11   bearing down.

12       Q    Did there come a time when his intracranial

13   pressure did increase during his stay?

14       A    Yes.  The natural history of bleeding in the brain

15   or bleeding anywhere is that there's trauma, then there's

16   disruption of cells.  The cells throw out inflammatory

17   substances and those inflammatory substances are what turns

18   things red and what cause swelling.  Like if you twist your

19   ankle, the ankle swells up.  Well, usually the swelling and

20   the inflammatory aspect takes place over about a three day

21   period.  If you start out with a swollen ankle on day one,

22   you can be guaranteed that it is more swollen on day two and

23   at it's worst on day three.

24       Same goes with the brain.  If you have a

25   significant brain injury, blood on the brain, torn axons,

1    periods -- areas that do not have the same amount of oxygen

2    in them or have excess fluid in them, it swells and

3    swelling, again, adds to the cycle of destruction.  The more

4    it swells, the less good the blood profusion, the less good

5    the substrate delivery and removal of acidotic byproducts,

6    the slower the mop up process.

7            In general, this peaks at about the third day post

8    injury.  So that's sort of the cut or fish -- the fish or

9    cut bait time of decision making.  You're pretty much gonna

10   see which direction you're gonna go and see if the person

11   has a chance at survival and meaningful survival after that.

12       Q    What happened to Robbie at the three day period?

13       A    He showed signs of significantly increased

14   intracranial pressure.  At the same time, deterioration in

15   his clinical exam.  He stopped moving, he stopped breathing

16   regularly.  He began a jerky, abnormal pattern of breathing.

17   He stopped opening his eyes.  His pupils stopped reacting as

18   well.  His tone went from too much tone to limp.  He stopped

19   withdrawing.  If you pinched him, he did stop reacting.  He

20   didn't cry.  He just went from looking like he had a

21   fighting chance to somebody who was on the path to death or

22   a vegetative state.

23       Q    Why does that happen?

24       A    Because with increased swelling -- Swelling is the

25   natural response to injury.  The inflammation takes place.

1   In response to swelling you have worsened profusion, you

2   have a tighter head, you have more difficulty getting in

3   oxygen and taking out byproducts, metabolism.  That, in

4   turn, allows an accumulation at the tissue level, the

5   substrate level of chemicals that poison the cell.  The

6   cells that are gonna live or are injured but might have a

7   chance to live, are now surrounded by a bath of things that

8   are bad for them.  So they begin to die off.  The cells that

9   have died originally are dead and gone.

10      Q    Did Robbie's brain begin to die off?

11      A    Yes, and there was radiographic evidence and

12   physical evidence that his brain had begun to liquify.

13      Q    Did there come a point when you felt it was

14   necessary to discuss with the family the likelihood that he

15   was not gonna recover?

16      A    Yes.  Right from the beginning I was pessimistic

17   that this was a survivable injury and if he could survive,

18   that he would probably be blind and damaged.

19      Q    Did you discuss that possibility with the family?

20      A    Yes.

21      Q    And what is your normal period of work?  I mean

22   when do you start during the week, when do you end during

23   the week?

24      A    The attending duties start on Monday morning at 7

25   o'clock and go until the following Monday morning at 7

1   o'clock with two relief nights during the week on Tuesday

2   and Thursday.  So you get to sleep on Tuesday and Thursday

3   and you work the rest of the time.

4       Q    Did your shift end during the time that Robbie was

5   in Shands?

6       A    Yes.  He came in on a Wednesday and my shift ended

7   on Monday morning.  At that time I introduced the family to

8   my replacement, Dr. Craig Weldon.  I had already laid the

9   groundwork that we were facing a hopeless situation, that

10  recovery was very improbable, and that if he did recover, he

11  would be very very damaged.

12      Q    Was the subject of a do not resuscitate order

13  discussed with the family?

14      A    Yes.  It was initiated early in the week.  On day

15  three, I believe, I first introduced it that now is the time

16  that we should be seeing signs of recovery and we're not.

17  We're seeing significant signs of deterioration.  So be

18  thinking about how you -- This is what I would say to the

19  family:  Be thinking of how you would want Robbie to spend

20  his final days and hours and how far would you want to go

21  knowing that his chance of recovery is virtually impossible?

22           That was amplified with a family meeting on

23  Sunday.  I had told them that this would be my last day on

24  service and that I would be replaced by Dr. Weldon and I

25  reassured them I would communicate everything that we had

1   talked about with Dr. Weldon and that we were all on the

2   same page about whether or not to do a DNR.

