# EXHIBIT

# I

*202-1-1981*

*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY               )
               Appellant,   )
                       )

                       )   CASE NUMBER   2000-2753-CFA

                       )   APPEAL NUMBER 1D02-4788

v.                    )   VOLUME IX

STATE OF FLORIDA                    )
               Appellee,   )

## TRANSCRIPT
## RECORD

### HONORABLE MARTHA ANN LOTT
#### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

675

202-1-1781

IN THE CIRCUIT COURT OF FLORIDA
EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY

CASE NO. 01-2000-CF-002753-A

THE STATE OF FLORIDA

vs.

BRIAN PATRICK HERLIHY,

            DEFENDANT.

_____/

Volume IX

1002-4788

Docket _____

05-14-2003

No Attorney
Consent

TRANSCRIPT ON APPEAL
PAGES 675 - 834
VOLUME VI

| PROCEEDINGS: | JURY TRIAL |
| BEFORE: | THE HONORABLE MARTHA ANN LOTT, CIRCUIT JUDGE |
| DATE: | SEPTEMBER 12TH, 2002 |
| TIME: | 1:29 P.M. |
| PLACE: | COURTROOM 4A ALACHUA COUNTY COURTHOUSE GAINESVILLE, FLORIDA |

APPEARANCES:

    JEANNE SINGER, ESQUIRE
    and
    STEPHEN H. PENNYPACKER, ESQUIRE
    120 WEST UNIVERSITY AVENUE
    GAINESVILLE, FLORIDA 32601
    ATTORNEY FOR THE STATE OF FLORIDA

    GORDON H. GROLAND, ESQUIRE
    and
    JOHN TEDDER, ESQUIRE
    500 EAST UNIVERSITY AVENUE, SUITES B&C
    GAINESVILLE, FLORIDA 32601
    ATTORNEY FOR THE DEFENDANT

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1                          INDEX VOLUME VI

2                              WITNESSES

3    DR. ANNE DICKINSON

4       Cross-Examination by Mr. Tedder................Page    678

5       Cross-Examination by Mr. Groland...............Page    741

6       Redirect Examination by Mr. Pennypacker........Page    743

7

8    NICOLE PERRONE

9       Direct Examination by Ms. Singer...............Page    757

10      Cross-Examination by Mr. Groland...............Page    787

11

12   CHRISTINA S. MILLARD

13      Direct Examination by Ms. Singer...............Page    790

14      Voir Dire Examination by Mr. Groland...........Page    815

15      Continued Direct Examination by Ms. Singer......Page    817

16

17

18

19

20

21

22

23

24

25

```
1              INDEX VOLUME VI CONTINUED

2

3                    EXHIBITS

4

5   STATE'S EXHIBITS

6   No.   11 - Blood Sample............................Page   764
    No.   12 - Small White Stain.......................Page   766
7   No.   13 - Large White Stain.......................Page   766
    No.   14 - Red Stain...............................Page   766
8   No.   15 - Carpet..................................Page   768
    No.   16(a) - Large Pillow Sham....................Page   771
9   No.   16(b) - Pillow...............................Page   771
    No.   17(a) - Pillowcase...........................Page   773
10  No.   17(b) - Pillow...............................Page   773
    No.   18(a) - Pillow Sham..........................Page   775
11  No.   18(b) - Pillowcase...........................Page   775
    No.   18(c) - Pillow...............................Page   775
12  No.   19(a) - Pillowcase...........................Page   777
    No.   19(b) - Pillow...............................Page   777
13  No.   20 - Throw Pillow Matching Shams.............Page   778
    No.   21(a) - T-shirt..............................Page   780
14  No.   21(b) - White Kitchen Towel/Red Stripe.......Page   782
    No.   21(c) - White Kitchen Towel/Blue Stripe......Page   782
15  No.   21(d) - Bath Towel...........................Page   782
    No.   22 - Comforter...............................Page   784
16  No.   23(a) - Flat Sheet...........................Page   787
    No.   23(b) - Fitted Sheet.........................Page   787
17  No.   24(a) - 24(p) - Photographs..................Page   801
    No.   25 - Bottle..................................Page   811
18  No.   26(a) - 26(e) - Polaroid Photographs.........Page   817
    No.   27 - Videotape...............................Page   820
19  No.   28(a) - 28(u) - Photographs..................Page   824

20

21

22

23

24

25
```

P R O C E E D I N G S

1   
2          (Whereupon, the following proceedings were held,
3   the defendant and counsel being present.)
4          THE COURT:  Is there anything we need to put on the
5      record before the jury comes back in?
6          MR. GROLAND:  Nothing for the defense.
7          MS. SINGER:  Nothing from the state at this time,
8      Your Honor.
9          THE COURT:  Bring the jury in, please.
10         (The jury entered the courtroom.)
11         THE COURT:  All right.  Is the defense ready for
12     cross-examination?
13         MR. TEDDER:  Yes, ma'am.
14         THE COURT:  Go ahead, Mr. Tedder.
15         MR. TEDDER:  May it please the Court, ladies and
16     gentlemen of the jury.
17                    CROSS-EXAMINATION
18   BY MR. TEDDER:
19     Q     Good afternoon, Dr. Dickinson.
20     A     Hello.
21     Q     Dr. Dickinson, you're not a neurologist, are you?
22     A     No, but I've had extensive training in neurology.
23     Q     I'm only asking, you are not a board certified
24   neurologist?
25     A     I am not a board certified neurologist.

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1      Q    You're not a board certified neurosurgeon, are you?

2      A    Correct.

3      Q    You're not a board certified radiologist either,

4  are you?

5      A    No.

6      Q    You're not a board certified forensic pathologist,

7  are you?

8      A    No.

9      Q    In fact, when this baby first came to the hospital,

10  you were making your rounds, as you testified, you learned

11  you had a critically ill patient coming in, so you sent the

12  doctor to go take care of the patient first from the

13  pediatric care unit who was a resident doctor, correct?

14      A    No, he was a fellow.

15      Q    He was still in training?

16      A    He was in fellowship.

17      Q    All right.  And you came down there as soon as you

18  could, right?

19      A    No.  I never went to the emergency room because I

20  waited for the baby in the intensive care unit.

21      Q    So you work, that's where you work, in the

22  pediatric intensive care unit, correct?

23      A    I work some of the time in the pediatric intensive

24  care unit, some of the time in the operating room, some of

25  the time in the newborn ICU.

1    Q    You deal primarily, exclusively with children,

2  right?

3    A    No.  I deal with both adults and children.

4    Q    The percentage of your practice is 95 percent or

5  more dealing with children; isn't that correct?

6    A    It depends about which half of my job you're

7  speaking, whether I'm serving as an anesthesiologist or

8  serving as a pediatric intensivist.

9    Q    You're not a surgeon, are you?

10    A    I have surgical training.

11    Q    Ever done brain surgery?

12    A    I have put in bur holes, but that's not

13  sophisticated brain surgery and it's not recent either.

14    Q    That was back in your medical school?

15    A    No.  It was early in my training when one of the

16  functions of the pediatric intensivist was to relieve

17  pressure on the brain.

18    Q    So what you did was you cut a hole to relieve

19  pressure on the brain, years and years ago, correct?

20    A    Yes.

21    Q    And that's the only thing that you've done that

22  even remotely, remotely can be characterized as brain

23  surgery; isn't that true?

24    A    I've done many anesthetics for surgery on the

25  brain.  And in the process of doing anesthetics, I cooperate

1   with the surgeon to achieve the same end.  I touch the brain;

2   I manipulate the brain; I give drugs that affect the brain

3   function; and work very closely in a cooperative fashion with

4   the neurosurgeon.

5       Q    You think that makes you a neurosurgeon?

6       A    No.  It makes me skilled and knowledgeable in

7   neurosurgery.

8       Q    When was the last time you witnessed a surgery on

9   the brain?

10      A    About three months ago.

11      Q    Now, in your diagram you drew of the brain here

12  today, you left out the pia, didn't you?

13      A    Yes, because --

14      Q    The pia is the third layer below the arachnoid

15  layer?

16      A    It's right on the surface of the brain.

17      Q    That's right.  So it's the third layer below the

18  skull bone, correct?  You've got the skull bone, you've got

19  the dura, you've got the arachnoid, then you have the pia,

20  correct?

21      A    The pia is synonomous with the surface of the

22  brain.

23      Q    And you left that out of your diagram, didn't you?

24      A    No, I drew the surface of the brain.

25      Q    You didn't identify it as the pia, did you?

1      A      Yes, I think I did.

2      Q      Well, let's look at the diagram.

3      A      The brain was the wobbly blue line.

4      Q      Ma'am, I'm asking the questions.  You think you

5   wrote on here pia?

6      A      No, I didn't write, I verbally --

7      Q      You didn't describe pia either, did you?

8      A      I said it was the surface of the brain.

9      Q      You didn't describe it as pia, you said the surface

10  of the brain, correct?

11     A      I mentioned the word pia.

12     Q      That's what you believe you said?  Never mind.

13     A      I don't know where you're going with this.

14     Q      Okay.  Now, you're saying retinal hemorrhaging is

15  caused by sudden acceleration and deceleration, correct, of

16  the eye?

17     A      That's one of the proposed mechanisms for how it

18  comes about.

19     Q      Your testimony today was that the retinal

20  hemorrhaging that you saw in Robbie, you believe came from

21  sudden acceleration and deceleration, correct or not, yes or

22  no?

23     A      Not correct.

24     Q      Not correct?

25     A      That is not what I testified.  I said it was one of

1   the proposed mechanisms.

2        Q    What of the what mechanisms?

3        A    One of the proposed mechanisms for how retinal

4   hemorrhaging can take place was acceleration deceleration.

5   And the other, one of the other mechanisms that I mentioned

6   was that there are different momentums between fat and

7   vitreous, so they are accelerated differently.  And I

8   mentioned the mechanism of veinous congestion and arterial

9   blockade.

10       Q    The fact of the matter is, that acceleration

11  deceleration does not always cause retinal hemorrhaging;

12  isn't that true?

13       A    That's true.

14       Q    Now, it's your testimony, do you agree or disagree,

15  that a subdural hematoma can be caused after child birth?

16       A    After child birth?  I didn't hear you.

17       Q    During child birth, do you agree or disagree, yes

18  or no, that a subdural hematoma can be caused during child

19  birth?

20       A    Yes, I agree.

21       Q    And in this case, there was evidence from the CAT

22  scan of both chronic and acute subdural hematomas in this

23  baby's head, were there not?

24       A    Yes, and also hydromas.

25       Q    Just please just answer the question.  You don't

1   need to add anything.  You'll get a chance to add when the

2   state redirects you, okay.

3            I agree with you, you also testified there were

4   hydromas correct, yes?

5        A    That was the radiographic interpretation and I also

6   saw them.

7        Q    And in fact, the problem this child had was because

8   of the subdural hematomas, correct?

9        A    Incorrect.

10       Q    Incorrect.

11           So you don't agree that the problem was acute

12   subdural and epidural hematomas?

13       A    You've included epidural now.  He had several types

14   of hematomas.  He had several places in the brain where he

15   was bleeding.  The probable, the worst probable bleeding was

16   the bleeding that took place in the brain substance itself.

17   And in other order of endangerment to his life are

18   subarachnoid bleeding and epidural bleeding.  The least

19   likely of these four types of bleeding that he had in his

20   brain to be responsible for any sort of acute situation is

21   the subdural hematoma.

22       Q    You agree, do you not, that there was evidence of

23   an old injury in this baby?

24       A    Yes, there were hydromas.

25       Q    And there were also chronic subdural hematomas,

685

```
1   were there not?
2        A     There were multi-generational chronic subdural
3   hematomas in addition to hydromas.
4        Q     Pardon?
5        A     In addition to the four other types of bleeding.
6        Q     So you agree then that there were
7   multi-generational subdural hematomas?
8        A     Yes.
9        Q     Correct?
10       A     Yes.
11       Q     And multi-generational meaning it's happened more
12   than once, or twice, or three or four times, you don't know
13   how many times it happened, do you?
14       A     No.
15       Q     And every time you had a hematoma, that means you
16   had a new bleeding, isn't that true?  Because a hematoma
17   doesn't just materialize, it has to come from bleeding,
18   correct?
19            MR. PENNYPACKER:  Your Honor, it's a compound
20        question.  I don't think he let her answer his first
21        question.  If he could do that and then go to the next
22        question.
23            THE COURT:  The objection is sustained on both
24        counts.
25            THE WITNESS:  The reason I paused about
```

1       multi-generational is because I don't think we got into

2       how the body cleans up a hematoma.  I did mention the

3       development --

4              MR. TEDDER:  Ma'am.

5              THE WITNESS:  -- in occasion of a membrane.

6    BY MR. TEDDER:

7       Q    My question is simply, you saw multi, evidence of

8    multi-generational hematomas?

9       A    Yes.

10      Q    Yes, okay.

11           And in fact, the way a hematoma cleans up is it

12   creates a membrane around the hematoma, correct?

13      A    It may, it may not.

14      Q    And then the body sends in enzymes that dissolve

15   the blood and it sends it out, right?

16      A    It sends in white blood cells, which release

17   enzymes which dissolve the components of debris, dissolves

18   the brain tissue, the dead brain tissue, and then reabsorbs

19   it.  A membrane develops, if it's a large thing, a large

20   lake, and if there are any anatomical eyelets or convolutions

21   on the surface of it that you make a small bridge.  It is not

22   inevitable that it heals with the development of a membrane.

23      Q    It's your opinion that chronic subdural hematomas

24   usually do not rebleed, correct?

25      A    Correct.

1      Q      However, they can rebleed, that's correct as well,

2  isn't it?

3      A      They can rebleed if they have a membrane, a

4  neomembrane it's called.

5      Q      Now, you testified earlier today that you looked in

6  the eye and you could not even see the retina because of the

7  vitreous bleeding, correct?

8      A      Correct.

9      Q      Are you aware that the eyes were sent off for

10 pathological examination by Dr. Bell in Fort Lauderdale?

11     A      I don't know who sent them or who analyzed them,

12 but I was aware that the eyes were examined.

13     Q      Were you aware that his examination, his

14 microscopic examination of the eyes revealed that there was

15 no bleeding in the vitreous matter of the eye?

16     A      You mean ten days after the incident?

17     Q      Are you aware that he found no evidence of blood in

18 the vitreous matter, yes or no?

19     A      No, I wasn't aware of that.

20     Q      Are you aware that he also found evidence of old

21 bleeding in the eyes, not just recent?

22     A      I'm confused about what you're asking.

23     Q      Are you aware that Dr. Bell, who's a forensic

24 pathologist, examined the eyeballs of Robbie Quirello

25 microscopically and found evidence that there was old blood

1    in the eyes?

2         A    If you're asking if I'm aware of that, the answer

3    is no.  If you're asking if I was aware --

4         Q    That's all I asked you, were you aware.

5         A    -- there was old blood in the eyes, the answer is

6    yes.

7         Q    Pardon me?

8         A    If you were asking if I was aware that there were

9    old blood, there was old blood found on the postmortem

10   examination, the answer is yes.

11        Q    Now, your testimony is that the eyes can be shaken

12   around.  Isn't it true that eyes are anchored in the skull

13   with muscle and ligaments; isn't that true?

14        A    Muscle, ligaments, fat, skin, eyelids.

15        Q    They're anchored in the skull, correct?

16        A    Yes.

17        Q    Now, you're aware that, you are aware of the

18   autopsy findings in this case, are you not?

19        A    Not intimately.

20        Q    All right.  Would it surprise you that one of the

21   autopsy findings was anoxic ischemic encephalopathy global?

22        A    No, because that's what he had clinically.

23        Q    Which means lack of oxygen to the brain; isn't that

24   correct?

25        A    No.  It means lack of circulation to the brain,

1    compound lack of oxygen to the tissues.

2         Q    Doesn't anoxia mean due to lack of oxygen?

3         A    No.

4         Q    How would you define it?

5         A    Anoxia, anoxia means there isn't oxygen in the

6    immediate environment around the cell, not oxygen --

7         Q    Lack of oxygen, correct?  Lack of oxygen to the

8    cell?

9         A    Immediately around the cell.  Anoxia means that,

10   yes.

11        Q    And ischemic means the deficiency of the blood due

12   to the interruption of blood supply to that part; is that not

13   true?

14        A    It means an insufficiency of circulation or

15   surrounding fluid around the cell.

16        Q    And encephalopathy means any disorder of the brain,

17   does it not?

18        A    It means any disorder in the neuro electrical

19   functioning of the brain, not, it doesn't mean a disorder of

20   the anatomy of the brain.

21        Q    Now, you've testified this baby had bleeding both

22   epidural, subdural, subarachnoid, and I believe you also

23   testified you believe there was blood in the brain, in the

24   cranium itself; is that correct?

25        A    Yes.

690

1    Q    Are you surprised if you learned that the doctor

2  who did the forensic examination of the brain found no blood

3  in the cranium?

4    A    I would be very surprised.

5    Q    Now --

6    A    Did he look for it?

7    Q    -- would you expect as part of an autopsy for the

8  dura to have been sent off for an examination?

9    A    I would have expected that.

10    Q    Wouldn't you expect as part of an examination the

11  brain stem to have been sent off for microscopic examination?

12    A    In a suspected shaken baby?  Yes.

13    Q    Now, you testified there was no evidence of any

14  aspiration by this baby while in the hospital, correct?

15    A    Correct.

16    Q    Were you aware, you were aware, were you not, that

17  this baby, when he was first found by the emergency medical

18  technicians and the paramedics, was not breathing at all,

19  were you aware of that?

20    A    It was reported that he was in full arrest, which

21  means no heartbeat, no pulse, no blood pressure and no

22  breathing.  However --

23    Q    Were you aware that when the EMTs got there --

24         MR. PENNYPACKER:  Your Honor, I'd ask the doctor be

25         allowed to finish, please.

1          MR. TEDDER:  I'm asking her yes or no questions.

2          THE COURT:  Mr. Tedder, you have to allow the

3     witness to answer the question you pose and you cannot

4     interrupt her answer.  If you believe that the witness's

5     answer is unresponsive to your question, your remedy is

6     to ask the Court to direct the witness to answer your

7     question, not to interrupt.

8          MR. TEDDER:  Your Honor, I'd ask you to ask her to

9     answer the question.  I'm asking yes or no questions.

10         THE COURT:  There is no such thing as yes or no

11    questions that can be required of a witness.

12    BY MR. TEDDER:

13    Q    Are you aware that the EMTs, when they got to the

14    scene, found the baby not breathing, yes or no?

15    A    I am aware that at the time that they arrived at

16    the scene they found the baby gurgling and making noises and

17    having fluids coming in and out of its nose.

18    Q    Are you aware --

19    A    That's breathing.

20    Q    Are you aware that they had to vacuum out or

21    suction out the baby's breathing passages, are you aware of

22    that?

23    A    Well, they should, that's standard procedure.

24    Q    Especially if someone is choking on their own

25    vomit?

632

1       A     It's standard procedure regardless of whether

2  they're choking.  You want to optimize the passageway so that

3  there's the least amount of resistance to air moving in and

4  out.

5       Q     You're saying when you find a patient who's not

6  breathing, correct?

7       A     No, I'm saying it's standard procedure when you're

8  trying to stabilize a patient who is unstable.  Whether or

9  not they're breathing, you want to clean out their nasal

10 passages.

11      Q     Who's having a full respiratory arrest like this

12 child was, correct?

13      A     I'm not convinced he's had a respiratory arrest.

14 His blood gases do not support that.  The fact that he was

15 making vocal noises suggested he's getting air into his

16 lungs.  The fact that he's still moving is a sign that he's

17 meeting his metabolic needs.  We have no proof that he has

18 experienced a depravation of breathing, association of

19 breathing for a significant amount of time.

20      Q     So you're saying then that the four or five folks

21 who came in here yesterday and testified under oath that when

22 they arrived at the scene --

23          MS. SINGER:  I'm going to lodge the objection

24      because if he asks to make an opinion as to the

25      credibility of any other witness, that is improper, and

693

1      I'd be lodging my objection, and it sounds like it's

2      going in that direction.

3           THE COURT:  It does sound like that, but of course

4      not knowing the full question, I can't actually rule

5      yet.

6           But, Doctor, I'll ask you not to answer the

7      question until Mr. Tedder phrases it and so that I can

8      see if Mr. Singer is going to relodge that objection and

9      then I can rule on it.

10  BY MR. TEDDER:

11      Q    Now, would you agree, you would agree, would you

12  not, that if the baby was able to cry with the tube in his

13  throat that was supposed to be intubated to him that he was

14  not properly intubated?

15      A    Yes.

16      Q    And you're aware, are you not, that the first

17  doctor who saw this baby in the hospital, Dr. Rohlwing, had

18  the tube removed because the baby was trying to cry a little

19  bit and he knew that meant the tube wasn't properly

20  installed?

21      A    Actually it was our team who made that recognition

22  and advised Dr. Rohlwing that it ought to be removed.

23      Q    And you agree that this baby had seizures when he

24  arrived at the hospital?

25      A    No, I don't know that.

1     Q    You don't know that?

2     A    No.

3     Q    You testified just a moment ago, a few hours ago,

4  that the baby was having such a strong seizure that you could

5  pick him up by his leg and he was stiff as a board.

6     A    That's the intensive care unit, not the hospital.

7     Q    Okay.  So the intensive care unit is not part of

8  the hospital, is that your testimony?

