# EXHIBIT

# J

*202·1-17814*
*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY    }
        Appellant,  }
                         }

                         }

v.                        }

                         }

STATE OF FLORIDA    }
        Appellee,  }

CASE NUMBER   2000-2753-CFA

APPEAL NUMBER 1D02-4788

VOLUME X

Dock~   66
05 -14.2003
~rida Attorney
General

# TRANSCRIPT
# RECORD

### HONORABLE MARTHA ANN LOTT
ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

202-1-17814
F

IN THE CIRCUIT COURT OF FLORIDA
EIGHTH JUDICAL CIRCUIT
IN AND FOR ALACHUA COUNTY

CASE NO: 01-2000-CF-2753-A

TRANSCRIPT ON APPEAL
VOLUME VII
(Pages 835 - 961)

STATE OF FLORIDA

vs.

BRIAN PATRICK HERLIHY,

                    Defendant.
_____/

Volume X
1002-4788
Docket CA
05-14-2003
Appeals Attorney
General

| Proceedings: | Jury trial |
|---|---|
| Before: | The Honorable Martha Ann Lott, Circuit Judge |
| Date: | September 13, 2002 |
| Time: | 9:00 a.m. |
| Place: | Courtroom 4-A Alachua County Courthouse Gainesville, Florida |
| Reporter: | Stacey K. Bryant, RPR Judicial Court Reporter |

APPEARANCES:

    Jeanne Singer, Assistant State Attorney
    Stephen Pennypacker, Assistant State Attorney
    120 W. University Avenue
    Gainesville, Florida 32608
        Appearing on behalf of the State of Florida

    Gordon Groland, Esquire
    John Tedder, Esquire
    Post Office Box 2848
    Gainesville, Florida 32602
        Attorneys for defendant

836

INDEX TO PROCEEDINGS

STATE'S CASE:


TINA MILLARD,

RESUMED DIRECT EXAMINATION BY SINGER: .............. 839
CROSS-EXAMINATION BY GROLAND: ..................... 883
REDIRECT-EXAMINATION BY SINGER: ................... 932



INDEX TO EXHIBITS

STATE'S EXHIBIT NO. 29...MARKED IN EVIDENCE......... 849

STATE'S EXHIBIT NO. 30...MARKED IN EVIDENCE......... 850

STATE'S EXHIBIT NO. 31...MARKED IN EVIDENCE......... 851

STATE'S EXHIBIT NO. 32...MARKED IN EVIDENCE......... 852

STATE'S EXHIBIT NO. 33...MARKED IN EVIDENCE......... 854

STATE'S EXHIBIT NO. 34...MARKED IN EVIDENCE......... 855

STATE'S EXHIBIT NO. 35...MARKED IN EVIDENCE......... 856

STATE'S EXHIBIT NO. 36...MARKED IN EVIDENCE......... 857

STATE'S EXHIBIT NO. 37...MARKED IN EVIDENCE......... 858

STATE'S EXHIBIT NO. 38...MARKED IN EVIDENCE......... 859

STATE'S EXHIBIT NO. 39...MARKED IN EVIDENCE......... 860

STATE'S EXHIBIT NO. 40...MARKED IN EVIDENCE......... 861

STATE'S EXHIBIT NO. 41...MARKED IN EVIDENCE......... 862

STATE'S EXHIBIT NO. 42...MARKED IN EVIDENCE......... 863

```
 1   STATE'S EXHIBIT NO. 43...MARKED IN EVIDENCE......... 864

 2   STATE'S EXHIBIT NO. 44...MARKED IN EVIDENCE......... 866

 3   STATE'S EXHIBIT NO. 45...MARKED IN EVIDENCE......... 872

 4   STATE'S EXHIBIT NO. 46...MARKED IN EVIDENCE......... 873

 5   STATE'S EXHIBIT NO. 47...MARKED IN EVIDENCE......... 874

 6   STATE'S EXHIBIT NO. 48...MARKED IN EVIDENCE......... 875

 7   STATE'S EXHIBIT NO. 49...MARKED IN EVIDENCE......... 875

 8   STATE'S EXHIBIT NO. 50...MARKED IN EVIDENCE......... 876

 9   STATE'S EXHIBIT NO. 51...MARKED IN EVIDENCE......... 877

10   STATE'S EXHIBIT NO. 52...MARKED IN EVIDENCE......... 877

11   STATE'S EXHIBIT NO. 53...MARKED IN EVIDENCE......... 878

12   STATE'S EXHBIIT NO. 54...MARKED IN EVIDENCE......... 879

13   STATE'S EXHIBIT NO. 55...MARKED IN EVIDENCE......... 880

14

15   DEFENSE EXHIBIT NO. 1....MARKED IN EVIDENCE......... 924

16   DEFENSE EXHIBIT NO. 2....MARKED IN EVIDENCE......... 924

17

18

19

20

21

22

23

24

25
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1           P R O C E E D I N G S

2                  *  *  *  *  *

3          (Out of the presence of the jury.)

4          THE COURT:  Anything we need to put on the record

5     before the jury comes in?

6          MR. GROLAND:  Yes, your Honor.

7          THE COURT:  All right.

8          MR. GROLAND:  Just briefly yesterday I revisited

9     some issues and your Honor indicated that you were

10     going to rule on something at 12 noon.  I didn't want

11     to push the issue.

12          THE COURT:  Right.

13          MR. GROLAND:  I'm wondering if we're in a position

14     to get a ruling?

15          THE COURT:  In regards to the special instruction

16     as to Crystal Quirello, is that the ruling that you're

17     talking about?

18          MR. GROLAND:  Yes, your Honor.

19          THE COURT:  I think so.  I'm gonna hear a little

20     bit of argument from both of you.  Since we're right in

21     the middle of a witness, we won't do it right now.  But

22     we will definitely do it this morning.

23          MS. SINGER:  Is it to disregard the testimony?

24          THE COURT:  No.  We're going to discuss whether or

25     not there should be any instruction at all, and,

1    whether or not there is some further ruling the Court

2    needs to make in regard to if and when the defense

3    opens the door.  So you're way ahead.  You're jumping

4    to what the possible ruling might be after argument and

5    review of the transcript, and we're not there yet.

6         MS. SINGER:  Okay.  Great.

7         THE COURT:  Good enough.  Bring the jury in.

8         (Before the jury:)

9         THE COURT:  All right.  Ms. Singer, you may

10   continue.  Ms. Millard, you can come back to the stand.

11        MS. SINGER:  Does the Court wish to inquire about

12   any of the reading of the newspaper?

13        THE COURT:  I will do so.  Ms. Millard, come up

14   and have a seat.  You're still under oath.

15        Ladies and gentlemen, I want to confirm with you

16   nobody has listened to any news reports, or read any

17   news reports, or been contacted by anybody about this

18   trial.  Is that still correct?

19        JURORS:  Yes.

20        THE COURT:  All right.  Thank you.

21        Ms. Singer, you may proceed.

22              DIRECT EXAMINATION (Resumed)

23   BY MS. SINGER:

24        Q    Where we stopped yesterday was in the middle of

25   some identification of photographs, Ms. Millard, and I'm

1   gonna bring you back down here.  And, Mr. West, if you can

2   come up here and set this machine up for me.  Is it warmed

3   up sufficiently for us to go forward with the pictures at

4   this time?

5           I believe the clerk allowed me to mark the last

6   picture I was on.

7           (Pause in the proceedings.)

8           MS. SINGER:  Mr. Bailiff, could you just dim the

9       lights a bit?  Okay.

10  BY MS. SINGER:

11      Q    Okay.  Ms. Millard, taking you back a bit.  We

12  were in the process of looking at some photographs and I

13  think the last one we had identified up on the screen, it

14  was for the record 28-U and we actually had two photographs

15  on the screen at the time that you were testifying.  Do you

16  recall 28-U?  Does that photograph look familiar to you?

17      A    Yes, it does.

18      Q    Just for the record, so that there's some kind of

19  continuity here, would you just tell the jury again what

20  that photograph depicts?

21      A    Again, this is in the back of the closet.  You've

22  got the little baby outfit here, the tie, and there is a

23  blue plastic bag hanging in the closet.

24      Q    Now, this was the other photograph, this was 28-U

25  that I had placed together just so you could show the jury

1   where in relation to the entire closet the blue Wal-Mart bag

2   was placed in that closet.

3        A    Again, in this photograph the same baby outfit,

4   the blue tie, and the shadows there, that blue bag.

5        Q    Simply looking in the closet, Investigator

6   Millard, were you able to visualize that bag without going

7   further in and actually moving clothing or examining the

8   area where the ties and the baby outfit were located?

9        A    Initially from the door I couldn't see it, but

10  upon walking in the closet, giving another inspection,

11  that's when I discovered this bag hanging there.

12       Q    Go to the next picture then.  It was 28-V and ask

13  you whether you recognize that picture and what it depicts?

14       A    This is a baby outfit on the bed.  There is a

15  comforter.  Here's a second sham there, and a pillow, more

16  towels.

17       Q    That was -- Did you take that baby outfit into

18  evidence upon the execution of the search warrant?

19       A    Yes, per the search warrant all baby items were

20  collected.

21       Q    28-W, what is that, ma'am?

22       A    I believe that's a diaper pad on the floor folded

23  up.

24       Q    And did you photograph that because you took that

25  into evidence as well?

1       A     Yes, I did.

2       Q     Was that located in the bedroom or do you need to

3   look at a bigger picture to see?

4       A     I don't recall exactly.   I would have to see a

5   bigger picture.

6       Q     All right.   28-X, should we have it this way

7   perhaps?

8       A     Yes.   That's correct.

9       Q     All right.   Tell us what this depicts?

10       A     On the side here you see that's the dresser, okay?

11   So this right here is gonna be where the footboard would be

12   of the bed.   The bed, the mattress, everything has been

13   removed and packaged.   The mattress has been removed.   This

14   is just the bed frame.

15           Now, what I'm looking at here is that there's

16   really nothing -- earlier yesterday we saw the white stains

17   on the carpet, on the other side of the bed.   This picture

18   is mainly depicting that there is not a visible stain on the

19   carpet at the end of the footboard.

20       Q     Now, did you actually visualize the entire

21   carpeting at the end of the footboard of the bed?

22       A     Yes, I did inspect the carpet.   And again, the

23   only visible stains that I observed were the ones on the

24   opposite side of the bed.

25       Q     Now, I'm gonna show you 28-Y.   I think that would

1    also be the way the photographs should be laid.  Is that

2    correct?

3         A    That is correct.

4         Q    Tell the jury what that is.

5         A    Again, here's the bed, the headboard would be over

6    here.  The window is over here.  And this is the carpet that

7    you saw yesterday that got cut out.

8         Q    Was that the only stains of any substance that you

9    identified on the rug, in the bedroom of the Herlihy

10   apartment?

11        A    That's correct, the only visible stains that were

12   noted to me.

13        Q    I show you 28-Z, which I think should go in this

14   direction.  And would you tell the jury what this depicts?

15        A    Again, this is the bed after all the items have

16   been individually collected, packaged, the mattress removed.

17   And you see that the canopy is missing and this is just --

18   you can see most of the carpet in this room.

19        Q    And if you could with the laser pointer just to

20   verify where were the stains in relation to the headboard?

21        A    Over here on the opposite side of the bed.

22        Q    And where is the window, just so we can have a

23   picture?

24        A    The window is right here.

25        Q    That faces out to the parking lot?

1       A    That faces to the parking lot.

2       Q    I show you 28-AA, and I ask you to tell the jury

3  what this picture depicts?

4       A    I'm standing at the headboard looking back on the

5  footboard, and the dresser, and the carpet, and the

6  footboard.

7       Q    Now, does this picture then depict what the

8  carpeting looked like underneath the bed spring and the

9  mattress of the bed?

10      A    Yes.

11      Q    And did you note any stains, of any nature,

12  underneath the area -- on the area that would have been

13  underneath the mattress and the wall?

14      A    Nothing in this area.

15      Q    I'll show you two pictures now.  State's 28-BB and

16  State's 28-CC, and if you could, tell the jury what these

17  pictures depict?

18      A    This is the spot of the carpet where I cut it out,

19  and it was displayed to you yesterday so you could see where

20  the carpet was removed in both places.  It's the same

21  picture, just photographed twice, shows the same carpet.

22      Q    And this would be the same documentation of where

23  the carpet was removed in respect to the other side of the

24  room?

25      A    That is correct.

1          Q      This would be a close-up of that particular

2   carpet?

3          A      Yes, ma'am.

4          Q      And the last picture, I should say that was DD --

5   for the photograph that was a different perspective and, EE,

6   for the close-up of the removal of the carpet for the

7   record.

8                 And 28-FF, the last picture that I'm going to be

9   showing you at this time.

10         A      I'm standing in the corner of the room, by the

11  window, looking across the room to the closet.  Again, just

12  showing the room once the bed frame was removed.

13         Q      You may go ahead and take your seat back.

14                THE COURT:  All right.  Would you bring the lights

15         backup, please?

16  BY MS. SINGER:

17         Q      Now, after you took photographs, Investigator

18  Millard, did you then begin collecting evidence?

19         A      Yes, I did.

20         Q      Was, in fact, the bed, bed frame, box spring, and

21  mattress collected by you or in your presence with the help

22  of other folks?

23         A      Yes.

24         Q      And is that now presently at the Gainesville

25  Police Department, to your knowledge?

```
 1        A    To my knowledge it is still at the Gainesville
 2   Police Department.
 3        Q    Did you find in the removal of the bed whether or
 4   not it was -- how difficult it was to take the bed apart?
 5   Was there any --
 6        A    There was a special tool, a, I believe it was a --
 7   mind if I look through my notes for the exact name of the
 8   tool.
 9        Q    Absolutely.
10        A    Okay.  It was a torque wrench located in the
11   dresser, per the search warrant.  I was looking for all baby
12   items and located a torque wrench, which was the right size
13   to dismantle this bed.
14        Q    Did you take the wrench into custody?
15        A    Yes, I did.
16        Q    All right.  Once you take the photographs, you
17   have the bed removed, and actually transport it, I suppose,
18   to the department, to the department evidence locker.  Did
19   you then collect items from the bed, and baby items?
20        A    Yes, I did.
21        Q    We have a number of items, some of which are
22   already in evidence, and some of which need to be
23   identified.  We've already looked at your first item, I
24   believe, which was the baby bottle.  And the next three
25   items which were the swabbings?
```

1          A     That is correct.

2          Q     Item number 5, what was item number 5 that you

3    took into evidence?

4          A     Okay.  Item number 5 was the Comfopedic 1

5    mattress.

6          Q     What was item number 6?

7          A     It was the Comfopedic box springs.

8          Q     What was number 7?

9          A     The black metal-type headboard.

10         Q     What was number 8?

11         A     The black metal-type footboard.

12         Q     What was number 9?

13         A     The brown, metal bed frame.

14         Q     What was 10?

15         A     The gray carpet that we examined yesterday.

16         Q     All right.  What was 11?

17         A     Number 11 is the large pillow and the pillow sham

18   from the bed.

19         Q     All right.  And what was 12?

20         A     Number 12 was the pillow and the white pillow

21   case.

22         Q     All right.  What was 13?

23         A     The small pillow and the sham with the medical

24   tape on it.

25         Q     What was 14?

1       A      The pillow with the white pillowcase and the

2   burgundy stripes on it.

3       Q      All right.  If I can go ahead and open this

4   package.  And take a look at that package and tell me

5   whether or not that is the package that would have held that

6   particular item?

7       A      Yes.

8       Q      Examining this item, is this that item that you

9   took into evidence at that time?

10      A      Yes.  White pillow with a pillowcase with a

11  burgundy stripe.

12      Q      Does it appear to be in the same or similar

13  condition as when you took it into evidence?

14      A      Yes.

15      Q      Do you need to look at any particular item?

16      A      No.  It looks okay.  And, actually, right here on

17  the top of it I have my initials C.S.M.

18      Q      This is the pillow?

19      A      Yes, it is.

20              MS. SINGER:  Move this into evidence as the next

21          numbered exhibit, your Honor?

22              THE COURT:  Any objection?

23              MR. GROLAND:  No objection, your Honor.

24              THE COURT:  It will be admitted as number?

25              THE CLERK:  29.

1    THE COURT:   29.   Thank you.   In evidence for the

2    state.

3         (State's Exhibit No. 29 was received in evidence.)

4    BY MS. SINGER:

5    Q    Number 15, pardon me, 16.   I think that was 15 --

6    I think that was.

7    A    Number 16, is a pillow, with a white pillowcase

8    and burgundy stripes.

9    Q    All right.   We're looking at this bag and I'm

10   opening it.   Is that the bag reflecting that you took that

11   in evidence and that is this bag?

12   A    Yes, it is.

13   Q    This pillow?

14   A    Yes.   And again my initials are on the inside.

15   Q    Is that correct?

16   A    Yes, that's correct.

17   Q    Does it appear to be in the same or similar

18   condition as when you took it into evidence back on, I think

19   it was the 16th of August?

20   A    Yes.

21        MS. SINGER:   Your Honor, at this time I move this

22   one in as the next numbered exhibit.

23        THE COURT:   Any objection?

24        MR. GROLAND:   No, your Honor.

25        THE COURT:   Be number 30?

1              THE CLERK:  Yes, your Honor.

2              THE COURT:  Number 30 in evidence for the state.

3              (State's Exhibit No. 30 was received in evidence.)

4    BY MS. SINGER:

5        Q    Next item of evidence that you collected, please,

6    number 17?

7        A    Number 17 is gonna be a black throw pillow.

8        Q    Was this also removed from the bed?

9        A    Yes, it was.

10       Q    This bag look like the bag that you packaged it

11   in?

12       A    Yes, it does.

13       Q    This black pillow, do you recognize that?

14       A    Yes.

15       Q    Do you need to look at it to see if your initials

16   are on it, right in here?

17       A    I can't tell if that's it or not.  With being a

18   black pillow, I was using a black Sharpie pen to mark these

19   things.

20       Q    Take a look at the bag and tell me whether or not

21   that appears to be the same bag?

22       A    But the bag does have department card, my

23   handwriting, my initials on the seal that she did open.

24   Okay.

25             MS. SINGER:  At this time I tender the black

1    pillow in as the next-numbered exhibit.  Any objection,

2    Mr. Groland?

3         MR. GROLAND:  No objection.

4         THE COURT:  It will be admitted as State's Exhibit

5    Number 31.

6         THE CLERK:  Yes, your Honor.

7         (State's Exhibit No. 31 was received in evidence.)

8  BY MS. SINGER:

9    Q    The next item you put into evidence would be

10  number 18?

11   A    Number 18 is going to be another black throw

12  pillow.

13   Q    Another black throw pillow.  Take a look at this

14  bag.

15   A    Again, the same handwriting, my I.D, and number,

16  and my initials, and signature on the back.

17   Q    This may have been opened at some other time for

18  inspection?

19   A    Yes, it was.

20   Q    Does it appear to be in the same condition?

21   A    It does appear to be in the same condition.

22   Q    I'm breaking the seal now and I'm removing the

23  pillow.  Tell me if this appears to be the item that you

24  took?

25   A    It does appear to be the same item.

852

```
1        Q    Does it appear to be in the same or similar

2   condition as when you took it into evidence back there?

