# EXHIBIT

# K

$\partial o 2 \text{-} / \text{-} / 78 /$
$F$

# In the District Court of Appeal

## FIRST DISTRICT

## of Florida

BRIAN PATRICK HERLIHY    }
         Appellant,    }

                      }        CASE NUMBER   2000-2753-CFA

                      }        APPEAL NUMBER 1D02-4788

v.    }

                      }        VOLUME XI

STATE OF FLORIDA    }
         Appellee,    }

Docket CH
05-14-2003
Office Attorney
General

# TRANSCRIPT
# RECORD

## HONORABLE MARTHA ANN LOTT
### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

2003 MAY 12  PM 2:38
ATTORNEY GENERAL'S OFFICE
CRIMINAL APPEALS
TALLAHASSEE
RECEIVED

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

202-1-17814

1                                    IN THE CIRCUIT COURT OF FLORIDA
                                     EIGHTH JUDICIAL CIRCUIT
2                                    IN AND FOR ALACHUA COUNTY

3                                    CASE NO. 01-2000-CF-002753-A

4    THE STATE OF FLORIDA

5    vs.                             Volume XI

6    BRIAN PATRICK HERLIHY,          1002 - 4788

7                 DEFENDANT.

8    _____/

9                                              Dock____ /14

10              TRANSCRIPT ON APPEAL          05. 14. 2003
                PAGES 962 - 1098
11              VOLUME VIII

12

13   PROCEEDINGS:          JURY TRIAL
     BEFORE:               THE HONORABLE MARTHA ANN LOTT,
14                         CIRCUIT JUDGE
     DATE:                 SEPTEMBER 13TH, 2002
15   TIME:                 1:29 P.M.
     PLACE:                COURTROOM 4A
16                         ALACHUA COUNTY COURTHOUSE
                           GAINESVILLE, FLORIDA
17
     APPEARANCES:
18
         JEANNE SINGER, ESQUIRE
19       and
         STEPHEN H. PENNYPACKER, ESQUIRE
20       120 WEST UNIVERSITY AVENUE
         GAINESVILLE, FLORIDA 32601
21       ATTORNEY FOR THE STATE OF FLORIDA

22       GORDON H. GROLAND, ESQUIRE
         and
23       JOHN TEDDER, ESQUIRE
         500 EAST UNIVERSITY AVENUE, SUITES B&C
24       GAINESVILLE, FLORIDA 32601
         ATTORNEY FOR THE DEFENDANT

25

1                    INDEX VOLUME VIII

2                        WITNESSES

3    DR. WILLIAM FRANK HAMILTON

4      Direct Examination by Ms. Singer...............Page   965

5      Cross-Examination by Mr. Tedder...............Page  1003

6      Cross-Examination by Mr. Groland..............Page  1028

7      Redirect Examination by Ms. Singer............Page  1037

8    DR. STEPHEN JOHN NELSON

9      Direct Examination by Mr. Pennypacker..........Page  1049

10     Cross-Examination by Mr. Tedder...............Page  1072

11     Redirect Examination by Mr. Pennypacker........Page  1090

12

13                        EXHIBITS

14   STATE'S EXHIBITS

15   No. 56 - Proof Sheet............................Page   965

16   No. 57 - Autopsy Photo.........................Page   997

17   No. 58 - Autopsy Photo.........................Page   999

18   No. 59 - Autopsy Photo.........................Page  1000

19   No. 60 - Autopsy Photo.........................Page  1000

20   No. 61 - Autopsy Photo.........................Page  1000

21

22

23

24

25

1              P R O C E E D I N G S

2              (Whereupon, the following proceedings were held,

3     the defendant and counsel being present.)

4              THE COURT:  Is the state ready to proceed?

5              MS. SINGER:  We are, Your Honor.

6              THE COURT:  Defense ready to proceed?

7              MR. GROLAND:  Yes, Your Honor.

8              THE COURT:  You can bring the jury back in.

9              (The jury entered the courtroom.)

10             MR. GROLAND:  Can we tell the judge what we just

11      spoke about out in the hall?

12             MS. SINGER:  Yes, but I'd like it on the record, so

13      we need to approach.

14             (A sidebar discussion was held:)

15             MR. GROLAND:   Your Honor, just for the record,

16      we've agreed that John Quirello's grandmother, the first

17      witness in the case, Doris Bridwell, can come into the

18      courtroom during the trial.  We've excused her from the

19      rule.  I don't want to make a big deal, any kind of deal

20      about it in front of the jury.  I'd just like the record

21      to reflect that she's in the courtroom now with our

22      permission and with the Court's approval.

23             THE COURT:  All right.

24             (The sidebar discussion was concluded.)

25             MS. SINGER:  Your Honor, before we call

1        Dr. Hamilton, who will be our next witness, the state at

2        this time moves State's Exhibit F for identification

3        into evidence, pursuant to the Court's order, and make

4        this State's Exhibit 56 in evidence.

5            THE COURT:  It will be so marked.

6            MR. TEDDER:  Objection, Your Honor.

7            THE COURT:  Yes.

8            (State's Exhibit No. 56 was moved and admitted into

9    evidence.)

10            MS. SINGER:  State would call William Hamilton,

11        Dr. William Hamilton.

12            While we're waiting for Dr. Hamilton, if I may

13        approach defense counsel with some photographs that I

14        will be attempting admission.

15            May I proceed, Your Honor?

16            THE COURT:  Go ahead.

17            (The witness was duly sworn by the clerk.)

18            THE CLERK:  You may be seated.

19    WHEREUPON:

20                    DR. WILLIAM HAMILTON,

21    called as a witness herein, having been first duly sworn, was

22    examined and testified as follows:

23                    DIRECT EXAMINATION

24    BY MS. SINGER:

25        Q    Dr. Hamilton, if you would, please state your full

1   name.

2          A     William Frank Hamilton.

3          Q     And your occupation and profession, sir?

4          A     I am a pathologist and the medical examiner of the

5   Eighth District of Florida.

6          Q     You are a pathologist?

7          A     Yes, ma'am.

8          Q     Give us an outline of your undergraduate and

9   graduate education.

10         A     Yes, I went to the University of South Florida as

11  an undergraduate; and then to the University of Miami School

12  of Medicine; and then to the Duke University Medical Center

13  for post-graduate education in anatomic and clinical

14  pathology; and to the office of the chief medical examiner of

15  the State of North Carolina; to the University of North

16  Carolina at Chapel Hill for forensic pathology residency.

17         Q     And after that did you come back to Florida?

18         A     Yes, I came back to Florida after about 15 months

19  in Kentucky and six months in North Carolina.

20         Q     What positions did you hold in North Carolina and

21  Kentucky?

22         A     Well, in Kentucky I was associate chief medical

23  examiner with the state with responsibilities for

24  medical/legal death identification in the eastern half of the

25  state; and in North Carolina I was a regional pathologist

1   with the North Carolina medical examiner system and hospital

2   pathologist in Sheldon, North Carolina.

3       Q    What is a forensic pathologist, if you could give

4   us a thumbnail sketch so the jury understands what your job

5   is, what your duty and role is?

6       A    Pathology is study of disease and injury.  It is a

7   diagnostic specialty in medicine.  Forensic pathology is that

8   branch of pathology that is of special interests to courts,

9   involve all manner of violent and unnatural death and deaths

10  where there is a significant element of public interest.  And

11  what is an element of public interest is defined by the

12  statutes of the various states, and it varies from state to

13  state.  Florida has a very comprehensive law.

14      Q    Does that include the autopsy of children?

15      A    It includes investigations of all violent and

16  unnatural deaths, homicide, suicide, accidents, without

17  regard of the age of the decedent, also deaths that occur

18  suddenly when an individual was thought to be in good health,

19  deaths in which there is probably a public health hazard,

20  deaths in prison and police custody, and several other

21  categories.

22      Q    You said you were the medical examiner for the

23  Eighth District.  What does that encompass?

24      A    The Eighth Medical Examiner District of Florida

25  corresponds exactly with the Eighth Judicial District of

```
1   Florida, and that is the counties of Alachua, Baker, Bradford
2   Gilchrist, Levy and Union.
3       Q   And how long have you been practicing as the
4   medical examiner for the Eighth District?
5       A   Since 1981.
6       Q   So that is over 20 years?
7       A   Yes, ma'am.
8       Q   As medical examiner are you called to testify in
9   criminal cases to render expert opinions regarding injuries
10  that you see upon examination and cause of death in
11  particular cases?
12      A   Yes, ma'am, I am.
13      Q   And have you been tendered as an expert witness in
14  the area of forensic examination and pathology?
15      A   Yes, ma'am.
16      Q   Approximately how many times have you testified as
17  an expert in cases of a criminal nature?
18      A   I'd say an average of once a month for about the
19  last 22 or 23 years.
20      Q   Are you board certified in the area of pathology?
21      A   Yes, I have board certification in anatomic
22  pathology, clinical pathology, and forensic pathology.
23      Q   Is there any other area of pathology other than
24  those three areas?
25      A   Oh, yes, there are several other fields of
```

1 | subspecialization in pathology.

2 |     Q   Have you maintained your accreditation in the areas

3 | in which you have been certified?

4 |     A   Yes.  To this point there has been no requirement

5 | for recertification.

6 |         MS. SINGER:  Your Honor, at this time I'd tender

7 |         William Hamilton, M.D., as an expert in the area of

8 |         forensic pathology.

9 |         MR. TEDDER:  We have no objection to that area,

10 |         Your Honor.

11 |         THE COURT:  Dr. Hamilton, you'll be allowed to give

12 |         opinion testimony in forensic pathology.

13 | BY MS. SINGER:

14 |     Q   Dr. Hamilton, taking you now back to August 10th of

15 | the year 2000, by your earlier testimony, you were in fact

16 | the medical examiner on that day, correct?

17 |     A   That's correct.

18 |     Q   And was your office called upon to perform an

19 | autopsy on a deceased child who was identified to you as

20 | Robert Quirello?

21 |     A   Yes, ma'am.

22 |     Q   What is your routine procedure in preparing for the

23 | performance of an autopsy?

24 |     A   Well, first we have to establish the fact that we

25 | have reason to assume jurisdiction, so the circumstances

1    surrounding death are investigated.  And once we have decided

2    that we do have reason to assume jurisdiction, we do so, and

3    the body is brought in for examination.

4         The examination may be simply an external

5    examination of the body or it may be a full autopsy with

6    examination of the outside of the body and then opening up

7    the body and examining the interior, removing organs,

8    examining them, dissecting them, taking specimens for

9    laboratory testing along the way, preparing tissue for slide

10   examination and the like of the laboratory tests as needed,

11   toxicology, and so forth.

12        And then after all of the information has been

13   gathered from these various pursuits, a final report is

14   generated and cause of death is determined and manner of

15   death, death certificate is issued.

16   Q    Did you, when you received the body of Robbie

17   Quirello, did you determine that both an external examination

18   as well as an internal examination would be necessary to

19   perform your duties as the medical examiner in this case?

20   A    Yes, ma'am.

21   Q    And would you tell the jury how you first -- are

22   you being paged, sir?

23   A    No, I'm just moving the cell phone out of the way.

24   Q    Would you please tell the jury how you would first

25   do the external examination and what information you collect

1   before you go onto the internal examination?

2        A    Well, we examine the body as it is received from

3   where it comes, be it at the hospital, a field, or a

4   residence, or the street.  We examine it looking for signs of

5   injury or signs of therapeutic intervention.  We examine it

6   to see if there's any evidence that needs to be collected.

7   All injuries that are present on the outside of the body

8   would be documented by photographs.  In fact, the lack of

9   injury would be documented by photographs.

10       Q    Did you make an external examination of Robbie

11  Quirello when you began your procedure, your postmortem

12  examination?

13       A    Yes, the first part of the postmortem examination

14  was the examination of the outside of the body of Robbie

15  Quirello.

16       Q    Could you tell us, please, what you found upon

17  performing the external examination?

18       A    Yes, Robbie Quirello appeared to be a well

19  developed and well nourished white male infant, measured

20  26 inches from crown to heel.  Head and chest circumferences

21  were upper limits of normal for the age.  The body was clad

22  in a blue and white sleeper outfit, disposable diaper, and

23  blue socks.  There were hospital identification bands on the

24  right wrist and left ankle.  And there was abundant evidence

25  of therapeutic intervention.

1      Q     For the jury, what do you mean by therapeutic

2  intervention?

3      A     I mean evidence of treatment in the hospital, tubes

4  protruding from the nostrils, intravascular lines, IVs, in

5  the right femoral region or right groin region and on the

6  left wrist, and an arm board was attached to the left

7  forearm.  There are no significant injuries seen on the front

8  or the back of the body.

9      Q     Did you do a very thorough examination of the

10  actual body of this child?

11      A     Yes.

12      Q     And you saw no external injuries other than those

13  that you have indicated are due to therapeutic reasons?

14      A     That's correct.

15      Q     Did you also weigh the baby?

16      A     No, we did not have a weight.  I think that had

17  been recorded in the medical records, but I don't have that

18  here.

19      Q     Did you measure the head circumference of the

20  child?

21      A     Yes.

22      Q     And what was that, sir?

23      A     Seventeen and a quarter inch.

24      Q     Now, after you perform -- would that be the extent

25  of your external examination, what you described for us?  I

1    don't want to interpret you if you have more information.

2         A    I gave you some misinformation there.  I see on my

3    body diagram, I have recorded the body weight.  Body weight

4    16 pounds.  Sorry.

5         Q    And other than what you've discussed, Dr. Hamilton,

6    was there anything else externally that you noted that to you

7    was of significance and needed to be recorded?

8         A    No, ma'am, but we took photographs of the front and

9    the back of the body.

10        Q    Both clothed and unclothed?

11        A    Yes.

12        Q    Once you do your external examination, what's the

13   next step in the postmortem procedure?

14        A    Well, after the outside of the body has been

15   examined, the body is opened and the interior of the body is

16   examined, organs inspected and then removed and examined

17   individually.

18        Q    And did you do that in this case?

19        A    Yes, ma'am.

20        Q    Where would you start?

21        A    Well, in this case, and in most cases, we'll start

22   by examining the trunk, making a surgical incision down the

23   front of the body and opening it up and examining the organs

24   in place, collecting blood and urine for possible

25   toxicological studies or other laboratory studies, as

1    indicated by the individual case, and then removing

2    individual organs and weighing them and examining them,

3    dissecting them, looking for injuries or evidence of natural

4    disease.

5        Q    Did you in fact examine the trunk and body of

6    Robbie Quirello?

7        A    I did.

8        Q    And would you have started at the neck and moved

9    down, is that how you would do it, or do you start in any

10   particular place, or you do the trunk?

11       A    We start on the trunk first and open to examine the

12   chest and abdomen and then extend the upper portion of the

13   incision to examine the neck organ block, which is then

14   removed, the organs of the neck.  And then after those organs

15   have been removed, the head is opened and examined.

16       Q    Could you tell us what if anything you found in the

17   examination of the internal organs from the trunk down?

18       A    Well, the lungs were a little heavy, congested, had

19   excess blood in them.  That's a fairly nonspecific finding

20   with death, particularly with a death that has occurred very

21   suddenly.  When one dies slowly, the heart begins to fail and

22   as a result the lungs fill up with blood, which is backed up

23   because of the failing heart, and they get heavier.

24       Q    Let me ask you a little bit about the lungs then.

25   Other than finding that there was lung congestion consistent

1    with a slow dying process, as opposed to a sudden death, did

2    you find any evidence of any aspirant or foreign matter in

3    the lungs?

4         A    No, I found no evidence of foreign material either

5    in the airways or the tissue reaction one would expect when

6    material is aspirated or breathed into the lungs.  I did not

7    find pneumonia, any evidence of inflammatory response or

8    infection due to material that's sucked into the, into the

9    airway, be that vomited gastric contents or something from

10   the outside.

11        Q    And in making that determination, how thoroughly do

12   you actually examine the lungs?

13        A    Oh, I took quite a few sections.  In this case I

14   took seven blocks of lung tissue.  I examined all of those in

15   both the lungs to make sure that there was nothing there, or

16   if there was something there to find it.

17        Q    And you did not find anything even with the number

18   of sections that you took of Robbie's lungs?

19        A    That's correct.

20        Q    Now, other than the lungs -- do you examine the

21   heart as well at that point, since I know everything is close

22   by?

23        A    Yes.  Yes, I did.  I found no abnormalities in the

24   heart either of an injurious nature or malformation.

25        Q    Now, if the child had suffered from asphyxiation,

1    would you expect to see some evidence on the heart or on the

2    organs surrounding the heart?

3         A    Typically when one dies of asphyxiation acutely,

4    dies rather promptly, one would expect to see small

5    hemorrhages called petechiae on the lungs, on the thymus and

6    on the outside of the heart.  You see the same set of

7    findings with the sudden infant death syndrome.  That's why

8    it's thought that asphyxia is an important part of sudden

9    infant death syndrome because of those compilation of

10   findings.

11        Q    Now, you said it would be the thymus, the lungs,

12   and the heart --

13        A    Lungs, thymus, and the heart.

14        Q    -- the places that you would look at?

15             Did you find petechiae in any of those places,

16   small hemorrhages in any of these places?

17        A    No.

18        Q    Now, just so the jury understands, when you talk

19   about small hemorrhages, could you describe for us what you

20   are looking for, what it looks like?

21        A    Petechiae are very small little spots of

22   hemorrhage, maybe a millimeter in diameter.

23        Q    When you say hemorrhage, you're talking about

24   blood?

25        A    Blood, little spots of bleeding on the surface of

1    the organ.

2         Q     And you saw none of that?

3         A     That's correct.

4         Q     And just to make sure we all understand what

5    asphyxiation is, what would be a common term for the word

6    asphyxiation?

7         A     Asphyxiation is a condition in which there is

8    depravation of either blood or oxygen from to the individual

9    so that the tissues and the organs are deprived of oxygen to

10   carry on the metabolic activities.  There's a number of types

11   of asphyxia.  For instance, smothering is asphyxia;

12   suffocation is asphyxia; hanging is an asphyxial type of

13   death, it cuts off the supply of air.

14        Q     So you found none of that in your examination of

15   Robbie Quirello, nothing in the organs that supported it?

16        A     On the gross examination in the organs, I found no

17   evidence there.  Now, the brain is a different story.

18        Q     The brain, yes, I'm actually moving from the --

19   what you found to be normal to what you found to be abnormal.

20              Was there anything, Doctor, regarding the neck

21   organ or the esophagus that suggested to you that there was

22   an injury or trauma there?

