# EXHIBIT

# L

21-3

*202-1-17814*
*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

Dock _____
05-14-2003

BRIAN PATRICK HERLIHY            )
                 Appellant,      )
                                 )          CASE NUMBER   2000-2753-CFA
                                 )
                                 )
                                 )          APPEAL NUMBER 1D02-4788
                                 )
v.                               )
                                 )          VOLUME XII
                                 )
                                 )
                                 )
STATE OF FLORIDA                 )
                 Appellee,       )

# TRANSCRIPT
# RECORD

## HONORABLE MARTHA ANN LOTT
### ACTING TRIAL JUDGE

**APPEAL FROM THE CIRCUIT COURT
8th JUDICIAL CIRCUIT FOR
ALACHUA COUNTY, FLORIDA**

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

1099

202-1-17814

1    IN THE CIRCUIT COURT OF FLORIDA
     EIGHTH JUDICIAL CIRCUIT
2    IN AND FOR ALACHUA COUNTY

3    CASE NO. 01-2000-CF-002753-A

4    THE STATE OF FLORIDA

5    vs.

                        Volume XII
6    BRIAN PATRICK HERLIHY,
                        1002 - 4788
7         DEFENDANT.

8    _____/

9                                    Docket

                                     05-14-2003

10            TRANSCRIPT ON APPEAL
              PAGES 1099 - 1204
11               VOLUME IX

12

13   PROCEEDINGS:          JURY TRIAL
     BEFORE:               THE HONORABLE MARTHA ANN LOTT,
14                         CIRCUIT JUDGE
     DATE:                 SEPTEMBER 17th, 2002
15   TIME:                 9:06 A.M.
     PLACE:                COURTROOM 4A
16                         ALACHUA COUNTY COURTHOUSE
                           GAINESVILLE, FLORIDA
17

18   APPEARANCES:

19        JEANNE SINGER, ESQUIRE
          and
          STEPHEN H. PENNYPACKER, ESQUIRE
20        120 WEST UNIVERSITY AVENUE
          GAINESVILLE, FLORIDA 32601
21        ATTORNEY FOR THE STATE OF FLORIDA

22        GORDON H. GROLAND, ESQUIRE
          and
23        JOHN TEDDER, ESQUIRE
          500 EAST UNIVERSITY AVENUE, SUITES B&C
24        GAINESVILLE, FLORIDA 32601
          ATTORNEY FOR THE DEFENDANT

25

               Cheryl McDonough, RPR
     Judicial Court Reporter Eighth Judicial Circuit
                    (352) 384-3182

1    INDEX VOLUME IX

2    WITNESSES

3  DR. BERNARD MARIA

4    Direct Examination by Ms. Singer................Page 1108

5    Cross-Examination by Mr. Tedder................Page 1140

6    Redirect Examination by Ms. Singer.............Page 1186

7

8    EXHIBITS

9  STATE'S EXHIBITS

10  No. 62 - Diagram.................................Page 1108

11  No. 63 - Dr. Maria's CV.........................Page 1113

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **P R O C E E D I N G S**

2       (Whereupon, the following proceedings were held,

3   the defendant and counsel being present.)

4       THE COURT:  Which witness is the state intending to

5   call?

6       MS. SINGER:  Dr. Bernie Maria, who is present here

7   today.  We do have two matters that we'd like to present

8   to the Court before the jury is brought in, Your Honor.

9       THE COURT:  Go ahead.

10      MS. SINGER:  The first is last week Mr. Groland and

11  Mr. Tedder asked about providing the trial testimony to

12  their experts for review, and we didn't really know what

13  the answer to that was.  The state has done the research

14  on that, and that would be solely within the Court's

15  discretion.  If the Court wishes to allow that to occur,

16  then that would be permissible under the rules and the

17  law that we found in our research.  We'd just like to

18  present that to the Court.

19      THE COURT:  Well, I'll need argument from both

20  sides on that, so we won't try to do that this morning

21  before we start.

22      MS. SINGER:  I just wanted to advise the Court

23  about what the position was.

24      THE COURT:  Good enough.  We'll address that.  And

25  the witness in question would be called when?

1    　　　　MR. GROLAND:  One of the witnesses in question will

2    be called this afternoon, Dr. Plunkett, who we'd like to

3    provide with -- he's a pathologist, a forensic

4    pathologist.  We'd like to provide him with a copy of

5    Dr. Hamilton's realtime testimony.  And the other doctor

6    is tomorrow and we'd like to provide the doctor

7    tomorrow, and that is Dr. Uscinski, with a copy of

8    Dr. Anne Dickinson's testimony.

9    　　　　THE COURT:  My expectation is that I'll hear

10   argument about this when we switch courtrooms and while

11   we let the jury take a little bit of an extra break.

12   　　　　Anything else we need to address this morning?

13   　　　　MS. SINGER:  Yes, Your Honor, the second matter the

14   state wishes to bring to the Court is that John

15   Quirello, the natural father of the child Robert

16   Quirello, is present in the hallway.  And I had

17   approached Groland about allowing him to be released

18   from the rule to sit in for the remainder of the case,

19   and Mr. Groland has opposed that.  So I'm bringing this

20   to the attention of the Court and citing Section 960.001

21   of the Florida Statutes, which states that the parent of

22   a minor victim, in this case, the parent of Robbie

23   Quirello, is entitled it sit through the trial even if

24   subpoenaed to testify unless the Court determines that

25   such person's presence would be prejudicial.

1    Mr. Quirello has already testified in this case and I

2    don't believe that the defense will be able to show any

3    prejudice whatsoever in him being able to be released

4    from the rule for the purpose of being able to watch the

5    remainder of the trial.

6         MR. GROLAND:  The statute says upon motion.  I

7    don't know that there was a motion filed.  This is an

8    oral motion.  Certainly the prejudice would accrue to

9    the defendant because we anticipate, and that is why we

10   had him under subpoena in the first place, perhaps

11   calling him as a rebuttal witness.  And because of that,

12   there is a very real possibility that his testimony, if

13   we call him in rebuttal, may be impacted based upon what

14   he hears of the rest of the trial.  I don't think that

15   rule is intended to undermine and supersede the rule of

16   sequestration, and I think it puts us at a real

17   disadvantage should we decide to call him in rebuttal.

18        THE COURT:  What possible rebuttal testimony?

19        MR. GROLAND:  Well, rebuttal to some things that --

20        THE COURT:  You can be vague.  If I need more

21   information, I'll ask for it, but give me some idea.

22        MR. GROLAND:  Well, some things that perhaps

23   Crystal has said.

24        THE COURT:  That's sufficient.  You want to respond

25   to the possible --

1    MS. SINGER:  I have no response to that except that

2    he was allowed because of his travel plans and because

3    of Mr. Groland's request to me to be called out of order

4    and permitted to inquire on all areas on the first day

5    of trial.  The defense was allowed to bring forth any

6    possible rebuttal as to Crystal's testimony out of order

7    pursuant to an agreement between the state and defense.

8    And I don't see how he could offer any rebuttal at this

9    time that would not be cumulative and repetitive in its

10   nature.  However, I leave the decision to the Court.  I

11   believe that victims have rights as well and that

12   Mr. Quirello should have a right to be present during

13   the trial of his deceased son's death.

14       THE COURT:  Good enough.  I'm going to address this

15   likewise at the recess that we take at 10:30.  I won't

16   make a decision at this time.

17       MR. GROLAND:  I've got two minor matters.  One is

18   the diagram that the state attempted to move into

19   evidence that we opposed initially.  At this point we're

20   going to withdraw our objection to that and let the

21   state put that into evidence.  So we don't have to

22   address that again.

23       THE COURT:  Good enough.  It will be admitted into

24   evidence as soon as the jury is in place.  You can do

25   that at whatever point this morning in this courtroom.

1    MR. TEDDER:  Which diagram are you talking about?

2    MR. GROLAND:  The diagram that Tina Millard did

3    when she was there at 1:00.

4    I know the Court in the standard instructions

5    admonishes the jury that they're not supposed to do any

6    outside investigation.  What we have reminded them about

7    several times is to stay away from the media and the

8    newspaper and the TV about this case.  There's been very

9    little coverage.

10   Over the weekend I just kind of tuned into the

11   internet on SBS, I haven't done in it in a while.

12   There's a load of information out there that I would ask

13   the Court to specifically admonish the jurors, again,

14   since that is out there and available and no one

15   specifically said, Don't look on the internet, I would

16   ask the Court to:  A, inquire just in general; and B,

17   remind them that they are not to do any independent

18   research at any time during this case.

19   MS. SINGER:  Your Honor, just so the record is

20   clear, this Court in its preliminary instructions did

21   advise the jury not to do any independent investigation.

22   That is in the standard preliminary instructions.  And I

23   want the record to be clear that they were in fact

24   advised of that before the trial started.

25   I have no objection to continuous, a continuous

1    admonishment, but I just want the record to be clear

2    that they were told of that at the beginning of this

3    trial.

4          THE COURT:  Good enough.  I'll advise them again

5    and inquire again.

6          If you'll bring the jury back in.

7          (The jury entered the courtroom.)

8          THE COURT:  Ladies and gentlemen, thank you for

9    arriving right on time this morning.  We are ready to

10   continue the evidence.

11         You may or may not be aware that this is the first

12   day of the court's work week, and the reason we have

13   juggled courtrooms temporarily is for the same process

14   that you were part of at the beginning of the week last

15   week.  In other words, Courtroom 4A, which is our

16   largest courtroom, is filled with a mass of potential

17   jurors who will be inquired of today and then be sent to

18   individual courtrooms.

19         In order to make that process go as efficiently as

20   possible, we have agreed to move this trial just

21   temporarily this morning until 10:30 into a place where

22   we are really rather crowded.  However, I appreciate

23   your assisting in that.  And what that will do for us in

24   this trial is allow us to move the evidence along and

25   not delay the progress of the trial.  So bear with us in

1    these chairs while we go through one witness this

2    morning.  At the 10:30 recess we will move to our

3    regular assigned courtroom, which is 4A.

4         And with that I do need to also inquire, since we

5    have been separated during the course of this three day

6    weekend, whether or not anybody has gotten any

7    information or anyone has tried to make contact with you

8    regarding this case in any way?

9         THE JURORS:  No.

10        THE COURT:  Good enough.  And as I have told you at

11   the beginning of the case, you are not only prohibited

12   from news reports that might have to do with this case,

13   but also any independent inquiry, which means no

14   library, no internet, no going to the scene, and I'm

15   sure all of you have maintained that kind of

16   independence and attention to the evidence that's just

17   in this courtroom; is that correct?

18        THE JURORS:  (Nods of heads.)

19        THE COURT:  Good enough.  We're ready to continue.

20   State may call its next witness.

21        MS. SINGER:  Your Honor, at this time before I call

22   the next witness, the state would ask that a previously

23   defense exhibit marked A for identification be moved

24   into evidence at this time the state's next numbered

25   exhibit.

1    MR. GROLAND:  No objection.

2    THE COURT:  Good enough.  It will be admitted as

3  number?

4    THE CLERK:  Sixty-two, Your Honor.

5    THE COURT:  Sixty-two in evidence for the state.

6    (State's Exhibit No. 62 was moved and admitted into

7  evidence.)

8    MS. SINGER:  The state would now call Dr. Bernie

9  Maria, Bernard Maria.

10   (The witness entered the courtroom.)

11   THE CLERK:  Please stand and raise your right hand.

12   (The witness is duly sworn by the clerk.)

13   THE CLERK:  You may be seated.

14   MS. SINGER:  May I proceed, Your Honor?

15   THE COURT:  Yes.

16 WHEREUPON:

17        DR. BERNARD MARIA,

18 called as a witness herein, having been first duly sworn, was

19 examined and testified as follows:

20        DIRECT EXAMINATION

21 BY MS. SINGER:

22   Q   Dr. Maria, if you would please state your full

23 name?

24   A   Bernard Maria, M-A-R-I-A.

25   Q   Your profession, please?

1   A   I'm a pediatric neurologist.

2   Q   Where were you currently employed?

3   A   At the University of Missouri Columbia School of
4 Medicine.

5   Q   And what are your duties at the University of
6 Missouri at Columbia?

7   A   I'm the chairman of the department of pediatrics
8 and I also serve as the pediatrician in chief for the
9 children's hospital.

10   Q   Taking you back to August of 2000, where were you
11 employed?

12   A   I was at the University of Florida.

13   Q   What position did you hold at the University of
14 Florida?

15   A   I was professor in chief of pediatric neurology.

16   Q   At that time did you leave the University of
17 Florida to go to the University of Mississippi -- not
18 Mississippi, Missouri?

19   A   Missouri, yes.

20   Q   And the purpose for you leaving the University of
21 Florida to go to Missouri?

22   A   I was promoted from being a division chief to a
23 department chairman.

24   Q   As department chairman, could you describe what
25 your duties are and your role is regarding other physicians

1    at the University of Missouri?

2        A    Well, I oversee the pediatricians who are on the

3    faculty at the University of Missouri, and I also as

4    pediatrician in chief oversee all the doctors, medical and

5    surgical, that are taking care of children in our children's

6    hospital.

7        Q    When were you at the University of Florida did you

8    have a supervisory role as well?

9        A    Yes, I ran the division of pediatric neurology,

10   which means I oversaw the physicians and nurses who take care

11   of children with neurological problems.

12       Q    When you say neurology, could you tell the jury

13   briefly what that means in layman's terms?

14       A    The diseases of the brain, the spinal cord, the

15   nerves, and the muscles.

16       Q    What is your educational background, sir?

17       A    I'm native Canadian, born and raised, and then went

18   to medical school in Canada, University of Sherbrooke; and I

19   obtained my pediatrics training at Montreal Children's

20   Hospital and McGill University; moved to the States to do my

21   neurology training at John Hopkins in Baltimore; then I

22   obtained a fellowship on brain tumors at M.D. Anderson Cancer

23   Center in Houston; joined the University of Toronto, 1988;

24   then on a day where Celsius and Farenheit were about the same

25   number, I was recruited to Gainesville in 1990 to serve as

1    chief of pediatric neurology.

2        Q    Have you earned any other degrees other than your

3    medical degree, and tell us your degrees that you'll outline

4    for us?

5        A    I obtained a business degree with the business

6    school at Florida in 1995, MBA.

7        Q    Are you board certified in any particular areas of

8    medicine?

