# EXHIBIT

# M

*202-1-17814*
*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY }

            Appellant, }

                   }      CASE NUMBER   2000-2753-CFA

                   }

                   }      APPEAL NUMBER 1D02-4788

v.                }

                   }      VOLUME XIII

                   }

STATE OF FLORIDA      }

           Appellee, }

Docket [CH]

05-14-2003

[stamp: JUDICIAL APPEALS / ORIGINAL APPEALS / TALLAHASSEE]

[stamp: 2003 MAY 12 PM 2:38 RECEIVED]

## TRANSCRIPT
## RECORD

### HONORABLE MARTHA ANN LOTT
#### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

1205

202-1-17814

1   IN THE CIRCUIT COURT OF FLORIDA
    EIGHTH JUDICAL CIRCUIT
2   IN AND FOR ALACHUA COUNTY

3   CASE NO: 01-2000-CF-2753-A

4   TRANSCRIPT ON APPEAL
    VOLUME X
5   (Pages 1205 - 1368)

6   STATE OF FLORIDA

7   vs.

    Volume XIII

8   BRIAN PATRICK HERLIHY,

    1002-4788

9          Defendant.

10   _____/

11   Proceedings:        Jury trial

12   Before:             The Honorable Martha Ann Lott,
                         Circuit Judge
13
     Date:               September 17, 2002
14
     Time:               1:00 p.m.
15
     Place:              Courtroom 4-A
16                       Alachua County Courthouse
                         Gainesville, Florida
17
     Reporter:           Stacey K. Bryant, RPR
18                       Judicial Court Reporter

19   APPEARANCES:

20       Jeanne Singer, Assistant State Attorney
         Stephen Pennypacker, Assistant State Attorney
21       120 W. University Avenue
         Gainesville, Florida 32608
22           Appearing on behalf of the State of Florida

23       Gordon Groland, Esquire
         John Tedder, Esquire
24       Post Office Box 2848
         Gainesville, Florida 32602
25           Attorneys for defendant

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1                   INDEX TO PROCEEDINGS

 2

 3  PRELIMINARY MOTIONS: ............................. 1207

 4

 5  DEFENDANT'S CASE:

 6

 7                  DR. JOHN PLUNKETT,

 8  DIRECT EXAMINATION BY TEDDER: .................... 1211
    CROSS-EXAMINATION BY SINGER: ..................... 1254
 9  REDIRECT-EXAMINATION BY TEDDER: .................. 1304
    RECROSS-EXAMINATION BY SINGER: ................... 1328
10

11  STATE'S CASE:

12

13                 DR. LAWRENCE LEVINE,

14  DIRECT EXAMINATION BY PENNYPACKER: ............... 1330
    CROSS-EXAMINATION BY TEDDER: ..................... 1351
15  REDIRECT-EXAMINATION BY PENNYPACKER: ............. 1363

16

17                  INDEX TO EXHIBITS

18

19  DEFENSE EXHIBIT NO. 3....MARKED IN EVIDENCE....... 1217

20  DEFENSE EXHIBIT NOS. F, G..MARKED FOR I.D......... 1226

21  STATE'S EXHIBIT NO. 64...MARKED IN EVIDENCE....... 1334

22  STATE'S EXHIBITS G, H, I, AND J..MARKED FOR I.D... 1342

23  STATE'S EXHIBIT NOS. 65, 66, 67, 68, 69, 70......MARKED

24  IN EVIDENCE...................................... 1347

25
```

```
 1                    P R O C E E D I N G S

 2                         *  *  *  *  *

 3          (Out of the presence of the jury.)

 4          THE COURT:  Is the state ready to proceed?

 5          MS. SINGER:  Yes, your Honor.  We do have the

 6     instruction that the Court suggested for calling a

 7     witness out of order.  Its been prepared.  I know

 8     Mr. Groland and Mr. Tedder have gotten a copy of it.

 9     We have a copy for the Court.

10          THE COURT:  All right.  Is the defense ready to

11     proceed?

12          MR. GROLAND:  Yes, your Honor.

13          THE COURT:  And I infer from that that you all

14     have agreed to take defense witnesses out of order?

15          MR. GROLAND:  Yes.

16          MR. PENNYPACKER:  May I approach, your Honor?

17          THE COURT:  Yes.

18          MR. GROLAND:  It's as straightforward as Steve

19     could get it.

20          THE COURT:  I think that's pretty straightforward.

21     Good enough.  Anything else we need to put on the

22     record before the jury comes back in?

23          MR. GROLAND:  No, your Honor.

24          THE COURT:  Okay.  Would you bring the jury in?

25          MR. BAILIFF:  They're not here to.
```

1    THE COURT:  They're not here.  The jury is not

2    back yet?

3         MR. BAILIFF:  No.

4         THE COURT:  All right.  We'll be in recess until

5    the jury is back.

6         (Recess taken.)

7         (Outside the presence of the jury.)

8         MR. TEDDER:  Your Honor, prior to getting started

9    this afternoon, as you know, our next witness is

10   Dr. Plunkett, and one of the articles that he's going

11   to be talking about deals with --

12        MR. GROLAND:  Excuse me.

13        MR. TEDDER:  One of the articles he's going to be

14   talking about deals with the fact that anoxia can cause

15   subdural hematomas.

16        THE COURT:  I'm sorry.  Say it again.

17        MR. TEDDER:  Anoxia can cause subdural hematomas,

18   one of the facts in dispute in this case.  Some of the

19   state's witnesses are saying it cannot occur that way.

20   In the article there are photographs of a child that's

21   delivered by cesarean section that died of anoxia and

22   has his skull opened up.  I've previously shown these

23   photographs to the state.  And our witness would

24   testify that it shows evidence of subdural hematomas.

25   We would want to publish this to the jury since the

1    evidence or pictures are already in evidence of the

2    brain of the child, the victim, in this case, and this

3    does go to an issue in question before the jury, your

4    Honor.

5        MS. SINGER:  Your Honor, our only objection would

6    be whether or not those photographs will be properly

7    predicated upon the testimony as a demonstrative aid to

8    describe to the jury.  I don't know what other

9    relevance it would have in this case to be an exhibit

10   in evidence.  Demonstrative aid, yes, to explain

11   testimony.  Yes, all of the factors considering using a

12   demonstrative aid.  But these photographs do not depict

13   any part in this case.  They do not depict Robbie

14   Quirello, or any other person or thing relevant to this

15   case.

16       And so as an item of evidence that would go back

17   into the jury room, we would object.  As a

18   demonstrative aid, if the predicate is laid, then we

19   would have no objection.

20       MR. TEDDER:  We would ask they go back to the

21   jury.  We'll rely on the Court's ruling.

22       THE COURT:  Do you have any basis in the law?

23       MR. TEDDER:  As long as he can refer to them as a

24   demonstrative aid in his testimony, that's fine.

25       THE COURT:  Good enough.  They will be accepted as

1   demonstrative aids so long as you lay the proper

2   predicate.  They will not be admitted into evidence.

3   Anything else that we need to address?

4        MR. TEDDER:  Just the instruction regarding the

5   witness testifying out of order.

6        THE COURT:  I have it in front of me.  State and

7   defense both agreed to it; is that correct?

8        MR. PENNYPACKER:  Yes, ma'am.

9        MR. GROLAND:  Okay.

10       THE COURT:  State and defense agreed to the

11  instruction, Mr. Groland; is that right?

12       MR. GROLAND:  Yes, ma'am.

13       THE COURT:  Good enough.  And the jury is going to

14  indicate when they're ready?

15       MR. BAILIFF:  I believe they're still using the

16  facilities.

17       THE COURT:  Are they gonna knock?

18       MR. BAILIFF:  They're gonna knock when they're

19  ready.

20       THE COURT:  All right.  You can go ahead and bring

21  the jury in.

22       (Before the jury:)

23       THE COURT:  Ladies and gentlemen, we're about to

24  continue the trial.  At this time you're going to hear

25  from a witness for the defense.  This witness is

```
 1              testifying out of order to accommodate his travel
 2         plans.  Mr. Tedder, are you -- Go ahead and call your
 3         witness.
 4              MR. TEDDER:  Yes, ma'am.  Thank you, your Honor.
 5         May it please the Court?  At this time the defense
 6         would call a witness to the stand, Dr. John Plunkett.
 7                         JOHN PLUNKETT,
 8     having been produced and first duly sworn, testified as
 9     follows:
10                      DIRECT EXAMINATION
11    BY MR. TEDDER:
12         Q    Good afternoon, Dr. Plunkett.
13         A    Good afternoon, Mr. Tedder.
14         Q    Please tell the jury your name.
15         A    John Plunkett, P-L-U-N-K-E-T-T.
16         Q    Dr. Plunkett, please tell the jury what your
17    educational background is.
18         A    I graduated from the University of Minnesota
19    Medical School.  I then had a one year rotating, a general
20    internship at St. Paul Ramsey Hospital.  When I finished my
21    internship, I had an additional five years of training in
22    general pathology and forensic pathology at Ramsey and at
23    the Hennepin County Medical Examiner's Office.  I finished
24    my training in the spring of 1978, took board certification
25    examinations given by the American Board of Pathology in
```

1212

1    three areas; anatomic pathology, clinical pathology and

2    forensic pathology.  I passed the exams, which means that

3    I'm board certified and I went to work at Regina Hospital in

4    Hastings on September 1st and I've been there ever since.

5            Hastings is a river town.  The county seat is

6    Dakota County, which is the third largest county in

7    Minnesota and it's approximately 20 miles from downtown St.

8    Paul.

9        Q    I see.  And you say you went to medical school at

10   St. Paul Ramsey?

11       A    No.  University of Minnesota Medical School and

12   then internship and residency at Ramsey and Hennepin.

13       Q    Okay.  And where do you currently work, sir?

14       A    Regina Hospital.  I am the laboratory and medical

15   education director and I'm also the assistant coroner for

16   the Minnesota Regional Coroner's Office.

17           The coroner in Minnesota is required to be a

18   physician and is appointed by the county board.  It's not an

19   elected position.  We cover seven counties with a total

20   population of approximately three-fourths of a million and

21   we have an investigative staff of approximately 40,

22   administrative staff of three.  We actually go out and

23   investigate any sudden or unexpected death.  And as part of

24   that investigation, we will perform an autopsy approximately

25   15 percent of the time.  So we'll investigate about 2000

```
 1    deaths this year and perform about 300 autopsies.

 2              In the old days until about five years ago, the

 3    forensic part was a significant part of my practice.  Today

 4    it's primarily medical education and laboratory direction.

 5         Q    Now are you currently licensed in any states?

 6         A    Yes, sir.  Minnesota and Wisconsin.

 7         Q    And have you ever published any articles?

 8         A    Yes, sir.

 9         Q    Roughly how many?

10         A    Probably five or six actual original articles that

11    I've had and I've had three or four letters to the editor

12    published in the Journal of the American Medical

13    Association, for example.  Actually I think it's probably

14    six or seven letters.

15         Q    And are you a member of any professional

16    organizations?

17         A    A number.  Most of them have sort of evolved into

18    this, but things like the American Medical Association, the

19    American Academy of Forensic Sciences, the National

20    Association of Medical Examiners, and then a number of

21    others that are particularly related to the practice of

22    pathology.

23         Q    Have you ever given any presentations, speeches

24    regarding different medical issues?

25         A    A number.
```

1214

1    Q    Have you ever been a witness for the prosecution

2  in any criminal cases?

3    A    Yes, sir.

4    Q    How many times roughly?

5    A    Probably more than 200 for the -- at the request

6  of the prosecution and between 50 and 75 at the request of

7  the defense.

8    Q    All right.  Now are you going to be getting paid

9  to testify in this case?

10   A    Indirectly.  I'm a Regina Hospital employee and

11 Regina will send you a bill for my services.  However, I

12 don't see that money directly.  My salary is not dependent

13 on it and I don't get any comp time.

14   Q    All right.

15   A    Regina gets paid.  You know, indirectly I get

16 paid.

17   Q    How many autopsies would you estimate you've done?

18   A    More than 2000.  I've been doing this for 25

19 years.

20   Q    And have you ever been -- ever testified in court

21 as an expert?

22   A    Yes, sir.

23   Q    Do you know how many times?

24   A    More than 200 times.  The overall majority of them

25 criminal cases.  I've probably only testified in half a

1    dozen, ten at the most, civil cases in my life.

2        Q    What were you -- What area did you testify as an

3    expert in?

4        A    The majority of the time when I testified at the

5    request of the prosecution, it has involved deaths that

6    occurred in my own jurisdiction.  Somebody shot somebody

7    else, somebody stabbed somebody else, motor vehicle

8    accident, for example.  The majority of the time when I've

9    testified at the request of the defense, it has been

10   specifically in an issue of head injury in children.

11           MR. TEDDER:  Your Honor, I would tender this

12      witness as an expert in the area of forensic pathology.

13           MS. SINGER:  No objection, your Honor.

14           THE COURT:  The Doctor will be allowed to give his

15      opinion in the area of forensic pathology.

16           MR. TEDDER:  Your Honor, may I approach the

17      witness?

18           THE COURT:  Yes.  Go ahead.

19   BY MR. TEDDER:

20       Q    Dr. Plunkett, what did I just hand you, sir?

21       A    This is a copy of my CV, which I updated in

22   January of 2001.  The previous update had been in the spring

23   of 1994 and there are some changes from January of --

24   January of 2001 that have to do with a couple of relatively

25   minor things.  It lists me as the laboratory director of

1  Saulsiville (phonetic) Medical Center.  Saulsiville is now

2  closed.  I'm no -- Well, I guess that does list -- I was

3  gonna say I'm no longer inspector for the laboratory

4  accreditation program in pathology.  It shows that as

5  stopping in 1994.

6      Q    Other than that, is it accurate?

7      A    Well, there have been some additional letters that

8  I have written that have been published in the American

9  Journal of Forensic Medicine and Pathology, but that's not a

10  substantial difference.

11      Q    Yes, sir.

12          MR. TEDDER:  Your Honor, I would like to submit

13      this to be marked as State's -- excuse me -- Defense'

14      Exhibit 1.  I ask it to be moved into evidence.

15          MS. SINGER:  Your Honor, at this time without

16      viewing it -- I would like to have an opportunity to

17      view it and also if there is a part of this that

18      Dr. Plunkett has indicated by testimony no longer

19      applies, I would ask that it be deleted from or

20      scratched out of the document that he wishes to have

21      entered into evidence at this time and I think we're

22      already past number one for the defense.  Those are my

23      objections.

24          THE COURT:  All right.

25          MR. TEDDER:  Do you have an ink pen, Dr. Plunkett?

1217

```
 1          THE COURT:  The objection is overruled.  I'll

 2     allow it into evidence at this time as I believe it's

 3     Defense No. 2 in evidence.  Is that right?

 4          THE CLERK:  Three, your Honor.

 5          THE COURT:  Three in evidence at this time.

 6          (Defense Exhibit No. 3 was received in evidence.)

 7          MR. TEDDER:  Do you want us to delete anything

 8     that no longer applies or scratch through?  No?

 9          THE COURT:  No.

10          MR. TEDDER:  Okay.

11          MS. SINGER:  Then I would just lodge an objection

12     that it's not an accurate curriculum vitae because it

13     does no longer apply.

14          THE COURT:  Good enough.  Noted for the record.

15 BY MR. TEDDER:

16     Q    Dr. Plunkett, have you been sent various medical

17 records regarding Robbie Quirello?

18     A    Yes, sir, I have.

19     Q    Have you had an opportunity to review those prior

20 to coming to testify here today?

21     A    Yes, sir, I did.

22     Q    Would you tell the jury what documents you have

23 reviewed?

24     A    I've reviewed the autopsy report, the

25 neuropathology report completed by Dr. Nelson, the autopsy
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1  microscopic slides, the autopsy photographs and the -- and

2  Robbie's hospital records, also photos of the home.

3       Q    Are you aware of what the state contends happened

4  to Robbie Quirello in this case?

5       A    Yes, sir, I am.

6       Q    Were you able to reach a conclusion as to what

7  happened to Robbie Quirello based on what you observed and

8  the records?

9       A    Yes, sir, I was.

10      Q    Would you tell the jury what your opinion is

11  regarding what happened to Robbie Quirello?

12      A    Robbie died as a result of lack of oxygen or

13  hypoxia.  His brain did not receive enough oxygen to survive

14  or to function and he died.  He was resuscitated at the

15  hospital.  They were able to keep his heart going and his

16  other organs going for seven or eight days.  After, he was

17  ultimately removed from the respirator.  But his death was

18  caused by the lack of oxygen.

19      Q    Can you tell the jury what caused this lack of

20  oxygen?

21      A    I can't tell specifically what happened to Robbie

22  in this case because I wasn't there.  There are a variety of

23  causes for lack of oxygen.  For example, pneumonia.  Well,

24  Robbie didn't have pneumonia.  Mechanical asphyxiation, in

25  other words, you can't breath because your chest is impeded.

1    You're working on your car and a tire falls on you.  You

2    can't breathe and you die as a result of asphyxiation.

3    Spasm of the airway, such as occurs with an allergic

4    reaction can cause hypoxia and subsequent death.  A

5    prolonged seizure can lead to interference of the brain

6    centers that control breathing and ultimately death.  Brain

7    swelling impeding the brain centers control of breathing can

8    cause death due to lack of oxygen.

9         Q    Were you aware of what Brian Herlihy has told law

10   enforcement regarding where he found Robbie Quirello?

11        A    Yes, I am.

12        Q    Do you believe -- Did you have an opinion as to

13   whether what he has said, the state he found the baby in,

14   could have led to the anoxia to cause this child's death?

15        A    Yes, sir.

16        Q    How?

17        A    It could have.

18        Q    How could that have caused it?  Can you explain

19   that?

20        A    Well, the description, as best as I can

21   reconstruct it from the records, is that Mr. Herlihy found

22   Robbie wedged between the steel rails of the bed frame and

23   the mattress in a head down position with his legs more or

24   less either up in the air or partially against the mattress

25   itself, that he was wedged in that position.

1220

1    Q    Now have you ever seen a child that you believed

2    to have been abused?

3    A    Oh, yes.

4    Q    What types of evidence do you see when you find a

5    child has been abused?

6    A    Well, the simplest scenario would be a child who

7    just has an isolated injury, for example, a cigarette burn

8    or a fracture caused by another human being.  I know the

9    worst case would be a child with multiple injuries of

10   various ages to various parts of the body, including the

11   skin, the organs such as the liver or the kidneys, the brain

12   and even the lungs, fractures of various bones.  So that

13   abuse can -- is really a spectrum of injuries, anything that

14   is inflicted by another human being that we would certainly

15   not find acceptable today.

16   Q    Now did you write an article which was published

17   in the American Journal of Forensic Medicine and Pathology

18   in the spring of 1999 entitled Shaken Baby Syndrome and the

19   Death of Matthew Epan, a Forensic Pathologist's Response?

20   A    Yes, sir, I did.

21   Q    And why did you write that article?

22   A    At that time, specifically in November of 1997, a

23   number of pediatricians and one pathologist wrote a letter

24   to the editor of pediatrics objecting to defense testimony

25   in the Matthew Epan death, stating that the defense experts

1   were misusing evidence, were misstating science and so

2   forth.

3           I knew nothing about the actual Matthew Epan case.

4   I was not involved.  I was not a witness.  I did not review

5   any of the reports, but I did respond to the pediatricians'

6   assertions based on science.  In other words, I took the

7   four points that they had made in their letter and then

8   examined the actual scientific basis for their belief.  And

9   that was the purpose of the article, was to examine the

10  scientific basis for the assertions that the pediatricians

11  were making in the letter.

12      Q    Do you recall the assertions that the

13  pediatricians made in that article, in their letter?  Would

14  it refresh or help you if you can refer to the letter

15  itself?

16          MS. SINGER:  Your Honor, I'm going to lodge an

17      objection to relevance in this particular case.

18          THE COURT:  The objection is sustained.  You're

19      gonna have to rephrase your question.

20  BY MR. TEDDER:

21      Q    Dr. Plunkett, who was Paul Bruissard?

22      A    Paul Bruissard was the chair of forensic medicine

23  at the Sorbonne in Paris in the late 1800s.

24      Q    And do you have a quote from him that was at the

25  beginning of the article we're talking about?

1222

```
 1        A     Yes, sir.

 2        Q     Why did you include that quote?

 3              MS. SINGER:  Once again, your Honor, I would lodge

 4        an objection as to relevancy.

 5              THE COURT:  Sustained.

 6   BY MR. TEDDER:

 7        Q     What would you say is the significance of the

 8   quote you included from Paul Bruissard regarding the law of

 9   making a witness of a person who is a man of science?

10              MS. SINGER:  Once again, your Honor, I would lodge

11        an objection as to relevancy.

12              THE COURT:  The objection is sustained.

13   BY MR. TEDDER:

14        Q     Dr. Plunkett, can a child receive a subdural

15   hematoma as a result of normal childbirth?

16        A     Yes, sir.

17        Q     Were you aware of the birth Robbie Quirello had in

18   this case?

19        A     Yes, sir.

20        Q     How would you describe that for the jury?

21        A     Difficult.

22        Q     All right.  And what things do you take into

23   consideration as far as saying it was a difficult birth?

24        A     Length of the second stage of the labor, the

25   longer time it takes for the cervix to ripen or become flat
```

1  so that it can dilate, any evidence for fetal distress that

2  the child might have, difficulty during the delivery or

3  birth process itself.

4      Q    Now if a child was born with a subdural hematoma,

5  would the child necessarily exhibit symptoms at that time?

6      A    No, and most often they do not.  It's actually

7  relatively rare for a child with a subdural hematoma

8  associated with childbirth to develop symptoms.

9      Q    Can you tell the jury why that is?

10     A    No, because I don't know.  What I do know is that

11 the subdural hematoma itself, especially if it is caused by

12 what is called static loading, which is, for example, your

13 head in a vice, not a compliant head like a newborn.  If the

14 pressure is applied very very slowly, there's no traumatic

15 brain injury at all.  You just -- you get rupture of

16 bridging blood vessels and bleeding into the subdural space.

17         So the bleeding into the subdural space by itself

18 does not cause a problem unless the volume is so large, that

19 it starts to compress the rest of the brain and potentially

20 interfere with the breathing centers or cause a seizure.  So

21 unless that happens, a subdural hematoma is not gonna cause

22 signs or symptoms.

