# EXHIBIT

# O

202.1-17814
F

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY }
         Appellant, }
        }
        }
        }
v.         }
        }
        }
        }
STATE OF FLORIDA }
         Appellee, }

CASE NUMBER   2000-2753-CFA

APPEAL NUMBER 1D02-4788

VOLUME XV



Docketed
05-14-2003

## TRANSCRIPT
## RECORD

### HONORABLE MARTHA ANN LOTT
ACTING TRIAL JUDGE

### APPEAL FROM THE CIRCUIT COURT
### 8th JUDICIAL CIRCUIT FOR
### ALACHUA COUNTY, FLORIDA

2003 MAY 12 PH 2: 39
RECEIVED
ATTORNEY GENERAL'S OFFICE
CRIMINAL APPEAL JUDICIAL
TALLAHASSEE

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

1504

202-1-17814

1   IN THE CIRCUIT COURT OF FLORIDA
    EIGHTH JUDICIAL CIRCUIT
2   IN AND FOR ALACHUA COUNTY

3   CASE NO. 01-2000-CF-002753-A

4   THE STATE OF FLORIDA

5   vs.                          Volume XV

6   BRIAN PATRICK HERLIHY,       1002-4788

7          DEFENDANT.

8   _____/

        05-14-2003

9

10          TRANSCRIPT ON APPEAL
            PAGES 1504 - 1673
11             VOLUME XII

12

13  PROCEEDINGS:        JURY TRIAL
    BEFORE:             THE HONORABLE MARTHA ANN LOTT,
14                      CIRCUIT JUDGE
    DATE:               SEPTEMBER 18TH, 2002
15  TIME:               2:00 P.M.
    PLACE:              COURTROOM 4A
16                      ALACHUA COUNTY COURTHOUSE
                        GAINESVILLE, FLORIDA
17
    APPEARANCES:
18
        JEANNE SINGER, ESQUIRE
19      and
        STEPHEN H. PENNYPACKER, ESQUIRE
20      120 WEST UNIVERSITY AVENUE
        GAINESVILLE, FLORIDA 32601
21      ATTORNEY FOR THE STATE OF FLORIDA

22      GORDON H. GROLAND, ESQUIRE
        and
23      JOHN TEDDER, ESQUIRE
        500 EAST UNIVERSITY AVENUE, SUITES B&C
24      GAINESVILLE, FLORIDA 32601
        ATTORNEY FOR THE DEFENDANT

25

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1505

1                    INDEX VOLUME XII

2                      WITNESSES

3   DR. RONALD HENRY USCINSKI

4     Cross-Examination by Mr. Pennypacker...........Page 1506

5     Redirect Examination by Mr. Tedder.............Page 1558

6

7   DETECTIVE HELEN LEGALL

8   (Proffer of testimony outside the presence of the jury.)

9     Direct Examination by Ms. Singer...............Page 1577

10    Cross-Examination by Mr. Groland...............Page 1584

11

12  DETECTIVE HELEN LEGALL

13    Direct Examination by Ms. Singer...............Page 1592

14

15                      EXHIBITS

16  STATE'S EXHIBITS

17  No. - 71 - Miranda Waiver Form...................Page 1577

18  No. - 72 - Consent to Search Form................Page 1604

19  No. - 73 - Audiotaped Interview..................Page 1649

20

21

22

23

24

25

1          P R O C E E D I N G S

2              (Whereupon, the following proceedings were held,

3     the defendant and counsel being present.)

4              THE COURT:  Is the jury back?

5              THE CLERK:  Yes, ma'am.

6              THE COURT:  Anything we need to put on the record

7         before the jury comes back in?

8              MS. SINGER:  Not from the state.

9              MR. GROLAND:  No.

10             THE COURT:  Good enough.  Doctor, if you want to

11        come back up, we'll bring the jury in and we'll

12        continue.

13             (The jury entered the courtroom.)

14             THE COURT:  Have a seat.  Mr. Pennypacker, go

15        ahead.

16                     CROSS-EXAMINATION

17    BY MR. PENNYPACKER:

18        Q    Good afternoon, Dr. Uscinski.

19        A    Good afternoon.

20        Q    Can you tell us, please, how you got retained in

21    this case?

22        A    How I got retained?

23        Q    Yes, sir.

24        A    Yes.  I was approached by, let me see, I think it

25    was Mr. Groland, I don't remember exactly, after a lecture

1    I'd given in Nevada last year and told about the case.  And I

2    declined it.  I just had too much work to do.  Then the

3    family wrote me a letter several months later and I decided

4    to take it.

5        Q    Why did you decline the case initially?

6        A    I've had too many of these, they were interfering

7    with my regular practice.

8        Q    And what about the family's communication caused

9    you to change your mind?

10       A    It was a personal appeal.

11       Q    In addition to the $10,000 you get for being here

12   today, you also have charged an hourly rate to work on this

13   case, correct?

14       A    I do charge an hourly rate, yes, that's correct.

15       Q    You charge $900 an hour?

16       A    No.

17       Q    How much do you charge?

18       A    750.

19       Q    How many hours did you put into this case?

20       A    To be honest with you, I don't know.

21       Q    You are a neurosurgeon, correct?

22       A    That's right.

23       Q    Do you operate on adults and children?

24       A    Yes.

25       Q    Operate primarily on the heads of adults and

1  children; is that correct?

2      A    No, I would say it's probably equally distributed

3  now between the head and the spine and other parts of the

4  body.  The nervous system goes everywhere.

5      Q    You're not a pediatric neurologist, correct?

6      A    I'm not a neurologist at all.

7      Q    You're not a forensic pathologist?

8      A    That's correct.

9      Q    You're not a pediatrician, correct?

10     A    That's correct, although I do teach them.

11     Q    You're not board certified in pediatric critical

12  care?

13     A    That's correct.

14     Q    Not board certified in pediatric ophthalmology,

15  correct?

16     A    That's correct.

17     Q    In the last year, you've only operated on about ten

18  children; is that correct?

19     A    That would be about right.

20     Q    How many of those children had brain injuries?

21     A    Brain injuries?

22     Q    Yes, sir.

23     A    Two.

24     Q    So in the last year you've operated on two children

25  with brain injuries?

```
 1        A    That's right, in the last year.

 2        Q    Excuse me?

 3        A    In the last year, but my career goes over about 30

 4   years.

 5        Q    In addition to the conference you mentioned with

 6   Mr. Groland -- that was in Nevada; is that right?

 7        A    Right.

 8        Q    You've also spoken and given other presentations on

 9   the shaken baby syndrome, correct?

10        A    Yes.

11        Q    You go around, and your position is that it's not

12   an accurate syndrome; is that right?

13        A    I didn't hear what you said.

14        Q    Your position is that it's not an accurate

15   syndrome, there's no scientific support, correct?

16        A    That's correct.

17        Q    When you give presentations that's what your topic

18   is, isn't it?

19        A    That's correct.  The title of my article was Shaken

20   Baby Syndrome Fundamental Questions.

21        Q    You give these presentations to defense attorneys,

22   correct?

23        A    I give them to whoever is there, defense,

24   prosecution.  That's one that involves attorneys.  I've also

25   spoken to physicians.
```

```
 1        Q    When you were in Nevada you were on the panel with

 2   Dr. Plunkett, weren't you?

 3        A    Yes, I was.

 4        Q    You testified as an expert approximately 30 times;

 5   is that right?

 6        A    I'm not sure exactly.  Would you repeat your

 7   question?

 8        Q    How many times have you testified as an expert

 9   witness?

10        A    In what venue?

11        Q    Any venue.

12        A    No, it's been more than 30.  It's probably closer

13   to -- in any venue over 30 years, probably, I thought I said

14   50.  This is not -- this in addition to any testimony

15   regarding child abuse?  I mean, I've also testified as an

16   expert in medical malpractice suits and personal injury

17   suits.

18        Q    You've testified approximately 20 times in the last

19   five years as an expert witness; is that correct?

20        A    I'm sorry?

21        Q    You've testified approximately 20 times in the last

22   five years; is that correct?

23        A    Maybe a little more than that.

24        Q    In cases in which you didn't testify, how many

25   times have you been retained in that capacity, meaning cases
```

1  where you didn't actually go and give testimony in court, how

2  many times have you been retained and never had to testify?

3      A    Offhand, I don't recall.  Again, can you -- is this

4  in all cases or child abuse cases or what?

5      Q    All cases.

6      A    All cases.  I would say -- could you ask your

7  question again?

8      Q    Other than those cases in which you testified, how

9  many times in the last five years have you been retained as

10  an expert witness?

11     A    And not testified?

12     Q    And not testified.

13     A    And that's all cases, not just child abuse cases?

14     Q    Yes, sir.

15     A    I'd say about four or five times.

16     Q    How many times in just child abuse cases?

17     A    Once.

18     Q    So in the last four or five times that you've been

19  hired and didn't testify, only one of those was a child abuse

20  case, or four of them were child abuse cases?

21     A    One was a child abuse case.

22     Q    You never treated Robbie Quirello, correct?

23     A    That's correct.

24     Q    You never examined him while he was alive?

25     A    That's exactly right.

1    Q    You didn't do surgery on his brain?

2    A    No one did.

3    Q    So the movie that we saw earlier, you didn't do

4  that to this child, you didn't open him up and see anything

5  come out, or see the dura, or anything else?

6    A    That's right.

7    Q    You didn't talk to Dr. Hellrung, his pediatrician,

8  did you?

9    A    No.

10    Q    You didn't talk to Dr. Dickinson, the pediatric

11  intensivist?

12    A    No, all I did was read their reports.

13    Q    You didn't talk to Dr. Quisling or Dr. Nelson,

14  Dr. Hamilton or Dr. Levine, correct?

15    A    That's correct.

16    Q    You mentioned that you thought this child had a

17  difficult birth and you reviewed the obstetrical records; is

18  that right?

19    A    I have seen obstetrical records.  I don't think I

20  ever saw the actual delivery room record.  But I have seen

21  the obstetrical records and I have read the medical records

22  of the child when he was brought into Shands Hospital.

23    Q    What was difficult about his birth?

24    A    I believe he what's called a brow up presentation.

25  His head was malpositioned.  His head was malpositioned.

1   Q    That happens about 20 percent of the time, does it

2   not?

3   A    Probably less than that, but it does, the incidence

4   is certainly not zero.

5   Q    It's relatively common, isn't it?

6   A    I wouldn't say it's all that common.  Far and away

7   the most common presentation is called left occipital

8   anterior.  Brow up position is uncommon, especially

9   persistent brow up position, usually you can get the baby

10  turned around.

11  Q    What else if anything may have caused difficulty at

12  birth?

13  A    What else may have caused difficulty at birth?

14  Q    What else did cause difficulty?

15  A    That's enough.

16  Q    And what would brow up cause as far as the

17  difficulty?

18  A    Well, the way a baby's skull is shaped, it's

19  configured so that the easiest way for it to deliver through

20  the birth canal is with the face facing the sacrum.  In other

21  words, the brow is down.  Because that allows the neck to

22  flex and the facial bones to glide against the mother's

23  sacrum as it comes out, and for the neck to flex around the

24  front of the pelvis.  And when the baby is in the brow up

25  position, this part of the baby's head, the forehead, doesn't

1    get past the pelvis, so it's very difficult.  You wind up

2    compressing the head and face.

3        Q    You don't know how long it took this baby to

4    actually be delivered vaginally do you?

5        A    I don't recall.

6        Q    Are you saying that Robbie suffered from a subdural

7    hematoma at birth?

8        A    It certainly is possible.  We don't know for sure

9    and we're never going to know, but it certainly is possible.

10        Q    What evidence do you have that he suffered from

11   this subdural at birth based upon the birth records?

12        A    Based on the birth records?

13        Q    Yes, sir.

14        A    The brow up position, the fact that his clavicle

15   had to be fractured on the way out, and the fact that he had

16   chronic subdurals four months later.  The single most

17   traumatic event in a four month old infant's life is birth.

18   So on a simple basis, statistics and common sense, that's

19   what happened.

20        Q    It's your position that his clavicle had to be

21   broken at birth?

22        A    No, but was fractured during delivery.  Don't know

23   if it had to be or not.

24        Q    That's also a common birth occurrence, it is not?

25        A    Yes, but it's better not to have it.  I certainly

1    wouldn't call it a normal birth.

2        Q    There was no evidence of any neurological problems

3    to the child at the time of birth though, was there?

4        A    That's correct.

5        Q    In fact, there was no evidence of any neurological

6    problems for this child for at least two or three months of

7    his life, right?

8        A    That's correct, and equally not surprising.

9        Q    If he'd of had a subdural at birth that looks like

10   the pictures you showed us, then we would have seen

11   something, correct?

12       A    Not necessarily.

13       Q    You would have seen something in the way the child

14   behaved?

15       A    No, you might not see anything at all.

16       Q    No pressure on the brain, no damage to the brain

17   cells?

18       A    That's exactly right.  There might not be anything.

19   And actually, the initial CT scan indicates why there might

20   not be anything.  The baby's head was much larger than the

21   brain.  There was more fluid outside the brain than one

22   normally sees.  So the head was growing to accommodate this.

23       Q    If he had had a subdural at birth, he would have

24   healed well before August 2nd?

25       A    Again, no.  I've got a patient in my practice now

1    that's a year old and we're still following him with a

2    subdural.  The healing process in a subdural hematoma is a

3    dynamic process.  There is no time limit.

4        Q    Am I correct that veins in the head do not have

5    valves?

6        A    Yes, that's absolutely correct.

7        Q    The veins do not have the same pressure as

8    arteries, correct?

9        A    That's right.

10       Q    Veins actually don't really have any blood that's

11   being pumped through them, just the blood that gets

12   circulated; is that correct?

13       A    Well, there is, there are two terms, vis a tergo,

14   V-I-S-A-T-E-R-G-O and vis a fronte, V-I-S-A-F-R-O-N-T-E; one

15   is pushing from the back; and another one is pulling from the

16   front.  There is a negative pressure in the veins that allows

17   blood to flow towards the heart, but at the same time with

18   simple things such as respirations or coughing or burping,

19   the veins become engorged.  So the intracranial pressure is

20   fluctuating all the time.  So it's really a combination of

21   factors both working for blood flow and against blood flow,

22   the summation of which the result of blood flowing through

23   the brain.  Sometimes the force is from behind, sometimes the

24   force is from the front.

25       Q    The central veinous pressure in the vain is about 8

1   to 10 millimeter of mercury; is that correct?

2       A    Central veinous pressure.  That's pretty high.

3   Mercury you said?

4       Q    What is it then?

5       A    Pardon?

6       Q    What is it if it's not eight to ten?

7       A    You're asking me.  The veinous pressure in the

8   brain is probably zero to six centimeters of water.

9       Q    What's the arterial pressure in the brain?

10      A    Depends on where you are and under what

11  circumstances.

12      Q    It's higher --

13      A    And which arterial pressure are you talking about?

14      Q    It's higher than the veinous pressure, correct?

15      A    It should be, yes.

16      Q    There are at least four veins that drain the eye,

17  one at each quadrant; is that correct?

18      A    There's one central vein.  Most of them pole as to

19  one central vein.

20      Q    There are four veins that drain the eye, one at

21  each quadrant; is that not correct?

22      A    That may be, but the nature of veinous drainage is

23  the central retinal vein.

24      Q    Veinous drainage, there are four other veins that

25  drain the eye; is that correct, Doctor?

1    A    There may be more than four.  There are several

2  veins that drain the eye.

3    Q    The veins all go to the cavernous veinous system

4  that that you mentioned earlier, correct?

5    A    Some do, yes.

6    Q    And that eventually goes out the jugular, down the

7  bottom of the head?

8    A    Down the jugular system, yes.

9    Q    Isn't it true that if there were an occlusion or a

10  blockage of the vein to the eye, that the blood would drain

11  out those other four veins?

12    A    Eventually they might.

13    Q    You were aware, were you not, that there was no

14  damage to the optic nerve sheath in this child, correct, were

15  you aware of that?

16    A    Well, that's a pretty interesting point in the

17  autopsy, because the optic nerves were cut off flush with the

18  globe.  Now, if the optic verves are cut off flush with the

19  globe, they couldn't have examined them.

20    Q    So you would defer to the ophthalmologic

21  pathologist's report as to what he did observe; is that

22  correct, Doctor?

23    A    Well, as far as the reports are concerned, what I

24  noticed with the report from the eye doctor, Dr. Bell, is

25  that the optic nerves were cut immediately behind the globe.

1   So there was no visualization of the optic nerve sheath.

2   There couldn't have been.  The optic nerve sheath occurs a

3   little bit behind there.  Now, it may be that somebody saw

4   something at the autopsy.  But it wouldn't surprise me that

5   there wouldn't be any hemorrhaging in the optic nerve sheath

6   regardless.

7        Q    Robbie was born prematurely, correct?

8        A    I believe so, yes.

9        Q    Would you expect that he would have some delay in

10  development as a result of that?

11       A    It depends on how premature.  I think he was in six

12  weeks or thereabouts.

13       Q    Thirty-six weeks.

14       A    Yeah, any delay would be minimal.

15       Q    Do you know whether or not he was able to roll over

16  on August 2nd?

17       A    He was able to roll over on August the 2nd?

18       Q    Yes, sir.

19       A    I think there was a report saying that they

20  believed he was able to roll front to back but not back to

21  front.

22       Q    What report was that?

23       A    One report, one of the reports in the medical

24  records.  I don't remember exactly which one.

25       Q    Front to back?

1      A    I think.  If you want, I can look at the records.

2      Q    I'll trust your memory.  Do you believe that Robbie

3  was in full arrest on the morning of August 2nd, 2000?

4      A    Tell me what you mean by full arrest.

5      Q    Meaning both his heart is not working and his lungs

6  are not working.

7      A    I don't recall.  Let's take a look at the record.

8  If we're going to be asking those specific questions, it

9  would be good to have the record in front of us.

10           MR. TEDDER:  Your Honor, may I approach the

11      witness?

12           MR. PENNYPACKER:  I can do it.

13           THE COURT:  Go ahead.

14           THE WITNESS:  Yeah, and the reason I'm saying that

15      is because he was described as being in full arrest.

16      But I think that from the beginning they were able to

17      elicit a pulse on him, which means by definition he

18      would not be in "full arrest".  This is the paramedics

19      who got there on the scene.  I'm just looking for the

20      record.  So I will -- I don't want to take extra time,

21      but I will say that if he did indeed have a pulse, then

22      by definition there's no way he could be have been in

23      full arrest.

24  BY MR. PENNYPACKER:

25      Q    If he had a pulse when the paramedics were there,

1     it wouldn't have been full arrest, right?

2        A     It would not have been full arrest.  Full arrest is

3     no pulse, no blood pressure, no breathing.

4        Q     If he had a pulse on the 911 tape, wouldn't be a

5     full arrest, would it?

6        A     I'm sorry, the question again?

7        Q     You didn't listen to the 911 tape, did you?

8        A     No.

9        Q     You weren't aware then that on the 911 tape

10    Mr. Herlihy reports that the child has a pulse?

11       A     I don't recall.  Right, I didn't listen to the

12    tape.

13       Q     If his heart is beating, blood is still

14    circulating, correct?

15       A     That's correct.

16       Q     And the oxygen that's in that blood is going to be

17    distributed to some of the organs in his body, correct?

18       A     Depends -- well, yes, assuming that there is oxygen

19    in his blood.

20       Q     Are you familiar with the concept of shunting?

21       A     Shunting?

22       Q     Yes, sir.

23       A     Well, I just shunted somebody this past weekend.

24    Tell me what you mean.

25       Q     I'm not talking about inserting a shunt.  I'm

1    talking about the body making a choice between where the

2    oxygen goes, which organ is going to get the oxygen.

3        A    Well, the body may under certain circumstances

4    divert blood flow with whatever oxygen is in there.  So

5    you're not really talking about shunting oxygen, what you're

6    talking about is shunting blood.  You may shunt blood flow

7    preferentially, but if there's no oxygen in it or

8    insufficient oxygen, it's not going to work.

9        Q    And if he were having trouble breathing, he would

10   have insufficient oxygen, and as a result his body would

11   divert the blood primarily to the brain, correct?

12       A    Well, unfortunately that's true only to a limited

13   degree, yes.  The blood -- the body can divert blood away

14   from other organs and, therefore, by exclusion divert blood

15   towards other organs.

16       Q    Well, if the brain detects that it's not getting

17   enough oxygen, it will try to get more?

18       A    It will try to get more.  But if oxygen exchange is

19   not taking place at the lungs, it's not going to get more.

20       Q    And as a result then, you would expect the other

21   organs to get less blood, correct?

22       A    Get less?

23       Q    Less blood.

24       A    Yes.

25       Q    And as a result, you would expect there to be some

1523

1    damage in those organs if he had gone some significant period

2    of time --

3         A    No.

4         Q    -- without oxygen?

5         A    No, that's not correct.  Again, as I said earlier,

6    that is the entire basis for doing transplant surgery.  We

7    can save organs after the brain is dead.

8         Q    If someone is seizing, Doctor, their respiratory

9    rate actually increases, does it not?

10        A    Their respiratory effort may increase.  That does

11   not mean that they're moving air.

12        Q    People have seizures every day and they don't get

13   anoxia, correct?

14        A    People have seizures every day and they may not get

15   anoxic.  But that's one of the reasons why we try to treat

16   seizures right away.  One of them is people fall down and

17   bump their heads and can break other bones; and another one

18   is, they're not breathing very effectively when they're

19   seizing.

20        Q    But they continue to breathe, do they not?

21        A    They continue to attempt breathing.

22        Q    And in this particular case, you can't say whether

23   Robbie seized first or aspirated first, can you?

24        A    That's right.  That's correct.

25        Q    There's also nothing in the medical records showing

1    that he had an aspiration, is there?

2        A    Yes, there is.

3        Q    What?

4        A    He had -- the medical records indicated that he had

5    formula or milk coming out of his mouth and nose.

6        Q    Nothing in his lungs though, correct?

7        A    Nothing in his lungs.

8        Q    You can't say whether he seized or choked or choked

9    and seized; is that correct?

10       A    That's correct.

11       Q    You believe that he got wedged between the foot

12   rail of the bed and the mattress as a result of the seizure;

13   is that right?

14       A    Yes.

15       Q    How did that happen?

16       A    He seized.  He seized, he moved around, and he

17   rolled.

18       Q    When he seized, isn't it true that he would go

19   completely rigid?

20       A    Not necessarily.  He's giving you evidence of

21   having focal seizure activity on that CT scan.  He could have

22   seized on just one side of his body.

23       Q    He's in the middle of the bed, face down, how does

24   he get wedged?

25       A    The only way I can answer this is what I've just

1    described.  It is certainly conceivable to me.  As to exactly

2    which part got there first or how it happened, I wasn't there

3    and I can't tell you.

4         Q    You don't know?

5         A    That's correct.

6         Q    You in illustrating the CAT scans indicated that

7    the darker material could either be older blood or CSF,

8    correct, cerebral spinal fluid?

9         A    In the CT scans?

10        Q    Yes, sir.

11        A    Yes, and then proceeded to demonstrate why it

12   couldn't be cerebral spinal fluid.

13        Q    You can't see the membrane on the CT scans, can

14   you?

15        A    That's correct.  If they had given a scan with

16   contrast, one might have seen a membrane.

17        Q    The scan did not have contrast?

18        A    That's right.

19        Q    So you didn't see a membrane on that CAT scan, did

20   you?

21        A    That's right, only in the photos.

22        Q    And you can say with certainly, can you not, that

23   the subdural blood was not mixing with the subarachnoid,

24   correct?

