# EXHIBIT

# P

*202-1-17814*
*F*

# In the District Court of Appeal

## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY }
       Appellant, }
         }
         }
         }
v.          }
         }
         }
STATE OF FLORIDA  }
       Appellee, }

CASE NUMBER   2000-2753-CFA

APPEAL NUMBER 1D02-4788

VOLUME XVI

# TRANSCRIPT
# RECORD

## HONORABLE MARTHA ANN LOTT
### ACTING TRIAL JUDGE

### APPEAL FROM THE CIRCUIT COURT
### 8th JUDICIAL CIRCUIT FOR
### ALACHUA COUNTY, FLORIDA



**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

1674

202-1-17814

1   IN THE CIRCUIT COURT OF FLORIDA
    EIGHTH JUDICIAL CIRCUIT
2   IN AND FOR ALACHUA COUNTY

3   CASE NO. 01-2000-CF-002753-A

4   THE STATE OF FLORIDA

5   vs.

6   BRIAN PATRICK HERLIHY,

7           DEFENDANT.

8   _____/

9

Volume XVI

1002-4788

Docket CH
05-14-2003

10          TRANSCRIPT ON APPEAL
11          PAGES  1674 - 1787
               VOLUME XIII

12

13  PROCEEDINGS:        JURY TRIAL
    BEFORE:             THE HONORABLE MARTHA ANN LOTT,
14                      CIRCUIT JUDGE
    DATE:               SEPTEMBER 19TH, 2002
15  TIME:               9:07 A.M.
    PLACE:              COURTROOM 4A
16                      ALACHUA COUNTY COURTHOUSE
                        GAINESVILLE, FLORIDA
17
    APPEARANCES:
18
        JEANNE SINGER, ESQUIRE
19      and
        STEPHEN H. PENNYPACKER, ESQUIRE
20      120 WEST UNIVERSITY AVENUE
        GAINESVILLE, FLORIDA 32601
21      ATTORNEY FOR THE STATE OF FLORIDA

22      GORDON H. GROLAND, ESQUIRE
        and
23      JOHN TEDDER, ESQUIRE
        500 EAST UNIVERSITY AVENUE, SUITES B&C
24      GAINESVILLE, FLORIDA 32601
        ATTORNEY FOR THE DEFENDANT

25

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1    INDEX VOLUME XII

2    WITNESSES

3    DETECTIVE HELEN LEGALL

4    Continued Direct Examination by Ms. Singer......Page

5    Cross-Examination by Mr. Groland................Page

6

7

8

9    EXHIBITS

10   STATE'S EXHIBITS

11   No. - 74 - Audiotape of Re-enactment..............Page

12   No. - 75 - Miranda Wavier Form...................Page

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1  
2      (Whereupon, the following proceedings were held,  
3  the defendant and counsel being present.)  
4      THE COURT:  Anything we need to put on the record  
5      before the jury comes in?  
6      MS. SINGER:  Yes, Your Honor.  First of all, I'd  
7      like to put on the record that this morning on my way up  
8      in the elevator, I was speaking with Marie Samec, who's  
9      the Gainesville Police Department liaison.  She's also  
10     present to report to the Court.  The elevator was  
11     filled.  We didn't realize there was an alternate juror  
12     in the elevator.  I will report what I said to her,  
13     Ms. Samec, and she can also report to the Court what was  
14     said.  She asked me who I intended to call as witnesses  
15     today.  I reported to her that I intended to call Helen  
16     Legall and Larry Seale, and then I would rest.  She  
17     asked me whether or not I was going to call any other  
18     witnesses, and I said no, but you would need to speak  
19     with Mr. Groland about any witnesses he intended to call  
20     from the Gainesville Police Department.  And I think the  
21     only other thing that was said in the elevator, and  
22     Ms. Samec can confirm this or not, was she said, Well,  
23     many people want to know when they're going to go on the  
24     stand.  And I said, I hope I haven't inconvenienced them  
25     too much, but those are the two people I need today.

1    And does the Court wish Ms. Samec to come up and

2    offer additional testimony at this time?

3         THE COURT:  Mr. Groland?

4         MR. GROLAND:  Your Honor, I accept Ms. Singer's

5    representation as to exactly what was said.  It doesn't

6    concern me a whole lot.

7         THE COURT:  Now --

8         MS. SINGER:  Does the Court wish to inquire of that

9    particular juror?  I don't know her name, but I can

10   describe her for you.

11        THE COURT:  No.  Based on what you've said, based

12   on Mr. Groland's acceptance, all I'm going to do is

13   remind everybody.

14        MS. SINGER:  Yes.

15        THE COURT:  We all know the structure of this

16   courthouse.  We all know where the witnesses are going

17   to be sitting.  We all know which elevators the jurors

18   come up in, which are the same elevators that the

19   attorneys come up in the, the judges come up in,

20   everything.  So there could be, in reality, no

21   reasonable failure to anticipate that you should keep

22   your mouth shut outside this courtroom or unless you're

23   in your own office.

24        MS. SINGER:  And I apologize, I really apologize,

25   Your Honor.

1    THE COURT:  Okay.

2    MR. GROLAND:  A couple other matters.  One is --

3    Ms. Singer, I'm making a motion in limine with regard to

4    Detective Legall's testimony, because I know what is

5    coming, that she is to avoid editorializing or

6    commentary.  For instance, I expect she's going to say

7    such things as, now he changes his story to such and

8    such; now he tells a second story.  And I would want her

9    to specifically avoid that kind of commentary and just

10   instead tell the jury exactly what was said in

11   chronological order.

12   MS. SINGER:  That would be subject to objection.  I

13   don't know how I could control that any other way.  We

14   can instruct her when she gets back on the stand, if the

15   Court wishes her instructed, but --

16   THE COURT:  It would be a proper instruction.  It

17   would also be a proper objection.  And, therefore, there

18   would be no reason not to advise her ahead of time not

19   to make editorial comments.

20   MS. SINGER:  I do have one other thing I want to

21   put on the record.

22   MR. GROLAND:  And I do too.

23   MS. SINGER:  Your Honor, I want to put one other

24   matter on the record.  We had told Mr. Groland and

25   Mr. Tedder that we intended to call Ronald Quisling, MD,

1  radiologist in our case in chief.  We have decided not

2  to call him in our case in chief, and we have advised

3  defense counsel, and Dr. Quisling did provide us with an

4  article that he's read since his last deposition called

5  diffusion Weighted Magnetic Imaging in Shaken Baby

6  Syndrome.  A copy of that was provided to Mr. Tedder.

7  We received it yesterday afternoon, didn't get a chance

8  to really read it until after hours yesterday.

9  Mr. Tedder has received that, and we just want to put on

10  the record that Dr. Quisling may have some testimony

11  related to this article, and that if they choose to talk

12  to him and have him on the stand, they need to have this

13  available to them, and that's the extent of my

14  announcement as to that.

15      But in an abundance of caution, since we've had

16  this problem, this alleged problem with Dr. Levine, I

17  wanted to put them on notice why we're not calling him

18  and the fact that we've received the article.

19      MR. GROLAND:  And, obviously, that article helps

20  us.

21      MS. SINGER:  I read it, and I don't think it helps

22  you any, but --

23      MR. GROLAND:  Mr. Tedder has it.

24      MS. SINGER:  That's John Tedder's decision.

25      MR. GROLAND:  Your Honor, one last matter, and

1  that's something we addressed yesterday, and I think we

2  need to readdress.  It's been reported to me that there

3  are continuing conversations out in the hallway with the

4  students.

5  THE COURT:  All right.  Good enough.  We can handle

6  that very quickly.  The court administration has made

7  mediation rooms available, and I will instruct the state

8  and the defense to use them.  You put your witnesses in

9  the mediation rooms and do not let any witnesses remain

10  in the hall.  I do not have jurisdiction over the

11  general public, students or the general public.  It is a

12  public area.  Although I can ask them to stop doing it,

13  I can't do anything about it.  I cannot close the

14  courtroom.  I can move the witnesses.

15  MR. GROLAND:  I will tell the Court what's been

16  reported to me by my client's mother.  She overheard a

17  specific conversation by a student who was talking on

18  the cell phone to what appeared to be his or her

19  professor, reporting the contents of certain testimony

20  that was just had in the courtroom in the presence of

21  witnesses.

22  Your Honor, I just think I need, in an abundance of

23  caution, to put on the record what Ms. Herlihy knows

24  about this, and just so it's on the record.

25  THE COURT:  Certainly.  But I won't take that

 1     testimony right now --

 2          MR. GROLAND:  Okay.

 3          THE COURT:  We'll give you time to do that whenever

 4     you're ready.  I will direct right now that the state

 5     and defense go find their witnesses and go put them in

 6     the mediation room, except for Officer Legall --

 7          MS. SINGER:  Right now?

 8          THE COURT:  -- who's going to testify.  Yes.

 9          MS. SINGER:  Your Honor, while there are folks that

10     are under the rule, I would like to know, since I know

11     who my last witnesses are, whether or not Mr. Groland

12     intends to call any of these persons.  The persons

13     sitting outside are the family members of the deceased,

14     who have not been permitted inside this courtroom based

15     upon Mr. Groland's request that they be sequestered, and

16     I'd like to know whether he intends to call them in this

17     case.  That would be Richard Davis, the grandfather of

18     Robbie Quirello; that would also be John Quirello, the

19     father of Robbie Quirello.  And that would be the extent

20     of those folks, because I know I am not calling them.

21     They have been called.  And --

22          THE COURT:  If they are under subpoena and they

23     have not been released from the subpoena, I'm directing

24     that you put them in the mediation room.

25          MS. SINGER:  Thank you, ma'am.

1   MR. GROLAND:  I believe I have one witness outside.

2   MS. SINGER:  Your Honor, I do need some additional

3   direction.  One of the witnesses asked whether or not he

4   was permitted to sit outside of the courthouse while he

5   was waiting to be called by Mr. Groland.  And I advised

6   him, and I may be wrong, that he could go sit outside of

7   the courthouse, he just couldn't sit outside of this

8   area here.

9   And am I incorrect on that?  Or is he now required

10  to stay in that room in the courthouse throughout this,

11  the extent of this trial?

12  THE COURT:  I believe that your call on that was

13  correct.  Mr. Groland and Mr. Tedder, do you have any

14  objection to that?

15  MR. GROLAND:  No.

16  THE COURT:  Has that witness been advised that the

17  rule has been invoked and they're not to discuss this

18  testimony, and have they been advised that if anyone

19  comes into their vicinity, that they must leave the

20  area?

21  MS. SINGER:  That witness is Richard Davis, the

22  grandfather, who has already testified, who knows and

23  understands the rule of sequestration, Your Honor.  And

24  he is very emotionally upset right now.

25  THE COURT:  Certainly, and I understand that.  Now,

1    are there any students in the courtroom this morning?

2    Good.

3         Would you all stand up for a minute.  Do you

4    understand what we're discussing here?  No?  Anybody not

5    understand?  Okay.  I don't have any yeses, and I don't

6    have any noes.  Apparently, a lot of you or some of you

7    are very verbal outside the courtroom.  But I need some

8    information here.

9         Do you understand that in a trial, when the rule

10   has been invoked, each witness who comes into the

11   courtroom is required to testify from their own

12   knowledge, and, therefore, they cannot have information

13   about what some other witness has said.  And, therefore,

14   when other witnesses overhear you talking, as you are

15   entitled to do under the law, about what you have heard,

16   because you're members of the public and you are free to

17   come in and listen to all the testimony, you could

18   disrupt the trial, cause a mistrial, and cause the state

19   to have to try the entire two-and-a-half week case

20   again.  Do you each understand that?

21        STUDENTS:  Yes, ma'am.

22        THE COURT:  Do you each understand that because

23   you're members of the public and I must keep the trial

24   open to the public, although I can ask to you do it, and

25   I can even yell at you about it, I can't actually do

1    anything to you.  Do you understand that?

2           STUDENTS:  Yes, ma'am.

3           THE COURT:  Okay.  Now, so I must ask for your

4    cooperation, and I must ask that you assist me in

5    perhaps even getting this word out to other students,

6    that it is very important that if you're discussing the

7    case or testimony that you hear or if you're reporting

8    that to your professor, you've got to make sure that

9    you're not doing that in the courthouse.  Because, just

10   as you heard us discuss this morning, there are a number

11   of different ways that people might accidentally say

12   something in front of a juror or in front of a witness

13   that could disrupt the trial.  Everybody understand

14   that?

15          STUDENTS:  Yes, ma'am.

16          THE COURT:  Thank you very much.  I do appreciate

17   your interest, even though you're probably assigned to

18   do this.  I do appreciate your interest in sitting

19   through this trial.  I do hope it's educational for you.

20   But this is one of the important educational aspects of

21   it, that you need to understand how it works and what

22   things affect the trial.

23          You may have heard me instruct the jury over and

24   over and over, that they are not to listen to news

25   reports about this, and that's another example of the

1  same thing.  The jury must make a decision based upon

2  the evidence that is introduced in the case.  Okay?

3         Good enough.  Thank you very much.

4         With that, if you'll bring the jury in.

5         MS. SINGER:  No, Your Honor.

6         THE COURT:  Wait just a second.

7         MS. SINGER:  Did you already tell Ms. Legall

8  about --

9         THE COURT:  No, we did not.  I assumed that you had

10 instructed her.

11        MS. SINGER:  I have not spoken to the witness.

12        THE COURT:  All right.  Ms. Legall, yes, you're on

13 the stand.  She can't instruct you.  I have to.  There

14 has been a motion in limine made asking that you not be

15 allowed to editorialize in regard to interviews with the

16 defendant.  What that means is that you must not make

17 comments like, And then he changed his story, or, We

18 know he lied, or anything that would be a conclusion

19 about what happened.

20        THE WITNESS:  Yes, ma'am.

21        THE COURT:  You need to stick just to, This is what

22 he said, or, This is what I saw, so that there would not

23 be an objection that might cause a mistrial.

24        THE WITNESS:  Yes, ma'am.

25        THE COURT:  So with those instructions, I believe

1   that we can continue with the -- yes, ma'am?

2        MS. SINGER:  And I do want to tell the Court that I

3   instructed Ms. Legall about the pretrial ruling

4   regarding Mr. Herlihy's employment and other facts

5   regarding his employment and his military history, and

6   that the state, of course, will not be inquiring in that

7   area unless the door is opened.

8        THE COURT:  All right.  And because Ms. Legall is

9   in the middle of testimony, you would not be able to

10  give her these instructions.

11       If Mr. Tedder or Mr. Groland asks you a direct

12  question and failing to give a response regarding

13  alleged previous employment would, in fact, not be

14  telling the truth, then you may answer it.  If it

15  looks -- if you're not sure, if you look to me for

16  direction, I will be able to address it, or we can

17  recess and do a sidebar if necessary.

18       On the other hand, as you well know from having

19  testified many, many times, often a question will offer

20  a possibility of something added or explained.  Don't go

21  there.  But if in reality the question is so direct that

22  leaving it out would not be a truthful answer, then you

23  may answer.

24       THE WITNESS:  Yes, ma'am.

25       THE COURT:  And if you have any question, just look

1   up here, and we'll fix it.

2       THE WITNESS:  Yes, ma'am.

3       THE COURT:  All right.  Now, can we bring the jury

4   in?

