# EXHIBIT

# Q

$\angle 02-1-1784$
$F$

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY }
        Appellant, }

}

}

}

v. }

}

}

STATE OF FLORIDA }
        Appellee, }

CASE NUMBER   2000-2753-CFA

APPEAL NUMBER 1D02-4788

VOLUME XVII

Docket
05-14-2003

2003 MAY 12  PH 2: 39

# TRANSCRIPT
# RECORD

## HONORABLE MARTHA ANN LOTT
### ACTING TRIAL JUDGE

### APPEAL FROM THE CIRCUIT COURT
### 8th JUDICIAL CIRCUIT FOR
### ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

I:\USERS\YMC\Word\YVONNE\Circuit Criminal Documents\COV-SH.TRANS.FEL.doc

1788

*202-1-17814*

1    IN THE CIRCUIT COURT OF FLORIDA
     EIGHTH JUDICAL CIRCUIT
2    IN AND FOR ALACHUA COUNTY

3    CASE NO: 01-2000-CF-2753-A

4    TRANSCRIPT ON APPEAL
     VOLUME XIV
5    (Pages 1788 - 1961)

6    STATE OF FLORIDA

7    vs.                              *Volume XVII*

8    BRIAN PATRICK HERLIHY,           *1002-4788*

9              Defendant.

10   _____/

11   Proceedings:          Jury trial

12   Before:               The Honorable Martha Ann Lott,
                           Circuit Judge
13
14   Date:                 September 19, 2002

15   Time:                 1:00 p.m.

16   Place:                Courtroom 4-A
                           Alachua County Courthouse
17                         Gainesville, Florida

18   Reporter:             Stacey K. Bryant, RPR
                           Judicial Court Reporter

19   APPEARANCES:

20        Jeanne Singer, Assistant State Attorney
          Stephen Pennypacker, Assistant State Attorney
21        120 W. University Avenue
          Gainesville, Florida 32608
22            Appearing on behalf of the State of Florida

23        Gordon Groland, Esquire
          John Tedder, Esquire
24        Post Office Box 2848
          Gainesville, Florida 32602
25            Attorneys for defendant

Stacey K. Bryant, RPR
Judicial Court Reporter

1

INDEX TO PROCEEDINGS

2

3    PRELIMINARY MOTIONS: ............................... 1790

4

5    STATE'S CASE:

6

7                        HELEN LEGALL,

8    (CONTINUED) CROSS-EXAMINATION BY GROLAND:........... 1804
     REDIRECT-EXAMINATION BY SINGER: .................... 1883
9    RECROSS-EXAMINATION BY GROLAND: .................... 1927

10

11   FURTHER MOTION PRACTICE: ........................... 1928

12

13

14                      INDEX TO EXHIBITS

15

16   STATE'S EXHIBIT NO. 76....MARKED IN EVIDENCE........ 1926

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2                    *  *  *  *  *

 3        (Outside the presence of the jury.)

 4        THE COURT:  Okay.  As I'm coming back from lunch,

 5   I find that the evidence custodian is entering the

 6   basement.

 7           MR. TEDDER:  Your Honor?

 8           THE COURT:  Yes.

 9           MR. TEDDER:  Mr. Herlihy is not present.

10           THE COURT:  We need Mr. Herlihy.  Hold on.

11           MR. BAILIFF:  He's getting him right now.

12           (Defendant is present.)

13           THE COURT:  All right.  Now as I was coming back

14   from lunch, I find that there is a bed being delivered

15   by the evidence custodian through the basement.  I told

16   them to hold up at that location until I was advised of

17   what the logistics are since obviously this is quite a

18   cumbersome bit of evidence.  Now what's the state's

19   intention?

20           MS. SINGER:  The state's intention is the

21   predicate for the bed was laid through Tina Millard and

22   was not entered at that time, but through the

23   cross-examination of Mr. Groland suggesting that the

24   state has this bed and that the state does not wish the

25   jury to see this bed, I will be now moving or on
```

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1    redirect I will be moving the bed into evidence.  I'm
 2    not intending to set up the bed, I'm not intending to
 3    do any reenactment with the bed.  I'm intending to have
 4    it available in evidence for the jury so that the
 5    argument will not be made that they don't have a bed
 6    that the state has, they can't see a bed that the state
 7    has, that the state didn't want you to see the bed,
 8    which is what I fear from the way the questioning was
 9    going on the cross-examination of Helen Legall.
10        I don't intend to set up the bed, I don't intend
11    to do any reenactment, I don't intend to do any
12    demonstration with it.  I just want to have it
13    available in evidence for the jury so that that
14    argument that we're trying to mislead the jury in some
15    way is not made in closing.
16        I believe I'm entitled to do that and the
17    predicate was laid and, in fact, Mr. Groland had
18    indicated to me that he intended to use the bed, I
19    don't know if he does or not.  But I'm ready at this
20    time to do that.
21        THE COURT:  Frankly, I have no doubt that you're
22    entitled to introduce the bed into evidence, cumbersome
23    or not.  The question I have, though, of course, is
24    logistical because a bed in multiple pieces doesn't do
25    the jury any good, and I don't know of any basis on
```

1  which the jury would be required to try to put that bed

2  together themselves, and I don't know of any basis on

3  which the jury would be allowed to ask somebody else to

4  do it for them.  Therefore, we've got some continuing

5  logistical problems.  Mr. Groland?

6      MR. GROLAND:  Your Honor, I didn't say anything

7  about I didn't want the jury to think -- I didn't say

8  anything about, hey, the state's not gonna show the bed

9  to the jury.  I just asked her where the bed was.

10     THE COURT:  It doesn't matter because as we've

11  indicated, state is entitled to introduce it into

12  evidence.  Logistically does the defense desire to

13  utilize this bed in any way?

14     MR. GROLAND:  I don't know at this time.  It is

15  true I have previously told Ms. Singer I expected I was

16  gonna put the bed in.  I have not made a final decision

17  on that.  But I would say if they're gonna put the bed

18  in evidence, they need to put it together.  It's

19  disingenuous to just put the pieces of the bed in

20  evidence and say, okay, there's the bed in 20 different

21  pieces.  If they're gonna put it into evidence, it

22  needs to be assembled and then we'll have to figure out

23  how and under what circumstances the jury is gonna take

24  a look at it somewhere in the courthouse, whether it's

25  in the basement or --

1    So --

2    THE COURT: We're gonna figure that out now, is

3    what I'm saying.

4    MR. GROLAND: Okay. At this point I am not

5    prepared to make a final decision as to whether or not

6    we're gonna put the bed in evidence during our part of

7    the case.

8    THE COURT: It will already be in evidence.

9    MS. SINGER: I'm putting it into evidence.

10   MR. GROLAND: Well, if they put it in evidence,

11   then our position is they need to assemble it and let

12   the jury see it.

13   THE COURT: All right. Now that is going to be

14   done. The question is how and when is it going to be

15   done? One possibility may be that the grand jury room

16   may be available and we may be able to have the bed set

17   up in there, and the jury go look in there. Possibly a

18   better option may be, when the jury begins

19   deliberating, to set the bed up in this courtroom and

20   then the jury, if they choose to, would be able to in

21   reality use this courtroom.

22   MS. SINGER: As the deliberation room maybe.

23   THE COURT: As part of their deliberation room.

24   We can structure some logistics surrounding that.

25   There's quite a bit of evidence at this point.

1    MS. SINGER:  Yes.  We could close the windows and

2    actually seal this room.

3    THE COURT:  Yes.

4    MS. SINGER:  I think that would be something we

5    could do that would be actually pretty amenable to, if

6    they wanted to go back and talk further, they could

7    even use the back jury room.  They wouldn't have to

8    discuss --

9    THE COURT:  Right.  So it would be my intention to

10   first of all direct that the bed not be brought up the

11   stairs until the jury is back in the jury room or in

12   the box.  That at that point of course you can bring it

13   upstairs and of course you may introduce it into

14   evidence at whatever would be an appropriate time and

15   that I would advise the jury at the time it's

16   introduced, that this bed will be set up before they

17   are required to deliberate.

18   MR. GROLAND:  Your Honor, it could be that during

19   closing argument one or the other side might want to

20   utilize the bed to make argument.

21   THE COURT:  I may or may not allow that.  We'll

22   address that separately.  However, I think it would be

23   necessary and appropriate to advise the jury at the

24   time that they see all these pieces brought in, that

25   they're not going to be required to speculate on how

1   the pieces go together, and not gonna be required to

2   manually put it together themselves.  Whether or not I

3   allow the state or defense to utilize it in their

4   closing argument, we'll address when we get a little

5   bit closer to closing argument, because we're not as

6   close as we had hoped to be.

7        MR. GROLAND:  Your Honor, do we have a couple of

8   minutes because the jurors are still eating, am a

9   correct?

10       THE COURT:  Couple of minutes for what?

11       MR. GROLAND:  Just to bring up some issues.

12       THE COURT:  Yes.

13       MR. GROLAND:  Okay.  I need some direction here

14  from the Court because, or some clarification.

15  Ms. Singer had a realtime transcript here and it's like

16  four pages because she thinks -- well, she hasn't told

17  me this, but I suspect this is what she thinks, somehow

18  my questioning of the last of Legall I either bordered

19  on opening the door or opened the door to get into

20  other areas.  I don't know if the Court has seen the

21  realtime.  I don't think that's the case, your Honor.

22  I don't think it's even close.

23       THE COURT:  I have not.

24       MR. GROLAND:  But I'm worried that I don't have a

25  very bright line where I know I'm overstepping the

1    bounds here.  Let me just provide the Court with this

2    and ask your Honor to just look at those couple of

3    pages.

4        THE COURT:  All right.  Well, first I need to know

5    what in the world I'm looking for.

6        MR. GROLAND:  Well, I guess for an opening of the

7    door.

8        THE COURT:  Opening of the door on what area?

9        MR. GROLAND:  The area of to go into these things

10   that Mr. Herlihy said to Detective Legall that we have

11   already agreed are gonna stay out that relate to

12   alleged fabrication about prior employment, jobs, and

13   want to be this and want to be that.

14       THE COURT:  Okay.  Now I don't recall any

15   statement --

16       MR. GROLAND:  I don't either.

17       THE COURT:  -- or testimony regarding his

18   employment or training by this witness at all at this

19   point.

20       MR. GROLAND:  I don't think we're close on this,

21   but I almost feel like they're ready to jump on me.

22       THE COURT:  I'm sure they are if you make a

23   mistake, as you would do with them and as is your job.

24       MR. GROLAND:  I'm fearful that I don't have as

25   definitive an understanding as to what this Court's

1   order is.  I don't want to step over the line and I

2   want -- Since we have a few minutes, I would like to

3   get a little clarity for myself so that I don't make a

4   mistake.  I don't think I even came close before.  But,

5   you know, I came into the courtroom after we broke for

6   lunch and both counsel for the state were up there

7   looking at the realtime and I don't want to make a

8   mistake.  This is too important a case.

9       THE COURT:  Mr. Groland, I can't rule.  You're not

10  asking me to rule on anything.  There's nothing for me

11  to rule on.  I have already ruled and I have clarified

12  the ruling.  The ruling is this:  That the state cannot

13  accuse Mr. Herlihy of murdering a child because he is a

14  liar.  Those are two separate things.

15      If you open the door in a way that requires the

16  state or allows the state to respond as to what he may

17  have said that is inconsistent and may bring in

18  evidence of false statements, then we have to address

19  it when that happens.  But I cannot guess what you may

20  ask next, I cannot guess what this witness may answer

21  next, and therefore, I can't give you any clearer

22  definition than I've already given you.

23      MR. GROLAND:  For instance, just so I can -- this

24  will help me, if I ask this witness, Helen Legall, is

25  everything that Brian Herlihy told you at the time of

1    the demonstration, either on that tape or in your

2    police report, something like that potentially in

3    violation of this Court's order?

4         THE COURT:  It depends on what the answer will be.

5    If you ask her everything, and I'm speculating that you

6    may know from discovery that the answer to that

7    question would be no, that in fact he told me he was an

8    EMS technician or a Shands pediatrician or whatever

9    else he may have said.

10        MR. GROLAND:  If, your Honor, however, what if in

11   fact there were other statements that have nothing to

12   do with being a paramedic, but there were other

13   statements as well as statements where he said he was a

14   paramedic?  So we've had a dual situation here.  One

15   is, I'm trying to elicit from the witness testimony

16   that is relevant to this case, that is admissible, that

17   I think she should have brought out already or I'm

18   trying to bring out; and at the same time there's this

19   other stuff that we're supposed to stay away from.

20        I feel like I'm being handicapped that I can't

21   elicit that other information because there's also

22   something else out there.  If I'm asking the witness,

23   is there anything else, clearly I'm not looking for

24   paramedic testimony.

25        THE COURT:  It doesn't matter what you think

1   you're looking for.  If you say, Is there anything

2   else?  Then she's gonna get to answer that question.

3   So you have to narrow your question.

4        MR. GROLAND:  Okay.  Even if there's something

5   else that is totally proper and admissible that she has

6   left out, I'm foreclosed from asking that question

7   because there's also something here that the Court has

8   already excluded.

9        THE COURT:  Mr. Groland, let me clarify again that

10   the only reason that I have excluded false statements

11   made by Mr. Herlihy, is that in and of themselves they

12   are not evidence that he committed this crime of which

13   he is accused.  If you ask her if she has anything

14   else, then you are opening the door to anything else he

15   may have said.

16        Now you may choose to ask that question or not.

17   You are totally in control of that as his counsel.  If

18   you choose to ask that, then this witness is not

19   instructed by that pretrial order to lie and say, no,

20   there isn't anything else.

21        MR. GROLAND:  Then I may ask the Court for just a

22   little bit of latitude and permit me if that situation

23   does occur, I'm not even sure it will, to at least lead

24   the witness and say --

25        THE COURT:  This is cross-examination, of course

1   you may lead the witness.

2       MR. GROLAND:  I know that.  I guess that -- So

3   what I can do then, is, did he say anything else about

4   pillows and shams?  And certainly I'll be okay in that

5   respect.  Okay.  All right.  I'm just a little gun-shy.

6   This is too important to be confused about and I am a

7   little bit confused.  I think I have a better

8   understanding now, and thank you.

9       THE COURT:  Okay.  Let me explain one more time

10  just in case.  There is no rule that the evidence of

11  false statements would not come into this case if you

12  elicit the question, the answers that would bring in

13  those false statements.  It is not relevant to the

14  state's case in chief that he lied.  Any witness of

15  which you ask the question that would result in a

16  response as to what statements he made, you are free to

17  ask, but then they are free to answer and those

18  statements are then not excluded.

19      MR. GROLAND:  Okay.  I got it.  Thank you.

20      THE COURT:  Is there anything else we need to

21  address before the jury comes back in?  I see from the

22  bailiff that they must be back in the building.

23      MR. BAILIFF:  They're in the grand jury room until

24  we're ready in here.

25      THE COURT:  Okay.  Anything else?

```
 1          MS. SINGER:  The only other question I have is,
 2     are we going to actually bring the bed upstairs for
 3     marking and entering into evidence?  So do we need to
 4     call somebody?
 5          THE COURT:  Yes.
 6          MS. SINGER:  Do I need to do that, because I don't
 7     know where you left that?
 8          THE COURT:  Yes.  Okay.  S.J., if you will tell --
 9     it's Mynelle, you remember, and you may tell them that
10     they may go ahead and bring the bed up on the elevator,
11     at which time they'll have the jury in the jury room.
12     Go ahead.  And if you'll call and tell the bailiff to
13     bring the jurors through.
14          MS. SINGER:  Mr. Groland, are you going to object
15     to marking it in and putting it in and having it stored
16     behind you?  I guess we'll just tell them it will stay
17     up here and they can just take it out after it's marked
18     and that might help logistically because I don't know
19     where you're gonna keep it all.
20          THE COURT:  Once it is in evidence, it's up to the
21     clerk to decide who's gonna store it where, not either
22     attorney, and not the Court.
23          MS. SINGER:  I know you don't want it in the back
24     room.  That's why I'm thinking that maybe we need to
25     probably do something where maybe -- maybe the clerk
```

1   needs to make a telephone call on where they want to

2   put it before we do all of that so there's no --

3        THE COURT:  I'm thinking it's going to be leaning

4   against the wall right where Bobby is and those two

5   chairs.

6        MS. SINGER:  All right.  It's a lot.  It's pretty

7   big, but I don't know, it might fit there.

8        THE COURT:  Do you have any better ideas where we

9   might put this?

10        THE CLERK:  We will make it fit in the courtroom.

11        THE COURT:  Good enough.  Bring the jury through.

12        (Jurors escorted to the jury room.)

13        THE COURT:  All right.  Anything else we need to

14   put on the record before the jury comes back in?

15   Mr. Bailiff, have the jurors had sufficient bathroom

16   time or are they gonna need a five minute recess here

17   or do you have any idea?

18        MR. BAILIFF:  I think there's a few more that need

19   to use the restroom and stuff.  They started over

20   there.

21        THE COURT:  We'll be in recess until 1:30, which

22   is about six minutes from now.

23        MS. SINGER:  During that time period can Mynelle

24   bring in the bed?  That will also help with the

25   disruption.

Stacey K. Bryant, RPR
Judicial Court Reporter

1    (Recess taken.)

2    THE COURT:  Mr. Tedder, you're looking rested and

3    ready to proceed; is that correct?

4    MR. TEDDER:  I am, your Honor.  I hope Mr. Groland

5    is as well.

6    MR. GROLAND:  What was the question?

7    MR. TEDDER:  She asked if you're ready to proceed.

8    MR. GROLAND:  I guess.

9    THE COURT:  And is the state ready to proceed?

10   MS. SINGER:  We are, your Honor.

11   THE COURT:  Bring in the jury.

12   MS. SINGER:  Oh, before we --

13   THE COURT:  Hold on.

14   MS. SINGER:  Just so we don't have to interrupt in

15   the middle of the case, it was my understanding that

16   Mr. Groland has no objection to the bed having been in

17   the custody of the Gainesville Police Department and

18   being in the same or similar condition as to when it

19   was first delivered to the Gainesville Police

20   Department.  We have released Mynelle LaPoint as the

21   property custodian.  Is that right, Mr. Groland?

22   MR. GROLAND:  That's correct.

23   THE COURT:  All right.  Bring the jury back in.

24   (Before the jury:)

25   MR. GROLAND:  May I approach the clerk?

1    THE COURT:  All right.  Mr. Groland, go ahead.

2    MR. GROLAND:  Okay.

3    (CONTINUED) CROSS-EXAMINATION

4  BY MR. GROLAND:

5    Q    Detective Legall, during your break did you by any

6  chance have the opportunity to take a look at the

7  application for the search warrant?

8    A    Actually, no, I did not.

9    Q    Okay.  We have it coming up.  We'll get there in a

10  few minutes.

11    MR. GROLAND:  May I proceed?

12    THE COURT:  Yes.

13    MR. GROLAND:  May it please the Court?

14  BY MR. GROLAND:

15    Q    Detective Legall, this is the first case involving

16  an allegation of shaken baby syndrome or SBS that you've

17  ever been involved in; is that true?

18    A    That's correct.

19    Q    And just to take it a step further, actually this

20  is the first case that anyone in the Gainesville Police

21  Department has been involved in or GPD has investigated;

22  isn't that true?

23    A    I don't know if that's true or not.

24    Q    Have you previously testified that that's true?

25    A    I don't know if I have or not.

```
 1        Q    Okay.  I'm referring to page five and it begins on
 2   line 20, goes up to page six.  Do you recall giving a
 3   deposition on January 25th, 2001 in my office where I asked
 4   you questions?
 5             THE COURT:  Excuse me, Mr. Groland.  Does the
 6        witness have a copy of the deposition?
 7             MR. GROLAND:  State attorney, Jeanne Singer was
 8        present.  Do you recall giving a deposition at that
 9        time?
10             THE WITNESS:  Yes, sir, I do.
11   BY MR. GROLAND:
12        Q    Do you remember this question and your answer,
13   question by me on line 20, page five:  Has the Gainesville
14   Police Department, specifically any other detective on your
15   squad to your knowledge investigated that kind of a case?
16   In other words, as you're thinking, what I'm looking for is
17   did you confer with any other police officers in how to
18   handle a case like this?  Answer, No, other than obviously
19   talking to my sergeant.  But to my knowledge, I don't know
20   of any other shaken baby cases.
21             MS. SINGER:  Wait.  I'm going to ask the entire
22        answer be read.
23   BY MR. GROLAND:
24        Q    Of recent.  There seems to be a word missing, but
25   I don't know.  I don't know of any other shaken baby cases
```

1   of recent, is what you said.  Do you remember that question

2   and that answer?

3       A    After referring to this, I do, yes.

4       Q    Have there been any other cases to your knowledge

5   investigated by the Gainesville Police Department like this?

6       A    Shaken baby?

7       Q    Yeah.

8       A    Since then or prior to then?

9       Q    Well, prior to when I took this deposition

10  specifically.

11      A    As I answered then, to my knowledge I knew of

12  none.

13      Q    Okay.  So then there was no other detective with

14  more experience -- well, I'll leave it at that -- with more

15  experience that you could consult with on this kind of a

16  case; is that true?

17      A    To my knowledge that's true.

18      Q    In fact, you didn't consult with anybody about

19  this, anybody with experience?

20      A    No, I did not.

21      Q    All right.  And we already covered that this

22  initially was an accident.  You were dispatched to an

23  accident involving a baby, and I think, correct me if I'm

24  wrong, you were cancelled on the way to the scene, which

25  would be the apartment?

```
 1          A      That's correct.

 2          Q      You did go to the hospital anyway that morning for

 3    what purpose?

 4          A      We went there to offer victims assistance.

 5          Q      I think you testified to that on direct.  And then

 6    you left the hospital and went back to the Gainesville

 7    Police Department?

 8          A      That's correct.

 9          Q      And the initial determination that this was an

10    accident, you had nothing to do with that?  That

11    determination was made by somebody else?

12          A      That's correct.

13          Q      And that would be the two uniformed officers who

14    were dispatched, Sergeant Dawson and Orlando Alvarez?

15                 MS. SINGER:  Objection, calls for hearsay.

16                 THE COURT:  Objection is overruled.

17                 THE WITNESS:  I'm not actually sure who made the

18          determination, but I was advised by Sergeant Dawson

19          that it was an accident.

20    BY MR. GROLAND:

21          Q      Okay.  Now before you began this investigation,

22    did you yourself have any formulized training in the area of

23    shaken baby syndrome?

24          A      No, I have not.

25          Q      Had you attended any extended courses or seminars
```

```
1    that were devoted exclusively to the investigation of SBS

2    cases?

3         A    No, I had not.

4         Q    What was the extent, if any, of your background

5    with this kind of a case prior to August 2nd?

6         A    No background on shaken baby.

7         Q    Between August 2nd and August 3rd when you

8    arrested Mr. Herlihy or caused him to be arrested I guess

9    would be the more appropriate way to describe it, did you

10   educate yourself in any way on this subject matter?

11        A    Yeah.  I'm not sure of the date, but at some point

12   in time I did start reading up on the Internet on shaken

13   baby.

14        Q    Okay.  And that might have been after August 3rd;

15   is that correct?

16        A    That's possible it was after.

17        Q    All right.  When you read articles on the

18   Internet, did you read both articles that dealt with, yes,

19   shaken baby syndrome does exist and, no, SBS does not exist?

20        A    I don't know -- I'm not sure I understand the

21   question you're asking.

22        Q    I mean would you agree that this is a subject

23   matter of some controversy in the medical community whether

24   or not shaken baby syndrome exists?

25             MS. SINGER:  I'm going to lodge an objection,
```

1    beyond the scope of this witness to answer.  He's

2    asking on the part of the medical community.

