# EXHIBIT

# R

21-4

*202-1-17814*
*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY }
               Appellant, }
                  }

                  }      CASE NUMBER   2000-2753-CFA
                  }

                  }      APPEAL NUMBER 1D02-4788
v.                 }

                  }      VOLUME XVIII
                  }

STATE OF FLORIDA }
               Appellee, }

*Dept ____ CH*
*05.14.2003*
*State Attorney Consol*

## TRANSCRIPT
## RECORD

### HONORABLE MARTHA ANN LOTT
#### ACTING TRIAL JUDGE

2003 MAY 12  PH 2:39 RECEIVED

ATTORNEY GENERAL'S OFFICE
CRIMINAL APPEALS
TALLAHASSEE

### APPEAL FROM THE CIRCUIT COURT
### 8th JUDICIAL CIRCUIT FOR
### ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

1962

*202-1-17814*

1   IN THE CIRCUIT COURT OF FLORIDA
    EIGHTH JUDICIAL CIRCUIT
2   IN AND FOR ALACHUA COUNTY

3   CASE NO: 01-2000-CF-2753-A

4   TRANSCRIPT ON APPEAL
    VOLUME XV
5   (Pages 1962 - 2088)

6   STATE OF FLORIDA

7   vs.                          *Volume XVIII*

8   BRIAN PATRICK HERLIHY,       *1002-4180*

9         Defendant.             *05-14-2003*

10   _____/

11   Proceedings:            Jury trial

12   Before:                 The Honorable Martha Ann Lott,
                             Circuit Judge
13
14   Date:                   September 20, 2002

15   Time:                   9:00 a.m.

16   Place:                  Courtroom 4-A
                             Alachua County Courthouse
17                           Gainesville, Florida

18   Reporter:               Stacey K. Bryant, RPR
                             Judicial Court Reporter
19

20   APPEARANCES:

        Jeanne Singer, Assistant State Attorney
21      Stephen Pennypacker, Assistant State Attorney
        120 W. University Avenue
22      Gainesville, Florida 32608
           Appearing on behalf of the State of Florida
23
        Gordon Groland, Esquire
24      John Tedder, Esquire
        Post Office Box 2848
25      Gainesville, Florida 32602
           Attorneys for defendant

Stacey K. Bryant, RPR
Judicial Court Reporter

1963

1    INDEX TO PROCEEDINGS

2    PRELIMINARY MOTIONS: ............................ 1966

3

4    STATE'S CASE:

5                          LARRY SEALE,

6    DIRECT EXAMINATION BY SINGER: .................... 1975
     CROSS-EXAMINATION BY GROLAND: ................... 2010
7    REDIRECT-EXAMINATION BY SINGER: ................. 2030

8

9    STATE RESTS: .................................... 2039

10   MOTION FOR JOA: ................................. 2040

11   RULING ON MOTION FOR JOA: ....................... 2057

12

13   DEFENSE CASE:

14

15                         JAMES JACKSON,

16   DIRECT EXAMINATION BY GROLAND: .................. 2060

17

18                         ROBERT KING,

19   DIRECT EXAMINATION BY GROLAND: .................. 2064
     CROSS-EXAMINATION BY SINGER: .................... 2076
20   REDIRECT-EXAMINATION BY GROLAND: ................ 2083

21

22                     INDEX TO EXHIBITS

23

24   STATE'S EXHIBIT NO. 77.....MARKED IN EVIDENCE..... 1999

25

Stacey K. Bryant, RPR
Judicial Court Reporter

1964

```
 1                    P R O C E E D I N G S

 2                         *  *  *  *  *

 3          (Outside the presence of the jury.)

 4          THE COURT:  Let the record reflect that as usual

 5     Mr. Pennypacker is the first attorney to be here.

 6          Mr. Groland, I'm sure you know where Mr. Tedder

 7     is.

 8          MR. GROLAND:  He's coming real quick.  I'm sure

 9     he's on the street.

10          Your Honor, even before he gets here could I just

11     talk again about some logistics?

12          THE COURT:  Yes, but let me put something on the

13     record first.  Before, I think it was before any of the

14     attorneys came in, but as one of the jurors was

15     checking in, I said to the bailiff:  Have you let

16     security know we need Mr. Herlihy up?  I need to put

17     that on the record, make sure everybody knows about it

18     in case there's some question, you want to make some

19     inquiry of that juror.

20          MR. GROLAND:  In other words, insofar as the juror

21     or the jury knowing that he's in custody?

22          THE COURT:  That could be a concern you may or may

23     not have.  He may or may not have heard me say that.

24          MR. GROLAND:  Do we know that the juror definitely

25     heard that?
```

1      THE COURT:  No.  The juror was checking in with

2  the clerk when I said that to the bailiff.

3      MR. GROLAND:  Could I respond to that after

4  conferring with Mr. Tedder?

5      THE COURT:  Certainly.  I just wanted to put it on

6  the record.

7      MS. SINGER:  I don't know if you have logistics

8  issues.

9      MR. GROLAND:  Yes.  Judge, I'm just, once again,

10  trying to -- I want to give the Court just some of my

11  perspective as to what's gonna happen today.  I think

12  the state is gonna call an additional witness, Officer

13  or Sergeant Seale, and then from what Ms. Singer told

14  me, I think they're gonna rest after that.

15      Then we've got a JOA argument that's not gonna be

16  just perfunctory.  We've got some argument and I would

17  expect some real response.  And so my anticipation is

18  that argument on both sides will take half an hour to

19  45 minutes, something like that.

20      I think Sergeant Seale, just from what I know what

21  he's gonna talk about, shouldn't be more than 45

22  minutes on both direct and cross.

23      Then we're gonna be ready for the defendant's

24  case.  The defendant does anticipate testifying, but

25  we've got three officers that we want to call in

1    rebuttal for some matters.  Each are gonna be short.  I
2    don't imagine 10 or 15 minutes on each one.  It's
3    Office King, Officer Jackson, and Lieutenant Halvosa.
4    The only thing, Lieutenant Halvosa, according to what I
5    was told this morning, is really not available until
6    1 o'clock.  We can take him at 1 o'clock.  We've got
7    some items to put in evidence on our side of the case
8    and I think that should take us to the lunch hour, and
9    then Halvosa who also is gonna be very short will be at
10   1 o'clock if the Court permits us to do that.  Then
11   Mr. Herlihy will be ready to testify.  And I anticipate
12   that my direct of Mr. Herlihy will be about an hour.  I
13   think we can assume that the cross will be an hour,
14   perhaps more.  And then I think we'll be ready for a
15   jury instruction conference as between the Court and
16   the attorneys and that should take us to later on in
17   the afternoon, but I don't think quite to 5 o'clock.
18   I'm thinking that will be around 3:30 or 4:00.
19        We do anticipate calling another witness that is
20   not available today, and what we were trying to do is
21   locate the local ophthalmologist, physician, and we are
22   going to be working on that today and over the weekend,
23   and I will promise the Court that I will notify the
24   Court as soon as I know, and notify the state as soon
25   as I know:  A, who that will be; B, what he's going to

1   be testifying to, and how long I think it will take.

2   The only areas that I anticipate we're gonna go into

3   with that ophthalmologist will be the areas that we

4   addressed yesterday in our motion for sanctions that

5   relates to two areas that Dr. Levine first told us

6   about during the trial.  So I can't anticipate that

7   that witness will be very long.  If we end up doing

8   that witness first thing Monday, then I think the case

9   by 10 o'clock on Monday should be ready to begin

10  closing arguments and go to the jury early afternoon.

11       THE COURT:  You're assuming the state would have

12  no rebuttal testimony; is that correct?

13       MR. GROLAND:  I am assuming the state will have no

14  rebuttal.  If they have rebuttal witnesses, then of

15  course my estimate is off to the extent that we'll

16  probably go into Tuesday.

17       MS. SINGER:  Your Honor, I know nothing about this

18  new witness that they're attempting to locate for the

19  weekend.  I'm sure that Mr. Groland is taking the

20  position that this is some sort of remedy for the

21  deposition that was taken of the doctor prior to the

22  trial.  Obviously, we would object to a new witness at

23  this time.  That is, indeed prejudicial to the state.

24  We don't know who this person is.  That is not the

25  proper remedy for whatever issues came out of that

1   deposition.  The proper remedy for that deposition may

2   have passed for the defense.  The Court in an abundance

3   of caution may allow the defense to offer up a section

4   of the deposition to show that he was impeached.  I

5   don't believe the predicate was laid, but at the very

6   most I think that that would be the only remedy

7   available to the defense right now as to Dr. Levine's

8   testimony.

9       We're going to lodge an objection at this time to

10  the addition of any witnesses, especially an expert

11  witness at this time.  I think that they've had more

12  than adequate opportunity to hire an ophthalmologist

13  dating all the way back to September 18th, 2000, when

14  they were provided with the charts, medical records,

15  and written police reports outlining Dr. Levine's

16  testimony.

17      As far as rebuttal is concerned, I cannot respond

18  to that because I don't know what's going to be offered

19  in the defense case, so I can't speak to how long

20  rebuttal would be.  I was hoping to be able to rest on

21  both sides today, to be honest with the Court, and

22  proceed with closing immediately on Monday morning.  Of

23  course, you know, I can't predict exactly what's going

24  to happen.

25      But before the Court allows an additional witness,

1    I would ask the Court an opportunity to prepare an

2    argument in opposition to that, because I don't believe

3    it's an appropriate remedy.  The appropriate remedy

4    would have been at the time of the deposition, if the

5    deposition was such that Mr. Tedder believed he did not

6    get the information he needed for his defense at the

7    time.  He would always have the opportunity to come to

8    the court and require the witness to be deposed and

9    ordered to answer questions, number one.  Number two,

10   hiring an expert ophthalmologist to contest

11   Dr. Levine's opinions could have been done well before

12   his deposition was taken in August of 2002.  And at the

13   very least, even though I don't believe the predicate

14   was laid for impeachment, if the Court believes that

15   that remedy is appropriate, he can read the question

16   and answer to the jury as extensive proof of

17   impeachment.  I'm not stipulating that that's the case,

18   but that's the only remedy that I see that's even close

19   to fitting the situation in this case.

20       MR. GROLAND:  Your Honor, just very briefly.  As

21   the Court recalls, I don't remember the exact

22   terminology, but Ms. Singer at the deposition asked

23   Dr. Levine in essence, I'm paraphrasing:  Tell us what

24   you know about this case.  What have we got here?  He

25   specifically did not tell Ms. Singer or Mr. Tedder

1   about the crack that he now claims is absolutely

2   consistent with violent shaking, a crack in the

3   eyeball, or the other item involving the white spots

4   which are a form of retinopathy that is also indicative

5   or consistent with violent shaking.  Had he responded

6   to Ms. Singer's question, we would have known about

7   that and could have prepared accordingly.  We would

8   have either consulted with another person that could

9   have said, yes, he's right about that, you're just

10  gonna have to live with it; or, no, he's wrong.  What

11  he's looking at in the photo is really a vein.  It is

12  not a crack.  So that's where we are.

13       I don't know that we're going to, in fact, have an

14  ophthalmologist that we're gonna put on Monday, but I'm

15  just alerting the Court that that may happen.  I'm not

16  saying, Judge, we need another week to search around

17  the country for the right guy.  I'm telling the Court

18  that all I want is to get this trial done.  And I'm

19  asking for leave of court to, at least, have my people

20  work on it today and continue to work on it over the

21  weekend and as soon as we have an answer as to if we're

22  gonna call somebody, and if so, who, I will let the

23  state know about that and we will let the Court know

24  about it.

25       THE COURT:  All right.  Now, this is kind of a

1    convoluted ruling, but you need all this information so

2    that you know what you may do next.  First of all, the

3    ruling yesterday was there was no discovery violation

4    and that the defense had clearly established that the

5    witness was uncooperative.  The fact that Ms. Singer

6    asked the question and, in fact, he also did not answer

7    her question is simply additional indication that the

8    witness was uncooperative.  That did not preclude the

9    defense from taking any number of steps to remedy that

10   situation way before trial.  And I'm not finding -- and

11   I do -- I'm not finding that there has been any

12   prejudice to the defense created by the state, and I'm

13   specifically finding that there was no such prejudice.

14        On the other hand, in an abundance of caution to

15   protect Mr. Herlihy's rights, and to protect the state

16   from having to potentially retry this case in the event

17   of error, I will consider, if you find an expert,

18   allowing you to reopen your case when I have some basis

19   to make a ruling on that.  But the, you know, the

20   search that has to take place in the interim is not

21   something I can rule on in advance.

22        In addition, I am prepared to rule today, and as I

23   often do, this is a tentative ruling subject to

24   re-argument by the state and hearing from the defense,

25   if you feel like this would be something you would want

Stacey K. Bryant, RPR
Judicial Court Reporter

1   to pursue, I am prepared to let you present the entire

2   deposition to be read into the record by Mr. Tedder as

3   was suggested yesterday, but I mean literally read the

4.  questions and answers into the record for the benefit

5   of the jury, so that they will have the information

6   that this witness was, in fact, uncooperative, because

7   that is also a fact in this case.

8        MR. GROLAND:  It's not a matter if we have one

9   choice or the other.  In other words, the Court is

10  saying we can do that as well as continue to look for a

11  doctor who will address those issues that he raised at

12  trial?

13       THE COURT:  I am saying you may do that.  Now, I'm

14  not saying that you can then introduce another expert,

15  because anticipating an argument by the state they may

16  argue -- and I will be listening to both sides as to

17  whether or not that remedy was sufficient and whether

18  or not you ought to be entitled to then call another

19  expert.  But as you are saying, since you don't even

20  know if you can find one, and of course, you have no

21  way of knowing what that witness may say, it would be

22  way premature for me to guess how those factors might

23  balance out.

24       MR. GROLAND:  May I just have a moment with

25  Mr. Tedder?

 1          THE COURT:  Yes.

 2          MR. GROLAND:  Okay.  We're fine.

 3          THE COURT:  All right.  Anything else we need to

 4     put on the record before the jury comes in this

 5     morning?

 6          MS. SINGER:  No.

 7          MR. GROLAND:  I would just ask the Court, with my

 8     advising the Court as to what I perceive the logistics

 9     are, we're not prepared today to do closing argument.

10     I just wanted --

11          THE COURT:  I have not heard anything up to this

12     point that would lead me to the conclusion that I need

13     to forewarn you to be prepared to do your closing

14     argument this afternoon.

15          MR. GROLAND:  Okay.

16          THE COURT:  I do not anticipate that happening and

17     if everybody finishes at 10:30 this morning, that's

18     gonna change.  So if your estimates are accurate, then

19     I would anticipate closing argument beginning first

20     thing Monday morning.

21          I do anticipate that if there is any, that any

22     defense evidence is gonna come in today and any

23     rebuttal for the state is gonna come in today, and that

24     the evidence will be concluded today.

25          MR. GROLAND:  Except for what we just talked

                    Stacey K. Bryant, RPR
                    Judicial Court Reporter

1974

1     about?

2           THE COURT:  Except the potential argument and

3     ruling on whether or not the defense might be allowed

4     to reopen their case on one witness.  That's wild

5     speculation at this point.

6           MR. GROLAND:  Yes, ma'am.

7           THE COURT:  But I will certainly hear an argument

8     if you have one, if you have one to make.

9           MR. GROLAND:  Yes, ma'am.

10          THE COURT:  Anything else?  Okay.

11          Go ahead and bring the jury in, please.

12          (Before the jury:)

13          THE COURT:  Good morning, ladies and gentlemen.

14    As I have asked you everyday let me make sure that you

15    have the opportunity to let me know if anybody has

16    contacted you, if you've seen any reports, read any

17    newspapers, or in any other way gotten any information

18    regarding this case.  Anybody need to let me know

19    anything?  Okay.  Good enough.

20          Ms. Singer, go ahead and call your next witness.

21          MS. SINGER:  Yes.  The state would call Sergeant

22    Larry Seale.

23                      LARRY VINCENT SEALE,

24    having been produced and first duly sworn, testified as

25    follows:

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1              MS. SINGER:  May I proceed, your Honor?

 2              THE COURT:  Yes, go ahead.

 3                      DIRECT EXAMINATION

 4   BY MS. SINGER:

 5       Q    Sergeant Seale, if you'll state your full name and

 6   occupation for the record?

 7       A    Larry Vincent Seale, police officer, Gainesville

 8   Police Department.

 9       Q    How long have you been employed with the

10   Gainesville Police Department?

11       A    Twenty years as of about four days ago.

12       Q    What position do you hold at the Gainesville

13   Police Department?

14       A    I'm a sergeant assigned to the detective bureau.

15       Q    And as such, can you give an outline to the Court

16   and to the jury what your duties are?

17       A    My main responsibility is to supervise seven

18   employees that are in the detective division.  There are two

19   squads that actually work in our division and I have seven

20   of those employees; another sergeant has eight.  My job is

21   to supervise them in the course of investigations and

22   obviously conduct performance appraisals and pretty much

23   oversee any type of investigation that's assigned to our

24   squad.

