# EXHIBIT

# S

# In the District Court of Appeal
### FIRST DISTRICT
## of Florida

*202·1·17814*
*F*

BRIAN PATRICK HERLIHY

Appellant,

CASE NUMBER   2000-2753-CFA

APPEAL NUMBER 1D02-4788

v.

VOLUME XIX

STATE OF FLORIDA

Appellee,

# TRANSCRIPT
# RECORD

## HONORABLE MARTHA ANN LOTT
### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

2003 MAY 12  PH 2:39

Docketed *CH*
05·14·2003
Florida Attorney General

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

2089

202-1-17814

```
 1                              IN THE CIRCUIT COURT OF FLORIDA
                                EIGHTH JUDICIAL CIRCUIT
 2                              IN AND FOR ALACHUA COUNTY

 3                              CASE NO. 01-2000-CF-002753-A

 4    THE STATE OF FLORIDA

 5    vs.                              Volume XIX

 6    BRIAN PATRICK HERLIHY,
                                       1002-4788
 7              DEFENDANT.

 8    _____/

                                          Docket C4
 9
                                    05.14-2003
10              TRANSCRIPT ON APPEAL
                PAGES 2089 - 2176
11                 VOLUME XVI

12

13    PROCEEDINGS:        JURY TRIAL
      BEFORE:             THE HONORABLE MARTHA ANN LOTT,
14                        CIRCUIT JUDGE
      DATE:               SEPTEMBER 20TH, 2002
15    TIME:               12:50 P.M.
      PLACE:              COURTROOM 4A
16                        ALACHUA COUNTY COURTHOUSE
                          GAINESVILLE, FLORIDA
17
      APPEARANCES:
18
            JEANNE SINGER, ESQUIRE
19          and
            STEPHEN H. PENNYPACKER, ESQUIRE
20          120 WEST UNIVERSITY AVENUE
            GAINESVILLE, FLORIDA 32601
21          ATTORNEY FOR THE STATE OF FLORIDA

22          GORDON H. GROLAND, ESQUIRE
            and
23          JOHN TEDDER, ESQUIRE
            500 EAST UNIVERSITY AVENUE, SUITES B&C
24          GAINESVILLE, FLORIDA 32601
            ATTORNEY FOR THE DEFENDANT
25
```

2090

1                    INDEX VOLUME XVI

2                       WITNESSES

3   LIEUTENANT WILLIAM HALVOSA

4     Direct Examination by Mr. Groland...............Page 2110

5     Cross-Examination by Ms. Singer................Page 2119

6     Redirect Examination by Mr. Groland............Page 2128

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           INDEX VOLUME XVI CONTINUED

2                    EXHIBITS

3    DEFENSE EXHIBITS

4    No. 5 - Medical Records of Crystal Quirello.......Page 2110

5    No. 6 - Medical Records of Crystal Quirello.......Page 2110

6

7

8    DEFENSE RESTS....................................Page 2133

9    JURY CHARGE CONFERENCE...........................Page 2146

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2           (Whereupon, the following proceedings were held,

3  the defendant and counsel being present.)

4           MR. GROLAND:  Judge, based upon Your Honor's

5      clarification to me about what the state would be

6      permitted to do on cross-examination if Mr. Herlihy took

7      the stand, we've made a decision after consultation with

8      the client, his mom and dad, and his fiance, who are all

9      present in the courtroom, the consensus is we decided

10     Brian is not going to take the stand.

11          We'd like to have the Court inquire on that issue.

12          THE COURT:  Good enough.  Mr. Herlihy.

13          MR. GROLAND:  Stand up.

14          THE DEFENDANT:  Yes, ma'am, sorry.

15          THE COURT:  You understand you have an absolute

16     right to testify if you so choose?

17          THE DEFENDANT:  Yes, ma'am, I do.

18          THE COURT:  You understand that, of course, you may

19     confer and consult with anybody you choose to before

20     making that decision, but the decision is yours alone.

21          THE DEFENDANT:  Yes, ma'am, I do.

22          THE COURT:  Have you chosen not to testify in this

23     trial?

24          THE DEFENDANT:  I believe it's in my best interest,

25     yes, ma'am.

1          THE COURT:  Well, that may well be, but I just need

2     a yes or no.

3          THE DEFENDANT:  I'm sorry, ma'am.  Just a little

4     nervous.  Yes, ma'am.

5          THE COURT:  Good enough.  Anything else that the

6     state wants to inquire in regard to?

7          MS. SINGER:  Has anyone, Mr. Herlihy, is anyone

8     forcing you, threatening you, coercing you, or in any

9     way making you make this decision not to take the stand

10     at this time?

11          THE DEFENDANT:  No, they are not.

12          MS. SINGER:  Have you been promised anything by

13     Mr. Groland, Mr. Tedder, anybody on the defense team,

14     your mom, your dad, your fiance, that is making you now

15     make the decision not to take the stand?

16          THE DEFENDANT:  Certainly not.

17          MS. SINGER:  Are you doing this because you freely

18     and voluntarily believe it's in your best interest at

19     this time to not take the stand in this case?

20          THE DEFENDANT:  Yes, that is correct.

21          MS. SINGER:  I'm sorry?

22          THE DEFENDANT:  Yes, that's correct.

23          MS. SINGER:  All right.  Are you under the

24     influence of any drugs, intoxicants, liquor, or any

25     other medications that would cause you not to understand

```
 1          the decision you're making here this afternoon?

 2              THE DEFENDANT:  I'm under nothing at all.

 3              MS. SINGER:  So you fully understand the

 4          implications of making the decision not to testify on

 5          your own behalf in this case?

 6              THE DEFENDANT:  That's correct.

 7              MS. SINGER:  And has Mr. Groland outlined for you

 8          the fact that you can take the stand and explain your

 9          side of the story?

10              THE DEFENDANT:  Yes, he has.

11              MS. SINGER:  And you have decided, even knowing

12          that, that you wish not to take the stand in this case?

13              THE DEFENDANT:  Correct.

14              MS. SINGER:  I believe that's sufficient, Judge.

15          If there's anything else the Court wishes to ask about

16          that.

17              THE COURT:  Only are you satisfied with the advice

18          and assistance of your attorneys up to this point?

19              THE DEFENDANT:  Yes, ma'am.

20              THE COURT:  Good enough.

21              MS. SINGER:  All right.  Thank you.

22              THE COURT:  Let's talk about the logistics of the

23          trial for the remainder of the day.  Sergeant Halvosa

24          will be --

25              MR. GROLAND:  Thirty minutes max.  In fact, I think
```

1    both sides.

2        THE COURT:  And then you intend to rest; is that

3    correct?

4        MR. GROLAND:  Then we're going to ask that the bed

5    be put together.  And now that we may have a little more

6    time --

7        THE COURT:  There would be no reason to do that in

8    the case at this time.

9        MR. GROLAND:  Well, at this time we're going to

10   want the bed put together so that the jury can see the

11   bed in its assembled form at closing or before that,

12   however we can get it done.  We don't need to absolutely

13   do it this afternoon.

14       THE COURT:  Yes.

15       MR. GROLAND:  Because I don't even know that we've

16   decided where we're going to do it or whether we're

17   going to do it in here.

18       We have two items of evidence to move in, some

19   medical records, some hospital records that are just

20   marked for identification that we're going to want to

21   move in.  And let me just look -- and I think that but

22   for the ophthalmologist testimony, which would be the

23   first thing Monday, if I can get that together, we will

24   be able to rest on Monday.

25       THE COURT:  That's not going to happen in that

1    order as I explained to you.

2        MR. GROLAND:  Oh.  I thought, Your Honor -- then I

3    totally misunderstood.  I thought I was going to be able

4    to let the Court know and let the state know over the

5    weekend --

6        THE COURT:  No, that's exactly wrong.  That was

7    your request.  And what I said to you was, I'm not going

8    to recess the trial early and see whether or not you

9    come up with a witness.  On the other hand, after the

10    evidence is closed today and you rest your case, and the

11    state has presented any rebuttal testimony if they have

12    any, then if you find a witness, you may move Monday

13    morning to reopen your case and at that time I will

14    consider the grounds for it.

15        Does that refresh your memory about that?

16        MR. GROLAND:  It does indeed.

17        MS. SINGER:  Meaning that other decisions, such as

18    the decision that was just made regarding whether to

19    testify or not --

20        THE COURT:  There are lots of things that I will

21    consider at that time.  What I'm not doing is recessing

22    the trial early so that you can go look for a witness.

23    That's what we're not doing.

24        MR. GROLAND:  Okay.  The Court's not ordering that

25    we close today?

```
 1              THE COURT:  Yes, I am.

 2              MR. GROLAND:  Do the closing arguments today?

 3              THE COURT:  No, close your case.

 4              MS. SINGER:  Rest.

 5              MR. GROLAND:  Okay.

 6              THE COURT:  I'm ordering that you continue to

 7         present evidence or rest your case.

 8              MR. GROLAND:  Okay.  I understand.

 9              THE COURT:  Now, as to the bed, the bed is not

10         going to be set up during the trial.  Now, it will be

11         set up for the jury during deliberations, and we can

12         discuss that.  If either the state or defense request

13         that it be set up for purposes of closing argument, that

14         is a reasonable argument to make and I'll be glad to

15         hear from both sides as to whether or not that is

16         reasonable.  But the logistics of doing that are

17         cumbersome, and that's one of the many reasons why it's

18         not going to be set up this afternoon.  This courtroom,

19         for instance, is going to be used first thing Monday

20         morning for venire again.

21              So after you've presented medical records and

22         Mr. Halvosa, at that point you believe you'll be rested?

23              MR. GROLAND:  That's correct.

24              MS. SINGER:  Subject to reopening on the very

25         narrow ground of --
```

1      THE COURT:  Subject to a motion to reopen the case

2   for the purposes of one potential expert witness, which

3   I have not ruled on, but I'd hear a motion.

4      MS. SINGER:  Right.  I just want to make sure

5   because I'd like to be able to ask that the witnesses

6   that -- once he rests, the witnesses who are presently

7   under subpoena, I'd like to ask that they be released

8   from their subpoenas so they can come in for closing.

9   And I think they're entitled to be released once he

10   rests.

11      MR. GROLAND:  I think she's right about that.

12      THE COURT:  Good enough.  Now, in regards to

13   rebuttal testimony, does the state have any?

14      MS. SINGER:  Well, not knowing what Mr. Halvosa

15   says, we have no rebuttal as to Halvosa if he says what

16   I think he's going to say, and I have none as to the two

17   witnesses that have already testified.  I don't know

18   about this expert, so I can't answer that.

19      THE COURT:  But at this point, for purposes of this

20   afternoon, you would not be anticipating presenting any

21   rebuttal testimony?

22      MS. SINGER:  Not to what has already been

23   presented, and I doubt if Mr. Halvosa is going to raise

24   any issues for rebuttal.

25      MR. GROLAND:  Will the Court be okay if I -- once

1   ·we make a determination, that I just tell the Court over

2   the weekend:  A, we've got a witness; and B, who it is,

3   just so Your Honor knows beforehand and then tell the

4   state?

5        MS. SINGER:  If you would call me that would be

6   nice so I'll know ahead of time.

7        THE COURT:  No, I'll tell you how that's going to

8   work.  It's my belief that based upon finishing these

9   bits and pieces at approximately 2:00 P.M., that I would

10  not ask the state or the defense to begin closing

11  arguments this afternoon but that instead we would

12  conduct our charge conference this afternoon.

13       And then I would instruct the jurors to come back

14  for closing arguments on Monday at 10:30 and we would

15  begin the closing arguments at 10:30 in this courtroom.

16       MS. SINGER:  Because we don't have the courtroom

17  ·until 10:30?

18       THE COURT:  We don't have this courtroom until

19  10:30.

20       Now, in the interim, if any motions come up,

21  including the one that you're hoping to be able to

22  bring, that being the request to reopen for purposes of

23  one additional expert witness, then that motion would be

24  heard at 9:00 A.M. in Courtroom 2D on Monday.  Other

25  than that, unless that comes to fruition, and everybody

1    will just have to be on standby about that, other than

2    that, we'll need to be in this courtroom prepared to

3    present your closing arguments beginning at 10:15 Monday

4    morning.

