# EXHIBIT

# T

*202-1-17814*

*F*

# In the District Court of Appeal

## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY          }
              Appellant,          }

                          }
                          }

v.          }

                          }

STATE OF FLORIDA          }
              Appellee,          }

CASE NUMBER   2000-2753-CFA

APPEAL NUMBER 1D02-4788

VOLUME XX

D 5-14-2003

Florida Attorney
General

# TRANSCRIPT
# RECORD

### HONORABLE MARTHA ANN LOTT
#### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

2177

*d02-1-17814*

1    IN THE CIRCUIT COURT OF FLORIDA
     EIGHTH JUDICIAL CIRCUIT
2    IN AND FOR ALACHUA COUNTY

3    CASE NO. 01-2000-CF-002753-A

4    THE STATE OF FLORIDA

5    vs.                        Volume XX

6    BRIAN PATRICK HERLIHY,
                                1D02-4788
7         DEFENDANT.

8    _____/

9                                05-14-2003
                                 Florido Attorney
10        TRANSCRIPT ON APPEAL        General
          PAGES 2177 - 2267
11            VOLUME XVII

12

13   PROCEEDINGS:        JURY TRIAL
     BEFORE:             THE HONORABLE MARTHA ANN LOTT,
14                       CIRCUIT JUDGE
     DATE:               SEPTEMBER 23TH, 2002
15   TIME:               9:07 A.M.
     PLACE:              COURTROOM 4A
16                       ALACHUA COUNTY COURTHOUSE
                         GAINESVILLE, FLORIDA
17

18   APPEARANCES:

19        JEANNE SINGER, ESQUIRE
          and
20        STEPHEN H. PENNYPACKER, ESQUIRE
          120 WEST UNIVERSITY AVENUE
21        GAINESVILLE, FLORIDA 32601
          ATTORNEY FOR THE STATE OF FLORIDA

22        GORDON H. GROLAND, ESQUIRE
          and
23        JOHN TEDDER, ESQUIRE
          500 EAST UNIVERSITY AVENUE, SUITES B&C
24        GAINESVILLE, FLORIDA 32601
          ATTORNEY FOR THE DEFENDANT

25

2178

1                              INDEX VOLUME XVII

2

3

4                                WITNESSES

5    DR. MICHAEL BELL

6      Direct Examination by Mr. Tedder................Page 2208

7

8

9    DEFENSE RESTS....................................Page 2210

10

11   CLOSING ARGUMENTS

12     By Ms. Singer..................................Page 2213

13

14

15

16

17

18

19

20

21

22

23

24

25

1             P R O C E E D I N G S

2             (Whereupon, the following proceedings were held,

3       the defendant and counsel being present.)

4             THE COURT:  Mr. Tedder, I assume that you're

5       proceeding this morning without Mr. Groland?

6             MR. TEDDER:  Yes, ma'am, Your Honor, Mr. Groland

7       should be here around 10:00.

8             THE COURT:  That will be fine.  Now, do you have

9       motions you want to have heard?

10            MR. TEDDER:  Well, I believe Mr. Groland had talked

11      to Ms. Singer and Your Honor over the weekend about

12      possibly being allowed to reopen the case.

13            THE COURT:  All he did was leave a message that a

14      motion would be presented, which of course were his

15      instructions when we recessed.

16            MR. TEDDER:  Well, the motion that he wanted to

17      present was to have the Court consider whether or not to

18      allow us to reopen our case to present more testimony in

19      rebuttal.

20            THE COURT:  I'm hearing -- I'm listening, go ahead.

21            MR. TEDDER:  Possible testimony of Dr. Bell and

22      Dr. Dubovi (phonetic), who examined the eyes of the

23      baby.  I just spoke to one of them a moment ago and was

24      trying to finalize exactly what he would say.  I'm not

25      sure if we would ask the Court to allow us to do that or

1    not yet based on -- I just need to do more questioning

2    of him.  So if the Court -- Mr. Groland indicated to me

3    on the telephone he thought the Court was going to allow

4    us to open if we wanted to.  Obviously, I think I must

5    have gotten some -- not heard him straight on that.  We

6    would ask the Court consider that.  We're not sure we

7    want to do that but we'd ask the Court to consider doing

8    that.  I know we did not plan to begin the trial again

9    until 10:30 this morning.

10        THE COURT:  As I think I made it very clear on the

11   record last week, there is no ruling on any matter that

12   is not properly before the Court ever.  What I said on

13   the record last week is, if the state or the defense, as

14   I said throughout the trial, intends to add any

15   additional legal matters that must be addressed by the

16   Court, which will be addressed only in the court on the

17   record, then you should let each other know and let me

18   know so that we can be prepared to proceed.  That, of

19   course, is what has happened a couple, maybe three times

20   during this trial, which I appreciate, which I am sure

21   the other side appreciates, and that is what happened

22   this weekend.

23        There is no motion before me.  There is no ruling.

24   And we'll proceed with the jury instructions.

25        MS. SINGER:  Your Honor, we do have one other

1      motion to make.

2          THE COURT:  Go ahead.

3          MS. SINGER:  Based upon the information that was

4      provided to the state in the early evening hours of

5      Friday of last week that Monica Pena, one of the jurors

6      in this case, had left the courtroom here and had

7      proceeded to the state attorney's office with the

8      purpose of requesting that her no contact with her son,

9      who is a defendant in a case, be lifted, we had earlier

10     at the time of jury selection moved to challenge

11     Ms. Pena for cause based upon the fact she was a victim

12     in a pending criminal case and that her son was the

13     defendant in that case.  That motion was denied.  That

14     challenge was denied.

15         At this time the state is once again stating that

16     challenge for cause and we ask that Ms. Pena be excused

17     as a juror in this case and that the first alternate

18     juror will replace her on the panel.  The basis for that

19     is the great concern that the state had in the fact that

20     immediately upon leaving this courthouse, she traveled

21     to the state attorney office, communicated with members

22     of the state attorney's staff, requesting not a

23     dismissal of charges but a lifting of a no contact

24     provision in a case that is pending; that she had to be

25     advised at that time that because she was a juror in

1    this case and because the instructions were that no

2    member of the state attorney's office communicate with

3    the juror during the pendency of this case, that she had

4    to be turned away.  It was described as being an

5    amicable conversation with her but that she was very

6    frustrated by the fact that she couldn't get her case

7    taken care of, even though she was advised that we could

8    not communicate with her at that time.

9        We believe that this is highly prejudicial to the

10   state.  We once against restate all the reasons for the

11   challenge for cause we originally made at jury

12   selection.

13       MR. TEDDER:  If you need a response, I'll respond,

14   Your Honor.

15       THE COURT:  Yes, I do.

16       MR. TEDDER:  Your Honor, our position would be that

17   state attorney accepted the jury panel that was selected

18   in this case two weeks ago.  They did not ask the Court

19   for additional peremptories.  They did not tell the

20   Court what they would use additional peremptories for.

21   They didn't use a peremptory challenge to strike

22   Ms. Pena.  I don't have the paperwork in front of me as

23   far as where she was on the list and whether or not they

24   had exhausted all their peremptories before we got to

25   Ms. Pena or not, I don't think they -- I think she was

1    well enough in the panel where they could have used a

2    peremptory to strike her but instead chose to use it to

3    strike a person who was the astronomer that was on panel

4    who was a professor at the University of Florida, rather

5    than striking Ms. Pena.  So, Your Honor, our position is

6    that they've waived any challenge to Ms. Pena and they

7    certainly didn't reserve it by asking for additional

8    peremptories and tell the Court who they would use them

9    on.

10   MS. SINGER:  Brief response, Your Honor.  Obviously

11   these new facts that have come up since this trial has

12   proceeded suggest that in fact the challenge for cause

13   was a valid challenge and should have been granted.

14   Secondly, I'm going to ask the Court to consider

15   the notes the Court took as well as the notes of the

16   court reporter.  I believe she was if not the last

17   person on the panel, the second to the last person on

18   the panel, if I remember correctly.

19   THE COURT:  My notes are in the Courtroom 4A where

20   we'll begin the evidence.  Now, I still see no basis for

21   a challenge for cause.  On the other hand, as I have

22   inquired of the jurors every day, I will certainly

23   inquire as to whether or not they've got any information

24   about this case.  And I will certainly entertain a

25   request to inquire whether or not there's any reason why

1    any of them feel like they cannot continue.  I don't

2    know if I want to say it exactly that way.  I may make

3    some inquiry of a general nature that would give her the

4    opportunity to voice any concerns that she might have at

5    this time if either the state or the defense proposes

6    some inquiry.

7        MS. SINGER:  I would ask for an individual voir

8    dire, Your Honor.

9        THE COURT:  Of all 14 jurors?

10       MS. SINGER:  No, of Ms. Pena alone, so that she can

11   privately advise the Court and counsel and Mr. Herlihy

12   about whether or not she feels in any way that she could

13   not be fair and impartial due to the fact that she's had

14   communication with and contact with and was turned away

15   from the state attorney's office on Friday.

16       THE COURT:  Mr. Tedder.

17       MR. TEDDER:  Well, that would seem reasonable.

18   Ms. Singer already told the Court that whatever happened

19   was of a cordial nature.  And certainly other than that

20   nothing has changed since the jury was selected, other

21   than the fact that she went over there and was told she

22   needed to leave, I guess.  I don't know how they phrased

23   it.  Nothing else has changed.  She brought out in jury

24   selection that she knew Ms. Pena had a case pending

25   through their office, or her son did.  If the Court

1    wants to inquire of her individually, if anything, it

2    would seem to me that -- whatever the Court -- I'll

3    leave it to the Court's discretion, Your Honor.

4         THE COURT:  Good enough.  I will make an individual

5    inquiry of Ms. Pena --

6         MS. SINGER:  Pena.

7         THE COURT:  -- prior to deliberations.  If either

8    the state or the defense wants any specific question

9    posed to her, write it down, otherwise I will make the

10   inquiry.

11        MS. SINGER:  I do have the jury instructions now,

12   Your Honor.  I have made copies for the jury because I

13   did not know whether this Court actually has them read

14   along.

15        THE COURT:  Yes.

16        MS. SINGER:  So I made enough copies for each of

17   the jurors.  And I do have one single verdict form,

18   which if I could right now just show it to Mr. Tedder

19   and he can approve it before we go forward.

20        THE COURT:  Yes, go ahead.

21        MR. TEDDER:  It appears to be what we discussed

22   last week, Your Honor.

23        MS. SINGER:  Do you accept and approve the verdict

24   form?

25        MR. TEDDER:  I agree, I accept that it's what we

1    discussed.

2            THE COURT:  Good enough.

3            MR. TEDDER:  Judge, before we go through all the --

4            THE COURT:  We're not going to go through all of

5    them, Mr. Tedder.

6            MR. TEDDER:  Good.

7            THE COURT:  We went through all of them on Friday.

8    What's going to happen now is I'm going to ask that you

9    go through them, if you have not already, and make sure

10   that you agree that this is what we agreed to on Friday.

11           MR. TEDDER:  I went through part of that and I will

12   do that.  I didn't have my notes from Friday, but the

13   only thing I wasn't sure about were the changes on the

14   aggravated child abuse and child abuse statute.  It

15   appears to be what we discussed.  I went through the

16   murder, all the instructions on the murder and lessers

17   on murder, and those are what we agreed on.  So we do

18   accept the jury instructions as far as I can see, Your

19   Honor.

20           THE COURT:  This is your last opportunity.  So as

21   far as I can see, you accept them.

22           MR. TEDDER:  Ms. Singer, I trust you tracked

23   exactly what we discussed the other day?

24           MS. SINGER:  I did and read them over three times.

25   But, John, it's your job, not mine.  Take a look at

| | |
|---|---|
| 1 | them.  I'm sure the judge has a moment for him to go |
| 2 | through the rest of those to make sure they're correct. |
| 3 | MR. TEDDER:  Do you have the Supreme Court thing |
| 4 | with the modification? |
| 5 | MS. SINGER:  Yes. |
| 6 | MR. TEDDER:  Your Honor, while she's looking for |
| 7 | that, Mr. Groland wanted to ask that the bed be put |
| 8 | together. |
| 9 | THE COURT:  It is being put together at 10:15 by |
| 10 | staff of the state attorney's office.  That was the |
| 11 | instructions that I left on the record in front of you |
| 12 | on Friday afternoon. |
| 13 | MR. TEDDER:  Where is it going to be assembled? |
| 14 | THE COURT:  In the well. |
| 15 | MR. TEDDER:  In Courtroom 4A? |
| 16 | THE COURT:  Correct, just as we said on the record |
| 17 | on Friday.  There's been no change. |
| 18 | MS. SINGER:  Here it is. |
| 19 | (Pause in the proceedings.) |
| 20 | MR. TEDDER:  Your Honor, I've reviewed all of the |
| 21 | instructions that we disputed and/or talked about last |
| 22 | week as to the murder charge the jury instructions on |
| 23 | murder charges and aggravated child abuse and child |
| 24 | abuse and they are the way the Court ruled they would be |
| 25 | and we would accept them other than the objections we |

1    made last week during charge conference.

2         THE COURT:  Good enough.  Thank you.  Previously

3    made objections are noted for the record, the rulings

4    are the same.

5         Now, you have copies, Ms. Singer, where?

6         MS. SINGER:  I have enough copies for each juror

7    and the two alternates, as well as for the court

8    reporter, and the Court's copy I've given to the Court.

