# EXHIBIT

# U

α02-1-17814
F

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY            }
            Appellant,            }
                       }       CASE NUMBER   2000-2753-CFA
                       }
                       }
                       }       APPEAL NUMBER 1D02-4788

v.                      }
                       }       VOLUME XXI
                       }
                       }
STATE OF FLORIDA       }
            Appellee,   }

05-14-2003
Postage Money
General

# TRANSCRIPT
# RECORD

## HONORABLE MARTHA ANN LOTT
### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

2003 MAY 12 PH 2: 40
CRIMINAL APPEALS OFFICE
TALLAHASSEE

FOR APPELLANT
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

FOR APPELLEE
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

I:\USERS\YMC\Word\YVONNE\Circuit Criminal Documents\COV-SH.TRANS.FEL.doc

2268

*202-1-1781/4 F*

1    IN THE CIRCUIT COURT OF FLORIDA
     EIGHTH JUDICAL CIRCUIT
2    IN AND FOR ALACHUA COUNTY

3         CASE NO: 01-2000-CF-2753-A

4         TRANSCRIPT ON APPEAL
              VOLUME XVIII
5         (Pages 2268 - 2432)

6    STATE OF FLORIDA          *Volume XXI*

7    vs.                        *1002 - 4788*

8    BRIAN PATRICK HERLIHY,        COPY

9              Defendant.

10   _____/

11   Proceedings:          Jury trial

12   Before:               The Honorable Martha Ann Lott,
                           Circuit Judge
13
     Date:                 September 23, 2002
14
     Time:                 1:00 p.m.
15
     Place:                Courtroom 4-A
16                         Alachua County Courthouse
                           Gainesville, Florida
17
     Reporter:             Stacey K. Bryant,RPR
18                         Judicial Court Reporter

19   APPEARANCES:

20       Jeanne Singer, Assistant State Attorney
         Stephen Pennypacker, Assistant State Attorney
21       120 W. University Avenue
         Gainesville, Florida 32608
22          Appearing on behalf of the State of Florida

23       Gordon Groland, Esquire
         John Tedder, Esquire
24       Post Office Box 2848
         Gainesville, Florida 32602
25          Attorneys for defendant

1                              **INDEX TO PROCEEDINGS**

2

3     **CLOSING ARGUMENTS:**

4

5     **BY MR. GROLAND:** .................................... **2271**
      **REBUTTAL ARGUMENT BY SINGER:** ...................... **2383**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          Stacey K. Bryant, RPR
                          Judicial Court Reporter

```
 1                    P R O C E E D I N G S

 2                        *  *  *  *  *

 3          (Out of the presence of the jury.)

 4          THE COURT:  Mr. Bailiff, are the jurors ready?

 5          MR. BAILIFF:  Yes, your Honor.

 6          THE COURT:  Let's get Ms. Singer in first.

 7          MR. BAILIFF:  I'll double check with them just to

 8      make sure.

 9          THE COURT:  Okay.

10          MS. SINGER:  Judge, I do have information about

11      the alternates.

12          THE COURT:  About the what?  Jurors are ready?

13          MR. BAILIFF:  Just a couple in the bathroom.

14          THE COURT:  Yes, Ms. Singer.

15          MS. SINGER:  The sequestration of alternates only

16      pertains to death penalty cases, your Honor.

17          THE COURT:  All right.  Anything else we need to

18      put on the record before the jury comes in and

19      Mr. Groland begins his closing?

20          MR. GROLAND:  The juror, state attorney's office,

21      we're going to deal with that later.

22          MS. SINGER:  Yes.

23          THE COURT:  Go ahead and bring the jury in.

24          (Before the jury:)

25          THE COURT:  Mr. Groland, go ahead.
```

1    CLOSING ARGUMENT ON BEHALF OF THE DEFENSE:

2        MR. GROLAND:   Thank you.

3        Hello.   This is the first time that I've had the

4    opportunity to address all of you and stand up and talk

5    directly to you about this case.  We've passed in the

6    hallway.  I think we've even managed to avoid eye

7    contact.  Now I can look you all directly in the eye

8    and tell you what I believe the evidence and the

9    testimony has either shown or not shown in this case.

10       It's been a long and sometimes rather tedious two

11   weeks for all of us.  Very soon the attorneys are going

12   to be out of your hair and the case will be yours, all

13   yours, for deliberation and hopefully a verdict because

14   none of us want to try this case again, I'll tell you

15   that.

16       What I think I would like to do before even

17   getting into some of the things I was planning to say

18   to you at this point, is go right into my perception of

19   some of the things that the state has just said to you

20   in rebuttal to some of the assertions that Ms. Singer

21   has made.

22       First of all, this talk about the shirt that she

23   brought out, whoever identified that shirt as his

24   shirt?  Whoever said that that is Brian's shirt and he

25   put it in there at anytime?  No one.  I submit there

1    was absolutely no proof that that was Brian's shirt or

2    his towel.  There's no proof that that's his towel,

3    that he put it in there, and we do know other people

4    were in that apartment certainly between the 2nd and

5    the 16th just by virtue of the way the police described

6    the condition of the apartment as being very different.

7        Ms. Singer said to you that Robbie Quirello's

8    blood was found on the towel and on the shirt, and I

9    suggest to you that that is absolutely not the

10   testimony in this case.  Recall if you, the testimony

11   of the young lady from the lab.  She was able to tell

12   you that the only place that they could find blood that

13   they said was conclusively based upon DNA testing,

14   Robbie Quirello's blood, was that spot on the carpet

15   that she thought was an area where there was some vomit

16   or some aspirant.  That's the only place where she was

17   able to identify blood as Robbie Quirello's, not on the

18   towel, not on the shirt.

19       Ms. Singer said something about the pillows and

20   rolling up pillows or rolling downhill.  I don't know

21   that anybody knows exactly how the pillows were placed,

22   or what person actually put the pillows in a certain

23   position on the bed when some of the photographs were

24   taken, or whether the baby rolled uphill or downhill,

25   or exactly where the sham was, or whether the baby got

1    wedged in here, or whether the baby got wedged in

2    there.  So, I don't know that Ms. Singer can come in

3    front of you and tell you that consistent with the

4    evidence the baby rolled uphill.

5        I think Larry Seale also indicated to you that in

6    terms of what Ms. Singer said to you about the baby

7    being able to roll, he said he doesn't know anything

8    about kids.  He doesn't have kids, he doesn't know when

9    babies can roll, and I don't recall him saying that a

10   baby could not roll from point A to point B.

11       Let me just show you one thing.  Where's that

12   doll?  Well, we've got the bed here and we're talking

13   about the bed, I just want to show you tremendous

14   force, tremendous force.  Okay?  I don't know if it was

15   down here, or there, I don't know if the sham was in

16   here.  Tremendous, tremendous force described to you by

17   Larry Seale.  And remember, the testimony was that this

18   thing was pushed all the way up when they came in and

19   examined the specific location of the mattress as it

20   relates to the bed, and the frame, and the footboard.

21   They said the space was down here, it was six inches.

22   No one actually measured it, I don't believe.

23   Everybody was estimating six.  I think the evidence

24   technician admitted at one point it could have been

25   seven without the sham on it, could be more.  But this

1    is an example of tremendous force.  Okay?  That ought

2    to give you a little bit of a hint as to what we're up

3    against here in this case.

4         She mentioned something about Dr. Hamilton finding

5    no evidence that was consistent with the baby being

6    wedged in the bed, no external trauma.  Ms. Singer told

7    you that Dr. Dickison found some kind of a bruise on

8    the back of the head.  I do not remember that being the

9    testimony at all.  I recall Dr. Dickison saying that

10   there was a bruise, a little bruise over one of the

11   eyes that she observed when the baby came in.

12   Certainly something consistent with getting wedged in

13   between a mattress and a footboard that is made of a

14   hard surface.  I don't remember any testimony about a

15   bump on the back of the head.  If you all remember it

16   differently, then I certainly stand corrected, but I

17   don't think that is what Dr. Dickison said.

18        The state said that Dr. Hellrung, the

19   pediatrician, saw the baby two weeks before the

20   incident on August 2nd.  I don't remember that being

21   the testimony at all.  I think Dr. Hellrung's testimony

22   was specifically that he did not see the baby in July

23   because he was not available, but rather one of the

24   nurses in his office saw the baby.

25        Ms. Singer tells you that there is no chronic

1     subdural hematoma.  That is her position.  That is the

2     state's position in this case, that there was no prior

3     or earlier brain injury to the child.  That is so,

4     despite the fact that nine, and I mean nine doctors,

5     who have testified -- I'm sorry -- nine people that we

6     have heard about, who looked at the CAT scans, most of

7     whom testified in this case, confirmed that in fact

8     this baby had a chronic subdural hematoma and it was

9     very defined, and very evident on the CAT scan; namely,

10     certainly our two doctors, Dr. Uscinski, and

11     Dr. Plunkett, both found a chronic subdural hematoma

12     and they each went a step further and identified from

13     the autopsy photos the yellow area inside the dura as

14     being to them, based upon their experience, evidence of

15     chronic subdural hematoma.

16          Not only that, we've got the state's own doctors,

17     Dr. Maria, Dr. Dickison; and Dr. Dickison says when she

18     looked at the CAT scan that morning, not only she, but

19     five of her colleagues were all in agreement that in

20     fact what is represented on the CAT scan that they're

21     looking at, is a very well-defined area of

22     multigenerational hematoma that involved multiple

23     events of trauma over a period of time.  That's the

24     state's witness.  That's exactly what she said.

25          So where the state can, or how the state can come

1    before you and say, no chronic subdural hematoma, I

2    don't really have a clue as to why that is their

3    position when their own experts say otherwise.  And, in

4    fact, if they dispute it, if they dispute those five

5    doctors who testified in a total of nine who looked at

6    it, why don't they call in the three radiologists, who

7    also, as we know from the testimony, Dr. Quisling,

8    Dr. Agee, and Dr. Boughner, their three radiologists,

9    who, we have heard, also found evidence of chronic

10   subdural hematoma.  These are their witnesses.

11       So if they're gonna dispute that and dispute our

12   doctors, or dispute their other doctors who agree that

13   this baby had a prior chronic brain injury, why didn't

14   they call those three radiologists?  Sure, we could

15   have called them, too, and you will probably hear that

16   when the state gets backup.  But we didn't need to call

17   them.  We already had it in the record that it was

18   there, it was confirmed.  They weren't equivocating

19   about it.  Dr. Dickison said specifically it was there

20   and it was well-defined, and not only did I see it and

21   believe it, but so did five of my colleagues.

22       Ms. Singer said to you that this bag in the closet

23   with a wet towel and a wet shirt, again, and we don't

24   know who they belonged to, who put them there, or when

25   they put them there, she says to you they were Brian's,

1    and not only that, Brian Herlihy was trying to conceal

2    those items from the police.  Where does that come

3    from?  If Brian Herlihy was trying to conceal those

4    items from the police, do you think he would have

5    signed a consent to search his whole apartment the

6    first time he was asked, and allowed the police to go

7    into his apartment and look in every nook and cranny at

8    1 o'clock, at 3:30 p.m., and then later with a horde of

9    police officers at 6:30 p.m.?  If he was trying to

10   conceal it, I would think that it would not have been

11   in his apartment where he let the police go in and out

12   of his apartment all day long, traipsing in and out,

13   looking wherever they wanted to look, whether it was in

14   the shower, or in his dresser drawer, or in his closet.

15        It's clear he wasn't trying to conceal it and

16   there's no proof that it belonged to him, and there's

17   also no proof that Robbie Quirello's blood was on

18   either of those wet items in the bag.

19        She says to you that Brian told a couple of

20   different stories; that he told Crystal Quirello that

21   morning that the way this all happened is, Robbie

22   aspirated on some milk.  Well, the fact of the matter

23   is, Robbie did at some point aspirate on milk.  That's

24   why we have the milk stain with some blood in it in the

25   photographs.  That's why we cut this piece of carpet

1     out and showed it to you.  That's why the lab went in

2     there and took swabbings from that piece of carpet.

3     What Brian said is the same thing he's said all along,

4     right from the first call; and that is, when he came

5     out of the bathroom or out of the shower, and we'll get

6     into that later about shower and whether the floor was

7     wet or dry, but when he came out, he found the baby

8     wedged.  So he said that in the 911 tape, and on the

9     way to the hospital he mentioned to Crystal that the

10    baby aspirated.  Well, the baby did aspirate, but he

11    wasn't changing his story, and he wasn't saying to

12    Crystal, the baby is in this condition because the baby

13    aspirated.  I just want you to be clear on that.

14          She said to you that the doctors at the hospital

15    that morning called it like they saw it.  They didn't

16    know they were gonna have to testify.  For instance,

17    recall Dr. Dickison's testimony only in terms of

18    calling it like one's seeing it.  She says that this

19    child had a head full of unexplained trauma from

20    multiple events of injury over time.  She also said

21    that the -- that Robbie had evidence of multiple layers

22    of old hematoma from separate events of trauma over an

23    extended period of time.  The old injuries were

24    well-defined, but she was unable to date them and tell

25    you whether or not these injuries were there from

1    birth, or something happened during Robbie's four

2    months of life.  She told it like she saw it.

3         Ms. Singer spent considerable time talking to you

4    about what Dr. Dickison said, and what Dr. Maria said,

5    but she neglected to tell you that they also, when they

6    looked at the CAT scans, were unequivocal and they saw

7    chronic subdural hematoma and it was there.

8         This is not the bed?  I mean, I almost fell out of

9    my chair.  This is the bed that they put into evidence.

10   This is the bed that they took out of Brian's apartment

11   some -- Why they waited the two weeks, I have no idea,

12   but some two weeks after Brian -- after Robbie became

13   ill and was hospitalized.  This is the bed, except

14   she's right, the canopy is off.  But this is the bed,

15   these are the pillows, that's the bedding, this is the

16   gap.  I don't know anything about screws, but all I

17   know is that the testimony from the police is the

18   mattress and the box spring are all the way up to the

19   front, this is the box spring, this is the mattress,

20   this is the quilt, here's the footboard, and there's

21   that gaping hole at the end of the bed where any four

22   month old child can get stuck.

23        Dr. Plunkett did say you can shake a baby and kill

24   a baby from shaking, but he did go on to say, and

25   Ms. Singer didn't tell you, that it has to be for four

1    or five minutes, that it has to be repetitive, violent

2    shaking, and the baby is not gonna die from the

3    shaking, the baby is gonna die from not being able to

4    breathe.

5        Both Dr. Plunkett and Dr. Uscinski did say that if

6    we have both shaking and a blunt impact, that that can

7    be a problem.  Both of them said, not from a bed, not

8    from a soft mattress.  You can injure a baby from blunt

9    trauma, trauma with the floor, with a wall, but both of

10   them were very clear that if indeed Brian Herlihy said

11   that, that he plopped the baby down, both of them said

12   that they would not be injured, the baby would not be

13   injured from that.

14       And there's absolutely no evidence that Brian

15   Herlihy ever ever under any circumstances disciplined

16   Robbie at all, or that he shook the baby to try to get

17   him to stop crying.

18       Okay.  Now that I've gotten that out of the way,

19   let me just say that on behalf of my client, Brian

20   Herlihy, and his family, and my associate, John Tedder,

21   and the rest of my staff that have worked on this case

22   for a long time, we all thank you very much for the

23   very close attention we've seen all of you pay over the

24   last two weeks.  It's been a difficult and complicated

25   presentation for both sides.  We've gotten through some

1    difficult and very emotionally wrenching testimony and

2    photographs, and I especially thank you for that as

3    well.

4        This will be the only time that I will have a

5    chance to stand up in front of you and tell you what I

6    see about this case, the problems with this case, what

7    I believe the evidence has shown, or has not shown.  I

8    don't get another crack at it.  The state does get to

9    come up again and respond to some of the things, or

10   some of the issue I raised at this point.  So I would

11   ask you in fairness when you get back there and start

12   deliberating, to please think about some of the things

13   that I may say in response to some of the issues that

14   the state raises when they have their final closing and

15   I can't get up and say a word.  So, I would ask you to

16   do that.  Excuse me one second, please.

17       I'm sure you all remember from the beginning of

18   the case, and you'll hear it again from the Judge at

19   the end of the case during the jury instructions, that

20   Brian is entitled to an absolute presumption of

21   innocence in connection with this case, and that

22   presumption remains with him throughout the trial, from

23   beginning until end, until the government or the state

24   is successful in removing that presumption by

25   presenting proof to you that rises to the level of

1   beyond and to the exclusion of every reasonable doubt.

2   It's a very heavy and very difficult burden indeed in

3   any criminal case and for good cause.

4       Do you recall during jury selection we talked

5   about the difference between a criminal case and a

6   civil case?  I think you were told that in a civil case

7   where money damages only are involved, you win that

8   kind of a case by what's called a preponderance of the

9   evidence and it's something like this where the scales

10  are tipped 51 percent, or 49 percent to the other side.

11  The scales are tipped just slightly and that is enough

12  to prevail in a civil case.

13      In a case such as this, in a criminal case where

14  we're talking about a man's life, and a man's liberty,

15  and a man's future, it is a whole different story when

16  we're talking about proof beyond and to the exclusion

17  of every reasonable doubt.  It looks something like

18  this:  The proof must be compelling and positive, and

19  while Judge Lott will give you the legal definition at

20  the close of the case of reasonable doubt, I've got

21  some observations of my own that I would like to just

22  address at this point.

23      A reasonable doubt in any criminal case can arise

24  either from the evidence, or from a lack of evidence,

25  or from a conflict in the evidence.  Most respectfully

```
 1        I would say to you all, that there is not only a
 2    reasonable doubt in this case, there are a hundred
 3    reasonable doubts in this case both medically and
 4    factually because of the background that you've heard
 5    about in the testimony, and because of the very obvious
 6    poor and substandard police work, and that includes the
 7    medical examiner's office, that we've heard about
 8    during the course of this trial.
 9        I would ask you to consider that in the aggregate
10    -- Strike that.  I would just tell you this, that not
11    only do our experts disagree with their experts,
12    talking about medically for now, but their experts that
13    they have put on in this case, disagree amongst each
14    other and in fact there is testimony, and I think it
15    was Dr. Hamilton who said it, that even within the
16    entire medical community there is disagreement as to
17    whether or not the theory, and I say theory as opposed
18    to science, the theory of shaken baby syndrome actually
19    exists.
20        Dr. Dickison, who is a board certified physician
21    in I think four different areas, testified that she was
22    one of the first physicians to examine Robbie; she
23    spent considerable time with him over the next few days
24    of Robbie's hospitalization.  I think she actually
25    spent more time with him than any of the other doctors.
```

1     We've already talked about the CAT scan that she

2     reviewed.  She was absolutely certain and clear that

3     there was evidence of an older or chronic injury to

4     Robbie's brain.  She had no doubt about it.  She

5     testified that, again, she found a small bruise over

6     one of Robbie's eyes, not on the back of his head.

7     That, again, I would say, is consistent with a child

8     getting wedged in at the end of a bed where the

9     footboard is metal.  It certainly corroborates what

10    Brian said about how he found Robbie, and so does the

11    fact that there were no other bruises found on Robbie's

12    body anywhere that one would expect to find if we had

13    violent shaking over a period of time.

14         Recall, if you will, that when the paramedics got

15    there, the testimony was that Robbie had no shirt on,

16    all he was wearing was a diaper.  So if a person were

17    holding a child tightly by the shoulders, or the arms,

18    or the torso, and shaking a child violently, you could

19    be sure we would either have bruises, or red marks, or

20    something.  And if it wasn't evident right then, those

21    marks would turn into black and blue marks over a

22    period of time, at least during the eight days that

23    Robbie was in the hospital.

24         What else does Dr. Dickison say?  I would remind

25    you that she was asked specifically during her

1    examination by the state, Did this baby die from

2    shaking?  And her answer was, not absolutely.  Her

3    answer was, not definitely.  What she said was,

4    probably.  That was her answer to that question, which

5    is a far cry from reasonable doubt, beyond a reasonable

6    doubt.

7        She also conceded that retinal bleeding, as we

8    have heard about in this case, could be caused by brain

9    swelling and, again, that brain swelling comes from

10   having a seizure.  And she indicated that she did not

11   believe that Robbie was breathing when EMT's got into

12   Brian's apartment.  She said that, in fact, the child

13   could have, in her opinion, a good Apgar score at birth

14   and still have a subdural hematoma that was

15   asymptomatic; in other words, it did not show itself

16   either then, or for a period of time thereafter.  No

17   signs at all.  That was her testimony that she felt was

18   possible.

19       She also said that she felt that the dura and the

20   brain stem should absolutely have been preserved,

21   especially in a case like this, following the autopsy.

22       Now compare her testimony with the testimony of

23   the other state's key witness, the medical examiner in

24   this jurisdiction, Dr. William Hamilton, who admits

25   that he has made a number of significant mistakes in

1    connection with this case, and who, as we speak, is in

2    the process of being sued, is in litigation for

3    misdiagnosis in what kind of a case?  In a brain injury

4    case.  He admitted to that from the witness stand.

5        So what does he tell us?  He says that there is no

6    evidence of a prior injury or a chronic subdural

7    hematoma in this child's brain that was observed by him

8    when he did the autopsy, none; despite the fact that we

9    have this other testimony from all these other doctors.

10       In addition, he tells us that, Whoops, I didn't

11   keep or preserve, or send off what I should have that

12   would have been conclusive and definitive as to whether

13   or not there was a chronic subdural hematoma, and that

14   dura was destroyed, or I think he said it was buried

15   with Robbie, and it was his assistant, not him, who was

16   the one who made the mistake and forgot to preserve it

17   and there was no, the buck stops here, with him.  It

18   wasn't his mistake.  It was his assistant's mistake.

19       Okay.  He says it was not there.  He says it was

20   destroyed by mistake.  In court, I think at a certain

21   point on cross-examination, he admitted that it was his

22   mistake.  And who is on the short end of that stick,

23   ladies and gentlemen?  I think the answer to that

24   question is self-evident.

25       Not only did he not save the dura, as he should

1    have, this valuable piece of evidence, but he knew full

2    well right from the start before he began to conduct

3    that autopsy, that the radiologists in this case, the

4    three radiologists, Dr. Quisling, Dr. Boughner, and

5    Dr. Agee, had sent him reports, which he said he read.

6    All three reports were consistent that all three

7    radiologists found chronic subdural hematoma on this

8    child's brain, an older injury.

9        So he knew about it going in and not only did he

10    forget to preserve the dura, but he neglected to

11    include in his four page autopsy report, in that single

12    2-inch long paragraph that I referred to when I

13    cross-examined him, and that was the only part of the

14    report that dealt with Robbie's brain, he didn't

15    include in that paragraph about his findings; that

16    although the radiologists say that they all are in

17    agreement that this child had a chronic subdural

18    hematoma, I found none.  And his response to my

19    question as to why you didn't include that, if you

20    recall, was something along the lines of, I didn't want

21    to waste space in the report.

22        Okay.  What else about his autopsy?  Remember that

23    Dr. Nelson, who is the pathologist from another area, I

24    think Polk County, who the brain -- he's a

25    neuropathologist -- who the brain was sent off to for

1    him to examine, he said that in order for him to do a

2    better and much more complete and thorough examination,

3    especially in a case like this, he would have liked to

4    have had Dr. Hamilton send to him the pituitary gland,

5    the dura matter, of course, the pineal gland, and a

6    portion of the upper spinal cord so that he could

7    examine these areas and make a determination, a fully

8    informed decision as to whether or not we have what the

9    state is alleging we have here.  And he got none of

10   this.  And therefore his ability to conduct a thorough

11   examination was limited in that regard specifically by

12   Dr. Hamilton's screw up.  There's no other way we can

13   describe it.

