# EXHIBIT

# Y

*∂o2-1-1781*
*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY }
       Appellant, }

}
}
}
}
}

CASE NUMBER   2000-2753-CFA

APPEAL NUMBER 1D02-4788

v.               }

}
}

VOLUME XXV

}

STATE OF FLORIDA }
         Appellee, }

05-14-2003

## TRANSCRIPT
## RECORD

### HONORABLE MARTHA ANN LOTT
ACTING TRIAL JUDGE

### APPEAL FROM THE CIRCUIT COURT
### 8th JUDICIAL CIRCUIT FOR
### ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

202-1-17814

F

IN THE CIRCUIT COURT OF FLORIDA
EIGHTH JUDICAL CIRCUIT
IN AND FOR ALACHUA COUNTY

CASE NO: 01-2000-CF-2753-A

TRANSCRIPT ON APPEAL
(Pages 1 - 185)

Volume XXVI

1D02-4788

COPY

STATE OF FLORIDA

vs.

BRIAN PATRICK HERLIHY,

Defendant.

______________________________/

Proceedings: Pretrial motions

Before: The Honorable Martha Ann Lott, Circuit Judge

Date: September 4, 2002

Time: 9:00 a.m.

Place: Courtroom 3-D
Alachua County Courthouse
Gainesville, Florida

Reporter: Stacey K. Bryant,RPR
Judicial Court Reporter

Docketed CH 5-14-03 Florida Attorney General

APPEARANCES:

Jeanne Singer, Assistant State Attorney
Stephen Pennypacker, Assistant State Attorney
120 W. University Avenue
Gainesville, Florida 32608
Appearing on behalf of the State of Florida

Gordon Groland, Esquire
John Tedder, Esquire
Post Office Box 2848
Gainesville, Florida 32602
Attorneys for defendant

12 PM 2:40 CLERK'S OFFICE ... APPEALS ... TALLAHASSEE

INDEX TO PROCEEDINGS

RULE OF SEQUESTRATION INVOKED: ..................... 4

WITNESSES:


ORLANDO ALVAREZ,

DIRECT EXAMINATION BY GROLAND: ..................... 5
CROSS-EXAMINATION BY SINGER: ...................... 23
REDIRECT-EXAMINATION BY GROLAND: .................. 32
RECROSS-EXAMINATION BY SINGER: ................... 33
FURTHER REDIRECT BY GROLAND: ...................... 34, 36


VALERIE DAWSON,

DIRECT EXAMINATION BY GROLAND: .................... 36
CROSS-EXAMINATION BY SINGER: ...................... 59

BRUCE FERRIS,

DIRECT EXAMINATION BY GROLAND: .................... 60


DAVID CANNON,

DIRECT EXAMINATION BY SINGER: ..................... 71
CROSS-EXAMINATION BY GROLAND: ..................... 85
REDIRECT-EXAMINATION BY SINGER: .................. 98


ROBERT KING,

DIRECT EXAMINATION BY SINGER: .................... 105
CROSS-EXAMINATION BY GROLAND: .................... 107
REDIRECT-EXAMINATION BY SINGER: ................. 111
RECROSS-EXAMINATION BY GROLAND: ................. 112

HELEN LEGALL,

DIRECT EXAMINATION BY SINGER: ................... 114
CROSS-EXAMINATION BY GROLAND: ................... 137
REDIRECT-EXAMINATION BY SINGER: ................ 161


911 TAPE PLAYED: ............................... 000




ALAN COLEMAN,

DIRECT EXAMINATION BY SINGER: ................... 171
CROSS-EXAMINATION BY GROLAND: ................... 174
REDIRECT-EXAMINATION BY SINGER: ................ 177
RECROSS-EXAMINATION BY GROLAND: ................ 178

Stacey K. Bryant, RPR
Judicial Court Reporter

0002563        0002296

P R O C E E D I N G S

1   
2   THE COURT:  All right.  I have a whole stack of

3   motions here, so if you all can help me decide in what

4   order we're going to address these.

5   MS. SINGER:  Your Honor, I believe Mr. Groland has

6   a number of evidentiary motions and we do have

7   witnesses present, so perhaps we can take on those

8   motions first.

9   MR. GROLAND:  Your Honor, if I may, there are two

10  motions to suppress that deal with testimony.  We would

11  like to take those first.  Then there is a motion in

12  limine, some of which we agree on.  Other matters we'll

13  ask the court to defer on.  That we would like to take

14  after the witness testimony.  There is a third motion

15  to dismiss the indictment because of destruction of

16  evidence and that we have both agreed since this is

17  something that's recently come up, that we will defer

18  to another date when we can have a hearing where

19  perhaps the medical examiner is present.  We haven't

20  decided on that, but we're not gonna do that today if

21  that's okay with the court?

22  MS. SINGER:  Your Honor, I would like the record

23  to reflect that that motion was served on me this

24  morning.  I did not have any written motion and there

25  was no way that I could prepare for that response.

Stacey K. Bryant, RPR
Judicial Court Reporter

0002564     0002297

1      Secondly, I would like the court to be advised

2    that one of the motions in limine, I think it's eight

3    separate paragraphs, was served at about a quarter to

4    5:00.  I can meet many of the issues in that motion,

5    but there are several issues that due to the time and

6    the extent of the time I had after 5:00 p.m. to

7    respond, I am not prepared to meet every one of those

8    motions.  And so I would ask that those be deferred and

9    I believe some of them can be deferred to trial.

10    They're motions in limine that are evidentiary in

11    nature.  I could never get witnesses here in time.

12      MR. GROLAND:  Very briefly, your Honor.  We just

13    got their motions yesterday and what has happened here

14    is, we just got notice at the end of last week about

15    when your Honor set this hearing for this morning at 9

16    o'clock.  So both sides were scurrying to get motions

17    done as soon as possible with regard to the motion to

18    dismiss.

19      We didn't take the medical examiner's deposition

20    until Friday and didn't find out about the information

21    about the evidence until then.  I called them.  In fact

22    I called Steve after the deposition.  We were gonna

23    file a motion to dismiss because the evidence has been

24    destroyed, certain evidence.  So neither side is

25    prepared to go forward on that today.

1     MS. SINGER:  I just want to clarify one thing for

2     the record since this record may be very important in

3     the future, my motions were filed before yesterday with

4     the exception of two motions that were served

5     yesterday.  I would refer to the clerk's notes and I

6     would like those notes to refer to when they were

7     filed, your Honor.

8          As to the motions that -- on the issues -- on the

9     evidentiary issues, Mr. Groland was kind enough to tell

10    me, although it wasn't in written motion form, the

11    issues that he was interested in so that I could get my

12    witnesses present.  I would like the record to be clear

13    that although I didn't get the written motions until

14    yesterday for the evidentiary hearings, he did meet

15    with me and discuss what the issues were so I knew

16    ahead of time to get my witnesses here.

17         THE COURT:  All right.  Mr. Groland, which of the

18    motions to suppress do you want to proceed with first?

19         MR. GROLAND:  The motion to suppress evidence.  I

20    would like to call Officer Alvarez first and invoke the

21    rule and have the rest of the witnesses stay outside.

22         THE COURT:  Is this the motion that you filed the

23    3rd of September?  Is that the motion you're talking

24    about?

25         MR. GROLAND:  Yes.

1    THE COURT:  Okay.

2    MS. SINGER:  That would be the motion alleging

3 that the walk-through -- the evidence -- any evidence

4 contained in the walk-through, Mr. Groland?

5    MR. GROLAND:  Yes, that's correct.

6    MS. SINGER:  And then also the later allegation

7 that Gainesville Police Department entered the

8 defendant's apartment on a separate occasion without a

9 search warrant and without consent and took

10 photographs?

11    MR. GROLAND:  Yes.

12    MS. SINGER:  That's the last paragraph?

13    MR. GROLAND:  Yes.

14    MS. SINGER:  And then there's paragraph seven that

15 says, "Other grounds will be argued at the hearing."

16 I'm not sure what those other grounds are.  I'm not

17 sure I'll be prepared to respond, but I will try my

18 best.

19    THE COURT:  Yes, I think that would be a good idea

20 since jury selection is scheduled for Monday morning.

21    MS. SINGER:  Yes, ma'am.

22    THE COURT:  Go ahead, Mr. Groland.  You want to

23 invoke the rule?

24    MR. GROLAND:  Officer Alvarez.

25    THE COURT:  All right.  All of the other witnesses

1    do we need to exclude them from this sequence of

2    hearings?  The Rule's been invoked as to --

3         MS. SINGER:  Yes.  All of those witnesses would be

4    involved in just about all of the hearings.

5         THE COURT:  Good enough.  All of you who are

6    standing have been named as witnesses in one or more of

7    these many motions that we're gonna try to cover this

8    morning.  The Rule has been invoked and as you know

9    what that means is you must remain outside the

10   courtroom while the hearing is being conducted.  You

11   must not discuss this case or your testimony with

12   anyone other than the two defense attorneys who are

13   present, or the two state attorneys who are present.

14   If any lawyer comes outside to speak with you about

15   your testimony, you must make sure that you are away

16   from anybody else so that your conversation is

17   completely private.  Now if you all will have a seat

18   outside.

19        If you can raise your right hand, please, sir.

20             ORLANDO ALVAREZ,

21   having been produced and first duly sworn, testified as

22   follows:

23             DIRECT EXAMINATION

24   BY MR. GROLAND:

25   Q    Sir, would you state your name and occupation?

1      A     Orlando Alvarez, police officer, City of

2   Gainesville.

3      Q     How long have you been a police officer?

4      A     Total, just over 12 years.

5      Q     Okay.  You are familiar with this case, State of

6   Florida vs. Brian Herlihy?

7      A     Yes, sir.

8      Q     And I believe you were actually dispatched to the

9   scene on August 2nd, 2000 in the morning hours, correct?

10     A     Yes, sir.

11     Q     Where was that scene?

12     A     It was 1015 S.W. Ninth Street, Apartment A-21.

13     Q     Okay.  What kind of a call were you dispatched to?

14     A     The call originally came out as a deceased

15   pediatric patient and while I was in route, dispatch

16   informed me that the child had been resuscitated and was

17   being transferred to Shands.

18     Q     What time did you get the call?

19     A     9:52 approximately.

20     Q     Okay.  What time did you arrive?

21     A     9:56 I think based on the report, the numbers that

22   I put in my report.

23     Q     So you were close by?

24     A     Relatively close, yes, sir.

25     Q     All right.  And the address was 1015 S.W. Ninth

```
 1    Street?

 2        A    Yes, sir.

 3        Q    Apartment A-21?

 4        A    Right.

 5        Q    Were you riding by yourself or did you have

 6    somebody with you?

 7        A    No, I have someone with me.

 8        Q    What was that person's name?

 9        A    Robert King.

10        Q    He was in training?

11        A    Yes, sir.

12        Q    You were his training officer?

13        A    That's correct.

14        Q    When you got there to that address, correct me if

15    I'm wrong, the child in question had already been

16    transported to the hospital?

17        A    That's right.

18        Q    And the two other individuals there, one was Brian

19    Herlihy and the other was Crystal Quirello, they also --

20        A    They also --

21        Q    -- had left?

22        A    The area, that's correct.

23             MS. SINGER:  I'm going to object to the leading

24        nature, your Honor.  I realize we don't have a lot of

25        time, but I want to make sure that this is a
```

1   non-leading direct examination.

2          THE COURT:   Objection is sustained.

3   BY MR. GROLAND:

4   Q     Who was there?

5   A     When I arrived on scene, there was personnel from

6   Gainesville fire and rescue and EMT's.

7   Q     And where were they?

8   A     I remember the fire truck being parked outside and

9   there were several personnel walking up and down the stairs

10  in the apartment.

11  Q     Was everybody out of the apartment?

12  A     I don't recall if everyone was out of the

13  apartment.

14  Q     Do you remember me taking your deposition on March

15  the 3rd?

16  A     Yes, sir.

17  Q     Okay.  Have you read over that deposition before

18  today?

19  A     Yes.

20  Q     Let me just ask you the question again.  Do you

21  recall now whether or not there was anybody in the

22  apartment?

23  A     I don't recall.

24  Q     Okay.  Do you remember that anybody came out of

25  the apartment?

```
 1        A     Yes.

 2        Q     Who?

 3        A     EMS personnel, GFR personnel.

 4              MR. GROLAND:  Okay.  Your Honor, may I just

 5        approach counsel?

 6   BY MR. GROLAND:

 7        Q     Page four, deposition taken on March 3rd at

 8   10 o'clock, do you remember this question -- Do you have the

 9   deposition there?

10        A     Yes, sir.

11        Q     Line nine on page four, question, "Were the

12   personnel on the fire truck already in the apartment when

13   you arrived on the scene?"  The answer, "No.  They were

14   outside the apartment."  Do you remember that?

15        A     Yes.

16        Q     Is that accurate?

17        A     That's accurate.

18        Q     Who else was there, if anybody, when you got

19   there?

20        A     The only other officer?

21        Q     Who else --

22        A     Robert King was with me and I don't know anyone

23   else by name, but at that point EMS personnel.  Sometime

24   later Sergeant Val Dawson arrived.

25        Q     Okay.  Your sergeant comes up at some point?
```

```
 1        A     Correct.

 2        Q     She came up shortly after you arrived?

 3        A     Sometime thereafter, yes, sir.

 4        Q     Yes.  And that would be Sergeant --

 5        A     Val Dawson.

 6              THE COURT:  Mr. Groland, there's been an objection

 7        to leading questions.  It has been sustained.

 8              MR. GROLAND:  Your Honor, I'm not gonna ask the

 9        court to declare him a hostile witness, but I mean he

10        is an adverse witness in as much as he's a state

11        witness and --

12              THE COURT:  As soon as there is any indication on

13        the record that he is a hostile or adverse witness,

14        then of course that motion would be appropriate and

15        until that time the motion has been sustained.

16              MR. GROLAND:  All right.

17  BY MR. GROLAND:

18        Q     When Sergeant Dawson came to the scene, did you

19  have a discussion with her outside the apartment?

20        A     Yes.

21        Q     And what was that discussion about?

22        A     If I recall, briefly just the nature of the call.

23        Q     Okay.

24        A     And where people were transported to.

25        Q     Okay.  Did you and the Sergeant make a decision to
```

1   do something?

2        A     Yes.

3        Q     And what was that decision?

4        A     Enter the apartment.

5        Q     All right.  And who actually made that decision?

6        A     I think it was Sergeant Dawson's call.

7        Q     Okay.  For what purpose did you enter the

8   apartment?

9        A     We entered basically to determine if there was

10  anybody else other than EMT or GFR personnel inside the

11  apartment and determine if there were any signs of foul

12  play.

13       Q     Do you recall indicating in your report and in the

14  deposition that you entered the apartment because you were

15  looking for evidence of foul play?

16       A     Yes.

17       Q     Is that true?

18       A     Yes.

19       Q     Did you have the consent from anybody to enter the

20  apartment?

21       A     No.

22       Q     Did you have a search warrant?

23       A     No.

24       Q     Did you have any kind of probable cause?

25       A     No.

```
 1      Q    Was there any exigent circumstances that you knew

 2   of that you can describe today?

 3      A    The only answer I would give to that is the

 4   original nature of the call.

 5      Q    All right.  And what was that?

 6      A    Deceased pediatric patient.

 7      Q    Okay.  And while you were there, did you learn

 8   that the child was not in fact deceased?

 9      A    Yes.

10      Q    And that the child was no longer on the premises?

11      A    That's correct.

12      Q    How long did you stay in the apartment once you

13   got inside?

14      A    No more than ten or 15 minutes.

15      Q    What did you do while you were in there?

16      A    Just a walk-through.

17      Q    Okay.  Did you take photographs?

18      A    No.

19      Q    Did you make any diagrams?

20      A    No.

21      Q    Did you take any measurements?

22      A    No.

23      Q    Did you collect any evidence?

24      A    No.

25      Q    All right.  This is a small apartment?
```

 1     A     Yes.

 2     Q     Tell me what you did for 15 minutes.  I'm a

 3  little --

 4     A     The time may have been less.  I'm not sure.  That

 5  might have been the time that I spent speaking with Sergeant

 6  Dawson, walking upstairs, going through the apartment,

 7  coming back down, talking to the GFR personnel.

 8     Q     And while you were in the apartment, did you make

 9  certain observations?

10     A     Yes.

11     Q     What did you observe?

12     A     The one that sticks out in my mind is the fluid on

13  the carpet in the bedroom.

14     Q     When you say, fluid, do you know -- did you learn

15  either that day or thereafter what that fluid was?

16     A     It looked to me when I was there, it looked to be

17  like baby formula or something like that.

18     Q     Okay.  Did you find any evidence of foul play?

19     A     No.

20     Q     Was Sergeant Dawson with you in the apartment?

21     A     Yes, sir.

22     Q     She actually walked through with you?

23     A     Yes.

24     Q     Okay.  Was she with you just about the whole time

25  you were in there?

1       A    Yes.

2       Q    Did you leave together?

3       A    Yes.

4       Q    Was Officer King with you when the two of you were

5    there?

6       A    I think he was downstairs.

7       Q    Did he ever go into the apartment?

8       A    Not that I recall.

9       Q    Did you observe anything of significance in this

10   case either in the bathroom or on the bed that you now

11   recall?

12      A    No.

13      Q    Or any lack of anything in those areas?

14      A    Correct.  Nothing.

15      Q    Is that no?

16      A    That's a no.

17      Q    Okay.  Where did you go after you left the

18   apartment?

19      A    Shands ER.

20      Q    You went directly to Shands?

21      A    Yes.

22      Q    Okay.  With King?

23      A    Yes.

24      Q    And for what purpose?

25      A    Just to determine if I could speak to someone

1    there, find out what happened.

2          Q    Okay.  Who did you speak to there?

3          A    Mr. Herlihy.

4          Q    Who else did you speak to there?

5          A    At that point it was just basically him.

6          Q    Okay.

7          A    I tried to speak to Ms. Quirello, I think, but she

8    was very distraught and she was with one of the victim

9    advocate personnel.  So --

10              MR. GROLAND:  Your Honor, I will say to the court

11          that this witness has information that relates to the

12          second motion to suppress.  I'll go into that area and

13          leave the area at the apartment instead of calling him

14          back, however the court prefers to do it.

15              THE COURT:  So en route what you're telling me is

16          you would like to overlap and handle both motions

17          simultaneously?

18              MR. GROLAND:  Yes, ma'am.

19              THE COURT:  Fine with me.

20              MS. SINGER:  Do you want me to go ahead and

21          cross-examine him on this issue now or do you want me

22          to do both at the same time?

23              THE COURT:  I would like you to do both at the

24          same time.  Excuse me just a second.  Let me make sure

25          that I have in front of me the second motion to

```
 1            suppress, which was filed on what date?

 2                 MS. SINGER:  3rd of September.

 3                 THE COURT:  I believe -- I have both of them.

 4            They were just put together.  Okay.  Go ahead.

 5                 MR. GROLAND:  Thanks.

 6       BY MR. GROLAND:

 7            Q    You had a conversation with Brian Herlihy there?

 8            A    Yes.

 9            Q    That's Brian Herlihy over there in the red?

10            A    Yes.  The podium was in the way.

11            Q    All right.  Who was with you when you had a

12       conversation with him?

13            A    Officer King.

14            Q    Okay.  And following that conversation with

15       Mr. Herlihy, you then left the hospital?

16            A    I -- Yes, sir.

17            Q    And did you have anything to do with this case

18       from that time until you then became reengaged in this case?

19            A    No.

20            Q    At the hospital as well?

21            A    The second time, right.

22            Q    You came back to the hospital the second time?

23            A    Right.

24            Q    And that was at about 12, noon, or sometime around

25       there?
```

```
 1        A     That's correct.

 2        Q     Okay.  Who caused you to come back or why did you

 3   go back to the hospital?

 4        A     There was a call put in by Kevin Putansu.

 5        Q     Putansu?

 6        A     Putansu.  I'm sorry.  Yes.

 7        Q     He's a social worker at the hospital?

 8        A     Yes, sir.

 9        Q     Did you speak to him on the phone?

10        A     Not on the phone.

11        Q     He spoke to GPD and you got a call?

12        A     He called GPD and I guess dispatch knowing that I

13   had previous -- I worked on the case before, called me back

14   to the hospital.

15        Q     You then went back to the hospital?

16        A     Yes.

17        Q     And at the time you went back, there was shortly

18   after a meeting with several individuals?

19        A     My recollection was it was before the meeting with

20   several individuals.

21        Q     Okay.  After you got there, there was a meeting --

22        A     Yes, after.

23        Q     -- where you were in attendance?

24        A     Yes, I was.

25        Q     And was that shortly after you got there?
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1      A     Yes.

2      Q     All right.  And tell me who was in attendance at

3  this meeting from GPD.  Can I help you with this?

4      A     It was Halvosa, Legall, Seale, Cannon --

5      Q     Coleman?

6      A     Mr. Coleman, Detective Coleman, yes.

7      Q     All detectives?

8      A     All detectives.

9      Q     And some hospital personnel?

10      A     And some hospital personnel, yes, sir.

11      Q     Do you remember the name of the doctor that was

12  meeting with you all?

13      A     Dickison.

14      Q     Anne Dickison?

15      A     Right.  Yes, sir.

16      Q     And was Putansu at this meeting?

17      A     Yeah, I believe so.

18      Q     And at this meeting what was discussed?  Just give

19  us an overview of what the meeting was about.

20      A     The meeting was to discuss the results of the CAT

21  scan.

22      Q     And what was decided at that point?

23      A     Basically it was revealed that CAT scan revealed

24  trauma on the infant.

25      Q     And this is the first time that shaken baby

 1   syndrome was mentioned; is that correct?

 2        A    I didn't hear the term shaken baby syndrome while

 3   I was in the meeting.  It may have been after I left.  But

 4   all I remember was hearing that there was trauma.

 5        Q    Did the investigation at that point in that

 6   meeting change from an accident involving a child to a

 7   criminal investigation?

 8        A    Yes.

 9        Q    Were there detectives deciding in that meeting on

10   what should each one do?

11             MS. SINGER:  I'm going to lodge an objection to

12        the form of the question, leading.

13             THE COURT:  Overruled.

14             THE WITNESS:  I assume so.

15   BY MR. GROLAND:

16        Q    All right.  Were duties delegated in your

17   presence?

18        A    No.

19        Q    Do you know who was put in charge of this

20   investigation at that meeting?

21        A    No.

22        Q    Was Dawson, your sergeant, at this meeting?

23        A    Yes.  One of the sergeants.

24        Q    I'm sorry?

25        A    Sergeant Seale, he's also --

```
 1        Q     Was Sergeant Valerie Dawson, who was with you in

 2   the apartment, also at this meeting?

 3        A     I believe so.

 4        Q     Okay.  Did you have any conversations with her at

 5   this meeting or anytime that afternoon about what you all

 6   saw or found in the apartment?

 7        A     Yes.

 8        Q     Tell me about that conversation.

 9        A     Something to do with the shower, what he mentioned

10   to me about the shower.

11        Q     Who said what to who?

12        A     I think I related to her that he had told me he

13   had gone into the shower.

14        Q     Okay.

15        A     And something developed at the hospital.  I don't

16   know.  She kept asking me about, Well, he told you he went

17   into the shower?  Yeah, he stated he was in the shower.

18   So --

19        Q     Did you have this conversation with her in person

20   at the hospital?

21        A     It was in person at the hospital and I think over

22   our radio.

23        Q     Okay.  When you talked to her over the radio,

24   where was she?

