# EXHIBIT

# Z

21-5

# In the District Court of Appeal

*Lo2·1-1781*

## FIRST DISTRICT

## of Florida

BRIAN PATRICK HERLIHY

          Appellant,

        CASE NUMBER    2000-2753-CFA

        APPEAL NUMBER 1D02-4788

v.

        VOLUME XXVI

STATE OF FLORIDA

          Appellee,

## TRANSCRIPT
## RECORD

### HONORABLE MARTHA ANN LOTT
ACTING TRIAL JUDGE

### APPEAL FROM THE CIRCUIT COURT
### 8th JUDICIAL CIRCUIT FOR
### ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

1                                IN THE CIRCUIT COURT OF FLORIDA
                                 EIGHTH JUDICAL CIRCUIT
2                                IN AND FOR ALACHUA COUNTY

3                                    CASE NO: 01-2000-CF-2753-A

4                          TRANSCRIPT ON APPEAL
                              (Pages 1 - 108)
5
       STATE OF FLORIDA
6
       vs.
7
       BRIAN PATRICK HERLIHY,
8
                        Defendant.
9

10     _____/

       Proceedings:              Pretrial motions
11
       Before:                   The Honorable Martha Ann Lott,
12                                Circuit Judge

13     Date:                     September 5, 2002

14     Time:                     9:00 a.m.

15     Place:                    Courtroom 4-A
                                 Alachua County Courthouse
16                               Gainesville, Florida

17     Reporter:                 Stacey K. Bryant, RPR
                                 Judicial Court Reporter
18
       APPEARANCES:
19
             Jeanne Singer, Assistant State Attorney
20           Stephen Pennypacker, Assistant State Attorney
             120 W. University Avenue
21           Gainesville, Florida 32608
                Appearing on behalf of the State of Florida
22
             Gordon Groland, Esquire
23           John Tedder, Esquire
             Post Office Box 2848
24           Gainesville, Florida 32602
                Attorneys for defendant
25

```
 1              P R O C E E D I N G S
 2         THE COURT:  We have a brief matter to take up
 3    before we start many motions in Mr. Herlihy's case, and
 4    that is Mr. Cooper.  Does the jail have Mr. Cooper
 5    here?
 6         JAIL PERSONNEL:  We thought we were gonna do him
 7    first, your Honor.  We can get him.
 8         THE COURT:  Where is he, downstairs?
 9         JAIL PERSONNEL:  Yes, your Honor.
10         THE COURT:  And you don't care which order they go
11    in?
12         JAIL PERSONNEL:  No, your Honor.
13         THE COURT:  Then we'll just do these first.
14    That's fine.
15         MR. GROLAND:  Your Honor, may I just ask the Court
16    a question?  I know that your Honor said before we
17    adjourned yesterday that you wanted some written
18    argument if we wanted to do that.  Later when I got
19    back to my office I found out that we had set this for
20    this morning.  So I would ask the court for permission
21    to take five or seven minutes just to sum up factually
22    what we were able to elicit yesterday on my two motions
23    to suppress.
24         THE COURT:  No, I don't need a summation.  I heard
25    it just yesterday.  I have it very clearly in my mind.
```

1          On the other hand, if we complete all these other

2     motions in time, I'll be glad to hear your argument

3     instead of reading a written argument.  Neither the

4     state or the defense is required to argue.  Obviously I

5     want to make sure that you have sufficient information

6     on the record.  But bottom line, I feel personally

7     confident that I can makeup your arguments for you.

8     Now I'm willing to hear them, but I don't need them in

9     order to make a ruling.

10          MR. GROLAND:  For the record I would like if you

11     do have the time indeed, I would like to just take

12     about five or seven minutes to sum up.

13          THE COURT:  I'm not gonna listen to the facts

14     again, but I'll be glad to listen to your argument if

15     we have time.

16          MR. GROLAND:  Okay.

17          THE COURT:  Good enough.

18          MS. SINGER:  I just want to ask if the Court did

19     get the hand delivery yesterday?

20          THE COURT:  Yes.  I have a huge hand delivery.

21          MS. SINGER:  I just want to make sure.  It was

22     late coming.

23          THE COURT:  All right.  Now we still have a long

24     list of motions.  I obviously have no investment in

25     what order we take them.  Does either the state or the

1      defense have any request in what order we take them?

2           MR. GROLAND:  We've got two other pending.

3      They've got, I think, some eight other motions, some of

4      which we agree to.

5           THE COURT:  Okay.

6           MS. SINGER:  I think the most important motion,

7      Judge, that would be a motion that I think we need to

8      spend the most time on, is Mr. Groland and

9      Mr. Herlihy's motion to dismiss the indictment because

10     obviously if that's a motion that's granted at this

11     time, all the other motions don't need to be heard

12     today.

13          THE COURT:  Okay.  Mr. Groland, would you mind

14     taking that one first?

15          MR. GROLAND:  Well, let me just say this, your

16     Honor.  We did not learn this information about the

17     evidence being destroyed until just this past Friday.

18     We can't tell from the face of the autopsy report from

19     Dr. Hamilton that that occurred.  We didn't know it

20     until we took his deposition.

21          We have filed this motion, but our feeling is that

22     the Court, in order to make a fully informed decision

23     on this, needs to have some input from our pathologist

24     as to how significant this piece of evidence that is no

25     longer available is.  And what I would propose to the

1    Court, since he is out of state and is not gonna be

2    here until the middle of the trial and we cannot hear

3    this motion during the middle of trial, it has to be

4    done before we select a jury, is that we just arrange

5    for -- and this is not gonna have to be a one hour

6    telephone conference with him, but we arrange for a

7    time to have right before jury selection when

8    Dr. Plunkett can be available on the phone and can just

9    inform the Court as to what our position is about the

10   destruction of this evidence.

11        THE COURT:  Let me ask both the state and defense

12   how long you anticipate this jury selection taking?

13        MS. SINGER:  One day.

14        THE COURT:  Well, when you say one day, are you

15   talking about eight hours, 12 hours?

16        MR. TEDDER:  Judge, I think it could take more

17   than one day.  I would like to hope we could in one

18   day, but --

19        THE COURT:  It's gonna be one day even if it takes

20   us 'till midnight.  Let me clear that one up for you.

21        MR. TEDDER:  Well, one of the biggest concerns I

22   have, Judge, is of course how much any of the potential

23   jurors may have known about this case through pretrial

24   publicity.  There hasn't been much lately, but I know

25   there was a lot initially.

1          What more concerns me is what, if anything, these

2    potential jurors know or opinions they may have about

3    the diagnosis commonly known as shaken baby syndrome

4    and I think we may very well have to individual voir

5    dire on some of those folks.

6          THE COURT:  You may request individual voir dire

7    is what you mean.

8          MR. TEDDER:  Yes, ma'am, may request it.  All I'm

9    saying is, I would hate to have somebody get up and

10   just start spewing forth what they think about shaken

11   baby syndrome to a room full of folks and taint the

12   whole jury panel.

13         THE COURT:  I understand.  And of course we will

14   make sure that that does not happen.  It may or may not

15   require individual voir dire.

16         I'll tell you this:  As I just said, voir dire in

17   this case is going to take one day and we will start as

18   early as we can on Monday and we will go as late as we

19   need to on Monday.  This case is allocated for two

20   weeks for trial, which of course affects also the

21   state's motion to call one of their witnesses at a time

22   certain.  But this case is not gonna be dragged out.

23   We will go as late as we need to on a daily basis in

24   order to make sure that this case is tried in two

25   weeks.  So be prepared for that.

1        MR. TEDDER:  I think we should be able to get it

2   done in two weeks.

3        THE COURT:  And there will be no gaps in the

4   presentation of testimony.  We're not gonna recess the

5   trial for hours or days waiting for the next witness.

6        MR. TEDDER:  Well, Judge, we have two witnesses

7   who are out of state and we're making every effort to

8   get them here.  One of them is from Virginia, a

9   neuropathologist, is gonna charge an extremely heavy

10  fee and we need to be certain -- We told him we're

11  gonna call him on September the 18th.  We hope that

12  will be agreeable with the Court.

13       THE COURT:  What day is the 18th?

14       MR. TEDDER:  That's Wednesday the second week.

15  Monday, that day is a holiday.  So the state has

16  indicated they're planning on calling their out of

17  state witness on that Tuesday.

18       THE COURT:  That's what they're hoping for, but I

19  think that motion --

20       MS. SINGER:  Your Honor, we actually have -- we

21  have actually delineated the witnesses.  We have 47

22  witnesses and we will be well into the Tuesday of the

23  17th with our case in chief unquestionably.  We will be

24  well into that.  I've given them minimum amounts of

25  time, not counting the cross-examination that they're

1   gonna do, and I've got a number of witnesses to get us

2   through to that day.

3       THE COURT:  Right.  Having tried cases of this

4   nature before, as have all of you, I know full well the

5   complications of out of state witnesses and I know full

6   well that many things that happen in a trial cannot be

7   anticipated down to the minute, much less down to the

8   hour.  And what I'm telling you is, the case will not

9   be delayed while we're waiting for a witness that you

10  told they could come late.

11      So, however you need to arrange it so that your

12  witnesses are available, the case is scheduled for

13  trial for two weeks and a subpoena is good for the term

14  of the trial, as you all know, and that's the basis on

15  which we'll proceed.

16      MS. SINGER:  Your Honor, we're not working on

17  Saturday, Sunday or Monday?

18      THE COURT:  We are not working on Saturday, Sunday

19  or Monday.

20      MS. SINGER:  Because we could get him there then

21  if we were going to have the jury work those days.  But

22  he's scheduled for the Tuesday morning and I'm sure we

23  will be -- I'm almost positive we're gonna be well into

24  the Tuesday for trial with other witnesses as well.  So

25  I feel confident that we're in good shape with that.

Stacey K. Bryant, RPR
Judicial Court Reporter

0002753·          0002486

```
 1              THE COURT:  Okay.  Good enough.  Your motion's
 2      denied.  Just schedule him specially.
 3              And for the record, the motion to set that doctor
 4      specially was insufficient in the grounds stated to
 5      schedule him on that date because at the very least, he
 6      could fly in on Friday morning and testify Friday
 7      afternoon if necessary.
 8              MS. SINGER:  Okay.  That's fine.
 9              THE COURT:  All right.
10              MS. SINGER:  I do want to address the issue of the
11      motion to dismiss, Mr. Groland's request that we
12      continue it for some other time.
13              First of all, although we did get the motion in
14      writing yesterday morning, the state is prepared to
15      argue that motion today.  It is a pretrial motion that
16      would be subject to appeal.  The state does not want to
17      waive any rights to appeal on that motion.  We believe
18      that it is groundless and that the court would be able
19      to have sufficient information today to make a ruling
20      on it.
21              If it's going to become an evidentiary hearing and
22      we're going to call Dr. Plunkett, then is the court
23      going to then require us to call the number of
24      witnesses we have to contest Dr. Plunkett, which really
25      forms the basis of our argument that we're discussing a
```

1  factual issue here, not the destruction of evidence?

2      THE COURT:  We're going to hear that motion today

3  and I'm going to allow the defense to proffer what

4  testimony would be offered if that expert witness were

5  called at that motion hearing.

6      MS. SINGER:  May the state also proffer what it's

7  witnesses would say?

8      THE COURT:  Yes.

9      MR. GROLAND:  We can proffer what our doctor would

10  say?

11      THE COURT:  Yes.  Now in that regard, as the state

12  says, since this is an order that the state would have

13  the right to appeal if the motion is granted, then

14  that -- basically that one has to be heard first and we

15  might as well proceed with it.

16      MR. TEDDER:  Your Honor, I have not had a chance

17  to talk to our pathologist about this evidence,

18  Dr. Plunkett.  I tried to call him and have been unable

19  to reach him.  He goes to various states.  You know, I

20  just haven't been able to reach him.  So I don't know

21  exactly what he would say.  I would not be in a

22  position to proffer this.  As I said, we were totally

23  unaware of this evidence until last Friday.

24      THE COURT:  Why don't you just tell me what you do

25  have then.

1      MR. TEDDER:  I will.  Yesterday, your Honor, we

2      did depose Dr. Stephen Nelson, who is the state's

3      neuropathologist by telephone.  Mr. Pennypacker was

4      there.  I don't recall exactly what he said obviously,

5      but I do recall him saying that -- the fact the dura of

6      this child was not saved and presented to him for

7      further examination.  It was a very significant piece

8      of evidence that he would have liked to have had

9      because he knew going into that examination of the

10     child's brain, that a major issue in this case was

11     whether or not there were pre-existing chronic subdural

12     hematomas.

13         And I have also talked to another expert of ours,

14     Dr. Uscinski, who is a neuropathologist --

15         MS. SINGER:  He's a neurosurgeon.

16         MR. TEDDER:  Neurosurgeon, excuse me.  He

17     testified it would be very easy to destroy the evidence

18     of a chronic subdural hematoma if the skull was not

19     opened properly and that is very significant.  When he

20     left, he said, I'll leave that to Dr. Plunkett as far

21     as what significance not having the dura preserved for

22     further examination was.

23         I mean, that's all I can tell you now.  I wish I

24     had a transcript of what Dr. Nelson said, but he's

25     their state's witness and he thought it was pretty

```
 1        significant, and please correct me if I'm wrong,

 2        Mr. Pennypacker.

 3            MR. PENNYPACKER:  He thought it was significant,

 4        but he also said that's not the cause of death.  It

 5        wouldn't change his opinion one way or another whether

 6        he had access to that dura or not.

 7            MR. GROLAND:  Clearly that's not the cause of

 8        death.  It has to do with what happened on August 2nd

 9        whether or not a prior hematoma re-bled, caused a

10        seizure and that caused the event to occur.  Clearly

11        the cause of death is anoxia, deprivation of oxygen.

12        That's certainly not in dispute.

13            Your Honor, just so the court knows, the way that

14        Mr. Tedder and I have divided this up is, he's

15        basically addressing all of the medical in the case and

16        I'm doing the lay witnesses, police officers.  I just

17        wanted your Honor to know that.

18            THE COURT:  Okay.  Good.  That will help me

19        because of course in trial rather than list everybody's

20        name, to the extent that I have information or the

21        ability to, I try to call the name of the lawyer who's

22        gonna come forward and that might save a little

23        confusion for the jury.  Of course we'll work that out

24        as we go along, but thanks for that clarification.

25            Anything else the state wants to say by way of a
```

1    proffer or argument as to that motion?

2         MS. SINGER:  Yes, your Honor.  I have a number of

3    cases and I don't know -- are you -- you're standing

4    just on your written motion and you're ready to hear

5    the state's argument?

6         THE COURT:  They've offered me everything that

7    they have at this time.

8         MS. SINGER:  Yes, your Honor.  I do have a number

9    of items I would like to present and proffer first.  I

10   would like to proffer a copy of the deposition of

11   Bernie Maria, M.D.  Before I make my legal argument,

12   your Honor, if I might, I'm specifically citing in the

13   deposition, page 114 -- Pardon me, your Honor.  Wrong

14   page number.  Yes, it was 114, 114 and through the end

15   of that examination where I asked Dr. Bernie Maria,

16   who, for the court's information, is the pediatric

17   neurologist who actually treated Robbie Quirello who is

18   now the head of pediatrics for the University of

19   Missouri College of Medicine and who has rendered an

20   opinion in this case that this child suffered from a

21   brain injury that occurred between 9:00 -- I'm going to

22   give an estimate of time, between 9 o'clock and 10

23   o'clock when the child was in the hospital and that

24   this was not the result of an older injury.

