# EXHIBIT

# AA

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

*202-1-17814*
*F*

BRIAN PATRICK HERLIHY }

        Appellant, }

}

}

}

v. }

}

}

}

STATE OF FLORIDA }

        Appellee, }

CASE NUMBER    2000-2753-CFA

APPEAL NUMBER 1D02-4788

VOLUME XXVII

*Docket (PH)*
*05 - 14 · 2003*
*Dates Attorney General*

*2003 MAY 12  PH 2:41*
*CRIMINAL APPEALS OFFICE*
*TALLAHASSEE*

# TRANSCRIPT
# RECORD

## HONORABLE MARTHA ANN LOTT
### ACTING TRIAL JUDGE

## APPEAL FROM THE CIRCUIT COURT
## 8th JUDICIAL CIRCUIT FOR
## ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
HONORABLE C. RICHARD PARKER
PUBLIC DEFENDER
POST OFFICE BOX 2820
GAINESVILLE, FLORIDA 32602

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

202-1-17814

1

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICAL CIRCUIT
2           IN AND FOR ALACHUA COUNTY

3               CASE NO: 01-2000-CF-2753-A

4            TRANSCRIPT ON APPEAL
                (Pages 1 - 81)
5

STATE OF FLORIDA
6
vs.                        Volume XXVII
7
BRIAN PATRICK HERLIHY,        1002-4788
8
            Defendant.
9
_____/
10

Proceedings:          Sentencing hearing
11

Before:               The Honorable Martha Ann Lott,
12                              Circuit Judge

13   Date:         Docket CH      November 8, 2002

14   Time:     05.14.2003         9:00 a.m.

15   Place:    Case Attorney
                    Owned

16                              Courtroom 3-D
                                Alachua County Courthouse
                                Gainesville, Florida

17   Reporter:             Stacey K. Bryant, RPR
                           Judicial Court Reporter
18

APPEARANCES:
19
        Jeanne Singer, Assistant State Attorney
20      Stephen Pennypacker, Assistant State Attorney
        120 W. University Avenue
21      Gainesville, Florida 32608
            Appearing on behalf of the State of Florida
22
        Gordon Groland, Esquire
23      John Tedder, Esquire
        Post Office Box 2848
24      Gainesville, Florida 32602
            Attorneys for defendant
25

COPY

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1              P R O C E E D I N G S
 2          MS. SINGER:  Your Honor, before we get started,
 3      may I just approach with Mr. Groland for a moment?
 4          THE COURT:  Yes.
 5          MS. SINGER:  I apologize, your Honor.
 6          MR. GROLAND:  Do we need to --
 7          MS. SINGER:  No.  Do you want to put that on the
 8      record?
 9          MR. GROLAND:  No.
10          THE COURT:  All right.  Is the state ready to
11      proceed?
12          MS. SINGER:  Yes, your Honor.  If I could --
13          THE COURT:  Just a second.  Is the defense ready
14      to proceed?
15          MR. GROLAND:  Yes, your Honor.
16          THE COURT:  Ms. Singer, go ahead.
17          MS. SINGER:  If I can put this on the record.
18      We're here before the Court in the case style, State of
19      Florida vs. Brian Patrick Herlihy, 2000-2753-CFA, for
20      sentencing on the case that we're previously tried
21      before this Court approximately a month and a half ago.
22      Present for the state are the family members of the
23      victim in this case, Robbie Quirello, and present for
24      the defendant is his counsel, Gordon Groland, as well
25      as Mr. Herlihy.  And state is ready to proceed at this
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1   time, your Honor.

2        THE COURT:  All right.  Go ahead, Ms. Singer.

3        MR. GROLAND:  I guess we go first.

4        THE COURT:  You believe you do?

5        MR. GROLAND:  Yeah.

6        THE COURT:  I don't know that there's any

7   requirement, but I was believing that I would hear from

8   the state first and then hear from the defense.  If you

9   all have some other agreement or if you have some

10  argument --

11       MR. GROLAND:  May I just have one moment?

12       MS. SINGER:  Do you have mitigation you intend to

13  present?

14       MR. GROLAND:  Yeah.  I'll go first.

15       MS. SINGER:  Okay.

16       THE COURT:  Mr. Groland?

17       MR. GROLAND:  We've decided I'm gonna go.

18       THE COURT:  You're gonna go first?

19       MR. GROLAND:  Yes.

20       THE COURT:  Fine.

21       MR. GROLAND:  Your Honor, I have provided to the

22  state and have given a copy to the Court right there at

23  the bench something we took off the Internet.  It's a

24  news flash from U.S. Consumer Product Safety

25  Commission, dated September 5th, and I just wanted to

1       put that in the record, provide this information to the

2       Court and just read very briefly from this article

3       before I start.  I'm not gonna read the whole article.

4       The article does address certain safety issues as

5       indicated by Elaine Tyrell, who is the director of the

6       Consumer Product Safety Commission.  She indicates in

7       the article that, "We usually assume that our babies

8       are safe when they are asleep, but even the most

9       cautious parents may not be aware of the hidden hazards

10      of placing babies on adult beds or may not know how

11      important it is to put infants to sleep on their backs.

12      We have formed this remarkable partnership to spread

13      the word and save lives.

14          As part of the campaign, CPSC is providing safety

15      tips for parents and caregivers to use in creating safe

16      sleep environments for babies.  The tips include:

17      Babies should -- babies placed on adult beds risk

18      suffocation from several hidden hazards, such as

19      entrapment between the bed and the wall.  Always place

20      your baby asleep on his or her back to reduce the risk

21      of SIDS, to reduce the risk of suffocation, remove all

22      soft bedding such as pillows, thick pillows and

23      comforters before placing the baby to sleep."

24          And on the next page they give some tips which I

25      think, I just feel is appropriate that I should mention

Stacey K. Bryant, RPR
Judicial Court Reporter

1    here.

2         "Always place your baby to sleep on his or her

3    back to reduce the risk of SIDS. Whenever your baby

4    sleeps -- wherever your baby sleeps should be as safe

5    as possible. Babies placed on adult beds risk

6    suffocation from several hidden hazards, such as

7    entrapment between the bed and wall, entrapment

8    involving the bed frame, headboard or footboard, falls

9    from adult beds and piles of clothing and other things,

10   suffocation in soft bedding such as pillows, thick

11   quilts and comforters. I just wanted that -- something

12   I just wanted the Court to know about.

13        Your Honor, first --

14        THE COURT: Mr. Groland, I am aware of this. This

15   article is not relevant to this sentencing because

16   Mr. Herlihy has been found guilty of manslaughter by a

17   jury after trial.

18        MR. GROLAND: I understand. I just wanted to read

19   that into the record and make this article a part of

20   the record.

21        THE COURT: All right.

22        MR. GROLAND: Thank you.

23        Judge, the PSI, there are some things in there

24   that before I start with what I have to say about what

25   we feel the appropriate sentence is, specifically there

1    are some mistakes.  For one, on the front page they

2    indicate that he's got 316 days in custody.  That is

3    wrong and it's not even close.  In fact, the correct

4    number of days is 585.  At the appropriate time I can

5    give your Honor, perhaps when we're finished, the dates

6    that are involved there so that the Court can see and

7    the record can be reflected as to how I came up with

8    that figure.  But 585 is the correct figure, we feel

9    that is so.

10          THE COURT:  You may not have to specify dates if

11    the state's in agreement with the figure.

12          MS. SINGER:  I'm not necessarily in agreement,

13    your Honor, because I know he was held in the Broward

14    County Jail on other charges and I don't know whether

15    or not he was actually being held at the same time

16    simultaneously on our charges, because I don't believe

17    the capias had been executed, but if Mr. Groland has

18    proof of that, we may be able to stipulate.

19          THE COURT:  And of course I'll hear your evidence.

20          MR. GROLAND:  Okay.

21          The other thing is, I've not seen a PSI quite like

22    this one where the PSI investigator went to the trouble

23    of pulling from police reports a bunch of information

24    for offenses that the client has not been convicted of.

25    In that regard, I would ask your Honor not to take as

1    gospel what is indicated in the PSI as to these

2    offenses which he is not convicted of, and at this

3    point we don't know if these are sworn statements, we

4    don't know if these are statements that were

5    investigated by whatever prosecuting authority was

6    involved and found to be false.

7         But as things stand now, it's my understanding

8    that we only have a conviction for a misdemeanor,

9    disorderly conduct, that was resolved with a plea and a

10   sentence of time served for 60 days, and there are a

11   number of traffic related misdemeanors.  I think there

12   are about five of them.  All of them, I think, are --

13   we don't have things even like DUI, reckless driving.

14   I think they're all driving with a suspended license.

15        THE COURT:  I will certainly agree that these are

16   not convictions, and may amount to sworn testimony.

17        MR. GROLAND:  But we don't know.

18        THE COURT:  Correct.

19        MR. GROLAND:  So therefore, I don't think we can

20   consider it and that's my position.  I just wanted to

21   tell the Court.

22        THE COURT:  Go ahead.

23        MR. GROLAND:  Your Honor, we've been told by the

24   state that they're gonna ask for a maximum sentence

25   here, 15 years in the Department Of Corrections.  What

1    we're asking the Court to do, is not to follow that

2    recommendation, but instead to impose the minimum

3    recommended guidelines sentence of nine years and some

4    months, or in the alternative, to consider imposing a

5    lesser sentence than that recommended as a minimum

6    sentence for legal departure reasons that I will

7    address in a few minutes.

8         Judge, Brian Herlihy was charged two years ago

9    with premeditated first degree murder.  Even though

10   that was the charge, the state made it clear to the

11   jury in opening statement and later in closing

12   statement during the trial, that they were not gonna

13   argue this case as a premeditated first degree murder,

14   but instead, they were taking the position that this

15   was a first degree murder because it was a felony

16   murder and it caused -- the act of aggravated child

17   abuse was the cause of Robbie Quirello dying about a

18   week after he got into the hospital.

19        In fact, not only did the jury reject the state's

20   theory of first degree murder by the way of felony

21   murder, but they specifically rejected the concept that

22   an intentional act of aggravated child abuse, or any

23   other intentional act was committed by Brian which led

24   to the baby's death some seven days after he was

25   brought to the hospital.

1          And instead, while implicitly by virtue of their

2     verdict finding that an accident, that was criminal in

3     nature because it was culpable negligence occurred, the

4     jury specifically rejected the state's position that

5     there was some kind of an intentional act here, and

6     instead the jury found that an accident that was

7     criminal in nature, mainly manslaughter by culpable

8     negligence, occurred.

9          In addition to that, and I can't, I don't think,

10     emphasize the significance or the importance of this

11     well enough, but I think the fact that Robbie Quirello

12     had a chronic subdural hematoma, or stated in another

13     way in lay terms, a prior injury of some kind to his

14     brain, was conclusively established at the trial.

15          I think that was established both through our

16     experts, who were obviously in agreement with one

17     another, as well as the state experts, who testified in

18     the trial.  Dr. Dickison was very, very clear that she

19     found it to be definitive when she looked at the CAT

20     scan that she saw prior, earlier generations of

21     hematoma and she even indicated in her testimony that a

22     number of her peers viewed the CAT scan and they were

23     in agreement with her, in addition to Dr. Ron Quisling

24     and Dr. Frank Agee, the two radiologists who although

25     they did not testify at the trial, they submitted their

1    radiologists' reports with that finding that, yes, this

2    baby had a chronic subdural hematoma.

3        So I think that is very well-established and I

4    don't really think that this is at issue.

