# EXHIBIT

# CC

202-1-17814
F

# In the District Court of Appeal

## FIRST DISTRICT
### of Florida

BRIAN PATRICK HERLIHY
   Appellant

  )
  )
  )
  )

v.

  )
  )
  )
  )

STATE OF FLORIDA
   Appellee

  )
  )
  )
  )
  )

Docket
11-24-2003
Florida Attorney
General

CASE NO.   2000-CF-2753-A
APPEAL NO.  1D02-4788
VOLUME XXIX

## TRANSCRIPT
# RECORD

### HONORABLE MARTHA ANN LOTT
#### TRIAL JUDGE

**APPEAL FROM THE CIRCUIT COURT**
**8th JUDICIAL COURT FOR**
**ALACHUA COUNTY, FLORIDA**

2003 NOV 21   PM 4: 33

FOR APPELLANT
NADA M. CAREY
ASSISTANT PUBLIC DEFENDER
LEON COUNTY COURTHOUSE
APPEALS DIVISION – 4TH FLOOR
301 SOUTH MONROE
TALLAHASSEE, FLORIDA 32301

FOR APPELLEE
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

1

```
11-24-2003
Florida Attorney
General
```

IN THE CIRCUIT COURT OF FLORIDA
EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY

CASE NO: 01-2000-CF-002753-A

STATE OF FLORIDA

vs.

BRIAN P. HERLIHY,

         Defendant.

_____/

TRANSCRIPT ON APPEAL
VOLUME I
(1 through 172)

Volume XXIX

1D02-4788

| | |
|---|---|
| Proceedings: | JURY SELECTION |
| Before: | THE HONORABLE MARTHA ANN LOTT, Circuit Judge. |
| Date: | September 9, 2002 |
| Time: | 10:30 am |
| Place: | Alachua County Courthouse Gainesville, Florida |
| Reporter: | Betty Sue Vincent, CRR Senior Managing Court Reporter Registered Diplomate Reporter |

APPEARANCES:

    JEANNE M. SINGER, Esquire, Assistant State Attorney and
    STEPHEN H. PENNYPACKER, Esquire, Assistant State Attorney
    Post Office Box 1437
    Gainesville, Florida 32602
    352/374-3670

                 Attorney for state.

    GORDON H. GROLAND, Esquire and JOHN H. TEDDER, Esquire
    Post Office Box 2848
    Gainesville, Florida 32062
    352/373-4669

                 Attorney for defendant.

```
 1                    P R O C E E D I N G S
 2    September 9, 2002                          10:45 am
 3                        - - -
 4         (Defendant present.)
 5         THE COURT:  I have a few more preliminary questions I
 6    want to ask all of you, then I will let everybody take
 7    about a ten-minute recess.
 8         Is there anybody -- I need for you to raise your hand
 9    if your answer to this question is yes.  Is there anybody
10    remaining in the courtroom who has specialized knowledge
11    or experience about something known as shaken baby
12    syndrome?
13         (Several prospective jurors raised hands.)
14         THE COURT:  Okay.  I need your juror numbers.
15    Mr. Clerk, if you will collect those juror numbers.
16         MS. SINGER:  Your Honor, may Mr. Groland and I
17    approach the bench?
18         THE COURT:  Yes.
19         THE CLERK:  Your Honor, the question is have they
20    heard about it or how much knowledge would you like?
21         THE COURT:  All I need to know is do they have some
22    specialized knowledge.  I don't need to know any other.
23    So if they had their hand raised that they have some
24    specialized knowledge, if you will just get their number
25    for me.
```

```
1              THE CLERK:  Okay.

2              THE COURT REPORTER:  Off the record, your Honor?

3              THE COURT:  I'll announce the numbers when I get

4         them.

5              (A sidebar conference was held out of the hearing of

6    the jury and the court reporter.)

7              THE CLERK:  Your Honor, I've got six.

8              THE COURT:  Ladies and gentlemen, at this time we're

9         going to take a recess from this courtroom until -- for

10        ten minutes.  So if you will come back in this courtroom

11        at about two minutes to 11:00 by that clock and we'll

12        continue with some additional preliminary questions.

13             (Recess at 10:48 am.)

14             (Court reconvened at 11:08 am.)

15             (Defendant present.)

16             THE COURT:  All right.  Ladies and gentlemen, we're

17        about to begin the first round of jury selection.  I'm

18        going to ask some preliminary questions, and because the

19        court reporter will not be able to identify the individual

20        speaker, I'm going to get your jury number as I ask these

21        questions.

22             I am going to ask that everybody rise again for

23        purposes of this segment and the clerk will swear you in

24        again.  So if you will stand up, please, and raise your

25        right hand.
```

```
 1              (The prospective jurors were sworn collectively.)
 2          · THE COURT:  Ladies and gentlemen, the initial
 3     questions have to do with one case that will be tried over
 4     the course of the next two weeks.  The first preliminary
 5     question I need to ask all of you is, and if you will
 6     raise your hand if the answer to this question is yes:  Do
 7     any of you know Brian Herlihy?
 8          Mr. Herlihy, would you raise your right hand.
 9          Anybody in here know Brian Herlihy?
10          (No response.)
11          THE COURT:  Good enough.  Thank you.
12
13          THE COURT:  Do any of you know any of the witnesses
14     that the state may call?  And this is a long list.  You do
15     not have to memorize this list, but you just have to
16     recognize if you recognize any of these names, then if you
17     will raise your hand I'll write down your number so that
18     we may have some additional questions for you.
19          Yes, sir, did you --
20          PROSPECTIVE JUROR SIMS:  Yes, ma'am, I do
21     recognize -- I believe he used to work at the tissue bank,
22     RTI.
23          THE COURT:  You recognize who?
24          PROSPECTIVE JUROR SIMS:  Brian Herlihy.
25          THE COURT:  Mr. Herlihy?  And tell me your number,
```

5

```
1        please.
2               PROSPECTIVE JUROR SIMS:  162.
3               THE COURT:  Thank you, sir.
4               All right.  Now, Ms. Singer, would you read slowly
5        the list of names that the state may call, and make sure
6        that you're reading them loud.  You might want to step you
7        up here a little closer so the court reporter can hear you
8        because she is going to need to write down these names.
9               And if you recognize any of these names, you can just
10       wait until the end and raise your hand and I'll write down
11       your number.
12              MS. SINGER:  Your Honor, may I also have permission,
13       if I know their employment, to announce their employment
14       as well?
15              THE COURT:  Yes.
16              MS. SINGER:  Mr. Groland, do you have any objection
17       to that?
18              MR. GROLAND:  I didn't hear you.
19              MS. SINGER:  If I know their employment, announce
20       their employment as well?  For instance, police officer
21       and such.
22              MR. GROLAND:  That's fine.
23              MS. SINGER:  May I proceed, your Honor?
24              THE COURT:  Yes.
25              MS. SINGER:  Ken Johnson, with the Gainesville Fire
```

```
 1        Rescue; Dennis Meredith, with the Gainesville Fire Rescue;

 2        Darrell Brown, with Gainesville Fire Rescue; Bill Blair,

 3        Gainesville Fire Rescue; John Hellrung, M.D.; Crystal

 4        Quirello, John Quirello, Kathleen Morriston, Richard

 5        Davis, Doris Bridwell, Frank Agee, M.D.; Michael Bell,

 6        M.D.; Richard Kreinest, M.D.; David Stewart, M.D.; Kathy

 7        Long, Alachua County Sheriff's Office; Vicki Woodall,

 8        Yantz Enoch, airborne express; Thomas Whitley, Alachua

 9        County Fire Rescue; Russell Valentine, Alachua County Fire

10        Rescue; Harvey Rohlwing, M.D.; Leslie Francois (assumed

11        spelling), Shands Teaching Hospital; Kevin Putansu, Shands

12        Teaching Hospital; Ronald Quisling, M.D.; Anne Dickison,

13        M.D.; Lawrence Levine, M.D.; Orlando Alvarez, Gainesville

14        Police Department; Valerie Dawson, Gainesville Police

15        Department; Tina Millard, otherwise known as Christina

16        Millard, formerly with the Gainesville Police Department,

17        now with the Broward County sheriff's Office; Bruce

18        Ferris, Gainesville Police Department; Nicole Perrone,

19        Florida Department of Law Enforcement; David Cannon,

20        Gainesville Police Department; Alan Coleman, Gainesville

21        Police Department; Larry Seale, Gainesville Police

22        Department; Helen Legall, Gainesville Police Department;

23        Will Halvosa, Gainesville Police Department; Steven

24        Weaver, Gainesville Police Department; Duane Diehl,

25        Gainesville Police Department; William Hamilton, M.D.,
```

1   Steven Nelson, M.D., Bernie Maria, M.D.; Sal Cumella,

2   Patrick Minor, Howard Rogers (assumed spelling), M.D.;

3   Beth Talaga, Jon Williams M.D.; Jamie Snodgrass.

4        Your Honor, may I approach Mr. Groland?

5        THE COURT:  Yes.

6        MS. SINGER:  Nothing further, your Honor.

7        THE COURT:  All right.  Any of you who recognized the

8   names of any of the witnesses, would you raise your hand

9   again, please?

10        (Several prospective jurors raised hands.)

11        THE COURT:  Okay.  Good enough.  Put your hands down.

12        Is there anybody who feels like their relationship

13   with the witness named is so close and personal that no

14   matter what else you heard in the trial, that witness'

15   testimony would sway you one way or the other?

16        Do you feel like you know the witness so well that

17   nothing else would matter to you, would you raise your

18   hand again?

19        Okay.  Tell me your number, please, sir.

20        PROSPECTIVE JUROR HODGE:  207.

21        THE COURT:  207.  And which witness did you know?

22        PROSPECTIVE JUROR McMAHON:  John Quirello

23   (indiscernible).

24        THE COURT:  Say the names again of the witnesses.

25        PROSPECTIVE JUROR HODGE:  John Quirello, Doris

1    Bridwell, I think it's Kathleen Morriston now, I'm not

2    sure of the last name.

3           THE COURT:  All right.

4           PROSPECTIVE JUROR HODGE:  And Dr. Kreinest and

5    Dr. Stewart.

6           THE COURT:  Okay.  Thank you.

7           Anybody else know any of the witnesses so well that

8    the testimony would sway you no matter what else you

9    heard?

10          (No audible response.)

11          THE COURT:  All right.  Mr. Groland, would you read

12   the names of any additional witnesses that the defense may

13   call in this case?

14          MR. GROLAND:  Yes, your Honor.  The defense will call

15   Dr. Ronald Uscinski, M.D., Dr. John Plunkett (assumed

16   spelling), M.D.; perhaps Dr. Ronald Quisling, M.D.;

17   Dr. Frank Agee, M.D.; Sal Cumella and Patrick Minor.

18   Dr. Bell -- Michael Bell.

19          THE COURT:  Anybody recognize any of those names,

20   raise your right hand?

21          (A prospective juror raised their hand.)

22          THE COURT:  Thank you.

23          Anybody know any of those witnesses so well that no

24   matter what else you heard in the trial, you would be

25   completely swayed by that one witness' testimony?

```
 1              (No audible response.)

 2              THE COURT:  All right.  Mr. Pennypacker,

 3      Ms. Singer -- Ms. Singer, would you stand up?

 4              Mr. Groland, Mr. Tedder.

 5              I'm sorry, I don't know this lawyer's name.

 6              MR. GROLAND:  Toni Maloney.

 7              THE COURT:  Now, these are the attorneys that will be

 8      trying this case.

 9              Ms. Singer, would you raise your hand?

10              Mr. Pennypacker, would you raise your hand.

11              Mr. Tedder, would you raise your hand.

12              Ms. Maloney, would you raise your hand.

13              Mr. Groland, would you raise your hand.

14              (Each complied.)

15              THE COURT:  Do any of you know -- Would you sit down

16      now so I can see.  Thank you.

17              Do any of you know the attorneys that will be trying

18      this case?  If so, raise your hand.

19              (A prospective juror raised his hand.)

20              THE COURT:  Thank you, sir.

21              Do any of you know any of these attorneys so well

22      that no matter what the evidence in the case shows, the

23      fact that you know one or more attorneys would sway you in

24      the case one way or the other?

25              (No audible response.)
```

1        THE COURT:  Good enough.

2        All right.  I'm about to seat a panel of jurors --

3        Yes, sir.

4        (Brief off record discussion.)

5        THE COURT:  All right.  I'm about to sit the first

6        panel of jurors.  When I call your number, if you will

7        come forward and have a seat in this front row right by

8        the bailiff, and he'll direct you, and seat yourselves

9        across the front row and then across the back row

10       beginning in the chair closest to the front of the

11       courtroom.

12       The first juror is juror number 33, juror number 36,

13       juror number 117, juror number 190, juror number 23, juror

14       number 188, juror number 37 -- number 37 is Kristy

15       Currier.  Okay.  Juror number 212.

16       And then beginning on the second row, juror number

17       10, juror number 43, juror number 164, juror number 160,

18       juror number 128, juror number 38 -- Did 128 come forward?

19       128 is --

20       THE CLERK:  Your Honor, 128 is the one we're missing.

21       I'm sorry.

22       THE COURT:  Okay.  Thank you.

23       Juror number 38.

24       MS. SINGER:  So we are just passing 128?

25       THE COURT:  Yes.

000944

```
 1              Juror number 154, juror number 203, and juror number
 2       107.
 3              THE COURT:  Now that these names -- I'm sorry, the
 4       last name is Mr. Ramsey?
 5              PROSPECTIVE JUROR RAMSEY:  Yes.
 6              THE COURT:  Now, since your numbers have now been
 7       announced, I am going to ask you to stand one more time to
 8       be sworn one more time for this section of the
 9       questioning.
10              (The prospective jurors were sworn collectively.)
11              THE COURT:  All right.  Ms. Singer, Mr. Pennypacker,
12       you may inquire.
13              And just so everyone will have some basic
14       information, I expect that we will conduct this inquiry
15       for approximately an hour's time, then we will recess for
16       lunch and then we will reconvene in the afternoon, so just
17       to give you some idea of how long you will be sitting at
18       one time.
19              MR. GROLAND:  Ms. Singer, can we approach just
20       briefly?  Your Honor, may we?
21              THE COURT:  Yes.
22              THE COURT REPORTER:  Off the record, your Honor?
23              THE COURT:  Does this need to be on the record?
24              MR. GROLAND:  I don't know that we need it.
25              MS. SINGER:  I don't know.
```

```
 1              (A sidebar conference was held out of the hearing of
 2    the jury and the court reporter.)
 3              THE COURT:  All right.  Ladies and gentlemen, I do
 4    have some minor -- or short, that is -- not minor, but
 5    short additional questions I need to ask you before
 6    Ms. Singer begins.
 7              First of all, I need to advise you that this is a
 8    first degree murder case involving the death of an infant.
 9    The infant's name is Robert Quirello.  This is not a case
10    where the state is seeking the death penalty.
11              Is there anything regarding the nature of these
12    charges that makes any of you feel that you would not be
13    qualified to sit as a juror in this case?
14              THE PROSPECTIVE JURORS:  (No audible response.)
15              THE COURT:  Good enough.  All right.  Ms. Singer, you
16    may proceed.
17              MS. SINGER:  Thank you, your Honor.
18              I'm still looking at the clock.  Good morning,
19    everyone.  We are close to afternoon, but not quite.
20              My name is Jeanne Singer, and I'm an assistant state
21    attorney representing the people of the State of Florida
22    in the case styled the State of Florida versus Brian
23    Herlihy.
24              Today I will be beginning the case, along with my
25    co-counsel, Steven Pennypacker, who is also an assistant
```

```
1        state attorney, or prosecutor, as the term is often used.

2        We are the attorneys who represent the people of the State

3        of Florida in any criminal action.

4            Before I begin with any specific questions, and I do

5        have quite a number of them, I would like to tell you that

6        this is the time when I have an opportunity and

7        Mr. Pennypacker will have an opportunity and Mr. Groland

8        and Mr. Tedder will have an opportunity to speak with you

9        about your thoughts, your views, your perspectives, to

10       determine whether or not you will be fair and impartial

11       jurors in this case.  And both sides are looking for fair

12       and impartial jurors.

13           The task is sometimes trying, sometimes tedious, but

14       I would like to ask you all to please feel free to raise

15       your hand when I ask a question and communicate with me

16       and my partner, Steve Pennypacker, as well as with the

17       defense team, when we inquire of you regarding this case,

18       because we need to know whether or not the situation and

19       the circumstances of this case will make you the proper

20       juror.  You may not be a proper juror in this case and may

21       be a very proper juror in another case, and we need to

22       know that.

23           So this is going to be your opportunity to

24       communicate with us.  And I'm going to ask you please to

25       respond.  Don't be shy.  If I interrupt you and you have
```

1   more to say, raise your hand.  If I ask a group question

2   and you seem to have a no answer when everybody has a yes,

3   and you've done that already this morning, don't hesitate

4   to raise your hand.  If I ask you a specific question

5   aimed at you personally, it's not a personal question,

6   it's because I sense from our interaction that perhaps you

7   have a different view that I would like to know about, and

8   I'm sure the defense would like to know about as well.

9        This is about the only time that you and I and

10   Mr. Pennypacker will get to actually talk with one

11   another.  If you're chosen to be on this jury -- and

12   that's for everyone in the room -- if you're chosen to be

13   on this jury, once you become a juror, you are a fact

14   finder and a listener, you don't get to ask questions, you

15   don't get to interrupt, you have to be quiet for a period

16   of time.  So it's very, very important, very, very

17   essential, that we have good communication now, this

18   morning, and into this afternoon as we make our choices

19   regarding who will sit on this case.

20        Now, you heard from the judge very recently, just a

21   moment ago, that this is a very serious case, first degree

22   murder, a murder in the first degree, and it's a case

23   where the state has alleged that Brian Herlihy, through

24   committing the act of aggravated child abuse, caused the

25   death of an infant by the name of Robbie Quirello or

```
 1         Robert Quirello, that he is in fact guilty of that charge,

 2         and we are prepared to present evidence to the jury in

 3         this case so that you can make the ultimate determination.

 4             This is not going to be an easy case and, as the

 5         court asked you, if at any time you have something in your

 6         mind that you need to express regarding whether or not you

 7         can sit on this case, please don't be shy.

 8             I haven't had an opportunity to go through your jury

 9         information forms, and I will do that shortly, but I do

10         want to ask some general questions.

11             If I may just approach -- my notes, your Honor -- I

12         do have some general questions that I think the court

13         might be interested in where we could ask the group, and

14         then we can start with the more specific questions.

15             The court has asked you whether or not you had any

16         knowledge of both myself, Mr. Pennypacker, Mr. Groland and

17         Mr. Tedder and Mr. Herlihy.  And I understand from this

18         group, does anyone know anybody individually?

19             Yes, ma'am.  And, excuse me, let me make sure I have

20         you right here.  You would be Ms. Escalante -- Ms. Young?

21             PROSPECTIVE JUROR YOUNG:  Yes.

22             I may know Mr. Pennypacker in Rotary.  My husband is

23         in Rotary.

24             MS. SINGER:  Yes, Mr. Pennypacker is in Rotary.

25             Ms. Young, is there anything about your knowledge of
```

1      Mr. Pennypacker and his participation in Rotary that would

2      in anyway affect whether you could be fair and impartial

3      in this case?

4          PROSPECTIVE JUROR YOUNG:  No.

5          MS. SINGER:  Is there anybody else who knows any of

6      us?  I'm going to look at Mr. Ezzell, and I think his son

7      works for the state attorney's office; is that right?

8          PROSPECTIVE JUROR EZZELL:  Yes, he does.

9          MS. SINGER:  And I think we may have met walking in

10     the parking lot, or carrying some computers out of the

11     building one time.

12         PROSPECTIVE JUROR EZZELL:  Possibly.  Yes.

13         MS. SINGER:  Okay.  Does that sound familiar to you?

14         PROSPECTIVE JUROR EZZELL:  Yes, ma'am.  I've done

15     that.

16         MS. SINGER:  The fact that your son has employment

17     with our office as an assistant state attorney, does that

18     fact in and of itself make you feel so uncomfortable that

19     you would not be able to sit as a juror in this case?

20         PROSPECTIVE JUROR EZZELL:  No, ma'am.

21         MS. SINGER:  Is there anyone else who knows anyone

22     personally?

23         Now, let's talk about the state attorney.  The state

24     attorney in our circuit is a man by the name of William

25     Cervone.  He's actually your elected official.  And there

1    are 50 assistant state attorneys that cover the whole

2    circuit.  We are the biggest law firm in the five county

3    circuit that involves the 8th Judicial Circuit.

4         Is there anyone -- I'm not going to name all 50 of

5    these lawyers, but off the top of your head if any of you

6    are close friends or related to any assistant state

7    attorney in this circuit, would you raise your hand?

8    Besides Mr. Ezzell.

9         THE PROSPECTIVE JURORS:  (No audible response.)

10        MS. SINGER:  All right.  Is there anyone in this

11   group that is related to an assistant state attorney or

12   the state attorney in any circuit in the United States of

13   America?  Anyone related to any assistant US or US

14   attorney?  Those would be your prosecutors for the

15   federal.  No one.

16        Now, Mr. Groland has some partners, I don't know all

17   of them, but I'm sure he'll inquire about those partners

18   as well.

19        Have any of you had any close connection or

20   relationship with any of the judiciary, that would be the

21   judges, or court support staff, courthouse personnel?

22   Anybody have a personal relationship?  Mr. Ezzell.

23        You would be Ms. Martin?

24        PROSPECTIVE JUROR MARTIN:  Uh-huh.

25        MS. SINGER:  Ms. Martin, and who would you know in

```
 1          the court system?
 2               PROSPECTIVE JUROR MARTIN:  My husband is a public
 3          defender.
 4               MS. SINGER:  Oh, is your husband Abroncee Martin?
 5               PROSPECTIVE JUROR MARTIN:  Yes.
 6               MS. SINGER:  And you have a new baby -- a relatively
 7          new baby?
 8               PROSPECTIVE JUROR MARTIN:  Yes.  Yes.
 9               MS. SINGER:  A boy, I think.
10               PROSPECTIVE JUROR MARTIN:  Yes.
11               MS. SINGER:  He's very proud of his son.
12               Ms. Martin, would the fact that your husband is an
13          assistant public defender, and he basically does what
14          Mr. Groland does for Mr. Herlihy, would that fact alone,
15          sitting -- you know, without any other facts, you don't
16          have any other facts, would that fact alone make you so
17          uncomfortable that you could not be fair and impartial in
18          this case?
19               PROSPECTIVE JUROR MARTIN:  No, I don't think so.
20               MS. SINGER:  Do you think you would have difficulty
21          going home at night with your lips buttoned because you're
22          not going to be able to talk to him and get his advice
23          about the case?
24               PROSPECTIVE JUROR MARTIN:  He wouldn't let me.
25               MS. SINGER:  He wouldn't let you.  I think he pretty
```

1    well follows the rules.

2         Do you think you would be able to do that if you were

3    called to sit?

4         PROSPECTIVE JUROR MARTIN:   (Nods head.)

5         MS. SINGER:   Anyone else?   Someone else I saw.

6         Yes, sir.   You are Mr. Baxter?

7         PROSPECTIVE JUROR BAXTER:   Yes, ma'am.   Judge Lott

8    sat on a case on my niece and we had custody of her and it

9    was through the children services and all that, and there

10   was no close relationship, but she did rule on that.

11        MS. SINGER:   Did your experience with that case cause

12   you to in anyway be so disgruntled or disappointed with

13   the court system that you could not be fair and impartial

14   in this case?

15        PROSPECTIVE JUROR BAXTER:   Not a bit.

16        MS. SINGER:   So you're comfortable that you could put

17   aside whatever occurred in that court proceeding and go

18   forward in this case --

19        PROSPECTIVE JUROR BAXTER:   Yes, ma'am.

20        MS. SINGER:   -- realizing it's a totally different

21   matter?

22        PROSPECTIVE JUROR BAXTER:   Yes, ma'am.

23        MS. SINGER:   And no bad feelings towards Judge Lott

24   either way?

25        PROSPECTIVE JUROR BAXTER:   No.   She's super.

```
 1          MS. SINGER:  Okay.  Great.

 2          Anybody else?

 3          Mr. Ezzell, you know other folks?

 4          PROSPECTIVE JUROR EZZELL:  I know Judge Lott.  One

 5     time I had a driving situation, she handled that

 6     situation.

 7          Socially I've met one other judge, I can't recall his

 8     name right off the top of my head.

 9          And I've associated with Mr. Irby.

10          MS. SINGER:  All right.  The court has outlined for

11     you the charge and the fact that this pertained to a

12     four-month-old, or an infant child by the name of Robbie

13     Quirello.

14          Do any of you have any independent recollection of

15     this case appearing in the newspapers or on the media?  It

16     occurred approximately two years ago, the actual injury

17     was initially sustained on August 2nd of the year 2000 and

18     the child passed away on August 10th of the year 2000.

19          Is there anyone sitting here in the box right now

20     that has an independent recollection of reading about this

21     or paying any close attention to it in the media?

22          (Prospective jurors raise hands.)

23          MS. SINGER:  All right.  Let me go ahead and get

24     names here.  I have Ms. Littrup?

25          PROSPECTIVE JUROR WADE-LITTRUP:  Wade-Littrup.
```

1       MS. SINGER:  Wade-Littrup.

2       And I have Ms. Moran?

3       PROSPECTIVE JUROR MORAN:  (Nods head.)

4       MS. SINGER:  Ms. Escalante, and Ms. Young; is that

5   correct?

6       THE PROSPECTIVE JURORS:  Yes.

7       MS. SINGER:  I'm not going to ask you specifics about

8   what you might have read, that might be something that we

9   need to go into at sidebar.

10      What I wanted to know, first of all, is do you have

11   an independent recollection of what you read?  That's a

12   yes or no question.

13      Ms. Wade-Littrup?

14      PROSPECTIVE JUROR WADE-LITTRUP:  I remember the

15   names.  I don't -- and I remember vague details, but I

16   don't remember --

17      MS. SINGER:  Madam court reporter, can you hear that

18   all right?

19      THE COURT REPORTER:  So far.

20      MS. SINGER:  Okay.  I'll move back.  I realize I'm

21   blocking you, I think.

22      So you don't have any specific recollection of facts,

23   but the names ring a bell?  Is that what you're basically

24   saying?

25      PROSPECTIVE JUROR WADE-LITTRUP:  I remember reading

1    the article.  I don't remember all of the details in the

2    article.

3         MS. SINGER:  Okay.  And you're Ms. Moran; is that

4    correct?

5         PROSPECTIVE JUROR MORAN:  That's right.  Uh-huh.

6         MS. SINGER:  And do you have any specific

7    recollection of what you read?

8         PROSPECTIVE JUROR MORAN:  No.  No.  Similar

9    experience.  I just remember reading an article.

10        MS. SINGER:  Okay.  Ms. Escalante?

11        PROSPECTIVE JUROR ESCALANTE:  Same.

12        MS. SINGER:  And Ms. Young?

13        PROSPECTIVER JUROR YOUNG:  Same.

14        MS. SINGER:  And this is for the four of you, and

15   raise your hand if you disagree.  Is it my understanding

16   then that whatever you may have read in the article has

17   passed you and you can have an open mind and freely listen

18   to the evidence that's presented in this case, in the

19   courtroom, if you were asked to serve?

