# EXHIBIT
# DD

*202-1-17814*

*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY
    Appellant

v.

STATE OF FLORIDA
    Appellee

Dock— *CA*
*11-24-2003*
Florida Attorney
General

CASE NO.    2000-CF-2753-A
APPEAL NO. 1D02-4788
VOLUME XXX

# TRANSCRIPT
# RECORD

### HONORABLE MARTHA ANN LOTT
TRIAL JUDGE

**APPEAL FROM THE CIRCUIT COURT**
**8th JUDICIAL CIRCUIT FOR**
**ALACHUA COUNTY, FLORIDA**

2003 NOV 21  PM 4: 34

**FOR APPELLANT**
NADA M. CAREY
ASSISTANT PUBLIC DEFENDER
LEON COUNTY COURTHOUSE
APPEALS DIVISION – 4TH FLOOR
301 SOUTH MONROE
TALLAHASSEE, FLORIDA 32301

**FOR APPELLEE**
HONORABLE CHARLIE CRIST
ATTORNEY GENERAL'S OFFICE
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

COPY

202-1-17814

F

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN AND FOR
ALACHUA COUNTY, FLORIDA   Volume XXX

CASE NO. 01-2000-CF-0002753-A   1002-4788

TRANSCRIPT ON APPEAL

JURY SELECTION

VOLUME II, PAGES 173 to 375

STATE OF FLORIDA,

          Plaintiff,

vs

BRIAN HERLIHY,

          Defendant.

Docket
11-24-2003
Florida Attorney
General

| | |
|---|---|
| PROCEEDINGS: | JURY SELECTION |
| DATE: | September 9, 2002 |
| PLACE: | Alachua County Courthouse Gainesville, Florida |
| TIME: | 2:00 p.m. |
| REPORTER: | STACEY BRYANT Registered Professional Reporter Eighth Judicial Circuit |

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

APPEARANCES:


THE HON. WILLIAM P. CERVONE, STATE ATTORNEY,
Eighth Judicial Circuit of Florida, by:
JEANNE SINGER, ESQUIRE, and
STEPHEN PENNYPACKER, ESQUIRE
ASSISTANT STATE ATTORNEYS
Post Office Box 1437,
Starke, Florida  32601,


Attorneys for the State of Florida


JOHN TEDDER, ESQUIRE and
GORDON GROLAND, ESQUIRE,
Conflict Attorneys
P.O. BOX 2848,
Gainesville, Florida  32602,


Attorneys for the Defendant.


- - - - -


I N D E X

WITNESS        DIRECT  CROSS   REDIRECT      RECROSS

- NONE CALLED -



E X H I B I T S

EXHIBIT NO.          IDENTIFIED      RECEIVED

- NONE MARKED -


Scopist's Certificate                                375

1      THE COURT:  Any of you who have to pick up

2  children at 5 o'clock, if you will write your name,

3  your number, and where you have to pick the children up

4  from, on a piece of paper and give that to Ms. O'Neal,

5  circulate -- Ms. O'Neal is right here, she'll circulate

6  and if you'll let her know your name, your number, and

7  where you have to pick your children up, we'll make

8  sure that we don't have any children standing on the

9  sidewalks waiting for anyone.

10      Now, Mr. Tedder, you can continue.

11      MR. TEDDER:  Thank you, Your Honor.

12      Before, ladies and gentlemen of the jury panel,

13  before we just had a recess, we were talking about

14  witnesses, medical witnesses specifically.  And as I

15  indicated, there are a number of witnesses which the

16  state will call.  We're going to call two or three

17  ourselves.

18      You're not -- the judge is going to ask you to

19  judge each witness on his or her own credibility and

20  put it all together and make your decision based on the

21  law, based on the facts, based on what you've heard as

22  to what the verdict should be in this case.

23      Do any of you think that you could fall into the

24  trap of making a decision based on the number of

25  witnesses that one side or the other presented?  Does

1    anybody feel that's a way to make a decision in a case

2    like this?

3        Everybody is shaking their heads.  Anybody

4    disagree with that?

5        Now, I know doctors are under a tremendous amount

6    of pressure to treat people, to diagnosis things, and

7    try and figure out exactly what's going on with

8    someone.  They have a very difficult job.  But

9    sometimes a doctor looks at something, makes a decision

10   based on what they believe they see, and it just isn't

11   what they thought it was.

12       Has anybody had a personal experience like that?

13   Anybody you can think of?  Well, Dr. Abbitt is nodding

14   her head yes.  I won't ask for any examples from you.

15       I can give you a couple of personal examples.  I

16   mean, it's not the easiest thing to talk about.  But

17   when I was a child...

18       THE COURT:  Mr. Tedder, don't be testifying.  You

19   need to be asking questions.

20       MR. TEDDER:  I was just trying to give an example,

21   Your Honor.

22       THE COURT:  Get your examples from your venire.

23       MR. TEDDER:  Okay.  Does anybody have any personal

24   experience with a doctor telling you one thing?

25       Ms. Martin, you have.

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

```
 1              PROSPECTIVE JUROR MARTIN:  Not personally.

 2              MR. TEDDER:  OKAY.  Well, anything you know about?

 3         What do you know about?

 4              PROSPECTIVE JUROR MARTIN:  Well, I was watching a

 5         T.V. show.

 6              MR. TEDDER:  Pardon me?

 7              PROSPECTIVE JUROR MARTIN:  I was watching a T.V.

 8         show.

 9              MR. TEDDER:  T.V. show?  Okay.

10              All right.  Ms. Escalante?

11              PROSPECTIVE JUROR ESCALANTE:  One of my children

12         when they were very young had a fever and I kept taking

13         the fever and, you know, every couple hours, checking

14         on it, and the fever wouldn't go down.  I called the

15         mother.  They took the baby to the doctor and said

16         there was nothing with it and brought the baby back

17         again.  And the same -- and I watched the child again

18         the next day, and the same thing happened.  And I told

19         the mother the doctor was wrong; there's something

20         wrong with the child.

21              Come to find out it had the, what is it on the

22         brain?

23              MR. TEDDER:  Meningitis?

24              PROSPECTIVE JUROR ESCALANTE:  Yeah, meningitis,

25         you know?  But it took a couple of times to go to the
```

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

```
1    doctor to find this.

2          MR. TEDDER:  Anybody else have any other

3    experience?

4          Mr. Clark?

5          PROSPECTIVE JUROR CLARK:  My wife was screaming

6    about abdominal pain when we were in Orlando, to the

7    point she couldn't stand up.  She was screaming.

8    Jumped in the car, took her to the emergency room, got

9    her seen by the doctors.  They numbed her up, told me

10   to take her home, she's got gas.  The next day we

11   rushed her to the hospital again to the emergency room

12   for emergency surgery.  She had strangulated bowel.

13   Almost died.

14         MR. TEDDER:  Oh, my.  Anybody else have any

15   personal experiences?

16         Ms. Currier?

17         PROSPECTIVE JUROR CURRIER:  My mom was told she

18   had to have surgery.  She had some fluid in her lungs

19   and she had some broken ribs.  And they said it was the

20   only option.  And then they x-rayed it the day before

21   her surgery and called us an hour before surgery and

22   said she didn't need it after all.  That worked out to

23   the better side.

24         MR. TEDDER:  Yeah.  Anybody else have any personal

25   experiences?
```

Stacey K. Bryant, RPR
Judicial Court Reporter

0003112

1          With all due respect to you there, Dr. Abbitt,

2     this is not an attack on the medical professional.

3     This is a very difficult position to be in.  It's a

4     very difficult job.

5          Would everyone agree that medicine, like other

6     sciences, continues to evolve and change over time?

7          PROSPECTIVE JURORS:  Yes.

8          MR. TEDDER:  For example, there are some placeS in

9     the world they still use leeches to bleed people, use

10    maggots to clean wounds, te same things that used to be

11    done in this country.  Everybody agree with that notion

12    that things do change over time, what medicine believes

13    is true today may be held to be false tomorrow?  In

14    this case, of course, the state's theory of the case is

15    shaken baby syndrome.  Ms. Wade, correct me if I'm

16    wrong, but did you raise your hand when Judge Lott

17    asked if you knew anything about that?

18         PROSPECTIVE JUROR WADE:  No.  I asked her to

19    clarify what they had said.  She asked if anyone had

20    specialized knowledge.

21         MR. TEDDER:  Did anybody on the panel raise their

22    hand when Judge Lott asked that general question about

23    whether you had any knowledge of shaken baby?  Okay.

24         Has everyone, has anyone on the panel heard about

25    it?  I know Ms. Martin mentioned something about it.

```
 1    Has anyone else heard about this theory known as shaken
 2    baby?
 3         PROSPECTIVE JURORS:  We've heard about it.
 4         MR. TEDDER:  Do you believe it to be true or are
 5    you willing to keep an open mind?  How much knowledge
 6    do you think you have regarding it?
 7         Mr. Heileman, do you think you know very much
 8    about it?
 9         PROSPECTIVE JUROR HEILEMAN:  I only know the
10    facts.
11         MR. TEDDER:  Have you read about it or studied it
12    in any way?
13         PROSPECTIVE JUROR HEILEMAN:  (Shakes head.)
14         MR. TEDDER:  What about you Mr. Ramsey?
15         PROSPECTIVE JUROR RAMSEY:  I have no knowledge of
16    it, other than hearing of the name.
17         MR. TEDDER:  You've heard of it.  Okay.
18         Ms. Martin, did you have any special knowledge
19    regarding it?
20         PROSPECTIVE JUROR MARTIN:  No.  I didn't realize
21    there was theory on it.
22         MR. TEDDER:  Have you done any studying on it?
23         PROSPECTIVE JUROR MARTIN:  No.
24         MR. TEDDER:  Ms. Currier, how about you?
25         PROSPECTIVE JUROR CURRIER:  I know about things of
```

1    that but regarding training, nothing in particular.

2         MR. TEDDER:  Mr. Ezzell, how about you, sir?

3         PROSPECTIVE JUROR EZZELL:  No, only paper, or

4    articles in the paper, in the newspaper, people who are

5    accused of these type things.

6         MR. TEDDER:  Okay.  Ms. Shawn, do you have any

7    knowledge of it?

8         PROSPECTIVE JUROR SHAWN:  Just what I read in the

9    paper and, generally speaking, I think it's harmful to

10   shake a baby; yes, I believe that.

11        MR. TEDDER:  Ms. Escalante, what have you heard

12   about it, how much do you know about?

13        PROSPECTIVE JUROR ESCALANTE:  I don't know nothing

14   about it.  I hear about it.  I don't know about it.

15        MR. TEDDER:  Ms. Wade, how about you, have you

16   heard much about it?

17        PROSPECTIVE JUROR WADE:  I've heard about it.  I

18   have general knowledge.  I don't have any specialized

19   knowledge.

20        MR. TEDDER:  Mr. Clark, how about you?

21        PROSPECTIVE JUROR CLARK:  I've heard the term

22   before.  That's the extent of my knowledge of it.

23        MR. TEDDER:  Ms. Moran, how about you?

24        PROSPECTIVE JUROR MORAN:  Just read about it in

25   the newspaper.

1        MR. TEDDER:  Mr. Hudson, how about you, sir?

2        PROSPECTIVE JUROR HUDSON:  Just heard about it.

3        MR. TEDDER:  Heard about it?

4        And Mr. Baxter?

5        PROSPECTIVE JUROR BAXTER:  Common sense says you

6    can't shake something that delicate.  You don't have to

7    be a brain surgeon at the time.

8        MR. TEDDER:  Would you be open to what, to what

9    people testify to as far as what would happen if

10   something like that were to happen, as far as the

11   physiological things?

12       PROSPECTIVE JUROR BAXTER: Oh, definitely.

13       MR. TEDDER:  Ms. Roberts, have you heard much

14   about it?

15       PROSPECTIVE JUROR ROBERTS:  Not very much, other

16   than in the newspaper.

17       MR. TEDDER:  And Dr. Abbitt, I'm sure you've heard

18   of various things about it, I'm sure.

19       PROSPECTIVE JUROR ABBITT:  (Nodding.)

20       Mr. McMahan?

21       PROSPECTIVE JUROR McMAHAN:  Heard about it.  No

22   knowledge of it.

23       MR. TEDDER:  Ms. Walker, what about you?

24       PROSPECTIVE JUROR WALKER:  I have no special

25   knowledge of it.

1        MR. TEDDER:  All right.  Can each of you keep an

2    open mind regarding what actually would happen if

3    someone were to do what Mr. Herlihy is accused of?  In

4    other words, would any of you just assume what would

5    happen, or are each of you gonna keep an open mind as

6    to what would, or would not happen, if someone did

7    something like, what he's accused of?  Everybody do

8    that?

9        Mr. McMahan, can you do that?

10        PROSPECTIVE JUROR MCMAHAN:  Yes, sir.

11        MR. TEDDER:  Ms. Walker, can you do that?

12        PROSPECTIVE JUROR WALKER:  Yes.

13        MR. TEDDER:  Ms. Roberts?  And you, Dr. Abbitt, do

14    you think you can?

15        PROSPECTIVE JUROR ABBITT:  I'm not sure I

16    understand what you're asking me.

17        MR. TEDDER:  I guess what I should say, without

18    giving me your opinion, do you have -- well, I'm not

19    gonna touch that.

20        Mr. Hudson, would you be willing to keep an open

21    mind regarding it?

22        PROSPECTIVE JUROR HUDSON:  Of course.

23        MR. TEDDER:  Be able to listen to everybody, both

24    sides of the issue?  Okay.

25        Mr. Baxter, would you be willing to listen to both

1      sides of it?

2              PROSPECTIVE JUROR BAXTER:  Yeah.

3              MR. TEDDER:  Keep an open mind?  Okay.

4      And how about you, Mr. Clark, can you do that?

5              PROSPECTIVE JUROR CLARK:  Yes, sir.

6              MR. TEDDER:  Ms. Moran, can you do that?

7              PROSPECTIVE JUROR CLARK:  (Shakes head.)

8              MR. TEDDER:  Ms. Escalante, do you think you can

9      do that, keep an open mind, listen to both sides?

10             PROSPECTIVE JUROR ESCALANTE:  Yes, because you can

11     never assume anything.  You have to listen to

12     everything.

13             MR. TEDDER:  Ms. Wade, how about you, can you do

14     that, do you think?

15             PROSPECTIVE JUROR WADE:  (Nodding.)

16             MR. TEDDER:  Yes.  Mr. Ezzell, can you do that,

17     you think?

18             PROSPECTIVE JUROR EZZELL:  Yes.

19             MR. TEDDER:  Ms. Shawn, do you believe you could

20     do that?

21             PROSPECTIVE JUROR SHAWN:  Yes, sir.

22             MR. TEDDER:  Ms. Martin, do you believe you could

23     do that?

24             PROSPECTIVE JUROR MARTIN:  Yes.

25             MR. TEDDER:  Ms. Currier, can you do that?

```
1          PROSPECTIVE JUROR CURRIER:  Yeah.
2          MR. TEDDER:  Mr. Heileman, can you do that?
3          PROSPECTIVE JUROR HEILEMAN:  Yes, sir.
4          MR. TEDDER:  And Mr. Ramsey, can you do that?
5          PROSPECTIVE JUROR RAMSEY:  (Nodding.)
6          MR. TEDDER:  All right.  Mr. Tedder, let me
7     interrupt you just a minute.  We'll have to send some
8     more jurors down to another courtroom in order to keep
9     things moving in many places at once.  So Ms. O'Neal is
10    going to call some names out here or some numbers.
11    Ms. O'Neal feel free to use as much volume as you need
12    to, so everybody can hear you and then you all follow
13    Ms. O'Neal.
14         (Pause in proceedings while Ms. O'Neal callS
15    numbers.)
16         THE COURT:  Mr. Tedder, go ahead.
17         MR. TEDDER:  Thank you, Your Honor.
18         Did you get the sense those folks wanted to get
19    out of here in a hurry?  Oh, my.
20         Going back to what we were talking about, the
21    theory of the state's case -- and are you folks, those
22    of you who are asked to serve on this jury -- are you
23    willing to be educated on the physiology of a baby and
24    what happens and doesn't happen to a baby, or the body?
25         PROSPECTIVE JURORS:  Yes.
```

1          MR. TEDDER:  Are any of you all very familiar with

2     physics, with the laws of physicS?  Any of you studied

3     physics in school or have at least in high school?  I'm

4     sure Dr. Abbitt, excuse me, I'm sure she's trained in

5     physics.

6          Any of the rest of you had physics?  Ms. Moran?

7          PROSPECTIVE JUROR MORAN:  Had it in high school,

8     but...

9          MR. TEDDER:  Do you remember much about it?

10         Mr. Ezzell, do you remember much about it?

11         PROSPECTIVE JUROR EZZELL:  Not that much, but

12    every action has an opposite reaction or something like

13    that.

14         MR. TEDDER:  All right.  Every action has an

15    opposite reaction?  Force equals mass times

16    acceleration.  Basic Newtonian laws of physics.

17         Mr. Heileman, do you think there's any situation

18    in real life where the laws of physics would not apply?

19         PROSPECTIVE JUROR HEILEMAN:  No.

20         MR. TEDDER:  How about you, Mr. Ramsey, do you

21    think there's times when you can avoid the laws of

22    physics?

23         PROSPECTIVE JUROR RAMSEY:  No.

24         MR. TEDDER:  Ms. Martin, do you think you can?

25         PROSPECTIVE JUROR MARTIN:  No.  I don't know much

1      about it.

2            MR. TEDDER:  Well, if you whack your hand against

3      the wall, do you think your hand is gonna have a

4      reaction?

5            PROSPECTIVE JUROR MARTIN:  Yeah.

6            MR. TEDDER:  The wall stops your hand.

7            Ms. Currier, do you think the laws of physics can

8      be defied or ignored?

9            PROSPECTIVE JUROR CURRIER:  Not that I'm aware of.

10           MR. TEDDER:  How about you, Mr. Ezzell?

11           PROSPECTIVE JUROR EZZELL:  No, sir.

12           MR. TEDDER:  Ms. Young, would you agree that you

13     can't ignore the laws of physics?

14           PROSPECTIVE JUROR YOUNG:  I don't know how to

15     answer that.  I don't know that much about physics.

16           MR. TEDDER:  Okay.

17           Well, one of the laws of physics is if you jump

18     out of the window you're gonna go down to the ground;

19     gravity is going to pull you down.

20           PROSPECTIVE JUROR YOUNG:  Yes.

21           MR. TEDDER:  Things like that.  If I fall over,

22     I'm gonna hit the floor.

23           Ms. Escalante, do you think there are times in

24     life where the laws of physics would not apply?

25           PROSPECTIVE JUROR ESCALANTE:  I can't think of

1    any.

2         MR. TEDDER:  Ms. Wade, how about you?

3         PROSPECTIVE JUROR WADE:  I don't know, I'm sure

4    they repealed the helmet law, but they did not repeal

5    the law of physics, so you ought to wear a helmet.

6         MR. TEDDER:  Nice.  If you sing too hard, I guess

7    you can also strain your vocal cords, I guess that's

8    also kind of a law.

9         PROSPECTIVE JUROR WADE:  If you sing properly you

10   won't; theoretically one could.

11        MR. TEDDER:  I'm sure you could.

12        PROSPECTIVE JUROR CLARK:  Never.

13        MR. TEDDER:  Mr. Clark, how about you, do you

14   agree the law of physics always apply?

15        PROSPECTIVE JUROR CLARK:  I agree.

16        MR. TEDDER:  Ms. Moran, would you agree with that?

17        PROSPECTIVE JUROR MORAN:  I can't say always.  I

18   think so, but I'd hate to say always, because you don't

19   always know what will develop.

20        MR. TEDDER:  Okay.  How about you Mr. Hudson, do

21   you think the law of physics generally or apply all the

22   time, as far as you know?

23        PROSPECTIVE JUROR HUDSON:  As far as I know.

24        MR. TEDDER:  And Mr. Baxter.

25        PROSPECTIVE JUROR BAXTER:  They apply.

```
 1              MR. TEDDER:  And Ms. Roberts?

 2         PROSPECTIVE JUROR ROBERTS:  Yes, sir.

 3              MR. TEDDER:  Do you agree with that?

 4         PROSPECTIVE JUROR ROBERTS:  Yes, sir.

 5              MR. TEDDER:  Dr. Abbitt, do you agree with that?

 6         PROSPECTIVE JUROR ABBITT:  Yes, sir.

 7              MR. TEDDER:  Mr. McMahan, you agree with that?

 8         PROSPECTIVE JUROR McMAHAN:  Yes, sir.

 9              MR. TEDDER:  Ms. Walker, do you agree on that

10    notion?

11         PROSPECTIVE JUROR WALKER:  I'm not really familiar

12    with the law of physics, so, I couldn't tell you.

13              MR. TEDDER:  Are you willing to listen to someone

14    who can explain it to you the best they can?

15         PROSPECTIVE JUROR WALKER:  Oh, yeah, sure.

16              MR. TEDDER:  Dr. Abbitt, you indicated that,

17    obviously, I believe you said you were a radiologist at

18    the university or at Shands?

19         PROSPECTIVE JUROR ABBITT:  (Nodding.)

20              MR. TEDDER:  I think you indicated you know Dr.

21    Agee and Dr. Quisling; they're also radiologists there.

22         PROSPECTIVE JUROR ABBITT:  They're

23    neuroradiologists.

24              MR. TEDDER:  Neuroradiologists.  Okay.  And

25    they're well respected.  Are they well-respected?
```

1       PROSPECTIVE JUROR ABBITT:  Yes.

2       MR. TEDDER:  I think you also indicated you know

3   the resident person.

4       PROSPECTIVE JUROR ABBITT:  Dr. Boughner.

5       MR. TEDDER:  Is he well respected as far as you

6   know?

7       PROSPECTIVE JUROR ABBITT:  Yes.

8       MR. TEDDER:  And, lastly, something that applies

9   to every criminal case.  There are basically three

10  fundamental areas that apply in every criminal case

11  every time somebody is accused of a crime in this

12  country.  That is burden of proof, the right to remain

13  silent, and presumption of innocence.  Okay.  And those

14  of you who are asked to serve, you will learn later on,

15  as Judge Lott instructs you, the state, government, is

16  required to prove this case beyond a reasonable doubt,

17  and that the defendant is not required to prove

18  anything in this case.

19      Do you think that's fair to the state that they

20  have to prove their case beyond a reasonable doubt?

21  Mr. Heileman, do you think that's fair?

22      PROSPECTIVE JUROR HEILEMAN:  First amendment to

23  the constitution.

24      MR. TEDDER:  You agree with that, you don't have

25  any problem with it?

1      PROSPECTIVE JUROR HEILEMAN:  I don't have a

2   problem with it.

3      MR. TEDDER:  Mr. Ramsey, do you think that's fair

4   to the state?  Why do you think it's fair?

5      PROSPECTIVE JUROR RAMSEY:  First of all it's the

6   constitution and the law of the United States.  The

7   resources of the state fulfill the government a lot

8   more than we do.

9      MR. TEDDER:  Mrs. Martin, do you agree it's fair?

10      PROSPECTIVE JUROR MARTIN:  Yes.

11      MR. TEDDER:  Why do you think it's fair?

12      PROSPECTIVE JUROR MARTIN:  They should have.

13      MR. TEDDER:  Government has to prove its case

14   beyond a reasonable doubt before anybody can be

15   convicted of anything?

16      PROSPECTIVE JUROR MARTIN:  You're talking about

17   somebody's life.  I think that should apply.

18      MR. TEDDER:  Ms. Currier, do you think it's fair?

19      PROSPECTIVE JUROR CURRIER:  Yes.

20      MR. TEDDER:  Why do you think it's fair?

21      PROSPECTIVE JUROR CURRIER:  Same reason, it's

22   somebody's life.  It's not the government's decision.

23      MR. TEDDER:  Mr. Ezzell, do you agree with them or

24   have another reason to add as to why?

25      PROSPECTIVE JUROR EZZELL:  Just you are dealing

```
 1    with a life.
 2            MR. TEDDER:  Ms. Young, do you think it's fair
 3    that the government has to prove its case beyond a
 4    reasonable doubt or should they have a lower burden?
 5            PROSPECTIVE JUROR YOUNG:  No, they should have to
 6    prove it.
 7            MR. TEDDER:  Ms. Escalante, do you agree or
 8    disagree with that general notion?
 9            PROSPECTIVE JUROR ESCALANTE:  I agree.
10            MR. TEDDER:  Why do you agree?
11            PROSPECTIVE JUROR ESCALANTE:  Why do I agree?
12    Well...
13            MR. TEDDER:  You just do?
14            PROSPECTIVE JUROR ESCALANTE:  I just do.
15            MR. TEDDER:  You're an American citizen.
16            PROSPECTIVE JUROR ESCALANTE:  I just do.
17            MR. TEDDER:  All right.  Ms. Wade, how about you,
18    ma'am?
19            PROSPECTIVE JUROR WADE:  I agree because I think
20    it would be a pretty frightening country to live in if
21    the government didn't have to prove their point.
22            MR. TEDDER:  There are many places in the world
23    where they don't.  If you're accused, you go to trial,
24    they don't have to prove it.
25            Mr. Clark, what about you, sir, do you agree with
```

1    that whole notion?

2        PROSPECTIVE JUROR CLARK: Absolutely.  If someone

3    is accusing someone else of something, let them prove

4    this is why they're accusing them of it.  Of course.

5        MR. TEDDER:  Ms. Moran, do you agree with that

6    general notion?

7        PROSPECTIVE JUROR MORAN:  I agree.

8        MR. TEDDER:  You don't have any problem with it at

9    all?

10       PROSPECTIVE JUROR MORAN:  No.

11       MR. TEDDER:  Mr. Hudson, do you agree with that

12   general notion the government has to prove its case

13   beyond a reasonable doubt?

14       PROSPECTIVE JUROR HUDSON:  Yes.

15       MR. TEDDER:  Why do you agree with that?

16       PROSPECTIVE JUROR HUDSON:  The truth will set you

17   free.

18       MR. TEDDER:  Mr. Baxter, how about you, sir?

19       PROSPECTIVE JUROR BAXTER:  It's the constitution.

20       MR. TEDDER:  Ms. Roberts.

21       PROSPECTIVE JUROR ROBERTS:  Yes, sir, I agree.

22       MR. TEDDER:  You agree with that.

23       Dr. Abbitt, do you agree with it as well?

24       PROSPECTIVE JUROR ABBITT:  I do.

25       MR. TEDDER:  Mr. McMahan?

1      PROSPECTIVE JUROR McMAHAN:  Yes, sir.

2      MR. TEDDER:  And Ms. Walker?

3      PROSPECTIVE JUROR WALKER: Yes.

4      MR. TEDDER:  The second major area that applies in

5   every criminal case is that anyone accused of a crime

6   has an absolute right to remain silent.  They don't

7   have to respond in any way, shape, or form.  Those of

8   you who are asked to serve will be instructed if Mr.

9   Herlihy chooses not to take the witness stand, you'll

10   be instructed that you're not to consider that in any

11   way in reaching your verdict.  Would that cause you a

12   problem, anybody have a problem with that?

13      Mr. McMahan, would that cause you a problem if he

14   chose not to testify?

15      PROSPECTIVE JUROR McMAHAN:  Not at all.

16      MR. TEDDER:  Why not?

17      PROSPECTIVE JUROR McMAHAN:  He has the right.  The

18   burden is on the state to make the case, so if he

19   thinks they haven't made the case, then what's the

20   point of putting yourself in jeopardy?

21      MR. TEDDER:  Ms. Walker, how do you feel about it,

22   any problem with the defendant not testifying?

23      PROSPECTIVE JUROR WALKER:  No.  I'm sure there

24   will be enough evidence.

25      MR. TEDDER:  Ms. Roberts, how about you, do you

1    have any problem if Mr. Herlihy chose not to testify?

2            PROSPECTIVE JUROR ROBERTS:  No, sir.

3            MR. TEDDER:  Why not?

4            PROSPECTIVE JUROR ROBERTS:  Because that's his

5    right.

6            MR. TEDDER:  Dr. Abbitt, how about you, ma'am?

7            PROSPECTIVE JUROR ABBITT:  I have no problem with

8    that.

9            MR. TEDDER:  Mr. Hudson, would it cause you any

10   problem if he chose not to take the witness stand?

11           PROSPECTIVE JUROR HUDSON:  No problem.

12           MR. TEDDER:  Mr. Baxter, would it cause you any

13   concerns?

14           PROSPECTIVE JUROR BAXTER:  It would not cause me a

15   problem, but I don't understand it.

16           MR. TEDDER:  What do you mean by that?

17           PROSPECTIVE JUROR BAXTER:  If I'm accused of

18   something, if I'm here, I'm gonna talk.  It don't mean

19   that I don't agree with what the law is.

20           MR. TEDDER:  Yes, sir.

21           PROSPECTIVE JUROR BAXTER:  You know, he should

22   have the right he don't have to testify.  It's up to

23   the state to prove it.  But I just put myself in his

24   shoes, you couldn't keep me off that witness stand.

25           MR. TEDDER:  Well, what you said is a very valid

```
 1    point and I've often heard this issue of whether or not

 2    someone testifies being compared to being between a

 3    rock and a hard place.  And I'm not accusing you of

 4    believing this or not, but there are some folks out

 5    there who would think if someone would not testify they

 6    might have something to hide, and other folks think if

 7    they did testify they would lie or do whatever they

 8    could to get themselves out of trouble.  So it's sort

 9    of talking about between a rock and a hard place.

10         PROSPECTIVE JUROR BAXTER:  I think what you're

11    doing if he doesn't testify is you're putting your fate

12    into other's hands and they may know all the little

13    things but you know the big old truth.  That's my

14    feeling about it.

15         MR. TEDDER:  All right.

16         Mr. Clark, how about you, sir?

17         PROSPECTIVE JUROR CLARK:  I have no problem with

18    it at all.

19         MR. TEDDER:  Not at all?

20         PROSPECTIVE JUROR CLARK:  No.

21         MR. TEDDER:  Ms. Moran, cause you any concerns?

22         PROSPECTIVE JUROR MORAN:  No.

23         MR. TEDDER:  Ms. Escalante, cause you any

24    concerns?

25         PROSPECTIVE JUROR ESCALANTE:  No.
```

Stacey K. Bryant, RPR
Judicial Court Reporter

```
 1              MR. TEDDER:  Ms. Wade, how about you, have any

 2       problem with that?

 3              PROSPECTIVE JUROR WADE:  No.

 4              MR. TEDDER:  Mr. Ezzell, concern you in any way?

 5              PROSPECTIVE JUROR EZZELL:  No, sir.

 6              MR. TEDDER:  Mrs. Lovvern?

 7              PROSPECTIVE JUROR LOVVERN:  Not necessary.

 8              MR. TEDDER:  Ms. Martin?

 9              PROSPECTIVE JUROR MARTIN:  No.

10              MR. TEDDER:  Mr. Ramsey, concern you?

11              PROSPECTIVE JUROR RAMSEY:  (Shakes head.)

12              MR. TEDDER:  Ms. Currier?

13              PROSPECTIVE JUROR CURRIER: (Shakes head.)

14              MR. TEDDER:  Mr. Heileman?

15              PROSPECTIVE JUROR HEILEMAN:  No, sir.

16              MR. TEDDER:  Lastly it applies in every case in

17       which someone is accused of a crime is the presumption

18       of innocence.  The judge will instruct you that he's

19       been accused of a crime, but he's presumed to be

20       innocent.  Can each of you do that as Mr. Herlihy sits

21       here today accused of first degree murder, can each of

22       you presume him to be innocent in this case?  Anybody

23       have a problem with it?

24              PROSPECTIVE JURORS:  No.

25              MR. TEDDER:  Anybody think because the state's
```

1    accused him of something maybe he's guilty of

2    something?  Does that thought creep into anybody's mind

3    in this case?

