# EXHIBIT

# FF

202-1-17814

IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT OF FLORIDA

BRIAN PATRICK HERLIHY,

      Appellant,

v.                    CASE NO.   1D02-4788

STATE OF FLORIDA,

      Appellee.

_____/

ON APPEAL FROM THE CIRCUIT COURT
OF THE **EIGHTH** JUDICIAL CIRCUIT,
IN AND FOR **ALACHUA** COUNTY, FLORIDA

### INITIAL BRIEF OF APPELLANT

                    NANCY A. DANIELS
                    PUBLIC DEFENDER
                    SECOND JUDICIAL CIRCUIT

                    **NADA M. CAREY**
                    ASSISTANT PUBLIC DEFENDER
                    FLORIDA BAR NUMBER **0648825**
                    LEON COUNTY COURTHOUSE
                    SUITE 401
                    301 SOUTH MONROE STREET
                    TALLAHASSEE, FLORIDA 32301
                    (850) 488-2458

                    ATTORNEY FOR APPELLANT

AB
3/26/04

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . 37

ARGUMENT

    I.    THE TRIAL COURT ERRED IN RULING THE DEFENSE
        "OPENED THE DOOR" DURING THE CROSS-EXAMINATION
        OF CRYSTAL QUIRELLO AND FIREFIGHTER DENNIS
        MEREDITH AND ALLOWING THE STATE TO QUESTION
        THESE WITNESSES AS TO APPELLANT'S ALLEGED
        UNTRUTHFUL STATEMENTS. . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 50

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . 51

CERTIFICATE OF FONT SIZE . . . . . . . . . . . . . . . . . 51

## TABLE OF CITATIONS

CASES                                                                PAGE(S)

Alexander v. State, 627 So. 2d 437 (Fla. 1st DCA 1993). . . 39

Allred v. State, 642 So. 2d 650 (Fla. 1st DCA 1994) . 45,46,49

Ashcroft v. State, 465 So. 2d 1374 (Fla. 2d DCA 1985)   46,49

Bozeman v. State, 698 So. 2d 629 (Fla. 4th DCA 1997)  . 45,46

Brown v. State, 579 So. 2d 898 (Fla. 4th DCA 1991)  . . . . 45

Czuback v. State, 570 So. 2d 925 (Fla. 1981) . . . . . . . 50

Davis v. State, 216 So. 2d 87 (Fla. 2d DCA 1968) . . . . . 45

Dodson v. State, 356 So. 2d 878 (Fla. 3d DCA 1978) . . . . 45

Duncan v. State, 616 So. 2d 140 (Fla. 1st DCA 1993) . . . . 39

Fiddemon v. State, 858 So. 2d 1100 (Fla. 4th DCA 2003)   45,47

Fletcher v. State, 619 So. 2d 333 (Fla. 1st DCA 1993) . . . 45

Hernandez v. State, 569 So. 2d 857 (Fla. 2d DCA 1990)  . . 45

McCrae v. State, 395 So. 2d 1145 (Fla. 1980) . . . . . . . 45

Robertson v. State, 829 So. 2d 901 (Fla. 2002) . . . . . . 45

Taylor v. State, 601 So. 2d 1304 (Fla. 4th DCA 1992)  . . . 39

Yanzito v. Wagner, 244 So. 2d 761 (Fla. 1st DCA 1971) . . . 39


OTHER SOURCES

Florida Rules of Appellate Procedure
    Rule 9.210(a)(2)  . . . . . . . . . . . . . . . . . . . 51

IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT OF FLORIDA

BRIAN PATRICK HERLIHY,

        Appellant,

v.                          Case No.   1D02-4788

STATE OF FLORIDA,

        Appellee.
_____/

## INITIAL BRIEF OF APPELLANT

### PRELIMINARY STATEMENT

        This is an appeal from sentencing after jury trial. **BRIAN
PATRICK HERLIHY** was the defendant below.  The thirty-volume
record on appeal will be referred to by volume number and page
number.  All proceedings were before Circuit Judge Martha Ann
Lott, Alachua County.

### STATEMENT OF THE CASE AND FACTS

        On August 29, 2000, the grand jury charged Brian Herlihy
with the first-degree murder of Robbie Quirello.  I 8-9.  Herlihy
was found guilty of manslaughter and sentenced to fifteen years
in prison.  II 279-285.

        Robbie was the four-month-old son of John and Crystal
Quirello.  In July 2000, Crystal left John and became involved
with Brian Herlihy.  Crystal and Robbie stayed with Brian
occasionally, and Brian sometimes cared for Robbie while Crystal

1

worked. Crystal moved back in with John in late July but continued seeing Brian. On August 2, 2000, Crystal left Robbie with Brian while she ran some errands. While she was gone, Brian called 911. He said he found Robbie wedged between the mattress and bed rails, vomiting and having trouble breathing. Robbie was taken to Shands Hospital by ambulance. He never regained consciousness, and on August 10, brain death was established, and life support was removed.

Prior to trial, the trial judge granted the defense motion in limine to prohibit the state from eliciting in its case-in-chief various statements Brian had made regarding his employment, which were fabrications. I 95-97, XXVI 2804-2805.

At trial, the state's theory was that Robbie died from being violently shaken while in Brian's care on August 2. The defense theory was that Robbie had a prior brain injury, which re-bled, causing a seizure and/or a loss of oxygen, which caused his death.

John Quirello testified Robbie was a happy baby who rarely cried. V 145. The marriage was troubled, however. V 147. Over the July 4th weekend, 2000, Crystal was angry because John played in a golf tournament, leaving her with Robbie all day. They argued, and threatened to move out. She was so angry, John refused to allow her to take Robbie. V 148. Crystal called the Sheriff's Department and they told her she could not take Robbie

2

without John's permission.  She eventually calmed down, and John let her take Robbie.  A week later, they had another argument after John told her Robbie needed to be in better care.  She grabbed a knife and came towards John with it, then tried to hurt herself with it.  John took the knife away, and she bit him on the chest and arm.  As she ran off, she punched a wall, injuring her hand, and had to go to the emergency room.  V 164-165.

John and Crystal lived apart for several weeks, then reconciled.  On August 2, Crystal brought Robbie to John's workplace around 8:45 a.m.  Robbie was giggling and laughing. Crystal left with Robbie around 9.  At 10, John got a call from Crystal that Robbie was hurt and at Shands Hospital.  V 150-153. John went to the hospital and Crystal told him Robbie aspirated on some milk on the way home and she had called 911.  V 155, 178. The next story was she left Robbie with a female friend while she ran an errand, and when she got back, the fire trucks were there. V 157, 181-182.  Eventually she admitted she was involved with Brian and had left Robbie with him.  V 182.

John said Crystal was not known to be honest.  She had a short fuse, and her behavior was erratic at times.  After Robbie was born, things changed.  He was getting the bulk of the attention, which was a sore spot with her.  V 185.

On August 15, John learned Robbie's CAT scan showed a prior brain injury.  At the time, he surmised several things that may

3

have caused an old injury, including Robbie's birth and Crystal's
car accident while she was pregnant.  Also, a few days before
July 4th, Crystal was angry and plopped Robbie on the bed a
little rough.  John did not think anything was wrong at the time
because Robbie was laughing.  V 171-172.

    Crystal testified she was sick about 90% of the time during
her pregnancy.  V 195, 270.  On January 10, 2000, she was in a
car accident.  She hit the steering wheel while wearing a seat
belt.  She was taken to the hospital because of cramping, where
she remained for 3-4 days hooked up to fetal monitors.
Everything looked fine, so she was released.  After that, she
went into pre-term labor off and on.  Robbie was born four weeks
early.  Two weeks after the birth, she returned to full-time
work.  Robbie was cared for by John's grandmother, Doris
Bridwell.  V 198-205.  Crystal said she began a sexual
relationship with Brian after she and John separated.  When she
stayed with Brian, Robbie slept between them.  Some days, she
left Robbie with Brian while she worked.  She left Robbie with
Brian because she trusted him.  V 212-215.  Robbie could do a
half roll but not a consistent roll.  V 222.  On August 2, she
planned a trip to Cedar Key with Brian and Robbie.  After
visiting John, she went to Brian's and left Robbie with Brian
while she got gas.  Robbie seemed fine.  When she returned,
emergency vehicles were there.  V 225-237.  Brian was crying and

4

very upset.  V 300.  He said Robbie aspirated on his milk.  She
and Brian followed the ambulance to Shands in Brian's truck.  She
thought Robbie would be going home that day, so she drove back to
Brian's apartment and got the diaper bag and exchanged Brian's
truck for her car.  When she returned, she met with the hospital
social worker and John.  She lied initially because she thought
if John knew the truth, they would divorce.  V 239-248, 252.

