# EXHIBIT

# GG

IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT OF FLORIDA

BRIAN HERLIHY,

    *Appellant/Cross-Appellee,*

v.                         CASE NO.  1D02-4788

STATE OF FLORIDA,

    *Appellee/Cross-Appellant.*

_____/

> Docketed
> 6 1 04
> Florida Attorney
> General

---

On Appeal from the Circuit Court
of the Eighth Judicial Circuit,
in and for Alachua County, Florida

---

## STATE'S ANSWER BRIEF AS APPELLEE

### AND

## STATE'S INITIAL BRIEF AS CROSS-APPELLANT

CHARLES J. CRIST, JR.
ATTORNEY GENERAL

CHARLIE MCCOY
Senior Assistant Attorney General
Florida Bar No. 333646

Office of the Attorney General
The Capitol, Suite P1-01
Tallahassee, Florida  32399-1050
(850) 414-3300
(850) 922-6674 (fax)

*Counsel for Appellee/Cross-Appellant*

## TABLE OF CONTENTS

                                                                    **Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

### ISSUE I
*[Herlihy's Issue on Appeal]*
**DID THE TRIAL COURT ABUSE ITS DISCRETION BY ALLOWING THE STATE TO ELICIT, ON RE-DIRECT, PREVIOUSLY EXCLUDED TESTIMONY THAT THE DEFENDANT HAD DESCRIBED HIMSELF AS A PEDIATRIC NURSE AND A FIREFIGHTER?**

A. Standard of Review and Preservation  . . . . 9

B. Merits . . . . . . . . . . . . . . . . . . . 9

1. No Abuse of Discretion . . . . . . . . . . 9

2. Any Error was Harmless . . . . . . . . .  25

### ISSUE II
*[State's Issue on Cross-Appeal]*
**DID THE TRIAL COURT ABUSE ITS DISCRETION BY EXCLUDING HERLIHY'S ADMISSION TO A BAILIFF, AND THE BAILIFF'S ADMONISHMENT TO HIM, BOTH MADE DURING A CONVERSATION BEFORE THE MURDER?**

A. Standard of Review . . . . . . . . . . .  29

B. Preservation . . . . . . . . . . . . . .  29

C. Merits . . . . . . . . . . . . . . . . .  30

1. Herlihy's Remark to Deputy Long  . . . .  30

2. Deputy Long's Admonition to Herlihy  . . . 31

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . .  36

CERTIFICATES OF SERVICE *AND* COMPLIANCE WITH FONT-SIZE
    REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . .  36

i

## TABLE OF CITATIONS

**Cases**                                                                    **Page(s)**

<u>Allred v. State</u>, 642 So. 2d 650 (Fla. 1st DCA 1994)   . . . .   23

<u>Anderson v. State</u>, 241 So. 2d 390 (Fla. 1970),
  *vacated as to death penalty only*, 408 U.S. 938 (1972)   . . .   34

<u>Ashcraft v. State</u>, 465 So. 2d 1374 (Fla. 2d DCA 1985)   . . .   23

<u>Barber v. State</u>, 781 So. 2d 425 (Fla. 5th DCA 2001),
  *rev. dism. as improv. granted* 829 So.2d 900 (Fla. 2002)   . .   35

<u>Blackwood v. State</u>, 777 So. 2d 399 (Fla. 2000),
  *cert. den.* 534 U.S. 884 (2001)   . . . . . . . . . . . . .   32

<u>Bozeman v. State</u>, 698 So. 2d 629 (Fla. 4th DCA 1997)   . . .   20-22

<u>Brown v. State</u>, 579 So. 2d 898 (Fla. 4th DCA 1991)   . . . . .   12

<u>Connor v. State</u>, 803 So. 2d 598 (Fla. 2001),
  *cert. den.* 535 U.S. 1103 (2002)   . . . . . . . . . . . . .   31

<u>Cox v. State</u>, 819 So. 2d 705 (Fla. 2002),
  *cert. den.* 537 U.S. 1120 (2003)   . . . . . . . . . . . . .   22

<u>Czubak v. State</u>, 570 So. 2d 925 (Fla. 1990)   . . . . . . . .   23

<u>Davis v. State</u>, 216 So. 2d 87 (Fla. 2d DCA 1968)   . . . . . .   23

<u>Desue v. State</u>, 605 So. 2d 933 (Fla. 1st DCA 1992)   . . . . .   34

<u>Escobar v. State</u>, 699 So. 2d 988 (Fla. 1997),
  *cert. den.* 523 U.S. 1072 (1998)   . . . . . . . . . . . . .   31

<u>Fiddemon v. State</u>, 858 So. 2d 1100 (Fla. 4th DCA 2003)   . .   22-3

<u>Fletcher v. State</u>, 619 So. 2d 333 (Fla. 1st DCA),
  *rev. den.* 629 So.2d 132 (Fla. 1993)   . . . . . . . . . . .   23

<u>Franklin v. State</u>, 825 So. 2d 487 (Fla. 5th DCA 2002)   . . .   28

<u>Helton v. State</u>, 641 So. 2d 146 (Fla. 3d DCA 1994),
  *rev. den.* 651 So.2d 1194 (Fla. 1995)   . . . . . . . . . .   34

<u>Hernandez v. State</u>, 569 So. 2d 857 (Fla. 2d DCA 1990)   . . .   23

<u>Hinton v. State</u>, 347 So. 2d 1079 (Fla. 3d DCA 1977),
  *cert. den.* 354 So. 2d 981 (Fla. 1977)   . . . . . . . . . . . 9

Johnston v. State, 863 So. 2d 271 (Fla. 2003),
  cert. den. 124 S. Ct. 1676 (2004) . . . . . . . . . . . . 29

Jones v. State, 440 So. 2d 570 (Fla. 1983) . . . . . . . . 31

McCrae v. State, 395 So. 2d 1145 (Fla. 1980),
  cert. den. 454 U.S. 1041 (1981) . . . . . . . . . . . . 13-14

Nardone v. State, 798 So. 2d 870 (Fla. 4th DCA 2001) . . . . 29

People v. Rader, 651 N.E.2d 258 (Ill. App.),
  appeal den. 657 N.E.2d 634 (1995) . . . . . . . . . . 14

Roberts v. State, 568 So. 2d 1255 (Fla. 1990) . . . . . . . 24

Robertson v. State, 829 So. 2d 901 (Fla. 2002) . . . . . . 18-21

State v. DiGuilio, 491 So. 2d 1129 (Fla. 1986) . . . . . . . 29

Terrell v. State, 27 S.W.3d 423, 426 (Ark. 2000) . . . . . . 32

Thornes v. State, 485 So. 2d 1357 (Fla. 1st DCA 1986),
  rev. den. 492 So.2d 1335 (1986) . . . . . . . . . . 9,12,17-19

Williams v. State, 811 So. 2d 672 (Fla. 5th DCA 2001),
  rev. den. 821 So.2d 305 (Fla. 2002) . . . . . . . . . . . 27

## Other Authority

§90.401 & .401, Florida Statutes . . . . . . . . . . . . . 33

§90.803(3)(a), Florida Statutes . . . . . . . . . . . . 8, 30-1

Ehrhardt, Florida Evidence §801.6 (2004 ed.) . . . . . . . . 31

## STATEMENT OF THE CASE AND FACTS

**Case**--Herlihy, indicted for first degree murder by "violently shaking" an infant (R1:8-9),[1] was convicted for the lesser-included offense of manslaughter (R1:170, 279-80); and sentenced to 15 years. (R1:R2:282). Judgment was entered November 8, 2002. Notice of appeal was filed November 22. (R2:279, 305).

