# EXHIBIT
# JJ

*L05-1-32962*
*X*

# In the District Court of Appeal

## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY  
    Appellant  

        v.

STATE OF FLORIDA  
        Appellee

CASE NO.:   01-2000-CF-2753-A

> Docketed  
> 11-16-05  
> Florida Attorney  
> General

APPEAL NO. 1D05-

VOLUME I

RULE 3.850

# RECORD

### HONORABLE PETER K. SIEG
#### TRIAL JUDGE

### APPEAL FROM THE CIRCUIT COURT
### 8th JUDICIAL CIRCUIT FOR
### ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**  
DAVID MENGERS, ESQUIRE  
500 NORTHEAST 8TH AVENUE  
OCALA, FLORIDA 34470

**FOR APPELLEE**  
HONORABLE CHARLIE CRIST  
ATTORNEY GENERAL'S OFFICE  
THE CAPITOL  
DEPARTMENT OF LEGAL AFFAIRS  
CRIMINAL APPEAL SECTION  
TALLAHASSEE, FLORIDA 32399-1050

IN THE CIRCUIT COURT
OF THE EIGHTH
JUDICIAL CIRCUIT, IN
AND FOR ALACHUA
COUNTY, FLORIDA

BRIAN PATRICK HERLIHY
    Appellant

vs.

CASE NO. 01-2000-CF-2753-A
APPEAL NO. 1D05-

STATE OF FLORIDA
    Appellee

| INDEX INSTRUMENT | DATE FILED | PAGE NO. |
|---|---|---|
| DOCKET LINES | | |
| **VOLUME I** | | |
| MOTION TO VACATE SENTENCE AND CONVICTION PURSUANT TO FLA. R. CR. P. 3.850 AND MEMORANDUM OF LAW | 08-10-2005 | 1-59 |
| ORDER DENYING MOTION FOR POST-CONVICTION RELIEF | 09-30-2005 | 60-63 |
| NOTICE OF APPEAL | 10-27-2005 | 64-65 |
| DIRECTIONS TO THE CLERK | 10-27-2005 | 66-67 |
| STATEMENT OF JUDICIAL ACTS TO BE REVIEWED | 10-27-2005 | 68 |
| AMENDED NOTICE OF APPEAL | 10-28-2005 | 69-70 |
| AMENDED DIRECTIONS TO THE CLERK | 10-28-2005 | 71-72 |
| AMENDED STATEMENT OF JUDICIAL ACTS TO BE REVIEWED | 10-28-2005 | 73 |

```
                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                           ALACHUA COUNTY, FLORIDA
-------------------------------------------------------------------------------
```

ASE #: 01-2000-CF-002753-A                                    PAGE: 1

```
----------------------DEFENDANT NAME INFORMATION--------------------------
```

```
    TYPE --: 0
    NAME --: HERLIHY, BRIAN PATRICK              SUFFIX ----:
    ADDRESS: 19401 NW 10TH ST
    ADDRES2:
    CITY --: PEMBROOKE PINES        STATE: FL    ZIP -------: 33029
    ST ID#: 03796298                             DOB -------: 10/11/1970
    PLACE OF BIR> USA (UNITED STATES OF AMERICA)
    CITIZENSHIP : 1           RACE ----: W        SEX -------: M   HGT: 510
    HAIR COLOR -: BRO         EYE COLOR: BRO      WEIGHT ----: 185
    DL/ST NO ---:
    SOC SEC NO -:             DIST MRKS: SCAR OVER RT EYE
    DEF STATUS -:             STAT DATE:
    EMPLY/SCHL -: ALTERNATE PH #                 TEL # -----: 3056210420
    COMMENT ----: UPD 06-05-2001 LC
    FBI # ------:                                DPT OF CORR:
```

```
--------------------------- CASE INFORMATION ------------------------------
  CASE: 012000CF002753A  DATE FILE W/CLERK: 08102000  S.A. NO----:
  CASE CROSS REF:                PUB DEF LIEN: GPDG
```

```
--------------------------- ARREST INFORMATION ----------------------------
  BK DATE-: 03152002        BK NO---: 200200003610  ARST AGCY> ASO
  OFF LOC->                                         ARST DT-: 0810200
  OFFCR NO:                 CUST LOC> DEPARTMENT OF THE JAIL
```

```
--------------------------- COURT INFORMATION -----------------------------
  NXT CRT DATE--: 09092002
  COURT TYPE----> DAY CERTAIN TRIAL              JUDGE> 5
  DEF TYP/CNSL--> 1/1512 MENGERS, DAVID
  PROS ATTY-----> PKB0   BROCKWAY, PAMELA K
  SPDY TRIAL CMP: 02062001  PTI LGTH:  MTHS  DEFRD PROS LGTH:    MTHS
```

```
--------------------- POST SENTENCE INFORMATION ---------------------------
  MSG TYPE-------: P    APPEAL FILED: 10272005   MANDATE DATE: 11232004
  REOPENED REASON: P    REOPENED DTE: 08102005   CLOSED DATE-: 09302005
```

```
--------------------------- FINE INFORMATION ------------------------------
    FINE ASSESSED: 56,773.74  FINE PD/ADJ:    .00  FINE BALANCE: 56,773.
    REST ASSESSED: 17,515.46  REST PD/ADJ:    .00  REST BALANCE: 17,515.
```

```
  Date: 10/28/2005                                                    Page: 2
  Time: 12:00:44                                                      *prgrm name*
                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                         ALACHUA COUNTY, FLORIDA
-------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                           PAGE: 2

 ** BOND **---------------------------------------------------------------------
 NUMBER  ISEQ PSEQ TYPE   AMOUNT  STAT  POSTED   RETURNED   JUDGMENT  SATISFCT'N
-------------------------------------------------------------------------------
19603    000    BB  $50,000.00  RL 10/16/2000 05/16/2001
0118713B 000    BB  $50,000.00  RL 06/11/2001

 ** BENCH WARRANT / CAPIAS ** --------------------------------------------------
     B/C ORDERED     ISSUED     SERVED   RECALLED    STATUS      JUDGE
-------------------------------------------------------------------------------
    CP 08/29/2000 08/29/2000 08/31/2000              EXECUTED    CATES, ROBER
    CP 05/14/2001 05/15/2001 06/05/2001              EXECUTED    LOTT, MARTHA
    CP 07/20/2001 07/20/2001 03/14/2002              EXECUTED    TURNER, LARR

 ** COURT EVENT HISTORY---------------------------------------------------------
    ISEQ PSEQ           TYPE          DATE    TIME  LOC     JUDGE
-------------------------------------------------------------------------------
              BOND HEARING          10/17/2000 01:30  2E   CHANCE, CHESTER
              CASE MANAGEMENT       12/18/2000 01:30  3A   CHANCE, CHESTER
              CASE MANAGEMENT       01/17/2001 01:30  3A   CHANCE, CHESTER
              CASE MANAGEMENT       02/19/2001 01:30  3A   CHANCE, CHESTER
              CASE MANAGEMENT       03/19/2001 01:30  3A   LOTT, MARTHA AN
              PRE TRIAL CONFERENCE  02/20/2002 01:30  3D   LOTT, MARTHA AN
              PRE TRIAL CONFERENCE  07/17/2002 01:30  3D   LOTT, MARTHA AN
              TRIAL STATUS CONF     09/04/2002 02:00  3D   LOTT, MARTHA AN
              JURY SELECTION        09/09/2002 09:00  3D   LOTT, MARTHA AN
              DAY CERTAIN TRIAL     09/09/2002 09:00  4A   LOTT, MARTHA AN
```

```
prgrm name*                                                              Page: 3
  Date: 10/28/2005                                                    *prgrm name*
  Time: 12:00:45
                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                          ALACHUA COUNTY, FLORIDA
-------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                            PAGE: 3
------------------------ INITIAL CHARGE INFORMATION ------------------------

      STATUS------> ARRESTED         CHRG SEQ NO-----: 001
      OBTS NO-----: 0102021473       CITATION NO-----:
      DATE OF OFF-: 08102000         OFFENSE CODE----> 2196
      NCIC CODE---: 0912             LEVEL/DEGREE----: F/C
      STATUTE NO--: 78204  1A        MURDER
      ACTIVITY---->                  GEN OFF CHAR----: N
      WEAPONS----->                  DRUG TYPE------->
      RANGE------->                  AMOUNT----------: 000000
      UNIT-------->                  WORTHLESS CK AMT: 00000000


------------------------ PROSECUTOR CHARGE INFORMATION ------------------------

      STATUS------> SAME             CHRG SEQ NO-----: 001
      OBTS NO-----: 0102021473       S. A. FILE DATE-: 08292000
      FNL DEC DATE: 08292000         FINAL ACTION----> FILED
      DATE OF OFF-: 08102000         OFFENSE CODE----> 2192
      NCIC CODE---: 0912             LEVEL/DEGREE----: F/C
      STATUTE NO--: 78204  1A        MURDER FIRST DEGREE
      ACTIVITY---->                  GEN OFF CHAR----: N
      WEAPONS----->                  DRUG TYPE------->
      RANGE------->                  AMOUNT----------: 000000
      UNIT-------->                  WORTHLESS CK AMT: 00000000


                                                           C SEQ: 001
------------------------ COURT CHARGE INFORMATION ------------------------

  MANSLAUGHTER
    STATUS-------> REDCD           DATE OF OFF----: 08102000 OBTS NO: 0102021473
    OFFENSE CODE-> 2198            NCIC CODE------: 0909     LEV/DEG: F/S
    STATUTE NO---: 78207
    ACTIVITY----->                GEN OFF CHAR---: N         WEAPONS>
    DRUG TYPE---->                RANGE---------->           AMOUNT-: 000000
    UNIT--------->                APPEARANCE-----> 03        CONT--->
    CRT DISP DATE: 11082002        CRT ACT TAKEN--> ADJUDICATED GUILTY
    TRIAL TYPE---: 2              FINAL PLEA-----> NOT GUILTY
    VERDICT------> GJ             REMANDED?------:
    PSI?---------:                PSI RETURN DATE: 00000000
    COMMENT------:
```

```
prgrm name                                                              Page: 4
  Date: 10/28/2005                                                  *prgrm name*
  Time: 12:00:45
                      J.K. "BUDDY" IRBY, CLERK OF THE COURT
                          ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                             PAGE: 4

------------------------- SENTENCE INFORMATION  CNT: 001  -----------------
     DEF TYP/CNSL> 1 1512       MENGERS, DAVID
     PROS ATTY---> PKB0         BROCKWAY, PAMELA K
     JUDGE-------> MAL          LOTT, MARTHA ANN
     IMPOSED DTE-: 11082002     EFFECTIVE DATE-: 11082002 JURIS RET-:
     ASMT AMOUNT-> 05677374     ASMT BAL-:  56,773.74    GDLNS WVD--:
     REST AMOUNT-: 01751546     REST BAL-:  17,515.46    REST D/DATE:
     CNTY OF SUPV> ALACHUA      SUPV RATE:               SUPV AMOUNT:
     CONF TYPE---> STATE PRISON CONF LGTH:    15 y  m  d CONF SUSP:     y  m
     COM SRV HRS-:              COM CTL LGTH:    y  m  d DRG CNF TRM: 000y00m00
     PROB TYPE--->              PROB LENGTH-:    y  m  d PRB TRM DT:
     SENT TRM DTE:              DL SUSP/REV-: 00y00m00d  CR TIME SRV: 0347
     STATUS------>              REF CASE/SEQ NO: 01      0
     SENTENCE PROVISIONS---------->.
     SPECIAL SENTENCE PROVISIONS-->
     ADD SENT/CMT:                                       SUPV BAL-:        .0


  * * C R I M I N A L   F I N E S   A S S E S S M E N T   D A T A * *

-- FINE ASSESSMENTS ------------------------------------------------------------

EQ ST SEQ ST FILED PHASE  ASMT DATE  DUE DATE  ASMT AMT   TOTAL PTD    BALANCE
================================================================================
01  001  08/29/2000 COURT  11/08/2002 01/08/2003  56773.74      .00  56773.7

--DIST-----ASSESSED----- P-T-D--            ---DIST-----ASSESSED-----P-T-D-
 ** NO DIST CONTROL XXX RECORD **

** NO PAYMENT RECORD **

 ** CRIMINAL ACTION DOCKET ----------------------------------------------
    DATE        DESCRIPTION                                  DOC PG SEQ
 ------------------------------------------------------------------------
    08/10/2000 CASE OPENED - ON VIEW ARREST                  00000
    08/11/2000 FIRST APPEARANCE ORDER// CURTIN
    08/11/2000 THE DEFENDANT BE RELEASED ON STANDARD CONDITIONS
    08/11/2000 (F.S. 903.047) AND THE FOLLOWING CONDITIONS:
    08/11/2000 BAIL SET IN THE AMOUNT OF $ 500,000.00
    08/11/2000 THE COURT FINDS THE DEFENDANT IS ELIGIBLE
    08/11/2000 FOR AND APPOINTS THE PUBLIC DEFENDER, PENDING
    08/11/2000 THE FILING OF A FINANCIAL AFFIDAVIT AND PAYMENT
    08/11/2000 $40.00 APPLICATION WITHIN 7 DAYS (FS 27.52)
    08/11/2000 PHOTO IDENTIFICATION NOT FILED
    08/11/2000 BAIL SET AT  500000.00                        00000  000
    08/11/2000 SA ASSIGNED:  FERRERO, DENISE R               00000
    08/11/2000 PD ASSIGNED:  MOLLICA, SALVATORE D            00000
```

```
                   J.K. "BUDDY" IRBY, CLERK OF THE COURT
                        ALACHUA COUNTY, FLORIDA
-----------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                   PAGE: 5
```

## ** CRIMINAL ACTION DOCKET -----------------------------------------------------

| DATE | DESCRIPTION | DOC PG SEQ |
|------|-------------|------------|
| 08/17/2000 | SA ASSIGNED: SINGER, JEANNE M | 00000 |
| 08/22/2000 | NOTICE OF APPEARANCE: G GROLAND  (CURRENTLY REP | |
| 08/25/2000 | STIPULATION FOR SUBSTITUTION OF COUNSEL | |
| 08/29/2000 | ORDER ALLOWING SUBSTITUTION OF COUNSEL / GORDON | |
| 08/29/2000 | SUBSTITUTED AS COUNSEL // CHANCE | |
| 08/29/2000 | INDICTMENT FILED FOR FIRST DEGREE MURDER | |
| 08/29/2000 | ARRAIGNMENT          SET FOR 09192000 | 00000 |
| 08/29/2000 | CAPIAS      ISSUED | 00000 |
| 08/29/2000 | CAPIAS      ORDERED | 00000 |
| 08/29/2000 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | 00000 |
| 08/30/2000 | MOTION TO WITHDRAW | |
| 08/30/2000 | WRITTEN PLEA OF NOT GUILTY | |
| 08/30/2000 | DEMAND FOR DISCOVERY | |
| 08/30/2000 | AND DEMAND FOR JURY TRIAL | |
| 08/31/2000 | CAPIAS      SERVED | 00000 |
| 08/31/2000 | CASE MANAGEMENT        SET FOR 11222000 | 00000 |
| 08/31/2000 | DEFENDANT REARRESTED ON   08312000 | 00000 |
| 08/31/2000 | DEF NAME AT RARST HERLIHY, BRIAN PATRICK | 00000 |
| 08/31/2000 | FIRST APPEARANCE ORDER// CRENSHAW | |
| 08/31/2000 | DEFENDANT HELD WITHOUT BAIL | |
| 08/31/2000 | DEFENDANT WILL CONSULT PRIVATE COUNSEL | |
| 08/31/2000 | PHOTO IDENTIFICATION NOT FILED | |
| 08/31/2000 | ORDER GRANTING MOTION TO WITHDRAW / GORDON GROLA | |
| 08/31/2000 | RETAINED AS PRIVATE COUNSEL // CHANCE | |
| 09/18/2000 | MOTION TO COMPEL DISCOVERY | |
| 09/18/2000 | STATE'S DISCOVERY EXHIBIT | |
| 09/18/2000 | DEMAND FOR RECIPROCAL DISCLOSURE | |
| 09/21/2000 | CASE MANAGEMENT        SET FOR 11202000 | 00000 |
| 09/21/2000 | NOTICE ISSUED TO: DEFENDANT | 00000 |
| 09/21/2000 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | 00000 |
| 09/29/2000 | MOTION TO SET BOND | |
| 10/02/2000 | BOND HEARING         SET FOR 10172000 | 00000 |
| 10/02/2000 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | 00000 |
| 10/02/2000 | NOTICE OF HEARING ON  103000  AT / 2:00PM  / | |
| 10/13/2000 | ORDER SETTING BOND / $50,000.00 CASH // CHANCE | |
| 10/13/2000 | SPECIAL CONDITIONS: | |
| 10/13/2000 | NO CONTACT WITH VICTIM'S FAMILY OR EXTENDED FAMI | |
| 10/13/2000 | NO CONTACT WITH CHILDREN UNDER THE AGE OF 16 YEA | |
| 10/13/2000 | MUST RESIDE IN BROWARD CO., FLORIDA WITH HIS PAR | |
| 10/13/2000 | AT 19401 NW 10 ST, PEMBROKE PINES, FL UNTIL FURT | |
| 10/13/2000 | ORDER OF THE COURT AND SHALL NOT LEAVE BROWARD C | |
| 10/13/2000 | WITHOUT PERMISSION FROM THE COURT EXCEPT TO TRAV | |
| 10/13/2000 | TO GAINESVILLE, FL TO MEET WITH HIS ATTORNEYS OR | |
| 10/13/2000 | MAKE COURT APPEARANCES IN CONNECTION WITH THESE | |
| 10/13/2000 | IF DEFENDANT HAS A PASSPORT, SHALL SURRENDER TO | |

```
prgrm name                                                              Page: 6
  Date: 10/28/2005                                               *prgrm name*
  Time: 12:00:45
                  J.K. "BUDDY" IRBY, CLERK OF THE COURT
                        ALACHUA COUNTY, FLORIDA
------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                     PAGE: 6

** CRIMINAL ACTION DOCKET ----------------------------------------------------
    DATE        DESCRIPTION                               DOC PG SEQ
------------------------------------------------------------------------------
  10/13/2000 STATE ATTORNEY'S OFFICE OR ANOTHER DESIGNATED AG
  10/13/2000 SHALL NOT BECOME EMPLOYED IN THE MEDICAL OR HEAL
  10/13/2000 SECTOR DURING THE PENDENCY OF THIS CASE
  10/13/2000 SHALL WITHIN 10 DAYS OF POSTING BOND BE REFERRED
  10/13/2000 FAMILY DOCTOR IN BROWARD CO. TO A PSYCHIATRIST F
  10/13/2000 EVALUATION TO DETERMINE WHETHER OR NOT THE DEFEN
  10/13/2000 SHOULD BE ON ANY MEDICATION FOR DEPRESSION OR OT
  10/13/2000 MEDICAL PROBLEM
  10/13/2000 STIPULATION FOR BOND
  10/17/2000 BLANKET BOND POSTED ON 2000-02660-CFA            00000
  10/17/2000 BOND SET AT     50000.00 POSTED BLANKET BOND     00000  000
  10/17/2000 STATUS OF BOND IS  OPEN              BOND #: 1   00000  000
  10/17/2000 BLANKET BOND   BOND POSTED ON 10/16/2000         00000  000
  10/17/2000 BLANKET BOND POSTED FOR 2000-02660-CFA           00000
  10/17/2000 NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY          00000
  10/20/2000 RTN MAIL 10182000/TO BRIAN HERLIHY/FOR CASE MANA
  10/20/2000 11202000/UNABLE TO FORWARD//CRC
  11/09/2000 MOTION TO CONTINUE CASE MANAGEMENT CONFERENCE AN
  11/09/2000 MOTION TO EXCUSE THE DEFENDANT
  11/15/2000 ORDER GRANTING DEFENDANT'S MOTION FOR CONTINUANC
  11/15/2000 EXCUSING DEFENDANT FROM CASE MANAGEMENT CONFEREN
  11/15/2000 ON 11202000 / CONTINUED TO 12182000 // CHANCE
  11/15/2000 NOTICE OF TAKING DEPOSITIONS
  11/15/2000 NOTICE OF TAKING DEPOSITIONS
  11/16/2000 CASE MANAGEMENT       SET FOR 12182000           00000
  11/16/2000 NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY          00000
  11/16/2000 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H     00000
  11/27/2000 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
  12/18/2000 ORDER ON CASE MANAGEMENT CONFERENCE// CHANCE
  12/18/2000 CASE MANAGEMENT       SET FOR 01172001           00000
  12/21/2000 NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY          00000
  12/27/2000 NOTICE OF HEARING ON  01032001  AT / 1:45 PM  /
  12/27/2000 MOTION TO MODIFY A CONDITION OF RELEASE
  01/03/2001 COURT MINUTES ON MOTION TO COMPEL - CANCELLED/
  01/03/2001 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
  01/17/2001 ORDER ON CASE MANAGEMENT CONFERENCE// CHANCE
  01/17/2001 CASE MANAGEMENT       SET FOR 02192001           00000
  01/18/2001 NOTICE ISSUED TO: DEFENDANT                      00000
  01/18/2001 NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY          00000
  01/18/2001 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H     00000
  01/22/2001 AMENDED NOTICE OF TAKING DEPOSITION
  02/05/2001 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
  02/05/2001 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
  02/14/2001 NOTICE OF TAKING DEPOSITIONS
  02/15/2001 NOTICE OF TAKING DEPOSITIONS
```

```
prgrm name*                                                             Page: 7
  Date: 10/28/2005                                               *prgrm name*
  Time: 12:00:45
```

J.K. "BUDDY" IRBY, CLERK OF THE COURT
ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                      PAGE: 7

** CRIMINAL ACTION DOCKET --------------------------------------------------
     DATE        DESCRIPTION                                 DOC PG SEQ
--------------------------------------------------------------------------

| DATE | DESCRIPTION | DOC | PG | SEQ |
|------|-------------|-----|----|----|
| 02/15/2001 | NOTICE OF TAKING DEPOSITIONS | | | |
| 02/15/2001 | NOTICE OF TAKING DEPOSITIONS | | | |
| 02/15/2001 | NOTICE OF TAKING DEPOSITIONS | | | |
| 02/15/2001 | NOTICE OF TAKING DEPOSITIONS | | | |
| 02/19/2001 | CASE MANAGEMENT     SET FOR 03192001 | 00000 | | |
| 02/19/2001 | DEFENDANT SIGNED NOTICE FOR  031901  CASE MANAGE | | | |
| 02/20/2001 | NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY | 00000 | | |
| 02/20/2001 | AMENDED NOTICE OF TAKING DEPOSITION | | | |
| 02/21/2001 | NOTICE OF CANCELLATION OF DEPOSITION AT THE STAT | | | |
| 02/21/2001 | REQUEST | | | |
| 02/27/2001 | NOTICE OF HEARING ON  03052001  AT / 11:00 AM  / | | | |
| 03/05/2001 | COURT MINUTES ON MOTION TO MODIFY CONDITIONS OF | | | |
| 03/05/2001 | RELEASE - MOTION DENIED / ORDER TO BE PREPARED | | | |
| 03/05/2001 | BY STATE ATTORNEY / | | | |
| 03/16/2001 | NOTICE OF TAKING DEPOSITIONS | | | |
| 03/19/2001 | ORDER ON CASE MANAGEMENT CONFERENCE// LOTT | | | |
| 03/19/2001 | PRE TRIAL CONFERENCE SET FOR 09262001 | 00000 | | |
| 03/19/2001 | JURY SELECTION     SET FOR 10082001 | 00000 | | |
| 03/20/2001 | NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY | 00000 | | |
| 03/20/2001 | NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY | 00000 | | |
| 03/23/2001 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | | |
| 03/27/2001 | NOTICE OF TAKING DEPOSITIONS | | | |
| 03/27/2001 | NOTICE OF TAKING DEPOSITIONS | | | |
| 03/27/2001 | AMENDED NOTICE OF TAKING DEPOSITION | | | |
| 03/30/2001 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | | |
| 04/04/2001 | AMENDED NOTICE OF TAKING DEPOSITION | | | |
| 04/24/2001 | NOTICE OF CANCELLATION OF DEPOSITION | | | |
| 05/03/2001 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | | |
| 05/14/2001 | MOTION TO REVOKE BOND | | | |
| 05/14/2001 | ORDER REVOKING BOND AND DIRECTING CLERK TO ISSUE | | | |
| 05/14/2001 | CAPIAS//LOTT | | | |
| 05/14/2001 | CAPIAS     ORDERED | 00000 | | |
| 05/15/2001 | CAPIAS     ISSUED | 00000 | | |
| 05/16/2001 | STATUS OF BOND IS  RELEASED     BOND #: 1 | 00000 | | 000 |
| 05/22/2001 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND | | | |
| 05/22/2001 | LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT | | | |
| 05/22/2001 | $ 50.75 // PAID | | | |
| 06/01/2001 | NOTICE OF TAKING DEPOSITIONS | | | |
| 06/05/2001 | CAPIAS     SERVED | 00000 | | |
| 06/06/2001 | DEFENDANT REARRESTED ON   06052001 | 00000 | | |
| 06/06/2001 | DEF NAME AT RARST HERLIHY, BRIAN PATRICK | 00000 | | |
| 06/06/2001 | FIRST APPEARANCE ORDER// NILON | | | |
| 06/06/2001 | THE DEFENDANT BE RELEASED ON STANDARD CONDITIONS | | | |
| 06/06/2001 | (F.S. 903.047) AND THE FOLLOWING CONDITIONS: | | | |
| 06/06/2001 | BAIL SET IN THE AMOUNT OF $ 50,000.00 BLANKET WI | | | |

```
                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                          ALACHUA COUNTY, FLORIDA
------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                       PAGE: 8

** CRIMINAL ACTION DOCKET ---------------------------------------------------
     DATE          DESCRIPTION                             DOC PG SEQ
------------------------------------------------------------------------------
     06/06/2001 2000-2660-CFA
     06/06/2001 DEFENDANT WILL CONSULT PRIVATE COUNSEL
     06/06/2001 PHOTO IDENTIFICATION FILED IN CASE # 2000-2660-C
     06/06/2001 AFFIDAVIT OF INDIGENCY-NOT APPOINTED//NILON
     06/13/2001 BOND SET AT     50000.00 POSTED BLANKET BOND    00000    000
     06/13/2001 STATUS OF BOND IS  OPEN            BOND #: 0    00000    000
     06/13/2001 BLANKET BOND    BOND POSTED ON 06/11/2001       00000    000
     06/13/2001 BLANKET BOND POSTED FOR 2000-02660-CFA          00000
     06/13/2001 BLANKET BOND POSTED ON  2000-02660-CFA          00000
     06/19/2001 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
     06/19/2001  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
     06/19/2001 $59.50
     07/02/2001 NOTICE OF TAKING DEPOSITION
     07/02/2001 NOTICE OF TAKING DEPOSITION
     07/10/2001 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
     07/11/2001 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
     07/11/2001  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
     07/11/2001 $59.50
     07/20/2001 ORDER REVOKING CASH BOND AND DIRECTING THE ISSUA
     07/20/2001 CAPIAS //TURNER
     07/20/2001 CAPIAS      ISSUED                              00000
    ·07/20/2001 CAPIAS      ORDERED                             00000
     07/20/2001 SECOND MOTION TO REVOKE BOND HEARING / 07202001
     07/20/2001 1:30 PM BEFORE JUDGE TURNER
     07/20/2001 SECOND MOTION TO REVOKE BOND
     07/23/2001 STATUS OF BOND IS  RELEASED         BOND #: 0   00000    000
     07/25/2001 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
     07/26/2001 MOTION TO CONTINUE
     07/26/2001 NOTICE OF HEARING ON  08102001  AT / 11:00 AM  /
     07/31/2001 NOTICE OF CANCELLATION OF TAKING DEPOSITION
     08/02/2001 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
     08/08/2001 NOTICE OF TAKING DEPOSITION OF JOHN QUIRELLO
     08/08/2001 NOTICE OF TAKING DEPOSITION OF KIM BRAGG/BRANDY
     08/08/2001 AND DORIS BRIDWELL
     08/10/2001 COURT MINUTES ON MOTION TO CONTINUE - ATTORNEY W
     08/10/2001 SPEEDY TRIAL / MOTION GRANTED/PRETRIAL CONFERENC
     08/10/2001 CONTINUED TO JANUARY 2002/
     08/10/2001 PRE TRIAL CONFERENCE SET FOR 01302002           00000
     08/13/2001 NOTICE ISSUED TO: DEFENDANT                     00000
     08/13/2001 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H     00000
     08/20/2001 NOTICE OF CANCELLATION OF TAKING DEPOSITION
     09/05/2001 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
     09/06/2001 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
     09/06/2001  CHARTONE, INC.  IN THE AMOUNT OF $ 277.20 // PA
     09/07/2001 NOTICE OF TAKING DEPOSITIONS
```

prgrm name*                                                                    Page: 9
 Date: 10/28/2005                                                              *prgrm name*
 Time: 12:00:46

Case 1:09-cv-00052-MP-GRJ   Document 21-43   Filed 03/22/11   Page 12 of 106

J.K. "BUDDY" IRBY, CLERK OF THE COURT
ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                            PAGE: 9

** CRIMINAL ACTION DOCKET ------------------------------------------------------
     DATE        DESCRIPTION                                        DOC PG SEQ
--------------------------------------------------------------------------------
     09/07/2001 NOTICE OF TAKING DEPOSITIONS
     09/07/2001 NOTICE OF TAKING DEPOSITIONS
     09/21/2001 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
     09/21/2001  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
     09/21/2001 $70.00
     09/21/2001 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
     09/21/2001  LEBLANC COURT REPORTING  IN THE AMOUNT OF $ 129
     09/21/2001 NOTICE OF CANCELLATION OF TAKING DEPOSITION
     09/21/2001 AMENDED NOTICE OF TAKING DEPOSITION AS TO TIME
     10/10/2001 MOTION TO SET ASIDE BOND ESTREATURE
     10/23/2001 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
     10/26/2001 COURT MINUTES ON MOTION TO SET ASISE BOND
     10/26/2001 ESTREATURE - GRANTED/BOND MONEY TO BE RETURNED T
     10/26/2001 FAMILY/
     10/26/2001 ORDER GRANTING MOTION TO SET ASIDE BOND ESTREATU
     11/02/2001 RESTITUTION CHECK MAILED: $ 50,000.00  TO  LOIS
     11/06/2001 UNOPPOSED MOTION TO CONTINUE TRIAL
     11/21/2001 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
     11/21/2001  CHARTONE INC.  IN THE AMOUNT OF $ 277.20 // PAI
     11/27/2001 NOTICE OF HEARING ON  113001  AT / 1:30PM  / LOT
     11/30/2001 ORDER GRANTING DEFENDANT'S MOTION TO CONTINUE -
     11/30/2001 ORDERED AND ADJUDGED THAT THE DEFENDANT'S MOTION
     11/30/2001 AND THE SAME IS HEREBY GRANTED AND THIS CASE IS
     11/30/2001 RESCHEDULED FOR PRE-TRIAL CONFERENCE ON
     11/30/2001 MARCH 20, 2002 AT 1:30PM WITH TRIAL TO BE SCHEDU
     11/30/2001 COMMENCING ON THE WEEK OF MAY 13, 2002 WITH MAY
     11/30/2001 8TH TRIAL STATUS // LOTT
     12/12/2001 NOTICE OF TAKING DEPOSITIONS
     12/26/2001 NOTICE OF TAKING DEPOSTION - DR. ROHLING
     12/26/2001 NOTICE OF TAKING DEPOSTION - BETH TALAGA
     01/04/2002 NOTICE OF CANCELLATION OF TAKING DEPOSITION
     01/14/2002 NOTICE OF TAKING DEPOSITIONS
     01/14/2002 NOTICE OF TAKING DEPOSITIONS
     01/16/2002 DEFENDANT'S WITNESS LIST
     01/22/2002 MOTION FOR COURT ORDER ALLOWING DEFENDANT TO GET
     01/22/2002 COPIES OF CHILD PROTECTION TEAM RECORDS
     01/24/2002 PRE TRIAL CONFERENCE SET FOR 02202002            00000
     01/24/2002 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H     00000
     02/01/2002 UNOPPOSED MOTION TO CONTINUE TRIAL
     02/14/2002 NOTICE OF HEARING ON  030602  AT / 10:00AM  / LO
     02/25/2002 PRE TRIAL CONFERENCE SET FOR 03202002            00000
     02/25/2002 TRIAL STATUS CONF    SET FOR 04032002            00000
     02/25/2002 JURY SELECTION        SET FOR 04082002            00000
     02/25/2002 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H     00000
     02/25/2002 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H     00000

prgrm name Case 1:09-cv-00052-MP-GRJ   Document 21-43   Filed 08/22/11   Page 13 of 106
   Date: 10/28/2005                                                                    Page: 10
   Time: 12:00:46                                                                    *prgrm name*
                    J.K: "BUDDY" IRBY, CLERK OF THE COURT
                         ALACHUA COUNTY, FLORIDA
----------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                          PAGE: 10

** CRIMINAL ACTION DOCKET -----------------------------------------------
   DATE        DESCRIPTION                                    DOC PG SEQ
----------------------------------------------------------------------------
   02/25/2002 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H    00000
   02/27/2002 NOTICE OF TAKING DEPOSITIONS
   02/27/2002 NOTICE OF TAKING DEPOSITIONS
   02/27/2002 NOTICE OF TAKING DEPOSITIONS
   03/11/2002 PRE TRIAL CONFERENCE SET FOR 07172002           00000
   03/11/2002 TRIAL STATUS CONF     SET FOR 08072002          00000
   03/11/2002 JURY SELECTION        SET FOR 08122002          00000
   03/11/2002 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H    00000
   03/11/2002 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H    00000
   03/11/2002 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H    00000
   03/14/2002 NOTICE OF CANCELLATION OF TAKING DEPOSITION
   03/14/2002 AMENDED NOTICE OF TAKING DEPOSITION
   03/14/2002 CAPIAS      SERVED                              00000
   03/15/2002 DEFENDANT REARRESTED ON    03142002             00000
   03/15/2002 DEF NAME AT RARST HERLIHY, BRIAN PATRICK        00000
   03/15/2002 FIRST APPEARANCE ORDER// CRENSHAW
   03/15/2002 THE DEFENDANT BE RELEASED ON STANDARD CONDITIONS
   03/15/2002 (F.S. 903.047) AND THE FOLLOWING CONDITIONS:
   03/15/2002 BAIL SET IN THE AMOUNT OF $ 100,000.00
   03/15/2002 THE DEFENDANT REPRESENTS HE/SHE WILL CONSULT PRI
   03/15/2002 COUNSEL
   03/15/2002 PHOTO IDENTIFICATION FILED IN CASE # 2000-2660-C
   03/15/2002 AMENDED FIRST APPEARANCE ORDER AS TO BAIL
   03/15/2002 $1,000,000.00 // CRENSHAW
   03/27/2002 NOTICE OF HEARING ON  040302  AT / 9:00AM  / LOT
   03/27/2002 MOTION TO REINSTATE PREVIOUS BOND
   03/27/2002 NOTICE OF CANCELLATION OF TAKING DEPOSITION
   04/03/2002 COURT MINUTES ON MOTION TO REINSTATE PREVIOUS
   04/03/2002 BOND -
   04/03/2002 -DENIED/ORDER TO BE PREPARED BY STATE ATTORNEY/
   04/05/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
   04/05/2002 NOTICE OF TAKING DEPOSITIONS
   04/10/2002 NOTICE OF TAKING DEPOSITIONS
   04/16/2002 MOTION FOR ORDER ALLOWING ISSUANCE OF SUBPOENAS
   04/16/2002 TECUM FOR EMPLOYMENT AND EDUCATIONAL RECORDS OF
   04/16/2002 DEFENDANT
   04/22/2002 SUBPOENA DUCES TECUM HEARING / 04252002 AT 1:30
   04/22/2002 COURTROOM 3D BEFORE JUDGE LOTT
   04/23/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   04/23/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
   04/23/2002 $ 26.25 // PAID
   05/06/2002 COURT MINUTES ON MOTION FOR SUBPOENAS DUCES TECU
   05/06/2002 EMPLOYMENT RECORDS AND EDUCATIONAL RECORDS OF
   05/06/2002 DEFENDANT - GRANTED AS TO EMPLOYMENT/GRANTED AS
   05/06/2002 MILITARY AND EDUCATION WITH THE FOLLOWING PROVIS

```
prgrm name                                                          Page: 11
   Date: 10/28/2005                                                *prgrm name*
   Time: 12:00:47
               J.K. "BUDDY" IRBY, CLERK OF THE COURT
                     ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                         PAGE: 11

** CRIMINAL ACTION DOCKET -----------------------------------------------------
    DATE          DESCRIPTION                              DOC PG SEQ
--------------------------------------------------------------------------------
    05/06/2002 MILITARY AND EDUCATIONAL RECORDS WILL BE DELIVER
    05/06/2002 THE CLERK'S OFFICE UNDER SEAL/ORDER TO BE PREPAR
    05/06/2002 BY STATE ATTORNEY/
    05/06/2002 AMENDED NOTICE FOR SUBPOENA DUCES TECUM HEARING
    05/06/2002 MONDAY, MAY 6, 2002 AT 1:30PM
    05/22/2002 NOTICE OF TAKING DEPOSITION
    05/22/2002 NOTICE OF TAKING DEPOSITIONS
    05/24/2002 NOTICE OF TAKING DEPOSITION
    06/04/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    06/04/2002  VANLANDINGHAM, DURSCHER &VANLANDINGHAM  IN THE
    06/04/2002 OF 120.90/PAID/
    06/05/2002 DEFENDANT'S SUPPLEMENTAL WITNESS LIST
    06/06/2002 NOTICE OF TAKING DEPOSITION(S)
    06/06/2002 NOTICE OF CANCELLATION OF DEPOSITION
    06/20/2002 DEPOSITION OF HELEN LEGALL
    06/20/2002 RETURN OF SERVICE - UNSERVED
    06/20/2002 RETURN OF SERVICE - SERVED
    06/20/2002 RETURN OF SERVICE - SERVED
    06/20/2002 RETURN OF SERVICE - SERVED
    06/20/2002 RETURN OF SERVICE - SERVED
    06/20/2002 RETURN OF SERVICE - SERVED
    06/20/2002 RETURN OF SERVICE - SERVED
    06/25/2002 NOTICE OF TAKING DEPOSITIONS
    06/26/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    06/26/2002 VANLANDINGHAM, DURSCHER & VANLANDINGHAM IN THE A
    06/26/2002 OF $37.55 // PAID
    06/26/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    06/26/2002 LEBLANC COURT REPORTING SERVICES IN THE AMOUNT O
    06/26/2002 $129.50 // PAID
    06/26/2002 MOTION TO CONTINUE CAUSE
    06/26/2002 NOTICE OF HEARING ON  071102  AT / 8:45AM  / LOT
    06/28/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    06/28/2002 ADDENDUM TO MOTION TO CONTINUE CASE
    06/28/2002 NOTICE OF DEPOSITION
    07/05/2002 RETURN OF SERVICE - SERVED
    07/05/2002 RETURN OF SERVICE - SERVED
    07/10/2002 RETURN OF SERVICE - SERVED AS TO ANGIE HARN
    07/11/2002 TRIAL STATUS CONF    SET FOR 09042002          00000
    07/11/2002 JURY SELECTION       SET FOR 09092002          00000
    07/11/2002 MOTION TO CONTINUE CASE
    07/11/2002 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H    00000
    07/11/2002 NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H    00000
    07/12/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    07/12/2002 NOTICE OF TAKING DEPOSITIONS
    07/12/2002 NOTICE OF TAKING DEPOSITIONS
```

```
prgrm name                                                              Page: 12
  Date: 10/28/2005                                                   *prgrm name*
  Time: 12:00:47
                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                         ALACHUA COUNTY, FLORIDA
-------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                          PAGE: 12

** CRIMINAL ACTION DOCKET -----------------------------------------------------
    DATE        DESCRIPTION                                       DOC PG SEQ
-------------------------------------------------------------------------------
    07/12/2002 NOTICE OF TAKING TELEPHONIC DEPOSITION
    07/12/2002 NOTICE OF TAKING TELEPHONIC DEPOSITION
    07/15/2002 NOTICE OF TAKING TELEPHONIC DEPOSITION
    07/16/2002 NOTICE OF TAKING TELEPHONIC DEPOSITION
    07/17/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    07/17/2002 *SPECIAL CASE MGMT ON 080202 AT 9:00 A.M.*
    07/17/2002 DEFENDANT SIGNED NOTICE FOR  080202  CASE MANAGE
    07/18/2002 AMENDED NOTICE OF DEPOSITION
    07/18/2002 SUBPOENA DUCES TECUM
    07/19/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    07/19/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    07/19/2002 NOTICE OF TAKING DEPOSITION(S)
    07/22/2002 ORDER SCHEDULING SPECIAL CASE MANAGEMENT CONFERE
    07/22/2002 AUGUST 2, 2002 AT 9:00AM // LOTT
    07/23/2002 NOTICE OF TAKING TELEPHONIC DEPOSITION
    07/23/2002 NOTICE OF TAKING TELEPHONIC DEPOSITION
    07/24/2002 RETURN OF SERVICE - SERVED
    07/24/2002 RETURN OF SERVICE - SERVED
    07/24/2002 NOTICE OF TAKING TELEPHONIC DEPOSITION
    07/24/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    07/25/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    07/25/2002 CHARTONE, INC  IN THE AMOUNT OF $ 26.29 / PAID
    07/25/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    07/25/2002 CHARTONE  IN THE AMOUNT OF $ 448.85 / PAID
    07/25/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    07/25/2002  SHANDS HEALTH CARE  IN THE AMOUNT OF $ 25.00
    07/25/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    07/25/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    07/25/2002 $223.55
    07/25/2002 RETURN OF SERVICE - SERVED
    07/26/2002 RETURN OF SERVICE - SERVED
    07/29/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    07/30/2002 NOTICE OF TAKING DEPOSITION(S)
    08/02/2002 COURT MINUTES - CASE MANAGEMENT ON CASE NUMBERS
    08/02/2002 2000-2660CFA, 2000-2753CFA - RULING:  REMAIN ON
    08/02/2002 CURRENT COURT DATES
    08/06/2002 NOTICE OF TAKING DEPOSITIONS
    08/06/2002 NOTICE OF TAKING DEPOSITIONS
    08/06/2002 AMENDED NOTICE OF TAKING DEPOSITION
    08/06/2002 NOTICE OF TAKING DEPOSITIONS
    08/08/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    08/08/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    08/08/2002 NOTICE OF TAKING DEPOSITIONS
    08/09/2002 NOTICE OF TAKING DEPOSITION(S)
    08/13/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
```



J.K. "BUDDY" IRBY, CLERK OF THE COURT
ALACHUA COUNTY, FLORIDA

--------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A
PAGE: 13

** CRIMINAL ACTION DOCKET ----------------------------------------------
    DATE        DESCRIPTION                                    DOC PG SEQ
--------------------------------------------------------------------
    08/13/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    08/13/2002 RETURN OF SERVICE - SERVED
    08/13/2002 RETURN OF SERVICE - SERVED
    08/13/2002 RETURN OF SERVICE - SERVED
    08/13/2002 RETURN OF SERVICE - SERVED
    08/13/2002 RETURN OF SERVICE - SERVED
    08/13/2002 RETURN OF SERVICE - SERVED
    08/14/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    08/14/2002 RETURN OF SERVICE - SERVED
    08/14/2002 RETURN OF SERVICE - SERVED
    08/14/2002 RETURN OF SERVICE - SERVED
    08/14/2002 RETURN OF SERVICE - SERVED
    08/14/2002 RETURN OF SERVICE - SERVED
    08/14/2002 RETURN OF SERVICE - SERVED
    08/14/2002 RETURN OF SERVICE - SERVED
    08/14/2002 RETURN OF SERVICE - UNSERVED
    08/14/2002 NOTICE OF TAKING DEPOSITION(S)
    08/14/2002 NOTICE OF TAKING DEPOSITION(S)
    08/15/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    08/15/2002 RETURN OF SERVICE - SERVED
    08/15/2002 RETURN OF SERVICE - SERVED
    08/15/2002 AMENDED NOTICE OF TAKING DEPOSTITION(S)
    08/15/2002 NOTICE OF TAKING DEPOSITIONS
    08/16/2002 DEFENDANT'S SUPPLEMENTAL WITNESS LIST
    08/16/2002 NOTICE OF TAKING DEPOSITION(S)
    08/16/2002 NOTICE OF TAKING DEPOSITION
    08/16/2002 AMENDED NOTICE OF TAKING DEPOSITION
    08/20/2002 RETURN OF SERVICE - SERVED
    08/20/2002 RETURN OF SERVICE - SERVED
    08/22/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    08/22/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    08/22/2002 RETURN OF SERVICE - UNSERVED
    08/23/2002 WITNESS SUBPOENA
    08/23/2002 TRANSCRIPT OF DEPOSITION OF ANNE ELIZABETH DICKI
    08/23/2002 TRANSCRIPT OF DEPOSITION OF KEVIN PUTANSU
    08/23/2002 TRANSCRIPT OF DEPOSITION OF JOHN HELLRUNG, M.D.
    08/26/2002 DEFENDANT'S SUPPLEMENTAL WITNESS LIST
    08/26/2002 ORDER GRANTING DEFENDANT'S MOTION FOR COURT ORDE
    08/26/2002 ALLOWING CHILD PROTECTION TEAM TO TURN OVER COPI
    08/26/2002 RECORDS // LOTT
    08/27/2002 LETTER FROM DEFENSE ATTORNEY TO JUDGE LOTT
    08/27/2002 TRANSCRIPT OF DEPOSITION HELD ON 08162002
    08/28/2002 SUBPOENA FOR TRIAL
    08/28/2002 NOTICE OF TAKING TELEPHONIC DEPOSITION
    08/28/2002 NOTICE OF TAKING DEPOSITIONS

prgrm name
Date: 10/28/2005                                                    Page: 14
Time: 12:00:48                                                      *prgrm name*

                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                          ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                    PAGE: 14

** CRIMINAL ACTION DOCKET ------------------------------------------------------
    DATE        DESCRIPTION                                    DOC PG SEQ
--------------------------------------------------------------------------------
    08/29/2002  MOTION FOR ORDER IN LIMINE PRECLUDING REFERENCE
    08/29/2002  DEFENDANT'S LACK OF PRIOR CONVICTIONS
    08/29/2002  MOTION FOR ORDER IN LIMINE PRECLUDING ANY REFERE
    08/29/2002  TO THE POSSIBLE SENTENCE THAT MAY BE IMPOSED UPO
    08/29/2002  CONVICTION
    08/29/2002  STATE'S PRE-TRIAL MOTION FOR RULING ON THE
    08/29/2002  ADMISSIBILITY OF PHOTOGRAPHS
    08/29/2002  STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    08/29/2002  STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    08/29/2002  STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    08/30/2002  MOTION FOR PERMISSION TO CALL MEDICAL WITNESS AT
    08/30/2002  CERTAIN
    08/30/2002  MOTION FOR PERMISSION TO UTILIZE DEMONSTRATIVE A
    08/30/2002  MOTION FOR ORDER IN LIMINE PRECLUDING ANY REFERE
    08/30/2002  THE POSSIBLE SENTENCE THAT MAY BE IMPOSED UPON
    08/30/2002  CONVICTION HEARING / 090402 AT 9:00 AM
    08/30/2002  STATE'S PRE-TRIAL MOTION FOR RULING ON THE
    08/30/2002  ADMISSIBILITY OF PHOTOGRAPHS HEARING / 09042002
    08/30/2002  9:00 AM BEFORE JUDGE LOTT
    08/30/2002  MOTION FOR ORDER IN LIMINE PRECLUDING REFERENCE
    08/30/2002  DEFENDANT'S LACK OF PRIOR CONVICTIONS HEARING /
    08/30/2002  AT 9:00 AM
    08/30/2002  MOTION FOR PERMISSION TO CALL MEDICAL WITNESS AT
    08/30/2002  CERTAIN HEARING / 09042002 AT 9:00 AM
    08/30/2002  MOTION FOR PERMISSION TO UTILIZE DEMONSTRATIVE A
    08/30/2002  HEARING / 09042002 AT 9:00 AM
    08/30/2002  AMENDED NOTICE OF TAKING DEPOSITION
    08/30/2002  DEFENDANT'S SUPPLEMENTAL WITNESS LIST
    08/30/2002  SUBPOENA FOR TRIAL
    09/03/2002  MOTION TO ALLOW JURORS TO TAKE WRITTEN NOTES DUR
    09/03/2002  TRIAL
    09/03/2002  MOTION IN LIMINE TO PERMIT TESTIMONY CONCERNING
    09/03/2002  LOCATION OF INTERACTION WITH DEFENDANT HEARING /
    09/03/2002  AT 9:00 AM BEFORE JUDGE LOTT
    09/03/2002  MOTION TO ALLOW JURORS TO TAKE WRITTEN NOTES DUR
    09/03/2002  TRIAL HEARING / 090402 AT 9:00 AM BEFORE JUDGE L
    09/03/2002  MOTION IN LIMINE TO PERMIT TESTIMONY CONCERNING
    09/03/2002  LOCATION OF INTERACTION WITH DEFENDANT
    09/03/2002  STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    09/03/2002  MOTION TO SUPPRESS STATEMENTS
    09/03/2002  DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
    09/03/2002  DEFENDANT'S MOTION IN LIMINE
    09/03/2002  DEFENDANT'S MOTION TO STRIKE TESTIMONY ABOUT AND
    09/03/2002  USE OF A COMPACT DISC PURPORTING TO SHOW HOW AN
    09/03/2002  INCIDENT OF SHAKEN BABY SYNDROME OCCURS

```
prgrm name                                                                Page: 15
 Date: 10/28/2005                                                      *prgrm name*
 Time: 12:00:48
                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                          ALACHUA COUNTY, FLORIDA
------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                         PAGE: 15

** CRIMINAL ACTION DOCKET --------------------------------------------------
   DATE         DESCRIPTION                                       DOC PG SEQ
------------------------------------------------------------------------
   09/04/2002 COURT MINUTES - DEFENDANT'S MOTION TO DISMISS
   09/04/2002 INDICTMENT AND CHARGES OF FIRST DEGREE MURDER AN
   09/04/2002 MEMORANDUM OF LAW IN SUPPORT THEREOF BECAUSE OF
   09/04/2002 DESTRUCTION OF EXCULPATORY EVIDENCE ON CASE NUMB
   09/04/2002 2000-2660CFA, 2000-2753CFA - RULING:  TO BE RESC
   09/04/2002 COURT MINUTES - DEFENDANT'S MOTION TO SUPPRESS E
   09/04/2002 ON CASE NUMBERS 2000-2753CFA, 2000-2660CFA - RUL
   09/04/2002 RESERVED UNTIL 090502
   09/04/2002 COURT MINUTES - DEFENDANT'S MOTION TO SUPPRESS
   09/04/2002 STATEMENTS ON CASE NUMBERS 2000-2660CFA, 2000-27
   09/04/2002 RULING: RESERVED UNTIL 090502
   09/04/2002 REQUEST TO ADJOURN TRIAL AT OR NEAR 5:00 PM ON
   09/04/2002 WEDNESDAY SEPTEMBER 11, 2002 AND WEDNESDAY SEPTE
   09/04/2002 18, 2002
   09/04/2002 COURT MINUTES - STATE'S MOTION FOR PERMISSION TO
   09/04/2002 MEDICAL WITNESS AT TIME CERTAIN ON CASE NUMBERS
   09/04/2002 2000-2753CFA, 2000-2660CFA - RULING:  TO BE RESC
   09/04/2002 COURT MINUTES - STATE'S MOTION FOR ORDER IN LIMI
   09/04/2002 PRECLUDING REFERENCE TO DEFENDANT'S LACK OF PRIO
   09/04/2002 CONVICTIONS ON CASE NUMBERS 2000-2753CFA, 2000-2
   09/04/2002 -RULING:  TO BE RESCHEDULED
   09/04/2002 COURT MINUTES:  STATE'S MOTION FOR ORDER IN LIMI
   09/04/2002 PRECLUDING ANY REFERENCE TO THE POSSIBLE SENTENC
   09/04/2002 MAY BE IMPOSED UPON CONVICTION ON CASE NUMBERS
   09/04/2002 2000-2753CFA, 2000-2660CFA - RULING:  TO BE RESC
   09/04/2002 COURT MINUTES - STATE'S MOTION TO ALLOW JURORS T
   09/04/2002 WRITTEN NOTES DURING TRIAL ON CASE NUMBERS 2000-
   09/04/2002 AND 2000-2660CFA - RULING:  TO BE RESCHEDULED
   09/04/2002 COURT MINUTES - DEFENDANT'S MOTION IN LIMINE 1 T
   09/04/2002 ON CASE NUMBERS 2000-2753CFA, 2000-2660CFA - RUL
   09/04/2002 TO BE RESCHEDULED
   09/04/2002 COURT MINUTES - STATE'S MOTION FOR PERMISSION TO
   09/04/2002 UTILIZE DEMONSTRATIVE AID ON CASE NUMBERS 2000-2
   09/04/2002 2000-2660CFA - RULING:  TO BE RESCHEDULED
   09/04/2002 COURT MINUTES - DEFENDANT'S MOTION TO STRIKE TES
   09/04/2002 ABOUT AND USE OF A COMPACT DISC PURPORTING TO SH
   09/04/2002 AN INCIDENT OF SHAKEN BABY SYNDROME OCCURS ON CA
   09/04/2002 NUMBERS 2000-2753CFA, 2000-2660CFA - RULING:  TO
   09/04/2002 RESCHEDULED
   09/04/2002 COURT MINUTES - STATE'S PRE-TRIAL MOTION FOR RUL
   09/04/2002 THE ADMISSIBILITY OF PHOTOGRAPHS ON CASE NUMBERS
   09/04/2002 2000-2753CFA, 2000-2660CFA - RULING:  TO BE RESC
   09/04/2002 COURT MINUTES - STATE'S MOTION IN LIMINE TO PERM
   09/04/2002 TESTIMONY CONCERNING LOCATION OF INTERACTION WIT
   09/04/2002 DEFENDANT ON CASE NUMBERS 2000-2753CFA, 2000-266
```

```
prgrm name                                                          Page: 16
  Date: 10/28/2005                                              *prgrm name*
  Time: 12:00:48
                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                         ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                      PAGE: 16

** CRIMINAL ACTION DOCKET ----------------------------------------------------
     DATE        DESCRIPTION                              DOC PG SEQ
--------------------------------------------------------------------------------
  09/04/2002 RULING:  TO BE RESCHEDULED
  09/04/2002 DEFENDANT SIGNED NOTICE FOR  090902  JURY SELECT
  09/04/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
  09/04/2002 STATE'S PROPOSED JURY INSTRUCTION REGARDING
  09/04/2002 DEMONSTRATION EVIDENCE
  09/04/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
  09/04/2002 RETURN OF SERVICE - SERVED
  09/04/2002 RETURN OF SERVICE - SERVED
  09/04/2002 RETURN OF SERVICE - SERVED
  09/04/2002 EVIDENCE CONTROL FORM
  09/04/2002 SEVERAL EVIDENCE CONTROL FORMS
  09/05/2002 STIPULATION ON ADMISSION OF 911 CALL INTO EVIDEN
  09/05/2002 STIPULATION ON ADMISSION OF MEDICAL RECORDS AND
  09/05/2002 MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO SUP
  09/05/2002 STATEMENTS FILED BY DEFENDANT
  09/05/2002 DEFENDANT SIGNED NOTICE FOR  090902  JURY SELECT
  09/05/2002 COURT MINUTES - STATE'S MOTION IN LIMINE TO PERM
  09/05/2002 TESTIMONY CONCERNING LOCATION OF INTERACTION WIT
  09/05/2002 DEFENDANT ON CASE NUMBERS 012000CF2753A, 012000C
  09/05/2002 -RULING:  GRANTED
  09/05/2002 COURT MINUTES - STATE'S PRE-TRIAL MOTION FOR RUL
  09/05/2002 THE ADMISSIBILITY OF PHOTOGRAPHS:  1) AUTOPSY
  09/05/2002 2) DISSECTION OF THE SKULL 3) DEVELOPMENT OF CHI
  09/05/2002 4) PHOTOS OF RETINA ON CASE NUMBERS 012000CF2753
  09/05/2002 012000CF2660A - RULING:  1) GRANTED 2) GRANTED
  09/05/2002 3) GRANTED 4) GRANTED
  09/05/2002 COURT MINUTES - STATE'S PRE-TRIAL MOTION FOR RUL
  09/05/2002 THE ADMISSIBILITY OF PHOTOGRAPHS:  5) TAKEN BY AL
  09/05/2002 COLEMAN ON CASE NUMBERS 012000CF2753A, 012000CF2
  09/05/2002 -RULING:  5) GRANTED
  09/05/2002 COURT MINUTES - DEFENDANT'S MOTION TO STRIKE TES
  09/05/2002 ABOUT AND USE OF A COMPACT DISC PURPORTING TO SH
  09/05/2002 AN INCIDENT OF SHAKEN BABY SYNDROME OCCURS ON CA
  09/05/2002 NUMBER 012000CF2753A, 012000CF2660A - RULING:  D
  09/05/2002 COURT MINUTES - STATE'S MOTION FOR PERMISSION TO
  09/05/2002 UTILIZE DEMONSTRATIVE AID ON CASE NUMBERS 012000
  09/05/2002 AND 012000CF2660A - RULING:  GRANTED
  09/05/2002 COURT MINUTES - DEFENDANT'S MOTION IN LIMINE 1 T
  09/05/2002 ON CASE NUMBERS 012000CF2753A, 012000CF2660A - R
  09/05/2002 1) GRANTED 2) GRANTED 3) GRANTED NO RECREATION O
  09/05/2002 DEMONSTRATION 4) STIPULATED 5) WITHDRAWN 6) DENI
  09/05/2002 SUBJECT TO DEFENSE OBJECTING 7) WITHDRAWN 8) GRA
  09/05/2002 9) GRANTED SUBJECT TO REVIEW
  09/05/2002 COURT MINUTES - STATE'S MOTION TO ALLOW JURORS T
  09/05/2002 WRITTEN NOTES DURING TRIAL ON CASE NUMBERS
```

J.K. "BUDDY" IRBY, CLERK OF THE COURT
ALACHUA COUNTY, FLORIDA

--------------------------------------------------------------------------

ASE #: 01-2000-CF-002753-A                                    PAGE: 17

** CRIMINAL ACTION DOCKET ----------------------------------------------
    DATE          DESCRIPTION                            DOC PG SEQ
--------------------------------------------------------------------------
    09/05/2002 012000CF2753A, 012000CF2660A - RULING:  GRANTED
    09/05/2002 IS TO SECURE ENVELOPES EVERY NIGHT, ALL NOTES IN
    09/05/2002 DIFFERENT ENVELOPE EVERY DAY
    09/05/2002 COURT MINUTES - STATE'S MOTION FOR ORDER IN LIMI
    09/05/2002 PRECLUDING ANY REFERENCE TO THE POSSIBLE SENTENC
    09/05/2002 MAYBE IMPOSED UPON CONVICTION ON CASE NUMBERS
    09/05/2002 012000CF2753A, 012000CF2660A - STIPULATED
    09/05/2002 COURT MINUTES - STATE'S MOTION FOR ORDER IN LIMI
    09/05/2002 PRECLUDING REFERENCE TO DEFENDANT'S LACK OF PRIO
    09/05/2002 CONVICTIONS ON CASE NUMBER 012000CF2753A, 012000
    09/05/2002 -RULING: GRANTED
    09/05/2002 COURT MINUTES - DEFENDANT'S MOTION TO DISMISS
    09/05/2002 INDICTMENT ON CASE NUMBERS 012000CF2753A, 012000
    09/05/2002 -RULING: DENIED
    09/05/2002 COURT MINUTES - STATE'S MOTION FOR PERMISSION TO
    09/05/2002 MEDICAL WITNESS AT TIME CERTAIN ON CASE NUMBERS
    09/05/2002 012000CF2753A, 012000CF2660A - RULING:  DENIED
    09/05/2002 TRANSCRIPT - DEPOSITION OF WILLIAM FRANK HAMILTO
    09/05/2002 TRANSCRIPT - DEPOSITION OF ANNE ELIZABETH DICKIS
    09/05/2002 TRANSCRIPT - TELEPHONIC DEPOSITION OF BERNARD MA
    09/05/2002 TRANSCRIPT - DEPOSITION OF JAMIE LYNN SNODGRASS
    09/05/2002 TRANSCRIPT - DEPOSITION OF SERGEANT VALERIE DAWS
    09/05/2002 TRANSCRIPT - DEPOSITION OF WILLIAM FRANK HAMILTO
    09/05/2002 TRANSCRIPT - DEPOSITION OF DR RONALD QUISLING
    09/05/2002 TRANSCRIPT - DEPOSITION OF HARVEY G ROHLING JR,
    09/05/2002 TRANSCRIPT - DEPOSITION OF SURENDER RAJASEKARAN,
    09/05/2002 TRANSCRIPT - DEPOSITION OF OFFICER ORLANDO ALVAR
    09/05/2002 TRANSCRIPT - DEPOSITION OF DR FRANK AGEE
    09/05/2002 TRANSCRIPT - DEPOSITION OF OFFICER LARRY VINCENT
    09/05/2002 TRANSCRIPT - DEPOSITION OF DETECTIVE DUANE DIEHL
    09/05/2002 TRANSCRIPT - DEPOSITION OF HELEN LEGALL
    09/05/2002 TRANSCRIPT - DEPOSITION OF RICHARD KREINEST, M.D
    09/05/2002 TRANSCRIPT - DEPOSITION OF FIREFIGHTER KENNETH A
    09/05/2002 JOHNSON
    09/05/2002 TRANSCRIPT - DEPOSITION OF FIREFIGHTER WILLIAM B
    09/05/2002 BLAIR
    09/05/2002 TRANSCRIPT - DEPOSITION OF FIREFIGHTER DENNIS ME
    09/05/2002 TRANSCRIPT - DEPOSITION OF OFFICER DARYL WAYNE B
    09/05/2002 TRANSCRIPT - DEPOSITION OF ELIZABETH TALAGA
    09/05/2002 TRANSCRIPT - DEPOSITION OF LAWRENCE LEVINE, M.D.
    09/05/2002 TRANSCRIPT - DEPOSITION OF HOWARD LEE ROGERS, M.
    09/06/2002 MOTION FOR RECONSIDERATION OF ADMISSIBILITY OF
    09/06/2002 TESTIMONY OF DEPUTY CATHY LONG
    09/06/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
    09/06/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT

prgrm name
Date: 10/28/2005                                                    Page: 18
Time: 12:00:49                                                   *prgrm name*

J.K. "BUDDY" IRBY, CLERK OF THE COURT
ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                    PAGE: 18

** CRIMINAL ACTION DOCKET ------------------------------------------------------
   DATE        DESCRIPTION                                   DOC PG SEQ
-------------------------------------------------------------------------------
   09/06/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
   09/06/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   09/06/2002  ANDERSON REPORTING SERVICES, INC.  IN THE AMOUN
   09/06/2002 $ 87.45 /// PAID
   09/06/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   09/06/2002  GAINESVILLE REPORTERS  IN THE AMOUNT OF $ 335.5
   09/06/2002 // PAID
   09/06/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   09/06/2002  ESQUIRE DEPOSITION SERVICES  IN THE AMOUNT OF $
   09/06/2002 // PAID
   09/06/2002 DEFENDANT'S SUPPLEMENTAL WITNESS LIST
   09/06/2002 WITNESS SUBPOENA
   09/09/2002 SUBPOENA FOR TRIAL
   09/09/2002 DEFENDANT'S MOTION FOR REHEARING AND A DEMAND FO
   09/09/2002 RICHARDSON INQUIRY ON THE ISSUE OF THE ADMISSIBI
   09/09/2002 A COMPACT DISC PURPORTING TO SHOW A DEMONSTRATIO
   09/09/2002 SBS (SHAKEN BABY SYNDROME)
   09/09/2002 DEFENDANT'S RESPONSE IN OPPOSITION TO STATE'S MO
   09/09/2002 FOR RECONSIDERATION OF ADMISSIBILITY OF TESTIMON
   09/09/2002 DEPUTY KATHY LONG
   09/09/2002 WITNESS SUBPOENA
   09/09/2002 MOTION TO TAKE CONTINUING DEPOSITION OF RONALD
   09/09/2002 QUISLING, M.D.
   09/09/2002 ORDER DENYING MOTION FOR RECONSIDERATION OF
   09/09/2002 ADMISSIBILITY OF TESTIMONY OF DEPUTY CATHY LONG
   09/09/2002 DECORUM ORDER AS TO MEDIA - MEDIA PERSONNEL SHAL
   09/09/2002 REMAIN IN THE GALLERY SEATING DURING THE JURY SE
   09/09/2002 AND TRIAL
   09/09/2002 -TV20 AND THE GAINESVILLE SUN IS/ARE THE ONLY ME
   09/09/2002 HAS/HAVE REQUESTED AND HAS/HAVE BEEN AUTHORIZED
   09/09/2002 BRING A STILL CAMERA AND/OR VIDEO CAMERA INTO TH
   09/09/2002 COURTROOM FOR JURY SELECTION AND TRIAL.  NO
   09/09/2002 UNAUTHORIZED MEDIA WILL BE ALLOWED TO BRING A CA
   09/09/2002 INTO THE COURTROOM
   09/09/2002 -ONLY ONE STILL CAMERA/OR ONE VIDEO CAMERA WILL
   09/09/2002 ALLOWED IN THE COURTROOM.  NO FLASHES WILL BE AL
   09/09/2002 THE STILL PHOTOGRAPHER AND/OR VIDEOGRAPHER MUST
   09/09/2002 IN THE GALLERY.  NO PHOTOGRAPHS OR VIDEO OF THE
   09/09/2002 WILL BE ALLOWED.  NO DISRUPTED MOVEMENT WILL BE
   09/09/2002 ALLOWED
   09/09/2002 -NO INTERVIEWS WILL BE CONDUCTED INSIDE THE COUR
   09/09/2002 //LOTT
   09/09/2002 DEFENDANT'S SUPPLEMENTAL WITNESS LIST
   09/09/2002 DEFENDANT SIGNED NOTICE FOR  090902  JURY SELECT
   09/09/2002 DAY CERTAIN TRIAL    SET FOR 09092002           00000

prgrm name*
Date: 10/28/2005
Time: 12:00:49

Case 1:09-cv-00052-MP-GRJ   Document 21-43   Filed 03/22/11   Page 22 of 106

Page: 19
*prgrm name*

J.K. "BUDDY" IRBY, CLERK OF THE COURT
ALACHUA COUNTY, FLORIDA
------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                    PAGE: 19

** CRIMINAL ACTION DOCKET ------------------------------------------------
   DATE        DESCRIPTION                                  DOC PG SEQ
------------------------------------------------------------------------
   09/09/2002 DEFENDANT'S SUPPLEMENTAL WITNESS LIST
   09/09/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
   09/09/2002 MINUTES OF THE CLERK - JURY TRIAL
   09/10/2002 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT
   09/10/2002 TRANSCRIPT OF DEPOSITION AS TO CRYSTAL QUIRELLO
   09/10/2002 TRANSCRIPT OF DEPOSITION OF SERGEANT STEVEN WEAV
   09/10/2002 TRANSCRIPT OF DEPOSITION OF CORPORAL WHITNEY STO
   09/10/2002 TRANSCRIPT OF DEPOSITION OF KATHLEEN MARIE MORRI
   09/10/2002 TRANSCRIPT OF DEPOSITION OF CHRISTINA MILLARD
   09/10/2002 TRANSCRIPT OF DEPOSITION OF HELEN LEGALL
   09/10/2002 TRANSCRIPT OF DEPOSITION OF OFFICER JAMES CHRIST
   09/10/2002 JACKSON
   09/10/2002 TRANSCRIPT OF OFFICER ROBERT L KING, III
   09/10/2002 TRANSCRIPT OF LIEUTENANT WILLIAM THOMAS HALVOSA
   09/10/2002 TRANSCRIPT OF DEPOSITION OF RICHARD DAVIS,SR
   09/10/2002 TRANSCRIPT OF DEPOSITION OF DETECTIVE ALAN COLEM
   09/10/2002 TRANSCRIPT OF DEPOSITION OF DETECTIVE DAVID KEIT
   09/10/2002 CANNON
   09/10/2002 TRANSCRIPT OF DEPOSITION OF STEPHEN NELSON, MD
   09/10/2002 TRANSCRIPT OF DEPOSITION OF SERGEANT ROBERT BART
   09/10/2002 TRANSCRIPT OF DEPOSITION OF DORIS MARIE BRIDWELL
   09/10/2002 ORDER GRANTING MOTION FOR RELEASE OF EVIDENCE /
   09/10/2002 THE FOLLOWING ARTICLES SHALL BE RELEASED FROM EV
   09/10/2002 BY THE CLERK OF THE COURT TO JEANNE M SINGER SAI
   09/10/2002 EVIDENCE BEING PARTICULARLY DESCRIBED AS FOLLOWS
   09/10/2002 PAGES OF LEGAL CORRESPONDENCE WHICH WERE PART OF
   09/10/2002 STATE'S EXHIBIT #5 IN EVIDENCE UPON JOINT STIPUL
   09/10/2002 OF STATE AND DEFENSE // LOTT
   09/11/2002 RETURN OF SERVICE - UNSERVED
   09/13/2002 TRANSCRIPT OF DEPOSITION OF SALVADOR CUMELLA
   09/13/2002 TRANSCRIPT OF DEPOSITION OF DETECTIVE HELEN LEGA
   09/13/2002 TRANSCRIPT OF DEPOSITION OF DAVID SAMUEL ANDREW
   09/13/2002 STEWART, MD
   09/13/2002 TRANSCRIPT OF DEPOSITION OF MICHAEL BELL, MD
   09/13/2002 TRANSCRIPT OF DEPOSITION OF JONATHAN L WILLIAMS,
   09/13/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   09/13/2002  ESQUIRE DEPOSITION SERVICES  IN THE AMOUNT OF $
   09/13/2002 // PAID
   09/13/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   09/13/2002  HARMON'S PHOTOS AR NICE  IN THE AMOUNT OF $ 23.
   09/13/2002 // PAID
   09/16/2002 LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS
   09/16/2002 FEE TRAVEL AND PER DIEM ALLOWANCE
   09/16/2002 LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS
   09/16/2002 FEE TRAVEL AND PER DIEM ALLOWANCE

prgrm name
Date: 10/28/2005                                                    Page: 20
Time: 12:00:49                                                      *prgrm name*

                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                         ALACHUA COUNTY, FLORIDA
----------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                         PAGE: 20

** CRIMINAL ACTION DOCKET ---------------------------------------------------
    DATE        DESCRIPTION                                     DOC PG SEQ
----------------------------------------------------------------------------
    09/16/2002 LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS
    09/16/2002 FEE TRAVEL AND PER DIEM ALLOWANCE
    09/17/2002 LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS
    09/17/2002 FEE TRAVEL AND PER DIEM ALLOWANCE
    09/19/2002 LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS
    09/19/2002 FEE TRAVEL AND PER DIEM ALLOWANCE
    09/19/2002 LETTER TO JUDGE LOTT FROM JUROR #96
    09/19/2002 LETTER FROM STEPHAN P MICKLE UNITED STATES DISTR
    09/19/2002 JUDGE (FAX)
    09/19/2002 LETTER TO JUDGE FROM JUROR #73
    09/19/2002 LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS
    09/19/2002 FEE TRAVEL AND PER DIEM ALLOWANCE
    09/20/2002 STATE'S PROPOSED JURY INSTRUCTION REGARDING
    09/20/2002 DEMONSTRATION EVIDENCE
    09/20/2002 LETTER TO JUDGE FROM JURY
    09/20/2002 LETTER TO JUDGE FROM JUROR #73
    09/20/2002 INSTRUCTION TO JURY REGARDING WITNESS TESTIFYING
    09/20/2002 OF ORDER
    09/20/2002 MOTION FOR REHEARING ON THE ISSUE OF WHETHER THE
    09/20/2002 DEFENSE OR THE STATE OF FLORIDA OPENED THE DOOR
    09/20/2002 TO CAUSE THE ADMISSIBILITY OF CERTAIN EVIDENCE
    09/24/2002 LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS
    09/24/2002 FEE TRAVEL AND PER DIEM ALLOWANCE
    09/24/2002 LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS
    09/24/2002 FEE TRAVEL AND PER DIEM ALLOWANCE
    09/24/2002 LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS
    09/24/2002 FEE TRAVEL AND PER DIEM ALLOWANCE
    09/24/2002 LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS
    09/24/2002 FEE TRAVEL AND PER DIEM ALLOWANCE
    09/24/2002 QUESTIONS FROM JURY
    09/24/2002 QUESTIONS FROM JURY
    09/24/2002 NOTES FROM TRIAL
    09/25/2002 MOTION TO REOPEN DEFENDANT'S CASE AND ALLOW PREV
    09/25/2002 LISTED STATE WITNESSES TO TESTIFY
    09/25/2002 LETTER FROM JURORS
    09/25/2002 DEFENDANT'S MOTION FOR SANCTIONS AGAINST STATE F
    09/25/2002 WITHHOLDING CRITICAL TESTIMONY, DEMAND FOR RICHA
    09/25/2002 HEARING, AND MOTION FOR MISTRIAL
    09/25/2002 MOTION FOR RE-HEARING ON ISSUE OF ADMISSIBILITY
    09/25/2002 COMPACT DISC PRESENTATION
    09/25/2002 JURY INSTRUCTIONS
    09/25/2002 VERDICT -- GUILTY OF MANSLAUGHTER, A LESSER INCL
    09/25/2002 OFFENSE
    09/25/2002 DEFENDANT SIGNED NOTICE FOR  102902  SENTENCING
    09/25/2002 DISPOSITION          SET FOR 10292002          00000

```
prgrm name*                                                          Page: 21
 Date: 10/28/2005                                                *prgrm name*
 Time: 12:00:49
                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                          ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                       PAGE: 21

** CRIMINAL ACTION DOCKET ------------------------------------------------------
   DATE         DESCRIPTION                                     DOC PG SEQ
--------------------------------------------------------------------------------
   09/25/2002 *PLACED ON DIV I DISPOSITION DOCKET PER JUDGE*
   09/25/2002 PSI ORDERED - PSI DUE 101802
   09/26/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   09/26/2002  HARMON'S PHOTOS AR NICE  IN THE AMOUNT OF $ 85.
   09/26/2002 // PAID
   09/26/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   09/26/2002  EXPERT DIGITAL SOLUTIONS, INC.  IN THE AMOUNT O
   09/26/2002 $275.00 // PAID
   09/26/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   09/26/2002  HARMON'S PHOTOS AR NICE  IN THE AMOUNT OF $ 8.5
   09/26/2002 // PAID
   09/27/2002 ORDER GRANTING MOTION FOR PAYMENT OF STATE TRAVE
   09/27/2002 / PAID // PIERCE
   09/27/2002 ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT
   09/27/2002 CONCERNING PAYMENT OF STATE WITNESS
   09/27/2002 MOTION FOR PAYMENT FOR TRAVEL OF STATE WITNESS
   09/27/2002 ORDER GRANTING MOTION FOR PAYMENT OF STATE TRAVE
   09/27/2002 / PAID // PIERCE
   09/27/2002 ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT
   09/27/2002 CONCERNING PAYMENT OF STATE WITNESS
   09/27/2002 MOTION FOR PAYMENT FOR TRAVEL OF STATE WITNESS
   09/27/2002 MOTION FOR PAYMENT OF LODGING FOR A STATE WITNES
   09/27/2002 ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT
   09/27/2002 CONCERNING PAYMENT OF COSTS
   09/27/2002 ORDER GRANTING MOTION FOR PAYMENT OF LODGING FOR
   09/27/2002 WITNESS / PAID // PIERCE
   09/27/2002 MOTION FOR PAYMENT OF STATE WITNESS
   09/27/2002 ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT
   09/27/2002 CONCERNING PAYMENT OF STATE WITNESS
   09/27/2002 ORDER GRANTING MOTION FOR PAYMENT OF STATE TRAVE
   09/27/2002 /PAID // PIERCE
   09/30/2002 RETURN OF SERVICE - SERVED
   09/30/2002 RETURN OF SERVICE - SERVED
   09/30/2002 RETURN OF SERVICE - SERVED
   09/30/2002 RETURN OF SERVICE - UNSERVED
   09/30/2002 RETURN OF SERVICE - SERVED
   09/30/2002 RETURN OF SERVICE - SERVED
   09/30/2002 RETURN OF SERVICE - UNSERVED
   09/30/2002 RETURN OF SERVICE - SERVED
   09/30/2002 RETURN OF SERVICE - SERVED
   09/30/2002 RETURN OF SERVICE - SERVED
   10/03/2002 MOTION FOR NEW TRIAL
   10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
   10/07/2002 $105.00//PAID
```

prgrm name*  Case 1:09-cv-00052-MP-GRJ   Document 21-43   Filed 03/22/11   Page 25 of 106
 Date: 10/28/2005                                                    Page: 22
 Time: 12:00:49                                                   *prgrm name*

                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                         ALACHUA COUNTY, FLORIDA
-------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                    PAGE: 22

** CRIMINAL ACTION DOCKET -------------------------------------------------
     DATE        DESCRIPTION                               DOC PG SEQ
-------------------------------------------------------------------------
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $54.25//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $21.00//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $77.00//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $105.00//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $175.00//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $105.00//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $56.00//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $226.18//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $177.00//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $245.00//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES__ IN THE AMOUNT
    10/07/2002 $101.50//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $119.00//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $178.00//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $245.70//PAID
    10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
    10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
    10/07/2002 $50.40//PAID

```
prgrm name                                                              Page: 23
  Date: 10/28/2005                                                    *prgrm name*
  Time: 12:00:49
                   J.K. "BUDDY" IRBY, CLERK OF THE COURT
                        ALACHUA COUNTY, FLORIDA
---------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                      PAGE: 23

** CRIMINAL ACTION DOCKET -------------------------------------------------------
   DATE        DESCRIPTION                                      DOC PG SEQ
---------------------------------------------------------------------------------
   10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
   10/07/2002 $108.50//PAID
   10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
   10/07/2002 $84.00//PAID
   10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
   10/07/2002 $134.75//PAID
   10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
   10/07/2002 $197.75//PAID
   10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
   10/07/2002 $76.27//PAID
   10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/07/2002  LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT
   10/07/2002 $105.00//PAID
   10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/07/2002  LIGHT-WORK LABS  IN THE AMOUNT OF $ 20.00//PAID
   10/07/2002 ORDER FOR PAYMENT OF EXPERT WITNESS FEE TO BERNA
   10/07/2002 MARIA, M.D.M.B.A. IN THE AMOUNT OF $5500.00 // L
   10/07/2002 MOTION FOR PAYMENT OF EXPERT WITNESS FEE
   10/07/2002 ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT CONCERNIN
   10/07/2002 PAYMENT OF EXPERT WITNESS
   10/07/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/07/2002  WRIGHT TRAVEL  IN THE AMOUNT OF $ 572.50//PAID
   10/08/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/08/2002  ESQUIRE DEPOSITION SERVICES  IN THE AMOUNT OF $
   10/08/2002 // PAID
   10/08/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/08/2002  HARMON'S PHOTOS AR NICE  IN THE AMOUNT OF $ 126
   10/08/2002 // PAID
   10/08/2002 MOTION FOR PAYMENT OF EXPERT WITNESS FEE
   10/08/2002 ALACHUA CO. ATTORNEY'S ANNOUNCEMENT CONCERNING P
   10/08/2002 OF EXPERT WITNESS
   10/08/2002 ORDER FOR PAYMENT OF EXPERT WITNESS FEE / $3300.
   10/08/2002 GAINESVILLE PATHOLOGY GROUP // LOTT //////// PAI
   10/15/2002 REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND
   10/15/2002  BERNARD L. MARIA, MD., M.B.A.  IN THE AMOUNT OF
   10/15/2002 $7955.49/PAID /
   10/15/2002 MOTION FOR PAYMENT OF EXPERT WITNESS FEE
   10/15/2002 ALACHUA COUNTY ATTORNEY'S ANNOUCEMENT CONCERNING
   10/15/2002 PAYMENT OF EXPERT WITNESS
   10/15/2002 ORDER FOR PAYMENT OF EXPERT WITNESS FEE IN THE A
```

```
prgrm name*                                                          Page: 24
  Date: 10/28/2005                                                 *prgrm name*
  Time: 12:00:49
               J.K. "BUDDY" IRBY, CLERK OF THE COURT
                     ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                          PAGE: 24

** CRIMINAL ACTION DOCKET ------------------------------------------------------
    DATE        DESCRIPTION                                  DOC PG SEQ
--------------------------------------------------------------------------------
    10/15/2002 OF $8,000.0 TO STEPHEN J. NELSON, MD., PA,//PIER
    10/15/2002 MOTION FOR PAYMENT OF STATE WITNESS
    10/15/2002 ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT
    10/15/2002 CONCERNING PAYMENT OF STATE WITNESS
    10/15/2002 ORDER GRANTING MOTION FOR PAYMENT OF STATE TRAVE
    10/15/2002 / PAID // LOTT
    10/15/2002 MOTION FOR PAYMENT OF STATE WITNESS
    10/15/2002 ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT
    10/15/2002 CONCERNING PAYMENT OF STATE WITNESS
    10/15/2002 ORDER GRANTING MOTION FOR PAYMENT OF STATE TRAVE
    10/15/2002 / PAID // LOTT
    10/17/2002 LETTER TO JUDGE LOTT FROM PROBATION AND PAROLE
    10/17/2002 ORDER SETTING DISPOSITION DATE / FRIDAY, 8 NOVEM
    10/17/2002 2002 AT 9:00 AM // LOTT
    10/29/2002 ORDER DENYING MOTION FOR NEW TRIAL // LOTT
    10/30/2002 MOTION FOR JUDGEMENT FOR COSTS
    10/30/2002 NOTICE OF HEARING ON  110802  AT / 9:00AM  / LOT
    10/31/2002 WITNESS SUBPOENA PAID
    11/01/2002 ADDENDUM TO MOTION FOR JUDGMENT FOR COSTS
    11/07/2002 SECOND ADDENDUM TO MOTION FOR JUDGEMENT FOR COST
    11/08/2002 MOTION FOR ADVANCE PAYMENT OF STATE WITNESS / PA
    11/08/2002 ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT
    11/08/2002 CONCERNING PAYMENT OF STATE WITNESS
    11/08/2002 ORDER GRANTING MOTION FOR PAYMENT OF STATE WITNE
    11/08/2002 //PAID
    11/08/2002 PICTURE OF VICTIM
    11/08/2002 TRANSCRIPT OF MOTION TO DISMISS INDICTMENT ON 09
    11/08/2002 BEFORE JUDGE LOTT
    11/08/2002 PSI (ENVELOPE)
    11/08/2002 DECORUM ORDER AS TO MEDIA;
    11/08/2002 -MEDIA PERSONNEL SHALL REMAIN IN THE GALLERY SEA
    11/08/2002 DURING THE JURY SELECTION, TRIAL OR HEARING
    11/08/2002 -GAINESVILLE SUN IS THE ONLY MEDIA WHO HAS REQUE
    11/08/2002 AND HAS BEEN AUTHORIZED TO BRING A STILL CAMERA
    11/08/2002 THE COURTROOM FOR JURY SELECTION, TRIAL OR HEARI
    11/08/2002 -ONLY ONE STILL CAMERA WILL BE ALLOWED IN COURTR
    11/08/2002 -NO INTERVIEWS RELATED TO THIS TRIAL/HEARING WIL
    11/08/2002 CONDUCTED INSIDE THE COURTHOUSE // LOTT
    11/08/2002 AMENDED DECORUM ORDER AS TO MEDIA // LOTT
    11/08/2002 PRESENT WITH ATTORNEY                      00000
    11/08/2002 TRIAL TYPE/JURY AS TO CNT:                 00000  001
    11/08/2002 DEF PLED NOT GLTY AS TO CNT:               00000  001
    11/08/2002 DEFENDANT FOUND GUILTY BY JURY AS TO CNT:  00000  001
    11/08/2002 ADJUDICATED GUILTY          AS TO CNT:     00000  001
    11/08/2002 DEFENDANT SENTENCED AS TO CNT:             00000  001
```

prgrm name*
Date: 10/28/2005
Time: 12:00:49

Case 1:09-cv-00052-MP-GRJ   Document 21-43   Filed 08/23/11   Page 28 of 106

Page: 25
*prgrm name*

J.K. "BUDDY" IRBY, CLERK OF THE COURT
ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                              PAGE: 25

** CRIMINAL ACTION DOCKET ---------------------------------------------------
     DATE          DESCRIPTION                                    DOC PG SEQ
--------------------------------------------------------------------------------
| DATE | DESCRIPTION | DOC | PG | SEQ |
|------|-------------|-----|----|----|
| 11/08/2002 | DEFENDANT ASSESSED    314.00 AS TO CNT: | 00000 | 001 | |
| 11/08/2002 | DEF SENTENCED TO PRISON    15 y  m  d AS TO CNT: | 00000 | 001 | |
| 11/08/2002 | DEF GIVEN CREDIT FOR TIME SRVD  0347 days ON CNT | 00000 | 001 | |
| 11/08/2002 | ORDER ESTABLISHING MONETARY SUMS - TOTAL SUMS OR | | | |
| 11/08/2002 | SHALL BE PAID THROUGH THE CLERK OF COURT IN FULL | | | |
| 11/08/2002 | //LOTT | | | |
| 11/08/2002 | VICTIM NOTIFICATION DATA SHEET | | | |
| 11/08/2002 | RESTITUTION LIEN ORDER - EVIDENTIARY HEARING TO | | | |
| 11/08/2002 | DEFENDANT DOES NOT WAIVE HIS PRESENCE | | | |
| 11/08/2002 | COURT RESERVES AND RETAINS JURISDICTION AS TO | | | |
| 11/08/2002 | RESTITUTION // LOTT | | | |
| 11/08/2002 | SCORE SHEET//TOTAL  181.2 | | | |
| 11/08/2002 | AMENDED JUDGEMENT AS TO CRIME // LOTT | | | |
| | OR BOOK: 2552  OR PAGE: 1194 | | | |
| 11/08/2002 | ORDER REQUIRING TRANSCRIPTION OF TRIAL TESTIMONY | | | |
| 11/14/2002 | DOC COMMITMENT PACKET SENT TO ASO  11-13-2002//B | | | |
| 11/14/2002 | ADJUDICATORY JUDGMENT OF  110802 | | | |
| | OR BOOK: 2552  OR PAGE: 1195 | | | |
| 11/15/2002 | REOPENED CASE CLOSED 11082002 | 00000 | | |
| 11/15/2002 | NOTICE OF HEARING ON  112202  AT / 9:00 AM  / LO | | | |
| 11/15/2002 | MOTION FOR SUPERSEDEAS BOND | | | |
| 11/20/2002 | NOTICE OF FILING | | | |
| 11/22/2002 | APPEAL FILED 11222002 | 00000 | | |
| 11/22/2002 | COURT MINUTES - MOTION FOR SUPERSEDEAS BOND ON C | | | |
| 11/22/2002 | NUMBER 01-2000CF2753A, 01-2000CF2660A - RULING: | | | |
| 11/22/2002 | P.D APPOINTED FOR APPEAL | | | |
| 11/22/2002 | APPLICATION FOR APPOINTMENT OF PUBLIC DEFENDER A | | | |
| 11/22/2002 | AFFIDAVIT OF INDIGENCY & PUBLIC DEFENDER APPOINT | | | |
| 11/22/2002 | //LOTT | | | |
| 11/22/2002 | NOTICE OF APPEAL REGARDING JUDGMENT/SENTENCE | | | |
| 11/22/2002 | DIRECTIONS TO THE CLERK | | | |
| 11/22/2002 | DESIGNATION TO REPORTER AND REPORTER'S ACKNOWLED | | | |
| 11/22/2002 | ***PUBLIC DEFENDER PUT ON AS SPECIAL PERSON*** | | | |
| 11/22/2002 | STATEMENT OF JUDICIAL ACTS TO BE REVIEWED | | | |
| 11/22/2002 | DESIGNATION OF PUBLIC DEFENDER, SECOND JUDICIAL | | | |
| 11/22/2002 | FOR THE HANDLING OF APPEAL/FILED BY GORDON GROLA | | | |
| 11/22/2002 | MAILED CERTIFIED COPY OF NOTICE OF APPEAL AND CO | | | |
| 11/22/2002 | JUDGMENT/SENTENCE TO FIRST DISTRICT COURT OF APP | | | |
| 11/22/2002 | ONLY TO ATTORNEY GENERAL, ATTORNEY GROLAND, & NA | | | |
| 11/22/2002 | PUBLIC DEFENDER SECOND JUDICIAL CIRCUIT | | | |
| 11/22/2002 | COPY OF SEALED APPLICATION & AFFIDAVIT FOR SEARC | | | |
| 11/22/2002 | SEARCH WARRANT/RETURN PLACED IN FILE FROM COMPAN | | | |
| 11/22/2002 | 2000-2660-CFA | | | |
| 12/02/2002 | LETTER FROM JON S. WHEELER ASSIGNS FIRST DISTRIC | | | |
| 12/02/2002 | APPEAL #1D02-4788 | | | |
| 12/02/2002 | FIRST DISTRICT COURT OF APPEAL ORDER REQUIRES FI | | | |
| 12/02/2002 | ORDER OF INSOLVENCY WITHIN 30 DAYS | | | |

```
prgrm name*
  Date: 10/28/2005                                                  Page: 26
  Time: 12:00:50                                                    *prgrm name*
              J.K. "BUDDY" IRBY, CLERK OF THE COURT
                       ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                    PAGE: 26

** CRIMINAL ACTION DOCKET ------------------------------------------------
   DATE          DESCRIPTION                                 DOC PG SEQ
--------------------------------------------------------------------------
    12/02/2002 FIRST DISTRICT COURT OF APPEAL DIRECTS APPELLANT
    12/02/2002 AMENDED NOTICE OF APPEAL WITH DATE OF RENDITION
    12/02/2002 BE REVIEWED WITHIN 10 DAYS
    12/04/2002 NOTICE OF HEARING ON  122002  AT / 9:00 AM  / LO
    12/04/2002 ORDER FINDING DEFENDANT INDIGENT AND APPOINTING
    12/04/2002 DEFENDER OF THE EIGHTH JUDICIAL  CIRCUIT FOR HAN
    12/04/2002 OF APPEAL // LOTT
    12/18/2002 AMENDED NOTICE OF RESTITUTION/COSTS HEARING - JA
    12/18/2002 8, 2003 AT 9:00AM
    12/19/2002 THIRD ADDENDUM TO MOTION FOR JUDGEMENT FOR COSTS
    12/26/2002 FIRST DISTRICT COURT OF APPEAL ORDERS APPELLANT
    12/26/2002 CAUSE WITHIN 10 DAYS WHY APPEAL SHOULD NOT BE DI
    12/26/2002 FAILING TO COMPLY WITH COURT'S 11-27-02 ORDER RE
    12/26/2002 AMENDED NOTICE OF APPEAL WHICH STATE'S DATE OF R
    12/26/2002 ORDER TO BE REVIEWED
    12/30/2002 AMENDED NOTICE OF APPEAL/FILED BY JOHN KEARNS, A
    12/30/2002 PUBLIC DEFENDER
    01/06/2003 NOTICE OF FILING RECORD OF EXPENSES DUE AS RESTI
    01/07/2003 NOTICE TO ADVERSE PARTY OF REQUEST TO TAKE JUDIC
    01/07/2003 NOTICE
    01/08/2003 COURT MINUTES - MOTION FOR JUDGEMENT OF COSTS AN
    01/08/2003 RESTITUTION HEARING ON CASE NUMBER 01-2000CF2753
    01/08/2003 RULING:  GRANTED COSTS IN THE TOTAL AMOUNT OF
    01/08/2003 $56,459.74 / COSTS ARE REDUCED TO CIVIL JUDGEMEN
    01/08/2003 RESTITUTION ORDERED IN THE TOTAL AMOUNT $17,515.
    01/08/2003 RESTITUTION IS REDUCED TO CIVIL JUDGEMENT
    01/08/2003 SUMMARY OF RESTITUTION
    01/08/2003 SUMMARY OF COSTS
    01/08/2003 DEF MUST PAY RESTITUTION OF  17515.46 AS TO CNT:  00000  001
    01/08/2003 CIVIL RESTITUTION LIEN ORDER IN THE AMOUNT OF $
               OR BOOK: 2584  OR PAGE: 1153
    01/08/2003 PAYABLE TO  JOHN QUIRELLO  // LOTT
    01/08/2003 CIVIL RESTITUTION LIEN ORDER IN THE AMOUNT OF $
               OR BOOK: 2584  OR PAGE: 1154
    01/08/2003 PAYABLE TO  ALACHUA CO FIRE AND RESCUE  // LOTT
    01/08/2003 CIVIL RESTITUTION LIEN ORDER IN THE AMOUNT OF $
               OR BOOK: 2584  OR PAGE: 1155
    01/08/2003 PAYABLE TO  UNIVERSITY PHYSICIANS  // LOTT
    01/08/2003 CIVIL RESTITUTION LIEN ORDER IN THE AMOUNT OF $
               OR BOOK: 2584  OR PAGE: 1156
    01/08/2003 PAYABLE TO  SHANDS HOSPITAL AND CLINIC  // LOTT
    01/08/2003 ORDER AWARDING COSTS OF INVESTIGATION AND PROSEC
    01/08/2003 TO GAINESVILLE POLICE DEPARTMENT IN THE AMOUNT O
    01/08/2003 $7224.60 // LOTT
    01/08/2003 ORDER AWARDING COSTS OF INVESTIGATION AND PROSEC
    01/08/2003 TO ALACHUA COUNTY COURTHOUSE IN THE AMOUNT OF
    01/08/2003 $46,355.82//LOTT
    01/08/2003 ORDER AWARDING COSTS OF INVESTIGATION AND PROSEC
    01/08/2003 TO EIGHTH DISTRICT MEDICAL EXAMINER IN THE AMOUN
```

Case 1:09-cv-00052-MP-GRJ   Document 21-43   Filed 03/22/11   Page 30 of 106

                        J.K. "BUDDY" IRBY, CLERK OF THE COURT
                              ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                          PAGE: 27

** CRIMINAL ACTION DOCKET -----------------------------------------------------
    DATE        DESCRIPTION                                    DOC PG SEQ
--------------------------------------------------------------------------------
    01/08/2003  $895.00//LOTT
    01/08/2003  ORDER AWARDING COSTS OF INVESTIGATION AND PROSEC
    01/08/2003  TO FLORIDA DEPT OF LAW ENFORCEMENT IN THE AMOUNT
    01/08/2003  $1984.32//LOTT
    01/08/2003  ORDER DENYING MOTION FOR SUPERSEDEAS BOND // LOT
    01/10/2003  MAILED VOLUME I - II RECORD ON APPEAL AND TWO EN
    01/10/2003  COPIES OF EVIDENCE TO FIRST DISTRICT COURT OF AP
    01/10/2003  RECORD ONLY TO ATTORNEY GENERAL & PUBLIC DEFENDE
    01/13/2003  FAXED RESPONSE TO REQUEST FOR UPDATE FROM DEPART
    01/13/2003  CHILDREN AND FAMILIES, ATTENTION: JOANN STARK
    01/29/2003  ORDER ON DESIGNATION TO REPORTER//LOTT
    02/03/2003  ORDER ON DESIGNATION TO REPORTER//LOTT
    02/03/2003  MOTION FOR PAYMENT OF STATE WITNESS
    02/03/2003  ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT CONCERNIN
    02/03/2003  PAYMENT OF EXPERT WITNESS
    02/03/2003  ORDER FOR PAYMENT OF EXPERT WITNESS FEE IN THE
    02/03/2003  AMOUNT OF $61.00 TO SHERATON GAINESVILLE HOTEL//
    02/03/2003  //PAID//
    02/03/2003  MOTION FOR PAYMENT OF EXPERT WITNESS FEE
    02/03/2003  ALACHUA COUNTY ATTORNEY'S ANNOUCEMENT CONCERNING
    02/03/2003  PAYMENT OF EXPERT WITNESS
    02/03/2003  ORDER FOR PAYMENT OF EXPERT WITNESS FEE IN THE
    02/03/2003  AMOUNT OF $2250.00 TO RONALD H. USCINSKI, MD//LO
    02/03/2003  MOTION FOR PAYMENT OF EXPERT WITNESS FEE
    02/03/2003  ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT CONCERNIN
    02/03/2003  PAYMENT OF EXPERT WITNESS
    02/03/2003  ORDER FOR PAYMENT OF EXPERT WITNESS FEE IN THE A
    02/03/2003  OF $479.50 TO WRIGHT TRAVEL // LOTT // PAID
    03/03/2003  FIRST DISTRICT COURT OF APPEAL ORDER GRANTS COUR
    03/03/2003  MOTION FOR EXTENSION TO FILE TRANSCRIPTS BY 5-1-
    04/21/2003  TRANSCRIPT OF MOTION FOR SUPERSEDEAS BOND BEFORE
    04/21/2003  COURT REPORTER LAURIE ANN CHAFFIN, ORIGINAL & 2
    05/01/2003  TRANSCRIPTS VOLUME I - XVII JURY TRIAL HELD BEFO
    05/01/2003  LOTT ON 9-10-02 - 9-23-02, COURT REPORTERS STACE
    05/01/2003  CHERYL MCDONOUGH, ORIGINAL AND 2 COPIES
    05/01/2003  TRANSCRIPT OF PRETRIAL MOTION HELD 9-4-02 BEFORE
    05/01/2003  COURT REPORTER STACEY BRYANT, ORIGINAL AND 2 COP
    05/01/2003  TRANSCRIPT OF PRETRIAL MOTION HELD 9-5-02 BEFORE
    05/01/2003  COURT REPORTER STACEY BRYANT, ORIGINAL AND 2 COP
    05/05/2003  TRANSCRIPT OF JURY TRIAL HELD 9-23-02 THROUGH 9-
    05/05/2003  VOLUMES XVIII-XX HELD BEFORE JUDGE LOTT, COURT R
    05/05/2003  STACEY BRYANT, ORIGINAL AND 2 COPIES
    05/06/2003  TRANSCRIPT OF SENTENCING HEARING HELD 11-8-02 BE
    05/06/2003  LOTT, COURT REPORTER STACEY BRYANT, ORIGINAL & 2
    05/07/2003  MAILED SUPPLEMENTAL VOLUME III AND TRANSCRIPTS V

```
prgrm name                                                              Page: 28
  Date: 10/28/2005                                                    *prgrm name*
  Time: 12:00:50
                     J.K. "BUDDY" IRBY, CLERK OF THE COURT
                          ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                            PAGE: 28

** CRIMINAL ACTION DOCKET --------------------------------------------------------
      DATE       DESCRIPTION                                          DOC PG SEQ
--------------------------------------------------------------------------------
   05/07/2003 XXVII TO FIRST DISTRICT COURT OF APPEAL, ATTORNE
   05/07/2003 AND PUBLIC DEFENDER
   05/15/2003 DESIGNATION OF PUBLIC DEFENDER OF SECOND JUDICIA
   05/15/2003 FOR HANDLING OF APPEAL
   06/17/2003 MOTION FOR PAYMENT OF EXPERT WITNESS FEE
   06/17/2003 ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT CONCERNIN
   06/17/2003 PAYMENT OF EXPERT WITNESS
   06/17/2003 ORDER FOR PAYMENT OF EXPERT WITNESS FEE IN THE A
   06/17/2003 OF $9,710.00//PAID//LOTT
   09/22/2003 FIRST DISTRICT COURT OF APPEAL ORDER GRANTS APPE
   09/22/2003 MOTION TO SUPPLEMENT RECORD ON APPEAL WITH JURY
   09/23/2003 SUPPLEMENTAL DIRECTIONS TO THE CLERK OF THE ABOV
   09/23/2003 COURT
   09/23/2003 MOTION FOR ORDER DIRECTING COURT REPORTER TO TRA
   09/23/2003 NOTES
   09/24/2003 ORDER DIRECTING COURT REPORTER TO TRANSCRIBE NOT
   09/26/2003 COPY AFFIDAVIT FROM COURT REPORTER'S OFFICE
   10/10/2003 SUPPLEMENTAL DIRECTIONS TO THE CLERK OF THE ABOV
   10/10/2003 COURT
   10/10/2003 MOTION FOR ORDER DIRECTING COURT REPORTER TO TRA
   10/10/2003 NOTES
   10/16/2003 ORDER DIRECTING COURT REPORTER TO TRANSCRIBE NOT
   10/23/2003 AMENDED REQUEST FOR EXTENSION OF TIME TO PREPARE
   10/23/2003 ON APPEAL [COPY]
   10/24/2003 REQUEST FOR DOCUMENTS 940.04/SENT          ΔΔ
   11/03/2003 AFFIDAVIT FROM COURT REPORTER'S OFFICE
   11/05/2003 CORRECTED ORDER DIRECTING COURT REPORTER TO TRAN
   11/05/2003 NOTES//TURNER
   11/10/2003 AMENDED MOTION FOR ORDER DIRECTING COURT REPORTE
   11/10/2003 TRANSCRIBE NOTES
   11/10/2003 LETTER TO COURT REPORTER BETTY SUE VINCENT FROM
   11/10/2003 ASSISTANT TO ASSISTANT PUBLIC DEFENDER NADA CARE
   11/10/2003 ATTACHMENTS
   11/10/2003 FIRST DISTRICT COURT OF APPEAL ORDER GRANTS APPE
   11/10/2003 MOTION TO SUPPLEMENT RECORD ON APPEAL WITHIN 30
   11/12/2003 SUPPLEMENTAL DIRECTIONS TO THE CLERK OF THE ABOV
   11/12/2003 COURT
   11/18/2003 TRANSCRIPT OF JURY SELECTION HELD 9-9-02, COURT
   11/18/2003 STACEY BRYANT, VOLUMES I & II, ORIGINAL + 2 COPI
   11/19/2003 MAILED SUPPLEMENTAL RECORD ON APPEAL VOLUME XXVI
   11/19/2003 TRANSCRIPTS VOLUMES XXIX-XXX TO FIRST DISTRICT C
   11/19/2003 APPEAL, ATTORNEY GENERAL AND ASSISTANT PUBLIC DE
   04/07/2004 MEMO FROM ATTORNEY GENERAL TO CLERK RE: CROSS-AP
   04/07/2004 NOTICE OF CROSS-APPEAL FILED BY ATTORNEY GENERAL
   04/08/2004 LETTER TO FIRST DISTRICT COURT OF APPEAL WITH CE
```

```
prgrm name*                                                              Page: 29
  Date: 10/28/2005                                                      *prgrm name*
  Time: 12:00:51
                    J.K. "BUDDY" IRBY, CLERK OF THE COURT
                         ALACHUA COUNTY, FLORIDA
--------------------------------------------------------------------------------
ASE #: 01-2000-CF-002753-A                                           PAGE: 29

 ** CRIMINAL ACTION DOCKET -----------------------------------------------------
      DATE        DESCRIPTION                                        DOC PG SEQ
--------------------------------------------------------------------------------
      04/08/2004 COPY OF NOTICE OF CROSS-APPEAL, COPY OF LETTER T
      04/08/2004 ATTORNEY GENERAL AND PUBLIC DEFENDER
      04/15/2004 AMENDED NOTICE OF CROSS-APPEAL FILED BY ATTORNEY
      04/15/2004 MAILED CERTIFIED COPY OF AMENDED NOTICE OF CROSS
      04/15/2004 ATTACHMENTS TO FIRST COURT OF APPEAL/LE
      04/15/2004 TO ATTORNEY GENERAL AND ASSISTANT PUBLIC DEFENDE
      04/16/2004 MAILED VOLUME XXXI SUPPLEMENTAL RECORD ON APPEAL
      04/16/2004 DISTRICT COURT OF APPEAL, ATTORNEY GENERAL AND A
      04/16/2004 PUBLIC DEFENDER NADA CAREY
      06/21/2004 REQUEST FOR EXHIBITS/EVIDENCE FROM DEFENDANT'S M
      07/02/2004 CLERK'S RESPONSE TO REQUEST FOR EXHIBITS/EVIDENC
      07/19/2004 REQUEST FOR CRIMINAL DOCUMENTS
      07/21/2004 RESPONSE TO REQUEST FOR DOCUMENTS
      07/28/2004 LETTER FROM DEFENDANT REQUESTING COPIES OF EVIDE
      08/02/2004 LETTER TO JUDGE LOTT FROM DEFENDANT
      08/02/2004 LETTER TO  DEFENDANT FROM JUDGE TURNER
      08/26/2004 COPIES OF REQUESED EVIDENCE SENT
      11/23/2004 MANDATE AND OPINION AFFIRMED
      11/23/2004 MANDATE FILED 11232004                              00000
      12/22/2004 RETURNED FROM FIRST DISTRICT COURT OF APPEAL REC
      12/22/2004 APPEAL VOLUME I-III, TRANSCRIPT IV-XXVII, SUPPLE
      12/22/2004 XXVIII, TRANSCRIPT XXIX-XXX, SUPPLEMENTAL XXXI A
      12/22/2004 EVIDENCE
      01/07/2005 REPORTED AS CONVICTED FELON TO SUPERVISOR OF ELE  00000
      08/10/2005 MOTION TO VACATE SENTENCE AND CONVICTION PURSUAN
      08/10/2005 -FLA.R.CR.P. 3.850 AND MEMORANDUM OF LAW
      08/11/2005 CASE REOPENED 08102005 POST CONV RELIEF MOTION    00000
      08/17/2005 SA ASSIGNED:  BROCKWAY, PAMELA K                   00000
      09/30/2005 ORDER DENYING MOTION FOR POST-CONVICTION RELIEF/
      09/30/2005 //JUDGE SIEG
      10/03/2005 CERTIFICATE OF SERVICE - PCR ORDER TO DEFENDANT
      10/03/2005 REOPENED CASE CLOSED 09302005                      00000
      10/27/2005 APPEAL FILED 10272005                              00000
      10/27/2005 NOTICE OF APPEAL OF ORDER DENYING 3.850 MOTION     00002
      10/27/2005 DIRECTIONS TO THE CLERK                            00002
      10/27/2005 STATEMENT OF JUDICIAL ACTS TO BE REVIEWED          00001
      10/27/2005 PAYMENT OF $50 FOR APPEAL FILING FEE               00001
      10/28/2005 NOTICE OF APPEAL, AMENDED                          20000
      10/28/2005 STATEMENT OF JUDICIAL ACTS TO BE REVIEWED, AMEND   00001
      10/28/2005 DIRECTIONS TO THE CLERK, AMENDED                   00002
```

2008-CF-2753-A

IN THE CIRCUIT COURT OF
THE EIGHTH JUDICIAL
CIRCUIT IN AND FOR ALACHUA
COUNTY, FLORIDA

**STATE OF FLORIDA,**

**CASE NO. 02-2753-CF-A**

**vs.**

**BRIAN HERLIHY,**
   **Defendant.**
_____/

## MOTION TO VACATE SENTENCE AND CONVICTION
## PURSUANT TO FLA.R.CR.P. 3.850 AND MEMORANDUM OF LAW

COMES NOW the Defendant, Brian Herlihy, by and through his undersigned attorney, pursuant to Fla.R.Cr.P. 3.850, and moves to vacate the Judgment and Sentence for the offense of Manslaughter entered by the Circuit Court of the Eighth Judicial Circuit, in and for Alachua County, Florida, on the grounds that the Defendant was denied effective assistance of counsel as guaranteed by the Sixth Amendment of the Constitution of the United States and Article I, §§9 and 16 of the Constitution of the State of Florida, and in support thereof avers as follows:

1.   Defendant was charged with the offense of first degree murder.

2.   The essence of the accusation was that a child left in his care was killed by shaking, consistent with the so-called "Shaken Baby Syndrome."

3.   The Defendant was found guilty of manslaughter on September 25, 2002.

4.   The Defendant was sentenced to fifteen years in prison for said offense on November 8, 2002.

5.   The Defendant filed a Notice of Appeal on December 30, 2002.

6.   The Judgment was affirmed by the First Circuit Court of Appeal on November 3, 2004.

7.   There has been no previous Motion for Post-Conviction Relief.

8.   In violation of the Sixth Amendment of the Constitution of the United

1

0000001

States and Article I, §§ 9 and 16 of the Constitution of the State of Florida, the Defendant was deprived of effective assistance of counsel, as hereafter averred:

A.  Counsel was ineffective for failing to request a Frye Hearing prior to the admission of opinion evidence on the controversial theory of the so-called "Shaken Baby Syndrome."

B.  Significant disputed scientific evidence was presented at trial explaining the theory of the "Shaken Baby Syndrome."

9.  The introduction of expert proof concerning a new or novel scientific principle or process requires that the trial judge must decide whether the expert's testimony is based on a scientific principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs,"   Matos v. State, 30 Fla. L. Weekly D859a  (Fla.App. 4 Dist. 2005) *quoting* Frye v. United States, 293 F. 1013 at 1014 (D.C. Cir. 1923).

10. Florida courts require both the basic underlying principals and the methodology of scientific evidence be "sufficiently tested and accepted by the relevant scientific community." Brim v. State, 695 So2d. 268, 272 (Fla. 1997) *citing* Frye.

11. The issue of general acceptance is an issue to be addressed *de novo. See* Bevil v. State, 875 So.2d 1265 (Fla.App. 1 Dist. 2004), holding that on appeal, general acceptance is considered as of the time of the appeal. In determining the issue of general acceptance, the court "may examine expert testimony, scientific and legal writings, and judicial opinions." Id. at 1268.

12. Any doubt as to admissibility of evidence under Frye should be resolved

2

in a manner that minimizes the chance of a wrongful conviction." Id. at 1268.

13. "Shaken Baby Syndrome" is not a theory based on a scientific principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs," nor is it "sufficiently tested and accepted by the relevant scientific community."

14. Testimony elicited at trial established that the "Shaken Baby Syndrome" theory is not generally accepted among the relevant scientific community. Specifically:

   A. State Witness Dr. Anne Dickinson recognized the existence of the Duhaime scientific study which concluded that the amount of force that could be created by shaking did not come anywhere near the force that would be needed to create damage to the brain. Transcript, Page 722, lines 10-14.

   B. State Witness Dr. William Hamilton recognized that "Some people do not believe it (shaken baby syndrome) exists. Some people believe that what we call shaken baby syndrome is really due to blunt impact injury to the head."[1] Transcript, Page 1021, line 13-15. Dr. Hamilton also acknowledged the Duhaime study. Transcript, Page 1022-1023, lines 24, 25, and 1.

   C. State Witness Dr. Bernard Maria acknowledged the findings of the Duhaime study, which found that it is impossible for a human being to shake a child hard enough to cause the kind of force that's necessary to cause the brain injury in this case. Transcript,

---

[1] There was no indication of any trauma to the decedent.

3

Page 1176, line 3-12.  Dr. Maria also testified that there was no evidence of any external blow to the decedent.   Transcript, Page 1176, line 18.

D.    Defense Witness Dr. Plunkett testified about the Duhaime study, Trancript PP. 1250-1252,  and that the  computer animation used by the state was a fraud, Transcript P. 1241, Line 9.   He further testified that the type of force necessary to cause brain injury would also cause neck trauma.[2]   Transcript P. 1247, Line 21-22.

E.    Dr. Ronald Uscinski testified about various scientific articles discrediting the premises of the "Shaken Baby Syndrome" theory, including the Omaya study of 1968, Transcript P. 1435, -1443, 1451, and the Duhaime/Thibault study of 1987, Transcript P. 1443-1444, .

15.   A review of the scientific literature shows that there is no general acceptance of the "Shaken Baby Syndrome" Theory.   Specifically:

A.    John Caffey, the originator of the "Shaken Baby Syndrome" theory in 1972 (then called "Shaken Whiplash Syndrome"), originally concluded that brain injury was associated with long bone fractures and/or bilateral symmetrical fractures of the arms and legs.[3]  He also associated retinal hemorrhages with the Syndrome, but acknowledged that retinal hemorrhaging could be caused by ordinary events such as coughing, vigorous burping, CPR, bouncing a child on one's knee, throwing a baby into the

[2]Absent here.

[3]Absent here.

4

air, crossing rough roads, and from flipping a toddler head over heels to his or her feet. Caffey, "On the Theory and Practice of Shaking Infants," 124 American Journal of Diseases in Children; pp. 161-169 (1972).

B.   In 1974, Dr. Caffey wrote that infantile whiplash shaking syndrome was "associated with traction lesions of the periosteums of the long bones."[4]     Caffey, J. "The Whiplash Shaken Infant Syndrome: Manual Shaking by the extremities with whiplash-induced intraocular bleedings, linked with residual permanent brain damage and mental retardation." 54 *Pediatrics*; pp.396-403 (1974), attached and incorporated as Exhibit A.  Dr. Caffey specifically conceded that current evidence was "manifestly incomplete and largely circumstantial," Id. at 403, but nevertheless proposed a nationwide educational campaign with the following proposed doggerel:

> Guard well your baby's precious head,
> Shake, jerk and slap it never.
> Lest you bruise his brain and twist his mind,
> Or whiplash him dead forever.    Id. at 403.[5]

C.   In 1987 Duhaime, Genarelli, Thibault, Bruce, Marguiles, and Wiser

---

[4]Absent in this case.

[5]Counsel respectfully suggests that Dr. Caffey's poetry is better than his science, which is not saying much.

5

conducted an experiment by placing an accelerometer on a model of an infant and measuring the results of shaking versus impact. The peak acceleration for shaking was found to be between 10 and 12 G's. The study found that impact increased the force of shaking by up to 40 times. The experts concluded that shaking alone of an otherwise healthy infant could not cause the constellation of injuries generally associated with SBS. They determined that an impact was needed.   Duhaime, Genarelli, Thibault, Bruce, Marguiles, & Wiser. ""The Shaken Baby Syndrome."" J Neurosurg. 66: 409-415 (1987), attached and incorporated as Exhibit B.

D.    In the British Medical Journal, Dr. Patrick Lantz reported his review of evidence of Shaken Baby Syndrome as it relates to perimacular retinal folds in childhood abusive head trauma. Lantz, Patrick, 28 BMJ 754 (March 2004), attached and incorporated as Exhibit C.   He found that "the references cited to support statements about the specificity or causal mechanism of perimacular retinal folds and abusive head injury are all non-comparative observational reports, unsystematic review articles, and book chapters." Id. at 755 and found that "(s)tatements in the medical literature that perimacular retinal folds are diagnostic of shaken baby syndrome are not supported by scientific evidence." Id. at 756.

E.    In a letter to the editor in the same issue of the British Medical Journal, Dr. James LeFanu wrote that:

6

"These three patterns of clinical events [minor trauma, birth injury, and respiratory arrest][6]–in the absence of other circumstantial evidence for non-accidental injury–offer a more credible explanation than shaken baby syndrome for the presence of subdural and retinal hemorrhages. It should be noted that shaking has never been directly observed or proved to cause such injuries but is rather an inference based on (contested) theories of biomechanics." 328 BMJ (March 27, 2004), attached and incorporated as attached and incorporated as Exhibit D.

F.    Dr. Mark Donohue did a review of the studies on Shaken Baby Syndrome based on principles of evidence-based medicine and concluded that "(t)here was no evidence on the subject of SBS [Shaken Baby Syndrome] that exceeded QER III-2by the end of 1998, which means that there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS." Donohue, Mark, "Evidence-Based Medicine and Shaken Baby Syndrome," American Journal of Forensic Medicine and Pathology, Vol. 24, No. 3, p. 239-242, 241 (September 2003), attached and incorporated as Exhibit E. Dr. Donohue further concluded that:

"(b)efore 1999, there existed serious data gaps, flaws of logic, inconsistency of case definition, and a serious lack of tests capable of discriminating NAI [Non-Accidental Injury] cases from natural injuries. By 1999, there was an urgent need for properly controlled, prospective trials into SBS [Shaken Baby Syndrome], using a variety of controls. Without published and replicated studies of that type, the commonly held opinion that the finding of SDH

---

[6]All present in the instant case.

7

[Subdural hematoma] and RH [retinal hemorrhage] in an infant was unsustainable, at least from the medical literature." Id. at 241.

G.   Dr. Susan Elner, in a study published in 1990, noted that "(t)he forensic literature and experimental models of head injury indicate that blunt head trauma, in addition to whiplash shaking, may be necessary to produce lesions of sufficient severity to cause death. Elner, Susan G., "Ocular and Associated Systemic Findings in Suspected Child Abuse," Arch. Opthalmol. Vol. 108 (August 1990), attached and incorporated as Exhibit F.

H.   Retinal Hemorrhages–a keystone of the State's argument that the Decedent in Mr. Herlihy's case died of shaking–are often associated with the following alternative causes:

   i.   Vaginal deliveries in up to 30-40% of all vaginal births. Kaur, B. & Taylor, D. (1990). "Current Topic: Retinal Hemorrhages," Arch. Dis. Child 65: 1369-1372 (1990).

   ii.   Cardio respiratory resuscitation (CPR). Goetting, M.G., Sowa B. Retinal "Hemorrhage after Cardiopulmonary Resuscitation in Children: An Etiologic Reevaluation," Pediatrics 85: 585-588 (1990).

   iii.   Accidents and Accidental Trauma. Elner, S.G., "Occular and Associated Systemic Findings in Suspected Child Abuse. A Necropsy Study," Arch Ophthal 108: 1094-1101,

I.   In 2003, Geddes, J.F. and H.L. Whitwell, in a study of 53 fatally

8

injured children, found that:

i.    "In the so-called 'shaken baby syndrome' it has never been shown that the retinal bleeding is the result of direct trauma to retinal vessels; rather, it has been widely assumed to be so, despite the fact that an authoritative recent review of the biomechanics of paediatric head injury has described the hypothesis as 'biomechanically improbable' and suggests there is compelling evidence that rapidly rising intracranial pressure is responsible." Geddes, J.F. and H.L. Whitwell, "Inflicted head Injury in Infants," Forensic Science International 146 (2004) 83-88, 86.

ii.   A critical survey of the literature reveals that there have been no systematic formal neuropathological studies of infant head injury, accidental or non-accidental, merely a few series looking at specific aspects, that the evidence base for DAI [diffuse axonal injury[7]] being a common finding in infant head injury is poor. Id. at 83.

iii.  Subdural and retinal bleeding in these types of cases may well have a physiological aetiology, rather than being caused by trauma. Id at 83.                          —

J.    An editorial in Pediatric Neurosurgery in 2003 noted that "injuries thought to be pathognomic of abuse are not so thought of in other parts of the world. Indeed, there is a perception that in the United

---

[7]Diffuse axonal injury is the essence of the type of injury which the so-called "Shaken Baby Syndrome" purports to explain.

9

0000009

States the diagnosis of non-accidental injury is made too frequently." Pittman, Thomas, "Significance of a Subdural Hematoma in a Child with External Hydrocephalus," Pediatric Neurosurg 2003: 39: 57-58, attached and Incorporated as Exhibit G.

K.    There is no evidence that clearly establishes that retinal hemorrhages, be they intraretinal, subretinal, or subhyaloid, are indicative of nonaccidental trauma. Evidence does exist, however, that retinal hemorrhages in all layers of the retina occur in experimental as well as clinical situations that are not related to child abuse. Tongue, Andrea, "The Ophthalmologist's Role in Diagnosing Child Abuse," Ophthalmology, Vol 98, No. 7 (July 1991).

L.    A histological review of dura matter taken from a post-mortem series of 50 paediatric cases suggests that a combination of severe hypoxia, brain swelling and raised central venous pressure causes blood to leak from intracranial veins into the subdural space, and that the cause of the subdural bleeding in some cases of infant head injury is therefore not traumatic rupture of bridging veins, but a phenomenon of immaturity. Further, hypoxia with brain swelling would also account for retinal hemorrhages, and so provide a unified hypotheses for the clinical and neuropathological findings in cases of infant head injury, without impact or considerable force being necessary. Geddes, J.F., R.C. Tasker, A.K. Hackshaw, C.D. Nickols, G.G.W. Adams, H.L. Whitwell,

10

and I. Schelmberg, "Dural Haemorrhage in Non-Traumatic Infant Deaths: Does It Explain the Bleeding in 'Shaken Baby Syndrome?' Neuropathology and Applied Neurobiology 29, 14-22 (2003).

M. Statements in the medical literature that perimacular retinal folds are diagnostic of shaken baby syndrome are not supported by objective scientific evidence. Lantz, P.E. "Perimacular Retinal Folds," BMJ Vol. 328, 754-760 (2004), attached and incorporated as Exhibit H.

N. An editorial in the British Medical Journal noted that recent studies "make disturbing reading, because they reveal major shortcomings in the literature" and further stated that "We need to reconsider the diagnostic criteria, in not the existence, of shaken baby syndrome." Geddes, J.F "The Evidence Base for Shaken Baby Syndrome," BMJ Vol 328, 270 (March 27, 2004), attached and incorporated as Exhibit I.

16. Trial Counsel never requested a Frye Hearing to determine the admissibility of opinion testimony regarding the "Shaken Baby Syndrome." Had trial counsel done so, the testimony likely would not have been admitted and the Defendant would likely have been acquitted.

17. By failing to request a Frye hearing, counsel for the Defendant failed to provide effective assistance as required by the respective constitutional provisions of the Florida and United States Constitutions.

18. Trial Counsel's performance was deficient. By failing to require a Frye hearing, trial counsel allowed the jury to consider purported scientific

11

evidence not generally accepted by the relevant scientific community, resulting in conviction for manslaughter. Trial counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Counsel's errors were so serious as to deprive the defendant of a fair trial.

Wherefore, the Defendant respectfully moves this Honorable Court to vacate the Judgment and Sentences for the offense Manslaughter on the grounds that the Defendant was denied effective assistance of counsel as guaranteed by the Sixth Amendment of the Constitution of the United States and Article I, §§9 and 16 of the Constitution of the State of Florida.

I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this Motion and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

Brian Herlihy
G06137
South Bay CF
POST OFFICE BOX 7171
600 US Highway 27
South Bay, Fl 33493

Sworn to and subscribed before me on this _3_ day of _August_, by Brian Herlihy, who produced identification. Type of identification produced: _Facility_ .

STATE OF FLORIDA
COUNTY OF _Palm Beach_
Notary Public -- State of Florida
_Donna Poling_
(Seal)


Donna Poling
My Commission DD112256
Expires April 26, 2006

12

0000012

Respectfully submitted this _8_ day of _August_, 2005.

DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the Office of the State Attorney, 120 W. University Avenue, Gainesville, FL 32601 by hand/mail/fax delivery this _8_ day of _August_, 2005.

DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

13

## ARTICLES

# The Whiplash Shaken Infant Syndrome: Manual Shaking by the Extremities With Whiplash-Induced Intracranial and Intraocular Bleedings, Linked With Residual Permanent Brain Damage and Mental Retardation

John Caffey, M.D.

*From the Departments of Radiology and Pediatrics, University of Pittsburgh School of Medicine, and the Children's Hospital of Pittsburgh*

The theme of this report is fourfold: (1) it presents the essential clinical manifestations of the *whiplash shaken infant syndrome;* (2) it presents evidence which indicates that many so-called *battered babies* are really *shaken babies;* (3) it emphasizes the high vulnerability of the infantile head, brain and eyes to habitual, manual, whiplash stresses of ordinary shaking by the extremities; and (4) it supports the hypothesis that casual, habitual, manual whiplash shaking (WLS) of infants is a substantial primary, frequent cause of later mental retardation and permanent brain damage.

Subdural hematomas, intraocular bleedings and multiple traction changes in the long bones were the essential elements in our first descriptions of the *original six battered babies* in 1945.[1] In 1972 we reported that shaking was the probable major cause of traction stresses in the periosteums of the long bones, and also of intracranial and intraocular bleedings.[2]

Today we direct your attention to some important new evidence on the pathogenicity of WLS; some new examples of admitted WLS; necropsy findings in two cases; two cases of residual mental retardation at 12 months, which became evident several months after admitted WLS during early infancy; and one case of fatal cerebral palsy in an infant 10 months of age, who had been manually shaken at 2 months. We shall also evaluate the diagnostic significance of manual whiplash shaking, of the findings in the history, physical examination, necropsies and fundoscopic examinations. The pathogenic significance of subdural hematomas, the excessive pliability of the immature skull and brain, and the cumulative, progressive intra-cranial bleedings engendered by habitual but mild WLS will be correlated.

### EVIDENCE FOR THE PATHOGENICITY OF WLS DERIVED FROM THE RADIOGRAPHIC CHANGES IN THE LONG BONES OF SO-CALLED BATTERED BABIES

The first suggestions that many supposedly *battered infants* were actually *shaken infants* came from radiographic studies of scores of supposedly battered babies during several decades. Finally, it became conclusively clear that a reasonable explanation for the pathogenesis of these common lesions—metaphyseal avulsions and subperiosteal hemorrhages—was traction-stretching stresses on the periosteums, induced by grabbing the infants by the extremities or by the thorax, and then shaking them, which in turn induced whiplashing of the head onto the thorax. WLS of the head was the reasonable explanation for the presence of bilateral subdural hematomas and bilateral intraocular hemorrhages, combined with concurrent absence of external signs of trauma to the head and neck

(Received April 13, 1973; accepted for publication May 1974.)

Read in part as the Fourth Cornelius G. Dyke Memorial Lecture at the Neurological Institute, Columbia-Presbyterian Medical Center, New York City, May 2, 1973.

ADDRESS FOR REPRINTS: Department of Radiology, Children's Hospital of Pittsburgh, 125 DeSoto Street, Pittsburgh, Pennsylvania 15213.

0000014

to the extremities in more than half of our cases.

## EVIDENCE DERIVED FROM ADMISSION BY THE ASSAILANT IN THE HISTORIES OF SO-CALLED BATTERED BABIES

Direct evidence of trauma through admission the parent-assailant or the statement of a witness is rarely obtained or obtainable. Usually there no witnesses. The medical history of manual S is practically never obtained because it is sidered innocuous by both the parent-assailant the questioning physician. Although our evidence, based on admission by the assailant, is ger, it is valuable because it is reliable.

y far the most extensive anecdotal proof of mogenic manual WLS comes from the confessions to the savage shakings of dozens of infants by infant-nurse[3,4] who whiplashed three infants to th, maimed two others, and shook uncounted ers during a period of nine years. She stated t "one of her babies" died after she had bunded it on the back to get a bubble up." Prior a coroner's inquest she broke down and confessed that "baby K refused to drink her bottle so I zed her by both arms and shook her until her d bobbed and she became faint. Then I quickly t her down." After a preliminary investigation, Coroner charged that this infant-nurse had used the infants' deaths during her "uncontrollable fits of anger and uncontrollable urge to grasp ants between the elbows and shoulders and ke them as long as they persisted in crying." o others of the whiplashed babies were said to e been manhandled so severely that they become painfully injured. One year after the Coroner's inquest, two fathers, who had employed this e nurse to care for their two infants earlier, rerted that each of the infants had become intractably. As soon as the Coroner's report beme known to the community, "dozens" of thers reported that their infants had been significantly injured by this same nurse, and a review the office records of several pediatricians conmed additional injuries to many other infants m the same source. It is amazing that this innt-nurse was able to continue her brutal WLS ctices during the long period of nine years in enlightened academic community, on the infants of well-educated parents and on the patients well-trained expert pediatricians. This was due large part to the absence of external signs of uma after violent often repeated pathogenic aking.

Necropsies were done in two of the three fatal es. The protocols are dated 1948 and 1956 for bies H and K, respectively.

*Baby H, 12 days of age, premature girl was well until tonight, when she awakened crying as if in pain. There were no external signs of trauma. Nutrition good, respirations deep and gasping, anterior fontanel bulged slightly, diffuse hemorrhages in the ocular fundi. Death three hours after admission. No history of trauma, no fracture of calvaria. Necropsy findings: skin normal, thymus large. Microscopic focal hemorrhages in the myocardium; pinkish cellular exudate in the pulmonary alveoli; small subcapsular laceration of the liver filled with fresh blood, liver capsule intact. Brain and head: bulging anterior fontanel, bilateral subdural hematomas, bilateral subarachnoid bleedings, subpial bleeding, lacerations of the cerebral parenchyma, pyknosis and death of ganglion cells and large perivascular bleedings. Eyes: optic nerves congested and edematous; external bleeding throughout the fibrous layer of the retina with scattered hemorrhages in its inner nuclear layer.*

*Baby K, girl 11 weeks of age. Chief complaint: bulging of anterior fontanel. Fell asleep well but awakened crying and lethargic; semicomatose on arrival, tachypneic, fontanel bulging, reflexes hyperactive, ocular fundi invisible (bleeding?), moderate generalized cyanosis. Cerebrospinal fluid was bloody, gross fresh blood. Infant turned greyish and died 2 hours after admission. No external signs of trauma on the face or head. There was a small "sheet" burn at the left knee and a short superficial scratch in the abdominal wall. No evidence of fractures. Several small foci of atelectasis in the lungs. Brain: no external signs of trauma to the head; bilateral subdural hematomas with subarachnoid hemorrhages, as well, over both cerebral hemispheres; extensive bleedings at the sites of attachment of the bridging cerebral veins to the superior sagittal sinus. Microscopic findings: extensive subarachnoid but no intracerebral bleedings; eyes not examined.*

The findings in these two necropsies demonstrate that the manual WLS by an adult assailant was pathogenic, especially to the brains and eyes. The harmful effects of manual shaking are probably maximal at the tender ages of these two shaken infants. The absence of any external signs of trauma to the head notwithstanding the presence of massive intracranial and intraocular hemorrhages is especially noteworthy and significant in the pathogenesis of the intracranial and intraocular bleedings.

Guthkelch[5] found subdural bleedings in 13 of 23 abused infants, 22 of whom were younger than 18 months. Five of the 13 had no external signs of head trauma or cranial fracture. At necropsy, in one case bleedings over the cerebral cortex, and in another extensive cortical bruisings were found at

0000015

surgical explo...ion. In two additional cases, not included above, the clinical histories indicated that shaking rather than beating (battering) was the cause of subdural hematomas. In one infant 6 months of age, convulsions and a bulging fontanel, without a history of trauma or external physical signs of trauma, suggested the presence of subdural hematomas. This infant died three days later. At necropsy, several of the bridging cerebral veins were torn from their attachments at the falx cerebri. Also the edge of the underlying brain was torn and bruised. Trauma of any kind was denied at first by the mother, but later she admitted that she "held him up and shook him several times, to clear his throat and stop his coughing." The second patient, 6 months of age, was admitted to the hospital with complaints of vomiting and convulsions which led to a provisional diagnosis of meningitis. There were no external signs of trauma to the head, trunk or extremities and no fractures of the skull or long bones. The anterior fontanel, however, bulged. Subdural hemorrhages were found and treated. Soon after discharge of this patient from the hospital, his twin brother was admitted with a broken femur. The first twin returned shortly thereafter with recurrence of subdural hematomas. He now showed oval bruises on the skin of the arms which fitted exactly the sites where the pads of the thumbs and fingers of an assailant might have been applied, when he seized and shook him. At first the mother denied traumatic injury of any kind but later she admitted that the father "might have shaken him when he cried at night." Guthkelch thus discovered two cases: one fatal, with intracranial and intraocular hemorrhages, induced by admitted manual WLS; and in one case intracranial hemorrhages and ruptures of the cerebral bridging veins were demonstrated at necropsy.

In Helfer and Kempe's monograph, *The Battered Child*,[6] Weston reported two infants who had been shaken to death and who had subdural hematomas at necropsy. In the same monograph, Steele and Pollock describe two infants who were "shaken, roughed up and spanked," but who apparently did not develop intracranial hemorrhages.

Silverman[7] found massive traumatic involucrums and metaphyseal avulsions in the bones of the legs of a premature infant 7 months of age who apparently had been shaken manually many times since the second month. The mother shook her after grabbing her by the legs and inverting her. We have observed two infants who have developed typical bone changes after a single, violent jerk of that extremity; and in a third, 8 months of age, after manual shaking by an enraged and jealous sibling brother 8 years of age. Subdural hema-

toma was not detected in any of these three.

Fractures of the spine with local injuries to spinal cord of one infant were attributed by S...chuk[8] to manual WLS.

A bizarre example of pathogenic manual W... was reported by Guarnaschelli and associates.[9] ... infant 2 months of age was treated for "sun... fontanelle" (Caida de Mollera) by his Mexi... grandmother. Two days before admission to hospital, she had attempted to raise the sun... fontanel by a series of therapeutic maneuv... which terminated in holding the infant top... turvy by its ankles, with its head over a pan... water, and then shaking the infant up and do... while an assistant slapped and pounded on... soles of its feet. The sunken fontanel did rise ... had become bulgy when admitted to the hospi... Subhyaloid hemorrhages were found in the ocu... fundi and the pupils were fixed. There were... signs of external trauma to the head, trunk or... tremities. Clonic seizures developed and the ce... brospinal fluid from the cranial subdural sp... and the lumbar subarachnoidal space contain... fresh blood. The clinical signs subsided after tre... ment of the subdural hematomas. The infant di... 8 months later at 10 months of age from pneun... nia and quadriplegia. In this case, manual longi... dinal WLS of the inverted infant with concurr... pounding of the soles of its feet induced longitu... nal whiplash and jerking stresses to the he... which resulted in permanent severe generaliz... brain damage—with cerebral palsies. It is possi... that when the head is in the dependent positi... while being shaken, the vulnerability to intracr... ial and intraocular bleeding is increased.

Mushin and Morgan[10] record the story of an ... fant 3 months of age who appears to have be... subjected to a prolonged session of WLS. The... ther at first attempted to "strangle the infant w... a blanket," but when the infant convulsed duri... this assault and became stuporous, the father ... parently repented, and then with the mot... spent the rest of the night manually shaking... comatose infant in a belated effort to revive... The next morning the infant was admitted to... hospital with extensive bruising of the skin and... lateral intraocular bleedings. It died 24 ho... later. Necropsy findings included bilateral la... subdural hematomas and widely scattered int... ocular hemorrhages in the retinas. Microsc... examinations disclosed extensive intraretinal... hyaloid and small vitreous hemorrhages. In... case it is likely that the stresses of strangling... well as those of manual WLS contributed to... intraocular changes and possibly the subdural... matomas. In view of the fact that both par... spelled each other during several hours in vigo...

0000016

...xysmal manual sha..., the probabilities are ... that the head of the infant was subjected to ...eral hundred individual whiplash stresses from ...king alone.

## EVIDENCE FROM THE PHYSICAL EXAMINATION ON THE PATHOGENICITY OF MANUAL SHAKING

The most characteristic pattern of physical ...dings in the whiplashed infant is the absence of ...ternal signs of trauma to the head and the soft ...ues of the face and neck, and of the facial bones ...d calvaria, in the presence of massive traumatic ...tracranial and intraocular bleedings. This is an ...traordinary diagnostic contradiction. It is, in ...rge part, responsible for the frequent failures to ...iagnose subdural hematoma and retinal hemor-...hage, and the failure to attribute them to manual ...aking and whiplashing of the head. It is obvious ...at in such cases, routine examinations of the oc-...lar fundi in both sick and well infants would pro-...ide a convenient and accurate method for the ...rly diagnosis of bleedings in the eyes, and more ...ffective treatment and prevention of WLS. Fun-...oscopic visualization should become a routine ...ractice in the examination of infants for the de-...ction of the pathogenic whiplash shaking.

## EVIDENCE FROM OTHER TESTS ON THE PATHOGENICITY OF WHIPLASH SHAKING

In selected cases cerebral pneumography, cere-...ral angiography and isotopic scanning are all val-...able procedures in the diagnosis of subdural he-...matoma and intracerebral hemorrhages. In the ...mass routine detection of subdural hematomas, ...less hazardous and more convenient complemen-...ary procedures such as electroencephalography, ...onography and perhaps electroretinography ...ould be employed in selected cases after the fun-...doscopic changes were demonstrated.

## EVIDENCE OF PATHOGENIC WLS IN NECROPSIES

In two cases the most significant findings were ...limited to bleedings in the brains and eyes, in the ...subdural, subarachnoid and subpial spaces and in ...the cerebral substance itself. In one necropsy the ...optic nerve was congested and edematous. Exten-...sive hemorrhages were demonstrated in both the ...fibrous and nuclear layers of the retina. The walls ...of the inferior and superior sagittal sinuses were ...lacerated at the sites of the attachments of the ...bridging cerebral veins. Clots of blood covered ...parts of the falx cerebri. Ganglion cells were ...sparse and some were pyknotic. The only signifi-...cant finding outside the head was a subcapsular

hemorrhage i... the liver in one case. Microscopic focal bleedings in the myocardium were also found in one case. There were no external signs of trauma to the head in either of the infants.

## THE PATHOGENIC SIGNIFICANCE OF OCULAR LESIONS IN BATTERED AND WLS INFANTS

In the first six reported *so-called battered babies*,[1] retinal hemorrhages were present in two, both of whom had subdural hematomas. Intraocular hemorrhages have been reported in several *so-called battered infants* since. Similar ocular lesions have been reported in *shaken infants* by Mushin and Morgan in one case; in two infants, victims of the "shaking infant-nurse" (see above); in two cases by Guthkelch[6] and one by Guarna-schelli.[9] Mushin[12] found ocular changes in 12 of 19 *battered infants*, all 12 of whom had permanent impairment of vision in one or both eyes.

In 1964 Kiffney[11] found bilateral retinal detachments behind incomplete cataracts in one so-called battered infant 7 months of age, which were originally diagnosed as retinoblastomas. In follow-up studies of 16 battered infants, Maro-teaux and associates[13] found plaques in the ocular fundi which tended to be located in the periphery of the temporal segments of the retinas. The authors state that these lesions cannot be satisfactori-ly explained on the basis of battering and they question the validity of the term "battered child" for all abused infants, and its worldwide use in English. They propose that some of the affected infants are the victims of overvigorous *manipula-tions,* not battering. We agree with them and be-lieve that many of these infants are whiplash-shak-en rather than beaten, especially those with intra-cranial and intraocular bleedings. They also re-port resorption (lysis) of the nasal septum of sever-al abused infants in France, a lesion which I have never seen personally, nor have I seen reported in an abused infant in America. Aron and associ-ates[14] found similar retinal spots located in the peripheries of the temporal segments of the fundi, some with retinal detachments in all 18 abused in-fants. More than half of these lesions had persisted for more than ten years and one as long as 19 years.

In 1967 Gilkes and Mann[15] stated that they had found only one reference, that of Kiffney, on the status of the eyes of abused infants. In their cases, they were impressed with the extensive spread and the persistence of the signs of ocular hemor-rhages, both preretinal and intraretinal, and by the presence of gross papilledema in some cases. These authors cite the patients of Wallis who suf-fered from subdural hematomas induced by the parents who "gripping the infants by the ankles

Case 1:05-cv-00841-RJL Document 2-13 (so called appeared to result path 09/11/2005 from Page 51 of 106 cephalic pressures.

swung him in a circle around their heads) (so called cracking the whip); and the account of Breinin who "had a traumatic retinopathy" after having been gripped by the chest and shaken violently.

Eleven abused infants studied by Harcourt and Hopkins[16] had ocular complications, eight had permanent impairments of visual acuity and ten had intraocular bleedings. In five abused infants Freindly[17] found vitreous hemorrhages, bilateral cataracts, dislocated lenses and retinal detachments. The first case is possibly an example of bilateral cataracts from manual whiplash shaking in view of the lack of a history of trauma and lack of external signs of trauma to the head. In these reports by ophthalmologists manual shaking was admitted in three cases and was probable in several others. In the interesting report of Phelps[18] two infants, 31 days and 2 months of age, respectively, had numerous pale-centered retinal hemorrhages which were totally unexplained; there was no history of trauma and there were no external signs of trauma on the bodies. It is possible that in such cases, manual WLS is the primary causal traumatic factor.

The pathogenesis of retinal hemorrhages in the manual WLS of infants and children cannot be evaluated satisfactorily without a consideration of the incidence, nature, and persistence of idiopathic retinal hemorrhages of the newborn. Sezen[18] found retinal hemorrhages in 14% of 1,238 newly born infants immediately after birth. Between the third and fifth day this incidence of 14% had diminished to 2.6%. This indicates that most of the idiopathic retinal hemorrhages of the newborn infant disappear during the first weeks of life, in contrast to the observations of Aron[14] who found that the retinal hemorrhages in abused infants persisted for ten years and in one case for 19 years. Planten and Schaaf[20] concluded that idiopathic retinal hemorrhages of the newborn infant appear in 20% to 30%, but that they cannot be causally related to increased intracranial pressure during labor, they rarely occur during breech deliveries or cesarean section, and are rarely associated with subdural hematomas or other signs of brain damage. Schlaeder and others[21] detected idiopathic retinal hemorrhages, directly after delivery by the vacuum method (ventouse), to be about three times as frequent as after normal delivery (41/100 compared to 15/100). Baum and Bullpit[22] compared the incidence of idiopathic retinal hemorrhages and idiopathic conjunctival hemorrhages in the newly born infant. Retinal hemorrhages seemed to result from several causes: increase in the blood viscosity and polycythemia (RBC) appeared to be the major causal factors. Conjunctival hemorrhages on the other hand appeared to result from increased cephalic pressures. The preponderance of the evidence from several sources indicates that the idiopathic retinal hemorrhages of the newborn infant are not due to trauma at time of birth and the retinal hemorrhages found in battered and shaken infants are probably caused by postnatal manual shaking.

## SIGNIFICANCE OF SUBDURAL HEMATOMA IN PATHOGENESIS OF THE SHAKEN INFANT

Subdural hematoma is the most common, most injurious and the least understood lesion in the shaken infant, and it is also the most frequently detected. It is by far the most frequent cause of death of so-called battered infants. Infantile subdural hematomas are caused by trauma in practically all cases, and they are bilateral in more than 80% of cases. They remain undiagnosed in most cases owing to the lack of a history of trauma, the vagueness of the clinical picture and the usual diagnostic paradox of massive intracranial bleeding in the absence of external signs of trauma to the head and face. Diagnostic changes of bleeding in the ocular fundi are also commonly present. They are missed of course when the fundi are not adequately examined. Blood in the subdural and cerebrospinal fluid often confirms the diagnosis. Blood apparently is rarely identified in the urine.

According to Ingraham and Matson[23] the frequency and accuracy of diagnosis depends largely on the intensity of the search for subdural hematomas. General practitioners and pediatricians ordinarily do not have a high index of suspicion of subdural bleedings owing to the vagueness of the clinical findings and the failure of parents to offer the history of trauma voluntarily when questioned by the physician. Ingraham and Matson found subdural hematomas from all causes to be lesions essentially of the first year of life with a peak-age incidence of 6 months. In their study of 319 cases diagnosis was made during the second through the fifth months in 32, 30, 27 and 28 cases, respectively, and during the 20th through the 24th months only three, one, one and six cases, respectively. Their histories disclosed a high incidence of common infantile complaints as vomiting, hyperirritability, 41%; infections, 39%; seizures, 32%; history of birth trauma, 26%; and of postnatal trauma, 20%. The absence of a history of trauma of any kind in 54% is significant and suggests that whiplash shaking may be the cause in such patients. Their common physical findings included fever, 57%; hyperactive reflexes, 48%; bulging fontanel, 36%; anemia, 31%; enlarged head, 29%; abnormal ocular fundi, 22%; par[...]

and fractures of the skull, 9%. The absence of a sagging fontanel in 84%, of enlarged head in 71%, of fundus changes in 78%, of paralyses in 81% and of fractures of the skull in 91% is noteworthy. Signs of external trauma to the soft tissues of the head and neck were apparently so rare that they were not included in the records. It is manifest from these results in a relatively large, carefully studied group of infants suffering from proved subdural hematoma, that subdural hematoma should never be excluded because of an absence of a history of trauma, or absence of external signs of trauma to the head or eyes in the physical examination.

These facts indicate that many features of posttraumatic subdural hematomas are not satisfactorily explained or understood; namely, the nature of the primary causal trauma in more than half of the cases, the exact causal mechanisms of the combination of subdural and intraocular bleedings, or the vulnerability of the affected structures and tissues to whiplash stresses. The usual presumption that the chronic subdural hematomas are caused by a single acute traumatic episode which produces immediate and massive hematomas which then maintain their volume or increase in volume due to oncotic pressures is far from proved. Many of these facts are better explained theoretically on the basis of repeated subdural bleedings induced by repeated whiplash shaking which causes progressive cumulative changes in the hematomas over several weeks or months.

## THE NATURE OF THE WHIPLASH STRESSES AND THE RESISTANCE OF THE INFANTILE HEAD TO THESE STRESSES

The normal infantile brain and its blood vessels are highly vulnerable to whiplash stresses owing to several normal structural features. The infantile head is relatively heavier and the neck muscles of infancy are weaker than at any other age level. The whiplash stresses on the head from shaking the infant by the extremities and trunk are thus maximized in the infant, in comparison with children whose heads are relatively less in weight and whose cervical muscles relatively and absolutely stronger. The pliable sutures and fontanels are relatively larger and more stretchable in the infantile calvaria, which induces excessive tearing forces at the attachments of vessels to the more rigid fixed soft tissues, such as the falx cerebri, when the head is shaken. The infantile brain case is more supple, so that less forceful whiplash stresses can stretch the brain and its blood vessels more easily. Special lacerating stresses are thus applied to the cerebral bridging veins at the fixed sites of their attachments to the walls of the sagittal sinuses. The infantile brain is unmyelinated and is softer than older myelinated brains. This permits excessive stretching of both brain and vessels. The relatively greater volume of cerebrospinal fluid in the infantile ventricles and in the subarachnoid spaces shift farther and faster during whiplash shaking stresses, and thus increase their stretching effects on the more resistant brain parenchyma and attachments of the blood vessels.

Thus the heavy infantile head with its soft brain, supported poorly by normally weak cervical muscles, fulcrumed on the atlas through the occipital condyles and pivoted on the axis is highly vulnerable to many kinds of whiplash stresses on the head such as shaking, jolting and jerking, especially when they are repeated during long periods.

Shaking of the infant trunk causes a two-phase cycle of rapid, repeated, to-and-fro, alternating, acceleration-deceleration flexions of the head ventrad until the chin strikes the anterior chest wall (sternum), followed immediately by similar but reverse companion extensions of the head on the neck dorsad until the occiput strikes the back (upper thoracic spine). Infants are rarely subjected to a single manual shake. Commonly they are shaken in paroxysms which may be repeated frequently or infrequently over periods of days or weeks, or months in the case of habitual shaking. Many infants receive dozens and scores of whiplash stresses, some hundreds. It is obvious that although the single manual shake of an infant may be less forceful and pathogenic than the single whiplash in an automobile accident, the summation of the injurious effects of the many repeated but less forceful manual shakings may be much more harmful to the brain and the intracranial blood vessels and also to the veins in the eyes. The extremities of the shaker thus may become handles and levers for mishandling (whiplashing) the head; and the hands of an angry parent or jealous older sibling may become "deadly weapons" in either violent whiplash shaking assaults or in protracted habitual less violent casual shakings. Violent or habitual milder slapping or cuffing of the infant's head with the open hand could cause similar but probably less frequent intracranial and intraocular bleedings.

Ommaya, an experienced investigator of whiplash stresses on the brains of small experimental animals, wrote me recently in a personal communication that he agreed with me on the high risk of the whiplash shaking mechanism owing to the high vulnerability of the human infantile calvaria and brain. He and his associates[24] found that the crucial factor in whiplash injuries to the mature head is the inertial effect of the easily deformable brain moving with a time lag after rotating dis-

placement of its more less deformable mature container, the skull. Attachments to the outer surfaces of the brain and the inner surfaces of the skull are thus subjected to powerful tensile and shearing forces. He and his colleagues[25] also found that experimental cerebral concussion as well as gross bruises of the brain and upper cervical cord could be produced by rotational displacement *alone* of the head on the neck. In 1971 Ommaya and Hirsch[26] supported the hypothesis that approximately one half of the potential for brain injury during impact on the head is causally related to head rotation. Rotation of the head is of course a consistent additional stress in the manual ventro-dorsal shaking of infants.

Manual whiplash shaking of the head may be a major causal factor in sudden unexplained infantile deaths ("cot" or "crib" death) associated with epidural hemorrhages of cervical spine reported by Towbin,[27] who found such lesions in four infants who were apparently in good health and died suddenly without apparent cause. There was no history of birth trauma or postnatal trauma. They may have suffered unadmitted manual shaking which caused no physical signs of external trauma. Unfortunately the status of the ocular fundi is not mentioned and the possibility of manual shaking was not considered.

### THE LATENT WLS INFANT SYNDROME

In 1972[2] we raised questions on the probabilities of WLS during early infancy being one of the primary causes of permanent brain damage and mental retardation. In this paper, we have already reported three cases which establish a direct linkage between admitted manual WLS and mental retardation in two,[4] and severe motor deficits (cerebral palsy) in the third.[5] In follow-up studies of three groups of so-called *battered infants*,[28-30] many of whom may have been shaken infants, the incidences of mental retardation were surprisingly high in two groups (77% and 62%). In the third 33% were functionally retarded.

*Habitual, moderate, casual manual whiplash shaking* appears to be practiced to some degree nearly everywhere by many types of parents or parent-surrogates for a wide variety of reasons. The common motives for habitual casual whiplash shaking are punitive for minor misbehavior and disciplinary in normal training. The exact frequency, violence and pathogenicity of this type of infantile "mild" assault have never been studied and are not known, even approximately. However, in view of the high vulnerability of all normal infantile brains to several kinds of whiplash stresses, and the usual repetition of these casual milder shakings over protracted periods. it seems reason-

able to hypothecate that habitual whiplash shakings are pathogenic to some degree in many such cases. It follows that whiplash shaking may be responsible for repeated, small but cumulative intracranial and intraocular bleedings which slowly engender progressive, cumulative permanent disorders of the brain and eyes such as permanent cerebral palsies, mental retardation and permanent impairments of vision. These facts being true, it is highly probable that the routine regular examinations of the ocular fundi in all, even apparently healthy babies, would detect the residues of retinal hemorrhages and make possible the early stoppage of habitual casual shaking. More important, a massive educational campaign on the potential hazards of the habitual casual manual shaking of infants might prevent the development of "mild" mental retardation and "mild" cerebral palsies in thousands of otherwise normal healthy infants. It is possible that many slow-learning and clumsy children with IQs of 90 might have been intelligent and normally mobile children with IQs of 120, had they not been habitually shaken and whiplashed during infancy.

### SUMMARY

Our evidence, both direct and circumstantial, indicates that manual whiplash shaking of infants is a common primary type of trauma in the so-called *battered infant syndrome*. It appears to be the major cause in these infants who suffer from subdural hematomas and intraocular bleedings. The label *"battered infant"* is a misnomer in many cases which may interfere with early diagnosis and proper preventive treatment.

The essential elements in the *infantile whiplash shaking syndrome* present an extraordinary diagnostic contradiction. They include intracranial and intraocular hemorrhages, in the absence of signs of external trauma to the head or fractures of the calvaria, and are associated with traction lesions of the periosteums of the long bones in the absence of fractures and traumatic changes in the overlying skin of the extremities. Usually there is no history of trauma of any kind.

Habitual, prolonged, casual whiplash shakings may produce an insidious progressive clinical picture, the *latent whiplash shaken infant syndrome*, which is often inapparent to both parents and physicians. It usually first becomes evident at school age when minor *idiopathic* cerebral motor defects are first detected along with mild idiopathic mental retardation. Permanent impairments of vision and hearing may also be identified at this time for the first time when the children are 5 to 6 years of age. The actual number of such cases is incalculable from current evidence but it

0000020

...rs to be substantial...

...s concept of the *whiplash shaken infant syn*... ...warrants careful diagnostic consideration ...infants with unexplained convulsions, hy-...ritability, bulging fontanel, paralyses, and ...ful vomiting singly or in combination. The ...he careful examination of the ocular fundi of ...nfants should provide a superior screening ...od for early and massive detection of patho-...c whiplash shakings along with radiographic ...mination of the long bones for confirmation in ...ropriate cases.

...urrent evidence, though manifestly incom-...e and largely circumstantial, warrants a na-...wide educational campaign on the potential ...hogenicity of habitual, manual, casual whip-... shaking of infants, and on all other habits, ...ctices and procedures in which the heads of ...nts are habitually jerked and jolted (whip-...ed).

...he proposed nationwide educational cam-...gn against the shaking, slapping, jerking, and ...ing of infants' heads is summarized in the fol-...ing stanza:

Guard well your baby's precious head,
Shake, jerk and slap it never,
Lest you bruise his brain and twist his mind,
Or whiplash him dead, forever.

J.C.

## REFERENCES

Caffey, J.: Multiple fractures in the long bones of infants suffering from subdural hematoma. Amer. J. Roentgen., 56:163, 1946.

Caffey, J.: On the theory and practice of shaking infants, its potential residual effects of permanent brain damage and mental retardation. Amer. J. Dis. Child., 124:161, 1972.

Personal communication from Dr. Robert Salinger, Pediatrician, who first detected the guilt of the infant nurse and provided me with much valuable first hand information.

Benton, R.: Kids get on my nerves. Master Detective, 53:44, 1957.

Newsweek, 48 (pt. 1) 90, 1956.

Guthkelch, A. N.: Infantile subdural hematoma and its relationship to whiplash injuries. Brit. Med. J., 2:430, 1971.

Helfer, R. E., and Kempe, C. H.: The Battered Child. Chicago: University of Chicago Press, 1965.

Silverman, F. N.: The battered child syndrome. JAMA, 199:163, 1962.

Swischuk, L. E.: Spine and spinal cord trauma in the battered child syndrome. Radiology, 92:733, 1969.

Guarnaschelli, J., et al.: "Fallen fontanelle" (Caida de Mollera); a variant of the battered child syndrome. Amer. J. Dis. Child., 124:1545, 1972.

10. Mushin, A. S., and Morgan, C.: Ocular damage in the battered babe syndrome. Brit. J. Ophthal., 55:343, 1971.

11. Kiffney, G. T.: Ocular damage in the "battered child." Arch. Ophthal., 72:231, 1964.

12. Mushin, A. S.: Ocular damage in the batter-baby syndrome. Brit. Med. J., Aug. 14, 1971, p. 402.

13. Maroteaux, P., et al.: The sequels of Silverman's syndrome. Presse Med., 75:711, 1967.

14. Aron, J. J., et al.: Ocular signs observed in the syndrome of Silverman. Ann. Oculist., 208:533, 1970.

15. Gilkes, M. J., and Mann, T. P.: Fundi of battered babes. Lancet, II:48, 1967.

16. Harcourt, B., and Hopkins, D.: Ophthalmic manifestations of the battered-baby syndrome. Brit. Med. J., 3:398, 1971.

17. Freindly, D. S.: Ocular manifestations of physical child abuse. Trans. Amer. Acad. Ophthal. Otolaryng., 75:318, 1971.

18. Phelps, C. D.: The association of pale-centered retinal hemorrhages with intracranial bleeding in infancy: A report of two cases. Amer. J. Ophthal., 72:348, 1971.

19. Sezen, F.: Retinal hemorrhages in newborn infants. Brit. J. Ophthal., 55:248, 1970.

20. Planten, J. T., and Schaaf, P. C.: Retinal hemorrhages in the newborn. Ophthalmologica, 162:213, 1971.

21. Schlaeder, G., et al.: Retinal hemorrhages in the newborn after vacuum delivery and spontaneous delivery. Gynec. Obstet., 70:98, 1925.

22. Baum, J., and Bulpitt, C. J.: Retinal and conjunctival hemorrhage in the newborn. Arch. Dis. Child., 45:344, 1970.

23. Ingraham, F. D., and Matson, D. D.: Neurosurgery of Infancy and Childhood. Springfield, Ill.: Charles C Thomas, Publisher, 1967.

24. Ommaya, A. K., and Yarnell, P.: Subdural hematoma after whiplash injury. Lancet, 1969, p. 237.

25. Ommaya, A. K., et al.: Whiplash injury and brain damage: An experimental study. JAMA, 204:285, 1968.

26. Ommaya, A. K., and Hirsch, A. E.: Tolerance of cerebral concussions from head impact and whiplash in primates. J. Biomechanics, 4:13, 1971.

27. Towbin, A.: Sudden infant death ("cot" and "crib" death) related to spinal injury. Lancet, II:940, 1967.

27a. Harris, L. S., and Adelson, L.: Spinal injury and sudden infant death: A second look. Amer. J. Clin. Path., 52(3):289, 1969.

28. Elmer, E.: Children in Jeopardy: A Study of Abused Minors and Their Families. Pittsburgh: University of Pittsburgh Press, 1967.

29. Morse, C. W., et al.: A three-year study of abused and neglected children. Amer. J. Dis. Child., 120:439, 1970.

30. Martin, H., In Kempe's Helping the Battered Child and Its Family. Philadelphia: J. B. Lippincott Co., 1972.

## ACKNOWLEDGMENT

Dr. Michael Kashgarian, Pathologist, Yale School of Medicine, provided data from the necropsies of babies H and K.

J Neurosurg 66:409–415, 1987

# The shaken baby syndrome

## A clinical, pathological, and biomechanical study

Ann-Christine Duhaime, M.D., Thomas A. Gennarelli, M.D., Lawrence E. Thibault, Sc.D., Derek A. Bruce, M.D., Susan S. Margulies, M.S.E., and Randall Wiser, M.S.E.

Division of Neurosurgery and Department of Bioengineering, University of Pennsylvania, Philadelphia, Pennsylvania

✓ Because a history of shaking is often lacking in the so-called "shaken baby syndrome," diagnosis is usually based on a constellation of clinical and radiographic findings. Forty-eight cases of infants and young children with this diagnosis seen between 1978 and 1985 at the Children's Hospital of Philadelphia were reviewed. All patients had a presenting history thought to be suspicious for child abuse, and either retinal hemorrhages with subdural or subarachnoid hemorrhages or a computerized tomography scan showing subdural or subarachnoid hemorrhages with interhemispheric blood. The physical examination and presence of associated trauma were analyzed; autopsy findings for the 13 fatalities were reviewed. All fatal cases had signs of blunt impact to the head, although in more than half of them these findings were noted only at autopsy. All deaths were associated with uncontrollably increased intracranial pressure.

Models of 1-month-old infants with various neck and skull parameters were instrumented with accelerometers and shaken and impacted against padded or unpadded surfaces. Angular accelerations for shakes were smaller than those for impacts by a factor of 50. All shakes fell below injury thresholds established for subhuman primates scaled for the same brain mass, while impacts spanned concussion, subdural hematoma, and diffuse axonal injury ranges. It was concluded that severe head injuries commonly diagnosed as shaking injuries require impact to occur and that shaking alone in an otherwise normal baby is unlikely to cause the shaken baby syndrome.

KEY WORDS · shaken baby syndrome · head injury · child abuse

THE term "whiplash shaken baby syndrome" was coined by Caffey[3] to describe a clinicopathological entity occurring in infants characterized by retinal hemorrhages, subdural and/or subarachnoid hemorrhages, and minimal or absent signs of external trauma. Because a nursemaid admitted that she had held several such children by the arms or trunk and shaken them, the mechanism of injury was presumed to be a whiplash-type motion of the head, resulting in tearing of the bridging veins. Such an injury was believed to be frequently associated with fatalities in infantile child abuse and has been postulated as a cause of developmental delay in survivors.[4,15]

While the term "shaken baby syndrome" has become well entrenched in the literature of child abuse, it is characteristic of the syndrome that a history of shaking in such cases is usually lacking.[12] Shaking is often assumed, therefore, on the basis of a constellation of clinical findings and on the computerized tomography (CT) picture of subarachnoid and subdural hematomas,

particularly in the posterior interhemispheric fissure.[17] Because of the ambiguous circumstances of such injuries, medicolegal questions are particularly troublesome, and the neurosurgeon is often consulted to give an opinion as to whether the findings are consistent with child abuse or accidental injury.

This paper reviews all cases of the shaken baby syndrome seen at the Children's Hospital of Philadelphia (CHOP) between January, 1978, and March, 1985. To better study the mechanism of injury, autopsy results in all fatal cases were reviewed, and the biomechanics of this injury were studied in a series of infant models. Based on these observations, we believe that shaking alone does not produce the shaken baby syndrome.

## Clinical Studies

### Clinical Material and Methods

All reports submitted to the Suspected Child Abuse and Neglect team were reviewed. Since house officers

409

0000022

A. C. Duhaime, *et al.*

The s

## TABLE 1
*Initial clinical criteria for diagnosis of shaken baby syndrome*

| Diagnosis* | Cases | | No. of Deaths |
|---|---|---|---|
| | No. | Percent | |
| retinal hemorrhage + SAH or SDH | 29 | 60 | 5 |
| retinal hemorrhage + SAH & SDH | 10 | 21 | 5 |
| bilateral chronic SDH | 3 | 6 | 0 |
| SAH &/or SDH & interhemispheric blood on CT | 6 | 13 | 3 |
| total | 48 | 100 | 13 |

* SAH = subarachnoid hemorrhage; SDH = subdural hemorrhage; CT = computerized tomography.

## TABLE 2
*Best history in 48 cases of shaken baby syndrome*

| Etiology | Cases | |
|---|---|---|
| | No. | Percent |
| shaking only | 1 | 2 |
| fall or accidental blunt trauma | 15 | 31 |
| strike or fall plus shaking | 10 | 21 |
| strike only | 3 | 6 |
| trauma or shaking denied, caretakers in attendance | 8 | 17 |
| history unknown, caretakers not in attendance | 10 | 21 |
| cardiopulmonary resuscitation | 1 | 2 |

## TABLE 3
*Trauma associated with shaken baby syndrome in 48 cases*

| Associated Trauma | Cases | |
|---|---|---|
| | No. | Percent |
| no evidence of blunt impact to head | 18 | 37.5 |
| no extracranial trauma | 12 | 25.0 |
| additional extracranial trauma | 6 | 12.5 |
| acute | 3 | 6.25 |
| old trauma only | 3 | 6.25 |
| evidence of blunt impact to head | 30 | 62.5 |
| skull fractures | 12 | 25.0 |
| cranial soft-tissue contusions | 18 | 37.5 |
| additional extracranial trauma | 18 | 37.5 |
| acute | 15 | 31.25 |
| old trauma only | 3 | 6.25 |

and emergency room personnel are well trained in recognizing the clinical manifestations associated with this syndrome, it is considered that essentially all cases seen at CHOP are reported to this group.

Suspicion of shaking was based on history, clinical findings, and CT data. All subjects met the following criteria: presence of retinal hemorrhages with subdural and/or subarachnoid hemorrhages, bilateral chronic subdural hematomas, or a CT scan showing subdural or subarachnoid hemorrhages with interhemispheric blood. In addition, all patients were judged to have histories suggestive of child abuse or neglect; well-documented, witnessed accidental trauma was excluded. Histories were obtained from several interviews with caretakers by physicians, social workers, and in some cases law enforcement agents. Caretakers were routinely asked specifically about shaking.

Associated trauma data were obtained from physical examination, skull radiographs, CT scans, and skeletal surveys. All fatal cases were examined by the Philadelphia Medical Examiner, and pathology data were obtained from that office.

### Results

Fifty-seven patients with suspected shake injury were identified. Of these, detailed clinical information was available in 48 cases. These patients ranged in age from 1 month to 2 years (mean 7.85 months). Thirty-one patients were male (65%). There were 13 fatalities (27%). Initial clinical criteria for diagnosis of shaken baby syndrome are listed in Table 1. Thirty-nine patients (81%) had retinal hemorrhages plus subarachnoid and/or subdural hemorrhages. The remainder had bilateral chronic subdural hematomas (6%) or the above-mentioned CT findings without retinal hemorrhages (13%).

The most common presenting complaints were lethargy, breathing difficulty, irritability, poor feeding, and seizures. Best history is listed in Table 2; the most common histories were accidental blunt trauma (usually a fall) in 15 (31%) and blunt trauma plus shaking in 10 (21%); trauma and shaking were denied in eight (17%). In three cases (6%) the child was struck by the caretaker. In eight additional cases the history was unknown, usually because the child was left alone or

with a babysitter. There were two cases (4%) with no history to explain the present findings, but both children were known to have been abused previously or subsequently. One case was associated with cardiopulmonary resuscitation (2%). In only one case was a history of shaking alone obtained; this child was reportedly shaken when she appeared to have difficulty in breathing associated with a respiratory infection.

Associated trauma observed clinically, radiographically, or at autopsy is listed in Table 3. The presence of scalp contusion, subgaleal or subperiosteal hemorrhage, and/or skull fracture was considered evidence of blunt impact to the head. Twelve cases (25%) had intracranial findings associated with the shaken baby syndrome alone, with no findings of associated blunt trauma to the head and no extracranial trauma. Six additional cases (13%) had the syndrome without signs of blunt head trauma but did have associated extracranial trauma. Thirty cases (63%) had findings of blunt impact to the head in addition to the intracranial findings of the shaken baby syndrome. Of these, 12 (25%) had skull fractures and 18 (38%) had significant cranial soft-tissue contusions. Most of the fractures were in the occipital or parieto-occipital region.

Clinical history, physical findings, hospital course, intracranial pressure (ICP, when measured), and pathological findings of the 13 fatalities are listed in Tab

4 and 54% hospit died f associa was a size to ineffec

Pat dren w Eight h and sk finding appare and su and lac tion w callosu white usually

### Whole

To susce tively l of 1-m

0060023

# The shaken baby syndrome

TABLE 4
*Clinical and pathological findings in 13 fatal cases of shaken baby syndrome**

| Factor | Case 1 | Case 2 | Case 3 | Case 4 | Case 5 | Case 6 | Case 7 | Case 8 | Case 9 | Case 10 | Case 11 | Case 12 | Case 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| age (mos) | 24 | 7 | 3 | 22 | 11 | 9 | 8 | 5 | 10 | 13 | 24 | 4 | 19 |
| sex | F | M | M | M | F | F | F | M | F | M | M | M | F |
| history | | | | | | | | | | | | | |
|   fall or hit | + | | + | + | + | | | + | + | + | + | + | + |
|   shaking | | | + | | | | | | | | + | | + |
|   trauma denied | | | | | | | | | | | | | |
|   unknown | | + | | | | + | + | | | | | | |
| initial examination | | | | | | | | | | | | | |
|   unresponsive | + | + | + | + | + | + | + | + | + | + | + | + | + |
|   retinal hemorrhages | + | + | | + | | | + | + | + | + | + | + | |
|   cranial impact | + | | | + | | | | | | + | + | + | + |
|   extracranial trauma | + | | | + | + | | | | | | + | + | |
| intracranial pressure | $\uparrow\uparrow$ | NM | $\uparrow\uparrow$ | $\uparrow\uparrow$ | $\uparrow\uparrow$ | NM | $\uparrow\uparrow$ | NM | $\uparrow\uparrow$ | NM | $\uparrow\uparrow$ | $\uparrow\uparrow$ | $\uparrow\uparrow$ |
| survival time (days) | 2 | 2 | 7 | 2 | 3 | 2 | 2 | 1 | 1 | 1 | 4 | 1 | 1 |
| pathology | | | | | | | | | | | | | |
|   cranial contusions | + | + | + | + | + | + | + | + | + | + | + | + | + |
|   skull fracture(s) | ++ | | | ++ | ++ | | | | | | | + | + |
|   subdural hematoma | + | + | + | + | + | + | + | + | + | + | + | + | + |
|   subarachnoid hemorrhage | + | + | + | + | + | + | + | + | + | + | + | + | + |
|   hemispheric contusions | + | + | + | | | | + | | + | | | | + |
|   white matter tears | + | | | | | | + | | + | | | | + |
|   diffuse brain swelling | + | + | + | + | + | + | + | + | + | + | + | + | + |

* $\uparrow\uparrow$ = increased; NM = not measured; + = factor present; ++ = severe.

4 and 5. Mean age in this group was 12.23 months; 54% were male. All of these children arrived at the hospital in an essentially unresponsive state, and all died from the effects of uncontrollably increased ICP associated with massive brain swelling. In only one case was a subdural hematoma thought to be of significant size to warrant surgical intervention, and drainage was ineffective in controlling elevated ICP.

Pathological examination showed that all of the children who died had evidence of blunt head trauma. Eight had soft-tissue contusions and five had contusions and skull fractures. In seven cases, however, impact findings were noted only at autopsy, and had not been apparent prior to death. All fatal cases had subdural and subarachnoid bleeding. Focal cerebral contusions and lacerations occurred in six. Microscopic examination was performed in three cases and showed corpus callosum hemorrhages, cortical laminar necrosis, or white matter hemorrhages. All children had diffuse and usually massive brain swelling.

## Biomechanical Studies

### Whole Infant Models

To test the hypothesis that infants are particularly susceptible to injury from shaking because of a relatively large head and weak neck, we constructed models of 1-month-old infants that were implanted with an accelerometer to measure the results of shaking or impact manipulations. Since the mechanical properties of the infant neck have not been studied, three models were built with different neck structures in order to include the range of limiting conditions that might exist in the live infant. Both a fixed center of rotation with zero resistance (hinge model) and moving centers of rotation with low and moderate resistance (rubber neck models) were tested.

### Experimental Methods

The heads and bodies of the models were adapted from Just Born dolls. Head circumference was 36 cm, coronal width was 10 cm, anteroposterior diameter was 10.75 cm, and height from vertex to base (calculated from a line drawn from chin to caudal occiput) was 9.0 cm; values were comparable to human infants. Brain weight for an infant of this size was assumed to be 500 gm.[1] The ideal weight of the head was estimated by balance-weight measurements of several infants with an average age of 1 month, and was 770 to 870 gm. The heads of the models were tightly filled with cotton, with water added until the desired weight range was reached. The water was absorbed by the cotton and distributed so that no sloshing of the contents occurred. The heads were reweighed after neck insertion and sealing and at the end of all experiments.

Neck length from the skull base to the T-1 vertebra

0000024

TABLE 5

*Summary of findings in 13 fatal cases of shaken baby syndrome*

| Factor | Finding |
|---|---|
| age (mos) | |
| mean | 12.23 |
| range | 3–24 |
| sex M/F | 7/6 |
| history | |
| fall or hit (three with shaking) | 10 |
| unknown | 3 |
| initial examination | |
| unresponsive | 13 |
| retinal hemorrhages | 9 |
| cranial impact | 6 |
| extracranial trauma | 5 |
| intracranial pressure | |
| measured, unable to control | 9 |
| not measured | 4 |
| survival time (days) | |
| range | 1–7 |
| mean | 2.2 |
| pathology | |
| cranial contusions | 13 |
| skull fracture(s) | 5 |
| subdural hematomas (one requiring surgery) | 13 |
| subarachnoid hemorrhage | 13 |
| unilateral | 3 |
| diffuse | 3 |
| multifocal | 7 |
| hemispheric contusions | 6 |
| diffuse, multiple | 3 |
| focal, coup-contrecoup | 3 |
| white matter tears | 4 |
| gross | 2 |
| microscopic | 2 |
| diffuse brain swelling (11 with herniation evident) | 13 |

TABLE 6

*Mean acceleration and time course of shakes and impacts in all models*

| Manipulation | No. | Peak Tangential Acceleration (G) | Time (msec) | Angular Velocity (radians/sec) | Angular Acceleration (radians/sec²) |
|---|---|---|---|---|---|
| shakes | 69 | 9.29 | 106.6 | 60.68 | 1138.54 |
| impacts | 60 | 428.18 | 20.9 | 548.63 | 52,475.70 |

TABLE 7

*Effects of neck condition and "skull" on mean peak tangential acceleration and time course of shakes and impacts*

| Variant | Shakes | | Impacts | |
|---|---|---|---|---|
| | Acceleration (G) | Time (msec) | Acceleration (G) | Time (msec) |
| hinge neck | 13.85 | 92.7 | 423.42 | 18.6 |
| flexible rubber neck | 5.70 | 93.3 | 427.78 | 21.4 |
| stiff rubber neck | 7.02 | 130.5 | 433.33 | 22.8 |
| skull | 9.86 | 107.4 | 436.12 | 20.2 |
| no skull | 8.89 | 103.5 | 427.04 | 21.6 |

TABLE 8

*Effect of impact surface on mean peak tangential acceleration and time course*

| Surface of Impact | Acceleration (G) | Time (msec) |
|---|---|---|
| padded surface | 380.60 | 24.22 |
| metal bar | 489.51 | 17.13 |

was measured from lateral neck films of several normal infants with an average age of 1 month and ranged from 3.5 to 4.5 cm; all models were therefore given neck lengths of 4.0 cm. Necks were embedded in Castolite resin* superiorly, which was also used to seal the head. The interior part of the neck was secured in dental stone.† The stuffed body was then replaced around the dental stone "thorax," with lead weights added as necessary to the thorax to approximate a total body weight of 3 to 4 kg. Arms and legs were not weighted, so the slightly low total weight for age reflects an attempt to approximate trunk:head weight ratios.

Model 1 had a hinge neck made from a 360° steel hinge, 3.6 cm in width, placed in the horizontal plane to allow complete anteroposterior angulation of the head. The center of rotation was 3.3 cm below the estimated level of the neck base (approximating at the C-6 vertebral level). Model 2 had a 1.9-cm diameter hollow rubber neck with a 0.8-cm lumen. This neck

did not support the weight of the head in the upright position but did not kink when the head was allowed to fall unsupported. Model 3 had a 2.9-cm rubber neck with a 1.2-cm lumen. This neck was able to support the head in the vertical position but allowed full passive movement of the head. In all models, head motion was limited in the anteroposterior direction by the occiput striking the upper back and the chin striking the chest.

To test for the effect of the deformability of the model heads on impact, all models were tested with and without an external "pseudoskull" made from thermoplastic.‡ This "skull" was 1/8 in. thick and was molded to the occipital, parietal, temporal, and posterior frontal areas, with the facial area uncovered. The "skulls" weighed 170 to 200 gm.

Data were recorded from a piezoelectric accelerometer§ embedded in a small piece of thermoplastic and attached to the vertex in a coronal plane through the

* Resin manufactured by Buehler Ltd., Evanston, Illinois.
† Dental stone, Glastone Type IV, manufactured by Ransom and Randolph Co., Toledo, Ohio

‡ Polyform thermoplastic manufactured by Rolyan Medical Products, Menomonee Falls, Wisconsin.
§ Accelerometer manufactured by Endevco Corp., San Juan Capistrano, California.

412

*et al.*

The shaken baby syndrome

*ts in*

*ilar ation /sec²)*

3.54

5.70

*ntial*

Time msec)

18.6
21.4
22.8
20.2
21.6



FIG. 1. Representative tangential acceleration traces for infant models undergoing shake *(upper)* and impact *(lower)* manipulations. While manipulations of the infant models were performed as described, with a series of shakes followed by an impact, the magnitude of the impact accelerations was so much greater than that associated with the shakes that different scales are used to display the respective acceleration traces.



FIG. 2. Angular acceleration versus angular velocity for shakes and impacts, with injury thresholds from primate experiments scaled to 500-gm brain weight. DAI = diffuse axonal injury; SDH = subdural hematoma.

*ation*

center of the neck. Each model was subjected to repetitive violent shaking, allowing the head to travel its full excursion several times, by adult male and female experimenters. The models were held by the thorax facing the experimenter and were shaken in the anteroposterior plane, since this is the motion most commonly described in the shaken baby syndrome. At the end of each series of shakes the occiput was impacted against either a metal bar or a padded surface. Each model was tested at least 20 times. Acceleration traces were amplified and recorded.‖

*right owed neck rt the assive n was :ciput :hest. f the with ther-l was »oste- . The*

Angular accelerations were calculated from the measured peak tangential accelerations by using C-6 as the center of rotation in all cases. Angular velocity was calculated as the time integral of the acceleration curve. Translational forces were assumed to be minimal.

*Results*

The data were collected from 69 shaking episodes ("shakes") and 60 "impacts." Typical tangential acceleration traces for shake and impact manipulations are shown in Fig. 1. The criterion for significant difference was $p < 0.01$ in all cases.

*Shakes Versus Impacts.* Angular acceleration and angular velocity for each shake and impact are shown in Fig. 2. Mean peak tangential acceleration for 69 shaking episodes was 9.29 G; mean peak tangential acceleration for 60 impacts was 428.18 G (Table 6). The accelerations due to impact are significantly greater than those obtained by shaking ($p < 0.0001$); on the average, impact accelerations exceed shake accelerations by a factor of nearly 50 times. Mean time interval

*rom- : and h the*

*Medi- ., San*

for shakes was 106.6 msec and for impacts was 20.9 msec. This difference is significant at the $p = 0.001$ level.

*Effects of Neck Condition.* Mean tangential accelerations and time courses for shakes and impacts for each neck condition are presented in Table 7. There is no significant difference between the hinge neck, the flexible rubber neck, and the stiff rubber neck in the mean acceleration resulting from impacts (423.4, 427.8, and 433.3 G, respectively) or in the mean time course (18.6, 21.4, and 22.8 msec, respectively). With shakes, the more flexible hinge neck is associated with higher accelerations (mean 13.85 G) than the two rubber neck models (mean 5.7 and 7.0 G) ($p < 0.001$). There is an inverse relationship between neck stiffness and time duration of a shake: the stiff rubber neck was associated with a longer time course than the more flexible rubber neck (130.5 msec and 93.3 msec, respectively) ($p < 0.001$).

*Effects of "Skull."* The presence of a hard thermoplastic "skull" did not change the magnitude or time course of accelerations associated with shaking of the models. The acceleration magnitude and time course were also unchanged when the models were impacted. These data are shown in Table 7.

*Effects of Impact Surface.* Impact against a padded surface was associated with significantly smaller acceleration (mean 380.6 G) and longer time course (mean 24.22 msec) than that against a metal bar (mean 489.5 G and 17.13 msec) ($p < 0.001$). Data are shown in Table 8.

‖ Shock amplifier, Model 2740 A, and pulse memory unit, Model 2743, manufactured by Endevco Corp., San Juan Capistrano, California.



0000026

## Discussion

Clinical head injury can be classified into two major categories according to the distribution of pathological damage, whether focal or diffuse.[10] Such a distinction is important for treatment and prognosis, as well as for establishing the biomechanical conditions necessary to produce a given injury type. It has been established both experimentally and clinically that most focal injuries are associated with impact loading, resulting in contact phenomena, while diffuse injuries are associated with impulsive loading conditions resulting from acceleration-deceleration phenomena.[6] Damage to the brain occurs as a result of these biomechanical forces and from the secondary effects of ischemia due to altered autoregulation or brain swelling.

The shaken baby syndrome has been postulated to result from the effects of nonimpact acceleration-deceleration forces. It has been suggested that the back and forth movement of the head alone is sufficient to cause tearing of bridging veins, resultant subdural hematomas, and death.[8,13] The relatively large size of an infant's head, weakness of the neck musculature, softness of the skull, relatively large subarachnoid space, and high water content of the brain have been postulated to contribute to the susceptibility of shaking injuries in infants.[4,14]

While shaking alone has been considered sufficient to cause a fatal injury, the usual lack of history of the true mechanism of injury in these cases has hampered accurate clinicopathological correlations. It is of interest, however, that in a recent series of fatal cases of infantile head injuries from suspected child abuse,[5] white matter tears were found similar to those described by Lindenberg and Freytag[11] in blunt trauma in infancy. In addition, lesions in the distribution typical of diffuse axonal injury, like those found in adult head injury and in subhuman primates subjected to high acceleration-deceleration injury,[7] were described in some cases. In fact, at least one of Caffey's original cases[3] included "lacerations of the cerebral parenchyma." Shaking alone was the presumed mechanism of these injuries.

As experience has accumulated in experimental angular acceleration injury it has become clear that, besides the magnitude of the acceleration, another important biomechanical factor influencing injury type is the time interval over which the acceleration occurs. Thus, large angular accelerations occurring over shorter time periods tend to result in subdural hematoma, while longer intervals are associated with diffuse axonal injury.[6] A tolerance scale relating these two factors to resultant injury has been developed for the subhuman primate by Thibault and Gennarelli.[16] Values above certain critical limits result in a particular type of injury such as concussion, subdural hematoma, or diffuse axonal injury. When such a curve is scaled for the brain mass of an infant the size of our models, it can be seen that the angular acceleration and velocity associated with shaking occurs well below the injury range, while

the values for impacts span concussion, subdural, and diffuse axonal injury ranges (Fig. 2). This was true for all neck conditions with and without skulls. A padded surface decreases the magnitude of acceleration and lengthens the time course to some extent, but these impacts also fall in the injury range.

These results are consistent with the observation that the fatal cases of the shaken baby syndrome in this series were all associated with evidence of blunt impact to the head. This preponderance of blunt trauma has also been found in at least one other series of nonaccidental head trauma in childhood in which the mechanism of injury was investigated.[9] It is of interest that in more than half of our fatal cases, no evidence of external trauma was noted on the initial physical examination, which helped to contribute to the diagnosis of "shaken baby syndrome." Skull fractures and scalp contusions were found at autopsy, however, most often in the occipital or parieto-occipital region. In addition, several babies had parenchymal lesions in a distribution consistent with diffuse axonal injury.[11]

While some reports on the shaken baby syndrome mention brain swelling, in most reports the subdural collections themselves have been postulated as the cause of death. In this series, all fatalities were consequent to uncontrollable brain swelling, and it is clear that drainage of the small collections present would have been useless in controlling the ICP. The problem of acute brain swelling is particularly common in the pediatric population, and its cause is poorly understood.[2] Whether high accelerations in the anteroposterior direction have some particular association to this complication remains to be investigated.

It is our conclusion that the shaken baby syndrome, at least in its most severe acute form, is not usually caused by shaking alone. Although shaking may, in fact, be a part of the process, it is more likely that such infants suffer blunt impact. The most common scenario may be a child who is shaken, then thrown into or against a crib or other surface, striking the back of the head and thus undergoing a large, brief deceleration. This child then has both types of injury — impact with its resulting focal damage, and severe acceleration-deceleration effects associated with impact causing shearing forces on the vessels and parenchyma. Unless a child has predisposing factors such as subdural hygromas, brain atrophy, or collagen-vascular disease, fatal cases of the shaken baby syndrome are not likely to occur from the shaking that occurs during play, feeding, or in a swing, or even from the more vigorous shaking given by a caretaker as a means of discipline.

#### Acknowledgments

The authors are grateful to Lucy Rorke, M.D., Giustino Tomei, M.D., Karen Hess, M.S.E., Toni Siedl, M.S.W., and Thomas Langfitt, M.D., for advice and assistance with this project.

414

0000027

me, *et al.*

The shaken baby syndrome

### References

1. Adams RD, Victor M: **Principles of Neurology, ed 2.** New York: McGraw-Hill, 1981, pp 387–417
2. Bruce DA, Alavi A, Bilaniuk L, et al: Diffuse cerebral swelling following head injuries in children: the syndrome of "malignant brain edema." **J Neurosurg 54:**170–178, 1981
3. Caffey J: On the theory and practice of shaking infants. Its potential residual effects of permanent brain damage and mental retardation. **Am J Dis Child 124:**161–169, 1972
4. Caffey J: The whiplash shaken infant syndrome: manual shaking by the extremities with whiplash-induced intracranial and intraocular bleedings, linked with residual permanent brain damage and mental retardation. **Pediatrics 54:**396–403, 1974
5. Calder IM, Hill I, Scholtz CL: Primary brain trauma in non-accidental injury. **J Clin Pathol 37:**1095–1100, 1984
6. Gennarelli TA, Thibault LE: Biomechanics of head injury, in Wilkins RH, Rengachary SS (eds): **Neurosurgery.** New York: McGraw-Hill, 1985, pp 1531–1536
7. Gennarelli TA, Thibault LE, Adams JH, et al: Diffuse axonal injury and traumatic coma in the primate. **Ann Neurol 12:**564–574, 1982
8. Guthkelch AN: Infantile subdural haematoma and its relationship to whiplash injuries. **Br Med J 2:**430–431, 1971
9. Hahn YS, Raimondi AJ, McLone DG, et al: Traumatic mechanisms of head injury in child abuse. **Childs Brain 10:**229–241, 1983
10. Langfitt TW, Gennarelli TA: A holistic view of head injury including a new clinical classification, in Grossman RG, Gildenberg PL (eds): **Head Injury: Basic and Clinical Aspects.** New York: Raven Press, 1982, pp 1–14
11. Lindenberg R, Freytag E: Morphology of brain lesions from blunt trauma in early infancy. **Arch Pathol 87:**298–305, 1982
12. Ludwig S, Warman M: Shaken baby syndrome: a review of 20 cases. **Ann Emerg Med 13:**104–107, 1984
13. McClelland CQ, Rekate H, Kaufman B, et al: Cerebral injury in child abuse: a changing profile. **Childs Brain 7:**225–235, 1980
14. Merten DF, Osborne DRS: Craniocerebral trauma in the child abuse syndrome. **Pediatr Ann 12:**882–887, 1983
15. Sarsfield JK: The neurological sequelae of non-accidental injury. **Dev Med Child Neurol 16:**826–827, 1974
16. Thibault LE, Gennarelli TA: Biomechanics of diffuse brain injuries, in: **Proceedings of the Fourth Experimental Safety Vehicle Conference.** New York: American Association of Automotive Engineers, 1985
17. Zimmerman RA, Bilaniuk LT, Bruce D, et al: Computed tomography of craniocerebral injury in the abused child. **Radiology 130:**687–690, 1979

Manuscript received June 16, 1986.
*Address reprint requests to:* Ann-Christine Duhaime, M.D., Division of Neurosurgery, University of Pennsylvania, Philadelphia, Pennsylvania 19014.

dural, and
was true for
. A padded
ration and
, but these

rvation that
me in this
lunt impact
trauma has
of nonacci-
the mecha-
erest that the
evidence of
physical ex-
ne diagnosis
es and scalp
, most often
In addition,
distribution

y syndrome
he subdural
as the cause
consequent
s clear that
would have
problem of
n in the pe-
understood.[2]
sterior direc-
is complica-

y syndrome,
not usually
ing may, in
ely that such
non scenario
own into or
: back of the
deceleration.
impact with
eleration-de-
ausing shear-
na. Unless a
dural hygro-
disease, fatal
not likely to
play, feeding,
rous shaking
ine.

A.D., Giustino
l, M.S.W., and
ance with this

0000028

expression of autoantibodies of man and the NOD mouse: evidence for early determination of subsequent diabetes. *Proc Natl Acad Sci USA* 2000;97:1701-6.

19 Martin S, Wolf-Eichbaum D, Duinkerken G, Scherbaum WA, Kolb H, Noordzij JG, et al. Development of type 1 diabetes despite severe hereditary B-lymphocyte deficiency. *N Engl J Med* 2001;345:1036-40

20 Imagawa A, Hanafusa T, Itoh N, Waguri M, Yamamoto K, Miyagawa J, et al. Immunological abnormalities in islets at diagnosis paralleled further deterioration of glycaemic control in patients with recent-onset type 1 (insulin-dependent) diabetes mellitus. *Diabetologia* 1999;42:574-6.

21 Herold KC, Hagopian W, Auger JA, Poumian-Ruiz E, Taylor L, Donaldson D, et al. Anti-CD3 monoclonal antibody in new-onset type 1A diabetes mellitus. *N Engl J Med* 2002;346:1692-8.

22 Foulis AK, Liddle CN, Farquharson MA, Richmond JA, Weir RS. The histopathology of the pancreas in type 1 diabetes (insulin dependent) mellitus: a 25-year review of deaths in patients under 20 years of age in the United Kingdom. *Diabetologia* 1986;29:267-74.

23 Verge CF, Gianani R, Kawasaki E, Yu L, Pietropaolo M, Jackson RA, et al. Prediction of type 1 diabetes in first-degree relatives using a combination of insulin, GAD, and ICA512bdc/IA-2 autoantibodies. *Diabetes* 1996;45:926-33.

24 LaGasse JM, Brantley MS, Leech NJ, Rowe RE, Monks S, Palmer JP, et al. Successful prospective prediction of type 1A diabetes in schoolchildren through multiple defined autoantibodies: an 8-year follow-up of the

25 Kulmala P, et al. Prediction of insulin-dependent diabetes mellitus: psychological impact on children and parents. *J Pediatr Endocrinol Metab* 2001;...

26 Barker J, Klingensmith G, Barriga K, Rewers M. Clinical characteristics of type 1 diabetic children identified by a genetic screening and intensive follow-up program. *Diabetes* 2003;52(suppl 1):A188.

27 Turner R, Stratton I, Horton V, Manley S, Zimmet P, Mackay IR, et al. UKPDS 25: autoantibodies to islet-cell cytoplasm and glutamic acid decarboxylase for prediction of insulin requirement in type 2 diabetes. *Lancet* 1997;350:1288-93.

28 Atkinson MA, Leiter EH. The NOD mouse model of type 1A diabetes: as good as it gets? *Nat Med* 1999;5:601-4.

29 Diabetes Control and Complications Trial, Epidemiology of Diabetes Interventions and Complications Research Group. Retinopathy and nephropathy in patients with type 1A diabetes four years after a trial of intensive therapy. *N Engl J Med* 2000;342:381-9.

30 Vajo Z, Duckworth WC. Genetically engineered insulin analogs: diabetes in the new millennium. *Pharmacol Rev* 2000;52:1-9.

31 Buhl GB, Owens DR. Insulin glargine. *Lancet* 2001;358:443-5.

32 Meyer L, Guerci B. Metformin and insulin in type 1A diabetes: the first step. *Diabetes Care* 2003;26:1655-6.

33 Shapiro AM, Lakey JR, Ryan EA, Korbutt GS, Toth E, Warnock GL, et al. Islet transplantation in seven patients with type 1A diabetes mellitus using a glucocorticoid-free immunosuppressive regimen. *N Engl J Med* 2000;343:230-8.

---

**EXHIBIT "C"**

---

## Evidence based case report

# Perimacular retinal folds from childhood head trauma

P E Lantz, S H Sinal, C A Stanton, R G Weaver Jr

Editorials by Geddes and Plunkett and Harding et al

Department of Pathology, Wake Forest University School of Medicine, Winston-Salem, NC 27157, USA
P E Lantz *associate professor*
C A Stanton *associate professor*

Department of Paediatrics, Wake Forest University School of Medicine
S H Sinal *professor*

Department of Ophthalmology, Wake Forest University School of Medicine
R G Weaver Jr *associate professor*

Correspondence to: P E Lantz plantz@wfubmc.edu

*BMJ* 2004;328:754-6

A previously healthy 14 month old child was transferred to our medical centre with a severe head injury. The father had collected the boy and his 3 year old brother from their mother at his workplace car park and taken them home while their mother went to work. The children had been watching television while the father prepared dinner. After hearing something fall, the father found the boy on the floor with the television covering the right side of the head and anterior chest. A homemade television stand was partially across the child's lower legs. His older brother stated, "television fell." As soon as the father removed the television, he noticed the child's head beginning to swell. A neighbour drove them to the local hospital. According to the father and the neighbour, the child never stopped breathing and no resuscitative efforts were attempted.

Cranial computed tomography showed extensive head injuries. He had soft tissue swelling of the scalp, diffuse cerebral oedema with a subdural haematoma overlying the frontal convexities and layering along the falx cerebri, a left sided skull fracture adjacent to a widely diastatic coronal suture, cerebral contusions beneath the fracture, and a rightward midline shift measuring 8 mm. The paediatric ophthalmologist described bilateral dot and blot intraretinal haemorrhages, preretinal haemorrhages, and perimacular retinal folds (fig 1).

The child's condition deteriorated, and he died 18 hours after the incident. Child Protective Services removed the 3 year old sibling from the home because the retinal haemorrhages and retinal folds were considered diagnostic of abusive head trauma from shaking. This action was taken despite the father's repeated detailed, consistent account provided to emergency staff, the paediatric child abuse specialist, paediatric intensive care doctors, and law enforcement authorities.

## Postmortem evidence

A forensic autopsy showed no direct trauma to the orbits or eyes. There were prominent bilateral scalp contusions with soft tissue and intramuscular haemorrhage, symmetrical parietal skull fractures with coronal sutural diastasis, and a lacerated dura mater with extrusion of brain and blood. In addition to bilateral subdural and subarachnoid haemorrhages, a thin epidural haematoma partially covered the frontoparietal, calvarial lamina interna. The brain showed bilateral cortical contusions, severe cerebral oedema, and diffuse anoxic-ischemic injury. Postmortem ocular examination showed haemorrhages of the optic nerve sheaths with subdural haemorrhage greater than subarachnoid haemorrhage. Both eyes had extensive retinal haemorrhages with perimacular retinal folds (fig 2). Retinoschisis and peripapillary intraretinal haemorrhages were evident, and the retinal haemorrhages extended from the posterior pole to the ora serrata affecting the preretinal, intraretinal, and subretinal layers.

When investigators went to the house to recover the television before the family returned home, it was still on the carpeted floor. The 480 mm screen television with built in videocassette recorder weighed 19.5 kg. The homemade television stand measured 762 mm (height)×635 mm (width)×508 mm (depth) and had a bottom drawer that held videotapes. A greasy smudged area on the glass of the television corresponded with the impact site on the child's head.

A re-enactment in which a 11.4 kg weight (similar to the child's weight at autopsy of 11.8 kg) was placed on the partially opened drawer caused the television and


*Details of the included studies are on bmj.com*

0000029

Case 1:09-cv-00052-MR-GRJ to Document 21-43   Filed 03/22/11   Page 62 of 106

According to investigators, the family home was 7 km from the workplace and about 6 km from the local hospital. Based on the distance and estimated driving times plus workplace time clock records, the father was home with the children about 20 minutes when the incident happened. The day after the incident, while in foster care, the 3 year old sibling corroborated the father's account. Despite all this evidence, the paediatric ophthalmologist repeated that perimacular retinal folds coincident with retinal haemorrhages were considered specific for shaken baby syndrome secondary to retinal traction exerted by the oscillating vitreous.

## Search for published evidence

We were unable to find a published report of perimacular retinal folds in a childhood non-abusive head injury. We therefore did a systematic review of the medical literature on perimacular retinal folds associated with abusive head trauma in infants and young children. Our background question became: "In infants and young children with an acute intracranial injury, are perimacular retinal folds specific for head injury from vitreoretinal traction occurring during cycles of acceleration and deceleration (shaken baby syndrome)?"

We searched the Medline (1966-2003) database using the terms retinal folds and child abuse and uncovered seven non-comparative case series articles.[1-7] We also examined references cited in these articles plus review articles and book chapters on ocular findings in child abuse mentioning or discussing perimacular retinal folds relative to non-accidental head injury. Similar searches in the Cochrane Library, ISI Web of Science, and Ovid found no additional articles.

## Results

We found 42 articles and book chapters discussing perimacular retinal folds in childhood abusive head trauma. Seventeen mentioned the presence of retinal folds in non-accidental head injury but did not comment on specificity or formative mechanism. A table on bmj.com gives details of the remaining articles. All but two of the articles are non-comparative clinical or autopsy case series, case reports, review articles, or book chapters.

The two studies that included controls both showed bias in selection of controls and contained no cases with perimacular retinal folds but discussed the postulated causal mechanism.[8 9] In the prospective controlled study, the authors reported on 79 children younger than 3 years who had sustained head injuries.[8] The manner of injury in one case was indeterminate. Three children, including one who died, had non-accidental head injury diagnosed, all of whom had retinal haemorrhages; 72 of the 75 children with non-abusive injuries were managed by observation alone. No perimacular retinal folds were observed; however, the presumed causative mechanism of traumatic retinoschisis and retinal folds was discussed.

The second controlled study was a prospective autopsy study that examined the presence and location of ocular findings in 169 childhood deaths.[9] Ocular haemorrhages (retinal, peripheral retinal, optic nerve sheath and intrascleral) were more likely in craniocer-



Fig 1  Clinical image highlighting temporal portion of perimacular retinal fold at 2-3 o'clock area in left eye with a blood vessel bending over the fold (magnification ×6)

ebral trauma than in non-head injuries and natural diseases. Although case selection was purportedly random, the study contained a disproportionately high number of deaths from child abuse compared with natural and non-abusive causes. Case selection depended on the pathologist's willingness to participate in the study, and we were told by one of the authors that pathologists were more willing to participate when they believed that the deaths were abusive or suspicious (M Gilliland, personal communication, 2002). Perimacular retinal folds were not noted, but the authors concluded that acceleration-deceleration injury to the retina accounts for peripheral retinal haemorrhages and retinal folds.

## Supporting evidence

The references cited to support statements about the specificity or causal mechanism of perimacular retinal folds and abusive head injury in the articles we found are all non-comparative observational reports, unsystematic review articles, and book chapters. Seventy per cent of the articles cited four non-comparative case series.[1 2 3 10] We assessed the quality of this evidence.

Gaynon et al reported on two infants with presumed shaken baby syndrome who had retinal folds and concluded that these folds may be a hallmark



Fig 2  Transilluminated retinal image of right eye at autopsy showing circinate, elevated, perimacular retinal fold and extensive retinal haemorrhages

0000030

down a stairway.

Massicotte et al reported the ocular findings at autopsy of three children with perimacular retinal folds.[7] Two infants had sustained direct head trauma, but in the other there was no physical or forensic evidence of direct head trauma. They observed that the vitreous had partially separated from the retina but remained attached to the internal limiting membrane at the apices of the folds and the vitreous base. They concluded that their study confirmed the role of vitreous traction in formation of perimacular folds and proved that shaking alone caused these folds and shaking was never an accidental phenomenon.

Elner et al reviewed the ocular and autopsy findings in 10 consecutive children who died of suspected child abuse.[3] Perimacular retinal folds were observed in three children, all of whom had evidence of blunt head injuries.

Greenwald et al reported five cases of children in whom definite or probable physical abuse during infancy was associated with traumatic retinoschisis.[10] They hypothesised that when an infant is shaken, the head is subjected to repetitive accelerations and decelerations causing the relatively dense lens to move forward and back within the ocular fluids. Transmission of force through firm attachments between the lens, vitreous gel, and particularly the macular retina presumably would result in appreciable traction on the retina causing it to split and creating the surrounding folds.

## Discussion

Statements in the medical literature that perimacular retinal folds are diagnostic of shaken baby syndrome are not supported by objective scientific evidence. Non-comparative observational reports and unsystematic narrative review articles contain insufficient evidence to provide unbiased support for or against diagnostic specificity, and inferences about associations, causal or otherwise, cannot be determined. Clinical and autopsy evidence of ocular lesions must therefore be considered alongside other physical findings and a thorough investigation before concluding whether a head injury is caused by abuse. The child in our case had ocular haemorrhages (peripheral retinal, optic nerve sheath and intraocular) and retinoschisis, which again some people consider specific for child abuse. Unfortunately, the evidence for these assumptions has similar problems to

syndrome diagnosis.[1998] uncovered a weak scientific evidence base, selection bias, inappropriate controls, and the lack of precise criteria for case definition were identified as important problems with the data. Many studies committed a fallacy of assumption, selecting cases by the presence of the clinical findings that were sought as diagnostically valid. Unsystematic reviews and consensus statements often mingled opinion with facts and added no original supporting evidence.

Perimacular retinal folds are associated with increased neurological morbidity and mortality in infants and children with abusive head injuries.[4] The reported incidence of perimacular retinal folds in shaken baby syndrome varies from 6% in a consecutive clinical case series to 50% in a sequential autopsy case series.[4 12] Clinical and autopsy studies with appropriately matched controls are needed to determine the causal mechanism of perimacular retinal folds and their specificity for abusive head injury. Until good evidence is available, we urge caution in interpreting eye findings out of context.

Contributors: PEL conceived the idea, collected the articles, and wrote the initial draft. All authors contributed to the review process, writing, and final editing of the paper. PEL is the guarantor.

Competing interests: None declared.

1  Gaynon MW, Koh K, Marmor MF, Frankel LR. Retinal folds in the shaken baby syndrome. Am J Ophthalmol 1988;106:423-5.
2  Massicotte SJ, Folberg R, Torczynski E, Gilliland MG, Luckenbach MW. Vitreoretinal traction and perimacular retinal folds in the eyes of deliberately traumatised children. Ophthalmology 1991;98:1124-7.
3  Elner SG, Elner VM, Arnall M, Albert DM. Ocular and associated findings in suspected child abuse. A necropsy study. Arch Ophthalmol 1990;108:1044-101.
4  Han DP, Wilkinson WS. Late ophthalmic manifestations of the shaken baby syndrome. J Pediatr Ophthalmol Strabismus 1990;27:299-303.
5  Marshall DH, Brownstein S, Durey MW, Addison DJ, Carpenter B. The spectrum of postmortem ocular findings in victims of shaken baby syndrome. Can J Ophthalmol 2001;36:377-83.
6  Mills M. Funduscopic lesions associated with mortality in shaken baby syndrome. J Am Assoc Pediatr Ophthalmol Strabismus 1998;2:67-71.
7  Munger CE, Peiffer RL, Bouldin TW, Kylstra JA, Thompson RL. Ocular and associated neuropathologic observations in suspected whiplash shaken infant syndrome: a retrospective study of 12 cases. Am J Forensic Med Pathol 1993;14:193-200.
8  Buys YM, Levin AV, Enzenauer RW, Elder JE, Letourneau MA, Humphreys RP, et al. Retinal findings after head trauma in infants and young children. Ophthalmology 1992;99:1718-23.
9  Gilliland MG, Luckenbach MW, Chenier TC. Systemic and ocular findings in 169 prospectively studied child deaths: retinal haemorrhages usually mean child abuse. Forensic Sci Int 1994;68:117-32.
10  Greenwald MJ, Weiss A, Oesterle CS, Friendly DS. Traumatic retinoschisis in battered babies. Ophthalmology 1986;93:618-25.
11  Donohue M. Evidence-based medicine and shaken baby syndrome. Part 1: literature review, 1966-1998. Am J Forensic Med Pathol 2003;21:239-42.
12  Kivlin JD, Simons KB, Lazoritz S, Ruttum MS. Shaken baby syndrome. Ophthalmology 2000;107:1246-54.

(Accepted 28 January 2004)

## Submitting articles to the *BMJ*

We are now inviting all authors who want to submit a paper to the *BMJ* to do so via the web (http://submit.bmj.com).

Benchpress is a website where authors deposit their manuscripts and editors go to read them and record their decisions. Reviewers' details are also held on the system, and when asked to review a paper reviewers will be invited to access the site to see the relevant paper. The system is secure, protected by passwords, so that authors see only their own papers and reviewers see only those they are meant to.

Anyone with an internet connection and a web browser can use the system.

The system provides all our guidance and forms and allows authors to suggest reviewers for their paper. Authors get an immediate acknowledgement that their submission has been received, and they can watch the progress of their manuscript. The record of their submission, including editors' and reviewers' reports, remains on the system for future reference.

The system itself offers extensive help, and the BMJ Online Submission Team will help authors and reviewers if they get stuck.

Benchpress is accessed via http://submit.bmj.com or via a link from bmj.com

0000031

## Subdural and retinal haemorrhages are not necessarily signs of abuse

EDITOR—The "serious data gaps, flaws of logic, and inconsistency of case definition" shown up by the evidence based case report of the shaken baby syndrome (p 754) and highlighted in the accompanying editorials (pp 719 and 720) will be of interest to the many parents who over the past 10 years have maintained that they have been wrongly accused and convicted of causing their children's injuries.[1-3]

Furthermore, the recent evidence emphasised by Geddes and Plunkett that trivial falls and other minor injuries can give rise to the allegedly characteristic signs of subdural and retinal haemorrhages is consistent with a triad of possible alternative explanations for shaken baby syndrome. This triad has emerged from an analysis of 98 parental accounts reported to the support group the Five Percenters, each of the three being compatible with a distinct type of neuropathology.

The first is minor trauma (37% of cases). This group gives a history of minor trauma (such as a fall from a bed or sofa) with either immediate loss of consciousness or delayed presentation of an acute subdural bleed and retinal haemorrhages. This is in line with the recently reported series from the United States of independently witnessed minor falls resulting in an acute intracranial bleed, the retinal haemorrhages being caused by a sudden rise in retinal venous pressure as in Terson's syndrome.[4]

The second is birth injury (29% of cases). The clinical presentation in the second group is quite different. There is a general period of variable length of non-specific symptoms such as vomiting and lethargy warranting repeated medical consultations until computed tomography shows the presence of a chronic subdural haemorrhage. The most likely aetiology is a subdural bleed at birth, which, though usually associated with prematurity or a difficult labour, can follow a normal delivery.[5]

The third is respiratory arrest (22% of cases). In this group the precipitating event is suggestive of respiratory arrest—often followed by attempts at resuscitation—that could result in the subdural and retinal haemorrhages characteristic of hypoxic encephalopathy. The findings that severe traumatic brain damage is not, as previously thought, present in these cases contradicts the assumption that such injuries could only have been induced by violent shaking.[6]

A fourth type of presentation, epileptiform seizures (12%) is presumably secondary to underlying intracranial disease—and is thus uninformative about possible aetiology.

These three patterns of clinical events—in the absence of other circumstantial evidence for non-accidental injury—offer a more credible explanation than shaken baby syndrome for the presence of subdural and retinal haemorrhages. It should be noted that shaking has never been directly observed or proved to cause such injuries but is rather an inference based on (contested) theories of abuse.

James LeFanu *general practitioner*
Mawbey Brough Health Centre, London SW8 1UD

Bloch Edwards-Brown *director*
The Five Percenters, PO Box 23212, London SE14 5WB
sbs5@clivium.co.uk

Competing interests: JLeF—none declared. RE-B is director of a voluntary organisation providing advice, information, and support to parents who state that they have been wrongly accused of shaken baby syndrome. Neither she nor any individual in the organisation has any financial competing interests.

1  Leese PB, Steal SH, Sesmon CA, Weaver RG Jr. Perinatal retinal folds from childhood head trauma. *BMJ* 2004;328:578-4. (27 March).
2  Geddes JF, Plunkett J. The evidence base for the shaken baby syndrome. *BMJ* 2004;328:719-20. (27 March).
3  Harding B, Risdon RA, Krous HF. Shaken baby syndrome. *BMJ* 2004;328:720-1. (27 March).
4  Plunkett J. Fatal pediatric head injuries caused by short-distance falls. *Am J Forensic Med Pathol* 2001;22:1-12.
5  Towner D, Castro M, Eby-Wilkins E, Gilbert W. Effect of mode of delivery in nulliparous women on neonatal intracranial injury. *N Engl J Med* 1999;341:1709-14.
6  Geddes J, Tasker R, Hackshaw A, Nickols C, Adams G, Whitwell H, Scheimberg I, et al. Dural haemorrhage in non-traumatic infant deaths: Does it explain the bleeding in the "shaken baby syndrome"? *Neuropathol Appl Neurobiol* 2003;29:14-22.
7  Ommaya AK, Goldsmith W, Thibault L. Biomechanics and neuropathology of adult and paediatric head injury. *Br J Neurosurg* 2002;16:220-42.
8  Minns RA, Busuttil A. Patterns of presentation of shaken baby syndrome. Electronic responses re: Brain haemorrhage in babies may not indicate violent abuse. bmj.com 2003. bmj.com/cgi/eletters/326/7400/616a (accessed 17 July 2003).

## Reluctance in child protection must be for several reasons

EDITOR—In his news item Dyer reports that doctors are reluctant to work on child protection committees.[1] I have yet to meet a paediatrician who is genuinely keen to do child protection work. Not surprisingly, the Royal College of Paediatrics and Child Health is experiencing enormous difficulties filling the relevant posts.

Most paediatricians in training today do not wish to do community paediatrics in the future. It is certainly essential to have a named paediatrician for child protection in every hospital, but, ironically, in my experience, even the named paediatricians for child protection in some cases are reluctant to show passion in this field.

This general reluctance must be for several reasons, not least a lack of proper training. The royal college should look into this with an open mind. Also, why should only paediatricians have the responsibility for child protection work? There is no reason why other medical specialties such as general practice and orthopaedics should not take equal responsibility.

Ashok Bucksey *staff paediatrician*
Epsom and St Helier University Hospitals Trust, Epsom KT18 7EG
buckaye@aol.com

Competing interests: None declared.

1  Dyer C. Doctors reluctant to work on child protection committees, survey shows. *BMJ* 2004;328:307. (7 February)

## Labouring in water

### Method is unclear

EDITOR—The method of the study by Cluett et al comparing labouring in water with standard augmentation in managing dystocia requires clarification.[1] The authors have not defined the criteria by which the first stage of labour was diagnosed, thus putting into question the diagnosis of dystocia.

In current practice an expectant policy is advocated especially during the latent phase of labour, to avoid unnecessary intervention. It is unclear whether the authors have taken this into account and whether some women were inappropriately recruited.

We think that an alternative arm of the study should have included an expectant group without recourse to water immersion or augmentation and thus the true impact of water immersion would be defined. The inclusion of women with both intact and ruptured membranes in each study arm further adds to difficulty in evaluating the true effect of water immersion.

Jamal Zaidi *consultant obstetrician and gynaecologist*
Conquest Hospital, St Leonards on Sea, East Sussex TN37 7RD
jamal.zaidi@esht.nhs.uk

Farzela Zaidi *senior lecturer, midwifery*
University of Brighton, East Sussex

Competing interests: None declared.

1  Cluett ER, Pickering RM, Getliffe K, Saunders NJ. Randomised controlled trial of labouring in water compared with standard of augmentation for management of dystocia in first stage of labour. *BMJ* 2004;328:314. (7 February)

### Findings do not fully support conclusions

EDITOR—The study by Cluett et al, comparing labour in water with standard augmentation for dystocia, tackles an important area.[1] Too often modern obstetrics concentrates on major medical interventions and neglects the low tech solutions that many women would prefer.

Despite the study's robust design the findings do not fully support the conclusions. Neither of the primary outcomes (epidural rates and assisted delivery rates) differed significantly between the two groups: only by combining all outcome

0000032

◼ ▬▬▬▬▬ ◼ ▬▬▬▬▬ ◼

EXHIBIT   "E"

# Evidence-Based Medicine and Shaken Baby Syndrome
## Part I: Literature Review, 1966–1998

*Mark Donohoe, MD*

(Am J Forensic Med Pathol 2003;24: 239–242)

In recent years, there has been a clear move toward basing medical practice and opinions on the best available medical and scientific evidence. This process has been termed *evidence-based medicine* (EBM) and involves a review of the quality of evidence that is available in various diseases and fields of inquiry within medicine.

This is the first of 2 articles that attempts to formally rank the available medical scientific evidence by internationally accepted methods, to determine the degree of confidence that can be held on various claims about the condition termed *shaken baby syndrome* (SBS). Areas with good scientific evidence are identified, and shortcomings in the research and publications on the subject are addressed.

Approximately half of all indexed medical publications on the subjects of SBS and shaken-impact syndrome were published before 1999 and half since that time. Given that 1998/1999 is regarded as the turning point in acceptance of the tenets and practice of EBM, it seemed reasonable to assess the quality of evidence before 1999 and compare it with the quality of evidence on the same subject matter since that time. At the conclusion of Part II, the 2 periods are compared to determine the extent to which EBM has affected the field of SBS in terms of quality of available evidence.

The aim of this review is to be neutral on the subject of SBS. Neutrality is difficult to define in this field, in part because of the polarization of opinions on the highly emotional subject of infant injury and death and in part because of clear data deficiencies arising from difficulties in performing experiments. It is clearly unethical to intentionally shake infants to induce trauma, and there is an obvious problem with studies and reports that rely on either indirect or disputed evidence of the occurrence, severity, or type of trauma.

Many studies lacking these critical data make the obvious logical error of selecting cases by the presence of the very clinical findings and test results they seek to validate as diagnostic. Not surprisingly, such studies tend to find their own case selection criteria pathognomonic of SBS.

*Neutrality* in this review simply means that there is no selective quotation of the available literature, and literature is not chosen to support any particular view. The assessment is of the methods and quality of the actual research, and until this assessment is complete, the content, findings, and recommendations are irrelevant. At the end of the ranking, those studies that achieve the highest QER scores are reviewed for their content, findings, and recommendations. Their outcomes are collated, and the entire published data set is then reviewed as a whole to determine the summarized recommendations, noting areas of agreement, conflict, or controversy. From this, the problems with the published evidence are noted, and data gaps are identified. Recommendations can then be made according to the summarized data.

In assessment of the quality of the available scientific evidence, the author has taken an approach recently defined worldwide as an appropriate scale for review of quality of evidence. This approach has been described recently in context of setting Australian clinical guidelines.

Genuine hypothesis testing requires use of appropriate research methodologies, including collection of relevant control data, and suitable statistical analysis. The interpretation of individual study findings may be constrained by factors such as whether the cohort examined was adequately representative of the patient population in general. Replication across studies and in independent research centers is a key factor in the reliability of evidence.

Compelling evidence comes from consistent findings in 2 or more well-constructed, controlled trials or population-based epidemiologic studies (i.e., level I or level II evidence). By contrast, clinical practice guidelines with level IV evidence represent consensus statements of the expert panel according to clinical experience and limited scientific data. Although these statements may influence current practice,

Manuscript received December 2, 2002; accepted May 29, 2003.
From Mosman, New South Wales, Australia.
Address correspondence and reprint requests to Mark Donohoe, PO Box 328, Mosman, New South Wales, Australia. E-mail: drmark@bigpond.net.au
Copyright © 2003 by Lippincott Williams & Wilkins
0195-7910/03/2403-0239
DOI: 10.1097/01.paf.0000083635.85457.97

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

0000033

they are likely to be modified in response to further research findings. Data from a single case series without control subjects provide little more than a stimulus for subsequent hypothesis testing.

## Quality of Evidence Ratings

I: Consistent evidence obtained from more than 2 independent, randomized, and controlled studies or from 2 independent, population-based epidemiologic studies. Studies included here are characterized by sufficient statistical power, rigorous methodologies, and inclusion of representative patient samples. Meta-analyses of smaller, well-characterized studies may support key findings.

II: Consistent evidence from 2 randomized controlled studies from independent centers, a single multicenter randomized controlled study, or a population-based epidemiologic study. Data included here have sufficient statistical power, rigorous methodologies, and the inclusion of representative patient samples.

III-1: Consistent evidence obtained from 2 or more well-designed and controlled studies performed by a single research group.

III-2: Consistent evidence obtained from more than 1 study but in which such studies have methodologic constraints, such as limited statistical power, or the inclusion of patient samples that may be nonrepresentative.

III-3: Evidence obtained from a single case study or a selected cohort study.

III-4: Conflicting evidence obtained from 2 or more well-designed and controlled studies.

IV: Consensus opinions of authorities according to clinical experience or descriptive reports.

## SBS: Literature Review (1966–1998)

### Overview and Methods

The entire Biomednet Medline database (http://www. biomednet.com/db/medline) was searched by using the search term *shaken baby syndrome* and Internet Explorer in late November 1998. Other articles identified that had not yet been indexed on MEDLINE but had been published were also included.

The entire set of retrieved articles was reviewed, and those in which SBS was only peripherally mentioned or in which SBS was unrelated to the original article were omitted. Letters and brief correspondence were also discarded, unless they added new information or data on SBS. Articles in non-English journals that lacked an English abstract were also generally excluded from assessment.

These exclusions reduced the initial list of 71 articles to 54, which were reviewed, categorized, and ranked according to the QER above. To these was added the important study by Jayawant et al. from *BMJ* of December 5, 1998. The editorial was omitted because it added nothing to the original article.

It was impossible to review the full original article in many cases, although all of the major articles were reviewed in full. The remainder was assessed for categorization by using the authors' abstracts.

Each article was assigned to 1 of 4 categories: (1) randomized controlled trial; (2) case series with or without controls (with date, series size recorded); (3) single case reports; and (4) other, including review articles, opinion pieces, and articles on social implications.

## Results of Quality of Evidence Ratings

Fifty-four articles or abstracts were reviewed. One was a randomized controlled trial.[34] This trial was not relevant to the general topic of SBS because it assessed a diagnostic technique (electroretinograph) that proved unsuccessful in diagnosis. Twenty-six were case series.[1,2,7,9,11,13–15,18,19,26,28–30,33,36,39,42, 45–50,52,53] Twenty-five were retrospective studies, and 1 was prospective.

In total, 307 SBS cases were claimed to have been assessed among the 23 articles in which numbers of SBS patients were provided, with a mean study size of 13 cases and a median of 7 cases per series.

Selection criteria for SBS cases were unstated in 12 articles, based on presumption or suspicion in 10, and confirmed in 4 by confession or conviction. Two studies had appropriate control groups, 3 had inappropriate control groups, and 21 were case series without control groups. Twelve studies were case reports:[3–5,8,10,17,22,24,31,32,51,55]

Retinal pathology in suspected SBS, 5 cases

Blunt head injury at autopsy, 1

Subdural hemorrhage (SDH) and retinal hemorrhage (RH) as a result of fall and chest compression, 1 case

Shaking causing traumatic aneurism, 1 case

Arteriovenous malformation, not SBS, as cause, 1 case

Intentional asphyxia and shaking of 15-week-old baby, 1 case

Magnetic resonance imaging value in diagnosis, 1 case

Raised intracranial pressure as cause of RH, 1 case

Fifteen were "other" articles[6,12,16,20,21,23,25,27,37,38,40,41,43, 44,54]

Historical reviews of SBS, 10 articles

Opinion papers without original material, 3 articles

Social issues and SBS, 1 article

Review of imaging in SBS (computed tomography versus magnetic resonance imaging), 1 article

## RESULTS

The randomized controlled trial was unrelated in any aspect of interest in this review and addressed a method of assessment of the retinae that proved to be unsuccessful.

Of the case series, the flaws noted above are relevant. All but 1 was retrospective, and all but 5 had no control population to compare cases with. Three of those that did

© 2003 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

0000034

include controls chose insufficient or inappropriate controls (head impact trauma, without healthy controls or other illness unrelated to head injury). This shortcoming would normally have excluded these studies from the literature review (because they do not fulfill criteria for inclusion). Given the difficulties inherent in assessment of SBS and of identifying appropriate control groups, however, these articles have been included as QER III-2.

In studies with confirmed (i.e., admitted or observed) trauma and SBS, there were few common findings, apart from the presence of SDH accompanied by RH in 80% of examined cases. Some articles attempt to measure other risk factor, and the study by Jayawant et al.[42] is noteworthy in this respect.

Finally, the "other" articles do little but summarize opinions and summarize past data. Such articles do not add to the quality of understanding of the condition, nor are they necessarily accurate in what has become a rather emotionally charged area of research and polarized opinion.

In this article, the quality of evidence, rather than the predominance of findings, is being assessed. The issue of the evidence for SBS appears analogous to an inverted pyramid, with a small database (most of it poor-quality original research, retrospective in nature, and without appropriate control groups) spreading to a broad body of somewhat divergent opinions. One may need reminding that repeated opinions based on poor-quality data cannot improve the quality of evidence.

## Data Gaps Identified

There exist major data gaps in the medical literature about SBS. There is a very obvious lack of clear definition of cases. For valid studies, some method of determining cases of actual proven shaking must be found, and appropriate control groups (trauma without shaking, other illness, healthy controls) must be defined and assessed blindly. This gold standard has yet to be achieved in even a single study in the field of SBS. There is a lack of useful and specific laboratory or other markers proven to identify SBS. There is poor definition and quantification of the social and family risk factors to provide guidance on likelihood of abuse for a given set of circumstances. Last, there is a strong need for a checklist or other diagnostic or management tool to assess cases and to quantify index of suspicion of shaking.

## CONCLUSIONS

There was no evidence on the subject of SBS that exceeded QER III-2 by the end of 1998, which means that there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS.

The majority of evidence achieved only a level of QER IV, opinions that shed no new light upon SBS and did not add

to knowledge about SBS. Many of the authors repeated the logical flaw that if RH and SDH are nearly always seen in SBS, the presence of RH and SDH "prove" that a baby was shaken intentionally. Many other studies assumed that the presence of RH and SDH was sufficient to make the diagnosis of SBS in terms of case selection.

The remainder of articles are QER III-3, and as noted above, the inclusion of case series without controls would normally not occur. Thus, the data available in the medical literature by the end of 1998 were inadequate to support *any* standard case definitions, or *any* standards for diagnostic assessment.

Before 1999, there existed serious data gaps, flaws of logic, inconsistency of case definition, and a serious lack of tests capable of discriminating NAI cases from natural injuries. By 1999, there was an urgent need for properly controlled, prospective trials into SBS, using a variety of controls. Without published and replicated studies of that type, the commonly held opinion that the finding of SDH and RH in an infant was strong evidence of SBS was unsustainable, at least from the medical literature.

## REFERENCES

1. Schmidt US, Mittelviefhaus K, Hansen LL. *Klin Monatsbl Augenheilkd.* [Retinal hemorrhage in the infant as an indication of shaken baby trauma]. 1997;211:354–358.
2. Matthews GP, Das A. Dense vitreous hemorrhages predict poor visual and neurological prognosis in infants with shaken baby syndrome. *J Pediatr Ophthalmol Strabismus.* 1996;33:260–265.
3. Weissgold DJ, Budenz DL, Hood I, et al. Ruptured vascular malformation masquerading as battered/shaken baby syndrome: a nearly tragic mistake. *Surv Ophthalmol.* 1995;39:509–512.
4. Granry JC, Chapotte C, Monrigal JP, et al. [Shaken baby syndrome]. *Ann Fr Anesth Reanim.* 1994;13:133–134.
5. Poepel B, Seiberth V, Knorz MC, et al. [Eye manifestations of shaken baby syndrome: case presentation]. *Ophthalmologe.* 1994;91:380–382.
6. Spaide RF, Swengel RM, Scharre DW, et al. Shaken baby syndrome. *Am Fam Physician.* 1990;41:1145–1152.
7. Alexander R, Sato Y, Smith W, et al. Incidence of impact trauma with cranial injuries ascribed to shaking. *Am J Dis Child.* 1990;144:724–726.
8. Keithahn MA, Bennett SR, Cameron D, et al. Retinal folds in Terson syndrome. *Ophthalmology.* 1993;100:1187–1190.
9. Duhaime AC, Gennarelli TA, Thibault LE, et al. The shaken baby syndrome: a clinical, pathological, and biomechanical study. *J Neurosurg.* 1987;66:409–415.
10. Lambert SR, Johnson TE, Hoyt CS. Optic nerve sheath and retinal hemorrhages associated with the shaken baby syndrome. *Arch Ophthalmol.* 1986;104:1509–1512.
11. Wilkinson WS, Han DP, Rappley MD, et al. Retinal hemorrhage predicts neurologic injury in the shaken baby syndrome. *Arch Ophthalmol.* 1989;107:1472–1474.
12. D'Lugoff MI, Baker DJ. Case study: shaken baby syndrome: one disorder with two victims. *Public Health Nurs.* 1998;15:243–249.
13. Ludwig S, Warman M. Shaken baby syndrome: a review of 20 cases. *Ann Emerg Med.* 1984;13:104–107.
14. Shannon P, Smith CR, Deck J, et al. Axonal injury and the neuropathology of shaken baby syndrome. *Acta Neuropathol (Berl).* 1998;95:625–631.
15. Odom A, Christ E, Kerr N, et al. Prevalence of retinal hemorrhages in pediatric patients after in-hospital cardiopulmonary resuscitation: a prospective study. *Pediatrics.* 1997;99:E3.
16. Wong JS, Wong PK, Yeoh RL. Ocular manifestations in shaken baby syndrome. *Singapore Med J.* 1995;36:391–392.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

0000035

Donohoe    The American Journal of Forensic Medicine and Pathology • Volume 24, Number 3, September 2003

17. Lam CH, Montes J, Farmer JP, et al. Traumatic aneurysm from shaken baby syndrome: case report. *Neurosurgery*. 1996;39:1252–1255.

18. Betz P, Puschel K, Miltner E, et al. Morphometrical analysis of retinal hemorrhages in the shaken baby syndrome. *Forensic Sci Int*. 1996;78: 71–80.

19. Haseler LJ, Arcinue E, Danielsen ER, et al. Evidence from proton magnetic resonance spectroscopy for a metabolic cascade of neuronal damage in shaken baby syndrome. *Pediatrics*. 1997;99:4–14.

20. Cox LA. The shaken baby syndrome: diagnosis using CT and MRI. *Radiol Technol*. 1996;67:513–520.

21. Chiocca EM. Shaken baby syndrome: a nursing perspective. *Pediatr Nurs*. 1995;21:133–38.

22. Jansson B. [Shaken baby syndrome: severe brain injuries caused by child abuse can be detected by fundus oculi examination]. *Lakartidningen*. 1994;91:491–494, 499.

23. Lancon JA, Haines DE, Parent AD. Anatomy of the shaken baby syndrome. *Anat Rec*. 1998;253:13–18.

24. Fernandes YB, Maciel Júnior JA, Guedes CM, et al. [Shaken baby syndrome: report of a case]. *Ar Qneuropsiquiatr*. 1995;53:649–653.

25. Nashelsky MB, Dix JD. The time interval between lethal infant shaking and onset of symptoms: a review of the shaken baby syndrome literature. *Am J Forensic Med Pathol*. 1995;16:154–157.

26. Han DP, Wilkinson WS. Late ophthalmic manifestations of the shaken baby syndrome. *J Pediatr Ophthalmol Strabismus*. 1990;27:299–303.

27. American Academy of Pediatrics Committee on Child Abuse and Neglect. Shaken baby syndrome: inflicted cerebral trauma. *Pediatrics*. 1993;92:872–875.

28. Gaynon MW, Koh K, Marmor MF, et al. Retinal folds in the shaken baby syndrome. *Am J Ophthalmol*. 1988;106:423–425.

29. Roussey M, Dabadie A, Betrémieux P, et al. [Not-always-apparent abuse: the shaken baby syndrome]. *Arch Fr Pediatr*. 1987;44:441–444.

30. Apolo JO. Bloody cerebrospinal fluid: traumatic tap or child abuse? *Pediatr Emerg Care*. 1987;3:93–95.

31. Spaide RF. Shaken baby syndrome: ocular and computed tomographic findings. *J Clin Neuroophthalmol*. 1987;7:108–111.

32. Levin AV, Magnusson MR, Rafto SE, et al. Shaken baby syndrome diagnosed by magnetic resonance imaging. *Pediatr Emerg Care*. 1989; 5:181–186.

33. Brenner SL, Fischer H, Mann-Gray S. Race and the shaken baby syndrome: experience at one hospital. *J Natl Med Assoc*. 1989;81:183–184.

34. Fishman CD, Dasher WB 3rd, Lambert SR. Electroretinographic findings in infants with the shaken baby syndrome. *J Pediatr Ophthalmol Strabismus*. 1998;35:22–26.

35. Duhaime AC, Christian CW, Rorke LB, et al. Nonaccidental head injury in infants: the "shaken-baby syndrome." *N Engl J Med*. 1998;18(338): 1822–1829.

36. Kapoor S, Schiffman J, Tang R, et al. The significance of white-centered retinal hemorrhages in the shaken baby syndrome. *Pediatr Emerg Care*. 1997;13:183–185.

37. Coody D, Brown M, Montgomery D, et al. Shaken baby syndrome: identification and prevention for nurse practitioners. *J Pediatr Health Care*. 1994;8:50–56.

38. Hansen KK. Folk remedies and child abuse: a review with emphasis on caída de mollera and its relationship to shaken baby syndrome. *Child Abuse Negl*. 1998;22:117–127.

39. Loh JK, Chang DS, Kuo TH, et al. Shaken baby syndrome. *Kao Hsiung I Hsueh Ko Hsueh Tsa Chih*. 1998;14:112–116.

40. Butler GL. Shaken baby syndrome. *J Psychosoc Nurs Ment Health Serv*. 1995;33:47–50.

41. Shaken baby syndrome: inflicted cerebral trauma: Committee on Child Abuse and Neglect, 1993-1994. *Del Med J*. 1997;69:365–370.

42. Jayawant S, Rawlison A, Gibbon F, et al. Subdural haemorrhages in infants: population based study. *BMJ*. 1998;317:1558–1561.

43. Dorfman DH, Paradise JE. Emergency diagnosis and management of physical abuse and neglect of children. *Curr Opin Pediatr*. 1995;7:297–301.

44. Williams DF, Mieler WF, Williams GA. Posterior segment manifestations of ocular trauma. *Retina*. 1990;10(suppl 1):S35–44.

45. Closset M, Leclerc F, Hue V, et al. [Is pericerebral hemorrhage a cause of severe malaise in infants? ]. *Pediatrie (Bucur)*. 1992;47:459–465.

46. Munger CE, Peiffer RL, Bouldin TW, et al. Ocular and associated neuropathologic observations in suspected whiplash shaken infant syndrome: a retrospective study of 12 cases. *Am J Forensic Med Pathol*. 1993;14:193–200.

47. Teyssier G, Rayet I, Miguet D, et al. [Cerebro-meningeal hemorrhage in infants: shaken children? abuse or accidents? 3 cases]. *Pediatrie*. 1988; 43:535–538.

48. Bass M, Kravath RE, Glass L. Death-scene investigation in sudden infant death. *N Engl J Med*. 1986;315:100–105.

49. Hadley MN, Sonntag VK, Rekate HL, et al. The infant whiplash-shake injury syndrome: a clinical and pathological study. *Neurosurgery*. 1989; 24:536–540.

50. Harada K, Hayashi T, Anegawa S, et al. [Vitreous hemorrhage after accidental head injury with chest compression: case report]. *No To Shinkei*. 1994;46:1095–1099.

51. Starling SP, Holden JR, Jenny C. Abusive head trauma: the relationship of perpetrators to their victims. *Pediatrics*. 1995;95:259–262.

52. Budenz DL, Farber MG, Mirchandani HG, et al. Ocular and optic nerve hemorrhages in abused infants with intracranial injuries. *Ophthalmology*. 1994;101:559–565.

53. Ward JD. Pediatric issues in head trauma. *New Horiz*. 1995;3:539–545.

54. Rabl W, Ambach E, Tributsch W. [Asphyxia protracted after shaking trauma]. *Arch Kriminol*. 1991;187:137–145.

© 2003 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

0000036

**EXHIBIT   "F"**

# Ocular and Associated Systemic Findings in Suspected Child Abuse

## A Necropsy Study

Susan G. Elner, MD; Victor M. Elner, MD, PhD; Michael Arnall, MD; Daniel M. Albert, MD

● We reviewed complete ocular and systemic necropsy findings of 10 consecutive children who died of suspected child abuse. All 10 children had evidence at necropsy of blunt head trauma, although external signs of blunt trauma occasionally were covert. Ocular injuries were observed in 7 of the 10 cases and when present always included retinal, vitreous, and subdural optic nerve hemorrhages. In 5 cases, intrascleral hemorrhage from the circle of Zinn occurred at the sclera–optic nerve junction. In 4 cases, traumatic retinoschisis or tractional retinal folds were present. Anterior segment findings were uniformly consistent with blunt trauma. Hemosiderin, indicating old hemorrhage, was present in 3 cases. Intracranial hemorrhage, present in all cases with abnormal ocular findings, was always accompanied by signs of direct head trauma, such as subgaleal hemorrhage, skull fracture, cerebral contusion, or external contusions, which were sometimes subtle or hidden beneath the hair.

(*Arch Ophthalmol.* 1990;108:1094-1101)

P hysical child abuse frequently results in significant morbidity and death for its victims.[1,4] Child abuse and its numerous physical manifestations

Accepted for publication March 20, 1990.
From the Department of Ophthalmology, Kellogg Eye Center (Drs S. G. Elner and V. M. Elner), and the Department of Pathology (Dr V. M. Elner), University of Michigan, Ann Arbor; Office of the Medical Examiner, District 21, Ft Myers, Fla (Dr Arnall); and Howe Laboratory of Ophthalmology, Massachusetts Eye and Ear Infirmary, Boston (Dr Albert).
Reprint requests to Kellogg Eye Center, University of Michigan, 1000 Wall St, Ann Arbor, MI 48105 (Dr V. M. Elner).

have been reported with increased frequency. Ocular injuries due to physical child abuse, particularly retinal hemorrhages, occur often.[3,4,7,8] The recent ophthalmic literature stresses the shaken baby syndrome[9-11] and its constellation of ocular, systemic, and computed tomographic (CT) findings. In contrast to whiplash shaking, recent reports from Japan[12] and the United States[13] indicate that blunt head trauma is commonly associated with child abuse. To assess the pathogenesis of ocular injury and death associated with alleged child abuse, we reviewed the ocular and systemic necropsy findings of 10 consecutive children who died of suspected child abuse. All 10 children had evidence of blunt trauma at necropsy, but the signs of clinically observable blunt trauma occasionally were covert. Pathologic ocular findings were present in 7 of the 10 children. In this report, we present the postmortem ocular and systemic findings of these 7 cases.

## MATERIALS AND METHODS

Complete autopsies, including ocular examination, were performed in 10 consecutive cases of suspected child abuse. Both eyes of all 10 patients were examined grossly and histopathologically. Gross pathologic examination with selective histopathologic correlation was performed on nonocular tissues. Hematoxylin-eosin, periodic acid-Schiff, and Perls' iron stains were performed in all cases.

Ocular pathologic findings were categorized as involving the anterior segment (Fig 1), retina and vitreous (Figs 2 and 3), and optic nerve (Fig 4). Particular attention was paid to gross pathologic findings of head injuries (Fig 5), including subdural hematoma (Fig 6), and histopathologic intra-

cranial findings (Fig 7). Other pathologic findings consistent with physical child abuse were also sought.

## REPORT OF CASES

Case 1.—A 17-month-old boy was brought to the hospital "comatose and shaking after a fall from a high chair." Head CT showed multiple hemorrhagic contusions of the left frontal lobe and massive left hemispheric edema. Autopsy revealed small contusions of the back and scalp, a small left temporal abrasion, and a dermatographic handprint at the left costophrenic margin. Widening of skull sutures, subgaleal hemorrhage, subdural hematoma, and a hemorrhagic contusion of the left frontal lobe (Fig 5, bottom right) were also noted. In addition to fresh subdural hemorrhage, Perls' iron stain revealed deposits of hemosiderin at the dura mater–hematoma interface (Fig 7, bottom). Ocular examination revealed posterior subcapsular cataract, subhyaloid and intraretinal hemorrhages (Fig 2, top), and peripheral chorioretinal adhesions. The optic nerves showed papilledema as well as disc and subdural hemorrhages. Intrascleral hemorrhage at the sclera–optic nerve junction extended from the circle of Zinn to the subdural hemorrhage. Perls' iron stain demonstrated hemosiderin in the sensory retina (Fig 3, left) and at the sclera–optic nerve junction, where fresh hemorrhage was also noted.

Case 2.—A 4-year-old girl was hospitalized in a coma with agonal respirations. A brain flow scan was normal but CT revealed subarachnoid hemorrhage and cerebral edema but no subdural hemorrhage. Autopsy demonstrated subarachnoid and subdural hemorrhages with extensive cerebral edema. Multiple contusions of the back, upper and lower extremities, labia minora, tongue, and head, including the ear, brow, cheek, upper lip, and periorbital regions, were noted. The lip mucosa contained teeth

Child Abuse—Elner et al





Fig 1.—Anterior segment pathologic findings. Top, Voesius' ring (arrow). Bottom, Voesius' ring with iris pigment epithelium (arrow) adherent to the lens capsule. The lens epithelium beneath the pigment is edematous (hematoxylin-eosin, original magnification ×32).



Fig 2.—Retinal pathologic findings. Top, Severe intraretinal (arrow) and subretinal (asterisk) hemorrhages as well as full-thickness hemorrhagic retinal necrosis are seen (hematoxylin-eosin, original magnification ×32). Center, The edge of a large schisis cavity is seen within the macula. The inner retinal layer (arrows) has been torn from the remaining outer retina. Hemorrhage lines the schisis cavity and is found in the retina, vitreous, and subretinal space (hematoxylin-eosin, original magnification ×13). Bottom, A tractional retinal fold of temporal macula also is noted clinically. The inner limiting membrane has been torn from the fold (arrow) and surrounding retina, which shows full-thickness hemorrhagic necrosis (asterisk) (hematoxylin-eosin, original magnification, ×8).



.—Retinal findings indicative of old injury. Left, Gliotic nerve fiber layer contains hemosiderin (blue) following resorption of hemorrhage (Perls' iron stain, original magnification ×79). Right, Resolving subsensory retinal hemorrhage contains macrophages (straight arrows) engulfing debris from lysed erythrocytes. Fresh preretinal hemorrhage and hemosiderin (curved arrow) in the choroid indicate injuries of different ages (hematoxylin-eosin, original magnification, ×79).



Fig 4.—Optic nerve pathologic findings. Top left, Subdural optic nerve hemorrhage (arrow). Top center, Subdural (straight arrow) and subarachnoid (curved arrow) hemorrhages as well as florid papilledema and associated optic disc and peripapillary retinal hemorrhages are present (hematoxylin-eosin, original magnification ×4). Top right, Peripapillary intrascleral hemorrhage (straight arrows) originating from the circle of Zinn resulted from force transmitted to the optic nerve–eye junction. In this case, it is continuous with the subdural hemorrhage. Papilledema and severe optic disc, retinal, and subhyaloid (curved arrow) hemorrhages are evident (hematoxylin-eosin, original magnification ×8). Bottom left, Infarct (arrow) of the optic nerve (shown at top left) shows axonal loss and microcystic change. Massive subdural hemorrhage (asterisk), papilledema, and retinal and subinternal limiting membrane hemorrhages are also seen (hematoxylin-eosin, original magnification ×8). Bottom center, Severe intrascleral hemorrhage (arrow) from the circle of Zinn has dissected into the surrounding sclera and is continuous with the subdural hemorrhage (asterisk). Intraretinal and periretinal hemorrhages are also present (hematoxylin-eosin, original magnification ×13). Bottom right, Hemosiderin deposits (blue) in perineural scar tissue are indicative of old, organized hemorrhage. Fresh, subdural optic nerve hemorrhage was also present (Perls' iron stain, original magnification ×79).



Fig 5.—Gross pathologic features of head injury. Head injuries, except subdural hematoma, usually indicate direct trauma. Top left, Multiple skin and soft-tissue contusions (arrows) are evident on the forehead and over the zygoma. A parieto-occipital subdural hematoma, not found by computed tomography prior to death, was present. Top center, Subgaleal hemorrhage (arrows), superficial to the skull, occurs from hair pulling or direct blows. Top right, Skin contusions (arrows) from direct trauma are frequently small, inconspicuous, and hidden under the hair but may be the only external signs of severe intracranial injury. Bottom left, A linear parietal fracture (arrow) due to direct trauma is shown. The unfused skull sutures are spread by a hypoxic, edematous brain. Bottom right, A cerebral contusion, intraparenchymal hemorrhage, and surrounding edema are seen. Multiple hemorrhagic contusions (arrows) are present just beneath the cortical surface.

imprints. Subgaleal and bilateral temporalis muscle hemorrhages were found. Postmortem ocular findings included angle recession and early posterior subcapsular cataract. The posterior segment showed vitreous hemorrhage, extensive intraretinal hemorrhages, retinoschisis, and serous retinal detachment. The optic nerves showed papilledema, disc hemorrhages, focal infarction, and subdural hemorrhage (Fig 4, top center). Hemorrhage was also found in extraocular muscles and orbital tissues surrounding the optic nerves.

CASE 3.—A 5-month-old infant boy was found dead in his crib. Autopsy revealed small abrasions on the scalp and nose, severe diaper rash, a torn frenulum, subgaleal (Fig 5, top center) and subdural hemorrhages, and cerebral edema. No brain lacerations were found. Epidural and subdural hemorrhages surrounded the spinal cord. Ocular examination revealed vitreous, intraretinal, and subretinal hemorrhages as well as subdural, subarachnoid, and pial optic nerve hemorrhages. Intrascleral hemorrhage surrounded the optic nerve. Extensive necrosis of the retinal nerve fiber layer and focal optic nerve infarcts were also found.

CASE 4.—A 7-month-old infant boy "fell from a changing table." A CT scan demonstrated subdural hematoma, and he was deemed brain dead. Premortem fundus examination showed extensive retinal hemorrhage, papilledema, and a crescentic retinal fold temporal to the macula (Fig 2, bottom). Autopsy revealed no external signs of injury, but roentgenograms demonstrated a vertebral compression fracture at T-8 and a linear fracture of the parietal bone (Fig 5, bottom left). Subgaleal, subdural, and subarachnoid hemorrhages, cerebral contusion and edema, and widened skull sutures were present (Fig 5, bottom left). A mesenteric hemorrhage was also found. Ocular examination demonstrated Vossius' ring (Fig 1); vitreous, intraretinal, and subretinal hemorrhages; retinoschisis; retinal edema; bilateral perimacular retinal folds (Fig 2, bottom); and subdural and subarachnoid optic nerve hemorrhages.

CASE 5.—A 7-month-old infant girl was hospitalized with mental status changes 1 week after "falling down." Ocular examination revealed a choroidal tear; retinal edema; and vitreous, preretinal, intraretinal, and subretinal hemorrhages. Head CT prior to death revealed subarachnoid hem-

orrhage and cerebral edema but no subdural hematoma. Postmortem examination demonstrated multiple contusions on the forehead, occiput (Fig 5, top right), cheek, chest, abdomen, and right temporal region. Subgaleal, subdural, and subarachnoid hemorrhages were present, as were cerebral edema, widened skull sutures, and mesenteric hemorrhage. Histopathologic ocular examination revealed extensive intraretinal, subretinal, and vitreous hemorrhages. Perimacular retinal folds and retinoschisis (Fig 2, center) were also present. Subdural and subarachnoid optic nerve hemorrhages were associated with bilateral intrascleral hemorrhages surrounding the optic nerve (Fig 4, bottom center).

CASE 6.—A 12-month-old girl found unresponsive at home had been admitted to the hospital 9 days previously for burns from suspected child abuse. Premortem funduscopy showed retinal hemorrhages and papilledema bilaterally. The vitreous was torn from the right macula with subhyaloid hemorrhage. A CT scan showed no evidence of intracranial hemorrhage (Fig 6, center and right). Postmortem examination demonstrated burns, contusions, and abra-



Fig 6.—Necropsy findings of subdural hematoma were absent on a premortem computed tomographic scan. Left, A large subdural hematoma (arrow) is seen over the left parieto-occipital convexity of the brain. Center, A parieto-occipital hematoma is not visible on a computed tomographic scan of the patient shown at left. Right, A computed tomographic cut inferior to that seen in center. No subdural hemorrhage, midline shift, or ventricular abnormalities are visible.

sions of the temporal region (Fig 5, bottom left), forehead, nose, occiput, arm, and thigh. One heel was ulcerated and a blister was present on the other foot. Subgaleal and subdural hemorrhages (Fig 6, left) and cerebral edema were noted. Histopathologic ocular examination revealed posterior subcapsular cataract, vitreous hemorrhage, acute and organising retinal hemorrhages (Fig 3, right), perimacular retinal folds, and retinoschisis. The optic nerves showed focal infarcts, intrascleral hemorrhage from the circle of Zinn, acute and organizing subdural and subarachnoid hemorrhages, and organizing hemorrhage surrounding the optic nerve and extending into orbital tissue (Fig 4, top left and bottom left). Perls' iron stain demonstrated hemosiderin in the sensory retina and in tissues surrounding the optic nerve, including sclera, dural sheath, and orbital tissue (Fig 4, bottom right).

CASE 7.—An unresponsive 4-month-old infant boy brought to the hospital was deemed brain dead. Several days earlier, during hospitalization for aspiration pneumonia, facial bruises were noted. A premortem CT scan demonstrated a subdural hematoma and cerebral edema. Ophthalmologic examination demonstrated bilateral retinal hemorrhages. Postmortem examination revealed multiple contusions of the forehead, temporal region, back, and buttocks. Gross findings included a subdural hematoma and cerebral edema (Fig 7, top), acute bronchopneumonia, and pulmonary edema but no brain lacerations. Histopathologic ocular examination revealed vitreous, subhyaloid, and intraretinal hemorrhages; multifocal perimacular retinoschisis; and intraneural, subarachnoid, and subdural optic nerve hemorrhages (Fig 4, right). Perls' iron stain demonstrated hemosiderin in brain and ocular tissue.

RESULTS

Ocular injuries were present in 7 of children who died of alleged child abuse (Table). In all 7 cases, eyes con-

tained vitreous hemorrhage, subdural optic nerve hemorrhage (Fig 4), and recent retinal hemorrhage (Figs 2 through 4). Hemorrhagic retinoschisis (Fig 2) and retinal folds temporal to the macula (Fig 2) were present in 4 and 3 cases, respectively. One eye exhibited a choroidal rupture. Intraparenchymal optic nerve hemorrhage (Fig 4) was present in 4 of 7 cases, and intrascleral hemorrhage from the circle of Zinn at the sclera-optic nerve junction (Fig 4) was found in 5 of 7 cases. Four cases demonstrated anterior segment injuries due to blunt trauma, including cataract, Vossius' ring (Fig 1), or angle recession. In 3 cases, hemosiderin indicating old hemorrhage was found in the retina (Fig 3), optic nerve sheaths, or perineural or-

bital tissues (Fig 4), or around blood vessels in the sclera surrounding the optic nerve (Fig 4).

Autopsy revealed that all seven patients with eye injuries died of head trauma (Table). Subdural hematoma (Figs 6 and 7) and subarachnoid hemorrhage were found at autopsy in six and three cases, respectively. In one case of purported acute head injury, the subdural hematoma stained positively for hemosiderin at autopsy, indicating old hemorrhage (Fig 7). Subgaleal hemorrhage (Fig 5), resulting from hair pulling or blunt trauma, was present in six of the seven cases. Head contusions (Fig 5) were a common external sign of blunt head trauma but were sometimes subtle or hidden beneath the hair (Fig 5). A skull fracture

| | Case No.[*] | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Retinal hemorrhage | + | + | + | + | + | + | + |
| Vitreous hemorrhage | + | + | + | + | + | + | + |
| Subdural optic nerve hemorrhage | + | + | + | + | + | + | + |
| Intraneural optic nerve hemorrhage | + | + | − | − | − | + | + |
| Intrascleral peripapillary hemorrhage | + | − | + | − | + | + | + |
| Retinoschisis | − | − | + | + | + | + | − |
| Hemosiderin deposition | + | − | − | − | − | + | + |
| Perimacular retinal fold | − | − | + | + | + | + | − |
| | | | | | | | |
| Subdural hemorrhage | − | + | + | + | + | + | + |
| Presence on premortem computed tomographic scan | − | − | * | − | + | − | + |
| Subarachnoid hemorrhage | − | + | − | + | + | − | − |
| Subgaleal hemorrhage | + | + | + | + | + | + | + |
| External, visible head contusions | + | + | − | − | + | + | + |
| Skull fracture | − | − | − | + | − | − | + |
| Mesenteric hemorrhage | − | − | − | + | − | − | − |

[*] Plus sign indicates present; minus sign, absent.

(Fig 5) was present in one case in which no external signs of blunt trauma were seen. Additional evidence of trauma included mesenteric hemorrhage in two children and a dermatographic handprint in another.

Head CT was performed prior to death in six of our seven cases (Table). In three cases, the subdural hematoma could not be detected on a CT scan, but autopsy revealed a significant subdural hematoma. Retinal hemorrhages, however, were consistently found in all cases that demonstrated postmortem subdural hematoma.

## COMMENT

Head trauma is the leading cause of death in alleged child abuse[1,2] and is frequently accompanied by ophthalmic manifestations. Children younger than 2 years are particularly prone to the head and neck injuries that result from child abuse.[1] Our findings confirm these observations (Table). Nine of the 10 consecutive alleged child abuse victims we examined were younger than 2 years and 7 were 1 year or younger. All 7 fatally abused children with ocular injuries were found to have postmortem evidence of direct head trauma.

Anterior segment injuries in child abuse are usually the result of direct eye trauma[3] and commonly include hyphema, subconjunctival hemorrhage, cataract, lens subluxation, and glaucoma, with corneal opacification.[4] Cataract was the most common anterior segment injury in our cases. The angle recession and Vossius' ring (Fig 1) in our cases also indicate direct trauma.

Posterior segment hemorrhage occurs in 34% to 80% of children who suffer abuse.[1,2,7] We found retinal hemorrhages in 7 of the 10 allegedly fatally abused children and in all 7 children who exhibited ocular injury. The hemorrhages were most frequently seen in the posterior fundus. Injury was often so severe that hemorrhagic inner or full-thickness retinal necrosis was evident (Fig 2). Recent clinical studies of abused children have also stressed characteristic ophthalmoscopic features, including hemorrhagic retinoschisis[9] and perimacular retinal folds.[10] In 4 of our cases, massive intraretinal hemorrhage dissected the internal limiting membrane or necrotic nerve fiber layer, producing varying degrees of retinoschisis (Fig 2). Perimacular folds (Fig 2) were also noted in 3 cases, each of which had clinical evidence of severe retinal trauma with either macular schisis, traumatic vitreous separation from

the macula, or full-thickness macular hemorrhage and a choroidal tear. The folded retina was hemorrhagic and often necrotic, with either taut vitreous fibrils emanating from the crest of the fold or the inner retinal layers torn from the retinal surface. The histopathologic appearances of the retinal hemorrhages, folds, and schisis in our cases were strikingly similar to those reported by Cox[13] in experimental blunt, nonperforating eye trauma. Retinal injuries, including retinal detachment,[4,14,15] may result in retinal vascular attenuation and gliosis,[15] macular scarring and cysts,[7,9] chorioretinal atrophy,[16] and optic nerve atrophy,[7] all of which may cause profound visual loss in abused children.

The pathogenesis of retinal and vitreous hemorrhage in abused children has been attributed to (1) acute intracranial hypertension following cerebral injury, resulting in retinal venous hypertension[17]; (2) venous transmission to the brain and eyes (Purtscher's retinopathy) of acute intrathoracic or intra-abdominal forces during compressive injury,[18] particularly in cases of sexual abuse[19]; and (3) direct head trauma.[7] The full-thickness hemorrhagic retinal necrosis in five of the seven patients with ocular injuries, and hemorrhagic retinoschisis and perimacular retinal folds in four of these seven patients, suggest that severe anteroposterior acceleration-deceleration forces as proposed by Greenwald et al[9] directly produce retinal injuries in abused children who die of blunt head injury. That such trauma may be repeated is indicated by positive stains for hemosiderin in three cases. Blunt head trauma, seen in all of our patients with ocular injuries, may be necessary to produce significant vitreoretinal traction, resulting in the constellation of severe retinal injuries seen in these children.

Subdural optic nerve hemorrhages (Fig 4), present in all seven fatal cases of patients with eye injury, are not thought to be extensions of intracranial, subdural, or subarachnoid hemorrhages, or to result from transmission of increased intracranial venous pressure. Rather, they are caused by local rupture of dural-pial bridging vessels.[20,21] Subdural hemorrhages may result from severe intracranial hypertension, which is transmitted to the optic nerve subarachnoid space and causes increased pressure within and subsequent hydrostatic rupture of optic nerve dural-pial vessels.[20] Direct trauma to the optic nerve during acceleration-deceleration or blunt head injury may also result in hemorrhage





Fig 7.—Intracranial histopathologic findings that reflect initial injuries with superimposed cerebral hypoxia and edema. Top, Subdural hemorrhage may result from shearing of bridging vessels (curved arrow), cerebral contusions, or lacerations. The hypoxic, edematous cerebral tissue shows diffuse pallor; pericellular and perivascular microcavitation (straight arrows); and pyknotic, eosinophilic neurons (hematoxylin-eosin, original magnification ×32). Bottom, Dura mater with underlying hematoma is seen. Fresh hemorrhage and hemosiderin at the dural-hematoma interface (arrows) indicate repeated hemorrhage (hematoxylin-eosin, original magnification ×79). Iron staining of an adjacent histopathologic section showed intense positivity for hemosiderin.

**NOTE:** To view the article with Web enhancements, go to:
http://www.medscape.com/AANS/NF/1999/v07.n04/nf0704.05.piat/nf0704.05.piat-01.html

# A Pitfall in the Diagnosis of Child Abuse: External Hydrocephalus, Subdural Hematoma, and Retinal Hemorrhages

**Joseph H. Piatt, Jr, M.D.**, Departments of Neurosurgery and Pediatrics. Oregon Health Sciences University, Portland, Oregon

[Neurosurg Focus 7(4), 1999. © 1999 American Association of Neurological Surgeons]

## Abstract

External hydrocephalus has been associated with subdural hematomas in infancy, and the hematomas have been noted to be secondary to minor trauma or have even been described as spontaneous. The author reports the case of an infant with external hydrocephalus who developed retinal as well as subdural hemorrhages after sustaining a minor head injury. Although retinal hemorrhage in infancy has been considered virtually pathognomonic of child abuse, in the setting of external hydrocephalus a more cautious interpretation may be appropriate.

## Introduction

One clinical hallmarks of child abuse is a discrepancy between the traumatic lesion that the patient exhibits and the causative explanation offered by the caretaker[19] The explanation may appear to be discrepant on a developmental basis: the child, for example, is reported to have caused a self injury that is inconsistent with his developemental level. Or the discrepancy may be a mechanistic one: the severity of the injury is out of proportion with the forces purportedly involved in the accident. In the latter case, the physician must exercise diligence to rule out preexisting diseases, such as platelet disorders, deficiencies of coagulation factors, and osteogenesis imperfecta, that might render the child exceptionally susceptible to injury[8,11,17,32]

External hydrocephalus is a common condition characterized by diffuse enlargement of the subarachnoid spaces.[2,3,5,6,10,16,21,23,24,29,31,36,38,40,41] It is most often associated with macrocephaly, but there are children with normal or even small head circumferences in whom diffuse enlargement of the subarachnoid spaces has developed.[1,5,33] The description, "benign subdural effusions of infancy," was used to characterize this condition before the era of modern neuroimaging[7,25,39] but it is a misnomer because the excessive fluid resides in the subarachnoid space rather than in the subdural space[4,44] In many instances a family history consistent with a dominant pattern of inheritance can be elicited. The natural history is generally benign, and there are normal developmental outcomes in most cases as well as imaging-documented resolution of abnormalities by the time the patient reaches school age.

Whereas enlargement of the subarachnoid spaces persists during infancy, the brain does not fill the space available within the cranial cavity, and a state of "craniocerebral disproportion" exists. The presence of craniocerebral disproportion that develops from any cause--external hydrocephalus, internal hydrocephalus, arachnoid cyst, or chronic subdural hematoma--makes the patient exceptionally susceptible to subdural

0000043

hemorrhage after what would otherwise be inconsequential trauma[5,14,18,20,25,35,37] In particular, the prevalence of subdural hematoma in case series of patients with external hydrocephalus seems significant. In a study reported by Azais and Echenne,[5] "spontaneous" subdural hemorrhage was demonstrated in five of 41 patients with "benign enlargement of the subarachnoid spaces" on ultrasonography and computerized tomography scanning. Laubscher, et al.,[21] have described a "nonbattered" infant among their 22 patients with pericerebral subarachnoid space enlargement, in whom a "spontaneous" subdural "hygroma" developed that the authors attributed to the vulnerability of the bridging subarachnoid veins. Mori, et al.[26] have reported three infants with subdural hemorrhage of 20 patients with infantile subarachnoid fluid collection. Although they fall within the shadow of publication bias, these series suggest that the prevalence of subdural hematoma in infants with external hydrocephalus may be as high as 11%.

Caffey,[9] who first described the shaken infant syndrome, recognized that infants with hydrocephalus were prone to the development of subdural hematomas, but neither he nor any subsequent author has arrived at the following logical conclusion: the development of a subdural hematoma after minor trauma in an infant with craniocerebral disproportion might be the occasion for unjustified accusations of child abuse. The concomitant presence of retinal hemorrhages in such an instance would reinforce that the diagnosis of inflicted injury is incorrect in such cases.

## Case Report

**History.** Emergency medical technicians were called to evaluate this 4-month-old boy because of status epilepticus.

**Presentation.** The child had been well except for the presence of macrocephaly. At 6 weeks of age his head circumference had been measured as 41.5 cm (> 95th percentile). On the day of presentation, his mother had been propping him up in a standing position against a piece of furniture in the presence of his father and paternal grandmother. The mother became distracted, and the infant fell, striking the back of his head on a carpeted floor. He cried immediately, but soon experienced a generalized convulsion. A sequence of generalized convulsions followed and ceased only after diazepam was administered rectally.

**Examination.** General physical assessment at the receiving hospital revealed no other injuries. The patient's head circumference measured 44.3 cm (> 95th percentile). Funduscopic examination demonstrated retinal, preretinal, and subhyaloid hemorrhages (Fig. 1).



Figure 1. Fundus drawings demonstrating extensive, deep blot hemorrhages in all four quadrants of both eyes. In this case report there were preretinal and subhyaloid hemorrhages in each eye as well. Both optic nerve heads were well perfused and had sharp margins. There were no abnormalities of the nerve fiber layer. (Drawings courtesy of William Rodden, M.D., Ashland, Oregon).

0000044

A computerized tomography scan of the head revealed a small acute subdural hematoma that was associated with bilateral low-density extracerebral fluid collections. On Day 3 postadmission magnetic resonance imaging established that these fluid collections reflected diffuse enlargement of the subarachnoid spaces (Fig. 2). A skeletal survey was negative.



Figure 2. Magnetic resonance imaging studies. Upper: A transaxial, $T_1$-weighted image of the head demonstrating a small left frontal subdural hematoma of mixed intensities (white arrow heads). There is a prominent, symmetrical, extracerebral fluid collection of the same intensity as ventricular cerebrospinal fluid (CSF) (white asterisk). Lower: Coronal, $T_2$-weighted image demonstrating that the extracerebral fluid remains at the same intensity as ventricular CSF, and anastomotic veins can be seen passing from the surface of the cortex to the dura through it (black arrows). The extracerebral fluid therefore represents enlargement of the subarachnoid space. These images are diagnostic of external hydrocephalus.

The patient recovered without specific treatment.

**Investigation of Physical Abuse.** An extensive police and social service investigation, which at the parents' request included polygraph testing, failed to uncover any risk factors or circumstances suspicious for child abuse.

**Diagnosis.** The infant was seen in pediatric neurosurgical consultation at age 6 months, at which time he was well. The only notable physical finding was a head circumference that measured 47 cm. The diagnosis of external hydrocephalus was made at this time.

**Follow-Up Course.** Under careful ophthalmological surveillance, the retinal hemorrhages were noted to clear within 3 months, and the subhyaloid hemorrhages cleared within 6 months. No amblyopia or other visual disturbance persisted.

The patient remained at his home in the care of his natural parents, and at his 18 month follow-up examination, his development was normal. His head circumference measured 51 cm. Magnetic resonance imaging of his head showed very mild prominence of the subarachnoid spaces and judged to be within normal limits. A telephone follow-up interview with the community physician of the patient when he was 44 months of age indicated excellent general health, perfectly normal development, and a stable family life.

## Discussion

The coexistence of subdural hematoma and retinal hemorrhage in an infant is considered virtually indicative that

0000045

child abuse has occurred. The significance of these findings has been established over time by their frequent association with other typical signs of abuse: injuries at various ages and those affecting various body parts, as well as parental delay in seeking medical attention. In the case described here, however, no other injuries or suspicious circumstances were present, and the accusations of abuse grew entirely out of the perception that the mechanism of the injury was implausible. Although the question of inflicted injury can never be dismissed completely, the recognition of preexisting external hydrocephalus in this case at least partly undermines the explanation that the subdural hematomas were mechanistically implausible. Furthermore, the small volume of the hematomas and the absence of lasting neurological sequelae constitute additional evidence that the traumatic forces responsible for the injury case were not great. The child's subsequent healthy development in his home environment further validates the diagnosis that his injury was accidental.

The mechanism for the development of subdural hemorrhage in infants has been thought to be shear injury to the anastomotic veins, passing from the surface of the cerebral cortex to the dural venous sinuses, particularly the sagittal sinus.[12] Because the brain and the skull have differing viscoelastic properties, sudden forces applied to the head cause the brain to "slosh" inside the skull[34] Regardless of cause, craniocerebral disproportion compromises the natural mechanical stability of the brain within the skull. In cases in which external hydrocephalus is present, the bridging veins passing from the cerebral convexities to the dural venous sinuses may be rendered more vulnerable to shear injury by their long courses through the exaggerated subarachnoid spaces.

The association of retinal hemorrhage with catastrophic intracranial hemorrhage is familiar to all neurosurgeons. Aneurysmal subarachnoid hemorrhage is the paradigm, and the accepted mechanism is transmission of the sudden elevation of intracranial pressure to the central retinal vein and its choroidal anastomoses via the subarachnoid space of the optic nerve sheaths.[20,27] In infancy retinal hemorrhages have long been recognized as a distinctive feature of head injury caused by physical abuse[3,28,42] but the physical mechanisms remain to be clarified.[15] One possibility is that the rupture of retinal veins is caused by a pressure surge transmitted either from the cranial cavity through the subarachnoid space of the optic nerve sheaths or from the chest through the cervicocephalic veins (the so-called Purtscher retinopathy)[42] Another possibility, by analogy with subdural hemorrhage, is that a direct acceleration-deceleration insult to the globe causes shear stresses between the ocular tissues with differing mechanical properties; this mechanism of injury is especially prominent in autopsy cases.[15,22] Because a gradation of inflicted ocular injury corresponds to the gradation of severity of the associated intracranial injury[15,43] different mechanisms likely come into play in response to varying degrees of violence.

To the best of the author's knowledge, retinal hemorrhages have not been described before in association with minor trauma in the setting of external hydrocephalus. Whether or not external hydrocephalus imparts a special susceptibility to ocular hemorrhage is unknown; however, in the present case the involvement of the eyes seems severe in relation to the extent of the intracranial hemorrhage. One mechanistic hypothesis is that the subarachnoid spaces along the optic nerves may be dilated in the same manner as the intracranial subarachnoid spaces are. Furthermore, the dilated intracranial subarachnoid spaces may transmit pressure impulses more efficiently, and with less dampening than in the normal state. Intracranial compliance may be low in the setting of external hydrocephalus as well. A minor skull impact could therefore generate an exaggerated intracranial pressure impulse that might, in turn, be transmitted undampened out along the optic nerves and into the orbits as far as the globes. Because of the format of the imaging studies obtained in the case reported here, it was not possible to assess the subarachnoid spaces within the optic nerve sheaths, and so this explanation remains speculative.

Until its pathogenesis has been elucidated more thoroughly, the forensic interpretation of retinal hemorrhage should be handled cautiously in the setting of external hydrocephalus. In many familiar clinical situations, retinal hemorrhage is linked to the occurrence of sudden pressure transients within the cranial cavity. The mechanical properties of the cranium and its contents are abnormal in cases of external hydrocephalus, and the mechanical coupling of the cranium and eye may therefore be abnormal as well. The outcome of the case reported here

0000046

reinforces this line of reasoning and raises a concern that can only be settled by additional clinical experience and, perhaps, experimental data: in the setting of external hydrocephalus, retinal hemorrhage may not be pathognomonic of abusive injury.

Address reprint requests to: Joseph Piatt, M.D., Department of Neurosurgery (L472), Oregon Health Sciences University, Portland, Oregon 97201-3098. email: piattj@ohsu.edu.

## References

1. Akaboshi I, Ikeda T, Yoshioka S: Benign external hydrocephalus in a boy with autosomal dominant microcephaly. **Clin Genet 49:**160-162, 1996
2. Alvarez LA, Maytal J, Shinnar S: Idiopathic external hydrocephalus: natural history and relationship to benign familial macrocephaly. **Pediatrics 77:**901-907, 1986
3. Andersson H, Elfverson J, Svendsen P: External hydrocephalus in infants. **Childs Brain 11:**398-402, 1984
4. Aoki N: Extracerebral fluid collections in infancy: role of magnetic resonance imaging in differentiation between subdural effusion and subarachnoid space enlargement. **J Neurosurg 81:**20-23, 1994
5. Azais M, Echenne B: [Idiopathic pericerebral swelling (external hydrocephalus) of infants. **Ann Pediatr 39:**550-558, 1992 (Fr)
6. Bode H, Strassburg HM: [Craniocerebral dysproportion--a contribution to the significance of extracerebral fluid collections in infancy. **Klin Padiatr 199:**399-402, 1987 (Ger)
7. Briner S, Bodensteiner J: Benign subdural collections of infancy. **Pediatrics 67:**802-804, 1981
8. Brown JK, Minns RA: Non-accidental head injury, with particular reference to whiplash shaking injury and medico-legal aspects. **Dev Med Child Neurol 35:**849-869, 1993
9. Caffey J: On the theory and practice of shaking infants. Its potential residual effects of permanent brain damage and mental retardation. **Am J Dis Child 124:**161-169, 1972
10. Carolan PL, McLaurin RL, Towbin RB, et al: Benign extra-axial collections of infancy. **Pediatr Neurosci 12:**140-144, 1985
11. Dietrich AM, James CD, King DR, et al: Head trauma in children with congenital coagulation disorders. **J Pediatr Surg 29:**28-32, 1994
12. Duhaime AC, Gennarelli TA, Thibault LE, et al: The shaken baby syndrome. A clinical, pathological, and biomechanical study. **J Neurosurg 66:**409-415, 1987
13. Gilkes MJ, Mann TP: Fundi of battered babies. **Lancet 2:**468-469, 1967
14. Gout A, Gautier I, Bellaiche M, et al: [Idiopathic peri-cerebral enlargement in infants: simple anatomical variant or hemorrhagic risk factor?] **Arch Pediatr 4:**983-987, 1997 (Fr)
15. Green MA, Lieberman G, Milroy CM, et al: Ocular and cerebral trauma in non-accidental injury in infancy: underlying mechanisms and implications for paediatric practice. **Br J Ophthalmol 80:**282-287, 1996
16. Hamza M, Bodensteiner JB, Noorani PA, et al: Benign extracerebral fluid collections: a cause of macrocrania in infancy. **Pediatr Neurol 3:**218-221, 1987
17. Hymel KP, Abshire TC, Luckey DW, et al: Coagulopathy in pediatric abusive head trauma. **Pediatrics 99:**371-375, 1997
18. Kapila A, Trice J, Spies WG, et al: Enlarged cerebrospinal fluid spaces in infants with subdural hematomas. **Radiology 142:**669-672, 1982
19. Kempe CH: Paediatric implications of the battered baby syndrome. **Arch Dis Child 46:**28-37, 1971
20. Khan SG, Frenkel M: Intravitreal hemorrhage associated with rapid increase in intracranial pressure (Terson's syndrome). **Am J Ophthalmol 80:**37-43, 1975
21. Laubscher B, Deonna T, Uske A, et al: Primitive megalencephaly in children: natural history, medium term prognosis with special reference to external hydrocephalus. **Eur J Pediatr 149:**502-507, 1990
22. Massicotte SJ, Folberg R, Torczynski E, et al: Vitreoretinal traction and perimacular retinal folds in the eyes of deliberately traumatized children. **Ophthalmology 98:**1124-1127, 1991
23. Maytal J, Alvarez LA, Elkin CM, et al: External hydrocephalus: radiologic spectrum and differentiation from cerebral atrophy. **AJR 148:**1223-1230, 1987

0000047

24. Ment LR, Duncan CC, Ehr R: Benign enlargement of the subarachnoid spaces in the infant. **J Neurosurg 54**:504-508, 1981

25. Mori K, Handa H, Itoh M, et al: Benign subdural effusion in infants. **J Comput Assist Tomogr 4**:466-471, 1980

26. Mori K, Sakamoto T, Nishimura K, et al: Subarachnoid fluid collection in infants complicated by subdural hematoma. **Childs Nerv Syst 9**:282-284, 1993

27. Muller PJ, Deck JHN: Intraocular and optic nerve sheath hemorrhage in cases of sudden intracranial hypertension. **J Neurosurg 41**:160-166, 1974

28. Mushin A, Morgan G: Ocular damage in the battered-baby syndrome. Report of two cases. **Br J Ophthalmol 55**:343-347, 1971

29. Nickel RE, Gallenstein JS: Developmental prognosis for infants with benign enlargement of the subarachnoid spaces. **Dev Med Child Neurol 29**:181-186, 1987

30. Nishimura K, Mori K, Sakamoto T, et al: Management of subarachnoid fluid collection in infants based on a long-term follow-up study. **Acta Neurochir 138**:179-184, 1996

31. Nogueira GJ, Zaglul HF: Hypodense extracerebral images on computed tomography in children. "External hydrocephalus": a misnomer? **Childs Nerv Syst 7**:336-341, 1991

32. O'Hare AE, Eden OB: Bleeding disorders and non-accidental injury. **Arch Dis Child 59**:860-864, 1984

33. Odita JC: The widened frontal subarachnoid space. A CT comparative study between macrocephalic, microcephalic, and normocephalic infants and children. **Childs Nerv Syst 8**:36-39, 1992

34. Ommaya AK, Faas F, Yarnell P: Whiplash injury and brain damage: an experimental study. **JAMA 204**:285-289, 1968

35. Page AC, Mohan D, Paxton RM: Arachnoid cysts of the middle fossa predispose to subdural haematoma formation fact or fiction? **Acta Neurochir Suppl 42**:210-215, 1988

36. Palencia Luaces R, Aldana Gómez J, Tresierra Unzaga F: [Idiopathic external hydrocephaly and familial macrocephaly in infancy.] **An Esp Pediatr 36**:186-188, 1992 (Sp)

37. Parsch CS, Krauss J, Hofmann E, et al: Arachnoid cysts associated with subdural hematomas and hygromas: analysis of 16 cases, long-term follow-up, and review of the literature. **Neurosurgery 40**:483-490, 1997

38. Pettit RE, Kilroy AW, Allen JH: Macrocephaly with head growth parallel to normal growth pattern: neurological, developmental, and computerized tomography findings in full-term infants. **Arch Neurol 37**:518-521, 1980

39. Robertson WC Jr., Chun RW, Orrison WW, et al: Benign subdural collections of infancy. **J Pediatr 94**:382-386, 1979

40. Roshan K, Elizabeth C, Chacko A, et al: External hydrocephalus--a report of 16 cases from Oman. **J Trop Pediatr 44**:153-156, 1998

41. Shen WC, Yang CF, Chang T: Benign hydrocephalus in infants. A computed tomographic and clinical correlative study. **Acta Radiol Suppl 369**:689-691, 1986

42. Tomasi LG, Rosman NP: Purtscher retinopathy in the battered child syndrome. **Am J Dis Child 129**:1335-1337, 1975

43. Wilkinson WS, Han DP, Rappley MD, et al: Retinal hemorrhage predicts neurologic injury in the shaken baby syndrome. **Arch Ophthalmol 107**:1472-1474, 1989

44. Wilms G, Vanderschueren G, Demaerel PH, et al: CT and MR in infants with pericerebral collections and macrocephaly: benign enlargement of the subarachnoid spaces versus subdural collections. **AJNR 14**:855-860, 1993



All material on this website is protected by copyright. Copyright © 1994-2000 by Medscape Inc. All rights reserved. This website also contains material copyrighted by 3rd parties. Medscape requires 3.x browsers or better from Netscape or Microsoft.

0000049

17 Bach JF. The effect of infections on susceptibility to autoimmune and allergic diseases. N Engl J Med 2002;347:911-20.
18 Yu L, Robles DT, Abiru N, Kaur P, Rewers M, Kelemen K, et al. Early expression of anti-insulin autoantibodies of man and the NOD mouse: evidence for early determination of subsequent diabetes. Proc Natl Acad Sci USA 2000;97:1701-6.
19 Martin S, Wolf-Eichbaum D, Duinkerken G, Scherbaum WA, Kolb H, Noordzij JG, et al. Development of type 1 diabetes despite severe hereditary B-lymphocyte deficiency. N Engl J Med 2001;345:1036-40.
20 Imagawa A, Hanafusa T, Itoh N, Waguri M, Yamamoto K, Miyagawa J, et al. Immunological abnormalities in islets at diagnosis paralleled further deterioration of glycemic control in patients with recent-onset type 1 (insulin-dependent) diabetes mellitus. Diabetologia 1999;42:574-8.
21 Herold KC, Hagopian W, Auger JA, Poumian-Ruiz E, Taylor L, Donaldson D, et al. Anti-CD3 monoclonal antibody in new-onset type 1A diabetes mellitus. N Engl J Med 2002;346:1692-8.
22 Foulis AK, Liddle CN, Farquharson MA, Richmond JA, Weir RS. The histopathology of the pancreas in type 1 diabetes (insulin dependent) mellitus: a 25-year review of deaths in patients under 20 years of age in the United Kingdom. Diabetologia 1986;29:267-74.
23 Verge CF, Gianani R, Kawasaki E, Yu L, Pietropaolo M, Jackson RA, et al. Prediction of type 1 diabetes in first-degree relatives using a combination of insulin, GAD, and ICA512bdc/IA-2 autoantibodies. Diabetes 1996;45:926-33.
24 LaGasse JM, Brantley MS, Leech NJ, Rowe RE, Monks S, Palmer JP, et al. Successful prospective prediction of type 1A diabetes in schoolchildren through multiple defined autoantibodies: an 8-year follow-up of the

Washington State diabetes prediction study. Diabetes Care 2002;25:505-11.
25 Johnson SB. Screening programs to identify children at risk for diabetes mellitus: psychological impact on children and parents. J Pediatr Endocrinol Metab 2001;14:633-9.
26 Barker J, Klingensmith G, Barriga K, Rewers M. Clinical characteristics of type 1 diabetic children identified by a genetic screening and intensive follow-up program. Diabetes 2003;52(suppl 1):A188.
27 Turner R, Stratton I, Horton V, Manley S, Zimmet P, Mackay IR, et al. UKPDS 25: autoantibodies to islet-cell cytoplasm and glutamic acid decarboxylase for prediction of insulin requirement in type 2 diabetes. Lancet 1997;350:1288-93.
28 Atkinson MA, Leiter EH. The NOD mouse model of type 1A diabetes: as good as it gets? Nat Med 1999;5:601-4.
29 Diabetes Control and Complications Trial, Epidemiology of Diabetes Interventions and Complications Research Group. Retinopathy and nephropathy in patients with type 1A diabetes four years after a trial of intensive therapy. N Engl J Med 2000;342:381-9.
30 Vajo Z, Duckworth WC. Genetically engineered insulin analogs: diabetes in the new millennium. Pharmacol Rev 2000;52:1-9.
31 Bolli GB, Owens DR. Insulin glargine. Lancet 2000;356:443-5.
32 Meyer L, Guerci B. Metformin and insulin in type 1A diabetes: the first step. Diabetes Care 2003;26:1655-6.
33 Shapiro AM, Lakey JR, Ryan EA, Korbutt GS, Toth E, Warnock GL, et al. Islet transplantation in seven patients with type 1A diabetes mellitus using a glucocorticoid-free immunosuppressive regimen. N Engl J Med 2000;343:230-8.

## Evidence based case report

# Perimacular retinal folds from childhood head trauma

P E Lantz, S H Sinal, C A Stanton, R G Weaver Jr

Editorials by Geddes and Plunkett and Harding et al

Department of Pathology, Wake Forest University School of Medicine, Winston-Salem, NC 27157, USA
P E Lantz
associate professor
C A Stanton
associate professor

Department of Paediatrics, Wake Forest University School of Medicine
S H Sinal
professor

Department of Ophthalmology, Wake Forest University School of Medicine
R G Weaver Jr
associate professor

Correspondence to: P E Lantz plantz@wfubmc.edu

BMJ 2004;328:754-6

A previously healthy 14 month old child was transferred to our medical centre with a severe head injury. The father had collected the boy and his 3 year old brother from their mother at his workplace car park and taken them home while their mother went to work. The children had been watching television while the father prepared dinner. After hearing something fall, the father found the boy on the floor with the television covering the right side of the head and anterior chest. A homemade television stand was partially across the child's lower legs. His older brother stated, "television fell." As soon as the father removed the television, he noticed the child's head beginning to swell. A neighbour drove them to the local hospital. According to the father and the neighbour, the child never stopped breathing and no resuscitative efforts were attempted.

Cranial computed tomography showed extensive head injuries. He had soft tissue swelling of the scalp, diffuse cerebral oedema with a subdural haematoma overlying the frontal convexities and layering along the falx cerebri, a left sided skull fracture adjacent to a widely diastatic coronal suture, cerebral contusions beneath the fracture, and a rightward midline shift measuring 8 mm. The paediatric ophthalmologist described bilateral dot and blot intraretinal haemorrhages, preretinal haemorrhages, and perimacular retinal folds (fig 1).

The child's condition deteriorated, and he died 18 hours after the incident. Child Protective Services removed the 3 year old sibling from the home because the retinal haemorrhages and retinal folds were considered diagnostic of abusive head trauma from shaking. This action was taken despite the father's repeated detailed, consistent account provided to emergency staff, the paediatric child abuse specialist, paediatric intensive care doctors, and law enforcement authorities.

## Postmortem evidence

A forensic autopsy showed no direct trauma to the orbits or eyes. There were prominent bilateral scalp contusions with soft tissue and intramuscular haemorrhage, symmetrical parietal skull fractures with coronal sutural diastasis, and a lacerated dura mater with extrusion of brain and blood. In addition to bilateral subdural and subarachnoid haemorrhages, a thin epidural haematoma partially covered the frontoparietal, calvarial lamina interna. The brain showed bilateral cortical contusions, severe cerebral oedema, and diffuse anoxic-ischemic injury. Postmortem ocular examination showed haemorrhages of the optic nerve sheaths with subdural haemorrhage greater than subarachnoid haemorrhage. Both eyes had extensive retinal haemorrhages with perimacular retinal folds (fig 2). Retinoschisis and peripapillary intraocular haemorrhages were evident, and the retinal haemorrhages extended from the posterior pole to the ora serrata affecting the preretinal, intraretinal, and subretinal layers.

When investigators went to the house to recover the television before the family returned home, it was still on the carpeted floor. The 480 mm 19 inch television with built in videocassette recorder weighed 19.5 kg. The homemade television stand measured 762 mm (height)×635 mm (width)×508 mm (depth) and had a bottom drawer that held videotapes. A greasy smudged area on the glass of the television corresponded with the impact site on the child's head.

A re-enactment in which a 11.4 kg weight (similar to the child's weight at autopsy of 11.8 kg) was placed on the partially opened drawer caused the television and

Details of the included studies are on bmj.com

0000050

television stand to readily topple forward. According to investigators, the family home was 7.8 km from the workplace and about 6 km from the local hospital. Based on the distance and estimated driving times plus workplace time clock records, the father was home with the children about 20 minutes when the incident happened. The day after the incident, while in foster care, the 3 year old sibling corroborated the father's account. Despite all this evidence, the paediatric ophthalmologist repeated that perimacular retinal folds coincident with retinal haemorrhages were considered specific for shaken baby syndrome secondary to retinal traction exerted by the oscillating vitreous.

## Search for published evidence

We were unable to find a published report of perimacular retinal folds in a childhood non-abusive head injury. We therefore did a systematic review of the medical literature on perimacular retinal folds associated with abusive head trauma in infants and young children. Our background question became: "In infants and young children with an acute intracranial injury, are perimacular retinal folds specific for head injury from vitreoretinal traction occurring during cycles of acceleration and deceleration (shaken baby syndrome)?"

We searched the Medline (1966-2003) database using the terms retinal folds and child abuse and uncovered seven non-comparative case series articles.[1-7] We also examined references cited in these articles plus review articles and book chapters on ocular findings in child abuse mentioning or discussing perimacular retinal folds relative to non-accidental head injury. Similar searches in the Cochrane Library, ISI Web of Science, and Ovid found no additional articles.

## Results

We found 42 articles and book chapters discussing perimacular retinal folds in childhood abusive head trauma. Seventeen mentioned the presence of retinal folds in non-accidental head injury but did not comment on specificity or formative mechanism. A table on bmj.com gives details of the remaining articles. All but two of the articles are non-comparative clinical or autopsy case series, case reports, review articles, or book chapters.

The two studies that included controls both showed bias in selection of controls and contained no cases with perimacular retinal folds but discussed the postulated causal mechanism.[8,9] In the prospective controlled study, the authors reported on 79 children younger than 3 years who had sustained head injuries.[8] The manner of injury in one case was indeterminate. Three children, including one who died, had non-accidental head injury diagnosed, all of whom had retinal haemorrhages; 72 of the 75 children with non-abusive injuries were managed by observation alone. No perimacular retinal folds were observed; however, the presumed causative mechanism of traumatic retinoschisis and retinal folds was discussed.

The second controlled study was a prospective autopsy study that examined the presence and location of ocular findings in 169 childhood deaths.[9] Ocular haemorrhages (retinal, peripheral retinal, optic nerve sheath and intrascleral) were more likely in craniocer-



Fig 1 Clinical image highlighting temporal portion of perimacular retinal fold at 2-3 o'clock area in left eye with a blood vessel bending over the fold (magnification ×6)

ebral trauma than in non-head injuries and natural diseases. Although case selection was purportedly random, the study contained a disproportionately high number of deaths from child abuse compared with natural and non-abusive causes. Case selection depended on the pathologist's willingness to participate in the study, and we were told by one of the authors that pathologists were more willing to participate when they believed that the deaths were abusive or suspicious (M Gilliland, personal communication, 2002). Perimacular retinal folds were not noted, but the authors concluded that acceleration-deceleration injury to the retina accounts for peripheral retinal haemorrhages and retinal folds.

## Supporting evidence

The references cited to support statements about the specificity or causal mechanism of perimacular retinal folds and abusive head injury in the articles we found are all non-comparative observational reports, unsystematic review articles, and book chapters. Seventy per cent of the articles cited four non-comparative case series.[1,3,5,10] We assessed the quality of this evidence.

Gaynon et al reported on two infants with presumed shaken baby syndrome who had retinal folds and concluded that these folds may be a hallmark



Fig 2 Transilluminated retinal image of right eye at autopsy showing circinate, elevated, perimacular retinal fold and extensive retinal haemorrhages

755

of shaking injuries in child abuse victims.[1] One infant reportedly fell 1.5 m to the floor while being carried down a stairway.

Massicotte et al reported the ocular findings at autopsy of three children with perimacular retinal folds.[2] Two infants had sustained direct head trauma, but in the other there was no physical or forensic evidence of direct head trauma. They observed that the vitreous had partially separated from the retina but remained attached to the internal limiting membrane at the apices of the folds and the vitreous base. They concluded that their study confirmed the role of vitreous traction in formation of perimacular folds and proved that shaking alone caused these folds and shaking was never an accidental phenomenon.

Elner et al reviewed the ocular and autopsy findings in 10 consecutive children who died of suspected child abuse.[3] Perimacular retinal folds were observed in three children, all of whom had evidence of blunt head injuries.

Greenwald et al reported five cases of children in whom definite or probable physical abuse during infancy was associated with traumatic retinoschisis.[4] They hypothesised that when an infant is shaken, the head is subjected to repetitive accelerations and decelerations causing the relatively dense lens to move forward and back within the ocular fluids. Transmission of force through firm attachments between the lens, vitreous gel, and particularly the macular retina presumably would result in appreciable traction on the retina causing it to split and creating the surrounding folds.

## Discussion

Statements in the medical literature that perimacular retinal folds are diagnostic of shaken baby syndrome are not supported by objective scientific evidence. Noncomparative observational reports and unsystematic narrative review articles contain insufficient evidence to provide unbiased support for or against diagnostic specificity, and inferences about associations, causal or otherwise, cannot be determined. Clinical and autopsy evidence of ocular lesions must therefore be considered alongside other physical findings and a thorough investigation before concluding whether a head injury is caused by abuse. The child in our case had ocular haemorrhages (peripheral retinal, optic nerve sheath, and intraorbital) and retinoschisis, which again some people consider specific for child abuse. Unfortunately, the evidence for these assumptions has similar problems to

that for perimacular retinal folds. An evidence based analysis of indexed medical publications on shaken baby syndrome from 1966-1998 uncovered a weak scientific evidence base.[11] Selection bias, inappropriate controls, and the lack of precise criteria for case definition were identified as important problems with the data. Many studies committed a fallacy of assumption, selecting cases by the presence of the clinical findings that were sought as diagnostically valid. Unsystematic reviews and consensus statements often mingled opinion with facts and added no original supporting evidence.

Perimacular retinal folds are associated with increased neurological morbidity and mortality in infants and children with abusive head injuries.[7] The reported incidence of perimacular retinal folds in shaken baby syndrome varies from 6% in a consecutive clinical case series to 50% in a sequential autopsy case series.[6-12] Clinical and autopsy studies with appropriately matched controls are needed to determine the causal mechanism of perimacular retinal folds and their specificity for abusive head injury. Until good evidence is available, we urge caution in interpreting eye findings out of context.

Contributors: PEL conceived the idea, collected the articles, and wrote the initial draft. All authors contributed to the review process, writing, and final editing of the paper. PEL is the guarantor.

Competing interests: None declared.

1 Gaynon MW, Koh K, Marmor MF, Frankel LR. Retinal folds in the shaken baby syndrome. Am J Ophthalmol 1988;106:423-5.
2 Massicotte SJ, Folberg R, Torczynski E, Gilliland MG, Luckenbach MW. Vitreoretinal traction and perimacular retinal folds in the eyes of deliberately traumatised children. Ophthalmology 1991;98:1124-7.
3 Elner SG, Elner VM, Arnall M, Albert DM. Ocular and associated findings in suspected child abuse. A necropsy study. Arch Ophthalmol 1990;108:1094-101.
4 Han DP, Williamson WK. Eye, retinal findings in the shaken baby syndrome. J Pediatr Ophthalmol Strabismus 1990;27:299-300.
5 Marshall DH, Brownstein S, Dorey MW, Addison DJ, Carpenter B. The spectrum of postmortem ocular findings in victims of shaken baby syndrome. Can J Ophthalmol 2001;36:377-83.
6 Mills M. Funduscopic lesions associated with mortality in shaken baby syndrome. J Am Assoc Pediatr Ophthalmol Strabismus 1998;2:67-71.
7 Munger CE, Peiffer RL, Bouldin TW, Kylstra JA, Thompson RL. Ocular and associated neuropathologic observations in suspected whiplash shaken infant syndrome: a retrospective study of 12 cases. Am J Forensic Med Pathol 1993;14:193-200.
8 Betz TM, Levin AV, Enzenauer RW, Elder JE, Letourneau MA. Ocular and optic nerve hemorrhages in abusive head trauma in infants and young children. Ophthalmology 1997;104:1718-23.
9 Gilliland MG, Luckenbach MW, Chenier TC. Systemic and ocular findings in 169 prospectively studied child deaths: retinal hemorrhages usually mean child abuse. Forensic Sci Int 1994;68:117-32.
10 Greenwald MJ, Weiss A, Oesterle CS, Friendly DS. Traumatic retinoschisis in battered babies. Ophthalmology 1986;93:618-25.
11 Donohoe M. Evidence-based medicine and shaken baby syndrome. Part I: literature review, 1966-1998. Am J Forensic Med Pathol 2003;24:239-42.
12 Kivlin JD, Simons KB, Lazoritz S, Ruttum MS. Shaken baby syndrome. Ophthalmology 2000;107:1246-54.

(Accepted 26 January 2004)



0000053

## References

### Table

### References

Greenwald MJ. The shaken baby syndrome. *Semin Ophthalmol* 1990;5:202-15.

Kaur B, Taylor D. Fundus haemorrhages in infancy. *Surv Ophthalmol* 1992;37:1-17.

Keithahn MA, Bennett SR, Cameron D, Mieler WF. Retinal folds in Terson syndrome. *Ophthalmology* 1993;100:1187-90.

American Academy of Pediatrics Committee on Child Abuse and Neglect. Shaken baby syndrome: inflicted cerebral trauma. *Pediatrics* 1993;92:872-5.

Meier P, Wiedemann P. Glaskörper- und fundusveränderungen beim Terson syndrom: Drei falldarstellungen. *Klin Monatsbl Augenheilkd* 1996;209:244-8.

Andrews AP. Ocular manifestations of child abuse. *Pa Med* 1996;99(suppl):71-5.

Rohrbach JM, Benz D, Friedrichs W, Thiel HJ, Wehner HD. Okuläre pathologie der kindesmißhandlung. *Klin Monatsbl Augenheilkd* 1997;210:133-8.

Ellis PS. The pathology of fatal child abuse. *Pathology* 1997;29:113-21.

Ophthalmology Child Abuse Working Party. Child abuse and the eye. *Eye* 1999;13:3-10.

Levin AV. Retinal haemorrhages and child abuse. In David TJ, ed. *Recent advances in pediatrics*. Vol 18. St Louis, MO: Churchill Livingstone, 2000:151-219.

Taylor D. Unnatural injuries. *Eye* 2000;14:123-50.

Levin AV. Ocular manifestations of child abuse. *Ophthalmol Clin North Am* 1990;3:249-64.

American Academy of Pediatrics Committee on Child Abuse and Neglect. Shaken baby syndrome: rotational cranial injuries-technical report. *Pediatrics* 2001;108:206-10.

Nadel FM, Posner JC. In the eye of the beholder. *Paediatr Ann* 2001;30:608-12.

Green MA, Lieberman G, Milroy CM, Parsons MA. Ocular and cerebral trauma in non-accidental injury in infancy: underlying mechanisms and implications for paediatric practice. *Br J Ophthalmol* 1996;80:282-7.

0000054

Gayle MO, Kissoon N, Hered RW, Harwood-Nuss A. Retinal haemorrhage in the young child: a review of aetiology, predisposed conditions, and clinical implications. *J Emerg Med* 1995;13:233-9.

Levin AV. Ophthalmology of shaken baby syndrome. *Neurosurg Clin N Am* 2002;13:201-11.

Greenwald MJ, Torczynski E, Mets MB. Acute retinal lesions in battered babies: Clinicopathological correlation of macular craters. *Ophthalmology* 1987;94(suppl):146.

Ober RR. Hemorrhagic retinopathy in infancy: a clinicopathologic report. *J Pediatr Ophthalmol Strabismus* 1980;17:17-20.

Drack AV, Petronio J, Capone A. Unilateral retinal haemorrhages in documented cases of child abuse. *Am J Ophthalmol* 1999;128:340-4.

Kivlin JD. Manifestations of the shaken baby syndrome. *Curr Opin Ophthalmol* 2001:12:158-63

Levin AV. Ocular manifestations of child abuse. In: Reece RM, Ludwig S, eds. *Child abuse: medical diagnosis and management.* Philadelphia, PA: Lippincott Williams and Wilkins, 2001:97-107.

Table

Articles referring to diagnostic specificity or causal mechanism of perimacular retinal folds (PRF) in childhood non-accidental head injury

| Reference | Publication date | Study type (No of cases) | Reference(s) cited re PRF |
|---|---|---|---|
| Gaynon MW et al[1] | 1988 | Clinical case series (2; 2 with PRF) | Case series[10] |
| Han DP et al.[4] | 1990 | Clinical case series (6; 2 with PRF) | Case series,[1] Abstract[w18*] |
| Greenwald MJ[w1] | 1990 | Review article | Case series[1;3;10] Case report[w19] Abstract[w18] |
| Massicotte SJ et al[2] | 1991 | Autopsy case series (3; 3 with PRF) | Case series[1;3] |
| Kaur B et al[w2] | 1992 | Review article | Case series[1;2] |

| | | | |
|---|---|---|---|
| Buys YM et al[8] | 1992 | Prospective clinical study; 0 with PRF | Case series[1,2] |
| Munger CE et al[7] | 1993 | Autopsy case series (12; 5 with PRF) | Case series[1,10] |
| Keithahn MAZ et a.[w3] | 1993 | Clinical adult case series (2; 2 with PRF) | Case series[1,2,3] |
| AAP Committee on Child Abuse & Neglect[w4] | 1993 | Position paper – Review article | Case series[10]  Review article[w12] |
| Gilliland MGF et al[9] | 1994 | Prospective autopsy study; 0 with PRF | Case series[1,2,7] |
| Meier P et al[w5] | 1996 | Clinical case series (2; 2 with PRF) | Case series[1,2,w3] |
| Andrews AP et al[w6] | 1996 | Review article | Case series[1,2] |
| Rohrbach JM et al[w7] | 1997 | Autopsy case report | Case series[1,2,3,10] |
| Ellis PS[w8] | 1997 | Review article | Case series[1,2] |
| Mills M[6] | 1998 | Clinical case series (10; 4 with PRF) | Case series[1,2] |
| Drack AV et al[w20] | 1999 | Clinical case series (4; 1 with PRF) | Case series[1,2] |
| Ophthalmology Child Abuse Working Group[w9] | 1999 | Consensus review article | Case series[1,2,3,7] |
| Levin AV[w10] | 2000 | Book chapter | Case series[1,2,6] |
| Taylor D[w11] | 2000 | Review article | Case report[w7]  Case series[1,2,3,7] |
| Levin AV[w22] | 2001 | Book chapter | Case series[10]  Book chapter[w10] |
| Kivlin JD[w21] | 2001 | Review article | Case series[1,2,6]  ——  Review article[w1,11] |
| AAP Committee on Child Abuse & Neglect[w13] | 2001 | Technical report – review article | Case series[10]  Review article[w12] |

| | | | Book chapter[w10] |
|---|---|---|---|
| Nadel FM et al[w14] | 2001 | Case report; 0 with PRF | Case series[w15]<br><br>Review article[w12;w16] |
| Marshall DH et al[5] | 2001 | Autopsy case series (6; 3 with PRF) | Case series[1;2]<br><br>Review article[11] |
| Levin AV[w17] | 2002 | Review article | Case series[2] |

PRF = perimacular retinal fold.

*Reference w18 could not be verified as cited.



Saturday 27 March 2004

**EXHIBIT    "I"**

# The evidence base for shaken baby syndrome

*We need to question the diagnostic criteria*

Editorial p 720
Clinical review p 754
Letters p 766
Personal view p 775

The phrase "shaken baby syndrome" evokes a powerful image of abuse, in which a carer shakes a child sufficiently hard to produce whiplash forces that result in subdural and retinal bleeding. The theory of shaken baby syndrome rests on core assumptions: shaking is always intentional and violent; the injury an infant receives from shaking is invariably severe; and subdural and retinal bleeding is the result of criminal abuse, unless proved otherwise.[1] These beliefs are reinforced by an interpretation of the literature by medical experts, which may on occasion be instrumental in a carer being convicted or children being removed from their parents. But what is the evidence for the theory of shaken baby syndrome?

Retinal haemorrhage is one of the criteria used, and many doctors consider retinal haemorrhage with specific characteristics pathognomonic of shaking. However, in this issue Patrick Lantz et al examine that premise (p 754) and conclude that it "cannot be supported by objective scientific evidence."[2] Their study comes hard on the heels of a recently published review of the literature on shaken baby syndrome from 1966 to 1998, in which Mark Donohoe found the scientific evidence to support a diagnosis of shaken baby syndrome to be much less reliable than generally thought.[3]

Shaken baby syndrome is usually diagnosed on the basis of subdural and retinal haemorrhages in an infant or young child,[1] although the diagnostic criteria are not uniform, and it is not unusual for the diagnosis to be based on subdural or retinal haemorrhages alone."[1] The website of the American Academy of Ophthalmology states that if the retinal haemorrhages have specific characteristics "shaking injury can be diagnosed with confidence regardless of other circumstances."[4] Having reviewed the evidence base for the belief that perimacular folds with retinal haemorrhages are diagnostic of shaking, Lantz et al were able to find only two flawed case-control studies, much of the published work displaying "an absence of ... precise and reproducible case definition, and interpretations or conclusions that overstep the data."[2] Their conclusions are remarkably similar to those of Donohoe, who found that "the evidence for shaken baby syndrome appears analogous to an inverted pyramid, with a very small database (most of it poor quality original research, retrospective in nature, and without appropriate control groups) spreading to a broad body of somewhat divergent opinions."[3] His work entailed searching the literature, using the term "shaken baby syndrome" and then assessing the

methods of the articles retrieved, using the tools of evidence based inquiry. Reviewing the studies achieving the highest quality of evidence rating scores, Donohoe found that "there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters," and identified "serious" data gaps, flaws of logic, inconsistency of case definition."[3]

The conclusions of Lantz et al and of Donohoe make disturbing reading, because they reveal major shortcomings in the literature relating to a field in which the opportunity for scientific experimentation and controlled trials does not exist, but in which much may rest on interpretation of the medical evidence.[5]

If the concept of shaken baby syndrome is scientifically uncertain, we have a duty to re-examine the validity of other beliefs in the field of infant injury. The recent literature contains a number of publications that disprove traditional expert opinion in the field. A study of independently witnessed low level falls showed that such falls may prove fatal, causing both subdural and retinal bleeding.[6][7] A biomechanical analysis validates that serious injury or death from a low level fall is possible and casts doubt on the idea that shaking can directly cause retinal or subdural haemorrhages.[7][8] An important lucid interval may be present in an ultimately fatal head injury in an infant.[8] Neuropathological studies have shown that abused infants do not generally have severe traumatic brain injury and that the structural damage associated with death may be morphologically mild.[9][10] What is the relevance of the craniocervical injuries to corticospinal tracts, dorsal nerve roots, and so on that have been described?[10][11] We do not know. What is the force necessary to injure an infant's brain? Again, we do not know.

While most abused children indisputably show the signs of violence, not all do. No one would be surprised to learn that a fall from a two storey building or involvement in a high speed road traffic crash can cause retinal and subdural bleeding, but what is the minimum force required? "It is one thing clearly to state that a certain quantum of force is necessary to produce a subdural hematoma; it is quite another to use examples of obviously extreme force ... and then suggest that they constitute the minimum force necessary."[11]

Research in the area of injury to infants is difficult. Quality evidence may need to be based on finite element

Additional references w1-w3 are on bmj.com

**P+**

0000058

structures, rather than living animals —
immature animal models of performed but not R)
validated against the known mechanical properties of
the Human infant. Pending completion of such studies,
the reviews by Lantz and Donohoe are a valuable
contribution and provide a salutary check for anyone
wishing to cite the literature in support of an opinion.
Their criticisms of lack of case definition or proper con-
trols can be levelled at the whole literature on child
abuse. If the issues are much less certain than we have
been taught to believe, then to admit uncertainty some-
times would be appropriate for experts. Doing so may
make prosecution more difficult, but a natural desire to
protect children should not lead anyone to proffer opin-
ions unsupported by good quality science. We need to
reconsider the diagnostic criteria, if not the existence, of
shaken baby syndrome.

J F Geddes *retired (formerly reader in clinical neuropathology, Queen Mary, University of London)*

London (j.f.geddes@doctors.org.uk)

J Plunkett *forensic pathologist*

Regina Medical Center, 1175 Nininger Road, Hastings, MN 55033, USA

1   American Academy of Pediatrics Committee on Child Abuse and Neglect. Shaken baby syndrome: rotational cranial injuries—technical report. *Pediatrics* 2001;108:206-10.
2   Lantz P, Sinai S, Stanton C, Weaver R. Perimacular retinal folds from childhood head trauma: Case report with critical appraisal of current literature. *BMJ* 2004;328:754-6.
3   Donohoe M. Evidence-based medicine and shaken baby syndrome. Part I: literature review, 1966-1998. *Am J Forensic Med Pathol* 2003;24:239-42.
4   American Academy of Ophthalmology. Shaken baby syndrome resources. www.aao.org/aao/education/library/shaken_baby.cfm (accessed 25 Feb 2004).
5   Milroy CM. Medical experts and the criminal courts. *BMJ* 2003;326:294-5.
6   Plunkett J. Fatal pediatric head injuries caused by short-distance falls. *Am J Forensic Med Pathol* 2001;22:1-12.
7   Ommaya AK, Goldsmith W, Thibault L. Biomechanics and neuropathology of adult and paediatric head injury. *Br J Neurosurg* 2002;16:220-42.
8   Denton S, Mileusnic D. Delayed sudden death in an infant following an accidental fall. *Am J Forensic Med Pathol* 2003;24:371-6.
9   Geddes JF, Hackshaw AK, Vowles GH, Nickols CD, Whitwell HL. Neuropathology of inflicted head injury in children. I. Patterns of brain damage. *Brain* 2001;124:1290-8.
10  Geddes JF, Vowles GH, Hackshaw AK, Nickols CD, Scott IS, Whitwell HL. Neuropathology of inflicted head injury in children. II. Microscopic brain injury in infants. *Brain* 2001;124:1299-306.
11  Shannon P, Smith CR, Deck J, Ang LC, Ho M, Becker L. Axonal injury and the neuropathology of shaken baby syndrome. *Acta Neuropathol* 1998;95:625-31.
12  People v Martinez, 51 P3d 1046 (2001) (R'hrg den. 2002) (cert. granted, 2002).

# Shaken baby syndrome

*Pathological diagnosis rests on the combined triad, not on individual injuries*

Shaken baby syndrome is a form of physical non-accidental injury to infants, characterised by acute encephalopathy with subdural and retinal haemorrhages, occurring in a context of inappropriate or inconsistent history and commonly accompanied by other apparently inflicted injuries.[1][2] Injuries to the neck and spinal cord may also be present. Controversy surrounds the precise causation of the brain injury, the retinal and subdural haemorrhages, as well as the degree of force required and whether impact in addition to whiplash forces is needed.[1][3][4] Although most discussion has concerned fatal injuries of this nature, not all are lethal, but they may be associated with subsequent neurological disability of varying severity.

Expert medical evidence about inflicted injury must have scientific validity, but applying the evidence based criteria appropriate to clinical practice entails some difficulties.[5] In clinical practice medical management of defined clinical problems can be compared and best practice distinguished by clinical outcomes. Conversely, in inflicted paediatric injuries, one is presented with the outcome, investigation follows rather than precedes that outcome, and the history may be incomplete or deliberately misleading. A need exists for an impartial and intelligent assessment, but how may this be achieved in practice?

Because of the serious implications of diagnosing inflicted injury such as shaken baby syndrome, every case must be evaluated in detail, taking account of all the circumstances surrounding the injury and considering the pathological features in full, rather than attempting to evaluate the significance of each component.

In shaken baby syndrome, it is the combined triad of subdural and retinal haemorrhage with brain damage, as well as the characteristics of each of these components that allow a reconstruction of the mechanism of injury, and assessment of the degree of force employed. The application of rotational acceleration and deceleration forces to the infant's head causes the brain to rotate in the skull. Abrupt deceleration allows continuing brain rotation until bridging veins are stretched and ruptured, causing a thin layer of subdural haemorrhage on the surface of the brain. This is not a space occupying lesion; its importance is in indicating the mechanism of injury. The retinal haemorrhages, which are characteristically extensive, occupy much of the circumference of the globe and extend through all the layers of the retina and similarly result from rotational acceleration and deceleration forces.

The mechanism of brain damage is problematic. Traditional wisdom has suggested shearing forces operating within the brain substance with consequent axonal damage.[6] Geddes et al, in a careful neuropathological study of head injuries in children using β amyloid precursor protein immunostaining, observed that the predominant changes in infants with evidence of shaking were hypoxic-ischaemic rather than the diffuse axonal injury seen in older children and adults with fatal head trauma.[7][8] These authors thought that acceleration and deceleration forces might damage the neuraxis to cause apnoea, with consequent ischaemic insult causing diffuse cerebral oedema.

Unfortunately, this logical idea was followed in a second paper by the statement, "Although mechanisms of

*Editorial* p 719
*Clinical review* p 754
*Letters* p 766
*Personal view* p 775

*BMJ* 2004;328:720-1

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,

    Plaintiff,

v.                                 CASE NO. 01-2000-CF-002753-A

BRIAN PATRICK HERLIHY,

    Defendant.

---

### ORDER DENYING MOTION FOR POST-CONVICTION RELIEF

**THIS CAUSE** comes before this Court upon Defendant's "Motion to Vacate Sentence

and Conviction Pursuant to Fla. R. Cr. P. 3.850 and Memorandum of Law," [hereinafter 'PCR

Motion'] filed August 10, 2005.

1.      Defendant alleges that trial counsel was ineffective for failing to request a *Frye*

Hearing prior to the admission of testimony which adduced that the victim died of Shaken Baby

Syndrome.  Defendant claims that a *Frye* Hearing was in order because the diagnosis of Shaken

Baby Syndrome is not based on a scientific principle or discovery that is "sufficiently established

to have gained general acceptance in the particular field in which it belongs," nor is it

"sufficiently tested and accepted by the relevant scientific community."  PCR Motion at 3 (citing

Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923) [hereinafter 'Frye'].

2.      Frye states that in order to introduce expert testimony deduced from a scientific

principle or discovery, the principle or discovery "must be sufficiently established to have gained

STATE V. HERLIHY
ORDER DENYING MOTION FOR POST-CONVICTION RELIEF
CASE NO. 01-2000-CF-002753-A
PETER K. SIEG, CIRCUIT JUDGE

general acceptance in the particular field in which it belongs." Frye at 1014. The ultimate

purpose of a Frye hearing is to "guarantee the reliability of new or novel scientific evidence,"

Brim v. State, 695 So. 2d 268, 271 (Fla. 1997); United States Sugar Corp. v. Henson, 823 So. 2d

104, 110 (Fla. 2002); therefore, a Frye hearing is not necessary where general acceptance of the

principle or discovery by the relevant scientific community is already recognized. Indeed, firmly

established scientific theories are never subject to Frye testing. *See* Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579 (1993).

      3.     Neither the United States Supreme Court, nor Florida appellate courts have

specifically addressed whether expert testimony on Shaken Baby Syndrome is subject to Frye

testing; however, Florida appellate courts recognize Shaken Baby Syndrome as an accepted

medical diagnosis and approve its use. *See* Dixon v. State, 691 So. 2d 515, 516 (Fla. 1st DCA

1997); Washington v. State, 737 So. 2d 1208 (Fla. 1st DCA 1999); N.L. v. Department of

Children and Family Services, 843 So. 2d 996 (Fla. 1st DCA 2003); Barber v. State, 781 So. 2d

425 (Fla. 5th DCA 2001); A.R. v. Department of Children and Families, 784 So. 2d 622, 623

(Fla. 5th DCA 2001); Moore v. State, 790 So. 2d 489, 491 (Fla. 5th DCA 2001).

      Jurisdictions outside of Florida acknowledge that the diagnosis of Shaken Baby

Syndrome is a result of extensive research and constitutes a widely accepted medical diagnosis.

*See* State v. Lopez, 306 S.C. 362, 367 (S.C. 1991); State v. McClary, 541 A.2d 96 (Conn. 1988);

State v. Leibhart, 266 Neb. 133 (Neb. 2003).

      4.     Defendant cites to a few articles which he purports criticize the diagnosis of

Shaken Baby Syndrome; he claims that these articles demonstrate that there is no general

acceptance of the syndrome. Even if this Court accepts that criticism exists in the relevant

scientific community, that does not support Defendant's claim that a Frye hearing was therefore

in order. The need for a Frye hearing is not indicated simply because some experts disagree with

a party's theory of medical causation. *See* Gelsthorpe v. Weinstein, 897 So. 2d 504, 511 (Fla. 2d

DCA 2005).

     5.     Here, Defendant alleges ineffective assistance of counsel as a basis for relief;

therefore, he must assert that trial counsel's performance did not comply with prevailing

standards of professionalism. *See* Strickland v. Washington, 466 U.S. 668, 691-92 (1984)

(hereinafter 'Strickland'). In addition, Defendant must be able to show that "there is reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." Strickland at 694.

     6.     Even accepting that trial counsel did not request a Frye hearing on the

admissibility of expert testimony regarding Shaken Baby Syndrome; Defendant fails to raise a

cognizable claim for relief. Counsel did not commit unprofessional error by not requesting a

Frye hearing to examine a diagnosis which courts already approve, and recognize as an accepted

medical diagnosis.

     7.     Furthermore, Defendant does not make a prima facie showing of prejudice for the

same reason that he fails to make a prima facie showing of unprofessional error. Based on the

courts' approval and recognition of Shaken Baby Syndrome, a reasonable probability does not

Page 3 of 4

STATE V. HERLIHY
ORDER DENYING MOTION FOR POST-CONVICTION RELIEF
CASE NO. 01-2000-CF-002753-A
PETER K. SIEG, CIRCUIT JUDGE

exist that but for trial counsel's omission the expert testimony on Shaken Baby Syndrome would

have been excluded.

8.      Therefore it is **ADJUDGED:**

Defendant's Motion for Post-Conviction Relief *is denied.* No successive motion

for post-conviction relief will be entertained by this Court. Defendant may appeal this decision

to the First District Court of Appeals within 30 days of this order's effective date.

**ORDERED** on September _24_, 2005.

_____
PETER K. SIEG, CIRCUIT JUDGE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Order was furnished by U.S.
Mail/hand delivery, on this _30_ day of September 2005, to the following:

David Mengers, Attorney for Defendant
500 NE 8th Ave.
Ocala, FL 34470

Mr. Brian Herlihy - DC #G06137
South Bay CF
P.O. Box 7171
600 US Hwy 27
South Bay, FL 33493

State Attorney's Office
Jeanne Singer, Chief Assistant State Attorney
Pamela K. Brockway, Assistant State Attorney

_____
Mary Fortinberry, Judicial Assistant

/dzm

0000063

02-CF-2753-A

## IN THE CIRCUIT COURT OF THE
## EIGHTH JUDICIAL CIRCUIT IN AND
## FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                         CASE NO.   02-2753-CF-A

vs.

BRIAN HERLIHY,
    Defendant.
_____/

### NOTICE OF APPEAL

NOTICE IS GIVEN that **Brian Herlihy/Appellant**, pursuant to Section 924.06, Fla.

Statute and Fla. R. App. P. 9.030(b)(1)(A), Fla. R. App. P. 9.110(a)(1), and Fla. R. App. P.

9.141, appeals to the Fifth District Court of Appeal the Order Denying his Motion to Vacate

Sentence and Conviction Pursuant to Fla.R.Cr.P. 3.850 entered on September 29, 2005 in the

above-styled cause.

The nature of the Order is a Final Order Denying without hearing the Defendant's Motion

for Post-Conviction Relief.

Dated this 27th[th] day of October, 2005.

David Mengers
Attorney for Defendant
Florida Bar # 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to
the Office of the State Attorney, 120 W. University Avenue, Gainesville, FL 32601 by





0000064

hand/mail/fax delivery this ___27___ day of __Oct.__, 2005.

DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

02-CF-2753-A

**IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT IN AND
FOR ALACHUA COUNTY, FLORIDA**

STATE OF FLORIDA,                         CASE NO.   02-2753-CF-A

     vs.

BRIAN HERLIHY,
   Defendant.

_____/

## DIRECTIONS TO THE CLERK

Brian Herlihy/Appellant, pursuant to Fla. R. App. P. 9.141(b)(2), directs the Clerk of the

above-styled Court to prepare and transmit to the Clerk of the Fifth District Court of Appeal a

Record on Appeal in the above-styled cause, in accordance with the applicable provisions of the

Florida Statutes and in accordance with the mandates of Fla. R. App. P. 9.141(b)(2).

Willie Wilkerson/Appellant specifically directs the Clerk of Court to include in the record

the Defendant's Motion for Post Conviction and the Order on the Motion.

Dated this 27th day of October, 2005.

                          David Mengers
                          Attorney for Defendant
                          Florida Bar # 0562394
                          500 NE 8th Avenue
                          Ocala, Florida 34470
                          (352) 622-5514

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to
the Office of the State Attorney, 120 W. University Avenue,  Gainesville, FL 32601 by



0000066

hand/mail/fax delivery this _27_ day of _Oct_ , 2005.

DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

OO CF-2753-A

**IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT IN AND
FOR ALACHUA COUNTY, FLORIDA**

STATE OF FLORIDA,                    **CASE NO.  02-2753-CF-A**

vs.

**BRIAN HERLIHY,**
**Defendant.**

_____/

2005 OCT 27  AM 11: 44

FILED

## <u>STATEMENT OF JUDICIAL ACTS TO BE REVIEWED</u>

Brian Herlihy/Appellant, states that the judicial acts to be reviewed are:

1.    The Denial of his Motion for Post-Conviction Relief.

Dated this 27th day of October, 2005.

David Mengers
Attorney for Defendant
Florida Bar # 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

### **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the Office of the State Attorney, 120 W. University Avenue, Gainesville, FL 32601 by hand/mail/fax delivery this 27th  day of October, 2005.

DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514



0000068

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT IN AND
FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                               CASE NO.   00-2753-CF-A

    vs.

BRIAN HERLIHY,
    Defendant.
_____/

## AMENDED NOTICE OF APPEAL

NOTICE IS GIVEN that **Brian Herlihy/Appellant**, pursuant to Section 924.06, Fla.

Statute and Fla. R. App. P. 9.030(b)(1)(A), Fla. R. App. P. 9.110(a)(1), and Fla. R. App. P.

9.141, appeals to the First District Court of Appeal the Order Denying his Motion to Vacate

Sentence and Conviction Pursuant to Fla.R.Cr.P. 3.850 entered on September 29, 2005 in the

above-styled cause.

The nature of the Order is a Final Order Denying without hearing the Defendant's Motion

for Post-Conviction Relief.

Dated this 28th[th] day of October, 2005.

                                          David Mengers
                                          Attorney for Defendant
                                          Florida Bar # 0562394
                                          500 NE 8th Avenue
                                          Ocala, Florida 34470
                                          (352) 622-5514

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to
the Office of the State Attorney, 120 W. University Avenue, Gainesville, FL 32601 by hand/



0000069

2

mail/fax delivery this ___28___ day of ___Oct___ , 2005.

DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT IN AND
FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                       CASE NO.   00-2753-CF-A

     vs.

BRIAN HERLIHY,
     Defendant.
_____/

## AMENDED DIRECTIONS TO THE CLERK

Brian Herlihy/Appellant, pursuant to Fla. R. App. P. 9.141(b)(2), directs the Clerk of the

above-styled Court to prepare and transmit to the Clerk of the First District Court of Appeal a Record

on Appeal in the above-styled cause, in accordance with the applicable provisions of the Florida

Statutes and in accordance with the mandates of Fla. R. App. P. 9.141(b)(2).

Brian Herlihy/Appellant specifically directs the Clerk of Court to include in the record the

Defendant's Motion for Post Conviction and the Order on the Motion.

Dated this 28th day of October, 2005.

David Mengers
Attorney for Defendant
Florida Bar # 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to
the Office of the State Attorney, 120 W. University Avenue,  Gainesville, FL 32601 by hand



71

/mail/fax delivery this 28th day of October, 2005.

DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT IN AND
FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                      CASE NO.   00-2753-CF-A

vs.

BRIAN HERLIHY,
      Defendant.
_____/

## AMENDED STATEMENT OF JUDICIAL ACTS TO BE REVIEWED

Brian Herlihy/Appellant, states that the judicial acts to be reviewed are:

1.      The Denial of his Motion for Post-Conviction Relief.

Dated this 28th day of October, 2005.

David Mengers
Attorney for Defendant
Florida Bar # 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the Office of the State Attorney, 120 W. University Avenue, Gainesville, FL 32601 by hand/mail/fax delivery this 28th  day of October, 2005.

DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

STATE OF FLORIDA

COUNTY OF ALACHUA

I, J.K. "Buddy" Irby, Clerk of the Circuit Court for the County of Alachua, State of Florida, do hereby certify that the foregoing pages 1 – 73 contain a true transcript of the 3.850 record in the case of BRIAN PATRICK HERLIHY v. STATE OF FLORIDA and a correct recital and copy of all such papers and proceedings in this cause as appears from the records and files of my office that have been directed to be included in said record pursuant to <u>Fla. R. App.p. 9.200.</u>

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Court this October 28, 2005.

J.K. "Buddy" Irby
Clerk of the Circuit Court
Alachua County, Florida



By _____

Shelley J. Carr
Deputy Clerk

I:\USERS\YMC\WORD\YVONNE\APPEALS\CIRCUIT CRIMINAL DOCUMENTS\CERT-PG-3850.FEL.DOC