# EXHIBIT

# OO

*Lc8-1-11934*

*F*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY      )
     Appellant      )
v.      )
     )
     )
STATE OF FLORIDA      )
     Appellee      )
     )
     )
     )
     )

*6-18-8 CH.*

CASE NO.    01-2000-CF-2753-A

APPEAL NO. 1D08-1588

VOLUME II

### SUPPLEMENTAL
# RECORD

### HONORABLE MARTHA ANN LOTT

### APPEAL FROM THE CIRCUIT COURT
### 8th JUDICIAL CIRCUIT FOR
### ALACHUA COUNTY, FLORIDA

**FOR APPELLANT**
MARY E. FITZGIBBONS, ESQUIRE
FITZGIBBONS LAW FIRM, P.A.
917 VERONA STREET
KISSIMMEE, FL 34741

**FOR APPELLEE**
HONORABLE BILL MCCOLLUM
ATTORNEY GENERAL
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

Created on 6/16/08

IN THE CIRCUIT COURT
OF THE EIGHTH
JUDICIAL CIRCUIT, IN
AND FOR ALACHUA
COUNTY, FLORIDA

BRIAN PATRICK HERLIHY
          Appellant

vs.

                                        CASE NO. 01-2000-CF-2753-A
                                        APPEAL NO. 1D08-1588

STATE OF FLORIDA
          Appellee

| INDEX INSTRUMENT | DATE FILED | PAGE NO. |
| --- | --- | --- |
| DOCKET LINES | | |
| **VOLUME I** | | |
| MOTION FOR POST-CONVICTION RELIEF | 11-28-2007 | 1-8 |
| NOTICE OF FILING | 11-28-2007 | 9 |
| SUPPLEMENTAL AFFIDAVIT OF DR. SCHEIBNER | 11-27-2007 | 10-28 |
| MOTION FOR LEAVE TO SUPPLEMENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 11-28-2007 | 29-30 |
| HEARING FOR DIVISION I | 01-29-2008 | 31 |
| ORDER GRANTING MOTION FOR LEAVE TO SUPPLEMNENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 02-05-2008 | 32-33 |
| HEARING FOR DIVISION I | 02-14-2008 | 34 |
| NOTICE OF FILING | 03-03-2008 | 35 |

| AFFIDAVIT OF JENNIFER LEIGH SALTER | 03-03-2008 | 36-41 |
| NOTICE OF FILING | 03-04-2008 | 42-43 |
| AFFIDAVIT OF LOIS HERLTHY | 03-04-2008 | 44-46 |
| FINAL ORDER DENYING MOTION FOR POST-CONVICTION RELIEF | 03-04-2008 | 47-50 |
| NOTICE OF APPEAL | 04-02-2008 | 51-52 |

**VOLUME II**

| FIRST DISTRICT COURT OF APPEAL ORDER | 06-11-2008 | 53-57 |
| MOTION TO VACATE SENTENCE AND CONVICTION PURSUANT TO FLA.R.CR.P. 3.850 AND MEMORANDUM OF LAW | 08-10-2005 | 58-115 |
| ORDER DENYING MOTION FOR POST-CONVICTION RELIEF | 09-30-2005 | 116-119 |
| RULE 3.850 MOTION FOR POST CONVICTION RELIEF, CONTINUED NEXT VOLUME | 08-25-2006 | 120-253 |

**VOLUME III**

| CONTINUED FROM PREVIOUS VOLUME, RULE 3.850 MOTION FOR POST CONVICTION RELIEF | 08-25-2006 | 254-289 |
| COLLATERAL RELIEF DETERMINATION MADE FROM MOTION [COMPUTER DOCKET ENTRY, NOT A DOCUMENT] | 08-31-2006 | ----- |
| CASE JUDGE REASSIGNED [COMPUTER DOCKET ENTRY, NOT A DOCUMENT] | 12-31-2006 | ----- |
| CASE LAW | 02-06-2007 | 290-314 |
| ORDER DENYING, IN PART, MOTION FOR POST CONVICTION RELIEF, SCHEDULING AN EVIDENTIARY HEARING, IN PART, AND APPOINTING OFFICE OF THE PUBLIC DEFENDER, CONTINUED NEXT VOLUME | 02-08-2007 | 315-454 |

**VOLUME IV**

CONTINUED FROM PREVIOUS VOLUME
ORDER DENYING, IN PART, MOTION FOR POST
CONVICTION RELIEF, SCHEDULING AN
EVIDENTIARY HEARING, IN PART, AND APPOINTING
OFFICE OF THE PUBLIC DEFENDER                    02-08-2007              455-489

MOTION TO STRIKE, OR IN THE ALTERNATIVE,
STATE'S RESPONSE TO DEFENDANT'S RULE 3.850
MOTION FOR POST CONVICTION RELIEF FILED
BY STATE OF FLORIDA                              02-13-2007              490-505

ORDER DIRECTING STATE TO FILE A WRITTEN
RESPONSE                                         02-19-2007              506

DEFENDANT'S RESPONSE TO MOTION TO STRIKE,
OR IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF                                05-17-2007              507-512

COPY OF ABOVE [NOT INCLUDED HERE BECAUSE
IT IS DUPLICATIVE]                               05-21-2007              -----

STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR
IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF, RESPONDING TO
DEFENDANT'S RESPONSE OF MAY 16, 2007,
CONTINUED NEXT VOLUME                            06-20-2007              513-655

**VOLUME V**

CONTINUED FROM PREVIOUS VOLUME,
STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR
IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF, RESPONDING TO
DEFENDANT'S RESPONSE OF MAY 16, 2007,           06-20-2007              656-752

ORDER SCHEDULING CASE MANAGEMENT
CONFERENCE`                                      08-20-2007              753

HEARING NOTES                                    08-30-2007              754

ORDER SCHEDULING HEARINGS ON PENDING

| | | |
|---|---|---|
| POST-CONVICTION RELIEF MATTERS | 09-07-2007 | 755-756 |
| DEFENDANT'S RESPONSE TO STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF, RESPONDING TO DEFENDANT'S RESPONSE OF MAY 16, 2007 | 09-14-2007 | 757-760 |
| NOTICE OF FILING – AFFIDAVIT OF VIERA SCHEIBNER | 09-14-2007 | 761-772 |
| NOTICE OF FILING – OATH PAGE | 09-24-2007 | 773-775 |
| NOTICE OF FILING – ATTACHED AFFIDAVITS | 09-26-2007 | 776-779 |
| HEARING NOTES | 09-28-2007 | 780 |
| DEFENDANT'S MOTION FOR LEAVE TO AMEND MOTION FOR POSTCONVICTION RELIEF WITH NOTICE OF FILING AND SUPPLEMENTAL AFFIDAVIT OF LOIS N. HERLIHY ATTACHED | 09-28-2007 | 781-785 |
| MEMO FROM J. SILVERMAN TO M. BECKER, STATE ATTORNEY OFFICE | 10-29-2007 | 786 |
| CASE CITATION | 10-29-2007 | 787-788 |
| COPY OF NOTICE OF FILING AFFIDAVIT OF LOIS N. HERLIHY | 10-29-2007 | 789-791 |
| ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF, CONTINUED NEXT VOLUME | 10-29-2007 | 792-856 |

**VOLUME VI**

| | | |
|---|---|---|
| CONTINUED FROM PREVIOUS VOLUME, ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 10-29-2007 | 857-1057 |

**VOLUME VII**

Created on 6/16/08

CONTINUED FROM PREVIOUS VOLUME,
ORDER GRANTING IN PART, THE STATE'S MOTION
TO STRIKE AND DISMISSING GROUND ONE OF
DEFENDANT'S MOTION FOR POST-CONVICTION
RELIEF                                    10-29-2007              1058-1107

| Case Number | Status | Judge |
|---|---|---|
| 2000 CF 002753 A | CLOSED | ROSIER, PHYLLIS M |

| In The Matter Of | Action |
|---|---|
| HERLIHY, BRIAN PATRICK | MANSLAUGHTER |

| Party | | Attorneys |
|---|---|---|
| HERLIHY, BRIAN PATRICK | DFNDT | FITZGIBBONS, MARY ELIZABETH |
| HERLIHY, BRIAN PATRICK | AKA | |
| BECKER, MICHAEL L | CNSLR | BECKER, MICHAEL L |

| Opened | Disposed | Case Type |
|---|---|---|
| 08/10/2000 | Undisposed | FELONY |

Comments:

| Charge: | 782.07 | Speed: | Zone: |
|---|---|---|---|

Description:  MANSLAUGHTER

Amnd Chrg:

Description:

Disposition: Adjudicated        Disposition Date:  11/08/2002
             Guilty/Deliquent in
             Juvenile Court

Plea: Not Guilty             Decision: Guilty Adjudication

Sentence:
Amount:   0.00              Traffic Points:        Restrictions:

License Suspended Days:      Start Date:            End Date:

Jail Time: 150;00;          Start Date:            End Date:
           00

Suspended:
Amount:

License Suspended Days:

Jail Time:

Probation:
Type:

Probation Officer:

Days on Probation: 000;00;00  Start Date:           End Date:

Comments:

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr     Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|---|---|---|---|---|
| 1 | 08/10/00 | CASE OPENED - ON VIEW ARREST | | 0.00 |
| 2 | 08/11/00 | FIRST APPEARANCE ORDER// CURTIN | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------|---------------|---------|
| 3  | 08/11/00 | THE DEFENDANT BE RELEASED ON STANDARD<br>CONDITIONS                    - | | 0.00 |
| 4  | 08/11/00 | (F.S. 903.047) AND THE FOLLOWING<br>CONDITIONS: | | 0.00 |
| 5  | 08/11/00 | BAIL SET IN THE AMOUNT OF $ 500,000.00 | | 0.00 |
| 6  | 08/11/00 | THE COURT FINDS THE DEFENDANT IS ELIGIBLE<br>                - | | 0.00 |
| 7  | 08/11/00 | FOR AND APPOINTS THE PUBLIC DEFENDER,<br>PENDING | | 0.00 |
| 8  | 08/11/00 | THE FILING OF A FINANCIAL AFFIDAVIT AND<br>PAYMENT OF THE            - | | 0.00 |
| 9  | 08/11/00 | $40.00 APPLICATION WITHIN 7 DAYS (FS 27.52) | | 0.00 |
| 10 | 08/11/00 | PHOTO IDENTIFICATION NOT FILED | | 0.00 |
| 11 | 08/11/00 | BAIL SET AT    500000.00 | | 0.00 |
| 12 | 08/11/00 | SA ASSIGNED:  FERRERO, DENISE R | | 0.00 |
| 13 | 08/11/00 | PD ASSIGNED:  MOLLICA, SALVATORE D | | 0.00 |
| 14 | 08/17/00 | SA ASSIGNED:  SINGER, JEANNE M | | 0.00 |
| 15 | 08/22/00 | NOTICE OF APPEARANCE: G GROLAND<br>(CURRENTLY REP BY PD) | | 0.00 |
| 16 | 08/25/00 | STIPULATION FOR SUBSTITUTION OF COUNSEL | | 0.00 |
| 17 | 08/29/00 | ORDER ALLOWING SUBSTITUTION OF COUNSEL /<br>GORDON GROLAND | | 0.00 |
| 18 | 08/29/00 | SUBSTITUTED AS COUNSEL // CHANCE | | 0.00 |
| 19 | 08/29/00 | INDICTMENT FILED FOR FIRST DEGREE MURDER | | 0.00 |
| 20 | 08/29/00 | ARRAIGNMENT          SET FOR 09192000 | | 0.00 |
| 21 | 08/29/00 | CAPIAS     ISSUED | | 0.00 |
| 22 | 08/29/00 | CAPIAS     ORDERED | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|---------------------------------------------------|-----|------|
| 23 | 08/29/00 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | | 0.00 |
| 24 | 08/30/00 | MOTION TO WITHDRAW | | 0.00 |
| 25 | 08/30/00 | WRITTEN PLEA OF NOT GUILTY | | 0.00 |
| 26 | 08/30/00 | DEMAND FOR DISCOVERY | | 0.00 |
| 27 | 08/30/00 | AND DEMAND FOR JURY TRIAL | | 0.00 |
| 28 | 08/31/00 | CAPIAS      SERVED | | 0.00 |
| 29 | 08/31/00 | CASE MANAGEMENT      SET FOR 11222000 | | 0.00 |
| 30 | 08/31/00 | DEFENDANT REARRESTED ON    08312000 | | 0.00 |
| 31 | 08/31/00 | DEF NAME AT RARST HERLIHY, BRIAN PATRICK | | 0.00 |
| 32 | 08/31/00 | FIRST APPEARANCE ORDER// CRENSHAW | | 0.00 |
| 33 | 08/31/00 | DEFENDANT HELD WITHOUT BAIL | | 0.00 |
| 34 | 08/31/00 | DEFENDANT WILL CONSULT PRIVATE COUNSEL | | 0.00 |
| 35 | 08/31/00 | PHOTO IDENTIFICATION NOT FILED | | 0.00 |
| 36 | 08/31/00 | ORDER GRANTING MOTION TO WITHDRAW / GORDON GROLAND | | 0.00 |
| 37 | 08/31/00 | RETAINED AS PRIVATE COUNSEL // CHANCE | | 0.00 |
| 38 | 09/18/00 | MOTION TO COMPEL DISCOVERY | | 0.00 |
| 39 | 09/18/00 | STATE'S DISCOVERY EXHIBIT | | 0.00 |
| 40 | 09/18/00 | DEMAND FOR RECIPROCAL DISCLOSURE | | 0.00 |
| 41 | 09/21/00 | CASE MANAGEMENT      SET FOR 11202000 | | 0.00 |
| 42 | 09/21/00 | NOTICE ISSUED TO: DEFENDANT | | 0.00 |
| 43 | 09/21/00 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | | 0.00 |

CRTR5925                          Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|---------------------------------------|------------------|-------------|
| 44  | 09/29/00 | MOTION TO SET BOND | | 0.00 |
| 45  | 10/02/00 | BOND HEARING        SET FOR 10172000 | | 0.00 |
| 46  | 10/02/00 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | | 0.00 |
| 47  | 10/02/00 | NOTICE OF HEARING ON  103000  AT / 2:00PM / | | 0.00 |
| 48  | 10/13/00 | ORDER SETTING BOND / $50,000.00 CASH // CHANCE | | 0.00 |
| 49  | 10/13/00 | SPECIAL CONDITIONS: | | 0.00 |
| 50  | 10/13/00 | NO CONTACT WITH VICTIM'S FAMILY OR EXTENDED FAMILY | | 0.00 |
| 51  | 10/13/00 | NO CONTACT WITH CHILDREN UNDER THE AGE OF 16 YEARS | | 0.00 |
| 52  | 10/13/00 | MUST RESIDE IN BROWARD CO., FLORIDA WITH HIS PARENTS | | 0.00 |
| 53  | 10/13/00 | AT 19401 NW 10 ST, PEMBROKE PINES, FL UNTIL FURTHER | | 0.00 |
| 54  | 10/13/00 | ORDER OF THE COURT AND SHALL NOT LEAVE BROWARD CO. | | 0.00 |
| 55  | 10/13/00 | WITHOUT PERMISSION FROM THE COURT EXCEPT TO TRAVEL | | 0.00 |
| 56  | 10/13/00 | TO GAINESVILLE, FL TO MEET WITH HIS ATTORNEYS OR TO | | 0.00 |
| 57  | 10/13/00 | MAKE COURT APPEARANCES IN CONNECTION WITH THESE CASES | | 0.00 |
| 58  | 10/13/00 | IF DEFENDANT HAS A PASSPORT, SHALL SURRENDER TO THE | | 0.00 |
| 59  | 10/13/00 | STATE ATTORNEY'S OFFICE OR ANOTHER DESIGNATED AGENCY | | 0.00 |
| 60  | 10/13/00 | SHALL NOT BECOME EMPLOYED IN THE MEDICAL OR HEALTHCARE | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|----------------------------------------|-----------------|-------------|
| 61 | 10/13/00 | SECTOR DURING THE PENDENCY OF THIS CASE | | 0.00 |
| 62 | 10/13/00 | SHALL WITHIN 10 DAYS OF POSTING BOND BE<br>REFERRED BY HIS | | 0.00 |
| 63 | 10/13/00 | FAMILY DOCTOR IN BROWARD CO. TO A<br>PSYCHIATRIST FOR AN | | 0.00 |
| 64 | 10/13/00 | EVALUATION TO DETERMINE WHETHER OR NOT THE<br>LEFENDANT | | 0.00 |
| 65 | 10/13/00 | SHOULD BE ON ANY MEDICATION FOR DEPRESSION<br>OR OTHER | | 0.00 |
| 66 | 10/13/00 | MEDICAL PROBLEM | | 0.00 |
| 67 | 10/13/00 | STIPULATION FOR BOND | | 0.00 |
| 68 | 10/17/00 | BLANKET BOND POSTED ON  2000-02660-CFA | | 0.00 |
| 69 | 10/17/00 | BOND SET AT    50000.00 POSTED BLANKET BOND | | 0.00 |
| 70 | 10/17/00 | STATUS OF BOND IS   OPEN<br>BOND #: 119603 | | 0.00 |
| 71 | 10/17/00 | BLANKET BOND    BOND POSTED ON 10/16/2000 | | 0.00 |
| 72 | 10/17/00 | BLANKET BOND POSTED FOR 2000-02660-CFA | | 0.00 |
| 73 | 10/17/00 | NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY | | 0.00 |
| 74 | 10/20/00 | RTN MAIL 10182000/TO BRIAN HERLIHY/FOR<br>CASE MANAGEMENT | | 0.00 |
| 75 | 10/20/00 | 11202000/UNABLE TO FORWARD//CRC | | 0.00 |
| 76 | 11/09/00 | MOTION TO CONTINUE CASE MANAGEMENT<br>CONFERENCE AND | | 0.00 |
| 77 | 11/09/00 | MOTION TO EXCUSE THE DEFENDANT | | 0.00 |
| 78 | 11/15/00 | ORDER GRANTING DEFENDANT'S MOTION FOR<br>CONTINUANCE AND | | 0.00 |
| 79 | 11/15/00 | EXCUSING DEFENDANT FROM CASE MANAGEMENT<br>CONFERENCE | | 0.00 |

CRTR5925                              Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|-------------------------------------------------------|-------------------|-------------|
| 80 | 11/15/00 | ON 11202000 / CONTINUED TO 12182000 //<br>CHANCE | | 0.00 |
| 81 | 11/15/00 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 82 | 11/15/00 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 83 | 11/16/00 | CASE MANAGEMENT      SET FOR 12182000 | | 0.00 |
| 84 | 11/16/00 | NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY | | 0.00 |
| 85 | 11/16/00 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON<br>H | | 0.00 |
| 86 | 11/27/00 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 87 | 12/18/00 | ORDER ON CASE MANAGEMENT CONFERENCE//<br>CHANCE | | 0.00 |
| 88 | 12/18/00 | CASE MANAGEMENT      SET FOR 01172001 | | 0.00 |
| 89 | 12/21/00 | NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY | | 0.00 |
| 90 | 12/27/00 | NOTICE OF HEARING ON  01032001  AT / 1:45<br>PM  / CHANCE | | 0.00 |
| 91 | 12/27/00 | MOTION TO MODIFY A CONDITION OF RELEASE | | 0.00 |
| 92 | 01/03/01 | COURT MINUTES ON MOTION TO COMPEL -<br>CANCELLED/ | | 0.00 |
| 93 | 01/03/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 94 | 01/17/01 | ORDER ON CASE MANAGEMENT CONFERENCE//<br>CHANCE | | 0.00 |
| 95 | 01/17/01 | CASE MANAGEMENT      SET FOR 02192001 | | 0.00 |
| 96 | 01/18/01 | NOTICE ISSUED TO: DEFENDANT | | 0.00 |
| 97 | 01/18/01 | NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY | | 0.00 |
| 98 | 01/18/01 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON<br>H | | 0.00 |
| 99 | 01/22/01 | AMENDED NOTICE OF TAKING DEPOSITION | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr     Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------------|-------------------------------|-------------|
| 100 | 02/05/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 101 | 02/05/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 102 | 02/14/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 103 | 02/15/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 104 | 02/15/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 105 | 02/15/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 106 | 02/15/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 107 | 02/15/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 108 | 02/19/01 | CASE MANAGEMENT      SET FOR 03192001 | | 0.00 |
| 109 | 02/19/01 | DEFENDANT SIGNED NOTICE FOR  031901  CASE MANAGEMENT | | 0.00 |
| 110 | 02/20/01 | NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY | | 0.00 |
| 111 | 02/20/01 | AMENDED NOTICE OF TAKING DEPOSITION | | 0.00 |
| 112 | 02/21/01 | NOTICE OF CANCELLATION OF DEPOSITION AT THE STATE'S | | 0.00 |
| 113 | 02/21/01 | REQUEST | | 0.00 |
| 114 | 02/27/01 | NOTICE OF HEARING ON  03052001  AT / 11:00 AM  / CHANCE | | 0.00 |
| 115 | 03/05/01 | COURT MINUTES ON MOTION TO MODIFY CONDITIONS OF | | 0.00 |
| 116 | 03/05/01 | RELEASE - MOTION DENIED / ORDER TO BE PREPARED | | 0.00 |
| 117 | 03/05/01 | BY STATE ATTORNEY / | | 0.00 |
| 118 | 03/16/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 119 | 03/19/01 | ORDER ON CASE MANAGEMENT CONFERENCE// LOTT | | 0.00 |

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|-----------------------------------------------------------------------|-------------------------------|-------------|
| 120 | 03/19/01 | PRE TRIAL CONFERENCE SET FOR 09262001 | | 0.00 |
| 121 | 03/19/01 | JURY SELECTION       SET FOR 10082001 | | 0.00 |
| 122 | 03/20/01 | NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY | | 0.00 |
| 123 | 03/20/01 | NOTICE ISSUED TO BONDSMAN: LOIS HERHIHY | | 0.00 |
| 124 | 03/23/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 125 | 03/27/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 126 | 03/27/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 127 | 03/27/01 | AMENDED NOTICE OF TAKING DEPOSITION | | 0.00 |
| 128 | 03/30/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 129 | 04/04/01 | AMENDED NOTICE OF TAKING DEPOSITION | | 0.00 |
| 130 | 04/24/01 | NOTICE OF CANCELLATION OF DEPOSITION | | 0.00 |
| 131 | 05/03/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 132 | 05/14/01 | MOTION TO REVOKE BOND | | 0.00 |
| 133 | 05/14/01 | ORDER REVOKING BOND AND DIRECTING CLERK TO ISSUE | | 0.00 |
| 134 | 05/14/01 | CAPIAS//LOTT | | 0.00 |
| 135 | 05/14/01 | CAPIAS     ORDERED | | 0.00 |
| 136 | 05/15/01 | CAPIAS     ISSUED | | 0.00 |
| 137 | 05/16/01 | STATUS OF BOND IS  RELEASED BOND #: 119603 | | 0.00 |
| 138 | 05/22/01 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 139 | 05/22/01 | LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT OF | | 0.00 |
| 140 | 05/22/01 | $ 50.75 // PAID | | 0.00 |

CRTR5925                                        Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|---|---|---|
| 141 | 06/01/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 142 | 06/05/01 | CAPIAS     SERVED | | 0.00 |
| 143 | 06/06/01 | DEFENDANT REARRESTED ON   06052001 | | 0.00 |
| 144 | 06/06/01 | DEF NAME AT RARST HERLIHY, BRIAN PATRICK | | 0.00 |
| 145 | 06/06/01 | FIRST APPEARANCE ORDER// NILON | | 0.00 |
| 146 | 06/06/01 | THE DEFENDANT BE RELEASED ON STANDARD<br>CONDITIONS              - | | 0.00 |
| 147 | 06/06/01 | (F.S. 903.047) AND THE FOLLOWING<br>CONDITIONS: | | 0.00 |
| 148 | 06/06/01 | BAIL SET IN THE AMOUNT OF $ 50,000.00<br>BLANKET WITH | | 0.00 |
| 149 | 06/06/01 | 2000-2660-CFA | | 0.00 |
| 150 | 06/06/01 | DEFENDANT WILL CONSULT PRIVATE COUNSEL | | 0.00 |
| 151 | 06/06/01 | PHOTO IDENTIFICATION FILED IN CASE #<br>2000-2660-CFA | | 0.00 |
| 152 | 06/06/01 | AFFIDAVIT OF INDIGENCY-NOT APPOINTED//NILON | | 0.00 |
| 153 | 06/13/01 | BOND SET AT    50000.00 POSTED BLANKET BOND | | 0.00 |
| 154 | 06/13/01 | STATUS OF BOND IS   OPEN<br>BOND #: 00118713B | | 0.00 |
| 155 | 06/13/01 | BLANKET BOND    BOND POSTED ON 06/11/2001 | | 0.00 |
| 156 | 06/13/01 | BLANKET BOND POSTED FOR 2000-02660-CFA | | 0.00 |
| 157 | 06/13/01 | BLANKET BOND POSTED ON  2000-02660-CFA | | 0.00 |
| 158 | 06/19/01 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 159 | 06/19/01 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF S | | 0.00 |
| 160 | 06/19/01 | $59.50 | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr     Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|------------------------------------|------------------|-----------|
| 161 | 07/02/01 | NOTICE OF TAKING DEPOSITION | | 0.00 |
| 162 | 07/02/01 | NOTICE OF TAKING DEPOSITION | | 0.00 |
| 163 | 07/10/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 164 | 07/11/01 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 165 | 07/11/01 | LEBLANC COURT REPORTING SERVICES   IN THE<br>AMOUNT OF $ | | 0.00 |
| 166 | 07/11/01 | $59.50 | | 0.00 |
| 167 | 07/20/01 | ORDER REVOKING CASH BOND AND DIRECTING THE<br>ISSUANCE OF | | 0.00 |
| 168 | 07/20/01 | CAPIAS //TURNER | | 0.00 |
| 169 | 07/20/01 | CAPIAS     ISSUED | | 0.00 |
| 170 | 07/20/01 | CAPIAS     ORDERED | | 0.00 |
| 171 | 07/20/01 | SECOND MOTION TO REVOKE BOND HEARING /<br>07202001 AT | | 0.00 |
| 172 | 07/20/01 | 1:30 PM BEFORE JUDGE TURNER | | 0.00 |
| 173 | 07/20/01 | SECOND MOTION TO REVOKE BOND | | 0.00 |
| 174 | 07/23/01 | STATUS OF BOND IS   RELEASED<br>BOND #: 00118713B | | 0.00 |
| 175 | 07/25/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 176 | 07/26/01 | MOTION TO CONTINUE | | 0.00 |
| 177 | 07/26/01 | NOTICE OF HEARING ON  08102001  AT / 11:00<br>AM  / LOTT | | 0.00 |
| 178 | 07/31/01 | NOTICE OF CANCELLATION OF TAKING DEPOSITION | | 0.00 |
| 179 | 08/02/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 180 | 08/08/01 | NOTICE OF TAKING DEPOSITION OF JOHN<br>QUIRELLO | | 0.00 |

CRTR5925                                      Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr      Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|---|---|---|---|---|
| 181 | 08/08/01 | NOTICE OF TAKING DEPOSITION OF KIM<br>BRAGG/BRANDY TAYLOR/ | | 0.00 |
| 182 | 08/08/01 | AND DORIS BRIDWELL | | 0.00 |
| 183 | 08/10/01 | COURT MINUTES ON MOTION TO CONTINUE -<br>ATTORNEY WAIVES | | 0.00 |
| 184 | 08/10/01 | SPEEDY TRIAL / MOTION GRANTED/PRETRIAL<br>CONFERENCE | | 0.00 |
| 185 | 08/10/01 | CONTINUED TO JANUARY 2002/ | | 0.00 |
| 186 | 08/10/01 | PRE TRIAL CONFERENCE SET FOR 01302002 | | 0.00 |
| 187 | 08/13/01 | NOTICE ISSUED TO: DEFENDANT | | 0.00 |
| 188 | 08/13/01 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON<br>H | | 0.00 |
| 189 | 08/20/01 | NOTICE OF CANCELLATION OF TAKING DEPOSITION | | 0.00 |
| 190 | 09/05/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 191 | 09/06/01 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 192 | 09/06/01 | CHARTONE, INC.  IN THE AMOUNT OF $ 277.20<br>// PAID | | 0.00 |
| 193 | 09/07/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 194 | 09/07/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 195 | 09/07/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 196 | 09/21/01 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 197 | 09/21/01 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 198 | 09/21/01 | $70.00 | | 0.00 |
| 199 | 09/21/01 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of Journal Book-Page-Nbr | Pleadings Filed, Orders and Decrees Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|-------------------------------|---------------------------------------------|-------------------------------|-------------|
| 200 | 09/21/01 | LEBLANC COURT REPORTING   IN THE AMOUNT OF $ 129.50 | | 0.00 |
| 201 | 09/21/01 | NOTICE OF CANCELLATION OF TAKING DEPOSITION | | 0.00 |
| 202 | 09/21/01 | AMENDED NOTICE OF TAKING DEPOSITION AS TO TIME | | 0.00 |
| 203 | 10/10/01 | MOTION TO SET ASIDE BOND ESTREATURE | | 0.00 |
| 204 | 10/23/01 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 205 | 10/26/01 | COURT MINUTES ON MOTION TO SET ASISE BOND | | 0.00 |
| 206 | 10/26/01 | ESTREATURE - GRANTED/BOND MONEY TO BE RETURNED TO | | 0.00 |
| 207 | 10/26/01 | FAMILY/ | | 0.00 |
| 208 | 10/26/01 | ORDER GRANTING MOTION TO SET ASIDE BOND ESTREATURE/LOTT | | 0.00 |
| 209 | 11/02/01 | RESTITUTION CHECK MAILED: $ 50,000.00   TO LOIS HERLIHY | | 0.00 |
| 210 | 11/06/01 | UNOPPOSED MOTION TO CONTINUE TRIAL | | 0.00 |
| 211 | 11/21/01 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 212 | 11/21/01 | CHARTONE INC.   IN THE AMOUNT OF $ 277.20 // PAID | | 0.00 |
| 213 | 11/27/01 | NOTICE OF HEARING ON  113001  AT / 1:30PM / LOTT | | 0.00 |
| 214 | 11/30/01 | ORDER GRANTING DEFENDANT'S MOTION TO CONTINUE - | | 0.00 |
| 215 | 11/30/01 | ORDERED AND ADJUDGED THAT THE DEFENDANT'S MOTION BE | | 0.00 |
| 216 | 11/30/01 | AND THE SAME IS HEREBY GRANTED AND THIS CASE IS | | 0.00 |
| 217 | 11/30/01 | RESCHEDULED FOR PRE-TRIAL CONFERENCE ON | | 0.00 |

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|---|---|---|---|---|
| 218 | 11/30/01 | MARCH 20, 2002 AT 1:30PM WITH TRIAL TO BE<br>SCHEDULED | | 0.00 |
| 219 | 11/30/01 | COMMENCING ON THE WEEK OF MAY 13, 2002<br>WITH MAY | | 0.00 |
| 220 | 11/30/01 | 8TH TRIAL STATUS // LOTT | | 0.00 |
| 221 | 12/12/01 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 222 | 12/26/01 | NOTICE OF TAKING DEPOSTION - DR. ROHLING | | 0.00 |
| 223 | 12/26/01 | NOTICE OF TAKING DEPOSTION - BETH TALAGA | | 0.00 |
| 224 | 01/04/02 | NOTICE OF CANCELLATION OF TAKING DEPOSITION | | 0.00 |
| 225 | 01/14/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 226 | 01/14/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 227 | 01/16/02 | DEFENDANT'S WITNESS LIST | | 0.00 |
| 228 | 01/22/02 | MOTION FOR COURT ORDER ALLOWING DEFENDANT<br>TO GET | | 0.00 |
| 229 | 01/22/02 | COPIES OF CHILD PROTECTION TEAM RECORDS | | 0.00 |
| 230 | 01/24/02 | PRE TRIAL CONFERENCE SET FOR 02202002 | | 0.00 |
| 231 | 01/24/02 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON<br>H | | 0.00 |
| 232 | 02/01/02 | UNOPPOSED MOTION TO CONTINUE TRIAL | | 0.00 |
| 233 | 02/14/02 | NOTICE OF HEARING ON   030602  AT / 10:00AM<br>/ LOTT | | 0.00 |
| 234 | 02/25/02 | PRE TRIAL CONFERENCE SET FOR 03202002 | | 0.00 |
| 235 | 02/25/02 | TRIAL STATUS CONF    SET FOR 04032002 | | 0.00 |
| 236 | 02/25/02 | JURY SELECTION       SET FOR 04082002 | | 0.00 |
| 237 | 02/25/02 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON<br>H | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr      Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------------------------|-------------------------------|-------------|
| 238 | 02/25/02 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | | 0.00 |
| 239 | 02/25/02 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | | 0.00 |
| 240 | 02/27/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 241 | 02/27/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 242 | 02/27/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 243 | 03/11/02 | PRE TRIAL CONFERENCE SET FOR 07172002 | | 0.00 |
| 244 | 03/11/02 | TRIAL STATUS CONF    SET FOR 08072002 | | 0.00 |
| 245 | 03/11/02 | JURY SELECTION     SET FOR 08122002 | | 0.00 |
| 246 | 03/11/02 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | | 0.00 |
| 247 | 03/11/02 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | | 0.00 |
| 248 | 03/11/02 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | | 0.00 |
| 249 | 03/14/02 | NOTICE OF CANCELLATION OF TAKING DEPOSITION | | 0.00 |
| 250 | 03/14/02 | AMENDED NOTICE OF TAKING DEPOSITION | | 0.00 |
| 251 | 03/14/02 | CAPIAS     SERVED | | 0.00 |
| 252 | 03/15/02 | DEFENDANT REARRESTED ON    03142002 | | 0.00 |
| 253 | 03/15/02 | DEF NAME AT RARST HERLIHY, BRIAN PATRICK | | 0.00 |
| 254 | 03/15/02 | FIRST APPEARANCE ORDER// CRENSHAW | | 0.00 |
| 255 | 03/15/02 | THE DEFENDANT BE RELEASED ON STANDARD CONDITIONS            - | | 0.00 |
| 256 | 03/15/02 | (F.S. 903.047) AND THE FOLLOWING CONDITIONS: | | 0.00 |
| 257 | 03/15/02 | BAIL SET IN THE AMOUNT OF $ 100,000.00 | | 0.00 |