3       Q    Was Robbie intubated for the period of time that

4   he was in the pediatric intensive care unit?

5       A    Until after the decision to make him DNR was made.

6   Then the decision that the family came to is the kindest and

7   most humane thing to happen was to let nature take it's

8   place, to take out the high technology things, to take out

9   the plastic breathing tube and take him off the ventilator

10  and allow his physical condition to determine whether or not

11  he would make it.  The expectation was taking out the

12  breathing tube would lead to his death and as death grew

13  nearer, no effort would be made to put the breathing tube

14  back in.

15      Q    Was the breathing tube removed?

16      A    Yes, it was.

17      Q    And did he die?

18      A    He died hours later after some comfort measures

19  were taken to give him additional oxygen and additional

20  pressure to help him fill up his lungs.

21      Q    Was his death a result of a re-bleed of a chronic

22  subdural hematoma?

23      A    No.

24      Q    Was his death the result of aspiration of vomit?

25      A    No.

1        Q    Was his death the result of hypoxemia?

2        A    No.

3             MR. TEDDER:  Objection, your Honor, beyond the

4        scope of the expert.

5             THE COURT:  Overruled.

6             THE WITNESS:  Hypoxemia is the presence of oxygen

7        in the blood, no.  It was not a result of hypoxemia.

8   BY MR. PENNYPACKER:

9        Q    Was his death the result of a seizure on the

10  morning of August 2nd, 2000?

11       A    It was related to a seizure, but what caused the

12  seizure and what caused the bleeding was more germane.

13       Q    Was his death the result of injuries that he had

14  to have suffered between 9:00 a.m. and 9:35 a.m. on

15  August 2nd, 2000?

16            MR. TEDDER:  Objection, calls for speculation.

17            THE COURT:  Overruled.

18            THE WITNESS:  Yes, unequivocally.

19  BY MR. TEDDER:

20       Q    Did he die from being shaken?

21       A    Probably.

22            MR. PENNYPACKER:  Thank you.  That's all the

23       questions I have.

24            THE COURT:  All right.  Now we are gonna recess at

25       this point before cross-examination for lunch.  You'll

1    have an hour and 20 minutes, ladies and gentlemen.  We

2    will reconvene with evidence at 1:30.  So if you'll

3    take your notebooks and put them in the evidence locker

4    again, please, and follow the bailiff.

5        (Out of the presence of the jury:)

6        THE COURT:  All right.  Doctor, you are free for

7    an hour and 20 minutes also unless of course the --

8        MR. GROLAND:  Your Honor?

9        THE COURT:  Yes, sir.

10       MR. GROLAND:  May we ask that the witness --

11       THE COURT:  Wait a second.  The door is open.

12       MR. TEDDER:  Your Honor, I would ask --

13       THE COURT:  Wait a second.  The door is still

14   open.  Wait just a second, Doctor.  I don't know if

15   this might be -- Could you close both doors for just a

16   minute?

17       MR. GROLAND:  First I would just ask that the

18   witness not talk to counsel between direct and

19   cross-examination.

20       MR. TEDDER:  Exactly.  That's what I was gonna

21   ask, too.  She's a witness.  She should not be allowed

22   to talk to anybody.

23       THE COURT:  Does the state agree or object?

24       MR. PENNYPACKER:  I think she can talk to other

25   people, your Honor.  We will not talk to her.

1          MS. SINGER:  We won't talk to her.

2          MR. TEDDER:  As long as she doesn't talk to any

3     other people about her testimony.

4          THE COURT:  Well, the rule has been invoked and I

5     assume that Dr. Dickison has been advised what that

6     means.  If there's any question, I'll do it again.

7          Doctor, the rule's been invoked.  That means that

8     during the course of the trial, you cannot discuss the

9     case or your testimony with anyone other than these

10    four attorneys.  Now since you're in the middle of your

11    testimony, for the next hour and a half you can't even

12    talk to them.  But other than that, you're free to

13    discuss the weather or anything else that might come up

14    during lunch.

15         Anything else we need to address before we recess?

16         MR. GROLAND:  No, ma'am.

17         THE COURT:  Okay.  Good enough.  I'll ask the

18    attorneys to be back at 1:15.  Court is adjourned.

19    I'll ask the bailiff and clerk to secure the courtroom.

20                    *  *  *  *  *

21

22

23

24

25