9     A    I wasn't present in the emergency room when he came

10 in, and to my knowledge he was not seizing when he was

11 brought into the emergency room.

12    Q    Is the intensive care unit part of the Shands

13 Hospital or not?

14    A    That's kind of a silly question.  Yes, it is part

15 of the Shands Hospital.

16    Q    And he developed seizures in the hospital in the

17 intensive care unit, did he not?

18    A    He was probably seizing before he reached the

19 intensive care unit, because when he reached the intensive

20 care unit, he was in trouble because of the seizing.

21    Q    So the answer is then that you agree this baby was

22 having seizures at the hospital?

23    A    At the hospital but not on arrival to the hospital,

24 which is what your original question was.

25    Q    Did you see the baby when he first arrived at the

1   hospital?

2        A    No, I was not in the emergency room.

3        Q    Then you don't know what the condition of the child

4   was when he first got to the hospital, do you?

5        A    No, except from the medical records.

6        Q    Now, you've testified earlier today that when you

7   examined this baby's fontanelle, I believe you testified it

8   was soft and bulging?

9        A    Yes, when he first came to the intensive care unit

10  it was soft.

11       Q    Soft?

12       A    But full.

13       Q    But full, all right.  And in fact, the fact of the

14  matter is, that you made notes on the very day you saw this

15  child as to the condition of the child, did you not?

16       A    After he had been stabilized.

17       Q    And isn't it true that you wrote in one of your

18  notes, tense bulging fontanelle?

19       A    Yes, I did write that in my notes several times on

20  several different days.

21       Q    And you wrote it on the very first day you saw the

22  child, the first time you saw him, your initial exam, pale

23  chubby baby, tense bulging fontanelle?

24       A    What time was that note timed?

25       Q    It appears to be -- I'll read you the sentence you

1   wrote.  On arrival PQ, looks like approximately 10:50 above

2   it, ER personnel called out.  He was losing his HR, initial

3   exam, pale chubby baby, tense bulging fontanelle.  That was

4   your first examination, correct?

5       A    That's when he was seizing and was very, very

6   stiff.

7       Q    So your testimony this morning then when you first

8   examined the baby's fontanelle that it was soft, you're now

9   correcting it to it was tense, correct?

10      A    May I explain the difference between how the

11  fontanelle feels when a baby is seizing and stiff compared to

12  after he has been relaxed and pharmacologically sedated?

13      Q    Well, isn't it true that a tense bulging fontanelle

14  is evidence of intracranial pressure?

15      A    Yes, it is true.

16      Q    And isn't it true that intracranial pressure can

17  occlude the veinous drainage from the eyes; isn't that true?

18      A    No, not true.

19      Q    Not true?

20      A    That's absolutely not true.

21      Q    So if the neurosurgeon comes in here and says that,

22  you disagree with him, correct?

23      A    Yes, I do.

24          MS. SINGER:  Once again, Your Honor, I'm going to

25      ask that we -- we're going to be objecting to any

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1    questions where a witness is asked to make any comment

2    as to any other witness that's testified.

3         THE COURT:  Okay.

4         MR. TEDDER:  She's been allowed to testify as a

5    so-called expert.

6         MS. SINGER:  Yeah, but my objection is she can't

7    make comments on whether or not another witness is

8    telling the truth or not telling the truth.

9         THE COURT:  That objection will be sustained every

10   time it's made.

11   BY MR. TEDDER:

12        Q    Now, you concluded that this, what you believe to

13   be something called shaken baby because of three reasons,

14   unexplained hemorrhaging -- excuse me -- unexplained brain

15   injury, retinal hemorrhaging, and a story that was

16   suspicious, correct?

17        A    Correct.

18        Q    And you're not aware from your experience of any

19   unexplained subdural hematomas, you're not aware of something

20   like that?

21        A    I think the baby had a head full of unexplained

22   hematomas.

23        Q    And you've already agreed that subdural hematoma

24   can be caused during child birth, correct?

25        A    Correct.

1    Q    And were you aware then that this child had a very

2 difficult birth?

3    A    I was not aware on admission.  I found out

4 retrospectively.

5    Q    The child was born brow up with the umbilical cord

6 around his neck and suffered possibly a broken clavicle,

7 you're aware of those things, correct?

8    A    Yes, I was aware of that.

9    Q    And you agree, don't you, that a subdural hematoma

10 can spontaneously rebleed?

11        MR. PENNYPACKER:  Your Honor, I think that's been

12        asked and answered.

13        THE COURT:  Overruled.  You may answer the

14        question.

15        THE WITNESS:  No, I disagree with that.

16 BY MR. TEDDER:

17    Q    You disagree that subdural hematomas can

18 spontaneously rebleed?

19    A    They can rebleed if they have a membrane and in

20 response to a provocation.

21    Q    Now, you viewed the CAT scans that were done on

22 this child the first day he came in?

23    A    Yes.

24    Q    And in fact, you made a note in your report there

25 was no contusions or bleeding; isn't that correct?

1       A    On the initial one when he came in there were none

2    visible with a noncontrast CT.

3       Q    And the reason you brought in -- you had board

4    certified radiologists who looked at the CAT scans, correct?

5       A    There were about five of us who looked at the CAT

6    scans, all of us with a degree of sophistication in how to

7    interpret these.

8       Q    You would not defer to Dr. Agee or Dr. Quisling as

9    far as interpreting the CAT scan?

10      A    Oh, yes, and I did defer to them.  I sought out

11   both of their opinions.

12           MR. TEDDER:  May I have a moment, Your Honor.

13           (Pause in the proceedings.)

14   BY MR. TEDDER:

15      Q    Now, the baby, when the baby came in, you examined

16   the outside of his body, you saw absolutely no evidence of

17   any injury to the outside of his body; isn't that correct?

18      A    Not entirely.

19      Q    All right.  You saw the evidence of one, you

20   testified you saw one -- I've forgotten the term.  They try

21   to stick a needle into the baby's --

22      A    Interosseous.

23      Q    Interosseous.  You saw one of those, correct?

24      A    Yes.

25      Q    So you missed the fact that they actually inserted

1    two of these interosseous into the leg, correct?

2        A    I only saw one.

3        Q    You didn't notice that they had done it on both

4    legs?

5        A    No.

6        Q    And did you also notice that they had inserted an

7    IV into one of the baby's hands?

8        A    Yes.

9        Q    You saw that part?

10       A    Yes.

11       Q    So you saw the one interosseous and you saw the

12   evidence of the IV to one of the hands, but you did not see

13   the other interosseous on the other leg?

14       A    No.  I was not aware that he had a second

15   interosseous.

16       Q    And other than those three things, you didn't see

17   any other evidence of trauma to the outside of this baby, did

18   you?

19       A    Yes, I saw swelling over the left occiput but no

20   discoloration.

21       Q    And that indicates the brain has intracranial

22   pressure; isn't that true?

23       A    No.

24       Q    Not true?  Okay.  That's not true?

25       A    No.

1    Q    The CAT scan revealed that there was no broken
2  bones, correct?

3    A    Correct.

4    Q    And also the baby was X-rayed, correct?

5    A    He had a baby gram and he had a lateral neck.  I
6  don't believe he had the extremity X-rays.

7    Q    You're not aware that Dr. Williams reviewed X-rays
8  of the skull, his neck, and his chest area?

9    A    I am aware of that.

10   Q    And you reviewed chest X-rays in part to make sure
11  that the tubes for breathing and feeding that you chose to
12  put in this baby was located in the right position inside the
13  child's body?

14   A    That wasn't my major objective but, yes, I did take
15  note of that.

16   Q    And in fact, on those X-rays of the child's body,
17  there was no evidence of any broken bones in his chest,
18  correct?

19   A    Correct.

20   Q    No evidence of any broken bones in his neck,
21  correct?

22   A    Correct, but I'd like to add something there, and
23  that's that babies really don't have very brittle bones,
24  they're cartilaginous.  You don't see broken bones in babies
25  where you might see a broken rib or a broken neck in an

1    adult.  And the majority of neck injuries that happen to

2    babies are not seen on X-rays.  That's why they're called

3    without radiologic evidence.

4        Q    You're telling me babies can't break their bones,

5    is that what you're trying to tell this jury?

6        A    That's correct.

7        Q    That's correct?  So if I had a baby in here and I

8    was fool enough to take that baby and try to break his little

9    arm, you're telling me I couldn't do that?

10       A    You will bend it before you'll break it, but you

11   can --

12       Q    Bend it before I break it, well, I would think so.

13   So now are you telling this jury a baby's bones cannot be

14   broken or not?

15       A    No, they can be broken but they are --

16       Q    All right.  Very flexible?

17       A    -- elastic.  They are very flexible.

18       Q    Just like plastic?

19       A    And so the same force that would break an adult's

20   ribs will not break a baby's ribs.  And it's an extremely

21   rare thing to have a four month old baby with a broken rib

22   because they're just so elastic.

23       Q    Isn't it true that if you grabbed a baby and held

24   it tightly, as you're claiming Mr. Herlihy did, or the

25   state's theory of this case is, isn't it true that would have

1    left red marks on this child's chest and back?

2        A    There's two parts to that question.  The first is

3    that's what we're claiming, the state is claiming that

4    Mr. Herlihy has done, and I'm unaware that that's what the

5    claim is.  And the second part to that is would it leave red

6    marks if this had happened, and the answer is no.

7        Q    No injuries.  So you can take a child and do

8    whatever you want to it violently and you're not going to

9    leave any physical evidence on the outside, is that your

10   testimony to this jury?

11       A    It is certainly a possibility.

12       Q    It's a possibility that you could do that and not

13   leave any evidence of external trauma?

14       A    Absolutely.

15       Q    And it's also much more likely that if you did

16   something like that you are going to leave evidence of

17   external trauma; isn't that true?

18       A    Not in a baby.

19       Q    Not on a baby, why, because they're so flexible?

20       A    Yes, because they don't have the hard surface of

21   the bones or the hard surface skull to act as a resistance to

22   compress a blood vessel against.  So babies do not bruise as

23   easily as adults do.

24       Q    Are you aware of the findings Dr. Agee made after

25   the first CAT scan on this case?

1     A     What were they?

2     Q     On August 2nd at 11:46 A.M.

3     A     What were the words?

4     Q     I'm getting to that.  Probably multi-generational

5  hematomas.

6     A     Yes.

7     Q     And no evident fracture, correct?

8     A     Correct.

9     Q     All right.

10     A     That was also the identical interpretation of mine

11  and of Dr. Quisling's and of the neurosurgical fellow who was

12  down there on X-ray rounds with us.

13     Q     I believe you testified that the -- I've forgotten

14  my question.

15           And that was -- okay.  I read Dr. Agee's

16  interpretation.

17           Going to the interpretation of Dr. Quisling, are

18  you aware of his impression on August the 3rd at 12:06 P.M.

19  bi-frontal extra-axial fluid collections of mixed age,

20  subdural blood clots both subacute and chronic components.

21  Are you aware of that finding?

22     A     Yes.

23     Q     And chronic means old?

24     A     Chronic means it's lasted over a period of time

25  outside of the right now.  So you can't say how old, you can

1    just say it wasn't right now.  It wasn't acute.

2         Q    Acute is right now?

3         A    Acute is right now.

4         Q    Now, the history of the child that you relied on

5    was what you heard from Crystal Quirello, correct, the mother

6    of the child?

7         A    I heard several histories in the course of intake.

8         Q    You never spoke directly to Mr. Herlihy though,

9    correct?

10        A    I spoke indirectly to him but not directly.

11        Q    And you heard what he told Crystal and what he told

12   the police, correct?

13        A    I didn't hear what he told Crystal.  I was -- I

14   gave a list of questions to ask a police investigator to ask

15   Mr. Herlihy, and Mr. Herlihy gave his answers to the police

16   investigator to my questions, and she passed them back to me.

17        Q    Now, would you agree that lack of oxygen to the

18   brain can cause a seizure?

19        A    Yes.

20        Q    And so would you agree that this baby, if he choked

21   on his own vomit, that would cut off oxygen; isn't that true?

22        A    No, not necessarily.

23        Q    So --

24        A    It might be true.

25        Q    So choking to you does not mean cutting off

1    breathing?

2        A    Correct.  It means that your protective reflexes

3    are working, you're trying to preserve your airway.

4        Q    And if this baby was unable to protect his airway

5    and continued to choke, that he would continue to be unable

6    to breathe; isn't that true?

7        A    No.

8        Q    That's not true?  Okay.  And then if he -- it's not

9    true?  Well, then -- no.

10       Are you aware that the baby had vomited that

11   morning when this whole accident began?

12       A    I don't know if he vomited before the incident or

13   after the incident or during the incident.

14       Can we go back to the choking?

15       Q    Now, you wrote in your initial assessment on August

16   the 2nd, unknown duration of hypoxia, correct?

17       A    Correct.

18       Q    Hypoxia means lack of oxygen?

19       A    To the tissues.

20       Q    To the tissues.  And the brain is tissue, correct?

21       A    It's one of a whole body worth of tissues.

22       Q    And you did not know how long oxygen had been cut

23   off to the tissues, correct?

24       A    By the history.

25       Q    That's why you put unknown, correct?

1    A    The history could not relate how long the baby

2  might have been without oxygen or might have been without

3  circulation or might have been without access of either

4  oxygen or circulation to the brain bone.

5    Q    Were you aware when the EMTs got there the baby had

6  a good pulse rate as far as they were concerned?

7    A    Yes, and this is why I don't believe the baby was

8  in full arrest or down.

9    Q    He was just not breathing?

10    A    No, I think he was breathing, they did not

11 recognize it.

12    Q    I see.

13    A    If you can't breathe, you can't choke either.

14    Q    You wrote in your assessment on August the 2nd,

15 CHI, you wrote epidural and subdural hematomas and

16 possibility of previous trauma.  That's what you put on it?

17    A    Correct.  CHI means closed head injury.  In other

18 words, there's no broken skull and no broken skin over the

19 head but there is a significant injury within the head.

20    Q    That you don't know the cause of, correct, you have

21 a theory?

22    A    It's trauma.

23    Q    It's trauma?

24    A    Yes.

25    Q    And bleeding on the brain causes trauma, correct?

1    A    It's usually trauma causes the bleeding on the

2  brain.

3    Q    Well, I know you don't believe subdural hematomas

4  can spontaneously bleed.

5    A    No, I don't.

6    Q    However, if a subdural hematoma begins to bleed, it

7  is going to bleed on the brain; isn't that true?

8    A    No, it's going to bleed in between the dura and the

9  arachnoid.

10    Q    And that's going to cause irritation to the brain;

11  isn't that true?

12    A    It may cause irritation of the dura and it may

13  cause irritation of the arachnoid membrane, and there can be

14  a sympathetic response from the surface of the brain that

15  takes place, but equally likely is there may be no

16  sympathetic response or irritation on the surface of the

17  brain.  That's why people can go months and years with the

18  aftermath of a subdural hematoma and not have any symptoms

19  from it.

20    Q    Precisely, just like it could have happened in this

21  baby.  Born, gets a subdural hematoma, goes four and a half

22  months before he presents with a seizure.  You just said

23  exactly what could have happened in this case, didn't you,

24  Doctor?

25    A    No, I said you do not respond with irritation to a

1   situation, that aftermath of a chronic hematoma.  The blood

2   is mopped up.  The inflammatory reaction is gone.  There are

3   no blood vessels.  It is not an irritative sort of thing.

4        Q    So you're saying that a subdural hematoma does not

5   have to cause immediate symptoms, that's what you're saying,

6   is it not?

7        A    That is correct.  That wasn't what I was saying but

8   that statement is correct.

9        Q    But is that correct?

10       A    It does not have to cause -- in fact, it usually

11  doesn't cause immediate symptoms.  It is low pressure.  It

12  doesn't exert mass effect, and it is not highly inflammatory.

13  It is not guaranteed to cause a seizure.  It is much better

14  tolerated by the body than a subarachnoid hemorrhage, an

15  epidural hemorrhage or intracranial hemorrhage.  It's these

16  other three types of hemorrhages that got this baby into

17  trouble, not the subdural hematoma.

18       Q    Would you agree that a neurosurgeon would be much

19  better able to tell the jury what happens inside a person's

20  brain?

21       A    No.

22       Q    No?  Okay.  Very good.  How about a neurologist?

23       A    Oh.  I should ask, compared to what?

24       Q    Compared to you.

25       A    No.  The answer is no.

1    Q    How about a neurologist?

2    A    A neurologist I think is the expert in this field.

3    Q    But a neurosurgeon is not?

4    A    A neurosurgeon is concerned with anatomical issues

5    and structural issues of the brain and is less concerned with

6    the medical functioning of the brain.  For example, seizures,

7    the neurologists are specialists at seizures, the

8    neurosurgeon is not.

9    Q    All right.  So you're saying somebody who has a

10   seizure couldn't be operated on by a neurosurgeon?

11   A    No, that's not what I said at all.  I said if a

12   person has a seizure, they would go to a neurologist as the

13   specialist.  They would not go to a neurosurgeon.

14   Q    If somebody is having a seizure, they're probably

15   going to taken to the emergency room, they're not going to

16   drive themselves to a neurologist; isn't that true?

17   A    The emergency room treats them with the first line

18   treatment of the seizure, same as the intensive care unit

19   does, and then the neurologist is called in for the diagnosis

20   of why the seizure happened, for advice on what medications

21   to give to control the seizures, for the medical workup about

22   what might have caused the seizure, or how to interpret the

23   scans.  The medical management of what caused this seizure is

24   in the ballpark of the intensive care unit, the emergency

25   room, and the neurologist.  It is outside the field of the

1  neurosurgeon.  The neurosurgeon is designed to let off

2  pressure, change the anatomy, and remove dead stuff or take

3  out tumors.  It's a surgical thing, it is not a medical

4  discipline.

5       Q    Are you saying -- you're telling this jury that a

6  neurosurgeon is not in a medical field?

7       A    I'm saying he's a surgeon.

8       Q    And a surgeon is not in a medical field?

9       A    He is -- actually, in the old England days surgeons

10  were barbers.  They were not considered to be doctors.  The

11  heritage is that they're butchers, you know, they use knives,

12  they create anatomy, they do sculpture.  But the people that

13  manage the medical issues are the physicians.  That's why

14  Columbia University is called College of Physicians and

15  Surgeons.  They are distinguishing between a physician and a

16  surgeon.  We consider each other colleagues.  We work hand in

17  hand as a team.  But the experts in controlling the medical

18  things are the neurologists.  The experts in doing the

19  surgical repair or response to the condition are the

20  neurosurgeons.  One can't really exist fully without the

21  other.

22       Q    Well, I'm glad you mentioned the business about the

23  barber.  Isn't it true that in old England, you're right,

24  barbers used to cut people to try to heal them, make them

25  bleed and try to heal them, isn't that true?

712

1     A     Yes.

2           MS. SINGER:  Now I'm going to have to lodge an

3     objection as to relevancy, we're going into old England.

4           MR. TEDDER:  She brought it up.  She opened the

5     door, Your Honor.

6           THE COURT:  Well, since Dr. Dickinson raised the

7     issue, I will let you ask one or two follow-up

8     questions.  Obviously we're not going to go too deep

9     into history.

10          MR. TEDDER:  No.  Well, thank goodness I've only

11    been cut once in a barber shop and it hurt.

12          THE COURT:  You're testifying again, Mr. Tedder.

13          MR. TEDDER:  I'm sorry.

14  BY MR. TEDDER:

15    Q     But they used to believe that you can bleed people

16  and that would heal them?

17    A     Yes, that was the belief.

18    Q     And that's obviously a mistaken belief that

19  medicine once had, correct?

20    A     Actually, they still do it under some circumstances

21  today.

22    Q     Like we have too much pressure on the brain, we

23  might want to do something to drain the blood or the fluid on

24  the brain --

25    A     If your blood is too thick --

1    Q    Let me finish my question.  Like if you had too

2  much pressure on the brain, you might shunt it or do

3  something to relieve the pressure such as you testified

4  earlier today?

5    A    If there's too much fluid in the ventricles, the

6  pockets of cerebral spinal fluid, you can surgically put in a

7  drain and drain that off.  If there's a collection of blood

8  in the subdural area that is pushing the brain over onto the

9  other side, you can take off the skull and relieve the

10  pressure.  That's a surgical intervention.  If you have a

11  epidural hematoma that is rapidly expending and pushing the

12  brain over onto the other side, you can put in a bur hole or

13  take off a part of the skull and drain that off.  That's a

14  surgical intervention.  If you have increased pressure

15  because of swelling, that is not a surgical thing.  You can't

16  do a surgical technique to improve that, that's medical

17  management.

18    Q    So the answer then is yes, you can do surgery to

19  relieve pressure on the brain?

20    A    It's a possibility.

21    Q    Possibility, okay.

22    A    It's not the main reason it's done.

23    Q    Now, the subdural, chronic subdural and acute

24  subdural that was seen on the CAT scan was located

25  bilaterally, meaning on both sides of the child's skull,

1    correct?

2        A    Correct.

3        Q    And in fact, there was more evidence of chronic

4    subdural, meaning old blood, than acute subdural on the CAT

5    scans; isn't that true?

6        A    It depends on how you define more.  The more scary

7    was the acute.  The more worrisome was the acute.  The more

8    volume --

9        Q    So your answer is that there was more chronic or

10   more chronic subdural than acute subdural, isn't that true,

11   in size?