3        A    Yes.

4        Q    Two years ago?

5        A    Yes.

6             MS. SINGER:  At this time, I tender this as the

7        next-numbered exhibit.

8             MR. GROLAND:  No objection.

9             THE COURT:  It will be admitted as 32 in evidence

10       for the state.

11            (State's Exhibit No. 32 was received in evidence.)

12   BY MS. SINGER:

13       Q    The next item that you took in is not the next

14   item I have.  So if you can just tell the jury what you took

15   in which would have been the next item?

16       A    Okay.  The next item would be number 19, which is

17   a throw pillow with the matching shams.

18       Q    All right.  And -- this is already in evidence as

19   Exhibit 20 for the state.  Is that the throw pillow and

20   shams that you took, matching sham?

21       A    Yes.

22       Q    It's a throw pillow?

23       A    That matches the shams, yes.

24       Q    All right.  That was 19, right.

25            20, what did you take in that was item 20?
```

1      A      20 is a red, white, blue, and brown baby jumper

2   with a bear, size 3 to 6 months.

3      Q      We'll open this package.  Does that appear to be

4   the package that you stored that particular item in?

5      A      That's correct.

6      Q      We'll open the seal.  Perhaps you can just tell

7   the jury what, as a crime scene investigator, you do, in

8   terms of sealing and the purpose of the sealing in a paper

9   bag, as opposed to any other type of bag or container.

10     A      What I'll do at the scene is I'll take each item

11  that I collect and place it in its own paper bag, individual

12  paper bag.  I will then take it back to the station for

13  further packaging, and marking, and sealing.

14          But then I'll always write the property card

15  number on it which will identify it to that case, the case

16  number on, it and my individual markings.  And then I'll

17  seal it and I'll -- with evidence tape, it's red -- and I'll

18  put my initials, and possibly the date, just so that I know

19  that yes, it is sealed, so that I can look at it later, say

20  either yes, this has been opened, or no, this has not been

21  opened before.

22     Q      And once it's in property, if others wish to

23  examine the property, the bags may be opened, but they would

24  be opened in the presence of the property custodian at

25  Gainesville Police Department?

1     A     That is correct.

2     Q     So -- and once those items are viewed again,

3  perhaps by counsel, that evidence custodian would reseal the

4  bag and make a marking on that, as well?

5     A     That is correct.

6     Q     Take a look at this baby jumper.  Does this appear

7  to be the baby jumper?

8     A     Yes, it does.

9     Q     Is that in the same or similar condition?

10    A     Yes.  And I have initials in the top corner here.

11          MS. SINGER:  Next numbered exhibit, your Honor,

12    into evidence, please?  Mr. Groland?

13          MR. GROLAND:  No objection.

14          THE COURT:  33 in evidence for the state.

15          (State's Exhibit No. 33 was received in evidence.)

16  BY MS. SINGER:

17    Q     This would be number 21, item 21.  Would you tell

18  the jury what's in this bag?

19    A     It's a white burp bib blanket.  It says daddy's

20  little angel on it.

21    Q     I showed you the red, blue, and white jumpsuit,

22  which was the last numbered item into evidence?

23    A     Yes.

24    Q     Did you also photograph that?

25    A     Yes.

1    Q    Did you show us on a close-up view where it was

2    located on the bed?

3    A    Yes, it was photographed and it was in the

4    photograph.

5    Q    Opening this item at this time.  I ask you to take

6    a look at it.

7    A    Daddy's little angel, my initial tag.

8    Q    Is this in the same or similar condition as when

9    you took it into evidence?

10   A    Yes.

11        MS. SINGER:  I tender as the next numbered

12        exhibit, your Honor.

13        THE COURT:  It will be admitted if there's no

14        objection as number 34 in evidence for the state.

15        MR. GROLAND:  No objection.

16        (State's Exhibit No. 34 was received in evidence.)

17   BY MS. SINGER:

18   Q    22, would you tell the jury what 22 is?

19   A    22 is the red and blue baby socks.

20   Q    Once again, looking at the packaging, does it

21   appear to be packaged and secured the way you did it?

22   A    Yes.

23   Q    Now, we're gonna open it up.  These socks were

24   photographed also on the end table?

25   A    These photographs were on the end table.  My

1   initials are on the inside of the little feeties.

2       Q    Do they appear to be in the same or similar

3   condition?

4       A    Yes.

5            MS. SINGER:  Tender as the next-numbered exhibit

6       into evidence, your Honor.

7            MR. GROLAND:  No objection.

8            THE COURT:  35 in evidence?

9            THE CLERK:  Yes, your Honor.

10           THE COURT:  And, of course, Mr. Clerk, if I get

11      the numbers wrong I hope that you'll correct me so our

12      record is correct.

13           (State's Exhibit No. 35 was received in evidence.)

14  BY MS. SINGER:

15      Q    Now what was item number 23?

16      A    Item number 23 is a brown and white kitchen towel

17  and this was recovered from the dresser in the bedroom.

18      Q    Let me let you look at this particular package and

19  whether or not this is the item?

20      A    Again, it's the same.  It has been examined by

21  someone and sealed by someone else.

22      Q    And when examination takes place at the

23  Gainesville Police Department, is a member of the

24  Gainesville Police Department property staff present during

25  the examination?

1    A    Yes, property custodian is present, witnesses what

2    goes on.   That's a log as to who actually inspects the

3    evidence, what items are inspected.   And then the property

4    custodian will actually do the resealing with the evidence

5    tape, and their initials, and I.D. number.

6    Q    Take a look at this particular item.   Do you

7    recognize that as being the item, brown towel that you took

8    into custody?

9    A    Yes, and my initials are on the tag again.

10    Q    Does it appear to be in the same or similar

11    condition?

12    A    Yes.

13    Q    You did photograph where this was located at the

14    time?

15    A    Yes, I did.

16    Q    That is depicted in the photograph?

17    A    It is depicted in the photograph on the dresser.

18          MS. SINGER:   We would tender as the next-numbered

19       exhibit, your Honor.

20          MR. GROLAND:   No objection.

21          THE COURT:   Number 36 in evidence for the state?

22          THE CLERK:   Yes, your Honor.

23          (State's Exhibit No. 36 was received in evidence.)

24   BY MS. SINGER:

25    Q    Are we on item 24?

1      A     You're on number 24.

2      Q     Let me show you package number 24.  Once again, do

3  you recognize your sealing?

4      A     Yep.

5      Q     Was this also inspected some other time?

6      A     Yes, it has.

7      Q     I'll go ahead and break the seal.

8      A     Number 24 is a white kitchen towel with red

9  stripes that was recovered from the dresser.

10     Q     I'm showing you now the actual exhibit.  Do you

11  recognize it?  I think I see it on the back?

12     A     Yep, and my initials are down on the bottom; yes

13  that is the same one.

14     Q     Does it appear to be in the same or similar

15  condition as when you took it into custody?

16     A     Yes, it does.

17         MS. SINGER:  Once again, your Honor, we tender as

18      the next-numbered exhibit into evidence for the state.

19      Mr. Groland?

20         MR. GROLAND:  No objection.

21         THE COURT:  Number 37 in evidence?

22         THE CLERK:  Yes, your Honor.

23         (State's Exhibit No. 37 was received in evidence.)

24  BY MS. SINGER:

25     Q     Next number 25 for you?

Stacey K. Bryant, RPR
Judicial Court Reporter

1          A     Number 25 is a white baby blanket with animals on

2     it.

3          Q     All right.  Take a look at this particular seal,

4     is that your seal?

5          A     Uh-huh, looks like it is.

6          Q     Looks like it has not been opened at all?

7          A     It has not been opened by anyone else.

8          Q     Do you recognize this particular item?

9          A     Yes.

10         Q     And if you'll take a look at it and tell me

11    whether or not it's in the same or similar condition as when

12    you first took it and placed it in this bag?

13         A     Yes, my initials are on it.

14              MS. SINGER:  Your Honor, we would tender this as

15         the next numbered exhibit.

16              MR. GROLAND:  No objection.

17              THE COURT:  38 in evidence.

18              THE CLERK:  This is 38, your Honor.

19              THE COURT:  Thank you.

20              (State's Exhibit No. 38 was received in evidence.)

21    BY MS. SINGER:

22         Q     Is the next-numbered exhibit on your list 26?

23         A     Number 26 is a blue and white washcloth.

24         Q     Once again, take a look at the seal and tell me

25    whether or not that is your seal?

```
 1        A     That is my seal.  It has not been opened.

 2        Q     Looking at this washcloth?

 3        A     Yes, and it does have my initials on it.

 4        Q     Does it appear to be in the same or similar

 5   condition as when you took it into evidence that day?

 6        A     Yes.

 7        Q     Did you photograph where this was located?

 8        A     Yes, it was photographed.

 9        Q     All right.

10              MS. SINGER:  We would tender as the next-numbered

11        exhibit, your Honor, in evidence.

12              MR. GROLAND:  No objection.

13              THE COURT:  39 in evidence for the state.

14              (State's Exhibit No. 39 was received in evidence.)

15   BY MS. SINGER:

16        Q     I'm gonna show you now our next number, 27?

17        A     Number 27 is a white padded blanket or a changing

18   pad.

19        Q     Was this the padded changing pad that you

20   photographed that's --

21        A     I believe it was.

22        Q     -- a close-up?

23        A     That was on the floor.

24        Q     I'm showing you your seal here?

25        A     Yes.
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1    Q    Before I tear it, is that your seal?

2    A    That is my seal.

3    Q    Appear to be untampered by anybody?

4    A    Yes.

5    Q    Looking at this, let me open it for you.  Okay.

6    A    Yep.  And my initials are down here.

7    Q    Now everything I see is a C.B.M.?

8    A    C.S.M.

9    Q    C.S.M.  We're calling you Tina Millard, but

10   you're?

11   A    Christina.

12   Q    Does this appear to be in the same or similar

13   condition as when you put it in the bag or collected it?

14   A    Yes.

15        MS. SINGER:  At this time, your Honor, we would

16   tender this as the next-numbered exhibit.

17        MR. GROLAND:  No objection.

18        THE COURT:  Number 40 in evidence for the state.

19        (State's Exhibit No. 40 was received in evidence.)

20   BY MS. SINGER:

21   Q    Number 28?

22   A    Number 28 is a Pooh diaper bag containing Enfamil

23   packets, socks and bottle goods.

24   Q    Taking a look at the seal, your seal?

25   A    My seal.

1    Q    Appears to be untampered with in any way?

2    A    That is correct.

3    Q    Not opened at any other time?

4    A    Yeah, it has not been opened by anyone else.

5    Q    And now we're tearing the taping.  Appear to be

6    the bag that you took into evidence?

7    A    Yes, it does.

8    Q    Looking for your initials on it?

9    A    I'm looking for my initials.  There, the tag, and

10   my initials are on the tag, on the inside of the bag.

11   Q    Seem to be in the same or similar condition as

12   when you took it into evidence on that day?

13   A    Yes, it does.

14   Q    I believe you did photograph this as well?

15   A    Yes, it was photographed.

16        MS. SINGER:  Your Honor, I would tender this item

17   as the next-numbered exhibit into evidence.

18        MR. GROLAND:  No objection.

19        THE COURT:  This is number 41, Mr. Clerk?

20        THE CLERK:  Yes, your Honor.

21        THE COURT:  All right.  41 in evidence for the

22   state.

23        (State's Exhibit No. 41 was received in evidence.)

24   BY MS. SINGER:

25   Q    Your next number is 29.  I know we're on 41, but

1   you're on 29?

2       A    My next number is 29.  It's a Shands at AGH, ABC

3   bag.  It was empty.

4       Q    All right.  Take a look at the seal and tell me

5   whether or not this is your seal?

6       A    This is my seal.

7       Q    Appear to be tampered with in any way?  We are

8   breaking the seal and removing the item.  I'll have you look

9   at that and tell me whether or not you recognize that as the

10  item you took into evidence on that day?

11      A    Yes, my initials are on the inside of the bag

12  here.

13      Q    Does it appear to be in the same or similar

14  condition as when you took it into evidence on that day?

15      A    Yes, it does.

16          MS. SINGER:  I'll tender, your Honor, as the

17      next-numbered exhibit in evidence.

18          MR. GROLAND:  No objection.

19          THE COURT:  42 in evidence for the state.

20          THE CLERK:  Yes, your Honor.

21          (State's Exhibit No. 42 was received in evidence.)

22  BY MS. SINGER:

23      Q    Your next number, Investigator Millard?

24      A    My number is number 30.

25      Q    What is that, ma'am?

1      A      It is a green, tan, and pink, striped bath towel.

2   My initials, my seal.

3      Q      Ever been opened?

4      A      It has not been opened.

5      Q      I'm breaking the seal at this time.  Okay.  I

6   think I'm breaking the seal at this time.

7             Is this the bag -- towel that you took into

8   evidence on the day that you executed the search warrant?

9      A      Yes, it is, and my initials are on the tag.

10     Q      Does it appear to be in the same or similar

11   condition?

12     A      Yes, it does.

13     Q      I'll show you the other side.

14     A      It's wrinkled.

15     Q      And you photographed where this was located before

16   you removed it and placed it in evidence?

17     A      Yes, I did.

18     Q      Your photographs will depict that?

19     A      That's correct.

20             MS. SINGER:  I move this one, the next piece of

21         evidence in as the next-numbered exhibit for the state.

22             THE COURT:  Any objection?

23             MR. GROLAND:  No objection.

24             THE COURT:  43 in evidence for the state.

25             (State's Exhibit No. 43 was received in evidence.)

```
 1   BY MS. SINGER:
 2        Q    Your next exhibit number would be item 31,
 3   correct?
 4        A    That's correct.
 5        Q    Would you tell the jury what that item is?
 6        A    Number 31 is striped overalls, size 3 to 6 months.
 7   It's gonna be with a red shirt with a blue collar.  Again
 8   that's three to six months.
 9        Q    All right.  Take a look at the packaging; is that
10   your seal?
11        A    Yes, it is.
12        Q    And the other?
13        A    Has not been opened.
14        Q    Breaking the seal at this time.  Does this appear
15   to be the item that we took into evidence?
16        A    Yes, it does, and my initials are on the inside.
17        Q    And is this the outfit that was hung in the
18   closet --
19        A    That is correct.
20        Q    -- by the ties that you photographed --
21        A    That is correct.
22        Q    -- on several occasions when you went in the
23   closet?
24        A    Yes.
25        Q    Appear to be in the same or similar condition?
```

1      A     Yes.

2             MS. SINGER:  At this time I would tender this as

3      the next-numbered exhibit, your Honor.