23        A     No, I found no evidence of injury either to the

24   neck organs or the esophagus, either in the neck or down into

25   the thorax.

```
1        Q    Did you find anything abnormal in the stomach or

2   intestinal area?

3        A    No.

4        Q    The liver, anything suspicious in your findings

5   regarding the child's liver?

6        A    No, ma'am.

7        Q    And was there anything in the organs of the chest

8   or in the bottom half of the baby's body, the legs, that

9   suggested to you that there was anything suspicious or that

10  gave you any concern?

11       A    No, ma'am, nor was there any injury to the skeleton

12  that I can determine.

13       Q    Where was the place where you found abnormal -- let

14  me think of how I can put this.

15            Where was it that you, where was it that you

16  examined where your findings were abnormal?

17       A    In the head.

18       Q    Please tell the jury how you would have examined

19  Robbie's head.

20       A    We examined it externally to begin with to see if

21  there was any evidence of impact injury, that is a blow to

22  the head or impact from a moving head striking a surface.

23  We'd look for a tear, laceration that is, or we'd look for a

24  bruise, common term for that is contusion.  Didn't see any of

25  that and didn't see any abrasions to indicate another type of
```

1  blunt force injury.

2          Then the head was opened up.  The inside of the

3  scalp was examined.  Sometimes a small bruise may not appear

4  on the outer surface of the scalp on the skin side but can

5  appear on the inside.  And then skull was examined, the skull

6  cap and the base of the skull were examined.  After the

7  cranium had been moved, we could see the base of the skull.

8      Q    Now, I know this is delicate area for the jurors,

9  and I know it's your business, but we do need to know how you

10 would go about opening the skull before you would attempt

11 examination internally.

12     A    An incision is made in the scalp from behind one

13 ear across the top of the head to behind the other ear.  Then

14 the scalp is reflected back from that incision and forward,

15 exposing the skull.  And then the skull is opened up with a

16 Stryker saw, reciprocating surgical saw.  And the skull cap

17 is removed and we can examine the contents of the cranium.

18     Q    Did you, in fact, examine the entire contents of

19 the cranium or the head?

20     A    Yes.

21     Q    Could you tell the jury what you found upon

22 examination of Robbie's skull, internal parts of his skull?

23     A    After we had taken the skull cap off -- the dura,

24 that is a tough membrane that is over the whole brain, it's

25 called the dura mater, it's a tough fibrous membrane between

1    the skull and the brain itself.  It's attached to the skull,

2    so when you take the cap off, it is still attached there to

3    the skull tap.  On the inner surface of it there was a thin

4    layer of dark red blood, on both sides of the head.  And over

5    the surface of the brain, there were similar collections of

6    blood, both clots, loosely adherent dark red clots, and blood

7    closer to the surface of the brain beneath the thin

8    membranous layer called the arachnoid, pia arachnoid.  That

9    means spidery-like.  It's a very delicate translucent

10   covering, gelatinous looking membranes that lie directly over

11   the brain.  And there was blood in that space and blood above

12   it in the potential space between the outer fibrous membrane,

13   the dura, and then the delicate inner layer, called a

14   subdural hematoma.  And there were two of them, one on the

15   left side and one on the right side.  This membrane, the

16   dura, has a central extension that looks like an udder of the

17   boat that goes down between the hemispheres of the brain.

18   And so these collections of blood were compartmentalized on

19   either side of that.

20        Q    Did you see both subdural hematoma and subarachnoid

21   bleeding?

22        A    Yes.

23        Q    Were you able to age the blood that you saw?

24        A    The blood looked to be very fresh, lightly

25   adherent, so it wasn't a day old, for instance.  It takes a

1    day or two before a fresh bleed into the area will actually

2    stick.  If you examine the body shortly after death and

3    there's a subdural hematoma, as you remove the skull cap, it

4    will literally slide off of the brain.  After a day or two,

5    it becomes sticky, it becomes adherent to the surface of the

6    brain, and it begins to organize.

7         Q    Is that why you called it lightly adherent in your

8    description?

9         A    Yes.

10        Q    Did you see, when you opened up the skull, did you

11   see evidence of any chronic, what would be described as a

12   chronic subdural hematoma?

13        A    I did not.  Now, when bleeding occurs in the

14   subdural space, something has to happen to it.  It's not just

15   going to sit there.  The body reacts to its presence.  And so

16   blood vessels and fibrous tissue begins to grow into it and

17   eventually it's organized, it's completely encapsulated,

18   separating from the surface of the brain, but that takes

19   maybe four weeks to occur.  And there's no evidence of

20   prolonged organization here.

21        Q    There was no evidence in this case of these

22   hematomas that you saw as being chronic?

23        A    Right, that's correct.

24        Q    They appeared to be new to you?

25        A    Yes, ma'am.

1       Q    Right.  Now, the term hygroma has been used in this

2   case.  The jury has heard that term.  Are you familiar the

3   term hydroma?

4       A    Yes, ma'am.

5       Q    What is a hygroma?

6       A    Okay.  A hygroma or hydroma, the terms are

7   equivalent, are collections of cerebral spinal fluid.

8   Cerebral spinal fluid is a watery transparent fluid that

9   surrounds the brain.  It sits in it, sort of floating in it.

10  It's in the subarachnoid space and above it.  And when a tear

11  occurs at an area of the subarachnoid, you can get a

12  localized collection of this fluid forming a mass effect.

13  It's just water but it's completely circumscribed and covered

14  by membranes, so it forms a distinct mass effect.

15          And it's thought that some subdural hydromas,

16  hygromas may be the result of old subdural hematomas that

17  have almost completely disappeared and liquified and somehow

18  make their way in there.  It's not really understood

19  precisely.  Those are the two types that are thought to have

20  occurred.  One is a result usually of trauma due to a tear in

21  the arachnoid, in the localized collection of fluid forming;

22  and the other also usually due to trauma but taking on the

23  end result of an actual bleed into a space rather than a de

24  novo collection of watery fluid there.

25      Q    And as a pathologist, as the medical examiner, how

1    would you be able to identify hygromas when you surgically

2    enter into the brain if it is a watery fluid?

3         A    Right.  Well, the second type that is thought to

4    have occurred from the almost complete resorption of an old

5    subdural hematoma, has membranes around it.  So you can see a

6    collection of membranes kind of collapsed over the surface of

7    the brain with this watery fluid in it.  Now, the other, an

8    acute subdural, or an acute hygroma, is going to be difficult

9    to identify if you cut into it when you're opening and taking

10   the skull cap off --

11        Q    And that is why, sir?

12        A    -- which can happen.

13        Q    What happens?

14        A    It flows out, it disappears, and the membranes that

15   are around it aren't organized enough to be apparent to you

16   when you take the brain out.  You just look at it and it

17   just, here's a brain, and the hygroma has disappeared because

18   you cut into it and it flows out.

19        Q    When you say it's like water, is it like water both

20   in consistency and in appearance?

21        A    Yes.

22        Q    So it's a clear fluid that runs, that has the

23   same --

24        A    That's correct.

25        Q    -- density or nature to it?

1       A     Right.

2       Q     Did you see any evidence of an organized hygroma in

3   your examination of the dura --

4       A     No, I did not.

5       Q     -- postmortem?

6             Did you see any evidence of a chronic injury in

7   this boy's head --

8       A     I did not.

9       Q     -- when you examined the area?

10      A     No, ma'am.

11      Q     Now, what did you do with the brain itself?

12      A     Well, I decided I should send the brain off to a

13  neuropathologist for examination, a forensic

14  neuropathologist.  So I instructed my assistant to package up

15  the brain and the dura and send it down to Dr. Nelson in

16  Bartow.

17      Q     And Dr. Nelson's full name is it Stephen Nelson?

18      A     That's correct.

19      Q     And does he have a subspecialty other than the

20  degree and certifications that you have, does he have a

21  pathological subspecialty?

22      A     Yeah, well, he is certified in anatomic pathology,

23  forensic pathology, and neuropathology.

24      Q     And neuropathology is the study of what?

25      A     Study of disease and injuries of the nervous

1   system, meaning the brain, spinal cord, and peripheral

2   nerves.

3        Q    You intended to package down the entire brain to

4   Dr. Nelson?

5        A    Correct.

6        Q    What happened?

7        A    Well, apparently there was a misunderstanding

8   between my autopsy technician and me and the dura didn't make

9   it down there.  The brain was sent but the dura was not sent

10  to him.

11       Q    Would the dura have been attached to a separate

12  part of the baby's body when you open up the --

13       A    Well, we strip the dura out of the skull

14  specifically to examine the base of the skull, because skull

15  fractures can occur there that you would miss unless you took

16  out this tough membrane.  It's not like the arachnoid, it's

17  not something you can see through.  It's fibrous, it's

18  opaque.  You have to strip it out.

19       Q    And did you see any fractures at the base of the

20  skull --

21       A    No, ma'am.

22       Q    -- when you did your exam?

23            Did you preserve the brain stem?

24       A    Yes, the brain stem and the proximal cervical

25  spinal cord went with the rest of the brain.

1      Q    Did you also examine Robbie's eyes?

2      A    I examined them externally.  I do not have an

3  opthalmoscope so that I could look inside and see what the

4  retinas looked like.  Both of the eyes have to be autopsied.

5  I sent them down to an ophthalmic, a specialist in eye

6  disease, pathologist at the Baskin-Palmer Eye Institute in

7  Miami.

8      Q    And did you receive a report from the Baskin -- is

9  it Bascome Eye Institute?

10     A    Baskin-Palmer.

11     Q    Baskin-Palmer Eye Institute, did you receive a

12  report from them regarding their findings upon examination of

13  the eyes?

14     A    Yes, I did.

15     Q    And what were their findings?

16     A    Retinal hemorrhages with positive iron stain in

17  both eyes, that is there was hemorrhage in the retina of the

18  back of the eye, the layer in the back of the eye, and there

19  was iron stain there.  And that you would expect to be

20  positive 24 to 48 hours after the bleed, because with the

21  breakdown of red blood cells iron pigment is formed there.

22     Q    So that finding is consistent with those retinal

23  hemorrhaging, hemorrhages being --

24         MR. GROLAND:  Objection, Your Honor, this is

25     leading.

1               THE COURT:   Sustained.

2    BY MS. SINGER:

3        Q    All right.  When you said the iron staining

4    indicates something, what does the iron staining indicate?

5        A    It indicates that the hemorrhage has been there at

6    least 24 hours, and probably longer.

7        Q    Do you know from your records when Baby Boy Robbie

8    Quirello was delivered to Shands Teaching Hospital?  If you

9    do not, that's --

10       A    No, I don't have his obstetric records with me.

11       Q    Do you know when he was seen for the injuries upon

12   which -- when he was first seen for the injuries upon which

13   he died?

14       A    He was seen on the 2nd of August, 2000, in the

15   emergency room.

16       Q    Is the positive iron stains -- if the retinal

17   hemorrhages were seen at that time with the positive iron

18   stains, would that at this point in time be consistent with

19   those retinal hemorrhages having been, having occurred on the

20   2nd?

21       A    Yes, they would be.

22       Q    Once you received -- oh, did you receive a report

23   also then after sending the brain and the organs attached to

24   the brain, other than the dura, did you receive a report from

25   Dr. Stephen Nelson?

1      A    Yes, I did.

2      Q    And did you consider that report in rendering your

3  diagnosis as to the cause of death in this case?

4      A    Yes, ma'am, I did.

5      Q    Do you have an opinion, based upon a reasonable

6  degree of medical certainty, on how Robbie sustained the

7  injuries that he had in his brain?

8      A    Yes, I did.

9      Q    And what is your opinion, sir?

10     A    Robbie has traumatic injuries to the brain.  I

11 think they're consistent with being shaken violently.  In

12 other words, I believe he died as a complication of shaken

13 baby syndrome.

14     Q    And what were the specific findings that support

15 that conclusion, Doctor?

16     A    The bilateral cerebral subdural hemorrhages over

17 the upper surface of the brain, the associated subarachnoid

18 hemorrhages, the retinal hemorrhages, and the ischemic

19 changes identified microscopically brain sections, they're

20 all very consistent.

21     Q    Now, you have in your autopsy findings that this

22 child died of anoxic ischemic encephalopathy global?

23     A    Yes.

24     Q    That's a lot of big words for us.  Can you tell us

25 what it means in layman's terms?

1      A      It means that he has changes to the brain which

2  indicate that he wasn't breathing for a while.

3      Q      Now, when one is dying of a brain injury, is there

4  a common pathway that eventually leads to death?

5      A      I guess it depends on the type of brain injury.

6      Q      In this particular case, what was the common

7  pathway that led to his death?

8      A      Well, I think the sequence of events, which is what

9  you're really asking for --

10     Q      Yes, sir.

11     A      -- was that he was shaken, and as a result of

12 that --

13            MR. TEDDER:  Objection, that's for the jury to

14        decide.  Ask to strike.

15            THE COURT:  The objection is sustained.  Rephrase

16        the question.

17 BY MS. SINGER:

18     Q      After the injury has occurred, Doctor, could you

19 explain anatomically what the sequence of events would be,

20 once the brain injury occurred?

21     A      Okay.  The shaking of the brain --

22            MR. TEDDER:  Objection, again, same objection, Your

23        Honor.  Ask to strike.  Ask for curative instruction.

24            THE COURT:  Overruled as to the way this answer is

25        phrased.  Go ahead.

1   BY MS. SINGER:

2       Q    Go ahead, sir.

3       A    When a baby is shaken, injuries occur at several

4   places.  The hemorrhages over the surface of the brain would

5   be the result of the tearing of small bridging veins, they're

6   called, that go from the surface of the brain to the dura,

7   specifically to the central vein across the top of the head

8   or so-called --

9              MR. TEDDER:  Your Honor, may we approach?

10             THE COURT:  Yes.

11             (A sidebar discussion was held:)

12             MR. TEDDER:  Your Honor, I object to him being

13         allowed testify to the theory of shaken baby.  His

14         testimony in his deposition is that the autopsy results

15         do not allow him to make any finding of acceleration or

16         deceleration.  And so he essentially testified at the

17         deposition that he can't say for the sure if the baby is

18         shaken baby.  That's his finding in the end that it died

19         from complications from the shaken baby.  He testified

20         he could not from the autopsy determine whether or not

21         there was deceleration or acceleration.

22             THE COURT:  It doesn't help me rule on your

23         objection since I don't have the deposition.

24             MR. TEDDER:  Right here.

25             MS. SINGER:  I'm not sure what the objection is.

1          MR. TEDDER:  The objection is he's testifying

2     beyond the scope of his expertise.

3          THE COURT:  You're allowed to cross-examine him.

4          MR. TEDDER:  Will you let me see if I can find the

5     portion that I'm talking about here?

6          Your Honor, I'll read it.

7          THE COURT:  No, you're not going to read it.

8     You're going to give it to me.

9          MR. TEDDER:  Line 25, Page 39.

10          THE COURT:  This is an area that you can

11     cross-examine him on.  There's nothing in what you're

12     showing me that would support the objection you're

13     making at this time.

14          MR. TEDDER:  Okay.

15          (The sidebar discussion was concluded.)

16          THE COURT:  The objection is overruled.

17   BY MS. SINGER:

18     Q    Dr. Hamilton, do you need me to restate the

19   question for you to return to the response that you were

20   giving, would that be helpful?

21     A    I think it would be helpful to restate it for the

22   jury.

23          MS. SINGER:  Madam Court Reporter, if you'd go back

24     to the question that was in fact allowed to be admitted

25     and read it back to the witness, I'd appreciate it.

1       Thank you.

2               (The requested portion of testimony was read.)

3    BY MS. SINGER:

4       Q    You may answer the question, Doctor.

5       A    Okay.  The baby is shaken.  A lot of bad things

6    happen.  Some of them happen at the same time, others happen

7    in sequence.  But over a period of time a very bad evolution

8    occurs.  Number one, when the head is shaken, the brain moves

9    around inside of the head.  It's suspended in this fluid,

10   cerebral spinal fluid, it's sitting on the brain stem like a

11   mushroom on a stalk, and it moves around like this

12   (indicating).  And as that happens, the little veins which go

13   from the surface of the brain to the dura, in the center

14   here, will break.  And if they break close to the surface of

15   the brain, you get bleeding of the subarachnoid space.  If

16   they break a little further out, you get bleeding in the

17   subdural space.  Thus you get subarachnoid hemorrhage and

18   subdural hemorrhage due to that one action.

19              Also when you shake the head like that, the base of

20   the brain can be slammed against the base of the skull.  In

21   the front of the skull you have all these rocky ridges, which

22   look like the surface of the moon.  If the brain strikes it,

23   it can get bruises, further impact injury to the base of the

24   brain.

25              In addition, when the head is moving rapidly back

1   and forth, sheering forces are applied to the substance of

2   the brain itself.   These are the really serious problems

3   here, not the subdural, not necessarily the contusions, but

4   the sheering forces applied to the inside of the brain,

5   because they damage the neurons the filaments that the axons,

6   the filaments that go from the neurons in the brain out to

7   the body.   And the nerve fibers that come from the body to

8   the head, sensory, motor, other types of neuro information,

9   can be disrupted when these neuro filaments are injured

10  during this process.   They can be actually sheered or just

11  stretched, but their function is disturbed.   As a result of

12  that, an individual is rendered almost immediately comatose

13  and may stop breathing.   Also --

14      Q    Can that also --

15      A    -- the brain has a very limited way of reacting to

16  injury.   What it usually does, it begins to swell.   So you

17  get swelling of the brain or cerebral edema, which Robbie's

18  brain displayed.

19      Q    At the time you saw Robbie's brain you saw cerebral

20  edema, correct?

21      A    That's correct.

22      Q    That was close to eight days post-injury?

23      A    Yes.   Yes, ma'am.

24      Q    And in a situation where the damage to the neurons

25  occurs and the child or the person is comatose, how soon

1  after the damage to the neurons do you expect to see them in

2  a comatose state?

3      A    You would expect to see it immediately after the

4  shaking, there is no lucid interval.

5      Q    There is no lucid interval?

6      A    Right.  In other words, they aren't conscious and

7  then lose consciousness later on an hour or two later.  They

8  should be immediately unconscious.

9      Q    After the damage is done, immediately thereafter

10 would you see the comatose state?

11     A    Now, this is assuming that a significant degree of

12 force is being applied.  A simple sort of shake might not do

13 that.  It just depends on the amount of force that you apply.

14 But typically the children who present with retinal

15 hemorrhages and subdural hemorrhages and the subarachnoid

16 hemorrhages have sustained enough injury that they are

17 rendered immediately unconscious.

18     Q    Unconscious?

19     A    That's correct.

20     Q    I'm sorry, the acoustics are bad in here.  I'm

21 repeating you and I don't mean to.

22          Am I understanding you correctly in that response

23 by saying that this child did not die because he had acute

24 subdural hematoma?

25     A    No, I think the subdural hemorrhages are a good

1    indicator of the type of force that was applied.  The

2    subdural hemorrhages alone, I don't believe, caused his

3    death.  Subdural hemorrhages are rarely obtained just by

4    themselves but there's always some degree of damage to the

5    brain itself.