9        A    Yeah, I have board certification in pediatrics,

10   also in neurology and psychiatry, with special qualifications

11   in child neurology.

12       Q    In the course of -- well, how many -- do you hold a

13   license to practice medicine?

14       A    Yeah, I'm licensed in Florida, in Texas, and in

15   Missouri.

16       Q    Have you published any particular articles, texts

17   or other monographs that have been read by your peers in

18   pediatric neurology or neurology?

19       A    Yeah, part of the job of an academic physician is

20   to contribute to discovery, new knowledge, and we share that

21   new knowledge through publications of manuscripts, books, and

22   the like.

23       Q    Have you also made presentations in the course of

24   your academic position with the University of Florida and now

25   with the University of Missouri?

1    A    Yes.

2    Q    Have you published actual texts or have you been

3 involved in the development of actual texts for the training

4 of new doctors, young doctors?

5    A    Yes, I edit a textbook in child neurology called

6 Current Management in Child Neurology, now in its second

7 edition.

8    Q    Have you received any honors in your position as a

9 pediatric neurologist?

10    A    Yes.

11         MS. SINGER:  I'm going to show you, if I may

12    approach the witness, Your Honor.

13         THE COURT:  Go ahead.

14 BY MS. SINGER:

15    Q    I'm going to show you, Dr. Maria, a curriculum

16 vitae that's dated July 2001, and have you go through that

17 briefly and tell me whether or not it accurately reflects

18 your training, experience, publications, presentations, as

19 well as honors up to the date it was printed, which was July

20 of last year?

21    A    Yes, it does.

22    Q    Have you added to this particular curriculum vitae

23 since July of 2001?

24    A    Yes.

25         MS. SINGER:  Your Honor, at this time I would

1    tender Dr. Maria's curriculum vitae as the next numbered

2    item into evidence.

3              THE COURT:  Any objection?

4              MR. TEDDER:  No, ma'am.

5              THE COURT:  It will be admitted as Number 63?

6              THE CLERK:  63, Your Honor.

7              THE COURT:  Sixty-three in evidence for the state.

8              (State's Exhibit No. 63 was moved and admitted into

9    evidence.)

10   BY MS. SINGER:

11        Q    Dr. Maria, how many years have you been practicing

12   medicine?

13        A    I graduated in 1981.

14        Q    So you're in your 21st year at this point?

15        A    Yes.

16        Q    And of those years have you been practicing in the

17   area of neurology and pediatric neurology?

18        A    Yes.

19        Q    In those 21 years of practice, have you treated

20   children who have been diagnosed with shaken baby syndrome?

21             MR. TEDDER:  Objection to the form of the question,

22        assumes.

23             THE COURT:  Overruled.

24   BY MS. SINGER:

25        Q    Have you, sir?

1    A    Yes, I have.

2    Q    How frequently would you say you have seen children

3  who have been diagnosed with shaken baby --

4         MR. TEDDER:  Objection, a theory is not a

5         diagnosis, Your Honor.

6         THE COURT:  Objection is overruled.

7         THE WITNESS:  On average, sadly, probably four to

8         five children a year.

9  BY MS. SINGER:

10    Q    When you say that you have a specialized area of

11  study of pediatric neurology, what does that mean?

12    A    Well, that our special interests and expertise is

13  in taking care of children, and children who have things that

14  go on in terms of the nervous system.  So some people define

15  children differently but generally people under the age of 21

16  that have anything that goes on with their nervous system

17  would typically be something that we would be called upon to

18  help with.

19    Q    Over the 21 years of your practice, are those the

20  patients that you have primarily dealt with?

21    A    Yes.

22         MS. SINGER:  Your Honor, at this time I would

23         tender Dr. Bernie Maria as an expert in the field of

24         neurology and specifically pediatric neurology.

25         THE COURT:  Any objection?

1   MR. TEDDER:  No objection, Your Honor.

2   THE COURT:  Dr. Maria will be allowed to give his

3   opinion testimony in the area of neurology and in the

4   area of pediatric neurology.

5   BY MS. SINGER:

6   Q   Dr. Maria, if you would, before we get into

7   specifics of this case, if you would, please, explain the

8   difference between a neurologist and a neurosurgeon for the

9   jury?

10  A   Well, neurosurgeons are people who master the

11  technical aspects of actually doing surgery, that is

12  providing, making an incision, removing a tumor, removing

13  pressure from the brain using surgical means.  The medical

14  specialty is focused on the diagnosis, on putting your finger

15  on what the problem is, where it is in the nervous system,

16  and managing it medically with prescriptions of various

17  medications.  We work very closely with neurosurgeons with

18  many of the problems that children present to us with.

19  Q   And when you were working at Shands Teaching

20  Hospital as the head of pediatric neurology, was there a team

21  approach in the treatment of children who came into that

22  hospital?

23  A   Yes.

24  Q   And when we say team approach, Doctor, could you

25  explain to the jury what that means?

1    A    Well, in a children's hospital, like the Children's

2 Hospital at Shands, there are lots of people that work with

3 the children and the families when they come into the

4 hospital, all the way from the emergency room setting to the

5 pediatric intensive care unit, as was the case with Robert.

6 So our nurses are very involved and they're specialized in

7 terms of taking care of kids and kids' needs.  We have teams

8 of doctors, that would include an intensivist, like

9 Dr. Dickinson, who's a person who's specialized in taking

10 care of children in the critical care setting when they're

11 really at their worst.  That's her specialty area.  Other

12 people, like Dr. Levine, who's an ophthalmologist --

13         MR. TEDDER:  I'm going to object to this, Your

14     Honor, improper bolstering of witnesses.

15         THE COURT:  Overruled.

16         THE WITNESS:  Like Dr. Levine who's an

17     ophthalmologist, who's special area is examining the

18     eyeball and what diseases may be affecting the eyes.  So

19     we, just like a football team would huddle, we as a team

20     would huddle in terms of trying to get our heads

21     together on what's going on when a child presents to the

22     hospital.

23 BY MS. SINGER:

24     Q    Taking you now to August 2nd of the year 2000, were

25 you called upon to examine a child identified to you as

1    Robbie Quirello?

2        A    Yes, I was.

3        Q    And how would you have been called upon or your

4    folks, the pediatric neurologists, been called upon to come

5    and actually examine Robbie?

6        A    Well, when a child comes into the hospital they can

7    be in any part of the hospital.  If they're not really very

8    sick, then they'll typically be admitted to the ward, or if

9    they're in the emergency room and they need our help then,

10   then we'll get called by the emergency room doctors.  So we

11   respond to the primary physician who is in charge, and in

12   this instance that was Dr. Dickinson, the pediatric

13   intensivist I mentioned.  So she gave us a call and said she

14   had concerns --

15            MR. TEDDER:  Objection, hearsay.

16            THE COURT:  The objection is sustained.

17   BY MS. SINGER:

18       Q    Dr. Maria, you don't need to tell us what she said,

19   but you can tell us what you did in response to what she

20   said.

21       A    Well, we were invited to provide an evaluation of

22   Robbie, what was going on with his brain.

23       Q    And did you personally do that evaluation, sir?

24       A    Yes.

25       Q    Did you -- when did you first see Robbie?

1    A    August 2nd, 2000.

2    Q    Could you, before you tell us what you did specific

3    to Robbie, could you tell us what you would do to assess a

4    child such as Robbie, a four and a half month old child who's

5    come into the PICU, what testing and review would you do?

6    A    Well, before actually laying on of hands, the

7    actual physical examination part, we'll collect information.

8    If there's information that's already been gathered as to

9    what's happened, it's oftentimes recorded in the chart or the

10   people who have been working and collecting that information

11   will speak to us directly.  So we try to find out exactly

12   what's happened before actually conducting the physical

13   examination.

14   Q    Would you have reviewed any CT scans or other

15   radiological examinations that had been done on the child

16   before you made your examination and assessment?

17   A    Yes.

18   Q    And would you have reviewed lab reports as well?

19   A    Yes.

20   Q    Or I guess you'd say results from laboratory

21   testing?

22   A    Any and all information that would have been

23   collected, including laboratory studies, any kind of

24   imagining of the brain, like a CAT scan, would be things that

25   we would want to include as part of our evaluation.

1    Q    Would you also do a physical examination of the

2 child yourself?

3    A    Yes.

4    Q    Did do you that in this case?

5    A    Yes.

6    Q    What did that entail, sir?

7    A    Well, it's sort of a -- there's a systematic

8 approach to evaluating different parts of how the brain is

9 working or not working.  So the examination has several

10 components to it.

11        One component involves examining what we call the

12 cranial nerves, which has to do with how the eyes are moving,

13 how the face is moving.  That tells us something about the

14 brain stem at the very base of the brain, how well it's

15 working.

16        And then the motor exam, which involves pulling out

17 our big reflex hammer and seeing if reflexes are present in

18 the knees and the arms, seeing if there's any movements of

19 the arms or legs.

20        A sensory exam, which would involve seeing whether

21 the child seems to appreciate touch or any kind of pain, do

22 they withdraw to pain or not.  So we go through this sort of

23 systematically trying to assess how well the brain is working

24 or not working.

25    Q    And did you do that with Robbie Quirello?

1   A   I did.

2   Q   Could you tell us what the results were of your

3   physical examination of Robbie Quirello on the 2nd of August?

4   A   Would you like me to go through the details of my

5   note on the 2nd, which I have in front of me?

6   Q   Yes, please, Doctor.

7   A   So the first aspects of the exam had to do with the

8   eyes.  And I noted on examining him with an opthalmoscope,

9   which is an instrument that we use to look into the eye, that

10  there was evidence of bleeding in the fluid of the eye,

11  called the vitreous, but also in the retina at the back of

12  the eye.  There were multiple hemorrhages.

13      I noticed also that his eyes would tend to what we

14  call sunset, that is look downward and fix downward, which is

15  an indication of injury to the highest part of the brain stem

16  called the midbrain.

17      I checked for what are called corneal reflexes, so

18  we'll take a little Q-tip and gently stroke the cornea on the

19  outer side of the eye to see if there's a blink response.

20  And I noted that it was diminished on the left but normal on

21  the right, which told me the left side of his brain stem at

22  that moment was having a little more trouble than the right

23  side.

24      He had what we call dolls eyes.  If you turn the

25  head to the left and then quickly to the right, the eyes will

1 | tend to stay in the midline in a child who is deeply sleeping
2 | or what we call obtundent, who is out of it basically, their
3 | eyes will tend to stay in the midline.  And that told us that
4 | that part of his brain stem was working just fine.
5 | Then we evaluated the various cranial nerves and
6 | there are 12 of them.  Cranial nerves 5 through 12 I found to
7 | be normal.  He had some abnormal movements of the arms and
8 | legs, which I refer to here as, you know, a fancy word,
9 | choreoathetoid movements, so he had some abnormal movements
10 | of his hands and legs indicating serious brain dysfunction.
11 | This was intermittent.
12 | When I checked for his reflexes, they were
13 | abnormally increased.  So when I tapped on his knees and his
14 | arms, his arms and legs jerked abnormally.  When I stroked
15 | the bottom of his feet, normally the toe, the big toe should
16 | point downwards when you do that, and when it points upwards,
17 | it indicates some damage to the motor tracts from the brain
18 | to the spinal cord, and both his toes moved in the wrong
19 | direction, so indicating further dysfunction of his brain.
20 | Then I reviewed his CAT scan.  I also felt his soft
21 | spot, which in children oftentimes doesn't close until
22 | they're about a year and a half, and his soft spot was tense,
23 | meaning tight, because of pressure in the head, and it was
24 | also jumpy or pulsatile, which is abnormal.
25 | And then I rendered an opinion as to what was going

1   on.

2        Q    And, Doctor, what was your opinion as to the injury

3   sustained by Robbie Quirello after your physical examination?

4        A    Well, I felt that there were three things going on:

5   One was that he had suffered from shaking and had shaken baby

6   syndrome; second, that he had a history of seizures that were

7   being treated with a seizure medication resulting from the

8   shaken baby syndrome; and that three, that he had increased

9   pressure in his head because of the bleeding and the damage

10  that had been done to his brain from shaking.

11       Q    So your finding as to the seizures were that the

12  seizures were the result of the brain damage that had

13  occurred before; is that your testimony today?

14       A    Yes.

15       Q    Now, as part of your evaluation would you have

16  reviewed laboratory tests that had been done on Robbie when

17  he was first admitted to the hospital?

18       A    Yes, blood work or the CAT scan.

19       Q    What would you expect to see in the blood work of a

20  child such as Robbie if he had suffered a hypoxic injury as

21  opposed to a shaken baby injury?

22       A    Well, one of the examples of that would be that we

23  see also all too often would be like in a near drowning, a

24  child who is in a swimming pool, or at his age he was in a

25  bath.

1    Q    That would be a hypoxic injury, a drowning?

2    A    Yes, a child who then would be deprived, whose

3    brain would be deprived of oxygen, a fancy word, hypoxic

4    ischemic injury.  So in that situation when the oxygen, when

5    there's a problem with oxygenation, the brain will suffer,

6    but other organs suffer also, particularly the kidneys, the

7    liver.  And there was, as I recall, no evidence of such

8    evidence in him, that is the blood work did not indicate that

9    his kidneys had suffered in any way from hypoxia.

10   Q    What does that tell you about the brain injury if

11   you don't see any corresponding sign or symptom in the other

12   organs?

13   A    That if there was a point where he had a reduced

14   amount of oxygen to the brain because he wasn't breathing or

15   wasn't breathing well enough, that the degree of damage that

16   he had really could not be explained, could not be explained

17   by a lack of oxygenation, that is, if that was present there

18   would have to be a one percent explanation for the whole

19   picture.

20   Q    Would his problems with breathing have been due to

21   the shaking?

22   A    Yeah, if --

23   Q    Would that be a result of being shaken violently?

24   A    If violently shaken, that can result in an arrest,

25   in the arresting breathing, and that's what I think has

1    happened here.

2        Q    As opposed to the brain damage being caused by no

3    oxygen?

4        A    Right, that is that if he suffered this degree of

5    brain damage from a lack of oxygen, his kidneys and his liver

6    would have shown equal dysfunction as in his brain.  There

7    was no evidence based on the blood work of any involvement of

8    those organs.

9        Q    And you also reviewed his CT scans, his

10   radiological studies, correct?