23     Q    Did you see CAT scans that were taken of Robbie on

24 August 2nd and 3rd?  Did you see CAT scans that were taken

25 of Robbie Quirello?

```
 1        A     No.   I read the reports.   I'm not a radiologist.

 2        Q     What did the reports reflect as exhibited in the

 3   CAT scans?

 4        A     Robbie had chronic subdural hematomas and was

 5   developing new bleeding into those chronic subdural

 6   hematomas.

 7        Q     Now if a person has a subdural hematoma, can it

 8   begin to have a new bleed?

 9        A     Yes.

10        Q     Is that part of the healing process?

11        A     It's part of the natural history of a subdural

12   hematoma.   That has been proved in two articles that I'm

13   aware of in which people were followed with serial CT scans

14   or MR scans who were in the hospital, people with subdural

15   hemorrhage.   And over time you get new bleeding, you get

16   resorption of some of the old blood, you get new bleeding,

17   you get resorption or healing of some of the old blood.

18   It's a cycle until you eventually heal the subdural hematoma

19   or the volume becomes so large that it requires surgical

20   removal.

21        Q     Is bleeding on the brain an irritant?

22        A     Bleeding in the subarachnoid space is, but I don't

23   know if bleeding in the subdural space itself is really an

24   irritant.   Almost always when you have subdural hemorrhage,

25   you're gonna have subarachnoid hemorrhage also because the
```

```
 1    dural blood vessels go through the arachnoid membrane.

 2         Q    Can bleeding on the brain cause a seizure?

 3         A    Yes.

 4         Q    And if someone had a seizure, could that cause

 5    them to quit breathing?

 6         A    Yes.

 7         Q    Can a lack of oxygen cause the brain to begin to

 8    bleed?

 9         A    It can cause -- Well, yes, it can.  You can cause

10    bleeding in the dural space and it can also cause bleeding

11    on the surface of the brain and at what are called the water

12    shed areas, the area between the gray and white matter where

13    the blood vessel supply is the most tenuous.  So lack of

14    oxygen in itself can cause bleeding.

15         Q    Have you read any articles that deal specifically

16    with lack of oxygen causing subdural hematomas?

17         A    Yes, sir.

18         Q    What article study have you read?

19         A    Dr. Jennian, J-E-N-N-I-A-N, Geddes, G-E-D-D-E-S,

20    is a neuropathologist at Queen Mary Hospital in London.  I

21    know her personally.  She has written a number of articles

22    regarding traumatic head injury in children.  Her most

23    recent article directly addresses the question of lack of

24    oxygen and development of subdural hemorrhage.  It is going

25    to be published either this month or next month in a journal
```

1    called Neurophysiology and Applied Neurobiology.  It is a

2    peer review journal.  She sent me the pre-print article

3    about four months ago along with the photographs that are

4    going to appear with that article.

5        Q    What does peer review article mean?

6        A    It means that someone, a physician or a nurse or

7    another scientist, has written an article that that person

8    thinks can be some helpful information.  To be published in

9    a number of journals requires that others of your peerage

10   review that article to make sure that at least your methods

11   are correct, that your conclusions are substantiated by your

12   data or evidence and so forth.  The reviewers may not agree

13   with your conclusions and that's not a reason to say that

14   something shouldn't be published, but it at least is

15   methodologically sound in most of the journals that articles

16   are published.

17       Q    Were there some photographs in that article that

18   would assist you in offering testimony regarding this case?

19       A    Yes, sir.

20           MR. TEDDER:  May I have these marked, your Honor,

21       as exhibits?

22           THE COURT:  They'll be marked as demonstrative

23       aids?

24           MR. TEDDER:  Yes, ma'am.

25           THE CLERK:  Defense F and G, your Honor.

1       THE COURT:  Go ahead.

2       MR. TEDDER:  I show these to the state attorney,

3   your Honor.  May I approach the witness, your Honor?

4       THE COURT:  Yes.

5   BY MR. TEDDER:

6       Q    Dr. Plunkett, I'll show you what's been marked as

7   Defense Exhibit F and G.  Do you recognize those?

8       A    F and G are the same photographs.

9       Q    Oh, they're the same photographs?

10      A    Two of the same thing.  These are photographs from

11  Dr. Geddes' study.  They're a photograph of a 34 week, 32

12  week gestation premature child who developed fetal distress,

13  was delivered with poor breathing, actually anoxia, no

14  breathing at that time, was resuscitated and was kept on a

15  respirator for a few hours.  The photographs demonstrate

16  intradural and subdural hemorrhage.

17          In the study that is going to be published, she

18  had either 51 or 53 such cases.  In other words, children

19  who died shortly after birth with hypoxia and almost all of

20  those children had intradural and subdural hemorrhage as a

21  result of the lack of oxygen, not any other extrinsic

22  trauma.

23      Q    Now do you see any subdural hematomas on those

24  photographs?

25      A    Yes, I do.

1    Q    Do you see a dura on that photograph?

2    A    Yes, I do.

3    Q    In this bleeding that you saw in those

4  photographs, is that chronic or acute?

5    A    That's acute.

6    Q    What color is acute bleeding?

7    A    Acute bleeding is purple or red purple.

8    Q    What color would chronic bleeding be?

9    A    Well, chronic bleeding would be a yellow or a

10  yellow brown and you would usually be able to see that by

11  looking at the dural membrane itself, not by looking at the

12  bleeding, because you always get new bleeding in subdural

13  hematomas and there's a mixture of blood.  So with just the

14  unaided eye, it's difficult to see.  Your medical imaging

15  studies are actually better for that.

16    Q    Medical imaging studies are what?

17    A    CT or MR scans.

18    Q    Now are you aware of the cause of death listed by

19  Dr. Hamilton in this case?

20    A    Yes, sir, I am.

21    Q    What is it?

22    A    Complications of shaken baby syndrome.

23    Q    Now the impressions that he listed above that,

24  what were those?

25    A    Autopsy findings.

1    Q    Okay.

2    A    Immature human brain with bilateral cerebral

3    subdural hematoma and subarachnoid hemorrhage.

4    Q    What does that mean to you?

5    A    It means that there was bleeding on the surface of

6    the brain on both sides and beneath the lining membrane of

7    the brain, the arachnoid on both sides.

8    Q    All right.  Is there a connection between subdural

9    bleeding and subarachnoid bleeding?

10   A    Yes, sir, there is.

11   Q    Explain to the jury how that is.

12   A    Well, the subdural -- the blood vessels that

13   rupture to allow traumatic subdural hemorrhage communicate

14   with the arachnoid space so that if the bleeding in the

15   dural space is caused by trauma, there will always be

16   bleeding in the subarachnoid space.  There will also be

17   bleeding in the subarachnoid space anytime there is brain

18   swelling and compression of the surface of the brain against

19   the inside of the skull.

20          So in and of itself, subarachnoid hemorrhage means

21   absolutely nothing in terms of causation or relationship to

22   trauma unless it is associated with a ruptured blood vessel

23   and inflammation.  That's the only time it has any

24   significance.

25   Q    Swelling on the brain, would that qualify as

1   trauma?

2        A     Swelling on the brain is a secondary event as a

3   result of either a primary trauma and I'm using the term

4   trauma very generically.  Pneumonia is a trauma.  So if you

5   have pneumonia and lack of oxygen, you're going to get

6   swelling of the brain.

7        Q     What type of trauma would you point to in this

8   case?  Would a seizure be a trauma?

9        A     Well, a seizure isn't a trauma.  A seizure is a

10  result of a prior injury.  Robbie has no trauma.  There are

11  no -- there are no new traumatic injuries that Robbie has.

12  The only primary trauma that he has is the subdural

13  hemorrhage, if it represents trauma at all.

14            I mean, his subdural hemorrhage could be related

15  to birth trauma.  It could be related to a condition called

16  cortical venous thrombosis, which is a clotting off of the

17  blood vessels on the surface of the brain, which has nothing

18  to do with primary trauma.

19            So with the exception of the subdural bleeding,

20  Robbie has no evidence for trauma at all.  He has secondary

21  evidence for trauma in the anoxia.  So the anoxia is a

22  secondary traumatic event, which could have been caused by

23  somebody else or could have occurred inadvertently.

24        Q     Now Dr. Hamilton listed anoxic ischemic

25  encephalopathy global in his findings.  What does that mean?

1    A    It means that there was lack of oxygen to almost

2  the entirety of the brain and I certainly agree with that.

3    Q    And you agree with that based on what, Doctor?

4    A    The autopsy photographs, the medical records.

5  This is not a surprising finding.  This is what caused

6  Robbie's death.

7    Q    Now he also put cerebral edema -- excuse me --

8  edema and vascular congestion.  What does that mean,

9  Dr. Plunkett?

10   A    Brain swelling and blood vessel congestion as a

11 result of the lack of oxygen, the secondary injury.

12   Q    Did you see any evidence of shearing to the brain

13 in the slides you examined?

14   A    No, there was none.

15   Q    What does shearing mean to you?

16   A    Shearing is one of the components of what is

17 called traumatic axonal injury.  Traumatic axonal injury is

18 a concept that was developed almost in parallel by people in

19 Scotland and by researchers in Philadelphia to explain

20 prolonged unconsciousness in people who have been in motor

21 vehicle accidents or had other accidents and yet did not

22 have a huge skull fracture or a large subdural hematoma.

23        Very simply stated, it means that one part of the

24 brain is moving or more accurately accelerating differently

25 from an adjacent part and it shears.  It breaks apart.

1    Robbie has no evidence for any shearing injuries anywhere.

2         Q    Were you able to examine the dura matter in this

3    case?

4         A    No, sir, I was not.

5         Q    Would you have liked to have seen the dura matter?

6         A    Yes, sir, I would have.

7         Q    Tell the jury why.

8         A    If it is important to try to age Robbie's chronic

9    subdural hematomas, you can do it two ways and the best way

10   to do it is to use both.  One is using the CAT scan or the

11   MR scan as the criteria that have been established in trying

12   to age a subdural hematoma.  And the other way is to look at

13   the dura under the microscope because the healing process

14   takes a more or less uniform and known path.  Using those

15   two things together, you can say, Well, this is all less

16   than 15 days old or some of it is five days old, some of it

17   is two or three weeks and some of it is more than two

18   months.

19        But you can't do that in this case because you

20   don't have the dura.  All you can use is the CT or MR

21   criteria, which say that at least when Robbie came in, the

22   majority of the bleeding that he had was what is called

23   chronic, which is usually taken to mean more than two weeks.

24   Then he had new bleeding that continued during his

25   hospitalization in that dural space, but that's just part of

1   the natural history.  I don't think the nurses caused any

2   trauma or the doctors on day two, day four or day six of his

3   hospitalization.

4       Q    If you had done the autopsy in this case and had

5   been aware of the evidence of pre-existing chronic subdural

6   hematomas and acute subdural hematomas, how would you have

7   gone about examining this child?

8       A    I would have saved a number of sections of the

9   brain.  I would have -- actually I would have saved the

10  brain in a fixed state and I would have sent that to a

11  neuropathologist and asked that person to assist me in the

12  evaluation, certainly including the dura and the spinal

13  cord.

14      Q    When the skull cap is removed during the autopsy,

15  how would you -- what efforts would you take to make sure no

16  damage was done to the dura or the area where the chronic

17  subdurals were?

18      A    It's pretty difficult sometimes.  There's a

19  standard way of removing the skull cap.  Some people

20  actually suggest removing the brain and the skull cap with

21  the head under water so that it's really almost floating.

22  Then you don't have the brain moving around artifactually

23  causing tears, for example, on the surface.

24           But sometimes it's difficult to not create

25  artifacts.  For example, when you're cutting across the

1    dura, you have to cut across a structure called the sagittal

2    sinus, which runs from the front to the back of the center.

3    Just as a result of cutting that vein, you're going to get

4    bleeding into the subdural space.  So you have to know that

5    maybe what you're seeing may in fact not be the result of

6    trauma, but something else entirely.

7         Q    Would microscopic examination of the dura have

8    been helpful?

9         A    Well, not only microscopic examination, but a good

10   gross description and good gross photographs.  There's only

11   one or two photographs of the dura in the autopsy that show

12   you anything and that clearly shows that there's a chronic

13   subdural hematoma.  The color is yellow.

14        Q    Did you see any photographs of the cap of the

15   skull?

16        A    I saw -- Well, the cap is there.  It's underneath,

17   but that's the outside.  I don't care about that.

18        Q    Right.

19             MR. TEDDER:  I would like to approach the witness,

20        your Honor.

21             THE COURT:  Go ahead.

22   BY MR. TEDDER:

23        Q    Dr. Plunkett, I want to show you State's Exhibit

24   59, 60 and 61.  If you could, please --

25             MR. TEDDER:  Your Honor, could the witness step

1235

```
 1         down in front of the jury to show them this?
 2              THE COURT:  Are these -- You want to use the
 3         overhead projector?
 4              MR. TEDDER:  Well, we could.  I don't know how to
 5         set that up.
 6              THE WITNESS:  I can show them, your Honor.
 7              MR. TEDDER:  He can show them, your Honor, if
 8         that's okay with the court?
 9              THE COURT:  That's fine.
10    BY MR. TEDDER:
11         Q    Dr. Plunkett, if you could refer to each by the
12    number on the back and then tell the jury what you see on
13    there, please.
14         A    Fifty-nine is the first one we're gonna show.
15    It's a photograph of Robbie's head with the skull cap
16    removed and pushed to the back.  The front of his face is
17    covered with a towel and he's on the right-hand side.  The
18    back of his head is on the left-hand side.
19              On the surface of the brain you can see a blood
20    clot.  It was adherent to the surface of the brain.  On the
21    left-hand side poking up from the skull cap itself is a
22    portion of the dura.  The inside surface of the dura has a
23    yellow or yellow brown color that is very distinct from the
24    areas of the dura that are away from it and very different
25    from the appearance of the inside of the skull.  Behind, the
```

1  dura has actually been pulled off from the inside surface of

2  the skull from it's location.  So the color is the tip off

3  that there's a chronic subdural hematoma.  That's 59.

4       Sixty is the same thing.  Sixty is a photograph

5  taken from looking down at the top of Robbie's head.  The

6  right is on the right side, the left is on the left side.

7  And again, on the left side this time we see yellow

8  discoloration of the dura indicating a chronic subdural

9  hematoma.

10       Sixty-one is a photograph taken from Robbie's left

11  side.  Again, the left side is his face.  The right side is

12  the back of the skull cap that has been removed.  This shows

13  blood clot actually adherent to the dura on the right-hand

14  side.  Dural adherence takes ten days, two weeks or

15  something like that to occur.  The yellow discoloration

16  takes three weeks, a month to occur.  But that's the best

17  that you can do just looking at it photographically and you

18  have to rely on the CT, MR scans and then what you see under

19  the microscope.

20     Q    Can the dura of the subdural hematomas be aged

21  through microscopic examination or other means?

22     A    It can, but the dating isn't real accurate.  It

23  takes about four or five days to be able to see iron pigment

24  from the breakdown of red blood cells in the inflammatory

25  cells.  There's iron pigment that can be seen and it won't

1   stay around for a long long time.  So the finding of iron

2   pigment just tells you, well, it happened at least four or

3   five days ago.  If you see specific types of blood vessels

4   growing into that space, you're talking about two or three

5   weeks.

6        Q    Iron pigment, is that what causes the yellow

7   discoloration?

8        A    Yes, it is.  Well, in part it is.  It's also

9   inflammatory cells containing fat.

10       Q    Okay.

11       A    It's a combination of those two things.

12       Q    Did you see in those photographs any possible

13   evidence of cortical venous thrombosis?

14       A    Well, the photographs really look like cortical --

15   like what you would see with cortical venous thrombosis,

16   clotting of the blood vessels on the surface of the brain

17   with secondary break-through of that blood into the dural

18   space.  I don't know whether that's a primary event.  In

19   other words, the primary injury in quotes that Robbie had

20   was, "Cortical venous thrombosis," or if this is simply a

21   result of the lack of oxygen and secondary clotting within

22   the blood vessels itself.  I can't tell you that, which it

23   is.

24            It certainly looks like cortical venous

25   thrombosis.  It is cortical venous thrombosis.  The question

1   is, is this the primary event or is this the result of the

2   lack of oxygen and just simply developed while he was in the

3   hospital?

4       Q    What causes cortical venous thrombosis?

5       A    Clotting of the blood vessels, the veins, from a

6   number of causes.  Infections, dehydration would be the two

7   that are most often identified.  However, you can identify

8   the cause in less than 50 percent of children who develop it

9   and adults also.  Adults develop cortical venous thrombosis

10  also.

11      Q    What would you have wanted to do to further

12  determine exactly what this was?  Examine microscopically?

13      A    You can examine it microscopically, but it's very

14  difficult when somebody has been on a respirator for eight

15  days to go back in terms of causation.  I mean, if Robbie

16  had died within minutes of the time that he came into the

17  hospital and this is what I saw, I would say that's cortical

18  vein thrombosis, period, because it doesn't develop that

19  rapidly.

20          But really there's nothing that you can do now

21  etiologically, even a radiologist.  One radiologist may say

22  looking at the CT scan when Robbie first came into the

23  hospital, This is cortical venous thrombosis.  Another

24  radiologist may say, No, it's not.  There is no -- The

25  autopsy is still the gold standard.  So that even with your

1   radiographic criteria and so forth, it's not 100 percent and

2   it doesn't even approach 100 percent.

3        Q    What's your professional opinion of the autopsy

4   Dr. Hamilton did in this case?

5             MS. SINGER:  I'm going to lodge an objection at

6        this time.

7             MR. TEDDER:  He's testifying from his expertise,

8        your Honor.

9             THE COURT:  Approach the bench.

10            MS. SINGER:  I think I'm gonna withdraw my

11       objection.  I think it's gonna be easier to just allow

12       the witness to answer.

13            THE COURT:  The objection is withdrawn.

14            MS. SINGER:  I'm sorry, Doctor.  I didn't mean to

15       interrupt.

16            THE WITNESS:  First of all, I don't know

17       Dr. Hamilton.  I hadn't met him.  I don't know his

18       background.

19            If I had done the autopsy, I would have -- I mean,

20       before my format would have been different, but that's

21       personal preference.  That doesn't have anything to do

22       with anything.  But I would have saved the dura.  I

23       would have done a microscopic examination of the dura.

24       I would have fixed the brain for a couple of three

25       weeks and I would have asked somebody to review those

1    CT scans or MR scans with me because clearly there is a
2    discrepancy between what Dr. Hamilton says that he
3    found, which is acute subdural hemorrhage only, and
4    three different radiology reports which say, No, this
5    is a chronic subdural hematoma with new bleeding.
6    That's a significant discrepancy.

7        But the pathologist, at least this pathologist,
8    would not simply say, I'm right and you're wrong.  I
9    would say, Let's look at this stuff and see why we're
10   differing.  But that's it.  I would have done this.
11   BY MR. TEDDER:
12       Q    Would you have liked to have examined the brain
13   stem?
14       A    That's part of what I was talking about, the dura
15   and the spinal cord.  Didn't I mention the spinal cord?
16       Q    I don't think we got there yet, Doctor.
17       A    You asked me what I would have done differently.
18   I said I would have saved the dura and the spinal cord.
19       Q    What would you have been looking for in the brain
20   stem and the spinal cord?
21       A    The spinal cord itself below the level of the
22   neck, nothing.  The spinal cord including the brain stem I
23   would have been looking for evidence of bleeding of whatever
24   ages.
25       Q    Could that have been discovered through

1    microscopic examination?

2        A    Yes, sir.

3        Q    Now are you familiar with a -- I believe it's a

4    computer generated series of photographs or pictures

5    prepared by someone named Dr. Davis?

6        A    Yes, sir, I am.

7        Q    And what is your opinion of that computer

8    generated thing?

9        A    The Davis cartoon is a scientific fraud.  The

10   child's brain does not move that way during any shake that

11   you can subject the child's brain to.  The brain of a human

12   being may move that way if you apply an acceleration to some

13   part of the head or the acceleration does not go through the

14   center of mass at an acceleration in excess of 10,000

15   radians per second squared.

16            A radian is a unit of measurement of circular

17   motion.  A radian is a radius.  There are approximately

18   16 -- approximately six radians in a circle.  A radian is

19   about 59 and a half degrees.  So 10,000 radians per second

20   squared as a unit of acceleration radially or circularly at

21   a radius of one foot, is equivalent to 10,000 feet per

22   second squared.

23            Acceleration due to gravity is 32 feet per second

24   squared.  Ten thousand feet per second squared is

25   approximately 350 times the acceleration due to gravity.  So

1242

1    if you were to accelerate a head at 350 times the

2    acceleration of gravity, and it can be done experimentally,

3    you will have the brain move within the skull case as

4    depicted in the Davis cartoon.

5         However, when you shake a child, the most

6    acceleration that you can generate is approximately ten

7    times the acceleration due to gravity.  Shaking a child is

8    not a good idea.  You can probably kill a child, but it does

9    not cause the brain movement depicted in the Davis cartoon

10   and it does not cause the type of injuries called the shaken

11   baby syndrome.

12        Q    How can you kill a baby by shaking it?

13        A    You can cause -- Well, first of all, if you did it

14   for long enough, a child is not going to be able to breathe

15   while you're shaking the child.  So if you shake the child

16   long enough, say three or four minutes, two or three minutes

17   so that the child is without oxygen for that period of time,

18   the child may die directly as a result of that.

19        You may also stretch the brain stem centers that

20   control breathing causing direct anoxia and death, and in

21   which case you will or should be able to see damage to the

22   brain stem when you look at it under the microscope.

23        You may cause an impact injury during shaking.  In

24   other words, you may cause the head to strike a solid

25   surface such as a wall or the floor, in which case it's not

1  the shaking that causes the injury, but rather the impact

2  against the non-yielding surface.  So there's a number of

3  ways that you can kill a child by shaking them.

4       Q    How long do you think a child or anybody can go

5  without oxygen in the brain before causing irreversible

6  brain damage?

7       A    I have to answer that as almost a three part

8  question.  First of all, differentiating breath holding from

9  lack of oxygen; professional divers, people who live in

10 cultures where they do deep diving for a livelihood have

11 learned to hold their breath for three or four minutes and

12 be able to dive to very great depths.  They've learned to

13 store up enough oxygen and blow off enough carbon dioxide by

14 hyperventilating to be able to do this without causing them

15 to faint from the hyperventilation.

16      People who are just regular folks, with some

17 training you can learn to swim 25 yards in a pool under

18 water or even 50 yards.  So in part it depends, you know, on

19 the training and whether there's breath holding involved or

20 not.

21      Secondly, it depends to a certain extent on the

22 mechanism of lack of oxygen.  If a lack of oxygen is because

23 the hemoglobin molecule is carrying less oxygen than normal,

24 then it can be a long time.  If it's simply because the

25 blood flow is cut off, the heart stops beating, for example,

1  then it's going to be very very quick, thirty seconds or a

2  minute.  If it's because the breathing centers are shut off,

3  but the heart continues to beat, then its gonna be longer.

4          It's probably longer in a child than in an adult.

5  There have been documented cases of kids that have been

6  under water for as long as 45 minutes who have survived and

7  ultimately recovered.  So a case of what's called cold water

8  emersion, cold water drowning where the drowning in cold

9  water is thought to induce some primitive reflex that slows

10  our heart rate way way down to five or ten beats per minute

11  allowing the brain to get enough oxygen and for you to

12  survive.