25        A    Yes, I think there is a minimal amount of blood in

1    the subarachnoid space.  The majority of it was in the

2    subdural space.

3        Q    Did you review Dr. Nelson's report, the

4    neuropathologist in this case?

5        A    Dr. Nelson?  Yes, I believe I did.

6        Q    Did you read his description of the subarachnoid?

7        A    I did.  If you can provide me with it, I'll look at

8    it again.

9        Q    It described at least one area of blood that was

10   eight by eight by nine millimeters?

11       A    Sure, that's less than one cubic centimeter of

12   blood.  I think we're talking about a lot more than that in

13   the subdural space, probably, I don't know, 15, 20, 30 times

14   that amount, much more than that, more than 30 times that

15   amount.  That's a miniscule amount.

16       Q    And it's your opinion that the subdural hematoma is

17   not in the subarachnoid space then, correct?

18       A    The subdural hematoma seen on those scans are in

19   the subdural space, yes.  When you put all the scans

20   together, look at them one on top of the other, and then look

21   at the scans from day to day, those findings can only reflect

22   blood in the subdural space.

23       Q    The bottom of the subdural space is the arachnoid,

24   correct?

25       A    I'm not sure what you mean.

1    Q    We have the skull?

2    A    Yes.

3    Q    We have the dura?

4    A    Yes.

5    Q    We have the subdural space?

6    A    Yes.

7    Q    We have the arachnoid?

8    A    Right.

9    Q    We have the pia?

10   A    Right.

11   Q    And we have the brain, correct?

12   A    Right.

13   Q    The part that you saw on the CAT scans is in the

14   subdural space above the arachnoid, correct?

15   A    It's -- okay.  I understand what you're saying.

16   It's probably better to say outside of the arachnoid, because

17   if you're on the bottom of the brain --

18   Q    Outside the arachnoid?

19   A    Extra-arachnoid, yes.

20   Q    The blood is outside the arachnoid.  How is it

21   touching the brain to cause a seizure?

22   A    The blood itself is an irritant.  Whether or not it

23   exerts its affects through -- nobody really knows, it just

24   happens through the magnetic properties of iron, through

25   local pressure.  Nobody can tell you because nobody has ever

1    been able to measure it.  But what we do know is that one way

2    that subdural hematomas present in patients is with seizures.

3    They provoke seizures.

4         Q    Are you telling us then you don't know whether or

5    not the blood in the subdural space was touching his brain?

6         A    His brain?

7         Q    Yes, sir.

8         A    By definition mechanically the blood in the

9    subdural space is not touching the brain, but that does not

10   mean it's not exerting any affect on the brain.

11        Q    One of the affects --

12        A    It's a mass that doesn't belong there.

13        Q    And if there were a large enough mass, we would see

14   some brain shift on the CAT scan, correct?

15        A    That's correct, unless it were on both sides, in

16   which case --

17        Q    There is no midline shift on these CAT scans, is

18   there?

19        A    That's correct.

20        Q    There's no evidence of any pressure on the brain

21   stem, is there?

22        A    Yes, that's correct also.

23        Q    You see brains all the time that are swollen,

24   edema, and yet you don't see occluded blood vessels, correct?

25        A    Are you speaking generally?

1    Q    Yes, sir.

2    A    You don't see occluded vessels.  Yes, that's right.

3    Q    You've seen lots and lots of brain injuries and you

4    never see edema occlude the blood vessel, correct?

5    A    That's almost correct.  The only circumstances

6    under which I've seen blood vessels occluded are the

7    intracranial pressure going so high that arterial blood flow

8    ceases, and that's not the same as occluding a blood vessel.

9    The blood goes to an area of greater pressure into an area of

10   lesser pressure, and if the intracranial pressure, for some

11   reason or other is so high that arterial blood pressure is

12   exceeded, then blood doesn't flow into the brain.  That

13   doesn't mean the vessels were occluded, but they're still not

14   getting any blood.

15   Q    So was Robbie's intracranial pressure sufficient to

16   occlude his arteries?

17   A    I don't believe so.

18   Q    Is it sufficient to occlude his --

19   A    In fact, I know not.

20   Q    Is it sufficient to occlude his veins?

21   A    No.

22   Q    No?

23   A    Of course not.

24   Q    Then he couldn't get retinal hemorrhages, could he,

25   Doctor?

1    A    No, oh, absolutely wrong.  I will proceed to

2    explain that now.  Number one, his intracranial pressure was

3    elevated because his fontanelle was bulging.  Number two, his

4    veinous pressure was working because his fontanelle was also

5    pulsing.  It wouldn't be pulsing unless blood were getting in

6    and getting out.  And when we're talking about retinal

7    hemorrhages, we're talking about retinal hemorrhages being

8    caused by a sudden increase in retinal veinous pressure as a

9    reflection of a sudden increase in intracranial pressure.

10   Now, the intracranial pressure can go up and then right back

11   down again.  The retinal hemorrhage has already occurred.

12   Just because the pressure goes up, it doesn't mean it has to

13   stay up.  It has to exceed the tolerances of the veins, you

14   get bleeding, and then it can drop back down again.

15       Q    And it's your opinion that the retinal hemorrhages

16   occurred as a result of the increased intracranial pressure

17   occluding the veinous drainage; is that right?

18       A    Temporarily, yes.

19       Q    The blood wouldn't have gone out those other four

20   veins and down the jugular?

21       A    If it happens very quickly, that's exactly right,

22   and there's literature to support that.

23       Q    Do you read the Journal of American Ophthalmology,

24   Doctor?

25       A    Once in a while.

1    Q    You might want to check out the September issue.

2    A    If you have the reference, I'll be happy to look at

3    it now.

4    Q    We might get there.

5         This child was not injured as a result of a car

6    accident, correct?

7    A    I don't believe so.

8    Q    You would agree that on the CAT scans there is no

9    evidence of severe brain swelling, correct?

10   A    What do you mean by severe brain swelling?

11   Q    Well, the sutures weren't separated?

12   A    Not significantly.

13   Q    Isn't that something you'd see if there was severe

14   swelling?

15   A    That would depend on when the imagines were taken

16   with regards to the onset of the brain swelling.

17   Q    In the autopsy photographs you see both subdural

18   and subarachnoid blood, do you not?

19   A    It's difficult to see subarachnoid blood.  What you

20   see on those pictures that I saw is subdural blood.

21   Q    This child had a bleeding of the subarachnoid area?

22   A    He had some blood in the subarachnoid area.

23   Q    He also had an epidural hematoma, did he not?

24   A    No, he didn't.

25   Q    Dr. Nelson's report shows a cerebral cortical

1  contusion, correct?

2       A     That's unclear from his report.  He mentions it in

3  passing and then he does not list it in the final diagnosis.

4  So it is unclear to me what he actually saw.  There's been a

5  problem with the records here.

6       Q     He doesn't actually give a final diagnosis?

7       A     Let's look at the report.

8       Q     Well, do you remember?

9       A     Off the top of my head, no.  I'd rather look it up.

10      Q     It's Dr. Hamilton's duty to assign a cause of

11  death; is that correct?

12      A     Did you want me to look at the report?

13      Q     No, sir.

14      A     Okay.  I'm sorry.

15      Q     It's Dr. Hamilton's duty to assign a cause of

16  death?

17      A     I don't know if he's the coroner or not.

18      Q     You don't know what his job title is?

19      A     I'm sorry?

20      Q     You don't know what his job title is?

21      A     I know of him as a forensic pathologist only.

22      Q     If he were the medical examiner, would it be his

23  duty to assign a cause of death?

24            MR. GROLAND:  Your Honor, I'm going to pose an

25       objection.  I mean, I think the question is asking this

1    witness, who's from out of state, to give an answer that

2    he may not know about because he's not familiar with the

3    particular responsibilities of --

4        THE COURT:  Is your objection that it calls for

5    speculation?

6        MR. GROLAND:  Yes, Your Honor.

7        THE COURT:  The objection is sustained.

8    BY MR. PENNYPACKER:

9        Q    The final pathway of this case was anoxic ischemic

10   encephalopathy; is that correct, Doctor?

11       A    I believe I read that, yes.

12       Q    And that means depravation of the brain of oxygen.

13   In this case it was global, meaning the entire brain; is that

14   right?

15       A    Yes, that's correct.

16       Q    That's what you would expect to see on August 10th

17   as a result of the injuries this child suffered on

18   August 2nd, correct?

19       A    Yes.

20       Q    It wasn't what existed on August 2nd, was it?

21       A    I'm sorry, it certainly was.

22       Q    Were you aware this child's brain had begun to

23   liquefy during this hospital stay?

24       A    Sure.  Again, that's exactly what you would expect

25   had he suffered an anoxic insult on August the 2nd.

1   Q    What are the three factors or criteria in shaken

2   baby syndrome?

3   A    You mean the hypothetical shaken baby syndrome?

4   Again --

5   Q    In shaken baby syndrome, what are the three --

6   A    I would emphasize to you that it's a hypothesis

7   that has never been proved.

8   Q    Can you tell me the three factors or not?

9   A    Yes.  Originally, fractures of the long bones of

10  the extremities, unexplained subdural hematomas and retinal

11  hemorrhages.

12  Q    Is it also a factor, a story that can't be

13  explained, a story that's fishy?

14  A    Well, that's a good point, but you see, that

15  conflicts directly with chronic subdural hematomas, which by

16  definition have no explained history.

17  Q    A cerebral cortical contusion would not be caused

18  by a chronic subdural hematoma, would it, Doctor?

19  A    No.

20  Q    That's a intracranial injury, is it not?

21  A    That's not exactly that.  It's an intracerebral

22  injury.  The substance of the brain.

23  Q    Only can happen from trauma, correct?

24  A    Yes, should only happen with trauma.

25  Q    Usually only from impact, correct?

1    A    That's correct.

2    Q    So if we see that in this child we know there's

3  been some impact; is that right?

4    A    If it's seen, then there should have been impact.

5  However, again, that's an inconsistency, because there's no

6  evidence of external impact.  There's no evidence on the skin

7  of impact.  There was no evidence on the skull of impact.

8  There is one mention of a contusion, which was never followed

9  up on.

10   Q    You've heard of down syndrome correct, Doctor?

11   A    Down syndrome?

12   Q    Yes, sir.

13   A    Yes.

14   Q    That's an accepted medical diagnosis, is it not?

15   A    It's actually a genetic diagnosis, yes.

16   Q    It's accepted in the medical community?

17   A    Yes.

18   Q    You've heard of Reye's syndrome?

19   A    I've heard of it.

20   Q    Excuse me?

21   A    I've heard of it.

22   Q    What is it?

23   A    It's a syndrome which occurs mainly in children and

24  it's characterized by high fevers and convulsions, usually

25  occurring after, I believe, salicylate ingestion and may be

1   associated with liver dysfunction.

2        Q    That's accepted in the medical community, is it

3   not?

4        A    Yes.

5        Q    Let's talk a little bit about Dr. Ommaya --

6        A    So are tonsillectomies.

7        Q    Excuse me?

8        A    So are tonsillectomies.

9        Q    So let's talk about Dr. Ommaya and Dr. Duhaime.

10  The high school physics textbook that you pulled out, force

11  equals mass times acceleration, correct?

12       A    Yes.

13       Q    My high school algebra says that if you reduce the

14  mass, the acceleration increases with the same force; is that

15  correct?

16       A    It must increase from the same force; that's

17  correct.

18       Q    So if we had a ping pong ball, it's going to go a

19  whole lot further with the same amount of force than if we

20  hit a bowling ball; is that right?

21       A    In a friction-free, nonatmospheric, gravity free

22  environment, yes.

23       Q    If you try to shake me with the same force you try

24  to shake Robbie Quirello, he would be shaken at a much higher

25  acceleration than you could shake me, correct?

1    A    Yes.

2    Q    The inside of the brain has different densities,

3 does it not, Doctor, the various components inside the brain?

4    A    Yes.

5    Q    Greater density and less the acceleration from the

6 same force, correct?

7    A    Yes.

8    Q    The dura is a lot harder than brain matter, is it

9 not?

10    A    Harder?

11    Q    Harder, more dense?

12    A    Denser, it's also flexible.

13    Q    It's more dense in the brain though, correct?

14    A    I'm not sure about the word dense.  It's a

15 different consistency certainly.  Both of them practically

16 float.  They're made of different type tissue, one of which

17 is much more, or much less, our word is -- adhesive is a

18 better one.  The brain is much less cohesive than the dura

19 is.  It's got different types of fibers in it.  The density

20 may be the same, but he the cross linking of fibers is

21 different.

22    Q    The tether that you mentioned inside the brain

23 certainly have a different density than the brain matter

24 itself, correct?

25    A    The what?

1    Q    The tether, didn't you mention tether earlier?

2    A    Tether?  I don't think so.

3    Q    How about the optic nerve, is that a different

4    density than the brain matter?

5    A    No, they're practically the same, same tissue,

6    neurons.

7    Q    The falx runs down the middle of the brain, does it

8    not?

9    A    It runs the two cerebral hemispheres, doesn't

10   actually run inside the brain.

11   Q    Harder than the brain matter?

12   A    I'm sorry?

13   Q    More dense than the brain matter, harder than the

14   brain matter?

15   A    It's a different type of tissue than brain matter.

16   Again, it's dura, so the same thing applies as I said

17   earlier.

18   Q    Gray matter and white brain matter have a different

19   densities?

20   A    Slightly different, yes.

21   Q    If all of these items are accelerated at the same

22   rate, they're going to decelerate and accelerate different

23   distances, are they not?

24   A    Yes, but not significantly.  Actually, that's

25   exactly why Ommaya developed those injury thresholds.  Let me

1   explain that to you.  See, they knew back in the '60s when

2   they were doing these experiments that they weren't going to

3   be able to measure these small differences in acceleration

4   between gray matter, white matter, falx, dura, et cetera, et

5   cetera.  But they didn't have to.  What they were really

6   interested in was the affect.  That's why they have injury

7   thresholds for concussion, subdural hematoma, and what's

8   called traumatic injury to the brain or diffuse axonal injury

9   to the substance of the brain.  They didn't really have to

10  know what the differential was with the movement of the

11  tissues inside the head.  What they had to know was whether

12  or not those forces were enough to exceed the injury

13  threshold to give this kind of injury.  So knowing that they

14  couldn't measure the various tissue densities did not stop

15  them from doing the experiment.  They knew that a certain

16  amount of force applied in this particular instance would

17  either result or not result in an injury, depending on the

18  amount of force that was achieved.  If you went over the

19  threshold, you got an injury.  If you went under the

20  threshold, you didn't.  And whether or not the tissue was

21  moving differentially or not was really a moot point, you got

22  the injury.

23      Q    They didn't use any four and a half month old

24  Rhesus monkeys, did they?

25      A    No, actually they used adult Rhesus monkeys.  And

1   that's pretty significant too, because the information that

2   was extrapolated by the pediatricians was on adult animals

3   and applied directly to children with no thought.

4        Q    So we don't know what would happened if we put a

5   baby monkey in that experiment, do we?

6        A    We're never going to be able to find out?  The PETA

7   people wouldn't allow that.

8        Q    We're never going to really know what would happen

9   to a four and a half month old baby in that experiment; isn't

10  that right?

11       A    For the same reasons.  But we do know that they

12  took the data from adult animals and applied it to children

13  erroneously.

14       Q    Dr. Duhaime's study showed that the amount of g's

15  that can be generated by a human is averaged about ten, is

16  that correct, 9.29 grams or g's?

17       A    Approximately, over a certain period of time, yes.

18       Q    We know a pilot dies from 4 g's; is that correct?

19       A    No, that's not correct at all.

20       Q    That's not correct?

21       A    I've got a personal friend who pulled 6 g's.

22       Q    How about ten, would that kill him?

23       A    No.  No.  You've got to understand something, you

24  can apply gravitational acceleration over a period of time.

25  If you apply it gradually, people can withstand it.  If you

```
 1    apply it very abruptly, they may not.  So it has to do with

 2    the rate of application of g forces also.

 3        Q    In shaking aren't we applying it rapidly?

 4        A    No, you're not.

 5        Q    Snapping back and forth at 10 g's?

 6        A    That's the whole point, you're applying it slowly.

 7    That's exactly why I gave the analogy of putting your brakes

 8    on and stopping in three seconds or hitting a brick wall and

 9    stopping in three thousandths of a second.  It's a question

10    of how rapid the deceleration occurs.  And the deceleration

11    in shaking does not occur with that rapidity.  That's exactly

12    why the radians per second number in shaking is so low and

13    the radians per second in impact is so high.  Radians per

14    second per second, I'm sorry.  We need to get that right.

15        Q    If you were shaking a baby at 10 g's and you

16    slammed him on the bed, that would be a pretty rapid

17    deceleration, would it not?

18        A    If you were shaking a baby at 10 g's and you

19    slammed him on the bed, it would depend on several factors:

20    One, how springy the bed was.  Okay?

21        Q    Got you.

22        A    Two, what the g forces were at the time you were

23    impacted.  Okay?

24        Q    That's it?

25        A    That's it.
```

1     Q     The injuries that you see in Robbie Quirello would

2  have required an impact, correct?

3     A     I'm sorry?

4     Q     The injuries that we see in Robbie Quirello, the

5  cortical contusions, the subarachnoid hemorrhage, those

6  require impact?

7     A     No.  You can have subarachnoid bleeding and a

8  subdural hematoma without impact.  And I've got some

9  questions about whether or not there was really a cortical

10  contusion.  It was unnoticed on the microscopic examination,

11  and that's where you should see one, and there's only one

12  mention made of it in passing, and it's not mentioned in the

13  final diagnosis.  That's a pretty significant thing to

14  mention.  It should be done.

15     Q     Dr. Nelson didn't see the cortical contusions on

16  his microscopic exam, is that right, Doctor?

17     A     I'd have to look at.

18         MR. TEDDER:  Your Honor, may the witness have an

19     opportunity to review these reports and that the

20     prosecutor needs to furnish it.  This is improper

21     impeachment to not allow him to refresh his memory of

22     the documents.

23         THE COURT:  Mr. Tedder, if you want to give him the

24     report, hand it to him.

25         MR. TEDDER:  Thank you.

1   BY MR. PENNYPACKER:

2       Q    October 23rd, Doctor, second paragraph, first line.

3       A    October 23rd.  I'm on September the 18th.  He's

4   contradicting himself in this report in that paragraph, since

5   you mentioned it.  I will read it to you.  The cerebral --

6   cerebral cortical contusions and subarachnoid hemorrhage --

7            THE COURT:  Doctor, I'm going to ask you to slow

8        down, please, because the court reporter has to write

9        what you're reading.

10      A    Okay.  Cerebral contusions and subarachnoid

11  hemorrhage and hematoma.  Then he says there is diffuse

12  endothelial cell swelling with extravasated erythrocytes.

13  Vacuolation of the neuropil and foamy macrophages throughout.

14  That's not a contusion.  A contusion is disruption of neural

15  tissue with blood.  He's not saying that.  What he's saying

16  here is that the endothelial cells died and blood that was in

17  there got out.  That's not the same thing.  So while he

18  starts out saying contusion, he doesn't verify it.  And then

19  at the very end, his impression:  Immature brain with

20  subarachnoid hemorrhage and hematoma.  Anoxic ischemic

21  encephalopathy global.  Cerebral edema generalized.  Vascular

22  congestion generalized.

23      Q    You would agree --

24      A    Doesn't say anything about cerebral contusions in

25  his final analysis.

1    Q    You would agree, Doctor, that there is no evidence

2  of an old subarachnoid bleeding in this case; is that

3  correct?

4    A    Well, I don't know how you could find any evidence

5  of an old subarachnoid bleeding.

6    Q    What's the left meninges?

7    A    They are the three coverings around the brain that

8  I described.

9    Q    The left meniges is one of the coverings in the

10  arachnoid space, correct?

11    A    No, the arachnoid is one of the left meninges.

12    Q    Your testimony was that a neomembrane takes two to

13  four weeks to surround and old hematoma; is that right?

14    A    No, it's a variable process.  It takes two weeks to

15  see visually the outer membrane, the outer neomembrane.  It

16  takes two, between two and four weeks for an innermembrane to

17  develop that is visible to the naked eye.

18    Q    So if this child had had a subdural hematoma at

19  birth, you would have expected to see this with the naked

20  eye, correct?

21    A    Not necessarily.  This child was also four months

22  old.  And the thing -- I understand the problem and I'll try

23  and explain it.  You're dealing with a biological system,

24  this is living tissue.  A child gets a subdural hematoma, for

25  instance, at birth.  Nature institutes a process of trying to

1    get rid of it, absorb it, so it forms this membrane.  If

2    there is no significant disruption regarding that subdural,

3    it could conceivably go away in early as one month.  However,

4    if rebleeding is occurring, and rebleeding is occurring at a

5    rate that's approaching resorption, the subdural is going to

6    continue to exist and will not go away.

7             As I said, I am personally following a child now

8    who's one year old, had a subdural at birth, and he's still

9    got some remanents of it.  We've never had to operate on him.

10   He's done well, but he's also been lucky.

11            Most of the times when I've seen kids with

12   subdurals at birth -- well, not most of the times, I'd say

13   half of the times, they're gone by four to six weeks, but not

14   always.  And, again, if a child gets a subdural and it's not

15   detected, nobody knows how long it can go before it goes away

16   because the child may not have any symptoms.  It's not that

17   easy to quantitate because you're dealing with a living

18   biological system that is both absorbing the blood and

19   bleeding anew at the same time.  Like even in the pictures

20   you saw here, there was bleeding going on after the child

21   come into the hospital.

22        Q    You mentioned that the science that surrounds the

23   shaken baby syndrome is, I believe you used the terms

24   clinical and anecdotal, correct?

25        A    Anecdotal, yes, I did.

1    Q    You didn't use the word clinical also?

2    A    I don't remember using the word clinical.  It could

3  be.  I mean, you could say clinical.

4    Q    Anecdotal would include stories by people who have

5  shaken babies and the babies have died, correct?

6    A    Who have confessed to shaking babies, yes.  One

7  would have to ask under what circumstances those confessions

8  were obtained.

9    Q    Confessions after trial's over, Yeah, I shook that

10  baby and it died.  That's anecdotal evidence of shaken baby

11  syndrome, Doctor?

12    A    Sure, just as sure as the ground is flat underneath

13  us.  There has never been, to my knowledge, to this day,

14  after over 30 years, a witnessed case of shaking.

15    Q    You know what nanny cams are right, Doctor?

16    A    I'm sorry?

17    Q    Nanny cams, ever heard of a nanny cam?

18    A    Yes.

19         MR. PENNYPACKER:  I'd like to ask Dr. Uscinski

20    about one particular CAT scan, but it's going to take me

21    a second to set the machine up.  I don't know if you

22    want to take a break or not or how you want to deal with

23    that.

24         THE COURT:  We'll take a short recess, ladies and

25    gentlemen, ten minutes.

1    (The jury exited the courtroom.)

2    (A recess was taken.)

3    THE COURT:  Ms. Singer, while Mr. Pennypacker is

4    doing that, could you and Mr. Groland and/or Mr. Tedder

5    approach the bench?

6    (A sidebar discussion was held off the record and

7    without the court reporter.)

8    THE COURT:  Mr. Pennypacker, are you ready to

9    proceed?

10   MR. PENNYPACKER:  Just about.

11   (Pause in the proceedings.)

12   THE COURT:  Now are you ready?

13   MR. PENNYPACKER:  Yes, ma'am.

14   MR. TEDDER:  I have one little thing I want to

15   bring up.