5       MR. GROLAND:  Yes.

6       THE COURT:  I do have two things to address with

7   jurors.  One is I've received a written notice from

8   Ms. Monplaiser.  Y'all remember she had federal jury

9   selection beginning next week?

10      MS. SINGER:  Correct.

11      THE COURT:  I will -- she has given me that

12  information in writing, and I will address that with the

13  federal court today, somehow, and get her released from

14  that.

15      I also have been advised that another juror may

16  have a doctor's appointment on Tuesday, and I will ask

17  that she put that information in writing also so that we

18  can address that appropriately.

19      MS. SINGER:  All right.

20      THE COURT:  Good enough.  Bring the jury in.

21      (The jury entered the courtroom.)

22      THE COURT:  All right.  Ladies and Gentlemen, we

23  are ready to continue with Detective Legall's testimony.

24  Before we do, I want to make sure that I ask the same

25  question I've been asking every morning, and that is, is

1    there anybody on the jury who's gotten any information

2    regarding this case or this trial outside of the

3    courtroom?

4              THE JURORS:  (Jurors shake heads.)

5              THE COURT:  Good enough.  I also have from

6    Ms. Monplaiser, the notification of her jury selection

7    for next week in federal court, and I'll take care of

8    that today.

9              Also I've been advised that there may be a juror

10   who has a doctor appointment next Tuesday, and if you'll

11   put that information in writing, we'll address that

12   also.

13             Good enough.  Thank you, very much.  And with that,

14   Ms. Singer, you may continue.

15             MS. SINGER:  Yes.

16                  CONTINUED DIRECT EXAMINATION

17   BY MS. SINGER:

18        Q    Investigator Legall, just to take us back to where

19   we were yesterday afternoon before we recessed, do you recall

20   going into the defendant's apartment at Tumbling Creek, A21,

21   with the defendant, Larry Seale, Will Halvosa, and Tina

22   Millard, and her intern?

23        A    Yes, I do.

24        Q    Were there other people besides those there?

25   Refresh my recollection.

1       A     No.

2       Q     And at that time the purpose of that return to his

3  apartment or that travel to his apartment; what was the

4  purpose of that?

5       A     The purpose of that was Mr. Herlihy had requested

6  our presence there so he could show us what had occurred that

7  day.

8       Q     Now, when you got to the apartment, what was the

9  purpose of Tina Millard being there?

10      A     She was going to videotape his re-enactment of what

11 had occurred.

12      Q     And what were you going to do to otherwise document

13 the contact with Mr. Herlihy at his apartment?

14      A     I also was there to witness what he was saying, and

15 I also took an audio cassette recorder with me to tape that

16 statement also.

17      Q      Did you later come to find that Ms. Millard's

18 video camera was not working and the demonstration was not

19 videotaped?

20      A     Yes, I did.

21      Q     And regarding your audiotaping, do you recall

22 whether or not your audiotape was working at that time?

23      A      Initially, was not, and it was probably user error

24 on my part.  But as soon as I realized it wasn't working, I

25 went, flipped the tape over, and I went back on the tape and

1    described what we had done for the first few minutes.

2        Q    And then did you audiotape the discussion that took

3    place in Mr. Herlihy's apartment?

4        A    Yeah.

5        Q    Did you then audiotape it?

6        A    Yes, we did.

7            MS. SINGER:  All right.  At this time, Your Honor,

8        I'd like to play the audiotape that was made at that

9        time, with the Court's permission.

10           THE COURT:  Any objection?

11           MR. GROLAND:  No objection.

12           THE COURT:  Good enough.  Go ahead.

13           (An audiotape is played for the jury.)

14           (The following is a transcription of a re-enactment

15   of alleged incident done on August 2, 2000, taken to the best

16   of the court reporter's ability.)

17           DETECTIVE LEGALL:  This is Detective Legall.  It's

18       1855 hours on Wednesday, August 2nd, 2000.  Minor

19       technical difficulties with the audio portion.  We

20       actually started five minutes ago but it wasn't working.

21       So present in the room is myself, Detective Helen

22       Legall; Brian Herlihy, whose residence we are at, 1015

23       Southwest 9th Street, Apartment A21; Sergeant Larry

24       Seale; Sergeant Will Halvosa; forensic investigator Tina

25       Millard, and forensic intern Jessica Green.

1        We are at the apartment at the request of Brian

2    Herlihy.  He suggested that he show us what occurred

3    today as far as the incident that occurred with

4    four-month old Robbie.

5        At this time he has shown us or explained that the

6    bed is a little bit out of place as to where it was at

7    the time he left.  He has replaced the sham between the

8    mattress and the footboard, and he has placed Robbie on

9    a pillow, demonstrating where Robbie was when he put him

10   down today.  So we'll kind of start off where we were.

11   Robbie is laying on the pillow, correct, Brian?

12       BRIAN HERLIHY:  Yes.

13       DETECTIVE LEGALL:  And his feet are facing the side

14   of the bed.

15       BRIAN HERLIHY:  Yes.

16       DETECTIVE LEGALL:  The radio is just off to

17   Robbie's right.

18       BRIAN HERLIHY:  Yes, ma'am.

19       DETECTIVE LEGALL:  And there is a cordless

20   telephone that is under some pillows on the bed.

21       BRIAN HERLIHY:  Yes, ma'am.

22       DETECTIVE LEGALL:  And other than that, the ceiling

23   fan was running at the time.  It's now off due to it

24   hitting the bed right now, but pretty much the room is

25   the same way that you left it?

1    BRIAN HERLIHY: Pretty much.

2    DETECTIVE LEGALL: And it was the same way, this

3    was pretty much at the time that the incident occurred

4    today with Robbie.

5    BRIAN HERLIHY: Yes, ma'am.

6    DETECTIVE LEGALL: Okay. If you could -- okay.

7    And the baby was face up on the pillow?

8    BRIAN HERLIHY: Yes, ma'am.

9    DETECTIVE LEGALL: Okay. Kind of demonstrate to us

10   what occurred once you laid Robbie down on the bed.

11   BRIAN HERLIHY: I turned the fan -- the baby likes

12   it when the fan's on, and it kind of soothes him. It's

13   a soothing thing. I left it -- before Crystal left, she

14   said, Why don't you get a shower real quick, and I'll go

15   get these things that we need to get done, and then

16   we'll go on our little trip that we're going to go on.

17   And I said, Okay.

18   After laying him down, I said, Robbie, are you

19   going to be okay? Can I get a goo out of you? And I

20   kept trying to get this little response from him, and

21   eventually he did it. And I went like this his legs or

22   fumbled with him or something and said, I'll be right

23   back. I remember even saying, I love you. Do you want

24   me to go ahead and just --

25   DETECTIVE LEGALL: Sure. Just walk through exactly

1   what you did.

2       BRIAN HERLIHY:  I just kept looking at him and

3   (unintelligible) watched him look at the fan was just in

4   awe he and was making noises and just laughing.

5   (Unintelligible)  It's funny.  And went in the bathroom,

6   which is right here.

7       DETECTIVE LEGALL:  Okay.  And the bathroom is

8   outside your bedroom door, it doesn't have a door, and

9   it's across --

10       BRIAN HERLIHY:  (Unintelligible).

11       DETECTIVE LEGALL:  -- a small hallway.

12       BRIAN HERLIHY:  I went ahead and closed the

13   bathroom door, just out of force of habit, went ahead

14   and used the facilities.  Was in here, not that long,

15   came in, went to go turn on my tub, turned it all the

16   way over and felt that it was cold.  Great.  I had no

17   hot water, got to wait a while (unintelligible).  Turned

18   it off, wasn't even on that long.  Walked out, went to

19   go flush the toilet again, just to make sure.  Came out

20   here.  And what I saw when I -- I kind of stopped for a

21   second, and Robbie was (unintelligible).  This was

22   almost to about here if not a little bit lower.  His

23   head --

24       DETECTIVE LEGALL:  Go ahead and show us the best

25   you can.

1    (Somebody else speaking unintelligibly.)

2    DETECTIVE LEGALL:  We're going to go off the video

3    temporarily at his request.

4    We were off video and tape for approximately 20

5    seconds.  We're back on video and tape.  It's 1900

6    hours.  We were demonstrating how you found Robbie.

7    BRIAN HERLIHY:  (Unintelligible) Like I said, I

8    know this was down.  I know it was down there a good

9    ways.  I saw most of this sham on the floor.  Robbie

10   just somehow got himself worked in -- and with this, it

11   doesn't have the weight, so I can't -- but he was

12   basically, when I found him, he was like this.  All I

13   remember seeing when I came in that doorway was his

14   little white socks like this.  The head was further

15   down.  He was clearly this bar.

16   DETECTIVE LEGALL:  Okay.

17   BRIAN HERLIHY:  I looked at him, and he had normal

18   color, so I went and I grabbed him up like this and

19   went, Robbie, are you all right, and blew on his face.

20   And usually I'd get a response out of him.  And then

21   he -- his head went back.  His arms went real limp and

22   he got real flaccid in my hands.  His eyes were not

23   open.  I put him down here, looking for my phone,

24   couldn't find the phone.

25   DETECTIVE LEGALL:  Okay.

1    BRIAN HERLIHY:  I gave him two breaths.

2    DETECTIVE LEGALL:  Kind of, just kind of

3  demonstrate what you did.

4    BRIAN HERLIHY:  How I did it?

5    DETECTIVE LEGALL:  Yes.

6    BRIAN HERLIHY:  Okay.  So I picked him up.  I went,

7  Robbie, are you okay?  And I blew like this.  And he --

8  the head went back.  The arms went.  I had him like

9  this.  He had formula coming out of his mouth and out

10  his nostrils, and there was some in here.  It was also

11  on his little -- his little -- I mean, he didn't have

12  the outfit on, he had nothing on, so I was wiping him

13  off.  I gave him the two breaths.  I didn't get the

14  response that I should have gotten.  Put him down.  I

15  think there was a little stain in the middle of the bed

16  where I kind of put him.  Right here, because there's

17  a --

18    MS. SINGER:  Your Honor, I need to turn the tape

19  over.

20    THE COURT:  All right.

21    (Audio Tape starts again.)

22    DETECTIVE LEGALL:  Now, this shows where you

23  walked --

24    BRIAN HERLIHY:  I went through here, kind of jumped

25  over the couch.  You see stuff knocked down here.

1    Couldn't find the phone.  I'm like, Where's my damn

2    phone?  And then (unintelligible) little pager thing

3    that sets off the pager.  Ran back in here,

4    (unintelligible), and I found the phone.  Picked him up

5    again, called 911.  Tried the two breaths.  Got rescue

6    on the phone, they said, What are you doing?  I said --

7    I told them exactly what I'm doing.  I had him on the

8    bed.  Now, when I had him on the bed, I had him about

9    here.  And I had him up and I did the two breaths.  And

10   that's when the dispatcher said, Put him on the floor.

11   And I picked him up -- I don't know why, but I walked

12   with him, put him down.

13       Well, actually, I had him -- I guess I had him up,

14   and I was going, Robbie, Robbie, and I tried it, and she

15   said, Put your head and ear to his mouth and see if you

16   can hear anything.  I said, He's not doing anything.  I

17   remember putting him down because he was emissing

18   (phonetic).  And she said, You're going to have to do it

19   on the ground.  And I had him about here.  And he began

20   to really bring up the formula through the nose and

21   through his mouth.  I turned him on his side, and I held

22   him like this, and I said, Breath, baby, breathe.

23   (Unintelligible) two breaths, waiting for rescue.

24   Rescue came up a few seconds later.  Saw them through

25   the verticals, opened it up, yelled, didn't get the

1    response.  Saw them going to the other building.  Said,

2    I got to leave you for a minute, or I can't remember

3    exactly what I said.  But I said, I've got to leave you

4    or something.  And I ran downstairs with the phone and

5    said, Guys, they're not in C, we're in A.  I need you

6    right now.  A three-and-a-half-month old baby that's not

7    breathing --

8         DETECTIVE LEGALL:  And you left him on the floor

9    right there?

10        BRIAN HERLIHY:  Yes, ma'am.

11        DETECTIVE LEGALL:  Okay.  Just like that, pretty

12   much?

13        BRIAN HERLIHY:  Pretty much.  He was on his back.

14   Rescue came up.  They were working with him.  They had

15   the bag, and I was bagging him.

16        At that time more paramedics or EMTs came up.  They

17   pulled the bed -- they pulled me literally out of the

18   room so that they could render assistance.  So I sat

19   down, just started to lose composure, started to cry.

20        DETECTIVE LEGALL:  Okay.  The pillows at the head

21   of the bed, how were they on the bed?  Do you remember?

22        BRIAN HERLIHY:  I know that most of them were --

23   they were kind of organized.  How I had it was -- I'm

24   really anal about this.  I don't usually do it.  I

25   usually have a white one up front and then a pillow sham

1  like that.  And I usually have the pillows like this.

2  But mom, this is before mom got here with the baby.

3  When mom and baby got here, she pulled pillows out to do

4  this.  And see, he even spit up on the pillow sham

5  previously.

6      DETECTIVE LEGALL:  And "mom" you're referring to

7  Crystal?

8      BRIAN HERLIHY:  Crystal, yes, I'm sorry.

9      DETECTIVE LEGALL:  That's okay.

10     INVESTIGATOR MILLARD:  I need a new battery.

11     BRIAN HERLIHY:  There was a --

12     DETECTIVE LEGALL:  Hold on.  We're changing

13  batteries on the video at 1905.

14     And we're back on video.

15     BRIAN HERLIHY:  There was another burping towel

16  that I used because he had been bringing up the formula

17  before.

18     DETECTIVE LEGALL:  The battery's dead.  We're going

19  off momentarily.

20     We've replaced the battery.  We're back on video

21  and audio at 1907.

22     I think we had left off where you were describing

23  how the pillows are on the bed.

24     BRIAN HERLIHY:  I really don't recall.  I do know

25  that the one pillow sham came from that side, and --

1    DETECTIVE LEGALL:  And you only had one sham

2    stuffed in between footboard and the mattress?

3    BRIAN HERLIHY:  (Unintelligible) the one side.

4    DETECTIVE LEGALL:  Okay.  You said he had a onesie

5    on, like a little onesie outfit that snapped --

6    BRIAN HERLIHY:  (Unintelligible).

7    DETECTIVE LEGALL:  -- earlier but where did you

8    last see that?

9    BRIAN HERLIHY:  It was next to the

10   (unintelligible).  I can't be for sure, because I don't

11   know.  I'm going to say it was next to the changing pad.

12   DETECTIVE LEGALL:  Okay.

13   BRIAN HERLIHY:  I don't know where it could have

14   gone to.  He wasn't wearing it.

15   SERGEANT HALVOSA:  And so you took it off him

16   because it had some --

17   BRIAN HERLIHY:  It had a ton of spit up all over

18   it.

19   DETECTIVE LEGALL:  Okay.  This is while Crystal was

20   gone?

21   BRIAN HERLIHY:  No, Crystal was here when --

22   SERGEANT HALVOSA:  (Unintelligible) he wearing,

23   just his diaper?

24   BRIAN HERLIHY:  Just his diaper and his little

25   socks because we were going to put on -- he has a new

1    outfit.  See where the outfit is at?  We were going to

2    put him that.  It's a little bit more roomier outfit for

3    him.  This one was real, real tight.  I don't know.