3         THE COURT:  Sustained.

4    BY MR. GROLAND:

5    Q    Are you aware that just the concept of shaken baby

6    syndrome is a theory that is controversial?

7    A    Yes.

8    Q    Did you -- When you did read up on this on the

9    Internet, read both sides of that subject?

10   A    Yes, I did read articles on both sides.

11   Q    Okay.  Did you save those articles?

12   A    I did at the time.  I printed out a few of the

13   articles, yes.

14   Q    I'm sorry?

15   A    I did print out a few of the articles, yes.

16   Q    Do you remember that when I took your deposition,

17   you promised to make copies and provide them to me?

18   A    I recall you asking for copies of them at some

19   point in time.

20   Q    Do you remember that you said you would provide

21   them to me?

22   A    Yes, I did.

23   Q    Did you do that?

24   A    No, I didn't.  I think that we forgot to do that.

25   Q    You forgot to do that?

1    A    Yes.

2    Q    Did you talk to either of the radiologists at the

3    hospital, either Dr. Quisling or Dr. Agee, who interpreted

4    the CAT scans, before arresting Brian Herlihy on August the

5    3rd?

6    A    No, I did not.

7    Q    Are you now aware that in fact there were four CAT

8    scans taken in this case, two on August 2nd, one on

9    August 3rd, and another one on August 4th?

10    A    I'm aware of them.  I'm not sure when they were

11    done, but, yes, I am aware of them.

12    Q    Prior to arresting Brian Herlihy, did you ever

13    look at those CAT scans?

14    A    No, I did not.

15    Q    Did you ever read the reports from the

16    radiologists before arresting him, either of the

17    radiologists?

18    A    We didn't have any reports at that point.

19    Q    Okay.  Do you know when those reports were

20    generated?

21    A    Some time way later.

22    Q    When you say, way later, you mean after

23    Mr. Herlihy was arrested for homicide on the 10th?

24    A    I believe I did not get them until after that

25    point.  I would have to re-check my notes, but I think it

1  was after that date.

2      Q    Prior to arresting Brian Herlihy on August the

3  3rd, you had a meeting in the state attorney's office,

4  correct?

5      A    On August 3rd we did, yes.

6      Q    Yes.   At that meeting you had conversations with

7  some of the doctors?

8      A    Over the phone, yes.

9      Q    Did you have any, other than Dr. Dickison who was

10 at that first meeting when you went to the hospital on

11 August 2nd, prior to arresting Brian Herlihy, did you meet

12 in person with any doctor?

13     A    No, I did not.

14     Q    And the doctor that you talked to in person that

15 first day, that first morning or midday, Dr. Anne Dickison,

16 she is an anesthesiologist, is she not?

17     A    I'm not sure what her title is.   I thought she was

18 an emergency room doctor.

19     Q    Okay.   She's not a neurologist or a neurosurgeon?

20     A    I'm not sure what she is.

21     Q    Is it true that you made a determination yourself

22 on August the 2nd, that afternoon while Brian Herlihy was in

23 your -- in the Gainesville Police Department, that since he

24 was the last person with the child, that he was responsible

25 for the injuries?

1812

```
1        A      That's correct.

2        Q      In fact there's a notation in your report to that

3   affect?

4        A      I believe there is.

5        Q      So you made this determination without meeting

6   with any of the doctors, correct?

7        A      That's correct.

8        Q      Or without talking either in person or on the

9   phone to Crystal Quirello, correct?

10       A      I did not talk to her, yes, that's correct.

11       Q      Or talking to John?  You didn't talk to the father

12  of the child either, John Quirello?

13       A      Other people were talking to those two

14  individuals.

15       Q      I'm talking about you.  You didn't talk to them?

16       A      No, I did not.

17       Q      In fact, your only in-depth interview with Crystal

18  in this case was on one occasion in your office on the

19  morning of August the 9th; is that correct?

20       A      I believe that's the correct date, yes.

21       Q      And that was six days after Brian was put in jail?

22       A      Yes.

23       Q      And then what happened after that is some seven

24  days later on the 10th, after Robbie passed away, Brian was

25  re-arrested not for first degree murder, you actually
```

1   arrested him for homicide; isn't that correct?

2        A    That's correct.

3        Q    And as of that date had you either seen the CAT

4   scans or read the CAT scan reports?

5        A    No, I had not.

6        Q    In fact, didn't you have a conversation with one

7   of the radiologists during the afternoon hours of August the

8   9th, Dr. Agee?

9        A    On the 9th?

10       Q    On the 9th.

11       A    Yes, I spoke with Mr -- I'm sorry -- I spoke with

12  Mr. Agee on the 9th on the phone.

13       Q    Doctor.  And in fact didn't he tell you there was

14  something suspicious in the CAT scan?

15       A    That's correct.

16       Q    And didn't he encourage you to read the CAT scan?

17       A    No.  He encouraged me to read his report, which I

18  did not have yet.

19       Q    Okay.  Did you read his report?

20       A    I attempted to.

21       Q    Okay.  Did you --

22            MR. GROLAND:  Excuse me one second.  May I just

23       have one moment, your Honor?

24            THE COURT:  Yes.

25            MR. GROLAND:  Thank you.

```
 1            (Pause in the proceedings.)
 2   BY MR. GROLAND:
 3       Q    Do you remember when you read his report, it had
 4   an indication that there were multiple generations of
 5   hematoma?
 6            MS. SINGER:  I'm going to lodge an objection.  It
 7        calls for hearsay as to this witness.
 8            MR. GROLAND:  Your Honor, the medical report's in
 9        evidence.
10            THE COURT:  I understand that.  The objection is
11        sustained.
12   BY MR. GROLAND:
13       Q    Did Dr. Agee tell you that he had found evidence
14   of prior injuries, specifically multiple --
15            MS. SINGER:  Objection, hearsay.
16            MR. GROLAND:  I need to approach, your Honor.  I
17        do have some case law.
18            THE COURT:  All right.
19            MR. GROLAND:  Thank you.
20            (Sidebar conference:)
21            MR. GROLAND:  Okay.  There's Alvarez -- Can I
22        speak?
23            THE COURT:  Let me just take a look at it real
24        quick.
25            MS. SINGER:  We only got one case.  I guess there
```

1   were a number of them.  I just have to wait and let the

2   Court look at theirs.  This is two of the same case

3   here.

4        MR. GROLAND:  Okay, Jeanne.  That's one case.

5        MS. SINGER:  That's the same one we have already.

6   We have that one.

7        THE COURT:  I have multiple copies of this case.

8        MR. GROLAND:  Your Honor --

9        THE COURT:  For efficiency sake, I'm going to let

10  you present argument, but not at this point.  I'll give

11  you more time later if you need it.  My question to you

12  is, how is this relevant?

13       MR. GROLAND:  Okay.  Can we -- I hate to ask to

14  have the jury excused.

15       THE COURT:  Just answer that.

16       MR. GROLAND:  It is relevant because it shows she

17  didn't do a darn thing with the information she had

18  about a prior brain injury as early as the 9th.  She

19  never followed up in any respect, in any way, shape or

20  form.  She never talked to any of the family witnesses.

21  She never went back and talked to any of the doctors

22  and she knew that this baby had a prior brain injury,

23  Judge.  It is not coming in for the truth of the matter

24  alleged because that's already in the record both

25  because of the hospital records, as well as at this

1   point other doctors that this finding was made.  It's

2   not coming in for the truth, rather it's coming in only

3   to show that this statement was made to her and she did

4   not act on it.  That is a clear definition of

5   non-hearsay.

6        THE COURT:  Okay.  I'm gonna give you plenty of

7   time to argue these cases on the record so that your

8   argument is completely clear in the event that I may be

9   making an error, but the objection is going to be

10  sustained as to this line of questioning.

11       On the other hand, you are certainly free to ask

12  her whether or not she took any follow-up steps in her

13  investigation as a result of the statement being made.

14  But the way you are phrasing the question, there could

15  be no conclusion by the jury other than that you're

16  having it admitted for the purposes of submitting the

17  truth of what was said.

18       MR. GROLAND:  No, your Honor.  It's already in the

19  record.

20       THE COURT:  That is the ruling.  You have plenty

21  of time to argue it at the recess.  If you want to ask

22  her about her reaction based on that statement, you

23  may, but you may not ask her about hearsay statements

24  alone.

25       MR. GROLAND:  But you will allow me to make

1    further argument on this?

2          THE COURT:  Absolutely, absolutely.

3          MR. GROLAND:  You want to keep these?

4          THE COURT:  No.

5          (Sidebar conference concluded.)

6          MS. SINGER:  I'm not sure that the actual ruling

7    on the objection was on the record.

8          THE COURT:  The objection was sustained

9    Mr. Groland, you can rephrase your question.

10         MR. GROLAND:  I will.

11   BY MR. GROLAND:

12         Q    You had a conversation, did you not, with

13   Dr. Frank Agee, on the telephone, on the 9th day of August

14   at about 2:15 p.m., is that correct?

15         A    That's correct.

16         Q    And he is what, a radiologist?

17         A    He's a radiologist.

18         Q    Okay.  Without going into what was said, did he

19   give you information?

20         A    Yes, he gave me information.

21         Q    Did you read his report that day?

22         A    No, I did not.

23         Q    Did you read his report anytime thereafter?

24         A    Yes, I did.

25         Q    And when did you read his report?

1    A    I don't think I received it until around the 25th

2  of August.

3    Q    Okay.  After talking to him, tell me what attempts

4  that day, if any, you made to get his report and read the

5  information contained in that report.

6    A    Actually I called the Shands records division and

7  they said I needed a consent from the parent to get those

8  records.

9    Q    You needed a consent from the parent to get

10  records, even though you were conducting a criminal

11  investigation?

12    A    Yes, sir.

13    Q    Aren't you able to get records from a hospital

14  when you're conducting a criminal investigation by getting a

15  subpoena from the court?

16    A    I can do it either way.

17    Q    Okay.  Why didn't you do it that way in this case?

18    A    Just thought it would be easier for the parent to

19  sign a consent.

20    Q    And what efforts did you make to get the parents,

21  either Crystal or John Quirello, to sign a consent for you

22  to get those records from Dr. Agee?

23    A    I had John Quirello come in and sign a consent.

24    Q    When did he come in?

25    A    I believe it was on the 14th.  I have to double

1    check and tell you exactly.  It was on the 14th of August.

2         Q    Did he sign a consent form on that day?

3         A    Yes, he did.

4         Q    What did you do with that consent form?

5         A    I faxed it to the Shands medical records division.

6         Q    Okay.  And when did you get those records?

7         A    I got them back on, I believe it was the 24th of

8    August.  Let me double check.

9         Q    Okay.  And those records contained Dr. Agee's

10   radiology report, did they not?

11        A    I believe it did at the time, yes.

12        Q    Okay.  Those records also contained Dr. Quisling's

13   radiology report, did they not?

14        A    That I'm not sure of.

15        Q    Well, take a look.  Do you have those records

16   there?  While you're looking, also look for Dr. Boughner's

17   radiology report, the third radiologist that looked at the

18   CAT scans in connection with this case.

19        A    You say Dr. Boughner?

20        Q    Yes.

21        A    I don't --

22        Q    B-O-U-G-H-N-E-R.

23        A    I have a one page report from Ronald Quisling and

24   I'm not sure if I have one from the other person you're

25   asking about.  I do have a one page report from that doctor

1    also.

2         Q    Okay.  And tell me how you acted on those three

3    radiology reports.  After receiving them as you've indicated

4    in August, what did you do about what those reports said?

5         A    Well, actually the doctors' names that had been

6    given to me that were involved in this particular case,

7    neither one of those names was mentioned to me at the time I

8    started my investigation.

9         Q    Okay.  But certainly those radiology reports from

10   those three doctors have to do with CAT scans taken of

11   Robbie Quirello on the 2nd, 3rd and 4th, did they not?  In

12   other words, you knew that this was your case?

13        A    Oh, yes, I did.

14        Q    So is your answer to my question that you didn't

15   do anything to follow-up on what was indicated in those

16   radiology reports?

17        A    No, I did not follow-up on those two radiology

18   reports.

19        Q    Okay.  But you certainly read them?

20        A    Well, I attempted to read them.  A lot of the

21   wording I did not understand.  It's doctor's words.

22        Q    Do you understand the words multigenerational?

23        A    Yes.

24        Q    What does that mean to you?

25        A    Probably more than one.

1    Q    Okay.  And when you arrested Mr. Herlihy on the

2  10th after the baby had unfortunately passed away, the only

3  difference between the charges really was that it now became

4  instead of an aggravated child abuse, it became a homicide?

5    A    That's correct.

6    Q    No additional facts other than that; is that

7  correct?

8    A    That's correct.

9    Q    Did you -- Before you arrested Mr. Herlihy the

10  first time, did you talk to his pediatrician, Dr. Hellrung?

11    A    No, I did not.

12    Q    After you -- Well, strike that.  Between the time

13  August 3rd, when you first arrested Mr. Herlihy, and

14  August 10th, during that time frame did you talk to the

15  baby's pediatrician, Dr. Hellrung?

16    A    I need to refer to my notes.  I did speak to him

17  at some point, but I do not remember the date.  I spoke with

18  Dr. Hellrung on August 22nd.

19    Q    Okay.  You had actually called his office on the

20  15th?

21    A    That's correct.

22    Q    But didn't speak to him at that time?

23    A    No, I did not.

24    Q    When you spoke to him for the first time, did you

25  convey to him what Dr. Agee had told you about his findings?

1822

```
 1        A    At that -- No, I don't believe I did.

 2        Q    Okay.  There is a notation in your report as to

 3   what Dr. Agee told you when you spoke to him on the 9th; is

 4   that correct?

 5        A    That's correct.

 6        Q    And that's the only time you've spoken to the

 7   radiologist, Dr. Agee; is that correct?

 8        A    That's correct.

 9        Q    Now that same day on the 9th that we're talking

10   about, that morning you also spoke to the father of Crystal;

11   in other words, Robbie's grandfather, Richard Davis,

12   correct?

13        A    That's correct.

14        Q    And he lives in Jacksonville?

15        A    Yes, he does.

16        Q    And you talked to him on the telephone?

17        A    Yes, I did.

18        Q    Okay.  Did you call him or did he call you?

19        A    No.  He called me.

20        Q    Is it also correct that what you learned from

21   Dr. Agee, whatever information you learned from him, you

22   also learned that same information from Crystal's father?

23        A    Yes.  Crystal's father is the first person that

24   gave me that information.

25        Q    Okay.  And in fact that information is what we're
```

1   not talking about specifically, but I think we all know what

2   we mean, was given to you for the first time by a person

3   that morning on the 9th, at 9 o'clock, and it was Richard

4   Davis who gave you that information, right?

5       A   Yes.

6       Q   And the information that he gave you was from what

7   doctors had told him, correct?

8       A   That's my understanding, yes.

9       Q   Okay.  And then the next time you heard that

10   information, the information we're talking about is CAT scan

11   results, is from Dr. Agee later that same day, that

12   afternoon at about 2:15, which is -- we talked about that

13   earlier, right?

14       A   That's correct.

15       Q   Two sources that day?

16       A   Yes.

17       Q   Okay.  Then Crystal comes in on August the 9th and

18   you speak to her in your office.  Is anyone else present?

19       A   I believe it was just me and Crystal at that

20   point.

21       Q   Do you tape record that statement?

22       A   No, I did not.

23       Q   No witnesses to that statement?

24       A   Not in the room with me.  I'm not sure if anybody

25   else was a witness or not.

1    Q    Did you have her write a written statement?

2    A    No, I did not.

3    Q    Was she advised of her rights?

4    A    No, she was not.

5    Q    She's no longer a suspect at that point even

6    though you had never talked to her before; is that correct?

7    A    That's correct.

8    Q    You had already made the call here, made the case,

9    made the arrest, you had made a decision it was Brian,

10   right?

11   A    That's -- I arrested him, yes.

12   Q    When you spoke to Dr. Hellrung for the first time

13   in August, did you tell Dr. Hellrung -- I may have just

14   asked this and I apologize -- anything about what you got in

15   the way of information from both Crystal's father and from

16   Dr. Agee?

17   A    I did not specifically mention it that way, no.

18   Q    Did you learn about a car accident that Crystal

19   was in at anytime during your investigation during this time

20   frame?

21   A    Yes, I did.

22   Q    Who did you learn that from?

23   A    Mr. Davis, her father.

24   Q    Okay.  Did you also hear from Crystal about that

25   accident?

1825

```
 1        A    I believe she may have mentioned it, yes.

 2        Q    And what was your understanding as to when that

 3   accident happened?

 4             MS. SINGER:  I'm going to once again lodge an

 5        objection as to this calling for a hearsay answer.  The

 6        witness is going to have to testify to what someone

 7        else told her to answer that question.

 8             MR. GROLAND:  It's already in the record, your

 9        Honor, by several witnesses.

10             THE COURT:  The objection is overruled.  Go ahead.

11             THE WITNESS:  Could you repeat the question?

12   BY MR. GROLAND:

13        Q    Yeah.  What was your understanding as to when she

14   was involved in that car accident?

15        A    My understanding was, she was pregnant at the

16   time.

17        Q    Right.  Did you ever after learning that she was

18   in a car accident when she was pregnant, did you ever get

19   the crash report to see what or how serious that accident

20   was?

21        A    No.

22        Q    Okay.  Did you ever follow-up on that crash by

23   obtaining with a subpoena or otherwise, her hospital records

24   relating to her hospitalization after that crash?

25        A    I did not obtain those, but I believe they were --
```

1826

```
1        Q    I'm sorry?

2        A    I believe they were obtained at some point in

3   time.

4        Q    By who and when?

5        A    I believe by the state attorney's office.

6        Q    Okay.  During the course of your investigation

7   before you closed out this case, did you ever get those

8   hospital records and read them?

9        A    From the accident?

10       Q    Yes.

11       A    No, sir.

12       Q    Did you ever go back after learning about this car

13  accident and her hospitalization and check with the doctor

14  who actually delivered the baby, not Dr. Kreinest, but

15  Dr. Stewart?

16       A    No.

17       Q    Did you ever talk to either of them?

18       A    No, I did not.

19       Q    Kreinest or Stewart?

20       A    No, I did not.

21       Q    Did you talk to Dr. Hellrung between the 3rd and

22  the 10th of August?

23       A    I don't believe that I did.

24       Q    Okay.  Page 18 of the deposition taken on

25  January 25th, line 13 through 17, do you remember this
```

1   question by Ms. Singer:  Did you speak to John Hellrung

2   between the 3rd and the 10th?  He's the child's

3   pediatrician.  Your answer:  Actually I did speak with John

4   Hellrung.

5       A    I don't recall talking to Dr. Hellrung.  It's

6   possible I did, but I don't recall doing that.

7       Q    Okay.  Do you remember making this statement?

8       A    Yes, I remember making this statement.

9       Q    Was that statement true?

10      A    At the time I may not have remembered that.  It's

11  possible I made a mistake.

12      Q    Okay.  Is there any notation in your report at

13  anyplace that you talked to Dr. Hellrung between the 3rd of

14  August and the 10th of August, 2000?

15      A    I don't believe that there is.

16      Q    Okay.  Before making the arrest in this case for

17  homicide, but after the baby passed away; in other words,

18  the baby passed away the early morning hours of the 10th,

19  the arrest was made later that day, so what we're talking

20  about is that day, did you have a conversation with the

21  medical examiner who performed the autopsy?

22      A    No, I did not.

23      Q    Have you ever spoken to him in connection with

24  this case?

25      A    No, I have not.

1    Q    You did, however, speak to his assistant at some

2  point, correct?

3    A    No, I did not.

4    Q    Okay.  Did you speak to anybody connected with the

5  medical examiner's office about this case?

6    A    No, I did not.

7    Q    All right.  Do you remember this question, page

8  19, deposition January 25th, 2001, page 19, line 13, talking

9  about the medical examiner, Dr. Hamilton, my question:  Did

10  you speak to him personally or did you just speak to one of

11  his assistants?

12           Answer:  Actually I think I spoke to Pete Zeller.

13           Question:  And Pete Zeller gave you what

14  Dr. Hamilton had told him about his preliminary findings on

15  the autopsy?

16           Answer:  Right.

17    A    No, I spoke with Sergeant Wayne McIntyre, who

18  spoke with Pete Zeller.

19    Q    So when you said you spoke to Pete Zeller, that

20  wasn't accurate?

21    A    No.  At the time I made an error.

22    Q    The pediatric neurologist in this case, Bernard

23  Maria, who is now out of state, you've talked to him in

24  connection with this case, have you not?

25    A    Yes, I have.

1    Q    And that, too, was a telephone conversation, not

2    in person, right?

3    A    That's correct.

4    Q    And when did you talk to him?

5    A    I spoke with him on the 9th of August.

6    Q    And did you talk to him before or after you spoke

7    to Dr. Agee in the afternoon?

8    A    Before.

9    Q    Okay.  But you did speak to him after you had

10   spoken to Crystal's dad and received some information from

11   him?

12   A    That's correct.

13   Q    Did you ever call Dr. Maria back and talk to him

14   about the information you had received from two sources

15   about the findings on the CAT scan?

16   A    I spoke with him that day about the possibility of

17   that in that conversation.

18   Q    Okay.  My question is, did you -- is there a

19   notation -- Let me ask it this way:  Is there a notation in

20   your report as to your conversation with Dr. Maria about CAT

21   scan findings specifically?

22   A    Specifically, no.

23   Q    Certainly you don't have an independent

24   recollection about talking to Dr. Maria about the CAT scans,

25   do you?

1   A    Not about the CAT scans, no.

2   Q    Did you have the phone numbers for Dr. Maria, and

3   Dr. Agee, and the ophthalmologist, Dr. Levine, those three

4   doctors, and if so, when did you get those phone numbers?

5   Can I help you with that?

6   A    I believe they were given to me by Beth Talaga.

7   Q    Okay.  Did you get those numbers from Beth Talaga

8   on August the 8th?

9   A    I'm not sure which date she gave them to me.

10   Q    Would you take a look at your report?

11   A    Okay.  That would be August 7th.

12   Q    Okay.  Would it be correct to assume then that you

13   did not have their phone numbers prior to that date?

14   A    Yes, that would be safe to say.

15   Q    All right.  So any conversations you had with

16   them, they called you?

17   A    No.

18   Q    If you didn't have their numbers, how did you get

19   in touch with them before the 7th?