25       Q    Is that particular squad assigned to investigate a
```

1976

1     type of crime?

2          A    Yes, ma'am.

3          Q    What type of crime or crimes does this squad

4     specialize in?

5          A    Currently I'm assigned to the death investigation

6     cases, robbery cases, any type of felony type person's

7     cases, which would include aggravated battery, aggravated

8     assault, and some other cases that may be of political

9     interest.

10         Q    Now, when you say person's cases, for the jury can

11    you differentiate what you mean if you say a person's case

12    versus a property case?

13         A    We have two additional squads that are assigned in

14    property crimes who handle predominantly burglary residences

15    or burglary business.  Our squads do not handle those.

16              The only other thing that my squad will handle

17    would be stolen vehicle cases.

18         Q    Now, you're gonna think these are crazy questions,

19    but I'm going to ask them.  How tall are you?

20         A    How tall?

21         Q    Yes, sir.

22         A    6'1".

23         Q    And how much do you weigh?

24         A    Two --

25         Q    You're under oath, sir.

Stacey K. Bryant, RPR
Judicial Court Reporter

1    A    224, according to the scale at the police

2  department gym.

3    Q    Okay.  Taking you back to August of the year 2000,

4  were you the same height and approximately the same weight?

5    A    I was the same height, but probably maybe ten

6  pounds maybe, less, maybe.  I'm not sure.

7    Q    Okay.  But around the same, approximately the

8  same?

9    A    Yes, ma'am.

10   Q    When you indicated that you supervised folks, your

11  squad people with the department who handle the

12  investigation of homicides, could you outline for the jury

13  how a squad would be assigned to investigate a homicide

14  case, and how tasks are given, and how communication is had

15  between squad members when an investigation such as that

16  takes place at the Gainesville Police Department?

17   A    Okay.  Well, initially we respond to the scene and

18  upon responding to the scene we try to make a determination

19  of initially what occurred.  Most of the time we get that

20  information from the original officers that are on scene.

21  They give us the best information that they have at the

22  time.

23   Q    When you say original officers, tell the jury what

24  they look like.

25   A    Okay.  They are regular patrol officers who are in

1  uniform that respond to the scene.  Sometimes by the time we

2  get there, they have already had the opportunity to talk to

3  individuals at the scene and relay information that they've

4  received initially at the scene.

5      Q    And then once that occurs what happens next?

6      A    Well, at that point hopefully the crime scene has

7  been actually sealed off, so we don't lose any forensic type

8  evidence that's there.  And once that's completed, we will

9  call in our forensic team to come in and basically start

10 processing the scene.

11     Q    Now, in a case such as this, if I were to tell you

12 that Tina Millard was involved in this particular case

13 regarding Robbie Quirello, would that be your forensic

14 investigator assigned?

15     A    Yes, ma'am.

16     Q    All right.  Go ahead, sir.

17     A    And at that point we would hope that obviously

18 that they begin processing, generally from the outside in.

19 There is, from our aspect, no hurry to process a crime

20 scene.  The best evidence most of the time that we get is

21 from within the scene.  We'll get the circumstances of what

22 occurred.

23     Q    How do you do that, sir?

24     A    How do we do that?

25     Q    How do you get information regarding the

1979

1   circumstances?

2       A    Again, generally from the original officers.  In a

3   lot of homicide cases we have family members that know

4   something, we have one recently we're working that basically

5   the family has provided us sufficient information putting us

6   on a path that we need to pursue.

7       Q    How many of your squad members would be involved

8   in a homicide investigation?

9       A    Well, we just don't limit it to my specific squad.

10  A murder investigation, we utilize everyone assigned to the

11  bureau, which would include the other squad, and include the

12  other property detectives as well.

13      Q    And would each of those squad members, along with

14  anyone else that you needed, be given certain tasks to

15  complete?

16      A    Yes, ma'am.

17      Q    And, for instance, can you give an example of what

18  kinds of tasks squad members would be given in a particular

19  case?

20      A    Well, we obviously want to conduct a neighborhood

21  canvass and in that neighborhood canvass what we do is we go

22  from door to door and we talk to people to see if we can

23  establish a time frame essentially on when someone saw the

24  person next door, who else they've seen at the residence.

25  We generally cover anywhere from three to four blocks on a

1    neighborhood canvass, if it warrants a neighborhood canvass.

2        Q    Now, in a case such as the one involving Robbie

3    Quirello, where the call had come in at about 12:15 that the

4    injuries were suspicious, could you tell the jury why it was

5    that a group of squad members met at Shands Teaching

6    Hospital?

7        A    Well, from my recollection of that specific

8    incident --

9        Q    Yes.

10       A    -- and that was that we wanted to be able to

11   establish that we actually had a crime.  We have to

12   establish that there is a crime that we can actually pursue.

13   There could be cases where things may appear to be criminal,

14   which may not be criminal.  And we have to, again, devote

15   our attention to the information that we have at hand to

16   make a determination on what we're going to do next.

17   Because if we miss that opportunity, we can never go back

18   and get that opportunity.

19       Q    Were you at a meeting of law enforcement officers

20   that took place in the emergency room conference room at

21   approximately 12:15 to 12:30 on August 2nd, the year 2000?

22       A    Yes, ma'am.

23       Q    And what was the purpose of that meeting?

24       A    The purpose of that meeting was to gain

25   information from the doctors who had seen Robbie to try to

1    make a determination on what their opinion was of why the

2    child was in the condition the child was in.

3        Q    Once that information was provided to you and

4    other members of the Gainesville Police Department, what

5    tasks, if any, were assigned, if you can recall?

6        A    If I can backtrack a second for the jury?

7        Q    Yes.

8        A    I was newly assigned to the detective division as

9    a sergeant.  Another sergeant, Sergeant Halvosa, he handled

10   the type of crimes that now I handle, but he has since been

11   promoted out of our bureau.  So he made the initial call in

12   terms of assignments on who did what next.

13       Q    Okay.

14       A    And then I was pretty much there as an observer

15   watching the process.

16       Q    And did you also get an assignment?

17       A    Yes, ma'am.

18       Q    What was your assignment?

19       A    My assignment was to go up and speak to the father

20   of the child.

21       Q    Would that have been John Quirello?

22       A    Yes, ma'am.

23       Q    The natural father of the child?

24       A    Yes, ma'am.

25       Q    And did you do that?

1    A    Yes, ma'am.

2    Q    Did you later report what you found to Helen

3    Legall, the investigator who was later identified as the

4    primary investigator in this case?

5    A    Yes, ma'am.

6    Q    Did you also do a written report for Investigator

7    Legall, so she could refer to it later if she needed?

8    A    Yes, ma'am.

9    Q    Do you know whether or not other investigators

10   that were in that meeting were given tasks similar to you?

11   A    At that point we were limited in terms of the

12   personnel we had at the scene, but, yes, those individuals

13   were assigned tasks to complete.

14   Q    Would it be normal routine procedures for the

15   Gainesville Police Department detective division for those

16   investigators as well to provide both oral information to

17   the primary investigator Helen Legall, as well as following

18   up with a written report?  Would that be normal procedure in

19   a case like this?

20   A    Normally, depending on the information that they

21   get, we do, typically we do on some homicide investigations

22   lead sheets.  Sometimes those lead sheets may turn into

23   nothing.  Sometimes, depending on what it is, the officer

24   may or may not be looking for it.

25   Q    In other interviews, for instance, if someone was

1   assigned, someone such as Alan Coleman was assigned to

2   interview Crystal Quirello, he would have followed the same

3   procedure you followed?

4       A    Yes, ma'am.

5       Q    Who else, do you remember who else happened to be

6   in that meeting besides yourself and Halvosa, the other

7   sergeant involved in this case?

8       A    I believe David Cannon, Detective David Cannon was

9   there and I vaguely remember another patrol officer being in

10  there, but I don't remember who that was.

11      Q    You were first given the task to talk to John

12  Quirello.  Did there come a time at approximately 5:40 p.m.

13  on August the 2nd when you actually came in contact with the

14  defendant in this case, that would be Brian Herlihy?

15      A    Yes, ma'am.

16      Q    Do you see that person here today and would you

17  please identify him for us?

18      A    That is the individual standing up in the

19  courtroom.

20           MS. SINGER:  Your Honor, may the record reflect

21      this witness has identified the defendant?

22           THE COURT:  It will so reflect.

23  BY MS. SINGER:

24      Q    Briefly Sergeant Seale, if you could tell the jury

25  how you came about to have personal contact with

1    Mr. Herlihy?

2         A    Well, again, my main assignment when I got back to

3    the station was obviously again to see, work the process of

4    where my squad was doing the work they were doing.   I

5    remember watching part of this interview.   In our police

6    department upstairs we have two cameras that are in each

7    room of the interview room.   We have monitors in our bureau

8    so we can watch those monitors during an interview.   We do

9    that for several reasons.   One, which of course is, if

10   anything occurs in that room where a suspect becomes

11   violent, or a person becomes violent, we have someone that

12   is watching it, and again, the more eyes watching an

13   interview generally is better.

14        Q    So you were, in fact, watching a bit of the

15   interview?

16        A    Yes, ma'am.

17        Q    Did you watch the entire interview?

18        A    No.

19        Q    All right.   Was there -- Do you know whether or

20   not that particular interview was videotaped?

21        A    At the time I think later I learned that it was

22   not.   But at the time I did not know if it was or not.

23        Q    All right.   What about the interview did you --

24   that drew your attention to Mr. Herlihy?

25        A    Well, part of the interview process when he was

1  explaining how he found Robbie and what he did with Robbie

2  and when he demonstrated what he did --

3          MR. GROLAND:  Your Honor, I would like to approach

4      the bench with the state just as a cautionary matter.

5          THE COURT:  Good enough.  It doesn't need to be on

6      the record at this time.

7          MR. GROLAND:  Yes, ma'am.

8          THE COURT:  You think it does?

9          MS. SINGER:  Yeah, I think it needs to be on the

10     record.  I think it needs to be on the record.

11         MR. GROLAND:  All right.

12         (Sidebar conference:)

13         MR. GROLAND:  I heard the word "demonstrate" and

14     I'm just, my impression is you can't unring the bell.

15     I just want to make sure that Ms. Singer has admonished

16     the witness not to use his hands in describing.

17         MS. SINGER:  I did.  Now, I will tell him again if

18     he raises his hands, but I don't think he will.  And I

19     can even ask my question in a way that will remind him.

20         MR. GROLAND:  Sure.

21         THE COURT:  Good enough.

22         (Sidebar conference concluded.)

23         THE COURT:  Give the court reporter a minute,

24     please.

25  BY MS. SINGER:

1    Q    Sergeant Seale, we're going to go to a part of the

2    testimony where you may feel some obligation to show us with

3    your hands what you saw, as opposed to tell us in words.

4    I'm going to ask you to please not show us, but tell us in

5    words what you saw.

6         You had indicated before we were interrupted that

7    you were watching a video, watching the monitor, and you had

8    heard the defendant explaining and demonstrating what he had

9    done; is that correct?

10    A    Yes, ma'am.

11    Q    Just to get us back where we were at.

12    A    Yes, ma'am.

13    Q    Specifically, do you remember what you heard or

14    what caused you to pay attention to the monitor at that

15    time?

16    A    I remember.

17    Q    All right.  What was that?

18    A    He made the statement that:  I removed Robbie, and

19    he was describing where he removed Robbie from.  He said:  I

20    removed Robbie, and shook.  And in the process of doing that

21    he had raised his hands to about chest height and did a

22    shaking motion.  And then he said:  I mean I blew in his

23    face.  And most of the time in interview schools and that,

24    obviously one of the techniques that, you know, is that when

25    you're watching an interview, people do things to simulate

1   what actually occurred.   They just don't know that they're

2   doing it.

3          Q    Okay.

4          MR. GROLAND:   Your Honor, I would object to that

5          and move to strike.   That is 100 percent speculation on

6          his part that he is attributing to what he supposedly

7          saw.

8          THE COURT:   The objection is noted.   Overruled.

9          Go ahead.

10  BY MS. SINGER:

11         Q    Once you had heard, or actually you had seen that,

12  correct?   I know you've given us the verbal description, but

13  you actually heard the words and saw the actions at the same

14  time, correct?

15         A    Yes, ma'am.

16         Q    Once you heard and saw those things at the same

17  time, what did you do?

18         A    Well, once Detective Coleman and Detective Legall

19  finished their interview, there was some discussion with

20  their Sergeant, Halvosa.   At one point, I was --

21         Q    You can't say what was said.

22         A    No, ma'am.

23         Q    All right.

24         A    That I wanted to go back into the room and discuss

25  that issue with Mr. Herlihy.

```
 1        Q     And did you do that, sir?

 2        A     Yes, ma'am.

 3        Q     What specifically did you ask him about that

 4   particular part of his interview with Investigator Legall

 5   and Coleman?

 6        A     Well, I wanted to get a clarification actually on

 7   what had actually occurred from him.  His description of the

 8   incident during the interview -- and I'm not a father, so it

 9   kind of surprised me that --

10            MR. GROLAND:  Objection, your Honor, move to

11        strike.

12            THE COURT:  The objection is sustained.

13            MS. SINGER:  All right.

14   BY MS. SINGER:

15        Q     You can't tell us what you were thinking, just

16   tell us what you did in response to that.

17        A     All right.  I went in and interviewed him.

18        Q     All right.

19        A     And asked him about what he did, the actions that

20   he conducted, and what I saw with his demonstration of his

21   hands, and I asked him to explain that to me.

22        Q     And what did he say in response?

23        A     And I asked him to describe that.  I said -- and

24   my statement to him was that I'm not a father, that if I

25   came into a room and I saw my child with his feet sticking
```

1  up from the corner of the bed, that I would pull my child

2  out of the bed.  And I would probably myself, shake my

3  child, to see if my child was okay.  I mean to me that just

4  seemed normal.

5      Q    All right.

6      A    And for him to be so cautious about his

7  description of that incident that I -- and again I know I

8  can't raise my hands, but the way he was doing it is just

9  gently blowing against this child that he was saying was

10 unconscious, just again, I could not conceive that.

11     Q    All right.  Did you tell him that?

12     A    Yes.

13     Q    What did he say in response to that?

14     A    And I asked him, I said:  Is it possible that you

15 shook him a little bit?  And I described just what I said to

16 him about I'm not a father.  I think this would be

17 reasonable to do under the circumstances.  And I said:  You

18 know, is it possible that you shook him?

19          And he said:  Yes, it's possible.

20          And I said:  Do you think you shook him hard

21 enough to cause an injury?

22          And he says that it was possible.

23     Q    Did he then invite -- Well, what did he say then?

24     A    He was certainly accommodating, and he said, he

25 asked us if we wanted to go back to the apartment and he

1990

```
 1   would show us what happened.

 2        Q    And did you do that?

 3        A    Yes, ma'am.

 4        Q    Did you go back to the apartment with him?

 5        A    Yes, ma'am.

 6        Q    Who else was present during that time that you all

 7   went back to the apartment?

 8        A    Investigator Millard, the forensic person that was

 9   there initially, Detective Legall and Sergeant Halvosa and

10   there was another intern, I can't remember her name right

11   off the bat.  She may or may not have been there.  I'm not

12   sure.  But I know that Sergeant Halvosa, and Detective

13   Legall, and myself, and Investigator Millard was there.

14        Q    And when you got to the house, what was

15   Investigator Millard's purpose in going to the scene with

16   you?

17        A    To video this incident.

18        Q    Did you later come to find out the videotape

19   machine was not working.

20        A    Unfortunately, yes, ma'am.

21        Q    All right.  Did there come a time when

22   Mr. Herlihy, the defendant in this case, demonstrated to you

23   what had occurred with the baby?