5         Now, is either the state or defense requesting that

6    the bed be set up for purposes of closing argument or

7    only for deliberations?

8         MR. GROLAND:  We so request that it be set up for

9    closing argument.

10        THE COURT:  All right.  State have any objection?

11        MS. SINGER:  I don't think that I have an

12   objection.  I don't know how I would have an objection

13   to that.

14        THE COURT:  I don't know either.  I'm just giving

15   you a chance to put it on the record in case you did.

16        MR. GROLAND:  Are they going to set it up from GPD?

17        MS. SINGER:  No Walt West, Mr. West is going to set

18   it up.  He's not back from lunch yet but he brought some

19   tools and he can be here Monday also.

20        THE COURT:  Does Mr. West know how long it will

21   take it set up?

22        MS. SINGER:  It doesn't take very long.

23        MR. GROLAND:  Where should we set it up?

24        MS. SINGER:  Well, if we do the closing here I

25   guess we have to set it up right here in the center of

1    the floor.  We set it up and it took about between 10

2    and 15 minutes at the most to set it up.

3         Are the screws in there?

4         MR. PENNYPACKER:  Yes.

5         MS. SINGER:  It really doesn't take all that long

6    to set up.

7         THE COURT:  Then I would direct that Mr. West come

8    at 10:15 on Monday morning, the attorneys will be here

9    at 10:15, and that it be set up.

10        MS. SINGER:  If it's not Mr. West, it could it be

11   any other male personnel from our office because if he's

12   off next week --

13        THE COURT:  Or female.

14        MS. SINGER:  It doesn't matter who it is.  Okay.

15        THE COURT:  But if the state will provide the

16   services of setting that up, that will be fine.

17        MR. PENNYPACKER:  Does set up include the frame,

18   box spring, mattress, and bedding, meaning the

19   comforter --

20        MS. SINGER:  The comforter and the pillows?

21        MR. PENNYPACKER:  -- the shams and the pillows?

22        THE COURT:  It includes the frame and the box

23   spring and the mattress.  Now, the state and defense and

24   the jurors, for that matter, are perfectly capable of

25   handling the bedding itself.  And based upon the

1    testimony in this case, I suspect that state and defense

2    and possibly jurors are going to want to shift that

3    stuff around anyway.  So whether or not you have that

4    put up or not -- and since the state will begin, you can

5    decide in what state you want it in regard to the linen

6    for purposes of your closing.  And then the defense may

7    shuffle those things around.

8        MR. PENNYPACKER:  Your Honor, can I ask another

9    question?  How will we --

10        THE COURT:  Go ahead.

11        MR. PENNYPACKER:  How will we have notice to be

12    here at 9:00 as opposed to 10:15, when will we know when

13    they have filed this motion or are going to make that

14    request?

15        THE COURT:  Well, Mr. Groland or Mr. Tedder, since

16    they have already established the communication lines,

17    are going to call us over the weekend and leave that

18    information so that we will all know whether or not we

19    show up at 10:15 or 9:00 A.M.  Right?

20        MR. TEDDER:  Yes, ma'am.

21        THE CLERK:  I was going to say, if you get here

22    early to set up the bed, it may be difficult with the

23    venire process.

24        THE COURT:  Yes, we're going to wait until they go

25    out.  I'm estimating but I'm estimating as close as

1    possible.  I have been told that they would be out at

2    10:15 and I am directing that we all be ready to take

3    over as soon as they start clearing this room.  And, of

4    course, if there is some delay Monday morning then we

5    will wait until the venire clears before we begin.

6         Our jurors may need to be collected.  What's going

7    on in the grand jury room first thing Monday morning?

8         THE BAILIFF:  I'll check on that.

9         THE CLERK:  I'll go find that out.

10        THE COURT:  We'll direct them to come in here at

11   10:20 so there shouldn't be too much overlap.  Anything

12   else we need to cover logistically?

13        MS. SINGER:  No, but since we're going to be going

14   directly into jury instructions, one of my jury

15   instructions is wrong.

16        THE COURT:  When we get to that.

17        MS. SINGER:  I'd like to be able to call my office

18   and see if I can't get one over here that's right.

19        THE COURT:  We'll take a brief recess between the

20   witnesses and our charge conference.

21        MS. SINGER:  Okay, great.  That would be good.

22        THE COURT:  Which will allow us to go ahead and

23   release the jurors for the afternoon.

24        Is there any objection by the state or the defense

25   in regard to the Court advising the jurors after they

1   have heard the defense rest that they are being released

2   early so that they will not have to begin deliberations

3   over the weekend?

4        MS. SINGER:  That's fine.

5        MR. GROLAND:  That's fine.

6        MS. SINGER:  I think that's good for them to know.

7        THE COURT:  Good enough.

8        MR. TEDDER:  Especially since, you know, they may

9   think, oh, gee, you're just going to make us come back

10  Monday, but if you stress to them how lengthy the

11  closing arguments are likely to be, you know, I mean,

12  it's not going to be a five minute closing by either

13  side, that's for sure.

14       MS. SINGER:  And then instructions and then they

15  would go back, and then they would not be able to be

16  released.  Because about this discussion about letting

17  them go home, we did some research on this, Judge, and

18  they go into deliberations, they would have to be

19  sequestered.  And I think that need to maybe --

20       THE COURT:  They would have to be sequestered?  We

21  might as well address that now.  Because if they begin

22  deliberations Monday afternoon and they don't conclude

23  them Monday night, what does that entail?

24       MS. SINGER:  It means they have to be sequestered.

25       THE COURT:  In a hotel room and the state makes

1     arrangements for that?

2          MS. SINGER:  We don't.  I believe the court

3     administrator's office does that.  At least that's what

4     they did with the Rolling case.

5          THE COURT:  So they need to be advised that they

6     need to come prepared in case they're sequestered all

7     night on Monday.

8          MS. SINGER:  I don't remember what happened with

9     the Rolling case.  I think family members were permitted

10    to bring things over.  I don't know if we actually told

11    them that ahead of time, because it lends itself to

12    people thinking they have to do that.  But I can't quite

13    remember, it's been several years ago.  I can't remember

14    whether we told them.  I don't think we told them to

15    bring anything.  I think we told them that they had to

16    contact family members to bring them a change of clothes

17    and a toothbrush.

18         THE COURT:  I'm not going to do that.  I'm not

19    going to wait until 5:00 on Monday afternoon and say, by

20    the way, or 10:00 P.M. on Monday night.  I'm going to

21    tell them now that once deliberations begin that they

22    will remain together until their deliberations are

23    complete, and that that can take whatever period of time

24    they decide as a jury is required by the circumstances

25    and facts of this particular case, and that we have no

```
 1    way of anticipating that.  Understanding that, that they
 2    may bring whatever they might need or they may advise a
 3    family member to be on call just in case.
 4          MS. SINGER:  Because they may need medication or
 5    some other --
 6          THE COURT:  Right.  Will there be any objection to
 7    that kind of instruction?
 8          MR. TEDDER:  Not really, Judge.
 9          THE COURT:  Well, I need to know yes or no because
10    not really doesn't tell me whether or not you have an
11    appellate argument or not.  You need to object or
12    stipulate.
13          MR. TEDDER:  The only concern I have, Judge, is
14    that if you tell them to come prepared to stay Monday
15    night, that may give them all weekend to think, well,
16    gee, I don't want to stay Monday night so I want to make
17    a decision as quick as I can right now and come in with
18    the attitude, you know, we're not going to be here all
19    night.  I'll be darned if I'm going to miss Monday night
20    football because of this trial, or be away from my
21    family because of this trial.  So I think if they start
22    to deliberate and we get into the -- let's say
23    deliberations go to 7:00 or 8:00 Monday evening, that
24    the Court can send a message into them inquiring as
25    to -- well, I mean they can always be given an
```

1     opportunity to call somebody to bring them whatever they

2     may need at whatever hotel they're put up in.

3          THE COURT:  And a single person who lives alone?

4          MR. TEDDER:  We could --

5          MS. SINGER:  We do have one of those.

6          THE COURT:  And who may have dogs locked in the

7     house, as we had last week.  Let's be realistic here.

8          MR. TEDDER:  Well, I'm trying to be realistic, Your

9     Honor, I am.  It's a delicate issue, you know, I would

10    leave it to the Court's judgment.  But I think another

11    thing, going back to an earlier issue, as to why they're

12    being sent home now and going with the trial or

13    finishing today, even if we try to plunge ahead, I doubt

14    they would be able to get a chance to make a decision

15    until after 5:00.

16         THE COURT:  Correct, I agree, and that's what I

17    would advise them.  There seems to be no realistic

18    possibility that they could begin deliberations before

19    5:00 P.M. and rather than ask them to begin their

20    deliberations over the weekend, that I have agreed to

21    recess until Monday morning.

22         MR. TEDDER:  Yes, ma'am.  As far as how to instruct

23    them on whether they should come prepared to stay

24    overnight, I don't know what you suggest.  Mr. Groland.

25         THE COURT:  Would this wording be agreeable to

1    state and defense, if I explained to them that once

2    deliberations begin, they will stay together until their

3    deliberations are complete?

4           MR. GROLAND:  I would agree with that, Judge.

5           THE COURT:  Simple enough?

6           MR. TEDDER:  Yes.

7           THE COURT:  They can speculate or draw their own

8    conclusions.

9           MR. GROLAND:  I'm going to go out and look for my

10   witness again.

11          MR. TEDDER:  I'm sure they've all heard of the

12   notion of a jury being sequestered.  It's a bright jury.

13   I think they probably know that if they can't reach a

14   decision they're going to be seeing each other for a

15   while.

16          (Pause in the proceedings.)

17          THE COURT:  All right.  Mr. Groland, are you ready?

18          MR. GROLAND:  Yes, I'm ready, and I have a witness.

19          THE COURT:  State ready?

20          MS. SINGER:  State is ready, Your Honor, except

21   Mr. Pennypacker.

22          MR. GROLAND:  The first thing I'll do before I call

23   the witness is move those two exhibits into evidence and

24   let me see if I can find them.

25          MS. SINGER:  We need to have the jury first before

1   we do that.

2        THE COURT:  Mr. Groland is getting ready with his

3   exhibits and you're looking for Mr. Pennypacker; is that

4   right?

5        MS. SINGER:  Right, if we could just wait one

6   moment for him.

7        (Pause in the proceedings.)

8        THE COURT:  All right.  Go ahead and bring the jury

9   in.

10        (The jury entered the courtroom.)

11        THE COURT:  Mr. Groland, call your next witness or

12   you had evidence?

13        MR. GROLAND:  Yes, Your Honor, at this time before

14   I begin, Your Honor, there are two exhibits, two defense

15   exhibits that have been marked for identification as

16   Defense Exhibit D and Defense Exhibit E.  At this time

17   we'd move these into evidence.

18        THE COURT:  Is there any objection?

19        MS. SINGER:  No objection.

20        MR. GROLAND:  These are Crystal Quirello's hospital

21   records.

22        THE CLERK:  Defense 5 and 6.

23        THE COURT:  Defense 5 and 6.

24        MS. SINGER:  One moment, Your Honor, one moment, I

25   just want to make sure I understand what I'm -- oh, yes.

1          THE COURT:  Defense 5 and 6 in evidence.

2          (Defense Exhibit Nos. 5 and 6 were moved and

3    admitted into evidence.)

4          THE COURT:  Now, Mr. Groland, go ahead and call

5      your next witness.

6          MR. GROLAND:  Will Halvosa.

7          (The witness entered the courtroom.)

8          (The witness was duly sworn by the clerk.)

9    WHEREUPON:

10              LIEUTENANT WILLIAM HALVOSA,

11   called as a witness herein, having been first duly sworn, was

12   examined and testified as follows:

13                DIRECT EXAMINATION

14   BY MR. GROLAND:

15      Q    Sir, would you state your name and occupation?

16      A    William Thomas Halvosa, IV.  I'm a lieutenant with

17   the Gainesville Police Department.