9         THE COURT:  Where are the copies?

10        MS. SINGER:  In my briefcase.

11        THE COURT:  You need to make sure that Mr. Tedder

12   has the opportunity to review those to make sure there's

13   no --

14        MR. TEDDER:  Your Honor, we would object to the

15   jury being given the jury instructions to read along

16   with the Court while the Court's reading them.  We would

17   ask you to simply instruct them.  We would object to

18   jury instructions being given to them at any time.  If

19   they need further instruction during deliberations, they

20   can always ask the Court for further instructions.  For

21   the Court to give them the instructions allows them to

22   go through and pick out different areas of instructions

23   to focus on, perhaps improperly, we don't know, while we

24   will always know if they have to come back in the

25   courtroom and ask the Court for further instruction.  We

1    will know then that they're getting the correct

2    instruction on the law.  And if you give those

3    instructions to the jurors, one or more of them may take

4    them and try to interpret them for other members of the

5    jury incorrectly.  So we would strongly object to jury

6    instructions being given to the jury to do with however

7    they feel back in the jury room.  The jury instructions

8    are not evidence and they shouldn't be allowed to take

9    that back there with them and be allowed to focus on

10   them.

11       THE COURT:  Good enough.  Your objection is noted

12   for the record.  It is overruled.  Now, I still want to

13   make sure you have the opportunity to review the

14   individual packets.  If you have any objection to any

15   individual set of instructions as being different in any

16   way from the oral instructions that I'm going to read to

17   them, then of course you can let me know.

18       MS. SINGER:  Your Honor, and the state would once

19   again ask that the two alternates be sequestered also

20   pending the return of a verdict in this case.

21       MR. TEDDER:  As far as that's concerned, Judge,

22   once the alternates are excused, they cannot participate

23   in jury deliberations at all, period.

24       THE COURT:  Well, that's my concern also.  I don't

25   know of any legal basis for this request.  You're going

Cheryl McDonough, RPR
Judicial Court Reporter Eighth Judicial Circuit
(352) 384-3182

1   to have to educate me on the area of law that would say

2   that during deliberations it makes any sense to

3   sequester alternates.  How can that be?  Since if

4   anything were to happen, those alternates couldn't be

5   substituted in at that point in the middle of the

6   deliberations, as far as I know.  Is there any basis for

7   that?

8       MS. SINGER:  If the Court gives me five minutes

9   I'll find out.  I know we did it in the Rolling case.

10  And if I could call my office I can perhaps give the

11  Court a cite.

12      MR. TEDDER:  I thought Mr. Rolling pled, I didn't

13  think it went to a trial.

14      MS. SINGER:  He was, he was, he was found to have a

15  recommended sentence of death and the jury sat on that.

16  And for the recommended sentence, the jurors that were

17  alternates were sequestered during the pendency of the

18  deliberations.

19      If the Court will allow me a moment to call my

20  office, I will.  If there is a cite, I will be able to

21  provide it to the Court.

22      THE COURT:  And, Mr. Tedder, your position on that

23  is what?

24      MR. TEDDER:  My position, Your Honor, is that once

25  the 12 folks go back to begin deliberations, whether

1      they're in there for an hour or two hours or however

2      long, whatever they do, if something happens and one of

3      them has to quit deliberating, we can't substitute in

4      somebody else who doesn't, who isn't privy to what has

5      gone on before.  And, you know, the whole point is once

6      those 12 folks begin to deliberate, they've got to stay

7      together and they've got to reach a decision.  If

8      they're unable to do so, then the only remedy, or the

9      only thing that can happen then is a mistrial.  And none

10     us want that obviously, but if that's what happens,

11     that's what happens.

12         THE COURT:  That's what I believe the law to allow

13     and require.  So if that is incorrect, then I'll need

14     some citation, Ms. Singer.

15         Now, what I'm going to do is take a recess until

16     9:45.  At 9:45 I will hear any remaining legal issues.

17     After I recess at 10:15 there will be no further

18     instructions, conference, anything other than we will

19     begin with the state's closing argument at 10:30.

20     Depending upon the length of the state's argument, I'm

21     going to recess for lunch.  I assume during these

22     closing arguments it's basically the luck of the draw as

23     to when that recess takes place between arguments.  I'm

24     going to ask the bailiff to see if there is a

25     possibility that lunch can be ordered and delivered to

1       the jury room basically early so that they can retire to

2       the jury room, eat lunch, come right back in and maybe

3       have something like a 30 minute recess.  If you can be

4       prepared to tell me if that's possibly by 9:45.

5               THE BAILIFF:  Have it here by noon or something

6       like that, 11:30, 12:00, is that too early?

7               THE COURT:  I don't know.  I won't be able to

8       anticipate the exact time of recess, so it would need,

9       in fact, to be something like cold sandwiched.

10              THE BAILIFF:  I'll get it from Larry's.  I did that

11      once before.

12              THE COURT:  See if that's a possibility.

13              THE BAILIFF:  It takes an hour.  They have to order

14      and it takes an hour to go get it and be back.

15              THE COURT:  That would be fine.  I would allow the

16      jurors to order their lunch before we even begin.  As

17      soon as you have them located, you can go ahead and give

18      them the order forms.

19              THE BAILIFF:  Very well.

20              THE COURT:  And then send someone to go get them,

21      so that whenever we recess for lunch they'll be ready.

22      Would that work, do you think?

23              THE BAILIFF:  Okay.

24              THE COURT:  Let me know at 9:45 anything else that

25      we're going to have to cover at the time.

| | |
|---|---|
| 1 | MR. TEDDER:  Your Honor, I cannot possibly |
| 2 | proofread this set of jury instructions between now and |
| 3 | then, so I'm going to trust Ms. Singer.  If Ms. Singer |
| 4 | is saying as an officer of the Court that the copies she |
| 5 | presented to me that I've proofread is exactly what they |
| 6 | have copied and are prepared to offer the jury over our |
| 7 | objection, if she's willing to state that as an officer |
| 8 | of the Court, I'm going to accept that representation. |
| 9 | MS. SINGER:  I didn't go through each of them |
| 10 | individually, they went through the copier, 20 copies. |
| 11 | I'll take them and I'll go through them in the 15 |
| 12 | minutes.  I didn't go through them individually, so I'm |
| 13 | not going to represent that they have every page in |
| 14 | them.  The machine doesn't typically make a mistake. |
| 15 | THE COURT:  Good enough.  Thank you, we'll be in |
| 16 | recess for 15 minutes. |
| 17 | (A recess was taken.) |
| 18 | MS. SINGER:  Your Honor, we have gone through the |
| 19 | 14 packets and we have reviewed each of them and they |
| 20 | each have the same set of instructions that the packets |
| 21 | provided to the Court and to Mr. Tedder. |
| 22 | THE COURT:  Mr. Tedder, you agree? |
| 23 | MR. TEDDER:  Yes, ma'am. |
| 24 | THE COURT:  Good enough. |
| 25 | MR. TEDDER:  She says it, I believe it. |

1          THE COURT:  Ms. Singer, turn those instructions

2     over to the clerk at this time.

3          MR. TEDDER:  Again, we object to them being given

4     to the jury.

5          THE COURT:  Yes, sir, noted.

6          MS. SINGER:  I have a packet also for the court

7     reporter, which I will check to make sure it's accurate.

8          THE COURT:  State have anything further in record

9     to the request that the alternates be sequestered?

10          MS. SINGER:  Nothing further at this time, Your

11     Honor.  We're still doing research on that.  As soon as

12     we get word on that, we will let the Court know.

13          THE COURT:  Anything further, Mr. Tedder?

14          MR. TEDDER:  Your Honor, as you indicated you

15     wanted a motion from us, we want to file a formal

16     motion.

17          THE COURT:  Mr. Tedder, I don't want a motion from

18     you.

19          MR. TEDDER:  You're requiring one and we have

20     prepared one.  However, Mr. Groland is not here yet.  I

21     just tried to call him.  If I can have one moment to

22     call him back regarding whether or not -- thank you,

23     ma'am.

24          (Pause in the proceedings.)

25          THE COURT:  Ms. Singer, anything further from the

1    state?

2         MS. SINGER:  Nothing at this time.

3         THE COURT:  Mr. Tedder, anything from the defense?

4         MR. TEDDER:  We would reopen our case if you allow

5    for the previously listed state witnesses to testify.

6    I'll hand Your Honor a written motion, if I could.

7         THE COURT:  All right.

8         MR. TEDDER:  Mr. Groland is trying to reach

9    Dr. Bell right now by telephone.  We've spoken to them

10   and they've indicated that they examined the eyes and

11   that they did not see evidence of retinopathy in the

12   eyes or nor did they see a crack in the eyes.

13        THE COURT:  I need something more specific,

14   Mr. Tedder.

15        MR. TEDDER:  Well, the doctors we put in the motion

16   that they're -- both these guys were previously listed.

17        THE COURT:  You're talking about reopening the case

18   with witnesses that I believe you indicated -- are these

19   local doctors?

20        MR. TEDDER:  No, ma'am, they are both in South

21   Florida available by telephone.  We'd also be asking the

22   Court to allow them to testify over the telephone.

23        THE COURT:  Logistically what are you requesting be

24   provided and how do you expect to do this if it were

25   granted?

1          MR. TEDDER:  Well, I would hope that the clerk has

2     a speaker phone in the courtroom.  If he doesn't we

3     would have to arrange for one, but the doctors are, I

4     mean, we can call them on the telephone, we have their

5     numbers to reach them on.

6          THE COURT:  Do you have any idea about their

7     availability?

8          MR. TEDDER:  Yes, ma'am, I think they're available

9     at 10:30.

10         THE COURT:  You think they are?

11         MR. TEDDER:  Yes, ma'am.

12         THE COURT:  Bottom line is I can't rule on

13    speculation.

14         MR. TEDDER:  Okay.  I know that Dr. Dubovi is

15    available, I know we're not going to call him.

16    Dr. Bell, Mr. Groland --

17         THE COURT:  You're not going to call Dr. Dubovi?

18         MR. TEDDER:  No, ma'am?

19         THE COURT:  Can you call Dr. Bell, that's your

20    motion?

21         MR. TEDDER:  Yes, ma'am.

22         THE COURT:  And you do or you do not know what

23    Dr. Bell is going to say?

24         MR. TEDDER:  I spoke to him.  He indicated he had

25    not seen retinopathy, he did not see this in this

1    child's eyes, and that it can be caused by increase in

2    intracranial pressure, and that he did not see a crack.

3    Beyond that, I have not spoken with him.  I tried to

4    call him this morning.

5            THE COURT:  Do you or do you not know whether or

6    not Dr. Bell would be available at 10:30?

7            MR. TEDDER:  I, at this time, at 10:30, no, ma'am.

8    I think he will be, from speaking to him last week, I

9    can't say to the Court I know he will be.

10           THE COURT:  What is it you wanted me to rule on?

11           MR. TEDDER:  Whether or not we can, if we get him

12   available to testify at 10:30 and if we choose to call

13   him at 10:30, whether you will allow us to do so.  So

14   that gives us 34 minutes.

15           THE COURT:  Do you know that there is no speaker

16   phone that would allow the jurors to hear this

17   testimony?

18           MR. TEDDER:  No, ma'am, I did not know that.

19           THE COURT:  My experience with every speaker phone

20   that is in every courtroom in this courthouse, which may

21   or may not be all inclusive, is that a speaker phone is

22   very difficult for anybody to hear that is outside of a

23   foot and a half away from it.  And it constantly -- both

24   the state, the defense, the defendant witnesses and the

25   Court are required to lean over the speaker phone to be

1    heard or to hear.

2         MR. TEDDER:  I don't like speaker phones either,

3    Judge, but if the Court allows it we would do the best

4    we can.

5         THE COURT:  Does the state have any response?

6         MS. SINGER:  The state has no objection to the

7    witness appearing by telephone, Your Honor.

8         THE COURT:  Does the state have any idea

9    logistically how this might be accomplished?

10        MS. SINGER:  We have no idea, Your Honor, and I

11   assume that Mr. Bell or Dr. Bell will be in a place

12   where he can sworn and where a record can be made at the

13   same time as he testifies, since I assume that Dr. Bell

14   will be in a place where he can be sworn and that a

15   record will be made, since this would be trial

16   testimony.  He cannot be sworn over the telephone.  The

17   clerk here cannot swear a witness over the telephone, so

18   that would be --

19        THE COURT:  Do you have any legal basis for that

20   conclusion?

21        MS. SINGER:  Well, I know that a notary public must

22   look at identification before a notary public can swear

23   a witness to tell the truth.  I don't know how this

24   clerk could identify who the person was on the other

25   side of the line, a person he's never met, a person he's

1      never seen, how he could put that person under oath?

2      Without having someone on the other side who has the

3      legal authority to administer an oath there to confirm

4      that in fact this is the same person that is taking, is

5      giving the testimony --

6          THE COURT:  And there is no stipulation as to how

7      identification is made?

8          MS. SINGER:  No, ma'am.  We only agree that the

9      witness can appear telephonically, we have no objection

10     to that.  But as far as the logistics, who's going to be

11     present on the other side, the record that's going to be

12     made, that all has to be arranged so that the record is

13     clear, since this is trial testimony.

14         THE COURT:  Anything further that the state needs

15     to let me know about --

16         MS. SINGER:  No, ma'am.

17         THE COURT:  -- that they are prepared to address,

18     that they have discussed with defense, that they object

19     to, anything else?

20         MS. SINGER:  No, ma'am.

21         THE COURT:  Anything else, Mr. Tedder, that you

22     have discussed with the defense that you are prepared to

23     present?