14        Now during Dr. Hamilton's testimony, all of you

15   were shown a photograph of Robbie as he appeared after

16   he passed away.  We all saw the reaction when you

17   looked at that photograph and it was understandable.  I

18   remind you, however, that you all promised during jury

19   selection that you would promise to keep emotion and

20   certainly sadness out of this case.  All of us agree, I

21   mean, there's no question that this was a horrible and

22   unfortunate tragedy, but I will tell you that you will

23   not hear the Judge instruct you to allow this sadness

24   to in any way lower or reduce the level of proof that

25   you must demand from the state in any criminal case,

1    specifically in a case like this where we're all sad as

2    to what happened.

3        You all agreed during jury selection that you

4    would not permit your emotion to get in the way here of

5    evaluating the evidence and the testimony.  That

6    includes from the lay-witnesses, Crystal, and her

7    situation, and the medical witnesses, all the doctors

8    that have had various things to tell you, and the

9    police officers and the things that they have said.

10   But in the final analysis, what we have here and what

11   we're talking about is a young child whose life was cut

12   way too short.

13       I also remind you that Dr. Hamilton did concede

14   during his examination that the entire medical

15   community is still debating whether or not the theory

16   of shaken baby syndrome is valid and actually exists.

17       All right.  Let's talk about Dr. Bernard Maria,

18   another of the state's witnesses.  Some of the things

19   he said were as follows:  He said, at one point he was

20   fairly certain that the child's injuries were caused by

21   shaking.  This is his testimony on direct-examination.

22   When the state got back to him or when he was asked

23   that again, he decided to bolster or shore up that

24   original statement, and he then said that he was as

25   sure as any case he had previously seen, and he went

1    from fairly certain to he was as sure as any case he

2    had ever seen.

3         He states that he saw both chronic and subdural

4    bleeding on CAT scan.  He agreed that when you have

5    subdural bleeding, you can also have subarachnoid

6    bleeding as well.  He could not point to any scientific

7    studies that confirmed, confirms that SBS or shaken

8    baby syndrome actually exists and is a valid theory.

9         He agreed that blood on the brain can cause

10   seizures, and he agreed that a seizure can cause a baby

11   to stop breathing, and that's exactly what we have here

12   in this case.  In other words, he agrees with the

13   plausibility of the defense's position in this case

14   that we had a chronic subdural hematoma in place, a

15   chronic subdural hematoma that virtually all of the

16   experts agree can spontaneously re-bleed, or re-bleed

17   just with the slightest bit of movement, and that

18   re-bleeding can cause a seizure, and the seizure can

19   cause vomiting, the vomiting can cause the baby to not

20   be able to catch it's breath, and we could have this

21   very same kind of situation that we had here back on

22   August 2nd, 2000 with Robbie Quirello.

23        He said that vomiting and aspirating can cause a

24   seizure and that being without oxygen for three to four

25   minutes could cause brain damage.  He also testified

1          that a patient may not immediately show signs or

2          symptoms of a subdural hematoma, and as I said, a

3          subdural hematoma can spontaneously re-bleed.  He also

4          said that a baby's neck is weaker than an adult's neck.

5          Again, specifically agreeing with both Dr. Plunkett and

6          Dr. Uscinski on that.

7               Dr. Lawrence Levine, their witness, the

8          ophthalmologist.  What can I say about him?  You will

9          recall that he claims to have made some observations in

10         Robbie's eyes, one of which was a crack in the eye that

11         he says he looked at through a special scope, and then

12         he had some photographs taken and found this crack in

13         the eye from the photographs.  He agreed that he did

14         not make a notation of this so-called crack in the eye,

15         which he says could only have come from violent shaking

16         in his report, nor was he forthcoming about that in his

17         deposition and told neither Ms. Singer or John Tedder

18         about it in the deposition.  In other words, the first

19         time anybody ever heard about this crack in the eye

20         that could have only come from shaking, was right there

21         on the witness stand when he testified.

22               And then this morning you heard the testimony of

23         another state witness, a forensic pathologist whose

24         been licensed in Florida for ten, 15 years, who is a

25         medical examiner down in south Florida, has a similar

1    job to Dr. Hamilton, and it was to him that the eyes

2    were sent for an examination.  He told you that he made

3    a gross examination, which means a visual examination

4    of the eyes, and also did a microscopic examination and

5    found no evidence whatsoever of a crack in the eye,

6    specifically refuting that doctor, who for some reason

7    left that out of his report and didn't tell anybody

8    about it until two years later when he came to testify

9    before you in this courtroom.

10          All right.  Let's talk for a moment about John

11   Plunkett, our doctor who we had to take out of turn.

12   We took both of our doctors out of turn not because

13   there was no proof that they were flying around the

14   country testifying in other cases.  Dr. Uscinski, in

15   fact, who is the brain surgeon, told you that he

16   doesn't do -- he rarely does this.  He actually turned

17   us down when we first contacted him about helping us

18   with this case, and it was only through the

19   intervention of Brian Herlihy's family that he got

20   involved in this case; that he is a brain surgeon, that

21   he does brain surgeries every week.  That is his job,

22   he's self-employed, and he was away from his practice,

23   and away from his patients, and had to fly back to go

24   back to his patients and his medical practice.  He

25   wasn't flying around the country testifying in other

1       cases like this.

2           Back to John Plunkett -- we will talk about

3       Dr. Uscinski a little later -- he's a board certified

4       pathologist.  He's been conducting autopsies for about

5       35 years.  He has told us that he is the head of the

6       coroner's office in his jurisdiction, has been so for

7       about 20 or so years, and that he has actually

8       testified as a state witness for the prosecution in

9       over 300 cases.

10          He is a man of science.  He was not paid anything

11      extra to be here, was actually not getting paid to be

12      here.  He came here because he believes in the case.

13      He came here to testify and indicated that insofar as

14      getting paid, all he gets is time off; in other words,

15      comp time, and the hospital is actually reimbursed by

16      the defense for his time.

17          He gave his opinion to you as to his belief as to

18      the cause of Robbie's death.  He told you about the

19      chronic subdural hematoma that Robbie had for an

20      unknown period of time and we don't know what the cause

21      is.  He believes that something caused this chronic

22      hematoma to re-bleed, some event, however slight, or it

23      could have started to re-bleed spontaneously for no

24      reason at all, as all of the doctors have said.  Even

25      Dr. Hellrung, the pediatrician, admitted that a chronic

1    subdural hematoma in a child's brain can spontaneously

2    re-bleed.

3        He says that he doesn't know if the seizure caused

4    Robbie to become trapped or wedged in the bed; in other

5    words, that Robbie seized himself into that crevice, or

6    if he rolled into that crevice and that caused the

7    seizure to occur.  He cannot give you a definitive

8    answer on that.  But he does say under oath that in the

9    event that the seizure led to a lack of breathing, thus

10   anoxia to the brain; in other words, anoxia is when the

11   brain is without oxygen, and that caused the whole

12   series of events that ultimately led to Robbie's

13   passing away some eight days later on August the 10th,

14   2000.

15       He said that he looked at the -- Just remember

16   this, if you will, no one, not even -- I don't think

17   any of the state witnesses actually looked at the

18   autopsy photos and told you what they saw.  It

19   certainly wasn't pleasant to see.  But our doctors,

20   both Dr. Plunkett and Dr. Uscinski, were able to look

21   at the autopsy photographs and point to a particular

22   area where the dura was, and tell you right there, that

23   is the chronic subdural hematoma.  We haven't heard a

24   single witness from the state called in rebuttal from

25   the 500 doctors or so they have at the hospital over

 1      there, or any of the radiologists who have already made

 2      a finding in their CAT scans, to refute that testimony

 3      when those two doctors specifically looked at the

 4      photographs and made that identification.

 5          In short, what I'm saying to you, it's there, it's

 6      proven that it's there.  There are state witnesses and

 7      defense witnesses that agree it's there and there's

 8      nothing in this record by the way of testimony of other

 9      witnesses to contradict that testimony that the chronic

10      subdural is there, except for William Hamilton, who

11      says, Whoops, I forgot to send the dura.  And by the

12      way, there wasn't a chronic subdural there anyhow.

13          What else does Dr. Plunkett tell us?  He tells us

14      that he would have -- that as to looking at the

15      photographs, he would have much preferred if the dura

16      were preserved so that he could look at the dura, but

17      he feels comfortable making the identification based

18      upon both the photographs and the CAT scan findings.

19      He says, and I think I've touched on this before, that

20      even if the state's theory is correct; in other words,

21      even if you believe for a moment that Brian Herlihy

22      said something about plopping the baby on the bed and

23      his head went back and forth, Dr. Plunkett says that

24      would not have caused the injury that we see in this

25      child.

1        He told you that chronic subdural hematomas of the

2   kind that we are talking about in this case, are most

3   common in either infants or in older people, and he

4   actually told you a story about that.  He told you

5   about President Ronald Reagan, who had a chronic

6   subdural hematoma, and it was -- I think it was for

7   some five months that he actually had this in his

8   brain, was totally asymptomatic, and then something

9   flared up.  I think he had an injury falling off a

10  horse.  Five months go by and no symptoms at all and

11  then something happens.  I don't think he went into

12  detail about what actually happened, but he did tell

13  you or give you that example that a chronic subdural

14  hematoma can indeed remain asymptomatic; in other

15  words, proof that these things do happen.

16        Dr. Plunkett also told you that a difficult

17  childbirth, such as what Robbie had in this case, could

18  cause a subdural hematoma at birth, and if the child

19  suffered no symptoms thereafter, it would actually go

20  undetected for a period of time.

21        Dr. Plunkett also told you that a lack of oxygen

22  for ten minutes or 15 minutes, or whatever we have

23  here, would absolutely not cause other organs in the

24  body to be injured, not only did Dr. Plunkett say that,

25  but I believe Dr. Uscinski said that as well and they

both gave you the same example that that's why we

have -- well, otherwise we would have no organ donors.

Part of the state's theory is that if Robbie was

deprived of oxygen for a period of time, a couple of

minutes, that his kidneys, and his liver, and his lungs

and all of that would start to fail.  Both of those

board certified experts in their respective fields have

told you that that is not true, that they do not agree

with that, and they gave you a very valid reason why,

something that we can all identify with.

He states that this is a child who dies not

because of a chronic subdural hematoma, but this is a

child who dies with a chronic subdural hematoma that

has, for whatever reason, re-bled, causing a seizure,

causing an inability to breathe, and thereby depriving

the baby's brain of oxygen, and we have the result that

we have here.

I said this already, but he stated that plopping

Robbie on the bed could not have caused the

deceleration necessary to cause an original subdural

hematoma.  And he did indicate that, you know, if we're

talking about a hard surface like a floor like this or

a wall, that would be a different story.  He said to

you that based upon his years of experience doing

thousands upon thousands of autopsies, in a case like

1   this, he would like to see the brain stem to see if

2   there were bleeding in the brain stem, and in this

3   case, although he didn't see it, and I don't think

4   anybody did, but there was a report that there was no

5   bleeding in the brain stem and he thinks that that is

6   absolutely consistent with a child not being shaken.

7       All right.  We're gonna talk about Dr. Uscinski a

8   little later on.  Let me just talk about Dr. Nelson for

9   a few minutes.  I've touched on this already, that as

10  we've said he wanted to see the dura, the pituitary

11  gland, the pineal gland, and a portion of the upper

12  spine.  He stated that he did look at the -- did look

13  at the brain stem, found no injury, which is consistent

14  with no shaking.  He found no injury to the brain stem.

15  And again, that's what both Dr. Uscinski and

16  Dr. Plunkett said that they would expect to find if the

17  state's theory in this case is correct.

18      He stated -- Let's talk about this, the cortical

19  contusion.  He stated that, as to, and we're talking

20  about an injury or a bruise to the brain itself, he

21  agreed that he saw no cerebral cortical contusions on

22  the gross examination of Robbie's brain.  What that

23  means is, he's looking at the brain, he's examining it,

24  and he sees nothing on the outside, no marks at all.

25      He does, however, say that he saw something on the

1    microscopic examination that he thinks is evidence of a

2    cerebral cortical contusion. Dr. Uscinski said, our

3    brain surgeon, that if there were a bruise on the

4    exterior of the brain, you would have been able to see

5    it on the gross examination. So there's some

6    inconsistency there.

7        Dr. Nelson was asked a question by Mr. Tedder, and

8    that question was, why, if we're talking about violent

9    shaking, would a child's neck not be injured or broken

10    during the process of shaking? And if you remember

11    Dr. Nelson's response, it was, to be intellectually

12    honest, I don't know why that would not happen.

13        Now, one thing I must tell you here, is that Judge

14    Lott is going to tell you, as was indicated by the

15    state, that when you come in to sit as a juror in a

16    case, you don't leave your common sense out on the

17    street. She's not gonna say it exactly that way, but

18    that's going to be the gist of it.

19        Going back for a moment to Dr. Hamilton's not

20    preserving the dura, then saying it's not there, and

21    then forgetting to even include that in his report,

22    what I would ask each of you to think about is what

23    does your good 'ol everyday common sense tell you about

24    this mistake to the detriment of my client that was

25    made by Dr. Hamilton? Do we have some type of cover up

1    or diabolical conspiracy here?  I think not.  And I

2    don't think anybody is suggesting that.  Did he make a

3    very significant and unforgivable mistake in a case

4    like this?  And then forget to even look for the

5    chronic subdural hematoma in the first place?  Not

6    cause the dura to be preserved and then just not

7    address it in his report because he made this blunder?

8    I think that's probably the case, and I believe that

9    all of you feel that way as well.  I don't think he did

10    anything intentional here, we're not saying that.  All

11    we're saying is that he made a mistake.  It was a major

12    mistake in a case like this.  That major mistake works

13    to the detriment of only Brian Herlihy and nobody else.

14         Okay.  Judge Lott is gonna instruct you on the

15    theory of reasonable doubt and the application of that

16    law, reasonable doubt, to the facts of this case.  In

17    that regard, her Honor, Judge Lott, is gonna tell you

18    specifically that, as we've touched on before, a

19    defendant in any criminal case must be presumed or

20    believed by you to be innocent throughout the case, and

21    this presumption stays with any accused person until

22    each and every allegation in the charge throughout the

23    whole trial, until and unless it has been overcome by

24    the evidence to the exclusion of every reasonable

25    doubt.

1   State has the only burden.  I think you already

2   know that by now, in any criminal case.  The defendant

3   has no burden to present testimony or call witnesses or

4   prove anything.

5   The judge will tell you that the reasonable doubt

6   is not a mere possible doubt, a speculative, imaginary

7   or forced doubt.  Such a doubt must not influence you

8   to return a verdict of not guilty if you have an

9   abiding conviction of guilt.

10   If on the other hand, after carefully considering,

11   comparing and weighing all of the evidence in the case,

12   there is not an abiding conviction of guilt, or if

13   having a conviction, it is one which is not stable, but

14   one which waivers and vacillates, then the charge is

15   not proven beyond and to the exclusion of every

16   reasonable doubt and the defendant must be found not

17   guilty because the doubt is reasonable.

18   It is to the evidence introduced at this trial and

19   to it alone that you are to look for that proof.  A

20   reasonable doubt, as we said, arises from the evidence,

21   from a lack of evidence, or from a conflict in the

22   evidence.  If you have a reasonable doubt, you should

23   find the defendant not guilty.  If you have no

24   reasonable doubt, the judge will tell you you should

25   find the defendant guilty.

1              I'll tell you that from my perspective, even if
2       you have a strong feeling in your gut that Brian
3       Herlihy might have done something wrong here, and he
4       did not, but if you have that feeling and it's not
5       based upon an abiding conviction of guilt after you
6       weigh and analyze all of the testimony in this case
7       from the police officers, the civilian witnesses, and
8       the medical people, then in such a situation the scales
9       have not been tipped the way they must be, the case has
10      not been proven beyond and to the exclusion of a
11      reasonable doubt, and you must find Brian Herlihy not
12      guilty.
13              I want to stress to you that the case is not
14      about, and this was touched on during jury selection,
15      who calls the most witnesses, or how many doctors one
16      side calls, or how many doctors the other side calls.
17      The issue is simply whether or not the state has proven
18      it's case beyond a reasonable doubt.
19              I remind you that for you to convict in this case,
20      you must totally reject and disregard the testimony of
21      both Dr. Ronald Uscinski, a board certified brain
22      surgeon, who has conducted some 1,000 brain surgeries
23      during his career, including a number of brain
24      surgeries on children; and you must totally reject the
25      testimony of board certified Dr. John Plunkett, a

1   forensic pathologist, who has done thousands and

2   thousands of autopsies, including autopsies on the

3   brains of children.

4       I also remind you here that during jury selection

5   you all agreed that you would not discount a witness'

6   testimony because he has been paid a fee to appear and

7   testify.  And again, that same thing applies to both

8   sides in this case.  Surely you recall that Dr. Bernard

9   Maria testified that for that day only that he was here

10  and away from his professorship at the University of

11  Missouri, that that day alone he was paid $5,000, and

12  you can be sure he was paid more money than that for

13  his involvement in this case at a previous point in

14  time.

15      Witnesses on both sides, physicians who generate

16  those kind of fees, are paid a lot of money to be away

17  from their job and away from their medical practice,

18  and I don't think that has any basis being considered

19  by you in this case since it kind of equals out.

20      As I pointed out before, John Plunkett, our

21  forensic pathologist, was not paid anything basically,

22  except time off to come here and testify in this case.

23      All right.  Let's go for a moment to talk about

24  some of the factual matters that we've heard about and,

25  specifically, Brian and his relationship with Robbie.

1    First of all, we know from what Crystal has told

2    us, that Brian was good with the baby.  According to

3    what she told us, he fed the baby, he bought the baby

4    things, he played with him even more than to some

5    extent his father did, he changed his diapers, and was

6    just in general a pretty good substitute father for the

7    time being while she was away from her husband.  I

8    think there's testimony that Brian even had a picture

9    of the baby on the refrigerator.

10    Remember, if you would, that Crystal testified

11    that on one occasion she actually lied to Brian,

12    surprise, surprise, and said that Robbie was actually

13    spending time with her brother in Silver Springs, and

14    she said that was not the case.  When I asked her why

15    she did that, she said that Brian always wanted to

16    spend all of his time with Robbie.  Think about it.

17    Does that sound like somebody who would be either

18    motivated to hurt a child, or inclined to hurt a child,

19    or would want to hurt a child?  He wanted to spend as

20    much time as he could with the baby.  That certainly

21    doesn't sound like somebody who didn't enjoy being

22    around Robbie, didn't like the baby.  Doesn't sound

23    like somebody who gets annoyed with the baby, or gets

24    angry with the baby.

25    Don't you think -- excuse me -- that there would

1    have been some hint, some suggestion, some incident,

2    even a minor incident, something, something said to

3    somebody, some person seeing something that just didn't

4    look right, some clue, a warning, some gesture,

5    something, anything at all that would tip somebody off

6    that Brian Herlihy was maybe either thinking about

7    hurting this child, or punishing this child, or

8    shouldn't be trusted with this child, or something.

9        The record is absolutely devoid of anything along

10   those lines from the testimony of the witnesses that

11   you've heard from.  And that, ladies and gentlemen,

12   just doesn't fit.  It just doesn't fit in.  When you

13   think about that in connection with the other things in

14   the case like the medical testimony, it even becomes

15   more of an indication of the kind of reasonable doubt

16   that we have in this case.

17       She testified, Crystal did, that Brian never got

18   angry with Robbie, never got frustrated with Robbie,

19   was never aggressive, or inappropriate, was certainly

20   never hurtful.  It was by all accounts a very short,

21   but loving relationship.  There's nothing in the record

22   to the contrary.

23       Remember, Brian himself, how he was behaving and

24   acting on August the 2nd when all of this was going on

25   and he probably didn't have a clue himself as to what

1    happened.

2         In the police testimony, he was crying, he was

3    very concerned about Robbie, he appeared to be

4    remorseful, he was very emotional, even Helen Legall

5    said that she thought it was sincere -- well, she

6    probably wishes now she hadn't said that, but she said

7    that right there from the witness stand.  No one was

8    accusing him and no one has accused him of faking it,

9    either faking it when he broke down in tears when he

10   went back to his apartment and the whole thing just

11   came back at him like a nightmare, remembering that

12   that child was hurt there that morning, right up to the

13   time when he was seen out there sitting on the curb

14   outside of the emergency room with nobody around.  He

15   wasn't putting on a show for anybody.  There wasn't any

16   police officer watching him at that point.  He was

17   sitting there by himself, alone, no cops, and what do

18   they say he was doing?  He was sobbing, he was crying,

19   he was very upset.

20        He was so upset that Officer Chris Jackson, who

21   had no clue as to what this case was about, felt he

22   better take this man inside, and he actually took him

23   into a pastor a chaplain inside the hospital.  Nobody

24   has even suggested, none of the police officers who saw

25   him or interacted with him that day, no one has

1   suggested that they thought he was faking it.  He was

2   hurt, he was upset, he was remorseful, he probably

3   thought he let Robbie down, and he was acting exactly

4   that way throughout the day.

5        Or stated another way, would you actually expect

6   someone who had just knowingly committed a criminal act

7   to act that way?  To outwardly like be blaming himself

8   knowing that a criminal investigation was going on?

9   Wouldn't you expect somebody to be acting to the

10  contrary, just kind of clamming up and just chilling,

11  excuse the expression?  I mean, acting like one is

12  blaming themself for a situation is not consistent with

13  a person who knowingly and intentionally commits a

14  criminal act.

15       All right.  Let's talk about Robbie for a moment.

16  A beautiful, wonderful baby by all accounts, no

17  question about it.  It's a sad situation, but I've got

18  a job to do and I've got to talk about this case.

19       What about Robbie's propensity or inclination to

20  cry and fuss?  How does that fit in or not fit in with

21  the state's theory in this case?  Consider, if you

22  will, the state's theory is the typical SBS case is a

23  situation where a baby is crying, a baby is fussing, a

24  baby is keeping somebody awake all night, a baby is

25  disturbing somebody on a continuing basis such that

1       they can't do whatever it is they're doing, and out of

2       frustration, or anger, or exasperation they grab the

3       baby and shake the baby violently and seriously injure

4       or kill the baby.  That's your typical scenario, I

5       would expect.

6            And again, certainly in such a situation you would

7       expect that the baby would have some kind of hand marks

8       on him, something.  I mean, you can't shake a baby

9       without holding on tight.  Just think about it.

10      Something -- he's -- Robbie's got no shirt.  The

11      paramedics are there within minutes.  There's no

12      indication that he has got even a red mark on his

13      chest, on his arms, on his shoulders, anywhere.

14      Absolutely nothing.

15           So what we've got here is a very well-behaved

16      little boy who doesn't cry, and according to his great

17      grandmother, such a tough little kid that he didn't

18      even cry the day after he got his shots.  He only cried

19      when he was hungry.  That's the testimony that's in the

20      record.  And the testimony is also in the record that

21      that morning he wasn't hungry.  He just got fed by

22      Crystal and I think there's testimony in the record

23      that right after that, Brian, before Crystal left to do

24      her errands, gave him a bottle.  So there's no

25      indication that he was crying or had a reason to cry.

1   Certainly it's in the record that earlier that

2 morning when Crystal took the baby and stopped by her

3 husband's job, the baby was fine, the baby was not

4 fussing, the baby was happy, the baby was healthy.

5   Crystal goes over to Brian's.  The baby is not

6 crying, the baby is happy, the baby is healthy.  They

7 go upstairs.  I guess they interact for awhile.

8 Crystal leaves.  The baby is fine, the baby has just

9 been fed, the baby is not crying.  She's gone for just

10 a matter of minutes, 20 minutes or so.  Where is the

11 constant crying?  Where is the time for the crying and

12 crying and crying?  It just isn't there.