25        A     I think probably, if I recall, either at the
```

1    hospital or back at the apartment.

2        Q    Did she go back inside the apartment to your

3    knowledge?

4        A    After I left?

5        Q    Yeah.

6        A    I don't know.

7        Q    Did she ever tell you she went back inside the

8    apartment?

9        A    No.

10        Q    Do you have any information from anybody else that

11    Sergeant Dawson went back inside the apartment?

12        A    No.

13        Q    What information did you relate to Sergeant Dawson

14    about your observations in the apartment about the shower?

15        A    There was no discussion on my observation, just

16    merely what he said to me.

17        Q    Did she say anything to you about what she

18    observed when she was in the apartment?

19        A    Something to the affect I think that it didn't

20    look as if the water was turned on.

21        Q    Okay.  Did she tell you where she checked the

22    water?

23        A    No.

24        Q    You never talked to Brian Herlihy at the scene?

25        A    Correct.

```
 1        Q    Because you never saw him?

 2        A    Right.

 3        Q    So when you were first at the scene at 10 o'clock,

 4   did you tell Sergeant Dawson about any conversation that you

 5   had with Brian Herlihy?

 6        A    I never spoke to Sergeant -- I mean to Brian

 7   Herlihy at 10 o'clock.

 8        Q    I'm sorry?

 9        A    You said if I asked or talked to Sergeant Dawson

10   about conversation with Mr. Herlihy at 10:00?

11        Q    Yeah.

12        A    Mr. Herlihy wasn't there at 10:00.

13        Q    So you wouldn't have had that conversation?

14        A    Right.

15             MR. GROLAND:  May I just have a minute?

16             (Brief pause.)

17   BY MR. GROLAND:

18        Q    When you left the apartment, did you leave anybody

19   there to watch the apartment?

20        A    Other than Sergeant Dawson?  She stayed behind.

21        Q    She stayed behind?

22        A    Yes.

23        Q    Did she stay inside the apartment?

24        A    When I left, she was outside the apartment.

25        Q    Okay.  Did you have any discussion with the
```

```
 1    Sergeant or anybody else about possibly getting a search

 2    warrant?

 3         A    No.

 4         Q    At anytime?

 5         A    At anytime.

 6              MR. GROLAND:  That's all I have, your Honor.

 7                        CROSS-EXAMINATION

 8    BY MS. SINGER:

 9         Q    Officer Alvarez, when you first got to the scene,

10    you did see EMT and other emergency personnel up and down

11    the stairs of the apartment?

12         A    Yes.

13         Q    And that is -- The apartment's on the second floor

14    of the apartment complex?

15         A    Yes.

16         Q    And were they carrying their medical equipment?

17         A    I believe so, yes.

18         Q    Did you have a brief conversation with them

19    regarding the status of the child?

20         A    Yes.

21         Q    Now you said the call came out as a deceased

22    pediatric patient.  This call was a 911 call?

23         A    Yes.

24         Q    Do you know who made that call to 911?

25         A    No.
```

```
 1       Q    Were you given any information as to whether or

 2  not there were suspicious circumstances at the time the call

 3  came out?

 4       A    No.

 5       Q    A deceased pediatric patient is a call that GPD

 6  routinely responds to when it comes over the dispatch?

 7       A    Yes.

 8       Q    In fact 911 dispatches both law enforcement and

 9  emergency when there is an allegation of a seriously injured

10  or deceased child?

11       A    Yes.

12       Q    And that's standard procedure for you to go out on

13  those calls?

14       A    Yes.

15       Q    Now at the time you get to the call, which is --

16  appears four minutes from the time you are dispatched,

17  you're not given any additional information as to how the

18  child may have suffered the injury, correct?

19       A    That's correct.

20       Q    And you have not talked to Mr. Herlihy, so you

21  haven't heard his side of the story?

22       A    Right.

23       Q    Then you wait a bit for Val Dawson to also come to

24  the scene?

25       A    She arrived shortly after I did.
```

1          Q    And do either of you or both of you speak with any

2     of the EMT personnel before you do the walk-through?

3          A    Briefly.

4          Q    To get some background?

5          A    Just to determine where the child was transported

6     to and who took the --

7          Q    Do you know whether or not Sergeant Dawson

8     obtained any further information as to how the child may

9     have been injured outside of your presence?

10         A    I don't know.

11         Q    Do you know whether or not any of the GFR or other

12    EMT's spoke with Mr. Herlihy and obtained a history of the

13    injury?

14         A    I don't know.

15         Q    In any event, when you get there GFR and EMT's are

16    out there, paramedics are parked outside and people are

17    coming -- it looked to you like they were coming out of the

18    apartment with this equipment?

19         A    Yes.

20         Q    Do you at that point then -- It's my understanding

21    you at that point go up to the apartment to do a

22    walk-through.

23         A    Yes.

24         Q    And the purpose of your walk-through is to make

25    sure that there isn't anybody else in the apartment who may

1    be a suspect in the criminal case, correct?

2         A    Correct.

3         Q    And also to see if there's any other signs of foul

4    play?

5         A    Right.

6         Q    Now were you also in the apartment for the purpose

7    of determining if there was any other evidence that might

8    shed some light on how the injuries occurred to the child?

9         A    Yes.

10        Q    Because that, of course, would be part of the

11   evidence of foul play?

12        A    Right.

13             MR. GROLAND:  Objection, your Honor, she's

14        leading, testifying.

15             THE COURT:  This is cross-examination.

16             MR. GROLAND:  I know it's cross-examination, but

17        it sounds like --

18             THE COURT:  Overruled.

19   BY MS. SINGER:

20        Q    So you had several different reasons why you went

21   in, all of which pertained to the injuries sustained to the

22   child later identified to you as Robbie Quirello, correct?

23        A    Yes.

24        Q    Did you provide any of the information that you

25   obtained, which I understand was that you found an area on a

```
 1   rug that appeared to be vomit, did you provide any of that
 2   information to --
 3              THE COURT:  I'm sorry, Ms. Singer.  You said
 4       appeared to be vomit?
 5              MS. SINGER:  Yes.
 6              THE COURT:  And the testimony was appeared to be
 7       baby formula.
 8              MS. SINGER:  Baby formula.  I'm sorry.
 9              THE WITNESS:  Baby formula.
10              MS. SINGER:  I'm sorry.  I got the impression that
11       you said from resuscitation and I apologize for that.
12   BY MS. SINGER:
13       Q    But did you provide the information regarding the
14   baby formula to anyone at Shands when you returned there?
15       A    I might have said something to the detectives, but
16   definitely Sergeant Dawson.
17       Q    All right.  Now you did not collect any evidence,
18   that's my understanding?
19       A    That's right.
20       Q    And you testified that you did not find any
21   evidence of foul play to your knowledge at the time you
22   walked through the apartment?
23       A    That's right.
24       Q    You are at this point then investigating or
25   involved in what appeared to be an accidental injury?
```

1      A    Yes.

2      Q    And in fact you were cleared from the call because

3  the call was determined to be accidental in origin?

4      A    Right.

5      Q    Now were you cleared from the call after you spoke

6  with Brian Herlihy?

7      A    Yes.

8      Q    All right.  So the discussions with Mr. Herlihy at

9  the time were your follow-up discussions regarding how the

10  baby was injured?

11      A    What had occurred, yes.

12      Q    Was there anything about his statements that

13  indicated to you that it was anything other than accidental

14  in nature?

15      A    No.

16      Q    Was he in custody at the time you interviewed him?

17      A    No.

18      Q    After you spoke with him, did you change your mind

19  about whether or not it was accidental in nature?

20      A    No.

21      Q    Did anything that he say make you change your mind

22  regarding the status of the call?

23      A    No.

24      Q    And you were in fact cleared from the call?

25           MS. SINGER:  You have the sheets, your Honor.

```
 1            I'll just have him go ahead and look at that.
 2                 THE WITNESS:  Well, the time was 10:36.
 3    BY MS. SINGER:
 4       Q    And you were cleared from the call and it was
 5    ruled accidental at 10:36?
 6       A    Yes.
 7       Q    You returned to the hospital.  You were called
 8    back to the hospital at approximately what time?
 9       A    12:05.
10       Q    So between 10:36 and 12:05 there may have been
11    additional information provided to law enforcement that
12    you're not aware of?
13       A    Right.
14       Q    Did you speak with Mr. Herlihy again after 12:05?
15       A    Yes.
16       Q    And where was he when you spoke with him again?
17       A    In the ER.
18       Q    And for what purpose did you speak with him?
19       A    I didn't approach him to interview him.  He
20    basically contacted me to try to determine the condition of
21    the child.
22       Q    So he approached you and requested that you give
23    him an update on the status of the child?
24       A    Yes.
25       Q    And were you able to provide him with any
```

```
 1   additional information?

 2        A    No.

 3        Q    Did he say anything to you, give you any

 4   additional details as to how the child was injured at that

 5   time?

 6        A    No.

 7        Q    But he approached you?

 8        A    Yes.

 9        Q    Were you in uniform?

10        A    Yes.

11        Q    Had you identified yourself to him as law

12   enforcement?

13        A    The first time.

14        Q    This meeting that you had with law enforcement

15   investigators and hospital personnel where the discussion

16   was had about the CAT scan, at that point was there any

17   direction given to you to arrest Brian Herlihy?

18        A    No.

19        Q    Was there any discussion given to you as to who

20   the perpetrator could have been?

21        A    No.

22        Q    There was certainly consideration of a number of

23   persons who could have been the perpetrator in this case?

24        A    Yes.

25        Q    Now the issue of the shower, you did not actually
```

```
 1   check the shower when you did your walk-through; is that

 2   right?

 3       A    That's right.

 4       Q    You didn't feel it, touch it, do anything with the

 5   water of the shower?

 6       A    That's right.

 7       Q    In fact you didn't touch anything in the house?

 8       A    That's right.

 9       Q    You didn't move anything in the house?

10       A    That's correct.

11       Q    You didn't take any evidence out of the house?

12       A    That's correct.

13       Q    You left it as it was after the EMT's had left it

14   providing service to the child, correct?

15       A    Yes, ma'am.

16       Q    So the only issue about the shower that you have

17   any information on, is what Brian Herlihy told you?

18       A    Right.

19       Q    He had told you he had gone into the shower?

20       A    Yes.

21            MS. SINGER:  One moment, your Honor.

22            (Brief pause.)  No further questions of this

23       witness, your Honor.

24            THE COURT:  Any redirect?

25            MR. GROLAND:  Yeah, just a couple.
```

```
 1              THE COURT:  All right.
 2                   REDIRECT-EXAMINATION
 3    BY MR. GROLAND:
 4        Q    Was there a reason why you didn't just go and
 5    secure the apartment?
 6        A    I didn't learn of the results of the scan until
 7    the second meeting and at that point I just turned it over
 8    to the detectives.
 9        Q    Wait a minute.  I think you -- Perhaps it was my
10    question.
11        A    The first time?
12        Q    Was there a reason when you were there that
13    morning at 10 o'clock, shortly after 10:00, that you didn't
14    just secure the apartment and leave?
15        A    When I left the first time, Sergeant Dawson
16    remained at the scene.  So I had no reason to secure the
17    apartment.
18        Q    Was the apartment left open when you left?
19        A    When I left, yes.
20        Q    Was the door closed?
21        A    When I left?
22        Q    Yeah.
23        A    I don't recall.
24        Q    I think you previously testified she was outside
25    when you left?
```

1      A      If I recall correctly.  I remember walking

2   downstairs to my car.  She may have followed me down.

3      Q      Do you know why she didn't leave with you?

4      A      I don't know.

5             MR. GROLAND:  That's all I have.

6             MS. SINGER:  I just want to clarify one point.

7                       RECROSS-EXAMINATION

8   BY MS. SINGER:

9      Q      Officer Alvarez, at the time you got to the scene,

10  to this apartment, you did not know whether or not there

11  were any other persons in the apartment who may have

12  information or knowledge regarding the child's injury,

13  correct?

14     A      Right.

15     Q      And one of the purposes of the walk-through was to

16  determine if there were any other persons in the apartment

17  who could provide information regarding the child's

18  injuries?

19     A      Right.

20     Q      And as well as to ascertain if you could from the

21  area how the injuries could have been caused for the

22  purposes of medical treatment?

23     A      Right.  Yeah.

24     Q      Or information to the hospital?

25     A      Correct.

1     Q    And at the time you went, walked through, it was

2  after the emergency call to 911?

3     A    Yes.

4         MS. SINGER:  No further questions.

5         THE COURT:  Do you have any redirect on that area?

6         MR. GROLAND:  I do.

7         THE COURT:  Go ahead.

8                FURTHER REDIRECT-EXAMINATION

9  BY MR. GROLAND:

10    Q    Was there a reason that you didn't indicate either

11  in your deposition or in your police report that you walked

12  through for another reason, specifically the one Ms. Singer

13  just asked you about, to look for other people in the

14  apartment?

15    A    The main purpose is to determine if there was any

16  foul play and that's basically law enforcement's job.

17    Q    Officer, I think you misunderstood my question.

18    A    Okay.

19    Q    My question was, is there a reason why you didn't

20  have that notation in your report or previously testify in

21  your deposition when questions were asked of you that your

22  reason or one of your reasons for going in there was to look

23  to see if there was anybody left behind?

24    A    No.  Was there a reason why I didn't put that in

25  there?

1  Q Yeah, or testify to it.

2  A I just -- I just -- I don't know.  I just didn't

3 put it in there.  It's an assumption on my part, I guess.

4  Q And so what if there was somebody in there, what

5 would that mean to you if this was an accident?

6  A Just another person I can speak to as to what

7 happened.

8  Q Did you knock on the door?

9  A The door was open.

10  Q Did you knock on the open door to see if anybody

11 was in there?

12  A No.

13  Q Did you say, Hey, is anybody home?

14  A No.

15  Q You just walked in and looked around?

16  A Yes.

17  MR. GROLAND:  All right.

18  THE COURT:  May this witness be released or does

19 he need to remain?

20  MS. SINGER:  As far as the state's concerned he

21 can be released.

22  MR. GROLAND:  I would like him to hang around

23 until after Sergeant Dawson testifies.

24  THE COURT:  All right.  Thank you.  If you'll

25 remain outside.  We'll let you know if and when you can

1    be released.  Go ahead and call your next witness.

2         MR. GROLAND:  I do have one other question, your

3    Honor.  I do apologize.

4         THE COURT:  Would you just stay right where you

5    are.  Speak up so the court reporter can hear you.

6         MR. GROLAND:  Thank you.  I will not do this

7    again.

8              FURTHER REDIRECT-EXAMINATION

9    BY MR. GROLAND:

10        Q    Officer, is there a reason why you didn't ask any

11   of the EMT people on the scene whether there was anybody in

12   the apartment?

13        A    No.

14        MR. GROLAND:  Okay.  Nothing further.

15        THE COURT:  All right.  Good enough.  Call your

16   next witness.

17        MR. GROLAND:  Sergeant Dawson.

18        THE COURT:  Good morning.  Would you raise your

19   right hand, please?

20              VALERIE DAWSON,

21   having been produced and first duly sworn, testified as

22   follows:

23              DIRECT EXAMINATION

24   BY MR. GROLAND:

25        Q    Would you please state your name and occupation?

1        A    Valerie Dawson, Sergeant, Gainesville Police

2   Department.

3        Q    How long have you been with GPD?

4        A    Since August of 1987.

5        Q    Okay.  You recall this case on August 2nd, 2000,

6   Brian Herlihy?

7        A    Yes, sir.

8        Q    Tell me, were you dispatched to the scene?

9        A    Yes, sir, I was.

10       Q    And about what time did you get there?

11       A    Maybe a couple minutes before 10:00.

12       Q    Okay.  When you got there, were there any other

13  officers present?

14       A    Yes, sir.

15       Q    Who was present when you got there?

16       A    Officer Alvarez and Officer King, his trainee.

17       Q    Okay.  And what specifically was going on at that

18  scene, let's just say, outside the apartment when you

19  arrived?

20       A    I remember seeing one of the fire trucks outside

21  the apartment.  Basically nothing else was going on as far

22  as I know outside the apartment.

23       Q    Everybody inside the apartment had left?

24       A    No, sir.  I don't think so.

25       Q    Okay.  Was the child still on the scene when you

1    arrived?

2        A    No, sir.  The child had already been transported.

3        Q    Was Brian Herlihy still on the scene?

4        A    No, sir, he was not.

5        Q    Okay.  Was the mother of the child, Crystal

6    Quirello, still on the scene when you got there?

7        A    No, sir.

8        Q    Who was still in the apartment?

9        A    I think the EMT's were basically clearing their

10   stuff out still and Officer Alvarez and Officer King, I

11   believe, were at the top of the stairs or somewhere in that

12   general vicinity when I arrived.

13       Q    They arrived first.  You got there after them.

14       A    Yes, sir.

15       Q    How much time after they announced on the radio

16   that they had arrived, did you arrive?

17       A    It couldn't have been more than a minute or two,

18   maybe.  Maybe a little more, maybe five minutes.  I can't

19   remember, but it wasn't that long.

20       Q    While you were there initially, did anybody tell

21   you that anybody was still in the apartment?

22       A    While I was there, no, sir.

23       Q    All right.  Did you prepare a report in this case?

24       A    No.  I didn't write one, no.

25       Q    Okay.  And as far as refreshing your recollection

1   as to what happened two years ago, what have you relied on

2   before you came to court today?

3       A    Basically Officer Alvarez's report.

4       Q    Okay.  And of course your deposition?

5       A    Yes, sir.

6       Q    All right.  Did Officer Alvarez tell you on the

7   scene before you went into the apartment that he had talked

8   to Brian Herlihy?

9       A    No, sir.  I don't recall that.

10      Q    Let me ask you to take a look at your deposition

11  that I took on March 3rd at 9 o'clock on page seven.  You

12  got it in front of you?

13      A    No, sir.

14      Q    All right.  Do you remember this question on page

15  seven, line four, "Tell me what you did -- What you just --

16  Tell me what you just told about that."  Answer, "Officer

17  Alvarez had told me that the complainant had said he had

18  been in the shower and had gotten out because there was no

19  sound and he was kind of suspicious and he walked out and

20  found the child."  Do you remember testifying to that in the

21  deposition?

22      A    Yes, sir, but I think he had found that

23  information out when he got to the hospital and it got

24  relayed to me.

25      Q    Well, do you remember this question on page six:

```
 1   "Did you go up to the apartment?"

 2        A     Did I go up?  Yes.  When I arrived, yes, I did.

 3        Q     And you went up to the apartment and you made

 4   observations?

 5        A     Yes, sir.

 6        Q     All right.  And what you're saying then, is what

 7   you were referring to when you answered that question is

 8   something that happened at a later point in time?

 9        A     No, sir.  You're not reading everything that I

10   told you.  Now when I said I did observations and after the

11   fact we went around the apartment, I did a cursory check

12   around the apartment to make sure no one was there.  We had

13   been dispatched to a deceased baby, so we were making sure

14   nothing was out of the ordinary.  We did that and then after

15   Officer Alvarez left and went to the hospital, then all the

16   other information came in.  But we had left the apartment by

17   that time.  I had closed the door.

18        Q     All right.  When you went in the apartment, was

19   anybody inside?

20        A     Like I say, I believe Officer Alvarez was there,

21   Officer King, and I believe maybe one of the EMT's was still

22   packing up a bag possibly.

23        Q     Did anybody let you in the apartment?

24        A     Yes, sir.

25        Q     Who?
```

```
 1        A      The door was already open.  I just went in.

 2        Q      Okay.  Did anybody let you in the apartment?

 3        A      As in Mr. Herlihy or anyone like that?

 4        Q      No.  As in anybody, any person say, Come on in?

 5        A      I believe Officer Alvarez and Officer King was

 6   already there, so we went up into the apartment.

 7        Q      Okay.

 8        A      Was I invited formally, no.

 9        Q      Was the decision made to go into the apartment,

10   made by you and Officer Alvarez downstairs in the street, in

11   the parking lot?

12        A      It could have been because I wanted to check and

13   make sure everything was all right in the apartment.

14        Q      Okay.  Did you check the apartment to make sure

15   there were no signs of foul play?

16        A      Make sure everything was not out of the ordinary,

17   yes, sir, we did.

18        Q      Okay.  And you did not have anybody's permission

19   to enter the apartment; is that true?

20        A      At that point, like I say, Mr. Herlihy wasn't on

21   scene, EMT's were trying to clean up --

22        Q      Would you answer the question?

23        A      No, sir, we did not.

24        Q      Did you have a search warrant?

25        A      No, sir, we did not.
```

```
 1        Q    Did you have any probable cause to believe a crime
 2   had occurred and exigent circumstances existed?
 3             MS. SINGER:  I'm going to lodge an objection to
 4        that question.  I believe a legal conclusion has to be
 5        drawn.  It's beyond the scope of this witness to answer
 6        the word exigent circumstances.
 7             THE COURT:  The objection is sustained on the
 8        basis of it's a compound question as you phrased it.
 9             MR. GROLAND:  Okay.  All right.
10   BY MR. GROLAND:
11        Q    Did you have any probable cause to believe a crime
12   had occurred and there was evidence of that crime in that
13   apartment?
14        A    Sir, at that point we didn't have anything other
15   than a dispatch about a baby had been injured, possibly dead
16   in the apartment.
17        Q    Okay.  Could you answer that question, though?
18        A    Did we have probable cause to believe that a crime
19   had occurred?  We didn't know what had occurred.
20        Q    All right.  All right.  Let me ask it again.  Did
21   you have any probable cause to believe a crime had occurred
22   and there was evidence of that crime in that apartment?
23        A    Did not know if a crime had occurred, no.
24        Q    And did any exigent circumstances exist such that
25   you had to go into that apartment at that time for fear that
```

```
 1    perhaps some of the evidence might be destroyed?

 2         A    Sir, I didn't know who was in the apartment.

 3              MS. SINGER:  I'm going to lodge an objection, your

 4         Honor.

 5              THE COURT:  What's the objection at this time?

 6              MS. SINGER:  That it requires a legal conclusion.

 7         The term exigent circumstances is not defined for this

 8         witness.  It's not a factual --

 9              THE COURT:  The objection is sustained as to use

10         of exigent circumstances and the fact that that word

11         under the law is a legal conclusion.  If you want to

12         rephrase the question, go ahead.

13              MR. GROLAND:  Sure, I will.

14    BY MR. GROLAND:

15         Q    Did you have any reason to believe that unless you

16    went into the apartment then and there, that evidence of a

17    crime might be immediately or at that point destroyed or

18    lost or stolen?

19         A    At that time, no.

20         Q    The medical emergency in question was over, was it

21    not, insofar as that particular place was concerned?

22              MS. SINGER:  I'm going to lodge an objection.

23         First of all, it's leading and, secondly, it once again

24         requires a conclusion on the part of this witness.

25              THE COURT:  Okay.  Your objection is overruled.
```

1       You may answer the question.

2           THE WITNESS:  They were still on the scene.  As

3       far as I knew, I knew the baby had been transported

4       away, but I didn't know who all was still there when I

5       got there.

6   BY MR. GROLAND:

7       Q    Was the baby the subject of this medical

8   emergency?

9       A    Yes.

10      Q    To your knowledge was anybody else either injured

11  or alleged to have been injured at that apartment?

12      A    Sir, I'll just answer like this, when we get

13  dispatched, we don't always get all the information.  So we

14  have to go and get all the information.

15          MR. GROLAND:  Your Honor, I would ask the court to

16      be permitted to cross-examine this witness.  I've asked

17      her a number of questions that have not -- her answers

18      have not been responsive.  I think she's been evasive

19      and I would like permission of the court to lead the

20      witness.

21          THE COURT:  Denied.

22  BY MR. GROLAND:

23      Q    How long were you in the apartment?

24      A    Maybe five, ten minutes.

25      Q    The whole time you were in the apartment, was

```
 1    Alvarez and King with you in the apartment?