25        And when I asked him about the pathologist -- he

1    did read the CT scans -- when I asked him about the
2    pathologist, he -- My question was, "If the pathologist
3    did not see evidence of a hygroma or chronic subdural
4    hematoma, would that in any way change your opinion as
5    to the mechanism of injury in this case?"  The answer
6    was, "No."

7        "Would the fact that the pathologist did not see
8    hygroma or chronic subdural hematoma support your
9    opinion or conclusion that what appears to be hygroma
10   on the CT scans is in fact something other than that,
11   because if it was a hygroma, it would not have
12   increased in size as you have noted in your testimony?"
13   His answer was, "Yes."

14       I'm going to proffer the entire deposition, your
15   Honor, because I understand that what I'm citing to you
16   now doesn't make sense unless you read what his opinion
17   is, which is earlier in the deposition.  But I do want
18   to make this part of the record at this time.

19       Also I want to make a part of the record the
20   deposition of William Hamilton.  I know Mr. Pennypacker
21   now is looking for page and line as to specifics in
22   that deposition.

23       But I would advise the Court that Dr. Hamilton did
24   state on the deposition that he followed the standard
25   procedures in his autopsy and in my argument I will be

1   providing the court with the administrative rules

2   regarding body parts in autopsy.  And Dr. Hamilton laid

3   out for the defense in his deposition that he did

4   follow the rules, that it is not essential to save the

5   dura.  It would have been nice to save the dura.  He

6   intended to save the dura.  Inadvertently, by accident,

7   there's no showing whatsoever of bad faith, the dura

8   was buried with the child and given back to the family.

9   And when I show you the administrative rules, I would

10  like to explain to the Court what the obligations of

11  the medical examiner are.

12      Once the autopsy is completed, they have a duty to

13  return the body parts to the next of kin for

14  appropriate disposition, in this case, burial.  His

15  testimony, and we will proffer this deposition to the

16  Court and make it a part of the record, is that there

17  was no intent on his part, there was no bad faith, he

18  was not directed to dispose of this piece of dura.  He

19  believed it was going to be put into an area where he

20  was going to send it to a neuropathologist for

21  examination.  He believed it was.  It was not.  He

22  indicated that that was inadvertent error and not

23  certainly anything intentional.  That's an important

24  point factually that the court has to have and I relate

25  to the court the case law that applies in this case.

1    The -- I would like to start now with -- Oh, and I

2    also have one other deposition, your Honor, and that is

3    Anne Dickison.  Anne Dickison is a several times board

4    certified physician who was an attending physician to

5    the child.  She's certified in anesthesiology,

6    emergency room medicine, pediatrics, and pediatric

7    intensive care, I believe.  Is that correct, Mr.

8    Pennypacker?

9    MR. PENNYPACKER:  Adult critical care, pediatric

10   critical care, anesthesiology, and pediatrics.

11   MS. SINGER:  She also attended to the child.  She

12   was actually the treating physician.  She made her

13   diagnosis and rendered her opinion based on the CT

14   scans that were provided to her by Dr. Quisling and

15   Agee and her opinion is not -- her opinion is based on

16   the fact that she was aware or believed there were

17   hygroma, although at the time of autopsy no hygroma was

18   seen.  I think this is important to show that it

19   doesn't matter whether there was hygroma or there were

20   not hygroma, whether or not the dura was saved or not

21   saved because in either event, the experts for the

22   state will be presenting testimony in this case to say

23   their opinion does not rest on the findings of hygroma

24   pathologically.  I would like to offer this up as well.

25   And I have one other matter and I guess we have to

1    do it by proffer because we do not have a copy of the

2    deposition, but Mr. Pennypacker did attend Dr. Nelson's

3    deposition yesterday.  Is there anything else,

4    Mr. Pennypacker, as far as his deposition that you

5    think we need to proffer for the record understanding

6    that the deposition will be transcribed Friday and that

7    if the court needs that as part of the record, we can

8    provide it?

9        MR. PENNYPACKER:  Dr. Stephen Nelson is the

10   medical examiner for District Eight, I believe, and he

11   is also a board certified neuropathologist.  He was

12   sent the brain by Dr. Hamilton.  In his examination of

13   that brain microscopically he found evidence of

14   cortical cerebral contusions, which he says indicates

15   blunt force trauma.  That is completely inconsistent

16   with the defense's theory of, we believe, a chronic

17   subdural hematoma.

18       He also found blood in the subarachnoid space,

19   which is inconsistent with the chronic subdural

20   hematoma.  His opinion was that the death was caused by

21   blunt force trauma, which is also inconsistent with

22   defense's theory.  When asked about the dura, as I said

23   previously, he said he would like to have had it, but

24   that it didn't impede or change his opinion in any way;

25   meaning that he was able to determine the cause of

1       death with the specimen that he had and that he does

2       not accept the defense's theory of how this child died.

3              THE COURT:  Anything else from the state?

4              MS. SINGER:  Yes.  There was only one other part.

5       We will be tendering Dr. Hamilton's deposition, but I

6       do want to relate to the Court that I believe, if I

7       remember correctly, and when I asked the Court to rely

8       on it's own reading, but I believe that Dr. Hamilton

9       was asked at deposition whether or not in the past he

10      has been told that radiologists have seen something and

11      when he's opened up the body, it isn't what he actually

12      sees when he does the autopsy.  I believe that he does

13      say that that has happened in the past.

14             So the mere fact as alleged in the motion that

15      radiologists may be seeing and making interpretations

16      of a view from the outside, that mere fact alone does

17      not make that a conclusive finding.  In fact, a

18      pathologist, the one who actually goes inside the body,

19      examines the organs and makes a record of that, that

20      person is in the best position to be able to make that

21      finding and I want the court to be aware of that.

22             I believe it's in the deposition.  If it is not, I

23      can tender that by affidavit, your Honor.  But I think

24      it was in the deposition.  Mr. Pennypacker is looking

25      for that.  In any event, I would like to start with my

1    legal argument if I may at this point.

2         The motion alleges, and I think the Court's

3    probably aware of this, that the state has failed to

4    disclose essentially exculpatory evidence and that we

5    have destroyed potentially exculpatory evidence, and

6    the state vehemently disagrees with that allegation.

7    The defense has offered no evidence at all to support

8    the fact that this was potentially exculpatory

9    evidence.  The fact that their expert said that they

10   would like to have looked at the dura, does not make

11   that exculpatory evidence.  In fact, as I've indicated

12   through the factual basis provided earlier, our

13   witnesses do not find that as a factor in their

14   diagnoses.

15        The only evidence that's been adduced is that the

16   brain was examined, including the dura, that there was

17   no evidence of subdural -- chronic subdural hematoma on

18   the dura, and that the medical examiner pursuant to

19   rules which I will now provide to the court, recorded

20   his findings by both written report, by documenting in

21   by photographs, and he completed the entire autopsy by

22   documenting, by photographs, and by written report the

23   entire body.

24        The reason why I say that this is important in my

25   later argument, the entire body was documented in

1    writing and by photographs as to the relevant parts.

2    Those photographs were made available to defense

3    counsel very early on in this case.  The discovery

4    answers that are in the file will show those

5    photographs were provided.  Those photographs were

6    available for viewing by their experts.  In fact,

7    copies were sent to their experts, copies were also

8    sent to or provided to Dr. Nelson.

9        The medical examiner has a statute and rules that

10   are very specific as to body parts that I would like to

11   read to the court.  The rules that were in fact

12   followed in this case by Dr. Hamilton to --

13       THE COURT:  I don't believe you need to read them.

14   Why don't you just file them since you have them in

15   writing.

16       MS. SINGER:  All right.  I have marked the

17   relevant part on the evidentiary aspect and if I could

18   put that in the record.  It's a blended line.  It says,

19   "Evidentiary aspects of retained body parts shall be

20   preserved by documentation by writing, photography,

21   radiography, or other indirect means, or by retention

22   of tissue samples.  Body parts themselves shall not be

23   retained as evidence for legal proceedings."

24       So, in fact, Dr. Hamilton followed -- This is a

25   marked copy.  I'll give you an unmarked copy, your

Stacey K. Bryant, RPR
Judicial Court Reporter



1    Honor, so you can read the whole thing.  And

2    Mr. Tedder, I'll just leave your pile here.

3         Dr. Hamilton in no way did anything intentionally

4    or in bad faith to destroy this matter.  In fact, the

5    dura is not routinely saved.  He did, in fact, make a

6    record as required by law.  The photographs have been

7    provided to the defense.  So there is no showing here

8    that any evidence was destroyed intentionally or not

9    provided to the defense.

10        It's important when you think of the argument here

11   that Dr. Hamilton did not preserve the lungs, and the

12   experts for the defense, one of the experts for the

13   defense suggests that the baby died of aspiration or

14   anoxia due to aspiration.  They could argue today that

15   we should have put the lungs back so that this doctor

16   could have examined them to make sure that this child

17   did or did not have pneumonia.

18        He did not preserve the heart.  If an expert came

19   in here and said, We don't believe Dr. Hamilton's

20   testimony that there was not a bullet in his heart when

21   he looked at the heart, then we would have had to have

22   the heart then to have their expert examine it?  I say,

23   no.

24        He didn't preserve the spine.  If their argument

25   was going to be --

1      THE COURT:  There are many parts of the body that
2   he didn't preserve.  Got it.
3      MS. SINGER:  Right, he didn't preserve it.  He has
4   no requirement to preserve them.  He did make the
5   record and he is subject to cross-examination and there
6   are photographs for their experts to examine.  If
7   there's an issue of the dura and they believe their
8   expert can testify that that's an essential part and it
9   raises a reasonable doubt, that's fine.  But they have
10   an ability to cross-examine this witness.
11      MR. PENNYPACKER:  Your Honor, I have the page
12   cites from Dr. Hamilton's deposition if you want me to
13   read you what he said.  In answer to a question about
14   medical examiners and radiologists and different
15   findings, he said on page 48 beginning with line 24 and
16   continuing to the top of page 49, "So correct me if I'm
17   wrong about this and here comes the question, are you
18   saying that not only did you make a mistake in this
19   case, but they may have made a mistake also?"  The
20   answer was, "I think that is a limitation of the
21   technique.  You know, I think anyone who has been doing
22   autopsies for awhile has done an autopsy and seen that
23   things were not as they were originally interpreted by
24   the radiologist.  I don't think that radiology has
25   completely replaced anatomic pathology yet."

1       And then later on on page 61 when he's asked if he

2    sees any evidence of the chronic subdural hematoma, he

3    says -- this is the answer to a question, "If you found

4    that what you believed to be evidence of chronic

5    subdural hematomas, how would you describe their

6    adherence?"  Answer, "It would be tightly adherent to

7    the dura and encapsulated completely."  Question, "And

8    you saw none of that?"  Answer, "None."  So he said in

9    his own testimony it wasn't there.

10       MS. SINGER:  Your Honor, this purported evidence

11    under the case law has to be shown to be exculpatory or

12    otherwise material to the defense.  At best, the

13    evidence as alleged in the motion without any real

14    support factually, at best this purported evidence may

15    only have been useful to the defense and actually might

16    be more inculpatory than exculpatory.

17       The defendant is required here to show bad faith

18    on the part of Dr. Hamilton and there is absolutely no

19    showing that bad faith is here and they will not be

20    able to make a showing, as you can see from

21    Dr. Hamilton's deposition, that there was bad faith.

22       The defendant is stacking multiple inferences in

23    his allegations to postulate that the preservation of

24    this body part was required for further examination,

25    but yet defendant has shown no prejudice, for his

1       witnesses will continue to testify as they have in

2       their depositions that their mechanism of injury is

3       totally different from what the state's witnesses are.

4           It doesn't matter basically.  The bottom line is,

5       that doesn't matter.  At best the defendant is saying,

6       contrary to the attending pathologist's report,

7       contrary to the neuropathologist's report for the

8       state, contrary to the clinicians, that there's a

9       possibility that further examination of the dura over

10      and above what has already been viewed through

11      photographs and through written reports and through

12      whatever slides and other objects that they viewed,

13      that there's a possibility that this may have helped

14      the defense in it's presentation of it's experts'

15      opinions as to mechanism of injury.  They don't allege

16      and don't show and they don't offer any testimony that

17      in any case this is material or exculpatory.

18          Your Honor, in the cases, and there are a number

19      of them, the cases require a two prong test for the

20      finding that the indictment should be dismissed.  The

21      first is that the court must make a finding that the

22      evidence itself is exculpatory in nature, which the

23      court knows our position on that.  I think I voiced it

24      enough already.  And the second is that the defendant

25      must make a showing of bad faith.

1          There are numbers of cases going all the way to

2     the landmark case of Arizona vs. Youngblood at 488 U.S.

3     109, 1988, a Supreme Court case.  There are a number of

4     cases in Florida, and I'm gonna give the court copies

5     of them to read, that have ruled that all sorts of

6     different kinds of evidence, including evidence that

7     has been maintained and then later destroyed by medical

8     examiners, did not constitute exculpatory evidence and

9     without a showing, if they did in fact constitute

10    exculpatory evidence, the defense must show bad faith

11    before there would be a dismissal of the indictment or

12    information.

13         I start first with a Florida Supreme Court case of

14    King vs. State, 808 So.2d 1237, where Mr. King was

15    alleging that the state destroyed vaginal swabbings and

16    a rectal swab which would have been exculpatory because

17    had they been tested for DNA, he would have been

18    vindicated, he would have been shown not to be the

19    person who sexually abused the particular deceased.

20    The court in that case held that there was no showing

21    of bad faith.  The swabs were destroyed inadvertently.

22         The Court can take a look at this case, but

23    specifically the medical examiner's office did not

24    preserve the swabs after the time period required under

25    the law that I gave you under the rules.  The medical

1     examiner under the rules is only required to keep

2     specimens for one year after the case had gone to trial

3     before DNA was a possible means to make identification.

4     The medical examiner's office destroyed the swabs.  He

5     came back later on appeal of his death sentence and

6     said, You know, now I want them tested.  Medical

7     examiner said, We don't have them anymore.  Totally

8     inadvertent.  No showing of bad faith.  They discussed

9     that in this case.

10         The court ruled that there was no bad faith, that

11    it's not -- it was not intentionally exculpatory

12    information in the court's mind at the time the

13    decision was made and that the defendant's request for

14    dismissal based on that ground was not upheld.

15         I have State vs. Thomas where the -- that's a

16    Second DCA case from 2002 and, I'm sorry, but -- it was

17    August 28th, 2002.  I only have the Lexus cite.  I can

18    get the cite for the Court later if we need it.  The

19    state contended that the circuit court should not have

20    dismissed charges against Thomas after it was disclosed

21    that a videotape of Thomas' alleged transaction with

22    undercover agents had been misplaced.

23         The Second District Court of Appeals agreed and

24    said, "The loss or destruction of evidence that is only

25    potentially useful to the defense violates due process

1    only if the defendant can show bad faith on the part of

2    the state."

3         I'll make this packet, your Honor, just go through

4    each of them for you if that's okay and just hand it to

5    you unless the court wishes to look at them as I talk.

6         Next is State vs. Daniels and Medico.  This is a

7    Fourth DCA case from 1997, 699 So.2d 837.  In this

8    case, once again, this was a record of a drug

9    transaction.  The court held that unless the defense

10   shows bad faith on the part of the state, dismissal is

11   not warranted.