5        I think we can also recall that not only did

6    Dr. Uscinski and Dr. Plunkett talk about these chronic

7    subdural hematomas re-bleeding for any reason at any

8    time, I think the testimony was that they can re-bleed

9    with little or no movement, or little or no cause, or

10   trauma, and they can more or less re-bleed

11   spontaneously without any outside event occurring.

12       The doctors, and I include their doctors, they

13   agree that if this re-bleeding event occurs, it can

14   cause a baby to aspirate on something the baby has

15   eaten, and if the Court will recall, the baby just had

16   a half a bottle that was given to him by his mother.  I

17   think the testimony was that he had the other half of

18   the bottle right before the mother left to go on her

19   errands.

20       So baby had a full stomach.  If the baby re-bled

21   for any reason at all, that could have caused the baby

22   to aspirate.  The aspiration could have caused the baby

23   to choke.  The choking could have caused the baby to go

24   into a seizure.  All the doctors agree that a seizure

25   can cause the baby to stop breathing.  And I think

1    that's what our doctors testified to.  Their doctors

2    said that they think something different happened, but

3    they did agree on cross-examination that that scenario

4    that I just described --

5        THE COURT:  Mr. Groland, the scenario that you

6    described in the trial and that you're describing now

7    is not relevant to the purposes of sentencing because

8    that defense was raised and the jury found that

9    Mr. Herlihy is guilty of manslaughter.

10       MR. GROLAND:  That's correct.

11       THE COURT:  So it's not possible to re-raise your

12   defense at this point.

13       MR. GROLAND:  Judge, I'm not re-raising the

14   defense.  I'm just explaining that this is an accident

15   that was criminal in nature as opposed to an

16   intentional act; that the jury heard all the evidence

17   and they rejected the state's theory and found

18   Mr. Herlihy guilty of culpable negligence either by way

19   of commission, or omission, in a situation where a baby

20   had a prior injury.  And I just think that that -- I'm

21   not trying to re-raise my defense, except to say to the

22   Court that I think those facts are something that the

23   Court should take into consideration in deciding today

24   what the appropriate sentence is.

25       THE COURT:  All right.  Go ahead.

1        MR. GROLAND:  All right.  Thank you.

2        And what I just said about a re-bleed, an

3    aspiration, choking, and a seizure being something that

4    in all probability given the fact that it was, from my

5    perspective, conclusively established that this baby

6    did have a chronic subdural hematoma, I think a likely

7    scenario as to what the jury -- and I'm not trying to

8    second guess -- but I think it's given the nature of

9    their verdict, that they find it was negligence as

10   opposed to an intensional act, I think that the jury

11   could have concluded that Brian panicked when this baby

12   got ill, for whatever reason, and that he may have,

13   while trying to remedy the situation, actually

14   exacerbated the situation and could have made it worse.

15       It could very well be that the jury found that in

16   so doing, that that was the act of negligence that they

17   found him guilty of.

18       And I think that is also consistent with what we

19   know from the record and that is, from the mother,

20   Brian was always good with the baby, Brian was -- had

21   what appeared to be a loving relationship with the

22   baby, Brian was never rough with the baby, Brian was

23   never frustrated with the baby, Brian was never

24   aggressive with the baby, or inappropriate in any way.

25   I think when we take that into account together with

1   the baby's chronic condition or prior brain injury, and

2   the fact that Brian showed from the very first moment,

3   this all started on August 2nd, 2000, deep remorse and

4   emotion, and I think if I'm not mistaken, even Helen

5   Legall testified on cross-examination that, yes, she

6   saw remorse and she saw emotion.  In her opinion, she

7   thought it was genuine.

8       The Court will hear this morning just from a

9   couple of people who will also tell your Honor about

10   Brian's deep remorse from day one about what has

11   happened here to Robbie Quirello.  The state thought it

12   was a violation of the court order, and perhaps the

13   Court thought it, too, but there was a time when he was

14   not in custody and he was here in town, and he actually

15   went to visit Robbie's grave by himself with his

16   companion that was with him.

17       I think that in and of itself shows remorse and

18   how badly he felt about what has happened here.  I

19   don't even know that he knows exactly what happened.

20   We're gonna hear from him in a few minutes.

21       Crystal is not here today, to my knowledge, nor

22   was she present during jury deliberations or jury

23   verdict.  And according to the PSI, she actually wrote

24   a letter to Alan Cats, the PSI investigator, something

25   like, and this comes from his report:

```
 1          Hi, Alan:  I'm sorry this took me so long to get
 2     back to you, but I've been busy with school and work.
 3     Just very consistent with her just very unusual
 4     behavior throughout this whole ordeal for everybody.
 5     And I don't know really what to say about Crystal and
 6     her many, many fabrications in this case to the police,
 7     to the medical personnel, to the jury in this case.  I
 8     don't understand her behavior on the day it happened,
 9     after it happened, when she came to court to testify,
10     and I cannot in good conscience point the finger at her
11     and say, She must have done this, or she must have done
12     that.
13          But I do know that her first statement when she
14     got to the hospital was that the baby on the way over
15     to Brian's, aspirated while he was in the car with her,
16     and that was her first statement.  Only Crystal knows
17     what really happened that morning before she got to
18     Brian's house, if anything.  But, it's just -- I point
19     that out because I think there are still a lot of real
20     unanswered questions in this case, and obviously we're
21     never gonna know the answers to some of these
22     questions.
23          Your Honor, there's no proof in this case that
24     Brian Herlihy ever intended in any way, shape or form
25     to hurt Robbie Quirello that morning on August 2nd, nor
```

Stacey K. Bryant, RPR
Judicial Court Reporter

0002867

```
 1    did the state argue that to the jury.  And the jury did

 2    not find that he intended to do that.  Instead what

 3    happened is, the state came up with a theory that

 4    Robbie must have vomited on Brian's clothing and that

 5    set into motion some kind of angry behavior on the part

 6    of Brian that led to the unfortunate situation that we

 7    are all here today about.

 8        I think Ms. Singer told the jury that the shirt

 9    that was found in his closet when they executed the

10    search warrant had vomit and blood on it, and I

11    objected to that.  I don't recall the Court's ruling,

12    but I do know that there was absolutely no proof during

13    the trial that there was any vomit on that shirt, or

14    that there was any blood on that shirt.  None at all.

15    No person from FDLE either in their report or during

16    their testimony indicated that there was blood anywhere

17    else, but in a small spot on the carpeting where the

18    baby was when the paramedics came and started

19    administering first aid.

20        The range here that -- the guideline range is from

21    seven -- strike that -- from nine and a half years to

22    15 years.  So the question is, with all of the issues

23    that have been raised in this case, together with the

24    finding that this was not an intentional act, does this

25    case call out for the maximum sentence of 15 years?
```

1    And we submit that it does not.  And in fact, I do ask

2    the Court to consider departing and imposing a sentence

3    below the nine and a half years, because there is a

4    legal, legitimate reason for departure right in the

5    rules and it's one of the boxes that can be checked,

6    and that is, offense was committed in an

7    unsophisticated manner, was an isolated incident, for

8    which the defendant has shown remorse.  Three parts to

9    that:  Unsophisticated manner, isolated incident, and

10    has shown remorse.

11    Your Honor, I would just say this and I'll finish

12    up:  If we were here today for sentencing in a

13    manslaughter culpable negligence case, and the victim

14    was an adult, and the victim was killed either in a

15    motor vehicle accident or in a fist fight behind the

16    bar, and a defendant came before the Court for

17    sentencing with virtually no criminal record of any

18    significant convictions, I doubt very seriously that we

19    would be talking about the maximum sentence here; but

20    rather we would be looking at something within the

21    guidelines.

22    And the problem is, that it is a heart wrenching

23    situation for everybody on both sides of the case, and

24    I'm sure for the Court as well.  The victim in the case

25    like this is an infant of four months of age, and just

1   like your Honor instructs the jury that we can't let

2   our emotions impact on us in such a way that it affects

3   the verdict, I'm just urging the Court to keep that in

4   mind also in deciding what is a reasonable and

5   appropriate sentence here.

6        It's a tragedy beyond belief for everybody and it

7   just -- I just don't think that the age of the victim

8   should dictate or in any way affect the Court in

9   deciding what is appropriate and a reasonable sentence

10  here.

11       We've got a young man with essentially no criminal

12  record.  He's a first offender before this Court for

13  sentencing, except for the offenses I've already

14  mentioned.  The PSI investigator, Mr. Cats, although

15  his report has some things in it I don't think should

16  have been in the report, he does at the end

17  specifically not recommend a maximum sentence.  Instead

18  he recommends a sentence in the Department of

19  Corrections to be followed by some kind of community

20  supervision.

21       Mr. Katz has been around for a long time and I

22  know that he knows, just as the Court knows, that the

23  only way we can do that is by giving Mr. Herlihy

24  something less than the maximum sentence, perhaps the

25  minimum nine and a half years, followed by a period of

1    probation for six and a half years, during which time

2    he would be still under the supervision of the Court.

3        So I would ask the Court to follow that implicit

4    recommendation of not giving him the maximum sentence

5    in the Department of Corrections and sentence him

6    either to the bottom of the guidelines or consider that

7    we have -- and I've got a little more to put on.  We'll

8    establish for the Court that the three factors are

9    there for the Court to consider departing.

10       Can I just have the dad and fiance come forward?

11       THE COURT:  Absolutely.

12       MR. GROLAND:  Thank you.

13       THE MOTHER:  Good morning, your Honor.

14       THE COURT:  Hello, ma'am.

15       THE MOTHER:  First of all, I would like to say to

16    John Quirello and his family, our family is very sad

17    and destroyed over what has happened to Robbie.  As a

18    member of a large family, I have witnessed five deaths

19    in children under the age of five in my own family.  We

20    are not on this earth to bury our children, much less

21    our grandchildren.

22       I was there from day one when this happened.  From

23    October of 2000, every night when Brian was home, I

24    would set half the night when he was pacing the floor,

25    looking at Robbie's picture, crying.  I took him many

1    times to Memorial Regional Hospital to the crisis

2    center because he could not sleep, he could not eat.

3    Halloween came, he would not even open the door because

4    it would have been Robbie's first Halloween.

5        This was not Brian's son.  He came into his life

6    and he affected his life, Robbie did.  I am the one

7    that would, when we came up to see him once he came to

8    Gainesville, I would listen to him cry.  I would see

9    that he smuggled a picture of Robbie.

10        I feel horrible for the Quirello family.  I know

11   that Brian would never hurt that baby intentionally.  I

12   think they both, him and Crystal both, exercised poor

13   judgment by putting the baby on a bed.  I would not

14   have told him not to do it, because I did it when my

15   son was a child.

16        I wanted to come here today and tell the Court he

17   is guilty of one thing:  Poor judgment of putting a

18   child on a bed.  And if they don't think he regrets and

19   cries all the time, and has been to group sessions to

20   talk about what happened to Robbie -- We will never

21   forget Robbie.  I don't care if you ever hear the name

22   Robbie, anybody in this room will automatically think

23   about Robbie Quirello and about the life he could have

24   had.  And that is what I would like to say.

25        THE COURT:  Thank you.

1      MR. GROLAND: State your name.

2      MS. SCOTT: My name is Simone Scott.

3      MR. GROLAND: And who are you?

4      MS. SCOTT: Brian's fiance. Okay. I know that

5  there were many medical things that were heard during

6  this trial, many medical theories, but there are many

7  things about Brian Herlihy that no one knows. No one

8  got the opportunity to hear about how Brian cries every

9  day, not every other day, every day about Robbie. No

10 one knows that five days after I met him, he showed me

11 a picture of Robbie and completely broke down and he

12 couldn't -- he couldn't -- I had to wait a couple of

13 minutes because he couldn't get it all out. No one

14 knows that when he got arrested in July of 2001 for a

15 charge that he was acquitted of, that he had me mail

16 Robbie's picture to him and he has kept Robbie's

17 picture with him in his pocket for over 400 days.