20        THE PROSPECTIVE JURORS:  Yes.

21        MS. SINGER:  Everyone acknowledges yes there?

22        THE PROSPECTIVE JURORS:  Yes.

23        MS. SINGER:  I have not gone through your individual

24   sheets, but I do want to ask a general question that may

25   also help the court, and that is whether or not any of you

```
1      are working now at Shands Teaching Hospital and Clinics

2      here at the University of Florida?

3            (Two prospective jurors raised hands.)

4            MS. SINGER:  I have Ms. Abbitt.

5            PROSPECTIVE JUROR ABBITT:  That's right.

6            MS. SINGER:  And I have Ms. Escalante.

7            PROSPECTIVE JUROR ESCALANTE:  (Nods head.)

8            MS. SINGER:  Does anyone now work at Shands Teaching

9      Hospital and Clinics besides those two folks?

10           THE PROSPECTIVE JURORS:  (No response.)

11           MS. SINGER:  Has anyone in the past worked at Shands

12     Hospital and Clinics and no longer works there?

13           A PROSPECTIVE JUROR:  (Raised hand.)

14           MS. SINGER:  Ms. Currier -- Sir, I did not get your

15     last name.

16           PROSPECTIVE JUROR HEILEMAN:  Heileman.

17     H-e-i-l-e-m-a-n.

18           MS. SINGER:  H-e-i-l-e-m-a-n.  Heileman?

19           PROSPECTIVE JUROR HEILEMAN:  Yes.  I temped there for

20     about three months in the '80s.

21           MS. SINGER:  Okay.  And that's the closest you've

22     been to them since?

23           PROSPECTIVE JUROR HEILEMAN:  (Nods head.)

24           MS. SINGER:  Okay.  Anyone else?  Ms. Currier?

25           PROSPECTIVE JUROR CURRIER:  I worked in the building
```

```
 1        but not for the hospital, with health care administration,

 2        not a part of the university.

 3            MS. SINGER:  Were you in like the business aspect as

 4        opposed to the clinical aspect or treating aspect?

 5            PROSPECTIVE JUROR CURRIER:  Yes.

 6            MS. SINGER:  Anyone else?

 7            Okay.  Let me talk about you two first and then I'll

 8        talk with you, Ms. Abbitt.

 9            Of you two folks, was -- is there any connection with

10        Shands Teaching Hospital now that you believe that you

11        could not be fair and impartial to the witnesses, many of

12        whom are presently staff at or employed with Shands

13        Hospital and Clinics?

14            THE PROSPECTIVE JURORS:  (Shake heads.)

15            MS. SINGER:  Now, I think it's Dr. Abbitt; is that

16        correct?  If I remember.

17            PROSPECTIVE JUROR ABBITT:  That's right.

18            MS. SINGER:  I did see your sheet because you're

19        earlier on in the numbers, 43.  I got there.  I got to 43.

20        I didn't get to 212, Mr. Heileman, but did I see that.

21            Now, you're presently employed as a physician at

22        Shands Teaching Hospital and Clinics?

23            PROSPECTIVE JUROR ABBITT:  I am.

24            MS. SINGER:  You must have known a number of the

25        folks that I listed.
```

```
 1          PROSPECTIVE JUROR ABBITT:  That's correct.

 2          MS. SINGER:  And I think specifically Dr. Frank Agee,

 3     who is a radiologist, as well as Dr. Ronald Quisling.

 4          PROSPECTIVE JUROR ABBITT:  That's right.

 5          MS. SINGER:  I don't know whether or not you knew the

 6     other clinical folks, Dr. Bernie Maria, Dr. Anne Dickison,

 7     Dr. Larry Levine?

 8          PROSPECTIVE JUROR ABBITT:  Mostly by reputation.

 9          MS. SINGER:  Okay.  Dr. Abbitt, because this case is

10     going to be based upon a lot of medical testimony,

11     especially folks that I think you work hand-and-hand with

12     in the radiology department, do you believe that you can

13     be fair and impartial as a juror in evaluating their

14     testimony in this case?

15          PROSPECTIVE JUROR ABBITT:  I do.

16          MS. SINGER:  You do believe you could fairly and

17     impartially consider their testimony and weigh it?

18          PROSPECTIVE JUROR ABBITT:  Yes.

19          MS. SINGER:  And not give it any additional

20     credibility?

21          PROSPECTIVE JUROR ABBITT:  I don't think so.  I think

22     I could be fair.

23          MS. SINGER:  All right.  Do you believe that you

24     would give it any less credibility because these are folks

25     that you work with at the hospital?
```

1        PROSPECTIVE JUROR ABBITT:  No, I don't think I would

2   give them less credibility.

3        MS. SINGER:  Dr. Agee and Dr. Quisling are

4   radiologists.  Do you work with them on a daily basis?

5        PROSPECTIVE JUROR ABBITT:  I do not.

6        MS. SINGER:  You're in a different part of the

7   Department of radiology?

8        PROSPECTIVE JUROR ABBITT:  I am.

9        MS. SINGER:  And what area of radiology are you

10  specializing in?

11       PROSPECTIVE JUROR ABBITT:  About half my time is

12  spent as a mammographer, reading mammograms, the other

13  half of my time is spent doing body CT and ultrasound.

14       MS. SINGER:  Do you have any close contact with Jon

15  Williams, who is another radiologist but in a different

16  department than the other two radiologists that we've

17  listed?

18       PROSPECTIVE JUROR ABBITT:  His -- he is also separate

19  from where I am.

20       MS. SINGER:  So you're not -- I don't know how you do

21  your job, that's why I'm trying to get this.  Do you all

22  review each other's work?

23       PROSPECTIVE JUROR ABBITT:  Absolutely not.

24  Absolutely not.

25       Just briefly, Dr. Agee and Quisling are

```
 1        neuroradiologists, they work in a whole different section

 2        and do very different studies than I do or Dr. Williams.

 3             MS. SINGER:  Would you consider yourself an expert in

 4        the field of neuroradiology?

 5             PROSPECTIVE JUROR ABBITT:  Absolutely not.

 6             MS. SINGER:  And do you read neuroradiological CT

 7        scans, MRI's or x-rays on a routine basis?

 8             PROSPECTIVE JUROR ABBITT:  I do not as a routine

 9        basis.

10             MS. SINGER:  So are you really sitting here -- I know

11        you know a lot about radiology, but are you sitting here

12        basically the same way we are in terms of listening to

13        them regarding what they do for a living?

14             PROSPECTIVE JUROR ABBITT:  Oh, no.  I think -- I know

15        what they do for a living.  I mean, I understand what they

16        do and I certainly had exposure to what they -- what they

17        do during my residency and my training.  It is not what I

18        do as a specialist.

19             MS. SINGER:  Did you at any time ever work in that

20        area of radiology, that being neuroradiology?

21             PROSPECTIVE JUROR ABBITT:  During my residency I had

22        to learn how to interpret a head scan, but I don't do that

23        now.

24             MS. SINGER:  All right.  And how long ago was your

25        residency?
```

```
 1              PROSPECTIVE JUROR ABBITT:  15 years ago.

 2         MS. SINGER:  How about chest x-rays?  Because

 3    Dr. Williams is a pediatric radiologist, and he's not

 4    going to be talking about the head, he's going to be

 5    talking about the chest.

 6         PROSPECTIVE JUROR ABBITT:  I read chest x-rays all

 7    the time.

 8         MS. SINGER:  All right.  Do you read chest x-rays --

 9    Now, mammography is one kind of chest x-ray that you read.

10    Do you read chest x-rays for diagnostic purposes?

11         PROSPECTIVE JUROR ABBITT:  I do.

12         MS. SINGER:  I.e., to diagnose pneumonia or some

13    other lung disease?

14         PROSPECTIVE JUROR ABBITT:  Yes.

15         MS. SINGER:  And that's in the normal course of your

16    job?

17         PROSPECTIVE JUROR ABBITT:  Yes.

18         MS. SINGER:  Do you believe, Dr. Abbitt, that if you

19    were a juror on this case and there were demonstrative

20    aids or pieces of evidence that were CT scans or chest

21    x-rays of this particular child, do you believe that you

22    would feel some kind of obligation to do an independent

23    interpretation of those CT scans or x-rays before you

24    could consider a verdict in this case?

25         PROSPECTIVE JUROR ABBITT:  Absolutely not.
```

1    MS. SINGER:  Would you feel that you would have to

2    give medical opinions or medical training to fellow jurors

3    if you were asked to sit in this case?  In other words, if

4    one of the other jurors asked you a question about

5    medicine, do you believe that you would feel some

6    obligation to give a short course on pneumonia in order to

7    further provide information to jurors before they made

8    their decision?

9    PROSPECTIVE JUROR ABBITT:  Do I feel responsible for

10   that?

11   MS. SINGER:  Yes.  In other words, if you're back in

12   the jury room and deliberating and someone says, Well,

13   there's an issue of pneumonia, Dr. Abbitt, tell us what

14   are the symptoms for pneumonia or what do you see on an

15   x-ray, do you feel you would be obligated to the jurors to

16   educate them on that area of medicine while you were in

17   the jury room?

18   PROSPECTIVE JUROR ABBITT:  I don't feel obligated.  I

19   think that if I were instructed that I was supposed to

20   explain something, that I would be glad to do that.  But I

21   don't feel like I'm obligated to do that.

22   MS. SINGER:  In other words, if the court didn't

23   instruct you, but someone asked you in the course of

24   deliberation, would you feel some ethical or moral

25   obligation to teach folks in the jury room about certain

1       aspects of medicine?

2            I'm talking about it in here, do you think if you

3       were sitting around a room deliberating with the other 12

4       jurors if you would feel like you would feel some

5       obligation in the course of the deliberations, because it

6       is a specialty of yours and because it is a part of this

7       case, do you feel you would have some -- You know, I don't

8       know how to say this -- a heart-felt obligation to provide

9       this information, even though it didn't come from the

10      jury -- from the witness stand, even though it wasn't in

11      the evidence?

12           PROSPECTIVE JUROR ABBITT:  No.

13           MS. SINGER:  I have another general question before I

14      go on to my more specific questions, your Honor, and that

15      is, do any of you -- there are many religious faiths,

16      there are many ethical beliefs, there are many moral

17      beliefs that say judge not lest you be judged.  Many

18      churches preach that.  Some people have engrained that

19      into their own belief system, even if they don't practice

20      a particular belief -- religion.

21           Is there anyone who is sitting on this panel right

22      now that believes that they cannot sit because they cannot

23      make a judgment, even if it's simply a factual

24      determination, that they cannot make a judgment against

25      another person, another human being?

```
 1          If you have that belief, moral, religious or

 2     otherwise, if you would raise your hand, please.

 3          THE PROSPECTIVE JURORS:  (No audible response.)

 4          (A juror raised hand.)

 5          MS. SINGER:  Yes.  Mr. Hudson, do you have that moral

 6     belief?

 7          PROSPECTIVE JUROR HUDSON:  I have that feeling that I

 8     wouldn't be a proper judge of an individual and tell the

 9     truth about it, because a person is not the same always.

10     A person can be in good health and in good condition, and

11     he have a free mind to act real -- you know, gentle with

12     other people, and then that same person, overnight, can

13     get sick and have a different -- and if that person was to

14     do something to somebody, after he got sick, well, that

15     person, he done did the crime but before he got sick, he

16     wouldn't have did it.

17          MS. SINGER:  Are you saying, Mr. Hudson, that no

18     matter what proof the state offers in this case, the proof

19     was overwhelming beyond and to the exclusion of every

20     reasonable doubt, you would not be able to find the

21     defendant guilty?

22          PROSPECTIVE JUROR HUDSON:  Well, I be able to find a

23     person guilty if I know that's his history.

24          MS. SINGER:  Okay.

25          PROSPECTIVE JUROR HUDSON:  From day one.
```

```
 1            MS. SINGER:  All right.  Well, what if you were not
 2     provided with a history?  What if you were only told what
 3     happened on a particular day?
 4            PROSPECTIVE JUROR HUDSON:  Well, if a person did -- a
 5     lot of peoples do things un- -- they don't mean to do it.
 6     Some people do things and it just happens so quick and
 7     really from their heart they didn't mean to do it.
 8            MS. SINGER:  Right.  I understand that, sir.
 9            Are you going to be -- My question to you is, are you
10     going to be able to come back with a verdict of guilty,
11     even if all you hear about is some one incident?
12            We're not going to talk about Mr. Herlihy's history,
13     we are just going to talk about one incident that has to
14     do with Mr. Herlihy and Mr. Quirello, little baby
15     Quirello.  Are you going to be able, with just that little
16     area of facts, are you going to be able to render a
17     verdict of guilty if you're satisfied that the state has
18     proven their case?
19            PROSPECTIVE JUROR HUDSON:  I will be able to answer
20     the question if they can say this person had a history of
21     what has happened.
22            MS. SINGER:  So if there is no history, you would not
23     be able to render a verdict of guilty?
24            PROSPECTIVE JUROR HUDSON:  No, ma'am.
25            MS. SINGER:  Is that no, sir?
```

1         PROSPECTIVE JUROR HUDSON:  No, ma'am, if there

2    wouldn't be a history of it.

3         MS. SINGER:  And you have a very special name for me,

4    because I know another Borie Hudson.

5         PROSPECTIVE JUROR HUDSON:  That's my son.

6         MS. SINGER:  That is your son.  All right.  He works

7    for the sheriff's department?

8         PROSPECTIVE JUROR HUDSON:  Yes, ma'am.

9         MS. SINGER:  Is there anyone else who has any issue

10   with the moral aspect of this or the ethical aspect of

11   this?

12        A PROSPECTIVE JUROR:  I have a qualification.

13        MS. SINGER:  Yes.

14        A PROSPECTIVE JUROR:  Are you asking in determining

15   guilt or innocence or what consequences?

16        MS. SINGER:  You're not going to be making any

17   determination as to consequence, but there are some faiths

18   that believe that you don't even get to the point of

19   making a decision to that person before the court.

20        Ms. Martin, do you have any problem with that?

21        PROSPECTIVE JUROR MARTIN:  No.

22        MS. SINGER:  We talked about the length of this

23   trial.  It's scheduled to go five days this week,

24   including today.  So four more days this week.  We get

25   Monday off because the courthouse is closed for Yom

1    Kippur, then we go back on for the rest of the week,

2    ending hopefully on or about September 20th, before the

3    next football game, which is the Bobcats, not the

4    Hurricanes.

5    So everybody -- almost everybody raised their hands

6    earlier this morning when you were asked whether or not it

7    would be inconvenient.

8    Is there anyone at this point that would find the

9    two-week period to be so overwhelmingly inconvenient that

10   they would either be unable to serve and support their

11   families, unable to serve and take care of anyone at home,

12   unable to serve for any other essential reason, if you

13   would raise your hand, please.

14   PROSPECTIVE JUROR WADE-LITTRUP:  I just have a

15   question as far as when would the day end of the jurors'

16   day?

17   MS. SINGER:  When would the day end of the jurors'

18   day?  That is up to the court.

19   THE COURT:  I'm thinking in order to accommodate this

20   trial, and to make sure that we do everything possible to

21   conclude it in the two weeks that is allocated, that we

22   would probably go from 9:00 every morning until 6:00

23   o'clock every night.  This is as close as I have estimated

24   for the lawyers at this time.

25   MS. SINGER:  The court did make a prior ruling that

1    on September 11th, which is a Memorial Day of sorts for

2    us, that we will be adjourning --

3         THE COURT:  At 5:00 o'clock on that day.

4         PROSPECTIVE JUROR WADE-LITTRUP:  Okay.  Because I do

5    have evening things scheduled that it would be very

6    difficult to get out of.

7         MS. SINGER:  And that would be even going to 6:00,

8    Ms. Wade-Littrup?

9         PROSPECTIVE JUROR WADE-LITTRUP:  If we really end at

10   6:00, 6:00 can work.  More would be --

11        THE COURT:  Well, obviously, I'm not going to want

12   the jury to sit so long during the day that you become

13   exhausted and can't take in the evidence.  So 6:00 o'clock

14   is about as far as we would ever go.

15        MS. SINGER:  Anyone else besides Ms. Wade-Littrup who

16   has indicated a concern about the length of time?

17        PROSPECTIVE JUROR ROBERTS:  (No response.)

18        MS. SINGER:  I'm ready now to look over jury forms,

19   your Honor.

20        I'll tell you what, I'm going to make this a little

21   easier.  Since we're going to be going for about an hour,

22   I'll take some of my other questions, and bear with me,

23   folks, because I didn't get a chance to look at your

24   sheets to check over them.  I know some of these are on

25   the sheets, but I think I can do it faster than going

```
 1            through the sheets.

 2                 How many of you in the box now have served on a jury

 3            before?

 4                 (Several hands raised.)

 5                 MS. SINGER:  Mr. Ezzell, Ms. Wade-Littrup.

 6                 Anyone else who has served on a jury before?

 7                 PROSPECTIVE JUROR ROBERTS:  (No response.)

 8                 MS. SINGER:  All right.  Of the two of you, were

 9            either of you the foreperson, foreman or forewoman of the

10            jury when you served?

11                 PROSPECTIVE JUROR EZZELL:  Yes.

12                 PROSPECTIVE JUROR WADE-LITTRUP:  No.

13                 MS. SINGER:  Mr. Ezzell was.

14                 Were you both able to reach a verdict?

15                 PROSPECTIVE JUROR EZZELL:  Yes.

16                 PROSPECTIVE JUROR WADE-LITTRUP:  Uh-huh.

17                 MS. SINGER:  Was the case a civil trial or a criminal

18            trial?

19                 PROSPECTIVE JUROR WADE-LITTRUP:  Mine was a criminal

20            trial.

21                 MS. SINGER:  Yours was a criminal trial, someone was

22            accused of a crime.

23                 Mr. Ezzell?

24                 PROSPECTIVE JUROR EZZELL:  Battery of a police

25            officer, I believe.
```

1           MS. SINGER:  That's a criminal case.

2           And how long ago, Ms. Wade-Littrup, did you serve?

3           PROSPECTIVE JUROR WADE-LITTRUP:  I'm not sure.  I

4    would guess about six years.

5           MS. SINGER:  Was it here in Alachua County?

6           PROSPECTIVE JUROR WADE-LITTRUP:  Yes.

7           MS. SINGER:  Were you satisfied with the experience?

8    Was it anything that you had hesitation about later?

9           PROSPECTIVE JUROR WADE-LITTRUP:  No.

10          MS. SINGER:  Do you bring with you anything about

11   that experience that causes you any concern in this case?

12          PROSPECTIVE JUROR WADE-LITTRUP:  No.

13          MS. SINGER:  What -- Do you remember what the charge

14   was?

15          PROSPECTIVE JUROR WADE-LITTRUP:  Yes.  A fellow had

16   battered his wife.

17          MS. SINGER:  It was a domestic --

18          PROSPECTIVE JUROR WADE-LITTRUP:  Yes.  But it was

19   decided in one day and it was very smooth and orderly.

20          MS. SINGER:  And, Mr. Ezzell, the battery of a law

21   enforcement officer, anything about that experience that

22   caused you any concern?

23          PROSPECTIVE JUROR EZZELL:  No, ma'am.

24          MS. SINGER:  And was that more than one day, or was

25   it one day?

```
 1              PROSPECTIVE JUROR EZZELL:  No, it was one day.

 2              PROSPECTIVE JUROR BAXTER:  Ma'am.

 3         MS. SINGER:  Yes, sir.

 4              PROSPECTIVE JUROR BAXTER:  I served on one back in

 5    the early '60s in California, and it was a civil case, it

 6    was insurance.  It was one day, and it wasn't anything

 7    criminal or anything like that.

 8         MS. SINGER:  So do you have a real recollection of

 9    that?

10              PROSPECTIVE JUROR BAXTER:  It was confusing because

11    none of us were CPA's or bookkeepers, and it involved a

12    lot of figures.  And we did the best we could, but, you

13    know, I don't know really if we did right or not.  You

14    almost had to be a CPA to do it.

15         MS. SINGER:  Okay.  So it must have been on damages,

16    then, you had to calculate some damages up there --

17              PROSPECTIVE JUROR BAXTER:  Yes.

18         MS. SINGER:  -- and you had to do all that math.

19    Sent you back with a calculator; right?

20         But you don't have any independent recollection of

21    the laws that were given to you?  That was in California?

22              PROSPECTIVE JUROR BAXTER:  No, ma'am.

23         MS. SINGER:  We don't have to worry about that

24    influencing you in anyway?

25              PROSPECTIVE JUROR BAXTER:  '62 or '63.  A long time
```

```
 1        ago.
 2             MS. SINGER:  Have any of you been called to serve as
 3        jurors before and were excused for any reason?
 4             (Several prospective jurors raised hands.)
 5             MS. SINGER:  We have Ms. Mahamrey?
 6             PROSPECTIVE JUROR WALKER:  Regina walker.
 7             No, I was summoned and had children under six and was
 8        excused for that.
 9             MS. SINGER:  And Mr. McMahon?
10             PROSPECTIVE JUROR McMAHON:  Yes.  I had work related
11        activities that I mailed in the form and they excused me.
12             MS. SINGER:  Anyone else?  Yes, Ms. Escalante?
13             PROSPECTIVE JUROR ESCALANTE:  Yes.  I had a daycare
14        center at the time and I couldn't.
15             MS. SINGER:  So none of you had any experience where
16        you felt that you were snubbed by the court system or that
17        you were not treated fairly by the court system?
18             THE PROSPECTIVE JURORS:  (Shake heads.)
19             MS. SINGER:  Do any of you have any regular contact,
20        other than Ms. Martin who has daily, unlimited contact,
21        any of you have any daily contact with lawyers?
22             PROSPECTIVE JUROR ROBERTS:  (Raised hand.)
23             MS. SINGER:  Yes.  You are Ms. Roberts, do I have
24        that right?
25             PROSPECTIVE JUROR ROBERTS:  Yes, ma'am.
```

```
 1              MS. SINGER:  What do you do, Ms. Roberts, that brings
 2    you in daily contact with lawyers?
 3              PROSPECTIVE JUROR ROBERTS:  Actually, he's just a
 4    friend.
 5              MS. SINGER:  All right.  And who is that?
 6              PROSPECTIVE JUROR ROBERTS:  Thomas Allen Crouch
 7    (assumed spelling).
 8              MS. SINGER:  I'm sorry?
 9              PROSPECTIVE JUROR ROBERTS:  Thomas Allen Crouch?
10              MS. SINGER:  And what kind of law does he practice,
11    do you know?
12              PROSPECTIVE JUROR ROBERTS:  It's realty and trust.
13              MS. SINGER:  Are you in the realty business?
14              PROSPECTIVE JUROR ROBERTS:  (Shakes head.)
15              MS. SINGER:  Do you discuss cases with him?
16              PROSPECTIVE JUROR ROBERTS:  (Shakes head.)
17              MS. SINGER:  He does land and property and probably
18    doesn't go to court very much.
19              PROSPECTIVE JUROR ROBERTS:  No, we don't discuss it.
20              MS. SINGER:  Is there anyone else, other than
21    Ms. Roberts and Mr. Ezzell, talking to his son probably,
22    and others in the system?  Other than the two of you, any
23    other folks who actually have daily contact -- and
24    Ms. Martin, who I'm sure talks to her husband on a daily
25    basis -- anybody else that has that kind of contact with
```

```
 1        lawyers?

 2             How about -- and I know Dr. Abbitt is going to say

 3        this because I've asked her a lot of questions -- how

 4        about daily contact with physicians, either in your work

 5        or socially?  Any others, other than Dr. Abbitt, who works

 6        with physicians, any of you have contact on a daily basis?

 7             PROSPECTIVE JUROR EZZELL:  I wouldn't say daily.  My

 8        son recently married and his wife is a medical student.

 9        She's currently in Alabama and will be there.

10             MS. SINGER:  Anyone else have contact on a daily

11        basis with physicians, works with them or otherwise

12        communicates with them?

13             PROSPECTIVE JUROR ESCALANTE:  (Raised hand.)

14             MS. SINGER:  Yes, Ms. Escalante?

15             PROSPECTIVE JUROR ESCALANTE:  You mean just being

16        around them?

17             MS. SINGER:  Yes, ma'am.

18             PROSPECTIVE JUROR ESCALANTE:  I do.

19             MS. SINGER:  And do you do that at work?

20             PROSPECTIVE JUROR ESCALANTE:  In management for

21        environmental service I'm around the doctors all the time.

22             MS. SINGER:  What would that job entail,

23        Ms. Escalante?  What do you do?  What kind of duties do

24        you have?

25             PROSPECTIVE JUROR ESCALANTE:  I make sure that the
```

```
1          place is clean.
2               MS. SINGER:  And you clean doctors' offices?
3               PROSPECTIVE JUROR ESCALANTE:  No.  No.  I work with
4          patients, ER, patients, anywhere in the hospital usually
5          but not offices.
6               MS. SINGER:  And what hospital is it that you work
7          in?
8               PROSPECTIVE JUROR ESCALANTE:  Shands.
9               MS. SINGER:  So you do have daily contact with
10         physicians?
11              PROSPECTIVE JUROR ESCALANTE:  Yeah.  I don't speak to
12         them or anything, but I'm around them.
13              MS. SINGER:  Is there anything about that, since we
14         have so many physicians listed in this case, is that going
15         to affect you in anyway?
16              PROSPECTIVE JUROR ESCALANTE:  No.  I don't know any
17         of them.
18              MS. SINGER:  Now, Ms. Escalante, do you believe
19         because you work around physicians, and you have contact
20         with them, that you would hold them in higher regard than
21         other witnesses that may come and testify?
22              PROSPECTIVE JUROR ESCALANTE:  No.  No.
23              MS. SINGER:  Now I have to ask you the opposite
24         question.  Do you think that because you work with them
25         every day and you know their foibles, their ins and outs,
```

```
 1        their bads and goods, that you would hold them in lower

 2        regard than other witnesses that may testify?

 3             PROSPECTIVE JUROR ESCALANTE:  No.

 4             MS. SINGER:  You believe that you could consider them

 5        and weigh their testimony as you would any other testimony

 6        we have?

 7             PROSPECTIVE JUROR ESCALANTE:  Right.

 8             MS. SINGER:  Which is what Dr. Abbitt said she would

 9        be able to do as well.

10             Both of you feel comfortable doing that?

11             THE PROSPECTIVE JURORS:  (Nod heads.)

12             MS. SINGER:  Have any of you been a victim of crime,

13        had your house broken into, your car stolen, pocketbook

14        taken, robbed, theft?

15             PROSPECTIVE JUROR HEILEMAN:  House broken into three

16        years ago.

17             MS. SINGER:  All right.  That was Mr. Heileman and

18        Ms. Martin, Mr. Ezzell, Ms. Young, Ms. Escalante,

19        Ms. Moran, Mr. McMahon, and juror 190, and I didn't get

20        your name.

21             PROSPECTIVE JUROR CLARK:  Donald Clark.

22             MS. SINGER:  Clark?

23             PROSPECTIVE JUROR CLARK:  Clark.

24             MS. SINGER:  C-l-a-r-k-e?

25             PROSPECTIVE JUROR CLARK:  Just k.
```

```
 1            MS. SINGER:  Mr. Clark, let's start with you since I
 2       haven't talked to you today.
 3            How long ago -- when was it that you were a victim of
 4       a crime?
 5            PROSPECTIVE JUROR CLARK:  About three years ago
 6       somebody broke into my truck, stole my stereo.
 7            MS. SINGER:  Was there an identified person that was
 8       later named as a defendant?
 9            PROSPECTIVE JUROR CLARK:  No.  No.
10            MS. SINGER:  It was never resolved --
11            PROSPECTIVE JUROR CLARK:  No.
12            MS. SINGER:  -- is what you're telling me?
13            Was a police agency called?
14            PROSPECTIVE JUROR CLARK:  Yep.
15            MS. SINGER:  Was it here in Alachua County?
16            PROSPECTIVE JUROR CLARK:  Yes, ma'am.
17            MS. SINGER:  And what agency was called to
18       investigate?
19            PROSPECTIVE JUROR CLARK:  Police department.
20            MS. SINGER:  Gainesville Police Department?
21            PROSPECTIVE JUROR CLARK:  Yes, ma'am.
22            MS. SINGER:  As opposed to the sheriff's department?
23            PROSPECTIVE JUROR CLARK:  Yes, ma'am.
24            MS. SINGER:  All right.  Was there -- Did someone
25       actually come out and have contact with you?  Or were you
```

```
 1          required to go in to the station to make a report?

 2              PROSPECTIVE JUROR CLARK:  They came out to me.

 3              MS. SINGER:  Did they process your truck for

 4          fingerprints?

 5              PROSPECTIVE JUROR CLARK:  Yes, ma'am.

 6              MS. SINGER:  It turned out they were not able to

 7          verify or identify a person?

 8              PROSPECTIVE JUROR CLARK:  Exactly.

 9              MS. SINGER:  Never got your car back -- your radio?

10              PROSPECTIVE JUROR CLARK:  No, ma'am.

11              MS. SINGER:  Was there anything about the experience

12          with law enforcement at that time, Mr. Clark, that so

13          turns you off to law enforcement in general that you would

14          not be able to listen and weigh the testimony of law

15          enforcement witnesses that are going to come in here and

16          testify today?

17              PROSPECTIVE JUROR CLARK:  No, ma'am.

18              MS. SINGER:  Was there anything about the way you

19          were treated that you would say, no, I can't bear to pay

20          attention to these folks because they treated me so badly?

21              PROSPECTIVE JUROR CLARK:  No, ma'am.

22              MS. SINGER:  How about the other way, are you so

23          uplifted by the way you were treated that you would say

24          anything they said was, you know, written in stone like

25          the Ten Commandments?
```

```
 1              PROSPECTIVE JUROR CLARK:  No, ma'am.

 2          MS. SINGER:  So you think you could give them a fair

 3     hearing?

 4              PROSPECTIVE JUROR CLARK:  Yes, ma'am.

 5          MS. SINGER:  Okay.  Were there any other contacts

 6     that you had with law enforcement that changes your mind

 7     about any answers I've just asked you regarding this

 8     particular contact?

 9              PROSPECTIVE JUROR CLARK:  No, ma'am.

10          MS. SINGER:  Okay.  Almost everybody in the world has

11     gotten a traffic ticket.  It's just a fact of life.  Is

12     there anybody who sits here today that has had an exchange

13     with a law enforcement officer that was so offensive,

14     whether it be traffic ticket or something major, so

15     offensive that you just have written them off, they can't

16     be trusted?  Anybody in this group today have that feeling

17     whatsoever?  Please be honest.

18          PROSPECTIVE JUROR McMAHON:  That person or the

19     organization as a whole?

20          MS. SINGER:  Mr. McMahon, were you rudely treated by

21     a law enforcement officer?

22          PROSPECTIVE JUROR McMAHON:  Yes, I was.  One time.

23          MS. SINGER:  Okay.  How long ago was that?

24          PROSPECTIVE JUROR McMAHON:  20 some years ago.

25          MS. SINGER:  And you haven't forgotten it, have you?
```

```
 1          PROSPECTIVE JUROR McMAHON:  I did not forget.

 2          MS. SINGER:  Believe it or not, I was rudely treated

 3     by a law enforcement officer.  They do it -- you know, it

 4     doesn't matter what sex, race, and I haven't forgotten it

 5     either and it was about 20 years ago.  So I know how you

 6     feel.

 7          Was it here in Alachua County?

 8          PROSPECTIVE JUROR McMAHON:  Yes.

 9          MS. SINGER:  Oh, shoot.  Okay.

10          Was it Gainesville Police Department?

11          PROSPECTIVE JUROR McMAHON:  No, it wasn't.

12          MS. SINGER:  Okay.  Well, maybe I can balance this

13     out.

14          Is there anything about that, though, Mr. McMahon,

15     putting that aside, and I know -- I myself have had that

16     experience -- putting that aside, is there anything that

17     so bothers you about that contact that you would not be

18     able to be fair and impartial?

19          PROSPECTIVE JUROR McMAHON:  Not at all.

20          MS. SINGER:  Was it during a traffic stop?

21          PROSPECTIVE JUROR McMAHON:  No.

22          MS. SINGER:  It was at some other time?

23          PROSPECTIVE JUROR McMAHON:  Yes.

24          MS. SINGER:  Okay.  Were you a victim?

25          PROSPECTIVE JUROR McMAHON:  No.
```

```
 1              MS. SINGER:  You were actually being investigated for
 2       charges?
 3              PROSPECTIVE JUROR McMAHON:  Yes -- Well, I was
 4       walking to a convenience store.
 5              MS. SINGER:  All right.  And you were stopped?
 6              PROSPECTIVE JUROR McMAHON:  Yes.
 7              MS. SINGER:  And inquired?
 8              PROSPECTIVE JUROR McMAHON:  Questioned.
 9              MS. SINGER:  So it was -- you were being inquired
10       upon by officers --
11              PROSPECTIVE JUROR McMAHON:  Yes.
12              MS. SINGER:  -- regarding why you were in a
13       particular place at a particular time?
14              PROSPECTIVE JUROR McMAHON:  Right.
15              MS. SINGER:  Did they actually take you off to jail?
16              PROSPECTIVE JUROR McMAHON:  No.
17              MS. SINGER:  All right.  But you were offended by
18       that contact?
19              PROSPECTIVE JUROR McMAHON:  Yes, I was.
20              MS. SINGER:  Okay.  Was it physical or was it verbal?
21              PROSPECTIVE JUROR McMAHON:  Both.
22              MS. SINGER:  It was physical and verbal.
23              Were you handcuffed?
24              PROSPECTIVE JUROR McMAHON:  Yes.
25              MS. SINGER:  And then you were let free, I assume?
```

```
 1              PROSPECTIVE JUROR McMAHON:  Yes.

 2         MS. SINGER:  So they unarrested you?

 3         PROSPECTIVE JUROR McMAHON:  I guess so.

 4         MS. SINGER:  Do you know what happened as a result of

 5    that?  Do you know whether or not someone was later

 6    identified as a perpetrator in some offense and you just

 7    happened to coincidentally be in the wrong place at the

 8    wrong time?

 9         PROSPECTIVE JUROR McMAHON:  I was stopped to be

10    questioned about the incident, but I don't remember if

11    they ever found out who done it.  It's been a long time.

12         MS. SINGER:  That's 20 years ago and I think on your

13    sheet your age -- but how old were you?

14         PROSPECTIVE JUROR McMAHON:  35.  I was 15 at the

15    time.

16         MS. SINGER:  You were 15?

17         PROSPECTIVE JUROR McMAHON:  Yes.

18         MS. SINGER:  So you were a kid?

19         PROSPECTIVE JUROR McMAHON:  Yes.

20         MS. SINGER:  Anybody else with you that was stopped

21    and treated the same way you were?

22         PROSPECTIVE JUROR McMAHON:  No.

23         MS. SINGER:  Can you put it aside?

24         PROSPECTIVE JUROR McMAHON:  Oh, yes.  It's already

25    aside.
```