4         PROSPECTIVE JUROR ESCALANTE:  They could be wrong,

5    too.

6         MR. TEDDER:  One of the best examples I ever heard

7    that was not a presumption of innocence that was given

8    by a judge a long time ago, he was talking about how

9    you see a car on the side of the road, blue lights

10   flashing, the police officer pulled him over.  It's

11   almost automatic, Gee, I wonder what that person did?

12        Can each of you, if you're asked to serve in this

13   case, presume Mr. Herlihy's innocent unless and until

14   the government proves its case beyond a reasonable

15   doubt?

16        Mr. Heileman, can you do that?

17        PROSPECTIVE JUROR HEILEMAN:  Reasonable doubt.

18        MR. TEDDER:  Mr. Lambert, can you do that?

19        PROSPECTIVE JUROR LAMBERT:  Yes.

20        MR. TEDDER:  Ms. Martin?

21        PROSPECTIVE JUROR MARTIN:  Yes.

22        MR. TEDDER:  Ms. Currier?

23        PROSPECTIVE JUROR CURRIER:  Yes.

24        MR. TEDDER:  Mr. Ezzell?

25        PROSPECTIVE JUROR EZZELL:  Yes.

```
1              MR. TEDDER:  Ms. Young, can you do that?
2              PROSPECTIVE JUROR YOUNG:  I think so.
3              MR. TEDDER:  Ms. Escalante, can you do that with
4         me?
5              PROSPECTIVE JUROR ESCALANTE:  Yes.
6              MR. TEDDER:  Ms. Wade?
7              PROSPECTIVE JUROR WADE:  Yes, sir.
8              MR. TEDDER:  Mr. Clark?
9              PROSPECTIVE JUROR CLARK:  Absolutely.
10             MR. TEDDER:  Ms. Moran?
11             PROSPECTIVE JUROR MORAN:  Yes.
12             MR. TEDDER:  Yes?
13             I'm sorry, Mr. Hudson?
14             PROSPECTIVE JUROR HUDSON:  Yes.
15             MR. TEDDER:  Mr. Baxter, do you think you can do
16        that?
17             PROSPECTIVE JUROR BAXTER:  Yes.
18             MR. TEDDER:  Ms. Roberts, do you believe you can
19        do that?
20             PROSPECTIVE JUROR ROBERTS:  Yes.
21             MR. TEDDER:  Dr. Abbitt, do you believe you can do
22        that?
23             PROSPECTIVE JUROR ABBITT:  Absolutely.
24             MR. TEDDER:  Mr. McMahan, can you do that?
25             PROSPECTIVE JUROR McMAHAN:  Absolutely.
```

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

0003133

```
 1              MR. TEDDER:  Ms. Walker, do you believe you can do
 2         that?
 3              PROSPECTIVE JUROR WALKER:  Yes.
 4              MR. TEDDER:  The way the case is gonna proceed is,
 5         as I said earlier today, those of you who are asked to
 6         serve on this jury, you'll hear preliminary
 7         instructions from Judge Lott, and you'll hear opening
 8         statements by each side, if they choose to give it, and
 9         then you'll hear the evidence of -- testimony, direct
10         testimony of witnesses, followed by cross-examination
11         of those witnesses, which is also evidence, as well as
12         perhaps even recross.  All the witnesses' testimony is
13         evidence.
14              You'll probably see some exhibits.  You may see
15         some actual physical exhibits, physical evidence.
16              At the end of that you'll then hear argument from
17         both sides, from the government and from us, and then
18         finally Judge Lott will instruct you folks on the law
19         that applies to this case.  And it won't be until that
20         time in, sometime at the end of next week that you're
21         gonna be told it's time to make a decision.  Up until
22         then you're gonna be told you cannot talk about the
23         case, talk about the facts, consider the evidence
24         amongst yourselves, and certainly not with anyone else
25         outside of those of you who are asked to sit on this
```

201

```
 1    jury.

 2         Can each of you wait until you're asked to begin

 3    to make a decision before you begin to do that?  And

 4    that's not easy to do; human nature, you hear things

 5    and you start jumping to conclusions.  I even thought

 6    the Gators were gonna win.  I lost on that.  Hopeful, I

 7    guess.

 8         Mr. Heileman, do you think you can wait?

 9         PROSPECTIVE JUROR HEILEMAN:  No problem.

10         MR. TEDDER:  Why do you think it will be no

11    problem?

12         PROSPECTIVE JUROR HEILEMAN:  I work supervisory

13    work with another company all the time in information,

14    so turn the T.V. on, no problem.  Somebody asks about

15    it, ask me later, I'll tell you.

16         MR. TEDDER:  Mr. Ramsey, do you think you can do

17    that, don't think it will be a problem?

18         PROSPECTIVE JUROR RAMSEY:  The sports page will be

19    a problem.

20         MR. TEDDER:  I'm the same way.  Do you think you

21    can get to read the sports page?  You'll have to get

22    your wife to go through that for you.

23         Ms. Martin, do you think you can wait?

24         PROSPECTIVE JUROR MARTIN:  Sure.

25         MR. TEDDER:  Your husband's an attorney.  I know
```

```
 1     he's gonna want to be talking to you about this case.

 2     Do you think you can keep him from badgering you?

 3          PROSPECTIVE JUROR MARTIN:  That's not a problem.

 4     I know there's always more than one side to the story.

 5     So I'm trained to wait and not form an opinion.

 6          MR. TEDDER:  Ms. Currier, do you think you can

 7     wait until the end?

 8          PROSPECTIVE JUROR CURRIER:  Yes.

 9          MR. TEDDER:  Why do you think you can do that?

10          PROSPECTIVE JUROR CURRIER:  Because you need to

11     hear all facts and come to conclusions later on.

12          MR. TEDDER:  Mr. Ezzell, do you believe you can do

13     that as well?

14          PROSPECTIVE JUROR EZZELL:  Yes, sir.

15          MR. TEDDER:  Ms. Young?

16          PROSPECTIVE JUROR YOUNG:  Yes, sir.

17          MR. TEDDER:  Mrs. Escalante, do you think you can

18     do that?

19          PROSPECTIVE JUROR ESCALANTE:  Yes.

20          MR. TEDDER:  Mrs. Wade, do you think you can do

21     that?

22          PROSPECTIVE JUROR WADE:  Yes.

23          MR. TEDDER:  Ms. Moran, do you think you can do

24     that?

25          PROSPECTIVE JUROR MORAN:  Yes.
```

1         MR. TEDDER:  Mr. Clark?

2         PROSPECTIVE JUROR CLARK:  Of course.

3         MR. TEDDER:  Mr. Baxter, can you do that?

4         PROSPECTIVE JUROR BAXTER:  (Nods head.)

5         MR. TEDDER:  Mr. Hudson?

6         PROSPECTIVE JUROR HUDSON:  Yes.

7         MR. TEDDER:  Dr. Abbitt?

8         PROSPECTIVE JUROR ABBITT:  Yes.

9         MR. TEDDER:  Mr. MCMAHAN?

10        PROSPECTIVE JUROR McMAHAN:  Yes.

11        MR. TEDDER:  Ms. ROBERTS?

12        PROSPECTIVE JUROR ROBERTS:  Yes.

13        MR. TEDDER:  And Ms. Walker?

14        PROSPECTIVE JUROR WALKER:  Yes.

15        MR. TEDDER:  The last question I'm gonna ask you

16   folks is those of you who are asked to serve on this

17   jury are gonna be told that your verdict is gonna have

18   to be unanimous, that is, whether it's guilty or not

19   guilty, all 12 of you who are asked to serve are gonna

20   have to agree on one verdict.  My question to you is:

21   Let's say you get back into the jury room and you take

22   your first vote and your vote is eleven to one, and

23   you're the one.  And it doesn't matter whether it's

24   guilty or not guilty, you're the one.  Everyone else

25   saw it differently.  What would your reaction be to

1     that, how would you deal with that?

2          Mr. Ramsey, how would you do it?

3          PROSPECTIVE JUROR RAMSEY:  I think at that point

4     those people tell me why they -- because if one person

5     saw it and eleven saw it a different way, either I'm

6     missing something or they're missing something, and

7     there needs to be discussion on that.

8          MR. TEDDER:  Would you hold out for your view

9     unless they convinced you to change?

10         PROSPECTIVE JUROR RAMSEY:  Yes, sir.

11         MR. TEDDER:  Mr. Heileman, how would you address

12     it?

13         PROSPECTIVE JUROR HEILEMAN:  We all perceive

14     things different ways.  I would ask them logically why

15     they saw it their way and then maybe if I missed

16     something we can ask the judge, you know.  But I would

17     be open.  But if I hang a jury, I'm gonna hang a jury.

18         MR. TEDDER:  Would you try to persuade them they

19     were wrong?

20         PROSPECTIVE JUROR HEILEMAN:  Yes, I would.

21         MR. TEDDER:  Ms. Currier, how would you deal with

22     that situation?

23         PROSPECTIVE JUROR CURRIER:  I'm not exactly sure.

24     Typically I would probably reconsider everything I

25     heard before talking to anybody else about it or any of

1     the jurors.  I typically stand behind the things, the

2     decisions that I make, but I've never been in a

3     situation like this before, so I couldn't tell you.

4          MR. TEDDER:  Mr. Ezzell, how about you, sir, how

5     do you think you would handle the situation?

6          PROSPECTIVE JUROR EZZELL:  Yeah, I would stand to

7     what I believed until somebody could prove otherwise

8     and the proof should be in the courtroom.  If that

9     doesn't happen and I can get something on the side or

10    we ask the judge for restatement or something, so be

11    it.

12         MR. TEDDER:  Ms. Martin, how would you react to

13    that situation?

14         PROSPECTIVE JUROR MARTIN:  I definitely feel the

15    same way, discussion would come into play as to whether

16    or not I would change my opinion.  I would consider my

17    opinion just as valid as anybody else's.  I wouldn't

18    change it because of what other people think

19    differently.

20         MR. TEDDER:  Ms. Young, how would you react to

21    that situation?

22         PROSPECTIVE JUROR YOUNG:  I'd take time to look at

23    all the evidence, the whole group, and I would hear

24    their side and hopefully they would want to hear mine.

25         MR. TEDDER:  Ms. Escalante, how about you, ma'am?

```
 1          PROSPECTIVE JUROR ESCALANTE:  I feel just the same
 2     way she does.
 3          MR. TEDDER:  Ms. Martin?
 4          PROSPECTIVE JUROR MARTIN:  You would have to weigh
 5     all the evidence.  They couldn't dissuade me to change
 6     until they showed me, you know, what they were seeing
 7     that I was missing.
 8          MR. TEDDER:  Ms. Wade, how about you, ma'am?
 9          PROSPECTIVE JUROR WADE:  I, really I don't know.
10     I would hope not to be in that situation personally, I
11     tell you honestly.  I can be very persistent and yet I
12     really can't tell you.
13          MR. TEDDER:  All right.  That's fair enough.
14          Ms. Moran, how about you, ma'am, how would you
15     react to that situation?
16          PROSPECTIVE JUROR MORAN:  I wouldn't just
17     acquiesce to the other eleven; on the other hand, I
18     could have missed something, so we need to have a
19     discussion why they believe what they believe and why
20     they did what they did, and how I feel.
21          MR. TEDDER:  Mr. Clark, how do you feel?
22          PROSPECTIVE JUROR CLARK:  Same.
23          MR. TEDDER:  Great.  You agree with Ms. Moran?
24          PROSPECTIVE JUROR CLARK:  Yeah.
25          MR. TEDDER:  Mr. Hudson, how about you?
```

Stacey K. Bryant, RPR
Judicial Court Reporter

0003140

1      PROSPECTIVE JUROR HUDSON:  Well, I feel if you got

2   eleven right, one wrong, you need to find out why that

3   one wrong and get on one accord with the whole 12 for

4   the thing to conclude.  And I feel like if I was the

5   one that was different from the other eleven, I would

6   have to feel like it might be something wrong with me

7   if eleven go for it and I don't go for it.  I always

8   say a majority win.

9      MR. TEDDER:  All right.  And in this case that's

10   not the case.  Majority doesn't win.  It's got to be

11   unanimous verdict.

12      Question is, would you hold out for your view if

13   you were the only one, or would you change testimony

14   automatically?

15      PROSPECTIVE JUROR HUDSON:  If I was the only one

16   that had it wrong like that and find out that all the

17   eleven had it the other way, I would change and get

18   with the other eleven.

19      MR. TEDDER:  All right.

20      Mr. Baxter, how would you react to that situation?

21      PROSPECTIVE JUROR BAXTER:  If I was the only one

22   that thought one way and all the rest of them -- the

23   evidence is the only thing can sway me.  I sat and

24   listened for hours to this stuff.  You may miss

25   something.  So maybe you didn't catch one of the

```
 1        things.  But if the rest of them heard that one thing

 2        and you reread the testimony and it was there, I could

 3        be swayed that way.  But other than the evidence, it's

 4        the only thing that can move me is the evidence.

 5             MR. TEDDER:  All right.

 6             Ms. Roberts, how about you, what would your

 7        reaction be?

 8             PROSPECTIVE JUROR ROBERTS:  Probably just review

 9        what I thought was the evidence and then compare my

10        notes to theirs.

11             MR. TEDDER:  All right.  Dr. Abbitt, how would you

12        hand that situation?

13             PROSPECTIVE JUROR ABBITT:  Well, I don't have a

14        problem sort of standing up for myself if that's what

15        you mean.  I think if I were by myself and I felt like

16        I came to that information, I feel strongly about that;

17        but I would, as everybody else has said here, certainly

18        have an open mind to agree and listen to the evidence.

19             MR. TEDDER:  Mr. McMahan, how would you react to

20        that situation?

21             PROSPECTIVE JUROR McMAHAN:  Same way.

22             MR. TEDDER:  And Ms. Walker?

23             PROSPECTIVE JUROR WALKER:  I would take my

24        decision serious, but I would reevaluate it.

25             MR. TEDDER:  If you were convinced you should
```

1  reevaluate?

2  PROSPECTIVE JUROR WALKER:  Yes, but my decision,

3  I'm gonna take a lot of thought to it.

4  MR. TEDDER:  All right.  Thank you, folks.

5  I don't have any other questions.

6  THE COURT:  All right.  The attorneys are gonna

7  confer and I'm gonna give you all some more

8  instructions.

9  First of all, to the entire group, as you can see

10  this is a lengthy process.  It is my intention, and the

11  directions that I have given to the attorneys is we

12  will select this jury tonight.  On the other hand, I'm

13  not gonna run you all into the ground to the point that

14  you are exhausted.

15  It is legally possible to recess and continue the

16  jury selection tomorrow morning, which of course, means

17  everybody has got to come back, and I'm sure that the

18  majority of you would agree that, if possible, it would

19  be better to resolve this this evening, at some

20  reasonable hour, of course.

21  So along those lines if at this point, it being

22  almost 4 o'clock, we're gonna take another brief

23  recess.  If there's anybody who suffers from diabetes

24  or the dinner hour is going to be crucial to them for

25  some reason, and, of course, on that basis they would

Stacey K. Bryant, RPR
Judicial Court Reporter

0003143

1    be willing to come back tomorrow morning or prefer to

2    come back tomorrow morning, you need to let the clerk

3    know, or Ms. O'Neal know, if she comes back in.

4         Likewise, when you come back in, I'm gonna move

5    you all around and I'm gonna ask that this side, this

6    section of the courtroom be cleared, and that you all

7    move over to the middle, possibly even all of you in

8    the middle, if you'll fit.  And that this entire panel

9    sit in this section, so that we can refill these seats

10   here, and I think that will speed up the process.

11        So with those instructions, I'll let the attorneys

12   confer.  The court reporter can take a recess and you

13   all can take a 15-minute recess.

14        (Recess 4:00 - 4:15.)

15        THE COURT:  All right.  Ladies and gentlemen, we

16   are ready to continue.  I want to thank you all.  I

17   know this is getting to be a long day.  All of you have

18   been very patient and attentive.  I know that the

19   terrorist attacks that occurred a year ago have really

20   brought to everybody's mind the responsibilities that

21   we share as citizens, as well as the rights that you

22   enjoy, and I don't know if that's playing any part in

23   this or not, but I just want you to know that you're

24   making this go as smoothly as it can possibly go, and

25   we all appreciate it, and we'll work with you to

1    continue make it go as smoothly and as quickly as we

2    possibly can.

3        So along those lines, I'm going to seat another 24

4    individuals, so that we can continue the questioning as

5    fast as possible.  And I'll ask Ms. O'Neal to take the

6    first 24 people in those first two or three rows and

7    seat them up here, beginning in this first chair.

8        So if you'll call out the name and number,

9    Ms. O'Neal, as soon as you get it.  If you'll come

10   forward and the Bailiff will direct you which chair to

11   sit in.

12       MS. O'NEAL:  Juror number 73, Ramona Perry; juror

13   number 28, Jeanine Cawthon; juror number 96, Jo-Anne

14   Monplaisir; juror 198, Jennifer Powell; juror number

15   eight, Cathy Traxler; 155, Viveca Jones; 189, Veta

16   Cumbaa; 185, Richard Furman; 208, Patsy Love; 157, Don

17   Pittman; juror number 21, Charles Telesco; 165, Lamar

18   Malphurs; 93, Marty Karle; 66, Harriet Flowers; 216,

19   Scott Smith; 40, John Cartell; 206, Helen Napier; 68,

20   Mike Harrington; 26, Monica Pena; 16, Steve Lambert;

21   187, Bill Hayden; 196, Eva Williams; 34, Mae Mahamery;

22   144, Justin Diamond.

23       THE COURT:  All right.  I believe that that's our

24   entire row.  Thank you, Ms. O'Neal.

25       Now, as soon as Mr. Hammond gets up here, I'm

```
 1        gonna ask that all of you stand and let the clerk swear
 2        you in for this portion of the questioning.
 3             (The prospective jurors were duly sworn by the
 4        clerk.)
 5             THE COURT:  All right.
 6             Mr. Karle, where are you?  There you are.
 7        Mr. Karle, I had a note here that you had listed
 8        previously that you were supposed to be out of state
 9        either this week or next week.
10             PROSPECTIVE JUROR KARLE:  Next week, that is
11        correct.
12             THE COURT:  Okay.  Is that something that can be
13        rescheduled or not?
14             PROSPECTIVE JUROR KARLE:  No.  I'm in charge of
15        the group, non-refundable group going to Knoxville and
16        also work related.  I rescheduled all my appointments
17        this week for next week.  I travel, Georgia.
18             THE COURT:  All right.  The attorney may have some
19        additional questions for you along those lines, but I
20        wanted to point that out.
21             Did anybody else get on an earlier list that -- in
22        regard to one of the questions?  If I missed, if so, I
23        missed your number.  I think Mr. Karle was the only
24        one.
25             Yes, sir?
```

1       PROSPECTIVE JUROR TELESCO:  You're talking about

2  people -- I was number 21, Telesco.  I wasn't on the

3  list but I turned in a yellow page around 1:00 o'clock.

4       THE COURT:  Yes.  And I did check that and the

5  attorneys may have some additional questions for you

6  also, Mr. Telesco.

7       PROSPECTIVE JUROR TELESCO:  Correct.

8       THE COURT:  Okay.  Mr. Telesco, the attorneys may

9  have some additional questions for you with regard to

10  your schedule.  All of you may have some issues

11  regarding that, that the attorneys are gonna have to

12  inquire into.

13       Now, is there anybody else that right now wants to

14  tell me that they do have an issue regarding -- time

15  wise, in regard to a two-week trial?  And again, I'm

16  not gonna go into the detailed reasons unless it's

17  something like surgery has been scheduled, like I said

18  earlier, but the attorneys may want to.  So if you just

19  raise your hands if you have an issue regarding trial.

20       That's Ms.?

21       PROSPECTIVE JUROR MONPLAISIR:  Monplaisir.

22       I don't know if it's an issue, but I got a summons

23  for federal jury duty, grand jury duty the 24th.  So I

24  don't know if that would --

25       THE COURT:  Yeah, if you were in this trial we

1    could take care of that for you.  Okay?  But thank you

2    for letting me know, because it is something we need to

3    be alerted to because we might need to assist you with

4    that.

5         Anybody else have a -- yes, ma'am, 88?

6         PROSPECTIVE JUROR TRAXLER:  I turned in something

7    after lunch.

8         THE COURT:  Tell me your name again.

9         PROSPECTIVE JUROR:  Catherine Traxler.

10        THE COURT:  Yes.  I got that note, too, and the

11   attorneys may have a question, or more, more than one

12   question.

13        Anybody else?  Yes, sir, that's Mr.?

14        PROSPECTIVE JUROR SMITH:  Smith.

15        THE COURT:  Mr. Smith.

16        PROSPECTIVE JUROR SMYTH:  Two weeks would not

17   really be a hardship on me, but it would be for my

18   boss.  I work for a very small company and I am the

19   primary labor source.

20        THE COURT:  Okay.  Good enough and the attorneys

21   may have some specific questions along that line.  Let

22   me -- Thank you for letting me know.

23        All right.  Now, in regards to Mr. Brian Herlihy,

24   who has been charged in this case -- Mr. Herlihy, raise

25   your hand again.  Do any of you know Brian Herlihy?

1    Okay.

2        And the attorneys have already been introduced and

3    you all have indicated that none of you know these

4    attorneys; is that right?

5        Yes, sir?

6        PROSPECTIVE JUROR FURMAN:  I know Mr. Groland.

7        THE COURT:  Okay.  Is your knowledge or

8    relationship with Mr. Groland so close that whatever

9    case he works on you're gonna rule in his favor?

10       PROSPECTIVE JUROR FURMAN:  (Shakes head.)

11       THE COURT:  Okay.  Good enough.  They may have

12   some additional questions for you, but these are just

13   some preliminary questions.

14       Now, you understand the charge that has been filed

15   is first degree murder; you've heard that.  Is there

16   anybody on this panel at this time who knows that for

17   some reason in their own history they could not qualify

18   as a juror in a first degree murder case,

19   understanding, of course, that this is not a death

20   penalty case, it is simply a very serious charge.

21   Everybody understand that?  Okay.

22       And understand that this case does involve the

23   death of an infant.  Is there anybody, who because of

24   their history or anything in their history, feels that

25   they could not qualify to sit as a juror in a case

```
1       involving the death of an infant?

2              All right.  Good enough.

3              Mr. Pennypacker, you may go ahead and inquire.

4              MR. PENNYPACKER:  May it please the Court?

5              Good afternoon, ladies and gentlemen.  We have an

6       attorney in our office who literally could come up here

7       now without this paper and tell you every one of your

8       names.  I can't do that so I want to go back through

9       and make sure I have everybody here.  Ms. Perry?

10             PROSPECTIVE JUROR PERRY:  Yes.

11             MR. PENNYPACKER:  Ms. Cawthon?

12             Ms. Monplaisir?  Am I pronouncing that correct?

13             PROSPECTIVE JUROR MONPLAISIR:  Yes.

14             MR. PENNYPACKER:  Ms. Powell?

15             PROSPECTIVE JUROR POWELL:  Yes.

16             MR. PENNYPACKER:  Ms. Traxler?

17             PROSPECTIVE JUROR TRAXLER:  Nodding.)

18             MR. PENNYPACKER:  Ms. Jones?

19             PROSPECTIVE JUROR JONES:  (Nodding.)

20             MR. PENNYPACKER:  Ms. Cumbaa?

21             PROSPECTIVE JUROR CUMBAA: (Nodding.)

22             MR. PENNYPACKER:  Mr. Furman?

23             PROSPECTIVE JUROR FURMAN:  (Nodding.)

24             MR. PENNYPACKER:  Mr. Cartell?

25             PROSPECTIVE JUROR CARTELL:  (Nodding.)
```

```
 1              MR. PENNYPACKER:  Mr. Smith?

 2              PROSPECTIVE JUROR SMITH:  (Nodding.)

 3              MR. PENNYPACKER:  Ms. Flowers?

 4              PROSPECTIVE JUROR FLOWERS:  (Nodding.)

 5              MR. PENNYPACKER:  Mr. Karle?

 6              PROSPECTIVE JUROR KARLE:  (Nodding.)

 7              MR. PENNYPACKER:  Mr. Malphurs?

 8              PROSPECTIVE JUROR MALPHURS:  (Nodding.)

 9              MR. PENNYPACKER:  Mr. Telesco?

10              PROSPECTIVE JUROR TELESCO:  (Nodding.)

11              MR. PENNYPACKER:  Mr. Pittman?

12              PROSPECTIVE JUROR PITTMAN:  (Nodding.)

13              MR. PENNYPACKER:  Ms. Love?

14              PROSPECTIVE JUROR LOVE:  (Nodding.)

15              MR. PENNYPACKER:  Ms. Napier?  Am I pronouncing

16        that correctly?

17              PROSPECTIVE JUROR DAMPIER:  Dampier.

18              MR. PENNYPACKER:  Dampier.

19              PROSPECTIVE JUROR DAMPIER:  Dampier.

20              MR. PENNYPACKER:  Dampier, okay.  Thank you.

21        Mr. Harrington?

22              PROSPECTIVE JUROR HARRINGTON:  Yes, sir.

23              MR. PENNYPACKER:  Ms. Pena?

24              PROSPECTIVE JUROR PENA:  (Nodding.)

25              MR. PENNYPACKER:  Mr. Lambert?
```

1          PROSPECTIVE JUROR LAMBERT:   (Nodding.)

2          MR. PENNYPACKER:  Mr. Hayden?

3          PROSPECTIVE JUROR HAYDEN:   (Nodding.)

4          MR. PENNYPACKER:  Ms. Williams?

5          PROSPECTIVE JUROR WILLIAMS:   (Nodding.)

6          MR. PENNYPACKER:  Ms. Mahamery?

7          PROSPECTIVE JUROR MAHAMERY:   (Nodding.)

8          MR. PENNYPACKER:  And Mr. Donovan?

9          PROSPECTIVE JUROR DONOVAN:   (Nodding.)

10          MR. PENNYPACKER:  Great.  Thank you.  Did you all

11     hear the list of the names of the witnesses that were

12     called earlier this morning; there was about 40, more

13     than 40 names?

14          PROSPECTIVE JUROR KARLE:  I was not here.  I was

15     in another trial.

16          MR. PENNYPACKER:  Okay.  What I would like to do

17     then is read the names of all the witnesses again and

18     refresh the names that you didn't hear to start with.

19          Ken Johnson, Dennis Meredith, Darrell Brown, Bill

20     Blair, John Hellron, M.D., Crystal Quirello, John

21     Quirello, Kathleen Morrison, Richard Davis, Doris

22     Bridwell, Frank Agee, M.D., Michael Bell, M.D., Richard

23     Kreinest, M.D., David Stewart, M.D.

24          Cathy Long is a deputy with the sheriff's

25     department, Vicki Woodall, Yantz Enoch, Tom Whitley,

```
1        Alachua County Fire Rescue, Russell Valentine, Alachua
2        County Fire Rescue.  Harvey Rohlwing, M.D., Lisa
3        Francois, Kevin Putansu, Ronald Quisling, M.D., Anne
4        Dickinson, M.D., Lawrence Levine, M.D., Orlando
5        Alvarez, Gainesville Police Department, Valerie Dawson,
6        Gainesville Police Department, Tina Millard, now
7        Christina Mallard, Gainesville Police Department, Bruce
8        Ferris, Gainesville Police Department, Nicole Peron,
9        FDLE, David Cannon, Gainesville Police Department, Alan
10       Coleman, Gainesville Police Department, Larry Seale,
11       Gainesville Police Department, Helen Legall,
12       Gainesville Police Department, Will Halvosa,
13       Gainesville Police Department, Steven Weaver,
14       Gainesville Police Department, Duane Diehl, Gainesville
15       Police Department., William Hamilton, M.D., Steven
16       Nelson, M.D., Bernie Maria, M.D., Sal Cumella, Patrick
17       Minor, Howard Rogers, M.D., Beth Talaga, John Williams,
18       M.D., and Jamie Snodgrass.
19            Anybody know any of those individuals?
20            All right.  Let's start with you, Ms. Cawthon.
21       Tell me who you know?
22            PROSPECTIVE JUROR CAWTHON:  Hellrung and Harvey
23       Rohlwing.
24            MR. PENNYPACKER:  How do you know Dr. Hellrung?
25            PROSPECTIVE JUROR CAWTHON:  He's in the pediatric
```

1    practice where my children go.

2         MR. PENNYPACKER:  Are your children still his

3    patients?

4         PROSPECTIVE JUROR CAWTHON:  Yes.  He's not our

5    primary doctor, but we've known him for years.

6         MR. PENNYPACKER:  He's one of the other doctors in

7    the practice?

8         PROSPECTIVE JUROR CAWTHON:  Yes.

9         MR. PENNYPACKER:  Who's the other doctor?

10         PROSPECTIVE JUROR CAWTHON:  I know his wife, too.

11         Thomas Addison.

12         MR. PENNYPACKER:  You know DJ?  Is that her name?

13    How do you know them other than as your doctor, do you

14    know them socially?

15         PROSPECTIVE JUROR CAWTHON:  Yes.

16         MR. PENNYPACKER:  Would your knowledge of

17    Dr. Hellrung and his wife keep you from being able to

18    be fair and impartial in this case when you listen to

19    Dr. Hellrung's testimony?

20         PROSPECTIVE JUROR CAWTHON: No.

21         MR. PENNYPACKER:  Are you going give his testimony

22    any greater weight than any other witness in this case?