On cross-examination, Crystal denied throwing Robbie on the
bed when angry.  She denied threatening to end her life when she
had the knife.  V 277-278.  She did not recall biting John,
punching a wall, or going to the hospital twice for injuries to
herself, even when shown the hospital records.  V 284-285.  She
did not remember telling Detective Legall she and Brian went
looking for an apartment.  She did not remember applying for a
loan for a truck she wanted to buy Brian.  When asked if Brian
was always good with the baby, she said she trusted him.  Brian
never did anything that caused her to be concerned about leaving
Robbie with him.  She never saw Brian angry, aggressive,
impatient, or frustrated towards Robbie.  Brian changed his
diapers, fed him, played with him as much as he could, and
brought him presents.  She felt Brian loved Robbie.  V 296-299.
When asked if it was true she never had any suspicion Brian might
want to hurt Robbie, she said she trusted him.  V 304.

5

On redirect, over defense objection, the state was allowed
to ask Crystal if her trust was based on anything other than what
she observed. She responded she also trusted him because he said
he was a pediatric nurse at Shands. V 306.

Doris Bridwell testified she was Robbie's primary caretaker
while Crystal worked. He was a "good" baby and cried only when
hungry. He was never sick or injured. Once, he projectile
vomited some apple juice. Another time, she noticed a "red
blood" spot in his eye. IV 61-67. He was not rolling from front
to back or back to front. IV 79.

Dr. Kreinest, Crystal's obstetrician, said there was no
evidence of prenatal problems. VI 398. Crystal was prescribed
Phenergan for nausea and vomiting. After the automobile
accident, tests to determine if there were problems with the
fetus were negative. After that, Crystal complained of pre-term
contractions and was given medication to prevent contractions.
Robbie was born four weeks premature and born face up, which
makes it more difficult but usually isn't a major problem. The
umbilical cord was wrapped around his neck and was lifted during
delivery. He may have had a broken clavicle. VI 383-398.

Dr. John Hellrung, Robbie's pediatrician, saw no signs of
neurological deficit at birth. V 117. He may have fractured his
collarbone going through the birth canal. V 114. In April,
Robbie was spitting up formula, and the formulas were switched.

6

A few weeks later, he was seen because of infrequent stooling,
and supplemental feedings were started, which brought his weight
up.  V 123-124.  In May, the nurse noted poor head and neck
control, and Dr. Hellrung did a neurological exam.  The exam was
normal with the exception of decreased muscle tone in the
shoulders and neck, which could be due to prematurity or be an
early sign of a neurological problem.  By mid-July, Robbie was
rolling from front to back, indicating neck muscle strength was
good.  He did not know if Robbie was rolling from back to stomach
but would not expect that.  V 125-129.  At four months of age, he
ruled out neurological deficit since Robbie's development was
normal.  V 137.

     The 911 tape was played at trial.  The call came in at 9:34
a.m.  VII 441.  On the tape, Brian told the dispatcher he was in
the shower, he came out, he found Robbie face down, and "he is
not really breathing too well."  He said he was helping him with
his breath but he was not responsive.  He came out of the shower
and Robbie was stuck between the headboard and bed.  He said he
was in the medical field and had never seen this before.  Robbie
was coughing and draining fluids out of his mouth.  The
dispatcher gave him instructions on how to resuscitate.  He said
rescue was there, then "this is all I need.  I've worked rescue.
... no, they were going to the wrong building....  I don't need
this today."  VII 441-447.

Thomas Whitley was the first paramedic to attend to Robbie. Whitley and his partner, Russell Valentine, arrived at 9:37. The baby was on the bedroom floor, unconscious and not breathing. Whitley suctioned a milky, white fluid from his mouth and intubated (tube inserted through mouth into trachea which leads to lungs) him, after which he was able to breath. He started to cry and move around a little upon arrival at the hospital but never regained consciousness fully. VII 508-517.

Valentine said Brian was frantic about the baby's condition. He said the baby became entrapped between the mattress and the bed frame while he was in the shower. VII 559-564.

Kenneth Johnson, a driver/paramedic, said when he arrived, he was advised the baby was in complete respiratory arrest, meaning no effort to breathe at all. When they arrived at the hospital at 9:56, the baby was making attempts to breathe. VII 449-468.

Dennis Meredith, a driver for Gainesville Fire Rescue, testified Brian said he was taking a shower and he came out and the baby was at the end of the bed with his head caught between the mattress and bed rails. Brian was wearing pants and socks but no shirt, and his hair was dry. VII 477-478. On cross-examination, Meredith agreed Brian was frantic, hysterical, and kept saying he didn't know what happened other than he found the baby wedged between the mattress and the footboard. When asked

8

if that was the only thing Brian said, Meredith said he also said he got out of the shower and found the baby there. VII 484. On redirect, over objection and motion for mistrial, the state was allowed to elicit from Meredith that Brian kept repeating he was a trained firefighter, an Orlando firefighter, and he could save other children but he couldn't save his own. VII 498.

Officer Orlando Alvarez testified he spoke to Brian at Shands shortly after Robbie was admitted. Brian was distraught and concerned about Robbie's well-being. He said he was planning to spend the day at Cedar Key with Crystal. She went to get gas. He fed the baby a bottle of formula, put the child on the bed face down, and jumped in the shower. While in the shower, he noticed it was quiet in the bedroom, got out, and found the baby wedged between the mattress and bed frame with his feet up.

Dr. Harvey Rohlwing, the ER physician who treated Robbie, testified Robbie was admitted in critical condition, essentially comatose though trying to breathe. He gagged and coughed and began crying, indicating the tube was not properly inserted, and the tube was removed. VI 328. There were no signs of external trauma. An eye exam showed he had retinal hemorrhages in both eyes. Tests were ordered, including a CAT scan of his brain, which showed multiple intracranial hemorrhages. The combination of retinal and brain hemorrhages led Dr. Rohlwing to make a preliminary diagnosis of shaken baby syndrome. VI 329-333.

9

On cross-examination, Dr. Rohlwing conceded he was not an expert in shaken baby syndrome. He was aware the EMT's reported Robbie was not breathing when they arrived. He agreed when someone is not breathing, this does critical damage to the brain within a short period of time. He agreed choking on vomit can block the nose and throat and impede breathing. Robbie was not seizing when he arrived and he did not treat Robbie for seizures in the ER. The initial radiology report indicated multiple hematomas of varying ages. VI 335-340. He was unaware seizure can cause retinal hemorrhaging. He agreed brain swelling would occlude venous drainage from the eyes. VI 355.

Dr. Anne Dickinson, the head of the Pediatric Intensive Care Unit (PICU) at Shands, testified as an expert in pediatric critical care. VIII 593. Dr. Dickinson said Robbie arrived at the PICU seizing and very distressed. His breathing was abnormal, and his color was ashen gray and mottled. VIII 601. There were no external signs of trauma except a small area on the left occipital part of the skull that looked like an old bruise. VIII 605. Robbie was given anti-seizure medication, and a breathing tube was inserted. VIII 610.

Test results showed no evidence of aspiration but a CAT scan showed fresh blood on both sides of the brain, above and below

10

the dura.[1]  VIII 612.  On both sides of the front part of the
brain were collections of clear fluid called hygromas.  There was
no evidence of midline shift, which would suggest a subdural
under pressure or an epidural under pressure or direct blunt
trauma.  There was no radiographic evidence of increased
intracranial pressure.  VIII 611-615.  Robbie also had retinal
hemorrhages in both eyes.  VIII 630.