The State accepts Herlihy's description of the procedural aspects of his issue, found in the argument portion of his brief. (initial brief, p.38, 43-5).

Before trial, Herlihy moved in limine to exclude evidence regarding numerous matters. The ninth item to be excluded was comprised of the statements made during a conversation between him and Cathy Long (deputy sheriff), while she was working as a bailiff in the Alachua County court house. (R1:96-7).

Upon a hearing, the motion was granted. The court agreed to reconsider based on whether the statement was admissible to show state of mind. (R26:2815-20). The State moved for reconsideration (R1:102-5), which was denied on September 6, 2002. (R1:137).

The State did not timely cross-appeal. By its order of March 30, 2004, this court granted the State's motion for belated cross-appeal. The State filed notice, which was amended eight days later. (R31:357, 361).

---

[1]The record on appeal consists of 31 volumes, which will be cited as (R[vol no.]:[page no.]). State-supplied emphasis is noted as [e.s.].

1

**Facts**--The State accepts Herlihy's statement as to the facts establishing guilt, with a few clarifications or additions.   The State provides the factual statement for its issue on cross-appeal.

### Issue I (Allowance of Testimony as to Defendant's False Statements)

Herlihy represents that the trial court granted his motion in limine to prohibit the State from eliciting, in its case in chief, statements he had made regarding past employment.  (initial brief, p.2).  This representation omits more than it reveals.

As part of a lengthy pretrial motion in limine, Herlihy sought to preclude admission into evidence a number of false statements he made to different people regarding his past employment.  (R1:94-6, item IV).  This exchange transpired:

> MS. SINGER [prosecutor]:  ... Defendant's statements to various individuals that he was employed in various endeavors ... should be excluded.  That, I think, is the same ruling that you  ...  made on [items] one and two, your Honor.   It's not relevant, I agree, but it may become relevant and we want to be able to offer rebuttal if it's not a collateral matter.
>
> THE COURT:  Good enough.   Then by stipulation the State will not produce in its--present in its case in chief any testimony regarding representations made by the defendant as to his previous endeavors or education and--
>
> *     *     *
>
> --employment.  And if in cross-examination or in its case in chief the defense opens that door, the state may then inquire of the court as to how far they may pursue that testimony.

(R26:2804-5).

The court ruled by noting both sides' agreement.   Later, it clarified the ruling:

> THE COURT:  ...  The earlier ruling was not that the state could not introduce false statements made by the

2

defendant.  The earlier ruling was specific that earlier
false statements in regard to his education, employment,
and professional endeavors that may have been false would
not be introduced in their case in chief.  I have made no
ruling in regard to the broad horizon of possible false
statements.

(R26:2817-18).

Taking an item from the motion in limine out of order, the
State addressed item VII, in which Herlihy sought to suppress a
part of the tape of his 911 call.  In that call, he twice said he
"was in the medical field" (R7:442-3) and had "worked rescue."
(R7:447).  The prosecutor urged the motion in limine be denied as
to item VII, because Herlihy's statement was not false.  Defense
counsel withdrew "Roman numeral VII."  (R26:2805).  Inferentially,
Herlihy admitted he was in the medical field when he made the call.

Defense counsel cross-examined the victim's mother, Crystal
Quirello.  He asked if it were "fair to say Brian was always good
with the baby."  Crystal replied:  "I trusted him, yes."  (R5:296-
7).  Later, defense counsel if it were true that Crystal "at no
time [had] ... any suspicion at all that he might want to injure
your son."  Crystal's replied: "No, sir, I trusted him."  (R5:304).

At sidebar, the prosecutor argued defense counsel opened the
door to ask "why you could trust him."  The court agreed, but
limited the prosecutor to this question:  "You may ask her if her
trust was based on anything other than what she observed."
(R5:305).  The prosecutor posed such question.  When Crystal
replied "yes," the prosecutor asked "why?" over objection.  Crystal

3

replied that Herlihy told her he "was a pediatric nurse at Shands hospital." (R5:306).

Dennis Meredith was a driver for the Gainesville Fire Department. He was among several persons who responded to the scene. (R7:474-5). The State elicited his description of what Herlihy told him about the baby's injury, and Herlihy's appearance. (R7:477-8). Defense counsel cross-examined at some length, eliciting Meredith's agreement that Herlihy was frantic, and kept saying he did not know what had happened, other than finding the baby wedged between the mattress and bed rail. Counsel elicited that the conversation lasted 5 minutes or more. (R7:478-84). This exchange followed:

> Q: That's what he said, that's the only thing he said, isn't it?
>
> A: He said he got out of the shower and found the baby there.

(R7:484).

After the defense finished, another sidebar occurred. The prosecutor urged the defense opened the door when it asked Meredith if finding the baby was the only thing Herlihy mentioned. (R7:489). The court agreed. (R7:491, 493-4). Accordingly, the State asked Meredith if Herlihy made any other statements. Meredith replied that Herlihy kept repeating he was a "trained firefighter; that the could save children, but he couldn't save his own." (R7:498).

4

### Issue II (Exclusion of Testimony by Deputy Long)

Cathy Long, a deputy for the Alachua County sheriff, was working as a bailiff at the courthouse (R1:96), one to three months before the child here was fatally injured. (R1:102 ¶2; R26:2810). Herlihy was "attending traffic court."   (R26:2810, line 18). Deputy Long had seen Herlihy in the courthouse once before, and helped him when he had a toothache.  The second time she saw him, she initially did not recall who he was.  Herlihy spoke first and jogged her memory; the two continued conversing.  (R26:2813)

Herlihy had the victim, Robbie Quirello, with him.  (R26:2816, lines 24-5).  He complained that the baby cried a lot.  He remarked that sometimes, when he could not get the baby to stop, he just felt like "picking the baby up and shaking him."  (R26:2813-14).

Long was interrupted by other business, which she finished. She returned to Herlihy, because what he said was "kind of serious."  She told him:

> ... I have a child and there were times when ... they won't stop crying.  ...  When that happens, just step back.  Don't pick them up.  Take a few minutes out.

(R26:2814).

Granting Herlihy's motion as to his conversation with Deputy Long, the court explained:

> A, she [Long] didn't say, Don't shake him; B, she didn't tell him what the result or consequences would be; C, there's nothing in his statement that would indicate he had any knowledge about the consequences.  ... [Y]ou're building assumptions on top of assumptions to the extent that I'm not seeing any way it could be relevant.