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|----------------------------------------------------------------------|-------------------------------|-------------|
| 258 | 03/15/02 | THE DEFENDANT REPRESENTS HE/SHE WILL CONSULT PRIVATE | | 0.00 |
| 259 | 03/15/02 | COUNSEL | | 0.00 |
| 260 | 03/15/02 | PHOTO IDENTIFICATION FILED IN CASE # 2000-2660-CFA | | 0.00 |
| 261 | 03/15/02 | AMENDED FIRST APPEARANCE ORDER AS TO BAIL | | 0.00 |
| 262 | 03/15/02 | $1,000,000.00 // CRENSHAW | | 0.00 |
| 263 | 03/27/02 | NOTICE OF HEARING ON  040302  AT / 9:00AM / LOTT | | 0.00 |
| 264 | 03/27/02 | MOTION TO REINSTATE PREVIOUS BOND | | 0.00 |
| 265 | 03/27/02 | NOTICE OF CANCELLATION OF TAKING DEPOSITION | | 0.00 |
| 266 | 04/03/02 | COURT MINUTES ON MOTION TO REINSTATE PREVIOUS | | 0.00 |
| 267 | 04/03/02 | BOND - | | 0.00 |
| 268 | 04/03/02 | -DENIED/ORDER TO BE PREPARED BY STATE ATTORNEY/ | | 0.00 |
| 269 | 04/05/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 270 | 04/05/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 271 | 04/10/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 272 | 04/16/02 | MOTION FOR ORDER ALLOWING ISSUANCE OF SUBPOENAS DUCES | | 0.00 |
| 273 | 04/16/02 | TECUM FOR EMPLOYMENT AND EDUCATIONAL RECORDS OF | | 0.00 |
| 274 | 04/16/02 | DEFENDANT | | 0.00 |
| 275 | 04/22/02 | SUBPOENA DUCES TECUM HEARING / 04252002 AT 1:30 PM | | 0.00 |
| 276 | 04/22/02 | COURTROOM 3D BEFORE JUDGE LOTT | | 0.00 |

CRTR5925                              Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr     Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------|-------------------|-------------|
| 277 | 04/23/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 278 | 04/23/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 279 | 04/23/02 | $ 26.25 // PAID | | 0.00 |
| 280 | 05/06/02 | COURT MINUTES ON MOTION FOR SUBPOENAS<br>DUCES TECUM FOR | | 0.00 |
| 281 | 05/06/02 | EMPLOYMENT RECORDS AND EDUCATIONAL RECORDS<br>OF | | 0.00 |
| 282 | 05/06/02 | DEFENDANT - GRANTED AS TO<br>EMPLOYMENT/GRANTED AS TO | | 0.00 |
| 283 | 05/06/02 | MILITARY AND EDUCATION WITH THE FOLLOWING<br>PROVISION: | | 0.00 |
| 284 | 05/06/02 | MILITARY AND EDUCATIONAL RECORDS WILL BE<br>DELIVERED TO | | 0.00 |
| 285 | 05/06/02 | THE CLERK'S OFFICE UNDER SEAL/ORDER TO BE<br>PREPARED | | 0.00 |
| 286 | 05/06/02 | BY STATE ATTORNEY/ | | 0.00 |
| 287 | 05/06/02 | AMENDED NOTICE FOR SUBPOENA DUCES TECUM<br>HEARING - | | 0.00 |
| 288 | 05/06/02 | MONDAY, MAY 6, 2002 AT 1:30PM | | 0.00 |
| 289 | 05/22/02 | NOTICE OF TAKING DEPOSITION | | 0.00 |
| 290 | 05/22/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 291 | 05/24/02 | NOTICE OF TAKING DEPOSITION | | 0.00 |
| 292 | 06/04/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 293 | 06/04/02 | VANLANDINGHAM, DURSCHER &VANLANDINGHAM<br>IN THE AMOUNT | | 0.00 |
| 294 | 06/04/02 | OF 120.90/PAID/ | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr      Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|---------|---------|---------|
| 295 | 06/05/02 | DEFENDANT'S SUPPLEMENTAL WITNESS LIST | | 0.00 |
| 296 | 06/06/02 | NOTICE OF TAKING DEPOSITION(S) | | 0.00 |
| 297 | 06/06/02 | NOTICE OF CANCELLATION OF DEPOSITION | | 0.00 |
| 298 | 06/20/02 | DEPOSITION OF HELEN LEGALL | | 0.00 |
| 299 | 06/20/02 | RETURN OF SERVICE - UNSERVED | | 0.00 |
| 300 | 06/20/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 301 | 06/20/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 302 | 06/20/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 303 | 06/20/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 304 | 06/20/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 305 | 06/20/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 306 | 06/25/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 307 | 06/26/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 308 | 06/26/02 | VANLANDINGHAM, DURSCHER & VANLANDINGHAM IN<br>THE AMOUNT | | 0.00 |
| 309 | 06/26/02 | OF $37.55 // PAID | | 0.00 |
| 310 | 06/26/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 311 | 06/26/02 | LEBLANC COURT REPORTING SERVICES IN THE<br>AMOUNT OF | | 0.00 |
| 312 | 06/26/02 | $129.50 // PAID | | 0.00 |
| 313 | 06/26/02 | MOTION TO CONTINUE CAUSE | | 0.00 |
| 314 | 06/26/02 | NOTICE OF HEARING ON   071102  AT / 8:45AM<br>/ LOTT | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|---------------------------------------------------------------------|-------------------------------|-------------|
| 315 | 06/28/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 316 | 06/28/02 | ADDENDUM TO MOTION TO CONTINUE CASE | | 0.00 |
| 317 | 06/28/02 | NOTICE OF DEPOSITION | | 0.00 |
| 318 | 07/05/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 319 | 07/05/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 320 | 07/10/02 | RETURN OF SERVICE - SERVED AS TO ANGIE HARN | | 0.00 |
| 321 | 07/11/02 | TRIAL STATUS CONF     SET FOR 09042002 | | 0.00 |
| 322 | 07/11/02 | JURY SELECTION       SET FOR 09092002 | | 0.00 |
| 323 | 07/11/02 | MOTION TO CONTINUE CASE | | 0.00 |
| 324 | 07/11/02 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | | 0.00 |
| 325 | 07/11/02 | NOTICE ISSUED TO DEF ATTY: GROLAND, GORDON H | | 0.00 |
| 326 | 07/12/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 327 | 07/12/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 328 | 07/12/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 329 | 07/12/02 | NOTICE OF TAKING TELEPHONIC DEPOSITION | | 0.00 |
| 330 | 07/12/02 | NOTICE OF TAKING TELEPHONIC DEPOSITION | | 0.00 |
| 331 | 07/15/02 | NOTICE OF TAKING TELEPHONIC DEPOSITION | | 0.00 |
| 332 | 07/16/02 | NOTICE OF TAKING TELEPHONIC DEPOSITION | | 0.00 |
| 333 | 07/17/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 334 | 07/17/02 | *SPECIAL CASE MGMT ON 080202 AT 9:00 A.M.* | | 0.00 |
| 335 | 07/17/02 | DEFENDANT SIGNED NOTICE FOR  080202  CASE MANAGEMENT | | 0.00 |

CRTR5925                              Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of Journal | Pleadings Filed, Orders and Decrees Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|-----------------|---------------------------------------------------------|-------------------------------|-------------|
| 336 | 07/18/02 | AMENDED NOTICE OF DEPOSITION | | 0.00 |
| 337 | 07/18/02 | SUBPOENA DUCES TECUM | | 0.00 |
| 338 | 07/19/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 339 | 07/19/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 340 | 07/19/02 | NOTICE OF TAKING DEPOSITION(S) | | 0.00 |
| 341 | 07/22/02 | ORDER SCHEDULING SPECIAL CASE MANAGEMENT CONFERENCE - | | 0.00 |
| 342 | 07/22/02 | AUGUST 2, 2002 AT 9:00AM // LOTT | | 0.00 |
| 343 | 07/23/02 | NOTICE OF TAKING TELEPHONIC DEPOSITION | | 0.00 |
| 344 | 07/23/02 | NOTICE OF TAKING TELEPHONIC DEPOSITION | | 0.00 |
| 345 | 07/24/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 346 | 07/24/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 347 | 07/24/02 | NOTICE OF TAKING TELEPHONIC DEPOSITION | | 0.00 |
| 348 | 07/24/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 349 | 07/25/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 350 | 07/25/02 | CHARTONE, INC  IN THE AMOUNT OF $ 26.29 / PAID | | 0.00 |
| 351 | 07/25/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 352 | 07/25/02 | CHARTONE  IN THE AMOUNT OF $ 448.85 / PAID | | 0.00 |
| 353 | 07/25/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 354 | 07/25/02 | SHANDS HEALTH CARE  IN THE AMOUNT OF $ 25.00 | | 0.00 |
| 355 | 07/25/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|---|---|---|---|---|
| 356 | 07/25/02 | LEBLANC COURT REPORTING SERVICES   IN THE<br>AMOUNT OF | | 0.00 |
| 357 | 07/25/02 | $223.55 | | 0.00 |
| 358 | 07/25/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 359 | 07/26/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 360 | 07/29/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 361 | 07/30/02 | NOTICE OF TAKING DEPOSITION(S) | | 0.00 |
| 362 | 08/02/02 | COURT MINUTES - CASE MANAGEMENT ON CASE<br>NUMBERS | | 0.00 |
| 363 | 08/02/02 | 2000-2660CFA, 2000-2753CFA - RULING:<br>REMAIN ON | | 0.00 |
| 364 | 08/02/02 | CURRENT COURT DATES | | 0.00 |
| 365 | 08/06/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 366 | 08/06/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 367 | 08/06/02 | AMENDED NOTICE OF TAKING DEPOSITION | | 0.00 |
| 368 | 08/06/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 369 | 08/08/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 370 | 08/08/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 371 | 08/08/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 372 | 08/09/02 | NOTICE OF TAKING DEPOSITION(S) | | 0.00 |
| 373 | 08/13/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 374 | 08/13/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 375 | 08/13/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 376 | 08/13/02 | RETURN OF SERVICE - SERVED | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|--------------------------------------------------------------------|-------------------------------|-------------|
| 377 | 08/13/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 378 | 08/13/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 379 | 08/13/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 380 | 08/13/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 381 | 08/14/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 382 | 08/14/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 383 | 08/14/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 384 | 08/14/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 385 | 08/14/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 386 | 08/14/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 387 | 08/14/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 388 | 08/14/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 389 | 08/14/02 | RETURN OF SERVICE - UNSERVED | | 0.00 |
| 390 | 08/14/02 | NOTICE OF TAKING DEPOSITION(S) | | 0.00 |
| 391 | 08/14/02 | NOTICE OF TAKING DEPOSITION(S) | | 0.00 |
| 392 | 08/15/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 393 | 08/15/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 394 | 08/15/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 395 | 08/15/02 | AMENDED NOTICE OF TAKING DEPOSTITION(S) | | 0.00 |
| 396 | 08/15/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |
| 397 | 08/16/02 | DEFENDANT'S SUPPLEMENTAL WITNESS LIST | | 0.00 |
| 398 | 08/16/02 | NOTICE OF TAKING DEPOSITION(S) | | 0.00 |

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------------------------------------|----------------------------------|-------------|
| 399 | 08/16/02 | NOTICE OF TAKING DEPOSITION | | 0.00 |
| 400 | 08/16/02 | AMENDED NOTICE OF TAKING DEPOSITION | | 0.00 |
| 401 | 08/20/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 402 | 08/20/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 403 | 08/22/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 404 | 08/22/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 405 | 08/22/02 | RETURN OF SERVICE - UNSERVED | | 0.00 |
| 406 | 08/23/02 | WITNESS SUBPOENA | | 0.00 |
| 407 | 08/23/02 | TRANSCRIPT OF DEPOSITION OF ANNE ELIZABETH<br>DICKISON, MD | | 0.00 |
| 408 | 08/23/02 | TRANSCRIPT OF DEPOSITION OF KEVIN PUTANSU | | 0.00 |
| 409 | 08/23/02 | TRANSCRIPT OF DEPOSITION OF JOHN HELLRUNG,<br>M.D. | | 0.00 |
| 410 | 08/26/02 | DEFENDANT'S SUPPLEMENTAL WITNESS LIST | | 0.00 |
| 411 | 08/26/02 | ORDER GRANTING DEFENDANT'S MOTION FOR<br>COURT ORDER | | 0.00 |
| 412 | 08/26/02 | ALLOWING CHILD PROTECTION TEAM TO TURN<br>OVER COPIES OF | | 0.00 |
| 413 | 08/26/02 | RECORDS // LOTT | | 0.00 |
| 414 | 08/27/02 | LETTER FROM DEFENSE ATTORNEY TO JUDGE LOTT | | 0.00 |
| 415 | 08/27/02 | TRANSCRIPT OF DEPOSITION HELD ON 08162002 | | 0.00 |
| 416 | 08/28/02 | SUBPOENA FOR TRIAL | | 0.00 |
| 417 | 08/28/02 | NOTICE OF TAKING TELEPHONIC DEPOSITION | | 0.00 |
| 418 | 08/28/02 | NOTICE OF TAKING DEPOSITIONS | | 0.00 |

CRTR5925                        Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

No.   Date of  Pleadings Filed, Orders and Decrees      Amount Owed/     Balance Due
               Journal Book-Page-Nbr      Ref Nbr       Amount Dismissed

419   08/29/02 MOTION FOR ORDER IN LIMINE PRECLUDING                        0.00
               REFERENCE TO

420   08/29/02 DEFENDANT'S LACK OF PRIOR CONVICTIONS                        0.00

421   08/29/02 MOTION FOR ORDER IN LIMINE PRECLUDING ANY                    0.00
               REFERENCE

422   08/29/02 TO THE POSSIBLE SENTENCE THAT MAY BE                         0.00
               IMPOSED UPON

423   08/29/02 CONVICTION                                                   0.00

424   08/29/02 STATE'S PRE-TRIAL MOTION FOR RULING ON THE                   0.00

425   08/29/02 ADMISSIBILITY OF PHOTOGRAPHS                                 0.00

426   08/29/02 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT                       0.00

427   08/29/02 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT                       0.00

428   08/29/02 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT                       0.00

429   08/30/02 MOTION FOR PERMISSION TO CALL MEDICAL                        0.00
               WITNESS AT TIME

430   08/30/02 CERTAIN                                                      0.00

431   08/30/02 MOTION FOR PERMISSION TO UTILIZE                             0.00
               DEMONSTRATIVE AID

432   08/30/02 MOTION FOR ORDER IN LIMINE PRECLUDING ANY                    0.00
               REFERENCE TO

433   08/30/02 THE POSSIBLE SENTENCE THAT MAY BE IMPOSED                    0.00
               UPON

434   08/30/02 CONVICTION HEARING / 090402 AT 9:00 AM                       0.00

435   08/30/02 STATE'S PRE-TRIAL MOTION FOR RULING ON THE                   0.00

436   08/30/02 ADMISSIBILITY OF PHOTOGRAPHS HEARING /                       0.00
               09042002 AT

437   08/30/02 9:00 AM BEFORE JUDGE LOTT                                    0.00

Date: 06/13/2008   14:11:40          Docket Sheet

CRTR5925                                Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------------------------|----------------------------------|-------------|
| 438 | 08/30/02 | MOTION FOR ORDER IN LIMINE PRECLUDING<br>REFERENCE TO | | 0.00 |
| 439 | 08/30/02 | DEFENDANT'S LACK OF PRIOR CONVICTIONS<br>HEARING / 090402 | | 0.00 |
| 440 | 08/30/02 | AT 9:00 AM | | 0.00 |
| 441 | 08/30/02 | MOTION FOR PERMISSION TO CALL MEDICAL<br>WITNESS AT TIME | | 0.00 |
| 442 | 08/30/02 | CERTAIN HEARING / 09042002 AT 9:00 AM | | 0.00 |
| 443 | 08/30/02 | MOTION FOR PERMISSION TO UTILIZE<br>DEMONSTRATIVE AID | | 0.00 |
| 444 | 08/30/02 | HEARING / 09042002 AT 9:00 AM | | 0.00 |
| 445 | 08/30/02 | AMENDED NOTICE OF TAKING DEPOSITION | | 0.00 |
| 446 | 08/30/02 | DEFENDANT'S SUPPLEMENTAL WITNESS LIST | | 0.00 |
| 447 | 08/30/02 | SUBPOENA FOR TRIAL | | 0.00 |
| 448 | 09/03/02 | MOTION TO ALLOW JURORS TO TAKE WRITTEN<br>NOTES DURING | | 0.00 |
| 449 | 09/03/02 | TRIAL | | 0.00 |
| 450 | 09/03/02 | MOTION IN LIMINE TO PERMIT TESTIMONY<br>CONCERNING | | 0.00 |
| 451 | 09/03/02 | LOCATION OF INTERACTION WITH DEFENDANT<br>HEARING / 090402 | | 0.00 |
| 452 | 09/03/02 | AT 9:00 AM BEFORE JUDGE LOTT | | 0.00 |
| 453 | 09/03/02 | MOTION TO ALLOW JURORS TO TAKE WRITTEN<br>NOTES DURING | | 0.00 |
| 454 | 09/03/02 | TRIAL HEARING / 090402 AT 9:00 AM BEFORE<br>JUDGE LOTT | | 0.00 |
| 455 | 09/03/02 | MOTION IN LIMINE TO PERMIT TESTIMONY<br>CONCERNING | | 0.00 |
| 456 | 09/03/02 | LOCATION OF INTERACTION WITH DEFENDANT | | 0.00 |

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|---|---|---|---|
| 457 | 09/03/02 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 458 | 09/03/02 MOTION TO SUPPRESS STATEMENTS | | 0.00 |
| 459 | 09/03/02 DEFENDANT'S MOTION TO SUPPRESS EVIDENCE | | 0.00 |
| 460 | 09/03/02 DEFENDANT'S MOTION IN LIMINE | | 0.00 |
| 461 | 09/03/02 DEFENDANT'S MOTION TO STRIKE TESTIMONY ABOUT AND | | 0.00 |
| 462 | 09/03/02 USE OF A COMPACT DISC PURPORTING TO SHOW HOW AN | | 0.00 |
| 463 | 09/03/02 INCIDENT OF SHAKEN BABY SYNDROME OCCURS | | 0.00 |
| 464 | 09/04/02 COURT MINUTES - DEFENDANT'S MOTION TO DISMISS | | 0.00 |
| 465 | 09/04/02 INDICTMENT AND CHARGES OF FIRST DEGREE MURDER AND | | 0.00 |
| 466 | 09/04/02 MEMORANDUM OF LAW IN SUPPORT THEREOF BECAUSE OF STATE'S | | 0.00 |
| 467 | 09/04/02 DESTRUCTION OF EXCULPATORY EVIDENCE ON CASE NUMBERS | | 0.00 |
| 468 | 09/04/02 2000-2660CFA, 2000-2753CFA - RULING:  TO BE RESCHEDULED | | 0.00 |
| 469 | 09/04/02 COURT MINUTES - DEFENDANT'S MOTION TO SUPPRESS EVIDENCE | | 0.00 |
| 470 | 09/04/02 ON CASE NUMBERS 2000-2753CFA, 2000-2660CFA - RULING: | | 0.00 |
| 471 | 09/04/02 RESERVED UNTIL 090502 | | 0.00 |
| 472 | 09/04/02 COURT MINUTES - DEFENDANT'S MOTION TO SUPPRESS | | 0.00 |
| 473 | 09/04/02 STATEMENTS ON CASE NUMBERS 2000-2660CFA, 2000-2753CFA - | | 0.00 |
| 474 | 09/04/02 RULING: RESERVED UNTIL 090502 | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|----------------------------------------------------------------------|------------------------------|-------------|
| 475 | 09/04/02 | REQUEST TO ADJOURN TRIAL AT OR NEAR 5:00 PM ON | | 0.00 |
| 476 | 09/04/02 | WEDNESDAY SEPTEMBER 11, 2002 AND WEDNESDAY SEPTEMBER | | 0.00 |
| 477 | 09/04/02 | 18, 2002 | | 0.00 |
| 478 | 09/04/02 | COURT MINUTES - STATE'S MOTION FOR PERMISSION TO CALL | | 0.00 |
| 479 | 09/04/02 | MEDICAL WITNESS AT TIME CERTAIN ON CASE NUMBERS | | 0.00 |
| 480 | 09/04/02 | 2000-2753CFA, 2000-2660CFA - RULING:  TO BE RESCHEDULED | | 0.00 |
| 481 | 09/04/02 | COURT MINUTES - STATE'S MOTION FOR ORDER IN LIMINE | | 0.00 |
| 482 | 09/04/02 | PRECLUDING REFERENCE TO DEFENDANT'S LACK OF PRIOR | | 0.00 |
| 483 | 09/04/02 | CONVICTIONS ON CASE NUMBERS 2000-2753CFA, 2000-2660CFA | | 0.00 |
| 484 | 09/04/02 | -RULING:  TO BE RESCHEDULED | | 0.00 |
| 485 | 09/04/02 | COURT MINUTES:  STATE'S MOTION FOR ORDER IN LIMINE | | 0.00 |
| 486 | 09/04/02 | PRECLUDING ANY REFERENCE TO THE POSSIBLE SENTENCE THAT | | 0.00 |
| 487 | 09/04/02 | MAY BE IMPOSED UPON CONVICTION ON CASE NUMBERS | | 0.00 |
| 488 | 09/04/02 | 2000-2753CFA, 2000-2660CFA - RULING:  TO BE RESCHEDULED | | 0.00 |
| 489 | 09/04/02 | COURT MINUTES - STATE'S MOTION TO ALLOW JURORS TO TAKE | | 0.00 |
| 490 | 09/04/02 | WRITTEN NOTES DURING TRIAL ON CASE NUMBERS 2000-2753CFA | | 0.00 |
| 491 | 09/04/02 | AND 2000-2660CFA - RULING:  TO BE RESCHEDULED | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr     Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|---|---|---|---|---|
| 492 | 09/04/02 | COURT MINUTES - DEFENDANT'S MOTION IN<br>LIMINE 1 THRU 9 | | 0.00 |
| 493 | 09/04/02 | ON CASE NUMBERS 2000-2753CFA, 2000-2660CFA<br>- RULING: | | 0.00 |
| 494 | 09/04/02 | TO BE RESCHEDULED | | 0.00 |
| 495 | 09/04/02 | COURT MINUTES - STATE'S MOTION FOR<br>PERMISSION TO | | 0.00 |
| 496 | 09/04/02 | UTILIZE DEMONSTRATIVE AID ON CASE NUMBERS<br>2000-2753CFA, | | 0.00 |
| 497 | 09/04/02 | 2000-2660CFA - RULING:  TO BE RESCHEDULED | | 0.00 |
| 498 | 09/04/02 | COURT MINUTES - DEFENDANT'S MOTION TO<br>STRIKE TESTIMONY | | 0.00 |
| 499 | 09/04/02 | ABOUT AND USE OF A COMPACT DISC PURPORTING<br>TO SHOW HOW | | 0.00 |
| 500 | 09/04/02 | AN INCIDENT OF SHAKEN BABY SYNDROME OCCURS<br>ON CASE | | 0.00 |
| 501 | 09/04/02 | NUMBERS 2000-2753CFA, 2000-2660CFA -<br>RULING:  TO BE | | 0.00 |
| 502 | 09/04/02 | RESCHEDULED | | 0.00 |
| 503 | 09/04/02 | COURT MINUTES - STATE'S PRE-TRIAL MOTION<br>FOR RULING ON | | 0.00 |
| 504 | 09/04/02 | THE ADMISSIBILITY OF PHOTOGRAPHS ON CASE<br>NUMBERS | | 0.00 |
| 505 | 09/04/02 | 2000-2753CFA, 2000-2660CFA - RULING:  TO<br>BE RESCHEDULED | | 0.00 |
| 506 | 09/04/02 | COURT MINUTES - STATE'S MOTION IN LIMINE<br>TO PERMIT | | 0.00 |
| 507 | 09/04/02 | TESTIMONY CONCERNING LOCATION OF<br>INTERACTION WITH | | 0.00 |
| 508 | 09/04/02 | DEFENDANT ON CASE NUMBERS 2000-2753CFA,<br>2000-2660CFA - | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

No.   Date of  Pleadings Filed, Orders and Decrees        Amount Owed/    Balance Due
               Journal Book-Page-Nbr     Ref Nbr          Amount Dismissed

509   09/04/02 RULING:  TO BE RESCHEDULED                                       0.00

510   09/04/02 DEFENDANT SIGNED NOTICE FOR  090902  JURY                        0.00
               SELECTION

511   09/04/02 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT                           0.00

512   09/04/02 STATE'S PROPOSED JURY INSTRUCTION REGARDING                      0.00

513   09/04/02 DEMONSTRATION EVIDENCE                                           0.00

514   09/04/02 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT                           0.00

515   09/04/02 RETURN OF SERVICE - SERVED                                       0.00

516   09/04/02 RETURN OF SERVICE - SERVED                                       0.00

517   09/04/02 RETURN OF SERVICE - SERVED                                       0.00

518   09/04/02 EVIDENCE CONTROL FORM                                            0.00

519   09/04/02 SEVERAL EVIDENCE CONTROL FORMS                                   0.00

520   09/05/02 STIPULATION ON ADMISSION OF 911 CALL INTO                        0.00
               EVIDENCE

521   09/05/02 STIPULATION ON ADMISSION OF MEDICAL                              0.00
               RECORDS AND REPORTS

522   09/05/02 MEMORANDUM OF LAW IN OPPOSITION TO MOTION                        0.00
               TO SUPPRESS

523   09/05/02 STATEMENTS FILED BY DEFENDANT                                    0.00

524   09/05/02 DEFENDANT SIGNED NOTICE FOR  090902  JURY                        0.00
               SELECTION

525   09/05/02 COURT MINUTES - STATE'S MOTION IN LIMINE                         0.00
               TO PERMIT

526   09/05/02 TESTIMONY CONCERNING LOCATION OF                                 0.00
               INTERACTION WITH

527   09/05/02 DEFENDANT ON CASE NUMBERS 012000CF2753A,                         0.00
               012000CF2660A

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

No.  Date of  Pleadings Filed, Orders and Decrees      Amount Owed/     Balance Due
              Journal Book-Page-Nbr      Ref Nbr        Amount Dismissed

528  09/05/02 -RULING:  GRANTED                                                0.00

529  09/05/02 COURT MINUTES - STATE'S PRE-TRIAL MOTION                         0.00
              FOR RULING ON

530  09/05/02 THE ADMISSIBILITY OF PHOTOGRAPHS:  1)                            0.00
              AUTOPSY

531  09/05/02 2) DISSECTION OF THE SKULL 3) DEVELOPMENT                        0.00
              OF CHILD

532  09/05/02 4) PHOTOS OF RETINA ON CASE NUMBERS                              0.00
              012000CF2753A,

533  09/05/02 012000CF2660A - RULING:  1) GRANTED 2)                           0.00
              GRANTED

534  09/05/02 3) GRANTED 4) GRANTED                                            0.00

535  09/05/02 COURT MINUTES - STATE'S PRE-TRIAL MOTION                         0.00
              FOR RULING ON

536  09/05/02 THE ADMISSIBILITY OF PHOTOGRAPHS: 5) TAKEN                       0.00
              BY ALAN

537  09/05/02 COLEMAN ON CASE NUMBERS 012000CF2753A,                           0.00
              012000CF2660A

538  09/05/02 -RULING:  5) GRANTED                                             0.00

539  09/05/02 COURT MINUTES - DEFENDANT'S MOTION TO                            0.00
              STRIKE TESTIMONY

540  09/05/02 ABOUT AND USE OF A COMPACT DISC PURPORTING                       0.00
              TO SHOW HOW

541  09/05/02 AN INCIDENT OF SHAKEN BABY SYNDROME OCCURS                       0.00
              ON CASE

542  09/05/02 NUMBER 012000CF2753A, 012000CF2660A -                            0.00
              RULING:  DENIED

543  09/05/02 COURT MINUTES - STATE'S MOTION FOR                               0.00
              PERMISSION TO

544  09/05/02 UTILIZE DEMONSTRATIVE AID ON CASE NUMBERS                        0.00
              012000CF2753A

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr     Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------------------------|-------------------------------|-------------|
| 545 | 09/05/02 | AND 012000CF2660A - RULING:  GRANTED | | 0.00 |
| 546 | 09/05/02 | COURT MINUTES - DEFENDANT'S MOTION IN LIMINE 1 THRU 9 | | 0.00 |
| 547 | 09/05/02 | ON CASE NUMBERS 012000CF2753A, 012000CF2660A - RULING: | | 0.00 |
| 548 | 09/05/02 | 1) GRANTED 2) GRANTED 3) GRANTED NO RECREATION OF THE | | 0.00 |
| 549 | 09/05/02 | DEMONSTRATION 4) STIPULATED 5) WITHDRAWN 6) DENIED | | 0.00 |
| 550 | 09/05/02 | SUBJECT TO DEFENSE OBJECTING 7) WITHDRAWN 8) GRANTED | | 0.00 |
| 551 | 09/05/02 | 9) GRANTED SUBJECT TO REVIEW | | 0.00 |
| 552 | 09/05/02 | COURT MINUTES - STATE'S MOTION TO ALLOW JURORS TO TAKE | | 0.00 |
| 553 | 09/05/02 | WRITTEN NOTES DURING TRIAL ON CASE NUMBERS | | 0.00 |
| 554 | 09/05/02 | 012000CF2753A, 012000CF2660A - RULING: GRANTED - CLERK | | 0.00 |
| 555 | 09/05/02 | IS TO SECURE ENVELOPES EVERY NIGHT, ALL NOTES IN | | 0.00 |
| 556 | 09/05/02 | DIFFERENT ENVELOPE EVERY DAY | | 0.00 |
| 557 | 09/05/02 | COURT MINUTES - STATE'S MOTION FOR ORDER IN LIMINE | | 0.00 |
| 558 | 09/05/02 | PRECLUDING ANY REFERENCE TO THE POSSIBLE SENTENCE THAT | | 0.00 |
| 559 | 09/05/02 | MAYBE IMPOSED UPON CONVICTION ON CASE NUMBERS | | 0.00 |
| 560 | 09/05/02 | 012000CF2753A, 012000CF2660A - STIPULATED | | 0.00 |
| 561 | 09/05/02 | COURT MINUTES - STATE'S MOTION FOR ORDER IN LIMINE | | 0.00 |
| 562 | 09/05/02 | PRECLUDING REFERENCE TO DEFENDANT'S LACK OF PRIOR | | 0.00 |

CRTR5925

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|---|---|---|
| 563 | 09/05/02 | CONVICTIONS ON CASE NUMBER 012000CF2753A,<br>012000CF2660A | | 0.00 |
| 564 | 09/05/02 | -RULING: GRANTED | | 0.00 |
| 565 | 09/05/02 | COURT MINUTES - DEFENDANT'S MOTION TO<br>DISMISS | | 0.00 |
| 566 | 09/05/02 | INDICTMENT ON CASE NUMBERS 012000CF2753A,<br>012000CF2660A | | 0.00 |
| 567 | 09/05/02 | -RULING: DENIED | | 0.00 |
| 568 | 09/05/02 | COURT MINUTES - STATE'S MOTION FOR<br>PERMISSION TO CALL | | 0.00 |
| 569 | 09/05/02 | MEDICAL WITNESS AT TIME CERTAIN ON CASE<br>NUMBERS | | 0.00 |
| 570 | 09/05/02 | 012000CF2753A, 012000CF2660A - RULING:<br>DENIED | | 0.00 |
| 571 | 09/05/02 | TRANSCRIPT - DEPOSITION OF WILLIAM FRANK<br>HAMILTON, M.E. | | 0.00 |
| 572 | 09/05/02 | TRANSCRIPT - DEPOSITION OF ANNE ELIZABETH<br>DICKISON, MD | | 0.00 |
| 573 | 09/05/02 | TRANSCRIPT - TELEPHONIC DEPOSITION OF<br>BERNARD MARIA, MD | | 0.00 |
| 574 | 09/05/02 | TRANSCRIPT - DEPOSITION OF JAMIE LYNN<br>SNODGRASS | | 0.00 |
| 575 | 09/05/02 | TRANSCRIPT - DEPOSITION OF SERGEANT<br>VALERIE DAWSON | | 0.00 |
| 576 | 09/05/02 | TRANSCRIPT - DEPOSITION OF WILLIAM FRANK<br>HAMILTON, M.E. | | 0.00 |
| 577 | 09/05/02 | TRANSCRIPT - DEPOSITION OF DR RONALD<br>QUISLING | | 0.00 |
| 578 | 09/05/02 | TRANSCRIPT - DEPOSITION OF HARVEY G<br>ROHLING JR, M.D. | | 0.00 |
| 579 | 09/05/02 | TRANSCRIPT - DEPOSITION OF SURENDER<br>RAJASEKARAN, M.D. | | 0.00 |

CRTR5925                                         Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr       Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|-----|-----|-----|
| 580 | 09/05/02 | TRANSCRIPT - DEPOSITION OF OFFICER ORLANDO<br>ALVAREZ | | 0.00 |
| 581 | 09/05/02 | TRANSCRIPT - DEPOSITION OF DR FRANK AGEE | | 0.00 |
| 582 | 09/05/02 | TRANSCRIPT - DEPOSITION OF OFFICER LARRY<br>VINCENT SEAL | | 0.00 |
| 583 | 09/05/02 | TRANSCRIPT - DEPOSITION OF DETECTIVE DUANE<br>DIEHL | | 0.00 |
| 584 | 09/05/02 | TRANSCRIPT - DEPOSITION OF HELEN LEGALL | | 0.00 |
| 585 | 09/05/02 | TRANSCRIPT - DEPOSITION OF RICHARD<br>KREINEST, M.D. | | 0.00 |
| 586 | 09/05/02 | TRANSCRIPT - DEPOSITION OF FIREFIGHTER<br>KENNETH A | | 0.00 |
| 587 | 09/05/02 | JOHNSON | | 0.00 |
| 588 | 09/05/02 | TRANSCRIPT - DEPOSITION OF FIREFIGHTER<br>WILLIAM B | | 0.00 |
| 589 | 09/05/02 | BLAIR | | 0.00 |
| 590 | 09/05/02 | TRANSCRIPT - DEPOSITION OF FIREFIGHTER<br>DENNIS MEREDITH | | 0.00 |
| 591 | 09/05/02 | TRANSCRIPT - DEPOSITION OF OFFICER DARYL<br>WAYNE BROWN | | 0.00 |
| 592 | 09/05/02 | TRANSCRIPT - DEPOSITION OF ELIZABETH TALAGA | | 0.00 |
| 593 | 09/05/02 | TRANSCRIPT - DEPOSITION OF LAWRENCE<br>LEVINE, M.D. | | 0.00 |
| 594 | 09/05/02 | TRANSCRIPT - DEPOSITION OF HOWARD LEE<br>ROGERS, M.D. | | 0.00 |
| 595 | 09/06/02 | MOTION FOR RECONSIDERATION OF<br>ADMISSIBILITY OF | | 0.00 |
| 596 | 09/06/02 | TESTIMONY OF DEPUTY CATHY LONG | | 0.00 |
| 597 | 09/06/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

No.  Date of  Pleadings Filed, Orders and Decrees      Amount Owed/    Balance Due
              Journal Book-Page-Nbr     Ref Nbr        Amount Dismissed