12       A    I would say there was more hydroma in size compared

13   to the evidence, the areas of multi-generation subdural that

14   still had blood elements in it.  The hydromas were larger

15   volume than the multi-generational chronics.  And the

16   multi-generational chronics were about equal in size in the

17   multiple areas of acute blood that was happening right now,

18   in several different parts of the brain.

19       Q    Now, you put in your notes on August 5th, the

20   fontanelle was still tense and bulging, correct?

21       A    It bulged, it got progressively more tense and more

22   bulgy as time went on.

23       Q    Progressively more tense, as you said, correct?

24       A    And that would be in a relaxed position because you

25   can't accurately assess the tenseness if the baby is

715

```
 1   screaming, coughing, grunting, straining to have a bowel

 2   movement or seizing.  Everybody's -- all children's

 3   fontanelles pop up when they are straining.

 4        Q    All right.  Then you wrote on your report on August

 5   the 6th, fontanelle tense and bulging but softer than on

 6   admission; isn't that correct?

 7        A    Correct.

 8        Q    Just a moment ago you testified that as the days

 9   went on, the fontanelle continued to become more and more

10   tense, and now you're admitting that actually it was a little

11   bit softer than the day he first came in; isn't that true?

12        A    I wasn't admitting, I was observing, and I was

13   interpreting it as a sign that the brain was liquifying.

14        Q    Isn't it true that if a baby, or anybody for that

15   matter, goes five minutes without oxygen to the brain the

16   brain is going to be permanently damaged?

17        A    Absolutely not.

18        Q    Absolutely not.  Oh, that's right, you're the one

19   who thinks a baby can go two hours without oxygen and the

20   brain will be fine, aren't you?

21        A    In cardiovascular surgery, the correction of

22   congenital heart surgery in babies of this age, babies are

23   cooled down and put, they're put on the heart pump, they are

24   cooled down and then everything is taken out, all lines are

25   taken out, the ventilator is turned off, the IVs are turned
```

1    off.   That baby is in a state of suspended animation and has

2    two hour's worth of heart operation, after which they warm

3    the baby back up, start the ventilator back up, and that baby

4    is neurologically intact.  Yes, a baby's brain can survive

5    two hours without any breathing and without oxygen under

6    specific circumstances.

7         Q    Under the circumstances that we encounter on a

8    daily basis, the answer is not two hours, is it not?

9         A    It depends on what you're doing on the daily basis.

10   If you're a cardiac anesthesiologist, you see it on a daily

11   basis.  If you're a cardiac surgeon, you see it on a daily

12   basis.  If you are resuscitating children that are pulled out

13   of ice water, you can see many minutes go by before it's

14   hopeless.

15        Q    120 minutes?

16        A    Yes.

17        Q    120 minutes?

18        A    66 is the record minutes of a little girl who was

19   pulled out of a cold water drainage in Salt Lake City.  She

20   was seen under water 66 minutes.  She was on the learning

21   channel not too long ago, within the last year, being

22   interviewed as a teenager.  She walks, talks, goes to school,

23   and she had known submersion, total lack of oxygen for 66

24   minutes.

25        Q    Well, let's talk about a baby who's, on August 2nd,

1   in Florida, in a home or an apartment that I assume had air

2   conditioning, although I don't know, those types of

3   conditions are considerably different than icy water; is that

4   not true?

5        A    They are different.

6        Q    If this baby goes five minutes without breathing

7   under those conditions, isn't it true that the baby would

8   have permanent brain damage?

9        A    No, it is not true.

10       Q    Not true?  Okay.

11       A    Absolutely unequivocally not true.

12       Q    All right.  So the baby, as soon as the EMTs got

13  there, they began to give this baby oxygen, correct?

14       A    I don't know.

15       Q    You don't know what they did.  Okay.  When the baby

16  got --

17       A    That would be standard procedure.

18       Q    When the baby got to the intensive care unit he was

19  being given oxygen, was he not?

20       A    When he got to the emergency room, he was given

21  oxygen.

22       Q    And he was being given oxygen because he couldn't

23  breathe on his own, isn't that true?

24       A    No, it's standard procedure, give the patient the

25  benefit of the doubt.  Oxygen is good.  In fact, there's a

1    saying, blood goes round and round, air goes in and out,

2    oxygen is good.  That's the basis of resuscitation.

3        Q    Now, turning to this video and what it demonstrated

4    as far as the theory of shaken baby, it's your testimony to

5    this jury that violently shaking a child will injure the

6    brain tissue before it does any damage to the neck; is that

7    correct, yes or no?

8        A    No, that was not my testimony.

9        Q    So you agree then that violently shaking a baby

10   causes or should cause neck injury?

11       A    Can cause neck injury.

12       Q    And wouldn't you agree that the focal point of

13   force being applied in such a, such a way is on the neck

14   itself, correct?

15       A    The fulcrum of force is at the neck.

16       Q    At the neck.  And that is where all the force

17   that's being exerted on that part of the body being

18   distributed down into the fulcrum; isn't that correct?

19       A    No, that's not correct.

20       Q    You agree that force equals mass times

21   acceleration?

22       A    Yes, Newton's Law.

23       Q    Basic Newton, Law of Newton, study of physics.

24       A    As applied to a flat surface without friction, like

25   a pool table.

719

1      Q      And as applied to any physical object in the world?

2      A      In space, if you --

3      Q      I'm not talking about outer space, ma'am, I'm

4    talking about the planet earth.

5      A      The earth has gravity.

6      Q      Correct.

7      A      Okay.  Gravity is an accelerational force.  If you

8    have a slanted surface, force equals mass times acceleration

9    needs a modifier, because you have the acceleration for

10   gravity and acceleration for the aftermath of the force that

11   was applied to the body.

12     Q      So you have two different forces or two different

13   accelerators being applied to the same mass to create

14   whatever force is created, correct?

15     A      No, it's the force that creates the acceleration,

16   not the acceleration that creates the force.

17     Q      Okay.  Now, are you aware that a study was done a

18   long -- I recognize that you specialize in pediatric medicine

19   and don't have an opportunity to read everything that's

20   published in the various journals, but were you aware of an

21   article study that was done by Dr. Ommaya back in the '60s

22   regarding whiplash?

23     A      He's a very well respected old time surgeon.  He

24   was the person who was responsible for developing the Ommaya

25   Reservoir that drains central spinal, cerebral spinal fluid

1    off, and he's also instrumental in treatment of cancers in

2    the brain.  He's very well respected in the childhood

3    literature.

4        Q    You're aware that he did a study published in the

5    Journal of American Medical Association, April of 1968, where

6    he did a study on whiplash injury and brain damage?

7        A    1968?

8        Q    Yes, ma'am.

9        A    The world has changed quite a bit since 1968.  That

10   was during the Vietnam war.  That was before the CAT scans

11   were developed.  That's before much of the neuro chemistry of

12   the brain and brain function --

13       Q    Are you aware or not of the study --

14           MR. PENNYPACKER:  Your Honor, I'd ask that

15       Dr. Dickinson be able to finish her answer.

16           MR. TEDDER:  She's not responding to the question,

17       Judge.

18           THE COURT:  Well, Mr. Tedder, let her finish the

19       answer, then you can ask her the next question.

20           THE WITNESS:  Many things have changed since the

21       1960s, especially in the field of neurology and

22       neurosurgery.  And the studies that were done in the

23       1960s were an excellent foundation, we needed them, but

24       we've moved on.  Science has moved on.  Technology has

25       moved on.  CAT scans have been invented.  The MRI was

1      invented.  Drain procedures and neurosurgical procedures

2      were invented.  And we have a great deal of better

3      understanding about how brains function or malfunction.

4  BY MR. TEDDER:

5      Q    You would agree, would you not, that whiplash

6  injury is injury to the neck?

7      A    And the head.

8      Q    Is it primarily to the neck and rarely to the

9  brain?

10     A    It's especially to the brain and to the mid brain.

11     Q    Mid brain?

12     A    It brings out the coup contrecoup type of forces

13 that are expressed in the head.

14     Q    Are you aware, are you aware of the study that

15 Dr. Ommaya did with some monkeys trying to determine the

16 amount of force that was created in whiplash accidents?

17     A    Yes, that study gained quite a bit of notoriety

18 among the animal rights people who objected to dropping a

19 ball on the head of Rhesus monkey at a static position --

20     Q    Obviously you haven't read the article.  So you're

21 not aware of how he did the studies on the monkeys, are you?

22     A    Yes, I am.

23     Q    Are you aware that the study was to determine what

24 force was needed to cause concussions, subdural hematomas,

25 and other injuries to the brain?

1      A    Yes, and I believe he was looking specifically at

2  translational forces and did not take into account angular

3  momentum or rotational forces or add in gravity.

4      Q    Are you aware that that study was then taken and I

5  believe another doctor, Dr. Duhaime, also did a study in

6  order to try and measure how much force could be created by

7  violently shaking something?

8      A    Yes, Dr. Anne Christine Duhaime was at Children's

9  Hospital of Philadelphia while I was there.

10      Q    And you're aware that her study concluded that the

11  amount of force that could be created by shaking did not come

12  anywhere near the force that would be needed to created

13  damage to the brain?

14      A    That was her conclusion.

15      Q    Thank you.

16      A    Although there were, she debated the pros and cons

17  of it throughout her career.

18      Q    In fact, she continued on and said that in order to

19  get the kind of force you would need to create damage to the

20  brain, you have to have shaking accompanied by a collision

21  with a hard object, isn't that true?

22      A    That is what she ended up concluding to explain the

23  subdural hematomas the intracranial bleeding and the other

24  types of axonal injuries that you see in victims of shaking.

25  She says, she postulates that you have to have two or three

1    different mechanisms of injury, acceleration, deceleration,

2    translational forces, and a blunt trauma, like a slap upside

3    the head.

4        Q    So her study was that you cannot do the damage,

5    create the force that is needed to a baby by merely shaking

6    it, that was her conclusion?

7        A    No, that was not her conclusion.  She thought it

8    was a combination of forces because you can't isolate, in

9    real life it's very difficult to isolate the types of forces

10   apart.  In other words, have an injury that takes place

11   without rotation or coup contrecoup type of blotment, and

12   that many incidences of shaking may also be accompanied by

13   throwing the baby down or by bumping the baby's head against

14   some other solid object in the course of being shaken.

15       Q    Are you aware that Dr. Ommaya has recently

16   published an article in the British Journal of Neurosurgery

17   in which he said his study regarding whiplash injury was

18   misapplied in the theory of shaken baby?

19       A    I was not aware of that.  I agree with it.

20       Q    Would you agree that the bleeding process is part

21   of the healing process of subdural hematomas?

22       A    Say that again, please.

23       Q    Isn't it true that the bleeding process is part of

24   the healing process of a subdural hematoma?

25       A    No, it's the initiator.  It initiates tissue

124

1    inflammation or tissue irritation, which calls out the

2    healing troops, and then the healing troops come in and start

3    the process of remedy.

4        Q    Now, it's safe to say in this case, is it not, that

5    this baby had increased intracranial pressure, correct?

6        A    Not in the beginning.

7        Q    Not in the beginning.  Yet the first examination

8    you made of this baby, you noted the fontanelle was tense.  I

9    think we said --

10       A    When the -- sorry.

11       Q    -- tense bulging fontanelle.  That doesn't indicate

12   to you --

13       A    When the baby was seizing, he was so stiff you

14   could pick him up by a leg, grunting and having trouble

15   managing his tongue, he was straining, and his fontanelle was

16   visibly bulging and was tense, as would any baby's under

17   those circumstances.

18       Q    And his fontanelle was never, was anything other

19   than tense while he was in the hospital?

20       A    No, that's incorrect.

21       Q    You wrote that it was tense and you wrote that it

22   was softer than before.

23       A    Look at the nurse's notes.

24       Q    Well, I'm looking at your notes, Doctor.

25       A    Okay.  Well, in his exam after he had Pentothal and

1   after he had Vecuronium, which makes him stop moving and stop

2   straining and stop seizing, at that point his fontanelle,

3   this is after he is intubated and I'm doing my very careful

4   physical exam, at that point his fontanelle was full but it

5   was still depressible.  And I believe in the emergency room

6   his fontanelle was described as sunken.

7        Q    Well, you wrote on August 2nd, 2000, tense bulging

8   fontanelle.

9             MS. SINGER:   What day was that, sir?

10            MR. TEDDER:   August 2nd.

11       A    When he rolled into the pediatric intensive care

12   unit seizing, stiff as a board, and struggling, his

13   fontanelle was tense and bulging.  After he had been given

14   medicines, it was full but not tense and bulging, and he had

15   no other signs of increased intracranial pressure,

16   hemodynamically, radiographically, or any other way.

17       Q    Isn't a seizure evidence of neurological

18   difficulty?

19       A    Yes.

20       Q    Then you wrote on August the 4th, 2000, fontanelle

21   tense, bulging, pulsative.  And then on August 5th you wrote

22   fontanelle still tense and bulging.  On August 6th,

23   fontanelle tense and bulging but softer than on admission.

24       A    Yes, as the brain was beginning to liquefy it was

25   getting softer.  That was on day four post-injury.

726

1    Q    So every time you examined the baby's fontanelle it

2    was tense; isn't that correct?

3        A    No, that's not correct.   That's what I wrote at the

4    time of the examination there, but when he was totally

5    relaxed on admission, his fontanelle was full.   You could see

6    it above the line of the skull but it was easy to depress.

7    As the brain swelling and the -- as the situation got worse,

8    as the brain swelling got worse, it became harder and harder

9    to depress it and became more and more obvious that they was

10   developing increased intracranial pressure.

11       Q    Now, your testimony is that the brain swelling did

12   not cause the retinal hemorrhaging, am I correct in that?

13       A    He came into the emergency room with retinal

14   hemorrhaging.

15           MR. TEDDER:   Judge, please ask her to just answer

16       the question.

17           THE WITNESS:   Yes, that is my testimony.

18   BY MR. TEDDER:

19       Q    So you don't believe that a brain can swell and put

20   pressure on the veinous drainage at the optic nerve, cut off

21   the veinous drainage thus causing pressure inside the eyes,

22   which could lead to retinal hemorrhaging; you don't believe

23   that's possible, correct?

24       A    You're asking for a very narrow range of pressures

25   exerted on the back of the eye, pressure low enough so that

1    the arterial supply can get into the eye but high enough so

2    that the veinous drainage can't get out of the eye.  That

3    means that it's got very high pressure, blood can't get into

4    the eye to get plugged up so it can't get back out.  And what

5    you would see there is a different sort of picture.  You

6    would see back of the eyes without blood.  You would see the

7    appearance of an embolic phenomenon inside the eyes.  You

8    would not see veinous engorgement or veinous bleeding.

9         Q    So your answer is no, you don't agree with that?

10        A    I don't agree that --

11        Q    Yes or no, do you or don't you agree with that?

12        A    That what?

13        Q    What I just asked you.

14        A    What did you just ask me?

15        Q    Whether or not brain swelling can cause veinous

16   occlusion that would lead to retinal hemorrhage?

17        A    It would have to be brain swelling within a very

18   narrow margin of pressure.  ICP, intracranial pressure, would

19   have to be lower than arterial pressure but above veinous

20   pressure.

21        Q    So you agree it can happen then?

22        A    Yes, within a very narrow range of pressures.

23        Q    You can't rule it out.  Thank you.

24             You ever play tether ball, Dr. Dickinson?

25        A    Back in the 1960s.

1      Q    That's the game, of course, where you have a ball

2  attached to a rope that's attached to a pole and you hit it

3  against an opponent who tries to hit it back the other way,

4  each of you trying to wrap it all the way around.

5           Would you agree that when you hit a tether ball as

6  hard as you can -- not playing the game but trying to hit it

7  as hard as you can -- you're going to apply a certain amount

8  of force to the ball when you hit it, which is then going to

9  be basically run out its course as it spins around the pole,

10 correct, so the force is going to be diffused as the ball

11 spins around the pole, correct?

12     A    The force is going to be applied to centrifugal

13 force.

14     Q    Now, if I hit a ball and it's flying around the

15 post, eventually it's going to quit spinning on the post and

16 it's going to halt, correct?

17     A    When the rope gets short enough so there's no

18 longer any radius --

19     Q    Okay, let's --

20     A    -- for the ever growing smaller circles.

21     Q    Let's say it's not going to wrap around the post.

22 Let's just say you've got a post with a small rope, maybe a

23 foot long or whatever, two feet, when you hit the ball, that

24 created a certain amount of force on the ball, correct?

25           Every action has an equal and opposite reaction,

1    correct?

2        A    That's correct.

3        Q    So if I hit this ball, it's going to start to fly

4    around in circle around the post, correct?

5        A    If it wasn't tied to the post it would keep going

6    in a straight line, and that's the vector of force that

7    you're applying is a straight line.  What you've got with the

8    tether, you've got a counter force and it's pulling the ball

9    off the course which will give it angular momentum.

10       Q    So the force that was immediately applied to the

11   ball when I hit it is being directed towards the point where

12   the rope is attached to the pole, isn't that correct, and the

13   pole has to counter that force?

14       A    Not entirely right.  What are you trying to get me

15   to say, that there is such a thing as centrifugal force?

16   Yes, there is.

17       Q    The force that's applied to the ball is directed to

18   the point where the rope is attached to the pole, correct?

19       A    No, not correct.

20       Q    Not correct?

21       A    The force that's applied to the ball will send the

22   ball in a straight line.  But the tether, the line that holds

23   it on there, is a counter force and it will pull it off the

24   line.  So energy is expended in redirecting the volley ball,

25   redirecting the ball into a circle.

1    Q    But the point that the rope is attached to the post

2    has to absorb all that force, has to be able to resist it,

3    does it not?

4    A    No.

5    Q    No?

6    A    No, it's not a resistive force.  It's a

7    countertraction force.  The force, the ball wants to go off

8    tangentially.  That's where the force is being applied.  And

9    it can't go tangentially, it just can go in small sections of

10   vectors around the circle in ever decreasing radiuses.  And

11   the smaller the radius goes, the faster the ball goes.  So

12   the same force to a same mass with a different radius will

13   cause acceleration, that's angular momentum.

14   Q    Now, would you agree, you would agree, would you

15   not, that all living tissue has a certain threshold before it

16   will be injured?

17   A    A certain threshold of what?

18   Q    Before it will sustain injury.

19   A    Yes.

20   Q    And in fact, Dr. Ommaya succeeded in doing

21   experiments with Rhesus monkeys that we talked about earlier,

22   wherein he determined the force that was necessary to cause a

23   concussion or a subdural hematoma; isn't that true?

24   A    Using translational forces and the static situation

25   where the monkey was strapped into a chair, not allowed to

1   turn his head, just sitting there watching the ball come at

2   his forehead, he got a direct blow, and you can calculate

3   with physics, the amount of translational force.  But that's

4   not analogous to a monkey not tied in a chair who's trying to

5   run away and is trying to avoid this or can duck and get the

6   glancing blow rather than a blow right in the middle of his

7   forehead.

8       Q   It's the closest thing that science has been able

9   to come up with to measure the amount of force necessary to

10  cause brain injury, is that true or not?

11      A   It is inhumane in many people's opinion to conduct

12  experiments on either animals or children to determine how

13  much force is needed to create a subdural hematoma.

14      Q   Well, this isn't Nazi Germany, Dr. Dickinson, we're

15  not conducting experiments on children.  Nobody has to my

16  knowledge.

17          MS. SINGER:  Judge, at this time I'd like to

18      object.

19          THE COURT:  What's your objection?

20          MS. SINGER:  Argumentative.

21          THE COURT:  The objection is sustained.

22  BY MR. TEDDER:

23      Q   Doctor, nobody has conducted experiments on

24  children to your knowledge, have they?

25          Is that a difficult question?

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1       A    Yes, it is.

2       Q    I mean experiments as to what we're talking about.

3       A    We conduct experiments every day on children in

4  terms of how do they react to this medication or how did they

5  react to this cancer therapy.  Those are experiments.

6       Q    Are the parents being told?

7       A    Yes.

8       Q    Fine.  Are there any studies being conducted, any

9  experiments being conducted on children to determine what

10  kind of force is needed to cause a child's a brain to suffer

11  brain injury?

12       A    No, I don't think so.

13       Q    That's what we're talking about here, Doctor.

14       A    It's considered inhumane and illegal.

15       Q    Yes, indeed.  However, Dr. Ommaya, back in the '60s

16  did conduct experiments with Rhesus monkeys wherein he tried

17  to determine the amount of force that was required to cause

18  brain injury, isn't that true?

19            MR. PENNYPACKER:  Your Honor, I think this is the

20         third time this question has been asked.

21            THE COURT:  Asked and answered, the objection is

22         sustained.

23  BY MR. TEDDER:

24       Q    Are you aware of the forces that he determined were

25  necessary to cause a concussion, yes or no?

1    A    In a monkey strapped to a chair, not moving, and

2  under translational issues only.  There was no angular

3  momentum.  There was no impact of gravity.  There were none

4  of the other variables that are in true life.

5    Q    So the answer is yes or no, you are or are not

6  aware of the forces he determined which were necessary?

7    A    Under certain circumstances, under specific limited

8  circumstances he determined, he made calculations about how

9  much force in a linear application, in a translational force,

10  like hitting a billiard ball, he determined how much force

11  would make that billiard ball go a certain distance on a flat

12  surface.