4             THE COURT:  Any objection?

5             MR. GROLAND:  No objection.

6             THE COURT:  It will be admitted as 44 in evidence

7      for the state.

8             (State's Exhibit No. 44 was received in evidence.)

9             MS. SINGER:  We need one moment, your Honor,

10     because the next items are items that we have already

11     entered in evidence, but I do want Investigator Millard

12     to identify them for the jury.

13            THE COURT:  All right.

14     BY MS. SINGER:

15     Q     Ms. Millard, Investigator Millard, your next

16     numbered exhibit is going to be?

17     A     Number 32.

18     Q     Would you describe for the jury what number 32 is?

19     A     Number 32 is the blue, Wal-Mart, plastic bag that

20     was hanging in the closet.  And it contains a white extra

21     large T-shirt, a white kitchen towel with red stripes, a

22     white bath towel, a white -- and white kitchen towel with

23     blue stripes.

24     Q     All right.  This has already been entered into

25     evidence as Composite Exhibit 21-A.  And you may want to put

1   gloves on.

2       A    Okay.

3            MS. SINGER:   It was Composite Exhibit 21 for the

4       record.   There are items in the bag, Madam Court

5       Reporter, that will be further identified by letter.

6   BY MS. SINGER:

7       Q    I'm going to show you what's been previously

8   marked into evidence as State's Exhibit 21-A.   Can you tell

9   me whether or not this is, in fact, the extra large T-shirt

10  that you took into evidence?

11      A    Yes, it is, with my initials on it.

12      Q    And does it appear to be in the same or similar

13  condition?

14      A    There is a lot of writing in blue and black that

15  was not there when I packaged it, but --

16      Q    Are you familiar with what that writing is from

17  your experience as a forensic investigator?

18      A    The item was sent off to FDLE for examination, and

19  through their processes they do mark on items.

20      Q    Does it appear, otherwise, to be in the same or

21  similar condition as when you received it?

22      A    Yes, it does.

23      Q    21-B, does this appear to be the white towel?

24      A    Yes, it does.   My initials are up in this top

25  corner right here, next to the blue writing.

1    Q    Once again, the blue writing you would say was

2  from the laboratory?

3    A    That is correct.

4    Q    Otherwise, it's in the same or similar condition?

5    A    That is correct.

6    Q    21-C?

7    A    The white kitchen towel.

8    Q    With the red stripe?

9    A    Yep.  My initials are in this corner here.

10   Q    Other than the writing, does it appear to be in

11 the same or similar condition?

12   A    Yes, it does.

13   Q    Do you recall whether these items were wet or dry

14 when you took them into evidence?

15   A    They actually were wet when I took them in.

16   Q    21-D?

17   A    Again, another towel and my initials are in this

18 corner over here.

19   Q    Appear to be in the same or similar condition?

20   A    That is correct, other than the FDLE writing.

21   Q    I'm going to also show you an item that's in the

22 bag as well.  Did you also place in item 32, along with

23 these items that were damp, the actual Wal-Mart bag?

24   A    Yes, I did.

25   Q    Does this appear to be the Wal-Mart bag?

1       A     Yes, it is a Wal-Mart bag, plastic bag.  Got the

2   FDLE writing on it.

3       Q     Does it appear to be in the same or similar

4   condition as it was?

5       A     Yes, it was.

6       Q     I don't know what this piece is.  Do you recognize

7   this at all?

8       A     I don't recall exactly.

9             MS. SINGER:  All right.  Your Honor, I would like

10        to have the bag moved into evidence as 21, I believe

11        that would be, E, as, making it part of this composite

12        exhibit.

13            MR. GROLAND:  That's fine, except for what she

14        doesn't recall.

15            MS. SINGER:  Correct.  That would be this, which

16        we will not move.  All that is state's evidence.  We

17        can mark that bag and include it in this composite,

18        your Honor.

19            THE COURT:  It will be marked as Exhibit 21-E in

20        evidence.

21            THE CLERK:  Yes, your Honor.

22   BY MS. SINGER:

23        Q     What number are we on, Investigator Millard?

24        A     My number is going to be Number 33.

25        Q     You describe Number 33 as?

Stacey K. Bryant, RPR
Judicial Court Reporter

1    A    The bright blue and tan comforter.

2    Q    All right.  I'm showing you what's been marked as

3 State's Exhibit 20.

4         Mr. Pennypacker, I'm going to need you.

5 BY MS. SINGER:

6    Q    This has been previously entered into evidence,

7 Investigator Millard, but if you need to, stand down to

8 examine where your initials are on this particular item,

9 which is State's 22 in evidence.

10   A    Do you see a tag anywhere?

11   Q    A tag on the item?

12   A    No.

13   Q    Does it appear to be the same comforter?

14   A    It does appear to be the same comforter.

15   Q    If you could go the other way, looking at it, did

16 you examine this comforter when you went into the apartment

17 and photographed it back on August the 2nd of the year 2000.

18   A    Yes, it is.  I did examine it.  It didn't appear

19 to have -- it didn't appear to have any visual large stains

20 on it that I observed.

21   Q    Did you notice any wetness or --

22   A    No, I did not.

23   Q    -- or spillage on it?

24   A    No, I did not.

25   Q    Let's see if we can work as partners truly by

1  folding this up.  Thank you.

2         Your next item in evidence, Investigator Millard?

3     A    It's gonna be Number 34, which is a sheet set

4  that's white with burgundy stripes.

5     Q    A sheet set, yes.  Okay.  24 is presently in

6  evidence as 23-B.  And I'm just going to go ahead and let

7  you look at it.  You don't need to fully examine it.  We

8  don't need to pull it out at this time, but there also is a

9  tag here.

10    A    This does appear to be the same.  It's got my

11 initials, my seal.  It has been opened by property and, it

12 appears, FDLE.

13    Q    Also in the same condition?

14    A    But it does appear to be the same.

15    Q    When you removed these, the sheets, and the fitted

16 sheet and the plaid sheet from the bed, did you notice any

17 staining, or any liquid, or moisture on these particular

18 items?

19    A    No.

20    Q    Your next-numbered exhibit or item taken into

21 evidence?

22    A    My next item was Number 35, which was a bed skirt

23 to match the shams.

24    Q    All right and looking at this particular package,

25 your seal?

1    A    My seal and it has not been opened by anyone else.

2    Q    And now breaking the seal, would you take a look

3  at that and tell me whether or not that is, in fact, the bed

4  skirt that you took?  Take your time.

5    A    It is a bed skirt.  It does match the comforter.

6  It appears to be the same one considering the bag has not

7  been opened since I closed it.

8    Q    All right.

9    A    And my initials are right here on the corner.

10   Q    Same similar condition as when you took it in?

11   A    Yes.

12   Q    After the bed had been, I suspect been taken

13  apart, because this would be between the mattress and the

14  footboard; is that correct?

15   A    That is correct.

16       MS. SINGER:  At this time I would move this in as

17    the next-numbered exhibit.

18       THE COURT:  Any objection?

19       MR. GROLAND:  No objection.

20       THE COURT:  Is that number 45?

21       THE CLERK:  Yes, your Honor.

22       THE COURT:  45 in evidence for the state.

23       (State's Exhibit No. 45 was received in evidence.)

24  BY MS. SINGER:

25   Q    What is the next item that you took?

1       A     My next item is number 36.   It is a brown and

2   white kitchen towel that was located on the floor.

3       Q     Have a look at this packaging.

4       A     It's got my initials, and it has been opened one

5   other time.

6       Q     Breaking the seal, do you recognize this item?

7       A     My initials are on the towel.   It does appear to

8   be in the same condition.

9             MS. SINGER:   We would tender this as the

10          next-numbered exhibit, your Honor, into evidence.

11            MR. GROLAND:   No objection.

12            THE COURT:   Any objection?   46 in evidence for the

13          state.

14            (State's Exhibit No. 46 was received in evidence.)

15   BY MS. SINGER:

16      Q     Your next item?

17      A     Number 37, which is Pampers wipes in a box.

18      Q     This was, in fact, photographs?

19      A     Yes, it was.

20      Q     Now, breaking -- is this your seal?

21      A     Yes, it is.

22      Q     Now, breaking the seal.   It appears it has not

23   been opened at any other time?

24      A     It has not been opened by anyone else.

25      Q     Examining that, does it appear to be in the same

1  or similar condition?

2       A    Yes, it does, and my initials are on the bottom of

3  the box.

4            MS. SINGER:  I tender as the next-numbered

5       exhibit, your Honor.

6            THE COURT:  Any objection?

7            MR. GROLAND:  No objection.

8            THE COURT:  Number 47 in evidence for the state.

9            (State's Exhibit No. 47 was received in evidence.)

10 BY MS. SINGER:

11      Q    Your next item?

12      A    Is Number 38.  It's going to be K-Swiss baby

13 shoes, size two.  That is my seal and it has not been opened

14 by anyone else.

15      Q    Breaking the seal.

16      A    It is shoes and my initials are on the bottom of

17 both of them.

18      Q    Do they appear to be in the same condition as when

19 you took the shoes in evidence that day?

20      A    Yes, they do.

21           MS. SINGER:  Your Honor, we would tender the shoes

22      as the next-numbered exhibit.

23           THE COURT:  Any objection?

24           MR. GROLAND:  No objection.

25           THE COURT:  It will be marked as 48 in evidence

1        for the state.

2             (State's Exhibit No. 48 was received in evidence.)

3   BY MS. SINGER:

4        Q    Your next item.

5        A    My next item 39, baby Oshkosh jumper, three to six

6   months.  It is my seal and has not been opened by anyone.

7        Q    Now, breaking the seal, looking at the jumper.  Do

8   you recognize it?

9        A    Yes.  And it's got my initials on it.

10       Q    Does it appear to be in the same or similar

11  condition as when you took it into evidence on that day?

12       A    Yes, it is.

13            MS. SINGER:  We would tender the jumper as the

14       next-numbered exhibit, your Honor.

15            THE COURT:  No objection?

16            MR. GROLAND:  No objection.

17            THE COURT:  49 in evidence.

18            (State's Exhibit No. 49 was received in evidence.)

19  BY MS. SINGER:

20       Q    Your next-numbered exhibit, Investigator Millard?

21       A    My next item is number 40.  It's gonna be Pampers

22  wipes refill.

23       Q    Taking a look at 40?

24       A    Yep, that is my seal.  It has not been opened.

25       Q    Now, breaking the seal.

1    A    Yes, it is, my initials are on the back.

2    Q    It appears to be in the same or similar condition?

3    A    Yes.

4         MS. SINGER:  We would tender as the next-numbered

5    exhibit, your Honor.

6         THE COURT:  Any objection?

7         MR. GROLAND:  No objection.

8         THE COURT:  50 in evidence for the state.

9         (State's Exhibit No. 50 was received in evidence.)

10   BY MS. SINGER:

11   Q    Your next item, Investigator Millard?

12   A    Number 41, a Johnson's Health blue baby bottle.

13   Q    Once again, your seal?

14   A    Yes.

15   Q    Otherwise not opened?

16   A    (Nods head.)

17   Q    I'm breaking the seal.  That's all that's in the

18   bag?

19   A    Correct.  My initials are on the bottle.

20   Q    Appear to be in the same or similar condition?

21   A    Yes.

22        MS. SINGER:  Tender as the next exhibit, your

23   Honor.

24        MR. GROLAND:  No objection.

25        THE COURT:  51 in evidence for the state.

1                    (State's Exhibit No. 51 was received in evidence.)

2    BY MS. SINGER:

3        Q      Your next item?

4        A      Number 42 is going to be a Pooh baby food, a bowl

5    containing two bottle caps, a pacifier, and one Enfamil

6    powder milk packet.

7        Q      Taking a look at the seal, yours?

8        A      That's mine.  It has not been opened.

9        Q      Unbroken at this time.  I will now break it.

10   Nothing else in the bag.  Do you recognize those particular

11   items?

12       A      Yes, I do.  Little pacifier, it has my initials on

13   it, bowl, and the two caps that have my initials.

14       Q      Appear to be in the same or similar condition as

15   when you took them into evidence?

16       A      Yes.

17              MS. SINGER:  Tender as the next-numbered exhibit,

18       your Honor.

19              THE COURT:  Any objection?

20              MR. GROLAND:  No objection.

21              THE COURT:  Number 52 in evidence for the state.

22              (State's Exhibit No. 52 was received in evidence.)

23   BY MS. SINGER:

24       Q      Your next-numbered item, Investigator Millard?

25       A      The next-numbered item is number 43, a Pooh baby

1   cup, Pooh spoon, a nipple, a bottle ring, and a bottle cap.

2        Q    Looking at your seal?

3        A    Yes, that's my seal.

4        Q    Does it appear to be intact?

5        A    Yes.  No other openings.

6        Q    I'll now break the seal.  Do those items appear to

7   be in the same or similar condition as when you took them

8   into evidence?

9        A    Yes, they are.

10       Q    Pursuant to the search warrant?

11       A    With my initials on them, yes.

12            MS. SINGER:  I would tender, your Honor, as the

13       next-numbered exhibit.

14            MR. GROLAND:  No objection.

15            THE COURT:  Number 53 in evidence for the state.

16            (State's Exhibit No. 53 was received in evidence.)

17  BY MS. SINGER:

18       Q    What was your next item, Investigator Millard?

19       A    My next item is Number 44, which is a banana apple

20  dessert and bananas from six months.  Baby food.

21       Q    All right.  Does this appear to be the package?

22       A    Yes.  My seal, unbroken, no one else has ever --

23       Q    We'll now break the seal.

24       A    Yes.  They both have my initials.

25       Q    They appear to be in the same or similar

1   condition?

2       A    Yes, they are.

3            MS. SINGER:  Tender as the next-numbered exhibit,

4       your Honor.

5            MR. GROLAND:  No objection.

6            THE COURT:  Number 54 in evidence.

7            (State's Exhibit No. 54 was received in evidence.)

8   BY MS. SINGER:

9       Q    Your next item, Investigator Millard?

10      A    My next item is Number 45 and it is a cat teething

11  ring.

12      Q    A?

13      A    A cat teething ring.

14      Q    And taking a look at this item?

15      A    Yeah, my seal.  It has not been opened by anyone

16  else.

17      Q    I'm now opening the seal.

18           You did good work.  You seal very well.  Taking a

19  look at the cat teething ring.  Do you recognize that?

20      A    Yes, I do.

21      Q    Does it appear to be in the same or similar

22  condition as when you put it in the bag and took it into

23  evidence?

24      A    Yes, with my initials on it.

25      Q    Photographed this item as well?

1      A     Actually, that item was in the freezer.  I do not

2  I believe it was depicted in the photographs.

3      Q     Now, there were several items that have been

4  previously marked into evidence that I just want to make

5  sure that the jury knows that it was you who, in fact,

6  collected these items so if I can have a moment to look at

7  my list?

8           THE COURT:  Are you intending to introduce that

9        into evidence?

10          MS. SINGER:  I would like to tender the cat

11       teething ring as the next-numbered exhibit in evidence,

12       your Honor?

13          MR. GROLAND:  No objection.

14          THE COURT:  Number 55?

15          MS. SINGER:  I apologize.  I got ahead of myself.

16          (State's Exhibit No. 55 was received in evidence.)

17  BY MS. SINGER:

18      Q     Item 11 for you, you describe as a large pillow

19  and sham for the bed?

20      A     Yes.

21      Q     It has now been marked in evidence as Composite

22  Exhibit 16.  Taking a look in here, does that appear to be

23  the pillow and the sham that you collected from the bed,

24  this has markings on it?

25      A     Yes.  It does appear to be the same.  I've got

1   my initials on the pillow and there is a smudge of what may

2   have been my initials at one time on the sham, but it does

3   appear the same.

4        Q    All right.  Item 12 you describe as -- your item

5   12 you describe as pillow and white pillowcase.  Did you

6   collect that from the bed as well?

7        A    Yes, I did.

8        Q    That has been entered into evidence as Composite

9   Exhibit -- I'll let you look at this while I look and see

10  what the composite exhibit is.  17 A and B.  This would have

11  been collected from the bed itself?

12       A    Yes, and it's got my initials.  And it's the

13  smudge of what probably was my initials at one time.  It

14  does appear to be the same, yes.

15       Q    Item number 13 has also been entered into evidence

16  and is presently State's Exhibit 19 A and B.  You described

17  it as a pillowcase with -- pardon me, a pillow with a white

18  pillowcase; is that correct?