6          But there are situations where one can die because

7    of subdural hemorrhage primarily being the cause of death.

8    If you got a large collection of blood in the subdural space,

9    it would press the brain downward, press the brain stem

10   against the floor of the skull.  The brain stem is where the

11   center for respiration -- the area of the brain that tells

12   you, keep breathing.  So when you compress it against the

13   base of the skull, it will stop breathing.

14        Q    And it is your opinion that this child did not die

15   of the subdural hematoma that you saw upon examination of the

16   head in this case?

17        A    No, the clots in the subdural spaces over the right

18   and left sides of head were small, thin and acute.  That is,

19   they were relatively fresh or consistent with an eight day

20   time frame.

21        Q    Dr. Hamilton, I need to show you some photographs

22   and ask if you identify them for me, please.  I'll show you

23   this photograph and ask you if you can identify that for me,

24   please?

25        A    Yes, ma'am, I can.

1    Q    What is that, sir?

2    A    The photograph of the body of Robert Quirello,

3    taken from the front, down on the whole body of the infant.

4    Q    And does that photograph reasonably and accurately

5    depict him when you first examined him back on August the

6    10th performing your postmortem examination?

7    A    Yes, ma'am.

8         MR. TEDDER:  Your Honor, I ask the photograph be

9         kept down by the doctor.

10        THE COURT:  Yes, don't show to the jury at this

11        time.

12   BY MS. SINGER:

13   Q    And, Doctor, on the -- I've got to see it this way.

14   On the right leg up towards the groin area, there is a red

15   mark.  Would you be able to tell the jury what that red mark

16   is?

17   A    Yes, that's where a intravascular line has been.

18   Q    That would be a piece of medical equipment that

19   would have been inserted for the care of the child?

20   A    Right, an intravascular line would be put in there

21   and then fluids inserted into the circulatory system through

22   that line.

23   Q    And you already testified to other interventions

24   that you saw on the child?

25   A    That's correct.

1    Q    There was nothing that you saw on the child,

2    looking that the part of the child, that suggested to you any

3    trauma or abrasions or lacerations?

4    A    That's correct.

5         MS. SINGER:  Your Honor, at this time I would move

6         this photograph into evidence as the next numbered state

7         exhibit.

8         MR. TEDDER:  We would like to see it, and we would

9         object for reasons previously registered.

10        THE COURT:  The objection is noted for the record

11        and is overruled.  It will be admitted as the state's

12        next numbered exhibit.

13        THE CLERK:  Fifty-seven, Your Honor.

14        THE COURT:  Fifty-seven in evidence.

15        (State's Exhibit No. 57 was moved and admitted into

16   evidence.)

17   BY MS. SINGER:

18   Q    Dr. Hamilton, we also have a second photograph I'd

19   like to have you look at.  And if you would examine that

20   photograph and tell me what that photograph shows.

21   A    This is a photograph of Robbie Quirello from the

22   posterior aspect of the body, looking at the back of the body

23   from the above.  It shows the entire body as it appeared at

24   the beginning of my examination.

25   Q    No, sir, in looking at the photograph, first of

1    all, does it fairly and accurately depict Robbie Quirello

2    when you saw him on the 10th?

3        A    Yes, ma'am, it does.

4        Q    There is an obvious red marking throughout the back

5    of the child, except on his buttocks, and it looks to be the

6    center of his back and part of his legs.  Could you explain

7    that redness for the jury?

8        A    Yeah, it's rather a reddish purple discoloration,

9    and that's call lividity or livor mortis.  It's the color of

10   death.  It appears after one has been dead for a while,

11   usually it's evident within an hour or two in a very light

12   skinned individual.  It's fully developed within a few hours.

13       Q    Could you explain --

14       A    It just tells that you the body was laying on its

15   back at the time after death at the time this coloration was

16   formed, and also the areas where it is not evident are areas

17   of contact with the surface in which the body is lying.  That

18   phenomenon is called blanching.  You don't see lividity in

19   areas where there's tight contact between the skin and some

20   surface.

21       Q    Is that the affect of gravity when a person's heart

22   is not pumping anymore, is that how that occurs?

23       A    Yes, it is.  After the person dies and the

24   heartbeat ceases, the blood will just settle, obeying the

25   laws of gravity, downward.

1    Q    Is that evidence at all of any injury to the child?

2  Looking at that photograph, does that suggest to you that the

3  child suffered any injuries in those areas?

4    A    No, ma'am.

5    Q    And did you find any injuries in those areas?

6    A    I did not.

7         MS. SINGER:  At this time I would tender this

8     photograph, Your Honor, as the next numbered exhibit

9     into evidence.

10        MR. TEDDER:  Object again, Your Honor.

11        THE COURT:  Objection noted for the record and

12    overruled.  It will be admitted as State's Number 58 in

13    evidence.

14        (State's Exhibit No. 58 was moved and admitted into

15  evidence.)

16  BY MS. SINGER:

17    Q    Doctor, I'm going to show you three more

18  photographs and ask you if you would look at these three and

19  tell me what they show?

20    A    These are photographs taken after of the head has

21  been opened and the skull cap has been taken off, reflected

22  backwards.  It shows the surface of the brain, the inside of

23  the skull cap, including the dura, that tough membrane we

24  talked about; and it shows the structures from three

25  different views, from above, and then from the right side and

1    from the left side.

2        Q    Do those fairly and accurately depict the brain

3    when you examined this body?

4        A    Yes, ma'am, it did.

5            MS. SINGER:  Your Honor, at this point I'd like to

6        have these marked in evidence as the next numbered

7        exhibits.

8            MR. GROLAND:  Same objection previously raised and

9        addressed.

10           THE COURT:  Noted for the record, overruled.

11           MS. SINGER:  You need to see them?

12           MR. TEDDER:  I'd like to see them, yes, ma'am.

13           MS. SINGER:  If I may have one moment, Your Honor,

14       with Mr. Pennypacker.

15           THE COURT:  Yes, these photographs are admitted

16       into evidence.

17           THE CLERK:  Do you want them marked as a composite?

18           MS. SINGER:  No, sir, I'd like them marked

19       separately.

20           THE CLERK:  They will be 59, 60 and 61.

21           THE COURT:  Thank you.

22           (State's Exhibit Nos. 59, 60, and 61 were moved and

23   admitted into evidence.)

24           MS. SINGER:  Your Honor, I'd like to ask permission

25       to publish State's Exhibit 57 and 58 to the jury at this

1   time.  The remainder of the photographs I will leave

2   with the clerk for the jury at the time of deliberation.

3        THE COURT:  Go ahead.

4        (State's Exhibit Nos 57 and 58 were published to

5   the jury.)

6        MS. SINGER:  Your Honor, I would tender

7   Dr. Hamilton for cross-examination at this time.

8        THE COURT:  All right.  Mr. Tedder.

9        MR. TEDDER:  Yes, sir -- yes, ma'am.

10       THE COURT:  Mr. Tedder, if your cross is going to

11   be lengthy and you'd rather take a recess before we

12   begin it, that might be more comfortable for the jury as

13   well.

14       MR. TEDDER:  Yes, ma'am, that's fine.

15       THE COURT:  Okay.  Good enough.  We'll take a 15

16   minute recess.

17       MR. TEDDER:  Your Honor, can we caution the jury

18   again about discussing the case just briefly.

19       THE COURT:  Ladies and gentlemen, do not discuss

20   the case or the evidence until you begin your

21   deliberations.

22       Step back into the jury room and we'll see if we

23   can have any of you that would like, an escort

24   downstairs for a few minutes.

25       (The jury exited the courtroom.)

1    MS. SINGER:  Yes, we have, after this witness --

2    it's now 2:30.  I believe that this will be a lengthy

3    cross-examination, or suspect it will be, because this

4    is an important witness.  I'm not speaking for you,

5    Mr. Tedder.  We also have Dr. Stephen Nelson, who is the

6    neuropathologist.  We know our direct is going to be

7    lengthy and we suspect his cross will be lengthy.  We

8    have two physicians at Shands waiting standby after

9    Dr. Nelson's testimony and we would like, knowing that

10    will take us close to 5:30, we'd like to know whether we

11    can just tell those folks we'll see them next week and

12    let them go about their clinical work.

13    THE COURT:  Yes.  The answer is yes.

14    MS. SINGER:  We'll finish after Dr. Nelson tonight.

15    THE COURT:  Yes, I think that's a reasonable

16    estimate of time.  We're in recess for 15 minutes.

17    Please secure the courtroom.

18    (A recess was taken.)

19    MS. SINGER:  The witness needs to be called back,

20    Your Honor.  I'll have Ms. Richard go and get him.

21    (Pause in the proceedings.)

22    THE COURT:  Ready, Dr. Hamilton?

23    THE WITNESS:  Pardon?

24    THE COURT:  Are you ready?

25    THE WITNESS:  Yes.

```
 1              THE COURT:  State ready?

 2              MR. PENNYPACKER:  Yes, ma'am.

 3              THE COURT:  Defense ready?

 4              MR. GROLAND:  Yes, ma'am.

 5              THE COURT:  Go ahead and bring the jury back in.

 6         Mr. Tedder, you can go ahead.

 7              (The jury entered the courtroom.)

 8              MR. GROLAND:  Can we approach one second for an

 9         informal question?

10              (A sidebar discussion was held off the record and

11    without the court reporter.)

12              THE COURT:  Mr. Tedder, go ahead.

13              MR. TEDDER:  Yes, ma'am.  May it please the Court,

14         ladies and gentlemen of the jury.

15                        CROSS-EXAMINATION

16    BY MR. TEDDER:

17         Q    Good afternoon, Dr. Hamilton.

18         A    Good afternoon, Mr. Tedder.

19         Q    Dr. Hamilton, you're a forensic pathologist?

20         A    That's correct.

21         Q    And you've done this for over 20 years?

22         A    That's correct.

23         Q    And so you're well aware of how important your job

24    is in the legal community, are you not?

25         A    Yes, sir.
```

1    Q     In fact, our case such as this -- scratch that.

2          You just know that your findings are extremely

3    important and they have to be accurate; isn't that true?

4    A     That's correct.

5    Q     So as part of being a forensic pathologist, you

6    strive to be as accurate and complete as possible on every

7    single autopsy you perform; isn't that true?

8    A     That's correct.

9    Q     You certainly failed in that regard, did you not?

10   A     Would you explain?

11   Q     Well, sir, for starters, you've testified that the

12   dura mater in a shaken baby theory case contains bridging

13   veins; is that true?

14   A     The bridging veins go from the dura to the surface

15   of the brain.

16   Q     And, in fact, your testimony has been that the

17   theory of shaken baby relies on bridging veins being torn;

18   isn't that true?

19   A     That's part of it.  That's not all of it.  That

20   just explains the dural hemorrhage.

21   Q     The dura is extremely important in a case like

22   this; isn't it?

23   A     Yes, it is.

24   Q     In fact, you're the only person in this case that's

25   seen the dura; isn't that true?

1    A    Well, my technician has seen it too, but no one

2  else has, you're correct.

3    Q    In fact, it was your intention to send the dura off

4  to Dr. Nelson to be examined microscopically; isn't that

5  correct?

6    A    Send it off to him to examine grossly and if he

7  wished to, microscopically.

8    Q    And, in fact, you didn't take any photographs of

9  the dura that remained on the cap of the skull, did you?

10   A    I think we have photographs that show the dura.  As

11  a matter of fact, they've already been entered into evidence.

12  And I'm sure Dr. Nelson will be showing that to the jury.

13   Q    The photographs that have been admitted -- you have

14  testified previously the skull cap was removed, correct?

15   A    That's correct.

16   Q    And that the dura remains attached to the skull

17  cap, correct?

18   A    That's correct.

19   Q    And no photographs were taken of the skull cap;

20  isn't that true?

21   A    No.  Where have you been during this trial?  These

22  photographs were entered here.  I discussed them.

23        MR. GROLAND:  Your Honor, I would object to that

24     remark and ask that it be stricken from the record.

25        THE COURT:  Overruled.  Go ahead.

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1   BY MR. TEDDER:

2       Q    So you're saying those photographs that were

3   admitted are photographs of the skull cap with the brain

4   inside the skull cap?

5       A    Yes, and the dura.  That's clearly depicted in the

6   photographs.

7       Q    So then your technician removed the brain from the

8   skull cap and sent the brain alone to Dr. Nelson; is that

9   what happened?

10      A    No, sir.  You've got it wrong again.  I removed the

11  brain and my technician peeled the dura, the membrane, out of

12  the skull cap and out of the base of the skull.

13      Q    And failed to send it to Dr. Nelson?

14      A    That's correct, sir.

15      Q    So bottom line is the dura never was sent to

16  Dr. Nelson; is that correct?

17      A    No, sir.  I think I've already said this to the

18  jury before.

19      Q    The dura was sent to Dr. Nelson?

20      A    I already said that it was not sent.

21      Q    That's a major mistake, wouldn't you agree?

22      A    It is certainly an occurrence I would not like to

23  happen again, sir.  And, in fact, I was not aware that it had

24  happened until I talked to Dr. Nelson later on.  I was of the

25  opinion that it had been sent with the brain, because those

1    were my instructions.

2        Q    So you agree then that was a major mistake on your

3    part?

4        A    I agree it was a mistake.  I don't think it was

5    major.  It was a fresh subdural.  Microscopically it wasn't

6    going to show anything.

7        Q    It's your testimony when you peeled back the skull

8    cap the clot separated; is that correct?

9        A    Yes, loosely adherent.

10       Q    Part of it remained attached to -- so you're saying

11   those photographs that have been introduced into evidence are

12   photographs from the bottom of the brain looking up; is that

13   correct?

14       A    No, down at the top of the brain.  They also show

15   the inside of the dura.

16       Q    When those photographs were taken, the skull cap is

17   in those photographs?

18       A    Yes.

19       Q    But you're looking down on top of the brain, like

20   down, the picture is from up here?

21       A    You can see the brain and you can see the dura.

22   Especially in the photograph showing the top of the brain,

23   you also see the inside of dura, because it's been reflected

24   back and you can see right inside of it.

25       Q    Can I see -- well.

1       Now, would you be surprised to know that Dr. Nelson

2   also would have liked to have seen other parts of this baby's

3   body for his examination?

4       A    What other parts would he like to have seen, sir?

5       Q    Are you aware that he would have liked to see the

6   pituitary gland, the pineal gland, the spinal cord, and the

7   eyes, are you aware of that?

8       A    I sent the eyes to Miami, so they were examined by

9   an ophthalmic pathologist.

10      Q    Correct, sir.

11      A    And if he needed to get them, the could have gotten

12  recuts of the slides.  All he had to do was ask.  I cut about

13  as far as down into the cervical canal as I could and got the

14  proximal portion of the spinal cord.  The spine itself was

15  intact.  I did examine the head.  When you have a broken

16  neck, the head is floppy upon the neck.

17      Q    You didn't send him the spinal cord; is that

18  correct?

19      A    There is a proximal portion of the spinal cord

20  attached to the brain stem, yes.

21      Q    The brain stem, correct, but as far as further down

22  the spinal cord, you did not --

23      A    I didn't send him the lower cervical cord or

24  thoracic cord or the lumbar cord, that's correct.  The spine

25  was intact, not injured.

1      Q    You didn't send him anything from the neck area;

2  isn't that true, yes or no?

3      A    The proximal part of the spinal cord is from the

4  neck area, and I've already said I sent it.

5      Q    That's it?

6      A    It's attached -- that's correct.

7      Q    And Dr. Nelson microscopically examined what you

8  sent him?

9      A    That's correct.

10     Q    Found no evidence of damage to the neck, isn't that

11  correct, is what you sent him?

12     A    He didn't see the whole neck.  He just saw the

13  proximal part of the spinal cord.  I examined the neck and I

14  found no injury to the neck.

15     Q    Would it surprise you that Dr. Nelson thinks it's

16  important to examine parts of a neck, especially in a case

17  for validation of the theory of shaken baby?

18     A    Yes.  And I examined the neck, I didn't find any

19  injury in the neck.

20     Q    You examined that grossly, just by looking with

21  your eyeball, correct?

22     A    Yes, by opening it up, examining the section, and

23  then taking microscopic slides and looking at them.

24     Q    You didn't look at any, you didn't do any

25  microscopic examination of the neck?

1    A    Yes, I did.  I got the neck organ block.

2    Q    You cut up the neck, took part of it

3 microscopically?

4    A    I took the neck organ block, which this area in

5 here (indicating), which is where you would find injuries if

6 someone had been strangled.

7    Q    You saw no evidence of injury to the neck?

8    A    That's correct.  I also saw no evidence on the skin

9 either that any pressure had been applied to the neck.

10    Q    So you agree there was absolutely no evidence of

11 any injury to the outside of this baby's body, other than

12 therapeutic?

13    A    That's correct.

14    Q    Isn't it true you also incorrectly informed

15 Dr. Nelson that the brain weighed 1,826 grams?

16    A    That was a typographical error.  And you'll see in

17 the --

18    Q    It was corrected by Dr. Nelson, correct?

19    A    No, it was corrected by me.  My autopsy report says

20 826 grams.  I got a copy of that, I believe.  And on the

21 diagram where it gives organ weights, it's 826.  So if

22 someone said 1826, that was a mistake.  I'm not sure what

23 protocol he's talking about, because I don't see anything in

24 my records that says 1826.

25    Q    All right.  You received two letters from

1   Dr. Nelson, did you not?

2         A    Yes, and one of them says 1826.

3         Q    Dated September 18th, 2000?

4         A    Uh-huh.

5         Q    He put in there, I noted in the protocol which you

6   included for me that the brain weight at autopsy was listed

7   at 1826 grams?

8         A    Well, that puzzles me, because I have that -- I

9   have the autopsy report, it says 826.

10        Q    Your final report says 826.  I agree with that.

11        A    Oh, okay.  The preliminary thing that you got may

12  have had a typographical error in it.  That was corrected.

13        Q    That was -- now, isn't it true that one of your

14  assistants actually did the incision for the removal of the

15  skull cap?

16        A    Yes, used the Stryker saw to cut the skull cap off.

17        Q    And you did not supervise that, someone else did it

18  for you?

19        A    That's routine, yes, sir.

20        Q    Now, you're aware before that was done that there

21  were CAT scans done on this baby when he was in the hospital?

22        A    That's correct.

23        Q    And you were aware that those CAT scans were viewed

24  or revealed evidence of multi-generational subdural

25  hematomas?

1       A       That's what they said.

2       Q       And you reviewed those CAT scans prior to the skull

3    cap being removed?

4       A       No, I didn't have the scan themselves.   I had the

5    reports.   If I had had the scans, I wouldn't know what I'm

6    looking at; I'm not a radiologist.