11       A    Yes.

12       Q    Do you recall what you saw when you looked at the

13   CT scans?

14       A    Well, there was blood, new blood present, which of

15   course one would never see with a lack of oxygen to the

16   brain.

17       Q    This new blood, are you able to say whether or not

18   the blood caused the brain injury or the brain injury caused

19   the blood?

20       A    The blood is part of the injury.  The blood

21   actually was sitting outside of the brain.  But we know that

22   when blood is outside of the brain because of shaking, that

23   injury to the brain itself, which is harder to see on the CAT

24   scan, is a big part of the problem.

25       Q    Were you advised that at autopsy there was -- well,

1  let me ask you this question first:  Are you able to see

2  contusions or bruises on the brain when you examine a CAT

3  scan?

4      A    Usually not.  If the brain has been bruised because

5  it's been moved around within the skull, unless it's a very,

6  very severe bruise, in which case there may also be bleeding

7  with it, then it usually can't be seen in a CAT scan and one

8  will need to wait for an autopsy to confirm their presence.

9      Q    If you were advised that in fact there were

10  findings of cerebral cortical contusions on the brain, would

11  that be consistent with your diagnosis that this child was

12  violently shaken?

13     A    Yes, because when the shaking is occurring, the

14  brain is moving at a different speed than the skull.  So sort

15  of picture, if you will, a hardened jello within the skull.

16  If the head is moving in one direction, that jello is moving

17  in the opposite direction for a period of time, smashing

18  against the bones of the skull on the inside, thus causing

19  bruising or contusion within the brain.

20     Q    And that would be consistent with your opinion

21  regarding how this child was injured and later died?

22     A    Yes.

23     Q    Now, along with your physical examination and

24  review of testing, did you also review a test called the EEG?

25     A    Yes.

1      Q    What is an EEG?

2      A    EEG stands for electroencephalography.  Basically

3  it's a recording of the electricity within the brain.  So we

4  put these little electrodes, leads, on the head, all over the

5  head, and we record what the electrical current is within the

6  brain and whether that's normal or not.

7      Q    Did you do that or did you all do that in the case

8  of Robbie Quirello to measure his electrical activity?

9      A    Yes.

10     Q    And were you able to review those EEGs?

11     A    Yes.

12     Q    And what finings, what did the findings of the EEG

13 tell you about Robbie's brain?

14     A    The EEG showed that throughout his brain that the

15 amount of electrical activity in the brain was deeply

16 suppressed and that there was what we call a slowing.  So

17 these waves that we record over the surface of the head have

18 a certain frequency and a certain amplitude, so they were

19 suppressed, that is it was dampened if you will, a deep

20 decrease, significant decrease in the amount of electricity

21 that was there.  And the waves themselves were very slow,

22 indicating that the process that had led to his brain

23 dysfunction was one that involved the whole brain.

24     Q    Was that consistent with a finding that Robbie had

25 suffered a seizure that caused this injury to his brain?

1    A    Consistent with what, with the underlying shaking

2  injury in terms of disrupting the whole brain.  The seizures

3  resulted to damage that was greater in some areas of the

4  brain than others.  But if he was just having seizures, say,

5  from some irritation of the brain because of the blood that

6  was there, you wouldn't see a depression in the rest of the

7  brain.  It would look reasonably normal.

8    Q    Could you give the jury a brief summary of what

9  kind of damages you're seeing in Robbie's brain at this point

10  when you're looking at the CT scans, the EEG, and the lab

11  work, what's actually going on in Robbie's brain at this

12  point?

13    A    Well, the way we approach this is sort of like

14  putting the pieces of the puzzle together, that is we'll

15  collect some information on our examination, that's one piece

16  of the puzzle, including the examination of the eyes,

17  examination of the neurological function of the brain.  And

18  then we'll look at lab work.  We'll look a CAT scan.  We'll

19  look at an EEG.  And these are all different pieces of the

20  puzzle.  And as we put all of these pieces together, we come

21  to what's called a unifying diagnosis, that is, what is the

22  thing that can best explain each and every one of these

23  things.  Putting that together led us to the conclusion that

24  he had shaken baby syndrome.

25    Q    Doctor, are you able to tell us today, based upon a

1    reasonable degree of medical certainty, that that is what

2    this child suffered on August 2nd, the year 2000?

3        A    Yeah, there is no question in my mind that this

4    young man was shaken.

5        Q    Now, are you able to tell us when in time this

6    shaking would have occurred?

7        A    When this shaking takes place, it will immediately

8    result in a loss of consciousness or a deep suppression of

9    consciousness, something that's really obvious.  There's

10   nothing subtle about it.  So it's not like there's a lucid

11   period, like the shaking occurs and the child is fine, then,

12   you know, two hours later they're in a coma.  It's immediate.

13          So based on that, and based on my review of the

14   records, given that what was reported was that he was fine up

15   until 9:00 and then EMS, I think, was in the mix around 9:30,

16   9:35, the shaking had to have taken place in that 30-minute

17   window.

18       Q    In the course of your experience treating children

19   for neurological injuries, neurological disease, have you

20   ever seen -- let me rephrase the question.

21          In the course of your experience in treating

22   children who have been diagnosed with shaken baby syndrome,

23   specifically, you indeed lay out a predicate for us that you

24   have seen a number of those children, have you ever seen a

25   child who was reported to have been intentionally shaken

1    suffer a broken neck?

2        A    No.

3        Q    Doctor, do you have an explanation for why that is

4    that the shaking takes place but the baby's neck is not

5    broken as a result?

6        A    I mean, children have -- I think in my deposition I

7    referred to them as rubber balls, you know, they have this

8    kind of ability to flex tendons and muscles that we don't

9    have.  We all know that children have a lot of flexibility in

10   their joints, you know, that we lose over time.  The same

11   would apply for the neck.  So I can't remember -- and, you

12   know, we're talking four to five children for 20-plus years,

13   I can't remember a single instance where there was injury to

14   the neck itself resulting in, say, a fracture of the spine.

15       Q    Had it been reported to you that Robbie had

16   suffered a seizure at some point when he was admitted to the

17   pediatric intensive care unit after leaving, I believe, the

18   radiological area; was that reported to you?

19       A    Yes, by history, had seizures and had been started

20   on an anti-seizure medicine called Phenytoin.

21       Q    With respect to the diagnosis that you have made

22   that the child was violently shaken, could you explain to the

23   jury why Robbie would have been suffering from seizures at

24   the time that he was admitted into the PICU?

25       A    There are a couple of reasons for that.  One is

1   that any time you have blood directly on the surface of the

2   brain, it's very irritating, and that can lead to some

3   abnormal firing of brain cells, thus resulting in a seizure.

4   The other reason is that when the shaking is going on,

5   there's some blood vessels that are tearing at the surface of

6   the brain that caused the blood that we saw, but much of the

7   damage is happening within the brain itself.

8          The brain cells, called neurons, their axons, which

9   is the tracts that allow them to connect with one another,

10  are being shredded.  Those cells are suffering.  And when

11  brain cells suffer, they tend to discharge abnormally, thus

12  causing seizures.

13         So there are two reasons:  One is irritation of the

14  brain on the surface; and the other is the damage that's been

15  done to the brain cells themselves within the brain.

16     Q    There has also been some issue about whether or

17  not -- well, the type of seizures that Robbie was suffering.

18  Could you describe for the jury what a typical seizure would

19  be for a child of the age of four and a half months?

20     A    There are many types of seizures.  The ones, you

21  know, that you all have seen on ER would be the one that

22  results in some stiffening of the arms and legs and then

23  shaking of the whole body at the same time.  We call that an

24  atonic/clonic generalized seizure.  But there are other kinds

25  that may be more subtle with some eye blinking or lip

1131

1   smacking, chewing motions.  So seizures come in many

2   different types.

3       Q    Would a seizure, such as the one you described,

4   where the child could be shaken, could that cause the kind of

5   shaking injury you saw in Robbie's brain?

6       A    No.

7       Q    And would you expect to see a child of Robbie's

8   age, four and a half months, roll several times as a result

9   of a seizure?

10      A    No, I've never seen that.

11      Q    Would a seizure, Dr. Maria, cause the retinal

12  hemorrhaging that you saw in the eyes of Robbie Quirello?

13      A    No.

14      Q    Does a seizure cause intracranial pressure?

15      A    A seizure, if very prolonged, as in at least 30

16  minutes, usually hours, can result in some swelling of the

17  brain.  But it's usually the other way around, it's usually

18  something like an infection in the brain, like the West Nile

19  encephalitis we all have been hearing about, where there is

20  swelling in the brain and then seizure resulting from the

21  swelling and the damage to the brain.  But it's actually very

22  unusual for a swelling of the brain to occur from seizures,

23  and they're usually very prolonged.  And it's almost always

24  the case that it's something else underlying causing the

25  seizure that's also causing the swelling.

1132

1    Q    Now, it has been testified that Robbie suffered

2   both a subdural and subarachnoid bleeding.  Are you able to

3   see that, or were you able to see that on the CAT scan?

4    A    Yes.

5    Q    Would the subdural bleeding that was seen on the

6   CAT scan explain blood in the arachnoid space?

7    A    Could I take a minute to just go over the layers?

8    Q    Yes, please.

9    A    So you have, you know, the skin and you have some

10  muscle underlying the skin, and then you have the skull.  And

11  underlying the skull you have this thick membrane called a

12  dura, which sticks to the skull.  It's actually very hard to

13  pull the dura away from the skull.  And then under this dura

14  you have what's called the arachnoid.  And then under the

15  arachnoid you have the pia.  And then you have the brain.  So

16  the brain has those three layers, if you will, before you get

17  to the skull.

18       So bleeding can occur in any one of those layers.

19  It could be over the dura; what we call an epidural; it could

20  be under the dura, over the arachnoid, we call that subdural;

21  it could be under the arachnoid, over the pia, we call that

22  subarachnoid.  In his case there was evidence of both

23  subarachnoid and subdural bleeding.

24    Q    Would the blood from the dural space, the subdural

25  space be able to get into the subarachnoid space?

1     A     Not unless there was a tear in the arachnoid.

2     Q     Now, if Robbie had an old subdural hematoma, one

3  that he had gotten at birth, what outward signs, as a

4  neurologist, would you expect to see upon the birth of

5  Robbie?

6     A     Well, if there was trauma at birth resulting in the

7  subdural, I can't -- I've seen that before and in every one

8  of those instances there was, it was clear that labor and

9  delivery was a big problem, and that is there was significant

10  molding of the head, bruising of the skull, swelling of the

11  scalp, bleeding under the skin over the skull.  In other

12  words, there would be outward evidence of involvement of the

13  skull, and perhaps even fracture of the skull because of the

14  very traumatic delivery.

15     Q     Would you expect to see Apgar scores of eight at

16  one minute and nine at five minutes had this child suffered a

17  subdural hematoma at birth?

18     A     Apgar scores refer to basically how well a baby is

19  at birth and they can go all the way up to ten.  And Apgars

20  of eight and nine are what most babies have at birth.  So,

21  no, I would expect the Apgar scores to be very low and for

22  the child to be showing evidence of suffering from having had

23  bleeding on the surface of the brain.

24     Q     Would you expect to see outward signs of

25  neurological deficit at well-baby checks after the birth had

1    this child suffered from a subdural hematoma at birth?

2        A    If by some miracle that the youngster seemed

3    outwardly unaffected but had these subdurals, we would see

4    very quickly that the child's head size would be, you know,

5    way above what is it normal, because the blood is there, and

6    the brain is growing, and that extra blood doesn't belong, so

7    we would expect to see the head size, you know, within two

8    months be significantly above what is normal.

9        Q    Let's assume, assuming that Robbie did have a

10   subdural hematoma at birth, we're just going to assume that

11   for a moment.  In your opinion, based upon a reasonable

12   degree of medical certainty, was that the cause of the

13   injuries you saw on August 2nd that led to his death?

14       A    No.

15       Q    We talked a little bit about death caused by lack

16   of oxygen.  As a pediatric neurologist, you treat children

17   who have been injured as a result of lack of oxygen.  You

18   said near drowning is one?

19       A    Yes.

20       Q    Were the findings in this case, do the findings in

21   this case support an opinion that these injuries were caused

22   by lack of oxygen?

23       A    No.

24       Q    Would lack of oxygen explain the retinal

25   hemorrhaging?

1    A    No.

2    Q    Did you continue to examine and treat Robbie during

3  his course at Shands Teaching Hospital until his death --

4    A    Yes.

5    Q    -- on August 10th?

6    A    Yes, I did.

7    Q    Could you outline for the jury how he progressed --

8  we do have, sir, a copy of the entire chart if you need that.

9  I know you've brought some notes with you, but if you need

10  the entire chart for any kind of review, we do have that in

11  evidence at this time.

12       Could you outline for the jury how he progressed

13  from his first day, which is August 2nd?

14    A    From day one to day two, really there really wasn't

15  much of a change in him.  He was still pretty impaired.  I

16  noticed some worsening in terms of the pressure in his brain.

17  When I felt his soft spot or his fontanelle, it was full like

18  it had been on the first day, but now the pulsations, which

19  kind of reflect the blood flow to the brain, were increased.

20  So I made a note that his, that the pulsation, that his

21  fontanelle was hyper-pulsatile, which meant that the pressure

22  in his brain was greater, which in the first 24 to 48 hours

23  after the brain has taken a hit from something, that's when

24  you see pressure, that's when brain damage and swelling

25  occur.  So when brain cells are damaged, the maximum amount

1  of swelling is typically within the first day, two days. So

2  I documented that sure enough the pressure was going up based

3  on the exam.

4        Q    In your opinion was this injury evolving?

5        A    Yeah, we were seeing, you know, basically the

6  consequences of injury to the brain at time zero, we were

7  seeing the progression of that within the first 24 hours,

8  which is when most of the trouble occurs in the brain after

9  an injury.

10       Q    And what else did you note then after that

11  particular day?

12       A    I noted that his corneal reflex that I tested the

13  day before to check part of his brain stem had actually

14  returned, so both corneals were now present. The rest of his

15  brain stem reflexes were normal. He withdrew to pain,

16  appeared to roll his eyes to pain, so he wasn't technically

17  comatose, because technically he wouldn't do those things if

18  the was comatose. He had some feelings of what was going on

19  around him. And that his reflexes, like the day before, were

20  brisk and those toes were up going again, suggesting damage

21  to the motor system which controls the arms and legs and

22  reflexes that I elicited with my hammer and by stroking the

23  underside of his feet.