13          In general, four our five minutes without oxygen,

14  you're dead.  The brain is dead.  The brain is dead.  The

15  heart may continue to beat.  If the heart is stopped, you

16  may be able to get the heart going again.  But most often

17  you do not walk out of the hospital.  The survival rate, for

18  example, of all of the hospital cardiac arrests where

19  somebody is resuscitated, brought into the hospital on a

20  respirator with their heart beating and their lungs and

21  everything else working, is around two percent.  It's not

22  very long.

23      Q    Why would your heart continue to beat after your

24  brain is dead?

25      A    Well, your heart -- The brain does not correct --

1   the brain does not directly control the heartbeat.  There is

2   an indirect control by a nerve from the brain stem that does

3   it, but the heart has it's own beating.  You can cut the

4   heart out, cut all of it's nerve supply off from the outside

5   and it still continues to beat.

6          So, for example, if somebody is on a respirator in

7   the hospital because they were in an automobile accident and

8   had a head injury and the person is going to be an organ

9   donor and you have been breathing for them for a week or ten

10  days or whatever and you take them off the respirator, their

11  heart continues to beat for seven to ten minutes after you

12  have removed them from the respirator.  So the heart

13  function is or at least can be totally independent of the

14  brain function.

15     Q    The state has elicited testimony regarding the

16  lack of damage to other organs in Robbie's body and whether

17  or not there should have been damage to other organs in

18  Robbie's body because of a lack of oxygen.  What is your

19  opinion on that, Dr. Plunkett?

20     A    Well, the fact that there is no evidence for

21  damage to the other organs simply shows you that the amount

22  of time that Robbie's brain was without oxygen is relatively

23  short.  This is one of the criteria that you use for organ

24  donors.  You know, if somebody is on a respirator and most

25  of them, usually when you're able to get the heart going

1246

1    again, the rest of the organs are okay.

2         Now in very young children, I'm talking about

3    premature kids and newborns, it's a little bit different

4    deal because they do develop damage to the bowel, what's

5    called necrotizing intracolitis as a result of the lack of

6    oxygen.  But, in general, if you can get the heart going

7    again, the other organs are gonna be okay.  It's the brain

8    that's the problem.  It's the brain that doesn't come back.

9         Q    There was evidence in this case that Robbie's

10   heart never quit beating, but that he was not breathing when

11   first discovered by paramedics.  What would your opinion be

12   then?

13        A    That the amount of time that he had been without

14   oxygen was very short.

15        Q    Would it have been short enough or long enough to

16   cause some type of brain injury or if you know?

17        A    Yes.

18        Q    Could new bleeding in the subdural hematomas cause

19   anoxia?

20        A    Yes, indirectly by either causing a seizure or by

21   compressing the brain centers that control breathing.  For

22   example, I know that Robbie had brain swelling when he came

23   into the hospital because his fontanel, soft spot on the

24   front center of his head was tense and bulging.

25        Q    Do you believe that shaking Robbie the way the

1    state contends he was shaken could cause the type of brain

2    injury this child suffered?

3        A    Well, it certainly did not cause the initial

4    subdural hematoma.  It did not cause new bleeding in the old

5    subdural hematoma.  Could Robbie have been shaken and that's

6    what caused his death?  Yes, that's a possibility.  But

7    there is no evidence that that's what occurred.

8        Q    What evidence can you point to that shows that is

9    not what occurred?

10       A    Well, I think first and foremost there is an

11   acceptable cause of death for Robbie and that is global

12   hypoxia, lack of oxygen with an acceptable mechanism,

13   getting his head wedged in the bed.

14            Secondly, there is no evidence for any neck damage

15   in Robbie.  There are no fractures.  There are no bruises.

16   There is nothing.  With the exception of the brain, Robbie

17   has no injuries whatsoever.

18            Now you don't always see evidence for those types

19   of injuries in someone that has been abused, but if someone

20   is to be shaken to the point where that is the primary cause

21   of the person's death, at a minimum you would expect

22   evidence for neck damage.

23       Q    There's none of that in this case?

24       A    No evidence for it.

25       Q    Dr. Plunkett, what could cause the retinal

1    hemorrhaging that was present in this baby?

2        A    Retinal hemorrhage is a secondary event.   It

3    simply occurs as a result of the brain swelling.   Anytime

4    there is an obstruction of the return of venous blood from

5    the eyes to the heart, you will get hemorrhage into the

6    retina.   You may also get break-through bleeding from the

7    retina into the vitreous.

8            The pressure of the veins is only slightly higher

9    than the pressure within the cerebral spinal fluid itself.

10   In a youngster four and a half months old, it's probably in

11   the range of about five millimeters of mercury.   Compare

12   that to an adult diastolic pressure of 80 millimeters of

13   mercury.   The venous pressure in a child is probably about

14   eight or ten.   The arterial pressure is probably about 30

15   for a four and a half month old, maybe 40.

16           So as soon as you exceed -- as soon as the

17   pressure within the brain exceeds the venous pressure,

18   you're gonna get retinal bleeding.

19       Q    In your opinion, is the theory of shaken baby

20   similar to whiplash injury?

21       A    Well, the theory is, yes.

22       Q    Tell the jury about that.

23       A    Well, there was a lot of research, funded research

24   through the National Institutes of Health for the automobile

25   industry and subsequently for the space program and for

1   fighter pilots looking at whiplash because people were

2   concerned that either gravitational forces by themselves

3   that somebody flying to the moon might experience, or

4   gravitational forces that someone might have happen if he or

5   she was in an automobile accident could cause head injury.

6   So they started to research the mechanisms of head injury.

7           It was found that not only can whiplash cause neck

8   injury, but it also under certain controlled conditions also

9   causes primary brain damage.  The primary -- The ability of

10  whiplash to cause primary brain damage depends on a number

11  of factors.  Number one, and probably the most important,

12  the level of acceleration.  Something in the range of a

13  couple hundred times of the acceleration.

14          It's also dependent on the location of the applied

15  force.  Force that is applied front to back or back to front

16  is less likely to cause damage than is acceleration applied

17  side to side.  It's more damaging to have side to side

18  acceleration than it is front to back.

19          What is called the jerk, J-E-R-K, which is the

20  rate of change of acceleration.  Mathematically it's the

21  first derivative of acceleration.  So the rate of change of

22  acceleration is an important fact.

23          The duration of acceleration is important.  Very

24  short durations, for example, five or ten thousands of a

25  second, which would be typical in an impact injury, are more

1    likely to cause this type of injury than are long durations,

2    say a twentieth of a second, 15 milliseconds such as what

3    occur in automobile accidents.

4         So all of these factors have been known and known

5    for a long time.  A group of physicians borrowed this

6    knowledge and then applied it to the concept of the shaken

7    baby without understanding that they were misinterpreting

8    and misapplying the fundamental research that had been done.

9         Dr. Caffey (phonetic) was one of the first

10   published on this and Dr. Amiah (phonetic), who had done the

11   research, spoke to Dr. Caffey after he published his first

12   paper and told him that he had gotten it wrong, that

13   Dr. Caffey apparently didn't understand that he had the

14   science wrong and it has persisted for the last 30 years.

15       Q    Are you aware of any studies that have been done

16   to try and determine the amount of acceleration a human

17   being can put on an object roughly the size of a baby?

18       A    You mean in terms of head injury?

19       Q    Yes, sir.  I mean type of acceleration that can be

20   done by shaking.

21       A    Oh, you mean what you can do theoretically, yes.

22       Q    Yes, sir.  What is your knowledge with respect to

23   the maximum amount of force that a human being may be able

24   to generate?

25       A    Well, the maximum acceleration that a person is

1    able to accelerate or do is known experimentally from three

2    different groups.  One is from the bioengineering group in

3    Philadelphia.  An article was published in 1987.  Those

4    people came up with approximately ten G's times the

5    acceleration of the gravity from the shake.

6         Q    Who wrote that study?

7         A    A neurosurgeon named Duhaine, D-U-H-A-I-N-E, and

8    her engineering advisor was named Thibauot, T-H-I-B-A-U-O-T.

9    Thibauot designed the model, showed her how to do the study

10   and told her what the results meant.  He was the engineer

11   and physician.

12        Those studies have been replicated by a woman

13   named Corrina Cory, C-O-R-Y, and Michael Jones, J-O-N-E-S,

14   of the Bioengineering Unit in Dundee.  And they have more

15   recently been replicated by Michael Prange, P-R-A-N-G-E, and

16   Susan Margulies, M-A-R-G-U-L-I-E-S, again in Philadelphia.

17   They're doing studies independent of what the other two are.

18   They all came up with the same answer.  Mike Jones was able

19   to get one person that could actually generate an

20   acceleration of 16 G's and Prange again was like ten or 11

21   G's.

22        Q    G meaning the force of gravity?

23        A    Sixteen times the force of gravity.  So ten G's

24   would be 320 percent squared.  And the threshold for coma

25   is -- or the threshold for concussion is probably a hundred

1252

1   G's.

2        Q    Do you know what the threshold is for a subdural

3   hematoma?

4        A    Approximately 150 G's, but the mechanism -- that's

5   a little bit misleading to try to use those kinds of terms

6   because the mechanism in many cases is actually different

7   from that that's used experimentally to cause subdural

8   hemorrhage.

9        Q    Are you aware of any scientific studies that have

10  been done experimentally on the theory known as shaken baby

11  that support the theory?

12       A    No.   There have been none.

13       Q    What papers that you have read are you aware of in

14  dealing with the theory of shaken baby are merely based on

15  anecdotal stuff or not based on anything?

16       A    Well, they're based on opinion.   No one has ever

17  seen anyone shake a child.   No nanny cams have ever caught

18  somebody shaking a child.   It's pure theory, which has been

19  repeated as accepted fact for at least 30 years and there is

20  no scientific evidence to support it and the scientific

21  evidence says, No, that's not what's happening if you are

22  gonna cause injury by shaking.

23       Q    Have you seen evidence in your experience over the

24  years, have you seen children that you believe suffered from

25  sudden impact injury?

1    A    Yes.

2    Q    And what kind of trauma would they have typically?

3    A    Well, almost always, but not always they're gonna

4    have evidence for an actual impact injury, a bruise on the

5    scalp or skull, which you may not see until you do an

6    autopsy.  They will have evidence for subdural hemorrhage.

7    They will have evidence in some cases of direct brain

8    damage.  In some cases they will have evidence for a skull

9    fracture.  Those are impact injuries and the mechanism of an

10   impact injury is fundamentally different from the mechanism

11   of a shaking.

12            MR. TEDDER:  I tender the witness, your Honor.

13            THE COURT:  All right.

14            MS. SINGER:  Your Honor, my cross-examination is

15       going to be rather lengthy.  Does the court wish to

16       continue at this point?  We've gone for over an hour.

17            THE COURT:  We're gonna take a recess at this

18       time, ladies and gentlemen, for 15 minutes.

19            (The jury is out of hearing of the court.)

20            THE COURT:  We'll be in recess for 15 minutes.

21            (Recess 2:25 - 2:48.)

22            THE COURT:  I was looking for you, Dr. Plunkett.

23       You're still right here.

24            All right.  Is the state ready?

25            MS. SINGER:  We're ready, your Honor.

```
 1              THE COURT:  Is the defense ready?

 2              MR. TEDDER:  Yes, ma'am.

 3              THE COURT:  Go ahead and bring the jury back in.

 4          Go ahead and have a seat, Dr. Plunkett.  You all have a

 5          seat.  Go ahead, Ms. Singer.

 6                          CROSS-EXAMINATION

 7     BY MS. SINGER:

 8          Q    Dr. Plunkett, before I begin with some of the

 9     questions regarding your qualifications, I do want to ask

10     one question regarding your testimony on direct, and that is

11     that you agree, as I understood your testimony, that shaking

12     can kill a baby if it's done long enough, two or three

13     minutes without oxygen, that period of time being shaken the

14     baby would stop breathing and that would explain anoxia?

15          A    I think that's certainly theoretically possible.

16          Q    And you also agree that shaking a baby could

17     stretch the centers of breathing and that could cause death

18     due to anoxia, correct?

19          A    That's correct.

20          Q    And I believe you also agree that if a baby was

21     shaken and then there was some kind of impact, such as being

22     thrown to a bed or a floor, I think you said a wall, that

23     that too could cause the injuries that you see in Robbie

24     Quirello?

25          A    No.
```

1       MR. GROLAND:  Your Honor, may I just pose an

2   objection?  She's added some facts in there.  Some of

3   which are in evidence, some of which are not in

4   evidence and I think it's confusing.

5       THE COURT:  Your objection is on the basis it was

6   a compound question?

7       MR. GROLAND:  Yes.

8       THE COURT:  Sustained on that basis.

9       MS. SINGER:  I'll restate it.

10  BY MS. SINGER:

11  Q    Isn't it true, Dr. Plunkett, that you have written

12  articles on impact injuries causing significant brain injury

13  in children?

14  A    Yes, I have.

15  Q    And impact injuries would be where a child would

16  have had his head struck in some way?

17  A    Either struck or his head strikes something else,

18  his or her head strikes something else, correct.

19  Q    That could include being thrown to the floor?

20  A    Correct.

21  Q    Thrown on a bed?

22  A    No.

23  Q    A bed would not meet that consideration?

24  A    No.

25  Q    That would not cause the deceleration that you

1   described in the articles?

2       A    That's correct.

3       Q    But you do agree that falling on a padded carpet

4   would in fact cause conditions?

5       A    Would?

6       Q    Yes, sir.

7       A    Yes, it would.

8       Q    In fact, you testified to that in the Singer case

9   in Canada, did you not?

10      A    Yes, and probably in a number of other cases also.

11      Q    So if there was shaking, plus impact, that is

12  indeed a way that these injuries could be sustained in an

13  infant?

14      A    Well, the shaking has nothing to do with it.  In

15  impact injury, certainly you can slam a child's head into a

16  wall or the floor and you can kill the child.  The shaking

17  has nothing to do with it.

18      Q    Now you had discussed on your direct examination

19  the fact that you are now the medical education coordinator,

20  did you say?

21      A    Director.

22      Q    Director.  And you are also the head of the

23  anatomic laboratory?

24      A    That's correct, anatomic and clinical.

25      Q    I'm sorry.  I missed the other part.

1       A       Anatomic and clinical, both the laboratories

2   anatomic and clinical.

3       Q       The anatomic and clinical laboratories are where

4   patients are being seen in that hospital possibly for

5   routine procedures or for diagnosis of certain cancers or

6   tumors and you actually supervise the laboratory in their

7   examination of samples taken during surgery, correct?

8       A       That was sort of a compound question.  It was a

9   compound question.  That part of the laboratory, yes, I

10  supervise all of the people that do the laboratory testing

11  in the hospital.  I also examine biopsies that are done, a

12  breast biopsy, for example, or if your appendix is removed,

13  I will look at those and give it a name or a diagnosis.

14      Q       That is 90 percent of the time that you spend as a

15  pathologist, is it not?

16      A       That was probably true a couple of years ago.  I

17  would say that I probably spend one-fourth of my time right

18  now reviewing these types of cases today.

19      Q       So you spend approximately 75 percent of your time

20  now working in the laboratory and 25 percent of your time

21  testifying in cases where shaken baby syndrome has been

22  alleged as the cause of death?

23      A       No.  I spend approximately 25 percent of my time

24  reviewing cases.  I actually testify on about one out of

25  four or one out of five of the cases that I review.  It

1  takes longer to review than to come to a conclusion than it

2  does to testify.

3      Q   You are not board certified in pediatrics,

4  correct?

5      A   That's correct.

6      Q   You're not board certified in adult critical care?

7      A   Or infant critical care, that's correct.

8      Q   Pediatric critical care?

9      A   That's correct.

10     Q   You're not board certified in anesthesiology or

11  anesthesia?

12     A   No.

13     Q   You're not board certified in radiology?

14     A   Correct.

15     Q   In fact, your testimony on direct was, I don't

16  read the CT scans because I'm not a radiologist?

17     A   That's correct.

18     Q   So you must depend or defer to the radiologists

19  who in fact do read the CT scans, correct?

20     A   In terms of the objective findings, yes, I do.

21     Q   You're not an ophthalmologist as well?

22     A   That's correct.

23     Q   And you're not a pediatric ophthalmologist?

24     A   No.

25     Q   Which is a specialty of ophthalmology, right?

1   A   That is correct.

2   Q   I know you testified quite a bit about birth and

3   birth trauma, but you are not board certified in obstetrics

4   and gynecology?

5   A   No, I am not.

6   Q   And as such I know you offered a bit of testimony

7   regarding the birth of Robbie Quirello, but as such would

8   you defer to a board certified obstetrician as to whether or

9   not Robbie Querillo's death was -- pardon me -- his birth

10  was difficult?

11  A   Well, I'm not sure.  First of all, you want that

12  person that did the testimony to be the person that actually

13  delivered Robbie, for starters, and then I would want to

14  know that person's specialty.  In other words, if that

15  person is somebody who takes care of high risk infants and

16  mothers, then on that scale Robbie's birth may not have been

17  traumatic.  So it really depends on the perspective of the

18  person that's giving the testimony rather than an objective

19  determination based on the signs and symptoms that Robbie

20  had.

21  Q   In your conclusion that Robbie Quirello suffered

22  from a difficult birth, you indicated that fetal distress

23  was something that you would have considered.

24  A   Yes.

25  Q   What did you review in the records that suggested

 1    to you that Robbie in any way suffered from fetal distress?

 2        A    The statement that I'm relying on is from the

 3    birth records which show that he was born one month

 4    prematurely, which is not a very big deal, had a broken

 5    collarbone, which means that they had to intentionally break

 6    his collarbone during the deliverly process.  It's not very

 7.   common to have an accidental break of a collarbone during

 8    birth, which suggests to me that was a difficult delivery.

 9        Q    Now would you defer to both a pediatrician and an

10    obstetrician regarding the occurrence of broken collarbones

11    in birth?

12        A    In what respect?  I'm not trying to be

13    argumentative.

14        Q    If the obstetrician and pediatrician were both to

15    say that it is quite common to have broken collarbones at

16    birth, would you defer to their expertise rather than your

17    own in making the conclusion or drawing the opinion that

18    this child had a difficult birth because of some intentional

19    breaking of the collarbone?

20        A    Well, first of all, I would want them to quantify

21    their observation, not just say common, but put it in

22    numbers.  In fact, the incidences are around one or

23    two percent.  Now if somebody wants to say that that's

24    common, fine, but I won't say whether it's common or

25    uncommon.  I'll just tell you what the incidence is and then

1    you can makeup your own mind.

2        Q    Other than the broken collarbone, what other

3    evidence do you have to show this baby had fetal distress?

4        A    He didn't have any evidence for fetal distress as

5    far as I know.

6        Q    Correct.  In fact, the fetal heart monitor shows

7    no evidence of fetal distress, doesn't it?

8        A    That's correct.

9        Q    In fact, there was no use of forceps in this

10   delivery?

11       A    That's correct.

12       Q    There was no suction used in this delivery?

13       A    That's correct.

14       Q    Although it was a sunny side up or face up

15   delivery, other than that, there was no other indication in

16   the birth records that suggested to you that any other

17   extraordinary means needed to be used to have this baby

18   delivered?

19       A    No.

20       Q    So you are relying totally on the fact that this

21   child had a broken clavicle for your opinion that he had a

22   difficult birth?

23       A    Well, that and the duration of the second stage of

24   labor.  I don't have those records right in front of me, but

25   if I remember correctly, it was prolonged.

1262

1    Q    Now you also do not have a board certification in

2    neurology, correct?

3    A    That's correct.

4    Q    And you don't have a board certification in

5    pediatric neurology?

6    A    No, I do not.

7    Q    You don't have a degree in physics?

8    A    No.

9    Q    In fact, you, in other testimony, have had to rely

10   on reviewing your college physics textbook to bring yourself

11   up to date on the laws that you apply in your theory

12   regarding the absence of shaken baby syndrome as a viable

13   diagnosis?

14   A    Well, as of five years ago that was certainly

15   true, even though we should have been taught mechanics as

16   part of our pathology or at least forensic pathology

17   residency.  We use mechanics.  We talk about bullet

18   velocities and energy and accelerations and so forth, but

19   were never really taught it.

20        So I was really forced to relearn classic

21   mechanics at the age of almost 50 and since that time I've

22   had the opportunity to work with and learn some -- learn

23   from the primary neuro researchers really in the world on

24   this topic talking about the mechanics of head injury in

25   adults and children.

Stacey K. Bryant, RPR
Judicial Court Reporter

1    Q    But you have not returned to an institution of

2  higher learning to obtain any degree in physics, physical

3  engineering or engineering; is that correct?

4    A    No.   I'm not an engineer.   I'm not gonna be an

5  engineer.   I'm not gonna build any bridges.

6    Q    And in the area of pathology, you are not board

7  certified in the specialization, which is neuropathology?

8    A    That is correct.

9    Q    Neuropathology is a specialization in pathology

10  that concentrates solely on the brain and the cervical cord?

11    A    That's correct.

12    Q    And you are not a specialist in that area?

13    A    That is correct.

14    Q    You did review Dr. Stephen Nelson's report, did

15  you not?

16    A    Yes, I did.

17    Q    And he is a neuropathologist?

18    A    That is correct.

19    Q    And in Dr. Stephen Nelson's report, he reports

20  evidence or findings, microscopic findings of cortical

21  cerebral contusions; isn't that correct?

22    A    Correct.

23    Q    And those cortical cerebral contusions are in fact

24  evidence of a traumatic injury to Robbie's brain?

25    A    Only in that they are the result of the swelling

1264

1   of the brain itself and the fact that Robbie was on the

2   respirator.  They are not a separate or independent injury

3   from them.

4       Q    Would that finding of contusions on the brain be

5   consistent with a child suffering from a traumatic injury,

6   such as an impact injury?

7       A    Well, they could be, but Robbie has no evidence

8   from --

9       Q    I'm not asking about Robbie.  I'm asking about a

10  child.

11      A    It would depend on the specific location of those

12  injuries, whether or not they truly represent contusions,

13  which are extremely rare in children under the age of

14  approximately six months.  The types of contusions that they

15  get are fundamentally different.  They're called contusional

16  tears, T-E-A-R-S, and they occur in a very specific part of

17  the brain.  Children under four and a half months don't get

18  traumatic contusions.

19      Q    Unless something happens to them that is

20  intentional in nature to cause those contusions; isn't that

21  correct, Doctor?

22      A    No, that is not correct.  Only if they are in fact

23  what are called contusional tears.  Those can occur

24  accidentally from a fall or they can occur if somebody slams

25  a child's head into a wall.

1265

1    Q    So you agree with me then?

2    A    Well, you said only indicative of intentional

3  abuse and I'm perhaps paraphrasing.  And I said, No, I

4  disagree with that.