16   THE COURT:  You gave me that indication.  We're

17   waiting for your client.

18   (The defendant enters the courtroom.)

19   MS. SINGER:  Before we bring the jury in, just one

20   other issue.  The next witness, we will have to lay a

21   predicate for voluntariness outside of the presence of

22   the jury.

23   THE COURT:  We're going to take a recess between

24   witnesses anyway.  Yes, Mr. Tedder.

25   MR. TEDDER:  Your Honor, it has just come to my

1   attention that, as you know, we've had a number of

2   student observers in the courtroom during this trial.

3   And it's come to my attention that some of them have

4   been talking about the facts of the case, possibly in

5   front of the presence of witnesses.  I just wanted to

6   ask the Court to consider maybe making an instruction to

7   all of the people present.

8        THE BAILIFF:  I can make a statement.  They were

9   talking outside.  I pulled them inside the courtroom.

10  You saw me in the back of the courtroom.

11       MR. TEDDER:  Obviously, they wouldn't know any

12  better, I'm not ascribing any bad motive to them but

13  they need to be admonished to be careful.

14       THE COURT:  Well, we can close the courtroom.  Are

15  students present that are with any instructor or what

16  kind of students, college students, law students?

17       UNIDENTIFIED MEMBER OF THE AUDIENCE:  Business law.

18       THE COURT:  Law students?

19       MR. TEDDER:  Business law is what he said.

20       THE COURT:  So undergraduate?

21       UNIDENTIFIED MEMBER OF THE AUDIENCE:  Yes, ma'am.

22       THE COURT:  Then let me give you some instructions.

23  You could create a situation where we could have to

24  start over completely in this murder trial and retry the

25  whole thing if you talk about the facts of the case in

1    front of people that have to testified.

2         Now, as Mr. Tedder indicated, obviously you didn't

3    know that or you wouldn't have done it.  And, of course,

4    a trial is open to the public and you are free to watch

5    any portion of it, and in fact, you're free to discuss

6    any portion of it.  But I must ask you to not discuss it

7    in the courthouse at all so you don't create a situation

8    where we have to start over with a two week trial.  I

9    know you understand and I know you'll cooperate with

10   that.  Thank you very much and thank you for having the

11   interest to attend.

12        Anything else we need to address --

13        MR. TEDDER:  Not for me.

14        THE COURT:  -- before we bring the jury back in?

15   As I've indicated, we will take a recess between

16   witnesses.  Doctor, if you would, I don't know if you

17   want to sit down or stand up whatever.

18        THE WITNESS:  Probably going to be standing up, so

19   I might as well.

20        THE COURT:  Good enough.  Go ahead and bring the

21   jury back in.  Thank you.

22        (The jury entered the courtroom.)

23        MR. GROLAND:  Your Honor, can I step outside?

24        THE COURT:  Yes.

25   BY MR. PENNYPACKER:

1      Q   I hope that what we have up on the screen now is

2  the CAT scan that was done on August 4th, I believe it is at

3  2:03, which is 2:00 in the morning?

4      A   I think it was in the morning but I'm not sure, I

5  honestly don't remember.

6      Q   Is this the CAT scan the series of imagines that

7  would have been from August 4th of 2000 for Robbie Quirello?

8      A   I believe so, yes.

9      Q   I'm going to walk through a couple of the frames.

10  We're about midway, is this way?

11          MS. SINGER:  Your Honor, could we lower the lights

12      a little bit?

13          THE WITNESS:  No.  You're pretty close to the top

14      of the head.

15          THE COURT: Mr. Clerk, could you please turn off

16      the lights over the jury box again, please?

17          MR. TEDDER:  Your Honor, could I ask that we move

18      the podium, please?

19          MS. SINGER:  Yes, I'll move it.

20          MR. TEDDER:  Thank you.

21          THE WITNESS:  You see this area where there's no

22      bones here, that's the fontanelle, that's the soft spot

23      on the top of the head.

24          MR. PENNYPACKER:  As we go up, we do this, Doctor,

25      if you'll look down at the bottom area here?

1    MS. SINGER:  Do you have the laser pointer?

2    MR. PENNYPACKER:  No.

3    MS. SINGER:  Perhaps the doctor will allow you to

4    use the laser pointer.

5    THE WITNESS:  Yeah, here, use this, sure.

6    BY MR. PENNYPACKER:

7    Q    This area right here, Doctor, what is that

8    (indicating)?

9    A    That is a cortical sulcus with a little bit of

10   blood in it.

11   Q    That's inside the brain, is it not?

12   A    No, it's outside the brain.  This is -- the brain

13   has gyri and sulci.  Gyri, it's like furrows in a field, gyri

14   are the hump, sulci are the valleys.  And if you look at the

15   surface of the brain, it sort of looks like cauliflower.

16   Those are, those are the convolutions of the brain.  It's a

17   way of saving space.  It's a very good way of saving space.

18   It's an extremely efficient way of saving space.

19   Q    Where is that on the head?

20   A    That would be, let's see, that would be back

21   behind, well behind the vertex, probably close to the

22   parietal occipital junction, so it would be right about here

23   (indicating), and I can draw you a diagram if you want.

24   Q    That's all right.  Right up here, top right side of

25   the head (indicating)?

1   A    Yes, at the midline.

2   Q    And if our radiologist said that that is inside the

3   brain, he's incorrect; is that right?

4   A    All I can tell you is that the gyri and sulci are

5   right there.  And why don't -- let's see, if that were inside

6   the brain, it should not look like that.  If it were inside

7   the brain, what you would expect to see is this hemorrhage

8   would be rounded like this (indicating), because what's

9   happened is that you have disrupted part of the brain.  And

10  when you have a contusion, for instance, if that's what the

11  radiologist thinks that it is, if it's a contusion, it's a

12  bruise on the surface of the brain and it looks just like,

13  it's like a black and blue mark.  And blood in that area will

14  tend to start out locally and then diffuse outward.  And you

15  don't see that here.  You see a sharply demarcated area just

16  as if it were in the sulcus of the brain, the cortical

17  sulcus.

18  Q    If the radiologist said that's a laceration, he's

19  incorrect also?

20  A    Correct.  I would very definitely disagree with

21  him, and for another reason too.  In order to get a

22  laceration there, a laceration is a cut, in order to get a

23  laceration there, you're going to have to have an impact

24  right there, and there's no evidence of impact in that part

25  of his head.  So, yes, I would very definitely disagree with

1   that.

2      Q   Do you agree or disagree that cerebral cortical

3  contusions are evidence of impact?

4      A   I do, but I don't think that's a contusion.

5      Q   This was not present on the first two scans, was

6  it?

7      A   I don't recall.  That's right, I think it was not.

8      Q   So it developed 24, 48 hours into the child's

9  course of stay in the hospital, correct?

10     A   Two days later, yes.  And, again, if it were a

11  contusion, I would have expected to see something in the

12  first scan.

13     Q   That's all of this.  Thank you, Doctor, if you

14  could take the stand again, please, sir?

15     A   Sure.

16     Q   Doctor, you mentioned that in the autopsy photos

17  you were looking at blood clots; is that right?

18     A   Yes.

19     Q   And you said those blood clots could have been from

20  seven days to seven weeks old; is that right?

21     A   No.

22     Q   You didn't say that?

23     A   I don't believe so.  Today.

24     Q   That had to have been less than seven days old,

25  right?

1       A      Yes.

2       Q      So we know it occurred sometime between or on

3    August 2nd and were present at autopsy, correct?

4       A      Yes.

5       Q      You don't have any evidence that Dr. Hamilton had

6    washed off any clots, do you?

7       A      I -- let's look at the report.  He says lightly

8    adhering clots in the subdural spaces.  Now, the only way

9    you're going to find out if they're adherent is if you try to

10   unadhere them, meaning move them.  So obviously if they're

11   adherent, that means he tried to do that.  Usually what

12   happens with pathologists, and the only reason I can say this

13   is because I've seen it, when the brain is removed, they'll

14   try to irrigate the surface of the brain if there's a

15   subdural there to see if it washes off.

16      Q      There's no evidence that Dr. Hamilton washed this

17   off before he sent it off to Dr. Nelson for examination, is

18   there?

19      A      Or didn't, that's right.  But what he says here is

20   lightly adherent.

21      Q      That would be consistent with a seven day old

22   injury?

23      A      That would be consistent with a subdural that's

24   beginning to organize, which means that it's several days

25   old, not necessarily seven, the number, but several days old.

1    Q    Let me read you a paragraph or some sentences from

2    Dr. Duhaime's article and tell me if you agree with this,

3    okay?

4    A    Which article?

5    Q    Dr. Duhaime's.  I think you may have referred to it

6    as Dr. Gennarelli and Dr. Tibualt's 1987 study, Journal of

7    Neurosurgery.

8    A    Yes, the shaken baby syndrome biomechanical study.

9    Q    Clinical, pathological and biomechanical study?

10   A    Yes.

11   Q    Values above certain critical limits result in a

12   particular type of injury, such as concussion, subdural

13   hematoma or diffuse axonal injury; do you agree with that?

14   A    Yes, that's what we said.

15   Q    When such occur the scales for the brain mass of an

16   infant the size of our models, we can be seen that the

17   angular deceleration and velocity associated with shaking

18   occurs well below the injury range of the values for impacts

19   span concussion subdural and diffuse axonal injury ranges,

20   correct?

21   A    That's correct.

22   Q    This was true for all neck conditions with and

23   without skulls, correct?  This is true for all neck

24   conditions with and without skulls, correct?

25   A    With and without skulls?

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1       Q       Yes, sir.

2       A       I don't recall her saying that.

3       Q       Do you recall her saying this, a padded surface

4   decreases the magnitude of acceleration and lengthens the

5   time course to some extent but these impacts also fall in the

6   injury range?

7       A       Yes.   In other words, the padded surface did not

8   influence the fact that they could exceed the injury

9   thresholds.

10      Q       A padded surface like a bed?

11      A       I think they used a bar with padding on it.

12      Q       This is Dr. Duhaime's conclusion, and tell me if

13  you remember this:   It's our conclusion that the shaken baby

14  syndrome at least in its most severe acute form is not

15  usually caused by shaking alone.   Although shaking may in

16  fact be a part of the process, it is more likely that such

17  infant suffers blunt impact; you agree with that, correct?

18      A       Yes, I do.

19      Q       The most common scenario may be a child who is

20  shaken, then throw into or against a crib or other surface,

21  striking the back of the head, and thus undergoing a large

22  brief deceleration.   This child then has both types of

23  injury, impact with its resulting focal damage, and severe

24  acceleration and deceleration affects associated with impact

25  causing sheering forces on the vessels and parenchymal,

1   correct?

2       A    Right, but the operative words there are impact

3   with its focal damage.  What she's talking about there is the

4   impact of the scalp, and you don't have that here.

5       Q    Right up here on the head, correct, Doctor?

6       A    Right.

7       Q    You didn't see any vomit in the crib, did you?

8       A    I wasn't there.

9       Q    No vomit on the floor?

10      A    I thought there was a statement that there might

11  have been vomit on the floor.

12      Q    No vomit on the floor at the end of the bed where

13  the child was allegedly wedged correct, doctor?

14      A    I don't recall.

15      Q    He must have swallowed it then; is that right?

16      A    No.

17      Q    You would agree that he did not aspirate because of

18  being wedged into the bed and the mattress, correct?

19      A    I would think not.

20          MR. PENNYPACKER:  That's all the questions I have.

21          THE COURT:  Any redirect?

22          MR. TEDDER:  Yes, ma'am.

23                  REDIRECT EXAMINATION

24  BY MR. TEDDER:

25      Q    Dr. Uscinski, the state attorney asked you how many

1    children you've operated on in the last year.  How many

2    children would you estimate you've operated on over the

3    course of your career as a neurosurgeon?

4        A    Oh, a few thousands.  As I said, I did all the

5    pediatric neurosurgery for Georgetown for a ten-year period,

6    and we got all the kids from just about everywhere.

7        Q    How many, over a thousand?

8        A    I would say so, yes.

9        Q    Is that all brain surgery or does it also include

10   other surgery?

11       A    The majority of it in children would be brain

12   surgery.  There was a fair amount of spinal surgery, some

13   children have spinal birth defects; and a smattering, I

14   think, of peripheral nerve surgery also.

15       Q    Now, the state attorney, of course, pointed out to

16   you, you did not see Robbie Quirello or treat him personally.

17   What is your opinion in this case based on?

18       A    My opinion is based on the available medical

19   information and my own knowledge.

20       Q    Now, every child you've described in your direct

21   examination cortical caudal development -- I think I have

22   that correct.

23       A    Cranial caudal development.

24       Q    Cranial caudal development.  Excuse me.

25       A    Actually, the other one is okay too, but cranial

1   caudal development is the recognized one.

2      Q   And that indicates that the child's developing as

3   downward, from the brain down?

4      A   Yes.

5      Q   Even as a child one day learns to walk a child also

6   one day learns to roll over?

7         MS. SINGER:  I'm going to object to the form of the

8         question, Your Honor, leading.

9         THE COURT:  I'm sorry, I didn't hear that question.

10  BY MR. TEDDER:

11     Q   Would you agree, Doctor, that at some in point

12  every child learns to roll over?

13        THE COURT:  The objection would be overruled.

14        MS. SINGER:  No objection to that question, Your

15        Honor.

16        THE COURT:  All right.

17        THE WITNESS:  Whether you use the word learn or

18        begins to, because their nervous symptoms develops to

19        that point, yes, they do.

20  BY MR. TEDDER:

21     Q   And when that begins is at different times for

22  different kids?

23     A   Sure.

24     Q   No predicting when that day will be?

25        MS. SINGER:  I'm going to lodge an objection to the

1    form of the question, Your Honor, leading.

2  BY MR. TEDDER:

3    Q    Can you predict when that would happen from child

4  to child?

5    A    No.

6    Q    And the evidence that you're aware of is that this

7  child was beginning some, beginning to be able to move either

8  front to back or back to front?

9    A    Right.

10    Q    That's the beginning process, is it not?

11    A    Right.

12    Q    Now, you testified in your cross-examination about

13  how if a CAT scan had been done with contrast you'd be able

14  to see the different layers, I believe.  Can you explain to

15  the jury what a scan contrast is?

16    A    Sure.  I mentioned it earlier in the day.  You can

17  give a patient a medium, a chemical that flows through the

18  blood vessels and tends to congregate in places where blood

19  vessels are concentrated, that's a contrast agent.  And since

20  the membranes of subdurals are very vascular structures, the

21  contrast agent is going to tend to concentrate there.  And so

22  what you will see is at certain parts of the dura will become

23  brighter with the injection of the contrast agent.  That's if

24  there's a neomembrane there, which I think there is.

25    Q    Now, the state attorney was questioning you about

1   Dr. Nelson's report regarding cerebral contusions.  You still

2   have his report in front of you on Dr. Nelson's microscopic

3   examination?

4        A    Yes, I do.  Dr. Nelson's report?

5        Q    He actually wrote two letters to Dr. Hamilton, I

6   believe one September 18th, 2001; one October 23rd of 2000?

7        A    I don't think I have that one.

8        Q    You should.

9        A    September 18th and October 23rd, yes.

10       Q    Yes.  Now, the September 18th letter, what does

11  that letter refer to, as far as Dr. Nelson's examination of

12  this brain?

13       A    I'm missing the question.  What did it refer to?

14       Q    I'm sorry.  Is that the letter dealing with his

15  gross examination of the brain?

16       A    Yes.

17       Q    And explain to the jury what a gross examination of

18  the brain is?

19       A    A gross examination of the brain is simply looking

20  at it with the naked eye.  You look at its contours, look at

21  its structure, you look for deformity, you look at the

22  anatomy, and you may and should take sections of it.  What

23  you literally do is take a special knife that cuts through

24  the brain and you take sections through the brain and you

25  look at these sections individually.  In a manner very

1    similar to what you see on a CT scan, only at a different

2    angle.  You usually take the cuts from front to back, and

3    that allows the pathologist to look inside the brain for any

4    disease or deformity or destruction of the internal

5    structures.

6        Q    Does he mention anything in his gross examination

7    about seeing cerebral contusions?

8        A    I'm looking at the 18th of September letter?

9        Q    Yes, sir.

10       A    There were no identified cerebral cortical

11   contusions.

12       Q    Now, turn to his letter of October 23rd.  Does that

13   refer to the microscopic examination?

14       A    Yes.

15       Q    And he mentions, you've testified earlier in

16   cross-examination, that he contradicts himself regarding what

17   he observed microscopically on the cerebral contusions?

18       A    As I read it, yes.

19       Q    Would you explain to the jury again what your

20   interpretation is?

21           MR. PENNYPACKER:  I think explain again is

22       repetitive testimony.

23           THE COURT:  Sustained.

24   BY MR. TEDDER:

25       Q    The state attorney talked to you about if a

1    subdural hematoma put pressure on the brain that it would

2    cause the brain to shift, cause the midline to shift?

3        A    Yes.

4        Q    Did you see any evidence of that in this case at

5    all?

6        A    No.  No.  He had bilateral subdurals, he had

7    subdurals on both sides.  So if you've got one on one side

8    and one on the other side, you might not see a shift.

9        Q    The state attorney was asking you about different

10   portions of the brain and how the different tissue and when

11   they move around how they interreact or interact, I should

12   say.  Can you explain to the jury how the different parts of

13   the brain interact with motion?

14            That's a difficult question.

15       A    We don't have a lot of time.  You don't have that

16   many years.  I'll try to answer some of it.  The brain does

17   move inside the head.  The brain floats in and is surrounded

18   by cerebral spinal fluid.

19       Q    Is that in the subarachnoid space?

20       A    Yes, it's in the subarachnoid space.  And the brain

21   is capable of a certain amount of motion inside the head and

22   with impact the brain will move.  Nobody's ever seen it

23   happen but we know it has to.

24            The same Dr. Ommaya who did some of this research

25   actually took a piece of skull out of a monkey and took the

1   dura off so you could see the brain, put a portion of plastic

2   called Lexan, which is completely visible, and inert,

3   chemically inert, in place of the skull and he was actually

4   able to move the animal's head around and you could see the

5   brain moving around inside the skull through the calvaria.

6   However, this is normal movement, and it's supposed to be

7   able to do that.  And the cerebral spinal fluid around the

8   brain buffers it and prevents it from sloshing back and

9   forth.  You can't have sloshing inside the head.  You only

10  have sloshing when you have an interface between two fluids,

11  like, for instance, air and water.  So while there is

12  movement, it's normal movement, it's not excessive movement.

13          It's only when you have very, very rapid

14  deceleration, it's the kind of decelerations that you see, as

15  I said, with an impact, that you may have movement where the

16  brain is impinged against the side of the skull or the base

17  of the skull or the surface of the skull, and you get those

18  kinds of contusions or bruises, or there is a blow to the

19  skull where the skull is bent inward or fractured, in which

20  case the impulse is transmitted to the brain, you get a local

21  contusion that way.

22      Q   Now, the state attorney asked about the tethers in

23  your direct testimony.  Are the --

24          MR. PENNYPACKER:  Your Honor, I'm going to object.

25  I think his answer was he didn't discuss that on his

1    direct testimony.

2            MR. TEDDER:  Your Honor, can we approach the bench?

3            THE COURT:  We don't need to.  You may complete

4    your sentence, Mr. Tedder, and then I'll see if there's

5    an objection.

6    BY MR. TEDDER:

7    Q    Are bridging veins attached in any way?

8    A    Oh, yeah, they're attached.  They're attached to

9    the brain and they're attached to the dura.

10   Q    Would you refer to that as being tethered?

11   A    I wouldn't refer to it as tethering, it's

12   communication, but there is a certain amount of slack with

13   the veins.  They're movable.  If it's a tether, it's a long

14   one.

15   Q    The state attorney questioned you about the

16   different portions of the brain, again, and their different

17   densities.  Can you briefly tell the jury how the different

18   tissues in the brain are different?  I know there's a lot of

19   different parts of the brain.

20   A    Well, the densities are miniscule, and for

21   practical purposes not relevant.

22   Q    What do you mean the densities are miniscule, you

23   mean the differences?

24   A    The differences in tissue densities, yeah, they're

25   miniscule.  The brain is almost the density of water, and all

1   the other structures around it likewise, almost the density

2   of water, which is why the brain will float in the media.  It

3   is not possible with the capabilities that we have today to

4   see microscopic movements within the brain itself.

5        And as I said earlier, the research, or mentioned

6   earlier, the researchers that were doing this work in the

7   1960s knew that, and realized they couldn't do it, but it

8   really didn't matter, because what they were interested in is

9   whether or not --

10        MR. PENNYPACKER:  I'm going to object.  This is not

11        responsive to the question.  He asked him about the

12        densities.

13        THE COURT:  The objection is overruled, you can

14        continue, Doctor.

15        THE WITNESS:  What they were interested in was not

16        how the brain moves relative to the various structures

17        inside the skull but what it takes to take this whole

18        mass together, with all its different densities, and

19        make a concussion or a subdural.  The way we know that

20        happens is with an injury.  So they injured the brain.

21        They injured the head.  And they assumed that whenever

22        they reached the injury thresholds, whatever was

23        happening to those densities was going to pass the

24        normal realm and move into the pathologic realm.  Which

25        how do we know that?  The patient got a concussion, the

1    patient got a subdural.  So you don't really have to

2    know the exact numbers.  What you have to look at is the

3    outcome.  It's a difficult concept, I just hope I'm

4    making it clear.

5       Q    What is diffuse axonal injury, Doctor?

6       A    Diffuse axonal injury is a term that was first used

7    in the early 1970s by some researchers who were studying the

8    mechanisms of head injury; one of them is same Dr. Gennarelli

9    and the same Dr. Tibualt also who have been mentioned

10   earlier.  And diffuse axonal injury is a term that is used to

11   describe the very rapid, again, acceleration injury to the

12   brain where the injury threshold is not only reached but is

13   present throughout the brain.  So the affects of this very

14   rapid acceleration or deceleration -- deceleration is nothing

15   more than an acceleration with a negative sign in front of

16   it.  These very rapid decelerations cause injuries throughout

17   the substance of the brain.  And when you see diffuse axonal

18   injury, patients are immediately very, very sick and they

19   don't survive.  And when you look at this kind of an injury

20   on a scan, you see little tiny hemorrhages scattered

21   throughout the substance of the brain.  That was not the case

22   here.

23      Q    Now, the three different kinds of brain injury that

24   was studied in Tibualt, or I guess Duhaime study, the

25   concussion, subdural hematoma, diffuse axonal --

1    A    Right.

2    Q    -- which is the most severe versus the least

3    severe?

4    A    Diffuse axonal injury is the most severe and that's

5    the one that requires the greatest amount of energy, greatest

6    amount of force.

7    Q    Okay.  You referred to the PETA people not allowing

8    further experimentation.  Who are the PETA people?

9    A    People for the Ethical Treatment of Animals.

10   Q    Have they managed to prevent any further

11   experimentation with Rhesus monkeys?

12   A    Oh, yes.

13   Q    Now, the state attorney questioned you about a

14   pilot being killed with the g force of 4.  Can you explain to

15   the jury why, or what a g force of 4 or what happens to a

16   pilot when the g force gets too high?

17   A    Depends on the circumstances.  A g force is the

18   force of gravity is increased by 4.  So it would be as if you

19   were carrying three people your equal weight, pretty heavy.