4         SERGEANT HALVOSA:  Sergeant Seale, do you have any

5    questions?

6         SERGEANT SEALE:  I just noticed when you were

7    pushing that down, it looked like it took a lot of force

8    to do that.

9         BRIAN HERLIHY:  Well, I looked and I thought that

10   maybe it was this one, which you'll see if you look at

11   the two of them, one's a heck of a lot thicker than the

12   other one.  And I know it was (unintelligible).

13        DETECTIVE LEGALL:  Because it's thinner than that

14   one?

15        BRIAN HERLIHY:  Yeah.

16        DETECTIVE LEGALL:  Okay.

17        BRIAN HERLIHY:  Because it's easier -- and I know

18   it can get in there.  This one you can't get in there.

19        SERGEANT SEALE:  What's this bed made of?  Almost

20   looks plastic.

21        BRIAN HERLIHY:  Metal, I guess.  Cheap metal, I

22   guess.  (Unintelligible).

23        SERGEANT SEALE:  Have you ever seen the baby roll

24   over; can the baby roll over?

25        BRIAN HERLIHY:  Oh, He rolls over.  In fact,

1    yesterday he had been laid one way and we were going

2    downstairs, and she said, Honey, you got to see this.

3    He rolled.  He did a complete 180.  But there was a time

4    where we had spoken about before where he actually was

5    laid here and dipped right in.  He might have been

6    closer to the edge than that.  And he went right to the

7    bottom.  And I went to go grab him, and his head was

8    about here.  And this time his face was facing towards

9    the mattress.  It wasn't facing away.  He was still

10   basically asleep.  We -- I discussed taking him to the

11   hospital (unintelligible), makes a big fuss

12   (unintelligible).

13        SERGEANT SEALE:  I guess I'm trying to visualize,

14   if you'd hand me that doll there, with him laying here,

15   I mean, can he crawl?  Because I'm not again --

16        BRIAN HERLIHY:  No.

17        SERGEANT SEALE:  -- I'm not a parent, so I'm not

18   sure if at this age --

19        BRIAN HERLIHY:  (Unintelligible)  I do know that he

20   can move quite a bit because there are times when we

21   will come in and he'll be laid on his face or on his

22   stomach at one point, and he'll roll back over.  And

23   that's usually when he wakes up and fusses, because he

24   doesn't like to be left alone.  And we're like, Okay,

25   he's awake.

1    SERGEANT SEALE:  So he can roll from the stomach to

2    his back?

3    BRIAN HERLIHY:  All the time.

4    DETECTIVE LEGALL:  Can he roll from his back to his

5    stomach?

6    BRIAN HERLIHY:  Yeah.  He's done that, too.  He's

7    done that here several times.

8    SERGEANT SEALE:  So from here --

9    BRIAN HERLIHY:  Because he'll roll this way.  And

10   I've even in the past, I've done -- I did this

11   yesterday.  I put a pillow kind of like this to prevent

12   the roll, but he goes that way anyway.

13   SERGEANT SEALE:  Well, that's what I was looking

14   at.  I mean, with that being out of there, you know, the

15   pillow looks like it's canted that way, where,

16   obviously, it would be easy to roll that way.  I'm sure

17   that's why we would be doing that for that reason.  But

18   I'm trying to figure out even with the weight, and I'm

19   putting some pretty descent pressure there, how,

20   somehow, you know, I'm trying to figure that out, you

21   know, myself.

22   BRIAN HERLIHY:  I understand.

23   SERGEANT SEALE:  I could, even in my mind, I could

24   rationalize that the baby could crawl up here and go

25   down there.

1    BRIAN HERLIHY:  Right.

2    SERGEANT SEALE:  That seems logical, but with a

3    pillow up where you had it --

4    BRIAN HERLIHY:  And like I'm telling you, I mean,

5    it happened hours ago.  I could have this misaligned.

6    I'm just telling you I know I put the pillow in there.

7    SERGEANT SEALE:  Right.

8    BRIAN HERLIHY:  (Unintelligible) the damn thing

9    vertical, not thinking, and that's -- I can't remember

10   now, I really can't.

11   SERGEANT SEALE:  But you're certain the pillow was

12   there?

13   BRIAN HERLIHY:  Yeah.

14   SERGEANT HALVOSA:  And did you give him a -- did he

15   have a bottle at the time?

16   BRIAN HERLIHY:  He had a bottle ten minutes before

17   that.  He didn't have a bottle with him at the time, no.

18   SERGEANT HALVOSA:  Okay.

19   BRIAN HERLIHY:  Because, in fact, when we had

20   gone -- to backtrack some, we had gone -- Crystal was

21   leaving.  She left him facing this way.  He was right --

22   kind of (unintelligible) in the general vicinity.  And I

23   walked her downstairs, whatever.  I came back upstairs

24   and I could not remember if he had been burped.  And he

25   had spit up a little bit, but it was just the usual.

1    And I picked him up, and went to go burp him, and

2    nothing really came out.  I laid him back down

3    (unintelligible) little bit more.  And then I put him

4    back up, and I didn't get a real big burp.  So,

5    therefore (unintelligible) I went, Oh, happy baby.

6    Okay, Everything is fine, okay, I can run a shower real

7    quick.  And the bottle was sitting actually where you're

8    sitting right now, Detective.

9        SERGEANT HALVOSA:  The bed wasn't slid any more

10   forward, because this mattress is, that's as far as it

11   will go.  (Unintelligible)  That's as far forward as it

12   can go.

13       BRIAN HERLIHY:  Like I said, when it comes to this

14   thing, I don't know.  I mean, sometimes we'll jam it in

15   horizontal, sometimes we jam it in vertically.

16       SERGEANT SEALE:  Well, I mean, clearly, if this was

17   vertically, it would, I guess from my perspective, be

18   even harder to push down because there's more to push

19   down than it would be if it was turned sideways.

20       BRIAN HERLIHY:  It's become such a ritual with him,

21   it's just like we don't even think about it, we just do

22   it.  And, you know, it's -- actually, I started it

23   because (unintelligible) incident, I went oh, wait a

24   minute, let's put this in here.

25       SERGEANT SEALE:  So you're saying the baby cannot

1    crawl.  That the baby --

2        BRIAN HERLIHY:  I've never seen him crawl.

3        SERGEANT SEALE:  But the baby can turn over?

4        BRIAN HERLIHY:  Yes, he can turn over.

5        SERGEANT SEALE:  And from the front, the baby can

6    turn over.

7        BRIAN HERLIHY:  And for some God forsaken reason,

8    he can go from this angle -- I'd like to see it -- to

9    this angle.  I would like to see how he does that.  And

10   he does it fast.  Because, like I said, when Crystal

11   told me yesterday that he did a complete 180, he did

12   that fast, you know (unintelligible) that fast.  And I

13   came in and remember him laying one way, and sure

14   enough, he was the other way.  I went, Okay, it's crib

15   time.  We got a buy a crib.  We've got to do something.

16   We got to put him in a playpen.

17       DETECTIVE LEGALL:  We're concluding our

18   re-enactment at 1914 hours.

19       (The audio tape was concluded.)

20       MS. SINGER:  Your Honor, at this time, the state

21   would like to have this tape recorded statement moved

22   into evidence as the next numbered state exhibit.

23       MR. GROLAND:  No objection.

24       THE COURT:  It will be admitted as state's

25   number --

1    THE CLERK:  74.

2    THE COURT:  -- 74.

3    (State's Exhibit No. 74 was moved and admitted into

4    evidence.)

5    MS. SINGER:  And I'm rewinding it now for the

6    clerk, and then I will present it to the clerk for

7    marking.

8    BY MS. SINGER:

9    Q    Investigator Legall, after the re-enactment took

10   place -- and I'm going to have you step down a moment, if

11   Mr. West can help me with the photographs here.  But just

12   before we start that, after the re-enactment took place,

13   where did Mr. Herlihy go?

14   A    He stayed at his home.

15   Q    And where did the law enforcement officers go?

16   A    We left and went home.

17   Q    All right.  I'm going to be showing you some

18   photographs that have previously been entered into evidence.

19   If you need the laser pointer -- Mr. Pennypacker, can you go

20   get it.

21   What I'd like to do, Investigator Legall, once we

22   get this set up, is to have you step down and show the jury

23   particular areas during the course of the re-enactment that

24   you were referring to in the taped statement.

25   Just for the record here, this is 24(a).  And,

1   Investigator Legall, is that a front view of the second floor

2   apartment where you actually entered with Mr. Herlihy to do

3   the re-enactment?

4       A    Yes, it is.

5       Q    And this particular photograph here, is this --

6            MS. SINGER:  Your Honor, could we just lower the

7       lights a bit to a get better view of that?

8            THE COURT:  Yes.

9   BY MS. SINGER:

10      Q    Is this a photograph of the bed that was referred

11  to in the re-enactment?

12      A    Yes, it is.

13      Q    And does it appear to be the same or similar

14  condition when you first entered into the apartment that day?

15      A    Yes.

16      Q    And I see the jurors want to step down, so if we

17  can make sure everyone can see.

18           Now, would it be better for you, again, like you

19  did yesterday, to go up to the screen and point?

20      A    Yes.

21      Q    All right.  When you initially set up the

22  re-enactment with Mr. Herlihy, you indicated that the baby

23  was laid on the bed a certain way.

24           Can you show the jury how Mr. Herlihy showed you

25  the baby was laid on the bed prior to the baby allegedly

1   rolling into the frame of the bed?

2       A    Mr. Herlihy told us that he had the baby laying on

3   this white pillow that's under the sham, and the head would

4   be towards the center of the bed, and the feet would be

5   towards the side of the bed.

6       Q    And tell the jury then, how he showed you the baby

7   moved from that white pillow over the sham into the crevice

8   of the bed?

9       A    Actually, what he had done was taken this sham, and

10  as you heard on the tape with Sergeant Seale kind of asking

11  him how he was pushing it down, he had pushed it down.  He

12  was showing us how the sham had gotten down in between the

13  mattress and the frame, and it was almost to the bottom of

14  the floor.  And the baby, or Robbie had turned with his head

15  this way and had gone down into that area with his face

16  facing out and his feet down, and his feet -- I'm sorry, with

17  his head down and his feet up.

18      Q    When he indicated to you that he found Robbie,

19  could you show the jury where he indicated the child's feet

20  were?

21      A    The feet were sticking up past the mattress.

22      Q    And where did he indicate the child's head was?

23      A    The head, he described as being in between this

24  area right here (indicating).

25      Q    When he said he removed the child from that area,

1    what did he say he did with the pillows, if anything?

2         A    He said that he had left them the way they were.

3         Q    And that is how the picture is portrayed now?

4         A    Yes.

5         Q    When he removed the child, where did he say he took

6    the child?

7         A    He initially stated he put the child in the middle

8    of the bed while he looked for the phone.

9         Q    Let me put another photograph on of the two

10   pillows.

11        Does this accurately reflect how the pillows looked

12   when you first came into the apartment?

13        A    Yes, ma'am.

14        Q    I have to do one thing for the record.  I need to

15   say this is 24(e) in the record, for the record.  Let me push

16   it up there to get a full view of that.  All right.

17        And so this is a closer view of the bed.  If you

18   could show the jury where he said the head of the baby was

19   before the baby fell into the crevice, please?

20        A    The head of the baby would be at the top of the

21   white pillow that's underneath the sham, and the feet would

22   be at the bottom of the white pillow closer to the side of

23   the bed.

24        Q    And once again, was it his testimony that when he

25   removed the child from the crevice, that the pillows remained

1    the same?

2              MR. GROLAND:  Objection, Your Honor that's leading.

3              MS. SINGER:  I'll --

4              THE COURT:  Sustained.

5    BY MS. SINGER:

6        Q    Does this picture accurately depict how he

7    described the pillows as being left after he moved the child?

8        A    Yes.

9        Q    Now, showing you 24(g), which is a different view,

10   does this picture accurately reflect the bed as you saw it

11   this afternoon --

12       A    Yes, it does.

13       Q    -- that you did the re-enactment?

14       A    Yes.

15       Q    If you could show the jury where the end of the

16   sham is as it relates to the crevice with your hand.

17       A    Well, this is the footboard.  This would be the

18   post that's closest to the window.  The pillow's on the other

19   side of the bed, and the crevice is hanging pretty much on

20   the edge of the mattress.

21       Q    When you viewed the -- when you viewed this

22   particular area, could you describe what this area looked

23   like to you when you initially viewed the area, the area

24   where the sham is meeting the head -- the footboard.

25       A    I'm not exactly sure I understand what you're

1   asking me.

2       Q    Well, could you describe how much of a space there

3   was between the footboard and the sham when you initially

4   viewed it that day?

5       A    Actually, it kind of looks a little askew on here.

6   The pillow is not -- this is a round part.  The pillow is

7   more on the other side of the round part.  The round part

8   goes out just a little bit, and that's not where he was

9   showing me.

10          On this side of the post, and on that side of the

11  post, is where the sham was -- it was kind of over the edge

12  but not pushed down to where he was showing us where it was

13  pushed down at.

14      Q    Did he then take this particular sham and push it

15  down during the course of the re-enactment?

16      A    Yes, he did.

17      Q    This is now picture 24(j).  Let me see.  Oh, yes,

18  24(j), and I don't know whether or not it's going to

19  be -- are you able to see that photograph?  It's not showing

20  very well.

21      A    I'm not really sure what that is.

22      Q    Let me go ahead and show it to you.  It will be

23  published to the jury.  Look at 24(j), and if you could just

24  step up here, step up here with me so that I can show you.

25  This particular area here, does this show where the sham met

1    the foot rail.

2         A    Okay.   This -- actually, this is the end of the

3    bed, and this is where the sham was when we came into the

4    room and --

5              MR. GROLAND:  Your Honor, excuse me, we can't see

6         what they're doing.

7              THE COURT:  You want to move around?

8              MR. GROLAND:  Well, I thought they were using the

9         screen.

10             THE WITNESS:  Well, now that I've seen the picture,

11        I can probably do it on the screen.

12             This is the edge of the bed, and this is the sham.

13        And what it's showing is it's canted off the edge of the

14        mattress a bit in between the frame and the mattress.

15   BY MS. SINGER:

16        Q    Now, going back to one picture, when Investigator

17   Seale was inquiring of Mr. Herlihy as to how the baby would

18   have fallen into the crevice, I'm going to show you now

19   24(e), and would you show the jury what pillows Investigator

20   Seale was inquiring about when he was asking Mr. Herlihy

21   whether the baby could crawl?

22        A    He's asking -- excuse me.  He's asking him about

23   the pillow sham --

24        Q    All right?

25        A    -- which is the colored pillow.

1   Q   And why was he asking about that?

2   A   This is the sham that he tried -- when he showed

3   us, this is the sham he was shoving in between the bed and

4   the frame to show us how far down they put the sham when they

5   put Robbie on the pillow so that he doesn't fall in.  And

6   this was when he was questioning as to how hard he was

7   pushing it into the bed.

8   Q   And did he also ask about the way the white pillow

9   was located in relation to the sham?

10   A   Yes.

11   Q   And what did he ask about that?

12   A   He -- what he was asking was is if Robbie can

13   crawl, meaning could he crawl or -- there's not a significant

14   difference, but there's enough of a difference for a baby to

15   crawl over the sham.  So the baby -- he was saying that the

16   baby would have had to crawl over the sham and then down.