20   A    Well, I didn't get in touch with them before the

21   7th.

22   Q    Well, did you have a conversation with Bernie

23   Maria, as you just indicated, on the 3rd?

24   A    That conversation actually took place with

25   Ms. Singer in her office.

1      Q      Well, you said you talked to Dr. Maria on the

2   phone?

3      A      I talked to Dr. Levine on the phone.  Dr. Maria

4   did call her office that night to speak with us about the

5   case.

6      Q      Okay.  So did you or did you not talk to Dr. Maria

7   on the phone on August 3rd before Brian Herlihy was

8   arrested?

9      A      No, I did not.

10     Q      What about Dr. Levine?

11     A      I call him Levine, was actually on the speaker

12  phone in Ms. Singer's office that evening.

13     Q      Did he call the office or did you all call him, if

14  you recall?

15     A      I believe that Ms. Talaga had asked them to call

16  her office.

17     Q      Okay.  Beth Talaga is not a doctor.  She's a

18  nurse?  I don't mean that in a disparaging way, but is that

19  correct?

20     A      I believe that's her title, yes.

21     Q      She actually works for the child protection team,

22  does she not?

23     A      She did at the time.

24     Q      And her boss is Dr. Howard Rogers, another witness

25  in this case?

1    A    I believe at the time he was.

2    Q    Is he still employed in that capacity?

3    A    I have no knowledge.  I don't know.

4    Q    Did you ever read his report?

5    A    I did have his report and I do believe I read it

6    at some point.

7    Q    Okay.  Are you aware that he didn't do a report in

8    this case, but merely signed off on the nurse's report?

9    A    I believe his name's on it.  I don't know who

10   actually wrote it.

11   Q    Do you know what a subdural chronic hematoma is?

12   Just yes or no at this point.

13   A    Kind of I do.  I've learned since.

14   Q    When did you learn about that?

15   A    That they're --

16   Q    I didn't ask you what you learned.  When did you

17   learn about that?

18   A    I've been learning since this case started.

19   Q    In other words, what you're really saying is

20   you've been learning since you arrested Brian Herlihy; isn't

21   that true?

22   A    The first arrest, yes.

23   Q    And the only difference between the first arrest

24   and the second arrest, is that Robbie passed away; isn't

25   that true?

1      A      That's true.

2      Q      So again back to my question.  You're learning

3  since you arrested Brian Herlihy; isn't that true?

4      A      Yes, I'm learning.

5      Q      What is your understanding as to what a chronic

6  subdural hematoma is, what have you learned?

7      A      That it's a massive amount of blood in the brain,

8  something to that affect.

9      Q      That's it?  That's your understanding?

10     A.     Something to that affect.  It has something to do

11  with the eyes and some other things.

12     Q      You do not know then that a chronic subdural is an

13  old subdural as opposed to a new subdural?

14         MS. SINGER:  I'm going to lodge an objection as to

15         the relevancy of this line of questioning as to this

16         witness.

17         THE COURT:  The objection is sustained.

18  BY MR. GROLAND:

19     Q      Do you know now how this child's brain was injured

20  before August 2nd?  Do you know how it happened?

21     A      No, I don't.

22     Q      You don't know if it was from an accidental

23  injury, or an intentional injury, or a birth injury, you

24  have no knowledge?

25     A      No, I don't.

1    Q    Or a car accident?

2    A    I don't know.

3    Q    If this child had a prior brain injury; in other

4    words, a chronic subdural hematoma, have you learned or do

5    you know whether or not in any way that has any impact on

6    whether or not this is a shaken baby syndrome case?

7         MS. SINGER:  I'm going to lodge an objection,

8    beyond the scope of this witness' ability to answer.

9    This is a medical question being asked of a law

10   enforcement officer.

11        THE COURT:  The objection is overruled.  You may

12   answer the question.

13        THE WITNESS:  I'm sorry.  Could you repeat it

14   again?

15        THE COURT:  Madam Court Reporter, would you read

16   the question back, please?

17        (Question read back.)

18   BY MR. GROLAND:

19   Q    Do you know?

20   A    Based on what I've learned, yes, it could be

21   shaken baby, if I answered your question correctly.

22   Q    No.

23   A    I'm sorry.

24   Q    That's not -- It's not responsive to the question.

25   A    I'm not sure I understand the question, sir.

1    Q    Let me see if I can go ahead and rephrase it in a
2  more understandable way.

3         During the course of your learning about this new
4  area, have you been able to learn whether or not if a child
5  has a prior brain injury that they call a chronic subdural
6  hematoma, do you know whether or not it would impact on
7  whether you correctly determined that this is a shaken baby
8  syndrome type of case?

9         MS. SINGER:   I'm going to lodge the very same
10        objection.   It's requiring this witness to render some
11        kind of medical opinion and this witness is not
12        qualified to answer that question.   It's beyond the
13        scope of her expertise of law enforcement.

14        THE COURT:   The objection is overruled.

15        THE WITNESS:   I have -- I don't really know how to
16        answer that question.   I have learned that there is
17        some debate about it, as you previously asked, as to
18        whether it's shaken baby or not.

19  BY MR. GROLAND:

20   Q    You don't understand the question, do you?

21   A    I don't understand your question, no.   I

22  understand it to a point, but I'm not really sure how to

23  answer it.   I don't know how to answer that question.

24   Q    Okay.   After talking to Crystal's dad that morning

25  at 9 o'clock on the phone and getting certain information

1  from him about his conversation with doctors, did you

2  specifically readdress that subject matter with Crystal

3  during your discussion with her at GPD?

4      A    I did talk to her about any potential prior abuse

5  or injuries to the child, yes, I did.

6      Q    Did you tell her what her father had just told you

7  15 minutes earlier?

8      A    I don't believe that I actually mentioned that.

9      Q    Why is it that you didn't tell Crystal what it is

10  that her dad just told you about some 15 minutes before you

11  started talking to her that morning?

12      A    When you're interviewing someone and trying to get

13  information, you don't necessarily come right out and say

14  that.  You ask them in other ways to try and determine if

15  something else may have occurred without just blurting that

16  out, and that's what I did.

17      Q    Okay.  After trying to find out information in

18  other ways after doing that, did you then tell her what her

19  dad had just told you about what he learned?

20      A    No, I did not.

21      Q    Do you know who Dr. Anne Dickison is?

22      A    Yes, sir.

23      Q    Do you know that she believes that Robbie suffered

24  multiple brain injuries over a period of time before August

25  2nd?

```
 1        A    No, I don't think that I knew that she said that.

 2        Q    From multiple traumatic events?

 3        A    I don't know that she said that.  I was not party

 4   to that conversation.

 5        Q    During your -- How long did you talk to Crystal?

 6        A    Probably for about, referring to my notes, a

 7   little over two hours, just a little over two hours.

 8        Q    And you made notes as you talked to her?

 9        A    Yes, I did.

10        Q    And when you make these notes, you write down

11   somebody's answer?

12        A    I write down what they're saying, yes.

13        Q    Their answer to your questions?

14        A    Yes.

15        Q    You don't write down the question?

16        A    No.

17        Q    So when you're recording a dialogue that you have

18   with a person you're interviewing, we only really have

19   recorded half of the dialogue; is that correct?

20        A    I guess you could put it that way.

21        Q    All right.  And that would be the same situation

22   with Brian Herlihy when you talked to him for two and a half

23   hours and then come into court and testify and read from

24   your notes, you really only have in front of you half of the

25   dialogue because you don't have any other questions,
```

1  correct?

2      A    Well, I wouldn't say I don't have any of the

3  questions.  Sometimes I do put some of the questions that

4  I'm asking in my report.

5      Q    For the most part, you do not have your questions,

6  correct?

7      A    I can't say that.

8      Q    Well, then tell me what your --

9      A    As I said, I do write in here, I asked her such

10  and such, I asked him such and such, and then whatever they

11  say or some version of what they've said, not necessarily

12  verbatim on everything they say.

13      Q    Brian Herlihy talks pretty rapidly, does he not?

14      A    He wasn't talking rapidly with me.  I consider

15  myself a rapid talker and --

16      Q    Would you say that certainly the more accurate way

17  to take down exactly what a person says, every little word,

18  every nuance, the way of saying it, the more accurate way

19  would be to tape record it or video record it?

20      A    Yes, I would agree.

21      Q    Why didn't you do that?

22      A    At that point in my career that was not something

23  I did on a regular basis.

24      Q    Well, why wouldn't you do it on a regular basis at

25  that point in your career?

1    A    One, it's not required that we do it; two, I had

2  been working person's crimes for under a year and in

3  property crimes we never did it.

4    Q    Okay.  Even though you agree that it's a more

5  accurate way of preserving somebody's statement, because

6  you're not required to do it, that's why you don't do it?

7    A    No.  That was -- I'm giving you a reason for, part

8  of the reason I didn't do it then.  If I knew then what I

9  know now, I would be taping all of them.

10    Q    You could also fudge it a little better if it's

11 not recorded, can't you?

12    A    I don't fudge anything that I write in my report.

13    Q    Is there a reason other than you just don't do it

14 that you can give us as to why you didn't videotape or tape

15 record Crystal's statement to you?

16    A    No, I have no other reason.

17    Q    Same with Brian?

18    A    Same with who?

19    Q    The same with Brian, those statements that you

20 took from him that were not recorded, the same reason, there

21 was no reason?

22    A    I don't have a reason for that, no.

23    Q    Did Dr -- Did you ever meet with other doctors,

24 specifically five other doctors or colleagues of Dr.

25 Dickison that morning at the hospital on August 2nd?

1    A    No, I did not.

2    Q    Is it true that at some point during your

3  investigation of this case you had a personal concern that

4  the injury may have happened another way?

5    A    I don't recall that I did.

6    Q    Okay.  Page 30, same deposition taken on January

7  25th, 2001, bottom of page 30.  My question, line 24:  That

8  kind, meaning --

9         Your answer:  Meaning SBS?

10         My question:  Meaning the kind you found on

11  August 7th?

12         Answer:  Correct.

13         Question:  That was found?

14         Your answer:  Because that was a concern of mine,

15  that maybe it happened some other way and he indicated to me

16  that it was probably not possible, talking about

17  Dr. Hellrung.

18         Remember saying that in your deposition on January

19  25th, 2001?

20         MS. SINGER:  Your Honor, I'm gonna ask that the

21      question begin from line 19 on page 30 so that there's

22      some sequence to this.  It doesn't make sense in the

23      order that Mr. Groland has read it.

24         THE COURT:  If that is the question full and

25      complete, then the question and the answer is the only

1    thing that is required at this time.  But of course on

2    redirect you may clarify any additional aspects of that

3    deposition that may be relevant to the jury's

4    understanding.  Go ahead, Mr. Groland.

5         MR. GROLAND:  I'll do exactly what counsel said

6    because I think it would be better for the jury.  Line

7    19 on page -- Strike that.  Okay.

8         MS. SINGER:  Line 19.

9         MR. GROLAND:  Sure.  Okay.  Well, actually it

10   starts with --

11   BY MR. GROLAND:

12      Q    Okay.  My question is:  Okay.

13           Then line 19, your answer on page 30:  I mean, I'm

14   fairly sure we did talk about the injury with the baby and

15   part of my questions to Dr. Hellrung were, could an injury

16   have occurred to Robbie in utero?  He didn't seem to think

17   that that kind of injury could have occurred that way.

18           My question:  That kind, meaning?

19           Your answer:  Meaning SBS.

20           Question:  Meaning the kind you found on August

21   the 7th?

22           Answer:  Correct.

23           Question:  That was found?

24           Your answer:  Because that was a concern of mine

25   and maybe it happened some other way, and he indicated to me

1   that that was probably not possible.

2           Do you remember giving that answer, remember those

3   questions and that answer in your deposition?

4       A    Actually I seem to recall that August 7th wasn't

5   an issue.  It was August 2nd, not the 7th.

6       Q    That's either my mistake or the court reporter's

7   mistake as to the date.

8       A    Okay.

9       Q    But is it true that you had a concern that maybe

10  the injuries in this case happened another way, as you have

11  testified?

12      A    On August 2nd that was a concern.

13      Q    Let's just go to -- We're gonna digress for one

14  moment -- the search warrant.

15          MR. GROLAND:  Your Honor, may I approach?

16          THE COURT:  Yes.

17  BY MR. GROLAND:

18      Q    Do you have it?

19      A    Yes, sir.

20      Q    Have you had a chance to read it, your affidavit,

21  or do you want just a chance to look at it?

22          MS. SINGER:  Mr. Groland, I know you're using my

23       copy and I know the original -- Is the original here?

24          THE COURT:  Yes.

25          MS. SINGER:  I'm going to ask that Mr. Groland

1   give me my copy back.

2          MR. GROLAND:  Sure.

3          MS. SINGER:  I'm sorry, but I gave it to him to

4   refer to.  If he can make a copy, we can have Mr. West

5   run to the copy machine.

6          THE COURT:  Are you talking about the search

7   warrant and affidavit?

8          MR. GROLAND:  I'm talking specifically about the

9   affidavit in support of a search warrant.

10         THE COURT:  Which has been sealed under court

11  order.

12         MR. GROLAND:  Correct, and I think it can be

13  unsealed at this point by agreement.

14         MS. SINGER:  We have no objection, your Honor, at

15  this time to unsealing it.

16         THE COURT:  Based on stipulation, I'll direct the

17  clerk to unseal the affidavit for search warrant and

18  the search warrant.

19         MR. GROLAND:  Your Honor, may I just sit down for

20  one moment or stand up and read this?

21         (Pause in the proceedings.)

22  BY MR. GROLAND:

23     Q    Okay.  Detective Legall, you've had a chance to

24  review the application in support for your request for a

25  search warrant, correct?

1    A    Correct.

2    Q    Okay.  And that search warrant was executed on the

3  16th of August, correct?

4    A    Yes, sir.

5    Q    And when was the application actually sworn to?

6    A    That was also on the 16th.

7    Q    All right.  And at the same time, what we talked

8  about earlier was, you also had a chance to review your

9  sworn affidavit, which we call a mittimus, that was in

10  support of your request for an arrest warrant in this case;

11  is that correct?

12    A    Actually, no, I have not reviewed that.

13    Q    All right.  Would you take a look at that also.  I

14  think that's a couple of pages.  And let me ask the question

15  again.  As you look through it, you can look for a specific

16  thing.  Did you in either affidavit make any mention of a

17  prior brain injury to Robbie as found in the CAT scans?

18    A    No, I did not recall I did.

19    Q    Okay.  Now, do you need to review your mittimus

20  before giving me a final answer on that?

21    A    No, I did not.

22    Q    And again as we discussed before, the purpose of

23  an arrest mittimus is to get somebody arrested, and an

24  affidavit in support of a search warrant, is to search

25  somebody's dwelling, is to give the judge who's making a

1   decision all of the information that he or she needs to make

2   a determination as to whether or not it's appropriate to do

3   what the judge is asked to do; is that correct?

4       A    That's correct.

5       Q    And that includes good things about the case and

6   bad things about the case; isn't that correct?

7       A    That is correct.

8       Q    With specific regard to the sworn affidavit when

9   you requested a search warrant, in as much as you had

10  already talked to both Crystal's father on the 9th, Dr. Agee

11  on the 9th, can you tell us now whether or not there is a

12  good reason why you left out the information you received

13  from both of those individuals in your affidavit?

14      A    There is a reason and I didn't purposely leave it

15  out.

16      Q    Did you mistakenly leave it out?

17      A    No, I did not mistakenly leave it out.

18      Q    You left it out intentionally?

19      A    No.  I left it out -- I didn't leave it out

20  because it was not something that we were going to put in

21  there based on doctors' testimonies.

22      Q    Well, based upon doctors' testimony?

23      A    Doctors.

24      Q    A doctor's testimony?

25      A    Several doctors.

1    Q    Okay.  But not based on Dr. Quisling's testimony,

2    or Dr. Agee's testimony, or Dr. Boughner's testimony, the

3    three radiologists that made findings in the CAT scans?

4    A    I had not talked to Dr. Quisling or Dr. Boughner,

5    so I can say, no, I had never spoken to them.  I would not

6    have their reports to refer to.

7    Q    You said before that you spoke to Dr. Hellrung,

8    John Hellrung on the 22nd of August?

9    A    That's correct.

10   Q    And you had a conversation with him.  And the

11   notations as to that conversation are in your police report?

12   A    I believe so, yes.

13   Q    Without getting into what was discussed, did you

14   and Dr. Hellrung ever have a subsequent conversation about

15   this case?

16   A    I don't recall that we did.

17   Q    You were present at Dr. Quisling's deposition and

18   Dr. Agee's deposition in this case, were you not?

19   A    Dr. Quisling, I'm not sure if I was.

20   Q    He's the radiologist.  Didn't we allow you to

21   attend that deposition?

22   A    I was in a deposition with you and Ms. Singer.  I

23   remember Dr. Quisling.  I'm not sure if there was --

24   Q    Remember Dr. Agee, he's a little bit hard of

25   hearing?

```
 1        A    Okay.  If that's the person, yes.

 2        Q    It comes back now?

 3        A    Yes.

 4        Q    Both of those individuals are Shands radiologists

 5   that have been involved in this case, correct?

 6        A    As far as I know, yes.

 7        Q    After hearing what they had to say in their

 8   deposition, did you do any further investigation in this

 9   case regarding how, if at all, Robbie could have received a

10   prior brain injury?

11        A    No, I did not.

12        Q    Did you go back and talk to the pediatrician,

13   Dr. Hellrung?

14        A    No, I did not.

15        Q    Did you go back and talk to the OB-GYN,

16   Dr. Stewart?

17        A    No, I did not.

18        Q    Did you go back and talk to Crystal?

19        A    No, I did not.

20        Q    Are you aware of the names of the different

21   individuals that have cared for Robbie during his lifetime?

22        A    I believe I know some of them.

23        Q    Okay.

24        A    I'm not sure if I know all of them.

25        Q    Did you learn that the father, Richard Davis, was
```

1    someone who watched over Robbie?

2         A    Yes.

3         Q    And his wife, Tammy Davis?

4         A    Well, I assumed they're married.  At some point

5    she did have some, but I had not spoken with her, no.

6         Q    And Crystal's got two sisters, Michelle and Dana?

7         A    I know she has a sister that I've met on one or

8    two occasions.

9         Q    Did you ever ask Crystal the question, Tell me who

10   has been with the baby over the last four months of the

11   baby's life?

12        A    No.

13        Q    Have you ever spoken at all to Richard Davis'

14   wife, Tammy Davis, in Jacksonville?

15        A    No, I have not.

16        Q    You never talked to either Michelle or Dana,

17   Crystal's two sisters, who have watched the baby?

18        A    In regards to the case?

19        Q    In regards to them being alone with Robbie on

20   occasion?

21        A    No, I have not.

22        Q    Do you know who Doris Bridwell is?

23        A    I'm sorry?

24        Q    Doris Bridwell?

25        A    I believe that is the grandmother, Robbie's

1  grandmother on the father's side.

2      Q   Have you talked to her outside the hall during

3  this case in the last week and a half?

4      A   Not in reference to the case.

5      Q   I'm sure you haven't.

6          During your investigation of this case, have you

7  ever once talked to that nice lady about what she may be

8  able to tell us about Robbie's prior brain injury?

9      A   No.  I talked to her daughter.

10     Q   And you learned, did you not, during the course of

11 your investigation, that Doris Bridwell was indeed the

12 primary baby-sitter during Robbie's lifetime?

13     A   I learned that she did care for Robbie on

14 occasion.  I don't know that she was the primary.

15     Q   Well, didn't you learn that she was the

16 baby-sitter five days a week, four weeks a month, for the

17 whole time that Robbie was alive while Crystal went to work?

18     A   No, I did not know that.

19     Q   But you knew that Crystal had a job at the

20 Civitan, did you not?

21     A   Yes, I did.

22     Q   Did you ever ask her the question, Crystal, tell

23 me when you went to work, who took care of your baby?

24     A   Yes, I did.

25     Q   What did she say?

1    A    She said that John's mother and grandmother

2  watched him on occasion.

3    Q    Do you know that John's grandmother is Doris

4  Bridwell?

5    A    Yes, I do.

6    Q    First time you talked to John Quirello was in your

7  office on what date, August, did you say 15th?

8    A    Hold on, I'll tell you.  August 15th, that's

9  correct.

10    Q    And that, too, was five days after Brian was in

11  jail on a homicide charge, right?

12    A    That's correct.

13    Q    And you did not, I take it from what I gather

14  here, talk to him specifically about what you learned from

15  Crystal's dad and Dr. Agee?

16    A    I asked him questions about abuse or having ever

17  seen the baby being abused, but I did not come out and

18  actually say the terminology you're using.

19    Q    Okay.  Did you say to him, listen, I've been told

20  such and such by so and so and what's up with that?

21    A    No.  As I previously testified, I don't normally

22  come out and say it that way.  I usually kind of go around

23  and about trying to determine if any other injuries have

24  occurred or any other abuse has occurred.

25    Q    Well, just like I asked you before, once you do

1    that, is there a reason why at the end of that type of

2    procedure you don't say, Well, here's what I got.  What do

3    you have to say about that?

4        A    I don't have anything to say about that.  I asked

5    him the questions I needed answered.

6        Q    We're gonna backtrack.  When you made contact with

7    Brian at 1 o'clock on the 2nd and asked him to go back, he

8    readily agrees to accompany you?

9        A    That's correct.

10       Q    No hesitation?

11       A    No.

12       Q    And in fact you told him, hey, this is now a

13   criminal investigation?

14       A    At that point we explained to him that due to the

15   injuries, we needed him to come back, if he would, and speak

16   with us about what had happened that day.

17       Q    My question is, do you tell him at that point that

18   Brian, this is now a criminal investigation?

19       A    I don't think I said it exactly that way, no.

20           MR. GROLAND:  Excuse me, your Honor.  Are we gonna

21       break soon?

22           THE COURT:  About ten or 15 minutes, yes.

23           MR. GROLAND:  Okay.  Can I have that depo?

24   BY MR. GROLAND:

25       Q    He was fully cooperative?

1    A    Yes, he was.

2    Q    Your handwritten notes, what do you do with those

3    after you're finished?

4    A    I transcribe them into a report or I type them

5    into a report and then I shred them.

6    Q    They're destroyed?

7    A    Yes, they are.

8    Q    Why do you not preserve your notes in connection

9    with a first degree murder case?

10   A    Because everything that's in my notes is in my

11   report.   There would be no reason to.

12   Q    Unless somebody wanted to look at your notes?

13   A    They wouldn't find anything there that's not in

14   here.

15   Q    The first part of your interview with Brian,

16   Detective Dave Cannon is present?

17   A    That's correct.

18   Q    Does he take notes?

19   A    I don't know if he took notes or not.  I don't

20   recall.

21   Q    At some point during the afternoon while you're

22   talking to Brian, does Alan Coleman present himself outside

23   of the interview room?

24   A    Yes, he does.

25   Q    And what had his responsibility been that morning,

1    if you know?

2        A    I believe his responsibility, he talked to some

3    other people at the hospital and I believe he may have

4    talked to John Quirello.