24        A    Yes, ma'am.

25        Q    And do you know whether or not that was
```

1    tape-recorded also by Helen Legall, the investigator in this

2    case?

3         A    Yes, and we do have a copy of that.

4         Q    All right.  Did there come a time on that

5    particular tape recording when you began asking questions of

6    Mr. Herlihy?

7         A    Yes, ma'am.

8              MS. SINGER:  At this time, your Honor, I would

9         like to play that particular section so I can ask

10        questions regarding that particular section.  It's

11        already been entered into evidence as State's 72.  It's

12        a very brief portion.

13             THE COURT:  All right.

14             MR. GROLAND:  I'm sorry.  I didn't hear that.

15             MS. SINGER:  At this time I'm going to be playing

16        the section that Investigator Seale specifically asked

17        questions of Mr. Herlihy.

18             MR. GROLAND:  Excuse me.  My objection is asked

19        and answered.  It has already been played through the

20        testimony of another witness.  The jury has heard it.

21        My objection is the same objection that I had when we

22        were talking about certain transcripts in this case.

23        It's already been played, the jury's heard it.

24             THE COURT:  The objection is noted.  It is

25        overruled.  You may play a small section relevant to

1    this testimony.

2         MS. SINGER:  Thank you.

3         (Tape played:)

4         "HALVOSA:  Sergeant Seale, do you have any

5    questions?

6         SEALE:  I just noticed that when you were pushing

7    that down, it looked like it took a little force to do

8    that.

9         HERLIHY:  Well, I looked and I thought that maybe

10   it was this one, but you'll see if you look at the two

11   of them, one's a heck of a lot thicker than the other

12   one.  All I know, it was that one.

13        LEGALL:  Because it's thinner than that one?

14        HERLIHY:  Yeah.

15        LEGALL:  Okay.

16        HERLIHY:  It's easier to -- I know he can get in

17   there, this one he can't get in there.

18        SEALE:  What's this bed made out of?

19        HALVOSA:  Almost looks plastic.

20        HERLIHY:  Metal, I guess.  Cheap metal, I guess.

21   I don't know, it was just dragged in the room by the

22   moving guys one day, and I saw sparks fly so...

23        SEALE:  Have you ever seen the baby roll over?

24   Can the baby roll over?

25        HERLIHY:  Yeah.  Oh, he rolls over.  In fact,

1    yesterday, he had been laid one way, and we had gone

2    downstairs, and she said:  Honey, you gotta see this,

3    and he rolled.  He did a couple of 180s, but there was

4    a time that we had spoke about before where he had

5    actually, was laid here and dipped right in.  He might

6    have been closer to the edge than that, he went right

7    to the bottom.  I mean, I went to go grab him and his

8    head was about here.  And this time his face was facing

9    towards the mattress, it wasn't facing away, and he was

10   still basically asleep.  And you know, we had

11   discussed:  Do you want to take him to the hospital?

12   And she goes:  If he makes a big fuss, but he didn't

13   make a big fuss.

14        SEALE:  I guess I'm trying to visualize with that

15   doll there, with him laying here, I mean can he crawl?

16   Again, I'm not a parent, so --

17        HERLIHY:  No.

18        HALVOSA:  I'm not sure at this age what the stage

19   would be.

20        HERLIHY:  Not that I know of, I don't think he can

21   crawl.  I do know that he can move quite a bit because

22   there are times when we'll come in and he'll be laid on

23   his face, on his stomach at one point, and then roll

24   back over, and that's usually when he wakes up and he

25   fusses and because he doesn't like to be left alone.

1994

1    And I'm okay.  He's awake.

2         HALVOSA:  So he can roll from his stomach to his

3    back?

4         HERLIHY:  All the time.

5         HALVOSA:  Can he roll from his stomach to his

6    back?

7         HERLIHY:  Yeah, he's done that, too.  He's done

8    that here several times.

9         SEALE:  So from here --

10        HERLIHY:  'Cause he'll roll this way, and I've

11   even in the past, I've done -- I did this yesterday.  I

12   put a pillow kind of like this to prevent the roll, but

13   he always goes that way anyway.

14        SEALE:  Well, that's what I was looking at.  When

15   he left being out of there, you know, the pillow looks

16   kind of canted that way, where obviously it would be

17   easy to roll that way and I'm sure that's why you do it

18   for that reason.  But, what I'm trying to figure out

19   even with the weight, and I'm putting some pretty

20   decent pressure here.  Now, somehow, you know, I'm

21   trying to figure that out, you know, myself.

22        HERLIHY:  I understand.

23        SEALE:  I could, even in my mind I could

24   rationalize if the baby could crawl up here and go down

25   there --

1    HERLIHY:  Right.

2    SEALE:  That seems logical, but with the pillow up

3  where you had it.

4    HERLIHY:  And like I'm telling you, I mean, it

5  happened hours ago.  I could have misaligned.  I'm just

6  telling you I know that I put the pillow in there.

7    SEALE:  Right.

8    HERLIHY:  I probably could have put the damn thing

9  in vertical, not thinking, and that's -- I can't

10  remember now, I really can't.

11    SEALE:  But you're certain the pillow was there?

12    HERLIHY:  Yeah.

13    HALVOSA:  And did you give him a bottle at the

14  time, or?

15    HERLIHY:  He had a bottle, um, 10 minutes before

16  that.  He didn't have a bottle with him at the time,

17  no.  Because, in fact, when we had gone -- to backtrack

18  some -- we had gone, Crystal was leaving.  She left him

19  facing this way, he was left, kind of where the diaper

20  pad is, in the general vicinity, and I walked her

21  downstairs to go get whatever, and I came back

22  upstairs, and I could not remember -- he had burped,

23  and he had spit up a little bit, but it was just his

24  usual, and I went to go burp him and nothing really

25  came out. I laid him back down and he hadn't had a

1  whole lot, so I give him a little bit more.  And I came
2  back up and I didn't get a real big burp.

3       So then when I put him down, I was, like:  Are you
4  okay?  And he was just, heh, heh, and I went: Oh, happy
5  baby.  Okay, everything's fine.  Okay.  And can run and
6  get a shower real quick, and the bottle was sitting
7  actually where you're standing right now, Detective.

8       HALVOSA:  This bed wasn't slid anymore forward,
9  'cause this mattress is, that's as far as it will go.
10  It won't even go.  That's done.  That's as far forward
11  as it can go.

12       HERLIHY:  Like I said, when it comes to this
13  thing, I don't know.  I mean, sometimes we'll jam it in
14  horizontally, sometimes we'll jam it in vertically.

15       SEALE:  Well, I mean, clearly if this was in
16  vertically, it would, I guess from my perspective, be
17  even harder to push down because there's more to push
18  down than it would be if it was turned sideways.

19       HERLIHY:  It's become such a ritual with him, it's
20  just like we don't even think about it.  We just do it
21  and actually, I started it, because after that one
22  little hipping incident, I went, Oh, wait a minute,
23  let's put this in here.

24       SEALE:  So you're saying the baby cannot crawl.
25  That the baby...

1    HERLIHY:  I've never seen him crawl.

2    SEALE:  But the baby can, from his back, turn

3    over?

4    HERLIHY:  Yes, he can turn over.

5    SEALE:  And from the front, the baby can turn

6    over?"

7    MS. SINGER:  One second.  I think we should play

8    this.

9    HERLIHY:  And for some godforsaken reason, he can

10   go from this angle. I would like to see it, to this

11   angle.

12   SEALE:  Right.

13   HERLIHY:  I would like to see how he does that and

14   he does it fast.  Because like I said, Crystal told me

15   yesterday when he did a complete 180, I said:  How

16   fast?  He's four months old.  He's, that's way too

17   fast.  I came in and he was laid one way and sure

18   enough he was another.  And, okay, it's crib time.  We

19   got to buy a crib.  We got to do something, we've got

20   to put him in a play pen.

21   LEGALL:  We're concluding our reenactment at 1914

22   hours."

23 BY MS. SINGER:

24   Q    Sergeant Seale, was this, in fact, your voice

25 asking questions of Mr. Herlihy at the time you were at his

1    residence that evening on August the 2nd?

2         A    Yes, ma'am.

3         Q    Who was the other male voice on that tape?

4         A    That was Sergeant Halvosa.

5         Q    I'm going to ask you to step down a moment and I'm

6    gonna put up some photographs so you can explain to the jury

7    what you were seeing as you were asking the questions.

8              MS. SINGER:  If we can have one moment to set that

9         up, your Honor?

10             (Pause in the proceedings.)

11   BY MS. SINGER:

12        Q    Sergeant Seale, while we're setting that up, did

13   you actually attempt to put the doll into the crevice

14   yourself at the time you were asking questions of

15   Mr. Herlihy?

16        A    Yes, ma'am.

17        Q    And let me show you what's been marked as State's

18   Exhibit M for identification, ask you if you recognize this

19   particular item?

20        A    Yes, ma'am.

21        Q    Is this the doll that you used while you were

22   attempting to do what Mr. Herlihy said happened at the house

23   on August the 2nd of the year 2000?

24        A    It appears to be one and the same.

25        Q    And is it in the same or similar condition?

Stacey K. Bryant, RPR
Judicial Court Reporter

1999

```
 1      A    Yes, ma'am.

 2           MS. SINGER:  All right.  Your Honor, at this time

 3      I would like to move M into evidence as the

 4      next-numbered exhibit.

 5           THE COURT:  Any objection?

 6           MR. GROLAND:  No objection.

 7           THE COURT:  It will be admitted as the

 8      next-numbered exhibit in evidence, which is State's

 9      number?

10           THE CLERK:  77, your Honor.

11           THE COURT:  77.  Thank you.

12           (State's Exhibit No. 77 was received in evidence.)

13           MS. SINGER:  I'm gonna wait a moment.  We're gonna

14      put some pictures up.

15 BY MS. SINGER:

16      Q    Before you attempted to use the doll to see

17 whether you could fit the doll into the crevice, did you in

18 any way make Mr. Herlihy move the pillows in any certain

19 fashion?  Did you allow him the freedom to move the pillows

20 in any way he wished to set it up as it was, as he recalled

21 it?

22      A    He was allowed to.  We asked him to set everything

23 up the way he recalled it being there.

24      Q    Did you force him in any way to make a particular

25 kind of setup on that bed?
```

1        A     No.

2        Q     Did you threaten him or in any way promise him

3    anything in exchange for him setting up the bed in a

4    particular fashion?

5        A     No.

6        Q     Tell the jury how you asked Mr. Herlihy to show

7    you what happened.

8        A     I think Detective Legall had made that request of

9    him.  I did not ask him specifically.  But again, it was,

10   you know, we're gonna do a reenactment.  Can you put

11   everything back the way it was as best you remember?

12       Q     And did he do that?

13       A     Yes, ma'am.

14       Q     All right.

15             I'm going to just show you for identification

16   purposes, 24-A.  Oh, we'll need to put the lights down just

17   a bit, Mr. Bailiff, just so that we know we're talking about

18   the same place.  On 24-A, is this the apartment here that

19   you went to?

20       A     Yes, ma'am.

21       Q     I'm showing you now 24-D and we might want to use

22   the laser pointer here, Mr. Pennypacker.  I don't know if

23   you prefer to go up to the picture and show us or if you

24   would like to use the laser pointer; either way is fine with

25   us, but --

 1    A    Well, I don't know if they'll be able to see.  I
 2   don't know if I'll block their view.
 3        Q    All right.  Come on this side then.  And, if you
 4   would, please, using the laser pointer, looking at that
 5   particular item that's in this particular photograph; is
 6   that the bed?
 7             MR. GROLAND:  Sergeant -- I'm sorry, Jeanne.  I'm
 8        sorry to interrupt.  Can you move so we can see?
 9        That's fine.
10             MS. SINGER:  You need to speak loudly, Sergeant
11        Seale.  I know the court reporter has to hear you as
12        well as the jury.
13   BY MS. SINGER:
14        Q    Looking at this particular photograph, is this the
15   bed as you saw it back on August the 2nd, year 2000?
16        A    Yes, ma'am.
17        Q    If you would, please, show the jury where
18   Mr. Herlihy indicated he had rested the baby or laid the
19   baby down.
20        A    He indicated that the baby was on the pillow, the
21   white pillow.
22        Q    And how was the baby's head and feet located?
23        A    The head was towards the window and the feet were
24   sticking out this way.
25        Q    Did you allow him to move that pillow any way he

1  wished before you required him or asked him to show you what

2  happened?

3      A    Yes, ma'am.  He was allowed to set it up exactly

4  how it was.  Again, we wanted his demonstration of what

5  occurred as he had previously told us in the interview room.

6      Q    Did he basically acknowledge that this is the way

7  the pillows were set up?

8      A    Yes, ma'am.

9      Q    All right.  Tell us now from there, if you can

10 using this photograph, and I may have a better photograph

11 for you if you need it.  I'll show you E, for now.  You can

12 tell me whether you prefer E over B.  Does this help you?

13     A    Either one is fine.

14     Q    If you can take a look at this photograph.  If you

15 can go ahead and explain to the jury what you saw and what

16 you inquired about, regarding Mr. Herlihy's laying the baby

17 and what the baby did.

18     A    He had made a statement, obviously again, that's

19 on tape, he put the sham, this sham, in the bed to keep the

20 child from rolling into the portion of the bed which is the

21 end of the mattress and this metal frame.

22          And he had already indicated, again, this is on

23 tape, that the child has previously done this in the past.

24 So he had set this up, rolled this in, and the white pillow

25 was laying there, and he demonstrated by putting the baby

1    here.

2         Q    That would have been the doll?

3         A    The doll, yes, ma'am.

4         Q    The same doll we've identified?

5         A    Yes, ma'am.

6         Q    All right.  Did he then show you how the doll

7    would have gotten from there to the edge of the bed?

8         A    Well, he picked up the doll and then -- he didn't

9    actually show where the doll would actually roll or anything

10   like that.  He immediately picked it up and then tried

11   forcing it down into here.  Again, this is -- once that sham

12   is in there, it's a tight, very tight area.  So I think the

13   other picture that you have may be able to see the end of

14   the bed a little bit better.  But he was saying that the

15   child, Robbie's head was down this far and the feet were

16   sticking up.  And again, because he's already described this

17   to us, he had to take the doll and force the doll in that

18   far, and again, while I was watching him do this, I was in

19   disbelief, that --

20        Q    Well, you don't need to say what you were

21   thinking, but you can say what you did in response to that?

22        A    Again, as a result of watching him perform that

23   task, again I was later asked did I have any questions.  And

24   yes, I asked him the question of the child and could the

25   child roll.  I was concerned about the issue of the child at

1    that age being able to.  From my observations of that white

2    pillow, it would have seemed apparent to me that the child

3    would roll to the child's right into the center of the bed,

4    not be able to role to the child's --

5            MR. GROLAND:  Objection, your Honor, move to

6        strike as to what he thinks should have happened.

7            THE COURT:  Objection is sustained.

8    BY MS. SINGER:

9        Q    All right.  Based upon what you viewed of the way

10   the pillows were laid, did you inquire of Mr. Herlihy as to

11   how the child would have rolled over the sham?

12       A    Yes.

13       Q    And what was his explanation for how the baby

14   would have rolled over the sham, as opposed to rolling more

15   towards the head of the bed?

16       A    Right.  Again it's clear on the tape, and I think

17   he really did not have a good explanation for that.

18       Q    Did you, yourself, actually attempt to place the

19   doll, State's Exhibit 77, did you actually attempt to place

20   the doll yourself between the footboard of the bed, and the

21   mattress, and box spring of the bed?

22       A    Yes, ma'am.

23       Q    And would you describe to the jury how you

24   attempted to get the doll into that area?

25       A    Well, if I can hold it, I'll -- What I did is I

1   grabbed the doll like this.

2           MR. GROLAND:  Objection.

3           THE COURT:  The objection is sustained.

4           MS. SINGER:  Your Honor, may I approach?

5           THE COURT:  Yes.

6           (Sidebar conference:)

7           MS. SINGER:  This is not what Mr. Herlihy did.

8       This is what this witness did and I believe he is

9       entitled to testify to what he did and how he then

10      inquired of Mr. Herlihy as to any acts.  This is not a

11      demonstration of what Mr. Herlihy did.  This is his own

12      actions.

13          THE COURT:  The pretrial ruling was that neither

14      demonstration could be reenacted.

15          MS. SINGER:  This is not a demonstration of what

16      Mr. Herlihy did.

17          THE COURT:  The pretrial rule was that neither

18      demonstration could be reenacted.

19          MS. SINGER:  This is not a demonstration; this is

20      what this witness did.

21          THE COURT:  And you call it what?

22          MS. SINGER:  This is what this witness did, just

23      like this is this witness walked into the apartment,

24      this witness walked to the bathroom.

25          MR. GROLAND:  He is demonstrating, Jeanne, not

1    saying it.

2        MS. SINGER:  All right.  So he needs to say it

3    without --

4        (Sidebar conference concluded.)

5        MS. SINGER:  Without using it -- Oh, I'm sorry,

6    Madam Court Reporter.

7        THE COURT:  Correct.

8  BY MS. SINGER:

9        Q    Investigator Seale, without using the doll to show

10   the jury, but using in words what you did, and maybe first

11   you can show with the laser pointer the area that you

12   attempted to place the baby so that they know where you

13   were.

14       A    I was placing it in the same direction, or the

15   same location Mr. Herlihy had utilized the doll to place it,

16   which is right pretty much in the middle of the sham.

17       Q    And what did you do?  Like I say, you have to just

18   tell us in words what you did.

19       A    I put my hands in my pocket.

20       Q    All right.

21       A    Basically, I placed my hand on the backside of the

22   doll and had the doll facing up, so my hand was beneath the

23   doll.  And I used my two middle fingers and the other finger

24   to support the head of the doll, and I tried to put the doll

25   in the same position that Mr. Herlihy had just placed the

1    doll.

2         Q    Were you able to do that?

3         A    I was physically able to do that, yes, ma'am.

4         Q    How much effort did it take for you to do that?

5         A    It took a tremendous amount of effort to do that.

6    And again, we did not have a test set up to be able to

7    establish a poundage pressure or anything of that nature.

8    But in my observations of Mr. Herlihy, he was having

9    difficulty doing it, and I had equal difficulty as well.

10        Q    All right.  Did you inquire of Mr. Herlihy about

11   that after he attempted to get the doll into the area of the

12   headboard -- the footboard, and the mattress, did you ask

13   him anything about that?

14        A    I did.  Again, part of one of my questions was

15   again the baby's ability to roll.  When I inquired about the

16   baby being able to roll to his right, he said there may have

17   been another pillow there.  So he tried to basically make

18   that statement that there may have been a pillow there.

19        Q    But you had given him -- had you given him

20   opportunity to set up the bed the way it was when the baby

21   was on the bed before he allegedly rolled?

22        A    Yes, ma'am.

23        Q    At this point after your attempts he was now

24   indicating that it was not set up the way -- is that my

25   understanding?

1      A     Based on my questioning of why I thought that --
2   again based on my questioning, yes, ma'am.

3      Q     All right.  And did he make any other statements
4   to you at that point?

5      A     Well, the other statements he made were, there
6   were two of these shams and that one was thicker than the
7   other, and again this was the thinner of the two and he knew
8   that that was the thinner of the two based on his statement.
9   And he put the thinner of the shams, the thinner one there.
10  Obviously the thicker one would have made it more difficult.

11            Then he made the statement:  Well, this may have
12  been vertical.  If you look at this pillow, this pillow here
13  is obviously horizontal this way.  What he said was, the
14  pillow may have been in the other way.  But if you take that
15  pillow and flip it to its left, that's what he would be
16  saying, the other pillow would have been in the other way.

17     Q     Did he actually flip it vertically?

18     A     No, ma'am.

19     Q     All right.  But he said it could have been?

20     A     Yes.

21     Q     And did you ask him about that?

22     A     Well, again this is on tape, and I don't have my
23  notes right in front of me of what I said, but again, to me,
24  that made the appearance that that would have even been much
25  more difficult.

1      Q    You may go back to the stand, Sergeant Seale.

2      A    Thank you.

3           MR. GROLAND:  Ms. Singer, could you please leave

4      that in place for me?

5           MS. SINGER:  Sure.  What we'll do is, we will move

6      it back in a moment, bring it back up here.

7  BY MS. SINGER:

8      Q    Sergeant Seale, at anytime during your contact

9  with Mr. Herlihy did you in any way threaten him, coerce

10  him, force him, or in any way make him make any of these

11  statements to you?

12     A    No, ma'am.

13     Q    Could you describe for the jury as completely as

14  you recall it how you were invited to the house?  Whose idea

15  was that?

16     A    Mr. Herlihy's idea.  In the interview room he

17  invited us back to the house.

18     Q    And was there anything about your contact with

19  Mr. Herlihy that suggested that he was providing this

20  information to the Gainesville Police Department out of

21  force, coercion, threat, promises, or anything other than

22  voluntary statements?

23     A    No.

24          MS. SINGER:  If I may have a moment, your Honor?

25          THE COURT:  Yes.  Go ahead.

Stacey K. Bryant, RPR
Judicial Court Reporter

2010