18      Q    Back in August of 2000 you were a sergeant?

19      A    Yes, sir.

20      Q    Are you familiar with the Brian Herlihy case?

21      A    Yes, sir.

22      Q    You have some limited involvement with that case?

23      A    Yes, sir.

24      Q    Going right to where I want to talk to you about,

25   the particular area, did you and some other detectives go to

1    Brian Herlihy's apartment during the mid afternoon of

2    August 2nd, 2000?

3        A    Yes.

4        Q    Do you recall that address?

5        A    I'd have to look it up.

6        Q    Go ahead.

7        A    The numerical address, it was 1015 Southwest 9th

8    Street, Apartment A21.

9        Q    What time did you get there?

10       A    About 3:25 P.M.

11       Q    And who was with you when you went into the

12   apartment?

13       A    I was with the Detective Alan Coleman.

14       Q    And was any other police officer in the apartment

15   when you arrived?

16       A    I don't believe there was any other police officers

17   in the apartment.  I met the -- Detective David Cannon was

18   there, had met us there, and also Investigator Tina Millard.

19       Q    But they were outside as you arrived?

20       A    They were either outside or met us there as we

21   arrived.

22       Q    Did y'all go into the apartment?

23       A    Yes.

24       Q    And the purpose of going in was for Tina to do

25   something?

1       A      We were going to take some photographs and look to

2    see if there was anything of any evidentiary value that was

3    obvious to us.

4       Q      Did you personally collect any items or did you

5    just walk in and make observations?

6       A      I walked in and made some observations.

7       Q      Did you look at the bed?

8       A      Yes.

9       Q      Did the bed have pillows on it?

10      A      Yes.

11      Q      Did you take notice of any gaps in the bed between

12   the mattress and the footboard?

13      A      Yes.

14      Q      Did you estimate or measure that gap and make a

15   notation of it?

16      A      Yes, I estimated it.

17      Q      What did you estimate the gap between the mattress

18   and the headboard to be?

19      A      Zero.  Now, if you asked me the mattress and the

20   footboard --

21      Q      Is that right?  I think it's been a long two weeks.

22      A      Yeah, the gap between the mattress and the

23   footboard, just taking a look at it, looked to be about,

24   again, with no pillows or shams in there, looked to be about

25   six inches.

1    Q    And when you say in response to my question that I

2    didn't mean to ask, that the gap between the headboard and

3    the mattress was zero, what do you mean by that, that the

4    mattress was pushed up as far as it can go?

5    A    Well, let me kind of clarify that.  I really don't

6    know the answer to that first question about the mattress and

7    the headboard, but when we had come back later, that's when I

8    tried to push the mattress towards the headboard and it

9    didn't move.

10   Q    Okay.  So if it was in the same position it would

11   be flush?

12   A    Right.

13   Q    In other words, if it was in the same position at

14   3:00 as it was at 6:30, it would be flush?

15   A    Right.

16   Q    Did you notice any pillows on the bed?

17   A    Yes, there were, from my notes there was pillows

18   and shams up near the headboard.

19   Q    Did you notice any pillows or shams at the

20   footboard?

21   A    Well, I didn't, didn't notice them and I didn't

22   reflect them in my notes.

23   Q    Were you there when Tina Millard was taking

24   photographs?

25   A    I was there a couple of times, when Tina was doing

1    the videotaping, and I believe when the call originally came

2    out at 9:00 that morning, and it was just an injured baby.

3    There are some photographs taken by Tina Millard that show

4    you know, the pillow and the sham towards the end of the bed.

5    But my recollection wasn't that the pillow and the sham were

6    at the end of the bed at 3:25, but they very well could have

7    been.

8        Q    You don't remember them being there at 3:25?

9        A    Right.  I know they were not there when we went

10   back with Mr. Herlihy.

11       Q    They were not there when you went back in the

12   evening either?

13       A    Right.

14       Q    So --

15       A    He set them up for us.

16       Q    So what you're saying then is that -- strike that

17   question.

18            Can I have that photo, sir?

19            (Pause in the proceedings.)

20   BY MR. GROLAND:

21       Q    Let me show you on the projector what's been marked

22   as State's Exhibit 24(d) in evidence.  You want to come up a

23   little closer?

24       A    I can see it.

25       Q    You can see it?

```
 1        A     Yeah.

 2        Q     Detective Halvosa --

 3        A     Actually, I will come up.

 4        Q     It's been -- well, let me ask you this question:

 5   You're saying that you did not see a sham and pillow at the

 6   end of the bed when you were there at what time?

 7             MS. SINGER:  I'm going to lodge an objection to the

 8        leading nature of that question.

 9             THE COURT:  Overruled, go ahead.

10   BY MR. GROLAND:

11        Q     At what time?

12        A     At 3:25 we were back at the apartment, and if there

13   was a pillow and a sham, I didn't report it on my notes is

14   what I'm saying.

15        Q     Have you testified before that you did not see a

16   pillow and a sham?

17        A     Right.

18        Q     So then when you were there at 3:00 it would be

19   correct it did not look like this?

20             MS. SINGER:  I'm going to lodge an objection.

21             MR. GROLAND:  That is leading.

22   BY MR. GROLAND:

23        Q     When you were there at 3:00?

24        A     3:25.

25        Q     3:25.  Did it look like that with the sham and the
```

1   pillow at the end of the bed?

2       A    I don't remember if it did or not.  I didn't

3   reflect it in my notes, and I didn't take pictures.  This

4   picture clearly indicates that the pillow and sham are there.

5       Q    Do you know who put the pillow and the sham there

6   as depicted in this photograph taken at some time after

7   1:00 by Tina Millard?

8       A    According to Mr. Herlihy, he put them there.

9       Q    No.  Do you know who put those pillows in that

10  place at 1:00 when this photograph was taken?

11      A    Nobody from our department put them there, if

12  you're asking.

13      Q    The answer is you don't know?

14      A    Right.

15      Q    Sir, I've got one more picture.  Let me show you

16  one other exhibit, and it's marked State's Exhibit 26(a) in

17  evidence.  This is a Polaroid shot that was taken, according

18  to testimony by Tina Millard, between 3:00 and 3:30.  Were

19  you present when that photograph was taken?

20      A    I could have been in the apartment or around the

21  apartment, yes, sir.

22      Q    Your previous testimony that, no, you didn't see

23  any pillows or shams, do you stand by that testimony?

24      A    No.  I testified what I wrote down, I didn't put

25  down there was pillow or shams.  But if you look at the

1   picture, there's pillow and shams in there.  So if this was

2   taken at 3:25, I was in the vicinity of those pillows and

3   shams.

4       Q    Do you remember this question and this answer?  And

5   it's a deposition that I took of you in my office on

6   June 12th, 2002, and it's Page 10, and I'll show it to you,

7   and it's Line 11 through 14.

8            Do you remember this question:  Tell me about your

9   observations.

10           Let's see inside the apartment I observed Crystal's

11  photograph and Robbie's photograph on the fridge.  There was

12  women's underwear on the dressers drawers.  There was also

13  baby clothes in one of the dresser drawers, several pairs of

14  women's shoes in master bedroom.  There was a baby bag on the

15  nightstand just to the left of the bed.  The bed was made up

16  and there was several pillows and shams near the headboard.

17           My question:  Anything near the footboard.

18           No.  It did mention in here that the bed was fake

19  metal.

20           Did you previous testify under oath that there was

21  nothing at the footboard?

22      A    Yes.

23           MR. GROLAND:  You can turn this off.  Thank you.

24           MS. SINGER:  You need the machine though.

25           MR. GROLAND:  Oh, I do, I guess I do.  Sorry.

1   BY MR. GROLAND:

2       Q    Showing you what's marked as State's Exhibit 28(j).

3   This is a photograph that Investigator Millard testified that

4   she took at between 1:00 and 1:30?

5           MS. SINGER:  No, Your Honor.  I would like to lodge

6       an objection.  That photograph was taken pursuant to the

7       execution of the search warrant on the 16th of August,

8       and so I would ask counsel to restate his question based

9       upon that.

10          MR. GROLAND:  Okay.

11  BY MR. GROLAND:

12      Q    Do you see the gap in the space between the

13  footboard and the back of the mattress in this picture?

14      A    Yes.

15      Q    That picture, as correctly pointed out by the

16  state, was taken when the search warrant was executed on

17  August 16th?

18      A    Right.

19      Q    Do you recall that gap, the six-inch gap that you

20  described looked like that?

21      A    It was probably something more consistent than

22  that, yes.

23          MS. SINGER:  Do you still need Mr. West?

24          MR. GROLAND:  I don't.

25          MS. SINGER:  I just want to make sure he moves that

1    machine.

2         MR. GROLAND:  We're finished.

3         THE COURT:  Detective Halvosa, I think you can come

4    back up here and have a seat.

5         MR. GROLAND:  That's all I have.

6         THE COURT:  Any questions?

7         MS. SINGER:  Briefly.

8                    CROSS-EXAMINATION

9    BY MS. SINGER:

10        Q    Sergeant Halvosa, the first time you went to Brian

11   Herlihy's apartment was at 3:25 A.M., correct?

12        A    Correct.

13        Q    You went with Detective Cannon, Sergeant Seale,

14   Corporal Coleman, correct?

15        A    Correct.

16        Q    And you met Tina Millard, who was the forensic

17   investigator assigned to this case at that time?

18        A    Right.

19        Q    You all entered the apartment together?

20        A    Yes.

21        Q    In fact, David Cannon showed you a written consent

22   form that Brian Herlihy had executed allowing you to enter

23   that apartment?

24        A    Correct.

25        Q    And the purpose of entering the apartment at that

```
 1    time was to take eight Polaroid photographs for use during
 2    the interview process back at the station; isn't that
 3    correct?
 4         A    I believe that to be correct, yes.
 5         Q    You also were looking for a collection of evidence,
 6    if there was anything obvious to y'all that you wanted to
 7    take into evidence at that time?
 8         A    Right.
 9         Q    In fact, a baby bottle, I think, was taken into
10    evidence at that time; are you aware of that?
11         A    I believe so, yes.
12         Q    Now, Tina Millard was the person who took the
13    photographs?
14         A    Right.
15         Q    You didn't take the photographs; Coleman didn't
16    take the photographs; Cannon didn't take the photographs?
17         A    Right.
18         Q    And Seale did not take the photographs.
19              Now, were you always with Tina Millard during the
20    time that she was taking photographs?
21         A    No.
22         Q    Did you move anything in that apartment when you
23    were in it at 3:25 P.M. on August the 2nd?
24         A    No.
25         Q    Did you touch any of the pillows on the bed?
```

1    A    No.

2    Q    Did you tamper with any of the items that were in

3    the apartment at all when you entered at 3:25 P.M.?

4    A    No.

5    Q    Did Sergeant Seale, Detective Cannon, Alan Coleman,

6    or Tina Millard tamper with any of the items in that

7    apartment when you entered in at 3:25, to your knowledge?

8    A    To my knowledge, no.

9    Q    Did anybody do that in your presence?

10   A    No.

11   Q    So the photographs that Tina Millard took at about

12   3:25, the eight Polaroids, would accurately reflect what was

13   seen at the apartment at that time of day?

14   A    Correct.

15        MR. GROLAND:  Objection, Your Honor, he didn't take

16        the photographs and he wasn't present all the time when

17        she was taking the photographs, so he cannot answer that

18        question.

19        THE COURT:  The objection is sustained.

20   BY MS. SINGER:

21   Q    To the best your knowledge and belief, those

22   photographs were accurate, correct?

23   A    Right.

24   Q    Now, had you known -- I know you were not the chief

25   investigator in this case, correct?

```
 1        A     Correct.

 2        Q     You were one of this team that was working on this

 3   homicide?

 4        A     Correct.

 5        Q     It wasn't even a homicide then, was it, you were

 6   still trying to figure out what happened to the baby?

 7        A     We were still collecting facts at the time, right.

 8        Q     That's right.  In fact, the baby hadn't died yet?

 9        A     Correct.

10        Q     And nobody was quite sure what had happened to the

11   baby that morning at the apartment?

12        A     Absolutely.

13        Q     And everybody was given tasks to do?

14        A     Correct.

15        Q     So that you could develop a factual basis to decide

16   what had actually happened on August 2nd between 9:00 and

17   9:34 A.M. when this baby suffered the injuries?

18        A     Exactly.

19        Q     So you're walking through the apartment for the

20   purpose of gathering information to help draw some

21   conclusions regarding what happened, correct?

22        A     Correct.

23        Q     And at that time nobody was a suspect, nobody was

24   under arrest, correct?

25        A     Correct.
```

1       Q    And you were basically fact finding?

2       A    Correct.

3       Q    You were one of many assigned to that task, weren't

4    you?