24         MR. TEDDER:  No, ma'am.

25         THE COURT:  All right.  Subject to revisiting this

1    issue at 10:20 before the jury comes in at 10:30,

2    assuming we are on the record at that time, the motion

3    of the defense to reopen testimony and allow a doctor

4    previously disclosed by the state to testify

5    telephonically, the motion is denied based upon the lack

6    of any realistic logistical possibility and the lack of

7    this witness being present to testify before the jury.

8        We'll be in recess now until 10:20.  I need for the

9    attorneys to be up there ready to proceed.  I need the

10   bailiff ready to proceed because we have other jury

11   issues, jury management issues to address before we

12   actually begin closing arguments at 10:30.  I'll need

13   Mr. Herlihy in the courtroom as soon as possible,

14   understanding that we have to remove an entire venire.

15       MR. TEDDER:  Your Honor, we would object to your

16   ruling.  I understand your ruling but we would object.

17       THE COURT:  Yes, sir, thank you.  Noted.  How much

18   time does the state anticipate needing for closing

19   argument?

20       MS. SINGER:  Hour and a half.

21       THE COURT:  How much time does the defense

22   anticipate needing for closing argument?

23       MR. TEDDER:  Mr. Groland is giving the closing

24   argument.  My guess would be at least three to four

25   hours, but I do not know how long he plans to speak.

1          THE COURT:  Have you discussed it with him at all?

2          MR. TEDDER:  The length of time he would need?

3          THE COURT:  Yes.

4          MR. TEDDER:  No, ma'am, I have not.

5          THE COURT:  Okay.  And I assume he's going to be

6     here any moment; is that right?

7          MR. TEDDER:  I sure hope so.  My understanding is

8     he is on the way, Your Honor.

9          THE COURT:  Good enough.  We'll address that again

10    when Mr. Groland is present.

11          We'll be in recess until 10:20.  We will reconvene

12    in Courtroom 4A.

13          (A recess was taken.)

14          THE COURT:  We need Mr. Herlihy.

15          (Defendant enters courtroom.)

16          THE COURT:  Anything else the state needs to put on

17    the record?

18          MS. SINGER:  I don't think so, Your Honor.

19          THE COURT:  Anything else from the defense?

20          MR. GROLAND:  Yes.  With regard to our motion to

21    reopen our case, which I know Mr. Tedder has brought

22    before the Court, we do have Dr. Bell on standby on the

23    phone in front of a notary.  He is there at exactly

24    10:30, which is in five minutes.  He will be available

25    to be asked that singular question about that area, one

    1    area about what Dr. Levine said about observing a crack

    2    in the back of the eye, it was not in his report, that

    3    he did not tell us about in his deposition.  And just by

    4    way of a proffer for the Court, Dr. Bell will say that

    5    he did both the microscopic and a gross examination of

    6    the eye and saw no such thing.  That will be the extent

    7    of the testimony after Mr. Tedder qualifies him as to

    8    who he is, under what circumstances he received the eye,

    9    there will be one substantive question asked and it will

   10    be just about the crack.  And I anticipate, Your Honor,

   11    just correct me if I'm wrong, that on cross by the state

   12    that we're not going to go in and open up a whole new

   13    area, that the cross is going to be limited in scope to

   14    the one question, the one substantive question that we

   15    ask.

   16         THE COURT:  Why would that be legally?

   17         MR. GROLAND:  Well, it would be beyond the scope.

   18    If I understand this Court's -- not ruling but the

   19    conversations that we've had on the record about this

   20    issue, if the Court is inclined to allow us to reopen,

   21    it will be for solely for the limited purpose of

   22    addressing the issue of the areas that Dr. Levine

   23    neglected to include in his report and which he was not

   24    forthcoming about in his deposition.  So if we ask

   25    Dr. Bell, again, a state's witness and part of the

1    state's case that they didn't call, this question, if we

2    are to -- if the state is allowed to go into a number of

3    different areas with this doctor, then I would think

4    that we would be permitted to redirect so that we can

5    follow up on any areas they open up, as opposed to just

6    keeping it limited in scope to that one area.

7         THE COURT:  Well, you're correct in that if you

8    call this witness, if it is allowed, then any area

9    regarding this case that the state opens up on cross,

10   you would be allowed to redirect on.

11        Now, in regard to the potential logistics --

12        MR. GROLAND:  I didn't hear that.

13        THE COURT:  I was asking for court administration

14   to come into the courtroom so that we can discuss

15   whether or not this is even logistically possible on the

16   basis that the speaker phone will in no way provide the

17   jury with the opportunity to hear any testimony.  It

18   doesn't go that far.  In other words, the speaker phone

19   is only effective within a range of a foot or two.

20        MR. GROLAND:  That's the voices going into the

21   speaker phone.  I think you're right about that.  And

22   the only folks that are going to speaking will be the

23   attorneys in the courtroom, so we can position ourselves

24   in the right place.  But as far as hearing, I think they

25   will be able to hear on the speaker all the way back

```
 1        here.

 2               THE COURT:  All right.  You do?

 3               MR. GROLAND:  I do.  And we've called the court

 4        administrator's office already about 20 minutes ago

 5        about the speaker phone availability and we were told

 6        that they were working on it.  You know about that?

 7               THE CLERK:  She's on her way.

 8               THE COURT:  They're about to bring the jury

 9        through.  Anything we need to put on the record before

10        they come through the courtroom?

11               MR. GROLAND:  No, ma'am.

12               THE COURT:  Madam Bailiff, would you direct that

13        they may be escorted through.

14               (The jury entered the courtroom and into the jury

15        room.)

16               THE COURT:  We're on the record.  My understanding

17        is, based on the fact that we now have the logistics in

18        place, that it is possible for the defense to call one

19        additional witness by phone who was previously listed by

20        the state, that the defense's examination will be

21        limited, and without any ruling by the Court the state

22        has agreed to limit their cross-examination; is that

23        correct?

24               MR. PENNYPACKER:  That's correct, Your Honor.

25               THE COURT:  And I understand from Mr. Groland that
```

```
1     this witness is before a notary; is that correct?

2          MR. GROLAND:  I'm trying to get through right now,

3     Your Honor, I've arranged for that.  They've assured me

4     of that.  But before we get on the record with the jury,

5     I want to make sure it's in place.

6          MS. SINGER:  We also have the matter of Ms. Pena,

7     Your Honor.

8          THE COURT:  Matter of what?

9          MS. SINGER:  Matter of Ms. Pena.

10         THE COURT:  We're not going to deal with that prior

11    to the completion of closing arguments but before

12    deliberations we will inquire.

13         MS. SINGER:  Okay.  Are we going to inquire of the

14    whole group though before we even get started?

15         THE COURT:  In the usual manner, yes.

16         (Pause in the proceedings.)

17         THE COURT:  Is there any inquiry that the state's

18    going to request or require in regard to verification

19    that this is a licensed notary?

20         MS. SINGER:  No, Your Honor, we will trust that

21    she's licensed.

22         MR. GROLAND:  She works in the --

23         MS. SINGER:  I'm fine.  We're fine.  We're not

24    objecting.

25         MR. TEDDER:  Will the state agree as to him being
```

1    an expert in forensic pathology, since if you stipulate

2    it and make it quicker?

3    MR. PENNYPACKER:  As long as he clarifies that he's

4    not an ophthalmologist.

5    THE COURT:  Anything else we need to put on the

6    record before we bring the jury in?

7    Good enough.  Bring the jurors in.

8    (The jury entered the courtroom.)

9    THE COURT:  Good morning, ladies and gentlemen.  We

10    are ready to conclude the case today.  Before we begin,

11    I do need to inquire as I have every other day,

12    particularly since this has been over a weekend, is

13    there anybody on the jury at this time who has in any

14    way received any information regarding this case outside

15    the presence of the state, the defense counsel, the

16    defendant and the judge?

17    THE JURORS:  (Jurors shake heads.)

18    THE COURT:  Good enough.  I have ruled that the

19    defense will be allowed to call one additional witness

20    who will testify by telephone, and we have arranged the

21    technology so that you will be able to hear that

22    testimony, although the witness will not be appearing in

23    person.

24    Mr. Groland, the defense may proceed.

25    MR. GROLAND:  Thank you, Your Honor.

1            THE COURT:  Mr. Tedder, defense may proceed.

2            MR. TEDDER:  Thank you, Your Honor.  May it please

3       the Court, ladies and gentlemen of the jury.

4            Your Honor, should I go ahead and just sit in the

5       witness chair or how would you prefer I do this?

6            THE COURT:  You can stand right where you are, that

7       will be fine.  I believe if you give the court reporter

8       the number; is that correct?

9            THE COURT REPORTER:  I have it.

10           MR. TEDDER:  We're going to be calling a

11      Dr. Michael Bell.

12           (The court reporter dials the telephone number.)

13           THE WITNESS:  Hello.

14           MR. TEDDER:  Dr. Bell?

15           THE WITNESS:  Yes.

16           MR. TEDDER:  This is John Tedder.  You're live in

17      front of the jury right now.  Please don't say -- is a

18      notary there?

19           THE WITNESS:  Yes.

20           MR. TEDDER:  If you would ask the notary to please

21      identify herself.

22           THE WITNESS:  Okay.  Just a second.

23           THE NOTARY:  Hello.

24           MR. TEDDER:  Hi, ma'am, My name is John Tedder.

25      You are live in court up here in Gainesville.  Would you

1          please identify yourself?

2                  THE NOTARY:  My name is Sherry Baker.

3                  MR. TEDDER:  And are you a notary?

4                  THE NOTARY:  Yes, I am.

5                  MR. TEDDER:  Ma'am, would you please swear

6          Dr. Bell?

7                  THE NOTARY:  Okay.

8                  MR. TEDDER:  Swear in Dr. Bell to testify, please.

9                  THE NOTARY:  Hello.

10                 MR. TEDDER:  Hello.

11                 THE NOTARY:  Dr. Bell, do you swear to tell the

12         truth, the whole truth and nothing but the truth?

13                 THE WITNESS:  I do.

14                 MR. TEDDER:  Thank you, ma'am.

15     WHEREUPON:

16                             DR. MICHAEL BELL,

17     called as a witness herein, having been first duly sworn, was

18     examined and testified as follows:

19                          DIRECT EXAMINATION

20     BY MR. TEDDER:

21         Q    Dr. Bell, please tell us your name.

22         A    My name is Dr. Michael Bell, B-E-L-L.

23         Q    And where did you go to medical school at?

24         A    I went to Dartmouth Medical School.

25         Q    How long have you been licensed to practice

```
 1    medicine in the State of Florida?

 2         A    Since, boy, probably back in -- since 1988.

 3         Q    And what is your current area of medical practice?

 4         A    I'm a forensic pathologist.  I'm a medical examiner

 5    in Fort Lauderdale, Florida.

 6         Q    And how long have you been a medical examiner in

 7    Fort Lauderdale, Florida?

 8         A    I've been here since April of 2001, but I've been a

 9    medical examiner full time since 1991.

10         Q    Are you an ophthalmologist?

11         A    No.

12              MR. TEDDER:  Your Honor, I'd ask to have this

13         witness declared an expert in the area of forensic

14         pathology.

15              MR. PENNYPACKER:  No objection by the state.

16              THE COURT:  Dr. Bell will be allowed to give his

17         opinion in the area of forensic pathology.  Go ahead.

18    BY MR. TEDDER:

19         Q    Dr. Bell, did there come a time about two years

20    ago, and more recently at our request, did you examine the

21    slides that were prepared of the eyes of Robert Quirello?

22         A    Yes.

23         Q    Did you see any cracks in the examination of his

24    eyes?

25         A    No.
```

1    Q    Dr. Bell, you examined his eyes grossly?

2    A    Grossly and microscopically, yes.

3    Q    And you saw no cracks in the eyes?

4    A    That's correct.

5         MR. TEDDER:  Thank you, sir.  No further questions.

6         THE COURT:  Just a second, Dr. Bell.  Any questions

7    from the state?

8         MR. PENNYPACKER:  No questions by the state, Your

9    Honor.

10        THE COURT:  Good enough.  Thank you, Dr. Bell,

11   we're going to hang up now.

12        THE WITNESS:  Thank you.

13        MR. TEDDER:  Thank you very much for your time.

14        Your Honor, we would rest at this time.

15        THE COURT:  Thank you.  Ladies and gentlemen, both

16   the state and the defendant have now rested their cases.

17   The attorneys will now present their final argument.

18   Please remember that what the attorneys say is not

19   evidence.  However, do listen closely to their

20   arguments, they are intended to aid you in understanding

21   the case.  Each side will have equal time.  However, the

22   state is entitled to divide this time between an opening

23   argument and a rebuttal argument after the defense has

24   spoken.

25        Now, I do anticipate that the arguments will be

1   lengthy, and I do anticipate that we will take recesses

2   at regular intervals, even if it's in the middle of an

3   argument.  As we have done throughout the trial, it will

4   be approximately every hour and a half.  But if at any

5   point any of you becomes uncomfortable or distracted and

6   needs to take a recess, just indicate to me and we will

7   recess as needed for your comfort and your convenience

8   and so that you can pay close attention.

9        With that, Ms. Singer, is the state ready to

10  proceed?

11       MS. SINGER:  We are, but may we approach the bench

12  for one moment, Mr. Groland and the myself?

13       THE COURT:  Yes.  Does this need to be on the

14  record.