13   In short, there's no proof or evidence or

14 testimony in the record that would indicate that Robbie

15 was fussing, or crying, or doing anything out of the

16 ordinary that morning other than just being himself,

17 little Robbie, with his chronic subdural hematoma in

18 his brain that no one, and I mean no one, knew about up

19 to that point.  Reasonable doubt?  You bet it is.

20   So what caused this all to occur?  I wish I could

21 answer that with 100 percent assurance.  Our experts,

22 both Dr. Uscinski and Dr. Plunkett, and their experts

23 are in very specific disagreement.  They are

24 diametrically opposed as to what happened.  That alone,

25 I would say, is reasonable doubt.  I mean, if the

1    medical experts that are involved in this case cannot

2    agree on what happened here, and if the medical experts

3    within the whole medical community, and I suppose that

4    means across the world, cannot agree, how can we expect

5    that you all as jurors can find specifically that this

6    is indeed a case of shaken baby syndrome?

7         Disregard it, all the facts, all of the facts

8    about the baby not crying that morning, all the facts

9    about Robbie not being a crier, all the facts about

10   that short period of time and not even talking about

11   Crystal Quirello and her testimony.  We haven't even

12   gotten to that yet.  We haven't even talked about the

13   police investigation.  Just the point at which we are

14   now, I suggest to you, that there is more than

15   sufficient reasonable doubt in this case for you to

16   acquit and find Brian Herlihy not guilty.

17        All right.  Let's talk about some of their

18   doctors.  Ms. Singer talked about Dr. Rohlwing.  He was

19   the first doctor that had any involvement in this case.

20   He conceded that he has minimal or no experience in

21   connection with the theory, again, the theory of shaken

22   baby syndrome.  That was his testimony.  He told us

23   that certainly a subdural hematoma can be caused at

24   birth, that they can re-bleed spontaneously.  He also

25   agreed, and this is important, that retinal bleeding

1    such as what we have here, can be caused by

2    intracranial pressure; in other words, the kind of

3    pressure that one would get on their brain following a

4    seizure.  He also agreed that bleeding on and around

5    the brain can cause the brain to swell, and that can,

6    as well, cause intracranial pressure.  That's about it

7    that I have for Dr. Rohlwing.  He didn't have a lot to

8    say.  He conceded on the stand that he had very very

9    limited knowledge as to the SBS theory.

10        The state then called the pediatrician, John

11   Hellrung, whose been around in town for years and

12   everybody probably knows him, including Ms. Singer and

13   myself.  He's a good doctor, a great pediatrician, but

14   he may be a little out of his field being involved in a

15   case like this.  He admitted that he has little, if

16   any, experience with regard to SBS.

17        He concluded initially anyhow on his

18   direct-examination, that he saw no evidence of a

19   chronic subdural hematoma, although he concedes that he

20   didn't look at a CAT scan, he didn't do an x-ray, he

21   didn't do an MRI.  He was basing it on behavior alone.

22   We all know at this point that chronic subdural

23   hematomas can absolutely be asymptomatic for an

24   extended period of time.  So the fact that Dr. Hellrung

25   bases his opinion on not seeing any evidence of

1    questionable behavior, which caused him to believe

2    there was no chronic subdural hematoma, was not quite

3    the correct way to look at it.

4        He went on to say that within reasonable medical

5    probability Robbie had no prior brain injury because he

6    saw no neurological signs of it, and he based his

7    opinion on that, the lack of neurological signs.   Then

8    on cross-examination he conceded to me, Well, I guess

9    there were some neurological deficits noted, and he

10   kind of backtracked a little and admitted that the

11   underdeveloped neck muscles could be a sign to him that

12   there were some neurological problems with Robbie, even

13   though they were not so significant that people around

14   him would notice.

15       Dr. Hellrung stated that one in 85 childbirths

16   involve a broken collarbone, so it's not that common at

17   all.   He did admit that a baby can get a subdural

18   hematoma at birth.   He said, though, that he would

19   expect to see immediate symptoms.   I just don't think

20   he's right on about that, and I think that conflicts

21   with what a number of other doctors, including other

22   state witnesses, have said in this case, and especially

23   Dr. Uscinski and Dr. Plunkett to the affect that

24   subdural hematomas can be hidden and the manifestations

25   of which could not be seen to the casual observer.

1          He did state on cross-examination that chronic

2    subdural hematomas can cause seizures.  That's what

3    we're saying happened here.  This is their doctor,

4    Robbie's pediatrician.  He also says that just because

5    a person has a chronic subdural hematoma, they don't

6    necessarily have a seizure, which means it's another

7    way of saying that they can be asymptomatic for a

8    period of time.

9          He finally conceded on cross-examination that I

10    guess it is possible to have a chronic subdural

11    hematoma without exhibiting any signs.  He agreed that

12    a chronic subdural hematoma can re-bleed spontaneously

13    without any intervening event at all.  Just with the

14    baby in a stroller going down Oaks mall, it could

15    happen at anytime.  Spontaneously means just in and of

16    itself.  The membrane, remember the video?  That was

17    hard to look at.  That membrane is so thin, anything at

18    all can cause it to re-bleed, any slight event, or

19    nothing.  It's so thin, that membrane, that nothing can

20    be involved in that thing erupting and re-bleeding.

21    That's what they mean when they say can spontaneously

22    re-bleed.

23          Okay.  Now was there a birth injury in this case?

24    We certainly can't answer that definitively, but we

25    sure do have a lot of suspicious intervening events

1   here while she was carrying the baby, and a difficult

2   childbirth as well.

3       When he was born, Robbie was brow up with the

4   umbilical cord wrapped around his neck, although not

5   tightly.  He did have a broken collar bone and he was

6   four weeks premature.

7       Now the state called a doctor, but for some reason

8   they called Dr. Kreinest, who did attend to Crystal

9   while she was carrying Robbie.  But they didn't call

10  the doctor who performed the actual delivery.  I'm sure

11  you recall from Dr. Kreinest's testimony, he wasn't

12  there when the baby was born.  It was Dr. Stewart who

13  actually delivered Robbie in March of 2000.

14      We know about the car accident, all right.  And we

15  know that it was a significant enough impact, such that

16  her car was towed away, she rear ended some other

17  vehicle, that she was hospitalized, as I recall for

18  about a week, and this happened in January in 2000, and

19  this was during her sixth month of pregnancy.  This

20  impact was so severe, that when she went into the

21  hospital, you recall that she said this, that the

22  doctors actually thought that she was gonna deliver

23  Robbie at that point, some three months early.  That's

24  why she stayed in the hospital for about a week.

25      And she actually, I think -- I don't remember that

1    she said this, but I remember that John, her husband,

2    said this, that he thought that he remembered that she

3    actually went back in again to the hospital sometime

4    before Robbie was born on March 22nd of 2000 for the

5    same thing, she was having problems.  She indicated

6    that she had cramps, severe.  She wasn't quite so

7    forthcoming about it and I had to draw it out of her

8    and remind her of what she said in the deposition.  She

9    initially just said she had some little cramps.  But

10   what she testified to in the deposition was, she had

11   such severe cramps, unlike any that she had ever had at

12   any time during pregnancy, that she thought the baby

13   was hurt.  That was her testimony.

14        Could Robbie have been injured because of that

15   accident or because of the difficult delivery?  We

16   don't know.  But certainly it's not too far fetched to

17   think that that's what happened, and that that may have

18   contributed to causing the beginnings of a chronic

19   subdural hematoma, which evolved over his four months,

20   and then spontaneously re-bled when unfortunately Brian

21   Herlihy happened to be with him some four months later.

22        Do we, the defense, have to prove what happened

23   here in terms of the chronic subdural hematoma or

24   anything?  I think you know by this point that we have

25   no burden of proof.  We don't have to prove anything.

1      We don't even have to prove that there was a chronic

2      subdural hematoma.  Indeed we have.  I think that goes

3      without saying at this point based upon what's in the

4      record.  We don't have to prove how that chronic

5      subdural hematoma occurred, whether it was from the car

6      accident, or the childbirth, or from some other cause.

7          Remember what Dr. Dickison said to you just before

8      she got off the witness stand?  She felt that the

9      multiple generations of hematoma indicated to her a

10     series of earlier traumatic events, separate events

11     over a period of time.  In other words, she saw in the

12     CAT scans, this state witness, evidence of what looked

13     like to her several injuries on top of one another

14     evidenced in the CAT scan that were -- that occurred

15     over a period of time.  I asked her, Is there any way

16     to date it or tell how old it was, whether it went all

17     the way back to birth, or what?  She said, No, she

18     could not do that.  Might have been able to do that if

19     we had the dura preserved.  Think about that.

20         So we have no burden.  We don't have to prove a

21     thing in this case.  The whole burden is right over

22     here to your right and my left at that table.  They,

23     the State of Florida, the state attorney's office, the

24     government, the Gainesville Police Department have the

25     only burden of proof in this case, this criminal case,

1    just like in any other case whether it's a DUI case or

2    first degree murder case.  The burden rests and lies

3    solely with the state and it's squarely on their

4    shoulders, nowhere else.

5        It's a huge burden.  It's a huge burden for very

6    obvious reasons that I'm sure all of you at this point

7    anyhow recognize.  We're talking about a person's life,

8    we're talking about a person's liberty, we're talking

9    about not money damages.  That's why the burden is so

10   high.  That's why reasonable doubt is just one

11   micrometer under absolute certainty.  It's right up

12   here.  This is reasonable doubt right up here.

13       I submit to you that based upon the testimony of

14   Crystal Quirello, a number of things that happened with

15   the police department that we will address in a few

16   minutes, and the unrebutted testimony of our medical

17   witnesses in this case, there is a mountain of

18   reasonable doubt that exists in this case, which the

19   State of Florida cannot overcome.

20       Okay.  This is probably a good time as soon as I

21   have a sip to stop and talk about Brian Herlihy and the

22   fact that he has not testified in this case.

23       Now, I remind you that you were told by

24   Mr. Tedder, I'm trying to remember if it was during

25   jury selection or in his opening statement, but you

1    were told at the beginning of the case, I think it was

2    opening statement, that Brian Herlihy would testify and

3    take the stand in this case.

4         Now, first of all, opening statements, just like

5    closing statements, what we're doing now, is not

6    evidence.  The only evidence in this case that you are

7    to consider comes from right there, the witness stand,

8    and all of these things over here.  Maybe Ms. Singer's

9    gonna clue us all in when I sit down as to what this

10   mountain of evidence is all about over here.  But this

11   is the evidence in the case.  Opening statements and

12   closing statements are not evidence.  It's just kind of

13   a guide to you as to where we're going and where we've

14   been, and the judge will tell you that and instruct

15   you.

16        I will tell you this:  It is a lawyer's decision,

17   after consultation with his client, whether or not to

18   put a client on in any case, have him testify and be

19   subject to cross-examination.  Many many factors are

20   involved in that decision and, most importantly, we

21   look at whether or not we believe the state has put

22   forth sufficient proof and evidence in a particular

23   case, put evidence in the record in order for us to

24   meet the challenge presented and necessarily put our

25   client on the stand.

1     Our decision in this case is that they hadn't met

2     that threshold for us because of some of the things

3     we've already talked about, and some of the things that

4     we will talk about shortly, and we made a decision that

5     it was not necessary to put Brian Herlihy on the case,

6     on the stand in this case, which we believe is a clear

7     and convincing case of a lack of reasonable doubt on

8     the part of the State of Florida in their presentation.

9     So Mr. Herlihy, to answer your question that may

10    have been in your minds, he's decided to follow the

11    advice of counsel and exercise his constitutional right

12    not to testify.  Judge Lott will instruct you very

13    specifically when you hear the jury instructions that

14    you are not permitted to consider in any way, shape or

15    form during your deliberations the fact that

16    Mr. Herlihy has decided to exercise his constitutional

17    right not to testify.  The judge will remind you that

18    you are to base your decision in this case solely on

19    the evidence presented through testimony of witnesses

20    and other items of evidence that have been entered into

21    evidence by either side.

22    I remind all of you that during jury selection you

23    all promised both sides that you would follow the law

24    to the letter.  You also, and I do believe it was

25    discussed, promised that you would not hold it against

1    anybody, or any person, or any defendant who chose not

2    to testify.  You wouldn't say, Where's the other side

3    of the story?  You promised you wouldn't do that.

4    There's an instruction you cannot do that.  You

5    promised to follow the law and I would hope and expect

6    that each one of you will do that without exception.

7    Thank you.

8        Okay.  I also remind you that at the beginning of

9    this trial, Mr. Tedder told you during his opening

10   statements that the evidence and testimony in this case

11   would show you three things with regard to our side of

12   the case:  Number one, that Brian Herlihy was a loving

13   and responsible caretaker of Robbie Quirello.  There

14   isn't a thing in the record that points to the

15   contrary, and, in fact, everything that's in the record

16   shows that in fact that was the interrelationship

17   between Brian Herlihy and Robbie.

18       He told you that the evidence would show that

19   Robbie had a serious, pre-existing condition known as a

20   chronic subdural hematoma, which hematoma could

21   spontaneously re-bleed and thereafter cause a seizure,

22   which could lead to vomiting and then inability to

23   breathe, and loss of oxygen to the brain, serious

24   injury, and then death.  We showed you that.  That's in

25   the record and that's clear and that in most respects

1    is unrefuted.

2        We also told you that the third thing that we

3    would prove to you is that the State of Florida would

4    be unable to provide you with documented scientific

5    proof that the theory of shaken baby syndrome is

6    actually a valid theory, and has been proven by science

7    as opposed to theory.  And our position at this point,

8    ladies and gentlemen, is that we have proven each of

9    these things to you through our witnesses, through

10   cross-examination of their witnesses, and I think the

11   record shows that what we promised you we would put in

12   in the way of evidence, we did indeed.

13       Now let's talk about some of the other witnesses.

14   John Quirello, Robbie's father, he tells us that, and

15   we know this from Crystal, it was an unhappy marriage.

16   The police came out to their house a number of times.

17   It was a troubled relationship.  He told us a number of

18   things about Crystal that I feel certain we might not

19   have otherwise known about because she wasn't about to

20   admit to any of the things that he said about her

21   anger, her temper, her short fuse, and her propensity

22   for violence.  She wouldn't have told us about any of

23   that, count on it.

24       John told us that Crystal does get angry on

25   occasion.  She denies it.  John told us that Crystal

1    gets violent on occasion.  She denies it.  John told us

2    that she had gotten so angry on one occasion, that she

3    actually bit him and left marks.  She denies it.  John

4    tells us that Crystal attacked him with a knife.  She

5    denies it.  John told us that with that same knife she

6    threatened to kill herself.  She denies it.  John tells

7    us that one time in July, maybe two, she got so angry

8    she punched the wall, injured her hand, and had to go

9    to the emergency room.  She denies it.

10        But that last denial about what we just talked

11   about, about not going to the hospital, should, I

12   think, provide us some pretty good insight as to

13   exactly who is lying as between John and Crystal.

14   Because remember, if you will, I walked right up to

15   her -- Mr. Clerk, do you have those records?  And right

16   in her face, right up here, I had the hospital records,

17   two entries, I think one was July 25th.  I can't

18   remember the other one.  I want to say July 8th, in

19   July, when she went to the emergency room, her name on

20   the records.  One time it said she punched the wall and

21   I can't remember what it said for the other time.  And

22   I showed them to her and she looked at them, Not me,

23   didn't happen, no way, no how.  I think that one little

24   thing that moment will give you all some idea that it

25   is much more likely than not that every single thing

1    John Quirello told us about his ex-wife, Crystal, is

2    indeed accurate and true.

3         You'll be able to look at these when you get to

4    the jury room.  There it is, July 25th, no fracture or

5    dislocation is seen.  Got her name on here, Crystal

6    Quirello, her date of birth, right hand pain after

7    hitting wall.  Another one July 13th.  This time it

8    says she jammed her right hand in a car door.  Why is

9    it that I don't think that's accurate?  It doesn't

10   matter.  We've got two hospitalizations in July for her

11   injuring the same hand, both right hand, and she looks

12   at them, I'm sure she sees her date of birth, Not me,

13   no how, no way.  I think that will sum it up for

14   Crystal Quirello.

15        It doesn't matter if she's under oath or not.  It

16   doesn't matter.  She lies to the police.  She tells you

17   that she did.  She lied to hospital personnel.  She's

18   lied to her husband and family.  It doesn't matter if

19   it's in a deposition that we've previously taken in

20   this case.  It doesn't matter if it's right here

21   sitting in this courtroom.  Even after the state

22   attorney asked her, Are you gonna tell the truth today?

23   She said she was.  She lied about that, too.  I don't

24   think we can believe anything, anything that Crystal

25   told us except for a couple of basic things like her

1    name and some other things that probably she hasn't

2    lied about.  But I think as far as substance and

3    important things that have happened in this case, when

4    she went back to his apartment, and why she went back

5    to the apartment, and when she got the onesie, and when

6    she gave the key to the police, and how many times she

7    was in there, and why she was in there in the first

8    place, and how Robbie got these other injuries, I don't

9    think her credibility was worth anything.  I think

10   she's demonstrated that clearly to all 14 of you.

11       Now what Ms. Singer's gonna get up and say, and

12   again, I can't respond, so some of the things she's

13   gonna say I'm gonna try and anticipate.  She's gonna

14   tell you Crystal Quirello is not on trial in this

15   courtroom.  Brian Herlihy is.  And while that is

16   factually correct, I still expect that we're gonna hear

17   that.  But certainly you will agree that Crystal's

18   overall credibility as the mother of Robbie is as much

19   on trial in this courtroom today as is anything else in

20   this case.

21       We don't need to be reminded about who's on trial

22   here.  We all know who is on trial in this courtroom.

23   Certainly when a witness takes the witness stand, his

24   or her credibility is subject to being looked at very

25   closely by the parties, and the sides, and by each of

1   you as jurors who have to decide what to believe, who

2   to believe, and how much to believe.

3        Now I want to stop here and go into some of the

4   police investigation.

5        Your Honor, may I ask the Court for a break?  I

6   think we're ready at an hour and a half.

7        THE COURT:  Yes.  We'll take a 15 minute recess,

8   ladies and gentlemen.  Step into the jury room.

9        MR. GROLAND:  Thank you.

10       (Recess taken.)

11       (Outside the presence of the jury.)

12       MR. GROLAND:  Your Honor, there is a matter --

13  Ms. Singer, can we approach?

14       MS. SINGER:  Yes.

15       (Sidebar conference:)

16       MR. GROLAND:  Judge, it's been reported to me that

17  Dr. Dickison is in the courtroom.  She's making facial

18  gestures during the testimony that the jury can see.  I

19  did not see it myself, but it was reported to me by two

20  members of my client's family.  I don't know exactly

21  what to do about it, but since the jury is out, maybe

22  we can have Dr. Dickison come up and the Court can just

23  tell her she need not do that.