 2         A     They left before I did.  I believe I closed the

 3    door and at that point I went outside in the parking lot and

 4    waited for another officer to come and relieve me.

 5         Q     Okay.  Do you now know for sure that there was an

 6    EMT in the apartment when you got in there?

 7         A     For sure, no, I can't say that.  I think I recall

 8    someone still packing a bag when I arrived there.

 9         Q     Did you collect any evidence in the apartment?

10         A     No, sir.

11         Q     You made some observations?

12         A     That's all.

13         Q     Did anybody ask you to make any specific

14    observations?

15         A     No, sir, not at that point, no.

16         Q     You went in and looked around?

17         A     Yes, sir.

18         Q     Did you make notes of your observations?

19         A     I did not write anything down.  I just recall what

20    I saw.

21         Q     Okay.  Who was the first person that you

22    communicated to after being in that apartment as to the

23    observations you made?

24         A     After I got some information from Officer

25    Alvarez -- In fact, I was communicating with him the whole
```

 1   time.  We were communicating back and forth after he had

 2   arrived at the hospital.

 3        Q    Okay.  He left before you?

 4        A    Yes, sir.

 5        Q    Okay.  And why did you remain behind?

 6        A    Well, number one, the place was not secure.  We

 7   didn't have anybody to turn the apartment over to.  We

 8   hadn't -- It wasn't locked.  So we weren't gonna leave the

 9   apartment open.

10        Q    So you yourself, Sergeant Dawson, stayed behind to

11   make sure nobody would go in?

12        A    Yes, sir.

13        Q    And how long did you remain there doing that?

14        A    Until I was relieved by Officer Bruce Ferris.

15        Q    Okay.  And what time was that?

16        A    I don't know.  Sometime after 10:00.

17        Q    Was Bruce Ferris there to your knowledge when

18   Crystal Quirello -- excuse me -- Quirello came back to that

19   apartment while the baby was in the hospital?

20        A    I couldn't answer for him.  I don't know.

21        Q    Okay.  Are you aware that the mother of the child

22   left the hospital when the child was in PICU and returned to

23   that apartment for some reason?

24        A    I'm not aware of that, no.

25        Q    You've never heard that?

1        A     No, sir.

2        Q     Okay.  Bruce Ferris came how much time after 10

3   o'clock to stay at that apartment?

4        A     Like I say, I don't know his exact time when he

5   got there.

6        Q     Well, it has to do with when he left; does it not?

7        A     It should, yes.

8        Q     So my question is, how much time after Alvarez

9   left did you remain there at that location?

10       A     It wasn't that long, ten minutes or so, something

11   until I got a backup.

12       Q     So if you were in the apartment for about ten

13   minutes and then --

14       A     I say possibly five to ten, yes.

15       Q     All right.  About five or ten minutes?

16       A     Yes, sir.

17       Q     And then Alvarez left and you waited about another

18   ten minutes, then you left sometime just before 10:30; would

19   that be fair to say?

20       A     I think I did leave before 10:30, yes.

21       Q     Before 10:30?

22       A     I think so.

23       Q     And you left another officer there.  That would be

24   Officer Ferris?

25       A     Yes, sir.  I believe it was Officer Ferris.

1    Q    Okay.  Did you cause him to come there to watch

2  the premises?

3    A    I'm pretty sure I called for a backup to come and

4  sit at the apartment and make sure no one came in or out,

5  yes, sir.

6    Q    Okay.  And where did you go right after that?

7    A    To the hospital.

8    Q    Is Officer Ferris on your squad?

9    A    At that time, no, he was not on my squad.  He

10  worked on my shift.

11    Q    Have you ever since that day talked to Officer

12  Ferris about whether or not anybody came back and went to

13  that apartment, went inside while he was there?

14    A    No, sir.

15    Q    Tell me about what observations you made in there.

16    A    Basically walked in, there was some wet, whitish

17  looking material on the floor near the bed.

18    Q    What did that look to you to be?

19    A    I didn't make a predetermination on what it was.

20  All I know it was a wet, white spot, that's all.  Like I

21  said, I did a cursory look.  I didn't go over to take a

22  direct look at it.  I guess it was something from when they

23  were trying to resuscitate the baby.  That was my

24  observation when I first went in.

25    Q    Did you and the other officers have a discussion

1  about that observation while you were in the apartment?

2       A    I believe we talked about it, yes, sir.

3       Q    Okay.  And what other observations did you see --

4  did you make?

5       A    The bed, I believe, had -- I thought it had a baby

6  romper on it.  It didn't look askew too much.

7       Q    It didn't look -- I'm sorry.

8       A    It didn't look askew.  The bed didn't look askew

9  to me.

10      Q    What do you mean by that?

11      A    It didn't look rumpled or anything like that as

12  far as I could tell.  You know, if there had been some kind

13  of struggle or something, it didn't look like that.  I went

14  to the restroom, just peeked in.  We noticed that it

15  wasn't -- the floor wasn't damp or anything like that

16  because usually the floors are slippery or something when

17  you go into restrooms and it wasn't.  I remember seeing a

18  pair of shorts on the floor --

19      Q    Can you stop there?

20      A    -- outside the bathroom.

21      Q    Stop here.  Were you looking for anything in

22  particular in the restroom?

23      A    Sir, like I say, the place had not been cleared.

24  We didn't know who was in the apartment.  So we wanted to

25  make sure nobody else was in the apartment.  So I just

1    peeked in.

2         Q    Okay.  My question, Sergeant, is, were you looking

3    for anything in particular in the restroom?

4         A    Possibly maybe a person being in there and there

5    was not.

6         Q    Okay.  And you examined the shower and the shower

7    floor?

8         A    When I go in and look for people, I look behind

9    curtains, yes, I do that.

10        Q    What led you to believe there was somebody else in

11   that apartment?

12        A    Sir, we got a phone call about a baby being dead.

13   Like I say, I always -- every scene I go to, when you go to

14   something serious, you want to make sure that you have

15   everyone, whether they be witness, someone could tell you

16   something or anybody left in the house.  It could have been

17   other kids in the house.  We didn't know.

18        Q    Did you ever ask any of the EMT's who had been in

19   the apartment when you arrived, whether or not there was

20   anybody else in the apartment?

21        A    I don't recall.  I don't recall talking to them,

22   actually.

23        Q    And why is it that you did not ask that question

24   to any of the EMT's before going into the apartment to look

25   for people?

1          A     Usually they're not looking for people.  They're

2     dealing with the emergency.  That's what their job is.

3          Q     Okay.  And that's why you didn't ask?

4          A     Like I say, they were doing something else at the

5     time.  I just didn't get an opportunity to talk to them.

6          Q     Okay.  Did you make any other observations other

7     than what you have already testified to, either things you

8     saw or things you did not see?

9          A     Not that I recall.

10         Q     Did you ever go back to that apartment inside a

11    second time?

12         A     Yes, I did.

13         Q     Okay.  And when did you go back?

14         A     When the forensic person arrived on the scene

15    later that day.

16         Q     Okay.  And what time was that?

17         A     Sometime before 1:00.

18         Q     Okay.  And was the forensic person in there

19    already?

20         A     No, sir, she was not.

21         Q     Okay.  Where was she?

22         A     She was downstairs in the parking lot.

23         Q     Okay.  And then both of you went inside?

24         A     Yes, sir.

25         Q     All right.  And what time would you say it was

1   that both of you went in?

2       A    Probably about 1 o'clock.

3       Q    Okay.  And who else besides yourself went in with

4   the forensic person?

5       A    It was just me that I recall.  I was walking her

6   around to the place where the baby had been, showed her the

7   bed.  And then after that point I asked her did she need any

8   other assistance.  She said, no, she would take care of it

9   and I left.

10      Q    Okay.  The forensic person that we're talking

11  about is Tina Millard?

12      A    Yes, sir.

13      Q    Who no longer works with GPD?  She's down south?

14      A    Correct.

15      Q    And, Sergeant, her report indicates she got there

16  at 12:45.

17      A    Uh-huh.

18      Q    Would you defer to her report on that?

19      A    I'll take your word on it.

20      Q    Okay.  When you got there, was she already there

21  or did you both get there at the same time?

22      A    I think she had just arrived in her truck.

23      Q    All right.  Did you both immediately go in after

24  she arrived?

25      A    No, sir.  She has things that she has to do at her

1    truck before we got to go in.

2          Q     Okay.  The apartment was still unlocked?

3          A     Yes, sir.

4          Q     And how long was it before you and Tina Millard

5    went in after you both arrived?

6          A     Probably about ten to 15 minutes because she has

7    to get her camera equipment and get all her stuff put

8    together and we had to get information and we hadn't entered

9    until in fact I had already received information from

10   Detective Cannon that we could go in.  But she was

11   downstairs just preparing all her stuff so we could go in.

12         Q     Okay.  Did you have anything to do with Brian

13   Herlihy giving consent to go into the apartment?

14         A     I have never spoken to him, no.

15         Q     You were not present when he signed the consent

16   form?

17         A     No, I was not.

18         Q     Okay.  Who notified you, if anybody, that Brian

19   Herlihy had consented to officers going back into his

20   apartment?

21         A     Detective Cannon.

22         Q     Okay.  And what time did you receive that

23   notification?

24         A     Sometime before 1 o'clock.  I think a few minutes

25   before 1 o'clock, maybe 12:30 or something like that.

1    Q    Okay.  And how did you receive that information

2    from Cannon, on the phone or over the radio?

3    A    Over the radio, I believe.

4    Q    Okay.  Did you call him or did he call you?

5    A    He called me.

6    Q    Okay.  What was the subject of that conversation

7    besides the consent, if any?

8    A    That's pretty much it.  In fact I had been at the

9    hospital prior to going back to the apartment and I had

10   actually spoken to Detective Cannon for a little while, but

11   then he gave me the permission on my way there.

12   Q    Okay.  Were you there the whole time Tina Millard

13   was there?

14   A    I, as I said, I walked her around.  After I asked

15   her did she need anything else from me, she said, no, I

16   left.

17   Q    Okay.  Do you know why -- Strike that.  Did you

18   point out to her anything about the shower being dry?

19   A    At that point I had had information from Officer

20   Alvarez.  I'm pretty sure that I may have said something

21   about the area in the bathroom not being wet, as in the

22   floor by the shower.

23   Q    You do remember telling her that?

24   A    Like I say, I may have.  I'm not sure that I did

25   or not.

1    Q    Do you know why she didn't photograph the shower?

2    A    No.  I can't speculate on why she may have or not.

3    Q    Did you take her around and show her what you

4    thought as a sergeant that she should photograph?

5    A    Like I said, I took her around in the bedroom area

6    where the baby was because she wanted to know where the baby

7    was, where the baby's head was supposed to have been and

8    that's what I pointed out.

9    Q    How did you know that information?

10   A    Officer Alvarez.

11   Q    And had Officer Alvarez come back to the apartment

12   and showed you --

13   A    No, sir.

14   Q    Let me finish -- and showed you on the bed where

15   the baby was?

16   A    No, sir.  Like I said, I had been at the hospital

17   and after he had talked to people, he would come back to me

18   and relay the information that he had.  That's how I knew.

19   Q    Do you know who drew a diagram in this case?

20   A    No, I do not.

21        MR. GROLAND:  All right.  Can I have this marked,

22   your Honor?

23        THE COURT:  Yes.  Mark it for identification,

24   please, as Defense No. A for identification.

25   BY MR. GROLAND:

1      Q    Let me show you, Sergeant, what's been marked as

2   State's Exhibit A for identification only.

3           THE CLERK:  I'm sorry.  I believe that's a defense

4      exhibit.

5           MR. GROLAND:  What did I say?

6           THE CLERK:  State's.

7           MR. GROLAND:  Thank you.  Its been a long time.

8           MS. SINGER:  It's okay.  We know what side he's

9      on.

10  BY MR. GROLAND:

11     Q    Do you recognize that?

12     A    I'm guessing it's the apartment.

13     Q    Okay.  Who's I.D. number 481?

14     A    I don't know.

15     Q    Okay.  Do you know Tina Mallard's I.D. number?

16     A    Its been awhile.  No, I can't say.  I don't even

17  know people's I.D. numbers now.

18     Q    Do you agree that this diagram indicates an

19  arrival on the scene at 12:35 p.m.?

20     A    Okay.  Actually arrival time is 12:45, you're

21  right.

22     Q    Yeah.  A call at 12:35 and arrival at 12:45?

23     A    Right.

24     Q    Okay.  And that's consistent with your

25  recollection as to when you got there with Tina?

Stacey K. Bryant, RPR
Judicial Court Reporter

0002619     0002652

1          A       She was told to standby, yes.

2          Q       Okay.  Did somebody tell you both to standby

3   before you went into the apartment?

4          A       As I said, I was at the hospital and had got

5   information from Detective Cannon that we would probably be

6   going up and he said that he had consent.  And we went over

7   to the apartment.  She waited in the parking lot.

8          Q       Can you just try to answer my question.

9                  MR. GROLAND:  Ms. Court Reporter, could you read

10         that back for me?

11                 (Court Reporter read back last question.)

12  BY MR. GROLAND:

13         Q       Would you answer that question?

14         A       Yes.

15         Q       Who told you to standby?

16         A       Detective Cannon.

17         Q       Okay.  And why didn't you go back in as you had

18  done before?  Why did you wait?

19         A       Well, the situation had changed by this point.  So

20  we didn't know what we had still.  But once that I was told

21  to standby, that's what I did, I stood by.

22         Q       Detective Cannon, is he a sergeant?

23         A       No, he's not.

24         Q       You're his supervisor because you're a sergeant?

25         A       No, no.  I'm a road supervisor or was at the time.

1      Q      Okay.  What do you do now?

2      A      Right now I've been transferred to detective.

3      Q      When you were at Brian Herlihy's apartment, are

4  you the officer who actually took care of his dogs and gave

5  them some water?

6      A      I don't remember.  It's two years ago.  I have no

7  idea.  I don't even remember seeing a dog.

8      Q      Do you remember how many firemen or paramedics or

9  EMT personnel were there when you got there that first time?

10     A      No, sir.

11     Q      When you were told by Cannon that Brian Herlihy

12  had consented and went into the apartment, did any officers

13  show up, any officers or detectives show up right after

14  that?

15     A      The only officer that was still on scene was

16  Officer Ferris and he hadn't gone into the apartment.

17     Q      This exhibit, Defense Exhibit A, do you know who

18  wrote on there baby shaking?

19     A      No, sir, I don't.

20     Q      Okay.  When you were there you don't remember two

21  Rottweilers being at that apartment, two puppy Rottweilers?

22     A      They might have been.  I just didn't --

23     Q      On the balcony?

24     A      Actually I think they were on the balcony, yeah.

25     Q      Did you take care of them in any way?

1      A    I don't think so.  I remember seeing them.  I

2  don't think I did.

3              MR. GROLAND:  That's all I have, your Honor.

4              THE COURT:  Ms. Singer?

5              MS. SINGER:  Very briefly.

6                        CROSS-EXAMINATION

7  BY MS. SINGER:

8      Q    You did not enter the apartment with Tina Millard

9  until you received word from Detective Cannon that the

10  officers or the GPD had consent to go into that apartment by

11  it's owner?

12      A    This is correct.  I know the time that he pointed

13  out on there about the 12:45, that's -- we always do that

14  regardless of how long we be somewhere, we always have to

15  put the time of dispatch and the time of arrival.

16      Q    All right.  So you are sure today that neither you

17  nor Tina Millard entered that apartment without having

18  consent?

19      A.   We did not.  At least I did not and she got there

20  after I did, I believe.  So, no, we did not enter.

21      Q    And Officer Ferris was there basically watching

22  over the apartment until you all got there?

23      A    Yes, ma'am.

24              MS. SINGER:  No further questions, your Honor.

25              THE COURT:  Any redirect?

1      MR. GROLAND:  No questions.

2      THE COURT:  May Detective Dawson be released?

3      MS. SINGER:  May this witness be excused?

4      MR. GROLAND:  Yes, and so may Alvarez.

5      THE COURT:  You're free to go and would you let

6    Officer Alvarez know that he's also released at this

7    time.

8      MS. SINGER:  Would you let Officer Ferris in,

9    please?

10                    BRUCE FERRIS,

11   having been produced and first duly sworn, testified as

12   follows:

13                 DIRECT EXAMINATION

14   BY MR. GROLAND:

15     Q    State your name, please.

16     A    Bruce Ferris.

17     Q    Okay.  Bruce, how long have you been with the

18   Gainesville Police Department?

19     A    I've been there five years full-time and I was a

20   reserve officer for about three and a half years prior to

21   that.

22     Q    Do you remember this case August 2nd, 2000?

23     A    Yes, I do.

24     Q    What was your first involvement in this case?

25     A    I was on uniform patrol that day and I was

1 dispatched to the crime scene.

2      Q    Okay.  Did you prepare a report in connection with

3 your involvement in this case?

4      A    No, I did not.

5      Q    All right.  And what time were you dispatched?

6      A    I don't recall the exact time.  I think I would be

7 only guessing.

8      Q    Well, let's see if we can narrow it down.  Was it

9 morning time, before noon, or was it the afternoon time or

10 following that?

11     A    I'm thinking it was late morning-ish, noon-ish.

12 I'm not really sure.

13     Q    Okay.  An officer just testified, Sergeant Dawson,

14 that you arrived shortly before 10:30.

15     A    Okay.

16     Q    Do you dispute that?

17     A    No.  That's consistent with my recollection.

18     Q    Okay.  And what -- for what purpose were you there

19 at the apartment?

20     A    To secure the apartment to make sure no one

21 entered or exited.

22     Q    And how did you secure the apartment?  Were you

23 inside securing it or did you --

24     A    No.  I parked my vehicle in the parking lot and

25 got out and stood and observed the door.

```
 1          Q     Was the door closed?

 2          A     Yes, it was.

 3          Q     Was Officer -- Was Sergeant Lawson (sic) there

 4    when you arrived?

 5          A     Sergeant Dawson, yes.

 6          Q     Dawson.  Was she there?

 7          A     Yes, she was.

 8          Q     Where was she when you got there?

 9          A     To the best of my recollection she would be -- as

10    I pulled up, she was standing where she could also see the

11    door and she asked me to -- showed me -- pointed to where

12    the apartment was and I took my position.

13          Q     Okay.  And how long did you stay there and watch

14    that front door?

15          A     It was a significant amount of time.  I couldn't

16    say the exact amount of time.

17          Q     Okay.  Who relieved you or how did you get

18    relieved?

19          A     Eventually Sergeant Dawson came back to the scene

20    and also a crime scene investigator had arrived and just

21    prior, I believe, to Sergeant Dawson's arrival.

22          Q     As soon as they arrived did they go right up into

23    the apartment?

24          A     I'm not sure how soon after, but, yes, once they

25    arrived back, there was some period of time and then they
```

1   did enter.

2       Q    All right.  Tell me as you think back, which of

3   the two arrived first or did they get there at the same

4   time?

5       A    Officer -- I believe Tina Millard is her name, she

6   changed -- she got married somewhere in there; she arrived

7   while I was there and then I believe then Sergeant Dawson

8   came back.

9       Q    Okay.  How long was Ms. Millard there

10  approximately before Sergeant came?

11      A    I don't remember the length of time.

12      Q    Okay.  After the Sergeant got there, did they

13  immediately go upstairs?

14.     A    They went upstairs.  I don't know about the word

15  immediately.  I couldn't speak to that.

16      Q    Do you have any recollection as to how long it was

17  before they went upstairs after both of them were there?

18      A    I would say it was a short period of time.  I

19  couldn't put a number of minutes on it.

20      Q    I mean when you say short, five minutes, two

21  minutes?

22      A    No.  I really couldn't say.

23      Q    Did you have any discussion with either of them

24  about how they could get into the apartment, by how, I mean

25  the authority for getting into the apartment?

1    A    No, I did not.

2    Q    Did you have your radio on?

3    A    Yes, I did.

4    Q    Was there any radio transmissions that you heard

5    relating to going into this apartment?

6    A    Nothing that I recall.

7    Q    Okay.  What channel were you on?  Were you on -- I

8    don't recall what the -- There's a main channel that

9    everybody is on?

10    A    Right.

11    Q    Then you have another channel that you can go to

12    for some private conversations car to car?

13    A    Uh-huh.

14    Q    What channel were you on?

15    A    As standard procedure would have it, I would be on

16    the primary channel.  I don't remember.  You know, that's

17    where I'm supposed to be in case they needed me or I need to

18    make a transmission.  Standard procedure would be I would be

19    on the primary channel.

20    Q    Did you hear anything on the primary channel about

21    going into the apartment, consent?

22    A    Nothing that I could testify to.

23    Q    Were you involved in any conversation with them

24    about that at any point before they went in?

25    A    No, I was not.

```
 1        Q    Did you go into the apartment with them?
 2        A    I believe when they finally entered, I walked up
   and I remember walking in the front door and then that was
 3   it.  Then I took off.  I left the scene.
 4
 5        Q    You were not there when Tina Millard was taking
 6   photographs and doing what she --
 7        A    No.  I went back into service and went back to
 8   routine patrol as would be dictated.
 9        Q    Did anybody arrive at the apartment while you were
10   there by yourself and either go into the apartment or
11   attempt to go in?
12        A    No.
13        Q    There's been information in this case that the
14   mother of the child, Crystal Quirello, came back and went
15   into the apartment.  You don't know anything about that?
16        A    Nobody went into the apartment when I was there.
17        Q    Have you heard from anybody else in connection
18   with this case that the mother of the child went back from
19   the hospital into the apartment?
20        A    No.  This is the first time I've heard such a
21   comment.
22        Q    So I have this straight and then I'm finished,
23   your understanding is when you got there, you were relieved
24   by Elena Dawson?  When you got there --
25        A    Right.
```

1     Q   Elena Dawson -- Got my people mixed up -- Valerie

2  Dawson left?

3     A   Yes.  I took control of that door essentially,

4  that external door when she left.

5     Q   And it's your understanding that she was there

6  from the -- continuously from the time she first arrived?

7     A   I wouldn't have knowledge of that.

8     Q   All right.  But you were there and then you were

9  relieved by some other officers, and then you left and

10  that's your whole involvement in this case?

11     A   Well, I mentioned we talked, the crime scene

12  investigator arrived, and then Sergeant Dawson returned.

13  Then I did go back into regular service and left.  That's

14  all my involvement.

15     Q   Do you have any knowledge as to when that

16  apartment was unattended that morning by police personnel

17  after 10 o'clock?

18     A   My only involvement was being dispatched there.  I

19  took the position that Valerie Dawson had and then I left

20  after that.  I have no knowledge of that.

21         MR. GROLAND:  I'm about finished.  May I just have

22       one moment, Your Honor?

23         THE COURT:  Yes.

24        (Brief pause.)

25        MR. GROLAND:  That's all I have.

1          MS. SINGER:  No questions of this witness.  No

2      objection to him being excused.

3          MR. GROLAND:  No objection.

4          THE COURT:  All right.  Fine.  Thank you.  You are

5      free to go.

6          THE WITNESS:  Free to leave the courthouse?

7          THE COURT:  Yes, sir.  Thank you.

8          Go ahead and call your next witness.

9          MR. GROLAND:  Okay.  Your Honor, I guess you want

10     to do argument, I assume?

11         MS. SINGER:  Are we going to go on with the issue

12     of the later entry of the apartment because I do have

13     David Cannon?  We can put David Cannon on to tell you

14     whether consent was signed.  If the issue is --

15         THE COURT:  Hold on.  Slow down.

16         MS. SINGER:  All right.

17         THE COURT:  Bottom line is, do you have any other

18     witnesses, Mr. Groland, that you want to call on either

19     of your motions to suppress?

20         MR. GROLAND:  Oh, yeah.  Just hold on one second.

21     Yes.

22         THE COURT:  Go ahead and call them.

23         MR. GROLAND:  Okay.  The motion to suppress

24     statements, as I indicated to the court at sidebar, I

25     believe the state has the burden of going forward on

1    that.  So I think Helen Legall is going to testify and

2    I'll cross-examine her.

3        THE COURT:  Okay.  Good enough.  Then any

4    motions -- excuse me -- any witnesses the state wants

5    to call as to the statements that are sought to be

6    suppressed?

7        MS. SINGER:  Yes.  Both the statements and the

8    search, yes, ma'am, I have a lot of evidence I wish to

9    present.

10        THE COURT:  All right.

11        MS. SINGER:  So he's resting now?

12        THE COURT:  He's resting and of course we have

13    combined the motions for a hearing and it's going to be

14    a little bit complicated since some witnesses will be

15    called for direct and some on cross.  So you may choose

16    in what order you call your witnesses.

17        I think it would make the most sense to call those

18    witnesses that you would call in response to the motion

19    to suppress evidence as opposed to statements.  Then he

20    would be able to cross-examine those witnesses and then

21    if you could sequentially call your witnesses that you

22    intend to call for purposes of the statements, then of

23    course he would be able to cross-examine those

24    witnesses as well.  Would that make sense?

25        MS. SINGER:  That's fine.

1    Your Honor, the motion to suppress evidence, just

2    so that I'm clear on this, we're discussing the

3    evidence, whatever evidence was collected by Officers

4    Alvarez and Dawson when they went into the apartment at

5    approximately 10:00 a.m. on August 2nd, 2000; and we're

6    also discussing paragraph six of the motion where

7    there's a very general allegation that other members of

8    the Gainesville Police Department entered the

9    defendant's apartment without a search warrant and

10   without consent of the defendant, made observations,

11   took photos, et cetera.  So there's a separate area

12   there which I believe, although it's generally stated

13   here, is the post consent entry by Tina Millard.  Is

14   that correct, Mr. Groland?

15        MR. GROLAND:  I won't agree that it's post

16   consent, but we're talking about the entry by Tina

17   Millard.

18        MS. SINGER:  By Tina Millard.

19        Then there is another time that officers entered

20   the apartment with Brian Herlihy.  Are we contesting

21   when they go into the apartment with Brian Herlihy?  I

22   just want the record to be clear on that.

23        MR. GROLAND:  I think it is.  That's not addressed

24   in the motion, Jeanne.  So the answer is, that's not a

25   part of my motion to suppress.