12        State vs. Erwin, Fifth DCA case, September 20th,

13   1996, 686 So.2d 688.  Here this was a DUI case with

14   vials of blood or, pardon me, it may have been vials of

15   blood.  It was blood.  They collected two vials.  One

16   was tested.  Blood alcohol level was gained.  The

17   second one was contaminated.  It broke and could not be

18   tested.

19        Arguments were made that that second vial was

20   supposed to be available to the defense to do their own

21   tests and that it was potentially exculpatory.  The

22   court ruled, "There's no duty upon the state or it's

23   agents to collect two vials for analysis," just as

24   there's no duty for the medical examiner to hold the

25   dura.

```
 1              He examined the dura and did what he was legally

 2      responsible to do under the law and there is no due

 3      process violation if the state's analysis necessarily

 4      consumes the entire content of the vials, citing Howser

 5      vs. State.  And then if there was a possibility that

 6      the second vial contained exculpatory evidence, the

 7      appellee was required to show bad faith upon the part

 8      of the state in destroying the evidence.

 9              I think that's important because, once again, I'm

10      saying that the medical examiner did what he was

11      supposed to do.  He didn't keep the whole body.  It

12      would have been nice for their experts to examine the

13      whole body, but we also have a competing public

14      interest, competing state interest and it's a

15      compelling state interest and that is to the victims,

16      the family, the survivors to put to rest their child.

17              So there is competing interest here and I think

18      the law specifically allows pathologists to examine and

19      make a report and we rest on their conclusions and

20      they're subject to cross-examination.

21              State -- Did I say Erwin?  Yes, I gave you Erwin

22      vs. State.  Merk vs. State, it's a Supreme Court case

23      decided in 1995 at 664 So.2d 939.  What happened in

24      Merk vs. State is, Mr. Merk murdered someone and the

25      body was found and there was evidence collected at the
```

1      crime scene, 2and the evidence technician failed to

2      keep as evidence a pair of khaki pants that were

3      located during the search of a vehicle abandoned by

4      Mr. Merk and his companion after the murder.  The

5      witness testified that he had examined those khaki

6      pants and saw nothing of evidentiary value upon his

7      examination, and so therefore he did not take them into

8      evidence.

9          Later Merk argued that those pants would have

10     shown that his codefendant had blood on those pants and

11     he would have been able to have those pants and have

12     them examined by their expert to show that in fact his

13     codefendant was the murderer, not Merk.  The court

14     said, No.  The court said, Unless you show, there is

15     simply no showing that Detective Nester acted in bad

16     faith in deciding not to preserve pants which had no

17     blood stains, which is very analogous to this.

18         I can read it this way:  There's simply no showing

19     that Dr. Hamilton acted in bad faith in deciding not to

20     preserve a dura that did not have any evidence on it.

21     Do you see where I'm going there, Judge?

22         THE COURT:  Totally.

23         MS. SINGER:  Moreover, Merk has to stack multiple

24     inferences in order to postulate that the pants were

25     either material or exculpatory.  Doesn't do that in

```
 1    this case.  Does not show bad faith in this case.  The

 2    Supreme Court says, No dismissal.

 3         MR. GROLAND:  Ms. Singer, do you have copies of

 4    those?

 5         MS. SINGER:  Everything, I'm making a pile.  Do

 6    you want them all now?

 7         MR. GROLAND:  Please.

 8         MS. SINGER:  I'm making a pile for you.

 9         MR. GROLAND:  Thank you.

10         MS. SINGER:  State cites now Kelly vs. State,

11    another Supreme Court of Florida opinion at 569 So.2d

12    754.  Judge, I think you'll see I'm going down from the

13    2002s all the way down to when Youngblood was decided

14    in 1986 and I'm gonna tell the court that I've got a

15    few more left.  I didn't copy all of them, but I copied

16    ones that I believe were salient to this case.  There

17    are a number of cases on this issue.

18         Kelly vs. State, here Mr. Kelly was charged with

19    murder.  He was convicted and he was given the death

20    sentence.  He argued that the state's destruction of

21    material evidence prior to his trial deprived him of

22    his constitutional rights.  The court concluded that

23    the state had not been negligent in causing destruction

24    of evidence and further held that the evidence in

25    question did not prejudice Kelly's case.
```

1          What was destroyed was, and I want to make sure I

2     get this correct -- what happened was in this case, the

3     victim's death had been closed for many years.  It was

4     what we call a cold case, Judge.  And once there was

5     evidence gleaned that Mr. Kelly may have been the

6     perpetrator, the case was reopened and the state found

7     that much of the evidence had either been deteriorated,

8     lost, or otherwise gone, the physical evidence that had

9     been collected.

10         There was a finding at a hearing and the court

11    concluded a hearing that there was no showing that the

12    state had been -- had acted in bad faith or that the

13    state was otherwise negligent.  It was just that this

14    case had been aged and that that's what happens,

15    evidence deteriorates.

16         Kelly argued then on his appeal to the Supreme

17    Court that certain crime scene evidence was destroyed

18    which was not encompassed within the court's earlier

19    ruling, and that had that evidence been available, he

20    would have been found not guilty, that it was in fact

21    exculpatory evidence.

22         The court did not agree with that.  It's a very

23    brief opinion on that ground because there were other

24    grounds he raised as well, but the court cites a number

25    of cases including Youngblood, "Unless the defendant

1    shows bad faith on the part of appellee's failure to

2    preserve potentially useful evidence, does not

3    constitute denial of due process."  I apologize for the

4    underlining on this one, Judge.  I was in a rush and I

5    don't like to write on my copies to the Court, but I

6    did on that one.

7        The next case is a Fourth DCA case, State vs.

8    Robinson, cited at 552 So.2d 943.  This is a case where

9    defendant argued that destruction of photographic

10   lineups that were used by persons who later identified

11   him, he was unable to view the lineup to see whether or

12   not there was any prejudice associated with how the

13   lineup was set up.  He argued that that was potentially

14   exculpatory evidence and that as a result the case

15   should be dismissed.

16       The court ruled that the destruction of the lineup

17   was inadvertent.  The witness had testified that he had

18   thrown the lineups away, that he did not have any

19   intention at that time -- no one had been identified on

20   several of the lineups, so he just threw them away.

21       The court said, "Based on Arizona vs. Youngblood

22   that unless the criminal defendant can show bad faith,"

23   which they did not in that case, "Dismissal is not an

24   appropriate remedy."

25       And then I have a copy and I didn't make a copy

1       for you of Arizona vs. Youngblood, but I have a copy of

2       Arizona vs. Youngblood, which is what all these cases

3       are based on.  In that case, Judge, the victim in that

4       case, in the case that went up to the Supreme Court of

5       the United States, was a young boy who had been

6       molested, sodomized, and when he -- after the report,

7       he was taken to a hospital where a sexual assault kit

8       was collected.  That sexual assault kit should have

9       been refrigerated.  It was not.  So the evidence,

10      whatever there might have been in that case, was

11      deteriorated to such an extent that it could not be

12      examined and tested.

13          The defendant, who was later identified and

14      convicted of the offense, argued that that -- that

15      there was potential evidence in that sexual assault kit

16      that could have been exculpatory in nature; and thus,

17      the failure to properly preserve it was sufficient to

18      require a dismissal of his charges.  And the U.S.

19      Supreme Court said, and that's what the basis of all

20      these cases are, that Mr. Youngblood failed to show any

21      bad faith on the part of the law enforcement officials,

22      that in fact the destruction of the evidence was

23      inadvertent and negligent at the very best and that in

24      fact he would not be entitled to dismissal in the case.

25          This is really the case that forms the basis of

1      all the other cases that I've given to the Court and I

2      would go ahead and give the remainder to the Court.   I

3      think I handed the rules to the court already, did I

4      not?

5              THE COURT:  Yes.   Thank you.

6              MS. SINGER:  I just want to make sure I covered

7      everything and if I could just speak with

8      Mr. Pennypacker and make sure that he has nothing he

9      wishes to add.

10             THE COURT:  Okay.

11             MS. SINGER:  The bottom line here is that there

12     has been absolutely no showing that this is potentially

13     exculpatory evidence.  What's at the very least being

14     shown is that there's a contest between experts as to

15     what's important and that occurs in almost every case

16     where there's expert opinion.

17         The issue here really isn't whether or not the

18     dura's been preserved.  That's a smoke screen for the

19     true issue, and that is, who is the jury going to deem

20     credible?  They have a lot of argument to make.  They

21     have a lot of opportunity in cross-examination to

22     question Dr. Hamilton's examination of the brain and

23     how he handled this particular case and that's great

24     for jury argument and he will be able to do that.

25         .   But this is really not a destruction of evidence

1   issue.  This is an attempt to try to make something a

2   destruction of evidence issue when there is no proof

3   whatsoever that there is any kind of potential

4   exculpatory nature to this dura, this body part that

5   otherwise under the law is required to go with the body

6   at burial.

7       If I may have one moment to check with

8   Mr. Pennypacker.  Mr. Pennypacker, do you have anything

9   you want to add at this time?

10      MR. PENNYPACKER:  No.  I just want to make sure

11  that -- we need to put in a copy of Dr. Hamilton's

12  deposition.

13      MS. SINGER:  Yes.  At this time, your Honor, I

14  would like to present that to the Court with the

15  records that you already have of the transcripts.

16      THE COURT:  All right.  Anything else from the

17  state?

18      MS. SINGER:  No, ma'am.

19      THE COURT:  Anything else from the defense?

20      MR. TEDDER:  Your Honor, we would like to also --

21  we don't have copies available here today, but we can

22  get them to you today and proffer and offer into

23  evidence the deposition transcripts of Dr. Agee, Dr.

24  Quisling, Dr. Plunkett and Dr. Uscinski.

25      Dr. Agee and Dr. Quisling are the two radiologists

1    at Shands who examined CAT scans of the baby in

2    question in this case.  Both of them found that there

3    was evidence from the CAT scans of chronic subdural

4    hematoma, as well as evidence of recent acute subdural

5    hematoma.

6         Those CAT scans were relied on in analysis that

7    Dr. Dickison made, who was the pediatric doctor at the

8    scene.  They were also relied on by their CPT nurse,

9    Beth Talaga, as well as the CPT doctor, Dr. Rogers.

10         Everything in this case leading up to the death of

11    the child focused on the fact that everyone believed

12    there were chronic subdural hematomas and acute

13    subdural hematomas that had bled, caused a problem with

14    the brain, which caused the baby to die.

15         There is also evidence that the baby was not

16    breathing at the scene when the paramedics arrived at

17    the scene.  The evidence was the baby was not breathing

18    at all.  Again, the cause of death in this case was

19    lack of oxygen to the brain.

20         Also the doctors in the state's case, all of them

21    do conclude that this baby suffered from the thing

22    known as shaken baby syndrome, all say that he had

23    evidence of chronic subdural hematomas, coupled with

24    retinal hemorrhaging and that was the coup de grace.

25    Add both those two things together, the only thing you

1    could have was shaken baby syndrome.

2         Dr. Nelson yesterday, the state's

3    neuropathologist, said during the deposition that

4    subdural or rather -- excuse me -- retinal hemorrhaging

5    is not necessarily associated exclusively with shaken

6    baby syndrome.  So their own experts are gonna

7    contradict everything else their experts have been

8    saying and relying on in reaching their conclusions.

9         So if the court will allow it, we would at least

10   like to submit those four additional depositions.

11   They're all pretty lengthy.  It's a lot for the court

12   to look at.

13        As I said a moment ago, all these witnesses

14   considered the evidence regarding the dura and the dura

15   is what everyone focused on going into the autopsy.

16   Dr. Hamilton was aware from having read the previous

17   reports that everybody suspected shaken baby syndrome.

18   He opens it up.  He testified he didn't see anything.

19   We don't know whether he missed it or what, or whether

20   he destroyed it inadvertently.  We don't know.  It's

21   not preserved.

22        Now can we -- Obviously we can't prove it's

23   exculpatory because it's not here.  It's destroyed.  We

24   don't know what, if anything, it would have shown.  It

25   may have been inculpatory.  We don't know what was on

1    that dura.  Its been destroyed.  The only thing we know

2    is what Dr. Hamilton testified that he saw.

3         Again, they indicated -- the state indicated in

4    their argument that our experts were gonna say that the

5    baby aspirated.  Well, their witnesses are going to say

6    the same thing.  I mean, this baby was not breathing

7    when EMT's arrived on the scene.  He had seizures in

8    the emergency room.  Everything -- Their own evidence

9    is all consistent with the fact this baby quit

10   breathing.

11        Now what caused the baby to quit breathing?  We're

12   not sure, but there is evidence on the 911 tape you

13   heard yesterday, you could hear Mr. Herlihy screaming

14   frantically, There's stuff coming out of his nose.

15   There's stuff coming out of his mouth.  They were

16   directing him to try to clean out the trachea or rather

17   clean out the mouth and stuff like that and then to

18   begin -- try to provide aid to the baby.

19        And the EMT's, when you hear their testimony at

20   trial, they're going to say that they used some sort of

21   an instrument to suck out aspirant from the baby's

22   throat and mouth and then they began to pump oxygen

23   into the baby to try to revive him.  So there is ample

24   evidence that that did in fact happen in this case.

25        The argument which Ms. Singer made about not

1  preserving other body parts is, I would submit, silly,

2  but the whole case centered around what happened to

3  this child's head and what happened to his neck, which

4  is another body part that was not preserved and another

5  body part that Dr. Nelson indicated he would have liked

6  to have looked at yesterday, specifically the portion

7  coming out of the brain, going into the neck, he would

8  have liked to have seen it because he indicated in

9  deposition that had a baby been violently shaken, there

10 could have been evidence of that in this particular

11 body part.  That was not preserved as well.

12      Obviously the state's case law all says we've got

13 to show prejudice.  Well, we can't show prejudice here

14 because the evidence has been destroyed.  Now even if

15 the evidence existed, we may not have been able to show

16 prejudice, I'll acknowledge that.  But we had no

17 opportunity whatsoever.

18      As far as bad faith on the part of Dr. Hamilton, I

19 can only say this, Judge:  We took his deposition and

20 he said, You know, I intended to send that dura off,

21 and he laughed about it and I can't remember exactly

22 how it came up, but he laughed and he said, Oh, yeah, I

23 forgot to send it.  I intended to send it, but I just

24 didn't send it.  Can I show bad faith?  I don't know.

25 I don't know Dr. Hamilton well enough to do that.

1        But I will say this, your Honor, that Dr. Hamilton

2    knew going into that autopsy that the critical portion

3    of this child's brain and skull that needed to be

4    examined involved the dura and it was destroyed for

5    whatever reason.

6        I think Mr. Groland may have something to add.

7        MR. GROLAND:  Briefly, your Honor, just to

8    follow-up.  Dr. Hamilton did testify that before he did

9    the autopsy, it was indicated in our motion, he knew

10   from having read the radiologists' reports that they

11   made a finding that they observed in the CAT scans over

12   a period of three days chronic old subdural hematoma.

13   So going into the autopsy he knew indeed that the dura

14   was an important area to either preserve or examine

15   closely, but at least preserve.  And I would point out

16   to the Court it's not even noted in his autopsy report

17   that he did not preserve the dura or did not take

18   slides of the dura.