18     What the jury didn't get to hear, is that because

19 Brian was forbidden to go to the cemetery, he asked me

20 to go to the cemetery myself, and he asked me to find

21 the most colorful, happy flowers that I could find to

22 place them on the grave, wash the grave, make sure it

23 was shiny because that's all that was left that he

24 could do for Robbie, even if it was me that was doing

25 it.

1      He asked me to pray to Robbie, to ask Robbie why

2   this is happening, to help him find a way to show

3   everyone that all he did was try to help Robbie.

4      I think, I believe that Robbie did in fact do the

5   best that he could to help the jury see what did happen

6   that day, because he was not convicted of first degree

7   murder like the state wanted.  He didn't know all the

8   right words to get through to the jury, but he did make

9   it clear that Brian did try to help him.

10      It was probably a very sad day in Heaven when

11   Robbie realized that one of the many people that cared

12   for him was convicted of such a heinous crime.

13      The only reason that Brian didn't take the stand

14   was because of several alleged statements that he made

15   that had absolutely nothing to do with what this case

16   was about, and that is the reason he didn't take the

17   stand, and that is the reason that he was not able to

18   prove, which I am 100 percent sure that he would have

19   if he had been able to speak about Robbie the way that

20   his family and I hear him speak about Robbie.

21      And I want everyone to know that Brian cannot feel

22   more remorse because of what has happened, and even

23   though he did nothing wrong, he blames himself that he

24   didn't know enough, he didn't know what to do to help

25   Robbie.  And no matter what this Court does to him, he

1   will always blame himself because he didn't know what

2   to do to help Robbie.

3       Brian doesn't blame the family, Robbie's family

4   for thinking that he's some kind of monster and that

5   he's a baby killer, a baby murderer.  He understands

6   that the family's grief over the loss of Robbie and the

7   anger that they felt and continue to feel because of

8   what doctors like Anne Dickison said, I believe it was

9   probably that he was shaken, not definitely, not -- was

10  probably.  And I think that she doubts her own

11  conclusion and, I myself, don't blame the family for

12  thinking what they think.  A baby died there has to be

13  a reason why.  He was there.  That's why.  He's it.

14      I do find comfort in the fact that everyone in the

15  courtroom today that thinks, that wholeheartedly

16  believes that he is a baby murderer, will one day when

17  it's their turn to meet their maker, they will see, it

18  will be proven that he did nothing but to try to help

19  Robbie and they will feel sad, and they will feel sad

20  that day.

21      And I want everyone to know that I stand here and

22  I believe Brian's innocent 900 percent.  If I didn't, I

23  wouldn't be here.  This is not something that I would

24  get involved with.  It hasn't been easy.  I'm not the

25  one that's incarcerated, but I am the one that has to

1    calm him down when he starts crying hysterically.  And

2    I ask your Honor for some sort of leniency and the

3    opportunity to help him start his life over.  And what

4    I mean by starting his life over, Judge, I don't mean

5    walking out of that door and he's gonna forget about

6    Robbie.  That will never happen.  Because I can't talk

7    to him for more than ten minutes and he doesn't talk

8    about Robbie.  Robbie did this, or Robbie was this, and

9    I loved Robbie so much.

10            And for unknown reasons to all of us, Robbie's

11   life was taken by God, but on the other hands -- on the

12   other hand, excuse me, Brian's future is in the hand of

13   men, man.  And once again I ask your Honor for leniency

14   and I thank you.

15           MR. GROLAND:  Thank you, Simone.

16           State your name, please.

17           THE FATHER:  My name is John Herlihy.  I am the

18   accused's father.  I would like to make two-points.

19   The first point that is significant to me, in the 32

20   years that I've known him, this is the first time his

21   concern was focused on the outcome.  He was far more

22   upset over the death of the infant than he was about

23   any possible consequences, which is very significant

24   for me having known him all of his life.  And also my

25   experience at a premier teaching hospital in the State

1    of Florida, my job involves the daily review and the

2    search for truth in medical cases involving deaths.

3    And while we're all devastated by any kind of adverse

4    outcome, especially the death of a child, that

5    particular review from my profession is a search for

6    the truth and it is not directed at proving one thing

7    or another.  It is simply to address the issues, the

8    root causes of that death, and to prevent further

9    deaths, similar situations.

10        This has been the first thing out of his mouth

11   every time we speak, is his concern.  He is full of

12   remorse over the death of this child.  Even though he

13   understands from his very earliest CPR classes that

14   despite the best intentions and following the best

15   possible technique, as we see in the hospitals, death

16   is an outcome many times and it is often outside of our

17   control.  Thank you.

18        MR. GROLAND:  Thank you.

19        May I just have a moment?

20        THE COURT:  Sure.  Go ahead.

21        THE DEFENDANT:  Good morning, your Honor.  Forgive

22   me, I might get a little emotional.  This whole thing,

23   it's very hard.

24        I prepared a little speech that I kind of wanted

25   to say some things because I did not take the stand on

1   my own defense.  I didn't feel I had to because the

2   state did not prove anything on me.  So, with your

3   permission, your Honor, I would like to say what I kind

4   of prepared.

5        I come before the Court, Robbie's family, my own

6   family, everyone else present today to attempt to put

7   into words how much Robbie's death has meant to me, but

8   rather, how much his life meant to me.  For the past

9   two and a half years I have had to every day wonder

10  what happened.  Do I feel remorse for what happened to

11  Robbie?  Yes.  I in no way intentionally did anything

12  to harm that young man.

13       It is not my intention or purpose to dramatize

14  anything involving myself, Robbie, or either of our

15  families.  That would be completely and totally

16  inappropriate and just dead wrong.

17       For me to say that I loved Robbie is just not

18  enough.  Robbie was with me for a short time, but in

19  essence, he's kind of still with me.  He's with us

20  today.  He's in my mind and heart everyday.  I can

21  fondly remember the first time I ever met him, when I

22  gave him a bottle at the Oaks mall.  That was probably

23  the most peaceful feeling I've ever had in my life.

24       Many wonderful things occurred when I spent this

25  time with Robbie.  I'll always cherish them.  It is

1    evident that he was the bright spot in many people's

2    lives, because he sure was in mine.

3        The sickening part of this entire ordeal is that

4    the state and the authorities misled Robbie's family,

5    the jury, members of the court, with a theory or

6    accusation that I harmed Robbie intentionally in any

7    way.  That is completely and totally untrue.  If there

8    was an inkling, your Honor, that I did anything to

9    Robbie, I would not have put my family, Robbie's

10   family, Mr. Groland, Mr. Tedder, and everyone in this

11   courtroom through this entire ordeal of a trial.  I

12   sure as wouldn't have put myself through it.

13       There's also been a lot of discussions from the

14   state attorney's office to my attorneys regarding the

15   possibility of me taking a deal.  I'm sure that if the

16   details of those discussions could be made light to the

17   public, even more questions about this case would have

18   surfaced.

19       It has been always made clear to me from

20   Mr. Groland, Mr. Tedder, I told them this:  That I

21   cannot take a deal for something I did not do.

22       I feel a tremendous amount of pain in my life

23   because Robbie is no longer here on earth with us.  He

24   is always with those who love him, and he's with them

25   in spirit.

1    But also what hurts me is that the prosecution

2    knew many, many things from their own witnesses that

3    they depositioned (sic), that could have been presented

4    to the jury and the Court about Robbie's chronic

5    injury; however, they didn't.  Instead they maintained

6    their stance because Detective Helen Legall said in

7    trial, quote, "We had our suspect," end quote.  This

8    was said despite testimony from other police officers,

9    as well as others that more doubts were raised.

10    I've read the victim injury or victim panel

11    statements from John Quirello, Crystal Quirello, their

12    other family members.  I too feel their pain and I

13    always will.  I've had loved ones die.  I've had them

14    taken from me.  I found an uncle who hung himself.  I

15    had spent the night before with him.  He was my best

16    friend.  I found him.  I had to call my father in south

17    Florida because I didn't know who to call.  It was a

18    rural area.  There was no 911.  I had to deal with

19    that.

20    Then I had to leave and go see my grandmother.  I

21    come from a large family, as you've heard her say.  The

22    first thing my grandmother says, Brian, what happened

23    to my boy?  How do you come to an answer for something

24    like that?

25    The anger felt by the loss of Robbie Quirello has

1    affected many people, not just his family.  But what is

2    really upsetting to me, is that one of those who should

3    have been present throughout this entire trial, was his

4    primary caregiver, was absent, as Mr. Groland said, for

5    the jury verdict, and is in fact absent here today.

6         So much of what has come to light in the trial

7    proceedings angers me.  Mostly though, it's not really

8    known yet what happened to Robbie, that I refer to as

9    my little buddy.

10        It's with a very, very heavy heart that I stand

11   here before your Honor and I relay my thoughts, my

12   emotions.  There's a lot of them.

13        I want both the Davis family and the Quirello

14   family, regardless of what they think of me, to know

15   that I did and truly in fact love and care for Robbie

16   with all my heart.

17        I thank you, your Honor, Judge Lott, for allowing

18   me to speak.  It's been a long time.  I thank my family

19   and my friends, not just here today, but outside of the

20   courtroom, outside in town, for all the support that

21   they've given me.

22        I really wish to thank Mr. Groland, Mr. Tedder,

23   and his entire office for believing in me.  He wouldn't

24   have taken the case if he didn't believe in me.

25        I also want to thank him for doing everything

1    possible to help me survive this horrible and tragic

2    ordeal.  That's all I want to say.

3        MR. GROLAND:  Thank you, your Honor.

4        THE COURT:  Thank you.  Anything else?

5        MR. GROLAND:  Mr. Tedder has a couple of remarks

6    to make, but if we may, we would like to do that after,

7    as soon as the state finishes.  Thank you.

8        THE COURT:  Ms. Singer, go ahead.

9        MS. SINGER:  Your Honor, I would like to make a

10   statement and I do have folks who also want to speak on

11   behalf of the state in this case.

12       As the Court is well aware under section 921.002

13   Florida statutes and under the new criminal punishment

14   code, or relatively new criminal punishment code, the

15   legislature has outlined in writing what the -- or

16   defined in writing what the primary purpose of

17   sentencing is.  The primary purpose of sentencing is to

18   punish the offender.  Rehabilitation is a desired goal.

19   It's ordinant to the goal of punishment.  And lastly,

20   the statute says that the penalty imposed should be

21   commensurate with the severity of the offense, and the

22   circumstances of the offense.

23       And so I'm going to be asking the Court, who sat

24   through the entire trial, along with the trial, heard

25   proffered testimony that was not admitted, but was --

1    can be considered by this Court.  The rulings were that

2    it was prejudicial, not that it was not truthful in

3    nature.  The Court may consider all of those things in

4    determining the sentence based upon the severity of the

5    offense, as well as the circumstances.

6        The state asks, as Mr. Groland has said, has asked

7    the Court to sentence the defendant to the maximum

8    period of incarceration permitted under the law.

9    Guidelines sentencing score sheet has been provided to

10   the Court, is up at the bench, for the record, has been

11   initialed by Mr. Groland.  He has reviewed it.