1        MS. SINGER:  All right.  Do you have any friends or

2    any people now that are in the law enforcement arena?

3        PROSPECTIVE JUROR McMAHON:  I have acquaintances.  I

4    wouldn't say any good friends, but I have a lot of

5    acquaintances.

6        MS. SINGER:  And did you know any of my witnesses,

7    the witnesses we listed?

8        PROSPECTIVE JUROR McMAHON:  No.  Actually, I was

9    surprised I didn't.

10       MS. SINGER:  Okay.  Now, I had some other victims.

11   Mr. Ezzell was a victim, Mr. Heileman, you said you were a

12   victim, I think Ms. Martin, Ms. Young, Ms. Escalante,

13   Ms. Moran.  We had a lot of victims of crime.

14       Let me ask you, Mr. Heileman, what kind of crime was

15   it?  Was your house broken into, burglarized?

16       PROSPECTIVE JUROR HEILEMAN:  (Nods head.)

17       MS. SINGER:  Were they able to catch someone?

18       PROSPECTIVE JUROR HEILEMAN:  (Shakes head.)

19       MS. SINGER:  Did not?

20       PROSPECTIVE JUROR HEILEMAN:  Not.

21       MS. SINGER:  Did this happen in the City of

22   Gainesville or in the county?

23       PROSPECTIVE JUROR HEILEMAN:  In the county.

24       MS. SINGER:  And did they process your house?  That

25   is --

```
 1            PROSPECTIVE JUROR HEILEMAN:  Yes, they did.

 2            MS. SINGER:  -- take pictures and try to collect

 3       evidence from your house?

 4            PROSPECTIVE JUROR HEILEMAN:  Yes, they did.

 5            MS. SINGER:  And how were you treated, as opposed to

 6       Mr. McMahon?

 7            PROSPECTIVE JUROR HEILEMAN:  Very well.

 8            MS. SINGER:  And how long ago was that?

 9            PROSPECTIVE JUROR HEILEMAN:  It was about three years

10       ago.

11            MS. SINGER:  Anything about that experience that

12       causes you to -- will in anyway affect credibility of

13       these witnesses?

14            PROSPECTIVE JUROR HEILEMAN:  No, ma'am.

15            MS. SINGER:  All right.  Ms. Martin, you were also a

16       victim.  How long ago was that?

17            PROSPECTIVE JUROR MARTIN:  In high school our house

18       was burglarized and then at work my purse was stolen out

19       of my office.

20            MS. SINGER:  Where do you work?

21            PROSPECTIVE JUROR MARTIN:  University of Florida.

22            MS. SINGER:  And what type of work do you do?

23            PROSPECTIVE JUROR MARTIN:  I'm an academic advisor.

24            MS. SINGER:  For students -- undergraduate students?

25            PROSPECTIVE JUROR MARTIN:  Yes.
```

```
 1        MS. SINGER:  And so that would have been the
 2   University Police Department that would have handled that
 3   purse theft; correct?
 4        PROSPECTIVE JUROR MARTIN:  Yes.  I'm not -- actually
 5   I can't remember if they called them.  I think they were
 6   called but I wasn't questioned, no big deal made out of it
 7   I know.
 8        MS. SINGER:  Was there anything about the break-in
 9   when you were a child, when you were living at home with
10   your parents, did you have any interaction with law
11   enforcement at that time?
12        PROSPECTIVE JUROR MARTIN:  No.  I know they came to
13   my house.
14        MS. SINGER:  Do you have any bad feelings, good
15   feelings or any feelings whatsoever regarding the
16   testimony of law enforcement officers?
17        PROSPECTIVE JUROR MARTIN:  No.
18        MS. SINGER:  Your husband comes home at night --
19        PROSPECTIVE JUROR MARTIN:  Uh-huh.
20        MS. SINGER:  -- he tries a lot of cases, we know.
21        PROSPECTIVE JUROR MARTIN:  Uh-huh.
22        MS. SINGER:  Does he come home and, you know, give
23   you the scoop on what folks have done on the stand during
24   the day?
25        PROSPECTIVE JUROR MARTIN:  Well, yeah, he talks about
```

1    the cases he's had in general, about trials.  But I've

2    heard both sides, really I have.

3         MS. SINGER:  So, I mean, does he express any

4    opinions -- we all have our own opinions.  I'm convinced

5    that no matter what questions I ask you, I'm not going to

6    change your mind about anything, you're not going to

7    change my mind about anything.  I'm convinced of that,

8    having done this for a while.

9         Is there anything about his opinions that he has

10   expressed to you that has put any kind of taint,

11   Ms. Martin, on your ability to be fair and impartial?

12        PROSPECTIVE JUROR MARTIN:  No, not on my ability.

13        MS. SINGER:  Okay.  Because I know he has bad days

14   and he has good days.

15        PROSPECTIVE JUROR MARTIN:  Right.

16        MS. SINGER:  Now, Ms. Young, you also indicated that

17   you had a break-in?

18        PROSPECTIVE JUROR YOUNG:  Yes.  Back in the '80s

19   there was a cat burglar, whatever, and he broke into our

20   house while we were there and didn't know it until the

21   next morning.

22        MS. SINGER:  And he stole items?

23        PROSPECTIVE JUROR YOUNG:  No.  He got in on the back

24   porch and broke a window but he didn't actually get in.

25        MS. SINGER:  Was he caught?

```
1              PROSPECTIVE JUROR YOUNG:  Yes, he was.

2              MS. SINGER:  Were you a witness in the case?

3              PROSPECTIVE JUROR YOUNG:  No.  He was killed in

4    another state or something doing the same thing he did

5    before.

6              MS. SINGER:  Oh, my gosh.

7              So did you report -- obviously you reported it to law

8    enforcement and they were able to link him up to this

9    crime.

10             PROSPECTIVE JUROR YOUNG:  Right.

11             MS. SINGER:  You were not involved at all in the

12   trial of that matter or prosecution of that matter?

13             PROSPECTIVE JUROR YOUNG:  No.

14             MS. SINGER:  Anything about that experience and your

15   contact with law enforcement that has caused you any

16   concern or --

17             PROSPECTIVE JUROR YOUNG:  No.

18             MS. SINGER:  -- gives you any question right now --

19   And I'm talking about -- I don't know where people feel --

20   I kind of feel it right here (indicating).  Some people

21   feel it here in the belly (indicating) where you say, I

22   can't be fair because Ms. Singer is going to put police

23   witnesses on and I -- down here I'm thinking I don't know

24   anything about this case and I'm thinking right now, I'm

25   not going to be fair.  Do you have any of that?
```

```
 1              PROSPECTIVE JUROR YOUNG:  No.

 2              MS. SINGER:  Ms. Escalante, you also were a victim of

 3         a break-in, did you say?

 4              PROSPECTIVE JUROR ESCALANTE:  No, not a break-in.  I

 5         worked at a convenience store and I was robbed.

 6              MS. SINGER:  And was that at gunpoint or was that --

 7              PROSPECTIVE JUROR ESCALANTE:  Not that time.  The

 8         other times.  I've been robbed several times.

 9              MS. SINGER:  Oh, my gosh.  Perpetrators caught?

10              PROSPECTIVE JUROR ESCALANTE:  Yes.

11              MS. SINGER:  Have you had to testify as a witness in

12         a case?

13              PROSPECTIVE JUROR ESCALANTE:  Yes.

14              MS. SINGER:  Okay.  So you know the experience of

15         being on the witness stand?

16              PROSPECTIVE JUROR ESCALANTE:  Yes.

17              MS. SINGER:  Is it fun?

18              PROSPECTIVE JUROR ESCALANTE:  Well, not -- yeah --

19         No.  No.  No.

20              (Laughter.)

21              MS. SINGER:  Okay.  But you have actually had to come

22         in and testify?

23              PROSPECTIVE JUROR ESCALANTE:  Yes.

24              MS. SINGER:  And how many times have you done that?

25              PROSPECTIVE JUROR ESCALANTE:  I've done that probably
```

1           about three times.

2                 MS. SINGER:  And was it here in Alachua County?

3                 PROSPECTIVE JUROR ESCALANTE:  Yes.

4                 MS. SINGER:  And the outcome of the cases?

5                 PROSPECTIVE JUROR ESCALANTE:  He was found guilty.

6                 MS. SINGER:  All right.  And was there anything about

7           that experience that causes you to be concerned about

8           whether you could be fair and impartial as a juror --

9                 PROSPECTIVE JUROR ESCALANTE:  No.

10                 MS. SINGER:  -- having lived through the experience

11           of being a witness in the case?

12                 PROSPECTIVE JUROR ESCALANTE:  No.

13                 MS. SINGER:  How about your contact with law

14           enforcement, how was that?

15                 PROSPECTIVE JUROR ESCALANTE:  It was good.

16                 MS. SINGER:  It was okay.  No bad feelings about law

17           enforcement?

18                 PROSPECTIVE JUROR ESCALANTE:  No.

19                 MS. SINGER:  Are you going to give them a higher

20           credibility, are you going to think they are better

21           because of what they did for you?

22                 PROSPECTIVE JUROR ESCALANTE:  No.

23                 MS. SINGER:  Are you going to think they are worse?

24                 PROSPECTIVE JUROR ESCALANTE:  No.

25                 MS. SINGER:  Either way, you're going to give them

```
 1          fair and equal consideration?

 2               PROSPECTIVE JUROR ESCALANTE:  Yes.

 3               MS. SINGER:  Okay.  Ms. Moran?

 4               PROSPECTIVE JUROR MORAN:  Uh-huh.

 5               MS. SINGER:  You also were a victim, I believe.

 6               PROSPECTIVE JUROR MORAN:  Uh-huh.  When I was a

 7          teenager we were on a vacation in a rental home, some kids

 8          broke in, took our towels and just vacation stuff.

 9               MS. SINGER:  Okay.  Was anybody ever identified as a

10          perpetrator?

11               PROSPECTIVE JUROR MORAN:  No.

12               MS. SINGER:  Was that reported to law enforcement?

13               PROSPECTIVE JUROR MORAN:  Yes.

14               MS. SINGER:  Was it here in Alachua County?

15               PROSPECTIVE JUROR ESCALANTE:  No.  It was in Georgia.

16               MS. SINGER:  Anything about that experience that

17          causes you any concern?

18               PROSPECTIVE JUROR ESCALANTE:  No.

19               MS. SINGER:  Mr. Hudson, you are very close to your

20          son who has been working for law enforcement, I would

21          guess, 25 years?

22               PROSPECTIVE JUROR HUDSON:  I believe so.

23               MS. SINGER:  All right.  Now, do you think that the

24          fact that you have a son who is so tied to law enforcement

25          and has been so involved for that many years, that that
```

```
 1      would cause you to not be able to be fair and impartial in

 2      this case?

 3              PROSPECTIVE JUROR HUDSON:  Not at all.

 4              MS. SINGER:  Anybody else related to law enforcement

 5      officers besides Mr. Ezzell?

 6              A PROSPECTIVE JUROR:  I have a sister who served as a

 7      police officer in Cocoa Beach.  She's now retired and

 8      works in a secretarial capacity for a police department in

 9      Cocoa Beach.

10              MS. SINGER:  Anything about that that would cause you

11      to be unfair?

12              A PROSPECTIVE JUROR:  No.  No, ma'am.

13              MS. SINGER:  Think you would listen to all witnesses

14      differently -- I mean --

15              A PROSPECTIVE JUROR:  Yes.

16              MS. SINGER:  -- pay attention to them?

17              Anybody else?

18              I asked Mr. McMahon if he recognized anybody on the

19      list, I know I already talked to the doctor and I know she

20      knows a number of folks on the list.  Anybody else, when

21      you heard the names on the list said, Aha, I know

22      somebody?  Ms. Martin knew somebody.

23              (Prospective jurors Wade-Littrup and Currier raised

24      hands.)

25              MS. SINGER:  Ms. Currier knew someone.
```

```
 1              You're not related to Professor Currier, are you,
 2       from law school?
 3              PROSPECTIVE JUROR CURRIER:  No.  No.
 4              MS. SINGER:  And who else knew?
 5              (Prospective Jurors Wade-Littrup and Walker raised
 6       hands.)
 7              MS. SINGER:  Ms. Walker and Ms. Wade-Littrup also
 8       knew people on the list.
 9              All right.  Let me start with Ms. Martin on the back.
10       Who was it that you knew on the list?
11              PROSPECTIVE JUROR MARTIN:  Sal Cumella was a fellow
12       student, and John Hellrung is --
13              MS. SINGER:  That's your pediatrician.
14              And you knew Sal Cumella as a former student?
15              PROSPECTIVE JUROR MARTIN:  Yes.  He was in our
16       department.
17              MS. SINGER:  What department is that?
18              PROSPECTIVE JUROR MARTIN:  Health science education.
19              MS. SINGER:  Ms. Martin, did you ever talk to
20       Mr. Cumella about this case?
21              PROSPECTIVE JUROR MARTIN:  No.  No.  I don't think I
22       was a student at the time that happened.
23              MS. SINGER:  All right.  So the subject has never
24       come up where you've had any discussion with him about
25       this particular case?
```

```
 1          PROSPECTIVE JUROR MARTIN:  No.  It's only been a few
 2     times that I've actually seen it.
 3          MS. SINGER:  And it would be an academic --
 4          PROSPECTIVE JUROR MARTIN:  Right.
 5          MS. SINGER:  And then Dr. Hellrung is your
 6     pediatrician, takes care of your child?
 7          PROSPECTIVE JUROR MARTIN:  Right.
 8          MS. SINGER:  Ms. Currier, you said you knew someone?
 9          PROSPECTIVE JUROR CURRIER:  I think it was the same
10     person, Beth Talaga, we just bought a home from her a few
11     months ago.  But I only met her twice, once for the
12     signing, once for the closing.  That's all.
13          MS. SINGER:  Do you even know what she does for a
14     living, other than restoring houses?
15          PROSPECTIVE JUROR CURRIER:  No --
16          MS. SINGER:  She and her husband restore houses.
17          PROSPECTIVE JUROR CURRIER:  Yes, we just bought a
18     home they restored, pre-owned.
19          MS. SINGER:  So you don't know of any other of her
20     employment?
21          PROSPECTIVE JUROR CURRIER:  No.
22          MS. SINGER:  All right.  And Ms. --
23          PROSPECTIVE JUROR WADE-LITTRUP:  I just recognized
24     Dr. Hellrung because EJ, his wife, and I worked in the
25     hospital together when we had our first babies.
```

1          MS. SINGER:  Okay.

2          PROSPECTIVE JUROR WADE-LITTRUP:  So that was a very

3     long time ago.

4          MS. SINGER:  Yes.  And your son or daughter has

5     graduated from college already?

6          PROSPECTIVE JUROR WADE-LITTRUP:  Well, joined the

7     Marines.

8          MS. SINGER:  Boy, I hope he's okay.

9          All right.  So that's how you know them?

10          PROSPECTIVE JUROR WADE-LITTRUP:  Yes.  So it's not

11     like a close --

12          MS. SINGER:  Right.  And he was not your child's

13     physician?

14          PROSPECTIVE JUROR WADE-LITTRUP:  No.  Because he

15     wasn't practicing then.

16          MS. SINGER:  Who else raised their hand?

17          Oh, Ms. Walker, who did you know?

18          PROSPECTIVE JUROR WALKER:  Dr. Hellrung.  Ten years

19     ago he was my son's pediatrician.  He's not now, but ten

20     years ago he was.

21          MS. SINGER:  Was there anything about the

22     relationship that caused you to leave Dr. Hellrung?

23          PROSPECTIVE JUROR WALKER:  No, just insurance.

24     Insurance change.

25          MS. SINGER:  All right.  So you were satisfied with

```
 1        his services?

 2             PROSPECTIVE JUROR WALKER:  Yes.

 3             MS. SINGER:  And I should ask Ms. Martin, no problem

 4        with Dr. Hellrung?

 5             PROSPECTIVE JUROR MARTIN:  No problem.

 6             MS. SINGER:  You're satisfied with his services?

 7             PROSPECTIVE JUROR MARTIN:  Yes.

 8             PROSPECTIVE JUROR EZZELL:  Ms. Singer, I was a victim

 9        of a crime.

10             MS. SINGER:  Let me just give you my list of

11        questions.

12             I left you out, I'm sorry.  What kind of crime was

13        it?

14             PROSPECTIVE JUROR EZZELL:  Back in early '70s, a tape

15        deck stolen out of the car.  That was at the University,

16        called University Police.

17             In the early '80s, Florida State football game, my

18        car was vandalized there.

19             In the early '80s, a parent of the school system bit

20        me.

21             MS. SINGER:  So you were the victim of a battery?

22             PROSPECTIVE JUROR EZZELL:  Yes.

23             MS. SINGER:  Did any of those cases go to trial?

24             PROSPECTIVE JUROR EZZELL:  No, ma'am.

25             MS. SINGER:  The parent, daughter, didn't go to court
```

1          at all?

2               PROSPECTIVE JUROR EZZELL:  No, ma'am.

3               MS. SINGER:  So you never had to be called as a

4          witness in the case?

5               PROSPECTIVE JUROR EZZELL:  Not in those cases.  No,

6          ma'am.

7               MS. SINGER:  Not in those cases.

8               But you have been a witness in other cases?

9               PROSPECTIVE JUROR EZZELL:  Yes, ma'am.

10              MS. SINGER:  And you work for the Alachua County

11         school system?

12              PROSPECTIVE JUROR EZZELL:  Bradford County.

13              MS. SINGER:  Bradford County school system.

14              But you had to testify in relation to your work?

15              PROSPECTIVE JUROR EZZELL:  Yes, ma'am.

16              MS. SINGER:  As an eyewitness or as an expert

17         witness?

18              PROSPECTIVE JUROR EZZELL:  Expert witness.

19              MS. SINGER:  And what's your expertise?

20              PROSPECTIVE JUROR EZZELL:  I'm in school

21         administration.