23         PROSPECTIVE JUROR CAWTHON:  No.

24         MR. PENNYPACKER:  You said you know Dr. Rohlwing.

25    How do you know him?

```
1              PROSPECTIVE JUROR CAWTHON: Socially.
2              MR. PENNYPACKER:  Same question, do you think you
3         could be fair and impartial?
4              PROSPECTIVE JUROR CAWTHON:  Yes.  Same thing.
5              MR. PENNYPACKER:  All right, who else knew
6         somebody?
7              Yes, ma'am, Ms. Cumbaa, how do you know --
8              PROSPECTIVE JUROR CUMBAA:  Dr. Hellrung.
9              MR. PENNYPACKER:  How do you know him?
10             PROSPECTIVE JUROR CUMBAA:  He's my daughter's --
11        in the same practice as my daughter's pediatrician.
12             MR. PENNYPACKER:  Who is your daughter's
13        pediatrician?
14             PROSPECTIVE JUROR CUMBAA:  Dr. Sellran.
15             MR. PENNYPACKER:  Same question.  Anything about
16        your knowledge of Dr. Hellrung that would cause to you
17        give his testimony any greater weight than any other
18        witness?
19             PROSPECTIVE JUROR CUMBAA:  No.
20             MR. PENNYPACKER:  You would be fair and impartial
21        when you hear his testimony?
22             PROSPECTIVE JUROR CUMBAA:  Yes.
23             MR. PENNYPACKER:  Who else knew somebody?
24             Yes, Ms. Flowers?
25             PROSPECTIVE JUROR FLOWERS:  Dr. Hellrung also.
```

```
 1              MR. PENNYPACKER:  He's a popular man.  Your

 2     children were his patients?

 3              PROSPECTIVE JUROR FLOWERS:  My children have

 4     outgrown his practice, but he took care of them from

 5     birth.

 6              MR. PENNYPACKER:  Same question: Do you think that

 7     you could be fair and impartial listening to his

 8     testimony, give it the same weight as any other

 9     witness?

10              PROSPECTIVE JUROR FLOWERS:  Yes.

11              MR. PENNYPACKER:  Anyone else that you knew

12     besides Dr. Hellrung?

13              PROSPECTIVE JUROR FLOWERS:  No.

14              MR. PENNYPACKER:  Anyone else know any other

15     witnesses?

16              Yes, Mr. Pittman.

17              PROSPECTIVE JUROR PITTMAN:  Dr. Hellrung is my

18     children's pediatrician and Bernie Maria used to work

19     with my wife, and I recognize some of the doctor's

20     names over at Shands.

21              MR. PENNYPACKER:  Would your knowledge of

22     Dr. Hellrung cause you to give his testimony any

23     greater weight than any other witness?

24              PROSPECTIVE JUROR PITTMAN:  No, sir.

25              MR. PENNYPACKER:  How does your wife know Dr.
```

1    Maria as well?

2        PROSPECTIVE JUROR PITTMAN:  She worked at the

3    hospital with him.  We socialized at gatherings.

4        MR. PENNYPACKER:  When's the last time you saw Dr.

5    Hellrung?

6        PROSPECTIVE JUROR PITTMAN:  Christmas party.

7        MR. PENNYPACKER:  He is no longer at the

8    University of Florida is my understanding.  Have you

9    had any contact with him besides seeing him personally

10   at Christmas?

11       PROSPECTIVE JUROR PITTMAN:  No.

12       MR. PENNYPACKER:  Would you give his testimony any

13   greater weight than any other witness?

14       PROSPECTIVE JUROR PITTMAN:  No.

15       MR. PENNYPACKER:  Who else knew some of the people

16   on the witness list?  No one else?  Okay.

17       Mr. Pittman, you said you knew someone else.  Who

18   was that?

19       PROSPECTIVE JUROR PITTMAN:  I recognized some of

20   the physicians' names.

21       MR. PENNYPACKER:  Did you remember who any of them

22   were?

23       PROSPECTIVE JUROR PITTMAN:  I work for a home care

24   agency where we do IV therapy and I recognize some of

25   them, just prescriptions being filled.

```
 1              MR. PENNYPACKER:  All right.  Thank you.

 2         Does anyone know any of the attorneys in the state

 3    attorney's office other than Ms. Singer and me today?

 4    Who do you know?

 5         PROSPECTIVE JUROR FURMAN: Omar Hechavarria.

 6         MR. PENNYPACKER:  Omar?

 7         PROSPECTIVE JUROR FURMAN:  Omar.

 8         MR. PENNYPACKER:  How do you know Omar?

 9         PROSPECTIVE JUROR FURMAN:  Through church.

10         MR. PENNYPACKER:  Anyone else know any of the

11    state attorneys?

12         Anyone know Mr. Cervone, my boss?

13         Does anyone know any of the attorneys from

14    Mr. Groland's office?  Mrs. Proctor, Mr. Groland,

15    Mr. Tedder, and Mr. Workman?

16         Mr. Furman, who do you know there?

17         PROSPECTIVE JUROR FURMAN:  Mr. Groland.

18         MR. PENNYPACKER:  You mentioned that you knew Mr.

19    Groland.  How do you know him?

20         PROSPECTIVE JUROR FURMAN:  I retained his advice

21    on a matter with a family member about three weeks ago.

22    It took about 30 minutes and I was told that there

23    wasn't an issue.  So that was it.  His professional

24    counsel.

25         MR. PENNYPACKER:  He is not currently representing
```

1      you or anybody in your family?

2              PROSPECTIVE JUROR FURMAN:  No.

3              MR. PENNYPACKER:  Is there anything about that

4      communication with Mr. Groland that would cause you to

5      not be fair or impartial in this case to the state or

6      Mr. Groland?

7              PROSPECTIVE JUROR FURMAN:  No, I just appreciated

8      good honest counsel.

9              MR. PENNYPACKER:  Good.

10             I wanted to go back to those of you who mentioned

11     that you had time conflicts.  Ms. Traxler, I think you

12     said you had a time conflict.  What was your issue?

13             PROSPECTIVE JUROR TRAXLER:  I am a pediatric

14     student, full-time graduate student at university of

15     Florida.  I just started and if I had to miss two weeks

16     of classes I would have to withdraw from all my classes

17     for this semester in order to prevent myself from

18     failing them.  And I have to maintain a certain GPA in

19     order to have my tuition paid and without that I can't

20     go to school.  So this would destroy my academic life.

21             MR. PENNYPACKER:  You just started your Ph.D.

22     program two weeks ago?

23             PROSPECTIVE JUROR TRAXLER:  Yeah.  Two weeks.

24             MR. PENNYPACKER:  What are you getting a Ph.D. in?

25             PROSPECTIVE JUROR TRAXLER:  It's called health

1    behavior, but it's really more like public health.

2         MR. PENNYPACKER:  Ms. Monplaisir, you said you had

3    a time problem.  What is that?

4         PROSPECTIVE JUROR MONPLAISIR:  I don't know that

5    it would be a time problem, but I do have to report to

6    federal jury duty on the 24th.  So I think that would

7    kind of, two weeks on the calendar, but it would be

8    close.

9         MR. PENNYPACKER:  Okay.  Let's see.  Fairly close.

10   Do you buy lottery tickets?  Go on jury duty twice in a

11   month like that.

12        Mr. Smith, I understood you have -- you're the

13   only employee for your boss; is that right?

14        PROSPECTIVE JUROR SMITH:  I'm the primary driver

15   for a small food service company that only has one

16   other driver, and he's only part-time, and he's a very

17   old man and he does not work very fast.  And now with

18   campus in full session our business has picked up to

19   the point where if I'm not there, they're in trouble.

20        MR. PENNYPACKER:  All right.  What's the name of

21   that business?

22        PROSPECTIVE JUROR SMITH:  GRS Food Service.

23        MR. PENNYPACKER:  Okay.  Did I miss anybody else

24   that said they had a time problem?

25        Yes?  Mr. Karle?

1    PROSPECTIVE JUROR KARLE:  Yes, I got jury summons

2    and rescheduled all my appointmentS this week --

3        MR. PENNYPACKER:  That's right.

4        PROSPECTIVE JUROR KARLE:  -- and first of next

5    week.  Then Friday morning I got a bus I'm in charge of

6    going to Knoxville, Tennessee, which is a

7    non-refundable trip, which, my one trip I take my

8    daughter.

9        MR. PENNYPACKER:  What is that business?

10       PROSPECTIVE JUROR KARLE:  What business am I in?

11       MR. PENNYPACKER:  Yes, sir.

12       PROSPECTIVE JUROR KARLE:  I work for PCS Joint

13   Ventures out of Moultrie, Georgia.  I'm a sales

14   representative.  I travel south Florida, north Florida,

15   southwest Georgia.

16       MR. PENNYPACKER:  Who else mentioned a time

17   problem?  Yes, Ms. Powell?

18       PROSPECTIVE JUROR POWELL:  I'm also full-time

19   student at Santa Fe.

20       MR. PENNYPACKER:  Okay.  Missing two weeks of

21   class is gonna cause you to have to withdraw?

22       PROSPECTIVE JUROR POWELL:  Probably.

23       MR. PENNYPACKER:  Mr. Telesco?

24       PROSPECTIVE JUROR TELESCO:  I'm a professor of

25   astronomy at the university of Florida and I'm also

1   principle investigator on a camera that is being built

2   for an observatory in south America and it's a project

3   been going on for four years.  And this next three

4   weeks are the, what we call the acceptance testing

5   phase.  As the principle investigator, I'm the one who

6   is contractually bound to oversee this particular

7   phase, which would then, with the university, and since

8   I'm the representative for the university, and so if

9   there are any legal problems, basically the university

10  would look to me to try to resolve those in order to

11  meet, make the contract requirements.

12      So, in essence, it puts the university on the spot

13  if I'm not present during these critical tests.

14      MR. PENNYPACKER:  No one else in your department

15  who can fill your shoes during this time period?

16      PROSPECTIVE JUROR TELESCO:  No, I'm the person

17  who's duly responsible.  I'm at the top of the

18  contract.  Basically it's my responsibility.  So...

19      MR. PENNYPACKER:  I understand.

20      PROSPECTIVE JUROR TELESCO:  I can shuffle things

21  around a few days, but two weeks is a bit much.  It's a

22  rather critical phase.

23      MR. PENNYPACKER:  Anyone else have a time problem

24  we haven't discussed?  Yes, Mr. Diamond?

25      PROSPECTIVE JUROR DIAMOND:  Well, I think I would

1   like to serve, but I should also say I'm a student

2   also.

3           MR. PENNYPACKER:  Where do you go to school?

4           PROSPECTIVE JUROR DIAMOND:  The University of

5   Florida.

6           MR. PENNYPACKER:  Missing two weeks of class,

7   would that cause you to have to withdraw?

8           PROSPECTIVE JUROR DIAMOND:  Well, I really don't

9   know.

10          MR. PENNYPACKER:  What are you studying?

11          PROSPECTIVE JUROR DIAMOND:  I'm an English major.

12          MR. PENNYPACKER:  Anyone else time problems?

13          Yes, sir, Mr. Malphurs?

14          PROSPECTIVE JUROR MALPHURS:  When is this trial

15   gonna start?

16          MR. PENNYPACKER:  Tomorrow morning and it's

17   probably gonna go at least through next Wednesday.

18          PROSPECTIVE JUROR MALPHURS:  Here's what I'm

19   saying is I got to have time -- I got calves shut up in

20   a dry lot.  I'm the only one, I don't have no help and

21   they need feed every day.  And you know, if they all

22   had put on that summons that it might be for two weeks,

23   and that give you time to find somebody to see if they

24   can look after them.  I hadn't thought about it being

25   more than one day, and so I hadn't got anybody lined up

1    or hunt somebody to do it for me.

2        MR. PENNYPACKER:  As Judge Lott said most of the

3    trials that we have last a day or two.  It's unusual to

4    have one that's gonna last as long as this one does.

5    Do you need to feed your cows both in the morning and

6    at night, or is it just once a day?

7        PROSPECTIVE JUROR MALPHURS:  Just once a day and

8    make sure they ain't tore the water off and got --

9    water go down a dry lot.

10       MR. PENNYPACKER:  Would you be able to do that

11   before and after court if you were to sit on the jury?

12       PROSPECTIVE JUROR MALPHURS:  According to what

13   time we start and what time it ended.  It would be kind

14   of a rush, but...

15       MR. PENNYPACKER:  Normally we don't start until

16   9:00 a.m. and Judge Lott mentioned we were gonna go to

17   6:00 on some days.  If you got out by 6:00, would that

18   accommodate you, as far as starting at 9:00 and getting

19   out at 6:00?

20       PROSPECTIVE JUROR MALPHURS:  I think I could do

21   it.

22       MR. PENNYPACKER:  Anyone else with a time problem?

23   All right.

24       Anyone know anyone that works in the court system:

25   bailiffs, court clerks, Buddy Irby, anybody else?

1          Yes, Mr. Karle.

2          PROSPECTIVE JUROR KARLE:   I know Buddy Irby.   I

3     also know Cervone's secretary, Erin McKinley, she's my

4     first cousin.

5          MR. PENNYPACKER:   Okay.   Would your relationship

6     to Ms. McKinley cause you to not be able to be fair and

7     impartial to Mr. Herlihy or the state attorney's

8     office?

9          PROSPECTIVE JUROR KARLE:   I don't know why that

10    would.

11         MR. PENNYPACKER:   Anybody else know anyone in the

12    court system?

13         Yes, Mr. Cartell?

14         PROSPECTIVE JUROR CARTELL:   My wife works with

15    Judge Nilon's wife.

16         MR. PENNYPACKER:   What does she do, what does your

17    wife do?

18         PROSPECTIVE JUROR CARTELL:   She's a media aide at

19    Terwilliger.

20         MR. PENNYPACKER:   Do you know Judge Nilon?

21         PROSPECTIVE JUROR CARTELL:   No, I just know the

22    last name.

23         MR. PENNYPACKER:   Have you ever met him?

24         PROSPECTIVE JUROR CARTELL:   Met him, but that's

25    it.

```
1              MR. PENNYPACKER:  Would that relationship cause

2      you to not be impartial?

3              PROSPECTIVE JUROR CARTELL:  No.

4              MR. PENNYPACKER:  Yes.  Ms. Cawthon?

5              PROSPECTIVE JUROR CAWTHON:  Judge Nilon, Judge

6      Monaco, Buddy Irby.

7              MR. PENNYPACKER:  How do you know Judge Nilon?

8              PROSPECTIVE JUROR CAWTHON:  Socially, neighbors,

9      and we go to the same church.

10             MR. PENNYPACKER:  Would that relationship cause

11     you to not be impartial to either Mr. Herlihy or the

12     state?

13             PROSPECTIVE JUROR CAWTHON:  No.

14             MR. PENNYPACKER:  How about Judge Monaco, how do

15     you know him?

16             PROSPECTIVE JUROR CAWTHON:  Mainly through church.

17             MR. PENNYPACKER:  Same question, would you be able

18     to be impartial?  And Mr. Irby, how do you know him?

19             PROSPECTIVE JUROR CAWTHON:  I served on the

20     governing board of the library with him and I just have

21     known him through boy scouts and various things.

22             MR. PENNYPACKER:  Would that relationship impact

23     your ability to be a fair and impartial juror?

24             PROSPECTIVE JUROR CAWTHON:  No.

25             MR. PENNYPACKER:  Anyone else know anyone in the
```

1    court service?

2        Yes, Mr. Furman?

3        PROSPECTIVE JUROR FURMAN:  I know Ms. O'Neal.

4        MR. PENNYPACKER:  The court liaison?

5        PROSPECTIVE JUROR FURMAN:  You just asked me if

6    that would be a problem.

7        MR. PENNYPACKER:  She's nodding her head.  All

8    right.  Anyone else know anyone in the court system?

9        Anyone familiar with a Tumbling Creek Apartments?

10    You've probably heard Ms. Singer ask about that in the

11    earlier questions, Tumbling Creek Apartments are over

12    off Depot Avenue behind P.K. Yonge and I think there is

13    a fraternity house actually between P.K. Yonge and

14    where these apartments are located.  Has anybody been

15    to those apartments?

16        Why have you been there?

17        PROSPECTIVE JUROR CAWTHON:  I had a friend that

18    used to live there while she was in college.

19        MR. PENNYPACKER:  So that's been some time ago?

20        PROSPECTIVE JUROR CAWTHON:  Five or six years.

21        MR. PENNYPACKER:  Ever been there in the last five

22    or six years?

23        PROSPECTIVE JUROR CAWTHON:  No.

24        MR. PENNYPACKER:  Anyone else ever been there?

25        Any of you know each other?  There's 24 of you, so

1       take a look around.  I see some finger pointing here.

2           Mr. Cartell, I think you were pointing at

3       Mrs. Flowers.

4           PROSPECTIVE JUROR CARTELL:  No, Ms. Cawthon.  I

5       know Jeanine Cawthon.

6           MR. PENNYPACKER:  How do you know Jeanine Cawthon?

7           PROSPECTIVE JUROR CARTELL:  She volunteers at the

8       same school my wife works at.

9           MR. PENNYPACKER:  If the two of you were to end up

10      sitting on a jury together, would that relationship

11      impact how you decide the case?

12          PROSPECTIVE JUROR CARTELL:  No.

13          MR. PENNYPACKER:  You don't think you would be

14      influenced one way or the other; if she had a different

15      opinion than you, you would listen to her?

16          PROSPECTIVE JUROR CARTELL:  (Shakes head.)

17          MR. PENNYPACKER:  Ms. Cawthon, you said the same

18      answers?  It wouldn't influence you in any way?

19          PROSPECTIVE JUROR CAWTHON:  No.

20          MR. PENNYPACKER:  Who else knew each other?

21      Mr. Karle?

22          PROSPECTIVE JUROR KARLE:  I know Mr. Malphurs.

23          MR. PENNYPACKER:  How do you know him, first of

24      all?

25          PROSPECTIVE JUROR KARLE:  I ran a fertilizer plant

1    in Alachua, Florida, for 15 some years.  Mr. Malphurs

2    was one of my customers and friends.

3         MR. PENNYPACKER:  If the two of you sat on the

4    jury, could you --

5         PROSPECTIVE JUROR KARLE:  We think a lot alike.

6         MR. PENNYPACKER:  Think a lot alike.  Okay.

7         Mr. Malphurs, you agree with that?

8         PROSPECTIVE JUROR MALPHURS:  Yeah.

9         MR. PENNYPACKER:  If you were to sit on the jury

10   with Mr. Karle would you be able to keep your own mind

11   and not necessarily think like him in case you didn't

12   think like him when you got back in the jury room?

13        PROSPECTIVE JUROR MALPHURS:  I don't think it

14   would influence me that much, no.

15        MR. PENNYPACKER:  Okay.  Who else knew each other?

16   I still saw some fingers up.

17        Mr. Furman, you're pointing to Mrs. Flowers;

18   Mrs. Flowers, you're pointing back.  How do you know

19   each other?

20        PROSPECTIVE JUROR FLOWERS:  Through church years

21   ago.  We've kind of gone our separate ways, but we're

22   still friends, right?

23        MR. PENNYPACKER:  Have you seen each other in the

24   last couple years?

25        PROSPECTIVE JURORS FURMAN AND FLOWERS:  No.

MR. PENNYPACKER: Would that relationship inhibit your ability to keep your own mind?

BOTH PROSPECTIVE JURORS: No.

MR. PENNYPACKER: Anyone know anything about this case? I saw a couple people in the first group that seemed to remember reading something in the paper at some point. Anybody remember anything like that? Is that all no?

Who's been a victim of a crime in this panel? Just one? It's amazing. Let's go ahead, get those hands up. I'm sure more than one of you have been victim of a crime.

Ms. Perry, tell me what happened.

PROSPECTIVE JUROR PERRY: Well, this was back in, probably I would say '67, our car was stolen from my husband's work. They found it. It was in okay shape. They said probably some teenagers. Only one print in it, which led to our German shepherd was all they could find.

MR. PENNYPACKER: I'm pretty sure the German shepherd didn't commit the crime.

PROSPECTIVE JUROR PERRY: No.

MR. PENNYPACKER: Were you satisfied with the way law enforcement responded to this?

PROSPECTIVE JUROR PERRY: Yes, I was.

```
1              MR. PENNYPACKER:  Did anybody get arrested, you
2       said nobody was found?
3              PROSPECTIVE JUROR PERRY:  No, they couldn't trace
4       it.
5              MR. PENNYPACKER:  Any other problems that you've
6       been a victim of?
7              PROSPECTIVE JUROR PERRY:  No.
8              MR. PENNYPACKER:  Who else raise their hand?
9              PROSPECTIVE JUROR CAWTHON:  Our car was stolen out
10      of our driveway.
11             MR. PENNYPACKER:  Was anybody apprehended?
12             PROSPECTIVE JUROR CAWTHON:  No.
13             MR. PENNYPACKER:  Were you satisfied with the way
14      law enforcement responded?  Did they respond?
15             PROSPECTIVE JUROR CAWTHON:  Yes, they responded.
16             MR. PENNYPACKER:  Were you satisfied?  You kind of
17      hesitated the way you answered that.
18             PROSPECTIVE JUROR CAWTHON:  Well, they didn't
19      didn't recover it.  It was found stripped later.
20             MR. PENNYPACKER:  Did insurance take care of it?
21             PROSPECTIVE JUROR CAWTHON:  Yes.
22             MR. PENNYPACKER:  Who else?
23             PROSPECTIVE JUROR JONES:  My pocketbook was stolen
24      out of the trunk of my car and I didn't report it.
25             MR. PENNYPACKER:  You didn't report it?  How come
```

1    you didn't report it?

2        PROSPECTIVE JUROR JONES:  Well, no money was

3    there.

4        MR. PENNYPACKER:  No credit cards, no driver's

5    license?

6        PROSPECTIVE JUROR JONES:  Just cancelled

7    everything and just replaced everything.

8        MR. PENNYPACKER:  Mr. Furman.

9        PROSPECTIVE JUROR FURMAN:  Our house was shot into

10   20-some years ago.  They arrested a young juvenile.

11   Never heard any more about it.

12       Then the house was broken into maybe 15 years ago.

13   I don't think they ever caught anybody that we know.

14   Everything was handled very matter of factly.

15       MR. PENNYPACKER:  Who else?  Second row; yes, sir?

16       PROSPECTIVE JUROR DIAMOND:  We were burglarized

17   about 13-15 years ago.

18       MR. PENNYPACKER:  Did you call law enforcement?

19       PROSPECTIVE JUROR DIAMOND:  Yeah.

20       MR. PENNYPACKER:  Satisfied with the response?

21       PROSPECTIVE JUROR DIAMOND: Yeah.

22       MR. PENNYPACKER:  Did anybody get apprehended?

23       PROSPECTIVE JUROR DIAMOND:  No.

24       MR. PENNYPACKER:  Who else?  Mr. Karle?

25       PROSPECTIVE JUROR KARLE:  You want it all?  Auto

1    burglary or theft.  About four times I have had a

2    breaking and entering, and house completely cleaned out

3    three times, and I've had three thefts from my yard.

4         MR. PENNYPACKER:  Where do you live?

5         PROSPECTIVE JUROR KARLE:  Alachua, Gainesville,

6    Archer, Williston, during the years.

7         MR. PENNYPACKER:  Did law enforcement come out

8    each of those times that you mentioned?

9         PROSPECTIVE JUROR KARLE:  One or two incidents law

10   enforcement dropped the ball when they failed to report

11   a stolen, or forgot to report a stolen truck from my

12   company.  Computers down, they failed, and I recovered

13   it myself in Tampa.

14        They did an excellent job on one of, a couple of

15   recoveries.  Some of them I didn't report because of

16   insurance deductible, it wasn't worth the call.

17        And then the state's attorney dropped the ball on

18   one of the burglaries.  I think they didn't want to

19   prosecute and they passed the buck to me, which passed

20   the buck to the insurance company, which straightened

21   it out with the Alachua Police Department.

22        MR. PENNYPACKER:  Explain to me how did the state

23   attorney do what you said.

24        PROSPECTIVE JUROR KARLE:  He basically told the

25   insurance company that I failed to want to prosecute,

1    which I was never informed of the trial.  And at that

2    time, I was adamant that I did want to prosecute

3    because this was a person that had broke in and robbed

4    me previous, two years previous, and got out.  And he

5    was making the circuit again on -- everything was new,

6    let's go back and get it.

7        I can't tell you the attorney's name.  I know it

8    did put a strain on my friend, Rod Smith, who was the

9    state attorney at that time.  But we worked through it.

10       MR. PENNYPACKER:  How long ago was that?

11       PROSPECTIVE JUROR KARLE:  This about six years

12   ago, four years ago, six or four.

13       MR. PENNYPACKER:  You mentioned you were satisfied

14   one other time.  Tell me what happened with that one.

15       PROSPECTIVE JUROR KARLE:  The Alachua police

16   recovered my property.  They set the guy up, but he got

17   released on good behavior and about two years later he

18   came back.

19       MR. PENNYPACKER:  Mr. Malphurs, I think you raised

20   your hand.

21       PROSPECTIVE JUROR MALPHURS:  Yeah, I had my house

22   broke into a couple of times.

23       MR. PENNYPACKER:  Did law enforcement respond?

24       PROSPECTIVE JUROR MALPHURS:  Yeah they responded

25   to it.

1      MR. PENNYPACKER:  Were you satisfied with what

2    they did?

3      PROSPECTIVE JUROR MALPHURS:  Well, in a way yes

4    and no.  I know it's a lot, you know, like there's a

5    lot of things that interfere with them when they're

6    putting their finger on somebody.  They did catch one

7    fellow with two of the guns in Alachua, and I got those

8    two guns back.  But I don't know what happened to him.

9      I know the judge called me and wanted to know what

10   would I do.  And I said, judge, you got the man now.

11   It's yours, in your court.  As for that, if I caught

12   him, if I caught him between the four walls of my house

13   I would have killed him.  That's how I felt at that

14   time, if I had caught him inside of my house.

15     But we did get two of the guns back and I think

16   they done as much as they could do.

17     MR. PENNYPACKER:  Is that the only incident or

18   have you had others?

19     PROSPECTIVE JUROR MALPHURS:  Yeah.  The first one

20   they just got a little money.  I think it was young

21   'uns.  They just pull the slab out of the front door

22   and went in and got piggy banks and stuff that belong

23   today my young 'uns and we never did really catch

24   nobody with that, but there wasn't any fingerprints in

25   either case.  So...

```
 1          MR. PENNYPACKER:  Who else on the second row?

 2     Mr. Telesco?

 3          PROSPECTIVE JUROR TELESCO:  Let's see.  I lived

 4     until Honolulu about 20 years ago and I've had cars

 5     broken into, suitcases stolen, and personal belongings

 6     on two occasions.  I didn't report it; it was a foolish

 7     thing to leave in a car.  That was the end of it.

 8          MR. PENNYPACKER:  Mr. Whitman?

 9          PROSPECTIVE JUROR WHITMAN:  My wife's purse and

10     cell phones were broken into and taken.

11          MR. PENNYPACKER:  Did you call law enforcement?

12          PROSPECTIVE JUROR WHITMAN:  Yes.

13          MR. PENNYPACKER:  Was anyone ever apprehended?

14          PROSPECTIVE JUROR WHITMAN:  No.

15          MR. PENNYPACKER:  Anyone else?  Ms. Pena?

16          PROSPECTIVE JUROR PENA:  I'm currently on a case

17     of domestic battery.  My son, he was arguing with his

18     wife.  I got in the way and I was the one that got

19     pushed.  So they arrested him, because she called.  And

20     they have a no contact order against him.

21          MR. PENNYPACKER:  Is that case ongoing now?

22          PROSPECTIVE JUROR PENA:  Yes, sir.

23          MR. PENNYPACKER:  Are you involved with anybody in

24     the state attorney's office as far as prosecuting that

25     case?
```

```
1        PROSPECTIVE JUROR PENA:  I went to see if they
2    could take that contact order off because he really
3    didn't do nothing to me.  I was in the middle.  I tried
4    to stop it.  He pushed me and I fell.  So she jumped
5    over him, called the police, and they came and arrested
6    him.
7        MR. PENNYPACKER:  So the no contact order is to
8    have your son have no contact with you.
9        PROSPECTIVE JUROR PENA:  Uh-huh.
10       MR. PENNYPACKER:  Any other involvement with the
11   criminal justice system as far as being a victim of a
12   crime or anything else?
13       PROSPECTIVE JUROR PENA:  No.
14       MR. PENNYPACKER:  Who else on the back row been a
15   victim of a crime?  Ms. Williams.
16       PROSPECTIVE JUROR WILLIAMS:  My car was stolen
17   from my driveway.
18       MR. PENNYPACKER:  How long ago was that?
19       PROSPECTIVE JUROR WILLIAMS:  About eight years
20   ago.
21       MR. PENNYPACKER:  Did you call law enforcement?
22       PROSPECTIVE JUROR WILLIAMS:  Yes, I did.
23       MR. PENNYPACKER:  Were you satisfied with their
24   response?
25       PROSPECTIVE JUROR WILLIAMS:  Yes.
```

1    MR. PENNYPACKER:  Was anyone apprehended for that?

2    PROSPECTIVE JUROR WILLIAMS:  Yes.

3    MR. PENNYPACKER:  Do you know the outcome of the

4    case, did it go forward?

5    PROSPECTIVE JUROR WILLIAMS:  No.

6    MR. PENNYPACKER:  Do you know why the case did not

7    go forward?

8    PROSPECTIVE JUROR WILLIAMS:  Because it was

9    youths, some young boys, and I assumed that -- they

10   sent me a letter and they said that they had handled

11   the matter.  So I never did follow-up on it, because I

12   did get my car back, and the insurance company fixed

13   it.

14   MR. PENNYPACKER:  Mr. Diamond, think you were

15   gonna raise your hand.

16   PROSPECTIVE JUROR DIAMOND:  Yeah.

17   MR. PENNYPACKER:  Okay.

18   PROSPECTIVE JUROR DIAMOND:  Well, I've had several

19   crimes.  My bike was stolen.  My house broken into, car

20   broken into twice, I guess.

21   MR. PENNYPACKER:  Did you call law enforcement

22   each time?

23   PROSPECTIVE JUROR DIAMOND:  Yes.

24   MR. PENNYPACKER:  Were you satisfied with their

25   response?

1          PROSPECTIVE JUROR DIAMOND:  No.

2          MR. PENNYPACKER:  Tell me why you were

3     unsatisfied?

4          PROSPECTIVE JUROR DIAMOND:  You know, they didn't

5     even really send a full-fledged cop and...

6          MR. PENNYPACKER:  You got a service technician or

7     someone like that?

8          PROSPECTIVE JUROR DIAMOND:  I guess so.  It seemed

9     to me like it wasn't handled too seriously.

10          MR. PENNYPACKER:  Do you know if anyone was

11     arrested as a result of those reports?

12          PROSPECTIVE JUROR DIAMOND:  Not to my knowledge.

13          MR. PENNYPACKER:  Anyone else the victim of a

14     crime?

15          Anyone ever been a witness in a case?  There were

16     a couple people in the first panel been witnesses.

17          Mr. Pittman?

18          PROSPECTIVE JUROR PITTMAN:  I had to give a

19     deposition at the state attorney's office.

20          MR. PENNYPACKER:  What was that for?

21          PROSPECTIVE JUROR PITTMAN:  I caught some

22     juveniles stealing from my neighbor's home.

23          MR. PENNYPACKER:  Didn't actually go to trial and

24     testify in court?

25          PROSPECTIVE JUROR PITTMAN:  No, sir.

1    MR. PENNYPACKER:  Anyone else ever been a witness

2    in a case?  Mr. Carl?

3    PROSPECTIVE JUROR KARLE:  Depositions in a

4    lawsuit, civil suit, a farmer against a chemical

5    manufacturer and also depositions in cases of crimes

6    committed against the company I worked for, such as

7    damage done by juveniles doing damage and also civil

8    suits on a traffic case.

9    MR. PENNYPACKER:  Did you ever take the witness

10   stand in the courtroom like this?

11   PROSPECTIVE JUROR KARLE:  No, never.  I always

12   went to pretrial intervention.

13   MR. PENNYPACKER:  Anyone else ever been a witness?

14   Yes, Ms. Perry?

15   PROSPECTIVE JUROR PERRY:  There was a deposition,

16   an accident.  A lady ran out in front of me.

17   MR. PENNYPACKER:  I'm sorry, couldn't hear you.

18   PROSPECTIVE JUROR PERRY:  It was a deposition,

19   that's all it was.  It didn't go to trial or anything.