In Dr. Dickinson's opinion, Robbie "probably" died from
being shaken.  VIII 631, 671.  The jury was shown a two-minute
computer animation showing what has been hypothesized to occur
when the brain is shaken.  The computer animation showed a series
of pictures of a doll being shaken.  While the computer animation
was being shown, Dr. Dickinson explained what the animation
demonstrated.  VIII 638-647.

Dr. Dickinson said being wedged between a mattress and bed
frame with the feet up was inconsistent with Robbie's brain or
eye injuries though being plopped on the bed so that his head
bounced could cause those injuries.  VIII 656.  She did not think
the brain injuries and retinal hemorrhages could have been caused
by re-bleeding of a chronic subdural hematoma.  She said the CAT

---

[1] As explained by Dr. Nelson, the dura is the outermost
covering of the brain.  The dura is held tightly to the inside of
the skull bone.  Below the dura is the subdural space.  Above the
dura is a potential space called the epidural.  On top of the
brain is a thin spidery-like covering, called the arachnoid.
Below that, adherent to the brain, is the pia, the thinnest
membrane.  XI 1061.

scan showed subdural, epidural, and subarachnoid bleeding on both sides of the brain.  VIII 657.  Only the subdural bleeding could have been caused by re-bleeding from a chronic subdural hematoma. VIII 663.  If a subdural re-bled, you would not expect blood touching the brain surface.  In her opinion, if Robbie had suffered a subdural hematoma at birth, the body would "mop up" or absorb the blood products within a week, leaving a hygroma, a membrane filled with clear fluid.  VIII 664.  She agreed re-bleeding of a subdural hematoma may cause a seizure but did not think Robbie's death resulted from re-bleeding of a chronic subdural hematoma, aspiration of vomit, hypoxia, or seizure. VIII 671.  Violent shaking doesn't break the neck because a baby's neck is very elastic.  VIII 648.

On cross, Dr. Dickinson agreed Robbie had a head full of unexplained hematomas.  She could not say how many injuries or how old they were.  In her opinion, chronic subdural hematomas usually do not re-bleed but can re-bleed in response to provocation.  IX 697-698.  If a subdural re-bleeds, it bleeds between the dura and arachnoid.  IX 708.  The dura was the most important piece of brain that should have been sent off for examination.  IX 739.  She was not convinced Robbie was in respiratory arrest because the blood gases did not support that and he was making noises, meaning he was getting air in his lungs.  IX 692.  She agreed lack of oxygen to the brain can cause

a seizure. She agreed if a baby chokes on his own vomit, this could cut off oxygen. IX 705-706. She did not think loss of oxygen for 5 minutes would cause permanent brain damage. IX 715. She agreed brain swelling can cause venous occlusion leading to retinal hemorrhage. IX 728. She said the hypothesis that a chronic subdural hematoma began to re-bleed, causing a seizure, which led to Robbie's death was "farfetched." IX 736. She agreed, however, the CAT scan evidence of older injuries was very definitive and said all five doctors agreed the CAT scans showed multiple traumatic events over a period of time. IX 741-742. Getting wedged in the bed was inconsistent with Robbie's injuries because there was evidence of multiple types of injuries in multiple parts of his brain. The theory is that when a child is shaken, different parts of the brain are injured differentially because the elements of the brain are of different densities and will be accelerated at different velocities. In her opinion, the new injuries, not the old ones, killed Robbie. IX 748-754.

Dr. William Hamilton, the medical examiner of the Eighth District, performed the autopsy on August 10. XI 966. Dr. Hamilton found no evidence of foreign matter in the airways or lungs or the tissue reaction you would expect when material is aspirated or breathed into the lungs. XI 975. He found no evidence of injury to the neck organs or head externally. XI 977-981. When he removed the skull cap to examine the dura, the

13

tough fibrous membrane over the brain (which stays attached to
the skull when the skull is removed), he found a layer of dark,
red blood on both sides of the head. On the surface of the brain
were similar collections of blood, loosely adherent dark red
clots. There also was blood beneath the thin membrane layer
called the arachnoid, which lies directly over the brain. The
blood looked fresh, not a day old, lightly adherent. He found no
evidence of a chronic subdural hematoma. XI 981.

The brain, brain stem, and cervical spinal cord were sent to
a neuropathologist, Dr. Stephen Nelson, for examination. Due to
a misunderstanding, the dura was not sent but was buried with the
child. XI 984-984.

The eyes were sent to an eye specialist. The specialist's
report indicated Robbie had retinal hemorrhages with positive
iron stain in both eyes. The staining indicated the hemorrhage
had been there at least 24 hours. XI 986-987.

In Dr. Hamilton's opinion, Robbie's brain injuries were
consistent with being shaken violently. XI 988. Dr. Hamilton
said when a baby's head is shaken, the veins that go from the
surface of the brain to the dura break, which causes bleeding in
the subdural space and the subarachnoid space. The brain also
can strike the base of the skull, resulting in bruising or impact
injury to the base of the brain. When the head is moving back
and forth, sheering forces are applied to the brain itself. The

sheering forces can damage neurons that go from the brain to the body. When this happens, the individual is rendered almost immediately comatose and may stop breathing. The brain usually swells, which Robbie's brain displayed. XI 992-993. In Dr. Hamilton's opinion, the subdurals alone did not cause Robbie's death. The subdural clots were small, then, and acute. They were relatively fresh and consistent with an eight-day time frame. XI 995.

On cross-examination, Dr. Hamilton agreed the dura was extremely important and that it was a mistake not to send it. XI 1004. He felt the gross examination was enough to say the subdural was fresh, not acute but agreed Dr. Nelson would need to do a microscopic examination to precisely date the age of the injury. XI 1034. He could not explain the discrepancy between what he found and the radiographic reports but said such discrepancies occurred fairly often. XI 1034. He agreed chronic subdural hematomas can spontaneously re-bleed and that blood on the brain can cause seizures, which can cause a person to stop breathing. XI 1018. In his opinion, however, Robbie's death was caused by axonal injury, which caused brain stem malfunction, which led to oxygen deprivation. XI 1019.

Dr. Stephen Nelson testified as an expert in forensic pathology and neuropathology. XI 1051. Dr. Nelson received Robbie's brain, along with Dr. Hamilton's preliminary autopsy

15

findings. XI 1053. Dr. Nelson's gross examination of Robbie's brain revealed blood clotting in the subarachnoid space and brain swelling. He did not have the dura to examine for evidence of an old subdural but said if there were a large enough subdural, he would expect shifting of the brain from one side to the other and discoloration on the brain surface, and there was none. XI 1055-1056. The microscopic examination showed contusions or bruises, as well as dead or dying changes of the nerve cells inside the brain. Bruises typically would be caused by blunt force trauma. An old subdural hematoma would not cause bruising on the brain, nor would seizure, aspiration, or a lack of oxygen. Plopping a baby on the bed so hard that its head bounced would be considered blunt force trauma. XI 1057-1059.

Dr. Nelson said a subdural hematoma can cause a subarachnoid hemorrhage but that was not typical. If subdural bleeding got into the subarachnoid space, the staining on the surface of brain would be immediately below the subdural, not everywhere, as here. XI 1062-1063. If Robbie had suffered a subdural hematoma at birth, he would expect to see staining on the dura or in the arachnoid, and he saw no evidence of that. XI 1065, 1070.

On cross-examination, Dr. Nelson said he was unaware Robbie had a rapid increase in head size during the 4-1/2 months he was alive. He agreed 4-5 minutes without breathing could cause irreversible brain damage. XI 1077. He agreed a subdural

16

hematoma can re-bleed spontaneously.  XI 1079.  He agreed blood on the brain can cause a person to have a seizure, which can cause a person to stop breathing.  XI 1087.  If he had been able to examine the dura, he could have conclusively determined whether there was a chronic subdural hematoma.  XI 1080.

Dr. Maria, who evaluated Robbie the day he was admitted, testified for the state as an expert in pediatric neurology. XII 1115-1116.  Dr. Maria concluded Robbie's injuries were consistent with being shaken and possibly thrown on the bed. The shaking, he said, had to have occurred between 9 and 9:35 that morning.  XII 1128.  Shaking damaged the brain cells so they could not use oxygen, resulting in their death, and the seizures and increased intracranial pressure resulted from bleeding and damage due to shaking.  XII 1122, 1190, 1196.