(R26:2815).

5

## SUMMARY OF ARGUMENT

**Issue I (State's Re-Direct Exam)**--Herlihy complains that the State twice was allowed to adduce harmful, improper testimony on re-direct. Before trial, the disputed testimony was excluded from the State's case-in-chief by agreement. However, the court ruled the State could adduce the testimony on re-direct if Herlihy opened the door on cross-exam.

The victim's mother testified. On cross-exam, defense counsel asked her if she had "any suspicion at all" Herlihy would hurt the baby. She said no, because she "trusted him." Such questioning misled the jury by implying the mother trusted Herlihy based on what she actually knew or had seen of him. On re-direct, the State was allowed to ask if there were other reasons she trusted Herlihy. The mother replied that Herlihy told her he was a pediatric nurse.

Dennis Meredith, a firefighter who responded to Herlihy's 911 call, testified about events occurring while others attended to the baby. He described a conversation with Herlihy; but, in accord with the pretrial ruling, noted only Herlihy's account of finding the baby wedged in the bed frame.

On cross-exam, defense counsel established the conversation between Meredith and Herlihy lasted 5 minutes or more. Immediately afterward, counsel asked if finding the baby was the "only thing he [Herlihy] said." Such questioning misled the jury by implying that Herlihy always spoke consistently with his initial claim of accidental injury to the child. On re-direct, the State was allowed to ask if Herlihy said anything else. Meredith testified

6

that Herlihy claimed to be a trained firefighter who could "save" other children but not his own.

In both instances, the trial court correctly ruled that defense counsel opened the door, and allowed the State to use re-direct to explain testimony elicited by the defense on cross-exam. The trial court did not abuse its discretion.

The State's evidence showed injuries to the victim were severe and characteristic of shaking; that no other explanation matched the facts. It also showed the child was left with Herlihy by the mother, and he was the only person with the child during the short time in which the fatal injuries were inflicted.

The disputed testimony amounted to two terse comments about an extraneous matter, Herlihy's alleged work experience and training. It was elicited early in a lengthy trial dominated by medical testimony. Although there was other evidence undermining Herlihy's credibility, there was none to show his actual employment or training. The jurors would have no basis to infer, from the disputed testimony, that he routinely lied.

The testimony did not inherently speak of prior or collateral crimes, and could not be so construed. By pardoning Herlihy down to manslaughter, the jury rejected the State's case as to the heightened culpability necessary to prove first or second degree murder; that is, Herlihy's state of mind. The disputed testimony had no effect on the verdict. Any error in allowing it was harmless.

7

**Issue II (Exclusion of Deputy Long's Testimony)**--Herlihy was in the courthouse several times in the last three months before the murder.   During a conversation with a bailiff, Deputy Long, he remarked that sometimes could not get the baby to stop crying, and felt like picking him up and shaking him.   Perceiving the remark as "serious," Long told him to "take a few minutes out," and not to pick up the child when that happened.   Herlihy's remark was admissible as excepted hearsay under §90.803(3)(a), Florida Statutes, to show his state of mind or explain his later conduct.

Deputy Long's admonition to Herlihy was not hearsay.   Instead, Long would be testifying to her own words, which were proffered only to show Herlihy was on notice not to shake the child.   The admonition was relevant to show state of mind of the person (Herlihy) who heard it.

Both remarks should have been admitted.   Instead, the court construed Deputy Long's testimony very literally, and concluded all of it was irrelevant under any theory.   In so doing, the trial court abused its discretion.   If retrial is necessitated by this court's disposition of Issue I, exclusion of Long's testimony as to both statements must be reversed.

8

## ARGUMENT

### ISSUE I

*[Herlihy's Issue on Direct Appeal]*

**DID THE TRIAL COURT ABUSE ITS DISCRETION BY ALLOWING THE STATE TO ELICIT, ON RE-DIRECT, PREVIOUSLY EXCLUDED TESTIMONY THAT THE DEFENDANT HAD DESCRIBED HIMSELF AS A PEDIATRIC NURSE AND A FIREFIGHTER?** *(Restated)*.

### A. Standard of Review and Preservation

"[Generally,] the scope of redirect examination rests largely in the discretion of the court." Hinton v. State, 347 So.2d 1079, 1080 (Fla. 3d DCA 1977), *cert. den.* 354 So.2d 981 (Fla. 1977). *See also* Thornes v. State, 485 So.2d 1357, 1359 (Fla. 1st DCA 1986), *rev. den.* 492 So.2d 1335 (1986) (holding trial court abused its discretion by excluding redirect testimony by the defendant as to witnesses' position at time of shooting, when prosecutor's cross-exam alluded to that witness' version of the shooting). The State agrees this issue is preserved.

### B. Merits

### 1. No Abuse of Discretion

Herlihy complains of two rulings made during trial, as a result of questions defense counsel posed during cross-exam. Before turning to each alleged error, the State emphasizes that defense counsel was warned that the pretrial ruling in limine applied only to the State's case in chief; and that no comparable restriction would be placed on State's rebuttal if defense questioning opened the door:

> [THE COURT]: And if in cross-examination or in its case in chief the defense opens that door, the state may then

9

inquire of the court as to how far they may pursue that testimony.

(R26:2805, lines 2-5).  Later, the court said:

> THE COURT: No. That's incorrect in regard to the earlier ruling.  The earlier ruling was not that the state could not introduce false statements made by the defendant.  The earlier ruling was specific that earlier false statements in regard to his education, employment, and professional endeavors that may have been false would not be introduced in their case in chief.  I have made no ruling in regard to the broad horizon of possible false statements.

(R26:2817-18).

Were this not enough, the prosecutor and court reprised these events just before Crystal Quirello (victim's mother) testified about matters covered in the defense's motion in limine.  The trial court again noted that re-direct exam could broach Herlihy's claim of being a pediatric nurse,[2] if the defense opened the matter during cross-examination.  (R5:207, lines 7-13).

Crystal was testifying to circumstances surrounding the death of her very young son, when she left him in Herlihy's care.  Defense counsel should have anticipated she would try to justify her decision to place her child, literally and figuratively, into Herlihy's hands.  Nevertheless, counsel asked Crystal two questions eliciting the response:  "I trusted him."  The first occurred when she was asked if it "[w]ould be fair to say Brian was always good with the baby?"  (R5:296-7).  This exchange occurred during cross-

---

[2]At sidebar only, the prosecutor represented that Herlihy was working at Wal-mart.  (R5:206, lines 18-25).

exam, when defense counsel had much latitude to ask leading questions, and could have sought a "yes or no" response.

Regardless, the State will assume the first question alone would not have opened the door; as the same response had already been elicited on direct exam. (R5:215, line 3). However, defense counsel soon asked a far more troubling question:

> Crystal, it is true, is it not, that at no time ... <u>did you have any suspicion at all</u> that he [Herlihy] might want to injure your son." [e.s.].