598  09/06/02 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT                          0.00

599  09/06/02 STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT                          0.00

600  09/06/02 REQUEST FOR PAYMENT (LOCAL CRIMINAL                             0.00
              JUSTICE FUND) TO

601  09/06/02 ANDERSON REPORTING SERVICES, INC.  IN THE                       0.00
              AMOUNT OF

602  09/06/02 $ 87.45 /// PAID                                                0.00

603  09/06/02 REQUEST FOR PAYMENT (LOCAL CRIMINAL                             0.00
              JUSTICE FUND) TO

604  09/06/02 GAINESVILLE REPORTERS  IN THE AMOUNT OF $                       0.00
              335.50

605  09/06/02 // PAID                                                         0.00

606  09/06/02 REQUEST FOR PAYMENT (LOCAL CRIMINAL                             0.00
              JUSTICE FUND) TO

607  09/06/02 ESQUIRE DEPOSITION SERVICES  IN THE                             0.00
              AMOUNT OF $ 150.00

608  09/06/02 // PAID                                                         0.00

609  09/06/02 DEFENDANT'S SUPPLEMENTAL WITNESS LIST                           0.00

610  09/06/02 WITNESS SUBPOENA                                                0.00

611  09/09/02 SUBPOENA FOR TRIAL                                              0.00

612  09/09/02 DEFENDANT'S MOTION FOR REHEARING AND A                          0.00
              DEMAND FOR A

613  09/09/02 RICHARDSON INQUIRY ON THE ISSUE OF THE                          0.00
              ADMISSIBILITY OF

614  09/09/02 A COMPACT DISC PURPORTING TO SHOW A                             0.00
              DEMONSTRATION OF

615  09/09/02 SBS (SHAKEN BABY SYNDROME)                                      0.00

616  09/09/02 DEFENDANT'S RESPONSE IN OPPOSITION TO                           0.00
              STATE'S MOTION

CRTR5925           Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees | Amount Owed/ | Balance Due |
| --- | --- | --- | --- | --- |
| | | Journal Book-Page-Nbr    Ref Nbr | Amount Dismissed | |
| 617 | 09/09/02 | FOR RECONSIDERATION OF ADMISSIBILITY OF TESTIMONY OF | | 0.00 |
| 618 | 09/09/02 | DEPUTY KATHY LONG | | 0.00 |
| 619 | 09/09/02 | WITNESS SUBPOENA | | 0.00 |
| 620 | 09/09/02 | MOTION TO TAKE CONTINUING DEPOSITION OF RONALD | | 0.00 |
| 621 | 09/09/02 | QUISLING, M.D. | | 0.00 |
| 622 | 09/09/02 | ORDER DENYING MOTION FOR RECONSIDERATION OF | | 0.00 |
| 623 | 09/09/02 | ADMISSIBILITY OF TESTIMONY OF DEPUTY CATHY LONG // LOTT | | 0.00 |
| 624 | 09/09/02 | DECORUM ORDER AS TO MEDIA - MEDIA PERSONNEL SHALL | | 0.00 |
| 625 | 09/09/02 | REMAIN IN THE GALLERY SEATING DURING THE JURY SELECTION | | 0.00 |
| 626 | 09/09/02 | AND TRIAL | | 0.00 |
| 627 | 09/09/02 | -TV20 AND THE GAINESVILLE SUN IS/ARE THE ONLY MEDIA WHO | | 0.00 |
| 628 | 09/09/02 | HAS/HAVE REQUESTED AND HAS/HAVE BEEN AUTHORIZED TO | | 0.00 |
| 629 | 09/09/02 | BRING A STILL CAMERA AND/OR VIDEO CAMERA INTO THE | | 0.00 |
| 630 | 09/09/02 | COURTROOM FOR JURY SELECTION AND TRIAL. NO | | 0.00 |
| 631 | 09/09/02 | UNAUTHORIZED MEDIA WILL BE ALLOWED TO BRING A CAMERA | | 0.00 |
| 632 | 09/09/02 | INTO THE COURTROOM | | 0.00 |
| 633 | 09/09/02 | -ONLY ONE STILL CAMERA/OR ONE VIDEO CAMERA WILL BE | | 0.00 |
| 634 | 09/09/02 | ALLOWED IN THE COURTROOM. NO FLASHES WILL BE ALLOWED. | | 0.00 |

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr      Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------|------------------|-------------|
| 635 | 09/09/02 | THE STILL PHOTOGRAPHER AND/OR VIDEOGRAPHER<br>MUST REMAIN | | 0.00 |
| 636 | 09/09/02 | IN THE GALLERY.  NO PHOTOGRAPHS OR VIDEO<br>OF THE JURY | | 0.00 |
| 637 | 09/09/02 | WILL BE ALLOWED.  NO DISRUPTED MOVEMENT<br>WILL BE | | 0.00 |
| 638 | 09/09/02 | ALLOWED | | 0.00 |
| 639 | 09/09/02 | -NO INTERVIEWS WILL BE CONDUCTED INSIDE<br>THE COURTHOUSE/ | | 0.00 |
| 640 | 09/09/02 | //LOTT | | 0.00 |
| 641 | 09/09/02 | DEFENDANT'S SUPPLEMENTAL WITNESS LIST | | 0.00 |
| 642 | 09/09/02 | DEFENDANT SIGNED NOTICE FOR  090902  JURY<br>SELECTION | | 0.00 |
| 643 | 09/09/02 | DAY CERTAIN TRIAL    SET FOR 09092002 | | 0.00 |
| 644 | 09/09/02 | DEFENDANT'S SUPPLEMENTAL WITNESS LIST | | 0.00 |
| 645 | 09/09/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 646 | 09/09/02 | MINUTES OF THE CLERK - JURY TRIAL | | 0.00 |
| 647 | 09/10/02 | STATE'S SUPPLEMENTAL DISCOVERY EXHIBIT | | 0.00 |
| 648 | 09/10/02 | TRANSCRIPT OF DEPOSITION AS TO CRYSTAL<br>QUIRELLO | | 0.00 |
| 649 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF SERGEANT<br>STEVEN WEAVER | | 0.00 |
| 650 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF CORPORAL<br>WHITNEY STOUT | | 0.00 |
| 651 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF KATHLEEN MARIE<br>MORRISTON | | 0.00 |
| 652 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF CHRISTINA<br>MILLARD | | 0.00 |

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr     Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|---------------------------------------------------------|------------------|-------------|
| 653 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF HELEN LEGALL | | 0.00 |
| 654 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF OFFICER JAMES<br>CHRISTOPHER | | 0.00 |
| 655 | 09/10/02 | JACKSON | | 0.00 |
| 656 | 09/10/02 | TRANSCRIPT OF OFFICER ROBERT L KING, III | | 0.00 |
| 657 | 09/10/02 | TRANSCRIPT OF LIEUTENANT WILLIAM THOMAS<br>HALVOSA | | 0.00 |
| 658 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF RICHARD<br>DAVIS,SR | | 0.00 |
| 659 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF DETECTIVE ALAN<br>COLEMAN | | 0.00 |
| 660 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF DETECTIVE<br>DAVID KEITH | | 0.00 |
| 661 | 09/10/02 | CANNON | | 0.00 |
| 662 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF STEPHEN<br>NELSON, MD | | 0.00 |
| 663 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF SERGEANT<br>ROBERT BARTLEY | | 0.00 |
| 664 | 09/10/02 | TRANSCRIPT OF DEPOSITION OF DORIS MARIE<br>BRIDWELL | | 0.00 |
| 665 | 09/10/02 | ORDER GRANTING MOTION FOR RELEASE OF<br>EVIDENCE / | | 0.00 |
| 666 | 09/10/02 | THE FOLLOWING ARTICLES SHALL BE RELEASED<br>FROM EVIDENCE | | 0.00 |
| 667 | 09/10/02 | BY THE CLERK OF THE COURT TO JEANNE M<br>SINGER SAID | | 0.00 |
| 668 | 09/10/02 | EVIDENCE BEING PARTICULARLY DESCRIBED AS<br>FOLLOWS: 24 | | 0.00 |
| 669 | 09/10/02 | PAGES OF LEGAL CORRESPONDENCE WHICH WERE<br>PART OF THE | | 0.00 |

CRTR5925                              Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr      Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|-----------------------------------------------------|-----|------|
| 670 | 09/10/02 | STATE'S EXHIBIT #5 IN EVIDENCE UPON JOINT<br>STIPULATION | | 0.00 |
| 671 | 09/10/02 | OF STATE AND DEFENSE // LOTT | | 0.00 |
| 672 | 09/11/02 | RETURN OF SERVICE - UNSERVED | | 0.00 |
| 673 | 09/13/02 | TRANSCRIPT OF DEPOSITION OF SALVADOR<br>CUMELLA | | 0.00 |
| 674 | 09/13/02 | TRANSCRIPT OF DEPOSITION OF DETECTIVE<br>HELEN LEGALL | | 0.00 |
| 675 | 09/13/02 | TRANSCRIPT OF DEPOSITION OF DAVID SAMUEL<br>ANDREW | | 0.00 |
| 676 | 09/13/02 | STEWART, MD | | 0.00 |
| 677 | 09/13/02 | TRANSCRIPT OF DEPOSITION OF MICHAEL BELL,<br>MD | | 0.00 |
| 678 | 09/13/02 | TRANSCRIPT OF DEPOSITION OF JONATHAN L<br>WILLIAMS, MD | | 0.00 |
| 679 | 09/13/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 680 | 09/13/02 | ESQUIRE DEPOSITION SERVICES  IN THE<br>AMOUNT OF $ 200.50 | | 0.00 |
| 681 | 09/13/02 | // PAID | | 0.00 |
| 682 | 09/13/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 683 | 09/13/02 | HARMON'S PHOTOS AR NICE  IN THE AMOUNT OF<br>$ 23.00 | | 0.00 |
| 684 | 09/13/02 | // PAID | | 0.00 |
| 685 | 09/16/02 | LAW ENFORCEMENT OFFICER CERTIFICATION OF<br>WITNESS | | 0.00 |
| 686 | 09/16/02 | FEE TRAVEL AND PER DIEM ALLOWANCE | | 0.00 |
| 687 | 09/16/02 | LAW ENFORCEMENT OFFICER CERTIFICATION OF<br>WITNESS | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|----------------------------------------------|---|---|
| 688 | 09/16/02 | FEE TRAVEL AND PER DIEM ALLOWANCE | | 0.00 |
| 689 | 09/16/02 | LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS | | 0.00 |
| 690 | 09/16/02 | FEE TRAVEL AND PER DIEM ALLOWANCE | | 0.00 |
| 691 | 09/17/02 | LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS | | 0.00 |
| 692 | 09/17/02 | FEE TRAVEL AND PER DIEM ALLOWANCE | | 0.00 |
| 693 | 09/19/02 | LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS | | 0.00 |
| 694 | 09/19/02 | FEE TRAVEL AND PER DIEM ALLOWANCE | | 0.00 |
| 695 | 09/19/02 | LETTER TO JUDGE LOTT FROM JUROR #96 | | 0.00 |
| 696 | 09/19/02 | LETTER FROM STEPHAN P MICKLE UNITED STATES DISTRICT | | 0.00 |
| 697 | 09/19/02 | JUDGE (FAX) | | 0.00 |
| 698 | 09/19/02 | LETTER TO JUDGE FROM JUROR #73 | | 0.00 |
| 699 | 09/19/02 | LAW ENFORCEMENT OFFICER CERTIFICATION OF WITNESS | | 0.00 |
| 700 | 09/19/02 | FEE TRAVEL AND PER DIEM ALLOWANCE | | 0.00 |
| 701 | 09/20/02 | STATE'S PROPOSED JURY INSTRUCTION REGARDING | | 0.00 |
| 702 | 09/20/02 | DEMONSTRATION EVIDENCE | | 0.00 |
| 703 | 09/20/02 | LETTER TO JUDGE FROM JURY | | 0.00 |
| 704 | 09/20/02 | LETTER TO JUDGE FROM JUROR #73 | | 0.00 |
| 705 | 09/20/02 | INSTRUCTION TO JURY REGARDING WITNESS TESTIFYING OUT | | 0.00 |
| 706 | 09/20/02 | OF ORDER | | 0.00 |
| 707 | 09/20/02 | MOTION FOR REHEARING ON THE ISSUE OF WHETHER THE | | 0.00 |

CRTR5925                              Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

No. Date of  Pleadings Filed, Orders and Decrees      Amount Owed/    Balance Due
             Journal Book-Page-Nbr     Ref Nbr        Amount Dismissed

708  09/20/02 DEFENSE OR THE STATE OF FLORIDA OPENED THE                    0.00
              DOOR SO AS

709  09/20/02 TO CAUSE THE ADMISSIBILITY OF CERTAIN                         0.00
              EVIDENCE

710  09/24/02 LAW ENFORCEMENT OFFICER CERTIFICATION OF                      0.00
              WITNESS

711  09/24/02 FEE TRAVEL AND PER DIEM ALLOWANCE                             0.00

712  09/24/02 LAW ENFORCEMENT OFFICER CERTIFICATION OF                      0.00
              WITNESS

713  09/24/02 FEE TRAVEL AND PER DIEM ALLOWANCE                             0.00

714  09/24/02 LAW ENFORCEMENT OFFICER CERTIFICATION OF                      0.00
              WITNESS

715  09/24/02 FEE TRAVEL AND PER DIEM ALLOWANCE                             0.00

716  09/24/02 LAW ENFORCEMENT OFFICER CERTIFICATION OF                      0.00
              WITNESS

717  09/24/02 FEE TRAVEL AND PER DIEM ALLOWANCE                             0.00

718  09/24/02 QUESTIONS FROM JURY                                           0.00

719  09/24/02 QUESTIONS FROM JURY                                           0.00

720  09/24/02 NOTES FROM TRIAL                                              0.00

721  09/25/02 MOTION TO REOPEN DEFENDANT'S CASE AND                         0.00
              ALLOW PREVIOUSLY

722  09/25/02 LISTED STATE WITNESSES TO TESTIFY                             0.00

723  09/25/02 LETTER FROM JURORS                                            0.00

724  09/25/02 DEFENDANT'S MOTION FOR SANCTIONS AGAINST                      0.00
              STATE FOR

725  09/25/02 WITHHOLDING CRITICAL TESTIMONY, DEMAND FOR                    0.00
              RICHARDSON

726  09/25/02 HEARING, AND MOTION FOR MISTRIAL                              0.00

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------------------|-------------------------------|-------------|
| 727 | 09/25/02 | MOTION FOR RE-HEARING ON ISSUE OF ADMISSIBILITY OF | | 0.00 |
| 728 | 09/25/02 | COMPACT DISC PRESENTATION | | 0.00 |
| 729 | 09/25/02 | JURY INSTRUCTIONS | | 0.00 |
| 730 | 09/25/02 | VERDICT -- GUILTY OF MANSLAUGHTER, A LESSER INCLUDED | | 0.00 |
| 731 | 09/25/02 | OFFENSE | | 0.00 |
| 732 | 09/25/02 | DEFENDANT SIGNED NOTICE FOR  102902 SENTENCING | | 0.00 |
| 733 | 09/25/02 | DISPOSITION           SET FOR 10292002 | | 0.00 |
| 734 | 09/25/02 | *PLACED ON DIV I DISPOSITION DOCKET PER JUDGE* | | 0.00 |
| 735 | 09/25/02 | PSI ORDERED - PSI DUE 101802 | | 0.00 |
| 736 | 09/26/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 737 | 09/26/02 | HARMON'S PHOTOS AR NICE  IN THE AMOUNT OF $ 85.40 | | 0.00 |
| 738 | 09/26/02 | // PAID | | 0.00 |
| 739 | 09/26/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 740 | 09/26/02 | EXPERT DIGITAL SOLUTIONS, INC.  IN THE AMOUNT OF | | 0.00 |
| 741 | 09/26/02 | $275.00 // PAID | | 0.00 |
| 742 | 09/26/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 743 | 09/26/02 | HARMON'S PHOTOS AR NICE  IN THE AMOUNT OF $ 8.50 | | 0.00 |
| 744 | 09/26/02 | // PAID | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|---------------------------------------------------------------------|-------------------------------|-------------|
| 745 | 09/27/02 | ORDER GRANTING MOTION FOR PAYMENT OF STATE TRAVEL / | | 0.00 |
| 746 | 09/27/02 | / PAID // PIERCE | | 0.00 |
| 747 | 09/27/02 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT | | 0.00 |
| 748 | 09/27/02 | CONCERNING PAYMENT OF STATE WITNESS | | 0.00 |
| 749 | 09/27/02 | MOTION FOR PAYMENT FOR TRAVEL OF STATE WITNESS | | 0.00 |
| 750 | 09/27/02 | ORDER GRANTING MOTION FOR PAYMENT OF STATE TRAVEL / | | 0.00 |
| 751 | 09/27/02 | / PAID // PIERCE | | 0.00 |
| 752 | 09/27/02 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT | | 0.00 |
| 753 | 09/27/02 | CONCERNING PAYMENT OF STATE WITNESS | | 0.00 |
| 754 | 09/27/02 | MOTION FOR PAYMENT FOR TRAVEL OF STATE WITNESS | | 0.00 |
| 755 | 09/27/02 | MOTION FOR PAYMENT OF LODGING FOR A STATE WITNESS | | 0.00 |
| 756 | 09/27/02 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT | | 0.00 |
| 757 | 09/27/02 | CONCERNING PAYMENT OF COSTS | | 0.00 |
| 758 | 09/27/02 | ORDER GRANTING MOTION FOR PAYMENT OF LODGING FOR STATE | | 0.00 |
| 759 | 09/27/02 | WITNESS / PAID // PIERCE | | 0.00 |
| 760 | 09/27/02 | MOTION FOR PAYMENT OF STATE WITNESS | | 0.00 |
| 761 | 09/27/02 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT | | 0.00 |
| 762 | 09/27/02 | CONCERNING PAYMENT OF STATE WITNESS | | 0.00 |
| 763 | 09/27/02 | ORDER GRANTING MOTION FOR PAYMENT OF STATE TRAVEL / | | 0.00 |

Date: 06/13/2008 14:14:41
CRTR5925
Case 1:09-cv-00052-MP-GRJ Document 21-49 Filed 06/22/11 Page 49 of 117
Docket Sheet
Summary
Page 42

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr      Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|---|---|---|---|---|
| 764 | 09/27/02 | /PAID // PIERCE | | 0.00 |
| 765 | 09/30/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 766 | 09/30/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 767 | 09/30/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 768 | 09/30/02 | RETURN OF SERVICE - UNSERVED | | 0.00 |
| 769 | 09/30/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 770 | 09/30/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 771 | 09/30/02 | RETURN OF SERVICE - UNSERVED | | 0.00 |
| 772 | 09/30/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 773 | 09/30/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 774 | 09/30/02 | RETURN OF SERVICE - SERVED | | 0.00 |
| 775 | 10/03/02 | MOTION FOR NEW TRIAL | | 0.00 |
| 776 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 777 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 778 | 10/07/02 | $105.00//PAID | | 0.00 |
| 779 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 780 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 781 | 10/07/02 | $54.25//PAID | | 0.00 |
| 782 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 783 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |

2000 CF 002753 A  HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|--------------------------------------------------|----------------------------------|-------------|
| 784 | 10/07/02 | $21.00//PAID | | 0.00 |
| 785 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 786 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 787 | 10/07/02 | $77.00//PAID | | 0.00 |
| 788 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 789 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 790 | 10/07/02 | $105.00//PAID | | 0.00 |
| 791 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 792 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 793 | 10/07/02 | $175.00//PAID | | 0.00 |
| 794 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 795 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 796 | 10/07/02 | $105.00//PAID | | 0.00 |
| 797 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 798 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 799 | 10/07/02 | $56.00//PAID | | 0.00 |
| 800 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 801 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr     Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|------|------|------|
| 802 | 10/07/02 | $226.18//PAID | | 0.00 |
| 803 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 804 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 805 | 10/07/02 | $177.00//PAID | | 0.00 |
| 806 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 807 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 808 | 10/07/02 | $245.00//PAID | | 0.00 |
| 809 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 810 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 811 | 10/07/02 | $101.50//PAID | | 0.00 |
| 812 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 813 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 814 | 10/07/02 | $119.00//PAID | | 0.00 |
| 815 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 816 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 817 | 10/07/02 | $178.00//PAID | | 0.00 |
| 818 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 819 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |

CRTR5925                        Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|-----------------------------------------------|--------------------|-------------|
| 820 | 10/07/02 | $245.70//PAID | | 0.00 |
| 821 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 822 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 823 | 10/07/02 | $50.40//PAID | | 0.00 |
| 824 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 825 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 826 | 10/07/02 | $108.50//PAID | | 0.00 |
| 827 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 828 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 829 | 10/07/02 | $84.00//PAID | | 0.00 |
| 830 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 831 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 832 | 10/07/02 | $134.75//PAID | | 0.00 |
| 833 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 834 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |
| 835 | 10/07/02 | $197.75//PAID | | 0.00 |
| 836 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL<br>JUSTICE FUND) TO | | 0.00 |
| 837 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE<br>AMOUNT OF | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------|-------------------|-------------|
| 838 | 10/07/02 | $76.27//PAID | | 0.00 |
| 839 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 840 | 10/07/02 | LEBLANC COURT REPORTING SERVICES  IN THE AMOUNT OF | | 0.00 |
| 841 | 10/07/02 | $105.00//PAID | | 0.00 |
| 842 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 843 | 10/07/02 | LIGHT-WORK LABS  IN THE AMOUNT OF $ 20.00//PAID | | 0.00 |
| 844 | 10/07/02 | ORDER FOR PAYMENT OF EXPERT WITNESS FEE TO BERNARD L | | 0.00 |
| 845 | 10/07/02 | MARIA, M.D.M.B.A. IN THE AMOUNT OF $5500.00 // LOTT | | 0.00 |
| 846 | 10/07/02 | MOTION FOR PAYMENT OF EXPERT WITNESS FEE | | 0.00 |
| 847 | 10/07/02 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT CONCERNING | | 0.00 |
| 848 | 10/07/02 | PAYMENT OF EXPERT WITNESS | | 0.00 |
| 849 | 10/07/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 850 | 10/07/02 | WRIGHT TRAVEL  IN THE AMOUNT OF $ 572.50//PAID | | 0.00 |
| 851 | 10/08/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 852 | 10/08/02 | ESQUIRE DEPOSITION SERVICES  IN THE AMOUNT OF $ 383.30 | | 0.00 |
| 853 | 10/08/02 | // PAID | | 0.00 |
| 854 | 10/08/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 855 | 10/08/02 | HARMON'S PHOTOS AR NICE  IN THE AMOUNT OF $ 126.50 | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr     Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|-------------------------------------------|-------------------|-------------|
| 856 | 10/08/02 | // PAID | | 0.00 |
| 857 | 10/08/02 | MOTION FOR PAYMENT OF EXPERT WITNESS FEE | | 0.00 |
| 858 | 10/08/02 | ALACHUA CO. ATTORNEY'S ANNOUNCEMENT CONCERNING PAYMENT | | 0.00 |
| 859 | 10/08/02 | OF EXPERT WITNESS | | 0.00 |
| 860 | 10/08/02 | ORDER FOR PAYMENT OF EXPERT WITNESS FEE / $3300.00 TO | | 0.00 |
| 861 | 10/08/02 | GAINESVILLE PATHOLOGY GROUP // LOTT //////// PAID | | 0.00 |
| 862 | 10/15/02 | REQUEST FOR PAYMENT (LOCAL CRIMINAL JUSTICE FUND) TO | | 0.00 |
| 863 | 10/15/02 | BERNARD L. MARIA, MD., M.B.A.  IN THE AMOUNT OF $ | | 0.00 |
| 864 | 10/15/02 | $7955.49/PAID / | | 0.00 |
| 865 | 10/15/02 | MOTION FOR PAYMENT OF EXPERT WITNESS FEE | | 0.00 |
| 866 | 10/15/02 | ALACHUA COUNTY ATTORNEY'S ANNOUCEMENT CONCERNING | | 0.00 |
| 867 | 10/15/02 | PAYMENT OF EXPERT WITNESS | | 0.00 |
| 868 | 10/15/02 | ORDER FOR PAYMENT OF EXPERT WITNESS FEE IN THE AMOUNT | | 0.00 |
| 869 | 10/15/02 | OF $8,000.0 TO STEPHEN J. NELSON, MD., PA,//PIERCE | | 0.00 |
| 870 | 10/15/02 | MOTION FOR PAYMENT OF STATE WITNESS | | 0.00 |
| 871 | 10/15/02 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT | | 0.00 |
| 872 | 10/15/02 | CONCERNING PAYMENT OF STATE WITNESS | | 0.00 |
| 873 | 10/15/02 | ORDER GRANTING MOTION FOR PAYMENT OF STATE TRAVEL / | | 0.00 |
| 874 | 10/15/02 | / PAID // LOTT | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|---------|---------|---------|
| 875 | 10/15/02 | MOTION FOR PAYMENT OF STATE WITNESS | | 0.00 |
| 876 | 10/15/02 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT | | 0.00 |
| 877 | 10/15/02 | CONCERNING PAYMENT OF STATE WITNESS | | 0.00 |
| 878 | 10/15/02 | ORDER GRANTING MOTION FOR PAYMENT OF STATE TRAVEL / | | 0.00 |
| 879 | 10/15/02 | / PAID // LOTT | | 0.00 |
| 880 | 10/17/02 | LETTER TO JUDGE LOTT FROM PROBATION AND PAROLE | | 0.00 |
| 881 | 10/17/02 | ORDER SETTING DISPOSITION DATE / FRIDAY, 8 NOVEMBER | | 0.00 |
| 882 | 10/17/02 | 2002 AT 9:00 AM // LOTT | | 0.00 |
| 883 | 10/29/02 | ORDER DENYING MOTION FOR NEW TRIAL // LOTT | | 0.00 |
| 884 | 10/30/02 | MOTION FOR JUDGEMENT FOR COSTS | | 0.00 |
| 885 | 10/30/02 | NOTICE OF HEARING ON  110802  AT / 9:00AM / LOTT | | 0.00 |
| 886 | 10/31/02 | WITNESS SUBPOENA PAID | | 0.00 |
| 887 | 11/01/02 | ADDENDUM TO MOTION FOR JUDGMENT FOR COSTS | | 0.00 |
| 888 | 11/07/02 | SECOND ADDENDUM TO MOTION FOR JUDGEMENT FOR COSTS | | 0.00 |
| 889 | 11/08/02 | MOTION FOR ADVANCE PAYMENT OF STATE WITNESS / PAID | | 0.00 |
| 890 | 11/08/02 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT | | 0.00 |
| 891 | 11/08/02 | CONCERNING PAYMENT OF STATE WITNESS | | 0.00 |
| 892 | 11/08/02 | ORDER GRANTING MOTION FOR PAYMENT OF STATE WITNESS// | | 0.00 |
| 893 | 11/08/02 | //PAID | | 0.00 |

CRTR5925                          Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|-----------------------------------------------------------------------|----------------------------------|-------------|
| 894 | 11/08/02 | PICTURE OF VICTIM | | 0.00 |
| 895 | 11/08/02 | TRANSCRIPT OF MOTION TO DISMISS INDICTMENT<br>ON 090502 | | 0.00 |
| 896 | 11/08/02 | BEFORE JUDGE LOTT | | 0.00 |
| 897 | 11/08/02 | PSI (ENVELOPE) | | 0.00 |
| 898 | 11/08/02 | DECORUM ORDER AS TO MEDIA; | | 0.00 |
| 899 | 11/08/02 | -MEDIA PERSONNEL SHALL REMAIN IN THE<br>GALLERY SEATING | | 0.00 |
| 900 | 11/08/02 | DURING THE JURY SELECTION, TRIAL OR HEARING | | 0.00 |
| 901 | 11/08/02 | -GAINESVILLE SUN IS THE ONLY MEDIA WHO HAS '<br>REQUESTED | | 0.00 |
| 902 | 11/08/02 | AND HAS BEEN AUTHORIZED TO BRING A STILL<br>CAMERA INTO | | 0.00 |
| 903 | 11/08/02 | THE COURTROOM FOR JURY SELECTION, TRIAL OR<br>HEARING. | | 0.00 |
| 904 | 11/08/02 | -ONLY ONE STILL CAMERA WILL BE ALLOWED IN<br>COURTROOM | | 0.00 |
| 905 | 11/08/02 | -NO INTERVIEWS RELATED TO THIS<br>TRIAL/HEARING WILL BE | | 0.00 |
| 906 | 11/08/02 | CONDUCTED INSIDE THE COURTHOUSE // LOTT | | 0.00 |
| 907 | 11/08/02 | AMENDED DECORUM ORDER AS TO MEDIA // LOTT | | 0.00 |
| 908 | 11/08/02 | PRESENT WITH ATTORNEY | | 0.00 |
| 909 | 11/08/02 | TRIAL TYPE/JURY AS TO CNT: : Seq #: 001 | | 0.00 |
| 910 | 11/08/02 | DEF PLED NOT GLTY AS TO CNT: : Seq #: 001 | | 0.00 |
| 911 | 11/08/02 | DEFENDANT FOUND GUILTY BY JURY AS TO CNT:<br>: Seq #: 001 | | 0.00 |
| 912 | 11/08/02 | ADJUDICATED GUILTY          AS TO CNT:<br>: Seq #: 001 | | 0.00 |

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|-----------------------------------------------|------------------|-------------|
| 913 | 11/08/02 | DEFENDANT SENTENCED AS TO CNT: : Seq #: 001 | | 0.00 |
| 914 | 11/08/02 | DEFENDANT ASSESSED    314.00 AS TO CNT: : Seq #: 001 | | 0.00 |
| 915 | 11/08/02 | DEF SENTENCED TO PRISON    15 y  m  d AS TO CNT: : Seq #: 001 | | 0.00 |
| 916 | 11/08/02 | DEF GIVEN CREDIT FOR TIME SRVD  0347 days ON CNT: : Seq #: 001 | | 0.00 |
| 917 | 11/08/02 | ORDER ESTABLISHING MONETARY SUMS - TOTAL SUMS ORDERED | | 0.00 |
| 918 | 11/08/02 | SHALL BE PAID THROUGH THE CLERK OF COURT IN FULL // | | 0.00 |
| 919 | 11/08/02 | //LOTT | | 0.00 |
| 920 | 11/08/02 | VICTIM NOTIFICATION DATA SHEET | | 0.00 |
| 921 | 11/08/02 | RESTITUTION LIEN ORDER - EVIDENTIARY HEARING TO BE SET | | 0.00 |
| 922 | 11/08/02 | DEFENDANT DOES NOT WAIVE HIS PRESENCE | | 0.00 |
| 923 | 11/08/02 | COURT RESERVES AND RETAINS JURISDICTION AS TO | | 0.00 |
| 924 | 11/08/02 | RESTITUTION // LOTT | | 0.00 |
| 925 | 11/08/02 | SCORE SHEET//TOTAL  181.2 | | 0.00 |
| 926 | 11/08/02 | AMENDED JUDGEMENT AS TO CRIME // LOTT 2552-1194- | | 0.00 |
| 927 | 11/08/02 | ORDER REQUIRING TRANSCRIPTION OF TRIAL TESTIMONY//LOTT | | 0.00 |
| 928 | 11/08/02 | RESTITUTION ORIGINAL AMOUNT OWED: $17515.46 BALANCE DUE AT CONVERSION: $17515.46 | 17,515.46 | 17,515.46 |
| 929 | 11/08/02 | CF/SANTA FE CEN ORIGINAL AMOUNT OWED: $2.85 BALANCE DUE AT CONVERSION: $2.85 | 2.85 | 2.85 |

CRTR5925                              Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------|----------------|-------------|
| 930 | 11/08/02 | CF-STATE LEF<br>ORIGINAL AMOUNT OWED: $3.00<br>BALANCE DUE AT CONVERSION: $3.00 | 3.00 | 3.00 |
| 931 | 11/08/02 | CF $200 F-CJF<br>ORIGINAL AMOUNT OWED: $195.00<br>BALANCE DUE AT CONVERSION: $195.00 | 195.00 | 195.00 |
| 932 | 11/08/02 | CF $50 C.V.<br>ORIGINAL AMOUNT OWED: $49.00<br>BALANCE DUE AT CONVERSION: $49.00 | 49.00 | 49.00 |
| 933 | 11/08/02 | CF TEEN COURT<br>ORIGINAL AMOUNT OWED: $2.85<br>BALANCE DUE AT CONVERSION: $2.85 | 2.85 | 2.85 |
| 934 | 11/08/02 | CF JAC<br>ORIGINAL AMOUNT OWED: $2.85<br>BALANCE DUE AT CONVERSION: $2.85 | 2.85 | 2.85 |
| 935 | 11/08/02 | CF FACI COST<br>ORIGINAL AMOUNT OWED: $50.00<br>BALANCE DUE AT CONVERSION: $50.00 | 50.00 | 50.00 |
| 936 | 11/08/02 | CF LOCAL LEF<br>ORIGINAL AMOUNT OWED: $2.00<br>BALANCE DUE AT CONVERSION: $2.00 | 2.00 | 2.00 |
| 937 | 11/08/02 | CF TEEN CT S/C<br>ORIGINAL AMOUNT OWED: $0.15<br>BALANCE DUE AT CONVERSION: $0.15 | 0.15 | 0.15 |
| 938 | 11/08/02 | CF JAC S/C<br>ORIGINAL AMOUNT OWED: $0.15<br>BALANCE DUE AT CONVERSION: $0.15 | 0.15 | 0.15 |
| 939 | 11/08/02 | CF C.V. S/C<br>ORIGINAL AMOUNT OWED: $1.00<br>BALANCE DUE AT CONVERSION: $1.00 | 1.00 | 1.00 |
| 940 | 11/08/02 | CF F-CJF S/C<br>ORIGINAL AMOUNT OWED: $5.00<br>BALANCE DUE AT CONVERSION: $5.00 | 5.00 | 5.00 |
| 941 | 11/08/02 | CF/SANTA FE S/C<br>ORIGINAL AMOUNT OWED: $0.15<br>BALANCE DUE AT CONVERSION: $0.15 | 0.15 | 0.15 |
| 942 | 11/14/02 | DOC COMMITMENT PACKET SENT TO ASO<br>11-13-2002//BLB | | 0.00 |
| 943 | 11/14/02 | ADJUDICATORY JUDGMENT OF  110802<br>2552-1195- | | 0.00 |