13    Q    He didn't do it with billiard balls, he did it with

14  monkeys.

15    A    I'm explaining to you what translational force is.

16    Q    Well, I'm not interested in that.  I want to know

17  whether or not you know what the forces were that he

18  determined after doing these experiments, killing the

19  monkeys, cutting them open, taking a look at their brains,

20  what forces did he determine that were needed to cause

21  subdural hematomas, concussions, and other brain injuries?

22    A    It's totally irrelevant because what he did to the

23  monkeys does not apply to real life.

24    Q    Okay.  So monkeys, would you or would you not agree

25  that monkeys and other primate creatures are the closest

1    animals to mankind?

2         A    No, I wouldn't agree.

3         Q    You would not?  Okay.  What other form of life is

4    closer to mankind than monkeys and apes?

5         A    Actually, fetal pigs have a closer similarity to

6    the retina than baby monkeys do.

7         Q    And in fact, recently experiments have been done

8    with fetal pigs as far as measuring retinal hemorrhaging as

9    well; isn't that true?

10        A    That's true.

11        Q    Wouldn't you agree it's important to know how much

12   force is needed to cause brain injury, that's an important

13   thing to know?

14        A    No.

15        Q    You don't think that's important?

16        A    It's totally irrelevant.

17        Q    Totally irrelevant.  Okay.  And wouldn't you agree

18   it's important to know how much force a person can put on an

19   object that is roughly shaped the same size as a baby by

20   shaking it?

21        A    No.

22        Q    That's not important to you?  Okay.

23        A    No, it's how the mass responds.

24        Q    So the only thing that's important to you is you've

25   got three findings and then you jump to a conclusion; is that

1    what you're saying?

2         A    No.

3         Q    What scientific studies are you aware of, if any,

4    that have shown how much force is needed to cause the kind of

5    brain injury we're talking about in this case?

6         A    Force is irrelevant.

7         Q    Force is irrelevant.  So physics don't apply to the

8    injury that Robbie Quirello suffered, is that what you're

9    saying?

10        A    In that equation that you quoted, force equals mass

11   times acceleration, the baby mass is small.  The same amount

12   of hit or force that is applied to a small baby, small mass,

13   will accelerate that mass at an exponentially faster pace,

14   faster velocity, send it a farther distance, and have a

15   greater exertion of gravity than will of identical force to a

16   larger mass.  So the important part of that equation is the

17   acceleration and what happens to the baby at the end of the

18   acceleration than to how hard he was hit.

19        Q    Well, there's no evidence whatsoever in this case

20   that the baby was hit, you're aware of that, are you not?

21        A    There was no external physical evidence, which does

22   not eliminate the fact that there was blunt trauma or shaking

23   or impact on the baby's head to explain the amount of

24   bleeding inside his head.

25        Q    Unless, of course, the chronic subdural hematoma

736

1    began to spontaneously bleed, which led to a seizure, which

2    led to this whole problem?

3         A    No, I reject that hypothesis.

4         Q    You reject that.

5         A    I think it's very farfetched.

6         Q    Are you aware of mandatory reporting in the State

7    of Florida for child abuse?

8         A    Am I aware that it exists?

9         Q    Yes.

10        A    Yes.

11        Q    In fact, if you report child abuse in good faith

12   and it turns out it's not child abuse, you're immune from

13   liability?

14             MR. PENNYPACKER:   Your Honor, it's beyond the scope

15        of direct.   And she's not an attorney, he's asking for a

16        legal conclusion.

17             MR. TEDDER:   She's aware of it.

18             THE COURT:   Sustained.

19   BY MR. TEDDER:

20        Q    So it's your testimony then, Dr. Dickinson, that a

21   person can take a baby, shake it violently, cause injury to

22   the brain but no damage to the neck; is that your testimony?

23        A    No.

24        Q    Okay.   So you agree that there would be damage to

25   the neck, correct?

1    A    There could be damage to the neck.

2    Q    And you agree that in order to determine whether or

3  not there's damage to the neck, the brain stem and other

4  tissues from the neck should have been sent off for an

5  autopsy for microscopic examination?

6    A    Before you get to autopsy you can do a clinical

7  exam on how the spinal cord functions and how the cranial

8  nerve functions and how the brain stem functions.

9    Q    In fact, you indicated that you could have done an

10  MRI to the baby, Robbie Quirello, to determine whether or not

11  he had any injury to his neck, to his brain stem, when he was

12  in the hospital while he was still alive, you could have done

13  that, couldn't you?

14    A    It would be technically possible to do it but I'm

15  not sure why I would want to do it, because he's moving his

16  arms and legs.  I know his spinal cord is intact.  He's

17  spontaneously breathing.  I know his breathing center in his

18  brain stem is intact.  He's opening his eyes, both eyes.  I

19  know the nerves that go to his eyelids are intact.  Those are

20  brain stem functions.  He's constricting his pupil.  That's a

21  brain stem function.  So if his brain stem is functioning and

22  his spinal cord is functioning, so the injury there was not a

23  devastating injury.  It's not what we were dealing with as

24  the acute incident which was life threatening to him, and

25  that was in his head.

1    Q    You don't know whether or not he had any injuries

2    to his brain stem or not?

3    A    I would imagine he did.

4    Q    Imagine, but you don't know, yes or no, you don't

5    know, you didn't examine the brain stem at all, did you?

6    A    Yes, I did.

7    Q    You did?

8    A    I examined the function of all the nerves that come

9    out of the brain stem, the hemodynamic response, the

10   breathing, the breathing pattern, the movement of the arms

11   and legs.  All the things that the brain stem is responsible

12   for doing and the spinal cord is responsible for doing, I

13   examined clinically.  I concluded clinically that he didn't

14   have a broken neck.  He didn't have a broken spinal cord.

15   And he didn't have a life threatening situation in his brain

16   stem that would have stopped his breathing.

17   Q    And yet after you drew the conclusion that this

18   baby suffered from shaken baby, the baby's brain was sent off

19   for an autopsy to determine what damage was there; isn't that

20   true?

21   A    There being the brain?

22   Q    In the brain.

23   A    You said the brain was sent off to determine what

24   damage was there?

25   Q    Yes.

1      A     Yes, that's true.

2      Q     Because just because you find something doesn't

3  mean it's necessarily so; isn't that true?

4      A     No, that's not true.  If I find it, it's there.

5      Q     You never make a mistake, is that right?  Never

6  make a mistake, Doctor?

7      A     Of course I make mistakes.  I'm human.

8      Q     And in fact, the most important piece of the brain

9  that should have been sent off for examination was the dura;

10 isn't that true?

11     A     It depends on what you want that information for.

12 For forensic reasons, yes, probably so.

13     Q     Well, the whole theory of shaken baby is that the

14 connecting veins or the blood vessels or whatever, the

15 connecting vessels or whatever you call them, ridging vessels

16 or ridging veins, are between the outside of the brain and

17 the dura, through the dura, correct?

18     A     Actually, no, that's not correct.

19     Q     Okay.

20     A     That's an explanation of where a subdural comes

21 from, but there's a whole lot more to shaken baby than just a

22 subdural hematoma.  The more vital problem is what happens in

23 the middle part of the brain, in the white matter part of the

24 brain.

25     Q     Which was shown to have no damage?

1    A    No, he had damage.

2    Q    You did the autopsy?

3    A    No, I didn't do the autopsy.  But I have seen the

4    CT scans and I have done a clinical exam on him.

5    Q    The autopsy showed that this baby's injury was due

6    to lack of oxygen to the brain which led to brain swelling.

7    It doesn't mention anything about damage to the inside of the

8    brain, are you aware of that?

9    A    I think that's not an appropriate interpretation of

10   the conclusion that the baby died of anoxic ischemic

11   encephalopathy, which I would agree with a hundred percent.

12   That doesn't mean there was no damage to the internal part of

13   the brain, the deep part of the brain.

14   Q    Would you agree microscopic --

15   A    And anoxic ischemic doesn't mean stopping

16   breathing.

17        MR. GROLAND:  Your Honor, we've got another round

18        of questioning.  May I ask the Court to perhaps think

19        about taking a recess now?

20        THE COURT:  No.

21        MR. GROLAND:  May I approach with the state for one

22        second?

23        THE COURT:  Yes.

24        MR. GROLAND:  Thank you.

25        (A sidebar discussion was held:)

```
 1              MR. GROLAND:  Your Honor, I've got five or six
 2         questions that I've scribbled out.  I don't think
 3         Mr. Tedder can read my notes.  I'll ask the questions
 4         myself with the court's permission.
 5              THE COURT:  Sure.
 6              MR. GROLAND:  Thank you.
 7              (The sidebar discussion was concluded.)
 8                       CROSS-EXAMINATION
 9    BY MR. GROLAND:
10         Q    We're almost finished.  Dr. Dickinson, do you agree
11    that the evidence in the CAT scan of the older injury to this
12    child's brain was very definitive?
13         A    Yes.
14         Q    And you do indeed, even though you're not a
15    radiologist, have extensive training in radiology, correct?
16         A    Correct.
17         Q    And in fact, the five people that we were talking
18    about that looked together with you at this CAT scan that
19    morning all agreed with your interpretation that the evidence
20    of the older injury was indeed definitive, correct?
21         A    Correct.
22         Q    And it is also true that your examination of the
23    CAT scans in this case led you to conclude that what we have
24    here are multiple traumatic events over a period of time that
25    injured this child's brain, correct?
```

1      A     Correct.

2      Q     And I've got one last question or two.  And in

3  fact, it is also your opinion, is it not, that the evidence

4  of these multi-generational hematomas in Robbie's brain means

5  to you that what we have here are repeated injuries or

6  repeated bleeds over a period of time, correct?

7      A     Correct.

8      Q     And in fact, trying to date these older injuries

9  that extend over a period of time is basically impossible, we

10  can't do that?

11      A     Correct.

12          MR. GROLAND:  No further questions, Your Honor.

13          THE COURT:  We are going to take a recess now for

14      15 minutes.  Ladies and gentlemen, if you'll step back

15      into the jury room.

16          (The jury exited the courtroom and a recess was

17  taken.)

18          THE COURT:  Anything we need to put on the record

19      before the jury comes back in?

20          MS. SINGER:  Not from the state, Your Honor.

21          THE COURT:  Doctor, are you ready?

22          THE WITNESS:  Yes.

23          THE COURT:  Go ahead and bring the jury in.

24          (The jury entered the courtroom.)

25          THE COURT:  Mr. Pennypacker, go ahead.

1                    REDIRECT EXAMINATION

2    BY MR. PENNYPACKER:

3        Q     Dr. Dickinson, Mr. Tedder asked you whether or not

4    the subdural hematoma was Robbie's main problem at the time

5    of admission and your answer was no.  What was his main

6    problem?

7        A     Acute bleeding on the brain surface and multiple

8    sites of bleeding that were happening right now.

9        Q     You were asked about the presence of blood in the

10   vitreous and the eyes and the examination done by

11   Dr. Boughner some ten days later after admission.  Would

12   there be a healing process for the retinal hemorrhages and

13   the vitreous hemorrhages during the child's stay in the

14   hospital?

15       A     Yes, there is a healing process, and I believe

16   Dr. Levine could address this better, he visited the baby

17   almost on a daily basis to see how the eye process was coming

18   along.

19       Q     The cause of death at least as listed by the

20   medical examiner is anoxic ischemic encephalopathy.  What

21   does the term final pathway mean, do you know what that

22   means?

23       A     Yes, it means as the body, as the organism winds

24   down towards death and the fires start to go out, the final

25   common pathway is that the heart stops, the breathing stops,

1   and the metabolism stops.

2       Q    Is that a simpler way of saying anoxic ischemic

3   encephalopathy?

4       A    Yeah, sort of.  It's not identical.  It doesn't

5   mean the same thing, because the final common pathway of the

6   heart stopping, the breathing stopping, and the metabolic

7   function stopping, can happen from reasons other than

8   ischemic or depravation of adequacy of circulation or lack of

9   oxygen.

10      Q    The cause of death as listed by the medical

11  examiner is not a recitation of the injuries that were

12  existing on August 2nd; is that right?

13      A    That is correct.

14      Q    Was there any evidence of aspiration in the chest

15  X-rays?

16      A    None whatsoever.

17      Q    Was there any evidence of aspiration in the blood

18  gases or any of the tests that were done on the child?

19      A    None whatsoever.

20      Q    Who made the decision to remove the endotracheal

21  tube in the emergency room?

22      A    I did.

23      Q    Do you know what Apgar scores are?

24      A    Yes.

25           MR. TEDDER:  Objection, this is beyond the scope of

1    cross-examination.

2         MR. PENNYPACKER:  I believe he asked about the

3    difficult birth.

4         THE COURT:  Objection is overruled.

5  BY MR. PENNYPACKER:

6    Q    Are Apgar scores of eight and nine good scores?

7    A    They're excellent scores.

8    Q    What's that indicate as far as the neurological

9  condition of a baby at birth?

10   A    That he had full tone, could bring his arms up into

11 this position (indicating), into a fisting position, could

12 make a grimace with his face, could bring his legs up in a

13 frog position, and had a very good cry, scream, that

14 neurologically he was intact.  He probably lost a point for

15 color because very commonly there's a little bit of grayness

16 left around the mouth.  That would be a score of nine.

17        His one minute score was eight or his five minute

18 score was eight?

19   Q    Honestly, Doctor, I don't know.

20   A    But either way, ten is a perfect situation, and

21 it's hard to achieve.  Nine is better than most babies

22 achieve at their ten minute score and even getting up to

23 eight is pretty admirable at a one minute or a five minute

24 score.

25   Q    Is that consistent with the child's suffering from

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1    a subdural hematoma at the time of birth?

2        A    If the child had had a intrauterine event, a brain

3    injury while he was still inside his mother, and the brain

4    had had opportunity to mop up the blood in the subdural space

5    and the blood in the, any brain debris in the developing

6    brain, he could have been born with a hygroma, a fluid filled

7    pocket where blood used to be.

8            And so your question again was what?

9        Q    I'll rephrase it.  If the birth process itself had

10   caused a subdural hematoma, would that be consistent with

11   Apgar scores of eight and nine?

12       A    Yes, he could have a subdural hematoma occurring at

13   the time of birth that was asymptomatic, as most are, and he

14   could still have a good neurologic exam and still be very

15   well.

16       Q    If he had --

17       A    There are a number of studies that show when the

18   when a baby dies of something else and is autopsied,

19   something in the neonatal period will cause the death of baby

20   and the baby is autopsied, there's been description of

21   coincidental finding of hematomas in resolution, presumably

22   from the birth process.

23       Q    If he had had a subdural hematoma as a result of

24   the delivery process, how long would it take for his brain to

25   mop it up?

1    A    About a week.  It would be rare to last longer than

2    a week.

3    Q    Would you continue to see that on the CAT scan?

4    A    You would see it as a hygroma, something without

5    blood in it, a pocket of fluid usually in the frontal parts

6    of the brain that is under low pressure and is usually

7    accompanied with an absence of brain tissue in the area where

8    there is normally brain tissue.

9    Q    You mentioned that on your examination of Robbie

10   when he made it to the pediatric intensive care unit, you saw

11   swelling on the occiput; is that correct?

12   A    Yes.

13   Q    Why do you suppose that existed at that time?

14   A    I think he had a traumatic incident and it just

15   never turned black and blue.

16   Q    What is the baby gram?

17   A    It's an X-ray of the head, neck, chest and abdomen,

18   and it's a surveillance screen looking for life threatening

19   conditions that would need immediate intervention and

20   immediate recognition.  In the neck, you look for disruption

21   of the neck.  In the head, you look for obvious skull

22   fractures.  In the chest, you're looking in particular for a

23   collapsed lung or blood in the chest or something called a

24   widened mediastinum.  Mediastinum is an area in the middle of

25   the chest that contains the heart and the big blood vessels.

1   So if something had twisted the heart or torn loose a big

2   blood vessel, this mediastinum area would fill up and take up

3   a disproportionate amount of space.  You would also look for

4   evidence of a ruptured diaphram, so the intestines would be

5   not in the abdomen, they would be up in the chest.  And you

6   would look for any evidence of ruptured stomach or ruptured

7   intestine, which can happen with a blow to the abdomen.

8       Q    Would it be fair to call occiput swelling a bump on

9   the head?

10      A    Yes.

11      Q    You related that you had communicated with police

12  officers indirectly with Mr. Herlihy and you were given

13  facts, or at least statements or allegations as to how the

14  child gotten wedged into the bed?

15      A    Yes.

16      Q    Was that consistent with the injuries that he

17  presented with in the hospital?

18      A    No, not at all.

19      Q    The constellation, three elements of shaken baby

20  syndrome, that is a diagnosis and not a theory; is that

21  correct?

22          MR. TEDDER:  Objection.

23          THE COURT:  Sustained.

24  BY MR. PENNYPACKER:

25      Q    Are the three elements of shaken baby syndrome a

1  constellation of symptoms that you look for to make that

2  diagnosis?

3          MR. TEDDER:  Objection.

4          THE COURT:  Overruled.

5          THE WITNESS:  Yes.

6  BY MR. PENNYPACKER:

7      Q    You mentioned that there was evidence on the CAT

8  scans of the bilateral bleeding in the subdural space.  Would

9  that mean there would be tearing of the bridging veins on

10  both sides of the --

11     A    Yes.

12     Q    The discussion about the Newtonian laws of physics

13  and how they apply to the interior of a baby's head when he's

14  shaken, are the tissues, the white matter, the gray matter,

15  dura, are all those of the same density?

16     A    No, they're of multiple densities.  There are some

17  gelatinous elements that are about the consistency of a

18  poached egg, a little bit more than a poached egg.  But more

19  of the elements are closer to water balloons, like the

20  ventricles are filled with water and they are like a water

21  balloon.  There are some very fibrous areas like fish line,

22  very small fish line that can be cutting.  There are some

23  areas that are like barely cooked spaghetti, some of the long

24  axons are like barely cooked spaghetti, so they're still

25  pretty stiff.  There are some firm jello areas.  And all of

750

1   these are encapsulated in a surface that is irregular, that

2   has tethers coming in, tethers to the ears, tethers to the

3   nose, tethers to the falx, tethers to the brain stem.

4   There's multiple holes in the base of the skull where nerves

5   go out, and the nerves are pretty tough fibrous little

6   creatures.  They are not soft and gelatinous like some of the

7   surface anatomy of the brain.  So there is a whole group of

8   constituents here, all of different densities, all of

9   different weights, all of different vulnerabilities, and all

10  of which will be accelerated at different velocities, and all

11  of which will have a different inertia and a different

12  momentum.

13      Q    Would the result be that --

14           MR. TEDDER:  Objection, leading.

15           THE COURT:  The objection is overruled at this

16      time.  However, Doctor, in case Mr. Tedder it is right

17      and this does turn out to be a leading question, don't

18      answer it until I see whether or not there's a leading

19      question.  Mr. Pennypacker, finish your question.

20  BY MR. PENNYPACKER:

21      Q    Would the part of the brain that had a lesser

22  density and the part of the brain that has a greater density

23  travel at the same distance given the same initial force?

24           THE COURT:  There is no objection.  You can answer

25      the question.

1      A      No.   Momentum is mass times velocity.   Mass has --

2   mass per volume is density.   The distance something will

3   travel is dependant on its mass, on its volume, on its

4   density.   So something that's heavier that's hit with the

5   same force will go a shorter distance; and something that's

6   lighter, hit with the same force, will travel a farther

7   distance.   Things that are elastic will absorb the impact and

8   bounce off at a faster velocity and for a farther distance.

9   And things that are gelatinous and will absorb, like a smurf

10  ball, will absorb some of the shock, will act more as a

11  bumper.

12          So in any given part of the brain, the same force

13  will cause different accelerations, different distances

14  traveled, different momentum, and different impact on the

15  opposite surface, because the force is translated to the

16  opposite surface.   The speed at which something splats into a

17  wall is going to be different depending on how much mass and

18  what the characteristic density of it is, like hitting a

19  tennis ball against a wall versus hitting a poached egg

20  against the wall versus hitting a water balloon against the

21  wall.   They all impact with a different significance.

22      Q    So what happens to all of the different density

23  tissues inside the brain when a baby is shaken?

24          MR. TEDDER:   Objection, Your Honor, area of

25      expertise.

1          THE COURT:  Overruled.

2      A    It acts like a scrambler.  Back and forth with

3  different accelerations and different impacts on the opposite

4  side will injure different parts of the brain differentially.

5  There are some characteristic points of vulnerability that

6  are related to the constituents.  For example, the tough falx

7  that is right in the middle does not give, and if anything is

8  accelerated into it or just under it, it will be skinned; it

9  will receive a lacerating type of movement.

10          If something is slammed, the frontal parts of the

11  brain are slammed or impacted into the back of the eye, that

12  has a translational force into the fat in the back of the

13  eye, and that's a different type of force or different type

14  of injury than what one might see where the front of the

15  brain stem travels a very short distance and then impacts

16  against the base of the skull in front of the brain stem.

17          The end result of what I'm saying is that it acts

18  as a scrambler, things bounce back and forth at different

19  speeds with different impacts and different surfaces to land

20  on and that causes a variety of injuries.

21      Q    Is that what happened inside Robbie Quirello's

22  brain?