19       A    Number 12 you advised?

20       Q    Yes.

21       A    Yes, that is correct.

22       Q    Does this appear to be the same white pillowcase

23  and -- did I say item number 12?  I meant --

24       A    What item number is it?

25       Q    Item number 15.

1    A    Item number 15?

2    Q    Yes.

3    A    Item number 15 is a pillow, white pillowcase.

4    Q    Does that appear to be the same item?

5    A    Yes.

6    Q    This bag that I'm showing you now, does that

7  appear to be the bag that you packaged it in?

8    A    Yes.  That is the bag with item 15 on it.

9    Q    Did you take this into evidence at the same time?

10   A    Yes, I did.

11   Q    This would have been from the bed?

12   A    Yes.

13        MS. SINGER:  One moment, your Honor, I need just

14        one moment to review my notes, but I believe I'm almost

15        through.

16            (Pause in the proceedings.)

17  BY MS. SINGER:

18   Q    Other than the photography and collection of

19  evidence which you've previously testified to, Investigator

20  Millard, other than placing these items into evidence and

21  completing your paperwork, was there anything else that you

22  did as a forensic investigator in this case?

23   A    I believe that we've discussed everything that I

24  had involvement in already, yes.

25        MS. SINGER:  If I may have one moment to speak

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1            with Mr. Pennypacker, your Honor?

 2                 (Pause in the proceedings.)

 3                 MS. SINGER:  No further questions of this witness,

 4       your Honor.

 5                 MR. GROLAND:  May it please the Court?

 6                 THE COURT:  Mr. Groland, go ahead.

 7                          CROSS-EXAMINATION

 8  BY MR. GROLAND:

 9       Q    Ms. Millard?

10       A    Yes.

11       Q    You testified yesterday that you had a trainee

12  with you on August 2nd, and another trainee with you on the

13  16th?

14       A    One was an intern and one was a police service

15  technician from the Gainesville Police Department.

16       Q    Why were the trainees always riding with you?

17       A    Because I worked day shift.

18       Q    Okay.  And your job title when you were with the

19  Gainesville Police Department was crime scene investigator?

20       A    Forensic investigator, yes.

21       Q    And, as such, you respond to crime scenes, I

22  guess?

23       A    That is correct.

24       Q    All right.  And when you were dispatched to 1015

25  Southwest 9th Street, apartment A-21 on August 2nd, indeed
```

```
 1   you were dispatched to a crime scene at that time; were you
 2   not?
 3        A    I was advised that it was a injured infant with
 4   suspicious circumstances, yes.
 5        Q    Were you going there with the idea in your mind
 6   that this was a potential crime scene?
 7        A    Potential.
 8        Q    What else were you told in the original dispatch,
 9   if you recall?
10        MS. SINGER:  I'm going to lodge an objection to
11        the hearsay nature of that.
12        MR. GROLAND:  Your Honor, I think that is an
13        exception to the hearsay rule.
14        THE COURT:  Sustained.  Approach the bench.
15        (Sidebar conference:)
16        THE COURT:  The exception is?
17        MR. GROLAND:  I keep on calling it the wrong
18        thing.  It's not hearsay.  It's not exception at all,
19        Judge.  It's not hearsay.  It's not coming in for the
20        truth.  It's coming in for what was told to her in
21        the -- for the truth of what was alleged.
22        THE COURT:  For what purpose?
23        MR. GROLAND:  For the purpose of showing that she
24        was instructed to do certain things.  So it's not
25        bringing it in for the truth, but just to show what she
```

1    heard from the transmission, and what she did in

2    response to what she was told.

3         THE COURT:  That's not proper exception.

4         MS. SINGER:  I have no argument.  I agree with the

5    Court.

6         MR. GROLAND:  I did say I made a mistake.  It's

7    not an exception to the hearsay rule.  It's not

8    hearsay, it's non-hearsay because it's not coming in

9    for the truth.

10        THE COURT:  But you're not giving me any legal

11   evidentiary basis why it would come in.

12        MR. GROLAND:  To show what she did in response to

13   what she was told.

14        THE COURT:  She can testify as to what she did.

15        MR. GROLAND:  Okay.

16        (Sidebar conference concluded.)

17   BY MR. GROLAND:

18   Q    What was your understanding as to what you were to

19   do at that particular location, apartment A-21?

20   A    Photograph, observe.

21   Q    Collect?

22   A    Not at that time, no.

23   Q    How did you know that not at that time were you to

24   collect, inasmuch as that is a typical function of yours?

25   A    From my understanding it wasn't determined at that

886

```
 1   point what the circumstances were yet.

 2        Q    Did you do a diagram in this case?

 3        A    I did do a sketch.

 4        Q    Do you have it with you?

 5        A    I do not have it with me.

 6        Q    Do you know where it is?

 7        A    I believe that --

 8             THE WITNESS:  Do you have it, Ms. Singer?

 9             MS. SINGER:  I may have a copy of it.  The

10        original, I believe, may be at Gainesville Police

11        Department.

12             MR. GROLAND:  Mr. Clerk, do you have a copy of

13        that diagram that, I believe, I had marked for evidence

14        at an earlier point in time in this case?  I believe at

15        a hearing last week.

16   BY MR. GROLAND:

17        Q    What time were you dispatched to this apartment?

18        A    I was dispatched at 1235 hours.

19        Q    Okay.  In fact, your report says 1234, does it

20   not?

21        A    Okay.

22        Q    And you were -- Do you remember where you were

23   when you got that call?

24        A    No, I don't.

25        Q    And you arrived at the apartment at what time?
```

1      A      1245 hours approximately.

2      Q      Did you arrive there and were you the only law

3  enforcement there?

4      A      No, I was not.

5      Q      Who else, who was there?

6      A      Officer Bruce Ferris was there when I arrived.

7      Q      Okay.  Did you have an understanding as to what he

8  was doing there, if anything?

9      A      He was basically standing by, watching the

10 apartment.

11     Q      Okay.  Do you know how long he had been there?

12     A      I have no idea.

13     Q      Did you talk to him about that?  I'm not asking

14 you what was said, I'm just asking you whether or not you

15 talked to him about how long he had been there.

16     A      I don't recall that specific question, no.

17         MR. GROLAND:  May I approach the witness?

18         MS. SINGER:  Mr. Groland, can I see your exhibit?

19     I just want to make sure that's the same one.

20         Yes, we have no objection to it being entered into

21     evidence at this time if you want to do that.

22         MR. GROLAND:  Okay.  First we're gonna just

23     identify it.

24 BY MR. GROLAND:

25     Q      Let me show you what's been marked previously as

```
 1    Defense Exhibit A for identification only.  I'll ask if
 2    you'd take a look at that?
 3         A     Uh-huh.
 4         Q     Is that a diagram you prepared when you went to
 5    that apartment?
 6         A     Yes, sir.
 7         Q     Okay.  And I take it you did it while you were
 8    there?
 9         A     Yes, I did.
10         Q     Okay.  It has a notation on there, something about
11    baby shaking?
12         A     That is correct.
13         Q     Is that your handwriting?
14         A     That is my handwriting.
15         Q     So that notation was made sometime between
16    1 o'clock and 1:45 when you, I believe, testified that you
17    left?
18         A     I don't recall that it was actually written on
19    that particular day, no.
20         Q     The diagram or the notation?
21         A     The notation.
22         Q     When would you have written it, at a later point
23    in time?
24         A     I don't recall exactly when that was written.
25         Q     Why would you have written that on there at a
```

1    later point in time?

2         A    When I go through -- I was actually at that

3    apartment four times.  When I go through my notes,

4    everything is kept, you know, in one notebook and that may

5    have been something I wrote later.  I don't recall exactly

6    when I wrote it.

7         Q    So it's fair to say you may have written it while

8    you were there on the 2nd between 1:00 and 1:45?  You don't

9    remember?

10        A    It's a possibility.

11        Q    All right.  Could you tell us what time you

12   actually entered that apartment?

13        A    I don't recall exactly what time I entered.  I

14   know --

15        Q    If you got there at 12:45, as you have testified

16   to --

17        A    Right.

18        Q    -- can you think back -- and I know it's two years

19   ago -- did you have a chance to look at your deposition and

20   the police reports?  Can you tell me how long you were

21   there, on the scene, in the parking lot, before you went

22   into the apartment?

23        A    I don't know how long I was in the parking lot,

24   but for a little bit.

25        Q    Okay.  Why were you in the parking lot for a

1    little bit?

2        A    I was waiting for consent to enter the apartment

3    before I went inside.

4        Q    You were waiting for information about consent

5    from the owner of the apartment?

6        A    That is correct.

7        Q    Okay.  Was Sergeant Valerie Dawson there at this

8    time just before 1 o'clock or at 1 o'clock on August 2nd?

9        A    I spoke with her on the radio about consent.

10       Q    Was she there at the apartment when you were

11   there?

12       A    I don't recall, remember seeing her there.  I

13   don't know.

14       Q    Do you remember seeing her or talking to her in

15   person at any time that day in connection with this

16   investigation?

17       A    I recall speaking with her on the radio about the

18   consent.

19       Q    But not in person?

20       A    I don't remember a conversation in person.

21       Q    I hope you don't mind.  I'm gonna jump around a

22   little bit.

23       A    Okay.

24       Q    When you went back -- and what we were just

25   talking about this morning as opposed to yesterday -- on the

```
 1    16th pursuant to the search warrant --

 2         A    Yes.

 3         Q    -- did you collect every single item of baby

 4    clothing you could find in the apartment?

 5         A    I believe I did.

 6         Q    And would it be fair to say that you looked in

 7    every nook and cranny?

 8         A    Yes, I believe I did a thorough search.

 9         Q    Drawers, everything?

10         A    Yes.

11         Q    It wasn't a cursory look.  You looked everywhere?

12         A    That is correct.

13         Q    So.  Are you aware that Crystal Quirello has

14    testified in this case that she went back into the apartment

15    after the bed had been removed and removed an item of baby

16    clothing?

17              MS. SINGER:  I'm going to lodge an objection.

18         This witness was placed under the sequestration rule

19         and would not have been advised of anyone else's

20         testimony in this case.

21              THE COURT:  The objection is sustained.

22    BY MR. GROLAND:

23         Q    Do you know of your own knowledge that she went

24    back in after the police were there on the 16th?

25         A    I have no knowledge of her going to the apartment,
```

1    no.

2          Q    There is an item in this case called a onesie.

3    It's an ESPN blue child's or infant's outfit.  Have you ever

4    seen that item?

5          A    I saw a lot of baby clothing in there.

6          Q    Okay.  I'll show it to you.

7               MR. GROLAND:  Your Honor, may I open this exhibit?

8               THE COURT:  There is no objection, is there?

9               MS. SINGER:  No objection.

10              THE COURT:  Go ahead.

11   BY MR. GROLAND:

12         Q    Let me show you what's been marked as State's

13   Exhibit 8 in evidence.  Let me show you this.  Do you

14   recognize this blue onesie?

15         A    I don't specifically remember seeing it.

16         Q    Okay.  And I take it then that you never placed

17   this item in evidence if you never saw it before?

18         A    No.

19         Q    Okay.  And you specifically did not see it when

20   you were in the apartment either on the 16th or anytime

21   prior thereto?

22         A    I don't remember seeing that item.

23         Q    Okay.  In fact, as you say, you've been in the

24   apartment four times in connection with this case, 1 o'clock

25   on the 2nd, approximately 3 o'clock on the 2nd, 6:30 on the

1    2nd, and then during the -- I can't remember if it was day

2    or night, but on the 16th you executed the search warrant?

3         A    That's correct.

4         Q    What time of day was that?

5         A    I believe it was in the evening.

6         Q    When you entered the apartment to take

7    photographs, initially, the first time at 1 o'clock or

8    approximately 1:00, whatever time it was, did Ferris go in

9    there with you and walk around with you?

10        A    I don't remember if he went in with me or not.

11        Q    Okay.  Did anyone tell you beforehand exactly what

12   to look for or photograph?

13        A    I was advised that --

14        Q    First, if you would just tell me yes or no?

15        A    Yes.

16        Q    All right.  And who was that person that you spoke

17   to?

18        A    I don't recall.

19        Q    Do you recall if it was a person who had been in

20   the apartment, or if it was a person who was just involved

21   in the investigation?

22        A    Someone that was just involved in the

23   investigation, I believe.

24        Q    All right.  So would it be fair to say that you

25   didn't know exactly what to look for or photograph when you

1    went in?

2         A    I went in to photograph everything and I knew the

3    focus was the bedroom.

4         Q    Do you know, as part of your investigation, that

5    Crystal, the mother of this child, actually came back into

6    that apartment sometime that morning while the child was in

7    the hospital?  Do you know about that?

8         A    I am not aware of any information like that, no.

9         Q    You did not secure -- Strike that.

10             When you got to that apartment, it was unlocked?

11        A    It was unlocked when I was there the first time,

12   yes.

13        Q    Right.  We covered this yesterday and I think

14   while you were in there you found keys on the counter?

15        A    Yes.

16        Q    And you yourself locked it up?

17        A    That is correct.

18        Q    Did you do anything to secure that apartment as a

19   crime scene after you left?

20             In other words, did you put the yellow tape up

21   that we're all familiar with?

22        A    No, I don't believe so.

23        Q    Do you remember anybody with you in the apartment

24   during the 45 minutes that you were in there on the 2nd, any

25   other officer or any other person?

```
 1        A    The first time I was in there?

 2        Q    Yep.

 3        A    The intern, Jessica Green, was in there.

 4        Q    Okay, yeah.

 5        A    And I do believe Bruce Ferris was there, but I

 6   don't know exactly where he went in the apartment.

 7        Q    And you took photographs of the bed that we've

 8   gone through and seen on the screen?

 9        A    Yes, I did.

10        Q    And photographs in the bathroom?

11        A    Yes, I did.

12        Q    And am I correct you didn't photograph the floor

13   specifically or the floor of the shower?

14        A    No, I didn't.

15        Q    No one asked you to do that; you didn't think to

16   do that yourself?

17        A    I was not aware that that was an issue.

18        Q    Do you know which pillow specifically it is, of

19   the ones you photographed and later collected, that the baby

20   is supposed to have been laying on?

21        A    Initially.

22        Q    Here's what I would like you to -- If you could,

23   just tell me yes or no whether you know specifically, and

24   then I'll ask the next question.  Do you know?