7       Q       You were provided those CAT scans about month or so

8    ago by the state attorney's office, right?

9       A       Yes, I was.

10      Q       But you didn't look at them, right?

11      A       That's correct, because I saw the brain.

12      Q       Now, you -- isn't it true that no specific

13   directions were given to the person who removed the skull cap

14   in order to try to avoid doing any damage to the evidence of

15   the pre-existing chronic subdural hematomas; isn't that true?

16      A       The method he used and the incision he made would

17   not have disturbed the chronic subdural hematoma.

18      Q       Isn't it true that if the incision was improperly

19   made, that evidence that was there could be destroyed; isn't

20   that true?

21      A       That's correct but the incision was properly made

22   to accomplish the task at hand.

23      Q       But not by you?

24      A       That's correct.

25      Q       It was done by someone else?

1    A    That's right.  And he's done, by now, about a

2  thousand of these.

3    Q    But no effort was made to tell that person where

4  this evidence of chronic multi-generational subdural

5  hematomas may have been in the brain, no one told that

6  person?

7    A    I didn't tell him to do anything different in this

8  case because there was no indication to.

9    Q    You knew that there was evidence from the CAT scan

10  and from everything you'd received from the hospital --

11    A    The incisions he made in the place he made them

12  would not have disturbed the subdural hematoma.

13    Q    That's your opinion.  Okay.  Do you agree if the

14  incision was made in the wrong place that it could destroy

15  the evidence?

16    A    It's not likely to.  It's likely to make an

17  incision into it, but you don't destroy a subdural of

18  significant size by running a Stryker saw and creating a thin

19  slice through it.  That wouldn't destroy it.

20    Q    But you can destroy a hydroma by doing that,

21  correct?

22    A    You could destroy a hydroma easily.

23    Q    You've testified, I believe, that hydromas can be

24  the final result of a subdural hematoma?

25    A    They can be.  But in those cases they're well

1  encapsulated and they're really easy to diagnose.  You won't

2  destroy that.

3      Q    So if those existed, they would have been on the

4  dura, which was buried with the baby, correct?

5      A    Yes, but they weren't.

6      Q    Now, in fact, someone from here in Gainesville

7  prepared the slides that Dr. Nelson reviewed; isn't that

8  true?

9      A    Yes, I reviewed my records and found that that's

10  what happened.  He sent the blocks back after he took them,

11  processed in our laboratory and sent to him.

12      Q    Isn't it true that no cerebral cortical contusions

13  were observed grossly?

14      A    I didn't see any because there were, there was the

15  subarachnoid hemorrhage and the subdural hemorrhage covering

16  the brain.  I did not dissect the brain.  I sent it to a

17  neuropathologist for a specialist examination.

18      Q    He was only able to discover that through

19  microscopic examination; isn't that true?

20      A    I don't know.  You'll have to ask him.

21      Q    You make no mention in your original examination of

22  observing any subarachnoid bleeding; isn't that correct?

23      A    That's correct.

24      Q    You only mention it in your conclusion because the

25  information you received from Dr. Nelson; isn't that true?

1    A    No, actually I looked at the photographs and saw

2    them there.  They weren't mentioned initially but they

3    certainly were recorded initially in the photographs.

4    Q    Well, Dr. Hamilton, this case, it's over two years

5    old.  You've done, no doubt, hundreds if not thousands of

6    autopsies since then, correct?

7    A    I do about 250 to 300 autopsies a year.

8    Q    And the fact of the matter is, you've already

9    testified when you do your examinations and you do your

10   reports, you try to be as accurate and complete as you

11   possibly can be, correct?

12   A    That's correct.

13   Q    And in the postmortem examination of the body of

14   Robert Quirello, which you prepared in this case, you make

15   absolutely no mention whatsoever of the subarachnoid

16   hemorrhages you are now testifying about in open court; isn't

17   that true?

18   A    Actually, it's in the list of autopsy findings.

19   Q    I understand that, sir.  And that was the list of

20   autopsy findings that also included other information you

21   received from Dr. Nelson and Dr. Bell; isn't that true?

22   A    That's true.

23   Q    However, in the initial examination that you

24   yourself did, you made no notation whatsoever of any

25   observations of subarachnoid hemorrhaging; isn't that true?

1       A       That's true.  It's an oversight.

2       Q       Now, insofar as the autopsy findings which you

3   made, you indicated this baby had an immature human brain

4   with bilateral cerebral subdural hematoma and subarachnoid

5   hemorrhage?

6       A       That's correct.

7       Q       You did not mention there whether or not the

8   subdural hematoma was either chronic or acute, did you?

9       A       No.

10      Q       You knew that was a critical issue in this case; is

11  that not true?

12      A       Actually, I didn't think it was a critical issue in

13  this case because it looked to be a fairly classic example of

14  shaken baby syndrome.  By definition a clot is acute.   I

15  didn't think it was necessary to mention chronicity because I

16  wasn't even considering chronicity.

17      Q       Well, isn't it true -- I mean, if it's such a

18  simple open and shut case, then there's really no need for

19  you to send this stuff off to Dr. Nelson to look at it, is

20  there?

21      A       He's a neuropathologist and in case there were any

22  other developmental abnormalities or evidence of previous

23  injury, I wanted to know.

24      Q       So it was important enough that you needed a second

25  opinion, correct?

1   A   Oh, absolutely.

2   Q   And we need a third opinion from Dr. Bell looking

3   at the eyes microscopically, correct?

4   A   That's correct.

5   Q   And you're aware, are you not, that Dr. Bell found

6   out when he examined the eyes, there was evidence of older

7   bleeding?

8   A   That's not correct.

9   Q   You're not aware of that?

10   A   No, I don't see any evidence of that.  He says iron

11   stain but iron can be found within a day or so of a bleed.

12   Q   Or as old as three or four months; isn't that true?

13   A   That's absolutely true.  But I would expect to see

14   it in a retinal hemorrhage that had occurred a week or so

15   before death and before the eye was examined.

16   Q   You just testified that it is absolutely true that

17   it can be as old as three our four months, correct?

18   A   It could be older than that.  Once the iron pigment

19   is formed there, it can stay there for a long time.

20   Q   No way to know, right?

21   A   That's true.

22   Q   Isn't it true that subarachnoid bleeding is common

23   where there's subdural bleeding?

24   A   Yes, they're usually found together.  Sometimes the

25   subarachnoid is just covered by the dural hemorrhage.

1    Q    And isn't it also true that chronic subdural

2  hematomas can spontaneously rebleed?

3    A    Yes, they can.

4    Q    Isn't it true that blood on the brain is an

5  irritant?

6    A    Absolutely.

7    Q    And that if the blood, if there is bleeding on the

8  brain, that irritation can cause the person whose brain is

9  receiving blood on it to go into a seizure; isn't that true?

10   A    That's correct.

11   Q    Isn't it true that if a person has a seizure, that

12 can cause them to stop breathing?

13   A    That's true.

14   Q    Now, isn't it also true that your pathway, you said

15 that led to death, came primarily from the fact that oxygen

16 was deprived to this child's brain for one reason or another,

17 correct?

18   A    That's true.

19   Q    And you testified earlier that if there was

20 bleeding on the brain, that it forced the brain down to put

21 pressure on the -- I have a brain block on that one

22 term -- on this brain stem which controls breathing, correct?

23   A    That's correct.

24   Q    The fact was that microscopic examination of the

25 brain stem showed no damage to the brain stem; isn't that

1    true?

2         A    That's true.

3         Q    We can rule that out, can't we, categorically?

4         A    Yes, we can rule out affect of subdural hemorrhage

5    causing downward shifting of the brain and compression of the

6    brain stem.

7         Q    So we can rule out any possibility that that cause

8    of the brain being deprived of oxygen did not occur?

9              The brain was deprived of oxygen, you agree with

10   that, correct?

11        A    State that again.

12        Q    The brain was deprived of oxygen, correct?

13        A    Yes.

14        Q    Which caused the serious events that ended with

15   this baby passing away?

16        A    No, it was just part of the events.

17        Q    Part of the events?

18        A    Part of the events.

19        Q    And we can rule out --

20        A    It's not just the oxygen depravation, it's also

21   axonal injury, which led to the brain stem malfunction.

22        Q    Sir, isn't it true there was no evidence of diffuse

23   axonal injury in this baby?

24        A    After eight days, the brain that's been severely

25   damaged is going to have a lot of autolytic changes.  So I

1   wouldn't be at all surprised if we didn't find any

2   microscopic axon changes.  And I don't think Dr. Nelson would

3   be surprised either.

4        Q    So your answer is yes, there was no evidence of

5   diffuse axonal injury?

6        A    I think there was plenty of clinical evidence and

7   there was certainly morphologic evidence of the subdural,

8   combination of subdurals and retinal hemorrhage and brain

9   swelling.

10       Q    Well, sir, would you agree that there are

11  basically -- I'm sure there are probably more than this, so

12  I'm sure you may not agree.  But there are at least three

13  forms of brain injury that we can talk about, namely a

14  concussion, a subdural hematoma, and diffuse axonal injury,

15  would agree all three of those are a form of brain injury?

16       A    Yes.

17       Q    And most the serious of those would be diffuse

18  axonal injury; is that correct?

19       A    Usually a subdural by itself, particularly a

20  chronic subdural, can cause death without much input from the

21  other two.

22       Q    And concussion less -- the least serious of the

23  three, do you agree?

24       A    What a concussion is is a matter of some

25  controversy.  Some event, acute event occurs to cause a total

1    malfunction of the brain but you don't see any evidence of

2    it.  You postulate it having occurred.  For instance, by

3    close proximity of a soldier to an arillary shell which went

4    off near him but did not actually touch his body, would be

5    found dead and it is presumed that the concussive affects of

6    that explosion, whatever that is, caused his heart to stop

7    and him to stop breathing and die.

8         Q    So you agree then that some areas of medicine are

9    in dispute?

10        A    I think all areas of medicine are in dispute, sir.

11        Q    Including the theory of shaken baby syndrome; isn't

12   that true?

13        A    Yes, sir, it is.  Some people do not believe it

14   exists.  Some people believe that what we call shaken baby

15   syndrome is really due to blunt impact injury to the head.

16        Q    Which makes a lot more sense when you think about

17   it, doesn't it, Doctor?

18        A    It makes a lot of sense to some people.

19        Q    Well, you believe that the laws of physics apply to

20   human beings, do you not?

21        A    I certainly do.

22        Q    And so you would agree that I could break a baby's

23   arm, would you not agree with that?

24        A    Yes, sir.

25        Q    So when Dr. Dickinson testified yesterday that it

1   would be difficult for me to break a baby's arm, she was out

2   to lunch, wasn't she?

3            Well, your laughing kind of answers the question,

4   Doctor.

5            Would you agree that the human body, that different

6   body parts have an injury threshold, in other words, a

7   certain threshold of force must be applied before injury is

8   going to occur?

9       A    Yes.

10      Q    And that that threshold varies from person to

11  person, correct?

12      A    That may be correct.

13      Q    To a certain extent?

14      A    To a limited extent, yes.

15      Q    And certainly varies from tissue to tissue, that

16  being brain tissue, bone tissue, skin tissue, whatever,

17  correct?

18      A    That's correct.

19      Q    Now, are you aware of studies that have been done

20  in the past to try and determine injury thresholds and the

21  force that's required to cause injury to the brain?

22      A    I'm aware of that studies have been done in the

23  remote past.  I'm not aware of any recent studies.

24      Q    Were you aware of a study that was done by a

25  Dr. Duhaime in 1986?

1    A    Yes, I've heard of this study.

2    Q    And are you aware that as part of that study they

3  tried to determine, or they figured out how much force was

4  needed to cause a concussion, are you aware of that?

5    A    I'm not sure how they define concussion.

6    Q    Were you aware that they tried to determine how

7  much force was needed to cause a subdural hematoma?

8    A    I'm not at this point really familiar with all of

9  the details of the article.  I've not read the article in

10  recent years, that's for certain.

11    Q    There's an article published in the Journal of

12  Neurosurgery back in 1987.  Would it surprise you, sir, to

13  learn that their study found that there's no way a person can

14  inflict the kind of force on a baby to create the kind of

15  injury, to create the kind of force that would be needed to

16  cause an injury such as a concussion, a subdural hematoma, or

17  diffuse axonal injury?

18    A    You mean shaking cannot produce any of these injury

19  patterns, is that what you're saying?

20    Q    They said that shaking alone could not create the

21  force that was needed to cause either a concussion, a

22  subdural hematoma, or diffuse axonal injury, that something

23  else was needed?

24    A    Well, that may be their conclusion, but I don't

25  agree with that and I think most pathologists don't agree

```
 1   with that.  Certainly most pediatricians don't agree with
 2   that.
 3       Q    Well, would you agree, sir, that someone who
 4   studies neurosurgery or neurology knows a lot more about the
 5   brain than a pediatrician, do you agree or disagree with
 6   that?
 7       A    I know, I know that someone who is a specialist in
 8   neurology or neurosurgery knows how to treat those disorders
 9   better, but I would not agree that pediatricians don't know
10   anything about neurological disorders.
11       Q    I didn't say that, sir.  I said that a neurosurgeon
12   or neurologist would know a great deal more about the brain
13   and nervous system of a human being than a pediatrician would
14   know?
15       A    I think overall in knowledge of the nervous system
16   in toto, I think that would be correct.  I think a
17   neurosurgeon would know how to do surgery on the brain better
18   than the pediatrician.
19       Q    So you were not aware then that Dr. Duhaime's
20   report found that basically in order to create the kind of
21   force needed to cause a concussion, subdural hematoma, or
22   diffuse axonal injury to the brain, required blunt impact
23   such as slamming somebody's head against the floor or against
24   a wall or against another hard object, are you aware of that?
25       A    I think I had heard that years ago.  It's been a
```

1    long time since I've seen that article.  And in which case if

2    he is correct, then everything we call shaken baby is merely

3    homicidal blunt impact of the head.

4        Q    Now, I believe you've already testified that you've

5    thoroughly examined this baby's body, correct, grossly, just

6    looking at the outside of the baby's body?

7        A    Yes, I looked at all surfaces on the body.

8        Q    And you carefully looked for any injuries other

9    than therapeutic injuries to this child?

10       A    That's true.

11       Q    You saw no evidence of that whatsoever, correct?

12       A    I don't recall seeing anything significant.

13       Q    If you had, such as a broken bone in the head or

14   broken bone elsewhere, you would have included that in your

15   report, wouldn't you?

16       A    Yes, sir, I would have.

17       Q    And you indicated that you looked at the scalp and

18   noticed that there were no lacerations or contusions or

19   bruising on the baby's scalp, correct?

20       A    That's correct.

21       Q    That means, a contusion is a cut or a scrape?

22       A    A contusion is a bruise.

23       Q    A bruise.  So you put contusions and bruises, put

24   it twice then?

25       A    Sometimes I do so because I know that the reports

1    are not read just by doctors.

2        Q    That's right.

3        A    Everybody knows what a bruise is, not everybody

4    knows what contusion is.  Everyone knows what a scrape is,

5    not everybody knows what an abrasion is.

6        Q    All right.  But you didn't include that there were

7    no abrasions on here, or did you?

8        A    There were none.

9        Q    So that was something you --

10       A    That's not an oversight.

11       Q    But you testified earlier there was no abrasions,

12   correct?

13       A    That's correct.

14       Q    But you didn't include it in your initial

15   postmortem examination; is that correct?

16       A    That's true.  And years ago I was told a story of

17   an important official in Egypt whose autopsy report was 1,000

18   pages long because the pathologist felt obliged to put in

19   everything he didn't see.  I don't do that.

20       Q    You do put in everything you see, such as the

21   subarachnoid hemorrhaging that you saw, you forgot to put

22   that --

23       A    I try to put in everything that I see.  I am human

24   and on occasion I may leave something out on that, but I

25   think we can see that it's well documented in the

1  photographs.

2      Q    Dr. Hamilton, certainly no one is going to accuse

3  you of doing an overextensive autopsy protocol.  I mean, this

4  was one and three-quarters pages long.

5      A    Actually, if you'll look at the report of the

6  investigation, the top part of that is observations from the

7  external examination of the body.  Why should I pad the

8  report by saying he was circumcised or has blue eyes with

9  three millimeter pupils, when I can put it in this page here.

10  And you'll also see that it is two pages long, with a half

11  page of findings and supplemented by two pages of the

12  neuropathology report and -- actually one, two, three, four

13  pages of neuropathology report, and two pages of the

14  ophthalmic report.  These are all part of the autopsy.  The

15  fact that I chose consultants doesn't mean I don't know what

16  I'm doing.

17      Q    All right.  So you're including as part of your

18  autopsy report, the two, three page letters which Dr. Nelson

19  wrote to you, correct?

20      A    And the ophthalmic pathology report.

21      Q    As well as what Dr. Bell wrote?

22      A    Right, it's all part of the autopsy, sir.

23          MR. TEDDER:  Good.  Good.  Could I have just a

24      moment, please, to review my notes?

25          THE COURT:  Yes.

1          (Pause in the proceedings.)

2          MR. GROLAND:  May it please the Court.

3          MS. SINGER:  Your Honor, I'd like to come to

4     sidebar.

5          THE COURT:  I don't think this needs to be on the

6     record.

7          (A sidebar discussion was held off the record and

8     without the court reporter.)

9          THE COURT:  Go ahead, Mr. Groland.

10         MR. GROLAND:  Thank you.

11                        CROSS-EXAMINATION

12    BY MR. GROLAND:

13      Q    Dr. Hamilton, this autopsy report that Mr. Tedder

14    was just waving around, that's got four or five pages, that

15    we just talked about?

16      A    Yes.

17      Q    Actually, the only thing that specifically

18    addresses this case, that's relevant to this case, is this

19    one little paragraph right in the middle of page one that

20    addresses your examination and findings as it relates to the

21    brain; isn't that correct?

22      A    That's correct.  I do not feel compelled to

23    generate an extensive report here since I was sending the

24    brain off to be examined.

25      Q    Thank you.  Have you ever been accused of a

1   misdiagnosis involving a brain issue?

2        A    Yes, I have.

3        Q    In fact, there is some litigation ongoing right

4   now, is there not?

5        A    Yes, there is.

6        Q    Now, in this particular case you were given

7   information before you did the autopsy on August 10th from

8   the police as to what they believed this case was all about,

9   true?

10       A    That's true.

11       Q    And that information I don't think was given

12  directly to you, it was given to your assistant, Pete Zeller,

13  who communicated it to you?

14       A    Mr. Zeller got the initial information, yes, sir,

15  he conveyed that to me.

16       Q    You didn't talk to the police yourself?

17       A    Not initially, no.

18       Q    When did you talk to the police in this case?

19       A    I can't really tell you.  I don't know what,

20  exactly what date I talked to the police officer.