24       Q    What kind of treatment do you offer to a child like

25  Robbie when he's suffered this kind of injury on day two and

1137

1   until he passes on the 10th?

2       A   Well, sadly the treatment is just supportive.  We

3   try to do our best to keep the pressure to a minimum, to

4   control the seizures when we can, but basically the damage is

5   done.

6       Q   Is there a surgical intervention that would be

7   appropriate in a case such as Robbie's?

8       A   Not really.  There's blood on the outside of the

9   brain, so you might think, well, what if we remove the blood.

10  But the problem is not so much the blood.  The blood tells us

11  how this happened.  The problem is the damage to brain

12  itself, which is a lot harder to see on a CAT scan than blood

13  is.

14      Q   This would be damage to those neurons, those little

15  wires in our brain?

16      A   Yes.

17      Q   Can they be put together?

18      A   No.

19      Q   Reattached?

20      A   I'm afraid not.  No, the damage is really

21  irreversible.

22      Q   And that damage would have occurred prior to seeing

23  the symptoms that were seen on August 2nd in the morning

24  hours?

25      A   The damage was done before he -- yes.  I'm not sure

1    I understand the question.

2         Q    In other words, the damage is done at the time of

3    the shaking?

4         A    That's correct.

5         Q    And it's irreversible at that point?

6         A    Right.

7         Q    And you just follow him as physicians and

8    caretakers to see whether or not there's any way that he can

9    recover from that himself?

10        A    Yes.  And, you know, as days go by you become, your

11   heart sinks because you begin to appreciate that should the

12   child survive, that the likelihood of having qualities or

13   meaningful recovery dwindles rapidly.

14        Q    What types of sustained injuries would you have

15   expected to see in Robbie Quirello had he survived this

16   episode?

17        A    What we sometimes see is, you know, I'll sit with

18   families and describe, you know, what I say to them is kind

19   of a fate worse than death, that is the lower part of the

20   brain stem which allows your heart to beat and allows you to

21   breathe is the hardest thing to kill and that can recover and

22   do well, but everything that makes you a person, your ability

23   to interact with others, to recognize family, to think, to do

24   something with your life, is gone.  Sometimes it's called a

25   vegetative state.  But I felt that had he survived this, that

1  the probability that he would have cerebral palsy, require

2  constant care, be mentally retarded, have seizures that were

3  hard to control, was very, very high.

4      Q    There does come a time then when he does pass; is

5  that correct?

6      A    Yeah.  It's a difficult issue because technically

7  he's not dead because he's breathing, parts of his brain stem

8  are working, but the parts that make us human are dead or

9  dying.  So we have this very difficult sit-down decision with

10 families about what the best thing is, you know, what would

11 he want, what would your son want.  Do you really want us, if

12 his heart stops, if he stops breathing, do you really want us

13 to use the technology to keep his body alive knowing his

14 brain will not serve him well.

15     Q    And was the decision made that if he were to stop

16 breathing, no extraordinary measures would be used to have

17 him begin breathing again?

18     A    Yes.

19     Q    And on August 10th, in fact, did he stop breathing

20 on his own?

21     A    Yes.

22     Q    He passed at that time?

23     A    Yes.

24     Q    Now, Doctor, that death, was that death the result

25 of a rebleed of a chronic subdural hematoma?

1      A    No.

2      Q    Was that death a result of aspiration or

3  asphyxiation?

4      A    No.

5      Q    Was that death a result of a seizure?

6      A    No.

7      Q    Is it your opinion, based upon a reasonable degree

8  of medical certainty, that the death of Robbie Quirello was

9  due to shaking on August 2nd, the year 2000?

10     A    Yes.

11          MS. SINGER:  At this time, if I may approach

12     co-counsel, Your Honor.

13          THE COURT:  All right.

14          MS. SINGER:  No further questions at this time,

15     Your Honor.

16          THE COURT:  All right.  Mr. Tedder or Mr. Groland.

17          MR. GROLAND:  It's going to be Mr. Tedder.

18          THE COURT:  All right.

19                    CROSS-EXAMINATION

20  BY MR. TEDDER:

21     Q    Good morning, Dr. Maria.

22     A    Good morning.

23     Q    May it please the Court, ladies and gentlemen of

24  the jury panel.

25          Doctor, obviously you testified that you're a

1    doctor?

2        A    Yes.

3        Q    Board certified in, I believe you said pediatrics

4    and neurology?

5        A    Yes.

6        Q    Obviously medicine is a science, you agree with

7    that?

8        A    Yes.

9        Q    Based on sound principles of medical science?

10       A    Yes.

11       Q    Not based on conjecture?

12       A    Right.

13       Q    Requiring proof, correct?

14       A    Yes.

15       Q    In order to come up with proof as to medical

16   science, studies are done, correct?

17       A    Yes.

18       Q    Theories are laid, correct?

19       A    Yes.

20       Q    Postulated and then proven, correct, in a lab?

21       A    Yes.

22       Q    And you hold true to that, is that not true?

23       A    Sure.

24       Q    Isn't it true that when I last spoke to you, you

25   said you have to ponder for a couple of weeks and have a few

1   drinks to decide whether you remain a man of science, the law

2   made you a witness; isn't that true?

3       A    Well, I think you quoted an author from the 19th

4   century.

5       Q    Sir, was that your response or not that you would

6   need to ponder it for a while and have a few drinks, whether

7   or not you would be a man of science or witness if the law

8   made you a witness in a court of law?

9       A    No, that's not true.

10      Q    That's not true what you said?

11      A    No.

12      Q    Do you recall giving your deposition in this case?

13      A    Yes.

14           THE COURT:  Give the doctor a copy of the

15      deposition.

16           MR. TEDDER:  Can we have the Court file, Your

17      Honor, Dr. Maria's deposition.

18           MS. SINGER:  Page please.

19           MR. TEDDER:  Just one moment.

20           Turning to page --

21           THE COURT:  Hold on a minute.

22           MR. TEDDER:  I'm sorry.

23           THE COURT:  Go ahead.  Thank you, Mr. Clerk.

24   BY MR. TEDDER:

25      Q    Doctor, if you could please turn to Page 110 and

1   begin on Line 20.

2        A    Yes.

3        Q    And then onto the next page, Page 111, Lines 1

4   through Lines 12.

5        A    Yes.

6        Q    Do you recall that series of questions and answers,

7   sir?

8        A    Yes.

9        Q    Isn't it true that in response to my question -- I

10  asked you following question, okay.  Question:  Okay.

11  According to this article that I just got today, he has a

12  quote that says if the law has made you a witness, remain a

13  man of science, you have no victim to avenge, no guilty or

14  innocent person to ruin, you must bear witness within the

15  limits of science.

16            Question:  Do you agree or disagree with that

17  general notion?

18            Answer:  I'd have to ponder that for a couple of

19  weeks and have a few drinks over it.

20       A    I remember that.

21       Q    That was your answer then, wasn't it?

22       A    Well, my -- yes.

23       Q    Thank you.  Now, you then testified here today that

24  you're a man of science; is that correct or not?

25       A    Yes.

1    Q    A man of science.  And you agree, do you not, that

2  physics apply to human beings, the laws of physics?

3    A    Yes.

4    Q    And yet you're telling this jury that a child's

5  neck would not be broken because of violent shaking; is that

6  correct?

7    A    What I told the jury is that in my years of

8  experience of taking care of children who have suffered from

9  shaken baby syndrome, I've never seen a fracture of the

10  spine, yes.

11    Q    And wouldn't you agree that the laws of physics,

12  that it would seem logically that shaking a baby would

13  increase the odds of breaking a child's neck, would you agree

14  with that or disagree with that?

15    A    I'm just not aware of any studies that have ever

16  shown that.

17    Q    You've looked into studies regarding shaken baby?

18    A    I've never heard that nor have I ever witnessed it.

19  So in my readings and experience in child neurology, I've not

20  come across any writings on spine fracture as a result of

21  shaking.

22    Q    Would you say that in shaken baby cases logic does

23  not always apply?

24    A    I don't know what that means.

25    Q    Would you agree that logic does always apply?

1    A    I don't have a response for that.

2    Q    Do you recall -- refer again to Page 110, line

3  Number 15.  Do you remember that question and answer?

4    A    Yes.

5    Q    Do you recall me asking you then, Question:  It

6  would seem to me that logically in the laws of physics that

7  would even increase the chances of neck injury?

8         Answer:  Now you're thinking like a lawyer, not

9  like a physician or scientist, logic doesn't always apply.

10   A    Yes.  What I went by that, is that when you

11  consider, you know, the differences in the density of the

12  bone of a child, the differences in the density of the

13  connective tissues and muscles and so on, that if you were

14  going to apply the laws of physics, you'd have to take all of

15  these things into consideration, and I don't think that one

16  can do that in medicine.

17   Q    Isn't it true that children have a larger head size

18  proportional to the trunk size?

19   A    Sure.

20   Q    Especially a four and one half month old baby?

21   A    Right.

22   Q    In fact, I think you testified that if an adult had

23  a head side proportional to the trunk, such as a four and a

24  half month old baby's head is to that child's trunk, that the

25  adult's head would fill half the room?

1    A    It was an exaggeration to make the point, yes.

2    Q    Well, you were under oath when you made that

3  exaggerated comment, were you not?

4    A    Yes.

5    Q    You were trying to tell the truth, were you not?

6    A    Trying to illustrate my answer, yes.

7    Q    And you agree, do you not, that children's neck

8  muscles are weaker than an adult's neck muscles?

9    A    Yes, they also have more flexibility.

10   Q    You've testified here today that children are like

11 little rubber balls; is that correct?

12   A    Trying to make a point that children have a lot of

13 flexibility in their tissues.  They're more flexible than we

14 are, and I used rubber ball as a term, yes.

15   Q    You would agree it's a poor term, poor example,

16 don't you agree with that?

17   A    No.

18   Q    Well, then flexible like a rubber ball, you can

19 bounce them off the walls; is that what you're saying?

20   A    No, what I'm saying is --

21   Q    Bounce them off the floor?

22   A    -- that it's generally understood that children can

23 take a fall and recover from it more quickly than we can.

24   Q    Okay.  Thank goodness for that.

25        Now, isn't it true, sir, that a child's bones can

1   be broken?

2       A    Yes.

3       Q    Would it surprise you, sir, that Dr. Dickinson, one

4   of the doctors you referred to earlier, who was part of your

5   team, has testified under oath that it will be difficult to

6   break a child's arm, would that surprise you?

7       A    Depends on the context.

8       Q    Would it surprise you that she testified that it

9   would bend and then break eventually?

10      A    That wouldn't surprise me.

11      Q    Would it surprise you that she has testified under

12  oath that a child can go for two hours without oxygen and not

13  suffer any brain damage?

14      A    We've seen that rarely, yes.

15      Q    Very special circumstances, such as basically being

16  nearly frozen; isn't that correct?

17      A    Yes.

18      Q    None of which had anything to do with this case;

19  isn't that true?

20      A    That's true.

21      Q    You would agree, would you not, if the child was

22  being deprived of oxygen to the brain, that irreversible

23  brain damage can happen in a matter of minutes; isn't that

24  true.

25      A    It can, yes.

1    Q    In fact, you've aware that in this case when the

2  paramedics arrived at the scene to treat Robbie Quirello,

3  that the child was not breathing; are you aware of that, sir?

4    A    Yes.

5    Q    And are you aware of the fact that no one knew at

6  that point in time, or to this day, how long the child had

7  gone without breathing; are you aware of that?

8    A    Yes.

9    Q    Are you aware that the EMTs were only able to begin

10 putting oxygen into the child's lungs by inserting the tube

11 into the child's neck?

12   A    Right.

13   Q    So you're aware, sir, that the child was without

14 oxygen to the brain due to lack of breathing for at least

15 three or four minutes?

16   A    I wouldn't say that.

17   Q    Well, you don't know?

18   A    We don't know, right.

19   Q    And you would agree, sir, that if the child went

20 three or four minutes without having oxygen provided to the

21 brain, that the child could suffer the kind of brain damage

22 that you saw in this case?

23   A    No.

24   Q    You disagree with that?

25   A    Yes.

1   Q    So just a moment ago you indicated that if the

2   child went without oxygen to the brain for three or four

3   minutes, that the child would suffer irreversible brain

4   damage?

5       A    Yes.

6       Q    And yet now you testimony is that the child could

7   not have suffered the kind of brain damage you saw in this

8   case?

9       A    Yes.

10      Q    Isn't it true, sir, that when you began -- let me

11  ask you this:  You're aware, are you not, that children are

12  placed in car seats by law, correct?

13      A    Yes.

14      Q    And that especially for young infants the car seat

15  is required to be facing backwards, correct?

16      A    Correct.

17      Q    And that, you're aware, sir, is to protect the

18  child's neck in the event of an automobile collision; is that

19  not true?

20      A    Yes.

21      Q    Because a child's neck is exceedingly weak; is that

22  not true?

23      A    It's to protect the whole child, including the

24  neck.

25      Q    Especially the neck, is that not true?

1     A    No, not necessarily.

2     Q    Well, then, sir, if you face a child forward,

3  facing forward, a small four and one half month old baby, the

4  child is facing forward, isn't it true that if the person

5  driving the vehicle is in an automobile collision that the

6  child's neck is going to be snapped forward; isn't that true?

7     A    It's not to protect the neck, it's to protect the

8  head.

9     Q    Okay.

10    A    Primarily.

11    Q    To protect the head --

12    A    The whole head.

13    Q    -- to prevent the head from going forward?

14    A    To protect the whole child, yes, including the head

15  and neck, yes.

16    Q    If the child is facing backwards, the neck cannot

17  snap forward or backwards, correct?

18    A    I don't know about snap but cannot move forward.

19    Q    Cannot move, okay.

20         Wouldn't you agree, sir, that the Apgar scores that

21  you referred to earlier simply mean that the baby is

22  breathing and responding to stimuli and nothing more?

23    A    No.

24    Q    You disagree with that?

25    A    Yeah.

1    Q    Now, you indicated that you are a neurologist,

2  correct?

3    A    Yes.

4    Q    And as part of your training in neurology, you

5  obviously had to do a residency in neurology, correct?

6    A    Yes.

7    Q    And are you aware, sir, of the training that

8  neurosurgeons go through?