5    Q    So it can be a fall or intentional abuse?

6    A    To cause contusional tears, yes.  Robbie does not

7  have contusional tears.

8    Q    There is no allegation that this child fell.

9    A    That's correct.

10   Q    Now your consultation, is that part of you being

11  the medical director -- pardon me -- the education director

12  for Regina Medical Center, the fact that you go across the

13  country testifying in cases such as this?

14   A    Well, it's part of my job as a pathologist, the

15  same as you would have a surgeon on your staff who might see

16  patients from a different city or even go to a different

17  city to have a clinic or do whatever.  It's part of my

18  responsibilities as a pathologist at the hospital.

19   Q    You've been retained by defense counsel in at

20  least 300 cases alleging that children have died or suffered

21  injury as a result of shaken baby syndrome, have you not?

22   A    Goodness, no, not even close.

23   Q    You've spoken at conferences for public defenders

24  and criminal defense attorneys?

25   A    Yes, I have.

1    Q    In fact, several years ago you spoke at the annual

2  conference of the public defenders in the State of Florida?

3    A    Yes, I did.

4    Q    And in 2001 you spoke at the annual public

5  defender seminar in Iowa?

6    A    I may have.  I forgot about that, but, yes, I was

7  in Iowa.

8    Q    There have been many other public defender and

9  defense lawyer conferences in which you have provided

10  information regarding your position on shaken baby syndrome;

11  is that correct?

12    A    Let me think about this for a second.  Florida I

13  remember very well.  Iowa I had forgotten about.  I spoke in

14  Reno I believe a year ago at approximately this time.  Let

15  me think for just a minute.  I don't recall any other either

16  public defender or regular defender meetings that I have

17  spoken at.  So over the last 25 years I have spoken three

18  times.  I wish I would be asked and had the time to do it

19  more often.

20    Q    At each of these conferences you have advocated

21  the position that you stated today, that there is no such

22  thing as shaken baby syndrome; is that correct?

23    A    No, that's not what I've said at all.  That's not

24  what I said today.

25    Q    Your testimony today is that this baby could not

1    be shaken in a way that would have caused the injuries that

2    were sustained?

3        A    Well, my testimony was that Robbie was not shaken,

4    that the chronic subdural hematoma that he had was not

5    caused by shaking.  Robbie died with, not because of a

6    subdural hematoma.

7        Q    Did you in fact testify at your deposition taken

8    on August 12th --

9            MS. SINGER:  And I will be providing a copy to

10           counsel -- to the doctor in a moment, your Honor.

11   BY MS. SINGER:

12       Q    -- That you do not believe a baby can suffer death

13   as a result of shaken baby syndrome?

14       A    On August 12th of this year?

15       Q    Yes, sir.

16       A    I certainly did not.  I said that the injuries

17   called the shaken baby syndrome cannot be caused by shaking.

18   There are other injuries that can.

19       Q    And so at this point you're saying that the

20   injuries can be sustained so long as there is an impact

21   involved with the shaking?

22       A    The shaking has nothing to do with it.  If you

23   have an impact injury to a child's head, the child may die.

24   You may kill a child by shaking it.  But adding shaking to

25   impact or impact to shaking does not change the mechanics of

1   the injury or the mechanism of injury.  They are two

2   fundamentally different concepts.

3       Q    Are you now scheduled to testify in another case

4   tomorrow?

5       A    What day is today?

6       Q    Today is -- That's a good question.  I think today

7   is the 17th of September.

8       A    What day of the week?

9       Q    Today is Tuesday.

10      A    Tuesday.  I'm scheduled to testify in Iowa on

11  Thursday.  I believe I fly to Des Moines.  It's at the

12  request of a woman who has been in prison for 13 years.

13  It's a post-conviction relief hearing and I'm going there

14  for the cost of a plane ticket that they're buying.

15      Q    And isn't it true that after your deposition on

16  August 12th of this year, you were scheduled to be in

17  Orlando on behalf of the defendant on August 19th of this

18  year?

19      A    Yes.

20      Q    And weren't you scheduled to be in Wisconsin the

21  week of August 26th on behalf of the defendant?

22      A    Yes.  That was in -- That was not an infant case

23  and that case settled.  I did not testify.

24      Q    And isn't it true you were also scheduled to be in

25  Reno, Nevada the week of September 9th on behalf of the

1    defendant?

2         A    That case also did not go.

3         Q    And you're also scheduled to be in Iowa the week

4    of September 23rd?  That was on your calendar in fact on

5    August 12th?

6         A    Oh, that was the Rodie (phonetic) case.  That was

7    all part of the same thing.  I think I had it listed over a

8    week's time.  I wasn't sure what date.

9         Q    Isn't it true you were also double booked to be in

10   British Columbia during the same week to testify on behalf

11   of the defendant?

12        A    I'm actually triple booked.  British Columbia is

13   at the request of the prosecutor.  I think I'm also

14   scheduled to be in two other places at the same time, but

15   that won't happen again.

16        Q    Well, of course there's no question here that you

17   did not personally treat Robbie Quirello?

18        A    That is correct.

19        Q    Did you not examine him or make any clinical

20   findings on his behalf before you rendered your opinion in

21   this case?

22        A    That is correct.

23        Q    And as a forensic consultant in this case, you did

24   not perform an autopsy yourself?

25        A    That is correct.

1    Q    Dr. Hamilton performed the autopsy and you

2    reviewed what written material and slides and photographs

3    that were provided to you by defense counsel?

4    A    Yes, that is correct.

5    Q    And before your deposition that was taken on

6    August 12th, you spent a total of approximately two or three

7    hours reviewing the records and other data before reaching

8    your opinion?

9    A    That's correct.

10   Q    You have not spoken to Brian Herlihy, the

11   defendant, in this case regarding what occurred on August

12   the 2nd, correct?

13   A    That's correct.  I haven't even met him.

14   Q    And you were provided the CT scans of Robbie

15   Quirello along with the EEG's and blood work and the chart,

16   the medical chart that outlined his clinical progression?

17   You were provided that record for review at the time you

18   rendered your opinion?

19   A    I was provided the record, but if I received the

20   CT and MR scans, I would have sent them back because I don't

21   look at them.

22   Q    Do you also not read EEG's?

23   A    That's correct.

24   Q    So you would not be able to render any opinion on

25   what the EEG showed regarding Robbie's brain damage?

1    A    That's correct.

2    Q    And you would have to defer to the pediatric

3  neurologist, who in fact did read the EEG's in the course of

4  his diagnosis?

5    A    Well, I would certainly defer to somebody other

6  than myself.  Who that person would be, I don't know, but I

7  wouldn't do it.

8    Q    Now you did not speak with Dr. Bernard Maria, the

9  pediatric neurologist who attended to Robbie Quirello, did

10  you?

11    A    No, I did not.

12    Q    So you did not get any updated information from

13  him regarding his clinical impressions or his clinical

14  examination?

15    A    You mean something different from what is in the

16  medical records?

17    Q    Yes.  You did not get any additional information?

18    A    Well, if there's something different from what is

19  in the medical records, then, no, I didn't.

20    Q    You did not personally speak with Dr. Lawrence

21  Levine, who's the pediatric ophthalmologist who attended to

22  Robbie Quirello?

23    A    That is correct.

24    Q    And I understand although you find Dr. Hamilton's

25  autopsy not to be up to par, you did not personally speak

1272

1   with Dr. Hamilton, the District Medical Examiner for the

2   Eighth District here in Florida to discuss his findings with

3   him, did you?

4        A    No.   There is no point in discussing the findings

5   with somebody where an incident occurred some time later

6   because I have to -- everyone has to rely on your written

7   report and your photographs and your slides.   There's

8   nothing else that is reliable.   Your memory is not reliable.

9        Q    If you had a concern --

10            MR. TEDDER:   Your Honor, my objection is he was

11        still answering the question when he was interrupted.

12            THE COURT:   All right.   Don't interrupt the

13        witness, Ms. Singer.

14            MS. SINGER:   I'm sorry.

15            THE COURT:   Go ahead.

16            THE WITNESS:   Your memory, at least my memory is

17        not reliable.   I have to rely on what I have written

18        and what I have photographed and what I have on the

19        microscopic slides.   I can't remember next week what I

20        did today.

21   BY MS. SINGER:

22        Q    You did not speak with Dr. Hamilton about what he

23   saw upon his examination of Robbie Querillo's brain and

24   skull, did you?

25            MR. GROLAND:   Objection, asked and answered.   He

1273

```
 1          said he did not talk to Dr. Hamilton and that meant

 2          ever.

 3                THE COURT:  The objection is sustained.

 4   BY MS. SINGER:

 5          Q    Doctor, did you voice a concern to Dr. Hamilton

 6   regarding your inability to view the dura?

 7          A    No.  It's a little late.

 8          Q    Did you personally contact your peer,

 9   Dr. Hamilton, to discuss with him what he may have seen when

10   he viewed the dura?

11          A    No.

12          Q    Does it surprise you to know that Dr. Hamilton

13   does not agree with your findings regarding the photographs

14   of the dura?

15          A    No, it doesn't.

16          Q    And in fact does it surprise you that neither

17   Dr. Hamilton, nor Dr. Nelson agree with you regarding your

18   findings on the dura?

19          A    Well, I don't know how Dr. Nelson can disagree.

20   He didn't get any dura either and he didn't get any spinal

21   cord either.

22          Q    But he did get the photographs, though.

23          A    Yes, he did.

24          Q    You did not personally speak with Dr. Nelson, did

25   you?
```

1    A    No, I did not.

2    Q    Now he was the neuropathologist that actually

3    dissected the brain and viewed the cortical contusions; is

4    that correct?

5    A    To the best of my knowledge Dr. Nelson did not

6    examine the brain.  Dr. Nelson did not receive the brain.

7    Dr. Nelson received eight microscopic slides.  There is no

8    description that I have been able to find of the examination

9    of the brain performed by Dr. Nelson if he in fact performed

10   an examination of the brain other than the microscopic

11   slides.

12          MR. TEDDER:  May we approach, your Honor?

13          THE COURT:  Yes.

14   BENCH CONFERENCE HELD:

15          MR. TEDDER:  Your Honor, I became aware of the

16          fact that Dr. Nelson had grossly examined the child's

17          brain during the course of his deposition in a letter

18          which he sent to Dr. Hamilton.  It was then transmitted

19          to me via fax from Dr. Nelson's office in Lakeland,

20          Florida.  We did not have it in our file before then.

21          I had asked that that be sent to Dr. Plunkett and

22          apparently he's not received it.  So I would ask for a

23          recess and he be given an opportunity to review that

24          letter dated September 18th.  The only letter we have

25          is a letter dated October 23rd, which does deal with

1      the microscopic slides.

2            THE COURT:  I'm not going to interrupt

3      cross-examination to address this issue.  I'll be glad

4      to revisit it before your redirect.

5      BENCH CONFERENCE CONCLUDED.

6  BY MS. SINGER:

7      Q    So, Dr. Plunkett, you did not receive in the

8  packet that defense provided to you a letter dated September

9  18th, 2002 to Dr. William Hamilton from Dr. Stephen Nelson

10 stating, "Thank you for sending me the decedent's brain to

11 examine in consultation.  It arrived a couple of weeks ago.

12 And in an abundance of caution, the formula was changed and

13 it was allowed to fix for the additional couple of weeks"?

14 You have not seen that letter?

15     A    No, I haven't.

16     Q    And you were not aware of the fact that Dr. Nelson

17 did examine this brain?

18     A    I assumed that Dr. Nelson had examined the

19 microscopic slides and that Dr. Hamilton had examined the

20 brain.

21     Q    In fact, the neuropathologist, the expert in the

22 area of the brain at autopsy, did examine this brain, did he

23 not?

24     A    I would like to see the report.

25     Q    That report was provided to you after examination

1   in a letter dated October -- I believe it's the 23rd, 2000.

2   Do you have that letter, Doctor?

3        A    Yes, I do.

4        Q    And you've had more than sufficient time to review

5   that letter.  That letter was in fact provided to you, was

6   it not?

7        A    Yes.  That's a description of the microscopic

8   examination.

9        Q    And so your testimony is that you were not

10  provided with the information regarding the gross inspection

11  of the brain; is that correct?

12       A    I have seen no report of the gross inspection of

13  the brain.

14       Q    And your opinion is based on not reviewing that

15  particular letter; is that correct?

16       A    Well, Dr. Nelson has diagnoses or impressions and

17  I happen --

18       Q    You did not personally speak -- I'm sorry, sir.

19       A    -- I happen to agree with his diagnoses or

20  impressions.

21       Q    You have not personally spoken with Dr. Nelson?

22       A    No.

23       Q    Personally, Dr. Plunkett, in terms of head trauma,

24  you have only done two autopsies on children whose deaths

25  were exclusively due to head trauma; is that correct?

1   A   That's correct.

2   Q   You did one back in 1975?

3   A   It's either '75 or '76.  It was while I was only a

4   fellow.

5   Q   And the second one was in the early '90s?

6   A   That's correct.

7   Q   And you have not done one since then?

8   A   That's correct.

9   Q   So over 25 years as a pathologist you have done

10  only two out of the many thousands of autopsies you've done

11  as both assistant coroner and coroner for the various

12  counties in which you've been employed, correct?

13  A   In children who died exclusively as a result of

14  head trauma.  Other children had head trauma as part of a

15  battered child syndrome with other organ injuries and so

16  forth.

17  Q   You have never arrived at an opinion in a case for

18  which you have been assigned or reviewed that a child was

19  the victim of shaken baby syndrome?

20  A   Well, actually I have.  I came to that conclusion

21  in a Ramsey County case and in an Iowa case -- No.  In a

22  Wisconsin case in the early '90s.  Today I would not have

23  come to that conclusion.  As a matter of fact, I've got the

24  newspaper article of the one from Ramsey County saying that

25  a person subsequently pleaded and they said, well, I had

1   reviewed it and they concurred that it was a shaken baby

2   syndrome.  Today I wouldn't.

3        Q    Your testimony today is that Robbie had an old

4   subdural hematoma that bled, correct?

5        A    Well, the words are correct.  I'm not sure the

6   context or the implication is.

7        Q    That he had an old subdural hematoma that bled?

8        A    Well, he had a chronic subdural hematoma that was

9   bleeding.

10       Q    That was bleeding on August the 2nd of 2000?

11       A    Yes.

12       Q    The day that he entered into the hospital?

13       A    That's correct.

14       Q    And what signs would you expect to see in a child

15   with a bleeding subdural hematoma?

16       A    Well, first of all, you may see none because

17   bleeding is part of the subdural hematoma, it's part of the

18   natural history.  Certainly Robbie had been bleeding for a

19   long time into that subdural hematoma prior to August 2nd

20   and as far as I know, he didn't have any signs or symptoms

21   whatsoever.  So the first thing that you may see is nothing.

22            The second thing that you may see is a seizure as

23   a result of it.  The third thing that you may see is

24   irritability, change in eating patterns, fussiness and so

25   forth caused by pressure on the brain from the volume of the

1    subdural hematoma.  You may see an increase in the head

2    size.

3        Q    Isn't it true that if there was pressure on the

4    brain as a result of the hematoma, that that would be noted

5    in the CT scans that were done upon his admission?

6        A    Well, there was no herniation, but his fontanel is

7    described as tense and bulging.  That means there was

8    pressure.

9            MR. GROLAND:  Objection, your Honor.  Same

10           objection.

11           MS. SINGER:  I think he was nonresponsive to the

12           question, your Honor.  Should I ask for him to respond

13           every time he's nonresponsive to the question?

14           THE COURT:  Yes, ma'am, you should.

15   BY MS. SINGER:

16       Q    I don't believe you were responsive to the

17   question, Doctor.  On the CT scans that were done upon

18   admission, isn't it true that there was no evidence that the

19   subdural hematomas that you say were in existence were in

20   fact affecting the brain?

21       A    Oh, I agree.  The subdural hematoma in and of

22   itself was not of sufficient volume to cause signs and

23   symptoms.

24       Q    Isn't it true that an old subdural hematoma, let's

25   say at birth, which is where I believe you're putting the

1280

1  subdural hematoma as being created --

2      A     That is not correct.  I am not putting it there.

3  I'm saying that it is more than two weeks old and could

4  relate back to birth.

5      Q     If the child had a subdural hematoma more than two

6  weeks old, would not the body form a neomembrane in order to

7  wall off that subdural hematoma and begin the mopping up

8  process?

9      A     It starts to develop a neomembrane, yes.

10     Q     Isn't it true that eventually the body mops up the

11 blood products and what is left is a hygroma?

12     A     Well, that's the shorthand version.  Complete

13 healing would mean that you have nothing left except for

14 staining of the dura caused by the residual inflammatory

15 cells of iron pigment.  If it goes on to develop a hygroma,

16 which is strictly speaking just water on the surface of the

17 brain, that is certainly not healing.  The subdural hygroma

18 by itself may continue to enlarge and may require surgical

19 removal.

20     Q     But a hygroma itself does not bleed, does it,

21 Doctor?

22     A     That's correct.

23     Q     And in premature children, isn't there often

24 evidence of cerebral spinal fluid surrounding the brain?

25     A     Well, all people have evidence for cerebral spinal

1281

1    fluid surrounding their brain.

2        Q    Doesn't cerebral spinal fluid look the same on CT

3    scans as old blood?

4            MR. GROLAND:  Objection, your Honor.  He's already

5        testified he's not a radiologist.  He doesn't read CAT

6        scans.  It's beyond his field of expertise.

7            THE COURT:  Overruled.  If you're able to answer

8        the question, Doctor, you may do so.

9            THE WITNESS:  I agree with Mr. Groland.

10   BY MS. SINGER:

11       Q    So you would defer to a radiologist --

12       A    Yes.

13       Q    -- To make that determination?

14       A    Yes, I would.

15       Q    Now is it your testimony, as I understand it

16   today, that bleeding in the subdural space always results in

17   bleeding in the subarachnoid space?

18       A    Yes.  Well, no, no.  If the cause of the bleeding

19   is rupture of bridging veins, then there must be bleeding in

20   the subarachnoid space.  If the blood in the subdural space

21   is caused by bleeding within the dura itself, what

22   Dr. Geddes calls intradural hemorrhage with break-through

23   bleeding into the subdural space, then you may not see

24   subarachnoid hemorrhage.

25       Q    So you would expect to see bleeding in the

1   subdural space and the subarachnoid space if there was a

2   rupture of the bridging veins?

3       A    That's correct.

4       Q    And isn't it true that rupture of the bridging

5   veins occurs when there is traumatic injury to the brain?

6       A    When there is traumatic injury to the bridging

7   blood vessels, which may occur with no injury of the brain

8   itself.

9       Q    And isn't it true then that if there was an impact

10  injury, there could be rupture of the subdural bridging

11  veins as well as bleeding in the subarachnoid space?

12      A    Yes, there could be.

13      Q    Now you cited and used some photographs from a

14  neuropathologist by the name of Jennian Geddes, correct?

15      A    That's correct.

16      Q    And that article is not published yet, correct?

17      A    No.

18      Q    And the photographs that you were relying on, you

19  indicated were of a 32 week premature child, correct?

20      A    I'm not relying on them.  I'm simply showing the

21  jury what is going to appear in her article for

22  demonstrative purposes.

23      Q    But the photographs were of a 32 week old newborn

24  child?

25      A    That's correct.

```
 1        Q    And not a four and a half month old child?

 2        A    That's correct.

 3        Q    And also you indicated that there was difficulty

 4   in birth and fetal distress, correct?

 5        A    That's correct.

 6        Q    With poor breathing and the child was

 7   resuscitated?

 8        A    That's correct.

 9        Q    You can't say whether or not forceps were used in

10   that delivery, can you?

11        A    Yes, I can.

12        Q    What is the answer to that, sir?

13        A    No, they were not.  It was a C-section.

14        Q    All right.  But that was after it was discovered

15   that the child was having fetal distress in the womb, is it

16   not?

17        A    That's correct.

18        Q    So the problem with breathing occurred before the

19   baby went through the birth canal?

20        A    That's correct.

21        Q    We don't have that situation here with Robbie

22   Quirello.  He was four and a half months old; is that

23   correct?

24        A    That's correct.

25        Q    You also indicated that when blood is in the brain
```

1  for four to five days, there is a sign of iron pigment,

2  correct?  Did I understand you correctly on direct

3  examination that you would have some iron staining after

4  four or five days?

5      A    I don't recall if that's what you and I discussed

6  during the deposition or whether I actually said it on

7  direct examination, but it takes about four to five days to

8  be able to see iron pigment when you're looking at a section

9  of the dura under a microscope.

10         When the eyes were examined, iron was seen in the

11  bleeding in the retina.  But Robbie had been in the hospital

12  for eight days.  So the fact that there is iron there does

13  not surprise me at all.  It doesn't tell you whether the

14  initial injury occurred eight days before or eight weeks

15  before.

16      Q    And you agree that the autopsy is the gold

17  standard?

18      A    For what?

19      Q    For making a determination or making a final

20  determination as to cause of death?

21      A    Well, I think that it's gonna depend on the

22  quality of the autopsy and the quality of the person doing

23  the examination.  But the purpose of the autopsy is not to

24  determine the cause of death.  Robbie's cause of death was

25  clear from the hospitalization.  You didn't need to perform

1    an autopsy to determine why Robbie died.  You needed to

2    perform an autopsy in order to document any and all injuries

3    that he had, to document them well so that two years plus

4    later you can come back and reconstruct it.

5        Q    You have corrected radiologists in the past in

6    your own experience?

7        A    What?

8        Q    Have you corrected radiologists in the past?

9        A    Corrected radiologists?

10       Q    Yes.

11       A    I have a brother who's head of radiology at Abbott

12   Northwestern.  I don't think he would take kindly to me

13   correcting him.  I have discussed discrepancies in findings

14   between myself and a radiologist.

15       Q    So you have found that there are discrepancies?

16       A    Yes.

17       Q    Now you keep -- you kept saying on direct

18   examination that you would have wanted to examine the brain

19   stem.

20       A    I didn't keep on saying that.  I would have wanted

21   to examine the dura itself.  I would have wanted to examine

22   the brain stem and the spinal cord for purposes of trying to

23   date the initial injury.  Even with that, I may not have

24   been able to.

25       Q    You were not aware that Dr. Nelson did in fact

1 examine -- the neuropathologist did in fact examine the
2 brain stem?

3     A    Well, he did examine the brain stem because that's
4 part of his examination, but he didn't -- that's part of the
5 brain and there's a description of it in his microscopic
6 report. But there is no -- there's no description of the
7 spinal cord.

8     Q    Now you were asked quite a bit about lack of
9 oxygen, but the heartbeat of the child still being -- still
10 occurring.

11     A    That's correct.

12     Q    If we can get to that. It's my understanding that
13 had there been a finding that the heartbeat was still
14 occurring, that the lack of oxygen would have been very
15 short, in your opinion, for the heartbeat to have been
16 continual or have been continuously occurring?