20   What happens when G forces are applied depends on the

21   direction of the forces.  And pilots usually get in trouble

22   when they're pulling G forces, that is that are resulting in

23   blood being pulled away from the head, pulled away from the

24   brain.  In other words, if they were in an airplane, they're

25   taking a dive, and then coming out of a dive, and they're in

1    the heads-up position, not the heads-down position, and when

2    that happens, the force of gravity literally pulls blood out

3    of their head and their blood pressure is not high enough and

4    their cardiac output is not effective enough to push blood

5    back up.  So what happens to them is they pass out and they

6    may not regain consciousness, which is why what a g suit is.

7    When pilots wear the g suits, what these suits do is act like

8    balloons against their legs and their torsos to prevent blood

9    from pooling down below and to keep it up high so that it's

10   easier for them to maintain their cardiac output.

11       Q    If the pilot manages to regain consciousness before

12   crashing, would he have brain injury?

13       A    I'm sorry?

14       Q    If the pilot manages to regain consciousness when

15   something like this happens, before the plane commanding

16   crashes, would he have brain injury?

17       A    Depends on whether he gets control of the plane, I

18   would think.

19       Q    I mean if he doesn't crash.

20       A    Right.

21       Q    Would just passing out cause you a brain injury?

22       A    No, you have to be deprived of oxygen for about

23   four minutes.  You could pass out and not get blood flow to

24   your brain for four minutes.

25       Q    Okay.  Now, you indicated that you can't find --

1  maybe I misunderstood you about not finding subarachnoid

2  hemorrhaging.  Can you explain to the jury again, will blood

3  clot in the subarachnoid space?

4      A    No, it usually doesn't clot in the subarachnoid

5  space because it's mixed with cerebral spinal fluid.

6  Actually that picture that was shown, the CT scan that was

7  shown just a little while ago with the blood in the cortical

8  sulcus, that might have been blood in the subarachnoid space.

9  And that actually could even be the blood that was seen in

10 the autopsy in the subarachnoid space.

11     Q    The state attorney asked you about gyri and sulci,

12 I guess it is, in the brain?

13     A    Yes.

14     Q    Can you explain to the jury what that is?

15     A    Yeah, they're the folding that you see on the

16 surface of the brain.  Well, you haven't seen the brain.  It

17 looks, the brain looks like cauliflower, it's got little

18 bumps and little ridges and little furrows, kind of like

19 furrows in a plowed field.  And the out-pouches are called

20 gyri and the in-foldings are called sulci and is a very,

21 very, very efficient mechanism for reducing the surface

22 volume of the brain to a manageable amount.

23          Think about it this way.  If you took all the

24 neurons on the surface of the brain and you laid them out one

25 next to the other, you would more than encompass this

1    courtroom.  If you want to encase that in bone and protect

2    it, that would be a pretty heavy head.  On the other hand, if

3    you took it and folded it all together like crumpling up a

4    piece of paper, you wind up having exactly the same surface

5    area but in a much smaller space.  And not only that, but the

6    neurons that have to communicate with each actually have a

7    lot less distance to travel.  So it's a really, really

8    efficient system.

9         All you have to do is get a mental picture.  Take a

10   large piece of paper, crumple it up into a small ball.

11   You've got the same molecules on that paper but now they're a

12   lot closer together.  That's the gyri and sulci on the

13   surface of the brain.  That's the thing that enables us to

14   lift our head up and not be pulled down to the ground.

15   That's what makes us human.

16       Q    You indicated earlier in the state attorney's

17   cross-examination that perhaps you could draw a diagram to

18   show the sulcus -- the questions he was asking about the

19   cortical sulcus.  Would you like to do that, Doctor?

20       A    Sure.

21            MR. TEDDER:  Set this chart up, Your Honor, just

22       briefly.

23            THE COURT:  Yes.

24            MR. TEDDER:  Let me hold it for you.

25            MS. SINGER:  There should be a piece there.

1    THE WITNESS:  You know what I think, somebody did

2    this with a string, because there's a hook in two places

3    here.

4         MS. SINGER:  That's not ours.

5         THE WITNESS:  This is not in my job description.

6         MR. TEDDER:  Doctor, I'll hold it for you.  How is

7    that?

8         MR. PENNYPACKER:  Can I move where I can see the

9    drawing?

10        THE WITNESS:  That's not the bad news.  The bad

11   news is I didn't get the art gene in the family, my son

12   did.

13        That's the brain.  This would be the frontal lobe,

14   this would be the parietal lobe, this would be the

15   occipital lobe, this is the temporal lobe.  And you have

16   little foldings on the brain that look sort of like this

17   (indicating), and some back here.  Okay.  It's folded

18   over on itself many, many, many times over.  If you took

19   this part of the brain here and looked at in cross

20   section, it would look like this (indicating).  And then

21   it would be another frontal lobe on the other side like

22   that.  This neuro tissue is all folded over on itself,

23   and actually much more folded over on itself than you

24   see right here.

25        The net effect is that you take all these neurons

1    that are on the surface of the brain and you fold them

2    up into a lot smaller surface area, which allows it to

3    fit inside a skull, which allows you to pick your head

4    up.  Otherwise, you're going to have the sulcus

5    surrounding this whole thing.  So this is nature's way

6    of making an efficient system.  The neurons over here

7    have to communicate with the neurons over here.  And

8    when they do it this way, they don't have to travel as

9    far.  By the same token, cerebral spinal fluid has to

10   surround this and bone has to surround this.  The amount

11   of bone that would have to surround this quantitatively

12   is a lot less than the amount of bone that has to

13   surround that, given the same thickness of the bone in

14   the two instances.

15   BY MR. TEDDER:

16        Q    Doctor, lastly, the state attorney was questioning

17   you about the Duhaime study and the language that she

18   included in there regarding the throwing against a crib.  You

19   mentioned something about the impact had to be focal contact.

20   What did you mean again by that?

21        A    I'm sorry?

22        Q    I'm sorry.  The last question they asked you on

23   cross-examination regarding the Duhaime paper, the one in

24   '86?

25        A    Yes.

1  Q    You responded, I believe, something to the effect

2  of maybe some more focal contact or something?

3  A    Yes, the focal contact.  You have a focal injury

4  when the head strikes the crib, or whatever the surface is

5  that the head is striking against.  If you're going to have

6  that kind of a focal injury, you would expect to see

7  something on the skin also.  If you've got enough force to

8  injure the brain, you've got enough force to injure the skin.

9  Q    We don't see that in this case?

10  A    Right.

11  MR. TEDDER:  I don't have any other questions.  Oh,

12  wait, I forgot.

13  MR. GROLAND:  Just one moment, Your Honor.

14  MR. TEDDER:  We don't have any other questions,

15  Your Honor.

16  THE COURT:  May Dr. Uscinski be released or does he

17  need to remain available for any reason?

18  MR. PENNYPACKER:  He can be released, Your Honor.

19  MR. TEDDER:  Yes, ma'am, he can certainly be

20  released.

21  THE COURT:  Thank you, Doctor, you're free to go.

22  We will take a recess at this time, ladies and

23  gentlemen, and anybody that wants to go downstairs for a

24  few minutes will be escorted.  So we'll take a 15 minute

25  recess.

1    MR. TEDDER:  Fifteen minutes, Your Honor?

2    THE COURT:  Yes, sir.

3    (A recess was taken.)

4    MS. SINGER:  Your Honor, in order to facilitate a

5    smooth direct examination of Helen Legall, the next

6    witness, the state would ask at this time to be able to

7    do the proffer of the two separate times that

8    Mr. Herlihy was Mirandized --

9    THE COURT:  Go ahead.

10   MS. SINGER:  -- to show the Court the voluntary

11   nature of that.  If we could have Helen Legall please

12   step up.

13   Mr. Clerk, there is several forms that were entered

14   into evidence in the suppression hearing.

15   THE CLERK:  Please raise your right hand.

16   (The witness is duly sworn by the clerk.)

17   MS. SINGER:  Your Honor, may I approach the clerk?

18   THE COURT:  Yes.

19   MS. SINGER:  I'd like to have this marked as the

20   next state's exhibit for identification, please.

21   While that is being marked for identification, Your

22   Honor, I'd like the record to reflect that before trial

23   a motion to suppress certain statements was heard and

24   the Court ruled that statements made by Brian Herlihy

25   between 1:20 P.M. and 3:55 P.M. on August 2nd, the year

1    2000 were otherwise admissible and we don't need to lay

2    a proffer for those statements at this time, since

3    there's been a pretrial ruling.

4        This proffer will only pertain to the post-Miranda

5    statements that were made at 1555 hours or 3:55 P.M. on

6    August 2nd, the year 2000; and then the later statements

7    that were made at 2255 hours on August 3rd, 2000.  And

8    I'm just going to go directly to these statements if I

9    might, Your Honor.

10        THE COURT:  Go ahead.

11        MS. SINGER:  Understanding the Court's already

12    heard much of the testimony prior to that.

13        THE CLERK:  That was State's Exhibit K, Your Honor.

14        THE COURT:  Thank you.

15        MS. SINGER:  One more thing, Your Honor.  As to the

16    initial Miranda rights waiver form, it was in fact

17    entered into evidence in the suppression hearing

18    pursuant to testimony, and it was previously marked as

19    Exhibit 3.  This would not be appropriate now that we're

20    at trial.  So I'm going to ask that it be marked as the

21    next numbered exhibit into evidence, since it's already

22    been authenticated for the Court.

23        MR. GROLAND:  No objection.

24        THE COURT:  Good enough.

25        MS. SINGER:  And I would suggest we just place the

1    sticker over the original one so there will be no

2    prejudice to the jury as far as when this came into

3    evidence.

4         MR. GROLAND:   That's fine.

5         THE COURT:   Good enough.

6         THE CLERK:   State's 71, Your Honor.

7         THE COURT:   Thank you.

8         (State's Exhibit No. 71 was moved and admitted into

9    evidence.)

10   WHEREUPON:

11                 DETECTIVE HELEN LEGALL,

12   called as a witness herein, having been first duly sworn, was

13   examined and testified as follows:

14                    DIRECT EXAMINATION

15   BY MS. SINGER:

16       Q    Investigator Legall, for the record, would you

17   please state your full name and occupation?

18       A    Helen Legall, I'm a detective with the City of

19   Gainesville Police Department.

20       Q    How long have you been so employed?

21       A    A little over 16 years.

22       Q    Were you employed on August 2nd, the year 2000?

23       A    Yes, I was.

24       Q    At that time were you assigned to a case involving

25   the serious injury and then fatal death of Robbie Quirello?

1    A    Yes, I was.

2    Q    And during that time period did you come into

3 contact with one Brian Herlihy?

4    A    Yes, I did.

5    Q    Do you see him here today in the courtroom?

6    A    I do.

7    Q    Where is he sitting and what is he wearing?

8    A    He's sitting at the defense table.  I can't really

9 see his jacket.  He's standing up.  It's a grayish color

10 suit.

11        MS. SINGER:  Let the record reflect the witness has

12        identified the defendant.

13        THE COURT:  It will so reflect.

14 BY MS. SINGER:

15    Q    In that time did you first speak with Mr. Herlihy

16 for some period of time between 1:20 P.M. and 1555 or

17 3:55 P.M.?

18    A    Yes, I did.

19    Q    And after that time did he become a focus of your

20 investigation due to other information you were provided?

21    A    Yes, he did.

22    Q    And once he became a focus of your investigation,

23 did you provide him with his Miranda rights pursuant to

24 written form?

25    A    Yes, I did.

1      Q   I show you what's been marked as State's Exhibit 71

2   into evidence and ask you to look at this particular item.

3   Do you recognize it?

4      A   Yes, I do.

5      Q   And what is it, ma'am?

6      A   It's a Miranda waiver form that we use at the

7   Gainesville Police Department.

8      Q   Was that the Miranda rights waiver form that was

9   used when you interviewed Brian Herlihy on the 2nd at

10  approximately 1555 P.M.?

11     A   Yes, it is.

12     Q   And if you would, please, tell the Court how you

13  advised Mr. Herlihy of his rights.

14     A   Well, what I initially do is start off with asking

15  him his name, his personal information, his address, his

16  phone number.  I put the date and time that I started the

17  Miranda waiver form, the case number of the incident that I'm

18  investigating, and then I write in the person's name that I'm

19  talking to, who is Brian Herlihy.  You are, and then there's

20  two little sentences, one says under arrest and not under

21  arrest.

22     Q   And in this particular case what did you circle?

23     A   Not under arrest, and I scratched out under arrest.

24     Q   And was that because he was not under arrest at

25  that time?

1    A    That's correct.

2    Q    He was merely the focus of the investigation?

3    A    That's correct.

4    Q    So after you did that, what else did you do in

5    advising him of his rights?

6    A    Then I read this Miranda form to him.  Do you want

7    me to read it?

8    Q    Did you read it verbatim?

9    A    Yes, I did.

10    Q    And after you would read each paragraph verbatim,

11    did you ask him for a response?

12    A    Yes, I did.

13    Q    Why don't you go ahead and tell us, go ahead and

14    read it into the record, please.

15    A    It says Brian Herlihy, which is what I wrote, you

16    are not under arrest, which is what is circled, charged with,

17    and it says NA for not applicable, because he wasn't charged

18    with anything.  Before we ask you any questions you must

19    understand what your rights are.  You have the right to

20    remain silent.  You are not required to say anything or

21    answer any questions.  Anything that you say can and will be

22    used against you in court.  Then there's a question, do you

23    understand that, with a line.  Mr. Herlihy wrote yes.  And

24    there's a signature block, and then Mr. Herlihy signed his

25    name.

1      Q    Go ahead to the next paragraph, please.

2      A    The next paragraph is you have the right to talk to

3   a lawyer for advice before being questioned and you have the

4   right to have him with you while you are being questioned.

5   If you cannot afford to hire a lawyer, one will be provided

6   for you.  Again, it says do you understand that.  Again,

7   Mr. Herlihy wrote yes.  And, again, there's a signature

8   block, and, again, Mr. Herlihy signed his name.

9      Q    Go ahead.

10     A    The next paragraph is, if you want to answer

11  questions now without a lawyer present, you still have the

12  right to stop answering at any time.  You also have the right

13  to stop answering at any time you want to talk to a lawyer.

14  Again, it says do you understand that.  Again, Mr. Herlihy

15  wrote yes.  There is a signature block again, and again

16  Mr. Herlihy signed the signature block.

17        Then it says, waiver, I have read or had read to me

18  that statement of my rights as stated above.  I understand

19  what my rights are.  I am willing to answer questions and

20  make a statement.  I do not want a lawyer at this time,

21  although I understand that I can have one.  No promises or

22  threats have been made by anyone to cause me to make a

23  statement, and I've not been mistreated or harmed by anyone

24  to cause me to make a statement.  And I asked him if he

25  agrees with that, then I need him to sign his name again,

1    which he did.

2         Q    Were his signatures witnessed by anyone?

3         A    Detective Coleman.

4         Q    And did you also witness those signatures?

5         A    Yes, I did.

6         Q    During any time when you advised Mr. Herlihy of his

7    rights, did he ask to have a lawyer present?

8         A    No, he did not.

9         Q    Did he at any time prior to the advising of his

10   rights, or after he was advised of his rights and he spoke

11   with you, did he ask to have a lawyer present?

12        A    No, he did not.

13        Q    Did you force or coerce or threaten him in any way

14   to make him sign this particular document, State's Exhibit

15   71?

16        A    No, I did not.

17        Q    Did you promise him anything for the signatures on

18   this document?

19        A    No, I did not.

20        Q    Did he appear to be under the influence of drugs,

21   intoxicants, alcohol, or any substance that would have caused

22   him to not understand what was said on this form and what he

23   executed?

24        A    No.  And actually there is a block that he filled

25   in saying that he wasn't under the influence of any alcohol,

1   drugs or medication.

2       Q    He told you his age was 29?

3       A    I have to --

4       Q    You need to look at that?

5       A    It was two years ago.

6       Q    Did he fill in the block that he was 29 years of

7   age?

8       A    He filled in all of these blocks right here

9   (indicating).

10      Q    He told you he had gone to school for 16 years?

11      A    Yes.

12      Q    And you asked him, Do you understand the statements

13  written above, and he wrote in the word yes?

14      A    Yes.

15      Q    And are you presently under the influence of

16  alcohol, drugs and medication, he answered no?

17      A    Correct, and then he signed his name again.

18      Q    After the Miranda rights were given, did you in

19  fact take a statement from Brian Herlihy regarding the events

20  that took place August 2nd, 2000?

21      A    I did.

22      Q    Did there come a time when you taped that

23  statement?

24      A    Yes, I did.

25      Q    Part of the statements were oral and part were

1   taped?

2       A     Yes.

3             MS. SINGER:  Your Honor, at this time we would

4       tender Ms. Legall for cross-examination on this initial

5       Miranda form.  I do have another Miranda form from

6       another day and we can do this one by one.

7             THE COURT:  Any questions?

8             MR. GROLAND:  Yeah, I have a few.

9                         CROSS-EXAMINATION

10  BY MR. GROLAND:

11      Q     Why wasn't the whole thing taped?

12      A     Why wasn't the whole thing taped?

13      Q     Yeah.

14      A     Well, I didn't actually -- normally what we do is

15  we talk to somebody, and at that point he was not a focus of

16  the investigation, so that's why we didn't tape the initial

17  conversation with him.

18      Q     No.  No.  I'm talking about what just happened at

19  1555 where you advise him, you take a taped statement from

20  him?

21      A     Correct.

22      Q     I think your testimony was that some of it was

23  taped thereafter and some of it was not.  My question was,

24  why wasn't the whole statement, after you advised him, taped?

25      A     I didn't think to tape it, Mr. Groland.

1    Q    You didn't what?

2    A    I didn't think to tape it at that point.  I had a

3    witness in the room with me.

4    Q    So in other words, at some point you shut the tape

5    off and then you continue talking to him?

6    A    No.

7    Q    Tell me how it happened.

8    A    Okay.  We read him his Miranda rights and then we

9    went on tape.  And I went over with him on the tape that we

10   had already read him his Miranda rights, and he said that he

11   did on the tape.

12   Q    Then you talked to him?

13   A    Right.

14   Q    Then you shut off the tape?

15   A    We shut off the tape about 26 minutes later.

16   Q    And then you started talking again?

17   A    Well, actually we took a break at that point.  We

18   talked a little bit more to him.  He suggested that we go to

19   his home so he could show us what happened.

20   Q    Listen.  I'm not asking the substance of the

21   conversation.  My question is, after you shut the tape off,

22   you did start talking to him again, correct?

23   A    Correct.

24   Q    Why didn't you turn the tape back on and record

25   that part of the statement too?

1    A    At that point in time -- the initial reason for

2 doing the tape was to get his initial statement as to what

3 happened on tape in case he later changed what he was saying.

4 So, no, we didn't go into any major more detail after that to

5 go back on the tape.

6    Q    Who else was there besides Detective Coleman?

7    A    Detective Coleman was the only one there when we

8 made the tape.

9    Q    And who else was there when you advised him of his

10 rights?

11    A    Detective Coleman.

12    Q    And what was he doing there?

13    A    He was witnessing a Miranda waiver.

14    Q    Had he been in there before when Brian was talking

15 to you for the preceding two and a half hours?

16    A    No.

17    Q    So what was Coleman doing in there at that specific

18 time, did you call him in from somewhere to just witness the

19 Miranda waiver or was he there for another reason?

20    A    No.  The reason he was there was that he had --

21 while I was talking with Mr. Herlihy for -- it wasn't two and

22 a half hours, it was about an hour and a half.  Detective

23 Coleman was doing something else, speaking to other people,

24 which I had not heard the conversations from those other

25 people, so he was familiar with some of the conversations

1   that we were going to need to ask Mr. Herlihy questions

2   about.  So that is why he sat in there, because it was not

3   information that I had.

4        Q    The document, is that the original document?

5        A    Yes, sir.

6             MR. GROLAND:  That's all I have.

7             MS. SINGER:  Your Honor, at this time the state

8        would submit that the statements that were taken or

9        given after the Miranda warnings were given on 8/2 at

10       3:55 P.M. were freely and voluntarily made after

11       Miranda.  And we'd ask the Court to make a finding so

12       that we can proceed and provide those statements to the

13       jury today.

14             MR. GROLAND:  We have no comment.  We just -- I

15       don't think there's an issue about voluntariness, so I

16       don't have any argument to make.

17             THE COURT:  Good enough.  You may use the evidence.

18             MS. SINGER:  Now, may I proceed then to the next --

19             THE COURT:  Yes.

20             MS. SINGER:  -- contact, which we're now going to

21       another day?

22             THE COURT:  But let me just find out, because if,

23       again, since you all have prepared this case for many

24       months, if there's no argument in opposition, there's no

25       point in proffering.  Is there going to be any argument

1    in opposition or objection?

2         MR. GROLAND:  As to this one?

3         THE COURT:  Yes.

4         MR. GROLAND:  That we just talked about?

5         THE COURT:  No.  No.

6         MR. GROLAND:  The next one?

7         THE COURT:  The next one.

8         MR. GROLAND:  I don't know, because I haven't -- I

9    need --

10        THE COURT:  You need to know what she's going to

11   say again?

12        MR. GROLAND:  Well, I've got a pretty good idea

13   what she's going to say, but I think it just needs to be

14   on the record.

15        THE COURT:  No, I'm not going to listen to a

16   proffer when there is no basis to even think that there

17   might be an objection.  If you have no argument in

18   regard to this testimony, then I'm going to let the

19   state put it on.  Having prepared this case for many

20   months, if you believe that this testimony for any

21   reason will be inadmissible, I'll be glad to hear it

22   now.

23        MR. GROLAND:  Well, I think the only issue right

24   now is voluntariness, and I don't have, quite candidly,

25   a position that it wasn't voluntary.

1    THE COURT:  Well, it's up to the jury to determine

2    in part whether or not it's voluntary.  Unless you have

3    an argument that it is not legally admissible in front

4    of the jury, then it's up to them to decide whether or

5    not the statements were actually made and whether or not

6    they were in fact voluntary.

7    MR. GROLAND:  Then I think we can just go forward

8    and have the Court make that finding then.

9    THE COURT:  The Court's not making that finding.

10   It will be a factual --

11   MS. SINGER:  I believe under the law the Court must

12   make a preliminary finding that the statements were made

13   voluntarily.  That's why we're making the proffer.  But

14   I believe outside of the presence of the jury, the law

15   requires a --

16   THE COURT:  That I make a determination that the

17   statements are admissible?

18   MS. SINGER:  That the statements are admissible,

19   correct.

20   THE COURT:  Good enough.  I make such a finding.

21   MS. SINGER:  Just so the record is clear, it's my

22   understanding that Mr. Groland is now stating he has no

23   objection to the August 3rd statements that were taken

24   at 2255 hours?

25   MR. GROLAND:  I'm not saying I have no objection to

1   the statement.  I have a whole lot of issues with regard

2   to that statement.  I'll raise them at the proper time.

3   But as to the specific narrow area of voluntariness, if

4   that's what we're here about --

5        MS. SINGER:  Yes, it is.

6        MR. GROLAND:  -- I do not have an argument to make.

7        THE COURT:  You may object, of course, at any point

8   during the trial.  There simply will not be another

9   opportunity to proffer testimony.  I will rule on

10  objections as they're made.

11       MS. SINGER:  If I could just approach counsel and

12  ask him if you have any objection to the Miranda rights

13  form that was executed at 2255 hours on 8/3, whether or

14  not we can have it admitted into evidence, that will

15  speed things along.