17   Q   All right.  And that's why he was asking the

18   questions about whether the baby could crawl?

19   A   Yes.

20   Q   Did he ask -- was there any discussion about the

21   baby rolling to the other side towards the head of the bed?

22   A   Yeah.  I recall that -- I believe Mr. Herlihy said

23   that he put this sham here, you know, obviously, the baby

24   should roll that way.  And that was the discussion about the

25   pillow, that he would normally roll that way or any baby

1    would roll that way.

2        Q    Now, there comes a time when Mr. Herlihy describes

3    for you what he does with the baby before EMT arrives,

4    correct?

5        A    Yes.

6        Q    He indicated to you that the baby was placed in the

7    center of the bed; is that right?

8        A    That's correct.

9        Q    I'm showing you 24(g).  Does this picture

10   accurately depict how the bed looked when you did the

11   re-enactment?

12       A    Yes.

13       Q    And was the towel and the phone on the bed at that

14   time when you came into the apartment?

15       A    I believe it was.

16       Q    Did there come a time when he showed you where he

17   laid the baby down after he allegedly found the baby wedged

18   in the bed?

19       A    He said he had laid the baby in the center of the

20   bed.

21       Q    And did he indicate to you whether or not there

22   would have been vomit or spit up in that area?

23       A    Yes, he did.

24       Q    And did you examine that particular area of the

25   bed?

1    A    Yes, I did.

2    Q    Did you find any evidence of vomit or spit up in

3  that area?

4    A    I didn't see any.

5    Q    Where did he say he moved the baby after laying the

6  baby on the bed?

7    A    He said that when he was talking with the 911

8  operator, she asked him to move the baby to the floor, which

9  is what he did.

10    Q    Did he show you what part of the floor he moved the

11  baby to?

12    A    Yes.  It would be the part of the floor on the

13  opposite side of the bed between the bed and the window.

14    Q    The window faces what part of the parking lot?

15    A    It faces the -- I think it's the west side of the

16  parking lot.  It faces west.

17    Q    I'm going to go back to 24(a), and ask you whether

18  or not you can see the bedroom window in this picture?

19    A    This is the bedroom window (indicating), and I

20  believe that's west.

21    Q    I do have several more to show you, Investigator

22  Legall, if you'll be patient with me.

23         Did he show you the place on the floor where he

24  eventually did lay the baby down?

25    A    Yes, he did.

1    Q    And showing you now 24(i) in evidence, if you could

2    first tell me whether this fairly and accurately depicts the

3    home when you went in for the re-enactment?

4    A    Yes.

5    Q    And could you show us where the window would be

6    located on this picture so that the jury can get an idea of

7    what part of the bedroom they're looking at?

8    A    As I stated, this is the opposite side of the bed

9    from where the sham was.  This is a screen, which I think

10   there's another picture that you can actually see the window

11   and the screen.  There's a screen over kind of near the

12   corner of the bedroom, and then the window is -- if you're

13   looking at the screen, the window is to the right of the

14   screen.

15   Q    All right.  And is there an area on this particular

16   photograph that he indicated to you was the area where he

17   laid the baby down?

18   A    It would be this area right here (indicating).

19   Q    And did you note anything on the floor there?

20   A    Yes, there appeared to be some kind of liquid vomit

21   or something to that effect.

22   Q    Now, I'm going to have you go ahead and sit back

23   down, Investigator Legall.

24        There was a time on the tape, Investigator Legall,

25   where you paused for, I believe it was 20 seconds.

1   Specifically, you said, Go ahead and show us the best you

2   can.  We're going to go off video temporarily at his request.

3   You also turned the audio off at that time?

4        A    Yes.

5        Q    And why was it that you turned the audio off at

6   that time?

7        A    Mr. Herlihy asked me to.

8        Q    And did you at any time during the time that the

9   audio was turned off, threaten him, coerce him, force him, or

10   make him make any further statements to you about this

11   particular re-enactment?

12        A    No.

13        Q    And did you promise him anything during that

14   time --

15        A    No.

16        Q    -- that would cause him to make any statements to

17   you?

18        A    No, I did not.

19        Q    That was solely at his request?

20        A    Yes.

21        Q    Did he tell you how he laid the baby on the bed

22   when the baby was initially laid on the bed before this

23   alleged incident took place?

24        A    He initially stated that he had laid the baby like

25   I had showed up there with his head towards the middle, and

1   his feet towards the side of the bed facing up.

2       Q   Where was his face?  Where was the baby's face?

3       A   Face up.

4       Q   And did he tell you whether or not before the

5   incident whether or not Robbie had been spitting up?

6       A   Yes, he did.

7       Q   Mr. Herlihy was not under arrest at that time,

8   correct?

9       A   No, he was not.

10      Q   He was allowed to remain at his home?

11      A   Yes, he was.

12      MS. SINGER:  I'd like to have one moment, Your

13   Honor.

14      THE COURT:  Yes.

15  BY MS. SINGER:

16      Q   Investigator Legall, did there come a time on the

17   3rd day of August when you again came into contact with

18   Mr. Herlihy?

19      A   Yes, there was.

20      Q   Approximately what time of day was it that you came

21   in contact with Mr. Herlihy on the 3rd day of August?

22      A   A little before 11:00 P.M.

23      Q   And where was it that you came in contact with him?

24      A   At the Gainesville Police Department.

25      Q   Before that time, Investigator Legall, had you

1    received a telephone call from Mr. Herlihy?

2        A    Yes, I did.

3        Q    And did you call him back?

4        A    Yes, I did.

5        Q    And after calling him back, what did you do?

6        A    He was very upset, and I arranged for someone from

7    the crisis center to speak with him.

8        Q    And then later that very same night, at about 2250

9    hours, you did have contact with him again, correct?

10       A    Correct.

11       Q    And did I ask you where you had contact with him?

12   I apologize if I did.

13       A    Yes, you did.  The Gainesville Police Department.

14       Q    All right.  And who brought him there to you?

15       A    He was actually there already when I got there, and

16   he had been brought there by Detective Steve Weaver, and, I

17   believe, Whitney Stout.

18       Q    And had he been arrested at that time?

19       A    Yes, he had.

20            MS. SINGER:  Now, Your Honor, I'm returning the

21       photographs and having this marked by the clerk, and

22       while I do that, I need to have another item of

23       evidence --

24   BY MS. SINGER:

25       Q    At the time that you came into contact with

1    Mr. Herlihy, was he under arrest at that time?

2         A    Yes, he was.

3         Q    Had an arrest warrant been issued for his arrest?

4         A    Yes, there had.

5         Q    And you were advised by dispatch or some other

6    person that he was at the station?

7         A    Actually, I was called at home by Detective Weaver.

8         Q    All right.  At the time that you came into contact

9    with Mr. Herlihy on that night, where was he placed in the

10   Gainesville Police Department?

11        A    He was in one of the interview rooms, that I had

12   previously described, in the criminal investigations

13   division.

14        Q    And at that time did you advise Mr. Herlihy of his

15   rights pursuant to Miranda?

16        A    I did.

17        Q    I'm going to show you what's been previously marked

18   State's K for identification and ask you if you could look at

19   this form and tell me whether you can identify it?

20        A    Yes, I can.

21        Q    And what is that form?

22        A    This is a Miranda rights waiver form.

23        Q    And this was -- is this, in fact, the Miranda

24   rights waiver form that you executed with Mr. Herlihy during

25   the late evening hours of August 3rd, 2000?

1    A    Yes.

2    Q    Would you tell the jury how you executed that form

3  with Mr. Herlihy?

4    A    It's the same form that I had previously described

5  to you.  It has his personal information over here, which I

6  did fill out, Brian Herlihy.  He leaves at 1015 Southwest 9th

7  Street, Apartment A21, Gainesville, Florida, 32601.  And he

8  gave a phone number of (352)271-0466.  Put my case report

9  number up here, which is 00 for 2000, dash, 13656.  The place

10  is GPD, which is Gainesville Police Department.  The date is

11  8/3 of 2000, and the time was 2255 hours, which is 10:55 P.M.

12    Q    All right.  Would you go ahead and tell the jury

13  how you went about advising him of his Miranda rights for a

14  second time?

15    A    Again, I wrote in the person whose name I'm talking

16  to, it is Brian Herlihy.  You are, and this time I did

17  circle, You are under arrest, and I scratched out not under

18  arrest, charged with aggravated child abuse.

19         Before we ask you any questions, you must

20  understand what your rights are.  You have the right to

21  remain silent.  You are not required to say anything or

22  answer any questions.  Anything that you say can and will be

23  used against you in court.  I asked him, Do you understand

24  that?  He wrote yes, and then he signed his signature.

25    Q    Did you actually read this document to him?

1    A    Yes, I did.

2    Q    And the charge of aggravated child abuse, on

3  August 3rd was Robbie Quirello still alive?

4    A    Yes, he was.

5    Q    All right.  So after reading him that portion, what

6  did you do next?

7    A    The next paragraph is, You have the right to talk

8  to a lawyer for advice before being questioned, and you have

9  the right to have him with you while being questioned.  If

10  you cannot afford to hire a lawyer, one will be provided for

11  you.  Do you understand that?  Mr. Herlihy wrote, yes, and

12  then Mr. Herlihy signed his signature.

13    Q    Did he ask for a lawyer at that time?

14    A    No, he did not.

15    Q    All right.  Your next part of the admission --

16    A    The next statement is --

17    Q    -- part of the waiver?

18    A    -- if you want to answer questions now without a

19  lawyer present, you still have the right to stop answering at

20  any time.  You also have the right to stop answering at any

21  time you want to talk to a lawyer.  I asked him, Do you

22  understand that?  And he wrote, yes, and again signed his

23  name.

24    Q    All right.  What was the next section of the

25  document that you went over with him?

1    A     The next section of the document is called the

2    waiver.  It says, I have read or had read to me that

3    statement of my rights as stated above.  I understand what my

4    rights are.  I am willing to answer questions and make a

5    statement.  I do not want a lawyer present at this time,

6    although I understand that I can have one.

7          No promises or threats have been made by anyone to

8    cause me to make a statement.  I have not been mistreated or

9    harmed by anyone to cause me to make a statement.  And,

10   again, Mr. Herlihy signed his name.

11   Q     Now, did you, in viewing and discussing these --

12   this waiver of rights with Mr. Herlihy note whether or not he

13   was under the influence of any drugs, intoxicants, or

14   narcotics to such an extent that he would be unable to

15   understand you when you advised him of his Miranda rights?

16   A     No.  And there is actually a question on here that

17   I do ask him that.

18   Q     Yes.  So you asked him that question as well on the

19   3rd.  I know you did it on the 2nd, but did you also do it on

20   the 3rd?

21   A     Yes, ma'am.

22   Q     And what was his response to that question?

23   A     No.

24   Q     And was there any indication to you that he did not

25   understand his rights or that he was waiving those rights

```
 1   when he executed that agreement?

 2        A    No.

 3        Q    That waiver form.  Did you promise him anything in

 4   return for any statements in this case, Investigator Legall?

 5        A    No, I did not.

 6        Q    Did you threaten him, coerce him, or force him in

 7   any way to make statements to you regarding what happened on

 8   August 2nd, year 2000?

 9        A    No, I did not.

10        Q    Is there another section of that form that is read

11   to Mr. Herlihy, or have you read every section that has been

12   read to Mr. Herlihy?

13        A    No, there is another section.

14        Q    And what is that section?

15        A    There are several questions.  One says, What is

16   your age?  He wrote 29.  DOB, which is date of birth, he

17   wrote 10/11 of '70.  POB, which is place of birth, is

18   Fayetteville, North Carolina.  He wrote that.  Number two,

19   far did you go in school?  He wrote 16.  Number three, do you

20   understand the statements written above?  He wrote yes.  And

21   number four, are you presently under the influence of

22   alcohol, drugs, or medication; and he wrote, no, and then he

23   signed his name again.

24        Q    And did anyone else sign that particular document?

25        A    Detective Weaver.
```

1    Q    And did you sign it as well?

2    A    Yes, I did.

3         MS. SINGER:  Your Honor, at this time, I would

4    tender State's K for identification into evidence as the

5    next numbered exhibit for the state.

6         THE COURT:  Any objection?

7         MR. GROLAND:  No objection.

8         THE COURT:  Is that number 75?

9         THE CLERK:  Yes, Your Honor.

10        THE COURT:  It will be admitted as State's 75 in

11   evidence.

12        (State's Exhibit No. 75 was moved and admitted into

13   evidence.)

14   BY MS. SINGER:

15   Q    After he was given his Miranda rights, Investigator

16   Legall, did Mr. Herlihy, the defendant in this case, make any

17   statements to you regarding what had happened to Robbie?

18   A    Yes, he did.

19   Q    What did he tell you regarding Robbie?

20        MR. GROLAND:  Your Honor, I'm going to object and

21   ask that counsel for the state ask what specific

22   questions she asked of my client and what his responses

23   were, instead of just having her give it in a narrative

24   way.  I'm just concerned that if we don't do that, then

25   we may run afoul of previous orders of the Court.

```
 1            MS. SINGER:  If the Court will allow me to, or
 2       Mr. Groland will allow me to lead a bit, I think I can
 3       control that, if that's okay, without being objected to.
 4       That's way I asked a more open-ended question.
 5            MR. GROLAND:  Sure.  Fine.  Let's do it that way.
 6            THE COURT:  Go ahead, Ms. Singer.
 7  BY MS. SINGER:
 8       Q    What did Mr. Herlihy tell you about his concerns
 9  regarding Robbie dying?
10       A    He told me that he had had nightmares about it.
11       Q    And when did he say he had had nightmares?
12       A    He said that when I asked him -- I need to refer to
13  my notes to make sure I have this exactly.
14       Q    Yes, please.
15       A    He stated that if Robbie died, he wanted to die.
16  He said that, I love that little man.  He said that he had
17  had nightmares about this before, and ever since then, that's
18  been his biggest fear.
19       Q    What did he tell you about Robbie's behavior that
20  particular day?
21       A    Well, I asked -- I told Mr. Herlihy that the
22  explanation that he was giving us for Robbie's injuries were
23  not consistent with the injuries.  And I asked him to tell me
24  what really had happened that day.  He said -- he sat for a
25  minute, and he said that he was crying, and that he couldn't
```

1   get him to stop crying.

2       Q    Did he then tell you what he did when he realized

3   he couldn't get the child to stop crying?  You can be

4   specific using your notes, if you need to, to refresh your

5   recollection.

6       A    Yes.  He said that when he wouldn't stop crying, he

7   thought maybe that he had a wet diaper, so he went to change

8   his diaper.  He put on the ceiling fan.  As I previously

9   testified, Robbie liked watching the fan, so he turned on the

10  fan.  He also turned on the music, the Titanic music that

11  Robbie liked.  He said that he also moved Robbie's legs back

12  and forth, and he described that as trying to maybe get gas

13  out of his stomach, and maybe that would relieve the crying.

14          He said at that point he went into the bathroom.

15  Robbie was still crying, but he considered it to be a fake

16  cry.

17      Q    He said a fake cry?

18      A    Fake cry.

19      Q    And did he describe for you what he meant by the

20  words "fake cry"?