5        Q    Didn't Larry Seale talk to John Quirello?

6        A    I could have that backwards.  They had other

7    duties to do and I'm not sure who spoke to who.

8        Q    Isn't it in your report as to who did what?

9        A    Yeah.  If I refer to my report, I can tell you

10   that.

11       Q    You read your report certainly before coming into

12   court today and yesterday?

13       A    Yes.

14       Q    All right.  You don't remember that Coleman spoke

15   to Crystal, and Seale spoke to John Quirello?

16       A    Now that I referred to my report I do.

17       Q    Did Coleman briefly that afternoon tell you what

18   Crystal had told him at the hospital?

19       A    Briefly, yes.

20       Q    How brief?  I mean, how much time did you spend

21   out in the hall, I guess, talking to him about Crystal's

22   statements?

23       A    It actually wasn't just him that I was talking to.

24   We were talking about various things that had occurred

25   outside of my presence.

1854

1    Q    How much time did you spend with Detective Alan
2    Coleman talking about what Crystal had told him?

3    A    I would say probably, and I don't have an exact
4    time that I exited the room to talk to him in my report, but
5    I would say I don't think it was anymore than 10 minutes.

6    Q    All right.  And then you turned the tape on and
7    we've already gone over this, so I'm not going to belabor
8    it, but the tape that you take is only 26 minutes and then
9    you, I guess, attempt to consolidate the two and a half
10   hours into 26 minutes?

11   A    That's correct.

12   Q    And then you turn the tape off?

13   A    That's correct.

14   Q    But you continue talking to him?

15   A    For a few minutes we did, yes.

16   Q    Okay.

17   MR. GROLAND:  Your Honor, may I approach counsel
18   just for one second?

19   (Pause in the proceedings.)

20   BY MR. GROLAND:

21   Q    Isn't it true that your report contains a
22   statement that Robbie sustained injuries that could not have
23   been caused in the manner in which Brian Herlihy was
24   describing?

25   A    That is correct.

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1        Q    And that's talking about injuries from being
 2   wedged in the bed?
 3        A    That's correct.
 4        Q    All right.  So you got that information from a
 5   doctor, I believe?
 6        A    No.  Actually that is information I received from
 7   several individuals prior to going and doing the Miranda.
 8        Q    Okay.  Would you say that that information that
 9   you got from several individuals -- I take it from other
10   police officers?
11        A    That's correct.
12        Q    -- they got that information from doctors?
13        A    I assumed that's where they got it from.
14        Q    Well, do you know where it came from?  You got an
15   indication that Robbie sustained injuries that could not
16   have been caused in the manner in which Brian was
17   describing, that didn't come from you, right?
18        A    It did not come from me, no.
19        Q    Okay.  And do you know who it came from?
20        A    Not specifically.
21        Q    Why is it in your report then if you don't even
22   know where it came from?
23        A    Because detective -- As I previously testified, I
24   spoke to some other detectives who were doing other things
25   that I had no knowledge of at the time.
```

1    Q    Okay.  And you don't know who to attribute this
2    statement to?

3    A    I'm not --

4    Q    Who told you this?

5    A    It was one of two or three detectives --

6    Q    All right.

7    A    -- that I was talking to in a group.

8    Q    Okay.  And do you know where that unnamed
9    detective got the information from; in other words, what
10   doctor, or what technician, or what nurse, or where that
11   came from?

12   A    No, I don't know specifically.

13   Q    Did you have any follow-up discussion that day or
14   the next day with anybody at the hospital as to whether or
15   not Robbie throwing up and then having a seizure could have
16   caused those injuries?

17   A    I believe I did speak with someone about asking
18   them about the seizures.  I don't recall --

19   Q    Who would that be?

20   A    I don't recall who that was.  I have to refer to
21   my notes.

22   Q    Okay.  I mean there's a notation in your report
23   that some nurse by the name of Barbara told you he was
24   having seizures; is that what you're looking for?

25   A    In my report?

1    Q    Yeah.

2    A    I'm not sure exactly who Barbara is you're talking

3  about.

4    Q    I don't think it has a last name.  It just says

5  Barbara, nurse Barbara.  All right.

6         You took two taped statements from Brian Herlihy

7  on August 2nd; one was a 26 minute statement, the other was

8  about 19 minutes at the apartment, correct?

9    A    Approximately, yes.

10    Q    Does he say anything in either of those

11  statements, or do you ask him in either of those taped

12  statements about shaking the baby?

13    A    I believe that we talked about it, yes.

14    Q    Okay.  So what you're telling us is that you

15  believe there's something about Brian shaking the baby on

16  those taped statements?

17    A    Actually on the taped statements, I'm not sure

18  it's on the taped statements.  I believe it was in the

19  conversation prior to the tape.  I'm sorry.

20    Q    So your answer to my question then is, there's no

21  discussion at all, no question by you, or answer by Brian

22  that relates to Brian allegedly shaking the baby in either

23  of the two taped statements, correct?

24    A    I'm just -- I need to refer to my notes because I

25  don't recall at what point he said that.

1    Q    Okay.  I'm talking about the taped statements.

2    A    I understand that.

3         THE COURT:  I assume you have a number of

4    additional questions?

5         MR. GROLAND:  You mean am I gonna go on?

6         THE COURT:  Yes.

7         MR. GROLAND:  Yes, ma'am.

8         THE COURT:  Good enough.  We've been in session an

9    hour and a half.  We'll go ahead and recess at this

10   time for 15 minutes.  I know we had one juror trying to

11   call their office.  Do you need to make additional

12   phone calls?  If you can make this phone available so

13   he can do that during this recess, please.

14        And also while we're in recess, Ms. Monplaiser,

15   where are you?  There you are.  I have gotten a

16   response from the Federal District Court relieving you

17   of jury duty next week.  I'm sure they're gonna mail

18   this to you also, but they faxed us a copy.  So I'll go

19   ahead and give you a copy.

20        JUROR MONPLAISER:  Okay.

21        (Recess taken.)

22        THE COURT:  Anything else we need to put on the

23   record before we continue?

24        MS. SINGER:  Not from the state, Your Honor.

25        MR. GROLAND:  I'm sorry, your Honor?

1859

1    THE COURT:  Ready to continue?

2    MR. GROLAND:  Yes.

3    THE COURT:  Okay.  You can have a seat.

4    THE WITNESS:  Thank you.

5    MR. GROLAND:  Your Honor, is the Court gonna allow

6    me to finish my argument on that one issue regarding

7    non-hearsay?

8    THE COURT:  At some point, Mr. Groland, I am.

9    MR. GROLAND:  But it has to do with this witness.

10    THE COURT:  I've already ruled.  I'm just gonna

11    allow you to put your entire argument on the record for

12    appellate purposes.

13    MR. GROLAND:  Okay.  Is there any chance that the

14    Court might listen and reconsider it?

15    THE COURT:  Well, it appears to me from your

16    questioning that you may have slightly misunderstood

17    the ruling.  The ruling was, you may ask her about

18    those findings in regards to what she did.  You keep

19    skipping that saying what we are referring to as if

20    that's a secret.  It's not a secret.  You may ask the

21    witness what she did as part of her investigation in

22    response to information she got that this child did or

23    may have had prior injuries.

24    What you may not do and what you were starting to

25    do when there was an objection that was sustained was,

1   you were simply asking her, Did you get this report of

2   prior injuries?  The reason that objection was

3   sustained, is because that alone could not be inferred

4   by the jury to mean anything other than it was admitted

5   for the truth of the matter asserted.

6       MR. GROLAND:  Okay.

7       THE COURT:  On the other hand, had you phrased the

8   question and if you phrased the question with, When you

9   got information that this child did or may have had

10  prior injuries, what action did you take?  Then the

11  question is in regards to her action and that is

12  perfectly admissible.  Does that make sense?

13      MR. GROLAND:  I think.  I think I understand.

14      THE COURT:  Now after the ruling, what you did is

15  you kept referring to when you got the information that

16  we're not mentioning, what action did you take.

17      MR. GROLAND:  So I can mention the information?

18      THE COURT:  Yes, so long as the question is in

19  regard to the action that the officer took.

20      MR. GROLAND:  Okay.

21      THE COURT:  Good enough.  Bring the jury in.

22      (Before the jury:)

23      THE COURT:  Mr. Groland, go ahead.

24      MR. GROLAND:  Thank you.

25  BY MR. GROLAND:

1   Q   Detective Legall, going back to one particular

2   area specifically regarding the information you got from

3   Dr. Agee, when you learned from him that there were multiple

4   generations of older hematoma, did you act on that

5   information and do anything thereafter in your

6   investigation?

7   A   Somewhat.

8   Q   Tell me what specifically you did.

9   A   In my questioning of people in my investigation,

10  without specifically mentioning that terminology you're

11  using, I did talk to people and ask them in other ways had

12  they seen any abuse to the child.

13  Q   In other words, you asked people that you knew

14  were part of this case, had they seen any signs of injury?

15  A   Right, or anyone abusing the child.

16  Q   Okay.  Did you ask any of these people, that it's

17  been reported to me that there is an older injury, can you

18  explain it?

19  A   Not directly that way, no.

20  Q   And this information you got both from the father

21  of Crystal and from Dr. Agee on the 9th; is that correct?

22  A   That's correct.

23  Q   Now earlier today I asked you a question about

24  whether or not when you first approached Mr. Herlihy at the

25  hospital just before 1 o'clock on August 2nd in an effort to

1862

1  get him to go to the Gainesville Police Department with you

2  to talk and to get him to sign the consent form, whether or

3  not you specifically told him that we're now involved in a

4  criminal investigation.  Your answer was, no.

5          I want to ask you if you remember testifying under

6  oath in court in a hearing on September 4th, 2002, before

7  Judge Lott, page 79, the statement -- and I don't have a

8  copy for the witness -- where this question was asked of you

9  in court:

10         Question:  All right --

11         THE COURT:  I'm sorry.  You don't have a copy for

12     the witness?

13         MR. GROLAND:  I do not, your Honor.  I'm sorry.

14 BY MR. GROLAND:

15     Q   This question:  All right.  And in fact it is

16 true, is it not, that when you approached Brian outside of

17 the hospital and asked him to come back to the Gainesville

18 Police Department, you tell him this is now a criminal

19 investigation?

20         Your answer:  That's explained to him when we do

21 the consensual that we're going there to find out something.

22 We asked him to come back with us to the station to tell us

23 what happened that day.

24         Question:  In that same conversation you tell him

25 this is now a criminal investigation?

Stacey K. Bryant, RPR
Judicial Court Reporter

1    Answer:  While we're reading the consent to

2    search, we explain that to him.

3    Question:  Right at the front end, 1 o'clock or

4    five minutes after 1:00 when all this is going on at Shands

5    outside the emergency room, you tell him this is now a

6    criminal investigation?

7    Your answer:  Yes.

8    A    Yes, I did testify to that.

9    Q    I'm sorry?

10   A    Yes, I did testify to that.

11   Q    And you also testified earlier today that you did

12   not tell him that.  So my question is, Detective Legall,

13   which is true?

14   A    The question that I was asked was not exactly the

15   same as the question that was asked of me on the 4th.

16   Through the consent form, there is a part in there that says

17   that any evidence found during this can be used in the

18   matter of which you may stand accused of.

19   Q    Yeah.

20   A    The answers that I was answering on the 4th is,

21   yes, we were telling him that through the consent form.

22   Q    Is there anything on the consent form that says

23   this is now a criminal investigation?

24   A    I don't think it specifically says that, no.

25   Q    Well, so when you answered this question on the

1    4th in court under oath, that you tell him that this is now

2    a criminal investigation, that was my question, and you say,

3    yes; that wasn't true then?

4         A    I don't think that I used those exact words when

5    we talked to him that this is now a criminal investigation.

6         Q    Do you dispute that you testified this way in

7    court, under oath, on the 4th?

8         A    No, I do not dispute that.

9         Q    Do you dispute that you testified differently

10   today, under oath, in court?

11        A    The wording may be different, but I do not dispute

12   that I am testifying the same as I did on the 4th.

13        Q    You testified earlier that Brian told you he shook

14   the baby.  Is it true that he said he shook the baby to try

15   to revive the baby, but was careful not to hurt the baby?

16        A    I believe it was to get a response from the baby,

17   but was careful not to hurt the baby, that's correct.

18        Q    You didn't say that when you testified, did you?

19   You didn't add the rest of his sentence that you just

20   elaborated on, did you?

21        A    I believe I answered the question the way it was

22   posed to me.

23        Q    When you answered the question that Ms. Singer

24   asked you about what he said about shaking the baby, did you

25   add to that what you just told the jury, but I was careful

1    not to hurt the baby?

2         A    No, I don't think I added that on at the time.

3         Q    Why didn't you add that earlier?

4         A    I answered the question the way it was posed to

5    me.

6         Q    And how was it posed to you such that you thought

7    that the full answer to the question was not appropriate?

8         A    I'm not saying the full answer to the question was

9    not appropriate.  Mr. Herlihy made many statements to me at

10   the time.

11        Q    Okay.  Although you say that Brian stated to you

12   that he shook the baby, am I correct in saying that he never

13   stated to you, or confessed to you, or admitted to you that

14   he had any criminal culpability?

15        A    No, he did not.

16        Q    In fact, he maintained all along it was an

17   accident?

18        A    Yes, he did.

19        Q    Tell us what you perceived your job to have been

20   with specific regard to this case back on August 2nd when

21   you headed up this investigation, give information.  I mean,

22   tell me or tell the jury what it is that your responsibility

23   was in connection with this case.

24        A    Originally my responsibility was to ask

25   Mr. Herlihy to come back to the police department to talk to

1866

```
 1    us.  I was originally not under the impression that I was in

 2    charge of the case at that point.  After I realized I was in

 3    charge of the case, at that point my responsibility is to

 4    try and determine what occurred in the apartment on that

 5    day.  That is my sole responsibility at that point.

 6         Q    And you do that by talking to people?

 7         A    Correct.

 8         Q    Talking to witnesses, but then again, Crystal

 9    wasn't talked to until after the arrest, correct?

10         A    Not by me.  She was spoken to by someone else.

11         Q    Okay.  Your conversation with Coleman at the

12    police department was, what did you say, ten minutes?

13         A    Approximately, yes.

14         Q    And did Coleman make a decision in this case as to

15    who to charge and with what, or did you make that decision?

16         A    No.  During my conversation with Detective

17    Coleman, which is why he came into the room, was because I

18    did not have the information of what Ms. Quirello had said.

19    He did.

20         Q    All right.

21         A    And we jointly -- we work off of each other

22    because he has information and I have information and

23    neither of it was from the same person.

24         Q    So your job then is to talk to witnesses, talk to

25    witnesses who have spoken to witnesses, in a case like this
```

1  certainly talk to doctors, correct?

2      A    That's correct.

3      Q    And certainly in a new type of endeavor, such as

4  one you've never handled before, gather as much information

5  as you can?

6      A    That's correct.

7      Q    And reading medical reports would you say is part

8  of that function?

9      A    I try to read medical reports.  A lot of them are

10  not, unless you're a medical person, they're hard to

11  understand.

12      Q    Did you attempt to read any medical reports in

13  this case before you arrested Brian Herlihy on August the

14  3rd?

15      A    I did not have any medical reports.

16      Q    So the answer is, no?

17      A    No.

18      Q    And the doctors, of course, their involvement in

19  this case is to administer to people, treat people, do CAT

20  scans, things of this nature?

21      A    Yes.

22      Q    And they have nothing really to do with the

23  criminal investigation or the criminal charges other than to

24  respond to your questions to them about, Hey, what do we

25  have here, correct?

1    A    That's correct.

2    Q    All right.  So you're -- The buck stops here,

3  right?  You're it, I mean?

4    A    No.  I have to rely on their medical expertise.

5    Q    No, but I mean the ultimate decision that is made

6  by a police officer to go to the next step and make a

7  charge, that's your decision?  It's certainly not the

8  doctors' decision.

9    A    That is my decision to a point, yes.

10    Q    I think I asked you this before, but Tina Millard,

11  when she was out at Brian's apartment that evening and the

12  video didn't work, there were a couple of problems with the

13  video, were there not?  We had a battery problem and then a

14  malfunction problem; is that right?

15    A    Well, that evening, to my knowledge, and again I

16  wasn't there previous in the day, but to my knowledge there

17  was a problem with the video camera that they thought they

18  had repaired prior to going there.

19    Q    Okay.

20    A    While they're there, she had to switch batteries,

21  I believe, one or two times.

22    Q    Okay.  What was wrong with your audio recorder?

23    A    I believe what had happened was, I had put it on

24  the wrong side.  So it was already at the end of the tape

25  and not taping to the best of my recollection.

1    Q    What was going on while you thought it was

2  recording, but it wasn't?

3    A    Mr. Herlihy was explaining the setup of where

4  things were on the bed.

5    Q    Where what?

6    A    Where things were on the bed.

7    Q    So that's not on the tape?

8    A    No, but when I went on tape, I reiterated

9  everything we had done at that point.

10   Q    Brian at no time told you that he took a shower,

11 right?

12   A    No.

13   Q    He told you that he was planning to, turned the

14 water on, cold water, and then went back outside into the

15 apartment, right?

16   A    That's correct.

17   Q    Used the toilet?

18   A    That's correct.

19   Q    Do you know if anybody at anytime observed any

20 finger marks on Robbie's torso that day at the hospital?

21   A    I don't know if they did or not, no.

22   Q    You haven't heard that?

23   A    No.

24   Q    In fact, Robbie did not have a shirt on when he

25 became ill; is that correct?

1    A    According to Mr. Herlihy, that's correct.

2    Q    And according to Crystal, too?

3    A    I believe Crystal did also say the same thing.

4    Q    So you're satisfied that Robbie just had diapers

5    on when this happened, not a shirt?

6    A    Diapers and socks.

7    Q    And I'm sorry?

8    A    Socks.

9    Q    You're not aware of any bruises, or redness, or

10   marks, or anything anywhere on his torso, or arms; is that

11   correct?

12   A    That's correct.

13   Q    And that includes the paramedics, too.  You've not

14   gotten any report from them along those lines; isn't that

15   correct?

16   A    That's correct.

17   Q    And they were there immediately, isn't that also

18   true?

19   A    To my understanding, I assumed they were.

20   Q    Did you interview the paramedics?

21   A    No.  That was someone else's task to do.

22   Q    You did not do that?

23   A    No, I did not.

24   Q    Do you know why Investigator Millard didn't

25   collect the bedding on either August 2nd or August 3rd?

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1        A      No, I do not.

 2        Q      Who's in charge of this investigation?

 3        A      I was in charge of the investigation, but I was

 4    not there at the time.

 5        Q      Well, you were there that evening, weren't you?

 6    Weren't you there on August the 2nd in the evening?

 7        A      Oh, in the evening, yes, I was.

 8        Q      And Tina was there?

 9        A      Yes, she was.

10        Q      And you were in charge?

11        A      Yes, I was.

12        Q      And you left the bedding?

13        A      Yes, we left the bedding.

14        Q      And the pillows?

15        A      Yes, we left the pillows.

16        Q      And the shams?

17        A      Yes, we did.

18        Q      If fact, there were three shams on the bed; is

19    that correct?

20        A      That I'm not sure.  I know at least of two.

21        Q      Do you know who was in that apartment between

22    August the 3rd when you arrested Brian Herlihy, and August

23    the 16th when you went back, or when Tina went back?

24        A      I'm not sure.

25        Q      Okay.  Who went back August 16th on the search
```

1   warrant; were you there?

2        A    Yes, I was.

3        Q    Okay.  Who else went back with you?

4        A    I believe Sergeant Halvosa was there, Ms. Millard

5   was there, and I believe there was another, Investigator

6   Huff and Sergeant McIntyre.

7        Q    So you actually know then what Tina collected at

8   that time because you were there with her?

9        A    That's correct.

10        Q    And you've actually seen her police report and I

11   would assume talked to her during the course of this case

12   over the last two years?

13        A    That's correct.

14        Q    You are aware, are you not, that she found some

15   items in a bag in the closet that were wet, not damp, but

16   wet?

17        A    That's correct.

18        Q    And what do you know about those items as to where

19   they came from, who put them there, or how long they were

20   there?

21        A    I don't know who put them there.  I don't know how

22   long they were there.

23        Q    Okay.  Do you know or do you have any information

24   about Crystal Quirello going back into Brian's apartment

25   between August the 2nd, when she told you she was there, and

1  August the 16th when you were there for the search warrant?

2      A    No.  I have no information of her going back.

3      Q    Do you have any information about Crystal Quirello

4  going into that apartment for whatever reason between the

5  16th when you were there on the search warrant, and the 25th

6  when she reported to you and gave you the onesie?

7      A    No.  I do not have any information on that.

8      Q    Did she give you a key when she stopped by and

9  gave you the onesie?

10     A    No.  She actually told me she had keys and I told

11  her she needed to give them to me, because that was not

12  something she needed to have and she mailed them to me.

13     Q    She didn't give it to you when she gave you the

14  onesie?

15     A    No.  I believe -- Let me check my report before I

16  answer that question.  I think she mailed it to me.

17     Q    Okay.  Do you remember when you received -- does

18  your report indicate when you received the keys?

19     A    I don't think that my report refers to it, but I

20  believe I put them into property.

21     Q    Okay.

22     A    And I can tell you which day I put them in.

23     Q    Good.  Please.

24     A    I put them into property on August 17th.

25     Q    Okay.  That would be the day after the search

1    warrant?

2         A    That's correct.

3         Q    And that would be eight days before she met with

4    you in your office and returned the onesie on the 25th?

5         A    That's correct.

6         Q    Okay.  Do you know how it is that you came to --

7    Well, let me ask you this:  Did you receive them on that

8    same day that you turned them in, the keys?

9         A    Usually that's what I do, yes.

10        Q    Okay.  Did she just stop by on the 25th and give

11   you the onesie or had you contacted her and asked her to

12   come in?

13        A    I had previously asked her to drop the onesie off

14   to me as soon as she could get it to me.

15        Q    Okay.  Was she living in town?

16        A    I'm not sure if she was living in town at that

17   point or not.  I'm not sure.  I know at some point she was

18   living in Orlando, but I don't remember exactly when it was.

19        Q    When you first contacted Brian outside the

20   hospital, would it be fair to characterize his demeanor as

21   very upset, wondering how the baby was and more concerned

22   about the baby than anything else?

23        A    He was concerned, yes.

24        Q    When you talked to Brian following his arrest on

25   August 3rd and you told him how ill that Robbie was, you

1    said that Brian says that he loves him and if he dies, I

2    want to die?

3         A    That's correct.

4         Q    And it is true, is it not, that he was very very

5    emotional and upset when he said that?

6         A    Yes, he was.

7         Q    And you didn't disbelieve him, did you?

8         A    No, I did not.

9         Q    All right.  Did you think this information about a

10   prior brain injury was irrelevant to this case?

11        A    Based on what the doctors were telling me, I

12   did --

13        Q    Well, first let me ask you this.

14        A    I'm sorry.

15        Q    I apologize for interrupting you.  You have to

16   answer yes or no and if you want to explain, the state can

17   ask you to explain.  Did you think it was irrelevant?