```
 1                    (Pause in the proceedings.)
 2   BY MS. SINGER:
 3        Q     Was that the last -- Well, let me ask this.  Did
 4   that end your contact with Mr. Herlihy after this
 5   reenactment?
 6        A     Yes, ma'am.
 7              MS. SINGER:  Your Honor, we would tender the
 8        witness.  If I can go to the clerk first and return the
 9        items of evidence.
10              THE COURT:  All right.  Mr. Groland, go ahead.
11              MR. GROLAND:  Thank you.
12              Jeanne, I need the photos.
13              MS. SINGER:  I gave them back to the clerk.
14                         CROSS-EXAMINATION
15   BY MR. GROLAND:
16        Q     Larry?
17        A     Mr. Groland.
18        Q     No question about he was fully cooperative?
19        A     Yes, sir.
20        Q     Answered all your questions?
21        A     Yes, sir.
22        Q     Not evasive, seemed to answer your questions very
23   responsibly to the particular question?
24        A     He was very cooperative.
25        Q     All right.  Now, I think you testified when
```

1    Ms. Singer asked you some questions, that when you first got

2    there, he was given the opportunity to set it up and, in

3    fact, he did set it up?

4        A    Yes, sir.

5        Q    So he placed these, the sham and the pillow, in

6    that location?

7        A    Yes, sir, he placed those on the bed.

8        Q    Okay.  And where had those items been before he

9    placed those items in that location?

10       A    If I'm not mistaken, they were already on the bed

11   in some disarray.

12       Q    So -- and these photographs were taken at what

13   time, do you know?

14       A    I'm not certain.

15       Q    These photographs certainly weren't taken at

16   6 o'clock.  Was it 6:30 you were there?

17       A    Six -- 6:40.

18       Q    6:40.  Because, in fact, no photographs were taken

19   at that time, correct?

20       A    Not that I'm aware of, no, sir.

21       Q    So it's your testimony that when you came in, the

22   pillow and the sham did not look like as depicted in the

23   photo, but rather they were somewhere else on the bed?

24       A    That's correct.

25       Q    Okay.

1       A    He was --

2       Q    Okay.  And he put them in that position?

3       A    Yes, sir.  They may have been rolled up a little

4  bit tighter than that, but that is the place that they were

5  located.

6       Q    Do you know who had moved those items, the sham

7  and the pillow, to other places on the bed other than as

8  depicted in that photograph?

9       A    No, sir.

10      Q    And, in fact, it's true, is it not, that as soon

11  as Brian walked into that apartment with you all, he broke

12  down and cried?

13      A    Yes, sir.

14      Q    And that wasn't the only time he cried during this

15  demonstration, actually during the taping he broke down and

16  cried to the point where he couldn't even talk, correct?

17      A    Momentarily, yes, sir.

18      Q    And Helen Legall actually shut off the tape?

19      A    Yes, sir.

20      Q    Did he ask her to shut off the tape or did she

21  just shut it off?

22      A    To my recollection he asked her to turn it off.

23      Q    And before you left the apartment, I understand

24  it's your testimony that Brian was not absolutely satisfied

25  with this rendition of how these items were positioned on

1    the bed?  He wasn't sure if the sham was vertical or

2    horizontal and he wasn't sure if there may have been another

3    pillow in the area; is that correct?

4         A    Yes, sir.

5              (Discussion off the record.)

6    BY MR. GROLAND:

7         Q    All right.  Let me make sure I understand what you

8    said.  First of all, how much do you think this doll weighs?

9              MS. SINGER:  I'm gonna lodge an objection, beyond

10        the scope of this witness to answer.

11             THE COURT:  Overruled.

12   BY MR. GROLAND:

13        Q    Hold that doll.  What are we talking, a couple

14   ounces?

15             MS. SINGER:  Once again, I'm going to lodge an

16        objection.  Let him answer the question he just asked.

17             THE COURT:  This is cross-examination, you can

18        lead.

19             MR. GROLAND:  Go ahead.

20             THE WITNESS:  Certainly less than a pound.

21   BY MR. GROLAND:

22        Q    I think it would be less than half a pound, don't

23   you think?

24        A    Half a pound?  Okay.  I do work out, but I only

25   work out lightly.

1    Q    All right. And, Sergeant Seale, what you're

2  telling us is that you took this doll and you tried to wedge

3  this doll between that sham, which is made of cloth and

4  cotton, and the base of the bed.  And in order to wedge this

5  doll in there, you had to use a tremendous amount of force?

6    A    Yes, sir.

7    Q    Is that your testimony?

8    A    Yes, sir.

9    Q    And, in fact, at some point you measured the

10  distance in there, did you not, or were present when it was

11  measured and the gap in there is actually about six inches;

12  isn't that correct?

13    A    My testimony earlier is that the gap would be from

14  the top portion of the mattress to the top, or the top

15  portion of where that sham was, to the top portion of where

16  the frame is.

17    Q    The gap between the mattress and the frame is

18  about six inches; isn't that correct?

19    A    From the top portion of the sham to the top

20  portion -- I know I can't use my hands, but to the top

21  portion of where that metal footboard is, at the top, that's

22  six inches, was not representative of the gap all the way to

23  the floor.

24    Q    All right.  And the top gap is six inches from the

25  mattress to the footboard, but some of that gap is filled up

1    with cloth, right, and that cloth is from the sham?

2         A    If you will allow me to use my hand, I'll give a

3    better indication of where that six inches was.

4         Q    I'm afraid I can't do that because there's been a

5    Court ruling.  But tell us again, have you determined that

6    the gap at the back of that bed is six inches and have you

7    previously testified to that?

8         A    At a specific distance, that's correct.

9         Q    Okay.  And did you measure it or were you present?

10        A    That's an approximate guess, yes, sir.

11        Q    And that would be at the top of the mattress,

12   between the top of the mattress and the footboard, right?

13        A    More vertical on the footboard, but, yes, sir.

14   Well, I guess, at an angle, is what I'm saying.  From the

15   top of the sham to the top of that -- if you'll use your

16   hand right and go to your right, right about there, up, up,

17   that's far up.

18        Q    Let me say this.  I think this will make it

19   easier.  Let's assume this footboard was a solid piece of

20   wood.

21        A    Yes, sir.

22        Q    All right.  So from the back of that mattress to

23   that solid piece of wood is about six inches?

24        A    That was from the top of the sham to the top of

25   that piece of metal.

1      Q    The top of the sham here?

2      A    The way that the sham was in place, the bottom of

3    that sham to the top of that -- I'll put my hand under here.

4    Can I go up with the pointer?

5      Q    I think not.  I think you and I are probably both

6    confusing the jury.

7           Let's take the sham out of there for a moment.

8      A    Okay.

9      Q    Let's just say we got this thing, without any

10   sham, without any pillow.  What kind of space do we have

11   between the top of this mattress and this wooden footboard,

12   if it was just a straight board up and down?  Do we have six

13   inches?

14     A    Probably so, yes, sir, without the sham present.

15     Q    And that's your estimate?

16     A    Yes, sir.

17     Q    Did you estimate this space between the box spring

18   and the back of the footboard?

19     A    No, sir.

20     Q    Does it look to be about the same?

21     A    Yes, sir.

22     Q    And, in fact, the mattress and the box spring are

23   both pushed up as far to the headboard as possible?

24     A    Yes, sir.

25     Q    And then what is in that space, that six inch

1    space, that prevents it from being just a gape -- a gap,

2    excuse me, and a cloth sham, right?

3        A    Yes, sir.

4        Q    And it's your testimony to that jury that that

5    cloth sham in that six inch space caused you to have to use

6    a tremendous amount of force to put this doll in there?

7        A    Yes, sir.

8        Q    Is that your testimony?

9        A    Yes, sir.

10       Q    While the tape was on, did you hear Detective

11   Legall say to Brian -- Strike that.

12            While the tape was on, did you hear Brian Herlihy

13   ever say to you, or to Helen Legall, the pillows are in the

14   exact same place I left them?

15       A    I don't believe so.  Again, I have the transcripts

16   here.  I don't believe so.

17       Q    No photos were taken at 6:30, right?

18       A    No, sir.  The videotape did not work.

19       Q    Videotape was taken, didn't work.  Did you do a

20   diagram?

21       A    No, sir.

22       Q    Did you do a rough sketch of the layout of the bed

23   and the relative position of the pillows and sham on the

24   bed?

25       A    No, sir.

2018

1    Q    Did you take any actual measurements and make note

2  of the measurements on any police report?

3    A    Not with a tape measure.  My report says

4  approximately six inches.  No, sir.

5    Q    I'm talking about with a tape measure.

6         Did you do a neighborhood canvass in this case?

7    A    No, sir.

8    Q    Now, I think you said you were new on the

9  detective bureau when this case first evolved back in

10 August?

11   A    Yes, sir.

12   Q    In fact, you were in training as a detective at

13 that time?

14   A    I wouldn't call it in training, but -- and I was

15 obviously going out to calls like this.

16   Q    Okay.  Were you riding with another detective who

17 was showing you the ropes, so to speak?

18   A    Sergeant Halvosa asked me to go with him to this

19 scene.

20   Q    In the meeting that we were talking about at the

21 hospital, that meeting that you went to?

22   A    Yes, sir.

23   Q    What time would you say that meeting was?

24   A    12:30.

25   Q    Okay.  And there were four or five detectives

1    involved in that meeting?

2         A    Four, yes, sir.

3         Q    And Orlando Alvarez, uniformed officer, was there?

4         A    I believe he was in the room.  I'm not sure who

5    the other officer was.

6         Q    Okay.  And there were doctors there and hospital

7    personnel?

8         A    Yes, sir.

9         Q    Correct.  And that is the first time that shaken

10   baby syndrome was mentioned that you know of; is that

11   correct?

12        A    Certainly since my tenure, yes, sir.

13        Q    And there was a discussion about that, was there

14   not?

15        A    I don't recall the complete discussion.  There was

16   a discussion of the syndrome, yes, sir.

17        Q    About that.  And it was at that meeting, I think

18   you indicated, that you determined, or it was determined

19   that a crime had been committed; is that correct?

20        A    Based on the information that was there, this was

21   a probable cause of the child's injury, which --

22        Q    See if you can answer my question.  Would you say

23   that the police department, the consensus at the time, was

24   that a crime had been committed and the investigation then

25   began?

1        A    I would say we had to follow-up on the information

2   that we had.

3        Q    Okay.  Did you say before that you were there and

4   purposes of that meeting was to establish whether or not a

5   crime had been committed?

6        A    Yes, sir.

7        Q    Was that established?

8        A    Yes, sir.

9        Q    It was?

10       A    I'm sorry.  What was your last --

11       Q    Okay.  Was that, in fact, established at that

12  preliminary stage?

13       A    At that stage in the report, my report, it's

14  titled as an aggravated child abuse case.

15       Q    Okay.  And that's a crime?

16       A    Yes, sir.

17       Q    All right.  And, in fact, Brian Herlihy was a

18  suspect at that time following that meeting because he was

19  the last one that you all knew was with the child, correct?

20       A    That was purported to be that.  But things are

21  never, ever, sometimes the way they seem, so --

22       Q    At that point he was a suspect because you all

23  knew that he was last with the baby, correct?

24       A    Yes, sir.

25       Q    In your minds, he was a suspect?

1      A      I was not conducting that follow-up, but clearly

2   he was the person we wanted to talk to.

3      Q      The meeting that you had there at the hospital,

4   that was in a private room.  Tell us where it was.

5      A      We were in the emergency room initially.  There

6   was a lot of us standing out there in the emergency room.

7   One of the doctors asked to put us in a room to get us out

8   of the way basically, because, again, we are in the

9   emergency room.  As you walk into Shands Hospital, the

10  emergency room, we are off to a room to the left of the

11  actual hospital, but we're on the bottom floor at the

12  emergency room.

13     Q      Okay.  It was a private room where you all had

14  some privacy?

15     A      Yes, sir, it was a conference room.

16     Q      Chairs, desk, a place to talk?

17     A      Yes.

18     Q      Everybody sit down at the table and talk?

19     A      No, sir.

20     Q      Doors were closed?

21     A      To the best of my recollection, yes, sir.

22     Q      It wasn't a room where other people were doing

23  their business and sitting at computers.  This was a private

24  room where you all had some privacy?

25     A      Yes, sir.

1      Q    Was there a reason that Brian Herlihy wasn't

2   talked to, to your knowledge, in that room, as opposed to

3   taking him down to the police department?

4      A    I think he was already outside somewhere.  I think

5   we had an officer out with him.  He was standing outside the

6   emergency room.

7      Q    Okay.

8      A    We had the issue obviously of him, the father

9   there, who should be arriving at the hospital, and the

10  mother at the hospital.

11     Q    Okay.

12     A    So we did not want a conflict at the hospital.

13     Q    Okay.  And who did you have that discussion with

14  as to, that in order to avoid a conflict between some

15  people, we need to take them to GPD, instead of talking to

16  him here?

17     A    I did not have that conversation, Sergeant

18  Halvosa --

19     Q    Did you overhear that conversation?

20     A    I don't recall hearing that.  I don't know how he

21  arrived at the police department, whether he drove or

22  whether he was taken.

23     Q    You were delegated the responsibility to talk to

24  Robbie's father, John Quirello?

25     A    Yes, sir.

1    Q    And when did you talk to him?

2    A    Right after that meeting.

3    Q    Okay.  Where did you find him?

4    A    He was -- I don't know.  I don't remember the

5  actual room number.  He was upstairs.  I think it may have

6  been the second floor.  I'm not sure, but he was upstairs

7  and I spoke with him in a room upstairs.

8    Q    Okay.  Was he with Crystal?

9    A    I don't believe so.

10    Q    Was he with the baby?

11    A    No, sir.

12    Q    Who was he with?

13    A    I don't know how he got there.  I know he was

14  there.  I don't know exactly how he arrived at the hospital.

15    Q    How did you -- I guess what I mean is, how did you

16  find him?  How did you know:  Hey, this is John?

17    A    I'm not sure.  I'm not sure.  I know that I met

18  with him.  I'm not sure how he got there, where he was, who

19  he was with.

20    Q    When he -- when you met with him, did he show you

21  some bite marks he had just got from his wife?

22    A    Yes, sir.

23         MS. SINGER:  I'm going to lodge an objection.

24    This is going to call for hearsay.

25         MR. GROLAND:  I don't think it's hearsay.  This

1      has already been testified to.

2           THE COURT:  Your objection is sustained.

3  BY MR. GROLAND:

4      Q    How long did you talk to John Quirello?

5      A    Probably 30 minutes.

6      Q    Okay.  And without going into exactly what was

7  said, you got background information on John and Crystal and

8  their marriage and things of that nature?

9      A    Yes, sir.

10     Q    You never talked to Brian Herlihy at the hospital?

11     A    No, sir.

12     Q    Did you ever see him there?

13     A    No, sir.

14     Q    Now, when you -- Okay.  Your next involvement in

15  this case was you were at the Gainesville Police Department

16  sometime that afternoon in the detective bureau when Helen

17  Legall was talking to Brian, correct?

18     A    With Detective Coleman, yes, sir.

19     Q    With detective who?

20     A    Coleman.

21     Q    Coleman, all right.  What time would that be?  Do

22  you have any estimate?  Is it noted in your report?

23     A    It notes in my report the time that I spoke with

24  him, but I don't know exactly what time they got back there

25  and they started that interview.

1      Q     What time did you get there and start looking at

2   the monitor?

3      A     I'm not sure, Mr. Groland.

4      Q     Does 5:40 -- I'm looking at your report -- sound

5   about right?  5:40 p.m.?

6      A     That's when I went in and spoke with him.

7      Q     Okay.

8      A     So there was previous interview process with him.

9      Q     Okay.  How long had you watched the monitor before

10  5:40 when you went in and talked to him?

11     A     There were different variations of the time that I

12  watched it.  Again, I'm watching it and then one of my

13  individuals that I'm supervising, one of my detectives comes

14  up and asks me a question about a case that they're working.

15  So I did not watch that total interview.

16     Q     Do you have an estimate as to when you may have

17  started looking at that interview?

18     A     No, sir.

19     Q     Are we talking hours?

20     A     I don't think hours, no, sir.

21     Q     And you described for the jury a conversation that

22  you heard Brian having with Detective Legall where you said

23  he shook the baby?

24     A     Yes, sir.

25     Q     In fact, didn't he say he shook the baby to try to

1    revive the baby, but not to hurt the baby?  Isn't that what

2    he said?

3         A    In my interview with him and the interview with --

4         Q    No.  Please, let's stay on track here.

5              What I'm talking about is what you heard him say

6    to the detective that you related to the jury a little while

7    ago.  Didn't he say -- that was his full and complete

8    statement:  I did shake the baby to try and revive the baby.

9    I tried not to hurt him?

10        A    He made the statement:  I moved Robbie and

11   shook -- I mean, I blew in his face.

12        Q    Did you hear him say that he shook Robbie, talking

13   about to Helen Legall, to try and revive him, but not to

14   hurt him?

15        A    Later, yes, sir.

16        Q    All right.  You didn't testify to that before, did

17   you?

18        A    I don't think I was asked that before, but --

19        Q    Did he ever tell you, or anybody else in your

20   presence, in any conversation you overheard, either while

21   you were looking at the monitor, or later at his residence,

22   that he shook the baby to either hurt the baby or punish the

23   baby?

24        A    No, sir.

25        Q    He maintained throughout that it was an accident;

1    is that correct?

2          A    No, sir.

3          Q    He did not maintain that it was an accident that

4    caused Robbie to be injured?

5          A    Initially his conversation he did not admit to

6    shaking the baby.

7          Q    Okay.

8          A    And he later admitted to shaking the baby.

9          Q    All right.  My question to you is:  Did he ever

10   maintain that it was anything other than an accident?

11         A    No, sir.

12              THE COURT:  Is the light in your eyes?

13              UNIDENTIFIED VOICE:  Yes.

14              THE COURT:  Mr. West, could you fix this?

15              MS. SINGER:  Oh, I'm sorry.  That's been going on

16         now for a few minutes.

17              MR. GROLAND:  Your Honor, may I just have a

18         moment?

19              THE COURT:  Yes.

20              (Pause in the proceedings.)

21   BY MR. GROLAND:

22         Q    When you were in the apartment, did you see some

23   photographs on the refrigerator of the baby?

24         A    Yes, sir.

25         Q    And, in fact, you also looked in Brian's vehicle

1    and he had a photograph on the dashboard, didn't he?

2         A    I did not look in his vehicle, no, sir.

3         Q    Are you sure about that?

4         A    I'm pretty certain.

5         Q    Okay.

6         A    I don't think I had a reason to look in his

7    vehicle, but --

8         Q    Are you aware he signed a consent to allow the

9    Gainesville Police Department to look in his Ford Explorer?

10        A    If he did, I was not present when that was done.

11        Q    When Brian was crying, you saw real tears, didn't

12   you?

13        A    I think so.

14        Q    I'm sorry?

15        A    I think so.  I mean, I don't remember him dabbing

16   his eyes, but I don't remember specifically.  I know he was

17   crying.

18        Q    Correct me if I'm wrong on this, but the bathroom,

19   if the person was coming out of the bathroom, the bathroom

20   is over here, right?

21        A    That picture appears to be taken from the doorway.

22   So if you were standing at the doorway, the bathroom would

23   be right to your left.

24        Q    To your left, okay.  So it's over here.  So a

25   person coming from the bathroom, heading toward the back of

1    the bed, would not be coming from this way, but rather would

2    be coming from this way as I'm indicating; am I correct?

3        A    No, sir.  I think that is the doorway to the

4    bedroom.  So if you walk in, the bathroom -- if you walk

5    from the living room to the back bedroom, you have the

6    living room, then the bedroom is to your right, and the

7    bathroom is to your left.

8        Q    Okay.  The bathroom is to the left, indicating to

9    the left of the bed in this area, correct?

10       A    Not the doorway, but, yes, sir.

11       Q    Okay.  The doorway that you think this photo was

12   taken from, we don't know, is the doorway into the bedroom;

13   is that correct?

14       A    Yes, sir.

15       Q    All right.  And the bathroom is to the left of the

16   bedroom?

17       A    Yes.

18       Q    And the door to the bathroom is to the left of

19   that?

20       A    If you're standing in the doorway, yes, sir.

21       Q    Okay.  Just, in other words, what I'm saying, I

22   guess the point I'm trying to make is, a person leaving the

23   bathroom, coming toward the bedroom and seeing the baby at

24   the end of the bed, would not be coming directly to the

25   footboard; is that correct?

1       A    To my recollection it would be coming directly to

2   the end of the bed.

3       Q    Thank you, sir.

4            THE COURT:  Does thank you, sir, mean you have no

5       more questions?

6            MR. GROLAND:  I have no more questions with this

7       piece of equipment.  And I'm about finished, your

8       Honor.

9            THE COURT:  All right.  Thank you, Mr. West.

10  BY MR. GROLAND:

11      Q    If the baby weighs about 17 pounds -- Would you

12  say the baby weighs about 17 times or maybe 30 times as much

13  as that little doll?

14      A    I do not know the weight of the baby, but if that

15  would be -- I can do the math, that would be appropriate.

16           MR. GROLAND:  I have no further questions, your

17      Honor.

18           THE COURT:  All right.  Any redirect?

19           MS. SINGER:  Yes, ma'am.

20                   REDIRECT-EXAMINATION

21  BY MS. SINGER:

22      Q    Mr. Seale, or Sergeant Seale, could you tell the

23  jury what time it was that you all went back to the

24  residence for Mr. Herlihy to demonstrate for you how the

25  baby was wedged in the bed?  Would you look at the report

1    and tell me what time, or do you know it in your head?

2        A    Well, I've seen the report.  It was 20 minutes to

3    7:00 in the evening.

4        Q    All right.  And isn't it -- if you look at your

5    report, did you not also go to the scene --

6            MR. GROLAND:  Objection, your Honor, leading.

7            THE COURT:  Sustained.

8            MS. SINGER:  All right.

9    BY MS. SINGER:

10       Q    Refreshing your recollection, if you could refresh

11   your recollection with your report, was there another time

12   that you went to the residence before the actual reenactment

13   took place?

14       A    That was at 3:25 in the afternoon.

15       Q    Who was at -- who did you go to the residence

16   with?

17       A    Sergeant Halvosa, Detective Coleman, Detective

18   Cannon and Investigator Millard was there.

19       Q    And the purpose of going to the house at -- when

20   is 1525 by the way, what time is that?

21       A    That's 3:25.

22       Q    3:25?

23       A    Yes, ma'am.

24       Q    What was the purpose of going to the house at that

25   time?

1          A    At that time to look at the apartment, to see what
2    was inside the apartment.

3          Q    Do you know what Tina Millard did when she was at
4    the apartment at 3:25?

5          A    She took photographs and I believe collected
6    evidence.

7          Q    Did any of you move any of the items in the
8    apartment at that time?

9          A    Not that I'm aware of.  I do not know what she
10   did.

11         Q    All right.  Now, Mr. Groland asked you whether or
12   not the bed looked the same at 6:25, or approximately
13   6 o'clock, as it did in those photographs.  Do you
14   specifically recall whether or not the bed looked the same
15   at 6:25?

16             MR. GROLAND:  Objection, your Honor, that's an
17         improper question.

18             THE COURT:  Objection overruled.

19             THE WITNESS:  The bed was in the same location and
20         the items that were on the bed appeared to be the same,
21         yes, ma'am.

22   BY MS. SINGER:

23         Q    All right.  When you offered your testimony today
24   regarding where the pillows were located, were those the way
25   the pillows were located when Mr. Herlihy was advising you

1    about what occurred?

2              MR. GROLAND:  Objection, your Honor, leading.

3              THE COURT:  Overruled.

4              THE WITNESS:  The pillows were placed by him in

5         the location of where the original pillows or those

6         pillows were seen there.

7              MS. SINGER:  All right.

8              THE WITNESS:  Again, they may have been rolled up

9         a little bit tighter than that, but they were in the

10        same location.

11   BY MS. SINGER:

12        Q    And was there anyone in the group of you that made

13   Mr. Herlihy put the pillows in any particular position

14   before he demonstrated it for you?

15        A    No.  Ma'am.

16        Q    Mr. Groland asked you a number of questions about

17   the gap between the mattress, and the box springs, and the

18   footboard.  I want to take you there now.

19        A    Yes, ma'am.

20        Q    When you were at the apartment on August the 2nd

21   with Mr. Herlihy, was there a comforter also on the mattress

22   and the box spring, along with the pillows and shams?

23        A    Yes, ma'am.

24        Q    In your estimate of the gap between the mattress,

25   and box springs, and headboard, did it take into

1  consideration any of the other bedding that was on the bed

2  or was that an estimate without the bedding?

3      A    You mean the footboard and not the headboard?

4      Q    I meant the footboard, I'm sorry.

5      A    No.  That was just what was there at that time.

6      Q    And did it take into consideration the sham being

7  stuffed between the mattress and the footboard?

8      A    Yes.

9      Q    Was there six inches more after the mattress?

10     A    No, ma'am.

11     Q    Explain that to the jury, because I was confused

12  about what you were trying to say.

13     A    From the top of that location to the top of the

14  frame of that mattress or the frame of the actual footboard

15  itself, there appeared to be about a six inch gap, which to

16  me would make it seem that the child could get to that

17  location if the child could roll.  But again, it was an

18  issue of how the child could get from that portion all the

19  way to the bottom where Mr. Herlihy said the child's head

20  was and the feet sticking up.

21          MR. GROLAND:  Objection, your Honor, excuse me --

22     Move to strike.  It was not a responsive answer to that

23     particular question and he was elaborating on something

24     that did not relate to the question.

25          THE COURT:  The objection is noted.  Overruled.

1    BY MS. SINGER:

2         Q    Why was that, sir, what shape was the gap?  Are

3    you able to describe the gap, was it an actual straight down

4    gap?

5         A    No.  It was the height where the sham and the

6    mattress was to the height of the frame of the footboard.

7         Q    All right.

8         A    So that frame was taller than the height of where

9    the mattress and the sham was.

10        Q    Can you show that on a picture for us?

11        A    If we have an adequate picture.

12        Q    I would like to show you the group of pictures

13   that were taken by Tina Millard at 1:40 p.m. that day.

14   They're all entered into evidence as a composite exhibit.

15   See if you can go through here and see if there is a picture

16   that depicts that for the jury and then you can explain what

17   you saw.

18             (Pause while witness examines pictures.)

19   BY MS. SINGER:

20        Q    Now, I'm gonna ask you:  Did those pictures help?

21   If you'll turn them over, please, and tell me what the

22   numbers are on the back so we have a proper record?

23        A    24-E and 24-H, as in hotel.

24        Q    Will they help you in explaining to the jury what

25   the gap looked like?

1        A     Yes, ma'am.

2             MS. SINGER:  Mr. West, again, please, if you don't

3        mind?  May the witness step down?

4             THE COURT:  Yes.

5             MS. SINGER:  If you'll step down and show the jury

6        what you're referring to.

7   BY MS. SINGER:

8        Q     Now which picture would you like of those two of

9   them?

10       A     I would like to be able to show both.

11       Q     All right.  We'll start with this one then, 24 E,

12  and if we can have the lights, Mr. Bailiff?  It will take a

13  moment to warm up a little bit here; is that right,

14  Mr. West?  Would you have the laser pointer?  That would

15  help if you go ahead and explain it, about what you're

16  talking about when you talk about the measurements.