5       A    Yes, ma'am.

6       Q    All right.  And when you got to the apartment at

7    3:25 P.M., did you know that Tina Millard had already been in

8    the apartment at approximately 1:20 P.M. and had already

9    taken 35-millimeter photographs of the apartment when she

10   entered it at that time?

11      A    Well, I think when the call originally came out, I

12   believe that forensics had responded, Tina Millard had

13   responded.  So I didn't know to what extent she had done any

14   processing of the apartment.

15      Q    But it would have been routine for her to take

16   photographs if she processed the scene?

17      A    It's the first thing we do, right.

18      Q    So she would have taken photographs at

19   approximately 1:00, then she came back and she took some

20   Polaroids?

21      A    Right.

22      Q    You returned back to the apartment again with Brian

23   Herlihy at approximately -- well, it's not in your police

24   report -- do you remember specifically what time?

25           MR. GROLAND:  Objection, Your Honor, beyond the

```
 1          scope, we didn't go into that at all.
 2                 THE COURT:  Overruled.
 3                 THE WITNESS:  6:50 hours.
 4     BY MS. SINGER:
 5          Q    And, in fact, you spoke with Brian Herlihy at that
 6     time?
 7          A    Well --
 8          Q    You asked him some questions?
 9          A    -- Detective Legall was doing the majority.  I
10     didn't want to confuse Brian with additional people asking
11     him questions.
12          Q    But there were several questions on the tape
13     recorded statement that later was preserved?
14          A    Correct.
15          Q    That have your voice on it --
16          A    Right.
17          Q    -- correct?  And when you came back later, that was
18     upon the invitation of Brian Herlihy, as I understand it?
19          A    Right.
20          Q    He invited you all back to the apartment?
21          A    Right.
22          Q    He was going to show you what happened?
23          A    Right.
24          Q    And you were willing to do that?
25          A    Absolutely.
```

```
 1        Q    And you didn't force him to go back or coerce him
 2   or do anything to make him do that, right?
 3        A    Right.
 4        Q    Did you promise him, did you personally promise him
 5   anything to take him back to the apartment?
 6        A    No.
 7        Q    It was basically a very cooperative effort.  He was
 8   inviting y'all back, you went back.  And at that time, Brian
 9   Herlihy, the defendant in this case, was allowed to set up
10   the bed the way he remembered the bed was set up before the
11   baby was injured, correct?
12        A    Correct.
13        Q    And the pillows that were set up were in fact in
14   the same constellation or in the same way that they are
15   reflected in the photographs that we have in this case,
16   aren't they?
17        A    Other than the sham, he was confused about which
18   way the sham was wedged down between the --
19        Q    At one time the sham, he tried to wedge it in
20   horizontally, correct?
21        A    Right.
22        Q    And another time he decided that that wasn't
23   working real well, so he made it go vertically; is that
24   right?
25        A    Right.
```

2126

```
 1        Q    But other than him moving that, he didn't change
 2   the little white pillow that was the bed, did he?
 3        A    No.
 4        Q    And he told you that the baby was laying face up
 5   with his head towards the center and his feet towards the
 6   back?
 7        A    Yes.
 8        Q    And he told you that the baby rolled over the sham
 9   into the spot between the sham and the --
10             MR. GROLAND:  I'm going to object again.  This is
11        an area that we did not inquire.  We've already gone
12        into this with other witnesses.  And I did not ask this
13        detective any questions about this area or this time
14        frame, which is some three hours later than what I asked
15        him about.
16             THE COURT:  The objection is overruled.
17   BY MS. SINGER:
18        Q    You understand -- do you remember my question?
19        A    That was his explanation to us.
20        Q    And what was that, sir?
21        A    The baby must have come over that sham to get
22   wedged down between the footboard and the sham.
23        Q    And you had testified on cross-examination that at
24   the time that you returned back to the house at about
25   6:00 P.M. for Mr. Herlihy to explain what had happened, that
```

1    the headboard -- pardon me, that the mattress and box spring

2    were flush with the wall?

3         A    Correct.

4         Q    So the headboard of the bed was at the wall?

5         A    Right.

6         Q    And the mattress and box spring was pushed all the

7    way up so that it was also flush with the wall?

8         A    Correct.

9         Q    There was no more, could go no farther up?

10        A    I also have to -- I think just the mattress itself

11   is what I actually tried to move forward to the headboard and

12   it wouldn't.

13        Q    You actually tried to do that yourself?

14        A    Right.

15        Q    To give him the maximum amount of gap that would be

16   available to him --

17        A    Right.

18        Q    -- correct?  And you couldn't push it?

19        A    No.

20        Q    How much do you weigh?

21        A    Do I weigh?

22        Q    Yes, sir, how much do you weigh?

23        A    190.

24        Q    And how tall are you?

25        A    Five-eleven.

1    Q    What kind of effort did you put into pushing that

2  mattress up to the wall?

3    A    Enough exertion, I thought, to push it, and it

4  wasn't moving.

5    Q    All right.  So was it your opinion then it was

6  flush with the wall?

7    A    It was as far as it was going to go.

8    Q    And that he had the gap, the maximum gap he could

9  have to put that baby doll in there if he saw fit?

10   A    Right.

11   Q    Was he able to get that baby doll in there?

12   A    With some force, but I don't think he was

13  successful at that point.

14        MS. SINGER:  One moment, Your Honor.  No further

15     questions of this witness, Your Honor.

16        MR. GROLAND:  Thank you.

17                  REDIRECT EXAMINATION

18  BY MR. GROLAND:

19   Q    Did you see Tina Millard position these pillows

20  before she started taking the picture?

21   A    No.

22   Q    You did not?

23   A    Huh-uh.

24   Q    But you didn't see the pillows in place as depicted

25  in the photo at the baseboard or the footboard?

1          A     Correct.

2          Q     You did do a report in this case?  Did you do a

3     report in this case?

4          A     Yes, sir.

5          Q     Do you make any notation in your report that you

6     did about any pillows or shams on that bed?

7          A     Yes.

8          Q     Do you make a notation in your report that the

9     pillows and the shams on that bed were at the headboard?

10         A     Yes.

11         Q     Do you make any notation about any pillows or shams

12    being at this footboard?

13         A     No.

14         Q     And were these notations based upon your

15    observations at 3:30 P.M. when Tina Millard was also there

16    taking photographs?

17         A     Yes.

18         Q     Now, the force that you said Mr. Herlihy used --

19    let me see that doll, please.

20               Does this look like the guy?

21         A     Yes.

22         Q     The force that Mr. Herlihy used to push this doll

23    in that gap, whether it was six inches or maybe four inches

24    because we've got a sham in there, or maybe two inches, how

25    would you describe that force that he used to push this in

```
 1    the gap?
 2         A    Well, I think he tried to demonstrate to us how the
 3    baby was found with his face against the mattress and the
 4    legs sticking up out of there.
 5         Q    Could you do me one favor?
 6         A    Sure.
 7         Q    Could you answer that question?  Describe the
 8    force, if you could articulate that?
 9         A    He was, had the baby like you have it and was
10    pushing.
11         Q    And having trouble getting it into that space?
12         A    Yes.
13              MR. GROLAND:  And excuse me one second, Your Honor.
14              (Pause in the proceedings.)
15    BY MR. GROLAND:
16         Q    Would you describe -- did you try to push this in
17    yourself?
18         A    No, sir.
19         Q    Did you see Larry Seale try to stick it in there?
20         A    Yes.
21         Q    And would you describe the amount of force that
22    Larry Seale used trying to push this little doll in that
23    space?
24              MS. SINGER:  I'm going to lodge an objection to any
25              demonstration with the doll either by the witness and
```

```
 1          the counsel, since there was an objection laid
 2          throughout the state's case regarding demonstrations.
 3              MR. GROLAND:  Okay.  Put the doll down.
 4     BY MR. GROLAND:
 5          Q    Would you describe the amount of force as
 6     tremendous force, would that be a word you're comfortable
 7     with in describing what you saw Larry Seale doing?
 8          A    Tremendous is a little strong, but it was
 9     significant.  He was -- Larry's a big guy.  It was
10     significant effort to get that baby down here.
11          Q    This same doll?
12          A    Uh-huh.
13              MR. GROLAND:  No further questions.
14              THE COURT:  All right.
15              MS. SINGER:  No further questions.
16              THE COURT:  May this witness be released?
17              MS. SINGER:  No objection to releasing this
18          witness.
19              MR. GROLAND:  Thank you, Lieutenant.
20              THE WITNESS:  Thank you.
21              THE COURT:  Thank you, you're free to go.
22              MR. GROLAND:  May I just confer to make sure I'm
23          not forgetting anything?
24              THE COURT:  Yes.  As a matter of fact, I want both
25          state and defense to approach the bench.
```

1          This does not need to be on the record yet.

2          (A sidebar discussion was held:)

3          MR. TEDDER:  I don't know what you are calling us

4     up here for, but I'm glad you did.

5          THE COURT:  To remind you that I have instructed

6     you that if you intend to introduce the deposition of

7     Dr. Levine as rebuttal you are to do that today.  It's

8     not open for opportunity on Monday.

9          MR. GROLAND:  Well, can you give us, we don't have

10    to break away for a recess, but can you give us a minute

11    or two, Your Honor, because I wasn't thinking about

12    that, so that we can make a decision.

13         THE COURT:  Yes.  Anything else that we need to

14    address up here?

15         MS. SINGER:  No.

16         MR. GROLAND:  Can we just make --

17         MS. SINGER:  Mr. Tedder had something else he

18    wanted to address up here.

19         MR. GROLAND:  We've just got to include the client

20    in that decision.

21         MR. TEDDER:  I was just going to say if we're about

22    to recess I'd ask you to give a real strong cautionary

23    instruction about them not reading anything or watching

24    anything and also specifically telling them not to go on

25    the internet, because there's all kinds of information,

1       or anything else like that, Your Honor.

2             MS. SINGER:  Oh, yeah, we would ask for that too.

3             THE COURT:  Stay right here.

4             (The sidebar discussion was concluded.)   .

5             MR. GROLAND:  May we approach, Your Honor?

6             THE COURT:  Mr. Herlihy, come on up.

7             THE DEFENDANT:  Yes, ma'am.

8             (A sidebar discussion was held including the

9       defendant:)

10             MR. GROLAND:  Your Honor, the decision that we've

11       made with our client regarding the reading of the

12       deposition of Dr. Levine, after discussion with Brian

13       Herlihy, we all have decided not to do that.

14             THE COURT:  Is that correct?

15             THE DEFENDANT:  Yes, ma'am, it is.

16             THE COURT:  Anything else you need to put on the

17       record?

18             MR. TEDDER:  Not that I'm aware of, Your Honor.

19             (The sidebar discussion was concluded.)

20             MR. GROLAND:  Are you waiting for an announcement?

21             THE COURT:  Yes.

22             MR. GROLAND:  Your Honor, the defense announces

23       rest.

24             THE COURT:  Any rebuttal testimony from the state?

25             MS. SINGER:  No rebuttal, Your Honor.

1          THE COURT:  Ladies and gentlemen, the evidence in

2     this case is concluded.  However, when you consider the

3     length of time for the necessary recesses for all of us,

4     including you, and the time for closing arguments and

5     jury instructions, if I continue the trial this

6     afternoon, and that there are additional legal issues

7     that we have to address also, it would not be possible

8     for you to begin your deliberations until after 5:00 at

9     some time.  And, therefore, it's my decision that we

10    recess the trial at this time and that you return on

11    Monday for closing arguments and instructions and then

12    to begin your deliberations.  Because once the

13    deliberations begin, you must all stay together until

14    your deliberations are complete.