15       MS. SINGER:  Yes, it does.

16       THE COURT:  Madam Court Reporter.

17       (A sidebar discussion was held:)

18       MS. SINGER:  My only concern, since this is not

19  evidence, is that the jurors look like they may be

20  taking notes during the closing and I don't know whether

21  that would be permitted.

22       THE COURT:  What's the defense's position?

23       MR. GROLAND:  As long as it's clear to them that --

24       THE COURT:  Do you agree that the notebooks should

25  be picked up or they should keep them?

1          MR. GROLAND:  Keep them.

2          THE COURT:  Keep them or pick them up?

3          MS. SINGER:  I think they should be picked up

4     because this is not evidence.  The note taking was for

5     the evidentiary portion of the case.

6          THE COURT:  What I'm going to do, in an abundance

7     of caution, understanding the burden is on the state in

8     order to provide due process to Mr. Herlihy, I'm going

9     to direct that the jurors clearly note that this is

10    closing argument, to separate it from their notes, and

11    allow them to keep their notebooks.

12         MS. SINGER:  That's fine.  I agree with that.  I

13    have no objection to that.

14         (The sidebar discussion was concluded.)

15         THE COURT:  Ladies and gentlemen, the issue that we

16    have discussed and all have agreed on is that, of

17    course, you may take notes during the closing argument,

18    but I'm going to ask that you clearly mark in your notes

19    that this is not any portion of the evidence, that this

20    is the closing argument.  So at the top of a clean page,

21    you write in large letters, closing argument or some

22    other demarcation that will make sense to each of you,

23    then you may use your notebooks as you see fit during

24    those closing arguments, as you have throughout the

25    trial.

1          MS. SINGER:  May I proceed, Your Honor?

2          THE COURT:  Go ahead.

3          MS. SINGER:  Good morning, members of the jury.

4     You have in evidence and you will be able to view these

5     photographs (indicating).

6          Members of the jury, this was Robbie Quirello.  At

7     9:00 A.M. on August 2nd, the year 2000, Robbie Quirello

8     was seeing; Robbie Quirello was focussing on his hands;

9     Robbie Quirello was laughing; Robbie Quirello was

10    visiting with friends, with the friends of John

11    Quirello, his father.  He was at Airborne Express on or

12    about 9:00 on that day, a healthy, thriving four and a

13    half month old child.

14         His pediatrician, John Hellrung, had seen him two

15    weeks before and had given him a clean bill of health.

16    He was doing everything a premie was supposed to be

17    doing.  He had caught up.  He had grown.  His appetite

18    was thriving.  His physical abilities were growing.  He

19    was meeting the landmarks that he was to meet to be a

20    healthy child and to grow as a healthy adult.

21         On August 2nd, the year 2000, Robbie Quirello

22    started his day like he did every other.  And by

23    9:34 A.M. he was dying.  When 911 was called, Robbie

24    Quirello's eyes had glazed over and closed.  He was

25    unconscious.  He wasn't breathing very well.  He was

1    unresponsive.  He was barely able to keep himself alive.

2    Between 9:00 A.M. and 9:34 A.M. on August 20th, the year

3    2000, Robbie Quirello suffered immediate and irreparably

4    and devastating brain damage.

5        He had been shaken.  He had been thrown down on a

6    bed so hard that his head bounced.  He had been shaken

7    and thrown so hard that the neurons in his brain had

8    been stretched and broken, so much so that the

9    electrical impulses that keep us alive, that keep our

10   brains working, were fatally injured.  He was thrown

11   down and shaken so much so that he had cortical

12   contusions, bruises on the brain.  His neurons were

13   irreparably stretched.  And where his head hit, there

14   was evidence of injury.

15       Between 9:00 A.M. and 9:34 A.M., members of the

16   jury, Robbie Quirello was in the hands of one man.  He

17   was in the hands of Brian Herlihy, the defendant in this

18   case.  And by 10:00 A.M. at the emergency room,

19   Dr. Harvey Rohlwing, a board certified emergency room

20   physician who has treated thousands of patients, saw

21   Robbie.  And in examining Robbie, he saw classic signs.

22   He saw significant neurological damage.  And he saw

23   retinal hemorrhaging, consistent with the syndrome that

24   through his years of experience he was familiar with.

25   This is not something that he sees in automobile

1    accidents.  This is not something he sees when he deals

2    with children or people who have fallen.  Retinal

3    hemorrhaging and severe neurological damages measured up

4    to one thing for Dr. Rohlwing:  This child had been

5    shaken.  This child suffered from what is called shaken

6    baby syndrome.

7         The medical findings were consistent throughout

8    Robbie's stay at Shands Teaching Hospital, his

9    physicians saw the same signs, the same symptoms.  The

10   evidence to the folks who were treating Robbie Quirello,

11   who have no interest in the outcome of this case, the

12   evidence was classic, this child had been shaken and it

13   was evidence of impact.  These findings spoke volumes on

14   what had happened to Robbie Quirello between 9:00 and

15   9:34 on August the 2nd, the year 2000.

16        This child had suffered intentional injuries,

17   abusive injuries, lethal injuries.  And as we all know,

18   as we heard from the witness stand from a number of

19   physicians in this case, these injuries result in

20   Robbie's death on August 10th of the year 2000.

21        Robbie Quirello was born on March 22nd, 2000.  He

22   was born at Shands at Alachua General Hospital and he

23   returned to Shands pediatric intensive care unit to die

24   133 days later.  We're here to make a determination as

25   to who is responsible for the injuries that led to his

1    death, who must be held accountable for the facts which

2    resulted in the death of this child, this beautiful

3    child, Robbie Quirello (indicating).

4         The state submits that the man who, by his own

5    words on the 911 tape, on the 911 call tape, which is in

6    evidence, that man who stated he was the sole caretaker

7    of Robbie Quirello when these injuries occurred, that

8    man is to be held accountable.  That man who through a

9    series of inconsistent statements to law enforcement

10   tried to cover up his intentional acts, those

11   intentional acts that result in Robbie's death.  The man

12   who on August the 3rd, one day after he abused this

13   child, admitted to Investigator Helen Legall from the

14   Gainesville Police Department, that Robbie was crying

15   and would not stop.  The man who first stated that the

16   crying was fake, that all Robbie wanted was attention, a

17   four and a half month old, a four and a half month old

18   fake crying.  The man who later changed that story to

19   say that the crying wasn't fake.  The man who then said

20   that he swung Robbie back and forth and to and fro,

21   after which he plopped Robbie on the bed so hard that

22   his head bounced.  That man who admitted that he did not

23   support this baby's head when he, quote, plopped that

24   baby on the bed.  That man who admitted that he knew he

25   shouldn't roughhouse with a four and a half month old,

| | |
|---|---|
| 1 | that he knew he had been rough with Robbie. And that he |
| 2 | knew at the moment that baby hit that bed that that baby |
| 3 | was significantly injured, because his eyes rolled back |
| 4 | and he went out of focus and the crying stopped. The |
| 5 | man who knew his acts were intentional. He was angry. |
| 6 | He was punishing this child. He was abusing this child. |
| 7 | That man must be held accountable today. That is the |
| 8 | man who is the defendant in this case. That is Brian |
| 9 | Herlihy. |
| 10 | Now, members of the jury, you've heard an extensive |
| 11 | amount of testimony. This has been a very lengthy trial |
| 12 | for all of us and we appreciate all of the attention |
| 13 | you've given, especially with the world outside and with |
| 14 | your own interests and with your own families and your |
| 15 | own obligations, you have consistently shown the |
| 16 | attention that jurors should show in a case like this. |
| 17 | And we appreciate it. |
| 18 | And as we stated, Mr. Pennypacker and I, in jury |
| 19 | selection, Mr. Pennypacker in his opening statement, |
| 20 | that under both the State of Florida's constitution and |
| 21 | the federal constitution, the state has the burden of |
| 22 | proving this case. We represent the people of the State |
| 23 | of Florida. We told you in opening that we were going |
| 24 | to meet that challenge. And we submit to you in closing |
| 25 | that we have met our duty. We have proven that a crime |

1    has been committed, number one; and number two, that the

2    defendant is the person who committed that crime.

3        Before I review the facts with you, to discuss with

4    you how we have met our burden, I would like to review

5    with you the elements of the offense charged so you can

6    have an understanding of how the facts fit with the

7    charges that are before you for deliberation.

8        As I indicated -- or I did not indicate, excuse me,

9    as Mr. Pennypacker indicated in opening statement,

10   Mr. Herlihy, the defendant in this case, is charged with

11   the offense of murder in the first degree.  Under the

12   laws of the State of Florida, there are two ways that

13   you can prove murder in the first degree.  One is by

14   proving premeditated murder; and the second is by

15   proving felony murder.  And as we indicated to you early

16   on in our opening, we did not have an intention of

17   proving premeditated murder, although you will be

18   instructed on that, but rather we will be going under

19   the doctrine of felony murder.  And I'd like to talk to

20   you about that.

21       To prove first degree felony murder, the state must

22   prove:  Number one, that Robbie Quirello is dead, and I

23   think there's no question about that.  There's

24   absolutely no question about that.  That's

25   uncontroverted.  And that the death occurred as a

1    consequence of and while the defendant was either

2    engaged in the commission of the crime of aggravated

3    child abuse or while the defendant was attempting to

4    commit the crime of aggravated child abuse.

5         So you have one element, and that is that the state

6    must prove that either the defendant committed the crime

7    of aggravated child abuse or attempted to commit the

8    crime of aggravated child abuse.  When that results in

9    death, you have felony murder in the first degree.

10        To understand then, or to render your verdict, you

11   must understand what the elements of aggravated child

12   abuse are.  And there are three ways that one can commit

13   aggravated child abuse.  One is by committing an

14   aggravated battery upon a child, which means that one

15   intentionally or knowingly causes great bodily harm,

16   permanent disfigurement or permanent disability.

17        The second way that we can prove aggravated child

18   abuse is if we prove to you that the defendant

19   maliciously punished the child, and in so doing caused

20   great bodily harm, permanent disability or permanent

21   disfigurement.  There is no question that there has been

22   permanent disability, permanent disfigurement or great

23   bodily harm in this case.  This child died.  We have

24   proved that unquestionably.

25        The third way you can prove felony murder is to

1     prove that one knowingly commits child abuse and by

2     doing an intentional act that would reasonably be

3     expected to result in physical or mental injury to a

4     child and which results in great bodily harm, permanent

5     disability or permanent injury.  One knowingly commits

6     child abuse by doing an intentional act that would

7     reasonably be expected to result in physical or mental

8     injury to a child and which results in great bodily

9     harm, permanent disability or permanent injury.

10     Now let's talk about the facts.  The state has

11     offered and you have heard testimony about Robbie's life

12     from the time he was conceived to the day of his death.

13     You've heard testimony from those who cared for him, who

14     bathed him, who fed him, who were with him and loved him

15     each day of his life.  You've heard from Crystal

16     Quirello.  You've heard from John Quirello.  You've

17     heard from Doris Bridwell.  You've heard from Richard

18     Davis.  You've heard from the folks who knew this child

19     from the day he was born to the day he died.

20     But not only did you hear testimony from the

21     laypeople, the people who actually were with this child

22     every day of his life, but you heard testimony from the

23     people who treated both Crystal Quirello during her

24     pregnancy, from the pediatrician who cared from Robbie

25     during his very short term of life, and the doctors who

1    treated and cared for Robbie until his death.

2         You heard testimony from Richard Kreinest, an

3    experienced board certified obstetrician who reported to

4    you that he has cared for over 3,000 moms and delivered

5    in the course his lifespan as an obstetrician over 3,000

6    babies.  Dr. Kreinest monitored Robbie's development

7    before his birth.  He testified to the scans that were

8    done, to the examinations that took place.  He told you

9    that Robbie had a birth without complication, that this

10   child came into this world with an eight, nine Apgar

11   score.  He required no extraordinary medical

12   intervention at birth.

13        And Dr. Kreinest told us something else, something

14   that's very important about Robbie Quirello, and about

15   the defense that's been presented in this case.

16   Dr. Kreinest told us that he's seen lots of babies born

17   sunny side up, face up.  He's seen lots of babies born

18   where you have to lift an umbilical cord.  He's seen

19   lots of babies born with a broken clavicle.  But he's

20   never seen a baby born with subdural hematoma.  3,000

21   births.  This baby was born healthy.  He was early, he

22   had to do some catching up, but he was born healthy.  He

23   was going to make it in this world.  He was going to

24   survive until he was in the hands of Brian Herlihy.

25        Then you heard from John Hellrung, a very well

1    respected board certified pediatrician who cares for

2    children in this community.  And John Hellrung, Dr. John

3    Hellrung outlined for you the care that this baby was

4    given, how he was taken routinely to his well-baby

5    checks, how he was examined and how there was absolutely

6    no signs or symptoms of a subdural hematoma or any old

7    injury in Robbie Quirello.  In fact, he saw Robbie

8    Quirello two weeks before his death.

9         Then you heard about Robbie's last days, you heard

10   Richard Davis tell you about his birthday celebration in

11   Jacksonville on Sunday, July 30th.  Am I right there?

12   31st, a Monday -- pardon me, it was the 30th.  Monday

13   was the 31st, Tuesday was the 1st and Wednesday was the

14   2nd.  On July 30th, Richard Davis described to you how

15   his baby grandson was with him throughout the day when

16   they went to Applebee's where they celebrated his

17   birthday.  That baby showed no signs or symptoms of

18   lethargy, no signs and symptoms of lack of appetite, no

19   inconsolable crying, no injuries on the outside of his

20   body, nothing was there to suggest that this baby was

21   not a healthy four and a half month old Robbie when he

22   saw him for the last time healthy at his birthday.