24       MS. SINGER:  First of all, that assumes that it's

25  true and I don't know whether that's true or not; and

```
 1        secondly, I don't see what that has to do with
 2        anything.
 3               MR. GROLAND:  Well, she's a witness.
 4               THE COURT:  Let me say for the record that I'm in
 5        a position to see the jury and to see Dr. Dickison and,
 6        of course, I have not been watching any of them
 7        100 percent of the time, but I have seen no such
 8        responses from where the defendant's family is sitting.
 9        I don't know how they could see that or how they can be
10        concerned with that.  The jury might see that, but in
11        an abundance of caution, we will take steps to try to
12        ensure there is no question in that regard.  So any
13        reason not to ask Dr. Dickison to sit on that
14        right-hand side?  I'll ask the other state's witnesses
15        to sit --
16               MS. SINGER:  We'll ask.
17               THE COURT:  Do you have an objection to asking the
18        state to direct her to sit over there?
19               MR. GROLAND:  No problem at all.
20               THE COURT:  Anything else we need to address?
21               MR. GROLAND:  No.
22               (Sidebar conference concluded.)
23               THE COURT:  All right.
24               MS. SINGER:  Can we do that before anything
25        happens?
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1          THE COURT:  Yes.

2          Bring the jurors back in.

3          (Before the jury:)

4          THE COURT:  Go ahead, Mr. Groland.

5          MR. GROLAND:  Thank you.  May it please the Court?

6     Let's talk about the police witnesses that have

7     testified in this case.  First of all, the first police

8     witness that came in was Orlando Alvarez.  He is a

9     uniform police officer that was the first officer

10    dispatched to the apartment.  He did tell us that he

11    believed Brian told him that he went into the shower as

12    opposed to going in to take a shower.

13         Compare, if you will, that testimony with his

14    partner, Officer Robert King, the young black officer

15    who was in training at the time, who told us in court

16    and in his deposition that he was there at the same

17    time that Orlando Alvarez talked to Brian at the

18    hospital that morning, probably around 10 o'clock,

19    right after the baby was taken in, and he said that

20    what Brian said, as far as what he remembered, was that

21    Brian said he went in to take a shower, but used the

22    toilet instead.

23         Now I don't know if we're gonna make a big deal

24    out of the fact that there was no toilet paper in the

25    holder, and I don't know if it was used up at that

1    point, and I don't know if there's toilet paper in the

2    cabinet right next to the toilet.  I think if you look

3    at some of the pictures you'll actually see that the

4    little cabinet under the sink, next to the toilet, is

5    partially open when the police are there later taking

6    their photographs.

7         The point is that Officer Robert King confirms

8    that what Brian told Helen Legall later on at the

9    police station between 1 o'clock and 4 o'clock when she

10   took that untaped, un-Mirandized statement, that Brian

11   said to her, I went in to take a shower.  Didn't take a

12   shower.  Turned the water on, turned it off.  It was

13   cold.  Used the toilet instead.  We have Officer King

14   coming in here and testifying yesterday or the day

15   before, losing track here, very recently, I do know

16   that, and he said that they were both there talking

17   together and he heard Brian say, Went in to take a

18   shower, but he didn't actually take a shower.

19        Is that what this case has come down to, whether

20   the floor is wet or not?  In fact, they didn't even

21   check the floor.  I mean we're talking about something

22   that happened early in the morning and they didn't even

23   check the floor until later on in the afternoon when

24   the lab was there.  So we're talking, I don't know,

25   four hours, three hours.  He didn't say he turned the

1    shower on.  He told Detective Legall, according to her

2    testimony, he turned the faucet on.  We don't even have

3    any photographs of the tub.  If that was so much of an

4    issue that day when she was there taking her 50 or so

5    photographs, why don't we have a picture down there of

6    the floor, of the shower, or the drain?  She indicated

7    she didn't know if up was up, or down was down, or

8    which way it shut off.  She just observed it in a

9    certain position, and I don't remember which way she

10   saw it.  She didn't check it.  She didn't feel it.

11       Okay.  What else does Orlando Alvarez tell us?  He

12   says that he remembers that when Brian told him about

13   going into the bathroom, he said Brian told him he put

14   the baby face down on the bed.  I mean, think about it.

15   That remark is just hard to believe.

16       I asked Officer Alvarez, when you heard that

17   remark, I put the baby, this four month old infant face

18   down on the bed and went into the bathroom for five

19   minutes, I asked Officer Alvarez, knowing this is a

20   case involving a baby that's injured, did you follow-up

21   with a question to Brian and something like, You what?

22   You did what or did I get that right?  He said he asked

23   no follow-up questions.  He just heard that.

24       Do I think he is intentionally lying about this?

25   I actually do not.  I think that when he ever got

1    around to preparing his police report and remembering

2    that Brian said when he came out of the shower, the

3    baby was wedged in face down, he got that mixed up and

4    he heard face down when he wrote his report.  That's

5    what he wrote.  I don't think he intentionally lied or

6    intentionally misrepresented on that.  I just think he

7    made a mistake and he thinks that that's what he heard

8    when he heard it.

9        All right.  I was gonna talk at this point about

10   Detective, Sergeant Larry Seale.  Where's that doll?

11   And the doll.  We've already done this already.  So I

12   won't do it again, but you will have the doll, you will

13   have the bed, and you will have the space, and you will

14   be able to exert the tremendous amount of force

15   necessary to get this little doll in there and take it

16   out.

17       Remember I asked Lieutenant Halvosa about that

18   description of tremendous amount of force?  He said,

19   Well, maybe it wasn't tremendous, but he had to use a

20   lot of force.  Again, remember, the bed, per the

21   testimony, the mattress and the box spring are pushed

22   all the way up, which is how it is now.  This is the

23   space, even with the sham on here, that we're talking

24   about here.  It's still not clear from their so-called

25   demonstration where their video broke down, and their

1    lack of taking photographs, even though Tina Millard

2    had a couple cameras, she had a Polaroid and a

3    35-millimeter and didn't take any photographs of where

4    Brian was saying that he positioned the pillows.  It's

5    still not clear from the testimony even though the

6    couple of cops that were there, exactly what they were

7    talking about, how this -- how Brian showed them.

8        We've got an audio that only works for part of the

9    time because she's got the tape in backwards.  We've

10   got a video that doesn't work.  We've got no one

11   thinking to draw a diagram and take some measurements.

12   I mean, we're talking about this is a first degree

13   murder case.  We don't have any of that.  We've got

14   nothing.  What we really need is a photograph showing

15   where Brian Herlihy claims to the police that night

16   where the sham was, and the pillow was, and the baby

17   was.  Heck, they even had this there.  So they could

18   have photographed everything.

19       And remember, I asked Tina Millard, who came up

20   from south Florida, when she discovered this video

21   wasn't working, so that I could then lead into my other

22   questioning of her about why you didn't take some

23   photographs.  And she said she didn't know about it at

24   the time.  The camera was just rolling.  We had a

25   battery problem.  We took the battery out.  I reminded

1    her by pulling out the deposition that she gave about a

2    year ago, and I said, Do you remember this question and

3    this answer?  I don't have it right in front of me, but

4    the question was, When did you find out at the

5    demonstration that the video camera was malfunctioning?

6    The answer was, Immediately.  I didn't ask -- I don't

7    think I asked it that way.  I didn't say the

8    demonstration.  We were talking about the

9    demonstration.  I asked her when she found out the

10   video was malfunctioning.  She said, Immediately.

11        Then in court I asked her to explain how she could

12   have told me a year ago she knew immediately, and now

13   she's saying that she didn't know until the next day,

14   and her answer was that she thought I was talking about

15   another incident when at another time that camera

16   wasn't working.  That was her answer.

17        So getting back to what I was saying, we have

18   absolutely no documentation, no proof, no diagram, no

19   photograph, no rough sketch, no video, a partial tape

20   where Brian agreed -- Brian's at the police station for

21   three hours answering their questions and explaining to

22   them how this happened, and that it was an accident,

23   and obviously he was getting the very distinct

24   impression that there was disbelief on the other side.

25   In fact, it's no wonder that he thought that because

1      one of the police officers told him, You're a lying

2      piece of shit.  You heard that about what Coleman said.

3      So I would think that an exasperated Brian Herlihy

4      would say, Come on back and I'll show you, and that's

5      exactly what happened.

6          The only problem is, they didn't document it in

7      any way, shape, or form.  They come in here into this

8      courtroom, two years later, and try to explain to you

9      what he showed them and what they think they remember

10     he showed them without the benefit of some photographs

11     that were taken at the time, or a diagram, or

12     something.

13         All right.  What does Tina Millard tell us in

14     addition to what we've already covered?  She's there

15     for the first time at about 1 o'clock.  They're waiting

16     for Brian to sign the consent form.  She goes in there

17     and takes the 35-millimeter Polaroids.  She makes some

18     observations.  She collects no evidence.  She's

19     unaware, according to her testimony, that Crystal has

20     already been back to the apartment at some point and

21     has gone inside and done whatever it is she did, taken

22     whatever it is she took, rearranged whatever she

23     rearranged.  But remember, she told Legall, when they

24     finally got around to talking on August the 9th, that

25     when she went back, it looked different.

1       So she's there at 1 o'clock to 1:30.  She's taken

2   photographs.  I asked her the question, when she got

3   these photographs with the pillow and the sham in a

4   certain location, I guess the way it is in the

5   photograph, something like this, they're saying, you

6   know, that the baby had to roll uphill, because that's

7   how it is in the photographs; I asked Tina Millard, Do

8   you know who put those pillows in that place?  She

9   said, no, she did not.  She didn't know when they were

10  put there, or who put them there.  And remember, we had

11  paramedic Meredith who was asked by me the question:

12  When you left the apartment, were there any pillows on

13  the bed?  No.  They were already taken off.

14      So the paramedics leave, Crystal and Brian leave

15  right after them.  The apartment is empty.  Crystal

16  comes back at some point.  Tina Millard is there at

17  1 o'clock and left these pillows there.  She doesn't

18  know how they got there, when they got there, or who

19  put them there.

20      That apartment at that point in time should have

21  been sealed, secured, and preserved because, just like

22  Helen Legall told us, she was now initiating a criminal

23  investigation, even though -- we'll get into that

24  soon -- Brian Herlihy wasn't a suspect, wasn't her

25  focus, didn't leave this apartment unattended,

1   unsecured, anybody can go in and go out, no tape, you

2   know, that yellow tape we see at crime scenes, none of

3   that.

4       All right.  She does what she does at 1 o'clock.

5   Then she comes back at 3 o'clock and she takes those

6   eight Polaroids.  I haven't actually held the

7   35-millimeter up with the Polaroids, perhaps I should

8   have, to see if the pillows are in exactly the same

9   place.  But just by looking at them casually, it looks

10  to me like they are.

11      But she's back in there and she takes these eight

12  Polaroid shots of where the pillows are on the bed.  At

13  the same time, at 3:30, Lieutenant Halvosa is there.

14  You heard from him yesterday or the day before, and he

15  said when he came into the apartment with Tina Millard,

16  there's no pillows at the end of the bed.  Everything

17  is up at this end.  Not only does he testify to that,

18  he admits that he testified to that in his deposition,

19  and it is so noted that way in his report.  No pillows

20  at the end of the bed.

21      Nevertheless, Tina Mallard takes her Polaroid

22  shots and there they are again, down there positioned

23  in the same way.  Who positioned them?  I don't have a

24  clue.  I asked Halvosa, Did you see her positioning the

25  pillows and shams before you took the photographs?  He

1    said, No, I didn't.

2         One other thing:  Tina Millard also does a diagram

3    at 1 o'clock, a rough sketch, no measurements.  She's

4    got the bed.  She shows no pillows on the bed.

5    Consistent with what the paramedics said about when he

6    left, there were no pillows on the bed.  Who moved

7    these pillows around?  Who knows?

8         Okay.  They return at about 6 o'clock after she

9    takes these Polaroids, six or seven of them there.

10   There's Legall, there's Halvosa, there's Coleman,

11   there's Larry Seale, Tina Mallard, she had the rider

12   with her, there's Brian Herlihy.  That's maybe eight

13   people there.

14        Tina Mallard says in her testimony that everything

15   looks the same as when she was there at 3 o'clock.  The

16   pillows are in the same place.  Larry Seale and Halvosa

17   both say, Huh-uh.  These pillows were all over the bed

18   and Brian rearranged them at 6:30 for the

19   demonstration.  Figure that out.  Reasonable doubt.

20   Reasonable doubt.  This case is loaded with reasonable

21   doubt.  It's about right up to here now.

22        This whole thing about the pillows is very

23   confusing.  I think there are a number of suspicious

24   circumstances here about the pillows, and who put them

25   where and when.  There are inconsistent, contradictory

1    statements by the police officers.  Do police officers

2    lie?  You bet they do.  Do they exaggerate?  Tremendous

3    amount of force?  You bet they do.  It's a fact of

4    life, especially when they got somebody in their sights

5    and they want -- they think that's the person.  We got

6    him.

7         Tina Millard makes observations at the time, sees

8    some vomit or aspirant on the floor next to the bed,

9    which she doesn't collect for two weeks.  No, I take

10   that back.  She collects -- She did a swabbing that

11   day, but she doesn't cut out the floor until she comes

12   back on the 16th.

13        Clearly consistent with what Brian told Detective

14   Legall.  And the fact that there's, and I'll just

15   digress here for a minute, the fact that there's no

16   vomit down here, Brian didn't say the baby was vomiting

17   when he's stuck in there, when he found the baby stuck

18   in there.  He said, When I picked the baby up, the baby

19   started to vomit.  So it's no wonder that we don't have

20   any vomit on the sham, nor do we have any vomit on the

21   floor down here, or at this end of the quilt.  He

22   didn't say the baby was wedged in vomiting all over the

23   place.  He said when he picked the baby up, the baby

24   started to vomit.

25        Now I will tell you this:  The lab person who came

 1       in here didn't even testify that there was blood on

 2       that T-shirt.  Okay?  Not only did she not testify that

 3       it wasn't Robbie Quirello's blood, as represented to

 4       you by the state, she didn't even say there was blood

 5       on that.  The only place in that apartment that that

 6       lab person from upstate Florida, the only place in that

 7       apartment that she found blood, was right on the floor,

 8       she thinks, mixed in with the aspirant where Robbie

 9       threw up.  That is certainly consistent with having a

10       seizure and going through what he was going through.

11       No blood on the T-shirt, no blood on the pillow, just

12       not there.  It wasn't -- it was not testified to.

13            Excuse me, your Honor.  May I just --

14            The state says that the doctors have no interest

15       in this case.  I see that Dr. Dickison has joined us at

16       this point.  So obviously she has some interest in this

17       case.  And I think, as I look, I'm gonna go right back

18       to something.  Excuse me for jumping around a little

19       bit.

20            These are the questions and I kind of paraphrased

21       them before when I was talking about her testimony as

22       relates to how sure she was about the multiple

23       instances of older hematoma.  These are the questions

24       that were asked and her answers:

25            Dr. Dickison -- this is her testimony in court --

1    Do you agree that the evidence in the CAT scan of the

2    older injury to this child's brain was very definitive?

3         Her answer:  Yes.  She said that in fact --

4         I spilled the water, your Honor.  May I take just

5    a minute, get a towel or something, get something to

6    clean this up?

7         All right.  This question was asked of her and

8    this was her response:  And in fact the five people

9    that we are talking about looked together with you at

10   this CAT scan, and all agreed with your interpretation

11   that the evidence of the older injury was indeed

12   definitive?

13        She said, Correct.

14        And is it also true that your examination of the

15   CAT scans in this case led you to conclude that what we

16   have here are multiple traumatic events over a period

17   of time that injured this child's brain?

18        Correct.

19        And my last question to her was:  And in fact it's

20   also your opinion, is it not, that the evidence of

21   these multigenerational hematomas in Robbie's brain

22   means to you that what we have here are repeated

23   injuries, or repeated bleeds over a period of time?

24        Her answer was, Correct.

25        I don't believe this happened.  All right.  Sorry

1    for the digression there.

2         Back to the police.  Again, we don't know, and the

3    doctors have so indicated that we don't know if the

4    baby rolled into that position.  Remember, I asked

5    Helen Legall, did you ever ask Crystal a specific

6    question, was Robbie rolling over both ways at this

7    time?  She said, I don't recall asking her that.  Okay.

8    So we don't know if the baby rolled into that wedge,

9    that short distance, or seized himself, as the doctors

10    described it, into that position by having a seizure

11    and ending up wedged in that spot.

12         Okay.  And remember, according also to Detective

13    Legall's interview or interrogation, whatever you want

14    to call it, with Brian, she asked Brian that question,

15    could Robbie roll over both ways?  And he talked about

16    Robbie being able to roll over one way for a

17    considerable period of time, a month or so, and then he

18    had recently started rolling over the other way, and I

19    don't remember which way it was, front to back or how

20    that went.  But he did tell the detective that Robbie

21    in fact rolled over in both directions.

22         And I mentioned to you before when we were talking

23    about Dr. Hamilton and who is on the short end of the

24    stick there, the same thing applies with what we're

25    talking about right now with the lack of video, a lack

1    of photographs, the lack of a diagram, no measurements

2    here when Brian went back and showed them.  We've got

3    nothing at all preserved to document what he said

4    except the memory of some police officers two years

5    later, and we already know that they're inconsistent

6    and contradictory to one another in many respects.

7        All right.  So after all of this, and after Brian

8    goes back there and actually breaks down crying on two

9    occasions, when they first entered the apartment and in

10   the middle of the tape, and Detective Legall, when

11   she's on the stand, all she says about that is, Yes, he

12   asked us to stop the tape one time.  Well, I came back

13   on cross-examination and said, Why didn't you give the

14   jury the full answer, that he got very emotional, that

15   he was crying, that he couldn't even talk, and that's

16   why you had to stop the tape?

17       I mean, this is not a game.  This is not a

18   contest.  This is supposed to be a search for the

19   truth, so you all have all the information, so that you

20   can make a decision based upon all of the facts, not

21   just some of the facts, not just the fact that the

22   state thinks happen to look good to their side of the

23   case.  You want to know everything.  Why should I have

24   to pull that out of her?  There are a couple of other

25   examples of that same kind of stuff and we'll get into

1    that in a few minutes.

2        They're there three times that day.  They know how

3    critical Robbie is.  Detective Legall knows she's gonna

4    arrest him, if not that day, she knows she's gonna

5    arrest him the next day.  They don't even collect the

6    bed.  They don't collect the bedding.  I mean, not only

7    did they not document it the way I just described to

8    you, they don't take the bed.  They don't do any of

9    that proper police work.  They don't do anything along

10   those lines.  Who suffers?  Who's on the short end?

11   Right behind me.

12       Two weeks later, and who knows whose been in there

13   for that period of time?  Who knows?  Well, we know

14   Crystal's got a key.  We know she's been in there at

15   some point.  At this point I don't know if Crystal was

16   in there after the police were there on the 16th and

17   took the bed, although she said that's when it was

18   because the bed was gone.  I don't know if she was in

19   there between the 2nd and the 16th when the police took

20   the bed, and I don't know if she went in there just on

21   the 2nd when she left the hospital and the baby was in

22   critical condition in PICU, and went back and switched

23   cars so her husband wouldn't know what was going on,

24   and took the onesie at that time.  Because that's what

25   Helen thinks.  That's what she testified to.

1          Reasonable doubt, it's all over the place.  It is

2     all over this case, in every nook and cranny.

3          We don't know who put that shirt -- whose shirt it

4     was, when that wet shirt was put in there.  That

5     certainly does not have Robbie Quirello's blood on it.

6     We don't know when that got in there.  And surely

7     somebody was in there recently or it would have been --

8     Don't you remember the state asked the question, It was

9     damp?  No.  It was wet.  It wasn't damp.  It was wet.

10    Somebody was in there recently.

11         Millard told us that the apartment looked totally

12    different and you can look at the photographs that were

13    taken on the 16th and you can see for yourselves that

14    the apartment looks different.  Things are moved

15    around.  You'll just see for yourself there's just a

16    number of things that are different in there.

17         Helen Legall, my impression of this detective who

18    is recently in the homicide unit from the person's

19    crimes unit, is that once she's got Brian Herlihy in

20    her sights, nothing, nothing, even if it's smack right

21    in front of her, is gonna steer her off that course

22    toward what she is heading toward, and that is

23    arresting Brian Herlihy for hurting Robbie, even though

24    there is absolutely no background factually in terms of

25    how Brian and Robbie interacted with one another.

 1          There's just no basis for it.  The kid doesn't -- the

 2     baby doesn't cry.  Brian doesn't seem, according to

 3     witnesses' testimony, to have the inclination or the

 4     propensity to hurt a child.  There's no basis for it.

 5     We've got a child with a brain injury.  You were last

 6     there.  You're it.  And not only does she think that,

 7     she wrote that in her report.

 8          Do you remember I asked her this:  Isn't it true,

 9     Detective Legall, that in your report where you're

10     writing about what went on during the early afternoon

11     hours of August the 2nd, you have a notation in your

12     report that you've decided that since Brian Herlihy was

13     last with the baby, he must be responsible for those

14     injuries?  She already made that up in her mind.

15          And at the same time she comes in here two years

16     later and tells you with a straight face:  He wasn't a

17     suspect.  He wasn't my focus.  I was just on a fact

18     finding mission, and that's why I didn't advise him of

19     his right to remain silent.

20          She doesn't want to -- she doesn't want to know

21     anything to the contrary than Brian Herlihy shook this

22     baby and injured this baby.  And on the 9th -- Let me

23     just say this before I go to the 9th.  Dr. Dickison, I

24     just went over what she said about her observations on

25     the CAT scan.  Recall, if you will, that Dr. Dickison

1    that morning on August 2nd at the hospital, 12:30,

2    12:45, she had a meeting with about five or six

3    detectives, Orlando Alvarez was there, Legall was

4    there, Coleman was there, Halvosa was there, and she's

5    telling them about, Hey, we just got the CAT scan.  I

6    think it is a fair presumption, since she's testified

7    about how definitive this older injury was, I think

8    it's a reasonable conclusion that she mentioned that at

9    that meeting, and that Helen Legall knew that that very

10   day, that there was an older injury just like

11   Dr. Dickison did, and just like the radiologist did.

12       We know one thing for sure, if she didn't know it

13   on that day, she darn well knew it on August the 9th,

14   because at 9 o'clock that morning she got a call from

15   Crystal's dad up in Jacksonville, Trooper Richard

16   Davis, who told her, Hey, the doctors are telling me

17   that Robbie had older brain injuries.  What's up?

18       Fifteen minutes later after hearing that

19   information, she begins a two hour debriefing of

20   Crystal Quirello, the first time she talked to her.

21   She's never talked to her before about this case.

22   Brian Herlihy's already sitting in jail.  She knew that

23   Crystal had been telling conflicting stories and things

24   didn't match.  Focus, Brian Herlihy.  Tunnel vision,

25   Brian Herlihy.  Blinders on Brian Herlihy.

1    So she finally gets Crystal and they sit down for

2    two hours and they talk about whatever it is they talk

3    about.  And I asked her this question:  Did you tell

4    Crystal, the mother of Robbie, that you just got off

5    the phone with Richard Davis, Robbie's grandfather, and

6    you just heard that the doctors think it was an older

7    brain injury.  And remember what she said?  No, no,

8    didn't do it, because that's not my way of questioning

9    people.  I just don't do it that way.

10    I asked her:  Well, after you were through with

11    your questioning protocol, I didn't use that word, but

12    your method of questioning, did you wrap it all up

13    with, Hey, your dad just told me that the doctors are

14    telling him -- No, didn't mention it to Crystal.

15    Incredible.  Incredible.  Reasonable doubt all

16    over the place in this case.

17    That afternoon, that same afternoon, August the

18    9th, 2:15 p.m. she gets a call from Dr. Frank Agee, a

19    Shands radiologist, who examined the CAT scans, and

20    tells her the same thing.  We see multiple generations

21    of older brain injury.  She gets that information not

22    only from Robbie's grandfather, but from the

23    radiologist that was called upon that day to interpret

24    the CAT scans.  She hears it from both of them.

25    She does absolutely nothing with that.  She

doesn't talk to anyone about that.  She doesn't tell
anyone about that because I got my blinders on.  Brian
Herlihy's in jail.  I've made the call.  I've made the
decision.  He is it.  He did it.  I don't want to hear
about this other stuff.  It's contradictory to my first
impression of this case and it doesn't fit in.  I don't
want to know about it.

She doesn't even talk to other members of the
family.  Not only does she not talk to Crystal that
day, she doesn't go back and talk to John Quirello and
ask him about it, the prior injury.  She doesn't call
Richard Davis back up and talk to him about it.  She
also learns about the car accident during her six month
of carrying Robbie and finds out that she's been in the
hospital for a full week.  She finds out information
about the rough deliverly and she just lets that stuff
lie.  She doesn't call anyone.  She doesn't call upon
any person who knows more than she does, and we already
know what she knows about shaken baby syndrome.

She doesn't inquire of anybody to see whether or
not there was a remote possibility that this prior,
this chronic subdural hematoma that everybody agrees
was there, could have in any way impacted on what we've
got here.  The reason why she doesn't, is she's already
made the call, she's made the decision, Brian's in

2348

1    jail, case closed.

2         In fact, she did close out the case.  Don't you

3    remember I asked her about that notation in her file?

4    It's marked CLO for closed.  On September 7th, 2000,

5    three, four weeks later, case closed.

6         Does she even go back and talk to Dr. Bernie Maria

7    or Dr. Hellrung, the doctors she has already talked to

8    and say, Hey, what's up with this?  Now we talked

9    about, you know, your treatment of this doctor.  What's

10   up with I'm hearing that we got a prior brain injury?

11   We've got Dr. Dickison saying not only do we have a

12   prior brain injury, we might have a number of prior

13   brain injuries that were not significant enough to

14   cause Robbie to have a seizure, but they were certainly

15   there and clearly evident in the CAT scan, as noted by

16   the three radiologists and the other doctors who looked

17   at these CAT scans together with Dr. Dickison that

18   morning.  She doesn't do squat.  Brian Herlihy is

19   sitting in jail.

20        What else?  She sits in that chair and she tells

21   you, as I said, with a straight face, that the reason

22   she didn't advise him is he wasn't a suspect and he

23   wasn't the focus.  That's what she said on

24   direct-examination by Ms. Singer.  Okay.  He wasn't a

25   focus.