```
 1         MS. SINGER:  That will help me with my witnesses

 2    because I would have to go back into that then.  I

 3    understand that we are not contesting the later entry

 4    with Mr. Herlihy and Helen Legall, Larry Seale, Will

 5    Halvosa and Alan Coleman, correct?

 6         MR. GROLAND:  That is correct.

 7         MS. SINGER:  I believe Tina Millard was there as

 8    well.

 9         MR. GROLAND:  Correct.

10         MS. SINGER:  And are we not also -- we're not

11    contesting the entry into the apartment upon the

12    execution of a search warrant?  I don't have the date

13    in my head.

14         MR. GROLAND:  16th of August, no.

15         MS. SINGER:  The 16th of August.  We're not

16    contesting that as well?

17         MR. GROLAND:  No, we're not.

18         MS. SINGER:  All right.  So the record's clear

19    because I think it's important that the court needs to

20    know that there are other entries and I can really

21    conserve time here by just going to the one.

22         I would like to call David Cannon with the

23    Gainesville Police Department as my witness.  And while

24    Mr. Cannon is coming, Investigator Cannon is coming in,

25    your Honor, I would like to advise the court that I
```

```
 1        also wish to play -- If I were to proceed to provide
 2        this evidence, I would have played the 911 tape first,
 3        because I do have an argument that -- There are
 4        actually two arguments to be made here, the exigent
 5        circumstances argument and consent argument, and I want
 6        the court to hear the 911 tape before we adjourn today
 7        because I think it's important information.
 8              THE COURT:  That's fine.
 9              MS. SINGER:  Detective Cannon, if you would take
10        the stand, please, and be sworn.
11                          DAVID CANNON,
12   having been produced and first duly sworn, testified as
13   follows:
14                       DIRECT EXAMINATION
15   BY MS. SINGER:
16        Q    Detective Cannon, if you would state your full
17   name, please, and your occupation for the record.
18        A    David Keith Cannon, detective with the Gainesville
19   Police Department.
20        Q    And, Detective Cannon, were you so employed on
21   August 2nd of the year 2000?
22        A    Yes, ma'am.
23        Q    At that time were you dispatched or assigned to
24   investigate a suspicious trauma to a child by the name of
25   Robert Quirello?
```

```
 1        A    Yes, ma'am.
 2        Q    Who was approximately four months old at the time?
 3        A    Yes, ma'am.
 4        Q    And were you originally dispatched to the
 5   hospital, Shands Teaching Hospital?
 6        A    Yes, ma'am.
 7        Q    And who were you with at that time?
 8        A    Detective Legall, Helen Legall.
 9        Q    And at that time were you given information
10   regarding the status of the child?
11        A    Yes, ma'am.
12        Q    Originally was the case ruled to be or considered
13   by GPD to be an accidental injury?
14        A    Yes, ma'am.
15        Q    And were you called off of the case for
16   investigative purposes?
17        A    Yes, ma'am.
18        Q    What happened to -- About what time was it that
19   you were all called off of the case for investigative
20   purposes?
21        A    I think it was somewhere around 10 o'clock that
22   morning where we were actually asked to respond to,
23   originally to the apartment.  Then we were told to go to
24   Shands emergency room.  And just prior to getting there, we
25   were cancelled off of it, off the call.  But then our
```

1    sergeant, Sergeant Halvosa, asked us just to respond to the

2    hospital and make contact with the parents.

3         Q    All right.  And is that basic procedure for the

4    Gainesville Police Department where there's trauma,

5    significant trauma to a child that you might do a follow-up

6    investigation?

7         A    Yes, ma'am.

8         Q    And did you return to the hospital?

9         A    Yes, ma'am.

10        Q    Did you have contact with Brian Herlihy at that

11   time?

12        A    That afternoon.  Not the original time, I did not.

13        Q    All right.  Did it later come to your attention

14   that the injuries sustained by the child may have been

15   criminal in nature?

16        A    Yes, ma'am.

17        Q    How were you given that information?

18        A    I was notified -- Myself and Detective Legall were

19   contacted by Sergeant Halvosa and we were asked to respond

20   back to Shands emergency room in reference to the trauma to

21   the child.

22        Q    All right.  So you originally are called to go and

23   then you're called off and then you're called back?

24        A    Yes, ma'am.

25        Q    Do you know what sergeant -- what information

1   Sergeant Halvosa got that caused him to change his mind

2   regarding the information?

3        A    I was just briefed that there was some major

4   trauma to the child's head, the brain area.

5        Q    All right.  When you got there, did you come in

6   contact with Brian Herlihy?

7        A    Yes, ma'am.

8        Q    Do you see that person here in the courtroom?

9        A    Yes, ma'am.

10       Q    Would you identify him and what he's wearing,

11  please?

12       A    He's wearing the red shirt at the table.

13            MS. SINGER:  May the record reflect the witness

14       has identified the defendant?

15            THE COURT:  It will so reflect.

16  BY MS. SINGER:

17       Q    Could you tell the court under what circumstances

18  you actually came in contact with Mr. Herlihy?

19       A    He was outside the emergency room in the area

20  where the ambulances come into Shands.

21       Q    And did you speak with him there?

22       A    Yes, I did.

23       Q    And at that time was he a suspect in any criminal

24  investigation when you spoke with him?

25       A    No.

1     Q    Do you recall your conversations with him?

2     A    Yeah.  We asked if he would be willing to come

3  down to the police department.  We would like to talk to him

4  about the -- what had occurred that morning.

5     Q    Do you know whether or not Brian Herlihy is

6  related to Robbie Quirello, the child in this case?

7     A    I did not know it at that point.

8     Q    All right.  What was his response to your request

9  or inquiry as to whether he would be willing to come down to

10  the station?

11     A    He said he would.  He had been very cooperative.

12  He said he wanted to come down and, you know, talk about

13  what had occurred.

14     Q    How was his demeanor at the time that you spoke

15  with him?

16     A    He was very upset and he seemed to be really

17  concerned about the child's welfare.

18     Q    Was he under the influence of alcohol intoxicants

19  at the time that you inquired about whether he would be

20  willing to come to the station to speak with you?

21     A    I don't recall him being under any influence.

22     Q    Did he appear to understand what you were saying?

23     A    Yes.

24     Q    Did he know you were a law enforcement officer?

25     A    Yes, he did.

1      Q     Was there any force or coercion used to ask, to

2    convince him that he needed to go to the police station?

3      A     No.  We just asked him if he would be willing to

4    come down to the police department and talk to us.

5      Q     Was there -- Were there any promises made in

6    exchange for him coming down to the police station?

7           MR. TETTER:  Your Honor, we have to object to the

8           leading nature of all these questions.

9           THE COURT:  Overruled.

10   BY MS. SINGER:

11     Q     Were there any promises made to get him to go to

12   the police station?

13     A     No, ma'am.

14     Q     Was there anything that was indicated to you that

15   suggested that he did not willingly go with you to the

16   police station?

17     A     No.

18     Q     When -- Who transported him to the police station?

19     A     I transported him.

20     Q     And who else was in the vehicle?

21     A     Detective Legall.

22     Q     And where were you all seated in the vehicle?

23     A     I was driving.  I believe I was driving.

24   Detective Legall may have been in the front seat and I think

25   Mr. Herlihy may have been in the back seat or it could have

1    been opposite.  Mr. Herlihy could have been in the front

2    seat.  I don't recall.

3         Q    Okay.  Was there any discussion by Mr. Herlihy

4    while you were transporting him to the police station that

5    suggested to you he did not want to go to the police station

6    with you?

7         A    No, ma'am.

8         Q    Was there anytime during the course of this

9    transportation to the police station that he told you to

10   stop or let him out or he did not intend to go to the police

11   station with you?

12        A    No, ma'am.

13        Q    Was there any discussion about the case while you

14   were in the police vehicle?

15        A    Not that I recall.

16        Q    Did you discuss with him whether or not law

17   enforcement officers could go into his apartment where the

18   child had been injured?

19        A    Yes, ma'am.

20        Q    And who had that discussion with Mr. Herlihy?

21        A    I believe I spoke to Mr. Herlihy outside when we

22   were out by the ambulance and he at that point he gave us

23   verbal consent.  And then when we got inside the vehicle,

24   Detective Legall had a written consent form that we filled

25   out and Mr. Herlihy signed.

1    Q    Okay.  Tell us about the circumstances regarding

2  the verbal consent.  You specifically spoke with Mr. Herlihy

3  about going into the apartment?

4    A    I believe I did.  It was right outside and we

5  asked if we could go back inside the apartment because

6  everyone had left and we needed to or we wanted to look

7  inside the apartment to find out what had happened to the

8  child and he said, Yes.  Then at that point when we got into

9  the car, we went ahead and did a written consent.

10    Q    Now did you advise Sergeant Valerie Dawson that

11  you had obtained consent from Mr. Herlihy to allow entry

12  into the apartment by crime scene?

13    A    Yes, ma'am.

14    Q    And how would you have done that?  How would you

15  have communicated that with Sergeant Dawson?

16    A    A portable radio.

17    Q    And at the time that you communicated that to her,

18  do you know whether or not the actual written consent had

19  been signed or whether you had already obtained the verbal

20  consent and you were in the process of getting the written

21  consent signed?

22    A    It was just verbal because we had the consent form

23  inside the car.  And from the time we were at the ambulance,

24  I mean out where the ambulances were until we got to the

25  car, once we got to the car.  So when I radioed her, it was

```
 1   just verbal consent.

 2       Q    All right.  Was there anything about the consent

 3   that suggested to you that Mr. Herlihy did not freely and

 4   voluntarily consent to the search of his residence?

 5       A    No, ma'am.

 6       Q    Did you force him, coerce him, or threaten him in

 7   any way to get him to give you the consent?

 8       A    No, ma'am.

 9       Q    Was there anything that indicated to you that he

10   did not understand your request to ask to go into the

11   apartment again?

12       A    No, ma'am.

13           MS. SINGER:  Your Honor, at this time I might

14       since we're breaking a seal here, offer this.  I

15       believe it has the written consent, actual consent.

16       You're not gonna object to this?

17           MR. GROLAND:  (Shakes head.)

18           MS. SINGER:  All right.

19   BY MS. SINGER:

20       Q    Detective Cannon, were you present when the

21   written consent was signed?

22       A    Yes, ma'am.

23           MS. SINGER:  Could we have this marked as State's

24       Exhibit -- One moment.  If I can approach counsel, I

25       might just make it an exhibit into evidence.  (Brief
```

1          pause.)   State's 1 into evidence, your Honor.

2               THE COURT:   Without objection it will be admitted

3     as State's No. 1 in evidence.

4               (State's Exhibit No. 1 was received in evidence.)

5               MS. SINGER:   I'll go ahead and show this to the

6     witness.

7  BY MS. SINGER:

8     Q     Investigator Cannon, if you would go ahead and

9  take a look at State's 1 of the evidence and tell me whether

10  you recognize this?

11    A     Yes, ma'am.

12    Q     What is that, sir?

13    A     That's the written consent signed by Mr. Herlihy

14  in my vehicle.

15    Q     Were the rights that are defined in the consent or

16  were the statements that are found in the consent, were they

17  given to Mr. Herlihy?

18    A     Yes, ma'am.   Detective Legall read this to

19  Mr. Herlihy.

20    Q     It says there that it was executed at Shands ER?

21    A     Yes, ma'am.

22    Q     And the date is the 2nd?

23    A     Yes, ma'am.

24    Q     And the time is 1300 hours?

25    A     Yes, ma'am.

1     Q    Did you obtain the verbal consent before the

2  actual written consent was signed?

3     A    Yeah.  It would have been somewhere around 12:45,

4  12:50.

5     Q    All right.  Does this appear to be in the same or

6  similar condition as to when it was executed?

7     A    Yes, ma'am.

8          MS. SINGER:  Your Honor, if we're combining both

9       the motion to suppress statements and the motion to

10      suppress evidence, Investigator Cannon also has

11      information about the statements.  Should I just go on

12      to that now or do I allow for cross-examination?

13         THE COURT:  Go on with that.

14         MS. SINGER:  All right.

15 BY MS. SINGER:

16    Q    Did you also proceed to the station -- Pardon me.

17 Once you got to the station, did you have contact with

18 Mr. Herlihy during the investigative process?

19    A    Yes, ma'am.

20    Q    And tell us what you did with Mr. Herlihy as you

21 came to the station.

22    A    We drove him to the station.  We escorted him up

23 to -- walked him up the stairs to -- we have two interview

24 rooms upstairs in the -- across the hall from the detective

25 division.  Asked him to have a seat in there.  We sat down

1    and we talked for, I don't know, maybe an hour or so.

2         Q    All right.  And during that time, Detective

3    Cannon, was Brian Herlihy under arrest?

4         A    No, ma'am.

5         Q    Was he in fact free to leave the station if he

6    chose to do so?

7         A    Yes, ma'am.

8         Q    And was the purpose of your interview at that time

9    to obtain information from a person with knowledge regarding

10   what had occurred to the child, Robbie Quirello, on that

11   day?

12             MR. GROLAND:  Objection, your Honor, that's

13        leading.  She did call the witness.  This is direct.

14             THE COURT:  Your objection's overruled.

15   BY MS. SINGER:

16        Q    Well, what was the purpose for your interview?

17        A    It was just to find out what had occurred and we

18   knew he had knowledge.

19        Q    Now in the course of your assignment as an

20   investigator, have you brought other persons with knowledge

21   or witnesses to the station to interview them regarding

22   crimes?

23        A    Yes, ma'am.

24        Q    Is that a standard procedure of your employment?

25        A    It's not standard, but it's ideal.  I mean it's --

1   there's less distractions.  It's quiet and there's just not

2   as many distractions as there would have been say at the

3   emergency room.

4        Q    At anytime while you were in the presence of Brian

5   Herlihy and Helen Legall during this interview period for

6   approximately one hour, did you or anyone in your presence

7   confront Mr. Herlihy and accuse him of being guilty of some

8   event?

9        A    No.

10       Q    Were your conversations open-ended or close ended?

11       A    I believe that -- Detective Legall was asking most

12   of the questions, but it was just, you know, what had

13   occurred, you know, and more like a time line.

14       Q    Was there any intimidation used to obtain

15   information from Mr. Herlihy during this time?

16            MR. TETTER:  Objection, your Honor, it's leading.

17            THE COURT:  Overruled.

18            THE WITNESS:  No.

19   BY MS. SINGER:

20       Q    Were any promises or any other statements made to

21   Mr. Herlihy to ensure him that any statements that he would

22   have made would protect him from being charged with any

23   crime?

24       A    No, ma'am.

25       Q    Was he handcuffed or any way otherwise detained?

```
 1        A     No, ma'am.

 2        Q     Now as far as the statements were made, Detective

 3   Cannon, you did not do a formal written report specifically

 4   as to those statements; is that correct?

 5        A     No, ma'am, I did not.

 6        Q     Detective Helen Legall would have been the officer

 7   who did that report?

 8        A     Yes, ma'am.

 9        Q     Was there anytime during the course of the

10   interview that you had with Brian Herlihy that he told you

11   he wanted to leave?

12        A     Not that I recall, no, ma'am.

13        Q     Did there come a time, Detective Cannon, when

14   Mr. Herlihy indicated to you that he was willing to go back

15   to his residence to show you and others how the injuries

16   were sustained to the child?

17        A     Not while I was there.

18        Q     All right.  By that time you had already left?

19        A     Yes, ma'am.

20        Q     Do you know approximately what time you left the

21   interview room?

22        A     I know it was 2:50, somewhere around 2:50.

23        Q     And at that time do you recall who went into the

24   interview room with Helen Legall?

25        A     I, you know, would just have to base it off of
```

```
 1    Detective Legall's report.
 2              MS. SINGER:  I don't have any further -- Well, one
 3         moment, your Honor.  Let me check with Mr. Pennypacker.
 4         One moment, your Honor, just for me to check my waivers
 5         here.  (Brief pause.)  I have no further questions of
 6         this witness, your Honor.
 7              THE COURT:  All right.  Mr. Groland?
 8                        CROSS-EXAMINATION
 9    BY MR. GROLAND:
10         Q    Are you aware that Helen Legall actually talked to
11    Brian for about two and a half, three hours that afternoon?
12         A    Yes, ma'am.  Yes, sir.  Excuse me.
13         Q    And at no time while you were present for that
14    first hour was there any mention of his Miranda rights or
15    constitutional rights; is that correct?
16         A    That's correct.
17         Q    All right.  Now you indicated that you are the one
18    that went up to Brian at the hospital and asked him about
19    going back to GPD?
20         A    That's my recollection, yes, sir.
21         Q    Okay.  There in fact was a meeting just before
22    that where I think Halvosa was in charge and he delegated
23    certain responsibilities to different detectives?
24         A    Yes, sir.
25         Q    And I think Coleman talked to Crystal?
```

1      A      I --

2      Q      And -- Do you remember that?

3      A      No.

4      Q      And somebody else, I think Larry Seale, talked to

5  the father, John Quirello?

6      A      Like I say, I was asked to go out and find

7  Mr. Herlihy.

8      Q      Okay.  And in fact you were told to actually get

9  Mr. Herlihy and bring him back to the Gainesville Police

10 Department for you and Helen?

11     A      I was asked to see if he would come down and talk

12 to us.

13     Q      And Brian was the only one of the three people

14 that were being interviewed, John Quirello, Crystal, and

15 Brian Herlihy, that was asked to go back to the Gainesville

16 Police Department; is that correct?

17     A      That's correct.

18     Q      He was the focus then as to the investigation?

19     A      No, sir.

20     Q      Who was?

21     A      At this point apparently -- I was just asked to

22 talk to Mr. Herlihy.

23     Q      Were you involved in that meeting with all the

24 detectives and hospital personnel where it was discussed

25 that there was significant trauma to the baby's brain

1    thought to be shaken baby syndrome?

2       A    I overheard that at the meeting, but then I was

3    only in there for a brief period of time.

4       Q    Okay.  That was discussed for the little bit of

5    time you were in there?

6       A    I recall there being discussion about trauma to

7    the head, to the brain.

8       Q    And was it also discussed at that meeting that

9    Brian was the last person with the baby and therefore he was

10   thought to be the focus of the investigation?

11      A    Not at that point.

12      Q    When did you hear that discussed?

13      A    That was later.  That was later on, I guess, that

14   day when I wasn't in at that point.  It was later on in the

15   course of the afternoon.

16      Q    Okay.  Do you know why the other -- Well, strike

17   that.  When you went up to Brian, where was he?

18      A    He was outside.

19      Q    He was sitting on the curb outside the emergency

20   room?

21      A    Yes, sir.

22      Q    He was crying?

23      A    Yes, sir.

24      Q    And who was with him?

25      A    I think it was Officer King.

1       Q    All right.  Did you and Helen go to talk to Brian

2   at that point or were you by yourself?

3       A    I believe Helen was with me, but I think I spoke

4   to Mr. Herlihy.

5       Q    All right.  And you asked him if he would

6   accompany you to the Gainesville Police Department?

7       A    Yes, sir.

8       Q    All right.  Do you remember that Helen told him

9   right at that point that this is now a criminal

10  investigation?

11      A    I don't recall that.

12      Q    Okay.  Do you recall that that was not said?

13      A    I don't recall that.

14      Q    Either way?

15      A    Yeah.

16      Q    Do you remember Brian saying to you and to Helen

17  right at that point, Do you think maybe I should talk to a

18  lawyer?

19      A    No.

20      Q    You don't remember anything about that?

21      A    No, sir.

22      Q    He went to the Gainesville Police Department with

23  you all in a police car?

24      A    No.  Unmarked vehicle.

25      Q    Was it a police car?

```
 1      A    It's a Ford Taurus, the white, Ford Taurus.

 2      Q    Well, it wasn't Brian's car, right?

 3      A    No markings or anything.

 4      Q    Is it your car?

 5      A    Yeah, it's my car.

 6      Q    Your police car?

 7      A    Yes.

 8      Q    All right.  It had a radio in it?

 9      A    Yeah, basic radio.  It doesn't work anymore.

10      Q    It worked then, didn't it?

11      A    Yeah, but we weren't using it.  We had it turned

12   off.

13      Q    Do you know why he wasn't advised of his rights

14   when you first got him into the interrogation room?

15      A    At that point we were just trying to find

16   information.  As far as I was concerned, it wasn't -- you

17   know, he wasn't a suspect at that point.  He was a person

18   with knowledge.

19      Q    You were trying to get information from him as to

20   what he knew?

21      A    What had occurred.

22      Q    Okay.  And that interview room in fact has

23   facilities for taping and videotaping?