19       Now this was known to him from the very beginning

20   and at the same time it was known to the state and

21   Dr. Hamilton that there was an issue as to whether or

22   not there was an old injury to this child's brain.  We

23   did not know and I don't know when the State Attorney's

24   Office knew, but we did not know that that area that

25   we've all been focusing on for years in this case was

1       not preserved until we took the doctor's deposition.

2       That's why we're at this point right now with this

3       motion at this late stage.

4            He didn't note it in his report.  He admitted in

5       his deposition that he had a conversation with the

6       other pathologist, Dr. Nelson, the fact that he forgot

7       and did indeed make a mistake and should have saved the

8       dura, but did not.  So, he knew about it.  He knew it

9       was important and whether or not he passed that on to

10      the state and they knew a year ago or two years ago, I

11      don't know.

12           Let me just say briefly about the several cases

13      that they've cited.  One is Milton Thomas, and in

14      Thomas they make reference to the Brady case, a case

15      with which all of us are familiar.  They cited a

16      portion of Brady saying, "Suppression by the

17      prosecution of evidence favorable to the accused

18      violates due process when the evidence is material

19      either to guilt or to punishment regardless of the good

20      or bad faith."  We're not saying in our motion, we're

21      not arguing that what we have here is a bad faith

22      situation, which is what the state was focusing on when

23      they made their argument.

24           Arizona vs. Youngblood, which is a case that we

25      provided to the court yesterday through the clerk and

1    the case that we rely on, goes on to say and it

2    somewhat waters down Brady, Youngblood says, "The loss

3    or destruction of evidence that is only potentially

4    useful to the defense, violates due process only if the

5    defendant can show bad faith."

6        We're not saying it is potentially exculpatory.

7    We're saying it is exculpatory and a close reading of

8    Youngblood will show that the holding in Brady about

9    destroying evidence favorable to the accused still

10   stands.  We're saying that our doctors, were they able

11   to be here today and testify, would say that that is

12   exculpatory evidence given what they know in this case

13   having examined the records and having viewed the CAT

14   scans.

15       So our position is that we don't have to show bad

16   faith.  We have to show that it is exculpatory as

17   opposed to potentially exculpatory.  The only way we

18   can do that is through the testimony of our witnesses

19   who, I would just proffer to the Court, they would take

20   the position that it is exculpatory given the facts of

21   this case and given the medical records that they've

22   examined.  Because of that, we don't have to show bad

23   faith.  I think that to some degree distinguishes our

24   position from what state thinks our position is.

25   That's all we have.

1          THE COURT:  Good enough.  The motion to dismiss

2     the indictment, of course having been filed by the

3     defense, the burden is on the defense to carry that

4     motion and there is an insufficient showing that the

5     evidence destroyed is exculpatory, material, or that

6     there was any bad faith.  Therefore, the motion to

7     dismiss the indictment is denied.

8          MR. TEDDER:  Your Honor, we just lodge an

9     objection for the record.

10         THE COURT:  Yes, sir.  Now, which motions filed by

11    the state is the defense prepared to stipulate to so we

12    can mark those off the hearing calendar?

13         MS. SINGER:  If I can just go through them, your

14    Honor, I think we can probably go through my quick ones

15    first and then leave the more complicated ones.

16         MR. GROLAND:  Sure.

17         MS. SINGER:  The motion for order in limine

18    precluding reference to defendant's lack of prior

19    convictions if he were to take the stand, I understand

20    Mr. Groland has no objection to that.

21         MR. GROLAND:  That's correct.

22         MS. SINGER:  I have two stipulations that I would

23    like to file with the Court that Mr. Groland and I have

24    agreed to.  The first is that copies of medical records

25    or reports for the baby, Robert Quirello, which would

```
 1      include CT scans, photographs, testing results, strips,

 2      anything that's in the record that was used by the

 3      doctors, that those records, reports, and records and

 4      reports of the mother, Crystal Quirello, at the time

 5      she was pregnant with the child and gave birth, that

 6      they could be entered into evidence without further

 7      need of authenticity and chain of custody; is that

 8      correct, Mr. Groland?

 9           MR. GROLAND:  That's correct, your Honor.

10           THE COURT:  You have a written stipulation to that

11      effect?

12           MS. SINGER:  Written stipulation.

13           MR. GROLAND:  Yes.

14           THE COURT:  But that is not a motion in limine

15      or --

16           MS. SINGER:  No, but I wanted to advise the court

17      so that you know what we've agreed to.  I have just a

18      pile here.

19           We also have stipulated to the admission of the

20      911 call without need to lay the predicate as to

21      authenticity.

22           MR. GROLAND:  Correct.

23           MS. SINGER:  We have filed a motion in limine

24      precluding the defendant from making any reference

25      whatsoever to the possible sentence that might be
```

1   imposed upon conviction.  We have advised the defendant
2   and the court through Ms. Dawicke that this is not a
3   case where we will be asking for the death penalty.
4   So, therefore, the issue of penalty is not relevant and
5   state has cited a number of cases to show --
6          MR. GROLAND:  That's the law.
7          THE COURT:  You stipulate to that?
8          MR. GROLAND:  Yes, we do.
9          THE COURT:  Okay.
10         MS. SINGER:  Now we have -- I guess my request to
11  adjourn trial close to 5 o'clock on Wednesday is out.
12  It's denied.
13         THE COURT:  Now as to September 11th --
14         MS. SINGER:  Yes.
15         THE COURT:  -- we may have some argument.  As to
16  the 18th, I would doubt that that one could be granted,
17  but I'll be glad to let you put any basis --
18         MS. SINGER:  I think by the 18th we're gonna be in
19  good shape.  We're gonna be close to -- Their witnesses
20  are gonna have already testified and we may be close to
21  closings.  I'm okay with the 18th.  But the 11th I
22  would like to argue that that is a very significant day
23  in our history.  I don't know whether or not there is
24  going to be any reminiscent or memorial services.  My
25  reason for asking for early excusal or excusal at or

```
1    about 5:00 p.m. is to another obligation that I have

2    outside of that, but I think that for the jurors it may

3    be something that they would want to have some time

4    with their families or perhaps go to a memorial service

5    at their church, synagogue, or somewhere else.  So I

6    would ask to consider that we adjourn at 5:00 p.m. on

7    that day.  Mr. Groland has no objection I don't think.

8         THE COURT:  On September 11th out of respect to

9    our nation as a whole, I am going to adjourn court at

10   5:00 p.m. or as close to that time as we reasonably can

11   adjourn.  Any request to adjourn on the 18th at 5:00

12   p.m. is denied.

13        MS. SINGER:  All right.  I mean we may adjourn at

14   5:00 p.m. on the 18th, but we may go later; that's what

15   you're saying?

16        THE COURT:  Correct.

17        MS. SINGER:  I also filed a motion or the state

18   has filed a motion to allow jurors to take written

19   notes during the trial.  This is a very extensive case

20   with a lot of testimony.  We intend to call or we have

21   calculated at this time that we will be calling 22

22   witnesses.  I know that defense is calling at least two

23   experts.  I understand Mr. Herlihy may testify and he

24   has other -- Mr. Herlihy may have other witnesses that

25   they intend to call.  I don't know how many in all.
```

1      But in any event, it's expected to take a number of

2      days.  I don't know if Mr. Groland has an objection to

3      this motion.  I haven't spoken with him, but we would

4      be asking the court to consider this motion.

5            MR. TEDDER:  Your Honor, we would object to it for

6      two reasons:  Number one, I think if a juror takes

7      notes, that distracts from their ability to pay

8      attention to the testimony that's being offered at the

9      time they're making notations of the previous

10     testimony.  Number two, when they get back to the jury

11     room to make a decision, that those who have taken more

12     extensive notes than others may try to say, Well, gee,

13     my notes -- I took all these notes, and rely on them to

14     convince other people that they have a better

15     recollection of what the evidence was and other jurors

16     may defer to folks who took more extensive notes than

17     simply trying to rely on their memory of what the

18     evidence was.  So for those reasons we would ask the

19     Court not to allow them to take notes.

20           THE COURT:  The motion to allow the jurors to take

21     notes is granted and I will give the jurors special

22     instructions in regard to consideration of those notes

23     and of course I'll be glad to entertain the

24     recommendation on motion of the defense as to how, that

25     is, the instructions, can best be given.

1    MR. GROLAND:  Your Honor, what will we do with the

2    notes at the end of the day?

3    MR. TEDDER:   I was gonna ask the Court also in

4    addition to the instructions, your Honor, also to

5    admonish them to not, and I know the Court's going to

6    be doing this, to admonish them not to discuss the case

7    with family and friends when they go home.  But also to

8    not, if they're at home thinking about the case, to

9    make a notation of something that came to them about

10   the evidence that day and bring that note back in the

11   next day and try to incorporate it into the notes they

12   were making while the Court -- In other words, the

13   notes should be limited strictly to what they write

14   down in court.

15   And also I would ask the Court to keep each

16   juror's notes in separate envelopes, carefully marked

17   and closed up, of course, so we know that they get only

18   their notes and that they're not all intermingled one

19   with the other so that when they're handed back out the

20   next day, there's no question every juror gets their

21   notes and not someone else's by mistake.

22   THE COURT:  State want to be heard on that?

23   MS. SINGER:  I agree.  That's fine with me.

24   THE COURT:  All right.

25   MS. SINGER:  If you want to lock them up and also

Stacey K. Bryant, RPR
Judicial Court Reporter

0002793·            0002526

1    put in -- require them to have a cover sheet on the top

2    of their notes with their name.

3         THE COURT:  Here's how we're gonna do it.  Each

4    juror will be issued a spiral bound notebook.  Their

5    name will be put on the notebook.  The notebooks will

6    be collected when the jurors are released each day and

7    each put into an individual envelope, also marked with

8    the juror's name.  The clerk will be directed to secure

9    those envelopes every night to be redistributed every

10   morning.

11        I will not instruct the jurors as to what they may

12   write down.  They may write down anything in those

13   notebooks that they feel helps them focus on the

14   evidence in this case, understand the evidence in this

15   case, evaluate the evidence in this case.  And they may

16   each individually share those notes with each other

17   during deliberations only as they see fit.  It would be

18   impossible to direct the jurors as to what they may and

19   may not specifically write down.  This is not a

20   dictation of all the testimony.  That's impossible.

21   But individuals have different mental processes that

22   assist them in focusing.  They will be allowed to take

23   notes and use those notes as I have indicated.  So I

24   will ask the clerk to make those envelopes available

25   for sealing.

```
1          THE CLERK:  Yes, ma'am.
2          THE COURT:  They'll need to be separate envelopes
3     everyday because I want you to seal them, reopen them,
4     and then put them in a new envelope every night.  And I
5     will ask that the state provide the notebooks for the
6     jurors and of course no pages will be taken out, but it
7     will be one notebook per person.  Any question about
8     that?
9          MS. SINGER:  That's fine, but I was thinking -- Do
10    you have -- Do you want an independent party to go and
11    buy those notebooks so there's no suggestion that
12    there's anything in those notebooks that could be
13    placed there by anyone?
14         THE COURT:  No.  It's the state's request that the
15    jurors be provided notebooks, so I'm asking the state
16    to provide them.
17         MS. SINGER:  Right.  And I'll allow Mr. Groland to
18    examine each notebook.
19         THE COURT:  Absolutely.
20         MR. GROLAND:  Your Honor, while we're talking
21    about jurors, I have not selected a jury of 12 people
22    in front of your Honor.  Could you just tell us
23    briefly --
24         THE COURT:  No.  When we finish these motions,
25    then we will address the jury selection.
```

1          MR. GROLAND:  Okay.  Fine.

2          THE COURT:  Yes, sir.

3          MR. PENNYPACKER:  As to the notebooks, your Honor,

4     should we purchase 14, 12 jurors, two alternates?

5          THE COURT:  Might as well go for 15 in case we

6     select a third alternate.

7          MS. SINGER:  The next motions that we have, your

8     Honor, are -- may be contested.  So if we could just

9     turn to Mr. Groland and see how many of his motions we

10     can take care of that are not contested, then we'll

11     move on from there.

12          MR. GROLAND:  Well, Jeanne, don't you have another

13     one about the motions to permit testimony concerning

14     location interactions?

15          MS. SINGER:  Yes, we do.  Is that going to be

16     contested?

17          MR. GROLAND:  No, it's not contested, but I think

18     I spoke with Steve about this.

19          THE COURT:  If you all don't have an agreement as

20     to which order and you want to discuss which order,

21     which of course I'm not going to waste time doing that,

22     I'm gonna start calling them for hearing.

23          MS. SINGER:  All right.

24          THE COURT:  So either somebody go forward with a

25     motion --

1          MR. GROLAND:  We're in agreement as long as we can

2     just mention the in court traffic matters.

3          MS. SINGER:  Yeah.  We have -- This is the Cathy

4     Long request.  Read the title of the motion for the

5     record, please.

6          MR. PENNYPACKER:  Motion in limine to permit

7     testimony concerning location of interaction with

8     defendant under Deputy Cathy Long, as a bailiff, in the

9     spring of 2000.  She had some interactions with

10    Mr. Herlihy.  She has some very relevant testimony.  We

11    don't want to prejudice the defendant by having the

12    jury conclude that he was in court for any other

13    proceeding, but she needs to be able to say how she ran

14    into him, how she had the interaction.

15         MR. GROLAND:  And I believe I spoke to

16    Mr. Pennypacker about this.  If we could just indicate

17    and figure out how we can do that.  He was in court

18    for -- he was in the courthouse for a traffic matter.

19    So they don't think or start assuming that perhaps he

20    was here for another felony, I'm fine with that.

21         MR. PENNYPACKER:  Deputy Long did not know why he

22    was here and didn't determine that.  So she can't say

23    it.

24         MR. GROLAND:  But we know.  So we can figure out a

25    way to just get that to the jury.

1        MR. PENNYPACKER:  As long as I know what that way

2    is, I don't have a problem.

3        THE COURT:  Now that was a complete waste of time.

4    The motion is not clear, the response is not clear, I

5    can't make a ruling.  So if we can go forward and when

6    you all either have a stipulation, put it on the

7    record, or when you have an argument, put it on the

8    record.  Go forward with the next one.

9        MS. SINGER:  The next two, I believe, that we

10   have, which would be the Court's rulings on the

11   photographs, which will take some time, and the motion

12   to use demonstrative aid, I believe, are contested.  Do

13   you want to cover your uncontested motions now?  We

14   have that motion in limine you filed with eight

15   separate things.  We can agree to a lot of those if we

16   can find it.  I guess I have it in front of me.  I can

17   tell the Court what it is.  This is defendant's motion

18   in limine and I think we've agreed to several things.

19       THE COURT:  Let me see if I can find it.

20       MS. SINGER:  It was filed on the 3rd, your Honor.

21   That's what it looks like (indicating).  It's probably

22   in the court file.

23       THE COURT:  Yes.

24       MS. SINGER:  All right.  Thank you, ma'am.

25       THE COURT:  Go ahead.

1    MS. SINGER:  On the issue number one, Brian

2    Herlihy's identity is previously known to Gainesville

3    Police Department, the state does not have any

4    intention whatsoever to bring in any witnesses as to

5    Brian Herlihy's prior contact with the Gainesville

6    Police Department.  However, if Mr. Herlihy were to

7    take the stand and make some statement regarding his

8    prior history or his prior paramedic history or his

9    prior EMT history, and if in fact it was relevant and

10   not a collateral matter for rebuttal impeachment, the

11   state would ask for a proffer to allow the rebuttal

12   testimony and a pretrial ruling -- pardon me -- a

13   pre-jury ruling from the Court on it's admissibility

14   before we would offer it into evidence.