12       The sentencing guidelines has the low end at 9.47,

13   I believe, years, and the high end at 15 years maximum.

14   We would be asking for 15 years and these are the

15   reasons:

16       One, all of the information that's been provided

17   in the presentence investigation.  I understand

18   Mr. Groland has, I suspect, made an objection to parts

19   of the record.  We don't know specifically what parts,

20   but I'm going to ask the Court to do this:  If the

21   Court has any questions about any parts of the record,

22   the parts that the state is relying upon are the

23   criminal history, which I'm going to ask the Court to

24   take judicial notice of the case files that are in

25   Alachua County, if the Court does not feel comfortable

1  relying on Mr. Katz' rendition of those reports.   I

2  believe the Court can take judicial notice and have

3  them looked at if the Court is not comfortable with

4  Mr. Katz' rendition on the criminal history.

5       I will ask the Court also to take judicial notice

6  of each and every one of the injunctions that were

7  issued in Alachua County for the number of cases where

8  Mr. Herlihy was enjoined from contact with women in

9  this county, based upon acts of violence, harassment,

10 and stalking.  I believe these are matters that the

11 Court can consider in sentencing in this case.  Those

12 matters are here in this Alachua County Courthouse and

13 can be reviewed.  And any other matters, the state will

14 be happy to supplement the record with police reports

15 and certified records of the police reports in each of

16 the cases if the Court is not satisfied with Mr. Katz'

17 rendition of the facts.

18      I submit that Mr. Katz has done a very thorough

19 job in the presentence investigation, telling the Court

20 a lot about the background of the man, Brian Herlihy,

21 who stands here not as a remorseful defendant, because

22 the statements he made a moment ago, do not signify

23 remorse.  I can't take a deal for something I did not

24 do.  That is not remorse.  He may feel very sorry for

25 himself and about the circumstances he's in, but he is

1      not remorseful.

2          I'm going to ask the Court if the Court has any

3      concerns about the presentence investigation, to allow

4      us to supplement and we will, because we believe that

5      Mr. Katz has done a very thorough and accurate

6      presentence investigation.

7          The Court can also, for the purposes of

8      sentencing, consider the factual basis that was

9      provided in detail through the trial in this case.  I

10     want to ask the Court to consider another matter that

11     was provided to this Court that was not heard by the

12     jury, and that was the proffered testimony of Deputy

13     Cathy Long, that was held not to be admissible because

14     it was too prejudicial at the time of trial, but can be

15     considered in sentencing.

16         MR. GROLAND:  We object to that, and our position

17     is since the Court made a specific finding, that that

18     should not come in.  It certainly can't come in at

19     sentencing.  The Court having made that ruling should

20     not consider it.

21         THE COURT:  The objection is noted.  It is

22     overruled.  You may proceed.

23         MS. SINGER:  And the Court may be familiar, I

24     don't know if the Court has an independent recollection

25     of that.  I can read the verbatim police report if the

1    Court needs to have that.  But the bottom line from

2    Cathy Long's testimony was, that before the child had

3    been injured, Ms. Long, Deputy Long, who is a Bailiff

4    in this courthouse, had contact with Mr. Herlihy and

5    Mr. Herlihy reported to her that sometimes he gets so

6    frustrated with the baby crying, that he just wants to

7    shake the baby; at which time Deputy Long gave him some

8    good advice, and that is, many parents feel that way,

9    many people feel that way.  You need to walk out of the

10   room.  You need to take a break from the child.  Let

11   the baby cry it out, but you cannot shake a baby.

12       Mr. Herlihy knew that before the day of August the

13   2nd, 2000 when he was in the sole custody of the child,

14   Robbie Quirello.  He knew from whatever little medical

15   training he's had, and from common sense, that one does

16   not shake a baby and he did in fact based upon the

17   testimony that was offered in this case, shake Robbie

18   Quirello, causing the fatal injuries, resulting in his

19   death on August the 10th.

20       The Court can consider the age of the defendant,

21   the age the time that this crime occurred, and his

22   age today.  He was an adult.  He was in a position of

23   trust.  He was in a position of ultimate trust.  He was

24   in a position to protect what is unquestionably a

25   vulnerable infant.  He was in a position to protect and

1      care for someone who could not care for themselves, and

2      he violated that trust. He violated that trust in such

3      a severe way that it led to the death of this child,

4      and as a result of that violation, he should be

5      sentenced and punished the maximum period of time that

6      can be imposed by law.

7          Not only did he violate the trust imposed upon him

8      by Robbie Quirello, the individual, the child versus

9      the adult, but he also violated the community, the

10     state's trust. We have -- it's not just Florida. It's

11     not just the United States of America. It is a

12     societal, human trust that we have, that we are to care

13     for and refrain from harming infants and children. It

14     is accepted in every society, in every country of this

15     world. In fact, it's even accepted in the animal

16     world, to protect our young, to protect our most

17     vulnerable.

18         It is our responsibility to make sure that the

19     weakest of us are taken care of. It's our duty to

20     refrain from acts that can cause harm, injury, and

21     ultimately death. We, as adults, Brian Herlihy, as an

22     adult, had a duty to refrain from taking out his anger

23     and frustration on this child. He had a duty to assure

24     that that child was properly cared for. He failed in

25     that duty. These responsibilities are universally

1    understood and accepted.

2       No one had to tell Brian Herlihy before

3    August 2nd, much less Cathy Long, but no one had to

4    tell him that you don't shake a baby.  No one had to

5    tell him that you don't punish a baby of four months.

6    And that's why his acts are particularly egregious.

7       This is not someone who gets behind a wheel

8    believing that they can control the vehicle, and goes

9    off the road and hits another vehicle.  This is a

10    person who is absolutely sober, in control of his life,

11    in control of his actions, who could walk out of that

12    room, go in the bathroom, take a walk around the block,

13    who chose not to.

14       Instead, out of frustration and anger, which I

15    submit to the Court the presentence investigation shows

16    you is a part of the character of Brian Herlihy that

17    was evinced before August 2nd, because there is

18    evidence of anger and violence in his background well

19    before August 2nd, that once again, Brian Herlihy's

20    anger, his flawed character, his inability to control

21    his frustrations were shown, were evinced in his

22    actions towards a four month old child, a particularly

23    vulnerable victim, Robbie Quirello.  Couldn't fight

24    back.

25       These were not like the women who went to the

1    courthouse and got injunctions and had judges tell him

2    to stay away, and had judges tell him not to threaten

3    them anymore.  This was is a baby who couldn't speak

4    for himself, that's what makes this particularly

5    egregious.  That's what makes this the kind of case

6    that requires the maximum punishment.

7        The maximum sentence is necessary both to properly

8    punish Brian Herlihy, which is what 921 requires.  It

9    also is an opportunity in a safe, secure environment

10   for Brian Herlihy to obtain whatever rehabilitation he

11   needs to get that problem that he has with anger, and

12   with imposing violence on others, under control.

13       But the third factor that the Court can consider

14   and is so important in this case is, while he is being

15   punished and obtaining whatever opportunities are

16   available to him, he is secure from others in this

17   community.  And we, the community, those of us who walk

18   the streets of Gainesville, Florida, and Miami, and

19   Broward County and wherever else, Pennsylvania,

20   wherever else Brian Herlihy ends up going, we are

21   protected for the period of time that Brian Herlihy is

22   incarcerated.  Those are three reasons why the maximum

23   penalty should be imposed.