22              MS. SINGER:  Anything about the contact with law

23         enforcement, first, before I move on to the issue of being

24         a witness, anything about the law enforcement aspect of

25         your job where you had these complaints where you had to

```
 1          contact law enforcement, anything about that that would

 2          cause you to be unfair or impartial?

 3               PROSPECTIVE JUROR EZZELL:  No, ma'am.

 4               MS. SINGER:  Not impartial in this case?

 5               PROSPECTIVE JUROR EZZELL:  No, ma'am.

 6               MS. SINGER:  You could be fair?

 7               PROSPECTIVE JUROR EZZELL:  Yes, ma'am, I could.

 8               MS. SINGER:  Mr. Heileman, you were about to raise

 9          your hand, like I brought something up that you wanted to

10          talk about.

11               PROSPECTIVE JUROR HEILEMAN:  I might have -- I worked

12          with Dave Cannon's ex-wife back at Shands back in 1980s, I

13          went to their house once --

14               THE COURT REPORTER:  I'm sorry.  You were talking

15          quickly and I kind of lost the whole gist there.

16               PROSPECTIVE JUROR HEILEMAN:  I worked with Dave

17          Cannon's ex-wife at Shands back in the '80s, stopped at

18          their house, said hello and left.  I wouldn't recognize

19          him.

20               MS. SINGER:  All right.  You wouldn't recognize him

21          if you saw him again?

22               PROSPECTIVE JUROR HEILEMAN:  No.

23               MS. SINGER:  Anybody else who knows any of the other

24          witnesses?  Long list.

25               Okay.  Now, there were several folks who talked about
```

```
 1        being witnesses.  Ms. Escalante's been a witness before in
 2        a criminal case, Mr. Ezzell's been an expert witness.
 3             Has there been anyone else who has had to come and
 4        testify at an administrative hearing, a court proceeding,
 5        come for friend to testify on their behalf at any kind of
 6        family court matter, any time when you've had to come and
 7        be a witness and be put under oath to provide information
 8        or testimony?
 9             (Prospective juror Wade-Littrup raised hand.)
10             MS. SINGER:  Ms. Wade-Littrup.  Anybody else?
11             (Prospective jurors Baxter and Abbitt raised hands.)
12             MS. SINGER:  All right.  All right.  That would be
13        Mr. Baxter, Dr. Abbitt, Ms. Wade-Littrup; correct?  And,
14        Mr. Ezzell, you testified as well, and Ms. Escalante has
15        testified as well.
16             Okay.  Let me go ahead and talk to Mr. Baxter first.
17             How long ago was that, Mr. Baxter, that you were
18        called to come in as a witness?
19             PROSPECTIVE JUROR BAXTER:  A couple or three years
20        ago, I guess.  I wasn't called as a witness but I had to
21        testify in the -- on behalf of my niece when we was
22        getting custody of her, and we was in court and out of
23        court and in court.
24             MS. SINGER:  So you were actually sworn and were
25        asked questions?
```

```
 1          PROSPECTIVE JUROR BAXTER:  Yes, ma'am.  We were sworn

 2     in each time we appeared before the judge.

 3          MS. SINGER:  Did you have a lawyer representing you,

 4     sir?

 5          PROSPECTIVE JUROR BAXTER:  No.

 6          MS. SINGER:  Or the family?

 7          PROSPECTIVE JUROR BAXTER:  No.

 8          MS. SINGER:  So you were what we call pro se, you

 9     came in as an individual?

10          PROSPECTIVE JUROR BAXTER:  We came in -- My niece was

11     awarded -- We was awarded custody of our niece through

12     children services, then we had hearing after hearing after

13     hearing to see if she was -- if the mother was fit so the

14     child could be returned.  And this went on for a number of

15     years.  And every time we appeared in court we had to be

16     sworn in.  But it was not nothing unpleasant, just

17     something we had to do.

18          MS. SINGER:  Was there anything about that experience

19     that would put you in a position where you could not be

20     fair and impartial to the witnesses that have been called

21     to testify in this case?

22          PROSPECTIVE JUROR BAXTER:  Absolutely not.

23          MS. SINGER:  You will be able to listen to what they

24     have to say?

25          PROSPECTIVE JUROR BAXTER:  Yes, ma'am.
```

1          MS. SINGER:  Pay attention to what they have to say?

2          PROSPECTIVE JUROR BAXTER:  (Nods head.)

3          MS. SINGER:  You understand what the experience is

4     like to have to be a witness?

5          PROSPECTIVE JUROR BAXTER:  Uh-huh.

6          MS. SINGER:  And will appreciate that as well when

7     you're listening to testimony?

8          PROSPECTIVE JUROR BAXTER:  Right.

9          MS. SINGER:  Dr. Abbitt, did you testify as an

10    expert, as a radiologist, or did you testify as what I

11    would call a lay witness or citizen witness?

12         PROSPECTIVE JUROR ABBITT:  As an expert witness.

13         MS. SINGER:  And what kind of suit was it that you

14    were involved in?

15         PROSPECTIVE JUROR ABBITT:  The State of Florida was

16    bringing suit against a man for vehicular homicide and I

17    had read his CT scan.

18         MS. SINGER:  So it was in a criminal case.  You were

19    a witness in a criminal case.  If the State of Florida was

20    charging someone with vehicular homicide, that would be

21    just like what we are doing right now.  You were a medical

22    witness in a criminal case.  That's what it sounds like.

23         PROSPECTIVE JUROR ABBITT:  Exactly.

24         MS. SINGER:  All right.  Okay.  How long ago was

25    that?

```
 1              PROSPECTIVE JUROR ABBITT:  It was about two years

 2        ago.

 3              MS. SINGER:  Did you ever find out the outcome of the

 4        case?  Did you ever follow after you testified to see

 5        whether or not he was found guilty or not guilty?

 6              PROSPECTIVE JUROR ABBITT:  I did not.  I was just

 7        deposed -- they deposed me and I don't know the result.

 8              MS. SINGER:  So you were never called as a trial

 9        witness?  In other words, they took your statement like in

10        your office maybe or a court reporter's office?

11              PROSPECTIVE JUROR ABBITT:  It was here.

12              MS. SINGER:  It was here?

13              PROSPECTIVE JUROR ABBITT:  Uh-huh.

14              MS. SINGER:  And then at some time the case resolved,

15        you never had to actually come in front of a jury and

16        testify?

17              PROSPECTIVE JUROR ABBITT:  Right..

18              MS. SINGER:  Have you ever had to come before a jury

19        to testify?

20              PROSPECTIVE JUROR ABBITT:  In front of a jury?  No.

21              MS. SINGER:  Okay.  So you've given depositions but

22        never gone farther in the court process?

23              PROSPECTIVE JUROR ABBITT:  Right.

24              MS. SINGER:  Was there anything about that experience

25        that's going to affect your ability to be fair and
```

```
 1        impartial in this case?
 2            PROSPECTIVE JUROR ABBITT:  I don't think so.
 3            MS. SINGER:  Ms. Escalante, I know we spoke.
 4            Ms. Martin?
 5            PROSPECTIVE JUROR MARTIN:  Yes.
 6            MS. SINGER:  Did you raise your hand about being a
 7        witness?
 8            PROSPECTIVE JUROR MARTIN:  No.
 9            MS. SINGER:  Who else had raised their hand?
10            Ms. Wade-Littrup?
11            PROSPECTIVE JUROR WADE-LITTRUP:  I was a character
12        witness for a young man in a custody over his son.  And it
13        was maybe six months ago here at the courthouse, just in
14        front of the judge.
15            MS. SINGER:  It was a family law matter?
16            PROSPECTIVE JUROR WADE-LITTRUP:  Yes.
17            MS. SINGER:  And was there anything about that
18        experience -- not a fun experience, I assume?
19            PROSPECTIVE JUROR WADE-LITTRUP:  No.
20            MS. SINGER:  Were there lawyers on both sides?
21            PROSPECTIVE JUROR WADE-LITTRUP:  Yes.
22            MS. SINGER:  Okay.  So you were actually subject to
23        questioning?
24            PROSPECTIVE JUROR WADE-LITTRUP:  Uh-huh.
25            MS. SINGER:  And how was that for you?
```

```
 1              PROSPECTIVE JUROR WADE-LITTRUP:  It was positive, but

 2      it was difficult.  Because when you're asked questions and

 3      it's -- some questions are very difficult to have wisdom

 4      on.

 5              MS. SINGER:  All right.  Anything about it, though,

 6      that would make it difficult for you to sit as a juror?

 7              PROSPECTIVE JUROR WADE-LITTRUP:  No.

 8              MS. SINGER:  You would be able to appreciate the

 9      witnesses when they come, they will be sitting right

10      there, be able to appreciate the position they are in as

11      witnesses?

12              PROSPECTIVE JUROR WADE-LITTRUP:  (Nods head.)

13              MS. SINGER:  Did I miss anybody on that question?

14      That's an important question for me to know if you've ever

15      been a witness.

16              Mr. Ramsey, I have not asked you one single question

17      but I guarantee you there's one in my pile that will fit

18      you.

19              You've never been a victim of a crime, Mr. Ramsey?

20              PROSPECTIVE JUROR RAMSEY:  (Shakes head.)

21              MS. SINGER:  You lucky thing.

22              Mr. Ezzell testified that he was called to be an

23      expert witness and, Dr. Abbitt, although you may have been

24      told that because of the type of work you do,

25      interpreting -- I guess you would call it interpreting
```

```
 1        scans and x-rays and radiological documents, that you

 2        would be also considered to be an expert.

 3             Let me talk to Mr. Ezzell first and then I'll talk

 4        with you.

 5             Mr. Ezzell, when you were called to testify as an

 6        expert, as opposed to being a citizen witness, did you

 7        have to prepare before you went to that particular

 8        hearing?  Did you do any research or do any

 9        investigations?

10             PROSPECTIVE JUROR EZZELL:  A little investigation.

11             MS. SINGER:  All right.  And what area of expertise

12        would you be testifying to?  Can you give us an idea what

13        you would be testifying to?

14             PROSPECTIVE JUROR EZZELL:  In this particular case?

15             MS. SINGER:  Yes.

16             PROSPECTIVE JUROR EZZELL:  It was in regards to a

17        discipline issue.  At that time I was kind of

18        disciplinarian dean, sort of, at the middle school.

19             MS. SINGER:  And you were in fact qualified to do

20        that?  You were asked questions about your training and

21        experience?

22             PROSPECTIVE JUROR EZZELL:  Yes, ma'am.

23             MS. SINGER:  Was there anything about being an expert

24        witness that causes you now, as you sit here today, to put

25        more pressure on people who may also be called as experts?
```

```
 1        In other words, do you have a higher expectation of those
 2        witnesses because you yourself have been called as an
 3        expert?
 4             PROSPECTIVE JUROR EZZELL:  No, I wouldn't say so.  I
 5        think I could have empathy for them.
 6             MS. SINGER:  All right.  And what does that mean?
 7             PROSPECTIVE JUROR EZZELL:  That means I understand --
 8        I mean, everything you say, you're telling the truth, and
 9        you want to make sure it's the truth, yet at times
10        sometimes the truth sometimes is a little bit gray.
11             MS. SINGER:  That's correct.  That's correct.
12             Do we all agree on that?  That the world is not, as
13        much as we'd like it to be black and white, the world is
14        really shades of gray.  How many of us agree with that?
15        Raise your hand.
16             (Several prospective jurors raised hands.)
17             MS. SINGER:  Mr. Ramsey.  Oh, great.  I got you.
18             Anybody not feel that way?
19             And it's okay if you feel that, you know, things
20        should be very black and white.  It's either a yes or no.
21        There aren't any maybes in life.  That's okay if you feel
22        that way.
23             Do any of you feel that way?
24             Mr. Hudson, do you feel that way about life?
25             PROSPECTIVE JUROR HUDSON:  I didn't quite get that
```

```
 1        question too good.

 2             MS. SINGER:  All right.  Mr. Hudson, in this world do

 3        you agree that there's lots of places where things are not

 4        certain or sure?

 5             PROSPECTIVE JUROR HUDSON:  Oh, yeah.

 6             MS. SINGER:  Or do you believe that things are black

 7        and white in this world, it's either a yes or a no?  Do

 8        you think that there are some maybes in life?

 9             PROSPECTIVE JUROR HUDSON:  Your first question was

10        now -- I can't hardly get it.  You got to put it plain to

11        me.

12             MS. SINGER:  Okay.  All right.  Do you, Mr. Hudson,

13        do you expect things in your life to be very cut and

14        dried, either it's a yes or no?

15             PROSPECTIVE JUROR HUDSON:  No.  No.

16             MS. SINGER:  So you see the grays in life?  You see

17        that there are times when you can't just answer yes or no?

18             PROSPECTIVE JUROR HUDSON:  Yes, there's times.

19             MS. SINGER:  All right.  My question isn't very good,

20        I know that.  A strange question.

21             But we are all in agreement about that?  All right.

22             THE COURT:  Ms. Singer, if there is anything else

23        that you want to make sure you ask before lunch, you might

24        want to move to it, because in about five minutes we're

25        going to recess.
```

```
1              MS. SINGER:  Does that mean that I'm through?

2          THE COURT:  No.

3          MS. SINGER:  All right.

4          THE COURT:  Just wanted to give you that warning in

5      case there was something you wanted to make sure you

6      covered before we recessed.

7          MS. SINGER:  Okay.  I will go ahead and just continue

8      on because there's -- we won't waste any time then.

9          I know that, Mr. Ezzell -- But I do want to talk to

10     Dr. Abbitt because I know you did depositions, it's a

11     little different than being called up to the stand and

12     offer your qualifications and give an expert opinion.

13         But I presume you did that in the deposition as well,

14     did you not?

15         PROSPECTIVE JUROR ABBITT:  Yes.

16         MS. SINGER:  And Mr. Ezzell commented about his

17     thoughts on that.

18         Do you have any thoughts on how that experience was

19     for you rendering an expert opinion as opposed to a lay or

20     citizen opinion?

21         PROSPECTIVE JUROR ABBITT:  Well, I have had other

22     experiences with expert witnesses and I do believe that

23     there are situations where you basically can pay an expert

24     witness to say whatever you need them to say.

25         MS. SINGER:  You do believe that that's --
```

1        PROSPECTIVE JUROR ABBITT:  I do believe that that can

2    happen.

3        MS. SINGER:  All right.  Is that based upon a

4    personal experience or is that based upon the fact that

5    you have worked in the medical environment where there are

6    lawsuits, we know that, and where your folks talk about

7    consultants -- expert consultants in cases?

8        PROSPECTIVE JUROR ABBITT:  It's probably because I

9    work in a medical environment and I see that, and it also

10   is I was involved in a situation where that was very much

11   the case, where you had two very conflicting expert

12   opinions and, you know, they both couldn't be right.

13       MS. SINGER:  Okay.  Would you be able to -- or

14   because of your experience -- and I can only talk -- you

15   can only tell me how you feel.  It's really not a knowing

16   thing, it's more of a feeling thing.

17       From that experience do you believe that you could

18   not be fair in listening and weighing the testimony of

19   various experts?

20       PROSPECTIVE JUROR ABBITT:  No.  I think that I would

21   just really scrutinize them very carefully, from either

22   point of view.

23       MS. SINGER:  Would it make a difference to you if

24   some of the experts were actually the treating physicians

25   as opposed to whether the experts were hired folks who

 1        came in and looked on after the fact?

 2             PROSPECTIVE JUROR ABBITT:  Would it make a

 3        difference -- I think they would each have their own, you

 4        know, thing to bring to the table.

 5             MS. SINGER:  Okay.  And you would be able to listen

 6        to both of them, or -- There are numbers of witnesses,

 7        obviously.

 8             PROSPECTIVE JUROR ABBITT:  Right.

 9             MS. SINGER:  So you would be able to consider all of

10        their credentials and their qualifications?

11             PROSPECTIVE JUROR ABBITT:  (Nods head.)

12             MS. SINGER:  Would you be able to consider and weigh

13        where they stood in time during the process?

14             PROSPECTIVE JUROR ABBITT:  Yes, and that would be

15        very important.

16             MS. SINGER:  Okay.  Is it understood -- I know in the

17        medical community that, you know, we can't Monday morning

18        quarterback.  We don't know what's going to happen when we

19        are treating folks.  We're treating them and then

20        sometimes really good things happen and then sometimes

21        really bad things happen.  Do you agree with that?

22             PROSPECTIVE JUROR ABBITT:  Absolutely.

23             MS. SINGER:  And do you believe that experts have

24        different perspectives, depending upon what their area of

25        specialization is?

```
 1            PROSPECTIVE JUROR ABBITT:  Absolutely.

 2       MS. SINGER:  Do you think it makes a difference

 3  whether you actually see a patient?  Because I know in

 4  radiology you do not necessarily see a patient.  I don't

 5  know if you do, but I know some radiologists don't see

 6  their patients.

 7       Do you think that makes a difference in making an

 8  overall clinical or an overall diagnosis of a patient?

 9       PROSPECTIVE JUROR ABBITT:  A huge difference in some

10  situations, a huge difference, whether you saw the patient

11  or not.

12       MS. SINGER:  And in your field of radiology, do you

13  make diagnoses or do you give interpretations and allow

14  the clinicians, the people who are treating the patient,

15  to make the diagnoses?

16       PROSPECTIVE JUROR ABBITT:  Many times I make the

17  diagnosis.

18       MS. SINGER:  And that would be in mammography?

19       PROSPECTIVE JUROR ABBITT:  Uh-huh.

20       MS. SINGER:  Is that because it's a specialized area?

21       PROSPECTIVE JUROR ABBITT:  Yes, and sort of the

22  personality that I have.

23       MS. SINGER:  Okay.  Do you actually see your

24  patients?

25       PROSPECTIVE JUROR ABBITT:  Many of them, yes.
```

1           MS. SINGER:  So you actually physically have contact

2      with your patients?

3           PROSPECTIVE JUROR ABBITT:  (Nods head.)

4           MS. SINGER:  Do you physically examine the patients?

5           PROSPECTIVE JUROR ABBITT:  Not all of them.

6           MS. SINGER:  But you have on occasion done that?

7           PROSPECTIVE JUROR ABBITT:  Many occasions.

8           MS. SINGER:  Do you do that on a daily basis?

9           PROSPECTIVE JUROR ABBITT:  Often.  You know,

10     sometimes I'm not in mammography, so I'm in areas where I

11     wouldn't see patients.

12          MS. SINGER:  Because I know from what we've learned

13     that a lot of radiologists never do actually have patient

14     contact.  But you would be a different type of radiologist

15     because you actually have patient contact?

16          PROSPECTIVE JUROR ABBITT:  I think that's the thing.

17     There are many radiologists who would never see a patient.

18          MS. SINGER:  And do you think that that would

19     influence their ability to make a final diagnosis?

20          PROSPECTIVE JUROR ABBITT:  It would depend on the

21     diagnosis.

22          MS. SINGER:  Okay.  Do any of you know each other?

23     Take a look around.

24          Mr. Hudson, you're saying no?

25          PROSPECTIVE JUROR HUDSON:  I looked and I don't know

1    nobody.  (Inaudible.)

2         MS. SINGER:  All right.  We're going to be talking

3    about some pretty serious stuff, obviously.  We're going

4    to be talking about the death of an infant.

5         THE COURT:  And before you go any further, we might

6    as well recess for lunch, because I know you have

7    additional questions.

8         MS. SINGER:  Right.

9         THE COURT:  Ladies and gentlemen, I'm going to

10   release everybody for one hour for lunch.

11        Hold on a minute, let me give you some instructions.

12        You can come back to this courtroom in one hour.  At

13   1:30 some of you will be sent to different courtrooms.  So

14   if there's anybody that's in this group that is seated

15   that wants to put down in writing the reason why they feel

16   that they would not be qualified to sit in this jury for

17   scheduling purposes, or on the basis of any question

18   you've already heard put forward, if you will write that

19   down with your juror number, and your name, and give that

20   to the clerk, as soon as you come back, even if that's a

21   little bit earlier than 1:30, we'll be glad to consider

22   that.  Because, of course, I want to be as efficient as

23   possible in assigning individuals to courtrooms.

24        So with those instructions only, and with this one

25   additional instruction:  As you've heard, there have

1    already been a couple of questions regarding news

2    reporting in this case in particular.  I'm going to alert

3    all of you to the fact that it is very important that you

4    not discuss this case, anything that you may have heard or

5    read, with any of the other potential jurors.

6         So with that instruction, if you will come back --

7         Yes, ma'am?

8         MS. SINGER:  Your Honor, could you instruct the

9    venire that we -- that despite the fact that we would like

10   to be friendly, we cannot be friendly.

11        THE COURT:  Yes.  That's a good thing to say at this

12   point.

13        All of us who are working in this courtroom today,

14   may see some of you, of course, over lunch or even for the

15   rest of the week, and we might look aloof, like we're

16   trying to keep some distance from you.  And that is for

17   your protection, so that if any of you are selected as the

18   jurors to try this case, there won't be anything that

19   happens during this jury selection process that makes it

20   even look for a second like anybody is trying to contact

21   you or influence you in anyway whatsoever.

22        So if you see anybody that is in the courtroom today

23   during the lunch hour, and they seem to kind of keep their

24   distance from you, again, it's for your protection that we

25   are all doing that, so that you won't feel like there's

1    any pressure or any attempt to contact you.

2         Good enough.  So with those instructions you may go

3    to lunch for one hour.

4         (Luncheon recess at 12:33 pm.)

5         (Court reconvened at 1:36 pm.)

6         (Defendant present.)

7         THE COURT:  I know that wasn't very long for lunch,

8    but I appreciate all of you coming back on time so that we

9    can move along and hopefully not keep you here too late.

10        Ms. Singer, you want to continue?

11        MS. SINGER:  Yes, ma'am.

12        May it please the court.

13        THE COURT:  Yes.

14        MS. SINGER:  Mr. Groland, Mr. Tedder.

15        I did have an opportunity to look through your forms

16   over lunch, and that was very helpful and will save me a

17   lot of time.

18        I do have some serious questions I was about to begin

19   when we broke for lunch, so I'm going to start back by --

20   but I believe I stopped saying that this is a very serious

21   crime that we're here on.  It's not to be denied.  First

22   degree murder is a very serious crime.  There are two ways

23   that one can be found guilty of first degree murder.  The

24   first way is when the state proves beyond a reasonable

25   doubt that a person has committed the death or caused the

1     death of another person with a premeditated design to

2     effect that death.  The second way is when the state

3     proves that a person has died as a result of another

4     person committing certain felonies, and one of the

5     felonies that is considered to fit into the first degree

6     murder category, one of those felonies is aggravated child

7     abuse, and that's the felony that we are proceeding on

8     today.  We're going through this case as a felony murder

9     prosecution, underlying felony aggravated child abuse in

10    the death of the infant Robbie Quirello.

11          This case necessarily pertains to the death of a

12    child and in this case it's an infant child.  And I need

13    to ask all of you, and I want everyone to raise their

14    hands who have any kind of concern about this.  Have any

15    of you been involved in anyway supporting a family member,

16    supporting a church member, involved in your profession,

17    perhaps as a physician would be, where you have dealt with

18    the loss of a child, or you've helped a family member or

19    close friend or someone you have a relationship with deal

20    with the loss of a child?  Have any of you?  Yes.

21          PROSPECTIVE JUROR WALKER:  A friend of mine's infant

22    drowned, so we still talk about it weekly.

23          MS. SINGER:  All right.  Now, Ms. Walker, your

24    relationship is very close with this person?

25          PROSPECTIVE JUROR WALKER:  A very good friend, yes.

1    MS. SINGER:  This is not a drowning death, this is

2    not your friend.  Are you going to be able to separate --

3         PROSPECTIVE JUROR WALKER:  Yes.

4    MS. SINGER:  -- that relationship and consider the

5    evidence in this case and be fair to Mr. Herlihy and to

6    the State of Florida?

7         PROSPECTIVE JUROR WALKER:  Yes.  This is an

8    accidental drowning in her case.

9    MS. SINGER:  All right.  Is there anyone else?  Yes,

10   sir.

11        PROSPECTIVE JUROR BAXTER:  Yeah, I lost my oldest

12   girl to an automobile accident.  She was 28.  It was just

13   one of those things you deal with.  It wouldn't no way

14   affect anything here.

15   MS. SINGER:  How many children do you have?

16        PROSPECTIVE JUROR BAXTER:  Five.

17   MS. SINGER:  Okay.  So do you believe, sir, that you

18   would be able to put that aside and realize this is a

19   different case and be fair to both Mr. Herlihy and to the

20   state?

21        PROSPECTIVE JUROR BAXTER:  Yes, ma'am.  It's not

22   anything even relating to anything like this.

23   MS. SINGER:  Yes, Ms. Martin?

24        PROSPECTIVE JUROR MARTIN:  I had -- I don't know how

25   you define "support," but I had a student that lost --

1    both were miscarriages, a student and a friend of mine

2    that had miscarriages.

3        MS. SINGER:  Do you think you would be able to put

4    that aside, realizing that that's emotional for your

5    friends and to talk about that, do you think you would be

6    able to put that aside and be fair and impartial to both

7    Mr. Herlihy and to the State of Florida?

8        PROSPECTIVE JUROR MARTIN:  Sure.  (Nods head.)

9        MS. SINGER:  Ms. Walker, in the case of your friend

10   was there any criminal investigation as a result of that?

11       PROSPECTIVE JUROR MARTIN:  No.

12       MS. SINGER:  You're also going to hear as part of

13   this case that the defendant, Mr. Herlihy, is not related

14   to the victim Robbie Quirello.  The victim, Robbie

15   Quirello, was in his care because he was having a

16   relationship with the victim's mom.  Her name is Crystal

17   Quirello.

18       The fact that this is a situation where there may be

19   some underlying relationships, adult relationships that

20   some would consider to be extra-marital relationships,

21   some maybe consider to be adulterous relationships, does

22   that fact, in and of itself, so affect you that you would

23   not be able to listen to all of the evidence in this case?

24       I'm going to start with you, Mr. Heileman.  I saw

25   your face, I saw you looking at me, does that have

```
 1        anything to do with affecting your ability to be fair and

 2        impartial in this case?

 3             PROSPECTIVE JUROR HEILEMAN:  No, ma'am.

 4             MS. SINGER:  You'll be able to listen to the evidence

 5        and consider --

 6             PROSPECTIVE JUROR HEILEMAN:  Yes, ma'am.

 7        (Inaudible.)

 8             MS. SINGER:  I understand that that may be pertaining

 9        to issues of credibility.  You know, and your job as a

10        juror is to weigh credibility.

11             Do you understand what I mean when I say "weigh

12        credibility"?

13             PROSPECTIVE JUROR HEILEMAN:  Yes, ma'am.

14             MS. SINGER:  What does that mean to you, sir?

15             PROSPECTIVE JUROR HEILEMAN:  Who is speaking with --

16        who is speaking more of the truth.

17             MS. SINGER:  Okay.  And would you be able to do that,

18        weigh the credibility of the witnesses?

19             PROSPECTIVE JUROR HEILEMAN:  Yes, ma'am.

20             MS. SINGER:  Okay.  You're comfortable, even though

21        there might be some subjects about the adults in this case

22        that, you know, we may not be comfortable accepting as

23        appropriate behavior?  Some of us may think it's okay,

24        some not.

25             PROSPECTIVE JUROR HEILEMAN:  Yes, ma'am.
```

```
 1        (Indiscernible.)  I don't have a problem.

 2             MS. SINGER:  How about you, Ms. Currier?

 3             PROSPECTIVE JUROR CURRIER:  Uh-huh.

 4             MS. SINGER:  Do you have any feelings -- If I said

 5        "extra-marital affair," do you close your ears and say, I

 6        can't listen to that --

 7             PROSPECTIVE JUROR CURRIER:  No.

 8             MS. SINGER:  -- because I'm so opposed to that?

 9             PROSPECTIVE JUROR CURRIER:  No.  I mean, I am opposed

10        to it but I have no reaction to it at all.

11             MS. SINGER:  Do you think you could be fair and

12        consider all of the testimony?

13             PROSPECTIVE JUROR CURRIER:  Yes.

14             MS. SINGER:  All of the facts that people bring

15        together?

16             PROSPECTIVE JUROR CURRIER:  Yes.

17             MS. SINGER:  Mr. Ezzell, any problem with that, sir?

18             PROSPECTIVE JUROR EZZELL:  No, ma'am.

19             MS. SINGER:  How about you, Mr. Ramsey, in the back

20        there?

21             PROSPECTIVE JUROR RAMSEY:  Pretty common practice in

22        our society.

23             MS. SINGER:  So just that fact alone, knowing that

24        Mr. Herlihy is not related to this child, does not offend

25        you in anyway, and you'll be willing to listen to all of
```

1          the testimony?