20   MR. PENNYPACKER:  You didn't testify in court?

21   PROSPECTIVE JUROR PERRY:  No.

22   MR. PENNYPACKER:  Anyone else a witness?

23   Yes, Mr. Lambert?

24   PROSPECTIVE JUROR LAMBERT:  I apprehended a purse

25   snatcher, but when we got to the actual court date, the

1    other parties didn't show and they were let go.

2         MR. PENNYPACKER:   Okay.   Did that leave a bad

3    taste in your mouth?

4         PROSPECTIVE JUROR LAMBERT:   Yeah.

5         MR. PENNYPACKER:   Yes?

6         PROSPECTIVE JUROR LAMBERT:   (Nods head.)

7         MR. PENNYPACKER:   Do you think that that

8    experience with the criminal justice system would

9    impact you in your ability to serve as a jurors in this

10   case?

11        PROSPECTIVE JUROR LAMBERT:   That experience?   No.

12        MR. PENNYPACKER:   Is there anything else in your

13   life as far as the criminal justice system?

14        PROSPECTIVE JUROR LAMBERT:   Oh, yeah.

15        MR. PENNYPACKER:   Tell me about that.

16        PROSPECTIVE JUROR LAMBERT:   I wrote it on -- I

17   would rather not, unless I'm forced to.

18        MR. PENNYPACKER:   It's on your questionnaire?

19        PROSPECTIVE JUROR LAMBERT:   Yeah.

20        MR. PENNYPACKER:   Anyone experience the loss of a

21   child?   I know Ms. Singer asked some questions about

22   family, friends, or your own children that you know

23   where someone experienced the loss of a child.

24   Mr. Cartell?

25        PROSPECTIVE JUROR CARTELL:   I had a child die at

1    birth.

2        MR. PENNYPACKER:  Child died at birth?

3        PROSPECTIVE JUROR CARTELL:  Yeah.

4        MR. PENNYPACKER:  Would that experience influence

5    you or impact you in your ability to sit in this case

6    knowing that a four-and-a-half-month-old child died.

7        I don't really know, to be honest with you.  I

8    mean, it's been a long time ago, but it's still, it's

9    always with you.  I don't know.  I don't think so, but

10   I don't know.

11       MR. PENNYPACKER:  Anyone else know anyone?

12       Yes, Ms. Perry?

13       PROSPECTIVE JUROR PERRY:  My son died with cancer.

14       MR. PENNYPACKER:  How old was he?

15       PROSPECTIVE JUROR PERRY:  He was a young adult.

16   He was 29.

17       MR. PENNYPACKER:  Would that loss impact your

18   ability to be fair to Mr. Herlihy or to the state in

19   this case?

20       PROSPECTIVE JUROR PERRY:  No.

21       MR. PENNYPACKER:  Anyone else know anyone that had

22   a child die.  Mr. Pittman?

23       PROSPECTIVE JUROR PITTMAN:  My sister passed away

24   when she was eleven and I work with Hospice patients

25   and been with children.

1        MR. PENNYPACKER:  Would that experience impact

2    your ability to be a fair and impartial juror in this

3    case?

4        PROSPECTIVE JUROR PITTMAN:  I don't think so.

5        MR. PENNYPACKER:  Ms. Mahamery, you raised your

6    hand.

7        PROSPECTIVE JUROR MAHAMERY:  My sister's baby died

8    like a week after birth.

9        MR. PENNYPACKER:  How long ago was that?

10       PROSPECTIVE JUROR MAHAMERY:  Approximately 13

11   years ago.

12       MR. PENNYPACKER:  Would that experience impact

13   your ability to be fair and impartial in this case?

14       PROSPECTIVE JUROR MAHAMERY:  I don't think so.

15       MR. PENNYPACKER:  Another question that you heard

16   this morning, adultery.  There's going to be some

17   testimony that the mother of the victim in this case

18   and Mr. Herlihy --

19       THE COURT:  Mr. Pennypacker, don't get into the

20   facts of the case, please.  Use hypotheticals.

21       MR. PENNYPACKER:  Would the fact that people have

22   committed adultery influence you as far as their

23   credibility as witnesses in the case?  The fact that

24   someone's engaged in an extramarital relationship, do

25   you think they would be any less credible as a witness

1      if they were to testify?

2            I'm not seeing any nods, yes?  I'm gonna assume

3      that's all no?  Mr. Hayden?

4            PROSPECTIVE JUROR HAYDEN:  Yes, sir.

5            MR. PENNYPACKER:  Adultery, would that impact your

6      ability or your weighing the credibility of a witness

7      if you were to know that they engaged in an

8      extramarital relationship?

9            PROSPECTIVE JUROR HAYDEN:  Adultery itself is,

10     it's a breach of trust.  I mean, any testimony we're

11     gonna get is you're sworn to tell the truth here.  But,

12     yeah, adultery is a breach of trust, so I guess you

13     would have to weigh that in some form or fashion.

14           MR. PENNYPACKER:  Would you look at someone as a

15     witness that committed adultery different than someone

16     who hadn't?

17           PROSPECTIVE JUROR HAYDEN:  Maybe subconsciously.

18           MR. PENNYPACKER:  Mr. Harrington, as far as

19     adultery, if you had a witness that committed adultery,

20     would you look at that person differently and weigh

21     their testimony differently than other witnesses?

22           PROSPECTIVE JUROR HARRINGTON:  I don't believe so.

23     Assuming that everyone was sworn to tell the truth, I

24     would believe that's what's happening.

25           MR. PENNYPACKER:  Ms. Flowers, same question as

1      far as adultery.  You knew someone who committed

2      adultery and they were testifying, would you look at

3      them differently as a witness?

4              PROSPECTIVE JUROR FLOWERS:  I don't think so.

5              MR. PENNYPACKER:  Tell me why you wouldn't.

6              PROSPECTIVE JUROR FLOWERS:  Well, along those same

7      lines, I mean they're sworn to tell the truth.  I can't

8      judge what they've done, you know, as far as the

9      adultery part.  I can just listen to the facts of the

10     case and to what they're being questioned about.

11             MR. PENNYPACKER:  Ms. Cumbaa, what's your opinion

12     on that question?

13             PROSPECTIVE JUROR CUMBAA:  I wouldn't think it

14     would be relevant to the case.

15             MR. PENNYPACKER:  Why not?

16             PROSPECTIVE JUROR CUMBAA:  I just, I don't think

17     it would be a factor in whether or not you would tell

18     the truth, or that you could describe what happened in

19     the case.  I don't think that it would be a factor.

20             MR. PENNYPACKER:  Ms. Jones, as far as this issue

21     of adultery and a witness, would you weigh that

22     person's testimony the same as anyone else's?

23             PROSPECTIVE JUROR JONES:  They are sworn to tell

24     the truth.  So that's what you're looking for them to

25     do.

1          MR. PENNYPACKER:  Would the fact that they've

2     committed adultery mean they could or couldn't tell the

3     truth?

4          PROSPECTIVE JUROR JONES:  I don't think so.

5          MR. PENNYPACKER:  Mr. Tedder was asking some

6     questions of the earlier panel about the burden of

7     proof, and we heard a lot about reasonable doubt.  If

8     the state were to prove this case beyond a reasonable

9     doubt, would any of you have any hesitation with the

10    finding of guilty?  Is there anyone that thinks if we

11    prove our case that you would not be able to vote

12    guilty?

13         All right.  Ms. Love, if we prove our case beyond

14    a reasonable doubt are you gonna be able to go back

15    there and vote guilty?

16         PROSPECTIVE JUROR LOVE:  Of course, if you're able

17    to do that.

18         MR. PENNYPACKER:  Ms. Dampier?

19         PROSPECTIVE JUROR DAMPIER:  Of course.

20         MR. PENNYPACKER:  Yes?

21         PROSPECTIVE JUROR DAMPIER:  (Nods head.)

22         MR. PENNYPACKER:  Mr. Harrington?

23         PROSPECTIVE JUROR HARRINGTON:  Yes.

24         MR. PENNYPACKER:  Mr. Hayden?

25         PROSPECTIVE JUROR HARRINGTON:  Probably not.

1          MR. PENNYPACKER:  Ms. Williams?

2          PROSPECTIVE JUROR WILLIAMS:  No problem.  If you

3     can prove it without a shadow of a doubt, no problem.

4          MR. PENNYPACKER:  It's necessarily beyond a shadow

5     of a doubt.  It's beyond a reasonable doubt.  It's high

6     enough as it is, let's not get any worse.

7          PROSPECTIVE JUROR WILLIAMS:  I don't have any

8     problem with it.

9          MR. PENNYPACKER:  If we prove testimony beyond a

10    reasonable doubt, you can vote guilty.

11         PROSPECTIVE JUROR WILLIAMS:  I have no problem.

12         MR. PENNYPACKER:  What about the issue of corporal

13    punishment?  At what age do you think it's permissible

14    to punish a child using corporal punishment?  First of

15    all, does anyone think we should not have corporal

16    punishment, that it's improper to punish a child that

17    way?  Ms. Cumbaa?

18         PROSPECTIVE JUROR CUMBAA:  I don't believe in it.

19         MR. PENNYPACKER:  Anyone else not believe in it?

20         At what age do you think it's appropriate to use

21    corporal punishment?  Ms. Flowers?

22         PROSPECTIVE JUROR FLOWERS:  I mean three, maybe.

23    I'm trying to think back to when my children were

24    small.  I think I verbally punished them probably up

25    until about the age of two or three, a little pat on

1    the bottom.

2         MR. PENNYPACKER:  How old were they when you

3    started?

4         PROSPECTIVE JUROR FLOWERS:  Three maybe.  It's a

5    long time ago.

6         MR. PENNYPACKER:  Ms. Mahamery, do you believe in

7    corporal punishment?

8         PROSPECTIVE JUROR MAHAMERY:  Yes, definitely.

9         MR. PENNYPACKER:  At what age do you think it's

10   appropriate to begin corporal punishment in a child?

11        PROSPECTIVE JUROR MAHAMERY:  Around two.  As soon

12   as they are in the stage where they can be potty

13   trained; around two.

14        MR. PENNYPACKER:  Mr. Diamond, do you think it's

15   appropriate to issue corporal punishment?  At what age

16   should it be used at?

17        PROSPECTIVE JUROR DIAMOND:  I do think it's

18   appropriate, but I can't really answer what age.  I

19   don't have good conception for like what age of a child

20   in response to maturity.

21        MR. PENNYPACKER:  Did your parents use corporal

22   punishment with you?

23        PROSPECTIVE JUROR DIAMOND:  You know, I can't ever

24   remember them doing that, but I know that they must

25   have spanked me.

1          MR. PENNYPACKER:  But you don't have a conscious

2     memory of it?

3          PROSPECTIVE JUROR DIAMOND:  No, I don't.

4          MR. PENNYPACKER:  Mr. Smith, at what age do you

5     think it's appropriate to begin corporal punishment?

6          PROSPECTIVE JUROR SMITH:  I believe it should only

7     be used when absolutely necessary, and only when the

8     child is old enough to understand what they've done

9     wrong, and why they are getting punished for it.

10         MR. PENNYPACKER:  Okay.  And is there any magic

11    age when you think that happens?

12         PROSPECTIVE JUROR SMITH:  Each child is different.

13    Each child matures at a different pace.

14         MR. PENNYPACKER:  Ms. Williams, what age?

15         PROSPECTIVE JUROR WILLIAMS:  I say what he was

16    saying.  As soon as they begin to understand, I think

17    that's when you should.

18         MR. PENNYPACKER:  Is there a certain chronological

19    date when you think that happens in this case?

20         PROSPECTIVE JUROR WILLIAMS:  I say between three

21    and four.

22         MR. PENNYPACKER:  Mr. Traxler?

23         PROSPECTIVE JUROR TRAXLER: I would like to change

24    my answer.  I don't have a lot of -- I don't have

25    children, so I shouldn't even be saying this, but I

1     don't believe in corporal punishment when I don't have

2     them.

3          MR. PENNYPACKER:  What about you, Ms. Powell?

4          PROSPECTIVE JUROR POWELL:  Same thing, I don't

5     believe in it.  I think you can punish a child in

6     different ways besides hitting them.

7          MR. PENNYPACKER:  What other ways would you think

8     is appropriate to punish children?

9          PROSPECTIVE JUROR POWELL:  Verbal.

10         MR. PENNYPACKER:  Excuse me?

11         PROSPECTIVE JUROR POWELL:  I think verbal, just

12    telling them they're doing -- wrong is wrong.

13         MR. PENNYPACKER:  Ms. Monplaisir, what age do you

14    think is appropriate for corporal punishment for

15    children?

16         PROSPECTIVE JUROR MONPLAISIR:  I think it's only

17    appropriate in the most extreme cases.  With my own son

18    I can only remember two or three times for the really

19    big things, and then I think it should be in proportion

20    to the age of the child.

21         MR. PENNYPACKER:  What was a really big thing he

22    got spanked for?

23         PROSPECTIVE JUROR MONPLAISIR:  I'm trying to

24    remember.  I can't really recall.  But he was at least

25    in kindergarten.  I mean, not below that age, maybe

1    five, six.

2        MR. PENNYPACKER:  You've heard the term "shaken

3    baby syndrome" and you were asked, when we had all of

4    you out there in the audience to begin with, whether

5    you had any knowledge of the shaken baby syndrome.

6        Were any of you 24, any of those that raised their

7    hand when the judge asked that question this morning?

8    Yes, Ms. Pena?

9        PROSPECTIVE JUROR PENA:  I don't have like a

10   special knowledge of it.  I am a nurse and we have to

11   study about it.  They do tell you it's not right.

12   Plus, I have three grandbabies, and both my sons,

13   they're real big, and they tend to play a little rough

14   with them, and I'm always telling them that they have

15   to be a little more careful with them.  And I always

16   talk to them about that.

17       MR. PENNYPACKER:  Where do you work as a nurse?

18       PROSPECTIVE JUROR PENA:  I was, I was working at

19   the VA hospital.

20       MR. PENNYPACKER:  How long ago did you receive

21   this training?

22       PROSPECTIVE JUROR PENA:  I graduated in '95 as an

23   RN, but I graduated in '88 as LPN, so they do teach you

24   that also.

25       MR. PENNYPACKER:  Anyone else have any special

1     knowledge?
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        Ms. Cawthon?

2        PROSPECTIVE JUROR CAWTHON:  I have a friend whose

3    child was shaken by a sitter and it was determined that

4    the child had shaken baby syndrome.

5        MR. PENNYPACKER:  Did the child live?

6        PROSPECTIVE JUROR CAWTHON:  Yes.

7        MR. PENNYPACKER:  Anyone else?  Yes?  Ms. Cumbaa?

8        PROSPECTIVE JUROR CUMBAA:  I am a registered nurse

9    and I've had training in triage and emergencies, not

10   specifically that, but --

11       MR. PENNYPACKER:  Anyone else with shaken baby

12   syndrome knowledge?  Mr. Pittman?

13       PROSPECTIVE JUROR PITTMAN:  Just general articles.

14       MR. PENNYPACKER:  Reading about it in the paper?

15       PROSPECTIVE JUROR PITTMAN:  Uh-huh.

16       MR. PENNYPACKER:  Tomorrow is election day.

17   Anybody here connected with any political campaigns?  I

18   don't want to know what party you are, but does anyone

19   look like oh, I cannot do this because I've got to get

20   to the polls tomorrow, or hold up my signs, or stand on

21   the street corners, or do whatever it is you do to

22   support a candidate?  Is anyone connected to any

23   political candidates?

24       You should be able to vote.  I believe you'll be

25   able to get there and do it in the morning or whenever

1        you leave here tomorrow.

2             One of the jurors this morning mentioned that.  I

3        think it was Ms. Wade, that she felt like she was

4        better able to grasp information if she heard it as

5        opposed to if she read it.  Maybe I have it backwards.

6        Maybe she said she grasped it better when she read

7        testimony as opposed to hearing it.  I heard that's

8        called auditory learning or visual learning.

9             Does anyone here consider themselves one or the

10       other, meaning you only take information in through

11       your ears and you don't take it in through your eyes,

12       or, the other way around, you only take it in through

13       your eyes and not your ears?  Anyone consider

14       themselves auditory as opposed to visual or the other

15       way around?  Okay.

16            Anyone here work at Shands?  Ms. Powell, where do

17       you work?

18            PROSPECTIVE JUROR POWELL:  I work on the pediatric

19       floor.  I'm a clerk.

20            MR. PENNYPACKER:  You're a clerk?

21            PROSPECTIVE JUROR POWELL:  (Nods head.)

22            MR. PENNYPACKER:  How long have you been there?

23            PROSPECTIVE JUROR POWELL:  I just started a couple

24       of weeks ago.

25            MR. PENNYPACKER:  Did you know any of the names

1    that we read a few moment ago?

2         PROSPECTIVE JUROR POWELL:  I just started, but I

3    actually do work with the patients.

4         MR. PENNYPACKER:  You actually have contact with

5    the kids in the pediatric intensive unit or just on the

6    floor?

7         PROSPECTIVE JUROR POWELL:  On the regular floor.

8         MR. PENNYPACKER:  Anyone else work at Shands now?

9    Yes, ma'am.

10        PROSPECTIVE JUROR TRAXLER:  Sort of, the Shands

11   @AGH.

12        MR. PENNYPACKER:  That's still Shands.  Shands

13   bought AGH at some point.

14        PROSPECTIVE JUROR TRAXLER:  I'm doing sort of the

15   independent study sort of thing at Shands AGH with the

16   mother baby group.

17        MR. PENNYPACKER:  I may have asked you.  You're

18   getting a Ph.D. in health care?

19        PROSPECTIVE JUROR TRAXLER:  They call it health

20   behavior.  It's sort of the public health, but it's

21   through the health education department.

22        MR. PENNYPACKER:  Anyone here ever work at Shands?

23   Ms. Love, when did you work there?

24        PROSPECTIVE JUROR LOVE:  I worked there in '88 in

25   the operating room and then have since left.  I'm a

1    nurse, registered nurse; left my practice in the

2    operating room and now I teach at the University of

3    Florida College of Nursing.  But I didn't recognize

4    anybody.  I only know surgeons and they all wear masks.

5         MR. PENNYPACKER:  I hope there's not a reason for

6    that.

7         When you left Shands did you do it so you could

8    become a professor or how did that come about?

9         PROSPECTIVE JUROR LOVE:  Actually, no.  I left it

10   to become a trauma nurse, a night nurse at north

11   Florida and then didn't come back to my alma mater

12   until five years ago.

13        MR. PENNYPACKER:  There was nothing about your

14   departure from Shands that would cause you to treat it

15   any different than --

16        PROSPECTIVE JUROR LOVE:  Oh, no, no.  Well, I

17   didn't like eight-hour gall bladders.  Residents take

18   their time on things.  The real doctors at North

19   Florida, it's 15 minutes and we got a gall bladder out.

20        MR. PENNYPACKER:  Anybody here watch reality court

21   T.V.?  Meaning court T.V. or state versus, shows like

22   that?

23        Ms. Mahamery, what do you watch?

24        PROSPECTIVE JUROR MAHAMERY:  Judge Judy.

25        MR. PENNYPACKER:  I call that T.V. court.  How

1          about Judge Joe Brown, anybody watch that show?  All

2          right.  Ms. Hayden, why do you watch that show?

3                PROSPECTIVE JUROR WILLIAMS:  Williams.

4                Oh, I'm sorry.  I was looking at Ms. Hayden.

5                Ms. Williams, I'm sorry.

6                MR. PENNYPACKER:  Ms. Williams, why do you watch

7          that show?

8                PROSPECTIVE JUROR WILLIAMS:  I watch it because I

9          like to see the outcome, you know, that's about it.

10                MR. PENNYPACKER:  You know we're not getting this

11          done in 30 minutes today obviously.

12                PROSPECTIVE JUROR WILLIAMS:  Right.

13                MR. PENNYPACKER:  It's not gonna be anywhere near

14          what you saw on T.V.

15                Who else watches any kind of court television?

16          Anybody watch the practice or -- Mr. Hayden, what do

17          you watch?

18                PROSPECTIVE JUROR HAYDEN:  The practice.

19                MR. PENNYPACKER:  Why do you watch that show?

20          What's entertaining about it?

21                PROSPECTIVE JUROR HAYDEN:  Just pure

22          entertainment.  I know it's not how it's really done.

23                MR. PENNYPACKER:  Okay.  And Ms. Flowers, I think

24          you were raising your hands.

25                PROSPECTIVE JUROR FLOWERS:  It's like a soap

1    opera, the practice is.

2         MR. PENNYPACKER:   Soap opera?  Do you watch that

3    one, too?

4         PROSPECTIVE JUROR FLOWERS:   Yeah.

5         MR. PENNYPACKER:   Mr. Karle, what do you watch?

6         PROSPECTIVE JUROR KARLE:   Law and order.

7         MR. PENNYPACKER:   Why do you find that show

8    entertaining?

9         PROSPECTIVE JUROR KARLE:   It's an interesting show

10   from start to finish.

11        MR. PENNYPACKER:   Okay.  Anyone else watch any

12   court-related television?

13        Mr. Pittman, what do you watch?

14        PROSPECTIVE JUROR PITTMAN:   Law and Order.

15        MR. PENNYPACKER:   Who served on a jury before?

16   Oh, boy.

17        Ms. Jones, was it a civil or criminal case?

18        PROSPECTIVE JUROR JONES:   I served on the grand

19   jury for six months.

20        MR. PENNYPACKER:   Have you ever served on a petit

21   jury, meaning a jury like this, where you served on a

22   criminal or civil case?

23        PROSPECTIVE JUROR JONES:   No.

24        MR. PENNYPACKER:   Mr. Furman, prior jury service?

25        PROSPECTIVE JUROR FURMAN:   Yes.

1          MR. PENNYPACKER:  Were you able to reach a

2     verdict?

3          PROSPECTIVE JUROR FURMAN:  Yes.

4          MR. PENNYPACKER:  Were you the foreperson?

5          PROSPECTIVE JUROR FURMAN:  No.

6          MR. PENNYPACKER:  Who else on the second row?  Mr.

7     Cartell.

8          PROSPECTIVE JUROR CARTELL:  It was a civil matter.

9          MR. PENNYPACKER:  Were you able to reach a

10    verdict?

11         PROSPECTIVE JUROR CARTELL:  Yes.

12         MR. PENNYPACKER:  Were you the foreperson?

13         PROSPECTIVE JUROR CARTELL:  No.

14         MR. PENNYPACKER:  Mr. Malphurs?

15         PROSPECTIVE JUROR MALPHURS:  I reckon a criminal

16    case; it was a murder.  We reached a verdict.

17         MR. PENNYPACKER:  Were you are the foreperson?

18         PROSPECTIVE JUROR MALPHURS:  No, I was just a hold

19    out when they went to deliberate.  I got to watch the

20    whole thing but I wasn't in on making the decision.

21         MR. PENNYPACKER:  Okay.  Mr. Pittman, was it a

22    civil or criminal case?

23         PROSPECTIVE JUROR PITTMAN:  Criminal.

24         MR. PENNYPACKER:  How long ago was that?

25         PROSPECTIVE JUROR PITTMAN:  About ten years ago, I

1    believe.

2         MR. PENNYPACKER:  Go ahead.

3         PROSPECTIVE JUROR PITTMAN:  I was chosen but they

4    had a plea the next day; it really didn't go to trial.

5         And the second time I wasn't chosen at all.

6         MR. PENNYPACKER:  All right.

7         Ms. Love, were you raising your hand?

8         PROSPECTIVE JUROR LOVE:  Yes.  I was on a jury for

9    criminal trial about 12 years ago, and no, we didn't

10   reach a verdict.  And I was on a trial here about six

11   years ago and it was settled the morning we were all

12   sat.

13        MR. PENNYPACKER:  Okay.  I think you said the case

14   that you were unable to reach a verdict that was a

15   criminal case?

16        PROSPECTIVE JUROR LOVE:  That's correct.

17        MR. PENNYPACKER:  Who else has prior jury service?

18   Ms. Pena?

19        PROSPECTIVE JUROR PENA:  Yeah.  It was a criminal

20   case and it was like two years ago and we did reach a

21   verdict.

22        MR. PENNYPACKER:  You served as the foreperson?

23        PROSPECTIVE JUROR PENA:  Yes.

24        MR. PENNYPACKER:  Ms. Williams, did you reach a

25   verdict?

000200

1          PROSPECTIVE JUROR WILLIAMS:  Civil.  No.

2          MR. PENNYPACKER:  Anything about your service as

3     jurors that would make you find this process

4     distasteful, meaning there's no way, I don't want to do

5     that again?  Are you willing -- you served as jurors

6     before, are you willing to do it again?

7          I think I'm gonna get the personal questionnaires

8     and ask you some questions about those.  Ms. Perry you

9     say that you have, you or somebody in your immediate

10    family has been a party to a lawsuit, is that correct?

11    You checked actually yes and no, so explain that to me.

12         PROSPECTIVE JUROR PERRY:  Well.  Yes it was.  That

13    was the car that ran out in front of --

14         MR. PENNYPACKER:  So you were a witness but

15    didn't, actually were a party in the case?

16         PROSPECTIVE JUROR PENA:  No, the car ran out in

17    front of me.

18         MR. PENNYPACKER:  And so you hit the car?

19         PROSPECTIVE JUROR PENA:  Well, yeah.  There was

20    nowhere else to go.  I looked for an out but there was

21    nowhere.  She stopped.

22         MR. PENNYPACKER:  So you were actually the

23    plaintiff in the lawsuit?

24         PROSPECTIVE JUROR PENA:  Yes.

25         MR. PENNYPACKER:  Any other involvement in any

1    kind of lawsuits?

2          PROSPECTIVE JUROR PENA:  No.

3          MR. PENNYPACKER:  You work for the RTS?

4          PROSPECTIVE JUROR PENA:  Yes, I do.

5          MR. PENNYPACKER:  That's transit operator.  What

6    does that mean?

7          PROSPECTIVE JUROR PENA:  That means that I drive

8    the bus or a route, a timed route, and I also serve as

9    a safety instructor to help new people coming in to

10   learn to drive.  I evaluate the older drivers, the

11   younger drivers.

12         MR. PENNYPACKER:  You say you've lived in Florida

13   for 52 years, but Alachua County for three years.

14   Where did you live outside of Alachua County before?

15         PROSPECTIVE JUROR PENA:  Well, I grew up in Tampa.

16   I married in Tampa.  We had our children there.  We

17   moved to Citrus County and then we moved to Georgia

18   because my husband is from North Carolina, but I

19   couldn't go that far up.  So we stopped in Georgia.

20         And I just couldn't get used to the rain and the

21   dreariness, ten below zero, and we came home.  And

22   that's about it.

23         MR. PENNYPACKER:  How did you end up in Alachua

24   County instead of going back to Tampa or Citrus County?

25         PROSPECTIVE JUROR PENA:  Oh, no, my husband, like

1    I said, is from North Carolina.  He does not like real

2    big cities.

3        MR. PENNYPACKER:  You have three grown children,

4    is that right?

5        PROSPECTIVE JUROR PENA: Yes.  I had four and, of

6    course, we lost our son and I have three sons left.

7        MR. PENNYPACKER:  Do you have any grandchildren?

8        PROSPECTIVE JUROR PENA:  Yes, I do.  I have seven

9    grandchildren and one great grandson.

10       MR. PENNYPACKER:  Ms. Cawthon, you put yes that a

11   member of your family has been accused, or victim, or

12   witness to a criminal case.  Is that something that we

13   haven't discussed yet?

14       PROSPECTIVE JUROR CAWTHON:  My husband was one of

15   the witnesses with the Nintendo Bandit several years

16   ago, helped apprehend him.

17       MR. PENNYPACKER:  All right.

18       PROSPECTIVE JUROR CAWTHON:  But that's the only

19   time.

20       MR. PENNYPACKER:  And you are, let's see it says

21   school board member.

22       PROSPECTIVE JUROR CAWTHON:  Yes.

23       MR. PENNYPACKER:  I thought I recognized that

24   name.  Your husband works for the UF foundation.

25       PROSPECTIVE JUROR CAWTHON:  Yes.

1       MR. PENNYPACKER:  And you have three children.

2       PROSPECTIVE JUROR CAWTHON:  Yes.

3       MR. PENNYPACKER:  How old are your children?

4       PROSPECTIVE JUROR CAWTHON:  I have a handicapped

5 daughter that's 23, and I have sons 17 and 11.

6       MR. PENNYPACKER:  Does your oldest daughter

7 require full-time care?

8       PROSPECTIVE JUROR CAWTHON:  Yes.

9       MR. PENNYPACKER: Ms. Monplaisir, you are a

10 teacher.  Where do you teach?

11       PROSPECTIVE JUROR MONPLAISIR:  I'm a media

12 specialist at Talbott Elementary.

13       MR. PENNYPACKER:  Do you know Ms. Cawthon?

14       PROSPECTIVE JUROR MONPLAISIR:  Well, I don't know

15 her personally, but I see her on television all the

16 time.

17       MR. PENNYPACKER:  Okay.  Your husband is

18 self-employed and he's a stock trader.  How has his

19 business been the last year?

20       PROSPECTIVE JUROR MONPLAISIR:  Don't ask.

21       MR. PENNYPACKER:  Okay.  You have one child?

22       PROSPECTIVE JUROR MONPLAISIR:  Yes.

23       MR. PENNYPACKER:  How old is he or she?

24       PROSPECTIVE JUROR MONPLAISIR:  Thirty-four.

25       MR. PENNYPACKER:  Ms. Powell, you are not married?

```
1          PROSPECTIVE JUROR POWELL:  Correct?

2          MR. PENNYPACKER:  No children?

3          PROSPECTIVE JUROR POWELL:  Correct.

4          MR. PENNYPACKER:  Lived in Florida for nineteen

5     years, in Alachua County for nineteen years.  Did you

6     go to high school here?

7          PROSPECTIVE JUROR POWELL:  I went to Buchholz.

8          MR. PENNYPACKER:  Buchholz.  So you must be in

9     your first year at Santa Fe?

10         PROSPECTIVE JUROR POWELL:  Second year.

11         MR. PENNYPACKER:  Second.

12         Ms. Traxler, you have you're married and your

13    husband is a medical student?

14         PROSPECTIVE JUROR TRAXLER:  Third year medical

15    student.

16         MR. PENNYPACKER:  Does he know what kind of

17    medicine he wants to practice when he finishes?

18         PROSPECTIVE JUROR TRAXLER:  He thinks probably

19    pediatrics.

20         MR. PENNYPACKER:  Does he come home and talk about

21    what he's learning in school?

22         PROSPECTIVE JUROR TRAXLER:  Yeah, he does.

23         MR. PENNYPACKER:  Has he ever mentioned shaken

24    baby syndrome to you?

25         PROSPECTIVE JUROR TRAXLER:  No, but you've heard
```

```
 1         about it.

 2              MR. PENNYPACKER:  Ms. Jones, you checked that you

 3         have a close friend or relative who's a law enforcement

 4         officer.  Who is that?

 5              PROSPECTIVE JUROR JONES:  My husband.

 6              MR. PENNYPACKER:  What agency does he work for?

 7              PROSPECTIVE JUROR JONES:  He works from Florida

 8         State Prison, corrections officer.

 9              MR. PENNYPACKER:  Up in Lake Butler?

10              PROSPECTIVE JUROR JONES:  (Nods head.)

11              MR. PENNYPACKER:  How long has he been there?

12              PROSPECTIVE JUROR JONES:  Six years, the last six

13         years.

14              MR. PENNYPACKER:  You have two children.

15              PROSPECTIVE JUROR JONES:  Uh-huh.

16              MR. PENNYPACKER:  How old are they?

17              PROSPECTIVE JUROR JONES:  Fifteen and 17.

18              MR. PENNYPACKER:  Ms. Cumbaa, it's got registered

19         nurse with Av-Med health plan.  Does that mean you go

20         to people's houses?  What do you do?

21              PROSPECTIVE JUROR CUMBAA:  No.  I'm a case manager

22         for dialysis patients, so I just make sure they're

23         getting the services they need.

24              MR. PENNYPACKER:  Okay.  So you supervise other

25         nurses in providing that care.
```

1    PROSPECTIVE JUROR CUMBAA:  No, I just work with

2 them to make sure that they're serving a patient and

3 coordinate it.  It's not actually hands-on care.