Dr. Maria agreed irreversible brain damage can occur in minutes due to oxygen deprivation but said this would not result in the brain damage or retinal hemorrhages Robbie had. XII 1131.  Oxygen deprivation would not cause bleeding on the surface of the brain or in the eye itself.  XII 1196.  Also, if the brain injury were due to oxygen deprivation, other organs would suffer, and the blood work showed no evidence of that. XII 1123.

On cross-examination, Dr. Maria agreed the CAT scans indicated chronic subdural hematomas and that Robbie may have

17

had chronic subdurals.  He agreed swelling can cause retinal hemorrhages.  XII 1155-1156.  He agreed weak neck muscles could be a sign of neurological damage and was unaware Robbie had weak neck muscles.  XII 1168.  He agreed a subdural hematoma can occur at childbirth and would not have to show signs.  XII 1169.  He agreed blood on the brain can cause a seizure, which can cause a person to quit breathing.  He agreed being lodged between the bed and footboard as Brian described could cause a child to have a seizure.  He agreed a seizure can cause increased intracranial pressure, which can cause pressure on the optic nerve but said he was unaware this could occlude the venous drainage.  XII 1171-1172.

Dr. Lawrence Levine, the pediatric ophthalmologist who examined Robbie on August 2, testified he saw a massive amount of blood in both eyes at every layer, one of the worse three cases he had seen.  XIII 1338.  In his opinion, the retinal hemorrhages were due to trauma, not intracranial pressure.  Two findings, documented by photographs, supported this.  One, Robbie had white spots in the back of the eyes, called Purtscher's retinopathy, caused by trauma.  Two, there was a crack in the back of the eye, a choroidal rupture, which is due to trauma.  XIII 1339.  Also, the ocular pathology report from Dr. Bell noted the optic nerve had no blood on it, and he would have expected evidence of intracranial pressure buildup on the

18

optic nerve.  Also, the vitreous jelly was shaken loose, which
bleeding alone would not cause.  In Dr. Levine's opinion,
Robbie's retinal hemorrhages were due to shaking which occurred
the day he saw Robbie or the day before.  XIII 1347-1350.

On cross-examination, Dr. Levine agreed intracranial
hemorrhages can occlude the veins and cause bleeding in the eye
but said it would not be everywhere normally.  XIII 1362-1364.

Dr. John Plunkett testified for the defense as an expert
in forensic pathology.  Dr. Plunkett is the laboratory and
medical education director at Regina Hospital in Hastings,
Minnesota and the assistant coroner for the Minnesota Regional
Coroner's Office.  He reviewed the autopsy report, Dr. Nelson's
neuropathology report, the autopsy microscopic slides and
autopsy photographs, Robbie's hospital records, and photographs
of the home.  XIII 1215-1217.

Dr. Plunkett said Robbie died of hypoxia, meaning his
brain did not receive enough oxygen to survive.  Dr. Plunkett
could not say what caused the lack of oxygen but said being
wedged between the steel rails of the bed frame and mattress in
a head down position with his legs up, as described by Brian,
could have led to the anoxia that caused Robbie's death.  XIII
1218-1219.

According to the radiologists' report of the CAT scans,
Robbie had chronic subdural hematomas and was developing new

19

bleeding into those chronic subdurals. Dr. Plunkett explained that studies done with serial CT scans of patients have shown that new bleeding is part of the natural history of a subdural. Over time, you get new bleeding as well as resorption of some of the old blood. This is a cycle until it heals or the volume becomes so large surgical removal is required. Bleeding in the subarachnoid space is an irritant though bleeding in the subdural may not be. You almost always have bleeding in the subarachnoid when you have subdural hemorrhage because the dural vessels go through the arachnoid membrane. There also will be subarachnoid bleeding anytime there is brain swelling and compression of the brain against the inside of the skull. XIII 1223-1225, 1229.

Bleeding on the brain can cause a seizure, which can cause the person to quit breathing. Lack of oxygen itself can cause bleeding in the dural space and also on the surface of the brain and at the water shed areas where the blood vessel supply is the most tenuous. In a soon-to-be published study, Dr. Jennian Geddes, a neuropathologist in London, reported fifty such cases, children who died after birth with hypoxia, almost all of whom had intradural and subdural haematomas due to lack of oxygen, not any other extrinsic trauma. XIII 1227.

In Dr. Plunkett's opinion, Robbie had no new traumatic injuries. The only primary trauma he had was the subdural

20

hemorrhage, if it represented trauma at all. His subdural hemorrhage could be related to birth trauma or could be due to a condition called cortical venous thrombosis, which is clotting of blood vessels on the surface of the brain, which has nothing to do with trauma. The anoxia was a secondary traumatic event which could have been caused by somebody else or could have occurred inadvertently. XIII 1230.

Dr. Plunkett said there was no evidence of shearing to the brain in the slides he examined. Sheering is one of the components of traumatic axonal injury. It describes what happens when one part of the brain is accelerating differently from an adjacent part: it shears or breaks apart. Robbie had no evidence of shearing injuries anywhere. XIII 1231-1232.

Based on the CT criteria, the majority of the bleeding Robbie had was chronic, meaning older than two weeks. XIII 1232. The photographs of the dura clearly showed chronic subdurals because the color is yellow, which takes three weeks to a month to occur. Photograph sixty-one also showed blood clot adherent to the dura on the right-hand side, which takes ten days to two weeks to occur. XIII 1234-1236. The photographs looked like cortical venous thrombosis but he could not tell if that was a primary event or the result of lack of oxygen. The primary causes of cortical venous thrombosis are

21

dehydration and infections but the cause is identified in less than 50% of children or adults who develop it.  XIII 1236.

Dr. Plunkett characterized the computer generated series of photographs prepared by Dr. Davis as a "scientific fraud." "The child's brain does not move that way during any shake you can subject the child's brain to."  The brain of a human would move that way if you were to accelerate the head at 350 times the acceleration of gravity.  When you shake a child, however, the most acceleration you can generate is about 10 times the acceleration of gravity.  XIII 1241-1242.  This has been shown experimentally by three different groups.  One study was done by Dr. Christina Duhaime, a neurosurgeon in Philadelphia, and Dr. Thibauot, an engineer.  The Philadelphia studies were replicated by Corrina Cory and Michael Jones of the Bioengineering Unit in Dundee, and by Michael Prange and Susan Margulies in Philadelphia.  XIII 1251.  There were no studies that supported the theory of shaken baby syndrome.  XIII 1252.

Dr. Plunkett said you may be able to kill a child by shaking but shaking does not cause the injuries called the shaken baby syndrome.  You could shake a child long enough so that the child was not breathing for three or four minutes, and the child could die that way.  Or you might also stretch the brain stem centers that control breathing, causing direct anoxia and death, in which case you could see damage to the

22

brain stem microscopically. XIII 1241-1242. In general, 4 to 5 minutes without oxygen results in death. Here, the lack of damage to other organs simply shows the amount of time Robbie's brain was without oxygen was relatively short. XIII 1244-1245. The fact that Robbie's heart never quit beating but he was not breathing when paramedics arrived indicates the amount of time he was without oxygen was very short. It would have been long enough to cause brain injury. XIII 1246.

New bleeding in the subdural hematoma could cause anoxia either indirectly by causing a seizure or by compressing the brain centers that control breathing. Robbie had brain swelling when he came into the hospital because his fontanel was tense and bulging. XIII 1246. Shaking did not cause the initial hematoma or new bleeding in the old subdural. Also, if Robbie had been shaken to death, at a minimum, you would expect neck damage, and Robbie had no fractures, no bruises. XIII 1247.

When asked what caused the retinal hemorrhages in Robbie, Dr. Plunkett said retinal hemorrhage occurs as a result of brain swelling. Brain swelling also results in break-through bleeding from retina into vitreous. XIII 1248, 1290.