Crystal's replied: "No, sir, I trusted him." (R5:304).

Defense counsel could easily have asked if she had ever seen Herlihy behave as if he could injure her son, perhaps focusing on any incident when the child would not stop crying. Instead, by asking Crystal if she ever harbored suspicion of Herlihy, counsel strongly implied her trust was based on what she had seen or personally knew. On the heels of Crystal's earlier remark that she trusted Herlihy, the second problematic question was not the product of inadvertence. Having rattled the knob, counsel could not resist pushing the door.

At sidebar, the prosecutor argued defense counsel opened the door to ask "why you could trust him." The court agreed, but limited the prosecutor to this question: "You may ask her if her trust was based on anything other than what she observed." (R5:305). The prosecutor posed such question. When Crystal replied "yes," the prosecutor asked "why?" over objection. Crystal replied that Herlihy told her he "was a pediatric nurse at Shands hospital." (R5:306).

11

Defense counsel, duly warned, elicited misleading responses from Crystal.  Particularly troubling is the second incident, which strongly invited juror speculation.  The trial court properly allowed limited re-direct exam about why Crystal trusted Herlihy.

In <u>Brown v. State</u>, 579 So.2d 898 (Fla. 4th DCA 1991), the defendant was tried for attempted manslaughter with a firearm, etc.  The trial court allowed the State to impeach Brown, after he testified he had quit his job as a law enforcement officer, with evidence he had been fired.  Finding the trial court did not abuse its discretion, <u>Brown</u> observed:

> The trial judge obviously saw the original testimony as an attempt to enhance Brown's credibility by his testimony that he himself had been a law enforcement officer ....

*Id.* at 899.

Here, defense counsel attempted to enhance Herlihy's credibility, and increase the plausibility that death resulted from accidental or pre-existing injury (re-bleeding of chronic subdural hematoma) by establishing the mother had no reason to suspect he would injure the child.  The inference sought was that her trust was based on actual knowledge or observations.  It was proper for the State to show she also relied on Herlihy's representation he was a pediatric nurse.

To open the door to explanatory redirect exam, Herlihy's position would require the degree of precision this court rejected in <u>Thornes</u>.  Were this not enough, the trial court here greatly limited the State's inquiry by allowing only one specific question.

12

Everything said about defense questioning of Crystal can be said with equal force about defense questioning of Dennis Meredith, a firefighter who responded to the scene. Defense counsel cross-examined at some length about Meredith's conversation with Herlihy as others were trying to revive the child. Counsel established that Herlihy was frantic, and kept saying he did not know what had happened other than finding the baby wedged between the mattress and bed rail. (R7:478-84). Counsel then established the conversation lasted "up to five minutes or more." (R7:484, line 9). This exchange followed:

> Q That's what he said, <u>that's the only thing he said,</u> isn't it?
>
> A He said he got out of the shower and found the baby there.

(R7:484) [e.s.].

Had defense counsel established only that the conversation lasted 5 minutes, Herlihy might have a point. But counsel went further. He established Herlihy's claim to have found the child upon getting out of the shower was the "only" thing he said.

The problem is that the prosecutor had instructed Meredith how to answer in conformance with the trial court's ruling on the motion in limine. (R7:489, lines 19-22). The jury, of course, heard only Meredith's reply. Defense questioning implied Herlihy always spoke consistently with his claim of accidental injury.

In <u>McCrae v. State</u>, 395 So.2d 1145, 1151 (Fla. 1980), *cert. den.* 454 U.S. 1041 (1981), the State was allowed to cross-examine the defendant about his admitted criminal past; because defense

13

counsel "tactfully attempted to mislead the jury into believing that appellant's prior felony [assault with attempt to commit murder] was inconsequential." *Id.* at 1151. Here, defense counsel just as tactfully attempted to mislead the jury into thinking the mother trusted Herlihy based on what she had seen or knew herself; and into thinking Herlihy said nothing more in a frantic, five-minute conversation with a firefighter. If the disputed cross-exam was proper in <u>McCrae</u>, the disputed re-direct exam was proper here.

The trial court properly allowed the State to "explain" through re-direct what more was said during the 5 minutes. In accord with the court's ruling, the prosecutor asked a single question about what else Herlihy said. Meredith replied that Herlihy kept repeating he was a "trained firefighter; that the could save children, but he couldn't save his own." (R7:498). Such exclamations, even if false, were relevant to show Herlihy was aware the injuries were severe--otherwise, he would not have despaired of his inability to "save" the child. *See* <u>People v. Rader</u>, 651 N.E.2d 258, 264 (Ill. App.), *appeal den.* 657 N.E.2d 634 (1995) (observing that the "defendant immediately sought medical attention for [the child], which demonstrated his conscious awareness of the severity of [the child's] injuries").

Herlihy's argument is subtly but significantly flawed from the outset. He begins by urging:

> To open the door to evidence of <u>prior bad acts</u>, the defense must first offer misleading testimony or make a specific factual assertion which the state has a right to correct .... [e.s.; internal quote omitted].

14

(initial brief, p.45). The flaw is that no evidence was ever adduced to show Herlihy's actual work history and training. The jurors, even by the end of trial, had no way of knowing his claim to have been a pediatric nurse was false; and thus prior "bad acts." Even if false, representations of being a pediatric nurse or a trained firefighter are not inherent admissions of crimes. Herlihy's tack of analogizing to stringent requisites for admitting evidence of "prior bad acts" (<u>Williams</u> rule testimony) is wrong from the beginning.

Nothing in the State's opening broached Herlihy's past. (R4:15-27). Until Crystal testified on re-direct, there was no evidence of his <u>alleged</u> work history or training. On re-direct, the State did not establish his actual employment. (R5:305-8). Intervening testimony did not mention Herlihy's actual employment or training before the murder.

By stipulation, a tape of Herlihy's 911 call was played to the jury. During the call, he twice said he "was in the medical field" (R7:442-3), and had "worked rescue." (R7:447). A driver-paramedic testified about emergency measures performed on the child, etc. without mentioning Herlihy's past. (R7:449-72).

Next, Dennis Meredith, who was a "driver operator" for the Gainesville Fire Department at the time (R7:474), testified about talking with Herlihy. (R7:475-8). Defense counsel cross-examined him specifically about that conversation, which occurred as others were attending to the child. (R7:483-5). Counsel elicited Meredith's agreement that Herlihy was frantic, and kept saying he

15

did not know what had happened; other than finding the baby wedged between the mattress and bed rail.  (R7:478-84).

Defense counsel then established the conversation lasted "up to five minutes or more."  (R7:484, line 9).   This exchange followed:

> Q That's what he said, <u>that's the only thing he said</u>, isn't it?
>
> A He said he got out of the shower and found the baby there.

(R7:484) [e.s.].  As she would note at sidebar, the prosecutor had instructed Meredith how to answer in conformance with the trial court's ruling on the motion in limine.  (R7:489, lines 19-22). The jury did not know this.  It heard only Meredith's reply that Herlihy said he got out of the shower and found the child.