CRTR5925                              Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr      Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|------|------|------|
| 944 | 11/15/02 | REOPENED CASE CLOSED 11082002 | | 0.00 |
| 945 | 11/15/02 | NOTICE OF HEARING ON  112202  AT / 9:00 AM<br>/ LOTT | | 0.00 |
| 946 | 11/15/02 | MOTION FOR SUPERSEDEAS BOND | | 0.00 |
| 947 | 11/20/02 | NOTICE OF FILING | | 0.00 |
| 948 | 11/22/02 | APPEAL FILED 11222002 | | 0.00 |
| 949 | 11/22/02 | COURT MINUTES - MOTION FOR SUPERSEDEAS<br>BOND ON CASE | | 0.00 |
| 950 | 11/22/02 | NUMBER 01-2000CF2753A, 01-2000CF2660A -<br>RULING: DENIED | | 0.00 |
| 951 | 11/22/02 | P.D APPOINTED FOR APPEAL | | 0.00 |
| 952 | 11/22/02 | APPLICATION FOR APPOINTMENT OF PUBLIC<br>DEFENDER AND              - | | 0.00 |
| 953 | 11/22/02 | AFFIDAVIT OF INDIGENCY & PUBLIC DEFENDER<br>APPOINTED // | | 0.00 |
| 954 | 11/22/02 | //LOTT | | 0.00 |
| 955 | 11/22/02 | NOTICE OF APPEAL REGARDING<br>JUDGMENT/SENTENCE | | 0.00 |
| 956 | 11/22/02 | DIRECTIONS TO THE CLERK | | 0.00 |
| 957 | 11/22/02 | DESIGNATION TO REPORTER AND REPORTER'S<br>ACKNOWLEDGMENT | | 0.00 |
| 958 | 11/22/02 | ***PUBLIC DEFENDER PUT ON AS SPECIAL<br>PERSON*** | | 0.00 |
| 959 | 11/22/02 | STATEMENT OF JUDICIAL ACTS TO BE REVIEWED | | 0.00 |
| 960 | 11/22/02 | DESIGNATION OF PUBLIC DEFENDER, SECOND<br>JUDICIAL CIRCUIT, | | 0.00 |
| 961 | 11/22/02 | FOR THE HANDLING OF APPEAL/FILED BY GORDON<br>GROLAND, ESQUIRE | | 0.00 |

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|----------------------------------------------------------------------|-------------------------------|-------------|
| 962 | 11/22/02 | MAILED CERTIFIED COPY OF NOTICE OF APPEAL AND COPY OF | | 0.00 |
| 963 | 11/22/02 | JUDGMENT/SENTENCE TO FIRST DISTRICT COURT OF APPEAL/LETTER | | 0.00 |
| 964 | 11/22/02 | ONLY TO ATTORNEY GENERAL, ATTORNEY GROLAND, & NANCY DANIELS | | 0.00 |
| 965 | 11/22/02 | PUBLIC DEFENDER SECOND JUDICIAL CIRCUIT | | 0.00 |
| 966 | 11/22/02 | COPY OF SEALED APPLICATION & AFFIDAVIT FOR SEARCH WARRANT/ | | 0.00 |
| 967 | 11/22/02 | SEARCH WARRANT/RETURN PLACED IN FILE FROM COMPANION CASE | | 0.00 |
| 968 | 11/22/02 | 2000-2660-CFA | | 0.00 |
| 969 | 12/02/02 | LETTER FROM JON S. WHEELER ASSIGNS FIRST DISTRICT COURT OF | | 0.00 |
| 970 | 12/02/02 | APPEAL #1D02-4788 | | 0.00 |
| 971 | 12/02/02 | FIRST DISTRICT COURT OF APPEAL ORDER REQUIRES FILING FEE OR | | 0.00 |
| 972 | 12/02/02 | ORDER OF INSOLVENCY WITHIN 30 DAYS | | 0.00 |
| 973 | 12/02/02 | FIRST DISTRICT COURT OF APPEAL DIRECTS APPELLANT TO FILE | | 0.00 |
| 974 | 12/02/02 | AMENDED NOTICE OF APPEAL WITH DATE OF RENDITION OF ORDER TO | | 0.00 |
| 975 | 12/02/02 | BE REVIEWED WITHIN 10 DAYS | | 0.00 |
| 976 | 12/04/02 | NOTICE OF HEARING ON  122002  AT / 9:00 AM / LOTT | | 0.00 |
| 977 | 12/04/02 | ORDER FINDING DEFENDANT INDIGENT AND APPOINTING PUBLIC | | 0.00 |
| 978 | 12/04/02 | DEFENDER OF THE EIGHTH JUDICIAL  CIRCUIT FOR HANDLING | | 0.00 |
| 979 | 12/04/02 | OF APPEAL // LOTT | | 0.00 |

CRTR5925                                         Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr     Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------------|-------------------------------|-------------|
| 980 | 12/18/02 | AMENDED NOTICE OF RESTITUTION/COSTS HEARING - JANUARY | | 0.00 |
| 981 | 12/18/02 | 8, 2003 AT 9:00AM | | 0.00 |
| 982 | 12/19/02 | THIRD ADDENDUM TO MOTION FOR JUDGEMENT FOR COSTS | | 0.00 |
| 983 | 12/26/02 | FIRST DISTRICT COURT OF APPEAL ORDERS APPELLANT TO SHOW | | 0.00 |
| 984 | 12/26/02 | CAUSE WITHIN 10 DAYS WHY APPEAL SHOULD NOT BE DISMISSED FOR | | 0.00 |
| 985 | 12/26/02 | FAILING TO COMPLY WITH COURT'S 11-27-02 ORDER REQUIRING | | 0.00 |
| 986 | 12/26/02 | AMENDED NOTICE OF APPEAL WHICH STATE'S DATE OF RENDITION OF | | 0.00 |
| 987 | 12/26/02 | ORDER TO BE REVIEWED | | 0.00 |
| 988 | 12/30/02 | AMENDED NOTICE OF APPEAL/FILED BY JOHN KEARNS, ASSISTANT | | 0.00 |
| 989 | 12/30/02 | PUBLIC DEFENDER | | 0.00 |
| 990 | 01/06/03 | NOTICE OF FILING RECORD OF EXPENSES DUE AS RESTITUTION | | 0.00 |
| 991 | 01/07/03 | NOTICE TO ADVERSE PARTY OF REQUEST TO TAKE JUDICIAL | | 0.00 |
| 992 | 01/07/03 | NOTICE | | 0.00 |
| 993 | 01/08/03 | COURT MINUTES - MOTION FOR JUDGEMENT OF COSTS AND | | 0.00 |
| 994 | 01/08/03 | RESTITUTION HEARING ON CASE NUMBER 01-2000CF2753A - | | 0.00 |
| 995 | 01/08/03 | RULING:  GRANTED COSTS IN THE TOTAL AMOUNT OF | | 0.00 |
| 996 | 01/08/03 | $56,459.74 / COSTS ARE REDUCED TO CIVIL JUDGEMENT | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr      Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|---|---|---|
| 997 | 01/08/03 | RESTITUTION ORDERED IN THE TOTAL AMOUNT<br>$17,515.46 | | 0.00 |
| 998 | 01/08/03 | RESTITUTION IS REDUCED TO CIVIL JUDGEMENT | | 0.00 |
| 999 | 01/08/03 | SUMMARY OF RESTITUTION | | 0.00 |
| 1000 | 01/08/03 | SUMMARY OF COSTS | | 0.00 |
| 1001 | 01/08/03 | DEF MUST PAY RESTITUTION OF  17515.46 AS<br>TO CNT: : Seq #: 001 | | 0.00 |
| 1002 | 01/08/03 | CIVIL RESTITUTION LIEN ORDER IN THE AMOUNT<br>OF $ 4372.96<br>2584-1153- | | 0.00 |
| 1003 | 01/08/03 | PAYABLE TO   JOHN QUIRELLO  // LOTT | | 0.00 |
| 1004 | 01/08/03 | CIVIL RESTITUTION LIEN ORDER IN THE AMOUNT<br>OF $ 432.00<br>2584-1154- | | 0.00 |
| 1005 | 01/08/03 | PAYABLE TO   ALACHUA CO FIRE AND RESCUE  //<br>LOTT | | 0.00 |
| 1006 | 01/08/03 | CIVIL RESTITUTION LIEN ORDER IN THE AMOUNT<br>OF $ 4511.00<br>2584-1155- | | 0.00 |
| 1007 | 01/08/03 | PAYABLE TO   UNIVERSITY PHYSICIANS  // LOTT | | 0.00 |
| 1008 | 01/08/03 | CIVIL RESTITUTION LIEN ORDER IN THE AMOUNT<br>OF $ 8199.50<br>2584-1156- | | 0.00 |
| 1009 | 01/08/03 | PAYABLE TO   SHANDS HOSPITAL AND CLINIC  //<br>LOTT | | 0.00 |
| 1010 | 01/08/03 | ORDER AWARDING COSTS OF INVESTIGATION AND<br>PROSECUTION | | 0.00 |
| 1011 | 01/08/03 | TO GAINESVILLE POLICE DEPARTMENT IN THE<br>AMOUNT OF | | 0.00 |
| 1012 | 01/08/03 | $7224.60 // LOTT | | 0.00 |
| 1013 | 01/08/03 | ORDER AWARDING COSTS OF INVESTIGATION AND<br>PROSECUTION | | 0.00 |
| 1014 | 01/08/03 | TO ALACHUA COUNTY COURTHOUSE IN THE AMOUNT<br>OF | | 0.00 |

CRTR5925                              Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|------|------|------|
| 1015 | 01/08/03 | $46,355.82//LOTT | | 0.00 |
| 1016 | 01/08/03 | ORDER AWARDING COSTS OF INVESTIGATION AND<br>PROSECUTION | | 0.00 |
| 1017 | 01/08/03 | TO EIGHTH DISTRICT MEDICAL EXAMINER IN THE<br>AMOUNT OF | | 0.00 |
| 1018 | 01/08/03 | $895.00//LOTT | | 0.00 |
| 1019 | 01/08/03 | ORDER AWARDING COSTS OF INVESTIGATION AND<br>PROSECUTION | | 0.00 |
| 1020 | 01/08/03 | TO FLORIDA DEPT OF LAW ENFORCEMENT IN THE<br>AMOUNT OF | | 0.00 |
| 1021 | 01/08/03 | $1984.32//LOTT | | 0.00 |
| 1022 | 01/08/03 | ORDER DENYING MOTION FOR SUPERSEDEAS BOND<br>// LOTT | | 0.00 |
| 1023 | 01/08/03 | COST PROSECUTIO<br>ORIGINAL AMOUNT OWED: $56459.74<br>BALANCE DUE AT CONVERSION: $56459.74 | 56,459.74 | 56,459.74 |
| 1024 | 01/10/03 | MAILED VOLUME I - II RECORD ON APPEAL AND<br>TWO ENVELOPES | | 0.00 |
| 1025 | 01/10/03 | COPIES OF EVIDENCE TO FIRST DISTRICT COURT<br>OF APPEAL / | | 0.00 |
| 1026 | 01/10/03 | RECORD ONLY TO ATTORNEY GENERAL & PUBLIC<br>DEFENDER | | 0.00 |
| 1027 | 01/13/03 | FAXED RESPONSE TO REQUEST FOR UPDATE FROM<br>DEPARTMENT OF | | 0.00 |
| 1028 | 01/13/03 | CHILDREN AND FAMILIES, ATTENTION: JOANN<br>STARK | | 0.00 |
| 1029 | 01/29/03 | ORDER ON DESIGNATION TO REPORTER//LOTT | | 0.00 |
| 1030 | 02/03/03 | ORDER ON DESIGNATION TO REPORTER//LOTT | | 0.00 |
| 1031 | 02/03/03 | MOTION FOR PAYMENT OF STATE WITNESS | | 0.00 |
| 1032 | 02/03/03 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT<br>CONCERNING | | 0.00 |

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr      Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|-----------------------------------------------------------------------|-------------------------------|-------------|
| 1033 | 02/03/03 | PAYMENT OF EXPERT WITNESS | | 0.00 |
| 1034 | 02/03/03 | ORDER FOR PAYMENT OF EXPERT WITNESS FEE IN THE | | 0.00 |
| 1035 | 02/03/03 | AMOUNT OF $61.00 TO SHERATON GAINESVILLE HOTEL//LOTT// | | 0.00 |
| 1036 | 02/03/03 | //PAID// | | 0.00 |
| 1037 | 02/03/03 | MOTION FOR PAYMENT OF EXPERT WITNESS FEE | | 0.00 |
| 1038 | 02/03/03 | ALACHUA COUNTY ATTORNEY'S ANNOUCEMENT CONCERNING | | 0.00 |
| 1039 | 02/03/03 | PAYMENT OF EXPERT WITNESS | | 0.00 |
| 1040 | 02/03/03 | ORDER FOR PAYMENT OF EXPERT WITNESS FEE IN THE | | 0.00 |
| 1041 | 02/03/03 | AMOUNT OF $2250.00 TO RONALD H. USCINSKI, MD//LOTT/PAID | | 0.00 |
| 1042 | 02/03/03 | MOTION FOR PAYMENT OF EXPERT WITNESS FEE | | 0.00 |
| 1043 | 02/03/03 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT CONCERNING | | 0.00 |
| 1044 | 02/03/03 | PAYMENT OF EXPERT WITNESS | | 0.00 |
| 1045 | 02/03/03 | ORDER FOR PAYMENT OF EXPERT WITNESS FEE IN THE AMOUNT | | 0.00 |
| 1046 | 02/03/03 | OF $479.50 TO WRIGHT TRAVEL // LOTT // PAID | | 0.00 |
| 1047 | 03/03/03 | FIRST DISTRICT COURT OF APPEAL ORDER GRANTS COURT REPORTER | | 0.00 |
| 1048 | 03/03/03 | MOTION FOR EXTENSION TO FILE TRANSCRIPTS BY 5-1-03 | | 0.00 |
| 1049 | 04/21/03 | TRANSCRIPT OF MOTION FOR SUPERSEDEAS BOND BEFORE JUDGE LOTT | | 0.00 |
| 1050 | 04/21/03 | COURT REPORTER LAURIE ANN CHAFFIN, ORIGINAL & 2 COPIES | | 0.00 |

CRTR5925                                Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

No.  Date of  Pleadings Filed, Orders and Decrees     Amount Owed/     Balance Due
              Journal Book-Page-Nbr      Ref Nbr      Amount Dismissed

1051 05/01/03 TRANSCRIPTS VOLUME I - XVII JURY TRIAL                        0.00
              HELD BEFORE JUDGE

1052 05/01/03 LOTT ON 9-10-02 - 9-23-02, COURT REPORTERS                   0.00
              STACEY BRYANT &

1053 05/01/03 CHERYL MCDONOUGH, ORIGINAL AND 2 COPIES                      0.00

1054 05/01/03 TRANSCRIPT OF PRETRIAL MOTION HELD 9-4-02                    0.00
              BEFORE JUDGE LOTT

1055 05/01/03 COURT REPORTER STACEY BRYANT, ORIGINAL AND                   0.00
              2 COPIES

1056 05/01/03 TRANSCRIPT OF PRETRIAL MOTION HELD 9-5-02                    0.00
              BEFORE JUDGE LOTT

1057 05/01/03 COURT REPORTER STACEY BRYANT, ORIGINAL AND                   0.00
              2 COPIES

1058 05/05/03 TRANSCRIPT OF JURY TRIAL HELD 9-23-02                        0.00
              THROUGH 9-25-02

1059 05/05/03 VOLUMES XVIII-XX HELD BEFORE JUDGE LOTT,                     0.00
              COURT REPORTER

1060 05/05/03 STACEY BRYANT, ORIGINAL AND 2 COPIES                         0.00

1061 05/06/03 TRANSCRIPT OF SENTENCING HEARING HELD                        0.00
              11-8-02 BEFORE JUDGE

1062 05/06/03 LOTT, COURT REPORTER STACEY BRYANT,                          0.00
              ORIGINAL & 2 COPIES

1063 05/07/03 MAILED SUPPLEMENTAL VOLUME III AND                           0.00
              TRANSCRIPTS VOLUME IV -

1064 05/07/03 XXVII TO FIRST DISTRICT COURT OF APPEAL,                     0.00
              ATTORNEY GENERAL

1065 05/07/03 AND PUBLIC DEFENDER                                          0.00

1066 05/15/03 DESIGNATION OF PUBLIC DEFENDER OF SECOND                     0.00
              JUDICIAL CIRCUIT

1067 05/15/03 FOR HANDLING OF APPEAL                                       0.00

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------------|------------------------------|-------------|
| 1068 | 06/17/03 | MOTION FOR PAYMENT OF EXPERT WITNESS FEE | | 0.00 |
| 1069 | 06/17/03 | ALACHUA COUNTY ATTORNEY'S ANNOUNCEMENT CONCERNING | | 0.00 |
| 1070 | 06/17/03 | PAYMENT OF EXPERT WITNESS | | 0.00 |
| 1071 | 06/17/03 | ORDER FOR PAYMENT OF EXPERT WITNESS FEE IN THE AMOUNT | | 0.00 |
| 1072 | 06/17/03 | OF $9,710.00//PAID//LOTT | | 0.00 |
| 1073 | 09/22/03 | FIRST DISTRICT COURT OF APPEAL ORDER GRANTS APPELLANT'S | | 0.00 |
| 1074 | 09/22/03 | MOTION TO SUPPLEMENT RECORD ON APPEAL WITH JURY SELECTION | | 0.00 |
| 1075 | 09/23/03 | SUPPLEMENTAL DIRECTIONS TO THE CLERK OF THE ABOVE-ENTITLED | | 0.00 |
| 1076 | 09/23/03 | COURT | | 0.00 |
| 1077 | 09/23/03 | MOTION FOR ORDER DIRECTING COURT REPORTER TO TRANSCRIBE | | 0.00 |
| 1078 | 09/23/03 | NOTES | | 0.00 |
| 1079 | 09/24/03 | ORDER DIRECTING COURT REPORTER TO TRANSCRIBE NOTES//LOTT | | 0.00 |
| 1080 | 09/26/03 | COPY AFFIDAVIT FROM COURT REPORTER'S OFFICE | | 0.00 |
| 1081 | 10/10/03 | SUPPLEMENTAL DIRECTIONS TO THE CLERK OF THE ABOVE-ENTITLED | | 0.00 |
| 1082 | 10/10/03 | COURT | | 0.00 |
| 1083 | 10/10/03 | MOTION FOR ORDER DIRECTING COURT REPORTER TO TRANSCRIBE | | 0.00 |
| 1084 | 10/10/03 | NOTES | | 0.00 |
| 1085 | 10/16/03 | ORDER DIRECTING COURT REPORTER TO TRANSCRIBE NOTES//TURNER | | 0.00 |

CRTR5925

Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr      Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|---|---|---|---|---|
| 1086 | 10/23/03 | AMENDED REQUEST FOR EXTENSION OF TIME TO PREPARE TRANSCRIPT | | 0.00 |
| 1087 | 10/23/03 | ON APPEAL [COPY] | | 0.00 |
| 1088 | 10/24/03 | REQUEST FOR DOCUMENTS 940.04/SENT | | 0.00 |
| 1089 | 11/03/03 | AFFIDAVIT FROM COURT REPORTER'S OFFICE | | 0.00 |
| 1090 | 11/05/03 | CORRECTED ORDER DIRECTING COURT REPORTER TO TRANSCRIBE | | 0.00 |
| 1091 | 11/05/03 | NOTES//TURNER | | 0.00 |
| 1092 | 11/10/03 | AMENDED MOTION FOR ORDER DIRECTING COURT REPORTER TO | | 0.00 |
| 1093 | 11/10/03 | TRANSCRIBE NOTES | | 0.00 |
| 1094 | 11/10/03 | LETTER TO COURT REPORTER BETTY SUE VINCENT FROM LEGAL | | 0.00 |
| 1095 | 11/10/03 | ASSISTANT TO ASSISTANT PUBLIC DEFENDER NADA CAREY WITH | | 0.00 |
| 1096 | 11/10/03 | ATTACHMENTS | | 0.00 |
| 1097 | 11/10/03 | FIRST DISTRICT COURT OF APPEAL ORDER GRANTS APPELLANT'S | | 0.00 |
| 1098 | 11/10/03 | MOTION TO SUPPLEMENT RECORD ON APPEAL WITHIN 30 DAYS | | 0.00 |
| 1099 | 11/12/03 | SUPPLEMENTAL DIRECTIONS TO THE CLERK OF THE ABOVE-ENTITLED | | 0.00 |
| 1100 | 11/12/03 | COURT | | 0.00 |
| 1101 | 11/18/03 | TRANSCRIPT OF JURY SELECTION HELD 9-9-02, COURT REPORTER | | 0.00 |
| 1102 | 11/18/03 | STACEY BRYANT, VOLUMES I & II, ORIGINAL + 2 COPIES | | 0.00 |
| 1103 | 11/19/03 | MAILED SUPPLEMENTAL RECORD ON APPEAL VOLUME XXVIII AND | | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees | Amount Owed/ | Balance Due |
|-----|---------|-------------------------------------|--------------|-------------|
| | | Journal Book-Page-Nbr    Ref Nbr | Amount Dismissed | |

| | | | |
|---|---|---|---|
| 1104 | 11/19/03 | TRANSCRIPTS VOLUMES XXIX-XXX TO FIRST DISTRICT COURT OF | 0.00 |
| 1105 | 11/19/03 | APPEAL, ATTORNEY GENERAL AND ASSISTANT PUBLIC DEFENDER | 0.00 |
| 1106 | 04/07/04 | MEMO FROM ATTORNEY GENERAL TO CLERK RE: CROSS-APPEAL | 0.00 |
| 1107 | 04/07/04 | NOTICE OF CROSS-APPEAL FILED BY ATTORNEY GENERAL | 0.00 |
| 1108 | 04/08/04 | LETTER TO FIRST DISTRICT COURT OF APPEAL WITH CERTIFIED | 0.00 |
| 1109 | 04/08/04 | COPY OF NOTICE OF CROSS-APPEAL, COPY OF LETTER TO | 0.00 |
| 1110 | 04/08/04 | ATTORNEY GENERAL AND PUBLIC DEFENDER | 0.00 |
| 1111 | 04/15/04 | AMENDED NOTICE OF CROSS-APPEAL FILED BY ATTORNEY GENERAL | 0.00 |
| 1112 | 04/15/04 | MAILED CERTIFIED COPY OF AMENDED NOTICE OF CROSS-APPEAL AND | 0.00 |
| 1113 | 04/15/04 | ATTACHMENTS TO FIRST DISTRICT COURT OF APPEAL/LETTER ONLY | 0.00 |
| 1114 | 04/15/04 | TO ATTORNEY GENERAL AND ASSISTANT PUBLIC DEFENDER CAREY | 0.00 |
| 1115 | 04/16/04 | MAILED VOLUME XXXI SUPPLEMENTAL RECORD ON APPEAL TO FIRST | 0.00 |
| 1116 | 04/16/04 | DISTRICT COURT OF APPEAL, ATTORNEY GENERAL AND ASSISTANT | 0.00 |
| 1117 | 04/16/04 | PUBLIC DEFENDER NADA CAREY | 0.00 |
| 1118 | 06/21/04 | REQUEST FOR EXHIBITS/EVIDENCE FROM DEFENDANT'S MOTHER | 0.00 |
| 1119 | 07/02/04 | CLERK'S RESPONSE TO REQUEST FOR EXHIBITS/EVIDENCE | 0.00 |
| 1120 | 07/19/04 | REQUEST FOR CRIMINAL DOCUMENTS | 0.00 |

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr     Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|---------|---------|---------|
| 1121 | 07/21/04 | RESPONSE TO REQUEST FOR DOCUMENTS | | 0.00 |
| 1122 | 07/28/04 | LETTER FROM DEFENDANT REQUESTING COPIES OF<br>EVIDENCE | | 0.00 |
| 1123 | 08/02/04 | LETTER TO JUDGE LOTT FROM DEFENDANT | | 0.00 |
| 1124 | 08/02/04 | LETTER TO  DEFENDANT FROM JUDGE TURNER | | 0.00 |
| 1125 | 08/26/04 | COPIES OF REQUESED EVIDENCE SENT | | 0.00 |
| 1126 | 11/23/04 | MANDATE AND OPINION AFFIRMED | | 0.00 |
| 1127 | 11/23/04 | MANDATE FILED 11232004 | | 0.00 |
| 1128 | 12/22/04 | RETURNED FROM FIRST DISTRICT COURT OF<br>APPEAL RECORD ON | | 0.00 |
| 1129 | 12/22/04 | APPEAL VOLUME I-III, TRANSCRIPT IV-XXVII,<br>SUPPLEMENTAL | | 0.00 |
| 1130 | 12/22/04 | XXVIII, TRANSCRIPT XXIX-XXX, SUPPLEMENTAL<br>XXXI AND COPY OF | | 0.00 |
| 1131 | 12/22/04 | EVIDENCE | | 0.00 |
| 1132 | 01/07/05 | REPORTED AS CONVICTED FELON TO SUPERVISOR<br>OF ELECTIONS | | 0.00 |
| 1133 | 08/10/05 | MOTION TO VACATE SENTENCE AND CONVICTION<br>PURSUANT TO | | 0.00 |
| 1134 | 08/10/05 | -FLA.R.CR.P. 3.850 AND MEMORANDUM OF LAW | | 0.00 |
| 1135 | 08/11/05 | CASE REOPENED 08102005 POST CONV RELIEF<br>MOTION | | 0.00 |
| 1136 | 08/17/05 | SA ASSIGNED:  BROCKWAY, PAMELA K | | 0.00 |
| 1137 | 09/30/05 | ORDER DENYING MOTION FOR POST-CONVICTION<br>RELIEF// | | 0.00 |
| 1138 | 09/30/05 | //JUDGE SIEG | | 0.00 |
| 1139 | 10/03/05 | CERTIFICATE OF SERVICE - PCR ORDER TO<br>DEFENDANT | | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A   HERLIHY, BRIAN PATRICK

No.   Date of  Pleadings Filed, Orders and Decrees     Amount Owed/    Balance Due
               Journal Book-Page-Nbr     Ref Nbr       Amount Dismissed

1140 10/03/05 REOPENED CASE CLOSED 09302005                                0.00

1141 10/27/05 APPEAL FILED 10272005                                        0.00

1142 10/27/05 NOTICE OF APPEAL OF ORDER DENYING 3.850                      0.00
              MOTION

1143 10/27/05 DIRECTIONS TO THE CLERK                                      0.00

1144 10/27/05 STATEMENT OF JUDICIAL ACTS TO BE REVIEWED                    0.00

1145 10/27/05 PAYMENT OF $50 FOR APPEAL FILING FEE                         0.00

1146 10/28/05 NOTICE OF APPEAL, AMENDED                                    0.00

1147 10/28/05 STATEMENT OF JUDICIAL ACTS TO BE REVIEWED,                   0.00
              AMENDED

1148 10/28/05 DIRECTIONS TO THE CLERK, AMENDED                            0.00

1149 10/28/05 LETTER FORWARDING RECORD ON APPEAL, VOLUME                   0.00
              I 3.850 RECORD,

1150 10/28/05 CERTIFIED COPY OF NOTICE OF APPEAL AND                       0.00
              AMENDED NOTICE OF

1151 10/28/05 APPEAL AND COPY OF ORDER TO FIRST DISTRICT                   0.00
              COURT OF APPEAL,

1152 10/28/05 RECORD ONLY TO ATTORNEY GENERAL AND                         0.00
              ATTORNEY MENGERS

1153 11/03/05 LETTER FROM FIRST DISTRICT COURT OF APPEAL                   0.00
              ASSIGNS FIRST

1154 11/03/05 APPEAL #1D05-5203                                            0.00

1155 11/10/05 REFUND CHECK #50076513 IN THE AMOUNT OF                      0.00
              $50.00 PAYABLE TO

1156 11/15/05 ATTORNEY MENGERS FOR REIMBURSMENT OF                        0.00
              APPEAL FILING FEE

1157 04/26/06 ORDER FROM FIRST DISTRICT COURT OF APPEAL                    0.00
              DENIES APPELLANT

1158 04/26/06 REQUEST FOR ORAL ARGUMENT                                    0.00

CRTR5925                                  Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------------------------------------------------------------------|-------------------------------|-------------|
| 1159 | 05/12/06 MANDATE FILED 05122006 | | 0.00 |
| 1160 | 05/12/06 MANDATE FROM FIRST DISTRICT COURT OF APPEALS AND OPINION | | 0.00 |
| 1161 | 05/12/06 AFFIRMED | | 0.00 |
| 1162 | 06/15/06 APPEAL CLERK NOTES: ITEMS RETURNED FROM DCA VOLUME I 3.850 | | 0.00 |
| 1163 | 06/15/06 RECORD ON APPEAL | | 0.00 |
| 1164 | 08/25/06 CASE REOPENED 08252006 POST CONV RELIEF MOTION | | 0.00 |
| 1165 | 08/25/06 MOTION FOR POST CONVICTION RELIEF - PRO SE | | 0.00 |
| 1166 | 08/25/06 APPENDIX IN SUPPORT OF RULE 3.850 POST CONVICTION RELIE | | 0.00 |
| 1167 | 08/25/06 APPENDIX IN SUPPORT OF RULE 3.850 POST CONVICTION RELIE | | 0.00 |
| 1168 | 08/25/06 MOTION FOR POST CONVICTION RELIEF - PRO SE | | 0.00 |
| 1169 | 08/31/06 COLLATERAL RELIEF DETERMINATION MADE FOR MOTION FOR | | 0.00 |
| 1170 | 08/31/06 RELIEF FROM JUDGMENT-NEW TRIAL (3.850) | | 0.00 |
| 1171 | 12/31/06 CASE JUDGE REASSIGNED | 0.00 | 0.00 |
| 1172 | 02/06/07 CASE LAW IN FILE | 0.00 | 0.00 |
| 1173 | 02/08/07 ORDER DENYING, IN PART, MOTION FOR POST CONVICTION RELIEF, SCHEDULING AN EVIDENTIARY HEARING, IN PART, AND APPOINTING OFFICE OF THE PUBLIC DEFENDER 2/6/07 /MAL | 0.00 | 0.00 |
| 1174 | 02/13/07 MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.8540 MOTION FOR POST CONVICTION RELIEF FILED BY STATE OF FLORIDA | 0.00 | 0.00 |
| 1175 | 02/19/07 ORDER DIRECTING STATE TO FILE A WRITTEN RESPONSE 2/13/07 /MAL | 0.00 | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A  HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr     Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|---|---|---|---|---|
| 1176 | 04/11/07 | NOTICE OF APPEARANCE<br>FILED BY MARY ELIZABETH FITZGIBBONS, ESQ. | 0.00 | 0.00 |
| 1177 | 04/13/07 | LETTER FROM CLERK TO ATTORNEY FITZGIBBONS | 0.00 | 0.00 |
| 1178 | 04/25/07 | DEFENDANT'S MOTION FOR SUBSTITUTION OF<br>COUNSEL | 0.00 | 0.00 |
| 1179 | 05/08/07 | ORDER GRANTING SUBSTITUTION OF COUNSEL<br>(MARY FITZGIBBONS)//ROSIER | 0.00 | 0.00 |
| 1180 | 05/17/07 | DEFENDANT'S RESPONSE TO MOTION TO STRIKE,<br>OR IN THE ALTERNATIVE, STATE'S RESPONSE TO<br>DEFENDANT'S RULE 3.850 MOTION FOR POST<br>CONVICTION RELIEF | 0.00 | 0.00 |
| 1181 | 05/21/07 | (COPY) DEFENDANT'S RESPONSE TO MOTION TO<br>STRIKE, OR IN THE ALTERNATIVE, STATE'S<br>RESPONSE TO DEFENDANT'S RULE 3.850 MOTION<br>FOR POST CONVICTION RELIEF | 0.00 | 0.00 |
| 1182 | 06/20/07 | STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR<br>IN THE ALTERNATIVE, STATE'S RESPONSE TO<br>DEFENDANT'S RULE 3.850 MOTION FOR POST<br>CONVICTION RELIEF, RESPONDING TO<br>DEFENDANT'S RESPONSE OF MAY 16, 2007 | 0.00 | 0.00 |
| 1183 | 06/21/07 | NOTICE OF APPEARANCE OF CO-COUNSEL: JOSHUA<br>SILVERMAN | 0.00 | 0.00 |
| 1184 | 08/20/07 | ORDER SCHEDULING CASE MANAGEMENT<br>CONFERENCE / 08302007 AT 1:30 PM // LOTT | 0.00 | 0.00 |
| 1185 | 08/20/07 | MEMO TO JUDICIAL ASST  FROM  CLERK<br>(INCLUDES RESPONSE FROM JUDICIAL ASST.) | 0.00 | 0.00 |
| 1186 | 08/30/07 | HEARING NOTES-RULING: NOV 1 AND 2 FOR POST<br>CONVICTION HEARING<br>09282007 CASE MANAGMENT DEFENSE COUNSEL TO<br>DO ORDER TO TRANSPORT | 0.00 | 0.00 |
| 1187 | 09/07/07 | ORDER SCHEDULING HEARINGS ON PENDING<br>POST-CONVICTION RELIEF MATTERS//JUDGE LOTT | 0.00 | 0.00 |
| 1188 | 09/14/07 | DEFENDANT'S RESPONSE TO STATE'S SUPPLEMENT<br>TO MOTION TO STRIKE, OR IN THE<br>ALTERNATIVE, STATE'S RESPONSE TO<br>DEFENDANT'S RULE 3.850 MOTION FOR POST<br>CONVICTION RELIEF, RESPONDING TO<br>DEFENDANT'S RESPONSE OF MAY 16, 2007 | 0.00 | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees<br>Journal Book-Page-Nbr    Ref Nbr | Amount Owed/<br>Amount Dismissed | Balance Due |
|-----|---------|---|---|---|
| 1189 | 09/14/07 | NOTICE OF FILING - AFFIDAVIT OF DR. VIERA<br>SCHEIBNER | 0.00 | 0.00 |
| 1190 | 09/24/07 | NOTICE OF FILING - OATH PAGE | 0.00 | 0.00 |
| 1191 | 09/26/07 | NOTICE OF FILING - ATTACHED AFFIDAVITS | 0.00 | 0.00 |
| 1192 | 09/28/07 | HEARING NOTES | 0.00 | 0.00 |
| 1193 | 09/28/07 | DEFENDANT'S MOTION FOR LEAVE TO AMEND<br>MOTION FOR POSTCONVICTION RELIEF WITH<br>NOTICE OF FILING AND SUPPLEMENTAL<br>AFFIDAVIT OF LOIS N. HERLIHY ATTACHED | 0.00 | 0.00 |
| 1194 | 10/29/07 | FAXEDLETTER FROM J SILVERMAN TO M BECKER | 0.00 | 0.00 |
| 1195 | 10/29/07 | CASE CITATION | 0.00 | 0.00 |
| 1196 | 10/29/07 | COPY OF NOTICE OF FILING | 0.00 | 0.00 |
| 1197 | 10/29/07 | ORDER GRANTING IN PART, THE STATE'S MOTION<br>TO STRIKE AND DISMISSING GROUND ONE OF<br>DEFENDANT'S MOTION FOR POST CONVICTION<br>RELIEF<br>/MAL | 0.00 | 0.00 |
| 1198 | 10/29/07 | CERTIFICATE OF SERVICE OF POST CONVICTION<br>RELIEF ORDER | 0.00 | 0.00 |
| 1199 | 10/30/07 | XXXX | 0.00 | 0.00 |
| 1200 | 11/28/07 | OBTS POST-COURT ENTRY<br>Count: 1<br>POST SENTENCE PHASE<br>Date Reopened: 11/28/2007<br>Reason Reopened: Motion for Post<br>Conviction Relief | 0.00 | 0.00 |
| 1201 | 11/28/07 | MOTION FOR POST CONVICTION RELIEF | 0.00 | 0.00 |
| 1202 | 11/28/07 | NOTICE OF FILING SUPPORTING DOCUMENTS OF<br>MOTION FOR POST CONVICTION RELIEF | 0.00 | 0.00 |
| 1203 | 11/28/07 | MOTION FOR LEAVE TO SUPPLEMENT DEFENDANT'S<br>MOTION FOR POST-CONVICTION RELIEF | 0.00 | 0.00 |
| 1204 | 01/29/08 | HEARING NOTES | 0.00 | 0.00 |

CRTR5925                                    Summary

2000 CF 002753 A    HERLIHY, BRIAN PATRICK

| No. | Date of | Pleadings Filed, Orders and Decrees Journal Book-Page-Nbr    Ref Nbr | Amount Owed/ Amount Dismissed | Balance Due |
|-----|---------|------------------------------------------------------------------------|-------------------------------|-------------|
| 1205 | 02/05/08 | ORDER SCHEDULING STATUS CONFERENCE (02142008)// LOTT | 0.00 | 0.00 |
| 1206 | 02/05/08 | ORDER GRANTING MOTION FOR LEAVE TO SUPPLEMENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF //LOTT | 0.00 | 0.00 |
| 1207 | 02/14/08 | HEARING NOTES | 0.00 | 0.00 |
| 1208 | 03/03/08 | NOTICE OF FILING | 0.00 | 0.00 |
| 1209 | 03/03/08 | AFFIDAVIT OF JENNIFER LEIGH SALTER | 0.00 | 0.00 |
| 1210 | 03/04/08 | NOTICE OF FILING | 0.00 | 0.00 |
| 1211 | 03/04/08 | AFFIDAVIT OF LOIS HERLIHY | 0.00 | 0.00 |
| 1212 | 03/04/08 | FINAL ORDER DENYING MOTION FOR POST CONVICTION RELIEF //LOTT | 0.00 | 0.00 |
| 1213 | 03/05/08 | CERTIFICATE OF SERVICE OF POST CONVICTION RELIEF ORDER | 0.00 | 0.00 |
| 1214 | 03/05/08 | XXXX | 0.00 | 0.00 |
| 1215 | 04/02/08 | NOTICE OF APPEAL | 0.00 | 0.00 |
| 1216 | 04/02/08 | ENVELOPE FROM INCOMING MAIL | 0.00 | 0.00 |
| 1217 | 04/02/08 | LETTER FORWARDING NOTICE OF APPEAL | 0.00 | 0.00 |
| 1218 | 04/07/08 | LETTER FROM FIRST DCA TO CLERK ASSIGNING APPEAL NUMBER 1D08-1588 | 0.00 | 0.00 |
| 1219 | 04/24/08 | LETTER FORWARDING RECORD ON APPEAL, VOLUME I 3.850, TO FIRST DCA, AG AND ATTORNEY FIZGIBBONS | 0.00 | 0.00 |
| 1220 | 06/11/08 | ORDER FROM FIRST DCA GRANTS APPELLANT'S MOTION TO SUPPLEMENT RECORD ON APPEAL | 0.00 | 0.00 |

```
                        Totals By:  COURTS COSTS        74,289.20        74,289.20
                                    INFORMATION              0.00             0.00
                        *** End of Report ***
```

**DISTRICT COURT OF APPEAL, FIRST DISTRICT**
**301 S. Martin Luther King, Jr. Blvd.**
**Tallahassee, Florida 32399-1850**
**Telephone No. (850) 488-6151**

June 9, 2008

**CASE NO.: 1D08-1588**

L.T. No. : 01-2000-CF-002753-A

Brian Patrick Herlihy                    v.        State Of Florida

---

Appellant / Petitioner(s),                          Appellee / Respondent(s).