23          MR. TEDDER:  Objection, speculation.

24          THE COURT:  Overruled.

25      A    Robbie had evidence of multiple types of injuries

1    in multiple parts of his brain suggesting that he had

2    multiple forces in play, not just one.

3        Q    You were asked about Dr. Ommaya and his study with

4    Rhesus monkeys and apparently his assertion that recently he

5    wants to question how that study was used.  You said you

6    agreed with that.  Why did you agree with that?

7        A    The interpretation of whiplash was misunderstood, I

8    believe was the statement, or that his concept of the

9    mechanisms behind whiplash had been inappropriately applied

10   to babies.  My speculation would be that --

11            MR. TEDDER:  Objection to what the speculation

12       would be.

13            THE COURT:  The objection to speculation with

14       regard to this question is sustained.

15   BY MR. TEDDER:

16       Q    Mr. Groland asked you about the multi-generational

17   injuries in the child's head and whether or not that was

18   evidence that he had suffered trauma on more than one

19   occasion.  Was any of the old trauma evident in the places

20   where he bled inside his brain other than the subdural space?

21            Not a clear question; should I try it again?

22       A    Anatomically his brain was normal, with the

23   exception of the frontal hydromas, which are leftover, mopped

24   up, totally resolved subdurals.  So his ventricle system was

25   anatomically normal.  His brain shape was anatomically

**754**

1   normal.  The only thing that might be considered somewhat

2   abnormal is he had a smaller brain than the size of his

3   skull, meaning that there was probably some atrophy or

4   wasting of the surface of the brain or that the brain was not

5   growing as rapidly as it should have been.

6        Q    You were asked whether or not it was possible to

7   date the hydromas.  Can you say what the minimum age of the

8   hydromas must have been?

9        A    A couple of weeks.

10       Q    Was it the old injuries that killed him or the new

11  injuries?

12       A    The new injuries.

13            MR. PENNYPACKER:  That's all.

14            THE COURT:  All right.  May Dr. Dickinson be

15       released from the subpoena or not?

16            MR. GROLAND:  I think we need to approach on that

17       issue.  Ms. Singer.

18            THE COURT:  Does this need to be on the record?

19            MR. GROLAND:  Yes.

20            (A sidebar discussion was held:)

21            MR. GROLAND:  There is impeachment testimony that

22       we want to elicit from her that's not related to the

23       direct examination.

24            She's living out of town?

25            MS. SINGER:  Yes.

1          MR. GROLAND:  Where is she living?

2          MS. SINGER:  Indiana, I believe.

3          MR. GROLAND:  Illinois.  Will you permit me to go

4     into the question?

5          MS. SINGER:  No, sir.

6          MR. GROLAND:  No?

7          MS. SINGER:  No.

8          MR. GROLAND:  Then I can't excuse her at this

9     point.

10         MS. SINGER:  She can be excused and he can arrange

11    to have her come back when he needs her.

12         MR. GROLAND:  Who's going to pay for that?

13         THE COURT:  Are you intending to call her as a

14    rebuttal witness?

15         MR. GROLAND:  Yes.

16         THE COURT:  Then you'd have to pay for that.

17         MR. GROLAND:  I don't want to excuse her.  She's

18    under subpoena now, Judge, I'm not agreeing to excuse

19    her.  She's under is subpoena.

20         MS. SINGER:  She can go back home.

21         THE COURT:  We'll address her at the end of the

22    day.  I'm going to release her.

23         (The sidebar discussion was concluded.)

24         THE COURT:  Doctor, we're going to release you from

25    the courthouse at this time.  There is some possibility

1          that you might be recalled, and so we'll give you

2          instructions at the end of the day or send word to you

3          as to how available you need to be, but you don't need

4          to stay in the courthouse for the rest of the afternoon.

5          Thank you very much.

6               Ms. Singer, Mr. Pennypacker, call your next

7          witness.

8               MS. SINGER:  State would call Nicole Perrone from

9          Florida Department of Law Enforcement.

10              One moment, Your Honor.

11              (The witness entered the courtroom.)

12              MS. SINGER:  Ms. Perrone, will you take the witness

13         chair and we'll start with you in a second.

14              THE WITNESS:  Thank you.

15              THE CLERK:  Raise your right hand for me, please.

16              (The witness is duly sworn by the clerk.)

17              THE CLERK:  You may be seated.

18              MS. SINGER:  Your Honor, if I may just approach the

19         clerk.  It is my understanding, for the record, that

20         Mr. Groland has no objection to the chain of custody,

21         that we can go ahead and open these with these

22         witnesses, the evidence that was actually collected by

23         another witness who will be longer testimony and who

24         lives in -- and who is available to us later.  Is that

25         correct, Mr. Groland?

```
 1            MR. GROLAND:  That's correct.
 2            MS. SINGER:  I can begin, Your Honor, individually
 3       anyway.
 4   WHEREUPON:
 5                      NICOLE PERRONE,
 6   called as a witness herein, having been first duly sworn, was
 7   examined and testified as follows:
 8                     DIRECT EXAMINATION
 9   BY MS. SINGER:
10       Q    Ms. Perrone, if you would state your full name,
11   please, for the record?
12       A    Nicole Perrone.
13       Q    And your occupation or profession, please?
14       A    I'm a crime laboratory analyst with the Florida
15   Department of Law Enforcement in the Jacksonville Regional
16   Laboratory.
17       Q    What training do you have -- in fact, what's your
18   educational background, first of all?
19       A    I've earned a bachelor of science degree from
20   Michigan Technological University in the field of clinical
21   laboratory sciences.
22       Q    And after that were you then hired by the Florida
23   Department of Law Enforcement?
24       A    Yes, I was.
25       Q    Did you receive training from them?
```

758

1    A    Yes, I did.

2    Q    And how much training did you receive from them?

3    A    I went through two different training programs.

4  The first one was approximately six months in length; and the

5  second one was specific for DNA training, and that was

6  approximately one year in length.

7    Q    And what type of position do you hold with the

8  Florida Department of Law Enforcement, what is your job

9  description?

10   A    I'm a serologist, which means I examine items of

11 evidence for the presence of biological material.

12   Q    And is that also known as forensic serology?

13   A    Yes, it is.

14   Q    Do you, after making examination and testing, make

15 reports to law enforcement agencies regarding your findings?

16   A    Yes, I do.

17   Q    And are you a member of any professional groups

18 related to your area of expertise?

19   A    Not at this time.

20   Q    Is this a daily job, examining for fluids and

21 making reports?

22   A    Yes, it is.

23   Q    As a part of your duties, how many such tests have

24 you run in the course of being a serologist with the Florida

25 Department of Law Enforcement?

1        A     I've probably run thousands of tests.

2        Q     Is part of your job to render opinions regarding

3    your testing at depositions that have been taken by counsel?

4        A     Yes.

5        Q     And is part of your job also offering testimony in

6    criminal cases when called for, as you have been today?

7        A     Yes, it is.

8        Q     Have you testified at trial?

9        A     This is my first trial.

10       Q     Have you been deposed, have you had your deposition

11   taken?

12       A     Yes, I have.

13       Q     And at that time you've been qualified to give

14   opinions at deposition?

15       A     Yes.

16       Q     Opinions on serology and your findings?

17       A     Yes.

18            MS. SINGER:  Your Honor, at this time I would

19       tender Nicole Perrone as an expert in the field of

20       forensic serology for the purpose of testifying about

21       evidence that was provided to her by the Gainesville

22       Police Department.

23            MR. GROLAND:  We would be happy to stipulate that

24       you are an expert.

25            THE COURT:  Go ahead.  She will be allowed to give

760

1           her opinion testimony.

2    BY MS. SINGER:

3           Q     In the course of your employment as a forensic

4    serologist for the Florida Department of Law Enforcement, did

5    you have occasion to examine certain items or exhibits

6    provided to you by Gainesville Police Department under FDLE

7    Laboratory Number 20010402844?

8           A     Yes, I did.

9           Q     Could you explain to the jury how you would come

10   about getting these items, how are they received by the

11   laboratory?

12          A     Evidence is received into the laboratory via the

13   evidence intake section where each case and exhibit is given

14   a unique identifying number.

15          Q     And do you have an intake system, a place where

16   these items come into the lab?

17          A     Yes, we do.

18          Q     And are the items in a sealed container when

19   they're received by the laboratory?

20          A     Generally they are, yes.

21          Q     Once they're received by the laboratory, how do you

22   as the forensic serologist receive the items for testing?

23          A     I receive it from the evidence intake section, and

24   it's documented both electronically and on paper.

25          Q     And once you receive the items then do you go on

1    and begin your examination, testing of each item

2    individually?

3        A    Yes, I do.

4        Q    Did you do that in this case?

5        A    Yes, I did.

6        Q    When you would receive a particular item, and we're

7    going to go through the individual items, because I do want

8    to review them individually, but generally speaking, when you

9    get each item, do you do a visual examination first?

10       A    Yes, I begin by making note of the packaging and

11   the container that the evidence was received in.  I then open

12   the evidence, examine the evidence visually for any

13   possibility of biological staining.

14       Q    And once you do the visual examination, do you then

15   do chemical testing?

16       A    Yes, I do.

17       Q    What kind of chemical testing do you do?

18       A    We have chemical tests to help us identify

19   biological materials, such as semen, saliva and blood.

20       Q    Once you do the chemical testing, are there any

21   further testing means available to you to identify the source

22   of the particular bodily fluid?

23       A    I am qualified to attempt to develop a DNA profile

24   from biological material.

25       Q    If you are given a known blood sample, such as in

```
 1    this case, I believe you were supplied with a known liquid

 2    blood sample of Robbie Quirello, are you able to compare the

 3    known blood samples with unknown samples that may have been

 4    found on exhibits of evidence that were provided to you?

 5        A    Yes.

 6        Q    Did you do that in this case?

 7        A    Yes, I did.

 8        Q    At this point, Ms. Perrone, once you did the

 9    testing, did you prepare a report?

10        A    Yes, I did.

11        Q    Did you bring that report with you today?

12        A    Yes, I did.

13        Q    Because I know there were quite a number of items

14    and we're going to go through each one individually.  Before

15    we get started though, I want to make it clear to the jury

16    that you would receive all these items, one submission, all

17    of the items would be received by you for examination?

18        A    Correct.

19        Q    So this would be your entire case?

20        A    Correct.

21        Q    And then you would go through each item one by one?

22        A    Yes.

23        Q    Would you start with the first item?

24        A    In this case I did, yes.

25        Q    And that would have been Exhibit 119-I-14,
```

1    described to you as the navy blue onesie?

2         A    Yes.

3         Q    Let me go ahead and show you what's been previously

4    marked into evidence and has been opened, Exhibit 8 for the

5    state, and tell me whether or not you can tell on the

6    markings of the bag whether or not this was the navy blue

7    onesie that you examined pursuant to the request made by the

8    Gainesville Police Department on April 26th, the year 2001?

9         A    Yes, I can clearly see my handwritten initials on

10   this package.

11        Q    And what were the results of your testing and

12   examination of this particular item, Exhibit 8, into

13   evidence?

14        A    On the navy blue onesie, I failed to demonstrate

15   chemical indications for the presence of blood.

16        Q    So you did not find any blood on the onesie?

17        A    I did not.

18        Q    Let me now go over 119-I-16, the blood sample for

19   Robbie Quirello.  I think I have it on my desk.  That would

20   have been the liquid blood sample that you would have used to

21   make the comparison?

22        A    Correct.

23             MS. SINGER:  If I may have a moment, Your Honor.

24        If may I approach the witness.

25   BY MS. SINGER:

1       Q    Known blood sample of Robbie Quirello marked as

2  119-I-16.  Take a look at this particular envelope, and I ask

3  you whether or not that is in fact the liquid blood sample

4  from Robbie Quirello that you used in order to do further

5  testing once you determined that there was blood or unknown

6  blood on some of the samples that you, some of the exhibits

7  that you examined?

8       A    Yes, I can identify this package, again, by my

9  initials.

10          MS. SINGER:  Your Honor, at this time I'd like to

11      move this particular exhibit into evidence as the next

12      numbered state's exhibit.

13          MR. GROLAND:  No objection.

14          THE COURT:  It will be admitted as the State's

15      Number?

16          THE CLERK:  Eleven, Your Honor.

17          THE COURT:  Eleven in evidence.  Thank you.

18          (State's Exhibit No. 11 was moved and admitted into

19  evidence.)

20          MS. SINGER:  We're not going to open this for

21      further examination since it is a blood product.  I'd

22      ask that it be marked on the outside.  If the jury

23      wishes to open it, I think they probably would need to

24      have gloves provided.

25  BY MS. SINGER:

1      Q    The next item that you examined is marked in your

2   notes as 388-1-2.  I think we can do all three of these,

3   one-two, one-three, one-four, that are described as stains.

4   It says here small white stain, red stain, and large stain.

5   I'll have you look at each of these and tell me what they are

6   and what you did with each of those items.

7      A    The first one I had was 388-I-2, and it was

8   described to me as a large white stain; 388-I-3 was little

9   white stain; and 388-I-4, red stain.

10     Q    Did you find in opening the packages that in fact

11  they were Q-tip swabs of collections?

12     A    Yes, I did.

13     Q    And did you analyze those particular items?

14     A    Yes, I did.

15     Q    Were you able to find any unknown bodily fluids or

16  blood on these items that demanded further examination?

17     A    On the large white stain and the small white stain,

18  I found no chemical indications for the presence of blood;

19  and on the red stain, I did identify a sample that gave

20  positive indications for the presence of blood.

21     Q    Did you further test that exhibit, which would be

22  I-4, to determine whose blood it was that you -- or to

23  compare it to the known blood of Robbie Quirello?

24     A    I did develop a partial DNA profile from the red

25  blood stain.

1    Q    And were you able to give a number as to what the

2    likelihood is that the blood that you found on that

3    particular swab did in fact come from Robbie Quirello?

4    A    The frequency of occurrence of the partial DNA

5    profile from the red stain from unrelated individuals in the

6    following populations is approximately 1 in 40 in the

7    Caucasian population; 1 in 200 in the African American

8    population; and 1 in 40 in the Southeast Hispanic population.

9         MS. SINGER:  I'd ask that the three items be marked

10        into evidence as the next numbered exhibits for the

11        state.

12        MR. GROLAND:  No objection.

13        THE COURT:  They will be admitted into evidence as

14        12, 13 and 14; is that right, Mr. Clerk?

15        THE CLERK:  Yes, Your Honor.

16        MS. SINGER:  Once again, they will not be opened at

17        this time, Your Honor.

18        (State's Exhibit Nos. 12, 13, and 14 were moved and

19    admitted into evidence.)

20    BY MS. SINGER:

21    Q    The next item I show that you've examined is the

22    item that's been identified to you 388-I-10.  And in your

23    note you indicate three separate pieces and you marked them

24    10(f), 10(g) and 10(h); is that correct?

25    A    That's correct.

1        Q        Why is it that, Ms. Perrone, that you would have

2   made a separation as to items in this particular bag?

3        A        This piece of evidence was a very large section of

4   carpet and the three areas that I tested were not in close

5   proximity to one another, so I differentiated them by the

6   letters F, G, and H.

7        Q        Why don't we go ahead and open that at this time.

8   And I'll be happy to go without gloves and you put your

9   gloves on because you'll need them.  If you could step down

10  and show the jury where you marked the particular area so the

11  jury can see when you refer to different areas on the carpet.

12  Hold it up high enough for them to see.

13       A        There were several other areas on the carpet that I

14  examined.  F, G, and H were where I took samples from for

15  further DNA testing.

16       Q        And after removing samples for DNA testing, were

17  you able to identify whether or not there was any evidence of

18  blood or bodily fluids at the particular sites that you

19  marked?

20       A        I was able to develop a partial DNA profile from

21  stain F, G and H.

22       Q        Were you able to further identify -- come back down

23  and show where the partial DNA profile came from.

24       A        All three of them gave partial profiles, F, G and H

25  (indicating).

1      Q    And were you able to make a further determination

2  as to whether or not the profiles were consistent with that

3  of Robbie Quirello?

4      A    Yes, I was.

5      Q    And are you able to give us the numbers for that?

6  I know you need to look at your report, so if you could go

7  back and do that for the jury so they can understand what the

8  findings were.

9      A    Stain F gave a frequency of occurrence of the

10 partial DNA profile for unrelated individuals in the

11 following populations:  Approximately 1 in 69 billion in the

12 Caucasian population; 1 in 12 trillion in the African

13 American population; and 1 in 110 billion Southeast Hispanic

14 population.

15          MS. SINGER:  Thank you.  Your Honor, at this time

16      we would tender this item for entering into evidence as

17      the next numbered exhibit.

18          THE COURT:  Any objection?

19          MR. GROLAND:  No objection.

20          THE COURT:  Number 15?

21          THE CLERK:  Yes, Your Honor.

22          (State's Exhibit No. 15 was moved and admitted into

23 evidence.)

24 BY MS. SINGER:

25      Q    Let me show you, I believe, your next examination

769

```
1    took place at 388-I-11; is that correct?

2         A    Yes.

3         Q    Described to you as a large pillow sham from bed?

4         A    Yes.

5         Q    And does this package appear to be the package that

6    you received at that time?

7         A    Yes.  Again, I can identify it by my handwritten

8    initials.

9         Q    And did you do a visual inspection first?

10        A    Yes, I did.

11        Q    Do you know whether or not you received the pillow

12   with the sham over the pillow and then you removed the sham,

13   or whether or not the pillow and the sham were separated when

14   you --

15        A    When I received the pillow, it was in the

16   multi-colored sham.

17        Q    Did you remove the pillow from the sham to do your

18   examination?

19        A    Yes, I did.

20        Q    When you repackaged it did you keep the sham off of

21   the pillow?  In other words, did you --

22        A    I didn't make note of that.

23        Q    All right.  We're opening it up now.  I'm going to

24   show you first this particular item, which I believe would be

25   described as the pillow.  Do you recognize that?
```

1       A     Yes, I do.

2       Q     And let me show you this second item from the bag,

3   which I would identify as a sham.  Do you recognize that?

4       A     Yes, I do.

5       Q     Did you do a visual inspection of the sham to

6   determine whether or not there was any staining on the sham?

7       A     Yes, I did.

8       Q     Did you find any staining or note any staining on

9   the sham when you visually inspected it?

10      A     I did not note any staining on the sham.

11      Q     Did you examine the pillow itself after removing

12  the sham?

13      A     Yes, I did.

14      Q     And did you note any staining or evidence of bodily

15  fluids on the pillow?

16      A     I tested one area on the pillow.

17      Q     What did you find?

18      A     Negative for the chemical indications for the

19  presence of blood.

20      Q     Now, can you show the jury where you actually

21  tested the pillow?

22      A     Letter A (indicating).

23            MS. SINGER:  At this time, Your Honor, I tender

24        this as the next numbered exhibit into evidence.

25            THE COURT:  Any objection?

171

1          MR. GROLAND:  No objection.

2          THE COURT:  That would be 16 and 17; is that

3     correct?

4          THE CLERK:  Yes, Your Honor.

5          MS. SINGER:  If you to want to make it into two

6     separate items, I would prefer to make it a composite

7     exhibit.

8          THE COURT:  16(a) and (b) will be fine.

9          MS. SINGER:  We'll make the sham A and the pillow B

10     because we might want to actually make it into a pillow

11     at some other time in the case.

12          (State's Exhibit Nos. 16(a) and 16(b) were moved

13     and admitted into evidence.)

14     BY MS. SINGER:

15     Q    Was the next one you looked at, the next item on

16     your list is I-12, 388-I-12?

17     A    Yes, it is.

18     Q    I show you I-12, and do you recognize that

19     particular packaging?

20     A    Again, my handwritten initials are on it.

21     Q    And what was it described to you as being when you

22     first received it?

23     A    Pillow in white pillowcase.

24     Q    Would you have removed the pillow from the white

25     pillowcase to do your examination, just as you did with the

1    sham pillow earlier?

2        A    Yes, I would have.

3        Q    Did you note -- did you visually examine both the

4    white pillow and the pillowcase?

5        A    Yes, I did.

6        Q    And did you note any staining on the pillow itself?

7        A    On the pillow itself, yes, I did.

8        Q    And is this where you marked the Letter D?

9        A    There should be letters A through D.

10       Q    All right.  If you would show the jury that.

11       A    Area D is on the pillow, and A through C should be

12   on the pillowcase.

13       Q    All right.

14       A    And here we have A, B (indicating).

15       Q    Let me put it the right way, I'm holding it upside

16   down.

17       A    There's A and B on the pillowcase on the front and

18   on the back we have C (indicating).

19       Q    And did you then proceed -- D is on the pillow,

20   which would be right there (indicating)?

21       A    Yeah.

22       Q    Then did you proceed to do testing on those

23   particular areas?

24       A    Yes, I did.

25       Q    And were you able to make any findings whatsoever

1   after examining these areas?

2       A    Stains A through D were all negative for the

3   chemical indications for the presence of blood.

4            MS. SINGER:  I'd like to move this into evidence as

5       the next numbered composite exhibit, the pillowcase

6       being the A exhibit, and the pillow being the B exhibit.

7            MR. GROLAND:  No objection.

8            THE COURT:  17(a) and (b).

9            THE CLERK:  Yes, ma'am.

10           (State's Exhibit Nos. 17(a) and 17(b) were moved

11  and admitted into evidence.)