25        A    I believe I do.
```

1      Q    Okay.  And you know that because you were told by

2  someone else?

3      A    No.

4      Q    Or -- Then tell me how you do know of your own?

5      A    Based on the location of where the pillows were

6  when I initially got there.

7      Q    Okay.

8      A    Based on some medical evidence tape that was left

9  on a pillow at the headboard was how I distinguished the two

10  pillows, with pillow shams, from each other.

11     Q    Do you know that Crystal Quirello told Helen

12  Legall that the apartment looked totally different when she

13  went back in?

14          MS. SINGER:  I'm going to lodge an objection.

15  Once again, we're now --

16          THE COURT:  Sustained.

17  BY MR. GROLAND:

18     Q    Do you know how many people -- Strike that.

19          Are you aware that Sergeant Dawson and Orlando

20  Alvarez were in that apartment before you were in there?

21     A    I'm not aware of who was in there first.

22     Q    Do you know -- Do you know how many people, I

23  guess, is my question, were in there before you got there at

24  1 o'clock?

25     A    I don't know what occurred before I arrived.

1    Q    Do you personally have knowledge as to who placed

2    the pillows in the location where you photographed them on

3    August 2nd?

4    A    No.

5    Q    So would it be fair to say that if you don't know

6    who placed the pillows there, you don't exactly know,

7    yourself, which pillow the baby was on?

8    A    I wasn't there when the event occurred, so, no.

9    Q    So the answer would be that you don't know

10   personally?

11   A    I know where they were when I got there.

12   Q    Okay.  You only know where the pillows were when

13   you got there?

14   A    Right.

15   Q    I think you said there were no visible stains on

16   the bed quilt?

17   A    I didn't see any visible, no big wet spots.

18   Q    Okay.  Would it be correct that at that time you

19   just made a cursory look, you just looked at it, you didn't

20   bend down and actually examine it closely?

21   A    I did examine it, you know, and I didn't see any

22   noticeable wet spots.

23   Q    Did you ever take a close-up of the quilt itself,

24   photograph?  Just the quilt.

25   A    I took several photographs with the quilt in it.

1  I don't think I took a photograph after I removed

2  everything, because at that point I didn't move anything.  I

3  didn't touch anything.

4      Q    You didn't move anything when you were there at 1

5  o'clock on the 2nd?

6      A    That is correct.

7      Q    The only time you moved anything is when you were

8  back on the 16th?

9      A    That is correct.

10     Q    And you know Sergeant Halvosa, he's a lieutenant

11  now, he was a sergeant at the time?

12     A    Yes.

13     Q    Did you ever speak to him about his observations

14  of the bed and where the pillows were when he was there?

15     A    No.

16     Q    Was he there with you at any time that day,

17  specifically 3 o'clock when you came back and took the

18  photographs?

19     A    He was not there when I went back at 3 o'clock.

20     Q    Okay.

21     A    He was there the third time I went back.

22     Q    The third time, which is in the evening on the

23  videotape?

24     A    That is correct.

25     Q    All right.  So the first time you were there, you

1   didn't collect the bed, you didn't collect the bedding and

2   you didn't collect any pillows?

3       A    No.

4       Q    Nor did you collect any of those items the second

5   time you were there on the 2nd at 3 o'clock, correct?

6       A    The second time I collected a baby bottle and

7   swabbings and that was it.

8       Q    Now, the baby bottle, I think you testified

9   yesterday that the baby bottle when you picked it up at 3

10  o'clock, it was cold?

11      A    That is correct.

12      Q    Which really means it wasn't warm, it wasn't --

13      A    Correct.

14      Q    Right.  And, in fact, that baby bottle had been

15  sitting there since the morning when the mother brought it

16  over?

17      A    I have no --

18           MS. SINGER:  Your Honor, I'll lodge an objection.

19      Beyond the scope of this witness to answer.

20           THE COURT:  Sustained.

21  BY MR. GROLAND:

22      Q    You don't know that?

23      A    I have no idea.

24      Q    You don't know how long it was sitting there, who

25  put it there, or where it came from?

1      A    No.

2      Q    Did you, when you went in, into the bathroom and

3  checked the shower, or did you just observe whatever it is

4  you observed, or did you do anything more than make an

5  observation?

6      A    I observed that there was not water anywhere.  The

7  floor wasn't slick and wet.  There weren't bubbles, you

8  know, in the bathtub as if it had been run.  It was -- I

9  just noticed that it was dry.

10     Q    Okay.  When you observed that the drainage, the

11 word -- what did you call it?

12     A    Plug.

13     Q    -- plug was down, was that just an observation or

14 did you do anything more than just observe it?

15     A    I just observed it.

16     Q    Okay.  You didn't say, you didn't determine

17 whether it worked in the up position, or worked in the down

18 position, or if it worked at all?

19     A    No, I did not.

20     Q    Nor did you check the drain to see if it was

21 recently used?

22     A    No, I did not.

23     Q    All right.  You testified yesterday to questions

24 that I asked you, you were given the keys by Helen Legall?

25     A    Yes.

901

1      Q      She was the lead detective on this case?

2      A      That is correct.

3      Q      When and where did you give her the keys to the

4   apartment?

5      A      I believe it was back at the station, after I

6   returned.

7      Q      Okay.  After you left at 1:45; is that where you

8   went, right back to the station?

9      A      I believe so.  I don't remember exactly whether I

10   had lunch or --

11      Q      What was the specific purpose that you went back

12   at 3 o'clock, for what reason?

13      A      At 3 o'clock?

14      Q      Yes.

15      A      At the request of detectives.

16      Q      To do what?

17      A      They requested Polaroids.

18      Q      Okay.  And why is it that you did a swabbing of

19   the floor at that point, but hadn't done it before?

20      A      Again, at their request.  Initially we weren't

21   sure, you know, what the situation was.

22      Q      And the red stain on the floor in the area of the

23   white stain, I believe you said yesterday you don't remember

24   exactly where on that piece of carpet you collected it from;

25   is that correct?

```
 1        A     No, I don't.

 2        Q     Do you remember whether or not it was -- Well,

 3   could it have been in and around the white stain?

 4        A     It was in the area.

 5        Q     Okay.  You have no way of knowing how it got

 6   there, whether it got there from the paramedics, or from

 7   when the child was on the floor?

 8        A     No, I personally do not know.

 9        Q     Have you ever talked to the child's mother?

10        A     No, I haven't.

11        Q     Okay.  When you return at 3 o'clock, do you have

12   another or subsequent consent from the owner of the

13   apartment, my client, Mr. Herlihy?

14        A     At 3 o'clock I was advised that consent had been

15   given to detectives.

16        Q     Are you telling me that your understanding was

17   that a second consent had been given by Mr. Herlihy to go

18   back in?

19        A     I'm not aware of whether it was a second one or

20   they were working off of the first consent.

21        Q     Okay.  How do you know -- in other words, where

22   did you get the information from that he had consented

23   again?

24        A     Detective Cannon and Detective Coleman were

25   actually there on scene with me and they advised they had
```

1    consent.

2        Q    And we're talking about the 3 o'clock entry?

3        A    That is correct.

4        Q    Did you ever see a written consent form for the

5    entry into the apartment either at 1 o'clock or 3 o'clock?

6        A    I personally don't recall seeing one.

7        Q    Who else was there besides Dave Cannon, Alan

8    Coleman, and yourself, at 3 o'clock?

9        A    The intern, Jessica Green, was still with me.

10        Q    What is she doing now?

11        A    I don't know.

12        Q    She went to Gainesville Police Department?

13            MS. SINGER:   Excuse me -- that's fine.

14   BY MR. GROLAND:

15        Q    Is she with the Gainesville Police Department?

16        A    I've been gone a year-and-a-half. I don't know

17   where she is.

18        Q    Was she an intern to join the police department?

19        A    I believe she was just a student at the

20   university.   That's all I know.

21        Q    Okay.   You, yourself, took those Polaroids, not

22   Coleman?

23        A    I took Polaroids.

24        Q    All right.   And this was your Polaroid camera that

25   you carry with you as part of your gear that goes with you

1    to every scene?

2        A    That's correct.

3        Q    And also carry a 35-millimeter camera as well?

4        A    Yes, I did.

5        Q    Everywhere?

6        A    Yes.

7        Q    All right.  And other than the baby bottle, you

8    collect nothing else at 3 o'clock?

9        A    That is correct.

10       Q    Do either of the two detectives who are there

11   collect anything, or move anything, or become involved in

12   what you're doing at all?

13       A    Not that I observed.  I did not see them move

14   anything, take anything, no.

15       Q    Okay.  And again, we don't take the bed, the

16   bedding, or pillows, or anything?

17       A    No, we don't.

18       Q    How long were you in at 3 o'clock?  Did you say

19   how long you were in the apartment?

20       A    Just a few minutes.  I don't recall an exact time

21   frame, but it wasn't very long.

22       Q    When you came back at 3 o'clock, did you have a

23   key at that time?

24       A    The detectives had a key, because the door was

25   locked.

1    Q    One of the two of them?

2    A    Yes.

3    Q    Okay.  And then you return a third time, as we

4    discussed already?

5    A    Right.

6    Q    At 6:45, 6:30 or something?

7    A    That's correct.

8    Q    And the purpose of that third entry that day was

9    to do a video demonstration with Mr. Herlihy being present?

10   A    That is correct.

11   Q    Was there any photographs taken at the time we

12   (sic) went back the third time?

13   A    No.  I did not take any photographs at that time.

14   Q    So the only thing we had at that time at the

15   6:30/6:45 entry into the apartment, was a video camera that

16   malfunctioned.  And, in fact, you did have a audio recorder

17   that Helen Legall possessed?

18   A    That is correct.

19   Q    Did you get there first at 6:45 or did you all get

20   there at the same time?  Tell me how that happened.

21   A    I don't recall whether, you know, we came in

22   spurts, or all arrived together.  I do know that we were

23   waiting in the parking lot and went in together.

24   Q    Okay.  How did Mr. Herlihy get there?

25   A    I don't know.

1      Q     You did not see him arrive?

2      A     I don't recall seeing him arrive, no.

3      Q     Were you in the apartment already before

4   Mr. Herlihy got back there?

5      A     No.

6      Q     Do you know why it is you didn't see him arrive?

7      A     I didn't see.

8      Q     All right.  Did he come in a police car?

9      A     Excuse me?

10      Q     If you know?

11      A     Did he come in a police car?

12      Q     Yeah.

13      A     I don't know.

14      Q     Okay.  And you were all there from approximately

15   6:45 to -- and I've looked at your report -- 7:20 p.m.

16   Would that be correct?  You can refer to that if you would

17   like.

18      A     I don't recall the exact time frames.

19      Q     Okay.  Would you take a look and see if that's

20   noted in your report?

21      A     That is correct.

22      Q     True?

23      A     Yes.

24      Q     So we're there for 35 minutes, everybody,

25   including Mr. Herlihy?

```
 1        A     That is correct.

 2        Q     All right.  It's also true, is it not, that as

 3   soon as you get there and turn the video camera on, you

 4   learn that it is not operating?

 5        A     That is not correct.

 6        Q     Okay.  Do you remember giving a deposition in this

 7   case on Monday, April 2nd, 2001, page 15?

 8              THE COURT:  Do you have a copy of the deposition

 9        for the witness?

10              MR. GROLAND:  Let's see my -- May I have a moment,

11        your Honor?

12              THE COURT:  Yes.

13              (Pause in the proceedings.)

14              MR. GROLAND:  May I approach the witness?

15              THE COURT:  Yes.

16   BY MR. GROLAND:

17        Q     If you would turn to page 15.

18              Do you remember this line of questioning -- and

19   I'll have to just read a couple paragraphs to get to the

20   area.

21              Page 15, Line 10:  Had this camera ever

22   malfunctioned before?