21       Q    Who did you talk to?

22       A    I don't have it recorded, discussions with the

23  police officer.

24       Q    The reports that Mr. Tedder asked you about, you

25  indicated you did read those reports?

1    A    Yes.

2    Q    Those two radiologist reports that you have in your

3    file, one is from Dr. Brice Boughner, and the other is from,

4    I believe, John or Ron Quisling from Shands Hospital,

5    correct?

6    A    That's correct.

7    Q    And both of those basically are the same, they both

8    indicate findings of chronic subdural hematoma and/or

9    multi-generational hematoma in the child's brain, correct?

10    A    Yes, that was their interpretation of the imagines

11    that they saw on the --

12    Q    Doctor, what I would ask you to do, please, is

13    don't editorialize, just answer my questions.  If the state

14    feels that they want to follow up a question, that's how we

15    do it here.  Thank you.

16         The emergency room physician, Dr. Anne Dickinson,

17    who testified in this case, indicated in her testimony that

18    she found --

19         MS. SINGER:  I'm going to lodge an objection, the

20         rule of sequestration, we're not going to share this

21         information.

22         THE COURT:  The objection is sustained.

23    BY MR. GROLAND:

24    Q    Did you find any area of bruising above this

25    child's eye, I can't recall which eye, on the front of his

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1031

1    face?

2        A    No, there was a slight periorbital or skin within

3    the socket, pink, change, but that was not distinct bruising

4    by any means.

5        Q    How many times in your 20-plus years as a medical

6    examiner have you performed autopsy on infants where shaken

7    baby syndrome was suspected?

8        A    Four or five times.

9        Q    That's all?

10       A    That's all I can think of.  Fortunately it's not a

11   very common problem.

12       Q    Sir, please.

13            Now, I think you testified that as far as your

14   mistake in not having the dura sent off, there was a

15   miscommunication between you and your assistant?

16       A    That's right, sir.

17       Q    Can you tell us what that miscommunication

18   specifically was, what happened there?

19       A    What happened?

20       Q    What happened?

21       A    I told him to send the brain and the dura off, and

22   apparently he didn't hear the part about the dura, because he

23   just sent the brain.  And when it arrived there, the dura was

24   not in it.

25       Q    And when did you find out that the dura was not

1   sent off?

2       A    After I talked to Dr. Nelson.

3       Q    And the dura, when you did this autopsy, was

4   removed from the brain?

5       A    It was removed from the skull cap.  When you take

6   the skull cap off, the dura remains attached to the skull

7   cap.

8       Q    So the dura was not removed from the child?

9       A    When you take the top of the skull off, the dura

10  remains attached to it over the skull cap.  The dura under

11  the brain is still there, it's on the base of the skull.

12      Q    So the dura that was attached to the skull cap

13  remained in the skull cap, and when the skull cap was put

14  back in place, then it was buried with the child; is that

15  correct?

16      A    No, it was peeled off.  We peeled off the top and

17  off the bottom, so that we can examine the inside of the

18  skull to see if there are any fractures.

19      Q    The dura then was peeled off.  What was done with

20  the dura that was peeled off?

21      A    Apparently it was returned with the rest of the

22  remains to the funeral director.

23      Q    The dura that was not peeled off, what happened

24  with that?

25      A    The whole dura was peeled off.

1    Q    The whole dura?

2    A    Yeah.

3    Q    I misunderstood what you just said.

4         Now, knowing, going into the autopsy, that we have,

5    that we have in our hand, in our file, these two

6    radiologists' reports that are in agreement as to the

7    multi-generational hematoma that they observed, and not

8    finding that as you do the autopsy, is there a reason why you

9    don't include a sentence in that, in the one paragraph on

10   your report that relates to your brain examination?

11   A    Yes, there is an answer.

12   Q    Can you tell me what the answer is?

13   A    The answer is I thought that the dura was going off

14   to Dr. Nelson along with the rest of the brain and the

15   subdural clot and that he would comment on it in his report.

16   Q    But you testified that you looked for it and didn't

17   find it, so wouldn't it be --

18   A    No, I said --

19   Q    Dr. Hamilton, let me finish the question.  If you

20   look for the chronic subdural hematoma, as noted in the

21   radiologists' report, and do not find them, we certainly

22   don't need further confirmation from Dr. Nelson, do you, to

23   include it in our report?

24   A    That's true.

25   Q    So why wasn't it there?

1    A    Because I simply stated what I found there.  I did

2  not want to go into great detail on my report because he was

3  going to generate a complete report for me.  It just said

4  subdural clot.  What I mean by that, fresh subdural clot is

5  what we usually see.  Chronic subdural hematomas are not that

6  common.  When I see them, I will certainly describe them and,

7  you know, certainly the photographs demonstrate the blood

8  clot that is fresh, not old blood clot, and not an organized

9  hematoma.

10    Q    Then why, Doctor, would you not want to go into a

11  little more detail in this report?

12    A    Because we have a neuropathologist who is going to

13  generate a consultation for us and describe it completely.

14    Q    And this report is actually done by you with a

15  dictaphone and you just talk into it?

16    A    That's correct.

17    Q    So all you had to do was talk another sentence into

18  it, right?

19    A    That's correct.

20    Q    Okay.  You would agree, would you not, that as far

21  as either Dr. Nelson or our experts in this case being able

22  to definitively determine whether or not there was chronic

23  subdural hematoma in this child's brain, they would need to

24  have the dura, correct?

25    A    I would say to precisely date the age of the

1   injury, then it would have been necessary for someone else

2   to, or for me to do a microscopic examination for precise

3   determination of exact age.  However, I think that the gross

4   appearance was sufficient to say that it's a fresh subdural

5   hematoma and not a chronic one.  And the discrepancy between

6   the radiographic reports and what we find in autopsy is not

7   unique to this case, it occurs fairly often.

8        Q    Speaking of microscopic examination, you also took

9   some slides, did you not, in this case?

10       A    Actually, Dr. Nelson took the slides and he

11  generated the microscopic report there.  I took slides of the

12  rest of the body and found no contributory changes.

13            MR. GROLAND:  I just have a few more questions,

14       Your Honor.

15  BY MR. GROLAND:

16       Q    Can you just tell us about your specialized

17  training in the area of shaken baby syndrome, that theory,

18  before you did the autopsy in this case, tell us what

19  specific training you've had?

20       A    Well, on several -- you mean before I did this

21  case?  Okay.  I've been to a meeting of the American Academy

22  of Forensic Sciences where forensic pediatric pathology was a

23  major topic of discussion for a half day seminar, and one of

24  the major topics there was shaken baby syndrome.

25       Q    That was what, about an hour?

1    A    About an hour, yes.

2    Q    That's it, right?

3    A    That's it.

4    Q    Your whole career, right?

5    A    Actually, I've seen some articles on the topic over

6  the years, and was aware of the controversy concerning its

7  very existence.

8    Q    Do you disagree that the evidence of an older

9  injury to this child's brain was very definitive, do you

10  disagree with that statement?

11    A    I don't recall seeing an older injury, sir, so we

12  disagree.

13    Q    Do you also disagree with the statement that

14  evidence of multi-generational hematoma in this child's brain

15  indicating repeated injuries or repeated bleeds were there,

16  you disagree with that too?

17    A    I didn't find them.

18    Q    And lastly, do you disagree with the statement that

19  in examination in this case reveals multiple traumatic events

20  over a period of time that injured this child's brain, you

21  disagree with that?

22    A    Yes, I disagree with that.  I think these events

23  occurred very rapidly over a very short period of time in one

24  episode.

25         MR. GROLAND:  No further questions.

1      THE COURT:  Any redirect?

2      MS. SINGER:  Yes.

3                  REDIRECT EXAMINATION

4   BY MS. SINGER:

5      Q    Briefly, Dr. Hamilton, you do agree that if there

6   was evidence of hygroma, which could be remanents of a healed

7   subdural hematoma, that if they were hygroma you may not be

8   able to see that at autopsy, correct?

9      A    I think I --

10     MR. GROLAND:  Excuse me, that's a leading question.

11     THE COURT:  The objection is sustained.

12  BY MS. SINGER:

13     Q    Doctor, hygroma, could you tell the jury whether or

14  not hygroma may be evidence of an older healed subdural

15  hematoma?

16     MR. GROLAND:  Same objection, Your Honor.

17     THE COURT:  Overruled.

18     A    It is thought by some workers in the field that

19  when some subdural hematomas are completely healed, when they

20  resolve, that they can have collections of fluid in them that

21  are completely encapsulated by membranes, and this is called

22  a subdural hygroma.  That is a little misleading because

23  that's evidence of a chronic situation, whereas acute

24  subdural hygroma, having the same name but an entirely

25  different situation, can occur not just from a collection of

1    blood but from a tear in the arachnoid membrane in a

2    localized collection of fluid.  If you cut one of those when

3    you're opening the skull cap, the fluid rushes out and it

4    will disappear completely.  You won't even see it.

5        Q    When you examined the skull and the dura and the

6    brain, did you see evidence of what is called a neomembrane?

7            MR. TEDDER:  Objection, leading.

8            THE COURT:  Overruled.

9        A    No, I did not.

10       Q    And what would evidence of a neomembrane have told

11   you if you had seen it there?

12       A    That there was a subdural hematoma that had been

13   there long enough to start becoming organized and that fiber

14   forming cells and small blood vessels growing into it from

15   its outer surface.  These are very dangerous because they can

16   bleed into it and cause rebleeding in these subdurals.  But

17   the bleeding then occurs on the outer surface of the blood

18   clot and is not associated with subarachnoid hemorrhage.

19       Q    So in your complete examination of the skull, the

20   dura, and the top of the brain, since you did not dissect the

21   brain, did you have any evidence whatsoever of a chronic

22   subdural that rebleed?

23       A    No, ma'am, I did not.

24       Q    And your explanation for why the radiological

25   findings might be different, is what?

1    MR. TEDDER:  Objection, he is not an expert in

2    radiology, Your Honor.

3    THE COURT:  Overruled.

4  BY MS. SINGER:

5    Q    You may answer, Dr. Hamilton.  Tell the members of

6  the jury why the radiologist may have seen it differently

7  than you, the pathologist?

8    A    Not being a radiologist, I really can't tell you,

9  but --

10    MR. GROLAND:  I would object to this, Your Honor,

11    if he can't answer the question, we certainly don't want

12    him to speculate for the jury.

13    THE COURT:  I need for you to rephrase the question

14    because, Doctor, you cannot speculate.  However, you may

15    answer the question if you're able to without

16    speculating, based on your expertise.

17  BY MS. SINGER:

18    Q    You were asked on cross-examination why you did not

19  see what the radiologists reported to you in their reports,

20  why when you opened and examined the skull and the brain you

21  did not see what were in reports that were interpretations of

22  CAT scans.  Can you explain to the jury why pathologically

23  you did not see what they may have interpreted as being there

24  on the reports?

25    MR. GROLAND:  Your Honor, I object again most

1    respectfully.  I think that is beyond this doctor's

2    expertise to give an opinion on what a radiologist may

3    think in looking at a CAT scan.

4         THE COURT:  The objection is overruled.  The

5    question is can you, and if you can, Doctor, go ahead.

6         THE WITNESS:  I did not find all of the things they

7    interpreted as being there on the CAT scan.  They just

8    weren't there.  I'm sorry.  But I think all pathologists

9    have had this experience of occasionally having that

10   sort of thing happen, something is seen on an image that

11   is interpreted one way and then you actually do the

12   autopsy and you find it's a different situation.

13   BY MS. SINGER:

14        Q    You also said that radiological discrepancies, such

15   as the one described by Mr. Groland on his cross-examination,

16   are not unique.  What do you mean by that?

17        A    I think I just stated that, that periodically we

18   will find things on the autopsy that are different than what

19   the radiographic interpretation was.  It's not often, they're

20   usually very good about their interpretations.

21        Q    Now, you were asked about the number of pages of

22   your report, Dr. Hamilton.  Does your postmortem examination

23   and report include more than just a written report?

24        A    Yes, it does.  It includes more than my

25   contribution to this case.  There's a brief written report

1   that I have, the list of autopsy findings, there's a diagram

2   showing the external surface of the body and notations of

3   same, and then there are formal reports from a

4   neuropathologist and from a ophthalmic pathologist; all of

5   these are part of the postmortem examination.

6       Q    And when you make your report, do you also take

7   photographs of the subject, the patient in order to preserve

8   and to, to preserve the information should anyone else wish

9   to look at the body and examine after the child or this

10  person is buried or cremated?

11      A    Yes, ma'am.

12      Q    Is that part of your routine procedure?

13      A    Yes, it is.

14      Q    Is that the routine procedure of pathologists

15  throughout the State of Florida?

16      A    I believe it is.

17      Q    Do we preserve every organ of a particular patient

18  after autopsy --

19      A    No, we don't.

20      Q    -- for examination later?

21      A    No, we don't.  We try to return as much of the body

22  as possible to the family for proper burial.

23      Q    You also were asked about whether you could see

24  contusions on the brain, and you indicated that you could not

25  because of arachnoid hemorrhage.  Can you explain to the jury

1   why it would be that you, in viewing the brain and not

2   dissecting it, would be unable to see the contusions because

3   of the arachnoid hemorrhage?

4       A     Because the hemorrhage is in the subarachnoid

5   space, that is the hemorrhage is in this set of membranes

6   which is closely applied to the surface of the brain.  The

7   contusion, this bruise is on the underlying brain surface

8   itself, basically obscured by an overlying layer of blood.

9   You only make that diagnosis when you cut into the brain and

10  discover the bruises in the substance of the brain itself.

11      Q     You were also asked about why -- you were also

12  asked whether diffuse axonal injury was seen upon examination

13  of the brain, and you answered that it did not surprise you

14  if none was seen because of the autolytic changes of the

15  brain.  First of all, what do you mean by autolytic changes

16  of the brain?

17      A     Excuse me, that's a change of postmortem

18  decomposition.  After death the tissues begin to break down,

19  and autolysis is a chemical breakdown of tissues.  Because of

20  that, I was not surprised that they weren't seen.  It's been

21  my experience in other cases, similar, and that were also

22  consulted by a neuropathologist, that this is not, excuse me,

23  uncommon.

24      Q     As a pathologist, Dr. Hamilton, have you seen

25  necrotic changes in tissues of a living person?

1    A    Yes.

2    Q    For instance, in a case such as this, in Robbie's

3 case, could his brain have been suffering from autolytic

4 changes even while he was alive on life support?

5    A    Parts of an injured brain may, you know, die at

6 different rates.  He had neuronal changes that were

7 consistent with dying neurons that had been in his brain for

8 several days.  They were red neurons.  They're normally not

9 red, but after they sustain an ischemic injury, interruption

10 in the blood supply, or blood is coming there but is not

11 oxygenated, then the neurons die.  As one set of cells are

12 dying off, other cells can keep going for a bit longer.

13 Cells don't die all at the same time at the same rate.

14    Q    How many aspiration deaths have you autopsied,

15 Dr. Hamilton?

16    A    I've seen quite a few case where there was

17 aspiration pneumonia.  Aspiration, per se, by itself as a

18 cause of death is really uncommon unless you aspirate a big

19 chunk of roast beef that you're eating at a restaurant and it

20 got stuck in your throat.  But lots of times liquids are

21 aspirated, they are irritating and cause you to cough.  I

22 suppose that occasionally a large amount of liquid, if

23 aspirated in a debilitated patient could cause enough hypoxia

24 to liquid aspirated into the lungs, that causes an

25 inflammatory process, chemical irritation of the lungs, and

1    maybe pneumonia and certainly --

2        Q    That would not be immediate death?

3        A    No, that's not an immediate thing usually.  A

4    massive large aspiration of liquid into the lungs could kill

5    you off pretty rapidly, but that's rather uncommon.  More

6    common is a lesser amount of fluid making its way into the

7    lungs causing chemical inflammation and pneumonia.  Because

8    everything you aspirate is not sterile, and very frequently

9    in head injury with survival, in a few days we will find

10   pneumonia in the lungs along with the head injuries.

11       Q    Now, Doctor, we did mark, and I did not publish to

12   the jury, several photographs.  I'm going to ask you to talk

13   about them starting with the State's Exhibit 61.  Just to

14   make it clear, of course, these photographs were taken at the

15   time that you performed your postmortem examination, correct?

16       A    That's correct.

17       Q    And they are part of your examination, correct?

18       A    Yes, ma'am.

19       Q    Would these photographs be available to Dr. Nelson

20   should he desire to examine them?

21       A    Absolutely.

22       Q    I'm going to show you 61 and ask you if you would

23   please to describe for the jury whether or not the dura mater

24   is --

25            MR. TEDDER:  Objection, leading, Your Honor.

1        THE COURT:  Overruled.

2    BY MS. SINGER:

3        Q    Whether or not the dura mater is shown in that

4    photograph?

5        A    It is on the photograph.  The dura mater is inside

6    the skull cap, it's here (indicating).

7        Q    And as you look at that particular photograph, do

8    you see any evidence whatsoever of a chronic

9    subdural hematoma --

10        MR. TEDDER:  Objection, leading.

11        THE COURT:  Overruled.

12    BY MS. SINGER:

13        Q    Any evidence whatsoever of a chronic subdural

14    hematoma that has rebled?

15        A    No.

16        Q    Do you see any evidence of a hygroma with

17    neomembrane?

18        MR. TEDDER:  Objection, leading.

19        THE COURT:  Overruled.

20        THE WITNESS:  No.

21    BY MS. SINGER:

22        Q    What is it, Doctor, that is the red substance that

23    you note in viewing that photograph?

24        A    It's blood.

25        Q    And --

1    A    Blood clot.

2    Q    Are you able to age that blood, the blood clot?

3    A    It's acute process.  It has not been there for very

4   long.  It's very consistent with an injury having occurred

5   eight or nine days before this photograph was taken.

6    Q    I'm going to show you State's 60 in evidence, sir,

7   and ask you whether or not you can see the dura mater in that

8   particular photograph?

9    A    Yes, ma'am, I can.

10   Q    Is that the dura mater you examined?

11   A    Yes, ma'am, it is.

12   Q    Was there any evidence of a chronic subdural

13  hematoma that had rebled on that dura?

14   A    No, there is not.

15   Q    And do you also see a red substance shown on the

16  brain in that photograph?

17   A    Yes.

18   Q    And is your testimony the same that that is a new

19  bleed?

20   A    It is, my testimony is the same.

21   Q    Do you see any evidence of a neomembrane or hygroma

22  on that?

23   A    No, ma'am, I do not.

24   Q    And that was 60.  I believe I showed you 59.

25       MR. TEDDER:  Your Honor, this is beyond the scope

1    of cross-examination.  We didn't go into the details of

2    those photographs at all.