9    A    Yes.

10   Q    You aware that neurosurgeons, in addition to doing

11  residencies in neurosurgery, also go through residencies in

12  neuropathology, are you aware of that?

13   A    They don't go through residencies, they have

14  rotations.  They get exposure to neuropathology, yes.

15   Q    And radiologist go through residencies in

16  neuroradiology?

17   A    Again, they don't go through residencies.  They

18  have training, several months of exposure to those things.

19   Q    So you agree they have training in addition to

20  neurosurgery, training in neuropathology and neuroradiology?

21   A    Just like neurology, yes.

22   Q    But you don't have any training neurosurgery,

23  correct?

24   A    We have rotations, we get exposed to neurosurgery

25  in the same way as neurosurgeons get exposed to neurology.

1152

1    Q    All right.  You've never done any neurosurgery,

2    have you?

3    A    I've been in the operating room, if that's what you

4    mean.

5    Q    Have you actually performed any surgeries on the

6    brain, yes or no?

7    A    As an assistant to a neurosurgeon, yes.

8    Q    That's the extent of your experience in that,

9    correct?

10    A    Yes.

11    Q    And you indicated that the EEGs were showing low

12    brain activity; isn't that true?

13    A    Yes.

14    Q    Isn't it true that low EEGs, essentially what you

15    were seeing was that this child was already brain dead; isn't

16    that true?

17    A    No.

18    Q    It's not true?

19    A    No.

20    Q    You indicated that the child had reached the point

21    of no return, correct?

22    A    Based on my clinical evaluation, yes.

23    Q    You testified that the child, while technically

24    still alive, was not capable of living the kind of life we

25    prefer for children, people want to live?

1    A    Right.

2    Q    Because of brain damage, correct?

3    A    Yes.

4    Q    Isn't it true that basically the baby was brain

5  dead?

6    A    Brain death is a very specific deal.  Brain death

7  refers to a failure in brain stem function.  This is a child

8  whose brain stem was still working, but the things that make

9  us human and interactive were going.

10   Q    And were gone?

11   A    And some of them were gone.

12   Q    And you've testified previously that this child had

13  no chance of recovery, that's what you testified to, right?

14   A    No chance of meaningful recovery, yes.

15   Q    Now, you indicated on your first exam on August the

16  2nd you noticed that the fontanelle was tense, correct?

17   A    Yes.

18   Q    Which indicates to you that there was pressure in

19  the brain, correct?

20   A    In the skull, yes.

21   Q    In the skull.  And isn't it true that that pressure

22  actually increased the next time you examined the baby on

23  August the 3rd?

24   A    Seemed that way, yes.

25   Q    Which could indicate to you that there was more

1   bleeding in the brain, correct?

2        A     No.

3        Q     Or could it also indicate to you that the brain was

4   expanding or swelling?

5        A     All of the above.

6        Q     All of the above?

7        A     Yes.

8        Q     So it indicated to you that there was possibly more

9   bleeding and also possibly more swelling of the brain?

10       A     Yes.

11       Q     And isn't it true that you examined the CAT scans

12   on August the 2nd?

13       A     Yes.

14       Q     You examined the CAT scans that were done on August

15   the 3rd as well?

16       A     Yes.

17       Q     And in your examination of the CAT scans, you saw

18   evidence of both old and new blood in the subdural regions in

19   the baby's head, yes or no?

20       A     A qualified yes.

21       Q     In fact, there was clear evidence in the CAT scans

22   that this child had what's called a chronic subdural

23   hematoma; isn't that true?

24       A     That was a possibility.

25       Q     Well, you testified previous that you, isn't it

1    true, that you saw in the CAT scan clear evidence of old

2    blood in the subdural space?

3        A    There was a dark area surrounding the brain, which

4    looked to be in the subdural space, but there are a number of

5    explanations for that, including chronic subdurals.

6        Q    Okay.  And you testified -- well, sir, turn to Page

7    25, Line 13.  Actually, if you could begin reading on Line 8

8    on Page 25.

9        A    Okay.

10       Q    Do you recall this series of questions and answers?

11   Question:  What does bilateral subdural mean?

12           Answer:  It means on both sides of the brain, under

13   the dura, which is one of the coverings of the brain, there

14   was evidence of a collection of fluid that doesn't belong.

15           Question:  All right.  And what type of fluid do

16   you believe it was?

17           Answer:  Both new and old blood.

18           Do you recall that question, series of --

19       A    Yes, I do.

20       Q    So the fact is, you observed that there was a

21   chronic subdural hematoma present in this child when he was

22   admitted to the hospital, isn't that true?

23       A    That's what we were thinking at the time, yes.

24       Q    Now, were you aware that the baby had had a seizure

25   on August the 2nd; isn't that true?

1    A    Yes.

2    Q    Because you saw the baby was receiving seizure

3  medication?

4    A    Yes.

5    Q    Now, isn't it also true that swelling in the brain

6  can cause pressure on the optic nerve?

7    A    Yes.

8    Q    And isn't it true that swelling on the brain can

9  cause retinal hemorrhaging?

10    A    Yes.

11    Q    So this child had brain pressure, correct?

12    A    Yes.

13    Q    Had a chronic subdural hematoma, correct?

14    A    Maybe.

15    Q    Well, sir, you just said a moment ago that you

16  observed old blood when you looked at the CAT scan.

17    A    I said that's what we were thinking at the time,

18  yes.

19    Q    Well, that's what you saw based on your training,

20  correct?

21    A    At the time, yes.

22    Q    And you agree, would you not, that a chronic

23  subdural hematoma, it is impossible to age it or determine

24  how old it was unless it's microscopically examined; isn't

25  that true?

1    A    It can be -- yes, that's true, it is hard to date.

2    Q    And you're aware, sir, are you not, that the dura

3  in this case was inadvertently buried by the medical

4  examiner?

5    A    What do you mean by buried?

6    Q    Well, sir, that the dura was not preserved in order

7  to be examined by the neuropathologist in this case, are you

8  aware of that?

9    A    Right, uh-huh, yes.

10    Q    You would agree, would you not, that examining the

11  dura is extremely critical in a case such as this?

12    A    Well, I think the dura was examined grossly.

13    Q    Grossly?

14    A    Yes.

15    Q    And you're aware, are you not -- the state

16  mentioned earlier something about contusions on this child's

17  brain?  And you're aware that Dr. Hamilton, who's a local

18  medical examiner, did the original autopsy, correct?

19    A    Yes.

20    Q    And that he sent portions of the child's body off

21  to be examined by a neuropathologist by the name of

22  Dr. Nelson; are you aware of that?

23    A    Yes.

24    Q    And you're aware, are you not, that Dr. Nelson's

25  gross examination of this child's brain specifically said

1    there were no identified cerebral cortical contusions?

2        A    One of the pathologists reported contusions.  I

3    can't tell you which one of the two.

4        Q    Well, you're aware that Dr. Hamilton, a letter that

5    Dr. Nelson sent to Dr. Hamilton, dated September 18, 2000,

6    specifically contained the following phrase, specifically

7    there were no identified cerebral cortical contusions?

8        A    Okay.

9        Q    And that was based on his gross examination of the

10   child's brain; are you aware of that?

11       A    Yes.

12       Q    And you're aware that in this particular letter to

13   Dr. Hamilton, he indicated to Dr. Hamilton that he had

14   received no dura mater, pituitary gland, pineal gland, spinal

15   cord or eyes?

16       A    Yes.

17       Q    Are you aware of that?

18       A    Yes.

19       Q    Now, you're aware that later on microscopic

20   examination, Dr. Nelson did observe some -- that he actually

21   indicated that he saw cerebral cortical contusions because of

22   examining through a microscope slides of the brain tissue?

23       A    Yes.

24       Q    Are you aware that Dr. Nelson did not make any

25   mention of any nerve damage whatsoever on his microscopic

1    examination of the brain?

2        A    Yes.

3        Q    And I believe you testified earlier that this child

4    suffered from damage to the nerves in his brain; isn't that

5    correct?

6        A    I saw one pathology report that showed that there

7    were neurons that had suffered, yes.

8        Q    Are you aware that what Dr. Nelson essentially

9    found was that the child had a swollen brain?

10       A    It would help me to see what you're referring to as

11   a report before I answer that.

12       Q    So you have not referred or read all the reports?

13       A    Well, I've read all the reports but since you're

14   grilling me on one of them, I'd like to see it.

15            MS. SINGER:  If I could see what you're showing the

16       witness.

17            MR. TEDDER:  May I approach the witness?

18            THE COURT:  Yes, sir.

19            Mr. Tedder, looks like that we're going to have to

20       interrupt your cross to switch courtrooms.  Would this

21       be a good time?

22            MR. TEDDER:  That's fine with me, Judge.

23            THE COURT:  Doctor, if you don't mind, and ladies

24       and gentlemen of the jury, we're going to switch

25       courtrooms at this time.  I'm going to give you a few

1   minutes in case anybody needs to take a restroom break

2   but we won't take basically a smoke break between

3   witnesses.  So if you'll go to Courtroom 4A, please, and

4   gather in the jury room, and then the rest of us will

5   follow you.

6          (The jury exited the courtroom.)

7          (The trial proceedings were continued in Courtroom

8   4A.)

9          THE COURT:  Yes, Ms. Singer.

10          MS. SINGER:   Your Honor, as to the issue of

11   Mr. Quirello coming in to sit as an observer in this

12   trial, and Mr. Groland's objection to that based upon

13   his fact that the rule of sequestration has been

14   imposed, witnesses such as Dr. Maria or the other

15   medical witnesses that are going to testify, including

16   the medical expert, in no way could affect any testimony

17   that John Quirello could give in rebuttal in this case,

18   since this is all medical expert testimony.  And I'm

19   further providing that argument to the Court in

20   consideration to allow Mr. Quirello to sit in, that

21   there would be no prejudice to the defendant, especially

22   with these witnesses.

23          THE COURT:  I'm going to address that more fully

24   after we finish this first witness.  And just as I've

25   just told Mr. Groland in regard to his motion that is

```
1        pending, that I have indicated I will rule on this
2        morning, and just as I indicated to the jurors, I'm
3        going to give them another recess as soon as Dr. Maria
4        has completed his testimony.  At that time we will
5        address both of these legal matters.
6             Go ahead and bring the jury back in.
7             (The jury entered the courtroom.)
8             THE COURT:  Mr. Tedder, you may continue.
9    BY MR. TEDDER:
10        Q    Dr. Maria, I believe when we left off I was talking
11   to you about the neuropathological exam that was done on
12   Robbie Quirello.
13        A    Yes.
14        Q    Basically dealing with microscopic examination of a
15   child brain?
16        A    Yes.
17        Q    Would it surprise you to learn that the impression
18   Dr. Nelson came up with at the end of this was immature human
19   brain, subarachnoid hemorrhage and hematoma; would that
20   surprise you?
21        A    I'm sorry, I didn't hear you, and I thought you
22   were going to show me the report.
23        Q    Well, I can show you the report.  I was just going
24   to ask you this preliminary, whether this would surprise you
25   as to these findings?
```

1   　　　　MS. SINGER:  Your Honor, I'm going to lodge an

2   objection at this time.  This witness had asked to be

3   able to review the report that he has been questioned on

4   when he was downstairs and he was not provided with that

5   report.

6   　　　　MR. TEDDER:  May I approach the witness?

7   　　　　THE COURT:  Yes.

8   　　　　MS. SINGER:  And for the record, what is the date

9   of that letter, Dr. Maria?

10   　　　　THE WITNESS:  October 23rd, 2000.

11   　　　　MS. SINGER:  Thank you, sir.

12   　　　　THE WITNESS:  What was your question on this

13   report?

14   BY MR. TEDDER:

15   　　Q    Turning to the second page, the impression, isn't

16   it true that what Dr. Nelson found essentially is an immature

17   human brain with subarachnoid hemorrhage and hematoma,

18   correct?

19   　　A    Yes.

20   　　Q    He also found anoxic ischemic encephalopathy

21   global?

22   　　A    He did.

23   　　Q    Cerebral edema generalized?

24   　　A    Edema, right.

25   　　Q    Anoxic ischemic encephalopathy global means

1  essentially that the brain was denied oxygen which caused him

2  to die; isn't that true?

3       A    Sort of.  It's that the brain cells suffered from a

4  lack of oxygenation.

5       Q    And anoxic means lack of oxygen, correct?

6       A    Yes, sir.

7       Q    Ischemic means lack of blood flow?

8       A    Yes.

9       Q    Encephalopathy means damage to the brain, correct?

10      A    It does.

11      Q    Global means the entire brain, right?

12      A    It does.

13      Q    So basically he's saying this brain died because it

14  wasn't getting enough oxygen through blood flow, correct?

15      A    Cells weren't getting enough oxygen or using oxygen

16  properly, yes.

17      Q    He also indicated cerebral edema generalized,

18  correct?

19      A    Edema, right.

20      Q    Edema, I'm sorry.  Edema means swelling; isn't that

21  true?

22      A    It does.

23      Q    So that basically means the brain was swollen,

24  correct?

25      A    Yes.

1    Q    And vascular congestion generalized also means that

2  basically the brain was swollen, correct?

3    A    Yes.

4    Q    Makes no mention in there whatsoever of any

5  microscopic findings of nerve damage, does it?

6    A    No, it does, on the first page.

7    Q    But he does not include that in his impressions?

8    A    Right.

9    Q    And where on the first page do you find that?

10   A    Second paragraph, line three, the neurons display

11 the typical anoxic ischemic histologic changes.

12   Q    And, again, that means that the neurons are showing

13 a lack of oxygen, correct?

14   A    They're showing the appearance of what a neuron

15 does when it hasn't had enough oxygen, yes.

16   Q    So they're not showing tearing like you were trying

17 to imply to the jury on direct examination, does it?

18   A    No.

19   Q    So your testimony now to the jury is not that the

20 nerves of a baby's brain are torn when the child is shaken as

21 you claim; is that correct?

22   A    No, that can happen as part of shaking.

23   Q    But didn't happen in this case, did it?

24   A    No, I can't say that.

25   Q    You testified earlier that it did, didn't you?

1    A    I testified that the nerve cells were damaged and

2    this is what has shown in the pathology report.

3    Q    It's showing that the nerve cells are damaged

4    because of lack of oxygen, correct?