17     A    Less than seven to ten minutes, that's correct.

18     Q    And were you aware that at the time that 911 was
19 called for this child, the child was reported to be
20 breathing?

21     A    Yes, I was.

22     Q    And were you aware of the fact that during the
23 time that 911 was communicating with Brian Herlihy, but
24 before the EMT's got to the house, the child had been
25 gurgling?

1287

1      A    Yes.  Well, I didn't interpret it as gurgling.  I

2   thought it was vomiting.  That's how I was interpreting it.

3      Q    You didn't listen to the 911 tape?

4      A    No, I didn't.

5      Q    So you did not have that available to you to

6   determine exactly how the child was described while the

7   EMT's were on their way to the apartment?

8      A    No.

9      Q    So if you were told that the child had been

10  breathing intermittently, had a heart rate and was gurgling

11  during that time, would you not agree the child was showing

12  signs of breathing during that time period?

13     A    No.  That type of intermittent breathing is what's

14  called agonal, A-G-O-N-A-L, breathing.  It's sometimes

15  called kussmahl, K-U-S-S-M-A-H-L, breathing.  It's agonal

16  breathing that occurs sporadically and is not very good at

17  oxygen exchange.  It's a leftover primitive reflex, as best

18  I know, to try to keep you going, but it doesn't work very

19  effectively.

20     Q    Is it your testimony today that the injury that

21  occurred to Robbie Quirello was the result of lack of

22  oxygen?

23     A    His death was as a result of a lack of oxygen.

24     Q    Was the injury to his brain that was seen on

25  August the 2nd due to lack of oxygen, Doctor?

1288

1    A    No.

2    Q    Ultimately his brain gave out and he couldn't

3    breathe anymore and he died, correct?

4    A    Well, I don't know if I would characterize it as

5    his brain going out.  The parts of the brain that control

6    breathing were damaged and he stopped breathing.  It was the

7    stoppage of the breathing that ultimately caused his death.

8    Q    And is it your testimony today that the damage or

9    injury that occurred to Robbie Quirello was due to him being

10   wedged in a bed?

11   A    This injury and subsequent death could have

12   occurred if Robbie was trapped in that bed exactly as

13   stated.  The complicating factor is that he has a chronic

14   subdural hematoma that is going to be subject to new

15   bleeding with no trauma or to new bleeding with relative

16   lack of oxygen, because someone with a chronic subdural

17   hematoma does not have a normal brain structure.  I just

18   don't know where to put that chronic subdural hematoma into

19   the cause and effect relationship of what happened to

20   Robbie.  I don't know where exactly to put it.

21   Q    Dr. Plunkett, do you recall your deposition taken

22   on August 12th of this year?

23   A    I don't recall it at all, but go ahead.

24   Q    All right.

25        THE COURT:  Give the Doctor a copy of the

1      deposition.

2  BY MS. SINGER:

3      Q    I'm turning now to page 44.  Dr. Plunkett, on line

4  ten, my question or statement to you was, "The injury that

5  you see in Robbie's brain, is it your opinion that it is a

6  result of having been trapped between the bed?"  Answer,

7  "No, no."  And I finished my question by saying, "Rail and

8  the mattress?"  Answer, "No, it's not, no."  Do you recall

9  that question and that answer?

10     A    Yes, I do.

11     Q    Now I can take my deposition back, please.  Thank

12  you, sir.

13     A    Can I read --

14     Q    You'll have an opportunity to explain it on

15  redirect, sir.

16         Now let's talk about the retinal hemorrhaging that

17  you agree was found during the course of the autopsy.  You

18  do agree with that, correct, that there was retinal

19  hemorrhaging?

20     A    Yes, that's correct.

21     Q    Is it my understanding that your testimony is the

22  retinal hemorrhaging was due to brain swelling that occluded

23  the vein that went into the eyes and supplied blood to the

24  retina?

25     A    The retinal hemorrhage was the result of pressure

1    within or around the veins exceeding the venous pressure.

2        Q    What -- I'm sorry, sir.

3        A    That can occur as a direct result of an impact, a

4    drastic increase in pressure.  It can occur as a result of

5    structural or functional clotting such as occurs with

6    cortical venous thrombosis.  It can occur as a result of

7    generalized or even localized swelling of the brain.

8        Q    So you agree then that at least in your theory of

9    how the retinal hemorrhages occurred, they could be due to

10   an impact injury to Robbie Quirello?

11       A    Yes.

12       Q    What vein is occluded when there is intracranial

13   pressure that causes retinal hemorrhaging?

14       A    Well, there are a number of veins that can be

15   occluded.  The central retinal vein may be occluded, the

16   peripheral veins that are not directly connected to the

17   central retinal vein may be occluded.  The exact veins that

18   are occluded is unknown.  As a matter of fact,

19   experimentally it's difficult to cause retinal hemorrhage by

20   simply occluding the central retinal vein.  It usually takes

21   contributaries (sic) also.

22       Q    For this intracranial pressure to occur and cause

23   the retinal hemorrhaging, that would have had to occur

24   before Robbie was seen in the emergency room, correct?

25       A    I'm not sure of the time course of documentation

1    of the retinal hemorrhage.

2        Q    Let's assume for a moment that the chart shows

3    that they were documented in the emergency room.

4        A    Sure.

5        Q    All right.  Let's just assume that for a moment.

6    I don't think I'm misleading you here.  I think that's

7    testified to.

8        A    No.  That's fine.

9        Q    For your testimony to explain those retinal

10   hemorrhages, they would have had to occur before they were

11   actually documented in the emergency room, correct?

12       A    That's correct.

13       Q    And that pressure would have been so high to cause

14   the actual pressure to these veins and cause the occlusion

15   that causes the bleeding?

16       A    I'm going to quantify so high for you rather than

17   using it qualitatively.

18       Q    Good.

19       A    Anything above eight or ten millimeters of

20   mercury, it could have occurred days or even weeks prior to

21   the time that Robbie was seen in the emergency room.

22       Q    Or it could have also occurred right before Robbie

23   went into the emergency room?

24       A    That is correct.

25       Q    It could have occurred as a result of an impact

1    injury that occurred right before Robbie went into the

2    emergency room?

3        A    Yes.

4        Q    It could have occurred in conjunction with other

5    injuries sustained to Robbie's brain?

6        A    I'm not sure what you mean by other injuries, but

7    if Robbie had an impact injury, yes, that could cause

8    retinal hemorrhage.

9        Q    Well, we know Robbie was in an unconscious state

10   or a semiconscious state when he was admitted into Shands

11   Teaching Hospital.

12       A    He was unconscious.  I would classify it as

13   unconscious.

14       Q    And we know that that was as a result of a brain

15   injury.

16       A    Yes, that's correct.

17       Q    And you don't disagree that the retinal

18   hemorrhaging could have occurred at the very same time that

19   the brain injury occurred?

20       A    Well, if you're talking about the initial -- Are

21   you talking about the initial injury causing the subdural

22   hematoma?  Is that what you're talking about?

23       Q    I'm talking about the fact that it is indeed

24   possible that this child could have sustained severe brain

25   injury and retinal hemorrhaging shortly before his admission

1    into Shands Teaching Hospital, that it is indeed possible

2    under your theory, is it not, Doctor?

3         A    I mean, I will never say never, but that is a

4    mischaracterization of the actual injury that he has.  What

5    Robbie has is simply a cessation of his breathing.  He

6    doesn't have an impact injury.  He doesn't have a mark on

7    his body.  He doesn't have a skull fracture.  There's no

8    bruise underneath the scalp.  He has a cessation of

9    breathing that's caused his death.

10        Q    Did you not review Dr. Anne Dickison's notes in

11   the chart reflecting that in fact there was a noted bruise

12   to the occipital area of the head of this child?

13        A    Well, I didn't see it.  It was not commented on in

14   the radiology reports and it's not commented on in the

15   autopsy report.  If the autopsy is the gold standard, then

16   where are we?

17        Q    Had there been such a finding, would that be

18   consistent with an impact injury, sir?

19        A    Yes, it would.

20        Q    And would it be consistent with the brain injuries

21   that occurred as a result of an impact injury?

22        A    With the exception that Robbie has an established

23   brain injury at the time he was brought into the hospital on

24   August 2nd.

25        Q    Is it yes or no, sir?  Is it consistent?

1    A    Yes.

2    Q    Now you were talking a little bit about the

3  physics here and I do have some questions about that.  What

4  you said on direct examination is that 1G is 320 feet per

5  second?

6    A    No, I didn't.

7    Q    Well, you did say that on direct examination.  Do

8  you want to correct that?  You did.

9    A    No, I didn't.  I said 1G is 32 feet per second

10  squared.

11    Q    All right.

12    A    Ten G's is 320 feet per second squared.

13    Q    Ten G's is 320 feet per second?

14    A    Squared.  It's acceleration.

15    Q    And 320 feet would be the length of a football

16  field?

17    A    Yes, in Canada.

18    Q    In Canada, right.

19    A    Canada.

20    Q    We only have 300 feet here.

21    A    Right.

22    Q    And it's your testimony that folks have been able

23  to shake or been able to get the acceleration of up to 16

24  G's in biomechanical testing or biomechanical

25  experimentation?

1    A    Yes.

2    Q    That's about as high as they can go?

3    A    That's correct.

4    Q    Isn't it correct that eight G's will kill a pilot?

5    A    Actually four G's will, but that's an entirely

6  different mechanism.  It's caused by the lack of blood flow,

7  which causes you to blackout, not a traumatic brain injury.

8  So it's totally different.  Four G's or five G's will do it.

9    Q    So you're saying that ten G's maximum force, which

10  would be 320 feet per second squared, going the force of --

11  going an entire football field squared several times in

12  shaking a baby would not cause injury to this child; is that

13  what you're saying?

14    A    That's correct.  It does not cause the types of

15  brain injuries that you see in Robbie.  Its been well

16  studied and well characterized for the last 60 years.

17    Q    You are in the minority on this issue, are you

18  not, sir?

19    A    Among the pediatricians, certainly.  Among the

20  forensic pathologists, no.

21    Q    And as a result you have gone across the country

22  testifying on behalf of defendants in criminal cases such as

23  this, presenting this minority view?

24    A    You mean as a result of being in the minority,

25  have gone across the country presenting this minority view?

1   No, I don't think that's correct.  I've testified in 15 or

2   16 states.  I'm one of the first people that has been

3   willing to address this issue from a scientific standpoint.

4        Q     And it is your testimony that's offered in these

5   cases that it is not possible to shake a baby the length of

6   a football field in a split second and cause the injuries

7   that are seen in shaken baby syndrome?

8        A     You've just said two different things.  If you're

9   talking about 320 feet per second squared, that's not a

10  split second.  You're talking about motion.  You are able to

11  shake a child; and you can do this as an actual experiment

12  or you can do it as a mind game, you can shake a child at

13  three or four cycles per second, three or four times back

14  and forth a second and you can calculate the maximum

15  acceleration that you achieve.

16          Dancers doing pirouettes, divers going off of a

17  10-millimeter platform generate more rotational acceleration

18  during the pirouette or during the dive than does a human

19  shaking a child.

20       Q     Now, sir --

21       A     I don't think it's a good idea to shake a child,

22  but you do not cause the injuries called the shaken baby

23  syndrome by shaking someone.

24       Q     Now, sir, a diver is not four and a half months

25  old, correct?

1    A    That's correct.

2    Q    A diver is not constructed like a four and a half

3  month old infant, correct?

4    A    That's correct.

5    Q    A diver does not have the same head to body size

6  ratio as an adult, correct?

7    A    Well, as a baby, that's correct.

8    Q    As a baby as an adult would have?

9    A    That's correct.

10    Q    And isn't it true that dancers are not four and a

11  half months old?

12    A    Most of them.

13    Q    All right.  You know one that's four and a half

14  months old?

15    A    My second granddaughter is trying to dance at

16  eight months and she just started walking.

17    Q    But before they start walking?

18    A    No.

19    Q    Unlikely.  And it's your testimony that you can't

20  shake a baby hard enough, I understand that, and my question

21  is this:  You haven't done any experiments shaking babies,

22  have you?

23    A    No, I haven't.

24    Q    Nobody's done any experiments shaking babies, have

25  they?

1    A    No.

2    Q    That's because it would be unethical to shake

3 babies?

4    A    Yes, that's correct.

5    Q    The reason why it would be unethical is because

6 you would cause significant, severe brain damage in an

7 experimentation of this theory that you offer that such

8 injuries cannot occur?

9    A    No.  I think that's the reason that's given.  You

10 also don't find any volunteers who are just taking babies

11 and dropping them three feet to the floor, which I think

12 would be unethical because I know what will happen there.

13    Q    Right.  In fact, sir, you have written articles

14 where a baby can suffer a fall that will result in death by

15 falling merely 33 inches?

16    A    Even less than that.

17    Q    Even less than that.  So impact certainly could

18 cause that?

19    A    Yes.

20    Q    And shaking with impact could cause death?

21    A    Shaking has nothing to do with it.  You can

22 cause -- Shaking and impact are totally different mechanisms

23 of mechanical causes of injury.

24         MS. SINGER:  One moment, your Honor.

25         (Brief pause.)

1   BY MS. SINGER:

2     Q   Dr. Plunkett, you had indicated that those retinal

3  hemorrhages that were seen upon examination in the emergency

4  room could have been there well before August the 2nd; is

5  that correct?  Is that what I understood your testimony to

6  be?

7     A   That's correct, yes.

8     Q   Did you examine the slides that were done at the

9  Alliant Eye Institute during the autopsy, the specific

10  autopsy of the eyes that were done in this case?

11     A   No.  I relied on the report.

12     Q   If the evidence was that those retinal hemorrhages

13  were so severe that this child would be blind, would you

14  contest that at this time?

15     A   No.

16     Q   So Robbie Quirello wouldn't have been playing with

17  his daddy and focusing on his daddy at 9:00 a.m. if he had

18  those retinal hemorrhages and they caused him to be blind

19  before that time; is that correct?

20     A   That is not true.  The retinal hemorrhages that

21  were found at the time of the autopsy are not indicative of

22  the condition of his eyes when he came into the emergency

23  room, anymore than the condition of his brain at the time of

24  the autopsy was indicative of the condition of his brain

25  when he came into the emergency room.

1       MS. SINGER:  No further questions, your Honor.

2       THE COURT:  All right.  Since we've been going an

3  hour again, unless you have only a few questions,

4  Mr. Tedder, we will take another recess.

5       MR. TEDDER:  No, ma'am.  I have more than a few

6  questions.

7       THE COURT:  We'll take a 15 minute recess, ladies

8  and gentlemen.

9       Ms. Singer, Mr. Pennypacker, don't leave yet,

10  please.

11       (Out of the presence of the jury.)

12       THE COURT:  Now at sidebar Mr. Tedder had asked

13  that Dr. Plunkett be given another medical report to

14  review prior to redirect, which of course if that is

15  done and if you ask questions regarding that area,

16  that's going to require a recross on that area.

17       MR. TEDDER:  Well, I think we have no choice, your

18  Honor.  This letter only came to my attention in the

19  middle of the deposition on September the 4th, 2002

20  because I did not have it and Dr. Nelson was referring

21  to his gross examination of the brain.  We recessed the

22  deposition.  Dr. Nelson faxed me the letter.  I thought

23  I had directed someone in our office to send it to

24  Dr. Nelson -- excuse me -- Dr. Plunkett and

25  Dr. Uscinski.  I suppose it wasn't done.

1    THE COURT:  What does the state say?

2    MS. SINGER:  I don't have a problem with that,

3    Judge, but I do want the record to be clear on

4    something.  Dr. Stephen Nelson's name was provided to

5    defense counsel in October of the year 2000 and there

6    was an opportunity to speak with Dr. Nelson from

7    October 2000 throughout the time that his deposition

8    was taken.  I just want the record to be clear on that.

9    As far as whether or not Mr. Tedder wishes to show

10   this to Dr. Plunkett, I'm not going to oppose that as

11   long as I'm allowed to cross-examine on any new areas

12   that come of it.

13   THE COURT:  You will be.  All right.  You may

14   utilize the recess as you see fit.  Recess for 15

15   minutes.

16   MR. TEDDER:  Your Honor, I'm just going to hand

17   him this letter, show it to Ms. Singer first.  I'm not

18   going to say anything to Dr. Plunkett whatsoever about

19   it.

20   (Recess 3:51 - 4:04.)

21   (Out of the presence of the jury.)

22   MR. TEDDER:  Your Honor, as you know before the

23   last recess we provided Dr. Plunkett a copy of the

24   letter dated September 18th, 2000 that Dr. Nelson sent

25   to Dr. Hamilton.  He indicated to me that there was

1  something Dr. Plunkett wanted to relay to me about the

2  contents of this letter.  I did not ask him what that

3  was.  We would like to find out what it was prior to

4  bringing the jury out.  I would ask leave of court to

5  speak to Dr. Plunkett with the prosecutors to find out

6  exactly what he found in this letter.

7          MS. SINGER:  We would leave it up to the court.

8          THE COURT:  Have a seat, Dr. Plunkett.

9          MR. TEDDER:  I'll re-hand him the letter again.

10         THE COURT:  And all of these attorneys may speak

11  with Dr. Plunkett simultaneously to find out what this

12  new issue is so long as it doesn't take very long.

13  This does not need to be reported, does it?

14         MR. GROLAND:  No.  This is just an informal --

15         (Brief pause.)

16         THE COURT:  All right.  Are we ready for the jury

17  to come back in?

18         MR. TEDDER:  Yes, ma'am.

19         THE COURT:  Before we do, one of the jurors,

20  Mr. Cartel has requested a new notebook.  Any

21  objection?

22         MS. SINGER:  No, ma'am, but I don't know if I have

23  a new notebook.

24         THE COURT:  The state had already provided 15 as

25  opposed to 14, so we do have one.

1     MS. SINGER:  Oh, great.

2     THE COURT:  However, I'll alert the state and

3  defense just in case other jurors might be running out

4  of room, that you might want to bring more tomorrow.

5     MS. SINGER:  I'll have my investigator go ahead

6  and purchase -- As soon as she comes back, Judge, I'll

7  tell her to go ahead and purchase more notebooks for

8  tomorrow.  Judge, how many do you want?  Should we get

9  a whole set of 12?

10     THE COURT:  I don't want any personally.  It's

11  totally up to you and if the jurors request them, we'll

12  give them one.

13     (The jury is present and seated in the jury box.)

14     THE COURT:  Mr. Cartel, there you are.  You have

15  requested an additional notebook; is that right?

16     JUROR CARTEL:  No.

17     THE COURT:  We got the information wrong.  Did one

18  of the jurors request an additional notebook?  Good

19  enough.  If you need one we can get it.

20     All right.  Go ahead and have a seat, Doctor.

21  And, Mr. Tedder, you may continue with your redirect.

22     MS. SINGER:  Excuse me, your Honor, if I can just

23  move this podium.

24     MR. TEDDER:  Thank you, Ms. Singer.

25     MS. SINGER:  You're welcome, Mr. Tedder.

1                         REDIRECT-EXAMINATION

2 BY MR. TEDDER:

3     Q    Dr. Plunkett, several times throughout your

4 testimony you described evidence seen in the photographs,

5 which you described as a cortical venous thrombosis.

6     A    Yes.

7     Q    Tell the jury what that is, please.

8     A    Cortical venous thrombosis refers to clotting of

9 the blood vessels on the surface of the brain.  It is part

10 of a process that can in and of itself kill somebody.  It's

11 uncommon.  It is frequently misdiagnosed as representing

12 inflicted trauma and I have seen it misdiagnosed probably a

13 half a dozen times.

14     Q    Now in the recess we provided you with a letter

15 from Dr. Nelson to Dr. Hamilton dated September 18th, 2000,

16 correct?

17     A    Yes, that's correct.

18     Q    We neglected to get that information to you prior

19 to just now; is that correct?

20     A    That's correct.

21     Q    Dr. Plunkett, you had an opportunity to review

22 that letter from September 18th, 2000?

23     A    That is correct.

24     Q    Tell the jury what -- does that -- does what's in

25 that letter change your opinion in any way in this case?

1305

1    A    No.  It really confirms what I thought I was

2   looking at with just the photographs of the brain.

3   Dr. Nelson's describing the most prominent area of

4   subarachnoid hematoma.  He describes it as a hematoma, an

5   actual collection of blood, not just bleeding.  It was on

6   the left superior frontal gyri, a clot of blood measured

7   eight by eight by nine millimeters.  That is exactly what

8   you see in the photographs.  It is cortical vein thrombosis.

9   I just don't know if it's cortical vein thrombosis that

10  developed after Robbie was hospitalized, or was in fact the

11  primary event.

12    Q    Now you also indicated there was some concerns you

13  had from the letter dated September 18th, 2000 with respect

14  to the autopsy at the time of this case.  Can you tell the

15  jury what those are?

16    A    Well, it's probably a little bit picky, but the

17  autopsy report is dated August 10th of 2000.  In

18  Dr. Nelson's letter he states that he notes in the protocol,

19  which included for me that the brain weight at autopsy was

20  listed as 1,826 grams.  Well, that's not what the brain

21  weight is listed as in the protocol today.  It's listed as

22  826 grams.  So somebody went back, changed the number

23  without indicating that that number had been changed.  To

24  me, that's not kosher.  When you're making a change in the

25  report based on subsequent information, even if it's a typo,

Stacey K. Bryant, RPR
Judicial Court Reporter

1   that should be dated and initialed.

2       Q    Anything else in that letter dated September 18th

3   that you would want to draw to the attention of the jury?

4       A    No, other than I completely agree with

5   Dr. Nelson's diagnoses, which are immature human brain,

6   subarachnoid hemorrhage and hematoma, cerebral edema, which

7   means brain swelling generalized, and vascular congestion

8   generalized.  I completely agree with that.  He doesn't

9   describe any subdural hemorrhage because he can't.  He

10  didn't get the portion of the dura to examine.  So I would

11  agree with his diagnoses, not necessarily the implication of

12  those diagnoses, but the diagnoses themselves, yes, I would.

13      Q    Now during cross-examination the state asked you

14  whether you could kill a baby by shaking the baby.  You

15  indicated it's theoretically impossible.

16      A    Yes.

17      Q    Explain to the jury what you mean by that.

18      A    We don't know failure characteristics of various

19  structures in infants.  We don't know how much stretch the

20  infant mid brain can take before the brain centers fail.  We

21  don't know how much we can stretch the ligaments around the

22  cervical vertebral bodies in infants before they fail.