16       MR. GROLAND:  Let me see the other one.

17       MS. SINGER:  Do you have any objection to State's

18  Exhibit K for identification?

19       MR. GROLAND:  No.

20       MS. SINGER:  We'd ask that it be marked into

21  evidence as the next numbered exhibit for the state.

22       THE COURT:  It will be marked into evidence.  It's

23  already been moved into evidence at the hearing?

24       MS. SINGER:  No, ma'am, this is the second

25  statement.

1  THE COURT:  You can mark it into evidence when the

2  jury is here.

3  MS. SINGER:  Oh, okay, you want me to go through

4  the procedure?  All right.  I'll let you hold onto it

5  then.  It's going to be a while before we get to it.

6  THE COURT:  Anything else?

7  MR. TEDDER:  Your Honor, the only thing I would ask

8  we address, as the Court knows we did file a pretrial

9  motion to suppression statements that were made before

10  he was read Miranda.  And I just wanted to ask hopefully

11  the state would be clear on when Detective Legall

12  testifies as to what statement she's testifying about so

13  we can raise the proper objection to the denial of the

14  motion to suppress that statement.

15  THE COURT:  Correct.  I'm sure that the state will

16  be clear in their questions in regard to the date and

17  time each interview was taken so you can make any

18  objections that need to be noted for the record.

19  MS. SINGER:  Yes, Your Honor.

20  THE COURT:  Bring the jury in.

21  (The jury entered the courtroom.)

22  MR. GROLAND:  Excuse me, Your Honor, we just need

23  about another 30 seconds.

24  (Pause in the proceedings.)

25  MS. SINGER:  May I proceed, Your Honor?

1592

1  THE COURT:  Yes.  Detective Legall already been

2  sworn in.  Does she need to be resworn in front of the

3  jury?

4  MS. SINGER:  Yes, please.

5  THE COURT:  Mr. Clerk, would you reswear this

6  witness?

7  (The witness was duly sworn by the clerk.)

8  THE CLERK:  You may be seated.

9  MS. SINGER:  May I proceed, Your Honor?

10  THE COURT:  Go ahead.

11  WHEREUPON:

12  DETECTIVE HELEN LEGALL,

13  called as a witness herein, having been first duly sworn, was

14  examined and testified as follows:

15  DIRECT EXAMINATION

16  BY MS. SINGER:

17  Q  Investigator Legall, if you would please state your

18  full name and your occupation and profession for the record?

19  A  My name is Helen Legall.  I'm a detective with the

20  Gainesville Police Department.

21  Q  And how long have you been so employed?

22  A  A little over 16 years.

23  Q  And are you assigned to a particular unit?

24  A  The detective division.

25  Q  And what are your duties as a detective?

1    A    My duties are to work person's crimes, which

2  include homicides, robberies, the occasional aggravated

3  battery, and the occasional natural death.

4    Q    Taking you back to August 2nd of the year 2000,

5  what unit were you assigned to at that time?

6    A    I was assigned to the person's squad.

7    Q    So your duties were the same back then as well as

8  they are today?

9    A    Yes.

10    Q    Who was your immediate supervisor on August 2nd,

11  year 2000?

12    A    Sergeant Will Halvosa.

13    Q    And his position would be sergeant over a

14  particular group, that would be person's crimes?

15    A    Yes.

16    Q    What would that be called, what do you call the

17  person's crimes unit, is it a squad, unit?

18    A    Well, we call it a squad.

19    Q    Do you recall being called to Shands Teaching

20  Hospital at approximately 10:00 A.M. the morning of

21  August 2nd, year 2000?

22    A    Yes, I was.

23    Q    And do you recall the purpose of being called to

24  Shands at that time?

25    A    Yes, I do.

1      Q      And what was the purpose for being called to

2    Shands?

3      A      It was to investigate an injured child.

4      Q      And what time approximately did you arrive?

5      A      Little bit after 10:00 A.M.

6      Q      Who did you meet when you got to Shands Teaching

7    Hospital at that time?

8      A      I met Mr. Herlihy and Crystal Quirello.

9      Q      You indicated you met a person by the name of

10   Mr. Herlihy, would that be Brian Herlihy, the defendant in

11   this case?

12     A      Yes, ma'am.

13     Q      Do you see him here today?

14     A      I do.

15     Q      And where is he sitting and what is he wearing,

16   please?

17     A      He's sitting on the defense table.  He's the

18   gentleman standing up in the gray suit with the, I guess it's

19   a maroon kind of tie.

20          MS. SINGER:  May the record reflect that the

21        witness has identified the defendant?

22          THE COURT:  It will so reflect.

23   BY MS. SINGER:

24     Q      Did you make contact with Crystal Quirello and

25   Brian Herlihy?

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1    A    Yes, I did.

2    Q    For what purpose did you make contact?

3    A    I made contact to offer them any victims'

4  assistance that they might need, being the caretakers of the

5  child.  We have a victim's advocate that we usually offer up

6  for assistance.

7    Q    At that point was there a criminal investigation

8  pending?

9    A    No, there was not.

10    Q    Why was it that the Gainesville Police Department

11  would send investigative staff to Shands for an injured baby

12  when there was no criminal investigation?

13    A    It's standard protocol to determine that no crime

14  has occurred.

15    Q    And at that time was there a determination made

16  that there was no crime or no evidence of a crime at that

17  time?

18    A    At that time, yes.

19    Q    So from being at Shands Teaching Hospital and

20  having contact with Crystal Quirello and Brian Herlihy, where

21  did you go?

22    A    I went back to the Gainesville Police Department.

23    Q    Did there come a time when you were called back to

24  Shands Teaching Hospital?

25    A    Yes, there was.

1    Q    About what time of day was that?

2    A    It was about 12:15 that same day.

3    Q    And were you actually working with a partner at

4    that time?

5    A    I was with Detective David Cannon.

6    Q    Is he a part of the squad, the person's squad?

7    A    Yes, he was.

8    Q    And did he go back to Shands Teaching Hospital with

9    you?

10   A    Yes, he did.

11   Q    What time did you arrive at Shands?

12   A    It was approximately 12:40 P.M.

13   Q    And at that time did you meet with other officers

14   or members of the Gainesville Police Department?

15   A    Yes, I did.

16   Q    What was the purpose of your return at that time?

17   A    The purpose of my return at that time was the

18   hospital personnel had determined that --

19            MR. TEDDER:  Objection.

20            MR. GROLAND:  Objection.

21            MR. TEDDER:  Hearsay.

22            THE COURT:  Sustained.

23   BY MS. SINGER:

24   Q    Don't tell us what they told you, but tell us what

25   your purpose would have been in return.

1     A     To investigate a criminal incident.

2     Q     When you arrived, do you know who else was there

3  from the Gainesville Police Department?

4     A     Yes, I do.

5     Q     And who was there that you recall?

6     A     My immediate supervisor, who was Sergeant Will

7  Halvosa, Sergeant Larry Seale, who is currently my new

8  supervisor, Detective David Cannon went with me there, and

9  Detective Alan Coleman was there.

10     Q     And after arriving at Shands Teaching Hospital,

11  where did you go?

12     A     I'm not sure I understand.

13     Q     Did you have a meeting of some type?

14     A     Yes, we did.

15     Q     And was that with the personnel from the

16  Gainesville Police Department?

17     A     Yes, it was.

18     Q     Did you meet with any staff at Shands?

19     A     Yes, we did.

20     Q     Do you recall who you met with from Shands Teaching

21  Hospital?

22     A     Yes, I do.

23     Q     Who were those people?

24     A     Dr. Anne Dickinson and a Kevin Putansu.

25     Q     And after speaking with Dr. Anne Dickinson and

1   Mr. Kevin Putansu -- do you know what position Mr. Putansu

2   holds?

3       A   No, I don't.

4       Q   After meeting with those two folks, were you given

5   any tasks or responsibilities from your sergeant, from your

6   supervisor, Will Halvosa?

7       A   Yes, I was.

8       Q   And were you assigned those tasks with another

9   person?

10      A   Yes, I was.

11      Q   And who was that?

12      A   Detective David Cannon.

13      Q   And what was the task that you were assigned to?

14      A   We were assigned to ask Mr. Herlihy, the defendant,

15  to come with us to the Gainesville Police Department

16  voluntarily and speak with us about the events of the day.

17      Q   Where did you see Mr. Herlihy, the defendant in

18  this case, where was he located at the hospital?

19      A   He was sitting outside of the emergency room at

20  Shands Hospital where the ambulances drive in.

21      Q   Under the awing part?

22      A   Yeah, it's under a roof.

23      Q   It's covered?

24      A   Yes.

25      Q   The covered part of the emergency room?

1    A    Yes.

2    Q    And was he with anyone?

3    A    He was standing there with an officer from the

4  Gainesville Police Department.

5    Q    Who was that, do you remember?

6    A    I think his name is Robert King.

7    Q    And when you approached Mr. Herlihy, what exactly

8  did you ask him?

9    A    I asked him if he would be willing to voluntary

10  come back with us and talk at the police department.

11    Q    Did you tell him whether or not there was a

12  criminal investigation at that time?

13    A    I believe that we told him that due to the injuries

14  of the child, we were trying to find out what had happened

15  that day.

16    Q    And what was his response to you when you asked him

17  to voluntarily return to the station?

18    A    He was willing to cooperate with us and come.

19    Q    Did you ask -- did he appear to understand you as

20  you spoke with him?

21    A    Yes, he did.

22    Q    And did you force him, coerce him, threaten him, or

23  in any way make him come back to the station with you?

24    A    No, I did not.

25    Q    Did you promise him anything in return for his

1    going to the station with you voluntarily?

2        A    No, I did not.

3        Q    Did there come a time before you left to go to the

4    station where you asked Mr. Herlihy if you could have consent

5    to enter into his apartment to view his apartment?

6        A    Yes, we did.

7        Q    And could you describe to the jury what you did

8    there?

9        A    At that point, I believe that Detective Cannon

10   actually called another sergeant and told them that he had

11   given us verbal consent to go in.

12       Q    Well, let's talk about the conversation about going

13   into the apartment.  Do you recall specifically what you

14   asked him and what he said back to you?

15       A    Well, I recall that I told him that we're going in

16   there because something potentially happened in the apartment

17   and we needed to process the apartment.

18       Q    Did you ask him or tell him that you were going

19   into the apartment?

20       A    I asked him if we could go into the apartment.

21       Q    And what was his response?

22       A    He was willing to let us do that.

23       Q    And did you force him, coerce him, threaten him, or

24   make him consent to entry into the apartment?

25       A    No, I did not.

1    Q    Did you promise him anything in return for him

2  allowing you to enter into his apartment?

3    A    No, I did not.

4    Q    Did he allow you to go into his apartment

5  voluntarily?

6    A    He allowed other detectives to go in, yes.

7    Q    He gave consent?

8    A    Yes, he did.

9    Q    Did there come -- about what time was it that he

10 had given you oral consent?

11   A    It was about 12:50, around there.

12   Q    About ten to 1:00 --

13   A    Yes.

14   Q    -- in that area?

15        And at that time that oral consent was given or

16 that information was given to other officers?

17   A    Yes.

18   Q    Now, did there come a time around 12:50 when you

19 and Investigator Cannon had Mr. Herlihy execute a written

20 consent to enter into his apartment?

21   A    Yes, we did.

22   Q    And where did that take place, Investigator Legall?

23   A    In Detective Cannon's car.

24        MS. SINGER:  If I may approach the clerk.

25        THE COURT:  Go ahead.

1    MS. SINGER:  I believe we're going to have to mark

2    this for identification, Your Honor, and ask permission

3    to mark it as I indicated we marked the other exhibit.

4         THE COURT:  It will be so marked.

5         MS. SINGER:  I'll show this to Mr. Groland and

6    explain.

7         THE COURT:  Go ahead.

8         (Pause in the proceedings.)

9         MR. GROLAND:  No objection.

10        THE COURT:  Good enough.  Go ahead.

11   BY MS. SINGER:

12   Q    I'm going to show you what's been marked now

13   State's Exhibit L for identification and ask you to take a

14   look at this particular document.  Do you recognize that?

15   A    I do.

16   Q    And what is that?

17   A    This is a consent to search form that we use at the

18   Gainesville Police Department.

19   Q    And is that in fact the consent to search form that

20   you executed with Brian Herlihy on the 2nd day of August,

21   year 2000?

22   A    Yes, it is.

23   Q    And does it appear to be in the same or similar

24   condition as to when you first had it executed on that day?

25   A    Yes, it is.

1    Q    Could you tell the jury how you reviewed that form

2  with Mr. Herlihy before he executed it?

3    A    It says consent to search at the top.  We put our

4  case number on here, and I filled in all of the blanks pretty

5  much, with the exception of my signature on the bottom and

6  Detective Cannon's signature on the bottom, and Mr. Herlihy's

7  signature in the middle.

8         It says, I, Brian Herlihy, which is what I wrote

9  in, give my full consent that my residence located at 1015

10  Southwest 9th Street, Apartment A21, may be searched by the

11  following persons, and I put members of the Gainesville

12  Police Department because at that point in time I didn't know

13  exactly who was doing the searching.  I give this consent

14  freely and voluntarily without compulsion or threat of any

15  kind.  I understand that the above described residence, which

16  I wrote in, cannot be searched without my consent or unless

17  said officers obtain a search warrant for said residence,

18  which is what I wrote in, before making any search.  I

19  further agree that anything or any article that may be found

20  in the search of the above described, and then it has a

21  choice of premises or vehicle, and I scratched out vehicle,

22  because we're searching a premises, may be taken as evidence

23  and used in the trial in any matter of which I may stand

24  accused.  Then it says, signature of person consenting to the

25  search, which Brian Herlihy signed.  The place we were at at

1  the time was Shands ER.  The date was 8/2 of 2000.  The time

2  was 1300, which is 1:00 P.M.  And I witnessed it with my

3  signature and Detective Cannon witnessed it with his

4  signature.

5      Q    Did you actually read this form to Mr. Herlihy?

6      A    Yes.

7      Q    Or did you leave it for him to read?

8      A    No, I read it to him.

9      Q    And was there anything about the execution of this

10 form that suggested that he was forced or coerced or

11 otherwise made to sign this form?

12     A    No.

13          MS. SINGER:  Your Honor, at this time I'd like to

14     have this marked into evidence as the next numbered

15     evidence for the state.

16          THE COURT:  It will be admitted in evidence for the

17     state.  Number?

18          THE CLERK:  Number 72, Your Honor.

19          THE COURT:  Seventy-two, thank you.

20          (State's Exhibit No. 72 was moved and admitted into

21 evidence.)

22 BY MS. SINGER:

23     Q    Now, that form was actually executed in the parking

24 lot of the ER or on the way to the station?

25     A    We're actually sitting in a car, in Detective

1    Cannon's car, when you come off of Archer Road, you pull in

2    and then you come into the ER, our car was parked kind of in

3    that roadway and we were sitting in the car.

4        Q    And where did you go from the ER?

5        A    We went to the Gainesville Police Department.

6        Q    About what time did you get to the station?

7        A    Little bit after 1:00.

8        Q    And when you got to the station where did you go?

9        A    Upstairs to the criminal investigations division.

10       Q    And can you tell the jury what the criminal

11   investigations division looks like and where you would have

12   taken Mr. Herlihy when you entered that area?

13       A    Well, it looks a lot nicer now than it did then,

14   because we got new desks, but there's a whole area where the

15   detectives sit that general people aren't allowed to go into

16   unless they're sworn or unless we bring them in there.

17       Q    What do you mean by sworn?

18       A    Sworn meaning a sworn police officer that has

19   arrest powers in the State of Florida.

20       Q    Okay.

21       A    There's a hallway that runs by our division and

22   then there's some interview rooms across where the side door

23   is in the division, we are across from the side door.

24       Q    And where did Mr. Herlihy go when you brought him

25   to the investigations division?

1    A    It was in one of those interview rooms.

2    Q    Describe the room for us, please.

3    A    Well, it's a square.  And I don't know exactly how

4  big it is.  It's not huge but it's not tiny either.

5    Q    Does it have furniture in it?

6    A    Yes.

7    Q    What kind of furniture does it have in it?

8    A    We have a table in there that's probably as big as

9  the square on the bottom of the TV stand, or actually the

10  middle of the TV stand.  And then there are several chairs.

11  The walls are carpeted.  And there's an air cleaner in there

12  usually.

13    Q    And what was the purpose of taking Mr. Herlihy to

14  that particular interview room?

15    A    The hospital was very noisy and it's not conducive

16  for talking to somebody.

17    Q    Did you in fact do an interview of Mr. Herlihy at

18  that time?

19    A    Yes, we did.

20    Q    And at the time that you did the interview was he a

21  suspect in the criminal investigation?

22    A    No, he was not.

23    Q    What was the purpose of your interview at that

24  time?

25    A    We were basically on a fact finding mission to

1    determine what had happened at Mr. Herlihy's apartment that

2    day.

3        Q    Did you speak with Mr. Herlihy?

4        A    Yes, we did.

5        Q    And for approximately how long did you speak with

6    Mr. Herlihy?

7        A    We talked to him for a while.  I left the room on

8    and off a couple of times.  But it started about 1:20 and it

9    ended, like I said, with a couple of breaks in between there,

10   around 5:30 or 6:00.

11       Q    Did there come a time when Mr. Herlihy became the

12   focus of your criminal investigation?

13       A    Yes, there was.

14       Q    And that was -- can you tell the jury how one would

15   come from being merely a person with knowledge in a fact

16   finding mission, to a focus of investigation?  What happened

17   in between being a person with knowledge and the focus of an

18   investigation that brought him to that point?

19       A    Basically what we did is we asked him about what

20   had occurred that day in the apartment.  Obviously, we're not

21   there and he was.  So he's one of the two people that would

22   know what happened that day.  From going from a fact finding

23   mission where we're just talking to him, to the point where

24   he becomes the focus of the investigation, is based on not

25   only his statements but other statements made by other

1    people.

2        Q    And once he became a focus of the investigation,

3    did you advise him of his Miranda rights?

4        A    Yes, I did.

5        Q    Before we talk about any statements that were made

6    after Miranda, I'd like to ask you about some of the

7    information gleaned during the time that he was merely a

8    person with knowledge in your mind --

9        A    Okay.

10       Q    -- if I might.

11            During the course of the interview, before he was

12   Mirandized, did he tell you the status of Robbie after

13   Crystal Quirello had left the apartment but before 911 was

14   called?

15       A    Yes, he did.

16       Q    How did he describe Robbie's demeanor and his

17   physical appearance before 911 was called?

18            MR. TEDDER:  Objection, pretrial motion.

19            THE COURT:  Noted for the record and overruled.  Go

20       ahead.

21            MS. SINGER:  Your Honor, I have no objection to the

22       record reflecting that there is a continuing objection

23       as to the pretrial rulings in this case in order to

24       afford Mr. Tedder some peace.

25            MR. TEDDER:  Can we approach on that issue, please,

1    briefly?

2         THE COURT: No, we don't need to. An ongoing

3    objection is noted for the record. And, Mr. Tedder, you

4    may feel free at any point that you want it noted

5    specifically to object again. Go ahead.

6    BY MS. SINGER:

7    Q    Going back to the question, did he describe for you

8    Robbie's demeanor, his physical status? What did he tell

9    you, I think was my question?

10   A    Yeah. He had -- after Crystal had left, he said

11   that he, initially Robbie had drank some of a bottle. And he

12   said that he had finished feeding Robbie about, I think it

13   was about half the bottle. It was an eight-bottle. He

14   complained about the bottle being not the kind that he wanted

15   to use, because he likes the bent neck bottles. And this was

16   one of those Evenflo kind of bottles, which is the plastic

17   bottle with the plastic liners in it. He said that that was

18   too much air that the baby drank when the baby was drinking

19   his bottle. He said the baby was happy, that he was playing,

20   that he was wearing -- he had spit up a little bit from

21   drinking the bottle before they went to burp him, I guess,

22   earlier before Crystal left, he had spit up a little bit. So

23   they had taken a onesie off of him, a onesie being one of

24   those little baby outfits, there's not much to it, it snaps

25   on the crotch. I's just a little outfit, it's nothing

1    spectacular.  They had explained that he had spit up all over

2    and that he and Crystal had taken that off before Crystal

3    left.  So all the baby was wearing at that point in time was

4    his diaper and little white socks on his feet.

5        Q    Did he tell you whether or not Robbie was able to

6    focus and see when he was handed over to Brian Herlihy

7    immediately before Crystal left?

8        A    Yes.  He said that he had put on the ceiling fan,

9    which seemed to calm Robbie down when he was upset or when he

10   was crying, he liked to focus on the turning of the ceiling

11   fan.  And he also had a radio that was on the bed that he

12   liked to -- apparently Robbie liked Titanic music, so he

13   would turn on the boom box for Robbie to listen to Titanic

14   music.

15       Q    Did he tell you how he had placed Robbie on the

16   bed?

17       A    Yes.  He told me that there -- it's a queen size

18   bed and it's made out of, the bed itself is made out of a

19   kind of wrought iron but it's not really wrought iron.  It

20   looks like it's kind of fake wrought iron.  It didn't have

21   any curtains or anything on it.  It was just a standard metal

22   looking bed.  It had a design on the footboard of the bed,

23   and I think it was also on the headboard, that was kind of

24   like a sunset where it kind of goes around and then has a

25   couple of rungs, and then it's got some lines in it where it

1   kind of looks like a sun on a sunset.  That's how I would

2   describe it.  It's a queen size bed.  There's a comforter on

3   it.  There's a couple of pillows at the head.  And then he

4   puts Robbie on what he called was a T-shirt material

5   pillowcase pillow on -- if you're looking at the headboard of

6   the bed, it would be on the left side of the bed towards the

7   bottom of the bed.

8        Q    He faced the baby so that the baby's head was

9   towards the headboard and his feet were to the footboard or

10  did he lay the baby horizontal?

11       A    No, the way he described it to me was that he laid

12  the baby going from the side of the bed to the side of the

13  bed.  And his feet were towards the side that was closest to

14  going off the side of the bed, and his head was more towards

15  the middle of the bed.

16       Q    Was the baby placed face up or face down --

17       A    Face up.

18       Q    -- when he spoke to you?

19       A    He told me face up.

20       Q    When you spoke with him before he was the focus of

21  the investigation, did he describe to you how he found

22  Robbie?

23       A    Yes, he said that he found Robbie -- he had left

24  Robbie on the pillow and told him he was going to go take a

25  shower, something to the effect of, Robbie, I'm going to go

1    take a shower.  I'll be right back.

2          He goes across the hall, which it's a small

3    apartment, he goes across the hall into the bathroom, closes

4    the door.  He said that he used the bathroom, he turned on

5    the water for the shower, the water was too cold.  He turned

6    it off, figured he'd take one later when the water was

7    warmer.  He came out and he didn't hear the baby crying or

8    saying anything and he went in to check on Robbie.  And when

9    he saw Robbie, he said that he was head down -- it's kind of

10   hard to describe.  You've got the end of the bed and then

11   you've got the metal frame of the canopy, which goes up a

12   little higher than the bed itself.  He said the baby was head

13   down, face out, and his feet were up.

14       Q    Did he tell you whether or not the baby was

15   vomiting or spitting up that the time?

16       A    Yes, he did, he said the baby was vomiting.

17       Q    And did he tell you whether or not the baby spit up

18   on the comforter?

19       A    At some -- not at that point he hadn't spit up on

20   the comforter, at a little bit later after that he had spit

21   up on the comforter.

22       Q    Did he tell you how much vomit or spit up was on

23   the comforter?