21      A    He said a fake cry was that Robbie wanted

22  attention, but he really wasn't crying.

23      Q    And did he describe for you how he knew Robbie

24  really wasn't crying?

25      A    Yes.  He said that Robbie's face was not red, and

1    there were no tears.

2         Q    Did he say what had happened later at that point?

3         A    He said he went into the bathroom.  And when he

4    came out, he saw Robbie wedged in between the end of the bed

5    between the mattress and the footboard.

6         Q    Now, regarding the fake crying, did Mr. Herlihy

7    tell you about conversing with Robbie before he went into the

8    bathroom?

9         A    At that point, no.

10        Q    Was there -- did there come a point later that he

11   mentioned that to you?

12        A    Yes, it did, there was.

13        Q    What did he tell you about that?

14        A    He said that he told him that Mr. Brian is going to

15   take a shower now, but I want to hear a goo first.  He stated

16   Robbie gave him a goo, so he left Robbie and went in to take

17   a shower.

18        Q    Did he say what he did with Robbie when he

19   allegedly found him in the crevice?

20        A    Yes.  He said he pulled him out.  He wasn't moving,

21   and he said, I was wigging out.  I felt helpless.

22        Q    Did you then speak with him about the contact with

23   911?

24        A    Yes, I did.

25        Q    And what did he tell you about what he was doing

1    when 911 arrived?

2       A    He said that he was giving Robbie breaths and

3    trying to get him to respond to him.

4       Q    When the EMTs were present, did he make any

5    statement to you regarding what, if anything, he did with

6    Robbie during that time?

7       A    He said that once the EMS personnel had arrived,

8    that he was bagging the baby.

9       Q    Did he tell you what that meant, bagging the baby?

10      A    I knew what it meant, but I did ask him, and there

11   is a bag that helps provide air for someone, and they put it

12   over their face to try and give them air.

13      Q    Did you then go back and talk about Robbie being

14   fussy?  Did you then go back to the area of the facts where

15   he had told that you Robbie had been crying and fussing?

16      A    Yes, I did.

17      Q    And what did he tell you about whether or not

18   Robbie was crying when Crystal was leaving to get the gas?

19      A    He said that when he came back upstairs, Robbie was

20   crying, so he fed him some more of his formula.

21      Q    Did he then tell you what else he did while Robbie

22   continued to cry?

23      A    Yeah.  He said that he had tried to burp him, and

24   he had a little burp.

25      Q    Did he also tell you -- was the baby still crying

1   at that time?

2        A    Yes, he was.

3        Q    And what did he say he did at that point?

4        A    Again, he stated he turned on the fan, turned on

5   the music, and tried to calm Robbie down.

6        Q    Was there a time when he expanded on that

7   explanation?

8        A    He expanded on the explanation of talking to

9   Robbie, asking him to give a goo, and he had explained to me

10  that a goo meant that Robbie was happy.

11       Q    Did there come a time when he described to you how

12  he handled Robbie?

13       A    Yes, there was.

14       Q    And what did he say about how he handled Robbie?

15       A    He said that once he pulled Robbie out, that he

16  shook him gently.

17       Q    Let me talk about handling Robbie during the time

18  that the child was crying.

19       A    Okay.

20       Q    Did there come a time when he described for you how

21  he handled Robbie while the child was crying?  If you need to

22  refresh your notes, please do.

23       A    He, again, talked about the fake crying and about

24  pumping his legs.

25       Q    All right.  And did there come a time when he even

1  gave you a more extensive explanation for how he treated

2  Robbie?

3       A    Yes.

4       Q    All right.  If you would please move on to that

5  part.

6       A    Yeah.  He stated that he did, he did remember that

7  he was swinging him back and -- I won't use my hands.  But he

8  was swinging him back and forth, trying to get him to laugh

9  and play.

10      Q    And did he describe to you exactly how he swung the

11  baby back and forth?

12      A    He said he was swinging him from side to side.

13      Q    Tell he tell you what he did after he swung the

14  baby from side to side?

15      A    He said he plopped him down on the bed on the

16  pillow.

17      Q    Did he describe for you how he plopped Robbie down

18  on the pillow?

19      A    He stated that he plopped him fairly hard, and his

20  head was not supported.

21      Q    Are the terms, quote, fairly hard, his words?

22      A    Fairly hard were his words.

23      Q    Did he tell you what he, what concerns he had after

24  he had plopped the baby fairly hard?

25      A    He stated he thought he may have done something to

1    his neck.

2        Q    What else did he say about the matter of swinging

3    him from side to side and plopping him on -- putting him on

4    the pillow kind of hard?

5        A    He said verbatim, I know you're not supposed to

6    roughhouse with a four month old.

7        Q    Did he tell you how he believed he put the child

8    down?

9        A    He stated he believed he put him down fairly hard.

10       Q    And did he say whether or not he thought that was

11   the time the child been injured?

12       A    Yes.  He said that when he put him down roughly, he

13   thought that that's when the injury may have occurred.

14       Q    Did he say how the baby's head hit onto the

15   mattress of the bed?

16           MR. GROLAND:  Your Honor, at this point -- I know

17       I've agreed to some leading.  At this point, I'm going

18       to object.  Leading is one thing.  Testifying is

19       another.  While counsel can lead her in particular

20       areas, I would object to counsel testifying.

21           THE COURT:  The objection is overruled.

22           MS. SINGER:  Because I'm in a very delicate place

23       here.

24           THE COURT:  Go ahead.

25   BY MS. SINGER:

1    Q    Did he tell you -- did he tell you how -- what he

2  saw when the baby's head touched or hit or struck the

3  mattress?

4    A    He said the baby's head bounced on the pillow.

5    Q    And at that time, did you end your conversation

6  with him?

7    A    For a few minutes.

8    Q    All right.  Did -- and that was at -- what time was

9  that part of the conversation ended?

10   A    That was the 0015, which is 12:15 A.M, just after

11 midnight.

12   Q    All right.  And that would have been on the 4th of

13 August?

14   A    Yes, ma'am.

15   Q    Your report says the 11th of August; is that a

16 typographical error?

17   A    Yes, it is.

18   Q    All right.  Now, did you have another conversation

19 with him shortly thereafter?

20   A    Yes, I did.

21   Q    And what did you tell Mr. Herlihy before that

22 conversation began?

23   A    I told Mr. Herlihy that I didn't think he was

24 telling me everything.

25   Q    Did you ask him any further questions?

1      A    Yes, I did.

2      Q    What did you ask him?

3      A    I asked him about Robbie crying and why he thought

4   that it was a fake cry.

5      Q    And what did Mr. Herlihy, the defendant, do when

6   you asked him that question?

7      A    Mr. Herlihy hung his head and said that he wasn't

8   fake crying.

9      Q    He was not fake crying?

10     A    He was not fake crying.

11     Q    What did he tell you then?

12     A    He said that what he had just told us never really

13  happened.

14     Q    What did he say happened at that point?

15     A    He said that when he plopped Robbie on the pillow,

16  his head bounced.

17     Q    What else did he say?

18     A    He said that Robbie became quiet, and his eyes were

19  dazed.

20     Q    Then what happened?

21     A    He said that he told Robbie that he would be okay.

22     Q    Did he describe how the baby's eyes looked?

23     A    Yes.  He said that the baby's eyes were open, but

24  Robbie was not focussing on anything.

25     Q    Did he say whether or not Robbie was making any

1    sounds?

2        A    He said there was no sounds.

3        Q    What then did he tell you?

4        A    He said that at that point that what -- actually

5    what he said was, There was a little bit of -- and then he

6    stopped.  And I asked him, A little bit of what?  And at that

7    point, he said that he walked out of the room, he walked

8    away, and left Robbie laying there.

9        Q    And at that point when he walked away from Robbie,

10   did he tell you whether or not he knew about Robbie's

11   condition?

12       A    He said that he was uncertain how Robbie was, and

13   then he asked me, What do you do for a dazed baby.

14       Q    And then what happened?

15       A    At that point he went back to -- he went into the

16   bathroom to take a bath or a shower, and that when he came

17   out, he saw Robbie had rolled into the crevice of the bed.

18       Q    Now, was that the end of your conversation with him

19   at that point?

20       A    Yes, it was.

21       Q    And about what time of day was it at that point

22   when you ended that conversation with Mr. Herlihy?

23       A    That was approximately 0040, which is 12:40 A.M.

24       Q    And what did you tell him at that time?

25       A    I told him that I was done talking to him, and I

1  was taking him to the jail.

2      Q    And approximately what time did you head out to the

3  jail?

4      A    At 0050, which is 12:50 A.M.

5      Q    And how did you get him to the jail?  Describe to

6  the jury how you would have transported him to the jail.

7      A    Detective Weaver's vehicle is what we went in.

8  It's an unmarked vehicle.  I think at the time it was a blue

9  Ford Taurus.  Detective Weaver was driving.  Mr. Herlihy was

10  in the front seat with Detective Weaver, and I was in the

11  back seat.

12      Q    And why is it that Mr. Herlihy was in the front

13  seat in that particular vehicle and not in the back seat?

14      A    It's an officer safety issue, and in unmarked

15  vehicles, we do not have cages.

16      Q    You probably need to tell the jury a little bit

17  more about that --

18      A    Okay.

19      Q    -- so they understand what you're talking about.

20      A    A police vehicle has cages between the top of the,

21  the seat that the front people are sitting in and the roof.

22  And that's specifically for officer safety reasons so that a

23  defendant or a suspect cannot reach through and choke the

24  officer while he's driving or if he can get his handcuffs

25  off, get some kind of weapon and hurt the officer.

1     Q     All right.  But you're not in that kind of vehicle.

2     You're in an unmarked vehicle?

3     A     Yes, we're in an unmarked vehicle.

4     Q     And so as a result, how do you situate yourselves

5     in that vehicle to offer security during the course of the

6     transfer?

7     A     As I said, we put the defendant in the front seat

8     next to the driver, and then usually another detective will

9     ride in the back seat, and that's to prevent any kind of

10    movements that the defendant could make if he were to try to.

11    Q     Is that the way you were situated that particular

12    day?

13    A     Yes.

14    Q     Now, on the way to the jail, you're traveling from

15    Gainesville Police Department, which is located on Northwest

16    6th Street?

17    A     Yes.

18    Q     And you're traveling to where?

19    A     To the Alachua County department of the jail, which

20    is 3333 Northeast 39th Avenue, which is across from the

21    airport.

22    Q     And as you're traveling there, is there a

23    conversation between you and Mr. Herlihy?

24    A     Yes, there is.

25    Q     And what -- describe for the jury how the

1  conversation is initiated.

2      A   Mr. Herlihy wanted to talk some more, and I

3  explained to him that we were going to continue driving to

4  the jail.

5      Q   And then what happened?

6      A   He asked if we could just pull over, that he really

7  wanted to say some more.  So Detective Weaver pulled over for

8  a moment.

9      Q   Where did y'all pull over?  Do you remember?

10     A   It was somewhere just off of Main Street on

11 Northeast 16th Avenue.

12     Q   And tell us what Mr. Herlihy told you regarding his

13 treatment of Robbie Quirello when you were stopped along the

14 roadside on the way to the jail.

15     A   He said that he remembered bouncing Robbie on the

16 bed, that it was hard, and that, verbatim, I know I was rough

17 with him.  Can we please stop and talk?

18     Q   What did you tell him in response to that?

19     A   Again I told him that we were going to continue

20 driving to the jail.

21     Q   What else did he say?

22     A   He said that he abruptly had put Robbie down, that

23 his hands were still on Robbie, and that he told Robbie he

24 would be okay when he walked away from him.

25     Q   What happened after he walked away?

1     A     He stated as he walked away, he thought is Robbie

2   okay, is he all right, but he walked away anyway.

3     Q     And then what did he say happened?

4     A     He said that when he came back, he saw him, and he

5   freaked.  He stated that he knew something was wrong.

6     Q     Did he say anything else?

7     A     He said, I panicked, I freaked.  And he said that

8   he was afraid to go to jail because he knew what they did to

9   people who hurt babies.

10    Q     Now, did you tape record these particular

11  statements that were made by Brian Herlihy, the defendant in

12  this case --

13    A     No, I did not.

14    Q     -- both at the interview room and then later in the

15  jail?

16    A     No, I did not.

17    Q     And why is it that you did not tape these

18  statements?

19    A     Honestly, I didn't think about it.

20    Q     Are these verbatim statements that you have

21  recorded?  Could you tell the jury how you recorded verbatim

22  statements?

23    A     Actually, I write extensive notes, and then if

24  there's something specific that someone says that strikes me

25  as odd, I write it verbatim in my notes, and then I transfer

1  all of my notes into a report, which is what I did.

2      Q    So your testimony regarding verbatim statements

3  were, in fact, the words he used?

4      A    Yes, they are.

5      Q    Now, once you delivered Mr. Herlihy to the jail,

6  did you have other investigative functions in this case?

7      A    Yes, I did.

8      Q    Did you talk with other witnesses?

9      A    Yes, I did.

10      Q    Further your investigation?

11      A    Yes.

12      Q    And eventually were you advised that Robbie

13  Quirello died on August 10th of the year 2000?

14      A    Yes, I was.

15      Q    And after being advised of that, did you formally

16  arrest Mr. Herlihy for the offense of murder in the first

17  degree?

18      A    Yes, I did.

19              MS. SINGER:  If I may have a moment, Your Honor.

20              THE COURT:  Yes.

21              MS. SINGER:  I have no further questions of this

22      witness at this time, Your Honor.

23              THE COURT:  We'll take a recess before the

24      cross-examination for 15 minutes, Ladies and Gentlemen.

25              MR. GROLAND:  Your Honor, and I do have a matter to

1    bring before the Court when the jury goes out.

2         THE COURT:  All right.  If you all will step into

3    the jury room, and I will ask any jurors that would like

4    to be escorted downstairs, be so escorted, if you have

5    the staff available.

6         THE BAILIFF:  Yes, Your Honor.

7         (The jury exited the courtroom.)

8         THE COURT:  All right.  Yes, Mr. Groland.

9         MR. GROLAND:  Your Honor, I'm going to join the

10   state's previous request that the jury be provided a

11   copy of the transcript of Mr. Herlihy's statement, this

12   statement, because I believe, from my notes and from

13   what I've heard, that this witness testified to things

14   she claims that Mr. Herlihy said that, indeed, were not

15   on the tape.  And I think it's important that they look

16   or have available anyhow a copy of the transcript as I

17   cross-examine this witness.

18        MS. SINGER:  I have an objection to that at this

19   time.  They were not permitted to have the transcript

20   during the course of either of the 911 tape, they were

21   not provided the transcript at the time I requested it

22   for the initial tape recording, and they were not

23   provided during the second, and now Mr. Groland wants

24   them to have a transcript so that when he cross-examines

25   the witness, they have something to refer to, and I

1    think that's totally improper.  That transcript should

2    have been provided to them at the time the testimony was

3    offered.  This Court ruled based upon his request, and I

4    do think at this point it is improper for them to have a

5    transcript for only half of the testimony.  So I object.

6         MR. GROLAND:  Okay.  I'll say this:  The first area

7    that jumps out to me right here is what this witness

8    just testified to is that Brian Herlihy said --

9         MR. TEDDER:  Why don't you have the witness step

10   outside.