18        A    Not totally irrelevant.

19        Q    Okay.  But nevertheless, even though you thought

20   it was partially relevant, you really didn't do anything

21   with that information; isn't that true, other than what

22   you've already told us?

23        A    Nothing other than what I've told you that I did.

24        Q    Which is to ask people, Did you ever see any signs

25   of injury?

1   A   That's correct.

2   Q   Certainly it didn't fit in with your theory; isn't

3   that true?

4   A   I didn't have a theory.

5   Q   Well, you did have a theory that Brian shook the

6   baby and that's what caused all of us to be here today;

7   isn't that your theory?

8   A   No.  That was the information that was provided to

9   me by the doctors.

10   Q   Okay.  Do you know how long a period of time

11   Crystal was gone from the hospital that morning to go back

12   to Brian's apartment?

13   A   No, I do not.

14   Q   Do you know why she went back?

15   A   I know what she told me.

16   Q   She switched cars, didn't she?

17   A   That's what she said.

18       MS. SINGER:  I'm going to lodge an objection.

19   It's calling for a hearsay answer, your Honor.

20       THE COURT:  Sustained.

21   BY MR. GROLAND:

22   Q   Do you know that she switched cars other than what

23   she tells you from other sources?

24       MS. SINGER:  That would be the same.  It would all

25       be hearsay unless she knows directly.

1        THE COURT:  Sustained.  Rephrase the question.

2  BY MR. GROLAND:

3      Q    Do you have personal knowledge that she took

4  Brian's car back and got her own car and came back to the

5  hospital?

6      A    No, I don't have personal knowledge.

7           MR. GROLAND:  Okay.  I need about five minutes,

8      your Honor, and I'm finished just for the Court's

9      information.

10          THE COURT:  Five more minutes of questioning?

11          MR. GROLAND:  I just want your Honor to know that

12      I'm winding up.

13          THE COURT:  All right.  Fine.

14  BY MR. GROLAND:

15      Q    Do you know who put the room back together, who

16  made changes in the apartment that Crystal found?  Do you

17  know who did that?

18      A    No, I don't.

19      Q    Okay.  Did you ever ask Crystal Quirello if the

20  baby was rolling over yet?

21      A    I need to refer to my report to tell you that.

22      Q    Okay.

23      A    I'm sorry it's taking me so long.  I recall that

24  conversation, but I don't know if I'm the one that had it

25  with her.

1    Q    You don't know?

2    A    I don't recall if I'm the one that had that

3    conversation with her.  It may have been someone else who

4    provided me that information.

5    Q    All right.  We've gone through a lot of things and

6    let me just end with this question.  The first time that you

7    heard about this prior injury was from Dr. Agee and

8    Crystal's father, and that was on August the 9th, correct?

9    A    That's correct.

10   Q    Do you remember going to a bond hearing in this

11   case and testifying under oath, and I don't have a copy to

12   give the witness, but it's a hearing on April the 3rd, this

13   year, in court with Judge Lott, and Ms. Singer was present

14   and I was present, and I asked you this question, it's on

15   page 12 of the transcript:

16        Question:  Has Ms. Singer told you about the

17   statement that I took from the radiologist, where the

18   radiologist indicated to both of us about a month ago that

19   there was a prior significant injury in this child's brain

20   before August 2nd?

21        Your answer:  She told me this morning.

22        My question:  That's the first you learned of

23   this?

24        Your answer:  Yes.

25        That wasn't true, was it?

1    A    I don't recall that.  I know that that is correct

2  testimony because I do remember testifying to it.  But at

3  that point in time it's possible I had forgot that I had

4  spoken with Dr. Agee.  It's possible.

5    Q    And the prosecutor?

6    A    That's correct.

7    Q    And you knew all along that there was an

8  indication of a prior brain injury?

9    A    That information had been provided to me.

10   Q    In fact, you were at the deposition as we talked

11 about before, where both Dr. Quisling and Dr. Agee testified

12 for hours about the chronic subdural hematoma, correct?

13   A    Correct.  I'm not sure if that was before or after

14 that, though.

15   Q    Well, in fact, I'll tell you, it was a couple

16 months before this.  So that when you testified at this

17 hearing, that was not true, your answer to that question;

18 isn't that correct?

19   A    I can't answer -- I can't answer that.  I don't

20 know.  I know that I did attend that.  I don't forget that.

21 I know I went to Shands and you were there and Ms. Singer

22 was there.

23   Q    Do you deny making that statement?

24   A    No, I don't deny making that statement.

25   Q    Do you deny that that statement is incorrect?

1    A    That statement is incorrect, yes.

2    Q    And you're saying then to this jury that the

3 reason why this statement is incorrect that you made under

4 oath, is that you forgot that you learned about this the

5 very beginning of this case, and knew about it throughout

6 the whole case, and were questioned about it during my

7 deposition of you, and you attended the deposition of the

8 radiologist, you forgot?

9    A    That's not how I would answer that question.

10   Q    Well, tell me how you would answer that question.

11   A    I would answer that question by saying that

12 information that had been provided to me by other doctors, I

13 was told discounted that theory.

14        MR. GROLAND:  I have no further questions.

15        MS. SINGER:  Mr. Groland, may I see that?

16    Mr. Groland, may I see that?  May I proceed?

17        MR. GROLAND:  Your Honor, I'm very sorry.  I just

18    have one follow-up question on the record.

19 BY MR. GROLAND:

20    Q    What you're saying to this jury, is that the

21 reason why you answered no, as to not having heard it

22 before, is other doctors discounted the theory?

23    A    I can't answer why.  That was a long time ago and

24 I cannot answer why I answered it at that point.

25    Q    Well, a long time ago is August -- I'm sorry -- is

1881

1    April of this year when we had that bond hearing.

2         A    That's correct.

3         Q    That's four months ago, five months ago?

4         A    I am going -- I don't recall when I was with you

5    at Shands during that testimony.

6         Q    Just a second, please.

7         A    Okay.

8         Q    Do you remember that we took Dr. Quisling's

9    deposition --

10             MR. GROLAND:  May I approach the witness, your

11        Honor?

12             THE COURT:  Yes.

13   BY MR. GROLAND:

14        Q    -- on April the 8th, 2002, which is right around

15   the same time that we had that bond hearing, just a couple

16   of days before, and your name, Helen Legall, is there as

17   being present?

18        A    Right, I was present.

19        Q    Okay.  So I asked you that question about when you

20   knew about it --

21             MR. GROLAND:  Ms. Singer, can I have that date,

22        please?

23             MS. SINGER:  The date is April the 3rd.

24   BY MR. GROLAND:

25        Q    -- on April the 3rd?

1       A    On April the 3rd I had not been to that deposition

2   with you and heard all of that testimony from Dr. Quisling

3   and Dr. Agee.

4       Q    Okay.  Didn't we have a meeting with Dr. Quisling

5   at the hospital before that deposition was taken, you,

6   Ms. Singer and myself?

7       A    No, I did not.  That was the first time I was

8   there with you and Ms. Singer.

9       Q    Okay.  So your testimony then to this jury is the

10  reason why you answered this way, in that hearing, under

11  oath, is you forgot about learning about this at the

12  beginning of the case and talking about it during the case?

13      A    Correct, and the answer I just provided you.

14      Q    Okay.  And I questioned you about this in great

15  detail, did I not, during your deposition that I took of

16  you?

17      A    I recall that you did.

18      Q    And so your answer then is you forgot?

19      A    That is correct.

20      Q    Not that other doctors had discounted it, but that

21  you forgot?

22      A    And that other doctors had discounted it.  I had

23  gone on the testimony of the other doctors when I made the

24  arrest of Mr. Herlihy.

25      Q    Do you remember the question that was asked, When

1   did you first find out?  And your answer was that I read to

2   you, Just this morning from Ms. Singer.  That wasn't true at

3   all, was it?

4        A    I can't answer that any other way than the way

5   I've testified.

6             MS. SINGER:  One moment.

7             (Pause in the proceedings.)

8                    REDIRECT-EXAMINATION

9   BY MS. SINGER:

10       Q    Ms. Legall, just to clarify that a bit, the

11  question that was asked of you was, "Has Ms. Singer told you

12  about the statement that I took from the radiologist, where

13  the radiologist indicated to both of us, meaning Ms. Singer

14  and Mr. Groland, about a month ago that there was a prior

15  significant injury to this child's brain before August 2nd?"

16            And your answer was:  She, meaning Ms. Singer,

17  told you that this morning.

18            Was that a true and correct answer as you recall

19  it back on April the 3rd when you gave the testimony in the

20  bond hearing?

21       A    I recall that question, yes.

22       Q    And his next follow-up question was, That's the

23  first time you learned of this, meaning, Ms. Singer --

24            MR. GROLAND:  Objection --

25            MS. SINGER:  Excuse me.  Excuse me.  May I finish

1     my question?

2          MR. GROLAND:  Yeah.  You're saying me, not on that

3     one.  Your Honor, she doesn't need to interpret what

4     she thinks is meant.  She can read the question.

5          THE COURT:  Don't answer the question, please,

6     Detective.  Finish the question, then you may object,

7     and then I'll rule on it.

8  BY MS. SINGER:

9     Q    The next question asked was, That's the first time

10 you learned of this?  And I would like for you to explain to

11 the jury what was meant by that when you answered in

12 response, That's the first you learned of this, and I'll

13 allow you to review the transcript.

14    A    When I'm answering yes to this, I'm answering,

15 yes, to that was the first time I had heard that you and

16 Mr. Groland had had a statement taken from the radiologist.

17    Q    Was that the truth at the time when you made that

18 testimony before the Judge at a bond hearing?

19    A    Yes, it was.

20    Q    And after that, were you invited to attend the

21 deposition of Dr. Ronald Quisling and Dr. Frank Agee?

22    A    Yes, I was.

23    Q    And did you attend those depositions?

24    A    Yes, I did.

25    Q    And did you also get the information from

1    Dr. Quisling and Dr. Agee at that time?

2         A    Yes, I did.

3         Q    You have always known about issues regarding past

4    injuries to this child, have you not?

5              MR. GROLAND:  Objection, your Honor, leading.

6              THE COURT:  Sustained.

7    BY MS. SINGER:

8         Q    What have you known about the possibility of past

9    injuries with this child?

10        A    I knew that that was an issue at the time at the

11   beginning of my investigation.

12        Q    And in the course of your investigation, what did

13   you do with that information?

14        A    I talked to several people, including Mr. Herlihy,

15   Ms. Quirello, Mr. Quirello, the grandmother, the

16   grandfather, or the grandmother meaning John Quirello's

17   mother.  They had never seen the child injured or abused at

18   any other point in time.

19             I also talked to the doctors to determine if the

20   way that Mr. Herlihy is saying that the baby rolled in

21   between the bed, could have caused the damage that was

22   caused to Robbie, and I was told, no, that --

23             MR. TEDDER:  Objection, your Honor.  The answer

24        led to hearsay.  We ask the Court to strike her last

25        comment and issue a cautionary instruction to the jury.

1    THE COURT:  The objection is overruled based upon

2    the line of questioning in regard to why she took the

3    actions that she did.

4  BY MS. SINGER:

5    Q    Investigator Legall, did you ever investigate --

6  Pardon me.  Did you ever speak with witnesses including the

7  physicians on when the injuries to Robbie Quirello occurred?

8    A    Yes, I did.

9    Q    And based upon the investigation that you did, did

10  you come to a conclusion as to when the injuries to Robbie

11  Quirello occurred?

12   A    Yes, I did.

13   Q    Was there a window of time that you were able to

14  develop or determine was the window of time when the

15  injuries would have occurred?

16   A    Yes, I did.

17   Q    And what was that window of time as best as you

18  recall it?

19    MR. TEDDER:  Objection, your Honor, that's for the

20    jury to decide.

21    MR. GROLAND:  It's also hearsay.

22    THE COURT:  The objection is overruled.  Go ahead

23    and answer the question.

24    THE WITNESS:  I believe you're asking me the

25    window of time, correct?

Stacey K. Bryant, RPR
Judicial Court Reporter

BY MS. SINGER:

    Q   Yes.  What was the window of time you developed in the course of your investigation as the window of time when the injuries to Robbie Quirello occurred?

    A   Okay.  During my investigation, I determined that the window of time is when the baby went unconscious and that's when the injury occurred.

    Q   And during the course of your investigation, did you develop who was with the baby during that window of time?

    A   Yes, I did.

    Q   And who was with the baby during that window of time?

    A   Mr. Herlihy.

    Q   Was there anyone else with the baby at that window of time?

    A   No, there was not.

    Q   Mr. Groland spoke to you and asked several questions or read from depositions, a deposition that you gave and continued on two other occasions.  I would like to ask you a few questions about that.

    Do you recall the date of your first deposition or when the deposition commenced?

    A   I believe it was in January of 2001.

    Q   All right.  I want to show you a copy of your

1    deposition.  If you would just refer to the first page and

2    tell me the date and time that the deposition commenced on

3    that day?

4         A    That was on Thursday, January 25th, 2001 at 9

5    o'clock a.m.

6         Q    If you would turn to the last page, ma'am.  Would

7    you tell us when, the time you actually were adjourned for

8    the evening that day?

9             MR. GROLAND:  Objection, your Honor.  I don't

10            think this is relevant at all, when she had her

11            deposition taken, when she adjourned.

12            THE COURT:  Overruled.

13   BY MS. SINGER:

14        Q    Do you see that, ma'am?

15        A    Yes.  Adjourned at 4:00 p.m.

16        Q    And was that deposition continued on another day?

17        A    Yes, it was.

18        Q    I'm going to show you the second deposition

19   transcript that I have, and ask you to report to the jury

20   what time and date the second or the continuation of the

21   deposition took place?

22        A    It was Thursday, June 21st, 2001, at 1:00 p.m.

23        Q    And when did that deposition end?

24        A    3:10 p.m.

25        Q    And was it adjourned to another day?

1889

1      A    I recall I think it was.

2      Q    I'm gonna show you an excerpt or actually the

3  remainder of the deposition.  If you would tell the jury how

4  long -- what day you took that deposition or continued that

5  deposition, and how long that deposition was?

6      A    It was Monday, August 26th, 2002, at 1:30 p.m.

7      Q    When did it end?

8      A    At 1:50 p.m.

9      Q    Thank you.  I'll take that back.

10          And during this continuous deposition that was

11  adjourned, were you questioned by Mr. Groland regarding what

12  you did on this case?

13      A    Yes, I was.

14      Q    And did you answer the questions as best as you

15  could at that time?

16      A    Yes, I did.

17      Q    You were asked on cross-examination about the bed

18  and whether or not the bed was taken into evidence pursuant

19  to the execution of a search warrant.  You were present when

20  the bed was taken into evidence?

21      A    Yes, I was.

22      Q    And once the bed was taken into evidence, where

23  does it go in the Gainesville Police Department?

24      A    We have a property division and they have certain

25  closets, if you will, or storage facilities that they put

1890

1    those items in.

2         Q    And are you aware of whether or not the bed has

3    been delivered to the courthouse today by Mynelle LaPoint,

4    the property custodian for the Gainesville Police

5    Department?

6         A    Yes, I am.

7         Q    You had indicated that the bed had been put

8    together for Mr. Groland and for myself for examination?

9         A    That's correct.

10        Q    And you were present during that time?

11        A    I don't believe I was present when Mr. Groland was

12   present, but I was present when you were.

13        Q    In examining the bed that was put together, did it

14   appear to be the same, in the same or similar condition as

15   to when it was taken into evidence back on the 16th of

16   August of the year 2000?

17        A    Yes, it was.

18        Q    Was the bedding on the bed, though, when you saw

19   it the second time?

20        A    No, it was not.

21        Q    You were asked a number of questions about the

22   demonstration that Mr. Herlihy, the defendant in this case,

23   did at the apartment on the 2nd of August, at about 6

24   o'clock.

25        A    That's correct.

1    Q    During that demonstration was there any -- did any

2  of you keep Mr. Herlihy from moving any of the pillows, or

3  any of the shams, or any of the other items that were on the

4  bed in order for him to do the demonstration?

5    A    No, we did not.

6    Q    Was he free to use whatever he needed to use to

7  demonstrate to you what happened to Robbie Quirello that

8  day?

9    A    Yes, he was.

10    Q    Did you hand him any particular item that he had

11  to use?

12    A    No, I did not.  I take that back.

13    Q    What was it?

14    A    Well, he didn't have to use it, but we did have a

15  doll.

16    Q    All right.  Other than the doll, was there

17  anything that either of you, either yourself or anyone in

18  your presence, did to limit what Mr. Herlihy could do to

19  show you what happened to Robbie Quirello that day?

20    A    No, I did not.

21    Q    You didn't choose a particular sham for him to

22  use?

23    A    No, I did not.

24    Q    What did he do?

25    A    He explained to us the way the bed was set up and

1    he selected the shams as to which one he used.

2        Q    And did he make any changes in the shams at

3    anytime?

4        A    He did make a comment at the time that the sham

5    may have gone in vertically instead of horizontally, but it

6    would have been the thinner sham, and we determined during

7    that time that it would not have been going in that way.

8        Q    Now Mr. Groland in the very beginning of your

9    cross-examination asked you whether or not the defendant

10   acknowledged that the bed was exactly the same way as when

11   he left it that day.  Do you remember that part of your

12   cross-examination?

13       A    Yes, I do.

14       Q    You did not specifically on the tape ask him that

15   question, correct?

16       A    Not specifically.

17       Q    Was there anything that was said to you either on

18   the tape or off the tape that day that indicated to you that

19   Mr. Herlihy did not agree that the bed looked about the same

20   as when he left it that day?

21       A    No.

22       Q    Did he in any way change the bed, the bedding, the

23   pillows, to suggest to you that there was any change to the

24   bed after he had left the house that day to take Robbie

25   Quirello to the hospital?

1    A    No.

2    Q    When he acknowledged, when he had indicated to you

3  how the pillows were laid on the bed, the white pillow with

4  the T-shirt type material, and the sham pillow that you've

5  looked at in the photographs, did he in any way move those

6  pillows in any other manner to show you how the baby was

7  laid that day?  Let's talk about the white pillow first.

8  Did he move the white pillow?

9    A    I believe the white pillow was right where it was

10  in the picture.

11    Q    What pillow then, or which of those items did he

12  move?

13    A    He would have moved the sham that has the printed

14  cover on it.

15    Q    And did he move that sham many different ways

16  during the course of this reenactment?

17    A    Yes, he did.

18    Q    And was that during the time that he was

19  explaining to you how the baby would have fallen down into

20  the crevice?

21         MR. TEDDER:  Objection, leading.

22         THE COURT:  Overruled.

23         THE WITNESS:  Yes, it was.

24  BY MS. SINGER:

25    Q    Now you were also asked about measurements,

Stacey K. Bryant, RPR
Judicial Court Reporter

1894

1    correct?

2        A    Yes.

3        Q    Whether or not there were any measurements made of

4    the apartment, or of the bedding, or the shams, or the

5    pillows, et cetera.  What happened to the pillows, the

6    shams, the bed, the comforter, on August 16th, the year

7    2000?

8        A    They were all collected and placed into evidence.

9        Q    You were also asked whether or not you took any

10   still photographs of Mr. Herlihy performing the reenactment

11   during the time that you and others were at the apartment

12   being shown by Mr. Herlihy what occurred.  Do you remember

13   that question?

14       A    Yes, I do.

15       Q    Why was it that no still photographs were being

16   taken at the time?

17       A    Because at the time we thought that the video was

18   working properly.

19       Q    You were also asked whether or not you examined

20   the bed at the time that Mr. Herlihy referred to a spot or

21   stain on the bed where the baby vomited.  Do you remember

22   that question?

23       A    Yes, I do.

24       Q    And do you remember when in time you looked at the

25   bed, at the comforter?

Stacey K. Bryant, RPR
Judicial Court Reporter

1895

1    A    I believe it was when Mr. Herlihy had pointed out

2 that the baby had vomited in the center of the bed.

3    Q    When you looked at that particular area, what did

4 you see?

5    A    I did not see any vomit.

6    Q    When you -- Now I'm gonna go back to Shands.  I'm

7 gonna jump around probably as much as Gordon Groland did,

8 and I apologize for that, but that's how my notes follow his

9 notes.  So, I apologize.

10           MR. GROLAND:  Blame it on me.

11           MS. SINGER:  I know you, too, well.

12 BY MS. SINGER:

13    Q    I'm gonna move now back to the emergency room at

14 Shands.  The first time you went to the emergency room at

15 Shands, you were there for no other reason than to offer

16 comfort and support to the family, correct?

17    A    That's correct.

18    Q    You were called back about 12:15, got there about

19 12:40?

20    A    That's correct.

21    Q    And there was some additional information provided

22 to members of Gainesville Police Department?

23    A    That's correct.

24    Q    And at that time is it my understanding that

25 others were also called to the hospital to aid in the

Stacey K. Bryant, RPR
Judicial Court Reporter

1896

1    investigation?

2        A    That is correct.

3        Q    Or a number of officers?

4        A    Several detectives, yes.

5        Q    Several detectives.

6            When you first met with the several detectives and

7    the members of the staff at Shands Teaching Hospital, did

8    you have anything on your mind to accuse Brian Herlihy of

9    shaking this baby?

10           MR. TEDDER:  Objection, leading.

11           THE COURT:  Overruled.

12           MS. SINGER:  I'll rephrase.

13   BY MS. SINGER:

14       Q    Was there anything when you first got to that

15   meeting that caused you to suspect Brian Herlihy was the

16   perpetrator in this offense?

17       A    No, there was not.

18       Q    Did you know Brian Herlihy?

19       A    No, I did not.

20       Q    You were given instructions at about 12:40,

21   correct?

22       A    Correct.

23       Q    And is that the standard procedure?

24       A    Yes, it is.

25       Q    All right.  And your instructions were what?

1    A    My instructions were to go with Detective Cannon,

2  locate Mr. Herlihy, and ask him to come back and talk with

3  us at the police department.

4    Q    At that time how would you have described

5  Mr. Herlihy, what position would you put him in?

6    A    I would put him in the position of someone who may

7  have information since it was his apartment that the baby

8  was found in.

9    Q    Would you call that a person with knowledge?

10   A    Yes, I would.

11   Q    When you do an investigation, a criminal

12 investigation, whether you're in the property section or the

13 personal crimes section, do you talk to a lot of people with

14 knowledge about a crime?

15   A    Yes, we do.

16   Q    Give us some examples of who people are with

17 knowledge when you're investigating a case.

18   A    Any particular, just any case?

19   Q    Any case.

20   A    Okay.  A person with knowledge would be someone

21 who maybe knows the person, maybe on a domestic battery it

22 may be someone who knows past experience or problems with

23 that couple, it could be someone who has seen the person

24 before, but doesn't necessarily have any knowledge about a

25 crime.

1    Q    Okay.  Do you tape record every interview of a

2  person with knowledge that you talk to in the course of

3  investigating criminal cases?

4    A    No, I do not.

5    Q    And during the time that you interview a person

6  with knowledge, do you videotape those persons?