17       A     It you look at this pillow and the sham the way

18  it's tucked in and it's tucked down this way.  If you took a

19  yardstick, per se, and laid a yardstick horizontal this way,

20  the gap that I'm referring to, is the gap from the corner

21  here to the gap here on this sham itself.  That is the gap

22  I'm referring to.

23       Q     All right.  If I may use this arrow, did you note

24  anything about how much of a gap there was between what

25  we'll call the first rung from the floor and the second rung

1    from the floor?

2        A    Well, that portion of it was, again, stuffed with,

3    the sham is stuck down in there.  So it appeared to me to be

4    tight, but I didn't measure that, but it appeared to be

5    tight.

6        Q    The second photograph, which is 24-H, could you

7    further explain to the jury?

8        A    Well, it would provide them with a different view

9    from the other side, which is the same, the same.  It looks

10   tighter obviously in that, but it's that distance there from

11   that piece of frame to the top of the sham there.

12       Q    Thank you.  You may take your seat, sir.

13            Now, Mr. Groland asked you -- I'll let you sit

14   down first before I ask you a question.  I apologize.

15            Mr. Groland asked you about the defendant stating

16   that he shook, then, pause, blew in Robbie's face.  When he

17   made that statement, did he also do anything, was there

18   anything done at the time he made that statement?

19            MR. GROLAND:  Your Honor, I object, because it's

20       beyond the scope of cross.

21            THE COURT:  The objection is sustained because it

22       was asked and answered.

23            MS. SINGER:  May we approach on this, your Honor?

24            THE COURT:  Yes.

25            MS. SINGER:  I tell you what, I'm just gonna

1    withdraw the question.  I have no further questions

2    of --

3        MR. GROLAND:  I do, your Honor.  Your Honor, I

4    mean, may I approach on that?

5        THE COURT:  Yes.

6        (Sidebar conference:)

7        MR. GROLAND:  Your Honor, they started talking

8    about the comforter as if the comforter had some width.

9    I show you the comforter, which we have right over

10   here.  He's now saying the six inch gap is from the top

11   of the sham, the corner of the sham, to the back of the

12   bed, which was different than what he said when he

13   testified 15 minutes ago.  And I want to ask him is he

14   talking about the sham being stuffed down.  And I want

15   to ask why it's not stuffed down later in the picture.

16       THE COURT:  No.  All that was covered and I'm not

17   gonna allow any recross on that.  Is there anything you

18   want to put on the record about what I didn't let you

19   go into?

20       MS. SINGER:  No, I'm all right with it.

21       THE COURT:  Go ahead.

22       (Sidebar conference concluded.)

23       MS. SINGER:  May this witness be excused, your

24   Honor?  I have no further questions.

25       THE COURT:  This witness will remain under

1    subpoena in case you want to call him in your case in

2    chief, Mr. Groland.

3        Sergeant Seale, you're free to leave the

4    courthouse.  You may not remain in here, but remain

5    outside in case you're asked for re-call.

6        MS. SINGER:  Your Honor, the state would rest at

7    this point.

8        THEREUPON, THE STATE RESTED ITS CASE IN CHIEF.

9        THE COURT:  Ladies and gentlemen, we're going to

10   take a recess.  There are some legal issues that we are

11   going to address, so you'll have more time than your

12   break, so make yourselves comfortable.  The best

13   estimate will be about 30 minutes and, yes, we'll make

14   sure those of you who want to be escorted downstairs

15   can go downstairs.

16       We'll take a 15-minute recess for the court

17   reporter first before we address other matters.  So the

18   court will be in recess for 15 minutes.

19       (Recess taken.)

20       (Outside the presence of the jury.)

21       THE COURT:  All right, Mr. Groland, Mr. Tedder.

22       MR. GROLAND:  On JOA?

23       THE COURT:  Yes.

24       MR. GROLAND:  Mr. Tedder is prepared to do that.

25       MR. TEDDER:  Your Honor, of course at this time we

1    would ask the Court to enter a ruling of a Judgment of

2    Acquittal as to the crime of first degree murder,

3    wherein the state has alleged that he committed first

4    degree murder on Robert Quirello by violently shaking

5    Robert Quirello.  We suggest the state failed in

6    proving their burden in proving a prima facie case, and

7    I'm just going to pinpoint which instruction applies in

8    this case.  Ms. Singer and I have already been talking

9    about that over the recess.

10       If you go by statute, rather the jury instructions

11   that were in effect at the time this event occurred, we

12   would submit to the Court that the state has not proven

13   that Brian Herlihy willfully or knowingly -- excuse me,

14   proved aggravated child abuse by aggravated battery.

15   We submit that the state has not shown by a prima facie

16   case Brian Herlihy committed battery against Robbie

17   Quirello by intentionally touching or striking him

18   against his will, or intentionally causing violent harm

19   to him; or, that he intentionally or knowingly caused

20   Robbie Quirello great bodily harm, permanent disability

21   or permanent disfigurement, nor was any weapon used.

22       The other form of aggravated child abuse that was

23   in effect at the time of this event, dealt with

24   torturing and maliciously punishing a child or caging

25   the child.  Obviously, there's no evidence whatsoever

1  of any torture, malicious punishment, or caging in this
2  case.
3      If you go by the jury instruction the state feels
4  should be used, which is recently, I guess, promulgated
5  by the Supreme Court of Florida, we submit the state
6  has not proven a prima facie case that Brian Herlihy --
7  the one they're proposing in this case, that Brian
8  Herlihy maliciously punished Robert Quirello or
9  knowingly unlawfully committed child abuse upon Robbie
10  Quirello, and the said punishment created great bodily
11  harm, permanent disability, permanent disfigurement.
12      Your Honor, we would submit that the only evidence
13  before the Court so far is of an accidental incident,
14  wherein, if you take the state's case in the light most
15  favorable to the state, the only evidence of anything
16  that Mr. Herlihy may have intentionally done to this
17  child was swing him back and forth as the child was
18  laughing and then plop him on the bed, I believe is
19  what the testimony was through the detectives, and that
20  Robbie then had a dazed look on his face.  Plopping a
21  baby on a bed, a soft bed, a mattress where a child
22  would bounce up, is not an intentional act such as one
23  would intentionally try to cause an aggravated battery
24  on someone.
25      I think the state has to show, by a prima facie

1    case, that Mr. Herlihy intended to hurt this child.  I

2    would submit to the Court they have failed to do so.

3         Now, what they may have done is shown, they may

4    have very well elicited what occurred that precipitated

5    a series of events that the medical people have

6    testified about which led to Robbie's death:  Namely,

7    you heard testimony from different doctors that chronic

8    subdural hematoma can spontaneously re-bleed for no

9    reason at all.  Certainly, that being the case, and

10   this is from both doctors on both sides of the case,

11   not just our experts, not just Dr. Uscinski or Dr.

12   Plunkett, but Dr. Maria testified to that.  I believe,

13   I can't recall which other doctors, I think

14   Dr. Dickison testified to that, and I'm not sure, but

15   I'm positive Dr. Maria, their neurologist testified

16   that a chronic subdural hematoma can spontaneously

17   re-bleed.

18        So assuming Mr. Herlihy plopped Robbie on the bed

19   and then Robbie had a dazed look and everything began

20   to go from there, the state has not shown that

21   Mr. Herlihy, by plopping the baby, Robbie, on the bed,

22   intentionally did something to cause aggravated battery

23   or aggravated child abuse.  He had no intention of

24   harming this child at all in any way, shape, or form.

25   In fact, the evidence before the Court is that

1      Mr. Herlihy cared a great deal about Robbie, was a very

2   caring person with respect to taking care of this baby,

3   and the mother testified that she never saw him do

4   anything wrong to the child.  No one testified that he

5   ever did anything wrong to the child in the way of

6   taking care of this baby.  There's no evidence that

7   Brian intentionally tried to hurt this baby.

8       There is lots of evidence before the Court that

9   this baby had a pre-existing condition that little or

10   nothing could have set off and precipitated a series of

11   events leading to the spontaneous re-bleeding of this

12   chronic subdural leading to the, that causing a

13   seizure, leading to everything else, causing the baby

14   to not be able to breathe, which then led to the child

15   eventually becoming brain dead due to anoxic ischemic

16   encephalopathy.

17       There's no evidence whatsoever of any injury to

18   the child's brain stem or to any portion of his spine.

19   No evidence of any physical injury to Robbie Quirello

20   anywhere else on his body, other than in the brain and

21   there's a very logical explanation for what happened.

22       The state has to prove, I'll submit to you, they

23   have to prove, show a prima facie case that he

24   intentionally did something to hurt Robbie Quirello.

25       I just have a couple of cases, your Honor, that I

1    would submit show what certainly does -- if I can

2    approach -- what does constitute aggravated child

3    abuse.  The most, the one that everybody has heard, of

4    course, being State of Florida vs. Richard Adams, which

5    led to the enactment of Kayla's Law, I believe it was

6    called, wherein Richard Adams brutally beat Kayla --

7    I've forgotten what her name was, Kayla McKeane, a

8    four-year-old child, who in that case, there was just

9    an incredible amount of evidence, and he was convicted

10   of first degree murder, I believe sentenced to life,

11   and basically asserted that the Court having properly

12   instructed the jury on malice.  Since then I believe

13   that, in fact, a new jury instruction which Ms. Singer

14   gave me today, has been modified to reflect, I believe,

15   the jury instruction that Adams was seeking.

16        But in any event, in that case my point is, in

17   this case it talks about the kinds of evidence that was

18   available to show that the child was clearly,

19   intentionally injured.  The pathologist testified Kayla

20   had the kind of blunt, the kind of injury to her that

21   you would see in a high-speed automobile accident.

22   That she was hit by a board, that she was kicked, she

23   had just an incredible number of injuries to her body.

24   In this case, we have nothing, no injuries to Robbie at

25   all, and no evidence at all that he intentionally hurt

Stacey K. Bryant, RPR
Judicial Court Reporter

1    the child.

2         And Adams' case, he, eventually, I think he

3    confessed, but the mother of the child testified she

4    was with him when he took Kayla up and buried her in

5    the Ocala National Forest, and then came back and

6    again, told law enforcement that she had been abducted,

7    which, of course, led to a five-day search for her.

8    But her right leg was swollen twice the size of her

9    left leg.  I mean, I'm not going to -- the Court can

10   obviously read this.  She had incredible, extensive

11   injuries which we do not have in this case.

12        Another case that I provided is Lukehart, I forgot

13   the cite for Adams.  Adams is at 799 So.2d 1084, Fifth

14   District Court of Appeals.

15        Next, is Lukehart, L-U-K-E-H-A-R-T, vs. State, 776

16   So.2d 906.  I did not print out this entire opinion

17   because the only one pronounced portion really dealt

18   with what I wanted to bring to the Court's attention.

19   I believe in this case the gentleman was sentenced to

20   death, and he had basically violently injured this

21   child.  There was a lot of evidence that the child,

22   that he pushed the baby down on the floor; that he was

23   frustrated because the baby needed a clean diaper; that

24   he tried to change her diaper.  The baby died of

25   injuries caused by blunt trauma from five blows to her

1    head, two of which caused skull fractures; that the

2    baby had bruises, that these injuries could have

3    resulted only from the use of substantial force.

4        In this case before the Court here, of course,

5    Robbie Quirello has no skull fractures, has no external

6    injuries of any being hit in any way whatsoever.  Of

7    course, you're well aware of that.  You sat through the

8    trial.  We would submit that case shows the kind of

9    force you need for aggravated child abuse.

10       Another case is Slocum vs. State, 775 So.2d 1246

11   wherein Mr. Slocum, essentially what he did was he took

12   this child and he completely confessed to this after

13   initially trying to mislead law enforcement as to what

14   had happened to this baby.  He eventually confessed

15   that he had been annoyed with the child, strapped the

16   child to a car seat, pushed or kicked the child's car

17   seat, with the child in it, into a pool.  The child, of

18   course, drowned.  He then got the child out, took the

19   car seat off, and tried to cover everything up, tried

20   to act like it was an accidental injury, but he

21   eventually confessed to it.  And clearly in that case

22   you have evidence of aggravated child abuse supporting

23   a conviction for felony murder calling for first degree

24   murder.

25       Our position, your Honor, is that this case before

1   the Court today, there is not enough evidence to rise

2   to the level of the prima facie showing that

3   Mr. Herlihy intentionally did anything to harm this

4   child, which the state has to show at least a prima

5   facie case.  There is nothing to support that, your

6   Honor, and we ask the Court to grant a Judgment of

7   Acquittal.

8       MR. GROLAND:  Your Honor, I just have follow-up

9   argument that's very brief.  We would also ask the

10  Court for a Judgment of Acquittal because Brian is

11  charged with first degree premeditated murder.  The

12  indictment alleges that this offense occurred on August

13  the 2nd, 2000.  In fact, Robbie was alive on that date.

14  He did not die on that date, and died, as the testimony

15  indicates, on August the 10th, which is the proper

16  date.  So we would add that as another reason for

17  dismissal at this time and ask the Court to consider

18  reducing the charges if the Court finds there was a

19  prima facie showing of something, to manslaughter by

20  culpable negligence.

21      MS. SINGER:  Your Honor, in response to

22  Mr. Groland's argument, if the Court would look at the

23  indictment, in fact, it alleges that the injuries

24  occurred on the 2nd, and the child was -- passed away

25  on the 20th, I believe, it's in the indictment.  I

1    don't know if you have a copy --

2         MR. GROLAND:  I don't have a copy of that.

3         MS. SINGER:  But if the Court needs to see that,

4    it was properly alleged that he died on the 10th.

5         MR. GROLAND:  Okay.  I apologize for that.

6         MS. SINGER:  I don't have it in front of me now,

7    but if the clerk can find it for the Court, if that's

8    an issue the Court needs to review at this time, I'd

9    ask the clerk to do that.

10        MR. GROLAND:  Your Honor, I stand corrected on

11   that and I apologize.  I looked at that this morning.

12        MS. SINGER:  Is that true?  Did you look at it?

13        MR. GROLAND:  Yes.

14        MS. SINGER:  Your Honor, I don't know if the Court

15   wants to just address questions to me or if the Court

16   just wants to hear argument, but I do have argument to

17   make as to Mr. Tedder's motion.

18        THE COURT:  I have no questions.

19        MS. SINGER:  It is obvious from the beginning of

20   this case we have been pursuing this case under the

21   theory of felony murder, which would be delineated

22   felony aggravated child abuse caused the death of

23   Robbie Quirello.  To prove the offense of aggravated

24   child abuse, Mr. Tedder refers to the jury

25   instruction -- I'm going to refer to the statute

1    because I think that's what the Court measures Judgment

2    of Acquittal on, and the statute, which is 827.03(2),

3    states that the crime of aggravated child abuse can be

4    committed in three different, separate ways:  One,

5    aggravated child abuse is committed if one commits an

6    aggravated battery on a child; and, of course,

7    aggravated battery has its own set of elements; two,

8    aggravated child abuse occurs when a person willfully

9    tortures, maliciously punishes, or willfully and

10   unlawfully cages a child; or, three, aggravated child

11   abuse occurs when a person knowingly or willfully

12   abuses a child and in so doing, causes great bodily

13   harm, permanent disability, or permanent disfigurement

14   to the child.

15        Then one must go to the definition that's in the

16   statute for abuse to be able to further define C.  And

17   under that same statute, 827.03, the statute reads:

18   Child abuse means either A, intentional infliction of

19   physical or mental injury upon a child; or, B, an

20   intentional act that could reasonably be expected to

21   result in physical or mental injury to a child; or, C,

22   -- which I don't believe applies -- active

23   encouragement of any person to commit an act that

24   results or could reasonably be expected to result in

25   physical or mental injury of a child.

1       It's the state's contention that we have made a

2    prima facie case of aggravated child abuse in two

3    separate ways, maybe three separate ways.  We believe

4    we have shown sufficient factual basis for malicious

5    punishment, and we also believe we have shown

6    sufficient factual basis for knowingly or willfully

7    abusing a child, and in so doing, causing great bodily

8    harm, permanent disability, or permanent disfigurement.

9       We may have also, and I believe we have sustained

10   a finding that aggravated battery has also occurred.  I

11   can go through each of these elements.

12      I would like to start first with the issue of

13   proof of intent, which Mr. Tedder says we have not

14   proven, haven't offered prima facie proof.  We have

15   offered prima facie proof by the statements of the

16   defendant himself by saying I knew I shouldn't have

17   roughhoused with the child.  I knew that I was too

18   rough with the child.  And, I believe, he also said

19   that after he had swung the baby back and forth, side

20   to side, he plopped the baby on the bed so hard his

21   head bounced.  I think all that goes to intent.  He

22   knew before he acted what he was doing, he then, in

23   fact, did what he intended to do.

24      There is no question -- Now, Mr. Tedder argued we

25   have not proven a prima facie case as to permanent

1    disability, permanent disfigurement, great bodily harm

2    has occurred.  I submit to the Court that the testimony

3    of Bernie Maria, Anne Dickison, Larry Levine, Harvey

4    Rohlwing, the EMT's, everyone that touched that baby

5    after 9:34 a.m. testified that this baby was in severe

6    distress, was dying, did die.  So I don't think there's

7    an issue as to whether or not the baby suffered the

8    permanent disability, permanent disfigurement, or great

9    bodily harm that's required.

10   So basically, the only issues that I think that we

11   even needed to talk about is whether or not there has

12   been adequate proof of intent, and for the sub C

13   paragraph of aggravated child abuse, we need to prove

14   intentional infliction or an intentional act that could

15   reasonably be expected to result in physical or mental

16   injury, and we submit we have met the case, prima facie

17   case on both of those.

18   And for aggravated battery, we're required to

19   prove he intentionally, knowingly and intentionally did

20   the harm that he did.  We've proved that as well.

21   So on all counts for aggravated child abuse, the

22   state would argue that we have met the prima facie

23   burden and then, of course, it becomes a jury question.

24   I would like to cite for the Court a number of

25   cases.  I also cite the Slocum case.  The Court needs

1    to look at that.  But the case that I think is even

2    more on point, and I don't have a copy for John or for

3    the Court, so I'm gonna read it and give it to the

4    Court and get John a copy, is the Coffman, State vs.

5    Coffman, which is at 746 So.2d 471, Second DCA case,

6    August 26, 1998.  This was a case where the infant son

7    of the defendant's girlfriend was taken to the hospital

8    because he had stopped breathing and was having a

9    seizure.

10        The medical staff concluded the child suffered

11   permanent brain damage as a result of shaken baby

12   syndrome.  The child had been in the defendant's care

13   most of the day preceding the incident.  Defendant was

14   charged and convicted of aggravated child abuse based

15   on the malicious punishment part of that statute, and

16   the court held, the appeals court held -- well, during

17   trial, the trial court denied various motions for

18   judgment of acquittal, but after the trial, the court

19   granted a JNOV, and the appeals court indicated that

20   not only was there legally sufficient evidence for

21   proof of a prima facie case, but the review of the

22   court's rulings, they found that the testimony that was

23   offered regarding the fact that this man was with the

24   child -- and I can read the facts to the Court if the

25   Court needs it, but the Court can probably read it

Stacey K. Bryant, RPR
Judicial Court Reporter

1    quicker than I can -- but basically what the appeals

2    court said, is there was legally sufficient evidence in

3    the case to constitute proof beyond a reasonable doubt

4    and they reinstated the verdict in that case.

5        I cite that case to the Court, but that's on the

6    issue of malicious punishment.

7        On the issue of the sub C section of 827.03(2)(c),

8    the requirement of proving abuse, that would be the

9    State vs. Slocum, or Slocum vs. State case that also

10   Mr. Tedder gave the Court, 757 So.2d 1256, where the

11   court says a first degree murder conviction is proper

12   if a child dies as a result of the defendant's act of

13   aggravated child abuse.  To establish aggravated child

14   abuse, the state must prove the defendant either

15   committed an aggravated battery on a child or willfully

16   tortured, maliciously punished, or unlawfully caged a

17   child, or knowingly and willfully abused a child, and

18   in so doing, caused great bodily harm, permanent

19   disability, or permanent disfigurement to the child.

20       A battery is aggravated when the defendant

21   intentionally or knowingly causes great bodily harm,

22   permanent disability, or permanent disfigurement.

23       That intent is usually a jury question.  In

24   Washington an infant sustained extensive external and

25   internal injuries and died.  The state presented

1     evidence that the defendant was sole custodian --

2     during the playground (sic) and that it could have been

3     inflicted anywhere between 10 seconds and 45 minutes.

4     The evidence suggested that a change in technique and

5     positioning of a defendant's hands would have been

6     required to inflict the different injuries that

7     caused -- different types of injuries and that pauses

8     necessary to make the changes would have allowed the

9     defendant time to reflect.  The court held that given

10    the varied and extensive nature of injuries to the

11    eleven-month-old victim, we find ample support for

12    sending the question to the jury.

13        Regarding another conduct element of aggravated

14    child abuse, the dividing line between permissible

15    punishment and malicious punishment is not always easy

16    to draw.  The defendant maliciously punishes a child if

17    the punishment is imposed willfully, intentionally, and

18    without legal justification or excuse.

19        The element of malice requires evidence that the

20    defendant acted with ill will, hatred, spite, or evil

21    intent.  That's the Slocum case.

22        Then I have several others to cite to the court.

23        THE COURT:  If you're gonna read portions into the

24    record, please read them at a rate that the court

25    reporter won't have to struggle to follow them.

1          MS. SINGER:  Yes.  Yes, ma'am.  I apologize.

2          I'm going to cite Worden, W-O-R-D-E-N, vs. State,

3     Second District Court of Appeal, 603 So.2d 581, 1992.

4     Appellant's nine-month-old son died from an injury to

5     his brain while he was in appellant's care.  As a

6     result, the jury convicted appellant of first degree

7     murder and aggravated child abuse.  On appeal, the

8     court held that because there was competent substantial

9     evidence to support the verdict, and because the state

10    was not required to rebut every possible variation of

11    events and only produce evidence inconsistent with

12    appellant's theory of the case, trial court properly

13    denied motion for Judgment of Acquittal and upheld jury

14    verdict.

15         I'll allow the Court to see that one.  I don't

16    think really the Court needs to read the facts in that

17    one.

18         I also cite Witt, W-I-T-T, vs. State, 780 So.2d

19    946, Florida Fifth DCA, 2001.  Appellant, was, who was

20    20 years old, was convicted under 827.03(2)(c), abuse,

21    aggravated child abuse.  That's where the abuse results

22    in great bodily harm, permanent disfigurement,

23    permanent injury.  The defendant was charged for

24    punching a 16-year-old boy in the head with his fist.

25    The blow and ensuing fall on a concrete parking stop

1    resulted in the boy's death and the court ruled that

2    there was sufficient factual basis in that case to show

3    that that constituted abuse under the definition, and

4    so, therefore, could go to the jury on the charge of

5    aggravated child abuse and first degree murder.

6         Let me see if there's anything more I need to cite

7    to the Court at this time, unless the Court has

8    questions.

9         THE COURT:  Anything else?

10        MS. SINGER:  I have nothing else, your Honor.

11        THE COURT:  Mr. Tedder?

12        MR. TEDDER:  Your Honor, it's awful hard for me to

13   respond to the cases she provided to you because I

14   don't have a copy of them, especially the Coffman case.

15   She cited facts as to the Witt case and I believe

16   another one, but you know, I don't have any idea what

17   the underlying facts were in Coffman, which, I believe,

18   was the one that the judge granted judgment

19   notwithstanding the verdict and that was reversed on

20   appeal, or am I mistaken?

21        MS. SINGER:  I think that's the Coffman case where

22   the infant was in the sole custody of the defendant.

23        MR. TEDDER:  I don't know if that case involved a

24   confession where the person said what he did or whether

25   there was physical evidence to the child in that case.

1      So it's awfully hard for me to respond.

2          THE COURT:  My question is not anything other than

3      do you have a response you would like to make?

4          MR. TEDDER:  No.

5          THE COURT:  Good enough.  I am finding that the

6      evidence presented by the state is legally sufficient

7      to establish a prima facie case and that the issue is

8      one that goes to the jury, that the defense motion for

9      judgment of acquittal is denied.

10         Now, is the defense ready to proceed?

11         MR. GROLAND:  I hope so.  I mean, I am, I just got

12     to get my officers out there.

13         THE COURT:  Go ahead.

14         MS. SINGER:  Judge, do you need to see the

15     indictment to see the allegations?

16         THE COURT:  No.  You all agree on those.

17         MS. SINGER:  Okay.

18         MR. GROLAND:  Your Honor, I've got two officers in

19     the courthouse.  I've been told one of them is in a

20     trial right now in Judge Giunta's courtroom.

21         I've got one officer we can start with, Officer

22     Jackson.

23         THE COURT:  Is the officer that's in the trial on

24     the stand?

25         MR. GROLAND:  I don't know.  I didn't go check.

 1          THE COURT:  We need to know that, because if that
 2     officer's not on the stand, I think it would be better
 3     to call them first.
 4          MR. GROLAND:  Judge Giunta would be on the third
 5     floor.  You want me to go down there?  We can start
 6     with this officer.
 7          THE COURT:  Wait just a minute.  If the officer
 8     that you're going to need is not on the stand, and the
 9     testimony is going to be brief --
10          MR. GROLAND:  Okay.
11          MR. TEDDER:  Your Honor, by the way, we would
12     object to the Court's ruling on denial of the motion
13     for Judgment of Acquittal.
14          THE COURT:  Noted.
15          MR. BAILIFF:  He's on his way up.
16          MR. GROLAND:  Just to remind the Court, the third
17     officer is set for 1 o'clock.  He'll be here at
18     1 o'clock.
19          May I have my first officer just come up to the --
20          THE COURT:  No.  I want you to call the other
21     officer first.  You're saying you have an officer who's
22     going to have testify in two different trials.  He's
23     not on the stand in the other trial right this minute.
24     His testimony here is going to be brief apparently from
25     what you've told me.  So, it makes more sense to me

1    that you call that officer first, unless there's some

2    big disruption in your presentation?

3         MR. GROLAND:  That's fine.  This officer is

4    actually going to be briefer, if that matters.

5         THE COURT:  No, it doesn't, because this officer

6    doesn't have to be in two courtrooms at once.

7         MR. GROLAND:  Okay.

8         THE COURT:  If I understood correctly.

9         MR. BAILIFF:  Officer King is finished with his

10   testimony.

11        THE COURT:  Good.

12        MR. GROLAND:  This is Officer King.  Just have a

13   seat.

14        MR. TEDDER:  We need to ask the other officer to

15   step outside.

16        THE COURT:  Let me make sure I understand.

17   Officer King, you do not have to testify in another

18   courtroom?

19        OFFICER KING:  I'm currently in one in 3A now,

20   ma'am.

21        THE COURT:  So he does.

22        MR. GROLAND:  Who said that he's finished?

23        OFFICER KING:  I was told I may have to be called

24   back.  I may have to go back, be called back, but right

25   now I'm done.

2060