15         So with that explanation, brief though it is, I'm

16    going to ask that you go ahead and lock up your

17    notebooks.  I do of course have to give you the

18    additional instruction again that over the period of

19    this weekend, you must not begin any form of

20    consideration or deliberations, because you have not

21    heard the closing arguments or the legal instructions

22    that I must give you before you begin your

23    deliberations.  You must not speak to anyone about the

24    case.  You must not discuss any of the evidence.  You

25    must not read any newspapers, watch any news reports, or

1    do any investigation of any sort on your own, whether

2    that be on the internet, or by location that you may

3    have heard referenced in this case.

4         So with that -- oh, the other instruction is that,

5    as you know, because of the venire situation on Monday

6    morning, rather than this coming Monday, bounce you from

7    courtroom to courtroom, I will ask that you come to this

8    courtroom to begin the trial at 10:30.  So if you will

9    come to the courthouse at 10:20 on Monday, then we will

10   be having a smooth presentation for you at that point.

11        When you come up, of course we're cutting the time

12   as close as we can so the other venire will be moving

13   through, the bailiff will be instructed to gather you

14   all in a mediation room here on the fourth floor, and

15   then when this courtroom is cleared, you'll be brought

16   into this courtroom at one time and we'll begin right as

17   we are scheduled to do.

18        So with those instructions, if you will lock up

19   your notebooks.

20        UNIDENTIFIED JUROR:  Question, Your Honor.

21        THE COURT:  Yes, sir.

22        UNIDENTIFIED JUROR:  You said during our

23   deliberations, are we going to be sequestered?

24        THE COURT:  Depending upon the length of

25   deliberations, that is a possibility.

```
 1              (The jury exited the courtroom.)

 2         MS. SINGER:  I do want to put something on the

 3    record once --

 4         THE COURT:  You have plenty of time for that.

 5         MR. TEDDER:  Your Honor, the jury's back, they're

 6    gone?

 7         THE COURT:  The doors are closed.  Of course

 8    they'll be coming through and, of course, there are a

 9    number of things that we're going to address.

10         MR. TEDDER:  We'd just go ahead and put in a

11    renewed motion for judgment of acquittal at this time,

12    Your Honor.

13         THE COURT:  Do you want to put any further argument

14    on the record?

15         MR. TEDDER:  No, not at this time.

16         THE COURT:  Good enough.  Motion for judgment of

17    acquittal is noted and the motion is denied.

18         MR. TEDDER:  And we object for the record.

19         MS. SINGER:  Your Honor, the only other comment I

20    wanted to make regarding the jury is that when they do,

21    when they are excused for deliberation, the state would

22    be asking the two alternates be sequestered and

23    separated apart in case there is some difficulty with

24    the 12 jurors during the course of deliberations.  State

25    does not wish to have those alternates excused.
```

1          THE COURT:  All right.  Well, I'll hear any

2     response of the defense on Monday regarding that,

3     because I've never had that issue raised.  I don't know

4     if there is any legal issue there.  So let me know if

5     there is on Monday.

6          MS. SINGER:  I only know from my personal

7     experience with the Rolling case, we did separately

8     sequester the alternates.

9          MR. TEDDER:  Your Honor, I don't see how that --

10    not that you've asked for us to respond right now, but

11    I'd say I can't imagine what could possibly happen.

12         THE COURT:  Here's the issue.  If you want to

13    stipulate, fine.  If you want to object, wait until

14    Monday so you'll have time to be prepared.

15         MR. TEDDER:  Yes.

16         THE COURT:  Now, we'll just be at ease until the

17    jury goes through, at which point we will take a

18    15-minute recess before we address the jury instructions

19    and any other legal matters that might be appropriate.

20         (Pause in the proceedings.)

21         MS. SINGER:  Oh, Your Honor, may the witnesses all

22    be excused from the rule at this time since the defense

23    has announced rest?

24         MR. GROLAND:  Well, we may, depending upon what

25    happens Monday morning -- in terms of what, Jeanne,

1    coming in the courtroom?

2            MS. SINGER:  Well, in terms of Richard Davis, John

3    Quirello, Vicki Woodall, Larry Seale, Helen Legall.

4            MR. GROLAND:  Are you talking about them coming in

5    the courtroom?

6            MS. SINGER:  I want them to be released from their

7    obligations under the rule of sequestration since the

8    defense has rested.

9            MR. GROLAND:  Excuse me, Your Honor.  We oppose

10   that because there is still a possibility that there

11   will be additional testimony.

12           THE COURT:  After our recess we will address that

13   on a witness-by-witness basis and determine who might be

14   released.

15           MR. GROLAND:  We may be able to -- excuse me.

16   Ms. Singer.

17           THE COURT:  Wait a minute, Mr. Groland.

18           (The jury exits the courtroom.)

19           THE COURT:  Now, in regard to the state's request

20   and the defense's objection, let me just say first --

21           MR. GROLAND:  I can maybe speed it up for the

22   Court, I do have a follow up to that.  We don't have any

23   objection to any of them coming in at this point and

24   Monday except for one, and that is Crystal's father,

25   Richard Davis, had a face-to-face confrontation with my

1   client a year and a half ago in one of the first court

2   proceedings.  He has eyeballed him during the course of

3   this trial from outside the door, and my client is

4   concerned about him because there were some words

5   between the two of them and there's been a lot of eye

6   contact that concerns him, and I want to avoid that

7   during closing arguments.  I don't think the jury should

8   see an angry person or see somebody trying to make faces

9   at my client.  And I think our position is that as to

10   all the other witnesses, if they -- we have no objection

11   to that, except for Richard Davis, who had this prior

12   episode that I've described to the Court.  I think the

13   state actually knows about that.

14        MS. SINGER:  I don't think that that's sufficient

15   grounds, first of all.  Secondly, under 960, as the

16   grandparent of a deceased child, I think Richard Davis

17   is entitled to be present.  I believed he was entitled

18   to be present throughout the entirety of this trial.

19   There are no witnesses being called anymore.  He is no

20   longer going to be under the rule of sequestration.  He

21   is a citizen of this country, just like any other

22   citizen of this country, and he is entitled to sit in

23   through the remainder of this case.

24        There were no -- there weren't, other than some

25   leers and some bad looks between them a year and a half

1    ago, and some words, there's been nothing, nothing

2    offered to show that he is in any way a threat.  He goes

3    through a metal detector whenever he comes into this

4    courthouse.  He's maintained himself on the stand when

5    he testified.  He is a law enforcement officer.  He

6    understands the rules of the Court.  There is absolutely

7    no reason -- because Brian Herlihy doesn't want to see

8    him in the audience isn't a reason to deny him his right

9    as a citizen, his right as the grandfather of this

10   child, to sit in through the remainder of this trial.

11       THE COURT:  Does the state have any objection to

12   the Court instructing him as to where it would be most

13   appropriate for him to sit?

14       MS. SINGER:  I have no problem with that at all,

15   Your Honor, and I think he would follow, gleefully

16   follow the Court's direction, because he's wanted to sit

17   in this entire case because this is a grandson.  I

18   believe he will follow your directive without fail.

19       THE COURT:  Now, there would be no reason to take a

20   chance that the jury is in any way being affected by

21   somebody's looks even, and we can accommodate that.  So

22   long as Mr. Davis sits on the far, my far right, which

23   is as far as away from Mr. Herlihy as we can get him.

24       MR. GROLAND:  And the jury.

25       THE COURT:  And which also puts him outside the

1    sightline of the jury, and so long as he is at least in

2    the middle row or farther back, there could be no

3    reasonable concern that he might in any way affect

4    Mr. Herlihy or the jury.  Do you agree?

5         MR. GROLAND:  Yes.

6         MR. TEDDER:  Your Honor, can we agree to leave the

7    screen up then.

8         MS. SINGER:  No, ma'am, I think he should be

9    allowed to see the closing.  He comes in the courtroom

10   and he has to be blocked?

11        THE COURT:  Does either the -- I assume that

12   neither the state nor the defense is requesting the use

13   of the screen during closing; is that correct?

14        MS. SINGER:  I will not be using the screen, Your

15   Honor.

16        MR. GROLAND:  You say you are?

17        MS. SINGER:  I will not be.

18        MR. GROLAND:  I don't think I will.  I just --

19        THE COURT:  You decide, Mr. Groland, because it's

20   going to be removed from the courtroom.

21        MR. TEDDER:  Judge, I would suggest, if you're

22   saying you didn't want the jury to see him doing

23   anything, the screen just logically blocks it.  But he

24   can still see the closing with --

25        THE COURT:  Mr. Tedder, that is not going to be the

```
 1        basis on which the screen remains.
 2             MR. GROLAND:  I don't believe I'm going to use the
 3        equipment.
 4             THE COURT:  Mr. West, you may remove the screen.
 5             MR. WEST:  Yes, ma'am.
 6             THE COURT:  I assume it's yours.
 7             MR. WEST:  Yes, ma'am.
 8             THE COURT:  If not, don't remove it.
 9             Now, any other witness that the defense wants to
10        object to specifically?
11             MR. GROLAND:  No.
12             THE COURT:  The only other concern that I have is,
13        of course, the jury being not sequestered over the
14        course of the weekend, I would be hesitant to instruct
15        any witness that the rule requiring that they not
16        discuss the case or their testimony with anyone be
17        lifted until such time as the jury is in deliberations
18        and they are sequestered.
19             So why would you want me to so instruct them at
20        this time?  Obviously there will be nothing left for
21        them to watch.
22             MS. SINGER:  I missed that.
23             THE COURT:  Let me say it again.  You're requesting
24        that I advise all witnesses that they are released from
25        the rule.  The rule includes the instructions that they
```

1    are not to discuss this case or their testimony.

2        MS. SINGER:  Oh, I'm just saying that they're

3    permitted to come into the courtroom.  If you want to

4    further instruct them not to discuss their testimony for

5    fear that there might be some collusion or some contact

6    with the jury, I'm fine with that.

7        THE COURT:  Are they wanting to watch the jury

8    instructions or are you just talking about for closing

9    arguments?

10       MS. SINGER:  I think they want to feel like they

11   can walk through that front door, whether it be today

12   for a half an hour, to see the boring nature of the jury

13   instructions, because they haven't been able to do that.

14   I think they want to walk through the front door.

15       THE COURT:  That's fine.  The rule will be modified

16   to say that any individuals who have testified may come

17   into the courtroom from this point on.  The only one who

18   is restricted in terms of seating is Mr. Davis, as we

19   have all agreed.  And the rule that they not discuss the

20   case or their testimony with anyone except the

21   attorneys, stays in effect.

22       MS. SINGER:  Until the verdict.

23       THE COURT:  Until the jurors begin their

24   deliberations.

25       MS. SINGER:  Okay.  Can we call them in to tell

1      them that?  Because I think it would be best if you told
2      them.
3           THE COURT:  Yes.
4           MR. GROLAND:  Is the Court going to individually
5      admonish the one witness that we had a concern about or
6      is the Court going to leave it to the state to do that?
7           THE COURT:  I'm going to tell him.  I'm not going
8      to admonish him.  I'm going to advise him.
9           MR. GROLAND:  Yes, ma'am.
10          (The witnesses enter the courtroom.)
11          THE COURT:  That's fine right there, you don't need
12     to come into the well.  I just need to address all of
13     you.  By stipulation and agreement, the rule has been
14     modified at this point.  The evidence has been
15     concluded, and any of you who may have an interest in
16     the legal matters, such as jury instructions that we
17     will be addressing, or motions that may be heard first
18     thing Monday morning, or the closing arguments and the
19     jury instructions, are free to come into the courtroom.
20          Because of the nature of the case and the emotional
21     circumstances, I am going to ask, actually direct
22     Mr. Davis that you sit in this far right section of the
23     courtroom, at least halfway back.  As a matter of fact,
24     I would request that all of the witnesses utilize that
25     section.  That way if you want to come and go, there

1   would be very little chance of disruption to the closing

2   arguments or the instructions that I'm giving.