23        And then you heard from Doris Bridwell, who was the

24   primary caretaker for Robbie.  Doris outlined for you

25   the next two days that she did care for Robbie.  She

1    bathed him, fed him.  He was focussing now to where that

2    he was laying on the sofa and he was trying to take the

3    flowers off the fabric.  He was able to get his fine

4    motor coordination together and he was starting to

5    develop that.  He was laughing.  He was smiling.  She

6    said he would give you that interesting grin.  He was

7    enjoying life.  And Doris bathed him that day, the last

8    day she saw him healthy, and she fed him.  And there was

9    no signs, no signs.

10        Both Richard Davis and Doris Bridwell told you

11   something else that's important in this case.  Robbie

12   wasn't rolling from his back to his front.  Robbie

13   wasn't doing that.  When he was on his back, he wasn't

14   rolling.  And that's another important fact that you

15   must consider in this case.  These are the people who

16   took care of Robbie, who cared for Robbie, who loved

17   Robbie.

18        You heard too from John Quirello, Robbie's father,

19   who picked up Robbie on the day of the 1st from his

20   grandmother, Mimi, from Doris Bridwell, and brought him

21   home.  And he slept through the night without a problem.

22   And he too told you that he wasn't rolling from the

23   front to the back, but rather only from the back --

24   pardon me, he was not rolling with his back on the --

25   laying on his back but he could only roll laying on his

1   stomach.  He hadn't quite mastered the other yet.  And

2   he also told you there was no evidence, no suggestion,

3   no indication that this child was lethargic, sick,

4   inconsolably crying, giving any sign whatsoever of a

5   prior brain injury at the time that John had Robbie on

6   the 1st, through that evening into the morning of the

7   2nd.  And you heard from Crystal Quirello who said the

8   very same thing.

9        And so when we got to this point, we took you to

10  the day of August 2nd, and you heard that mom and dad

11  were very proud that Robbie was finally fitting into an

12  ESPN onesie and mom had dressed Robbie to take him to

13  Federal Express -- to Airborne Express to show him off.

14  And between 8:30 and 9:00 A.M., Robbie was seen, not

15  only by family members, but by Yantz Enoch, a person

16  with no interest in the outcome of this case, who told

17  you that he was giggling, he was laughing, he was

18  playing with the bell.  They were enjoying playing with

19  the little bell on the counter.  That this baby was

20  healthy and active.  A man who has several children of

21  his own, who said he saw nothing at or about 9:00 A.M.

22  on August the 2nd that suggested that this child had

23  blood on his brain that was so overwhelming that it was

24  compressing the functions of the brain and causing what

25  would later be significant injury.  They saw nothing.

 1        They saw nothing because nothing was happening, because

 2        this baby hadn't had a chronic subdural hematoma.  This

 3        baby was a growing, thriving baby.

 4            And then you heard Crystal did travel to the

 5        apartment of the defendant, Brian Herlihy.  And you

 6        heard that because she trusted him, she turned the baby

 7        over to Brian Herlihy the defendant, in order to get

 8        some gas and to pick up some laundry before going to

 9        Cedar Key.  This case is not about John Quirello and

10        Crystal Quirello's marriage.  This case is not about

11        Crystal Quirello and Brian Herlihy's relationship.  This

12        case is about a window of time that we're going to be

13        talking about right now between 9:00 A.M. and 9:34 A.M.

14        And it is uncontroverted that between that period of

15        time, by the defendant's own statements on the 911 tape,

16        that you have in evidence, and by the proof of the

17        receipts that are in evidence from Crystal Quirello,

18        there was only one person with Robbie Quirello during

19        that time frame.  And that person was the defendant,

20        Brian Herlihy.

21            So what does the 911 tape tell us?  It tells us

22        that Robbie was unconscious but breathing.  The

23        defendant says, He's breathing but he's very slow.  He's

24        got a heartbeat.  He's gurgling.  He's coughing.  His

25        little heart is beating.  And he also reports that the

1   baby vomits. We later find out that in that vomit is

2   blood, Robbie's blood, evidence of trauma, evidence not

3   of a subdural hematoma but evidence of trauma.

4       Robbie Quirello was not in full arrest when the

5   defendant called 911. Robbie had not just suffered some

6   accidental injury which caused him to suffocate or be

7   asphyxiated. By 9:34 A.M., Robbie had been crying, had

8   annoyed, had maddened, had frustrated, the defendant in

9   this case, and as a result he was punished. He was

10  intentionally shaken and thrown down on the bed. And

11  that baby stopped crying. That baby stopped crying

12  because his head bounced so hard that his eyes rolled

13  back.

14      At 9:34 A.M. Robbie was dying. And that's when,

15  that very same time, the defendant, Brian Herlihy, knew,

16  he knew he was in trouble. He knew he had to have an

17  explanation consistent with some innocence, because he

18  knew what he had done. He knew he caused the injuries

19  that were sustained, and he knew he had to talk himself

20  out of it. Human nature? I would say so.

21      Even so, the stories begin right on that 911 tape

22  when he says to the 911 operator, I came out of the

23  shower. Oh, we're going to later hear there was no

24  shower. There was no water in the tub. The tub stopper

25  was down. We're going to hear how this is inconsistent.

1      But at the very moment he calls 911, he better have a

2      story.  He better not have his hands on Robbie Quirello

3      because he knows the implications of that.  He knows

4      what he's done.  He knows this child is significantly if

5      not fatally injured.  And he starts the stories

6      immediately.

7          On 911, I just came out of the shower.  And then we

8      have EMTs Tom Whitley and Ken Johnson who come in, along

9      with Russell Valentine, the young man who had just

10     gotten his EMT license, had just -- had been working for

11     a while but had just really started to get onboard as an

12     EMT, who had an opportunity to speak with Mr. Herlihy,

13     who was told by the defendant that he had gone in the

14     bathroom and had taken a shower.  He couldn't remember

15     on the stand how long Mr. Herlihy said he was in the

16     shower but he remembered that the defendant told him he

17     had gone inside and taken a shower.  Russell Valentine

18     also noticed that there was no indication of that.

19     There was no outside physical evidence to support that

20     claim that he had taken a shower.  There was no steam.

21     There was no evidence.

22          And then there was retired fire fighter Dennis

23     Meredith who told you that he had a very significant

24     recollection of this case.  Because he remembered

25     talking with the defendant, Brian Herlihy, and it seemed

1    quite unusual, even suspicious to him, that this man

2    that had said he'd been in the shower, had a dry head of

3    hair, had his socks on, had his pants on, and had no

4    shirt on but no evidence of water or any indication of

5    showering at the time.

6        What did Brian Herlihy tell Dennis Meredith?  He

7    remembered it very clearly.  He told him he had just

8    gotten out of the shower when he found Robbie.  He was

9    sure on the stand.  He said that the defendant told him

10   he had taken a shower and he thought it was suspicious

11   because there was no evidence that the defendant had

12   been in the shower.

13       Now, it's true, Dennis Meredith didn't go and write

14   a police report.  He didn't go call 911 and report his

15   suspicions.  He noted it though and he remembered it

16   though, and when he found out later that this baby had

17   died, he came forward to testify.

18       And remember the description too.  He described

19   Brian Herlihy as not having a shirt on.  Where was the

20   defendant's shirt?  Was it on the floor in the bathroom

21   where he had just taken a shower?  Was it on the bed?

22   Was it in the dirty clothes hamper?  Members of the

23   jury, that shirt, that shirt is in evidence.  That shirt

24   is a shirt that you'll be able to examine.  And I submit

25   to you, this shirt was found in a Wal-Mart bag hidden,

1   concealed in the back of Brian Herlihy's closet along

2   with a towel that has remanents of blood on it, along

3   with another towel that has remanents of formula on it,

4   just as the shirt does.  Brian Herlihy had this shirt

5   on.  Brian Herlihy had this shirt on when this child was

6   crying, when that child spit up on him, and that's on

7   the tape.  That's on both tapes.  And he was mad because

8   that child had spit up on him and that child was

9   inconsolable, wouldn't stop crying, and he didn't know

10  what to do.  He just wanted to get that kid to shut up.

11  That kid was going to pay.  Because he's a neat freak.

12  That's on the tape too.  He's a neat freak.  And he just

13  got spit up on by a kid who's crying and won't shut up.

14  And he shook that baby and he threw that baby down.

15        MR. TEDDER:  Objection, Your Honor, arguing facts

16  not in evidence.

17        THE COURT:  Overruled.

18        MS. SINGER:  That shirt is in evidence and you will

19  find that that shirt was later concealed in the back of

20  a closet with a towel that has blood on it, according to

21  Nicole Perrone who testified from the FDLE lab, and

22  another white towel that he says on the tape he used to

23  burp the baby.  Well, it's there and it's got formula on

24  it.  He took those three items and he hid them.  They

25  say it was wet, maybe he tried to wash the evidence out

 1    first.  That's for you to decide.  But he put them in a

 2    plastic bag and he hid them in the back of his closet so

 3    nobody would find them.  That, members of the jury, can

 4    be considered by you.

 5        But the stories -- let's go back to the stories a

 6    moment.  We have the stories to 911.  We have the

 7    stories to the EMTs.  And then we have Officer Alvarez,

 8    who meets Brian Herlihy at the hospital.  We find out

 9    that the defendant has told Officer Alvarez that he laid

10    the baby face down on the bed.  We later find out it

11    wouldn't work if the baby was laying face down on the

12    bed, so we have the baby face up on the bed.

13    Inconsistencies.  Inconsistencies.  As Mr. Herlihy is

14    asked to give an explanation, he has to fill in his

15    lies.  Human nature.  Human nature.  We tell a story --

16        MR. TEDDER:  Objection, improper argument.

17        THE COURT:  Overruled.

18        MS. SINGER:  A story is told and then the details

19    have to be filled in.

20        Not only did he tell Officer Alvarez that the baby

21    had been laying face down and that he had jumped into

22    the shower -- once again, we're back in the shower.

23    We're getting washed.  Not only had he told him that,

24    but he's told Crystal, the mother of the child, that the

25    baby had aspirated some milk, a totally different story,

1    and a story that is completely inconsistent with every

2    physician, including the defense's physicians, the

3    defense's experts, totally inconsistent with every story

4    that was -- every explanation that was given by every

5    expert in this case.  This child did not die from

6    aspiration on milk.  This child's lungs, on the day he

7    died, was clear of any infiltrate, any signs of

8    something being in his lungs that caused him to die.

9    There's no evidence of that.  Yet he told Crystal that

10    the baby had aspirated on milk.

11        The stories didn't end, and as the defendant

12    conversed with the Gainesville Police Department,

13    further inconsistencies were revealed, and I'm going to

14    discuss it later, but it all culminates with the trip to

15    the jail.  When, please, don't take me to jail.  I'll

16    tell you what really happened.  And, members of the

17    jury, I submit to you, that that day and on the way to

18    the jail, you heard what really happened.

19        We offered a number of doctors.  I know it was

20    tedious.  I know we talked about that in jury selection

21    and in opening that there would be a lot of medical

22    lessons to be learned in this case, and I'm sure that we

23    all learned a lot.

24        The physicians that the state offered up as

25    witnesses in this case were all board certified in their

1     respective fields.  They were all very, very experienced

2     in their areas of specialty.  They were very well versed

3     in their area of practice.  None of the physicians were

4     shown to have any interest in the outcome of this case.

5     None of the physicians were shown to have any bias or

6     prejudice or favoritism towards the defendant or any of

7     the persons in this case.

8          These doctors were put in the position of having to

9     treat Robbie as his injuries evolved, as he was on the

10    way to dying.  And that's how they described what they

11    saw and what they did, to you.  They weren't making

12    their diagnoses thinking about what legal ramifications

13    were going to come up two years from now.  They weren't

14    making their calls and their decisions on how to treat

15    Robbie based upon some expectation that they would be

16    called to the stand later in some criminal case.  They

17    called it as they saw it.  Kind of like umpires or

18    referees on a football field, they called it as they saw

19    it.

20         And what's remarkable how they called it, is that

21    they all called it so consistently.  They all saw it the

22    same way.  Why?  Because it is what it is, because it's

23    classic.  Because there is no other explanation.  This

24    child was not wedged in a bed.  This child did not

25    suffer a subdural hematoma that rebled and caused

1    compression to the brain that remarkably and

2    coincidentally came to its paramount when this baby was

3    alone with Brian Herlihy.  That's not what happened.

4         Years of experience, years of treating children.

5    Dr. Rohlwing, thousands, thousands of patients in the

6    emergency room.  He didn't see any physical injuries

7    consistent with wedging.  He didn't see any marks on

8    this baby's body where he was supposedly pulled out from

9    this bed.  He saw lethal neurological damage, severe

10   neurological damage, intracranial hemorrhaging on the CT

11   scan, new bleeding in his head, and he saw retinal

12   hemorrhages, obvious retinal hemorrhages.  At 10:00 A.M.

13   or by 10:20 A.M. they were seen, consistent with what he

14   knew, what he was familiar with, even as a primary care

15   physician, even as an emergency room physician, he knew

16   was classic shaken baby syndrome.

17        In the years that Dr. Rohlwing has been in the

18   emergency room examining people every day for accidents

19   and other traumatic events, he told you unequivocally

20   that he has never seen retinal hemorrhaging in

21   automobile accidents, whiplash injuries, which he says

22   he sees daily, choking injuries.  He's never seen

23   retinal hemorrhages except in children who have been

24   shaken.