```
 1              Let's just quickly run through what was going on.
 2        They got him out there in the street with a police
 3        guard.  Robert King tells him he can't leave because
 4        he's instructed he can't leave.  They approach him, two
 5        detectives, Cannon and Legall.  He's sitting on the
 6        curb.  They asked him to -- Remember what she said
 7        about that?  She first slipped up and said, I told him
 8        we're going to the police department to talk.  And then
 9        she kind of backed away from that and said, Well, I
10        asked him if he would go down voluntarily.  She said
11        that.  I heard it and I know you heard it, too.
12              She asked him not only to accompany her and Cannon
13        to the police department, she asked him to sign a
14        consent form for a full and complete search of his
15        apartment.  If he was hiding something, would he have
16        signed that like that?  And they asked him for a
17        consent to search his car.  He signs off on that.  She
18        takes him down there and he's not a suspect, he's not
19        the focus.
20              And I'm going through all of this, let me tell you
21        why I'm going through all of this with you, because
22        pretty soon we're gonna get to what she claims Brian
23        Herlihy said to her on August the 3rd when she arrested
24        him with another cop right there with her, Detective
25        Weaver, who we've not heard from, and made these, what
```

1    she likes to call them, incriminating statements about

2    plopping the baby down, this and that, not tape

3    recorded, and we know she had a tape recorder.  We're

4    gonna get to that in a few minutes and we're gonna

5    explore that in more detail.  But I'm explaining to you

6    why we're going through this other detail because don't

7    you know, Helen Legall's credibility is at issue in

8    this case also, especially when she attributes to Brian

9    Herlihy certain statements that she claims he made as

10   she arrested him that were absolutely contradictory and

11   inconsistent with what he was saying the day before

12   about, I don't know what happened here.  I think this

13   is an accident.  It doesn't fit in.  And she didn't

14   tape it.

15        She had somebody sitting there with her, Mike

16   Weaver, from the moment he was arrested by Weaver, to

17   the time they went to the Gainesville Police

18   Department.  They're in a room together.  They go out

19   together, chat in the hallway, they talk some more,

20   they go to the police car, they run him off to the

21   jail, they have another conversation in the police car

22   where they supposedly pulled off the road, and then she

23   takes him into the jail and Weaver is there the whole

24   time, the whole time.

25        And the state's gonna get up and they're gonna

1    tell you -- I guess I'm gonna talk about this now.  The

2    state's gonna get up and they're gonna tell you, Well,

3    I could have called him.  Well, let me tell you

4    something, I don't call any police witness unless I

5    know what they're gonna say in trial in that chair in

6    that witness stand, and that's why I didn't call him.

7        On the other hand, the state knows exactly what a

8    police officer is gonna say before he comes to court.

9    They did not call -- not only didn't they tape it, they

10   didn't call the witness who was right there when Brian

11   is alleged to have made those incriminating statements.

12   That has to do with her credibility as a witness just

13   like any other witness in the case, and that's why

14   we're going through what she said to you about him not

15   being a suspect, and being on a fact finding mission,

16   and that's why she didn't advise him.

17       So he gets in the car with two police officers, in

18   a police car.  Everybody else was at the hospital, she

19   said, the father, and the mother of the child, and the

20   baby was sick and certainly we can understand that.

21   I'm not taking issue with that and I'm not saying that

22   Crystal should have been dragged down there, too.  But

23   she didn't get around to talking to Crystal until seven

24   days later, way after Brian Herlihy was already in the

25   can, in jail.  And she didn't talk to John Quirello

1        until the 15th of August, two weeks later.

2                Your Honor, can I get a drink of water?

3                I guess Detective Legall still has an interest in

4        the case because she's in the courtroom, too.

5                He's taken down to the -- And I say that because

6        the state is talking to you about people who don't have

7        an interest in the case.

8                Two detectives get in the police car, get him to

9        sign off on forms that say if you don't sign this,

10       we're gonna get a search warrant.  He lets the police

11       in his house, he goes down there.  They put him in what

12       I call an interrogation room, what they call an

13       interview room.  No windows, small table, two cops.

14       All you have to do is push a button and the video

15       camera and the audio come on.  Why didn't you do it?

16       Didn't think to do it.  I take notes.  Well, you take

17       notes, you only got half of it, right?  You only got

18       half of the dialogue.  You don't have any of your

19       questions in your report.  Well, that's true.

20               Isn't the more accurate way to preserve important

21       conversations in a case like this to tape the

22       conversations, either video or audiotape?  I guess it

23       is.  Why didn't you tape them when you arrested him on

24       August the 3rd and you and Weaver took him down to the

25       Gainesville Police Department?  Why didn't you tape

1    them then?  I didn't think of it.  I didn't think of

2    it.  Do you believe that for one second?

3         So he's at the Gainesville Police Department.

4    They're playing good guy, bad guy.  They're actually

5    playing good girl, bad guy when Coleman is the

6    aggressor in there and confronts him, gets right in his

7    face.  Other detectives are coming in and out, taking a

8    crack at him, and he's there and he's answering all the

9    questions and he admits, Yes, I did shake the baby, but

10   not to hurt the baby, to try to revive the baby.

11        Just think for one second what you would feel like

12   if -- what a person --

13        MS. SINGER:  I'm going --

14        MR. GROLAND:  That's a correct objection.

15        Consider what Brian Herlihy was feeling when he

16   didn't know what's happened here.  He didn't know

17   what's going on here.  All of a sudden the baby is limp

18   in his arms, the eyes are rolling back.  I mean to

19   shake a baby, I guess might be a natural response, but

20   he is clear that when he says that to Helen Legall, he

21   said, I shook the baby, I blew in his face, and I tried

22   to revive him, not to hurt him.

23        The interesting thing about that statement is,

24   both Detective Legall and Detective Seale when they

25   talked about, when they testified, about that statement

1    where Brian said he did shake the baby, they both said

2    he admitted to shaking the baby.  Neither one of them

3    offered to you, the jury, the full statement that I did

4    it in such a way as not to hurt the baby, only to

5    revive the baby.  I had to bring that out on

6    cross-examination so that you could hear it.

7         All right.  Not the focus, not a suspect.  There

8    at his apartment they take a bunch of photographs.  She

9    goes back at 3 o'clock, Tina Millard, and I'm sure

10   there's a lot of radio exchange back and forth between

11   a lot of the police who were involved in this case.

12   Some know what's going on, probably others don't.  But

13   Tina Millard goes back there and takes swabbings this

14   time from the carpet, takes Polaroid shots.

15        Then she decides she's going to advise him of his

16   rights.  She's finished talking to him.  The whole

17   conversation takes about two and a half hours.  So now

18   she takes out -- there's that tape recorder, it's right

19   there.  She takes out that tape recorder, presses the

20   button, and takes a taped statement from Brian for 20

21   minutes or so.  You know you'll have that statement

22   back there.  I think I'm right about the time.

23        Then she admits there's more conversation after

24   that, not on tape.  Why she didn't keep the tape

25   rolling, I do not know.  But at some point, Brian, and

1    I will suspect out of frustration says, Let's go back

2    to the apartment.  I'll show you.  So they all pile in

3    the cars, they go back there.  We've already discussed

4    what happened there, a fiasco to the absolute detriment

5    of my client, on trial for his very life in a first

6    degree murder case.

7        I started to say forget about the medical

8    examiner.  Don't forget about the medical examiner.

9    The medical examiner, and then the police at this

10   demonstration, and not doing anything at all to

11   follow-up on a very legitimate, established issue of a

12   prior, older brain injury?

13       Reasonable doubt throughout this case, every nook

14   and cranny, every situation.

15       You've got three things moving around here.  We've

16   got Crystal and her situation at home, and her

17   demeanor, her suspicious behavior, her many many lies

18   that didn't even stop two weeks ago.  We've got the

19   medical testimony where we've brought in for your

20   edification two very well-respected, well-credentialed

21   (sic) physicians, who have tons of experience in their

22   respective fields.  I mean, Uscinski is a brain

23   surgeon.  That was him up there on the screen going

24   into somebody's brain.

25       We've got the medical, and then we've got the

1   police work.  Any one of these three areas, any one of

2   these and then I guess you got Dr. Hamilton.  I guess

3   four areas.  Okay.  Any one of which is sufficient

4   reasonable doubt for you all to acquit in this case.

5   When you take it all together and look at the

6   aggregate, we got a mountain of reasonable doubt up to

7   here, and I'm not even finished yet, but I will be

8   soon.

9       Remember that I asked her during my

10  cross-examination why she didn't tape the additional

11  two and a half hour session.  She also said it's not

12  required, because she was only on a fact finding

13  mission.  That's just not acceptable.  That is

14  substandard police work.  It is not acceptable in any

15  case, let alone a first degree murder case.

16      She admitted that she has got no experience

17  whatsoever with regard to the theory of shaken baby

18  syndrome, none, zip, zero.  Never had a case, never

19  went to a seminar, never talked to any experts.  Read

20  some things on the Internet.  That was after she

21  arrested Brian Herlihy.  And she read some things on

22  the Internet and she claimed that she read some things

23  where it was written by proponents, who believed that

24  shaken baby syndrome existed, and other people who

25  said, Huh-uh, can't happen.  Laws of physics.  And she

1    claimed to have saved those and remembered that she had

2    promised to provide those to me and said, I forgot to

3    do that.

4        A case like this is supposed to be a search for

5    the truth.  That's what all these witnesses parading in

6    and out over the last two weeks, that's what it's all

7    been about, a search for the truth so that you all when

8    you go back and start your deliberations have got it

9    all.  Not some game being played out in the street or

10   on Florida field where we're strategizing and trying to

11   hide information, or shuffling things around, making

12   our case look better than it is just to get somebody

13   convicted.  It's supposed to be a search for the truth.

14       The reason for that is, so that you, the jury, can

15   make an intelligent, fully-informed decision as to two

16   things:  A, whether or not a crime was committed in

17   this case, and I submit that there was not; and, B,

18   whether Brian Herlihy committed the crime, if indeed

19   you find that a crime was committed.

20       Detective Legall testified on direct-examination

21   regarding the demonstration, that Brian told her when

22   she went into the apartment, that the pillows and the

23   shams were in the same place that he left them that

24   morning when they went to the hospital.  Well, I then

25   asked her on cross-examination because, you know, all

1    that stuff is on tape.  She taped it as a backup to the

2    video, or actually she taped most of it.  I think

3    there's about ten or 15 minutes that she didn't have it

4    on tape because her tape recorder wasn't working.  And

5    I asked her:  Detective, are you sure he said that?

6    And she thought a little bit and she said:  Well, maybe

7    he didn't say that exactly.  I said:  Isn't it a fact

8    that he just told you the room looked the same, that he

9    never mentioned the pillows, or the sham, or the bed?

10   She admitted that was true.

11       She misrepresented when she told you that he said

12   these pillows, how ever they were positioned down there

13   at the end of the bed, were in the same place.  That

14   was not true.  He did not say that.  What she told you

15   about that was just not true, and she finally admitted

16   that.

17       Okay.  No, I'm not done.  What about the search

18   warrant?  All right.  There are two things that

19   happened in this case in July that caused Helen Legall

20   to prepare a written affidavit; in other words, a

21   writing under oath.  One of those writings was an

22   affidavit in support of her request for an arrest

23   warrant on August 3rd to arrest Brian for aggravated

24   child abuse.  So she had to fill out a narrative

25   telling the judge about all the facts in the case.

1     The second document, just like that, was prepared

2     by her on August the 16th when she realized that she

3     forgot all of this evidence, you know, all of this, if

4     you call it evidence, this -- I don't know what this

5     stuff is over here.  I mean, I think of show and tell.

6     Show me everything, but tell me nothing.  What does

7     this tell us over here?  I mean, I know we don't have

8     any vomit on any of these things.  What is this?  What

9     does -- What is it?  What does that tell you?  It tells

10    you nothing.

11    She remembers on the 16th, holy cow, this is a

12    murder case.  Not only did I not secure that apartment

13    as a crime scene, but dog gone it, we left everything

14    in there that we need in this case.  So she gathers her

15    forces, and writes up a document, and enlists the help

16    of other people, and she prepares an affidavit in

17    support of her request for a search warrant, and takes

18    it to a judge; and just for your information, Judge

19    Lott was not involved in either of these situations,

20    takes it to a judge so that she can collect the

21    pillows, and the shams, and the little pillows, and the

22    bedding, and the sheets, and the bed itself, and

23    clothing, and baby clothing, and all of these, all of

24    these things that should have been collected on the 2nd

25    when they were there three times that day.  She didn't

1    think to collect it at anytime in a first -- well, at

2    that point it was not a first degree murder case.  I

3    take that back.  A case that she knew full well could

4    have been a homicide case because of Robbie's

5    condition.  She didn't collect it.

6        So what she does is, she prepares the paperwork,

7    and remember, at this point on the 16th she knows from

8    two sources that Robbie had extensive multigenerational

9    hematoma on his brain that indicated prior injuries

10   over a period of time predating August the 2nd.  All

11   right?

12       Here's the dialogue of my questions about that to

13   her in court about specifically informing that judge,

14   so that judge, who is in a position to decide whether

15   or not I can let the police go back in and do this; in

16   other words, whether there's probable cause here or

17   not -- I think I lost my train of thought.

18       So she is making application to the judge and

19   here's what I asked her:

20       Did you in either affidavit, and I was talking

21   about her request for a search warrant and her

22   affidavit for an arrest warrant on August 3rd, did you

23   in either affidavit make mention of a prior brain

24   injury to Robbie?

25       Answer:  No, I did not recall that I did.

1    Okay.  Do you need to review your mittimus before

2    giving me a final answer on that?

3    No, I do not.  I did not.

4    Question:  And again, as we discussed before, the

5    purpose of both an arrest mittimus, to get somebody

6    arrested, and an affidavit in support of a search

7    warrant, to search somebody's dwelling, is to give the

8    judge who's making the decision all of the information

9    that he or she needs to make a determination as to

10   whether or not it's appropriate to do what the judge is

11   asked to do; is that correct?

12   Answer:  That's correct.

13   And that includes good things about the case, and

14   bad things, too; isn't that correct?

15   That's correct.

16   That was her testimony in court.  Then she

17   absolutely did not do that in this case either when she

18   got the arrest warrant, or when she on the 16th got the

19   search warrant.  She did not to tell the judge that

20   there was evidence of a prior brain injury, that she

21   absolutely knew about.

22   I'll tell you something else:  When you go get a

23   search warrant from a judge, you don't talk to the

24   judge outside of the document.  The purpose of the

25   affidavit is, judge, here it is.  The affidavit goes to

1        the judge and it's signed under oath.  The judge reads

2        it.  Doesn't get into a dialogue.  That's not the way

3        it's done.  Then makes a determination based upon

4        what's on the four corners of that document and signs

5        off on it.

6            In this case she got the search warrant.  She left

7        out important information that the judge needed to

8        know, didn't know, and she basically misrepresented to

9        that judge not only on the 16th, but on the 3rd, if she

10       knew that information as I suspect she did on the 3rd

11       from her meeting at the hospital with Dr. Dickison

12       after Dr. Dickison read the CAT scans.

13           Her credibility is as much an issue in this case

14       as any other issue because she attributes some

15       statements to Brian Herlihy on the 3rd without any

16       supporting proof at all even though, A, the video

17       button was right there; B, there was another cop

18       sitting right next to her who could have come into this

19       court and testified, Well, here's what Brian said, and

20       he didn't.  And I don't know if he didn't want to go

21       along with the charade, or why he isn't in court, the

22       fact is he's not here.  And remember, I don't call a

23       witness unless I know what he's gonna say from that

24       witness stand.  They know.  I don't.

25           She made a decision not only from day one, ladies

1    and gentlemen, but from hour one, from hour one that

2    Brian Herlihy committed a crime, and nothing, nothing

3    was gonna stand in her way of making sure that he ended

4    up in jail, charged with this offense.

5         I asked her about the CAT scan reports.  Did she

6    read them?  She did have the information on the phone

7    from Dr. Agee.  She said:  Well, I didn't have them

8    because I didn't get a consent from the mother or

9    father.

10        I said:  Well, why didn't you get that right away?

11        Well, I couldn't get it right away.

12        When did you get the consent?

13        I didn't get it until the 25th.

14        So when did you get the CAT scan reports?

15        Some time right after the 25th.

16        Could you have gotten them any other way?

17        No, had to get the consent.

18        Well, Detective Legall, what about a subpoena?

19    Can't you just go down and get a subpoena from the

20    clerk's office, take it over to the hospital, and you

21    got them in your hand?

22        I guess I could have done that.

23        Why didn't you do that in this case?  No answer.

24        I think I said this before regarding Crystal's

25    accident, didn't get the accident report, didn't talk

1    to the hospital people, didn't get her medical reports

2    from that hospitalization, didn't follow-up by calling

3    her OB-GYN who examined her after the car accident, I

4    am sure.  Didn't do squat.

5         She stated she doesn't know how the older injury

6    occurred, but what is more important is she never ever

7    once tried to find out.

8         I asked her this question about taking statements,

9    I said -- I hope you remember this.  I asked her if it

10   were easier to fudge what a person says if you don't

11   take a statement.  Do you remember her answer?  Her

12   answer was:  I don't ever fudge anything that I write

13   in my report.  That's an interesting answer.  Think

14   about it.  I would think the better answer would have

15   been, I never fudge anything at any time for any

16   reason.

17        Regarding Mike Weaver and being there, what I

18   recall about her testimony is that she actually said

19   that she's talking to Brian, and he's making these

20   statements, and then she goes out in the hallway and

21   she has a conversation with Weaver to kind of fill him

22   in on some of the background.  So he was actually

23   supposedly participating.  He wasn't just, you know,

24   sitting there falling asleep on the chair.  She was

25   interacting with him about what she was doing.  So he

1        wasn't just a bump on a log.

2            It's unacceptable that she did not tape him on

3        August the 3rd and then expects to come in here and

4        have you all believe, given what we've just talked

5        about, believe that Brian Herlihy made those statements

6        that are absolutely inconsistent and contradictory to

7        everything he said the day before when he was trying to

8        let everybody know, I didn't do anything.  This was an

9        accident.  I don't know what happened.

10           So does it make sense that after he's arrested

11       he's gonna say, Okay, you know, I threw the baby around

12       the room?  It doesn't even add up.  And I'll tell you

13       another way it doesn't add up, she wrote this report,

14       okay, before she talked to Crystal, before she talked

15       to Crystal's dad, before she talked to John, certainly

16       before she talked to the primary baby-sitter, Doris,

17       because we know she never even once talked to her, not

18       once.  So she had no information from the family, or

19       from Crystal that Robbie never cried, that Robbie

20       wasn't a fusser.  Okay?  She didn't know that that

21       didn't fit in with this child.

22           And by the time she wrote all this up about Brian

23       saying, This kid was crying.  I couldn't get him to

24       stop crying.  I did this or I did that, I threw him on

25       the bed.  His head bounced.  And the state would have

1    you believe that he bounced on the bed, if you want to

2    believe this story just for a second, but he bounced on

3    the mattress and got a bump on his head from that.  It

4    doesn't fit in.  It doesn't gibe.  The pieces don't fit

5    together.

6        What does make sense is that she had no

7    information that little Robbie didn't cry, especially

8    when he wasn't hungry.  He didn't cry.  We all know

9    that she didn't know it when she wrote up this report

10   and came up with this cock-and-bull story about Brian

11   saying that the baby during that short time, that

12   window of time, was crying so much I shook him and

13   threw him on the bed.  Actually she didn't say that.

14   She said:  He was swinging him back and forth and then

15   threw him on the bed and then threw him down.

16       The main thrust of what I'm trying to get at is,

17   she would have you believe that all of this happened

18   according to what she says Brian said because Robbie

19   was crying uncontrollably and would not stop, and we

20   know that little boy did not do that.

21       That morning, he was acting fine at his father's,

22   he was acting fine when his mother brought him over

23   there.  When his mother was there, and when his mother

24   left, Robbie was doing fine.

25       Now let me just give you one more example as far

1   as her credibility is concerned.  Do you remember right

2   at the end of cross-examination I asked her the

3   question about making a statement at a prior hearing in

4   this case, about just learning the particular

5   information about the older injury.  I remind you that

6   she gave four different versions, or four different

7   answers to the same question.  It had to do with when

8   she found out about the older injury.

9       Initially she said that she had just learned about

10  it that morning in the hearing, and that was the

11  transcript that I had.  The version in court was that

12  she answered that she had just learned that morning

13  because she found out that the information provided by

14  the doctors discounted the theory.  Okay.  Think about

15  that for one second.

16      She is saying that the reason why she said

17  something that wasn't correct, as far as when she found

18  out, is because the doctors, she learned, discounted

19  the theory.  So that means that she didn't find out?  I

20  mean, it doesn't make sense.  That was her second

21  version.

22      Her third version was, she answered that way

23  because she had just, "forgot," about the prior injury.

24  Then when Ms. Singer got up on redirect, she told

25  Ms. Singer that she answered that way because she was

1    responding to a different question than the one I had

2    asked her in court, which may have been accurate.  I

3    will concede that, it may have been accurate.

4        The point I'm making is, that before we were able

5    to get to that point, she had already just rattled off

6    three answers, none of which were correct or true

7    before we got to the heart of the matter, which was

8    that she misunderstood the question, or I misunderstood

9    how the question was posed.  All the variations were

10   different.

11       She stated that one of the reasons that she

12   arrested Brian Herlihy was that the doctors stated that

13   the injuries that Robbie sustained would not come from

14   being wedged in between the mattress and the footboard

15   as Brian had told them.  Ladies and gentlemen, we have

16   never said to anyone, to any doctor, we are not saying

17   it to you, Brian never said it to anybody, we've never

18   said that getting wedged in there has caused the

19   situation that evolved and developed with Robbie.  What

20   we said is, that's where we found him, and that's how

21   we found him.  But we've never said that Robbie's brain

22   injuries were caused from being in this space.  Brian

23   never said that, and we never said that.

24       But we are saying, you know, his injuries come

25   from a confirmed case of chronic subdural hematoma,

1    which re-bled, caused him to either vomit and then have

2    a seizure, or, and Dr. Uscinski and Plunkett are not

3    sure which way it happened, or caused him to have a

4    seizure and then vomit, and he aspirated on the vomit

5    that caused him to stop breathing, and then the rest

6    followed.

7         Ms. Singer mentioned something before about they

8    checked his lungs and there was no aspirant in his

9    lungs.  Well, surely that is the case because remember

10   that the paramedics assumed as they got to the scene,

11   the first thing they did is they suctioned him out, and

12   we know he was aspirating because we have it on the

13   carpet.

14        Judge Lott will talk to you about weighing the

15   credibility of the witnesses, tell you to use your

16   common sense, just like Ms. Singer told you.  Judge

17   Lott will tell you that you may find some of the

18   evidence not reliable, less reliable than others.

19        You should consider a number of things:

20        Did the witness have an opportunity to see and

21   know what the witness testified?

22        Did the witness seem to have an accurate memory?

23        Was the witness honest and straightforward?

24        Did the witness have some interest in how the case

25   is going?

1      Did the witness' testimony agree with the other

2   testimony and the other evidence in the case?

3      What I'm talking about is the police, the police

4   work and Crystal, and her testimony.

5      Did the witness at some other time make a

6   statement that is inconsistent with the testimony that

7   he and she gave in court?  Plenty.

8      Reasonable doubt, it's up here.  It is all over

9   this case.  You will hear when Judge Lott tells you

10   about reasonable doubt, that if you find from the

11   evidence a reasonable doubt, a reasonable doubt, and I

12   told you before that this case has got a hundred

13   reasonable doubts, and I haven't counted them, but

14   there are a multitude of reasons to have a reasonable

15   doubt in this case.

16      Was it proven that the general reputation of the

17   witness for telling the truth and being honest was bad?

18   No.  You heard what John said about Crystal.  I asked

19   him that very question.

20      What impact her lies and her inconsistent

21   statements and her misrepresentations, I'm talking

22   about Crystal, have or should have on this case is

23   really hard to say.  I don't know that I can help you

24   with that.  That's a decision that you all are gonna

25   have to make.  One thing is clear, and that is, Crystal

1     and her erratic and questionable conduct back in June

2     and July of 2000, and right up to the very day that

3     this all happened, is very suspicious, in some ways

4     incriminating, and very troubling.  What involvement,

5     if any, she had in Robbie's prior brain injury, I can't

6     even say, and I don't know if it was a birth injury,

7     and I don't know if she had no involvement at all and

8     is completely innocent of any wrong doing as to the

9     older injuries.  I can't answer that.  We don't have to

10    prove it and I don't know that you all have to

11    determine what really happened there.

12        We do know that on one occasion right about the

13    time that he was involved with some projectile

14    vomiting, Robbie did have a red blood spot in his eye

15    as seen by his grandmother.  Is that significant?  I

16    don't know.  I just wanted to call it to your

17    attention.

18        This was all going on at a time when the police

19    routinely visited out there where they lived to mediate

20    problems that she was having with her mother-in-law and

21    with her husband.  She was looking for, according to

22    testimony, and I recall that this came from Helen

23    Legall who said that Brian told her this, that she was

24    looking for an important.  She was supposedly,

25    according to her husband, signing papers on the trailer

1    that they were gonna buy.  She didn't know what she was

2    gonna do, who she was gonna be with, who she was gonna

3    live with, whether she was gonna get divorced or not.

4    A very difficult and confusing time for Crystal.  And

5    then, of course, we have the testimony from John about

6    the knife, and the incident, and the threatened

7    suicide, and the biting, and the punching of the wall.

8        It just leaves us with an impression, if I may,

9    about an environment that is conducive to an infant

10   somehow, some way, either being punished too severely

11   or mistreated in some way.  I am not telling you that

12   that happened because I do not know it happened.  I'm

13   talking to you about an environment.  We can't overlook

14   the environment.  There was a lot of stuff going on

15   there that Brian Herlihy was not a part of other than

16   the fact he was involved in a relationship with

17   Crystal, thinking that she was going to get divorced.

18       All right.  Let me talk -- really getting close.

19   Let me talk just a little bit about what's called

20   lesser included offenses.  You're going to hear from

21   the judge about lesser included offenses.  Judge Lott

22   will instruct you that there are lesser included

23   offenses; first degree murder, second degree murder,

24   third degree murder, manslaughter, and you'll hear

25   about a couple of other lesser included offenses.

1        I want to emphasize, please don't do us any favors

2   here.  We're not looking for some compromise to come

3   out of this.  If there is reasonable doubt in this

4   case, as I suggest to you most strongly there is, then

5   reasonable doubt applies not only to first degree

6   murder, but to all of the lesser included offenses as

7   well.

8        All right.  Just a couple of things about

9   Dr. Ronald Uscinski.  Brain surgeon, 30 years,

10  thousands of surgeries, self-employed, takes care of

11  his patients, not here to make money, had to go back to

12  his practice, talked about a lot of this.  Who could

13  know more about a brain or brain injuries or chronic

14  subdural hematoma than a hands-on person with brain

15  surgeries that go back for so many years?  He was the

16  only witness in this whole trial who showed you the CAT

17  scans that were taken of Robbie on the 2nd, 3rd and

18  4th, and he showed each one to you and told you very

19  clearly on the CAT scans where the prior injury was.

20  No single state witness has been called in this case to

21  dispute that.

22       He showed you what a dura looks like from

23  photographs.  You saw the operation.  When you saw the

24  operation, you could clearly see how thin and

25  vulnerable the membrane that surrounds the hematoma is.

1    I mean, you don't need a sharp, blunt instrument to

2    poke through it.  It is very thin and can just on it's

3    own open up and re-bleed.

4        Dr. Uscinski also showed you a photograph of a

5    brain surgery involving a one year old child that was

6    taken in 1961 by one of his instructors in medical

7    school, and the reason why he showed you that, is he

8    wanted you to see that the structure and the pathology

9    were the same as far as the membrane in both the

10   child's brain and in an adult brain that he performed

11   the surgery on in the video.

12       He also told you very candidly that there was a

13   time in his career years ago when he believed in the

14   theory of shaken baby syndrome.  He told you that one

15   day he was asked to look at a child in a case and offer

16   an opinion as to shaken baby syndrome.  He researched

17   it and found that the child in question was not the

18   victim of abuse at all, but rather had a chronic

19   subdural hematoma, just like we have in this case, that

20   re-bled, and they thought in that case the person who

21   was with the child had committed a criminal act and

22   that turned things around for him completely.  He has

23   done further research and scientific studies and has

24   read up on it, and I suggest to you that he is

25   certainly by far the most qualified expert in this case

1    as a brain surgeon to tell you about what he has found

2    out about why shaken baby syndrome is not in fact a

3    valid theory.

4         I mentioned that Dr. Uscinski contradicted what

5    Dr. Nelson said about the cerebral contusion, that he

6    should have seen it in the gross examination, did not.

7    He said there was a contradiction in his report about

8    that, because Dr. Nelson claimed to only have seen it

9    in the microscopic examination.

10        All right.  Ladies and gentlemen, I urge you to

11   consider and find that this case is riddled with

12   reasonable doubt, and mistakes, and inconsistencies,

13   and unfortunately, lies and exaggerations, and some

14   fabrications, and inept police work, and grossly inept

15   professionalism on the part of unfortunately our

16   medical examiner in this community, who dropped the

17   ball in many many different ways with regard to his

18   autopsy in this case.

19        Even remember, if you will, just for a moment

20   Dr. Levine, even in his testimony he said that when the

21   eyes -- I may be wrong about that.  I take that back.

22        I do remember Dr. Levine saying something about a

23   mistake being made at the autopsy and I'm not clear on

24   what that was.

25        You've got Detective Legall, and we're not gonna

1      go through it all again, has done some things and more

2      significantly has not done the appropriate things in

3      this case.  She has specifically rejected and excluded

4      and dismissed anything that flies in the face of her

5      theory.

6          And then lastly I would just say again about

7      Detective Mike Weaver and the alleged statements that

8      they claim that Brian made, bring us that witness,

9      bring us -- if you want this jury to believe, bring us

10     that corroboration, bring us the video, bring us a tape

11     recording, bring us the dura.  You want a conviction in

12     first degree murder in this case, bring us the proof.

13         To say that this case is a tragedy of great

14     proportion is a gross understatement on my part.

15     Robbie was a wonderful and beautiful child.  Nobody

16     doubts that for a second.  And by all accounts,

17     everybody, everybody loved him very much, including

18     Brian Herlihy.  Brian Herlihy is somebody else's

19     wonderful child, too.

20         MS. SINGER:  I'm gonna object to this line of

21     argument, your Honor.

22         THE COURT:  Sustained.

23         MR. GROLAND:  Please do not compound this tragedy

24     by convicting an innocent man.  Thank you for your

25     attention.  I appreciate it.

1      THE COURT:  We're gonna take another recess,

2   ladies and gentlemen.  Step into the jury room, please.

3      (Outside the presence of the jury.)

4      THE COURT:  We might as well do this on the

5   record.  Come on up, state and defense, and Sergeant

6   Amerson, and let's discuss what arrangements have been

7   made for sequestration because based on the late hour,

8   I do intend to give this jury information and

9   instructions regarding their sequestration.

10      First issue being, that their cars are parked in

11   the parking garage; is that right, and must be moved by

12   7:00 p.m., is that right?

13      SERGEANT AMERSON::  Do you know the time Monday

14   night?

15      MR. BAILIFF:  2:00 p.m. or 1:00 p.m.  They have

16   downtown taverns and all that stuff.  I think they stay

17   open until 2:00 p.m.

18      THE COURT:  2:00 a.m.?

19      MR. BAILIFF:  Excuse me, 2:00 a.m., your Honor.

20      THE COURT:  We need to double check that because

21   obviously I would not anticipate that they would

22   continue deliberations until 2:00 a.m., and that would

23   mean that unless the protocol requires it, they would

24   be allowed to take their own cars to the hotel.

25      SERGEANT AMERSON::  Not normally.

Stacey K. Bryant, RPR
Judicial Court Reporter

 1          THE COURT:  Okay.  So they would be located where?
 2          SERGEANT AMERSON::  The parking garage is
 3  completely locked up, all the doors and a fencing type
 4  material and they actually would be very safe there in
 5  my opinion.
 6          THE COURT:  So they would just remain in the
 7  parking garage?
 8          SERGEANT AMERSON::  Yes, ma'am.
 9          THE COURT:  All right.  In regards to providing
10  dinner for the jurors, based upon the time frame --
11  Just a second.
12          MR. BAILIFF:  We have one juror that needs to make
13  a phone call before quarter to 5:00.
14          THE COURT:  We're gonna let her do that in just a
15  minute.  I'm gonna allow the jurors at this recess to
16  go ahead and advise family members, if necessary, that
17  they're gonna be here late and possibly overnight.  Any
18  of them who want to make a phone call at this time, go
19  ahead and do so.  Any objection to that?
20          MS. SINGER:  None.
21          MR. GROLAND:  No objection.
22          THE COURT:  I'm also going to, might as well
23  advise them at this time that any of them that wished
24  to ask family members to bring them a suitcase or
25  overnight bag, to go ahead and do that at this time

1        when they make those phone calls.  Any objection to

2        that?

3            MS. SINGER:  None.

4            MR. GROLAND:  (Shakes head.)

5            THE COURT:  About supper tonight, what

6        arrangements would be recommended by security?

7            SERGEANT AMERSON::  Would they remain tonight

8        while they're here at the courthouse, your Honor?

9            THE COURT:  That's my question.  Should we escort

10       them to dinner or bring dinner in?

11           SERGEANT AMERSON::  We can arrange to have dinner

12       brought in, for example, by Harry's, your Honor.

13           THE COURT:  Good enough.  If you'll go ahead and

14       get the menus for that to make those orders, and they

15       can go ahead and do that right away when they start

16       deliberating.

17           MR. BAILIFF:  The garage closes at 10:00 p.m.,

18       10 o'clock tonight.

19           THE COURT:  All right.  But if they -- if they're

20       going to recess for the evening, I'll direct them that

21       they should make that decision.

22           MR. BAILIFF:  There's gates and it's locked up and

23       secured overnight.

24           THE COURT:  But they're gonna have to move those

25       cars in case they reach a verdict tonight past 10:00

1      p.m., which they're entitled to do if they choose to do

2      that.  They're gonna have to move those cars so they

3      have access to them.

4          SERGEANT AMERSON::  Either, one, we can have them

5      move their vehicles prior to that hour, or I believe we

6      can access an emergency key to the parking garage,

7      either one.  Which if the cars are gonna be parked in

8      the parking garage overnight, I believe they'll be very

9      safe, safer than they would be probably on the street.

10          THE COURT:  I understand that and I agree.  My

11     question is, the jurors have the option to deliberate

12     past 10:00 p.m.

13          SERGEANT AMERSON::  M yes, ma'am.

14          THE COURT:  Or to reach a verdict tonight or in

15     the wee hours of the morning, if they so choose.  If

16     they elect that option then past 10 o'clock, there

17     wouldn't be any access to their vehicles unless you get

18     a key so that you can arrange that somehow.

19          SERGEANT AMERSON::  Yes, ma'am.

20          THE COURT:  Can you inquire about that to see if

21     that's possible?

22          SERGEANT AMERSON::  Yes, ma'am.

23          MS. SINGER:  Would the Court consider rebuttal and

24     instructing them tomorrow morning?

25          THE COURT:  No, absolutely not.

1          MS. SINGER:  Okay.  Just asking.

2          MR. TEDDER:  I was thinking the same question.

3          MS. SINGER:  Just asking.

4          THE COURT:  Now depending upon the length of

5      rebuttal.

6          MS. SINGER:  I don't think I'm gonna go as long as

7      Mr. Groland did.  I went an hour and 20 minutes for my

8      first closing.  I was assuming that I was gonna go

9      another 40 for a two hour close, another 40 minutes in

10     rebuttal.  Mr. Groland went three hours and some odd

11     minutes in his closing, but I'm not saying I'm gonna

12     use all that time.

13         THE COURT:  Based upon the lateness of the hour at

14     this point, I think that that might be the most

15     reasonable option, is to allow you your rebuttal, and

16     then bring them back in the morning for instructions.

17         MS. SINGER:  You might want to just ask them if

18     they would prefer to start tonight, or be able to go

19     home, or do they want to be instructed tomorrow morning

20     and then have a whole day?  That's something you might

21     just want to ask them as the Court and see how they

22     want to proceed.

23         THE COURT:  I will give them options once the case

24     is delivered to them.  Yes, sir, Mr. Groland?

25         MR. GROLAND:  I was just gonna say you might

1    prefer to do something like that.

2        THE COURT:  All right.  Then that's what we're

3    gonna do.

4        MS. SINGER:  Which way are we gonna go?

5        THE COURT:  I'll allow the state to complete their

6    rebuttal, then I'll adjourn, and have the jurors

7    brought back in the morning.  I'm gonna tell them

8    that's what we're gonna do now, so that they'll know

9    that we do not have to stay.

10        MS. SINGER:  Stay overnight.

11        MR. TEDDER:  And, of course, the press has

12    actually been in attendance today, Judge.  That's even

13    more important than ever that they not --

14        THE COURT:  I'll give them the same instructions

15    that we have every day.

16        MR. BAILIFF:  I'm going to call over to the garage

17    and see if there's some way we can access those cars

18    after today.

19        THE COURT:  You won't need to at this point.

20        Okay.  We will take a -- I think we're gonna take

21    ten minutes before we bring the jury back in.

22        (Recess taken.)

23        THE COURT:  All right.  Is the state ready to

24    proceed?

25        MS. SINGER:  Yes, your Honor.