24      A    It has -- it has a monitor where you can tape.

25      Q    Okay.  Do you know why Brian's three hour
```

1   statement that afternoon was not taped?

2        A    We just did not tape it.  I mean I don't know.  I

3   can't speak for the other, but for the hour and 20 minutes

4   we were there, we were just getting information.

5        Q    Okay.  Was it ever discussed in your presence or

6   did you ever discuss with anybody whether or not that

7   statement should be taped?

8        A    No, I did not.

9        Q    And during the hour or so you were there, did you

10  partake in any questioning of Brian?

11       A    Not that I recall.  I just -- I was a witness.

12       Q    Just Helen?

13       A    Yes.

14       Q    Did you make a report?

15       A    No, I did not.

16       Q    You did not prepare any report in this case?

17       A    No, I did not.

18       Q    Did you make any handwritten notes as to Brian's

19  statement to Helen?

20       A    I may have.  I think I probably wrote it down

21  during the interview.

22       Q    Was she making notes?

23       A    I believe so.

24       Q    Was Brian ever told that he was free to leave at

25  any point, You can just leave anytime?

1      A    I don't remember if he was told that or not.

2      Q    Does this interview room have two-way mirrors so

3  that other people can look in, other detectives?

4      A    I have to think which interview room it was.  I

5  don't think this one -- that one did, no.

6      Q    Well, is it -- Are people on the outside, other

7  detectives who are not in the room, able to overhear with

8  whatever audio facilities you have set up?

9      A    Yeah, they can overhear the monitor.

10     Q    All right.  Who was listening in when Helen was in

11 there with Brian that first hour questioning him, if you

12 know?

13     A    I do not know.

14     Q    Was somebody listening in?

15     A    They could have been.  The monitor is in the

16 detective division.

17     Q    Okay.  That room you can also videotape a

18 statement?

19     A    That's correct.

20     Q    All right.  All you got to do is press a button to

21 make it work?

22     A    Put a video in there and press the button.

23     Q    When you first got the consent from him, it's your

24 testimony that it was initially verbal and that was while he

25 was at the hospital sitting on the curb?

1       A    Yes, sir.

2       Q    So then it's fair to say that you didn't read him

3  the consent form at that point?

4       A    No.

5       Q    You just asked him, Can we go in?

6       A    Can we have your consent to go into your

7  apartment?

8       Q    He said, Yes?

9       A    Yes.

10      Q    So you didn't then tell him that he had a right to

11 refuse that consent; is that correct?

12      A    Not until we got it on the paper.

13      Q    So none of these things indicated on here that, I

14 understand that the premises cannot be searched without my

15 consent, or unless the search -- the officers obtain a

16 search warrant.  I further agree that any article that may

17 be found in the search, may be taken as evidence, used in

18 trial, none of that was said to him initially?

19      A    No, sir.

20      Q    But before the actual written consent was

21 signed -- I think you said that was in the car on the way to

22 the department?

23      A    That was actually before we left to go to the

24 station.

25      Q    Okay -- that you communicated the verbal consent

1    to the officers that they could go into the apartment

2    because he had consented?

3        A    I just -- I made -- I notified Sergeant Dawson

4    that we had verbal consent.  I'm not aware whether they went

5    into the apartment at that time or not.

6        Q    Okay.  What was the time frame between getting the

7    verbal consent and getting the written document signed in

8    the police car?

9        A    I think ten minutes.

10       Q    All right.  Did you tell Brian why you wanted to

11   go into his apartment?

12       A    I think Detective Legall did.

13       Q    What did she tell him about that?

14       A    We just wanted to -- Since everyone had left, the

15   police department wanted to go back inside and look in the

16   apartment.

17       Q    Did anyone tell Brian that two officers or three

18   officers had already been in there for ten or 15 minutes

19   looking around?

20       A    I'm not aware of that.

21       Q    You were not aware that Alvarez and Dawson and

22   Officer King had already been in there shortly after 10

23   o'clock and made observations and reported those

24   observations to Helen Legall?

25       A    I'm not aware of that.

1      Q     Okay.  Did Detective Legall tell Brian Herlihy

2     that if he did not consent, she could get a search warrant?

3      A     I don't recall that, no.

4      Q     There's something --

5      A     It says in the consent.  That says, Without a

6     search -- Will you consent or we would have to obtain a

7     search warrant.

8      Q     Okay.  Was there a discussion about a search

9     warrant either at the same time or right after the written

10    consent form was signed by Brian?

11     A     No, sir.

12     Q     Did either you or Helen specifically tell him that

13    you were gonna be looking for evidence with regard to a

14    criminal investigation, that that's why you wanted to go in?

15     A     I don't recall saying that.  Detective Legall may

16    have.

17     Q     And I think you said you don't recall who came in

18    after you left?

19     A     I -- After reading the report I know who it was,

20    but I'm not -- I didn't see that person.

21     Q     Why did you leave?

22     A     I went and met -- I went to Mr. Herlihy's

23    apartment and met Sergeant Halvosa and Detective Coleman.

24     Q     Okay.  Are you aware that Detective Legall --

25    you've read her report?

1      A      Yes.

2      Q      So you are aware that she indicated in the report

3    that during that debriefing of Brian, she felt that he was

4    responsible for the injuries to the child because he was the

5    last one with the child?

6      A      I understand that she put in there he was the last

7    one with the child.

8      Q      Okay.  What about the rest of it, that he was

9    responsible for the injuries?

10     A      I read the report.  It's in the report, but --

11     Q      Yeah.  Did you have a discussion with her about

12   that before you left that it looks like Brian is responsible

13   because he is the last one with the child before the child

14   was injured?

15     A      No, sir.

16     Q      Are you -- Strike that.  Was there an audiotape

17   right there on the desk, I mean available?

18     A      No, sir.

19     Q      Are you aware that Helen turned the tape on after

20   she concluded the statement for three hours and then took a

21   26 minute taped statement from him?

22     A      No, sir.

23     Q      Do you know where she got that tape recorder from?

24     A      It probably would have been hers.  We're issued

25   tape recorders.

1        Q    Do you need a tape recorder in that room to tape

2    somebody's statement or is that already set up and all you

3    got to do is turn it on and put a tape in?

4        A    No.  You need a tape recorder.

5        Q    All right.  So it's not like the video's already

6    in place ready to go?

7        A    No.

8        Q    All right.  Was Brian ever allowed out of the room

9    while you were there for that hour?

10       A    I think he might have gone to the bathroom.  I

11   don't recall.  Or we may have got him something to drink.

12       Q    Were you there when he was confronted by Officer,

13   by Detective Coleman and told he was a lying son of a bitch?

14       A    No, sir.

15       Q    Did Coleman have any discussion with you outside

16   of that room that he was gonna confront Brian and accuse

17   him?

18       A    No, sir.

19       Q    Did you have a discussion with Helen Legall that

20   we won't arrest him today so that we don't have to advise

21   him of his Miranda rights?

22       A    No, sir.

23       Q    Was there any discussion that you had with Helen

24   about arresting Brian that day or anytime?

25       A    No, sir.

```
 1        Q    Did he ever ask, Am I under arrest?

 2        A    No, he did not.

 3        Q    Not even at the hospital, at the same time that he

 4   was asked to sign the consent form to search his apartment?

 5        A    No, sir.

 6        Q    Did you have any communication with Officer King

 7   about what went on -- let me just -- and I'll just finish,

 8   about what went on when King was there with Brian?

 9        A    No.

10        Q    Do you know anything about Officer King telling

11   Brian that he was not allowed to leave Shands Hospital?

12        A    No, I do not know about that.

13             MR. GROLAND:  May I just have a minute, your

14        Honor?

15             THE COURT:  Yes.

16             (Brief pause.)

17   BY MR. GROLAND:

18        Q    Detective, isn't that interview room behind

19   secured doors, in other words, somebody in that interview

20   can't just get up and walk out to the street?

21        A    No.  You have to lock it from the outside.  So

22   it's not where if it closes, it's locked.

23        Q    Well, I'm talking about the area within the

24   Gainesville Police Department where the interview room is.

25   If you go out of the interview room, don't you still have to
```

1  be let out of that area of the --

2      A    No, sir.

3      Q    You do not?

4      A    No, sir.  You can actually walk down the hallway,

5  go down the stairway and you're in the lobby.

6      Q    Okay.  Did he ever ask for an attorney while in

7  the room or discuss, Should I maybe call an attorney?

8      A    No, sir.

9      Q    Can somebody walk in off the street and walk up

10  there to the interview room without being let in?

11      A    No.  You have to be buzzed in.

12      Q    You got to be buzzed in, but you can walk out,

13  correct?

14      A    Yes, sir.

15      MR. GROLAND:  That's all I have.

16      THE COURT:  Any redirect?

17      MS. SINGER:  Yes, very briefly.

18              REDIRECT-EXAMINATION

19  BY MS. SINGER:

20      Q    Do you videotape every witness that you interview

21  in a criminal case?

22      A    No, ma'am.

23      Q    Do you audiotape every witness that you interview

24  in a criminal case?

25      MR. TETTER:  Objection, it's irrelevant, your



1        Honor.

2                THE COURT:  Sustained.

3    BY MS. SINGER:

4        Q    Have you ever in the course of your employment

5    Investigator Cannon, had witnesses who at first agreed to

6    talk with you and then later left the police station on

7    their own?

8                MR. TETTER:  Objection, irrelevant.

9                THE COURT:  Sustained.

10   BY MS. SINGER:

11       Q    In this particular case was there anytime in your

12   presence that Mr. Herlihy indicated to you that he wanted to

13   leave the police department?

14       A    No, ma'am.

15       Q    Now regarding the contact at Shands emergency

16   room, do you know whether or not Mr. Herlihy had left Shands

17   emergency room sometime before you had contact with him in

18   the ambulance area?

19       A    I can't say whether he did or not.

20       Q    All right.  Are you aware of the fact or did he

21   report to you that Crystal had asked him to leave the

22   hospital because she did not want her husband, John, to have

23   any contact with him when John found out that the baby had

24   been injured?

25       A    I don't remember that.

Stacey K. Bryant, RPR
Judicial Court Reporter

0002662

```
 1        Q     So as far as you know, Brian could or could not

 2   have left the hospital area anytime before you had contact

 3   with him?

 4        A     Yes, ma'am.  I was there at 10:00 and left and

 5   went back.  I didn't get back until 12:00, 12:45.

 6        Q     Are you familiar with the fact that Mr. Herlihy

 7   went to another section of the hospital and spoke with the

 8   chaplain of the hospital?

 9        A     No.

10             MR. TETTER:  That's beyond the scope of the

11        cross-examination.

12             MS. SINGER:  It goes --

13             THE COURT:  Overruled.  Go ahead.

14   BY MS. SINGER:

15        Q     Are you aware of that fact, sir?

16        A     No, ma'am.

17        Q     When you spoke with Mr. Herlihy verbally about

18   going into the apartment, when you indicated that he was

19   cooperative, did he make any statements to you that --

20   regarding how to get into the apartment or his dogs or

21   anything such as that?

22        A     No, ma'am, not that I remember.

23        Q     But he did indicate to you that you were permitted

24   to go in?

25        A     Yes, ma'am.
```



1       Q       Later he confirmed that in writing?

2       A       Yes, ma'am.

3               MS. SINGER:  No further questions, your Honor.

4               MR. GROLAND:  Just one.

5                       RECROSS-EXAMINATION

6       BY MR. GROLAND:

7       Q       Did somebody have the keys to his apartment?

8       A       I believe Mr. Herlihy may have had them and gave

9       them to me.

10      Q       Do you remember that?

11      A       I think I did open the door with a key.

12              THE COURT:  All right.  May this witness be

13      released or does he need to remain?

14              MS. SINGER:  I do want to ask one question about

15      that, your Honor.

16              MR. GROLAND:  I'm not finished.

17              MS. SINGER:  Oh, I'm sorry.  I thought the Judge

18      said that was the last question.

19              THE COURT:  He said one question, so I assumed

20      when he said one question, he actually meant one

21      question, but that assumption is incorrect.  So go

22      ahead.

23              MR. GROLAND:  Just to follow-up to that one.

24      BY MR. GROLAND:

25      Q       Are you aware that he actually gave the keys to

1    his vehicle so that Crystal could go back to the apartment?

2        A    No, I'm not aware of that.

3        Q    Are you sure he gave you the keys?

4        A    To the best of my recollection because I think

5    there was trouble locking the door to the apartment.

6        Q    So what you're saying is, you remember having some

7    keys?

8        A    Yes, sir.

9        Q    Do you know where you got the keys from?

10       A    I thought I had got them from Mr. Herlihy.

11            MR. GROLAND:  Thank you, your Honor.

12            THE COURT:  And did you have any re-redirect?

13            MS. SINGER:  No.

14            THE COURT:  May this witness be released?  What

15       was the answer?  May this witness be released?

16            MR. GROLAND:  Yes, your Honor.

17            MS. SINGER:  No objection.

18            THE COURT:  Thank you very much.  You're free to

19       go.  We're gonna take a 15 minute recess.

20            (Recess 11:18 - 11:30.)

21            MS. SINGER:  Let me tell the court who my next

22       witnesses are and why I want to call them in the order

23       that I'm calling them so the court understands about

24       the time because I know time is of the essence.

25            I have Officer King.  He's scheduled for a root

1    canal.  He's already an hour late.  He's very brief.

2    He's going to talk about the contact, if any he had,

3    with the defendant at the hospital.

4        I have Duane Diehl, who for some period of time

5    with Detective Cannon sat with Helen Legall and had

6    contact with Mr. Herlihy.  He would testify briefly

7    that he made no promises, no threats, no quandary and

8    in fact discussed matters that aren't even matters

9    pertaining to this investigation.  But just so the

10   record is clear, I would like to put him on briefly to

11   do that.

12       And then Helen Legall, who would be the substance

13   of the cross-examination by Mr. Groland.

14       So that's how I'm laying it out for the court.  I

15   have other witnesses, but I understand now if we're on

16   the record, I would like to put on the record that

17   Mr. Groland is not going to be objecting to any post

18   Miranda statements.

19       So the court is aware, there is an allegation in

20   the motion to suppress, statements that a police

21   officer specifically told Mr. Herlihy, this would be

22   paragraph eight, that he was a lying son of a bitch.

23   That statement was made by an officer that had contact

24   with Mr. Herlihy after his Miranda rights were given.

25   Mr. Groland contests that.  So we will be calling Alan

1    Coleman to go over that aspect of the case as well,

2    your Honor.

3        The state will not be able to rest and make

4    argument without these witnesses.  I know time is of

5    the essence.  This case is two years old.  These issues

6    have been a long time known and I want the opportunity

7    to present all of this evidence to the Court.

8        MR. GROLAND:  Can the Court tell us how much time

9    we have allotted anyhow today?

10       THE COURT:  You had from 9:00 until 12:00.

11   Because there was confusion about Mr. Herlihy's

12   transport, of course we didn't get started until 9:30.

13   That would mean that you would have until 12:30.  I

14   have other hearings scheduled to start at 1 o'clock and

15   of course we will do whatever we have to do, including

16   you may submit memorandums and deposition transcripts

17   if necessary and I'll rule over the weekend.  Go ahead

18   and call Deputy King so he can get to his doctor.

19       MS. SINGER:  Well, I don't -- I'm gonna call Helen

20   Legall then because she's essential and I don't want --

21       THE COURT:  No, I'm not gonna leave that officer

22   in pain that much longer.  You should have called him

23   first and we shouldn't have held up his surgery.

24       MS. SINGER:  All right.

25       THE COURT:  Having had several of those myself, I

1           take judicial notice of what that entails.  Would you

2           raise your right hand?

3                           ROBERT KING,

4     having been produced and first duly sworn, testified as

5     follows:

6                         DIRECT EXAMINATION

7     BY MS. SINGER:

8           Q    Officer King, if you would state your full name,

9     please?

10          A    Robert Lee King, III.

11          Q    And your occupation or profession?

12          A    Gainesville police officer.

13          Q    Were you working as a Gainesville police officer

14    on August 2nd, the year 2000 at approximately 10:00 a.m.?

15          A    Yes, I was.

16          Q    Were you an officer in training at that time?

17          A    Correct, I was.

18          Q    And were you assigned to ride with Orlando

19    Alvarez?

20          A    Correct.

21          Q    He was a patrol officer?

22          A    Yes.

23          Q    Both of you were in uniform?

24          A    Yes, ma'am.

25          Q    And approximately 10:00 a.m. that morning did you

1   proceed -- Strike that.  I'm going to move to approximately

2   10:36 a.m.  Officer King, did you and Officer Alvarez travel

3   to Shands Teaching Hospital to follow-up on a call that a

4   child had been injured?

5        A    Correct, yes.

6        Q    At that time do you recall coming into contact

7   with one Brian Herlihy?

8        A    At the hospital, we did, yes.

9        Q    Do you see that person here today?

10       A    I do.

11       Q    Could you tell me where he's sitting and what he's

12   wearing, please?

13       A    He's wearing a red top and a gray sweatshirt.

14            MS. SINGER:  May the record reflect the witness

15       has identified the defendant?

16            THE COURT:  It will so reflect.

17   BY MS. SINGER:

18       Q    Officer King, at the time that you had contact

19   with Mr. Herlihy, did you ask him any questions?

20       A    I did not.

21       Q    Did you give him any directions whatsoever?

22       A    No, I didn't.

23       Q    Did you ever tell him that he could not leave the

24   hospital grounds?

25       A    No.

1      Q    Did anyone in your presence tell him that he could

2    not leave the hospital grounds?

3      A    I don't believe so.

4      Q    Well, did you have any contact with him that

5    suggested to him that he was under arrest?

6      A    No.

7      Q    Did you ever tell him he was under arrest?

8      A    No.

9      Q    Do you know whether or not he left the premises at

10   anytime?

11     A    I cannot be sure about that.

12          MS. SINGER:  No further questions, your Honor.

13          MR. GROLAND:  Just a couple.

14                     CROSS-EXAMINATION

15   BY MR. GROLAND:

16     Q    When you got there to the scene with Officer

17   Alvarez initially --

18     A    Yes.

19     Q    -- was everybody out of the apartment?

20     A    At the scene, yes, sir, there were.

21     Q    In fact all of the paramedics had left the area,

22   but the firemen were still there downstairs loading up their

23   truck; is that right?

24     A    Correct.

25     Q    And it was just three of you there, Sergeant

```
 1    Dawson, Orlando Alvarez, and yourself?

 2         A    Correct.

 3         Q    And as between the three of you a decision was

 4    made by the Sergeant, let's go upstairs and take a look?

 5         A    Correct.

 6         Q    And was the reason for that your understanding

 7    that they were looking for evidence of foul play?

 8         A    Yes, sir, anything suspicious.

 9         Q    Did you go up into the apartment, look around with

10    them?

11         A    We did.

12         Q    Was that the only reason that was discussed in

13    your presence to go into the apartment to look around for

14    evidence of foul play?

15         A    Correct.

16         Q    Nothing else?

17         A    No, sir.

18         Q    Did you stay in there with them the whole time the

19    two of them were looking around?

20         A    Yes.

21         Q    How long were you inside the apartment?

22         A    Approximately five, six minutes or so.

23         Q    Did you make any observations of anything that you

24    now remember that's relevant to this case?

25         A    I didn't notice anything that was out of ordinary
```

```
 1   there.

 2        Q    Okay.  When you left, you went to the hospital

 3   with Orlando?

 4        A    Yes.

 5        Q    Did Sergeant Dawson leave at the same time?

 6        A    No, she didn't.

 7        Q    She stayed behind?

 8        A    Yes.

 9        Q    Do you know why she stayed?

10        A    I couldn't tell you why.

11        Q    And you went from there to the hospital?

12        A    Yes.

13        Q    And at the hospital you had contact with Brian,

14   that would be outside the emergency room?  He was sitting on

15   the curb crying?

16        A    I believe we probably may have contacted him, but

17   I can't be too sure of the time.

18        Q    But at some point you went out there and he was

19   out there crying?

20        A    Yes.

21        Q    Were you told to go out there and stand by him?

22        A    I believe I was told to go out and make sure that,

23   you know, he was okay, he didn't leave the area because I

24   think they wanted to just keep an eye on him because of the

25   situation.
```

```
 1        Q     In fact you were told to go out there and make
 2   sure he didn't leave; isn't that true?
 3        A     I can't recall the exact words on that.
 4        Q     Who told you to go out there and stay with him?
 5        A     I don't remember.
 6        Q     Didn't Brian actually ask you if he could leave
 7   and you said you had to check with your sergeant?
 8        A     I had to check with the supervisor, correct,
 9   because I was in training.
10        Q     Okay.  And he asked you if he could leave and you
11   said you had to check with your supervisor.  Did you do
12   that?
13        A     I believe I did.
14        Q     And you were told he could not leave; isn't that
15   true?
16        A     That's the instruction I received, yes.
17        Q     Who was that supervisor that told you that Brian
18   could not leave?
19        A     I don't know who the supervisor was at the time.
20        Q     Did you check by calling somebody on a cell phone
21   or over your radio?
22        A     I didn't have a cell phone, so it must have been
23   over the radio.
24        Q     Your understanding then after that conversation
25   was he was staying there and you were watching him?
```

```
 1       A     I was keeping observation of him, correct.

 2             MR. GROLAND:  That's all I have, your Honor.

 3             THE COURT:  Any redirect?

 4             MS. SINGER:  Yes, I do.

 5                        REDIRECT-EXAMINATION

 6   BY MS. SINGER:

 7       Q     Do you know whether he left or not?

 8       A     No, I don't know if he left or not.

 9       Q     Did you leave before he left?

10       A     We left the hospital before he did, yes.

11       Q     So there was a point after you left that he was

12   not being supervised by you?

13       A     Correct.

14       Q     You don't know where he went at that time?

15       A     No, I do not.

16             MS. SINGER:  No further questions, your Honor.

17             THE COURT:  Wait a minute.  You think you want to

18   do a recross on what new area that the state now

19   opened?

20             MR. GROLAND:  Yeah.

21             THE COURT:  On what new area?

22             MR. GROLAND:  About him leaving, about my client

23   leaving.  She just asked about that and I would like to

24   follow-up on that.