15   MR. GROLAND:  We agree with that.  We're not going

16   to use it in the case.

17   THE COURT:  Good enough.  The state, in it's case

18   in chief, will present no testimony as to number one in

19   the defense's motion and if Mr. Herlihy takes the stand

20   or the defense in any other way by cross-examination or

21   in their case in chief offers evidence that opens the

22   door to this issue, then outside the presence of the

23   jury the state will be allowed to proffer any rebuttal

24   testimony or any other testimony that may then become

25   relevant.

```
 1          MS. SINGER:  Two, Brian Herlihy's affinity for a
 2     collection of firefighter and/or paramedic or nursing
 3     memorabilia including clothing, decals or other items
 4     including his license tag should be excluded.  Your
 5     Honor, there are photographs we're going to talk about
 6     in a motion to ask for pretrial ruling as to
 7     admissibility of photographs.  There are photographs in
 8     this case that do have some firefighter memorabilia in
 9     them.  It's not the state's intention in any way to
10     make this a focus of the trial.  In fact, many of the
11     photographs that have the memorabilia are not going to
12     be used by the state in this case.  We're gonna let the
13     Court look at those pictures and I'm going to make a
14     record for the Court as to the specific items.  But
15     there are one or two photographs that have a cap or
16     have a hat in them and I would show those to the Court
17     later and we'll have a ruling on whether they can be
18     admitted.
19          My argument is on those photographs, it doesn't
20     say anything about his affinity for fire fighting and I
21     believe that the Court can rule individually.  It
22     doesn't have to make an overall ruling as to this
23     collection of memorabilia.  I think the Court can make
24     individual rulings as to the photographs when she sees
25     them and views them and decides whether they're
```

1     prejudicial or not.  That's the state's position.

2     Mr. Groland?

3          MR. GROLAND:  I think we also have an agreement on

4     this.  This is something Ms. Singer and I talked about

5     just the other day.  They've agreed not to do any of

6     this or have any testimony elicited about any of this

7     during their case in chief.  Ms. Singer showed me a

8     couple of photographs of the inside of a closet.  I

9     didn't think the closet was particularly relevant.  We

10    can address that issue, I guess, when we come to it.

11    In the closet there are some fireman hats or something.

12         MS. SINGER:  There's a cap like a golf cap that

13    has E-1 on it, which I understand is a fire engine

14    manufacturer.  Does that say anything about whether

15    he's with the fire department?  I think not.  But we'll

16    show the court the photograph and the court can make a

17    ruling when the court looks at all the photographs

18    because I want you to look at all the photographs.

19         THE COURT:  Okay.  Here's the ruling as to number

20    two:  The state will not elicit any testimony regarding

21    Mr. Herlihy's collection of memorabilia or any items

22    referencing EMT, law enforcement, fire department, or

23    anything of that nature.  Photographs that might be

24    relevant to establish some other issue will be ruled on

25    separately.  If in cross-examination or in direct

```
 1          testimony the defense opens the door, then of course
 2          the state will be allowed to inquire of the Court as to
 3          the extent to which they may pursue further inquiry in
 4          that area.
 5               MS. SINGER:  Thank you, your Honor.
 6               MR. GROLAND:  Okay.
 7               MS. SINGER:  The Gainesville Police Department's
 8          demonstration of a demonstration should not be
 9          permitted.  It's probably contested, so we're gonna
10          move from that for now.
11               THE COURT:  I'm sorry?
12               MS. SINGER:  The number three that's in that
13          motion, number three paragraph --
14               THE COURT:  Yes.
15               MS. SINGER:  -- is contested.  So we can -- You
16          want to hear the noncontested first?
17               THE COURT:  No.  I want to go through them one by
18          one.  So let's address number three.
19               MS. SINGER:  Okay.
20               MR. GROLAND:  May I just remind Ms. Singer of a
21          conversation?
22               MS. SINGER:  Yes.
23               (Off the record discussion held between counsel.)
24               MR. GROLAND:  I think we're in agreement on that.
25          You want to state what it is or should I?
```

```
 1          MS. SINGER:  Go ahead.

 2          MR. GROLAND:  The agreement that we have is in

 3     fact the Gainesville Police Department is not going to

 4     try to recreate a demonstration of a demonstration

 5     which they tried to do with a video camera that

 6     malfunctioned.  And they will not utilize a doll and a

 7     police officer in the bed to try and recreate what

 8     Mr. Herlihy attempted to show to them when the video

 9     broke.  We have agreed to likewise not attempt a

10     demonstration during Mr. Herlihy's direct examination

11     if he chooses to testify along the same lines.

12          MS. SINGER:  It's understood, though, however,

13     your Honor, that there is testimony regarding the

14     demonstration.  There is testimony regarding the

15     demonstration.  Folks viewed it and we are not waiving

16     our right to offer the testimony regarding the

17     demonstration.  Is that understood and agreed to?

18          MR. GROLAND:  Yeah.  Of course we can offer

19     testimony regarding a description of a demonstration.

20          MS. SINGER:  Correct.

21          MR. GROLAND:  Okay.  Understood.

22          THE COURT:  There will be by the state or defense

23     no recreation by demonstration of a previous

24     demonstration.  And of course both the state and the

25     defense can offer testimony about any demonstration
```

1    that was earlier done and what was observed in that

2    demonstration.

3         MS. SINGER:  There were also photographs taken of

4    the residence and those photographs can be used in the

5    testimony, I believe, right?

6         MR. GROLAND:  Sure.  Yes.

7         THE COURT:  Of course I have no idea what

8    photographs you just stipulated to.

9         MS. SINGER:  We're okay.

10        MR. GROLAND:  We're gonna look at them

11   individually.

12        MS. SINGER:  Yeah.  We're okay.

13        Defendant's statements to various individuals that

14   he was employed in various endeavors, which

15   representations were false, should be excluded.  That,

16   I think, is the same ruling that you have to make on --

17   right, it's the same ruling you made on one and two,

18   your Honor.  It's not relevant, I agree, but it may

19   become relevant and we want to be able to offer

20   rebuttal if it's not a collateral matter.

21        THE COURT:  Good enough.  Then by stipulation the

22   state will not produce in it's case -- present in it's

23   case in chief any testimony regarding representations

24   made by the defendant as to his previous endeavors or

25   education and --

1        MR. GROLAND:  Employment.

2        THE COURT:  -- and employment.  And if in

3   cross-examination or in it's case in chief the defense

4   opens that door, the state may then inquire of the

5   Court as to how far they may pursue that testimony.

6        MR. GROLAND:  With a proffer.

7        MS. SINGER:  Your Honor, there's only one area

8   where I believe that we do not take that position, and

9   that is, if the Court could just skip over to page

10   four, Roman numeral VII on the motion where the

11   statement is made on the 911 tape --

12        MR. GROLAND:  Why don't we do that when we get to

13   it.

14        MS. SINGER:  No.  I want to do it because it's

15   relevant here.  The defendant allegedly said on the 911

16   tape that he was in the medical field and that false

17   statement should be redacted and stricken.  The state

18   is in opposition to that.  First of all, it is not a

19   falsehood.  He was in fact --

20        MR. GROLAND:  We're gonna withdraw that.  Simple

21   as that.

22        MS. SINGER:  Okay.

23        MR. GROLAND:  We're gonna withdraw this motion in

24   limine as to item number -- Roman numeral VII where he

25   said on the tape he was in the medical field.

1          THE COURT:  Good enough.  Withdrawn.

2          MR. GROLAND:  Okay.  Let's go back to where we

3     were, Jeanne.

4          MS. SINGER:  Yes.  We were at -- I guess we're at

5     five, the eight Polaroid photographs of the inside of

6     the defendant's apartment taken by members of

7     Gainesville Police Department do not accurately depict

8     the apartment as it was at the time of the incident and

9     should therefore be excluded.  Your Honor, give me a

10    moment, I'll get you the eight photographs.

11         MR. GROLAND:  Wait, wait.  Let's do that when we

12    get to them.  I'm gonna not do that by way of a motion

13    in limine.  I think it's probably not appropriate.

14    When we get to you introducing the photographs, we'll

15    voir dire on that and do it that way.

16         MS. SINGER:  Well, we're gonna voir dire on it

17    today because we'll be going over quite a bit today.

18    So you want to pass that paragraph of the motion?

19         MR. GROLAND:  Yes.

20         THE COURT:  Motion is withdrawn as to that

21    paragraph.

22         MR. GROLAND:  We're not withdrawing our objection

23    to the photographs coming in, but doing it in this

24    matter.

25         MS. SINGER:  Defendant, while being questioned by

```
 1        the officers from the Gainesville Police Department
 2        made many statements which were neither admissions, nor
 3        confessions and are otherwise irrelevant hearsay
 4        without exception and therefore should be stricken or
 5        redacted.  Mr. Groland and I spoke about this today.
 6        Mr. Groland, you want to put on the record what I told
 7        you and see if that's sufficient for the Court?  I told
 8        you that I know the rules of evidence.
 9             MR. GROLAND:  We actually had a handshake on it.
10             MS. SINGER:  Yes, sir.  Your Honor, I'm gonna put
11        this on the record.  I know the rules of evidence.  I
12        know what I believe would be appropriate statements
13        against interest that I would intend to introduce.  If
14        there's a time that I believe that there's a question
15        in my mind, I believe it's misspoken or perhaps there's
16        a different view, I will ask for a proffer.
17             I don't believe under this motion in limine this
18        Court can even make a ruling today without hearing the
19        testimony and I think that there are some things you
20        can't rule on ahead of time.  Mr. Groland wanted to go
21        line by line of police reports.  There is no way that a
22        witness testifies exactly to what is stated in a police
23        report.  It's not fair to the state to make a ruling
24        pretrial.
25             I've done this a long time.  I will be very
```

1    cautious in eliciting statements from Ms. Legall.  The

2    Court saw a lot of testimony yesterday and I think the

3    Court knows I know the rules.  I will do my best to

4    follow them and I will proffer what I believe is

5    questionable at the time that it's going to be moved

6    into evidence.

7        We don't have a ruling yet, actually, on the

8    admissibility of the statements, but assuming that the

9    statements are admissible -- we have stipulated to the

10   post Miranda statements being admissible; is that

11   correct, Mr. Groland?

12       MR. GROLAND:  Well, I didn't file a motion to

13   suppress those statements.

14       MS. SINGER:  Right.

15       MR. GROLAND:  I'm not waiving any right to object

16   when we get there.

17       MS. SINGER:  Right.  So we'll have to do a proffer

18   anyway because he's basically saying he's not waiving.

19       MR. GROLAND:  I'm not doing it at this moment.

20       THE COURT:  All right.  Mr. Groland?

21       MR. GROLAND:  Your Honor, I've known Ms. Singer a

22   long time, 25 years.  I trust her word on what she says

23   and if it turns out that I'm wrong in doing that, then

24   at the appropriate time I'll make an objection and we

25   may have to have a different kind of hearing.  But

1    instead of going through all the testimony, looking at

2    all the police reports today and making a pretrial

3    ruling, which I agree would be very cumbersome, I'll

4    defer to Ms. Singer's promise to me and my client that

5    she's gonna do the right thing here.

6         THE COURT:  By following the law.

7         MR. GROLAND:  Yes.

8         THE COURT:  And of course the law would not

9    require and may not allow me to go line by line through

10   all the potential testimony.  So the motion in limine

11   as to paragraph number six is denied, subject, of

12   course, to the defendant's right to object, and

13   subject, of course, to any request by either the state

14   or the defense to proffer testimony prior to the jury

15   being able to hear it.

16        Now that's not to say that I'm gonna sit and

17   listen to the entire trial testimony outside the

18   presence of the jury and then rule what they get to

19   hear.  The remedies for improperly admitted evidence

20   are objection and motion for mistrial if it is such

21   that it makes it impossible for the defendant to have a

22   fair trial.  It is not the law that the judge is gonna

23   rule on every bit of testimony prior to trial.

24        MR. GROLAND:  Yes, ma'am.

25        THE COURT:  Okay.

```
 1          MS. SINGER:  Number seven the Court's ruled on.
 2   We agreed to that.
 3          Number eight, state agrees, clergy privilege.  We
 4   don't intend to call any clergyman regarding whatever
 5   Mr. Herlihy told his clergyman.
 6          MR. GROLAND:  Could you just wait one second on
 7   the next one?
 8          MS. SINGER:  All right.
 9          MR. GROLAND:  Mr. Tedder will respond to the last
10   one.
11          MS. SINGER:  I'll let Mr. Pennypacker respond for
12   this one.  I can read it on the record, Mr.
13   Pennypacker, Cathy Long.  It's Cathy Long.
14          MR. TEDDER:  Your Honor, as you can see in
15   paragraph nine, we filed a motion to ask the Court to
16   not allow Deputy Cathy Long to testify to statements
17   that she says Mr. Herlihy made to her while he was
18   attending traffic court.  Her testimony, I believe, was
19   that she saw him in May, in June, and July, I believe
20   on three different occasions and he had a baby with him
21   on three different occasions, and that he said at
22   various times, talked to her about being frustrated
23   with the child and -- but otherwise was happy with the
24   child.  The child appeared to be happy and was not
25   crying or upset or anything like that.  He made a
```

1    comment to her, she claims, and says that he testified

2    something to the affect that sometimes he felt like

3    shaking the baby.

4        She told us during deposition she did not take

5    that seriously, she did not in any way think he was

6    serious, she didn't report it to anyone, she didn't

7    bring it to anyone's attention, she didn't tell her

8    husband, who is also in law enforcement.

9        In fact, at one point in time Mr. Herlihy

10   allegedly gave her a photograph of the baby in question

11   in this case which she had, and on the back had written

12   something about, Thanks for taking care of Uncle Brian,

13   or something to that affect.  I don't know exactly what

14   the verbiage was on the back of the photograph.

15       She then recalled all of this when this horrible

16   accident happened and Robbie Quirello died, and then

17   she went to law enforcement and brought this to their

18   attention.

19       From taking the deposition of the mother, Crystal

20   Quirello, she indicated that she did not even meet

21   Brian Herlihy until, I believe, six to eight weeks

22   before the accident happened and that he did not have

23   the baby in May.  I don't recall exactly when she said

24   he had the baby.  She left the baby with Brian on five

25   or six or three or four occasions.  I'm not even sure

1          the number of times that she left the baby with him.

2              So there's some discrepancy over whether or not

3          the dates Cathy Long is relying on are actually the

4          dates she saw him with the baby.  Apparently she did

5          because she has a photograph of the baby.

6              It's our position, your Honor, that obviously it's

7          incredibly prejudicial if the court allows this to come

8          in since the whole theory of the state's case is that

9          he shook this baby to death, then be allowed to bring

10         in testimony that he supposedly said at some previous

11         time that sometimes he felt like shaking the baby.  It

12         would be extremely prejudicial.