24       I have a number of comments I want to make

25   regarding the specific rendition of facts given by

```
 1        Mr. Groland.  The state takes the position, and I think

 2    the Court is well aware of this through -- the Court is

 3    so familiar with this case and the factual basis of

 4    this case, that I don't think I need to reiterate it

 5    for the Court.  I ask the Court to just rely on it's

 6    memory and notes, whatever the Court needs.  But there

 7    has been no showing whatsoever that there has been any

 8    mitigating factor under 921 that would suffice to allow

 9    a departure downward.  I don't believe, unless the

10    Court thinks I need to make more argument on that, that

11    the Court should find that there should be a departure

12    downward.  And I ask the Court, does the Court need

13    further argument on that issue at this time?  Because I

14    will argue specifics.

15        I think the lack of remorse itself, I think

16    Mr. Herlihy's own statement today shows that there is

17    no remorse.  Remorse is, I am sorry for having hurt

18    this child.  What I heard was, I didn't take a deal

19    because I didn't do it.  If I didn't do it, if that's

20    what it is, that is not remorse.  Yeah, I'm feeling

21    really bad because I might go to prison today, and I'm

22    really sad because this baby is dead, but I didn't do

23    it.  There has been absolutely no showing of remorse.

24    I think on that ground alone, that mitigating factor

25    does not apply.
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1    The second mitigating factor, isolated incident.

2    This is not by the actions and the descriptions in the

3    presentence investigation, and with the finding that

4    the jury made, this is not an isolated incident.

5    Showing temper, showing physical violence as a result

6    of frustration in the acts towards the women in his

7    life that are listed in that presentence investigation

8    and supported by the record, I submit to the Court the

9    Court can look at the court file of Alachua County,

10   supported by the record, shows that this is not an

11   isolated incident.

12       Is it an isolated incident in regard to a four

13   month old child who can't defend itself?  Maybe so.

14   Maybe these women didn't trust him with their children,

15   or maybe they didn't have children.  But it's not an

16   isolated incident.  So on those two cases, those two

17   factual bases, there are no sufficient facts to support

18   a deviation downward.  I think that probably covers

19   that argument.

20       Before I have the family stand up, your Honor, I

21   want to say one other thing about the comments that

22   were made at the sentencing so that -- because I will

23   tell you that the family will be very emotional as they

24   approach, I suspect, having talked to them and about

25   how much they loved Robbie.  There are two things I

1    want to say:  First of all, whatever this Court's

2    ruling is, I am certain, as certain as I can be of

3    anything, that the family of Robbie Quirello does not

4    want Brian Herlihy at the grave site of this child.

5    The comments that he is sending people to the grave

6    site, while I understand there probably is nothing this

7    Court can do about that, I want the record to show so

8    that they don't have to say it to you, because I think

9    they will say it with the emotion that would be

10   attached to it, that they don't want that.

11       There's one last thing before I allow the family

12   to step up here, and that is, the family would like the

13   court record, the actual court file to have a

14   photograph of Robbie Quirello in the court file, so

15   that any future persons who may come in to review this

16   file, and to view this file, can see a picture of

17   Robbie as he was.  This is a picture that is in

18   evidence, your Honor, but I realize that the

19   photographs are not going to be in the actual court

20   file.  So with the Court's permission, we would like to

21   go ahead and have this put in the court file so that if

22   anyone ever chooses in the years ahead to view this

23   file, they will know that Robbie Quirello was a person,

24   he's not just a name, he's not just a document, he is a

25   person and that that's what this was about.

1        Now if I could --

2        MR. GROLAND:  Aren't there photographs in

3    evidence?

4        MS. SINGER:  In evidence, but not in the court

5    file.

6        MR. GROLAND:  That's fine.  I have no objection.

7        MS. SINGER:  Your Honor, I have a number of family

8    members who want to speak.  I believe Mr. Quirello, the

9    father of Robbie Quirello, would like to come up and

10   speak at this time.  If you would like to come up,

11   please.  And if I could have one moment with him.

12        (Pause in the proceedings.)

13        MS. SINGER:  For the record this is John Quirello,

14   Jr., Robbie's dad.

15        THE FATHER:  I was told that I was gonna be able

16   to get a chance to come up here and talk to you about

17   how this has impacted my life, my family's life, in a

18   little less over two years now.  And I don't really

19   know what I can even say about it.

20        The day my son got hurt, that morning I was

21   playing with him at my job.  He was sitting on the

22   counter, laughing, ringing a bell.  An hour and a half

23   later, he's got tubes sticking out of him at a hospital

24   because that man shook him and killed him.  I had to

25   sit there and watch my son die for almost a week

1    because of what that person did.

2         Now, when Mr. Groland asked you and tells you

3    that, you know, if this was an adult in this case with

4    the same conviction that you might not -- he might not

5    get that term if he would have killed another adult in

6    a bar fight, he's right, and maybe that's the way it

7    should be. My son was four and a half months old. If

8    I'm in a bar fight, at least you can defend yourself.

9    My baby had no chance whatsoever against him.

10        He killed my son because he wouldn't stop crying.

11   He made threats that he was gonna do that weeks before

12   he actually picked my son up and shook him because he

13   was crying. An officer of the court heard him say

14   that. She didn't get to tell the jury that, for some

15   reason because of some law. The jury didn't get to

16   find out that he has a violent past and a violent

17   history. No one got to hear that. If they did, he

18   wouldn't be sitting here for manslaughter right now.

19        Since my son's been killed, I lost my wife, I lost

20   my job, and moved down to Orlando because I couldn't

21   walk in the door of my job and see the counter where I

22   last saw Robbie healthy again. I couldn't do it

23   anymore. I took a huge financial loss to go down

24   there, which I really don't care about. That's not the

25   point. I have to take six different medications just

1    to where I can stay functioning in society.  I've been

2    through all kinds of different counseling and

3    everything just to where I can make it through the day

4    without losing it and wanting to die.

5         Something has got to happen, some example has got

6    to be set to where my son didn't die in vain.  And I

7    don't care what his fiance or his father said.  Let me

8    pose the question to you:  If he would have gotten

9    killed, how would you feel about it?  Would you have

10   wanted to sit there and listen to this if your son was

11   killed by somebody?

12        I just can't have this go away.  I can't sit here

13   and listen to him get some lesser sentence.  And he

14   needs to be made an example of.  He needs to be away

15   where he can't hurt anybody else's kid again.  That's

16   all I have to say.

17        MS. SINGER:  Your Honor, before I call Mr. Davis,

18   who is the grandfather, maternal grandfather of the

19   child, and his wife, Tammy, I would like to say that I

20   think all the comments that were made regarding Crystal

21   Quirello have absolutely nothing to do with the

22   sentencing in this case.  I know this Court very well

23   and I don't believe that it would have any affect.  I

24   believe it's totally irrelevant whether Crystal

25   Quirello sat through jury selection, or whether or not

Stacey K. Bryant, RPR
Judicial Court Reporter

0002895

1   she was here today.  She did make a statement in the

2   presentence investigation report.  I think it's a very

3   thorough statement and I ask the Court to consider that

4   as her impact statement in this case.  She was not to

5   blame for the death of her child.  Brian Herlihy was

6   convicted, or was found guilty for the death of Robbie

7   Quirello, and that issue is not a matter that should be

8   considered in sentencing today.

9        I would like to have Richard Davis and Tammy Davis

10  step forward now representing Crystal Quirello, and

11  allow them to make their impact statement, if the Court

12  would allow.  Mr. and Mrs. Davis.

13       MR. DAVIS:  Mine kind of takes a few minutes.

14       MS. SINGER:  All right.  All right.  Let's just be

15  ready.  I know the Court has a docket.  So I want to

16  make sure you're up here ready.  So, let's see what's

17  going on.

18       MR. DAVIS:  Your Honor, I'm Richard Davis, the

19  baby's grandfather.  I would like to make a couple

20  statements to why my daughter's not here, is we've got

21  a very strained relationship.  I told her not to be

22  here.  I'm the responsible party that she's not here

23  and the reason our relationship is strained is I don't

24  agree with her part, and what I mean by her part, is

25  the fact that she committed adultery.  She failed to

1    take advice from her father like so many kids do, that

2    you have to work at a marriage every day.  Her marriage

3    was failing and she decided the grass was greener on

4    the other side of the fence.

5        And I was barred from most of the trial, but, I

6    being a police officer of 33 years and a homicide

7    investigator for 23, I understand the system.  I

8    understand how the jury works, how the defense defends

9    people that do crimes.  I've heard things that's not

10   so, and I know them not to be so, but because I am an

11   investigator and have been for 23 years of my 33, so I

12   did a little investigating on this case myself.  And I

13   understand that in courts you have objections.  We

14   stand up in court and we swear to tell the whole truth

15   and nothing but the truth, but only that truth that we

16   want to hear, or that's allowed to get into court, such

17   as the bailiff that heard him say "I could just shake

18   him sometimes."

19       Now the whole story could have been summed up and

20   in half a day in this courtroom.  It's the fact that a

21   woman committed adultery and was taken in by a smooth

22   talker.  And his history shows that he's smooth talker.

23   And my daughter, I'm here to tell you today and not in

24   her defense in any way, but she is retarded and I've

25   known this for a long time and I'm putting it on a

1    matter of record today, whether I ever go to her

2    face-to-face and say that you are, but when she was

3    about two weeks old she went about six-and-a-half

4    minutes without air.  Now, is that a reason for her

5    committing adultery.  She was brought up in the

6    church -- and I say brought up in the church after I

7    became saved and became a Christian and this has been

8    about eight years ago, I got her into church -- would

9    that have changed anything?  Would that have changed

10   the actions or consequences that people do?  That

11   people decide to do to other people for whatever

12   reason?  I don't think so.  But Brian Herlihy did, in

13   fact, according a doctor that attended the child -- and

14   this has always amazed me how people can bring in

15   people that weren't at the scene of my traffic crashes,

16   and be expert witnesses on them, and never been to the

17   scene of a traffic crash.  And I can be there and they

18   can come in and they can be paid to say:  Well, that

19   don't happen, or that does happen.  And I'm there.

20        And I've worked over 500 fatalities.  I do

21   understand blunt force trauma to brains.  There's two

22   organs in the body and I understand that we have a

23   doctor present that can verify this, the order goes to

24   the heart; the heart floats in the body.  In a traffic

25   crash, and it's no different than a baby being shaken,

1    is the brain floats and the heart floats.  There are

2    two organs in the body that float.  When a baby is

3    shaken, the brain will actually make contact with the

4    skull that causes injuries, and somebody didn't do

5    their homework there when they were defending Brian

6    Herlihy, and that was the blunt force trauma.

7         My question is:  Why wasn't it never brought up,

8    and this is not and it couldn't have been, it couldn't

9    have been brought out as evidence.  My thing is, is he

10    had a pre-existing injury.  Brian watched this child on

11    numerous occasions.  Was he just violent the day that

12    he killed Brian, that he killed Robbie Quirello?  Or

13    was he violent on days before that?  That was a

14    question.

15         But I understand why it can't come in because I do

16    understand our legal system.  I stood up in the legal

17    system many times, and the fact that Robbie was four

18    months old.  A baby wants three things at four months

19    old, and we all, as baby's, that's all we wanted.  We

20    wanted love; we wanted to be dry; and we wanted to be

21    fed.

22         I held that baby two days prior to its death and

23    there was nothing wrong with that child.  And I am a

24    Christian and I can swear to the good Lord up above,

25    may he strike me right here, right now, dead, if that's

1    not so.  That baby was as bright and vibrant as any

2    baby on the face of the earth.  And I held it and I

3    savor those times.  And I was asked to prepare a

4    statement how this has affected my life and I couldn't

5    do that in a lifetime.  I couldn't do that in a

6    lifetime.

7         I was barred from this court, and I did it.  And I

8    did it because I said a prayer at Robbie's funeral.  I

9    said a prayer that let the justice system handle this

10   and I could have, I could have, I could have done a lot

11   of things, but as a Christian that would really be

12   witnessing to people that I witness to on a daily

13   basis.  I can go out and okay, it's okay for him to do

14   it, and it's okay for me to do something to get even,

15   and all this stuff.  And I'm not all about that,

16   because I'm gonna say something here that's gonna shock

17   the Quirello family, and it almost shocks me, but as a

18   Christian I have to do it.

19        I forgive Brian for what he done.  And I stood in

20   a church in West Virginia and said I do that one day.

21   And I can look him in the face and say it.  I forgive

22   you for what you done.  But now it's payday.  Now it's

23   time for him to answer for why he shook Robbie Quirello

24   to death.

25        And I know they say the jury.  What runs through

1    juries' minds is, I'm sure that it's a factor of a lot

2    of things.  But I don't think they fully understood the

3    aggravated child abuse if they found that aggravated

4    child abuse was committed; that they had to find him

5    guilty of first degree murder.

6         And, as a matter of fact, one of jurors, and I

7    believe it was Currier, had made that statement to the

8    newspaper, and I picked it up off the Internet and

9    thereabouts.  But, you know, the thing is, is the whole

10   truth and nothing but the truth.  They can waltz people

11   in here and say that doesn't happen.  That's the most

12   absurd thing and -- that I've ever heard.  But they had

13   their job to do and they did it and they did it

14   admirably.  My hat's off to you.  You all are good.

15   But that's what they're paid to do.  They're paid to

16   defend.  We're paid to serve.

17        But, you know what?  We -- and I'm not by no means

18   trying to make the judge mad when I say this.  Our job

19   is to speak for the dead, mine as a homicide

20   investigator to speak for the dead.  Robbie is dead.

21        And I sat down and I prayed about this coming back

22   from Baldwin High School the other day.  And then I'll

23   conclude.  I said:  How does this affect me?  And

24   there's no way I could do it.  I tried, and tried, and

25   tried.

```
 1          And I started out on my computer.  This is in
 2     response to how Robbie Quirello's death has affected
 3     the family household of Richard Davis, Tammy Davis, and
 4     Natalie.  We have prayed about how to respond as
 5     Christians to this question and it has been placed upon
 6     our hearts to talk for Robbie, and how it has affected
 7     him.
 8          We would now like to ask questions and make
 9     comments as if Robbie was able to do this himself.  And
10     this is from Robbie.  I was only four months old and
11     was a happy baby.  I loved my grandparents very much.
12     I loved to be held by them and visit them, which I am
13     no longer able to do as everyone is aware.  My life and
14     pursuit of happiness was cut way too short.  This was
15     done by my mother's poor judgment, and by the hand of
16     Brian Herlihy.  The law found Brian guilty of something
17     called manslaughter, but I was just a baby.  Why want
18     it will called babyslaughter.  I would have even
19     settled for being as good as anyone else, and it be
20     called murder, because that's exactly what Brian did to
21     me.  It does take a lot -- it doesn't take a lot of
22     sense to know that Brian is at least ten to 15 times my
23     size and way strong than I was at my age.  Yeah, maybe
24     I was crying, maybe I was hungry, or even wet, but this
25     is why I cried.
```

1          It was not worth his anger that took my life.  In

2     court everybody got up on the stand and swore to tell

3     the whole truth, and nothing but the truth; however,

4     this did not happen.  There was this man, no names

5     necessary, that stated there was no such thing as baby

6     shaken syndrome.  But another person, a very nice lady

7     that tried to save my life, stated he was shaken so

8     violently that it did, in fact, cause his death.  The

9     state attorney that spoke for me was a very nice lady

10    and did her best.  The judge did exactly what her oath

11    of office expects her to do.  Even the attorneys for

12    Brian, parentheses boogyman, keep in mind Robbie's

13    writing this, not me, through my heart, did their job.

14         For two-and-a-half weeks this case went on to

15    prove that my death happened or did not happen.  My

16    questions are:  Why am I dead?  What would my first

17    Christmas have been like?  The Easter bunny, the Tooth

18    Fairy.  Why can't I have these things such as a wife

19    and children?

20         I know I am in a better place, Heaven.  I am sorry

21    for how this has affected so many lives in my short

22    four months on earth.  I am sorry for the sleepless

23    nights of the people that loved me and their grief.  I

24    am asking that Brian Herlihy answer and send a message

25    to everyone that a four-month-old baby only wants to be

1    held and loved, and has that right.

2         Now is the time for you, the judge, to pass

3    sentence on Brian Herlihy to the fullest extent of the

4    law.  By the way my grandparents and my family will

5    reunite with me in Heaven one day because God said so.

6    Thank you.

7         MS. SINGER:  Your Honor, the next person to speak

8    is Tammy Davis, maternal grandmother.

9         MS. DAVIS:  I'm just gonna read mine.

10        Since we know that Robbie was a healthy and happy

11   four-month-old baby, even Brian Herlihy agreed to that.

12   On the morning of August the 2nd, 2000, Robbie was part

13   of a scheduled outing with his mother Crystal and her

14   boyfriend, Brian.  Robbie had no say in the outing.  He

15   would have been more content that day to stay with his

16   great grandmother, Mimi, but at that time he was being

17   used as a pawn.  He was handed over to Brian Herlihy so

18   Crystal could go run errands for her and Brian before

19   their outing at Cedar Key.

20        Robbie hadn't fully been fed for his satisfaction,

21   bathed like his everyday routine was with Mimi, and

22   maybe had a wet diaper.  He was out of his comfort zone

23   and daily routine.

24        Everyone that sat in the courtroom for

25   two-and-a-half weeks did agree that Robbie's death

```
 1      occurred within like a real small time frame that was

 2      after crystal left.  It was 20 to 25 minutes.