2                 PROSPECTIVE JUROR RAMSEY:  (Nods head.)

3                 MS. SINGER:  Ms. Martin?

4                 PROSPECTIVE JUROR MARTIN:  Sure.

5                 MS. SINGER:  Ms. Young?

6                 PROSPECTIVER JUROR YOUNG:  Yes.

7                 MS. SINGER:  Ms. Escalante?

8                 PROSPECTIVE JUROR ESCALANTE:  Yes.

9                 MS. SINGER:  Ms. Moran?

10                PROSPECTIVE JUROR MORAN:  (Nods head.)

11                MS. SINGER:  Mr. Hudson?

12                PROSPECTIVE JUROR HUDSON:  (Nods head.)

13                PROSPECTIVE JUROR ABBITT:  No problem.

14                PROSPECTIVE JUROR McMAHON:  No problem.

15                MS. SINGER:  Okay, everybody, appreciate it.

16          I should ask you a few questions.

17                PROSPECTIVE JUROR CLARK:  No.

18                MS. SINGER:  No problem then.  Good.

19          How many of you -- Well, let's see how many of you

20     have or had children in your life, raise your hand.

21                THE PROSPECTIVE JURORS:  (Raise hands.)

22                MS. SINGER:  Okay.

23                PROSPECTIVE JUROR CLARK:  Do they necessarily have to

24     be our own?

25                MS. SINGER:  No.

```
 1              Okay.  So you've taken care of other folks' children?
 2         PROSPECTIVE JUROR CLARK:  (Nods head.)
 3         MS. SINGER:  How many of you would describe yourself
 4    as being close to -- if you haven't had your own, close to
 5    nieces, nephews, friends' children where you've had
 6    contact on more than an occasional basis?
 7         THE PROSPECTIVE JURORS:  (Raise hands.)
 8         MS. SINGER:  I see everybody seems to be giving me
 9    their hand.
10         Mr. Ramsey, children?
11         Grandchildren?  How many grandchildren?  Any
12    grandchildren?
13         PROSPECTIVE JUROR CLARK:  Six -- Seven.
14         MS. SINGER:  My word.
15         PROSPECTIVE JUROR BAXTER:  14.
16         MS. SINGER:  Okay.  We can put that as well.
17         How many of you believe that corporal punishment may
18    be appropriate under some circumstances?
19         I'll define "corporal punishment".  That's a spanking
20    or a licking, or some people say beating, some people say,
21    you know, use the strap, some people say use the switch.
22         How many of you in this group would say that there
23    may be occasions where corporal punishment is appropriate
24    with your children?
25         THE PROSPECTIVE JURORS:  (Raise hands.)
```

1          MS. SINGER:  Okay.  You do not?

2          A PROSPECTIVE JUROR:  (Shakes head.)

3          MS. SINGER:  Let me see who had their hands raised.

4          THE PROSPECTIVE JURORS:  (Raise hands.)

5          MS. SINGER:  Okay.  Well, then we'll have some

6     questions for Mr. Clark.  You do not believe in corporal

7     punishment?

8          PROSPECTIVE JUROR CLARK:  No, I don't.

9          MS. SINGER:  Okay.  When -- How do you handle a

10     situation when a child may need some discipline other than

11     using a switch or a spanking?

12          PROSPECTIVE JUROR CLARK:  Time outs, taking away

13     something they enjoy doing, grounding.

14          MS. SINGER:  So you do believe that some form of

15     punishment is necessary, but not a spanking?

16          PROSPECTIVE JUROR CLARK:  Right.

17          MS. SINGER:  All right.

18          PROSPECTIVE JUROR CLARK:  All I've ever gotten from a

19     punishment like that on a child is hate, that's all I've

20     ever gotten from them.

21          MS. SINGER:  You have no children of your own --

22          PROSPECTIVE JUROR CLARK:  Exactly.

23          MS. SINGER:  -- but you've raised other's children?

24          PROSPECTIVE JUROR CLARK:  Yes, ma'am.

25          MS. SINGER:  Whose children have you raised?

```
1              PROSPECTIVE JUROR CLARK:  My wife's grandchildren.

2              MS. SINGER:  Okay.  And how old were you -- how old

3       were they when you started to have contact with them?

4              PROSPECTIVE JUROR CLARK:  Since birth.

5              MS. SINGER:  Okay.  So you've had dealings with

6       infants as well as children as they've grown up?

7              PROSPECTIVE JUROR CLARK:  Uh-huh.  Uh-huh.

8              MS. SINGER:  Okay.  Ms. Moran, do you have contact

9       with children?

10             PROSPECTIVE JUROR MORAN:  Nieces and nephews.  I do

11      not have any disciplinary authority over them.  I was just

12      thinking from the standpoint of how I grew up.  I only had

13      to be spanked once and that was all it took.

14             MS. SINGER:  All right.  Do you believe that there's

15      a certain age before which you would even use any kind of

16      form of corporal punishment?  For instance, would the

17      child have to be a certain age before you would consider

18      spanking a child?

19             PROSPECTIVE JUROR MORAN:  Yes.

20             MS. SINGER:  And what age would you -- what range --

21      I know you don't have children of your own, so I'm asking

22      you because I know you're not every day dealing with

23      children.

24             PROSPECTIVE JUROR MORAN:  I would think maybe grade

25      school.
```

1          MS. SINGER:   Is there anyone who disagrees with that

2      and believes that children can be punished by spanking

3      earlier than the age of five, kindergarten?  It's okay.

4      It's okay.

5          PROSPECTIVE JUROR WADE-LITTRUP:  Yes, I spanked my

6      children from, I would say, probably three on.

7          MS. SINGER:   Fingers on a hot stove or running in the

8      street?

9          PROSPECTIVE JUROR BAXTER:  What degree do you call

10     corporal punishment?  Not beating them, just a slap --

11         MS. SINGER:   No.  A slap or a spank.

12         PROSPECTIVE JUROR BAXTER:  I agree with her, around

13     three.

14         PROSPECTIVE JUROR WADE-LITTRUP:  On their behind with

15     a hand.

16         MS. SINGER:   Right.

17         And I know Ms. Martin is there raising her hand.

18         How old is your son now?

19         PROSPECTIVE JUROR MARTIN:  He's 15 months.

20         MS. SINGER:   Okay.  Is he too young yet?

21         PROSPECTIVE JUROR MARTIN:  Yes.

22         MS. SINGER:   Do you all agree that there may be

23     times, as a parent, or taking care of grandchildren, or

24     even as an aunt, when you become frustrated with kids?  Do

25     we all agree on that?

```
 1              Mr. Ramsey, do you agree on that?

 2              PROSPECTIVE JUROR RAMSEY:  (Nods head.)

 3              MS. SINGER:  Ms. Currier, I know you don't have

 4         children --

 5              PROSPECTIVE JUROR CURRIER:  (Nods head.)

 6              MS. SINGER:  -- but do you agree there may be times

 7         when you reach a frustration level?

 8              PROSPECTIVE JUROR ROBERTS:  (Nods head.)

 9              MS. SINGER:  Is there anyone who doesn't agree with

10         that?  Mr. McMahon?

11              PROSPECTIVE JUROR McMAHON:  I agree.

12              MS. SINGER:  And how many children do you have?

13              PROSPECTIVE JUROR McMAHON:  Two stepchildren.

14              MS. SINGER:  So you have dealings with them on a

15         daily basis?

16              PROSPECTIVE JUROR McMAHON:  Daily basis.  Yes.

17              MS. SINGER:  We have a lot of witnesses.  We have a

18         lot of witnesses, it's obvious.  And because of the

19         scheduling of some of the witnesses, especially the expert

20         witnesses, the clinicians over at Shands who are actually

21         working there as well as coming in to offer testimony, we

22         cannot call everyone in chronological order.

23              Do any of you have a problem -- I'll ask Mr. Heileman

24         first and Mr. Ramsey on this side, then move on to this

25         side -- do either of you have a problem understanding that
```

```
 1          the state presents evidence and not everything that you

 2          hear may be in chronological order?

 3                  PROSPECTIVE JUROR HEILEMAN:  No problem.

 4                  MS. SINGER:  No problem with that.

 5                  Ms. Martin, do you have a problem, Ms. Currier,

 6          Mr. Ezzell, Ms. Young?

 7                  THE PROSPECTIVE JURORS:  (Shake heads.)

 8                  MS. SINGER:  Ms. Escalante?

 9                  Does anyone have a problem with that?  Mr. Clark?

10                  THE PROSPECTIVE JURORS:  (Shake heads.)

11                  MS. SINGER:  Understanding that until you hear all of

12          the evidence, you can't deliberate anyway, and that it may

13          come in bits and pieces?

14                  I like to say it's like doing a jigsaw puzzle.  How

15          many of you have done a jigsaw puzzle?

16                  THE PROSPECTIVE JURORS:  (Raise hands.)

17                  MS. SINGER:  Almost looks like everybody.

18                  Doing a jigsaw puzzle, you do a little bit of the

19          sky, then you get to the barn when you get tired of doing

20          the sky.  Okay.  That's the way it's going to be.  Anybody

21          have a problem -- Ms. Moran, going to have a problem with

22          that at all?

23                  PROSPECTIVE JUROR MORAN:  (Shake heads.)

24                  MS. SINGER:  Ms. Escalante, any problem with that?

25                  PROSPECTIVE JUROR ESCALANTE:  No.
```

```
 1            MS. SINGER:  Because we do have so many folks coming.
 2            Also, how many of you went to the football game or
 3      watched it on TV this weekend?
 4            THE PROSPECTIVE JURORS:  (Raise hands.)
 5            MS. SINGER:  Okay.  Good number.
 6            Do you all agree that you may be watching -- I'll use
 7      Mr. Clark, because I didn't ask you a lot of questions.
 8      You're my victim now.
 9            Do you agree, Mr. Clark, that you may be watching a
10      football game with a friend, your wife or someone, and you
11      may be watching the quarterback, and she may be watching
12      the receiver.  You're both watching the same game but it's
13      from a different perspective.
14            PROSPECTIVE JUROR CLARK:  Yes.
15            MS. SINGER:  You do?  Has that ever happened to you
16      where --
17            PROSPECTIVE JUROR CLARK:  Yes.
18            MS. SINGER:  -- you comment, Did you just see that
19      white truck go across the yellow line?  And your wife say,
20      It was because the red truck was coming at it, or
21      something like that.
22            PROSPECTIVE JUROR CLARK:  (Nods head.)
23            MS. SINGER:  You've had that experience?
24            PROSPECTIVE JUROR CLARK:  Yes, ma'am.
25            MS. SINGER:  How many of you have had an experience
```

```
 1        where you've been with someone else and they've seen what

 2        you believe to be the same thing but from a different

 3        perspective?  How many of you have had?

 4              THE PROSPECTIVE JURORS:  (Raise hands.)

 5              MS. SINGER:  Okay.  Anybody not had that experience?

 6        Do any of you at this point -- Ms. Moran, I'll pick

 7        on you now -- Do you, Ms. Moran, have any expectation it's

 8        going to be any different when witnesses come in the

 9        courtroom regarding what they saw?

10              PROSPECTIVE JUROR MORAN:  No.

11              MS. SINGER:  Okay.  Do you all understand that each

12        person who comes in to be a witness is going to have their

13        own perspective?

14              Mr. Heileman, you're acknowledging.

15              Ms. Currier -- Do you agree with that, Ms. Currier?

16              PROSPECTIVE JUROR CURRIER:  (Nods head.)

17              MS. SINGER:  Why do you think that is?

18              PROSPECTIVE JUROR CURRIER:  Every person experiences

19        things from different ways, expertise.

20              MS. SINGER:  So do you consider that to be very

21        usual?

22              PROSPECTIVE JUROR CURRIER:  Uh-huh.

23              MS. SINGER:  And will you all bear that in mind when

24        you're listening to the witnesses?

25              PROSPECTIVE JUROR CURRIER:  (Nod heads.)
```

```
 1          MS. SINGER:  Does anyone, as you sit here today, not
 2    knowing anything about this case, expect perfection?  That
 3    is, everybody's testimony and everybody's appearance and
 4    everybody's view is going to be exactly the same?
 5          THE PROSPECTIVE JURORS:  (Shake heads.)
 6          MS. SINGER:  Nobody expects that?
 7          Ms. Roberts, do you expect that?
 8          PROSPECTIVE JUROR ROBERTS:  No.
 9          MS. SINGER:  How many of you watch Law And Order?
10    State V?
11          THE PROSPECTIVE JURORS:  (Raise hands.)
12          MS. SINGER:  What's the Boston case, the Sunday night
13    case?
14          PROSPECTIVE JUROR McMAHON:  The Practice?
15          MS. SINGER:  The Practice.  Thank you.
16          How many of you watch those kinds of shows?
17          THE PROSPECTIVE JURORS:  (Nod heads.)
18          MS. SINGER:  Anybody here expecting that this is
19    going to take place in an hour?  Obviously not, we're not
20    out yet.  Anybody have that expectation?  No.
21          We're going to have people running from the back of
22    the courtroom, like Perry Mason, or have, you know,
23    anything happen in any particular order and in any
24    particular way?  No one.
25          Am I checking everybody out here?  Mr. Clark, no
```

1    problem?

2         PROSPECTIVE JUROR CLARK:  Not at all.

3         MS. SINGER:  Okay.  The reason I say that is there

4    are lots of documentary type TV shows now.  Have any of

5    you seen where they go back in the jury room, watching

6    jurors deliberate?  There are quite a number of them on

7    TV.

8         Mr. Ezzell is acknowledging.

9         I don't know, Mr. Clark, you ever seen one?

10        PROSPECTIVE JUROR CLARK:  (Shakes head.)

11        MS. SINGER:  Doctor, have you seen anything like

12   that?

13        PROSPECTIVE JUROR ABBITT:  (Shakes head.)

14        MS. SINGER:  And that's not the way it's going to be

15   here, and I don't want anybody going in, Well, I know how

16   this is going to be and I know how the jury room is going

17   to be and how the facts are going to come in, because you

18   don't and I don't.

19        It's going to be -- it's all an individual case and

20   do we all accept that and be ready for that?

21        THE PROSPECTIVE JURORS:  (Nod heads.)

22        MS. SINGER:  All right.  And, Mr. McMahon, you're

23   giving me the sign you're comfortable with that?

24        PROSPECTIVE JUROR McMAHON:  Yes.  Very.

25        MS. SINGER:  Okay.  The court has a role in this

 1    case.  The court doesn't present evidence.  The court has

 2    a role, however, to rule on objections to evidence, and

 3    I'm sure this court will be doing that, and we'll be doing

 4    our job in making objections.

 5         The court also has a role to instruct you on the law

 6    at the end of the case.  And you get the law, and those of

 7    you that sat on juries are familiar with this, you get the

 8    law and you go out to the jury room and apply the law to

 9    the facts.  My question to all of you is this:  Even if

10    you don't accept the law -- Who can I pick?  Mr. Baxter.

11    Mr. Baxter, let's say the judge read you the law and you

12    said to yourself, I'm opposed to that.  I think wearing

13    turquoise suits are legal and I can't go back in the jury

14    room and convict Ms. Singer of wearing a turquoise suit

15    because I don't see that that's illegal.  If the judge

16    instructed you, would you be able to follow the law, even

17    if in your mind you thought that the law was unfair or

18    shouldn't be a law?

19         PROSPECTIVE JUROR BAXTER:  Ma'am, we're a nation of

20    laws and we have to obey the laws regardless of how we

21    personally feel about each and everyone of them.

22         MS. SINGER:  So your answer --

23         PROSPECTIVE JUROR BAXTER:  I differ with some laws,

24    but I obey them because it is the law.

25         MS. SINGER:  All right.  Ms. Roberts, how do you feel

```
 1        about that example?  Do you think you would be able to
 2        follow the law even if in your heart or in your mind you
 3        said to yourself, I don't agree with that, I don't think
 4        that should be a law?
 5             PROSPECTIVE JUROR ROBERTS:  Yes, I do.
 6             MS. SINGER:  If you sat as a juror, would you be able
 7        to follow the law?
 8             PROSPECTIVE JUROR ROBERTS:  (Nods head.)
 9             I heard you but I'm not sure the court reporter did.
10             PROSPECTIVE JUROR ROBERTS:  Yes, ma'am.
11             MS. SINGER:  Is there any time where you would say to
12        yourself, There's no way I could convict someone because I
13        don't feel the law is fair?
14             PROSPECTIVE JUROR ROBERTS:  No, if that's the law,
15        that's the law.
16             MS. SINGER:  So you're comfortable with that duty?
17        Because once you're sworn as a juror, that's going to be
18        your duty, to follow the law, and you could do that?
19             PROSPECTIVE JUROR ROBERTS:  Yes, ma'am.
20             MS. SINGER:  How about you, Ms. Walker?
21             PROSPECTIVE JUROR WALKER:  Yes, ma'am.
22             MS. SINGER:  Mr. McMahon?
23             PROSPECTIVE JUROR McMAHON:  Yes, ma'am.
24             MS. SINGER:  Despite everything that happened to you?
25             PROSPECTIVE JUROR McMAHON:  It was a long time ago.
```

```
 1              MS. SINGER:  Okay.  All right.

 2              PROSPECTIVE JUROR ABBITT:  Yes.

 3              MS. SINGER:  Mr. Hudson?

 4              PROSPECTIVE JUROR HUDSON:  (Nods head.)

 5              MS. SINGER:  Could you follow the law even if you

 6      disagreed with it?

 7              PROSPECTIVE JUROR HUDSON:  (Nods head.)

 8              MS. SINGER:  That's a yes, for the court reporter?

 9              PROSPECTIVE JUROR HUDSON:  That's yes.

10              MS. SINGER:  All right.  Ms. Moran?

11              PROSPECTIVE JUROR MORAN:  Yes.

12              MS. SINGER:  Ms. Escalante?

13              PROSPECTIVE JUROR ESCALANTE:  Yes.

14              MS. SINGER:  Ms. Young?

15              PROSPECTIVER JUROR YOUNG:  Yes.

16              MS. SINGER:  Ms. Martin?

17              PROSPECTIVE JUROR MARTIN:  Yes.

18              MS. SINGER:  Mr. Ramsey?

19              PROSPECTIVE JUROR RAMSEY:  Yes.

20              MS. SINGER:  Mr. Heileman?

21              PROSPECTIVE JUROR HEILEMAN:  Yes.

22              PROSPECTIVE JUROR CURRIER:  Yes.

23              PROSPECTIVE JUROR EZZELL:  Yes.

24              PROSPECTIVE JUROR WADE-LITTRUP:  Yes.

25              PROSPECTIVE JUROR CLARK:  Yes.
```

 1          MS. SINGER:  Because it's very important.  That's

 2     what your duty is and you'll be instructed to do that.

 3          I did have a couple of questions just to follow up

 4     here, and then I will be through, believe it or not.

 5     Seems like an eternity.

 6          The place where this crime occurred is a place

 7     located at, listen closely, 1015 Southwest 9th Street --

 8     9th Street, in Gainesville, Florida.  It's the Tumbling

 9     Creek apartment complex located directly east of the P. K.

10     Young laboratory school down in the southwest section of

11     Gainesville, Florida.

12          Have any of you ever lived in the Tumbling Creek

13     apartment complex or that address?

14          THE PROSPECTIVE JURORS:  (Shake heads.)

15          MS. SINGER:  All right.  Are any of you familiar with

16     that area so much so that we would have to talk about

17     specifics on the apartment?  Mr. Baxter?

18          PROSPECTIVE JUROR BAXTER:  Well, I'm in the

19     transportation business and there's some people that live

20     there that we have to transport.  I personally don't go

21     get them, but my drivers do, and I converse with them on

22     the phone.  But I've never been to the complex.

23          MS. SINGER:  Okay.  So you've never been inside the

24     apartments there or anything?

25          PROSPECTIVE JUROR BAXTER:  No.

1       MS. SINGER:  Anyone have any personal knowledge of

2   that area?

3       PROSPECTIVE JUROR BAXTER:  (Shake heads.)

4       MS. SINGER:  Well, you're not to go and personally

5   make yourself knowledgeable if you're not, but I wanted to

6   make sure at this point.

7       Now, I just have few backup questions and then we'll

8   be through.

9       And that is, Ms. Currier, what is MindSolve

10  Technologies?

11      PROSPECTIVE JUROR CURRIER:  It's a software company.

12  They develop human resource web-based stuff.

13      MS. SINGER:  And you work for the Fisher School of

14  accounting?

15      PROSPECTIVE JUROR CURRIER:  Yes.

16      MS. SINGER:  What degree do you hold?

17      PROSPECTIVE JUROR CURRIER:  (Indiscernible) Athletic

18  degree.

19      MS. SINGER:  So you're not in accounting but you work

20  at their facility, you're working for them as an

21  undergraduate?

22      PROSPECTIVE JUROR CURRIER:  Yes.

23      MS. SINGER:  Is that similar, possibly, to what

24  Ms. Martin does?

25      PROSPECTIVE JUROR CURRIER:  Yes, I believe so.

1          MS. SINGER:  Do you all know each other?

2          PROSPECTIVE JUROR CURRIER:  No.

3          MS. SINGER:  I know I asked that question before, but

4     you do not know each other?

5          PROSPECTIVE JUROR CURRIER:  No.

6          MS. SINGER:  And, Ms. Roberts, you work for Wireless

7     Retail?

8          PROSPECTIVE JUROR ROBERTS:  Retail.

9          MS. SINGER:  And what kind of job is that?

10          PROSPECTIVE JUROR ROBERTS:  I sell cell phones.

11          MS. SINGER:  You sell cell phones?

12          PROSPECTIVE JUROR ROBERTS:  Yes.

13          MS. SINGER:  And are you in the retail business or in

14     the wholesale business?

15          PROSPECTIVE JUROR ROBERTS:  Retail.

16          MS. SINGER:  And how long have you been doing that?

17          PROSPECTIVE JUROR ROBERTS:  For about five months.

18          MS. SINGER:  Did you grow up in Gainesville?

19          PROSPECTIVE JUROR ROBERTS:  Yes, ma'am.

20          MS. SINGER:  21 years here and 21 years old, I

21     figured you did.

22          What high school did you go to?

23          PROSPECTIVE JUROR ROBERTS:  Gainesville High.

24          MS. SINGER:  I have a son at Gainesville High School.

25          And did you attend school after Gainesville High

```
 1        School here or did you go away to school somewhere else?
 2             PROSPECTIVE JUROR ROBERTS:  I'm at Santa Fe right
 3        now.
 4             MS. SINGER:  All right.  So you're attending college
 5        here in Gainesville?
 6             PROSPECTIVE JUROR ROBERTS:  Yes, ma'am.
 7             MS. SINGER:  And you did check that you or a member
 8        of your family has been a party to a lawsuit.
 9             Do you know specifically about that, was that you or
10        was that another family member?
11             PROSPECTIVE JUROR ROBERTS:  One of my sisters.  But
12        it's settled, it's a civil suit.  Something else I don't
13        really know.
14             MS. SINGER:  Okay.  Mr. Baxter, you have five
15        children but they are all grown?
16             PROSPECTIVE JUROR BAXTER:  Yes, ma'am.
17             MS. SINGER:  And you have a number of grandchildren?
18             PROSPECTIVE JUROR BAXTER:  Uh-huh.
19             MS. SINGER:  How frequently do you see your
20        grandchildren?
21             PROSPECTIVE JUROR BAXTER:  Well, I've got -- Some are
22        in Connecticut, some in California, some here in
23        Gainesville.  And I keep in touch with them.  The ones out
24        of state I don't see but maybe once a year, but the ones
25        in town it's sometimes every two weeks, sometimes once a
```

1     week.

2          MS. SINGER:  And have you seen them since birth?

3          PROSPECTIVE JUROR BAXTER:  Oh, yeah.

4          MS. SINGER:  The ones that are here in Gainesville?

5          PROSPECTIVE JUROR BAXTER:  I was at the hospital when

6     they were born, most of them here in Gainesville.

7          MS. SINGER:  So you do have fairly frequent contact

8     with the kids?

9          PROSPECTIVE JUROR BAXTER:  Yes, ma'am.

10         MS. SINGER:  Mr. Clark, you have how many?

11         PROSPECTIVE JUROR CLARK:  Seven.

12         MS. SINGER:  And are they here in Gainesville?

13         PROSPECTIVE JUROR CLARK:  Two are here in

14    Gainesville, the rest are -- two in Gainesville, one in

15    Orlando, and the rest Ohio.

16         MS. SINGER:  What does your wife do?  Does she work

17    outside of the home?

18         PROSPECTIVE JUROR CLARK:  She's retired.

19         MS. SINGER:  What type of employment was she doing

20    before she retired?

21         PROSPECTIVE JUROR CLARK:  She operated a computer for

22    Disney.

23         MS. SINGER:  And did you come up here then after some

24    period of time or were you always here in Gainesville?

25         PROSPECTIVE JUROR CLARK:  No, we moved from Orlando

1    about ten years ago.

2         MS. SINGER:  You work with GREM?

3         PROSPECTIVE JUROR CLARK:  Yes, ma'am.

4         MS. SINGER:  Gainesville Regional --

5         PROSPECTIVE JUROR CLARK:  No, ma'am.  Gainesville

6    Real Estate Management.

7         MS. SINGER:  Oh, and what do you do for them?

8         PROSPECTIVE JUROR CLARK:  I'm a maintenance

9    supervisor.

10        MS. SINGER:  And, of course, this Tumbling Creek is

11   not part of your area?

12        PROSPECTIVE JUROR CLARK:  No, ma'am.

13        MS. SINGER:  As maintenance supervisor you're

14   responsible to go from place-to-place and make sure things

15   are running up to speed?

16        PROSPECTIVE JUROR CLARK:  Emergency on call for half

17   of the properties they have, and then I have two

18   properties I manage myself.

19        MS. SINGER:  Okay.  And that means that you have your

20   own things to take care of plus you're on call with them?

21        PROSPECTIVE JUROR CLARK:  Yes, ma'am.

22        MS. SINGER:  Is that your business, Gainesville --

23        PROSPECTIVE JUROR CLARK:  No, ma'am.

24        MS. SINGER:  And, Ms. Wade-Littrup, you play music?

25        PROSPECTIVE JUROR WADE-LITTRUP:  Uh-huh.

1     MS. SINGER:  What kind of music do you play?

2     PROSPECTIVE JUROR WADE-LITTRUP:  Sing and play all

3  kinds.  Fat lady music, opera, classical, jazz, blues,

4  gospel.  Don't do rap.

5     MS. SINGER:  Gospel?

6     PROSPECTIVE JUROR WADE-LITTRUP:  Usually sing by

7  myself.

8     MS. SINGER:  All right.  Your children, grown?

9     PROSPECTIVE JUROR WADE-LITTRUP:  Yes.

10     MS. SINGER:  Do you have any grandchildren?

11     PROSPECTIVE JUROR WADE-LITTRUP:  No.

12     MS. SINGER:  I know how old your oldest is because I

13  know when EJ's daughter was born.

14     PROSPECTIVE JUROR WADE-LITTRUP:  Not exactly the same

15  day, but close.

16     MS. SINGER:  Close.

17     And, Mr. Ezzell, is Bill your only child?

18     PROSPECTIVE JUROR EZZELL:  Yes.

19     MS. SINGER:  But you have dealt with children a lot

20  being a school teacher and working the school system?

21     PROSPECTIVE JUROR EZZELL:  Yes, ma'am.

22     MS. SINGER:  You've been around children for how many

23  years?