4    MR. PENNYPACKER:  How old are your children?

5    PROSPECTIVE JUROR CUMBAA:  Fourteen and 22.

6    MR. PENNYPACKER:  Girls or boys?

7    PROSPECTIVE JUROR CUMBAA:  Girls.

8    MR. PENNYPACKER:  What is Sun Coast Skyline

9 Display.

10    PROSPECTIVE JUROR CUMBAA:  It's a trade show

11 display, graphic design company.

12    MR. PENNYPACKER:  You've also been in Florida for

13 50 years and Alachua County for 24.  Where did you live

14 when you weren't in this area?

15    PROSPECTIVE JUROR CUMBAA:  I grew up in Orlando.

16    MR. PENNYPACKER:  What brought you to this county?

17    PROSPECTIVE JUROR CUMBAA:  School.

18    MR. PENNYPACKER:  You came to UF and you didn't

19 leave?

20    PROSPECTIVE JUROR CUMBAA:  Sort of.

21    MR. PENNYPACKER:  Mr. Furman, I don't have your

22 form or it's in a different place.

23    MS. SINGER:  It may be in a different place.  It's

24 189 -- pardon me, he's 185.  He would be on --

25 Mr. Hayden is 187.

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

0003207

274

```
 1            MR. PENNYPACKER:  Just asked you the questions.
 2      Are you married?
 3            PROSPECTIVE JUROR FURMAN:  Yes.
 4            MR. PENNYPACKER:  How many children do you have?
 5            PROSPECTIVE JUROR FURMAN:  Three: 20, 18 and 15.
 6            MR. PENNYPACKER:  How are you employed?
 7            PROSPECTIVE JUROR FURMAN:  Work for a small firm
 8      that manufactures inspection testing equipment for deep
 9      foundations.
10            MR. PENNYPACKER:  How long have you been in
11      Alachua County?
12            PROSPECTIVE JUROR FURMAN:  52 years.
13            MR. PENNYPACKER:  Where did you go to school?
14            PROSPECTIVE JUROR FURMAN:  J.J. Finley, Woodward,
15      Westwood, GHS, Santa Fe Community College, University
16      of Florida, two degrees.
17            MR. PENNYPACKER:  There's not a school here that
18      you haven't been to.
19            Ms. Love, how old are your children?
20            PROSPECTIVE JUROR LOVE:  '64 and '69.  I mean,
21      that's the years they were born.  That's not how old
22      they are.
23            MR. PENNYPACKER:  I was gonna ask you how you did
24      that.
25            PROSPECTIVE JUROR LOVE:  They're older.
```

1          MR. PENNYPACKER:  Let me try, 38 and 33.

2          PROSPECTIVE JUROR LOVE:  They're five years apart,

3     right.

4          MR. PENNYPACKER:  You've been in Alachua County

5     for 14 years?

6          PROSPECTIVE JUROR LOVE:  Yes.

7          MR. PENNYPACKER:  What brought you here?

8          PROSPECTIVE JUROR LOVE:  My oldest daughter

9     graduated from high school and I couldn't really afford

10     to send her to UF, but if I moved up and became her

11     roommate, we could do that.  So it took her eight years

12     to graduate, but --

13          MR. PENNYPACKER:  She's not still your roommate,

14     is she?

15          PROSPECTIVE JUROR LOVE:  No.

16          MR. PENNYPACKER:  Mr. Pittman, how old are your

17     children?

18          PROSPECTIVE JUROR PITTMAN:  19, 15, and 10.

19          MR. PENNYPACKER:  I asked you that already.  What

20     brought you to Alachua County?

21          PROSPECTIVE JUROR PITTMAN:  School.

22          MR. PENNYPACKER:  You checked off that you know

23     someone in law enforcement.  Who is that or who are

24     those people?

25          PROSPECTIVE JUROR PITTMAN:  My brother is a

1    retired state trooper; my sister-in-law is a retired

2    deputy sheriff, and I have one friend that's on the

3    ASO.

4        MR. PENNYPACKER:  Would all of those relationships

5    influence you as far as the police officers and law

6    enforcement people that are gonna testify in this case?

7        PROSPECTIVE JUROR PITTMAN:  I don't believe so.

8        MR. PENNYPACKER:  Would you give their testimony

9    any greater credibility or any less credibility than

10   the other witnesses?

11       PROSPECTIVE JUROR PITTMAN:  I don't think so.

12       MR. PENNYPACKER:  Mr. Telesco, you don't have any

13   children, is that right?

14       PROSPECTIVE JUROR TELESCO:  That's correct.

15       MR. PENNYPACKER:  Where did you live before you

16   came to Alachua County.

17       PROSPECTIVE JUROR TELESCO:  I lived in Huntsville,

18   Alabama.  I worked for NASA 12 years, and then prior to

19   that, I lived until San Francisco, HONOLULU, Boston,

20   Chicago, Cleveland, and I grew up in south Florida,

21   amazingly ended up back here.

22       MR. PENNYPACKER:  All of that employment related

23   as far astronomy?

24       PROSPECTIVE JUROR TELESCO:  The Boston, the

25   Honolulu, San Francisco, Huntsville was employment.

```
 1        Prior to that I was at the University of Chicago and

 2        other schools.

 3            MR. PENNYPACKER:  I was reading something the

 4        other day about observatories on the mountains in

 5        Hawaii.

 6            PROSPECTIVE JUROR TELESCO:  That's where I worked,

 7        here and south America.  That's right.

 8            MR. PENNYPACKER:  That's because you're up high

 9        and there's not as much light so you can see the stars

10        better?

11            PROSPECTIVE JUROR TELESCO:  That's one of the many

12        reasons, yeah.

13            MR. PENNYPACKER:  Mr. Malphurs, how old are your

14        kids?

15            PROSPECTIVE JUROR MALPHURS:  My kids?  35 and 39.

16            MR. PENNYPACKER:  Mr. Karle, also your form's not

17        in order.  Let me ask you these questions.  How long

18        have you lived in Alachua County?

19            PROSPECTIVE JUROR KARLE:  Alachua County?

20            MR. PENNYPACKER:  Yes, sir.

21            PROSPECTIVE JUROR KARLE:  I moved to Alachua

22        County in 1980.

23            MR. PENNYPACKER:  Where did you live before that?

24            PROSPECTIVE JUROR KARLE:  In Archer, before that

25        Levy.
```

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

```
 1            MR. PENNYPACKER:  So Levy County then Archer?

 2            PROSPECTIVE JUROR KARLE:  Right.

 3            MR. PENNYPACKER:  Do you know any people in law

 4       enforcement?

 5            PROSPECTIVE JUROR MALPHURS:  There's people that

 6       have been in law enforcement.  Billy Malphurs, chief

 7       investigator for state attorney's office.  Paul

 8       Shimhouser, retired highway patrolman.  I mean, I know,

 9       I've known several: N. C. Swandell, Alachua police

10       Department; Robert Jernigan, police chief with Alachua

11       Police Department.

12            MR. PENNYPACKER:  Would your knowledge of those

13       individuals cause you to give any greater weight to the

14       testimony of the police officers who testify in this

15       case?

16            PROSPECTIVE JUROR MALPHURS:  Possibly some.  They

17       have been trained professionally to do their job.  They

18       call it like they see it.

19            MR. PENNYPACKER:  You understand they're people

20       like anybody else and they can make mistakes?

21            PROSPECTIVE JUROR MALPHURS:  I understand that,

22       too.

23            MR. PENNYPACKER:  Mr. Malphurs, you're not related

24       to Billy Malphurs, are you?

25            PROSPECTIVE JUROR MALPHURS:  Just a little bit.
```

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

1       MR. PENNYPACKER:  Tell me how you're related to

2   him.

3       PROSPECTIVE JUROR MALPHURS:  Cousins.

4       MR. PENNYPACKER:  Would your relationship cause to

5   you give Mr. Malphurs' testimony any greater weight?

6       PROSPECTIVE JUROR MALPHURS:  Well, listening to

7   him talk I would have to say it would be a little bit,

8   but I understand, too, that they can make mistakes

9   where I would have to kind of weigh it, you know,

10  everybody can make mistakes.

11      MR. PENNYPACKER:  Could you put that feeling aside

12  and only judge them based on what they say in this

13  courtroom?

14      PROSPECTIVE JUROR MALPHURS:  I think so.

15      MR. PENNYPACKER:  Ms. Flowers, you know somebody

16  in law enforcement.  Who do you know?

17      PROSPECTIVE JUROR FLOWERS:  Tom Terry is retired

18  from the Gainesville Police Department.  He's now

19  working for Santa Fe Community College where I work.

20      MR. PENNYPACKER:  Do you know anybody else?

21      PROSPECTIVE JUROR FLOWERS:  No.

22      MR. PENNYPACKER:  Would that knowledge cause you

23  to give greater weight to law enforcement testimony?

24      PROSPECTIVE JUROR FLOWERS:  No.

25      MR. PENNYPACKER:  How old are your children?

1        PROSPECTIVE JUROR FLOWERS:  21 and 23.

2        MR. PENNYPACKER:  You're an office manager at

3    Santa Fe.  What do you do?

4        PROSPECTIVE JUROR FLOWERS:  I work in the office

5    for development where we manage all the outside funding

6    for the college, whether it be federal, state, or

7    local, all the grants, the endowment corporations.

8        MR. PENNYPACKER:  Okay.  And Mr. Smith, you have

9    one child?

10       PROSPECTIVE JUROR SMITH:  Yes.

11       MR. PENNYPACKER:  Is that a boy or a girl?

12       PROSPECTIVE JUROR SMITH:  Girl.

13       MR. PENNYPACKER:  How old is she?

14       PROSPECTIVE JUROR SMITH:  Twenty-two.

15       MR. PENNYPACKER:  Where have you lived besides

16   Alachua County; you've got 28 years here.  Where else

17   have you been?

18       PROSPECTIVE JUROR SMITH:  I moved up here from

19   Kings County.

20        MR. PENNYPACKER:  So you lived in Florida all your

21   life?

22       PROSPECTIVE JUROR SMITH:  Since '67.

23       MR. PENNYPACKER:  Where did you live before that?

24       PROSPECTIVE JUROR SMITH:  Wisconsin.

25       MR. PENNYPACKER:  Mr. Cartell, how long have you

1      lived in Alachua County.

2          PROSPECTIVE JUROR CARTELL:  15 years.

3          MR. PENNYPACKER:  Where did you live before that?

4          PROSPECTIVE JUROR CARTELL:  Santa Rosa County.

5          MR. PENNYPACKER:  What brought you to Gainesville?

6          PROSPECTIVE JUROR CARTELL:  We always liked it

7      here and my job, I got a transfer.

8          MR. PENNYPACKER:  How are you employed?

9          PROSPECTIVE JUROR CARTELL:  I work for Social

10     Security.

11         MR. PENNYPACKER:  What do you do with Social

12     Security?

13         PROSPECTIVE JUROR CARTELL:  I'm a technical

14     expert.

15         MR. PENNYPACKER:  What's that mean?

16         PROSPECTIVE JUROR CARTELL:  It means I have to

17     know how do everything.  I mean, I may not, but I'm

18     supposed to know.

19         MR. PENNYPACKER:  Everybody comes to you with a

20     question?

21         PROSPECTIVE JUROR CARTELL:  Yeah.

22         MR. PENNYPACKER:  Do you know anybody in law

23     enforcement?

24         PROSPECTIVE JUROR CARTELL:  I'm sorry?

25         MR. PENNYPACKER:  Do you know anybody in law

1   enforcement?

2        PROSPECTIVE JUROR CARTELL:  No, sir.

3        MR. PENNYPACKER:  Ms. Dampier, how old are your

4   children?

5        PROSPECTIVE JUROR DAMPIER:  Thirty-eight, 37 and

6   17.  Long drop there.

7        MR. PENNYPACKER:  That's a long gap between kids

8   there.

9        PROSPECTIVE JUROR DAMPIER:  Yeah, it is.

10       MR. PENNYPACKER:  Do you know anybody in law

11   enforcement?

12       PROSPECTIVE JUROR DAMPIER:  Yes, I do.  Eugene

13   Dampier.

14       MR. PENNYPACKER:  Police chief, used to be Alachua

15   or High Springs.

16       PROSPECTIVE JUROR DAMPIER:  He's retired.

17   Alachua.

18       MR. PENNYPACKER:  Would your knowledge of former

19   Chief Dampier cause you to give law enforcement

20   officers' in this case testimony greater weight?

21       PROSPECTIVE JUROR DAMPIER:  No.

22       MR. PENNYPACKER:  I've got it here.  Let me find

23   it, Mr. Harrington.  Here it is.

24       How old are your kids?

25       PROSPECTIVE JUROR HARRINGTON:  Eleven and 14.

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

1     MR. PENNYPACKER:  What brought you to Alachua

2  County?

3     PROSPECTIVE JUROR HARRINGTON:  School, work and

4  staying in a warm climate.

5     MR. PENNYPACKER:  I cannot read -- not that, it's

6  not your handwriting, it's just marked through.

7     PROSPECTIVE JUROR HARRINGTON:  Oh, it's my

8  handwriting.  I wrote that at a stoplight on the way

9  here.  I was running a little late.

10     MR. PENNYPACKER:  You were stopped at the

11  stoplight, I gather?

12     PROSPECTIVE JUROR HARRINGTON:  Yeah.

13     MR. PENNYPACKER:  A teacher at UF, is that what it

14  says?

15     PROSPECTIVE JUROR HARRINGTON:  That's right.

16     MR. PENNYPACKER:  All right.  What do you teach?

17     PROSPECTIVE JUROR HARRINGTON:  I train faculty use

18  of technologies to combine with their instruction.

19     MR. PENNYPACKER:  Is that in a particular

20  department?

21     PROSPECTIVE JUROR HARRINGTON:  It's called

22  academic technology.

23     MR. PENNYPACKER:  Where did you work before coming

24  to UF?

25     PROSPECTIVE JUROR HARRINGTON:  University of

284

1    Hawaii, Honolulu.

2        MR. PENNYPACKER:  Ms. Pena, how old are your

3    children?

4        PROSPECTIVE JUROR PENA:  Twenty and 21.

5        MR. PENNYPACKER:  What brought you to Alachua

6    County?

7        PROSPECTIVE JUROR PENA:  I wanted my sons to learn

8    English.

9        MR. PENNYPACKER:  Okay, where did you come from?

10       PROSPECTIVE JUROR PENA:  Puerto Rico.

11       MR. PENNYPACKER:  You obviously learned English

12   from somewhere.

13       PROSPECTIVE JUROR PENA:  I was born in New York.

14       MR. PENNYPACKER:  So your children were born in

15   Puerto Rico and you brought them here?

16       PROSPECTIVE JUROR PENA:  Yes.

17       MR. PENNYPACKER:  Do you know anyone in law

18   enforcement?

19       PROSPECTIVE JUROR PENA:  I know Luis Acevedo.

20       MR. PENNYPACKER:  Gainesville Police Department?

21       PROSPECTIVE JUROR PENA:  Yes, sir.

22       MR. PENNYPACKER:  Would your knowledge of the

23   Officer Acevedo cause to you give his testimony greater

24   weight?

25       PROSPECTIVE JUROR PENA:  (Shakes head.)

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

0003218

1              MR. PENNYPACKER:  Mr. Lambert, how old are your

2       children?

3              PROSPECTIVE JUROR LAMBERT:  Thirteen and six.

4              MR. PENNYPACKER:  You've been in Alachua County

5       for seven years.  Where did you come from?

6              PROSPECTIVE JUROR LAMBERT:  Miami.

7              MR. PENNYPACKER:  What brought you up here?

8              PROSPECTIVE JUROR LAMBERT:  I escaped.

9              MR. PENNYPACKER:  Mr. Hayden, I know you've got

10      your questionnaire in here somewhere.  How long have

11      you been in Alachua County, Mr. Hayden?

12             PROSPECTIVE JUROR HAYDEN: Eleven years.

13             MR. PENNYPACKER:  What brought you here?

14             PROSPECTIVE JUROR HAYDEN:  I came to UF.

15             MR. PENNYPACKER:  And didn't leave?

16             PROSPECTIVE JUROR HAYDEN:  Didn't leave.

17             MR. PENNYPACKER:  Did you graduate?

18             PROSPECTIVE JUROR HAYDEN:  Yes, I did.

19             MR. PENNYPACKER:  What did you get a degree in?

20             PROSPECTIVE JUROR HAYDEN:  Computer science.

21             MR. PENNYPACKER:  Medical manager.  You work out

22      in Alachua with Mickey Singer?

23             PROSPECTIVE JUROR HAYDEN:  Yes, I do.

24             MR. PENNYPACKER:  How old are your children?

25             PROSPECTIVE JUROR HAYDEN:  They're four-and-a-half

1    months, two-and-a-half years, and my oldest turns four

2    today.  Birthday party's in about 30 minutes.

3         MR. PENNYPACKER:  Which one's turning, has the

4    birthday today?

5         PROSPECTIVE JUROR HAYDEN:  The oldest, the

6    four-year-old.

7         MR. PENNYPACKER:  Would the fact that you have a

8    four-and-a-half-month-old child cause you to not be

9    impartial in this case?

10        PROSPECTIVE JUROR HAYDEN:  I would think it would

11   be pretty hard to be.

12        THE COURT:  Did you say four-and-a-half-months or

13   four-and-a-half-weeks?

14        PROSPECTIVE JUROR HAYDEN:  Four-and-a-half-months.

15        MR. PENNYPACKER:  Ms. Williams, how long have you

16   been in Alachua County?

17        PROSPECTIVE JUROR WILLIAMS:  All my life.

18        MR. PENNYPACKER:  Okay.  How old are your

19   children?

20        PROSPECTIVE JUROR WILLIAMS: 33 and 15.

21        MR. PENNYPACKER:  Do you work with anyone, any of

22   the doctors at the VA?

23        PROSPECTIVE JUROR WILLIAMS:  No.

24        MR. PENNYPACKER:  Ms. Mahamery, how old is your

25   child?

1        PROSPECTIVE JUROR MAHAMERY:  She's 15.

2        MR. PENNYPACKER:  Where does she go to school?

3        PROSPECTIVE JUROR MAHAMERY:  East Side.

4        MR. PENNYPACKER:  What do you do at North Florida

5   Evaluation Treatment Center?

6        PROSPECTIVE JUROR MAHAMERY:  I'm a rehab

7   specialist for the criminally insane.

8        MR. PENNYPACKER:  How long have you been there?

9        PROSPECTIVE JUROR MAHAMERY:  Five years.

10       MR. PENNYPACKER:  People get rehabilitated and

11  leave that facility?

12       PROSPECTIVE JUROR MAHAMERY:  Some do.

13       MR. PENNYPACKER:  How long have you lived in

14  Alachua County?

15       PROSPECTIVE JUROR MAHAMERY:  Forty-one years.

16       MR. PENNYPACKER:  Do you know anyone in law

17  enforcement?

18       PROSPECTIVE JUROR MAHAMERY:  Yes, Willie Lee

19  Garrison.

20       MR. PENNYPACKER:  Who is that?

21       PROSPECTIVE JUROR MAHAMERY:  He's my ex-husband.

22       MR. PENNYPACKER:  Okay.  What agency does he work

23  for?

24       PROSPECTIVE JUROR MAHAMERY:  I think Gainesville

25  GPD.

```
 1          MR. PENNYPACKER:  Would the fact that he's your
 2     ex-husband cause you to give law enforcement any
 3     greater weight?
 4          PROSPECTIVE JUROR MAHAMERY:  No.
 5          MR. PENNYPACKER:  Nothing about being divorced
 6     says hey all law enforcement people, I'm not gonna
 7     believe them?
 8          PROSPECTIVE JUROR MAHAMERY:  (Shakes head.)
 9          MR. PENNYPACKER:  All right.  Mr. Diamond, where
10     did you live before you came to Gainesville?  I guess
11     you came here to go to school, where did you live?
12          PROSPECTIVE JUROR DIAMOND:  Miami.
13          MR. PENNYPACKER:  May have one moment, Your Honor?
14          THE COURT:  Yes.
15          (Pause in the proceedings.)
16          THE COURT:  Now, don't anybody get any ideas, but
17     Mr. Hayden, we're gonna let you go to the birthday
18     party.
19          All right.  Any other questions from the state?
20          MS. SINGER:  Yes, your Honor.  May I approach the
21     bench off the record?
22          (Sidebar conference off the record.)
23          MR. PENNYPACKER:  I'm almost done.  Who has
24     grandchildren that they care for, they keep or babysit
25     regularly?  Ms. Pena?
```

1      PROSPECTIVE JUROR PENA:  I got twin boys that are

2    nine months and a 17-month-old girl and one that's

3    coming in December.

4      MR. PENNYPACKER:  Anyone in the panel not care for

5    children at any point in their life?

6      Mr. Diamond?

7      PROSPECTIVE JUROR DIAMOND:  Yes.

8      MR. PENNYPACKER:  Anyone else never cared for

9    children?

10      Ms. Perry, do you have grandchildren?

11      PROSPECTIVE JUROR PERRY:  Yes, I do.

12      MR. PENNYPACKER:  How old are they?

13      PROSPECTIVE JUROR PERRY:  They range in age from,

14    what is she?  Seven years old to 20.

15      MR. PENNYPACKER:  And do you care for them and

16    have you cared for them in the past?

17      PROSPECTIVE JUROR PERRY:  Oh, definitely.  I don't

18    care for them now, but I do anytime I can get hold of

19    them.

20      MR. PENNYPACKER:  That's all the questions I have,

21    Judge.

22      THE COURT:  All right.

23      Mr. Groland?  Mr. Tedder?

24      MR. GROLAND:  Mr. Tedder.

25      THE COURT:  Go ahead.

1          MR. TEDDER:  Good afternoon, ladies and gentlemen.

2      I know it's been a long day.  I'll try to be as quick

3      as I can, but, obviously, each of you are aware of how

4      serious this case is and since we're trying to get a

5      jury today, I'll try to be quick.  I'm sorry.

6          First off, do any of you know anybody that's

7      employed in this office, Mr. Groland, myself, you

8      indicated you know Mr. Groland, the other two attorneys

9      in our office, Mr. Dale Workman and Kerry Proctor, and

10     I think each of you indicated you don't know any of us,

11     correct?  Okay.

12         Potential witnesses in addition to the ones the

13     state has already mentioned that we would be calling or

14     might be calling are Officers Chris Jackson and Rob

15     King of the Gainesville Police Department, as well as a

16     resident radiologist, I believe, Dr. Brice Boughner

17     from Shands.  Also a Dr. Agee and a Dr. Quisling who

18     are radiologists from Shands and a Dr. Bell from South

19     Florida, as well as Dr. Lewinski, and Dr. Plunkett.  Do

20     any of you folks know any of those witnesses?

21         The same thing I started out with the last group.

22     What was your reaction when you got the news to come

23     serve on jury duty?

24         Mr. Furman, what was your reaction?

25         PROSPECTIVE JUROR FURMAN:  Just willing to serve.

1     It's part of my civic duty.  I have no problem with it.

2         MR. TEDDER:  And Mr. Cartell, what was your

3     reaction, sir?

4         PROSPECTIVE JUROR CARTELL:  Well, I had already

5     been excused once because we had vacation plans.  I

6     knew it was coming and it was fine.  No problem.

7         MR. TEDDER:  Mr. Diamond, how about you, sir, what

8     was your reaction?

9         PROSPECTIVE JUROR DIAMOND:  I was surprised

10    because everyone I talked to seemed to think it was

11    like something bad.  But I kind of wanted to be on the

12    jury.

13        MR. TEDDER:  Why is that?

14        PROSPECTIVE JUROR DIAMOND:  I just like to collect

15    new experiences.

16        MR. TEDDER:  Okay.  Mrs. Mahamery, what was your

17    reaction, ma'am?

18        PROSPECTIVE JUROR MAHAMERY:  Well, at first it was

19    like, okay.  It's okay, but I hope I can stay awake

20    because I have no tolerance from sitting still.

21        MR. TEDDER:  Well, Mr. Smith, what was your

22    reaction, sir, when you got the notice?

23        PROSPECTIVE JUROR SMITH:  I had no problem until I

24    found out that it might be two weeks, then I start

25    worrying about my boss.

```
1          MR. TEDDER:  Ms. Cumbaa, did I pronounce that
2     correct?  What was your reaction, ma'am?
3          PROSPECTIVE JUROR CUMBAA:  It was okay.
4          MR. TEDDER:  Okay with that?  All right.
5          Ms. Jones, how about you, ma'am?
6          PROSPECTIVE JUROR JONES:  Again?  I said again?
7     I've been called three times.
8          MR. TEDDER:  Three times, yeah?  And I think you
9     indicated you have served before or have not?
10          PROSPECTIVE JUROR JONES:  I served on the grand
11     jury and then the last time I was called, but I didn't
12     have to serve because they threw the case out.
13          MR. TEDDER:  Okay.  All right.
14          Ms. Flowers, what was your reaction, ma'am?
15          PROSPECTIVE JUROR FLOWERS:  I didn't have a
16     problem with it except for the length of the time after
17     I found out.
18          MR. TEDDER:  Two weeks.
19          PROSPECTIVE JUROR FLOWERS:  Yeah.
20          MR. TEDDER:  This is a long time, it is.
21          Ms. Williams, what was your reaction?
22          PROSPECTIVE JUROR WILLIAMS:  When I got it I said:
23     Oh, my goodness, I haven't did this in a long time.
24     They calling me to do jury duty?  But it's okay.  If I
25     have to do it, it will be okay.
```

1          MR. TEDDER:  Okay.  Mr. Karle, what was your

2     reaction, sir?

3          PROSPECTIVE JUROR KARLE:  Look at it, said

4     explicit cuss word, read the directions, and I'm here.

5          MR. TEDDER:  I think I understand what you're

6     saying.

7          Ms. Traxler, is it?

8          PROSPECTIVE JUROR TRAXLER:  Traxler.

9          MR. TEDDER:  What was your reaction, ma'am?

10         PROSPECTIVE JUROR TRAXLER:  Well, like I said

11    before, this a massive disruption in my education at

12    the time.

13         MR. TEDDER:  I understand that.  Beyond that, if

14    it weren't for that?

15         PROSPECTIVE JUROR TRAXLER:  If it weren't for that

16    it would be fine, if I could actually take the time off

17    and do this.  In fact, I postponed this three times.  I

18    wrote a letter and said I'm gonna be done with my

19    degree in about two years, could I possibly do it in

20    two years?  You name the time and place and I'll be

21    happy to be there.  Here I am.

22         MR. TEDDER:  Ms. Powell, what was your reaction?

23    Obviously you're student as well.

24         PROSPECTIVE JUROR POWELL:  Just surprised.  All

25    the people I talked to never been here and I'm not far

1    from 18.  So --

2         MR. TEDDER:  Mr. Malphurs, what was your reaction,

3    sir?

4         PROSPECTIVE JUROR MALPHURS:  Well, I didn't have

5    any reaction.  I've had it before.  But I think it

6    ought to be stated in there where you can make

7    arrangements whether it's one day or two days.

8         MR. TEDDER:  Right.  That would be fair.  I agree.

9         Mr. Lambert, I think -- What was your reaction

10   when you got the notice to come serve jury duty?

11        PROSPECTIVE JUROR LAMBERT:  All right. I'm okay

12   with it.  It's citizen's duty.  Financial burden, it's

13   even a little frightening, but you know.

14        MR. TEDDER:  Would you lose pay if you were asked?

15        PROSPECTIVE JUROR LAMBERT:  I'm self-employed so

16   if I don't work, I don't even get the 30 a day.

17        MR. TEDDER:  I see what you're saying.

18        Ms. Pena, what was your reaction to serve?

19        PROSPECTIVE JUROR PENA:  Until I knew it was two

20   weeks -- I was supposed to be in Titusville for a test

21   for a job on Wednesday.  So if I get picked I'm gonna

22   lose that chance.  My only job.  I haven't been

23   employed for two months.  So --

24        MR. TEDDER:  Okay.  Where was that job

25   interviewing, ma'am?

```
1           PROSPECTIVE JUROR PENA:  Titusville.
2           MR. TEDDER:  Titusville.  Okay.
3           Mr. Telesco, well, you indicated you've got
4    something very important going on with your job.  What
5    was your reaction?
6           PROSPECTIVE JUROR TELESCO:  Other than that I
7    welcome the opportunity.  In fact, I wrote for an
8    excuse or got myself excused twice and moved and
9    scheduled it during this period of time because I
10   thought this was great in between two trips to Europe,
11   perfect timing.
12          MR. TEDDER:  Right.
13          PROSPECTIVE JUROR TELESCO:  But then we had a
14   delay in this project which pushes it right on top of
15   it.
16          But actually I think it's a great opportunity.  I
17   really do think it's an important civic responsibility.
18   I welcome the opportunity.  I'm a little concerned, as
19   I said, about the schedule conflict, but no, it's
20   important in a case like this potentially.  I mean,
21   this is, you know, it's extremely important.
22          MR. TEDDER:  It is.  And do you think if you're
23   asked to serve that the thing you have going on with
24   your job, that that could be handled without causing
25   everything to fall through or get messed up?
```

1    PROSPECTIVE JUROR TELESCO:  Well, it's

2    complicated, because as I said, I'm sort of the person

3    that the university, who is leaving me responsible for

4    a multi-million-dollar project, which is now finishing

5    and we're supposed to ship the instrument to Chile in

6    about four weeks.  Now we're in the final test phase.

7    We have people flying in from all over the world to sit

8    with us and go through the testing of the instrument to

9    demonstrate that we built it properly.  So you can

10   imagine if I turn any responsibilities over to other

11   people then ultimately I'm still the person who must

12   accept the responsibility and answer to the university

13   if I fail in the contract.

14       You know, it's one of those situations that I

15   don't feel like I have much choice in, but as I said,

16   unfortunately the decision, you know, if it's a

17   decision I could work on over the course of the next

18   few days then, but I realize that's not an opportunity.

19   I'm just plainly concerned about my responsibilities to

20   the State of Florida and my employer.  But other than

21   that I think it's extremely important.  I wouldn't miss

22   the chance.

23       MR. TEDDER:  Do you think you could devote your

24   attention to the case if you're asked to serve,

25   understanding your responsibility?