Dr. Plunkett said he had written articles on impact injuries causing significant brain damage in children. Impact injuries include being thrown to the floor or falling on a

23

padded carpet but not being thrown on a bed. XIII 1255. To have impact, you need a contact event. When you thrown someone on a bed, the bed deforms two or three inches, and the head doesn't deform at all, so there's not an impact. In contrast, when a head hits an unyielding surface, even a carpeted floor, you get a contact event. XIII 1308.

Dr. Plunkett said he reviewed Dr. Nelson's report, including his findings of cortical cerebral contusions. In Dr. Plunkett's opinion, the contusions resulted from swelling of the brain and the fact that Robbie was on a respirator and were not a separate or independent injury. In fact, children under six months of age don't get traumatic contusions, they get contusional tears, which can occur accidentally from a fall or from intentional trauma. Robbie did not have contusional tears. XIII 1263-1265.

In Dr. Plunkett's opinion, the reports that Robbie was breathing intermittently, had a heart rate, and was gurgling when 911 was called did not indicate Robbie was breathing during that time. That type of intermittent breathing, called agonal breathing, is a leftover primitive reflex that occurs sporadically and does not work effectively. XIII 1287.

In Dr. Plunkett's opinion, the parts of the brain that control breathing were damaged, and he stopped breathing, which ultimately caused his death. This injury could have occurred

24

if Robbie was trapped in the bed exactly as stated.  The
complicating factor is the chronic subdural hematoma, which is
subject to new bleeding with no trauma or with relative lack of
oxygen.  Dr. Plunkett said he did not know "where to put that
chronic subdural hematoma into the cause and effect
relationship of what happened to Robbie."  XIII 1288.

Dr. Plunkett did not see any mention of a bruise to the
occipital area of the head in the radiology reports or the
autopsy report.  If there had been such a finding, it would be
consistent with an impact injury.  XIII 1294.

Dr. Plunkett said he agreed with Dr. Nelson's diagnoses
but not necessarily with the implications of the diagnoses.
What Nelson described as hematoma is actually cortical vein
thrombosis, or clotting of the blood vessels on the surface of
the brain.  Cortical venous thrombosis is part of a process
that can in and of itself kill someone.  It is uncommon and
frequently is misdiagnosed as representing inflicted trauma.
Dr. Plunkett did not know if it developed after Robbie was
hospitalized or was the primary event.  XIII 1305.  The initial
injury was the chronic subdural hematoma, probably due to
trauma, which occurred earlier than July 25th.  If the chronic
subdural hadn't been there, given everything else, he would
conclude it happened exactly as Brian said.  The chronic
subdural did not kill Robbie but he did not know what role it

played.  Being trapped between rail and mattress may have
aggravated the pre-existing subdural causing it to become
symptomatic.  Cortical venous thrombosis could have been the
primary event, could have been the cause of what was apparently
an acute and chronic subdural hematoma.  XIII 1328.

Dr. Ronald Uscinski testified for the defense as an expert
in neurosurgery.  XIV 1394.  In Dr. Uscinski's opinion, based
on his review of the records, Robbie had a chronic subdural
hematoma that was undetected and bleeding.  It rebled, and he
obstructed his airway by one of two mechanisms:  one, he
vomited such that vomit lodged in his airway, closing it off,
or, two, the bleeding from the subdural irritated the surface
of the brain, he had a seizure, and was not breathing.  He
either vomited after a seizure or vomited and had a seizure.
Either way, his airway was obstructed and his brain was
deprived of oxygen.  When deprived of oxygen for 4 minutes, the
brain starts to die.  XIV 1407.  Dr. Uscinski said blood on the
brain, even when separated by the arachnoid membrane, can
precipitate seizing, and seizure can cause a person to stop
breathing.  The medical records indicated Robbie was seizing
and was not only having trouble breathing, but his brain was
deprived of oxygen.  He had vomitus around the mouth when
found, and the CT scan indicated his brain hadn't gotten any
oxygen.  XIV 1417-1418.

26

Dr. Usckinski said a child can suffer a subdural hematoma at birth, and it may never be detected. If a chronic subdural hematoma starts to re-bleed, you would expect symptoms in minutes to an hour or two. XIV 1420. Re-bleeding can occur spontaneously. XIV 1450. You would not expect other organs to also be damaged. Other organs can be fine, which is how we're able to do kidney transplants, for example. XIV 1425.

Dr. Uscinski said Robbie's CAT scans showed fresh and old blood in the subdural space. He said it was common to have a small amount of blood in the subarachnoid space for people with chronic subdural. XIV 1428.

Dr. Lawrence Tibault's study found the maximum force people were capable of exerting by shaking was nowhere near the injury threshold required to cause the injuries attributable to shaken baby syndrome. Impact is required to reach the acceleration level necessary to cause injury. XIV 1435-1446.

Retinal hemorrhage has long been known among neurosurgeons to reflect an abrupt increase in retinal venous pressure, as a reflection of an abrupt increase in intracranial pressure. XIV 1448.

In his opinion, you cannot shake a baby and cause the injuries Robbie had. If brain injuries resulted from shaking at all, you would expect to see injury in the brain stem and the cervical spinal cord, where most of the movement takes

27

place. Here, there was no evidence of injury to the brain stem, and the spinal cord was not examined. XIV 1451-1452.

Dr. Uscinski said he did all the neurosurgery at Georgetown and George Washington University from 1983 to 1993. He originally accepted shaken baby theory. He noticed, however, there always was a better explanation. In 1997, he was asked to review a case allegedly involving shaking. The baby had chronic subdural hematoma and anoxic insult to the brain. He read all the literature, every paper, and concluded science contradicts the theory. XIV 1465.

Dr. Uscinski showed Robbie's CAT scans to the jury on an overhead projector and explained what he saw. He said the scan showed a chronic subdural with fresh blood, and there was nothing else it could be. XIV 1482. The scan showed a chronic subdural that had continued to re-bleed. XIV 1486. He also pointed out in the autopsy photographs the yellow stains, which evidenced a chronic subdural. He also pointed out adherent clots, meaning they were old. Fresh subdural blood should slip off. XIV 1496-1500.

On cross-examination, Dr. Uscinksi said subdural from birth trauma would not necessarily have healed before August 2. XIV 1515. In his opinion, it was conceivable that Robbie seized, moved, rolled, and got wedged as result. XIV 1524.

28

The majority of the blood was in the subdural space, about thirty times as much as in the subarachnoid space.  XIV 1526. Retinal hemorrhages are caused by a sudden increase in retinal venous pressure as reflective of a sudden increase in intracranial pressure.  Intracranial pressure can go up then right back down again, at which time the retinal hemorrhage has already occurred.  If this happened very quickly, blood would not go out other veins, and there's literature to support that.

Dr. Michael Bell, the forensic pathologist who had been sent Robbie's eyes by Dr. Hamilton for examination, testified for the defense as an expert in forensic pathology.  Dr. Bell said he examined Robbie's eyes grossly and microscopically two years earlier and again more recently at the defense request. He did not see any cracks in his examination of the eyes.  **XX** 2209-2210.

Detective Helen Legall of the Gainesville Police Department went to Shands Hospital at 10 a.m. on August 2, 2000, as a matter of standard protocol due to a child having been injured.  She left after it was determined no crime was committed but returned around noon, as part of a criminal investigation.  XV 1593-1596.  After attending a meeting with law enforcement and hospital personnel, she and Detective Cannon were assigned to speak with Brian.  Brian agreed to go

29

to the police station and also gave consent to enter his apartment. XV 1597-1600.

Legall interviewed Brian from 1:20 to 5:30 or 6 p.m., with several breaks. XV 1607. The interview began as a fact-finding mission but at some point, Brian became a suspect and was advised of his Miranda rights. XV 1608. Before he was Mirandized, he told Legall he and Crystal fed Robbie and Robbie spit up on his onesie, so they removed it. After Crystal left, Brian fed him some more. He was happy. Brian put him on a pillow on the bed, feet to the side, face up. He went into the bathroom, turned on the water, and it was cold, so he decided to wait. He went to check on Robbie and found him head down, feet up, and vomiting. XV 1609-1613.