After the sidebar, the State asked a single question about what else Herlihy said.   Meredith replied that Herlihy kept repeating he was a "trained firefighter; that the could save children, but he couldn't save his own."  (R7:498).

At the time of this testimony, the jury still had not heard anything about Herlihy's actual past that would indicate his claims of being a pediatric nurse, in the medical field, or a trained firefighter were false.  To the contrary, a reasonable juror might conclude these occupations and training were related, thereby lending false credence to Herlihy's false representations.  Nothing else indicated Herlihy's false claims about past employment were "prior bad acts," as he now argues to this court.

16

The bulk of the State's remaining case consisted of police investigatory testimony, and medical personnel testimony. Herlihy's actual past training, if any, and actual past employment were not mentioned.

The State's closing did note "inconsistencies" in Herlihy's account of events.  However, these inconsistences involved his explanation of the child's injuries, not past employment. (R20:2216, 2226-8, 2230-1, 2248, 2257-64).  In rebuttal, the prosecutor noted the defense contention that Herlihy was good with the baby.  (R21:2409-10).  Nothing, however, alluded to his work experience.  Even when the prosecutor rebutted the defense contention Herlihy was framed (R21:2422-24), no mention was made of any false statements regarding his past jobs or training.

The jurors never had information from which they could infer Herlihy's statements about being a pediatric nurse, etc. were false.  Consequently, Herlihy cannot reasonably maintain the trial court, by allowing very limited re-direct exam, effectively admitted evidence of "prior bad acts."  At most, the jurors heard a few sentences on extraneous matters, early in a lengthy trial dominated by medical testimony.  Given its lack of factual support, Herlihy's argument should be rejected without further ado.

Also, in contrast to Herlihy's narrow view of re-direct exam, a "party may examine a witness on redirect to rebut, explain, qualify, or limit testimony elicited on cross examination." [e.s.].  Thornes v. State, 485 So.2d at 1359.  In Thornes, the defendant was charged with murder, a shooting.  He testified for

17

himself, claiming the gun accidentally discharged, and giving his version of the events.    On cross, the prosecutor asked if he "actually" shot the victim in the manner described by the victim's young son, who saw the shooting.  Thornes said "no."   *Id*.

On redirect, defense counsel asked where the son was, when the shooting occurred.  Upon the prosecutor's objection, the court held the question went beyond the scope of direct exam.   This court disagreed, saying:

> The fact that appellant made no mention of [the son's] testimony during direct examination is not a proper basis for excluding the testimony on redirect because the prosecutor's specific reference to Andrew's version of the events opened the door to this line of questioning.

*Id*.

Defense counsel here stood in much the same shoes as the prosecutor in Thornes.  Although he literally elicited from the victim's mother that she trusted Herlihy, counsel did so the second time by asking her if ever suspected Herlihy could injure her son. From the firefighter, defense counsel went further, eliciting that the conversation was 5 minutes long, but Herlihy said only that he found the child on the bed.   Moreover, defense counsel did so during cross-exam, when leading questions can be asked.   If the excluded cross-exam in Thornes should have been allowed, then the trial court properly allowed the State's re-direct here.

Herlihy quotes Robertson v. State, 829 So.2d 901, 913 (Fla. 2002), for its observation that "the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be

18

misled."   (initial brief, p.45).   Ignoring the fact <u>Robertson</u>
addressed <u>cross</u>-examination and its limits, rather than redirect
exam and its limits; Herlihy does not favor this court with the
immediately preceding language from <u>Robertson</u>:

> [C]ross-examination is not confined to the identical
> details testified to in chief, *but extends to its entire*
> *subject matter, and to all matters that may modify,*
> *supplement, contradict, rebut, or make clearer the facts*
> *testified to in chief ....*

*Id.* at 912-13 (cite omitted; emphasis court's).   Reading the two
passages from <u>Robertson</u> together, and keeping in mind this court's
description of redirect exam in <u>Thornes</u>; the necessary conclusion
is that reasonable inferences drawn from cross-exam testimony can
be both "specific" and "misleading," for purposes of opening the
door to explanatory testimony on re-direct.

   <u>Robertson</u> involved testimony by a husband accused of a second
degree, shooting-murder committed during a domestic dispute.   He
testified for himself, advancing the defense that the pistol
accidentally discharged while being cleaned.   On cross-exam, the
State asked if he had ever purchased an assault rifle, and had ever
threatened anyone with it.   After admitting to purchasing such a
rifle, Robertson said he had never threatened anyone.   *Id.*, 829
So.2d at 904-5.

   Based on Robertson's response, the State was allowed to adduce
testimony from his ex-wife, that he had threatened her 6 years
earlier with an AK-47 (rifle).   Such testimony was emphasized in
the State's closing.   *Id.* at 905.   Reversing, the court held:

19

> [W]hether Robertson threatened (without shooting) someone
> in the past with an assault rifle does not "modify,
> supplement, contradict, rebut, or make clearer" either
> Robertson's defense that his actual shooting in this case
> was unintentional, or his testimony that he was not very
> familiar with the particular gun .... Thus, Robertson
> did not open the door to evidence that he allegedly
> threatened his ex-wife six years before with an assault
> rifle ....

*Id.* at 913.

Nothing of the sort occurred here. The disputed testimony occurred early in a lengthy trial dominated by detailed medical evidence; greatly reducing its impact. The "pediatric nurse" statement was elicited from the mother, who was not known to be honest and admitted she was not always truthful. (R5:185, 246, 251-2). The prosecutor did not mention the matter in closing. The jurors never heard about Herlihy's actual employment and training, so they could not have used the disputed testimony--regardless of what else they heard--to infer he was a routine liar. <u>Robertson</u> has no bearing on this case.

Herlihy relies strongly on <u>Bozeman v. State</u>, 698 So.2d 629 (Fla. 4th DCA 1997), in which the conviction was reversed "because the trial court admitted evidence that Bozeman had a propensity for violence when the defense had not opened the door to such testimony." *Id.* at 629. Bozeman was an inmate in the "special management" unit of the Broward County jail. He assaulted a guard who had been talking to another inmate. *Id.*

On direct exam, the guard described the fight. The prosecution returned to the guard's use of "special management" unit, and asked the guard to define the term. The defense objected

20

based on lack of relevancy. Sustaining the objection, the trial court indicated the issue could become relevant "depending on the cross-examination." *Id.* at 630.

On cross, the defense asked only one pertinent question: "And you're saying that you were extra apprehensive just from the moment you walked in there?" The guard answered: "Yes." On redirect and over objection, the guard explained he was "extra sensitive" upon entering the special management unit because it housed the "worse behaved inmates in the Broward County jail system," men who were "maladjusted" and "violent," etc. During closing, the prosecutor called the jurors attention to the type of inmates housed in the special management unit. *Id.*

Finding the guard's testimony tantamount to improper character evidence, the court rejected the State's contention the defense opened the door during cross-exam. *See id.* at 631 (characterizing the defense's question on cross as "innocuous" and "hardly the type of deceptive conduct by a defendant that opens the door to evidence of prior bad acts;" and observing that the "offensive testimony was not responsive to any misleading statement made by the defendant during his direct examination").