---

## BY ORDER OF THE COURT:

Appellant's motion filed June 5, 2008, seeking to supplement the record on appeal with the materials filed below on the dates set forth in paragraph 4 of the motion, is granted.   Counsel for movant shall ensure preparation and transmittal of the supplemental record within 30 days of this date and the time for service of the initial brief is extended to 30 days thereafter.

A copy of the motion to supplement the record on appeal is attached to the copy of this order provided to the  clerk of the lower tribunal.

Appellant's motion for extension of time, filed June 5, 2008, is denied as moot in light of the foregoing.

I HEREBY CERTIFY that the foregoing is (a true copy of) the original court order.

Served:

Mary E. Fitzgibbons        Hon. Bill  Mc Collum, A.G.        Hon. J.K. "Buddy" Irby, Clerk
am

JON S. WHEELER, CLERK

FILED

2008 JUN -5 PM 12: 45

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIRST DISTRICT   CLERK.DISTRICT COURT OF APPEAL
FIRST DISTRICT OF APPEAL

STATE OF FLORIDA,
Plaintiff/Appellee,

DCA CASE NO.: 1D08-1588

L.T. NO. 02-2753-CF-A

vs.

BRIAN P. HERLIHY,
Defendant/Appellant.

**ORIGINAL**

_____/

### UNOPPOSED MOTION TO SUPPLEMENT THE RECORD

COMES NOW, Appellant, BRIAN P. HERLIHY, by and through the undersigned

attorney, and pursuant to Florida Rule of Appellate Procedure 9.200(f), moves the Court

to direct the clerk of the lower tribunal to supplement the record on appeal in this case

and in support states as follows:

1.　　　Appellant Herlihy is appealing the summary denial of his post-

conviction motion filed pursuant to Rule 3.850, Fla.R.Crim.P.

2.　　　In reviewing the record on appeal and in preparing the Initial Brief,

undersigned counsel discovered deficiencies in the record on

appeal. For instance, the record does not contain all of the

documents required to be included in a record on appeal. *See e.g.,*

Fla.R.App.P. 9.141(b)(2)(A).

3.　　　The record on appeal in the instant case contains Appellant

Herlihy's resubmitted Rule 3.850 Motion, Notice of Filing in

connection therewith, Supplemental Affidavit of Dr. Scheibner,

and Motion for Leave to Supplement Defendant's Motion for Post-

Conviction Relief (all filed on November 28, 2007), the notes re:

Hearing for Division I (filed January 29, 2008), the trial court's Order Granting Motion for Leave to Supplement Defendant's Motion for Post-Conviction Relief (filed February 5, 2008), the notes re: Hearing for Division I (filed February 14, 2008), Appellant Herlihy's Notice of Filing and Affidavit of Jennifer Leigh Salter (filed March 3, 2008), Appellant Herlihy's Notice of Filing and Affidavit of Lois Herlihy (filed March 4, 2008), the trial court's Final Order Denying Motion for Post-Conviction Relief (filed March 4, 2008), and Appellant Herlihy's Notice of Appeal (filed April 2, 2008).

4.     However, a review of the lower tribunal's docket (included at the beginning of the record on appeal) reveals that additional pleadings/orders/other documents related to the instant post-conviction proceeding were filed on August 10, 2005, September 30, 2005, August 25, 2006, August 31, 2006, December 31, 2006, February 6, 2007, February 8, 2007, February 13, 2007, February 19, 2007, May 17, 2007, May 21, 2007, June 20, 2007, August 20, 2007, August 30, 2007, September 7, 2007, September 14, 2007, September 24, 2007, September 26, 2007, September 28, 2007, and October 29, 2007.

5.     Accordingly, Appellant Herlihy respectfully requests that the Court direct the clerk of the lower tribunal to prepare a supplemental record on appeal containing the post-conviction pleadings/orders/

2

000055

other documents filed on August 10, 2005, September 30, 2005, August 25, 2006, August 31, 2006, December 31, 2006, February 6, 2007, February 8, 2007, February 13, 2007, February 19, 2007, May 17, 2007, May 21, 2007, June 20, 2007, August 20, 2007, August 30, 2007, September 7, 2007, September 14, 2007, September 24, 2007, September 26, 2007, September 28, 2007, and October 29, 2007. These pleadings/orders/other documents are necessary for full appellate review. *See* Hampton v. State, 591 So.2d 945 (Fla. 4th DCA 1991).

6.      Counsel for Appellant Herlihy hereby certifies that she previously contacted the Office of the Attorney General, and was advised that per opposing counsel, Assistant Attorney General Tricia Meggs Pate, Esq., Tallahassee Bureau Chief, Criminal Appeals, this Motion is unopposed.

WHEREFORE, Appellant Herlihy respectfully requests that the Court direct the clerk of the lower tribunal to prepare a supplemental record on appeal containing the items set forth above.

I HEREBY CERTIFY that the undersigned attorney has contacted opposing counsel as required for the purpose of conferring with same re: this Motion.

3

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. mail, postage pre-paid to the Office of the Attorney General, Criminal Appeals, The Capitol, PL-01, Tallahassee FL 32399-1050, on this _4th_ day of June, 2008.

By: _____

Mary Elizabeth Fitzgibbons
Fitzgibbons Law Firm, P.A.
917 Verona Street
Kissimmee FL 34741
Phone: 407 343-1777
Fax:    407 343-1677
Fla. Bar No.: 0056480
Attorney for Appellant

4

2000-CF-2753-A

IN THE CIRCUIT COURT OF
THE EIGHTH JUDICIAL
CIRCUIT IN AND FOR ALACHUA
COUNTY, FLORIDA

STATE OF FLORIDA,                    CASE NO.  02-2753-CF-A

vs.

BRIAN HERLIHY,
    Defendant.
_____/

## MOTION TO VACATE SENTENCE AND CONVICTION
## PURSUANT TO FLA.R.CR.P. 3.850 AND MEMORANDUM OF LAW

COMES NOW the Defendant, Brian Herlihy, by and through his undersigned attorney, pursuant to Fla.R.Cr.P. 3.850, and moves to vacate the Judgment and Sentence for the offense of Manslaughter entered by the Circuit Court of the Eighth Judicial Circuit, in and for Alachua County, Florida, on the grounds that the Defendant was denied effective assistance of counsel as guaranteed by the Sixth Amendment of the Constitution of the United States and Article I, §§9 and 16 of the Constitution of the State of Florida, and in support thereof avers as follows:

1. Defendant was charged with the offense of first degree murder.

2. The essence of the accusation was that a child left in his care was killed by shaking, consistent with the so-called "Shaken Baby Syndrome."

3. The Defendant was found guilty of manslaughter on September 25, 2002.

4. The Defendant was sentenced to fifteen years in prison for said offense on November 8, 2002.

5. The Defendant filed a Notice of Appeal on December 30, 2002.

6. The Judgment was affirmed by the First Circuit Court of Appeal on November 3, 2004.

7. There has been no previous Motion for Post-Conviction Relief.

8. In violation of the Sixth Amendment of the Constitution of the United

1

States and Article I, §§ 9 and 16 of the Constitution of the State of Florida, the Defendant was deprived of effective assistance of counsel, as hereafter averred:

    A.    Counsel was ineffective for failing to request a Frye Hearing prior to the admission of opinion evidence on the controversial theory of the so-called "Shaken Baby Syndrome."

    B.    Significant disputed scientific evidence was presented at trial explaining the theory of the "Shaken Baby Syndrome."

9.    The introduction of expert proof concerning a new or novel scientific principle or process requires that the trial judge must decide whether the expert's testimony is based on a scientific principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs," Matos v. State, 30 Fla. L. Weekly D859a (Fla.App. 4 Dist. 2005) *quoting* Frye v. United States, 293 F. 1013 at 1014 (D.C. Cir. 1923).

10.    Florida courts require both the basic underlying principals and the methodology of scientific evidence be "sufficiently tested and accepted by the relevant scientific community." Brim v. State, 695 So2d. 268, 272 (Fla. 1997) *citing* Frye.

11.    The issue of general acceptance is an issue to be addressed *de novo. See* Bevil v. State, 875 So.2d 1265 (Fla.App. 1 Dist. 2004), holding that on appeal, general acceptance is considered as of the time of the appeal. In determining the issue of general acceptance, the court "may examine expert testimony, scientific and legal writings, and judicial opinions." Id. at 1268.

12.    Any doubt as to admissibility of evidence under Frye should be resolved

2

in a manner that minimizes the chance of a wrongful conviction." Id. at 1268.

13.   "Shaken Baby Syndrome" is not a theory based on a scientific principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs," nor is it "sufficiently tested and accepted by the relevant scientific community."

14.   Testimony elicited at trial established that the "Shaken Baby Syndrome" theory is not generally accepted among the relevant scientific community. Specifically:

A.   State Witness Dr. Anne Dickinson recognized the existence of the Duhaime scientific study which concluded that the amount of force that could be created by shaking did not come anywhere near the force that would be needed to create damage to the brain. Transcript, Page 722, lines 10-14.

B.   State Witness Dr. William Hamilton recognized that "Some people do not believe it (shaken baby syndrome) exists.  Some people believe that what we call shaken baby syndrome is really due to blunt impact injury to the head."[1]  Transcript, Page 1021, line 13-15.   Dr. Hamilton also acknowledged the Duhaime study. Transcript, Page 1022-1023, lines 24, 25, and 1.

C.   State Witness Dr. Bernard Maria acknowledged the findings of the Duhaime study, which found that it is impossible for a human being to shake a child hard enough to cause the kind of force that's necessary to cause the brain injury in this case.  Transcript,

_____

[1]There was no indication of any trauma to the decedent.

3

Page 1176, line 3-12.  Dr. Maria also testified that there was no evidence of any external blow to the decedent.  Transcript, Page 1176, line 18.

D.    Defense Witness Dr. Plunkett testified about the Duhaime study, Trancript PP. 1250-1252, and that the computer animation used by the state was a fraud, Transcript P. 1241, Line 9.  He further testified that the type of force necessary to cause brain injury would also cause neck trauma.[2]  Transcript P. 1247, Line 21-22.

E.    Dr. Ronald Uscinski testified about various scientific articles discrediting the premises of the "Shaken Baby Syndrome" theory, including the Omaya study of 1968, Transcript P. 1435, -1443, 1451, and the Duhaime/Thibault study of 1987, Transcript P. 1443-1444, .

15.   A review of the scientific literature shows that there is no general acceptance of the "Shaken Baby Syndrome" Theory.  Specifically:

A.    John Caffey, the originator of the "Shaken Baby Syndrome" theory in 1972 (then called "Shaken Whiplash Syndrome"), originally concluded that brain injury was associated with long bone fractures and/or bilateral symmetrical fractures of the arms and legs.[3]  He also associated retinal hemorrhages with the Syndrome, but acknowledged that retinal hemorrhaging could be caused by ordinary events such as coughing, vigorous burping, CPR, bouncing a child on one's knee, throwing a baby into the

---

[2]Absent here.

[3]Absent here.

4

air, crossing rough roads, and from flipping a toddler head over heels to his or her feet. Caffey, "On the Theory and Practice of Shaking Infants," 124 American Journal of Diseases in Children; pp. 161-169 (1972).

B.     In 1974, Dr. Caffey wrote that infantile whiplash shaking syndrome was "associated with traction lesions of the periosteums of the long bones."[4]     Caffey, J. "The Whiplash Shaken Infant Syndrome: Manual Shaking by the extremities with whiplash-induced intraocular bleedings, linked with residual permanent brain damage and mental retardation." 54 *Pediatrics*; pp.396-403 (1974), attached and incorporated as Exhibit A.  Dr. Caffey specifically conceded that current evidence was "manifestly incomplete and largely circumstantial," Id. at 403, but nevertheless proposed a nationwide educational campaign with the following proposed doggerel:

> Guard well your baby's precious head,
> Shake, jerk and slap it never.
> Lest you bruise his brain and twist his mind,
> Or whiplash him dead forever.     Id. at 403.[5]

C.     In 1987 Duhaime, Genarelli, Thibault, Bruce, Marguiles, and Wiser

_____

[4]Absent in this case.

[5]Counsel respectfully suggests that Dr. Caffey's poetry is better than his science, which is not saying much.

000062
0000005.

conducted an experiment by placing an accelerometer on a model of an infant and measuring the results of shaking versus impact. The peak acceleration for shaking was found to be between 10 and 12 G's. The study found that impact increased the force of shaking by up to 40 times. The experts concluded that shaking alone of an otherwise healthy infant could not cause the constellation of injuries generally associated with SBS. They determined that an impact was needed.   Duhaime, Genarelli, Thibault, Bruce, Marguiles, & Wiser. ""The Shaken Baby Syndrome."" J Neurosurg. 66: 409-415 (1987), attached and incorporated as Exhibit B.

D.    In the British Medical Journal, Dr. Patrick Lantz reported his review of evidence of Shaken Baby Syndrome as it relates to perimacular retinal folds in childhood abusive head trauma. Lantz, Patrick, 28 BMJ 754 (March 2004), attached and incorporated as Exhibit C.    He found that "the references cited to support statements about the specificity or causal mechanism of perimacular retinal folds and abusive head injury are all non-comparative observational reports, unsystematic review articles, and book chapters." Id. at 755 and found that "(s)tatements in the medical literature that perimacular retinal folds are diagnostic of shaken baby syndrome are not supported by scientific evidence." Id. at 756.

E.    In a letter to the editor in the same issue of the British Medical Journal, Dr. James LeFanu wrote that:

6

000063

"These three patterns of clinical events [minor trauma, birth injury, and respiratory arrest][6]–in the absence of other circumstantial evidence for non-accidental injury–offer a more credible explanation than shaken baby syndrome for the presence of subdural and retinal hemorrhages.   It should be noted that shaking has never been directly observed or proved to cause such injuries but is rather an inference based on (contested) theories of biomechanics."    328 BMJ (March 27, 2004), attached and incorporated as attached and incorporated as Exhibit D.

F.   Dr. Mark Donohue did a review of the studies on Shaken Baby Syndrome based on principles of evidence-based medicine and concluded that "(t)here was no evidence on the subject of SBS [Shaken Baby Syndrome] that exceeded QER III-2 by the end of 1998, which means that there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS." Donohue, Mark,  "Evidence-Based Medicine and Shaken Baby Syndrome,"   American Journal of Forensic Medicine and Pathology, Vol. 24, No. 3, p. 239-242, 241 (September 2003), attached and incorporated as  Exhibit E.   Dr. Donohue further concluded that:

"(b)efore 1999, there existed serious data gaps, flaws of logic, inconsistency of case definition, and a serious lack of tests capable of discriminating NAI [Non-Accidental Injury] cases from natural injuries. By 1999, there was an urgent need for properly controlled, prospective trials into SBS [Shaken Baby Syndrome], using a variety of controls. Without published and replicated studies of that type, the commonly held opinion that the finding of SDH

---

[6]All present in the instant case.

000064
0000007

[Subdural hematoma] and RH [retinal hemorrhage] in an infant was unsustainable, at least from the medical literature." Id. at 241.

G.  Dr. Susan Elner, in a study published in 1990, noted that "(t)he forensic literature and experimental models of head injury indicate that blunt head trauma, in addition to whiplash shaking, may be necessary to produce lesions of sufficient severity to cause death. Elner, Susan G., "Ocular and Associated Systemic Findings in Suspected Child Abuse," Arch. Opthalmol. Vol. 108 (August 1990), attached and incorporated as Exhibit F.

H.  Retinal Hemorrhages–a keystone of the State's argument that the Decedent in Mr. Herlihy's case died of shaking–are often associated with the following alternative causes:

    i.  Vaginal deliveries in up to 30-40% of all vaginal births. Kaur, B. & Taylor, D. (1990).   "Current Topic: Retinal Hemorrhages,"  Arch. Dis. Child 65: 1369-1372 (1990).

    ii.  Cardio respiratory resuscitation (CPR).  Goetting, M.G., Sowa B.   Retinal "Hemorrhage after Cardiopulmonary Resuscitation in Children:   An Etiologic Reevaluation," Pediatrics 85: 585-588 (1990).

    iii.  Accidents and Accidental Trauma.  Elner, S.G., "Occular and Associated Systemic Findings in Suspected Child Abuse.   A Necropsy Study,"  Arch Ophthal 108: 1094-1101,

I.  In 2003, Geddes, J.F. and H.L. Whitwell, in a study of 53 fatally

8

000065
0000008

injured children, found that:

i.    "In the so-called 'shaken baby syndrome' it has never been shown that the retinal bleeding is the result of direct trauma to retinal vessels; rather, it has been widely assumed to be so, despite the fact that an authoritative recent review of the biomechanics of paediatric head injury has described the hypothesis as 'biomechanically improbable' and suggests there is compelling evidence that rapidly rising intracranial pressure is responsible." Geddes, J.F. and H.L. Whitwell, "Inflicted head Injury in Infants," Forensic Science International 146 (2004) 83-88, 86.

ii.   A critical survey of the literature reveals that there have been no systematic formal neuropathological studies of infant head injury, accidental or non-accidental, merely a few series looking at specific aspects, that the evidence base for DAI [diffuse axonal injury[7]] being a common finding in infant head injury is poor. Id. at 83.

iii.  Subdural and retinal bleeding in these types of cases may well have a physiological aetiology, rather than being caused by trauma. Id at 83.

J.    An editorial in Pediatric Neurosurgery in 2003 noted that "injuries thought to be pathognomic of abuse are not so thought of in other parts of the world. Indeed, there is a perception that in the United

---

[7]Diffuse axonal injury is the essence of the type of injury which the so-called "Shaken Baby Syndrome" purports to explain.

000066
0000009

States the diagnosis of non-accidental injury is made too frequently." Pittman, Thomas, "Significance of a Subdural Hematoma in a Child with External Hydrocephalus," Pediatric Neurosurg 2003: 39: 57-58, attached and Incorporated as Exhibit G.

K.   There is no evidence that clearly establishes that retinal hemorrhages, be they intraretinal, subretinal, or subhyaloid, are indicative of nonaccidental trauma.   Evidence does exist, however, that retinal hemorrhages in all layers of the retina occur in experimental as well as clinical situations that are not related to child abuse. Tongue, Andrea, "The Ophthalmologist's Role in Diagnosing Child Abuse," Ophthalmology, Vol 98, No. 7 (July 1991).

L.   A histological review of dura matter taken from a post-mortem series of 50 paediatric  cases suggests that a combination of severe hypoxia, brain swelling and raised central venous pressure causes blood to leak from intracranial veins into the subdural space, and that the cause of the subdural bleeding in some cases of infant head injury is therefore not traumatic rupture of bridging veins, but a phenomenon of immaturity.   Further, hypoxia with brain swelling would also account for retinal hemorrhages, and so provide a unified hypotheses for the clinical and neuropathological findings in cases of infant head injury, without impact or considerable force being necessary.   Geddes, J.F., R.C. Tasker, A.K. Hackshaw, C.D. Nickols, G.G.W. Adams, H.L. Whitwell,

10

and I. Schelmberg, "Dural Haemorrhage in Non-Traumatic Infant Deaths:   Does It Explain the Bleeding in 'Shaken Baby Syndrome?' Neuropathology and Applied Neurobiology 29, 14-22 (2003).

M.   Statements in the medical literature that perimacular retinal folds are diagnostic of shaken baby syndrome are not supported by objective scientific evidence.   Lantz, P.E. "Perimacular Retinal Folds,"   BMJ Vol. 328, 754-760 (2004), attached and incorporated as Exhibit H.

N.   An editorial in the British Medical Journal noted that recent studies "make disturbing reading, because they reveal major shortcomings in the literature" and further stated that "We need to reconsider the diagnostic criteria, in not the existence, of shaken baby syndrome."   Geddes, J.F "The Evidence Base for Shaken Baby Syndrome,"   BMJ Vol 328, 270 (March 27, 2004), attached and incorporated as Exhibit I.

16.   Trial Counsel never requested a Frye Hearing to determine the admissibility of opinion testimony regarding the "Shaken Baby Syndrome."   Had trial counsel done so, the testimony likely would not have been admitted and the Defendant would likely have been acquitted.

17.   By failing to request a Frye hearing, counsel for the Defendant failed to provide effective assistance as required by the respective constitutional provisions of the Florida and United States Constitutions.

18.   Trial Counsel's performance was deficient.   By failing to require a Frye hearing, trial counsel allowed the jury to consider purported scientific

11

evidence not generally accepted by the relevant scientific community, resulting in conviction for manslaughter.   Trial counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.   Counsel's  errors were so serious as to deprive the defendant of a fair trial.

Wherefore, the Defendant respectfully moves this Honorable Court to vacate the Judgment and Sentences for the offense Manslaughter on the grounds that the Defendant was denied effective assistance of counsel as guaranteed by the Sixth Amendment of the Constitution of the United States and Article I, §§9 and 16 of the Constitution of the State of Florida.

I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this Motion  and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

Brian Herlihy
G06137
South Bay CF
POST OFFICE BOX 7171
600 US Highway 27
South Bay, Fl 33493

Sworn to and subscribed before me on this _3_ day of _August_, by Brian Herlihy, who produced identification.  Type of identification produced:
_Facility_ .

STATE OF FLORIDA
COUNTY OF _Palm Beach_
Notary Public -- State of Florida
_Donna Poling_
(Seal)



Donna Poling
My Commission DD112258
Expires April 26, 2008

12

Respectfully submitted this _8_ day of _August_, 2005.

_____
DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the Office of the State Attorney, 120 W. University Avenue, Gainesville, FL 32601 by hand/mail/fax delivery this _8_ day of _August_, 2005.

_____
DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

13

EXHIBIT "A"

## ARTICLES

# The Whiplash Shaken Infant Syndrome: Manual Shaking by the Extremities With Whiplash-Induced Intracranial and Intraocular Bleedings, Linked With Residual Permanent Brain Damage and Mental Retardation

John Caffey, M.D.

*From the Departments of Radiology and Pediatrics, University of Pittsburgh School of Medicine, and the Children's Hospital of Pittsburgh*

The theme of this report is fourfold: (1) it presents the essential clinical manifestations of the *whiplash shaken infant syndrome;* (2) it presents evidence which indicates that many so-called *battered babies* are really *shaken babies;* (3) it emphasizes the high vulnerability of the infantile head, brain and eyes to habitual, manual, whiplash stresses of ordinary shaking by the extremities; and (4) it supports the hypothesis that casual, habitual, manual whiplash shaking (WLS) of infants is a substantial primary, frequent cause of later mental retardation and permanent brain damage.

Subdural hematomas, intraocular bleedings and multiple traction changes in the long bones were the essential elements in our first descriptions of the *original six battered babies* in 1945.[1] In 1972 we reported that shaking was the probable major cause of traction stresses in the periosteums of the long bones, and also of intracranial and intraocular bleedings.[1]

Today we direct your attention to some important new evidence on the pathogenicity of WLS; some new examples of admitted WLS; necropsy findings in two cases; two cases of residual mental retardation at 12 months, which became evident several months after admitted WLS during early infancy; and one case of fatal cerebral palsy in an infant 10 months of age, who had been manually shaken at 2 months. We shall also evaluate the diagnostic significance of manual whiplash shaking, of the findings in the history, physical examination, necropsies and fundoscopic examinations. The pathogenic significance of subdural hematomas, the excessive pliability of the immature skull and brain, and the cumulative, progressive intra-

cranial bleedings engendered by habitual but mild WLS will be correlated.

### EVIDENCE FOR THE PATHOGENICITY OF WLS DERIVED FROM THE RADIOGRAPHIC CHANGES IN THE LONG BONES OF SO-CALLED BATTERED BABIES

The first suggestions that many supposedly *battered infants* were actually *shaken infants* came from radiographic studies of scores of supposedly battered babies during several decades. Finally, it became conclusively clear that a reasonable explanation for the pathogenesis of these common lesions—metaphyseal avulsions and subperiosteal hemorrhages—was traction-stretching stresses on the periosteums, induced by grabbing the infant by the extremities or by the thorax, and then shaking them, which in turn induced whiplashing of the head onto the thorax. WLS of the head was the reasonable explanation for the presence of bilateral subdural hematomas and bilateral intraocular hemorrhages, combined with concurrent absence of external signs of trauma to the head and neck

(Received April 13, 1973; accepted for publication May 1974.)

Read in part as the Fourth Cornelius G. Dyke Memorial Lecture at the Neurological Institute, Columbia-Presbyterian Medical Center, New York City, May 2, 1973.

ADDRESS FOR REPRINTS: Department of Radiology, Children's Hospital of Pittsburgh, 125 DeSoto Street, Pittsburgh, Pennsylvania 15213.

00007
000014    71

the extremities in more than half of our cases.

## EVIDENCE DERIVED FROM ADMISSION BY THE ASSAILANT IN THE HISTORIES OF SO-CALLED BATTERED BABIES

Direct evidence of trauma through admission by the parent-assailant or the statement of a witness is rarely obtained or obtainable. Usually there are no witnesses. The medical history of manual WLS is practically never obtained because it is considered innocuous by both the parent-assailant and the questioning physician. Although our evidence, based on admission by the assailant, is meager, it is valuable because it is reliable.

By far the most extensive anecdotal proof of pathogenic manual WLS comes from the confessions to the savage shakings of dozens of infants by an infant-nurse[3,4] who whiplashed three infants to death, maimed two others, and shook uncounted others during a period of nine years. She stated that "one of her babies" died after she had pounded it on the back to get a bubble up." Prior to a coroner's inquest she broke down and confessed that "baby K refused to drink her bottle so I shook her by both arms and shook her until her head bobbed and she became faint. Then I quickly laid her down." After a preliminary investigation, the Coroner charged that this infant-nurse had caused the infants' deaths during her "uncontrollable fits of anger and uncontrollable urge to grasp infants between the elbows and shoulders and shake them as long as they persisted in crying." To others of the whiplashed babies were said to have been manhandled so severely that they became painfully injured. One year after the Coroner's inquest, two fathers, who had employed this same nurse to care for their two infants earlier, reported that each of the infants had become retarded mentally. As soon as the Coroner's report became known to the community, "dozens" of others reported that their infants had been significantly injured by this same nurse, and a review of the office records of several pediatricians confirmed additional injuries to many other infants from the same source. It is amazing that this infant-nurse was able to continue her brutal WLS practices during the long period of nine years in an enlightened academic community, on the infants of well-educated parents and on the patients of well-trained expert pediatricians. This was due in large part to the absence of external signs of trauma after violent often repeated pathogenic shaking.

Necropsies were done in two of the three fatal cases. The protocols are dated 1948 and 1956 for babies H and K, respectively.

*Baby H, 12 days of age, premature girl was well until tonight, when she awakened crying as if in pain. There were no external signs of trauma. Nutrition good, respirations deep and gasping, anterior fontanel bulged slightly, diffuse hemorrhages in the ocular fundi. Death three hours after admission. No history of trauma, no fracture of calvaria. Necropsy findings: skin normal, thymus large. Microscopic focal hemorrhages in the myocardium; pinkish cellular exudate in the pulmonary alveoli; small subcapsular laceration of the liver filled with fresh blood, liver capsule intact. Brain and head: bulging anterior fontanel, bilateral subdural hematomas, bilateral subarachnoid bleedings, subpial bleeding, lacerations of the cerebral parenchyma, pyknosis and death of ganglion cells and large perivascular bleedings. Eyes: optic nerves congested and edematous; external bleeding throughout the fibrous layer of the retina with scattered hemorrhages in its inner nuclear layer.*

*Baby K, girl 11 weeks of age. Chief complaint: bulging of anterior fontanel. Fell asleep well but awakened crying and lethargic; semicomatose on arrival, tachypneic, fontanel bulging, reflexes hyperactive, ocular fundi invisible (bleeding?), moderate generalized cyanosis. Cerebrospinal fluid was bloody, gross fresh blood. Infant turned greyish and died 2 hours after admission. No external signs of trauma on the face or head. There was a small "sheet" burn at the left knee and a short superficial scratch in the abdominal wall. No evidence of fractures. Several small foci of atelectasis in the lungs. Brain: no external signs of trauma to the head; bilateral subdural hematomas with subarachnoid hemorrhages, as well, over both cerebral hemispheres; extensive bleedings at the sites of attachment of the bridging cerebral veins to the superior sagittal sinus. Microscopic findings: extensive subarachnoid but no intracerebral bleedings; eyes not examined.*

The findings in these two necropsies demonstrate that the manual WLS by an adult assailant was pathogenic, especially to the brains and eyes. The harmful effects of manual shaking are probably maximal at the tender ages of these two shaken infants. The absence of any external signs of trauma to the head notwithstanding the presence of massive intracranial and intraocular hemorrhages is especially noteworthy and significant in the pathogenesis of the intracranial and intraocular bleedings.

Guthkelch[5] found subdural bleedings in 13 of 23 abused infants, 22 of whom were younger than 18 months. Five of the 13 had no external signs of head trauma or cranial fracture. At necropsy, in one case bleedings over the cerebral cortex, and in another extensive cortical bruisings were found at

surgical exploration. In two additional cases, not included above, the clinical histories indicated that shaking rather than beating (battering) was the cause of subdural hematomas. In one infant 6 months of age, convulsions and a bulging fontanel, without a history of trauma or external physical signs of trauma, suggested the presence of subdural hematomas. This infant died three days later. At necropsy, several of the bridging cerebral veins were torn from their attachments at the falx cerebri. Also the edge of the underlying brain was torn and bruised. Trauma of any kind was denied at first by the mother, but later she admitted that she "held him up and shook him several times, to clear his throat and stop his coughing." The second patient, 6 months of age, was admitted to the hospital with complaints of vomiting and convulsions which led to a provisional diagnosis of meningitis. There were no external signs of trauma to the head, trunk or extremities and no fractures of the skull or long bones. The anterior fontanel, however, bulged. Subdural hemorrhages were found and treated. Soon after discharge of this patient from the hospital, his twin brother was admitted with a broken femur. The first twin returned shortly thereafter with recurrence of subdural hematomas. He now showed oval bruises on the skin of the arms which fitted exactly the sites where the pads of the thumbs and fingers of an assailant might have been applied, when he seized and shook him. At first the mother denied traumatic injury of any kind but later she admitted that the father "might have shaken him when he cried at night." Guthkelch thus discovered two cases: one fatal, with intracranial and intraocular hemorrhages, induced by admitted manual WLS; and in one case intracranial hemorrhages and ruptures of the cerebral bridging veins were demonstrated at necropsy.

In Helfer and Kempe's monograph, *The Battered Child*,[6] Weston reported two infants who had been shaken to death and who had subdural hematomas at necropsy. In the same monograph, Steele and Pollock describe two infants who were "shaken, roughed up and spanked," but who apparently did not develop intracranial hemorrhages.