12  BY MS. SINGER:

13      Q    The next exhibit that you examined was I-13?

14      A    Correct.

15      Q    Which is described as pillow in sham with medical

16  tape; is that correct?

17      A    Yes.

18      Q    Take a look at this package and tell me whether or

19  not you recognize this as being the package that you opened

20  and examined?

21      A    Yes, it is.

22      Q    We'll open it right now.  Once again, would you

23  have removed the sham from the pillow in your examination?

24      A    Yes, in this case there was a sham -- there was a

25  pillow inside of a pillowcase inside of a sham.

774

1      Q    So there should be three pieces in this package?

2      A    Correct.

3      Q    First taking the pillow out, did you examine the

4 pillow visually to determine whether there was any stains?

5      A    Yes, I did.

6      Q    And did you find any staining on the pillow itself?

7      A    I tested no areas on the pillow.

8      Q    Did you then examine the pillowcase, which would be

9 the first sleeve on the pillow?

10     A    Yes, I did.

11     Q    Is this the pillowcase you examined?

12     A    Yes, it is.

13     Q    Did you find any evidence of staining on this case,

14 on the pillowcase that you later tested?

15     A    I tested no areas on the pillowcase.

16     Q    Then the third item was the sham itself?

17     A    Correct.

18     Q    It was on the outside of the pillow?

19     A    Yes.

20     Q    Did you examine this item visually?

21     A    Yes, I did.

22     Q    Did you note any areas of staining on this

23 particular item that you then tested subsequently?

24     A    Again, the sham contained no visible stains.

25         MS. SINGER:  Your Honor, I'd like to move this into

1    evidence as the next numbered composite exhibit.

2         THE COURT:  Any objection?

3         MR. GROLAND:  Sorry, Your Honor?

4         THE COURT:  Any objection?

5         MR. GROLAND:  No objection.

6         MS. SINGER:  Now, on this particular sham you noted

7    that there was the appearance of medical tape?

8         THE COURT:  Excuse me.  There's no objection.  Let

9    me announce for the record it will be admitted into

10   evidence as State's 18; is that correct?

11        THE CLERK:  Yes, Your Honor.

12        THE COURT:  A, B, and C.

13        MS. SINGER:  The sham will be A, the pillowcase

14   will be B, and the pillow itself will be C.  We're on

15   18?

16        THE CLERK:  Yes, ma'am.

17        (State's Exhibit Nos. 18(a), 18(b) and 18(c) were

18   moved and admitted into evidence.)

19   BY MS. SINGER:

20        Q    On 18(a), just to clarify for the jury, you noted

21   there was medical tape on the sham, and I'm going to show you

22   the particular area.  Would you show the jury where the

23   medical tape is located?

24        A    It begins in this corner and bends around and ends

25   over here (indicating).  It's approximately 12 inches long.

1    Q    That was examined visually by you?

2    A    Yes.

3    Q    And my understanding was there was nothing of value

4  here for you to test?

5    A    That is correct.

6    Q    The next item I show you received was I-15 or

7  388-I-15; is that correct?

8    A    Yes, it is.

9    Q    And that is described as being a pillow in a white

10  pillowcase; is that correct?

11   A    Yes.

12   Q    Once again, does this package appear to be the

13  package that you received with that item?

14   A    Yes, it does.

15   Q    And did you, once again, take the pillow out of the

16  pillowcase in order to examine it and test if necessary?

17   A    I did.

18   Q    The pillow itself, did you examine it visually for

19  the appearance of staining?

20   A    Yes, I did.

21   Q    Did you locate any staining on the pillow?

22   A    I found no stains of serological value on the

23  pillow.

24   Q    And the pillowcase itself, did you examine the

25  pillowcase for evidence of staining?

```
 1        A    Yes, I did.

 2        Q    Did you find any evidence of staining on the

 3   pillowcase?

 4        A    I did not.

 5             MS. SINGER:  Your Honor, I ask at this time to

 6        tender this as the next numbered composite exhibit, A as

 7        the pillowcase, and B as the pillow.

 8             THE COURT:  Any objection?

 9             MR. GROLAND:  No objection.

10             THE COURT:  All right.  19, Mr. Clerk?

11             THE CLERK:  Yes, Your Honor.

12             THE COURT:  Nineteen A and B.

13             (State's Exhibit Nos. 19(a) and 19(b) were moved

14   and admitted into evidence.)

15   BY MS. SINGER:

16        Q    I next show exhibit marked 388-119, is that the

17   next exhibit that you examined pursuant to the request from

18   the Gainesville Police Department?

19        A    388-I-19?

20        Q    Yes, ma'am.  Is that the next one?

21        A    Yes.

22        Q    Does this appear to be that particular exhibit?

23        A    Yes, it is.

24        Q    I'll go ahead and open that.  It was described to

25   you as a --
```

1        A      Throw pillow matching shams.

2        Q      Did you visually examine throw pillow matching

3   shams?

4        A      Yes, I did.

5        Q      Did you locate any evidence of staining that you

6   further examined and tested?

7        A      I did not.

8              MS. SINGER:  At this time, Your Honor, I'd like to

9         enter this in as the next numbered exhibit.

10             THE COURT:  Any objection?

11             MR. GROLAND:  No objection.

12             THE COURT:  Admitted as number 20, Mr. Clerk?

13             THE CLERK:  Yes, ma'am.

14             THE COURT:  Twenty in evidence.

15             (State's Exhibit No. 20 was moved and admitted into

16   evidence.)

17   BY MS. SINGER:

18       Q      Next exhibit I show is 388-I-32, which you have

19   split into four separate matters, 32-A, 32-B, 32-C and 32-D;

20   is that correct?

21       A      Yes.

22       Q      And you described this as a sealed brown paper bag

23   containing a white T-shirt, white kitchen towel with red

24   stripe, white kitchen towel with blue stripe, and white bath

25   towel; is that correct?

1       A       That's correct.

2       Q       Does this appear to be the package -- did I say

3   I-33?

4       A       No, this is I-33.

5       Q       I need I-32.  I'm sorry I apologize, I-32, and I

6   need 34-A and B and that would be at the end so maybe

7   I'm -- oh, we're in good shape.  I have everything.

8           I'm going to go ahead and show you I-32 now.  Is

9   this the package reflecting the four items that you

10  identified once you opened the brown paper sack?

11      A       Yes.  I can recognize this package by my case

12  number, initials, and exhibit number.

13      Q       Let me go ahead and open it for you right now.

14  Which of the four items did you examine first?

15      A       I began with the white T-shirt, which was

16  388-I-32-A.

17      Q       Would you have marked it as 32-A on the item?

18      A       Yes, on the inside of the neck, and it's there.

19      Q       And did you notice any presence of staining for

20  testing purposes on this particular T-shirt?

21      A       Yes.  I tested areas A through the letter K.

22      Q       All right.  And if you could, go ahead and show us

23  where the items A through K are.  It appears that the T-shirt

24  is inside out or right side in?

25      A       We tested both sides, so there will be lettering on

1    the inside as well as the outside.  I'm trying to find A to

2    start with.

3        Q    I think the A is right down here (indicating).

4        A    Thank you.  We have A at the bottom inside front of

5    the T-shirt.  B just above it.  C, D, E, F and G are on the

6    inside chest area of the T-shirt.  H and I are on the back

7    inside of the T-shirt.  J is on the back bottom of the

8    T-shirt.  And K is on the left armpit of the T-shirt.

9        Q    Did you test the particular areas to determine

10   whether or not there was any evidence of blood or bodily

11   fluids on the T-shirt?

12       A    I did.

13       Q    Were you able to make an identification of any

14   blood or bodily fluids on this particular T-shirt?

15       A    All of stains, A through K, were negative for the

16   chemical indications for the presence of blood.

17            MS. SINGER:  I'd like to have the T-shirt marked as

18        the next numbered exhibit.

19            THE COURT:  Any objection?

20            MR. GROLAND:  No, Your Honor.

21            THE COURT:  Exhibit 21 in evidence for the state.

22            (State's Exhibit No. 21(a) was moved and admitted

23   into evidence.)

24   BY MS. SINGER:

25       Q    You then tested 32-B, white kitchen towel with red

1    stripe; is that correct?

2        A    Yes, it is.

3        Q    Take a look at this and tell me whether or not that

4    is 32-B?

5        A    Yes, it is.

6        Q    And did you note any staining on the white kitchen

7    towel with red stripe?

8        A    Yes, I tested two areas.  A, in the top half of the

9    right side; and B, in the lower half of the right side.

10       Q    And were you able to obtain any evidence of bodily

11   fluids after testing those particular areas?

12       A    A was positive for the chemical indications of

13   blood; and B was negative for the chemical indications of

14   blood.

15       Q    Did you then check 32-C, described as the white

16   towel with blue stripe?

17       A    Yes, I did.

18       Q    And what were the findings on the testing

19   examination of C?

20       A    I tested one area labeled here as A.

21       Q    And what did you find?

22       A    And it was negative for the chemical indications of

23   the presence of blood.

24       Q    Did you then examine and tests any stains on

25   exhibit I-32-D, white towel?

1       A     Yes, I did.

2       Q     Show the jury what areas of staining were tested.

3       A     I tested this area of staining in the middle back

4    of the towel labeled as A.

5       Q     Were there any findings as a result of your testing

6    there?

7       A     It was negative for the chemical indication for the

8    presence of blood.

9             MS. SINGER:  Your Honor, I'd like to make this B, C

10        and D as the same numbered exhibit of the T-shirt.

11            THE COURT:  Any objection?

12            MR. GROLAND:  No objection.

13            THE COURT:  It will be admitted as a composite

14        exhibit, along with the T-shirt, B, C and D.

15            (State's Exhibit Nos. 21(b), 21(c) and 21(d) were

16    moved and admitted into evidence.)

17   BY MS. SINGER:

18      Q     Did you also note this particular bag, Ms. Perrone,

19   a blue Wal-Mart bag?

20      A     Yes, I did.

21      Q     Did you examine that blue Wal-Mart bag at all?

22      A     I did not.

23      Q     I believe we have one more exhibit left, if I'm

24   right.  No.  Well, no, we have two more exhibits left.  We

25   have I-33?

1       A     Yes.

2       Q     Which would have been your next one, described as

3  the comforter; is that right?

4       A     Yes.

5       Q     Take a look at this particular package and tell me

6  whether or not this appears to be the same I-33 that you

7  examined?

8       A     Yes, it was.

9       Q     This was described to you as a comforter?

10      A     Correct.

11      Q     Could you tell the jury what you would have done

12  with the comforter upon visual inspections?

13      A     I would have opened it up fully and examined for

14  areas of possible staining to further test for the chemical

15  indications for the presence of blood.

16      Q     Did you do that in this case?

17      A     Yes, I did.

18      Q     Is this the comforter that you examined?  I think

19  you probably need a corner.

20            MS. SINGER:  Mr. Pennypacker, if you could come up

21      here.

22      A     Yes, it is.

23      Q     Yes, that is the comforter that you examined.  Did

24  you find areas that you wished to test, areas of suspected

25  staining that you wished to test?

1      A     I tested areas A through E.

2      Q     If you could come down, Ms. Perrone, and we'll try

3  to hold this up where the letters are.  Let me take this

4  corner and you take that corner.

5            We'll have you look at the particular areas.

6      A     I see B, C, and D, and then A is over here.  E

7  might be on the back.

8      Q     Let's just turn it around.  Let's go back and look

9  for E.

10     A     E is up by your hand.

11     Q     I'm sorry, I'm covering it.  Once you identified

12 these particular areas, did you test these areas for evidence

13 of blood or bodily fluids?

14     A     Yes, I did, and they were all negative for the

15 chemical indications for the presence of blood.

16           MS. SINGER:  Your Honor, at this time I'd like to

17     move this into evidence as the next numbered exhibit.

18           THE COURT:  Any objection?

19           MS. SINGER:  Mr. Groland, no objection?

20           MR. GROLAND:  No objection.

21           THE COURT:  Is that Number 22?

22           THE CLERK:  Yes, Your Honor.

23           THE COURT:  It will be Number 22 in evidence for

24     the state.

25           (State's Exhibit No. 22 was moved and admitted into

1   evidence.)

2   BY MS. SINGER:

3       Q    And the last item that you examined was one sealed

4   brown bag containing two items; is that correct?

5       A    Yes, it is.

6       Q    And it was identified to you as being 388-134?

7       A    I-34.

8       Q    I-34, I'm sorry.  Does this appear to be that

9   particular item?

10      A    Yes.  Again, my handwritten initials are on the

11  package.

12      Q    And once you opened this item were there more than

13  one item in the bag?

14      A    Yes, I found a flat sheet and a fitted sheet.

15      Q    Did you examine the flat sheet first or fitted

16  sheet first?

17      A    I began with the flat sheet.

18      Q    Upon visual examination of the flat

19  sheet -- Mr. Pennypacker, I need you again.  Upon examination

20  of the flat sheet -- we'll let you first identify this as the

21  flat sheet that you examined.

22      A    Yes, it is.

23      Q    And if we can just lift it out and open it up for

24  you.

25      A    I think it's on the other side.

1    Q    Did you find areas of suspected stain that you

2    determined might be suitable for further testing?

3    A    Yes, I tested one area in the center there labeled

4    as A.

5    Q    And what was the result of your testing of that

6    particular area?

7    A    It was negative for the chemical indications for

8    the presence of blood.

9    Q    Item B was the fitted sheet?

10   A    Correct.

11   Q    Did you also examine this particular item for the

12   presence of staining?

13   A    Yes, and on this sheet I found no stains of value.

14   Q    And is that in fact the sheet that you examined?

15   A    Yes, it is.

16   Q    If you could just go ahead and show that to the

17   jury.  And there were no stains of value for testing?

18   A    That's correct.

19        MS. SINGER:  Your Honor, I'd like this to be marked

20        as the next numbered composite exhibit, with the flat

21        sheet being A and fitted sheet being B.

22        MR. GROLAND:  No objection.

23        THE COURT:  What number, Mr. Clerk?

24        THE CLERK:  23(a) and (b).

25        THE COURT:  23(a) and (b), thank you.

1            (State's Exhibit Nos. 23(a) and 23(b) were moved

2    and admitted into evidence.)

3            MS. SINGER:  I have no further questions of this

4        witness.

5            THE COURT:  Mr. Groland.

6            MR. GROLAND:  Thank you.

7                      CROSS-EXAMINATION

8    BY MR. GROLAND:

9        Q    Could you tell the jury and me, in layman's terms

10   so we all understand, what your specific DNA findings were?

11   In other words, do we have a match?

12       A    Yes, we do.  First, on the red stain I found a

13   partial profile that matched the profile that I developed

14   from the referenced blood standard identified to me as having

15   come from Robbie Quirello, R. Quirello.

16       Q    And that stain, your records indicate, was on the

17   carpet?

18       A    I do not have where that stain was collected from.

19       Q    We'll have to find that out.

20            And, in fact, you were looking for the presence of

21   blood exclusively?

22       A    Correct.

23       Q    You were not looking for the presence of vomit or

24   baby formula or aspirated milk or anything like that; is that

25   correct?

1      A      I have no tests to identify vomit or any baby

2  formula.

3      Q      The answer is that's correct, right, you were not

4  looking for anything else?

5      A      That's correct.

6      Q      And you examined two shams, two shams only, not a

7  third sham?

8      A      I examined one sham as exhibit 388-I-13.  And I

9  exhibit -- excuse me, I examined a second sham in exhibit

10  388-I-11, and those were the only two shams I examined.

11     Q      Only two.  Did anybody tell you in connection with

12  this cases that these items were actually collected two full

13  weeks after the incident in question, on the 16th of August,

14  did you have that information?

15     A      I don't have in my notes anywhere the date that the

16  evidence was collected.

17     Q      Can you tell me the difference -- and I'm looking

18  at the second page of your report under results.  The first

19  paragraph talks about a number of items, and you say there

20  that these items when you check the stains, it failed to

21  demonstrate chemical indications for the presence of blood.

22  And I'm comparing that with the third paragraph where you

23  say -- strike that.  I think I've read it wrong.  Disregard

24  it.  I withdraw that question.

25          MR. GROLAND:  That's all I have.  Thank you.

1     THE COURT:  Any redirect?

2     MS. SINGER:  No redirect.  May this witness be

3     excused, she does reside in Jacksonville, excused from

4     the rule and excused from further testimony?

5     MR. GROLAND:  She's excused.

6     THE COURT:  Good enough.  Thank you, ma'am.  You're

7     free to leave.  You're free from the subpoena.  We're

8     going to go ahead and take a recess at this time for 15

9     minutes.

10     MS. SINGER:  Before we go off the record -- never

11     mind.

12        (A recess was taken.)

13     THE COURT:  State ready to call the next witness?

14     MS. SINGER:  We are, Your Honor.

15     THE COURT:  Anything we need to put on the record

16     before the jury comes back in?

17     MR. GROLAND:  No, Your Honor.

18     THE COURT:  Go ahead and bring them in.

19     MS. SINGER:  May I approach Mr. Groland for a

20     moment?

21     THE COURT:  Yes.

22     MS. SINGER:  Your Honor, may I approach the bench

23     for a moment, it's logistics?

24        (A sidebar discussion was held off the record and

25  without the court reporter.)

1          MS. SINGER:  Your Honor, the state will call

2    Christina Millard.

3          (The witness entered the courtroom and is duly

4    sworn by the clerk.)

5          THE CLERK:  You may be seated.

6          MS. SINGER:  One moment, Your Honor.

7          May I approach, Your Honor.

8          THE COURT:  Yes.

9    WHEREUPON:

10                    CHRISTINA S. MILLARD,

11   called as a witness herein, having been first duly sworn, was

12   examined and testified as follows:

13                    DIRECT EXAMINATION

14   BY MS. SINGER:

15      Q    Ms. Millard, if you would state your full name,

16   please.

17      A    My name is Christina Selman Millard.

18      Q    And your occupation and profession?

19      A    I'm a deputy with the Broward County Sheriff's

20   Office currently.

21      Q    And before being a deputy with the Broward County

22   Sheriff's Office, were you employed with the Gainesville

23   Police Department?

24      A    Yes, I was.

25      Q    How were you employed?

1     A     I was employed with the Gainesville Police
2  Department for a period of five years in three different
3  capacities.
4     Q     Would you tell the jury what your particular jobs
5  were at the Gainesville Police Department?
6     A     I started as a road patrol officer; I then was
7  transferred to the forensic crime unit, where I spent two
8  years as an investigator; and then I was promoted to corporal
9  for a few months before I changed employment.
10    Q     And did you move to Broward County Sheriff's Office
11 because of your husband's employment?
12    A     That is correct.  My husband got a job down in
13 South Florida, so we moved.
14    Q     And then you obtained employment with the Broward
15 County Sheriff's Office?
16    A     That is correct.
17    Q     You're still in law enforcement?
18    A     Yes, I am still in law enforcement.
19    Q     What were your duties as a forensic crime
20 investigator when you were employed in that capacity with the
21 Gainesville Police Department?
22    A     What I would do is respond to a crime scene.  I
23 would take photographs.  I would collect evidence, do
24 documentation, so that the evidence could be preserved and
25 presented at a later time.

1    Q    Taking you now to August 2nd of the year 2000, were
2    you working that day?

3    A    Yes, I was.

4    Q    Were you called to conduct a crime scene
5    investigation at the address 1015 Southwest 9th Street,
6    Apartment A21?

7    A    That is correct, I was.

8    Q    That was in Gainesville, Alachua County, Florida?

9    A    Yes, it was.

10   Q    Approximately what time did you arrive at that
11   particular location?

12   A    I arrived about 12:45.

13   Q    Would that be 12:45 P.M., that is in the afternoon?

14   A    That is correct.

15   Q    When you arrived at that location, was there anyone
16   else from the Gainesville Police Department there?

17   A    Deputy Bruce Ferris was there on scene.

18   Q    He's Officer Ferris.  I know you're a deputy now.

19   A    Yes, Officer Bruce Ferris.

20   Q    Once you got to that area, were you waiting on
21   another officer, Officer Valerie Dawson, or did you
22   communicate with her?

23   A    Yes, we were waiting to communicate with her.

24   Q    And did you eventually come into contact with or
25   communicate with Valerie Dawson, Sergeant Valerie Dawson?

1        **A**    Yes, I did communicate with her.

2        **Q**    What was the purpose of that communication?

3              MR. GROLAND:  Objection, Your Honor, hearsay.

4              THE COURT:  Overruled.

5  BY MS. SINGER:

6        **Q**    What was the purpose of that communication?

7        **A**    I was waiting to obtain consent before I entered

8  the apartment.

9        **Q**    And were you able to receive confirmation that

10  there was consent to enter that apartment?

11        **A**    Yes.

12              MR. GROLAND:  Objection, leading; same objection,

13     hearsay.

14              THE COURT:  The objection as to leading at this

15     point is sustained based on the lack of clarity of the

16     question, it may call for hearsay.  You need to rephrase

17     the question.

18  BY MS. SINGER:

19        **Q**    Did you eventually enter the apartment?

20        **A**    Yes, I did, after consent was confirmed.

21        **Q**    Who was present with you when you first entered

22  into the apartment?

23        **A**    Officer Bruce Ferris was with me.

24        **Q**    And did Valerie Dawson at some time have contact

25  with you?

1       A       Via radio, yes.

2       Q       Did she later come to the apartment to your

3    knowledge?