23              Answer:  No.

24              Question:  Was this camera malfunctioning, or was

25   there a problem with the film, or did you forget to put
```

1   video film in it?

2           Answer:  No.  Actually, the way that camera works,

3   you open this side, you push a button to turn it on, it

4   gives a display and shows the battery charger, whether

5   you're in record, or pause, or record.  And it will give you

6   a motion sensor to keep the camera from shaking, whether

7   it's on or off.  And the entire display was static.  The

8   display screen wouldn't work at all.  You couldn't see what

9   was in front of the camera with the display screen on.

10          My question to you:  You're there and you turn the

11  camera on, and it, immediately upon turning it on, you

12  ascertain it's not operational?

13          Your answer:  Right.  When I went out there with

14  Detective Cannon and Coleman, the time before we couldn't

15  get the video.

16          So I asked you a question then and I guess I'm

17  gonna ask you now again.  When you got there.  Did you

18  determine right away that it wasn't working?

19      A    At 3 o'clock, when I was there with Detectives

20  Cannon and Coleman, yes.  I already knew there were problems

21  when we went back at 6:45 and at that time I thought it was

22  operating properly.  Through the entire reenactment I

23  thought I was recording.

24      Q    All right.  It's possible we didn't communicate

25  such that we understood each other.

1    A    Okay.

2    Q    My question to you, Ms. Millard, was you're there,

3 and I'm talking about there, because we're talking about the

4 scene at 6:45.  You're there and turn the camera on and

5 immediately upon turning it on, you ascertain that it's not

6 operational, and you say right?

7    A    There must have been a misunderstanding at the

8 deposition, because at 3 o'clock, yes, I immediately knew it

9 wasn't working.

10    Q    Well, then I asked you this next question, do you

11 recall, on page 16 this question:  The time before, which

12 would be at 3 o'clock, yes?  So at that point I alluded to

13 the 3 o'clock incident and I was talking before about the

14 6:45 incident?

15    A    Right.  I was talking about the 3 o'clock before.

16    Q    All right.

17    A    We were on the wrong page or something.

18    Q    When do you find out -- Did you have a, an idea

19 that this camera is not working when you're there at 6:45?

20    A    No.

21    Q    What was the problem with the camera?

22    A    I don't recall exactly.  I know that it was sent

23 off.  I believe it was a loose wire.  It was repaired.

24    Q    What was the problem at 3 o'clock?

25    A    As I explained in the deposition, the door opens,

1  it tells you everything, whether it's recording, whether

2  it's playing.  It gives you the battery indicator.  It gives

3  you everything.  It basically is a machine that, you know,

4  helps you out, tells you what's going on.  It was not

5  working at all.  I had static, I had fuzz, and I had no clue

6  what was going on with this machine.

7      Q    And this -- and you attempt to use the same video

8  camera at 6:45?

9      A    That is correct.

10     Q    And what you're saying then is at 6:45 it

11  malfunctioned again, but in a different way?

12     A    The first time it recorded when I didn't know it

13  was.

14     Q    Okay.  But was the malfunction that occurred at 3

15  o'clock the same malfunction that happened at 6:45?

16     A    The same type of thing, yes.

17     Q    Well, if you immediately knew when you turned it

18  on at 6:45 that it was malfunctioning -- strike that -- at 3

19  o'clock as you said --

20     A    Right.

21     Q    -- why didn't you, if it was the same, immediately

22  know it was malfunctioning when you turned it on that

23  evening at 6:45?

24     A    Because I took the camera back to the station

25  after the 3 o'clock, rewound the tape and discovered that I

1   had recorded the floor, the table, even though I was

2   thinking nothing was going on with this camera, it was, in

3   fact, recording.  I had another person look at it and while

4   we tried to record, we got the same static screen.  And, it

5   was determined that it did record.  So we thought, even

6   though, it was having problems, we thought it recorded.

7        Q    How many cameras, how many video cameras do we

8   have at the time within your unit available to use?

9        A    One unit is available to me.

10       Q    And how many units are -- how many video camera

11  units are in your unit?

12       A    There are four total.  One is assigned to each

13  investigator.

14       Q    How many officers were there at 6 o'clock, 6:45?

15       A    I believe there were four.

16       Q    And what is going on there is Mr. Herlihy is

17  demonstrating the pillows and putting things in places.

18  and --

19       A    Yes.

20       Q    -- you're running the camera?

21       A    I'm looking through the camera lens, yes.

22       Q    Did you, or anyone else, think to take any

23  photographs at that time of where anyone placed the pillows

24  in question?  Did you think to do that?

25       A    No.

1     Q     And, in fact, you didn't do that?

2     A     No.

3     Q     All right.  Wasn't this a time when Helen's audio

4  -- this same entry into the apartment, when Helen Legall's

5  audio wasn't working as well the first five minutes?  Do you

6  know about that?  Don't remember?

7     A     I don't remember.  I know that it was shut off at

8  one point and then we came back on.

9     Q     Okay.  Do you recall Helen saying to everybody

10  there that this thing malfunctioned the first five minutes,

11  her audio?

12     A     I was worried about my video camera that I was

13  having problems with.

14     Q     If we only have 19 minutes of audio with this

15  incident, you would agree that we're missing about -- you

16  were there for 35 minutes.  We're missing about 16 minutes

17  of conversation, are we not?

18     A     A lot of the time that's missing there is when we

19  got there.  We went up the stairs, we stood around, the

20  search warrant was actually -- I'm sorry.  I apologize.

21  That's a different day.

22     Q     Yeah.

23     A     I don't recall exactly what time we went in.  I

24  don't recall exactly what time we started.  I know we didn't

25  start right at the time we got there, because we were in the

1    parking lot.

2        Q    Okay.  No photos at all are taken by anybody; is

3    that correct?

4        A    At that time, no, they had taken photographs

5    previously.

6        Q    And, again, this time you didn't collect the bed,

7    or the bedding, or the pillows?  You took nothing?

8        A    No.

9        Q    Okay.  And after we left at this time, was that

10   apartment secured as a crime scene?

11       A    At that time, no.

12       Q    After Mr. Herlihy's arrest the following day on

13   August the 3rd, the next day on that Thursday, was that

14   apartment secured by you or anyone else as a crime scene, or

15   potential crime scene?

16       A    I don't know.

17            MS. SINGER:  Let this pass, whatever this is,

18       because I can't hear.  I'm sorry, your Honor, but the

19       acoustics are such.

20   BY MR. GROLAND:

21       Q    You did not secure it; is that correct?

22       A    I did not secure the scene.

23       Q    To your knowledge did anyone else secure that

24   apartment between August 2nd, when you were there with your

25   video camera, and two weeks later when you came back to

1   collect certain items?  Was it secure?

2       A    I don't know.

3       Q    Do you know how many people had been in there

4   during that two-week period of time?

5       A    I do not.

6       Q    Do you know how many people had a key to that

7   residence to go back in there during that period of time?

8       A    No, I'm not aware of who had keys.

9       Q    Now let's talk about that bag where we have some

10  wet items.

11      A    Right.

12      Q    Would it be fair to say that that indicates to you

13  somebody was there recently?  When I say recently, I'm

14  talking about recent to the date you made that observation

15  of the wet item in the bag on August 16th.  Somebody was

16  there?

17           MS. SINGER:  I'm going to lodge an objection,

18      beyond the scope of this witness to answer.  The

19      witness can't make any conclusions as to what --

20           THE COURT:  The objection is sustained.

21           MR. GROLAND:  Your Honor, I don't think you have

22      to be an expert to answer that.

23           THE COURT:  Mr. Groland, the objection has been

24      sustained.

25           MR. GROLAND:  Yes, ma'am.

BY MR. GROLAND:

Q    What did that indicate to you when you saw wet
items in that bag in the closet?  What did that tell you?
What did you think when you collected that item?

A    I don't know how long it had been there.  I don't
know.  I just noted that they were wet.

Q    And the only items that were wet were -- What was
in there that was wet?

A    There -- Do you mind if I refer to my notes?

Q    Oh, please do.

A    The towels.

     THE COURT:  Hold on a second, please.  Go ahead.

BY MR. GROLAND:

Q    What items?

A    At the time I was there the towels were wet.

Q    Okay.  There were wet towels in that bag?

A    That is correct.

Q    And you are aware, are you not, that Brian Herlihy
was in jail from the 3rd of August, past that date, you know
that, don't you?

A    Yes.

Q    All right.  You don't know who wet the towels or
when?

A    No.

Q    When Mr. Herlihy was showing you, and the other

1    law enforcement officers, what had happened that morning,

2    did you take note of what he was explaining?  In other

3    words, do you remember what he said?

4         A    Specifically, no.

5         Q    You didn't make any notes?

6         A    No, I was holding a camera.

7         Q    And at this time, this date, you have no

8    independent recollection of what he said because you were

9    concentrating on your video camera?

10        A    Not specific statements.

11             THE COURT:  Mr. Groland, I hate to interrupt your

12        cross, but based upon the length of time and

13        anticipating that you may have additional questions and

14        the state will have redirect, I think we're gonna need

15        to interrupt this witness.  Is there any reason why

16        this would not be a good point to take a break?

17             MR. GROLAND:  That's fine, your Honor.

18             THE COURT:  Good enough.  We're gonna take a 15 or

19        20-minute recess, ladies and gentlemen.  I'm gonna ask

20        that the bailiff and the clerk secure the courtroom

21        during the recess, and ask the attorneys and the

22        observers clear the courtroom.

23             We'll be in recess for 15 minutes.

24             (Recess taken.)

25             THE COURT:  All right.  Is the state ready to

1    proceed?

2         MS. SINGER:  We are, your Honor.  I think it was

3    cross-examination on the defense side.

4         THE COURT:  I'm asking both sides.  Is the defense

5    ready to proceed?

6         MR. TEDDER:  No, your Honor.  Mr. Groland hasn't

7    returned to the courtroom yet.

8         THE COURT:  All right.  And do you know where he

9    is?

10        MR. TEDDER:  I just knew that he was in the

11   hallway.  I believe he was down there reading.  He was

12   sitting there reading and he wasn't there when I just

13   looked out, so --

14        THE COURT:  Could you go find him, please?

15        MR. TEDDER:  I certainly will.

16        THE COURT:  Thank you.

17        (Pause in the proceedings.)

18        THE COURT:  Mr. Groland, are you ready to

19   continue?

20        MR. GROLAND:  Yes.

21        MR. TEDDER:  Your Honor, I have something to bring

22   up with the Court again.  During this past recess, I

23   was not allowed to come back in.  I thought the Court

24   had indicated yesterday as long as the bailiff and the

25   clerk is in the courtroom, the attorneys could be in

1    the courtroom.

2         THE COURT:  That's correct.  So long as either the

3    bailiff, or the clerk, or I, are in the courtroom that

4    constitutes securing the courtroom, and as long as that

5    individual can remain available, then the attorneys, of

6    course, should be allowed to come back in, as well as

7    the court reporter.

8         MR. TEDDER:  I just wanted to clarify that.

9         THE COURT:  Because evidence is loose in the

10   courtroom, because the notebooks are loose in the

11   courtroom, the courtroom must stay secure at all times,

12   as well as your personal items.

13        MR. TEDDER:  Right.  I just wanted to make sure

14   the Court hadn't changed the rule from yesterday,

15   that's all.  It just must have been a misunderstanding.

16        THE COURT:  All right.  Bring the jury back in.

17        (Before the jury:)

18        THE COURT:  The jurors are present and seated in

19   the jury box.

20        Yes, sir, go ahead.

21        Ms. Millard, of course, you're still under oath.

22   BY MR. GROLAND:

23   Q    Ms. Millard, when you went back on the 2nd of

24   August -- Strike that.

25        When you went in on the 2nd of August, were you

1   looking for that onesie, that blue outfit that -- You heard

2   about that, the onesie, that outfit that I showed you?

3       A    No.

4       Q    Okay.  Is this the first you've even known about

5   it?

6       A    About this specific?

7       Q    The onesie shirt, the outfit, ESPN, the blue shirt

8   that I showed you?

9       A    Yeah.  I don't recall any specific, significant

10  thing to that particular one, baby clothes, because I was

11  looking for all kind of baby clothes.

12      Q    So then your testimony is you were not looking for

13  a particular item at any time when you went back in the

14  apartment, or even the first time you went in?

15      A    I don't recall that I was looking for a specific

16  item.

17      Q    How about the, just -- I know you said you don't

18  recall -- and just directing your attention to the 16th when

19  you went back on the search warrant.  Was there any thought

20  at that time about looking around for that onesie outfit and

21  thinking --

22      A    Again, I was collecting all baby clothes.  I

23  wasn't looking for a blue --

24      Q    Did you collect every single item in the apartment

25  that was related to a baby?

1        A     Every item that I saw, yes.

2        Q     And that would include clothing, shoes, food,

3   diapers, baby wipes?

4        A     Yes, things that I observed, yes.

5        Q     There was a load of stuff in there that was baby

6   related; is that correct?

7        A     Yes, there was.

8              MR. GROLAND:  Your Honor, may I approach the

9        clerk?

10  BY MR. GROLAND:

11       Q     There was also a Teddy bear collected?

12       A     I would have to look at my list.

13             MR. GROLAND:  May I have a moment, your Honor,

14       please?

15             THE COURT:  Yes.

16  BY MR. GROLAND:

17       Q     Do you remember collecting a little Teddy bear --

18  Do you have a recollection, without looking at the photo, of

19  a Teddy bear with a little note written on there?

20       A     With Crystal's name on it?

21       Q     Yeah.

22       A     I do recall seeing that.  I did not collect that.

23       Q     Okay.  When you talked about doing just a visual

24  of the comforter on August the 2nd the first time you were

25  in, I take it that you didn't take it off the bed and

1   examine it?

2        A    No, I did not.

3        Q    Nor did you lift it up and examine the sheets

4   underneath?

5        A    No, I did not.

6        Q    In fact, as you look at these items today in

7   court, as they were shown to you, they look pretty clean, as

8   though they had been recently washed; would you agree with

9   that?

10       A    I don't know when they were washed, but they

11  weren't very dirty.

12       Q    Do they look clean to you?

13       A    Relatively.

14       Q    Did you photograph the place on the floor where

15  the baby aspirated?

16       A    Yes.

17       Q    Were you told to do that?

18       A    I don't recall if I was simply told to do that or

19  not.  I saw that there was what appeared to be possibly

20  spit-up on the floor.

21       Q    There was a notation in your report as to that

22  effect; is there not?

23       A    Information, possibly.  I believe EMS did CPR.

24       Q    Do you know who told you that the baby had

25  aspirated on the floor?

1      A    No.

2      Q    There was dry cleaning in a bag on the bed when

3  you went back in on the 16th.  You did not collect that?

4      A    No, I did not.

5      Q    Did you know the significance of that, whether or

6  not that related to the case?

7      A    No.

8      Q    Did Helen Legall go in with you on the 16th when

9  you did that search warrant?

10     A    Yes, she was there.

11     Q    Did you have any discussion with her about the dry

12 cleaning that was there on the bed as depicted in your

13 photographs?

14     A    I don't recall specific specific conversation

15 about dry cleaning.

16          MR. GROLAND:  May I mark these for identification?

17          THE COURT:  Any objection?

18          MS. SINGER:  No objection, your Honor.

19          THE COURT:  Go ahead and mark them for

20     identification, please, Mr. Clerk.

21          MR. GROLAND:  May I put these in now, Jeanne,

22     Ms. Singer?

23          MS. SINGER:  As long as she can identify them you

24     can have her look at them right now, Mr. Groland, and

25     do it that way.

923

```
 1                MR. GROLAND:  Sure.
 2   BY MR. GROLAND:
 3        Q    I show you two photographs, each one depicting a
 4   Teddy bear with a note on it.
 5        A    Yes.
 6        Q    You took those photographs?
 7        A    Yes.
 8        Q    Do they accurately depict what you photographed at
 9   that scene on the 16th of August, 2000?
10        A    I do remember the Teddy bear.
11        Q    Okay.  Do those photographs fairly and accurately
12   depict what you photographed at that time?  Did you take
13   those photographs?
14             You want to see the proof sheet?
15        A    Yeah.  Actually I would like to see more than just
16   this one item.
17        Q    Okay.
18        A    Thank you.
19             MR. GROLAND:  May I approach the witness, your
20        Honor?
21             THE COURT:  Yes.  Go ahead.
22             THE WITNESS:  Yes, these are my photographs.
23   BY MR. GROLAND:
24        Q    Now, having looked at the proof sheet, do you
25   recognize those two photographs?
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1      A    Yes.

2      Q    You took those on the 16th of August, 2000?

3      A    Yes.

4      Q    Okay.  And do those photographs fairly and

5   accurately depict what you photographed at that time?

6      A    Yes, they do.

7           MR. GROLAND:  Can we move this into evidence, even

8      though it's the state's side, Ms. Singer?

9           MS. SINGER:  No objection.

10          THE COURT:  State already indicated they have no

11      objection.  They will be entered out of order as

12      Defense Numbers 1 and 2.

13          THE CLERK:  Yes, your Honor.

14          (Defendant's Exhibit Nos. 1 and 2 were received in

15          evidence.)

16          MR. GROLAND:  Your Honor.  May I publish those to

17      the jury.  And I'll continue as we, as they're looking.

18          THE COURT:  Yes.

19          MS. SINGER:  You can publish them by way of this

20      machine, Mr. Groland, if you wish.

21          MR. GROLAND:  I think I can just pass them around;

22      it will be all right.  May I approach the jury?

23          THE COURT:  Yes.  Go ahead.

24   BY MR. GROLAND:

25      Q    Would it be accurate to say that when you went

1    back in on the 16th, on a search warrant, the apartment

2    looked very different than when you left it on August 2nd?

3        A    That is correct.  It was very different.

4        Q    You testified that there was a photo of the floor

5    and the foot rail and there was nothing noted, no stains

6    noted on the floor area?

7        A    That is correct.

8        Q    Were you specifically looking for something there?

9        A    I examined the entire room.

10       Q    Okay.

11       A    Yes, I did.

12       Q    And lastly, when you were there the first time, am

13   I correct that you determined that the mattress and the box

14   spring were pushed all the way up to the headboard?

15       A    That is correct.

16       Q    And you actually made a measurement between the

17   mattress and the foot rail and determined that that distance

18   was about six inches; is that correct?

19       A    Approximately six inches, yes.

20           MR. GROLAND:  I think I'm finished, your Honor.

21       May I just confer?

22           (Pause in the proceedings.)

23           MR. GROLAND:  I want to show the witness one

24       additional photograph.

25   BY MR. GROLAND:

1       Q    Do you recognize that photograph?  Is that the

2  back of the bed?

3       A    This is the footboard.

4       Q    Okay.  Does this photograph pretty much depict,

5  fairly and accurately depict the distance between the

6  mattress and the footboard when you were there?

7       A    That is correct.

8            MS. SINGER:  Your Honor, I'm going to lodge an

9       objection.  I didn't see the photograph and I'm not

10      sure when this photograph was taken.

11           THE COURT:  Show it to Ms. Singer.  The objection

12      is sustained.

13           MS. SINGER:  That particular photograph is already

14      in evidence.

15           MR. GROLAND:  Okay.  If I can ask another question

16      while I'm standing here?

17           THE COURT:  Sure.

18  BY MR. GROLAND:

19      Q    When you said there was no toilet paper in the

20  bathroom, was that just a visual, or did you look around in

21  the closet for toilet paper?

22      A    I didn't look in the closet, but I just observed,

23  noticed that there wasn't any there.

24      Q    Was there a roll of toilet paper on a toilet paper

25  holder -- And I promise this is relevant -- was there?

1        A     I noted that there was no toilet paper, so I don't

2   believe there was.

3        Q     Was there an empty roll on the toilet paper

4   holder?

5        A     I don't recall that there was an empty roll.  I

6   just know that there was no paper.

7        Q     Let me show you what's been marked as State's

8   Exhibit 28-J in evidence.  I think it's the same photo that

9   I just showed you a few moments ago?

10       A     Yes.

11       Q     Does that photo fairly and accurately depict the

12  distance between the mattress and the footboard and the foot

13  rail in Brian Herlihy's apartment when you took it?

14       A     Yes.

15       Q     Okay.  When did you take that photograph?

16             MS. SINGER:  Your Honor, did you say -- When did

17       you take it?  I'm sorry.

18  BY MR. GROLAND:

19       Q     When did you take it?

20       A     This was taken actually on the search warrant on

21  the 16th.

22       Q     And if, when you first saw it, the distance that

23  we're talking about on the 2nd when the mattress and

24  footboard were pushed all the way up to the headboard, it

25  was at least that same distance as we depicted in that

1   photograph; isn't that correct?  It certainly wouldn't be

2   any bigger because the footboard couldn't go -- the mattress

3   and box spring couldn't go any further forward; is that

4   right?

5       A     When it was measured, it was measured with the

6   bedding still on as it was.

7       Q     Okay.

8       A     I don't -- I mean the bed had been altered, so I

9   don't know the correlation in this photograph.

10      Q     Okay.  So if you say it was measured with the

11  bedding and the quilt still on there, actually the distance

12  itself would be a little bit longer than six inches; isn't

13  that true?

14      A     One more time, please?

15      Q     What you said is when you measured the six inch

16  gap between the footboard and the mattress and box spring

17  with the bedding on it, and it was about six inches.  If we

18  took the bedding, the quilt, and the sheets, two sheets off,

19  we would have something a little more than six inches, like

20  maybe seven inches; is that correct?

21      A     That's correct.

22      Q     All right.  And this photograph that we see here,

23  since the mattress and box springs can't go any farther

24  forward, this is at least six inches; is it not?

25      A     Again, I -- I don't know exactly.  I didn't, I

1    don't recall exactly whether measurements were taken after

2    everything was moved.

3          MR. GROLAND:  May I publish this to the jury again

4       since we're talking about the subject matter?

5          THE COURT:  Yes.

6          MR. GROLAND:  Thank you, your Honor.  And --

7          THE COURT:  And, Mr. Groland, do you want to

8       collect from Ms. Perry the other photographs that you

9       were circulating?

10          MR. GROLAND:  I'm just about through, your Honor.

11          (Pause in the proceedings.)

12          MR. GROLAND:  I have no further questions.

13          MS. SINGER:  I have a very brief redirect, but I

14       do need to confer with Mr. Groland for one moment.

15          THE COURT:  Why don't you all step over to

16       Mr. Groland's table?

17          MS. SINGER:  May we approach for a moment, and we

18       do need to be on the record.

19          (Sidebar conference:)

20          MS. SINGER:  Based upon the Court's pretrial

21       ruling regarding fire memorabilia, and paramedic

22       memorabilia, I did not introduce any pictures that had

23       any suggestion of that.  I do have --

24          MR. GROLAND:  Jeanne, please.

25          MS. SINGER:  I have a picture that I do now want

Stacey K. Bryant, RPR
Judicial Court Reporter

1    to -- I do want to show that that Teddy bear was in the

2    apartment on August 2nd when Christina Millard first

3    photographed it, approximately 1:20 p.m.

4       This is the photograph, your Honor, and it has a

5    hat depicted in it, that reads Navy Seal Team.  This

6    was one of the pictures that the defense was not

7    willing to stipulate to because of the ruling.

8       My point in introducing it at this time is there

9    had been a suggestion raised to the jury that other

10   persons have been in and out of this apartment,

11   including Crystal Quirello, moving things, setting

12   things, moving things.  And I want them to know that

13   that Teddy bear was there with that note when Tina

14   Millard went in on 1:20 p.m.

15      MR. GROLAND:  I think that is a valuable point

16   that the state makes.  I agree with that.

17      What I would ask the Court to consider doing is

18   just allow her at this time to ask the question was the

19   Teddy bear there during those photographs on this date.

20   Between now and the end of the trial we will take care

21   of this photograph such that anything that goes in is

22   this much of it.  Therefore we won't interfere with any

23   of the pretrial orders or stipulations that have been

24   made.  And for the time being, right now, that should

25   suffice to satisfy the state, I hope.  If we clean this

1      up, we won't have an issue.

2          MS. SINGER:  I'm not sure if Mr. Groland is saying

3      that he is going to clip part of this photograph off.

4          MR. GROLAND:  Jeanne, I'm not saying we're --

5      again, we can submit a photograph that's an inch

6      shorter.