3         THE COURT:  Overruled.

4  BY MS. SINGER:

5    Q    I'm going to show you what's State's Exhibit 59 and

6  ask you, Dr. Nelson -- excuse me, Dr. Hamilton, looking at

7  that photograph, did you also document the dura mater on that

8  photograph?

9    A    Yes, it's there.

10   Q    And that's the same dura mater you examined

11 thoroughly?

12   A    Yes, ma'am.

13   Q    Any evidence of a neomembrane on that photograph?

14   A    No, ma'am.

15   Q    Any evidence of a chronic subdural hematoma that

16 had rebled?

17   A    No, ma'am.

18   Q    Is there any evidence of a new or acute hematoma in

19 that photograph?

20   A    Yes, ma'am, there is.

21   Q    And is your testimony the same as to your belief as

22 to when that new or acute hematoma occurred?

23   A    Yes, it is.

24        MS. SINGER:  If I may have a moment, Your Honor.

25        THE COURT:  Yes.

1         MS. SINGER:  No further questions.

2         MR. GROLAND:  Your Honor, I have just two

3   questions.

4         THE COURT:  You can proffer it on the record after

5   we recess.  And, of course, Dr. Hamilton will remain

6   subject to subpoena in case you want to recall him.

7   Doctor, you're free to leave the courthouse at this time

8   now if you wish.

9         THE WITNESS:  Thank you, Your Honor.

10        THE COURT:  We will take a short recess before we

11  call the next and last witness for the day.

12        (A recess was taken.)

13        THE COURT:  Go ahead and bring the jury back in.

14        (The jury entered the courtroom.)

15        MR. PENNYPACKER:  State would call Dr. Stephen

16  Nelson.

17        THE CLERK:  Raise your right hand.

18        (The witness is duly sworn by the clerk.)

19        THE CLERK:  You may be seated.

20  WHEREUPON:

21        DR. STEPHEN JOHN NELSON,

22  called as a witness herein, having been first duly sworn, was

23  examined and testified as follows:

24        DIRECT EXAMINATION

25  BY MR. PENNYPACKER:

1    Q    Would you state your name, please?

2    A    I'm Dr. Stephen John Nelson.

3    Q    What is your occupation, Dr. Nelson?

4    A    I'm the chief medical examiner for the Tenth

5    Circuit of Florida, which is Polk, Hardee, and Highland

6    counties.

7    Q    What is your educational background?

8    A    I have a medical degree, master's degree, medical

9    degree from American University of Caribbean in Montserrat,

10   British West Indies; a master's degree in experimental

11   neuropathology from the State University of New York at

12   Buffalo; and postdoctoral residency training in anatomic

13   pathology and neuropathology from Albert Einstein College of

14   Medicine in New York City; and postdoctoral training in

15   forensic pathology from the University of Miami.

16   Q    Are you licensed to practice medicine in the State

17   of Florida?

18   A    Yes, I am.

19   Q    When were you so licensed?

20   A    I believe in 1990 -- I'm sorry, 1989.

21   Q    Are you licenseD in any other states?

22   A    Yes, The Commonwealth of Pennsylvania as well as

23   the State of New York.

24   Q    Are you board certified in any area or specialty?

25   A    Yes.

1    Q    Which areas of specials are you board certified in?

2    A    I'm board certified in anatomic pathology, board

3 certified in neuropathology and board certified in forensic

4 pathology.

5    Q    Have you received any specialized training in

6 pediatric neuropathology?

7    A    As part of forensic pathology and as part of

8 neuropathology in fellowship training.

9    Q    Is there a board certification available in

10 pediatric neuropathology?

11    A    No, there is not.

12    Q    What is your primary area of practice now?

13    A    Forensic pathology as the chief medical examiner.

14    Q    How long have you been practicing in the field of

15 forensic pathology?

16    A    Since late 1989.

17    Q    Have you published any articles in the medical

18 field?

19    A    Yes.

20    Q    Have you made any presentations in your area of

21 specialization?

22    A    Yes, numerous times.

23    Q    Do you have any university affiliations in a

24 teaching capacity?

25    A    Yes, I'm a clinical assistant professor at the

1    University of Miami.

2        Q    Have you held any positions on the state wide

3    medical exam association?

4        A    Yes, been appointed by the governor to the Medical

5    Examiner's Commission, which is the regulatory oversight

6    board for medical examiners in the State of Florida; and for

7    the past three, four-some years, I've served as a chairman of

8    that commission.

9        Q    Have you ever been qualified as an expert witness

10   before?

11       A    Many times.

12           MR. PENNYPACKER:  I would tender Dr. Nelson as an

13       expert in the area of forensic pathology with a

14       specialization in neuropathology.

15           MR. TEDDER:  No objection.

16           THE COURT:  Dr. Nelson will be allowed to give his

17       opinion testimony in forensic pathology and

18       neuropathology.

19   BY MR. PENNYPACKER:

20       Q    Dr. Nelson, can you explain to the jury what the

21   difference is between anatomic pathology, forensic pathology,

22   and neuropathology?

23       A    Anatomic pathology deals with anatomy, it's that

24   area of pathology.  And pathology is a subspecialty area of

25   medicine.  You folks probably never have any contact with a

1  pathologist other than in court listening to the medical

2  examiner.  The pathologist typically, in a hospital, is the

3  consultant's consultant.  If you have any type of laboratory

4  blood work done, any type of surgery done, anything that's

5  removed from you during surgery by the surgeon is examined by

6  a pathologist to see if it contains cancer, infections, if

7  it's abnormal or normal.  The same goes for laboratory work,

8  blood work, urine work, things of that nature.  That's the

9  laboratory medicine part of pathology and that's what

10  anatomic pathology is, the laboratory part.

11          Surgical pathology is anything to do with surgery.

12          The area of neuropathology is a subspecialty of

13  anatomic pathology, and that deals with diseases of the

14  brain, spinal cord, peripheral nerve, muscle and the eye.

15          And forensic pathology is another subspecialty area

16  of anatomic pathology dealing with how pathology in medicine

17  interacts with the law, largely through either the medical

18  examiner or the coroner in performing autopsies as mandated

19  by either county ordinance, state statute or a federal law.

20     Q    How do you get involved in cases as a

21  neuropathologist, you yourself?

22     A    I myself through consultation.  Someone will ask me

23  to examine something, whether it be a brain tumor or a whole

24  brain or spinal cord that was removed in autopsy.  Again,

25  it's a consultant's consultant position.  There's another

1    pathologist who's asking me to examine something.

2        Q    From what geographic areas do you receive brains or

3    other specimens for examination?

4        A    From all over, including for a while the

5    Commonwealth of Puerto Rico, largely any -- especially in

6    Florida here, any medical examiner's office who is looking

7    for a neuropathology consultation, I'm available.

8        Q    Specifically with regard to brains, how are they

9    sent to you for examination, how is it physically done?

10       A    Physically it's done, the brain is removed, it's

11   fixed or stored in formaldehyde liquid until the brain is

12   fixed, and then it's put into a box, transport box, and it's

13   typically sent via overnight courier.  If the folks are

14   relatively close by where I am, they'll actually physically

15   bring it with them or have law enforcement physically bring

16   it with them.

17       Q    Did you receive the brain of Robbie Quirello for

18   examination in this case?

19       A    Yes.

20       Q    Dr. William F. Hamilton the district medical

21   examiner for the Eighth Circuit, did you receive any other

22   records or information connected to the death of Robbie

23   Quirello before examining the brain?

24       A    At the same time I received a preliminary copy of

25   the autopsy report of Dr. Hamilton, a body diagram, and as

1054

1    well as a report of investigation, which is filled out by the

2    medical examiner's investigator here in Gainesville.

3        Q    What do you do in order to complete your duties

4    after you've received those records and actually taken

5    possession of the brain itself?

6        A    Well, we want to have as much information as

7    possible before we examine the brain, so we review the

8    materials that are submitted to us.  Oftentimes we don't have

9    the medical records, all of the medical records with the

10   specimen, but we've at least got basic information that the

11   medical examiner themselves typically had when they performed

12   the autopsy.

13            After that, we will physically examine what it is

14   that they've sent us.  We'll actually look at the brain

15   externally.  We'll take photographs of it.  We'll make notes

16   that will become a typewritten report.  And when we examine

17   the brain, sectioning it, looking for smaller abnormalities

18   and injuries inside of the brain, we will make microscopic

19   sections of those areas and then examine them under the

20   microscope, and that will also generate a typewritten report.

21       Q    Did you do the external examination of the brain of

22   Robbie Quirello in this case?

23       A    Yes.

24       Q    At the time of that external examination, were you

25   aware of the initial autopsy findings that Dr. Hamilton had

1    made?

2        A    Yes.

3        Q    What did you find upon the external gross

4    examination of Robbie Quirello's brain?

5        A    A significant amount of subarachnoid hemorrhage, as

6    well as blood clot within the subarachnoid space of the

7    brain.  The brain was swollen and congestive.

8        Q    Did you find any evidence of an old subdural

9    hematoma?

10       A    No, I did not.

11       Q    What would you expect to see upon gross

12   examination, external examination of the brain if there had

13   been old subdural hematoma?

14       A    Well, again, let me say I didn't receive the dura

15   mater, the dura mater with the brain.  But if there is a

16   subdural hematoma that is of such size that it produces

17   changes to the brain, it will produce a shifting of the brain

18   from one side to the other.

19           Subdural hematoma is bleeding inside of your skull

20   between the dura mater, the heavy layer, thick covering of

21   the brain, and the brain itself.  That is a tight and closed

22   box.  There's nowhere for anything to go except south through

23   the hole where your spinal cord comes in and out of your

24   head.

25           So when you have a space occupying lesion like

1    blood or a tumor or anything like that, it's in an area that

2    it's not supposed to be in, there's no place for any shift or

3    movement, so the brain will actually shift, even if that

4    material is removed, then the brain typically has some type

5    of residual look to it of a subdural hematoma having been

6    there prior to that.

7        Q    Did you prepare a letter after you did the gross

8    examination and set forth your findings?

9        A    Yes, I did.  September the 18th, 2000, which is the

10   same day that I actually examined the brain.

11       Q    And what were your initial findings based upon the

12   gross examination?

13       A    As I said, it was an immature brain inconsistent

14   with a child of four and a half months; that the child also

15   had subarachnoid hemorrhage, as well as blood clot in the

16   subarachnoid space; generalized swelling of the brain; and

17   generalized congestion of the blood vessels in the brain.

18       Q    If there had been an old subdural hematoma, would

19   you have expected any discoloration on the surface of the

20   brain itself?

21       A    Yes.

22       Q    Did you see any discoloration?

23       A    No.

24       Q    After the gross examination, you mentioned that you

25   sectioned the brain.  What do you actually do to do that?

1       A       We actually section the brain in a thickness of

2   about maybe a half an inch or a little bit less than that,

3   looking in a plane that goes from the front of the head all

4   the way to the back, almost like bread loafing, if you will,

5   looking at the internal anatomy of the brain, looking for

6   abnormalities in there.

7       Q       Do you do anything in addition to the sectioning in

8   order to complete the examination?

9       A       Yes, in addition to actually looking at it with the

10  naked eye, we will take smaller sections, thinner smaller

11  sections, those will be given to the laboratory and the

12  laboratory will then turn those smaller sections into glass

13  slides.  And the glass slides, we'll actually look at under

14  the microscope to see any microscopic abnormalities

15  associated.

16      Q       Were there any glass slides prepared in this case?

17      A       Yes, there were.  There were eight glass slides

18  prepared of this child's brain.

19      Q       Who actually prepared those, do you know?

20      A       Those slides were actually prepared by the surgical

21  pathology laboratory here at Shands at Alachua General

22  Hospital.

23      Q       So it would be, you got the brain initially, you

24  cut it into sections, and then you sent it back here for the

25  slides to be made, and then the slides were sent back to you;

1  is that correct?

2       A     Yes.

3       Q     Did you actually examine those slides?

4       A     Yes.

5       Q     What did you find when you did the microscopic

6  examination?

7       A     The microscopic examination was done a little over

8  a month later on October the 23rd.  And in addition to the

9  changes that we saw externally of the brain, the blood in the

10 subarachnoid space, the edema, and the congestion, we also

11 saw contusions or bruises, as well as dead or dying changes

12 of the nerve cells inside the brain.

13      Q     Where were the bruises located in the brain?

14      A     The bruises are located on both the left and right

15 superior frontal gyri, which is the left and right superior

16 and frontal, the front part the brain.

17      Q     What would cause bruising of the brain?

18      A     Blunt force trauma typically.

19      Q     An old chronic subdural hematoma would not cause

20 a --

21            MR. TEDDER:  Objection, leading.

22            THE COURT:  Sustained.

23 BY MR. PENNYPACKER:

24      Q     Would an old subdural hematoma cause a bruise on

25 the brain?

1    A    No, it would not.

2    Q    Would a seizure cause a bruise on the brain?

3    A    No, it would not.

4    Q    Would aspiration or choking cause a bruise on the

5  brain?

6    A    No, it would not.

7    Q    Could lack of oxygen cause bruising on the brain?

8    A    No, it would not.

9    Q    What is blunt force trauma?

10    A    We divide trauma into sharp force trauma and blunt

11  force trauma.  Sharp force would be cutting, stabbing,

12  incised wounds, chop wounds.  Everything else would be blunt

13  force, a kick, a punch, a motor vehicle crash, things of that

14  nature would be blunt force trauma.

15    Q    Would plopping a child on a bed so hard that his

16  head bounced be considered blunt force trauma?

17    A    Yes.

18    Q    You mentioned midline shift.  Can you explain how

19  you look for that when you actually have a brain?

20    A    If you actually have the brain to examine, and the

21  midline runs from the front of the brain all the way to the

22  back and divides the left hemisphere and the right

23  hemisphere, and if there is a mass lesion of some sort,

24  whether it be tumor or blood or something in one hemisphere

25  versus the other, it will actually shift the center part of

1   the brain across the midline.  And that is not compatible

2   with a number of things, including life, that these

3   structures should stay on either side of the midline.  The

4   structures in the brain that are midline should stay there,

5   and they shouldn't move from to one side to the other.  The

6   brain is a very tightly controlled box, your skull, and it

7   doesn't give a lot of room to move, to grow, things of that

8   nature.  So when there's any kind of movement, typically, any

9   type of significant movement, there's typically an adverse

10  affect to that movement on your brain.

11      Q    Would it take a substantial subdural hematoma in

12  order to cause a midline shift?

13          MR. TEDDER:  Objection, leading, Your Honor.

14          THE COURT:  Overruled.

15          THE WITNESS:  Yes, it would.

16  BY MR. PENNYPACKER:

17      Q    When you take the brain out of the skull, why is it

18  that the brain doesn't shift back to the center, if there

19  were a midline shift present?

20      A    Well, if you're talking -- is the subdural still

21  present?

22      Q    No, once it comes -- if there were a subdural

23  before and you saw the midline shift, how come it doesn't

24  shift back after the brain is taken out?

25      A    Because the brain essentially has a consistency of

1    a hardened flan, which is almost a vanilla custard.  It

2    doesn't move like jello.  Once it moves to an area and has

3    been there for a while, it's typically going to stay there

4    for a period of time.  And then what we're doing is we're

5    taking that brain, immersing it into formaldehyde, which is a

6    preservative, a fixative, so that it's going to preserve and

7    fix the brain in the condition that it was found at autopsy.

8    So, again, it's not like jello where it's got resilience and

9    it springs back.  It's going to stay in that condition in

10   which it was found.

11       Q    You mentioned that you also found a subarachnoid

12   hemorrhage, is that something different from the subdural

13   hematoma?

14       A    Yes.

15       Q    Can you explain the difference to the jury?

16       A    Yes.  The three areas of the meninges or the

17   covering of the brain, the dura mater is the outermost, and

18   it is tightly held to the inside of your skull bone.  Below

19   the dura mater is the space called the subdural space.  And

20   above -- like submarine below -- and above the dura mater is

21   a potential space that is called epidural.  And then on top

22   of the brain itself we've got a thin spider-like covering,

23   like a cobweb, called the arachnoid matter.  Arachnoid

24   meaning spider.  And it looks just like a spider web on top

25   of the brain.  Below that, adherent to the brain, is the pia

1    or thinnest membrane.  So the subarachnoid membrane is below,

2    the space is below the arachnoid, subarachnoid.  And that's

3    where blood is in this case that I saw.

4         Q    If there were blood in the subdural space, is it

5    possible for it to get from the subdural space, through the

6    arachnoid, down to the subarachnoid space?

7         A    Usually what happens is the other way around.  It

8    will start out in the subarachnoid space or start out in the

9    brain and burst through the subarachnoid space into the

10   subdural space.  For example, a stroke can often do that with

11   a large amount of hemorrhage, goes from one side to the

12   other.  It's unusual, I can't think of any instance, where a

13   subdural hematoma will start out as just a collection of

14   blood in the subdural space and somehow make its way to

15   diffusely involve the subarachnoid space.  Usually it's the

16   subarachnoid space extending upward to the subdural space,

17   not the other way around.

18        Q    Could a subdural hematoma cause a subarachnoid

19   hematoma or hemorrhage?

20        A    Again, that's not the typical way it would do it.

21   And I would say if it does, it would be decidedly in the

22   minority, no.  You would see changes that would be different.

23   The subdural hemorrhage or hematoma is present on the

24   outside, very, very outside of the brain.  If there's any

25   type of staining or discoloration from the subdural, it's

1    going to be on the surface of the brain immediately below the

2    subdural.  In this case, the subarachnoid hemorrhage is

3    everywhere.  It's on the outside surface, the top of the

4    brain, it's on the under surface of the brain as well.

5    That's not typical for how the subdural would happen.

6         Q    Were you able to age the blood that you saw in the

7    subarachnoid space?

8         A    No, there's nothing I can do to age that blood.

9         Q    Did you see a tear in the arachnoid?

10        A    No, I did not.

11        Q    You mentioned a stroke, I believe.  Any evidence of

12   a stroke?

13        A    No, there's absolutely no developmental, neurologic

14   abnormalities associated with this child whatsoever.

15        Q    Did you find any evidence of an aneurism?

16        A    None.

17        Q    Any evidence of any disease?

18        A    And no, and the reason that we specifically look

19   for these, is that, for example, an aneurism is the most

20   common reason to have subarachnoid hemorrhage.  So we're

21   playing statistics and we're specifically looking for the

22   things that happen commonly.  Common things happen commonly,

23   we'll look for those.  No, we didn't see any evidence of any

24   type of an aneurism or any type of common abnormalities that

25   would produce the subarachnoid hemorrhage.

1    Q    In your report you mention hemorrhagic abnormality

2  at death of sulci and gyri surfaces.  Can you explain that,

3  please?