5    A    Yes, that's correct.

6    Q    Nerve cells are living tissue, are they not?

7    A    Yes.

8    Q    And any living tissue requires oxygen, does it not?

9    A    It does.

10    Q    And if it doesn't receive oxygen for a period of

11    time, it's going to begin to die, won't it?

12    A    There are lots of ways it may not receive oxygen.

13    The answer to the question is yes.

14    Q    Thank you.  So that's all we're saying here with

15    this nerve damage is this baby was deprived of oxygen?

16    A    What we're saying is that those cells were deprived

17    of oxygen.  That's a big difference from the baby being

18    deprived of oxygen.

19    Q    But I'm talking, sir, about nerve damage.  And you

20    implied to the jury this morning that the nerves were torn?

21    A    Yes, what I said is in shaken injury they can be

22    torn, they can be sheered.  Doesn't mean the pathologist can

23    actually see that.

24    Q    Sir, if Dr. Nelson takes a baby's brain and slices

25    it into small pieces and examines it microscopically, he's

1   going to be in a better position to tell this jury whether or

2   not there's any actual tearing of the nerves; isn't that

3   true?

4        A    Sure.

5        Q    And he didn't see any, did he?

6        A    He didn't report any, no.

7        Q    Now, I believe you've testified earlier that this

8   baby -- let me ask you another question.

9             Doctor, how much are you charging the state to come

10  down here, fly all the way down from Missouri to testify in

11  this case?

12       A    Well, I charge my usual customary fee, which is in

13  terms of review, which is $500 per hour.

14       Q    So you're charging $500 an hour for travel time and

15  for being here and all that?

16       A    For working time, yes.

17       Q    Now, you indicated, wouldn't you agree, sir, that

18  if this child was shaken, as you claim this child was shaken,

19  that that should indicate some damage to the brain stem;

20  would you agree or disagree with that?

21       A    No.

22       Q    You disagree?

23       A    Yes.

24       Q    Would you agree, sir, that had the brain stem been

25  examined microscopically we could determine whether or not

1   there was actually damage to the brain stem?

2       A    In part.  The neurologic examination, like the

3   corneal reflex, for example, those are brain stem functions.

4   So slicing and looking under the microscope is one way to

5   determine whether the brain stem has been injured.  The other

6   way to examine the child.

7       Q    Your clinical examination of the child is what

8   you're referring to when you do the fontanelle -- or the

9   cortical --

10      A    The cranial nerve exams and so on.

11      Q    And, yes or no, would you agree that a microscopic

12  examination of the brain stem will reveal whether there was

13  damage to the brain stem?

14      A    It may, yes.

15      Q    Do you recall on Page 45, Line 4, us discussing

16  microscopic examination of brain stems?

17      A    Yes.

18      Q    You recall the following series of questions and

19  answers?

20      A    Yes.

21      Q    Question:  And you couldn't, or you don't think, or

22  do you know, do you know or do you not know whether or not a

23  microscopic examination of the brain stem would reveal

24  whether or not there was damage?

25              Answer:  A microscopic examination of the brain

1    stem, which can only done with a microscope, will reveal

2    whether there was damage to the brain stem, yes.

3              Do you recall that question and answer?

4        A    Yes.  I also pointed out on the same page at the

5    top that various aspects of the neurologic exam speak to

6    brain stem function.

7        Q    I understand that your other neurological exams are

8    testing of a motor tract of a person.

9        A    Not just the motor tract.  I mean, cranial nerves

10   are not motor tract.

11       Q    Now, would you agree that weak neck muscles can be

12   a sign of possible neurologic damage?

13       A    Yes.

14       Q    Are you aware that this baby had weak neck muscles?

15       A    No.

16       Q    Wouldn't you agree that a baby not eating properly

17   could be a sign of possible neurological damage?

18       A    Yes.

19       Q    Are you aware this child was having problems eating

20   sometimes?

21       A    No.

22       Q    Would you agree that -- would you agree that a

23   subdural hematoma can occur at child birth?

24       A    Yes.

25       Q    And were you aware that this child had a relatively

1    difficult child birth?

2        A    Yes.

3        Q    The child was born face up as opposed to face down,

4    which is more difficult, correct?

5        A    Yes.

6        Q    More difficult to navigate the birth canal.  And

7    also that the child was born with a broken clavicle?

8        A    Yes.

9        Q    Wouldn't you agree, sir, that a subdural hematoma

10   does not have to show signs, symptoms, when it initially

11   occurs, would you agree with that?

12       A    Extremely rare.

13       Q    Would you agree that it can happen?

14       A    Anything is possible.

15       Q    Do you agree or not agree that a subdural hematoma

16   does not immediately always show symptoms?

17       A    Yes.

18       Q    And would you agree, sir, that a subdural hematoma

19   can begin to bleed spontaneously?

20       A    Yes.

21       Q    That it can bleed for no reason at all?

22       A    Yes.

23       Q    And that if a subdural hematoma begins to bleed,

24   that's going to put blood on the brain?

25       A    No, not technically.

1170

```
 1      Q    Not technically?

 2      A    It will put blood on the arachnoid, which is

 3   overlying the brain.

 4      Q    So you're testifying then that if the subdural

 5   bleeds, it does in fact allow blood to get into the arachnoid

 6   area, subarachnoid area?

 7      A    No, I'm saying it stays above the arachnoid

 8   membrane.

 9      Q    Isn't it true that the dura and arachnoid are

10   connected by blood vessels?

11      A    Yes.

12      Q    And that these same blood vessels that can tear

13   when the new bleeding occurs in the dura mater, allow blood

14   to go into the arachnoid area?

15      A    No, not unless there's a tear in the arachnoid.

16      Q    So you say the only way blood can get to the

17   arachnoid is through a tear in the arachnoid?

18      A    Yes.

19      Q    And not from a tear in the blood vessels themselves

20   interconnecting these two areas?

21      A    If there's a tear at the base of a vessel that is

22   under the arachnoid, you could have blood both under the

23   arachnoid and under the dura, yes.

24      Q    So you agree that there can be blood in both?

25      A    Given the conditions I mentioned, yes.
```

1    Q    And wouldn't you agree that the blood on the brain

2    can cause a person to have a seizure?

3    A    Yes.

4    Q    And if a person has a seizure, that can cause them

5    to quit breathing?

6    A    Yes, rarely.

7    Q    And so this baby presents to the hospital with a

8    seizure, not breathing, correct?

9    A    Yes.

10   Q    Now, isn't it true that if a child became lodged

11   between the footboard of a bed and a bed, as Mr. Herlihy has

12   told folks he found this child, that that could cause a child

13   to have a seizure?

14   A    Yes.

15   Q    Isn't it also true that vomiting and aspirating

16   could cause a seizure?

17   A    If the oxygen is down for long enough, yes.

18   Q    Isn't it true, sir, that the intracranial pressure

19   would go up because of a seizure; isn't that true?

20   A    During the seizure, if it's a particular type of

21   seizure, it may, yes.

22   Q    Isn't it true that sometimes the seizure can cause

23   a rapid increase of intracranial pressure?

24   A    Yes.  During the seizure, if it's a generalized

25   atonic/clonic seizure involving the whole body.  It may

1   transiently or temporarily increase the pressure.

2       Q    And you're aware that Dr. Dickinson's testified

3   that this baby was so stiff from the seizure that you could

4   pick him up by his leg?

5       A    Yes.

6       Q    So he was having a very strong seizure; isn't that

7   true?

8       A    At some point, yes.

9       Q    Isn't it true that intracranial pressure can cause,

10  I think you indicated you agreed, that it can cause pressure

11  on the optic nerve?

12      A    It can, yes.

13      Q    And isn't it also true that intracranial pressure

14  and swelling of the brain can block off or occlude veinous

15  drainage from the eyes?

16      A    Not to produce the hemorrhages that this child had.

17      Q    Isn't it true that that can happen, however, it can

18  occlude or block off the veinous drainage?

19      A    I've never seen that.  I'm not aware that that

20  happens.

21      Q    You're not aware that that happens?

22      A    Right.

23      Q    Would it surprise you to learn that other experts

24  testified that this can and does --

25           MS. SINGER:  I'm going to lodge an objection.  I

1    think that is an improper question, Your Honor.

2         THE COURT:  Sustained.

3  BY MR. TEDDER:

4    Q    So you would defer to someone else who is an expert

5  in that area?

6    A    An ophthalmologist or neuro ophthalmologist would

7  be a better source of information on that particular issue.

8    Q    Wouldn't you agree that neurosurgeons would have

9  more information on that issue?

10   A    Probably not.

11   Q    Probably not, okay.  Now, isn't it true that the,

12  that you never saw any bruising whatsoever on this child's

13  scalp?

14   A    That's true.

15   Q    In fact, you saw no evidence whatsoever to this

16  child at all; isn't that true?

17   A    That's true.

18   Q    You saw no evidence of any red marks or bruising on

19  his chest area?

20   A    Right.

21   Q    No evidence of bruising or red marks on his little

22  arms?

23   A    I saw that Dr. Dickinson had reported some when I

24  followed the child, but I personally didn't observe any.

25   Q    You were following the trial?

```
 1        A    The child.

 2        Q    The child.  You observed that Dr. Dickinson had

 3   observed some bruising that appeared on the child, above one

 4   of the child's eyes, and on the back of his head, three or

 5   four days after admission?

 6        A    Yes.

 7        Q    And isn't that true that that could have occurred

 8   because of a minor incident happening?

 9        A    Yes.

10        Q    Isn't it true that you cannot explain to this jury

11   why violently shaking a baby does not cause a baby's neck to

12   break?

13        A    I don't think there's any -- I'm not aware of any

14   cases where that's ever been shown.  There are a lot of

15   things in medicine that can't be explained, and this is one

16   of them.

17        Q    Are you aware of a study Dr. Ommaya did back in the

18   1960s regarding whiplash injury?

19        A    You mentioned it to me when you took my deposition.

20        Q    Since that time have you researched it?

21        A    I haven't had a chance to look at it, no.

22        Q    You're aware that Dr. Ommaya did a study to try and

23   determine the amount of force that was needed to cause brain

24   tissue injury?

25        A    It's a study that could never ethically be done in
```

1   humans.

2       Q    Of course not.

3       A    I think it was done on chimps.

4       Q    Actually done on Rhesus monkeys.

5            And would you agree, sir, that different tissue has

6   a different injury threshold?

7       A    Yes.

8       Q    And that certain tissue can be damaged more easily

9   than other tissue?

10      A    Sure.

11      Q    However, every tissue has some injury threshold?

12      A    Yes.

13      Q    And there's a certain amount of force that's going

14  to be required to cause a concussion on a person, correct?

15      A    The same blow will produce concussions in some

16  people and not in others, but generally yes.

17      Q    There is a certain threshold where a concussion

18  would occur in somebody?

19      A    It's a very individual thing, yes.

20      Q    And that there is a threshold, higher threshold

21  before a subdural hematoma is going to be caused?

22      A    Yes.

23      Q    And you would also agree that it's an even higher

24  threshold before you're going to have what's called diffuse

25  axonal injury?

1    A    It's true, I can guarantee there are probably

2  individual differences.

3    Q    Are you aware, sir, that the study that another

4  doctor by the name of Duhaime then did a study to try and

5  determine in 1986 what amount of force a person could inflict

6  on an anatomically correct object?

7    A    I haven't read the study but I've heard of it, yes.

8    Q    And are you aware that the findings she made

9  indicate that it is impossible for a human being to shake a

10  child hard enough to cause the kind of force that's necessary

11  to cause the brain injury you're describing in this case?

12    A    Yes.

13    Q    And you're aware, sir, that in this case there was

14  no evidence of any impact injury at all to this child,

15  correct?  In other words, there is no evidence that you saw

16  this child was swung around and slammed into a wall or some

17  other hard object, was there?

18    A    There's no evidence of external blow, right.

19    Q    And you would have seen that, it would have been

20  present had a child come in with an injury caused by being

21  slammed into the floor, slammed into a wall, something like

22  that; isn't that true?

23    A    Unless shaking was a part of it.

24    Q    So you're aware of the scientific study that has

25  shown that is impossible for shaking, for the injury that

```
 1   this baby suffered to be caused by shaking, you're aware of

 2   it?

 3        A     What I know is that the study has never been

 4   conducted in humans, and that that opinion runs against a

 5   tidal wave of experience and day-to-day practice.

 6        Q     Do you have any studies?

 7        A     It would not be ethically appropriate to do a human

 8   study --

 9        Q     I understand, Doctor.

10        A     I'm not finished with my answer -- that would

11   involve shaking of humans.

12        Q     Everybody agrees with that, Dr. Maria.

13              Isn't -- science is based on experimentation,

14   correct?

15        A     Science includes experimentation but also includes

16   daily observation and practice, yes.

17        Q     Of course.

18        A     Medicine is not just a science, it's also an art.

19        Q     An art?

20        A     Medicine is an art and a science.

21        Q     Well, sir, isn't it true that in scientific

22   experiments oftentimes science uses other animals in order to

23   do experiments; isn't that true?

24        A     Yes.

25        Q     They use mice, correct?
```

```
 1      A     Yes.

 2      Q     Rats, correct?

 3      A     Yes.

 4      Q     Pigs?

 5      A     Uh-huh, yes.  And we're all too cautious to

 6  interpret that data as it relates to humans.  There are a lot

 7  of experiments on animals that haven't borne out in humans.

 8      Q     But it's the best we can do, isn't it?

 9      A     Ethically, yes.

10      Q     Now, the shaking, the test that Dr. Duhaime did,

11  are you aware that involved creating dolls that were

12  essentially the size of babies, three different types, that

13  had different types of necks, one being more flexible than

14  the next, and the next more stiff, so three different ideas

15  as far as the neck's flexibility; are you aware of that?

16      A     I'd have to read the study.  I'd have to look at

17  it.  I haven't seen it.

18      Q     You're not aware of what she actually did?

19      A     I'd have to read the details of the study to

20  comment.

21            MR. TEDDER:  Your Honor, if I can approach the

22        witness with the article to read.

23            THE COURT:  We're going to recess if you're going

24        to read an article and comment on it, but we can do

25        that.
```

1    MS. SINGER:  Your Honor, at this time I'm going to

2    lodge an objection to the relevancy.  I don't know if

3    this is appropriate.

4    THE COURT:  The objection is overruled.  Do you

5    want to recess, Mr. Tedder?