23           Using adult criteria, which we do have, it would

24  be theoretically possible to stretch those nerve fibers

25  beyond the point where they could recover and cause death by

1    direct stretching of the nerve fibers themselves.  In that

2    case, again using adult criteria, there ought to be

3    relatively massive neck damage because the neck damage

4    failure, whiplash, which is neck injury, whiplash occurs at

5    a lower threshold, a lower level than does the stretching of

6    those brain stem structures, at least on a theoretical

7    basis.  That would be one possible mechanism that shaking

8    could cause death.

9           Second mechanism, you shake a child for so long

10   that the child doesn't breathe for about three or four, five

11   minutes, something like that.  I don't think it's a good

12   idea to shake a child.

13   Q     Now you indicated that there's -- that tossing a

14   child on a bed would not cause the kind of deceleration

15   needed to cause a brain injury seen in this case, but him

16   falling on a carpet could, at least during

17   cross-examination.  Is that what you said?  Is that what you

18   meant to say?

19   A     I'm sorry.  Could you repeat that?

20   Q     Or did I mishear you?  I think the state was

21   cross-examining you about whether or not tossing a baby on a

22   bed could cause the kind of deceleration needed to create

23   the injury present in this child, and you indicated no.

24   A     Yes, that's correct.

25   Q     I think the state tried to say that falling --

1308

1    tossing a baby on the carpet could cause the type of

2    acceleration necessary.

3        A    Yes.

4        Q    Do you agree or disagree with that?

5        A    I agree with that.

6        Q    Why?

7        A    Well, throwing a child onto a bed is not an impact

8    injury at all.  Think about the pillow fights that you've

9    been in.  That's not an impact.  The only thing that flies

10   around is a bunch of feathers or a bunch of foam.

11           To have an impact, you need to have a contact

12   event or a contact phenomena.  You need a bruise, you need a

13   fracture, you need something to move, you need wave

14   propagation or physics.  Those are the essential ingredients

15   of an impact.

16           When you're throwing somebody to the bed and the

17   bed deforms two or three inches and your head doesn't deform

18   at all, that's not even an impact.  It's just -- It's

19   something totally different.  In contrast, if your head hits

20   a non-yielding surface, such as the floor, even if it's a

21   floor with a padded carpet, in that situation you do get a

22   local or contact phenomena.  You do get wave propagation and

23   you may certainly, although not always, get traumatic brain

24   injury.

25       Q    The state -- Quite frequently during your

1  testimony you indicated shaking has nothing to do with it.

2  What do you mean by that?

3      A    The mechanism of shaking -- Shaking is motion at a

4  distance from the applied force.  And by force, I really

5  mean acceleration, but I use the term force.  The best

6  example I can think of is, you shake the trunk or limb on an

7  apple tree and the apple falls off.  That's shaking.  You

8  never touched the apple at all and yet your motions caused

9  something to happen to that apple.

10      In contrast, an impact has the local phenomena

11  that I talked about, which has to be a contact event of some

12  sort, a bruise, a ruptured blood vessel.  It can be really

13  minor.  It can be really minor in wave propagation.

14      So they are two totally distinct mechanisms of

15  injury to living structures and I'm not limiting the living

16  structures to human beings.  These laws also apply to corn

17  plants up in Minnesota.  I mean, these are the bases for the

18  use of biomechanical principles for all living creatures, be

19  they animal or plant.

20      Q    You were asked about contusional tears.  What do

21  you mean by that?

22      A    Contusional tear is a specific type of contusion

23  or bruise that an infant almost always below the age of six

24  months gets as a result of an impact injury.  These are

25  first described by a neuropathologist named Lindenberg, I

1310

1   believe his last name is B-E-R-G, who was a neuropathologist

2   from Baltimore and was a neuropathologist for the Maryland

3   Medical Examiner's Office.  And he described tears

4   principally at the juncture of the gray and white matter of

5   the brain in infants who had impact head injuries and they

6   are very distinct and very different from those seen in

7   older children or adults.

8           Older children and adults get impact injuries on

9   the surface of the prominent part of the cerebral hemisphere

10  called the gyri and they don't get these tears at the

11  juncture of the gray and white matter as children under the

12  age of six months with an impact injury that is significant,

13  yet a different injury pattern.

14      Q   Did you see any evidence of that in this case?

15      A   Robbie has no evidence for contusional tears

16  whatsoever.

17      Q   Now the state tried to characterize your

18  professional testimony as being defense oriented.  How often

19  over your career as a forensic pathologist would you

20  estimate you have testified for state attorneys or

21  prosecutor's office in Minnesota?

22          MS. SINGER:  I'm going to lodge an objection,

23      repetitive.  That was asked and answered on direct

24      examination of this witness.

25          THE COURT:  Sustained.

Stacey K. Bryant, RPR
Judicial Court Reporter

BY MR. TEDDER:

Q    But you have testified for the prosecution?

A    Yes, sir.

Q    And would do so again today; is that correct?

A    That is correct.

MS. SINGER:  Your Honor, once again, I would lodge an objection, leading and asked and answered.

THE COURT:  Sustained on both bases.

BY MR. TEDDER:

Q    Now the state indicates that -- tries to imply that because you did not examine the child personally, that there should be some questions about your ability to form an opinion on what happened to the child. How would you respond to that point?

A    Well, the purpose of an autopsy report is to allow the person who did the autopsy to recall what he or she did or saw six months or even six years later. If the report -- And I would have to rely on what I had photographed and what slides I had and what my report said to reflect -- to refresh my own mind as to what I saw some time before, sometimes even the day before so that -- I mean, that's the purpose. The purpose of a report is to allow you or someone else to review the materials and at least have a database that is identical to the database of the person that did the autopsy.

1312

1    Q    And you indicated in cross-examination that you

2    were not surprised to learn that Dr. Hamilton disagrees with

3    you.  Why not?

4    A    Well, there are certainly a number of forensic

5    pathologists who disagree with me.  If Dr. Hamilton had

6    agreed with me, he would not have come to the conclusion

7    that he did two years ago.

8    Q    You testified during cross-examination, in the

9    past you came to a conclusion of shaken baby one time

10   before.  I believe you said that did exist a long time in

11   the past.  Is that the truth?

12   A    Well, I know of one time for sure because I've got

13   the newspaper article that says, "Plunkett looked at it and

14   he agreed."  There may have been a couple of other times in

15   the early '90s when I did.  I mean, I bought into this whole

16   thing until relatively recently.

17   Q    What caused you to change your mind?

18   A    Understanding the mechanics of the head injury.

19   Q    How did you learn about that?  When did you become

20   concerned about it and begin investigating the mechanics of

21   the head injury?

22   A    When I started to review all of the original

23   source literature regarding head injury from Wayne State

24   University, from the Naval testing in New Orleans, from the

25   Johnson Space Center.  I had to read all of these original

1  source documents and I didn't understand what the heck they

2  were saying.  So I had to relearn the physics and I had to

3  relearn the math and then I had to go to people who were

4  actually doing the research and talk to them so that I could

5  understand.

6          I still don't understand all of it.  I mean, those

7  are the people that are doing the work and those are the

8  people that fund me.  So I forced myself to understand the

9  mechanics enough to be able to explain a mechanism of injury

10 to myself so that I can understand it and hopefully to

11 others so they can understand it.  So it was that -- it was

12 the interest in science rather than opinion that drove me.

13    Q    You've indicated that a person can have a chronic

14 subdural hematoma and have no symptoms?

15    A    That's correct.

16    Q    And have a chronic subdural hematoma that is

17 continuing to bleed?

18          MS. SINGER:  I'm going to lodge an objection to

19     the leading nature of these questions, your Honor.

20          THE COURT:  Sustained.

21 BY MR. TEDDER:

22    Q    Can a chronic subdural hematoma bleed?

23          MS. SINGER:  I'm going to lodge an objection,

24     leading and asked and answered.

25          THE COURT:  It will be sustained on the basis that

```
 1        its been asked and answered.

 2             MR. TEDDER:  Your Honor, she raised it during

 3        cross-examination.

 4             THE COURT:  It was already sustained, Mr. Tedder.

 5   BY MR. TEDDER:

 6        Q    I think you testified during cross-examination

 7   that you would agree that a subdural hematoma does not cause

 8   an impact on the brain.

 9        A    That's correct.

10        Q    Did I get that straight or no?

11        A    I think so.

12        Q    Okay.  What impact, if any, does a subdural

13   hematoma have on the brain?

14        A    Well, it may have none.  If the volume -- I mean,

15   people get subdural hematomas and they have absolutely no

16   signs or symptoms whatsoever.  They develop signs and

17   symptoms if there is actually structural damage to the brain

18   at the time of the impact.  They develop signs or symptoms

19   if the subdural hematoma continues to enlarge and that can

20   be over --

21             For example, Ronald Reagan, about six months after

22   he left the presidency, was rushed from California to the

23   Mayo Clinic because he had a chronic subdural hematoma that

24   had occurred.  The initial injury had occurred some four

25   months earlier when he fell off his horse.  He was
```

 1   asymptomatic as far as anyone knew until just a couple days

 2   before they brought him to Mayo.  So it can be the volume of

 3   the new bleeding itself that can cause the signs and

 4   symptoms.

 5       Q    Can you explain to the jury the healing process of

 6   the subdural hematoma, please?

 7       A    The healing process is somewhat different from the

 8   healing process that we have with the rest of our injuries

 9   that we get.  You get a bruise, inflammatory cells go into

10   the area of bruising.  They remove the dead cells and new

11   blood vessels start to form.

12           Pretty much the same initial steps take place in

13   the brain with a subdural hematoma.  Unfortunately for

14   reasons that are not understood or at least I don't

15   understand, in some and perhaps many cases the subdural

16   hematoma rather than having that nice clean healing process,

17   continues to enlarge.

18           It can continue to enlarge because of new

19   bleeding, which will then enlarge the edges of the subdural

20   hematoma causing new bridging veins to rupture.  It can

21   continue to enlarge because of collection of fluid that

22   eventually has the consistency of cerebral spinal fluid and

23   is simply called a hygroma.

24           So the healing process is a little bit different

25   and no one really understands why chronic subdural hematomas

1    develop.  Certainly something is different from what happens

2    when you and I get hit with a baseball bat or racket ball or

3    with a car.

4        Q    You indicated on cross-examination that

5    pre-healing of a subdural hematoma leaves a stain on the

6    dura?

7        A    Yes.

8        Q    What kind of stain would it leave?

9        A    Iron pigment.  Iron pigment of old inflammatory

10   cells.  You can sometimes see it with your unaided eye and

11   you can almost always see it under the microscope.

12       Q    So it's not always visible with the naked eye?

13       A    No.  That's correct.  That's correct.

14       Q    Which again is why it would have been so important

15   for the dura to be microscopically examined?

16       A    Well, I think it would have been important if you

17   were gonna try to age and get more specific other than older

18   than 15 days.  So if you wanted to say, Well, you know,

19   parts of this are a couple of months old, then you've got to

20   have the dura.  But if the question is -- the only thing you

21   care about is knowing 15 days or less, you can answer that

22   by looking at the CT and MR scans.

23       Q    You testified on cross-examination about the

24   rupturing of the bridging veins between the dura and the

25   arachnoid space.  What do you mean by that?  What do you

1317

1   mean by the connection between them?

2        A    The dural blood vessels go from the under surface

3   of the dura, through the arachnoid membrane, to the surface

4   of the brain.

5        Q    Okay.  So they're not actually attached to the

6   arachnoid membrane?  They go through the arachnoid membrane?

7        A    They go through the arachnoid membrane and they

8   are attached.  They are attached, but they don't suddenly

9   end at the surface of the arachnoid.  They're on the

10  surface.  It looks like a spider web is the best way I can

11  describe it.

12       Q    All right.  And how are bridging veins injured?

13       A    Tearing.

14       Q    You indicated that the purpose of an autopsy was

15  not to determine cause of death.

16       A    That's correct.

17       Q    Tell the jury what the purpose of an autopsy is.

18       A    The purpose of an autopsy is to document

19  everything that you can about that body, every condition,

20  every possible question that may come up later that needs to

21  be answered; height, weight, weight and appearance of the

22  organs, saving various parts of organs if it becomes

23  important later to go back and do something else in order

24  for you to put the autopsy observations in conjunction with

25  the investigation to determine the cause of death.

1    A forensic pathologist has two tools; a history

2 and a physical examination, the same two tools that any

3 other physician has.  Those are the only tools we've got.

4 And the history is what is most important and as I said

5 earlier, our office will investigate 2,000 deaths this year

6 and we're only performing about 300 autopsies.  We are

7 relying on the investigation to allow us to determine the

8 cause of death and make an arrest.

9    But you don't determine causes of death in

10 autopsies.  You develop and document observations, which you

11 then have to put in the data bank with a review of the

12 medical records, for example, with someone like Robbie, to

13 try to figure out what happened.

14    Q    Now the state attorney questioned you about

15 discrepancies arising between folks who read CAT scans and

16 pathologists doing autopsies.  And you indicated that you

17 prefer to defer to the radiologist.

18    A    Yes.

19    Q    What sort of discrepancies have you been aware of?

20    A    Oh, there is -- A radiologist can say cortical

21 vein thrombosis or sagittal sinus thrombosis.  A pathologist

22 says, No, it's really subdural hemorrhage or vice versa.

23 These are two different ways of looking at something and we

24 have decided that the autopsy is the gold standard.  I think

25 it should be the gold standard.  But you still make the

1  assumption that the autopsy was done correctly and that the

2  observations are appropriately documented and preserved.

3  Then it becomes the gold standard.

4      Q    Now the state described Robbie's breathing as

5  being intermittent and you called it agonal breathing.  Tell

6  the jury again what you meant by agonal breathing.

7          MS. SINGER:  I'm going to lodge an objection.

8      Tell the jury again, just --

9          THE COURT:  Objection is sustained.

10         MR. TEDDER:  Your Honor, he answered it in

11     cross-examination.

12  BY MR. TEDDER:

13     Q    Explain what agonal breathing is, Doctor.

14         MS. SINGER:  I'm going to lodge the same

15     objection.  He's already explained that on

16     cross-examination.

17         THE COURT:  The objection is sustained.

18  BY MR. TEDDER:

19     Q    You testified during -- I believe you said during

20  cross-examination that the injury to Robbie's brain on

21  August 2nd, 2000 was not due to lack of oxygen.

22     A    That's correct.

23     Q    What was the injury on August the 2nd due to,

24  Dr. Plunkett?

25     A    Well, in the transcript that I was referring to in

1320

1   that testimony, we were talking about the initial injury

2   that Robbie had, which is the initial subdural hematoma.  I

3   said as best as I can determine, that is not due to lack of

4   oxygen.  That's trauma.  It's the most common.  But it

5   didn't occur on August 2nd or even on August 1st or even on

6   July 25th.  It was earlier than that.

7        Q    And you indicated a complicating factor in this

8   case with respect to the injury was the chronic subdural

9   hematoma?

10       A    Well, I think it's a terribly complicating factor

11  because I think if the chronic subdural hematoma hadn't been

12  there and everything else that we have was there, you would

13  come to the conclusion assuming investigation of the

14  circumstances and everything else panned out, that this

15  happened exactly the way Mr. Herlihy stated.

16            But now you've got this complicating factor of the

17  subdural hematoma, a brain injury that significantly

18  predates August 2nd and you're -- at least I'm saying, how

19  does this play a role in his death?  Is it something that's

20  really important or relevant?  Or is it simply that Robbie

21  died as a result of asphyxia and happened to have a chronic

22  subdural hematoma?  I know the chronic subdural hematoma

23  didn't kill him and I just don't know where exactly to put

24  it in in the cause and effect relationship.

25       Q    Dr. Dickison indicated -- Well, on

 1     cross-examination they talked to you about G force that

 2     could kill a pilot.  You indicated that it would be because

 3     the pilot couldn't breathe?

 4          A     No.

 5          Q     I misunderstood.

 6          A     No.   It has to do with redistribution of blood at

 7     four G's.   Think of it in reverse.  You know, if you're

 8     hanging somebody by his or her heels, they can blackout

 9     pretty quickly because of the difference of the blood flow

10     to the head.  So if the pilot's blacking out at four G's,

11     they don't want them flying upside down.  That's the whole

12     deal.

13               So it's a totally different mechanism of brain

14     injury in quotes than it is actual traumatic brain injury.

15     That's just a redistribution of blood flow and it happens to

16     be -- Ms. Singer said eight G's.  It's my understanding it

17     was actually closer to four or five.  It has nothing to do

18     with traumatic brain injury, which is a totally different

19     animal.

20          Q     So, in other words, if you're a pilot and you

21     blackout because of that force, once you decrease that

22     force, you regain consciousness?

23          A     Yes, if you haven't hit the ground first.

24          Q     All right.  And we have permanent brain injury?

25               MS. SINGER:  I'm going to lodge an objection to

1    the leading nature of the questions, your Honor.

2         THE COURT:  Overruled.

3         THE WITNESS:  No, you won't have any permanent

4    brain injury.  You just blackout and come back.  I

5    mean, it's an all or not.  If you come back, you're

6    fine.  If you don't come back, you're dead.

7    BY MR. TEDDER:

8    Q    Because you blacked out and --

9    A    Crashed the plane.

10   Q    Explain to the jury again what you mean by 32 feet

11   per second.

12        MS. SINGER:  Your Honor, I'll lodge an objection,

13   asked and answered.

14        THE COURT:  Overruled.

15        THE WITNESS:  That is the acceleration due to

16   gravity.  It is called a kinematic, K-I-N-E-M-A-T-I-C,

17   parameter.  It is one of the parameters that is used

18   when you're measuring biophysical events.  It is a

19   direct result of Newton's hypothesis regarding force.

20        Forces that are used in human and animal

21   experimentation are usually in the form of

22   accelerations that are applied and the numbers that are

23   usually used are in terms of multiples of gravitational

24   acceleration.  So you can talk about ten G's or 100 G's

25   or 1,000 G's and there are various thresholds that have

1  been developed that are the failure threshold for

2  various tissues.

3      You can say I can apply a force of such and such

4  to the brain at a certain direction for a certain

5  period of time and I'll get this.  I can do something

6  different to another part of the brain and I get a

7  different injury.  This stuff has actually been

8  remarkably remarkably mapped out.  I mean, that's the

9  basis for the structural safety features of cars, car

10  seats, I mean, everything we use in everyday life, the

11  surfaces we walk on are all based on these kinds of

12  studies.

13  BY MR. TEDDER:

14      Q    Now, Dr. Plunkett, the state indicates there have

15  been no experiments done with babies.  In your opinion, what

16  is the best way to do comparable experimentation?

17      A    Try to determine as best we can the structural

18  properties of the human infant and those kind of studies are

19  being done.  Unfortunately, it's usually with cadavers of

20  people whose baby has died.  Some of those studies have been

21  done, but they've been done on dead infants.

22      In Pennsylvania, for example, the next best way is

23  to use animal models to determine those failure

24  characteristics.  There have been a few animal studies that

25  have been done, not many.  There was one done, for example,

1   on baby rats trying to replicate the shaken baby syndrome.

2   The author of that study, who was working under a contract

3   for a pharmaceutical firm, was not able to do it, could not

4   cause what is called the shaken baby syndrome at all under

5   any circumstances with those rats.  It was published in the

6   Journal of Neuro Trauma, which is a peer review journal, I

7   believe in either 1999 or 2000.

8           But that's what we need to do.  We need to develop

9   models as best we can, then test them and validate them,

10  validate the models based on more experimentation.

11      Q    Now I believe you indicated during

12  cross-examination that a short fall can cause death.

13      A    Yes.

14      Q    How is that?

15      A    Well, a short fall is going to have a contact time

16  of approximately five or ten thousandths of a second.  By

17  contact time, I mean the time over which your head goes from

18  a certain impact velocity, say 15 feet per second, which is

19  what it would be in about a 3-foot fall, down to zero.

20          So you have a very very short contact time.  You

21  have a relatively large -- and 15 feet per second is

22  relatively large.  It's ten miles an hour.  That's what I

23  can do a 100-yard dash in if I do it in 20 seconds.

24          So imagine doing a 100-yard dash at ten miles an

25  hour and having a brick wall at the end of it and running

1325

1   into it.  That type of a very simple impact can generate a

2   force and acceleration well in excess of 100 times

3   deceleration of gravity and can kill you and does kill you.

4          Not so often in Florida because you don't have

5   much ice, but we see slips and falls in Minnesota in the

6   wintertime where somebody slips and falls, hits the back of

7   his or her head and dies.  It can happen.

8      Q    You indicated during cross-examination the autopsy

9   of the eyes would be different or the appearance of the eyes

10  at autopsy would be different than the way Robbie's eyes

11  appeared on admission to the hospital.

12     A    Well, certainly.

13     Q    In what ways, Doctor?

14     A    Well, I mean, the whole thing, the appearance of

15  everything in Robbie's autopsy is different from what it

16  would have been in terms of the brain, different from what

17  it was when he was admitted to the hospital.  I mean, it's

18  clear from the neuropathology report that Dr. Nelson is

19  describing a brain that has been on a respirator for eight

20  days, not one day, eight days.

21          The brain is dead.  Its been -- It's decomposing.

22  The eyes are dead.  There continues to be bleeding in those

23  eyes because of hypoxia because the brain is dead.  The

24  veins can't empty correctly.

25     Q    Now the state attorney also cross-examined you

```
 1    regarding your testimony at deposition regarding
 2    Mr. Herlihy's statement that Robbie was trapped between the
 3    bed and the rail, the footboard of the bed.  And they asked
 4    you the question, "The injury that you see in Robbie's
 5    brain, is it your opinion that it is the result of having
 6    been trapped between the bed?"  Answer, "No, no."  Question,
 7    "Rail and mattress?"  Answer, "No, it's not, no."  You
 8    attempted to follow-up on that response and the state didn't
 9    allow you to do that as to what you meant.
10         When she questioned you about being trapped
11    between the bed and the mattress and you were indicating
12    that the injury to his brain was not as a result of being
13    trapped, what did you mean by that?
14    A    Could I refer to the transcript so I can just
15    simply continue to read that paragraph to finish the
16    paragraph to put it into the context in which it was given?
17    Q    Yes, sir.
18         MS. SINGER:  I'm going to lodge an objection to
19         that form of testimony, your Honor.  He did finish the
20         question and answer that I read.  If he needs to
21         refresh his recollection in order to expand, that's
22         fine.  But to read from the deposition I think would be
23         improper.
24         THE COURT:  The objection as phrased is sustained.
25         Doctor, you can use the deposition to refresh your
```

```
 1        recollection and then you can explain your previous
 2        answer.
 3             THE WITNESS:  Okay.
 4    BY MR. TEDDER:
 5        Q    Explain to the jury.
 6        A    My statement regarding injury referred to the
 7    initial injury, the initial subdural hematoma.  My statement
 8    was that the initial subdural hematoma was not caused by
 9    being trapped in that bed.  Being trapped between the rail
10    and the mattress may have aggravated a pre-existing brain
11    injury, a subdural hematoma, causing it to become
12    symptomatic.  But the trapping itself did not cause the
13    initial injury.
14             MR. TEDDER:  Thank you.  Your Honor, I have no
15        further questions.
16             THE COURT:  Ms. Singer, do you have any recross?
17             MR. GROLAND:  Your Honor, excuse me.
18             MR. TEDDER:  Oh, I'm sorry.  I would ask a chance
19        to talk to Mr. Groland, please.  I'm sorry.
20             (Brief pause.)
21    BY MR. TEDDER:
22        Q    Dr. Plunkett, regarding the cortical venous
23    thrombosis, could it have been a primary event in this case?
24        A    Yes, it could have been.
25        Q    How?
```

1    A    Well, Robbie could have had cortical venous

2  thrombosis as the cause of what was apparently an acute and

3  chronic subdural hematoma.  It is very very difficult

4  radiographically to distinguish those many times and

5  unfortunately Robbie's on a respirator for eight days.