24       A    He described it as -- when he said that he had

25   vomited on the comforter, I said, How big a space did he

1    vomit, and he said it was about three to four inches in

2    circumference.

3        Q    And did you ask him specifically showing him the

4    size of your hand, or did he show you --

5            MR. GROLAND:  Objection, Your Honor, leading.

6            THE COURT:  Overruled.

7    BY MS. SINGER:

8        Q    Did he show you with his hands how big a spot it

9    was?

10       A    I don't recall that he actually showed me.  I think

11   he just told me it was three to four inches in size.

12       Q    There comes a time then, of course, because you've

13   gathered other evidence, where he becomes the focus of the

14   investigation.  That was about -- what time was it that he

15   became the focus of the investigation?

16       A    Shortly before 4:00.

17       Q    At that time did you advise him of his

18   constitutional rights pursuant to Miranda?

19       A    Yes, I did.

20       Q    I'm going to show you what's been previously

21   entered into evidence as State's 71 and ask you to take a

22   look at this particular document.  Do you recognize that?

23       A    Yes, I do.

24       Q    And what is that?

25       A    This is a Miranda of rights waiver form that we use

1614

1   at the Gainesville Police Department.

2       Q    And in this particular case, does this rights

3   waiver form reflect the rights that were read to Brian

4   Herlihy on the 2nd of August 2000 at about 1555 hours?

5       A    Yes, it does.

6       Q    And 1555 hours is what time, for those of us who

7   don't work with the police department or aren't in the army?

8       A    It's 3:55 P.M.

9       Q    And who is present with you when Mr. Herlihy was

10  advised of his Miranda rights at that time?

11      A    Detective Alan Coleman.

12      Q    Would you please describe to the jury how

13  Mr. Herlihy was advised of his rights, specifically showing

14  us how you would have advised him and what his response would

15  be, please?

16      A    Well, I do it the same way all the time.  So what

17  we do, and what I do, is the first blocks up here are the

18  person's information of who you're talking to.  And it says

19  Brian Herlihy, and actually this is my handwriting.  Brian

20  Herlihy, address, 1015 Southwest 9th Street, Apartment A21.

21  Address, that was his address.  City of Gainesville, Florida,

22  32601.  Phone number 352-271-0466.  Then there's my case

23  number, which is 00, which is for 2000, 13656.  Place, GPD,

24  which is Gainesville Police Department.  The date, 8/2 of

25  2000.  And the time, 1555 hours, which is 3:55 P.M.

1   Then I wrote in here, there's a line, it says,

2   Brian Herlihy, you are, and then there's two options here.  I

3   had the option of writing you are under arrest or you are not

4   under arrest.  I scratched out under arrest and circled not

5   under arrest.

6       Q   And why did you do that?

7       A   He was not under arrest.

8       Q   But why then were you Mirandizing him?

9       A   Because he was the focus of the investigation.

10      Q   And is that protocol to do that when you're the

11  focus of an investigation, even though you're not technically

12  going to be held in custody?

13      A   That's my protocol.

14      Q   Go ahead and continue.

15      A   I circled you are not under arrest, charged with --

16  and then if you had circled under arrest, you would write in

17  what the charge is here.  There was no charge because he was

18  not under arrest.  So I wrote NA, which is not applicable.

19      Before we ask you any questions you must understand

20  what your rights are.  You have the right to remain silent.

21  You are not required to say anything or answer any questions.

22  Anything that you say can and will be used against you in

23  court.  Then I read to him, do you understand that, and

24  there's a little line, either writes yes or no, that he

25  understands or doesn't understand.  Mr. Herlihy wrote yes.

1   And there's a signature block with a line where they sign

2   their name acknowledging that they said yes or no, but he

3   said yes.  So Brian Herlihy signed his name.

4        Q    So he indicated had he understood that?

5        A    Yes, he did.

6        Q    Was there anything about what he said to you when

7   he signed that particular part that suggested to you that he

8   did not understand what he was signing?

9        A    Absolutely not.

10       Q    Did you force him, coerce him, threaten him in any

11  way to get him to sign it?

12       A    No, I did.

13       Q    Did you promise him anything in exchange for that?

14       A    No, I did not.

15       Q    Go ahead.

16       A    The next paragraphs says, you have the right to

17  talk to a lawyer for advice before being questioned, and you

18  have the right to have him with you while being questioned.

19  If you cannot afford to hire a lawyer, one will be provided

20  for you.  Again, it's the same question, do you understand

21  that.  He again wrote yes, and Mr. Herlihy again signed his

22  name, Brian Herlihy.

23       Q    Go ahead.

24       A    The next question is, or statement, if you want to

25  answer questions now without a lawyer present, you still have

1    the right to stop answering at any time.  You also have the

2    right to stop answering at any time you want to talk to a

3    lawyer.  Again, it says, do you understand that, again

4    Mr. Herlihy said yes.  And again Mr. Herlihy signed his name

5    on the signature block as Brian Herlihy.

6        Q    Are there additional blocks that need to be filled

7    out in that particular form?

8        A    Yes, there are.

9        Q    What are those blocks?

10       A    Well, the next statement is called a waiver, and

11   this is actually what we read him to make sure he understood

12   everything before we go on any further.  And that says, I

13   have read or had read to me that statement of my rights as

14   stated above.  I understand what my rights are.  I am willing

15   to answer questions and make a statement.  I do not want a

16   lawyer at this time, although I understand that I can have

17   one.  No promises or threats have been made by anyone to

18   cause me to make a statement, and I've not been mistreated or

19   harmed by anyone to cause me to make a statement.

20            And usually I kind of add in something like, just

21   to make sure they understand, well, that kind of means I'm

22   not holding you down making you say something, because that's

23   a little more in layperson's language.  They would understand

24   that.

25            And at that point Mr. Herlihy again signed his

1618

1    name, Brian Herlihy, saying that he waived his right to an

2    attorney.

3        Q    All right.  And are there other blocks on that

4    particular form?

5        A    Yes, there are.

6        Q    That he filled in?

7        A    Yes.

8        Q    What are those blocks?

9        A    Actually, Mr. Herlihy filled these out.  Number one

10   says, what is your age, he said 29.  DOB, which is date of

11   birth, 10/11 of '70.  POB, which is place of birth, it's

12   Fayetteville, North Carolina.  And he used NC for the

13   abbreviation.  Number two, how far did you go in school.  He

14   put 16 years.  Number three, do you understand the statements

15   written above, and I usually say, these statements I just

16   read you.  And, again, he wrote yes.  Number four, are you

17   presently under the influence of alcohol, drugs or

18   medication.  He said no, wrote no.  And then he signed his

19   name, Brian Herlihy.

20       Q    Are there any other signatures on that particular

21   document?

22       A    Yes, there are two signatures.  This would be my

23   signature acknowledging that I had read him this and I was a

24   witness to him signing his name and writing yes in these

25   spaces and filling out these blocks.  And then the other

1  witness is Alan Coleman, and he's ID 75, he's the other

2  detective in the room with me at the time.

3      Q    After he executed this particular Miranda form, was

4  there anything said to him that caused him to feel that he

5  was threatened, coerced, or in any way made to sign this

6  form?

7      A    No.

8      Q    Was he willing to talk to you after he signed this

9  form?

10     A    Yes, he was.

11     Q    And, in fact, did you take a taped statement from

12 him at that time?

13     A    Yes, I did.

14         MS. SINGER:  Your Honor, I'd like to go ahead and

15     publish both the consent to search and the waiver form

16     at this time, and then I would like to proceed to play

17     the tape that was made by Investigator Legall after the

18     Miranda form was executed.

19         MR. GROLAND:  No objection.

20         THE COURT:  All right.  Go ahead.

21         MS. SINGER:  I would like to wait until everyone

22     gets the waiver until we start the tape.  So we'll take

23     a moment.

24         (Pause in the proceedings.)

25         MS. SINGER:  I do have some questions before we

1    start the tape.

2  BY MS. SINGER:

3    Q    Investigator Legall, before you actually took the

4  taped statement from Mr. Herlihy, did you receive

5  photographs, Polaroid photographs from Investigator Alan

6  Coleman, those photographs having been taken by Tina Millard

7  earlier on August 2nd, the year 2000?

8    A    Yes.

9    Q    I'm going to go ahead and show you now Composite

10  Exhibit 26, that includes eight photographs, and ask you to

11  take a look at these and if you recognize them?

12    A    Yes, I do.

13    Q    And what are they?

14    A    They're pictures of Mr. Herlihy's apartment.

15    Q    And are those the pictures that Investigator

16  Millard took with her Polaroid camera earlier on the 2nd of

17  August?

18        MR. GROLAND:  Objection, Your Honor, she wasn't

19      there.  She doesn't know.  And they're already in

20      evidence.

21        THE COURT:  Sustained.

22  BY MS. SINGER:

23    Q    Do those photographs appear to be the same

24  photographs that were provided to you by Alan Coleman before

25  your interview, your taped interview with Mr. Herlihy?

1    A    Yes, they are.

2    Q    And did you use those photographs during the course

3  of your interview with Mr. Herlihy?

4    A    Yes, I did.

5    Q    And would you be referring to photographs by their

6  number during the course of the interview?

7    A    Yes, I did.

8         MS. SINGER:  I'm now ready to play the interview,

9    Your Honor, and I will have further questions regarding

10    the photographs after that point.

11         THE COURT:  Go ahead.

12         MS. SINGER:  I'll try to adjust the sound so that

13    everybody can hear it.  Just signal if you cannot hear

14    it.

15         (An audio tape is played.)

16         (The following is a transcription of an interview

17  between Brian Herlihy and Detective Helen Legall and

18  Detective Alan Coleman on August 2, 2000, taken to the best

19  of the court reporter's ability.)

20         DETECTIVE LEGALL:  Today is August 2nd, 2000.  It

21    is Wednesday at 1600 hours.  We're at GPD in the

22    detective interview rooms.  This is Detective Helen

23    Legall.  Present is Detective Alan Coleman and Brian

24    Herlihy.  Case Number is 2000-13656.  It's an

25    investigation into some injuries caused to a four month

1  old baby named Robbie.

2       Brian, let me just kind of go over -- we've talked

3  about what happened already today; is that correct?

4       BRIAN HERLIHY:  Yes, ma'am.

5       DETECTIVE LEGALL:  Okay.  I'm going to show you a

6  couple different forms.  This is a concent to search for

7  your residence.  I read this to you and you did sign

8  this, correct?

9       BRIAN HERLIHY:  Yes, ma'am.

10       DETECTIVE LEGALL:  Okay.  And that was at 1300

11  hours today, which is 1:00?

12       BRIAN HERLIHY:  Yes, ma'am.

13       DETECTIVE LEGALL:  Okay.  And the second form we're

14  going to show you is also a consent to search for your

15  vehicle, which is '96 Ford Explorer, and you signed that

16  here at the police department at 1455 hours, right?

17       BRIAN HERLIHY:  Yes, ma'am.

18       DETECTIVE LEGALL:  Okay.  And we've just actually

19  read to you your Miranda waiver or Miranda rights on the

20  waiver, and these are your signatures acknowledging that

21  you understand?

22       BRIAN HERLIHY:  Yes, ma'am.

23       DETECTIVE LEGALL:  Okay.  And this is your

24  signature waiving your right to an attorney at this

25  point?

1    BRIAN HERLIHY:  Yes, ma'am.

2    DETECTIVE LEGALL:  Okay.  Basically what we want to

3    do is, like I said, we had gone over pretty much what

4    occurred in your home today with Robbie, and in the last

5    couple of days.  And we've got some photos, I believe

6    it's eight photos sitting in front of you, Polaroid

7    photos; is that correct?

8    BRIAN HERLIHY:  Yes, ma'am.

9    DETECTIVE LEGALL:  Are these photos of your

10   apartment?

11   BRIAN HERLIHY:  Yes, ma'am.

12   DETECTIVE LEGALL:  And is your apartment at 1015

13   Southwest 9th Street, Apartment A21?

14   BRIAN HERLIHY:  Yes, ma'am.

15   DETECTIVE LEGALL:  Okay.  What we, what we want to

16   do is -- we'll start with today.  Is Robbie your birth

17   child?

18   BRIAN HERLIHY:  No, ma'am.

19   DETECTIVE LEGALL:  No.  How do you come to take

20   care of Robbie?

21   BRIAN HERLIHY:  His mother, Crystal, and I are

22   involved, romantic, boyfriend and girlfriend.  Actually,

23   she's my fiance.

24   DETECTIVE LEGALL:  Okay.

25   BRIAN HERLIHY:  And we were planning on, planning a

1   little trip today.  She was going to run some errands

2   while I tended to Robbie like I've done several times in

3   the past.

4        DETECTIVE LEGALL:  Okay.  What time did she come

5   over this morning?

6        BRIAN HERLIHY:  Between 8:30 and 9:00.

7        DETECTIVE LEGALL:  Okay.  And how long had she

8   stayed at that point before she left?

9        BRIAN HERLIHY:  Approximately 30 minutes.

10       DETECTIVE LEGALL:  How was Robbie dressed when he

11   came to your house this morning?

12       BRIAN HERLIHY:  He was in a little outfit with

13   little white socks on.

14       DETECTIVE LEGALL:  Okay.  Any particular design on

15   the outfit?

16       BRIAN HERLIHY:  It had a ESPN logo on the one side.

17   I think it was on the left breast.

18       DETECTIVE LEGALL:  Okay.

19       BRIAN HERLIHY:  I could be mistaken, it could be

20   the right side.

21       DETECTIVE LEGALL:  And we previously kind of

22   identified it as one of those onesie outfits with the

23   snaps in the crotch, correct?

24       BRIAN HERLIHY:  Yes, ma'am.

25       DETECTIVE LEGALL:  Okay.  He appeared to be in good

1    health when he came over this morning?

2        BRIAN HERLIHY:  Yeah, he was making his little

3    noises like he wanted to talk and he was smiling, just

4    very active.

5        DETECTIVE LEGALL:  Okay.  Did Crystal indicate that

6    there was any problems with illness or injury to him at

7    that time?

8        BRIAN HERLIHY:  No, ma'am.

9        DETECTIVE LEGALL:  No.  Okay.  What did you do

10   exactly when Crystal came this morning?  Kind of walk us

11   through what happened up until the incident with Robbie.

12       BRIAN HERLIHY:  I was in the process of doing a

13   bath for my dogs on the balcony, and I saw them pull in.

14   And she had Robbie in her hands, and I said, Hey,

15   Robbie.  And he kind of looked up.  I don't know if he

16   actually saw me or not but he had a smile on his face.

17   And she brought him up, came up the steps, and I met

18   them at the front door.  I live in a two story.  And she

19   handed him right to me and he was all smiling.  I gave

20   him a kiss on the forehead, and held him and kind of

21   just held him and spun around, just was talking to him.

22   How's my little boy.  I said, How has he been.  She

23   goes, He's been fine.  I can feel that he was wet, so I

24   said, Oh, somebody needs a diaper change.  So I laid him

25   on the bed and did the diaper change.  And he was a

1    little fussy, and I said, When's the last time he ate?

2    And she goes, About an hour ago.  And I said, Let me go

3    make a bottle.  I made a bottle and I brought it into

4    him and he just started sucking away.

5        DETECTIVE LEGALL:  Okay.  There's a bottle in

6    picture four.

7        BRIAN HERLIHY:  Yes, ma'am.

8        DETECTIVE LEGALL:  Is that the same bottle that

9    you're talking about?

10       BRIAN HERLIHY:  Yes, ma'am, it is.

11       DETECTIVE LEGALL:  Okay.  And is it breast milk or

12   formula?

13       BRIAN HERLIHY:  It's formula.

14       DETECTIVE LEGALL:  Formula.  Do you know what kind?

15       BRIAN HERLIHY:  Enfamil with iron.

16       DETECTIVE LEGALL:  Okay.  So who actually fed

17   Robbie?

18       BRIAN HERLIHY:  I fed him for probably -- there's,

19   I made an 8-ounce bottle.  I fed him probably for a good

20   portion of that and mom held him for a few minutes

21   because I had to go in and do something with the dogs.

22   And I said, When I come back, let me go wash my hands

23   real quick and I'll hold him.  And she says, Well, I

24   need to go get gas in the truck and I need to get those

25   towels.  I said okay.  And I said, Well, you can leave

1    him here with me and I'll help him finish his bottle.

2    And she put a pillow on his chest, a little decorative

3    pillow.  Like a picture of a three, a little black one

4    and it propped up.  And I said, It's not going to stay.

5    And sure enough, it did roll off.  I said, It's okay,

6    I'll stay here and I'll hold the bottle.  Because I

7    usually play with his legs, so that when he has gas

8    buildup, this is good for his legs.  And she left us and

9    I said, We'll see you in a little while.  And she said,

10   Oh, before I get back, while he's laying down, why don't

11   you just take a quick shower real quick so we can go

12   when I get back.  And I said, Well, we have to wait for

13   the dogs to dry.  And she said, Do you think they'll be

14   dry by the time I get back?  And I said, Well, they may

15   or may not, because I have to put a medication on them

16   once they dry.  I said, If they don't, then we'll just

17   do it tonight.  And she left and I helped him with his

18   bottle.  He had maybe half an ounce left.  I put him up

19   on my shoulder to burp him and he spit up on me, which

20   happens all the time.  He spit up before that actually

21   when she was feeding him and we cleaned him up.  And

22   when I burped him this last time, he didn't make like a

23   loud burping noise like he usually does.  It was just a

24   small, like an air rushing noise.

25             DETECTIVE LEGALL:  Had you taken the onesie off of

1   him yet at this point?

2          BRIAN HERLIHY:  Yes, I had.

3          DETECTIVE LEGALL:  Okay.  When did do you that?

4          BRIAN HERLIHY:  When he had spit up on Crystal.

5          DETECTIVE LEGALL:  Okay.  Now, when Crystal left?

6          BRIAN HERLIHY:  Uh-huh.

7          DETECTIVE LEGALL:  Did you walk her downstairs?

8          BRIAN HERLIHY:  Yes, I did.

9          DETECTIVE LEGALL:  Okay.  And where was the baby at

10   that point?

11          BRIAN HERLIHY:  The baby was on the bed.

12          DETECTIVE LEGALL:  Okay.  When you came up, baby

13   still there?

14          BRIAN HERLIHY:  The baby was fine.

15          DETECTIVE LEGALL:  Baby was fine.

16          BRIAN HERLIHY:  Moving his hands and looking at the

17   fan, because I turn the fan on for his amusement.

18          DETECTIVE LEGALL:  Okay.  So there was no

19   indication at that point that something might be wrong

20   with him?

21          BRIAN HERLIHY:  No, ma'am.  I did notice that when

22   we did have him laid in this position on this picture

23   here.

24          DETECTIVE LEGALL:  Picture one?

25          BRIAN HERLIHY:  How the pillow was this way.

1    DETECTIVE LEGALL:  Okay.

2    BRIAN HERLIHY:  He had -- well, he didn't have this

3    pillow.  This was the one he was laying on, he was

4    laying on one of these cloth pillows, but he had rotated

5    himself 90 degrees.

6    DETECTIVE LEGALL:  Okay.

7    BRIAN HERLIHY:  So I was like, What are you doing,

8    and I picked him back up and put him back on the pillow.

9    DETECTIVE LEGALL:  Was he on his back or his

10   stomach at that point?

11   BRIAN HERLIHY:  He was on his back.

12   DETECTIVE LEGALL:  On his back.

13   BRIAN HERLIHY:  He was on his back.

14   DETECTIVE LEGALL:  And he rotated himself on his

15   back?

16   BRIAN HERLIHY:  Uh-huh.

17   DETECTIVE COLEMAN:  Using this picture, was he

18   lying horizontally across the bed or vertically?

19   BRIAN HERLIHY:  Vertically.

20   DETECTIVE COLEMAN:  Be toward the --

21   BRIAN HERLIHY:  Be toward the footboard, yes, sir.

22   And then I usually -- we do it for him all the time, I

23   put on a CD let the music play.  It soothes him.  That's

24   why I have the radio like you have in this picture here.

25   DETECTIVE LEGALL:  Picture three.

1    BRIAN HERLIHY:  Or in here.

2    DETECTIVE LEGALL:  And four -- or two.

3    BRIAN HERLIHY:  And that just soothes him.

4    DETECTIVE LEGALL:  Okay.

5    BRIAN HERLIHY:  I said, Okay, Robbie, back in a few

6    minutes, you okay.  When he gets mad it's like a gee.

7    And when he's happy he says goo.  He said goo and I said

8    goo back.  And I went to the bathroom.

9    DETECTIVE LEGALL:  How long do you think that you

10   were gone during that time period from the time you

11   walked her down to the time you came back?

12   BRIAN HERLIHY:  About two minutes, if even that.

13   DETECTIVE LEGALL:  Do you know exactly what time

14   she left?

15   BRIAN HERLIHY:  I would say 9:15.  The only reason

16   I know is because my TV was on and NYPD Blue was on and

17   it's -- I watch that show pretty good and I knew we were

18   about -- I got back upstairs about 9:13 because I

19   remember looking the cable box and it said 9:13 on it.

20   DETECTIVE LEGALL:  Okay.

21   BRIAN HERLIHY:  So then --

22   DETECTIVE LEGALL:  So when you get back upstairs,

23   Robbie is fine?

24   BRIAN HERLIHY:  Well, that's when he was vertical.

25   DETECTIVE LEGALL:  Right.

1    BRIAN HERLIHY:  And I realigned him on the regular

2    pillow, not the pillow sham pillow, but just the regular

3    sleeping pillow.  And he said his goo.  And I said, all

4    right, goo, I'll go to the bathroom.  And I went in the

5    bathroom and closed the door and I used the bathroom.

6    And I went to go turn the bathtub on, and the water was

7    ice cold.  I went, Okay, I guess I'll wait until I get

8    showered or I'll just take a cold shower.  I flushed the

9    toilet and I opened the door.

10    DETECTIVE LEGALL:  Okay.  Stop.  How long were you

11    in the bathroom?

12    BRIAN HERLIHY:  I'd say five minutes.  I don't

13    think it was much more than that.  I'm not in there for

14    an extended period of time.

15    DETECTIVE LEGALL:  Okay.  So you come out of the

16    door?

17    BRIAN HERLIHY:  Come out of the door.  And I said,

18    Robbie, hey, Robbie.  All I saw were his little

19    stocking, little sockie feet staring up at me.  And he

20    was kind of like a downward angle, head down.  The

21    pillow sham was almost to the floor.  He was, he was

22    horizontal this way, like the same direction of the bed.

23    DETECTIVE LEGALL:  From side to side?

24    BRIAN HERLIHY:  Yes, ma'am.  And his head was on

25    this pillow.  He wasn't on this.  This pillow sham was

1    turned around so that the part that you put the pillow

2    in was facing away from him.  I didn't want him get his

3    hands caught in there or whatever.  The pillow was

4    jammed almost down to here, to the bottom part, actually

5    where that bottom rail was at.  And his head was right

6    about here.

7         DETECTIVE LEGALL:  Okay.  So on picture four we're

8    talking about his head's like to the second rung coming

9    up from the floor?

10        BRIAN HERLIHY:  Yes, ma'am, in between the first

11   and second.

12        DETECTIVE LEGALL:  Okay.  So it's the design, the

13   top bar of the design under the circle?

14        BRIAN HERLIHY:  Yes, ma'am.

15        DETECTIVE LEGALL:  Okay.  And he was pretty much

16   head down then?