11        MR. GROLAND:  That's probably a good idea.

12        THE COURT:  Detective, you're on recess.  Thank

13   you.  We'll let you know of any rulings that affect any

14   further testimony.

15        (The witness exits the courtroom.)

16        THE COURT:  We'll take care of the phone calls in

17   just a few minutes.

18        (The jurors exit the courtroom.)

19        THE COURT:  All right.  Mr. Groland, go ahead.

20        MR. GROLAND:  The first thing that I've got a note

21   about is she testified that Brian Herlihy specifically

22   stated that the pillows and the sham were in the same

23   place on the bed as when they walked into the

24   demonstration.  There's nothing about that on the tape

25   at all.  The closest that anything comes to that is

1   she's asking Mr. Herlihy about the room being in the

2   same general way, other than the fan hitting the bed,

3   but there's no reference to the pillows or the sham

4   being as he left them that morning, and that's what she

5   testified to.

6         So I think that in order for the jury to understand

7   more clearly that, indeed, that was not said on the tape

8   at any place, I think a copy of the transcript should be

9   made available to them.

10        It's true.  I objected before, but I think

11  something new has developed.  I objected before because

12  I -- my argument, as I recall, was that the jury doesn't

13  have to necessarily hear it twice.  They can hear the

14  tape.  If it's audible on the tape, that should be

15  sufficient.  They don't have to see a transcript at the

16  same time that they're listening to the tape.

17        But here I think we've got different testimony

18  being attributed to Mr. Herlihy that is inconsistent

19  with the transcript of the taped statement, and I think

20  the jurors should be able to see it in black and white.

21        THE COURT:  The motion to provide transcript is

22  denied.

23        Anything else we need to put on the record at this

24  time?  We'll take a 15-minute recess.

25        (A recess was taken.)

1       THE COURT:  Would you mind asking Detective Legall

2    to come back in?

3       MR. PENNYPACKER:  I've got it.

4       (Pause in the proceedings.)

5       THE COURT:  State's ready?  Defense ready?

6       MR. GROLAND:  We're ready.

7       THE COURT:  Bring them in.

8       (The jury entered the courtroom.)

9       THE COURT:  Mr. Groland, go ahead.

10      MR. GROLAND:  Thank you, Your Honor.  May it please

11   the Court.

12                      CROSS-EXAMINATION

13   BY MR. GROLAND:

14      Q    Detective Legall, where we just left off with, the

15   statement on August 3rd and August 4th, you indicated none of

16   that was recorded?

17      A    That's correct.

18      Q    In any way at all?  Nothing was written down?  No

19   written statements?  No video?  Nothing?

20      A    No.  I recorded my notes.

21      Q    The only thing that was documenting what he was

22   saying was your notes that you're making as he was speaking?

23      A    Yes, sir.

24      Q    You certainly do have a tape recorder?

25      A    Yes, I do.

1    Q    And I believe you said that you actually got a call

2  at home by Detective Weaver letting you know that he had been

3  arrested, and you got up and went down to the Gainesville

4  Police Department?

5    A    Yes, sir.

6    Q    You actually had made prior arrangements to do

7  that, because, indeed, you wanted to talk to Brian Herlihy

8  again; isn't that correct?

9    A    If he had been located, yes, sir.

10   Q    If Brian was arrested, you wanted to talk to him

11 for the fourth time, third time, whatever number it was?  You

12 wanted to talk to him?

13   A    Yeah, I did want to talk to him, yes.

14   Q    Okay.  And did you not think to have a tape

15 recorder available; is that your testimony?

16   A    That is my testimony.

17   Q    Okay.  And somebody was with you at the time,

18 Detective Weaver?

19   A    Detective Weaver, yes, sir.

20   Q    He was with you from the time of his arrest of

21 Brian Herlihy all the way until you dropped him off at the

22 apartment?

23   A    I didn't drop him off --

24   Q    Drop him off at the jail?

25   A    At the jail, yes.


Q And I think you indicated that there was a time when there was a pause in your questioning of Brian. You went outside the room for a bit?
A That's correct.
Q And what was the reason that you did that?
A Detective Weaver was not involved in the beginning parts of this investigation, so I went out into the hallway to kind of fill him in on what was going on.
Q You had a conversation with him?
A A brief one, yes.
Q And then you went back in?
A Yes, sir.
Q Okay. You indicated that Brian told you in this nonrecorded statement that the baby was crying and he couldn't get the baby to stop crying; is that right?
A Correct.
Q And you are, I'm sure, aware that everyone, and I do mean everyone from mother to father to great grandmother and grandfather, all testify without exception and without reservation, that Robbie was not a crier. You know that?
A I know they've told me. I don't know what they testified in here.
Q He was never a crier. That's what they told you?
A Unless he was hungry.
Q Right. And, in fact, that morning, I think from

1    what you have learned, Robbie was fed by both Crystal and by

2    Brian, right?

3        A    Yes.

4        Q    The tape recording that we did take of the,

5    whatever you want to call it, re-enactment or demonstration,

6    that tape recording you've heard it, of course, before you

7    heard it today in court?

8        A    Yes.

9        Q    And how long ago before today was the last time you

10   heard it?

11       A    I believe I listened to it sometime last week.

12       Q    And how about before that?

13       A    Probably a month before, about a month ago.

14       Q    And you've also, it is true, read a transcript of

15   that, correct?

16       A    That was just recently.

17       Q    Okay.  So you've heard it recently a number of

18   times, and you've read a typed transcript of what whoever was

19   listening to it said was said on that tape, correct?

20            MS. SINGER:  I'm going to ask that we approach the

21       bench.  I would like to lodge an objection, I believe.

22            THE COURT:  Come on up.

23            (A sidebar discussion was held.)

24            MS. SINGER:  Your Honor, I don't -- I'm not sure

25       where Mr. Groland is going with this.  If there's going

1   to be a suggestion made to this jury that the transcript

2   is being withheld from them because of any action of the

3   state, that the state has the transcript, but they're

4   not entitled to have it and that there's going to be

5   some argument of that, I'm going to lodge an objection

6   to any questions that are going in that direction and

7   ask for a curative instruction on the issue of whether

8   they're entitled to the transcript.  Because right now

9   it looks like we're going in the direction that

10  everybody has a transcript except the jury, and I don't

11  think that that's fair to the state, since the defendant

12  was the one who initially made the request that the

13  transcripts not be made available to the jury.

14      MR. GROLAND:  Ms. Singer, you're way off base.

15  Your Honor, I'm headed toward her inaccuracy in her

16  testimony.  She's heard the tape a number of times.

17  She's read the transcript.  I'm not going to indicate at

18  the time we've got one here.  Although I actually -- I

19  actually do have one that I'm going to take a look at

20  perhaps in the presence of the jury, but the jury's not

21  going to know that I object or the state objects or

22  whether it's a typical situation that they get a

23  transcript.  I'm not going to go into any of that.  All

24  I'm trying to do is to elicit testimony from this

25  witness as to how certain she is of what she testified

1    to.  She read a transcript and listened to the tape and

2    that's where I'm going.

3         MS. SINGER:  If the purpose is impeachment, he can

4    ask her, Did you hear the statement today and did you

5    make some other statement inconsistent with that

6    statement you heard today, not referring to any

7    transcript.

8         THE COURT:  Frankly, because half the statements

9    were made on the tape and half the statements were made

10   off tape, I can't consider the significance of the

11   transcript.

12        MR. GROLAND:  Okay.  But let me ask her the

13   question I asked to let me then go right -- let me go

14   then right to the area of what she said and what I

15   believe the tape and the transcript shows and I'll focus

16   on the tape --

17        THE COURT:  All right.

18        MR. GROLAND:  -- in terms of questioning her about

19   it.

20        MS. SINGER:  I would much prefer that.  That would

21   be my objection, and I would be satisfied if he just

22   talked about what she heard on the tape as opposed to

23   what may have been available to her, because it does

24   give a false, an improper perspective on what the jury

25   is being given.  They have 75 items and if they don't

1    have a transcript, there may be the suggestion that I'm

2    hiding something, and I don't want that to be on the

3    record that I'm hiding anything from them.

4         MR. GROLAND:  I really didn't hear that, but I'm

5    going to --

6         THE COURT:  I understand the argument.  I don't

7    know what legal basis the objection is made on so --

8         MS. SINGER:  Improper impeachment.

9         THE COURT:  When that is made, I'll rule on it.

10        (The sidebar discussion was concluded.)

11   BY MR. GROLAND:

12        Q    You're familiar with what's on that tape regarding

13   that statement at the demonstration, correct?

14        A    Yes.

15        Q    And correct me if I'm wrong, but there is nothing

16   on that tape where Brian says on that tape, that the pillow

17   and the sham were in exactly the same place as he left it

18   that morning?

19        A    I believe we asked him if the room was the same as

20   when we're coming in, and he said pretty much.

21        Q    The answer, then, to my question is there's nothing

22   on that tape that says the pillow and the sham were in the

23   exactly the same place that he left it in the morning; is

24   that correct?

25        A    Not specifically saying that, no.

1    Q    But you specifically testified that that's what he

2    said, did you not?

3    A    I think I testified that the room was the same as

4    when -- I'm not sure. I would have -- I've testified to a

5    lot this morning, I'm not sure what the question was.

6    Q    We haven't even started.

7    A    Okay.

8    Q    When we took this taped statement at 6:30 on

9    August 2nd, we had a couple of problems with the audio, your

10   tape player --

11   A    Uh-huh.

12   Q    -- and the video malfunctioned altogether, and we

13   changed the battery a couple of times, so we have nothing in

14   the way of documenting what Brian was describing except your

15   audiotape?

16   A    Yes.

17   Q    In fact, your audiotape wasn't even on for the

18   whole time. The whole time you were there was about 26 or 27

19   minutes, and we only have 19 minutes of audio; isn't that

20   correct?

21   A    No, the time of the re-enactment we have on the

22   tape with the exception of the first five minutes where my

23   tape was not working properly.

24   Q    Well, what time did you arrive there?

25   A    Just before 7:00.

1    Q    Do you have an exact time that you arrived there?

2    A    I can tell you from referring to my report.

3    Q    Please do.

4    A    At 1850 hours, which is 6:50 P.M.  --

5    Q    Okay.

6    A    -- we entered the apartment.

7    Q    And what time did you leave there?

8    A    We left there at 1920, which is 7:20 P.M.

9    Q    Okay.  So you were there, then, for, about 25

10   minutes.

11   A    Approximately.

12   Q    Okay.  And how much time of that 25 minutes do we

13   have on tape?

14   A    Well, I haven't actually timed it myself, but

15   approximately, I think, 17 minutes.

16   Q    So we have about ten minutes that are not on tape;

17   would that be fair to say?

18   A    That would be fair to say.

19   Q    Do we have any photographs that were taken of where

20   Brian was placing the pillows or the shams as he's showing

21   you and the other four or five detectives what's going on

22   there?

23   A    No.

24   Q    Does anybody do a diagram?

25   A    I can't answer that question.  I don't know if

1    anybody did or not.

2        Q    You didn't?

3        A    I did not do a diagram.

4        Q    You were the lead detective on the case?

5        A    Yes.

6        Q    And certainly at this point, some two years later,

7    after where we are now at, you know, the trial situation in

8    this case, if someone had done a diagram, you would know

9    about it, would you not?

10       A    I may know about it, I may not.

11       Q    Have you ever seen a diagram that anybody did that

12   has to do with his recreation of what happened?

13       A    No.

14       Q    Did anybody take any measurements of the pillows on

15   the bed or the sham on the bed or where he claimed to have

16   left the baby on the bed relative to various positions?

17       A    During the re-enactment, no.  I don't know if they

18   were before.

19       Q    Well, were they before?

20       A    I don't know.  I wasn't there prior in the day.

21       Q    Have you ever seen a report from anybody, a crime

22   scene investigator, any uniformed officer, anybody in this

23   case where we have a diagram with measurements?

24       A    I've never seen a diagram.

25       Q    Have you seen the diagram that Tina Millard did

1    when she was there at 1:00?

2        A    No, I don't believe I have.

3        Q    Let me show you what's been marked as State's

4    Exhibit 62 in evidence.  You ever seen that before?

5        A    No, I have not.

6        Q    Whose ID number is on there?

7        A    481, I believe.

8        Q    That's Tina Millard?

9        A    I think that might be her ID number.  I'm not sure.

10       Q    We've got the right case number on there, do we

11   not?

12       A    Yes.

13       Q    And as you look at that diagram and that exhibit,

14   would you agree that that, to some extent, depicts the inside

15   of Brian Herlihy's apartment?

16       A    I believe so.

17       Q    No measurements?

18       A    No, I don't see any measurements.

19       Q    No pillows on the bed?

20       A    No, no pillows on the bed.

21       Q    You told the jury that at a point during the taping

22   of this re-enactment, Brian Herlihy asked to shut the tape

23   off?

24       A    That's correct.

25       Q    And, in fact, the reason why that happened is he

1    was getting emotional and choked up and couldn't talk; is

2    that not true?

3        A    That's true.

4        Q    Why didn't you tell the jury that?

5        A    I wasn't asked that.

6        Q    And there's something on your audiotape about the

7    fan striking the bed --

8        A    I believe so.

9        Q    -- when you were in there at 6:30, 7:00, correct?

10       A    I believe there is.

11       Q    And would that indicate to you that the bed was not

12   in the same position where it would normally be?

13       A    That's correct.

14       Q    Do you know how that happened?

15       A    I believe Mr. Herlihy had stated that the

16   paramedics moved the bed when they were working on the baby.

17       Q    You do know that Crystal Quirello was back in that

18   apartment at some point that day early in the morning while

19   the baby was in the hospital?

20       A    That's my understanding, yes.

21       Q    And that's your understanding from her?

22       A    Yes.

23       Q    And, in fact, didn't she tell that you the

24   apartment looked totally different?

25       A    She said it looked cleaned up.

1    Q    Did she tell you it looked different?

2    A    She said it looked straightened up, cleaned up.

3    Q    I'm really not trying to quibble, but I guess it

4  would appear as though I am.

5         Do you have a notation in your report as to what

6  she told you?

7    A    Yes.

8    Q    And does that notation indicate that she said the

9  apartment looked different?

10        MS. SINGER:  I'm going to lodge an objection.  It

11        calls for a hearsay answer.  I've let her answer the

12        question twice now.  Now we're on the third time.  It's

13        calling for hearsay and a repetitive answer.

14        THE COURT:  The objection is sustained.

15  BY MR. GROLAND:

16   Q    You said you examined the bed and you didn't see

17  any vomit?

18   A    I didn't see any, no.

19   Q    And I take it you examined the bed while we're

20  doing this audiotaping?

21   A    Yes.

22   Q    Is there anything in that audiotape that refers to

23  you looking on the bed and not seeing any vomit?

24   A    I don't think that I actually stated it on the

25  tape.

1    Q    In fact, there is something on that tape where

2  Brian actually tells you and the other officers who were

3  there, There's a stain over there in the middle of the bed

4  where I kind of put him?  Didn't he say that?

5    A    He said something to that, yes.

6    Q    And was he pointing to a nonexistent stain?

7    A    Well, I believe that's the point that I looked and

8  I didn't see anything.

9    Q    Actually, that's the point in which your audio

10  turned off; isn't that true?