7    A    No, I do not.

8    Q    You also were questioned about the signing of the

9  consent form in the car.  First you received oral consent

10 from Mr. Herlihy to go into the house, correct?

11   A    That's correct.

12   Q    And at that time did you advise him about what the

13 purposes were for someone to go back into the house, back

14 into the apartment?

15   A    Yes, I did.

16   Q    Did you verbally tell him that?

17   A    Yes, I did.

18   Q    Was the subject of it being a possible criminal

19 investigation, did that come up at that time to your

20 recollection?

21   A    It was -- I believe it was in other terminology,

22 but it was to that affect, yes.

23   Q    All right.  And then you actually executed a

24 signed consent form --

25        MS. SINGER:  Which I will need, Madam Clerk, and

Stacey K. Bryant, RPR
Judicial Court Reporter

1      you're not Steve.  So let me go ahead and get behind

2      you.  I think I know where it is.

3  BY MS. SINGER:

4      Q    I want to show you again item 72 in evidence.

5  This is the consent form that you read to him?

6      A    Yes, ma'am.

7      Q    And at that time was that information regarding

8  the fact that evidence could be used against him if it was

9  collected from the residence, was that told to him?

10      A    In different terminology, but, yes.

11      Q    Well, read the language that's on there.

12      A    Basically says, "I further agree that anything or

13  any article that may be found in the search of the above

14  described premises, and not vehicle, because we were

15  searching the premises at the time, may be taken as evidence

16  and used in the trial of any matter of which I may stand

17  accused."

18      Q    All right.  And did he sign that form?

19      A    Yes, he did.

20      Q    Was there anything about your conversation with

21  Brian Herlihy during that time period that suggested to you

22  that he was forced, coerced, threatened, or otherwise made

23  to sign that form?

24      A    No.

25      Q    Was he handcuffed?

1900

```
 1        A    No.

 2        Q    Was he shackled?

 3        A    No.

 4        Q    Was he in the back of a police car?

 5        A    No.

 6        Q    Did he tell you he didn't want to sign this form?

 7        A    No.

 8        Q    Did he later invite you back into his residence to

 9   reenact the incident for you?

10        A    Yes, he did.

11        Q    When you used the Polaroid photographs that were

12   given to you I believe from Alan Coleman --

13        A    That's correct.

14        Q    -- in your interview --

15             MR. TEDDER:  Objection, your Honor.  I believe

16        that's beyond the scope of cross-examination.

17             MS. SINGER:  I know they were discussed in

18        cross-examination.  We can go back.  I do have the

19        approximate time even, it was 11:26, approximately,

20        when they came up in the cross.

21             THE COURT:  Overruled.

22   BY MS. SINGER:

23        Q    When you used the Polaroids during the course of

24   the interview with Mr. Herlihy, was he free to show you

25   whatever he wished to show you on those photographs?
```

1.    A    Yes, he was.

2    Q    If he wanted to discuss where the pillows were

3  located, was he free to discuss that with you?

4    A    Yes, he was.

5    Q    Did you limit him in any way in using those

6  photographs?

7    A    No, I did not.

8    Q    Did you correct him or make him say that the

9  pillows were a certain way when you showed him those

10  photographs?

11    A    No, I did not.

12    Q    You were asked a number of questions about whether

13  or not you considered the fact that Robbie may have had some

14  other injury at some other time in the course of

15  investigating this case.  You recall a number of questions

16  on that issue?

17    A    Yes, I do.

18    Q    Why was it that you reached the conclusion that

19  Brian Herlihy was the perpetrator and he was the person to

20  be subject to arrest?

21        MR. TEDDER:  Objection, calls for hearsay.

22        MR. GROLAND:  Also asked and answered, your Honor.

23    She talked about the window.

24        THE COURT:  Overruled.

25        THE WITNESS:  It was based on information that I

1      had received from doctors as to when the actual injury

2      had occurred.

3  BY MS. SINGER:

4      Q    Did you also receive information from doctors on

5  how the injury would have occurred?

6      A    Yes, I did.

7      Q    Do you have in your notes the specific doctors you

8  spoke with?  Let's start with August the 2nd at about 12:15,

9  I should say 12:40.  Do you recall the physicians that were

10  in the room when you were first being updated on the events?

11      A    That was Dr. Dickison, and a Kevin Putansu.

12      Q    Do you recall later speaking with other

13  physicians?

14      A    Yes, I did.

15      Q    If you would tell the jury who those physicians

16  were.

17      A    A Dr., I'm not sure if he pronounces it Levine or

18  Levine, but it was one of those, Dr. Agee, and I believe

19  Dr. Maria.

20      Q    And it was based upon a combination of the

21  doctors' testimony as well as --

22          MR. GROLAND:  Objection, your Honor, that's

23      leading.

24          MS. SINGER:  All right.  It's leading, you're

25      right.

Stacey K. Bryant, RPR
Judicial Court Reporter

1903

```
 1  BY MS. SINGER:
 2      Q    What else did you consider besides the doctors'
 3  information in determining that Brian Herlihy was the
 4  perpetrator in this case?
 5            MR. TEDDER:  Objection, that's for the jury to
 6        decide.  That's a legal conclusion, perpetrator.
 7            THE COURT:  Rephrase the question.
 8  BY MS. SINGER:
 9      Q    Who else did you speak with or what other
10  information did you gather before you came to the conclusion
11  that Brian Herlihy should be arrested for this charge?
12      A    It was from talking with other detectives and the
13  information they had obtained, and also with -- well, that
14  would be later.
15      Q    Did you also at the time that Brian Herlihy was
16  arrested, take a statement from him on the way to the jail?
17      A    Yes, I did.
18      Q    And did he make any admissions to you at that
19  time?
20      A    Yes.
21            MR. GROLAND:  Objection, your Honor, that is a
22        jury decision, especially in this case in light of the
23        specific statement that was given.
24            THE COURT:  The objection is sustained.  Rephrase
25        the question.
```

1    BY MS. SINGER:

2        Q    Did he make any statements to you that were

3    consistent with information you were provided by the

4    physicians in this case?

5            MR. GROLAND:  Objection, your Honor, that calls

6        for a conclusion, speculation on the part of this

7        witness, and I think it's beyond the scope of her

8        expertise.

9            THE COURT:  Overruled.  You may answer this

10       question.

11           THE WITNESS:  I'm sorry.  Could you repeat it?

12   BY MS. SINGER:

13       Q    Yes.  Did he make any statements to you that were

14   consistent with the other information you were provided with

15   in this case regarding Robbie's injuries?

16       A    Yes, he did.

17       Q    What specific statements were they that he told

18   you when he was on his way to the jail?

19       A    He specifically made comments to --

20           MR. GROLAND:  Your Honor, excuse me.  The

21       objection here is, A., this is beyond the scope of

22       cross.  We didn't go into this.  B., its been asked and

23       answered.

24           THE COURT:  The objection is overruled on both

25       grounds.  You may answer the question.

1  BY MS. SINGER:

2      Q      And, Investigator Legall, I want you to refer to

3  your notes to be specific, please.

4      A      He made several statements about things that

5  occurred that I went with what the doctors said.  It sounded

6  like the same type of thing, that what the doctors were

7  saying happened, is what happened with Mr. Herlihy.

8      Q      Specifically what did Mr. Herlihy say both at the

9  station and on the way to the jail, please?

10     A      Specifically he talked about how he had plopped

11 him down on the bed, that it was fairly hard, that he didn't

12 have his head supported, and that he may have done something

13 to his neck.

14     Q      Did he tell you what he had been doing with the

15 baby before he plopped the baby on the bed?

16     A      He stated that he was swinging him back and forth

17 from side to side.

18     Q      Did he tell you how the baby's head reacted once

19 it hit the bed?

20     A      He said that the baby's head bounced on the

21 pillow.

22     Q      Did he tell you whether or not he knew that it was

23 wrong what he did?

24     A      Yes, he did.

25     Q      What did he tell you?

1    A    He said that he knows that you're not supposed to
2    roughhouse with a four month old.

3    Q    Did he tell you whether or not he knew the baby
4    was hurt at the time that he had plopped the baby on the
5    bed?

6    A    He stated that he believed it must have been when
7    the baby was injured.

8    Q    Do you know who attended the autopsy on behalf of
9    the Gainesville Police Department?

10    A    I believe it was Investigator Millard.

11    Q    Would information from that autopsy be provided to
12    you by written report?

13    A    Yes.

14    Q    In other words, you would get a written report
15    from Ms. Millard?

16    A    Yes, ma'am.

17    Q    You've been asked a number of questions about how
18    you would record, and what I mean by record, how you would
19    make or document statements that were made to you.  If you
20    would, please, just to outline for the jury a typical --
21    You've been an investigator now how many years?

22    A    It will be 12 at the end of November.

23    Q    And you've gone to the academy for that training?

24    A    Yes.

25    Q    Have you had continued training as a police

Stacey K. Bryant, RPR
Judicial Court Reporter

1     officer through those number of years?

2          A     Yes, I have.

3          Q     Is part of that training how to collect

4     information from witnesses and document that information?

5          A     Yes.

6          Q     Would you layout for the jury how you would

7     collect and document information if you were doing an

8     interview with someone like Brian Herlihy without using a

9     tape recorder or video?

10         A     Normally I ask the questions.  I do not write the

11    questions that I ask, but I write the answers that they give

12    me in such a way that I know what the question is that I

13    asked when I go and do my report.  I pretty much try to

14    write as much as I can of what they're saying.  Then what I

15    do is after I write everything on my notes, at some point in

16    time, when I get a chance to do it, I write a typed report.

17         Q     And did you do that in this case?

18         A     Yes, I did.

19         Q     And there are a number of places where you've

20    actually used quotations; is that correct?

21         A     Yes, there is.

22         Q     Have you testified to those quoted statements here

23    today?

24         A     Yes, I have.

25               MS. SINGER:  I have one more question, your Honor,

1    and then I think I need to address a matter at sidebar.

2    It might be a good time to take a break at that time.

3    But I would like to ask one more question and then

4    address it at sidebar.

5         THE COURT:  Go ahead.

6    BY MS. SINGER:

7    Q    You were asked by Mr. Groland whether or not

8    during the course of the taped statements, Mr. Herlihy said

9    anything about shaking the baby.  Do you recall that

10   question?

11   A    Yes, I do.

12   Q    And he gave you an opportunity, I believe, to

13   review your notes regarding the taped statements that was

14   taken at approximately 1600 hours.

15        MR. GROLAND:  What time?

16        MS. SINGER:  1600, which was the taped statement

17   in the office as opposed to at the home.

18   BY MS. SINGER:

19   Q    Do we have a transcript or other notes of that

20   statement, ma'am?

21   A    I have a transcript of that taped statement, yes,

22   ma'am.

23   Q    Going to the seventh page.

24   A    They're not numbered.  I don't know if that's the

25   correct page that you're talking about.

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1        Q     Yes, it was.  Going to Mr. Herlihy's response to
 2   your question:  So you had pulled him out and set him on the
 3   bed, and then you went to find the phone; do you see that?
 4             MR. GROLAND:  Where are you, Ms. Singer?
 5             MS. SINGER:  It's the last question Ms. Legall
 6        asks Mr. Herlihy on that page.
 7             THE WITNESS:  Yes, I see that question.
 8   BY MS. SINGER:
 9        Q     If you would please refresh your recollection as
10   to what Mr. Herlihy said to you upon that question.
11        A     Yes.  He said that he went to get the phone --
12             MR. GROLAND:  Objection, your Honor.  I don't
13        think the whole thing needs to be re-read.  If there's
14        a particular area that counsel is alluding to, then I
15        think that is the only thing that should be re-read.  I
16        think we already had a conversation about these items
17        right here.
18             THE COURT:  Is your objection that the question
19        was asked and answered?
20             MR. GROLAND:  Yes.
21             THE COURT:  The objection is sustained on that
22        basis.  Rephrase your question.
23   BY MS. SINGER:
24        Q     My question is -- Could you refresh your
25   recollection about that particular paragraph.  Take your
```

1   time to refresh your recollection about that particular

2   paragraph.

3          Now I'm going to ask my question.  To your

4   recollection, Ms. Legall, did Brian Herlihy make a reference

5   to shaking the baby when he was taped back at 1400 hours on

6   August 2nd, the year 2000?

7      A    Yes, he did.

8          MR. GROLAND:  1600.

9          MS. SINGER:  1600, I'm sorry.  Did I say 1400?

10     1600.  Your answer, please?

11         THE WITNESS:  Yes, ma'am.

12         MR. GROLAND:  Your Honor, may I approach the

13     state?

14         THE COURT:  Yes.

15         MR. GROLAND:  Thank you.

16         (Pause in the proceedings.)

17         MS. SINGER:  Your Honor, my next questions require

18     me to approach the bench or do something outside the

19     presence of the jury.

20         THE COURT:  This is close enough.  We'll go ahead

21     and take a recess at this time, ladies and gentlemen.

22         (Out of the presence of the jury.)

23         MS. SINGER:  I see you're reading something.

24         THE COURT:  Go ahead.  I was just getting ready.

25     Go ahead.

```
 1        MS. SINGER:  Okay.  I know how you feel.
 2        There are three places that I want to refer to in
 3   the cross-examination that I would submit to the Court
 4   require me to ask follow-up questions that may require
 5   answers that consist of information that would
 6   otherwise have been ruled admissible had the door not
 7   been opened by defense counsel during
 8   cross-examination.  I would like to refer to those
 9   areas now and ask the Court to consider allowing
10   questions and follow-up.
11        The first was the part of the transcript that I
12   was fortunate to be able to get from the court reporter
13   this morning, and I believe the Court may have a copy
14   of that realtime.  Is it up there on the top?
15        THE COURT:  Did one of you hand it to me?
16        MR. GROLAND:  I did.
17        MS. SINGER:  All right.  I'll go ahead and refer
18   to that.  I had the court reporter transcribe a number
19   of the questions before the bottom line question I
20   believe opens the door to allow the witness to further
21   explain her answer.  The last question that's
22   transcribed is the question that I believe is the
23   question that allows me to do follow-up.  The court --
24   the question was:  And the truth is that Brian
25   maintained --
```

1    THE COURT:  What page are you on?

2    MS. SINGER:  The very last page, ma'am.

3    And the truth is that Brian --

4    THE COURT:  I'm sorry.  I must not have the

5    correct transcript.

6    MS. SINGER:  It isn't the last page, you're right.

7    It's the second to the last page right here.

8    THE COURT:  Here it is, yes.  Go ahead.

9    MS. SINGER:  Got it.  Because the last page has a

10   separate section I want to argue.

11   And the truth is that Brian maintained to you all

12   day long during the first conversation for two and a

13   half hours, whatever it was, and the second

14   conversation, part of which was taped, and then the

15   third conversation at his house, part of which was

16   taped, also he maintained throughout the day that was

17   accidental and he never intended to hurt the baby;

18   isn't that true?

19   And the answer was:  That's true.

20   But the question requires this witness to make a

21   statement that that was all that was discussed during

22   that two and a half hour period.  And then later at

23   2:55 p.m. today, and I know this court reporter

24   cannot --

25   THE COURT:  I'm sorry.  Your conclusion is that

```
 1        this question requires the witness at this time in this
 2        answer?
 3             MS. SINGER:  No, but I'm going to now take you to
 4        2:55 p.m. today, because there's a second section here
 5        that I think plays into this.
 6             THE COURT:  All right.
 7             MS. SINGER:  The leading question, which I
 8        understand we have the court reporter reporting and she
 9        can go back and I would urge the Court to allow us to
10        go back to make sure, I wrote it down, but I did not
11        transcribe it, but the question was:  If you attempt to
12        consolidate two and a half hours into 26 minutes, then
13        you continue to turn -- then you turn the tape off and
14        continue to talk to him.
15             And the witness said:  That was correct.
16             But I think these two questions open the door to
17        this witness being allowed to explain to the jury, not
18        necessarily the subject matter of what was said, but
19        that other matters were discussed with Mr. Herlihy
20        during this two and a half hour time period.  Because
21        it looks like we're browbeating this man for two and a
22        half hours to get a 26 minute tape, and that's not what
23        happened for that first two and a half hours.  Much of
24        the two and a half hours was getting background
25        information on Crystal and on Brian, much of that
```

1   background information not being admissible due to a

2   prior court order.  I think I should be able to follow

3   up and at the very least have this witness say that

4   during the two and a half hour period there were other

5   matters discussed besides what happened on August the

6   2nd so that it's clear to the jury that this

7   consolidation from two and a half hours to 26 minutes

8   means she only let him talk about what she liked.  The

9   rest of the stuff wasn't allowed to be taped.  That's

10  what it sounds like.

11       MR. GROLAND:  If that's all she wants to do, that

12  they did talk about background of Crystal and

13  background of Brian, I don't see that that's anything

14  that prejudices us.  I don't think it gets into that

15  other area that we're all trying to stay away from, and

16  I've got no problem with going back in and clarifying

17  that if you think it needs clarification for the jury.

18       MS. SINGER:  All right.

19       MR. GROLAND:  As long as it is limited in the

20  manner in which you described.

21       MS. SINGER:  If you let me lead the witness and

22  ask her during that two and a half hour period, were

23  there other matters not necessarily relevant to this

24  case discussed with Mr. Herlihy?  If you let me ask

25  that question, she can acknowledge yes or no.  That

1    would resolve it in my manner in my head and that way

2    it will explain the time.

3        THE COURT:  All right.

4        MS. SINGER:  And the second part of my motion

5    outside of the presence of the Court (sic) does pertain

6    to the last page that was given.  This was when

7    Mr. Groland was asking Ms. Legall where Brian was at

8    the hospital:  Do you have any time that he was there

9    at the hospital that's unaccounted for?

10       And her answer was:  I don't know if there's any

11   unaccounted for time or not.  I do not know.

12       I believe that if other witnesses testify that

13   this, it's not for right now, it's not for Ms. Legall,

14   your Honor, but if other witnesses testify, including

15   Mr. Herlihy, I believe that I am entitled to go into

16   the time that Brian was supposedly at the hospital

17   that's otherwise not accounted for, because I believe

18   that that might have testimony that otherwise would

19   have been ruled inadmissible.

20       I believe Mr. Herlihy at one point made a call,

21   represented himself as a doctor in another section of

22   the hospital, spoke with witnesses to try to get

23   information representing himself as a doctor, and I

24   believe this may open the door to that later if other

25   witnesses are called by the defense to testify.

1    MR. GROLAND:  Okay.  Can I just respond to that?

2    MS. SINGER:  Yes.

3    MR. GROLAND:  A., I don't think she's right about

4    that at all, but, B., we've taken the depositions of

5    the witnesses that she alludes to and Mr. Putansu

6    states in his deposition that he can't honestly say it

7    was Mr. Herlihy, because he didn't talk to him.

8    Someone else did.  That someone else is a person that

9    hasn't been named, hasn't been listed by the state, and

10   hasn't been deposed.  So if by some stretch here your

11   Honor feels that we opened the door to that, I don't

12   think that can come in anyhow because they don't have a

13   witness.

14   THE COURT:  The bottom line is, it's way too

15   premature for me to guess how that may occur.

16   MR. GROLAND:  That's good.  That will do it.

17   THE COURT:  All right.

18   MS. SINGER:  That's it for the state.

19   I understand then I can just ask the question,

20   during that two and a half hour period, were other

21   matters discussed other than what happened to Robbie on

22   August the 2nd, and that's the end of my question.

23   MR. GROLAND:  Okay.  Then I have some re -- just,

24   your Honor, I just have a couple of --

25   THE COURT:  Recross on what areas?

1    MR. GROLAND:  Your Honor, I have some very

2  important things just to clarify when she went into

3  window of opportunity when the injuries were supposed

4  to have happened.

5    THE COURT:  As you know, recross would only be as

6  to any new area that the state may have opened on

7  redirect.  If you can point me to a new area that the

8  state has opened on redirect, I'll be glad to hear it.

9    MR. GROLAND:  I'm doing it.

10   THE COURT:  If it's simply something that you

11  forgot to cover in a day and a half of

12  cross-examination, forget it.

13   MR. GROLAND:  It wasn't a day and a half, your

14  Honor.

15   THE COURT:  Yes, for the record the Court notes

16  that was an exaggeration.

17   MR. GROLAND:  All right.  She's going into window

18  of opportunity when the doctors are saying that the

19  injury had to have occurred.  I want to ask her about

20  the window of time regarding the older injuries,

21  whether or not she's -- whether she was able to narrow

22  that time down along -- I'm not saying it right.  But

23  if they were able to ask that question, I think I

24  should be able to follow with a question about a window

25  of time regarding the older injury to the child's

1   brain.  That's the first area I wanted to go into.

2        The second area was something they were talking

3   about a stain on the middle of the bed, and I wanted to

4   ask her something about that.  But perhaps that's not

5   the new area because we covered that.  Your Honor, I

6   don't have but five minutes of questions.

7        THE COURT:  Mr. Groland, no.  Request for recross

8   is denied.  Now we have just a couple more questions on

9   redirect.

10        MR. GROLAND:  Oh, I do have something very

11   important.

12        THE COURT:  All right.

13        MR. GROLAND:  This witness stated that my client

14   said -- I want to do this out of the presence of this

15   witness right now.

16        THE COURT:  All right.  I'm sure you would be

17   happy to take a ten minute break right now.

18        THE WITNESS:  Yes, ma'am.

19        (Out of the presence of the witness.)

20        MR. GROLAND:  Your Honor, what the witness

21   testified to just now is something about swinging the

22   baby back and forth from side to side, but what she

23   neglected to add to that sentence, which is in her

24   report, is that, And the baby was laughing.  I think I

25   have a right to bring that out to the jury to clarify

1    that sentence and also have the jury know that she only

2    gave half an answer and was misleading about that.  I

3    mean, you're talking about shaking the baby back and

4    forth.  Well, Mr. Herlihy, if he made that statement,

5    also said, And the baby was laughing at the time.

6         The picture that they are presenting is that he

7    was doing it with an evil intent or some malice,

8    malicious intent.  But in fact he said the baby was

9    laughing and I think the jury needs to know about that.

10        THE COURT:  The jury does know about that because

11   that was asked and answered.

12        MR. GROLAND:  Not shaking.  This is swinging from

13   side to side.  It did not come out either on direct or

14   on redirect, that statement.

15        THE COURT:  It came out in cross-examination.

16        MR. GROLAND:  Your Honor, it didn't come out in

17   cross-examination either about the baby laughing, I

18   promise you.  This is an area that I did not go to.

19        THE COURT:  How could I have heard it, because I

20   heard it?

21        MR. GROLAND:  Your Honor, I hesitate to ask the

22   state am I right, but, your Honor, when you heard it,

23   we had a pretrial motion and the pretrial motion had to

24   do -- it was in a pretrial motion.  I put something in

25   a motion.  I can't remember what motion it was, but I

said -- it was a motion that Mr. Pennypacker did, and I
said, their description of this event was not correct.
What they have not put in, is that the baby was being
swung from side to side, and the baby was laughing.
That was in a pretrial motion.

THE COURT:  I'll be glad if the state stipulates
that I heard it at the pretrial motion, that's fine.
Otherwise we can review the transcript here.

MS. SINGER:  I would rather review the transcript
because I don't remember what was said, to tell you the
truth.

THE COURT:  If, because you did object that some
of the state's questions were asked and answered, and
because that objection was overruled at the time, there
not being any question that I recognized as being asked
and answered, and because the state then followed it
with a series of questions and answers that were
clearly repetitious and had been asked and answered,
even though there was no additional objection, I will
allow you to ask that one question on a recross if it
was not asked specifically in this cross-examination.
So we'll find it in the transcript.

At this point we're gonna take a 15 minute recess.

MR. GROLAND:  Okay.  It wasn't asked.  You want
the court reporter to look for that?

1    THE COURT: Yes, I would. I think that still

2    counts as a break for her, more or less, because she

3    doesn't have to type during that time.

4    MR. GROLAND: Okay. And I can actually find the

5    motion that I'm talking about.

6    (Recess taken.)

7    MS. SINGER: We looked at this afternoon's record

8    and we can't get this morning's record when that would

9    have been on direct. So I am going to ask -- I'm still

10   on redirect. Mr. Groland, of course, wants to do

11   recross, but I'm still on redirect. So I will be happy

12   to let her flush out that particular statement on

13   redirect along with the other question I have, which

14   was the very leading question, Was there anything else

15   that you two discussed that was not related to this

16   during the two and a half hours?

17   MR. GROLAND: All right. A., I don't want a

18   leading question on this flushing out thing. I thought

19   she was finished. I thought what we were talking about

20   was her motion regarding allegedly opening the door and

21   this other area that we're gonna go into now. So I

22   thought she was through. Otherwise I don't even know

23   that I would have brought it up at that time. I didn't

24   bring it up for Ms. Singer to ask a question to flush

25   something out for the jury. It was my intent to ask

1    the question on cross-examination in a leading way and

2    I think I should be allowed to ask the question.  I was

3    led to believe and it appeared from what we were doing

4    here, that we finished with her redirect and we were

5    talking about another matter.

6        THE COURT:  I understand.  Now, you had one more

7    question regarding the other areas covered.

8        MS. SINGER:  Right.  I want to say something,

9    because he could have covered that on cross-examination

10   and he didn't, but that was part of direct.  Now he's

11   going to make some kind of statement that this witness

12   is not being completely truthful and I think I should

13   be able to flush it out if there's a concern about it.

14       MR. GROLAND:  Wait, your Honor.  I could not have

15   covered it.

16       MS. SINGER:  If he's saying it wasn't asked on

17   direct, then he could have covered it on cross, which

18   he did not.

19       MR. GROLAND:  It would have been beyond the scope.

20       MS. SINGER:  No, because all of the other

21   statements were made on direct.

22       THE COURT:  I understand you all are getting tired

23   and I'm getting tired, too, and I'm sure the jury's

24   getting tired, but that doesn't mean we're going to

25   recreate all of the rules of argument to be this like

1    bantering thing, as opposed to you give me your side,

2    and then you give me your side, and then I rule.  This

3    is not helpful to either side's case and it's certainly

4    not helpful to my keeping a clear head and staying

5    focused on this.  So --

6         MS. SINGER:  I want to see how she wrote that.

7    I'm sorry.  A little levity.

8         THE COURT:  A little levity might be a good thing

9    at this point in time.

10        Now, here's what we're going to do.  I'm going to

11   allow Ms. Singer to ask that additional question that

12   frankly we all agree she should be allowed to ask, and

13   Mr. Groland agrees she should be allowed to ask.  I can

14   think of no reason why she would not be allowed to also

15   ask, Was the baby laughing when the baby was swung side

16   to side?

17        MR. GROLAND:  It's leading, your Honor.  That's a

18   leading question.

19        MS. SINGER:  I have a question.  How did Brian,

20   how did the defendant describe the baby's demeanor?

21        MR. GROLAND:  Well, she's sitting right here, your

22   Honor.

23        MS. SINGER:  That's my question.  How did Brian

24   Herlihy describe the baby's demeanor when he said he

25   swung the baby from side to side?

1    MR. GROLAND:  Can I follow-up with a question just
2    on that as to why a certain thing didn't happen with
3    regard to that testimony?
4        THE COURT:  Mr. Groland, I'll tell you the honest
5    truth, it's my concern is if I say you can ask one
6    question, that you won't just ask one question.
7        MR. GROLAND:  I promise you I'll ask one question.
8    I'll say it right on the record, one question.
9        THE COURT:  You understand that if you ask more
10   than one question, I'm simply going to interrupt you.
11       MR. GROLAND:  Hold me in contempt.
12       THE COURT:  I'm not.  I'm simply going to
13   interrupt you and tell you to sit down.
14       MR. GROLAND:  Thank you.  Okay.
15       THE COURT:  Then if you don't sit down, I'll hold
16   you in contempt.  But I don't think we'll go that far.
17       Now are we clear on what we're gonna do for the
18   rest of today?  This will be the last witness.  We're
19   not gonna call another witness tonight.
20       MS. SINGER:  Okay.
21       MR. GROLAND:  One second.  There is a matter that
22   I thought they were gonna call another witness, and
23   what I told Ms. Singer was, our motion on the discovery
24   issue, we are -- would like to encourage the Court to
25   think about doing it today.

1    THE COURT:  I will address that when we release

2    the jury.  Now about this bed, since we now have it.

3    MS. SINGER:  I'll have it put into evidence after

4    I -- I'm gonna do that before we leave tonight.

5    THE COURT:  Then the clerk will be able to handle

6    that.

7    MS. SINGER:  Right.

8    What I would like to do is do the last two

9    questions and I can do whatever he wants to do, then

10   we're gonna move the bed, and then we'll call our next

11   witness and that's tomorrow.

12   THE COURT:  Tomorrow.  And then we'll address any

13   of the remaining legal issues.

14   MS. SINGER:  Yes.

15   THE COURT:  Good enough.  Bring the jury back in.

16   (Before the jury:)

17   THE COURT:  Go ahead, Ms. Singer.

18   BY MS. SINGER:

19   Q    Investigator Legall, you were asked on

20   cross-examination about a two and a half hour interview that

21   you had with Mr. Herlihy that was not taped.  Do you

22   remember that on cross-examination?

23   A    Yes, ma'am.

24   Q    Did you speak with Mr. Herlihy about other things

25   totally unrelated to this case during that two and a half

1   hour period?

2       A    Yes, I did.

3       Q    All right.  And when you spoke with Mr. Herlihy on

4   the late evening hours of the 3rd to the early morning hours

5   of the 4th of August, and he told you that he was swinging

6   the baby from side to side, how did he describe the baby's

7   demeanor during that time?

8       A    It's okay if I refer to my notes?

9       Q    Yes, please.

10      A    He stated that he was swinging him back and forth

11  from side to side and Robbie was laughing.

12           MS. SINGER:  I have no further questions.  At this

13      time, your Honor, I would also like to move the bed as

14      a composite exhibit, whatever the next-numbered state

15      exhibit is, Mr. Clerk.

16           THE CLERK:  It would be 76 A, B, C, D, E, F and G,

17      your Honor.

18           THE COURT:  76 Composite in evidence, is there any

19      objection?

20           MR. GROLAND:  No objection.

21           (State's Composite Exhibit 76 was received in

22           evidence.)

23           THE COURT:  You had one more question?

24           MR. GROLAND:  Thank you, your Honor.

25           THE COURT:  Go ahead.