```
 1            MR. GROLAND:  You've already testified.  You may
 2       be called back on rebuttal or something?
 3            OFFICER KING:  Yes.
 4            MR. GROLAND:  Okay.
 5            THE COURT:  So you're free for the next 30 minutes
 6       as far as you know?
 7            OFFICER KING:  As far as I know.
 8            THE COURT:  Good enough.  The rule has been
 9       invoked.  Officer King, if you'll have a seat outside.
10            Mr. Groland, you may call the witnesses in
11       whatever order you wish to.
12            MR. GROLAND:  Thank you.
13            THE COURT:  Bring the jury in.
14            (Before the jury:)
15            THE COURT:  Mr. Groland, go ahead.
16            MR. GROLAND:  Yes, sir. (sic)
17            Officer Jackson, would you come up here, please?
18                     JAMES CHRISTOPHER JACKSON,
19       having been produced and first duly sworn, testified as
20       follows:
21            MR. GROLAND:  May I proceed?
22            THE COURT:  Yes, go ahead.
23                         DIRECT EXAMINATION
24       BY MR. GROLAND:
25            Q    Sir, would you state your name, full name and
```

1    occupation, please?

2         A    My name is James Christopher Jackson, patrol

3    officer, Gainesville police officer.

4         Q    How long have you been with the Gainesville Police

5    Department?

6         A    Ten years.

7         Q    All right.  On August the 2nd, 2000, during the

8    morning hours were you dispatched to Shands Hospital?

9         A    Yes, sir, I was.

10        Q    Okay.  Are you familiar with the Brian Herlihy

11   case?

12        A    Somewhat.

13        Q    Okay.  I mean you know what we're here about?

14        A    Yes, sir.

15        Q    When you got to the hospital, do you recall about

16   what time it was?

17        A    Just sometime in the morning.

18        Q    All right.  When you got to the hospital, did you

19   ever see a person who later became known to you as Brian

20   Herlihy?

21        A    Yes, sir.

22        Q    Do you see Brian in court?

23        A    Yes, sir, I do.

24        Q    Okay.  Where is he?

25        A    Young man right there in the suit with the purple

1   shirt.

2        Q    Were you riding alone in your car that morning?

3        A    Yes, sir, I was.

4        Q    Can you tell me where you first saw Brian?

5        A    I was walking out of the emergency room of Shands,

6   between Shands and that big, what's it, a four-story parking

7   garage.

8        Q    Yes, sir.

9        A    Along that road right there.

10       Q    Okay.

11       A    That's where I first saw him.

12       Q    And what was -- where was he, was he standing,

13  sitting?

14       A    He was sitting on the curb just outside the

15  garage.

16       Q    Okay.  Was he alone?

17       A    Yes, he was.

18       Q    No police officers around except yourself, nobody

19  else?

20       A    Nobody else.

21       Q    What was he doing?  Describe his demeanor when you

22  first saw him.

23       A    He had his head between his legs and he was

24  crying.

25       Q    Okay.  Did you walk up to him and have a

1   conversation with him?

2        A    Yes, I did.

3        Q    Short conversation?

4        A    Yes, sir.

5        Q    After that brief conversation, did you take him

6   somewhere?

7        A    Yes, sir.  We went, and I think we asked the

8   security guard where the chaplain's office was, and I walked

9   him to the chaplain's office and turned him over to the

10  chaplain.

11       Q    Was he crying pretty much the whole time he was

12  with you?

13            MS. SINGER:  I'm going to lodge an objection to

14       the leading nature of this.

15            THE COURT:  Overruled.

16  BY MR. GROLAND:

17       Q    Go ahead.

18       A    Yes, sir.  He would cry and get himself together,

19  and then cry.

20       Q    After you left him with the chaplain, did you have

21  any further involvement with Brian Herlihy?

22       A    No, sir.

23            MR. GROLAND:  No further questions, your Honor.

24            MS. SINGER:  No questions of this witness.

25            THE COURT:  All right.  May this witness be

1      excused?

2              MR. GROLAND:  Yes, ma'am.

3              THE COURT:  Good enough.  You're free to go.

4              THE WITNESS:  Thank you, ma'am.

5              THE COURT:  You may call your next witness.

6              MR. GROLAND:  Robert King, please.

7                      ROBERT LEE KING,

8      having been produced and first duly sworn, testified as

9      follows:

10             THE COURT:  Go ahead.

11             MR. GROLAND:  Thank you.

12                      DIRECT EXAMINATION

13     BY MR. GROLAND:

14     Q    Sir, would you state your name and occupation?

15     A    Robert Lee King, III, Gainesville police officer.

16     Q    How long have you been with the Gainesville Police

17     Department?

18     A    Approximately three years, since 1999.

19     Q    At this time, what shift do you work?

20     A    Shift four, midnight shift 10:00 at night to 8:00

21     in the morning.

22     Q    In fact, this is the second trial you've testified

23     in today, right?

24     A    Correct.

25     Q    Going back home to go to sleep right after you're

1    finished?

2        A    I hope so.

3        Q    All right.  Do you recall the date August the 2nd,

4    2000, and do you recall being dispatched to a certain

5    apartment address?

6        A    I do.

7        Q    Okay.  Who were you riding with that morning?

8        A    I was in training with my FTO, Orlando Alvarez,

9    Officer Alvarez.

10       Q    Did you and Orlando Alvarez actually go to a

11   particular address?

12       A    Yes, we did.

13       Q    Okay.  Do you recall that apartment address and

14   which complex it was?

15       A    1015 Southwest 9th Street, apartment A-21.

16       Q    Okay.  Did you later learn that was Brian

17   Herlihy's apartment?

18       A    Correct.

19       Q    Did you meet up with Brian Herlihy or his

20   girlfriend at the apartment?

21       A    No, we did not.

22       Q    Were any of the individuals who stayed at that

23   apartment there when you arrived with your partner?

24       A    No.

25       Q    Who was present when you got there?

1        A     Alachua County Fire Rescue was present and other

2     responding officers from the department.

3        Q     Okay.  Was everybody out of the apartment by the

4     time you got there?

5            MS. SINGER:  I'm gonna lodge an objection,

6        leading.

7            THE COURT:  Overruled.

8            THE WITNESS:  As far as I knew, yes, sir.

9     BY MR. GROLAND:

10       Q     All right.  Did a sergeant come on the scene?

11       A     Yes.

12       Q     Did you and the sergeant and your training officer

13    go into the apartment and look around?

14       A     Yes, we did.

15       Q     Did you make any observations that you now recall

16    or did everything look routine to you?

17       A     We just made notes of the location of the

18    occurrence, which was on the bed area, and we also observed

19    a liquid substance on the floor between the bed and --

20       Q     It looked like somebody had spit up or thrown up?

21       A     Yes.

22       Q     Do you recall where that was with reference to the

23    bed?  In other words, was it toward the back of the bed or

24    closer to the side of the bed?

25       A     It was closer to the side of the bed, a little.

1       Q     Other than looking around as you described, did

2  you do anything else inside that apartment?

3       A     No, sir.

4       Q     You didn't make any diagrams, or do anything, or

5  take photographs?

6       A     No, sir, I did not.

7       Q     Did you see anybody else do that at that time?

8       A     I did not.

9       Q     Did you and Officer Alvarez then leave and go

10 somewhere else?

11      A     Yes, we left and went to Shands at UF.

12      Q     Okay.  And were you dispatched there or did you

13 both decide to go there on your own?

14      A     We were directed to go there.

15      Q     Do you recall for what purpose you were directed

16 to go to Shands?

17      A     Just to continue the investigation into the

18 emergency.

19      Q     Okay.  What were you investigating?

20      A     Just to, more or less making sure what was the, I

21 guess, the further condition of the baby and basically just

22 to make sure everything was okay.

23      Q     Did you and your partner decide that this was an

24 accident at that early stage?

25            MS. SINGER:  I'm going to lodge an objection.

Stacey K. Bryant, RPR
Judicial Court Reporter

1          Calls for speculation.

2                 THE COURT:  Sustained.

3     BY MR. GROLAND:

4          Q    Did you classify this initially as a criminal

5     matter or as an apparent accident?

6                 MS. SINGER:  Once again, I'm going to lodge an

7            objection.

8                 THE COURT:  That's overruled.  You can answer that

9            question if you're able to, Officer.

10                THE WITNESS:  I can't answer that.

11    BY MR. GROLAND:

12         Q    You cannot?

13         A    No.  We were dispatched to another emergency.

14         Q    After you got there, I'm talking about while

15    you're still en route to the hospital, after you get to the

16    hospital --

17         A    Yes.

18         Q    -- do you and your partner decide that this is

19    still an accident, or is it a criminal investigation from

20    your perspective?

21         A    It's still an accident at that time.

22         Q    I'm sorry?

23         A    Still an accident at that time.

24         Q    And, in fact, you and -- Well, strike that.

25                Do you see Mr. Herlihy in court?

1      A    Yes, I do.

2      Q    You met him at the hospital, correct?

3      A    Yes.

4      Q    Would you identify him, please, for the record?

5      A    He's sitting right over there with the dark

6  colored blazer, I guess.

7      Q    And did there come a time when you and your

8  partner actually approached Mr. Herlihy and had a

9  conversation with him?

10     A    Yes.

11     Q    Was there a discussion about a shower?

12     A    There was.

13     Q    What do you recall Mr. Herlihy told you and your

14  partner about going into the shower? Did he tell you -- Go

15  ahead.

16     A    Yeah.  Basically he said that he just fed the

17  baby, laid the baby on the bed, and he went in to take a

18  shower, because they were getting to leave the area, to go

19  out of town.

20     Q    Did he tell you he took a shower or did he tell

21  you --

22          MS. SINGER:  I'm going to lodge an objection.

23          MR. GROLAND:  I didn't finish my question.

24          THE COURT:  Don't answer it yet, Officer.  Let him

25      finish.

1    BY MR. GROLAND:

2        Q    Did he tell you he took a shower or did he tell

3    you he did something else?

4            THE COURT:  Do you have an objection to that?

5            MS. SINGER:  I don't have an objection to that.

6            THE WITNESS:  He said he went in and started the

7        shower, and if I recall correctly, he was using the

8        bathroom before he took a shower.

9    BY MR. GROLAND:

10       Q    Did he tell you he did not take a shower?

11           MS. SINGER:  I'm going to lodge an objection,

12       that's also a leading question.

13           THE COURT:  The objection is overruled.  That is

14       not leading.

15           THE WITNESS:  I can't recall if he said he took a

16       shower.  All I remember is he said he went in to take a

17       shower.

18   BY MR. GROLAND:

19       Q    Do you remember giving a deposition in this case

20   in my office on June 12th, 2002, and you got a copy?

21       A    Yes, I have a copy.

22       Q    Do you remember this question on Page nine, Line

23   nine?

24           Question by me:  "And did he tell you after he

25   used the toilet is when he went out and found the baby?

1          Answer:  Yes.  He said he had the shower running

2     at the same time.  He was about to get in the shower, but he

3     used the toilet first.

4          Question:  Used the toilet and then went out and

5     checked on the baby, so he did not get in the shower?"

6          Answer:  Correct.

7          Is that how it went?

8     A     As far as I concur, yes.

9     Q     Now you remember?

10    A     Yes.

11    Q     So did he tell you that and Officer Alvarez that

12    at the same time, or did you have a separate conversation

13    with him, yourself?

14    A     No, we both were spoken to at the same time.

15    Q     So when Mr. Herlihy made this statement about not

16    going in the shower, but using the toilet instead, he said

17    that to both you and Orlando Alvarez simultaneously?

18    A     Correct.

19         MS. SINGER:  Objection, leading, your Honor.

20         THE COURT:  Sustained.

21    BY MR. GROLAND:

22    Q     You never had a separate -- Did you ever have a

23    separate conversation with him?

24    A     No, I did not.

25    Q     Every conversation with Mr. Herlihy was when both

1  of you were there?

2       A    Yes.

3       Q    After that, did you leave the hospital?

4       A    After which, which point, sir?

5       Q    After talking to Mr. Herlihy.

6       A    I think we stayed around a little longer, but

7  eventually we did leave the hospital, yes, sir.

8       Q    All right.  Before you left the hospital, did you

9  ever see Mr. Herlihy again?

10      A    Before we left the hospital?

11      Q    Yes, sir.

12      A    I can't be too sure about where -- What exactly

13 are you asking, where in the hospital or --

14      Q    Did you ever see him again after the conversation

15 that we were just talking about?

16      A    Yes, we did.

17      Q    Okay.  Did you specifically see him again in the

18 hospital area?

19      A    I did.

20      Q    Was that inside the hospital or outside the

21 hospital?

22      A    When I saw him he was outside the hospital.

23      Q    And where did you see him outside the hospital?

24      A    The emergency room entrance area.

25      Q    Okay.  And what was he doing when you saw him

2073