3        Any questions about that?

4        MS. SINGER:  Yes.  You also have to tell them not

5   to discuss the case.

6        THE COURT:  Yes.  That portion of the rule that

7   says you must not discuss this case or your testimony

8   with any person other than the four attorneys who are

9   directly involved, remains in effect because, of course,

10  the trial is not complete and the jury has not

11  deliberated.  And in an abundance of caution, to avoid

12  any potential that this case may have to be retried, we

13  want to do everything possible to make sure there is no

14  possibility of information that might in some way impact

15  the case or the trial.

16       Any questions about any of that?

17       MR. DAVIS:  No, Your Honor.

18       THE COURT:  Good enough.  Then of course you are

19  free to stay.  We're going to take a 15 minute recess at

20  this time, and then there are legal matters, including

21  jury instructions, that we're going to be discussing for

22  part of the afternoon.

23       We'll be in recess for 15 minutes.

24       (A recess was taken.)

25       THE COURT:  Is the state ready?

1           MS. SINGER:  We're ready.

2           THE COURT:  Defense ready?

3           MR. TEDDER:  Yes, ma'am.

4           THE COURT:  I have in my hand a packet of proposed

5      jury instructions.  Is this the latest or most accurate

6      version that we have?

7           MS. SINGER:  I have a revised aggravated child

8      abuse instruction, depending on the Court's ruling on

9      that.  And I prepared draft verdicts, which after we

10     decide on the verdict I'm going to collect up and tear

11     up and we'll do whatever is decided upon.  I did draft a

12     verdict as well.  I'm ready to do whatever the Court

13     desires in terms of instructions.

14          THE COURT:  Anything else we need to address

15     besides instructions this afternoon that the defense is

16     aware of at this time?

17          MR. TEDDER:  Not that I'm aware of.

18          THE COURT:  What I'll do is go through these

19     instructions one page at a time.

20          MS. SINGER:  My understanding from Mr. Pennypacker

21     is that Mr. Groland wanted to talk about closing

22     arguments as well.  I don't know if he wants to do it

23     now or if he wants to do it after instructions.

24          MR. GROLAND:  Well, I just actually inquired of

25     Mr. Pennypacker whether or not you all were going to

1      split it up.

2           MS. SINGER:  We're not spitting our closing.  I am

3      doing closing, both first close and rebuttal close.

4           MR. PENNYPACKER:  Your Honor, I remember you ruled

5      there was no splitting, meaning that they couldn't share

6      their closing, we can't share our closing.

7           THE COURT:  Correct.  Anything else?

8           MR. GROLAND:  No.

9           THE COURT:  Now, we'll go through them one page at

10     a time.  I won't necessarily read the entire page into

11     the record.  I need for the state or the defense if

12     there is any comment or objection to simply let me know

13     on a page-by-page basis and we will address it.

14          MR. TEDDER:  Yes, ma'am.  I'm sorry.

15          THE COURT:  You understand?

16          MR. TEDDER:  Yes, ma'am.  Mr. Gordon said something

17     to me.

18          THE COURT:  First page is simply the style of the

19     case and the title of jury instructions.

20          The second page is --

21          MR. PENNYPACKER:  Your Honor, I think there may be

22     two case numbers.

23          MS. SINGER:  Mine does not have two case numbers.

24          MR. PENNYPACKER:  I thought the case had two case

25     numbers.

1           MS. SINGER:  The case does not have two case

2      numbers.  It should be 2753-CFA.  Madam Clerk, would you

3      please verify or, Steve, could you please verify the

4      case number that should be on the jury instructions

5      please?  I have 2000-2753-CFA.

6           THE CLERK:  Yes, that's correct.

7           THE COURT:  The next page is 2.01, introduction to

8      final instructions.

9           MR. TEDDER:  No objection.

10          THE COURT:  Next page is 2.02, statement of the

11     charge.

12          MR. TEDDER:  The statement of the charge appears to

13     be standard.  We have no objection.

14          MR. GROLAND:  Well, except for the fact that

15     aggravated child abuse may be a lesser.  I'm recalling a

16     case in Levy County I think Your Honor presided over,

17     somebody was charged with murder and they're found

18     guilty of aggravated child abuse.  I think.  So, I'm not

19     sure.

20          THE COURT:  That was happened to be a second count

21     in that case.  I don't believe it was charged as a

22     lesser included at the time of jury instructions.  And

23     my understanding of the law at this point is that the

24     law has changed, that it is no longer an option of the

25     defense to request lesser included instructions.

1          How has that changed, or has it changed that the

2     state may also now include lesser included charges?

3          MS. SINGER:  Yes, I'm sure the state can include

4     them.

5          THE COURT:  It used to be the idea it was only a

6     defense option; is that correct?

7          MR. TEDDER:  I do not know.

8          THE COURT:  Well, bottom line, is there any

9     objection to this instruction?

10         MR. GROLAND:  We may decide that we want no

11    lessers.  And is the Court saying that we have -- it's

12    the Court's understanding that we have the option?

13         THE COURT:  No, sir.  My belief is that the law at

14    this time allows for either the state or the defense to

15    request instructions on lesser included offenses.

16         MR. TEDDER:  We haven't even gotten to that yet.

17         MS. SINGER:  It's right on the first paragraph.

18         MR. GROLAND:  There's a paragraph.  So we'll come

19    back to that?

20         THE COURT:  No, we're not.  We're doing it now.  My

21    question is, is there any objection or requested

22    modification of this instruction?

23         MR. TEDDER:  My understanding is that the

24    introduction to homicide is a standard instruction that

25    has to be given.  If I'm incorrect, then we don't want

1     it, but that's my understanding.  I don't think it

2     specifically lists the lessers.

3          MS. SINGER:  It does in paragraph, in the fourth

4     paragraph down.

5          THE COURT:  Maybe we need to take a longer recess

6     or maybe I need to give the instructions over.

7          The state is proposing this instruction, so I

8     assume the state has no objection to this instruction.

9          MS. SINGER:  No objection.

10         THE COURT:  I need to know from the defense whether

11    or not there is any objection to this instruction.

12         MR. GROLAND:  There's no objection to the

13    instruction but we would like to add aggravated child

14    abuse as another lesser and make that change only on

15    this page.

16         THE COURT:  Where would that fit on this page?

17         MR. GROLAND:  That would fit in the first

18    paragraph, introduction, the second subparagraph talks

19    about lessers, so we would be asking that right after

20    manslaughter, aggravated child abuse be added in here

21    and that change be made.  And otherwise that page is

22    fine with us, because we're going to ask for aggravated

23    child abuse as a lesser included offense.

24         MR. TEDDER:  Your Honor, maybe we ought to take a

25    recess and Mr. Groland and I should talk about this.  I

1       apologize.  Can you give us ten minutes?

2              THE COURT:  Yes, I'm going to do that.  But before

3       I do that, let's make sure that we understand what we're

4       going to do when we come back.

5              Now, lesser included instructions are going to be

6       addressed.  It does not appear to me that this is the

7       location where we would add lesser included

8       instructions.  So I will need for you to address

9       specifically whether or not this is the proper location

10      and be prepared to provide some legal basis for that if

11      you think so.

12             Now, if you have not gone through these proposed

13      instructions page by page, then we're not ready for

14      this.

15             MR. TEDDER:  I have.

16             THE COURT:  Okay.  Good enough.  We're going to

17      take another ten minutes so you can discuss it with

18      Mr. Groland and go through all of them page by page with

19      Mr. Groland so that you are both on the same page.  And

20      then we'll pick up at this point.

21             As I told you several days ago, if there are any

22      additional requested instructions, they need to be here

23      at this time in writing.  I will assume that if you have

24      any, you have them with you.

25             MR. TEDDER:  Judge, what I did was I prepared some

1    modifications as to the homicide instructions, which I

2    do have here, but I --

3         THE COURT:  Since we're on that page, this would be

4    the appropriate time for you to show me those.

5         MR. TEDDER:  No, that is not where the modification

6    was, it was actually further on down the line.

7         MR. PENNYPACKER:  To save time, Your Honor, perhaps

8    Mr. Tedder could show that to us and we can go over it.

9         MR. TEDDER:  Sure.

10        THE COURT:  Here's what we're going to do.  We're

11   going to take -- is 15 minutes enough time for all of

12   you to discuss these instructions?

13        MS. SINGER:  Sure.

14        THE COURT:  We'll take a 15 minute recess.  State

15   and defense, discuss the instructions, so that when I

16   come back on the bench, you'll be prepared to tell me

17   where you agree and where you disagree.

18        (A recess was taken.)

19        THE BAILIFF:  Court will return to order.  Please

20   be seated back.

21        THE COURT:  State ready to proceed?

22        MR. PENNYPACKER:  Yes, ma'am.

23        THE COURT:  Defense ready to proceed?

24        MR. TEDDER:  Yes, ma'am.

25        THE COURT:  I'm on the third page of the

1      instructions beginning with the title page.  The top of

2      the page reads 2.02, Statement of the Charge.  Is there

3      any objection to that instruction?

4           MR. GROLAND:  There's no objection but we want to

5      add to it.

6           THE COURT:  Where?

7           MR. GROLAND:  John, you want to do this?

8           MR. TEDDER:  Yes, Your Honor, I think we've agreed

9      that in the second sentence under introduction to

10     homicide, that it should read murder in the first degree

11     includes the lesser crimes of murder in the second

12     degree, murder in the third degree, manslaughter, and

13     aggravated child abuse, all of which are unlawful.

14          MS. SINGER:  We have no objection.

15          THE COURT:  Good enough.  Any other changes to that

16     page?

17          MR. TEDDER:  No, ma'am.

18          THE COURT:  Next page begins Florida Statute

19     782.04(1)(a).  Any change to that page?

20          MR. TEDDER:  Yes, ma'am, we would request that the

21     Court take out of sentences one, two, and three, the

22     words victim and defendant before Robert Quirello's name

23     and Brian Herlihy's name.  It should simply read

24     sentence number one, Robert Quirello is dead.

25          THE COURT:  Is this how the standard instruction is

1      worded?

2             MR. TEDDER:  The standard instruction says victim,

3      in paragraphs, is dead.  And I've always seen it just

4      the name of the victim inserted.  Likewise, defendant,

5      they have -- every time you have defendant, it's in

6      paragraphs.

7             THE COURT:  What's the state's response?

8             MS. SINGER:  Whatever the Judge wants, whatever the

9      Court wants.

10            THE COURT:  Good enough.  Remove the word victim

11     and remove the word defendant from paragraphs one, two,

12     and three.

13            MS. SINGER:  And we also found we left out a

14     paragraph there, Judge.  The definition of an act should

15     have been right after the subparagraph three, which will

16     be included in the new packet, and we're agreeable to

17     that.

18            THE COURT:  Right after?

19            MS. SINGER:  After it says there was a premeditated

20     killing of Robert Quirello, there should be a definition

21     that says an act contains a series of related actions.

22     For some reason that was not added in the computerized

23     version that we had.  We're going to put it in there.

24            THE COURT:  Defense agrees; is that correct?

25            MR. TEDDER:  Yes, ma'am, I pointed that out to

1     them.

2          THE COURT:  And beneath that first section under

3     first degree felony murder, the same issue arises,

4     victim, defendant and victim will be removed from

5     paragraphs one, two, three; is that correct?

6          MR. TEDDER:  Yes, ma'am.

7          THE COURT:  Any other changes to that page?

8          MR. TEDDER:  Yes, ma'am.  We would ask as to

9     paragraph two, simply say the death occurred as a

10    consequence of and while Brian Herlihy was engaged in

11    the commission of aggravated child abuse, period, and

12    not have anything regarding attempting to commit an

13    aggravated child abuse.

14         MS. SINGER:  We disagree with that, Your Honor.  I

15    know the Court has, I think, a book of instructions, and

16    I would ask the Court to take a look at the standard,

17    which allows us to allege every applicable section.  And

18    it is the state's contention that there is sufficient

19    evidence to prove either that the act of aggravated

20    child abuse was committed or that Brian Herlihy was

21    attempting to commit that act.  It would be on -- well,

22    you're using a different book.