25        And then there was Anne Dickinson.  Anne Dickinson

1     is a very interesting person.  She's got a degree in

2     theology, a degree in chemical engineering, and she

3     holds four separate board certifications.  She has

4     dedicated herself to caring for the illest, the sickest,

5     the most injured children that we have in this world.

6     And her whole life has been that.  She has board

7     certification in pediatrics, in adult critical care, in

8     pediatric critical care, and in anesthesiology.  And she

9     has put together a life concentrating solely on children

10    in the pediatric intensive care unit.

11         You heard a lengthy testimony from Anne Dickinson.

12    I know you all were taking notes and you'll rely on

13    those notes if you need to in making your determination

14    as to what she said.  But the bottom line is this, she

15    told you this unequivocally, this child did not die from

16    aspiration.  This child did not choke.  This child did

17    not choke on vomit; did not choke being caught behind

18    the foot of this bed.  This child did not suffocate.

19    This child did not die as the result of some old injury.

20    This is not the result of a bleeding subdural hematoma.

21    This child died as a result of new trauma that occurred

22    in that window of time between 9:00 and 9:34, that

23    window of time, and that when that injury occurred the

24    symptoms were immediate, just like when you hear on the

25    911 tape.

1        Those symptoms were immediate.  When that baby's

2   head bounced, when it was unsupported and that baby's

3   head bounced on this mattress and those eyes rolled back

4   and he looked dazed and he couldn't focus anymore,

5   that's when the fatal brain injuries occurred.  And

6   that's when Brian Herlihy had custody of this child.

7   And that is why during the course of the investigation,

8   which we'll talk about a little later, that is why law

9   enforcement was looking for what happened during that

10  window of time because that's when these injuries

11  occurred.

12       She explained in detail different accelerations of

13  the different parts of the brain at different densities.

14  She told you the tissues of the head move at different

15  rates.  And when there are forces moving at different

16  rates, the neurons, the electrical wiring that we have

17  in our heads that keep us going and make us think and

18  make us smile and make us live and make us enjoy life,

19  that those get stretched, those get damaged, and

20  sometimes they break.  And as a result, irreparable

21  brain injury, death.

22       She told you that not only did she see the evidence

23  of that internal damage of that brain being shaken to

24  and fro and being torn inside, but she also saw a bump,

25  a bump on Robbie's head.  She saw what was evidence of

1    blunt trauma and she noted it.  And later Dr. Uscinski,

2    the defendant's expert, on cross-examination by

3    Mr. Pennypacker, on the screen, he identified new

4    bleeding on the CT scan consistent with where

5    Dr. Dickinson had indicated the child had suffered

6    trauma, blunt trauma.  Consistencies.  Consistencies

7    through the defense witness.  Consistencies that support

8    what the defendant told Helen Legall when he knew this

9    was his last chance to talk himself out of jail, because

10   he knew what they do with people who kill babies in

11   jail.  That's what he told her.

12        Old injuries did not kill Robbie Quirello.  Being

13   swung to and fro, if you want to call it swung to and

14   fro, or you want to call it back and forth, or you want

15   to call it shaking, or being thrown on the bed or being

16   plopped on the bed.  That's what killed Robbie Quirello.

17        Then there were other experts.  We had lots of

18   specialists who tended to Robbie, but they all knew,

19   they all knew one thing, they knew they couldn't do much

20   for him.  They knew they couldn't do much for him

21   because this kind of injury doesn't get fixed.  And had

22   it not been as severe as it was and had he survived, he

23   would have been, what I believe one of the physicians

24   described, in a vegetative state.  Fortunately or

25   unfortunately, fortunately for the family because they'd

1    want him no matter what, but fortunately for Robbie who

2    couldn't keep breathing on his own and he passed away.

3         But what's remarkable about this is that there were

4    lots of specialists who paid attention to the injuries

5    and who were able to tell us what they saw.  And one was

6    Dr. Lawrence Levine, a pediatric ophthalmologist who

7    confirmed the findings of Dr. Rohlwing in the emergency

8    room, and Dr. Dickinson when she examined Robbie's eyes

9    in the PICU, and that is of the retinal hemorrhaging.

10   And you'll have these photographs to look at.

11        But Dr. Levine remembers Robbie Quirello.  He told

12   us he sees thousands of children who have eye problems

13   and eye diseases, and he's also extremely dedicated to

14   his work, but he remembers Robbie Quirello because of

15   all the thousands of children that he treats, he's only

16   had three children die and Robbie was one of them.  And

17   he knows that of all the children he treated that had

18   these findings, the only children that had these

19   findings, were children who have been shaken.  Children

20   who have died.

21        He said this is like pouring catsup all over your

22   retina.  Robbie would have been blind with the bleeding

23   that was shown in these photographs.  Robbie was not

24   blind at 9:00 in the morning.

25        And Dr. Plunkett had to admit that.  Dr. Plunkett

1    had to admit there was no retinal hemorrhage in Robbie

2    Quirello's eyes at 9:00 in the morning, because Robbie

3    would have been blind at 9:00 in the morning.  But when

4    he rolls into that emergency room, he is blind.  His

5    eyes look like this, so severe that there's bleeding not

6    only in the retinal area but in the vitreous, in the

7    jelly part that doesn't have capillary action, doesn't

8    have blood running through it.

9         How does that blood get there, Dr. Levine?  When

10   you shake it hard enough the blood actually splatters

11   into the vitreous, that's how that blood got there.

12   This isn't because the baby fell onto a floor or got

13   wedged into a bed.  Unequivocally, without question,

14   Dr. Levine said the damage he saw in Robbie Quirello's

15   eyes come from one thing and one thing only.  Shaking.

16   Shaking a baby so violently that it causes retinal

17   hemorrhaging.  And it's not just a little bit of

18   hemorrhaging.  It's extensive hemorrhaging.  He had no

19   doubt about it.  And he remembered it.  He remembered

20   it, because Robbie was one of the very few that he's

21   lost.

22        The state also called what I would call the

23   clinical leader of the treatment for Robbie Quirello,

24   and that was the pediatric neurologist, because that's

25   what a pediatric neurologist studies, brain injuries to

1    children.  We called Bernie Maria, who now works as the

2    head of pediatrics for the University of Missouri and

3    who was at the time that Robbie was seen at Shands, the

4    head of pediatric neurology at Shands.

5        Now, Dr. Maria told you something that's very

6    important.  In the 21 years that he's been practicing as

7    a physician, he's seen four or five cases of shaken baby

8    syndrome a year.  Some of those children survive.  They

9    survive with disabilities, which he outlined for you,

10   cerebral palsy, learning problems, physical problems.

11   Some of those children survive.  But he's the one who's

12   seen over close to a hundred shaken babies in his

13   experience.  He knows that babies can be shaken.  He

14   knows that babies can die as a result of shaking.

15       And his clinical examination included a look at the

16   retinal hemorrhaging, number one, seeing both retinal

17   and vitreous blood; the sunsetting of the eyes that

18   reflected injury to the midbrain; the stroking of the

19   cornea, which he described, where he found a diminished

20   response suggesting damage to the reflexes; abnormal

21   movements, consistent with serious brain injury; an

22   abnormal increase in reflexes and damage to the motor

23   tract.

24       Then he looked at the CT scan and he saw bleeding

25   in two separate areas of the brain; bleeding in the

1    subdural space and the subarachnoid space; and he
2    explained, just as Dr. Dickinson had done so wonderfully
3    when she sat down and explained to you and drew for you
4    and gave you a lesson on anatomy, he told you and so did
5    Dr. Dickinson told you, blood in the subarachnoid space
6    doesn't mix with the blood in the subdural space.  There
7    is no seepage.  When there's new blood in the
8    subarachnoid space, that means new injury.  When there's
9    new blood in the subdural space, that means new injury.
10   And Dr. Uscinski said, I see new blood right there
11   (indicating), right there, where the impact was.
12   They're all consistent.  Two places where new blood was
13   seen, two places that as Dr. Maria and Dr. Dickinson
14   follow Robbie Quirello's course in the hospital, two
15   places on that CT can that evolve.  Over time they take
16   another scan, more blood, more new blood, more evidence
17   of the injury, because just as when you scrape and you
18   bleed, when you shake this head and you move these
19   different densities and you tear and you sheer, the
20   bleeding comes and it continues.  And so from the first
21   CT scan to the last, that injury was evolving.  This was
22   not an old injury.  This was an evolving new injury.
23        Dr. Maria said that the CT scans and the clinical
24   examination, he looked at the blood laboratory tests, so
25   did Dr. Dickinson, there was no evidence that this child

1    was anoxic, had suffered these injuries because he had

2    suffocated or had asphyxiated. Why? Because his liver

3    profile was normal, and that would not be; his kidney

4    information was normal, and that would not be. His

5    blood work showed that he suffered not from lack of

6    oxygen, not from suffocation, not from asphyxiation, no

7    infiltrate in the lungs when they X-rayed that child

8    throughout his course. They say one thing. They saw

9    severe neurological damage and retinal hemorrhaging and

10   no explanation that fit how this could have occurred,

11   except the explanation that we get on August the 3rd.

12       And Dr. Maria looked at something else, something

13   else that he thought to be very important, and it turns

14   out to be very important in this case, he looked at the

15   EEG, which is the brain wave studies that they do. And

16   he said to you that that baby had significant brain

17   injury inconsistent with seizure, but that would result

18   in seizure. Oh, we heard this baby had a seizure and

19   rolled into the crevice. This baby had a seizure and --

20   this baby had a seizure and rolled uphill. This baby

21   had a seizure, rolled uphill, and forced himself down to

22   three inches below this bed. Dr. Maria says no and

23   Dr. Dickinson says no. The seizures they saw were the

24   stiffening seizures that are standard and typical for

25   brain damage. There was no rolling. There was no

1    crawling.  There was no walking.

2        What Dr. Maria said as he closed out his testimony

3    is that all of the findings were consistent with trauma

4    to the brain.  All of the findings in his medical expert

5    opinion, based on years of study and based on years of

6    experience, was due to shaking, and that that shaking

7    occurred in the window of time between 9:00 A.M. when he

8    was seen healthy and 9:34 A.M. when he was seen in the

9    coma.

10        The state also called two medical examiners, who in

11   examining Robbie postmortem confirmed the diagnoses that

12   were made by the folks at Shands Teaching Hospital.

13   Dr. Hamilton is the district medical examiner for the

14   Eighth District, which is the circuit, same as the

15   Eighth Judicial Circuit, and he's a 20-year veteran who

16   told you what he saw, what he examined, what he found

17   and what he didn't find.  He didn't find any external

18   physical injuries consistent with this baby being wedged

19   in a bed.  He didn't find any external physical injuries

20   consistent with being pulled out of the bed.  He didn't

21   find any evidence of an older brain injury.  He didn't

22   find any evidence of an older subdural hematoma.  He

23   didn't find any evidence that the child died from

24   choking or aspiration.  He didn't find any evidence that

25   the child died from suffocation or from lack of oxygen

1     on August the 2nd.

2         What he did find was the absence of external and

3     internal injury to all the vital organs except the

4     brain.  And he described for you how injuries to the

5     brain, such as those on Robbie Quirello, occur.  It was

6     a vivid illustration.  He said, I believe, a child's

7     brain is like a mushroom on a stalk and when it's

8     shaken, damage occurs.

9         In an abundance of caution, he sent the brain to

10    the medical examiner of the Twelfth District, who is a

11    neuropathologist who specializes and is board certified

12    in studies of the pathology of the brain.  That was

13    Steven Nelson who testified, I believe, Friday evening.

14    He was the last witness we called on Friday evening.

15    Dr. Nelson told you that he found cerebral cortical

16    contusions consistent with the brain of this infant

17    having been shaken.  He described that inside the brain,

18    as the brain is shaken, it collides with the skull and

19    causes bruising.  And that was consistent with the

20    damage that he saw when he examined the brain

21    microscopically.

22        He also found bleeding all over the arachnoid area,

23    new bleeding, bleeding consistent with severe

24    neurological injury, and he found new bleeding in the

25    subdural space.  Dr. Nelson's conclusion was the same of

1    that as Dr. Hamilton, was the same as that of

2    Dr. Dickinson, was the same as that of Dr. Levine, was

3    the same as that of Dr. Maria.  This child had suffered

4    lethal injuries, fatal injuries, as a result of being

5    shaken.

6         Next you heard from members of the Gainesville

7    Police Department who were called upon as part of their

8    duties and their responsibilities as law enforcement

9    officers for this area to go and address issues of an

10   injured baby back on August the 2nd, the year 2000.

11        The defendant in his opening statement told you

12   that Brian Herlihy was framed.  They didn't look any

13   farther than Brian Herlihy.  When they got Brian

14   Herlihy, they knew they had their man and they didn't do

15   anything but persecute him.

16        That's just not the way it is.

17        MR. TEDDER:  Objection, Your Honor, may we

18   approach?

19        THE COURT:  No.  The objection is noted for the

20   record.  Go ahead.

21        MR. TEDDER:  Improper argument, misstates my

22   opening, Your Honor.

23        MS. SINGER:  May I proceed?

24        THE COURT:  Go ahead.

25        MS. SINGER:  That's not what happened.  Here's what

1    happened:  They got a call at 9:34, 911, baby injured,

2    and pursuant to policy they went to that call and they

3    ended up at Shands Teaching Hospital.  At that time

4    there was no criminal investigation.  There were two

5    people who look like caring parents who were devastated.

6    And what did they do, what did the members of the

7    Gainesville Police Department do?  They offered victim

8    services to Crystal Quirello and to Brian Herlihy.