```
 1                 THE COURT:  Is defense ready to proceed?
 2                 MR. GROLAND:  Yes, ma'am.
 3                 THE COURT:  Okay.  Bring the jury back in.
 4                 (Before the jury:)
 5                 THE COURT:  Ladies and gentlemen, we are ready to
 6       continue.  The state's entitled to a rebuttal.  Based
 7       on the hour, which is now 20 to 5:00, I think it's only
 8       reasonable to let you know what schedule we are
 9       anticipating.  Because the rebuttal and the jury
10       instructions will take some period of time, I'm going
11       to allow the state to complete their rebuttal argument,
12       then you will be released for the night, and you will
13       come back in the morning and be given the instructions
14       first thing in the morning and then begin your
15       deliberations.  You will not be required to deliberate
16       tonight, so that hopefully it will be as reasonable a
17       schedule as we can create.
18                 With that brief bit of information, Ms. Singer,
19       you may go ahead.
20                 REBUTTAL ARGUMENT ON BEHALF OF THE STATE:
21                 MS. SINGER:  Thank you, your Honor.  May it please
22       the Court, Mr. Groland, Mr. Tedder, Mr. Herlihy?
23                 I'm going to try to make this as short as I can.
24                 One of the first things I want to say to rebut
25       Mr. Groland's argument is this:  Mr. Groland stood up
```

1    here and said what Anne Dickison, who is in the

2    audience today, has an interest in this case.  He

3    suggested to you that her testimony was affected by

4    that interest, that she twisted and turned that

5    testimony to accuse Brian Herlihy, the defendant in

6    this case, of abusing this child.  I'm going to urge

7    you to go back and recall her testimony.  That's number

8    one.

9         I'm going to suggest to you another factor,

10   another fact that should be considered in this case,

11   and that is, Robbie Quirello drew the interest of a lot

12   of people.  Robbie Quirello was a beautiful child.

13   Anne Dickison is here not because Brian Herlihy is on

14   trial, but because she cared about Robbie Quirello.

15        I want to take you back, back where you need to be

16   to deliberate in this case.  There is a life, there is

17   a life in this case, there is a life that you should be

18   considering in this case.  A life that's gone, a life

19   that doesn't have a future, a life that lived 133 days.

20   This is about a life.  We're here about a life.  This

21   is a very serious matter and those physicians at Shands

22   Teaching Hospital, who saw this injury evolve, they

23   told Investigator Helen Legall, and Sergeant Halvosa,

24   and Sergeant Seale, the fact that makes the most

25   important point in this whole case, not that there were

1    old injuries, not that there could have been old

2    injuries that were unconfirmed on autopsy, but that the

3    injuries that took this life occurred between 9:00 a.m.

4    and 9:34 a.m.

5        That's what those doctors told Helen Legall,

6    that's what those doctors told Sergeant Seale, and Will

7    Halvosa, and Alvarez, and everybody that was in that

8    room, because those doctors knew that a chronic

9    subdural hematoma does not bleed into the arachnoid

10   space.  Chronic subdural hematoma does not bleed in a

11   manner to cause the significant, severe, lethal brain

12   damage that they saw.  Seizures don't take people's

13   lives.  Seizures don't stop people from breathing so

14   long that they're unable to survive.  This was not a

15   child that had an old injury that resulted in a seizure

16   that caused the baby to roll into the crevice.  This

17   was a baby who suffered new, dramatic, tragic injuries.

18       And the defense wants you to believe that Helen

19   Legall, she had Brian Herlihy in her sights.  She had

20   no one in her sights except whoever the last person was

21   with that baby before the signs and symptoms of the

22   injuries to the brain were shown, or came out, were

23   seen, were revealed.  And when was that?  When that

24   baby's head bounced and his eyes rolled back.  And who

25   told us that?  Brian Herlihy, the defendant in this

1       case.

2           Now, Mr. Groland talked a lot about reasonable

3       doubt.  We came here, we were challenged.  We told you

4       we were gonna meet that challenge.  Yes, we must prove

5       this case beyond a reasonable doubt, but reasonable

6       doubt does not arise from collateral matters.

7       Reasonable doubt arises from the facts that prove the

8       elements.

9           I submit to you, members of the jury, there is no

10      reasonable doubt.  There is no reasonable doubt as to

11      when these injuries occurred.  We know when these

12      injuries occurred by the 911 tape.  We know when these

13      injuries occurred by what Brian Herlihy told us he did.

14      We know how these injuries occurred because of what the

15      doctors, and the EMT's, and everyone that treated

16      robbery told you.  And that is this:  That the comatose

17      state immediately comes after the injuries are

18      sustained.

19          Anne Dickison said, window of time.  When was the

20      last time that baby was seen healthy?  9:00 a.m.  When

21      was the first time the baby was told to be unhealthy,

22      comatose?  9:34 a.m.  That is the window of time.  And

23      to now accuse Helen Legall of having some agenda

24      because she did her job, she alone with other

25      investigators -- one spoke with John Quirello, who was

1   obviously not with the child between 9:00 and 9:34 a.m.

2   He was at work at Airborne.  He last saw the child at

3   9:00 a.m. and the child was healthy.

4        By speaking with Crystal Quirello at the hospital,

5   when she said, I wasn't there and I have receipt to

6   show I was at the gas station here.  I was at the Suds

7   and Duds here.  And then the 911 tape where Brian

8   Herlihy himself says, The baby was fine.  I don't know

9   what happened.  He knew what happened.  He knew darn

10  well what happened.  He knew what he did.  He knew he

11  was in trouble.

12       There was no agenda on the part of the law

13  enforcement.  If anything, they began this case trying

14  to offer services to Brian Herlihy and Crystal Quirello

15  believing them to be the family.  It was only after the

16  information was provided to them by the medical people

17  who treated this child, who saw this child, who

18  examined this child, not medical experts, who just saw

19  a chart or parts of a chart.

20       Obviously Dr. Plunkett didn't see all the records.

21  He had to be shown a letter.  Very critical of

22  Dr. Hamilton and Dr. Nelson until he realized, you

23  know, I wasn't given everything to review.  Not experts

24  who didn't view the child's EEG's.  Both Dr. Plunkett

25  and Dr. Uscinski never testified that they examined or

1    otherwise considered the EEG's.

2        Dr. Maria, the only physician, the only physician

3    that testified for you that said he had seen cases of

4    shaken baby syndrome, a hundred cases in his 21 years,

5    the only doctor, pediatric neurologist, a specialist,

6    who said brain surgeons don't treat these kids.

7    Because you know why?  You can't fix them.  We can look

8    at surgery all we want.  We can watch films and films

9    of surgery.  It doesn't make a difference in this case

10   because you can't fix them.

11       And the pediatric neurologist does whatever he can

12   by medicine, by clinical practice to hopefully get the

13   baby past that three day window period between the time

14   of the injury, and the time when it looks like they're

15   gonna heal, or they're gonna die.

16       So, in fact, when Helen Legall began her fact

17   finding, and that is in fact what happened, as part of

18   the team, nobody was really quite sure whether little

19   Robbie was gonna live, or little Robbie was gonna die.

20   So she wasn't working a murder case on August the 2nd,

21   and she wasn't working a murder case on August the 3rd,

22   because Robbie hadn't died yet.  She was working an

23   aggravated child abuse case and doing a darn good job

24   of collecting whatever she could collect in terms of

25   evidence and information to put together the puzzle

1   pieces to identify who the perpetrator was.  And who

2   was the perpetrator?  The man who was with the baby

3   from 9 o'clock to 9:34.

4       You know, if Brian Herlihy loved Robbie Quirello

5   so much, I urge you to listen to the 911 tape.  He

6   didn't even know how old he was.  If this was a loving

7   man who took the place of John Quirello in this boy's

8   life, then how come he didn't know, you know, how old

9   he was?  That doesn't make sense.

10      Mr. Groland talked about the bed, put the baby in

11  the bed.  You're gonna have the bed.  The bed is here

12  for you.  But I submit to you, I ask you, I urge you to

13  look at the photographs from August 2nd and the four

14  photographs from August 16th.  This is not a bed that

15  is in the same condition as when the police officers

16  and the defendant went back to do the reenactment.

17  There is a huge part of this bed that's missing that

18  was not in the apartment on August 16th, and that huge

19  part of the bed held it together with posts in a

20  square.  Now, let's see how far we can bend it back.

21      You don't see the bed that the law enforcement

22  officers saw on 08-02.  You don't have the bed that was

23  in that apartment on 08-02.  That bed was dismantled.

24  It's up to you to decide why that bed was dismantled

25  and who would have dismantled it.  It's for you to

1    consider that.

2         But isn't it interesting that just as soon as this

3    bed was dismantled, there's a bag hanging in the

4    closet.  I never said there was blood on that shirt.

5    If you misunderstood me and I said that, I apologize to

6    you.  You're going to get an instruction from the Court

7    that says you have to rely on your own recollection.

8         The blood is on the towel.  If I could have that

9    bag, Mr. Clerk.  There were three things in that

10   Walmart bag.  There was a shirt, which I submit to you

11   has got vomit on it, there was a white towel, that I

12   submit to you has some what appears to be baby formula

13   on it, and there was this red towel.  And this, members

14   of the jury, is what was identified as the piece that

15   Nicole Perroni found blood.

16        Stuffed in a Walmart bag, hidden behind the ties.

17   You have the photograph.  You'll be able to view it.

18   Out of sight.  Whose shirt is it in that closet?  Whose

19   shirt is it in that Walmart bag?  Whose shirt is it

20   with the towel and the other towel?  Whose shirt is it?

21   It's for you to decide whose shirt it is, for you to

22   decide.

23        And, you know, we talked so much about whether you

24   could fit the baby doll in here, and whether the

25   mattress was all the way up or all the way down to the

2391

1    back when it happened, when this baby got wedged.  Push

2    it all the way down.  Whatever way it was, you have the

3    defendant's statement while he's trying to explain

4    himself on the reenactment, and it's amazing that in

5    his statement he's being asked by Sergeant Seale, Gee,

6    you know, this doesn't seem like -- it looks like

7    you're using quite a bit of force there.  Then he goes,

8    Well, maybe this wasn't like this.  Maybe it was like

9    this.  Well, I don't know.  That's even more unlikely

10   that he could have fit down there.  You have the tape.

11   It's in evidence.

12       Mr. Groland wanted you to believe that these

13   pillows were put there in some scheme from the law

14   enforcement officers to set Brian Herlihy up.  There

15   has been no evidence of that.  There's been evidence of

16   people not writing reports.  There's been evidence of

17   people not paying attention.  But there's no evidence

18   of anybody trying to set up these pillows.  And

19   secondly, there's been overwhelming evidence by Helen

20   Legall, Sergeant Seale, and Will Halvosa, the defense's

21   witness, that in fact the police were very open about

22   this.  Brian, just position the pillows whatever way

23   you see fit.  Brian, it's your show.  Show us what

24   happened.  Show us what happened.  That's what

25   happened.

1    And what did Mr. Herlihy do?  He positioned the

2    pillows just as the photographs were shown.  That's why

3    Sergeant Seale had a question, and you hear it in the

4.   tape.  You can hear it in his voice.  Gee, you know, it

5    doesn't seem right.  Wouldn't the baby have rolled this

6    way?  Now does this baby crawl?  That's what he asks on

7    the tape:  Does this baby crawl?  Why?  Because to

8    Sergeant Seale this baby would have had to crawl up to

9    get down.  You have that evidence.  You'll be able to

10   hear it.  You've heard it once.  It's here available to

11   you.  You have that evidence.

12       This was not a setup.  This was not a group of law

13   enforcement officers trying to hang a charge on Brian

14   Herlihy.  These were people who were giving him an

15   opportunity to explain the situation.  What happens?

16   What happens when you explain the situation with lies?

17       I ask you to go back to your experience.  That's

18   what you're gonna take with you in the jury room.  What

19   happens when you explain your situation with lies?  The

20   lies don't fit and you get caught.  You get caught in

21   the details.  You get caught in the details.  That's

22   what happened to Brian Herlihy, he got caught in the

23   details.

24       You know, on August 2nd, he wasn't -- if it was

25   their agenda to take this man down because they wanted