25             THE COURT:  Go ahead.
```

1                    MR. GROLAND:   Thank you.

2                    RECROSS-EXAMINATION

3   BY MR. GROLAND:

4      Q    You just said you were told to watch him and my

5   understanding of your testimony in response to Ms. Singer's

6   question is, you nevertheless after you were told to watch

7   him, allowed him to leave?

8      A    No, I didn't allow him to leave.  Myself and

9   Orlando Alvarez left before he left, sir.  We left the area

10  first.

11     Q    Okay.  So --

12     A    We did not stay at the hospital the whole time.

13     Q    So you and Alvarez left and you left him there?

14     A    We essentially left the area, sir.

15     Q    And did you leave him there with any other

16  officer?

17     A    To my understanding, no, we did not.

18     Q    Don't you remember somebody taking him from the

19  area of the curb outside of the emergency room, into the

20  hospital to go talk to a clergyman?

21     A    No, I don't.

22     Q    Do you know Officer Jackson, Chris Jackson?

23     A    Yes, I do.

24     Q    Didn't he come up and have contact with Brian and

25  actually take him inside to a clergyman?

1     A     I don't remember that, sir.

2     Q     You don't remember it?

3     A     No.

4           MR. GROLAND:  That's all I have, your Honor.

5           THE COURT:  Now may Officer King be released or

6     does he need to remain?

7           MS. SINGER:  Yes, as long as the issue is cleared

8     up as to the time frame here and I'm comfortable with

9     it if the court is.

10          THE COURT:  I'm totally comfortable.

11          MS. SINGER:  Yes, this witness may be excused.

12          THE COURT:  Thank you, Officer King.

13          THE WITNESS:  You're quite welcome.

14          THE COURT:  Good luck with your tooth.

15          Go ahead and call your next witness.

16          MS. SINGER:  Helen Legall.

17          THE COURT:  This witness is gonna take some time

18    you said?

19          MS. SINGER:  Yes.

20                          *  *  *  *  *

21          (A change of plea was taken in a different case at

22          this time.)

23                          *  *  *  *  *

24          THE COURT:  Go ahead, Ms. Singer.

25                          HELEN LEGALL,

Stacey K. Bryant, RPR
Judicial Court Reporter

0002676

0002109

1    having been produced and first duly sworn, testified as

2    follows:

3                        DIRECT EXAMINATION

4    BY MS. SINGER:

5        Q    Investigator Legall, if you would state your name

6    and profession for the record?

7        A    Helen Legall.  I'm a detective with the

8    Gainesville Police Department.

9        Q    Investigator Legall, in the course of your

10   employment as an investigator for the Gainesville Police

11   Department, were you assigned to a case styled State of

12   Florida vs. Brian Herlihy?

13       A    Yes, I was.

14       Q    Do you see Brian Herlihy here today?

15       A    I do.

16       Q    Where is he sitting and what is he wearing,

17   please?

18       A    He's sitting at the defense table.  He's wearing a

19   red shirt, looks like white or gray sleeves with a gray mark

20   right here (indicating).

21            MS. SINGER:  May the record reflect the witness

22       has identified the defendant?

23            THE COURT:  It may so reflect.

24   BY MS. SINGER:

25       Q    Investigator Herlihy -- Herlihy, excuse me.

1    Investigator Legall, do you recall when you were first

2    called to commence this investigation?

3        A    I was originally called when the 911 call had been

4    called in and patrol apparently responded and requested the

5    detectives respond.

6        Q    Okay.  Is it routine procedure at the Gainesville

7    Police Department or in this city -- Excuse me, ma'am.

8            MS. SINGER:  I'm sorry, your Honor.

9    BY MS. SINGER:

10       Q    Is it routine procedure in this city that when

11   there is a call for significant injury or possible death of

12   an infant, that the police are also called as well as EMT's

13   and emergency medical personnel?

14       A    Yes, it is.

15       Q    All right.  You reported to Shands Teaching

16   Hospital or you were on your way to Shands Teaching

17   Hospital?

18       A    I was on my way, but I was cancelled on the way.

19       Q    And why was that?

20       A    It was determined according to Sergeant Dawson

21   that it was an accidental injury and that we no longer

22   needed to respond.

23       Q    Were you later called to Shands Teaching Hospital?

24       A    Actually we continued on to Shands Teaching

25   Hospital to offer assistance to the parents of the child.

1     Q     Okay.  And approximately what time did you get

2     there?

3     A     A little after 10:00 that morning.

4     Q     Did you speak with any of the persons, parents,

5     persons with knowledge of the case at that time?

6     A     I briefly spoke with Mr. Herlihy and a woman who

7     turned out to be Crystal Quirello.

8     Q     All right.  And in speaking with Mr. Herlihy, did

9     you take a statement from him regarding what had occurred?

10    A     Not at that point.

11    Q     All right.  Was it merely to console the family?

12    A     Yeah.  They were already with a victim's advocate

13    from the hospital and my job was to go and offer them any

14    kind of victim assistance the Gainesville Police Department

15    had to offer them.

16    Q     All right.  And did you do that?

17    A     Yes, I did.

18    Q     About how long were you in contact with

19    Mr. Herlihy?

20    A     I don't know.  Maybe five or ten minutes at the

21    most.

22    Q     Did you have any contact -- At that time did you

23    believe he was the father of the child?

24    A     No.  My understanding I think was he was the

25    stepfather initially.

Stacey K. Bryant, RPR
Judicial Court Reporter

0002679

1        Q    All right.  Where did you go from Shands Teaching

2   Hospital?

3        A    I went back to the police department.

4        Q    When were you re-contacted?

5        A    Around 12:15 Sergeant Halvosa came to me and

6   Detective Cannon and said that we needed to respond back to

7   Shands, that some medical tests had come back that they had

8   done on the baby and there was some suspicious injuries.

9        Q    And so you reported back to the hospital at

10  approximately what time?

11       A    Probably around 12:40ish, somewhere around there.

12       Q    Now at that time or in that area of time between

13  12:15 and 12:40, I understand these are estimates at this

14  point, correct?

15       A    Right.

16       Q    Would you have radioed where you were going or

17  were you in the car with somebody who would have advised

18  dispatch of where you were going?

19       A    I was in the car with Detective Cannon, who was

20  driving.  We were in his car and I don't recall for sure,

21  but I would assume that we normally say that we're en route

22  somewhere.

23       Q    All right.  Just so that the Court understands

24  that you're giving very gross estimates of time as opposed

25  to some of these other officers who had their tag sheets; is

1    that correct?

2        A    I'm giving times based on what I was writing in my

3    notes at the time.

4        Q    All right.  Now you get to Shands Teaching

5    Hospital.  Who do you meet there?

6        A    When I first get there, we're taken into like a

7    conference room.

8        Q    Yes.

9        A    And Sergeant Halvosa was in there, Sergeant Seale,

10   Alan Coleman, Dave Cannon, Kevin Putansu, who works for the

11   hospital, and Dr -- I think her name's Anne Dickison.

12       Q    All right.  What were you told?

13       A    At that point we were told that there was

14   conflicting stories being given as to what had occurred to

15   the baby by both Mr. Herlihy and the mother of the child.

16       Q    And at that time was Mr. Herlihy a focus of any

17   criminal investigation?

18       A    No.

19       Q    Did you have any idea whatsoever, whoever could

20   have caused the injuries to this child?

21       A    No.

22       Q    What were your duties or functions at that time?

23       A    I was working for Sergeant Halvosa at the time and

24   he pretty much divied out who needs to go do what.

25       Q    All right.

1    A    Someone was gone -- sent to go talk to Crystal

2  Querillo, someone was sent to go talk to John Querillo, who

3  was the actual father of the child who ended up being at the

4  hospital, and Detective Cannon and I were sent to go speak

5  with Mr. Herlihy.

6    Q    All right.  And at the time that you were sent to

7  go speak with Mr. Herlihy, was he a focus of your

8  investigation?

9    A    Not at that point.

10   Q    Was he under arrest?

11   A    No.

12   Q    Was he otherwise in custody?

13   A    No.

14   Q    Where did you see him?  Where did you come in

15  contact?

16   A    He was sitting out in the -- it's like the

17  driveway where the ambulances come in at Shands emergency

18  room.

19   Q    What was he doing?

20   A    He was sitting there, just sitting on the ground.

21   Q    Was there anybody else with him?

22   A    Officer King was standing there.

23   Q    All right.  And what happened at that time?  Did

24  you introduce yourselves, present your badges, or somehow

25  identify yourselves?

1      A      Well, I think he knew who I was originally from

2   the first time we met.  But we did tell him again that we

3   were there and we wanted him to voluntarily come to the

4   station and talk to us about what had happened.

5      Q      Okay.

6      A      And he agreed that he would do that.

7      Q      Okay.  Now you used the word voluntarily.  Do you

8   recall what you said to him regarding whether or not he had

9   to come with you to the station?

10      A      No.  I said we asked him if he would voluntarily

11   come with us.

12      Q      All right.  So at that time he was basically told

13   by you that he did not have to come with you if he did not

14   want to?

15              MR. TETTER:  Objection, leading.

16              THE COURT:  Sustained.

17   BY MS. SINGER:

18      Q      What do you remember about that conversation?

19      A      I remember telling him that we wanted him to

20   voluntarily come to the station.

21      Q      All right.  Did he advise you whether or not he

22   was willing to come to the station?

23      A      He said that was fine, he would come with us.

24      Q      Okay.  Did he say anything else about that?

25      A      Well, we had also asked him if we could have

1    consent to go into his apartment to look in the apartment

2    for any evidence of what had happened.  And he said that we

3    could and once we got in the car we did an actual written

4    consent to search the apartment.

5              MS. SINGER:  I gave the Court Exhibit 1.  If I

6         might have it, your Honor?  I'm sorry.  I didn't

7         realize it went to the clerk.

8    BY MS. SINGER:

9         Q    Showing you Exhibit 1 already into evidence, is

10   this the consent to search apartment that you executed with

11   Mr. Herlihy?

12        A    Yes.

13        Q    And I see that it says 1300 hours.  What time

14   would that be?

15        A    1 o'clock, 1:00 p.m.

16        Q    Would you have received verbal consent before that

17   time?

18        A    Prior to that, yes.

19        Q    Are you able to estimate how many minutes lapsed

20   between the time you received verbal consent to the time you

21   had the written consent?

22        A    No, I'm not, no.

23        Q    All right.  Did you actually read that form to

24   him?

25        A    Yes, I did.

```
 1        Q     And it indicated that he was freely and
 2   voluntarily allowing you to go into the apartment?
 3        A     Yes.
 4        Q     Did he ask you any questions at the time that this
 5   consent was executed?
 6        A     No.  He was just -- He was real upset.
 7        Q     Did he indicate to you that he did not want you to
 8   go into the apartment?
 9        A     No, he did not.
10        Q     Did he ask for a lawyer?
11        A     No, he did not.
12        Q     During the course of your whole contact with Brian
13   Herlihy on the 2nd of August, the year 2000, did he ask for
14   a lawyer?
15        A     No, he did not.
16        Q     Now I know there comes a time when you do read him
17   Miranda and you're not going to have to address that issue
18   in this hearing, but even after he was read his Miranda
19   rights and executed a written waiver form, did he ask for a
20   lawyer?
21        A     No, he did not.
22        Q     At the time that you had the initial contact with
23   him at the hospital where you asked him to voluntarily leave
24   with you to go to the station, what was the purpose of
25   taking him to the station for the interview?
```

1    A    We were on a fact finding mission pretty much to

2    determine what had happened in his apartment that day.

3    Q    Was there any concern about Brian Herlihy coming

4    into contact with John Querillo, the father of the child?

5         MR. GROLAND:  Objection, leading.

6         THE COURT:  Overruled.

7    BY MS. SINGER:

8    Q    Was there any concern by law enforcement on the

9    possibility that Brian Herlihy could come into physical

10   contact with the father of the child, John Querillo?

11   A    I don't know if I can answer that because I'm not

12   sure that I knew at that point.  I think I later knew that

13   John was pretty upset with the whole situation, but at that

14   point I don't think that I knew that.

15   Q    Okay.  So you were basically asking him to go to

16   the station for what reason?  What was the reason why you

17   wanted to do the interview at the station as opposed to the

18   hospital?

19   A    It's quieter, it's easier without distractions,

20   especially at the hospital.  There's like a million people

21   running around and we keep getting interrupted.  It's just

22   not an environment to do that in.

23   Q    And that's why you asked him to voluntarily come

24   to the station with you?

25   A    Yes.

```
 1        Q     That was the sole purpose?

 2        A     Yes.

 3        Q     Not to hold him in custody in any way?

 4        A     No.

 5        Q     Okay.  So is there anything said in the car on the

 6   way to the station that suggests to you that Brian Herlihy

 7   did not want to voluntarily come to the station with you?

 8        A     No.

 9        Q     And did you have probable cause to arrest him for

10   any offense at the time you brought him to the station

11   approximately 1:00 p.m. on August 2nd, the year 2000?

12        A     No, I did not.

13        Q     All right.  You do have an interview with him,

14   correct?

15        A     Yes.

16        Q     The interview begins at approximately 1:20 p.m.?

17        A     Approximately, yes.

18        Q     And there is a break in the interview at 2:55 p.m.

19   for Investigator Duane Diehl to come and speak with

20   Mr. Herlihy about matters totally separate and apart from

21   the case that you were looking at?

22        A     I need to just refer to my note to make sure

23   exactly what time it was.  Actually at 1450, which is

24   2:50 p.m., I left the room for a few minutes to speak with

25   hospital personnel who had some questions that they needed
```

1   answered when I originally left the hospital.  Detective

2   Diehl at that point went in with me at 1455, which is

3   2:55 p.m. and did a consent to search of the vehicle.

4        Q    All right.  And let me go ahead and show you --

5             MS. SINGER:  Do you have any objection to this

6        being marked into evidence?  This is a vehicle consent.

7             MR. GROLAND:  No.

8             MS. SINGER:  No objection.  If I could mark this

9        as 2 in evidence, your Honor?

10            THE COURT:  It will be admitted as No. 2 in

11       evidence for the state without objection.

12            (State's Exhibit No. 2 was received in evidence.)

13   BY MS. SINGER:

14       Q    Investigator Legall, I'm going to show you 2 into

15   evidence and ask if you recognize this particular document?

16       A    I do.

17       Q    And is that the consent to search vehicle that was

18   obtained by Duane Diehl and yourself at approximately 1455

19   hours or 2:55 p.m. on 2, August, the year 2000?

20       A    Yes.

21       Q    Did you read that particular consent to search

22   with Mr. Herlihy at the same time?

23       A    Yes, I did.

24       Q    Was there any indication that Mr. Herlihy did not

25   read English?

1      A      No.

2      Q      Was there any indication that he was not of an

3  educational level to be able to read?

4      A      No.

5      Q      Was there ever any indication that he was under

6  the influence of drugs or intoxicating liquors or beverages

7  that would cause him to be unable to give voluntary consent?

8      A      No.

9      Q      Was this executed in your presence?

10     A      Yes.

11     Q      Did he ask for a lawyer?

12     A      No.

13     Q      Did he discuss with you the fact that he was

14  asking -- that you were asking to go hunt through his

15  vehicle?  Did he make any statements to you that he did not

16  want you to go into his vehicle?

17     A      No.

18     Q      Did you force and coerce or threaten or make him

19  sign this particular document?

20     A      No.

21     Q      Did you promise him anything in return for signing

22  this particular document?

23     A      No.

24     Q      Did he ask for a lawyer?

25     A      No.

1    Q    All right.  Now there's that break then.  Duane

2  Diehl speaks with him for a bit and you obtain a consent for

3  the vehicle.  Did you continue to speak with Mr. Herlihy

4  until 1555 hours?

5    A    Actually left the room and returned at 1520, which

6  is 3:20 p.m.

7    Q    Okay.  And during that time he was in the custody

8  of, or I shouldn't use the word custody, he was being

9  interviewed by Duane Diehl?

10    A    Duane Diehl was in there talking to him about

11  something unrelated.

12    Q    All right.  And to your knowledge was Duane Diehl

13  going to arrest him for any crimes that he was aware of?

14    A    To my knowledge, no.

15    Q    Do you know whether or not Duane Diehl later did

16  arrest him for any crimes?

17    A    No.

18    Q    He did not arrest him?

19    A    No.

20    Q    Okay.  And during this whole time that you have

21  Brian Herlihy in this interview room from 1320 to 1555, is

22  he handcuffed?

23    A    No.

24    Q    Is he told he cannot leave?

25    A    No.

 1      Q    Did he ask to leave?

 2      A    No.

 3      Q    Did he ask to use the bathroom or get something to

 4  eat or anything such as that that you can recall?

 5      A    No.  I actually offered several times if he wanted

 6  to leave or get a drink or food or anything and he declined.

 7      Q    All right.  And in your opinion was he being

 8  cooperative with you, willing to participate in the

 9  interview process?

10      A    Yes.

11      Q    Was there any signal that you got that he did not

12  wish to speak with you at anytime during this interview?

13      A    No.

14      Q    And during the time period from 1320 to

15  approximately 1555, was he in fact a suspect in a criminal

16  investigation or I should say was he in fact the focus of

17  the criminal investigation of this case?

18      A    No.

19      Q    There is a change obviously at 1555.  I don't know

20  if you need your notes, but at 1555 a waiver of rights form

21  was completed.

22          MS. SINGER:  I'm going to ask this be marked as 3

23      if there's no objection by defense counsel, State's 3.

24      That's his waiver.

25          MR. GROLAND:  No objection.

1           THE COURT:  It will be admitted as State's No. 3

2      in evidence without objection.

3           (State's Exhibit No. 3 was received in evidence.)

4  BY MS. SINGER:

5      Q    Now at the time, at 1555, something changed in the

6  course of your investigation that suggested to you that he

7  was in fact a suspect and you needed to provide him with

8  Miranda warnings; is that correct?

9      A    Actually it's just a little before 1555.

10     Q    Okay.  Tell the court what it was that brought you

11 to that point where you felt he needed to fill out a written

12 waiver form.

13     A    Well, at that point Sergeant Halvosa, Sergeant

14 Seale, and Alan Coleman and several people had returned from

15 talking to people at the hospital.  They came back to kind

16 of regroup and talk about what everybody said happened.

17          When I went out there and heard what everybody was

18 saying that was happening, who said what had happened versus

19 what Mr. Herlihy had said that happened, we had determined

20 that Mr. Herlihy was the sole person in the apartment at the

21 time with the child, and according to doctors that those

22 other detectives had talked to, that the injury had to have

23 occurred when the baby went unconscious.  And being that

24 Mr. Herlihy was the only one in the apartment at that point,

25 Mr. Herlihy became the focus of the investigation.

1     Q    All right.  And once he became the focus of the

2   investigation, did you in fact provide him with his Miranda

3   warnings?

4     A    I did.

5     Q    And how did you do that?

6     A    I read them from a Miranda waiver.

7     Q    I show you State's 3.  Is this the written Miranda

8   waiver that you completed with Brian Herlihy?

9     A    Yes, it is.

10    Q    And did you go over each and every one of the

11  paragraphs with him?

12    A    Yes.

13    Q    Did he write the words in there answering the

14  questions, Do you understand that?

15    A    That's his writing, yes.

16    Q    And each of those questions responds with the

17  answer, Yes?

18    A    Yes.

19    Q    And you also signed indicating that he was Brian

20  Herlihy signing for each of the paragraphs?

21    A    Right, stating that he understood each right that

22  I had read.

23    Q    All right.  And there were also other questions

24  that relate to his educational background and whether or not

25  he was on any drugs or medication.  Did he fill out that

1    part of the form?

2        A    Yes, he did.

3        Q    Did you read the questions and have him write the

4    answers in there or did you write the answers in there?

5        A    I normally -- No.  He wrote the answers in.

6    That's not my handwriting.  And normally I read the

7    questions, but it's possible that he read them.  I don't

8    remember.

9        Q    Okay.  And he also signed under that paragraph of

10   the written waiver form?

11       A    Yes.

12       Q    And I see also that Alan Coleman, another officer,

13   witnessed both his signature and your signature?

14       A    Yes.

15       Q    And was there anything said after he -- after

16   Brian Herlihy filled out this form that indicated to you

17   that he wished to have a lawyer present?

18       A    No.

19       Q    That he wished to stop questioning?

20       A    No.

21       Q    That he wanted to leave the station?

22       A    No.

23       Q    I notice in the written waiver form that you

24   circled, You are not under arrest; is that correct?

25       A    That's correct.

1       Q    And what is -- Why is it that that is circled?

2       A    Well, the way that our Miranda waivers were

3   written, it says -- there's a blank and you put whoever's

4   name in it you're talking to.  It says, Brian Herlihy.  It

5   says, You are under arrest/not under arrest.  He was not

6   under arrest, so I scratched out under arrest and I circled

7   and underlined not under arrest.

8       Q    Did you tell Mr. Herlihy that he was not under

9   arrest at the time that you were doing this waiver form?

10      A    As I read it and I'm circling that, I do explain

11  that.

12      Q    And did he know before you even did this waiver

13  form that he was not under arrest?

14      A    Yes.

15      Q    In the hours that you had interview time before

16  that?

17      A    Yes.

18      Q    All right.  Now the signature of Alan Coleman on

19  this form, is this when he, when Alan Coleman began to sit

20  in with you to do an interview with Brian Herlihy?

21      A    Yes.

22      Q    Was Alan Coleman in that interview room before you

23  executed the written waiver of rights form with Brian

24  Herlihy?

25      A    I don't think so, no.

1      Q    There is an allegation in there to suppress

2   statements at some point an officer, and I need to get that

3   so I can read it, that sometime during the interview

4   interrogation process, Brian Herlihy was at one point told

5   that he was a lying son of a bitch.

6      A    Yes.

7      Q    Do you recall that particular statement that he

8   was a lying son of a bitch?

9      A    It was something to that affect, yes.

10     Q    And who was it who made that statement to Brian

11  Herlihy?

12     A    Detective Coleman.

13     Q    Was that after his rights were read?

14     A    Yes.

15     Q    Did Mr. Herlihy respond to that statement in any

16  way by indicating he did not no longer wish to speak with

17  you regarding what had occurred to the baby, Robert

18  Quirello?

19     A    He was a little upset with Detective Coleman.  He

20  didn't want to talk to Detective Coleman anymore, but he was

21  okay to talk to me.  I had Alan leave the room, Detective

22  Coleman.

23     Q    All right.  Did he say he wanted to have a lawyer

24  present?

25     A    No.

1    Q    Did he ever say to you that there was -- that he

2    wanted to stop the interview process?

3    A    No.

4    Q    Did he refuse to answer anymore questions?

5    A    No.

6    Q    Did there come a later time in that interview when

7    Mr. Herlihy invited you back to his residence so that you

8    could actually see the bed and where the incident occurred?

9    A    Yes.

10   Q    Was that upon Mr. Herlihy's recommendation and

11   suggestion that you all went back to the residence to allow

12   him to reenact what had occurred?

13   A    Yes, it was.

14   Q    And at that time was -- were all those actions --

15   was Mr. Herlihy under arrest?

16   A    No.

17   Q    In fact after his interview, his entire interview

18   proceeding with Mr. Herlihy, did he not leave your presence

19   and go home?

20   A    Actually we were at his home and left him at his

21   home and we left his home.

22   Q    All right.  And he was not arrested at that time?

23   A    No, he was not.

24   Q    During the entire course of this contact with

25   Mr. Herlihy, did Mr. Herlihy ever express to you that he did

1    not wish to make statements to you regarding what happened

2    to Robbie Querillo?

3        A    No.

4        Q    And throughout this particular interview both

5    before he was Mirandized on August the 2nd and after he was

6    Mirandized on August the 2nd, was he in custody of the

7    Gainesville Police Department?

8        A    No.

9        Q    Was there at anytime during the course of the

10   contact that you had with Mr. Herlihy, any coercion,

11   intimidation, or force used to get him to make any

12   statements to you regarding what had occurred at his

13   residence during the early morning hours of that day?

14       A    No.

15       Q    During the interview process that you had with

16   Mr. Herlihy between 1320 hours and 1455 -- pardon me -- 1555

17   hours, did you in any way take on any kind of confrontive

18   (sic) stance with him regarding accusations towards -- Let

19   me rephrase that again.

20           Perhaps, Ms. Legall, you can explain to the court

21   how you do your interviewing.  Is it more an open-ended

22   interview or do you -- are you more of a confrontive (sic)

23   interviewer?

24       A    Most of the time I'm a pretty open-ended

25   interviewer.

1    Q    In this case between 1320 hours and 1555 hours how

2  would you have described your interview with Mr. Herlihy?

3    A    My interview with Mr. Herlihy was open-ended.

4    Q    Okay.  Why was that?  Why was it that you were

5  having an open-ended interview with him at that time period?

6    A    Because I didn't know -- I don't know Mr. Herlihy,

7  I don't know Crystal Querillo, I don't know what happened at

8  the house.  I wasn't there.  I'm on a mission to find out

9  what happened, who was there, who's telling the right story,

10  and determine what happened to the baby.

11    Q    Was that the situation in your interviewing

12  between 1320 hours and 1555 hours?

13    A    Yes, it was.

14    Q    It is my understanding at 1555 hours you did tape

15  a statement from Mr. Herlihy?

16    A    Yes.  Actually it was a few minutes later than

17  that.

18    Q    All right.  And then also you taped a separate

19  statement by Mr. Herlihy when he went to his apartment and

20  reenacted the incident for you with members of GPD,

21  Gainesville Police Department?

22    A    Yes.

23        MS. SINGER:  I have no further questions of this

24        witness at this time.

25        THE COURT:  Mr. Groland?

1            MR. GROLAND:  Your Honor, just to tell the court,

2        I'm now gonna be at least as long as Ms. Singer and

3        maybe a little longer.

4            THE COURT:  Then you better get started.

5            MR. GROLAND:  I'm gonna get going.

6                        CROSS-EXAMINATION

7    BY MR. GROLAND:

8        Q    We don't have to go through a lot of the

9    preliminaries that Ms. Singer just went through with you.

10   After you get dispatched and then cancelled and then go to

11   the hospital and then leave the hospital, there comes a

12   point when you're at the Gainesville Police Department and

13   you're told by your sergeant to go back?

14       A    Correct.

15       Q    And at some time after 12 o'clock you actually go

16   back to the hospital and there is five detectives including

17   yourself that are present, you, Halvosa, Coleman, Seale,

18   Cannon, five?

19       A    Correct.

20       Q    And then you have a brief meeting with Dr. Anne

21   Dickison.  Who is she?

22       A    I believe she was the ER nurse at the time, or ER

23   doctor.

24       Q    Okay.  And she tells you all that she's now got

25   the results of the CAT scan back.  We've got some serious

1    brain injuries.  It is very suspicious in nature.  And that

2    is where shaken baby syndrome is first discussed, is it not?

3         A    Correct.

4         Q    And following -- How long was that meeting, would

5    you say?  How long did you all meet and talk?

6         A    Well, it wasn't too long because we got there

7    around 12:40 and by the time we're in the car sitting

8    outside of the emergency room with Mr. Herlihy signing the

9    consent to search, it's 1 o'clock.

10        Q    Okay.  At that meeting with Dr. Dickison, you also

11   indicate that this is an injury that just happened?  This is

12   a recent injury that happened in the apartment?

13        A    That was my understanding, yes.

14        Q    Now when you just tell Jeanne Singer about ten

15   minutes ago that the reason why you later advised

16   Mr. Herlihy of his rights after talking to him for some two

17   and a half hours, was that at 3:55 p.m. that afternoon after

18   everybody came back and you huddled again, you learned that

19   Mr. Herlihy was the last one with the child and that this

20   injury was an injury that occurred then and there in the

21   apartment where he was, right?

22        A    That was kind of an aggregate discussion of what

23   Mr. Herlihy had told me and what they had found out from the

24   other people they had talked to.

25        Q    And once you learn all this information, you then

1   decide he's a suspect and the focus of your investigation,

2   correct?

3        A    Correct.

4        Q    Okay.  Now let's talk about what you learned at

5   that meeting.  You certainly knew at that meeting from

6   Alvarez what Brian Herlihy had said about being the last one

7   with the baby.  You knew that, correct?

8        A    I'm trying to remember exactly what -- Are you

9   talking about the very initial, when we went there to offer

10  victim's assistance?

11       Q    Well, in other words, by the time you got back to

12  the hospital between 12:00 and 1 o'clock that afternoon, you

13  knew that Brian was the one that had made the 911 call and

14  that he was the last one with the baby and had actually been

15  in the apartment alone with the baby and Crystal was

16  somewhere else?

17       A    Actually my first -- what was first told to me was

18  that there's differing stories on where exactly Crystal was.

19       Q    Right.

20       A    The first story that I initially heard was that

21  Crystal had gone downstairs to the car to get something.

22       Q    Okay.

23       A    So when you tell me I knew Brian was there by

24  himself all that time, I don't know that for sure Brian is

25  the only one that's there when the baby gets hurt.

1    Q    Crystal is the one that's telling the conflicting

2  stories as to where and when the baby was injured; is that

3  correct?

4    A    According to what I was being told, yes.  I had

5  not talked to her.

6    Q    But you did know from Sergeant Dawson and Orlando

7  Alvarez that Brian Herlihy was the one that made the 911

8  call when he was in the apartment with the baby?

9    A    I believe I did.

10   Q    All right.  And you also knew from the

11  conversation or that meeting that you had that this was

12  something that just happened then and there in the

13  apartment, correct?

14   A    Yes.

15   Q    So that what you knew at 3:55 p.m. that caused you

16  to decide Mr. Herlihy is the focus and indeed the prime

17  suspect, so we better advise him of his rights, was

18  something you already knew at 1 o'clock, true?

19   A    No, not true.

20   Q    How is that not true?

21   A    Because I wasn't sure that Crystal hadn't been in

22  the apartment at that point.

23   Q    Well, who spoke to Crystal at the hospital?

24   A    I want to think it was Lieutenant or Sergeant

25  Seale.