13             Our argument is that it's too remote in time, she

14         didn't take it seriously, and our whole case is that he

15         obviously did not shake this baby, that the whole

16         theory of the state as far as shaken baby syndrome is,

17         for lack of a better term, voodoo medicine.  I mean it

18         is not based on scientific fact and for them to be

19         allowed to introduce evidence that he supposedly said

20         something in an offhand manner about feeling like

21         shaking the baby when there was absolutely nothing, the

22         baby wasn't doing anything wrong, the baby was behaving

23         well and Brian was otherwise appearing to be very

24         caretaking of the baby, not doing anything

25         inappropriate, is absolutely prejudicial and, your

1    Honor, we don't think it goes to the issue in question

2    in this case whether or not Mr. Herlihy committed a

3    crime of trying to hurt this baby by shaking the baby

4    violently.  To allow it in, your Honor, I think it's

5    just -- it shouldn't be allowed, your Honor.

6        MR. PENNYPACKER:  I'll read Deputy Long's

7    testimony in her deposition to you, please.  It's on

8    pages 19 and 20, the relevant testimony begins on line

9    15, a question by Mr. Tedder, "The second time you met

10   with this gentleman, do you remember him saying -- what

11   do you remember him saying?  You say he approached you

12   and asked you if you remembered him.  Tell us about the

13   conversation that ensued."  Answer, "He came up to me

14   and said, Do you remember me?  And at first I didn't

15   remember him and I told him, No.  Where did I know him

16   from?  He said, Remember I'm the one that had the

17   toothache and I was downstairs and you helped me?  And

18   I said, Oh, I remember who you are."  Question, "Was

19   there anything else said between the two of you at that

20   time?"  Answer, "He had a baby with him in a baby

21   carrier.  I remember the baby was awake and kicking and

22   he had complained that the baby was very colicky and

23   cried a lot.  After he said that, he had mentioned that

24   it was his sister's baby and that she was in a car

25   accident, that he couldn't take care of the baby and

1     that he had said that sometimes the baby starts crying

2     and crying and crying and he can't get the baby to stop

3     and he said, Sometimes I just feel like picking the

4     baby up and shaking him.  And at that time somebody

5     came up to me and interrupted me from talking to him.

6     I don't remember specifically what it was, but asking

7     for directions to a courtroom or something.  And I went

8     back to him and because, you know, what he was saying

9     was kind of serious.  I said, you know, I told him I

10    have a child and there were times when my child was

11    small and being babies, they won't stop crying.  You

12    don't know what to do with them.  I said, When that

13    happens, just step back.  Don't pick them up.  Take a

14    few minutes out.  I asked him, Do you have anybody that

15    can help, to come and help you with him?  And he said

16    that his parents were supposed to be flying in, but I

17    don't remember, specifically remember where he said

18    they were coming from and they were supposed to come

19    and help him with the baby."

20         Clearly it's relevant testimony.  She took it

21    seriously because she stopped her duties and went back

22    and talked to him.

23         As far as the remoteness in time --

24         THE COURT:  It's relevant to what issue?

25         MR. PENNYPACKER:  To intent, his knowledge of what

1    would happen if he shook this baby.

2         THE COURT:  How does it show his knowledge of what

3    would happen?

4         MR. PENNYPACKER:  Because she said, You can't do

5    that.  He knew that shaking a baby was wrong.  She told

6    him.

7         THE COURT:  Where did she tell him?  I missed it.

8         MR. PENNYPACKER:  "I said, you know -- I went back

9    to him because, you know, what he said was kind of

10   serious.  I said, you know -- I told him I had a child.

11   There were times when my child was small and being

12   babies they won't stop crying.  You don't know what to

13   do with them.  I said, When that happens, I just step

14   back.  Don't pick them up.  Take a few minutes out."

15   She tells him, Don't shake him.  You can't do that.

16        THE COURT:  A, she didn't say, Don't shake him; B,

17   she didn't tell him what the result or consequences

18   would be; C, there's nothing in his statement that

19   would indicate that he had any knowledge about the

20   consequences.  So, bottom line is, you're building

21   assumptions on top of assumptions to the extent that

22   I'm not seeing any way that it could be relevant.  So

23   if I'm missing something or if you find case law that

24   would say that those assumptions would be lawful and

25   relevant, I'll be glad to revisit this issue.  But it

1    doesn't say what you're arguing it says.

2       MR. PENNYPACKER:  All right.  As far as the

3    remoteness in time, your Honor, she said that she went

4    back after she realized the significance of the

5    statements and looked at the dates of when she worked

6    and the dates that he would have appeared in court.

7    She believed it to be May 15th, June 5th, and a date in

8    July.  June 5th would have been the second time that

9    she saw him that she said that is within the time frame

10   that Ms. Quirello says that she was acquainted with

11   Mr. Herlihy.  So it does fit within that time frame.

12   But as far as the relevance --

13      THE COURT:  There's another complication I need to

14   get clear on.  There appears to be a conflict in the

15   argument or presentation in regard to what baby this

16   was he was even with on those dates.  There's a

17   reference to his sister's baby and then there's a

18   reference to the decedent in this case as being a

19   separate baby; is that correct?

20      MR. PENNYPACKER:  Your Honor, Mr. Herlihy

21   apparently was telling not just Deputy Long, but other

22   people that this was his sister's baby when in fact it

23   wasn't his sister's baby.  That was his story as to why

24   he had this child with him.  But there's no

25   disagreement, I believe, that this was Robbie Quirello.

```
 1              THE COURT:  All right.
 2              MR. TEDDER:  Your Honor, that goes to what you
 3         already have ruled on with the other statements
 4         Mr. Herlihy has made that were false.  If in fact he
 5         told Deputy Long this baby was his sister's baby, that
 6         was obviously false.  But, you know, Mr. Herlihy has
 7         said a number of things according to the different
 8         depositions that have been done, the police reports
 9         that have been done.  He has made a number of
10         statements to different people regarding different
11         matters that simply weren't true regarding his
12         employment, regarding whose baby this was, things like
13         that, you know.
14              I think the state has pretty much agreed they
15         weren't gonna get into that.  So if Deputy Long is
16         allowed to testify to that particular fact about the
17         baby being his sister's, that's contrary to an earlier
18         ruling I think the Court's already made.
19              THE COURT:  No.  That's incorrect in regard to the
20         earlier ruling.  The earlier ruling was not that the
21         state could not introduce false statements made by the
22         defendant.  The earlier ruling was specific that
23         earlier false statements in regard to his education,
24         employment, and professional endeavors that may have
25         been false would not be introduced in their case in
```

1    chief.  I have made no ruling in regard to the broad

2    horizon of possible false statements.

3         MR. TETTER:  My mistake, your Honor.  But

4    nonetheless, we still would argue this particular piece

5    of evidence doesn't go to the issue the jury has to

6    decide.  As you have already commented, you know, it's

7    building on assumptions.

8         THE COURT:  Okay.  Bottom line is, I have ruled

9    and I'll be glad to review it, as I said.  But the

10   assumptions that the state is making are not based upon

11   the evidence that you're proffering.

12        MS. SINGER:  But the Court is open to --

13        THE COURT:  Review.

14        MS. SINGER:  -- us providing, if we can prove or

15   could provide the Court with case law on the fact that

16   it goes to his state of mind?  This is prior to the

17   injury of the child, that it would go to his state of

18   mind prior to the subsequent injury to the child.

19   That's what we would use it for, to prove state of mind

20   before.  The Court is ruling that we're allowed --

21        THE COURT:  State of mind is a different argument

22   from he knew the consequences.

23        MS. SINGER:  Right.

24        THE COURT:  So if you want to make a separate

25   argument in regard to state of mind and if you're

1    prepared to do that now, I'll be glad to hear that now.

2         MS. SINGER:  Yes.  We believe it's relevant to

3    show his state of mind because subsequently the child

4    is critically, actually fatally injured as a result of

5    shaking, and earlier he says, Sometimes I'm so

6    frustrated that I just want to shake the baby, and then

7    subsequently while the baby is in his sole care and

8    custody, the baby suffers a fatal injury as a result of

9    shaking.  That is relevant to show that he in fact

10   thought about it beforehand, followed through on it on

11   August 2nd, the year 2000.  That's where the relevancy

12   attaches.

13        THE COURT:  Okay.  No, I'm not making that finding

14   that this statement could be used to show intent.

15   You've got to find some case law.

16        MS. SINGER:  All right.  If we're allowed to

17   provide that to the Court, we will do that.

18        THE COURT:  All right.  It may be evidence that

19   may be admissible to show state of mind that he was

20   frustrated, not anything beyond that so far as what I'm

21   hearing at this point and so far as I know the law at

22   this point.  So if there's something that you can take

23   it to beyond that, I'll be glad to hear it, but I'm not

24   going to take a chance of admitting evidence for one

25   reason, which may well be very limited, and then having

1    you argue way beyond that by way of intent and by way

2    of he knew the consequences because these statements,

3    if admitted, do not show that.

4         MR. GROLAND:  Your Honor, and just lastly I would

5    tell the Court that we will hear from the grandparents,

6    the mother and father of the child that this child

7    never cried, this child never cried, never fussed at

8    anytime.  I just think that if we do have a hearing on

9    the admissibility of this at a later date and the state

10   decides to revisit it, we'll hear testimony along those

11   lines, too, as well.

12        THE COURT:  Then let me point out to you, while

13   you're doing your research, that I can't see how that

14   would be relevant.  Whether the baby was colicky or not

15   doesn't really have anything to do with whether he was

16   frustrated or not.  So his state of mind being

17   frustrated does not depend upon evidence that the baby

18   did or did not do something to create frustration.

19        MR. PENNYPACKER:  Your Honor, the baby's health is

20   significant when it comes to medical evaluations and

21   their theory of the case, being that chronic subdural

22   hematoma, if it had been bleeding all along, would have

23   shown up in the child in the way he behaved.  So it

24   does -- that evidence of the child not being colicky,

25   not crying, is relevant to that issue.

1      THE COURT:  I'm sorry.  I didn't follow that.

2  Argue that again.

3      MR. PENNYPACKER:  They say that with the chronic

4  subdural hematoma that had to have existed for some

5  period of time, their doctors will say that if it had

6  been bleeding, you would have seen evidence of it in

7  the form of lethargy, fussiness, or something like that

8  in the child.  The testimony that he didn't appear that

9  way rebuts their theory of the case.

10     THE COURT:  It may be relevant to that issue.  I'm

11 not ruling on that at this time.

12     All right.  We are to paragraph number --

13     MR. GROLAND:  That motion in limine for the record

14 is granted?

15     THE COURT:  Which paragraph are you looking at

16 now?

17     MR. GROLAND:  The last one we were just talking

18 about now.

19     THE COURT:  Let me get to it.  Which paragraph is

20 it?

21     MS. SINGER:  That's Cathy Long.

22     THE COURT:  Cathy Long, that's number nine in the

23 motion.  The motion in limine is granted as to

24 paragraph number nine, subject to review if the state

25 presents case law that says that this evidence may be

1    admissible to show the defendant's state of mind.  Of

2    course if they have some real strong case law as to

3    those other issues that I have indicated they cannot go

4    into, I'll be glad to review that case law.

5       But it appears to me that there may be a legal

6    issue as to whether or not that evidence is admissible

7    for purposes of showing the defendant's state of mind

8    and I see no other possibility at this time.  So it's

9    subject to review as to that specifically.  That takes

10   care of the motion in limine.

11      MS. SINGER:  State has the photographs, your

12   Honor.  Does the Court wish to start going through

13   that?  One of the paragraphs in Mr. Groland's motion in

14   limine were the Polaroids, which we do intend to use.

15      MR. GROLAND:  Mr. Singer?

16      MS. SINGER:  Yes.

17      MR. GROLAND:  Can I just ask that before we get

18   into the many individual photographs, we take a look at

19   the compact disk first and my one motion directed to

20   it?

21      THE COURT:  Yes.  We're gonna look at the compact

22   disk first.

23      MS. SINGER:  Your Honor, does the Court mind

24   stepping down and watching it on this laptop right

25   here?

```
 1          THE COURT:  No.  I'll be happy to do that.  About
 2    how long is it?
 3          MS. SINGER:  It's very short.
 4          MR. PENNYPACKER:  About two minutes.
 5          MS. SINGER:  It's about two minutes at the most.
 6          THE COURT:  Okay.  And right after I view that,
 7    then we're going to take a recess, Madam Court
 8    Reporter.  I've advised the Court Reporter that she
 9    does not have to report any offhand comments that might
10    be made by any of us at this point and that once I view
11    the video and come back on the bench, that then we'll
12    go back on the record.
13          (The compact disk was published to the Court.)
14          THE COURT:  Mr. Groland, do you have any
15    objection?
16          MR. GROLAND:  Yes.  Mr. Tedder is going to address
17    that.
18          THE COURT:  If it's going to be a lengthy
19    argument, then I'll take a recess first.
20          MR. TEDDER:  Your Honor, I'm never very long.
21          THE COURT:  Okay.  Go for it.
22          MR. TEDDER:  First we would argue that it's a
23    discovery violation because we just became aware of it
24    in the last week.  Be that as it may, the state intends
25    to use it solely as a demonstrative aid.
```

1       Your Honor, our position would be that the thing

2    you just witnessed is not based on any scientific

3    evidence or fact.  There's no scientific studies that

4    can show exactly what a brain does when it's being

5    shaken, assuming it's being shaken violently like the

6    state contends in this case.  The only studies that

7    have been done, scientific studies on the brain and

8    what happens to a brain through trauma, shows that

9    shaking -- the force necessary to cause injury by

10    shaking cannot be achieved and that the only -- you

11    need force as well as blunt trauma, like being slammed

12    up against a desk, a floor, a wall or something like

13    that.  You have to have an impact injury to cause the

14    kind of brain injury that they're claiming happened

15    here.

16       The diagram or the demonstration there does not

17    show any potential injury to the neck.  It just focuses

18    solely on the bridging veins, which the bridging veins

19    are in the dura, which the dura has been destroyed.  So

20    they're going to be showing damage in a computer or

21    rather a cartoon generated film that is showing things

22    and creating evidence that doesn't exist.

23       The state has managed -- their own expert has

24    managed to throw away the dura or allow it to be buried

25    with the baby.  That is where those bridging veins are,

1    which is their whole case here that they want to show

2    through that video is the subdural bleeding that caused

3    brain injury.  Their pathologist testified yesterday

4    that basically the brain was swollen, had edema from

5    the injury, the trauma, whatever it suffered, the

6    bleeding.  The doctor said subarachnoid bleeding

7    yesterday.

8         But we just -- Our position is basically that

9    video is not based on scientific evidence or fact.  So

10   therefore it shouldn't be allowed because it becomes,

11   even though they're gonna try to testify to what it

12   shows, it becomes evidence in and of itself.

13        THE COURT:  Okay.

14        MR. GROLAND:  May I just add a paragraph or two,

15   your Honor?  This case is two years old.  We've done a

16   lot of discovery, both sides.  If we had this during

17   the course of the case a year ago, we could have used

18   this compact disk as we were deposing their various

19   state witnesses.  We're now unable to do that.  We've

20   taken all the depositions.  As we're on the eve of

21   trial, to attempt to use this at this point I think

22   greatly prejudices us because we have not had the

23   opportunity to ask questions at deposition of their

24   experts with this available.

25        THE COURT:  All right.  Now, this aid is addressed

1    by both the state motion and defense motion; is that

2    correct?

3            MR. TEDDER:  Yes, ma'am.

4            MS. SINGER:  That's correct.

5            THE COURT:  Okay.  The state's motion to utilize

6    this aid is granted.  The defense's motion to strike

7    the use of this aid is denied.  The defense will be

8    allowed to utilize this same aid in cross-examination

9    of any witness or in direct examination of their own

10   witness, and I will direct that the state make this

11   software or whatever it is available for such use.  Of

12   course, any testimony in regard to that demonstrative

13   aid is subject to cross-examination and objection in

14   regard to any scientific validity or absence thereof.