 3          Out of the mouth of Brian Herlihy, Robbie was

 4      smiling, cooing, et cetera, when Crystal placed him in

 5      Brian's hands.  Then something happened.  Robbie's life

 6      was over.  A perfectly normal, little baby now was a

 7      brain dead infant.  Life is -- I'm not able to really

 8      comprehend how or why we are able to allow people to

 9      tear down other people during the trial and the

10      defendant has all rights.  For two-and-a-half weeks we

11      heard testimony after testimony, the defending

12      attorneys were allowed to destroy people's character,

13      some of which have high standings in the community.

14      Lawfully no one could touch Brian's character.  Brian's

15      temperament and characteristics are what caused

16      Robbie's death.  One of the most devastating things I

17      heard from the state was, quote, I don't have time for

18      this today, unquote.  This was sad.  This was said on

19      the 911 tape.  He didn't have time for Robbie's death

20      on that day.

21          My question to him would be what would be the

22      right day for it?  Every day that goes by I think of

23      Robbie.  I was blessed by his presence and he was a

24      bright spot in my life.  He was my first grandchild,

25      what a bundle of pride and joy.
```

1    Death is always a bad thing.  A death like

2    Robbie's is terrible, and I don't even know if the word

3    terrible was strong enough.  He wasn't sick, he wasn't

4    in a car accident.  His was a death that was chosen by

5    someone else because they were having a bad day.

6    Brian's life shows a life of destruction.  He has had

7    all opportunity of living and having a full life.  His

8    actions took away all of Robbie's opportunity for life.

9    I was really saddened when the trial was over and

10    a verdict of manslaughter was handed down.  I feel that

11    the wording in the law, intentionally and knowingly,

12    could have determined a more justly verdict.  This is

13    sad.

14    As one of the defending attorneys stated, the jury

15    came back with a middle-of-road verdict.  Reflecting

16    back on all of this, I'm glad to know though that

17    Robbie's little life was able to touch so many lives

18    for the good.  Some people go a lifetime and won't

19    touch very many lives for good at all.

20    Again, he brought so much happiness to me and in

21    my heart there a place that is Robbie's and only

22    Robbie's.  No other grandchild will be able to fill

23    that spot.

24    I'm sorry that this death happened because of

25    selfishness and temperament and low regard for

1    another's life, Robbie's life was taken.  It has left

2    behind emptiness in loved one's lives, sickness,

3    depression, anger, broken homes, separation of family

4    members, such as brothers, and sisters, and

5    stepmothers, aunts, uncles, cousins, et cetera, which

6    can never be undone.  And I am begging of you, Judge

7    Lott, to pass down the strongest sentence that you can.

8    This is in hopes that no other little baby or child

9    will have to die such a death as Robbie did.

10        Good citizens know there are consequences for

11    things that they do when they break the laws of the

12    land.  Knowing that there are consequences to pay for

13    wrongdoing keeps us on the right track.  Please make an

14    example out of the wrong that was done in this case.

15    Thank you.

16        MS. SINGER:  Your Honor, one last person wishes to

17    speak and that's Kathleen Morriston, the paternal

18    grandmother of Robbie Quirello.

19        MS. SHIRLEY DAVIS:  Your Honor, I'm Shirley Davis,

20    victim advocate.  Ms. Morriston has asked me to read

21    the letter.

22        "This message is being sent to you on behalf of

23    Jeanne Kennedy Quirello, to the attention of the court

24    in the sentencing hearing of Brian Herlihy.  Excuse

25    me -- In regards to the death of my great grandson,

1   Robert Benjamin Quirello.  My name is Jeanne Kennedy

2   Quirello, and I'm the great grandmother of Robert

3   Benjamin Quirello.  It has now been two years since

4   Robbie was so tragically and senselessly taken from his

5   family.  We have been, we have seen various holidays

6   pass without him, and now we are entering into another

7   holiday season with heartbreak because Robbie will not

8   be here to share it with us.  Robbie never got to see a

9   birthday cake and blow out his candles.  Robbie never

10  got to experience the excitement of Halloween and

11  tricks or treats.  He never shared a Thanksgiving

12  turkey leg with his father.  He never saw beautiful

13  Christmas tree, brightly wrapped Christmas presents, or

14  sat on Santa's lap.  No Easter bunny or Easter basket

15  will ever excite his little eyes.

16      In addition to those wonderful childhood moments,

17  which are the inherent rights of all children, Robbie

18  was denied the greatest gift of all, the right to life.

19  It is never right to deprive an innocent person of

20  their life and to deny the defenseless their life is

21  the most heinous and vicious crime of all.

22      Your Honor, I am not a vicious person, but my

23  great grandson is dead because Brian Herlihy ever

24  evidently saw him as an annoyance, and so he killed

25  Robbie to solve his annoyance problem.  Brian Herlihy

1    brought no joy into little Robbie's life just pain,

2    misery, and death.

3        Robbie deserves justice, Your Honor, and I pray

4    you will administer that justice for Robbie in the

5    sentencing of his killer today.

6        I also request that the defendant be required to

7    undergo anger management therapy during his

8    incarceration.  Respectfully, Ms. Jeanne Kennedy

9    Quirello, 7460 West 12th Avenue, Hialeah, Florida

10    33014."

11        MS. MORRISTON:  Your Honor, this speaks volumes

12    for how our immediate family feels.  The people that

13    were with him daily.  And I do want to make a comment

14    that Brian mentioned that Robbie's primary caregiver

15    was not present here today, nor during the trial.

16    Well, she is, it's his great grandmother.  She spent

17    the most time during the day with him and gave him

18    extraordinary care.  There was not one moment that she

19    left him unattended.  And I just want you to consider

20    the fact that it was indicated that he smuggled photos

21    of Robbie into the prison.  The fact that he ignored

22    the order not to have any contact with the victim, or

23    the victim' family by going to the cemetery, is to me a

24    statement of his disrespect for the law and for our

25    family.

1           Thank you.

2           MS. SINGER:  Your Honor, for the record, the

3   primary caretaker referred to by Ms. Morriston is Doris

4   Bridwell, who is present in the courtroom today, but

5   does not wish to make a statement at this time.  She

6   believes her statements have been made through other

7   family members.  Is that right, Ms. Bridwell?

8           MS. BRIDWELL:  Yes, I'm just not able to at this

9   time.

10          MS. SINGER:  I do have two more things to say,

11  your Honor, before I turn over for Mr. Tedder to rebut.

12          I think it's important after hearing what the

13  family members have said here today, to just remind the

14  Court that we're not here because of the state or the

15  authority misleading the Court and the jury, which was

16  what Mr. Herlihy said when he made a statement to the

17  Court.  We're not here because the state did not prove

18  anything against Brian Herlihy.  In fact, we're here

19  because the state has proved the crime of manslaughter

20  against Mr. Herlihy.  We're not here because Brian

21  Herlihy didn't do anything, which is what he said when

22  he just addressed the Court a moment ago.  We're here

23  because Brian Herlihy needs to be held accountable to

24  the maximum amount allowed by law for the death of

25  Robbie Quirello.

1          At sentencing the Court must handle some other

2     matters at well.  And before we have Mr. Tedder speak,

3     I think Mr. Groland can speak on two other issues that

4     would be before the Court sentencing:  That would be

5     the issue of restitution, and the issue of the motion

6     for state' costs which has been filed in this case,

7     written motion and addendums have been filed throughout

8     the last two weeks when we've been able to get the

9     calculations through the Board of County Commissioners

10    and the payments made.  I understand from Mr. Groland

11    that both the issue of restitution and costs at this

12    time will be reserved and...

13         MR. GROLAND:  With the Court's permission.

14         MS. SINGER:  With the Court's permission.  Because

15    those matters are extensive.  I think the Court's

16    probably aware if the Court's looked through the court

17    file, that we would need to schedule that for some

18    other time.  Is that correct, Mr. Groland?

19         MR. GROLAND:  Perhaps there's some things we can

20    agree to and some other things if we can not agree we

21    can bring before the Court.

22         THE COURT:  Okay.

23         MS. SINGER:  As far as any other statements from

24    the state, Your Honor, we have at this time no other

25    statements, unless the Court has inquiry of the state

1    before the state proceeds to Mr. Tedder' rebuttal.

2            THE COURT:  No, no other questions.

3            Go ahead, Mr. Tedder.

4            MR. TEDDER:  May I speak from here, Your Honor?

5            THE COURT:  Yes.

6            MR. TEDDER:  Your Honor, the first thing I would

7    like to point out, that was not earlier addressed, is

8    on the first page of the presentence investigation

9    indicates the offense statutes that Mr. Herlihy was

10   convicted of as 787.07; it's actually 782.07.

11           MS. SINGER:  That's correct.  I noticed that

12   myself, Your Honor, if we can correct that scrivener's

13   error on the presentence investigation.  I appreciate

14   it.

15           MR. TEDDER:  Your Honor, I can't -- what -- we

16   can't say anything to rebut what the family members

17   have said.  This is obviously a horrible, horrible

18   tragedy for them.  Mr. Herlihy's heart goes out to

19   them, his family's heart goes out to them, Mr. Groland

20   and my hearts go out to them.  There is nothing that

21   can change what has happened.

22           I will respectfully disagree with Ms. Singer's

23   summary as to why we're here, saying we're here because

24   of something Brian did.  I would respectfully suggest

25   that we're here because the medical community itself

1       doesn't understand what happened in this case.  I would

2       suggest to the Court that what happened in this case

3       was that Robbie Quirello had a pre-existing injury that

4       was well-documented by doctors for the state, as well

5       as our doctors who examined the records, which the

6       state had.  That pre-existing injury was with Robbie,

7       that he was in Brian's care for half an hour or less,

8       and because of something that happened while he was in

9       Brian's care, perhaps as doctor or Detective Legall

10      said, perhaps the plop on the bed when he was swinging

11      him back and forth and Robbie was laughing, and

12      Detective Legall said that Brian said he plopped him on

13      his bed and his eyes rolled back.  Perhaps that is what

14      happened?  Who knows?

15       I would suggest and respectfully disagree with the

16      state that Mr. Herlihy did not shake this baby.  The

17      medical community disagrees among itself over whether a

18      child can be shaken and killed by violently shaking the

19      baby.  Dr. Uscinski convinced me very early on when I

20      began to work on this case and talked to him about this

21      case, that if someone was able to shake a child the way

22      the state contents, he did that the child's neck would

23      break first before a brain injury would occur, and

24      there has been absolutely no proof or scientific

25      evidence presented by any of the state' doctors that

1    supports the theory that they operate under.  Whereas,

2    we presented a lot of evidence from scientific studies

3    as to the amount of force that can be generated by

4    shaking an object, and the amount of force that is

5    needed to cause the kind of injury that they claim he

6    caused.  And it all comes down to you have to have

7    blunt impact and not just shaking.

8         I would respectfully disagree with the state

9    attorney as far as the criminal -- The criminal

10   punishment code is for punishment, but it also allows

11   for mitigation, and that's clearly in the code itself.

12        Mr. Herlihy said a moment ago that he didn't want

13   to plead to something he didn't do, and he was always

14   very adamant to us about that, that he didn't do

15   anything to hurt Robbie Quirello.  In fact, I will

16   never forget one of the first times we met with

17   Mr. Herlihy, he looked at me, after we had been talking

18   for a long time about everything, and he started crying

19   and said I just want to know what happened?  I want to

20   know what happened to Robbie?

21        And I've certainly seen throughout the course of

22   my working on this case, lots and lots of times that

23   Mr. Herlihy, being very, very remorseful about Robbie's