24     PROSPECTIVE JUROR EZZELL:  30 years.

25     MS. SINGER:  The judge tricked me and she called --

1    not only did she call -- she called you out of order from

2    the order, so I have to go back now and find your number

3    because you're not really next to Mr. Ezzell in the

4    numbering, and I covered you on MindSolve Technology.

5         So now let me see.  Mr. Heileman's number is 212.

6         Mr. Heileman, I don't know -- I still don't have your

7    sheet, but maybe you can tell me where you are working

8    right now.

9         I know you worked with Shands a long time back in the

10   '80s.

11        PROSPECTIVE JUROR HEILEMAN:  Nationwide Insurance.

12   (Indiscernible.)

13        MS. SINGER:  I'm sorry.  I'm sorry.  Say it again.

14        PROSPECTIVE JUROR HEILEMAN:  Nationwide Insurance,

15   problem solver, customer service department computer tech.

16        MS. SINGER:  So you're not a customer service person,

17   you're an internal person, you work on internal

18   (indiscernible) --

19        PROSPECTIVE JUROR HEILEMAN:  It's hard to give a job

20   description, that is my job description, but I do mostly

21   internal customer (indiscernible), not sales.

22        MS. SINGER:  And how long have you been with

23   Nationwide?

24        PROSPECTIVE JUROR HEILEMAN:  Ten years.

25        MS. SINGER:  What is your educational background that

1       takes you there?

2          PROSPECTIVE JUROR HEILEMAN:  Got a four-year degree,

3       Nationwide paid for it so I stay with them.

4          MS. SINGER:  Very good.  What is it in, computer --

5          PROSPECTIVE JUROR HEILEMAN:  Actually, business.

6          MS. SINGER:  Good.  And you have no children?

7          PROSPECTIVE JUROR HEILEMAN:  No, I don't.

8          MS. SINGER:  But you do have contact with children?

9          PROSPECTIVE JUROR HEILEMAN:  Yeah, nieces and

10      nephews.

11         MS. SINGER:  Are they here in Gainesville?

12         PROSPECTIVE JUROR HEILEMAN:  No, they're in Colorado,

13      but I do hear from them fairly often.

14         MS. SINGER:  All right.  Do you have any contact with

15      friends' children?

16         PROSPECTIVE JUROR HEILEMAN:  Yes.

17         MS. SINGER:  Have you ever been responsible for any

18      infants?

19         PROSPECTIVE JUROR HEILEMAN:  Yes, I have.

20         MS. SINGER:  Have you ever been the caretaker for an

21      infant?

22         PROSPECTIVE JUROR HEILEMAN:  No, just emergency

23      babysitting.

24         MS. SINGER:  Okay.  So your contact with infants

25      would be occasional, at best?

1          PROSPECTIVE JUROR HEILEMAN:  Yes.

2          MS. SINGER:  All right.  Thank you very much.

3          Mr. Ramsey -- I think I do have Mr. Ramsey's sheet.

4     You are retired?

5          PROSPECTIVE JUROR RAMSEY:  Told you my company went

6     broke.

7          MS. SINGER:  What company was that?

8          PROSPECTIVE JUROR RAMSEY:  Company called

9     (indiscernible) Transport Freight out of Minnesota, we had

10    an office in Gainesville.

11         MS. SINGER:  Okay.  That's just made the news

12    recently, did it not?

13         PROSPECTIVE JUROR RAMSEY:  No.  Different.  That's

14    Consolidated Freightways.

15         MS. SINGER:  Yeah, but that was on the news.

16         PROSPECTIVE JUROR RAMSEY:  Big thing.

17         MS. SINGER:  Big thing.

18         And have you always been in the Gainesville area or

19    did you settle --

20         PROSPECTIVE JUROR RAMSEY:  I was born here, left in

21    '67, came back in '94.

22         MS. SINGER:  All right.  And do you have any

23    children?

24         PROSPECTIVE JUROR RAMSEY:  I have two.

25         MS. SINGER:  All right.  They are adults now?

```
 1            PROSPECTIVE JUROR RAMSEY:  38 and 36.

 2            MS. SINGER:  Do you have grandchildren?

 3            PROSPECTIVE JUROR RAMSEY:  Yes.

 4            MS. SINGER:  Where are they located?

 5            PROSPECTIVE JUROR RAMSEY:  One group is in Tulsa,

 6   Oklahoma, the other in Gulfport, Mississippi.

 7            MS. SINGER:  Have you had contact with a number of

 8   children in your many years?

 9            PROSPECTIVE JUROR RAMSEY:  Yes.  Yes.

10            MS. SINGER:  All right.  Have you had custodial -- or

11   custody or control over young children that you had to

12   take care of?

13            PROSPECTIVE JUROR RAMSEY:  Only my own and

14   grandchildren occasionally, you know.

15            MS. SINGER:  All right.  So right now you're

16   basically looking for something else?

17            PROSPECTIVE JUROR RAMSEY:  Right.

18            MS. SINGER:  Maybe you'll have a free two weeks then,

19   if you didn't have a problem.  Of course, you don't get

20   paid very much here.

21            And, Ms. Martin, I know you have an 18-month old?

22            PROSPECTIVE JUROR MARTIN:  Yes.  15.

23            MS. SINGER:  15-month old.  And do you have the care

24   of any other children?

25            PROSPECTIVE JUROR MARTIN:  No.
```

1          MS. SINGER:  And, Ms. Young, children?

2          PROSPECTIVE JUROR YOUNG:  Two girls, two

3    grandchildren, and another on the way.

4          MS. SINGER:  Congratulations.

5          PROSPECTIVE JUROR YOUNG:  Thank you.

6          MS. SINGER:  Are they here?

7          PROSPECTIVE JUROR YOUNG:  Atlanta and Nashville, but

8    very close, see them often, babysit often.

9          MS. SINGER:  Very good.  You have the freedom to be

10   able to do that?

11         PROSPECTIVE JUROR YOUNG:  Plus I have taught first

12   grade the last 20 years in Alachua County.  Just retired.

13         MS. SINGER:  A lot of contact with kids?

14         PROSPECTIVE JUROR YOUNG:  Yes, ma'am.

15         MS. SINGER:  Ms. Escalante?

16         PROSPECTIVE JUROR ESCALANTE:  I have one son.

17         MS. SINGER:  Do you have any grandchildren?

18         PROSPECTIVE JUROR ESCALANTE:  No.

19         MS. SINGER:  And you mentioned earlier that you did

20   some daycare center work at one time?

21         PROSPECTIVE JUROR ESCALANTE:  Yes, I had.

22         MS. SINGER:  When was that in the course of your

23   employment history?  I know you work for Shands now.

24         PROSPECTIVE JUROR ESCALANTE:  Yes.  Probably about 15

25   years ago.  I had my own daycare center in my home, took

1    care of children.

2          MS. SINGER:  Where was that?  Alachua County?

3          PROSPECTIVE JUROR ESCALANTE:  Yes, it was here, right

4    behind Home Depot.

5          MS. SINGER:  All right.  And did you take care of

6    infants?

7          PROSPECTIVE JUROR ESCALANTE:  Yes.

8          MS. SINGER:  And how old -- what age range did you

9    have in the daycare center?

10          PROSPECTIVE JUROR ESCALANTE:  From six weeks to two

11    years.

12          MS. SINGER:  So you took care of the real little --

13          PROSPECTIVE JUROR ESCALANTE:  Little kids.

14          MS. SINGER:  And was there a reason why you ended

15    that business?

16          PROSPECTIVE JUROR ESCALANTE:  Well, they all grown

17    up.  I took care of them until they started school and

18    then I decided to get a job where I would have better

19    benefits.

20          MS. SINGER:  You were like in business for yourself

21    then, I assume?

22          PROSPECTIVE JUROR ESCALANTE:  Yes.

23          MS. SINGER:  Was that during the time that your child

24    was also growing up and you were home with your child as

25    well?

```
1              PROSPECTIVE JUROR ESCALANTE:  Yes.  Yes.

2         MS. SINGER:  And then you -- when he or she moved on,

3    you moved on also?

4              PROSPECTIVE JUROR ESCALANTE:  Right.

5         MS. SINGER:  Okay.  Do you have any contact with

6    children now?

7              PROSPECTIVE JUROR ESCALANTE:  No, all my children

8    that I have contact with are older.

9         MS. SINGER:  Ms. Moran, let me get your sheet.  You

10   did have an interesting -- I think if I look at your sheet

11   I did have a question about -- You work for Singular

12   Wireless?

13             PROSPECTIVE JUROR MORAN:  Uh-huh.

14        MS. SINGER:  And you manage call centers.  I have a

15   question about that because that was a little different

16   from Wireless, Inc. sales.

17        What do you do?

18             PROSPECTIVE JUROR MORAN:  Customer service -- manage

19   customer service centers in Ocala, Miami, Ocean Springs,

20   Mississippi and (indiscernible).

21        MS. SINGER:  And you're able to stay here in

22   Gainesville and do that?

23             PROSPECTIVE JUROR MORAN:  Uh-huh.  My home base is

24   Ocala.

25        MS. SINGER:  So you work in Ocala during the day?
```

1      PROSPECTIVE JUROR MORAN:  Uh-huh.

2          MS. SINGER:  Would you have any problem whatsoever

3      turning that over to someone else for a few weeks if we

4      ask you to serve on this jury?

5          PROSPECTIVE JUROR MORAN:  No.

6          MS. SINGER:  And what background and training do you

7      have for the job to manage all these call centers?

8          PROSPECTIVE JUROR MORAN:  I've been in

9      telecommunications since '87 and I worked for BellSouth

10     and BellSouth actually owns Singular.

11         MS. SINGER:  So you just moved to a wireless business

12     from a wired business?

13         PROSPECTIVE JUROR MORAN:  Right.  Right.

14         MS. SINGER:  Hard line business or whatever.

15         And you came from somewhere else to come to Florida

16     to do this?

17         PROSPECTIVE JUROR MORAN:  Uh-huh.

18         MS. SINGER:  Where did you come from?

19         PROSPECTIVE JUROR MORAN:  Actually transferred five

20     times in the last six years from Baton Rouge, New Orleans,

21     Lafayette, Orlando and here.

22         MS. SINGER:  And do you think you've settled down

23     here?

24         PROSPECTIVE JUROR MORAN:  I hope so.

25         (Indiscernible.)

1      MS. SINGER:  And your contact with children I think

2  we went over.

3      PROSPECTIVE JUROR MORAN:  Yes.  I taught Sunday

4  school six years and was also involved with Boys And Girls

5  Club.

6      MS. SINGER:  Volunteered?

7      PROSPECTIVE JUROR MORAN:  Uh-huh.

8      MS. SINGER:  And, Mr. Hudson, are you retired, sir?

9      PROSPECTIVE JUROR HUDSON:  Yes, ma'am.

10     MS. SINGER:  And what did you do before you were

11 retired?

12     PROSPECTIVE JUROR HUDSON:  I was maintenance

13 repairman.  I retired.

14     MS. SINGER:  Where did you work, sir?

15     PROSPECTIVE JUROR HUDSON:  University of Florida.

16     MS. SINGER:  All right.  And how many years did you

17 work there before you retired?

18     PROSPECTIVE JUROR HUDSON:  I put in 27 years at the

19 University of Florida, and six years with the county road

20 department.

21     MS. SINGER:  And then you were able to retire?

22     PROSPECTIVE JUROR HUDSON:  Yes, ma'am.  I was able

23 to.

24     MS. SINGER:  What are you doing now in your spare

25 time?

1          PROSPECTIVE JUROR HUDSON:  Just anything I feel like
2     I want to do.
3          MS. SINGER:  In the course of doing anything you feel
4     like you want to do, do you ever take care of your
5     grandchildren?
6          PROSPECTIVE JUROR HUDSON:  My wife do that sometime.
7     I go out and I mess around out there and I get dirtier
8     than I did when I was working a real job.  She said, You
9     look worse than you did when you were working for real.
10         MS. SINGER:  You ever take care of any of your
11    grandchildren?
12         PROSPECTIVE JUROR HUDSON:  I kept raising about eight
13    of them.
14         MS. SINGER:  All right.  So you've had a lot of
15    contact with kids in your life?
16         PROSPECTIVE JUROR HUDSON:  Right.  I drove a school
17    bus for 17 years, ten years without missing a day.
18         MS. SINGER:  Ten years without missing a day?
19         PROSPECTIVE JUROR HUDSON:  Without missing a day.
20         MS. SINGER:  You should have gotten an attendance
21    award.
22         PROSPECTIVE JUROR HUDSON:  I got that.
23         MS. SINGER:  Should have given you an attendance
24    award.
25         PROSPECTIVE JUROR HUDSON:  I got two five-year

```
 1      awards.
 2              MS. SINGER:  Dr. Abbitt, contact with kids?
 3              PROSPECTIVE JUROR HUDSON:  From the school board,
 4      that was back there in the days (indiscernible).
 5              THE COURT:  Let me interrupt you again for a moment.
 6              I'm going to send some of the jurors to a different
 7      courtroom, and I have a list here and I will ask
 8      Ms. O'Neil if you will get close enough to locate those
 9      jurors and take them to Judge Kotey's courtroom.
10              So if you all will just pay attention to --
11              MS. SINGER:  Your Honor, while they are doing that,
12      if it's okay for me to confer with Mr. Pennypacker?
13              THE COURT:  Yes.
14              (Brief pause.)
15              MS. SINGER:  Dr. Abbitt, you have two children?
16              PROSPECTIVE JUROR ABBITT:  Two sons.
17              MS. SINGER:  And are they grown?
18              PROSPECTIVE JUROR ABBITT:  20 and 15.
19              MS. SINGER:  And other than that do you have other
20      contact with kids -- younger kids?  I assume you took care
21      of your younger children when they grew up and you had
22      them, but other than that are you in contact with younger
23      children, infants, on a daily basis or routine basis?
24              PROSPECTIVE JUROR ABBITT:  No.  We have a very young
25      neighborhood and there are a lot of children that come
```

1      over and do stuff around, but no more than that.

2            MS. SINGER:  And you said 20 and 15?

3            PROSPECTIVE JUROR ABBITT:  Uh-huh.

4            MS. SINGER:  Mr. McMahon, you told me you've had

5      stepchildren.  Raised them?

6            PROSPECTIVE JUROR McMAHON:  From five.

7            MS. SINGER:  How about your contact with infant

8      children, had any contact with infant children?

9            PROSPECTIVE JUROR McMAHON:  I have, yes.

10           MS. SINGER:  And describe that for me, please.

11           PROSPECTIVE JUROR McMAHON:  Not on a daily basis,

12     more of an occasional basis.

13           MS. SINGER:  Believe it or not, I have no more

14     questions.  I really appreciate your patience with me and

15     I thank you very much, and I will tender, your Honor,

16     examination by Mr. Groland and Mr. Tedder.

17           THE COURT:  All right.  Mr. Tedder.

18           MR. TEDDER:  Thank you, your Honor.  May it please

19     the court.

20           Ladies and gentlemen of the jury panel, good

21     afternoon.

22           MS. SINGER:  Mr. Tedder, I think I left my pen up

23     there.  I'm sorry, sir.

24           MR. TEDDER:  Ladies and gentlemen, the first thing I

25     would like to do is just introduce myself.  As Judge Lott

1    has said, my name is John Tedder, and I'm an attorney with

2    a law firm here in Gainesville known as Groland &

3    Associates, founded by my boss, Mr. Groland.  We also have

4    two other lawyers who work in the office with us by the

5    name of Dale Workman and Carrie Proctor.

6        Do any of you folks -- are any of y'all familiar with

7    either one of those attorneys?

8        THE PROSPECTIVE JURORS:  (Shake heads.)

9        MR. TEDDER:  No.

10       I'd also like to correct something that was said

11   earlier.  The lady sitting at counsel table with us is not

12   an attorney, she's a paralegal that is working with us,

13   and her name is Toni Maloney, and she's going to assist us

14   in this trial as much as possible.

15       Another thing, we inadvertently neglected to advise

16   you folks of three other potential witnesses that may be

17   called in this trial, and I will say their names and see

18   if any of you know any of them.

19       THE COURT:  Mr. Tedder, if you would do that loudly

20   enough so that anybody that's sitting out there can also

21   hear those same names, that might be helpful, and we'll

22   get those numbers.

23       MR. TEDDER:  Yes, ma'am.

24       The three additional possible witnesses are two

25   Gainesville police officers:  Officer Rob King, and

```
 1      Officer Chris Jackson.  The third witness is a radiologist

 2      we believe at Shands, Dr. Bruce Boatner (as pronounced).

 3      I'm not sure if I pronounced his name correctly.

 4          Do any of you folks know any of those people?

 5          PROSPECTIVE JUROR ABBITT:  He's not a radiologist at

 6      Shands.  I mean, I don't know the name.  I know he's not a

 7      radiologist at Shands.

 8          MS. SINGER:  Mr. Tedder --

 9          (Off record discussion between Ms. Singer and

10      Mr. Tedder.)

11          MR. TEDDER:  Thank you, ma'am.

12          I believe the name is Bonner (as pronounced),

13      B-o-u-g-h --

14          PROSPECTIVE JUROR ABBITT:  Brice Boughner.  He's a

15      radiology resident at Shands.

16          MR. TEDDER:  Brice --

17          PROSPECTIVE JUROR ABBITT:  He pronounces it bonner.

18          MR. TEDDER:  Boughner.  Spelled B-o-u-g-h-n-e-r?

19          PROSPECTIVE JUROR ABBITT:  Right.

20          MR. TEDDER:  Great.  Thank you very much, Doctor.  I

21      had a feeling you would know who he was.

22          PROSPECTIVE JUROR ABBITT:  It's very confusing how to

23      say his name.

24          MR. TEDDER:  So it's Brice --

25          PROSPECTIVE JUROR ABBITT:  Boughner.  It's like
```

1    bonnet, but bonner.

2        MR. TEDDER:  Obviously a doctor you know?

3        PROSPECTIVE JUROR ABBITT:  He's a resident and I know

4    him.

5        MR. TEDDER:  Okay.  Does anybody else in the panel

6    know any of those three witnesses?

7        THE PROSPECTIVE JURORS:  (Shake heads.)

8        MR. TEDDER:  No?  Okay.

9        There are some specific questions I want to ask a

10   couple of you before I get into general questioning here

11   today.

12       First of all, just make a comment.  Mr. Hudson, I

13   really like the way you describe what you do nowadays.  I

14   hope to be able to get to that stage some day in my life,

15   I tell you what.

16       PROSPECTIVE JUROR HUDSON:  Thank you.

17       MR. TEDDER:  But, Mr. Heileman, you indicated you

18   work at Nationwide Insurance?

19       PROSPECTIVE JUROR HEILEMAN:  Yes, sir.

20       MR. TEDDER:  Do you know a lady by the name of Cathy

21   Morriston who works through them also?

22       PROSPECTIVE JUROR HEILEMAN:  Peripherally, that's

23   about it.

24       MR. TEDDER:  Peripherally?  What do you mean by that,

25   sir?

1      PROSPECTIVE JUROR HEILEMAN:  I work on the second

2    floor and I know she works on the first floor.  That's

3    about it.

4      MR. TEDDER:  Do you know what she does?

5      PROSPECTIVE JUROR HEILEMAN:  I think she's personnel,

6    but I can't swear by it.  But I think, you know, I -- If

7    you told me -- sent me to find her, if I asked enough

8    people, I would find her, but I don't know where she sits

9    or who supervises her or anything.

10      MR. TEDDER:  Okay.  She's a witness in this case and

11    is in fact the grandmother of the baby that passed away in

12    this case.

13      Do you think if you're asked to sit on this jury that

14    that would cause you a problem?

15      PROSPECTIVE JUROR HEILEMAN:  No, sir.

16      MR. TEDDER:  Okay.  And you wouldn't have a problem

17    seeing her at work, regardless of what your verdict was in

18    this case?

19      PROSPECTIVE JUROR HEILEMAN:  No problem.

20      MR. TEDDER:  Do you also know a police officer by the

21    name of Dave Cannon, by any chance?

22      PROSPECTIVE JUROR HEILEMAN:  His wife, I worked with

23    her very briefly at Shands.  One night she needed a ride

24    home, that's it.  (Indiscernible.)  Hi, how are you.  Made

25    sure she got to the front door.  That was it.  I took off.

```
 1    I wouldn't recognize him if I passed him, but he might

 2    know me, so --

 3         MR. TEDDER:  All right.  Now, Dr. Abbitt, you

 4    indicated obviously you're a full-time employee as a

 5    radiologist at Shands?

 6         PROSPECTIVE JUROR ABBITT:   (Nods head.)

 7         MR. TEDDER:  If you were asked to serve on this jury,

 8    would it cause you any kind of problem being away from

 9    work for two weeks?

10         PROSPECTIVE JUROR ABBITT:  That's -- I don't think

11    so.  I welcome the opportunity.  Like Mr. Hudson, I

12    welcome the opportunity.  How's that?

13         MR. TEDDER:  I had the same thing happen to me one

14    time when I worked another job and had a jury duty notice

15    for federal jury duty.  I asked my boss about it, he said,

16    No, go ahead, we'll cover, we'll cover.  And I almost got

17    to sit on a jury that was to supposed to last a month.

18    Anyhow --

19         Okay.  First question I would like to ask each of you

20    folks is what was your reaction when you got the notice to

21    come serve jury duty here this week?

22         Mr. Heileman, what was your reaction, sir?

23         PROSPECTIVE JUROR HEILEMAN:  After 911, kind of

24    proud.

25         MR. TEDDER:  Pardon me?
```

```
1            PROSPECTIVE JUROR HEILEMAN:  After 911, kind of proud

2       to be picked.

3            MR. TEDDER:  Ms. Currier, what was your reaction?

4            PROSPECTIVE JUROR CURRIER:  I kind of chuckled

5       because someone told me they have always gotten called and

6       I said, I have never been called, and then it comes in the

7       mail.

8            MR. TEDDER:  Do you have any problems if you're asked

9       to serve on this trial?

10            PROSPECTIVE JUROR CURRIER:  No, sir.

11            MR. TEDDER:  Mr. Ezzell, what was your reaction?

12            PROSPECTIVE JUROR EZZELL:  It's about time.  I only

13       served one other time and I've been here close to 30

14       years, I guess.

15            MR. TEDDER:  How long ago was it you got to serve?

16            PROSPECTIVE JUROR EZZELL:  How long ago?

17            MR. TEDDER:  Yes, sir.

18            PROSPECTIVE JUROR EZZELL:  Quite a while back, in the

19       late '70s, maybe early '80s.

20            MR. TEDDER:  And, Ms. Wade-Littrup, what was your

21       reaction when you got the notice?

22            PROSPECTIVE JUROR WADE-LITTRUP:  Well, I chuckled

23       because I was called in June and wasn't able to do it.  I

24       said, Please, I can do it August, but not June.  And they

25       said, Okay, we'll send it to you in August, but it didn't
```

```
 1        come until September.  So --
 2             MR. TEDDER:  Would you have a problem if you're asked
 3        to serve this week?
 4             PROSPECTIVE JUROR WADE-LITTRUP:  Not more than normal
 5        inconveniences.
 6             MR. TEDDER:  Mr. Clark, how about you, sir, what was
 7        your reaction when you got the notice to come serve on
 8        jury duty this week?
 9             PROSPECTIVE JUROR CLARK:  I never had jury duty
10        before.  I had no idea.  It was just something new.
11             MR. TEDDER:  Cause you any problems?
12             PROSPECTIVE JUROR CLARK:  No, not at all, a few days
13        off from work.  No problem.
14             MR. TEDDER:  No problem if it's more than a few days,
15        talking about two weeks?
16             PROSPECTIVE JUROR CLARK:  Not a problem.
17             MR. TEDDER:  Mr. Baxter, how about you, what was your
18        reaction when you got the notice to serve?
19             PROSPECTIVE JUROR BAXTER:  Well, when I first heard
20        it, I thought, Now why can't I do this?  And then the
21        state our nation is in right now, Nope, I'm going.  So I'm
22        here.
23             MR. TEDDER:  Consider it your patriotic duty to
24        serve?
25             PROSPECTIVE JUROR BAXTER:  I feel like it is.
```

```
 1          MR. TEDDER:  And, Ms. Roberts, what about you, ma'am,

 2    what was your reaction?

 3          PROSPECTIVE JUROR ROBERTS:  Actually today is my best

 4    friend's birthday so --

 5          MR. TEDDER:  Today is your best friend's birthday?

 6          PROSPECTIVE JUROR ROBERTS:  (Nods head.)

 7          MR. TEDDER:  Do you have plans for a birthday party

 8    for that person?

 9          PROSPECTIVE JUROR ROBERTS:  No.  We already

10    celebrated it last week.

11          MR. TEDDER:  Pardon me?

12          PROSPECTIVE JUROR ROBERTS:  We celebrated it last

13    week.

14          MR. TEDDER:  Celebrated it last week?

15          Okay.  Would you have any problems if you're asked to

16    serve on this jury?

17          PROSPECTIVE JUROR ROBERTS:  No, sir.

18          MR. TEDDER:  Ms. Walker, what was your reaction when

19    you got the notice to come serve?

20          PROSPECTIVE JUROR WALKER:  It was my duty, I would

21    show up.

22          MR. TEDDER:  All right.  And if you are asked to

23    serve do you have any problems -- will a two-week trial

24    cause you any problems?

25          PROSPECTIVE JUROR WALKER:  No.
```

```
 1              MR. TEDDER:  Mr. McMahon?

 2              PROSPECTIVE JUROR McMAHON:  McMahon.

 3              MR. TEDDER:  Sorry.

 4         What was your reaction when you got the notice to

 5    come serve jury duty?

 6              PROSPECTIVE JUROR McMAHON:  Surprised it came so

 7    soon.  I had previously been excused from jury twice,

 8    because my business is cyclical and it was at our peak

 9    times, and I was fortunate enough to get excused twice.

10              MR. TEDDER:  And you work for Gator Textbooks?

11              PROSPECTIVE JUROR McMAHON:  One of the owners.  Yes.

12              MR. TEDDER:  And is your business -- it's not a bad

13    time or this is an okay time?

14              PROSPECTIVE JUROR McMAHON:  This is a perfect time.

15              MR. TEDDER:  You provide books for the University?

16              PROSPECTIVE JUROR McMAHON:  Yes.

17              MR. TEDDER:  I imagine that's pretty busy.

18              PROSPECTIVE JUROR McMAHON:  Oh, yeah, it was.  Now

19    it's slowing down again.  We get back to everyday life.

20              MR. TEDDER:  And, Dr. Abbitt, what was your reaction

21    when you were asked to come serve jury duty this week?

22              PROSPECTIVE JUROR ABBITT:  Well, I sort of share your

23    feeling, I was excited about the opportunity.  I'm not

24    very optimistic that I might get chosen, but I would like

25    to.  I feel like it's our responsibility as citizens.
```

1      MR. TEDDER:  Okay.  So what is it about this that

2  would excite you?

3      PROSPECTIVE JUROR ABBITT:  Well, it's very different

4  from what I do every day all -- every day -- and, I mean,

5  I do think we have a responsibility as citizens to do it.

6      MR. TEDDER:  Mr. Hudson, what was your reaction when

7  you got the notice to come serve this week?

8      PROSPECTIVE JUROR HUDSON:  I didn't have to figure

9  out what I was going to do.

10     MR. TEDDER:  You ever thought about going into

11 politics?

12     Ms. Moran, what was your reaction when you got the

13 notice to come serve jury duty this week?