1    PROSPECTIVE JUROR TELESCO:  I would.  I mean if I

2  were told that I would have to be here, I would,

3  certainly, I would.  As I said it's too important not

4  to give the whole thing very careful consideration.

5    MR. TEDDER:  Yes, sir.

6    Ms. Monplaisir, is that how you pronounce that?

7    PROSPECTIVE JUROR MONPLAISIR:  Yes.

8    MR. TEDDER:  What was your reaction?

9    PROSPECTIVE JUROR MONPLAISIR:  I was actually

10  pleased to get it.  I've been called three or four

11  times and never actually served on the jury.  You know

12  wasn't selected or I think one time it was settled out

13  of court or something.  So I've never really been

14  through the process and I would like to serve.

15    MR. TEDDER:  Okay.  And Ms. Cawthon, what was your

16  reaction when you got it?

17    PROSPECTIVE JUROR CAWTHON:  I was expecting it

18  because I was excused 12 weeks ago.

19    MR. TEDDER:  Mr. Pittman, what was your reaction,

20  sir?

21    PROSPECTIVE JUROR PITTMAN:  Third time, you've

22  averaging one time every ten years.  It seems fair.

23    MR. TEDDER:  Mr. Harrington, what was your

24  reaction, sir?

25    PROSPECTIVE JUROR HARRINGTON:  This is the first

1    time I've been called so I'm frankly looking forward to

2    it.  I know that it is a responsibility that I would

3    like to be part of.  My kids are at an age, too, where

4    I think this sets a real good model for them to see

5    that this is part of life.

6        MR. TEDDER:  Ms. Dampier, what was your reaction

7    you had?

8        PROSPECTIVE JUROR DAMPIER:  This is my first time

9    ever, ever experiencing this.  It's gonna be a

10   wonderful experience.  But I'm caretaker and a state

11   worker, so as long as it doesn't interfere with my job.

12       MR. TEDDER:  Okay.  So it would interfere with

13   your job you're indicating obviously?

14       PROSPECTIVE JUROR DAMPIER:  I mean, you know, I

15   have to get everything okayed and everything.

16       MR. TEDDER:  I see.  On your information sheets

17   you put HSW-II.  What does that stand for?

18       It's HSW-II.  It's a Human Services Worker II.

19       MR. TEDDER:  I see you indicated you know Chief

20   Dampier.  I thought I heard you say something about

21   knowing a Chief Dampier.  Did I mishear you?

22       PROSPECTIVE JUROR DAMPIER:  Yeah, he's retired and

23   he's a wonderful person.

24       MR. TEDDER:  Is he related to you?

25       PROSPECTIVE JUROR DAMPIER:  By marriage.

1            MR. TEDDER:   Okay.

2            PROSPECTIVE JUROR DAMPIER:   He's one of the best,

3      Eugene Dampier.

4            MR. TEDDER:   Ms. Love, what was your reaction when

5      you got the notice to come serve?

6            PROSPECTIVE JUROR LOVE:   I was really kind of

7      excited.   I really, I felt helpless since 9/11.   So it

8      was an opportunity for me to do something that I could.

9      A lot of our students are, that have graduated were up

10     there and e-mailed me and things.   So I felt like it

11     was something I was proud to do.

12           MR. TEDDER:   Okay.   Ms. Perry, what was your

13     reaction, ma'am?

14           PROSPECTIVE JUROR PERRY:   I was pleased that I had

15     been selected out of Gainesville since I've only been

16     here for three years.   I really didn't expect it until

17     later but I welcomed the challenge.

18           MR. TEDDER:   I think it's been talked about

19     previously, you probably heard me talking earlier to

20     the other group of folks, about whether or not they

21     would give law enforcement officers greater weight

22     merely because that person was a law enforcement

23     officer.   Would any of you folks do that?

24           Ms. Dampier, would you do that since your husband,

25     I guess your husband is in law enforcement, or retired,

1     or what?

2          PROSPECTIVE JUROR DAMPIER:  No, that was on my

3     husband's side.

4          MR. TEDDER:  Okay.

5          PROSPECTIVE JUROR DAMPIER:  It's my uncle.

6          MR. TEDDER:  Your uncle I guess.

7          Would anybody on the panel give a police officer's

8     testimony greater weight merely because they were a

9     police officer?  Everybody agree they're human beings

10    and make mistakes just like the rest of us?  All right.

11         Has anybody -- I know you've been sitting all day

12    long, you've heard about this all day long -- has

13    anybody suddenly remembered they read something or

14    heard something about this case when it first happened

15    a little over two years ago?  Anybody think of

16    anything?  Okay.

17         Would each of you be agreeable to, if you're asked

18    to serve, to not read anything in the newspaper or

19    watch anything on television about this case, if you're

20    asked to serve?  Can each of you agree to do that?

21         All right.  I'm trying not to ask everybody

22    individually, so I hope you're nodding yes.

23         But that's very important because those of you

24    asked to serve are going to be told to do that.  That's

25    extremely important, because you're only, those of you

1    who are asked to serve should only receive information

2    about this case here in the courtroom, where everybody

3    is present.  Okay.  That's the reason for that.

4         Going along with that, you know, each of you,

5    obviously you're going to be going home.  Those of you

6    who are asked to serve, going home to family and

7    friends, so on and so forth.  They're going to be

8    asked:  Gee, what was the trial about today?  What

9    happened today?  What did you learn interesting?  What

10   did you think of this, so on and so forth.

11        That's -- to not talk about it is not gonna be

12   easy.  But again, you may think:  Gee, I can talk to my

13   wife; I can talk to my husband, my boyfriend, or my

14   girlfriend, good buddy, whatever.  It's not gonna

15   impact on what I do as a juror.

16        The problem is anything you say to someone else,

17   they're gonna respond to what you say and that's the

18   whole reason why you're gonna be asked not to do it.

19   Can each of you agree not to do that?  That's not going

20   to be easy.  You're talking about two weeks of not

21   talking about this to anybody.

22        Can each of you do that?  Okay.  Not only that,

23   you'll be asked to not talk about it among yourselves

24   until Judge Lott tells you to.  Can each of you agree

25   to do that?

302

```
 1          You heard, I'm sure, me talking earlier about the

 2     photographs that are expected to be introduced in this

 3     case which are autopsy photographs of Robbie Quirello,

 4     the baby in this case.  Do any of you think you can

 5     sort out the emotion of looking at these photographs

 6     from trying to analyze the facts in deciding whether a

 7     crime was committed in this case?

 8          Mr. Furman, do you think you can do that?  Why do

 9     you think you can do that?

10          PROSPECTIVE JUROR FURMAN:  (Nods head.)  I've

11     observed autopsies.  I've seen more gruesome pictures

12     than that as a matter of setting aside the emotion and

13     dealing with the facts.

14          MR. TEDDER:  When did you observe autopsies?

15          PROSPECTIVE JUROR FURMAN:  1968.

16          MR. TEDDER:  Okay.  Was that through military

17     experience?

18          PROSPECTIVE JUROR FURMAN:  No, that was through

19     the university.  I was working for the environmental

20     engineering department.  They had a class where they

21     required all their students to observe an autopsy and

22     those who couldn't see one they showed the films.  I

23     set the film up and ran the film for them.

24          MR. TEDDER:  All right.  How about you Ms. Cumbaa,

25     do you think you can separate out the emotion of these
```

```
 1   photographs when trying to sort out the facts of this
 2   case?
 3        PROSPECTIVE JUROR CUMBAA:  I think so.  I've seen
 4   a lot as a nurse and I think I could do it.
 5        MR. TEDDER:  How about you, Ms. Jones, can you
 6   sort out the emotion looking at photographs from
 7   sorting out the facts of the case.
 8        PROSPECTIVE JUROR JONES:  Yeah, I think I can do
 9   that.
10        MR. TEDDER:  Why do you believe you can do that,
11   ma'am?
12        PROSPECTIVE JUROR JONES:  Because you have to
13   consider all the evidence and everything like that.
14   And sometimes what you think you see is not really what
15   you see.  It might make a difference.
16        MR. TEDDER:  Ms. Traxler, can you separate the
17   emotion out?
18        PROSPECTIVE JUROR TRAXLER:  I don't know.
19   Honestly, I don't know.  I'm very addicted to the news.
20   I find testimony very difficult.  I would find
21   testimony very difficult.
22        MR. TEDDER:  Very difficult to not watch the news.
23        Ms. Powell, how about you, ma'am, can you sort out
24   the emotion if you're asked to serve?
25        PROSPECTIVE JUROR POWELL:  Yeah.
```

1          MR. TEDDER:  Ms. Monplaisir, excuse me, if you're

2     asked to serve on this jury, do you think you can sort

3     out the emotion from the photographs in trying to

4     decide the facts?  Why do you think you could do it?

5          PROSPECTIVE JUROR MONPLAISIR:  Because I know it

6     would be my job as a juror to put my emotions aside and

7     just judge the case on the testimony and the facts.

8          MR. TEDDER:  All right.  Same question

9     Ms. Cawthon, do you think you could do that?

10          PROSPECTIVE JUROR CAWTHON:  I don't know.

11          MR. TEDDER:  Okay.  That's fair enough.

12          PROSPECTIVE JUROR CAWTHON:  Probably not.

13          MR. TEDDER:  Probably not?  Okay.  Do you think it

14     would upset you too much?

15          PROSPECTIVE JUROR CAWTHON:  It would prejudice me.

16          MR. TEDDER:  Okay.  That's fair enough.

17          Ms. Perry, how about you, ma'am, do you think you

18     can sort out the emotion from the facts?

19          PROSPECTIVE JUROR PERRY:  I think that you would

20     have to if you're going to even want to serve on a

21     jury.  I think you have to be able to separate emotion

22     from the facts.

23          MR. TEDDER:  Ms. Love, how about you, ma'am, do

24     you think you can sort out emotion in looking at

25     photographs and try to sort out the evidence?

```
 1              PROSPECTIVE JUROR LOVE:  Yes.

 2              MR. TEDDER:  Why?  I know you're experienced as a

 3         nurse.

 4              PROSPECTIVE JUROR LOVE:  Well, 25 years in the

 5         operating room.  So --

 6              MR. TEDDER:  You've seen it all.

 7              PROSPECTIVE JUROR LOVE:  Afraid so.  But like also

 8         she was mentioning, you know, it is about fairness

 9         ultimately, so no, there shouldn't be any emotionality.

10              MR. TEDDER:  Mr. Pittman, how about you, sir?

11              PROSPECTIVE JUROR PITTMAN:  I believe so.  I

12         believe I can.

13              THE COURT:  I'm sorry, Mr. Pittman, I can't hear

14         you.

15              PROSPECTIVE JUROR PITTMAN:  I'm sure there would

16         be a certain degree of shock but the analytical part I

17         can analyze something.

18              MR. TEDDER:  Mr. Telesco, do you think you can

19         sort it out?

20              PROSPECTIVE JUROR TELESCO:  I would not be

21         prejudiced in any way in that sense.  I suppose, I hate

22         to say this, but I'm one of those people that I might

23         pass out, you know.  I'm one of those people that gets

24         really nervous seeing that kind of stuff, but it's not,

25         it has more to do with my personal history.  It has
```

1   nothing to do with prejudicing me.  It wouldn't

2   prejudice me, but literally, I get sick when I see

3   things like that.  So it just depends a little bit on

4   the form.  I mean, you know, in how they're presented,

5   I suppose.

6        MR. TEDDER:  Mr. Malphurs, how about you, sir?

7        PROSPECTIVE JUROR MALPHURS:  Well, I think I

8   could.  It would be a little hard, being a baby, than

9   it would be a grown person, but I think, you know, yes

10  I could.  I'm not sure.

11       MR. TEDDER:  All right.

12       PROSPECTIVE JUROR MALPHURS:  Because I think that

13  would.

14       MR. TEDDER:  Mr. Karle, how about you, sir?

15       PROSPECTIVE JUROR KARLE:  Well I've butchered a

16  lot of animals and I've hunted, but I just don't know

17  about a photograph of an infant.  I do not know.  I

18  would consider myself and hope that I won't be so cold

19  that it not affect me.

20       MR. TEDDER:  All right.  I don't think -- I

21  believe it will affect everyone to a certain extent.

22  The question is, can you deal with that emotional

23  aspect of it and go on and be objective about the

24  evidence, or is it, when you see the pictures are you

25  saying:  Oh, my gosh.  It's over.

1    PROSPECTIVE JUROR KARLE:  No, a photograph's not

2    gonna turn me one way or the other with the trial.

3         MR. TEDDER:  Ms. Flowers, how about you, ma'am?

4         PROSPECTIVE JUROR FLOWERS:  I'm gonna have a big

5    problem with testimony.

6         MR. TEDDER:  You're gonna have a big problem?

7         PROSPECTIVE JUROR FLOWERS:  Even just today

8    knowing what this case is about has just, I'm having a

9    big problem with it.

10        MR. TEDDER:  I understand.  That's why we're

11   talking about it and we appreciate your honesty.

12        Mr. Smith, how about you, sir?

13        PROSPECTIVE JUROR SMITH:  No problem.

14        MR. TEDDER:  No problem.

15        Mr. Cartell, did I pronounce your name correctly?

16        PROSPECTIVE JUROR CARTELL:  Yeah.  It would be

17   hard to separate the emotion, but I think I could do it

18   because there is facts and emotions; they're two

19   different things.

20        MR. TEDDER:  All right.  Mr. Diamond?

21        PROSPECTIVE JUROR DIAMOND:  I would not have a

22   problem.

23        MR. TEDDER:  Why do you feel that way?

24        PROSPECTIVE JUROR DIAMOND:  I've just I've seen a

25   lot of sick images.

```
 1          MR. TEDDER:  All right.  I don't know if I'll
 2    follow-up that.
 3          Ms. Mahamery, what's your reaction to that?
 4          PROSPECTIVE JUROR MAHAMERY:  I would not have a
 5    problem.
 6          MR. TEDDER:  Why not?
 7          PROSPECTIVE JUROR MAHAMERY:  Because, like he
 8    said, you've seen a lot of graphic stuff working where
 9    I'm at.  I've seen a lot of blood and I've seen a lot
10    of bruises and stuff, so I don't think that sort of
11    stuff wouldn't bother me.
12          MR. TEDDER:  Ms. Williams, how about you, ma'am?
13          PROSPECTIVE JUROR WILLIAMS:  I have a problem with
14    it because I'm very emotional.
15          MR. TEDDER:  Okay.
16          PROSPECTIVE JUROR WILLIAMS:  But I don't think by
17    me being emotional I don't think that it would cause me
18    to not make a reasonable -- I mean a decision about
19    what's right or wrong.
20          MR. TEDDER:  Okay.
21          PROSPECTIVE JUROR WILLIAMS:  But I'm very
22    emotional.
23          MR. TEDDER:  You think it might cause you to lower
24    what you would expect as proof from the state?
25          PROSPECTIVE JUROR WILLIAMS:  No, I don't think so.
```

1     I'm just an emotional person.

2     MR. TEDDER:  Mr. Lambert, what about you, sir, do

3     you think these pictures will bother you?

4     PROSPECTIVE JUROR LAMBERT:  No.  I believe I could

5     separate a photo from actual evidence that's one thing

6     and separate it, and not mesh the two.

7     MR. TEDDER:  Ms. Pena, how about you, ma'am?  I

8     know you've had experience as a nurse.

9     PROSPECTIVE JUROR PENA:  I wouldn't have a

10     problem.

11     MR. TEDDER:  You don't think you would have a

12     problem with that?

13     PROSPECTIVE JUROR PENA: · (Shakes head.)

14     MR. TEDDER:  Mr. Harrington, how about you?

15     PROSPECTIVE JUROR HARRINGTON:  I don't think it

16     would be a problem.

17     MR. TEDDER:  Why is that?

18     PROSPECTIVE JUROR HARRINGTON:  After high school I

19     worked in a hospital and had to take people to the

20     morgue on occasion.  I've been exposed to death in that

21     way.  But more so something that you said earlier this

22     morning, we need to accept the fact that this child has

23     died and be able to look at the facts separate from

24     that.  I don't believe that would bother me.

25     MR. TEDDER:  Ms. Dampier, how about you, ma'am, do

1       you think it would cause you a problem?

2               PROSPECTIVE JUROR DAMPIER:  I don't think so.

3       I've been in a lot of situations before by working with

4       the State of Florida.

5               MR. TEDDER:  Going on to what Mr. Harrington just

6       said as I said earlier today that obviously Robbie

7       Quirello has passed away.  He's dead.  And those of you

8       who are going to be asked to serve are going to have to

9       decide whether a crime was committed in this case.  Can

10      each of you agree to set aside the emotional aspect,

11      the fact that this baby is dead, from determining what

12      the facts are, and what the evidence is in this case?

13      Can each of you agree to do that?

14              Do you think -- excuse me -- do any of you think

15      that because of the fact that we're talking about a

16      four-and-a-half-month-old baby who's passed away that

17      would cause you to lower the proof you expect from the

18      government in trying to decide this case?

19              Mr. Furman, would you?

20              PROSPECTIVE JUROR FURMAN:  No.

21              MR. TEDDER:  Mr. Cartell, would you do that?

22              PROSPECTIVE JUROR FURMAN:  No.

23              MR. TEDDER:  Mr. Diamond?

24              PROSPECTIVE JUROR DIAMOND:  No.

25              MR. TEDDER:  Would anybody, could that, would

```
 1        anybody think the facts of this case, what it's
 2        about -- I'll ask you, Ms. Flowers, you already kind of
 3        indicated.
 4             PROSPECTIVE JUROR FLOWERS:  I'm having a real
 5        problem with the age of the child and the whole issue
 6        of, you know.
 7             MR. TEDDER:  It's a tragic case, no doubt about
 8        it.  Now, I'm sure you all heard me talking earlier
 9        about the fact that one of the witnesses or some of the
10        witnesses are being paid to come in and testify.  Would
11        any of you give their testimony less credibility merely
12        because this person is being paid to come in and offer
13        their testimony, their opinion about what may or may
14        not have happened here?  Mr. Furman?
15             PROSPECTIVE JUROR FURMAN:  No.
16             MR. TEDDER:  Ms. Cumbaa, would you do that?
17             PROSPECTIVE JUROR CUMBAA:  No.
18             MR. TEDDER:  Ms. Jones?
19             PROSPECTIVE JUROR JONES:  No.
20             MR. TEDDER:  Ms. Traxler?
21             PROSPECTIVE JUROR TRAXLER:  (Shakes head.)
22             MR. TEDDER:  Ms. Powell?
23             PROSPECTIVE JUROR POWELL:  No.
24             MR. TEDDER:  Ms -- I can't read my handwriting.
25        Ms. Monplaisir?
```

1          PROSPECTIVE JUROR MONPLAISIR:  No.

2          MR. TEDDER:  Ms. Cawthon, do you think you might

3     do that?

4          PROSPECTIVE JUROR CAWTHON:  No.

5          MR. TEDDER:  Ms. Perry?

6          PROSPECTIVE JUROR PERRY:  No.

7          MR. TEDDER:  Anybody think they might do that?

8     Anybody have a problem?  Mr. Lambert?

9          PROSPECTIVE JUROR LAMBERT:  If he's a paid expert

10    witness, obviously he's being paid to come up and

11    render a decision which is favorable to whatever side

12    presents, brings him in.

13         MR. TEDDER:  That's what some people would think.

14    Is that what you think?

15         PROSPECTIVE JUROR LAMBERT:  Well, yeah, I mean, if

16    I'm wrong then I would like you to stand and correct

17    me.

18         MR. TEDDER:  Well --

19         PROSPECTIVE JUROR LAMBERT:  I mean, not that I'm

20    challenging, but I always assumed that a paid witness

21    was brought in to offer his expertise in this manner

22    and one wouldn't bring him in if his findings were

23    gonna be --

24         MR. TEDDER:  That's correct.  However, that

25    doesn't necessarily mean that just because someone is

```
 1    being paid that they're gonna fabricate the testimony.

 2    I mean, he is being brought in to testify as to his

 3    expertise, that's correct.

 4         Would you be willing, if you were asked to serve,

 5    to listen to the witnesses and judge them just on all

 6    Judge Lott's gonna give you folks, rules of credibility

 7    that you judge each and every witness on?  And experts

 8    are only slightly different than regular witnesses in

 9    that you're allowed to listen to their opinion on

10    something, as opposed to just what they observed or

11    what they witnessed.  Otherwise, they're judged on the

12    same rules of credibility.  If you don't believe an

13    expert, you don't have to.  If you do, you give them

14    whatever weight you want.

15         Anybody have a problem, anybody other than

16    Mr. Lambert have a possible problem with experts coming

17    in, being in this situation?  Anybody?

18         I talked about earlier about doctors.  Everybody

19    respects the job, the job that they do, that they have

20    a difficult job, very important job, and they're asked

21    to make decisions and try to treat people.  But does

22    anybody, any of this group of people, have any personal

23    experiences or know anyone that had a special

24    experience with a physician wherein the treatment or

25    the advice was wrong?  And I see Ms. Love.
```

```
 1              PROSPECTIVE JUROR LOVE:  I'm gonna plead the fifth
 2        on that one; twenty-five years in the operating room.
 3              MR. TEDDER:  You don't have to name any names, I
 4        mean, have you?
 5              PROSPECTIVE JUROR LOVE:  Well, I think what you
 6        said at the beginning, I mean, we're all human beings
 7        and we need to understand that.  And some of us that
 8        have spent years up close and personal, it isn't
 9        specific to Alachua County.  I've been in, you know, in
10        Emory University and around the country and they're
11        always a few that aren't necessarily functioning at the
12        highest level --
13              MR. TEDDER:  Right.  Okay.
14              PROSPECTIVE JUROR LOVE:  -- and make mistakes.
15              MR. TEDDER:  That's fair enough.  I think that's
16        common.
17              Anybody else have any personal experience with
18        that?  Ms. Flowers, you're nodding your head.  Can you
19        tell us?
20              PROSPECTIVE JUROR FLOWERS:  Actually with
21        Dr. Hellrung when my children were smaller, but it was
22        just a prescription.  When I say "just" but yeah, the
23        prescription was written incorrectly.  The pharmacist
24        didn't catch it either.  I don't hold that against
25        Dr. Hellrung, never have.
```

1          MR. TEDDER:  Pardon me?

2          PROSPECTIVE JUROR FLOWERS:  I don't hold that

3      against Dr. Hellrung.  I never have or I wouldn't have

4      gone to him for 18 years.

5          MR. TEDDER:  I trust nothing seriously bad

6      happened to your child?

7          PROSPECTIVE JUROR FLOWERS:  No.

8          MR. TEDDER:  Anyone else have an experience to

9      relate to this?  Would anyone disagree with what

10     Ms. Love said about doctors being human beings just

11     like the rest of us?  They're subject to the same

12     pressures we all have; pressures at home, pressures at

13     work, tired and make a mistake, honestly make a

14     mistake.  Everybody agree with that?  All right.

15         Does everyone agree that medicine continues to

16     evolve and change just like other sciences?  I'm sure

17     Mr. Telesco and Mr. Harrington are both professors, I

18     think you said at UF, and forgive me if I've forgotten

19     anybody else on the panel who also is a teacher, but in

20     your areas of expertise are things continually

21     changing?  Is that fair to say, Mr. Telesco?

22         PROSPECTIVE JUROR TELESCO:  Sure.

23         MR. TEDDER:  Mr. Harrington, is that fair to say?

24         PROSPECTIVE JUROR HARRINGTON:  (Nods head.)

25         MR. TEDDER:  Would anyone on the panel be

1    surprised to learn that medicine just like any other

2    science, what they know and what they think changes

3    over time?  Would anybody disagree with that?

4         The theory the state is proceeding under here is

5    called "shaken baby."  Were any of you folks, anybody

6    raise their hand earlier when Judge Lott asked if you

7    had a specific knowledge about that?  I don't see

8    anybody raising their hand.

9         Would anybody, if you do, raise your hand, if you

10   feel like you have any specialized knowledge or

11   information regarding the theory of shaken baby.

12   Nobody?  Not Ms. Cumbaa, or Ms. Love, or anybody else.

13        Is everybody on the panel willing to listen to and

14   become, to keep an open mind regarding this whole

15   notion?  Is everybody willing to do that?  Mr. Furman,

16   can you do that?

17        PROSPECTIVE JUROR FURMAN:  Yes.

18        MR. TEDDER:  Mr. Cartell, can you do that?

19        PROSPECTIVE JUROR CARTELL:  Uh-huh.

20        MR. TEDDER:  Mr. Diamond can you do that?

21        PROSPECTIVE JUROR DIAMOND:  Yes.

22        MR. TEDDER:  Ms. Mahamery?

23        PROSPECTIVE JUROR MAHAMERY:  Yes.

24        MR. TEDDER:  Ms. Williams, can you?

25        PROSPECTIVE JUROR WILLIAMS:  Yes.

```
 1        MR. TEDDER:  Mr. Lambert, do you think you can?

 2        PROSPECTIVE JUROR LAMBERT:  (Nods head.)

 3        MR. TEDDER:  Ms. Pena, can you?

 4        PROSPECTIVE JUROR PENA:  (Nods head.)

 5        MR. TEDDER:  Mr. Harrington?

 6        PROSPECTIVE JUROR HARRINGTON:  Yes.

 7        MR. TEDDER:  Ms. Dampier?

 8        PROSPECTIVE JUROR DAMPIER:  Yes.

 9        MR. TEDDER:  Ms. Love?

10        PROSPECTIVE JUROR LOVE:  Yes.

11        MR. TEDDER:  Mr. Pittman?

12        PROSPECTIVE JUROR PITTMAN:  (Nods head.)

13        MR. TEDDER:  Mr. Telesco, can you do that?

14        PROSPECTIVE JUROR TELESCO:  (Nods head.)

15        MR. TEDDER:  Mr. Malphurs?

16        PROSPECTIVE JUROR MALPHURS:  Yes.

17        MR. TEDDER:  Mr. Karle?

18        PROSPECTIVE JUROR KARLE:  (Nods head.)

19        MR. TEDDER:  Ms. Flowers?

20        PROSPECTIVE JUROR FLOWERS:  (Nods head.)

21        MR. TEDDER:  Mr. Smith can you do that?

22        PROSPECTIVE JUROR SMITH:  (Nods head.)

23        MR. TEDDER:  Ms. Cumbaa?

24        PROSPECTIVE JUROR CUMBAA:  (Nods head.)

25        MR. TEDDER:  Mrs. Jones?
```

```
 1          PROSPECTIVE JUROR JONES:   (Nods head.)

 2          MR. TEDDER:  Ms. Powell?

 3          PROSPECTIVE JUROR POWELL:   (Nods head.)

 4          MR. TEDDER:  Mrs. Traxler?

 5          Mrs. Dampier, can you keep an open mind on this?

 6          PROSPECTIVE JURORS TRAXLER AND DAMPIER:  Yes.

 7          MR. TEDDER:  Ms. Cawthon, can you keep an open

 8      mind?

 9          PROSPECTIVE JUROR CAWTHON:   (Nods head.)

10          MR. TEDDER:  Ms. Perry, can you keep an open mind

11      as well?

12          PROSPECTIVE JUROR PERRY:  Yes, I can.

13          MR. TEDDER:  Having a couple of professors here,

14      do any of you on the panel have any, or have very much

15      familiarity with the laws of physics?  Mr. Telesco

16      certainly does.  Okay, Mr. Harrington.

17          Mr. Telesco, would you agree that the human body

18      is subject to the laws of physics?

19          PROSPECTIVE JUROR TELESCO:  Most certainly.

20          MR. TEDDER:  Okay.  Would you agree or disagree

21      that a child is subject to the laws of physics?

22          PROSPECTIVE JUROR TELESCO:  Of course.

23          MR. TEDDER:  Anybody on the panel feel that the

24      laws of physics don't apply anytime a human being is in

25      the environment?  Ms. Dampier, do you agree or disagree
```

```
 1        with that?
 2              PROSPECTIVE JUROR DAMPIER:  I agree with that.
 3              MR. TEDDER:  You agree with that.
 4              Mr. Harrington, do you agree laws of physics apply
 5        to human beings?
 6              PROSPECTIVE JUROR HARRINGTON:  Yes.
 7              MR. TEDDER:  Ms. Pena, you agree with that?
 8              PROSPECTIVE JUROR PERRY:  (Nods head.)
 9              MR. TEDDER:  Mr. Lambert?
10              PROSPECTIVE JUROR LAMBERT:  Yes.
11              MR. TEDDER:  Mrs. Williams, agree with that
12        notion?
13              PROSPECTIVE JUROR WILLIAMS:  (Nods head.)
14              MR. TEDDER:  Ms. Mahamery, you agree?
15              PROSPECTIVE JUROR MAHAMERY:  Yes.
16              MR. TEDDER:  Rather than going through everybody
17        else's name -- I know it's getting late.  Does
18        everybody agree or disagree, regarding that human
19        beings are subject to the laws of physics like
20        everybody else?  That may seem like a stupid question,
21        especially this time of day.  Does anybody disagree
22        with that?
23              And has anybody, does anyone on the panel have any
24        problem with being asked to serve on the anniversary of
25        the attack on your country this Wednesday?  Does
```

1    anybody have a problem with that?  I don't know if any

2    of you folks had any relatives or friends killed in

3    that attack.  Anybody have that happen to them?

4         PROSPECTIVE JUROR SMITH:  I would worry about

5    being in a government building.

6         MR. TEDDER:  Yeah.  We have tight security.

7         PROSPECTIVE JUROR SMITH:  Yeah.  They can't cover

8    the street outside.

9         MR. TEDDER:  That's a good question.  I don't know

10   what to tell you about that.

11        Finally going into the law that applies.  In

12   reference to this case in which a person is accused of

13   a crime, I'm sure you all heard me talk about this

14   earlier.  In every case where someone is accused of a

15   crime there are three major rules that apply:  They are

16   presumed to be innocent; they have the absolute right

17   to remain silent; and, the burden of proof is entirely

18   on the government to prove its case beyond a reasonable

19   doubt.  The accused does not have to prove anything.

20        As I said earlier, one of the best examples I've

21   heard of presumption, or not being the presumption of

22   innocence is a car pulled over on the side of the road,

23   the police officer behind them, lights flashing.  It's

24   almost human nature to think:  Gee, what happened, what

25   did that person do?

1          Do each of you agree that's not the presumption of

2     innocence?  I had a lady one time during a questioning

3     like this she said:  Well -- she said when she saw

4     somebody, she saw a police officer pull somebody over,

5     the first thing she did, she would react:  What did

6     that person do?  She looked at her speedometer to see

7     if she was going too fast and slow it down.

8          Do you believe, Mr. Furman, that you can presume

9     Mr. Herlihy innocent throughout this case?

10         PROSPECTIVE JUROR FURMAN:  Yes.

11         MR. TEDDER:  And Ms. Cumbaa, do you think you can

12    do that, will you do that?