Shortly before 4 p.m., Brian was read his Miranda rights and a 26-minute taped statement taken, which was played for the jury. During the taped interview, Detective Legall used photographs of Brian's apartment taken earlier that day. In this statement, Brian repeated his earlier statement. He fed Robbie the rest of his bottle after Crystal left, then put Robbie on the bed. Robbie was lying vertically across the bed on his back. Brian walked across the hall and into the bathroom, used the bathroom, then turned on the shower. The water was cold, so he decided to wait. He was in the bathroom about 5 minutes. When he came out, Robbie was wedged between

30

the mattress and foot rail, with his feet up and head down, vomiting. Brian pushed the mattress back and got Robbie out. He was making gurgling noises. Brian blew in Robbie's face tried mouth-to-mouth, then called 911. Robbie was coughing up stuff and frothing out of his mouth. He spit up on the comforter, leaving a stain in the middle of the bed. The paramedics came. They put a tube in his mouth and moved the bed so they could work on him. XV 1619-1635. Three weeks before, when Crystal and Robbie had spent the night there, Robbie had slid down to the foot of the bed while they sleeping and Brian pulled him up. XV 1642.

After the tape was played, Detective Legall said Brian indicated he had placed Robbie on a white pillow and that a sham had been placed between the end of the mattress and the bed frame. XV 1651. He said he found Robbie with his head between the first and second rungs of the bed frame, about 3 inches from the floor. XV 1652.

After the tape was turned off, Legall continued to talk to Brian. At one point, Investigator Coleman accused Brian of being a "lying piece of shit," and she asked Coleman to leave. XV 1656-1657. They continued talking, and Brian was cooperative and forthright. He said when he was giving Robbie CPR, he may have shook him gently to get a response but was careful not to hurt him. XVII 1864-1865. Sergeant Seale

31

joined Detective Legall in the interview room, and Legall brought a doll to the room. Brian demonstrated by putting his hands around the doll's waist and giving it one "stern" shake. XV 1658-1663. In response to Sergeant Seale's question, Brian said it was possible he shook him harder. Brian then offered to show them what happened at his apartment. XV 1664.

At 7 p.m. that evening, Legall, Seale, Sergeant Halvosa, and Tina Millard went to Brian's apartment, where Brian demonstrated with a doll how he placed Robbie on the bed and how he was lodged between the mattress and foot board. An audiotape of the demonstration was played for the jury.[2] XVI 1690-1705. Brian said Robbie could roll from front to back and from back to front. After the re-enactment, Brian stayed at his house, and the officers went home. XVI 1706.

Detective Legall spoke to Brian again at 10:50 the next night at the police station after his arrest. XVI 1719-1720. Brian said he had nightmares about Robbie dying and if Robbie died, he wanted to die too. He was very upset and emotional. After Legall told Brian his explanation was not consistent with Robbie's injuries, Brian said he couldn't get Robbie to stop crying. He changed his diaper, turned the ceiling fan on, and put on some music Robbie liked. He moved his legs back and

---

[2] The officers attempted to videotape the demonstration but discovered later the camcorder had malfunctioned and nothing was recorded. XV 1666.

forth, trying to get gas out of his stomach.  Then he went in the bathroom.  Robbie was still crying but he considered it to be a "fake" cry, meaning Robbie wanted attention but wasn't really crying since his face wasn't red and there were no tears.  When he came out of the bathroom, Robbie was wedged in the bed and not moving.  XVI 1726-1728.  They continued talking, and Brian said after he tried the music, fan, and pumping Robbie's legs, he swung him from side to side, trying to get him to laugh, then plopped him on the pillow.  While he was swinging the baby, Robbie was laughing.  He plopped him "fairly hard" and his head bounced on the pillow.  He thought he may have done something to his neck and told Legall he knew "you're not supposed to roughhouse with a four-month old."  XVI 1729-1733, XVII 1926.

A little later, Legall asked Brian why he thought it was a fake cry, and Brian said he wasn't fake crying and what he just told them never happened.  He said when he plopped Robbie on the pillow, his head bounced and he became quiet.  His eyes were dazed, open but not focusing.  Brian walked out of the room, uncertain how Robbie was.  He went into the bathroom to take a shower and when he came out, he saw Robbie had rolled into the crevice of the bed.  XVI 1734-35.

Detective Legall then took Brian to jail in Detective Weaver's vehicle.  On the way, Brian asked Weaver to pull over,

33

he wanted to say more. He said he remembered bouncing Robbie on the bed, that it was hard, and "I know I was rough with him." He said he abruptly had put Robbie down, that his hands were still on Robbie, and he told Robbie he would be okay when he walked away. When he came back, he "freaked." He knew something was wrong and panicked. XVI 1735-1739.

On cross-examination, Legall said this was her first case of shaken baby syndrome. She did not consult anyone, had no formal training, and no background in it. She did some reading on the Internet and was aware the theory was controversial. XVII 1804-1809. She did not talk to the radiologists before Brian's arrest. The only doctor she spoke to in person before the arrest was Dr. Dickinson, on August 2. She decided herself on the afternoon of August 2, while Brian was at the police station that since he was the last person with Robbie, he was responsible for the injuries. XVII 1811-1812. On August 9, Dr. Agee, one of the radiologists, told her there was something suspicious on the CAT scan and advised her to read his report. XVII 1813. Crystal's father gave her the same information about the CAT scan. XVII 1822. She did not follow up. XVII 1820. She found out about Crystal's car accident but never got the crash report or medical records before she closed the case. XVII 1825-1826. She did not speak to the doctor who delivered Robbie, to his pediatrician, or to the medical examiner who

34

performed the autopsy. XVII 1826-1828. She asked Crystal about possible prior abuse or injuries but never told her about what the CAT scan showed. She did not know Dr. Dickinson believed Robbie had suffered multiple brain injuries before August 2. XVII 1836.

Sergeant Seale testified he monitored part of the untaped August 2 interview from another room. As Brian was describing how he removed Robbie, he said he removed Robbie and shook, and as he said that, he raised his hands to chest height and made a shaking motion. Then he said, I mean I blew in his face. Seale went in the interview room and asked Brian if it was possible he shook him a little bit, and he said it was possible. He asked Brian if he thought he shook him hard enough to cause an injury, and he said it was possible. XVIII 1984-1989.

Sergeant Seale said when Brian walked into the apartment to do the re-enactment, he broke down and cried. He broke down again during the taping to the point where he couldn't even talk. As he was showing what happened, Seale told him it seemed the child would roll to the center of the bed, not the other way over the sham. Brian responded there may have been another pillow there. Seale said when he tried to place the doll between the mattress and footboard, it took a tremendous amount of effort. XVIII 2007. The space between the mattress

35

and footboard was about six inches, and it appeared Robbie could get to that location, if he could roll.  XVIII 2034.

Tina Millard, a crime scene investigator, took photographs of Brian's apartment on August 2.  The bathtub was dry.  IX 796.  There were two pillows at the head of the bed and two pillows at the foot.  There was a large white stain and a smaller red stain on the carpet between the bed and wall, where paramedics worked on Robbie.  IX 798.  Part of a sham was between the mattress and footboard.  IX 804.  One of the stains matched Robbie's DNA profile.  IX 768.

James Jackson testified he was dispatched to Shands on the morning of August 2.  He saw Brian sitting on the curb just outside the ER, with his head in his hands, crying.  Jackson spoke with Brian, then walked him to the chaplain's office.  XVIII 2061-2063.

Officer Robert King went with Orlando Alvarez to Brian's apartment the morning of August 2, and then to Shands.  At the hospital, Brian told King and Alvarez he fed the baby, laid the baby on the bed, and went in to take a shower.  He used the bathroom, then started the shower.  King initially said he could not recall if Brian said he did not take a shower, but when he was read back his deposition testimony, he said the deposition testimony was correct, Brian said he did not get in the shower.  XVIII 2071, 2083.