Under these circumstances, Herlihy's reliance on <u>Bozeman</u> is badly misplaced. There is no factual similarity between <u>Bozeman</u> and this case. Here, the disputed testimony on redirect did not imply any bad acts; and, standing alone as it did throughout trial, did not impugn Herlihy's character.

21

Also, the testimony about Herlihy's alleged past work experience or training were incidental--even trivial--to the State's case. As Herlihy admits to this court: "That Crystal also trusted him because he told her he was a nurse was completely superfluous." (e.s.; initial brief, p.49). If the disputed testimony was "superfluous," it could not be critical to the State's case. Bozeman is not persuasive. See Cox v. State, 819 So.2d 705, 714 (Fla. 2002), cert. den. 537 U.S. 1120 (2003) (observing that a close reading of Bozeman "reveals that the information related to the jury ... was critical to the prosecution's factual theories").

Herlihy's reliance on Fiddemon v. State, 858 So.2d 1100 (Fla. 4th DCA 2003), fares no better. Fiddemon was convicted for murdering his girlfriend. The State agreed to a motion in limine, that it would not adduce evidence of his violent assault on the girlfriend 4 months before the murder. During trial, the defense asked an investigating detective if he learned of a 10-year-old restraining order the victim had against her former husband. Based on this question, the trial court ruled the defense opened the door to proof of the violent assault. The Fourth DCA held Fiddemon did not so open the door, and reversed.

The defense question in Fiddemon was precise, relating to an old restraining order against a different man. By itself, it did not intimate the evidence the State was allowed to adduce on re-direct. Like the facts of Bozeman, the facts of Fiddemon are too different to be persuasive here.

22

Herlihy lastly relies on Czubak v. State, 570 So.2d 925 (Fla. 1990). (initial brief, p.50). There, a "key state witness ... stated during cross-examination that Czubak was an escaped convict." Id. at 927. The inference of past criminality was obvious, and completely different from the disputed testimony here. Like Bozeman an Fiddemon, Czubak does not pertain.

Herlihy cites to several cases with a common theme: the testimony which opened the door involved statements was a claim that certain events "never" happened. (initial brief, p.45-6). See Allred v. State, 642 So.2d 650, 651 (Fla. 1st DCA 1994) (finding defendant opened the door to impeachment testimony when he testified he "had never hit any woman"); Fletcher v. State, 619 So.2d 333, 334 (Fla. 1st DCA), rev. den. 629 So.2d 132 (Fla. 1993) (same, when defendant testified he "never pointed a gun at anybody"); Hernandez v. State, 569 So.2d 857, 859 (Fla. 2d DCA 1990) (same, when defendant testified "he had never done any drug deals in his life"); Ashcraft v. State, 465 So.2d 1374, 1375 (Fla. 2d DCA 1985) (same, when defendant "misled the jury by saying that he had never hurt anyone during those prior crimes"); Davis v. State, 216 So.2d 87, 89 (Fla. 2d DCA 1968) (same, when defendant testified he had "never owned firearms").

Correctly citing these cases as examples when the evidentiary door was opened, Herlihy neglects to mention that none require a claim of "never" for cross or re-direct exam to be proper. Nothing about those cases upholds his argument that the State's re-direct exam here was improper.

23

More useful is <u>Roberts v. State</u>, 568 So.2d 1255 (Fla. 1990). There, the court faced an ineffectiveness claim for counsel's failure to challenge hearsay statements concerning Roberts' 1975 conviction for rape and assault with intent to commit murder. During the penalty phase, a police officer who had investigated the 1975 crime testified in detail about the former victim's account of it. *Id.* at 1262.

On cross-exam, the defense "emphasized" the absence of the victim in the 1975 crime, by asking: "You didn't attempt to get hold of her to bring her here, did you?" On redirect, the officer testified that he asked the 1975 victim to come, but she was not willing; as the victim said she "never got over the assault" and "couldn't face it again." *Id.* Rejecting Roberts' claim on several grounds, the court first noted that the defense "opened the door for testimony concerning the victim's statements as to why she would not come to Miami to testify[.]" *Id.*

Here, defense counsel emphasized the mother's willingness to trust Herlihy by twice posing broad or vague questions. The second time was far more egregious, as it was couched in terms of Crystal's lack of suspicion that Herlihy could hurt the child. Similarly, defense counsel emphasized the contents of a firefighter's conversation with Herlihy by establishing the conversation was 5 minutes long, but still conveyed only Herlihy's claim he found the child on the bed. Just as defense counsel opened the door in <u>Roberts</u>, defense counsel opened the door here.

Herlihy's final observation subsumes his mistaken view of his trial. He claims: "This was a close case." (initial brief, p.50). As detailed in the State's argument that any error was harmless, this case was far from close in its most important aspect--Herlihy killed a child. There was conclusive evidence he was the only person with the child when the injuries occurred. Those injuries were severe and highly characteristic of a shaken baby. Herlihy's various explanations did not match the facts.

If any aspect of this case was close, it was proof--given the court excluded Deputy Long's testimony (see Issue II)--of whether Herlihy acted with premeditation or heightened culpability to sustain the two highest offenses charged. The jury answered this question by pardoning him down three steps to manslaughter. Herlihy's claim of a "close" case is tenuous. His argument must be rejected and his conviction affirmed.

### 2. Any Error was Harmless

The State's evidence as to the cause of death and Herlihy's identity as the murderer was compelling and thorough. Essentially, the injury--particularly the massive bleeding into the eyes--was severe and characteristic of external impact and shaking, rather than accident. (R6:329-33; R8:626-31, 667-9, 672; R9:748-54; R11:988-94; R12:1122-28, 1139-40, 1186, 1189-96; R13:1338-50). The injuries were not caused by a re-bleed of an earlier, chronic hematoma (R8:664), which was not seen by the medical examiner who did the autopsy. (R11:981). The jury could reasonably infer no

25

explanation but shaking or deliberately-caused impact to the head matched the facts.

It was not disputed that the mother left her baby with Herlihy, the only person with the child during the short time when the fatal injuries could have been inflicted. (R5:224, 228-37). Herlihy, in an interview with the police, admitted the child was alone in his care; and, when he threw the child down on the bed, the head bounced and the child became unresponsive. (R16:1734-5).

Against this, the jurors heard two witnesses very briefly comment about an extraneous matter, Herlihy's alleged work experience as a pediatric nurse (R5:305) and his past training as a firefighter (R7:498). They heard such testimony very early in a lengthy trial dominated by medical testimony. The impact of the disputed testimony, if any, would have been greatly diminished.

Herlihy's claim to have been a pediatric nurse was relayed by the child-victim's mother, whose credibility was reduced to nil by evidence of her reputation for not being honest (R5:184-5); her admission to not telling the truth about the day's events (R5:154-7, 178-82, 251-2); and her concealment of her relationship with Herlihy from her husband (R5:210-11, 246). If the jurors recalled the pediatric nurse comment at all, it probably carried no weight.