Silverman[7] found massive traumatic involucrums and metaphyseal avulsions in the bones of the legs of a premature infant 7 months of age who apparently had been shaken manually many times since the second month. The mother shook her after grabbing her by the legs and inverting her. We have observed two infants who have developed typical bone changes after a single, violent jerk of that extremity; and in a third, 8 months of age, after manual shaking by an enraged and jealous sibling brother 8 years of age. Subdural hema-

toma was not detected in any of these three.

Fractures of the spine with local injuries to spinal cord of one infant were attributed by Svchuk[8] to manual WLS.

A bizarre example of pathogenic manual WLS was reported by Guarnaschelli and associates.[9] An infant 2 months of age was treated for "sunken fontanelle" (Caida de Mollera) by his Mexican grandmother. Two days before admission to the hospital, she had attempted to raise the sunken fontanel by a series of therapeutic maneuvers which terminated in holding the infant topsy-turvy by its ankles, with its head over a pan of water, and then shaking the infant up and down while an assistant slapped and pounded on the soles of its feet. The sunken fontanel did rise and had become bulgy when admitted to the hospital. Subhyaloid hemorrhages were found in the ocular fundi and the pupils were fixed. There were no signs of external trauma to the head, trunk or extremities. Clonic seizures developed and the cerebrospinal fluid from the cranial subdural space and the lumbar subarachnoidal space contained fresh blood. The clinical signs subsided after treatment of the subdural hematomas. The infant died 8 months later at 10 months of age from pneumonia and quadriplegia. In this case, manual longitudinal WLS of the inverted infant with concurrent pounding of the soles of its feet induced longitudinal whiplash and jerking stresses to the head which resulted in permanent severe generalized brain damage—with cerebral palsies. It is possible that when the head is in the dependent position, while being shaken, the vulnerability to intracranial and intraocular bleeding is increased.

Mushin and Morgan[10] record the story of an infant 3 months of age who appears to have been subjected to a prolonged session of WLS. The father at first attempted to "strangle the infant with a blanket," but when the infant convulsed during this assault and became stuporous, the father apparently repented, and then with the mother spent the rest of the night manually shaking the comatose infant in a belated effort to revive it. The next morning the infant was admitted to the hospital with extensive bruising of the skin and bilateral intraocular bleedings. It died 24 hours later. Necropsy findings included bilateral large subdural hematomas and widely scattered intraocular hemorrhages in the retinas. Microscopic examinations disclosed extensive intraretinal subhyaloid and small vitreous hemorrhages. In this case it is likely that the stresses of strangling as well as those of manual WLS contributed to the intraocular changes and possibly the subdural hematomas. In view of the fact that both parents spelled each other during several hours in vigo-

0000016    000073

oxysmal manual shaking, the probabilities are
that the head of the infant was subjected to
several hundred individual whiplash stresses from
shaking alone.

hemorrhage in the liver in one case. Microscopic
focal bleedings in the myocardium were also
found in one case. There were no external signs of
trauma to the head in either of the infants.

## EVIDENCE FROM THE PHYSICAL EXAMINATION ON THE PATHOGENICITY OF MANUAL SHAKING

The most characteristic pattern of physical findings in the whiplashed infant is the absence of external signs of trauma to the head and the soft tissues of the face and neck, and of the facial bones and calvaria, in the presence of massive traumatic intracranial and intraocular bleedings. This is an extraordinary diagnostic contradiction. It is, in large part, responsible for the frequent failures to diagnose subdural hematoma and retinal hemorrhage, and the failure to attribute them to manual shaking and whiplashing of the head. It is obvious that in such cases, routine examinations of the ocular fundi in both sick and well infants would provide a convenient and accurate method for the early diagnosis of bleedings in the eyes, and more effective treatment and prevention of WLS. Funduscopic visualization should become a routine practice in the examination of infants for the detection of the pathogenic whiplash shaking.

## EVIDENCE FROM OTHER TESTS ON THE PATHOGENICITY OF WHIPLASH SHAKING

In selected cases cerebral pneumography, cerebral angiography and isotopic scanning are all valuable procedures in the diagnosis of subdural hematoma and intracerebral hemorrhages. In the mass routine detection of subdural hematomas, less hazardous and more convenient complementary procedures such as electroencephalography, sonography and perhaps electroretinography could be employed in selected cases after the funduscopic changes were demonstrated.

## EVIDENCE OF PATHOGENIC WLS IN NECROPSIES

In two cases the most significant findings were limited to bleedings in the brains and eyes, in the subdural, subarachnoid and subpial spaces and in the cerebral substance itself. In one necropsy the optic nerve was congested and edematous. Extensive hemorrhages were demonstrated in both the fibrous and nuclear layers of the retina. The walls of the inferior and superior sagittal sinuses were lacerated at the sites of the attachments of the bridging cerebral veins. Clots of blood covered parts of the falx cerebri. Ganglion cells were sparse and some were pyknotic. The only significant finding outside the head was a subcapsular

## THE PATHOGENIC SIGNIFICANCE OF OCULAR LESIONS IN BATTERED AND WLS INFANTS

In the first six reported *so-called battered babies*,[1] retinal hemorrhages were present in two, both of whom had subdural hematomas. Intraocular hemorrhages have been reported in several *so-called battered infants* since. Similar ocular lesions have been reported in *shaken infants* by Mushin and Morgan in one case; in two infants, victims of the "shaking infant-nurse" (see above); in two cases by Guthkelch[5] and one by Guarnaschelli.[6] Mushin[12] found ocular changes in 12 of 19 *battered infants*, all 12 of whom had permanent impairment of vision in one or both eyes.

In 1964 Kiffney[11] found bilateral retinal detachments behind incomplete cataracts in one so-called battered infant 7 months of age, which were originally diagnosed as retinoblastomas. In follow-up studies of 16 battered infants, Maroteaux and associates[13] found plaques in the ocular fundi which tended to be located in the periphery of the temporal segments of the retinas. The authors state that these lesions cannot be satisfactorily explained on the basis of battering and they question the validity of the term "battered child" for all abused infants, and its worldwide use in English. They propose that some of the affected infants are the victims of overvigorous *manipulations*, not battering. We agree with them and believe that many of these infants are whiplash-shaken rather than beaten, especially those with intracranial and intraocular bleedings. They also report resorption (lysis) of the nasal septum of several abused infants in France, a lesion which I have never seen personally, nor have I seen reported in an abused infant in America. Aron and associates[14] found similar retinal spots located in the peripheries of the temporal segments of the fundi, some with retinal detachments in all 18 abused infants. More than half of these lesions had persisted for more than ten years and one as long as 19 years.

In 1967 Gilkes and Mann[15] stated that they had found only one reference, that of Kiffney, on the status of the eyes of abused infants. In their cases, they were impressed with the extensive spread and the persistence of the signs of ocular hemorrhages, both preretinal and intraretinal, and by the presence of gross papilledema in some cases. These authors cite the patients of Wallis who suffered from subdural hematomas induced by the parents who "gripping the infants by the ankles

swung him in a circle around the head" (so-called cracking the whip); and the infant of Breinin who "had a traumatic retinopathy" after having been gripped by the chest and shaken violently.

Eleven abused infants studied by Harcourt and Hopkins[16] had ocular complications, eight had permanent impairments of visual acuity and ten had intraocular bleedings. In five abused infants Freindly[17] found vitreous hemorrhages, bilateral cataracts, dislocated lenses and retinal detachments. The first case is possibly an example of bilateral cataracts from manual whiplash shaking in view of the lack of a history of trauma and lack of external signs of trauma to the head. In these reports by ophthalmologists manual shaking was admitted in three cases and was probable in several others. In the interesting report of Phelps[18] two infants, 31 days and 2 months of age, respectively, had numerous pale-centered retinal hemorrhages which were totally unexplained; there was no history of trauma and there were no external signs of trauma on the bodies. It is possible that in such cases, manual WLS is the primary causal traumatic factor.

The pathogenesis of retinal hemorrhages in the manual WLS of infants and children cannot be evaluated satisfactorily without a consideration of the incidence, nature, and persistence of idiopathic retinal hemorrhages of the newborn. Sezen[19] found retinal hemorrhages in 14% of 1,238 newly born infants immediately after birth. Between the third and fifth day this incidence of 14% had diminished to 2.6%. This indicates that most of the idiopathic retinal hemorrhages of the newborn infant disappear during the first weeks of life, in contrast to the observations of Aron[14] who found that the retinal hemorrhages in abused infants persisted for ten years and in one case for 19 years. Planten and Schaaf[20] concluded that idiopathic retinal hemorrhages of the newborn infant appear in 20% to 30%, but that they cannot be causally related to increased intracranial pressure during labor, they rarely occur during breech deliveries or cesarean section, and are rarely associated with subdural hematomas or other signs of brain damage. Schlaeder and others[21] found idiopathic retinal hemorrhages, directly after delivery by the vacuum method (ventouse), to be about three times as frequent as after normal delivery (41/100 compared to 15/100). Baum and Bullpit[22] compared the incidence of idiopathic retinal hemorrhages and idiopathic conjunctival hemorrhages in the newly born infant. Retinal hemorrhages seemed to result from several causes: increase in the blood viscosity and polycythemia (RBC) appeared to be the major causal factors. Conjunctival hemorrhages on the other hand ap-

peared to result principally from increases in cephalic pressures. The preponderance of the dence from several sources indicates that the pathic retinal hemorrhages of the newborn in are not due to trauma at time of birth and the nal hemorrhages found in battered and shaken fants are probably caused by postnatal man shaking.

## SIGNIFICANCE OF SUBDURAL HEMATOMA IN PATHOGENESIS OF T SHAKEN INFANT

Subdural hematoma is the most common, injurious and the least understood lesion in shaken infant, and it is also the most frequently detected. It is by far the most frequent cau death of so-called battered infants. Infantile dural hematomas are caused by trauma in prac ally all cases, and they are bilateral in more 80% of cases. They remain undiagnosed in cases owing to the lack of a history of trauma, vagueness of the clinical picture and the usua agnostic paradox of massive intracranial bleed in the absence of external signs of trauma to head and face. Diagnostic changes of bleeding the ocular fundi are also commonly present. T are missed of course when the fundi are not quately examined. Blood in the subdural and c brospinal fluid often confirms the diagnosis. Bl apparently is rarely identified in the urine.

According to Ingraham and Matson[23] the quency and accuracy of diagnosis depends lar on the intensity of the search for subdural hem mas. General practitioners and pediatricians narily do not have a high index of suspicion subdural bleedings owing to the vagueness of clinical findings and the failure of parents to the history of trauma voluntarily when questi by the physician. Ingraham and Matson found dural hematomas from all causes to be lesion sentially of the first year of life with a peak-ag cidence of 6 months. In their study of 319 case agnosis was made during the second throug fifth months in 32, 30, 27 and 28 cases, respec ly, and during the 20th through the 24th mon only three, one, one and six cases, respecti Their histories disclosed a high incidence of common infantile complaints as vomiting, hyperirritability, 41%; infections, 39%; s 32%; history of birth trauma, 26%; and of p tal trauma, 20%. The absence of a history of ma of any kind in 54% is significant and su that whiplash shaking may be the cause in patients. Their common physical findin cluded fever, 57%; hyperactive reflexes, bulging fontanel, 36%; anemia, 31%; en head, 29%; abnormal ocular fundi, 22%; pa

000075 0000018

and fractures of the skull, 9%. The absence of ...ing fontanel in 84%, of enlarged head in 71%, ...ndus changes in 78%, of paralyses in 81% and ...actures of the skull in 91% is noteworthy. Signs ...xternal trauma to the soft tissues of the head ...neck were apparently so rare that they were ...included in the records. It is manifest from ...e results in a relatively large, carefully studied ...up of infants suffering from proved subdural ...matoma, that subdural hematoma should never ...excluded because of an absence of a history of ...uma, or absence of external signs of trauma to ...head or eyes in the physical examination.

These facts indicate that many features of post...umatic subdural hematomas are not satisfacto...y explained or understood; namely, the nature ...the primary causal trauma in more than half of ...e cases, the exact causal mechanisms of the com...nation of subdural and intraocular bleedings, or ...lnerability of the affected structures and tissues ...whiplash stresses. The usual presumption that ...e chronic subdural hematomas are caused by a ...ngle acute traumatic episode which produces ...mmediate and massive hematomas which then ...aintain their volume or increase in volume due ...oncotic pressures is far from proved. Many of ...ese facts are better explained theoretically on ...e basis of repeated subdural bleedings induced ...y repeated whiplash shaking which causes pro...ressive cumulative changes in the hematomas ...ver several weeks or months.

## THE NATURE OF THE WHIPLASH STRESSES AND THE RESISTANCE OF THE INFANTILE HEAD TO THESE STRESSES

The normal infantile brain and its blood vessels ...re highly vulnerable to whiplash stresses owing ...o several normal structural features. The infantile ...ead is relatively heavier and the neck muscles of ...nfancy are weaker than at any other age level. ...he whiplash stresses on the head from shaking ...he infant by the extremities and trunk are thus ...aximized in the infant, in comparison with chil...ren whose heads are relatively less in weight and ...whose cervical muscles relatively and absolutely ...tronger. The pliable sutures and fontanels are ...relatively larger and more stretchable in the in...antile calvaria, which induces excessive tearing ...forces at the attachments of vessels to the more ...rigid fixed soft tissues, such as the falx cerebri, ...when the head is shaken. The infantile brain case ...is more supple, so that less forceful whiplash ...stresses can stretch the brain and its blood vessels ...more easily. Special lacerating stresses are thus ...pplied to the cerebral bridging veins at the fixed ...ites of their attachments to the walls of the sagit-

tal sinuses. The infantile brain is unmyelinated and is softer than older myelinated brains. This permits excessive stretching of both brain and vessels. The relatively greater volume of cerebrospinal fluid in the infantile ventricles and in the subarachnoid spaces shift farther and faster during whiplash shaking stresses, and thus increase their stretching effects on the more resistant brain parenchyma and attachments of the blood vessels.

Thus the heavy infantile head with its soft brain, supported poorly by normally weak cervical muscles, fulcrumed on the atlas through the occipital condyles and pivoted on the axis is highly vulnerable to many kinds of whiplash stresses on the head such as shaking, jolting and jerking, especially when they are repeated during long periods.

Shaking of the infant trunk causes a two-phase cycle of rapid, repeated, to-and-fro, alternating, acceleration-deceleration flexions of the head ventrad until the chin strikes the anterior chest wall (sternum), followed immediately by similar but reverse companion extensions of the head on the neck dorsad until the occiput strikes the back (upper thoracic spine). Infants are rarely subjected to a single manual shake. Commonly they are shaken in paroxysms which may be repeated frequently or infrequently over periods of days or weeks, or months in the case of habitual shaking. Many infants receive dozens and scores of whiplash stresses, some hundreds. It is obvious that although the single manual shake of an infant may be less forceful and pathogenic than the single whiplash in an automobile accident, the summation of the injurious effects of the many repeated but less forceful manual shakings may be much more harmful to the brain and the intracranial blood vessels and also to the veins in the eyes. The extremities of the shaker thus may become handles and levers for mishandling (whiplashing) the head; and the hands of an angry parent or jealous older sibling may become "deadly weapons" in either violent whiplash shaking assaults or in protracted habitual less violent casual shakings. Violent or habitual milder slapping or cuffing of the infant's head with the open hand could cause similar but probably less frequent intracranial and intraocular bleedings.

Ommaya, an experienced investigator of whiplash stresses on the brains of small experimental animals, wrote me recently in a personal communication that he agreed with me on the high risk of the whiplash shaking mechanism owing to the high vulnerability of the human infantile calvaria and brain. He and his associates[24] found that the crucial factor in whiplash injuries to the mature head is the inertial effect of the easily deformable brain moving with a time lag after rotating dis-

placement of its much less deformable mature container, the skull. Attachments to the outer surfaces of the brain and the inner surfaces of the skull are thus subjected to powerful tensile and shearing forces. He and his colleagues[23] also found that experimental cerebral concussion as well as gross bruises of the brain and upper cervical cord could be produced by rotational displacement *alone* of the head on the neck. In 1971 Ommaya and Hirsch[26] supported the hypothesis that approximately one half of the potential for brain injury during impact on the head is causally related to head rotation. Rotation of the head is of course a consistent additional stress in the manual ventrodorsal shaking of infants.

Manual whiplash shaking of the head may be a major causal factor in sudden unexplained infantile deaths ("cot" or "crib" death) associated with epidural hemorrhages of cervical spine reported by Towbin,[27] who found such lesions in four infants who were apparently in good health and died suddenly without apparent cause. There was no history of birth trauma or postnatal trauma. They may have suffered unadmitted manual shaking which caused no physical signs of external trauma. Unfortunately the status of the ocular fundi is not mentioned and the possibility of manual shaking was not considered.

### THE LATENT WLS INFANT SYNDROME

In 1972[2] we raised questions on the probabilities of WLS during early infancy being one of the primary causes of permanent brain damage and mental retardation. In this paper, we have already reported three cases which establish a direct linkage between admitted manual WLS and mental retardation in two,[4] and severe motor deficits (cerebral palsy) in the third.[6] In follow-up studies of three groups of so-called *battered infants*,[28-30] many of whom may have been shaken infants, the incidences of mental retardation were surprisingly high in two groups (77% and 62%). In the third 33% were functionally retarded.

*Habitual, moderate, casual manual whiplash shaking* appears to be practiced to some degree nearly everywhere by many types of parents or parent-surrogates for a wide variety of reasons. The common motives for habitual casual whiplash shaking are punitive for minor misbehavior and disciplinary in normal training. The exact frequency, violence and pathogenicity of this type of infantile "mild" assault have never been studied and are not known, even approximately. However, in view of the high vulnerability of all normal infantile brains to several kinds of whiplash stresses, and the usual repetition of these casual milder shakings over protracted periods, it seems reasonable to hypothecate that habitual whiplash shakings are pathogenic to some degree in many such cases. It follows that whiplash shaking may be responsible for repeated, small but cumulative intracranial and intraocular bleedings which slowly engender progressive, cumulative permanent disorders of the brain and eyes such as permanent cerebral palsies, mental retardation and permanent impairments of vision. These facts being true, it is highly probable that the routine regular examinations of the ocular fundi in all, even apparently healthy babies, would detect the residues of retinal hemorrhages and make possible the early stoppage of habitual casual shaking. More important, a massive educational campaign on the potential hazards of the habitual casual manual shaking of infants might prevent the development of "mild" mental retardation and "mild" cerebral palsies in thousands of otherwise normal healthy infants. It is possible that many slow-learning and clumsy children with IQs of 90 might have been intelligent and normally mobile children with IQs of 120, had they not been habitually shaken and whiplashed during infancy.

### SUMMARY

Our evidence, both direct and circumstantial, indicates that manual whiplash shaking of infants is a common primary type of trauma in the so-called *battered infant syndrome*. It appears to be the major cause in these infants who suffer from subdural hematomas and intraocular bleedings. The label *"battered infant"* is a misnomer in many cases which may interfere with early diagnosis and proper preventive treatment.

The essential elements in the *infantile whiplash shaking syndrome* present an extraordinary diagnostic contradiction. They include intracranial and intraocular hemorrhages, in the absence of signs of external trauma to the head or fractures of the calvaria, and are associated with traction lesions of the periosteums of the long bones in the absence of fractures and traumatic changes in the overlying skin of the extremities. Usually there is no history of trauma of any kind.

Habitual, prolonged, casual whiplash shakings may produce an insidious progressive clinical picture, the *latent whiplash shaken infant syndrome,* which is often inapparent to both parents and physicians. It usually first becomes evident at school age when minor *idiopathic* cerebral motor defects are first detected along with mild idiopathic mental retardation. Permanent impairments of vision and hearing may also be identified at this time for the first time when the children are 5 to 6 years of age. The actual number of such cases is incalculable from current evidence but it

000077
0000020

...rs to be substantial.

...s concept of the *whiplash shaken infant syn*-
...warrants careful diagnostic consideration
...infants with unexplained convulsions, hy-
...ritability, bulging fontanel, paralyses, and
...ful vomiting singly or in combination. The
...ne careful examination of the ocular fundi of
...nfants should provide a superior screening
...iod for early and massive detection of patho-
...c whiplash shakings along with radiographic
...ination of the long bones for confirmation in
...ropriate cases.

...urrent evidence, though manifestly incom-
...e and largely circumstantial, warrants a na-
...wide educational campaign on the potential
...hogenicity of habitual, manual, casual whip-
... shaking of infants, and on all other habits,
...ctices and procedures in which the heads of
...nts are habitually jerked and jolted (whip-
...ed).

...he proposed nationwide educational cam-
...gn against the shaking, slapping, jerking, and
...ing of infants' heads is summarized in the fol-
...ing stanza:

Guard well your baby's precious head,
Shake, jerk and slap it never,
Lest you bruise his brain and twist his mind,
Or whiplash him dead, forever.

J.C.

## REFERENCES

Caffey, J.: Multiple fractures in the long bones of infants suffering from subdural hematoma. Amer. J. Roentgen., 56:163, 1946.

Caffey, J.: On the theory and practice of shaking infants, its potential residual effects of permanent brain damage and mental retardation. Amer. J. Dis. Child., 124:161, 1972.

Personal communication from Dr. Robert Salinger, Pediatrician, who first detected the guilt of the infant nurse and provided me with much valuable first hand information.

Benton, R.: Kids get on my nerves. Master Detective, 53:44, 1957.

Newsweek, 48 (pt. 1) 90, 1956.

Guthkelch, A. N.: Infantile subdural hematoma and its relationship to whiplash injuries. Brit. Med. J., 2:430, 1971.

Helfer, R. E., and Kempe, C. H.: The Battered Child. Chicago: University of Chicago Press, 1965.

Silverman, F. N.: The battered child syndrome. JAMA, 199:163, 1962.

Swischuk, L. E.: Spine and spinal cord trauma in the battered child syndrome. Radiology, 92:733, 1969.

Guarnaschelli, J., et al.: "Fallen fontanelle" (Caida de Mollera); a variant of the battered child syndrome. Amer. J. Dis. Child., 124:1545, 1972.

10. Mushin, A. S., and Morgan, G.: Ocular damage in the battered babe syndrome. Brit. J. Ophthal., 55:343, 1971.

11. Kiffney, G. T.: Ocular damage in the "battered child." Arch. Ophthal., 72:231, 1964.

12. Mushin, A. S.: Ocular damage in the batter-baby syndrome. Brit. Med. J., Aug. 14, 1971, p. 402.

13. Maroteaux, P., et al.: The sequels of Silverman's syndrome. Presse Med., 75:711, 1967.

14. Aron, J. J., et al.: Ocular signs observed in the syndrome of Silverman. Ann. Oculist., 208:533, 1970.

15. Gilkes, M. J., and Mann, T. P.: Fundi of battered babes. Lancet, II:48, 1967.

16. Harcourt, B., and Hopkins, D.: Ophthalmic manifestations of the battered-baby syndrome. Brit. Med. J., 3:398, 1971.

17. Freindly, D. S.: Ocular manifestations of physical child abuse. Trans. Amer. Acad. Ophthal. Otolaryng., 75:318, 1971.

18. Phelps, C. D.: The association of pale-centered retinal hemorrhages with intracranial bleeding in infancy: A report of two cases. Amer. J. Ophthal., 72:348, 1971.

19. Sezen, F.: Retinal hemorrhages in newborn infants. Brit. J. Ophthal., 55:248, 1970.

20. Planten, J. T., and Schaaf, P. C.: Retinal hemorrhages in the newborn. Ophthalmologica, 162:213, 1971.

21. Schlaeder, G., et al.: Retinal hemorrhages in the newborn after vacuum delivery and spontaneous delivery. Gynec. Obstet., 70:98, 1925.

22. Baum, J., and Bulpitt, C. J.: Retinal and conjunctival hemorrhage in the newborn. Arch. Dis. Child., 45:344, 1970.

23. Ingraham, F. D., and Matson, D. D.: Neurosurgery of Infancy and Childhood. Springfield, Ill.: Charles C Thomas, Publisher, 1967.

24. Ommaya, A. K., and Yarnell, P.: Subdural hematoma after whiplash injury. Lancet, 1969, p. 237.

25. Ommaya, A. K., et al.: Whiplash injury and brain damage: An experimental study. JAMA, 204:285, 1968.

26. Ommaya, A. K., and Hirsch, A. E.: Tolerance of cerebral concussions from head impact and whiplash in primates. J. Biomechanics, 4:13, 1971.

27. Towbin, A.: Sudden infant death ("cot" and "crib" death) related to spinal injury. Lancet, II:940, 1967.

27a. Harris, L. S., and Adelson, L.: Spinal injury and sudden infant death: A second look. Amer. J. Clin. Path., 52(3):289, 1969.

28. Elmer, E.: Children in Jeopardy: A Study of Abused Minors and Their Families. Pittsburgh: University of Pittsburgh Press, 1967.

29. Morse, C. W., et al.: A three-year study of abused and neglected children. Amer. J. Dis. Child., 120:439, 1970.

30. Martin, H., In Kempe's Helping the Battered Child and Its Family. Philadelphia: J. B. Lippincott Co., 1972.

## ACKNOWLEDGMENT

Dr. Michael Kashgarian, Pathologist, Yale School of Medicine, provided data from the necropsies of babies H and K.

J Neurosurg 66:409–415, 1987

# The shaken baby syndrome

## A clinical, pathological, and biomechanical study

ANN-CHRISTINE DUHAIME, M.D., THOMAS A. GENNARELLI, M.D.,
LAWRENCE E. THIBAULT, SC.D., DEREK A. BRUCE, M.D.,
SUSAN S. MARGULIES, M.S.E., AND RANDALL WISER, M.S.E.

*Division of Neurosurgery and Department of Bioengineering, University of Pennsylvania, Philadelphia, Pennsylvania*

✔ Because a history of shaking is often lacking in the so-called "shaken baby syndrome," diagnosis is usually based on a constellation of clinical and radiographic findings. Forty-eight cases of infants and young children with this diagnosis seen between 1978 and 1985 at the Children's Hospital of Philadelphia were reviewed. All patients had a presenting history thought to be suspicious for child abuse, and either retinal hemorrhages with subdural or subarachnoid hemorrhages or a computerized tomography scan showing subdural or subarachnoid hemorrhages with interhemispheric blood. The physical examination and presence of associated trauma were analyzed; autopsy findings for the 13 fatalities were reviewed. All fatal cases had signs of blunt impact to the head, although in more than half of them these findings were noted only at autopsy. All deaths were associated with uncontrollably increased intracranial pressure.

Models of 1-month-old infants with various neck and skull parameters were instrumented with accelerometers and shaken and impacted against padded or unpadded surfaces. Angular accelerations for shakes were smaller than those for impacts by a factor of 50. All shakes fell below injury thresholds established for subhuman primates scaled for the same brain mass, while impacts spanned concussion, subdural hematoma, and diffuse axonal injury ranges. It was concluded that severe head injuries commonly diagnosed as shaking injuries require impact to occur and that shaking alone in an otherwise normal baby is unlikely to cause the shaken baby syndrome.

KEY WORDS · shaken baby syndrome · head injury · child abuse

THE term "whiplash shaken baby syndrome" was coined by Caffey[3] to describe a clinicopathological entity occurring in infants characterized by retinal hemorrhages, subdural and/or subarachnoid hemorrhages, and minimal or absent signs of external trauma. Because a nursemaid admitted that she had held several such children by the arms or trunk and shaken them, the mechanism of injury was presumed to be a whiplash-type motion of the head, resulting in tearing of the bridging veins. Such an injury was believed to be frequently associated with fatalities in infantile child abuse and has been postulated as a cause of developmental delay in survivors.[4,15]

While the term "shaken baby syndrome" has become well entrenched in the literature of child abuse, it is characteristic of the syndrome that a history of shaking in such cases is usually lacking.[12] Shaking is often assumed, therefore, on the basis of a constellation of clinical findings and on the computerized tomography (CT) picture of subarachnoid and subdural hematomas,

particularly in the posterior interhemispheric fissure.[17] Because of the ambiguous circumstances of such injuries, medicolegal questions are particularly troublesome, and the neurosurgeon is often consulted to give an opinion as to whether the findings are consistent with child abuse or accidental injury.

This paper reviews all cases of the shaken baby syndrome seen at the Children's Hospital of Philadelphia (CHOP) between January, 1978, and March, 1985. To better study the mechanism of injury, autopsy results in all fatal cases were reviewed, and the biomechanics of this injury were studied in a series of infant models. Based on these observations, we believe that shaking alone does not produce the shaken baby syndrome.

## Clinical Studies

### Clinical Material and Methods

All reports submitted to the Suspected Child Abuse and Neglect team were reviewed. Since house officers

000079   ~~0000022~~

t al.

[47D
eptor
Cell

ation
es *in*

jestin
mical
ns in

a and
as of
15
ry 3:

nole-

et al:
ioma

rvous
other
s and

eroid
Fail-
r 53:

eptor
-636,

- and
nors.

· and
and
g, 54:

and
Ste-

rnia.
4.D.,
ncer
)33.

987

A. C. Duhaime, *et al.*

The sl

TABLE 1

*Initial clinical criteria for diagnosis of shaken baby syndrome*

| Diagnosis* | Cases | | No. of Deaths |
|---|---|---|---|
| | No. | Percent | |
| retinal hemorrhage + SAH or SDH | 29 | 60 | 5 |
| retinal hemorrhage + SAH & SDH | 10 | 21 | 5 |
| bilateral chronic SDH | 3 | 6 | 0 |
| SAH &/or SDH & interhemispheric blood on CT | 6 | 13 | 3 |
| total | 48 | 100 | 13 |

* SAH = subarachnoid hemorrhage; SDH = subdural hemorrhage; CT = computerized tomography.

TABLE 2

*Best history in 48 cases of shaken baby syndrome*

| Etiology | Cases | |
|---|---|---|
| | No. | Percent |
| shaking only | 1 | 2 |
| fall or accidental blunt trauma | 15 | 31 |
| strike or fall plus shaking | 10 | 21 |
| strike only | 3 | 6 |
| trauma or shaking denied, caretakers in attendance | 8 | 17 |
| history unknown, caretakers not in attendance | 10 | 21 |
| cardiopulmonary resuscitation | 1 | 2 |

TABLE 3

*Trauma associated with shaken baby syndrome in 48 cases*

| Associated Trauma | Cases | |
|---|---|---|
| | No. | Percent |
| no evidence of blunt impact to head | 18 | 37.5 |
| no extracranial trauma | 12 | 25.0 |
| additional extracranial trauma | 6 | 12.5 |
| acute | 3 | 6.25 |
| old trauma only | 3 | 6.25 |
| evidence of blunt impact to head | 30 | 62.5 |
| skull fractures | 12 | 25.0 |
| cranial soft-tissue contusions | 18 | 37.5 |
| additional extracranial trauma | 18 | 37.5 |
| acute | 15 | 31.25 |
| old trauma only | 3 | 6.25 |

and emergency room personnel are well trained in recognizing the clinical manifestations associated with this syndrome, it is considered that essentially all cases seen at CHOP are reported to this group.

Suspicion of shaking was based on history, clinical findings, and CT data. All subjects met the following criteria: presence of retinal hemorrhages with subdural and/or subarachnoid hemorrhages, bilateral chronic subdural hematomas, or a CT scan showing subdural or subarachnoid hemorrhages with interhemispheric blood. In addition, all patients were judged to have histories suggestive of child abuse or neglect; well-documented, witnessed accidental trauma were excluded. Histories were obtained from several interviews with caretakers by physicians, social workers, and in some cases law enforcement agents. Caretakers were routinely asked specifically about shaking.

Associated trauma were obtained from physical examination, skull radiographs, CT scans, and skeletal surveys. All fatal cases were examined by the Philadelphia Medical Examiner, and pathology data were obtained from that office.

### Results

Fifty-seven patients with suspected shake injury were identified. Of these, detailed clinical information was available in 48 cases. These patients ranged in age from 1 month to 2 years (mean 7.85 months). Thirty-one patients were male (65%). There were 13 fatalities (27%). Initial clinical criteria for diagnosis of the shaken baby syndrome are listed in Table 1. Thirty-nine patients (81%) had retinal hemorrhages plus subarachnoid and/or subdural hemorrhages. The remainder had bilateral chronic subdural hematomas (6%) or the above-mentioned CT findings without retinal hemorrhages (13%).

The most common presenting complaints were lethargy, breathing difficulty, irritability, poor feeding, and seizures. Best history is listed in Table 2; the most common histories were accidental blunt trauma (usually a fall) in 15 (31%) and blunt trauma plus shaking in 10 (21%); trauma and shaking were denied in eight (17%). In three cases (6%) the child was struck by the caretaker. In eight additional cases the history was unknown, usually because the child was left alone or

with a babysitter. There were two cases (4%) with no history to explain the present findings, but both children were known to have been abused previously or subsequently. One case was associated with cardiopulmonary resuscitation (2%). In only one case was a history of shaking alone obtained; this child was reportedly shaken when she appeared to have difficulty in breathing associated with a respiratory infection.

Associated trauma observed clinically, radiographically, or at autopsy is listed in Table 3. The presence of scalp contusion, subgaleal or superiosteal hemorrhage, and/or skull fracture was considered evidence of blunt impact to the head. Twelve cases (25%) had intracranial findings associated with the shaken baby syndrome alone, with no findings of associated blunt trauma to the head and no extracranial trauma. Six additional cases (13%) had the syndrome without signs of blunt head trauma but did have associated extracranial trauma. Thirty cases (63%) had findings of blunt impact to the head in addition to the intracranial findings of the shaken baby syndrome. Of these, 12 (25%) had skull fractures and 18 (38%) had significant cranial soft-tissue contusions. Most of the fractures were in the occipital or parieto-occipital region.

Clinical history, physical findings, hospital course, intracranial pressure (ICP, when measured), and pathological findings of the 13 fatalities are listed in Tab

The shaken baby syndrome

#### TABLE 4
*Clinical and pathological findings in 13 fatal cases of shaken baby syndrome\**

| Factor | Case 1 | Case 2 | Case 3 | Case 4 | Case 5 | Case 6 | Case 7 | Case 8 | Case 9 | Case 10 | Case 11 | Case 12 | Case 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| age (mos) | 24 | 7 | 3 | 22 | 11 | 9 | 8 | 5 | 10 | 13 | 24 | 4 | 19 |
| sex | F | M | M | M | F | F | F | M | F | M | M | M | F |
| history | | | | | | | | | | | | | |
|   fall or hit | + | | + | + | + | | | + | + | + | + | + | + |
|   shaking | | | + | | | | | | | | + | | + |
|   trauma denied | | | | | | | | | | | | | |
|   unknown | | + | | | | + | + | | | | | | |
| initial examination | | | | | | | | | | | | | |
|   unresponsive | + | + | + | + | + | + | + | + | + | + | + | + | + |
|   retinal hemorrhages | + | + | | + | | | + | + | + | + | + | + | |
|   cranial impact | + | | | + | | | | | | + | + | + | + |
|   extracranial trauma | + | | | + | + | | | | | | + | + | |
| intracranial pressure | ↑↑ | NM | ↑↑ | ↑↑ | ↑↑ | NM | ↑↑ | NM | ↑↑ | NM | ↑↑ | ↑↑ | ↑↑ |
| survival time (days) | 2 | 2 | 7 | 2 | 3 | 2 | 2 | 1 | 1 | 1 | 4 | 1 | 1 |
| pathology | | | | | | | | | | | | | |
|   cranial contusions | + | + | + | + | + | + | + | + | + | + | + | + | + |
|   skull fracture(s) | ++ | | | ++ | ++ | | | | | | | + | + |
|   subdural hematoma | + | + | + | + | + | + | + | + | + | + | + | + | + |
|   subarachnoid hemorrhage | + | + | + | + | + | + | + | + | + | + | + | + | + |
|   hemispheric contusions | + | + | + | | | + | | + | | | | | + |
|   white matter tears | + | | | | | + | | | + | | | | + |
|   diffuse brain swelling | + | + | + | + | + | + | + | + | + | + | + | + | + |

\* ↑↑ = increased; NM = not measured; + = factor present; ++ = severe.