4       A       I don't recall.

5       Q       Once you, once you approach an apartment or a crime

6    scene, could you just lay out for the jury what your first

7    task would be?

8       A       What I would do is first just observe to see what's

9    going on, to see what kind of an area I'm looking at, what

10   kind of a scene I'm looking at, just to get myself organized

11   before I do anything.

12      Q       Do you jot notes while you do that?

13      A       Yes.

14      Q       In this particular case, how would you have

15   surveilled the scene or initially examined the scene?

16      A       With this apartment, you know, it's generally just

17   a walk-through of each room to see, you know, how big it is,

18   to know that it's a one bedroom, one bath apartment, just to

19   get the general layout.

20      Q       Did you do that in this case?

21      A       Yes, I did.

22      Q       And were you able to get a particular layout of

23   this apartment?

24      A       Yes, I was.

25      Q       Can you give us a brief description?  And if you

1   need your notes to refresh your recollection, please feel

2   free to use them.

3        A    Thank you.   The apartment that we're talking about

4   is a second story apartment.   The entire apartment is on the

5   second floor.   You'll go up some stairs and then there's the

6   door to your right.   You'll open one door out, the screen

7   door comes out, and the main door goes in.   Upon entering,

8   you're in a, just a little entryway.   To the left side is a

9   small kitchen.   It has a low counter to where from the

10  kitchen you can see the living room, which is on the right

11  side of you.   On the other side of the living room, there's a

12  sliding glass door with a balcony that looks at the parking

13  lot.   So there's, you know, your first view of the apartment.

14            As you walk through the entryway, through the

15  kitchen/living room area, you're in a small hallway.   There

16  is a door on the left, which was a small closet.   And then

17  there was a second door on the left, which was a small

18  bathroom.   There was only one door on the right, which was

19  the one bedroom.   And then in the, I guess, the closest

20  left-hand wall there was a large walk-in closet in that

21  bedroom.

22       Q    After you do the walk-through, do you then start

23  photographing and collecting evidence?

24       A    Yes, I do.   I usually start by photographing

25  everything before I touch anything.   Before anything is moved

```
1    I take photographs.

2         Q    Did you in fact do a walk-through of the bathroom

3    itself and the bedroom --

4         A    Yes, I did.

5         Q    -- before you photographed and collected evidence?

6         A    That is correct.

7         Q    Let's talk about the bathroom specifically.

8         A    Okay.

9         Q    Could you describe what you saw when you walked

10   through the bathroom?

11        A    The bathroom, when you walk in, there's a counter

12   with a sink; there's the toilet right next to the counter;

13   and then there's the bathtub.  I recall that the toilet seat

14   was up, in the up position.  The shower curtain was pushed

15   all the way to one end.  And I observed that inside the

16   bathtub there was no water, everything was dry, the floor was

17   dry.  There was a --

18        Q    Go ahead.

19        A    There was a towel hanging on the towel rack that

20   was also dry.

21        Q    Did you notice the stopper in the tub itself and

22   whether it was on the open or closed position?

23        A    It was actually in the closed position.

24        Q    Meaning that if the tub had water coming in --

25             MR. GROLAND:  Objection, Your Honor.
```

1  BY MS. SINGER:

2      Q    Well, tell us what you mean by the closed position.

3      A    The closed position in the tub is where the stopper

4  was down, where, you know, when you run a tub, if it's up the

5  water is going to drain immediately; if the stopper is down,

6  the water is going to fill the tub up.  Is was in the

7  position of down when I observed it.

8      Q    Did you notice whether or not there was any bath

9  rugs in that particular bathroom?

10     A    There was a bathmat that was folded and underneath

11  the counter.  It's the type of counter where there's a

12  cabinet underneath the sink, but there's an open area where

13  if you had a chair you could push a chair underneath.  There

14  was no chair, but underneath there the bathmat was folded and

15  on the ground.

16     Q    Did you notice whether or not this particular

17  bathmat was wet or dry?

18     A    That bathmat was dry as well.

19     Q    Were there also some decorative towels on the back

20  of the door of the bathroom?

21     A    Yes, there were.

22     Q    Did you look at those and touch those to determine

23  whether or not they were wet or dry?

24     A    Those towels were also dry.

25     Q    Did you find anything in the bathroom that was wet

1   or damp?

2        A    No, I did not.

3        Q    Did you then examine the bedroom?

4        A    Yes, I did.

5        Q    And what, if anything, did you notice in the

6   bedroom that caused you some concern or was brought to your

7   attention?

8        A    In the bedroom there was one bed in the middle of

9   the room that was approximately a queen sized bed.  There was

10  a metal type frame post bed with a canopy.  There was a

11  dresser along one wall.  There were a lot of baby items

12  around the room.  There were several pillows on the bed, two

13  at the foot of the bed, and several more up at the head of

14  the bed.

15       Q    Did you notice anything with particularity on the

16  floor or carpeting in that room?

17       A    Yes, I did.  As you walk through the room, you pass

18  the bed, you pass the dresser, and in between the bed and the

19  wall, where the window is, on the ground next to the bed,

20  there was a large white stain and there was a small red stain

21  on the carpet in that area.

22       Q    Did you during some time in this visit to the scene

23  collect any swabbings of those stains?  Was it this visit or

24  was it another visit that you collected the swabs?

25       A    It was another visit.

1      Q    Did you examine the bed frame itself?

2      A    Yes, I did.

3      Q    What kind of texture or material was the bed frame?

4      A    It was a -- it wasn't like a smooth surface.  It

5  had a textured look to the bed frame.  It was not something

6  that was smooth and shiny but actually textured.

7      Q    Did you notice any damage to the bed frame, either

8  at the head or the foot of the bed?

9      A    I don't recall any damage specifically to the bed,

10  no.

11      Q    Once you did the walk-through and made these

12  cursory examinations, did you then photograph the scene?

13      A    I then photographed it.

14          MS. SINGER:  At this time, Your Honor, I'd like to

15      approach the witness?

16          THE COURT:  Go ahead.

17          MR. GROLAND:  Your Honor, may I walk up?

18          THE COURT:  Yes.

19          MS. SINGER:  I'm trying to think of the fastest way

20      to do this.  Ms. Millard, I'm going to show you a series

21      of photographs and ask you to go through them and tell

22      me whether or not you recognize each of those

23      photographs.  If you could keep them in order, I would

24      appreciate that.

25          MR. GROLAND:  Are you going to have her identify

1      each one?

2            MS. SINGER:  We're going to go ahead and do it

3      separately.  I'm going to have her authenticate all of

4      them and make it a composite exhibit.  It will make it

5      easier on the clerk, I think.

6   BY MS. SINGER:

7      Q    Do you recognize those photographs.

8      A    Yes, I do.

9      Q    Were those photographs taken at or about 1:00 P.M.

10  or --

11     A    Yes.

12     Q    -- after 1:00 P.M. on August the 2nd, year 2000?

13     A    That's correct.

14     Q    Do they fairly and accurately depict the scene that

15  is the Apartment A21 as you saw it back then?

16     A    Yes, they do.

17           MS. SINGER:  Your Honor, at this time I'd like to

18     make this a composite exhibit the next number and I will

19     approach the clerk with each individual to have it

20     marked A, B, C and D.

21           THE COURT:  Any objection?

22           MS. SINGER:  Mr. Groland?

23           MR. GROLAND:  No objection.

24           THE COURT:  Good enough.

25           MS. SINGER:  I'm going to go ahead --

1          THE COURT:  They'll be admitted as the next

2     numbered exhibit.

3          THE CLERK:  Twenty-four, Your Honor.

4          THE COURT:  Twenty-four, as a composite.  And

5     Ms. Singer will bring you each individual -- which will

6     be A; is that correct?

7          MS. SINGER:  Right.

8          (State's Exhibit Nos. 24(a) through 24(p) were

9     moved and admitted into evidence.)

10    BY MS. SINGER:

11    Q    I'm going to show you now what's marked State's

12    Exhibit 24(a) in evidence and ask you --

13         MS. SINGER:  Pardon me.  Your Honor, may this

14     witness stand down and may we use the magnifying

15     equipment to allow a full view to the jury at this time,

16     since they've been marked into evidence?

17         THE COURT:  Yes.

18         MS. SINGER:  Ms. Millard, if you'll step down and

19     we'll use the viewer here.  This will make it easier for

20     the entire jury to see the photographs as you are

21     describing them.

22         THE COURT:  Any jurors that want to move their

23     positions, as they did earlier, so that they can have a

24     good view, and if you'll dim those lights over the jury

25     box again, please.

1   BY MS. SINGER:

2       Q    Ms. Millard, looking at 24(a) into evidence, can

3   you tell the jury what that picture depicts?

4       A    This is the apartment that we're looking at on --

5   can I use the pointer, please?

6       Q    Absolutely.

7       A    On the far left side here is the stairwell that I

8   was talking about.  Going up those stairs is the front door.

9   This is the balcony that's off of the living room.  This is

10  the window to the bedroom (indicating).

11      Q    And this photograph, which would be 24(b) in

12  evidence?

13      A    Again, the stairwell going up, and then here's the

14  front door.  It's kind of dark.

15      Q    And C into evidence -- I'll figure this out by the

16  time I get -- what is that view?

17      A    It's just a closer view from the parking lot of the

18  same thing, the stairs and the balcony.

19      Q    Now, I'm going to show you what's been marked 24(d)

20  into evidence and tell me what this photograph depicts?

21      A    This is the bedroom; again, the queen size bed; the

22  metal type bed frame; and the pillows on the bed.

23      Q    Now, in this particular picture are we looking from

24  the doorway entry into the bedroom?

25      A    Yes, we are.  We're standing at the door looking

1   inside.

2        Q    And from this picture, are you able to show us the

3   area where the rug stain was located, the white stain that

4   you indicated you saw on the rug?

5        A    In this photograph, no, we can't see because the

6   stain is actually over on the other side of the bed, way over

7   here on the floor (indicating).

8        Q    The two pillows that are on the bed, did you move

9   them or display them in any way before you took this

10  photograph?

11       A    No, I did not move the pillows at all.

12       Q    And were those photographs -- does this photograph

13  accurately depict the pillows as you saw them when you went

14  into the apartment at approximately 1:00 P.M. or after 1:00

15  P.M. on that day?

16       A    This is how it was when I first observed them, yes.

17       Q    Looking at this picture, if you could, tell the

18  jury whether or not there are one or two pillows seen in that

19  particular photograph?

20       A    In this photograph there are two pillows down at

21  the end.  It's a white pillow, a pillow in a white case,

22  right here; and then you've got a pillow in the sham at the

23  foot of the bed (indicating).

24       Q    I'm now showing you 24(e) and ask you what this

25  picture depicts?

1      A      Again, this is just the pillow with the sham on top

2    of the other pillow in correlation to where the footboard is

3    at the end of the bed.

4      Q      Now, that particular pillow with the sham, were you

5    able to determine how it was located between the mattress and

6    the footboard of the bed?

7      A      As you can see, there's a pillow that's here, and

8    then there's the sham part that kind of hangs off the end of

9    the pillow.  The sham part is actually in between the end of

10   the bed and the footboard, but just a little bit of the sham

11   is in between there.  The whole pillow, as you can see, is

12   not in between the end of the bed and the footboard, just a

13   little bit of the sham.

14     Q      Now, I'm going to show you what's been marked 24(g)

15   and ask you to tell the jury what this picture depicts?

16     A      This is the same bed, obviously from the other

17   corner.  So we are actually on the opposite side.  Still the

18   footboard, still the same pillows down at the end of the bed,

19   we're just looking at an opposite angle.

20     Q      And then 24(h)?

21     A      Again, a repeat picture of the footboard and the

22   pillows down at the end of the footboard.

23     Q      You would be on the wall where the window is

24   located at this time?

25     A      That's correct.

1     Q    To get some idea.  And the doorway, that's to

2  your --

3     A    Here's the door, and here's the closet

4  (indicating).  So I'm opposite the front entry door right

5  next to the window.  This right here was the dresser that I

6  was talking about (indicating).

7          MS. SINGER:  I want to show you now what's been

8       marked as 24(i).  And I don't know whether or not it's

9       going to show well in this particular -- if we can turn

10      the lights a bit, is there any way we can turn the

11      lights a bit lower with the court's permission?

12         THE COURT:  Yes, you may.

13         THE WITNESS:  Can you switch it back to where it

14      was previously, just turn it.

15         Here is the side of the bed.  The footboard is down

16      here, the headboard up here, and here's the window

17      (indicating).  Right here, you can barely see a little

18      white spot.  Right there is where we're looking

19      (indicating).  I'll put the dot back on it.

20  BY MS. SINGER:

21     Q    And what was that, what does that photograph

22  depict?

23     A    It was the white stain, and then the red stain is

24  in the same general area on the photograph.

25     Q    I want to show you 24(f).  What does this picture

1   depict?

2       A    This is a picture of the dresser at the end of the

3   bed.  You can see numerous baby items, shoes.  This right

4   here is a bottle (indicating).  That bottle actually had cold

5   milk in it, it was cold to the touch.

6       Q    And I show you now 24(j), which is also a dark

7   photograph but perhaps you can identify this for the jury.

8       A    This photograph is a close-up at the end of the

9   bed.  The two pillows that we've been looking at a lot are

10  these two pillows here again (indicating).  There's the white

11  pillow.  Here's the pillow sham.  See how the sham is hanging

12  over right here.  Right along the edge here is the footboard.

13  Again, it's dark but this is the correlation of the end of

14  the bed.

15      Q    I'm going to show you now 24(n), and if you would

16  please tell the jury what this picture depicts?

17      A.   Can you lighten that up a little?  Okay.  What this

18  is is I'm standing in the bathroom and I'm looking across to

19  the bedroom.  It's very dark.  This is the dresser.  That

20  reflection right there is actually the mirror on the dresser,

21  the sun light coming in.  This is the dresser that we're

22  looking at showing the relation from the bathroom to the

23  bedroom (indicating).

24      Q    24(k)?

25      A    Now, this is the opposite.  I'm standing in the

1    bedroom looking into the bathroom.  There's the sink right

2    there and toilet is over here, showing again correlation

3    between the bedroom and the bathroom (indicating).

4         Q    24(m)?

5         A    Bathroom.  Underneath here is where the floor mat

6    is.  You see that it's not out in the general area, it's

7    underneath here folded.  Got baby wipes on the counter.  The

8    toilet seat is up.

9         Q    24(l)?

10        A    Shower curtain is back; there's a towel hanging;

11   and a baby bath in the tub.

12        Q    This was the tub as you saw it on August 2nd?

13        A    This was as I saw it.

14        Q    The toilet seat is also, up also in this picture?

15        A    There was also no toilet paper in the bathroom.

16        Q    Let me show you 24(q) or 24(o).

17        A    This is standing in the bedroom looking into the

18   closet.  You see a vacuum cleaner, some baby clothes hanging

19   up here, clothes on the floor.

20        Q    And the last picture at this time, 24(p), what was

21   that?

22        A    It was an end table next to the bed.  It's got a

23   baby bag, a bag containing clothes on top of the dresser.

24   Here's the edge of the bed.  It's an end table.

25             MS. SINGER:  You can take your seat.  Your Honor,

1       at this time I'd like to publish these or allow these

2       pictures to be circulated for closer inspection from the

3       jury.

4              THE COURT:  All right.

5              MS. SINGER:  I'll put them in proper order.

6              (Pause in the proceedings.)

7              THE COURT:  Are you ready, Ms. Singer?

8              MS. SINGER:  Yes.  I would rather have the jury to

9       be able to listen to the testimony after they look at

10      the photographs.  If the Court directs me to continue, I

11      will.

12             THE COURT:  I think we're almost through.  The

13      entire back row has not had a chance.

14             MS. SINGER:  Yes.

15             THE COURT:  All right.  We'll wait.

16             (Pause in the proceedings.)

17             MS. SINGER:  May I proceed, Your Honor?

18             THE COURT:  Yes.

19      BY MS. SINGER:

20      Q     After you took those photographs, Investigator

21      Millard, what else did you do at the time when you were in

22      the apartment?

23      A     At that time my involvement was mainly observing,

24      documenting and photographs.  So when I left, there were keys

25      on the counter, and I ended up locking the apartment and

1   turned those keys over to Detective Helen Legall.

2         Q     Did you return to that apartment at approximately

3   3:00 -- tell us what time you left the apartment.

4         A     I left the apartment about 1:45.

5         Q     Did you return to that apartment at approximately

6   3:00 P.M. of the same date at the request of Detective Cannon

7   and Detective Coleman --

8         A     Yes, I did.

9         Q     -- from the Gainesville Police Department?

10        A     I did.

11        Q     And at that time did you collect any items of

12   evidence?

13        A     Yes, I did.

14        Q     What did you collect?

15        A     At that time I collected swabbings of the white

16   stain and the red stain, and I collected the baby bottle that

17   had the cold milk on the dresser.

18        Q     I'm going to show you, currently unmarked, an

19   exhibit that's marked 388-I-1.  Before we talk about it,

20   could you tell the jury what the 388 is?

21        A     388 is my ID number for the Gainesville Police

22   Department, unique to me.

23        Q     So everything you collected you would mark first

24   with your ID number?

25        A     That is correct.

1      Q      What does the I stand for?

2      A      It stands for item.

3      Q      And then the one?

4      A      The item number one.

5      Q      Taking a look at what you've marked as 388-I-1, if

6  you would take a look at the outside and then if you would

7  like to open the inside to identify that item for me?

8      A      Okay.  On the outside it has the property number,

9  it has the case number, unique to this case, and then, again,

10 my initials, and item one.  I've sealed and initialed it on

11 the top.

12     Q      And was that on the outside of this?

13     A      On the outside it does say bottle on dresser.

14     Q      Do you want me to crack it open?  I'm much more

15 comfortable maybe doing that than you.

16     A      Sure.

17     Q      I'll be happy to and exhibit it to you.  Is this

18 the baby bottle that you took into evidence back on

19 August 2nd when you returned back to the scene?

20     A      Yes, it is.

21     Q      Does it appear to be in the same or similar

22 condition as when you picked it up?

23     A      The milk is a little rough, but yes.

24            MS. SINGER:  At this time I'd like to tender this

25     particular item into evidence as the next numbered

811

1          exhibit.

2                    THE COURT:  Any objection?

3                    MR. GROLAND:  No objection.

4                    THE COURT:  It will be admitted as number?

5                    THE CLERK:  Twenty-five.

6                    THE COURT:  Twenty-five in evidence.  Thank you.

7                    (State's Exhibit No. 25 was moved and admitted into

8    evidence.)

9                    MR. PENNYPACKER:  Your Honor, can I suggest that if

10        Ms. Millard is going to handle evidence that she might

11        want to put gloves on.

12                    MS. SINGER:  Yes.  We're not going to be opening

13        the next three exhibits.  These have already been marked

14        into evidence as State's is 12, 13 and 14.

15   BY MS. SINGER:

16        Q    And I just want to verify that these are the three

17   stains that you collected by swabbings when you returned to

18   the apartment at about 3:00 P.M. on the day of August the

19   2nd?

20        A    That's correct.

21        Q    And on the first stain marked 12, you have written

22   large white stain?

23        A    That's correct, large white stain.

24        Q    This would have been a swabbing from?

25        A    The large stain on the floor --

1       Q       Between the bed --

2       A       -- next to the bed.

3       Q       -- and the window?

4       A       That's correct.

5       Q       And then 13 was little white stain?

6       A       That is correct.  It was in the same area in

7   between the bed and the window.

8       Q       And then the third was Exhibit 14, red stain?

9       A       That is correct.  It was from the same area.

10      Q       And I know that there were other opportunities -- I

11  need the carpet.

12              I know that there was another opportunity when you

13  entered the residence, we're going to talk about in detail

14  just so the jury can understand where your swabbings came

15  from.

16              I'd like to show you what's been marked into

17  evidence as State's 15.  Do you recognize this particular

18  item?  I know that it's not out of the bag yet but the item

19  in the bag is a piece of carpeting?

20      A       Yes.

21      Q       Do you recognize that?

22      A       Yes.

23      Q       When you indicated large white stain, if you could

24  point to the jury where that was located?

25      A       Large white stain, small white stain (indicating).

1       Q    Can everyone see that?

2       A    At this present time I don't see the red stain.  I

3   do see the white stain, two white stains there.

4       Q    Was the red stain present on this piece when you

5   removed the carpet?

6       A    Actually, I believe it's over here (indicating),

7   but there was a two visible white stains and a visible red

8   stain that I collected swabbings from at the time.

9       Q    After collecting the swabbings, Investigator

10  Millard, did you take more photographs --

11      A    Yes, I did.

12      Q    -- of the area?

13      A    Yes, I did.

14      Q    What kind of photographs did you take of the area

15  at that time?

16      A    At the time, at the request of detectives, I took

17  Polaroid photographs so that they can could have them.

18      Q    Have for immediate development?

19      A    Exactly.

20      Q    Do you know what purpose they were going to use the

21  photographs for?

22      A    I don't recall their exact purpose, I was just

23  requested that Polaroids would help.

24           MS. SINGER:  May I approach the witness?

25           THE COURT:  Yes.

1    BY MS. SINGER:

2      Q    I'm going to approach you, Investigator Millard,

3   and ask you to look at these eight Polaroid photographs and

4   tell me if you recognize them?