7          MS. SINGER:  No, I won't agree to having it

8      digitally changed, because I don't think that's good

9      for the record.

10         MR. GROLAND:  All right.  Then I would like to at

11     least ask to have a little time to see what we can

12     figure out about doing that between now and when the

13     state is ready to rest.  I may be able to come up with

14     some way that we can keep that out as previously

15     ordered, and still you can ask the question at this

16     time.  I don't know if you have a right to get the

17     photo in, but as you asked the question, I will

18     stipulate in front of jury that that Teddy bear was

19     there when she was in there.  And then between now and

20     whatever, I can figure out something if I can.  We'll

21     get this photo in; is that fair?

22         MS. SINGER:  The reason which I don't want to just

23     offer oral testimony to that is if they don't believe

24     her and they don't see the photo to confirm it, then

25     they can disregard it.  That's why I want the photo to

1    confirm.

2          MR. GROLAND:  I understand.

3          MS. SINGER:  Whether it can be cropped in a

4    certain way, that will be up to the Court.  We don't

5    have to publish it at this time, but Ms. Millard was --

6          THE COURT:  Here's what we're gonna do.  You may

7    ask if it was in the apartment.  On redirect you may

8    ask her if she photographed it on that day.  You may

9    have her identify this photograph and mark it for

10   identification, and then you announce, by stipulation,

11   that you will have no objection to the photograph being

12   entered at a later time based upon rulings by the

13   Court.

14         MR. GROLAND:  Sure.  Fine, perfect.

15         MS. SINGER:  That will be announced in front of

16   the jury.

17         THE COURT:  Yes.

18         (Sidebar conference concluded.)

19                    REDIRECT-EXAMINATION

20   BY MS. SINGER:

21      Q    Investigator Millard, you were asked a number of

22   questions regarding Defense Exhibit A, the sketch of the

23   apartment, as well as the sketch of the bed that's attached

24   to it when you turn the page.  Does that sketch of the

25   apartment and the sketch of the bed appear to be in the same

1    or similar condition to when you actually reviewed those

2    items in the course of your investigation?

3         A    Yes.

4         Q    Is there anything about either of those documents

5    that indicates they have been tampered with in any way or

6    changed in any way?

7         A    No.

8              MS. SINGER:  Your Honor, at this time I would like

9         to move Exhibit Number A into evidence as the next

10        State's Exhibit.

11             MR. GROLAND:  Let me look at it again, please.  I

12        have an objection.  Can we argue it at the next recess?

13             THE COURT:  Yes.

14             MR. GROLAND:  Thank you.

15             MS. SINGER:  I just have one question.  Is it your

16        objection as to authentication or is it a substantive

17        objection, because --

18             MR. GROLAND:  Substantive.

19             MS. SINGER:  Substantive.  I will not need

20        Ms. Millard?

21             MR. GROLAND:  Absolutely not.

22             THE COURT:  Good enough.

23   BY MS. SINGER:

24        Q    Ms. Millard, I'm going to show you a proof sheet

25   to refresh your recollection of the photos you took back on

1    August 2nd, 1:20, and take a look at that proof sheet and

2    then I'll show you what I'm going to need to have marked as

3    the next State's Exhibit for identification purposes.  We

4    have Steve working hard today.  This will be State's F for

5    identification purposes.

6    BY MS. SINGER:

7        Q    Investigator Millard, I'm going to show you this

8    photograph.  Please do not display it to the jury at this

9    time.  Take a look at that and see if you locate that

10   particular photograph on the August 2nd proof sheet that you

11   have had developed?

12       A    Yes, I do.

13       Q    All right.  Was that photograph, marked as F for

14   identification, taken on August 2nd, the year 2000, at

15   approximately 1:20 or 1:40 when you were in the apartment at

16   that time?

17       A    Yes, it was.

18       Q    And does it depict the Teddy bear that you

19   identified during Mr. Groland's examination of you?

20       A    Yes, it does.

21       Q    And is it in the same location as it was in the

22   photograph that Mr. Groland showed you?

23       A    Yes, same area.

24       Q    Same area?  Is it situated in the same manner,

25   does it appear to you to be situated in the same manner?  In

1    other words, sitting, standing, laying, whatever.

2         A    Yes.

3              MR. GROLAND:  Your Honor, we would stipulate that,

4         in fact, that Teddy bear was there on August the 2nd

5         when Ms. Millard took the photographs at 1 o'clock and

6         we would have no objection to that photo going into

7         evidence following further orders by this Court.

8              THE COURT:  All right.

9              MS. SINGER:  One moment, your Honor.  I do want to

10        ask one question.

11   BY MS. SINGER:

12        Q    Mr. Groland kept referring to the items in the

13   Wal-Mart bag as being wet.  Were they wet or damp when you

14   opened the Wal-Mart bag?

15        A    They were wet.  I don't know -- I don't recall,

16   remember exactly, you know, whether there was just light

17   moisture, or, you know, I don't believe that they were

18   soaked.  They were just wet.

19             MS. SINGER:  No further questions, your Honor.

20             MR. GROLAND:  No further questions, your Honor.

21             THE COURT:  All right.  May this witness be

22        released from the subpoena?

23             MS. SINGER:  Yes, please.  She would like to

24        return back home to Broward County if that's okay with

25        Mr. Groland?

1          MR. GROLAND:  No objection to that.

2          THE COURT:  Thank you, Ms. Millard.  You are

3     released from the subpoena.

4          Now we are gonna recess early for lunch today,

5     ladies and gentlemen.  So if you'll step back into the

6     jury room, the bailiff will be with you in just a

7     moment to escort you to lunch.  If you'll take your

8     notebooks with you, please, and secure them in the

9     evidence locker.

10         (Out of the presence of the jury.)

11         THE COURT:  Now, while we're waiting for the

12     bailiff to be ready to escort the jurors to lunch --

13         Are you waiting for them?

14         MR. BAILIFF:  Yes, ma'am.

15         THE COURT:  -- is there any further argument?  Of

16     course, as I indicated yesterday, I have reviewed the

17     transcript and the pretrial ruling in regard to

18     statements allegedly made by Brian Herlihy, a number of

19     different times, to a number of different witnesses,

20     that, in fact, are alleged to have been untrue

21     regarding his work history, education, et cetera.  It

22     was the pretrial ruling that those statements would not

23     be admitted in the state's case in chief unless the

24     defense opened the door.  It was the ruling during the

25     trial that, in fact, the defense had opened the door to

1    statements made by Mr. Herlihy to Crystal Quirello

2    regarding his employment as, I believe, a pediatric

3    nurse at Shands.  And it was Mr. Groland's request that

4    the Court revisit that.

5         I have the complete transcript.  I have reviewed

6    it.  Is there any further argument that you want to

7    make, Mr. Groland?

8         MR. GROLAND:  Just briefly, your Honor.

9         Judge, I believe that it is a -- I believe that it

10   is a reasonable inference from what has happened here

11   that the witness had been instructed to avoid a

12   particular area.  I'm not suggesting that the state

13   attorney's office has sandbagged me here, but it could

14   be that the state witness did it on her own.  And I

15   don't know what really caused this to happen, but when

16   we look at the questions that were asked, and we start

17   with the question asked by the state where she

18   responded after Ms. Singer asked the question:  Why did

19   you leave the baby alone with Brian Herlihy?  She said:

20   I trusted him.

21        And then Ms. Singer correctly shut that down right

22   there.

23        It's clear that that is the subject matter, the

24   word "trust", that was addressed pretrial with the

25   witness, I'm sure, during the admonishment by

1    Ms. Singer, that we got to stay away from this, or else

2    what's gonna happen is, I'm sure she was told what

3    would happen.  And what would happen is some of the

4    issues that have come out during the course of the

5    trial.

6         And I think that if, indeed, the Court rules that

7    a door was opened as to this area, then certainly we

8    didn't open the door, because the first time that the

9    word trust came up -- and I don't believe I ever used

10   that word during my cross-examination, not once, nor

11   did I ever ask her why she felt a certain way or why

12   she had a good feeling about Brian Herlihy.  What I did

13   do is ask her about her observations of him interacting

14   with the baby.

15        I then asked her at the close of my cross a couple

16   of questions that went along the lines like this:  This

17   is the question.  Would it be fair to say that Brian

18   was always good with the baby?  And what I'm talking

19   about here, it's clear, I believe, is that we're

20   talking about interaction.  Good with the baby.  Not

21   what he had said.

22        THE COURT:  Hold on just one second.  Are you

23   ready to take the jurors for lunch?

24        MR. BAILIFF:  Yeah, they're reserving a table in

25   the next few minutes.

1       THE COURT:  Hold on just a second.  We're gonna

2    take the jurors through and send them to lunch.

3       (The jury is excused for the luncheon recess.)

4       THE COURT:  All right.  Go ahead, Mr. Groland.

5       MR. GROLAND:  What I'm saying is I asked her

6    whether or not Brian was always good with the baby.

7    And it's clear from the question I'm talking about

8    interaction with the baby and doing things with the

9    baby.  She answers:  I trusted him, yes.

10       I think the presumption, as far as I'm concerned,

11    is that she wanted to get that phrase out and open

12    something up.

13       My next question on the same page is:  Did Brian

14    ever do anything that caused you to feel concerned?

15    She answered no to that question.

16       And then lastly I said:  Did you ever, when Brian

17    was with Robbie, see anything like anger, aggression,

18    frustration, or lack of patience?

19       No, sir.

20       And my last question -- and it had nothing to do

21    with anything that Mr. Herlihy had ever said, had

22    nothing to do with trust -- my last question that

23    caused the Court to make the ruling that the Court did:

24    Crystal, it is true, is it not, that at no time during

25    your relationship with Brian Herlihy, when he was

1      around you and Robbie, and alone with Robbie, did you

2      have any suspicion at all that he might want to injure

3      the baby?  And this last question was a follow-up

4      question that took into account from my perspective the

5      previous three questions I asked about actual

6      interaction, doing things with the baby, and it stayed

7      away completely from anything that Mr. Herlihy may have

8      said to her that perhaps may have caused her to, as she

9      says, to trust him.

10          I don't believe, your Honor, that we've opened the

11     door.

12          Lastly, and I'll just be finished with this.  My

13     understanding in all the years I've been doing this

14     about opening the door, is giving the triers of the

15     fact a glimpse of an area that we have been cautioned

16     to stay away from.  That is what the door -- the flood

17     gates then open.  And I didn't give the jurors the

18     slightest hint of anything, or inclination to believe

19     that this question had something to do with something

20     that Brian Herlihy may have said to her on a previous

21     occasion.

22          I think, with all respect for the Court, I think

23     the ruling was incorrect and I think we can fix it and

24     I would ask your Honor to give an instruction to the

25     jury at the appropriate time during this trial that

Case 1:09-cv-00052-MP-GRJ   Document 21-16   Filed 03/22/11   Page 109 of 129

941

1    they are to disregard that later, that last testimony

2    by Crystal when the state was allowed to come back and

3    ask the question: Why did you trust him? They set it

4    up, and I think that we should not be penalized by what

5    they have done. By "they" I mean more particularly the

6    state witness, than -- I'm not accusing the state

7    attorney's office. I think Crystal set it up so that

8    this stuff could come in. And again I don't think we

9    opened the door. And I would ask the Court to give the

10   instruction that I request.

11           THE COURT: Okay.

12           MS. SINGER: Very brief response, your Honor.

13   This Court listened to a very lengthy examination and

14   cross-examination of Crystal Quirello. And as much as

15   we may be sympathetic with her loss, I don't think that

16   any of us would agree that she would have the

17   capabilities of thinking that far advanced in a legal

18   proceeding regarding setting anyone up for a particular

19   answer to a question. When that answer came on direct,

20   she was specifically told move on and she did. At that

21   time she could have said anything that she wanted to

22   say if she was going to set up a situation and she did

23   not.

24           Secondly, I don't agree with Mr. Groland's

25   rendition of the purpose for his questions of

Stacey K. Bryant, RPR
Judicial Court Reporter

1    Ms. Quirello at the time.  In fact, if the Court reads

2    that very lengthy series of questions --

3         THE COURT:  I have.

4         MS. SINGER:  -- Mr. Groland was painting a picture

5    with those questions bolstering his client's

6    credibility in front of the jury, bolstering his

7    client's position as far as what his propensities were

8    or lack of propensities were with the jury by those

9    questions.  And he fell into a hole, whether it was

10   purposeful or not, whether he intended it to be the

11   hole or not, whether his subjective viewpoint on that

12   question is that he didn't mean to do it or not, is

13   irrelevant.

14        The question was open-ended enough to have a

15   response:  No, I didn't suspect anything because I

16   trusted him.  And once that answer came out, then to

17   preclude the state from asking this witness:  Well,

18   what were the reasons why you trusted him?  Not being,

19   allowing the state to do that is unfair.  It ties the

20   hands of the state.  And as much as Mr. Groland does

21   not agree with the ruling of the Court when this

22   occurred, the state never agreed with the ruling of the

23   Court that these matters are not relevant.  We believe

24   these matters are, in fact, relevant.  I made a

25   statement a couple days ago as to why I believe they're

relevant, and I can restate it if the Court needs to hear it again, but I don't think the Court needs to hear it again.

THE COURT: I don't.

MS. SINGER: Our position is this information has always been relevant. We followed the Court's rulings. We moved our witness away from that area. That witness was drawn back to that area by a series of questions that were used to bolster the defendant's position with the jury, to show he had a lack of propensity, that he was a wonderful father figure, that he did everything well and good, and then they opened up the door. They opened up the door. And I think that the witness is not, should not be in a position to have to lie when answering a question. That's not our purpose. That's not the position that the state's taking on this --

MR. GROLAND: One last comment.

MS. SINGER: -- and we ask the ruling stand.

MR. GROLAND: I didn't ask her for an explanation. If anyone wanted an explanation, that would have been a question for redirect. I asked her a question that most specifically called for a yes or no answer. Did you have any suspicion? The response to that is no or yes, not: Well, no, I didn't have any suspicion because of such and such; or, yes, I had suspicion

1    because of such and such.  That's an improper response

2    to a question.  She added, she editorialized.  She

3    added things that were not asked for in the question.

4    All she could have responded and would have been

5    appropriate was yes or no.  Instead she added, I

6    trusted him, that same area that the state had told her

7    to stay away from.

8         THE COURT:  Mr. Groland, you're now repeating

9    yourself.  If there's any brief rebuttal you need to

10   make to Ms. Singer's argument, of course, you have that

11   opportunity.

12        MR. GROLAND:  Okay.  Right.

13        THE COURT:  You don't need to rehash everything

14   you said to me the first time and the second time.

15        MR. GROLAND:  Got it.

16        THE COURT:  Now, I understand the state's

17   perspective and the defense's perspective.  The Court's

18   perspective is slightly different, as it often is.

19   First of all, the pretrial rulings had to do with the

20   fact that there were numerous statements alleged to

21   have been by the defendant, which both sides seemed to

22   agree were false.  And it was the ruling of the Court

23   that you cannot accuse a man of murder based on the

24   fact that he may be a liar.  Those things are not

25   attached to each other, and that the fact that he may

1    have lied repeatedly, does not have any direct

2    relevance to the charge of first degree murder, unless

3    and until relevance becomes apparent during the trial.

4         Now, that can happen a number of different ways.

5    Certainly statements made by the defendant are

6    admissible for a number of different reasons, and in a

7    number of different contexts.

8         The pretrial ruling had to do with, more closely,

9    the analogy that the defense was making that trying him

10   as a liar would constitute something not Williams Rule

11   in nature, but closer to Williams Rule than anything

12   else.

13        The fact that a wrong, or wrong characteristics,

14   or immorality in that regard might influence the jury

15   was the basis for the pretrial ruling, that the state

16   could not bring into evidence in its case in chief for

17   purposes of establishing character the fact that

18   Mr. Herlihy may have lied repeatedly.

19        On the other hand, the defense's line of

20   questioning having to do with what Crystal Herlihy --

21   excuse me, Crystal Quirello saw between Mr. Herlihy and

22   the deceased child stayed within a save area, until

23   such time as Mr. Groland asked the witness what her

24   conclusion is by saying:  And you had no suspicion?  If

25   he had stuck with, Mr. Groland, if you had stuck with:

1    What did you actually see?  The door would not have

2    been opened.  But once you say:  You had no suspicion,

3    you asked for her conclusion, and the conclusion drawn

4    as to a person's credibility as the jury instructions

5    clearly say, can be based upon what a witness said, as

6    well as what they did.  And, on that basis, the Court

7    ruled and still rules that you then opened the door for

8    the state to inquire as to how she drew the conclusion

9    that there was no suspicion in regard to Mr. Herlihy.

10   Therefore, the ruling stands.

11        Now, is there anything else we need to address

12   that has been raised?  Do you want to address the

13   diagram issue?