4    A    Specifically where are you reading?

5    Q    I'm not sure what page, it's on the second report

6  on the microscopic slides.

7    A    Say it again.

8    Q    Hemorrhagic abnormality at death of sulci and the

9  gyri surfaces.

10   A    I'm not sure I understand your question, but any

11  type of hemorrhage in the subarachnoid space is what I'm

12  speaking of.  That is by definition abnormal, it shouldn't be

13  there.

14   Q    Did you receive the brain stem in this case?

15   A    Yes.

16   Q    Did you examine the brain stem?

17   A    Yes.

18   Q    Did you find anything abnormal in the brain stem?

19   A    No.

20   Q    What does the brain stem do?

21   A    Some of the lower portions of the brain stem are

22  responsible for the functions of the body that we take for

23  granted, respiration, heart rate, things of that nature where

24  you don't have to think about them.  It's also an area that

25  all of your motor functions run through it going from north

1 and south, south to north, to control your movements and

2 that. They go through the brain stem to be processed in the

3 cerebrum.

4     Q    If Robbie Quirello had an injury to his brain stem,

5 would you have expected him to be able to move his arms and

6 hands, open his eyelids, and to breathe?

7     A    Not if he had injury to that area, no.

8     Q    Did you receive any information about the birth of

9 Robbie Quirello or the circumstances?

10     A    Yes, I believe his birth is unremarkable, as it's

11 been reported to me. And I believe he had Apgar scores that

12 are eights and nines, which are appearance, pulse, grimace,

13 respiration, changes that the doctor will look for

14 immediately at birth at one minute and again re-evaluate that

15 child at three to five minutes. The higher the number, ten

16 is a perfect score, the higher the number the better, and

17 eight and nine is a near perfect score.

18     Q    If he had suffered from a subdural hematoma at the

19 time of birth, would you have expected to see evidence of

20 that four and a half months later?

21     A    Yes.

22     Q    What would you expect to see?

23     A    The brain will wall off or attempt to sequester

24 blood in a specific way. There will either be staining

25 present on the dura or staining in the meninges, the

1   arachnoid of the brain itself.  That staining indicates iron

2   pigment, because most of your blood cells are made of iron.

3   And that iron pigment is left behind, we can specifically

4   recognize it under the microscope.  If necessary, we can

5   specifically stain for it.  It gives a very brilliant blue

6   color with a stain called Crushing Blue.

7       Q    You mentioned in your letter to Dr. Hamilton that

8   you did not receive certain parts, that would be the

9   pituitary gland, spinal cord, and others.  Why are those

10  important to you?

11      A    Well, they're important for a number of reasons,

12  completeness being the one.  The information that I had when

13  the brain was sent to me in consultation was that the child

14  was thought to have a subdural hematoma and epidural

15  hematoma, as well as retinal hemorrhages and vitreous

16  hemorrhages, those were both present within the eye.

17  Examining the eyes is part of neuropathology, examining the

18  dura mater is part of neuropathology.  For completeness sake

19  we'd want to be able to evaluate those areas.

20           The pituitary gland is the master endocrine gland.

21  It controls all of your bodily functions that require any

22  kind of hormone input.  The pineal gland is responsible for

23  circadian rhythm, your sleep/wake cycles.  The spinal cord is

24  important for completeness, again, in any kind of shaken

25  abuse type of allegation to make sure there's no evidence of

1    trauma to the spinal cord.  The eyes, however, were instead

2    of sent to me, those were sent to the Baskin-Palmer Eye

3    Institute at the University of Miami School of Medicine.

4        Q    Did you become aware of the results of the

5    examination of Baskin-Palmer?

6        A    Yes, I was subsequently provided with a copy of

7    their report.

8        Q    What do retinal hemorrhages indicate to you in

9    conjunction with an epidural, subdural and subarachnoid

10   hemorrhage?

11       A    They would be consistent with the --

12            MR. TEDDER:  Objection, Your Honor, beyond the

13       scope of his expertise.

14            THE COURT:  Overruled.

15            THE WITNESS:  They would be consistent with the

16       syndrome referred to as shaken baby syndrome or whiplash

17       shaken baby syndrome.

18   BY MR. PENNYPACKER:

19       Q    Why is it when a baby is shaken sufficiently to get

20   epidural, subdural, subarachnoid hemorrhages, retinal

21   hemorrhages, how come their neck doesn't break?

22       A    I'm sorry?

23       Q    Why doesn't their neck break when they get shaken?

24       A    Well, the intellectually honest answer to your

25   question in this particular case is we don't know.  I don't

1    know that posterior neck dissection was done specifically in

2    this case, and I was not asked to examine the spinal cord.  I

3    don't know if the child has injuries to those areas.  It

4    depends obviously on how bad the shaking is, what the head is

5    doing, whipping back and forth.  They typically are

6    hypertension and hyperflexion injuries to the neck muscles

7    and the muscles that keep the spine erect.

8        Q    What would you expect to see in Robbie Quirello if

9    he had suffered a broken neck?

10       A    Hemorrhage in his neck.  Clinically he'd have

11   typically paralysis.  With regard to the spinal cord, the

12   spinal cord would be damaged.

13       Q    Would he be able to move his arms and legs?

14       A    Depending on where the injury is, he may be able to

15   move his arms but not his legs.

16       Q    So if he were able to move his legs in the hospital

17   subsequent to admission, could you conclude that his spinal

18   cord was intact?

19       A    I think everybody would.

20       Q    Are you familiar with the process of healing when

21   the body suffers from a subdural hematoma?

22       A    Yes, that's part of neuropathology.

23       Q    What does the body do to heal itself when it's

24   experiencing subdural hematoma?

25       A    It essentially attempts to wall off this blood clot

1    that is present beneath the dura but above the surface of the

2    brain.  And it walls it off by sending specific types of

3    scavenger cells to surround it, to isolate it, in an attempt

4    to dissolve it.

5        Q    What is the long term result after the body has

6    gone through this process?

7        A    Typically there will be some visible changes that

8    you'll see grossly at autopsy on the subdural space.

9    Microscopically you'll be able to see those changes under the

10   microscope.

11       Q    What is a hygroma?

12       A    That would be the resolution or the dissolution of

13   that blood clot will no longer look red like bloody nose red,

14   it will look almost translucent opaque, almost like a crude

15   oil type appearance to it.  Hygroma really means water or

16   watery appearance as opposed to hematoma, but it's got a

17   consistency of water, but it's a darker dirtier color, but

18   not bright red like a hematoma.

19       Q    If a subdural hematoma does not end up in a

20   hydroma, what is the end result inside the brain?

21       A    It will eventually, depending on when death ensues,

22   if death ensues quickly before there's been any ability to

23   wall it off, it will still look like a hard dark black red

24   blood clot.  But if you've had some period of healing, it

25   will just become a thickened membrane, a thickened portion of

1    the dura or a thickened scar on the surface of the brain that

2    typically will have a yellow color to it, because of the iron

3    pigment that's there and the blood pigment that's there, and

4    you'll be able to see it grossly with the naked eye at

5    autopsy.

6        Q    Did you see any evidence of that in your

7    examination?

8        A    No, I did not.

9        Q    What is anoxic ischemic encephalopathy?

10       A    Anoxic ischemic encephalopathy is the final common

11   pathway that the brain will undergo with brain death.  The

12   brain is a master control organ.  It controls not just your

13   thought process, but it controls your respiration and your

14   breathing, so that you can't have a pure ischemic event where

15   you don't have blood flow, and you can't have a pure anoxic

16   event where you don't have oxygen flow.  They go together.

17   So either a lack of oxygen will produce this, a lack of

18   glucose or sugar, blood sugar will produce this, and it's a

19   final common pathway to brain death.

20       Q    Are you able to indicate, to determine the cause of

21   death from what you saw with your study without the pituitary

22   gland, the spinal cord and the dura?

23       A    Yes.  Again, working as a consultant, the ultimate

24   determination of what the child's cause of death is left to

25   the medical examiner who is charged with that responsibility

1   under law, but certainly this is very consistent with shaken

2   baby.

3       Q    Have you ever been sent a child's brain to evaluate

4   with the suspicion that it was shaken baby and found that it

5   wasn't shaken baby?

6       A    Yes.

7       Q    How recent?

8       A    Just within the past maybe four months, five

9   months.

10      Q    And how are you able to determine that it wasn't

11  shaken baby?

12      A    The autopsy findings are completely diametrically

13  opposite to what the neuropathologic findings are.

14      Q    Have you ever seen a child killed by shaking who

15  was three or four years old?

16      A    I have not, no.

17      Q    Can you say within a reasonable degree of medical

18  certainty whether the injuries you saw in the brain of Robbie

19  Quirello were the result of inflicted trauma?

20      A    Yes, they are.

21      Q    Were they the result of blunt force?

22      A    Blunt force trauma, I would put that, I would put

23  whiplash shaken baby under that category.  I believe it's

24  certainly possibly to shake a child and produce death, just

25  as it's possible to shake and then induce a blunt force

1   trauma with either a slam or a hit and produce death.

2            MR. PENNYPACKER:  May I have a moment, Your Honor.

3            THE COURT:  Yes.

4            MR. PENNYPACKER:  That's all.

5            THE COURT:  All right Mr. Tedder.

6                         CROSS-EXAMINATION

7   BY MR. TEDDER:

8       Q    Afternoon, Dr. Nelson.

9       A    Good afternoon, Mr. Tedder.

10      Q    So you just testified that you put whiplash shaken

11  baby in the same category as blunt trauma, correct?

12      A    Yes.

13      Q    And you specifically refer to it as whiplash shaken

14  baby, correct?

15      A    Shaken baby, whiplash shaken baby.  I don't think

16  it makes a difference.

17      Q    Well, sir, whiplash is extremely critical, wouldn't

18  you agree with that, sir?

19      A    I think that the shaking produces, as I said

20  earlier, both hyperextension, neck flung back, and a

21  hyperflexion injury, put forward, and that is what most

22  people refer to as whiplash.

23      Q    Whiplash meaning if you're in an automobile and

24  you're rear-ended by another person, people suffer whiplash

25  injury, correct?

1    A    Yes.

2    Q    Because suddenly you're hit from the rear and your

3  neck snaps back, something like that, correct?

4    A    And then your neck goes forward.

5    Q    That's right.  And isn't it true that most often

6  when somebody has whiplash injury there is injury to the neck

7  and no injury to the brain whatsoever?

8    A    That's an adult.

9    Q    Isn't that true, however, sir?

10   A    True in adults.

11   Q    Okay.  So in an adult, whiplash injury causes

12 injury to the neck and no injury to the brain, correct, most

13 of the time?

14   A    And the reason for that --

15   Q    Sir, true or false?

16   A    The reason for that --

17   Q    Sir, is that true or false?

18   A    Yes, it's true.

19   Q    And, in fact, an adult has a stronger neck than a

20 child; is that not true?

21   A    That's exactly the reason why, is the neck muscles

22 are developed in the adult to prevent the head from flopping

23 around.

24   Q    So what you're saying here is that it's exactly the

25 same thing, it's an uncontrolled moving of the head on the

1   neck, shaking as opposed to be rear-ended in car,

2   uncontrolled movement of the head, correct?

3        A    In the baby?

4        Q    In both.

5        A    Yes.

6        Q    It's the same thing, correct?

7        A    Yes.

8        Q    And so, therefore, an adult who as a greater

9   ability to prevent his head, his or her head from being

10  snapped around, develops only a neck injury, whereas a baby

11  who has no ability to defend him or herself develops a brain

12  injury but no neck injury; is that what you're telling this

13  jury?

14       A    No, I'm not telling the jury that.

15       Q    Well, you didn't find any injury to the neck in

16  this child, did you?

17       A    I didn't autopsy this child.  I wasn't provided the

18  neck in consultation.  I can only work -- Mr. Tedder, do not

19  interrupt me.

20       Q    Sorry.

21       A    I can only work with what I'm given.  I was given

22  only the brain.

23       Q    And you would agree then that Dr. Hamilton did a

24  very poor job with providing you what you needed to do a

25  thorough examination?

1    A    I wouldn't say he did a very poor job.  If you're

2    suggesting that Dr. Hamilton should have provided me with the

3    entire body of Robert Quirello so that I had the neck to

4    examine, I wouldn't agree with that.

5    Q    Well, sir, I'm suggesting that when you first

6    examined this child, or the parts that were sent to you, the

7    brain and the brain only, you sent back a letter to

8    Dr. Hamilton, did you not, dated September the 18th, 2000?

9    A    Yes.

10   Q    And you indicated in that letter that you had

11   received from him no dura mater, pituitary gland, pineal

12   gland, spinal cord or eyes for examination, correct?

13   A    That's just what Mr. Pennypacker has told me, yes.

14   It didn't say anything about not having the child's neck.

15   Q    And you indicated that you would have preferred,

16   especially with suspicions of the theory of shaken baby, to

17   have had those things provided to you for examination; isn't

18   that correct?

19   A    What I have spelled out in the letter, not the

20   neck.

21   Q    You indicated in that letter you would like to have

22   part of the spinal cord; isn't that true?

23   A    Yes.

24   Q    And are you telling me the spinal cord does not run

25   through the neck?

1    A    The spinal cord runs through the neck, but I think

2  your earlier line of questioning had to do with the injury

3  associated to the neck.

4    Q    So if somebody has an injury to the spinal cord,

5  are you telling this jury that's not a neck injury, that's

6  spinal cord injury only?

7    A    Well, I would certainly make a distinction between

8  what's a spinal cord injury and what's a neck injury.

9    Q    Okay.  Fair enough.  But you've asked to see the

10 spinal cord and you were not provided that, correct?

11   A    Yes.

12   Q    Now, you were allowed to see the brain stem, a

13 portion of the brain stem, correct?

14   A    I think I've got pretty much, I saw pretty much all

15 of the brain stem where it had been severed.

16   Q    You indicated there was no evidence of any injury

17 to the brain stem, correct?

18   A    Yes.

19   Q    And so, therefore, that would prove or show that in

20 fact there was no downward pressure from the brain on the

21 brain stem, correct?

22   A    No, that's not correct.  Your understanding of

23 physiology and your understanding of neuroanatomy is not

24 correct.

25   Q    All right.  Well, isn't it true that a child's

1    skull, especially a four and a half month old child, the

2    bones in the skull are not completely fused yet, correct?

3         A    That's correct.

4         Q    And so, therefore, the child's brain is allowed

5    to -- the skull is allowed to continue to expand as the child

6    grows, correct?

7         A    Yes.

8         Q    And, in fact, if some sort of swelling occurs in

9    the brain or in the substance in the brain or around the

10   brain, the fact that the child's skull plates can expand

11   would allow for expansion; isn't that true?

12        A    Yes.

13        Q    Are you aware, sir, that this child had a rather

14   rapid increase in the size of his head during the short four

15   and a half months that he lived on this earth?

16        A    No, I'm not.

17        Q    Were you aware, sir, that this child was found to

18   be not breathing when it was first reached by paramedics?

19        A    Yes, I am aware of that.

20        Q    Sir, would you agree that a period of time of four

21   or five minutes without breathing could cause irreversible

22   brain damage?

23        A    Yes.

24        Q    Now, sir, would you also agree that subdural

25   hematomas can be caused by child birth?

1    A    Yes.

2    Q    And would you also agree, sir, that just because

3    someone had as subdural hematoma, that does not necessarily

4    mean they're going to have symptoms that would show that they

5    have it?

6    A    Well, then if they have the subdural hematoma, then

7    it's of inconsequence, has no affect, and just by having it

8    wouldn't mean anything.

9    Q    Okay.  So you agree then that a person can have a

10   subdural hematoma that goes undetected?

11   A    A person, or this particular child, or who are we

12   talking about, attorneys, who are we talking about,

13   Mr. Tedder?

14   Q    Sir, you agree or don't you agree that a person can

15   have a nonsymptomatic subdural hematoma?

16   A    Well, again, you'd have to give me more specifics,

17   because just the fact that you're telling me they have it,

18   they obviously have been found to have it for some reason.

19   Q    Sir, you're the expert here and you've been sworn

20   to offer an opinion.  I'm giving you a hypothetical situation

21   wherein if a person had a subdural hematoma, and was not

22   presenting with symptoms, is that or is that not possible?

23   A    Anything is possible, Mr. Tedder.  Pigs could fly,

24   it's possible.  Is it probable, no, it's not probable.

25   Q    You went to medical school at the University of

```
 1   Carribean; is that correct?
 2         A     American University, yes.
 3         Q     And that's located, where, in Panama?
 4         A     Montserrat, British West Indies.
 5         Q     You were not able to become admitted to any medical
 6   school in the United States?
 7         A     What's the point of your question?
 8         Q     The answer to that is yes?
 9         A     Yes.
10         Q     You tried, didn't you?
11         A     Yes.
12               MS. SINGER:  I'm going to lodge an objection.  I
13         think this is totally irrelevant, whether he tried or
14         not.
15               MR. TEDDER:  Well, Your Honor, the witness has
16         testified about pigs flying.
17               THE COURT:  Overruled.
18               MR. TEDDER:  I'm kind of wondering about him now.
19               THE COURT:  The objection is overruled.
20   BY MR. TEDDER:
21         Q     You agree, sir, that a chronic subdural hematoma
22   can bleed spontaneously?
23         A     Again, it would depend on what you define as
24   spontaneously.  There has to be some type of trauma
25   associated with it typically.  Yes, they may bleed
```

1    spontaneously.  It depends on how much they're bleeding and

2    to what extent.

3        Q    Would you also agree, sir, that a subdural hematoma

4    could be destroyed when the skull is opened during autopsy?

5        A    Not all of it, no.

6        Q    So, therefore, if a subdural hematoma was still

7    there on the opening of a skull and was even partially

8    destroyed, if the dura mater had been preserved and sent off

9    for proper examining by yourself microscopically, it could

10   have determined whether or not it existed; isn't that true?

11       A    Sounds like a multi-part question.  If the subdural

12   is present at autopsy, yes, I'd expect it to be seen at

13   autopsy.  When the autopsy --

14       Q    I didn't ask you that, sir.  I asked if it's

15   preserved --

16           MR. PENNYPACKER:  Your Honor, I'd ask Dr. Nelson be

17       allowed to finish his answer.

18           MR. TEDDER:  Let me rephrase the question because

19       apparently I gave him a multi-part question he says.

20   BY MR. TEDDER:

21       Q    Do you agree that a subdural hematoma could be

22   destroyed when the skull is opened?

23       A    Not completely, no.

24       Q    All right.  Would you agree, sir, that had you been

25   given an opportunity to look at the dura mater, you would

1   have been able to conclusively tell this jury whether or not

2   there was any subdural on the dura mater?

3       A    I would hope so, yes.

4       Q    Because you would have put it in slides and

5   microscopically examined it?