6    MR. TEDDER:  Let me just ask a couple other

7    questions rather than have him read this whole article.

8  BY MR. TEDDER:

9    Q    Would you agree, sir, that there are instruments

10  that can measure force?

11   A    Yes.

12   Q    And that if an instrument was placed on an object

13  and shaken it could measure the amount of force that was

14  generated by that shaking?

15   A    I'm not an expert on physics, so I'll defer to the

16  physicist on force instruments, measuring instruments, but

17  certainly, yes, I agree.

18   Q    Would you agree that what we're talking about here

19  is a biomechanical injury?

20   A    No, what we're talking about here is a four month

21  old child.

22   Q    I understand that, sir.  But we're talking about an

23  injury that occurred and your theory is that it occurred

24  because of biomechanical reasons, correct?

25   A    Why it occurred, I can't tell you why it occurred.

1   But I can tell you that it did, within a reasonable degree of

2   medical probability.

3       Q    So you're not certain if this child was shaken or

4   not; isn't that true?

5       A    No, I'm fairly certain that this child was shaken.

6       Q    Fairly certain?  Well, that's good.

7            MR. TEDDER:  May I have a moment, Your Honor.

8            THE COURT:  Yes.

9   BY MR. TEDDER:

10      Q    Now, Dr. Maria, going back to your fees.  How many

11  hours -- you have about ten hours in on this case for your

12  testimony today?

13      A    Today, yes.

14      Q    So your fee is going to be roughly $5,000 to

15  testify here today?

16      A    Yeah.

17      Q    Now, going to back to whiplash injury, wouldn't you

18  agree that whiplash injury is a neck injury?

19      A    Yes.

20      Q    And isn't it true that rarely does a whiplash

21  injury to an adult result in injury to the brain?

22      A    That's true.

23      Q    And that sometimes it does involve brain injury in

24  addition to neck injury sometimes?

25      A    Not the whiplash itself.

1    Q    And isn't it true that the whiplash injury is very
2    similar to what you're describing as shaken baby; isn't that
3    true?

4    A    Except that we rarely see whiplash in children.  I
5    can't ever remember having seen it in a child under 12 years
6    of age.

7    Q    But the biomechanics of whiplash and shaken baby,
8    as you're describing, is very similar; isn't that true?

9    A    No, I don't think that that's right.

10    Q    You don't agree with that?

11    A    No, I don't think it's appropriate to take whiplash
12    injury in an adult context and to apply that to the four
13    month old and all of the differences in children and adults.

14    Q    So an adult who suffers a whiplash injury and has a
15    stronger neck, correct?

16    A    Their neck muscles are stronger, yes.

17    Q    And isn't it true that that's caused because the
18    adult was unable to protect him or herself from the head
19    being snapped forward and back?

20    A    Yes.

21    Q    Exactly what you're saying about the baby, that
22    you're saying shaking the baby, the child can't prevent his
23    head from being moved because of a weakness of the neck,
24    correct?

25    A    It's also --

1    Q    Yes or no?

2    A    No.

3    Q    No?  Okay.

4         Would you agree or not agree that whiplash injury

5    is very similar to the shaken baby theory with respect to

6    front and back motion of the child's head?

7    A    No, I don't think it's appropriate to have whiplash

8    injury in any way related to shaken baby syndrome.

9    Q    Doctor, do you recall on Page 107, Line 6, the

10   following series of questions and answers --

11        MS. SINGER:  Your Honor, I'm just going to lodge an

12        objection.  I don't believe that this is impeachment of

13        any type, and I know the Court does not have a copy of

14        the deposition to see.

15        THE COURT:  The objection is sustained.  Lay the

16        proper predicate for impeachment, Mr. Tedder.

17   BY MR. TEDDER:

18   Q    Sir, do you agree or disagree that whiplash injury

19   is very similar to what you're describing, what you want this

20   jury to believe, occurs during the theory of shaken baby?

21   A    I'm saying it's an incomplete analogy.

22   Q    Do you agree or disagree?

23   A    Run it by me one more time.

24   Q    Do you agree or disagree that whiplash injury is

25   very similar to what you're describing in shaken baby

1    syndrome with front to back shaking?

2        A    Yes, in part.

3        Q    Do you recall this question and answer then, Page

4    107, Line 18?  Question:  And would you agree whiplash injury

5    is very similar to what you're describing in shaken baby

6    syndrome with front to back shaking?

7            Answer:  Yes, you can think of it in similar terms,

8    yes.

9            That's what you said then, isn't it?

10       A    The answer to your question is yes in part.

11       Q    You did answer yes, you could think of it in

12   similar terms at that time?

13       A    Fine, yes.

14       Q    Surely then you agree that the baby's neck is

15   weaker than an adult's neck, correct?

16       A    Yes.

17       Q    Yet you believe that an adult's neck is more likely

18   to be injured under similar circumstances than a baby's neck?

19       A    That seems to be fact, yes.  Let me restate that.

20   That is a fact.

21       Q    Point to a scientific study that shows why that is

22   a fact, sir, just one.

23       A    The prevalence of whiplash, if you go to the

24   general population, whiplash is going to be found -- as I

25   said, in 20 years of practice, I don't ever remember having

```
 1    seen a child who had sustained whiplash injury.  How's that?
 2    I've seen a lot of kids who have been in motor vehicle
 3    accidents.
 4         Q    Most children are in car seats; isn't that true?
 5         A    Not 12 year olds.
 6         Q    Isn't it true that most people who are in accidents
 7    do not suffer from whiplash?
 8         A    Yes.
 9         Q    So an event that occurs sometimes, correct?
10         A    Yes.
11         Q    Not all the time?
12         A    But the overwhelming majority of people with
13    whiplash are adults.
14         Q    Well, sir, I'm asking you to point me to a
15    scientific study of shaken baby.  Is there any that you're
16    aware of?
17         A    That does what?  There are lots of studies in
18    shaken baby syndrome.
19         Q    Anecdotal stories?
20         A    Again, who would do a study in anything other than
21    retrospective or anecdotal.  You can't do that kind of a
22    study in humans prospective.
23         Q    Again, your testimony a moment ago is that you were
24    fairly certain this child suffered from shaking, correct?
25         A    I am more certain that this child has shaken baby
```

1   syndrome than any child I've seen with shaken baby syndrome

2   in 20 years.

3        Q    And yet there's no damage whatsoever to the child's

4   neck, correct?

5        A    As far as we know.

6        Q    It wasn't examined, right?

7        A    Right, it usually isn't.

8        Q    No microscopic examination of the dura mater,

9   correct?

10           MS. SINGER:  Your Honor, at this time I'm going to

11           lodge an objection.  I think we're becoming very

12           repetitive here.

13           THE COURT:  Sustained.

14   BY MR. TEDDER:

15        Q    Sir, isn't the whole theory behind shaken baby that

16   the bridging veins in the dura mater are ruptured due to

17   violent shaking; isn't that the theory?

18        A    That's part of it.

19        Q    And, in fact, that dura mater would be critical

20   evidence to be examined; isn't that true?

21        A    That would be part of the evaluation by

22   pathologists.  I'll defer to pathologists as to whether what

23   was looked at was appropriate or not.

24           MR. TEDDER:  I don't have anything further.  Do you

25           have any questions?

```
 1              MR. GROLAND:  (Shakes head.)

 2              MR. TEDDER:  I don't have any other questions.

 3              THE COURT:  Any redirect?

 4              MS. SINGER:  Yes, Your Honor.

 5              THE WITNESS:  Did you want your form back?

 6              MR. TEDDER:  Thank you.

 7                        CROSS-EXAMINATION

 8   BY MS. SINGER:

 9        Q    Dr. Maria, are you in any way tailoring your

10   testimony today because you happen to be in a court

11   proceeding involving the death of Robbie Quirello?

12        A    No.

13        Q    Was your diagnosis that this baby was violently

14   shaken causing his death made before you were aware that

15   there was any kind of legal or litigation taking place in

16   this case?

17        A    It was my first thought when I saw him.  There was

18   no question that that's what happened back then, and I still

19   hold that opinion.

20        Q    Now, you were asked quite a bit of questions

21   regarding Dr. Nelson, who was the neuropathologist.  I do

22   need to have that form back.  In that report that Dr. Nelson

23   completed that you reviewed, do you note in paragraph two

24   that he did in fact find microscopically that there was

25   evidence of cortical cerebral contusions?
```

1    A    Yes, bruises.

2    Q    And would that be consistent with your clinical

3    finding -- when I use the word clinical finding, that is your

4    clinical opinion when you saw this baby.  Would that be

5    consistent with your clinical finding that this child

6    suffered from shaken baby syndrome?

7    A    It would be one more piece of the puzzle, yes.

8    Q    Would that piece of the puzzle be included with the

9    EEG findings, the CT findings, the blood work findings and

10   the physial examination --

11        MR. TEDDER:  I'm going to object to the leading

12        nature of this question.

13        THE COURT:  I'm sorry?

14        MR. TEDDER:  Objection, leading.

15        THE COURT:  Overruled.

16        THE WITNESS:  Yes.

17   BY MS. SINGER:

18   Q    Would you briefly explain to the jury what the

19   difference is between having a rotation in neurology and

20   being a resident in neurology?

21   A    Residency training is referred to, depending on the

22   specialty, as a block of time, you know, two years, three

23   years, four years, seven years, depending on the specialty,

24   where you become basically qualified in the given area.  And

25   it's different for neurosurgery than it is for pediatrics,

1    than it is for neurology, for example.  Within each of those

2    specialties -- let's say you graduated from medical school

3    and you wanted to become, say, an anesthesiologist.  While

4    you're studying to become an anesthesiologist you will do

5    rotations, a block of one month or three months in given

6    areas to kind of round out your skills.  So in neurosurgery,

7    one obtains some neurology, some neuropathology,

8    neuroradiology, neuro ophthalmology, so that you can practice

9    and having a sense of all of those different subspecialty

10   areas.  The same is true in neurology.  We can do the

11   neurosurgery electives or ophthalmology electives.  So those

12   are rotations, if you will, within the residency, that is the

13   complete period of time that it takes to become a specialist.

14        Q    When a diagnosis of shaken baby syndrome is made by

15   a neurologist, in this case a pediatric neurologist, would

16   you call in a neurosurgeon for any purpose whatsoever?

17        A    Usually not.  I mean, we'll call a neurosurgeon if

18   we're wondering -- we know the damage has been done to the

19   brain itself and there's nothing that can be done by a

20   neurosurgeon to help that.  But if there's blood on the

21   outside of the brain that's pushing on the brain, we might

22   ask a neurosurgeon to come and evaluate the youngster and

23   say, would that child benefit from having that clot removed.

24   But I can't remember the last time we did that, because

25   generally the blood that's on the outside is a small part of

1   the problem, sort of like the tip of the iceberg.  The real

2   problem is what damage has been done to the brain itself.

3        Q    The internal workings of the brain?

4        A    That's right.

5        Q    Is the blood a sign of the injury or is the blood

6   what causes the injury?

7        A    The blood can contribute to injury, like it can

8   make seizures more likely.  But the blood is kind of the sign

9   of how the injury to the brain took place, rather than being

10  the problem in and of itself.

11       Q    What is the difference between depravation of

12  oxygen to cells of the brain and depravation of oxygen to the

13  baby?

14       A    Okay.  If the baby is not breathing, oxygen levels

15  can go down.  The kidneys can get hurt.  The liver can get

16  hurt.  And the brain can get hurt.  Brain cells aren't

17  getting oxygen, they need oxygen and sugar to function.  But

18  at the same time, we don't have any evidence of kidney damage

19  or liver damage in this youngster, so that argues against

20  oxygen depravation to the brain from breathing.  But once the

21  brain has been damaged, those brain cells have been hurt in

22  and of themselves, they can't use oxygen very well.  So as a

23  consequence of that, and of the swelling that's taking place

24  in the brain, those brain cells are suffering on the inside.

25  And they die just as if you turned oxygen off and the baby

1  wasn't breathing.  They lack oxygen because of the damage

2  that's been done to them.  They can't use oxygen normally.

3  So even though you're giving them oxygen, a hundred percent

4  oxygen, the brain cell within the brain is so damaged that it

5  can't use the oxygen that it needs to survive.

6       Q    So it's your testimony then that the brain damage

7  resulted in the cells not being able to get oxygen, it wasn't

8  the lack of oxygen that caused the brain damage?

9            MR. GROLAND:  Objection, leading, Your Honor.

10           THE COURT:  The objection is sustained.

11           THE WITNESS:  It's -- the damage --

12           MS. SINGER:  Wait, Doctor.  You can't answer that

13      that way, so we need to rephrase.

14  BY MS. SINGER:

15       Q    So what is your opinion then as to the depravation

16  of oxygen?

17       A    The shaking damaged the brain cells in a way that

18  they couldn't use oxygen which result in their death.

19       Q    Now, you were asked about blood in the subdural

20  space getting to the subarachnoid space, and your testimony

21  was that you would have to have a tear in the arachnoid?

22       A    Yes.

23       Q    How does one get a tear in the arachnoid?

24       A    Well, one example would be, for example, if you had

25  an external trauma to the head or penetrating wound, it might

1    actually cut the dura and the arachnoid, in which case you'd

2    have subarachnoid bleeding.

3        Q    Is it your testimony that you must have trauma to

4    tear the arachnoid?

5        A    You have to have external trauma to tear the

6    arachnoid or you can have blood appear in the subarachnoid

7    space from shaking independent from the subdural bleeding.

8        Q    So would the subdural bleeding occur and

9    subarachnoid bleeding occur at the same time through the

10   shaking?

11       A    Yes.

12       Q    Is that what we have in this case, Dr. Maria?

13       A    That's what we have.

14       Q    You were also asked whether or not you saw any

15   evidence of bruising on the baby's body upon physical

16   examination.  Do you have to have external bruising to have a

17   brain injury such as the one you saw in Robbie Quirello?

18       A    Oftentimes that's not present because the

19   perpetrator can actually grab the chest and produce a

20   to-and-fro motion that doesn't leave marks on the skin or

21   fracture the rips.  Sometimes those things are present but

22   oftentimes they're not.

23       Q    So in your opinion, that does not, the fact that

24   there was no bruising does not in any way alter your opinion

25   regarding the fact that this baby was shaken?