6        So when you're looking at cortical venous

7  thrombosis in the autopsy photographs, which he has, you

8  just don't know if it's a primary event or not.  I don't

9  think that it is.  I don't think that it is.  I think it's

10 due to the fact that he's on a respirator, but I don't know

11 that for sure.

12        MR. TEDDER:  Thank you.  No further questions.

13        MS. SINGER:  I understand, your Honor, that my

14    recross is only as to the letter and the report; is

15    that correct?

16        THE COURT:  Correct.

17                 RECROSS-EXAMINATION

18 BY MS. SINGER:

19    Q    Dr. Plunkett, I only have one question then

20 because I cannot ask any other questions except on the new

21 matter.  I don't know if you need to have the new matter in

22 front of you.  I see you're gathering it up.

23    A    Probably not.

24    Q    As to your comment that the report was generated

25 on August 10th, 2000 and that the weight, the typographical

1    error was corrected after that time, Doctor, you don't know

2    whether or not the date August 10th, 2000 and the time 1500

3    hours is in fact the record of when the actual autopsy took

4    place, do you, sir?

5        A   No, I do not.

6        Q   And if that date was not the date the report was

7    generated, but rather the date that the autopsy report --

8    the autopsy was actually conducted, then the report itself

9    could have been dictated and typed at some other time,

10   correct?

11       A   Well, except that Dr. Nelson refers to the autopsy

12   report that he received, which states that the brain weight

13   was 1,826 grams.

14       Q   You do not know whether or not Dr. Nelson received

15   a preliminary report, do you, Doctor?

16       A   That's correct.

17       Q   And the final report would have included

18   Dr. Nelson's report as well as Dr. Bell's report from the

19   Alliant Eye Center?

20       A   That's correct.

21       MS. SINGER:  Thank you, sir.

22       THE COURT:  All right.  May Dr. Plunkett be

23   released at this time?

24       MS. SINGER:  I have no objection, your Honor.  The

25   state has no objection.

1         MR. TEDDER:  No objection, your Honor.

2         THE WITNESS:  Thank you, your Honor.

3         THE COURT:  All right.  Doctor, thank you very

4   much.  You're free to leave the courtroom and you're

5   released from the subpoena.

6         THE WITNESS:  Thank you, your Honor.

7         THE COURT:  May I have the attorneys approach the

8   bench for just a second?  This does not need to be on

9   the record.

10        (An off the record discussion was held at the

11        bench.)

12        THE COURT:  Go ahead and call your next witness.

13  This witness is for the state; is that correct?

14        MR. PENNYPACKER:  Yes, your Honor.  I call

15  Dr. Lawrence Levine.

16               LAWRENCE LEVINE,

17  having been produced and first duly sworn, testified as

18  follows:

19              DIRECT EXAMINATION

20  BY MR. PENNYPACKER:

21     Q   Good afternoon, Dr. Levine.  Could you state your

22  full name for the record, please?

23     A   Lawrence Levine.

24     Q   What is your occupation?

25     A   I'm a pediatric ophthalmologist at Shands Hospital

1   and the University of Florida.

2       Q    What is your educational background?

3       A    I have an undergraduate degree in chemistry.  I

4   went to medical school, M.D.  I did a residency in

5   ophthalmology and went on to specialize with further

6   training in children's eye care pediatric ophthalmology in

7   Chicago.

8       Q    How long is the pediatric ophthalmology residency?

9       A    I did a fellowship, I did a residency in

10  ophthalmology for three years, and a one year fellowship in

11  pediatric ophthalmology for a total of four years of

12  training in eye care.

13      Q    Are you licensed to practice medicine in the State

14  of Florida?

15      A    Yes.

16      Q    When were you licensed to practice in Florida?

17      A    I don't remember the original licensure.  It was

18  either 1998 or 1999.

19      Q    Are you licensed in any other states?

20      A    I have an active license in Illinois as well.

21      Q    Are you board certified in any areas of specialty?

22      A    Board certified in ophthalmology.

23      Q    You mentioned that you're now a pediatric

24  ophthalmologist at Shands.  What does a pediatric

25  ophthalmologist do with Shands?

1332

```
 1        A     I'm responsible for all children's eye care at the
 2   hospital.  It's a very busy service.  I see all children
 3   with eye problems and do their medical and surgical care, as
 4   well as all consultations, surgeries, and clinics.
 5        Q     Do you supervise other physicians in your
 6   day-to-day work?
 7        A     Yeah.  I'm responsible for teaching the
 8   ophthalmology residents the general aspects of pediatric
 9   ophthalmology as well.  So I teach the resident doctors.
10        Q     How long have you been practicing pediatric
11   ophthalmology here in Gainesville?
12        A     Four and a half years.
13        Q     Have you published any articles in the field of
14   pediatric ophthalmology?
15        A     Yes, I have.
16        Q     Approximately how many?
17        A     Approximately eight or nine total, two of those
18   are book chapters.
19        Q     You mentioned book chapters.  Have you written
20   anything other than book chapters and articles in
21   professional journals in the field of pediatric
22   ophthalmology?
23        A     Yes, I have.  I've authored or coauthored articles
24   in journals.
25        Q     Have you written anything recently in the field of
```

1   pediatric ophthalmology?

2       A    Yes.  My two most recent publications were:  One,

3   I'm a primary author and the only author on essentially a

4   chapter on pediatric eye injuries and as well as shaken

5   infant syndrome.  And then the most recent publication in

6   like a journal or professional magazine, would have been on

7   treatment of a child with Terson's syndrome, which is

8   bleeding in the eye, which I was a coauthor on.

9       Q    Have you ever been qualified as an expert witness

10  to testify in court before?

11      A    Yes, I have.

12      Q    Do you know in which areas you were qualified?

13      A    I'm not sure if I understand the question.

14      Q    I don't mean the geographic areas, but which

15  fields of specialty have you been qualified?

16      A    When I testified before?

17      Q    Yes, sir.

18      A    I testified in pediatric ophthalmology.  In fact,

19  the other times that I've been in court have also been in

20  shaken infant syndrome through the -- my job

21  responsibilities at the University of Florida Hospital.

22          MR. PENNYPACKER:  May I approach the witness, your

23      Honor?

24          THE COURT:  Yes.

25  BY MR. PENNYPACKER:

1    Q    Doctor Levine, I'm showing you a document entitled

2  curriculum vitae.  I ask if you recognize that?

3    A    Yes.

4    Q    Does that set forth your professional, educational

5  history, as well as your publications and lectures and

6  speeches that you've done in your career as a pediatric

7  ophthalmologist?

8    A    Yes.

9    Q    What is the date of that curriculum vitae?  Is it

10  current?

11    A    Yeah.  It's September 2002.

12    MR. PENNYPACKER:  Your Honor, I would like to move

13    that in as the state's next-numbered exhibit.

14    THE COURT:  Any objection?

15    MR. TEDDER:  No, your Honor.

16    THE COURT:  It will be admitted as State's No.

17    60 --

18    THE CLERK:  Four, your Honor.

19    THE COURT:  Sixty-four in evidence.  Thank you.

20    (State's Exhibit No. 64 was received in evidence.)

21    MR. PENNYPACKER:  Your Honor, I would like to

22    tender Dr. Levine as an expert in the field of

23    pediatric ophthalmology and ask that he be allowed to

24    give opinion testimony in that.

25    MR. TEDDER:  No objection.

1    THE COURT:  Dr. Levine will be allowed to give his

2    opinion in the area of pediatric ophthalmology.  Go

3    ahead.

4  BY MR. PENNYPACKER:

5    Q    What exactly does a pediatric ophthalmologist do?

6  Give us some description.  What do you do on a daily basis?

7    A    I examine children.  I see several thousand

8  children a year.  Some are routine eye exams, but by nature

9  of my job at a larger hospital, in a university hospital, I

10  ask to see most of the complex patients with complex

11  diseases in south Georgia and north Florida.  My

12  responsibilities are to care for those patients, to make a

13  diagnosis, and to treat them appropriately, and also I have

14  significant teaching responsibilities.

15    Q    Were you working at Shands on August 2nd of 2000?

16    A    I was working in the Shands system, yes.  I cover

17  Alachua General Hospital clinics as well.  So I was either

18  at Shands or Alachua General.  I'm not sure at what time I

19  was at both.  I go back and forth throughout the day.

20    Q    Did you receive a consult request for you to

21  examine a child by the name of Robbie Quirello?

22    A    Yes, a consultation was requested of the pediatric

23  ophthalmology service.

24    Q    What is a consultation request?

25    A    Consultation is when a doctor asks for another

1   doctor's opinion, and usually they request it for a

2   particular sign or evidence of a disease or if we can help,

3   help them in some way with the management of their patient.

4        Q    In this particular case with regard to Robbie,

5   what were you requested to do?

6        A    I was requested to examine the eyes for blood in

7   the eyes.

8        Q    And were you aware of the tentative diagnosis that

9   had been attached to Robbie at the time of your initial

10  exam?

11       A    Yes, I was.

12       Q    What was that diagnosis?

13            MR. TEDDER:   Objection, hearsay.

14            THE COURT:   Sustained.

15  BY MR. PENNYPACKER:

16       Q    Did you examine Robbie Quirello?

17       A    Yes.

18       Q    And is there a special instrument that you use in

19  order to examine the eyes of a child?

20       A    Yes.   It's something that I'm specially trained in

21  as an ophthalmologist.   It's called an indirect

22  ophthalmoscope.   It's a head unit that fits on my head with

23  a light source that allows it to shine in the pupil and give

24  me a three dimensional, large view of the whole inside of

25  the eye.   And that's something that an ophthalmologist would

1    use to look inside the eyes.

2        Q    Is there a reason why you would do this

3    examination as opposed to having a resident?

4        A    The serious nature of the request of the

5    consultation, as well as the possibility of potential

6    medical/legal ramifications, made me want to do the entire

7    exam and documentation myself.  I felt that it required an

8    attending's expertise.

9        Q    Did you actually examine Robbie on August 2nd of

10   2000?

11       A    Yes, I did.

12       Q    About what time was it that you were able to see

13   him?

14       A    It was between 7:00 and 8:00 p.m., approximately.

15       Q    Explain to the jury, if you would, what you did in

16   order to do the exam and what you found?

17       A    The patient was in the intensive care unit,

18   pediatric intensive care unit.  I went, I examined the

19   patient externally to note whether there was any external

20   injuries that might be consistent with any blood in the

21   eyes.  No external injuries were noted.  I examined the

22   eyelids.  There was nothing unusual noted.  The front of the

23   eye looked healthy.  The lens of the eye was healthy.  The

24   cornea was healthy.  There was nothing externally.  At which

25   point we dilated the patient's pupils and looked inside the

1    eye and that's when I made my -- I recorded my findings.

2       Q    What did you see after dilating the pupils and

3    looking into the eye?

4       A    I saw a massive amount of blood in both eyes.

5       Q    You mentioned that you looked at the pupils.  Did

6    you note anything unusual about the pupils?

7       A    The pupils were reactive and I made a note of

8    that.  That usually indicates that -- the pupils would be

9    unreactive if the pressure inside the head was so high as to

10   kind of squeeze the nerve fibers so that they wouldn't work

11   and make the pupils constrict.  So they were reactive.  It

12   just tells you a little something that the intracranial

13   pressure was not so high as to make it so the pupils would

14   not work.

15      Q    How would the blood have gotten into the retinal

16   apparatus?

17      A    Well, this was a significant amount of blood and

18   just to say there was blood in the eye, does not really tell

19   the whole story.  There was blood at every layer of the eye.

20   There was blood in the center of the eye, which is called

21   the vitreous body, the jelly inside the eye was full of

22   blood.  The area in front of the retina, what we call the

23   pre-retinal area had blood, and then the retina itself had

24   blood and it was a large amount of blood, so much, in fact,

25   that we had our photographers document it.  It was probably

1   of the children I've seen with it, one of the worst three

2   that I've seen.  They've all been about the same, those top

3   three.

4       Q    Was the bleeding in his eye the cause of

5   intracranial pressure?

6       A    No, not in my opinion.  There were some particular

7   aspects of that blood, as well as the inside of the eye that

8   would tell you that the source of the blood was from within

9   the eye and from other mechanisms, which would be trauma.

10      Q    And what were those indications that showed it was

11  trauma and not intracranial pressure?

12      A    The child had two other findings which were

13  documented with photography as well.  One is, there are

14  white spots in the back of the eye and that's termed

15  Purtscher's retinopathy, which is just a term.  It's not

16  particularly a disease.  It's just the way something looks.

17  Basically big white spots.  And those are only seen with

18  indirect trauma to the eye.  Basically they would have to be

19  generated by some sort of forces.  And those big white spots

20  are due to what is believed to be damage to the arteries,

21  not just the veins, but the arteries.  So the big white

22  spots go with artery damage.

23      Q    You mentioned that there were photographs taken.

24  Do you know how many pictures were taken of Robbie's eyes?

25      A    There were 24 pictures taken, I believe, probably

 1    each eye.  I failed to mention the other finding in the eye

 2    that was unique besides just the blood.  Not only was there

 3    white spots, which are known as Purtscher's retinopathy,

 4    which are consistent with trauma, there was also a crack in

 5    the back of the eye, which is called a choroidal rupture,

 6    just like a crack in the foundation of a building, and that

 7    wouldn't be caused by -- you know, that would take some kind

 8    of force.

 9        Q    If Robbie had been suffering from increased

10    intracranial pressure at that time and there had been some

11    kind of blocking of the veins to his eyes, what would happen

12    to the blood in his veins?

13        A    Meaning if there was some kind of blockage of the

14    blood, not in the eye, but further downstream, like in the

15    head?

16        Q    Yes.

17        A    Yeah.  Occasionally, and there have been studies

18    on this which I think are really important to say you can

19    get a little drop of blood in the eye, but you're not gonna

20    get massive amounts of blood at every level.  It's pretty

21    rare to get that.  There has been a recent, large study

22    where they looked at kids that had a lot of blood in the

23    head, intracranial blood, and of 55 patients in that study,

24    these were all kids with intracranial blood, only two had

25    any evidence of blood in the eye and it was just a drop,

 1   what we call literally a dot of blood on the retina.  One

 2   child had one dot and one had like five dots.  But they

 3   didn't have massive amounts.

 4        Furthermore, I think your question was if there

 5   was venous blockage, would blood backup in the eye?  And,

 6   no, that's not the dynamics of the eye.  There's been

 7   studies where they've clamped the retinal vein on the back,

 8   back towards where the brain is, and there's been no blood

 9   in the eye.  They've clamped it on monkeys.

10        And then there's other big draining veins on the

11   eye.  There's what's called the vortex veins.  There's four

12   big veins that drain the eye besides that central retinal

13   vein.  They don't all drain into the head.  There's other

14   outlets, what's called the facial vein and the choroid vein,

15   choroid plexus.  So there's other routes that blood goes to

16   other than just that little tiny vein back into the head.

17        Q    If there had been occlusion of the veins, then are

18   you saying that the blood would drain out in some other way

19   and not in the eye?

20        A    Yes.  It would go through the vortex veins and

21   possibly to the facial vein or the choroid vein.

22             MR. PENNYPACKER:  May I approach the witness, your

23        Honor?

24             THE COURT:  Yes.

25   BY MR. PENNYPACKER:

1    Q    Dr. Levine, you mentioned photographs that were

2    taken.  Are these four pictures representative or are those

3    duplicates of four of the 24 photos that were taken of

4    Robbie Querillo's eyes?

5    A    Yes, they are, and I have two additional ones that

6    I've made.

7    Q    Okay.

8    A    So, yes, these are duplicates.

9         MR. PENNYPACKER:  I would like to mark these four

10        for identification if we could.

11        THE COURT:  They will be marked for identification

12        with the next letters.

13        THE CLERK:  They will be State's G, H, I and J,

14        your Honor.

15        (State's Exhibit Nos. G, H, I, and J were marked

16        for identification.)

17   BY MR. PENNYPACKER:

18   Q    While the clerk is marking those, Dr. Levine, do

19   you have a picture of a normal eye that doesn't have the

20   damage to it?

21   A    Damage to these as well.  These are copies that I

22   made.  This is a normal eye.  Would you like me to show

23   that?

24   Q    If you could explain to the jury what they're

25   looking at with that picture?

1    A    It's a visual picture with a special machine that

2  we use, and this is actually what the inside of an eye looks

3  like when we look inside.  This is what I saw with my

4  indirect ophthalmoscope, the little head piece.  But I get a

5  three dimensional view, so it's really like I'm looking

6  inside and I see the depth.  This is flat, so you can't see

7  the depth.  But really it would curve around.  It would be

8  like looking in a bowl is the way it would be if you're

9  actually looking in the eye.

10    That's the optic nerve.  That is a little

11  connection between the eye and the brain.  To give you some

12  kind of scale, that's in real life 1.5 millimeters in

13  diameter.  To let you know how big 1.5 millimeters is, it's

14  pretty small.  And these are those blood vessels and they

15  look pretty big there on this blownup picture, but they're

16  pretty small.  This is 1.5 millimeters in diameter.  And

17  these are the retinal veins and these other little things

18  are the retinal arteries.  So in the background is just what

19  we call retina.

20    So you have an optic nerve, the arteries, and

21  veins, and in the back is the retina.

22    Q    Dr. Levine, if you could look at G, H, I, and J

23  and explain to the jury what those pictures depict.

24    A    This patient, what was unique was, the patient had

25  blood in all four quadrants of the eye.  So when we talk

1   about the eye, we're not just talking about the little area

2   around the optic nerve, we're talking about the quadrants of

3   the eye.  So we always kind of say there's four quadrants.

4   This patient had blood in every single quadrant.  I divide

5   the eye into four sections, like you're cutting an orange

6   into four sections.

7            So these are just pictures of the quadrants.  And

8   if you can compare, it looks like -- I know it looks like

9   somebody poured ketchup on the retina.  That's essentially

10  what it looks like.  That's blood in one quadrant, blood in

11  a quadrant.

12           This is a little different.  This is a little

13  further back.  The child was laying on his back, so blood's

14  gonna settle a little bit towards the back, down into the

15  eye.  This is the optic nerve here.  And this is the optic

16  nerve here with the blood kind of pooling or settling down.

17  That's a large amount of blood.  You can't see the retina

18  details at all.  It's thick.

19           More blood in the back of the eye with some white

20  spots.  I don't know if those show up real well.  These

21  white spots right here, and I have made another picture that

22  shows it fairly well, those are the white spots I was

23  talking about that actually come from what I believe to be

24  arterial damage and that's called Purtscher's retinopathy.

25  That's caused by trauma.

1    These would be the other two that I have and I
2  gave you a copy of them.  One is just the back of the eye.
3  This is the nerve down here.  This is the nerve here.
4  Actually it would be like that (indicating).  There's the
5  nerve, optic nerve.  And then this is blood.  And there's
6  blood in the vitreous or the inside of the eyes.  There's
7  also blood in front of the retina here and then blood within
8  the retina.  If you can see those little orange pockets of
9  retina, there's blood within it.

10    But really what's so neat about this picture or
11  what should be noted is, these white spots, you're not gonna
12  get those with increased intracranial pressure or with what
13  we call a vein occlusoin.  Those are from trauma and those
14  are called Purtscher's retinopathy, and those have something
15  to do with the arteries being kind of ripped apart or
16  traumatized somehow.

17    There's one other thing that should be noted.
18  This is another picture of the eye.  If you look like right
19  here, there's a white line that goes just around the eye
20  there, and that's a crack in the back and that's called a
21  choroidal rupture.  Just like if you hit a water balloon
22  with enough force, if there's enough force generated, it
23  might burst.  That's a rupture in the back of the eye.  So
24  that white line right there with nothing around it, is
25  what's called a rupture, just like a crack in the foundation

1   of a building or a wall.

2        Q    What would cause a choroidal rupture, Doctor?

3        A    That takes either direct or indirect occular

4   trauma, shear forces, energy generated that just breaks the

5   eye.  It has -- Force has to be transmitted somewhere and it

6   breaks the back of the eye or ruptures it.  You can get that

7   with direct trauma if you were to hit somebody in the eye,

8   but again, I didn't see any signs of external, you know,

9   injury.

10       Q    Do those six photos farily and accurately depict

11   the condition of Robbie Quirello's eyes on August 2nd of

12   2000?

13       A    Yeah.  In fact, by the time those pictures were

14   taken, they were -- actually, it should be noted, they were

15   taken two days later because I saw the patient at night and

16   I had to get a special photographer with a special camera to

17   get these pictures.  I thought they were so important to

18   get.  So we had to get a medical photographer with a camera

19   that can get a picture of the back of the eye.  The blood

20   probably had cleared a little bit.  At the time I saw it,

21   there was probably a lot more blood in the eye.  Blood had

22   probably started to clear at some point.  But they

23   accurately depict.

24            MR. PENNYPACKER:  I would like to move those six

25       photos into evidence as the state's next-numbered

1    exhibit.

2         THE WITNESS:  Okay.  These are yours and I gave

3    you guys two copies of these.

4         THE COURT:  Any objection?

5         MR. TEDDER:  I would like to see them again, your

6    Honor, please.  No objection, your Honor.

7         THE COURT:  They will be admitted as the

8    next-numbered state's exhibit.

9         THE CLERK:  65, 66, 67, 68, 69, 70, your Honor.

10        THE COURT:  Okay.  Thank you.  Go ahead,

11   Mr. Pennypacker.

12        (State's Exhibit Nos. 65, 66, 67, 68, 69, and 70

13        were received in evidence.)

14   BY MR. PENNYPACKER:

15   Q    Did you review the ophthalmology report from

16   Dr. Bell from the Baskin-Palmer Eye Institute?

17   A    Yes, I had an opportunity to review the ocular

18   pathology report.

19   Q    Is there anything in that report that is

20   inconsistent with the proposition that Robbie's retinal

21   hemorrhages were caused by blocking of the veins?