17        BRIAN HERLIHY:  I reached in there, I said, Robbie?

18   And, you know, usually a baby gets caught like that,

19   they start to cry.  And I didn't hear any crying.  And

20   that's when I said, Oh shit.  And I went to go grab him

21   and I pushed the mattress back because these mattresses

22   kind of move back some.  And I got him out.  And he was

23   unresponsive and he was making like this gurgling noise.

24        DETECTIVE LEGALL:  Okay.

25        BRIAN HERLIHY:  And my phone was sitting in the

1   middle of the bed.  I couldn't find the phone.  I

2   thought maybe I put it back on the cradle.

3           DETECTIVE LEGALL:  Is it a cordless phone?

4           BRIAN HERLIHY:  A cordless phone.

5           DETECTIVE LEGALL:  Okay.

6           BRIAN HERLIHY:  So I ran into the living room to

7   fine the cordless phone and I couldn't find it.  I hit

8   the little page thing, it was beeping, and I saw it.

9           DETECTIVE LEGALL:  Where's Robbie during this time?

10          BRIAN HERLIHY:  He's on the bed.  He's in the

11  middle of the bed.

12          DETECTIVE LEGALL:  So you had pulled him out and

13  set him on the bed and then you went to find the phone?

14          BRIAN HERLIHY:  I went to find the phone.  So I got

15  back and have it in my hands.  And I was, Robbie, shake,

16  trying to stimulate, blow in his face, because usually

17  he can wake up to that.  And when I saw his arms got

18  real flaccid and low, I went, This isn't good.  And he

19  wasn't breathing breathing.  So I put him back on the

20  bed, tilted his head up and gave him two quick breaths,

21  covering his mouth and nose.  And then I called 911.  In

22  between talking to her and giving him the breaths, I

23  mean, she kept saying keep doing it.  I am.  She said,

24  Put your ear to his nose and mouth and see if you can

25  hear anything.  I can't.  I said, Hold on, and I did it

1634

1    again.  And I remember saying to the dispatcher when do

2    you expect the F-ing guys here, I need them now.  It's

3    not my child.  It's my girlfriend's child.  I need to

4    know he's fine, and just was becoming very upset and

5    very hysterical.  He started to cough.  And I said, He's

6    coughing up stuff.  She said, Put him on his side.  He's

7    already on his side.  And if you look at this picture

8    here --

9         DETECTIVE LEGALL:  Picture 7?

10        BRIAN HERLIHY:  That's where he was emissing

11   (phonetic) formula from his nose, but was frothing out

12   of his mouth big time.

13        DETECTIVE LEGALL:  Okay.  Had any of that formula

14   come out while he was on the bed?

15        BRIAN HERLIHY:  When I had him laid down?

16        DETECTIVE LEGALL:  When you put him on the bed.

17        BRIAN HERLIHY:  When I get the phone you mean?

18        DETECTIVE LEGALL:  Right.  Was there any formula

19   coming out of his mouth and nose on the bed?

20        BRIAN HERLIHY:  There was a little.

21        DETECTIVE LEGALL:  Okay.

22        BRIAN HERLIHY:  Just a little.  I mean, I was -- I

23   didn't know to pick him up and go get the phone or get

24   the phone and get him.  And it was like, I know when I

25   did find it, he was right in the middle.  In fact, there

1   was a stain in the middle of the bed, right in the

2   middle of picture three, a stain where the formula had

3   actually, I guess, where I put him down the first time,

4   because I saw it, it was all matted there.

5        DETECTIVE LEGALL:  Okay.

6        BRIAN HERLIHY:  So we had him here, he had a little

7   bit of redness coming out of his nose, which I thought

8   was blood, and I got really, really upset.  And the

9   paramedics came and I had to open the -- leave his side

10  and open the sliding glass window and yell to them.

11  They didn't hear me.  So I had to run downstairs, You

12  guy's are going to the wrong building.  This is building

13  A.  Don't go to building C.  I'm here.  I said, I have a

14  F-ing four month here that can't breath.  So they came

15  in.  I was here still working doing the mouth to mouth

16  on him.  They tried to put the tube in his, in his mouth

17  to trach him or to tube him.  And I having to do the bag

18  thing, and at that time they moved my bed some, they

19  moved it out.  I remember they hit the fan with it.  And

20  they made me climb up over the bed to get out of the way

21  so they could get their work done.

22       DETECTIVE LEGALL:  Okay.

23       BRIAN HERLIHY:  And then I sat down on the couch

24  and it all hit me, the magnitude of this thing.  And

25  like I said, with that bottle, I had been trying to keep

1636

1  him away from that bottle, because that's the one he

2  always sucks in so much air.

3       DETECTIVE LEGALL:  Okay.  I think earlier you told

4  me you used the bent neck, the bent neck bottles?

5       BRIAN HERLIHY:  Yeah, the right angle bottles,

6  yeah, we were at Baby's 'R Us and I said, we need to get

7  those.  She said, They're kind of expensive.  And I

8  said, Yeah, because there's no air in there.  They're

9  the best.

10       DETECTIVE LEGALL:  Now, how long have you been

11  dating Crystal?

12       BRIAN HERLIHY:  Over a month, maybe a month and a

13  half, two months.

14       DETECTIVE LEGALL:  Okay.

15       BRIAN HERLIHY:  Yeah, it's almost two months.

16       DETECTIVE LEGALL:  And how often during that time

17  period has she left Robbie with you?

18       BRIAN HERLIHY:  He was with me yesterday, and I

19  hadn't seen him for --

20       DETECTIVE COLEMAN:  Brian, what hours yesterday, do

21  you remember?

22       BRIAN HERLIHY:  She had to go to some CPR thing at

23  11:00, so I had him about 10:15, 10:30, I'm trying to --

24  I know it was before she had to go to her CPR thing.

25  Then she picked him up, she was at the house about 1:30

1   because I had to go for an appointment in Williston at

2   2:15, she was coming about 1:45, somewhere around there.

3   And then I hadn't seen him for a week previous.  When

4   she comes to my house, and she was at the house every

5   day.  I'm like, Where's Robbie, where is he today?  She

6   would say, well, he's with either granddad or he was

7   with a friend of hers.  And the week before that, I'd

8   have him a couple hours a day.  Crystal would be there

9   with us and we'd -- she hadn't stayed the night with him

10  in a while.

11        DETECTIVE COLEMAN:  The night with you --

12        BRIAN HERLIHY:  Oh, yeah, stayed the night.  She

13  stayed over the house for the night.  He stayed at the

14  house with us one night and she felt bad because of the

15  domestic situation between her and her husband -- plus

16  she was being followed and she didn't want me dragged

17  into it.  So she just figured she would stay there.

18        DETECTIVE LEGALL:  Okay.  Where was Robbie like in

19  the last week?

20        BRIAN HERLIHY:  With one of her brothers.  I don't

21  know his name.

22        DETECTIVE LEGALL:  Okay.

23        BRIAN HERLIHY:  I've never met him.

24        DETECTIVE LEGALL:  I think you told me earlier he's

25  a trooper?

1638

1    BRIAN HERLIHY:  I believe this is the one with FHP.

2    She's got step-fathers and step-sisters.  I think this

3    was the one --

4         DETECTIVE LEGALL:  Do you know where he lives?

5         BRIAN HERLIHY:  No, I don't.

6         DETECTIVE LEGALL:  Do you -- was he with him the

7    entire time last week or?

8         BRIAN HERLIHY:  I don't know.  I don't know if he

9    was actually with him the entire time or his wife or --

10   I just know that when I said, Where's Robbie?  She goes,

11   Oh, my brother has him.  I said, Oh, okay.  Well, how

12   long is your brother going to have him to?  And she

13   said, Oh, I don't know.  I think he's going back home on

14   Saturday.  And on Sunday, because Crystal worked in

15   Chiefland on Saturday, and on Sunday she had to go to a

16   drive, and I said, Well, who has him?  She said, My dad

17   has him.

18        DETECTIVE LEGALL:  So her dad.  Where does he live?

19        BRIAN HERLIHY:  In the suburbs of Jacksonville, the

20   Jacksonville area.

21        DETECTIVE LEGALL:  So her dad had him Sunday and

22   she picked him up?

23        BRIAN HERLIHY:  Sunday and she -- Monday she met

24   either her dad or her stepmom.  She met whoever had

25   Robbie in Starke.  They met like halfway.

1639

1    DETECTIVE LEGALL:  On Monday?

2    BRIAN HERLIHY:  On Monday, yeah, Monday morning.

3    DETECTIVE LEGALL:  Monday morning?

4    BRIAN HERLIHY:  Right.

5    DETECTIVE LEGALL:  Do you know what time?

6    BRIAN HERLIHY:  It had to have been early because

7    she was at the house, my house, 10:30 in the morning.

8    DETECTIVE LEGALL:  And she had Robbie with her?

9    BRIAN HERLIHY:  Yes, ma'am.  Because I was all

10   happy when I saw him.  I was like, Hey, my boy's back.

11   My buddy's here.

12   DETECTIVE LEGALL:  Did he seem fine when you saw

13   him on Monday?

14   BRIAN HERLIHY:  Well, he was -- no, he was a little

15   crabby.  He was rubbing his eyes.  I said, Well, let's

16   give him a bottle and put him down.  And once I did

17   that, he was asleep.

18   DETECTIVE LEGALL:  Did she indicate to you any

19   problems he had had the week before?

20   BRIAN HERLIHY:  No, ma'am.

21   DETECTIVE LEGALL:  Okay.  Reference colic, you had

22   told us about the colic.

23   BRIAN HERLIHY:  Yeah, she said she had him one

24   night, I think it was before the brother picked him up

25   and had him, she said she was up a lot in the evening

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1   with him, middle of the night with him.  And this is a

2   baby that he sleeps real good at night.  I mean, he'll

3   go to bed with us or go to bed with her at 9:00 at night

4   and he might wake up at 5:00 and want to play and have a

5   bottle and then he'll go back to sleep.  So he sleeps

6   real well.  He slept yesterday for me for an hour, hour

7   and a half.  And I mean, I was laying right next to him

8   for a good portion of that time and then when we went to

9   the -- when I came back from my appointment, Crystal had

10  had him with him -- with her.  And I came back and we

11  were both there.

12       DETECTIVE LEGALL:  Yesterday?

13       BRIAN HERLIHY:  Yesterday.  And I went into the

14  apartment yesterday and I said, Where's my buddy?  And

15  she said, He's laying down.  He was fussing.  He was

16  real irritable.

17       DETECTIVE LEGALL:  What time was that?

18       BRIAN HERLIHY:  She got -- I got home at 3:00, she

19  got home she said about five minutes before I did.

20       DETECTIVE LEGALL:  So let me kind of clarify this.

21  She came around 10:15 or so, because she had to got to

22  CPR?

23       BRIAN HERLIHY:  Yes.

24       DETECTIVE LEGALL:  She came back around 1:45 or so?

25       BRIAN HERLIHY:  Right, because she had a break.

1641

1    DETECTIVE LEGALL:  Did she leave?

2    BRIAN HERLIHY:  Yeah, she left and went back --

3    DETECTIVE LEGALL:  And she took Robbie with her?

4    BRIAN HERLIHY:  Yes, ma'am, because she knew I

5    couldn't take the two dogs and the baby.

6    DETECTIVE LEGALL:  So you left at that point too?

7    BRIAN HERLIHY:  I left about ten till 2:00.

8    DETECTIVE LEGALL:  And then around threeish --

9    BRIAN HERLIHY:  I got home at 3:00 and her car was

10   already there.  And I said, When did you get home?  She

11   said, Five minutes before you did.  I said, Where's

12   Robbie?  She said, He's lying down on the bed.  I looked

13   and he was, she left his little shoes on.  He was just

14   happy as a clam.  He was asleep.

15   DETECTIVE LEGALL:  Okay.  But later when he wakes

16   up -- did he stay there most -- did he stay there all

17   night?

18   BRIAN HERLIHY:  No, they left about, because she

19   had, because of the domestic situation, she's still

20   moving stuff, and she didn't want to have to explain to

21   her husband, soon to be ex-husband, where her son was

22   at.  So she's, I'll just take him with me when I move

23   and get the boxes and stuff.  And they left.  They

24   weren't there long.  She left about quarter to 5:00,

25   maybe a lit about after.  I'm not to clear on the time.

1642

1        DETECTIVE LEGALL:  Okay.  And the next time you saw

2    him was when?

3        BRIAN HERLIHY:  This morning.

4        DETECTIVE LEGALL:  When she brought him over this

5    morning?

6        BRIAN HERLIHY:  Yes.

7        DETECTIVE LEGALL:  Okay.  Tell me about the

8    incident that happened three weeks ago with Robbie.

9        BRIAN HERLIHY:  I'd say three weeks before, I'm not

10    too sure.  It was the one night, one of the nights they

11    did stay over, I think it was one of the last nights,

12    because that's when she started having the domestic

13    problems.  And he was laying at the foot of the bed

14    like --

15        DETECTIVE LEGALL:  In the same place he was today?

16        BRIAN HERLIHY:  Yes, ma'am.  Actually he was a

17    little bit more centered.

18        DETECTIVE LEGALL:  Okay.

19        BRIAN HERLIHY:  And the pillow was brought up a

20    little bit more.  And mom was on this side of the bed.

21        DETECTIVE LEGALL:  Which would be the right side of

22    the bed?

23        BRIAN HERLIHY:  Left side of the bed, more or less.

24        DETECTIVE LEGALL:  She's on the left side of the

25    bed?

1    BRIAN HERLIHY:  I mean, it had been --

2    DETECTIVE LEGALL:  I'm looking at the headboard as

3    we're looking at picture number three.  Is she on the

4    left side or right side?

5    BRIAN HERLIHY:  Okay.  So I was on the left side

6    and she was on the right side.

7    DETECTIVE LEGALL:  Okay.  The baby is in between

8    you?

9    BRIAN HERLIHY:  In between.  I heard a noise.  And

10    I woke up and I said, Where is he?  And she looked and

11    all you could see was little feet was going down.  It

12    was like because he was sliding.  And I grabbed him.

13    She goes, Is he okay?

14    DETECTIVE LEGALL:  So he's falling down in the same

15    area he was at today?

16    BRIAN HERLIHY:  No, well, it was more in the center

17    here, it was a bigger gap.

18    DETECTIVE LEGALL:  Okay.

19    BRIAN HERLIHY:  And I grabbed him and I looked at

20    him and she says, Is he okay?  And his eyes opened real

21    quick and they went back down.  And I said, He looks

22    like he's fine to me, because they closed right back up.

23    I said, Robbie.  And he just gave me that sleepy look

24    and fussed.  And I said, You want to take him to the

25    hospital.  She said, Well, what do you think?  I said, I

1    think he's okay.  Let's just watch him.

2         DETECTIVE LEGALL:  Was he crying at all?

3         BRIAN HERLIHY:  Wasn't crying at all, just moving

4    his fist over his eyes like he was tired.  So we put a

5    pillow in between the two of us, laid him on his stomach

6    between us, and we slept until 9:00 that morning and he

7    was perfectly fine.

8         DETECTIVE LEGALL:  Did he wake up any point during

9    that time after that?

10        BRIAN HERLIHY:  No, slept like a baby.

11        DETECTIVE COLEMAN:  When Crystal came back, was

12   rescue already there today?

13        BRIAN HERLIHY:  Yes, sir.

14        DETECTIVE COLEMAN:  Your understanding your

15   relationship with Crystal is that she is your fiance?  I

16   heard you use that term.

17        BRIAN HERLIHY:  Well, she used it and I figured

18   we're going to be getting married.  So, yeah, I guess

19   you could say that she's my fiance.

20        DETECTIVE COLEMAN:  There was some kind of receipt

21   on your dresser for something to do with jewelry.  Is

22   that some kind of engagement ring?

23        BRIAN HERLIHY:  That was a repair on, she had an

24   heirloom that was missing a stone or something.  It was

25   just a claim check.

1645

1    DETECTIVE COLEMAN:  So that had nothing to do

2    with --

3        BRIAN HERLIHY:  No, sir.

4    DETECTIVE COLEMAN:  I noticed there are some baby

5    clothes and some woman clothes in the house.

6        BRIAN HERLIHY:  Uh-huh.

7    DETECTIVE COLEMAN:  I've heard you say she stayed

8    overnight.  Has she -- do you consider her quasi-semi

9    living with you?

10       BRIAN HERLIHY:  No.  No.  She had even brought

11   forward to me, we had talked last week.  I said, Why

12   don't you stay over since the baby is with your brother?

13   DETECTIVE COLEMAN:  And there were like four pair

14   of shoes there.

15       BRIAN HERLIHY:  Yeah, well, she comes over and she

16   changes because where she's living she doesn't have a

17   washer and dryer and I like to do laundry.  I'm one of

18   these people who's a clean freak.  And I usually, when I

19   go to the place where we -- where she went to pick up

20   the towels today, I do all her laundry.  I iron the

21   scrubs and all that.  She says I'll make a good wife

22   some day.  I mean, so I do all the laundry.  I even do

23   the baby's laundry.  I hand wash all his clothes because

24   I don't want to put them in a washer, because it needs

25   to get done and she doesn't have the time.  I have the

1    time so I do it.  And sometimes when she comes from the

2    house, she'll take a shower at my place and she'll go to

3    work.  She says it's just easier that way.  I don't see

4    how it's easier, a is a shower, but I don't mind.  But

5    she doesn't really, I mean, doesn't pay any bills,

6    doesn't really -- she's like stayed over maybe twice the

7    entire time.

8         DETECTIVE COLEMAN:  Okay.  I think I'm getting a

9    better picture.  Okay.  This morning, you stated before

10   that she had gotten there, to your best of your

11   knowledge, between 8:30 and 9:00.  How firm are you

12   there on the time there, or are you firm?

13        BRIAN HERLIHY:  I'm pretty firm.  I hate to put it

14   to TV but I had my FX on and MASH was still on when she

15   showed up.

16        DETECTIVE COLEMAN:  She was there 20, 30 minutes or

17   so?

18        BRIAN HERLIHY:  Yeah, we were -- she says, Do you

19   still want to go to Cedar Key today.  I said, Well, do

20   we really have to because this is your only day off and

21   we've got the baby here.  Let's have fun with the baby.

22   And she says, No, I really want to go to Cedar Key.  I

23   said, Okay.  Well, my truck, I need to get gas in it.

24   And she said, Give me keys, I'll pick up the stuff and

25   I'll go get gas in your truck.  I said, Okay.

1    DETECTIVE COLEMAN:  We've got a receipt here that

2    you apparently told these detectives about, and she told

3    me about, it's dated today.  It's 9:25.  I haven't had a

4    chance to verify the time is right.  9:25 A.M.  She says

5    that she bought $31 and some odd of gas, 19 gallons.

6        BRIAN HERLIHY:  Of gas.

7        DETECTIVE LEGALL:  That was in your truck too,

8    correct?

9        BRIAN HERLIHY:  Right, yes, ma'am.

10       DETECTIVE COLEMAN:  So I don't know if this clock

11   is right but does that sound about right to you for the

12   time that she would have been buying gas, about 9:25.

13       BRIAN HERLIHY:  Yeah.  Where exactly -- where is

14   that -- actually because I'm trying to think --

15       DETECTIVE LEGALL:  That's going to be probably next

16   to the fire station.

17       BRIAN HERLIHY:  Yeah.  I was wondering if she --

18   yeah, that is the one by the fire station, by station

19   two.

20       DETECTIVE COLEMAN:  Right.

21       DETECTIVE LEGALL:  On Archer Road.

22       BRIAN HERLIHY:  I'm just trying to remember if -- I

23   didn't know if she went to -- I told her to go here

24   first, and then go here.

25       DETECTIVE COLEMAN:  I know that she told me she got

1648

1   gas first and went to Duds & Suds, or whatever.

2       BRIAN HERLIHY:  Right.

3       DETECTIVE COLEMAN:  And this does not have a time

4   on it.

5       BRIAN HERLIHY:  Right.

6       DETECTIVE COLEMAN:  However, since it is an ATM,

7   debit, we can get a time on it.

8       BRIAN HERLIHY:  I just figured she did it was I

9   told her versus going all the way out there, do one trip

10  and do it on your way back.  But she wears the pants in

11  the relationship, so that's fine with me.

12      DETECTIVE COLEMAN:  Okay.  All right.  Let's see if

13  we can call the hospital and check on Robbie's

14  condition.  Do you want something to drink, go to the

15  bathroom or anything like that?

16      BRIAN HERLIHY:  No.

17      DETECTIVE COLEMAN:  Okay.  If you can do me a favor

18  and just hang loose just a minute, we'll update you on

19  his condition and we'll get back to you.

20      BRIAN HERLIHY:  Okay.

21      DETECTIVE LEGALL:  This concludes our conversation

22  with Brian Herlihy.  It's 1626 hours.

23      (The audiotape was concluded.)

24      MS. SINGER:  Your Honor, at this time I'd like to

25  move this tape into evidence as the next numbered

1    exhibit for the state.

2        MR. GROLAND:  No objection.

3        THE COURT:  It will be admitted as state's number

4    seventy?

5        THE CLERK:  Three, Your Honor.

6        THE COURT:  Seventy-three in evidence.

7        (State's Exhibit No. 73 was moved and admitted into

8    evidence.)

9        MS. SINGER:  Your Honor, at this time I would like

10   to have Mr. West set up the machine so that I can ask

11   some questions regarding the photograph --

12       THE COURT:  Come on up, Mr. West.

13       MS. SINGER:  -- to Investigator Legall.  We're

14   probably going to need to dim the lights a bit when the

15   time comes, as well as I'm going to ask that

16   Investigator Legall be allowed to leave the stand.  I

17   need the laser pointer.

18       Investigator Legall -- Investigator Legall, if you

19   could step down.  If you need your notes, feel free to

20   bring them with you.

21       But otherwise may I proceed, Your Honor?

22       THE COURT:  Go ahead.

23   BY MS. SINGER:

24   Q    Investigator Legall, during the course of this

25   taped interview, you made reference to the bottle that

1   Mr. Herlihy indicated to you he used to feed the child.  In

2   the statement, you stated there was a bottle in picture four.

3   This is picture four.  Is this the particular bottle that you

4   were referring to when you asked Mr. Herlihy about the

5   bottle?

6        A    Yes, it is.

7        Q    Was it located on the dresser area?

8        A    Yes, it is.

9        Q    Is this the footboard of the wrought iron bed that

10  you were referring to in the interview?

11       A    Yes, it is.

12       Q    You then made reference to picture number one I've

13  now placed on the screen, and this is 26(a) of the composite.

14  I'm now showing you picture one.  You asked Mr. Herlihy how

15  he had positioned the baby on the bed.  Using this

16  photograph, I'm going to let you have the laser pointer, if

17  you could explain to the jury how he showed you on the

18  photograph the baby was positioned, using this particular

19  photograph?

20       A    Actually, it's easier for me if I go up there and

21  kind of point, is that okay?

22       Q    That's fine.  If that's okay with the Court?

23            THE COURT:  Go ahead.

24       A    This is the end of the footboard.  These are the

25  poles to the canopy bed.  This is a pillow sham.  And then on

1   another picture it's a little easier to see, but there's a

2   white, like I said, he called it T-shirt material pillowcase

3   that's kind of under this on the either side (indicating).

4       Q    All right.  And what direction did he say he laid

5   the baby in?

6       A    He said he laid the baby this way, which would be

7   side to side on the bed, with the head more towards the

8   middle and the feet towards the side of the bed (indicating).

9       Q    Did he lay the child on the sham pillow or the

10  pillow immediately --

11      A    On the white pillow, which you can't really see in

12  this picture.