11    A    I don't know.  I would need to hear that again.

12  I'm not sure if that's where it went off or not.  Are you

13  talking about when it went off or when we changed sides?

14    Q    He's telling you there's a stain in the middle of

15  the bed and then your audio goes off.  Do you remember that?

16    A    There was two points when the audio goes off; when

17  he asked me to go off, and I don't believe we were talking

18  about that then; and then another time when I switched the

19  side of the tape, I had to flip the tape over because we had

20  run out of tape.  And I'm not sure that that's what we were

21  talking about at that point in time.

22    Q    You testified yesterday that you were called back

23  to the hospital at about 12:30; is that correct?

24    A    A little bit earlier than that, 12:15.

25    Q    Did you say 12:30 yesterday?

1758

1    A    No, I said I had got there probably around 12:30.

2    Q    I think you said got there about 12:40.  Do you

3 remember that?

4    A    I was asked to go there at 12:15, and I actually

5 arrived there at 12:40.

6    Q    And your testimony yesterday was that you were told

7 to begin a criminal investigation; isn't that correct?

8    A    Actually, I was told to have Mr. Herlihy -- ask

9 Mr. Herlihy if he was willing to come back to the police

10 department with us.

11   Q    We're jumping ahead a little bit, Detective.  What

12 I'm talking about is when you first got to the hospital, and

13 as you were dispatched by GPD or whoever dispatched you, was

14 it not your testimony yesterday that you were dispatched to

15 investigate a criminal incident?  Yes or no?

16   A    Yes, it is.

17   Q    So at least by 12:30 the matter had already changed

18 from what first appeared to be an accident to a criminal

19 investigation; is that true?

20   A    That would be correct.

21   Q    And that's without you talking to Crystal

22 Quirello --

23   A    That's correct.

24   Q    -- correct?  And without you actually talking to

25 Brian Herlihy, correct?

1   A    That's correct.

2   Q    And I believe that you indicated that when you went

3   to the hospital, the first thing that happens after you get

4   there at 12:40 is you have a meeting with various people?

5   A    That's correct.

6   Q    And where is this meeting had?

7   A    There's a conference room in the emergency room at

8   Shands.

9   Q    Is it a private room?

10  A    I assume so.

11  Q    Well, I mean, were y'all able to close the door?

12  A    Yes.

13  Q    And the folks that are in there is yourself,

14  Detective Larry Seale, Detective -- correct me if I'm wrong

15  on any of these -- Detective Dave Cannon.  Who else?  Help

16  me.

17  A    Will Halvosa.

18  Q    Will Halvosa, he's a sergeant?

19  A    Yes.

20  Q    Orlando Alvarez, who's a uniformed officer, and he

21  was the first officer on the scene?

22  A    Correct.

23  Q    We've got Dr. Anne Dickinson, who was the nice lady

24  doctor that was the first physician involved there?

25  A    Yes.

1   Q    And we've also got a couple other people from the

2   hospital?

3   A    Correct.

4   Q    And this -- at this meeting was the first time that

5   shaken baby syndrome and child abuse was mentioned; is that

6   not true?

7   A    I believe that was the first time.

8   Q    Okay.  Did Dr. Dickinson talk to you all about the

9   CAT scan?  Well, strike that.  Let me just go back.

10       Do you know if at point, when you've having this

11  meeting, a CAT scan had been taken and read?

12  A    Yes.

13  Q    And how do you know that?

14  A    The first time that I had been at the hospital, I

15  was told that the baby was going in to have CAT scans done at

16  that point, when I left.

17  Q    When you got back, did you learn from Dr. Dickinson

18  that a CAT scan had been completed and the reports furnished

19  to her, or that she had read the CAT scan one way or the

20  other?

21  A    I believe she had.

22  Q    And would it also be correct that after that

23  meeting, you have two suspects, Crystal and Brian Herlihy?

24  A    To my understanding, that would be correct.

25  Q    Well, haven't you previously testified to that,

1    that you had two suspects after that?

2         A    No, I don't think I've testified to that yet.

3              MR. GROLAND:  Page 59, Lines 22 to 25.

4              MS. SINGER:  I'm just going to lodge an objection

5         as to the vagueness of the question.  If we're going to

6         try to impeach, because I think she was referring to her

7         testimony today or yesterday afternoon as opposed to

8         deposition testimony.

9              THE COURT:  The objection is sustained on the basis

10        of insufficient predicate at this point.  Make sure that

11        the witness has a copy of the transcript, please,

12        Mr. Groland.

13             MR. GROLAND:  Okay.  I'll just also clarify it with

14        a better question.

15   BY MR. GROLAND:

16        Q    When you came out of that meeting, did you have two

17   suspects in mind?

18        A    Yes, I did.

19        Q    And that was Brian Herlihy and Crystal Quirello,

20   the mother of the baby?

21        A    Yes.

22        Q    Correct?

23        A    Correct.

24        Q    That was your focus, those two people?

25        A    That was our focus.

1    Q    And yesterday you did say that you didn't advise

2  Brian Herlihy of his right to remain silent because you were

3  basically on a fact finding mission during that three hours

4  you had him over there at the Gainesville Police Department;

5  isn't that correct?

6    A    That's correct.

7    Q    But he was one of two individuals who were the --

8  who was the focus of your investigation, correct?

9    A    We weren't sure what had happened at that point.

10   Q    Answer that question.

11   A    He was one of two people, yes.

12   Q    Who were the focus of your investigation, correct?

13   A    Yes.

14   Q    And I believe you testified yesterday that the

15 reason why you talked to him for three hours, approximately

16 three hours, without advising him of his right to remain

17 silent is that until 3:55 that afternoon, he was not the

18 focus of your investigation.  Is that what you said

19 yesterday?

20   A    That is what I said yesterday.

21   Q    And you're saying something different today?

22   A    No, I'm not.

23   Q    Okay.  Was he not one of two suspects who were the

24 focus of your investigation?  Yes or no?

25   A    He was one of two people that could provide

1    information.  I don't know that he was a suspect at that

2    point.

3        Q    A few minutes ago you agreed with me that he was

4    one of two people who were the focus of your investigation.

5    Are you now receding from that position, or tell me what

6    you're talking about.

7        A    No, I'm -- when I was initially asked to go speak

8    with Mr. Herlihy, I was not in charge of the case at that

9    point.  I had been asked to go do something, which is what I

10   did.

11       Q    Okay.  And one of the reasons why you did not

12   advise him of his right to remain silent is in truth and in

13   fact you didn't want him to remain silent; isn't that true?

14       A    That's not why I didn't read it to him, no.

15       Q    Is it true -- I'll ask the question again.

16            Is it true that one of the reasons why you did not

17   tell him of his right to remain silent is you, Detective

18   Legall, did not want him to remain silent?

19       A    Reading his Miranda rights at that point was not an

20   issue.

21       Q    I don't think you're --

22       A    But, yes, I did want him to --

23            MR. GROLAND:  Your Honor, I'm going to ask the

24       Court to tell the witness to be responsive to my

25       question.

1    THE COURT:  Okay.  Detective Legall, you need to

2    answer the question that he puts to you to the best of

3    your ability.

4    THE WITNESS:  Yes, ma'am.

5    MR. GROLAND:  Do you remember the question?

6    THE COURT:  Repeat the question, please.

7  BY MR. GROLAND:

8    Q    My question is:  Isn't it true that one of the

9  reasons that you did not advise him of his right to remain

10 silent is you did not want to remain silent?

11    A    That's correct, we wanted him to tell us what

12 happened.

13    Q    Okay.  You wanted him to talk and incriminate

14 himself, true?

15    A    No, not true.

16    Q    And the truth is that Brian maintained to you all

17 day long during that first conversation for two and a half

18 hours, whatever it was, and the second conversation, part of

19 which was taped, and then the third conversation at his

20 house, part of which was taped also, he maintained throughout

21 the day that this was accidental, and he never intended to

22 hurt the baby; isn't that true?

23    A    That's true.

24    Q    Yesterday you were asked by the state about the

25 consent form itself, and you were asked by Ms. Singer what

1   you said to him.  And your testimony to this jury was you

2   said to him, We are going into your apartment to see what

3   happened.  Do you remember saying that yesterday?

4        A     Something to that effect, yes.

5        Q     So the truth is, you didn't ask him, you first told

6   him?

7        A     No, I explained to him why we needed to go in

8   there.

9        Q     Did you tell him, We are going into your apartment?

10       A     No, I said we needed to go into his apartment.

11       Q     Yesterday you did say, I told him, We are going

12   into your apartment, did you not?

13       A     Okay.  Yes, I probably said that, but that's not

14   what I --

15       Q     It's not what you said or not what you meant?

16       A     I think it's getting a little twisted around.

17       Q     Well, you said it.

18       A     Well, I can refer to my report, and my report says

19   that we explained to him that we needed to go in there to

20   process the scene because of the injuries to the baby.

21       Q     When you left the hospital at 1:00 that day with

22   Detective Cannon in the car and Brian Herlihy in the police

23   car --

24       A     Yes.

25       Q     -- you were investigating what you believed was a

1    criminal matter?

2        A    Yes.

3        Q    You had two suspects who were the focus your

4    investigation, correct?

5        A    Correct.

6        Q    And you knew, did you not, from another police

7    officer, specifically Alvarez, what Brian had told him about

8    what happened in the house, in the apartment?

9        A    He -- I don't know that he went into detail with me

10   before that.

11       Q    Okay.  Didn't you speak to Orlando Alvarez about

12   his first statement at the hospital with Brian when there was

13   an issue about whether he was in the shower, going to take a

14   shower?  Didn't you have that conversation with Alvarez?

15       A    A very brief, very brief conversation with Officer

16   Alvarez.

17       Q    Did you learn from Alvarez that Brian was there

18   alone with the baby when the baby, for lack of a better term,

19   became ill?

20       A    Actually, I believe what I was first told was that

21   Crystal had run downstairs to the car.

22       Q    Let me -- just let me just see if I can get you

23   directed in the right way.

24            What I'm asking you about is your conversation with

25   Alvarez about Brian Herlihy.

1   A   Correct.

2   Q   That's what we're talking about now.

3   A   Correct.

4   Q   Did Alvarez tell you that Brian Herlihy said to him

5   that he was alone in the apartment with the baby when the

6   baby became ill?  Yes or no?

7   A   No.

8   Q   Okay.  What did Alvarez -- Alvarez did not talk to

9   Crystal, did he?

10   A   I don't know.

11   Q   You don't know.  Don't you know that Coleman is the

12   one who talked to Crystal that morning at the hospital?

13   A   I know someone was assigned that task.  I'm not

14   exactly sure who or how many people talked to her.

15   Q   Okay.  You've got a typed report right there in

16   front of you, it's 45 pages.

17   A   Yes.

18   Q   That's your report.  You've had it for two years,

19   have you not?

20   A   That's correct.

21   Q   Is there anything in that report about Coleman

22   talking to Crystal at the hospital?

23   A   I believe that -- I think there's more than one

24   person that talked to Crystal, but I believe that Coleman did

25   talk to Crystal at some point.

1    Q    Is there anything in that report about Alvarez

2  having any contact with Crystal about this case at all?

3    A    That would be in Officer Alvarez's report.

4    Q    Well, have you read his report?  As the lead

5  detective in this case, have you read the first officer's

6  report?

7    A    Actually, I just read it last week.

8    Q    Is there anything in that report about Alvarez

9  having any interaction at all with Crystal?

10       MS. SINGER:  Your Honor, I'm going to lodge an

11       objection, I think that calls for hearsay.

12       THE COURT:  The objection is sustained.

13  BY MR. GROLAND:

14    Q    How long was the meeting that you had at the

15  hospital with the doctors and the other detectives?

16    A    My portion of the meeting may have been five

17  minutes.

18    Q    And when you say your portion, did you walk in on

19  the meeting?

20    A    No.  When I came in, there was several people

21  there, and I was assigned a task to go do, and we went to do

22  it, but I believe that there was other people still there

23  when I left.

24    Q    Your task was to get in touch with Brian Herlihy

25  and take him to the Gainesville Police Department for a

1    statement?

2         A    Ask him to go to the police department, yes.

3         Q    And to your knowledge, was anybody else that day

4    brought to the Gainesville Police Department for a statement?

5         A    To my knowledge, I don't think so.

6         Q    Okay.  In fact, the first time you talked to

7    Crystal Quirello in this case was on August the 9th, early in

8    the morning, at the Gainesville Police Department; is that

9    correct?

10        A    I would need to refer to my notes to see the exact

11   date.  August 9th, that is correct.

12        Q    And that's some six days after you had already made

13   a decision to arrest Brian Herlihy and he was in jail,

14   correct?

15        A    That's correct.

16        Q    And this is so despite the fact that you were told

17   or you knew about a number of conflicting stories that

18   Crystal was telling to both police and hospital personnel

19   that morning?

20             MS. SINGER:  Once again, I think that's going to

21        call for a hearsay answer, Your Honor, it's referring to

22        other people's statements.

23             THE COURT:  Detective, if you can answer that of

24        your own personal knowledge, of course, you may answer

25        it.  If it would require what someone else told you,

1    other than Crystal Quirello herself, then the objection

2    would be sustained.

3  BY MR. GROLAND:

4    Q    Did you know about her conflicting statements

5  before you sat down and talked to her?

6    A    Based on what other people told me.

7    Q    All right.  Just getting back to Mr. Herlihy not

8  being the focus of your investigation, when you asked him to

9  volunteer to come down there with you and Cannon, is he --

10  he's not under arrest.  Is he free to leave?  Can he walk

11  away at any time?

12    A    Yes, he can.

13    Q    Do you ever tell him that specifically, Mr. Herlihy

14  you can leave?

15    A    No, I don't recall we did.

16    Q    Were you the police officer who told Officer King

17  to watch Mr. Herlihy at the hospital and don't let him leave?

18    A    No, I was not.

19    Q    Do you know who was?

20    A    No, I do not.

21    Q    You had Mr. Herlihy sign a consent to search the

22  house, and that form actually says something about a search

23  warrant if you don't consent; isn't that correct?

24    A    That's correct.

25    Q    You had him also sign that.  You had him also sign

1    another form I think a little later in the afternoon.  It's

2    called a consent to search a motor vehicle?

3        A    That's correct.

4        Q    And he did that.  And we have a crime scene

5    investigator actually dispatched to his apartment at 1:00 to

6    go in and make observations, take photographs, and collect

7    evidence; is that correct?

8        A    To my understanding, that is correct.

9        Q    And we also have that same crime scene investigator

10   and another detective go back at 3:00 or 3:30 and take some

11   more photographs, correct?

12       A    I believe that's true, but it's not from my own

13   knowledge.

14       Q    You know they went back and took Polaroids?

15       A    Yeah, I do, but I don't know what time that was.

16       Q    Did you ever get a consent from Mr. Herlihy to go

17   back into his apartment at 3:30?

18       A    I don't know that they had left.  I'm not sure.  I

19   did not get a consent, no, another one.

20       Q    You're not aware that Tina Millard left at about

21   1:45?

22       A    It's possible she left, but I don't know if

23   everybody had left.

24       Q    Well, who else would have been there?

25       A    I'm not sure.  I believe Detective Cannon went over

1    there, and I believe Sergeant Halvosa went over there, and I

2    believe Detective Coleman went over there, but I don't know

3    the time frames.