```
 1                    RECROSS-EXAMINATION

 2   BY MR. GROLAND:

 3        Q    Detective Legall, is there a good reason why when

 4   you first told this jury that Brian said he was swinging the

 5   baby back and forth from side to side, that you didn't also

 6   tell them that Robbie was laughing?

 7        A    No, I don't have a reason for that other than I

 8   answered the question asked.

 9             MR. GROLAND:  Okay.

10             THE COURT:  Good enough.

11             All right.  Ladies and gentlemen, I am going to

12        release you all at this time.  We do have some legal

13        matters.  I know it seems early, but with the same

14        instructions, we do have some legal issues that we need

15        to address.  Same instructions, no local news, no local

16        newspapers, no conversations with anybody about the

17        case.  If anybody contacts you, please let us know

18        first thing in the morning.  And if you'll lock your

19        notebooks in the evidence room, then you'll be free

20        until tomorrow at 8:50.  Thank you.

21             (Outside the presence of the jury.)

22             MS. SINGER:  Your Honor, we still have the witness

23        on the stand.  I was wondering -- we have no objection

24        to her leaving the courthouse.  I would like her to

25        stay under the rule for possible rebuttal testimony.
```

1    MR. GROLAND:  That's fine.

2    THE COURT:  Good enough.  You may leave the

3    courthouse.  You are subject to potential re-call the

4    rule remains in effect.

5    THE WITNESS:  Yes, ma'am.

6    MR. GROLAND:  Your Honor, I just want -- doesn't

7    need to be on the record.

8    (An off the record discussion was held.)

9    MR. TEDDER:  Let's start talking about the case on

10   the record.

11   THE COURT:  All right.  We can go back on the

12   record.  I'm happy to have it all on the record,

13   Mr. Tedder.

14   MR. TEDDER:  I know.  I'm not accusing you of any

15   wrong.  The one concern I have, Judge, that is going to

16   be something we're gonna have to spend some time

17   talking about are the jury instructions, because I

18   reviewed the jury instructions the state attorney

19   provided us, and I'm not quite sure why a lot of the

20   instructions that have been prepared were prepared by

21   the order based on my comparison of what is in them

22   with what is based on the jury instructions in the

23   book.

24   THE COURT:  Good enough.  What I need for you to

25   do, is present the instructions that you would like

1    given to the jurors.  So long as the state and defense

2    are in agreement, of course we have no issue.  If the

3    state and defense are not in agreement, then obviously

4    I will rule.

5         MR. TEDDER:  All I want to do is track the

6    instructions in the book.

7         MS. SINGER:  I need to tell Mr. Tedder that the

8    instruction for aggravated child abuse was just

9    recently changed.  It's not in your book.  That

10   instruction is the instruction that I have.  But it's

11   in one of the new Florida Law Weekly's if you want to

12   pull it.  I can bring it to you tomorrow.

13        MR. TEDDER:  Would you?

14        MS. SINGER:  Yeah.  Because I know that one in the

15   book, the book is not correct.  There's a new one.

16        MR. TEDDER:  That's one of the concerns I had.

17   Also, I wasn't sure -- the indictment does not mention

18   what they allege in the form of child abuse.  It says

19   premeditated murder.  So, you know, I want to know

20   exactly what theory they're going on under child abuse

21   because there's a variety of different ways the state

22   can try to prove aggravated child abuse.  I certainly

23   don't think they're alleging this was torture or

24   malicious punishment.  I'm not sure what they're

25   alleging.  So that's what I want to clear up.

1      Also, the other big concern I had, you know, it

2  says, Injury was caused to the victim, Robbie Quirello,

3  by the defendant, Brian Herlihy, you know.  For

4  example, in the first portion of the -- what they have

5  to prove is to death, they put, The victim, Robbie

6  Quirello is dead.  I don't think they can put the

7  victim, Robbie Quirello, is dead.

8      MS. SINGER:  I just used the standard form.

9      THE COURT:  Hold on.

10     MS. SINGER:  I'm sorry.

11     MR. TEDDER:  We'll talk about that when we get to

12  the charge conference.

13     THE COURT:  Well, let me tell you right now, that

14  unless your objection is merely that an instruction

15  that has been proposed does not apply and I will simply

16  make a ruling to remove it or not, then you need to

17  present to me in writing the instructions as you want

18  them given.  Then I will rule on whether yours are

19  given, hers are given, or some combination thereof.

20     MR. TEDDER:  Very well, your Honor.

21     THE COURT:  Okay.

22     MS. SINGER:  As to the allegations in the

23  indictment, we can, in fact the law is that we charge

24  premeditated murder under the felony murder rule.  I

25  have some cases on that and felony murder is

1    appropriate I would be happy to discuss with John

2    separately if he didn't know what our theories were,

3    what our theories are.

4         MR. TEDDER:  I knew they could proceed on the

5    felony murder even though they only charged first

6    degree premeditated murder.  I just want to make sure I

7    understand what theory of child abuse they are

8    proceeding on.

9         THE COURT:  Okay.  Good enough.

10        Mr. Groland, your motion.

11        MR. GROLAND:  Mr. Tedder's doing it.

12        THE COURT:  Mr. Tedder's motion.

13        MR. TEDDER:  Another attorney in the office

14   prepared this motion for sanctions against the state

15   for withholding privileged testimony, demand for

16   Richardson hearing, and motion for mistrial that was

17   filed, incorrect date on here, it says September 3rd of

18   2002.  I'm certain it wasn't filed then.  I believe it

19   was filed two days ago.  What's today?  The 18th, 19th?

20        THE COURT:  They're all running together for me,

21   too.  I believe it's the 19th of September today and my

22   recollection is it was filed first thing yesterday

23   morning.  Am I wrong about that?

24        MR. TEDDER:  No.  I think you're right.

25        THE COURT:  All right.  Go ahead.

1    MR. TEDDER:  The first thing is, the person who

2    prepared it did not include a part of the evidence that

3    was presented during the trial September 17th through

4    the witness, Dr. Levine.  He mentioned in paragraph two

5    of the motion that Dr. Levine testified in the state's

6    case in chief from the medical examination photographs

7    at the time of the incident revealed --

8    THE COURT:  Mr. Tedder, you better slow down

9    because the court reporter, of course, has been working

10   all day also and --

11   MR. TEDDER:  I'm sorry.  At the time of the

12   incident revealed displacement and cracking of the

13   retinal portion of the alleged victim's eyeballs.  I

14   don't recall Dr. Levine actually said that.  As I

15   recall, he said he saw a crack in the back of the eye

16   from the photographs.  I don't remember if he said it

17   was in the retina or where it was.

18   The other thing that should have been included in

19   this motion and was not, is that Dr. Levine at that

20   time also testified about another finding he made from

21   looking at the photographs, which he called Purtscher's

22   retinopathy.  That should have been included in this

23   motion.  Those were two things that were new that he

24   came up with.

25   I'm sure, as the Court recalls, I tried to

Stacey K. Bryant, RPR
Judicial Court Reporter

1   cross-examine him on that about the fact he did not

2   include that in his initial report, what he wrote on

3   the chart, and as far as his follow-up, he dictated a

4   letter a month or so later after he testified he had

5   viewed the photographs.  He did not dictate that to the

6   letter.  He then responded essentially that when I

7   asked him why he didn't disclose it during the

8   deposition, he said, Well, you didn't ask.  And I'm

9   sure you recall, Well, how am I supposed to ask if I

10  don't know that it's there?  He said, Well, I saw it

11  from the photographs.  The photographs are part of the

12  record.

13       During the deposition that was taken of Dr. Levine

14  on August 30th, I'll just read the questions basically

15  I asked of him that deal with why he should disclose it

16  if he was going to disclose it.  On page eight, line

17  23, my question was:  Tell us what you did Dr. Levine.

18       On page nine, at line 20, question was:  Well,

19  tell us what you saw when you did this exam, please.

20       On page ten, line one:  What was the other thing

21  you saw?

22       And page 13 --

23       THE COURT:  I'm sorry.  In regard to that

24  question, And what was the other thing you saw, what

25  were you referring to or what was he referring to at

1    that time?

2         MR. TEDDER:  Yes, ma'am.  On page nine, at line --

3    Okay.  On page nine, line 20, question:  Well, tell us

4    what you saw when you did this exam, please.

5         Answer:  I saw a massive amount of intraocular

6    blood, intraretinal blood, intraretinal, retinal

7    hemorrhages and intraocular blood.

8         Question:  What does intraocular blood mean?

9         Answer:  --

10        THE COURT:  Let me just slow you down, since you

11   don't need to read the entire deposition, I don't

12   believe, into the record.  I'll be glad to read it if

13   you refer it to me.  But here's what I need to know:

14   Did you ever ask him what he saw in the photographs

15   specifically?

16        MR. TEDDER:  Yes, I did, your Honor.  I only had

17   the answer as far as going back to trying to clear up

18   and what was the other thing you saw, I have one more

19   answer, short answer.

20        THE COURT:  All right.

21        MR. TEDDER:  I said, What does intraocular blood

22   mean?

23        Answer:  It means it's in the eye.

24        And then the next question on page ten was, Then

25   what was the other thing you saw?  All right.  And I

 1    believe he said intraretinal, and explained that.

 2         And on page 13 I asked, line 18, Could swelling in

 3    the brain cause the kind of hemorrhage you observed in

 4    these eyes?

 5         His answer was, No.

 6         As to the -- Let me see.  If I could, there's just

 7    a couple more questions that I asked him specifically.

 8         On page 18, In your examination of the eyes, could

 9    you see any of those other tissues that anchor the eye?

10         Answer:  No.  That was lines 13 to 15.

11         All right.  Page 19, line five, question:  I know

12    you have got all these slides.  Can you go ahead and

13    show them to us?  He was reluctant to do that, I can

14    tell you that.

15         Page 20 --

16         THE COURT:  Well, what was the response?  That he

17    was reluctant to do that doesn't help me rule on your

18    motion.

19         MR. TEDDER:  Page 19, line five, I know you have

20    all -- have got all these slides.  Can you go ahead and

21    show them to us?

22         Answer:  And these are representative of the

23    slides that just show blood in the eyes.

24         By way of explanation, what the doctor had

25    intended to do, was just show three or four slides, I

1   think there were 24 in total, and the state's present,

2   he was quite annoyed that I asked to see all of them.

3          Anyhow, then I said to Ms. Singer, I presume

4   you're planning to use them at trial, Ms. Singer?

5          She replied:  Yes, not all of them, but whatever

6   are the represented ones.

7          I said, Would it be better to turn off the lights?

8          The witness:  Yes.

9          And then we started going on through the slides.

10  The first question I asked him about the slides was

11  what number was the slide, 15?

12         Answer:  I would not pay attention to that.  I

13  don't know what that means.

14         Then on the next page, page 20, that's after he's

15  begun to show us the slides, question, line two, on

16  page 20, Yes, please, tell us what you see.  That's

17  referring to the slides.

18         So then he proceeded to run through the slides and

19  describe them.  Okay.  And I -- did I ask him what --

20  basically he just said, oh, just blood everywhere.  You

21  can't see the retina.  He makes no mention whatsoever

22  of the two findings he came up with de novo in trial.

23  No mention at all.  I mean, I don't know, your Honor, I

24  go through --

25         THE COURT:  You're ahead of me.  Slow down.  I

1   need for you to find in that deposition where he

2   reviewed for you in deposition what he saw in the

3   slides that were actually admitted in evidence.

4        MR. GROLAND:  Your Honor, while Mr. Tedder is

5   looking for that, can I just tell the Court this?  The

6   reason why these two omissions are so significant --

7        THE COURT:  I understand why they're significant.

8   The question is, did you complete discovery or not?

9   That's optional.

10        MR. GROLAND:  Let me just finish the sentences.

11   He said for the first time as far as we're concerned,

12   is that these two things that he hadn't noted before in

13   his report he told us about, could have only happened

14   with violent shaking.  That's why it's so significant.

15   And also the crack that he's talking about, is not

16   self-evident to us from the photograph.  I mean, what

17   he's talking about looks just like a vein in the eye.

18   So unless somebody like a state witness explains to us

19   what it's appearing to him to be, we have no other way

20   of knowing.

21        THE COURT:  Maybe the appellate courts needed that

22   explanation.  Go ahead.

23        MR. TEDDER:  All right.  Line 20 -- page 20, line

24   two, question:  Yes, please, tell us what you see.

25        Answer:  --

1    THE COURT:  Is this the slide that was -- is now

2    in evidence?

3        MR. TEDDER:  This was the first -- Well, I don't

4    know if it's in evidence or not.  I don't know which --

5    I mean, they said they were gonna use the ones that

6    were most representative of the ones that -- he showed

7    me every picture that was taken of Robbie Querillo's

8    eyes that day.

9        THE COURT:  Is there any way from the deposition

10   and the way those slides were identified in the

11   deposition that you can determine where he's testifying

12   regarding the actual photographs that were entered into

13   evidence?

14       MR. TEDDER:  No, ma'am, there's not, and I can

15   tell you why.

16       THE COURT:  Okay.

17       MR. TEDDER:  This witness was absolutely, totally

18   unwilling to cooperate, unlike every other doctor whose

19   deposition I took in this case.  He was not at all

20   interested in being there.  He was quite annoyed that I

21   was asking him any questions at all.  And when I tried,

22   I'm not a doctor.  I've been trying to learn medical

23   stuff the past two months, very difficult to do.  When

24   I would ask him questions to try to ask him what this

25   word or that word he used meant, at one point in time,

1  I'll have to find it in here, he said, I'm not here to

2  educate you.  If you want to learn about ophthalmology

3  or whatever, go get your own expert, which is precisely

4  what we would have done had we known he was gonna come

5  up with this new stuff here.

6      I don't know when the state became aware of it.  I

7  don't know if his testimony came as a surprise to them

8  or not.  But, you know, the case law, I believe, is

9  pretty clear that Mr. Workman quoted in here in the

10  motion, is that the state has a continuing duty to

11  disclose to us any new evidence, you know.  And the

12  fact that one of these -- there's some language in one

13  of these cases that basically says --

14      THE COURT:  You don't need to go further.  I

15  understand that.  I've reviewed the case law that you

16  presented.  What's the state's response?

17      MS. SINGER:  Yes, your Honor.  I have extensive

18  response.  I would like to offer factual response first

19  because I think that this is not subject to a

20  Richardson inquiry, but let's assume that it is for a

21  minute.  I think we need to lay a factual predicate.

22      On September 18th, year 2000, the name of Lawrence

23  Levine, M.D., from the Department of Ophthalmology

24  along with a full copy of the chart of Robbie Quirello,

25  were provided to the defendant through his counsel.

Stacey K. Bryant, RPR
Judicial Court Reporter

1    That chart specifically reflects that photographs of

2    the eyes were taken by a medical photographer on, I

3    believe it was, August 4th, the year 2000.  That's

4    important because Dr. Levine's testimony and his

5    examination occurred on August the 2nd.

6        Also, there was a police report generated and

7    provided to defense counsel on that same day,

8    September 18th, 2000, a rather lengthy police report

9    that included an interview with Dr. Levine, where it

10   was specifically stated that his examination of the

11   eyes showed extensive hemorrhaging and ocular damage,

12   O-C-U-L-A-R, ocular damage.

13       This is important because in arguing that there

14   was any prejudice to the defendant in terms of the

15   testimony, the defendant has to show this Court that

16   they would have had a change in strategy regarding that

17   witness had they had that information.  And what they

18   had back in 2000 and what they had when they took the

19   deposition of Larry Levine on the 30th of August, 2002,

20   was that this witness from the police report where it

21   specifically states that he was going to give the

22   opinion that these -- this ocular damage and this

23   retinal hemorrhaging, the bleeding and the tearing,

24   were due to shaking unquestionably.  His testimony was

25   in the police report and in the chart where it's

1    written that this was a violent act of shaking, not

2    mild for sure, and that was in quotations in the police

3    report from Helen Legall.

4         So they knew back in 2000 that the state was gonna

5    present evidence that there was retinal hemorrhaging

6    and ocular damage as a result of violent shaking.  They

7    knew what this expert was going to say.  They prepared

8    their case with that in 2000.  They knew that before

9    they went into the deposition on the 30th of August,

10   2002.  The defendant -- the witness was available for

11   that entire time.  He's been at Shands for that entire

12   time and available for deposition anytime before that

13   time on the 30th of August, 2002.

14        When the photographs were shown, copies were made

15   available to defense counsel.  There was no discussion

16   from defense counsel at that time that they had an

17   expert or intended to have an expert.  That's their

18   decision to make.

19        But there was obvious information provided

20   throughout the course of this case that we were

21   presenting testimony from Larry Levine, our pediatric

22   ophthalmologist, that he would say that there was

23   ocular damage and bleeding damage as a result of

24   violent shaking.

25        For them to now argue that they are entitled --

1   that, first of all, there was any discovery violation,

2   we submit to the Court there was no discovery

3   violation.  They were provided the police report, they

4   were provided an opportunity to ask questions of the

5   witness, they were provided the chart, they were

6   provided the photographs.

7       The state never misguided the defendant or defense

8   counsel about what they intended to offer up in

9   evidence.  The Court must find, first, that there was a

10  violation of the discovery rule, which we submit there

11  was not; and secondly, that the noncompliance resulted

12  in prejudice.  The defendant must show that the

13  defendant's trial preparation or strategy would have

14  been materially different had this violation not

15  occurred.

16      Their strategy all along has been that this baby

17  was not shaken, that this injury occurred through a

18  theory where the blood was pressed or blocked and the

19  breeding occurred that way.  They have taken on that

20  theory all along.  You've heard the testimony of their

21  expert witnesses on that theory.  They have not changed

22  their strategy because of anything Dr. Levine said.

23  They've contradicted it through their own experts and

24  intended to all along.

25      At the very most, all of this information is

1    inculpatory.  It is certainly not exculpatory.  So what

2    we have here basically, is an opportunity for them on

3    cross-examination to impeach the witness, which I

4    believe they may have properly because of the surprise

5    that Mr. Tedder showed.  They may have impeached the

6    witness and they get an instruction that the witness

7    may have made an inconsistent statement, if it even

8    fits, and I'm not quite sure it did.  But they will get

9    that instruction anyway because of other witnesses.

10          But they certainly have not shown and will not be

11   able to show, by any means, that they were in any way

12   not afforded this information, because it was told to

13   them in September of 2000 in the police report and

14   maintained in the chart, and they were preparing

15   knowing that this witness was gonna take the position

16   that this baby's eyes were damaged as a result of

17   violent shaking.

18          I want to cite to the Court, Cox vs. State, a case

19   that they have attached to their case, which basically

20   held that there is a duty for them to show, first of

21   all, that there was a discovery violation, which I

22   don't believe they did; and secondly, that they would

23   have changed their strategy regarding this witness had

24   they known that.  There is no showing whatsoever of

25   that.

1944