```
 1    outside?
 2         A    He was outside and visibly upset, emotionally
 3    upset.
 4         Q    Okay.  And was he sitting, or standing, or?
 5         A    I can't recall if he was sitting or standing at
 6    that time.
 7         Q    Did you ever tell him he could not leave the area?
 8         A    I was instructed to inform him not to leave the
 9    area because --
10         Q    What time was this that you told Mr. Herlihy not
11    to leave the area?
12         A    I don't know what time it was.
13         Q    Would you agree it was before 1 o'clock?
14         A    It could have been.
15         Q    If, in fact, he left at 1 o'clock with detectives,
16    could you estimate for us when you first saw him and had
17    this conversation with him?
18         A    It was shortly after we arrived from the actual
19    scene.
20         Q    Shortly after you arrived?
21         A    To the hospital.
22         Q    All right.  What time did you arrive at the
23    hospital?
24         A    I don't know the exact time.
25         Q    What time were you dispatched to the apartment?  I
```

1    tell you what, did you do a report?

2         A    I did not do a report.

3         Q    All right.  Let me --

4              MR. GROLAND:  May I have a moment, your Honor?

5              (Pause in the proceedings.)

6    BY MR. GROLAND:

7         Q    Did Officer Alvarez, to your knowledge, do a

8    report?

9         A    Yes, he has, sir.

10        Q    Did you look at that report before?

11        A    I have.

12        Q    Did you read that report before your deposition

13   was taken in this case?

14        A    I did.

15        Q    Would you like to see it now?

16        A    Yeah, that would be fine.

17        Q    Let me see if I can find it.  I can't put my hands

18   on it.  Do you have an estimate as to what time you got this

19   call that morning?

20             MS. SINGER:  Mr. Groland, would you let me just

21        attach the part of the report that applies?  But I do

22        need it back.

23             MR. GROLAND:  Thanks.  May I approach the witness,

24        your Honor?

25             THE COURT:  Yes.

2075