23         THE COURT:  Well, I have the other book too.

24         MS. SINGER:  It's on Page 1480 at the very top.

25         THE COURT:  1480?

1       MS. SINGER:  1480.

2       THE COURT:  Give me just a second, 1480, very top.

3   All right.

4       MS. SINGER:  Yes.  It's the state's position that

5   the instruction should be given as to anything that is

6   applicable, and I believe that it's the state's position

7   that both A and B are applicable; C is not applicable

8   and was not alleged.

9       THE COURT:  What's the defense say?

10      MR. TEDDER:  We disagree that the evidence supports

11  that he committed aggravated child abuse or attempted to

12  commit aggravated child abuse.  But I know the Court's

13  already denied our motion for judgment of acquittal.  We

14  would just submit to the Court that the state has to

15  pick one theory or the other.  I object to both being

16  given.

17      THE COURT:  The objection is noted for the record

18  and is overruled.  Paragraph two under first degree

19  felony murder will include, or the death occurs as

20  consequences of and while Brian Herlihy was attempting

21  to commit aggravated child abuse.

22      Any other changes to that page?

23      MR. TEDDER:  No, ma'am.

24      THE COURT:  I'm noticing here that I did not mark

25  out "the" the first time around, you might want to make

1    sure your corrections --

2         MS. SINGER:  I'm going to give you a copy that is

3    completely -- you're going to toss this one away or hold

4    it to compare, and I'm going to give you a brand new

5    copy.

6         THE COURT:  I know you are.  I appreciate that.

7    But I wanted to make sure that while you're marking what

8    corrections need to be made for the new copy that you,

9    like I just did, marked through the word "the" as well

10   as victim and defendant so that it's clear.

11        MS. SINGER:  Absolutely.  I'm going to redo the

12   whole thing and do my best to make sure -- all the comas

13   will be out and everything else.

14        THE COURT:  Next page, Florida Statute 782.04(2),

15   Second Degree Murder.  Any changes to that page other

16   than the ones we've already noted, which means in

17   paragraphs one, paragraphs two, and paragraph three, the

18   words the victim, the defendant, and the victim would be

19   removed.

20        Any other changes?

21        MR. TEDDER:  No, ma'am.

22        THE COURT:  Next page, Florida Statute 782.04(4).

23   Any changes to that page?

24        MS. SINGER:  Except taking out the words defendant

25   and victim.  There is an additional paragraph I believe

1      Mr. Tedder and Mr. Groland would like to add to this,

2      and we have no objection, and that is the definition of

3      child abuse that is found in the aggravated child abuse

4      instruction.

5          MR. TEDDER:  Which says, Child abuse means the

6      intentional infliction of physical or mental injury upon

7      a child or intentional act that would reasonably be

8      expected to result in physical or mental injury to the

9      child.

10         THE COURT:  Good enough.  So on this page, the

11     words the victim, the defendant, and the defendant will

12     be removed from paragraphs one, two and three

13     respectively.  And at the bottom of the page, the

14     definition of the elements of child abuse will be

15     included; is that correct?

16         MR. TEDDER:  Yes, ma'am.

17         MS. SINGER:  Yes, but it's not the elements of

18     child abuse.  It's actually --

19         THE COURT:  Excuse, me the definition.

20         MS. SINGER:  The definition of child abuse --

21         THE COURT:  Thank you for that correction.

22         MS. SINGER:  -- as opposed to the elements.  I did

23     provide the Court with a copy of the instructions for

24     the elements because I understand, and perhaps defense

25     counsel needs to go on the record, they do not want to

1   have that read.  They simply want the definition read.

2   Is that correct, Mr. Tedder?

3       MR. TEDDER:  Yes, ma'am.  That's what we discussed.

4       THE COURT:  Good enough.  Next page, Florida

5   Statute 782.07, Manslaughter.  The corrections, the

6   victim --

7       MR. TEDDER:  Your Honor, I'm sorry, there's one

8   other thing on the third degree murder.

9       THE COURT:  Yes.

10      MR. TEDDER:  And that is we would have the same

11  objection to the alternate theories being offered,

12  engaged in the commission of child abuse or attempt to

13  commit child abuse.

14      THE COURT:  Noted for the record, overruled.

15  Florida Statute 782.07, Manslaughter.  The victim, the

16  defendant, those terms will be removed from paragraphs

17  one and two.

18      Any other changes?

19      MS. SINGER:  Which one are we at?  Manslaughter.

20      THE COURT:  Yes.

21      MS. SINGER:  Yes, ma'am, I'm sorry.

22      THE COURT:  Any other changes?

23      MR. TEDDER:  Yes, ma'am, they inadvertently left

24  off at the end of the manslaughter instruction the

25  sentence -- well, okay, we have a couple of objections.

```
 1          Number one, as to paragraph two, we would submit that it
 2      should only say that Brian Herlihy caused the death of
 3      Robert Quirello by culpable negligence.
 4              MS. SINGER:  We would agree to that, Your Honor.
 5              THE COURT:  Remove the word intentionally, is that
 6      what your agreement is?
 7              MS. SINGER:  Yes, intentionally caused the death of
 8      the victim, we'll take that out, Brian Herlihy caused
 9      the death of the victim, we'll take victim out, caused
10      the death of Robert Quirello by culpable negligence.  In
11      other words, the words victim are not going to be in
12      there, right, John?
13              MR. TEDDER:  Right.
14              THE COURT:  Any other changes to that page?
15              MR. TEDDER:  I don't think we need the definition
16      of procure.
17              MS. SINGER:  I'm fine with that if the defense does
18      not wish to have it.  I don't think it applies.
19              THE COURT:  Remove the definition of to procure.
20      Any other changes to that page?
21              MR. TEDDER:  No, ma'am.
22              THE COURT:  Next page, Florida Statute 827.03(2),
23      Aggravated Child Abuse.
24              MS. SINGER:  I have another one for the Court, Your
25      Honor.  I added -- I completely drafted the complete --
```

1      I drafted the complete instruction for aggravated child

2      abuse that has been passed by the Supreme Court.  And so

3      I'm going to ask the Court to consider that one in lieu

4      of the one that you have in front of you at this time.

5            THE COURT:  Mr. Tedder has a copy?

6            MS. SINGER:  Yes, we provided a copy.

7            THE COURT:  You looked at this, Mr. Tedder?

8            MR. TEDDER:  I was looking -- Ms. Singer provided

9      me with the --

10           MS. SINGER:  I have it here also.  I don't know --

11     did you pick up a copy of this, John?  This is the

12     actual one.

13           MR. TEDDER:  Oh, the new one, you mean?

14           MS. SINGER:  Yeah.

15           MR. TEDDER:  You gave me one of those earlier.

16           MS. SINGER:  Right.

17           THE COURT:  Any objection to the new instruction,

18     Florida Statute 827.03(2), other than in paragraphs one

19     and two, and one and two beneath it, the words the

20     defendant, the victim, the victim, the defendant, the

21     victim, and the defendant, would all be removed.

22           MR. TEDDER:  Yes, we agree with that and we would

23     have asked for the child, aggravated child abuse

24     instruction that was in effect back in August of 2000

25     when this event occurred.  I know the state's position

1       is that this -- I don't know when the Florida Supreme

2       Court drafted this or whether or not this was a proposed

3       change to jury instructions or whether it's actually

4       already ordered that it be changed.  I'm not sure.  I

5       was kind of looking through it.  Ms. Singer provided me

6       with the Florida Law Weekly where it has the --

7              THE COURT:  Ms. Singer, is the state convinced that

8       legally this corrected instruction is the one that

9       applies in this case?

10             MS. SINGER:  Yes, Your Honor.  In fact, the reason

11      why the instruction exists is because of cases such as

12      the Kaufman case and the Slocumb case before the Court

13      where while they did not reverse, I believe that they

14      both ruled that the instructions were not complete.

15             THE COURT:  Good enough.

16             MS. SINGER:  And, in fact, I provided the Court

17      with this, and I know you're counting on me to be the

18      one here, I do want other people to pay attention to

19      this because I'm relying a lot on Mr. Cervone, who gave

20      me this.  But the comment on the end of the instruction

21      was, it says in the comment, this instruction is based

22      on Section 827.03(2) Florida Statutes, 1999.  It's the

23      statute that would be in effect in this case and the

24      definition of malice as used in this too, is from State

25      v Gaylord, 1978, note that battery and child abuse are

1    not lesser included offenses of aggravated child abuse.

2    So they've explained in the comment the reason why

3    they've made these changes.  So I think that the

4    comments are also telling us that they made these

5    changes because the other instructions that were used

6    previously were not as complete.

7         THE COURT:  I agree.  Next page, 2.03, Plea of Not

8    Guilty, Reasonable Doubt, and Burden of Proof.

9         MR. TEDDER:  I understand.  We would just object

10   for the record as to the aggravated child abuse

11   instruction.

12        THE COURT:  Yes, noted and overruled.  Next page,

13   Plea of Not Guilty, Reasonable Doubt, and Burden of

14   Proof.  Any change to this page?

15        MR. TEDDER:  No, ma'am.

16        THE COURT:  Next page, 2.04, Weighing the Evidence.

17   Any change to this page?

18        MR. TEDDER:  No, ma'am.

19        MR. GROLAND:  Your Honor, weighing the evidence, do

20   we want to take out the ones that absolutely don't

21   apply?

22        THE COURT:  I don't know, do you?

23        MS. SINGER:  There aren't any that don't.

24        MR. GROLAND:  Well, has the witness been offered

25   any money, preferred treatment or other benefit in order

1     to get the witness to testify.

2          THE COURT:  Mr. Groland, you all were to discuss

3     this several days past, or during the first recess, and

4     during the second recess.  At this point, if you don't

5     have an agreement, what you need to do is make an

6     objection on the record that I can simply rule on.

7          What do you want removed?

8          MR. GROLAND:  I think I want to remove, and I don't

9     think the state will mind, the ones that do not apply,

10    which would be specifically paragraph number six.

11         THE COURT:  Paragraph six number.  What's the

12    state's response?

13         MS. SINGER:  We oppose removing that.  We had a

14    witness who testified he gets paid $10,000 to testify.

15         THE COURT:  Your request is denied.

16         MR. GROLAND:  Has any pressure or threat been used

17    against the witness that affected the truth of the

18    witness's testimony.

19         THE COURT:  What's the state's response?

20         MS. SINGER:  We oppose.  We think there might be

21    issues where the jury might consider the testimony of

22    the witnesses to have been put under pressure or threat.

23         THE COURT:  The request to have it removed is

24    denied.  Any other ones?

25         MR. GROLAND:  No.

1    THE COURT:  Okay.  Good enough.  Any other proposed

2    changes to this page?

3        MR. TEDDER:  Not from me.

4        THE COURT:  Next page, 2.04(a), expert witnesses.

5        MR. TEDDER:  Appears to be standard.

6        THE COURT:  Yes, sir, but do you have any objection

7    to it?

8        MR. TEDDER:  No, ma'am.

9        THE COURT:  Good enough.  It will be given as

10   provided.

11       Next page, defendant testifying, that one will be

12   removed.

13       MS. SINGER:  Correct.

14       THE COURT:  Next page, 2.04(d), defendant not

15   testifying.  Any proposed changes to this page?

16       MR. TEDDER:  No objection.

17       THE COURT:  Next page, 2.04(e), defendant's

18   statements.  Any proposed changes to this page?

19       MR. GROLAND:  No.

20       THE COURT:  Next page, 2.05, rules for

21   deliberation.  Any proposed changes?

22       MR. GROLAND:  No.

23       THE COURT:  Next page, 2.07, cautionary

24   instruction.  Any proposed changes?

25       MR. GROLAND:  No.

1     THE COURT:  Next page, 2.08, verdict.  Any proposed

2     changes?

3          MR. GROLAND:  No.

4          THE COURT:  Next page, 2.09, submitting the case to

5     the jury.  Any proposed changes?

6          MR. TEDDER:  No objection.

7          THE COURT:  Next page, Florida Statute 784.045,

8     aggravated battery.

9          MS. SINGER:  We're not going to be using any other

10    lessers, Your Honor.  We have agreed to the lesser

11    included offenses.  Those were given to you because we

12    didn't know what we were going to do.