9         It was only after they were recontacted at about

10   12:00 noon by members of the Shands staff, when they

11   were recontacted through the 911 call system, that the

12   injuries were consistent with intentional traumatic

13   acts, not an accident, not an accident, but intentional

14   acts, did they come back to Shands with a group of

15   investigators with the sole purpose of finding out what

16   happened, fact finding.  Fact finding, members of the

17   jury.  That's what law enforcement does when a crime is

18   reported, they fact find.  And then once they have

19   gotten the facts, they make a determination.

20        It was hospital personnel who became suspicious

21   about what had happened at the house that day, not the

22   Gainesville Police Department.  It was hospital

23   personnel who knew that this baby had not suffered

24   injuries as a result of aspiration.  It was hospital

25   personnel who knew that these injuries were not

1    consistent with the baby being wedged between the

2    mattress and the footboard of the bed.

3         This baby had brain injuries so severe, so

4    significant, he was dying and they knew it and they knew

5    how those injuries occurred.  And they gave this

6    information in bits and pieces as it came available to

7    them, as the CT scans became available to them, and the

8    lab results, and the EEGs, and everything else they used

9    to make their determination, they shared with members of

10   the GPD.  And it became the responsibility of the

11   Gainesville Police Department to find out who it was who

12   intentionally caused these injuries to Robbie Quirello.

13        When called these dedicated officers responded.

14   Not with any preset belief on who's going to be accused,

15   not with any bias or prejudice towards Brian Herlihy.

16   They started their investigation and they asked Brian

17   Herlihy if he would voluntarily go to the station

18   because they were fearful, as the testimony in defense

19   case turned out, they were fearful that had John

20   Quirello, who did not know his wife was having an

21   affair, who did not know his baby was dying, if John

22   Quirello would meet up with Brian Herlihy, somebody else

23   might get injured.

24        And John was going to be at bedside with his son.

25   John wasn't going to be asked to go to the Gainesville

1        Police Department to give a statement.  And Crystal was

2        going to be at bedside with her son.  Crystal was not

3        going to be asked to go to the Gainesville Police

4        Department to be interviewed because their child was

5        dying.  And it wasn't because anybody was being set up

6        or because there was any prejudice, but it was because

7        the family members -- it was because the Gainesville

8        Police Department was showing concern and showing

9        compassion for family members, that those two

10       individuals were interviewed at this hospital where

11       their son was.  Brian Herlihy was asked to voluntarily

12       come to the station, which he very willingly did.

13       There's been no showing whatsoever that he was forced to

14       do anything.  He went very willingly to the station.

15            And during the course of the time that he was being

16       interviewed and information was being gathered, it came

17       to the attention of the officers that Crystal was not

18       with the baby at the time the injuries were inflicted,

19       that Crystal had independent proof of that, and that

20       Brian himself, the defendant in this case, had told law

21       enforcement both in the untaped interview and the taped

22       interview which you have in evidence, that he was with

23       the baby alone when the injuries occurred and that the

24       baby was fine, the baby listening to Titanic music, the

25       baby was watching the fan and focussing, obviously had

1    his eyesight, and he was a happy little baby until Brian

2    Herlihy went in the shower.

3         So as the fact finding continued, it was becoming

4    obvious that Brian Herlihy was the man, was the person

5    who had sole custody of this child.  And that is when he

6    became the focus of the investigation, and that is when

7    his Miranda rights were read, and that is when he was

8    being looked at as the suspect.

9         His statements from the baby being face down for

10   Officer Alvarez, became face up for Investigator Legall.

11   From having taken a shower for Dennis Meredith and

12   Russell Valentine and Officer Alvarez, it was using the

13   toilet, running the water.  But remarkably when Tina

14   Millard gets there, three hours later, three and a half

15   hours later, and the spigot, the water drain is down --

16   and he had run that tub, you heard it on the tape, and I

17   ran that tub (indicating).  No toilet paper, toilet seat

18   up, and not a drip of water on the shower curtain or in

19   the tub.

20        Then the medical findings are coming in.

21   Investigator Legall is getting the information from

22   other officers and the picture is starting to come in

23   focus.  And the picture became very much clear when the

24   defendant voluntarily invited Sergeant Halvosa and

25   Sergeant Seale and Helen Legall back to the apartment to

1    demonstrate what had occurred.  And it didn't take long

2    for the investigators to see that the defendant's

3    stories weren't coinciding with the physical evidence.

4         The physical construction of the bed, the locations

5    of the pillows and the shams, Brian Herlihy, in setting

6    it up himself was unable to force the doll into the

7    crevice as he was contending Robbie rolled into the

8    crevice and neither could Sergeant Seale without using

9    force.

10        Now, this is not the same bed that was at Brian

11   Herlihy's residence on August the 2nd when he invited

12.  officers back to show them what happened.  This is a bed

13   that has been dismantled, taken apart, legs are missing,

14   screws are missing.  I'm going to talk about that a

15   little later but I want you to know that from the

16   beginning.  Yes, we have a bed, and it's in evidence for

17   you to look at and for you to use in your deliberations,

18   but I want you to know this is not the same bed --

19        MR. TEDDER:  Objection, Your Honor.

20        MR. GROLAND:  Objection, Your Honor, that's

21   inconsistent with the testimony.  They moved it into

22   evidence as the bed.  That's improper objection.

23        THE COURT:  The objection is sustained.

24        MS. SINGER:  What I mean is, it's the bed but it's

25   a changed bed.

1       MR. TEDDER:  Your Honor, objection, move for

2   mistrial.  She's adding evidence.

3       THE COURT:  The objection is sustained.  The motion

4   for mistrial is denied.

5       MS. SINGER:  You will see that there are two sets

6   of photographs, photographs taken on August the 2nd of

7   the bed that was used in the demonstration, the

8   re-enactment.  You will see that this bed had posts and

9   what looks like a canopy.

10      MR. GROLAND:  Your Honor, I'm going to pose an

11  objection to this testimony with those photographs.  The

12  testimony was no photos were taken at any time during

13  the demonstration, specifically those that she holds in

14  her hand and shows to the jury.

15      THE COURT:  The objection is noted, overruled.  Go

16  ahead.

17      MS. SINGER:  You have these photographs.  They're

18  in evidence.  And you can look at them yourself.  There

19  was a canopy, posts, and there were posts rising from

20  the bed itself.

21      Going back to the re-enactment, as I said to you

22  earlier in the closing, when you make up a story and you

23  stick with that story, you better know the details.  You

24  better be able to fit every detail into place.  That's

25  the difference between a lie and the truth.  Little did

1    the defendant know when he started this course, that he

2    would be asked specifics.  When he originally said he

3    was in the shower and the baby was wedged, he should

4    have thought long and hard about whether or not the

5    injuries would be consistent with that.  Because when it

6    came down to demonstrating it, his explanation did not

7    fit the physical evidence.

8         On the evening of August the 2nd, after that

9    re-enactment took place, after he knew and he got

10   nervous and started switching the pillows around and

11   stuffing pillows in and pulling pillows out, when he

12   knew he had been found out, that's when he knew it was

13   just a matter of time before the police would be back to

14   arrest him.

15        You will hear and you will be instructed that it's

16   going to be up to you to decide what evidence is

17   reliable.  You're going to -- or should consider how a

18   witness acted, as well as what they said.  You can

19   consider whether or not a witness has come voluntarily,

20   whether a witness has been paid, whether a witness has

21   taken or received any money or other benefit for their

22   testimony.  And you will be told that you can consider

23   whether the testimony agrees with other testimony or

24   other evidence in the case.

25        When we talk about expert witnesses the same rules

1    apply, the only difference between an expert witness and

2    any other witness that you've heard in this case is that

3    an expert is allowed to give opinions in the area in

4    which they have expertise.  And I'm going to urge you to

5    consider seriously who the expert witnesses were.  The

6    treating physicians who attended to Robbie Quirello,

7    Harvey Rohlwing, Anne Dickinson, Lawrence Levine and

8    Bernie Maria, who were the folks who touched this child,

9    cared for this child, attended to this child, who have

10   no interest in the outcome of this case.  And then you

11   have the other physicians who testified about Crystal's

12   obstetrical history Dr. Kreinest and Dr. Hellrung, who

13   have no interest in this case.

14       And you can compare that to the experts called by

15   the defense, Dr. John Plunkett and Dr. Ron Uscinski.

16   Dr. Uscinski, I believe, testified that he gets $10,000.

17   Both Dr. Plunkett and Dr. Uscinski travel the country

18   testifying that there is no such thing as shaken baby

19   syndrome.  They had to be out of here quickly because

20   they had other places to go so they could testify.

21       MR. TEDDER:  Objection, that's not -- that's

22   improper argument.  Facts not in evidence.

23       THE COURT:  The objection is noted, overruled.

24       MS. SINGER:  Dr. Plunkett and Dr. Uscinski did not

25   see Robbie Quirello alive.  They were given information.

1    They were given written reports and charts.  They were

2    given what they were given.  And, in fact, with

3    Dr. Plunkett, he had to admit that he didn't know

4    Dr. Nelson had even examined the brain microscopically

5    because he hadn't been given that report.  He hadn't

6    been given that report and he had to admit that, yes,

7    now that he's seen the report, Dr. Nelson was right.

8    There was evidence of cortical contusions to the brain.

9    Dr. Plunkett and Dr. Uscinski were given what they were

10   given, the cold chart, the autopsy reports, but they

11   were not given what needs to be given to render an

12   opinion such as the opinions given by the state's

13   witnesses, and that is they didn't see Robbie Quirello.

14       Both Dr. Uscinski and Dr. Plunkett though, actually

15   don't -- aren't that inconsistent with the state's case.

16   And I do want to discuss that for a moment.  Remember

17   now that Dr. Uscinski and Dr. Plunkett did not talk with

18   Dr. Maria, did not ask Dr. Dickinson what she saw, did

19   not talk to Lawrence Levine to see whether or not he had

20   additional facts other than what was in the chart to

21   consider and render their opinion.

22       Dr. Plunkett, who's a pathologist, he didn't call

23   William Hamilton, a peer, a person who does the same job

24   he does.  He didn't call him up and talk to him about

25   what he saw upon the physical examination of Robbie's

1    head.  He didn't ask him about the dura that's going to

2    be such a big matter to Dr. Plunkett.  He didn't think

3    to call him up.  Didn't think to call Dr. Nelson up, the

4    neuropathologist, the person specializing in brain

5    injuries.  Didn't think to ask Dr. Nelson what

6    additional reports he may have had.  When Dr. Plunkett

7    took the stand he thought that the neuropathologist

8    didn't even see the brain.  And that's where he came

9    from when he rendered his opinions and testimony today.

10         But he did say some things that are still helpful

11   for the state, and I want to point them out for you.

12   You can shake a baby to death.  That's what he said.

13   You can shake a baby so long that the baby stops

14   breathing.  Or, he said, you can shake a baby and then

15   have an impact that would cause immediate deceleration

16   of the brain in the skill, causing fatal injury.

17   Members of the jury, I submit to you that that is what

18   we have here.

19         Had Dr. Plunkett been aware of the brain bruising

20   before he flew into Gainesville to offer his testimony,

21   had he been aware of the statement of the defendant

22   before he took the stand, his opinion may have been

23   different.  He would not have necessarily said that this

24   child died of an old injury, a bleeding subdural

25   hematoma.

1          Dr. Uscinski.  Dr. Uscinski also agreed that the

2     injuries seen in Robbie Quirello could have been

3     inflicted by shaking, so long as there was an impact.

4     Then Dr. Uscinski looked at that CT scan during the

5     cross-examination by Mr. Pennypacker and Mr. Pennypacker

6     asked him what is this here?  That's new bleeding.

7     That's sign of a new injury.  That's new bleeding right

8     there.  Sign of new bleeding.

9          Then Mr. Pennypacker said, where on the head would

10    that bleeding be?  And Dr. Uscinski pointed to the back

11    of his head.  And Mr. Pennypacker said, consistent with

12    a bump on his head, Dr. Uscinski?  And Dr. Uscinski said

13    yes.

14         Both Dr. Plunkett and Dr. Uscinski talked a lot

15    about the monkeys, talked a lot about the balls being

16    hit on the Monkeys' heads.

17         MR. TEDDER:  Objection, misstatement of the

18    testimony, Your Honor.

19         THE COURT:  Noted, overruled.

20         MS. SINGER:  Talked about Dr. Duhaime, a very

21    reputable scientist and physician who's written a lot on

22    shaken baby syndrome.  And Dr. Uscinski said that he

23    agreed with a quotation from Dr. Duhaime's article that

24    Mr. Pennypacker read.  That quotation was:  It is our

25    conclusion that shaken baby syndrome at least in its

1      most severe acute form is not usually caused by shaking

2      alone.  Although shaking may in fact be part of the

3      process, it is more likely that such infants suffer

4      blunt impact.  The most common scenario may be a child

5      was shaken, then thrown into or against a crib or other

6      surface striking the back of the head and thus

7      undergoing a large brief deceleration.

8           Members of the jury, I submit to you that's what we

9      have here.  That's what Mr. Herlihy admitted to.  That's

10     what Dr. Uscinski and Dr. Plunkett say could be the

11     cause of this injury.  That's what occurred between

12     9:00 and 9:34 A.M. at the Tumbling Creek Apartment, A21,

13     when Robbie Quirello was alone with the defendant.

14          You will also be told that you can consider in

15     weighing the evidence whether or not the testimony

16     agrees with or coincides with other evidence in the

17     case.  In this case the physical evidence doesn't lie.