```
 1          to get somebody and they wanted to get him quick, if
 2          that was their agenda, if that was their plan, they
 3          could have arrested him on August 2nd.  Here he was.
 4          They obviously had inconsistencies, obviously didn't
 5          make sense.  Larry Seale is scratching his head, you
 6          know, I don't have kids.  I don't know.  I mean, it
 7          just doesn't seem right.  It's not fitting.  I can't
 8          get the baby doll down here.  You can't get the baby
 9          doll down here.  Will Halvosa is saying, It looks like
10          you're putting a lot of pressure on that.  And he goes,
11          Well, maybe the pillows were another way.  He's making
12          excuses and trying to change his testimony again and
13          again.
14              If they wanted to get Brian Herlihy, then if that
15          was the whole focus on what they were doing instead of
16          investigating a case of a very sick baby, they could
17          have arrested him right then and there.  But they
18          didn't, because they needed to get more information.
19          They wanted to check out more of the facts.  They
20          wanted to meet again, and share the information that
21          they had gathered from Crystal Quirello, and John
22          Quirello, and other folks at the hospital, and anyone
23          who had information.  That's what they wanted to do and
24          that's what they did do.
25              On August 3rd they came to court and got an arrest
```

1    warrant, which is what they do do when they don't

2    arrest someone on site.  Mr. Groland made a big deal

3    about the fact there was no mention in that arrest

4    warrant mittimus, the probable cause affidavit, that

5    this child had some findings of an older injury.

6    That's because all the physicians, Dr. Dickison,

7    Dr. Maria, Dr. Levine, who looked at the eyes, who said

8    unquestionably those eyes and those retinal hemorrhages

9    were due to shaking.  They said it happened between

10   9 o'clock and 9:34.

11       It didn't matter to the doctors that this child

12   had what appeared to them on the scans to be a subdural

13   hematoma, because subdural hematomas, chronic subdural

14   hematomas or hygroma, which are the healed subdural

15   hematomas, which is what we would have had here with

16   Robbie if he had a birth trauma, they heal and they go

17   away and they don't bleed.  This injury does not cause

18   bleeding in the arachnoid space.  And by the way,

19   folks, Dr. Nelson told you, this injury does not cause

20   bruising on the brain, bruising that was seen at

21   autopsy.

22       Now they couldn't see that on the CT scan, just

23   like Mr. Groland said Bernie Maria doesn't know

24   anything about shaken baby syndrome because he couldn't

25   cite any literature, because we don't go into kid's

1          brains while they're alive, we don't shake kids when

2          they're alive.  It's immoral and unethical.  We don't

3          even shake monkeys anymore when they're alive.  You

4          know why?  Because there are people who are against the

5          mistreatment of animals.

6               But I'll tell you, Bernie Maria, a man who over 21

7          years has cared for kids with brain injuries, if there

8          is anyone who can give you evidence of the fact that

9          these things happen, it's Bernie Maria.  He told you

10         that he saw a child who had been shaken, had

11         neurological injury as the result of shaking, and he

12         was firm on that diagnosis, and he didn't come off of

13         that diagnosis.  He maintained that diagnosis.

14              You know, Mr. Groland talked about subdural

15         hematomas bleeding spontaneously, and Dr. Hellrung not

16         really knowing what he was talking about.  Dr. Dickison

17         spent a long time with you all, giving you a lot of

18         information about how the brain gets injured, or how

19         the brain has injuries, and how the brain heals.  She

20         went through how the body mops up subdural hematomas

21         and how after time, very short period of time, if this

22         baby suffered a brain injury at birth that it could not

23         bleed, because it would be a hygroma.  It would not

24         have blood vessels in it to bleed.  And it would look

25         the same on CT scan as a subdural hematoma.

1    Why is this important?  Because when Dr. Hamilton

2    at autopsy opens Robbie's skull, he doesn't find

3    evidence of a chronic subdural hematoma.  He doesn't

4    find evidence of a chronic subdural hematoma because

5    there wasn't one there.  There may have been hygroma,

6    and as Dr. Hamilton and Anne Dickison told you, hygroma

7    looks like cerebral spinal fluid.  It looks like water.

8    And Dr. Hamilton said there may have been evidence of a

9    hygroma.  When I cut in, that would have been fluid

10   that leaked out.  But if I saw motor oil, I'd know it

11   was a subdural hematoma, chronic subdural hematoma.

12   What he saw was this:  What Dr. Hamilton saw was

13   this:  He saw evidence of new bleed, lightly adherent

14   clots, new subdural bleeding consistent with this child

15   suffering a significant, traumatic injury to the brain

16   causing the bridging veins to bleed into the subdural

17   space.  That's what he saw, that's what he said he saw.

18   He didn't see anything on the dura, he didn't note

19   anything on the dura, and yes, he did not preserve the

20   dura as much as he would have liked to preserve the

21   dura, he didn't preserve the dura.

22   But his testimony is just as much a valid form of

23   evidence as Dr. Plunkett's testimony.  Dr. Hamilton has

24   no interest in whether or not Brian Herlihy gets

25   convicted.  Dr. Hamilton has done his job for 20 years,

1   has done it well.  He's acted as he should have.  He

2   noted what he saw.  He doesn't note everything he

3   doesn't see.  Otherwise, he said his paper would be a

4   thousand pages long.

5        You know what we would hear today, folks, if we

6   had the dura?  We would hear this:  They didn't keep

7   the lungs.  This baby aspirated.  Where are the lungs?

8   This baby aspirated.  We have clinicians who say he

9   didn't aspirate, and we have the medical examiner who

10  said, I examined the baby, and the lungs showed no

11  signs of infiltrate.  But if we had the dura here,

12  folks, we would have found out that the lungs had been

13  buried with the body.

14       You know what else was buried with the body?  His

15  arms, and his legs, and his heart, and his liver, and

16  his pancreas.  If we had kept all of those things, we

17  would have heard about something else we didn't keep.

18       Reasonable doubt does not rise out of collateral

19  matters.  Reasonable doubt arises on whether or not the

20  elements have been proven.  Whether Dr. Hamilton kept

21  the dura or allowed it to go with the family to the

22  funeral parlor, has nothing to do with whether or not

23  the state has proven this case.  Because Dr. Hamilton

24  is sworn, he is a professional, he is highly regarded,

25  and he takes a professional position as our medical

2398

1       examiner.  He told you he didn't see it.  You can

2       decide whether you believe him or not.  But I submit to

3       you there's been no evidence whatsoever to suggest that

4       he has lied in this case, none.  He was not impeached.

5       Nobody came up here and said he was lying.  He has no

6       reason to lie.

7            And you know what else is interesting?

8       Dr. Plunkett, when he testified, he's a brain

9       pathologist as well.  He's not a neuropathologist, he's

10      not as much of an expert as Dr. Nelson from Polk County

11      is, but he's a forensic pathologist.  What he said was

12      very interesting because it really contradicts the

13      defense's argument.  He said autopsy is the gold

14      standard.  Autopsy is the gold standard.  We may use

15      radiological reports, we may depend upon them when

16      we're living, human beings and we can't get inside, and

17      we put people through x-rays, we put people through CT

18      scans and MRI's, but if there's an autopsy, that's the

19      gold standard.  That's where people can actually look

20      and see.

21           And, Dr. Hamilton, he looked and he didn't see.

22      He didn't see any staining on the dura, he didn't see

23      any evidence of subdural hematoma.  He saw new blood

24      consistent with brain injury, consistent with shaking.

25           And, Dr. Dickison does report in her medical

1    records, which will be a part of your evidence, that

2    she noted, and I believe she even testified to this

3    because it's kind of interesting the way she described

4    it, she noted a bump on the baby's head.  It was

5    occipital bogginess, is how she described it, a

6    softness in the back of the head, like there had been a

7    bump.  And you know what was most interesting about

8    that?  Dr. Uscinski confirmed it for us with the CT

9    scan.  He even showed us just where it was, and he

10   showed us it was new bleeding.

11        Dr. Uscinski and Dr. Plunkett confirmed what is

12   the most consistent explanation for what happened to

13   Robbie Quirello between 9 o'clock and 9:34, and what is

14   consistent with what Brian Herlihy told Helen Legall on

15   his way to the jail when he realized the jig was up,

16   that this baby was crying.  Every baby cries.  I

17   believe that I could not convince anybody here that

18   there isn't an infant at four and a half months that

19   doesn't cry.  I don't think I could convince anyone of

20   that.

21        Robbie was a good baby.  He didn't cry

22   unconsolably (sic), he wasn't a sick baby, he didn't

23   have ear infections.  He was basically a good baby, but

24   every baby cries.  And what's remarkable about what

25   Brian Herlihy said about this crying was, at first it

 1    was a fake cry.  You know what that tells me?  That

 2    tells me that he was irritated.  This baby was crying

 3    for no reason.  It was a fake cry.  He wanted

 4    attention.  He wanted to be picked up and Brian wasn't

 5    gonna have any of that.  Brian had other things he

 6    wanted to do, whether it was dip the dogs, or take a

 7    shower, he wasn't gonna have any of it.  The baby was

 8    crying a fake cry.  There were no tears and the baby

 9    wasn't red.  This is a four and a half month old.

10        So I swung the baby back and forth, to and fro,

11    and I plopped the baby on the bed so hard that his head

12    bounced.  I knew I was rough with him.  I knew I

13    shouldn't roughhouse with a four and a half month old.

14    These are all statements that the defense wants you to

15    believe are not credible statements.  Well, if Helen

16    Legall was going to makeup a story, let's figure out

17    how she would have made up a story that would have put

18    Brian Herlihy in the position he's in right now.

19        Let me submit to you that if this wasn't said, do

20    you think Helen Legall would use the term plopped on

21    the bed?  I think Helen Legall would have said, I shook

22    the baby and threw him on the bed.  That's what I think

23    Helen Legall would say if she was making up a story.

24        But Helen Legall is not making up a story.  Helen

25    Legall was doing her job, got an arrest warrant during

1·    the daytime hours when she was working day shift, went

2    home, went to bed, and got a call and it was like

3    11:30.  Hold on a second.

4       Helen Legall, she works day shifts, got a family,

5    she's got a life of her own.  She's working a case with

6    a baby that's pretty sick, but isn't dying.  She gets a

7    call to come down to the station at 2255 hours, which

8    is 10:55, almost 11 o'clock.  Come on down.  We have

9    your man.  We got him arrested.  We got him down here.

10    You can come down to take him off.  I know you want to

11    talk to him a little bit and take him off to jail.

12    Okay.  Let me get dressed, let me get down there.  She

13    gets there at 11 o'clock, 2255 hours, five to 11:00.

14       She already knows that she has sufficient probable

15    cause to issue this arrest warrant.  She Mirandizes

16    Mr. Herlihy, there's no question about it.  Mr. Herlihy

17    did not have to speak with her.  Mr. Herlihy did not

18    have to make any more explanations.  Mr. Herlihy could

19    have asked for a lawyer.  Did he?  No.  Was he

20    threatened in any way?  No.  Was he promised anything?

21    No.

22       But on the way to the jail, just before -- as he's

23    in the interview room getting ready to be booked, go

24    out to the jail, that's when he decides I'm gonna tell

25    you what really happened.  Maybe I can talk myself out

1          of this.  Maybe I can talk myself out of this.

2              This wasn't Helen Legall making up a story.  This

3          wasn't Helen Legall trying to set him up.  These were

4          the facts and they fell into place.  This was the

5          puzzle as it was starting to form a picture and it was

6          Brian Herlihy that fit the last pieces into place by

7          his own statements.  Okay.  I'll tell you what really

8          happened.  The baby was crying.  I couldn't get the

9          baby to stop.  Put the fan on.  I tried to have music

10         on.  The baby wouldn't stop.  I swung the baby to and

11         fro, and I plopped the baby on the bed so hard that his

12         head bounced, and his eyes rolled back, and he started

13         to lose his focus and he started to go unconscious.

14         That's what happened.  That's what happened.

15             That's consistent with the injuries.  That's

16         consistent with the defense's experts.  Uscinski and

17         Plunkett are both saying that's how these injuries

18         occur.  That's consistent with the scenario that was

19         given to you.  His prior stories were not accurate.

20         His last story was accurate.

21             Mr. Groland says that the experts disagree with

22         each other.  They don't disagree when it comes down to

23         the bottom line.  None of the physicians disagree.  The

24         retinal hemorrhaging and the brain neurological injury

25         are consistent with one thing, and one thing only.

1    Dr. Maria and Dr. Dickison say you don't need impact to

2    cause this injury.  Dr. Plunkett and Dr. Uscinski say

3    you do.  Shaking and impact, that's what they say.

4         What do we have?  We have shaking and impact.  We

5    have shaking and impact, folks.  We have exactly what

6    all of the doctors say causes these injuries.

7         And then you have Dr. Lawrence Levine, the eye

8    man, the pediatric ophthalmologist, who described that

9    blood, the blood in the vitreous.  There are no veins

10   in the vitreous.  There are no arteries in the

11   vitreous.  The blood gets there one way and one way

12   only.  When you shake a baby hard enough, the blood

13   splatters into the vitreous.  That's what we have.

14   That's why you have retinal hemorrhaging along with the

15   brain injury, because the eye is so damaged, the veins

16   and the blood vessels break.

17        It's true from 10 o'clock in the morning to

18   12 o'clock when everyone thought this was a very bad

19   situation, it was accidental, nobody was sitting on the

20   apartment waiting with baited breath to get in and do a

21   search.  That's true.  And it's true that Crystal

22   Quirello went back and she got that onesie.  But she

23   also testified to this:  When the baby was left, there

24   was no spit up on the onesie.  When the onesie was

25   picked up, there was spit up on the onesie.  Who took

1   that onesie off?  When was it taken off?  That's a

2   question for you to decide.  Was that baby shaken after

3   he vomited on Brian Herlihy and wouldn't stop crying

4   and he spit up on Brian Herlihy?  Was he shaken with

5   that onesie on so there would be no mark shown on his

6   body, and then in a panic was the onesie removed to see

7   if he could get this baby going again before he called

8   911?  Is that what happened?  That's for you to decide.

9        The bottom line is, with the exception of the bump

10   on the back of the head, there are no injuries on

11   Robbie Quirello.  But all of the physicians, including

12   Dr. Uscinski, who read from Dr. Duhaim's report, says

13   there's not going to be necessarily signs of injury on

14   an infant.

15        What's also interesting in Dr. Nelson's findings,

16   Dr. Nelson's finding is consistent with the same

17   position the state is taking on this case.  This baby

18   was shaken, thrown on the bed, and impacted with the

19   bed so there was a complete deceleration, and the brain

20   injury occurred.  Dr. Nelson said he would have liked

21   to have seen the dura, but he didn't need it because he

22   found cortical cerebral contusions, bruises on the

23   brain itself consistent with only one thing, folks, one

24   thing, traumatic injury.

25        You don't get cerebral cortical constitutions from

1    an old subdural hematoma that spontaneously re-bleeds.

2    You don't get that.  You get cerebral cortical

3    contusions from traumatic injury, blunt trauma.  That's

4    what we have here, folks.  When that baby hit that bed

5    and that brain was moving in his head and it stopped

6    suddenly, that brain kept moving, skull was stopped,

7    brain kept moving.  What did it bump into, folks?  It

8    bumped into his skull, caused bruising.  That's what we

9    saw.  That's what Dr. Nelson says.

10       And I disagree with the statement that Mr. Groland

11   says that the medical community is debating whether or

12   not there is such a thing as shaken baby syndrome.  I

13   dispute that.  The medical community is not debating

14   this.  The medical community is not debating that when

15   you have a shearing injury in the brain due to shaking

16   and trauma that causes death, that that is an

17   intentional act and should be investigated.  That's not

18   being disputed.  Dr. Uscinski doesn't dispute that.

19   Dr. Plunkett doesn't dispute that.  That's what we have

20   here.

21       Mr. Groland said that, Well, you know, nobody

22   except Dr. Uscinski looked at the photographs that were

23   put into evidence.  Dr. Hamilton did not have to look

24   at the photographs.  He identified it.  He said that

25   was the brain, that was the skull opening that he

1    looked at, that's what he examined.  He did not have to

2    go into detail with you and have me put those

3    photographs up and have a detailed explanation.  The

4    reason why he didn't have to do that, because he told

5    you what he saw, what he didn't see.  He has never

6    changed that testimony.  He's always maintained that he

7    has not seen, did not see a chronic subdural hematoma.

8    It just wasn't there when he opened up the head.  It

9    just wasn't there.  Now whether it was a hygroma, that

10   would be a healed subdural hematoma that's clear, clear

11   liquid, a fluid that drains out, that could have been

12   there.  He agreed.  But that wouldn't re-bleed because

13   there are no vessels in the hygroma.

14        Remarkably we talked about all these radiologists,

15   of course there were no radiologists who testified, but

16   we talked about those radiologists, remarkably the

17   radiologists, it is agreed, and Anne Dickison said that

18   hygroma and a subdural hematoma, chronic subdural

19   hematoma look the same on CT scan.

20        There was no old injury that re-bled spontaneously

21   causing this baby to seize and roll into the crevice of

22   the bed.  An old subdural hematoma doesn't bleed into

23   the arachnoid space.  They're separated.  We went

24   through the anatomy.  There's the dura, the arachnoid,

25   and the pia, and the brain.  Irritation to the brain

1    comes, when the blood has gone in between the brain and

2    the arachnoid, not in the subdural space.  That's why

3    Ronald Reagan didn't know he had a chronic subdural

4    hematoma, because he didn't have a seizure, because

5    there was no blood on his brain, because there was no

6    pressure on his brain.  That's why people with subdural

7    hematomas don't know they have them.  This baby had a

8    new injury, significant injury.

9         We have proven to you beyond a reasonable doubt by

10   the clinical findings, that's the examination, the

11   actual examination, actual testimony, actually looking

12   at the pupils, actually studying the body, the EEG, the

13   CT scans that show new bleeding in the arachnoid space

14   and in the subdural space, and then in the autopsy, as

15   sadly as that is, proof of the cortical contusions that

16   this child suffered a shaken head impact injury.

17        The bleeding in the subarachnoid and the subdural

18   space did not cause the injury.  It was in response to

19   the injury.  If I slash my hand and I slash my arm, I

20   am going to bleed.  If I slash my arm, I am going to

21   bleed.  If I shake a baby hard enough to break the

22   vessels, it's going to have bleeding in his head.

23   That's what we saw.  That's what we've proved.

24        Mr. Groland said, Well, Dr. Plunkett does

25   thousands of cases like this, or has done thousands of

1   cases like this.  Don't get lost, don't get lost in
2   these huge exaggerations.  I asked Dr. Plunkett, In the
3   course of your time as a forensic pathologist, how many
4   autopsies of children with neurological damage have you
5   done?  He said, I've done two.  I did one in the '70s
6   and I did one in the early '90s.

7        Now Dr. Plunkett travels around the country.  He
8   says he doesn't get paid, but let me suggest to you
9   that he gets paid through his hospital.  He just
10  doesn't get his check like Dr. Uscinski does for a full
11  $10,000 hit.  He gets paid.  He's not doing this for
12  free.

13       What he does is he travels from place to place
14  testifying on behalf of defendants who are in the same
15  jam that Brian Herlihy is in.

16       MR. GROLAND:  Objection, your Honor.  There was no
17  testimony to that elicited at all during this trial.

18       THE COURT:  The objection is sustained.

19       MS. SINGER:  May I address the Court on that?

20       THE COURT:  Just go ahead and proceed.

21       MS. SINGER:  He did testify to the number of cases
22  that he's been testifying in in the past few years and
23  I do have that written in my notes here.  I will get to
24  that in a moment, your Honor.

25       Let me also tell you this:  Just rely on your own

1    memories.  I know you've been taking notes.  I know

2    you've been paying close attention.  If someone had

3    written that down about how many cases he's testified

4    on behalf of the defendant in the last five years, you

5    have it there.  But I also have it in my notes and I'll

6    get to it in a moment, but I don't want to spend too

7    much time.  I know you've been here a very long time

8    today.

9         One thing that Mr. Groland said that touched me

10   that I think that I need to talk about, is that all of

11   the evidence shows that Brian Herlihy's relationship

12   with Robbie was a good one.  He was good with the baby.

13        Now, Crystal trusted him with the baby, but we're

14   not supposed to believe anything Crystal said.  So

15   maybe she really didn't trust him with the baby.  Who

16   knows?  But people who are good with their children

17   don't necessarily refrain from treating them and

18   abusing them in a moment of frustration, in a moment of

19   temper or anger.

20        Just because he was good with the child in front

21   of other people, in front of Crystal and whomever else

22   saw him with that child, doesn't mean that when he was

23   alone with that child and that child was fake crying

24   and he was irritated with that child, that he failed to

25   refrain from using reasonable good sense, keeping his

1    hands off that baby and walk into another room and

2    taken a shower.  Just because other people saw him when

3    he was behaving correctly, doesn't mean that in the

4    privacy of his own bedroom he didn't act intentionally

5    and violently.

6         You need to consider that, because reasonable

7    people who are frustrated and angry with a four and a

8    half month old infant, take their frustration and anger

9    out not on that infant, but in some other way.  Take a

10   walk to another room.  They put the child in a safe

11   place, they let the child cry it out.  They do not do

12   what Brian Herlihy did in this case.  They do not shake

13   babies.  It goes back to my original opening, because

14   common sense tells you that if you shake a baby, bad

15   things are gonna happen.

16        So whether or not Brian Herlihy was good with the

17   baby doesn't really have anything to do with this,

18   because in the privacy of his own bedroom, he lost it,

19   he lost it.  He didn't treat this baby like a

20   reasonable person should treat this baby.  Instead he

21   intentionally mistreated and abused this baby and it

22   resulted in this baby's death.  That's what makes it

23   murder.

24        Shaking doesn't occur in public.  We heard that

25   from Dr. Maria, we heard that from Dr. Dickison.  These

 1          crimes don't occur in public.  Common sense tells us

 2     when people are around, we're on our best behavior.

 3     Brian Herlihy failed to refrain from doing an act that

 4     could reasonably have expected to result in abuse and

 5     injury to this baby.

 6          Is he remorseful now?  You bet he is.  But instead

 7     of being in a position where he could have explained

 8     what happened, the first thing he said was, I'm sorry.

 9     Sorry for an accident?  Sorry for something you did?

10     Going to the clergy.  Going to the clergy about an

11     accident?  Going to the clergy about something you did.

12     That's for you to decide.

13          To buy the explanation that the defense has

14     provided to you about what happened to Robbie Quirello

15     between 9 o'clock and 9:43 a.m., on August the 2nd, you

16     must buy, and accept, and find indisputable that a

17     series of coincidental happenings occurred in such a

18     manner --

19          MR. TEDDER:  Objection, improper argument, your

20     Honor.  May we approach?

21          THE COURT:  Overruled for the moment.

22          MR. TEDDER:  Move for a mistrial.

23          THE COURT:  Denied.

24          MS. SINGER:  You must find that there are a series

25     of acts that would have to have occurred in that time

1     frame.  You had to have a chronic subdural hematoma,

2     which has not been proven by autopsy, the gold

3     standard.  That subdural hematoma could not be a

4     hygroma because a hygroma doesn't have blood vessels.

5     It has to be a healing subdural hematoma with a

6     membrane that could bleed.  He has to have that.

7          He has to have been bleeding so much so, as to

8     compress the brain and to cause the brain pressure to

9     be such that the baby would be seizing, or that the

10    blood had to be on the brain, neither of which is

11    medically or anatomically possible.

12         Then you have to believe that all this comes to a

13    paramount when this baby is laid on the bed and

14    Mr. Herlihy goes to take a shower, goes to use the

15    toilet, goes to use the toilet and take a shower.

16    That's what you have to believe.  It doesn't make

17    sense.  Oh, no, no.  Then you have to believe that the

18    baby seizes, rolls once, twice, and dives himself into

19    the crevice so much so that he ends up between this

20    rail and this rail.  His head wedged in there.  To

21    believe that hypothesis, that's what you have to

22    believe.

23         Or you can believe what Brian Herlihy told us when

24    he spoke to Helen Legall at about 11 o'clock p.m., on

25    August the 3rd.  Believe that, you believe that the

1       acts that he performed on that baby, that he did to

2       that baby at that time, perfectly consistent with the

3       injuries that were sustained.

4           And, you know, Mr. Herlihy was getting to it on

5       August the 2nd.  He felt real bad.  First, I didn't

6       shake the baby.  Then, I blew and maybe shook the baby

7       to revive him.  And then he got to the point when he

8       was on his way to the jail, when he knew, when he knew

9       he was found out, All right.  I'll tell you the truth.

10      I'll tell you the truth.

11          Even Anne Dickison in her testimony talked about

12      the seizing and the aspirating as being a far-fetched

13      explanation at best.

14          And one thing about the reasonable doubt

15      instruction, there is no measurement of how many

16      microns there is before you get to a reasonable doubt.

17      What the Court will tell you is, if you have an abiding

18      conviction of guilt, you must find the defendant

19      guilty.  That's the burden that you have, not whether

20      you can measure it in microns, or inches, or feet.  You

21      have an abiding conviction of guilt if the most

22      reasonable common sense explanation for what happened

23      is what that Brian Herlihy told us when he talked to

24      Helen Legall.  That is what is most consistent with

25      every part of the physical evidence, then you must find

1     the defendant guilty because there is no reasonable

2     doubt.

3          Let's talk a little bit very quickly about police

4     witnesses.  We're not supposed to believe Orlando

5     Alvarez because Rob King disagreed with him.  Orlando

6     Alvarez is a seasoned training officer who wrote a

7     report, by the way.  And he wrote down in words that he

8     recalled what the defendant told him on that day, he

9     jumped into the shower and the baby was laid face down

10    on the bed.

11         Robert King was a trainee, didn't write a report.

12    When I cross-examined him, he agreed that everything

13    that I said on cross-examination, which was everything

14    that was in Alvarez' report, was accurate.  Then he

15    came back and said everything he told Mr. Groland was

16    accurate.  Well, you can't have it both ways.

17         Robert King is a nice man.  He's going to be a

18    very good police officer, but he was a brand new, he

19    said, green officer on the stand at this time and he

20    was.  He was just following along and learning, and

21    he's going to be a very skilled officer.  But at that

22    time he wasn't paying the kind of attention that

23    Orlando Alvarez was.

24         So when you weigh the credibility of witnesses,

25    you can weigh that, and I ask you to do so.

1          And just to make sure that we understand when

2     we're talking about a sham here, for those of you who

3     don't know, folks, this is a pillow, and a sham.  The

4     covering of this pillow is what we call the sham.  This

5     is a pillow sham.  This, that was referred to as a

6     sham, is a dust ruffle, and this is a comforter.

7          Mr. Herlihy said that he had stuffed the sham,

8     pillow sham into the crevice between the footboard and

9     the mattress.  He was allowed to choose whatever sham

10    he wanted, the thick sham, or the thin sham.  He chose

11    the thinner sham.  He laid out the bed the way he

12    wanted.  Sergeant Halvosa said that, Sergeant Seale

13    said that, Investigator Legall said that.

14         Mr. Groland wants you to think that Investigator

15    Legall was lying because she said on the tape that she

16    didn't ask him specifically, Were each of the pillows

17    aligned exactly the same way as when you left the baby

18    today, Mr. Herlihy?  No.  She asked him the original

19    question, Is this the way it looked?  Is this basically

20    the way it looked?  Yes, ma'am.  Go ahead.  Show us.

21    Move the pillows around.  You're free to do whatever

22    you want.  You're free.  Tell us everything.  We're

23    waiting on you to tell us.  We're not telling you.

24         He told them and it didn't make sense.  They're

25    not lying.  They're not out hunting bear.  They are

1    waiting for him to give a reasonable explanation, and

2    he couldn't give it.  He couldn't give it.

3         The pillows aren't an issue, the way the pillows

4    were before, the way the pillows were.  After you look

5    at the photographs, it's obvious those pillows weren't

6    moved.

7         Tina Millard went in there 1:40, about 1 o'clock,

8    took pictures, 1 o'clock, 1:40, you have those.  She

9    went back in 2:55 with Cannon and Halvosa, took

10   pictures, the same ones.  The Polaroids are not quite

11   as clear, but they're the same type pictures as the

12   ones she took earlier.  He comes in.  They let him move

13   the pillows around as much as he wants.  He can't get

14   the baby in horizontally, so he moves the sham

15   vertical, which Detective Seale says on the tape, Gee,

16   that would even make it harder for him to get over.

17   Larry Seale:  I just noticed that when he were pushing

18   it down, it took a little force to do that.

19        Then at that point the defendant changes the sham.

20   I guess I'm trying to visualize this with him laying

21   here.  Can he crawl?  I mean, this is not an

22   investigator who's setting Brian Herlihy up.  This is

23   an investigator looking, going, This doesn't make

24   sense.  This doesn't make sense.  The way the pillows

25   slanted, you sure he can roll that way?  His

1    explanation didn't make sense.  This wasn't officers

2    trying to set him up.  This is Brian Herlihy getting

3    caught in his lies.

4        You heard testimony from Nicole Perroni there's no

5    blood on this comforter.  This baby vomited blood.  The

6    swabbings that were taken the day of August the 2nd

7    came back positive for Robbie Quirello's blood.  The

8    carpet came back positive for Robbie Quirello's blood.

9    Brian Herlihy said this baby vomited a stain of three

10   or four inches in diameter.  There is no stain on this

11   comforter.  You will not find a stain on this comforter

12   Nicole Perroni searched that comforter looking for a

13   place to test for vomit, which would have had blood in

14   it because that's what the vomit had on the floor.

15   There was no vomit on that comforter.  The baby didn't

16   vomit on that comforter.

17       The baby got thrown on that bed, and when he

18   started looking like he was going out, he was picked up

19   and put to the floor, and that 911 operator gets called

20   and at the point that he was really getting sick, he

21   vomited on the floor.

22       Confusion about the video:  Boy, I wish we had a

23   video.  You know what?  You're gonna hear an

24   instruction that tells you you have to consider the

25   evidence you do have, not evidence that you could have

1   had, not evidence that you don't have, but the evidence

2   you do have.

3        These police officers who testified, swore to tell

4   the truth.  They told the truth as best as they knew

5   it.  Sergeant Halvosa was not called by me.  He would

6   be a cumulative witness for me.  He would be somebody

7   who would be repeating testimony for me.  He was called

8   by the defense.  I already had Helen Legall and Larry

9   Seale testify to what they knew.  He was called by the

10  defense and he confirmed what happened at that

11  reenactment.  He confirmed what he saw.

12       When you're instructed about the credibility of

13  witnesses and weighing credibility of the witnesses,

14  you can decide whether or not they have reasons to lie,

15  whether or not they have an interest in the case,

16  whether or not the testimony is consistent with one

17  another.  I submit to you that their testimony is

18  consistent, that there is no reason for them to lie,

19  that they told it like it was, and that's for you to

20  ultimately determine.

21       Helen Legall was on the stand for five and a half

22  hours.  She was not impeached.  There was an effort to

23  impeach her over a question that was asked at a bond

24  hearing, but she wasn't even allowed to look at the

25  testimony before she could answer the question.  He

1    read it from his podium.  He didn't let her look at the

2    testimony at all.  She didn't hear the question

3    completely.  It was only after I, on cross-examination,

4    had her read the question and I asked her, Do you

5    remember that?  And she said, Yes.  The answer to my

6    question is true, the first time I heard it, you and

7    Mr. Groland together, you, and Ms. Singer, and Mr.

8    Groland together had gone to talk to the radiologist

9    was today.

10        The answer was correct.  He made it look like she

11   was trying to lie.  She was totally confused.  He even

12   had to admit in his closing, even had to admit today in

13   his closing, it was confusing.  He tricked her.  He

14   tricked her.  He tricked her.  He didn't make her out

15   to be a liar.  She's not a liar.

16        She worked very hard on this case.  She had a very

17   thorough investigation.  For five and a half hours you

18   saw her go through her report and look for details that

19   he asked her about.  She was not impeached.

20        The reason why Helen Legall, two reasons why Helen

21   Legall did not look into the issue of the old subdural

22   hematoma re-bleeding, causing a seizure, causing Robbie

23   to fall into the crevice of the bed, is because

24   Dr. Dickison, Levine, Maria all said that is not how

25   this baby got injured.  She was told that this injury

1    occurred between 9:00 and 9:34.  This was not the

2    result of an old injury.

3        She did her interviews.  She talked to Crystal.

4    She didn't have to talk to Crystal on the 2nd of August

5    because another officer at the hospital did -- took an

6    in-depth interview of Crystal and they knew Crystal was

7    not there.  They knew on August the 2nd Crystal was not

8    with the baby when the baby was injured.  Crystal was

9    ruled out as a suspect after that interview.  There was

10   only one other person that was with the baby, and as

11   she discovered that at 2:55 in the afternoon that

12   Crystal was no longer a suspect, she advised

13   Mr. Herlihy of his rights.  He was the focus of the

14   investigation.  He was not under arrest.  He was just

15   the focus of the investigation.  She did it just the

16   way the book says to do it.

17       And the thing that's most interesting is, that

18   Mr. Groland wants to tell Helen Legall about how to get

19   information from people and Helen explained to you,

20   Investigator Legall explain you, you don't get

21   information from people by accusing them of causing

22   injuries.  You ask them questions.  Tell me about your

23   baby.  Tell me whether or not your baby has ever been

24   injured before.  Open-ended questions, questions that

25   gather information, not leading questions that accuse,

1      not accusatory questions, but open-ended questions.

2            She spent two and a half hours with Crystal when,

3      sadly to say, the baby was near death, and then she

4      spoke for a lengthy period of time with John after the

5      baby's funeral on the 15th.  She gathered information

6      during that entire time.

7            But based upon the medical testimony, based upon

8      Dr. Levine's unquestionable, unequivocal statements to

9      her about the retinal hemorrhaging and how they occur,

10     based upon the totality of the circumstances, she knew

11     that the window of time was between 9:00 and 9:34.  She

12     did her job as best as she could under the

13     circumstances that she could, and there is no question

14     that Helen Legall's credibility has not been shown to

15     be bad here.

16           She had eight hours of deposition, could impeach

17     her from any of that.  She had five and a half hours of

18     testimony.  She maintained throughout what she did.

19     She was honest and straightforward with every question

20     that was asked of her.

21           Where is Investigator Weaver?  There's no

22     necessity for Investigator Weaver because Helen Legall

23     is a credible witness, and her testimony should be

24     considered by you, and what she says happened, and what

25     she says Brian Herlihy told her.

Stacey K. Bryant, RPR
Judicial Court Reporter

1        If Helen Legall was going to frame Brian Herlihy

2    in the early morning hours of August the 4th, and late

3    evening hours of August the 3rd, I submit to you she

4    would have made a much better story up than I swung him

5    to and fro.  He was laughing and I plopped him on the

6    bed.  His head bounced and his eyes rolled back.  I

7    submit to you that if she was in the business of trying

8    to put Brian Herlihy in jail, she would have made up a

9    much better story than that.  She would have fit his

10    statement to fit every single part of this case without

11    equivocation so that she would have a jam up, jelly

12    tight case.

13        You know it's very easy to Monday morning

14    quarterback what the police should have done, but you

15    as jurors are going to be instructed that you are to

16    consider the evidence.  The evidence is testimony, the

17    evidence is the physical evidence, the evidence is the

18    photographs.  You are to consider the evidence that has

19    been introduced in this trial, and to that alone, in

20    determining your verdict.

21        It's easy to Monday morning quarterback.

22    Videotapes and duras and all this stuff, those are

23    collateral matters to what has been proven to you by

24    testimony.  Mr. Groland said, What is all that about?

25    That's for you to decide, folks.  That's what was taken

1     out of the house with the search warrant, along with

2     this bed that's missing a huge huge piece.  The part of

3     this bed that held it together and kept it firm and

4     together, that piece is missing.  It wasn't in the

5     house on the 16th when they did the search warrant.

6     For you to decide.

7          If we didn't put all those pieces of evidence in,

8     if I didn't move in that little tedious thing with Tina

9     Millard on the stand, a piece, by piece, by piece, if I

10    didn't put it all in, you know what I would be hearing?

11    What are they hiding from you?  How come you didn't see

12    the booties?  Where's the bottle?  Where is the diaper

13    bag?  That's reasonable doubt, members of the jury, you

14    didn't see that diaper bag.  You didn't see that bag.

15    That's a reasonable doubt.  There's a hundred

16    reasonable doubts in this case, members of the jury,

17    because you didn't get to see the diaper bag or the

18    booties.  That's what you would hear, just like where's

19    the dura?  Where's the lungs?  Or where is the baby's

20    little toe?  That's what you would hear, because that's

21    an argument that is made.  You have all the evidence

22    that's been collected and all the testimony.

23         The search warrant and the application, as I said,

24    there is no mention of an old subdural hematoma because

25    it isn't relevant in this case.  The injuries occurred

1    on August the 2nd between 9:00 and 9:34.  But what do

2    we get from the search warrant that tells us something?

3    Two things:  A bed that's been dismantled, the place

4    where the crime took place, and it was in the process

5    of being dismantled, and you have a bag in a closet

6    hidden behind clothing.  That's what you have from that

7    search warrant.

8        And I think it's very very important to note that

9    from the 2nd of August, after the reenactment, Brian

10    Herlihy was allowed to stay home.  These police

11    officers were planning to use this in some way of

12    railroading him.  Why did they let him stay home?  They

13    let him stay home because they were still in the course

14    of a thorough investigation.  And when they were able

15    to put all the pieces together, it pointed in only one

16    direction, the direction of Brian Herlihy.  He knew,

17    too.  He knew, too, that he was sunk because he knew

18    his explanation didn't make it.  He knew his lies

19    didn't fit.

20        On August 3rd, the morning of August 4th, Brian

21    Herlihy was in jail.  Where is that?  Where is the top

22    to that bed?

23        MR. TEDDER:  Object, your Honor, last argument is

24    improper.

25        THE COURT:  Overruled.

1     MS. SINGER:  Mr. Groland said, Brian never said

2     the injuries occurred as a result of the baby being

3     wedged in the bed.  That's correct.  Brian never said

4     that the injuries occurred as a result of this baby

5     being wedged in the bed.  Brian said these injuries

6     occurred when he shook him, and he tossed him on the

7     bed so hard his head bounced.  Brian said he was rough

8     with that baby and he knew it.  Brian said that baby

9     was crying, it wouldn't stop crying, it was fake

10    crying, he wanted attention and it got under his skin.

11    That's what Brian said.

12        This case is not about Crystal Quirello, not about

13    her relationship with John Quirello, not about whether

14    or not the police were called out to Williston or to

15    Archer where they lived, because Crystal Quirello is

16    not the perpetrator of the injuries to Robbie Quirello.

17        Crystal Quirello has nothing to do with this case

18    except to tell you she wasn't there between 9:00 and

19    9:34, and that's confirmed by Brian Herlihy himself.

20        This case is not about monkey, Rhesus monkeys.

21    This case is not about gravity or physics.  This case

22    is about what happened between 9 o'clock and 9:30.  If

23    I haven't made that point by now, I don't know if I'll

24    ever make that point.

25        Robbie Quirello could not tell us in words what

1    happened to him between 9 o'clock and 9:34 when he was

2    alone with the defendant.  He couldn't tell us in words

3    because he doesn't speak words, and by the time he was

4    seen at Shands Teaching Hospital emergency room at

5    10:00 a.m., he was in a state of coma so much so that

6    he wasn't able to even tell us anything.

7         But he did tell us in a very clear and unequivocal

8    way with the retinal hemorrhaging in his eyes, so bad

9    that Dr. Levine talked about the tearing in the eye, so

10   bad that Dr. Levine talked about the vitreous

11   hemorrhages, and he told us by his state of

12   unconsciousness, with is EEG, and with the CT scan, and

13   his blood work, and his lab work, he told us about what

14   happened at that time, because what happened at that

15   time was identified by the team of physicians who were

16   examining and treating him.

17        He told us with clinical findings, with tests, and

18   with opinions that unquestionably screamed that he had

19   been shaken.  He told us in the only way, in a way that

20   was only heard by those doctors who cared for him, that

21   medical team, who were trained to identify these

22   injuries, how they occur, were trained to treat those

23   injuries, and who came here to testify to what they

24   saw.  They came here, they lined up, and they told you.

25   They told you through Anne Dickison, they told you

1    through Bernie Maria, they told you through Lawrence

2    Levine, and they were confirmed by the pathologists who

3    looked at this baby after death, Dr. Nelson and

4    Dr. Hamilton, that this baby died of traumatic injuries

5    sustained during that time frame.

6        This medical team didn't know Brian Herlihy, they

7    have no links to Brian Herlihy, they have no prejudice

8    against Brian Herlihy, they have no feelings of favor

9    for Brian Herlihy.  Their only concern was Robbie

10   Quirello, and a justifiable concern that is.

11       They have no special interest in the outcome of

12   this case.  They rendered learned opinions based on

13   what they saw and what they know.

14       If you return a verdict of guilty, it should be

15   for the highest offense that the state has proven.

16   That is your duty as jurors in this case.  You must not

17   decide this case for or against anyone because you are

18   angry with anyone, or because you feel sorry for

19   anyone, whether it be the family, the Quirello family,

20   or whether it be Mr. Herlihy.

21       When Robbie Quirello was in the hands of this

22   defendant, he was beyond the protection of the law.  It

23   was Robbie, the infant, versus Brian Herlihy, the

24   adult.  We're all here and we all must follow the law.

25   Now, Brian Herlihy is not beyond the justice of the

1    law.

2         Robbie Quirello was born on March 22nd, 2000.  On

3    August 2nd of the year 2000 he should have been safe.

4    He was with an adult.  He should have been safe.  He

5    should have been allowed to cry and be an infant.  He

6    wasn't safe, members of the jury.  He was in the hands

7    of the person who killed him.

8         Robbie Quirello was a citizen of this state and at

9    four and a half months old he stands as a citizen of

10   this state and a citizen of this country, and he has

11   the same constitutional protections as every citizen.

12   As such, he's entitled to the same justice under the

13   laws that any of us are entitled to.

14        That's what we're seeking today.  We're seeking

15   justice, members of the jury.  We're seeking a verdict

16   that holds Brian Herlihy accountable for what he did

17   between 9 o'clock and 9:34 a.m., on August the 2nd, not

18   for Crystal Quirello and John Quirello's relationship,

19   not for what happened two or three weeks before, but

20   what happened between 9:00 and 9:34 a.m.  We ask you to

21   return a verdict that reflects justice.  On behalf of

22   the people of the State of Florida I ask you to return

23   a verdict of guilty as charged.  Thank you.

24        THE COURT:  All right.  Ladies and gentlemen, as I

25   told you we're gonna recess for the night at this time.