```
 1        Q     Okay.

 2        A     I think it was Sergeant Seale.

 3        Q     You sure it wasn't Alan Coleman?

 4        A     I'm not sure.  I would have to look at their

 5   reports.  I wasn't there.

 6        Q     Well, in fact didn't you get a briefing while you

 7   were in there with Brian for three hours from the detective

 8   who spoke to Crystal, and I do believe it was Coleman, who

 9   told you what she told him?  Isn't that in your report?

10        A     Like I said -- Well, I don't remember exactly --

11   When I'm having the conversation outside of the room, it's

12   Coleman and Halvosa and they're telling me they talked to

13   Crystal and John and hospital people.  So I'm not really

14   sure who talked to who without reading their report.

15        Q     Okay.  Here's my question.

16        A     Okay.

17        Q     Did Alan Coleman tell you during that afternoon

18   when you had Brian in that room, that he spoke to Crystal

19   and Crystal explained to him what had happened?

20        A     I'm not sure that it was Alan that told me that is

21   what I'm saying.

22        Q     All right.  Take a look at your report then.

23        A     Okay.  My report says I talked further with

24   Detective Coleman and Detective Halvosa.  Without looking at

25   their reports to see who they talked to and what those
```

```
 1    persons said to them, I can't answer that question because I
 2    don't remember who actually told me that information.
 3         Q    Okay.
 4         A    If you understand?
 5         Q    Okay.
 6         A    There was a lot of information at the time and I
 7    don't remember who exactly's mouth it was coming out of.
 8         Q    All right.  It's clear you talked to him for two
 9    and a half hours and you're actually investigating a
10    criminal matter?
11         A    Yes.
12         Q    All right.  And in fact it is true, is it not,
13    that when you approach Brian outside the hospital and ask
14    him to come back to the Gainesville Police Department, you
15    tell him, This is now a criminal investigation?
16         A    That's explained to him when we do the consent,
17    that we're going there to find out.  We asked him to come
18    back to the station to tell us what had happened that day.
19         Q    Okay.  In that same conversation you tell him,
20    This is now a criminal investigation?
21         A    While we're reading the consent to search we
22    explain all that to him.
23         Q    I guess what I'm saying is, right at the front end
24    at 1 o'clock or five minutes to 1:00 or five after 1:00 when
25    this is all going on at Shands outside of the emergency
```

1   room, you tell him, This is now a criminal investigation?

2       A    Yes.

3       Q    And isn't it true that Brian said to you,

4   Shouldn't I call an attorney?

5       A    Brian never said that to me.

6       Q    All right.  What did he say when you said to, him

7   Brian, this is now a criminal investigation?  What was his

8   response to that?

9       A    Actually, I told him that I needed -- we needed

10  him, if he would voluntarily come to the police department,

11  to have a talk with us to let us know what had happened.

12      Q    My question is, when you told him it was a

13  criminal investigation right there at the front end --

14      A    Okay.

15      Q    -- what was his response to that?

16      A    He was willing to come with us.  I don't recall a

17  specific response.  I have no response in my notes that he

18  gave me any specific response other than he would come with

19  us.

20      Q    Did he say, Oh, well, okay?

21      A    Yes.

22      Q    No discussion about who you were investigating or

23  what crime you were investigating?

24      A    Well, he knew what crime we were investigating.

25  We were there on the baby.  He was concerned about the

condition of the child.

Q     Okay.  Did you speak to Crystal that morning?

A     No.  Well, except for that very initial, you know,
We have a victim's advocate.  Is everybody going to be okay?

Q     Not about facts in this case?

A     Not about facts.

Q     In fact you did never talk to her until sometime
later on August the 9th; isn't that correct?

A     Right.  Somebody else interviewed her.

Q     Why was Brian taken back to the Gainesville Police
Department instead of talking to him there?  You said what?

A     We had a quieter environment to talk to him.

Q     Okay.  There's no rooms available for the police
to talk to people at the hospital?

A     I was asked by Sergeant Halvosa to take him back
if he would go and have a conversation with him at the
police department.

Q     Okay.  So it wasn't a matter of finding a quiet
environment for you.  Actually the reason why you took him
to the Gainesville Police Department is because your
supervisor asked you to do that?

A     Correct.

Q     All right.

A     But it was a quieter environment than the hospital
was that day.

1      Q      Where did you have that meeting when you met all

2   the police officers, the five of you all detectives and the

3   hospital personnel, where was that meeting?  Was that in a

4   room or out in the hallway?

5      A      No.  It's in a room that's like right off -- it's

6   in the ER area.

7      Q      Okay.  And you had a closed door?

8      A      I think the door was closed.

9      Q      Okay.  Was there a reason you couldn't talk to him

10  in that very same room that you had just been in and had

11  that meeting?

12     A      Because there was still people in there talking

13  about who was gonna go talk to who and when they were gonna

14  talk to them.  There was still activity going on.

15     Q      Okay.  Those people that were in there talking

16  were other detectives?

17     A      Correct.

18     Q      You couldn't just tell them to leave the room, I

19  got to talk to Brian Herlihy?

20     A      No.

21     Q      Okay.  When you go out there to Brian Herlihy,

22  he's there with Officer King; isn't that correct?

23     A      Correct.

24     Q      And you take him directly from there to the

25  Gainesville Police Department?

```
 1        A    Correct.

 2        Q    So there's no time when Officer King, who is there

 3   with Brian in your presence anyhow, that Officer King is off

 4   somewhere else?  When you see Brian out there, King is

 5   there?

 6        A    King is there.

 7        Q    And King doesn't leave until you leave?

 8        A    I have no idea when King leaves.

 9        Q    You -- King turns over Brian to you?

10        A    I wouldn't put it that way.

11        Q    How would you put it?

12        A    I would say that we approached Brian and asked him

13   to voluntarily come back to the police department and he

14   agreed.

15        Q    Okay.  Were you the supervisor that Officer King

16   talked to and told -- and was told by -- Let me ask that

17   again.  Did you talk to Officer King on the phone that

18   morning and tell him to make sure Brian Herlihy stays here

19   at the hospital?

20        A    No.

21        Q    Do you know who told him that?

22        A    That's the first I've heard of that.

23        Q    Well, I will tell you he testified this morning as

24   to that.

25        A    Okay.
```

| | |
|---|---|
| 1 | Q    Do you have any idea who told him to keep Brian |
| 2 | there? |
| 3 | A    I have no clue.  I guess that's the first I've |
| 4 | heard of that. |
| 5 | Q    Did you tell Brian that he does not have to agree |
| 6 | to the consent to sign off on the search of the premises? |
| 7 | A    Well, we explained the consent to search, which I |
| 8 | didn't read the whole thing.  I read it to him, but I didn't |
| 9 | read it in here. |
| 10 | Q    Okay. |
| 11 | A    That explains to him that he's voluntarily and |
| 12 | consensually doing it and that anything found that can be |
| 13 | used in a crime of which he can be held accountable for. |
| 14 | Q    Did he have any follow-up questions to that |
| 15 | advice? |
| 16 | A    No. |
| 17 | Q    Okay. |
| 18 | A    I think it's pretty straightforward. |
| 19 | Q    I think you indicated that there was a verbal |
| 20 | consent at some point before the written consent was |
| 21 | actually documented. |
| 22 | A    Correct. |
| 23 | Q    And you don't recall how much time before that it |
| 24 | was? |
| 25 | A    No.  It was while we were outside and it was just |

1   a matter of -- I want to think Detective Cannon actually

2   called someone on the radio and told him that he had given

3   us a verbal consent.  Then we got in the car and when you

4   turn off of Archer Road, the car was -- we weren't in the

5   emergency where the ambulances come in.

6        Q    Uh-huh.

7        A    We weren't in that section with Brian anymore.  We

8   had gotten into the car, which is when he did the consent to

9   search.

10       Q    And the reason for the consent, the request for

11  consent is you wanted to go into the apartment, process the

12  apartment, look for evidence of a crime?

13       A    Correct.

14       Q    Take photographs, collect whatever you needed to

15  collect?

16       A    Right.

17       Q    Did you tell Brian Herlihy when you got the verbal

18  consent that was communicated back to the apartment, did you

19  tell him that he did not have to consent?

20       A    We basically asked him, Is it okay for us to go

21  back into the apartment?

22       Q    Was there a discussion about a search warrant if

23  he did not consent?

24       A    No.

25       Q    There's been testimony today in this case about

1    officers being posted outside Brian's apartment from the
2    time of the initial call just before 10:00 up to 10:30 or
3    11:00 with Officer Ferris and then Sergeant Dawson being
4    there, and then Tina Millard coming in at 1 o'clock.  Is it
5    your understanding that from the time the first officer got
6    to Brian's apartment that morning, that there was a
7    Gainesville Police Department officer there at all times
8    until, let's say, Tina Millard got back and processed it?

9        A    I did not know that, no.  I knew that before
10   today, but I did not know that at the time.

11       Q    Okay.  In fact, Crystal Querillo has told you that
12   after the baby got to the hospital, she went back to the
13   apartment to retrieve some items and do whatever she did;
14   isn't that true?

15       A    Yes, it's true.

16       Q    Didn't she also tell you in that same conversation
17   that when she got back to the apartment, it looked different
18   than when she left earlier that morning with Brian to go to
19   the hospital?

20       A    Yes.

21       Q    Okay.  And you're satisfied she was telling the
22   truth about going back there into the apartment?

23       A    I don't know.

24            MS. SINGER:  I'm gonna object.  I don't think the
25        witness can comment on whether or not a particular --

```
 1          another witness is telling the truth or not.
 2               THE COURT:  Sustained.
 3   BY MR. GROLAND:
 4        Q    You didn't tape any of the statement that Brian
 5   made between 1 o'clock and 4 o'clock?
 6        A    No.
 7        Q    And you did have the tape recorder that you later
 8   used right there and available to you?
 9        A    Not during that time.  I went and got it from my
10   desk.
11        Q    Okay.  And you didn't advise him of his right to
12   remain silent at anytime, right?
13        A    Well, at 3:55 I did.
14        Q    At anytime during -- What we're talking about was
15   this statement.
16        A    No.
17        Q    And the reason for that, candidly, is you didn't
18   want him to remain silent.  You wanted him to talk to you;
19   isn't that true?
20        A    No.  Well, yes, I did want him to talk to me, but
21   I did not have him as a focus of my investigation at that
22   point.
23        Q    Okay.
24        A    There would be no reason to read him Miranda.
25        Q    Okay.  Well, it takes, what, about 30 to 45
```

1   seconds to read somebody their Miranda rights?  You got a

2   right to remain silent.  Anything you say can be used

3   against you, et cetera, et cetera, right?

4        A    Okay.

5        Q    And you -- And you have a right to an attorney.

6   You didn't want to tell him any of that because you wanted

7   him to keep on talking.  I mean that's correct, isn't it?

8        A    Yes.  I wanted him to tell me what happened.

9        Q    All right.  And you, I think, have previously

10  testified you were on a fact finding mission, right?

11       A    Yes.

12       Q    Why didn't you -- Strike that.  Did you go back

13  over everything with Brian after you Mirandized him and turn

14  the tape on, everything you had talked about before?

15       A    We pretty much went -- No.  Before the tape, no.

16       Q    No.

17       A    We went back over everything while we were on the

18  tape.

19       Q    All right.  In fact, the tape went from 4 o'clock

20  to 4:26 p.m., correct?

21       A    Correct.

22       Q    All right.  But you had previously talked to him

23  for at least two and a half going on three hours, right?

24       A    Correct.

25       Q    So we condensed it or consolidated it into just a

1    lot fewer questions and answers; is that true?

2        A    Yes.

3        Q    Why is that?

4        A    Well, a lot of our conversation was not

5    necessarily based on exactly what happened at the house

6    during that time frame.

7        Q    Okay.

8        A    A lot of the conversation was about Crystal, about

9    his relationship with Crystal.

10       Q    And that has a lot to do with this case, does it

11   not?

12       A    It does, but it wasn't something that I thought we

13   needed to put on tape.

14       Q    Okay.  Do you ever tell him during that two and a

15   half hour period that whatever he says, Whatever you say,

16   Brian, can be used against you?

17       A    No.

18       Q    Okay.  But you intended that whatever he said

19   could be used against him, did you not?

20       A    Not at that point.

21       Q    Well, if you were gonna arrest him, you

22   certainly --

23       A    I wasn't going to arrest him at that point.

24       Q    At that point you were not going to arrest him

25   because you knew the law about Miranda rights that you don't

 1    have to Mirandize somebody if they're not in custody, right?

 2        A    Not necessarily true.

 3        Q    You were aware of that?

 4        A    Not necessarily true.

 5        Q    Okay.

 6        A    If they are the focus of an investigation, you

 7    still should read them Miranda.

 8        Q    Okay.  What you're telling this court is that

 9    Brian Herlihy during that two and a half hour period was not

10    the focus of your investigation?

11        A    Not at that point.

12        Q    At what point during the two and a half hours when

13    you knew that he was the last one with the baby, you said it

14    was a nonaccidental injury and that it happened in the

15    apartment, he was the last one with the baby, at 1 o'clock

16    you knew that, at what point did he become the focus of your

17    investigation?

18        A    Okay.  As I had previously testified, at 1 o'clock

19    I knew that, yes, he was there, but that Crystal was

20    possibly also there, too, just maybe not in the apartment at

21    the time he called 911.  So I was not assured at that point

22    that Brian was the only one home with the child.  But when

23    he became a focus of the investigation, it was just prior to

24    1555 hours, which is 3:55 p.m., at which point I met with

25    Detective or Sergeant Halvosa and Detective Coleman and

1    discussed what other statements had been made by other

2    people in comparison to what Mr. Herlihy had told me.

3         Q    Well, in fact, weren't you being briefed during

4    the time you spent with Brian by going out in the hallway

5    several times talking to other detectives?

6         A    Well, actually when I left a couple of times, it

7    was to speak with hospital personnel, Beth Talaga with CPT

8    and Dr. Dickison had asked -- before I left Shands, there

9    were several questions that she needed to know to I guess

10   better, I don't know, to better make her decision of

11   whatever is going on.  You would probably have to ask her

12   about it.

13        Q    And then after you have finished questioning him,

14   after he has answered all of your questions at 3:55 p.m.,

15   you stop questioning him?

16        A    Well, it was prior to that, a little prior to

17   that.

18        Q    A couple minutes before?

19        A    Yeah, about five or ten minutes before.

20        Q    So you're through questioning him and at that

21   point you advise him of his Miranda rights?

22        A    Correct.

23        Q    Okay.  And during the time that he was in the

24   interview room, three or four other detectives actually went

25   in and talked to him?

1      A     During what time period?

2      Q     During the time that we're talking about here,

3   just the only time between 1:00 and 4:00.

4      A     No.  One other detective went in and talked to

5   him.

6      Q     Okay.  Let's see if we can -- Didn't Larry Seale

7   go in and talk to him?

8      A     Not between 1:00 and 4:00.

9      Q     Didn't Coleman go in and talk with him?

10     A     At 3:55.

11     Q     Okay.  That's before 4:00, isn't it?

12     A     Well, you said before -- when we got to the --

13  only one other detective had been in there.

14     Q     Wasn't Coleman actually in there with him without

15  the tape recorder being on for about 30 minutes?

16     A     Not to my knowledge, no.  Coleman came in with me

17  at 1555 and we went on tape at 1600, which is 4 o'clock.

18     Q     Okay.  At some point Alan Coleman said to Brian

19  Herlihy, You're a lying son of a bitch, or you're a lying

20  shit.  Alan couldn't remember which it was.  Isn't that

21  true?

22     A     Yes, he did.

23     Q     And that's not on tape, is it?

24     A     No, it's not on tape.

25     Q     So that must mean that it happened before you turn

1    the tape on, correct?

2        A    No.  It happened after.

3        Q    Okay.  When did that happen?

4        A    We went off tape at 1626 and at that point I left

5    the room and we talked, Detective Coleman and I talked some

6    more, and we decided at that point that he wasn't telling us

7    everything and the story that he was giving us was not

8    consistent with what the injuries were.

9        Q    Okay.

10       A    And then Detective Coleman went back in with me

11   and had more talk with Brian, which is when he said that.

12       Q    Why wasn't that additional talk on the tape

13   recorded?  Obviously it was right there where all you have

14   to do is press a button.

15       A    I can't answer that.  I just didn't think to put

16   it on the tape at that point.

17       Q    Was he ever allowed to make a phone call?

18       A    He never asked to make a phone call.

19       Q    Did you ever tell him he could make a phone call?

20       A    No.

21       Q    Did you ever tell him, Brian, you can leave at

22   anytime?  If you want to go home, you're too tired, you can

23   be out the door?

24       A    No, but I offered him breaks.

25       Q    You offered him a break?

```
1       A    If he wanted a drink or to use the restroom or for

2   me to get him something to eat, and he declined at least on

3   two occasions.

4       Q    And it is your testimony he was free to leave

5   anytime he wanted?

6       A    Yes, he was.

7       Q    But you never told him that?

8       A    No.

9       Q    How do you suppose he knew that?

10       A    Because when we initially asked him to come, it

11   was on a voluntary basis and I told him that.

12       Q    Did he eat anything or drink anything during that

13   time?

14       A    No.  I offered.  He declined.

15       Q    Did he ever go out and go to the bathroom?

16       A    I don't think so.  I'm not sure.  I don't think

17   so.

18       Q    Were there times when he was actually double

19   teamed, by double teamed I mean were there two detectives in

20   there with Brian more than when -- more than once when

21   Cannon was in there with you I guess a couple times?

22       A    No.  It was me and Cannon initially.  I left the

23   room.  Duane Diehl asked if he could go in and talk to him

24   about an unrelated incident.  I said, Fine.  So he did.