15           Now we'll take a 15 minutes recess.

16           MR. TEDDER:  Your Honor, just for the record we

17   object to denial of our motion and to the granting of

18   the state's motion.

19           THE COURT:  Good enough.

20           (Brief recess.)

21           THE COURT:  The motion in regard to photographs is

22   the only motion remaining; is that correct?

23           MS. SINGER:  I believe so, your Honor.

24           MR. GROLAND:  Yes.

25           THE COURT:  Okay.

```
1          MS. SINGER:  There are some that we have agreed
2     and stipulated to, so that's going to save us some time
3     right now.  The first photographs I would like to show
4     the Court and have a ruling on would be the autopsy
5     photographs, which we would be asking for, we're going
6     to ask to be admitted.  They're not all of the autopsy
7     photographs, but I would like to show the Court what I
8     have chosen.  I believe you haven't chosen anything?
9          MR. GROLAND:  Right.
10         MS. SINGER:  So if I could approach the Court and
11    I can explain?
12         THE COURT:  Yes.
13         MS. SINGER:  The first three photographs, your
14    Honor, are a front view, a rear view, and a top of the
15    head view of the child at autopsy and they have been
16    shown to Mr. Groland.
17         MR. TEDDER:  She described them, so I know which
18    photographs she's talking about.
19         MR. GROLAND:  We object to those.
20         MS. SINGER:  Your Honor, they're relevant to show
21    the absence of injuries and also for the medical
22    examiner to further explain what he saw upon his
23    examination of the body at autopsy.
24         THE COURT:  Your objection is what?
25         MR. TEDDER:  Your Honor, the state filed two
```

1    motions regarding those photographs.  The first one

2    indicates they think those photographs showed no

3    external injuries to the child at the time of his

4    death.  There are numerous witnesses who are gonna

5    testify that they thoroughly examined the child when he

6    came into the hospital and there was absolutely no

7    evidence whatsoever of any external injury to this

8    child at all, with the exception of two holes in his

9    shins that were the result of them, EMT's, in putting a

10   needle through into the bone marrow in his shin on

11   either leg in order to be able to give him IV's and

12   that was evident.

13        The only other evidence that is of any external

14   injuries on those photographs is after all of the

15   equipment that was used to try and save his life was

16   removed.  In other words, there is evidence of some

17   minor trauma from the medical treatment itself.  So the

18   photographs don't -- are not necessary to show that

19   there was no evidence of injury.  We're certainly not

20   going to get up there and argue to the jury, Hey, when

21   this baby came in the hospital he had all kinds of

22   bruises and --

23        THE COURT:  What's your legal basis for objection?

24        MR. TETTER:  Well, the legal basis, your Honor, is

25   that in our opinion -- Obviously your Honor has seen

1    numerous, I'm sure much much worse photographs of

2    victims.  Our position is that the only reason the

3    state is offering those photographs is to inflame the

4    jury, to sicken them with the sight of a small child

5    that's dead.  That's the only basis, especially if you

6    look at the rear photograph where the blood settles

7    after somebody dies, I mean it looks horrible.

8         Unless a person is experienced and used to seeing

9    that kind of thing, I mean it sickens me and I've been

10   doing this for 18 years.  But I haven't handled many

11   murder cases and I certainly never handled a murder

12   case where someone's accused of killing a baby.

13   Everybody loves babies, well, most people anyway.  Our

14   position is that those photographs are merely going to

15   elicit sympathy and direct ill will towards our client.

16        And the other argument they presented on the

17   second motion, I don't know which was filed first, says

18   those photographs go to show physiological indications

19   of intentional death.  Well, they aren't saying

20   intentional death here.  I thought they were going on a

21   felony murder theory.  You know, they filed an

22   indictment accusing premeditated murder, but I

23   certainly don't think they're going to argue that

24   Mr. Herlihy committed premeditated murder in this case.

25        They also say in paragraph six of the other motion

1    the photographs are relevant, not graphic, that the

2    probative value outweighs any prejudice, don't confuse

3    the issues, but clarify the issues in this cause.

4    They're talking about how these photographs -- In one

5    of these motions, the doctors are gonna use them to

6    show the injuries.  Oh, yeah, on the second page of

7    paragraph eight of the first motion says, They're

8    illustrative of the testimony of the expert witnesses,

9    provide visual verification of showing muscular

10   development of the child was at issue or his inability

11   to roll.  I don't see how those photographs show that

12   whatsoever, your Honor.

13        And, number two, that they show the victim's head

14   was proportionate compared to his overall body size,

15   that's not the testimony of some of the witnesses.

16   Some of the witnesses testified this baby had a

17   slightly enlarged head as opposed to his body size.

18   And that the victim fits the criteria for shaken baby

19   syndrome, those photographs don't show that at all.

20        The shaken baby syndrome, if it's established at

21   all, is only going to be established through the

22   testimony of their experts who looked at CAT scans,

23   looked at the skull, looked at the brain, looked at the

24   eyes through a special instrument and said you couldn't

25   see any damage to the baby's eyes unless you used a

1     special instrument, and I can't recall what it's

2     called, to look into the iris of the eyes.  So those

3     photographs don't show anything related to the

4     diagnosis of shaken baby syndrome at all.  So that's

5     our basis.

6              THE COURT:  Good enough.  I understand the

7     objection.  The ruling is that pursuant to the current

8     state of the law these photographs are admissible and

9     they will be admitted in this trial.

10             MR. TEDDER:  I just object to it.

11             THE COURT:  Yes, sir.

12             MS. SINGER:  Your Honor, now I have --

13             MR. GROLAND:  Jeanne, excuse me.  May I just

14    clarify?  Those were the three photographs that we were

15    talking about?

16             MS. SINGER:  Yes, the three pictures of the baby.

17             MR. GROLAND:  Now these are the autopsy photos?

18             MS. SINGER:  Yes.  Oh, I missed my count.  Your

19    Honor, the remaining seven photographs that the state

20    at this time, depending upon the testimony that's

21    elicited in the case, would be offering, and like I

22    say, because I'm not sure exactly what the testimony

23    will be, but I understand that one of the attacks on

24    the state's case is the failure of the medical examiner

25    to properly document and preserve evidence.

1          The next seven photographs are photographs that

2     were relied upon by experts in this case in order to

3     render their opinions.  For the record, they're the

4     dissection of the skull and I do agree that they are

5     very, I'm not gonna say the word graphic, but they're

6     not pleasant to look at.  I don't intend, unless it's

7     necessary, to have witnesses look at these and offer

8     testimony, but I believe in order to rebut the

9     allegations that there hasn't been a proper

10    preservation and the argument that where is the dura,

11    we haven't been able to look at the dura, we have to be

12    ready to meet that argument because it's an argument

13    that's been made throughout the time that we've been

14    addressing the pathologists in this case.

15         So I'm going to show the Court these photographs

16    at this time.  I don't know if the Court wants to rule

17    at this time or defer ruling pending the testimony

18    regarding the photographs.

19         THE COURT:  What's the defense's argument in

20    regard to these?

21         MR. TEDDER:  Well, your Honor, again, those

22    photographs are, I would submit, very graphic showing

23    brain tissue.  That's not something people see very

24    often.  Their experts can testify to that.  I don't see

25    why they have to be introduced into evidence.  They can

1    mark them for identification purposes and let the

2    experts testify about it.  I don't think that those

3    photographs being submitted to a jury is going to

4    clarify any issues they have to decide because none of

5    those jurors are gonna be able to look at brain tissue

6    and say, Oh, yes, this clearly shows subdural hematoma,

7    subarachnoid hematoma, or lack of the dura or whatever

8    as the experts are going to be talking about.  They are

9    graphic.  I don't see why the jury needs to be shown

10   those kind of photographs.

11       If the Court is inclined to let them in, we ask

12   the Court to consider deferred ruling until you hear

13   the expert testimony and decide whether they absolutely

14   need to be introduced.  The experts are gonna testify

15   to what they believe happened to cause this baby to die

16   and as one of the prosecutor's said earlier today, it's

17   a war of the experts and I just don't see how those

18   photographs are going to assist the jury in any way

19   whatsoever.

20       THE COURT:  Good enough.  The objection is noted

21   for the record.  These photographs of the dissection of

22   the skull as part of the autopsy are legally admissible

23   and will be admitted in this trial subject to, of

24   course, any objection that is properly made other than

25   those that have already been noted.  Any other

Stacey K. Bryant, RPR
Judicial Court Reporter

0002833     0002566

1    photographs?

2         MS. SINGER:  Your Honor, one of the matters that

3    has come up in discovery in this case is that this

4    child had a chronic injury that had occurred early on,

5    maybe even at birth, and that the child was exhibiting

6    signs and symptoms early on.

7         There are photographs that I have -- I have a

8    number of photographs.  I don't intend to use all of

9    them, but I have a number of photographs of the child

10   in his development, which will be properly identified

11   by the person who took the photographs at the different

12   ages that the child was.  I would be asking that they

13   be admitted to show the healthy development of this

14   child during his three and a half months.

15        I don't know if there's an objection or what

16   objection there is.  Mr. Groland, Mr. Tedder have not

17   told me what their objection is to these photographs,

18   but I will be showing them to the Court at this time.

19        MR. GROLAND:  Your Honor, I don't recall any

20   testimony of any of the experts at anytime in this case

21   where they said that because of the chronic injury,

22   this child was showing signs and symptoms early on.

23   Quite to the contrary.  Experts have testified that the

24   fact that there were no signs exhibited by the baby

25   during the four months the baby was alive, is more

1    consistent with an injury or hematoma that occurred at

2    birth than something that happened traumatically during

3    the child's lifetime.  To show to the jury a portfolio

4    of the grandfather's pictures --

5         THE COURT:  Hold on.  I don't even have the

6    photographs yet.  So if you'll just wait until I have

7    them, then I'll be able to understand your argument

8    against them.

9         MR. GROLAND:  All right.  Can we show the Court,

10   Ms. Singer?

11        MS. SINGER:  I am.  I'm just pulling out because I

12   don't intend to use all of them.  And so I am trying to

13   pull out the ones -- I realize if I handed you this

14   whole portfolio, that it would be overdoing it.  So I'm

15   trying to select photographs and if I can go over them,

16   and Gordon, Mr. Groland, if you would step up here, if

17   I can go over them with the Court and the reasons for

18   the photographs.  They're not in a particular order,

19   but I can --

20        Let me start with one of the issues that had been

21   discussed was, that had the child had a chronic

22   subdural hematoma, the child would not be able to

23   focus, would not -- would be delayed in his ability to

24   be attending to matters from the outside world.  This

25   is a photograph of the child viewing the mobile, which

1    we would intend to offer with testimony that he did in

2    fact focus and attend to the -- I think it's mobile,

3    mobile.

4         This is a photograph of the child where you can

5    see the arm movements, the fact at this age range he

6    was well within the normal limits in his smiling,

7    cooing, and his facial behavior, and that photograph

8    would show that.

9         This photograph -- One of the things that doctors

10   measure in development is when a child first identifies

11   his hand.  In this photograph the child is viewing his

12   hand.

13        This is another mobile picture.  I'll let the

14   Court -- defer to the Court on which mobile picture --

15   This is another mobile picture.  The mobile is better

16   in this picture.  Well, actually the mobile in this

17   picture is clearer.

18        This one here is a mobile picture, but also you

19   can see in that picture that the child is alert and is

20   also exhibiting the smiling behavior, which the

21   pediatrician will tell you is one of the developmental

22   signs that they look for for normal development, the

23   smiling, the laughing, the cooing that comes around the

24   age that Robbie was.

25        And these are just two more pictures to show the

1      alert nature of the child and also another picture of

2      the mobile, the fact that the child is attending to and

3      laughing at the mobile.

4           MR. GROLAND:  We have a total of how many?

5           MS. SINGER:  Count them.

6           MR. GROLAND:  Looks like seven.

7           MS. SINGER:  Seven.

8           THE COURT:  Seven.  All right.

9           MR. TEDDER:  Do we have any idea how old the baby

10     was in this picture?

11          MS. SINGER:  Yes.  The testimony will be that the

12     photographs were taken at various times.  Specifically,

13     the bath picture was taken -- this was reported to me

14     to be his last bath photograph by his grandmother,

15     which was approximately two weeks before his death.

16     The mobile pictures were taken approximately two weeks

17     prior to the child's death.  The hand picture was

18     approximately two weeks prior to the child's death

19     according to the information I was provided.  We will

20     offer testimony, your Honor, specific testimony because

21     the person who took the pictures will be available.

22     That's about it.

23          I have one other picture, Judge, of the baby at a

24     younger period of time focusing on his father.  Gordon?

25          MR. GROLAND:  Yeah, we object to that one, too.

1    MS. SINGER:  That's the picture of him focusing on

2    his father.

3         THE COURT:  So that would be eight photographs?

4         MS. SINGER:  Eight photographs.

5         THE COURT:  All right.  And defense's argument?

6         MR. GROLAND:  Your Honor, I would think if the

7    Court's inclined to do this, one or two photographs

8    might be sufficient.  Certainly a photograph of the

9    baby being held by dad is gonna do nothing to assist

10   the jury in determining what happened here and it's

11   more along the lines of a sympathy kind of situation.

12   I think, you know, when you see a father and a child at

13   that age and knowing that the child is deceased, I

14   don't think that picture should come in at all.

15        I think if the Court's inclined to let some of

16   these in, we would not object strenuously, but I don't

17   think seven pictures of the baby are necessary to come

18   in.

19        THE COURT:  Okay.  These pictures are admissible.

20   The only valid argument might be as to four different

21   mobile pictures might be cumulative.

22        MR. GROLAND:  And father and child?

23        THE COURT:  Father and child shows focusing at an

24   early age.  It's not about the father and child.  It's

25   about the focusing.  That's the basis on which it's

1    admissible.

2         MS. SINGER:  I'll pick a mobile picture.

3         THE COURT:  Okay.  Good enough.

4         MS. SINGER:  Actually, your Honor, if I can just

5    go ahead and do that right now.  I think there are two;

6    one where he's looking at the mobile, and one where

7    he's actually smiling.  Those would be the two that we

8    would ask the Court for.  The others we will --

9         THE COURT:  All right.  The state's limited to two

10   mobile pictures.  The other --

11        MS. SINGER:  The other two.

12        THE COURT:  The other four pictures will be

13   admissible.

14        MS. SINGER:  Thank you.

15        THE COURT:  So that's six pictures total of the

16   child's development and showing focusing.

17        MS. SINGER:  Yes.  And Mr. Groland's free to look

18   through the book for any other pictures if he wishes.

19        THE COURT:  All right.  Any other photographs?

20        MS. SINGER:  Yes, your Honor.  There is a

21   photograph that Cathy Long received from Brian Herlihy

22   where he writes on the back, Thank you for taking care

23   of my Uncle Brian, and it's a photograph that was taken

24   of Robbie Quirello.  This is not the photograph because

25   there's writing on the photograph, but this is a

1      depiction of the photograph.

2          MR. GROLAND:  At this point the Court's made a

3      ruling against you on that.  If we get to that later

4      and the Court reverses her position, I would say we can

5      get to that photo.