24   death, and remorseful that he couldn't do anything to

25   prevent Robbie's death, and the feeling of helplessness

1     he had when this whole event began.

2          And the lady pointed out what he said on the 911

3     tape, about I don't need this today.  I don't have time

4     for this.  I would just suggest to the Court and

5     respectfully submit to them that he didn't need mean by

6     that he didn't care.  He was in a panic state.  He was

7     in a panic state.  He didn't know what to.  Do he was

8     trying to help Robbie.

9          I will also respectfully disagree with the state's

10    position that, well, obviously in human society we do

11    have an agreement to protect children among ourselves,

12    but in the animal world it is different.  And not that

13    it really has much to do with this here, but in an

14    animal world siblings routinely kill each other.

15    Especially in birds, for example, if there is not

16    enough food, the stronger sibling will get food from

17    the parent and the others will be kicked out of the

18    nest.  And other animals attack other groups of animals

19    and kill each other.  So, I mean, it's different in

20    human world, obviously.

21         But in this case, the whole state's theory of the

22    case is that in the brief period of time that

23    Mr. Crystal Quirello was gone, Mr. Herlihy became angry

24    and violently shook the child.  And I would submit to

25    the Court that there has been absolutely no evidence

1    whatsoever that Mr. Herlihy became violent in any way

2    or angry in any way with Robbie, none.  Their whole

3    theory is the baby presented, as Dr. Uscinski said with

4    unexplained condition.  The child was having a seizure.

5    And it was caused by his pre-existing subdural, chronic

6    subdural hematoma that was there.  And it began to

7    spontaneously re-bleed.  Even their doctors admit that

8    could happen.  The child went into a seizure.  The

9    child became brain dead, because of lack of oxygen And

10   obviously the jury didn't buy into that, but they were

11   out 18-and-a-half hours and they came back with

12   manslaughter.

13       I respectfully disagree with their verdict.  I

14   would ask the doctors who testified for the state to

15   look into science behind the theory of shaken baby

16   syndrome, and would ask them to continue to look into

17   it, because I just don't think that it is out there.

18       Your Honor, a recent example of how a subdural or

19   a brain injury can suddenly present itself when a

20   person otherwise appears to be okay, happened recently

21   in a national football league.  A receiver by the name

22   of Darrell Jackson, who plays for the Seattle Seahawks,

23   was violently hit during the game, was helped off the

24   field, walked off the field, was in the locker room,

25   appeared to be fine, suddenly began to have a seizure,

1    and he nearly died.  I submit to you that,

2    unfortunately, that is what happened to Robbie.  If the

3    doctors at Shands had recognized that and had told the

4    family your baby had a pre-existing condition,

5    something happened, he began to bleed in his brain, and

6    this has happened, criminal charges wouldn't have been

7    brought and we would not be here.

8        Nonetheless, we respectfully respect the jury's

9    verdict.  They worked hard, 18-and-a-half hours.  They

10   came to their verdict.  I would ask the Court to find

11   that a mitigating factor does exist.  You heard the

12   testimony of Mr. Herlihy's mother about having to be

13   with brain, that he was crying, regarding this incident

14   and walking around looking at a picture of Robbie.

15   You've heard the testimony of his fiance, you heard the

16   testimony of Mr. Herlihy.  And I can submit to you,

17   Your Honor, that every time I've met Mr. Herlihy, he's

18   become emotional and distraught over what happened to

19   Robbie.  I've never heard him say:  Oh, Mr. Tedder,

20   they're gonna put me in prison.  Don't let them put me

21   in prison.  It's always:  I want to know what happened

22   to Robbie.

23       We would ask Your Honor to go below the

24   guidelines.  Thank you.

25       THE COURT:  I would like to say something to

1    Mr. Herlihy's family.  First of all, I want to say that
2    I appreciate you all being here.  I understand and
3    respect the fact that in your hearts and in your minds
4    Brian is not guilty.  And to Robbie's family, I want to
5    say I appreciate all of you being here as well.  I
6    understand and respect the fact that in your hearts and
7    in your minds Brian Herlihy will always be guilty of
8    first degree murder.

9        The verdict, as we all know, is that Mr. Brian
10   Herlihy is guilty of the crime of manslaughter.  And
11   there are consequences to the conduct and the choices
12   that all of us make, and Brian Herlihy faces those
13   consequences.

14       To Robbie's family I would urge you to do what you
15   have already begun and that is to do what you can to
16   heal yourselves and to heal each other and to forgive
17   and to honor Robbie's memory, and the four months that
18   he lived a life of joy and love by letting that back
19   into your lives to the extent that you're able and as
20   much as you're able throughout the rest of your lives.

21       Brian Herlihy, if you want to approach the bench
22   with your attorney.

23       Having been found guilty of manslaughter, I am
24   adjudicating you guilty of manslaughter and sentencing
25   you to 15 years in the Department of Corrections.  You

1    will be given credit for the time that you have served

2    on this offense and I will hear from both the state and

3    the defense as to the proper number of hours -- number

4    of days that you would be given credit for.

5        I am reserving jurisdiction to determine what

6    restitution may be awarded and what costs may be

7    entered against you as well.  I am ordering that you

8    pay the statutory, statutory mandated costs of $262, $2

9    criminal justice education and training fees, and $50

10   court facilities assessment.  The additional costs will

11   be determined as a later date.

12       Madam Clerk, is there anything else I need to

13   announce for the record at this time?

14       MS. SINGER:  Your Honor, I do have an order for

15   reserving the jurisdiction, for the Clerk and if

16   Mr. Groland can spend a moment with me, we will do the

17   credit for time served today, this morning, because the

18   Clerk needs that credit for time served.

19       MR. GROLAND:  Right.

20       MS. SINGER:  We'll do that after Mr. Herlihy's

21   removed.  The only other issue is whether Mr. Herlihy

22   waives his presence at any other hearings for

23   restitution or costs.

24       MR. GROLAND:  He has told me he will not waive his

25   presence.

Stacey K. Bryant, RPR
Judicial Court Reporter

0002919

1          THE COURT:  Good enough.

2          THE DEFENDANT:  Yes, ma'am.

3          THE COURT:  I will see if it's possible to do that

4     in the very near future.  At this time, I am gonna take

5     a 15-minute recess so the state and defense can confer

6     about what evidence they intend to present in regard to

7     credit for time served.

8          (Recess.)

9          MS. SINGER:  Your Honor, after brief recess,

10    Mr. Groland and I have looked at the docket lines and

11    have spoken with the jail regarding Mr. Herlihy's

12    credit for time served, and the state would be

13    requesting 347 days credit for time served.  That would

14    be the number of days that Mr. Herlihy has actually

15    served on the case before the Court in the Alachua

16    County case.

17         And I understand Mr. Groland wants to make some

18    argument regarding the remaining days.

19         MR. GROLAND:  Yes.

20         THE COURT:  Go ahead.

21         MR. GROLAND:  We're saying that he should get

22    credit for 585 days.  The difference being 238 days

23    that are at issue.  And here's what that's all about.

24    When he was in a situation where a capias was issued

25    here in July of '01 and Judge Turner, in place of Your

1    Honor for some reason I can't recall, set a bond at a

2    million dollars on a capias.  He was down in South

3    Florida and arrested there and there was a hold on him

4    there for this case.  What they did down there, because

5    of the one-million-dollar bond here, they set no bond

6    on that case down there.  And he actually stayed in

7    jail down there with the hold on him from Alachua

8    County for 238 days while that case concluded there,

9    with it going to a jury, and a jury in 30 minutes

10   making a not guilty, having a not-guilty verdict.

11       So even though he wasn't specifically arrested on

12   the capias from here that issued on July 20th until

13   March 14th of '02, and that is the 238 days that we're

14   talking about.  In other words, a capias issued in

15   July, million-dollar bond, that caused no bond there.

16   He was held in jail there 238 days.  That case

17   concluded and then he was brought here.

18       Our position with the Court is that it is

19   discretionary, given the facts as I just explained

20   them, and I don't think the state disputes my

21   version --

22       MS. SINGER:  I do dispute the version of facts on

23   why the no bond was placed, but I'll be heard after

24   Mr. Groland is done.

25       MR. GROLAND:  I think it's discretionary with the

1    Court since there was a hold placed on him.  And what

2    happened here did, indeed, cause him to remain in jail

3    down there until that concluded.  And we would ask that

4    he be given credit on the 15 years for the full 585

5    days that he stayed in jail as a result of this case.

6         THE COURT:  Was the case in South Florida a

7    violation of probation where no bond was discretionary.

8         MR. GROLAND:  Third degree felony.

9         THE COURT:  What would be the legal basis for it?

10        MR. GROLAND:  I don't know, but it really didn't

11   matter.  His attorneys down there didn't contest it,

12   because he had a million-dollar bond that he couldn't

13   make.

14        THE COURT:  All right.

15        Anything else you want to present?

16        MR. GROLAND:  No.  I may want to say something

17   after they speak.

18        THE COURT:  Ms. Singer.

19        MS. SINGER:  Your Honor, I do not agree with

20   Mr. Groland's rendition of the facts that the reason

21   why there was a no bond was based upon the fact that

22   Judge Turner issued a one-million-dollar bond in this

23   case.

24        First of all, he was not arrested on this case in

25   Broward County until after the cases in Broward County

1   were resolved.  There was no formal arrest.  He's not

2   technically entitled to the 238 for the record.

3        But, secondly, he had been arrested in Broward

4   County, and while incarcerated in the jail, contacted

5   the victim in that case, and I want to go back and just

6   look at the PSI, because it may be outlined in the PSI.

7        He had gotten arrested for stalking, and while in

8   jail contacted the victim.  And as a result of that

9   contact, the charge was increased to aggravated

10  stalking.

11       Now, I'm going on my memory.  Present in the court

12  is Investigator Helen Legall, and if she could just

13  step forward.  I think she's also familiar with it and

14  may be able to give the Court more information on what

15  happened in Broward County, but needless to say, he is

16  not entitled to that time.  It is discretionary.  He

17  was being held on a separate offense.  He was tried on

18  that offense and I believe he was acquitted of that

19  offense; is that correct?

20       MR. GROLAND:  That's correct.

21       MS. SINGER:  Investigator Legall, do you have

22  any -- Does the Court wish her to be under oath?

23       THE COURT:  It's up to Mr. Groland.  Do you want

24  me to swear her in?

25       MR. GROLAND:  Yes.

1        (The defendant was duly sworn by the court.)

2        MS. SINGER:  Ms. Legall, Investigator Legall, are

3    you familiar with the arrest history of Mr. Herlihy,

4    when he was arrested in Broward County during 2001 for

5    aggravated stalking?

6        INVESTIGATOR LEGALL:  Yes, I am.

7        MS. SINGER:  Are you able to advise the Court in

8    more detail than myself why it was that he was held on

9    that case?

10       INVESTIGATOR LEGALL:  My understanding is when the

11   aggravated stalking -- and this is from speaking with

12   the authorities down there at the time -- the

13   aggravated stalking is what put the no bond on him,

14   which is when we came forward to get -- I had found out

15   some other things in that case, for example, that was

16   he was violating on our bond here.  And I approached

17   Ms. Singer about it, and then we came before the court

18   and asked for a bond reduction, or a bond revocation.

19       Part of the sentence down there is he was required

20   to serve 60 days on their charge.

21       THE COURT:  I'm sorry.  That doesn't make sense to

22   me.  You're saying the sentence, and yet you're saying

23   he was acquitted.

24       INVESTIGATOR LEGALL:  No.  He was acquitted on one

25   charge.  There was another charge that they had made a

```
 1        deal with that he spend 60 days on.  That was brought

 2        up on our bond hearing here in March.