14     PROSPECTIVE JUROR MORAN:  I really thought maybe you

15 got all of the newbees first, figured since I was new to

16 Gainesville I came up on the list.

17     Just that I needed to be here.  I think if it goes

18 longer than two weeks it might be a problem, but two weeks

19 would be okay.

20     MR. TEDDER:  Okay.  Let's assume it did go longer

21 than two weeks, that going to be a major problem that

22 would distract you from serving on this jury?

23     PROSPECTIVE JUROR MORAN:  Maybe if it went longer

24 than two weeks.  I'm having to change a lot of things to

25 make two weeks work.

```
 1          MR. TEDDER:  We don't anticipate it going anymore
 2   than what we scheduled it for.
 3          Ms. Young -- Excuse me, Ms. Escalante, what was your
 4   reaction when you got the notice to come serve this week?
 5          PROSPECTIVE JUROR ESCALANTE:  Surprised.
 6          MR. TEDDER:  Why is that?
 7          PROSPECTIVE JUROR ESCALANTE:  Because I've never been
 8   on the jury before, and I think it's my duty to be here.
 9          MR. TEDDER:  Duty as a citizen?
10          PROSPECTIVE JUROR ESCALANTE:  Correct.
11          MR. TEDDER:  And, Ms. Young, what was your reaction
12   when you got the notice to come serve?
13          PROSPECTIVER JUROR YOUNG:  I thought I was lost in
14   the system, so I was really surprised.  I hadn't been
15   called since I first moved to Gainesville in 1981, I
16   guess.
17          MR. TEDDER:  And --
18          PROSPECTIVER JUROR YOUNG:  I'm fine with it.
19          MR. TEDDER:  Pardon me?
20          PROSPECTIVER JUROR YOUNG:  I am fine with it.
21          MR. TEDDER:  Ms. Martin, what was your reaction?
22          PROSPECTIVE JUROR MARTIN:  Well, it's a day I'm going
23   to lose because I never think I'm going to get picked
24   because of what my husband does, but I always wanted to
25   serve.
```

1      MR. TEDDER:  Your husband laugh when he heard you had

2  jury notice?

3      PROSPECTIVE JUROR MARTIN:  Yeah.  We both kind of

4  like, Oh, lose a day.

5      MR. TEDDER:  All right.  And, Mr. Ramsey, what was

6  your reaction, sir?

7      PROSPECTIVE JUROR RAMSEY:  Didn't really have a

8  reaction.  I thought nobody was going to be talking about

9  a two-week trial, though.  I just thought a couple of

10  days, one day -- I'm like her, thinking one day and you're

11  out of here.

12      MR. TEDDER:  If you are selected to serve on the

13  jury, are you willing to do it?

14      PROSPECTIVE JUROR RAMSEY:  I wouldn't have any

15  choice.

16      MR. TEDDER:  That's true.

17      PROSPECTIVE JUROR RAMSEY:  The judge is sitting right

18  there.

19      MR. TEDDER:  But now is the time.  You know, for you

20  all this is the only time y'all are going to get to really

21  feed back to us -- to the attorneys on both sides and to

22  the court, and so this is sort of like speak or forever

23  remain silent.  If it's going to be a problem -- We're

24  serious about it lasting around two weeks.  We're very

25  serious.  You know it's a serious case.  We need people

1  who can spend two weeks devoting their attention to this

2  case.  If you can't do it -- really can't do it, you need

3  to let us know.

4      Now, are any of you going to lose pay if you're asked

5  to serve such that it will distract you from your ability

6  to pay attention?  If so, please raise your hand.  Anybody

7  have a problem with that?

8      THE PROSPECTIVE JURORS:  (No audible response.)

9      MR. TEDDER:  No?  Okay.

10     The state attorney has already spoken some about law

11  enforcement officers and, as you've heard, there are going

12  to be a number of law enforcement officers testifying in

13  this case.  Some obviously more critical than others.

14     Would any of you give a police officer's testimony

15  more credibility merely because that person is a police

16  officer?  Any of you do that?

17     THE PROSPECTIVE JURORS:  (Shake heads.)  No.

18     MR. TEDDER:  Will each of you agree that police

19  officers are human beings, just like the rest of us?  They

20  make mistakes, just like the rest of us?  Everybody agree

21  with that?

22     THE PROSPECTIVE JURORS:  Yes.

23     MR. TEDDER:  Mr. Hudson, obviously, your son is a law

24  enforcement officer.

25     PROSPECTIVE JUROR HUDSON:  Yes, sir.

```
 1            MR. TEDDER:  Would you think that we should give a
 2      police officer's testimony greater weight just because
 3      they are a police officer?
 4            PROSPECTIVE JUROR HUDSON:  Do what now?
 5            MR. TEDDER:  Should we be more inclined to believe a
 6      police officer's testimony than a regular citizen's
 7      testimony just because that person is a police officer?
 8            PROSPECTIVE JUROR HUDSON:  Well, the law is the law.
 9      And, quite naturally, you're going to have to lean to the
10      law.
11            MR. TEDDER:  Okay.
12            PROSPECTIVE JUROR HUDSON:  Because the law of the
13      land is the law of the land.
14            MR. TEDDER:  Okay.  So do you think you would lean
15      more toward a police officer's testimony if you were asked
16      to serve?
17            PROSPECTIVE JUROR HUDSON:  Yes.
18            MR. TEDDER:  Ms. Walker, would you do that?  How do
19      you feel about that?
20            PROSPECTIVE JUROR WALKER:  I think they make mistakes
21      just like everybody else.
22            MR. TEDDER:  All right.  How about you, Mr. McMahon?
23            PROSPECTIVE JUROR McMAHON:  I think it's all
24      perception.  Everybody sees it a different way.  I mean, I
25      wouldn't give him anymore weight, I wouldn't give him any
```

```
 1      less weight.

 2              MR. TEDDER:  Dr. Abbitt, what do you think?

 3              PROSPECTIVE JUROR ABBITT:  Well said.  I mean, I

 4      think certainly hear what they have to say.

 5              MR. TEDDER:  And, Ms. Roberts, how about you?

 6              PROSPECTIVE JUROR ROBERTS:  It's not so much that

 7      they are a law enforcement officer, it's more how they say

 8      and what they say and how credible they seem to me as to

 9      how much emphasis I'm willing to give what they state.

10              MR. TEDDER:  Okay.  And, Mr. Baxter, how about you,

11      sir?

12              PROSPECTIVE JUROR BAXTER:  I think it's up to the

13      witness.  Whether they are a police officer or not, if

14      they are believable, that's the name of the game.

15              MR. TEDDER:  Okay.  So you take them on a one-by-one

16      basis?

17              PROSPECTIVE JUROR BAXTER:  One by one.

18              MR. TEDDER:  Doctor -- or, Mr. Clark, how about you,

19      sir?

20              PROSPECTIVE JUROR CLARK:  Everybody makes mistakes.

21      Whoever is more credible.

22              MR. TEDDER:  All right.  And, Ms. Moran, how about

23      you?

24              PROSPECTIVE JUROR MORAN:  Same.

25              MR. TEDDER:  You agree with that?
```

1           PROSPECTIVE JUROR MORAN:  Yes.

2           MR. TEDDER:  Ms. Escalante, how do you feel about

3      that?

4           PROSPECTIVE JUROR ESCALANTE:  Same.

5           MR. TEDDER:  Same way?

6           Anybody on the rest of the panel feel strongly

7      different?  Mr. Ezzell, would you --

8           PROSPECTIVE JUROR EZZELL:  Open mind.

9           MR. TEDDER:  Open mind.  Okay.

10          Now, Ms. Singer has talked some about various

11     publicity on this case, and I believe four of you

12     indicated you did recall reading something in the

13     newspaper about it in the past, Ms. Young, Ms. Escalante,

14     Ms. Moran and Ms. Wade-LIttrup.

15          Since we began this morning, have any of the four of

16     you that I just named remembered any additional details

17     about what you read in the newspaper about this?

18          THE PROSPECTIVE JURORS:  (Shake heads. )  No.

19          MR. TEDDER:  Ms. Wade-Littrup, have you?

20          PROSPECTIVE JUROR WADE-LITTRUP:  (Shakes head.)

21          MR. TEDDER:  Ms. Young, do you think if you're asked

22     to serve on this jury and you begin to hear testimony in

23     this case, that that would cause you to remember what you

24     may have read earlier in the newspaper?

25          PROSPECTIVE JUROR YOUNG:  It may.

```
 1          MR. TEDDER:  All right.

 2          PROSPECTIVE JUROR YOUNG:  It may.  I'm sure specifics

 3     of the case may come to mind then.

 4          MR. TEDDER:  Do you think that you could sort out --

 5     the judge is going to tell those of you asked to serve

 6     that you're only to reach a verdict based on the evidence

 7     that's presented here in open court and anything else is

 8     off grounds.

 9          Do you think you would be able to sort out what you

10     read in the past as opposed to what you're hearing here in

11     the courtroom if you're asked to serve?

12          PROSPECTIVE JUROR ESCALANTE:  Yes, sir, I will.

13          MR. TEDDER:  Ms. Escalante, how about you, do you

14     think you will remember things that you heard --

15          PROSPECTIVE JUROR ESCALANTE:  I doubt it.  There's so

16     much things going on now that -- This has happened a long

17     time ago.

18          MR. TEDDER:  Yes, ma'am.

19          PROSPECTIVE JUROR ESCALANTE:  And it's just so many

20     different crimes that have been going on that I probably

21     wouldn't remember.

22          I don't remember -- I barely remember hearing about

23     it.  I didn't read it, I heard it.

24          MR. TEDDER:  Okay.  And, Ms. Moran, how about you,

25     ma'am, do you think that might trigger your memory?
```

```
 1              PROSPECTIVE JUROR MORAN:  It might.  It's possible.

 2         MR. TEDDER:  If it did, do you think you would be

 3    able to sort out what you remembered from the past as

 4    opposed to what you hear here in open court?

 5         PROSPECTIVE JUROR MORAN:  Yes.

 6         MR. TEDDER:  Ms. Wade-Littrup, how about you, ma'am?

 7         PROSPECTIVE JUROR WADE-LITTRUP:  Well, I think I

 8    would be able to sort out of the difference because what I

 9    read I would recall visually.  What I hear I recall in a

10    different way.

11         MR. TEDDER:  All right.  We do expect there to be --

12    Has anybody else on the panel remembered reading or

13    hearing anything about this since this all began this

14    morning?

15         THE PROSPECTIVE JURORS:  (Shake heads.)

16         MR. TEDDER:  We do expect there to be --

17         PROSPECTIVE JUROR WALKER:  After thinking about it,

18    it seems like -- I mean, I read a lot of -- seems like I

19    notice a lot of facts dealing with children and stuff like

20    that, because of my friend or whatever.  But it seems like

21    now I do remember reading something about it, but I don't

22    remember specific details.

23         MR. TEDDER:  Okay.

24         PROSPECTIVE JUROR WALKER:  But it seems like I do.

25         MR. TEDDER:  I'll ask you the same question --
```

```
 1          PROSPECTIVE JUROR WALKER:  See it in the Gainesville

 2    Sun.

 3          MR. TEDDER:  Yes, ma'am.

 4          I'll ask you the same question I asked the other four

 5    ladies, and that is if you were asked to serve on this

 6    jury and you began to hear evidence and it triggered your

 7    recollection of what you may have read in the past, do you

 8    think you would be able to sort out what you read in the

 9    past, what was in the newspaper, as opposed to what is

10    being presented in open court?

11          PROSPECTIVE JUROR WALKER:  Yes.  Because I vaguely

12    remember it.

13          MR. TEDDER:  Everyone agree newspapers tend to make

14    mistakes in reports?  Everybody tend to agree with that?

15          THE PROSPECTIVE JURORS:  (Nods head.)

16          MR. TEDDER:  And I apologize to any member of the

17    press here.

18          But the bottom line is they make mistakes and report

19    things inaccurately, and the court -- the judge is going

20    to instruct you, you only make a verdict on what you hear

21    in court and you guys judge what is to be believed and how

22    much to be believed and so on and so forth.

23          We do expect this case to receive some coverage,

24    perhaps in local newspaper, perhaps by local television

25    reporting.  Those of you who are asked to serve, I believe
```

1   you will be told and ordered by the judge that you're not

2   to read anything about this case in the press or watch

3   anything about it on television.

4        I don't know about you folks, but I like to read the

5   newspaper every day, I like to watch the news on

6   television every day.  I do it.  I love to do it.  And if

7   you're asked to serve, Judge Lott may very well order you

8   to not read the newspaper, to not look at news on the

9   television.

10       Do each of you think you can do that?

11       THE PROSPECTIVE JURORS:  (Nod heads.)

12       MR. TEDDER:  Would anybody have a big problem if

13  you're asked to do that?

14       THE PROSPECTIVE JURORS:  (Shake heads.)

15       MR. TEDDER:  Mr. Heileman, that cause you any

16  problem?

17       PROSPECTIVE JUROR HEILEMAN:  No problem in the least.

18  I can do it.

19       MR. TEDDER:  You can do it?

20       PROSPECTIVE JUROR HEILEMAN:  Yes.

21       (Indiscernible.)

22       MR. TEDDER:  Mr. Ramsey, how about you, sir, would

23  that be a problem for you, sir?

24       Ms. Martin, would it cause you any problems?

25       PROSPECTIVE JUROR MARTIN:  No.

```
1            MR. TEDDER:  Ms. Currier, any problems with that?

2            PROSPECTIVE JUROR CURRIER:  (Shakes head.)

3            MR. TEDDER:  Ms. Ezzell?

4            PROSPECTIVE JUROR EZZELL:  (Shakes head.)

5            MR. TEDDER:  Ms. Young?

6            PROSPECTIVER JUROR YOUNG:  No.

7            MR. TEDDER:  Ms. Escalante, any problems with that?

8            PROSPECTIVE JUROR ESCALANTE:  No.

9            MR. TEDDER:  Ms. Wade-Littrup?

10           PROSPECTIVE JUROR WADE-LITTRUP:  No.  I don't watch

11     TV.

12           MR. TEDDER:  You don't watch TV?

13           PROSPECTIVE JUROR WADE-LITTRUP:  No.

14           MR. TEDDER:  I was going to ask that.  She already

15     asked you about what kind of music you did.

16           Mr. Clark, cause you any problem?

17           PROSPECTIVE JUROR CLARK:  Not a problem.

18           MR. TEDDER:  Ms. Moran, any problems?

19           PROSPECTIVE JUROR MORAN:  No.

20           MR. TEDDER:  Mr. Howard (sic), any problems with

21     that?

22           PROSPECTIVE JUROR HUDSON:  (Shakes head.)

23           MR. TEDDER:  Mr. Baxter?

24           PROSPECTIVE JUROR BAXTER:  Makes my wife an unhappy

25     camper.
```

 1          MR. TEDDER:  She likes to watch the television news?

 2          PROSPECTIVE JUROR BAXTER:  No.  I watch the news.  If

 3     I was told to turn it off, she would be out front

 4     celebrating.

 5          MR. TEDDER:  Ms. Roberts, how about you, that cause

 6     you any problems?

 7          PROSPECTIVE JUROR ROBERTS:  No, sir.

 8          MR. TEDDER:  Dr. Abbitt?

 9          PROSPECTIVE JUROR ABBITT:  I don't think so.

10          MR. TEDDER:  Mr. McMahon?

11          PROSPECTIVE JUROR McMAHON:  No, sir.

12          MR. TEDDER:  Ms. Walker?

13          PROSPECTIVE JUROR WALKER:  No.

14          MR. TEDDER:  All right.  In addition to that sort of

15     thing being ordered to not do, those of you who are asked

16     to serve, you're going to go home, you all have friends,

17     you all have family, you go home, the first question out

18     of your best friend or your wife or your husband or your

19     boyfriend or whatever is going to be, Gee, what happened

20     in court today?  What did you learn today?  What did they

21     tell you today?  So on so forth.  What did you see?  What

22     did you think?

23          You're going to be ordered not to talk about this

24     case with anybody.  Not only not with people who are --

25     have nothing to do with the trial, but even among

1    yourselves during recesses.  You guys are going to be

2    together, those of you asked to serve, and the judge is

3    going to tell you, you're not supposed to start talking

4    about this case until you've heard everything and are

5    specifically told by Judge Lott to begin to form a

6    decision.

7         Can you do that?

8         THE PROSPECTIVE JURORS:  (Nod heads.)

9         MR. TEDDER:  Does anybody think that's going to be a

10   problem?

11        THE PROSPECTIVE JURORS:  (Shake heads.)

12        MR. TEDDER:  Okay.  It's only natural, you get home,

13   thinking, rolling around, Gee, honey, you wouldn't believe

14   what came up today, what this lawyer tried to do, what

15   this witness said.

16        Each of you think you can do that?

17        THE PROSPECTIVE JURORS:  (Nod heads.)

18        MR. TEDDER:  It's very important.  Okay.

19        Now, which of you have small children?  I know

20   Ms. Martin has an 18 month --

21        PROSPECTIVE JUROR MARTIN:  15.

22        MR. TEDDER:  15 month.

23        Any of the rest of you have any small children right

24   now?

25        THE PROSPECTIVE JURORS:  (Shake heads.)

```
 1            PROSPECTIVE JUROR WALKER:  Ten year old.

 2            MR. TEDDER:  Ten year old.  Yeah, that's too old to

 3       be small.

 4            Those of you -- I think almost everybody here, if not

 5       everybody here, either has been or is a parent -- or is a

 6       parent.

 7            Ms. Martin, do you remember anything that they told

 8       you?  Was this your first baby?

 9            PROSPECTIVE JUROR MARTIN:  Yes.

10            MR. TEDDER:  Did the doctors give you any special

11       instructions on how to handle an infant when you first

12       took this baby home?

13            PROSPECTIVE JUROR MARTIN:  No.  I had a pretty good

14       background.

15            MR. TEDDER:  Had a pretty good background?

16            PROSPECTIVE JUROR MARTIN:  Yes.

17            MR. TEDDER:  And what, if anything, would you say is

18       a proper way to pick up an infant under six months old

19       with respect to their head and supporting it or not

20       supporting the head?

21            PROSPECTIVE JUROR MARTIN:  Definitely have to support

22       their heads.

23            MR. TEDDER:  Put your hand behind their head?

24            PROSPECTIVE JUROR MARTIN:  Yes.

25            MR. TEDDER:  And why do you think that's important to
```

1    do for such a small child?

2    PROSPECTIVE JUROR MARTIN:  Well, I mean, their --

3    well, I guess in the case of shaken baby syndrome or brain

4    damage, if their heads are jerked, you know.

5    MR. TEDDER:  Think it could cause a neck injury if

6    you did that?

7    PROSPECTIVE JUROR MARTIN:  I'm not so sure about neck

8    injuries.  Brain injuries.

9    MR. TEDDER:  Do you know much -- Without giving us

10   any answers, have you heard much through your employment

11   about the theory of shaken baby?

12   PROSPECTIVE JUROR MARTIN:  Not from employment.

13   MR. TEDDER:  Through other sources?

14   PROSPECTIVE JUROR MARTIN:  Reading.

15   MR. TEDDER:  Reading?

16   PROSPECTIVE JUROR MARTIN:  Reading.

17   MR. TEDDER:  If you're asked to serve on this jury

18   would you be willing to keep an open mind regarding that

19   theory and listen to other points of view on it?

20   PROSPECTIVE JUROR MARTIN:  Sure.  Sure.

21   MR. TEDDER:  Now, I heard some talking earlier about

22   the state attorney regarding spanking and corporal

23   punishment.  And would you folks agree that children can

24   bruise fairly easily?  Would anyone disagree with that?

25   THE PROSPECTIVE JURORS:  (Shake heads.)

 1          MR. TEDDER:   Dr. Abbitt, do you have an opinion on

 2    that?

 3          PROSPECTIVE JUROR ABBITT:   That children can bruise

 4    easily?

 5          MR. TEDDER:   Yes, ma'am.

 6          PROSPECTIVE JUROR ABBITT:   Sure.

 7          MR. TEDDER:   Has anybody done something to a child

 8    that they were surprised to later learn that a bruise had

 9    arisen?  And I asked -- One of my sons years ago, an older

10    brother said I needed to discipline him more and he

11    suggested spanking him.  So I tried it and I spanked him

12    one time.  I don't recall how old he was.  And over his

13    jeans, over obviously his underpants.  Later that night

14    when he was being given a bath he had marks on his bottom

15    which later bruised, and I'm talking open palm on his

16    jeans.  And I certainly wasn't striking him anywhere near

17    as much strength as I had.

18          Has anybody had a similar experience with that, with

19    causing bruising, or am I the only person that has done

20    something that bad?  Nobody had any experiences like that?

21    Okay.

22          Obviously this Wednesday is the one-year anniversary

23    of the terrorist attack on our country.  I did not

24    personally know anyone who perished in those attacks, but

25    I did know people -- one prosecutor I knew in particular

```
1     who had a brother who was killed in the attack.
2          Any of you folks know anyone who was killed that day?
3          THE PROSPECTIVE JURORS:  (Shake heads.)
4          MR. TEDDER:  Anybody?  No.
5          Okay.  Any of you have any friends or family members
6     who may have known someone that perished that day?
7          THE PROSPECTIVE JURORS:  (Shake heads.)
8          MR. TEDDER:  Are any of y'all going to have a problem
9     if you're asked to serve on this jury on September 11th,
10    this Wednesday?
11         THE PROSPECTIVE JURORS:  (Shake heads.)
12         MR. TEDDER:  Anybody have any special plans, that
13    they were going to go to some sort of memorial service or
14    something like that?  No?
15         THE PROSPECTIVE JURORS:  (No audible response.)
16         MR. TEDDER:  Now, this case -- Okay.  We anticipate
17    during the trial of this case that there are going to be
18    some photographs introduced into evidence that are fairly
19    graphic.  Okay?  Without describing what they are, I
20    remember one of the most graphic photographs I ever saw
21    was of a -- and I'm sure some of you folks remember it, if
22    not all of you -- of a little girl during the Vietnam War
23    who was running down a road naked, who had been the victim
24    of a napalm I think attack.  I'm not sure.  But it was a
25    horrible photograph.  And another one I remember from the
```

1  Vietnam War was one of the South Vietnamese soldiers

2  shooting a suspected Vietnam person in the side of the

3  head.  Just graphic photographs.

4      What is the most troubling photograph that anyone of

5  you folks can recall?  Mr. Ramsey, does any come to mind

6  for you?

7      PROSPECTIVE JUROR RAMSEY:  Same Life Magazine cover

8  you are talking about was the most troubling one.  Some of

9  that era.

10      MR. TEDDER:  All right.  Ms. Martin, do any

11  photographs come to your mind in your experience?

12      PROSPECTIVE JUROR MARTIN:  Not off top of my head.

13      MR. TEDDER:  Your husband ever bring home any

14  photographs?

15      PROSPECTIVE JUROR MARTIN:  (Shakes head.)

16      MR. TEDDER:  Mr. Heileman, how about you, sir?

17      PROSPECTIVE JUROR HEILEMAN:  Time, Life, the Jim

18  Jones massacrer.

19      MR. TEDDER:  The what masker?

20      PROSPECTIVE JUROR HEILEMAN:  Jim Jones.

21      (Indiscernible.)

22      MR. TEDDER:  How about you, Ms. Currier, anything

23  come to your mind?

24      PROSPECTIVE JUROR CURRIER:  I can't really think of

25  anything.  I'm not really disturbed by graphic --

1    obviously, if it's, I don't know, something -- I'm not

2    terribly bothered by photos.  In athletic training, they

3    sawed off things, you look at a lot of photos to see what

4    types of fracture it was.  So I've kind of grown

5    accustomed to it and don't seem to take it personally.

6           MR. TEDDER:  Okay.  Mr. Ezzell, what about you, sir?

7           PROSPECTIVE JUROR EZZELL:  I'm aware of all of the

8    photos you mentioned.  I mean, not that I approve of them,

9    certainly, but I'm okay.

10          MR. TEDDER:  When they depict a fact it's usually --

11   sometimes the photographs can be a trick, but we're

12   talking about real photographs.

13          Ms. Young, how about you, ma'am, do you recall any

14   troubling photographs in your life?

15          PROSPECTIVE JUROR YOUNG:  Just mainly the ones you

16   mentioned.  There are so many nowadays that I can't think

17   of one specific.

18          MR. TEDDER:  Anybody else on the rest of the panel

19   think of any photographs in particular?  Mr. Baxter?

20          PROSPECTIVE JUROR BAXTER:  Danny Rolling's murders in

21   Gainesville, worst -- beyond imagination.

22          MR. TEDDER:  All right.  Okay.  You didn't actually

23   see those crime scene photographs, sir, did you?

24          PROSPECTIVE JUROR BAXTER:  Yes, I did.

25          MR. TEDDER:  Did you serve on that?

```
 1              PROSPECTIVE JUROR BAXTER:  No, I did not, but I did

 2       see some of the photographs.

 3              MR. TEDDER:  Okay.  Ms. Roberts, how about you,

 4       ma'am, do you recall anything?

 5              PROSPECTIVE JUROR ROBERTS:  None come to mind.

 6              MR. TEDDER:  Ms. Walker, how about you?

 7              PROSPECTIVE JUROR WALKER:  No.

 8              MR. TEDDER:  Mr. McMahon, anything come to mind for

 9       you?

10              PROSPECTIVE JUROR McMAHON:  Nothing exceptionally

11       troubling.

12              MR. TEDDER:  All right.  Well, the reason I'm asking

13       you folks this is because there are going to be some

14       photographs in this case that, quite frankly, were

15       somewhat troubling -- are troubling.  And those of you who

16       are asked to serve are going to be shown those

17       photographs.

18              So my question is, if you are asked to serve, and

19       when you see those photographs, can you set aside your

20       emotional reaction in reaching a verdict in this case?

21              You aren't going to hear Judge Lott say as part of

22       this case that if you saw a photograph that was upsetting

23       to you that she should lower the burden of proof you would

24       expect from the state.

25              Can each of you hold the state to the burden that
```

1    they're required to prove, regardless of these photographs

2    and how they may make you feel on a instinctual level?

3         Ms. Walker, can you do that?

4         PROSPECTIVE JUROR WALKER:  Uh-huh.

5         MR. TEDDER:  Why do you believe you can do that?

6         PROSPECTIVE JUROR WALKER:  I just think I'll listen

7    more to the facts than looking at the photographs.

8         MR. TEDDER:  Okay.  How about you, Ms. Roberts, do

9    you think you can do that?

10        PROSPECTIVE JUROR ROBERTS:  Yes, sir.

11        MR. TEDDER:  Why do you feel you can do it?

12        PROSPECTIVE JUROR ROBERTS:  I don't know.  Pretty

13   much for the same reason, just facts are facts.

14   Everything has to be taken into consideration.

15        MR. TEDDER:  All right.  Mr. McMahon, how about you,

16   sir?

17        PROSPECTIVE JUROR McMAHON:  It's just one piece of

18   the puzzle.  Trying to determine about the whole -- the

19   whole process, it's just one part of it.

20        MR. TEDDER:  All right.  And, Dr. Abbitt, I'm sure

21   you would be able to do that probably.