13         PROSPECTIVE JUROR CUMBAA:  Yes.

14         MR. TEDDER:  Unless they prove their burden?

15         Ms. Jones, can you do that?

16         PROSPECTIVE JUROR JONES:  Yes.

17         MR. TEDDER:  Ms. Traxler?

18         PROSPECTIVE JUROR TRAXLER:  Yes.

19         MR. TEDDER:  Ms. Powell?

20         PROSPECTIVE JUROR POWELL:  (Nods head.)

21         MR. TEDDER:  Ms. Dampier?

22         PROSPECTIVE JUROR DAMPIER:  Yes.

23         MR. TEDDER:  Ms. Monplaisir?

24         PROSPECTIVE JUROR MONPLAISIR:  Monplaisir.

25         MR. TEDDER:  Monplaisir.  I'm so sorry.

322

1          Ms. Cawthon, can you do that, presume Mr. Herlihy

2    innocent throughout this case unless or until the

3    government proves its case?

4          PROSPECTIVE JUROR CAWTHON:  Yes.

5          MR. TEDDER:  Ms. Perry, do you believe you can do

6    that?

7          PROSPECTIVE JUROR PERRY:  Yes, I do.

8          MR. TEDDER:  Ms. Love, can you do that?

9          PROSPECTIVE JUROR LOVE:  Yes, sir.

10         MR. TEDDER:  Mr. Pittman, do you believe you can

11    do that?

12         PROSPECTIVE JUROR PITTMAN:  Yes.

13         MR. TEDDER:  Mr. Telesco, do you think you can do

14    that?

15         PROSPECTIVE JUROR TELESCO:  (Nods head.)

16         MR. TEDDER:  Mr. Malphurs, can you do that?

17         PROSPECTIVE JUROR MALPHURS:  (Nods head.)

18         MR. TEDDER:  Mr. Karle?

19         PROSPECTIVE JUROR KARLE:  (Nods head.)

20         MR. TEDDER:  Ms. Flowers?

21         PROSPECTIVE JUROR FLOWERS:  (Nods head.)

22         MR. TEDDER:  Mr. Smith?

23         PROSPECTIVE JUROR SMITH:  (Nods head.)

24         MR. TEDDER:  Mr. Cartell?

25         PROSPECTIVE JUROR CARTELL:  Yes.

1        MR. TEDDER:  Mr. Diamond?

2        PROSPECTIVE JUROR DIAMOND:  Yes.

3        MR. TEDDER:  Ms. Mahamery?

4        PROSPECTIVE JUROR MAHAMERY:  Yes.

5        MR. TEDDER:  Ms. Williams, can you do that; will

6 you do that?

7        PROSPECTIVE JUROR WILLIAMS:  Yes.

8        MR. TEDDER:  Mr. Lambert, can you do this as well?

9        PROSPECTIVE JUROR LAMBERT:  Yes.

10        MR. TEDDER:  Ms. Pena?

11        PROSPECTIVE JUROR PENA:  Yes.

12        MR. TEDDER:  Mr. Harrington, will you do that?

13        PROSPECTIVE JUROR HARRINGTON:  Yes.

14        MR. TEDDER:  Ms. Dampier?

15        PROSPECTIVE JUROR DAMPIER:  Yes.

16        MR. TEDDER:  The next major area is the right to

17 remain silent.  Every person, Mr. Herlihy, if he

18 chooses to, does not have to take the witness stand.

19 Those of you who are asked to serve, will be instructed

20 if he chooses not to testify that you are not to

21 consider that in any way in considering the verdict.

22        Mr. Malphurs, if Mr. Herlihy chose not to take the

23 witness stand in this trial, how would you react to

24 that?

25        PROSPECTIVE JUROR MALPHURS:  Well, I would figure

1       that's his right.  I would just have to listen to the

2       rest of the evidence and form my opinion from that.

3            MR. TEDDER:  Okay.  Mr. Karle, what would your

4       reaction be?

5            PROSPECTIVE JUROR KARLE:  He has a right to remain

6       silent?

7            MR. TEDDER:  Yes, sir.

8            PROSPECTIVE JUROR KARLE:  He has a right to listen

9       to counsel and the prosecutor has got a right to prove

10      him guilty.

11           MR. TEDDER:  They have the duty to prove him

12      guilty.

13           Ms. Flowers, would you be bothered by it if Mr.

14      Herlihy chose not to testify?

15           PROSPECTIVE JUROR FLOWERS:  I would kind of wonder

16      why but I understand that's his right.

17           MR. TEDDER:  Did you hear my example I made

18      earlier about being between a rock and a hard place?

19           PROSPECTIVE JUROR FLOWERS:  Yes.

20           MR. TEDDER:  Okay.  Again, some people think if a

21      person doesn't testify they have something to hide; and

22      other folks think they'll say or do anything to get out

23      of trouble.  So it's a tough decision.  There's a lot

24      of reasons why a person may or may not take the witness

25      stand.

Stacey K. Bryant, RPR
Judicial Court Reporter

0003258

```
1              Mr. Smith, would it cause you any problems?

2         PROSPECTIVE JUROR SMITH:  No.

3         MR. TEDDER:  Mr. Cartell, any problems?

4         PROSPECTIVE JUROR CARTELL:  No.

5         MR. TEDDER:  Mr. Diamond, any problems?

6         PROSPECTIVE JUROR DIAMOND:  No.

7         MR. TEDDER:  MS. Mahamery, cause you any problems?

8         PROSPECTIVE JUROR MAHAMERY:  No.

9         MR. TEDDER:  Ms. Williams?

10        PROSPECTIVE JUROR WILLIAMS:  No.

11        MR. TEDDER:  Mr. Lambert, would it cause you any

12   concerns?

13        PROSPECTIVE JUROR LAMBERT:  No.

14        MR. TEDDER:  Ms. Pena?

15        PROSPECTIVE JUROR PENA:  No.

16        MR. TEDDER:  Mr. Harrington, you?

17        PROSPECTIVE JUROR HARRINGTON:  No.

18        MR. TEDDER:  Ms. Dampier, would it concern you at

19   all?

20        PROSPECTIVE JUROR DAMPIER:  NO.

21        MR. TEDDER:  Ms. Love, would it cause you problems

22   if the defendant does not testify?

23        PROSPECTIVE JUROR LOVE:  No.

24        MR. TEDDER:  Mr. Pittman, would it concern you?

25        PROSPECTIVE JUROR PITTMAN:  No.
```

1           MR. TEDDER:  Mr. Telesco?

2           PROSPECTIVE JUROR TELESCO:  No.

3           MR. TEDDER:  Ms. Perry, would it cause you any

4       concerns if he chose not to testify?

5           PROSPECTIVE JUROR PERRY:  No, it wouldn't.

6           MR. TEDDER:  Mrs. Cawthon, what would your

7       reaction be if he chose not to testify?

8           PROSPECTIVE JUROR CAWTHON:  I would kind of wonder

9       why, but if it's his right, he certainly has a right to

10      do it either way he wants to.

11          MR. TEDDER:  What would your reaction be, Ms.

12      Monplaisir?

13          PROSPECTIVE JUROR MONPLAISIR:  The same; it's his

14      right.  He can do it.

15          MR. TEDDER:  Ms. Powell, what would your reaction

16      be?

17          PROSPECTIVE JUROR POWELL:  The same.

18          MR. TEDDER:  You would wonder why, but you would?

19          PROSPECTIVE JUROR POWELL:  Yeah.

20          MR. TEDDER:  Ms. Traxler, what about you?

21          PROSPECTIVE JUROR TRAXLER:  I also would be

22      curious.

23          MR. TEDDER:  Pardon?

24          PROSPECTIVE JUROR TRAXLER:  Same thing, I would be

25      curious.

1          MR. TEDDER:  Ms. Jones, what would your reaction

2      be?

3          PROSPECTIVE JUROR JONES:  The same.

4          MR. TEDDER:  The same?  All right.

5          Ms. Cumbaa?

6          PROSPECTIVE JUROR CUMBAA:  I would respect his

7      right not to talk.

8          MR. TEDDER:  And Mr. Furman, what would your

9      reaction be?

10          PROSPECTIVE JUROR FURMAN:  I would presume he's

11      doing it on advice of counsel and it's the wisest thing

12      he can.

13          MR. TEDDER:  Now those of you who indicated you

14      would wonder why, and any of the people in the back, I

15      should ask you: What would your reaction be, would any

16      of you agree with what these ladies said in the front

17      row?  Would you wonder why or would you respect the

18      right he has not to testify?  Anybody wonder why?  If

19      so, would you raise your hand?

20          Okay.  Mr. Diamond, would you wonder why?

21          PROSPECTIVE JUROR DIAMOND:  I probably would,

22      yeah.

23          MR. TEDDER:  Anybody else wonder why?

24          Would each of you, the judge -- those of you asked

25      to serve, if he chose not to testify, the judge is

1    gonna tell you you cannot consider that in any way.

2         All right.  Ms. Monplaisir, if you're asked to

3    serve and he chose not to testify, could you follow the

4    judge's instruction in that regard?

5         PROSPECTIVE JUROR MONPLAISIR:  Whatever the judge

6    said is what I would follow because that's what we're

7    here for.

8         MR. TEDDER:  Okay.  Ms. Cawthon, how about you,

9    ma'am?

10        PROSPECTIVE JUROR CAWTHON:  Yes, I could follow

11   the judge's orders, but I would still wonder why, but

12   maybe he wouldn't be comfortable speaking.  Maybe he

13   would be nervous or something and maybe that would be a

14   good reason not to.  So, you know.

15        MR. TEDDER:  Okay.  The last major area that

16   applies in every case when somebody is accused of a

17   crime is the burden of proof and --

18        THE COURT:  Mr. Tedder, we're gonna need to take

19   another recess here unless you're almost finished.

20        MR. TEDDER:  How much time do I have left, your

21   Honor, if I kept going?  I don't have that much left to

22   do, Judge, probably another five, ten minutes.

23        THE COURT:  Five minutes?

24        MR. TEDDER:  I'm not sure.  I may be able to wrap

25   it up in five minutes.  I'll certainly try.

1        THE COURT:  Okay.

2        MR. TEDDER:  I don't know if I emphasized this

3    enough earlier, but this, obviously you folks are here,

4    this is a criminal case and I'm sure you all know

5    Mr. Herlihy's charged with first degree murder.  We're

6    not here to talk about property rights or whatever, or

7    who should win a money suit.  We're here talking about

8    first degree murder and a burden of proof in a criminal

9    case is beyond and to the exclusion of every reasonable

10   doubt.

11        Have any of you folks seen the television program

12   entitled People's Court?  It used to be on.  Mr. Smith

13   is nodding his head yes.  Do you ever remember Judge

14   Wopner saying he was deciding this case by

15   preponderance of the evidence?  Okay, all he dealt with

16   were civil cases, where the burden is whichever side is

17   a little bit heavier than the other, that side should

18   win.  In a criminal case the government has to prove

19   beyond a reasonable doubt that a person is accused,

20   that is accused, is guilty of what they're accused of,

21   so it's a much heavier burden than a civil burden.

22        Would any of you feel it would be better if we had

23   a civil burden in criminal cases than what we have

24   here?

25        Mr. Furman, you're shaking your head no.  Why not?

 1          PROSPECTIVE JUROR FURMAN:  Because when you're

 2     found guilty you either go to jail for a long, long

 3     time and that's it.  I mean the penalties are much more

 4     severe than generally what happens on a civil trial.

 5     That might be a little money, or a little property, or

 6     something, but this is an individual's life for a long

 7     time.  So it needs to be well hammered out whether that

 8     individual is guilty or not.

 9          MR. TEDDER:  Would anybody disagree with what

10     Mr. Furman said?

11          Does anybody on the panel think that we should

12     have a lower burden in criminal cases?  Ms. Flowers,

13     Mr. Smith Mr. Cartell, you're shaking your heads no.

14     Mr. Karle, Mr. Malphurs, any of you folks disagree?

15     Mr. Telesco, do you disagree?

16          PROSPECTIVE JUROR TELESCO:  Human life is about as

17     important as you can get.  It seems to me like we've

18     got to be really careful.

19          MR. TEDDER:  Would anybody agree with what

20     Mr. Telesco said?  Anybody disagree with that?  Okay.

21     I'm not gonna pick on you.

22          Anybody think that it's unfair to the government

23     that they have to meet such a high burden in order for

24     someone to be convicted of a crime?  Anyone think

25     that's unfair?  Okay.

1          Lastly, I'm sure you all heard me talking earlier

2     about how trials proceed where basically you're gonna

3     hear all the evidence, you're gonna hear all the

4     argument, hear all the law.  As I've already said to

5     you, you can't begin to form a decision, at least the

6     judge is gonna tell you not to until or unless you get

7     back to the jury room and then the judge says make your

8     decision.  Can each of you agree to wait until that

9     time before you make any decision in this case, if

10    you're asked to serve?  Okay.

11         Lastly, you heard me asking people earlier if you

12    have 12 people on this jury to reach a verdict, it has

13    to be unanimous.  What would your reaction be, you get

14    back in the jury room, first vote, eleven to one and

15    you're the one.  And I don't care whether you're the

16    one guilty or not guilty, everyone else disagreed.

17    What would your reaction be to that?  How would you

18    deal with that?

19         Mr. Harrington, how would you deal with that?

20         PROSPECTIVE JUROR HARRINGTON:  I think I'm a

21    person who is fairly obstinate in his opinions when

22    they're fully formed, as you say waiting until the

23    proper time to develop an opinion, but I'm a person who

24    stands up for his opinions.  At that point I would not

25    be easily swayed.  I would try to convince others,

1   within reason, but not sway from my own opinion without

2   very good reason.

3       MR. TEDDER:  Ms. Dampier, what would your reaction

4   be, ma'am?

5       PROSPECTIVE JUROR DAMPIER:  I'm not sure.  I would

6   probably think it out real thoroughly and wait for a

7   later decision.

8       MR. TEDDER:  Ms. Love, what would your reaction

9   be?

10      PROSPECTIVE JUROR LOVE:  Well, I've already been

11  on one hung jury, but I wasn't alone.  It was kind of

12  half and half.  But I think rather than making the

13  wrong decision, even though it, you know, was not good

14  to have a hung jury, I felt very comfortable leaving

15  the jury room, because I thought everyone had exhausted

16  their own opinions.  And there is, you know, absolutely

17  no, you know, there is a sense you get when no one's

18  gonna move any further.  So I wouldn't have any

19  difficulty any more than I did then.

20      MR. TEDDER:  Okay.  Ms. Perry, what would your

21  reaction be?  How would you do it?

22      PROSPECTIVE JUROR PERRY:  I think in order to

23  discern right from wrong in any situation you have to

24  have both sides of the coin, so to speak.  And until

25  you have that, you're not able to do it.  So if you

```
 1      come up with one person not, maybe they didn't hear
 2      everything.  Maybe they didn't see everything.  I think
 3      that we would have to go back through it.  I won't be
 4      able to be persuaded over just because I couldn't do
 5      that.  It's too important.
 6           MR. TEDDER:  I'm sorry to interrupt.
 7           PROSPECTIVE JUROR PERRY:  That's okay.
 8           MR. TEDDER:  Anybody remember seeing the film
 9      Twelve Angry Men?
10           PROSPECTIVE JUROR PITTMAN:  Yeah, I was just
11      thinking about that.
12           MR. TEDDER:  Ms. Cawthon, what would your reaction
13      be?
14           PROSPECTIVE JUROR CAWTHON:  Well, I would feel
15      like I must have missed something somewhere if it could
16      be shown where that was and I could be convinced that
17      it was true, then I would switch.  But I would hope
18      that the other eleven people weren't just going
19      together for fear of being different, because sometimes
20      that happens.
21           MR. TEDDER:  Okay.  Mr. Pittman, what would your
22      reaction be?
23           PROSPECTIVE JUROR PITTMAN:  I think I would be, I
24      would try to be assertive in speaking my point, but I
25      think I could also step back and look at the others'
```

1   perspective and make a judgment, but I don't, if I

2   think I'm right, I think I'm right.

3        MR. TEDDER:  Ms. Pena, what would your reaction

4   be?

5        PROSPECTIVE JUROR PENA:  I'm usually not -- I

6   don't change my position once I make it, because I try

7   to look at all the facts, and I mean, once you make a

8   decision it's because everything you saw, you know,

9   leads you to make that decision.  They would have to

10  really, really, really bring up something that would

11  make me change.

12       MR. TEDDER:  Mr. Telesco, what would your reaction

13  be?

14       PROSPECTIVE JUROR TELESCO:  I mean, I guess in

15  situations like that -- I mean, I serve on a lot of

16  committees in which people argue out their sides and I

17  think that basically you just explore it until, as this

18  lady was saying, it's exhausted and usually it boils

19  down to often ethical -- I mean if it's really

20  unresolvable, it's usually based on more fundamental

21  things, not the facts of the case and -- but I think

22  you just get in there and you just listen and you

23  listen and you argue your side if that's the way you

24  see it.  And then you just take it as far as you can.

25       I mean, I have no problems being the lone person

```
 1        on one side or the other.  I've been that way half my
 2        career, so this doesn't matter, that's not an issue.
 3            MR. TEDDER:  Ms. Monplaisir, what would your
 4        reaction be?
 5            PROSPECTIVE JUROR MONPLAISIR:  I wouldn't
 6        acquiesce just for the sake of reaching a consensus.  I
 7        would think that maybe there was something that I
 8        missed and go back and look at everything again and
 9        then I would stick to what I believed was right.
10            MR. TEDDER:  Okay.  Ms. Powell, what would your
11        reaction be?
12            PROSPECTIVE JUROR POWELL:  I wouldn't change my
13        answers just because the eleven, you know, the eleven
14        other people did.  I would just consider my
15        possibilities and go from there.
16            MR. TEDDER:  Ms. Traxler, what would be your
17        reaction?
18            PROSPECTIVE JUROR TRAXLER:  Well, like they said,
19        I would do the same thing.  It would depend on how
20        preoccupied I was with what was going on with the rest
21        of my life and how much everything is falling apart.
22            MR. TEDDER:  Yes, ma'am.  We're not gonna let your
23        life fall apart.
24            Mr. Karle, what would your reaction be?
25            PROSPECTIVE JUROR KARLE:  Well, you've been on
```

1    that situation being on the board of directors on a

2    situation.  Sometimes I followed it, sometimes I stuck

3    my ground.  It would depend on the situation and the

4    circumstances.

5         MR. TEDDER:  Mr. Malphurs, how about you, sir?

6         PROSPECTIVE JUROR MALPHURS:  Well, you know, I

7    don't know exactly what would go on, as a juror.  I

8    never been in there, but I would talk to them, let's

9    see if there's something I missed.  But if they didn't

10   convince me that I was wrong, then this thing about

11   being by myself, if I thought I was right, even though

12   it's eleven to one, but, you know, if I talked with

13   them there and see if there was something I missed or

14   something they missed.

15        MR. TEDDER:  Mr. Lambert, how about you, sir, how

16   would you resolve that issue?

17        PROSPECTIVE JUROR LAMBERT:  I would want to at

18   least reexamine my decision if I were the one juror and

19   see if there was something I missed.  But I would think

20   my greatest fear would be the pressure of others who

21   just want to be done with it and that's just too high

22   of stakes here to fold under that kind of pressure.  I

23   think the evidence needs to be reexamined for whatever.

24        MR. TEDDER:  Ms. Williams, how would, what would

25   be your reaction?

1    PROSPECTIVE JUROR WILLIAMS:  Well, if one of the

2    jurors didn't agree with the majority, I think what you

3    should do is go back over the facts and then try it

4    again, make your decision from there.  But always go

5    over the facts.  You know, don't get upset because this

6    person didn't agree with the majority, regardless of

7    how long it takes.  You know because this is a serious

8    case.

9        MR. TEDDER:  That's right.  Ms. Mahamery, what

10   would your reaction be?

11       PROSPECTIVE JUROR MAHAMERY:  Well, I would stick

12   to my decision if I firmly believed that person was

13   innocent.  I would stick to that unless otherwise given

14   more facts.

15       MR. TEDDER:  Mr. Diamond, how about you, sir?

16       PROSPECTIVE JUROR DIAMOND:  Yeah, I would talk

17   about it.  I would explore all the possibilities, but,

18   I mean, when all the dust settles I would stay and

19   stick with my opinion.

20       MR. TEDDER:  Mrs. Flowers, how would you react to

21   it, ma'am?

22       PROSPECTIVE JUROR FLOWERS:  I would think we

23   certainly would have to sit down and start over.  I

24   mean, you know, not -- I would be open-minded to

25   whatever it was that I might have missed that they

```
 1    caught.  But like I heard someone say, you have to be
 2    real careful that they're not trying to just get it
 3    over with.  And maybe instead of them trying to
 4    persuade me or maybe just us all, you know, kind of
 5    starting over again looking at everything.
 6         MR. TEDDER:  Ms. Jones, how about you, ma'am?
 7         PROSPECTIVE JUROR JONES:  I believe what she said,
 8    go back over the evidence, go back over everything, and
 9    try to decide from that point.
10         MR. TEDDER:  Ms. Cumbaa, how about you?
11         PROSPECTIVE JUROR CUMBAA:  Look at the evidence
12    and have to vote your conscience.
13         MR. TEDDER:  Mr. Smith how about you, sir?
14         PROSPECTIVE JUROR SMITH:  I would want to know
15    what they saw or heard that was so much different from
16    what I saw or heard that gave them such a different
17    opinion than me.
18         THE COURT:  Okay.  Mr. Tedder, I'm about to take a
19    recess.
20         MR. TEDDER:  Two more people and I'll be done,
21    Judge.
22         THE COURT:  Okay.  Ask them.
23         MR. TEDDER:  Mr. Cartell.
24         PROSPECTIVE JUROR CARTELL:  Try to rehash
25    testimony, you know, go back at it, go over testimony
```

Stacey K. Bryant, RPR
Judicial Court Reporter

0003272

1    again.  If you think you're right and you're right,
2    then they're wrong.
3        MR. TEDDER:  Lastly Mr. Furman, what would your
4    reaction be?
5        PROSPECTIVE JUROR FURMAN:  I would present why I
6    made my decision the way I did and see if they could
7    convince me otherwise.  I have pretty good reasons to
8    believe what I do.
9        MR. TEDDER:  All right.
10       Thank you folks.  Thank you for your patience.
11       I have no further questions, Your Honor.
12       THE COURT:  All right.  We're gonna take a recess.
13   When you come back I need for that group to stay where
14   they are.  I'm gonna ask this group to move into that
15   side.  I'm gonna ask this group to sit in the center
16   section.
17       Before you leave, I'm gonna let the people that
18   have been questioned go ahead and take your recess.
19   I'm gonna see if I can release any of you that have
20   been waiting in the middle.  Give me just a moment.
21       I would ask the attorneys to come forward just a
22   second.
23       (Discussion off the record.)
24       THE COURT:  Ladies and gentlemen, as you can well
25   imagine this is just luck of the draw for those of you

1    who are not the lucky ones.  I apologize.  I'm doing

2    the best I can to let people leave as soon as

3    reasonably possible.  So at this point all of these

4    people, there are three women sitting together on one

5    row, and the entire row behind them.  Starting with the

6    lady in the blue sweater raise your hand, please,

7    ma'am?  That row is gonna be released at this time.

8    And my apologies to the rest of you that I may need.

9         For those of you who are remaining, you do get to

10   take a 15-minute recess for what that's worth.

11        (Discussion off the record.)

12        (A recess was taken from 6:30 p.m. to 6:45 p.m.)

13        THE COURT:  You can remain seated.  I just need

14   for you to be quiet.  We're gonna do this work here at

15   the bench in order for me to not throw anybody out.

16   There's not enough room for you to sit anywhere else.

17        If you can give us a few moments here we'll be

18   finished here.  I can tell you this:  We do have a bus

19   waiting to take you back to your cars.  And, I will

20   tell you this:  We well recess even -- before

21   8:00 o'clock, even if that means we'll have to come

22   back in the morning even though I don't think we will.

23   I want to give you as much information as I can at this

24   point.  If the attorneys will approach the bench,

25   please?

1      MR. GROLAND:  We'll waive his presence at the

2      time.

3      MR. TEDDER:  I think he needs to be up here, too.

4      THE COURT:  Now, the first issue is, of course,

5      what will be filed in the court file.  I believe the

6      attorneys have all had a chance to read the note by

7      Mr. Lambert in regard to why he feels like he would not

8      qualify as a juror.  Have all the attorneys read it?

9      MR. GROLAND:  I have not, but just real quick.

10     Okay.

11     MS. SINGER:  The state would move for cause, Your

12     Honor, based upon that note and his statements in the

13     box.

14     THE COURT:  Is there any objection?

15     MR. GROLAND:  No.

16     MR. TEDDER:  No.

17     THE COURT:  Number 68, will be excluded for cause.

18     Mr. William Hayden, number 187, on the basis of he

19     is the father of four-and-a-half-month-old child, was

20     excused for cause earlier off the record; is that

21     correct?

22     MR. TEDDER:  I think it was actually on the record

23     that's what happened.

24     THE COURT:  Good enough.  If it's on the record,

25     good.  We have excused him already.

```
 1              Is the state out of -- and also the defense, I
 2         don't know if this was on the record or not, but there
 3         was a discussion earlier that Mr. Boyd Hudson, number
 4         164, will be excluded for cause; is that correct?
 5              MS. SINGER:  The state will be moving for that,
 6         Your Honor, and I don't know if the defense has any
 7         objection.
 8              MR. TEDDER:  Who are you talking about?
 9              THE COURT:  Boyd, who was number 164, from the
10         first panel, who said in response to the defense
11         question if you're the only one voting one way and his
12         response was well, the majority wins.
13              MS. SINGER:  He also said that he would not be
14         able to render a verdict if he didn't know
15         Mr. Herlihy's history, which would not be, the state
16         could not offer that to him.  He was for cause for both
17         sides, I believe.
18              THE COURT:  Accepted.  Mr. Hudson is excused.
19              Now, of the remaining panel, does the state have
20         any motions for, as a challenge for cause of any juror?
21         Do them one at a time and then we'll argue them.
22              MS. SINGER:  Second panel, Your Honor?
23              THE COURT:  The entire panel.
24              MS. SINGER:  Right.  The first -- I'm going,
25         moving to the second.  I have nothing for the first
```

Stacey K. Bryant, RPR
Judicial Court Reporter

CC03276

1    panel.

2         THE COURT:  Okay.

3         MS. SINGER:  The second panel, the state -- would

4    you want all of them at once?

5         THE COURT:  One at a time.  We'll argue them.

6         MS. SINGER:  State would move for jury number

7    eight Ms. Traxler, who said that this would destroy her

8    academic life.

9         MR. TEDDER:  No objection.

10        MS. SINGER:  They have no objection.

11        THE COURT:  Yes, because I'm not sure that that

12   actually qualifies legally, no matter what she might

13   personally want.

14        MS. SINGER:  All of her answers were framed with

15   you all are destroying my life and if I have to sit

16   and, I guess I could do that, but you know most every

17   one of her questions after she made that statement was

18   that she, this would be difficult, if not impossible.

19   At one point she was on the verge of tears when

20   Mr. Tedder asked her a question and she said something

21   about --

22        THE COURT:  You don't have to repeat all the

23   questions because it's on the record already, but I

24   didn't hear any factual basis that would constitute

25   grounds for challenge for cause.

```
 1            MS. SINGER:  She said she couldn't listen to the

 2     evidence because her mind would be so concentrated on

 3     the fact that her life was being ruined and

 4     Mr. Tedder's response was something to the effect of:

 5     Well, we're not going to ruin your life.  I believe

 6     that's how you responded.

 7            MR. TEDDER:  That's what I said.

 8            THE COURT:  I don't know any legal basis that

 9     qualifies, myself.

10            MR. GROLAND:  Take a peremptory.

11            MS. SINGER:  No.  I'm not going to take a

12     peremptory.

13            THE COURT:  We're not there yet.  Any others?

14     Challenge for cause is denied.

15            MS. SINGER:  We're moving to Richard Furman, juror

16     number 185.  He was represented by Mr. Groland.

17            MR. TEDDER:  No, that's not his testimony.  He

18     said --

19            THE COURT:  If we're gonna argue we take turns and

20     one side starts and then the other side argues.

21            MS. SINGER:  He testified that he retained

22     Mr. Groland to advise him on family matters within the

23     last week or ten days, what did he say three weeks?  I

24     had ten days.  I don't know how we got that.  That's

25     why we're moving for challenge.
```

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

1          THE COURT:  It's denied.  30 minutes, paid, out

2     the door.

3          MR. GROLAND:  Didn't pay; just came in and talked.

4          THE COURT:  Not on the record.  Okay.

5          MS. SINGER:  It's their turn.

6          THE COURT:  No.  Any other you have?

7          MS. SINGER:  Ms. Pena, juror 26 at the top row of

8     the second panel.  Ms. Pena is currently a victim in a

9     case where her son is the defendant in that case is

10    currently pending with the state attorney's office.  I

11    believe that's sufficient basis for a challenge for

12    cause on Ms. Pena.

13         THE COURT:  Denied.  She didn't say anything about

14    prejudice here.  Any more?

15         MS. SINGER:  No more for the state.  I believe.

16         THE COURT:  Okay.  For the defense?

17         MR. TEDDER:  Number 198, Ms. Powell.  Student

18    indicated there was going to be more problems, she gave

19    the same reason as Ms. Traxler.

20         THE COURT:  Denied, same ruling.

21         MR. TEDDER:  Mr. Smith, he indicated if he was

22    here it would probably cost him his job, truck driver.

23         THE COURT:  He didn't say it was gonna cost him

24    his job.

25         MR. TEDDER:  He said it was gonna cause his boss a

1    problem; the indication was he was going to lose his

2    job.

3          THE COURT:  I don't know how you got to that.  He

4    didn't say that.  I didn't draw that conclusion.

5          MR. PENNYPACKER:  He said it was gonna cost his

6    employer a lot of money.

7          THE COURT:  Yeah, that's different than costing

8    him his job.

9          Any more?

10         MR. TEDDER:  Ms. Flowers, number 66, she thought

11   the emotional aspect of this case would interfere with

12   her ability to be fair and impartial in this case.

13         THE COURT:  What does state say about that?

14         MS. SINGER:  She said she was gonna have a very

15   big problem with it.  I don't know how I can oppose

16   that, Judge.  Number 66.  Does the Court agree with

17   that?  Do you recall the testimony?

18         THE COURT:  Yeah, that's what she said.

19         MR. TEDDER:  Ms. Cawthon.  She said the evidence

20   would prejudice her against the defendant.

21         MS. SINGER:  I would like to have an

22   opportunity -- we didn't have an opportunity to

23   rehabilitate her.  I think that we should have an

24   opportunity to rehabilitate her if we get to that

25   number.

CC00280

```
 1              THE COURT:  Okay.  Possibly.

 2         Any others?

 3         MR. TEDDER:  I believe that's it.

 4              THE COURT:  Somebody told me that possibly I think

 5    I already marked Hayden.  That's everybody.

 6         All right.  Double check your list as to cause.

 7    Make sure you've raised everything that you want to.

 8         MR. GROLAND:  Billy Malphurs was the chief

 9    investigator for the state attorney's office for years

10    and he is his nephew.

11              THE COURT:  Cousin, Malphurs is his cousin.

12         MR. GROLAND:  We move to have him excused for

13    cause, because he's related to the chief of, retired

14    chief of investigators.

15              THE COURT:  Denied.  Nobody is gonna move to

16    excuse Mr. Karle, who wanted to go to Knoxville.

17         MS. SINGER:  Well, we've got the hint.  I was

18    gonna say we got the hint from Your Honor.  I was going

19    to, but there was no rope to at that point.

20              THE COURT:  I mean there's all kinds of -- okay.

21         Now, beginning with the first 12 and beginning

22    with the state.  This takes you through Ms. JoAnn

23    Escalante, number 38.  That's your first panel.

24         MS. SINGER:  We would like as our first

25    peremptory, number 36, Ms. Roberts, but that's only
```

1    eleven.  Let's see.  Mr. Hudson is gone.  Okay.  Right.