36

Lieutenant William Halvosa testified he went to Brian's apartment at 3:25 on August 2. Several other officers were there, as well as Tina Millard, who was taking photographs. Halvosa made a note there were pillows and a sham near the headboard but he didn't notice or reflect in his notes any pillows or shams at the footboard. XIX 2113, 2128-2129. He wasn't comfortable using the word "tremendous" to describe the amount of force Sergeant Seale used to push the doll into the space between mattress and footboard but said it was a "significant effort." XIX 2131.

### SUMMARY OF ARGUMENT

The trial court reversibly erred in ruling the defense opened the door to evidence of prior bad acts. The trial court granted the defense motion in limine, with the state's agreement, to exclude any mention of Brian's fabrications about his employment. During trial, however, the trial court twice ruled the defense opened the door to testimony about these fabrications. The trial court's rulings were erroneous because in neither instance did the defense offer misleading testimony or make a specific factual assertion that the state was entitled to correct.

37

**ARGUMENT**

**Issue Presented**

**THE TRIAL COURT ERRED IN RULING THE DEFENSE "OPENED
THE DOOR" DURING THE CROSS-EXAMINATION OF CRYSTAL
QUIRELLO AND FIREFIGHTER DENNIS MEREDITH AND ALLOWING
THE STATE TO QUESTION THESE WITNESSES AS TO
APPELLANT'S ALLEGED UNTRUTHFUL STATEMENTS.**

Prior to trial, the defense moved to exclude Brian
Herlihy's untruthful statements to various individuals
regarding his employment as a nurse or firefighter. I 94-95.
The state agreed the statements were not relevant, and the
trial court ruled such statements were inadmissible in the
state's case-in-chief. XXVI 2804-2805.

During trial, however, the state asserted the defense
opened the door to Herlihy's fabrication during its cross-
examinations of Crystal Quirello, and over defense objection,
the trial court allowed the state to elicit on redirect that
Herlihy told Crystal he was a pediatric nurse at Shands.
Subsequently, the state argued the defense opened the door to
another false statement during its cross-examination of Dennis
Meredith. Again, over defense objection and motion for
mistrial, the state was permitted to elicit from Meredith that
Brian told him he was a trained firefighter. The trial court's
ruling was patently erroneous. The improper testimony was
highly prejudicial and presumptively harmful. Reversal for a
new trial is required.

38

## Standard of review

Although the scope of redirect examination rests in the discretion of the court, <u>Yanzito v. Wagner</u>, 244 So. 2d 761 (Fla. 1st DCA 1971), the court's discretion is narrowly limited by the rules of evidence.  See <u>Taylor v. State</u>, 601 So. 2d 1304 (Fla. 4th DCA 1992); <u>Duncan v. State</u>, 616 So. 2d 140 (Fla. 1st DCA 1993); <u>Alexander v. State</u>, 627 So. 2d 437 (Fla. 1st DCA 1993).

## Applicable Facts

During direct examination, the state asked Crystal Quirello:

Q     ... why is that you would bring the baby to Brian?

A     Because I trusted him.

V 215.

On cross-examination, the defense asked:

Q     Would it be fair to say that Brian was always good with the baby?

A     I trusted him, yes.

Q     And, in fact, during this period of time Brian played more with Robbie than John did?

A     I would say so, yes.

Q     Did Brian ever do anything that caused you to feel concerned about Brian being alone with the baby?

A     Not in my presence, no.

Q     What did you say, not in your presence?

A     Yes, sir.  No.

39

Q   Did you hear about him doing anything from anybody
    else during that time?

A   No, sir.

Q   Did you ever, when Brian was with Robbie, ever see
    anything like anger or aggression or lack of
    patience or frustration on Brian Herlihy's part
    toward Robbie?

A   No, sir.

Q   Changed the diapers?

A   Yes, sir.

Q   Fed Robbie?

A   Yes, sir.

Q   Bought him presents?

A   Excuse me?

Q   Bought him presents?

A   Yes, sir.

Q   Bought him clothing?

A   Shoes.

Q   Played with him as much as he could?

A   Yes, sir.

Q   And didn't you personally feel that he loved the
    baby?

A   Yes, sir.

    . . . .

Q   Crystal, it is true, is it not, that at no time
    during your relationship with Brian Herlihy when
    he was around you and Robbie and alone with Robbie
    did you have any suspicion at all that he might
    want to injure your son?

40

A    No, sir, I trusted him.

V 296-298, 303-304.

The state argued the last question and answer opened the
door to admit Herlihy's false statements.  The trial court
agreed, and over defense objection, the following testimony was
elicited on redirect:

> Q    Crystal, ... were there any other reasons other
> than what you may have witnessed regarding how
> Brian handled the baby that caused you to trust
> him?
>
> A    He told me that he was a pediatric nurse at Shands
> Hospital, an RN.

V 305-306.

Subsequently, during its direct examination of Dennis
Meredith, one of the paramedics who responded to the 911 call,
the state asked what Brian said about how the baby was injured.
Meredith answered that Brian said he was taking a shower and he
came out and the baby was at the end of the bed with its head
caught between the mattress and the bed rails.

On cross-examination, the following colloquy ensued:

> Q    . . . Now, needless to say, you testified tody you
> came in contact with Mr. Herlihy that day?
>
> A    Yes, sir.
>
> Q    And you already testified you didn't do a report?
>
> A    That's right, because it was an EMS run.
>
> Q    Okay.  EMS run.  You didn't go back and make any
> notes, did you?

A    No, sir.

Q    You didn't dictate a report?  You didn't make any
     personal notes or nothing about what happened that
     day; isn't that true?

A    That's true.

Q    Even though you knew this was a very serious
     situation, right?

A    Right.  I discussed it with the crew.  Just let it
     go at that.

Q    Now, isn't it - when you encountered Mr. Herlihy
     he was absolutely frantic; isn't that true?

A    Yes, sir.

Q    He was hysterical; isn't that true?

A    Yes, sir.

Q    And you didn't tape record what he said, did you?

A    No, sir.

Q    He spoke with you briefly, isn't that fair to say?

A    Maybe up to five minutes or more.

Q    And he repeatedly kept telling you he didn't know
     what happened, isn't that true, other than the
     fact that he found the baby wedged between the
     mattress and the rail, the footboard; isn't that
     true?

A    True.

Q    That's what he said, that's the only thing he
     said, isn't it?

A    He said he got out of the shower and found the
     baby there.

Q    Now, isn't it true that what he really said was he
     came out of the shower and found the baby in that
     position; isn't that what he said?

                              42

A    It could be.  He just said he was taking a shower
     and he just got out and checked on the baby and
     found him like that.

VII 483-484.

The state argued that by asking "that's the only thing he
said, isn't it?," the defense had opened the door to everything
Brian said to Meredith.  The defense argued the question
plainly was referring to the only thing Brian said "with
respect to what happened" and did not imply anything else.
Over defense motion for mistrial, the trial court ruled the
door was open to any other statements Brian made to the
witness, including the fabrications that were the subject of
its in limine order.  VII 488-494.  The state then asked on
redirect, "[d]uring that time frame did he make any other
statements to you?," and Meredith testified:

A    He kept repeatedly repeating that he was a
trained firefighter; that he could save children, but
he couldn't save his own.  He indicated to me that he
was an Orlando firefighter and he kept repeating the
same thing.  That was the reason I asked him to come
into the living room area because he was creating a
scene where the child was at, and they couldn't hear
and talk.  He just kept repeating that he was a trained
firefighter and he couldn't save his own child.  He
could save other children.

VII 498.

Subsequently, the trial court allowed the parties to
reargue the motion in limine, specifically as to whether the
door was open to other witnesses' testimony about Brian false

statements to them.  VII 520-528.  After hearing argument from the parties, the trial court explained its ruling:

> THE COURT:  Okay.  Now, in reality, although the case law would be very helpful, my ruling right now is based upon the same logic and argument as it was pretrial.  And so it's very clear to me and very simple.  And that is:  The pretrial ruling was based upon a motion made by defense that there are certain facts in this case that, although there is no dispute in regard to the fact that there are witnesses who could testify to these facts, they would not be relevant, and would be prejudicial to the defendant.  And it was the Court's ruling that, yes, in fact, the testimony that Mr. Herlihy is alleged to have lied repeatedly about a number of different subjects, could well be prejudicial to him, and would not necessarily be relevant to the state's case, unless the defense opens the door as to Mr. Herlihy's credibility and trustworthiness.  Which is, in fact, what the defense has inadvertently done by trying to imply that, in fact, Crystal had good reason to trust him.