The State did not adduce evidence showing Herlihy's actual employment, so the jurors had no factual basis to infer, from the disputed testimony, that he routinely lied. To the contrary, a day after hearing the "pediatric nurse" comment, the jury heard the tape of his 911 call. During the call, he twice exclaimed he was

26

in "medical field."  (R7:442-3).  The logical inference would be that Herlihy was alluding to his experience as a pediatric nurse.

The testimony did not inherently involve prior or collateral crimes.  It did not reveal "bad acts" to the jury at all, and could not be so construed in light of the other evidence.  *Cf.* <u>Williams v. State</u>, 811 So.2d 672 (Fla. 5th DCA 2001), *rev. den.* 821 So.2d 305 (Fla. 2002) (concluding witness' declaration that "appellant wasn't going to do that to her anymore" spoke to the future and did not indicate prior bad acts, and any error was harmless).

Moreover, there was other evidence undermining Herlihy's credibility--how his story changed as the investigation continued.  Herlihy began by claiming he discovered the child hanging or wedged in between the mattress and frame, when he got out of the shower.  (R7:441-2, 547; R15:1611-12, 1631-2, 1652, 1693-4, 1728).  His story then changed to an admission he shook him gently, pulling the child out of the bed and as part of CPR.  (R15:1658).  It then changed, implicitly, to a "stern shake" as demonstrated by Herlihy to the police with a doll (R15:1663); and through his admission he could have shaken the child harder than that.  (R15:1664).

Late in the evening of the day the child was injured, Herlihy was arrested under a warrant and been given his <u>Miranda</u> rights.  (R16:1720).  His account of events included gently shaking the baby (R16:1730; R17:1864), then swinging him from side to side and plopping him on the bed fairly hard, doing something to the chid's neck; to shaking the child some, possibly causing injury.  (R16:1731-2; R18:1989).

27

Herlihy said he knew not to roughhouse with a four month old. (R16:1732). He then admitted the child's head bounced on the pillow. (R16:1733). Shortly afterward, he again conversed with Defective Legall. After she said he wasn't telling everything, Herlihy admitted the baby's crying was not fake. (R16:1734). Herlihy then admitted he plopped the baby on a pillow so that his head bounced. The baby's eyes were glazed, and not focused; he made no sound. Herlihy then said he left the room, returned and saw the baby had rolled into the crevice of the bed. (R16:1734-5).

Herlihy was taken to the jail. On the way, the officer pulled over so he could talk some more. He said he bounced the baby hard on the bed, roughly. When he returned, he saw the child and panicked upon realizing something was wrong. (R16:1738-9).

Altogether, Herlihy's account of the child's plight changed as with his realization a more innocent explanation would not hold up to scrutiny. He so damaged his credibility this way, that the statements about prior work experience--had the jury realized they were false--were negligible.

Any harm was negated for another, uncommon reason. By pardoning Herlihy down to manslaughter, the jury rejected the State's case as to the heightened culpability necessary to show first or second degree murder. Restated, the jury rejected the aspect of the State's case most dependent on showing Herlihy's lack of credibility. Cf. Franklin v. State, 825 So.2d 487, 489 (Fla. 5th DCA 2002) (upholding denial of mistrial when testimony improperly alluded to prior bad acts, when defendant was convicted

only for violating a no-contact injunction but acquitted of several stalking counts, "which contain an element of maliciousness").

For these reasons, the disputed testimony had no effect on the verdict. Any error in allowing the State's brief re-direct exam was harmless. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).

## ISSUE II

*[State's Issue on* Cross-Appeal]

**DID THE TRIAL COURT ABUSE ITS DISCRETION BY EXCLUDING HERLIHY'S ADMISSION TO A BAILIFF, AND THE BAILIFF'S ADMONISHMENT TO HIM, BOTH MADE DURING A CONVERSATION BEFORE THE MURDER?**

### A. Standard of Review

"A trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion." Johnston v. State, 863 So.2d 271, 278 (Fla. 2003), *cert. den.* 124 S.Ct. 1676 (2004) (holding defendant's statements that another person lived inside him, etc. were relevant to second murder and not just propensity or bad character evidence). However, that discretion must operate within the rules of evidence. *Id., citing* Nardone v. State, 798 So.2d 870 (Fla. 4th DCA 2001).

### B. Preservation

This issue was placed before the court by Herlihy's motion in limine. The State urged the testimony was relevant to show Herlihy's intent, and knowledge of what would happen if he shook the baby. (R26:2814-15). The court granted Herlihy's motion,

29

saying "I'm not seeing any way that it could be relevant."
(R26:2815, line 22).

Shortly afterward, the court said it would reconsider whether
the testimony would be admissible to show Herlihy's state of mind,
which the court perceived as a "different argument from he knew the
consequences." (R26:2818, lines 21-22). Accordingly, the State
moved for reconsideration, arguing the testimony was relevant to
show motive and state of mind. (R1:104 at ¶4). The motion was
denied without a hearing (R1:137), preserving this issue.

### C. Merits

One to three months before he killed the child, Herlihy
voluntarily conversed with Cathy Long, a deputy sheriff working as
a bailiff. He remarked that sometimes when the child would not
quit crying, he felt like picking him up and shaking him.
(R26:2814). Long perceived this remark a "kind of serious." She
left, briefly attended to other business, and returned to admonish:
"When that happens, just step back. Don't pick them up. Take a
few minutes out." (R26:2814). The State will address each
statement separately.

### 1. Herlihy's Remark to Deputy Long

Herlihy's remark to Deputy Long--that he sometimes felt like
shaking the child--was to be elicited as hearsay through Long. It
was admissible under §90.803(3)(a), Florida Statutes (providing a
"statement of the declarant's then-existing state of mind" is
admissible when offered to prove the "declarant's state of mind

...at any other time when such state is an issue in the action" or to "prove or explain acts of subsequent conduct of the declarant").

Herlihy's unsolicited remark during the conversation with Deputy Long disclosed his "mental feeling" that he sometimes felt like shaking the child when it would not stop crying.  It·was relevant to show Herlihy's state of mind <u>later</u>, when the child was killed; or to explain his later conduct, that he indeed shook the child.  *See* <u>Jones v. State</u>, 440 So.2d 570, 577 (Fla. 1983) (concluding murder defendant's statement to officer, during violent resistance of arrest, that he was "tired of the police hassling him, he had guns, too and intended to kill a pig" was correctly found trustworthy and admissible under §90.803(3)(a)(2); as the statement "contain[ed] sufficient probative value to draw the inference that the act was done"); <u>Escobar v. State</u>, 699 So.2d 988, 998 (Fla. 1997), *cert. den.* 523 U.S. 1072 (1998) (concluding defendant's statement to witness, that he "carried a gun and he would kill a police officer before he would go back to jail" was admissible under §90.803(3)(a)1 & 2, as relevant to motive and then-existing state of mind, and explaining subsequent conduct); *partially abrogated on other grounds*, <u>Connor v. State</u> 803 So.2d 598 (Fla. 2001), *cert. den.* 535 U.S. 1103 (2002).