4 and 5. Mean age in this group was 12.23 months; 54% were male. All of these children arrived at the hospital in an essentially unresponsive state, and all died from the effects of uncontrollably increased ICP associated with massive brain swelling. In only one case was a subdural hematoma thought to be of significant size to warrant surgical intervention, and drainage was ineffective in controlling elevated ICP.

Pathological examination showed that all of the children who died had evidence of blunt head trauma. Eight had soft-tissue contusions and five had contusions and skull fractures. In seven cases, however, impact findings were noted only at autopsy, and had not been apparent prior to death. All fatal cases had subdural and subarachnoid bleeding. Focal cerebral contusions and lacerations occurred in six. Microscopic examination was performed in three cases and showed corpus callosum hemorrhages, cortical laminar necrosis, or white matter hemorrhages. All children had diffuse and usually massive brain swelling.

#### Biomechanical Studies

*Whole Infant Models*

To test the hypothesis that infants are particularly susceptible to injury from shaking because of a relatively large head and weak neck, we constructed models of 1-month-old infants that were implanted with an accelerometer to measure the results of shaking or impact manipulations. Since the mechanical properties of the infant neck have not been studied, three models were built with different neck structures in order to include the range of limiting conditions that might exist in the live infant. Both a fixed center of rotation with zero resistance (hinge model) and moving centers of rotation with low and moderate resistance (rubber neck models) were tested.

*Experimental Methods*

The heads and bodies of the models were adapted from Just Born dolls. Head circumference was 36 cm, coronal width was 10 cm, anteroposterior diameter was 10.75 cm, and height from vertex to base (calculated from a line drawn from chin to caudal occiput) was 9.0 cm; values were comparable to human infants. Brain weight for an infant of this size was assumed to be 500 gm.[1] The ideal weight of the head was estimated by balance-weight measurements of several infants with an average age of 1 month, and was 770 to 870 gm. The heads of the models were tightly filled with cotton, with water added until the desired weight range was reached. The water was absorbed by the cotton and distributed so that no sloshing of the contents occurred. The heads were reweighed after neck insertion and sealing and at the end of all experiments.

Neck length from the skull base to the T-1 vertebra

000081   0000024

The sl

TABLE 5

*Summary of findings in 13 fatal cases of shaken baby syndrome*

| Factor | Finding |
|---|---|
| age (mos) | |
| mean | 12.23 |
| range | 3–24 |
| sex M/F | 7/6 |
| history | |
| fall or hit (three with shaking) | 10 |
| unknown | 3 |
| initial examination | |
| unresponsive | 13 |
| retinal hemorrhages | 9 |
| cranial impact | 6 |
| extracranial trauma | 5 |
| intracranial pressure | |
| measured, unable to control | 9 |
| not measured | 4 |
| survival time (days) | |
| range | 1–7 |
| mean | 2.2 |
| pathology | |
| cranial contusions | 13 |
| skull fractures(s) | 5 |
| subdural hematomas (one requiring surgery) | 13 |
| subarachnoid hemorrhage | 13 |
| unilateral | 3 |
| diffuse | 3 |
| multifocal | 7 |
| hemispheric contusions | 6 |
| diffuse, multiple | 3 |
| focal, coup-contrecoup | 3 |
| white matter tears | 4 |
| gross | 2 |
| microscopic | 2 |
| diffuse brain swelling (11 with herniation evident) | 13 |

TABLE 6

*Mean acceleration and time course of shakes and impacts in all models*

| Manipulation | No. | Peak Tangential Acceleration (G) | Time (msec) | Angular Velocity (radians/sec) | Angular Acceleration (radians/sec²) |
|---|---|---|---|---|---|
| shakes | 69 | 9.29 | 106.6 | 60.68 | 1138.54 |
| impacts | 60 | 428.18 | 20.9 | 548.63 | 52,475.70 |

TABLE 7

*Effects of neck condition and "skull" on mean peak tangential acceleration and time course of shakes and impacts*

| Variant | Shakes | | Impacts | |
|---|---|---|---|---|
| | Acceleration (G) | Time (msec) | Acceleration (G) | Time (msec) |
| hinge neck | 13.85 | 92.7 | 423.42 | 18.6 |
| flexible rubber neck | 5.70 | 93.3 | 427.78 | 21.4 |
| stiff rubber neck | 7.02 | 130.5 | 433.33 | 22.8 |
| skull | 9.86 | 107.4 | 436.01 | 20.2 |
| no skull | 8.89 | 103.5 | 427.04 | 21.6 |

TABLE 8

*Effect of impact surface on mean peak tangential acceleration and time course*

| Surface of Impact | Acceleration (G) | Time (msec) |
|---|---|---|
| padded surface | 380.60 | 24.22 |
| metal bar | 489.51 | 17.13 |

FIG.
infant n
manipu:
were pe
by an in
so much
different
traces.

center
itive vi
excursi
perime
the exp
terior p
describ
each se
either a
tested a
fied and

Angu
ured po
center
calculat
Transla

*Results*

The
("shake
eration
shown i
was p <

*Shak*
angular
in Fig.
shaking
accelera
The acc
than th
average
tions by

was measured from lateral neck films of several normal infants with an average age of 1 month and ranged from 3.5 to 4.5 cm; all models were therefore given neck lengths of 4.0 cm. Necks were embedded in Castolite resin* superiorly, which was also used to seal the head. The interior part of the neck was secured in dental stone.† The stuffed body was then replaced around the dental stone "thorax," with lead weights added as necessary to the thorax to reach a total body weight of 3 to 4 kg. Arms and legs were not weighted, so the slightly low total weight for age reflects an attempt to approximate trunk:head weight ratios.

Model 1 had a hinge neck made from a 360° steel hinge, 3.6 cm in width, placed in the horizontal plane to allow complete anteroposterior angulation of the head. The center of rotation was 3.3 cm below the estimated level of the skull base (approximating at the C-6 vertebral level). Model 2 had a 1.9-cm diameter hollow rubber neck with a 0.8-cm lumen. This neck

did not support the weight of the head in the upright position but did not kink when the head was allowed to fall unsupported. Model 3 had a 2.9-cm rubber neck with a 1.2-cm lumen. This neck was able to support the head in the vertical position but allowed full passive movement of the head. In all models, head motion was limited in the anteroposterior direction by the occiput striking the upper back and the chin striking the chest.

To test for the effect of the deformability of the model heads on impact, models were tested with and without an external "pseudoskull" made from thermoplastic.‡ This "skull" was 1/8 in. thick and was molded to the occipital, parietal, temporal, and posterior frontal areas, with the facial area uncovered. The "skulls" weighed 170 to 200 gm.

Data were recorded from a piezoelectric accelerometer§ embedded in a small piece of thermoplastic and attached to the vertex in a coronal plane through t

---

* Resin manufactured by Buehler Ltd., Evanston, Illinois.
† Dental stone, Glastone Type IV, manufactured by Ransom and Randolph Co., Toledo, Ohio

‡ Polyform thermoplastic manufactured by Rolyan Medical Products, Menomonee Falls, Wisconsin.

§ Accelerometer manufactured by Endevco Corp., Juan Capistrano, California.

000082

0000025

Case 1:09-cv-00052-MP-GRJ   Document 21-49   Filed 03/22/11   Page 105 of 117

*et al.*



FIG. 1. Representative tangential acceleration traces for infant models undergoing shake *(upper)* and impact *(lower)* manipulations. While manipulations of the infant models were performed as described, with a series of shakes followed by an impact, the magnitude of the impact accelerations was so much greater than that associated with the shakes that different scales are used to display the respective acceleration traces.

center of the neck. Each model was subjected to repetitive violent shaking, allowing the head to travel its full excursion several times, by adult male and female experimenters. The models were held by the thorax facing the experimenter and were shaken in the anteroposterior plane, since this is the motion most commonly described in the shaken baby syndrome. At the end of each series of shakes the occiput was impacted against either a metal bar or a padded surface. Each model was tested at least 20 times. Acceleration traces were amplified and recorded.‖

Angular accelerations were calculated from the measured peak tangential accelerations by using C-6 as the center of rotation in all cases. Angular velocity was calculated as the time integral of the acceleration curve. Translational forces were assumed to be minimal.

## Results

The data were collected from 69 shaking episodes ("shakes") and 60 "impacts." Typical tangential acceleration traces for shake and impact manipulations are shown in Fig. 1. The criterion for significant difference was p < 0.01 in all cases.

*Shakes Versus Impacts.* Angular acceleration and angular velocity for each shake and impact are shown in Fig. 2. Mean peak tangential acceleration for 69 shaking episodes was 9.29 G; mean peak tangential acceleration for 60 impacts was 428.18 G (Table 6). The accelerations due to impact are significantly greater than those obtained by shaking (p < 0.0001); on the average, impact accelerations exceed shake accelerations by a factor of nearly 50 times. Mean time interval



FIG. 2. Angular acceleration versus angular velocity for shakes and impacts, with injury thresholds from primate experiments scaled to 500-gm brain weight. DAI = diffuse axonal injury; SDH = subdural hematoma.

for shakes was 106.6 msec and for impacts was 20.9 msec. This difference is significant at the p = 0.001 level.

*Effects of Neck Condition.* Mean tangential accelerations and time courses for shakes and impacts for each neck condition are presented in Table 7. There is no significant difference between the hinge neck, the flexible rubber neck, and the stiff rubber neck in the mean acceleration resulting from impacts (423.4, 427.8, and 433.3 G, respectively) or in the mean time course (18.6, 21.4, and 22.8 msec, respectively). With shakes, the more flexible hinge neck is associated with higher accelerations (mean 13.85 G) than the two rubber neck models (mean 5.7 and 7.0 G) (p < 0.001). There is an inverse relationship between neck stiffness and time duration of a shake: the stiff rubber neck was associated with a longer time course than the more flexible rubber neck (130.5 msec and 93.3 msec, respectively) (p < 0.001).

*Effects of "Skull."* The presence of a hard thermoplastic "skull" did not change the magnitude or time course of accelerations associated with shaking of the models. The acceleration magnitude and time course were also unchanged when the models were impacted. These data are shown in Table 7.

*Effects of Impact Surface.* Impact against a padded surface was associated with significantly smaller acceleration (mean 380.6 G) and longer time course (mean 24.22 msec) than that against a metal bar (mean 489.5 G and 17.13 msec) (p < 0.001). Data are shown in Table 8.

‖ Shock amplifier, Model 2740 A, and pulse memory unit, Model 2743, manufactured by Endevco Corp., San Juan Capistrano, California.



## Discussion

Clinical head injury can be classified into two major categories according to the distribution of pathological damage, whether focal or diffuse.[10] Such a distinction is important for treatment and prognosis, as well as for establishing the biomechanical conditions necessary to produce a given injury type. It has been established both experimentally and clinically that most focal injuries are associated with impact loading, resulting in contact phenomena, while diffuse injuries are associated with impulsive loading conditions resulting from acceleration-deceleration phenomena.[6] Damage to the brain occurs as a result of these biomechanical forces and from the secondary effects of ischemia due to altered autoregulation or brain swelling.

The shaken baby syndrome has been postulated to result from the effects of nonimpact acceleration-deceleration forces. It has been suggested that the back and forth movement of the head alone is sufficient to cause tearing of bridging veins, resultant subdural hematomas, and death.[8,13] The relatively large size of an infant's head, weakness of the neck musculature, softness of the skull, relatively large subarachnoid space, and high water content of the brain have been postulated to contribute to the susceptibility of shaking injuries in infants.[4,14]

While shaking alone has been considered sufficient to cause a fatal injury, the usual lack of history of the true mechanism of injury in these cases has hampered accurate clinicopathological correlations. It is of interest, however, that in a recent series of fatal cases of infantile head injuries from suspected child abuse,[5] white matter tears were found similar to those described by Lindenberg and Freytag[11] in blunt trauma in infancy. In addition, lesions in the distribution typical of diffuse axonal injury, like those found in adult head injury and in subhuman primates subjected to high acceleration-deceleration injury,[7] were described in some cases. In fact, at least one of Caffey's original cases[3] included "lacerations of the cerebral parenchyma." Shaking alone was the presumed mechanism of these injuries.

As experience has accumulated in experimental angular acceleration injury it has become clear that, besides the magnitude of the acceleration, another important biomechanical factor influencing injury type is the time interval over which the acceleration occurs. Thus, large angular accelerations occurring over shorter time periods tend to result in subdural hematoma, while longer intervals are associated with diffuse axonal injury.[6] A tolerance scale relating these two factors to resultant injury has been developed for the subhuman primate by Thibault and Gennarelli.[16] Values above certain critical limits result in a particular type of injury such as concussion, subdural hematoma, or diffuse axonal injury. When such a curve is scaled for the brain mass of an infant the size of our models, it can be seen that the angular acceleration and velocity associated with shaking occurs well below the injury range, while the values for impacts span concussion, subdural, and diffuse axonal injury ranges (Fig. 2). This was true for all neck conditions with and without skulls. A padded surface decreases the magnitude of acceleration and lengthens the time course to some extent, but these impacts also fall in the injury range.

These results are consistent with the observation that the fatal cases of the shaken baby syndrome in this series were all associated with evidence of blunt impact to the head. This preponderance of blunt trauma has also been found in at least one other series of nonaccidental head trauma in childhood in which the mechanism of injury was investigated.[9] It is of interest that in more than half of our fatal cases, no evidence of external trauma was noted on the initial physical examination, which helped to contribute to the diagnosis of "shaken baby syndrome." Skull fractures and scalp contusions were found at autopsy, however, most often in the occipital or parieto-occipital region. In addition, several babies had parenchymal lesions in a distribution consistent with diffuse axonal injury.[11]

While some reports on the shaken baby syndrome mention brain swelling, in most reports the subdural collections themselves have been postulated as the cause of death. In this series, all fatalities were consequent to uncontrollable brain swelling, and it is clear that drainage of the small collections present would have been useless in controlling the ICP. The problem of acute brain swelling is particularly common in the pediatric population, and its cause is poorly understood.[2] Whether high accelerations in the anteroposterior direction have some particular association to this complication remains to be investigated.

It is our conclusion that the shaken baby syndrome, at least in its most severe acute form, is not usually caused by shaking alone. Although shaking may, in fact, be a part of the process, it is more likely that such infants suffer blunt impact. The most common scenario may be a child who is shaken, then thrown into or against a crib or other surface, striking the back of the head and thus undergoing a large, brief deceleration. This child then has both types of injury — impact with its resulting focal damage, and severe acceleration-deceleration effects associated with impact causing shearing forces on the vessels and parenchyma. Unless a child has predisposing factors such as subdural hygromas, brain atrophy, or collagen-vascular disease, fatal cases of the shaken baby syndrome are not likely to occur from the shaking that occurs during play, feeding, or in a swing, or even from the more vigorous shaking given by a caretaker as a means of discipline.

### Acknowledgments

The authors are grateful to Lucy Rorke, M.D., Giustino Tomei, M.D., Karen Hess, M.S.E., Toni Siedl, M.S.W., and Thomas Langfitt, M.D., for advice and assistance with this project.

414

000084

0000027

## The shaken baby syndrome

### References

1. Adams RD, Victor M: Principles of Neurology, ed 2. New York: McGraw-Hill, 1981, pp 387–417
2. Bruce DA, Alavi A, Bilaniuk L, et al: Diffuse cerebral swelling following head injuries in children: the syndrome of "malignant brain edema." J Neurosurg 54:170–178, 1981
3. Caffey J: On the theory and practice of shaking infants. Its potential residual effects of permanent brain damage and mental retardation. Am J Dis Child 124:161–169, 1972
4. Caffey J: The whiplash shaken infant syndrome: manual shaking by the extremities with whiplash-induced intracranial and intraocular bleedings, linked with residual permanent brain damage and mental retardation. Pediatrics 54:396–403, 1974
5. Calder IM, Hill I, Scholtz CL: Primary brain trauma in non-accidental injury. J Clin Pathol 37:1095–1100, 1984
6. Gennarelli TA, Thibault LE: Biomechanics of head injury, in Wilkins RH, Rengachary SS (eds): Neurosurgery. New York: McGraw-Hill, 1985, pp 1531–1536
7. Gennarelli TA, Thibault LE, Adams JH, et al: Diffuse axonal injury and traumatic coma in the primate. Ann Neurol 12:564–574, 1982
8. Guthkelch AN: Infantile subdural haematoma and its relationship to whiplash injuries. Br Med J 2:430–431, 1971
9. Hahn YS, Raimondi AJ, McLone DG, et al: Traumatic mechanisms of head injury in child abuse. Childs Brain 10:229–241, 1983
10. Langfitt TW, Gennarelli TA: A holistic view of head injury including a new clinical classification, in Grossman RG, Gildenberg PL (eds): Head Injury: Basic and Clinical Aspects. New York: Raven Press, 1982, pp 1–14
11. Lindenberg R, Freytag E: Morphology of brain lesions from blunt trauma in early infancy. Arch Pathol 87: 298–305, 1982
12. Ludwig S, Warman M: Shaken baby syndrome: a review of 20 cases. Ann Emerg Med 13:104–107, 1984
13. McClelland CQ, Rekate H, Kaufman B, et al: Cerebral injury in child abuse: a changing profile. Childs Brain 7: 225–235, 1980
14. Merten DF, Osborne DRS: Craniocerebral trauma in the child abuse syndrome. Pediatr Ann 12:882–887, 1983
15. Sarsfield JK: The neurological sequelae of non-accidental injury. Dev Med Child Neurol 16:826–827, 1974
16. Thibault LE, Gennarelli TA: Biomechanics of diffuse brain injuries, in: Proceedings of the Fourth Experimental Safety Vehicle Conference. New York: American Association of Automotive Engineers, 1985
17. Zimmerman RA, Bilaniuk LT, Bruce D, et al: Computed tomography of craniocerebral injury in the abused child. Radiology 130:687–690, 1979

Manuscript received June 16, 1986.
*Address reprint requests to:* Ann-Christine Duhaime, M.D., Division of Neurosurgery, University of Pennsylvania, Philadelphia, Pennsylvania 19014.

000085   0000028

allergic diseases. ...

18 Yu L, Rubin DT, ... Kaur F, Revers M, Eisenuri K, et al. Early expression of anti-... autoantibodies of man and the NOD mouse: evidence for early initialization of subsequent diabetes. *Proc Natl Acad Sci USA* 2000;97:1701-6.

19 Martin S, Wolf-Eichbaum D, Duinkerken G, Scherbaum WA, Kolb H, Noordzij JG, et al. Development of type I diabetes despite severe hereditary B-lymphocyte deficiency. *N Engl J Med* 2001;345:1036-10

20 Imagawa A, Hanafusa T, Itah N, Waguri M, Yamamoto K, Miyagawa J, et al. Immunological abnormalities in islets at diagnosis paralleled further deterioration of glycaemic control in patients with recent-onset type I (insulin-dependent) diabetes mellitus. *Diabetologia* 1999;12:574-6.

21 Herold KC, Hagopian W, Auger JA, Poumian-Ruiz E, Taylor L, Donaldson D, et al. Anti-CD3 monoclonal antibody in new-onset type 1A diabetes mellitus. *N Engl J Med* 2002;346:1692-8.

22 Fuchtla AK, Liddle CN, Fanjularwni MA, Richmond JA, Weir RS. The histopathology of the pancreas in type 1 diabetes (insulin dependent) mellitus: a 25-year review of deaths in patients under 20 years of age in the United Kingdom. *Diabetologia* 1986;29:267-74.

23 Verge CF, Gianani R, Kawasaki E Yu L, Pietropaolo M, Jackson RA, et al. Prediction of type I diabetes in first-degree relatives using a combination of of insulin, GAD, and ICA512Bdc/IA-2 autoantibodies. *Diabetes* 1996;45:926-33.

24 LaGasse JM, Brantley MS, Leech NJ, Rowe RE, Monks S, Palmer JP, et al. Successful prospective prediction of type 1A diabetes in schoolchildren through multiple defined autoantibodies: an 8-year follow-up of the ...

11.

25 Johnson SB, Sch... programs to identify children at risk for diabetes mellitus: psycho-logical impact on children and parents. *J Pediatr Endocrinol Metab* 2001;11:653-9.

26 Barker J, Klingensmith G, Bantjas K, Rewers M. Clinical characteristics of type I diabetic children identified by a genetic screening and intensive follow-up program. *Diabetes* 2002;52(suppl 1):A188.

27 Turner R, Stratton I, Horman V, Manley S, Zimmet P, Mackay TR, et al. UKPDS 25: autoantibodies to islet-cell cytoplasm and glutamic acid decarboxylase for prediction of insulin requirement in type 2 diabetes. *Lancet* 1997;350:1288-93.

28 Atkinson MA, Leiter EH. The NOD mouse model of type 1A diabetes: as good as it gets? *Nat Med* 1999;5:601-4.

29 Diabetes Control and Complications Trial, Epidemiology of Diabetes Interventions and Complications Research Group. Retinopathy and nephropathy in patients with type I diabetes four years after a trial of intensive therapy. *N Engl J Med* 2000;342:381-9.

30 Vijn Z, Duckworth WC. Genetically engineered insulin analogs: diabetes in the new millennium. *Pharmacol Rev* 2000;52:1-9.

31 Bolli GB, Owens DR. Insulin glargine. *Lancet* 2000;356:443-5.

32 Meyer L, Guerci B. Metformin and insulin in type 1A diabetes: the first step. *Diabetes Care* 2003;26:1655-6.

33 Shapiro AM, Lakey JR, Ryan EA, Korbutt GS, Toth E, Warnock GL, et al. Islet transplantation in seven patients with type 1A diabetes mellitus using a glucocorticoid-free immunosuppressive regimen. *N Engl J Med* 2000;343:230-8.

**EXHIBIT "C"**

# Evidence based case report
# Perimacular retinal folds from childhood head trauma

P E Lantz, S H Sinal, C A Stanton, R G Weaver Jr

Editorials by Geddes and Plunkett and Harding et al

Department of Pathology, Wake Forest University School of Medicine, Winston-Salem, NC 27157, USA
P E Lantz
*associate professor*
C A Stanton
*associate professor*

Department of Paediatrics, Wake Forest University School of Medicine
S H Sinal
*professor*

Department of Ophthalmology, Wake Forest University School of Medicine
R G Weaver Jr
*associate professor*

Correspondence to:
P E Lantz plantz@wfubmc.edu

*BMJ* 2004;328:754-6

A previously healthy 14 month old child was transferred to our medical centre with a severe head injury. The father had collected the boy and his 3 year old brother from their mother at his workplace car park and taken them home while their mother went to work. The children had been watching television while the father prepared dinner. After hearing something fall, the father found the boy on the floor with the television covering the right side of the head and anterior chest. A homemade television stand was partially across the child's lower legs. His older brother stated, "television fell." As soon as the father removed the television, he noticed the child's head beginning to swell. A neighbour drove them to the local hospital. According to the father and the neighbour, the child never stopped breathing and no resuscitative efforts were attempted.

Cranial computed tomography showed extensive head injuries. He had soft tissue swelling of the scalp, diffuse cerebral oedema with a subdural haematoma overlying the frontal convexities and layering along the falx cerebri, a left sided skull fracture adjacent to a widely diastatic coronal suture, cerebral contusions beneath the fracture, and a rightward midline shift measuring 8 mm. The paediatric ophthalmologist described bilateral dot and blot intraretinal haemorrhages, preretinal haemorrhages, and perimacular retinal folds (fig 1).

The child's condition deteriorated, and he died 18 hours after the incident. Child Protective Services removed the 3 year old sibling from the home because the retinal haemorrhages and retinal folds were considered diagnostic of abusive head trauma from shaking. This action was taken despite the father's repeated detailed, consistent account provided to emergency staff, the paediatric child abuse specialist, paediatric intensive care doctors, and law enforcement authorities.

## Postmortem evidence

A forensic autopsy showed no direct trauma to the orbits or eyes. There were prominent bilateral scalp contusions with soft tissue and intramuscular haemorrhage, symmetrical parietal skull fractures with coronal sutural diastasis, and a lacerated dura mater with extrusion of brain and blood. In addition to bilateral subdural and subarachnoid haemorrhages, a thin epidural haematoma partially covered the frontoparietal, calvarial lamina interna. The brain showed bilateral cortical contusions, severe cerebral oedema, and diffuse anoxic-ischemic injury. Postmortem ocular examination showed haemorrhages of the optic nerve sheaths with subdural haemorrhage greater than subarachnoid haemorrhage. Both eyes had extensive retinal haemorrhages with perimacular retinal folds (fig 2). Retinoschisis and peripapillary intrascleral haemorrhages were evident, and the retinal haemorrhages extended from the posterior pole to the ora serrata affecting the preretinal, intraretinal, and subretinal layers.

When investigators went to the house to recover the television before the family returned home, it was still on the carpeted floor. The 480 mm screen television with built in videocassette recorder weighed 19.5 kg. The homemade television stand measured 762 mm (height)×635 mm (width)×508 mm (depth) and had a bottom drawer that held videotapes. A greasy smudged area on the glass of the television corresponded with the impact site on the child's head.

A re-enactment in which a 11.4 kg weight (similar to the child's weight at autopsy of 11.8 kg) was placed on the partially opened drawer caused the television and

 Details of the included studies are on bmj.com

000086

0000029



television stand to readily topple for... According to investigators, the family home was 7.8 km from the workplace and about 6 km from the local hospital. Based on the distance and estimated driving times plus workplace time clock records, the father was home with the children about 20 minutes when the incident happened. The day after the incident, while in foster care, the 3 year old sibling corroborated the father's account. Despite all this evidence, the paediatric ophthalmologist repeated that perimacular retinal folds coincident with retinal haemorrhages were considered specific for shaken baby syndrome secondary to retinal traction exerted by the oscillating vitreous.

## Search for published evidence

We were unable to find a published report of perimacular retinal folds in a childhood non-abusive head injury. We therefore did a systematic review of the medical literature on perimacular retinal folds associated with abusive head trauma in infants and young children. Our background question became: "In infants and young children with an acute intracranial injury, are perimacular retinal folds specific for head injury from vitreoretinal traction occurring during cycles of acceleration and deceleration (shaken baby syndrome)?"

We searched the Medline (1966-2003) database using the terms retinal folds and child abuse and uncovered seven non-comparative case series articles.[1-7] We also examined references cited in these articles plus review articles and book chapters on ocular findings in child abuse mentioning or discussing perimacular retinal folds relative to non-accidental head injury. Similar searches in the Cochrane Library, ISI Web of Science, and Ovid found no additional articles.

## Results

We found 42 articles and book chapters discussing perimacular retinal folds in childhood abusive head trauma. Seventeen mentioned the presence of retinal folds in non-accidental head injury but did not comment on specificity or formative mechanism. A table on bmj.com gives details of the remaining articles. All but two of the articles are non-comparative clinical or autopsy case series, case reports, review articles, or book chapters.

The two studies that included controls both showed bias in selection of controls and contained no cases with perimacular retinal folds but discussed the postulated causal mechanism.[8 9] In the prospective controlled study, the authors reported on 79 children younger than 3 years who had sustained head injuries.[8] The manner of injury in one case was indeterminate. Three children, including one who died, had non-accidental head injury diagnosed, all of whom had retinal haemorrhages; 72 of the 75 children with non-abusive injuries were managed by observation alone. No perimacular retinal folds were observed; however, the presumed causative mechanism of traumatic retinoschisis and retinal folds was discussed.

The second controlled study was a prospective autopsy study that examined the presence and location of ocular findings in 169 childhood deaths.[9] Ocular haemorrhages (retinal, peripheral retinal, optic nerve sheath and intrascleral) were more likely in craniocer-



Fig 1 Clinical image highlighting temporal portion of perimacular retinal fold at 2-3 o'clock area in left eye with a blood vessel bending over the fold (magnification ×6)

ebral trauma than in non-head injuries and natural diseases. Although case selection was purportedly random, the study contained a disproportionately high number of deaths from child abuse compared with natural and non-abusive causes. Case selection depended on the pathologist's willingness to participate in the study, and we were told by one of the authors that pathologists were more willing to participate when they believed that the deaths were abusive or suspicious (M Gilliland, personal communication, 2002). Perimacular retinal folds were not noted, but the authors concluded that acceleration-deceleration injury to the retina accounts for peripheral retinal haemorrhages and retinal folds.

## Supporting evidence

The references cited to support statements about the specificity or causal mechanism of perimacular retinal folds and abusive head injury in the articles we found are all non-comparative observational reports, unsystematic review articles, and book chapters. Seventy per cent of the articles cited four non-comparative case series.[1 2 10] We assessed the quality of this evidence.

Gaynon et al reported on two infants with presumed shaken baby syndrome who had retinal folds and concluded that these folds may be a hallmark



Fig 2 Transilluminated retinal image of right eye at autopsy showing circinate, elevated, perimacular retinal fold and extensive retinal haemorrhages

000087

0000030

reportedly fell ... to the floor while being carried down a stairway.

Massicotte et al reported the ocular findings at autopsy of three children with perimacular retinal folds.[3] Two infants had sustained direct head trauma, but in the other there was no physical or forensic evidence of direct head trauma. They observed that the vitreous had partially separated from the retina but remained attached to the internal limiting membrane at the apices of the folds and the vitreous base. They concluded that their study confirmed the role of vitreous traction in formation of perimacular folds and proved that shaking alone caused these folds and shaking was never an accidental phenomenon.

Elner et al reviewed the ocular and autopsy findings in 10 consecutive children who died of suspected child abuse.[3] Perimacular retinal folds were observed in three children, all of whom had evidence of blunt head injuries.

Greenwald et al reported five cases of children in whom definite or probable physical abuse during infancy was associated with traumatic retinoschisis.[10] They hypothesised that when an infant is shaken, the head is subjected to repetitive accelerations and decelerations causing the relatively dense lens to move forward and back within the ocular fluids. Transmission of force through firm attachments between the lens, vitreous gel, and particularly the macular retina presumably would result in appreciable traction on the retina causing it to split and creating the surrounding folds.

## Discussion

Statements in the medical literature that perimacular retinal folds are diagnostic of shaken baby syndrome are not supported by objective scientific evidence. Non-comparative observational reports and unsystematic narrative review articles contain insufficient evidence to provide unbiased support for or against diagnostic specificity, and inferences about associations, causal or otherwise, cannot be determined. Clinical and autopsy evidence of ocular lesions must therefore be considered alongside other physical findings and a thorough investigation before concluding whether a head injury is caused by abuse. The child in our case had ocular haemorrhages (peripheral retinal, optic nerve sheath and intrascleral) and retinoschisis, which again some people consider specific for child abuse. Unfortunately, the evidence for these assumptions has similar problems to

analysis of independent medical publications on shaken baby syndrome from 1966-1998 uncovered a weak scientific evidence base.[11] Selection bias, inappropriate controls, and the lack of precise criteria for case definition were identified as important problems with the data. Many studies committed a fallacy of assumption, selecting cases by the presence of the clinical findings that were sought as diagnostically valid. Unsystematic reviews and consensus statements often mingled opinion with facts and added no original supporting evidence.

Perimacular retinal folds are associated with increased neurological morbidity and mortality in infants and children with abusive head injuries.[6] The reported incidence of perimacular retinal folds in shaken baby syndrome varies from 6% in a consecutive clinical case series to 50% in a sequential autopsy case series.[6 12] Clinical and autopsy studies with appropriately matched controls are needed to determine the causal mechanism of perimacular retinal folds and their specificity for abusive head injury. Until good evidence is available, we urge caution in interpreting eye findings out of context.

Contributors: PEL conceived the idea, collected the articles, and wrote the initial draft. All authors contributed to the review process, writing, and final editing of the paper. PEL is the guarantor.

Competing interests: None declared.

1  Gaynon MW, Koh K, Marmor MF, Frankel LR. Retinal folds in the shaken baby syndrome. Am J Ophthalmol 1988;106:423-5.
2  Massicotte SJ, Folberg R, Torczynski E, Gilliland MG, Luckenbach MW. Vitreoretinal traction and perimacular retinal folds in the eyes of deliberately traumatised children. Ophthalmology 1991;98:1124-7.
3  Elner SG, Elner VM, Arnall M Albert DM. Ocular and associated findings in suspected child abuse. A necropsy study. Arch Ophthalmol 1990;108:1094-101.
4  Hau DP, Wilkinson WS. Laser ophthalmic manifestations of the shaken baby syndrome. J Pediatr Ophthalmol Strabismus 1990;27:294-303.
5  Marshall DH, Brownstein S, Dorey MW, Addison DJ, Carpenter B. The spectrum of postmortem ocular findings in victims of shaken baby syndrome. Can J Ophthalmol 2001;36:377-83.
6  Mills M. Funduscopic lesions associated with mortality in shaken baby syndrome. J Am Assoc Pediatr Ophthalmol Strabismus 1998;2:67-71.
7  Munger CE, Peiffer RL, Bouldin TW, Kylstra JA, Thompson RL. Ocular and associated neuropathologic observations in suspected whiplash shaken infant syndrome: a retrospective study of 12 cases. Am J Forensic Med Pathol 1993;14:193-200.
8  Buys YM, Levin AV, Enzenauer RW, Elder JE, Letourneau MA, Humphreys RP, et al. Retinal findings after head trauma in infants and young children. Ophthalmology 1992;99:1718-23.
9  Gilliland MG, Luckenbach MW, Chenier TC. Systemic and ocular findings in 169 prospectively studied child deaths: retinal hemorrhages usually mean child abuse. Forensic Sci Int 1994;68:117-32.
10  Greenwald MJ, Weiss A, Oesterle CS, Friendly DS. Traumatic retinoschisis in battered babies. Ophthalmology 1986;93:618-25.
11  Donohoe M. Evidence-based medicine and shaken baby syndrome. Part 1: literature review, 1966-1998. Am J Forensic Med Pathol 2003;24:239-42.
12  Kivlin JD, Simons KB, Lazoritz S, Ruttum MS. Shaken baby syndrome. Ophthalmology 2000;107:1246-54.