5      A    Yes, I do.

6      Q    And do those eight photographs fairly and

7   accurately depict the apartment as seen as you saw it back on

8   August the 2th, year 2000, at approximately 3:00 or soon

9   thereafter when you returned to collect samples and to take

10   Polaroid photographs?

11      A    Yes, they do.

12      Q    Did you, between the time that you took the initial

13   photographs that we've already shown the jury, and you took

14   these Polaroids, do anything when you were in the apartment

15   to change or otherwise move any items or tamper with any

16   evidence items in the apartment?

17      A    No, I did not move or change anything.

18      Q    Was there anyone with you that did in fact move

19   anything before you photographed the apartment?

20      A    I did not see anyone move anything when I was

21   there.

22      MS. SINGER: Your Honor, I would -- I understand

23      the Court's ruling on these, so I'm just going to have

24      them marked for identification, unless Mr. Groland is

25      withdrawing his previous objection.

1          MR. GROLAND:  I may now that I've seen these other

2     photos, but can I voir dire just for a minute on the

3     issue of these photographs?  I may agree they can come

4     in right now.

5          THE COURT:  All right.  Any objection?

6          MS. SINGER:  No objection.

7                    VOIR DIRE EXAMINATION

8  BY MR. GROLAND:

9     Q    When you left the first time, were you the last one

10  to leave that apartment?

11    A    Yes.

12    Q    And that would be, I think you said, at 1:45?

13    A    That's correct.

14    Q    And you had some keys?

15    A    Yes.

16    Q    And you got those keys from where?

17    A    I believe they were on the counter.

18    Q    So when you went in it was unlocked?

19    A    When I went in the first time, yes, it was unlocked

20  when I went in.

21    Q    So then when you left, after doing what you did the

22  first time, taking the photographs, you locked it up?

23    A    The door was locked.  I don't recall if I

24  specifically had to use a key or if I just turned a knob, but

25  the door was secured when I left, yes.

1    Q    And then when you came back at 3:00, it was still

2    locked the way you locked it, however you locked it?

3    A    It was still locked when we got back, yes.

4    Q    You had a key then from who?

5    A    I believe the detectives had the keys, I don't

6    recall which one.

7    Q    So it was a different key obviously than the one

8    you left on the counter that was still there?

9    A    No, I took the key from the apartment with me and

10   turned it over to Detective Legall.

11   Q    And everything looked the same when you went back

12   at 3:00?

13   A    Everything appeared the same as it was previously.

14        MR. GROLAND:  I have no objection.

15        MS. SINGER:  I'd like to make this a composite

16   exhibit the next numbered and the photograph marked one

17   being the next A, B, C, D, E.  While the clerk is

18   marking them, I will go ahead and go on to my next item.

19        THE CLERK:  Do you want to mark each individual

20   photo?

21        MS. SINGER:  Yes.  What is the next number?

22        THE CLERK:  Twenty-six.

23        MS. SINGER:  This would be 26(a), 26(b) --

24        THE CLERK:  Got you.

25        MS. SINGER:  And please don't cover the number.

817

1          (State's Exhibit Nos. 26(a), 26(b), 26(c), 26(d),

2   and 26(e) were moved and admitted into evidence.)

3                  CONTINUED DIRECT EXAMINATION

4   BY MS. SINGER:

5       Q    Once you collected the stain swabbings and the baby

6   bottle and the photographs, the Polaroid photographs, where

7   did you go next?

8       A    I --

9       Q    Did you leave the scene at that time?

10      A    I then left the apartment, that is correct.

11      Q    Did you return to the apartment again at

12  approximately 1845, that would be 6:45 P.M.?

13      A    That is correct.

14      Q    On the same day, August the 2nd?

15      A    Yes, I did.

16      Q    And did you travel with anyone or did you come by

17  yourself?

18      A    I actually had an intern with me, an intern Jessica

19  Green, but there were also several other detectives.

20      Q    Who were the detectives that came with you?

21      A    Detective Legall, Sergeant Halvosa, Sergeant Seale.

22      Q    That would be Larry Seale, Will Halvosa and Helen

23  Legall?

24      A    That is correct.

25      Q    And what was the purpose for you returning to the

1    scene at that time?

2         A    At that time my purpose was to assist in a

3    re-enactment, and my purpose was to videotape this

4    re-enactment.

5         Q    Was Mr. Herlihy, the defendant in this case,

6    present with the investigators at this time?

7         A    Yes, he was.

8         Q    Do you see that person here in the courtroom today?

9         A    Yes, I do.

10        Q    If you would identify him, please, by identifying

11   an article of clothing he's wearing and where he's sitting?

12        A    Gray suit, gray tie, white shirt, at the defense

13   table.

14             MS. SINGER:  Your Honor, may the record reflect the

15        witness has identified the defendant?

16             THE COURT:  It will so reflect.

17             MS. SINGER:  He's the only one in the gray suit.

18   BY MS. SINGER:

19        Q    So your purpose there, returning back to the scene

20   the third time that day, I'm sorry, what was your purpose?

21        A    To videotape.

22        Q    Did you bring a video camera with you?

23        A    Yes, I did.

24        Q    Would you tell the jury what happened when you

25   began videotaping the re-enactment of the occurrence that was

1    to be performed by Brian Herlihy?

2       A      Previously I had had problems with the videotape.

3       Q      With the video camera or --

4       A      With the video camera.  The camera was not

5    functioning properly.  We thought we'd looked at it and we

6    thought it was working properly.  So I did respond to the

7    scene with this video camera.  We went through the

8    re-enactment with Detective Legall, who was operating an

9    audio tape recorder.  So she was doing audio and I was doing

10   video.  Unfortunately, I found out after this was completed,

11   after I left and went back to the station, that the video did

12   not record.

13      Q      Let me go ahead and show you -- what did you do

14   with the videotape after you found out that the camera did

15   not in fact record what had occurred at the apartment at

16   approximately 6:45 P.M.?

17      A      The videotape was placed into evidence, even though

18   we did not record the re-enactment.

19      Q      Let me show you this particular item and ask you if

20   you can recognize it, it's marked 388-I-46?

21      A      Yes.

22      Q      And what is that?

23      A      That is the actual cassette tape from the recorder.

24      Q      This is the tape that you made?

25      A      Yes.

820

1    Q    What happened, how did you play it to find out it

2    wasn't working?

3    A    After I left, went back to the station, you know,

4    pressed rewind, pressed play, and basically when I was

5    testing the tape earlier, that's all that I saw.  The

6    re-enactment, the new stuff with Mr. Herlihy and the other

7    detectives was not on this tape.

8    Q    And I'm showing you now what was in the envelope.

9    Does that appear to be the tape?

10   A    It has the case number, the evidence seal with my

11   initials, and ID number, yes.

12        MS. SINGER:  I'd like to move this into evidence as

13        the next numbered exhibit.

14        MR. GROLAND:  I don't care.

15        THE COURT:  It will be admitted as number?

16        THE CLERK:  Twenty-seven, Your Honor.

17        THE COURT:  Twenty-seven in evidence.

18        (State's Exhibit No. 27 was moved and admitted into

19   evidence.)

20   BY MS. SINGER:

21   Q    Did there come a time, Investigator Millard, when

22   you returned -- pardon me.  Where did you go, what was the

23   next thing you did in the course of your investigation in

24   this case?  Did you respond to the medical examiner's office?

25   A    Yes, I did.  I did.  My next involvement in the

1    case was the autopsy of Robbie.

2        Q    Did you, did that take place on August 10th, the

3    year 2000?

4        A    Yes, it did.

5        Q    And you were present for that?

6        A    Yes, I was.

7        Q    After being present for the autopsy, did you, on

8    August 16th of the year 2000, respond back to the apartment

9    to execute a search warrant?

10       A    Yes, I did respond for the execution of a search

11   warrant.

12       Q    And were you with anyone when you made the

13   execution of the search warrant?

14       A    Yes.  Detective Legall was there; Sergeant Halvosa

15   was there; my supervisor, Sergeant McTire, was there; and I

16   had a trainee, PST Huff.

17       Q    And at that time could you outline for the jury

18   what you did before you began collecting evidence?

19       A    Again, as procedure, before I touched anything,

20   moved anything, I went through and photographed.  So I

21   rephotographed the entire apartment as, you know, so you

22   could see the changes as to what it looked like the day of

23   the search warrant and what it looked like the first time I

24   was there.

25       Q    I'm going to show you a packet of photographs and

1   ask you if you would please go through them and tell me

2   whether or not they fairly and accurately depict the

3   residence when you returned back on the 16th to execute the

4   search warrant and collect more evidence in this case?

5          MR. GROLAND:  Your Honor, can I approach counsel?

6          THE COURT:  Yes.

7          MR. GROLAND:  About expediting things?

8          THE COURT:  Yes.

9          MS. SINGER:  So you have no objection to them?

10         MR. GROLAND:  No.  This is everything on the 16th?

11         MS. SINGER:  This is not everything.

12         MR. GROLAND:  Is this everything that we're going

13     to put in for the 16th?

14         MS. SINGER:  That I'm going to put in.

15         MR. GROLAND:  Yes.

16         MS. SINGER:  You can look through and decide if you

17     want to put anything in.

18         MR. GROLAND:  Okay.

19         MS. SINGER:  Because of some prior rulings.  I'm

20     going to go ahead then and ask the clerk to make this a

21     composite exhibit and he can mark five of them for me as

22     the witness stands down and we can begin with those

23     photographs while he's marking the rest.

24         THE COURT:  Yes, that will be fine.  Now, I do not

25     think it would be necessary for you to show these on the

1    screen to the entire panel and then have the entire

2    panel, all the jurors look through them individually

3    again, since they'll have all this evidence in the jury

4    room for deliberations.  If you want to do that, then

5    we'll simply break up the testimony of this witness and

6    let her finish tomorrow.

7        MS. SINGER:  Well, I have a lot more too and I

8    don't know when you're going to stop, because I have

9    this physical evidence as well that needs to be entered

10   in.  So I don't know when the Court wishes to break.  We

11   can go on to 6:00 and then break.

12       THE COURT:  We'll go on until 6:00 and we won't go

13   beyond that, unless I have a lot of jurors saying,

14   please let's finish this witness, and I don't see

15   anybody looking like that.  Good enough.  We'll go until

16   6:00 and we'll recess at whatever point we are.

17       MS. SINGER:  Because she would be subject to

18   cross-examination as well, Your Honor, and I don't think

19   we could do it in the time frame allotted.  If we could

20   just start with it.

21       THE COURT:  Go ahead.

22       MS. SINGER:  While we're marking these, I'd like to

23   be able to circulate State's Composite Exhibit 26 to the

24   jury, and allow them to look at these Polaroids while

25   we're marking the others.

1      THE COURT:  That's fine.

2      THE CLERK:  The new exhibit is Exhibit 28, Your

3  Honor.

4      THE COURT:  Thank you.

5      (State's Exhibit Nos. 28(a) through 28(u) were

6  moved and admitted into evidence.)

7      MS. SINGER:  The Court's ruling that you would

8  prefer that she use the small photographs and point or

9  that she --

10     THE COURT:  You can use the large one.

11     MS. SINGER:  And then we can circulate them?

12     THE COURT:  Yes.

13     MS. SINGER:  Until 6:00 and then we stop for the

14  night?

15     THE COURT:  Correct.

16     MR. GROLAND:  While we're doing that, could counsel

17  and approach for a second?

18     (A sidebar discussion was held off the record and

19  without the court reporter.)

20  BY MS. SINGER:

21     Q    A few questions on these Polaroids, Investigator

22  Millard.  On these photographs marked 26(a), 26(c), and

23  26(e), if you could just point out the white pillow that was

24  underneath the sham pillow in each of these photographs?

25     A    There's a little bit of the white here in the first

1    photograph underneath the sham.  C you said?

2         Q    Any photograph.

3         A    And then this photograph, you can see a little edge

4    of the white underneath the sham here (indicating).  And then

5    again, you've got a little bit of the white underneath the

6    pillow sham there.

7         Q    That would be E.

8         A    Again, fourth picture.

9         Q    That would be F.

10        A    Right there (indicating).

11        Q    And this these photographs, when you took these

12   photographs, after taking the clearer 35 millimeter

13   photographs, there were no changes made to the bed at the

14   time you took these Polaroids?

15        A    There were no changes that am I aware of or

16   observed.

17        Q    Thank you.  Now we're going to move to the 16th,

18   which is when you executed the search warrant; is that

19   correct?

20        A    That is correct, yes.

21        Q    There are some of these that we can go through

22   right here for the jury and some I'm going to put on the

23   large screen for more clearer identification, if that's okay.

24        A    Okay.

25        Q    I'm showing you State's 28(a), and that photograph

1   for the jury, please?

2       A    It's, again, the parking lot looking at the

3   apartment.  You can see the stairs, the balcony, and the

4   window.

5       Q    That would be an identifying photograph for you to

6   begin your role?

7       A    That's correct.

8       Q    And then I'm showing you 28(b), this way?

9       A    You're looking from the hallway into the bathroom.

10      Q    Was there a difference or change in the bathroom at

11  the time you photographed it at this point?

12      A    In this photograph, compared to the first one, when

13  I was there previously the bathmat that was underneath the

14  counter here is missing, it's not there.  The trash can,

15  which was by the toilet, is up on top of the counter.  It had

16  been emptied.

17      Q    The toilet seat was up or down?

18      A    The toilet seat in this photograph is down.

19      Q    I'm going to show you C, 28(c), and tell me what

20  that photograph depicts, please?

21      A    Again, this is another photograph of the bathroom

22  with the changes from the first day.

23      Q    And D?

24      A    Another photograph of the shower.  The shower

25  curtain is pulled over.  The towel that was hanging here that

1    was dry, is no longer there.

2        Q    Who color was that towel that was drying, do you

3    recall?

4        A    I don't recall exactly.

5        Q    Would the photograph reflect, properly reflect the

6    towel that was drying there in the earlier photographs?

7        A    Yes.

8        Q    28(e).

9        A    The counter, again, the trash can is on top of the

10   counter with the baby pampers.

11           MS. SINGER:  The remainder of these photographs,

12       I'd like to ask the witness stand down, Your Honor?

13           THE COURT:  Go ahead.

14           MS. SINGER:  Investigator Millard, if you would

15       stand down.

16   BY MS. SINGER:

17       Q    Moving to 28(f) into evidence, what does this

18   photograph depict?

19       A    This is the photograph of the bedroom on the 16th.

20   As you can see, there are a lot of changes.  The most notable

21   change that I observed was the bed.  The bed was in the

22   process of being dismantled.  You don't have the poles, you

23   don't have the canopy, so half the bed is missing.  There's a

24   lot of stuff on the bed that wasn't there before.  There was

25   just a lot of changes.

1    Q     Did you specifically recognize anything in
2    particular on the bed that you had seen in another place in
3    the apartment earlier?

4    A     Right there, that black towel with the gold, that
5    was the towel that was hanging on, that there was a rack of
6    towels that was hanging on the back of the bathroom door the
7    first visit I was there.  Now that rack and the towels have
8    been moved to the bed.

9    Q     I'm going to show you now 28(g) and ask you why you
10   photographed the photograph?

11   A     This photograph, again, you can see that part of
12   the bed is missing.  But here you also see a bag on the
13   floor, another baby bag with baby items.  Per the search
14   warrant, I was told to collect all baby items, all linens,
15   all towels, and the actual bed itself.  So, again, this is
16   depicting the numerous baby items that were there in the
17   house.

18   Q     Let me show you 28(h), the purpose of this
19   photograph?

20   A     Again, a better picture of, you know, the bed, just
21   everything that was on it.  Here are the towels again, little
22   baby outfit on top, another towel on the bed.

23   Q     I'm going to show you 28(i) and what does that
24   depict?

25   A     Again, the end of the bed with the dresser and

1    different baby items and towels that were sitting on top of

2    the dresser.

3         Q    If you could identify what that particular item

4    that is right there for the jury, I'd appreciate it.

5         A    There is a towel there.  I believe it's a kitchen

6    towel, some sort of small towel there on the dresser.

7         Q    Thank you.  I'm going to show you 28(j), what does

8    that photograph depict?

9         A    This is the foot of the bed.  I'm taking it from

10   the side where the door is.

11        Q    I'm sorry, I had it wrong there.

12        A    I'm standing at the door, I've got the dresser on

13   the side.  This is showing you a little bit of the end of the

14   bed without the pillow in the way, just showing the

15   correlation to the frame and the bed.

16        Q    28(k)?

17        A    The baby bag on the floor, another bag, and then a

18   towel on the dresser.

19        Q    Did you collect that towel as well?

20        A    I'm sorry, that is the end table.  And, yes, I did

21   collect that.

22        Q    I'm going to show you 28(m).

23        A    That is right on the dresser that she was just

24   pointing at, there's that little kitchen towel, another

25   towel, little baby item that's sitting on the edge of the

1   dresser.

2           MS. SINGER:  That was 28(l), for the record, Madam

3       Court Reporter.

4   BY MS. SINGER:

5       Q    28(m).

6       A    This is the side of the bed, and this is the

7   window.  This is -- are the things that we were talking about

8   earlier the big white and little white.

9       Q    Were these the stains that were eventually

10  collected by --

11      A    That's correct, I cut out the carpet and removed

12  this whole piece here.

13      Q    Now, just for the jury, what is this area here?

14      A    This is the window.  So this is, I guess, the

15  window, you know, blind type thing that you saw in the

16  picture.  It's blocking the sun from the window.

17      Q    28(n).

18      A    Again, another picture of the bed from the door,

19  bathroom towels, folded towels, laundry, just showing

20  everything.

21      Q    28(o).

22      A    Little baby socks on the table.

23      Q    Did you collect those socks as well?

24      A    Yes, I did.

25      Q    28(p).

1    A    Again, this is a picture of the bed from the
2 opposite side looking at the closet and looking at the
3 bathroom.

4    Q    And I note here that you have pillow shams.  Are
5 these the pillows that were collected, along with the other
6 items, such as the comforter?

7    A    Yes.

8    Q    This photo depicts this?

9    A    Yes, it does.

10   Q    28(q).

11   A    Again, another picture of the bed, the bath towels,
12 you know, just the different changes.

13   Q    And those particular bath towels, where had they
14 been located when you first had gone to the apartment?

15   A    These black and gold bath towels were hanging on
16 the back of the bathroom door previously.

17   Q    28(r), explain to the jury why you took this
18 close-up photograph and what it depicts.

19   A    This picture is, again, the bed and the towels.
20 But right here underneath the towels is a wrench that wasn't
21 there previously, so a tool laying on the bed, and with the
22 bed being dismantled, you know, I don't know.

23   Q    You decided to take a photograph of it to preserve
24 it?

25   A    Yes.

1    Q    In case it had some importance?

2         28(s), where are you standing when you take this

3    particular photograph?

4    A    I'm standing on the opposite side of the room at

5    the head of the bed.  So I'm right in between the window and

6    the bed looking at the dresser and, again, the stained area.

7    Q    28(t).

8    A    This is the closet again.  The laundry on the floor

9    had been picked up but you've still got the same baby outfit

10   that's hanging here as previously.

11   Q    28(u).

12   A    On further inspection of the closet, I observed

13   this bag hanging here (indicating).

14   Q    What was that bag?

15   A    That bag contained numerous wet items.

16   Q    Do you recall specifically what wet items were in

17   the bag without your notes, or do you need to go back to your

18   notes to refresh your recollection?

19   A    I'd like to look at my notes for the exact items.

20   Q    In a moment -- let me just ask you a few questions

21   about the picture.

22   A    Okay.

23   Q    That's a close-up, and this picture is, this was

24   28(t), if you could show the jury where in 28(t), which would

25   be this photograph, this particular bag was located in closer

1    view?

2        A     From a distance it's difficult to see, but you can

3    see here's this little pant leg and here's this little tie.

4    Well, there's the same pant leg and there's the same tie.  So

5    this little bag is back over in here in the shadows of that

6    first picture (indicating).

7            THE COURT:  Ms. Singer, you might as well recess in

8        midstream because we're not going to get through all

9        these pictures.

10           MS. SINGER:  At this point I'll just go ahead and

11       ask the clerk if I can put a clip on my last picture and

12       that will help us remember.

13           THE COURT:  We'll pick up where we're leaving off

14       in the morning.

15           MS. SINGER:  Thank you.

16           THE COURT:  The jury, since you're already standing

17       up, go ahead and go into the jury room.

18           MR. TEDDER:  Your Honor, can you give a cautionary

19       instruction, please?

20           THE COURT:  Yes.  Ladies and gentlemen, the same

21       instructions, don't watch local news, don't read the

22       newspapers, except for sports and home page and national

23       news is fine.  And, please, secure your notebooks in

24       evidence locker and we'll see you at 8:50.

25           (The jury exited the courtroom.)

1          MS. SINGER:  While the jury is away, I'd just like

2     to put on the record that I understand Mr. Groland is

3     releasing Anne Dickinson, M.D. from her subpoena; is

4     that correct, Mr. Groland?

5          MR. GROLAND:  I'm sorry?

6          MS. SINGER:  That you're releasing Anne Dickinson

7     from her subpoena.

8          MR. GROLAND:  Yes, I am.

9          THE COURT:  Court is adjourned until 8:50 in the

10     morning.

11          (The trial was recessed 6:06 P.M. to the following

12     day, September 13, 2002 at 8:50 A.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25