14        Mr. Groland said he had an objection about the

15   substantive -- he had a substantive objection to Ms.

16   Millard's diagram, Defendant's A that the state

17   attempted to move in.

18        MR. GROLAND:  Your Honor, before we go on to that,

19   can I get a clarification?  I understand your ruling.

20   I just want to make sure that it does not apply to

21   other witnesses and other instances, but rather is

22   limited because in this circumstance with Crystal

23   Quirello, the Court feels I opened the door as to her

24   and I accept the Court's ruling.  I don't agree with

25   it, but I understand what you're saying.  But it only

1    applies in that instance; is that correct?

2    THE COURT:  Well, it has applied now in two

3    instances where the defense has opened the door to

4    statements made by Mr. Herlihy that -- There's been no

5    evidence at this point that those statements were in

6    fact false.  But based on the pretrial rulings it seems

7    to be -- although it wasn't a specific stipulation --

8    it seems to be the agreement between the state and

9    defense that those statements in regard to his training

10   and work experience are, in fact, false.

11   Now, you've opened the door as to two witnesses.

12   That certainly changes the tenure of the pretrial

13   ruling, because the pretrial ruling, although it

14   remains that the state cannot try Mr. Herlihy for

15   murder on the theory that he's a liar, it changes the

16   tenure in that, the fact that he has made repeated

17   statements regarding his experience has already come

18   in.

19   Now, why the Court would then rule that it would

20   be inadmissible as to other witnesses who may have

21   overheard other statements, will be different.  The

22   ruling that the state cannot try to prove he's a

23   murderer because he's liar, of course, remains the

24   same.  But the precaution is now different, because the

25   state -- the defense has opened the door as to two

1    witnesses, and as to two different statements that

2    apparently are false.

3         MR. GROLAND:  So what we're saying is that we will

4    treat each instance on its own merits or lack of merits

5    and the state isn't to just go on with each witness and

6    ask things that Mr. Herlihy, that asked questions of

7    Mr. Herlihy -- sorry -- asked questions of the witness

8    as to statements Mr. Herlihy made that were perhaps

9    untrue, but not relevant?  The Court isn't ruling that

10   anything that the state believes is a fabrication can

11   just automatically come in now.  Am I correct about

12   that?

13        THE COURT:  Well, correct.  It would not

14   necessarily be relevant.  But what I am also saying is

15   that the state is not necessarily bound by the pretrial

16   ruling.

17        Now, the defense may file a new motion in limine.

18   You all have done the depositions.  You know what the

19   witnesses are gonna say.  I do not.  You may file a new

20   motion in limine saying:  Judge, okay, those things are

21   in, but there are additional false statements made to

22   additional witnesses that are not in any way influenced

23   or impacted by these previous rulings, and we want a

24   new order in limine as to these new witnesses.

25        The state may, in fact, file a motion saying:

1    Judge, the statements are in; the fact that he lies is

2    in; and, we should not be precluded from allowing each

3    witness to testify as to the full extent of their

4    investigation at this point, because it would be

5    pointless to so restrict them.  I don't know, because I

6    don't know what the other witnesses are going to say.

7    I'm only announcing and clarifying what the rulings

8    have been up to this point.

9        MR. TEDDER:  Your Honor, just, I think I

10   understand, I hope.  Just for the record, we would

11   object to your ruling as to the witness, Mr. Meredith,

12   and Ms. Quirello.  And we understand, accept, and adopt

13   the ruling the Court made with respect to the other

14   witnesses.  I think you agree to that, Gordon?

15       MR. GROLAND:  Yes, and Ms. Singer and I both know,

16   Your Honor, what issues and witnesses we're talking

17   about.  I would ask the Court -- I'm actually asking

18   Ms. Singer, if something else is gonna happen, can we

19   just not spring it on everybody and let's have a

20   proffer beforehand?

21       MS. SINGER:  I know how to play the game.

22       MR. GROLAND:  You know we both play the game

23   fairly.

24       MS. SINGER:  Absolutely.  Try to be very fair.

25       MR. GROLAND:  Okay.

1    MS. SINGER:  I think we had another instance where

2    we were at the bench and I was given an opportunity to

3    ask a question and decided that, in the abundance of

4    caution, the question was not going to be asked.

5        MR. GROLAND:  Yeah.

6        MS. SINGER:  That was the last incident that

7    occurred.

8        THE COURT:  Correct.

9        MS. SINGER:  So I know I understand the parameters

10   of this system and I will be very careful.  But, I will

11   be approaching the Court with issues of proffer when

12   those times come up, if they come up at all in the

13   remainder of the witnesses.  And I'm not even going to

14   say they ever do.

15       THE COURT:  Now, we might as well go ahead and

16   address this issue regarding the Teddy bear and the

17   seal, Navy Seal hat, because although the Court ruled

18   that memorabilia, per se, could not, the collection of

19   memorabilia could not be used again, like Mr. Herlihy

20   being, making repeated false statements, could not be

21   used to prove he committed murder, once the defense

22   introduced a photograph there would be no reason that I

23   can think of for the seal hat that was also there to be

24   redacted from that photograph.

25       MR. GROLAND:  First of all, we didn't introduce

1    the photograph.  The state is seeking to introduce the

2    photograph.  What I'm asking the Court to do is hold

3    off ruling on that until we can find out if there is a

4    way to put that photograph into evidence in such a way

5    that no one on the jury will know that we have taken a

6    part of it off, pursuant to the Court's earlier

7    rulings.

8        THE COURT:  Based upon the introduction -- that

9    ruling, that photograph was originally eliminated

10   because of the hat; and then you introduced testimony

11   about the Teddy bear that's in that photograph.

12       MR. GROLAND:  No, your Honor, I introduced

13   testimony about the Teddy bear that was in other

14   photographs, that were clean photographs.  And I agreed

15   with the state when we were at sidebar she has a valid

16   reason to clarify that the Teddy bear was there on the

17   2nd.  I so stipulated in front of the jury.

18       The oral testimony of the witness has come out and

19   I think there's probably a way to get the photograph in

20   evidence.  All I'm asking for is a little bit of time

21   to try to figure out a way to do it.

22       THE COURT:  Certainly there is a way to do it.

23   The question is what would be the legal basis to do it?

24       MR. GROLAND:  Well, the legal basis is there was a

25   pretrial ruling keeping memorabilia out of this case.

952

1    And I don't think that at this time, I mean, I hesitate

2    to use the phrase "open the door."  I don't think, you

3    know, we have done anything to change that ruling.

4        All I'm saying is the jury now knows.  I don't

5    think there's any question about it that they know that

6    that Teddy bear with Crystal's handwritten note on it,

7    I don't know if the Court has actually seen the

8    photograph, but it says something like:  Brian, thank

9    you for everything you've done for me, signed Crystal,

10   and you can read it.  She takes a close-up shot of it.

11       I think -- I don't think there's any question in

12   the jury's mind at this time.  All I'm saying is at

13   this point in conformity with the Court's earlier

14   ruling, let's just see if there is a way we can get the

15   photograph in and still be in compliance with the

16   earlier ruling.  The jury now knows, I think, I don't

17   think there is any question in their mind, that that

18   Teddy bear was there on August the 2nd.

19       THE COURT:  We'll discuss it further.

20       MS. SINGER:  First of all, I don't see how the

21   Navy Seal hat is at all prejudicial and it goes back to

22   the pretrial ruling.  But I was following the pretrial

23   ruling in redacting that photograph from my packet.

24   When you look at the photograph, it does not say

25   anything about Brian Herlihy, the fact that there's a

1    hat in there.  My husband has a thousand hats from

2    different universities.

3         THE COURT:  Now, please don't testify.  I

4    chastised Mr. Tedder for doing that.

5         MS. SINGER:  Right, right.  I mean, the fact that

6    there happens to be a hat there with Navy Seal on it

7    does not show bad character, does not show that he's a

8    liar, does not show anything prejudicial to this

9    defendant.  In an abundance of caution, we separated

10   out all the pictures because we understood what the

11   pretrial ruling was.

12        But, when the defense moves in two photographs of

13   that bear taken on the 16th, and suggests on the

14   direct-examination, I believe it was clarified on the

15   cross-examination, pardon, on cross-examination, I

16   believe it was clarified on the redirect, but when

17   there's a suggestion that the apartment has been

18   tampered with, that people have been in and out, that

19   items have been moved, when that suggestion is raised

20   by the defense, which it was throughout Investigator

21   Millard's testimony, then the State has a right not

22   only to rely on a stipulation by defendant, or oral

23   testimony, but the state has a right to present the

24   photograph into evidence for the jury to see for

25   themselves.

1          The hat is not prejudicial.  It doesn't say

2     anything.  It's just in the picture.  So for two

3     grounds I see there is no reason not to allow the

4     entire photograph in.  The hat doesn't say anything.

5     It doesn't mean that he lied.  It doesn't mean

6     anything.

7          The picture, however, is relevant for the jury to

8     see that that item was there at 1 o'clock on the 2nd.

9     It was not placed there by Crystal Quirello at any

10    other time.  That makes it relevant.  To redact, cut,

11    clip, I think sending a picture in that has an erasure

12    where something was, or that's clipped in half, is much

13    more prejudicial to the defendant than to let that

14    picture go in the way it is with a hat that says Navy

15    Seals on it.  Because it doesn't say anything.

16         MR. GROLAND:  Maybe standing alone the hat with

17    Navy Seal on it might be totally harmless, but based

18    upon the Court's ruling just a few minutes ago, I'm not

19    sure where we're going with all of this.  And this is

20    just one more item, along the same line of prior bad

21    acts, or pretending to be somebody else, or saying

22    we're somebody else.  So I think it's important in that

23    sense.  I agree the hat itself hanging on the wall

24    doesn't mean a whole lot, but it may turn out to have

25    some significance.

1      I would like to, at least, have time to look at

2  the proof sheet.  Is there another photograph on the

3  proof sheet?

4      MS. SINGER:  I looked at it.  Now, you can look at

5  it yourself and see.

6      THE COURT:  Here is the bottom line.  You're

7  right, Mr. Groland, there's no telling how far down

8  this road the evidence will go.  And you're also right

9  that as you explained to the jury, the defendant is not

10  required to present any case.  You're not required to

11  cross-examine any witness.  You're not required to

12  present any evidence.  He's not required to testify.

13  However, when you do, you open the door to what

14  evidence there is and you cannot limit the state's

15  evidence as narrowly as you're wishing to when you keep

16  opening the door.  It's the ruling of the Court that

17  that photograph now comes into evidence.

18      Let me see the diagram.

19      MR. TEDDER:  Your Honor, as to that ruling we

20  would just object for the record.

21      THE COURT:  Yes, sir.

22      MS. SINGER:  Can we have that marked as the next

23  exhibit, or could we mark it as a part of the

24  exhibit --

25      THE COURT:  It's already been marked for

1   identification.  You may introduce it into evidence and

2   have it marked for evidence when the jury is back.

3        MS. SINGER:  All right.

4        THE COURT:  Now, what's the issue regarding this

5   diagram?

6        MR. GROLAND:  The issue on there is it says

7   "shaken baby". I don't know if it says syndrome or --

8        THE COURT:  Baby shaken is what is on the first

9   page.

10        MR. GROLAND:  Well, it's a conclusion, it's a

11   presumption.  It's prejudicial.  And I didn't -- I just

12   asked her to identify the document.  She doesn't know

13   if she wrote it on there that afternoon between 1:00

14   and 1:45, or at a later date.  I didn't have her

15   testify from the document.  Police reports don't go in.

16        I just -- I was eliciting from her information,

17   her testimony as to when she believed that this was a

18   criminal investigation involving a shaken baby.  The

19   police reports don't come in evidence.

20        MS. SINGER:  Right.  I did not originally have her

21   enter her diagram into evidence.  The Court can see

22   that that's also a diagram that's drawn of the

23   apartment, a sketch.  I did not bring that forward

24   because of the possibility of the words "shaken baby"

25   on there.

1        Mr. Groland spent a number of questions inquiring

2   about that and why she wrote that on there.  So he,

3   once again, brought the subject up.  I wanted to use

4   that diagram.  Once the predicate was met by him

5   bringing it in, having it identified as a defense

6   exhibit, and having her talk about what she wrote on

7   there, and how she documented it, I laid the predicate

8   to have it moved into evidence, because I think it is,

9   in fact, relevant to show how the apartment was laid

10  out, how the bed was taken apart, areas where the bed

11  had to be unscrewed, because there are issues about

12  whether the bed was being, in the process of being

13  dismantled.  And I think the Court's gonna hear more

14  testimony about that, that when she went back in on the

15  16th, the bed was in the process of being dismantled,

16  pieces were actually missing from the bed.  And there

17  is going to be -- I believe that's going to also be

18  relevant in state's argument in closing.

19       MR. GROLAND:  Judge, it's not to scale.  It's a

20  diagram that is cumulative in the sense we've got 40

21  photographs of the inside of the apartment.  There's no

22  indication that she took any measurements when she did

23  the diagram.  So it's not necessarily accurate in what

24  it depicts.  It looks to me like a pretty quickly drawn

25  diagram or sketch.  I don't think it should go to the

1    jury.

2         She didn't say how authentic it was or how

3    accurate it was.  The only area of questioning was why

4    that was written on there, and when it was written on

5    there.  And that's all we have on it.  Police reports

6    don't go into evidence.

7         THE COURT:  What about that argument that the

8    police reports do not go into evidence?

9         MS. SINGER:  That's not a police report.  That's a

10   diagram, a sketch done at the time that she entered

11   into the apartment.

12        MR. GROLAND:  Judge, that's got a case number on

13   there.

14        MS. SINGER:  A police report is a dictated summary

15   of investigation.  That is not.  That is a -- Those are

16   two diagrams done at the time:  One, for the bed to

17   show how the bed was dismantled, and what needed to be

18   unscrewed to have the bed immediately taken apart; and

19   the second is a diagram of the apartment showing the

20   floor plan, kitchen area, and I'm not -- I haven't

21   memorized it, but I think there might be a little

22   section where she had the stove, and how the stove and

23   the sink, and here -- I'm not sure what this is.

24        Oh, yeah I think this is a view from, looking

25   down, east, west, north and south.

1      MR. GROLAND:  Your Honor, may I have it in my hand

2   while I tell the Court why I think it's a police

3   report?  I think it's a police report because it's

4   actually an attachment to a police report.  It's got a

5   date; it's got a time of arrival; it's got a time that

6   she cleared; it's got a GPD case number; it's got her

7   I.D. number on there; it's got boxes to check burglary,

8   robbery, homicide; it's got notations on there as to

9   what certain items are.  And there's no way at this

10   point, with this witness having left, to authenticate

11   the accuracy of this addendum, if I may, to a police

12   report.  It is a police report.

13      THE COURT:  All right.  I'm gonna think about that

14   one.

15      Anything else that we need to address?

16      MS. SINGER:  What time do we need to be back?  We

17   have a professional witness outside.  I want to be able

18   to give them good --

19      THE COURT:  We're gonna begin the evidence again

20   at 1:30.  I'll ask you all to be back at 1:30.

21      We'll be in recess until then.

22      MS. SINGER:  Oh, Judge, Judge.  I'm sorry.  There

23   is one other thing.

24      It has come to my attention that Mr. Groland

25   intends to provide Dr. Dickison's testimony that was

Stacey K. Bryant, RPR
Judicial Court Reporter

1    taken yesterday to witnesses in his case.  I know the

2    rule of sequestration has been invoked.  We oppose

3    that, and I don't know what the Court's position, or

4    Mr. Groland's position on that is.  I want to advise

5    the Court that I understand the transcript of the

6    cross-examination, not the direct-examination, has been

7    done realtime, and we oppose any testimony being

8    provided to any witnesses since the rule has been

9    invoked.

10        MR. GROLAND:  May I just have a moment?

11        We're not gonna do anything along those lines

12   unless we decide to readdress the issue with the Court.

13   So it's true that we've had the cross-examination

14   only --

15        MR. TEDDER:  That's all we have.  I was wondering

16   where the direct was.

17        MR. GROLAND:  -- transcribed, and we will abide by

18   the Court's instructions and not provide that to any

19   witness unless we can figure out a legal basis to do

20   that.

21        THE COURT:  A legal basis to do that and

22   permission of the Court ahead of time.

23        MR. GROLAND:  Oh, that's exactly what I mean.

24        THE COURT:  Good enough.  All right.  Anything

25   else that we can possibly address before we recess for

```
 1      lunch?

 2           MS. SINGER:  None from the state, your Honor.

 3           MR. GROLAND:  No, ma'am.

 4           THE COURT:  All right.  Now we're really adjourned

 5      until 1:20.

 6           (Luncheon recess taken.)

 7                          * * * * *

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```