6       A    Yes.

7       Q    An injury to the brain is not always just visible

8   by eyesight, is it?

9       A    That's correct.

10      Q    In fact, isn't it true that the cerebral cortical

11  contusions that you've previously testified about here were

12  only visible on microscopic examination?

13      A    That's correct.

14      Q    Because they were so small, correct?

15      A    Correct.

16      Q    Isn't it also true that the subarachnoid

17  hemorrhaging you've referred to, you described, you measured

18  it, correct?

19      A    In one particular area where it's especially

20  prominent, yes.

21      Q    And that measurement you came up with was eight by

22  eight by eight -- excuse me, eight by eight by nine

23  millimeters?

24      A    Yes, sir.

25      Q    That's a small volume, correct?

1    A    That's a small volume but there's diffuse

2  subarachnoid hemorrhage all throughout the brain.  The

3  deepest area is eight by eight by nine millimeters that's

4  especially prominent.  The subarachnoid hemorrhage is

5  everywhere.

6    Q    You never included the word diffuse subarachnoid in

7  any of your reports to Dr. Hamilton, did you?

8    A    It says here on the second paragraph of that

9  September 18th letter, you can read along with me.  The

10 included left, l. meninges were thin but dusky with

11 subarachnoid hemorrhage.  I don't think I need to modify

12 diffuse.

13   Q    Well, diffuse means that it's all throughout the

14 brain, correct?

15   A    That's essentially what I'm saying when the

16 included left, l. meninges, plural, are thin but dusky with

17 subarachnoid hemorrhage.  The photographs demonstrate it's

18 everywhere.

19   Q    All right.  And you indicated the most prominent

20 area was the one that you just described that you measured as

21 eight by eight by nine millimeters?

22   A    That's what I just said.

23   Q    That's a very small area, is it not?

24   A    That's the most prominent area or it's the

25 thickest.

1       Q      It's a very small area, is it not?

2       A      It's about half an inch.  We're talking about a

3   child's brain that's very small.

4       Q      You also noticed in your letter back to

5   Dr. Hamilton that he apparently had a typographical error in

6   his initial message he sent to you about the weight of the

7   brain?

8       A      That's correct.

9       Q      Now, were you aware from the CAT scans that have

10  been done previously that it was believed this child had

11  chronic and acute subdural hematoma that were bilateral in

12  nature on both sides of the head?

13      A      I've only learned that subsequent.  At the time I

14  performed the examination, I only had the information that

15  was provided to me by the medical examiner's office.

16      Q      So in other words, you've learned since then that

17  there was believed to be bleeding on both sides of the brain?

18      A      Bleeding.  You talking about epidural, you talking

19  about subdural, what are you talking about bleeding?

20      Q      Subdural and epidural, both sides?

21      A      Yes.

22      Q      Now, sir, have you done any research into the

23  forces necessary to cause injury to the brain?

24      A      In children?

25      Q      Anybody.

1   A    Research into the forces necessary?  No.

2   Q    Were you aware of studies that show that the force

3  required to cause either a concussion, subdural hematoma or

4  diffuse axonal injury is not possible by merely shaking?

5   A    I don't subscribe to that theory.

6   Q    You're aware that that exists; correct?

7   A    A lot of people publish a lot of different things,

8  Mr. Tedder, it doesn't necessarily make them gospel.

9   Q    Well, name one recent study that you've reviewed

10  that shows it's based on science and not based on theory?

11   A    Well, again, I don't know that those studies that

12  are based, that you've just alluded to, are necessarily based

13  on science either, as opposed to theory.  Happily, we don't

14  allow people to do studies like this on children, to shake

15  them to see if they are injured or dead.

16   Q    Well, sir, thankfully you're correct about that,

17  and we all agree to that.

18       Are you aware -- you talked, the state asked you

19  earlier about the -- no.

20       Were you aware of studies that a Dr. Ommaya did

21  back in 1968 wherein he took Rhesus monkeys and applied blunt

22  force to their heads?

23   A    Yes.

24   Q    And are you aware that he, by doing that, was able

25  to determine the amount of force that was needed to cause a

1   concussion to a monkey?

2        A     Do you understand this the term concussion?

3        Q     Well, you're the doctor.

4        A     Well, then let me explain it to you, because it's

5   different than what I think you're talking about.   A

6   concussion is just a loss of consciousness, a transient loss

7   of consciousness.   What you're talking about and what you're

8   asking the questions about has to do with bleeding.   It's

9   different.

10       Q     Are you aware that in that same study he also found

11  out the amount of force necessary to cause subdural hematomas

12  or bleeding in the brain?

13       A     Again, in monkeys.   Those studies were done as part

14  of the automotive industry in an attempt to develop a safe

15  dashboard.

16       Q     Right.   And you also agree in that same study he

17  developed information on the amount of force required to

18  cause diffuse axonal injury in the brain?

19       A     Yes.

20       Q     Are you aware that those, that information was

21  taken by Anne Duhaime, another doctor who published a study

22  in 1986, wherein she tried to determine how much force a

23  person could actually generate in shaking an object; were you

24  aware of that?

25       A     I think your whole entire sentence is based on the

1   word tried, she tried to develop.  And, again, I'm not going

2   to debate the literature with you, Mr. Tedder.  I think

3   anybody can publish what they want to believe in the

4   literature and it doesn't make it gospel.

5       Q    Do you ever read the Journals of Neurosurgery?

6       A    No, I don't read the Journals of Neurosurgery.

7       Q    Are you aware that Dr. Ommya recently published an

8   article in the British Journal of Neurosurgery wherein he

9   says his study had been misused by people advancing the

10  theory of shaken baby syndrome?

11      A    Doesn't surprise me.

12      Q    And you're aware Dr. Ommya is a very well respected

13  scientist?

14      A    I am.

15          MS. SINGER:  Your Honor, objection as to comments

16      on other people.  I don't think that you can ask a

17      witness to comment on --

18          THE COURT:  The objection is overruled.  You can

19      ask the question, Mr. Tedder.

20          MR. TEDDER:  I think he already answered.

21  BY MR. TEDDER:

22      Q    Now, you indicated you believed there was -- well,

23  strike that.

24          Now, the cerebral cortical contusions that you

25  observed microscopically, isn't it true they were located on

1  the outside of the brain?

2      A    Well, they're actually located on the inside of the

3  brain but on the outer surfaces of the brain.

4      Q    Outer surface of the brain.  Okay.

5           Now, do you agree, sir, that a subdural hematoma

6  can spontaneously rebleed?

7      A    I think you've asked me that already.

8      Q    And your question -- answer was yes?

9      A    Yes.

10     Q    And you also agree, sir, that blood on the brain

11 can cause irritation?

12     A    Yes.

13     Q    And that an irritated brain can cause a person to

14 have a seizure?

15     A    That's correct.

16     Q    And that if a person has a seizure, that can cause

17 the person to not be able to breathe?

18     A    Yes.

19     Q    Would you also agree, sir, that in this case

20 essentially the brain was killed because of a depravation of

21 oxygen through blood?

22     A    Blood in the subarachnoid space.

23     Q    No.  No.  In other words, the brain was deprived of

24 its necessary oxygen flow for some period of time?

25     A    I don't know if that's necessarily the case.  To

1  me, that would speak to the clinical definition of brain

2  death, and I don't know if this child met the clinical

3  definition of brain death.  That's not the only way you that

4  can have the global anoxic ischemic encephalopathy, as I saw

5  it.  As I said earlier, you can see that with decreased or no

6  blood flow, decreased or no respiration, oxygen, decreased or

7  no blood sugar.

8      Q    Well, you didn't find any evidence of decreased

9  blood sugar in this child, did you?

10      A    I didn't check or blood sugar.

11      Q    But you did find decreased oxygen?

12      A    You're missing my point.  What I'm saying is I only

13  have the brain here to examine.  If there's an abnormality in

14  the blood sugar, that's something that the hospital docs

15  would have examined, would have found.  All I have is the

16  brain and all I have is the final common pathway of what is

17  referred to as anoxic ischemic encephalopathy.  That final

18  common pathway can come about from a number of means, and

19  I've just given you three of them, low blood sugar, low blood

20  flow, low oxygen flow to the brain.

21      Q    Anoxic means lack of oxygen?

22      A    Yes.

23      Q    Ischemic means lack of blood flow?

24      A    Correct.

25      Q    Encephalopathy means injury to the brain?

1     A     Correct.

2     Q     So you have a lack of -- something, some sort of

3 problem with oxygen blood flow causing a problem with the

4 brain?

5     A     Yes.

6     Q     If a child quits breathing, that's going to cause a

7 problem with oxygen, isn't it?

8     A     Yes.

9     Q     Because the brain gets its air or oxygen from blood

10 flow, correct?

11     A     Correct.  What we want to know as pathologists is

12 what caused the child to stop breathing.

13     Q     Of course, that's what everyone wants to know, sir.

14           You also indicated that the brain was swollen,

15 correct?

16     A     Yes.

17     Q     And, in fact, the swollen brain is not surprising

18 if it has bleeding on the brain, is it?

19     A     Or if it's been deprived of oxygen or blood flow.

20           MR. TEDDER:  Okay.  I have no further questions,

21     Your Honor.

22           THE COURT:  Any redirect?

23           MR. PENNYPACKER:  Yes, ma'am.

24                    REDIRECT EXAMINATION

25 BY MR. PENNYPACKER:

Case 1:09-cv-00052-MP-GRJ   Document 21-17   Filed 03/02/11   Page 131 of 139
1090

1    Q    Dr. Nelson, can you explain the difference why

2  adults get whiplash and children with whiplash shaken baby

3  syndrome don't get the same result?

4    A    Again, it largely has to do with the control of the

5  neck musculature and the duration of the force that's applied

6  in an adult versus the child.  Typically what's been reported

7  with regard to shaken baby, is it's not simply a shake like a

8  rear-end collision, it's a repetitive shaking.  The injuries

9  are produced because there's no contortion control to the

10  neck muscles and the head just flops free.  You don't see

11  that in an adult because we can all immediately guard when

12  somebody starts to shake you, even if your mother starts to

13  shake you, you can immediately guard your neck and stiffen

14  your neck, protect your head from just flopping around

15  loosely.

16    Q    Is that why with little babies you have to support

17  their head when you carry them around?

18    A    Absolutely, they have no neck muscle control.  They

19  won't have that until they start creeping or turning over.

20    Q    What is the distinction you make between spinal

21  cord injury and neck injury?

22    A    Well, the spinal cord is specifically that, the

23  spinal cord.  The spinal cord is contained within the central

24  canal of the neck called the vertebral column.  You may have

25  injury to the outside soft tissues or muscles of the neck

```
 1   without having injury to the spinal cord.  So, again, the

 2   reason for completeness is to examine all of it, examine the

 3   neck, examine the spinal cord, and the neck.

 4        Q    You were asked about the child's head circumference

 5   increased from birth until its death.  Were you aware that

 6   Robbie Quirello was born prematurely?

 7        A    I believe so, yes.

 8        Q    Would you expect a premature child to grow more

 9   quickly?

10             MR. TEDDER:  Objection, leading.

11             THE COURT:  The objection is overruled.

12   BY MR. PENNYPACKER:

13        Q    Would you expect that a child born prematurely to

14   grow more quickly to catch up to children of his age?

15        A    Certainly may do that.

16        Q    Would you expect then for the head circumference to

17   increase at a more rapid rate?

18        A    In order to catch up, yes, that's possible.

19        Q    If Robbie Quirello had experienced a subdural

20   hematoma at the time of birth and it was small in nature,

21   would you continue to see evidence of it four and a half

22   months later?

23        A    I would expect so, yes.

24        Q    If it were a substantial chronic subdural hematoma

25   at the time of birth, would you expect some kind of a
```

1    neurological sign at birth?

2        A    Definitely or subsequent to birth when it reaches

3    the critical filling stage to where it's produced signs and

4    symptoms, yes.

5        Q    If he had suffered some birth trauma to cause a

6    subdural hematoma sufficient to cause neurological problems,

7    would you see Apgar scores of eight to nine?

8        A    No.

9        Q    You mentioned the subarachnoid hemorrhage, I

10   believe you used the word everywhere?

11       A    Yes.

12       Q    And you were asked about a certain segment that you

13   measured.  What do you mean by everywhere?

14       A    It's literally everywhere, all over the top of the

15   brain, all over the sides of the brain, all over the bottom

16   of the brain.

17       Q    Could that blood have come from a chronic subdural

18   hematoma?

19       A    No, it could not.

20       Q    You were asked about the study with Rhesus monkeys.

21   Do you understand that in that study the Rhesus monkeys were

22   strapped into a chair and a steel ball was directed into

23   their forehead?

24       A    Yes.

25       Q    Is that similar to the way babies are injured in

1  shaken baby syndrome?

2      A    No.

3      Q    The final pathway of anoxic ischemic

4  encephalopathy, do you know what this child, what his

5  intracranial pressure was at the time he was presented to the

6  hospital on August 2nd?

7      A    No, I don't.

8      Q    Do you know the course of his intracranial pressure

9  from his admission through August 10th?

10     A    No, sir, I don't.

11     Q    If you knew that his intracranial pressure was not

12  high on admission, but began to increase during the eight

13  days in the hospital, would that be consistent with the brain

14  injury?

15         MR. TEDDER:  Objection, Your Honor, it's misstating

16     the evidence.

17         THE COURT:  Overruled.

18  BY MR. PENNYPACKER:

19     Q    Would that be consistent with the brain injury that

20  he suffered on August 2nd?

21     A    Yes, it would.

22     Q    If he got this injury as a result of traumatic

23  shaking between 9:00 and 9:30 in the morning on August 2nd of

24  2000, would you expect his brain to begin to swell gradually

25  over the course of the next eight days?

1    A    Yes.

2    Q    Would that result in anoxic ischemic encephalopathy

3  ten days later when this child died?

4    A    Yes.

5         MR. PENNYPACKER:  That's all the questions I have.

6         THE COURT:  All right.  We're going to recess for

7    the evening.  It's a little bit earlier and I'm happy to

8    be able to do that.

9         Thank you, Dr. Nelson, you can step down.

10        THE WITNESS:  Thank you.

11        THE COURT:  And is Dr. Nelson now released from the

12   subpoena?

13        MS. SINGER:  He is for the state, Your Honor.

14        MR. GROLAND:  Yes.

15        THE COURT:  Thank you, Dr. Nelson, you're released

16   from the subpoena.

17        Ladies and gentlemen, of course, as I have

18   instructed you before, if you'll seal your notebooks,

19   you will be of course having three days now, as I

20   indicated before we began this trial.  Monday is a court

21   holiday, the courthouse will be closed.  We will begin

22   the trial again Tuesday morning at 9:00 and I'll ask you

23   to be here Tuesday morning at 8:50.

24        During the weekend, the same instructions remain,

25   you're not to discuss any of the evidence or anything

1    about the case with any person.  You're not to listen to

2    any news or watch any news that might pertain to this

3    case.  So please refrain from local TV and news.  Of

4    course, national news should be completely safe for you,

5    and of course sports pages, home pages, those kinds of

6    things should be completely safe for you.

7        If anybody does, of course, try to talk to you or

8    contact you, let us know first thing Tuesday morning,

9    after you've already told them to stop and move away.

10       With those instructions, you may retire to the jury

11   room, collect any personal property that you may have in

12   there, and lock up your notebooks.  Thank you.

13       (The jury exited the courtroom.)

14       THE COURT:  Court is still in session, ladies and

15   gentlemen.  While we're waiting for the jury to collect

16   their belongings, Mr. Groland, I believe there were a

17   couple of questions you wanted to proffer for the record

18   that you would have posed to Dr. Hamilton.

19       MR. GROLAND:  I just put it away, my notes on that.

20   I'll remind the Court.  Can we do it next week?  I mean,

21   I'll dig it out.  I don't remember the questions.

22       Okay.  Is the room closed?

23       THE COURT:  Yes, the door is closed.

24       MR. GROLAND:  I don't have the deposition right in

25   front of me but if the Court will permit me, I'll

1    paraphrase.

2            THE COURT:  Okay.

3            MR. TEDDER:  Just a second, I can find it for you.

4            MR. GROLAND:  The first question I was going to ask

5    Dr. Hamilton on recross was a question on an area of the

6    brain where he described a color, and we had asked him

7    in the deposition about a color of chronic subdural

8    hematoma, and he indicated that over time chronic

9    subdural hematoma turns eventually to yellow.  And I was

10   going to ask him does he recall -- I was going to ask

11   him what this yellow area in these three pictures

12   indicates to him, and his response, I expect, would have

13   been that that probably, that yellow area is a problem

14   with the film in the camera.  He answered that in his

15   deposition.  I thought that that was an important

16   question to follow up with, since he had been talking

17   about not being able to observe chronic subdural

18   hematoma in the photographs that Ms. Singer showed him.

19           The second area of questioning I was going to ask

20   him about, the second question was as a follow up to

21   Ms. Singer's question as to could he offer an

22   explanation for why the radiologist may have

23   mistakenly -- I'm paraphrasing again, Ms. Singer, I

24   realize -- why the radiologist could have mistakenly

25   identified chronic subdural hematoma in the CAT scan and

1      he did offer an answer in court to that question.  As I

2      recall, however, in his deposition he stated he could

3      not offer an answer to that very same question that I

4      asked him.

5           MS. SINGER:  I do want the record to reflect that

6      the photographs that were shown to Dr. Hamilton in the

7      deposition were the photographs -- were not the same

8      photographs that were entered into evidence, that those

9      photographs, there were two sets of ME photographs made,

10     one was photographs taken by Tina Millard and one were

11     photographs taken by Dr. Hamilton and his staff.  And

12     the reference, I believe in deposition, as I best recall

13     it, were to photographs taken by Ms. Millard.

14          MR. GROLAND:  My recollection, just for the record,

15     is that we had all the photographs available at

16     Dr. Hamilton's deposition and they were all --

17          MS. SINGER:  Can you say what photograph you showed

18     him in the deposition?

19          MR. GROLAND:  I don't think that is indicated in

20     the deposition.  However, the photographs here do show a

21     yellow area in the dura area, so I would think he would

22     give us the same answer to that, it's a problem with the

23     film.

24          THE COURT:  Good enough.  Court is adjourned.

25          Yes, Mr. Pennypacker?

1     MR. PENNYPACKER:  You said you were going to rule

2     on the admission of the diagram that Ms. Millard had

3     created.  I don't know if that has been resolved or not.

4     THE COURT:  It has not been resolved and obviously

5     it's not going to be admitted today and we will address

6     it on Tuesday.

7     MR. PENNYPACKER:  Yes, ma'am.

8     THE COURT:  We're in recess until Tuesday morning

9     at 8:50.

10    (The trial was recessed at 5:30 P.M. to the

11    following workday, Monday, September 17th, 2002.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25