1    MR. TEDDER:  Objection.

2    MR. GROLAND:  Objection.

3    THE COURT:  The objection is what?

4    MR. GROLAND:  Leading.

5    THE COURT:  Sustained.

6  BY MS. SINGER:

7    Q    What if anything does the fact that there is no

8  evidence of bruising do to your opinion?

9    A    It doesn't detract from all of the pieces of the

10  puzzle we've been talking about.

11    Q    You also indicated on cross-examination that

12  Dr. Dickinson did note after several days that there was some

13  bruising on the back of the head and on the front of the

14  head.  Does that in any way play into your diagnosis?

15    A    It doesn't change the explanation for the

16  combination of injuries that were done and the basic cause of

17  it, which is the shaking.

18    Q    If you were advised that along with being shaken

19  this child was thrown on the bed, would that be consistent

20  with that explanation for the injuries?

21    A    Yeah.  Actually, yes would be the answer.

22    Q    You were asked a number of questions about whiplash

23  injury in adults and in children.  Why do you believe adult

24  whiplash injuries, or why do you believe that adults have

25  whiplash injuries when you do not see those in infants and

1   children?

2       A    It's sort of a statement of fact that we, I would

3   -- as I thought about whiplash after the deposition, I

4   couldn't remember ever having seen it in a child or an

5   infant.  So there must be something special about the tissues

6   of children and their flexibility that protect them from that

7   injury.  I also thought that in adults who are having

8   whiplash that it's very rare to have brain involvement,

9   unless they were in an accident, a car accident in which

10  there was trauma to the head.  And that makes me think that

11  the differences in terms of the child's brain, and the

12  child's brain relative to the child's skull, and the

13  wrappings of the skull, the differences between children and

14  adults make it that drawing from that adult experience on

15  whiplash is probably not appropriate in the context of shaken

16  baby, especially at four months of age.

17      Q    And what are some of the differences between the

18  adult skull and a child's skull or the way the brain is

19  situated in the skull that bring you to that opinion?

20      A    Well, a child's brain is growing fairly rapidly at

21  this age.  Our brain is roughly 90 percent of adult size by

22  age five, and 80 percent of adult size by, say, age three.

23  So there are a lot of changes taking place in terms of brain

24  growth.  The composition of fatty elements within the brain

25  are different.  How neurons are organized with one another

1  and the connections that are taking place between brain cells

2  in those first few years, there's roughly a 50-fold increase

3  in the number of brain connections from birth to age five

4  years.  So it's a very dynamic and very different physical,

5  the brain itself, in terms of the fatty acids in it, the

6  amount of fat versus water is different in a child than it is

7  in adults.  So the changes that are taking place within the

8  brain make it so that it doesn't move in the same way in the

9  skull as it would in the adult.  The spinal fluid that

10  surrounds the brain and normally affords protection, is also

11  a different volume, there's a different amount than there is

12  in an adult.  So there's some basic differences between how

13  the brains are wired in children versus adults and what the

14  content of the brain is that make it so that the movement of

15  the brain in the skull is different in children than it is in

16  adults.

17      Q    And in your opinion, does that also explain why the

18  damage can be so significant when a baby is shaken, such as

19  the case is here?

20      A    Yes.

21      Q    You were asked on cross-examination, or told on

22  cross-examination, that the diagnosis of shaken baby is based

23  on the breaking of the bridging veins.  My question to you

24  is, is that the only condition or finding that brings you to

25  the conclusion or the opinion that the baby has suffered from

1    shaken baby syndrome?

2        A    No.  Most of the damage that's done can't actually

3    be appreciated on the CAT scan initially.  It's the brain

4    itself being damaged rather than the blood on the outside of

5    it.

6        Q    What was the swelling of the brain due to,

7    Dr. Maria?

8        A    When brain cells suffer, there's an increased water

9    content within them, which produces what we call edema,

10   cytotoxic edema, so the brain swells because brain cells were

11   suffering or dying.

12       Q    And how were the brain cells dying or why were the

13   brain cells dying in Robbie's brain?

14       A    Because they were damaged by shaking.

15       Q    And the cortical contusions, what were they due to,

16   Dr. Maria?

17       A    A bruise on the brain is just like any kind of

18   bruise you would have on your skin, it requires a force.  So

19   the bruise on the brain or the contusion means that there was

20   a force applied to that part of the brain.  And the skull is

21   usually how that happens, because if the head is moving in

22   one direction, the brain doesn't quite follow, and it can get

23   bruised against the bony structures at the base of the brain.

24   At the base of the skull, I should say.

25       Q    And why did that occur in Robbie Quirello?

1     A     That's shaking.

2     Q     The retinal hemorrhages, sir, how were they caused?

3     A     Microscopic vessels that were torn by shaking.  And

4  their distribution in the eyeball, in terms of not being in

5  the central part of the eye, but all over the back of the

6  eye, can only be seen in shaking, as far as I know.

7     Q     In your opinion, were any of these injuries due to

8  a lack of oxygen when the baby was supposedly or allegedly

9  wedged in the bed?

10    A     A lack of oxygen would never cause bleeding on the

11 surface of the brain, nor would it cause any bleeding in the

12 eye itself.

13    Q     Were these findings consistent with this child

14 being shaken and possibly thrown on the bed?

15    A     Yes.

16         MS. SINGER:  One moment, Your Honor.

17         THE COURT:  All right.

18         MS. SINGER:  I have no further questions of this

19    witness, Your Honor.

20         THE COURT:  May Dr. Maria be released from the

21    subpoena?

22         MS. SINGER:  Yes.  He would like to return back

23    home to Missouri, I believe.

24         MR. GROLAND:  No objection.

25         THE COURT:  Good enough.  Thank you very much,

1197

1   Dr. Maria, you're released from the subpoena.  You're
2   free to leave the courthouse and go back to Missouri.
3       At this time we are going to take a recess and
4   because it's then going to run so close into lunch,
5   ladies and gentlemen, I'm going to ask that you be
6   escorted to lunch early.  We will of course then begin
7   the trial again a little earlier than normal and the
8   evidence will begin again at 1:30.
9       There are some legal matters that we need to
10  address, so I'll ask the attorneys to remain.  Thank you
11  very much.
12      If you'll step into the jury room, put your
13  notebooks into the locker, and you'll be escorted to
14  lunch.
15      (The jury exited the courtroom.)
16      THE COURT:  Let me say that one more time since
17  apparently there has been a miscommunication in a couple
18  of places.  The evidence in this trial will begin again
19  at 1:00.  It's now 11:30.  We're going to cover some
20  legal matters before we recess, and we will begin the
21  trial again at 1:00.
22      MR. GROLAND:  I'm sorry, I thought I heard 1:30.
23      THE COURT:  That's why I repeated it several times.
24      MR. GROLAND:  Your Honor, there is one matter that
25  is very important to me that I want to bring up right

1   now.  Before the trial, Ms. Singer and I had a number of

2   discussions about we're going to have to work with our

3   witnesses, both the defense experts flying in from out

4   of state, as well as Dr. Maria.  We had an agreement

5   that, in fact, we'll work with each other and we're

6   probably going to have to take some people out of turn.

7   In that same discussion, or perhaps even a little bit

8   later on, we had set Dr. Plunkett, who is in town now,

9   for this afternoon, and we were targeting 1:00 because

10  indeed he flew in from out of state at 11:00 today.  He

11  was picked up from the airport.  He's at my office now.

12  We're going to put him on at 1:00 and let him testify on

13  direct and cross this afternoon.  Dr. Uscinski, our

14  other expert, is coming in tonight and he will testify

15  tomorrow morning.

16      I tell the Court this because Dr. Plunkett has got

17  to be in another state first thing tomorrow morning, I

18  can't remember where, and is scheduled to fly out I

19  think at 6:05 today.  Ms. Singer told me this morning

20  that she's got Dr. Levine, who is here in town on

21  standby, and I think she now wants to put him on at

22  1:00, and I'm concerned about putting him on at

23  1:00 because of our limited amount of time with

24  Dr. Plunkett.  My request of the Court would be to allow

25  Dr. Plunkett to testify at 1:00 on direct for us out of

1    turn, then the state can cross, and then hopefully if we

2    have time left today, he can make his flight on time,

3    and then we can put Dr. Levine on after that is

4    completed.

5         THE COURT:  Now, first of all, let me say that none

6    of these so-called agreements were brought to the

7    Court's attention prior to this trial convening.  And

8    secondly, I don't know that I have any authority to

9    intervene in the state's case in chief and direct that

10   the defense be allowed to put their case on.  So if you

11   think I have any such authority, you have to show that

12   to me first of all.

13        MR. GROLAND:  Okay.

14        MS. SINGER:  May I -- we could probably resolve

15   this very quickly if I could ask Mr. Groland how long he

16   expects his direct examination to be.

17        MR. TEDDER:  I don't know, Judge, probably an hour,

18   hour and a half maybe, I don't know.

19        MS. SINGER:  I believe that we can do both

20   Dr. Plunkett and Dr. Levine today and end by 6:00 P.M.,

21   which is what our schedule is, if you're saying it's an

22   hour to an hour and a half.

23        THE COURT:  Let me stop you here.  This is a

24   discussion that has nothing to do with any ruling that

25   the Court is going to make, absent somebody showing me,

1     first of all, that I have any authority to make it.  You

2     all can discuss the order and any agreements you want to

3     make.  If you come to an agreement to take evidence out

4     of order, I would have no reason in the world to

5     intervene in that if it's by stipulation.  Absent a

6     stipulation that you all can come to outside the

7     presence of the Court, then you're going to have to come

8     up with some authority by which I could intervene before

9     I even agreed to address it.

10        Now, that said, there are some other issues that

11     we're going to address that are already pending, and

12     we're going to address those before you all begin your

13     negotiations outside the Court's presence.

14        The first one is in regard to the father's presence

15     in the courtroom for the remainder of the trial.  Now,

16     my understanding is that he is under defense subpoena;

17     is that correct?

18        MR. GROLAND:  That's correct.

19        THE COURT:  And is there any way in your mind,

20     Mr. Groland, you've already given me some information,

21     that anybody's testimony could be affected by his

22     rebuttal other than Crystal Quirello's?

23        MR. GROLAND:  Yes.  Well, I mean, his could.  I'm

24     worried about his testimony being affected.

25        THE COURT:  That's what?

1    MR. GROLAND:  We have police officers still to come

2    on.  We do have additional doctors.  But let me give a

3    little more information to the Court.

4    THE COURT:  You don't -- I don't think you need to,

5    because in the face of the fact that he has been named

6    as a defense witness and is under subpoena and the rule

7    has been invoked, I believe that takes him out of the

8    category of victim only.  And unless the state has case

9    law that would expand the parameters under which I would

10   consider him to be a victim as opposed to a witness, and

11   those two can coincide -- in other words, your argument

12   is a winning argument unless the state has something

13   further to offer as to why --

14   MS. SINGER:  We have nothing further to offer.

15   THE COURT:  Good enough.

16   MS. SINGER:  There is no case law.  It's a brand

17   new statute.

18   THE COURT:  Good enough.  Then Mr. Quirello will

19   have to remain outside the courtroom.

20   MS. SINGER:  Your Honor, the only question I have

21   regarding the witnesses today is would the Court

22   consider allowing the jury to stay to the completion of

23   Dr. Levine's testimony this afternoon if he were called

24   after counsel's witness was called?

25   MR. GROLAND:  Thank you.

1202

```
 1          THE COURT:  At a maximum hour of what?

 2          MS. SINGER:  I don't know how long their

 3     cross-examination of Dr. Levine is going to be.  I know

 4     our examination of him is probably --

 5          MR. GROLAND:  Can I just give you this?  We have

 6     got to have him, Dr. Plunkett, out of the courthouse at

 7     5:00 so he can catch his plane at 6:00 or whatever time.

 8     So you can be assured we're going to be finished with

 9     him at the very latest at 5:00.

10          MS. SINGER:  Well, never mind.

11          THE COURT:  You all can discuss that.

12          Now, the second issue is whether or not the

13     testimony presented during this trial up to this point

14     should be presented to any other witness.  Now what

15     would be the basis for that in law?  Because like the

16     previous argument, unless you've got something very

17     strong, there would be no basis on which I would order

18     that, unless you've got some case law.

19          MR. GROLAND:  We would be asking the Court to allow

20     it and not -- maybe I'm misunderstanding what Your Honor

21     is saying.  The state raised the issue yesterday by

22     objecting to -- they were anticipating that we were

23     going to do that.  Quite frankly, we were thinking about

24     doing that.

25          THE COURT:  How would you even think about doing
```

1    that once the rule has been invoked?

2         MR. GROLAND:  Because in the back of my mind, and

3    apparently I was correct because the state found some

4    case law, I've done it before over the years and did not

5    have a problem with it.

6         THE COURT:  Well, here's the bottom line.  The

7    ruling is the same.  Just as, in an abundance of

8    caution, the ruling having been invoked, Mr. Quirello

9    does not come into this trial because he may be a

10    rebuttal witness, the same rule applies to any expert

11    witness, and no testimony of any portion of this trial

12    will be disclosed to any witness so long as the rule is

13    invoked.

14         Now, is there anything else that we need to address

15    that has not already been addressed prior to you all

16    entering into some attempt to discuss order of

17    witnesses?

18         MS. SINGER:  One moment, Your Honor, we did write a

19    note here.

20         No, ma'am, there is not.  We've covered everything.

21         THE COURT:  I expect the jury should be ready now

22    to come through.

23         (The jury exited the courtroom.)

24         THE COURT:  All right.  I'll ask that the attorneys

25    be back in the courtroom no later than 12:45.

1    Now, if you expect to argue issues and address

2    other matters before the jury comes back in, you'll need

3    to let me know right now.

4    MR. PENNYPACKER:  We don't anticipate anything at

5    this time, Your Honor.

6    MR. GROLAND:  I think we're pretty much on the same

7    page as to what we're doing.

8    THE COURT:  Now, if you come to some agreement to

9    take witnesses out of order, I will assume that you

10   would want some kind of instruction to the jury about

11   that; is that correct?

12   MR. GROLAND:  Yes, I guess we've got to work that

13   out too.

14   MR. PENNYPACKER:  We'll come up with some language.

15   THE COURT:  12:45 be back in the courtroom.  Thank

16   you.  We'll be in recess until then.

17   (The proceedings were recessed at 11:38 A.M. to

18   continue after lunch at 12:45 P.M.)

19

20

21

22

23

24

25