22   A    The report had two interesting findings:  One, the

23   optic nerve, which is about 2.5 centimeters long, had no

24   blood in it anywhere.  They cut it longitudinally.  They cut

25   it along the long axis.  There was nothing wrong with the

1  nerve, nor was there any blood in it.  Nothing on that

2  nerve.  Everything was in the eye.

3      Q    Why is that inconsistent with there having been

4  blockage?

5      A    Well, you would think if there was some sort of

6  pressure buildup, it would have been transmitted down the

7  optic nerve to the eye, but there's no particular evidence

8  of that on pathology.  Secondly, the vitreous or that jelly

9  inside the eye, was shaken lose, and that's called a

10  vitreous detachment.  And one of the eyes had a vitreous or

11  a jelly detachment and, frankly, that just has to be shaken

12  loose.  That's not gonna come off on it's own and bleeding

13  is not gonna cause that vitreous to come off like that or

14  come loose.

15      Q    How would the trauma that you saw in Robbie's eyes

16  had to have occurred?

17      A    My opinion is that it was due to the forces that

18  are generated when you shake a baby, and those forces are

19  built up within the eye, which is a pretty delicate

20  structure, and those blood vessels and retina just got torn

21  and shredded and bled profusely and things got knocked

22  loose, like the vitreous, and the back of the eye cracked

23  due to those forces.  So that's my opinion, that it was due

24  to forces that were generated with shaking, and that's based

25  on no evidence of external injury as well.

1349

1    Q    Is there any other way that this child could have

2  received the retinal hemorrhages in this case?

3    A    I don't know of any other way.

4    Q    Do you have an opinion within a reasonable degree

5  of medical certainty that the nonaccidental eye injury

6  suffered by Robbie occurred some time approximately 48 hours

7  prior to August 4th of 2000?

8    A    Could you restate that?  I didn't hear it.  I'm

9  sorry.

10    Q    Yes.  Do you have an opinion within a reasonable

11  degree of medical certainty that the nonaccidental eye

12  injury suffered by Robbie Quirello occurred some time

13  approximately 48 hours prior to August 4th of 2000?

14    A    Yes.  That was very fresh, bright red blood,

15  recent.  And my opinion is that it occurred relatively

16  shortly before I saw the patient, within that day or the day

17  before.

18    Q    If you were aware that this child was playing with

19  his father at 9:00 a.m. on the morning of August 2nd, 2000,

20  interacting with him using his eyes, would it be fair to say

21  that he was seeing at that time?

22    A    I was not aware of that, but it would be fair to

23  say that the father would have noted a problem with the eyes

24  at that time.

25    Q    If he had had a retinal hemorrage that you saw on

1    August 2nd at 9:00 a.m., could the child see?

2        A    No.  His -- the retina was occluded with blood.

3    It would just be dark.

4        Q    Is it your opinion then within a reasonable degree

5    of medical certainty, that this child suffered trauma on the

6    morning of August 2nd, 2000 that caused the retinal

7    hemorrhages that you saw?

8        A    Yes.

9            MR. PENNYPACKER:  That's all.

10           THE COURT:  Mr. Tedder, any questions?

11           MR. TEDDER:  Your Honor, could we have a recess,

12    brief recess?  The Doctor is -- Can I approach?

13           THE COURT:  Yes.

14           (Sidebar conference:)

15           THE COURT:  You want a recess for what?

16           MR. TEDDER:  I want a recess so I can re-read

17    Dr. Bell's deposition, which is the doctor who did the

18    pathological examination of the eye in part because

19    this doctor's testimony is different from what he gave

20    during his deposition.

21           THE COURT:  Okay.  No.

22           MR. TEDDER:  Well, your Honor, I just would

23    object.  You're not giving my client an opportunity for

24    me to be properly prepared to defend him in this case.

25    This is significant evidence the doctor has just come

1    up with.

2            THE COURT:  Good enough.

3            (Sidebar conference concluded.)

4            MR. TEDDER:  May it please the Court, ladies and

5    gentlemen of the jury.

6                        CROSS-EXAMINATION

7  BY MR. TEDDER:

8       Q    Good afternoon, Dr. Levine.  Doctor, you examined

9  Robbie Quirello one time in the hospital over two years ago;

10 isn't that correct?

11      A    I -- the only time that I'm aware that I examined

12 him was on the date August 2nd, 2000.

13      Q    So the answer is, you examined him one time over

14 two years ago?

15      A    That is right.

16      Q    You haven't seen him since?  Of course not.  One

17 time?

18      A    That's right.

19      Q    The question is silly.

20           You examined him for approximately 20 minutes,

21 correct?

22      A    Approximately 20 minutes, that is right.

23      Q    And after you examined Robbie Quirello on that

24 date, you dictated a report, correct, a letter?

25      A    I documented in handwriting and then I dictated a

1   letter because sometimes the medical records and the charts

2   get misfiled or lost and I wanted a permanent dictation of

3   my assessment.  So, yes, I dictated and I hand wrote.

4       Q    And when you wrote the handwritten document into

5   the chart, you tried to be as complete as possible; isn't

6   that correct?

7       A    I, with reference to what I felt were the

8   important findings, which was the blood in the back of the

9   eye.  That was the most important thing to document and what

10  I should have documented, yes.

11      Q    You documented it as completely as you could

12  because you knew if you had to refer to it later, that would

13  be the only way to remember what you had seen; isn't that

14  true?

15      A    No.  I -- I'm not sure what you're asking.

16      Q    Well, it's -- what, you've examined, I would

17  presume, in the past two years, two plus years, you've

18  examined thousands of different children's eyes; is that

19  correct?

20      A    I remember this patient from the exam --

21      Q    Well, answer my question.

22           MR. TEDDER:  Your Honor, would you ask the witness

23      to please answer the question?

24           THE WITNESS:  Okay.

25           THE COURT:  Answer the question first, please,

1    Dr. Levine.

2  BY MR. TEDDER:

3    Q    In the plus two years since you examined Robbie

4  Quirello, you've examined thousands of different children's

5  eyes; isn't that true?

6    A    Yes.

7    Q    And when you examined Robbie Querillo's eyes, you

8  already knew before you went in that other people were

9  suspecting something was wrong in this case, correct?

10    A    Yes.

11    Q    So you knew even then it was even more important

12  to make sure whatever notes you made were as complete as

13  possible; isn't that correct?

14    A    Yes, with reference to the important diagnostic

15  findings.

16    Q    Well, you haven't testified to anything here today

17  that's not an important diagnostic finding, have you?

18    A    That's right, no.

19    Q    So you did the handwritten note on August the 2nd,

20  2000 in the chart, correct?

21    A    That is correct.

22    Q    And then later on September the 6th you dictated a

23  letter to the chart, correct?

24    A    That is correct.  I don't know the date of the

25  dictation, but I wanted to make sure that there was an

1   official documentation of my retinal findings.

2        Q    Now here today you come up with two additional

3   findings that you neglected to include in your handwritten

4   note on August the 2nd, 2000; isn't that true?

5        A    What are those findings?

6        Q    You mentioned something about white spots.  I've

7   forgotten what you called them, Purtscher's something?

8        A    Yeah.  The difference is, those were seen in the

9   photographs.  At the time I saw the patient it was

10  relatively new and the whole eye was so full of blood, that

11  when our photographer took the picture, areas were able to

12  clear and we were able to see the trauma to the back of the

13  eye.  It's kind of like when you shake up a globe with snow

14  it in and it's a very hazy view, then as the snow settles,

15  you can see what's in the globe.

16       Q    At no time have you ever amended the chart to

17  include the two additional findings you've testified about

18  here today; isn't that true?

19       A    That is true.  They're documented with

20  photographs.

21       Q    Documented with the photographs, but you didn't

22  think it was important enough to bring it to anybody else's

23  attention, did you?

24       A    I haven't amended the chart with anything, that's

25  correct.

1    Q    And the two additional findings that you forgot or

2    you neglected to mention -- The photographs were taken two

3    days after you examined him, correct?

4    A    Yes.

5    Q    And you examined the photographs soon after they

6    were taken; isn't that correct?

7    A    No.  They take a couple weeks to develop.

8    Q    So you developed --

9    A    A week or two.  They're sent off to a lab and

10   they're developed and returned.

11   Q    So you would have seen them before the end of

12   August; isn't that true?

13   A    I would have seen them at some point a week or two

14   later.

15   Q    Okay.  So the letter you dictated on September the

16   6th, 2000 is past a week or two later, is it not?

17   A    I examined the patient on August 2nd, yeah, and I

18   may not have included the findings of the retina in that

19   dictated letter.

20   Q    Well, my question to you, sir, is did you include

21   anything in your -- Scratch that.  The two new symptoms that

22   you're describing here today --

23   A    Well, they're findings.

24   Q    Findings, whatever you want to call them.

25   A    What I documented --

1     Q     Just a minute, Doctor.  Let me just ask the

2     questions.  You documented one as white, you said

3     Purtscher's retinopathy or something like that?

4     A     Many white spots, which are called Purtscher's

5     retinopathy, yes.

6     Q     Purtscher's retinopathy.  How do you spell that

7     last word, please?

8     A     Retinopathy?

9     Q     Yes.

10    A     R-E-T-I-N-O-P-A-T-H-Y.

11    Q     Purtscher's retinopathy?

12    A     Yeah.

13    Q     And your testimony here today is that Purtscher's

14    retinopathy is caused by trauma; is that correct?

15    A     It can be caused by long bone fractures and

16    pancreatitis as well, but it's mostly caused by ocular

17    trauma or indirect ocular trauma.

18    Q     And would you agree that swelling of the brain is

19    indirect ocular trauma?

20    A     There's -- No, that's brain trauma.  It's not eye

21    trauma.

22    Q     You don't agree that brain trauma causes injury to

23    other parts of the body?

24    A     It can, yes.

25    Q     You also indicate that you, on looking at these

1357

1    photographs, you saw a crack in the back of the eye,

2    correct?

3        A    Yes, the white line.

4        Q    Okay.  Now both of those two new findings that

5    you've testified about here today, you never included those

6    in any written report to put in the chart; isn't that

7    correct?

8        A    Right.  The reason --

9        Q    Even after you had examined the photographs?

10       A    The reason is, I document what I see and the

11   photograph documents a picture.  So I'm not going to dictate

12   a report on something I didn't see, okay?  So I can only

13   write in the chart what I saw at the time.  And then there

14   is a medical photograph, just like an x-ray or an MRI, that

15   is also part of the patient's medical record.  When asked to

16   look at that prior to this case, those are the other

17   findings which are noted.

18       Q    All right.

19       A    So the photography is considered part of the

20   medical record, but not what I saw at the time that I

21   examined.

22       Q    All right.  So you recall me taking your

23   deposition on August the 30th, 2002?

24       A    Yes.

25       Q    And in fact we looked at every single photograph

```
 1    you had that day; isn't it true, Dr. Levine?

 2         A    Yes.

 3         Q    You've never once mentioned anything to me at that

 4    time about the two new findings you're finding here today,

 5    the Purtscher's retinopathy, or the crack in the back of the

 6    eye?  You didn't mention either one of those to me when you

 7    looked at those photographs, did you?

 8         A    Those aren't new findings.  They were there.  And

 9    I only answered questions that you asked.

10         Q    I was pretty clear.  I asked you to tell me what

11    you saw in these pictures; isn't that correct?

12         A    I asked you to specifically ask me what you -- You

13    asked me about blood and veins for an extended period of

14    time and I only asked (sic) direct questions.

15         Q    You asked a few questions yourself; isn't that

16    true?

17         A    I answered direct questions that you asked me.

18         Q    Well, isn't it true that you did not mention

19    anything about those two findings during that deposition?

20         A    I wasn't asked about them.

21         Q    Okay.  How do I know to ask about those things

22    when you don't include them in your letter to the chart?

23         A    They're there in the pictures and we gave you

24    copies.  I gave you a copy of the -- I had copies of these

25    if you wanted to review them.
```

1    Q    How much training have you had to be able to see
2  something like this?

3    A    Meaning?

4    Q    Meaning do you think myself as a layperson is
5  gonna have the ability to determine what you're saying I
6  should have asked you about from these photographs?

7    A    My job is not to educate you in those photographs.
8  My job is to answer questions regarding those photographs.
9  And that's -- I made that clear at the deposition, too.

10    Q    You certainly did, Doctor.

11         Now you dictated to your letter that there was
12  vitreous hemorrhages, correct?

13    A    At the time I saw the patient, there was massive
14  vitreal and retinal hemorrhages, yes.

15    Q    Well, isn't it true that there was no blood in the
16  veins or vessels in the vitreous matter at all?

17    A    That is true, there was blood in the vitreous.

18    Q    So that was a misstatement when you said there was
19  vitreous hemorrhages?

20    A    Blood from somewhere else had gotten into the
21  vitreous body, into the center of the eye, which is called
22  the vitreous body.  So there's blood in the vitreous.

23    Q    That's what you meant to say.  That isn't what you
24  said, is it?

25    A    Can you tell me what I said?

1    Q    Let me read it to you, Doctor.  "Dilated

2  ophthalmologic exam demonstrated massive retinal hemorages

3  and vitreous hemorrhages."

4    A    Right.  So that's a fair statement that there's

5  blood in the vitreous, vitreous hemorrhages in the vitreous.

6  I didn't say where they came from.  There is no blood vessel

7  in the vitreous.  The blood, in fact, had to have come from

8  somewhere else.

9    Q    A hemorrhage is when a blood vessel begins to

10 bleed; isn't that true?

11   A    Yes.

12   Q    There is no blood vessels in the vitreous?

13   A .  That is correct.

14   Q    So, therefore, the vitreous could not have

15 hemorrhaged, correct?

16   A    But it had blood in it.

17   Q    All right.  It had blood in it, but it was a

18 misstatement when you said it had vitreous?

19   A    No.  That's correct ophthalmologic terminology.

20 If you look at any textbook, there will be a chapter or a

21 section on vitreous hemmorage.  The source, you know, can be

22 different sources, but that is correct ophthalmoligic

23 terminology, vitreous hemorrhage.  I think that it's

24 employed in our communication with other ophthalmologists as

25 well as in our written text.

1     Q    Now would you be surprised or, no, you shouldn't

2  be surprised.  You've had a chance to review the letter

3  Dr. Bell wrote?

4     A    I had a chance to review it, yes.

5     Q    And --

6     A    The pathology report I saw, that's what I saw.

7     Q    Isn't it true that Dr. Bell indicated that the

8  vitreous was clear in both eyes of blood?

9     A    Right, because that's what I was saying earlier,

10  is when the child had recently probably been shaken, the

11  blood was all stirred up.  But when they laid on their back,

12  it settled out and cleared.  So probably by the time that

13  the photographs were taken two days later, we could see

14  details.  Then by the time the autopsy was done, the blood

15  had settled down and settled away.

16     Q    Are you aware that Dr. Bell also found there was

17  evidence of old blood in the eyes?

18     A    I can't comment on that.

19     Q    Isn't it true that you don't have any idea why a

20  child's neck would not break with respect to what

21  Mr. Herlihy is accused of in this case?

22     A    Yeah.

23          MR. PENNYPACKER:  Objection, beyond the scope of

24          this witness' expertise and beyond the scope of

25          direct-examination.

1    THE COURT:  Well, the objection is overruled.

2    Doctor, if you're able to answer that question, you

3    may.  If that is beyond your area of expertise --

4    THE WITNESS:  I can't speak as to why a neck would

5    break or not break as an ophthalmologist, that's

6    correct.

7  BY MR. TEDDER:

8    Q    Now, isn't it true that brain swelling can cause

9  occlusion of the venous drainage from the eye?

10   A    There are reports that you can have bleeding in

11 the eye with brain swelling or really intracranial

12 hemorrhage.  And again, I talked earlier about those reports

13 indicate a small amount of blood.  Definitely a different

14 clinical picture than this picture.  I think I lost track of

15 the question.

16   Q    All right.  Well, you agreed, did you not, that

17 retinal bleeding can come from occlusion of the veins?

18   A    Yes.

19   MR. TEDDER:  Your Honor, if I could just have a

20   moment, please?

21   THE COURT:  All right.

22   (Pause in the proceedings.)

23   MR. TEDDER:  Your Honor, I don't think I have any

24   other questions of this witness.

25   THE COURT:  All right.  Any redirect?

1     MR. PENNYPACKER:  May it please the Court?

2     THE COURT:  Go ahead.

3                  REDIRECT-EXAMINATION

4  BY MR. PENNYPACKER:

5     Q    Dr. Levine, you mentioned that of the thousands of

6  cases that you've had, you specifically remember Robbie.

7  Why is that?

8     A    I've only had three patients that died, so I

9  remember them distinctly here at Shands.

10    Q    You discussed the term indirect ocular trauma.

11 How does that happen?  Can you explain that to us in

12 layman's terms?

13    A    The eyes are a pretty delicate structure, if you

14 can imagine, and with the movement back and forth, forces

15 are built up.  It's a lot like, if I'm telling the

16 residents, like if you're riding in your car on Highway 75

17 and you slam on the brakes, that force you feel, it

18 literally shears or tears off the blood vessels off the back

19 of the eye and they bleed out.  That's how those forces are

20 generated.  That amount of blood is not gonna track in

21 through that optic nerve, which didn't even have blood on

22 it.  They're not gonna come from a brain occlusion from

23 little tiny veins.  You can get blood in the eye with vein

24 occlusions, but it doesn't for this type of pattern.

25    Q    If you get blood in the eye from vein occlusions,

1      what would you see in the eye?

2          A     Well, you'll see blood in the eye and you can get

3      blood in the eye with different things, but it normally

4      follows the course of the veins.  So the veins rupture as

5      the pressure builds up in them, and the blood is a little

6      fanned out within the retinal veins along the retina.  It's

7      not everywhere in the eye, like you just poured in a

8      tablespoon of ketchup or something in the eye.  It's just

9      little dots of blood along the vessels there.

10         Q     What is the mechanism that gets the blood into the

11     vitreous area?

12         A     The whole inside of the eye, it's not like

13     separate compartments.  Everything communicates.  So if you

14     have blood, it has to go somewhere.  The outside of the eye

15     is a wall.  So it's gonna push inward and it goes into the

16     vitreous or that jelly.  So the pressure -- the blood has to

17     go somewhere.

18             MR. PENNYPACKER:  Thank you, Doctor.

19             THE COURT:  All right.  May Dr. Levine be released

20         from the subpoena?

21             MR. PENNYPACKER:  Yes.

22             THE COURT:  Any objection?

23             MR. TEDDER:  No.

24             THE COURT:  Thank you, Dr. Levine.  You are free

25         to leave the courthouse and you are free from the

1    subpoena.

2         Ladies and gentlemen, we are going to recess at

3    this time for the evening.  We will begin tomorrow

4    morning at, the evidence will begin at 9 o'clock.  I'll

5    ask that you be here again at 8:50.  If you'll retire

6    to the jury room long enough to lock your notebooks in

7    the evidence locker, please.  You'll be released for

8    the evening.  Thank you.

9         (Out of the presence of the jury.)

10        THE COURT:  All right.  Are there any legal issues

11   that we're going to have to address before the next

12   witness is called?

13        MR. PENNYPACKER:  None from the state, your Honor.

14        MR. GROLAND:  I don't think so, your Honor.

15        MR. TEDDER:  The only thing I can think of, Judge,

16   is Dr. Uscinski.

17        THE COURT:  Hold on just one second.

18        All right.  Now, Mr. Tedder, you were saying there

19   was some issue we may need to address?

20        MR. TEDDER:  Well, just I think Dr. Uscinski is

21   gonna have some different demonstrative aids that he

22   may want to show the jury and I'm not exactly sure what

23   they are because I have not seen them myself.  I've

24   only seen him an hour or so.  We may need to take a

25   little time to show it to the state before his

1    testimony.  If they object, have the Court rule whether

2    or not it should be allowed.  That's all.

3         THE COURT:  All right.  Mr. Pennypacker,

4    Ms. Singer, we'll start the evidence at 9 o'clock.

5    When do you want to meet with Mr. Tedder and

6    Mr. Groland or confer with them as to demonstrative

7    aids they want to utilize?

8         MS. SINGER:  8:30.  I don't know what these

9    demonstrative aids are or how long they are.

10        MR. TEDDER:  I don't exactly know for sure either.

11   We can get it done in a half an hour.

12        THE COURT:  You want Mr. Tedder or Mr. Groland to

13   call you tonight over the phone and explain to you what

14   these are?

15        MS. SINGER:  It might be best to tell

16   Mr. Pennypacker since he's handling the cross of

17   Mr. Uscinski, but I would also like him to reach me.

18   So he has a pager number where he can be reached.

19        THE COURT:  I will come on the bench at 8:45.  If

20   you'll need more time than that to argue this so

21   there's also a ruling before 9 o'clock, you'll need to

22   call me at home tonight or in the morning, and there's

23   a lot of telephone action at my house these days, so

24   you may have to call very very late or very very early

25   to get through.  Don't worry about that.  Just make

1    sure you get through.

2         MR. PENNYPACKER:  Your Honor, if you want to give

3    me your telephone number -- It's in the telephone book?

4         THE COURT:  It's in the telephone book, yes.  You

5    remember my name, don't you, Mr. Pennypacker?

6         MR. PENNYPACKER:  Yes, ma'am.

7         THE COURT:  That's all you need.  And so, frankly,

8    because of the nature of what you all are needing to do

9    to prepare, don't worry about the lateness or earliness

10   of the hour, but just make sure that I get the message

11   and that we get the legal issues handled in time to

12   begin the evidence at 9 o'clock.

13        Now my understanding is that the next -- Yes, sir,

14   something from the jail?

15        JAIL REPRESENTATIVE:  I'll wait until you finish,

16   your Honor.

17        THE COURT:  The next witness is also out of order

18   and will be a defense witness; is that correct?

19        MR. GROLAND:  Yes, ma'am.

20        THE COURT:  I'll give the same instruction again.

21        MR. PENNYPACKER:  Yes, ma'am.

22        THE COURT:  All right.  Now do we need to address

23   some -- do we need to address some issues from the

24   jail?

25        JAIL REPRESENTATIVE:  I just want to find out what

1    time, your Honor?

2        THE COURT:  If you'll have Mr. Herlihy here at

3    8:45.

4        JAIL REPRESENTATIVE:  Yes, your Honor.

5        THE COURT:  If something arises and we need to

6    start earlier than that on the record --

7        JAIL REPRESENTATIVE:  We should be downstairs

8    early.

9        THE COURT:  Whatever lawyer calls me, I'll tell

10   them to call the jail.

11       JAIL REPRESENTATIVE:  We'll be here early.

12       THE COURT:  Whoever calls me, I'll also ask them

13   to call the court reporter and the clerk.  So you may

14   want to get all those numbers before you leave just in

15   case.

16       All right.  Thank you.  We'll be in recess until

17   8:45.

18                    *  *  *  *  *

19

20

21

22

23

24

25

Stacey K. Bryant, RPR
Judicial Court Reporter