13      Q    Let me go ahead and put picture number five up,

14  marked as 26(e), and using this picture from a different

15  direction, if you could go ahead and tell the jury where the

16  baby was laid, how he showed you the baby was laid, using

17  this picture?

18      A    Actually -- there's a white pillow under here, and

19  the white pillow is what he laid the baby on.  The sham is

20  what he described as being pushed in between the end of the

21  mattress and the frame of the bed.

22      Q    Now, he does describe how Robbie was wedged into

23  the bed.  And, once again, showing you 26(a), picture number

24  one, could you show the jury where he indicated to you the

25  baby's head was when he found the child after leaving the

1652

1   bathroom?

2       A     Okay.   This sham would have been pushed in between

3   the frame and the bed.  It was probably, I don't know, maybe

4   six inches at the most.  And this sham would have been pushed

5   in horizontally like that.  And the baby was, Robbie was

6   upside down, his face was facing out, and his feet were up.

7   And he described him as being between the -- this is the

8   bottom rung towards the floor.  This is the second rung,

9   that's what I call it, rung.  And he was between the first

10  and second rung, that's where his head was.

11      Q     Where would his neck have been if his head was

12  between the first and second rung, where was his neck?

13      A     Well, if his head's here, his neck is probably

14  somewhere in that general vicinity (indicating).

15      Q     About how many inches from the floor did he say

16  Robbie's head was?

17      A     He said he was approximately three inches from the

18  ground up.

19      Q     And --

20          MR. TEDDER:  Your Honor, I'll object and ask to

21      strike that, it's the first -- that wasn't on the taped

22      statement.

23          THE COURT:  Overruled.

24  BY MS. SINGER:

25      Q     Showing you picture number four, did he indicate to

1   you whether or not there was any vomit or spit up on the rug

2   as depicted in this picture?

3        A    Actually, there is another picture --

4        Q    Yes, ma'am.

5        A    -- with --

6        Q    Did he say there was any vomit on this picture?

7        A    Not that I recall.

8        Q    I'm going to show you number seven.  And in your

9   interview with him, did he make reference to vomit on the rug

10  in this picture?

11       A    Yes.  This would be an area of vomit on the floor

12  that he told us this is where the child aspirated, is the

13  word that he used.  And actually, this is the other side of

14  the bed.  And then right here (indicating) -- on one of the

15  previous photos you can see, this is like a screen that's

16  over by the window that goes out to the parking lot.  So this

17  would be between the bed and that wall where the window is

18  that goes out to the parking lot.  So it's the opposite side

19  of the bed.

20       Q    He also made reference to a radio that he used to

21  play music for Robbie; is that correct?

22       A    Yes, he did.

23       Q    And he spoke of that radio being in picture number

24  three.  Let me show you picture number three here.  Can you

25  please show me where he pointed out that particular item?

1654

1   A    This is the radio right here that he was talking

2   about (indicating).

3   Q    Did he also show you that particular item in

4   picture number two, 26(b) in evidence?  Let me put that up

5   for you.

6   A    That would be the front of the radio, the other one

7   was a back view.

8   Q    He also indicated to you in his statement that he

9   pushed the mattress back because these mattresses can kind of

10  move back some, and I got him out, and he was unresponsive

11  and he was making this gurgling noise.

12        Could you show us on picture number one or picture

13  number six, which I can put up together.  I can't put them up

14  together, so I'll start with number one, 26(a), where the

15  mattress would be located that he would have pushed back?

16  A    Well, the mattress -- well, you can see the

17  mattress is right here and the space is going to be in

18  between the mattress.  And like this is the corner post of

19  the canopy, so it's in between there (indicating).

20  Q    All right.  Where did he say the pillow sham was at

21  that time, that the baby was wedged down there?

22  A    Almost to the floor.

23  Q    And was that the pillow sham that he identified up

24  there on the bed as the sham that was almost to the floor?

25  A    Yes.

1    Q    I'm showing you six now, which is a different view.

2   Could you show the jury where the space was that would have

3   had to be the space where the baby was located from this

4   view?

5    A    Okay.  It's going to be right -- this is the

6   opposite side of the post.  This is the post we were just

7   looking at.  And it's going to be like in this area right

8   here (indicating).

9    Q    And where was the baby's head from this position?

10   A    This is the floor, this is, like I said, what I

11   call the first rung of the bed, which is the closest to the

12   floor, this is the second rung.  And it was in between the

13   first and second rung.

14   Q    Now, you also indicated that picture number three

15   reflected where the stain, the vomit stain was, and you used

16   that picture.  And he stated that the stain was in the middle

17   of the bed right in the middle, like in picture number three.

18   The stain where the formula had actually, where I put him

19   down the first time, because I saw it was all matted there.

20       If you would please show the jury where he showed

21   you the formula stain would have been on the bed using -- let

22   me go ahead and get this right here, picture number three,

23   26(c) into evidence?

24   A    He said it was basically in the center of the bed,

25   so about the center of the bed, so it's going to be right in

1    this area (indicating).

2           MS. SINGER:  You may return to the stand,

3       Investigator Legall.

4           THE COURT:  Turn the lights back up, please.

5    BY MS. SINGER:

6       Q    After you took the taped statement from the

7    defendant, Mr. Herlihy, did you continue to have

8    conversations with him that were not tape recorded?

9       A    Yes, I did.

10      Q    Did there come a time when Investigator

11   Coleman -- well, let me ask you first:  Was that the voice of

12   Investigator Coleman on the tape recorder when you heard the

13   male voice?

14      A    Yes, it was.

15      Q    And did there come a time when Investigator Coleman

16   confronted Brian Herlihy and cussed at him?

17      A    Yes, there was.

18      Q    Do you remember specifically what he said or the

19   gist of what he said?

20      A    I remember the gist of what he said.

21      Q    And what did, what was the gist of what he said?

22      A    He accused Mr. Herlihy of being a lying piece of

23   shit.

24      Q    And where did Investigator Coleman go immediately

25   after making that statement?

1    A    I asked Detective Coleman to leave the room.

2    Q    Did he leave the room?

3    A    Yes, he did.

4    Q    What did Mr. Herlihy say about Investigator

5  Coleman?

6    A    He wanted nothing to do with Detective Coleman.

7    Q    And did he at any time, after that comment, tell

8  you he did not wish to speak with you anymore?

9    A    No, he did not.

10    Q    How was his demeanor with you after Detective

11  Coleman left?

12    A    He was still cooperative with me.

13    Q    How was your conversation with him?

14    A    My conversations with Mr. Herlihy were fine.  He

15  had no problem talking to me.  I had no problem talking to

16  him.

17    Q    And did he give you information or did you have to

18  ask him leading questions to obtain information from him?

19    A    No, he was forthright with most of the information.

20  Some questions I had to ask him, obviously, because there

21  were certain things I needed to know, but he was very willing

22  to tell me what had happened that day.

23    Q    Did you then have a time frame when Sergeant Larry

24  Seale came in to sit with you during the interview?

25    A    Yes.

1658

1    Q    Before that happened, do you recall conversing with

2    Mr. Herlihy where he had indicated that --

3              MR. GROLAND:  Objection, leading.

4              THE COURT:  Overruled.

5              MS. SINGER:  I can rephrase though to make it less

6         leading and make it more open-ended than that.

7    BY MS. SINGER:

8    Q    After Alan Coleman left but before Sergeant Seale

9    came in, did you continue to have your conversation with

10   Mr. Herlihy?

11   A    Yes, I did.

12   Q    And did he further expand on what he did with

13   Robbie at the house?

14   A    Yeah, he said that -- we talked a little bit more

15   about what had actually happened.  And he said that when he

16   was giving him some of the breaths for the CPR and stuff,

17   that he may have shook him gently.

18   Q    Did he demonstrate for you how he shook the baby?

19   A    At that point, I think it was it was pretty much

20   like he shook him.  Later on it turned a little bit more

21   force to it.

22   Q    Do you know whether or not Sergeant Seale was

23   watching this particular interview with the monitor that you

24   have for interviews of this type?

25             MR. TEDDER:  Objection, speculation.

```
 1              MS. SINGER:  If she knows.

 2              THE COURT:  The objection is sustained.

 3              MS. SINGER:  Do you know whether or not he was

 4         watching, I can't ask that question?

 5              THE COURT:  Not that way.

 6    BY MS. SINGER:

 7         Q    Did there come a time when Sergeant Seale came into

 8    the room?

 9         A    Yes, there was.

10         Q    And were you present when Sergeant Seale was in the

11    room?

12         A    At first Sergeant Seale was in the room and I was

13    not present, it was probably for five or ten minutes, and

14    then I was present.

15         Q    When you returned, did you continue to have a

16    conversation with Mr. Herlihy?

17         A    Yes, I did.

18         Q    And what occurred when you and Sergeant Seale were

19    in the room together with Mr. Herlihy?

20         A    When I came back into the room, I -- we have dolls

21    that we use at the police department for sexual battery

22    investigations.  And these dolls are called anatomically

23    correct dolls, and they have certain body parts on the dolls

24    that we use for small children to show us how somebody may

25    have assaulted them, because a lot of times children don't
```

1   have those words that they can use like we do as adults, so

2   they need to show us.  And we have these dolls, and I did

3   bring one of the dolls back in that was about, what I thought

4   maybe was about the same size as Robbie.

5        Q    Let me go ahead and show you this particular item

6   and ask you if you recognize it?

7        A    Yes, I do.

8        Q    And what is this?

9        A    This is our white male child who's anatomically

10  correct.

11       Q    Is that the doll you brought back into the room

12  with you when you returned back to the room and you were in

13  the presence of Mr. Herlihy, Sergeant Seale and yourself?

14       A    Yes, it is.

15       Q    And does it appear to be in the same or similar

16  condition?

17       A    Yes.

18            MS. SINGER:  Your Honor, I'd move this doll into

19       evidence as the next numbered exhibit.

20            THE COURT:  Any objection?

21            MR. GROLAND:  Can I ask a few questions before that

22       goes into evidence, voir dire?

23            MS. SINGER:  I'll just have it marked for

24       identification and allow him to voir dire during his

25       cross-examination.

1    THE COURT:  Good enough.

2    THE CLERK:  State's Exhibit M, Your Honor.

3    BY MS. SINGER:

4    Q    Showing you State's Exhibit M, did you bring this

5    doll in to use during the course of your interview with

6    Mr. Herlihy?

7    A    Yes, I did.

8    Q    And do you recall what occurred after you brought

9    the doll into the room?

10   A    I handed it to Mr. Herlihy and asked him in

11   relationship to Robbie how was the size of the doll.

12   MR. GROLAND:  Your Honor, I have an objection and

13   I'd like to approach the bench with counsel.

14   THE COURT:  Okay.  Do we need the court reporter?

15   MR. GROLAND:  Yes.

16   (A sidebar discussion was held:)

17   MR. GROLAND:  Your Honor, we filed a pretrial

18   motion in limine regarding demonstrations and the

19   agreement and the, I think the final order of the Court

20   would be that neither side would do any demonstrations

21   in court.  And my specific discussion with Ms. Singer, I

22   believe, in open court, in front of the judge, was that

23   would include Mr. Herlihy not doing the demonstration.

24   So I object to what looks like is about to happen as

25   being contrary to this Court's prior order on our motion

1662

1   in limine.

2        MS. SINGER:  I don't agree with what Mr. Groland

3   just said.  This testimony is in fact proper admission

4   testimony, words and acts constitute admissions.

5        THE COURT:  What about the pretrial rulings that

6   there would be no demonstrations.

7        MS. SINGER:  What I understood was that there would

8   be no re-enactment of the re-enactment.  And I agree

9   with that.  But this testimony is a demonstration of how

10  he used this doll in the manner that she viewed.  That's

11  not a re-enactment of a re-enactment.  That's testimony

12  regarding what she saw and heard during the course of

13  the interview.  I think it's totally proper and

14  admissible.

15       THE COURT:  She can describe it, she cannot

16  demonstrate it.

17       MS. SINGER:  All right.

18       (The sidebar discussion was concluded.)

19  BY MS. SINGER:

20  Q    Investigator Legall, after you bring the doll back

21  into the interview room, did Mr. Herlihy use that doll to

22  demonstrate how he handled Robbie during the time frame that

23  the child was injured?

24  A    Yes, he did.

25  Q    And what did -- you need to describe in words what

1    you saw.

2         A    Well, he took --

3              MR. GROLAND:  Objection, Your Honor, I see her

4         hands going up and I think that is contrary to the

5         Court's ruling.

6              THE COURT:  It is.

7    BY MS. SINGER:

8         Q    All right.  You can't use your hands to show us,

9    you have to describe in words verbally what you saw him do.

10        A    Okay.  I handed him the doll.  He said that it was

11   approximately the same size as Robbie except for the weight,

12   obviously, because it's a doll and Robbie is a baby.

13             He said that -- how do I describe this?  He

14   grabbed -- I don't want to say grabbed.  He took the doll and

15   put his hands around the waist of the doll, around maybe the

16   top of the pants, maybe a little bit higher, and put both his

17   hands on the doll, and said that he shook the doll.  And when

18   he shook the doll, it was a stern shake, and it was like one

19   movement.

20        Q    And were you present when Sergeant Seale asked him

21   about that particular shake?

22        A    Yes.

23        Q    And what do you recall -- I'm not going to ask you

24   what Sergeant Seale said.  We'll have Sergeant Seale to

25   testify to that.  What do you recall Mr. Herlihy, the

1    defendant's response to Sergeant Seale's question regarding

2    the shake?

3         A    Was that it's possible he shook him harder than

4    that.

5         Q    And did there come a time while Sergeant Seale was

6    present that Mr. Herlihy spoke about his apartment?

7         A    Yes.

8         Q    And what occurred next, what did he say next?

9         A    What he said was, he asked us if we would be

10   willing to come with him to his apartment and he would show

11   us exactly what happened.

12        Q    And did you all agree to do that?

13        A    Oh, yes.

14        Q    Who went?

15        A    I went, Sergeant Halvosa went, Sergeant Seale went,

16   Investigator Millard, who was our forensic investigator, went

17   and she had an intern that was with her named Jessica Green.

18        Q    And what was the purpose of Investigator Millard

19   going to the apartment?

20        A    She was going to videotape the re-enactment.

21        Q    And what was your purpose in going to the

22   apartment?

23        A    My purpose was to witness the re-enactment.

24        Q    Did you do that?

25        A    Yes, I did.

1    Q    And was there any time that Mr. Herlihy, the

2    defendant in this case, told you that he did not want you to

3    enter his apartment for this purpose?

4    A    No, there was not.

5    Q    Describe for us how Mr. Herlihy was acting towards

6    you entering into his apartment.

7    A    Like I said before, Mr. Herlihy was very

8    cooperative with us, almost to the point of friendly.  He

9    invited us in, and he opened the door, and we went in with

10   him.

11   Q    Did you bring equipment with you to tape this

12   particular re-enactment along with the videotape?

13   A    Yeah, I still had my tape recorder from the

14   previous tape that you all had just listened to with me.

15   Q    And do you recall whether or not you actually tape

16   recorded everything that was said at that time?

17   A    Actually, I had a little faux pas with the tape.  I

18   turned it on but apparently I didn't have the tape on the

19   right side, so probably the first couple of minutes was not

20   on the tape.  When I discovered that I had not turned it on

21   the right side, I stopped everything.  We went back on the

22   right side of the tape and I put everything verbally onto the

23   tape that we had done up to that point.

24   Q    Did you make any threats or in any way coerce

25   Mr. Herlihy to make any statements to you while the tape was

1666

1    not working?

2        A    No.

3        Q    Was there anything that occurred with any of the

4    other officers in your presence that suggested to you that

5    the defendant's statements at the time that he was at his

6    home were coerced or threatened or forced in any way?

7        A    No.

8        Q    Did you make any promises to him to get him to make

9    statements to you at the house?

10       A    No.

11       Q    And did you then tape record what had occurred

12   after you realized the tape recorder was not working

13   properly?

14       A    Yes.

15       Q    Did there come a time when you discovered that the

16   video camera wasn't working properly?

17       A    Yes.

18       Q    And at that time is that also part of the audible

19   tape, do you know, is there some discussion about that on the

20   tape itself?

21       A    No.   There was a problem on the tape where the

22   battery went dead and she had to change the batteries, I

23   think, one or two times, but I didn't find out about the tape

24   working until the next day.

25            MS. SINGER:  At this time, Your Honor, we have an

1      approximate 26 minute tape.  We're quarter to 6:00.

2      It's the Court's call on what we want to do.

3           THE COURT:  Ladies and gentlemen, we're going to

4      recess.  I don't think it would be reasonable to try to

5      conclude this witness tonight.

6           Also I have a written question from the jurors that

7      I'm going to read into the record and file, and it says,

8      Your Honor, in respect to the time allotted for this

9      trial, are we still on the original schedule estimated

10     at two weeks?  If not, what information can you provide

11     us to give our employers advance notice before Friday

12     morning about continuing absence from work?  Thank you,

13     Jurors.

14          I have discussed this with the attorneys and my

15     best estimate at this time is that we will not be able

16     to conclude the trial this week.  And, therefore, I will

17     not try to work everybody into the ground to attempt to

18     accomplish that when it's really not realistic.  The

19     best estimate that I can give you at this time is that

20     you will be back at work on Wednesday.  Of course, as

21     you can see, that is an estimate.  It is possible that

22     we would finish this trial Friday night.  It is possible

23     that we would finish this trial completely on Monday.

24     But since you're going to have to give your employers

25     some information, I think that the most reasonable thing

1    to tell them is that our very best estimate is you will

2    be back at work on Wednesday, and any earlier than that

3    will just be some extra time flexibility.

4         With that information, of course, I'm going to give

5    you the same admonishment.  Do not discuss the evidence

6    or the testimony or any additional information.  And you

7    will be released at this time for the evening after we

8    lock up your notebooks.

9         Just in case anybody's work schedule doesn't allow

10   them to contact their employer, for instance, before

11   9:00 in the morning, I'll make sure that tomorrow

12   morning each of you that may need to has an opportunity

13   during what may for some people a normal work schedule

14   to contact your employers and give them that

15   information.  So if anybody needs to make contact with

16   their employer between the hours of 9:00 and 5:00

17   tomorrow, let me know and we'll make sure you have phone

18   access tomorrow morning before the 10:30 recess, which

19   will be our first recess.

20        With that instruction, thank you very much.

21        MR. GROLAND:  Your Honor, can I approach with

22   something that I just gave a copy to the state.

23        THE COURT:  Yes.  Let the jurors come through.

24        (The jury exited the courtroom.)

25        MS. SINGER:  I need to approach the clerk and

1    provide, return these items.

2        THE COURT:  All right.  We're going to file this

3    motion.  I expect that now that we have a different

4    expectation in terms of time frame of the trial that

5    there will be some reasonable time to address this

6    motion.  I will tell you that from the face of it, it

7    appears that you would need to also file the deposition

8    of the doctor.

9        MR. GROLAND:  Yes, it is filed.

10        THE COURT:  All right.  Good enough.  Then we can

11    refer to it at the time of the hearing.  You'll need to

12    make note of any portions of that deposition that you

13    believe might be relevant.

14        Anything else we need to address before we recess

15    tonight?

16        MR. TEDDER:  Yes, Your Honor.  Previously we had

17    been instructed to get a copy of the DVD film

18    Dr. Uscinski used during his testimony.  I was told by

19    one of the employees of the office that the place we

20    took -- I was told last night at the office that that's

21    not possible to copy the DVD.

22        However, Mr. Groland's son came in during the

23    testimony of Detective Legall.  He informed me that this

24    disk does have the operation, for some reason, they were

25    not able to transfer the photographs of the one year old

1    baby.  I don't know if that's true or not.  If it turns

2    out to be true, I'm sure the state can look at this.

3    But Dr. Uscinski informed me before he departed that he

4    could overnight a copy.  Because our last conversation

5    with Dr. Uscinski, it's our understanding for some

6    reason they could not copy it, but he said he could make

7    a copy and overnight it to me.  So if the state will let

8    us know first thing in the morning, I can get

9    Dr. Uscinski to send us whatever we need.

10        MS. SINGER:  I think we better.  We can tell you

11   tonight to go ahead and call him and overnight it.

12        MR. TEDDER:  Well, he's not going to arrive home

13   until after 10:00, so the earliest I'm going to speak to

14   him is tomorrow evening.

15        MS. SINGER:  That's good.  Maybe you can get

16   someone in your office to call him tomorrow.

17        MR. TEDDER:  Yes.

18        THE COURT:  Anything else we need to put on the

19   record before we recess for the evening?

20        MR. TEDDER:  Are we going to hear this motion

21   tomorrow morning or some other time?

22        THE COURT:  We're not going to hear it tomorrow

23   morning.  Based on what we have anticipated in terms of

24   the scheduling of the witnesses, we will hear this

25   hopefully sometime between the hours of 9:00 and 5:00 on

1    some day before this trial is concluded and may in fact

2    be at a time when the jury is deliberating.

3         MR. GROLAND:  That would certainly not be our

4    preference, you know, we'd like to hear it sooner.

5    Because if the Court -- we're on?  If the Court finds

6    that what we say has merit, then we have a number of

7    options, the least desirable of which I think is a

8    mistrial, but it may involve instructions to the jury

9    before they begin to deliberate.

10        THE COURT:  Hold on just one second.

11        (The jury exited the courtroom.)

12        THE COURT:  Is everybody out?

13        THE BAILIFF:  Yes, everybody is out.

14        THE COURT:  I see that, Mr. Groland, from the

15   motion that in fact you are not requesting necessarily a

16   mistrial as the only potential sanction.  You're

17   requesting that the Court consider a special

18   instruction.

19        MR. GROLAND:  That is correct.  If we all decide

20   that a mistrial is not appropriate, and I've not really

21   discussed that issue with my client, but there may be

22   another remedy available if the Court feels that a

23   remedy is in order.

24        THE COURT:  Well, certainly under those

25   circumstances I will make sure that we hear this before

1672

1   the jury begins deliberations.  And I'll ask that you go

2   ahead and be prepared to present to the Court at the

3   time of the motion hearing what proposed instruction you

4   might be requesting as an alternative sanction.

5       MR. GROLAND:  I'll tell you, Your Honor, I know

6   what the instruction is.  We're asking that the Court

7   exclude that testimony on those two items and instruct

8   the jury that they are no disregard that if this Court

9   finds that there was a discovery violation.

10      THE COURT:  Write it down.  Obviously it's going to

11  be a little bit more, it's going to be too long for me

12  to paraphrase.  So you write it down and present it at

13  the time of argument.

14      Anything else we need to address tonight?

15      MR. PENNYPACKER:  My question, again, is this is

16  not tomorrow morning?

17      THE COURT:  This is not tomorrow morning.  The

18  evidence will begin at 9:00 A.M.  The jury will not be

19  delayed at 9:00 A.M. and it will be scheduled at some

20  later time.  Hopefully there will be some convenient

21  time that makes itself apparent.

22      Thank you.  We'll be in recess.  I'll need the

23  attorneys here by 8:50.  And as you did last night, if

24  something were to come up that we need to address

25  beforehand, please let me know, as you did last night,

1673

1    and be more realistic in terms of the estimated time

2    that we're going to need to address it.  Thank you.

3         MS. SINGER:  And for the witness, since you're on

4    the stand, we can no longer communicate with you about

5    this case, you understand that, until we're finished

6    with your examination.

7         THE WITNESS:  Okay.  I understand.

8         THE COURT:  We're in recess.

9         (The trial was recessed at 5:54 P.M. to the

10   following day, September 19, 2002 at 9:00 A.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25