4        Q    Okay.  What's a CAD report?

5        A    A CAD report is from our dispatch center, when they

6    put into a computer where somebody goes and when.

7        Q    Okay.  Have you looked at the CAD reports that were

8    prepared by your department in connection with this case to

9    find out who was where and when?

10       A    Just recently I did.

11       Q    Can you tell me, based upon your reading of those

12   reports, whether or not anybody was in Mr. Herlihy's

13   apartment between 2:00 and 3:30 when she went back in to take

14   photographs?

15       A    No, I can't tell you that.

16       Q    So all of this is going on, and we talked to him at

17   the Gainesville Police Department on our fact finding mission

18   for roughly two and a half hours, correct?

19       A    Correct.

20       Q    And we are talking to him in an interrogation room?

21       A    It's an interview room.

22       Q    Okay.  And does that room have windows?

23       A    No.

24       Q    That room actually has a video setup.  You can kind

25   of press a button and a video camera starts taking video,

1    does it not?

2        A    That's correct.

3        Q    Did you ever take any video of any of his

4    statements in this case?

5        A    No, we did not.

6        Q    Was there a reason why you didn't video

7    Mr. Herlihy's statement while you were on this two and a half

8    hour fact finding mission with him in that interview room?

9        A    I don't know why it was not videotaped.  As I said,

10   I was not the lead detective at that point, so I did not do

11   it.

12       Q    So what you're saying is you didn't have the

13   authority to press a button and turn the video on?

14       A    No, I didn't think to do it at that point.

15       Q    He's talked to by you for the most part, but

16   several other detectives come in and go out and get a crack

17   at him also; isn't that true?

18       A    Several other detectives came in and spoke with

19   him, yes.

20       Q    And, actually, during this same period of time,

21   there is a -- that day, in the middle of the day, there's a

22   guard placed at his apartment to make sure nobody comes in or

23   goes out or does something.  I'm talking about Officer Bruce

24   Ferris; is that correct?

25       A    That I don't know.

1    Q    Well, when you looked at the CAD reports, didn't

2    you see that Bruce Ferris was dispatched to Brian's apartment

3    that morning and stayed there for a period of time?

4    A    I believe that the CAD shows that Bruce Ferris was

5    not dispatched until we were called back to the hospital on

6    the second time.

7    Q    Isn't it true that somebody was standing guard

8    there at his apartment?

9    A    At some point, yes.

10   Q    A police officer?

11   A    At some point, yes.

12   Q    And what you're telling this jury that with all of

13   this going on we just discussed, Brian is not the suspect in

14   this case; is that what you're saying, he's not the suspect?

15   A    What I'm saying is I didn't know all of that was

16   going on at the time.  I was not the lead investigator at

17   that time.

18   Q    What about what we just went over were you not

19   aware of?

20   A    I was not aware of who was going to the apartment.

21   I was not aware of who may have been standing at the

22   apartment, Officer Ferris, as you just mentioned.  I was not

23   aware of who was speaking to any other parties involved in

24   this case.

25   Q    You all have radios and radio transmissions?

1    A    Yes, we do.

2    Q    You can hear one another?  So what you're saying is

3    that you were not aware that other officers were being

4    dispatched in this case to do certain things?

5    A    No, I was not aware of that at the time.

6    Q    The photographs that we put up here on the screen

7    with the sham in a certain place and the pillow under the

8    sham, do you personally know who put those items in that

9    place?

10   A    No, I do not.

11   Q    In fact, it's also true that Brian Herlihy did not

12   specifically say on the tape, I put that there, I put this

13   here; is that true?

14   A    That's true.

15   Q    So these eight photographs of these Polaroids that

16   we put up yesterday as to where the pillows are and where the

17   sham is, I mean, they're basically meaningless unless we're

18   looking at where the bed -- where the bed was, correct, since

19   we don't know who --

20        MS. SINGER:  Your Honor -- go ahead and ask it

21        first --

22        MR. GROLAND:  Let me just --

23        MS. SINGER:  -- and then I'll object to the

24        question.

25        MR. GROLAND:  -- just rephrase it then.

```
 1   BY MR. GROLAND:

 2        Q    In terms of where the pillows are positioned, they

 3   really have no value because you personally do not know who

 4   put them there; isn't that right?

 5             MS. SINGER:  I will lodge an objection, calls for

 6        speculation on the part of this witness.

 7             THE COURT:  Sustained.

 8   BY MR. GROLAND:

 9        Q    Why didn't we take the bed on August the 2nd?

10        A    I'm not sure why we didn't take the bed on

11   August 2nd.

12        Q    Why --

13        A    I can't answer that.

14        Q    Sorry.

15        A    Sorry.

16        Q    Why didn't we take the bed on August 3rd when you

17   arrested Brian Herlihy?

18        A    I'm not sure why we didn't take the bed on

19   August 3rd.

20        Q    Why did we wait two full weeks to apply for a

21   search warrant and go back in on August 16th and take the bed

22   and whatever other items the police collected?

23        A    Best to my recollection, I think we had discussed

24   whether we wanted to take the bed or not.  At the time it

25   wasn't an issue.
```

1    Q    Where is that bed now?

2    A    It's in our evidence custodian's office.

3    Q    When was the last time you saw it?

4    A    The last time I saw it would be the day that you

5    and Ms. Singer came to see it, and I don't know the exact

6    date.  I want to think it was --

7    Q    Do you know if it's still assembled?

8    A    Oh, I don't believe it would be.

9    Q    Do you know for sure that it's been taken apart?

10   A    I don't know for sure, but knowing my property

11   section, it probably has been.

12   Q    When you were in the apartment with Brian that

13   evening on August 2nd, there is some mention on the tape

14   about the onesie, where is the onesie?

15   A    That's correct.

16   Q    You were looking for that item of clothing,

17   correct?

18   A    That's correct.

19   Q    And why were you looking for it?

20   A    Because he had previously told me that they had

21   taken the onesie off of the baby, and there had been spit up

22   on it.

23   Q    And, in fact, it is true that when you were there

24   to do this demonstration, something about the onesie is

25   mentioned on the tape, and I believe you looked for it,

1    correct?

2        A    That's correct.

3        Q    And neither -- one more time.  Neither you nor

4    Brian could find the onesie; is that true?

5        A    That's true.

6        Q    Do you have any clue to where that onesie was in

7    that apartment?

8        A    Yes, I do.

9        Q    Where?

10       A    It wasn't in the apartment.

11       Q    Okay.  And where was the onesie?

12       A    Crystal Quirello had it.

13       Q    Okay.  And she had it, then, on August the 2nd

14   while you were there in the early evening hours doing the

15   demonstration?

16       A    As far as I know, she had it at that point, yes.

17       Q    And you didn't actually receive that onesie from

18   her until some three weeks later on August 25th; isn't that

19   true?

20       A    I did receive it from her, but I'll have to check

21   my notes to see exactly when that was.  What date did you --

22       Q    August 25th, I think.

23       A    That's correct.

24       Q    Do you know where that onesie had been for that two

25   week period of time?

```
 1        A      I believe Crystal Quirello had it.

 2        Q      Were you making contact with her during that period

 3   of time and asking her to bring that to you?

 4        A      Yes, I had asked her to bring it to me.

 5        Q      Is there a reason why it took so long?

 6        A      No, I don't recall there was a reason.  I just

 7   asked her to bring it to me.

 8        Q      So your understanding then from what you know is

 9   that she didn't go into Brian's apartment at a later date and

10   with a key open the door, go inside, do whatever she did, and

11   retrieve the onesie?

12        A      I don't know if she went in at a later date or not.

13   I can't answer that question.

14        Q      Well, you just testified that the reason why you

15   couldn't find it on the 2nd when you were there that night

16   looking for it is that she had it?

17        A      That is what she told me.

18        Q      Do you have any idea why Crystal would say that the

19   onesie looks different today in court as far as the stains

20   are concerned than when she gave it to you?

21             MS. SINGER:  I'm going to lodge an objection.  It

22        calls for a hearsay answer.

23             MR. GROLAND:  Prior testimony in court, Your Honor.

24             THE COURT:  I'm going to sustain the objection.

25   BY MR. GROLAND:
```

```
 1    A    Do you have -- when did you close this
 2    investigation out?
 3          Let me help you with that.  As you're looking, I
 4    have a note in my notes that there's something in your report
 5    marked CLO September 7th of 2000.  Would that --
 6    A    I'm trying to find it.  That would be the date I
 7    did close out this report.
 8    Q    Did you prepare another report at a later date?
 9    A    Yes, I did.
10    Q    That report you and I discussed, I think, recently
11    a couple of weeks ago about some minor incidental follow-up
12    matters?
13    A    That's correct.
14    Q    So for the most part, your main investigation, your
15    investigation, per se, was concluded as of September 7th;
16    would that be correct?
17    A    That's correct.
18          MR. GROLAND:  All right.  Your Honor, may I just
19       take a moment and approach the clerk?
20          THE COURT:  Yes.
21          MR. GROLAND:  I need the search warrant.
22    BY MR. GROLAND:
23    Q    Who actually prepared the search warrant in this
24    case, or who worked on it?
25    A    Ms. Singer.
```

1    Q    Did you work on it with her?

2    A    Yes, I did.

3    Q    And the affidavit in support of the search warrant,

4    tell us what that is and purpose of the affidavit?

5    A    The purpose of the affidavit is to explain my

6    probable cause for wanting to go back into the residence to

7    retrieve evidence for the case.

8    Q    And a search warrant, what do we do then with the

9    application for a search warrant; where do we take it?

10   A    We take it to a judge.

11   Q    And a judge reads the affidavit and determines

12   whether or not you have probable cause to go back in?

13   A    That's correct.

14   Q    And you put in the search warrant more relevant

15   information about the case so that a judge can determine

16   whether or not sufficient probable cause exists to allow you

17   to go in and do what you want, correct?

18   A    That's correct.

19   Q    You don't ever try to leave any important

20   information out because that would be misleading, correct?

21   A    We try not to.

22   Q    Did you put anything at all in your application for

23   the search warrant that you prepared on August the 16th about

24   having received information from two sources about Robbie

25   having a prior or older subdural hematoma?

1   A    I would need to refer to my application.

2   Q    Please do that.

3   A    It will just take me a minute.

4        MR. GROLAND:  Your Honor, the clerk needs to look

5   in the court file for this.  Can I just give him some

6   direction?

7        THE COURT:  Sure.

8        MR. GROLAND:  Let's move on while he's doing that.

9   BY MR. GROLAND:

10  Q    Did Brian tell you when you were over there at the

11  apartment something about not being sure which sham was the

12  one that he used?

13  A    There was some conversation about that, yes.

14  Q    And, in fact, one sham was thicker; the other sham

15  was thinner, correct?

16  A    That's correct.

17  Q    And, indeed, he wasn't sure which was the right

18  one?

19  A    That's correct.

20  Q    And do you know if the one we showed up here was

21  the thicker one or the thinner one?

22  A    I believe it was the thinner one.

23  Q    And how do you remember that?

24  A    Because we made a point of -- I believe on the tape

25  we did this too -- that we were looking at which one was the

1    thicker and the thinner of the two.

2        Q    When you have Brian arrested on a warrant on

3    Thursday, August the 3rd, that is on an arrest warrant,

4    correct?

5        A    That's correct.

6        Q    And just like with a search warrant, an arrest

7    warrant is something that's signed by a judge?

8        A    Correct.

9        Q    And the affidavit or the document that the judge

10   looks at to determine whether there is enough information is

11   called what?

12       A    A mittimus.

13       Q    And did you prepare a mittimus in this case?

14       A    Yes, I did.

15       Q    And just like with the application for the search

16   warrant, the mittimus is under oath by you?

17       A    That's correct.

18       Q    And just like with the application for a search

19   warrant, you try and put as much information in there as a

20   judge would need to know about the facts of the case so a

21   judge can make a decision?

22       A    That's correct.

23       Q    A fully informed decision, correct?

24       A    That's correct.

25       Q    All right.  The same question that we asked about

1    the search warrant, did you in your mittimus, when you had

2    Brian arrested for aggravated child abuse on August the 3rd,

3    put anything in there about chronic subdural hematoma?

4         A     I'm not sure I understand the question you're

5    asking me.

6         Q     Is there anything in there about an older injury to

7    Robbie's brain?

8         A     No, there was not.

9         Q     Okay.  Was the mittimus prepared the same day that

10   Brian was arrested?

11        A     Yes, it was.

12        Q     Do you remember anything of -- I apologize for

13   jumping around.  That's how I do it.

14        A     That's okay.

15        Q     Do you remember anything -- strike that question,

16   please.

17              You never had any suspicion about Brian going back

18   to the apartment that morning as Crystal did on August the

19   2nd, is that true?

20              MS. SINGER:  I'm going to lodge an objection to

21         that question.  It doesn't cause -- it doesn't relate to

22         any testimony or information.  Suspicion is -- requires

23         a conclusionary or speculative type answer.

24              THE COURT:  The objection is overruled.  You can

25         answer the question.

1    THE WITNESS:  I'm sorry.  Could you ask it to me

2    again?

3    BY MR. GROLAND:

4    Q    Did you ever think Brian went back to the

5    apartment?

6    A    I didn't know where Brian had been for some period

7    of time.

8    Q    In fact, didn't you later find out that Brian had

9    been out on the curb outside of the emergency room with first

10   Officer Chris Jackson and then later Officer Robert King?

11   A    That's correct.

12   Q    And when he wasn't with those two officers, did you

13   later find out that one of the two, I think it was Chris

14   Jackson, actually took him into the hospital to see some

15   clergy person?

16   A    That was my understanding, yes.

17   Q    Okay.  Do you have any time that he was there at

18   the hospital that's unaccounted for?

19   A    I don't know if there's any unaccounted for time or

20   not.  I do not know.

21   MR. GROLAND:  Okay.  Your Honor, may I ask the

22   Court to consider recessing now?  I mean, I do have a

23   long way to go and --

24   THE COURT:  If you'd approach the bench, and this

25   does not need to be on the record.

1       (A sidebar discussion was held off the record and

2  without the court reporter.)

3       THE COURT:  Ladies and Gentlemen, we're going to go

4  ahead and recess at this time for lunch.  So if you will

5  step into the jury room.  And I believe you've already

6  made orders for lunch; is that correct?

7       THE BAILIFF:  They're on their way to pick it up

8  now.

9       THE COURT:  Good enough.  If you'll step into the

10 jury room.

11      THE BAILIFF:  It will be another 15, 20 minutes

12 before they get back.

13      (The jury exited the courtroom.)

14      THE COURT:  We're going to reconvene at 1:00.  The

15 bailiff's best estimate is it may take the jurors until

16 about 1:05.  So if the attorneys will be back at 1:00,

17 that will be fine.

18      Anything else we need to put on the record before

19 that time?

20      MS. SINGER:  No, except that the witness is still

21 on the stand.

22      THE COURT:  Good enough.  And, of course, you must

23 not discuss the case with anyone during this lunch

24 recess.

25      THE WITNESS:  Yes.

1787

1    THE COURT:  We'll be in recess for an hour and five

2    minutes by the clock on the wall.

3    (The proceedings were recessed at 11:55 A.M. to

4    continue after lunch at 1:00 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25