```
1        They knew he was gonna say very bad things about
2    the injuries to the eye.  They knew he was going to say
3    it was a result of shaking.  They weren't going to --
4    if they have an expert, I don't know about it.  They
5    could have contested that from the very beginning.
6        I also want to cite to the Court -- you have Cox.
7    I also want to cite to the Court, Reese vs. State, I do
8    have a copy of that, which is a Supreme Court opinion,
9    694 So.2d 678, 1978.
10       In the Reese case -- if I may take a moment to
11   review the case here.  I'm not as up to speed on these
12   cases as I usually am, Judge.  I apologize.  I like to
13   give a good factual scenario here.  But the argument in
14   the Reese case was, the detective in that case had been
15   asked on deposition whether or not he recalled a
16   statement that the defendant made and, of course, the
17   Court is well aware the state is under a higher burden
18   as far as defense statements are concerned.  There's a
19   specific request, requirement that we provide any and
20   all statements to the defendant.
21       The argument was that the witness did not reveal a
22   statement that was made when he had his deposition
23   taken.  He later recalled that statement at trial and
24   they argued that that was a discovery violation and it
25   was prejudicial because it would have affected the
```

1    strategy of the case.  And this court held, and I would

2    ask the Court to take a look at the case itself, that

3    even a defendant's statement that had come up during

4    the course of the trial, was subject to

5    cross-examination and possible impeachment.  In fact,

6    they write in here very nice praise and I think it's

7    this case, but it may be in the Cox case -- give me a

8    moment.  The hearing established that the information

9    was not only in the detective's mind, but known to the

10   state attorney's office as well.  Contrary to what the

11   state asserts, Florida Rules of Criminal Procedure

12   makes it clear that they --

13        THE COURT:  Ms. Singer, slow down so the court

14   reporter can --

15        MS. SINGER:  This is not the case that I want to

16   cite, your Honor, for the quote.  If the Court will

17   give me a moment.  I also have several other cases.

18        I'm going to cite Street vs. State, which is

19   another Supreme Court case, cited at 636 So.2d 1297.

20   In that case, this was a case where Mr. Street claimed

21   the trial court erred in refusing to conduct a

22   Richardson inquiry when the state offered testimony

23   about which Street had no prior knowledge.  During the

24   deposition, Officer Anderson made one statement.  Later

25   he add to that statement at trial and the court said

1    when testimonial discrepancies appear, which sounds

2    like what we have here, may be at the very least --

3    most testimonial discrepancies, the witness' trial and

4    deposition testimony can be laid side by side for the

5    jury to consider.  This would serve to discredit the

6    witness and should be favorable to the defense.

7    Therefore, unlike failure to name a witness, changed

8    testimony, if that's what we have here, and I submit to

9    you we don't have that, but even if we have that, that

10   he said, All I see blood, and that's not sufficient for

11   Mr. Tedder, he didn't follow-up on that question, if

12   the testimony is changed and he says, Now I see more

13   than blood, let's assume that's the case, it does not

14   rise to the level of a discovery violation and will not

15   support a motion for Richardson inquiry.

16        At the very least, and I submit to you, I don't

17   think we even have this.  There's a change in

18   testimony.  There isn't a violation of any discovery in

19   this case.  In fact, all of this information was

20   provided well in advance and the defense had an

21   opportunity to spend all the time the defense wanted to

22   spend with this witness.

23        Obviously we spoke to Helen Legall for almost

24   eight hours, a little over eight hours.  If Dr. Levine

25   was a witness that they intended to discredit or in any

1   way use as a means to -- as a strategy means for their

2   case, they could have spoken to him for eight hours if

3   they wanted to.  They know how to do it.

4        They knew what he was gonna say.  They knew it was

5   hurtful and harmful.  He basically said what he said he

6   was gonna say when he was interviewed by Helen Legall

7   back in September of 2000.  He didn't change it.  He

8   gave more detail than he did in his deposition.  He

9   wasn't asked for that much detail in his deposition.

10  No slides were identified.  They were popped into the

11  machine and he was popping through them.  Mr. Tedder

12  didn't ask him to stop and consider each and every

13  slide.  No slides were identified.  No slides were

14  attached to the deposition.

15       They knew where they were going with this witness.

16  They knew this witness wasn't gonna be helpful to them.

17  They're not changing their strategy because of what

18  this witness said on the stand.

19       I want to cite for the Court Street vs. State and

20  also Bush vs. State, which basically says the same

21  thing, that at the very least this is a testimonial

22  change, and I submit to you, it's not and it wasn't --

23  the predicate wasn't laid for it.  But at the very

24  least, and that's not a discovery violation it's not

25  subject to Richardson.

1    I also want to cite to the Court -- Gosh, I hope I

2    have this case.  I do.  We're not, the state is not

3    required to prepare the defense's case.  There has

4    never -- we have never misled the defense about what

5    Dr. Levine was going to say and how we were going to

6    use it.  In all of the Richardson inquiries that have

7    gone to prejudice the defendant, there's always been

8    some allegation that the state was ambushing the

9    defense and we have never done that, especially with

10    Dr. Levine.

11    In fact, under Smith vs. State, I'm sure the Court

12    has seen this case before, 641 So.2d 1319, Supreme

13    Court of Florida says, it's not the state's duty to

14    prepared the defense's case.  It's not the state's duty

15    to follow-up on deposition questions because they chose

16    not to ask them.  There may have been a reason why they

17    didn't ask those questions.  We're not to look beyond

18    that.  There may have been a reason why those questions

19    weren't asked so you could act surprised when the

20    witness was on the stand.  I don't know.  I'm not

21    saying that's the case, but that's a possibility.  It

22    makes for good drama in the courtroom.

23    My point here is, that the Cox case, the Reese

24    case, the Smith case, the Street case, and the Bush

25    case all stand for the same proposition.  The state has

1    no requirement to actively assist the defense in

2    preparing it's case.  The testimony could not have

3    conceivably benefitted the defense, so it's not

4    exculpatory.  The concept that the eye damage shows

5    there was shaken baby syndrome was disclosed in the

6    year 2000.  All that's been added in is some detail

7    explaining that testimony.  That is merely something

8    the defense chose not to ask about in deposition.

9         The trial preparation and strategy must be shown

10   to have been materially different if the information

11   that wasn't given is going to be considered prejudicial

12   and that's B.T.G., another Supreme Court case, versus

13   State, which quotes -- pardon me, that's a First

14   District Court of Appeals case, B.T.G., a child, vs.

15   State, 694 So.2d 767, which cites a Supreme Court case,

16   State vs. Schopp, 653 So.2d 1016, which says that there

17   must be a showing of prejudice, there must be a showing

18   that their defense would have been -- their strategy

19   would have been materially different, and they cannot

20   make that showing.

21        THE COURT:  Let me ask Mr. Tedder a couple of

22   questions.  Did I understand you correctly, as

23   clarified by Ms. Singer, to say that all -- How many

24   slides were there?

25        MR. TEDDER:  Twenty-four.

1    THE COURT:  Twenty-four slides were there, and

2    that in fact in deposition you went through all of

3    them?

4    MR. TEDDER:  Let me -- I need to add -- We did go

5    through all of them, yes, ma'am.

6    THE COURT:  Okay.  Let me just ask a couple

7    questions here so I'm clear on what you've already

8    said, then you can add whatever you want to because, of

9    course, you're entitled to rebuttal in this argument.

10    You went through all of them.  Is it correct, as

11    Ms. Singer says, that none of these slides were

12    attached to the deposition or in any way identified

13    during deposition?

14    MR. TEDDER:  I believe that's correct, yes, ma'am.

15    THE COURT:  Did you ask individual questions in

16    regard to each slide?

17    MR. TEDDER:  No, ma'am, because they did all look

18    the same and they were all numbered the same as well.

19    THE COURT:  Okay.  Now, what's your rebuttal?

20    MR. TEDDER:  Well, getting to -- All right.  Here

21    was the question I asked on page 25, line 19:  Can you

22    run through all of them -- or the last statement he

23    made on the previous answer was, 17, was -- he showed a

24    couple of slides.  He says, Those are two samples.  We

25    have 24 photos just documenting and re-documenting the

1951

1   blood.

2       Question:  Can you run through all of them and

3   just show them to us?

4       Answer:  If that would make you happy.

5       Question:  I didn't list you as a witness.

6       Answer:  Is it necessary to go through 24 photos

7   that all look the same?

8       Question:  Do they all look the same?

9       Answer:  They all have blood in the quadrants of

10  the eye.  I'll be happy to do it.  This is a duplicate

11  set we made for you guys.

12      Ms. Singer:  We are getting copies.  We'll take

13  them with us then.

14      By the witness:  --

15      THE COURT:  I'm sorry.  Ms. Singer said what?

16      MR. TEDDER:  She said, We are getting copies.

17  We'll take them with us then.

18      MS. SINGER:  We got copies of the slides.

19      THE COURT:  She said that?

20      MR. TEDDER:  Yes.

21      THE COURT:  Go ahead.

22      MR. TEDDER:  Then the witness said, It's going to

23  take a little while, but we'll make it happen.  This

24  should only take about 45 minutes.

25      By Mr. Tedder, question:  Doctor, while you're

1952

1  doing that -- he was putting the slides in the

2  projector -- while you're doing that --

3       Answer:  I don't think I can concentrate on two

4  things at once.

5       Question:  Okay.

6       Ms. Singer says:  Doctor, I know that you want to

7  go through these, but if there is anything that you see

8  that is anything you haven't already testified to that

9  you want to show us, I would appreciate you commenting

10  on anything particularly unusual.

11       By the witness:  It's a lot of blood that is

12  located within the retinal tissues and within the

13  vitreous body and in all quadrants.

14       Ms. Singer:  That's a very full red.

15       By the witness:  Yes.  Our photographer was just

16  documenting.  The anatomy is highly distorted from what

17  I'm sure is shaking.

18       By Mr. Tedder:  Can you identify?

19       Answer:  It's hard to identify the anatomy after

20  this kind of trauma.

21       Question:  But are those slides marked so that you

22  know what quadrant is on each photograph as being

23  depicted?

24       Answer:  I think we can piece them together with

25  time, or our photographer will document which numbers

1      correspond to what he did, or it may have been a woman

2      photographer there, too.  It looks like they're all 15.

3          Question:  You said earlier that the hemorrhaging

4      from when venous drainage is occluded, that it looks

5      like different -- excuse me -- that it looks different

6      from this type of hemorrhaging?

7          Answer:  Yes.

8          Question:  How does it look different?  Again, if

9      you've already told me, I couldn't understand.

10          Answer:  Well, you know, I want to make one

11      comment here for the record.  This is the kind of stuff

12      that bothers me.  I went through it.  This doesn't look

13      like any venous hemorrhage to me.  Venous hemorrhage

14      follows the course of the blood vessels, okay?  And

15      it's not this massive.  It splays out within the

16      retina.  It's from retinal veins, okay?  If you want to

17      pursue your belief for every single thing that you can

18      think of that this might represent, you can get an

19      expert witness to go over that with you, or hire

20      somebody to review every kind of eye blood that ever

21      existed.

22          My professional opinion is this is due to shaken

23      infant syndrome.  It's intravitreal, it's within the

24      vitreous, it's within the intraocular cavities and it's

25      intraretinal.  I can't go through every single thing

1    you have ever heard of, okay?  That's not my job.

2           Question:  Okay.  Are you a forensic pediatric

3    ophthalmologist?

4           Answer:  No, I'm not.  Do you know one?

5           Question:  Did you do anything to try to rule out

6    any other conclusions other than the one you reached in

7    this case?

8           Answer:  No.  I thought that was your job.

9           Question:  Okay.  So your job is to take the

10   conclusions someone else has already made and work from

11   testimony?

12          Answer:  I didn't decide.  I didn't decide.  I

13   said my lettering here is quite clear, I'm sure.  I

14   documented vitreous hemorrhage and retinal hemorrhage

15   and that it was consistent with the diagnosis of shaken

16   baby syndrome.  And then you're going to take it to

17   court and argue that.  I still stand by what I said.  I

18   saw the blood in the eye.  I didn't say what caused it.

19   I said this exam is consistent with presumed diagnosis

20   of shaken baby syndrome, and you're asking me again the

21   same question that I'm saying yes.

22          Question:  What else is it consistent with?

23          Answer:  I don't know of anything else, okay?

24          Question:  Okay.  And what studies were you basing

25   your conclusion on?

1    Answer:  What studies would you like me to base

2    it?  I've written a book chapter on it.  I can't think

3    off the top of my head of every article that I've

4    written on it.  I don't know of any other in five years

5    of practice here almost, a year of training, three

6    years of residency, my internship and my medical

7    school, I can't think of another thing that would cause

8    it.

9    Question:  What else can cause both retinal

10   hemorrhaging and vitreous hemorrhaging to your

11   knowledge?

12   Answer:  Do I have to answer that, this question?

13   He was directing this to Ms. Singer.

14   Do we have to go through every single thing he can

15   think of?

16   Ms. Singer:  Are we talking about -- I think

17   that's repetitive.  I'll object.  I think he told you

18   about the bottle rocket situation, getting hit in the

19   eye.  There is a constellation of symptoms.

20   By the witness:  Answer, Yeah.  I don't want to

21   sit here.  I mean, yeah, you're here to ask me about my

22   eye findings and I gave them to you.  If you want to

23   get an ophthalmologist to sit and teach you

24   ophthalmology, you should get one.

25   By Mr. Tedder:  Question, Okay.

1956

1    Answer:  Can I make a comment for the record?

2    Ms. Singer:  No, sir, don't make a comment.

3    By Mr. Tedder:  Go ahead.  It's my deposition.

4    Ms. Singer:  I think Mr. Tedder needs to ask you a

5    question first.

6    By Mr. Tedder:  Question, I would like to hear the

7    comment that Dr. Levine has to make.

8    Answer:  My comment is, that as a pediatric

9    ophthalmologist, I'm receiving no money for this

10   personally, I have no personal involvement financially

11   with this, and that I'm simply making my statements

12   based on my best medical judgment consistent with my

13   position here as director of pediatric ophthalmology.

14   Question:  Would you agree with the statement that

15   no one knows what causes retinal hemorrhage?

16   Answer:  Do I have to answer?

17   Ms. Singer:  Do you agree or disagree?

18   By the witness:  These questions that are

19   ridiculous and make no sense to me?

20   Ms. Singer:  Yes, sir.  You need to answer that

21   question.

22   By the witness:  Answer, what's your question?

23   By Mr. Tedder:  Question, would you agree with the

24   statement that no one knows what causes retinal

25   hemorrhage?

Stacey K. Bryant, RPR
Judicial Court Reporter

1    Answer:  What statement, by who?  Let me --

2    THE COURT:  Unless you need to go further,

3    Mr. Tedder, you have established very clearly that the

4    witness was uncooperative.

5    MR. TEDDER:  To put it mildly, your Honor.  And I

6    would also like to add for the record the cases that we

7    would cite in addition to -- the state is correct, we

8    did cite the Cox case; also McArthur vs. State, at 671

9    So.2d 867, and Raffone, R-A-F-F-O-N-E, vs. State, I

10   believe at 483 So.2d 761.

11   Also, your Honor, I would like to respond as far

12   as how we tried to respond to this new evidence that

13   came in in the middle of trial.  I spoke to

14   Dr. Uscinski before his trial preparation yesterday and

15   he was prepared to respond as to what Purtscher's

16   retinopathy is.  The definition that I have pulled up

17   from a Stedman's medical dictionary is as follows:

18   Transient traumatic retinal angiopathy due to a sudden

19   rise in venous pressure as a compression of the body

20   from seat belt injury.  Occular film dye show large,

21   white patches associated with the retinal veins about

22   the disk, the macula, hemorrhages and retinal edema

23   thought to be due to fat embolism and bone marrow, and

24   then has some synonyms listed.

25   Dr. Uscinski was prepared to testify yesterday



1   that Purtscher's retinopathy is completely consistent

2   with venous pressure being increased, or by the

3   occlusion of the brain, intracranial brain swelling

4   that was present in this child.  He was precluded from

5   responding when I asked him about that question.  The

6   state objected and said it was beyond his area of

7   expertise, which the Court so ruled.  So we did attempt

8   to respond even in the middle of the trial and were

9   attempting to respond even during the middle of trial

10   from this day forward.

11       But had we known this -- I mean, the letter, at

12   one point in time during his deposition, Dr. Levine

13   says, My letter is very clear.

14       THE COURT:  Hold on.  I'm prepared to rule at this

15   time.  As to -- First of all, I find no basis to

16   conclude that there was a discovery violation and there

17   will be no Richardson inquiry as to that.  On the other

18   hand, you have established very clearly that the

19   witness was uncooperative at deposition and the

20   testimony offered during the trial, of course, in the

21   state's case in chief, was in fact prejudicial to the

22   defense.

23       Now whether or not you could have or would have

24   taken any other strategy pretrial, is subject to

25   further argument.  However, I will certainly consider

1    any potential remedy you want to try to implement at

2    this time, including re-calling any qualified doctor,

3    or possibly even allowing you to add a witness at this

4    late date, if you so choose.  I don't know if there

5    would be any legal basis to provide the jury with the

6    medical definition that you provided.  But the bottom

7    line is, there's no discovery violation and if there is

8    some legal remedy that you want to pursue, I'll be glad

9    to hear about it further.

10       MR. TEDDER:  We'll try to determine what kind of

11   legal remedy -- The Court then is denying the motion

12   for mistrial?

13       THE COURT:  Correct.

14       MR. TEDDER:  We would just object to that ruling,

15   your Honor.

16       THE COURT:  Yes.

17       MR. GROLAND:  And the other remedy that we wanted

18   the Court to consider, would be an instruction to the

19   jury to disregard the testimony of the witness.

20       THE COURT:  Well --

21       MR. GROLAND:  As to those two areas specifically

22   only, those new things that he testified to that we

23   didn't know about before the trial.

24       THE COURT:  All right.  I'll be glad to consider

25   that as part of our charge instruction.  You need to be

1 prepared to argue it at that time including case law.

2 MS. SINGER:  Is the ruling now that because they

3 had a hard time in a deposition, we have to exclude

4 testimony?  Because I would like to argue on that and

5 I'm prepared to argue on it right now.

6 THE COURT:  There is no testimony that is

7 excluded.  There is no ruling in regard to excluding

8 testimony.

9 MS. SINGER:  I wasn't sure.  I see what you're

10 saying is, he has to present that now as a separate

11 motion.

12 THE COURT:  Yes.  In fact, what has been clearly

13 established is, if none of Mr. Tedder's questions were

14 specific enough to elicit this testimony at deposition,

15 your question to him specifically does appear that he

16 should have been specifically responsive and he was

17 not.  The witness was uncooperative and the

18 repercussions of that we can see as we go along.

19 But I'm not making any ruling as to what else

20 comes in, or what might be excluded, or what

21 instructions may be given.  I'm only making a finding

22 at this point that the question was asked at

23 deposition, which should have elicited this response,

24 had he been forthcoming and forthright in his

25 testimony.

1    MS. SINGER:  An appropriate remedy may be to allow

2    his deposition to be admitted into evidence for

3    impeachment purposes.

4    THE COURT:  You all can discuss that and I'll be

5    glad to hear argument on it.

6    All right.  We will be in recess until 8:50

7    tomorrow morning.  I do have a meeting that I'm going

8    to attend beginning at 8:30.  So if anything is gonna

9    come up overnight, you need to let me know so we can

10   start way before that.  And otherwise, I will see you

11   at 8:50.

12   MR. GROLAND:  Your Honor, we would agree to put

13   the deposition in, only if Mr. Tedder can read it.  I'm

14   just kidding.

15   MS. SINGER:  Only if Mr. Tedder can read it, and

16   you're joking or you're on the record?

17   MR. GROLAND:  Of course I'm joking.

18   MS. SINGER:  Okay.  Because we would let

19   Mr. Tedder read it.

20   THE COURT:  All right.  We're off the record and

21   we're in recess.

22                    * * * * *

23

24

25

Stacey K. Bryant, RPR
Judicial Court Reporter