```
 1    BY MR. GROLAND:

 2         Q    Is that Orlando Alvarez's report that was prepared

 3    in connection with this case?

 4         A    Yes.

 5         Q    Can you tell me what time you were dispatched to

 6    the apartment?

 7         A    At 9:52 a.m.

 8         Q    Okay.  What time did you arrive?

 9         A    9:56.

10         Q    And how long did you say you stayed there?

11         A    At the apartment no more than five minutes or so.

12         Q    And from there you went to the hospital?

13         A    Yes, sir.

14         Q    And would you say you got to the hospital sometime

15    shortly after 10:00?

16         A    Yes.

17         Q    How long did you stay inside the hospital?

18         A    The hospital, approximately a half-an-hour.

19         Q    Okay.  And after that did you then go outside and

20    see Mr. Herlihy?

21         A    Upon our departure, yes.

22         Q    That's when you saw him, as you described, very

23    emotional outside?

24         A    Yes.

25         Q    Was anybody else around him at that time?
```

1     A     No.

2     Q     Do you recall who it was at that time that told

3  you not to let him leave the area?

4     A     I was instructed by my training officer, Alvarez.

5  I'm not sure who instructed him, but he gave me the word to

6  keep an eye on him, observation on him.

7     Q     Did you tell Mr. Herlihy you cannot leave the

8  area?

9     A     I don't recall that.  No, I don't recall telling

10  him not to leave the area at all.

11     Q     And did you stay with him until Detective Helen

12  Legall and Detective Dave Cannon arrived?

13     A     Yes.

14     Q     And did you turn him over to those two detectives?

15     A     Yes, I did.

16          MR. GROLAND:  No further questions, your Honor.

17          THE COURT:  Any questions?

18          MS. SINGER:  I do have questions and I need to

19      take the report back, Officer King, because I need to

20      refer to parts of it.  If you need it to refresh, just

21      tell me and I'll be happy to show it to you.

22                         CROSS-EXAMINATION

23  BY MS. SINGER:

24     Q     Officer King, you were training back in August of

25  2000, you were training?

1    A    Yes.

2    Q    And you'd been on the force for less than a year

3  at that time, correct?

4    A    Yes.

5    Q    And, in fact, Officer Alvarez was the officer that

6  would have been required to make a police report in this

7  case?

8    A    Correct.

9    Q    You did not have to write a report, you were

10  following along?

11   A    Yeah, I was fresh.

12   Q    You were fresh, okay.  And, in fact, Officer

13  Alvarez did make a report in this case, correct?

14   A    Yes.

15   Q    In that report he wrote down --

16       MR. GROLAND:  Objection, your Honor.  I mean, we

17       alluded to the report for times only, but we certainly

18       didn't get into narratives that are not admissible.

19       THE COURT:  The question may be objectionable.

20       Now, if you were about to read what was written down,

21       of course, it would be sustained.  If you were about to

22       describe it, then it would not be an objectionable

23       question.

24       MS. SINGER:  I can just go -- I can just move on.

25  BY MS. SINGER:

Stacey K. Bryant, RPR
Judicial Court Reporter

2078

1      Q    When you spoke with Mr. Herlihy, first of all, at

2  the house, at the residence, Mr. Herlihy wasn't there,

3  correct?

4      A    No, he was not.

5      Q    There was lots of EMT's, paramedics, fire people

6  there, correct?

7      A    Correct.

8      Q    They were still there when you got there?

9      A    Yes.

10     Q    You didn't know who was in the apartment when you

11  got there?

12     A    No.

13     Q    You didn't know whether or not there was anybody

14  up there that may have information regarding this baby's

15  injuries, did you?

16     A    No.

17     Q    That was the reason why you went in the apartment?

18     A    Yes.

19     Q    You went in the apartment to see if there was any

20  evidence of foul play, because the call went out that this

21  baby was either dying or dead?

22     A    Yes, ma'am.

23     Q    That's a call that requires you to go to a scene

24  and make sure that the situation is safe?

25     A    Yes, ma'am.

1     Q    All right.  You did a, what's called a walk

2  through, right?

3     A    Yes.

4     Q    Do that all the time, don't you?

5     A    Yes.

6     Q    Did not find anybody in the apartment?

7     A    No.

8     Q    Didn't touch anything?

9     A    No.

10     Q    Didn't move anything?

11     A    No.

12     Q    Just closed the door and went on to Shands?

13     A    Correct.

14     Q    Because it was still an investigation of a dying

15  or dead baby?

16     A    Yes.

17     Q    All right.  Just to get that cleared up there.

18          When you got there you saw Brian Herlihy, the

19  defendant in this case?

20     A    Yes.

21     Q    Correct.  And didn't you all see Crystal Quirello

22  also, the mom?  Did you see her there?

23     A    Yeah, we did see her.

24     Q    But you didn't have -- you didn't personally have

25  any contact with the mother?

Case 1:09-cv-00052-MP-GRJ   Document 21-24   Filed 03/22/11   Page 121 of 129

2080

```
 1        A    No, no.

 2        Q    Okay.  When you saw Brian Herlihy there, he told

 3   you that he and Crystal, or they had been planning to travel

 4   to Cedar Key for the day?

 5        A    Correct.

 6             MR. GROLAND:  Objection, your Honor, beyond the

 7        scope of the direct.

 8             THE COURT:  Overruled.  Go ahead.

 9   BY MS. SINGER:

10        Q    And he told you that the mother of the child,

11   Crystal Quirello had gone to fuel up the vehicle while he

12   was going to take or took a shower?

13        A    Correct.

14        Q    All right.  He told you he had just fed the infant

15   a bottle of formula and he had laid the baby on the bed face

16   down?

17        A    Yes, ma'am.

18        Q    And he also said that he had jumped into the

19   shower?

20        A    Yes, ma'am.

21        Q    He said that while in the shower, he noticed how

22   quiet it was; is that correct?

23        A    Correct.

24        Q    And he stepped out and discovered the infant

25   wedged between the mattress frame and the foot of the bed?
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1     A     Yes.

2     Q     He said he noticed the infant was not responsive.

3  So he administered CPR while simultaneously dialing 911?

4     A     Yes, he did.

5     Q     And Mr. Groland asked you about seeing

6  Mr. Herlihy, the defendant in this case, outside of the

7  hospital at some point?

8     A     Yes.

9     Q     There was a point, Officer King, was there not,

10  when you did not know where Mr. Herlihy was?

11     A     That's correct.

12     Q     You never saw Mr. Herlihy with Chris Jackson,

13  another member of the Gainesville Police Department, did

14  you?

15     A     No, I did not.

16     Q     You don't know whether or not Mr. Herlihy, the

17  defendant in this case, left the hospital at any point in

18  time, do you?

19     A     No, I do not.

20     Q     But there did come a time when you were at the

21  hospital, you saw Mr. Herlihy and someone had said to you

22  keep an eye on him?

23     A     Yes.

24     Q     And you did that?

25     A     Yes, ma'am.

2082

| | | |
|---|---|---|
| 1 | Q | And you kept an eye on him.  Did he go anywhere? |
| 2 | A | No, he did not. |
| 3 | Q | Did you have to follow him? |
| 4 | A | No. |
| 5 | Q | Did you have to arrest him? |
| 6 | A | No. |
| 7 | Q | Did you have to put him in handcuffs? |
| 8 | A | No, I didn't. |
| 9 | Q | You didn't do any of that, you just watched him? |
| 10 | A | Yes. |

11    Q    And he stayed in the same place, right underneath
12 the awning of the emergency room?
13    A    Yes, ma'am.
14    Q    And then Investigator Legall and Investigator
15 David Cannon came and they began talking to him?
16    A    Correct.
17    Q    And then you left?
18    A    Yes, ma'am.
19    Q    That was the extent of your contact with
20 Mr. Herlihy?
21    A    Yes, it was.
22    Q    You didn't force him to stay there?
23    A    No, I didn't.
24    Q    Didn't make him stay there?
25    A    No.

```
 1          MS. SINGER:  I have no further questions, your
 2     Honor.
 3                    REDIRECT-EXAMINATION
 4  BY MR. GROLAND:
 5     Q    Would you tell us, Officer Jackson, which is
 6  correct --
 7          MS. SINGER:  It's Officer King.
 8          MR. GROLAND:  Thank you.
 9  BY MR. GROLAND:
10     Q    Would you tell us, Officer King, which is correct,
11  your statement under oath that he told you he was not in the
12  shower, or a report not under oath, written by somebody
13  else?
14     A    It was from what I gave in the deposition.
15     Q    I'm sorry?
16     A    From what I gave in the deposition.
17     Q    That he told you he was not in the shower?
18     A    Yes.
19          MR. GROLAND:  Thank you.
20          THE COURT:  All right.  May Officer King be
21     released at this time?
22          MR. GROLAND:  Yes.
23          THE COURT:  I'm sorry.  I didn't hear you.
24          MS. SINGER:  Oh, yes.  No problem.  Thank you very
25     much.
```

1       THE COURT:  Officer King, you're free to go from

2   this one.

3       MS. SINGER:  I was just looking at the clock.  I'm

4   sorry, your Honor.

5       THE COURT:  We are gonna take a lunch recess at

6   this time, ladies and gentlemen.  We're gonna try to

7   make it as short as possible without rushing you all.

8   So I'm gonna ask, if possible, that you be back and

9   ready to begin the testimony at 1 o'clock.  On the

10  other hand, we will certainly wait for you.  So if that

11  does not give you enough time, then you take what time

12  you need.

13      But I'll ask that the attorneys be back and ready

14  at 12:50 so that we can, we will be ready if the jury

15  gets back in time.

16      (Outside the presence of the jury.)

17      THE COURT:  All right now, Mr. Groland?

18      MR. GROLAND:  Yes, your Honor.  I do have a

19  concern.  I'm going to -- I think I finally got the

20  hang of it and I think I'm gonna stay away from

21  anything that might even come close to opening the door

22  on my direct with my client.

23      What I am concerned about is the state, in their

24  cross-examination, either intentionally trying to pry

25  open the door, or inadvertently opening the door, that

1   would only be to my detriment.  So I think it would be

2   a safe thing to do right now, to have some very

3   specific guidelines as to what the state is permitted

4   to do, so that I don't have to get up in front of the

5   jury and make an objection to something that will

6   basically open the door to my detriment.  And I think I

7   would ask the Court to give the state some direction as

8   to what they are permitted to do consistent with your

9   Honor's prior ruling along these lines.

10       THE COURT:  On what basis?  I've given all kinds

11   of direction and I've ruled on everything you've

12   brought in front of me.

13       MR. GROLAND:  Here's what, Judge.  I'll make an

14   oral motion, I guess, for a clarification of an order

15   of Court that really applied to the defense opening the

16   door that we never discussed, nor was it ever addressed

17   before whether the state can open the door or what

18   happens if they do, or how do we deal with that?

19       So -- and that's the purpose of my oral motion at

20   this time, is for my clarification as to what they're

21   permitted to do.

22       Let me just tell the Court this:  There is

23   something in the record.

24       THE COURT:  Just to give you as broad a

25   perspective as I can at this time, there's nothing in

Stacey K. Bryant, RPR
Judicial Court Reporter

1    my pretrial ruling that would lead me to believe that

2    the state will be restricted in any way on

3    cross-examination if Mr. Herlihy chooses to exercise

4    his right to testify.  If he gets on the stand, he is

5    subject to cross-examination as to every aspect of this

6    case.

7         Now, the state cannot ask him about times that

8    have nothing to do with this case where he may have

9    made statements that were inaccurate, and if there is

10   such a thing, and I have no way of knowing, then those

11   things would not come in.  But if he testifies about

12   the events of this case, and if he takes the stand at

13   all, and he's subject to cross-examination in that

14   regard, then he's subject to cross-examination on any

15   false statements he may have made to law enforcement or

16   to anyone else involved in this case, because, by

17   taking the stand, he will have opened the door as to

18   his own credibility.

19        Now, as I have said before, and clarified before,

20   the state cannot charge a man with murder because he is

21   a liar.  And, therefore, the state was precluded from

22   presenting in their case in chief evidence that

23   Mr. Herlihy may have lied in ways that are, in fact,

24   collateral to the specific allegations.  If he takes

25   the stand, he puts his credibility in issue.  Then his

1    lying in this case becomes very much an area that they

2    can examine.

3        And I don't know any other possible interpretation

4    that anybody, including you, or even the appellate

5    courts could come to in regard to that.

6        MR. GROLAND:  Well, there's such a thing as lying

7    on matters that relate to the case, as your Honor has

8    correctly pointed out, and lying on collateral matters

9    that came up during the investigation.  In other words,

10   for instance previous schooling as a nurse.

11       THE COURT:  If it was during these, the

12   investigation in this case, it's going to come in as

13   far as I know.  I'm not asking any questions.  But it

14   is certainly not excluded on any legal basis

15   whatsoever.

16       MR. GROLAND:  Your Honor, what I'm talking about

17   is, I understand lies to the police are one thing, but

18   the police questioning him about lies to other people

19   that have nothing to do with this case, that should not

20   come in.  In other words, if the police question him

21   about a very collateral matter, just to establish for

22   their own --

23       THE COURT:  You have to give me an example.  If

24   the police asked him:  Five years ago did you lie on

25   your resume to such and such, you're right, that may be

1    way too collateral.

2         MR. GROLAND:  No.  I'm saying:  Did you lie when

3    you told such and such that you were a nursing student

4    or graduated from nursing school?

5         THE COURT:  I don't know who such and such is and

6    I don't know the time frame, so I have no way of

7    ruling.

8         Do you have anything specific you want me to rule

9    on?

10        MR. GROLAND:  I wasn't prepared to do that.  I

11   would like to go through Detective Legall's report once

12   again, which is about seven or eight pages, as relates

13   to Mr. Herlihy.  And I'll -- if the Court will allow me

14   at 1 o'clock, I can give the Court the specifics.

15        THE COURT:  At 12:45.

16        MR. GROLAND:  At 12:45 I'll do that.

17        THE COURT:  Good enough.  We'll be in recess until

18   12:45.

19        (Lunch recess taken.)

20                    * * * * *

21

22

23

24

25

Stacey K. Bryant, RPR
Judicial Court Reporter