13         THE COURT:  Good enough.  So aggravated battery,

14    felony battery and battery will be removed, as well as

15    child abuse; is that correct?

16         MS. SINGER:  That's correct.

17         THE COURT:  Is that right, Mr. Tedder?

18         MR. TEDDER:  Yes, ma'am.

19         MS. SINGER:  We'll need to add to the verdict form

20    that I provided to the Court on a separate line for

21    aggravated child abuse.  That's not on the verdict form

22    I gave you.  So that would be paragraph five, the

23    defendant, Brian Patrick Herlihy is guilty of aggravated

24    child abuse will be typed in there.  And then I'm going

25    to take the verdict forms back, if that's okay, so

1    there's no confusion.

2         THE COURT:  Yes.

3         MR. TEDDER:  Your Honor, can we go back to the

4    lessers?  We'd like to add child abuse as a lesser,

5    simple child abuse.

6         MS. SINGER:  As both a lesser included offense and

7    the definition, so we won't be changing the verdict, we

8    need instruction to add that definition, or will we

9    still be changing that?

10        THE COURT:  Let's go back and figure out which page

11   that would apply to.

12        MS. SINGER:  Murder three, third degree murder, we

13   had agreed to use the definition of child abuse instead

14   of reading the instructions for child abuse.  I don't

15   know if I'm making any sense here.

16        THE COURT:  Yes.

17        MS. SINGER:  I think if we're going to read the

18   instruction for child abuse -- third degree murder is

19   child abuse plus death.  I think we don't need that

20   extra paragraph to find the child abuse, unless

21   Mr. Tedder wants it included.  It's up to him.

22        MR. TEDDER:  I think it should be included.  We're

23   just wanting to add another lesser.

24        THE COURT:  The definition of child abuse can be

25   included on that page as requested and it can remain.

1       The page that is titled Florida Statute 827.03(2),

2       aggravated child abuse, after that list of elements, the

3       next Florida Statute defining the elements of child

4       abuse should be included at that point; is that correct?

5              MS. SINGER: Do you want it on the same page or do

6       you want it on a separate page?

7              THE COURT: A separate page is fine, just at that

8       location after that.

9              MS. SINGER: That's where it will be.

10             THE COURT: Is that agreeable, Mr. Tedder?

11             MR. TEDDER: Yes, ma'am. And, again, as to the

12      child abuse instruction the state prepared we just --

13             MS. SINGER: Yes, I'm going to take all of it out.

14             MR. TEDDER: We also disagree and would object to

15      the -- we would have asked for the instruction of child

16      abuse as it existed in 1990. I understand the Supreme

17      Court has changed. And we also object to the

18      alternative theories of how child abuse could happen.

19      We would object to the court's ruling on that.

20             MS. SINGER: I think the record needs to be clear

21      that in the year 2000 the statute that is in the book

22      now and the statute that we're referring to was in

23      effect. It was in effect in 1999 before this crime

24      occurred. That's what the Supreme Court refers to in

25      making the new jury instruction, cases that occurred in

1    1999.  So I just want the record to be clear that we're

2    not talking about a child abuse statute that occurred

3    some time ago.  We're talking about the actual statute

4    that's in effect now, it's the same statute that's in

5    effect back in 2000.

6        THE COURT:  The objection of the defense is noted

7    and is overruled.  Now, the instructions, the sequencing

8    of the instructions will include the page that begins

9    Florida Statute 827.03(2), aggravated child abuse; the

10   next page will be Florida Statute 827.03(1), child

11   abuse, with the corrections that the words the

12   defendant, the victim, the victim, the victim, be

13   removed; is that correct?

14       MS. SINGER:  Yes.

15       THE COURT:  And the next instruction after that

16   would be the plea of not guilty, reasonable doubt, and

17   burden of proof instruction, 2.03; is that correct?

18       MR. TEDDER:  Yes, ma'am.

19       THE COURT:  Okay.  Now, is there any other change,

20   direction, objection, that needs to be made for this

21   record?

22       MR. TEDDER:  Other than the objection that we

23   previously noted, we have no further that I know of.

24       THE COURT:  We will go over these final

25   instructions at 9:00 A.M. on Monday morning, along with

1    any potential motions that might be raised and, of

2    course, we'll review the verdict form at that time.  So

3    I'll need Mr. Herlihy brought to Courtroom 2D, please,

4    first.  And then we'll come up here at 10:30 as we've

5    indicated earlier.

6        Anything else that we need to address this

7    afternoon?

8        MR. TEDDER:  Not that I'm aware of, Your Honor.

9        MS. SINGER:  I thought there was one thing.  Was

10   there one thing?  I guess there is no more.  I guess it

11   was about splitting the closing.  I think it's been

12   taken care of.

13       THE COURT:  Yes, Mr. Groland, anything else?

14       MR. GROLAND:  No, ma'am.

15       THE COURT:  And if the defense determines over the

16   weekend that they are going to file the motion first

17   thing Monday morning in regard to any request to reopen

18   their case and present another expert witness, they're

19   to let the state know right away.  Since we do have that

20   block of time, you do need to let me know that.  I'll be

21   here 9:00 Monday morning ready to proceed with whatever

22   matters we need to address.  The state is entitled to

23   some advanced notice so they can prepare.

24       MR. TEDDER:  Sure.

25       THE COURT:  Anything else we need to address today?

1           MS. SINGER:  I just want to take your verdict form

2      back, so I can rip it up.

3           THE COURT:  Good enough.  Court is adjourned until

4      9:00 A.M. Monday morning.

5           (Pause in the proceedings.)

6           THE COURT:  Court is back in session.  There's

7      apparently something else we need to address.

8           MS. SINGER:  Your Honor, after we released the jury

9      today, juror named Monica Pena, Pena, came to the state

10     attorney's office.  She was the juror that the state had

11     moved to challenge for cause based upon the fact that

12     she had an active case pending as a victim.  She came to

13     the state attorney's office this afternoon requesting

14     that she have her no contact lifted.  Lee Libby from our

15     office advised her that we could not speak with her and

16     we sent her away.  I believe he had a witness with him

17     when he did that.  I want the record to reflect that.

18     And I think inquiry needs to be made on Monday morning

19     regarding whether or not there was anything else said to

20     her or whether or not she has had any inappropriate

21     contact.

22          THE COURT:  Mr. Groland?

23          MR. GROLAND:  I don't think there's any need to

24     single out that juror and do anything.  She already told

25     us during jury selection that she had a case and was a

1   victim, and that was explored.  And she was at the state

2   attorney's office to address that case and was just told

3   that since you're a juror, let's basically wait and we

4   can't talk to you at this time.  I don't think there's

5   any need to single her out and even question her at this

6   point.  I really don't.

7        THE COURT:  Well, my concern is that legally as a

8   victim she's entitled to certain rights, which would,

9   I'm believing, without researching it, include a right

10  to have access in regard to her case.  This may affect

11  her safety.  I have no way of knowing.  And, therefore,

12  I do have some large concerns about whether or not the

13  state should refuse to address what could be her safety

14  concerns in regard to the other case.

15       MR. GROLAND:  That makes sense.

16       THE COURT:  Now, separate and apart from that, as

17  was noted, there would be no basis that I could see to

18  challenge her for cause because that was pending.  And,

19  of course, an issue could arise that would mean she

20  needed to be substituted with an alternate.  But I do

21  not see how it could be appropriate to say, We will not

22  address the legal rights and concerns of a victim.  I

23  don't see how we can do that.

24       MS. SINGER:  We did not --

25       THE COURT:  I don't see how the state can do that.

1      MR. GROLAND:  She's there asking that the no

2    contact be lifted, I mean, I think we can infer from

3    that that there appears not to be a danger to her

4    situation, as opposed to where she's asking for more

5    help.  So I think on the face of things, it appears to

6    be okay, and I think we ought not do anything until we

7    have more information or have other reason to be

8    concerned.

9      THE COURT:  No.  No.  No.  I'm not going to wait

10    until something happens to a victim to be concerned.

11    That's, of course, one of the political arguments that

12    has to do with the Iraq, whether or not we wait -- no,

13    that's not going to happen.  I will certainly consider

14    whether or not she needs to be removed.  And I'm going

15    to direct the state, to the best of your ability,

16    whether or not that's through a victim advocate, whether

17    that's through law enforcement, or whether or not that's

18    through one of your attorneys or investigators, inquire

19    as to her safety.

20      MS. SINGER:  Well, we did send her home.  So can we

21    inquire as to her safety through the telephone?

22      THE COURT:  Correct.

23      MR. GROLAND:  Your Honor, I fully understand what

24    the Court is saying, but I think somebody from some

25    agency not connected with this case ought to contact her

1    specifically.  This is a GPD case, let somebody from the

2    sheriff's department, they've got advocates and whatnot.

3    I think somebody from that law enforcement agency should

4    be the one to make contact as opposed to somebody from

5    the state attorney's office.

6        THE COURT:  I have no problem with that.

7        MR. GROLAND:  Will you do that, Jeanne?

8        MS. SINGER:  I don't know how I can direct anybody

9    to do that.  Do you want to direct the sheriff's office

10   to do that?

11       THE COURT:  Yes, and I'm sure under the

12   circumstances they'll cooperate.

13       MS. SINGER:  All right.  We'll have somebody from

14   the sheriff's office contacted through the bailiff and

15   we'll be out of it completely.

16       THE COURT:  I need the contact information, which

17   you can get me through that --

18       MS. SINGER:  We can give you the name of the

19   person.  Who's the victim advocate?

20       THE COURT:  That doesn't help me.  I need how to

21   contact Ms. Pena directly, because she is your victim

22   and Mr. Libby apparently has that information.

23       MS. SINGER:  Yes, we can get that information.

24       THE COURT:  The bottom line is, we don't need the

25   discussion on the record.  Get me the information.  I

1   will direct the state, the sheriff's office to inquire

2   as to her safety.  And you can get me that information

3   in the next --

4        MS. SINGER:  Day.  Mr. Weaver is going to get it

5   right now for you.

6        The bottom line, Your Honor, is that we will still

7   be requesting of the Court to evaluate that because if

8   Ms. Pena feels that she did not receive the appropriate

9   services of the state attorney's office today, based

10  upon the fact that she was sitting on the jury, and she

11  cannot be fair and impartial to the state because of

12  that, I believe that we would have a right to have her

13  stricken as a juror.

14       THE COURT:  When we find out the circumstances,

15  we'll have some way to address it further and we'll

16  address it Monday morning.

17       MR. TEDDER:  Your Honor, before you leave,

18  Mr. Herlihy has asked me to see if there's any way he

19  can talk to his family with Mr. Groland and myself.  I

20  know the jail will not allow us to have a place to talk.

21  If perhaps we could go in the jury room, although I

22  think the evidence has been stored back there, but

23  someplace where we can have a private conversation,

24  where the deputies can guard, the bailiffs can guard and

25  make sure nothing funny is going on, Mr. Herlihy needs

1    to have some issues that he wants to talk to his family

2    about with us.

3         THE COURT:  I believe he would have phone access

4    through the jail.  His phone access has not been

5    restrict, has it?

6         MR. TEDDER:  No, but the whole point is to have a

7    group conversation is what he needs at this time.

8         THE COURT:  AT&T provides conference call services.

9    But Mr. Herlihy is in custody and I cannot interfere

10   with the security measures that the jail puts in place.

11        MR. TEDDER:  We're not asking you to interfere with

12   any security measures, Your Honor, we're simply asking

13   to have, you to give us --

14        THE COURT:  Mr. Tedder, did you not understand the

15   no there?  Maybe I wasn't clear.  The answer is no.  Get

16   a conference call scheduled or file a motion to have him

17   released on his own recognizance.  Other than that, he

18   is under the security measures that the jail imposes and

19   I do not interfere with those.

20        Now, anything else you need to put on the record?

21        MR. TEDDER:  No, ma'am.

22        THE COURT:  Court is in recess until 9:00 Monday

23   morning.

24        (The trial was recessed at 3:19 P.M. to the

25   following workday, September 23rd, 2002 at 9:00 A.M.)

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182