18     In this case, the physical evidence corroborates,

19     supports, enhances explains, how Robbie Quirello was

20     hurt.  How?  Let's look at it.

21          Before we look at all the evidence from the

22     apartment, some of which I know is tedious, but

23     everything that was collected you have, you can look at.

24     Before we look at the evidence from the apartment, let's

25     review the physical evidence that was documented by the

1     medical personnel.

2          Robbie Quirello had no marks scrapes, bruises or

3     lacerations, that would have supported the argument that

4     he had skinned himself and slipped on this bed.  There

5     was no signs of wedging.  There was no signs of bruising

6     where he was supposedly pulled out.  There was, however,

7     noted by Dr. Dickinson, and later by Dr. Uscinski, a

8     bump on the back of Robbie's head.  That bump consistent

9     with that baby being plopped down in a fashion so hard,

10    without his neck supported, that his head bounced.  That

11    bump being not immediately drawn to the attention of

12    Dr. Rohlwing because there were bigger problems in the

13    emergency room than a bumped head, but was eventually

14    noted when the baby was seen at the PICU.

15         I'm going to urge you to look at the photographs

16    that were taken on August 2nd and look at the

17    photographs that were taken on August 16th at the

18    execution of the search warrant when you deliberate to

19    .see the differences in the bed that was taken into

20    evidence from the bed that was present in the apartment

21    when the re-enactment took place.

22         The defendant's initial explanation for the

23    injuries required Robbie to roll from his front to his

24    back, over a sham, and then maneuver his body so that

25    his head would be below his feet, and he would wedge

```
 1        himself to within three inches of the floor between the

 2        two bottom bars of the footboard.

 3             Robbie weighed 16 and a half pounds.  His head

 4        circumference was 17 and a quarter inches.  Obviously,

 5        the doll used in the demonstration did not weigh the

 6        same.  Obviously the head circumference was not the

 7        same.  The defendant was given every opportunity to

 8        position the pillows and the shams in the manner in

 9        which he would be find more favorable to his

10        explanation.  He had the mattress pushed as far against

11        the headboard as possible.  You have to understand that

12        this was against the wall as you look at the

13        photographs.  It's not against the wall now.  But he was

14        allowed to move the mattress as high as he wanted to the

15        headboard.  He was allowed to pick the thinnest sham on

16        the bed to place between the mattress and the footboard.

17        He could use whatever force he wanted, and he couldn't

18        get the baby wedged, and neither could Sergeant Seale.

19        The testimony of Investigator Legall, Sergeant Seale,

20        and Sergeant Halvosa, was that the defendant was given a

21        full opportunity to do what he needed to do to show what

22        happened.  He wasn't forced to do it.  He wasn't coerced

23        to do it.  He wasn't threatened to do it.  His

24        statements were always made voluntarily.  There's been

25        no evidence to show otherwise.  He knit his sweater.  He
```

1    built up his story, and became -- reached a paramount

2    and it didn't fit.

3         We also have to accept that as physical evidence

4    that Robbie Quirello being four and a half months would

5    not be able to crawl.  And I think that there's no

6    conflict about that.  We heard a lot about physics in

7    this trial.  We heard about tether balls.  We heard

8    about gravity.  It's well accepted and Larr Seale

9    testified that babies don't roll uphill.  Babies roll

10   downhill, just like balls roll downhill.  Gravity.  It's

11   inconsistent in his explanation of what happened when he

12   re-enactment, when he showed law enforcement what

13   happened, that this baby would be able to roll uphill,

14   roll over a sham that was stuffed into the crevice, roll

15   over that sham to get it wedged.  It's not credible.

16   It's not believable.  It's not supported.

17        You also have to realize that all of this would

18   have happened, as Mr. Herlihy said, within a very, very

19   short period of time, because he was only in the

20   bathroom a minute, two minutes, three minutes, he was in

21   the bathroom five to seven minutes at one point, then he

22   went down to two or three minutes.  Who knows?  The

23   story gets expanded, it gets changed.  All of this would

24   have happened, this amazing rolling uphill into the

25   crevice, without a noise, without a sound, without a

1    peep.

2        Then the defendant says that the baby vomited.

3    There was no vomit found on the foot of the bed where

4    the baby was supposedly wedged.  There was no vomit

5    found.  He said there was a three to four inch spot of

6    vomit on the comforter.  There was no spot located on

7    the comforter.  When Helen Legall looked, she didn't see

8    it.  When Nicki Perrone looked, she didn't see it.

9    There was no vomit on the bed.  That baby didn't vomit

10    on the bed.  That baby was thrown on the bed, his eyes

11    rolled back, Brian picked that baby up -- pardon me --

12    Mr. Herlihy went into the bathroom and went, oh, my God,

13    what did I do.  I hope that baby gets well when I go

14    back out there.  Then he came back out and realized the

15    baby wasn't getting any better.

16        The physical evidence supports the state's case.

17    The T-shirt, the towel with evidence of blood on it, all

18    hidden in a Wal-Mart bag in the back of a closet.  The

19    bed dismantled.  You may consider all of those things.

20    On August 2nd that bed was in place.  On August 3rd the

21    defendant was arrested and in jail.

22        Common sense, you're going to hear a lot about this

23    in instructions.  You're going to be instructed to use

24    your common sense in deciding what evidence is reliable

25    and what evidence should not be relied upon in the

1    course of your deliberations.  And the state urges you,

2    urges you to use your common sense.

3        Let's start with the simplest of premises.  Babies

4    are delicate but resilient commodities.  They come out

5    of the woman and they bend in all different ways, ways

6    that we can't imagine, but they come out.  They come out

7    without broken necks.  They come out with flexible bones

8    and floppy heads.  They come out with heads that are

9    much bigger than their bodies, that weigh a lot more

10   than their bodies.  The simplest of premises, common

11   sense tell us that a baby's head needs to be supported.

12       It doesn't take a rocket scientist or any other

13   expert to tell us that you don't shake a baby.  We don't

14   need expert to tell us you don't throw a baby down so

15   hard that his head bounces.  Even the defendant knew

16   when he made his statements to law enforcement, I know I

17   shouldn't have roughhoused with a four and a half month

18   old child.

19       Common sense tells us when an infant is shaken, bad

20   things are going to happen.  We heard it described.

21   Dr. Dickinson, Dr. Maria, Dr. Hamilton, Dr. Levine,

22   Dr. Nelson, and even Dr. Plunkett said shaking can cause

23   death.  Baby's skull has room for the brain to grow.

24   When the head is shaken the brain moves inside that

25   skull, part of the brain, different parts of that brain

1    move at different rates, neurons get stretched, neurons

2    get damaged, damaged neurons, stretched neurons result

3    in injury, irreparable injury, tragic injury, lethal

4    injury.

5         Common sense also tells us that an adult has a duty

6    to refrain from doing any act that will hurt or

7    otherwise injury an infant.  Common sense tells us that

8    it is unreasonable to think that you can discipline a

9    four and a half month old that's crying.  That's not

10   acceptable.  That's abuse.  Common sense tells us that

11   when a four and a half month old is crying, you don't

12   shake it to get it to stop crying.  You don't throw it

13   to get it to stop crying.  That's abuse.  That's not

14   reasonable.  That's not behavior that common sense tells

15   us is acceptable.

16        As an adult, one must refrain from actions with an

17   infant that would cause injury.  When one doesn't walk

18   away but rather acts without concern, without thought of

19   what would happen if the baby was shaken, what would

20   happen if the baby was thrown, but just acts without

21   thinking about that, the thinking only of intentionally

22   shutting that baby up anyway they can, when one acts in

23   that fashion, one commits aggravated child abuse; and

24   when that baby dies one commits felony murder.

25        We talked about this before, common sense tells you

1     a four and a half month old does not crawl.  Gravity
2     doesn't force a baby uphill.  After you injure a baby,
3     common sense also tells us that panic and concocting a
4     story are well within human nature.  Members of the
5     jury, use your common sense in determining why Brian
6     Herlihy's last explanation is in fact what occurred.
7          My God, this is all I need, I don't need this
8     today.  That's what Brian Herlihy said on that 911 tape
9     at 9:34 A.M. on August the 2nd, 2000.  I'm worried about
10    me.  Sir, sir, I don't need to know that right now.  I
11    need to know the condition of the baby.  I'm worried
12    about me.  I'm worried about me.  Human nature.  Human
13    nature.  I'm worried about me.  I need to get a story.
14         MR. TEDDER:  Objection, improper argument.
15         THE COURT:  Overruled.
16         MS. SINGER:  I need to figure out a way to be able
17    to explain this that points to innocence.  Just as a
18    child whose lied, hasn't thought it out fully, Brian
19    Herlihy forgot the details, so the details became
20    inconsistencies and eventually the inconsistencies led
21    him to his arrest, and upon arrest he finally tells us
22    what really happened.
23         At first it was to Sergeant Seale and Helen Legall,
24    I didn't shake the baby.  Then it was, I may have shaken
25    the baby to revive him, to I swung him back and forth,

1    to and fro, and plopped him on the bed, to I plopped him

2    on the bed so hard that his head bounced.  I did this

3    because the baby was crying.

4        Yet when he describes swinging the baby to and fro

5    and back and forth, he said the baby was laughing, to

6    Helen Legall.  He swung the baby to and fro, back and

7    forth because the baby was crying, but then the baby was

8    laughing, and then he plopped the baby on the bed where

9    his head bounced.  Members of the jury, that baby wasn't

10   laughing.  That baby was on the way to dying.

11       The defendant was allowed to stay home the evening

12   of August the 2nd after he had spent a number of hours

13   with law enforcement, after he had done his

14   re-enactment.  I submit to you, members of the jury,

15   that he read the writing on the wall.  He knew his

16   explanation didn't fit.  He knew he couldn't get the

17   baby wedged in the bed like it was supposed to be.  By

18   August 3rd, he knew that he needed to tell what really

19   happened.  And on the way to the jail he said, I knew I

20   was rough with him.  I'm afraid to go to jail.

21       Members of the jury, Robbie was intentionally

22   shaken.  Robbie was intentionally thrown down on this

23   bed.  Robbie suffered irreversible brain injury.  Robbie

24   died as a result of that irreversible brain injury.

25   That injury occurred between 9:00 and 9:34 A.M.  The

1    defendant, Brian Herlihy, was the person who killed him.

2         When we spoke in jury selection, it was understood

3    that as jurors you would be required to follow the law.

4    There is no reason not to follow the law in this case.

5    The state, Mr. Pennypacker and I, as representatives of

6    the community, are not asking for a verdict based on

7    sympathy.  We are not asking for a verdict based on

8    anger.  We are asking for a verdict based on justice.

9         The facts have been before you.  It is evident, it

10   is beyond a reasonable doubt, and we are going to ask

11   you at the end of this case to render a verdict that is

12   true, that reflects what happened to Robbie Quirello, a

13   verdict of guilty.  Thank you very much.

14        THE COURT:  Ladies and gentlemen, we're going to

15   take a recess before the next argument and lunch will be

16   provided for you.  If you'll step into the jury room.

17        MR. TEDDER:  Your Honor, you want to caution them

18   on discussing the case.

19        THE COURT:  I will.  Ladies and gentlemen of the

20   jury, as I told you before, of course, your

21   deliberations do not begin and your discussion of any

22   part of the case in the evidence does not begin until

23   you've heard all the arguments and the instructions that

24   I will read to you.  So if you'll wait please.  Just

25   enjoy your lunch.

1          (The jury exited the courtroom.)

2          THE COURT:  Yes, sir?

3          (A sidebar discussion was held off the record and

4   without the court reporter.)

5          THE COURT:  We're going to stay in the courtroom on

6      the record for about five minutes before we recess for

7      30 minutes for lunch.  I'll need the attorneys and

8      Mr. Herlihy back in the courtroom at 1:00.  We'll stay

9      here for just five minutes.

10          (Pause in the proceedings.)

11          MR. GROLAND:  Could I do it with everybody here but

12      not the prosecutor?

13          THE COURT:  Ms. Singer, Mr. Pennypacker, if you

14      wish to leave the room, you're free to do so.

15          MR. GROLAND:  I want to have conversation with him

16      with regard to the bed outside of your presence.

17          MS. SINGER:  All right.  Let me gather my things

18      up.

19          MR. GROLAND:  I do appreciate that.

20          MS. SINGER:  What time are we due back, Judge.

21          THE COURT:  1:00.

22          MR. PENNYPACKER:  Do we still stay five minutes?

23          MS. SINGER:  You still want us here, to stay

24      outside or can we go to lunch?

25          THE COURT:  Go to lunch.

1          MR. GROLAND:  Half hour from now.

2          THE COURT:  At 1:00 we will begin with the defense

3     closing arguments.  That's half an hour, that's correct.

4     I have agreed to stay on the bench for five minutes so

5     you can keep Mr. Herlihy in the courtroom.  The state

6     has agreed to leave the courtroom at this time.  If you

7     want to do it, you're now down to three minutes.

8          MR. GROLAND:  Well, they haven't left yet.

9          MS. SINGER:  The public can stay in but the state

10    can't stay in?

11         THE COURT:  It's -- no, the state can't -- I don't

12    think I have any jurisdiction to order you out of the

13    courtroom.  I have told you you're free to leave and you

14    have exercised that option.

15         MR. GROLAND:  Thank you.

16         (A recess was taken at 12:30 P.M. to resume after

17    lunch at 1:00 P.M.)

18

19

20

21

22

23

24

25