```
 1        I am gonna ask you to come here early in the morning so
 2     that we can give you the instructions early, and that
 3     you can begin your deliberations early.  Of course I'm
 4     going to instruct you that you not listen to any news
 5     reports, or look at any newspapers, or have anything to
 6     do with local news that might have information
 7     regarding the trial in this case.
 8        I will ask that you be here by 8:20 in the morning
 9     so that we can begin the instructions promptly at 8:30,
10     and then you will begin your deliberations.  As I
11     advised you before, once deliberations begin, you will
12     not be allowed to separate.  Meals will be brought to
13     you as needed.  So if you need to make any preparations
14     based on speculation, total speculation on how long
15     deliberations may take, feel free to do that.  But, of
16     course, we will make arrangements as necessary.  So you
17     don't need to worry about that in advance.
18        If you have any property in the jury room, you may
19     collect it and then you're free to go.  And, Ms. Pena,
20     I believe you had a question that we'll address if you
21     can wait just a minute.  The rest of you may collect
22     any property that you have.  Ms. Pena, if you want to,
23     you can go ahead and lock up your notebook first.
24            (Outside the presence of the jury.)
25            THE COURT:  While we're waiting for the jury to
```

1      come through, I want to make sure everyone is clear

2      about what time we're gonna start in the morning.

3      Since there has been some confusion before when we

4      changed the schedule, the state understands you're to

5      be here at 8:20?

6           MR. PENNYPACKER:  Yes, ma'am.

7           MS. SINGER:  Yes, ma'am.

8           THE COURT:  To begin at 8:30?

9           MS. SINGER:  Yes, ma'am.

10          THE COURT:  Okay.  Does the defense understand

11     that you are to be here at 8:20 to begin at 8:30?

12          MR. GROLAND:  Yes, ma'am.

13          THE COURT:  Clerk have that information, 8:20,

14     8:30?

15          THE CLERK:  Yes, ma'am.

16          THE COURT:  Bailiff understands 8:20?  We're gonna

17     begin at 8:30.  Court reporter have that information.

18          COURT REPORTER:  Yes, ma'am.

19          MS. SINGER:  Are we doing the juror today?

20          THE COURT:  Yes.

21          MS. SINGER:  All right.  Does she know that?

22          THE COURT:  Yes.

23          (Pause in the proceedings.)

24          THE COURT:  Ms. Pena, during jury selection you

25     let everybody know that you had a case pending where

1    you were the victim or a witness, and I understand that

2    you have approached the state attorney's office to try

3    to address that case and were told that they couldn't

4    speak to you at this time.  I need to ask you if that,

5    any of that is in any way affecting your ability to be

6    a juror in this case?

7              JUROR PENA:  Not really because the thing was --

8              THE COURT:  You don't have to go into that.

9              JUROR PENA:  Okay, okay.

10             THE COURT:  I just need to know is it affecting

11   you or not?  I need a firm yes or a no.

12             JUROR PENA:  Well, at this point I had to solve it

13   any way I could.  So -- They couldn't do nothing

14   Friday, so I had to go away with two kids.  It's not

15   solved completely.

16             THE COURT:  Is that affecting your ability to be a

17   juror in this case?

18             JUROR PENA:  No.

19             THE COURT:  Good enough.  That's the only thing I

20   need to be sure about and we'll see you at 8:20 in the

21   morning.  Thank you very much.

22             JUROR PENA:  Okay.

23             (Juror excused.)

24             THE COURT:  All right.  Anything else we need to

25   put on the record before the jury instructions?

1        MR. TEDDER:  None that I know of.

2        THE COURT:  I am, as we have discussed, going to

3   advise the jurors that they will be allowed to come

4   into the courtroom to examine the bed, in particular.

5   I will instruct court administration first thing in the

6   morning to block the windows so that there will be no

7   way to observe the jurors doing that, and I will

8   instruct court security that they are to remain inside

9   the courtroom, and in the event the jurors request that

10  they be allowed to utilize this space, that you then

11  position yourself immediately out the door and give

12  them basically the same instruction whereas here they

13  would ring the bell if they need to leave, or ask a

14  question, or ask for anything, we'll ask that they

15  knock on that door so you'll know when to come back in.

16       MR. BAILIFF:  That's if they want --

17       THE COURT:  If they come into this space, you will

18  clear this space so that they are alone within the

19  courtroom.

20       MR. BAILIFF:  Yes, your Honor.

21       THE COURT:  Anything else that we need to address?

22       MR. GROLAND:  No.

23       THE COURT:  Good enough.  We are in recess until

24  8:20 in the morning.

25                    *  *  *  *  *

Stacey K. Bryant, RPR
Judicial Court Reporter

202-1-17814
F

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY }
           Appellant, }

                               CASE NUMBER   2000-2753-CFA }

}

}

v.                                          APPEAL NUMBER 1D02-4788 }

}                          VOLUME XXII

STATE OF FLORIDA }
           Appellee, }

# TRANSCRIPT
# RECORD

## HONORABLE MARTHA ANN LOTT
### ACTING TRIAL JUDGE

**APPEAL FROM THE CIRCUIT COURT**
**8th JUDICIAL CIRCUIT FOR**
**ALACHUA COUNTY, FLORIDA**

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050