25   Then I went in with Duane to do the consent to search of the
```

1    vehicle.  Then I leave the room again.  We have a

2    conversation with Sergeant Halvosa and Detective Coleman.

3    Then Detective Coleman goes in with me because Detective

4    Diehl is not part of the investigation.  He just wanted to

5    talk to him about something else.  And I don't know where

6    Detective Cannon was at that point, but he might not have

7    been there, which is why Detective Coleman went in with me.

8    Plus Detective Coleman had spoken to other people at the

9    hospital, so he had some more information that I didn't

10   have.

11        Q    And at some point Brian told you that he shook the

12   baby to try to revive the baby; is that true?

13        A    Correct.

14        Q    And am I also correct that he never confessed to

15   you in a sense that he knowingly committed a criminal act?

16        A    No.

17        Q    He did not?

18        A    No, he did not.

19        Q    He's always maintained to you that it was an

20   accident; is that true?

21             MS. SINGER:  I'm going to lodge an objection.  It

22        requires a conclusion that would require this witness,

23        unless this witness is going to read verbatim

24        Mr. Herlihy's statements from other occasions that he

25        was spoken to, I think that it's too broad.

1          THE COURT:  The objection is overruled.

2   BY MR. GROLAND:

3      Q    We're talking about this time frame that's at

4   issue here.  Did he not maintain the whole time you talked

5   to him for that two and a half hour period of time that this

6   was an accident?

7      A    Yes, he did.

8          MR. GROLAND:  May I just have a moment?

9          THE COURT:  Uh-huh.

10          (Brief pause.)

11   BY MR. GROLAND:

12      Q    How were you all sitting in the room, you and the

13   two detectives when that occurred, when there were two

14   detectives in a room with Brian?

15      A    Myself and Detective Cannon?

16      Q    Yeah.

17      A    You walk in the room and the walls go like this

18   (indicating).  There's a table that comes off the right wall

19   if you're coming in.

20      Q    Uh-huh.

21      A    There's a chair on that side of the table.

22   There's a chair at the end of the table, which is where I

23   was sitting.  Brian was sitting on the backside of the table

24   and Dave was sitting on the front side of the table.

25      Q    How far away is he from you and Dave, how many

1    feet?

2         A    Oh, I don't know.  He was pretty close to me.

3         Q    Okay.  And how big is the room?  Can you give me

4    the approximate dimensions?

5         A    I have no idea.  I have no idea.

6         Q    Well, I mean is it six feet by four feet or is it

7    ten feet by 12?

8         A    It's square.

9         Q    All right.

10        A    I'm not good on that.  I don't know.  I would say

11   it's at least --

12        Q    Does it have windows?

13        A    No windows.

14        Q    No windows?

15        A    No.  Actually, the room we were in the first day

16   had no windows.

17        Q    You moved to another room?

18        A    No.  On another day.  It's not really a window,

19   but it's a window that goes to another room.

20        Q    Okay.  You knew that Crystal was saying to some

21   people that she was alone with the baby that morning when

22   the baby was injured?

23        A    I knew that there had been a -- when I was in the

24   conference room with all the detectives and the doctors,

25   there was some conversation that the mother was telling a

1    different story than Mr. Herlihy.

2        Q    Was there a reason that Crystal was never invited

3    down there to also talk to you for two and a half hours?

4        A    My job was to go talk to Brian.

5        Q    Okay.

6        A    I don't know why they didn't bring her to the

7    station to talk to her.  I can't answer that.

8            MR. GROLAND:  I have nothing further, your Honor.

9            THE COURT:  Ms. Singer?

10                    REDIRECT-EXAMINATION

11   BY MS. SINGER:

12       Q    Do you know, Ms. Legall, if Brian left the Shands

13   area, the emergency room area where the ambulances came in

14   at anytime during the time period that he was at Shands?

15       A    No, I don't know that.

16       Q    Have you since found out that he had gone to other

17   sections of the hospital --

18       A    Yes, I have.

19       Q    -- during the time that the baby had been

20   hospitalized?

21       A    Yes, I have.

22       Q    That is from your investigation after your contact

23   with him at 1:00 p.m.?

24       A    That was after my contact with him at 1:00 p.m.

25       Q    And in fact he did go to another floor of the

1   hospital and make some telephone calls to try to find out

2   the status of the baby?  At least you were told that?

3       A    Yeah.   There's a little discrepancy in that.   I

4   was told that he possibly had called to check on the status

5   of the baby and claimed he was a doctor.  But when I talked

6   to Brian about that, he denied that.  He said he had someone

7   else call and ask about the condition of the baby.

8       Q    When you had contact with him with Detective

9   Cannon at this same area outside of the emergency room, you

10  specifically told him that he -- you specifically requested

11  of him that he voluntarily come down with you to the

12  station?

13      A    Yes.

14           MS. SINGER:  No further questions, your Honor.

15           MR. GROLAND:  No questions.

16           MS. SINGER:  I have Duane Diehl unless it will be

17      stipulated to that he really had no questions, did not

18      do an interview with Mr. Herlihy regarding this case.

19           THE COURT:  May Detective Legall be released?

20           MR. GROLAND:  Yes.

21           MS. SINGER:  Yes.

22           THE COURT:  Thank you, Detective.  You're free to

23      go.

24           THE WITNESS:  Thank you.

25           MS. SINGER:  I have very brief Duane Diehl.

```
 1              MR. GROLAND:  We don't need him.

 2              MS. SINGER:  All right.

 3              THE COURT:  This discussion can go on off the

 4       record and you all can discuss what it is you're trying

 5       to stipulate to because you keep talking at once anyway

 6       and the court reporter can't possibly --

 7              (An off the record discussion was held between

 8              counsel.)

 9              MS. SINGER:  Madam Court Reporter, it's my

10       understanding that Mr. Groland agrees and stipulates

11       that Duane Diehl, if called as a witness in this case,

12       would state that he did in fact interview Mr. Herlihy

13       about totally unrelated matters that did not constitute

14       criminal acts and that Mr. Herlihy was not arrested by

15       Mr. Diehl during the time period that he spoke to

16       Mr. Herlihy; is that correct?

17              MR. GROLAND:  So stipulated.

18              THE COURT:  Good enough.

19              MS. SINGER:  The state has one other piece of

20       evidence, your Honor.

21              MR. GROLAND:  Jeanne, he was with Mr. Herlihy for

22       five to ten minutes only during that time frame.

23              MS. SINGER:  Yes.

24              THE COURT:  Release that witness and play the

25       tape.
```

1      MS. SINGER:  All right.

2      MR. GROLAND:  Your Honor, my client has indicated

3    to me he doesn't want to hear this tape.  They started

4    to play it before the recess and he broke down very

5    emotionally and has asked me if he can go back to the

6    cell while they play the 911 tape.

7      THE COURT:  Yes.

8      THE DEFENDANT:  Thank you, your Honor.

9      (The following is a transcription of the 911 call

10    tape.)

11      Gainesville Police Department, Case number

12    00-13656, State vs. Brian Herlihy, spelling of the last

13    name, H-E-R-L-I-H-Y.

14      OPERATOR:  911, what is your emergency?

15      HERLIHY:  Yes.  My girlfriend's three month old

16    child -- I was in the shower.  I came out, I found him

17    face down and he's not really breathing too well.  He's

18    three months old.

19      OPERATOR:  Sir, calm down and talk to me.  What's

20    your address?  What's your address?

21      HERLIHY:  1015 S.W. 9th Street.  She's not here.

22    She went to go get some gas.  We were going to go to

23    Cedar Key today.

24      OPERATOR:  Right, sir.  That's not important now.

25    Stay with me.  Let's talk about what's going on where

1    you're at.

2         HERLIHY:  You don't understand.  I'm in the

3    medical field.  This shouldn't have happened.

4         OPERATOR:  Sir, what's going on with the child

5    right now?

6         HERLIHY:  All right.  He's breathing, but he's

7    very slow.  His eyes are closed.  I'm helping him with

8    his breath.  I don't -- He's just not responsive to me

9    right now.  I came in and he was stuck between the bed.

10        OPERATOR:  Sir, sir, listen to me.  Stay with me

11   on the line.  I'm going to transfer you over to CDC.

12        HERLIHY:  Okay.  Thanks.

13        OPERATOR:  What apartment are you in, sir?

14        HERLIHY:  A-21.

15        OPERATOR:  A-21?

16        HERLIHY:  A as in apple, 21.

17        OPERATOR:  CDC, this is a transfer call.  Call

18   number 420.  Caller go ahead.

19        HERLIHY:  Hello?  My girlfriend's three month old

20   child -- I came out of the shower and he was stuck

21   between the frame and the bed.

22        OPERATOR:  What is stuck?  The child?

23        HERLIHY:  The child was.  He's on his back now.

24   I'm trying to give him CPR cause he's not really

25   responding.

1      OPERATOR:  Is he breathing?

2      HERLIHY:  Yeah, he's slowly breathing.  He's got a

3    heartbeat.  He's very peaked.

4      OPERATOR:  If he is breathing, do not do CPR.

5      HERLIHY:  Right, I understand, I understand.  I'm

6    in the medical field.  I've never seen this happen with

7    a child before.

8      OPERATOR:  Okay.  So he's having trouble breathing

9    right now?

10     HERLIHY:  He's breathing.  He's not breathing

11   regularly right now.  His eyes are not opening.  There

12   we go.  Hold on.

13     OPERATOR:  Listen to me carefully.  I want you to

14   put your ear down by his mouth and nose and see if you

15   can feel or hear any air coming out.

16     HERLIHY:  He's doing it.  It's very slow.

17     OPERATOR:  Okay.  But there is air coming out?

18     HERLIHY:  He's not even taking -- Hold on.

19     OPERATOR:  Listen to me, sir.  Sir?

20     HERLIHY:  Yes, ma'am.

21     OPERATOR:  Listen to me carefully.  Put your ear

22   down by his mouth and nose and see if you can feel or

23   hear any air coming out.  Do it now.

24     HERLIHY:  No.

25     OPERATOR:  No air at all?

1          HERLIHY:  No, but I hear his little heart going.

2          OPERATOR:  Okay.  But no air is coming out at all?

3          HERLIHY:  He's gurgling.

4          OPERATOR:  Okay.  I'm going to give you

5     instructions for CPR.  How old is the child?

6          HERLIHY:  He's three months old.  Hold on.  He

7     just took a breath.

8          OPERATOR:  Three months old?

9          HERLIHY:  He took a breath through his mouth and

10    he's gurgling.

11         OPERATOR:  Listen carefully.  I'm going to tell

12    you how to help the baby.

13         HERLIHY:  Okay.

14         OPERATOR:  Are you with him right now?

15         HERLIHY:  I'm right next to him.  I won't leave

16    his side.

17         OPERATOR:  Okay.  Lay him flat on his back on the

18    floor.

19         HERLIHY:  He's flat on his back, yes, ma'am.

20         OPERATOR:  Remove any pillows.

21         HERLIHY:  Okay.  No pillows.  I'm going to put him

22    on the floor.  He's very flaccid, operator.  God, I

23    can't believe this is happening.

24         OPERATOR:  Okay.  Remove any pillows from behind

25    his head.

1      HERLIHY:  Right.  I just have him flat on the

2  floor.

3      OPERATOR:  Place your hand under his neck.

4      HERLIHY:  Okay.

5      OPERATOR:  Okay, and shoulders and tilt the head

6  back.

7      HERLIHY:  All right.  He's got something coming

8  out of his nose.

9      OPERATOR:  Okay.  I want you to get a cloth and

10  clean out his mouth.

11      HERLIHY:  All right.  What I'm doing is I've got

12  him laid to the side cause he's draining out all these

13  white fluids.  I think it's formula cause he had a

14  bottle.

15      OPERATOR:  Turn his head to the side.

16      HERLIHY:  I have it.

17      OPERATOR:  Clean out his mouth and nose.  Do it

18  now, okay?

19      HERLIHY:  Okay.  My God, this is all I need.

20      OPERATOR:  Okay.  I want you to check again and

21  see if --

22      HERLIHY:  He's coughing, he's coughing, he's

23  coughing.  His color doesn't look that great, but he's

24  coughing.

25      OPERATOR:  Okay.  Listen to me carefully, all

```
 1          right?  I need you to follow my instructions
 2          specifically.
 3               HERLIHY:  Okay.
 4               OPERATOR:  Put your ear next to his mouth and see
 5          if you can feel or hear any breathing.
 6               HERLIHY:  No.
 7               OPERATOR:  Can you see his chest rise?
 8               HERLIHY:  No.
 9               OPERATOR:  Okay.  I'm going to tell you how to
10          give mouth to mouth, okay?
11               HERLIHY:  All right.  He's got something coming
12          out of his nose.  Looks like it's blood.  I don't know.
13               OPERATOR:  Turn his head to the side again and
14          clear out his mouth and nose.
15               HERLIHY:  It's still, ma'am, it's still coming
16          through his nose.
17               OPERATOR:  Okay.  Do you have a clean cloth?
18               HERLIHY:  I have a cloth right here.  Rescue's at
19          my front door.
20               OPERATOR:  They're at the door?
21               HERLIHY:  I'm not leaving his side.
22               OPERATOR:  Have somebody let them in now.
23               HERLIHY:  I'm here by myself.
24               OPERATOR:  Okay.  Go let them in.
25               HERLIHY:  Okay.  Guys, hello?  Over here, A21.
```

1    Come on.  I've got a three month old.  This is all I

2    need.  I've worked rescue.

3         OPERATOR:  Okay, sir.  Are they inside the house

4    now?

5         HERLIHY:  No.  They were going to the wrong damn

6    building.

7         OPERATOR:  Okay.  We are going to continue CPR

8    until they get in the house, okay?

9         HERLIHY:  I don't need this today.

10        OPERATOR:  Sir, listen to me.  Hello?

11        HERLIHY:  Yes, ma'am.

12        OPERATOR:  Okay.  I need you to go back to the

13    baby.

14        HERLIHY:  I'm with him right now.

15        OPERATOR:  Okay.  We're going to try mouth to

16    mouth again, okay?

17        HERLIHY:  Okay.  They are just walking in the door

18    right now.  I'm going to go ahead and leave him with

19    them.

20        OPERATOR:  Are they with him now?

21        HERLIHY:  Right next to me, yeah.

22        OPERATOR:  Okay.  They are with the baby?

23        HERLIHY:  Yes, ma'am.

24        OPERATOR:  You hang up the phone and go with them,

25    okay?

1           HERLIHY:  Yes, ma'am.

2           (End of tape.)

3           MS. SINGER:  Your Honor, the only other

4     stipulation that I believe we would have in this case

5     is that the statements that have been purported to have

6     been made by Alan Coleman, I believe Mr. Groland will

7     agree that any statements made by Alan Coleman where he

8     may have accused Mr. Herlihy of lying were statements

9     made after the Miranda rights.  Or do you want to have

10    Mr. Coleman come in briefly to say that?

11          MR. GROLAND:  I need to make a statement about

12    that.  Let me just take one moment with his deposition.

13          THE COURT:  Here's what we're gonna do.  We're

14    gonna take a recess at this point and not call any

15    additional witnesses in this moment and I'll need some

16    explanation from both of you as to how much additional

17    time to present testimony you're gonna need.

18          MS. SINGER:  That would be it.  It would take two

19    minutes to put him on to say when he did that.

20          THE COURT:  There is no such thing as calling a

21    witness for two minutes, but I accept the testimony

22    that it would be brief.  Now, just a second.  Detective

23    Coleman would be the only other witness that you need

24    to call today?

25          MS. SINGER:  Correct.

```
 1              THE COURT:  Okay.  And that would conclude all of
 2         the evidence that needs to be presented in regard to
 3         both motions to suppress; is that correct?
 4              MS. SINGER:  That's my understanding.
 5              MR. GROLAND:  Yes.
 6              THE COURT:  Okay.  Look at the deposition, call
 7         Detective Coleman.
 8              MS. SINGER:  All right.
 9                        ALAN COLEMAN,
10    having been produced and first duly sworn, testified as
11    follows:
12                     DIRECT EXAMINATION
13    BY MS. SINGER:
14         Q    Would you state your full name, please?
15         A    Alan Coleman.
16         Q    Your occupation or profession?
17         A    Police officer, City of Gainesville.
18         Q    Taking you back to August 2nd, the year 2000, were
19    you an investigator with the Gainesville Police Department
20    at that time?
21         A    Yes, ma'am.
22         Q    Were you called into an interview with a man by
23    the name of Brian Herlihy at approximately 1455 hours on
24    that day?
25         A    Yes, I was.
```

```
1        Q      Do you see that person here today?

2        A      Yes, I do.

3        Q      And would you just tell us what he's wearing so

4    the record will reflect who you're identifying?

5        A      Young man with a crew cut, red, short-sleeved

6    shirt over gray sweats.

7        Q      Before 1455 p.m. on that date, August 2nd, the

8    year 2000, did you have any contact with Brian Herlihy the

9    defendant in this case?

10       A      Not to my knowledge.

11       Q      Did you have any conversation with him at all?

12       A      Not to my knowledge.

13       Q      The first time you had conversations with him was

14   when he was at the Gainesville Police Department with Helen

15   Legall?

16       A      Yes.

17       Q      And before you had any conversation with him, was

18   he Mirandized?

19       A      Yes.

20       Q      Did you witness the Miranda form marked into

21   evidence as Exhibit 3 here?  Let me show it to you.

22       A      Yes.

23       Q      Did he ask for a lawyer?

24       A      No.

25       Q      Did he appear to understand the rights that were
```

1    read to him?

2        A     Yes, ma'am.

3        Q     Did there come a time during the course of the

4    interview with Mr. Herlihy that you called him a lying sack

5    of shit or lying piece of shit?

6        A     I think the latter is more accurate.

7        Q     All right.  And what happened in response to that

8    statement?  What did Mr. Herlihy say in response to that

9    statement?

10       A     I don't know.  I left the room.

11       Q     All right.  Did you in any way threaten him,

12   coerce him, or otherwise cause him to believe that you were

13   threatening him in any way?

14       A     No.

15       Q     During the course of this time that you had with

16   Mr. Herlihy, did you promise him anything in return for his

17   statements he might make?

18       A     No, I did not.

19       Q     Was there anything about the environment with

20   Ms. Legall that suggested to you that he was being coerced

21   or threatened in any way to make a statement?

22       A     Far from it, no.

23       Q     Did there come a time when in fact Mr. Herlihy

24   invited the investigators back to his home so that he could

25   reenact for them what had occurred that morning?

1    A    Yes.

2    Q    Did you go with him to the house at that time?

3    A    No, I did not.

4    Q    Is there anything about your contact with

5    Mr. Herlihy that suggested to you that his statements to law

6    enforcement during the time period that you were with him

7    were freely and voluntarily made?

8    A    I believe that they were.

9         MS. SINGER:  No further questions, your Honor.

10        MR. GROLAND:  Just very briefly, your Honor.

11                     CROSS-EXAMINATION

12   BY MR. GROLAND:

13   Q    Detective Coleman, the issue here is that at what

14   point you actually went in and spoke with Brian Herlihy.  Am

15   I correct that you spoke to him or were at least present

16   when he was being interviewed for about 30 minutes?

17   A    Yes.

18   Q    All right.  And what time was that that you

19   actually went into the interview room?

20   A    The time would have been at the time that the

21   Miranda was signed.

22   Q    Okay.  And how do you know that that is the time

23   limit?

24   A    Because of the time that's on the Miranda waiver.

25   Q    Did you witness it?

1   untruthful statements on his part.

2       Q    Okay.

3       A    Okay.  When I went back in the room, briefly I

4   confronted him and the words were exchanged as recorded.

5       Q    And that was not on tape?

6       A    I don't know.

7       Q    And then you stayed in there for an additional 30

8   minutes?

9       A    No.  After I said the words that came up, I left

10  the interview room and did not return for any part of any

11  interview.  I think I did bring him a Coke later on.

12      Q    At what point did you witness the Miranda waiver?

13      A    The time is on the top of the Miranda waiver form.

14      Q    Okay.  But what was going on just before you did

15  that?  Were you in the room for 30 minutes before that

16  happened?

17      A    I don't recall being in the room for any period of

18  time that long.

19      Q    Detective Coleman, I will tell you that your

20  accusation that he is a lying shit is not on the tape.  Can

21  you explain that?

22      A    Only if the tape was not running when I made the

23  accusation.  I don't have any other explanation.

24          THE COURT:  Any redirect?

25          MS. SINGER:  Yes.

Stacey K. Bryant, RPR
Judicial Court Reporter

1                    REDIRECT-EXAMINATION

2    BY MS. SINGER:

3        Q    Just to clarify, the rights were read and a

4    statement was taken in some amount of minutes?

5        A    Yes.

6        Q    That may or may not have been taped, correct?

7        A    Correct.

8        Q    You don't know whether it was taped or not?

9        A    I wasn't doing the taping.  It may have been

10   taped.  I don't know.

11       Q    And you left the room with Helen?

12       A    Yes.

13       Q    That's when you suggested to Ms. Legall that

14   perhaps he needed to be confronted?

15       A    Yes.

16       Q    And then you returned back into the room?

17       A    Very briefly.

18       Q    And the conversation took place where you

19   confronted Mr. Herlihy?

20       A    Yes.  That was a planned action.

21       Q    Okay.  He did not wish to respond to your

22   allegation that he was a liar?

23       A    I didn't stay.  Detective Legall would be a better

24   person to ask.  I left.

25       Q    All right.  You left after that and Detective

1    Legall stayed with Mr. Herlihy?

2         A    Yes.

3              MS. SINGER:  All right.  No further questions,

4         your Honor.

5              MR. GROLAND:  Just one, I mean one.

6                        RECROSS-EXAMINATION

7    BY MR. GROLAND:

8         Q    The last thing you said to him was, You're a lying

9    shit, and you left the room?

10        A    I stood up when I said, made the accusation, and I

11   walked out of the room.  I never returned for anymore

12   interview.

13             MR. GROLAND:  Okay.  Thank you.

14             THE COURT:  Good enough.  May this witness be

15        released?

16             MS. SINGER:  This witness may be released, your

17        Honor.

18             MR. GROLAND:  Yes.

19             MS. SINGER:  We have no other evidence to present,

20        your Honor.  I don't know if the court wishes us to do

21        argument at this time.

22             THE COURT:  No, you definitely can't do argument

23        at this time.  If you want to present argument, it will

24        have to be in writing.  I'm ready to rule, but if you

25        feel like argument would be valuable, then have it to

1    me by 9:00 a.m. tomorrow morning.  I'll be glad to wait

2    until I have that.  Likewise on the other two motions

3    that I have pending.

4         MS. SINGER:  We have a lot more motions pending.

5         THE COURT:  I have two more in front of me right

6    now, one being the motion for permission to call a

7    medical witness at a time certain.

8         MS. SINGER:  Yes.

9         THE COURT:  And one for permission to utilize a

10   demonstrative aid.  And then, of course, the next one

11   that I have is the motion to dismiss the indictment.

12   Am I missing anything?

13        MS. SINGER:  Yes, ma'am.

14        MR. GROLAND:  Yes.

15        THE COURT:  Okay.  We're gonna schedule additional

16   time and you can do it with Ms. Parramore about when

17   it's going to be.

18        MR. GROLAND:  May I approach?  I have supreme

19   court case that I would like your Honor to --

20        THE COURT:  You can file it with your written

21   arguments.  We'll be in recess until 1:30.

22        MS. SINGER:  Before we go off the record, I have

23   in my custody an open envelope that contains the 911

24   tape and the original statements made by Brian Herlihy.

25   Mr. Groland, do you have any objection to me continuing

```
1    to hold custody of these until trial, or do I need to
2    go ahead now and call a GPD officer here to pick them
3    up?
4         MR. GROLAND:  No.  Why don't we seal it up and you
5    hold onto it, please.
6         MS. SINGER:  Yes.  Will you witness the seal, Mr.
7    Tetter?
8         MR. TETTER:  Why don't we give it to the clerk.
9         MS. SINGER:  They won't take it because it's not a
10   piece of evidence.
11        MR. GROLAND:  Okay.  That's fine.
12        MS. SINGER:  Will someone from your office please
13   witness this and sign the seal as well?  Thank you,
14   sir.  I know that sounds crazy, but I don't want any
15   accusations.
16            (Whereupon, the motion hearing was concluded.)
17
18
19
20
21
22
23
24
25
```

CERTIFICATE OF ACCURACY

STATE OF FLORIDA

COUNTY OF ALACHUA

I, Stacey K. Bryant, RPR, Judicial Court Reporter, Eighth Judicial Circuit of Florida, do hereby certify that:

A motion hearing was held in re:  State of Florida vs. Brian Patrick Herlihy, Circuit Court of Alachua County, Florida, before the Hon. Martha Ann Lott, Circuit Judge, on September 4, 2002.

That I was authorized to and did report the proceedings had during said motion hearing and that the foregoing pages, numbered one through and including 184, constitute a true and correct transcription of my stenographic notes taken aforesaid, which were reduced to printing under my personal supervision.

I further certify that I am neither of counsel nor related to or employed by any party to the action, nor financially interested in the outcome of said cause.

IN WITNESS THEREOF, I have hereunto affixed my hand on this _____ day of _____ , 2003.


Stacey K. Bryant, RPR
Judicial Court Reporter
Eighth Judicial Circuit of Florida

Stacey K. Bryant, RPR
Judicial Court Reporter

0002745