6          MS. SINGER:  Right.  But I do want to show you the

7      photograph.  It's a small Olan Mills type photograph of

8      the child and on the back would be the writing.  That

9      one doesn't have the writing on it, but that's the

10     depiction that's on the front.

11         THE COURT:  Well, when you say this is not the

12     photograph, I'm not following you.

13         MS. SINGER:  Okay.  That is the photograph, but

14     that is not the copy that Cathy Long had.  That is in

15     evidence.  On the back of the one that Cathy Long has,

16     there's writing, but that's the depiction.

17         THE COURT:  Good enough.

18         MR. GROLAND:  Your Honor, if we get to it, then

19     certainly it's admissible.

20         THE COURT:  I agree.  If in fact Cathy Long gets

21     to testify about the interaction, then this is

22     admissible documentation that the interaction did in

23     fact take place.

24         MS. SINGER:  Yes.  I just wanted to show the Court

25     that ahead of time.

```
 1          THE COURT:  Any other photographs?
 2          MS. SINGER:  Yes.  There are photographs of the
 3     retina that were used by Dr. Levine for -- I have to
 4     get the ones that were blown up because I think those
 5     were the ones that were used.  The photographs by
 6     Dr. Levine were taken to depict the retinal
 7     hemorrhaging at the time that he viewed the child.  He
 8     would be using these photographs.  They have copies of
 9     all the photographs.
10          THE COURT:  Okay.  Do you have any objection to
11     these photographs?
12          MR. TEDDER:  Well, your Honor, I think they're
13     somewhat cumulative, but I presume Dr. Levine or
14     whatever his name is, is going to be more inclined to
15     educate the jury about what exactly is on those
16     photographs just as he educated me when I took his
17     deposition.  From looking at them, they're just a
18     mishmash of red.  You can't really figure out what's
19     what.  He wasn't really interested in taking the time
20     to explain it.
21          MS. SINGER:  I don't expect that we will be
22     putting in all those photographs, your Honor, but I
23     would ask permission to allow Dr. Levine to pick those
24     photos that he deems to be the most appropriate to
25     demonstrate what he saw and to use them to explain to
```

1    the jury exactly what retinal hemorrhaging is and what

2    differences there are in this eye as opposed to in a

3    normal eye.

4         THE COURT:  And you have three enlarged photos?

5         MS. SINGER:  Four enlarged.

6         THE COURT:  Four enlarged and 24 small

7    photographs?

8         MS. SINGER:  Yes.

9         MR. TEDDER:  Those are just photographs taken from

10   Robbie Quirello, correct?

11        MS. SINGER:  Correct.

12        MR. TEDDER:  No photographs contrasting?

13        MS. SINGER:  No.  I did hand you a copy of these.

14        MR. TEDDER:  Yes, you did.

15        THE COURT:  Good enough.  Those photographs are

16   admissible.  Defense is correct, I can't rule on

17   whether or not the 24 are in fact cumulative until such

18   time as the experts start defining what in the heck

19   they show since it is beyond the capability of at least

20   this layperson.  However, that's subject to objection

21   at the trial.

22        MR. TEDDER:  Yes, ma'am.

23        MS. SINGER:  We have the eight Polaroid

24   photographs that were taken by Alan Coleman on

25   August 2nd in the afternoon hours, and I understand

1    that Mr. Groland objects to the admission of these

2    photographs.

3         THE COURT:  All right.

4         MR. GROLAND:  And the reason why we object, and

5    we'll do it at the time that the state seeks to

6    introduce the photographs as well, is that various

7    witnesses have testified that when these photographs

8    were taken at 3 o'clock, the bed area in the apartment

9    in general, specifically looked different than when the

10   incident occurred.

11        Not only that, we have a police officer who is now

12   a lieutenant, was a sergeant at the time, Halvosa, who

13   testifies in his deposition that when he went there at

14   3 o'clock and took these photographs, there were no

15   pillows or shams at the foot of the bed.  I don't know

16   who put shams there, who put those pillows there, but

17   it's certainly inconsistent with what the testimony is.

18   It doesn't depict the alleged crime scene as it was

19   when it occurred and it's at odds with the actual

20   testimony and police witnesses who were there when

21   those photographs were taken.

22        There is some question in this case about where

23   pillows were placed by Mr. Herlihy, when they were

24   placed, how the baby was positioned with reference to

25   the pillows at the foot of the bed.  What we've got

1    here is photographs that were taken some five hours

2    after the incident, after we know Crystal Quirello came

3    back to the apartment from her testimony and from Helen

4    Legall's testimony, did something, was there by herself

5    according to her testimony, and then returned to the

6    hospital.

7         We've got Lieutenant Halvosa's testimony that the

8    pillows weren't there when he went in at the foot of

9    the bed and this is -- I'm not saying it's a staged

10   scene, but it's inaccurate and it's confusing and it's

11   not consistent with what we know from other testimony

12   and seem to have looked at when the incident occurred.

13   I think it's of no value and will be confusing to the

14   jury.

15        MS. SINGER:  I disagree with the rendition of the

16   facts and the state will be happy to provide the

17   predicate for how those photos were taken and who took

18   those photographs and whether or not anything was moved

19   prior to or after the photographs were taken and that

20   would be an appropriate predicate.  Whether there's a

21   conflict in the evidence is something that we argue to

22   the jury and we can use the photographs to demonstrate

23   that.  But as far as whether or not they accurately

24   depict what Alan Coleman saw when he went into the

25   apartment at approximately 2 o'clock on that day, then

1        I think that they're relevant and admissible.

2              THE COURT:  Okay.  And how is what Alan Coleman

3        saw relevant?

4              MS. SINGER:  Those photographs -- Because I don't

5        agree with what Mr. Groland has just said.  So perhaps

6        the best thing to do with these particular photographs

7        is to lay the predicate at trial, allow for the

8        examination of the witness and --

9              MR. GROLAND:  Ms. Singer, could you just tell us

10       what you don't agree with about what I said so the

11       Court doesn't think I misstated?

12             MS. SINGER:  Right.  I don't agree with the

13       testimony that the scene had been tampered with in any

14       way before Alan Coleman took those pictures.

15             MR. GROLAND:  Okay.

16             MS. SINGER:  I know what you say, but you don't --

17       but the deposition doesn't say what time Halvosa was

18       there and what time Alan was there.  If Alan was there

19       before Halvosa was there, then your issue about

20       Halvosa's testimony would not play into Alan's

21       photographs.

22             MR. GROLAND:  Ms. Singer, I'm sure can agree that

23       before either of those police officers were there, in

24       fact Crystal Quirello was there and came back and told

25       Detective Legall at a later date that it looked

1    different than when she left to go to the hospital.

2         MS. SINGER:  But no one has asked Crystal Quirello

3    what time of day she went back to the apartment.

4         MR. GROLAND:  Well --

5         MS. SINGER:  That's a critical part of the case.

6         THE COURT:  I understand the issues, but let me

7    tell you what the complication is from my perspective.

8         First of all, the photographs may well be

9    admissible subject to objection.  One of the

10   complicated things that can happen is, the state, if

11   they call the photographer first as their scene

12   witness, that witness may come in and say, This is the

13   crime scene as it appeared on that day when I took the

14   photographs, and the predicate might be technically

15   legally sufficient.

16        And then later witnesses might start contradicting

17   that clarity, those witnesses called by the state,

18   which would make it impossible for the defense to

19   adequately argue that these photographs prior to

20   admission did not in fact accurately depict the scene.

21   Therefore, it could create an issue allowing the

22   defense to move for a mistrial if these photographs are

23   admitted in that sequence.  That's my concern.

24        MS. SINGER:  Okay.  So do we want to do a proffer?

25        THE COURT:  There is no possibility of doing a

 1        proffer of all the witnesses as to the scene.

 2              MS. SINGER:  I know what we could do.

 3              THE COURT:  The only way to avoid the issue is to

 4        basically admit the photographs last.

 5              MS. SINGER:  Absolutely.

 6              THE COURT:  That would allow Mr. Groland to

 7        cross-examine as to every witness and that would allow

 8        then for the Court to make a proper ruling on their

 9        admissibility without creating the possibility of a

10        mistrial on this issue.

11              MR. GROLAND:  I'm fine with that.

12              MS. SINGER:  As long as I can use them as Exhibit

13        A and show witnesses and have them testify, and then at

14        the very end we'll move them in.  Would somebody remind

15        me so I don't forget, Madam Clerk?

16              THE COURT:  You want the clerk to remind you of

17        what?

18              MS. SINGER:  About moving them in at the very end

19        of the case.

20              THE COURT:  No.  Mr. Pennypacker will remind you

21        of that.  The clerk won't.

22              MS. SINGER:  All right.  Well, because the clerk

23        is gonna have all this stuff.

24              THE COURT:  No.  She's not gonna do that.  She's

25        not gonna tell you when and how to try your case.

| | |
|---|---|
| 1 | MS. SINGER: All right. That's fine. That's |
| 2 | fine. So long as I can show the photos to the |
| 3 | pertinent witnesses and have them discuss the photos |
| 4 | and then we'll move them in at the very end. |
| 5 | MR. GROLAND: That's fine. Are we done? |
| 6 | MS. SINGER: The only photos that were -- The only |
| 7 | issues that we have left are ones that if the Judge |
| 8 | would just -- if the Court will just allow Mr. Groland |
| 9 | and I to get together, I think we can work out the |
| 10 | crime scene. |
| 11 | THE COURT: I'll be happy for you all to get |
| 12 | together. I want you to get together. |
| 13 | MS. SINGER: I don't know if they have any |
| 14 | photographs or any other demonstrative aids that we |
| 15 | think that they want to -- We do have diagrams of an |
| 16 | eye, but we're not sure whether or not -- Where are |
| 17 | they? If I could show the Court another demonstrative |
| 18 | aid that we're not sure we're going to use, which I did |
| 19 | show to -- I showed these yesterday. They're what you |
| 20 | call an anatomical drawing. I'm not sure whether |
| 21 | Dr. Levine will want to use them or not. I'll show the |
| 22 | Court today, but we're not sure if we're gonna use |
| 23 | them. If you do not want to bother with it today, we |
| 24 | can take a break in the middle of court. We'll have a |
| 25 | lot of time in the afternoon before Dr. Levine |

Stacey K. Bryant, RPR
Judicial Court Reporter

0002848    ~~0002501~~

1   testifies.

2       THE COURT:  We're not gonna have a lot of time.

3   Most of this stuff is gonna be done after 6:00 p.m. on

4   each of those days so that the jury is not kept

5   waiting.  So plan for that.

6       MS. SINGER:  I assume you have an objection, maybe

7   not.

8       THE COURT:  You can discuss whether or not there's

9   a stipulation later.  Anything else we need to put on

10  the record today because I have more hearings?

11      MR. TEDDER:  Judge, we may have one demonstrative

12  aid.  We haven't decided whether or not we're going to

13  use this.  If you want to know what it is, I'll be glad

14  to tell you if you feel like we need to disclose it at

15  this time.

16      THE COURT:  Well, you're objecting to the fact

17  that they disclosed theirs late.  So on the basis of

18  that objection, I would assume that you believe that

19  there is an obligation on the part of the state and

20  defense to disclose it, so you better do it.

21      MR. TEDDER:  We may or may not present a

22  demonstrative aid that essentially involves a jar.  I

23  may not be describing this correctly.  It's a

24  demonstration wherein you put 12 eggs out of the shell

25  inside a jar filled with an appropriate amount of

1    liquid and vacuum sealed, and then have the strongest

2    bailiff we can find shake it in the presence of the

3    jury to demonstrate that it's impossible to break the

4    yokes of the egg in that type of action.

5        THE COURT:  A, there will not be a bailiff that

6    does that.  That's the first thing you need to know.

7    And, B, of course that would be subject to objection,

8    but you have put the state on notice, so if they have

9    any legal basis to object, then of course the only

10   ruling of the Court would be based upon evidence from

11   some expert that said this is in some way relevant.

12       MR. TEDDER:  Would I be allowed to shake it or our

13   expert be allowed to shake it?

14       THE COURT:  I would have no reason to assume that

15   you could not, but what I'm telling you is that I'm not

16   going to pull in Sheriff's resources for purposes of

17   Mr. Herlihy's trial.

18       MR. TEDDER:  Yes, ma'am.  I understand.

19       THE COURT:  But I would have no reason to assume

20   that you could not shake it.  That would be subject to

21   objection.

22       MR. GROLAND:  For the Court's edification, this

23   would be Dr. Uscinski, who has in fact done this before

24   in criminal trials like this.  It won't be a first time

25   thing.

1          THE COURT:  Yeah, I understand that.  Okay.

2     Anything else we need to put on the record today?

3          MS. SINGER:  I'm just filing the written

4     stipulations that we talked about.

5          MR. TEDDER:  Are you going to rule on the motions

6     to suppress that were heard yesterday, your Honor?

7          THE COURT:  Yes.  The motion to suppress the

8     evidence and the motion to suppress the statements are

9     both denied.

10          MR. TEDDER:  We would object to your ruling on

11     both of those, your Honor.

12          There was also a motion in limine the state filed

13     to permit testimony concerning location and interaction

14     that involves Deputy Long and Mr. Herlihy.  Does that

15     go along with your earlier ruling?

16          THE COURT:  Yes.

17          MR. TEDDER:  Yes, ma'am.  That's all we have.

18          THE COURT:  Okay.  Good enough.  We're finished

19     with Mr. Herlihy.  I'm gonna hear briefly from

20     Mr. Cooper and then at 1:30 I'm gonna meet with you all

21     about jury selection.

22          (An off the record discussion was held in regard

23          to jury selection procedures.)

24          THE COURT:  Now if we can have Mr. Cooper in,

25     please.

1              Let me say one more thing in regard to these

2      motions.  I have ruled on all the motions.  Obviously

3      we have a transcript of this proceeding.  Either the

4      state or the defense who wants these orders in writing

5      prior to the trial may draft those orders and I'll be

6      glad to sign them.  Otherwise, they will be documented

7      by this record.

8              (Whereupon, the proceedings were concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stacey K. Bryant, RPR
Judicial Court Reporter

| | |
|---|---|
| 1 | CERTIFICATE OF ACCURACY |
| 2 | STATE OF FLORIDA |
| 3 | COUNTY OF ALACHUA |

1

2

3

4  I, Stacey K. Bryant, RPR, Judicial Court Reporter, Eighth

5  Judicial Circuit of Florida, do hereby certify that:

6  A pretrial motion hearing was held in re:  State of Florida

7  vs. Brian Patrick Herlihy, Circuit Court of Alachua County,

8  Florida, before the Hon. Martha Ann Lott, Circuit Judge, on

9  September 5, 2002.

10  That I was authorized to and did report the proceedings had

11  during said pretrial motion hearing and that the foregoing

12  pages, numbered one through and including 107, constitute a

13  true and correct transcription of my stenographic notes

14  taken aforesaid, which were reduced to printing under my

15  personal supervision.

16  I further certify that I am neither of counsel nor related

17  to or employed by any party to the action, nor financially

18  interested in the outcome of said cause.

19  IN WITNESS THEREOF, I have hereunto affixed my hand on this

20  1st day of May , 2003.

21

22

23  Stacey K. Bryant, RPR
Judicial Court Reporter

24  Eighth Judicial Circuit of Florida

25

Stacey K. Bryant, RPR
Judicial Court Reporter
0002853   0002586