 3             MR. GROLAND:  That was a disorderly conduct,

 4        Judge.  That's a misdemeanor.

 5             THE COURT:  Slow down.  Slow down.

 6             How many different cases were filed against

 7        Mr. Herlihy in Broward County?

 8             INVESTIGATOR LEGALL:  My understanding from them

 9        was it originally started as a stalking.  It went to an

10        aggravated stalking and, I believe he was convicted of

11        the disorderly conduct.

12             MS. SINGER:  That's correct, but it...

13             INVESTIGATOR LEGALL:  With 60 days.

14             THE COURT:  Within what information?

15             INVESTIGATOR LEGALL:  I wasn't there on the

16        report.  I know that it was some deal that they made

17        down there.

18             THE COURT:  Well, bottom line is, I need the

19        details of what he was charged with, when he was

20        charged, when each information versus indictment came

21        down, which capias was issued first, for instance, to

22        determine whether or not there would be any basis to

23        consider discretionary time that he might be entitled

24        to.

25             MS. SINGER:  All right.  I'm looking at the
```

1    presentence investigation which does reflect that on

2    5/13/01 in Broward County he would been charged with

3    stalking and disorderly conduct.  On 1/8/02 he was

4    adjudicated guilty and sentenced to 60 days in the

5    county jail.

6         As far as the no bond is concerned, Your Honor, my

7    recollection -- and I'm going to advise the Court that

8    this is simply my recollection from over a year ago in

9    speaking with the prosecutors down there -- is they did

10   actually file a motion for no bond under the pretrial

11   detention rule that's presently in effect.  And the

12   reason why I remember that is because it's so rarely

13   used, but they did actually file that down there.  I

14   don't know if whether or not it was contested or not.

15        MR. GROLAND:  It was based upon this case that was

16   here that they were doing whatever it was that they

17   were doing there.  They knew that he was charged here

18   with first degree murder and that there was a capias

19   here and in the amount of 1 million dollars.  And that,

20   I think, caused the whole situation there to become

21   much more blown up than it really was.

22        The aggravated stalking was a phone call that he

23   alleged made when he came out of jail, calling her

24   asking about his clothing that was still there.  That's

25   when they charged him with aggravated stalking.  That's

1      when they put the no bond on him.  And again, he went

2      to trial on the felony and was acquitted.  His family

3      was in court, was there, am I correct?

4              THE MOTHER:  Yes, absolutely.

5              MR. GROLAND:  There was a hold on him the whole

6      time he was there.

7              THE COURT:  You keep saying acquitted.  You keep

8      saying found guilty of disorderly conduct.  Which is

9      it?

10              MR. GROLAND:  He pled to the disorderly conduct.

11      I think separate and apart, correct me if I'm wrong.

12              THE MOTHER:  Two different cases.

13              THE DEFENDANT:  Your Honor, ma'am?

14              MR. GROLAND:  He was acquitted, went to a jury

15      trial on the felony, and was acquitted of all charges.

16              THE MOTHER:  That's correct.

17              MR. GROLAND:  The disorderly conduct I think was

18      not even related to that.  It was a separate incident

19      there that he pled to, got 60 days in jail, credit for

20      time that he was already in.  So I think we're talk

21      about two separate things.  The jury did not find him

22      guilty of disorderly conduct, that I'm sure of.

23              THE MOTHER:  That's correct.

24              THE COURT:  All right.

25              MS. SINGER:  There was a brief outline of it in

1      the presentence investigation, Judge, read in the

2      record.  Pembroke Pines Police report was file:

3      Defendant willfully and maliciously --

4           THE COURT:  Slow down.  The court reporter has got

5      to type what you're saying.

6           MS. SINGER:  -- willfully, maliciously, and

7      repeatedly harassed victim by telephoning her place of

8      employment and cell phone.  Defendant also drove to the

9      parking lot of both her place of employment, her

10     parent's residence and appeared at her place of

11     employment confronting her and placing her in fear.

12     Defendant battered her on 5/12/01 in Sunrise, and is

13     presently out on bonds for willful homicide, slash,

14     premeditated murder of a child in Alachua County.

15          When located and confronted in the parking lot of

16     the victim' place of business, the defendant became

17     hostile, extremely loud, yelling obscenities, threw his

18     identification card at Officer Mason, drawing a crowd

19     and destroying the flow of traffic in the parking lot.

20     The victim gave this officer sworn taped statements.

21     The defendant, post-Miranda gave a sworn taped

22     statement admitting his phone calls and drive bys.

23          That's the outline.  It shows on 1/8/02, Count I,

24     stalking not prosecuted; Count II, disorderly conduct,

25     he was adjudicated guilty, given 60 days county jail

1     time.

2          MR. GROLAND:  And pled to the charge.  And when

3     this incident happened in the parking lot, his mom,

4     Ms. Herlihy, was present.  She's also --

5          THE COURT:  Let me ask the state a question and

6     I'll let the defense respond.

7          At the time of this incident of disorderly

8     conduct, was he placed under arrest?

9          MS. SINGER:  Was he?  Do you remember what...

10          THE MOTHER:  I know he was.

11          THE COURT:  And at that time he was out on bond on

12     the charge here in Alachua County?

13          MS. SINGER:  That's correct.

14          THE COURT:  And he went to first appearance on the

15     disorderly conduct and at that time was a no bond

16     entered?

17          MS. SINGER:  Not to my -- I cannot answer that

18     question.  I don't know.

19          THE MOTHER:  I can.

20          MR. GROLAND:  Your Honor?

21          THE COURT:  Bottom line is, if the state and the

22     defense have not reviewed the court files from Broward

23     County to determine what's actually in the court file

24     then I don't need additional testimony from the

25     families because, of course, their interpretation of

1    what may have happened, may or may not be consistent

2    with what the legal procedure was.  Therefore, if you

3    want to present the pleadings from that court file or

4    any document from that court file, I will consider

5    that.

6         But, it is my conclusion at this time that any

7    additional information regarding from the families here

8    about what may have happened would not be appropriate.

9         What else did you want to say, Mr. Groland?

10        MR. GROLAND:  I was just going to, if Your Honor

11   can, we'll look at the court files, Ms. Singer and

12   myself, but if you can help us focus what specifically

13   it is you would like us to find out from what happened

14   there, then it would be helpful.

15        THE COURT:  Yes.  It's very simple to me.  From

16   the way you're describing the charges and the sequence

17   of charges in South Florida, what it sounds like to me

18   is that there was an allegation made that may or may

19   not have resulted in the arrest of Mr. Herlihy, but

20   that those allegations were escalated by the disorderly

21   conduct charge, and arrest, and it sounds to me like

22   the no bond was entered based upon the fact that that

23   conduct appeared to the Court in Broward County to be

24   escalating, and to be creating an ongoing danger in

25   that community to the victim, or the alleged victim of

1    the stalking.  And that that was the legal basis for

2    the no bond being entered.  And that, in fact, the

3    capias, the increase in the Alachua County bond to

4    $1 million was, in fact, entered after the first

5    appearance where no bond was entered.

6         Now, if the sequence was other than that, based on

7    the court file, I will look at it again.  That is not

8    to say that I have made any determination, other than

9    based on the information that you have given me at this

10   time.  I find no basis on which Mr. Herlihy would be

11   even allowed consideration on discretionary time.  If

12   there is a basis, then I will consider whether or not

13   the Court should exercise discretion.  But at this time

14   I am going to order that Mr. Herlihy be given credit

15   for 316 days time that he has served.  2.

16        MR. GROLAND:  That was not...

17        MS. SINGER:  We are in agreement that he is

18   entitled 347 days.  He was incarcerated for aggravated

19   child abuse beforehand, which is subsumed in the

20   charge.  So we will give him the additional time, Your

21   Honor, 347 days.

22        MR. GROLAND:  Thank you.

23        THE COURT:  Yes, I was referring back to an

24   earlier note.  I see that that is correct, that the

25   state and defense have agreed he entitled to at least

1    347 days time that he has already served, and he will

2    be given credit for that in this judgment and sentence.

3        All right.  Now, is there anything else that we

4    can or should address today, understanding that there

5    has been a reserve of jurisdiction to certain costs and

6    restitution.

7        MS. SINGER:  No, other than he needs to be

8    fingerprinted in the Court's presence.

9        THE COURT:  All right.  Have Mr. Herlihy be

10    fingerprinted, please.

11        THE CLERK:  We'll set the restitution hearing on a

12    different day.

13        THE COURT:  Yes.

14        MS. SINGER:  Mr. Groland and I are going to meet

15    and go over the bills and things, and see what we can

16    agree to, so that it won't be a lengthy hearing, if

17    possible.

18        MS. SINGER:  I do have another matter before the

19    Court.

20        THE COURT:  Not in this case?

21        MS. SINGER:  Not in this case.

22        THE COURT:  We're going to take a brief recess for

23    ten minutes.

24        (Recess.)

25        (Which were all of the proceedings had in the

1    above-entitled cause on the day and date aforesaid.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

```
 1              CERTIFICATE OF ACCURACY

 2    STATE OF FLORIDA

 3    COUNTY OF ALACHUA

 4    I, Stacey K. Bryant, RPR, Judicial Court Reporter, Eighth

 5    Judicial Circuit of Florida, do hereby certify that:

 6    A sentencing hearing was held in re:  State of Florida vs.

 7    Brian Patrick Herlihy, Circuit Court of Alachua County,

 8    Florida, before the Hon. Martha Ann Lott, Circuit Judge, on

 9    November 8, 2003.

10    That I was authorized to and did report the proceedings had

11    during said sentencing hearing and that the foregoing pages,

12    numbered one through and including 80, constitute a true and

13    correct transcription of my stenographic notes taken

14    aforesaid, which were reduced to printing under my personal

15    supervision.

16    I further certify that I am neither of counsel nor related

17    to or employed by any party to the action, nor financially

18    interested in the outcome of said cause.

19    IN WITNESS THEREOF, I have hereunto affixed my hand on this

20    _6th_ day of _May_____, 2003.

21

22    _Stacey K. Bryant_____

23    Stacey K. Bryant, RPR
      Judicial Court Reporter

24

25
```

Stacey K. Bryant, RPR
Judicial Court Reporter

0002934