22        PROSPECTIVE JUROR ABBITT:  I would hope so.  Yes.

23        MR. TEDDER:  Mr. Hudson, how about you, sir, you

24   think you would allow photographs -- disturbing

25   photographs to hurt you?

```
 1          PROSPECTIVE JUROR HUDSON:  I think I would.

 2          MR. TEDDER:  You think you would or would not?

 3          PROSPECTIVE JUROR HUDSON:  I think I'm old enough.

 4          MR. TEDDER:  You think you're old enough to handle

 5     that?

 6          PROSPECTIVE JUROR HUDSON:  (Nods head.)

 7          MR. TEDDER:  Mr. Baxter, how do you feel about it,

 8     sir?

 9          PROSPECTIVE JUROR BAXTER:  I can handle it.  I mean,

10     photographs does not make someone guilty or innocent.

11          MR. TEDDER:  That's right.

12          PROSPECTIVE JUROR BAXTER:  Facts make them -- facts

13     make them guilty or innocent, not a photograph.

14          MR. TEDDER:  Okay.  Mr. Clark, how about you, sir?

15          PROSPECTIVE JUROR CLARK:  Absolutely no problem at

16     all.

17          MR. TEDDER:  No problem at all?

18          PROSPECTIVE JUROR CLARK:  No problem at all.

19          MR. TEDDER:  Ms. Moran, how about you?

20          PROSPECTIVE JUROR MORAN:  No problem.

21          MR. TEDDER:  No problem at all?

22          PROSPECTIVE JUROR MORAN:  Huh-uh.

23          MR. TEDDER:  Why do you feel that way?

24          PROSPECTIVE JUROR MORAN:  I feel like it's the whole

25     premise as to why we're here.
```

```
 1              MR. TEDDER:  Ms. Escalante, how do you feel about

 2        that?

 3              PROSPECTIVE JUROR YOUNG:  No problem.

 4              MR. TEDDER:  No problem?

 5              PROSPECTIVE JUROR ESCALANTE:  No.

 6              MR. TEDDER:  Ms. --

 7              PROSPECTIVE JUROR WADE-LITTRUP:  You can just say

 8        Wade.  Wade is good.

 9              MR. TEDDER:  Ms. Wade?

10              PROSPECTIVE JUROR WADE-LITTRUP:  Easy.

11              I really can't tell you honestly because I haven't

12        been in that situation.

13              I will tell you I have a semi-photographic memory, so

14        I might have a problem.  That's why when I explained that

15        I would easily be able to divide the differences from what

16        I read and what I hear, is because I remember what I read

17        very well.  I have a good visual memory.

18              So I honestly don't know.  I haven't been in that

19        situation and I can't tell you.

20              MR. TEDDER:  Okay.  That's fair enough.

21              Mr. Ezzell, how about you?

22              PROSPECTIVE JUROR EZZELL:  I think that's a pretty

23        logical answer.  I've never -- probably never seen such.

24        Certainly I hope I can handle that.

25              I understand the process and I understand the process
```

```
 1        is a chance to go through the court system and the rights,

 2        the wrong, and all that kind of thing.  I make my own

 3        determination.  As far as graphic picture, does it shock

 4        me?  It could.

 5            MR. TEDDER:  You think it could cause you to lower

 6        the burden you would expect from the state or not?

 7            In other words, everybody is asked to serve and the

 8        judge is going to tell you the government has the absolute

 9        duty to prove its case beyond a reasonable doubt, and that

10        the defense is not required to prove anything.

11            And so my question is, do you think there's any

12        possibility that these photographs might upset you so much

13        that it would cause you to lower what you would expect the

14        government to have to prove or that you would give them a

15        break on their evidentiary part of the case?

16            PROSPECTIVE JUROR EZZELL:  No, sir.

17            MR. TEDDER:  All right.  Ms. Young, how about you,

18        ma'am?

19            PROSPECTIVER JUROR YOUNG:  I think I can separate a

20        photo from the facts that are presented.

21            MR. TEDDER:  All right.  Ms. Martin, how about you?

22            PROSPECTIVE JUROR MARTIN:  I think it would be

23        difficult for me to see photos of an infant harmed, but it

24        would not sway me one way or another.  I just feel like I

25        would have to determine it to make sure of the things that
```

```
 1        I do (indiscernible).

 2            MR. GROLAND:  Your Honor, may I go up to him?

 3            THE COURT:  Yes.

 4            (Brief pause.)

 5            MR. TEDDER:  And Ms. Currier?

 6            PROSPECTIVE JUROR CURRIER:  Same thing.  I think I

 7    could separate and make my own judgment.

 8            MR. TEDDER:  Mr. Heileman, how about you, sir?

 9            PROSPECTIVE JUROR HEILEMAN:  No problem.  Same way I

10    guess everybody else said.

11            MR. TEDDER:  And, Mr. Ramsey, how about you?

12            PROSPECTIVE JUROR RAMSEY:  Like she was saying, I

13    don't know how the pictures will affect me but

14    (indiscernible) --

15            MR. TEDDER:  The photographs that I'm referring to

16    basically are autopsy photographs.  The people that are

17    asked to serve will see a picture of the baby deceased,

18    and then some other photographs during portion of the

19    autopsy.  That's the graphic nature of them.  I'm sure

20    Dr. Abbitt has -- Have you ever witnessed an autopsy

21    yourself?

22            PROSPECTIVE JUROR ABBITT:  I have.

23            MR. TEDDER:  Have any of the rest of you, by any

24    chance, witnessed an autopsy?  I know several of you have

25    worked at Shands before.
```

1           THE PROSPECTIVE JURORS:   (Shake heads.)

2           MR. TEDDER:  No?

3           In other words, the photographs that you're -- that

4    you will be seeing are not photographs showing him having

5    been allegedly hurt or mishandled in this case, but the

6    after effect of his death.  Okay?

7           And the next area that I want to talk about goes

8    hand-in-hand with what I was just talking about, and that

9    is basically the emotional impact.

10          What you've got here is, those of you who are asked

11   to serve, what you have is you have a child who passed

12   away when he was four-and-a-half months old.  Obviously,

13   it's a horrible thing that he died at such a young age.  A

14   horrible thing.  Nothing can change that.  Robbie Quirello

15   is dead.  He's dead.  There's nothing that can change

16   that.  We all feel bad about it.  Mr. Herlihy feels

17   terrible about it.  Everybody involved feels terrible

18   about it.

19          Do each of you think you can set aside your emotions

20   of the fact the baby is dead in deciding this case?  Do

21   any of you think that might be a problem?  Anybody?  Raise

22   your hand if you do.

23          Mr. Ramsey, do you think that will be a problem?

24          PROSPECTIVE JUROR RAMSEY:  (Shakes head.)

25          MR. TEDDER:  Mr. Heileman?

```
 1              PROSPECTIVE JUROR HEILEMAN:  (Shakes head.)

 2         MR. TEDDER:  Ms. Currier?  Ms. Martin?

 3         THE PROSPECTIVE JURORS:  (Nod heads.)

 4         MR. TEDDER:  You're shaking your head yes?

 5         PROSPECTIVE JUROR MARTIN:  No, I don't have a

 6    problem.

 7         MR. TEDDER:  Mr. Ezzell, you think that would be any

 8    sort of a problem for you?

 9         PROSPECTIVE JUROR EZZELL:  No.

10         MR. TEDDER:  Ms. Young, you think that would cause

11    you any problems?

12         PROSPECTIVER JUROR YOUNG:  I think I can handle that.

13         MR. TEDDER:  Ms. Escalante, you think that -- you

14    think you can do that?

15         PROSPECTIVE JUROR YOUNG:  I can do it.

16         MR. TEDDER:  Yes?  Why do you think you can do it?

17    You took care of young children for several years.

18         PROSPECTIVE JUROR ESCALANTE:  Yes, I did.  But I

19    think there's -- You have to weigh everything.  I believe

20    you have to listen and weigh all of the facts.  You can't

21    go just by pictures or hearsay or whatever.  You have to

22    weigh everything.

23         MR. TEDDER:  Ms. Young, you indicated you thought it

24    would be difficult but you thought you could do it?

25         PROSPECTIVER JUROR YOUNG:  I just think -- I'm sure
```

1    the pictures will be emotional, but I think I can, you

2    know, separate everything and make a fair decision.  I

3    don't know, I've never seen photos like this.

4          MR. TEDDER:  Ms. Wade, how about you?

5          PROSPECTIVE JUROR WADE-LITTRUP:  Are you talking

6    about photos now or talking about the fact that the baby

7    is dead?

8          MR. TEDDER:  Well, it's about the whole -- yeah, the

9    whole emotional fact, I mean, the baby is dead, and it's

10    an emotional thing.  Do you think you can separate out the

11    emotion from the facts in this case?

12          PROSPECTIVE JUROR WADE-LITTRUP:  Yes.

13          MR. TEDDER:  Why do you think you can do that?

14          PROSPECTIVE JUROR WADE-LITTRUP:  Because I'm very

15    good at that.

16          MR. TEDDER:  Very good at that?

17          PROSPECTIVE JUROR WADE-LITTRUP:  (Nods head.)

18          MR. TEDDER:  And, Mr. Clark, how about you, sir?

19          PROSPECTIVE JUROR CLARK:  Not a problem.

20          MR. TEDDER:  Not a problem?

21          PROSPECTIVE JUROR CLARK:  Not a problem.

22          MR. TEDDER:  Why do you not feel like it will be a

23    problem?

24          PROSPECTIVE JUROR CLARK:  Not being emotionally

25    attached to the child myself, I don't see -- not that I'm

```
 1    hard or anything.

 2         MR. TEDDER:  And, Ms. Moran, how about you, ma'am?

 3         PROSPECTIVE JUROR MORAN:  I don't think it will be a

 4    problem.  I think I can separate the emotional facts from

 5    the facts.

 6         MR. TEDDER:  Mr. Hudson, do you think you can do

 7    that?  You already indicated you think you can.

 8         PROSPECTIVE JUROR HUDSON:  Yes.

 9         MR. TEDDER:  You still think you can?

10         PROSPECTIVE JUROR HUDSON:  Yes, sir.

11         MR. TEDDER:  Mr. Baxter, how about you, sir?

12         PROSPECTIVE JUROR BAXTER:  I don't think I'll have

13    any problem.

14         MR. TEDDER:  All right.  Ms. Roberts, do you think

15    you can do that?

16         PROSPECTIVE JUROR ROBERTS:  Yes, sir.

17         MR. TEDDER:  Why do you think you can do it?

18         PROSPECTIVE JUROR ROBERTS:  That's what we're here to

19    do, so we have to separate the facts from -- I mean, it's

20    in the past.

21         MR. TEDDER:  Pardon?

22         PROSPECTIVE JUROR ROBERTS:  It's in the past, so we

23    can decide everything now.

24         MR. TEDDER:  And, Ms. Walker, how about you, ma'am?

25         PROSPECTIVE JUROR WALKER:  I can separate the emotion
```

1    from it.

2         MR. TEDDER:  Mr. McMahon, think you can do that?

3         PROSPECTIVE JUROR McMAHON:  Yes, sir.

4         MR. TEDDER:  And Dr. Abbitt?

5         PROSPECTIVE JUROR ABBITT:  I don't think that will be

6    a problem.

7         MR. TEDDER:  Would any of you feel that because

8    Robbie Quirello is dead that someone has to be responsible

9    for his death?

10        Mr. McMahon, would you feel that way?

11        PROSPECTIVE JUROR McMAHON:  No, sir.

12        MR. TEDDER:  Why not?

13        PROSPECTIVE JUROR McMAHON:  You have to hear all of

14   the facts before you can make a decision.

15        MR. TEDDER:  How about you, Doctor?

16        PROSPECTIVE JUROR ABBITT:  That somebody has to be

17   responsible for it?  No.  I mean, you know, you have

18   deaths all the time that nobody is responsible for.

19        MR. TEDDER:  Exactly.  Exactly.

20        In fact, those of you who are asked to serve, one of

21   the jury instructions you'll later hear is that you have

22   to decide whether a crime was committed and, if so, who

23   did it.

24        The first thing is whether a crime was committed.

25        Mr. Hudson, do you think -- how do you feel about

1      that?  Do you think somebody ought to be held responsible

2      just because Robbie Quirello is dead?

3           PROSPECTIVE JUROR HUDSON:  Some deaths are natural.

4           MR. TEDDER:  Some deaths are natural.  Exactly.

5           Ms. Moran, how about you, ma'am?

6           PROSPECTIVE JUROR MORAN:  I feel the same way.  I

7      don't think necessarily someone is going to be responsible

8      for every death.

9           MR. TEDDER:  Okay.  Ms. Escalante?

10          PROSPECTIVE JUROR ESCALANTE:  I feel the same way.

11          MR. TEDDER:  You agree with her?

12          PROSPECTIVE JUROR ESCALANTE:  Yes.

13          MR. TEDDER:  Ms. Young, how do you feel about that?

14          PROSPECTIVER JUROR YOUNG:  I think people are

15     responsible for a crime but not necessarily a death.

16          MR. TEDDER:  All right.  And would you be willing to

17     sort carefully through the evidence to determine whether a

18     crime even occurred?

19          PROSPECTIVER JUROR YOUNG:  Yes, sir.

20          MR. TEDDER:  Ms. Martin, how about you?

21          PROSPECTIVE JUROR MARTIN:  I agree with what she

22     said.

23          MR. TEDDER:  You think you can do that?

24          PROSPECTIVE JUROR MARTIN:  Yes.

25          MR. TEDDER:  And, Mr. Ramsey, how about you?

```
 1              PROSPECTIVE JUROR RAMSEY:  You have -- would you
 2    restate that question again?
 3              MR. TEDDER:  Yes, sir.
 4              PROSPECTIVE JUROR RAMSEY:  Because I'm confused.
 5              MR. TEDDER:  I'm sorry.  Glad you told me.
 6         The first question I guess I asked was, do you feel
 7    that because Robbie Quirello is dead that someone should
 8    be held responsible?  That's the first question.
 9              PROSPECTIVE JUROR RAMSEY:  (Nods head.)
10              MR. TEDDER:  Do you feel that someone should be held
11    responsible for that?
12              PROSPECTIVE JUROR RAMSEY:  To that question, no.
13              MR. TEDDER:  Okay.  And then the follow-up question
14    is whether you could sort through the evidence to
15    determine whether or not a crime even occurred?
16              PROSPECTIVE JUROR RAMSEY:  (Nods head.)
17              MR. TEDDER:  There's no doubt Robbie Quirello is
18    dead.  That's not a question.
19              PROSPECTIVE JUROR RAMSEY:  But you asked other
20    questions and that's the reason I asked you to repeat the
21    question.
22              MR. TEDDER:  Okay.  Mr. Heileman, how about you, sir?
23              PROSPECTIVE JUROR HEILEMAN:  Natural death happens,
24    we have to see what the facts have to say.
25              MR. TEDDER:  And, Ms. Currier, how do you feel about
```

1      that?

2           PROSPECTIVE JUROR CURRIER:  Same way.  I mean, people

3      are responsible for crimes but not for all deaths.  But

4      things do happen outside of their control.

5           MR. TEDDER:  Mr. Ezzell, how do you feel about that?

6           PROSPECTIVE JUROR EZZELL:  I have to weigh the facts.

7           MR. TEDDER:  ^And, Ms. Wade, how about you?

8           PROSPECTIVE JUROR WADE-LITTRUP:  Well, I don't think

9      simply because someone is dead means that a person has to

10     be -- has to be responsible.  It is possible that a person

11     is but it's not an imperative.

12          MR. TEDDER:  So you hold the state to its burden to

13     try to determine what actually happened here to the best

14     of your ability?

15          PROSPECTIVE JUROR WADE-LITTRUP:  (Nods head.)

16          MR. TEDDER:  Mr. Clark?

17          PROSPECTIVE JUROR CLARK:  I agree with her.

18          MR. TEDDER:  Okay.  Mr. Baxter, how about you, sir?

19          PROSPECTIVE JUROR BAXTER:  I think you got to go back

20     to prior to the death of the baby and look at the facts.

21     I mean, the baby may have just died or something else may

22     have happened, but until you get the facts you can't make

23     a decision on the death.

24          MR. TEDDER:  Okay.  And, Ms. Roberts, how about you,

25     ma'am?

```
 1        PROSPECTIVE JUROR ROBERTS:  Look at the facts.

 2        MR. TEDDER:  Look at the facts.

 3        And, Ms. Walker, how about you?

 4        PROSPECTIVE JUROR WALKER:  Well, I think natural

 5   causes would have to be proven, you know, to determine if

 6   there was a crime committed or not.

 7        MR. TEDDER:  You understand that the government has

 8   to prove a crime occurred?

 9        PROSPECTIVE JUROR WALKER:  Uh-huh.

10        MR. TEDDER:  We don't have to do anything.

11        PROSPECTIVE JUROR WALKER:  Right.

12        MR. TEDDER:  And you believe you can hold the

13   government to that burden?

14        PROSPECTIVE JUROR WALKER:  Yes.

15        PROSPECTIVE JUROR MARTIN:  Question.

16        We will be given a specific instruction as to what is

17   a crime and what constitutes --

18        MR. TEDDER:  Those that are asked to serve, Judge

19   Lott will give them some preliminary instructions and then

20   after -- the way a trial works, is those asked to serve

21   will hear preliminary instructions from her, then hear

22   opening statements from either side, if they choose to

23   give it, then you'll hear all of the evidence and lots and

24   lots of testimony, and then you'll hear arguments from

25   both sides, and then at the end of that period of time
```

1    Judge Lott will instruct those who are asked to serve on

2    exactly what the law is on this case, and at that time

3    they will be asked to go ahead and reach a verdict.

4         A general question for each of you:  Are you the kind

5    of person that expects proof or are you willing to assume

6    something may be true?

7         PROSPECTIVE JUROR ESCALANTE:  You don't assume.

8         MR. TEDDER:  You don't assume anything?

9         PROSPECTIVE JUROR ESCALANTE:  No.

10        MR. TEDDER:  Does anybody disagree?

11        PROSPECTIVE JUROR MARTIN:  If we don't hear it, all

12   we have is an assumption; right?

13        MR. TEDDER:  Well, you're going to have evidence of

14   various things --

15        PROSPECTIVE JUROR MARTIN:  Have to weigh the

16   evidence.

17        MR. TEDDER:  -- and you're going to decide what it

18   proves, if anything.  And my question is, would you expect

19   the government to be able to offer precise explanations on

20   what happened in this case to support their theory of the

21   case of what caused the death of Robbie Quirello?  Would

22   you require that?  Would you demand that?

23        THE PROSPECTIVE JURORS:  (Nod heads.)

24        MR. TEDDER:  Mr. Ramsey, would you?

25        PROSPECTIVE JUROR RAMSEY:  Yes.

1          MR. TEDDER:  Why would you feel that way?

2          PROSPECTIVE JUROR RAMSEY:  The burden of proof is

3     on -- you have to have proof something happened.  You

4     can't just assume that something happened.

5          MR. TEDDER:  Mr. Heileman, how do you feel about

6     that?

7          PROSPECTIVE JUROR HEILEMAN:  What he said, burden of

8     proof.

9          MR. TEDDER:  You will try to hold them to that?

10          PROSPECTIVE JUROR HEILEMAN:  Yes.

11          MR. TEDDER:  Ms. Currier, how about you?

12          PROSPECTIVE JUROR CURRIER:  Same thing.  You can't

13     accuse somebody of something that you don't have the proof

14     for.

15          MR. TEDDER:  And, Ms. Martin, how do you feel about

16     that?

17          PROSPECTIVE JUROR MARTIN:  Have to hear the evidence.

18          MR. TEDDER:  Any time, any crime, even the most minor

19     crimes, if the government accuses somebody of stealing a

20     stick of bubble gum, they've got to prove beyond a

21     reasonable doubt that the person did it.  It's not just a

22     piece of bubble gum, not unimportant.  They have to prove

23     it.  And I'm sure you know that, and I didn't mean to --

24          Ms. Young, would you agree with all of that?

25          PROSPECTIVER JUROR YOUNG:  Yes, sir.  I think the

```
 1          evidence needs to be there.

 2               MR. TEDDER:  And, Mr. Ezzell, do you agree with that?

 3               PROSPECTIVE JUROR EZZELL:  Yes.

 4               MR. TEDDER:  Ms. Wade, do you agree with that?

 5               PROSPECTIVE JUROR WADE-LITTRUP:  (Nods head.)

 6               MR. TEDDER:  Nodding your head yes.

 7               Mr. Clark?

 8               PROSPECTIVE JUROR CLARK:  Ditto.

 9               MR. TEDDER:  Ms. Moran, do you agree with that?

10               PROSPECTIVE JUROR MORAN:  Yes.  Yes.

11               MR. TEDDER:  And Mr. Hudson is already nodding his

12          head yes.

13               PROSPECTIVE JUROR HUDSON:  (Nods head.)

14               MR. TEDDER:  Mr. Baxter?

15               PROSPECTIVE JUROR BAXTER:  Innocent until proven

16          guilty.

17               MR. TEDDER:  Innocent until proven guilty.  That's my

18          favorite phrase.

19               Ms. Roberts, how about you?

20               PROSPECTIVE JUROR ROBERTS:  Yes, I do agree.

21               MR. TEDDER:  Ms. Walker?

22               PROSPECTIVE JUROR WALKER:  Yes.

23               MR. TEDDER:  Mr. McMahon?

24               PROSPECTIVE JUROR McMAHON:  Yes, sir.

25               MR. TEDDER:  And, Doctor?
```

```
 1          PROSPECTIVE JUROR ABBITT:  Yes.

 2          MR. TEDDER:  Now, as you folks have heard, there are

 3     a number of various doctors who are going to testify in

 4     this case, about a dozen are from this area.  One is a

 5     doctor who now works and lives in Missouri and two -- one

 6     is flying in from Minnesota, one coming in from Virginia,

 7     another coming up from south Florida, Miami I believe it

 8     is.  A lot of medical testimony is going to be presented

 9     in this case.  A lot of medical testimony.  And the

10     defense -- We are bringing in two people that -- as well

11     as a couple of others that we're bringing in, and one of

12     the witnesses that we're bringing in is a neurosurgeon,

13     and he's going to be paid to come down here and testify.

14     He's taking time away from his practice --

15          THE COURT:  Mr. Tedder, don't get too much into the

16     facts of this case.

17          MR. TEDDER:  Yes, ma'am.

18          THE COURT:  Use hypotheticals.

19          MR. TEDDER:  Basically what I'm trying get into is,

20     would you think that because a witness is an expert, is

21     being paid to come and offer his testimony, that their

22     testimony is not as credible as someone else?  Any of you

23     feel that way?

24          Mr. Heileman, would you feel that way?

25          PROSPECTIVE JUROR HEILEMAN:  No, sir.
```

1        MR. TEDDER:  Why not?

2        PROSPECTIVE JUROR HEILEMAN:  Listen to what he's

3   saying, you know, whether it be rebutted or not, judge his

4   credibility.

5        MR. TEDDER:  Ms. Currier, how about you, how do you

6   feel about that?

7        PROSPECTIVE JUROR CURRIER:  I don't believe whether

8   he's being paid or not means he's credible whether or not

9   he's paid.

10        MR. TEDDER:  How about you, Mr. Ezzell, cause you a

11   problem?

12        PROSPECTIVE JUROR EZZELL:  I'd have to look him in

13   the eye and see, to be honest with you.

14        MR. TEDDER:  Well, if you get an opportunity to serve

15   on this jury, you will get that chance.

16        PROSPECTIVE JUROR EZZELL:  Yes, sir.

17        MR. TEDDER:  Because they will be here in person.

18        Ms. Wade, how do you feel about it?

19        PROSPECTIVE JUROR WADE-LITTRUP:  Well, I don't

20   imagine that being paid or not being paid is the point as

21   to credibility of a witness.

22        MR. TEDDER:  Each witness is sworn to tell the truth

23   regardless of what their status is in the case, and each

24   is subject to cross examination by the other side to try

25   and undermine or destroy their credibility, and those who

1    are asked to serve are going to have to listen to

2    witnesses and decide that finding.

3         Mr. Clark, would it cause you any problems if someone

4    has been paid?

5         PROSPECTIVE JUROR CLARK:  No.  Not at all.

6         MR. TEDDER:  Mr. Baxter?

7         PROSPECTIVE JUROR BAXTER:  No, I don't think it's a

8    problem.

9         MR. TEDDER:  Ms. Roberts, how about you?

10        PROSPECTIVE JUROR ROBERTS:  No problem.

11        MR. TEDDER:  No problem.

12        Ms. Walker, how about you?

13        PROSPECTIVE JUROR WALKER:  No.

14        MR. TEDDER:  No?

15        Mr. McMahon?

16        PROSPECTIVE JUROR McMAHON:  No, sir.

17        MR. TEDDER:  Dr. Abbitt?

18        PROSPECTIVE JUROR ABBITT:  Well, basically we look

19   forward to experts telling us, you know, their side of the

20   story.  And if you're bringing somebody from Missouri, you

21   better be paying him to come across the country, you know.

22        MR. TEDDER:  Mr. Hudson, how about you, sir, would it

23   cause you any source of problem?

24        PROSPECTIVE JUROR HUDSON:  It wouldn't be a problem

25   because if I feel like if you want the truth and you want

```
 1        to know the truth, paid or no paid, you get the truth.

 2              MR. TEDDER:  Ms. Moran, how would you feel about it?

 3              PROSPECTIVE JUROR MORAN:  I don't think it's going to

 4        cause me any problem.

 5              MR. TEDDER:  Ms. Escalante?

 6              PROSPECTIVE JUROR ESCALANTE:  No, no problems.

 7              MR. TEDDER:  Ms. Young, any problems for you?

 8              PROSPECTIVER JUROR YOUNG:  No problem.

 9              MR. TEDDER:  Ms. Martin, how about you?

10              PROSPECTIVE JUROR MARTIN:  No problem.

11              MR. TEDDER:  Okay.  Mr. Ramsey is shaking his head

12        no.

13              All right.

14              THE COURT:  All right.  We're going to take a recess

15        right now, Mr. Tedder, for 15 minutes.

16              Now, I need to give y'all some instructions.  Because

17        this panel has to come right back into this seat, I'm

18        going to ask that those of you who are remaining go down

19        the elevators to the bathrooms on the first, second and

20        third floors, and let this panel have these bathrooms so

21        that they can get back and begin.

22              I'm going to ask the attorneys and staff to go down

23        to my office and that will give you all some place to go

24        for your 15 minutes, and then court staff personnel can

25        take care of that separately.
```

1          So if you will let this panel get out the door first,

2     then you all can take a recess for 15 minutes and come

3     right back where you are.

4          (Recess at 3:05 pm.)

5                         - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Betty Sue Vincent, RDR
Certified Realtime Reporter
Director - Court Reporting Department   0003105

```
 1                    C E R T I F I C A T E

 2    STATE OF FLORIDA   )

 3    COUNTY OF ALACHUA )

 4              I do hereby certify that I was authorized to and did

 5    stenographically report the foregoing proceedings and that the

 6    transcript, pages 1 through 172, is a true and correct record

 7    of my stenographic notes.

 8              Dated this 18th day of November, A. D., 2003.

 9

10

11

12

13

14

15

16                     Betty Sue Vincent

17                     SENIOR MANAGING COURT REPORTER
                       Certified Realtime Reporter
18                     Registered Diplomate Reporter

19

20

21

22

23

24

25
```