2         THE COURT:  Then for the defense, the first 12

3    goes now goes Mahamery.  Any peremptory challenges you

4    want to exercise?

5         MR. TEDDER:  Number 188, Mr. Ezzell.

6         THE COURT:  All right.  First 12 now goes through

7    Tenisha Martin.  What does the state?

8         MS. SINGER:  Juror number 23, Ms. Wade-Littrupp.

9         THE COURT:  Okay.  Now 12 goes through Jack

10   Ramsey, number 107.

11        MR. TEDDER:  We would strike number 43, Dr.

12   Abbitt.

13        THE COURT:  Twelve now goes through Ramona Perry.

14        MS. SINGER:  Number 212, Mr. Heileman.

15        THE COURT:  Okay.  Twelve now goes through

16   Ms. Monplaisir -- oh, excuse me Jeanine Cawthon would

17   still qualify because the challenge for cause is

18   subject to potential rehabilitation unless you want to

19   go ahead and strike her at this point.

20        MR. TEDDER:  At this time I'll strike number 154,

21   Ms. Young.

22        MR. GROLAND:  Judge, let us know before we run out

23   so we can save a peremptory.

24        MS. SINGER:  Are you counting those?

25        THE COURT:  Not yet.  We're not close enough for

```
 1     me to start counting them.  Okay 12 now goes through

 2     Jo-Anne Monplaisir.

 3          MS. SINGER:  All right.  I think his number was

 4     ten, Mr. McMahan.

 5          THE COURT:  Okay.  Twelve now goes through

 6     Jennifer Powell.

 7          MR. TEDDER:  I'm sorry, I didn't hear who they

 8     struck.

 9          THE COURT:  Dwayne McMahan.

10          MR. TEDDER:  Seven.

11          MS. SINGER:  Which one?

12          MR. GROLAND:  We haven't gone yet.

13          MR. TEDDER:  Mr. Baxter, number 117.

14          MS. SINGER:  117?

15          MR. GROLAND:  Yeah.

16          THE COURT:  Mr. Baxter.  Okay.  12 now goes

17     through Catherine Traxler.

18          MS. SINGER:  Ms. Traxler, number 8.

19          MR. TEDDER:  Which one did she strike?

20          THE COURT:  Telisha Martin, number 203.

21          Defense now goes through Viveca Jones.

22          MR. TEDDER:  Now through Ms. Jones.

23          THE COURT:  Yes.  And you promised Mrs. Traxler

24     that you wouldn't ruin her life.

25          MR. TEDDER:  Oh, man.
```

1      MS. SINGER:  You're gonna tell us when we confer

2  toward the eight here to see what the panel looks like.

3      MR. TEDDER:  Your Honor, we would strike number

4  155, Ms. Jones.

5      THE COURT:  Okay.

6      MR. TEDDER:  That's our fourth one.

7      THE COURT:  Let me count them up right now.  Let's

8  see.  State has struck five, defense has strike five.

9      MS. SINGER:  Okay.  How many do we have yet so far

10  that we passed to get to how many we do have that we

11  both agreed on, so far?

12      THE COURT:  It's hard to tell because Ms. Traxler

13  is -- Cawthon is subject to potential rehab.

14      Twelve, I mean you're up to 12, obviously.

15      MR. GROLAND:  Twelve in the box; 12 in.

16      THE COURT:  You're always up to 12; we're looking

17  at 12 every time, so unless I misunderstood the

18  question, we're always up to 12 people that have not

19  been struck, stricken for some reason -- struck or

20  stricken.  Now Veta Cumbaa is number 12 and whose side,

21  whose turn?

22      MR. TEDDER:  State.

23      THE COURT:  State's turn.

24      MS. SINGER:  All right.  Well, I'll strike Powell

25  if you strike Jackson.  I'm gonna strike 198, Powell,

```
 1    but I didn't promise her.
 2         THE COURT:  You're now up to Richard Furman.
 3         MR. GROLAND:  Could we just have one moment?
 4         MR. TEDDER:  We're gonna do number eight,
 5    Ms. Traxler.
 6         MS. SINGER:  You did the right thing there.
 7         We're gonna strike 185, Mr. Furman.  He is a
 8    Mormon because I know what church he goes to.
 9         MR. TEDDER:  Mr. Pittman.
10         THE COURT:  State has seven?  State has seven and
11    the defense has seven.  Okay.  State has seven, defense
12    has seven.  We've exhausted our challenges for cause.
13    We're down to Telesco and it's the state's turn.
14         MS. SINGER:  State will strike Telesco, number
15    205.
16         THE COURT:  We're up to Malphurs.
17         MR. TEDDER:  We'll strike Mr. Malphurs.
18         THE COURT:  We're up to August Karle.
19         MS. SINGER:  Can I take a look at the panel, Your
20    Honor?
21         THE COURT:  Yes.
22         MS. SINGER:  I'm gonna strike number 38, Escalante
23    from the first panel.
24         THE COURT:  Okay.  Mr. Karle, number 93.
25         MR. TEDDER:  Strike Mr. Karle.
```

352

```
 1              THE COURT:  State has stricken nine; defense has
 2      stricken nine.
 3              We're up to Scott Smith.  It's the state's turn.
 4              MS. SINGER:  Can I have a moment to just look at
 5      the panel?
 6              THE COURT:  Yes.
 7              (Pause in the proceedings.)
 8              THE COURT:  I think we're up to curtail, and of
 9      course we have to revisit the issue of Ms. Cawthon.
10              MR. GROLAND:  What's the Court gonna do with her?
11      I think we got enough.
12              THE COURT:  We can always strike her for cause.
13      You can always use a peremptory strike on Cawthon --
14              MS. SINGER:  This is our last one.
15              THE COURT:  -- if you want to.  We're up through
16      Cartell.
17              MS. SINGER:  We're gonna strike 208, Love.
18              THE COURT:  That's your last challenge.
19              MS. SINGER:  Right.  The defense can make a
20      decision about Jeanine Cawthon.  We have to bring her
21      up now and see.
22              THE COURT:  Ladies and gentlemen, I need your
23      attention for just one second.  The attorneys had one
24      more question they needed to ask Jeanine Cawthon,
25      number 128.  Ms. Cawthon, could you just come up here,
```

1   because that would be faster.  Thank you.  Ms. Singer

2   had another question she wanted to ask you.

3        MS. SINGER:  Ms. Cawthon, when we spoke with

4   Mr. Tedder, you spoke about the photographs, and I

5   wanted to ask you a few questions just to find out

6   whether or not you would be so prejudiced by the fact

7   of the photographs you haven't seen yet that you

8   wouldn't be able to fairly weigh and consider the

9   evidence in this case and render a fair and just

10  verdict.

11       PROSPECTIVE JUROR CAWTHON:  I don't think it's

12  entirely based on the photographs.

13       May I say something about when they let me go

14  before.  I found out afterwards it was a child molester

15  case and I just can't serve on a jury where children

16  are hurt or killed, just feel really strong.

17       MS. SINGER:  It's not the photographs.

18       PROSPECTIVE JUROR CAWTHON:  Well, that, too.  I

19  feel real strongly about hurting children and I don't

20  think I could be very fair.  And I want to tell you the

21  truth.

22       MS. SINGER:  All right.  That's sufficient.

23       PROSPECTIVE JUROR CAWTHON:  If you want to, put me

24  on a traffic case.

25       MS. SINGER:  You would be great.

```
 1              PROSPECTIVE JUROR CAWTHON:  But with children I

 2      don't think I could be very fair.

 3              THE COURT:  Thank you very much.

 4              MS. SINGER:  Where does that put us to?

 5              THE COURT:  Ms. Dampier, number 169 and you have

 6      one challenge left.

 7              MR. GROLAND:  They have used their ten?

 8              THE COURT:  They've used their ten.

 9              Excuse me.  I think we're up to -- I miscounted

10      them.  Yes.  We would be up to Harrington as the 12th

11      juror.

12              MS. SINGER:  So I do have one more.

13              THE COURT:  No, you've used your ten.

14              MS. SINGER:  Right.  Twelve jurors, right.

15              MR. TEDDER:  Your Honor, we would strike number

16      169, Ms. Dampier.

17              THE COURT:  Okay.  Then your last juror is number

18      26, Monica Pena?

19              MR. TEDDER:  Yes, Your Honor.

20              THE COURT:  Now there are three people left.

21              MS. SINGER:  I have five people left.

22              THE COURT:  No.

23              MR. PENNYPACKER:  I have four.

24              MS. SINGER:  I have -- oh, Harrington is on the

25      jury.  I'm sorry I have Pena.
```

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

```
 1          THE COURT:  Pena is number 12.  Want me to go
 2     through them from the beginning?
 3          Let me give you the list: Virginia Walker, 33, is
 4     number one; Donald Clark, 190, number two; Kristy
 5     Currier, number 37, is number three; Dorothy Moran,
 6     number 160, is number four; Jack Ramsey, number 107, is
 7     number five; Ramona Perry, number 73, is number six;
 8     Jo-Anne Monplaisir, 96, is number seven; Veta Cumbaa is
 9     number nine -- is number eight; Scott Smith, number
10     216, is number nine; John Cartell, number 40, is number
11     ten; Michael Harrington, number 68, is number eleven;
12     Monica Pena, number 26, is number 12.
13          MR. GROLAND:  How many alternates do we need?
14          MS. SINGER:  Is that right?
15          MR. PENNYPACKER:  That's right.
16          MS. SINGER:  Okay.
17          THE COURT:  It depends.  We need to pick at least
18     one alternate and then we'll see how many we're gonna
19     put on because it's 7:20 and rather than empanel
20     another whole group --
21          MR. TEDDER:  The next two ladies as alternate
22     jurors.  Do you agree at this time?
23          THE COURT:  Do you agree with either Williams or
24     Mahamery as alternates?
25          MS. SINGER:  Absolutely.
```

```
 1            THE COURT:  Absolutely?  Good enough.

 2            MR. GROLAND:  I would like to have three.

 3            THE COURT:  Do you agree with Justin Diamond as

 4      alternate?

 5            MS. SINGER:  No, I do not.

 6            THE COURT:  Then we're having two.

 7            MR. TEDDER:  I sure don't want to question anybody

 8      else.

 9            THE COURT:  Good enough.  I think that would be a

10      wise decision.

11            MR. TEDDER:  The only thing I was gonna say,

12      Judge, if we're gonna read preliminary instructions, I

13      would ask you to read defendant remain silent.

14            THE COURT:  All I'm gonna do is tell them don't

15      talk to anybody, don't read anything.

16            MS. SINGER:  Judge, if we could have one minute

17      before we finish this, I just have to ask

18      Mr. Pennypacker one question.

19            THE COURT:  All right.

20            MR. TEDDER:  I haven't tried a case with you.  I

21      just want to make sure of the question on defendant's

22      right.

23            THE COURT:  No, because it should be standard.

24            MR. TEDDER:  I heard one time of that happening.

25            MS. SINGER:  Yes.  Mr. Herlihy needs to stand
```

```
 1    here.

 2           THE COURT:  All right.  I've announced all the

 3    numbers.  Mr. Herlihy, did you hear all the names and

 4    numbers that I read?

 5           THE DEFENDANT:  No, Your Honor, I didn't.

 6           THE COURT:  Let me read them one more time, make

 7    sure you accept this jury.  It's Virginia Walker,

 8    number 43.  Donald Clark, number 190.  Kristy Currier,

 9    number 47.  Dorothy Moran, number 160.  Jack Ramsey,

10    number 107.  Ramona Perry, number 73.  Jo-Anne

11    Monplaisir, number 96.  Veta Cumbaa, number 189.  Scott

12    Smith, number 216.  John Cartell, number 40.  Michael

13    Harrington, number 68.  Monica Pena, number 26.

14           The alternates would be either Williams, number 6

15    and Mahamery, number 34.

16           THE DEFENDANT:  What about Mr. Diamond, the last

17    juror?

18           THE COURT:  The last one?  He was excluded by the

19    state.  You agree with that jury?

20           THE DEFENDANT:  Yes, ma'am.

21           THE COURT:  Okay.  Good enough.

22           All right.

23           Ladies and gentlemen, as I was about to say a

24    minute ago, when I call your name if you'll come

25    forward, have a seat in the yellow chairs.  I don't
```

```
 1    know if they're soft or not.  But beginning closest to

 2    me: Regina Walker, number 43; Donald Clark, number 190;

 3    Kristy Currier, number 37; Dorothy Moran, number 160;

 4    Jack Ramsey, number 107; Ramona Perry, number 173;

 5    Jo-Anne Monplaisir, number 96; Veta Cumbaa, number 189;

 6    Scott Smith, number 216.

 7        Mr. Smith, if you'll come on the top row, please.

 8    Thank you.

 9        John Cartell, number 40; Michael Harrington,

10    number 68.  Okay.  I'm missing somebody.  I'm sorry,

11    did I call Dorothy Moran?

12        Yes, I'm there.

13        MS. SINGER:  I don't believe you called Ms. Perry.

14        MR. TEDDER:  Ms. Pena is the last one.

15        THE COURT:  I'm not there yet.  I got

16    Mr. Harrington, Monica Pena, number 26.  Eva Williams,

17    number 196.  Mae Mahamery, number 34.

18        Does the state and defense both agree that this is

19    the jury that we have empaneled?

20        MS. SINGER:  We accept the jury, Your Honor.

21        MR. TEDDER:  It's what we agreed to, Judge.

22        MR. GROLAND:  Yes, Your Honor.

23        THE COURT:  Ladies and gentlemen, the rest of you

24    with our extreme gratitude for your patience are

25    released.  There is going to be a bus to take you back
```

1        to your parking.  If you'll just hold that bus for five

2        more minutes, I'll release these jurors as well.

3            Ladies and gentlemen, as you heard me say earlier,

4        it's very important that you not talk to any of us

5        during the entire two weeks that this trial is going on

6        except for anything that may occur in the courtroom on

7        the record reported by the court reporter.  Then if you

8        have any questions that you need to ask me, of course,

9        we can do that.  And you won't be allowed to talk to

10       the attorney, of course, or the defendant, or anybody

11       else.  It's basically me and the Bailiff.  That's it.

12           And if you have any questions that you direct to

13       the Bailiff, the bailiff's just gonna direct it to me.

14       So it would be better just to raise your hands while

15       we're in court or just simply say to the Bailiff I have

16       a question.  The Bailiff cannot give you any

17       information except where are we going for lunch, how

18       long is the break, and things like that, and minor

19       things having to do with how is security handled.  But

20       anything other than that is gonna have to be on the

21       record and I'll have to answer it for you.

22           So with those instructions please do not listen to

23       the news or read any news reports.  Now, if you want to

24       flip to the sports page, you know, or the home section

25       something that you know is not gonna actually cover any

1    news, of course, you may do that.  But you must take

2    every reasonable precaution to protect yourself from

3    becoming tainted in any way.  Just as I said, if

4    anybody tried to talk to you about the case, you must

5    tell them immediately that you are on the jury trying

6    the case and they must stop, and go away from them

7    and/or report it first thing in the morning.

8         Yes, sir.

9         PROSPECTIVE JUROR SMITH:  Can we watch out of

10   state or national news?

11        THE COURT:  I think that would be perfectly safe,

12   yes, sir.  I think that would be a good idea.  That way

13   you get a little bit of what might be going on of

14   interest to you.  If, as I said, if you see any of us,

15   we won't talk to you.  If when you come in, in the

16   morning, if you would please get here at 8:50, we'll

17   start the trial right at 9:00 o'clock.  And as I said,

18   I will do everything I can to conduct the trial from

19   9:00 a.m. to 6:00 p.m.

20        You will be escorted to lunch.  You will not be

21   sequestered.  Of course you would be allowed to go home

22   at night, but you have to tell everybody that you can't

23   talk about the case.  And lunch will be provided.  If

24   you want to bring any other snacks with you, we will

25   take recesses during the day, just like we did today.

```
 1          Legal issues could come up that I might have to
 2     address.  That means you might have to be waiting in
 3     the jury room, so if you want to bring a book with you,
 4     like some of you did today, just in case you're stuck
 5     waiting, that's fine also.
 6          The temperature in this building fluctuates.  The
 7     equipment is a little bit antiquated.  So if you can
 8     bring a sweater or a jacket with you so that you can
 9     keep yourself comfortable.  We can adjust it and of
10     course we'll do the best we can, but I have to warn you
11     that it goes up and down and we have to deal with that
12     on a daily basis.
13          Anybody have any questions?  Yes, ma'am, Ms.
14     Monplaisir?
15          Ms. MONPLAISIR:  What about my federal jury duty?
16     This won't impact that?
17          THE COURT:  It's not gonna impact this.  If for
18     any reason this trial continued, of course, we would
19     handle that for you, but I do not anticipate that it
20     will.  And, frankly, I expect that when you tell them
21     that you just served on a two-week jury that they will
22     then excuse you.  As a matter of fact, if they have
23     sent you the kind of questionnaire we do in state
24     court, you might want to give them that information
25     now, and ask if you can be excused by mail.  That might
```

1    be a possibility for you.

2          Yes, sir.

3          PROSPECTIVE JUROR CARTELL:  Can we take notes?

4          THE COURT:  Yes.  I'm glad you brought that up.

5    Because this is such a long trial I am gonna allow to

6    you take notes, but there are pros and cons with that

7    and I need to warn you a little bit.  First of all,

8    I'll give you some additional instructions tomorrow,

9    but each of you will be provided with a notebook that

10   you can write in during the trial if you wish to.  At

11   the end of every day the notebook will be collected and

12   sealed and then will be returned to you the next

13   morning.  So it's only yours and nobody else is gonna

14   look at it.  It's completely private.  You may write

15   whatever you want to in it.  When you deliberate you

16   may share it, if you choose to.  Nobody else is gonna

17   be bound by one individual's notes, and we'll give you

18   some additional instructions about how that might be

19   important.

20         But, yes, you will be able to take notes and, yes,

21   the equipment will be provided for you.

22         Any other questions?  Yes, sir.

23         PROSPECTIVE JUROR HARRINGTON:  Not being allowed

24   to discuss this, what can we say to our employer about

25   our absence for two weeks?

1      THE COURT:  Oh, you can certainly say that you

2   have been selected as a juror in a trial that is a

3   first degree murder case and will take two weeks.  But

4   other than that, once the evidence starts coming in,

5   that's what you cannot discuss, even among yourselves

6   or with anybody else, because as is apparent, you must

7   not deliberate or make any decision until you've heard

8   everything.  So that once you start your deliberations,

9   you've got the full picture.  All right.  So that's

10  what you cannot discuss.

11      The court is closed on Monday.

12      PROSPECTIVE JUROR CURRIER:  May we attend work on

13  Monday?

14      THE COURT:  Yes, if your business is in operation

15  and you want to go to work that day, that's fine.

16      PROSPECTIVE JUROR CURRIER:  Evenings okay as well?

17      THE COURT:  What you do, you'll be out of here by

18  6:00 or a little bit after 6:00 at the latest --

19  whatever you do in your free time it is still your free

20  time.  I just have to protect you from anything that's

21  gonna influence the trial.

22      PROSPECTIVE JUROR MONPLAISIR:  Weekends are not

23  included, are they, or are they?

24      THE COURT:  They are included in the rule that you

25  can't discuss it or watch news that might cover it, but

1    you will not be working on the weekends.

2         Now, in case you all are not finished deliberating

3    on Friday night when this case is over and you choose

4    to deliberate over the weekend, that will be one of the

5    things that you'll have an option about as opposed to

6    coming back on Monday.  But that will be something that

7    we will accommodate.  But my expectation, based on lots

8    of experience, is that the entire trial will be

9    concluded by the end of next week.  But it's an inexact

10   science.  I can't promise that.  That's just my very

11   best guess about how things will go.

12        Any other questions?

13        PROSPECTIVE JUROR CARTELL:  Meet here?

14        THE COURT:  Yes, this courtroom at 8:50.

15        PROSPECTIVE JUROR CARTELL:  Park?

16        THE COURT:  Park tomorrow in the parking garage

17   and those things will be stamped for you.

18        Anything else I need to tell them about parking?

19        THE CLERK:  No, just bring your ticket in and I'll

20   validate it for them.

21        THE COURT:  All right, bring your ticket in.

22        I know that this has been a very long day and

23   again I appreciate y'alls patience and your attention

24   and I appreciate your diligence and your sense of

25   responsibility and being willing and able to serve as a

1    juror in this case.

2         With that, I want to make sure I excuse you in

3    time to catch that bus that will take you back to your

4    cars.  And we'll see you in the morning.

5         MS. SINGER:  Your Honor, may Mr. Pennypacker be

6    excused?  I will be representing the state on any other

7    issues.

8         THE COURT:  Yes.  All right.

9         All the jurors have now left; is that correct?

10        MR. BAILIFF:  Yes, ma'am, I believe so.

11        (OUTSIDE THE PRESENCE AND HEARING OF THE JURORS:)

12        THE COURT:  Okay.  Thank you.

13        MR. GROLAND:  There is only one motion of the

14   three at issue.

15        THE COURT:  Okay.  That is?

16        MR. GROLAND:  And that is the Court's already

17   ruled on one.

18        The other is we've agreed that I can take

19   Dr. Quisling's short deposition one day this week by

20   phone at the noon hour.

21        MS. SINGER:  As long as the record clearly

22   reflects that Mr. Groland has already taken

23   Dr. Quisling's deposition and the state has no

24   objection to Mr. Groland covering what he believes is

25   new grounds at this very short continuation of the

```
1    deposition, I have knowledge problem with it.  But I do
2    object to sewing old grounds and I don't think
3    Mr. Groland intend to do that.
4         MR. GROLAND:  I have no intention of doing that.
5    The motion says we've taken it already.  It's going to
6    be, I would expect, ten minutes, 15 minutes, max.
7         THE COURT:  And you understand that the trial will
8    not be continued or delayed for this purpose?
9         MR. GROLAND:  I fully --
10        THE COURT:  So as long as you can fit it in your
11   brief lunch hour.
12        MR. GROLAND:  Yes, Your Honor.
13        THE COURT:  And if the state has no objection;
14   then, of course I have no objection.
15        MS. SINGER:  I would like to put two things on,
16   other things.
17        THE COURT:  There is one other thing I have.  I
18   would ask Mr. Groland because he filed the motion for
19   rehearing and a demand from Richardson hearing as to
20   the compact disk.
21        MR. GROLAND:  Yes.
22        THE COURT:  The Richardson inquiry you said.
23        MR. GROLAND:  That's also a potential discovery
24   violation.
25        THE COURT:  Oh, yes.
```

```
 1          MR. GROLAND:  Okay.  It's late for all of us.

 2    Your Honor, I have no problem with doing this at

 3    another date and time if the Court likes, before the

 4    state elects to try to use that presentation.

 5          THE COURT:  Okay.

 6          MR. GROLAND:  Do you want to hear my position on

 7    it now or?

 8          THE COURT:  I think I already did.  So any

 9    position, any legal argument that you have not raised,

10    if you'll file it in writing, I'll be glad to rule on

11    it.

12          MR. GROLAND:  Okay.  I would say that we did not

13    have a Richardson inquiry the last time we addressed

14    it, even though I alluded to that in my motion, and I

15    raised the issue of.  Here, two years later, we get

16    notice that they're gonna use this.  They don't even

17    provide us a copy, they just show it to me.  And so I'm

18    believing that that, in and of itself, is a discovery

19    violation, in addition to my other objections that I

20    raised in the motion about there's absolutely no

21    predicate, there's no authenticity, there's no

22    information.  They just want to slap it up on the

23    screen and show it to the jury.  I think that is

24    improper.

25          THE COURT:  I understand.  Those are all the same
```

1   arguments that you made.  Now, unless the state agrees

2   that this use of a demonstrative aid is a discovery

3   violation and would need to argue it, I've already

4   ruled.  So if I'm wrong, that's just the lucky break

5   for you, because you can appeal it.

6          MR. GROLAND:  Okay.

7          THE COURT:  I don't see because it is a

8   demonstrative aid that it could be interpreted as a

9   discovery violation.  Therefore that's why I'm not

10  gonna conduct a Richardson inquiry, per se.

11         MR. GROLAND:  Okay.

12         MS. SINGER:  Your Honor, since we have the Court

13  reporter present, and I think that Mr. Groland and I

14  have discussed opening statements tomorrow, is it

15  possible for us now to put on the record some of the

16  agreements we made?

17         MR. GROLAND:  Sure.

18         MS. SINGER:  There is one of the photographs that

19  the Court has already indicated would be admissible

20  into evidence we would be using in opening statement.

21  I understand Mr. Groland does not have an objection to

22  that.

23         MR. GROLAND:  I just wanted to show it to

24  Mr. Tedder.

25         MS. SINGER:  Yes.

1        The second issue, Your Honor, is that the

2    post-Miranda statements Mr. Groland does have an

3    announcement at this time that he has no objection to

4    the state referring to the post-Miranda statements in

5    opening statements.  Is that correct?

6        MR. GROLAND:  Ms. Singer asked me am I going to

7    object.  I indicated that I am not going to object to

8    anything in her opening, but I'm not necessarily going

9    to waive my right to object at a later point in time

10   should something develop.  Okay.

11       MS. SINGER:  That's so that we have on the record

12   at this point that there will be a ruling and objection

13   at that time.  At this point the state can discuss the

14   statements that were ruled upon by the judge for

15   pre-Miranda statements and also the post-Miranda

16   statements that Mr. Herlihy made.  Those statements can

17   be discussed in opening statements, is that correct,

18   Mr. Groland?

19       MR. GROLAND:  I promised you I would not object

20   and I'm saying that right here on the record.

21       MS. SINGER:  I didn't hear you.

22       MR. GROLAND:  You couldn't hear me?

23       MS. SINGER:  No.  I'm sorry.

24       MR. GROLAND:  So I've said it again.

25       MS. SINGER:  Thank you.  That's all I wanted to

```
 1      put on the record at this time and I will show
 2      Mr. Tedder and Mr. Groland the photograph again, but it
 3      was the photograph Mr. Tedder saw of a baby in the
 4      bathtub that I showed to your juror evaluator as well
 5      and I have it here for Mr. Tedder.
 6           THE COURT:  Is there any objection to the use of
 7      that photograph in opening?
 8           MR. GROLAND:  I don't believe so.  I just wanted
 9      to just have Mr. Tedder look at it.
10           THE COURT:  While they're pulling that photo, just
11      so we'll start out correctly, who's going to do the
12      opening for the state?
13           MR. GROLAND:  Mr. Tedder.
14           MS. SINGER:  And for the state would be
15      Mr. Pennypacker.
16           THE COURT:  Mr. Pennypacker and Mr. Tedder will do
17      opening statements.  Good enough.
18           After that, as I said, we'll just recall them as
19      best I can and you all just correct me if I've called
20      the wrong name.
21           MR. TEDDER:  Well, Your Honor, as far as the
22      picture goes, it's a very nice, cute picture of a very
23      handsome young baby boy.  I would submit the only
24      reason the state is going to use it during the opening
25      statement is to garner sympathy from the jury right off
```

1    the bat of the trial.

2         THE COURT:  Are you making a legal objection, or

3    are you just complaining about it?

4         MR. TEDDER:  I would object.

5         THE COURT:  The legal basis for the objection is

6    what?

7         MR. GROLAND:  It's not in evidence.  I mean

8    opening statements is not a time to bring forth

9    evidence.  It's not in evidence.

10        THE COURT:  Any response?

11        MS. SINGER:  At this time it would be a

12   demonstrative aid, Your Honor, in opening statement and

13   it's already been ruled upon as to whether or not it

14   passes the relevancy test and I submit to the Court

15   that we will be able to lay the proper predicate for

16   its admission into evidence.

17        THE COURT:  Okay.  You can do research overnight,

18   but my belief about the law is that based upon the

19   previous rulings of the Court, that it is going to be

20   proper for them to use that photograph in their opening

21   argument as a demonstrative aid.  I'll be glad to look

22   at any case law.  If you do find some, if you'll leave

23   a message on my home phone at 7:00 o'clock in the

24   morning, I'll get here early enough to read it.

25        MR. GROLAND:  Okay.

1      THE COURT:  Good enough.

2      Otherwise we will be in recess or we'll adjourn

3  until 8:45 in the morning.  Of course, I'll expect you

4  all to be here then.  Likewise any day that any legal

5  issues arise overnight -- and I understand this is also

6  a very significant case and that is a possibility,

7  although I would hope not -- that I need for you to let

8  me know at home so that we can convene everybody early

9  and we don't have the jury sitting in the jury room

10  waiting.

11      MR. GROLAND:  Is Your Honor listed in the

12  directory?

13      THE COURT:  Yes.

14      MR. TEDDER:  Judge, I want to make sure.  I wanted

15  to have Mr. Herlihy in here before the jurors are

16  brought in.  We kind of jumped through a gauntlet.

17  With the help of bailiffs I think we pulled it off.

18  Obviously, he'll be here early, as early as you want

19  him to be.  I don't know where you'll have the jurors

20  congregate.

21      THE COURT:  When they come to this door they will

22  be escorted directly into the jury room and be held

23  there.  So whoever the Bailiff who is on duty will

24  ensure they're not walking through while Mr. Herlihy's

25  being brought out from the holding cell, for instance.

1        MR. TEDDER:  Thank you.  That's our concern.

2        THE COURT:  Anything else we need to cover?

3        MR. GROLAND:  No.

4        THE COURT:  Thank you very much and it was very

5   professional and efficient and I appreciate that.  And

6   I know you all worked hard on it and I thank all the

7   court personnel for being so patient, too.

8        (The proceedings were recessed 7:45 p.m., to

9   reconvene the following day at 8:45 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

000330?

```
 1
 2                    C E R T I F I C A T E
 3    STATE OF FLORIDA      )
 4                          )
 5    COUNTY OF ALACHUA      )
 6                    I, DELIGHT D. KILYAN, CERT,
 7    SCOPIST/CERTIFIED ELECTRONIC COURT REPORTER AND TRANSCRIBER,
 8    hereby certify that I have transcribed from the
 9    tape-recorded proceedings and/or stenographic notes taken at
10    the foregoing jury impanelment, taken at the Alachua County
11    Courthouse, Gainesville, Florida, in the case STATE OF
12    FLORIDA, Plaintiff, vs. BRIAN HERLIHY, Defendant, Case No.
13    01-2000-CF-002753-A, taken on September 9, 2002, to the best
14    of my ability.
15
16                    DATED this 17th day of November 2003.
17
18
19    _____
20    DELIGHT D. KILYAN, CERT
      Scopist/Certified Electronic Court Reporter
      and Transcriber
21    Eighth Judicial Circuit Court
      State of Florida
22
23
24
25
```

Delight D. Kilyan
MY COMMISSION # DD134710 EXPIRES
July 21, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

**Stacey K. Bryant, RPR**
**Judicial Court Reporter**

C003308