> When you open the door as to Crystal's trust in him, then you open the door to the state addressing the fact that she trusted him, not only because of what she saw, but also because of what he specifically said to her.  And that is why the state was then allowed to go back over the entire basis for her trust.

> Likewise, with the witness then called by the state in regard to statements made by Mr. Herlihy, the defense was clearly asking this witness:  Was any other statement made?  Asking that the jury conclude that the statements made by Mr. Herlihy were, in fact, complete and they could rely upon his explanation as to what happened; bringing into, again, the issue of his credibility in regard to his explanation.

> If he is lying about peripheral facts, he may or may not be lying about the circumstances surrounding the injury to the child.  And the jury is entitled to have all that information once you open the door.  That is the basis for the ruling.

44

VII 528-529.  Later, the trial judge revisited the issue after
transcripts of the pertinent testimony was obtained and
affirmed her earlier ruling.  X 936-946.

### Application of Law

The applicable law is well-settled.  To open the door to
evidence of prior bad acts, "the defense must first offer
misleading testimony or make a specific factual assertion which
the state has the right to correct so that the jury will not be
misled."  Robertson v. State, 829 So. 2d 901, 913 (Fla.
2002)(quoting Bozeman v. State, 698 So. 2d 629, 630 (Fla. 4th
DCA 1997)); see also Fiddemon v. State, 858 So. 2d 1100 (Fla.
4th DCA 2003); Allred v. State, 642 So. 2d 650 (Fla. 1st DCA
1994); Fletcher v. State, 619 So. 2d 333 (Fla. 1st DCA 1993);
Brown v. State, 579 So. 2d 898 (Fla. 4th DCA 1991);  Hernandez
v. State, 569 So. 2d 857 (Fla. 2d DCA 1990); Dodson v. State,
356 So. 2d 878 (Fla. 3d DCA 1978); Davis v. State, 216 So. 2d
87 (Fla. 2d DCA 1968).

As the court in Bozeman explained, the "opening the door"
concept is based on considerations of fairness and the truth-
seeking function of a trial.  Thus, as noted in Robertson, in
order to open the door, the defense must offer misleading
testimony.  For example, in McCrae v. State, 395 So. 2d 1145
(Fla. 1980), defense counsel through his questions on direct
examination "tactfully attempted to mislead the jury into

45

believing that [the defendant's] prior felony was inconsequential." Id. at 1151. The supreme court held the defendant's

> line of questioning could have deluded the jury into equating appellant's prior conviction of assault with intent to commit murder with his previous misdemeanors. Consequently, the state was entitled to interrogate [the defendant] regarding the nature of his prior felony to negate the delusive innuendos of his counsel.

Id. at 1152.

Other cases illustrate the types of defense deceptions that open the door to prior bad acts. See Allred (defendant's testimony that he lacked violent propensity and had never hit a woman opened open to rebuttal evidence that defendant hit his first wife and a former girlfriend); Ashcroft v. State, 465 So. 2d 1374 (Fla. 2d DCA 1985)(defendant's testimony that he had never hurt anyone opened door to evidence of prior rape conviction).

In contrast, a question on cross-examination that is not in any way misleading and does not deceive or delude the jury about the matter at issue does not open the door to evidence of prior bad acts. In Bozeman, for example, the defendant was charged with battery on a police officer at the Broward County Jail. The officer testified on direct that he managed the "special management division" and that "it's important to keep prisoners in your visual sight lines where you can see them ... in order to minimize the opportunity for someone to attack

46

you." On cross-examination, the defense asked, "And you're saying that you were extra apprehensive just from the moment you walked in there?, to which the witness responded, "yes." On redirect, over objection, the witness was allowed the explain he was "extra sensitive" upon entering the special management unit because it housed the "worse behaved inmates in the Broward County jail system," men who were "maladjusted" and "violent," and who had "exhibited the propensity for violent behavior towards other inmates and staff." The court held the "innocuous" question posed by defense counsel to the witness did not open the door to evidence of prior bad acts because "the offensive testimony was not responsive to any misleading statement made by the defendant during his direct examination" and the defendant "did not place his reputation for nonviolence at issue."

Similarly, in Fiddemon, the defendant was convicted of second-degree murder after his girlfriend was found stabbed to death. Prior to trial, the court granted the defense's motion in limine, with the state's agreement, to prohibit the state from mentioning a physically violent dispute between the defendant and the victim four months earlier. At trial, the defense asked the investigating detective if he had found a restraining order from ten years before against the victim's former husband issued after he attacked her with a knife. The

47

trial court ruled the defense's questioning the thoroughness of the police investigation opened the door to the prior assault. On appeal, the Fourth District held the fact of the ten-year-old domestic violence incident was not misleading, and did not, in and of itself, open the door to the defendant's prior assault on the victim.  The court said the defense strategy in questioning the thoroughness of the detective's investigation "could open the door to additional information that the detective had uncovered, but it would not extend to the prior assault in this case."  Id. at 1102.

Here, too, in neither instance did the defense offer misleading testimony.  As defense counsel argued below, when questioning Crystal, he asked her solely about what she observed with regard to Brian's treatment of Robbie.  He asked whether Brian was good with Robbie, whether Crystal had ever seen any anger, frustration, aggression, or lack of patience towards Robbie, and whether she ever had any suspicion he might want to hurt the baby.  Twice during the defense questioning, Crystal editorialized a negative response with the statement, "I trusted him," just as she had stated during direct examination when asked why she left Robbie with Brian.  The testimony was not misleading in any way.  The defense strategy plainly was to bring out that Brian had spent a lot of time caring for this child and had never shown impatience or anger

48

towards him, had never done anything to suggest he could hurt this child, which, in fact, he had not. That Crystal also trusted him because he told her he was a nurse was completely superfluous. Furthermore, Crystal's repeated statements that she trusted Brian were not responsive to the question asked. The questions were "yes" or "no" questions, did you see, did you suspect, did you observe. Finally, Brian did not place his character or credibility in issue simply by asking Crystal what she observed in regard to his behavior towards Robbie. Cf. Allred; Ashcroft.

Likewise, the trial court erred in permitting the state to elicit Dennis Meredith's testimony that Brian said he was an Orlando firefighter. As defense counsel argued below, the question, "is that all he said" plainly meant "was that all he said about the matter in question," i.e., Brian's statement about what happened to Robbie. Significantly, Meredith answered the question just the way it was intended, and his testimony did not mislead or delude the jury in any way. There was no false inference created that the state was entitled to rebut, and the objected-to testimony--that Brian said he was a firefighter--did not "qualify, limit, or explain" Meredith's testimony on cross-examination in any way.

These errors twice placed before the jury inadmissible evidence of prior acts of misconduct. Such evidence is

49

presumed harmful.   See Czuback v. State, 570 So. 2d 925 (Fla.
1981).   This was a close case.   Though appellant was charged
with first-degree murder, the jury deliberated for two days and
came back with a verdict of manslaughter.   These errors cannot
be deemed harmless, and this Court should reverse for a new
trial.

## CONCLUSION

Based on the foregoing argument, reasoning, and citation
of authority, appellant asks this Court to reverse his
conviction and remand for a new trial.

Respectfully submitted

**Nada M. Carey**
Assistant Public Defender
Fla. Bar No. 648825
Leon County Courthouse, Ste. 401
301 S. Monroe Street
Tallahassee, ,FL 32301
(850) 488-2458

**ATTORNEY FOR APPELLANT**

50

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished By U.S. Mail to Thomas H. Duffy, Assistant Attorney General, The Capitol, Plaza Level, Tallahassee, Florida, and a copy has been mailed to appellant on this date, March 15, 2004.

## CERTIFICATE OF FONT SIZE

I HEREBY CERTIFY THAT, pursuant to Florida Rule of Appellate Procedure 9.210, this brief is typed in Courier New 12 Point.

Nada M. Carey
Assistant Public Defender

51