2. <u>Deputy Long's Admonition to Herlihy</u>

Long's admonition to Herlihy was offered to prove his state of mind as the "hearer."  Because Long would be testifying as to her own words, and not of truth of the matter, the admonition was not hearsay.  *See* Ehrhardt, <u>Florida Evidence</u> §801.6 (2004 ed.) ("When

31

evidence of an out-of-court statement is offered to prove the state of mind of a person who heard the statement, the statement is not hearsay because it is not being offered to prove the truth of the statement's contents."); Blackwood v. State, 777 So.2d 399 (Fla. 2000), cert. den. 534 U.S. 884 (2001) (agreeing that witness' statements about the victim's comments, that she was pregnant by another man etc., to the defendant were not hearsay as the comments were used to prove the truth of the matter; but were relevant to show defendant's motive and intent in committing murder).

Thinking out loud, the court observed that Long did not say "[d]on't shake him" or tell Herlihy what could happen if he did; and that Herlihy's remark did not indicate he knew the potential consequences. The court concluded the State was "building assumptions on top of assumptions to the extent that I'm not seeing any way it could be relevant." (R26:2815).

Were the court construing terms of a contract negotiated by two sophisticated entities, such precision would be laudable. However, the court was considering an unanticipated conversation, in which Herlihy's remark and Long's admonition foreshadowed the shaking death of an infant. By telling Herlihy not even to pick up the child and step back for a break, Long was unavoidably telling him not to shake it. The jury would be entitled to make such a plainly reasonable inference. Cf. Terrell v. State, 27 S.W.3d 423, 426 (Ark. 2000) (observing, in a shaken baby death case, that the jury "could have properly considered evidence of cover-up as proof

32

of a purposeful mental state[;]" and a "jury need not lay aside its common sense in evaluating the ordinary affairs of life").

Long came back to Herlihy to tell him so, indicating her concern. The reasonable inference is that such concern colored the admonition she gave. Herlihy had to know shaking the child was the wrong thing to do. Only the most literal construction, out of context to the point of a vacuum, would lead the trial court to its professed inability to "see[] any way it could be relevant." (R26:2815). By excluding Long's admonition to Herlihy as irrelevant, the trial court abused its discretion.

The trial court did not explain its denial of reconsideration. The only reasonable conclusion is that it found Long's testimony irrelevant to "state of mind" as well. The State agrees that Herlihy's remark to Long, by itself, does not prove he knew that shaking the child would harm or kill it. Seldom, however, does a single bit of evidence alone establish guilt beyond reasonable doubt. Nothing of the sort is required to show relevancy; to the contrary, "[r]elevant evidence is evidence tending to prove or disprove a material fact." [e.s.]. §90.401, Florida Statutes. Generally, relevant evidence is admissible. §90.402, Florida Statutes. Herlihy's remark was relevant to show he had contemplated shaking the child not long before the fatal shaking.

While Long's admonition did not literally warn Herlihy not to shake the child, or that shaking could hurt it; her words, in context, put him on notice that shaking the child was the wrong thing to do. Long's words were relevant to showing he was on such

33

notice; after all, she would have no other reason for admonishing him. That she did not say "don't shake him" goes to the weight of her admonition, not its admissibility.

Anticipating Herlihy's reply, the State notes that defense counsel represented--without quoting from Long's deposition--that Long did not take Herlihy's remark seriously; as she did not report it to anyone, etc. (R26:2811-12). However, Long perceived the remark as sufficiently serious to warrant her return after attending to other business. (R26:2814, lines 4-9). That she did not mention Herlihy's remark to anyone else until after the murder would also go the weight, not admissibility, of her admonition to him. *See* <u>Anderson v. State</u>, 241 So.2d 390, 394 (Fla. 1970) (observing that a witness' testimony that the defendant's made certain statements "in a jocular manner" went to the weight rather admissibility of the statements), *vacated as to death penalty only*, 408 U.S. 938 (1972).

As a deputy sheriff working in Alachua County, Long would have been available to testify and subject to cross-examination. The jurors would have heard any resultant answers tending to lessen her credibility or the weight of her admonition. *See* <u>Helton v. State</u>, 641 So.2d 146, 151 (Fla. 3d DCA 1994), *rev. den.* 651 So.2d 1194 (Fla. 1995) (observing that the defendant's argument, urging a particular witness' testimony should not believed went to weight, not admissibility; and that "defendant may use the conventional techniques of cross-examination"). *See also* <u>Desue v. State</u>, 605 So.2d 933, 934 (Fla. 1st DCA 1992) (observing that alleged

34

suggestiveness of in-court identification went to the weight rather than admissibility; and that trial court "thereafter permitted full direct and cross-examination on this issue").

Parents tell children not to play with matches, and not to cross busy streets without looking.  Although they may ignore their parents, children understand--from gestures and tone of voice-- doing so is wrong; even if they do not understand how badly they could be harmed.  Herlihy, as an adult, certainly knew why Long was telling him to "take a break," etc.  Long's testimony was relevant to show Herlihy knew shaking the baby was wrong, if not injurious. It was also relevant to show he could not mistakenly have believed otherwise.  *See* Barber v. State, 781 So.2d 425, 428 (Fla. 5th DCA 2001), *rev. dism. as improv. granted* 829 So.2d 900 (Fla. 2002) (parsing the evidence in prosecution for child abuse by daycare worker, and noting that "[w]itnesses testified that she [defendant] became frustrated while taking care of infants that demanded attention").

By construing Long's words very literally, the trial court concluded Long's testimony was irrelevant under any circumstance. In so doing, the trial court was actually weighing the evidence, and thereby abused its discretion.  If re-trial is necessitated by this court's disposition of Issue I, then exclusion of Long's testimony must be reversed.

35

## CONCLUSION

The court's ruling which allowed the disputed re-direct exam by the State must be affirmed, thereby upholding Herlihy's conviction and mooting Issue II. If the State's issue on cross-appeal is reached, the trial court's exclusion of Deputy Long's testimony must be reversed.

## CERTIFICATES OF SERVICE AND COMPLIANCE WITH RULE 9.210

I certify a copy of this ANSWER BRIEF has been sent by U.S. mail to Jackson's attorney: **NADA M. CAREY,** Assistant Public Defender, Leon County Courthouse, 301 South Monroe Street, Suite 401, Tallahassee, Florida  32301; on June /st, 2004. I also certify this brief complies with Fla. R. App. P. 9.210.

Respectfully submitted,

**CHARLES J. CRIST, JR.
ATTORNEY GENERAL**

**CHARLIE MCCOY**
Senior Assistant Attorney General
Florida Bar No. 333646

Office of the Attorney General
The Capitol, Suite Pl-01
Tallahassee, Florida  32399-1050
(850) 414-3300

36