(Accepted 28 January 2004)

## Submitting articles to the BMJ

We are now inviting all authors who want to submit a paper to the BMJ to do so via the web (http://submit.bmj.com).

Benchpress is a website where authors deposit their manuscripts and editors go to read them and record their decisions. Reviewers' details are also held on the system, and when asked to review a paper reviewers will be invited to access the site to see the relevant paper. The system is secure, protected by passwords, so that authors see only their own papers and reviewers see only those they are meant to.

Anyone with an internet connection and a web browser can use the system.

The system provides all our guidance and forms and allows authors to suggest reviewers for their paper. Authors get an immediate acknowledgement that their submission has been received, and they can watch the progress of their manuscript. The record of their submission, including editors' and reviewers' reports, remains on the system for future reference.

The system itself offers extensive help, and the BMJ Online Submission Team will help authors and reviewers if they get stuck.

Benchpress is accessed via http://submit.bmj.com or via a link from bmj.com.

000088
0000031

**EXHIBIT "D"**

## Subdural and retinal haemorrhages are not necessarily signs of abuse

EDITOR—The "serious data gaps, flaws of logic, and inconsistency of case definition" shown up by the evidence based case report of the shaken baby syndrome (p 754) and highlighted in the accompanying editorials (pp 719 and 720) will be of interest to the many parents who over the past 10 years have maintained that they have been wrongly accused and convicted of causing their children's injuries.[1-3]

Furthermore, the recent evidence emphasised by Geddes and Plunkett that trivial falls and other minor injuries can give rise to the allegedly characteristic signs of subdural and retinal haemorrhages is consistent with a triad of possible alternative explanations for shaken baby syndrome. This triad has emerged from an analysis of 98 parental accounts reported to the support group the Five Percenters, each of the three being compatible with a distinct type of neuropathology.

The first is minor trauma (37% of cases). This group gives a history of minor trauma (such as a fall from a bed or sofa) with either immediate loss of consciousness or delayed presentation of an acute subdural bleed and retinal haemorrhages. This is in line with the recently reported series from the United States of independently witnessed minor falls resulting in an acute intracranial bleed, the retinal haemorrhages being caused by a sudden rise in retinal venous pressure as in Terson's syndrome.[4]

The second is birth injury (29% of cases). The clinical presentation in the second group is quite different. There is a general period of variable length of non-specific symptoms such as vomiting and lethargy warranting repeated medical consultations until computed tomography shows the presence of a chronic subdural haemorrhage. The most likely aetiology is a subdural bleed at birth, which, though usually associated with prematurity or a difficult labour, can follow a normal delivery.[5]

The third is respiratory arrest (22% of cases). In this group the precipitating event is suggestive of respiratory arrest—often followed by attempts at resuscitation—that could result in the subdural and retinal haemorrhages characteristic of hypoxic encephalopathy. The findings that severe traumatic brain damage is not, as previously thought, present in these cases contradicts the assumption that such injuries could only have been induced by violent shaking.[6]

A fourth type of presentation, epileptiform seizures (12%) is presumably secondary to underlying intracranial disease—and is thus uninformative about possible aetiology.

These three patterns of clinical events—in the absence of other circumstantial evidence for non-accidental injury—offer a more credible explanation than shaken baby syndrome for the presence of subdural and retinal haemorrhages. It should be noted that shaking has never been directly observed or proved to cause such injuries but is rather an inference based on (contested) theories of

biomechanics.[7] By contrast, consistent parental testimony tallies with descriptions from independent witnesses. Furthermore, each pattern of clinical events is consistent with a distinctive type of neuropathology of acute subdural, chronic subdural, or the thin subdurals of hypoxic encephalopathy.

While we recognise the limitations of the volunteered parental testimony on which this analysis is based, the same triad of presentations—designated as acute encephalopathic, idiopathic subdural, and hyperacute presentation—has also been independently identified from an extended database of cases of suspected non-accidental injury (see previous letter).[8] These findings necessarily raise disturbing questions about the validity of the opinions expressed by medical experts in the courts. They warrant further, urgent, and appropriate scientific investigation.

**James LeFanu** general practitioner
Mawbey Brough Health Centre, London SW8 2UD

**Rhoda Edwards-Brown** director
The Five Percenters, PO Box 23212, London SE14 5WB
shek@ditron.co.uk

Competing interests: JLeF—none declared. RE-B is director of a voluntary organisation providing advice, information, and support to parents who state that they have been wrongly accused of shaken baby syndrome. Neither she nor any individual in the organisation has any financial competing interests.

1 Lantz PE, Sinal SH, Stanton CA, Weaver RG Jr. Perimacular retinal folds from childhood head trauma. BMJ 2004;328:754-6. (27 March.)
2 Geddes JF, Plunkett J. The evidence base for the shaken baby syndrome. BMJ 2004;328:719-20. (27 March.)
3 Fleming B, Blocker BA, Kwan HF. Shaken baby syndrome. BMJ 2004;328:720-1. (27 March.)
4 Plunkett J. Fatal pediatric head injuries caused by short-distance falls. Am J Forensic Med Pathol 2001;22:1-12.
5 Towner D, Castro M, Eby-Wilkens E, Gilbert WM. Effect of mode of delivery in nulliparous women on neonatal intracranial injury. N Engl J Med 1999;341:1709-14.
6 Geddes J, Talbert D, Nicholson A, Nichols G, Adams G, Whitwell H, Scheimberg I. Dural haemorrhage in non-traumatic infant deaths: does it explain the bleeding in "shaken baby syndrome"? Neuropathol Appl Neurobiol 2003;29:14-22.
7 Cummings AK, Goldsmith W, Thibault L. Biomechanics and neuropathology of adult and paediatric head injury. Br J Neurosurg 2002;16:220-42.
8 Minns RA, Busuttil A. Patterns of presentation of shaken baby syndrome. Electronic response to: Brain haemorrhages in babies may not indicate violent abuse. bmj.com 2003. bmj.com/cgi/eletters/328/7390/81#th (accessed 17 July 2002).

## Reluctance in child protection must be for several reasons

EDITOR—In his news item Dyer reports that doctors are reluctant to work on child protection committees.[1] I have yet to meet a paediatrician who is genuinely keen to do child protection work. Not surprisingly, the Royal College of Paediatrics and Child Health is experiencing enormous difficulties filling the relevant posts.

Most paediatricians in training today do not wish to do community paediatrics in the future. It is certainly essential to have a named paediatrician for child protection in every hospital, but, ironically, in my experience, even the named paediatricians for child protection in some cases are reluctant to show passion in this field.

This general reluctance must be for several reasons, not least a lack of proper training. The royal college should look into this with an open mind. Also, why should only paediatricians have the responsibility for child protection work? There is no reason why other medical specialties such as general practice and orthopaedics should not take equal responsibility.

**Ashok Bachaya** staff paediatrician
Epsom and St Helier University Hospitals Trust, Epsom KT18 7EG
bachaya@aol.com

Competing interests: None declared.

1 Dyer O. Doctors reluctant to work on child protection committees, survey shows. BMJ 2004;328:307. (7 February.)

## Labouring in water

### Method is unclear

EDITOR—The method of the study by Cluett et al comparing labouring in water with standard augmentation in managing dystocia requires clarification.[1] The authors have not defined the criteria by which the first stage of labour was diagnosed, thus putting into question the diagnosis of dystocia.

In current practice an expectant policy is advocated especially during the latent phase of labour, to avoid unnecessary intervention. It is unclear whether the authors have taken this into account and whether some women were inappropriately recruited.

We think that an alternative arm of the study should have included an expectant group without recourse to water immersion or augmentation and thus the true impact of water immersion would be defined. The inclusion of women with both intact and ruptured membranes in each study arm further adds to difficulty in evaluating the true effect of water immersion.

**Jameel Zaidi** consultant obstetrician and gynaecologist
Conquest Hospital, St Leonards on Sea, East Sussex TN37 7RD
jameel.zaidi@esht.nhs.uk

**Parveis Zaidi** senior lecturer, midwifery
University of Brighton, East Sussex

Competing interests: None declared.

1 Cluett ER, Pickering RM, Getliffe K, Saunders NJ. Randomised controlled trial of labouring in water compared with standard of augmentation for management of dystocia in first stage of labour. BMJ 2004;328:314. (7 February.)

### Findings do not fully support conclusions

EDITOR—The study by Cluett et al, comparing labour in water with standard augmentation for dystocia, tackles an important area.[1] Too often modern obstetrics concentrates on major medical interventions and neglects the low tech solutions that many women would prefer.[1]

Despite the study's robust design the findings do not fully support the conclusions. Neither of the primary outcomes (epidural rates and assisted delivery rates) differed significantly between the two groups: only by combining all outcome

000089    0000032

REVIEW

EXHIBIT   "E"

# Evidence-Based Medicine and Shaken Baby Syndrome
## Part I: Literature Review, 1966–1998

*Mark Donohoe, MD*

(Am J Forensic Med Pathol 2003;24: 239–242)

In recent years, there has been a clear move toward basing medical practice and opinions on the best available medical and scientific evidence. This process has been termed *evidence-based medicine* (EBM) and involves a review of the quality of evidence that is available in various diseases and fields of inquiry within medicine.

This is the first of 2 articles that attempts to formally rank the available medical scientific evidence by internationally accepted methods, to determine the degree of confidence that can be held on various claims about the condition termed *shaken baby syndrome* (SBS). Areas with good scientific evidence are identified, and shortcomings in the research and publications on the subject are addressed.

Approximately half of all indexed medical publications on the subjects of SBS and shaken-impact syndrome were published before 1999 and half since that time. Given that 1998/1999 is regarded as the turning point in acceptance of the tenets and practice of EBM, it seemed reasonable to assess the quality of evidence before 1999 and compare it with the quality of evidence on the same subject matter since that time. At the conclusion of Part II, the 2 periods are compared to determine the extent to which EBM has affected the field of SBS in terms of quality of available evidence.

The aim of this review is to be neutral on the subject of SBS. Neutrality is difficult to define in this field, in part because of the polarization of opinions on the highly emotional subject of infant injury and death and in part because of clear data deficiencies arising from difficulties in performing experiments. It is clearly unethical to intentionally shake infants to induce trauma, and there is an obvious problem

with studies and reports that rely on either indirect or disputed evidence of the occurrence, severity, or type of trauma.

Many studies lacking these critical data make the obvious logical error of selecting cases by the presence of the very clinical findings and test results they seek to validate as diagnostic. Not surprisingly, such studies tend to find their own case selection criteria pathognomonic of SBS.

*Neutrality* in this review simply means that there is no selective quotation of the available literature, and literature is not chosen to support any particular view. The assessment is of the methods and quality of the actual research, and until this assessment is complete, the content, findings, and recommendations are irrelevant. At the end of the ranking, those studies that achieve the highest QER scores are reviewed for their content, findings, and recommendations. Their outcomes are collated, and the entire published data set is then reviewed as a whole to determine the summarized recommendations, noting areas of agreement, conflict, or controversy. From this, the problems with the published evidence are noted, and data gaps are identified. Recommendations can then be made according to the summarized data.

In assessment of the quality of the available scientific evidence, the author has taken an approach recently defined worldwide as an appropriate scale for review of quality of evidence. This approach has been described recently in context of setting Australian clinical guidelines.

Genuine hypothesis testing requires use of appropriate research methodologies, including collection of relevant control data, and suitable statistical analysis. The interpretation of individual study findings may be constrained by factors such as whether the cohort examined was adequately representative of the patient population in general. Replication across studies and in independent research centers is a key factor in the reliability of evidence.

Compelling evidence comes from consistent findings in 2 or more well-constructed, controlled trials or population-based epidemiologic studies (i.e., level I or level II evidence). By contrast, clinical practice guidelines with level IV evidence represent consensus statements of the expert panel according to clinical experience and limited scientific data. Although these statements may influence current practice,

Manuscript received December 2, 2002; accepted May 29, 2003.
From Mosman, New South Wales, Australia.
Address correspondence and reprint requests to Mark Donahoe, PO Box 328, Mosman, New South Wales, Australia. E-mail: drmark@bigpond.net.au
Copyright © 2003 by Lippincott Williams & Wilkins
0195-7910/03/2403-0239
DOI: 10.1097/01.paf.0000083635.85457.97

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

they are likely to be modified in response to further research findings. Data from a single case series without control subjects provide little more than a stimulus for subsequent hypothesis testing.

## Quality of Evidence Ratings

I: Consistent evidence obtained from more than 2 independent, randomized, and controlled studies or from 2 independent, population-based epidemiologic studies. Studies included here are characterized by sufficient statistical power, rigorous methodologies, and inclusion of representative patient samples. Meta-analysis of smaller, well-characterized studies may support key findings.

II: Consistent evidence from 2 randomized controlled studies from independent centers, a single multicenter randomized controlled study, or a population-based epidemiologic study. Data included here have sufficient statistical power, rigorous methodologies, and the inclusion of representative patient samples.

III-1: Consistent evidence obtained from 2 or more well-designed and controlled studies performed by a single research group.

III-2: Consistent evidence obtained from more than 1 study but in which such studies have methodologic constraints, such as limited statistical power, or the inclusion of patient samples that may be nonrepresentative.

III-3: Evidence obtained from a single case study or a selected cohort study.

III-4: Conflicting evidence obtained from 2 or more well-designed and controlled studies.

IV: Consensus opinions of authorities according to clinical experience or descriptive reports.

## SBS: Literature Review (1966–1998)

### Overview and Methods

The entire Biomednet Medline database (http://www.biomednet.com/db/medline) was searched by using the search term *shaken baby syndrome* and Internet Explorer in late November 1998. Other articles identified that had not yet been indexed on MEDLINE but had been published were also included.

The entire set of retrieved articles was reviewed, and those in which SBS was only peripherally mentioned or in which SBS was unrelated to the original article were omitted. Letters and brief correspondence were also discarded, unless they added new information or data on SBS. Articles in non-English journals that lacked an English abstract were also generally excluded from assessment.

These exclusions reduced the initial list of 71 articles to 54, which were reviewed, categorized, and ranked according to the QER above. To these was added the important study by Jayawant et al. from *BMJ* of December 5, 1998. The editorial was omitted because it added nothing to the original article.

It was impossible to review the full original article in many cases, although all of the major articles were reviewed in full. The remainder was assessed for categorization by using the authors' abstracts.

Each article was assigned to 1 of 4 categories: (1) randomized controlled trial; (2) case series with or without controls (with date, series size recorded); (3) single case reports; and (4) other, including review articles, opinion pieces, and articles on social implications.

## Results of Quality of Evidence Ratings

Fifty-four articles or abstracts were reviewed. One was a randomized controlled trial.[34] This trial was not relevant to the general topic of SBS because it assessed a diagnostic technique (electroretinograph) that proved unsuccessful in diagnosis. Twenty-six were case series.[1,2,7,9,11,13–15,18,19,26,28–30,33,36,39,42,45–50,52,53] Twenty-five were retrospective studies, and 1 was prospective.

In total, 307 SBS cases were claimed to have been assessed among the 23 articles in which numbers of SBS patients were provided, with a mean study size of 13 cases and a median of 7 cases per series.

Selection criteria for SBS cases were unstated in 12 articles, based on presumption or suspicion in 10, and confirmed in 4 by confession or conviction. Two studies had appropriate control groups, 3 had inappropriate control groups, and 21 were case series without control groups. Twelve studies were case reports:[3–5,8,10,17,22,24,31,32,51,55]

> Retinal pathology in suspected SBS, 5 cases
> Blunt head injury at autopsy, 1
> Subdural hemorrhage (SDH) and retinal hemorrhage (RH) as a result of fall and chest compression, 1 case
> Shaking causing traumatic aneurism, 1 case
> Arteriovenous malformation, not SBS, as cause, 1 case
> Intentional asphyxia and shaking of 15-week-old baby, 1 case
> Magnetic resonance imaging value in diagnosis, 1 case
> Raised intracranial pressure as cause of RH, 1 case
> Fifteen were "other" articles[6,12,16,20,21,23,25,27,37,38,40,41,43,44,54]
> Historical reviews of SBS, 10 articles
> Opinion papers without original material, 3 articles
> Social issues and SBS, 1 article
> Review of imaging in SBS (computed tomography versus magnetic resonance imaging), 1 article

## RESULTS

The randomized controlled trial was unrelated in any aspect of interest in this review and addressed a method of assessment of the retinae that proved to be unsuccessful.

Of the case series, the flaws noted above are relevant. All but 1 was retrospective, and all but 5 had no control population to compare cases with. Three of those that did

240

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

000091    0000034

*The American Journal of Forensic Medicine and Pathology* • Volume 24, Number 3, September 2003     *Shaken-Baby Syndrome*

include controls chose insufficient or inappropriate controls (head impact trauma, without healthy controls or other illness unrelated to head injury). This shortcoming would normally have excluded these studies from the literature review (because they do not fulfill criteria for inclusion). Given the difficulties inherent in assessment of SBS and of identifying appropriate control groups, however, these articles have been included as QER III-2.

In studies with confirmed (i.e., admitted or observed) trauma and SBS, there were few common findings, apart from the presence of SDH accompanied by RH in 80% of examined cases. Some articles attempt to measure other risk factor, and the study by Jayawant et al.[42] is noteworthy in this respect.

Finally, the "other" articles do little but summarize opinions and summarize past data. Such articles do not add to the quality of understanding of the condition, nor are they necessarily accurate in what has become a rather emotionally charged area of research and polarized opinion.

In this article, the quality of evidence, rather than the predominance of findings, is being assessed. The issue of the evidence for SBS appears analogous to an inverted pyramid, with a small database (most of it poor-quality original research, retrospective in nature, and without appropriate control groups) spreading to a broad body of somewhat divergent opinions. One may need reminding that repeated opinions based on poor-quality data cannot improve the quality of evidence.

## Data Gaps Identified

There exist major data gaps in the medical literature about SBS. There is a very obvious lack of clear definition of cases. For valid studies, some method of determining cases of actual proven shaking must be found, and appropriate control groups (trauma without shaking, other illness, healthy controls) must be defined and assessed blindly. This gold standard has yet to be achieved in even a single study in the field of SBS. There is a lack of useful and specific laboratory or other markers proven to identify SBS. There is poor definition and quantification of the social and family risk factors to provide guidance on likelihood of abuse for a given set of circumstances. Last, there is a strong need for a checklist or other diagnostic or management tool to assess cases and to quantify index of suspicion of shaking.

## CONCLUSIONS

There was no evidence on the subject of SBS that exceeded QER III-2 by the end of 1998, which means that there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS.

The majority of evidence achieved only a level of QER IV, opinions that shed no new light upon SBS and did not add

to knowledge about SBS. Many of the authors repeated the logical flaw that if RH and SDH are nearly always seen in SBS, the presence of RH and SDH "prove" that a baby was shaken intentionally. Many other studies assumed that the presence of RH and SDH was sufficient to make the diagnosis of SBS in terms of case selection.

The remainder of articles are QER III-3, and as noted above, the inclusion of case series without controls would normally not occur. Thus, the data available in the medical literature by the end of 1998 were inadequate to support *any* standard case definitions, or *any* standards for diagnostic assessment.

Before 1999, there existed serious data gaps, flaws of logic, inconsistency of case definition, and a serious lack of tests capable of discriminating NAI cases from natural injuries. By 1999, there was an urgent need for properly controlled, prospective trials into SBS, using a variety of controls. Without published and replicated studies of that type, the commonly held opinion that the finding of SDH and RH in an infant was strong evidence of SBS was unsustainable, at least from the medical literature.

## REFERENCES

1. Schmidt US, Mittelviefhaus K, Hansen LL. *Klin Monatsbl Augenheilkd.* [Retinal hemorrhage in the infant as an indication of shaken baby trauma]. 1997;211:354–358.
2. Matthews GP, Das A. Dense vitreous hemorrhages predict poor visual and neurological prognosis in infants with shaken baby syndrome. *J Pediatr Ophthalmol Strabismus.* 1996;33:260–265.
3. Weissgold DJ, Budenz DL, Hood I, et al. Ruptured vascular malformation masquerading as battered/shaken baby syndrome: a nearly tragic mistake. *Surv Ophthalmol.* 1995;39:509–512.
4. Granry JC, Chapotte C, Monrigal JP, et al. [Shaken baby syndrome]. *Ann Fr Anesth Reanim.* 1994;13:133–134.
5. Poepel B, Seiberth V, Knorz MC, et al. [Eye manifestations of shaken baby syndrome: case presentation]. *Ophthalmologe.* 1994;91:380–382.
6. Spaide RF, Swengel RM, Scharre DW, et al. Shaken baby syndrome. *Am Fam Physician.* 1990;41:1145–1152.
7. Alexander R, Sato Y, Smith W, et al. Incidence of impact trauma with cranial injuries ascribed to shaking. *Am J Dis Child.* 1990;144:724–726.
8. Keithahn MA, Bennett SR, Cameron D, et al. Retinal folds in Terson syndrome. *Ophthalmology.* 1993;100:1187–1190.
9. Duhaime AC, Gennarelli TA, Thibault LE, et al. The shaken baby syndrome: a clinical, pathological, and biomechanical study. *J Neurosurg.* 1987;66:409–415.
10. Lambert SR, Johnson TE, Hoyt CS. Optic nerve sheath and retinal hemorrhages associated with the shaken baby syndrome. *Arch Ophthalmol.* 1986;104:1509–1512.
11. Wilkinson WS, Han DP, Rappley MD, et al. Retinal hemorrhage predicts neurologic injury in the shaken baby syndrome. *Arch Ophthalmol.* 1989;107:1472–1474.
12. D'Lugoff MI, Baker DJ. Case study: shaken baby syndrome: one disorder with two victims. *Public Health Nurs.* 1998;15:243–249.
13. Ludwig S, Warman M. Shaken baby syndrome: a review of 20 cases. *Ann Emerg Med.* 1984;13:104–107.
14. Shannon P, Smith CR, Deck J, et al. Axonal injury and the neuropathology of shaken baby syndrome. *Acta Neuropathol (Berl).* 1998;95:625–631.
15. Odom A, Christ E, Kerr N, et al. Prevalence of retinal hemorrhages in pediatric patients after in-hospital cardiopulmonary resuscitation: a prospective study. *Pediatrics.* 1997;99:E3.
16. Wong JS, Wong PK, Yeoh RL. Ocular manifestations in shaken baby syndrome. *Singapore Med J.* 1995;36:391–392.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

17. Lam CH, Montes J, Farmer JP, et al. Traumatic aneurysm from shaken baby syndrome: case report. *Neurosurgery*. 1996;39:1252–1255.

18. Betz P, Puschel K, Miltner E, et al. Morphometrical analysis of retinal hemorrhages in the shaken baby syndrome. *Forensic Sci Int*. 1996;78: 71–80.

19. Haseler LJ, Arcinue E, Danielsen ER, et al. Evidence from proton magnetic resonance spectroscopy for a metabolic cascade of neuronal damage in shaken baby syndrome. *Pediatrics*. 1997;99:4–14.

20. Cox LA. The shaken baby syndrome: diagnosis using CT and MRI. *Radiol Technol*. 1996;67:513–520.

21. Chiocca EM. Shaken baby syndrome: a nursing perspective. *Pediatr Nurs*. 1995;21:133–38.

22. Jansson B. [Shaken baby syndrome: severe brain injuries caused by child abuse can be detected by fundus oculi examination]. *Lakartidningen*. 1994;91:491–494, 499.

23. Lancon JA, Haines DE, Parent AD. Anatomy of the shaken baby syndrome. *Anat Rec*. 1998;253:13–18.

24. Fernandes YB, Maciel Júnior JA, Guedes CM, et al. [Shaken baby syndrome: report of a case]. *Ar Qneuropsiquiatr*. 1995;53:649–653.

25. Nashelsky MB, Dix JD. The time interval between lethal infant shaking and onset of symptoms: a review of the shaken baby syndrome literature. *Am J Forensic Med Pathol*. 1995;16:154–157.

26. Han DP, Wilkinson WS. Late ophthalmic manifestations of the shaken baby syndrome. *J Pediatr Ophthalmol Strabismus*. 1990;27:299–303.

27. American Academy of Pediatrics Committee on Child Abuse and Neglect. Shaken baby syndrome: inflicted cerebral trauma. *Pediatrics*. 1993;92:872–875.

28. Gaynon MW, Koh K, Marmor MF, et al. Retinal folds in the shaken baby syndrome. *Am J Ophthalmol*. 1988;106:423–425.

29. Roussey M, Dabadie A, Betrémieux P, et al. [Not-always-apparent abuse: the shaken baby syndrome]. *Arch Fr Pediatr*. 1987;44:441–444.

30. Apolo JO. Bloody cerebrospinal fluid: traumatic tap or child abuse? *Pediatr Emerg Care*. 1987;3:93–95.

31. Spaide RF. Shaken baby syndrome: ocular and computed tomographic findings. *J Clin Neuroophthalmol*. 1987;7:108–111.

32. Levin AV, Magnusson MR, Rafto SE, et al. Shaken baby syndrome diagnosed by magnetic resonance imaging. *Pediatr Emerg Care*. 1989; 5:181–186.

33. Brenner SL, Fischer H, Mann-Gray S. Race and the shaken baby syndrome: experience at one hospital. *J Natl Med Assoc*. 1989;81:183–184.

34. Fishman CD, Dasher WB 3rd, Lambert SR. Electroretinographic findings in infants with the shaken baby syndrome. *J Pediatr Ophthalmol Strabismus*. 1998;35:22–26.

35. Duhaime AC, Christian CW, Rorke LB, et al. Nonaccidental head injury in infants: the "shaken-baby syndrome." *N Engl J Med*. 1998;18(338): 1822–1829.

36. Kapoor S, Schiffman J, Tang R, et al. The significance of white-centered retinal hemorrhages in the shaken baby syndrome. *Pediatr Emerg Care*. 1997;13:183–185.

37. Coody D, Brown M, Montgomery D, et al. Shaken baby syndrome: identification and prevention for nurse practitioners. *J Pediatr Health Care*. 1994;8:50–56.

38. Hansen KK. Folk remedies and child abuse: a review with emphasis on caida de mollera and its relationship to shaken baby syndrome. *Child Abuse Negl*. 1998;22:117–127.

39. Loh JK, Chang DS, Kuo TH, et al. Shaken baby syndrome. *Kao Hsiung I Hsueh Ko Hsueh Tsa Chih*. 1998;14:112–116.

40. Butler GL. Shaken baby syndrome. *J Psychosoc Nurs Ment Health Serv*. 1995;33:47–50.

41. Shaken baby syndrome: inflicted cerebral trauma: Committee on Child Abuse and Neglect, 1993-1994. *Del Med J*. 1997;69:365–370.

42. Jayawant S, Rawlison A, Gibbon F, et al. Subdural haemorrhages in infants: population based study. *BMJ*. 1998;317:1558–1561.

43. Dorfman DH, Paradise JE. Emergency diagnosis and management of physical abuse and neglect of children. *Curr Opin Pediatr*. 1995;7:297–301.

44. Williams DF, Mieler WF, Williams GA. Posterior segment manifestations of ocular trauma. *Retina*. 1990;10(suppl 1):S35–44.

45. Closset M, Leclerc F, Hue V, et al. [Is pericerebral hemorrhage a cause of severe malaise in infants? ]. *Pediatrie (Bucur)*. 1992;47:459–465.

46. Munger CE, Peiffer RL, Bouldin TW, et al. Ocular and associated neuropathologic observations in suspected whiplash shaken infant syndrome: a retrospective study of 12 cases. *Am J Forensic Med Pathol*. 1993;14:193–200.

47. Teyssier G, Rayet I, Miguet D, et al. [Cerebro-meningeal hemorrhage in infants: shaken children? abuse or accidents? 3 cases]. *Pediatrie*. 1988; 43:535–538.

48. Bass M, Kravath RE, Glass L. Death-scene investigation in sudden infant death. *N Engl J Med*. 1986;315:100–105.

49. Hadley MN, Sonntag VK, Rekate HL, et al. The infant whiplash-shake injury syndrome: a clinical and pathological study. *Neurosurgery*. 1989; 24:536–540.

50. Harada K, Hayashi T, Anegawa S, et al. [Vitreous hemorrhage after accidental head injury with chest compression: case report]. *No To Shinkei*. 1994;46:1095–1099.

51. Starling SP, Holden JR, Jenny C. Abusive head trauma: the relationship of perpetrators to their victims. *Pediatrics*. 1995;95:259–262.

52. Budenz DL, Farber MG, Mirchandani HG, et al. Ocular and optic nerve hemorrhages in abused infants with intracranial injuries. *Ophthalmology*. 1994;101:559–565.

53. Ward JD. Pediatric issues in head trauma. *New Horiz*. 1995;3:539–545.

54. Rabl W, Ambach E, Tributsch W. [Asphyxia protracted after shaking trauma]. *Arch Kriminol*. 1991;187:137–145.

© *2003 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

EXHIBIT    "F"

# Ocular and Associated Systemic Findings in Suspected Child Abuse

## A Necropsy Study

Susan G. Elner, MD; Victor M. Elner, MD, PhD; Michael Arnall, MD; Daniel M. Albert, MD

● We reviewed complete ocular and systemic necropsy findings of 10 consecutive children who died of suspected child abuse. All 10 children had evidence at necropsy of blunt head trauma, although external signs of blunt trauma occasionally were covert. Ocular injuries were observed in 7 of the 10 cases and when present always included retinal, vitreous, and subdural optic nerve hemorrhages. In 5 cases, intrascleral hemorrhage from the circle of Zinn occurred at the sclera-optic nerve junction. In 4 cases, traumatic retinoschisis or tractional retinal folds were present. Anterior segment findings were uniformly consistent with blunt trauma. Hemosiderin, indicating old hemorrhage, was present in 3 cases. Intracranial hemorrhage, present in all cases with abnormal ocular findings, was always accompanied by signs of direct head trauma, such as subgaleal hemorrhage, skull fracture, cerebral contusion, or external contusions, which were sometimes subtle or hidden beneath the hair.

(Arch Ophthalmol. 1990;108:1094-1101)

Physical child abuse frequently results in significant morbidity and death for its victims.[1-4] Child abuse and its numerous physical manifestations

Accepted for publication March 20, 1990.
From the Department of Ophthalmology, Kellogg Eye Center (Drs S. G. Elner and V. M. Elner), and the Department of Pathology (Dr V. M. Elner), University of Michigan, Ann Arbor; Office of the Medical Examiner, District 21, Ft Myers, Fla (Dr Arnall); and Howe Laboratory of Ophthalmology, Massachusetts Eye and Ear Infirmary, Boston (Dr Albert).
Reprint requests to Kellogg Eye Center, University of Michigan, 1000 Wall St, Ann Arbor, MI 48105 (Dr V. M. Elner).

have been reported with increased frequency. Ocular injuries due to physical child abuse, particularly retinal hemorrhages, occur often.[3,4,7,8] The recent ophthalmic literature stresses the shaken baby syndrome[9-11] and its constellation of ocular, systemic, and computed tomographic (CT) findings. In contrast to whiplash shaking, recent reports from Japan[12] and the United States[13] indicate that blunt trauma is commonly associated with child abuse. To assess the pathogenesis of ocular injury and death associated with alleged physical child abuse, we reviewed the ocular and systemic necropsy findings of 10 consecutive children who died of suspected child abuse. All 10 children had evidence of blunt trauma at necropsy, but the signs of clinically observable blunt trauma occasionally were covert. Pathologic ocular findings were present in 7 of the 10 children. In this report, we present the postmortem ocular and systemic findings of these 7 cases.

## MATERIALS AND METHODS

Complete autopsies, including ocular examination, were performed in 10 consecutive cases of suspected child abuse. Both eyes of all 10 patients were examined grossly and histopathologically. Gross pathologic examination with selective histopathologic correlation was performed on nonocular tissues. Hematoxylin-eosin, periodic acid-Schiff, and Perls' iron stains were performed in all cases.

Ocular pathologic findings were categorized as involving the anterior segment (Fig 1), retina and vitreous (Figs 2 and 3), and optic nerve (Fig 4). Particular attention was paid to gross pathologic findings of head injuries (Fig 5), including subdural hematoma (Fig 6), and histopathologic intracranial findings (Fig 7). Other pathologic findings consistent with physical child abuse were also sought.

## REPORT OF CASES

CASE 1.—A 17-month-old boy was brought to the hospital "comatose and shaking after a fall from a high chair." Head CT showed multiple hemorrhagic contusions of the left frontal lobe and massive left hemispheric edema. Autopsy revealed small contusions of the back and scalp, a small left temporal abrasion, and a dermatographic handprint at the left costophrenic margin. Widening of skull sutures, subgaleal hemorrhage, subdural hematoma, and a hemorrhagic contusion of the left frontal lobe (Fig 5, bottom right) were also noted. In addition to fresh subdural hemorrhage, Perls' iron stain revealed deposits of hemosiderin at the dura mater-hematoma interface (Fig 7, bottom). Ocular examination revealed posterior subcapsular cataract, subhyaloid and intraretinal hemorrhages (Fig 2, top), and peripheral chorioretinal adhesions. The optic nerves showed papilledema as well as disc and subdural hemorrhages. Intrascleral hemorrhage at the sclera-optic nerve junction extended from the circle of Zinn to the subdural hemorrhage. Perls' iron stain demonstrated hemosiderin in the sensory retina (Fig 3, left) and at the sclera-optic nerve junction, where fresh hemorrhage was also present.

CASE 2.—A 4-year-old girl was hospitalized in a coma with agonal respirations. A brain flow scan was normal but CT revealed subarachnoid hemorrhage and cerebral edema but no subdural hemorrhage. Autopsy demonstrated subarachnoid and subdural hemorrhages with extensive cerebral edema. Multiple contusions of the back, upper and lower extremities, labia minora, tongue, and head, including the ear, brow, cheek, upper lip, and periorbital regions, were noted. The lip mucosa contained teeth

Child Abuse—Elner et al

000-4-000057



Fig 1.—Anterior segment pathologic findings. Top, Voasius' ring (arrow). Bottom, Voasius' ring with iris pigment epithelium (arrow) adherent to the lens capsule. The lens epithelium beneath the pigment is edematous (hematoxylin-eosin, original magnification ×32).

Fig 2.—Retinal pathologic findings. Top, Severe intraretinal (arrow) and subretinal (asterisk) hemorrhages as well as full-thickness hemorrhagic retinal necrosis are seen (hematoxylin-eosin, original magnification ×32). Center, The edge of a large schisis cavity is seen within the macula. The inner retinal layer (arrows) has been torn from the remaining outer retina. Hemorrhage lines the schisis cavity and is found in the retina, vitreous, and subretinal space (hematoxylin-eosin, original magnification ×13). Bottom, A tractional retinal fold of temporal macula also is noted clinically. The inner limiting membrane has been torn from the fold (arrow) and surrounding retina, which shows full-thickness hemorrhagic necrosis (asterisk) (hematoxylin-eosin, original magnification, ×8).



000095

0000038