Case 1:09-cv-00052-MR-GRJ   Document 21-50   Filed 03/23/11   Page 1 of 159



Fig 5.—Gross pathologic features of head injury. Head injuries, except subdural hematoma, usually indicate direct trauma. Top left, Multiple skin and soft-tissue contusions (arrows) are evident on the forehead and over the zygoma. A parieto-occipital subdural hematoma, not found by computed tomography prior to death, was present. Top center, Subgaleal hemorrhage (arrows), superficial to the skull, occurs from hair pulling or direct blows. Top right, Skin contusions (arrows) from direct trauma are frequently small, inconspicuous, and hidden under the hair but may be the only external signs of severe intracranial injury. Bottom left, A linear parietal fracture (arrow) due to direct trauma is shown. The unfused skull sutures are spread by a hypoxic, edematous brain. Bottom right, A cerebral contusion, intraparenchymal hemorrhage, and surrounding edema are seen. Multiple hemorrhagic contusions (arrows) are present just beneath the cortical surface.

imprints. Subgaleal and bilateral temporalis muscle hemorrhages were found. Postmortem ocular findings included angle recession and early posterior subcapsular cataract. The posterior segment showed vitreous hemorrhage, extensive intraretinal hemorrhages, retinoschisis, and serous retinal detachment. The optic nerves showed papilledema, disc hemorrhages, focal infarction, and subdural hemorrhage (Fig 4, top center). Hemorrhage was also found in extraocular muscles and orbital tissues surrounding the optic nerves.

CASE 3.—A 5-month-old infant boy was found dead in his crib. Autopsy revealed small abrasions on the scalp and nose, severe diaper rash, a torn frenulum, subgaleal (Fig 5, top center) and subdural hemorrhages, and cerebral edema. No brain lacerations were found. Epidural and subdural hemorrhages surrounded the spinal cord. Ocular examination revealed vitreous, intraretinal, and subretinal hemorrhages as well as subdural, subarachnoid, and pial optic nerve hemorrhages. Intrascleral hemorrhage surrounded the optic nerve. Extensive necrosis of the retinal nerve fiber layer and focal optic nerve infarcts were also found.

CASE 4.—A 7-month-old infant boy "fell from a changing table." A CT scan demonstrated subdural hematoma, and he was deemed brain dead. Premortem fundus examination showed extensive retinal hemorrhage, papilledema, and a crescentic retinal fold temporal to the macula (Fig 2, bottom). Autopsy revealed no external signs of injury, but roentgenograms demonstrated a vertebral compression fracture at T-8 and a linear fracture of the parietal bone (Fig 5, bottom left). Subgaleal, subdural, and subarachnoid hemorrhages, cerebral contusion and edema, and widened skull sutures were present (Fig 5, bottom left). A mesenteric hemorrhage was also found. Ocular examination demonstrated Vossius' ring (Fig 1); vitreous, intraretinal, and subretinal hemorrhages; retinoschisis; retinal edema; bilateral perimacular retinal folds (Fig 2, bottom); and subdural and subarachnoid optic nerve hemorrhages.

CASE 5.—A 7-month-old infant girl was hospitalized with mental status changes 1 week after "falling down." Ocular examination revealed a choroidal tear; retinal edema; and vitreous, preretinal, intraretinal, and subretinal hemorrhages. Head CT prior to death revealed subarachnoid hem-

orrhage and cerebral edema but no subdural hematoma. Postmortem examination demonstrated multiple contusions on the forehead, occiput (Fig 5, top right), cheek, chest, abdomen, and right temporal region. Subgaleal, subdural, and subarachnoid hemorrhages were present, as were cerebral edema, widened skull sutures, and mesenteric hemorrhage. Histopathologic ocular examination revealed extensive intraretinal, subretinal, and vitreous hemorrhages. Perimacular retinal folds and retinoschisis (Fig 2, center) were also present. Subdural and subarachnoid optic nerve hemorrhages were associated with bilateral intrascleral hemorrhages surrounding the optic nerve (Fig 4, bottom center).

CASE 6.—A 12-month-old girl found unresponsive at home had been admitted to the hospital 9 days previously for burns from suspected child abuse. Postmortem funduscopy showed retinal hemorrhages and papilledema bilaterally. The vitreous was torn from the right macula with subhyaloid hemorrhage. A CT scan showed no evidence of intracranial hemorrhage (Fig 6, center and right). Postmortem examination demonstrated contusions, and a bra-



Fig 6.—Necropsy findings of subdural hematoma were absent on a premortem computed tomographic scan. Left, A large subdural hematoma (arrow) is seen over the left parieto-occipital convexity of the brain. Center, A parieto-occipital hematoma is not visible on a computed tomographic scan of the patient shown at left. Right, A computed tomographic cut inferior to that seen in center. No subdural hemorrhage, midline shift, or ventricular abnormalities are visible.

...sions of the temporal region (Fig 5, bottom left), forehead, nose, occiput, arm, and thigh. One heel was ulcerated and a blister was present on the other foot. Subgaleal and subdural hemorrhages (Fig 6, left) and cerebral edema were noted. Histopathologic ocular examination revealed posterior subcapsular cataract, vitreous hemorrhage, acute and organizing retinal hemorrhages (Fig 8, right), perimacular retinal folds, and retinoschisis. The optic nerves showed focal infarcts, intrascleral hemorrhage from the circle of Zinn, acute and organizing subdural and subarachnoid hemorrhages, and organizing hemorrhage surrounding the optic nerve and extending into orbital tissue (Fig 4, top left and bottom left). Perls' iron stain demonstrated hemosiderin in the sensory retina and in tissues surrounding the optic nerve, including sclera, dural sheath, and orbital tissue (Fig 4, bottom right).

CASE 7.—An unresponsive 4-month-old infant boy brought to the hospital was pronounced brain dead. Several days earlier, during hospitalization for aspiration pneumonia, facial bruises were noted. A premortem CT scan demonstrated a subdural hematoma and cerebral edema. Ophthalmologic examination demonstrated bilateral retinal hemorrhages. Postmortem examination revealed multiple contusions of the forehead, temporal region, back, and buttocks. Gross findings included a subdural hematoma and cerebral edema (Fig 7, top), active bronchopneumonia, and pulmonary edema but no brain lacerations. Histologic ocular examination revealed vitreous, subhyaloid, and intraretinal hemorrhages; multifocal perimacular retinoschisis; and intraneural, subarachnoid, and dural optic nerve hemorrhages (Fig 4, right). Perls' iron stain demonstrated hemosiderin in and ocular tissue.

## RESULTS

...cular injuries were present in 7 of ...ildren who died of alleged child ...e (Table). In all 7 cases, eyes con-

| | Case No.* | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Retinal hemorrhage | + | + | + | + | + | + | + |
| Vitreous hemorrhage | + | + | + | + | + | + | + |
| Subdural optic nerve hemorrhage | + | + | + | + | + | + | + |
| Intraneural optic nerve hemorrhage | + | − | − | − | − | + | + |
| Intrascleral peripapillary hemorrhage | + | − | + | − | + | + | + |
| Retinoschisis | − | − | − | + | + | + | + |
| Hemosiderin deposition | + | − | − | − | − | + | + |
| Perimacular retinal fold | − | − | − | + | + | + | − |
| | | | | | | | |
| Subdural hemorrhage | − | + | + | + | − | + | + |
| Presence on premortem computed tomographic scan | − | · | · | + | − | − | + |
| Subarachnoid hemorrhage | − | + | − | + | + | − | − |
| Subgaleal hemorrhage | + | + | + | + | + | + | + |
| External, visible head contusions | + | + | − | − | + | + | + |
| Skull fracture | − | − | − | + | − | − | − |
| Mesenteric hemorrhage | − | − | − | + | + | − | − |

*Plus sign indicates present; minus sign, absent.

...tained vitreous hemorrhage, subdural optic nerve hemorrhage (Fig 4), and recent retinal hemorrhage (Figs 2 through 4). Hemorrhagic retinoschisis (Fig 2) and retinal folds temporal to the macula (Fig 2) were present in 4 and 3 cases, respectively. One eye exhibited a choroidal rupture. Intraparenchymal optic nerve hemorrhage (Fig 4) was present in 4 of 7 cases, and intrascleral hemorrhage from the circle of Zinn at the sclera–optic nerve junction (Fig 4) was found in 5 of 7 cases. Four cases demonstrated anterior segment injuries due to blunt trauma, including cataract, Vossius' ring (Fig 1), or angle recession. In 3 cases, hemosiderin indicating old hemorrhage was found in the retina (Fig 3), optic nerve sheaths, or perineural or-

bital tissues (Fig 4), or around blood vessels in the sclera surrounding the optic nerve (Fig 4).

Autopsy revealed that all seven patients died of head trauma (Table). Subdural hematoma (Fig 6 and 7) and subarachnoid hemorrhage were found at autopsy in six and three cases, respectively. In one case of purported acute head injury, the subdural hematoma stained positively for hemosiderin at autopsy, indicating old hemorrhage (Fig 7). Subgaleal hemorrhage (Fig 5), resulting from hair pulling or blunt trauma, was present in six of the seven cases. Head contusions (Fig 5) were a common external sign of blunt head trauma but were sometimes subtle or hidden beneath the hair (Fig 5). A skull fracture

Arch Ophthalmol—Vol 108, August 1990

Child Abuse—Elner et al

000098

(Fig 5) w
...in exter
...seen. A
...included
two chi
...handpri

Head
...death in
In three
...could no
...autopsy
...ral hem
...however,
cases th
...subdural

Head t
...death in
...frequentl
...thalmic
...younger
...prone to
that resu
...ings con
...ble). Nin
...child abu
...younger t
...or young
...dren with
...have pos
...head trau

Anterio
...abuse are
...eye trau
...hyphema,
...rhage, ca
...glaucoma
Cataract
...rior segm
...angle rec
1) in our
...trauma.

Posterio
...curs in 3
...suffer abu
...orrhages i
...abused ch
...who exhib
...orrhages
...the poster
so severe
...full thick
...ident (Fig
...abused ch
...character
...tures, inc
...schisis
...folds. In
...traretinal
...internal l
...crotic ne
...varying d
2). Perima
...noted in
...clinical e
...trauma
...traumatic

Arch Opht

(Fig 5) was present in one case in which no external signs of blunt trauma were seen. Additional evidence of trauma included mesenteric hemorrhage in two children and a dermatographic handprint in another.

Head CT was performed prior to death in six of our seven cases (Table). In three cases, the subdural hematoma could not be detected on a CT scan, but autopsy revealed a significant subdural hematoma. Retinal hemorrhages, however, were consistently found in all cases that demonstrated postmortem subdural hematoma.

## COMMENT

Head trauma is the leading cause of death in alleged child abuse[14] and is frequently accompanied by ophthalmic manifestations. Children younger than 2 years are particularly prone to the head and neck injuries that result from child abuse.[2] Our findings confirm these observations (Table). Nine of the 10 consecutive alleged child abuse victims we examined were younger than 2 years and 7 were 1 year or younger. All 7 fatally abused children with ocular injuries were found to have postmortem evidence of direct head trauma.

Anterior segment injuries in child abuse are usually the result of direct eye trauma[3] and commonly include hyphema, subconjunctival hemorrhage, cataract, lens subluxation, and glaucoma, with corneal opacification.[4] Cataract was the most common anterior segment injury in our cases. The angle recession and Vossius' ring (Fig 1) in our cases also indicate direct trauma.

Posterior segment hemorrhage occurs in 34% to 80% of children who suffer abuse.[1,2,7] We found retinal hemorrhages in 7 of the 10 allegedly fatally abused children and in all 7 children who exhibited ocular injury. The hemorrhages were most frequently seen in the posterior fundus. Injury was often so severe that hemorrhagic inner or full-thickness retinal necrosis was evident (Fig 2). Recent clinical studies of abused children have also stressed characteristic ophthalmoscopic features, including hemorrhagic retinoschisis[9] and perimacular retinal folds.[10] In 4 of our cases, massive intraretinal hemorrhage dissected the internal limiting membrane or necrotic nerve fiber layer, producing varying degrees of retinoschisis (Fig 2). Perimacular folds (Fig 2) were also noted in 3 cases, each of which had clinical evidence of severe retinal trauma with either macular schisis, traumatic vitreous separation from

the macula, or full-thickness macular hemorrhage and a choroidal tear. The folded retina was hemorrhagic and often necrotic, with either taut vitreous fibrils emanating from the crest of the fold or the inner retinal layers torn from the retinal surface. The histopathologic appearances of the retinal hemorrhages, folds, and schisis in our cases were strikingly similar to those reported by Cox[11] in experimental blunt, nonperforating eye trauma. Retinal injuries, including retinal detachment,[4,14,15] may result in retinal vascular attenuation and gliosis,[13] macular scarring and cysts,[13] chorioretinal atrophy,[16] and optic nerve atrophy,[7] all of which may cause profound visual loss in abused children.

The pathogenesis of retinal and vitreous hemorrhage in abused children has been attributed to (1) acute intracranial hypertension following cerebral injury, resulting in retinal venous hypertension[1]; (2) venous transmission to the brain and eyes (Purtscher's retinopathy) of acute intrathoracic or intra-abdominal forces during compressive injury,[18] particularly in cases of sexual abuse[19]; and (8) direct head trauma.[7] The full-thickness hemorrhagic retinal necrosis in five of the seven patients with ocular injuries, and hemorrhagic retinoschisis and perimacular retinal folds in four of these seven patients, suggest that severe anteroposterior acceleration-deceleration forces as proposed by Greenwald et al[9] directly produce retinal injuries in abused children who die of blunt head injury. That such trauma may be repeated is indicated by positive stains for hemosiderin in three cases. Blunt head trauma, seen in all of our patients with ocular injuries, may be necessary to produce significant vitreoretinal traction, resulting in the constellation of severe retinal injuries seen in these children.

Subdural optic nerve hemorrhages (Fig 4), present in all seven fatal cases of patients with eye injury, are not thought to be extensions of intracranial, subdural, or subarachnoid hemorrhages, or to result from transmission of increased intracranial venous pressure. Rather, they are caused by local rupture of dural-pial bridging vessels.[20,21] Subdural hemorrhages may result from severe intracranial hypertension, which is transmitted to the optic nerve subarachnoid space and causes increased pressure within and subsequent hydrostatic rupture of optic nerve dural-pial vessels.[20] Direct trauma to the optic nerve during acceleration-deceleration or blunt head injury may also result in hemorrhage





Fig 7.—Intracranial histopathologic findings that reflect initial injuries with superimposed cerebral hypoxia and edema. Top, Subdural hemorrhage may result from shearing of bridging vessels (curved arrow), cerebral contusions, or lacerations. The hypoxic, edematous cerebral tissue shows diffuse pallor; pericellular and perivascular microcavitation (straight arrows); and pyknotic, eosinophilic neurons (hematoxylin-eosin, original magnification ×32). Bottom, Dura mater with underlying hematoma is seen. Fresh hemorrhage and hemosiderin at the dural-hematoma interface (arrows) indicate repeated hemorrhage (hematoxylin-eosin, original magnification ×79). Iron staining of an adjacent histopathologic section showed intense positivity for hemosiderin.

0000042

000099

EXHIBIT   "G"

Today's Approach to Migraine Management

NOTE: To view the article with Web enhancements, go to:
http://www.medscape.com/AANS/NF/1999/v07.n04/nf0704.05.piat/nf0704.05.piat-01.html

# A Pitfall in the Diagnosis of Child Abuse: External Hydrocephalus, Subdural Hematoma, and Retinal Hemorrhages

**Joseph H. Piatt, Jr, M.D.**, Departments of Neurosurgery and Pediatrics. Oregon Health Sciences University, Portland, Oregon

[Neurosurg Focus 7(4), 1999. © 1999 American Association of Neurological Surgeons]

## Abstract

External hydrocephalus has been associated with subdural hematomas in infancy, and the hematomas have been noted to be secondary to minor trauma or have even been described as spontaneous. The author reports the case of an infant with external hydrocephalus who developed retinal as well as subdural hemorrhages after sustaining a minor head injury. Although retinal hemorrhage in infancy has been considered virtually pathognomonic of child abuse, in the setting of external hydrocephalus a more cautious interpretation may be appropriate.

## Introduction

One clinical hallmarks of child abuse is a discrepancy between the traumatic lesion that the patient exhibits and the causative explanation offered by the caretaker[19] The explanation may appear to be discrepant on a developmental basis: the child, for example, is reported to have caused a self injury that is inconsistent with his developmental level. Or the discrepancy may be a mechanistic one: the severity of the injury is out of proportion with the forces purportedly involved in the accident. In the latter case, the physician must exercise diligence to rule out preexisting diseases, such as platelet disorders, deficiencies of coagulation factors, and osteogenesis imperfecta, that might render the child exceptionally susceptible to injury[8,11,17,32]

External hydrocephalus is a common condition characterized by diffuse enlargement of the subarachnoid spaces.[2,3,5,6,10,16,21,23,24,29,31,36,38,40,41] It is most often associated with macrocephaly, but there are children with normal or even small head circumferences in whom diffuse enlargement of the subarachnoid spaces has developed.[1,5,33] The description, "benign subdural effusions of infancy," was used to characterize this condition before the era of modern neuroimaging[7,25,39] but it is a misnomer because the excessive fluid resides in the subarachnoid space rather than in the subdural space[4,44] In many instances a family history consistent with a dominant pattern of inheritance can be elicited. The natural history is generally benign, and there are normal developmental outcomes in most cases as well as imaging-documented resolution of abnormalities by the time the patient reaches school age.

Whereas enlargement of the subarachnoid spaces persists during infancy, the brain does not fill the space available within the cranial cavity, and a state of "craniocerebral disproportion" exists. The presence of craniocerebral disproportion that develops from any cause--external hydrocephalus, internal hydrocephalus, arachnoid cyst, or chronic subdural hematoma--makes the patient exceptionally susceptible to subdural

000100

0000043

8/22/2000 10:48 AM

hemorrhage after what would otherwise be inconsequential trauma[5,14,18,21,26,30,35,37] In particular, the prevalence of subdural hematoma in case series of patients with external hydrocephalus seems significant. In a study reported by Azais and Echenne,[5] "spontaneous" subdural hemorrhage was demonstrated in five of 41 patients with "benign enlargement of the subarachnoid spaces" on ultrasonography and computerized tomography scanning. Laubscher, et al.,[21] have described a "nonbattered" infant among their 22 patients with pericerebral subarachnoid space enlargement, in whom a "spontaneous" subdural "hygroma" developed that the authors attributed to the vulnerability of the bridging subarachnoid veins. Mori, et al.[26] have reported three infants with subdural hemorrhage of 20 patients with infantile subarachnoid fluid collection. Although they fall within the shadow of publication bias, these series suggest that the prevalence of subdural hematoma in infants with external hydrocephalus may be as high as 11%.

Caffey,[9] who first described the shaken infant syndrome, recognized that infants with hydrocephalus were prone to the development of subdural hematomas, but neither he nor any subsequent author has arrived at the following logical conclusion: the development of a subdural hematoma after minor trauma in an infant with craniocerebral disproportion might be the occasion for unjustified accusations of child abuse. The concomitant presence of retinal hemorrhages in such an instance would reinforce that the diagnosis of inflicted injury is incorrect in such cases.

## Case Report

**History.** Emergency medical technicians were called to evaluate this 4-month-old boy because of status epilepticus.

**Presentation.** The child had been well except for the presence of macrocephaly. At 6 weeks of age his head circumference had been measured as 41.5 cm (> 95th percentile). On the day of presentation, his mother had been propping him up in a standing position against a piece of furniture in the presence of his father and paternal grandmother. The mother became distracted, and the infant fell, striking the back of his head on a carpeted floor. He cried immediately, but soon experienced a generalized convulsion. A sequence of generalized convulsions followed and ceased only after diazepam was administered rectally.

**Examination.** General physical assessment at the receiving hospital revealed no other injuries. The patient's head circumference measured 44.3 cm (> 95th percentile). Funduscopic examination demonstrated retinal, preretinal, and subhyaloid hemorrhages (Fig. 1).



Figure 1. Fundus drawings demonstrating extensive, deep blot hemorrhages in all four quadrants of both eyes. In this case report there were preretinal and subhyaloid hemorrhages in each eye as well. Both optic nerve heads were well perfused and had sharp margins. There were no abnormalities of the nerve fiber layer. (Drawings courtesy of William Rodden, M.D., Ashland, Oregon).

00000̶4̶4̶  0 0 0 I 0  8/22/2000 10:48 AM

A computerized tomography scan of the head revealed a small acute subdural hematoma that was associated with bilateral low-density extracerebral fluid collections. On Day 3 postadmission magnetic resonance imaging established that these fluid collections reflected diffuse enlargement of the subarachnoid spaces (Fig. 2). A skeletal survey was negative.



Figure 2. Magnetic resonance imaging studies. Upper: A transaxial, $T_1$-weighted image of the head demonstrating a small left frontal subdural hematoma of mixed intensities (white arrow heads). There is a prominent, symmetrical, extracerebral fluid collection of the same intensity as ventricular cerebrospinal fluid (CSF) (white asterisk). Lower: Coronal, $T_2$-weighted image demomstrating that the extracerebral fluid remains at the same intensity as ventricular CSF, and anastomotic veins can be seen passing from the surface of the cortex to the dura through it (black arrows). The extracerebral fluid therefore represents enlargement of the subarachnoid space. These images are diagnostic of external hydrocephalus.

The patient recovered without specific treatment.

**Investigation of Physical Abuse.** An extensive police and social service investigation, which at the parents' request included polygraph testing, failed to uncover any risk factors or circumstances suspicious for child abuse.

**Diagnosis.** The infant was seen in pediatric neurosurgical consultation at age 6 months, at which time he was well. The only notable physical finding was a head circumference that measured 47 cm. The diagnosis of external hydrocephalus was made at this time.

**Follow-Up Course.** Under careful ophthalmological surveillance, the retinal hemorrhages were noted to clear within 3 months, and the subhyaloid hemorrhages cleared within 6 months. No amblyopia or other visual disturbance persisted.

The patient remained at his home in the care of his natural parents, and at his 18 month follow-up examination, his development was normal. His head circumference measured 51 cm. Magnetic resonance imaging of his head showed very mild prominence of the subarachnoid spaces and judged to be within normal limits. A telephone follow-up interview with the community physician of the patient when he was 44 months of age indicated excellent general health, perfectly normal development, and a stable family life.

## Discussion

The coexistence of subdural hematoma and retinal hemorrhage in an infant is considered virtually indicative that

child abuse has occurred. The significance of these findings has been established over time by their frequent association with other typical signs of abuse: injuries at various ages and those affecting various body parts, as well as parental delay in seeking medical attention. In the case described here, however, no other injuries or suspicious circumstances were present, and the accusations of abuse grew entirely out of the perception that the mechanism of the injury was implausible. Although the question of inflicted injury can never be dismissed completely, the recognition of preexisting external hydrocephalus in this case at least partly undermines the explanation that the subdural hematomas were mechanistically implausible. Furthermore, the small volume of the hematomas and the absence of lasting neurological sequelae constitute additional evidence that the traumatic forces responsible for the injury case were not great. The child's subsequent healthy development in his home environment further validates the diagnosis that his injury was accidental.

The mechanism for the development of subdural hemorrhage in infants has been thought to be shear injury to the anastomotic veins, passing from the surface of the cerebral cortex to the dural venous sinuses, particularly the sagittal sinus.[12] Because the brain and the skull have differing viscoelastic properties, sudden forces applied to the head cause the brain to "slosh" inside the skull[34] Regardless of cause, craniocerebral disproportion compromises the natural mechanical stability of the brain within the skull. In cases in which external hydrocephalus is present, the bridging veins passing from the cerebral convexities to the dural venous sinuses may be rendered more vulnerable to shear injury by their long courses through the exaggerated subarachnoid spaces.

The association of retinal hemorrhage with catastrophic intracranial hemorrhage is familiar to all neurosurgeons. Aneurysmal subarachnoid hemorrhage is the paradigm, and the accepted mechanism is transmission of the sudden elevation of intracranial pressure to the central retinal vein and its choroidal anastomoses via the subarachnoid space of the optic nerve sheaths.[20,27] In infancy retinal hemorrhages have long been recognized as a distinctive feature of head injury caused by physical abuse[3,28,42] but the physical mechanisms remain to be clarified.[15] One possibility is that the rupture of retinal veins is caused by a pressure surge transmitted either from the cranial cavity through the subarachnoid space of the optic nerve sheaths or from the chest through the cervicocephalic veins (the so-called Purtscher retinopathy)[42] Another possibility, by analogy with subdural hemorrhage, is that a direct acceleration-deceleration insult to the globe causes shear stresses between the ocular tissues with differing mechanical properties; this mechanism of injury is especially prominent in autopsy cases.[15,22] Because a gradation of inflicted ocular injury corresponds to the gradation of severity of the associated intracranial injury[15,43] different mechanisms likely come into play in response to varying degrees of violence.

To the best of the author's knowledge, retinal hemorrhages have not been described before in association with minor trauma in the setting of external hydrocephalus. Whether or not external hydrocephalus imparts a special susceptibility to ocular hemorrhage is unknown; however, in the present case the involvement of the eyes seems severe in relation to the extent of the intracranial hemorrhage. One mechanistic hypothesis is that the subarachnoid spaces along the optic nerves may be dilated in the same manner as the intracranial subarachnoid spaces are. Furthermore, the dilated intracranial subarachnoid spaces may transmit pressure impulses more efficiently, and with less dampening than in the normal state. Intracranial compliance may be low in the setting of external hydrocephalus as well. A minor skull impact could therefore generate an exaggerated intracranial pressure impulse that might, in turn, be transmitted undampened out along the optic nerves and into the orbits as far as the globes. Because of the format of the imaging studies obtained in the case reported here, it was not possible to assess the subarachnoid spaces within the optic nerve sheaths, and so this explanation remains speculative.

Until its pathogenesis has been elucidated more thoroughly, the forensic interpretation of retinal hemorrhage should be handled cautiously in the setting of external hydrocephalus. In many familiar clinical situations, retinal hemorrhage is linked to the occurrence of sudden pressure transients within the cranial cavity. The mechanical properties of the cranium and its contents are abnormal in cases of external hydrocephalus, and the mechanical coupling of the cranium and eye may therefore be abnormal as well. The outcome of the case reported here

reinforces this line of reasoning and raises a concern that can only be settled by additional clinical experience and, perhaps, experimental data: in the setting of external hydrocephalus, retinal hemorrhage may not be pathognomonic of abusive injury.

**Address reprint requests to: Joseph Piatt, M.D.**, Department of Neurosurgery (L472), Oregon Health Sciences University, Portland, Oregon 97201-3098. email: piattj@ohsu.edu.

## References

1. Akaboshi I, Ikeda T, Yoshioka S: Benign external hydrocephalus in a boy with autosomal dominant microcephaly. **Clin Genet 49:**160-162, 1996
2. Alvarez LA, Maytal J, Shinnar S: Idiopathic external hydrocephalus: natural history and relationship to benign familial macrocephaly **Pediatrics 77:**901-907, 1986
3. Andersson H, Elfverson J, Svendsen P: External hydrocephalus in infants **Childs Brain 11:**398-402, 1984
4. Aoki N: Extracerebral fluid collections in infancy: role of magnetic resonance imaging in differentiation between subdural effusion and subarachnoid space enlargement **J Neurosurg 81:**20-23, 1994
5. Azais M, Echenne B: [Idiopathic pericerebral swelling (external hydrocephalus) of infants. **Ann Pediatr 39:**550-558, 1992 (Fr)
6. Bode H, Strassburg HM: [Craniocerebral dysproportion--a contribution to the significance of extracerebral fluid collections in infancy.] **Klin Padiatr 199:**399-402, 1987 (Ger)
7. Briner S, Bodensteiner J: Benign subdural collections of infancy **Pediatrics 67:**802-804, 1981
8. Brown JK, Minns RA: Non-accidental head injury, with particular reference to whiplash shaking injury and medico-legal aspects. **Dev Med Child Neurol 35:**849-869, 1993
9. Caffey J: On the theory and practice of shaking infants. Its potential residual effects of permanent brain damage and mental retardation. **Am J Dis Child 124:**161-169, 1972
10. Carolan PL, McLaurin RL, Towbin RB, et al: Benign extra-axial collections of infancy **Pediatr Neurosci 12:**140-144, 1985
11. Dietrich AM, James CD, King DR, et al: Head trauma in children with congenital coagulation disorders **J Pediatr Surg 29:**28-32, 1994
12. Duhaime AC, Gennarelli TA, Thibault LE, et al: The shaken baby syndrome. A clinical, pathological, and biomechanical study. **J Neurosurg 66:**409-415, 1987
13. Gilkes MJ, Mann TP: Fundi of battered babies. **Lancet 2:**468-469, 1967
14. Gout A, Gautier I, Bellaiche M, et al: [Idiopathic peri-cerebral enlargement in infants: simple anatomical variant or hemorrhagic risk factor?] **Arch Pediatr 4:**983-987, 1997 (Fr)
15. Green MA, Lieberman G, Milroy CM, et al: Ocular and cerebral trauma in non-accidental injury in infancy: underlying mechanisms and implications for paediatric practice **Br J Ophthalmol 80:**282-287, 1996
16. Hamza M, Bodensteiner JB, Noorani PA, et al: Benign extracerebral fluid collections: a cause of macrocrania in infancy. **Pediatr Neurol 3:**218-221, 1987
17. Hymel KP, Abshire TC, Luckey DW, et al: Coagulopathy in pediatric abusive head trauma **Pediatrics 99:**371-375, 1997
18. Kapila A, Trice J, Spies WG, et al: Enlarged cerebrospinal fluid spaces in infants with subdural hematomas. **Radiology 142:**669-672, 1982
19. Kempe CH: Paediatric implications of the battered baby syndrome **Arch Dis Child 46:**28-37, 1971
20. Khan SG, Frenkel M: Intravitreal hemorrhage associated with rapid increase in intracranial pressure (Terson's syndrome). **Am J Ophthalmol 80:**37-43, 1975
21. Laubscher B, Deonna T, Uske A, et al: Primitive megalencephaly in children: natural history, medium term prognosis with special reference to external hydrocephalus. **Eur J Pediatr 149:**502-507, 1990
22. Massicotte SJ, Folberg R, Torczynski E, et al: Vitreoretinal traction and perimacular retinal folds in the eyes of deliberately traumatized children. **Ophthalmology 98:**1124-1127, 1991
23. Maytal J, Alvarez LA, Elkin CM, et al: External hydrocephalus: radiologic spectrum and differentiation from cerebral atrophy. **AJR 148:**1223-1230, 1987

0000047

8/22/2000 10:48 AM

24. Ment LR, Duncan CC, Geehr R: Benign enlargement of the subarachnoid spaces in the infant. **J Neurosurg 54**:504-508, 1981

25. Mori K, Handa H, Itoh M, et al: Benign subdural effusion in infants. **J Comput Assist Tomogr 4**:466-471, 1980

26. Mori K, Sakamoto T, Nishimura K, et al: Subarachnoid fluid collection in infants complicated by subdural hematoma. **Childs Nerv Syst 9**:282-284, 1993

27. Muller PJ, Deck JHN: Intraocular and optic nerve sheath hemorrhage in cases of sudden intracranial hypertension. **J Neurosurg 41**:160-166, 1974

28. Mushin A, Morgan G: Ocular damage in the battered-baby syndrome. Report of two cases. **Br J Ophthalmol 55**:343-347, 1971

29. Nickel RE, Gallenstein JS: Developmental prognosis for infants with benign enlargement of the subarachnoid spaces. **Dev Med Child Neurol 29**:181-186, 1987

30. Nishimura K, Mori K, Sakamoto T, et al: Management of subarachnoid fluid collection in infants based on a long-term follow-up study. **Acta Neurochir 138**:179-184, 1996

31. Nogueira GJ, Zaglul HF: Hypodense extracerebral images on computed tomography in children. "External hydrocephalus": a misnomer? **Childs Nerv Syst 7**:336-341, 1991

32. O'Hare AE, Eden OB: Bleeding disorders and non-accidental injury. **Arch Dis Child 59**:860-864, 1984

33. Odita JC: The widened frontal subarachnoid space. A CT comparative study between macrocephalic, microcephalic, and normocephalic infants and children. **Childs Nerv Syst 8**:36-39, 1992

34. Ommaya AK, Faas F, Yarnell P: Whiplash injury and brain damage: an experimental study. **JAMA 204**:285-289, 1968

35. Page AC, Mohan D, Paxton RM: Arachnoid cysts of the middle fossa predispose to subdural haematoma formation fact or fiction? **Acta Neurochir Suppl 42**:210-215, 1988

36. Palencia Luaces R, Aldana Gómez J, Tresierra Unzaga F: [Idiopathic external hydrocephaly and familial macrocephaly in infancy.] **An Esp Pediatr 36**:186-188, 1992 (Sp)

37. Parsch CS, Krauss J, Hofmann E, et al: Arachnoid cysts associated with subdural hematomas and hygromas: analysis of 16 cases, long-term follow-up, and review of the literature. **Neurosurgery 40**:483-490, 1997

38. Pettit RE, Kilroy AW, Allen JH: Macrocephaly with head growth parallel to normal growth pattern: neurological, developmental, and computerized tomography findings in full-term infants. **Arch Neurol 37**:518-521, 1980

39. Robertson WC Jr., Chun RW, Orrison WW, et al: Benign subdural collections of infancy. **J Pediatr 94**:382-386, 1979

40. Roshan K, Elizabeth C, Chacko A, et al: External hydrocephalus--a report of 16 cases from Oman. **J Trop Pediatr 44**:153-156, 1998

41. Shen WC, Yang CF, Chang T: Benign hydrocephalus in infants. A computed tomographic and clinical correlative study. **Acta Radiol Suppl 369**:689-691, 1986

42. Tomasi LG, Rosman NP: Purtscher retinopathy in the battered child syndrome. **Am J Dis Child 129**:1335-1337, 1975

43. Wilkinson WS, Han DP, Rappley MD, et al: Retinal hemorrhage predicts neurologic injury in the shaken baby syndrome. **Arch Ophthalmol 107**:1472-1474, 1989

44. Wilms G, Vanderschueren G, Demaerel PH, et al: CT and MR in infants with pericerebral collections and macrocephaly: benign enlargement of the subarachnoid spaces versus subdural collections. **AJNR 14**:855-860, 1993



000105   0000048

All material on this website is protected by copyright. Copyright © 1994-2000 by Medscape Inc. All rights reserved. This website also contains material copyrighted by 3rd parties. Medscape requires 3.x browsers or better from  Netscape or Microsoft.

000106

0000049

Clinical review

17 Bach JF. The effect of infections on susceptibility to autoimmune and allergic diseases. *N Engl J Med* 2002;347:911-20.
18 Yu L, Robles DT, Abiru N, Kaur P, Rewers M, Kelemen K, et al. Early expression of anti-insulin autoantibodies of man and the NOD mouse: evidence for early determination of subsequent diabetes. *Proc Natl Acad Sci USA* 2000;97:1701-6.
19 Martin S, Wolf-Eichbaum D, Duinkerken G, Scherbaum WA, Kolb H, Noordzij JG, et al. Development of type 1 diabetes despite severe hereditary B-lymphocyte deficiency. *N Engl J Med* 2001;345:1036-40
20 Imagawa A, Hanafusa T, Itoh N, Waguri M, Yamamoto K, Miyagawa J, et al. Immunological abnormalities in islets at diagnosis paralleled further deterioration of glycaemic control in patients with recent-onset type 1 (insulin-dependent) diabetes mellitus. *Diabetologia* 1999;42:574-8.
21 Herold KC, Hagopian W, Auger JA, Poumian-Ruiz E, Taylor L, Donaldson D, et al. Anti-CD3 monoclonal antibody in new-onset type 1A diabetes mellitus. *N Engl J Med* 2002;346:1692-8.
22 Foulis AK, Liddle CN, Farquharson MA, Richmond JA, Weir RS. The histopathology of the pancreas in type 1 diabetes (insulin dependent) mellitus: a 25-year review of deaths in patients under 20 years of age in the United Kingdom. *Diabetologia* 1986;29:267-74.
23 Verge CF, Ginnani R, Kawasaki E, Yu L, Pietropaolo M, Jackson RA, et al. Prediction of type 1 diabetes in first-degree relatives using a combination of insulin, GAD, and ICA512bdc/IA-2 autoantibodies. *Diabetes* 1996;45:926-33.
24 LaGasse JM, Brantley MS, Leech NJ, Rowe RE, Monks S, Palmer JP, et al. Successful prospective prediction of type 1A diabetes in schoolchildren through multiple defined autoantibodies: an 8-year follow-up of the

25 Washington State diabetes prediction study. *Diabetes Care* 2002;25:505-11.
25 Johnson SB. Screening programs to identify children at risk for diabetes mellitus: psychological impact on children and parents. *J Pediatr Endocrinol Metab* 2001;14:653-9.
26 Barker J, Klingensmith G, Barriga K, Rewers M. Clinical characteristics of type 1 diabetic children identified by a genetic screening and intensive follow-up program. *Diabetes* 2003;52(suppl 1):A188.
27 Turner R, Stratton I, Horton V, Manley S, Zimmet P, Mackay IR, et al. UKPDS 25: autoantibodies to islet-cell cytoplasm and glutamic acid decarboxylase for prediction of insulin requirement in type 2 diabetes. *Lancet* 1997;350:1288-93.
28 Atkinson MA, Leiter EH. The NOD mouse model of type 1A diabetes: as good as it gets? *Nat Med* 1999;5:601-4.
29 Diabetes Control and Complications Trial, Epidemiology of Diabetes Interventions and Complications Research Group. Retinopathy and nephropathy in patients with type 1A diabetes four years after a trial of intensive therapy. *N Engl J Med* 2000;342:381-9.
30 Vajo Z, Duckworth WC. Genetically engineered insulin analogs: diabetes in the new millennium. *Pharmacol Rev* 2000;52:1-9.
31 Bolli GB, Owens DR. Insulin glargine. *Lancet* 2000;356:443-5.
32 Meyer L, Guerci B. Metformin and insulin in type 1A diabetes: the first step. *Diabetes Care* 2003;26:1655-8.
33 Shapiro AM, Lakey JR, Ryan EA, Korbutt GS, Toth E, Warnock GL, et al. Islet transplantation in seven patients with type 1A diabetes mellitus using a glucocorticoid-free immunosuppressive regimen. *N Engl J Med* 2000;343:230-8.

## Evidence based case report
## Perimacular retinal folds from childhood head trauma

P E Lantz, S H Sinal, C A Stanton, R G Weaver Jr

*Editorials by Geddes and Plunkett and Harding et al*

Department of Pathology, Wake Forest University School of Medicine, Winston-Salem, NC 27157, USA
P E Lantz
*associate professor*
C A Stanton
*associate professor*

Department of Paediatrics, Wake Forest University School of Medicine
S H Sinal
*professor*

Department of Ophthalmology, Wake Forest University School of Medicine
R G Weaver Jr
*associate professor*

Correspondence to:
P E Lantz plantz@ wfubmc.edu

*BMJ 2004;328:754-6*

A previously healthy 14 month old child was transferred to our medical centre with a severe head injury. The father had collected the boy and his 3 year old brother from their mother at his workplace car park and taken them home while their mother went to work. The children had been watching television while the father prepared dinner. After hearing something fall, the father found the boy on the floor with the television covering the right side of the head and anterior chest. A homemade television stand was partially across the child's lower legs. His older brother stated, "television fell." As soon as the father removed the television, he noticed the child's head beginning to swell. A neighbour drove them to the local hospital. According to the father and the neighbour, the child never stopped breathing and no resuscitative efforts were attempted.

Cranial computed tomography showed extensive head injuries. He had soft tissue swelling of the scalp, diffuse cerebral oedema with a subdural haematoma overlying the frontal convexities and layering along the falx cerebri, a left sided skull fracture adjacent to a widely diastatic coronal suture, cerebral contusions beneath the fracture, and a rightward midline shift measuring 8 mm. The paediatric ophthalmologist described bilateral dot and blot intraretinal haemorrhages, preretinal haemorrhages, and perimacular retinal folds (fig 1).

The child's condition deteriorated, and he died 18 hours after the incident. Child Protective Services removed the 3 year old sibling from the home because the retinal haemorrhages and retinal folds were considered diagnostic of abusive head trauma from shaking. This action was taken despite the father's repeated detailed, consistent account provided to emergency staff, the paediatric child abuse specialist, paediatric intensive care doctors, and law enforcement authorities.

### Postmortem evidence

A forensic autopsy showed no direct trauma to the orbits or eyes. There were prominent bilateral scalp contusions with soft tissue and intramuscular haemorrhage, symmetrical parietal skull fractures with coronal sutural diastasis, and a lacerated dura mater with extrusion of brain and blood. In addition to bilateral subdural and subarachnoid haemorrhages, a thin epidural haematoma partially covered the frontoparietal, calvarial lamina interna. The brain showed bilateral cortical contusions, severe cerebral oedema, and diffuse anoxic-ischemic injury. Postmortem ocular examination showed haemorrhages of the optic nerve sheaths with subdural haemorrhage greater than subarachnoid haemorrhage. Both eyes had extensive retinal haemorrhages with perimacular retinal folds (fig 2). Retinoschisis and peripapillary intrascleral haemorrhages were evident, and the retinal haemorrhages extended from the posterior pole to the ora serrata affecting the preretinal, intraretinal, and subretinal layers.

When investigators went to the house to recover the television before the family returned home, it was still on the carpeted floor. The 480 mm screen television with built in videocassette recorder weighed 19.5 kg. The homemade television stand measured 762 mm (height)×635 mm (width)×508 mm (depth) and had a bottom drawer that held videotapes. A greasy smudged area on the glass of the television corresponded with the impact site on the child's head.

A re-enactment in which a 11.4 kg weight (similar to the child's weight at autopsy of 11.8 kg) was placed on the partially opened drawer caused the television and



Details of the included studies are on bmj.com

000107

0000050

television stand to readily topple forward. According to investigators, the family home was 7.8 km from the workplace and about 6 km from the local hospital. Based on the distance and estimated driving times plus workplace time clock records, the father was home with the children about 20 minutes when the incident happened. The day after the incident, while in foster care, the 3 year old sibling corroborated the father's account. Despite all this evidence, the paediatric ophthalmologist repeated that perimacular retinal folds coincident with retinal haemorrhages were considered specific for shaken baby syndrome secondary to retinal traction exerted by the oscillating vitreous.

## Search for published evidence

We were unable to find a published report of perimacular retinal folds in a childhood non-abusive head injury. We therefore did a systematic review of the medical literature on perimacular retinal folds associated with abusive head trauma in infants and young children. Our background question became: "In infants and young children with an acute intracranial injury, are perimacular retinal folds specific for head injury from vitreoretinal traction occurring during cycles of acceleration and deceleration (shaken baby syndrome)?"

We searched the Medline (1966-2003) database using the terms retinal folds and child abuse and uncovered seven non-comparative case series articles.[1-7] We also examined references cited in these articles plus review articles and book chapters on ocular findings in child abuse mentioning or discussing perimacular retinal folds relative to non-accidental head injury. Similar searches in the Cochrane Library, ISI Web of Science, and Ovid found no additional articles.

## Results

We found 42 articles and book chapters discussing perimacular retinal folds in childhood abusive head trauma. Seventeen mentioned the presence of retinal folds in non-accidental head injury but did not comment on specificity or formative mechanism. A table on bmj.com gives details of the remaining articles. All but two of the articles are non-comparative clinical or autopsy case series, case reports, review articles, or book chapters.

The two studies that included controls both showed bias in selection of controls and contained no cases with perimacular retinal folds but discussed the postulated causal mechanism.[8 9] In the prospective controlled study, the authors reported on 79 children younger than 3 years who had sustained head injuries.[8] The manner of injury in one case was indeterminate. Three children, including one who died, had non-accidental head injury diagnosed, all of whom had retinal haemorrhages; 72 of the 75 children with non-abusive injuries were managed by observation alone. No perimacular retinal folds were observed; however, the presumed causative mechanism of traumatic retinoschisis and retinal folds was discussed.

The second controlled study was a prospective autopsy study that examined the presence and location of ocular findings in 169 childhood deaths.[9] Ocular haemorrhages (retinal, peripheral retinal, optic nerve sheath and intrascleral) were more likely in craniocer-



Fig 1  Clinical image highlighting temporal portion of perimacular retinal fold at 2-3 o'clock area in left eye with a blood vessel bending over the fold (magnification ×6)

ebral trauma than in non-head injuries and natural diseases. Although case selection was purportedly random, the study contained a disproportionately high number of deaths from child abuse compared with natural and non-abusive causes. Case selection depended on the pathologist's willingness to participate in the study, and we were told by one of the authors that pathologists were more willing to participate when they believed that the deaths were abusive or suspicious (M Gilliland, personal communication, 2002). Perimacular retinal folds were not noted, but the authors concluded that acceleration-deceleration injury to the retina accounts for peripheral retinal haemorrhages and retinal folds.

## Supporting evidence

The references cited to support statements about the specificity or causal mechanism of perimacular retinal folds and abusive head injury in the articles we found are all non-comparative observational reports, unsystematic review articles, and book chapters. Seventy per cent of the articles cited four non-comparative case series.[1 3 9 18] We assessed the quality of this evidence.

Gaynon et al reported on two infants with presumed shaken baby syndrome who had retinal folds and concluded that these folds may be a hallmark



Fig 2  Transilluminated retinal image of right eye at autopsy showing circinate, elevated, perimacular retinal fold and extensive retinal haemorrhages

0000052

of shaking injuries in child abuse victims.[1] One infant reportedly fell 1.5 m to the floor while being carried down a stairway.

Massicotte et al reported the ocular findings at autopsy of three children with perimacular retinal folds.[2] Two infants had sustained direct head trauma, but in the other there was no physical or forensic evidence of direct head trauma. They observed that the vitreous had partially separated from the retina but remained attached to the internal limiting membrane at the apices of the folds and the vitreous base. They concluded that their study confirmed the role of vitreous traction in formation of perimacular folds and proved that shaking alone caused these folds and shaking was never an accidental phenomenon.

Elner et al reviewed the ocular and autopsy findings in 10 consecutive children who died of suspected child abuse.[3] Perimacular retinal folds were observed in three children, all of whom had evidence of blunt head injuries.

Greenwald et al reported five cases of children in whom definite or probable physical abuse during infancy was associated with traumatic retinoschisis.[10] They hypothesised that when an infant is shaken, the head is subjected to repetitive accelerations and decelerations causing the relatively dense lens to move forward and back within the ocular fluids. Transmission of force through firm attachments between the lens, vitreous gel, and particularly the macular retina presumably would result in appreciable traction on the retina causing it to split and creating the surrounding folds.

## Discussion

Statements in the medical literature that perimacular retinal folds are diagnostic of shaken baby syndrome are not supported by objective scientific evidence. Noncomparative observational reports and unsystematic narrative review articles contain insufficient evidence to provide unbiased support for or against diagnostic specificity, and inferences about associations, causal or otherwise, cannot be determined. Clinical and autopsy evidence of ocular lesions must therefore be considered alongside other physical findings and a thorough investigation before concluding whether a head injury is caused by abuse. The child in our case had ocular haemorrhages (peripheral retinal, optic nerve sheath and intrascleral) and retinoschisis, which again some people consider specific for child abuse. Unfortunately, the evidence for these assumptions has similar problems to

that for perimacular retinal folds. An evidence based analysis of indexed medical publications on shaken baby syndrome from 1966-1998 uncovered a weak scientific evidence base.[11] Selection bias, inappropriate controls, and the lack of precise criteria for case definition were identified as important problems with the data. Many studies committed a fallacy of assumption, selecting cases by the presence of the clinical findings that were sought as diagnostically valid. Unsystematic reviews and consensus statements often mingled opinion with facts and added no original supporting evidence.

Perimacular retinal folds are associated with increased neurological morbidity and mortality in infants and children with abusive head injuries.[4] The reported incidence of perimacular retinal folds in shaken baby syndrome varies from 6% in a consecutive clinical case series to 50% in a sequential autopsy case series.[5 9] Clinical and autopsy studies with appropriately matched controls are needed to determine the causal mechanism of perimacular retinal folds and their specificity for abusive head injury. Until good evidence is available, we urge caution in interpreting eye findings out of context.

Contributors: PEL conceived the idea, collected the articles, and wrote the initial draft. All authors contributed to the review process, writing, and final editing of the paper. PEL is the guarantor.

Competing interests: None declared.

1   Greenon MW, Koh K, Marmor MF, Frankel LR. Retinal folds in the shaken baby syndrome. Am J Ophthalmol 1988;106:423-5.
2   Massicotte SJ, Folberg R, Torczynski E, Gilliland MG, Luckenbach MW. Vitreoretinal traction and perimacular retinal folds in the eyes of deliberately traumatised children. Ophthalmology 1991;98:1124-7.
3   Elner SG, Elner VM, Arnall M Albert DM. Ocular and associated findings in suspected child abuse. A necropsy study. Arch Ophthalmol 1990;108:1094-101.
4   Han DP, Wilkinson WS. Late ophthalmic manifestations of the shaken baby syndrome. J Pediatr Ophthalmol Strabismus 1990;27:299-303.
5   Marshall DH, Brownstein S, Dorey MW, Addison DJ, Carpenter B. The spectrum of postmortem ocular findings in victims of shaken baby syndrome. Can J Ophthalmol 2001;36:377-83.
6   Mills M. Funduscopic lesions associated with mortality in shaken baby syndrome. J Am Assoc Pediatr Ophthalmol Strabismus 1998;2:67-71.
7   Munger CE, Peiffer RL, Bouldin TW, Kylstra JA, Thompson HW. Ocular and associated neuropathologic observations in suspected whiplash shaken infant syndrome: a retrospective study of 12 cases. Am J Forensic Med Pathol 1993;14:193-200.
8   Buys YM, Levin AV, Enzenauer RW, Elder JE, Letourneau MA, Humphreys RP, et al. Retinal findings after head trauma in infants and young children. Ophthalmology 1992;99:1718-23.
9   Gilliland MG, Luckenbach MW, Chenier TC. Systemic and ocular findings in 169 prospectively studied child deaths: retinal haemorrhages usually mean child abuse. Forensic Sci Int 1994;68:117-32.
10  Greenwald MJ, Weiss A, Oesterle CS, Friendly DS. Traumatic retinoschisis in battered babies. Ophthalmology 1986;93:618-25.
11  Donohoe M. Evidence-based medicine and shaken baby syndrome. Part 1: literature review, 1966-1998. Am J Forensic Med Pathol 2003;24:239-42.
12  Kivlin JD, Simons KB, Lazoritz S, Ruttum MS. Shaken baby syndrome. Ophthalmology 2000;107:1246-54.
(Accepted 28 January 2004)



000109        0000053

## References

Table

References

Greenwald MJ. The shaken baby syndrome. *Semin Ophthalmol* 1990;5:202-15.

Kaur B, Taylor D. Fundus haemorrhages in infancy. *Surv Ophthalmol* 1992;37:1-17.

Keithahn MA, Bennett SR, Cameron D, Mieler WF. Retinal folds in Terson syndrome. *Ophthalmology* 1993;100:1187-90.

American Academy of Pediatrics Committee on Child Abuse and Neglect. Shaken baby syndrome: inflicted cerebral trauma. *Pediatrics* 1993;92:872-5.

Meier P, Wiedemann P. Glaskörper- und fundusveränderungen beim Terson syndrom: Drei falldarstellungen. *Klin Monatsbl Augenheilkd* 1996;209:244-8.

Andrews AP. Ocular manifestations of child abuse. *Pa Med* 1996;99(suppl):71-5.

Rohrbach JM, Benz D, Friedrichs W, Thiel HJ, Wehner HD. Okuläre pathologie der kindesmißhandlung. *Klin Monatsbl Augenheilkd* 1997;210:133-8.

Ellis PS. The pathology of fatal child abuse. *Pathology* 1997;29:113-21.

Ophthalmology Child Abuse Working Party. Child abuse and the eye. *Eye* 1999;13:3-10.

Levin AV. Retinal haemorrhages and child abuse. In David TJ, ed. *Recent advances in pediatrics*. Vol 18. St Louis, MO: Churchill Livingstone, 2000:151-219.

Taylor D. Unnatural injuries. *Eye* 2000;14:123-50.

Levin AV. Ocular manifestations of child abuse. *Ophthalmol Clin North Am* 1990;3:249-64.

American Academy of Pediatrics Committee on Child Abuse and Neglect. Shaken baby syndrome: rotational cranial injuries-technical report. *Pediatrics* 2001;108:206-10.

Nadel FM, Posner JC. In the eye of the beholder. *Paediatr Ann* 2001;30:608-12.

Green MA, Lieberman G, Milroy CM, Parsons MA. Ocular and cerebral trauma in non-accidental injury in infancy: underlying mechanisms and implications for paediatric practice. *Br J Ophthalmol* 1996;80:282-7.

Gayle MO, Kissoon N, Hered RW, Harwood-Nuss A. Retinal haemorrhage in the young child: a review of aetiology, predisposed conditions, and clinical implications. *J Emerg Med* 1995;13:233-9.

Levin AV. Ophthalmology of shaken baby syndrome. *Neurosurg Clin N Am* 2002;13:201-11.

Greenwald MJ, Torczynski E, Mets MB. Acute retinal lesions in battered babies: Clinicopathological correlation of macular craters. *Ophthalmology* 1987;94(suppl):146.

Ober RR. Hemorrhagic retinopathy in infancy: a clinicopathologic report. *J Pediatr Ophthalmol Strabismus* 1980;17:17-20.

Drack AV, Petronio J, Capone A. Unilateral retinal haemorrhages in documented cases of child abuse. *Am J Ophthalmol* 1999;128:340-4.

Kivlin JD. Manifestations of the shaken baby syndrome. *Curr Opin Ophthalmol* 2001:12:158-63

Levin AV. Ocular manifestations of child abuse. In: Reece RM, Ludwig S, eds. *Child abuse: medical diagnosis and management.* Philadelphia, PA: Lippincott Williams and Wilkins, 2001:97-107.

Table

Articles referring to diagnostic specificity or causal mechanism of perimacular retinal folds (PRF) in childhood non-accidental head injury

| Reference | Publication date | Study type (No of cases) | Reference(s) cited re PRF |
|---|---|---|---|
| Gaynon MW et al[1] | 1988 | Clinical case series (2; 2 with PRF) | Case series[10] |
| Han DP et al.[4] | 1990 | Clinical case series (6; 2 with PRF) | Case series,[1] Abstract[w18*] |
| Greenwald MJ[w1] | 1990 | Review article | Case series[1;3;10] Case report[w19] Abstract[w18] |
| Massicotte SJ et al[2] | 1991 | Autopsy case series (3; 3 with PRF) | Case series[1;3] |
| Kaur B et al[w2] | 1992 | Review article | Case series[1;2] |

| | | | |
|---|---|---|---|
| Buys YM et al[8] | 1992 | Prospective clinical study; 0 with PRF | Case series[1;2] |
| Munger CE et al[7] | 1993 | Autopsy case series (12; 5 with PRF) | Case series[1;10] |
| Keithahn MAZ et a.[w3] | 1993 | Clinical adult case series (2; 2 with PRF) | Case series[1;2;3] |
| AAP Committee on Child Abuse & Neglect[w4] | 1993 | Position paper – Review article | Case series[10] <br><br> Review article[w12] |
| Gilliland MGF et al[9] | 1994 | Prospective autopsy study; 0 with PRF | Case series[1;2;7] |
| Meier P et al[w5] | 1996 | Clinical case series (2; 2 with PRF) | Case series[1;2;w3] |
| Andrews AP et al[w6] | 1996 | Review article | Case series[1;2] |
| Rohrbach JM et al[w7] | 1997 | Autopsy case report | Case series[1;2;3;10] |
| Ellis PS[w8] | 1997 | Review article | Case series[1;2] |
| Mills M[6] | 1998 | Clinical case series (10; 4 with PRF) | Case series[1;2] |
| Drack AV et al[w20] | 1999 | Clinical case series (4; 1 with PRF) | Case series[1;2] |
| Ophthalmology Child Abuse Working Group[w9] | 1999 | Consensus review article | Case series[1;2;3;7] |
| Levin AV[w10] | 2000 | Book chapter | Case series[1;2;6] |
| Taylor D[w11] | 2000 | Review article | Case report[w7] <br><br> Case series[1;2;3;7] |
| Levin AV[w22] | 2001 | Book chapter | Case series[10] <br><br> Book chapter[w10] |
| Kivlin JD[w21] | 2001 | Review article . | Case series[1;2;6] <br><br> Review article[w1;11] |
| AAP Committee on Child Abuse & Neglect[w13] | 2001 | Technical report – review article | Case series[10] <br><br> Review article[w12] |

| | | | |
|---|---|---|---|
| | | | Book chapter[w10] |
| Nadel FM et al[w14] | 2001 | Case report; 0 with PRF | Case series[w15] |
| | | | Review article[w12;w16] |
| Marshall DH et al[5] | 2001 | Autopsy case series (6; 3 with PRF) | Case series[1;2] |
| | | | Review article[11] |
| Levin AV[w17] | 2002 | Review article | Case series[2] |

PRF = perimacular retinal fold.

*Reference w18 could not be verified as cited.

Saturday 27 March 2004

# BMJ



EXHIBIT   "I"

Editorial p 720
Clinical review p 754
Letters p 766
Personal view p 775

# The evidence base for shaken baby syndrome

*We need to question the diagnostic criteria*

The phrase "shaken baby syndrome" evokes a powerful image of abuse, in which a carer shakes a child sufficiently hard to produce whiplash forces that result in subdural and retinal bleeding. The theory of shaken baby syndrome rests on core assumptions: shaking is always intentional and violent; the injury an infant receives from shaking is invariably severe; and subdural and retinal bleeding is the result of criminal abuse, unless proved otherwise.[1] These beliefs are reinforced by an interpretation of the literature by medical experts, which may on occasion be instrumental in a carer being convicted or children being removed from their parents. But what is the evidence for the theory of shaken baby syndrome?

Retinal haemorrhage is one of the criteria used, and many doctors consider retinal haemorrhage with specific characteristics pathognomonic of shaking. However, in this issue Patrick Lantz et al examine that premise (p 754) and conclude that it "cannot be supported by objective scientific evidence."[2] Their study comes hard on the heels of a recently published review of the literature on shaken baby syndrome from 1966 to 1998, in which Mark Donohoe found the scientific evidence to support a diagnosis of shaken baby syndrome to be much less reliable than generally thought.[3]

Shaken baby syndrome is usually diagnosed on the basis of subdural and retinal haemorrhages in an infant or young child,[1] although the diagnostic criteria are not uniform, and it is not unusual for the diagnosis to be based on subdural or retinal haemorrhages alone.[4] The website of the American Academy of Ophthalmology states that if the retinal haemorrhages have specific characteristics "shaking injury can be diagnosed with confidence regardless of other circumstances."[4] Having reviewed the evidence base for the belief that perimacular folds with retinal haemorrhages are diagnostic of shaking, Lantz et al were able to find only two flawed case-control studies, much of the published work displaying "an absence of ... precise and reproducible case definition, and interpretations or conclusions that overstep the data."[2] Their conclusions are remarkably similar to those of Donohoe, who found that "the evidence for shaken baby syndrome appears analogous to an inverted pyramid, with a very small database (most of it poor quality original research, retrospective in nature, and without appropriate control groups) spreading to a broad body of somewhat divergent opinions."[3] His work entailed searching the literature, using the term "shaken baby syndrome" and then assessing the

methods of the articles retrieved, using the tools of evidence based inquiry. Reviewing the studies achieving the highest quality of evidence rating scores, Donohoe found that "there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters," and identified "serious data gaps, flaws of logic, inconsistency of case definition."[3]

The conclusions of Lantz et al and of Donohoe make disturbing reading, because they reveal major shortcomings in the literature relating to a field in which the opportunity for scientific experimentation and controlled trials does not exist, but in which much may rest on interpretation of the medical evidence.[5]

If the concept of shaken baby syndrome is scientifically uncertain, we have a duty to re-examine the validity of other beliefs in the field of infant injury. The recent literature contains a number of publications that disprove traditional expert opinion in the field. A study of independently witnessed low level falls showed that such falls may prove fatal, causing both subdural and retinal bleeding.[6] [7] A biomechanical analysis validates that serious injury or death from a low level fall is possible and casts doubt on the idea that shaking can directly cause retinal or subdural haemorrhages.[7] [8] An important lucid interval may be present in an ultimately fatal head injury in an infant.[8] Neuropathological studies have shown that abused infants do not generally have severe traumatic brain injury and that the structural damage associated with death may be morphologically mild.[9] [10] What is the relevance of the craniocervical injuries to corticospinal tracts, dorsal nerve roots, and so on that have been described?[10] [11] We do not know. What is the force necessary to injure an infant's brain? Again, we do not know.

While most abused children indisputably show the signs of violence, not all do. No one would be surprised to learn that a fall from a two storey building or involvement in a high speed road traffic crash can cause retinal and subdural bleeding, but what is the minimum force required? "It is one thing clearly to state that a certain quantum of force is necessary to produce a subdural hematoma; it is quite another to use examples of obviously extreme force ... and then suggest that they constitute the minimum force necessary."[11]

Research in the area of injury to infants is difficult. Quality evidence may need to be based on finite element

Additional references w1-w3 are on bmj.com

P+

modelling from data on immature skulls, or from immature animal models, if performed, would need to be validated against the known mechanical properties of the human infant. Pending completion of such studies, the reviews by Lantz and Donohoe are a valuable contribution and provide a salutary check for anyone wishing to cite the literature in support of an opinion. Their criticisms of lack of case definition or proper controls can be levelled at the whole literature on child abuse. If the issues are much less certain than we have been taught to believe, then to admit uncertainty sometimes would be appropriate for experts. Doing so may make prosecution more difficult, but a natural desire to protect children should not lead anyone to proffer opinions unsupported by good quality science. We need to reconsider the diagnostic criteria, if not the existence, of shaken baby syndrome.

J F Geddes *retired (formerly reader in clinical neuropathology, Queen Mary, University of London)*

London (j.f.geddes@doctors.org.uk)

J Plunkett *forensic pathologist*

Regina Medical Center, 1175 Nininger Road, Hastings, MN 55033, USA

Competing interests: JFG and JP have given evidence in criminal cases at the request of both prosecution and defence.

1  American Academy of Pediatrics Committee on Child Abuse and Neglect. Shaken baby syndrome: rotational cranial injuries—technical report. *Pediatrics* 2001;108:206-10.
2  Lantz P, Sinai S, Stanton C, Weaver R. Perimacular retinal folds from childhood head trauma: Case report with critical appraisal of current literature. *BMJ* 2004;328:754-6.
3  Donohoe M. Evidence-based medicine and shaken baby syndrome. Part I: literature review, 1966-1998. *Am J Forensic Med Pathol* 2003;24:239-42.
4  American Academy of Ophthalmology. Shaken baby syndrome resources. www.aao.org/aao/education/library/shaken_baby.cfm (accessed 25 Feb 2004).
5  Milroy CM. Medical experts and the criminal courts. *BMJ* 2003;326:294-5.
6  Plunkett J. Fatal pediatric head injuries caused by short-distance falls. *Am J Forensic Med Pathol* 2001;22:1-12.
7  Omanaya AK, Goldsmith W, Thibault L. Biomechanics and neuropathology of adult and paediatric head injury. *Br J Neurosurg* 2002;16:220-42.
8  Denton S, Mileusnic D. Delayed sudden death in an infant following an accidental fall. *Am J Forensic Med Pathol* 2003;24:371-6.
9  Geddes JF, Hackshaw AK, Vowles GH, Nickols CD, Whitwell HL. Neuropathology of inflicted head injury in children. I. Patterns of brain damage. *Brain* 2001;124:1290-8.
10  Geddes JF, Vowles GH, Hackshaw AK, Nickols CD, Scott IS, Whitwell HL. Neuropathology of inflicted head injury in children. II. Microscopic brain injury in infants. *Brain* 2001;124:1299-306.
11  Shannon P, Smith CR, Deck J, Ang LC, Ho M, Becker L. Axonal injury and the neuropathology of shaken baby syndrome. *Acta Neuropathol* 1998;95:625-31.
12  People v Martinez, 51 P3d 1046 (2001) (R'hrg den. 2002) (cert. granted, 2002).

# Shaken baby syndrome

*Pathological diagnosis rests on the combined triad, not on individual injuries*

Shaken baby syndrome is a form of physical non-accidental injury to infants, characterised by acute encephalopathy with subdural and retinal haemorrhages, occurring in a context of inappropriate or inconsistent history and commonly accompanied by other apparently inflicted injuries.[1][2] Injuries to the neck and spinal cord may also be present. Controversy surrounds the precise causation of the brain injury, the retinal and subdural haemorrhages, as well as the degree of force required and whether impact in addition to whiplash forces is needed.[1][3][4] Although most discussion has concerned fatal injuries of this nature, not all are lethal, but they may be associated with subsequent neurological disability of varying severity.

Expert medical evidence about inflicted injury must have scientific validity, but applying the evidence based criteria appropriate to clinical practice entails some difficulties.[5] In clinical practice medical management of defined clinical problems can be compared and best practice distinguished by clinical outcomes. Conversely, in inflicted paediatric injuries, one is presented with the outcome, investigation follows rather than precedes that outcome, and the history may be incomplete or deliberately misleading. A need exists for an impartial and intelligent assessment, but how may this be achieved in practice?

Because of the serious implications of diagnosing inflicted injury such as shaken baby syndrome, every case must be evaluated in detail, taking account of all the circumstances surrounding the injury and considering the pathological features in full, rather than attempting to evaluate the significance of each component

In shaken baby syndrome, it is the combined triad of subdural and retinal haemorrhage with brain damage, as well as the characteristics of each of these components that allow a reconstruction of the mechanism of injury, and assessment of the degree of force employed. The application of rotational acceleration and deceleration forces to the infant's head causes the brain to rotate in the skull. Abrupt deceleration allows continuing brain rotation until bridging veins are stretched and ruptured, causing a thin layer of subdural haemorrhage on the surface of the brain. This is not a space occupying lesion; its importance is in indicating the mechanism of injury. The retinal haemorrhages, which are characteristically extensive, occupy much of the circumference of the globe and extend through all the layers of the retina and similarly result from rotational acceleration and deceleration forces.

The mechanism of brain damage is problematic. Traditional wisdom has suggested shearing forces operating within the brain substance with consequent axonal damage.[6] Geddes et al, in a careful neuropathological study of head injuries in children using β amyloid precursor protein immunostaining, observed that the predominant changes in infants with evidence of shaking were hypoxic-ischaemic rather than the diffuse axonal injury seen in older children and adults with fatal head trauma.[7][8] These authors thought that acceleration and deceleration forces might damage the neuraxis to cause apnoea, with consequent ischaemic insult causing diffuse cerebral oedema.

Unfortunately, this logical idea was followed in a second paper by the statement, "Although mechanisms of

Editorial p 719
Clinical review p 754
Letters p 766
Personal view p 775

*BMJ* 2004;328:720-1

000115   0000059

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,

     Plaintiff,

v.                               CASE NO. 01-2000-CF-002753-A

BRIAN PATRICK HERLIHY,

     Defendant.

_____

**ORDER DENYING MOTION FOR POST-CONVICTION RELIEF**

**THIS CAUSE** comes before this Court upon Defendant's "Motion to Vacate Sentence

and Conviction Pursuant to Fla. R. Cr. P. 3.850 and Memorandum of Law," [hereinafter 'PCR

Motion'] filed August 10, 2005.

1.     Defendant alleges that trial counsel was ineffective for failing to request a *Frye*

Hearing prior to the admission of testimony which adduced that the victim died of Shaken Baby

Syndrome. Defendant claims that a *Frye* Hearing was in order because the diagnosis of Shaken

Baby Syndrome is not based on a scientific principle or discovery that is "sufficiently established

to have gained general acceptance in the particular field in which it belongs," nor is it

"sufficiently tested and accepted by the relevant scientific community." PCR Motion at 3 (citing

Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923) [hereinafter 'Frye'].

2.     Frye states that in order to introduce expert testimony deduced from a scientific

principle or discovery, the principle or discovery "must be sufficiently established to have gained

STATE V. HERLIHY
ORDER DENYING MOTION FOR POST-CONVICTION RELIEF
CASE NO. 01-2000-CF-002753-A
PETER K. SIEG, CIRCUIT JUDGE

general acceptance in the particular field in which it belongs." Frye at 1014. The ultimate

purpose of a Frye hearing is to "guarantee the reliability of new or novel scientific evidence,"

Brim v. State, 695 So. 2d 268, 271 (Fla. 1997); United States Sugar Corp. v. Henson, 823 So. 2d

104, 110 (Fla. 2002); therefore, a Frye hearing is not necessary where general acceptance of the

principle or discovery by the relevant scientific community is already recognized. Indeed, firmly

established scientific theories are never subject to Frye testing. See Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579 (1993).

   3.  Neither the United States Supreme Court, nor Florida appellate courts have

specifically addressed whether expert testimony on Shaken Baby Syndrome is subject to Frye

testing; however, Florida appellate courts recognize Shaken Baby Syndrome as an accepted

medical diagnosis and approve its use. See Dixon v. State, 691 So. 2d 515, 516 (Fla. 1st DCA

1997); Washington v. State, 737 So. 2d 1208 (Fla. 1st DCA 1999); N.L. v. Department of

Children and Family Services, 843 So. 2d 996 (Fla. 1st DCA 2003); Barber v. State, 781 So. 2d

425 (Fla. 5th DCA 2001); A.R. v. Department of Children and Families, 784 So. 2d 622, 623

(Fla. 5th DCA 2001); Moore v. State, 790 So. 2d 489, 491 (Fla. 5th DCA 2001).

   Jurisdictions outside of Florida acknowledge that the diagnosis of Shaken Baby

Syndrome is a result of extensive research and constitutes a widely accepted medical diagnosis.

See State v. Lopez, 306 S.C. 362, 367 (S.C. 1991); State v. McClary, 541 A.2d 96 (Conn. 1988);

State v. Leibhart, 266 Neb. 133 (Neb. 2003).

   4.  Defendant cites to a few articles which he purports criticize the diagnosis of

Shaken Baby Syndrome; he claims that these articles demonstrate that there is no general

acceptance of the syndrome. Even if this Court accepts that criticism exists in the relevant

scientific community, that does not support Defendant's claim that a Frye hearing was therefore

in order. The need for a Frye hearing is not indicated simply because some experts disagree with

a party's theory of medical causation. *See* Gelsthorpe v. Weinstein, 897 So. 2d 504, 511 (Fla. 2d

DCA 2005).

5.     Here, Defendant alleges ineffective assistance of counsel as a basis for relief;

therefore, he must assert that trial counsel's performance did not comply with prevailing

standards of professionalism. *See* Strickland v. Washington, 466 U.S. 668, 691-92 (1984)

(hereinafter 'Strickland'). In addition, Defendant must be able to show that "there is reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." Strickland at 694.

6.     Even accepting that trial counsel did not request a Frye hearing on the

admissibility of expert testimony regarding Shaken Baby Syndrome; Defendant fails to raise a

cognizable claim for relief. Counsel did not commit unprofessional error by not requesting a

Frye hearing to examine a diagnosis which courts already approve, and recognize as an accepted ·

medical diagnosis.

7.     Furthermore, Defendant does not make a prima facie showing of prejudice for the

same reason that he fails to make a prima facie showing of unprofessional error. Based on the

courts' approval and recognition of Shaken Baby Syndrome, a reasonable probability does not

Page 3 of 4

000118     ~0000062~





Fig 3.—Retinal findings indicative of old injury. Left, Gliotic nerve fiber layer contains hemosiderin (blue) following resorption of hemorrhage (Perls' iron stain, original magnification ×79). Right, Resolving subsensory retinal hemorrhage contains macrophages (straight arrows) engulfing debris from lysed erythrocytes. Fresh preretinal hemorrhage and hemosiderin (curved arrow) in the choroid indicate injuries of different ages (hematoxylin-eosin, original magnification, ×79).



Fig 4.—Optic nerve pathologic findings. Top left, Subdural optic nerve hemorrhage (arrow). Top center, Subdural (straight arrow) and subarachnoid (curved arrow) hemorrhages as well as florid papilledema and associated optic disc and peripapillary retinal hemorrhages are present (hematoxylin-eosin, original magnification ×4). Top right, Peripapillary intrascleral hemorrhage (straight arrows) originating from the circle of Zinn resulted from force transmitted to the optic nerve–eye junction. In this case, it is continuous with the subdural hemorrhage. Papilledema and severe optic disc, retinal, and subhyaloid (curved arrow) hemorrhages are evident (hematoxylin-eosin, original magnification ×8). Bottom left, Infarct (arrow) of the optic nerve (shown at top left) shows axonal loss and microcystic change. Massive subdural hemorrhage (asterisk), papilledema, and retinal and subinteral limiting membrane hemorrhages are also seen (hematoxylin-eosin, original magnification ×8). Bottom center, Severe intrascleral hemorrhage (arrow) from the circle of Zinn has dissected into the surrounding sclera and is continuous with the subdural hemorrhage (asterisk). Intraretinal and periretinal hemorrhages are also present (hematoxylin-eosin, original magnification ×13). Bottom right, Hemosiderin deposits (blue) in perineural scar tissue are indicative of old, organized hemorrhage. Fresh, subdural optic nerve hemorrhage was also present (Perls' iron stain, original magnification ×79).

STATE V. HERLIHY
ORDER DENYING MOTION FOR POST-CONVICTION RELIEF
CASE NO. 01-2000-CF-002753-A
PETER K. SIEG, CIRCUIT JUDGE

exist that but for trial counsel's omission the expert testimony on Shaken Baby Syndrome would

have been excluded.

8.      Therefore it is **ADJUDGED:**

Defendant's Motion for Post-Conviction Relief *is denied*. No successive motion

for post-conviction relief will be entertained by this Court. Defendant may appeal this decision

to the First District Court of Appeals within 30 days of this order's effective date.

**ORDERED** on September 2̲9̲, 2005.

PETER K. SIEG, CIRCUIT JUDGE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Order was furnished by U.S.
Mail/hand delivery, on this _30_ day of September 2005, to the following:

David Mengers, Attorney for Defendant
500 NE 8th Ave.
Ocala, FL 34470

State Attorney's Office
Jeanne Singer, Chief Assistant State Attorney
Pamela K. Brockway, Assistant State Attorney

Mr. Brian Herlihy - DC #G06137
South Bay CF
P.O. Box 7171
600 US Hwy 27
South Bay, FL 33493

Mary Fortinberry, Judicial Assistant

/dzm

Page 4 of 4

Q00119          0000063



# IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
## IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,

*60CF2753A*

vs.                                          Case No: # 02-2753-CF-A

BRIAN HERLIHY,

    Defendant.

_____/

## RULE 3.850 MOTION FOR
## POST CONVICTION RELIEF

Comes now defendant, Brian Herlihy, pro-se and respectfully moves this Honorable Court to vacate the conviction in this cause and in support thereof does state:

1.) On or about August 4, 2000, defendant was arrested for the offense of aggravated child abuse.

2.) On or about August 10, 2000, the child victim died and on August 29, 2000, defendant was indicted for first-degree murder.

3.) After trial by jury, defendant was convicted of manslaughter on September 25, 2002 and sentenced to 15-years in prison on November 8, 2002.

4.) Timely notice of appeal was filed on December 30, 2002. Plenary appeal from the same was affirmed without opinion by the First District Court of Appeals on November 3, 2004, mandate issued on November 19, 2004.



1

5.) The offense arose and trial was conducted in Alachua County, Eighth Judicial Circuit. Trial was conducted before Honorable Judge Martha Ann Lott.

6.) A prior Rule 3.850 was filed in this cause on or about August 10, 2005, via counsel Mr. David Mengers. One ground for relief was presented, trial counsel's failure to request a **Frye** hearing to determine admissibility of medical diagnosis of Shaken Baby Syndrome, (SBS).

**Frye v. United States**, 293 F.1013 (D.C. Cir. 1923)

7.) Said motion was denied without order to show cause by Honorable Judge Peter R. Sieg on September 29, 2005. Notice of appeal was filed, brief of appellant was submitted and the First District Court of Appeal affirmed without opinion on or about May 10, 2006.

8.) Defendant was represented at trial by Gordon Groland & John Tedder. Defendant's plenary appeal was represented by Office of the Public Defender, Ms. Nada M. Carey, DCA # 1D02-4788. Defendant was represented by Mr. David Mengers on his previous Rule 3.850 Motion and Appeal therefrom.

### I. Timeliness

This motion is timely submitted as mandate from plenary appeal issued on November 19, 2004.

### II. This Motion is not impermissibly successive

Defendant respectfully submits that this Honorable Court has discretion to entertain this motion, defendant's second Rule 3.850. While "Second Tries" at postconviction are disfavored, they are permissible if required by the interests of justice. This motion is made in good faith and not intended to abuse the judicial process.

A circuit court has the authority to deny as successive on Second Rule 3.850 motion presenting new grounds, if there is no reason for not having presented the grounds in the prior

2

motion. **Owen v. Crosby**, 854 So.2d 182 (Fla. 2003) citing **Pope v. State**, 702 So.2d 221, 223 (Fla. 1997). See also **Baker v. State**, 878 So.2d 1236 (Fla. 2004).

While the aforecited authorities reference Section (F) of Rule 3.850, no clear examples of permissible reasons for a second motion are set forth. Of course a second motion is per-se permissible if the prior motion was found to be facially or legally insufficient and or summarily denied.

In accordance with the aforecited authorities, defendant sets forth the following reasons, urging the Court not to bar this pleading as impermissibly successive.

**(a) The prior motion failed to present a cognizable ground for relief.**

Honorable Judge Seig's order denying relief, rendered without response from the State, determined inter alia: "Even accepting that trial counsel did not request a **Frye** hearing on the admissibility of expert testimony regarding Shaken Baby Syndrome; defendant fails to raise a cognizable claim for relief. Counsel did not commit unprofessional error by not requesting a **Frye** hearing to examine a diagnosis which courts already approve, and recognize as an accepted medical diagnosis." Id. at pg. # 3, paragraph # 6.

Defendant respectfully submits that a motion that fails to present a cognizable ground for relief, is legally insufficient.

Moreover, the Order Denying Relief notes that the motion fails to make a prima facie showing or prejudice. A claim of ineffective assistance of trial counsel that fails to demonstrate such a showing, is legally insufficient. Id supra at paragraph # 7.

**(b) Defendant is actually innocent**

3

Defendant respectfully submits that he is actually innocent of the death of the deceased, then 4 months old Robert Quirello.  Review of the trial transcripts evidences that defendant refused all plea offers and maintained his innocence at sentencing.

All ten expert witnesses in this cause agreed that death resulted from lack of oxygen to the brain.[1]  Dispute arose as to whether the child had previous brain injury and whether the same brought about a seizure that resulted in additional injury and death.  The State argued that no prior brain injury existed and that death resulted from defendant shaking the child and bouncing the child's head on a mattress.

It was conceded at trial that the initial autopsy report contained several oversights and that a vascular brain membrane known as the dura mater, was improperly disposed of.  The significance of which was contested.

Two facets of the State's case were the linchpins of this conviction:

(i) That defendant lacked proof of causation for the prior brain injuries and seizure that brought about the child's death, and (ii) That defendant made inculpatory remarks to Detective Helen Legall, unrecorded & unwitnessed.

Defendant submits that Grounds One & Two herein, demonstrate that both the aforementioned are a direct result of trial counsel's error.  Specifically, that quite some time prior to trial, defense counsel Mr. Groland received a report from Dr. Viera Scheibner <presented as Exhibit # 2 & incorporated by reference in Ground # 1, infra>.  In sum, the same explains that the child was vaccinated twice with a complete series of six vaccines, some of which are listed as "hot lots".  The same are described by Dr. Scheibner as "a potent toxic cocktail."

---

[1] Defendant references the trial transcripts and setsforth in detail these allegations in Ground One of this motion infra.

Moreover, that post-trial examination of the medical records of the mother revealed that she was treated with a medication known as a Corticosteroid. As such, the child was exposed to the same in utero.

The Corticosteroid resulted in inter alia, both mother & child becoming diabetic. Additionally, that the mother was treated with the diabetes medication Micronase & breastfed the child, exposing the infant to the same.

Lastly, the child suffered from host of documented medical infirmities unknown to the jury. Had the report of Dr. Scheibner not been ignored, the child's poor health would have been discovered.

In Ground # 2, defendant submits that counsel failed to call Detective Weaver to testify that Weaver drove defendant & Detective Legall to the jail at the time the second unrecorded inculpatory statements were allegedly made. Detective Weaver did not pull the car over to the side of the road so defendant could confess, as alleged by Detective Legall. Detective Weaver would have substantially impeached Detective Legall and negated the purported statements, key evidence resulting in the manslaughter conviction. Detective Weaver was deposed by defense counsel and was available to testify.

As explained infra, these errors completely undermined defendant's defense and resulted in this conviction. Absent these errors, defendant could have proved his actual innocence and would have been acquitted.

(c) To bar this motion as impermissibly successive would constitute suspension of the Writ of Habeas Corpus.

Defendant respectfully contends that this Court has the authority to entertain this pleading pursuant to both Rule 3.850 (b) & Section (h) of the same.

5

Because this Motion is timely, and makes a prima facie showing of actual innocence, imposing a successive motion bar would constitute suspension of the Writ of Habeas Corpus. Such a bar, if otherwise applicable, should give way to defendant's showing of actual innocence. **Schlup v. Delo**, 115 S.Ct. 851 (1995).

To bar defendant from presenting the grounds set forth herein, as a result of post conviction counsel's error, would constitute a grave injustice, where defendant is actually innocent. See for example **James v. State**, 747 So.2d 462 (2nd DCA 1999), **Newman v. State**, 782 So.2d 925 (2nd DCA 2001), indicating that Section (h) is permissible when the error is attributable to post conviction counsel and timeliness is not an issue.

Based upon the reasons set forth above, defendant prays that he be permitted this opportunity to prove his innocence and bring closure to the tragedy that resulted in the child's death.

### Ground One

Failure of defense counsel to conduct reasonable pretrial investigation, which would have presented evidence of causation of death, deprived defendant of a fair trial.

Defendant submits that reasonable medical evidence of causation of death was provided to defense counsel, Gordon Groland on November 2000. Specifically, believing in the defendant's innocence, Mrs. Lois Herlihy, mother of defendant, sought consultation in the form of professional review of medical records of the mother and the child.

On or about November 2000, Mrs. Herlihy received seven-page report from Dr. Viera Scheibner, Principal Research Scientist, retired, providing an opinion to the affect that the child's double vaccination was a key factor in his death. Exh. # 2.

6

Mrs. Herlihy provided defense counsel with the report on or about _____ October,

2000. (sworn affidavit of Mrs. Herlihy Exh. # 1) counsel made no effort to contact Dr.

Scheibner or consult anyone of expertise in the field of toxicology.

This error in judgment prevented counsel from discovering facts, which if explored,

would have illustrated the following: [2]

(a) State's expert witness Dr. Krienest, testified that the birth of the deceased was without

incident, with the exception of having been born brow up, with the umbilical cord around his

neck & a broken collarbone and was born approximately 4 weeks premature, what was not

explained/discovered, was that Crystal Dawn Quirello (mother) was in labor eight days prior to

delivery. (Exh. # 3, Dr. A., pg. # 6). It was uncontested that the mother was hospitalized as a

result of an auto accident for about a week during her 26th week of gestation. The child was born

during the 34th week of gestation.

(b) The mother was treated with Betamethasone (Corticosteroid) during the last week of

pregnancy. As such, the deceased was exposed to corticosteroid in utero. (Exh. # 3, Dr. Al-

Bayati, pg. # 6) & after birth via breastfeeding.

(c) As a result of the Corticosteroid, both mother & child developed diabetes. Blood &

urine tests performed on the mother on 1-24-2000 & 3-3-2000, indicate that she did not suffer

from gestational diabetes during pregnancy. Her medical record shows that she was treated with

the anti-diabetic drug Micronase (glyburide) after delivery. She was advised to stop taking

Micronase on 6-8-2000. The mother took Micronase during the period she was breastfeeding the

deceased. (Exh. # 3 Dr. Al-Bayati, pg. # 13).

---

[2] The factual information is derived from the post-trial reviews conducted by Dr. Mohammed Ali Al-Bayati, PhD, DABT, DABVT, Toxicologist-Pathologist & Dr. F. Edward Yazbak, Md, FAAP. Both reports contain cover statements stating a professional opinion within a degree of medical certainty, that death was due to medical causes & not inflicted injury.

7

(d) The child's symptoms were induced by Corticosteroid. These are evidenced by (1) polyurea, chronic urination, (2) gastrointestinal & feeding problems (3) excessive weight gain, (4) muscle weakness, (5) vision Problems, (6) severe thymic atrophy. (Exh. # 3 Dr. Al-Bayati, pgs. 15-17).

(e) <u>The child was not a well child as portrayed by the State.</u>

State's witness Dr. Hellrung testified that he was the baby's pediatrician. (TT. 113). In sum, while the child evidenced some signs of possible neurological deficit the same was ruled out. Specifically, that the child spit up formula frequently (TT. 122), that his head circumference was slightly above average (TT. 125), had poor neck & head control (TT. 126) & poor eye tracking. (id., TT. 128). On his four-month check up, it was determined that the child was bigger then average for a baby not born premature. At that visit, the child was still spitting up. (TT. 130). In Dr. Hellrung's medical opinion, he didn't believe the child was suffering from a chronic subdural hematoma. (TT. 133). Dr. Hellrung was not aware that the radiologists found earlier generations of hematomas in the child's brain, existing prior to August 2, 2000, the date of incident. (TT. 134). Dr. Hellrung was not aware of the mother's auto accident & hospitalization during her pregnancy. (TT. 135). As such, Dr. Hellrung was equally unaware of the mother's treatment with Corticosteroids & Micronase. There is no indication of Dr. Hellrung ever being aware of the diabetes of mother or child. As a result of the same, the jury know not.

## ANALYSIS

Had defense counsel consulted Dr. Scheibner, the information presented in the reports of Dr. Al-Bayati & Dr. Yazbak would have been easily discoverable.

For example, no mention of the child's double vaccination was mentioned. There was no mention of the child's extensive sinusitis (maxillary & ethmoid) or his bilateral mastoiditis.

8

These findings are distinct, serious & unusual for a child that young. They were obviously long-standing indicating the child had two major pre-existing pathological processes in his head. (Exh. # 4, Dr. Yazbak, pg. # 18).

Additionally, as a result of the aforementioned pathology, the stress of the vaccinations of 5-19-2000 accentuated by vitamin C requirements of the same, resulted in a major increase in blood histamine. The same started a cascade of problems including; vascular fragility, cerebral & retinal hemorrhages. (Exh. # 4, Dr. Yazbak pgs. # 18, 20-23. Exh. # 3, Dr. Al-Bayati, pgs. # 17-22).

Not responding to Dr. Scheibner closed the door of opportunity to develop the existing facts as noted by Dr. Al-Bayati & Dr. Yazbak, Exh. # 3, Exh. # 4. Page six of Dr. Scheibner's report alone should have excited an interest in a case such as this, where "what done it" should have been the focal point as opposed to "who done it." Page six reads in part: "It is well documented in medical records that Robbie (the child) was given a multitude of vaccines starting as early as 7 weeks of his short life, and again at about 3 months of his age. Twelve vaccines in all. This represents a potent toxic cocktail, in small babies such as baby Robbie." (Exh. # 2, Dr. Scheibner, pg. # 6).

State expert Dr. Richard M. Kreinest testified that he first examined Crystal D. Quirello on August 31, 1999 at the crisis pregnancy center where at he practiced as a obstetrician/gynecologist. (TT. 376). Dr. Kreinest stated that after Crystal's auto accident of 1-10-2000, she began to have preterm contractions. (TT. 388). To prevent preterm delivery, medication known as Terbutaline was administered to relax the muscle of the uterus preventing contractions. According to Dr. Kreinest, Terbutaline has been used for at least 20 years & no evidence exists that it results in any significant harm to the fetus. (TT. 389).

9

## ANALYSIS

Dr Kreinest made no mention that Crystal was treated with Betamethasone (a corticosteroid) to mature the baby's lungs prior to birth. Defense counsel simply didn't have a clue as to what to examine the medical record for, as relates to toxicology, i.e. Corticosteroids. Counsel did not know that Crystal was treated with the Corticosteroid during her last month of pregnancy. Counsel was totally unaware of the scientific data related to the harm caused by the drug. Moreover, as briefly set forth infra, the Corticosteroid plus the "vaccine toxic cocktail," plus the child's diabetes all evidenced in the symptoms that brought about this child's death.

Defendant submits that Dr. Hellrung had a direct interest in not discussing the double vaccination of the child, as well as the child's 100.7-degree fever on 4-26-2000.

That Dr. Krienest also had a direct interest in not discussing Crystal's treatment with any Corticosteroid & Micronase.

As a result of the same, only pretrial review by a skilled expert would have discovered these documented medical facts. Having ignored Dr. Scheibner's report, defense counsel foreclosed development of crucial evidence to support defendant's only defense, e.g. that the child died of causes not related to defendant's care.

Dr. Bernard Maria testified as an expert for the State as a pediatric neurologist with 21 years experience. (TT. 1115). Dr. Maria was called upon to examine the child on August 2, 2000, by Dr. Dickinson. (TT. 1117). According to Dr. Maria, he examined the CT scans of the child, laboratory tests & a physical examination. (TT. 1118-1119). Dr. Maria utilized a device known as an ophthalmoscope to examine the eyes of the child. The same revealed bleeding in the fluid of the eye (vitreous), retina & multiple hemorrhages. (TT. 1120). The child had abnormal reflective movements & the soft spot in the child's head was tense, pulsatile, abnormal.

10

(TT. 1121). Dr Maria concluded that the child was being treated with an anti-seizure medication, & that the injuries were a direct result of the child having been shaken. (TT. 1122). Dr. Maria testified that an EEG scan of the child's brain demonstrated that the waves were very slow meaning the brain dysfunction involved the entire brain. (TT. 1126). Putting all the pieces together, known as unifying diagnosis; the conclusion was that the injuries resulted from traumatic shaking of the child. (TT. 1127). According to Dr. Maria, the shaking had to of occurred in a 30 minute window from 9:00 a.m. (TT. 1128). Dr. Maria opined that blood on the child's brain was an irritation & coupled with brain cell damage, which resulted in a seizure (TT. 1130). Dr. Maria testified that it's unusual for swelling of the brain to occur from seizures, it's almost always that something else causes the seizures & brain swelling. (TT. 1131). According to Dr. Maria, if the child had a subdural hematoma at birth, within two months the child's head would be significantly larger than normal. (TT. 1134). Dr. Maria stated that the child's injuries were not caused by a lack of oxygen & that a lack of oxygen would not explain the retinal hemorrhaging. (TT. 1134-1135).

On cross examination, Dr. Maria testified that injuries such as those suffered by this child, could not occur if the child went 3-4 minutes without air. (TT. 1148). Dr. Maria explained that brain death is a very specific ordeal & although the child's brainstem was still working, the child had no chance of meaningful recovery. (TT. 1153). Dr. Maria agreed that the CAT scans of the child possibly revealed an older injury, a chronic subdural hematoma. (TT. 1154). Apparently, the existence of the same was suspected to exist at the time of the CAT scans. (TT. 1155). Dr. Maria agreed that swelling of the brain could cause pressure on the optic nerve. (TT. 1156). That such swelling can cause retinal hemorrhaging & that maybe the child had a chronic subdural hematoma (id.). Dr. Maria agreed that a chronic subdural hematoma is

11

impossible to date without microscopic examination. (TT. 1156-1157). Dr. Maria testified that Dr. Nelson's autopsy report essentially found that the child had an immature brain with a subarachnoid hemorrhage & hematoma. (TT. 1162). Dr. Maria agreed that the child's brain cells suffered from a lack of oxygen. (TT. 1163). Dr. Maria testified that Dr. Nelson's autopsy report made no mention of any tearing of the brain nerves (TT. 1164). Dr. Maria agreed that in SBS injuries the brain nerves are torn (as testified to on direct) but that the same is not evidenced by the autopsy report. (TT. 1165-1166). Dr. Maria agreed that weak neck muscles & not eating properly can be an indication of neurological damage and that he was not aware of the existence of these in this child. (TT. 1168). Dr. Maria testified that he was aware that Dr. Dickinson noted a small bruise on the child's head, but that after examining the child, Dr. Maria found none. (TT. 1173-1174).

Defense counsel questioned Dr. Maria regarding the physics of SBS, the lack of neck injury in this case & several medical journal articles discrediting the theory. (TT. 1177-1184). The questioning centered upon the SBS theory as it relates to whiplash, a vigorous back & forth involuntary movement of the head. Dr. Maria testified that the child was the worst case of SBS he'd seen in over 20 years. (TT. 1184-1185). However, apparently there wasn't any damage to the child's neck. Also, that the child's neck wasn't examined & the neck usually isn't examined. (TT. 1185).

On redirect, Dr. Maria testified that if he was advised that the baby had been shaken & then thrown on a bed that yes, that would be the answer. (TT. 1192).

Dr. Maria testified that from day one to day two of the child's hospitalization that the child's fontanel (soft spot of the skull) was "full like it had been on day one but then had

12

pulsations." (TT. 1135). According to Dr. Maria this reflected that the blood to the brain was increased & the pressure to the brain was greater. (id.), (TT. 1153-1154).

## ANALYSIS

It is apparent from a reading of Dr. Maria's testimony that Dr. Maria was convinced that the child was shaken & that the same resulted in the injuries causing death. That while Dr. Maria agreed in part that the child may have had an older brain injury, he refused to acknowledge that the same resulted from birth. That as a result of not having any plausible explanation other then the mother's auto accident, the premature traumatic birth, no viable reasons for the older injury existed. As a result of this void, the jury was without explanation. It became far easier for the jury to believe the injury was caused by defendant's actions, as purportedly confessed to Detective Legall. (Ground 2, infra).

Had defense counsel not neglected Dr. Scheibner's report & investigated the same, the jury would have learned of the "potent toxic cocktail" the child suffered as result of the double vaccination. (Exh. # 2, Dr. Scheibner, pg. # 6). This line of investigation would have led to discovery that the child's bloodwork was not examined for vitamin C nor histamine levels; also that his vitamin C was critically low, and his histamine level was critically high. (Exh. # 4 Dr. Yazbak, pgs. 23-24). As a result of abandoning this line of investigation without meaningful exploration, counsel did not learn that the child suffered from extensive sinusitis (maxillary & ethmoid) or the child's bilateral mastoiditis. (Exh. # 4, Dr. Yazbak., pg. # 18). Whether the conditions existed pre-vaccination or developed post-vaccination, the conditions further diminished the child's vitamin C & K reserves. This line of investigation would reasonably resulted in discovery of the child's exposure to Corticosteroid & Micronase as well as the child's

13

blood glucose level of 317 mg/dl & his condition of glycosuria.  (Exh. # 3, Dr. Al-Bayati, pg. #

15).

 The importance of these facts is emphasized in part by Dr. Uscinski at trial:

> The brain is a biological living tissue, it needs to metabolize; it
> needs glucose, it needs oxygen to metabolize. It needs glucose. If
> you're a diabetic & your blood sugar goes all the way down, you
> go into a coma, that's what happens when your brain doesn't get
> glucose fed by the circulatory system.

(TT. 1409-1410).

 Dr. Dickinson testified on behalf of the State as an expert in pediatric critical care (TT.

593). Dr. Dickinson differentiated her specially that of a pediatrician whom concentrates more

on growth, development, childhood diseases, immunizations, and advice to parents (TT. 590).

One of Dr. Dickinson's fields is that of pharmacology.  (id.).  Although Dr. Dickinson felt she

was qualified to testify as an expert, she hadn't done such as she has"... a little bit of bias that as

an academic physician, this is not a very pure thing to do." (id.).  Dr. Dickinson related that she

was present in Shands on August 2, 2000, when the child was brought to the hospital.  (TT. 593).

The ER physician did a complete blood count, electrolytes, (chemicals in the blood) renal

studies, bun & creatinine, EKG, requested a baby gram, a lateral neck and CAT scan of the head.

(TT. 599). On arrival to the PICU from radiology, Dr. Dickinson noticed that the child was

seizing, very stiff; so stiff that the child could be picked up by a leg & would stay stiff.  (TT.

601-602).  The child's head was normal in appearance; the fontanel was visibly a little rounded,

but still fairly soft.  (TT. 604).  Dr. Dickinson noticed a very small older bruise on the child's

forehead.  (TT. 605).  The child's eyelids were striking, in that there was pronounced redness, a

fine web of capillaries. Dr. Dickinson was uncertain how to interpret that. (id.).  According to

Dr. Dickinson, the child was not suffering from increased intracranial pressure at the time of her

14

exam. (TT. 608-609). Because a seizure is bad for the brain, as it uses up oxygen unnecessarily, two basic anti-seizure medications were administered. (TT. 610-611). Dr. Dickinson then met with the pediatric radiologist & the neuroradiologist. (TT. 611).

Dr. Dickinson testified that her review of the CAT scans revealed fresh blood on both sides of the brain, both above & below the dura. (TT. 612). There were clear spaces where there shouldn't have been on both sides of the brain called hygromas. (id). That the ventricles were wide open & that no blood was in the ventricles. (TT. 613). Dr. Dickinson stated that there was no radiographic evidence of increased intracranial pressure. (TT. 614-615). Dr. Dickinson determined not to request an MRI. (TT. 617). The child had elevated cardiac enzymes known as Triponin I. (TT. 627). Dr. Dickinson stated that the enzymes are indicative of trauma or poisoning. (TT. 628). According to Dr. Dickinson, there was ample evidence that the child did not have an oxygen downtime of 4 or 5 minutes. (id., 629). The child had pronounced retinal hemorrhages. (TT. 630).

Regarding SBS, Dr. Dickinson testified that a baby's neck is very flexible and is designed to allow a lot of movement. (TT. 648). There would be trauma to the spinal cord & trauma to the brain stem. (id). Dr. Dickinson then proceeded to explain how the SBS theory causes damage to a child's eyes. (TT. 649-655). Dr. Dickinson testified that the deceased had the worst case of retinal-vitreal hemorrhages she's seen in over 300 cases. The damage was consistent with plopping the child down on a bed & his head hitting the mattress. (TT. 656). The injuries could not have been caused by a re-bleed of an older subdural hematoma. (TT. 657, 663, 664). The child continued to seizure throughout his eight days in the hospital. (TT. 666). Dr. Dickinson concluded that while the child's death was related to the initial seizure of August 2, 2000, death "probably" resulted from the child having been shaken. (TT. 672).

15

On cross-examination, Dr. Dickinson testified that she didn't state on direct that the child's retinal hemorrhaging resulted from acceleration & deceleration, but rather that the same are one of the proposed mechanisms. (TT. 682-683). Although not mentioned in her testimony on direct, Dr. Dickinson agreed that the child had both acute (new) & chronic (old) subdural hematomas in the child's head. (TT. 683). Dr. Dickinson agreed that there was evidence of old injury in the child's brain; hygromas and multi-generation chronic subdural hematomas. (TT. 684-685). Dr, Dickinson didn't know how many times the old hematomas had rebled. (TT. 685). Dr. Dickinson was not aware that Dr. Bell performed a pathological examination of the eyes of the child, and found no bleeding in the vitreous matter of the eyes. (TT. 687). Dr. Dickinson was aware that the post mortum examination of Dr. Bell revealed signs of old bleeding in the child's eyes. (TT. 687-688). Dr. Dickinson testified that she would be very surprised to learn that no blood was found in the cranium of the child at autopsy. (TT. 690). Dr. Dickinson would expect that in a suspected case of SBS, that the dura & brain stem would be sent for microscopic examination. (TT. 690). Dr. Dickinson testified that the child "had a head full of unexplained hematomas. (TT. 697). Dr. Dickinson agreed with the interpretations of the CAT scans rendered by Dr. Agee & Dr. Quisling namely that the child had both new & old hematomas" in his head, old meaning lasting a period of time outside the here & now. (TT. 703-704). Dr. Dickinson's opinion was that the causation was that of trauma. (TT. 707). Some people can go months or years with the aftermath of a subdural hematoma without any symptoms. (TT. 708). The chronic (old) & acute (new) subdural's seen on the CAT scan were located bilaterally, meaning both sides of the child's skull. (TT. 713-714). The old & new hematomas were about equal in size. (TT. 714). Dr. Dickinson testified that the child did not suffer from increased intracranial pressure upon arrival. (TT. 724). That the child's fontanel

16

was tense & bulging as a result of the seizure (id.). The child had no other signs of increased intracranial pressure, hemodynamically, radiographically or any other way. (TT. 725). Regarding SBS & the amount of force needed to cause brain injury by shaking, Dr. Dickinson found the same to be totally irrelevant. (TT. 734, 735). The evidence of older brain injury to the child revealed in the CAT scan was very definitive. (TT. 741). All 5 doctors that reviewed the CAT scans were of the same opinion. (id.). That trying to date the older brain injuries that extended over a period of time was basically impossible. (TT. 742).

On redirect, Dr. Dickinson candidly admitted that a child could be born with a subdural hematoma could still have a good neurological exam & be asymptomatic. (TT. 746).

Dr. Dickinson concluded her testimony as follows: Anatomically his brain was normal, with the exception of the frontal hygromas, which are leftover, mopped up, totally resolved subdurals. So his ventricle system was anatomically normal. His brain shape was anatomically normal. The only thing that might be considered somewhat abnormal is he had a smaller brain than the size of his skull, meaning that there was probably some atrophy or wasting of the surface of the brain or that the brain was not growing as rapidly as it should have been. The minimum age of the hygromas (healed hematomas) must have been a couple of weeks. (TT. 754).

## ANALYSIS

A summary of Dr. Dickinson's skilled testimony is that the child obviously had several older brain injuries existing before August 2, 2000. The injuries therefore were not attributable to defendant. Unfortunately, the only plausible explanation for the child's old injuries, was that of a traumatic birth resulting from premature labor induced by the mother's auto accident. Because no other explanation was presented, the injuries were without excuse.

17

Had defense counsel not ignored Dr. Scheibner's report regarding the "potent toxic vaccine cocktail" that the child received while under the care of pediatrician Dr. Hellrung, factual causation of both the old & new brain injuries could have been presented. Most notably, was Dr. Dickinson's one time mention that the child's elevated cardiac enzymes resulted from trauma or poisoning. (TT. 628). The matter of toxic poisoning was never explored as a result of defense counsel's error.

Moreover, the child's immature brain may well have been attributable to the child's exposure to a Corticosteroid in utero. (Exh. # 3, Dr. Al-Bayati, pg. # 13). In addition, as evidenced by the report of Dr. Yazbak, the child's blood was not tested to determine the diminished value of vitamin C & increased histamine levels. (Exh. # 4, Dr. Yazbak, pg. # 23-24).

The child's brain injuries could easily of been explained by the trained professionals that reviewed this cause, pre & post trial. Not to have explored this line of investigation clearly resulted in error so grave to deny defendant a fair trial & undermine the confidence in an outcome that rests on the SBS theory of causation.

Dr William F. Hamilton testified as an expert in forensic pathology for the State. (TT. 969). Dr. Hamilton was at the time of the child's autopsy, the Medical Examiner of the Eighth District of Florida. (TT. 966). Dr. Hamilton testified that an autopsy consists of several procedures, including toxicology. (TT. 970). The deceased measured 26 inches & had a head & chest circumference in the upper limits of normal for his age. (TT. 971). The child's head circumference was 17 ¼ inches. (TT. 972). Procedure was followed, whereby Dr. Hamilton collected blood & urine for possible toxicological or other laboratory studies. (TT. 973). No abnormalities were found with the child's heart. (TT. 975). Dr. Hamilton examined the child's

18

lungs, heart and thymus. (TT. 976). There was no injury to the neck region. (TT. 977). According to Dr. Hamilton, the only area of abnormality was in the child's head. (TT. 978). There wasn't any sign of outside trauma to the head. (TT. 978-979). The child had two subdural hematomas, one on the left side & one on the right. (TT. 980). Dr. Hamilton testified that the blood looked very fresh, lightly adherent, and not a day old. (id.). Dr. Hamilton found no evidence of a chronic subdural hematoma. (981). Dr. Hamilton saw no evidence of any organized hygromas or chronic injury (old) in the child's head. (TT. 984). Dr. Hamilton testified that he instructed his assistant to package up the brain & the dura & send it off for examination by Dr. Nelson. (TT. 984). Dr. Hamilton testified that there was a misunderstanding with his autopsy technician & the dura was not sent. (TT. 985). However, the brain stem & proximal cervical spinal cord were sent to Dr. Nelson with the brain. (id.). The child's eyes were sent to the Bascom-Palmer Eye Institute in Miami. (TT. 986). Dr. Hamilton received a report from the same concluding that there existed retinal hemorrhages. (id.). The positive iron stains in the child's eyes were consistent with the retinal hemorrhages having occurred on August 2, 2000. (TT. 987). Dr. Hamilton received a report from Dr. Nelson & considered the same in rendering his diagnosis. (TT. 988). Dr. Hamilton opined that the child's death resulted from being shaken. (id) The opinion in medical terminology is: bilateral cerebral subdural hemorrhage over the upper surfaces of the brain, the associated subarachnoid hemorrhages, the retinal hemorrhages, and the ischemic changes identified microscopically. (id.).

On cross-examination, Dr. Hamilton testified that dura is extremely important in a case like this. (TT. 1004). He admitted that he & his assistant were the only people that actually viewed the dura. (TT. 1004-1005). Dr. Hamilton admitted that not sending the dura to Dr. Nelson for examination was a mistake, but not a big one; as the subdural hematoma was new not

19

old. (TT. 1007). The clot in the child's brain was loosely adherent. (id.). Dr. Hamilton testified that the child had no neck injury. (TT. 1009-1010). One of Dr. Hamilton's assistants cut the child's skullcap off unsupervised. (TT. 1011). That if a hygroma existed in the child's skull, it would have been on the dura. (TT. 1013-1014). A hygroma could be destroyed easily. (TT. 1013). Dr. Hamilton made no mention in his report of subarachnoid bleeding. (TT. 1014). He felt it unnecessary as the same was recorded in the photographs. (TT. 1015). Dr. Hamilton explained that this was simply an oversight. (TT. 1016). Moreover, although Dr. Hamilton mentioned in his report that the child's brain was immature with bilateral cerebral subdural hematoma and subarachnoid hemorrhage, no mention was made whether the same were new or old (Acute v. chronic. (TT. 1016). It a moment of frankness, Dr. Hamilton stated: "I didn't think SBS. By definition, a clot is acute. I didn't think it was necessary to mention chronicity, because I wasn't ever considering chronicity." (id.).

Dr. Hamilton testified that his autopsy report actually contained one paragraph that addressed his findings as relates to the child's brain. (TT. 1028). Dr. Hamilton explained that he didn't feel compelled to generate an extensive report, as he was sending the brain off to be examined. (id). Dr. Hamilton stated that he has previously been accused of a misdiagnosis involving an issue of autopsy of a brain, and that civil litigation regarding the same was ongoing. (TT. 1028-1029). No sign of bruising on the child's forehead as testified to by Dr. Dickinson, was found by Dr. Hamilton. (TT. 1030). Dr. Hamilton testified that to date the age of the injury it would have been necessary for a microscopic examination. (TT. 1035). Dr. Hamilton did not recall seeing an older injury, that he didn't find them. (TT. 1036).

20

## ANALYSIS

Several crucial facets of Dr. Hamilton's testimony went without comment as a result of defense counsel not investigating Dr. Scheibner's report. While Dr. Hamilton testified that, he examined the child's thymus gland. (TT. 976), counsel couldn't develop a line of questioning regarding the same. Specifically, that the child's thymus gland weighed only 4 grams, approximately 20% of the normal weight. (Exh. # 3, Dr., Al-Bayati, 10, 17, 36, 38, 53; Exh. # 4, Dr. Yazbak, pg. 20). The child's thymus gland atrophy would have been discovered by defense counsel had Dr. Scheibner's report not been ignored. Specifically, "... the numerous central nervous system abnormalities which follow antecedent infections & vaccinations appear to share a common pathogenesis involving the immune system." (Exh. # 2, Dr. Scheibner, pg. # 5). Dr. Hamilton's statement that the child's thymus gland was normal, is a falsity.

Additionally, Dr. Hamilton testified that he collected "blood & urine for possible toxicological or other laboratory studies." (TT. 973). Review of Dr. Scheibner's report points out that the child's blood was not tested for CIC's. Dr. Scheibner informed counsel "... administration of the DPT vaccines does result in the formation of vaccine-specific circulating immune complexes. (CIC's). "... antigenic analysis of the CIC's showed them to be composed of vaccine-specific antigens with complementary antibodies. The test for these CIC's has not been done in the case of baby Robbie." (Exh. # 2, Dr. Scheibner, pg. # 3). Moreover, Dr. Scheibner, Al-Bayati, & Yazbak, point out the toxic affects of the child's double vaccination, complete with charts & related deaths. (Exh. # 3, Dr. Al-Bayati, pgs. 18-22, Exh. # 4, Dr. Yazbak, pgs. 20-24). A wealth of information not discovered as a result of counsel's negligence. Dr. Scheibner pointed out that the child's blood was not tested for CIC's. Dr. Yazbak points out that the first & second rounds of vaccinations occurred when the child's medical records show

21

clear signs or neurological problems & developmental delay.  (Exh. # 4, Dr. Yazbak, pgs. 15, 18).

As a result of not investigating Dr. Scheibner's timely information, counsel deprived the jury of knowing of the double "hot lot" vaccinations; administered during the child's neurological problems & development delay.  The role of the same, compounded with the serious infections (sinusitis & mastoiditis) added to the child's immature brain & diabetes from inter alia Corticosteroid in utero exposure, denied defendant of a fair trial & certainly undermines confidence in the outcome.  An outcome obtained in part from inculpatory statements never made (ground two) grave malpractice by the child's pediatrician, suspicious destruction of crucial autopsy evidence (the dura) & resting on the widely debated SBS theory.

Dr. Stephen J. Nelson testified as an expert in the fields of forensic pathology and neuro pathology (TT. 1051).  Dr. Nelson testified that he received the brain of the child for examination from Dr. Hamilton.  (TT. 1053).  Upon gross examination of the child's brain, Dr. Nelson found a significant amount of subarachnoid hemorrhage, as well as blood clot within the subarachnoid space.  The child's brain was swollen and congestive.  (TT. 1055).  He found no evidence of an old (chronic) subdural hematoma.  (id).  When asked what Dr. Nelson would expect to see had there been such an older injury, Dr. Nelson responded, "Well, again, let me say I didn't receive the dura mater, the dura mater with the brain." (id).  Dr. Nelson testified that the child's brain was immature, inconsistent with a child of 4½ months.  (TT. 1056).  Dr. Nelson explained that had there existed an old subdural hematoma, he would have seen discoloration on the suffice of the brain.  No such discoloration was found.  (TT. id.).  In addition to viewing the brain, Dr. Nelson prepared sections & glass slides resulted.  In reviewing the same, Dr. Nelson found bruises as well as dead or dying changes of the nerve cells inside the brain.  (TT. 1058).

22

Such brain bruising is "typically" caused by blunt trauma. (id). The bruising is consistent with "plopping a child on a bed so hard that its head bounced." (TT. 1059). Dr. Nelson testified that there was no way for him to age the blood he found in the child brain. (TT. 1063). Dr. Nelson stated that there was no evidence of a stroke, no developmental, neurological abnormalities associated with the child's brain whatsoever. (id). No evidence of disease. (id). Dr. Nelson received & reviewed the child's brain stem & found no injury. (TT. 1064). Dr. Nelson related that the information provided him indicated the child's birth was unremarkable. (TT. 1065). Had the child of suffered a subdural hematoma at birth, Dr. Nelson would have expected to see either a staining of the dura & or meninges as a result of iron in the blood cells. (TT. 1065-1066). Discussion then occurred regarding several body parts Dr. Nelson would have liked to have examined for completeness purpose. (TT. 1066). The same is important in shaken abuse cases. (id). When asked why a child's neck doesn't break as a result of such shaking, Dr. Nelson responded that in this particular case we don't know. (TT. 1067). When a child has a subdural hematoma, the body essentially attempts to wall off the blood clot. (TT. 1068-1069). As a result of the iron pigment in the blood a hygroma can be noticed as a thickened membrane on the dura or a yellow discoloration on the brain. (TT. 1069-1070). Dr. Nelson saw no evidence of the same. (TT. 1070). Dr. Nelson testified that to bring about anoxic ischemic encephalopathy (cause of death herein) the same requires a lack of oxygen or glucose, blood sugar. (id.). Dr. Nelson opined that the injuries were the result of inflicted trauma. (TT. 1071).

On cross-examination, Dr. Nelson testified that whiplash & SBS were the same thing. (TT. 1074). Dr. Nelson was unaware that the child had a rapid increase in the size of his head. He was aware that the child was not breathing when the paramedics arrived. (TT. 1077). Dr. Nelson agreed that 4 to 5 minutes without breathing could cause irreversible brain damage. (TT.

23

1077). Had Dr. Nelson of examined the missing dura, he could have conclusively determined if an old subdural hematoma existed. (TT. 1080-1081). Dr. Nelson stated that the largest of the bleeding areas in the child's brain was approximately ½ inch in size. (TT. 1083). At the time of Dr. Nelson's participation he had only the information provided by the medical examiner's office. He hadn't been supplied the CAT scans. (TT. 1083). When asked if he agreed that death resulted from the child's brain not receiving enough oxygen, Dr. Nelson responded: "I don't know if that's necessarily the case. As I said earlier, you can see that with decreased or no blood flow, decreased or no respiration, oxygen, decreased or no blood sugar." (TT. 1087-1088). When asked if he found any evidence of decreased blood sugar, Dr. Nelson responded that he didn't check for blood sugar, his job was to examine the brain. (TT. 1088).

## ANALYSIS

This is the second state expert that commented on causation being possibly related to low blood sugar. (TT. 1087-1088). The child blood results from August 2, 2000, revealed that the child suffered from glycosuria, as evidence by the blood glucose level of 317 mg./dl. (Exh. # 3, Dr. Al-Bayati, pg. # 5).

Had counsel not ignored Dr. Scheibner's report, counsel would reasonably begin a line of investigation that would have focused on what the child's blood & urine contained & what was absent. Notably the child's diabetic condition went completely unnoticed, unmentioned. (Exh. # 3, Dr. Al-Bayati, pgs. # 6, 8, 15, 27, 28).

Dr. Nelson did not receive the CAT scans or reports prior to his examination of the child's brain. (TT. 1083). The information Dr. Nelson received came from the medical examiner's office, Dr. Hamilton. (id). In sum then, Dr. Hamilton withheld the CAT scan reports, the same clearly evidence chronic (old) subdural hematomas and hygromas.

24

Compounding this, Dr. Hamilton's unnamed assistant otherwise disposed of the dura matter, the only actual proof of existence and age of the pre-existing brain injuries.

Of course, the State's experts found this regrettable. It was excusable though, as they already knew without doubt, that the child had been shaken by defendant.

Dr. Lawrence Levine testified on behalf of the State as an expert pediatric ophthalmologist. (TT. 1334). Dr. Levine has previously testified in SBS cases and authored an article on SBS as it relates to ophthalmology. (TT. 1333). On August 3rd, 2000, Dr. Levine visually inspected the child's eyes. (TT. 1337). The patient was in the PICU (Dr. Dickinson's care). Dr. Levine testified that no external injuries were noted. He examined the eyelids and "nothing unusual was noted." (id). [3] Dr. Levine dilated the child's pupils and examined the eyes. (TT. 1337-1338). According to Dr. Levine, there was an enormous amount of blood in the child's eyes. (TT. 1338-1339). In addition, the eyes contained Purtscher's retinopathy, large white spots; only seen with indirect trauma to the eyes. (TT. 1344-1339). There was also a crack in the back of the eye referred to as a choroidal rupture & that would take some kind of force. (TT. 1340, 1345-1346). Dr. Levine testified that he had reviewed Dr. Bell's ophthalmology report from the Bascom-Palmer Eye institute. (TT. 13478). Dr. Levine concluded that the injuries resulted from trauma on August 2, 2000.

On cross-examination, Dr. Levine testified that his examination of the child lasted approximately 20 minutes. That he prepared a handwritten report & then dictated the same. (TT. 1351-1352). The handwritten report was written on August 2, 2000 & the dictation was conducted on September 6, 2000. (TT. 1353). Dr. Levine did not amend the chart to include the Purtscher's retinopathy or the eye crack. (TT. 1354). Nor did Dr. Levine include the same in his

---

[3] This is contradictory of Dr. Dickinson's earlier testimony that "the child's eyelids were striking, there was pronounced redness and a fine web of capillaries." So striking that Dr. Dickinson "was uncertain how to interpret that." (TT. 605).

25

dictated report. (TT. 1355). The Purtscher's retinopathy can also be caused by pancreatitis as well. (TT. 1356). When asked why he did not mention either of these findings, in his deposition, Dr. Levine stated that he only answers direct questions & he wasn't asked. (TT. 1358). Dr Levine explained that his job was not to educate lawyers. (TT. 1359).

When asked why Dr. Bell found that the vitreous was clear of blood in both eyes, Dr. Levine testified that by the time the autopsy was done, the blood had settled down and settled away. (TT. 1361).

## ANALYSIS

Had counsel reasonably investigated the information provided by Dr. Scheibner counsel would have paid at least some attention to Dr. Scheibner's description of causation of retinal hemorrhages. Specifically, that available documentation exists that evidence "retinal hemorrhages as a rule accompany such meningeal hemorrhages because of a direct connection between the brain and the eyes. The Hib vaccine causes meningeal (subdural or subarachnoid) hemorrhages because the Haemophilus influenzae type B bacterium has a predilection for meninges." As pointed out by Dr. Scheibner, the child's blood was not checked for CIC's.

In addition, this line of investigation being pursued by a skilled professional such as Dr. Al-Bayati would have resulted in discovery of the child's hyperglycemia & glycosuria. These conditions in relation to the child's exposure to Corticosteroid & Micronase, coupled with the potent toxic vaccine cocktail, 14 days before the date of incident presents well-verified proof of causation. (Exh. # 3, Dr. Al-Bayati, pgs. # 8, 40-41).

Moreover, Dr. Levine's testimony that retinal hemorrhages can only be caused by trauma is suspiciously mistaken. Certainly, a renowned professor as Dr. Levine was aware of at least some of the articles published to his specialty field. Of particular note is that while adamantly

26

contending on direct examination that the retinal hemorrhages could only have occurred by direct trauma (shaking), Dr. Levine added the possible causation of pancreatitis (TT. 1356). Had proper investigation occurred, it could have been shown that the potent toxic vaccine cocktail, plus the child's hyperglycemia & glycosuria coupled with the child's existent sinusitis & mastoiditis brought about the retinal hemorrhages. (Exh. # 4, Dr. Yazbak, pgs. # 7-11, Exh. # 3, Dr. Al-Bayati, pgs. # 8, 40-41, Exh. # 2, Dr. Scheibner, pgs. # 6-7).

Dr. Levine's trauma only diagnosis was an important aspect of the State's case. Whether Dr. Levine was unaware of the published articles in his specialty field determining causation by other then trauma, or whether he simply perjured himself, is not the point. The point is that counsel had no method of proof by which allege causation. This error greatly prejudiced defendant, as once Dr. Levine testified that only 2 causations could exist, trauma or pancreititis; the burden shifted to defendant. By not investigating the report of Dr. Scheibner, causation via the Hepatitis B vaccine was not discovered. (Exh. # 2, Dr. Scheibner, pgs. # 4-7, Exh. # 4, Dr. Yazbak, pgs. # 7-8).

Dr. John Plunkett testified for the defendant as an expert in the area of forensic pathology. (TT. 1215). Dr. Plunkett testified that he examined the autopsy report (Dr. Hamilton's), the neuropathology report (Dr. Nelson's), the microscopic slides of the autopsy, the child's hospital records & photographs of defendant's apartment. (TT. 1217-1218). Dr. Plunkett stated that the child's death could well of been brought about as described by defendant, i.e. that the child became wedged between the mattress & bedrail. (TT. 1219). Dr. Plunkett testified that a child can develop a subdural hematoma from the birth process. Dr. Plunkett described the deceased's birth as a difficult one. (TT. 1222). According to Dr. Plunkett, a child with a subdural hematoma most often does not exhibit symptoms. (TT. 1223). Eventually the bridging

27

blood vessels rupture and bleed into the subdural space. (id). This itself does not cause any major problems unless it begins to compress the rest of the brain, which could cause a seizure. (id). Dr. Plunkett read the reports of the radiologists & agreed with their opinions that the child had chronic subdural hematomas & new bleeding into the same. [4] (TT. 1225). Dr. Plunkett testified that there is a connection between subdural bleeding and subarachnoid bleeding. There will always be bleeding in the arachnoid space as a result of subdural hemorrhage. (TT. 1229). Anytime there is brain swelling & compression of the surface of the brain against the inside of the skull there will be subarachnoid bleeding. (id). Dr. Plunkett stated that the child did not suffer trauma & that a seizure such as the child's is a result of a prior injury. Dr. Plunkett opined that the subdural hemorrhage could be related to birth trauma, or cortical venous thrombosis. Neither of these are evidence of abusive trauma. (TT. 1230). Dr. Plunkett testified that secondary evidence for trauma existed in the anoxia. The anoxia is a secondary traumatic event, which could have been caused by someone else or could have occurred inadvertently. (TT. 1230). It means lack of oxygen, brain swelling & vascular congestion; anoxic ischemic encephalopathy global. (TT. 1230-1231). The child had no evidence of any form of a brain shearing injury. (TT. 1231-1232). Dr. Plunkett testified that he certainly would have liked to examine the dura in this case. When asked why, Dr. Plunkett stated that there are two primary ways to date the age of the chronic subdural hematomas in the child's brain. [4] one way is the CAT scan & the second is to examine the dura under a microscope. (TT. 1232). The CAT scan (as Dr. Dickinson agreed) revealed that when the child entered the hospital, his brain had been bleeding for more then two weeks. (id). Dr. Plunkett testified that there were only two

---

[4] These are the same brain injuries that Dr. Hamilton testified didn't exist. The same brain injuries that could have been proven had Dr. Hamilton's unnamed assistant not allegedly accidently disposed of the dura. These are the same brain injuries that could have been documented had Dr. Hamilton of prepared microscopic slides of the dura, which is standard protocol.

28

photographs of the dura in the autopsy that show anything & they clearly show a chronic subdural hematoma. [*4]. (TT. 1234). Dr. Plunkett utilized the three photographs (# 59-61) to illustrate the yellow discoloration on the portion of the dura that was visible. (TT. 1235-1236). Dr. Plunkett opined that the photographs clearly depicted cortical venous thrombosis. (TT. 1237). A self-imposed question that Dr. Plunkett could not answer was whether the same was a primary event or resulted from a lack of oxygen & simply developed while the child was in the hospital. (TT. 1238). The two primary causes for cortical venous thrombosis in children are infection and dehydration. When asked what he would have done differently had he conducted the autopsy, Dr. Plunkett responded that he would have saved the dura & prepared a microscopic examination of the same. (TT. 1239) Notably, Dr. Plunkett would have requested that another trained professional review the CAT scan with him. According to Dr. Plunkett, collaboration was necessary where Dr. Hamilton says, he found acute subdural hemorrhage only and there are three different radiology reports that state the existence of a chronic subdural hematoma with new bleeding. Dr. Plunkett found that to be a significant discrepancy. (TT. 1239).[5]

## ANALYSIS

There is no indication that Dr. Plunkett was aware that the child was exposed to corticosteroid in utero or that child was breastfed while the mother was taking the diabetic medication Micronase. Dr. Plunkett was not aware that the child was twice exposed to not lot vaccines, two weeks before the August 2nd, date of injury. While Dr. Plunkett testified that the child's subdural hematomas more than likely resulted from the child's difficult birth, he was

[5]      Dr. Hamilton did not inform Dr. Nelson of the significance of the CAT scans (TT. 1083). Dr. Hamilton did not send the reports or scans themselves to Dr. Nelson. (id). Placing this in context, Dr. Hamilton intentionally suppressed from Dr. Nelson 3 expert opinions diagnosing existence of the older brain injuries. Additionally, his unnamed assistant purportedly disposed of the dura. (TT. 985). Although Dr. Hamilton intended to send the dura to Dr. Nelson with the brain, he didn't prepare any samples for microscopic examination. Moreover, although Dr. Dickinson agreed with the radiologist reports of the CAT scan, (TT. 684-685) she made no mention of the old brain injuries in the child's PICU records.

unaware of the direct consequence of the double vaccination on the child's premature brain.  By foreclosing this line of investigation, Dr. Plunkett could not factor what role the child's suppressed immune system (thymic gland atrophy) & hyperglycemia & glycosurea, played in both the retinal hemorrhages & cortical venous thrombosis.  The record of the State's experts makes clear that it was incumbent on defense counsel to discover the matters. Dr. Hellrung was not going to point out that the child received double "hot lot" vaccinations while exhibiting neurological & developmental delay. Exh. # 4 Dr. Yazbak, pg. # 15, Exh. 3, Dr. Al-Bayati, pg. 14-17.  While Dr. Dickinson was experienced in pharmacology (TT. 590), she could not be expected to testify of her incentive, that the child's blood was not scanned for CIC's 23-24).

Because defense counsel chose to disregard Dr. Scheibner's report without any investigation a wealth of data directly related to the causation of death herein, was not develop. Defendant's only explanations for the prior brain injuries were that they resulted from birth, 4 1/2 months before death.

Had counsel properly investigated this cause, it would have been determined that the chronic subdural hematomas escalated upon the child's first round of vaccinations, 14 days before the child's death.  Also, that the severe vitamin C depletion prevented the child's brain from starting to heal the subdural hematoma as would have been normal.  The child's hyperglycemia & glycosurea played a major role in the subdural hematoma not forming the healing membrane expected in a healthy child.

Defense counsel's failure to properly investigate Dr. Scheibner's report foreclosed development of what brought the causation of death in this cause.

Dr. Ronald Henry Uscinski was presented as a defense expert witness in the field of neurosurgery. (TT. 1393). Dr. Uscinsri testified that a child can develop a subdural hematoma

30

during childbirth & that it may is not always be immediately detected. (TT. 1404). The hematoma may or may not ever be detected. (TT. 1405). In Dr. Uscinski's opinion the child's birth was traumatic as reflected by the medical records. (TT. 1405). It was Dr. Uscinski's opinion that the child had a subdural hematoma that went undetected. That the same began to rebleed. The child then obstructed his airway. The bleeding of the subdural hematoma irritated the surface of the child's brain & a seizure resulted. (TT. 1407). Dr. Uscinski testified that the human brain is a biological tissue & requires two kinds of substances for it to metabolize, glucose & oxygen. Dr. Uscinski went on to say "You're diabetic and your blood sugar goes all the way down, you go into a coma, that's what happens when your brain doesn't get glucose." (TT. 1410). Dr. Uscinski testified that the medical records of the child shows that the child did have a seizure & that the child's brain had gone some time without oxygen. (TT. 1418). Dr. Uscinski explained to the jury how the CAT scan revealed that the brain had not received sufficient oxygen. (TT. 1419-1420) Dr. Uscinski explained how a subdural hematoma heals (TT. 1420-1423.) Dr. Uscinski noted that the healing is a dynamic process and test there is a problem associated with fibrinolytic enzymes, that they stop blood from clotting and capillaries are very weak walled structures. (TT. 1423). Dr. Uscinski stated that other organs of the child's body would not necessarily be damaged as a result of the brain not receiving sufficient oxygen. (TT. 1425). Dr. Uscinski testified that he examined the CAT scans of the child in this cause. (TT. 1427). Dr. Uscinski explained that he saw both new and old blood in the subdural space. People with chronic subdural hematomas may often have blood in the subarachnoid space. (TT. 1428). Blood in the subdural space does not clot. (id). Dr. Uscinski testified that he read the report of Dr. Bell whom microscopically & grossly examined the child's eyes & understood the same. (TT. 1431). Dr. Bell's report made no mention of Purtchner's retinopathy, contrary to Dr.

31

Levine's testimony. (TT. 1432-1433). Dr. Uscinski was aware that the child's dura was improperly disposed of, that it should not have been. (TT. 1434). Dr. Uscinski testified that the child had retinal hemorrhages, that is, bleeding in the lining of the back of the eye. (TT. 1428). According to Dr. Uscinski it is theoretically impossible to cause retinal bleeding by shaking without impact. (TT. 1449). Dr. Uscinski testified that subdural hematomas generally rebleed from the membrane. The capillaries are very thin-walled vessels and right next to these capillaries are the cells that elaborate fibrinolytic enzymes. (TT. 1450). No trauma is necessary to cause these to rebleed, they can do so spontaneously. (id). An overhead projector was used to show the jury the CAT scans of the child. The scans were discussed in succession from the two conducted on August 2nd, to the 3rd. (TT. 1475). The scan showed no sign of neck injury. (TT. 1476-1477). The scan evidenced a small amount of air in the eye socket. (TT. 1477). Dr. Uscinski explained that the same resulted from someone trying to vigorously trying to breathe for the child. (TT. 1478). The child was seizing when the scan was made. (TT. 1478-1479). The reason the scan looked smudgy was because of loss of the gray white interface, which is typical of someone that's been deprived of oxygen. (TT. 1479). Dr. Uscinski pointed to several areas that he believed indicated subdural hematoma. (TT. 1481,1482,1483,1486). Dr. Uscinski examined the autopsy photographs introduced as State's exhibits 59, 60 & 61. Dr. Uscinski testified that the same demonstrated evidence of chronic subdurals. (TT. 1496,1498,1499,1500). Dr. Uscinski testified that it was his opinion that the child died of non-violent conduct, i.e. not by shaking. (TT. 1501).

## ANALYSIS

Dr. Uscinski's testimony emphasized the importance of the brain to receive glucose. (TT. 1410). The central points debated throughout this trial & emphasized by Dr. Uscinski's

32

000151

testimony were the existence of the chronic subdural hematomas and if they existed, why they came about & what made them bleed. As for the existence of the subdural hematomas, Dr. Uscinski utilized the CAT scans to point out where the subdurals were. As Dr. Uscinski pointed out, the subdurals could not be dated to determine when the same were formed as result of destruction of the dura & not having prepared slides of the same for microscopic review. The only point in reference that Dr. Uscinski had for existence of the chronic subdural hematomas, was the child's difficult birth. Had defense counsel investigated the report of Dr. Scheibner's, counsel would have discovered that a wealth of instances exist wherein normal administration of "hot lot" vaccinations, resulted in subdural hematomas & retinal hemorrhages. (Exh. # 2, Dr. Scheibner, pgs. # 3-7, Exh. # 4, Dr. Yazbak, pgs. # 20-24, Exh. # 3, Dr. Al-Bayati, pgs. # 17-22). The jury was forced to determine whether or not the child's birth was traumatic & then whether or not the same produced the injuries. The State's experts all testified that the birth was not traumatic. By relying on the birth alone, the medically plausible & substantiated causation of both the chronic subdural hematomas & retinal hemorrhages were not mentioned to the jury. Disregarding Dr. Scheibner's report without any form of investigation, given the overwhelming complexity of the cause, constitutes an error that undermines the confidence in the outcome of this cause.

The last witness called by the defense was Dr. Michael Bell who testified as an expert in the field of forensic pathology (TT. 2209). Dr. Bell testified telephonically and was called in relation to the State's expert, Dr. Lawrence Levine, a pediatric ophthalmologist. Dr. Bell testified that he examined the child's eyes both grossly and microscopically. (TT. 2210). Dr. Bell testified that contrary to Dr. Levine's testimony, no cracks existed in the child's eyes. (TT. 2209-2210). The purported crack in the child's eye was extremely significant to Levine's

33

testimony, as according to him the same was a choroidal rupture & without doubt; takes force. (TT. 1340,1345-1346).

Dr. Levine previously testified in SBS cases and authored an article on SBS & pediatric ophthalmology. (TT. 1333). The only reasons that Dr. Lavine didn't update the child's chart, nor mention the Purtscher's retinopathy or choroidal rupture at deposition, is that "it's not his job educate lawyers."

## GROUND TWO

COUNSEL FAILED TO PRODUCE DETECTIVE WEAVER AS
A DEFENSE WITNESS TO IMPEACH DETECTIVE LEGALL
& PROVE THAT NO INCULPATORY STATEMENT WAS
MADE BY DEFENDANT WHILE BEING TRANSPORTED.

Detective Legall's testimony at trial is that she & Detective Weaver transported defendant in an unmarked car, after defendant's arrest. (TT. 1736). According to Legall, Detective Weaver was driving, defendant was in the passenger seat & Legall was in the back seat. (id.). Detective Legall testified that defendant wanted to talk some more, so he asked Detective Weaver to pull over & Detective Weaver pulled over for a moment. (TT. 1738). According to Legall defendant stated after roughly bouncing the child's head off the mattress that "... he walked away, he thought is Robbie okay, is he all right, but he walked away anyway. He said he came back, he saw him and he freaked. He stated that he knew something was wrong. He said I panicked, I freaked. And he said that he was afraid to go to jail because he knew what they did to people who hurt babies." (TT. 1738-1739).

On redirect Detective Legall testified as to defendant "said both at the station & on the way to jail ... how he plopped him down on the bed, fairly hard, his head wasn't supported & he may have done something to his neck. (TT. 1905). Before he "plopped the baby on the bed, he

34

was swinging him side to side & that the baby's head bounced on the pillow. He knew that what he did was wrong." (id.). "He knew he shouldn't have rough housed with a four month old & that when he plopped the child on the bed, that may have been when it was injured." (TT. 1906).

These purported statements were not recorded, as "honestly, I didn't think about it." (TT. 1739). Detective Legall writes things verbatim in her notes then transfers them to her report. (TT. 1739-1740, 1744, 1746). When asked why she didn't record the statements, Detective Legall testified she didn't have a reason not to. (TT. 1839).

Out of all the purported conversations with defendant, the two in which Detective Legall testified defendant made exculpatory statements, are not recorded. The exculpatory statement at the station was not witnessed. The purported follow up, the exculpatory statement in Detective Weaver's car while being transported, is negated by Detective Weaver.

Specifically, at deposition Detective Weaver testified that while he did transport defendant & Sergeant Legall, he was not asked to pull over; nor did he pull over. Detective Weaver testified that he did not over hear any such conversation, (defendant's purported confession).

Detective Weaver was available & willing to testify. Had counsel produced Detective Weaver as a witness. Detective Legall would have been thoroughly impeached. The importance of Detective Legall regarding the "transport" statement is crucial. The statement constitutes an admission to felony murder. Moreover, once impeached on the "transport" statement, Detective Legall's credibility would have clearly been in question regarding the proceeding statement-confession.

The State made optimal use of the statement in opening:

> That's gonna be followed by a member of other explanations, each one becoming more expansive, each containing additional details

35

culminating in an admission that in response to Robbie crying, the
defendant swung him and plopped him on the bed in a manner and
with enough force that his head bounced. It was then that the baby
became quiet. He looked dazed. It was then the defendant knew
that the child was significantly injured.

The injury was so significant that the defendant believed that he
had injured Robbie's neck. You're gonna hear that the defendant
admitted he was rough with Robbie, but after he bounced him on
the bed, he walked away knowing that the child was critically hurt,
but hoping that when he came back the child would be better. That
hope was quashed when he returned to find Robbie barely alive.

(TT. 24-25).

Again in closing the State emphasized the alleged confession as related by Detective

Legall:

He had been shaken. He had been thrown down on a bed so hard
that his head bounced. He had been shaken and thrown so hard
that the neurons in his brain had been stretched and broken, so
much that the electrical impulses that keep us alive, that keep our
brains working, were fatally injured. He was thrown down &
shaken so much that he had cortical contusions, bruises on the
brain. And where his head hit, there was evidence of injury.

(TT. 2214).

The stories didn't end, and as the defendant conversed with the
Gainesville Police Department, further inconsistencies were
revealed, and I'm going to discuss it later, but it all culminates with
the trip to the jail. When, please, don't take me to jail. I'll tell you
what really happened. And, members of the jury, I submit to you,
that that day and on the way to the jail, you heard what really
happened.

(TT. 2231).

After every expert witness (State & Defense) testified that the child could have sustained

the fatal injuries by swinging from side to side & having his head "plopped" off of the mattress

(the purported confession) defense counsel stated in closing.

... She claims Brian Herlihy said to her on August 3rd when she
arrested him with another cop right there with her, Detective
Weaver, who we've not heard from, & made these, what she likes
to call them, incriminating statements about plopping the baby

36

down, this & that, not tape recorded, and we know she had a tape recorder. Helen Legall's credibility is at issue in this case also, especially when she attributes to Brian Herlihy certain statements that she claims he made as she arrested him that were absolutely contradictory & inconsistent with what he was saying the day before about, I don't know what happened here.

She had somebody sitting there with her, Mike Weaver from the moment he was arrested by Weaver, to the time they went to the Gainesville Police Department. They run him off to the jail, they have another conversation in the police car where they supposedly pulled off of the road, & then she takes him to jail & Weaver is there the whole time, the whole time. And the State's gonna get up & they're gonna tell you – I guess I'm gonna talk about this now. The State's gonna get up and they're gonna tell you, well, I could have called him. Well, let me tell you something. I don't call any police witness unless I know what they're gonna say in trial in that chair in that witness stand, and that's why I didn't call him. On the other hand, the State knows exactly what a police officer is gonna say before he comes to court. They did not call – not only didn't they tape it, they didn't call the witness who was right there when Brian is alleged to of made the incriminating statements. That has to do with her credibility as a witness just like any other witness in this case, & that's why we're going through what she said to you about him not being a suspect."

(TT. 2350-2351).

Not to have called Detective Weaver as a witness in this cause was a serious error that substantially affected the outcome of the trial. Had counsel of called Detective Weaver as a witness to the affect that no such conversation took place, the jury would have felt free to discard Detective Legall's fabrications. The same were created in an attempt to establish causation, where movement with some form of impact was thought to be insufficient to cause injury. The "plopping" of the child on the bed so hard that the child's eyes were dazed (TT. 1734), formed a basis for which the jury based its manslaughter conviction. The State made much use of the alleged statements in opening & closing.

37

## STANDARD OF REVIEW

Defendant respectfully submits that counsel's failure to investigate the facts of the double vaccinations as set forth in Dr. Scheibner's report, foreclosed discovery of the child's documented health problems as evidenced by the reports in the accompanying Appendix.

Not to investigate in this cause was an error that a counsel functioning as a proper advocate would not have made. Counsel in this cause determined one line of defense, that the child had prior brain injury & that the same resulted from the child's traumatic birth. While this may or may not have been, no proof of the same existed, thanks to accidental destruction of the dura by an unnamed assistant of the State's medical examiner, Dr. Hamilton.

Defense counsel could not have decided to abandon the child's serious health problems, when counsel didn't know they existed.

To have allowed the State to present testimony of expert physicians that the child was a well baby, after the same physicians were responsible for bringing about events that may well have caused the child's death (double vaccination, diabetes, long standing sinusitis & mastoiditis, etc. al.) is per-se ineffective.

Had counsel properly investigated this cause, beginning with Dr. Scheibner's report, an affirmative defense to the affect that the child had serious health conditions brought about by the very experts that claimed the child was well could have been presented.

Moreover, not to have presented Detective Weaver as a witness to inform the jury of Detective Legall's fabrications consisting of defendant's purported confessions, requires new trial. Detective Legall's fabrications [6] so permeated the trial, that every expert was asked by the

---

[6]  Defendant remains ready as he has throughout, to undergo polygraph & or voice stress test, to collaborate that he never made the statements, that he never shook or injured the child.

38

State if the injuries were consistent with the confession, i.e. swinging side to side & roughly "plopping" the child's head on the bed.

Defense counsel did not operate as counsel guaranteed by the Sixth & Fourteenth Amendments of the U. S. Constitution.

The errors identified herein are substantive & the prejudice resulting from the same requires new trial, where absent the errors, it is reasonable that defendant would have been acquitted. **Strickland v. Washington**, 104 S.Ct. 2052 (1984).

## REQUIREMENT OF AN EVIDENTIARY HEARING

The facts & matters stated herein must be treated as true, unless conclusively refuted by the record. **Harich v. State**, 484 So.2d 1239 (Fla. 1984).

An evidentiary hearing should be conducted if it appears that defense counsel made a decision to do or not to do a particular act, and the same is considered a tactical decision. **Flores v. State**, 662 So.2d 1350 (2nd DCA 1995).

## RELIEF REQUESTED

Defendant prays that the State be ordered to show cause in writing why relief should not be granted, that hearing be conducted at which defendant can present evidence and that new trial be awarded.

Respectfully Submitted,

pro-se

39

## OATH/VERIFICATION

I hereby swear per the penalty of Perjury that I am the defendant in this cause that I have

read this Motion & that the facts & matters presented herein are true & correct. Signed & dated

this _22nd_ day of _August_ 2006.

40

000159

STATE OF FLORIDA
COUNTY OF _Braward_

#02-2753-CF-A

I, Lois Herlihy am the mother of the defendant in this cause, Brian Herlihy

On or about _October_ 2000 I contacted Gordon Groland and authorized him to request and pay for a report from Dr. Viera Schreiber and requested him to consider the same. Dr. Viera Schreiber did the report dated November 2000 and delivered it directly to Mr. Groland.

I was subsequently informed by Dr. Schreiber that counsel Groland did not contact her regarding the report and her willingness to assist in my son's defense.

_Lois Herlihy_

Lois Herlihy

## OATH

I hearby swear under the penalty of perjury that the facts and matters setforth herin are true and correct. Signed and dated this ___14___ day ___July___ 2006

Notary Name and seal: _____

S. UMPIERRES
MY COMMISSION # DD220050
EXPIRES: June 5, 2007
Bonded Thru Western Surety Co

2006 AUG 25 PH 2: 55
J.K. "BUDDY" IREY
CLERK OF COURTS
ALACHUA COUNTY FL.
FILED
CLK

000160

REPORT ON VACCINE INJURIES OF BABY ROBERT QUIRELLO

By Dr Viera Scheibner,
Principal Reasearch Scientist, Retired

The events of the 2nd of August 2000,
based on Mr Herlihy's statements to the police
-------------------------------------------------

On 2nd of August 2000, Brian Patrick Herlihy (therafter Brian),
the defendant, was busy with dipping and washing his dogs on the
balcony of his house when Crystal Quirello (thereafter Crystal),
the mother of the diseased baby Robert Quirello (thereafter
Robbie), walked in and asked Brian to look after her baby, while
she was going to attend to some errands.

After washing his hands, Brian took the baby, kissed his forehead
and said "Hey, Buddy, how are you?" Robbie laughed and smiled at
Brian. During a brief conversation with Crystal, Robbie started
to fuss and Brian asked Crystal when he last ate. Crystal said
"About 5 minutes ago".

"Robbie had a little spit up on his outfit which was unusual".
Brian then made Robbie's bottle and started feeding him. Crystal
seemed in a hurry to go. She also wanted for all of them to go
to Cedar Key for the afternoon. Brian did not want to go. When
changing Robbie's nappy, Brian commented how tight Robbie's one-
sy was and Crystal said "take it of him then". When Brian took
the one-sy off Robbie he noticed "red blotches all over his back,
chest and stomach". Crystal said "He gets heat rash real bad".
"I've never seen heat rash like that. Crystal did not seem
alarmed, so I left it go" Brian wrote. During a short discussion
with Crystal about whether Brian should take a shower? Brian
noticed Robbie spitting up and wiped him up. Brian did not want
to leave Robbie alone while taking the shower. Crystal was in a
hurry and asked Brian to walk her down to his truck which she was
going to use for her errands. When Brian objected, she said "he
[Robbie] will be fine". When Brian got back to his bedroom after
walking Crystal to his truck, Robbie "had formula all over his
mouth and running along his neckline, so I grabbed his burping
cloth and wiped it up. He seemed a little 'dazed'. I did not see
Crystal "burp " him after she gave him the rest of the bottle and
wondered if she had. I picked him up and burped him. He had a
little one, but spit up a lot of formula. I played with him
and picked him up and plopped him down on the pillow on his back.
It wasn't rough, I always swing him and play with him like that
and had no problems before". After propping Robbie up on his
bed, Brian asked Robbie to say "goo" for him, which Robbie did
after a few times being asked, and Brian then went to the toilet.
About five minutes later, Brian was back with Robbie and saw that
he rolled over so that he could only see his feet. Robbie was
not moving and Brian pulled him up. He shook him slightly
once to see if he was asleep, and said "Robbie! wake up! Are you
all right?", then blew in his face to see if his eyes would open.

1

"His arms got real relaxed his eyes were closed and I heard him gurgling. I felt myself started [sic] to panic. I felt his heartbeat, but he wasn't breathing. I couldn't believe this was happening. I cradled him in my left arm and gave him a breath, placing my mouth over his nose and mouth. It was a puff and watched his chest to see if it would rise and fall, but with short puffs like that it's hard to tell. I waited a few seconds and gave him another breath. I got no response. I felt helpless and said "Please, Robbie, don't die baby". I had to call 911, but I don't have a phone in my room" To find the phone, Brian placed Robbie down on the pillow and ran downstairs and hit the pager button on the cordless phone and heard the phone beeping in the bedroom. Brian ran back and found the phone. He grabbed it and gave Robbie a quick breath and called 911. "I told them I had a 3 and 1/2 months old who was unresponsive and not breathing. They told me to give him rescue breaths, I told them I was and wasn't getting a response. I was crying and they asked me what the address was, I told them and then Robbie began to have formula pouring out of his mouth and nose. I placed him on the floor and laid him on his side so if he started breathing he wouldn't aspirate on it. I saw red in the formula that was coming up of his nose. I told 911 this and they were telling me rescue was on its way. They asked me to do a 'finger sweep' which I did and said to Robbie "Please don't die". Brian also said words to the effect why did this had to happen today? When he saw paramedics going to the wrong building he ran out and directed them to his house. One medic said "I don't have the right stuff" and left and the other was fumbling around and nobody was breathing for Robbie. So, Brian grabbed the resuscitation bag and placed the mask over Robbie's nose and mouth and gave him a breath himself. The medic then tried to put the equipment together to use on Robbie. The bike-patrol medics arrived and pulled Brian out of the room and tried to console him. He told them that Crystal was his girlfriend and Robbie was her son and that she went out to run an errand. Soon after Crystal arrived and when she saw the medics working on Robbie started crying. Brian told her "I'm sorry I left him alone, I failed you and Robbie".

I leave the diary here. It provides a perfectly plausible story. Only an innocent person would communicate this way, including saying the last words about being sorry for leaving Robbie alone while it was clear that the baby was only left alone for about 5 minutes while Brian went to the toilet, and was vomiting right after being dropped off by his mother Crystal and nothing that happened or could have happened in those 5 minutes would have caused the observed serious symptoms.

### WHAT CAUSED BABY ROBBIE TO VOMIT AND DEVELOP BRAIN AND RETINAL HAEMORRHAGES?

Robbie was born on March 22, 2000, slightly premature at 36 weeks gestation. There was a birth trauma there: broken clavicle.

However, he seemed to be doing reasonably well and was given his first set of 6 vaccines on May 9, 2000, when 7 weeks old. It was

2

000162

the following vaccines:

DTaP1 (three in one); SKB a918 ac L leg
OPV/IPV1 (undifferentiated Connaught RO668 L leg
Hib1; Connaught VA510AA R leg
HepB1; SKB 3198AZ R leg

On 19 July, 2000, Robbie was given the second set of 6 vaccines
as follows:

DTaP2 SKB 956A2; R thigh
OPV/IPV2 Connaught R1433 R thigh
Hib2 Lederle 468487 L thigh
HepB2 SKB 3198A2 L thigh

There is no record of a dose of hepB at birth. It does not mean
that he was not given this vaccine at or shortly after birth.

The diary of events available to me does not contain any
information about any possible reactions to the first lot of 6
vaccines as above. This does not mean that there were no
reactions, clinical or subclinical.

The documented symptoms suffered by baby Robbie, appear to have
occurred 14 days after the second lot of 6 vaccines. This is not
unusual, because the so-called delayed vaccine reactions are a
rule rather than an exception, as documented by Wilkins (1988).
Wilkins (1988) documented that if reactions to vaccines are
triggered by the formation of circulating immune complexes, then
the reactions would not occur immediately. She stated: "...If
one assumes that the adverse reaction to the DPT vaccine may
result from an immunologic intravascular complexing of
particulate antigen (whole-cell or disrupted pertussis organisms)
with specific antibody to produce a Jarisch-Herxheimer reaction,
then the adverse reaction may not occur within 24 hours of
inoculation...If the postinoculation interval is extended to 2
weeks, an additional 93 case infants (now representing a total of
98 case infants) might have been at risk for an adverse reaction
to DTP vaccine." And: "The DTP vaccine will not be exhonorated
from causing an infants' sudden death until, tissues from suspect
infants have been examined and shown not to contain insoluble
immune complexes to pertussis antigen."

As demonstrated by Lewis et al. (1986), administration of the DPT
vaccines does result in the formation of vaccine-specific
circulating immune complexes (CIC's). They described petechial
and urticarial rash in a 4-months old baby 5 hours after given
DTP vaccines. Subsequent antigenic analysis of the CIC's showed
them to be composed of vaccine-specific antigens with
complementary antibodies. They also described the test which
detects such antibodies. The test for these CIC's has not been
done in the case of baby Robbie. As shown by the available
records, baby Robbie had his torso covered with urticaria
(described by Brian as "red blotches") when Brian undressed him
and it is reasonable to conclude that the rash was one of the

3

signs of the CIC's development; moreover, the rash could have developed already after his first dose of 6 vaccines as above, particularly since his mother told Brian that baby Robbie suffered what she called "heat rash". It is quite likely that that's what she was told by a doctor when she inquired about the persistent rash, namely, that it was only a heat rash.

Torch (1982 and 1986a, and 1986b) demonstrated that DPT vaccines cause infant deaths and brain encephalopathy which includes brain haemorrhages. Not only he demonstrated that there are increasing numbers of deaths with the increasing interval from the DPT injections, he also described brain oedema and haemorrhages caused by these vaccines.

Acellular pertussis vaccine of the type given to Robbie, is advertised as less reactogenic than the whole-cell pertussis vaccine. However, this vaccine caused unexpectedly high level of neurological reactions, such as the hypotonic-hyporesponsive episodes in the Swedish babies who participated in the so-called Swedish Trial of the acellular vaccines. They expected 20 deaths and experienced 45 (plus one accidental death). None of these deaths occurred before vaccination, even though a group of babies was given the first dose at 2 months and another group at 3 months. I emphasise, not a single death occured before vaccination. 45 deaths instead of the expected 20 is highly significant, yet all were judged as unrelated to vaccination (Olin et al. 1997). Importantly, the trial protocol only allowed for reactions that occurred wthin 48 hours of vaccination. This means, that the actual rate of reactions was more in the order of a rate 50-times that which was recorded and admitted (as demonstrated by Wilkins 1988; see above).

Retinal haemorrhages caused by hepatitis B vaccines were described by Devine et al.(1996). They described a case of a young man who developed retinal haemorrhages after both the first and second injections of this vaccines. The authors concluded that the causal relationship was indicated by the close proximity to the vaccine (1 week) and the reappearance of the retinal haemorrhages after the second dose.

Interestingly, Goldwater et al. (1990) described tests which clearly differentiate babies who died from trauma from those who died without any trauma, such as SIDS. They tested sera from babies who died from trauma and from those who died as SIDS for cross-linked degradation products (XLFDPs) using D-Di test (Diagnostica Stago, Asnieres, France) which utilizes a monoclonal antibody directed against the fibrin degradation product, D-dimer molecule. The mean XLFDP levels for SIDS sera was 1792 mgL (SD +-1498) and from controls sera was 56.6mgL (SD=-34.9). The high levels of XLFDP seen in sera of SIDS cases most probably reflect a massive consumptive coagulopathy. Even though the authors admitted that pathogenic mechanism underlying this is uncertain, they wrote that it is possible that in some cases it may be related to bacterial toxaemia. This would concur with their previous findings (Bettelheim et al. 1989) of toxigenic

4

Escherichia coli isolation from the intestine contents of SIDS cases. Importantly, intravascular coagulation is known to occur in other conditions caused by E. coli verotoxins, including haemolytic uraemic syndrome, the pathogenesis of which involves platelet aggregation and embolisation (with normal platelet count), which then results in haemorrhages into internal organs.

Vaccines and antibiotics are known toxic substances which cause proliferation of toxigenic E. coli in the gut.

Again, such tests for the presence of toxigenic E. coli (the Limulus test) have not been performed on baby Robbie.

Vaccines contain a number of substances which are toxic, starting with foreign proteins (antigens): bacteria and viruses or their protein envelopes) and continuing with formaldehyde, aluminium phosphate and aluminium hydroxide, mercury compounds and other toxic substances called adjuvants, which are known to cause anaphylactic (=hypersensitvity) reactions (Parfentjev 1955; Gupta et al. 1995 and many others). Far from providing immunity, vaccine injections actually increase the susceptibility of the recipients to the disease which the vaccines are supposed to prevent, and also to other, unrelated, bacterial and viral infections. This explains the well-documented 300% increase in the reported cases of whooping cough after 1978 when the individual US states mandated the DPT vaccines and which affected mainly the 2 to 6 months old babies, the well-vaccinated age group, as well as regular epidemics in vaccinated populations (Hutchins et al. 1988). This also explains the very high incidence of ear infections, bronchiolitis and other respiratory infections in the recipients of vaccines (Craighead 1975).

Vaccines, such as the whooping cough (pertussis) vaccine are actually used in animal experiments to induce the so-called experimental allergic encephalomyelitis (Levine et al.1966). As shown by Behan et al.(1973), such encephalomyelitis may be connected with brain haemorrhaging (=haemorrhagic encephalomyelitis). There are a number of mechanisms that explain this process, disseminated vasculomyelinopathy being one of them (Reik 1980). Also, Reik (1980) stated that the numerous central nervous system abnormalities which follow antecedent infections and vaccinations appear to share a common pathogenesis involving the immune system. Antigen-antibody complexes are formed following the introduction of foreign antigen by injection or inoculation cause vascular injury with secondary damage to myelin.

In 2001 and 2004, I have published two articles in Journal of Australasian College of Nutritional and Environmental Medicine (J ACNEM) in which I elaborate on material issues of vaccine reactions such as suffered by baby Robbie. Both are enclosed with this report.

5

SUMMARY OF MY FINDINGS OF THE CAUSE OF ROBBIE'S INJURIES

The diary of events as described in detail by Brian Herlihy is
plausible and clearly indicates that there was no shaking of
Robbie that could have caused any injury, neither before or after
the documented serious neurological symptoms appeared.  The
appearance of serious neurological symptoms, preceded by
vomiting, can plausibly and clearly be explained as linked to the
documented vaccine administration and did not require any
physical violence.  Brian only attempted to revive Robbie after
he developed serious neurological signs and gave him competent
resuscitation by gently puffing breaths into him and, when the
medics arrived, by correctly using the bag while one of the
medics was fumbling around.

It is well-documented in medical records that Robbie was given a
multitude of vaccines starting as early as at 7 weeks of his
short life, and, again at about 3 months of his age.  Twelve
vaccines in all.  This represented a potent toxic cocktail, 6ccm,
in short succession, just over 2 months apart.  Most vaccines
given to babies contain merthiolate (a mercury derivate) which
cumulatively may exceed the safe level of such toxic substance.
And this is before we even take into consideration the amount of
foreign proteins (antigens) and other toxic substances which such
vaccines contain.  According to immunological research, vaccine
injections do not immunise: rather they sensitise, make the
recipients more susceptible to the disease which the vaccine is
supposed to prevent and also to a host of unrelated bacterial and
viral infections (Parfentjev 1955, Craighead 1975).  To enhance
the immune response, vaccines contain adjuvants, which are toxic
substances and which further enhance the sensitisation effect of
the foreign antigens in the vaccines.  According to Gupta et al.
(1993), adjuvants in themselves are toxic and cause undesirable
side effects.  Some of the side effects can be ascribed to
unintentional stimulation of different mechanisms of the immune
system, while the others may reflect the known general adverse
pharmacological reactions.  It is a compromise between a
requirement of adjuvanticity and what is considered an acceptable
level of side effects.  However, such compromise does not make
the adjuvants any safer.

This is enough to cause brain and retinal haemorrhages in small
babies such as baby Robbie.  This also explains why the US has
such a high infant mortality rivalling the rates in the Third
World: it is the mandatory vaccination, resulting in some 98% of
all US babies being vaccinated with such toxic substances.  Until
about 1990, the "recommended" (=mandated) vaccines included only
DTP and Polio, vaccines (4 in all) at 2, 4, and 6 months of age.
The pathological findings in the babies who died from such
vaccines were minimal: mostly petechial haemorrhages into the

6

lungs, pericardium, thymus and other organs.  Since 1990s, babies
are given DTP, Polio, Hib and hepB vaccines.  This explains why
the pathological findings these days include brain and retinal
haemorhages, instead of just the minimal pathological finding of
petechial haemorrhages.  The Hib vaccine causes meningeal
(subdural or subarachnoid) haemorrhages because the Haemophilus
influenzae type B bacterium has a predilection for meninges (it
causes meningitis).  Retinal haemorrhages as a rule accompany such
meningeal haemorrhages because of a direct anatomical connection
between the brain and the eyes.  The HepB vaccine does not make
the situation any better, quite to the contrary.  Indeed, hepB
vaccination of newborns resulted in SIDS moving into the first
days of life.  That could have been the reason why the American
Academy of Pediatrics (AAP) and one stage withdrew the
recommendation for hepB vaccination of the newborn babies and
changed it instead to a recommendation to start with the hepB
vaccine at 6 months.  This, of course, would almost completely
camouflage the lethal effect of this vaccine.

In conclusion, baby Robbie's injuries and death were caused by
the 12 vaccines which he received within his short 3 and a half
months life.

The concept of the Shaken baby syndrome as a cause of the type of
injuries as experience by Robbie is on shaky ground, indeed.  I
Leadbeater & James (1955) questioned the relevance and strength
of the evidence which is supposed to support the concept.  They
concluded that it seems premature to warn against an act of
violence when its precise mechanism of action is not clearly
defined, its potential for serious trauma in the absence of
concomitant impact is not supported by existing experimental
data, and the clinical findings said to result from it are not in
themselves specific.

11.67.06

7

000167

References

Wilkins, J. 1988. What is 'significant' and DTP reactions (a letter). Pediatrics; 81(6): 912

Lewis, K., Jordan, S.C., Cherry, J.D., Sakai, R.S., and Le, C.T. 1986. Petechiae and urticaria after DTP vaccination: detection of circulating immune complexes containing vaccine-specific antigens. J Pediatrics; 1009-1012.

Torch, W.C. 1982. Diphtheria-pertussis-tetanus (DPT) immunization: a potential cause of the Sudden-Infant Death Syndrome (SIDS). Neurology; 32(2): A169-170.

Torch, W.C. 1986a. Characteristics of diphtheria-pertussis-tetanus (DPT) postvaccinal deaths and DPT-caused Sudden-Infant-Death Syndrome (SIDS): A review. Neurology; 36: 148.

Torch, W.C. 1986b. Diphtheria-pertussis-tetanus (DPT) immunization may be an unrecognized cause of Sudden-Infant-Death (SIDS) and Near-Miss Syndrome (NMS): 12 case reports. Neurology; 36: 149.

Olin, P., Rasmussen, F., Gustafsson, L., Hallander, H.O. et al. 1997. Randomised controlled trial of two-component, three-component and five-component acellular pertussis vaccines compared with whole-cell pertussis vaccine. Lancet; 350: 1569-1577.

Devin, R., Roques, G., Disdier, P., Bodor, F., and Weiller, P.J. 1996. Occlusion of central retinal vein after hepatitis B vaccination. Lancet; 347: 1626.

Goldwater, P.N., Williams, V., Bourne, A.J., and Byard, R.W. 1990. Sudden infant death syndrome: a possible clue to causation. Med J Australia; 153: 59-60.

Bettelheim, K.A., Smith, D., Goldwater, P.N., and Bourne, A.J. 1989. Toxigenic Escherichia coli associated with sudden infant death syndrome. Med J Australia; 151: 538.

Parfentjev, I.A. 1955. Bacterial allergy increases susceptibility to influenza virus in mice. Proc Soc exp Biol & Med: 373-

Gupta, R.K., Relyved, E.H.,. Lindblad, E.B., Bizzini, B. et al. 1993. Adjuvants - a balance between toxicity and adjuvanticity. Vaccine; 11(3): 293-306.

Hutchins,S.S., Cochi,S.L., Brink, E.W., Patriarca, P.A. et al. 1988. Current epidemiology of pertussis in the United States. Tokai J exp & clin Med; 13 (Suppl): 103-109.

B

Craighead, J.E. 1975.  Report of a workshop: disease accentuation after immunization with inactivated microbial vaccines.  J infect Dis; 1312(6): 749-754.

Levine, S., Wenk, E.J., Devlin, H.B., Pieroni, R.E. et al. 1966. Hyperacute allergic encephalomyelitis: adjuvant effect of pertussis vaccine and extracts.  J Immunol; 97(3): 363-368.

Behan, P.O., Moore, M.J., and Lamarche, J.B. 1973.  Acute necrotising hemorrhagic encephalopathy. Postgrad Med; 54: 154-160.

Reik, L. Jr. 1980.  Disseminated vasculomyelinopathy: an immune complex disease.  Ann Neurol; 7: 291-296.

AAP (Committee on infectious diseases and Committee on Environmental Health), 1999. Thimerosal in vaccines - an Interim Report to clinicians.  Pediatrics; 104(3): 570-574.

Leadbeater, S., and James, R. 1955.  The shaken infant syndrome. Shaking alone may not be responsible for damage.  Br med J; 310: 1600.

Scheibner V.  2001.  Diagnosis of shaken baby syndrome on shaky ground.  J ACNEM; 22(2): 5-8 &15.

Scheibner V.  2004.  Dynamics of critical days as part of the dynamics of non-specific stress syndrome discovered during monitoring with Cotwatch breathing monitor.  J ACNEM; 23(3): 10-14.

9

000169

**F. Edward Yazbak, M.D., F.A.A.P.**
**70 Viewcrest Drive**
**Falmouth, Massachusetts  02540**
**(508) 540 5060**

**May 1, 2006**

### The Case of Brian Herlihy

Brian Herlihy was accused of causing the death of Baby Robert Quirello.

A jury found Mr. Herlihy guilty of culpable negligence manslaughter on September 26, 2002 and he is now serving a 15-year sentence in a Florida Prison.

The accusation of abuse that eventually resulted in Mr. Herlihy's conviction was mostly based on:

- The fact that the reported history did not fit or support the findings.
- The claim that retinal and subdural hemorrhages can only be due to shaking and abuse.

Mr. Herlihy has always maintained that he is innocent.

It is my professional opinion within a degree of medical certainty that Baby Robert Quirello's death was due to medical causes and not to inflicted trauma.

Respectfully submitted

F. Edward Yazbak, MD, FAAP

1

**F. Edward Yazbak, M.D., F.A.A.P.**
**70 Viewcrest Drive**
**Falmouth, Massachusetts 02540**
**(508) 540 5060**

May 1, 2006

To whom it may concern

I the undersigned, F. Edward Yazbak, MD, FAAP am a pediatrician and a Fellow of
the American Academy of Pediatrics. I am duly licensed to practice medicine in
Rhode Island and Massachusetts and have testified as an expert witness in vaccine
injury, vaccine compensation and Shaken Baby Syndrome (SBS) cases in several
states including Florida.

Attached please find my Curriculum Vitae and a partial list of my publications.

I should point out that in 34 years as a pediatrician and school physician I had to
interpret and explain radiological, neurological, laboratory and other findings to
parents, discuss treatment options and recommend best course of action.

I am therefore qualified to review medical records.

Because of my extensive training in infectious diseases, I have a deep knowledge of
vaccines, their benefits and their complications and have published extensively on
the subject. I am also experienced in reviewing VAERS (Vaccine Adverse Events
Reporting System) reports and evaluating their significance and limitations. I am
pro-vaccination.

In the early sixties, as the Pediatric Director of the R.I. Child Development Study,
the Brown University division of the Collaborative Study of the National Institute of
Neurological Diseases and Blindness, I reviewed outcomes of pregnancy and
supervised longitudinal follow-ups of included children.

In the last few years, I have researched the problem of *Shaken Baby Syndrome (SBS)*
and published research papers on the subject.

_____
F. Edward Yazbak, MD

May 1, 2006

2

To whom it may concern,

In this report, I will conclusively show:

- That events actually support Mr. Herlihy's claim and contradict his accusers'

- That in spite of the claims by Mr. Herlihy's accusers, retinal and subdural hemorrhages can be due to a multitude of causes and not only to inflicted trauma

- That Baby Robert Quirello (Baby Robert) had evidence of pre-existing pathology that was overlooked by the medical staff for unknown reasons

- That all Baby Robert's findings were due to medical causes and only to medical causes.

> *"Too many of my colleagues (and most other physicians and almost the entire general public) think our profession is the "whodunit" discipline. It is not. Forensic pathology is the "what happened" specialty. When our focus is on the who" we forget the "what" or may consider it unimportant.   Worse,   we   may   alter   our explanation/interpretation of the "what" to make it conform to our opinion of the "who". The need to consider alternative explanations ceases, doors to further inquiry close: Do not go beyond, you will find nothing there. Objectivity fails because we are forced to defend an advocacy role, be it for the state or for the defendant. We must not forget that our only responsibility is to bear witness within the limits of science..."* John Plunkett, MD

Dr. Plunkett is a prominent Forensic Pathologist. The above from a 1998 letter to The American Journal of Forensic Medicine and Pathology seems prophetic when one reviews the case of Brian Herlihy, who has been in jail for over 5 years, because and only because some physicians at SHANDS, University of Florida, Gainesville felt that he inflicted fatal injuries on Robbie Quirello, a 4-month old boy left in his care for minutes.

Dr. Plunkett, M.D., Coroner, Minnesota Regional Coroner's Office and Director, Laboratory & Medical Education, Regina Medical Center, Hastings, MN is a recognized authority on Shaken Baby Syndrome (SBS) and the author of many reports on the subject including a March 2004 Guest Editorial in The British Medical Journal (BMJ) entitled *The evidence base for shaken baby syndrome*
[BMJ 2004;328:719-720 (27 March), doi:10.1136/bmj.328.7442.719].

**Dr. Plunkett has testified in Brian Herlihy's defense and remains convinced of his innocence.**

3

When a physician at SHANDS decided that Baby Robert's findings could only have been due to inflicted injury in spite of clear evidence of pre-existing pathology, other specialists focused on that possibility and ruled out all others, the Child Protective Team (CPT) simply concurred, as is often the case, and a report of abuse was filed.

It is a fact that when a suspicion of child abuse is initiated in a major medical center, no physician or social worker dares to contradict it and risk to release a potentially abusive parent or babysitter into society, to harm again.

Based on the reports from the medical center, Mr. Herlihy was arrested, charged and indicted.

John and Lois Herlihy, Brian's parents, have asked me to review the medical evidence of the case. Both know that Brian has not injured Baby Robert Quirello. John F. Herlihy, MBA, RRT, CPHQ, LHCRM is the Quality Assurance Coordinator, Accreditation & Licensure Department, Jackson Health System.

Brian Herlihy has always proclaimed that he is innocent and that he never hurt Baby Robert Quirello. My independent review of the medical evidence strongly supports his claim. As previously stated, Baby Robert died because of medical causes and not as a result of inflicted trauma.

I am willing to go anywhere and meet with anyone in order to present the important evidence contained in this report.

**To prove that Brian Herlihy is innocent and that he was wrongfully convicted, I will show:**

- **That events support his claim and contradict his accusers'. (Part I - Page 5)**

- **That the allegation that retinal and intracranial hemorrhages can only be due to inflicted trauma, an allegation that influenced the Jury and resulted in a guilty verdict, is wrong and unfounded. (Part II - Page 7)**

- **That Baby Robert Quirello's findings show evidence of pre-existing pathology and were due to medical causes and not to inflicted trauma. (Part III – Page 12)**

- **That the interpretation of the findings, the conclusions and some of the testimonies were flawed. (Part IV – Page 23)**

**For the Discussion and Summary: Part V – Page 31**

4

# Part I

# The Story

The case for the State and the charges were based on the Child Protective Team's (CPT) allegation that Crystal Quirello had decided to return to her husband and to break up with Brian Herlihy, whom she had met in July 2000. According to the State's proposed scenario, on the morning of August 2, 2000 Crystal Querillo and Baby Robbie stopped at his dad's work and then came to Mr. Herlihy's house where she allegedly announced to Brian Herlihy that their relationship was over. According to his accusers, Brian Herlihy fatally injured the baby when his mother left the house.

The State's scenario is illogical. A woman breaking up with her boyfriend and who just announced to him her intentions, does not leave her infant with him and take his truck to a gas station to fill it up with gas so they can all go on a day trip.

That this unlikely motive actually helped convict Mr. Herlihy is tragic.

In the Emergency Room (ER) on August 2, 2000 at 10:15 am, very shortly after the baby arrived by Rescue, the hospital social worker Ms. Leslie Francios (Pager 334 4646) wrote: "... I met with mother and boyfriend Brian. Mother was very upset, crying and shaking... Mother and boyfriend were notified by Dr.Roehlwing the baby was in critical condition, would need a CT scan and then would be transferred to the PICU. Mother was very upset to find out he would stay overnight. She is going through a divorce and the father of the baby will try to take custody. Dr. Roelwing and I told her to focus on the health of the baby right now."

This note, written by the hospital social worker in the Emergency Room, before admission -clearly contradicts later statements by social workers and doctors. There is no way to know why and if Crystal Quirello actually changed her story and under which circumstances or threats she did. The ER statement is evidently correct.

Dr. Dickison, Brian Herlihy's most fervent accuser, was aware that Crystal Querillo and Brian Herlihy were going on a trip with the Baby on August 2, 2000 and that therefore they were not breaking up. In her 3-page admission note that day she wrote: "The history as related by Brian to police investigator who was given medical questions by me. The mother had brought Robbie over the place before driving to Cedar Key. Robbie had already taken one bottle from his mom, but is still hungry which ███ left the apt. house to go get gas for the trip. He denied they had broken up." (p. 510)

A woman who announces to her boy friend that she is breaking up with him does not plan to take her baby and go on a day trip with him. She also does not leave her baby with him -while he is showering and getting ready-to rush and gas up his truck-in order to leave even sooner on their trip.

5

The irrefutable fact is that Crystal Quirello testified under oath that she did not tell Brian Herlihy that their relationship was over on the morning of August 2, 2000.

Brian Herlihy had NO MOTIVE to injure Baby Robert.

### *The events as they really happened*

According to Crystal Quirello, she was at DHL with Baby Robbie at 9 am on 8/2/2000 to visit her husband at work and arrived to Brian's house between 9:15 and 9:20 am as they were planning to go on a trip. This fact was confirmed by the special investigator who questioned both for Dr. Diekison. We know she talked with Brian, offered the baby some formula, burped him and settled him. She then took Brian's truck keys, went down to the truck, and drove it to the gas station across the street where she paid for gas by credit card at 9:32 am.

We also know that Brian called 911 at 9:35:02 and that a Rescue Vehicle was dispatched at 9:35:32 and arrived on scene at 9:38:02.

We know that according to Kenneth Johnson, EMS the baby was hooked to an EKG monitor when he arrived with the Rescue vehicle (p. 26) and that at 9:44 Baby Robbie had no respiratory effort and a brachial and recorded pulse of around 180/minute.

It is therefore evident that whoever attached the EKG monitor arrived on scene before EMT Johnson. It is also just as evident that Brian Herlihy, who was perfectly sane and composed when Crystal Quirello entrusted him with her baby and who expected her to be back promptly, could not have logically de-compensated, lost his mind and his temper, purposely injured a baby he loved, noticed that he stopped breathing, attempted to revive him and then called 911, all in just few minutes.

Clearly, the sequence of events described by Brian Herlihy, that was deemed suspicious enough to initiate a child abuse investigation, makes immensely more sense.

The baby because of some acute life-threatening event thrashed and ended up between the mattress and the foot-board. This is where Mr. Herlihy found him and from where he had to extract him - before he could attempt to revive him and call 911.

**********

6

## Part II

## Retinal hemorrhages: Accepted principles.

In recent years, it has been assumed that the presence of retinal hemorrhages is "evidence" of shaking or shaking impacting.

In 2002, renowned neurosurgeon R. Uscinski MD wrote in the British Journal of Neurosurgery [2002; 16(3): 217–219]: "...*prior to 1972 the presence of retinal hemorrhages was a diagnostic aid in detecting the presence of chronic subdural hematoma in children, and has long been known among neurosurgeons to reflect an abrupt increase in retinal venous pressure.*"

The unquestionable scientific facts are that:

- Although retinal hemorrhages, with or without intracranial bleeding, may be seen in cases of abuse, they are not ONLY seen in such cases.
- Retinal hemorrhages (RH) have **never been proven** to be the result of the acceleration and deceleration that supposedly must occur in Shaken Baby Syndrome (SBS) or Shaken Impact Syndrome.
  **They have only been presumed to be.**

In fact, retinal hemorrhages rarely if ever occur during the more severe and violent severe acceleration-deceleration events associated with motor-vehicle accidents such as when a car hits a tree or a bridge support.

Retinal hemorrhages have been reported in association with the following conditions:

- Vaginal deliveries possibly in up to 30-40% of all vaginal births Kaur B, & Taylor D. (1990) Current Topic: Retinal Hemorrhages. Arch. Dis. Child 65:1369 - 1372.
- Cardio respiratory resuscitation (CPR) Goetting MG, Sowa B (1990). Retinal hemorrhage after cardiopulmonary resuscitation in children: an etiologic reevaluation. Pediatrics 85:585-588.
- Accidents and accidental trauma Elner SG, Elner VM, Arnall M, Albert DM. (1990) Ocular and associated systematic findings in suspected child abuse. A necropsy study. Arch Ophthal 108: 1094-1101.
- Scurvy Hess, A. Scurvy Past and Present. J.P. Lippincott Company 1920.
- Conditions that cause central retinal vein occlusion
  --Gutman, F. (1983). Evaluation of a Patient with Central Vein Occlusion. American Academy of Ophthalmology. 90(5) 481-483.
  --Iijima H, Gohdo T, Imai M, & Tsukahra S. (1998) Thrombin-Anti-thrombin III Complex in Acute Retinal Vein Occlusion. American Journal of Ophthalmology 126(5): 677-682.

7

- After vaccination with Hepatitis B Vaccine
  Devin F, Roques G, Disdier P, Rodor F, Weiller P.J., (1996). Occlusion of central retinal vein after hepatitis B vaccination. The Lancet Vol. 147: 1626
- Goodpaster's Syndrome and similar autoimmune disorders Boucher,M.C. et. al. (1998) The Photo Gallery of Clinical Opthamology: Bilatera Serous Retinal detachments associated with Goodpasters's syndrome. Canadian Journal of Opthamology 33:46-47.
- Coagulation and bleeding disorders including Vitamin K deficiency.
- Temporary Vitamin C depletion

Jayawant (1998) noted an 80% association between RH and subdural hemorrhages (SDH), suggesting that a RH is not an "independent risk predictor", but is simply present as an extension or consequence of the intracranial bleeding. [Subdural haemorrhages in infants: population based study. [Jayawant S BMJ 1998 317 1558-61]

## Subdural hemorrhages: General Principles

Subdural hemorrhages (SDH) can be caused by biomedical disorders and are not exclusively the result of intentional trauma, obviously. Often the child may "appear" to be healthy and fine until an acute bleeding has occurred and is extensive enough to produce pressure and cause symptoms. In many instances the infant has had a subdural hemorrhage for some time (weeks or months) which has remained asymptomatic because the open sutures and fontanelles in an infant allow for expansion of the space in the skull.

SDH may be secondary to bleeding and coagulation problems due to Vitamin C and K deficiency, liver dysfunction, malabsorption syndromes and enzyme defects. It may be associated with connective tissue and vascular disorders or blood stream infections to name a few.

Two or more predisposing factors may co-exist: a malabsorption syndrome combined with even a mild factor XIII deficiency may result in a more significant intracranial bleeding than would have occurred with any one of them alone.

Infants with such underlying disorders may be asymptomatic or have rare symptoms and minor findings under the age of six months. They may be simply cranky or fail to thrive. Sometimes the intracranial bleed is the first flagrant symptom. It is the responsibility of the treating physician to obtain a very careful history and do a meticulous examination. Extensive testing to assess nutritional status, enzyme levels and liver, gut and kidney function should be ordered and properly interpreted.

It is evident that most often there is a tendency to assume that non-accidental injury (NAI) has occurred in infants with SDH and/or retinal hemorrhages (RH). Once the allegation of abuse has been made, and police or welfare services have become involved, there is a general unwillingness to consider other plausible causes or underlying

000177

conditions. The care-taker is assumed to be guilty and has to prove his innocence and not the other way around as the law requires. Investigations are continued in order to build a stronger case for NAI (bone scan, MRI, autopsy) rather than to identify alternative causes or contributory factors.

Prosecutors and their experts often proclaim that a SDH combined with retinal haemorrhage (RH) is pathognomonic of "non-accidental injury" (NAI).
The term "pathognomonic" implies a two-way relationship between the symptoms and signs on one hand, and the disease in question on the other hand. Pathognomonic symptoms or signs not only allow recognition of a disease, but differentiate it from all other diseases or disorders. Technically, it implies 100% specificity.

**In many cases, this is not true.**

The combination of SDH and RH strongly support a diagnosis of NAI, but in no way constitute proof that NAI occurred. The value of the diagnosis of SDH and RH is that their presence can markedly increase the confidence of a diagnosis of NAI, given other circumstances or findings which may indicate NAI. Even if it is assumed that all non-accidental injuries involving shaking or blunt trauma to the head of babies cause subdural haemorrhage and/or retinal haemorrhage, it does not follow that all cases of SDH and RH are caused by NAI. Other diseases and circumstances may cause SDH and RH. Since the mechanism of RH is unknown (Riffenburgh 1991), it is important that the specific hallmarks of NAI be delineated as proposed by Rohrbach (1997) who stated that *"Intraretinal haemorrhages alone are typical, though not pathognomonic for the 'battered-child syndrome'"*. Conditions apart from NAI which may result in SD and RH include: bleeding disorders; meningitis; septicaemia; leukaemia; galactosaemia; hypertension; and Henoch-Schonlein purpura.

Retinal hemorrhages also occur as a consequence of intracranial bleeding. A number of papers which deal with the mechanism of the RH have suggested that increasing intracranial pressure and subarachnoid haemorrhage lead to retinal haemorrhages (Jacobi 1986), and that these may be accompanied by SDH. In fact, this association is known as "Terson's syndrome". A number of papers (Giangiacomo 1985, Weingeist 1986, Jacobi 1986, Keithahn 1993, Poepel 1994) point out the similarities between Terson's syndrome and the retinopathy of shaken baby syndrome. Indeed, the possibility of SBS should be considered in the differential diagnosis of Terson's syndrome.

In general, any of the factors listed as potential causes of SDH must be considered a plausible cause of the RH as well and the combination of the two in the same patient is insufficient to prove any particular cause. It is likely that the majority of cases in which SDH and RH are found in infants are NAI, but this is only a statistical association. Each and every case must stand or fall on its own merits and only if other factors lead one to suspect NAI and only NAI. Recently Jayawant (1998) noted an 80% association between SDH and RH and postulated that retinal hemorrhages are not independent risk predictor, but simply markers of the extensiveness and severity of intracranial bleeding.

9

Most studies show that in most cases of non accidental injury clear evidence of trauma and abuse are evident. Jayawant, in a recent British retrospective study (1998), reported that 60% of the children exhibited signs of other trauma (bruising, fractures etc). Duhaime (1987), Alexander (1990) and Lancon (1998) reported that in cases of severe cerebral damage and death, overt signs of trauma and abuse were reported even more frequently and suggested that evident.

Others have suggested that in a higher percentage of cases, overt signs of trauma or abuse are evident. A number of authors (Duhaime 1987, Lancon 1998, Closset 1992) have suggested that shaking without impact does not generate sufficient forces to cause the types of injuries seen in SBS cases. Many others disagree, holding that shearing forces tend to rupture the fragile veins across the dural space. These other authors propose ways in which shaking with a rotatory component, possibly at particular frequencies, or with rapid deceleration caused by soft impact (eg pillow, etc), could cause shearing.

Because of their open fontanels, young infants with a SDH may remain asymptomatic for a relatively longer period –sometimes weeks. They may also have seemingly unrelated symptoms such as crankiness, restless sleep, poor feeding, vomiting, and failure to thrive.

SDH may be acute or chronic. A child may have spontaneous and separate acute and chronic subdural hemorrhages. A chronic SDH may also re-bleed.

Subdural hemorrhages of different "ages" will look different on CT-scan.

In a 1977 review, Bergstrom reported: "... *The histories reveal no new traumas in association with onset of symptoms. Spontaneous rebleeding may well explain the onset of symptoms as well as the attenuation values being so much higher than those of CSF and serum"*.

Ommaya, Goldsmith and Thibault in a comprehensive review (22 pages-126 references) published in 2002 in the British Journal of Neurosurgery wrote: *"The five categories of CT imaging were as follows: Layering type SDH hyperfibrinolytically active with a highest tendency to rebleed. The mixed density type has also a high tendency to rebleed but with lower hyperfibrinolytic activity ... "*

Also in 2002 and in the same journal, Uscinski wrote: *"Rebleeding in subdural hematomas may occur, with minimal or no trauma, owing to the nature of the membranes and the process of resorption... Common sense would seem to indicate that not all the subdural hemorrhages in children are inflicted injuries and prior to 1972 the presence of retinal hemorrhages was a diagnostic aids in detecting the presence of chronic subdural hematoma in children and has long been known among neurosurgeons to reflect an abrupt increase in intracranial pressure. Lastly, a simple point of consideration: when an adult presents with a chronic subdural hematoma, abuse is rarely a diagnostic consideration.  Given the similar pathology of the subdural hematoma in adults and children, why, logically, should the opposite be true in a child?*

10

In fact, chronic subdural hematomas do re-bleed during the regular course of healing with little to no impact [Parent (1992), Lindenberg (1993), Piatt (1999) and Mahmood (2000).

Because an old SDH can go undetected for a while and can re-bleed spontaneously, the determination of its cause and or circumstances is difficult. Accusing the adult who is unfortunate enough to be with the infant when he or she becomes symptomatic seems at the least illogical.

*****

11

## Part III

## The pre-existing conditions

### The Past History

The most flagrant error in the case management is the fact that Anne E. Dickison MD (Dr. Dickison) persistently ignored the fact that Baby Robbie arrived to SHANDS with a clearly identifiable old subdural hemorrhage and that persistently, she did **NOT acknowledge or record** that fact in her admission note, her progress notes and the discharge summary nor take it seriously. This has negatively impacted medical care and has caused legal difficulties for Mr. Herlihy. The duty of a physician is to report all the facts and not only those that they "like" because they "help prove" their diagnosis.

In addition, Dr. Dickison and her team constantly insisted that baby Robbie was normal until August 2, 2004, the day he stopped breathing and became unresponsive.

### That was not true.

### Baby Robert was not normal before August 2, 2004 because:

- **There were major problems with the mother's pregnancy**
- **There were major problems around the delivery**
- **There were major problems during the first four months of the Baby's life.**

### *The mother's complicated pregnancy*

Ms. Crystal Quirello (DOB 8.26.1979) was 20 years-old and weighed 115lbs when she started her pregnancy in July 1999. She had recurrent nausea and vomiting and was given Phenergan, an anti-emetic and anti- nausea drug. There have been no adequate studies in humans on the use of Phenergan during pregnancy. Ms. Quirello weighed only 120.8 lbs on week 34 of her pregnancy but then lost over 3 lbs during the following week, a very unusual and abnormal happening indeed. She weighed 117.5 lbs towards the end of her pregnancy thus registering a net gain of only 2 ½ pounds in all – or one tenth of the expected weight gain

An ultrasound (US) on 11/29/99 revealed a pregnancy at 20 weeks and 1 day, suggesting April 16, 2000 as the expected day of confinement (EDC).

At 26 weeks gestation (1/10/2000), Ms. Quirello was involved in a serious rear-end collision and was admitted to Alachua General Hospital (AGH) complaining of back, legs, and arms pain. She remained in the hospital for a week because of concerns for the baby and the pregnancy. She had abnormal laboratory results, including K 3.3, BUN 2.0, Creatinine 0.5 mg/dl, BUN/Creatinine ratio: 4.0 All low. Both the total protein of 5.8 and the albumin of 3.1 were also low, **indicating some degree of malnutrition.** Her AST, a

12

liver function test, was also low: 22 unit/L. A low AST is found in pregnancy but also with Vitamin B6 deficiency.

It is not clear why the mother's blood group was listed as O negative (p. 570) and A-negative (p.5, 6, 8). Crystal Quirello tested negative for Group B Streptococcus and for hepatitis B surface antigen. She was immune to rubella.

She received RhoGAM during the January hospital stay (P. 569). In 1999, RhoGAM contained 30µg of mercury per unit-dose.

On 2/4/2000, she was started on Chromagen (BID) for anemia.

According to the testimony of Richard Kreinest MD (Dr. K), Crystal Quirello's obstetrician of record, Crystal was first seen at Dr. K's office on August 31, 1999, after she had been seen at the "crisis pregnancy center". Dr. K performed a life-affirming ultrasound and the routine screening tests.

Dr. K interpreted the November 29, 1990, an US as showing the baby in a transverse position.

Dr. K then described his care and findings during Crystal's hospitalization at Alachua General Hospital following her automobile accident of January 10, 2000 and reported that Crystal complained of pre-term contractions –"uterine irritability" – and was given "terbutaline, which relaxes the muscle of the uterus and prevents contractions". He did another ultrasound. (US)

Another ultrasound on 3/14/2000 revealed a decreased amount of amniotic fluid. Estimated baby weight was                . Baby was in a vertex presentation.

**Because of all the above events and complications, the pregnancy was NOT a normal pregnancy**

Dr. K testified that Dr. Stuart, who was covering, delivered the baby and that the baby was occipito-posterior, had the cord around the neck and sustained a fracture of the left clavicle at delivery. **The delivery was premature and also abnormal.**

Mrs. Quirello had difficulty with breastfeeding and when she was seen by Dr. K on June 29, 2000 she had stopped breastfeeding.

### *The peri-natal period*

Crystal Quirello started having contractions on 3/2/2000. She was examined on 3/3/2000 and her cervix was 2 cm (open). She was monitored, given MgSo4 and started on Terbutaline every six hours.

13

Membranes ruptured 3/21/2000 at 2026 hour and the baby was delivered at 0142 on 3/22/2000. APGARs were 8 at 1 minute and 9 at 5 minutes.

As mentioned, the baby who was in the occipito-posterior presentation, had the cord around the neck once and sustained a fractured left clavicle, an unusual finding in a baby born at 36 weeks gestation and weighing around six pounds.

The mother breastfed the baby but had difficulties. A formula and then another were also offered.

The baby and mother were discharged on 3/24/00 at 0740

Following delivery, the mother was placed on Micronase, an oral anti-diabetic agent. The drug was discontinued on 6/8/2000.

***Baby Robert's nursery stay***

Baby Robert stayed in the nursery from 3/22 to 3/24/2000.

On 3/22 at 0900 his temperature was 97° R and he was placed under a warmer. His PKU screen was 2mg % (normal 0.0-2.0). A repeat test was not performed (page 20). The baby's blood group was O positive. He was breastfed and received a formula supplement.

The mother's diabetes history was listed as NEGATIVE on 3/22/2000. It is not clear why she was placed on Micronase, a product that is not recommended during lactation.

***The period before August 2, 2000***

3/27/2000 visit (3 days post discharge): seen by J. Manning, ARNP: Normocephalic. ? Left clavicle fracture.

At the 2 weeks checkup, on 4/5/2000 [Ht 20", Wt 6lb and HC 35 ½ cm], the baby is breastfeeding and on Isomil. Spitting up frequently.

On 4/17/2000: Wt 6'9". Impression: poor feeding. A formula was suggested after breastfeeding.

On 4/19/2000: Reason for visit: Feeding problems. Wt 7'1" No BM in 2 days-The mother is offering the breast and supplementing with Enfamil with iron.

On 4/26/2000 at age 1 month: Wt 7lbs. T. 100.7- Note says: In for weight-check, No visit, Dr. H. will see in two weeks.
It is not clear why a 1-month old baby with a fever was not examined.

At the 7 week visit, on 5/9/2000 [Ht 22", Wt 9'1" and HC 39cm], the baby did not track well – 1 out of 4 attempts- and only tracked 100° each eye. Neurological examination:

14

Question of developmental delay. The baby had tight hips and brisk patellar reflexes (3+). He also had poor head and neck control when prone and sitting up. The baby received DTAP (A918A2). IPV (R0668), HIB (UA510AA) and Hepatitis B vaccine (3198A2). This visit was with J. Manning ARNP.

Baby Robert was rechecked on 6/6/2000 – listed age 2 ½ months- 10 ½ weeks. (Page 41 and 563) Wt 12lbs. Baby was still not holding his head up. He had 4+ knee jerks, 2 beat clonus in heel-cords, moderate hypotonia, poor head control and poor shoulder girdle tone. The anterior fontanel was described as flat and the HC was 41 cm. The record is signed JH.

At the 16 weeks visit, on 7/19/2000 [Ht 25.5", Wt 15'12" and HC 43.5cm. Although Baby Robert did not reach for objects, he was felt to be normal. A detailed neurological examination was not done. The baby was thought to be a "well child" (WC) and given DTAP (956A2), IPV (R1433), HIB (468487) and Hepatitis B vaccine (3198A2).

*The HC was unchanged at autopsy on 8/10/2000 at 1500 Hour (17 ¼").*

*This offers uncontestable evidence that the head had enlarged to its maximal size days before the events of August 2nd.*

*The baby had abnormal neurological findings on June 6, 2000.*

\*\*\*

**The first CT-scan of the Head at SHANDS on August 2, 2000**

The following is exact transcription of the report of the first CT-scan of the head done shortly after arrival to SHANDS.

Date:  8/2/00 CT w/o contrast 10:43
Findings: Clinical indications respiratory arrest in him from of unknown age, with unequal pupils, I told, during a telephone conversation with Dr. Rowling in the emergency room, that the patient also has bilateral retinal hemorrhages, and that like me, he is strongly suspects non accidental trauma.  I have apprised him of scan findings and in adition, have reviewed the images with Dr. Dickison (PEDS), both at approximately 10:50 hours on 8/2/00.

Comparison:  None
Exam: Cerebral Ct was performed in axial plane from the vertex to the skull base. No contrast material was given

15

Findings: There is no evidence of calvarial fracture of there is significant sinus and mastoid disease, involving mainly the left maxillary antrum, ethmoids slightly, both mastoids and middle ear areas. There is also a bubble of gas within the soft tissues of the right forehead, without a definite fracture although one could still be occult, and a bubble of gas adjacent or within the left cornea.

Intracranially, the ventricles are the upper limits of normal size and essentially nondisplaced, although there is pathology present, it being fairly distant from the ventricular system. There are bilateral mid to fairly convexity bifrontal hygromas which especially on the left side suggest slight flattening of gyri as though this is creating mass effect and may have been at one time, hemorrhagic,

There is fresh hemorrhage present at multiple sites, most notable in the high bifrontal areas were probably most is subdural but a lower component is in part likely epidural, and there is a slight amount of parafalcine, characterized by quite bright or somewhat mixed density. There is also a high right parietal, somewhat smaller subdural component of hemorrhage. There is no apparent transtentorial or tonsillar herniation.

In the orbits there is a suggestion of at least right global retinal hemorrhage, the left side more equivocal. There is trace subarachnoid hemorrhage at several sites most notably right posterior parietal, parafalcine.

Impression: Ventricles upper limits of normal size, widespread sinus and mastoid disease, multiple probably multi generational hematomas, and no evident fractures. Possible, retinal hemorrhage on the right. This has the suspected character of non accidental trauma, a finding that apparently is also suspected by the clinical personnel, ER and peds personnel have been apprised of findings either by telephone or in person as soon as the images were viewed

Dictated by O. Frank Agee M.D.
August 2, 2000 11:46A

---

The following is a copy of the August 4, 2000 CT-Scan report

Date 8/4/00 Ct of the head w/o contrast 2:20

Reason: Increased seizure activity

16

Findings: Clinical indications: Multiple, multi generation or extra-axial hemorrhage. This there is a follow-up. The left reported similar study of 8/3/00 is available for comparison

Exam: Cerebral Ct was performed in axial plane from the vertex to the skull base. No contrast material was given

Findings: Today's exam is identical to that yesterday, patient continues to show areas extra-axial fluid collections that perhaps are diminishing slightly in their conspicuity with passage of time but have not quantitatively changed. Patient continues to show slightly spread sutures secondary to the fluid collections. Sinus/mastoid remains, although ethmoids sinus disease appears slightly improved. There are no new hemorrhages.

Impressions: No change since 4/3/00, Continued mass-effect from fluid collections as noted above. Incidentally, we have never been informed as to whether the child has normal bleeding and clotting times, which if abnormal, could conceivably be a factor in the development of these fluid collections

Dictated by: O Agee M.D.
Dictated Date; Aug 4,2000

---

### The issue of the old hemorrhages

The significance of the old hemorrhages was neither appreciated nor seriously considered by the medical staff and specifically Dr. Dickison.

It should have been because:

1. There was no fracture of the skull – old or new.
2. There was no external evidence of injury: bruises, burns, cuts etc
3. The old hemorrhages were probably related to the slow and continued abnormal enlargement of the head starting shortly after birth
4. Brian Herlihy only met Crystal Querillo in July 2000
5. The same factor/factors that caused the old hemorrhages could have caused the more recent acute hemorrhage.

By not getting an MRI, Dr. Dickison not only compromised the diagnosis but possibly the level of care and the outcome of the case. Her statement that an MRI was not medically necessary is wrong; her argument that it was risky has no justification as infants like Baby Robbie are investigated by MRI all the time. (p. 617) Dr. Dickison also stated that "The factor that was most

17

determining to me was I knew what we were dealing with. I knew it was not a surgical emergency. (p.618) In reference to surgical emergencies and surgeons, Dr. Dickison said: "actually, in the old English days surgeons were barbers. They were not considered to be doctors. The heritage is that they're butchers, you know, they use knives…" (p. 711)

### The issue of the sinusitis and mastoiditis

Baby Robert had extensive sinusitis (maxillary and ethmoid) and bilateral masoiditis when he arrived to the emergency room on 8/2/2000. These findings are distinct, serious and unusual at this young age. They are not and cannot be related to shaking injury. They were obviously long-standing indicating that Baby Robert had two major pre-existing pathological processes in his head.

If the baby already had such pathology on 7/19/2000 – which is likely – then the stress and Vitamin C depletion caused by these serious infections in a 4-month-old - when accentuated by the further stress of the multiple vaccinations with its added Vitamin C requirements - could have resulted in a major increase in blood histamine that started a cascade of problems including vascular fragility, cerebral and retinal hemorrhages and eventually culminated in the ALTE. The treating physicians did not test the Vitamin C level in the serum or the Histamine level in the blood on admission. They also did not administer Vitamin C. If they had, they could have saved the baby. (Discussion to follow)

The thymus shrinks rapidly during serious illness or great physical stress. Baby Robert's thymus only weighed 4 grams at autopsy – or <u>20-25% of its expected weight.</u>

If Baby Robert did not have the described sinus and mastoid disease described on 7/19/2000 prior to vaccination, then these were due to post-vaccinal immune paralysis-another serious condition that we have been aware of for a century. When a vaccine (antigen) is injected into a baby, the baby's immune system is busy making antibodies against the antigen and the infant is wide open to invasion by bacteria, viruses etc.. This results in the baby's immune system being overwhelmed and crashing. Baby Robert received not one but SIX antigens on 7/19/2000.

The vaccinations that the baby received will be discussed in detail later in the report and so will the VAERS reports that were submitted about the vaccine lots administered.

### The size of the head and brain

When Baby Robert's head circumference is plotted on the CDC percentile charts, a substantial and abnormal increase is noted - from below the 25° at age 2 weeks to almost 90° at age 16 weeks. Normally, in a baby weighing 6lbs at birth, the head circumference is expected to follow the percentile curves and increase gradually. Baby Robert's head

18

circumference increased in an almost straight vertical line and crossed 3 percentile curves in 3 ½ months, in an unquestionably abnormal fashion.

The very first CT-scan of the head obtained on 8/2/2000, shortly after arrival to the ER showed old hemorrhages bilaterally as hygromas.

The baby's brain was swollen and edematous when the autopsy was performed. According to Dr. Nelson, the neuropathologist who examined the fixed brain later, the cerebral edema was generalized. Dr. Nelson described the brain as being immature with a subarachnoid hemorrhage, generalized vascular congestion and no cortical contusions. (Page 24-25). The findings are not specific for inflicted injury and could suggest a vaccine reaction. They also suggest that the cause of the baby's quickly enlarging head by age 4 months could have been due to pre-existing hemorrhages (the hygromas) and not only to actual brain growth. This would explain the baby's abnormal neurological development and findings at age 7 weeks.

In addition, there was a serious and most regrettable problem with the autopsy: The dura was NOT submitted with the brain to the neuropathologist who was therefore unable to "date" the different hemorrhages. The dura MUST ALWAYS be submitted in case of suspected injury or brain hemorrhages, because it offers the only absolute way to know whether the hemorrhage is old, new or both. The examination of the dura could have actually PROVED conclusively the innocence of Brian Herlihy - who had only known the baby's mother a short time. This major deficiency – if brought out at the trial would have raised reasonable doubt and led to a non-guilty verdict. At an August 2004 Evidentiary Hearing, the presiding judge reversed the verdict in another well-known Florida case based on deficiencies in the autopsy.

The problem with the brain and chronic hemorrhages was discussed at the trial and under oath by Dr. Dickison herself, Mr. Herlihy's principal accuser: *"Question: And I have one last question or two. And in fact, it is also your opinion, is it not that the evidence of these multi-generational hematomas in Robbie's brain means to you that what we have here are repeated injuries or repeated bleeds over a period of time, correct?* Answer: *Correct"* (Page 742)

And a little later: *"The only thing that might be considered somewhat abnormal is he had a smaller brain than the size of his skull, meaning that there was probably some atrophy or wasting of the surface of the brain or that the brain was not growing as rapidly as it should have been".* (Page 754)

Baby Robert's brain was smaller than expected because of the chronic hemorrhages that were present for weeks or months in his large and abnormally-enlarging head.

The findings described by the radiologist who read the CT-Scan, the physician-accuser and the neuropathologist did not and COULD NOT HAVE OCCURRED in the few minutes that Brian Herlihy spent alone with Baby Robert on August 2, 2000 and MUST HAVE PREDATED the few weeks that Brian Herlihy had known Ms. Crystal Quirello.

19

In summary: Baby Robert was not normal prior to his ALTE as attested by the physicians at SHANDS. He had an abnormally-enlarging head, old subdural hemorrhages, a smaller than normal brain, a serious infection of his sinuses and mastoid and some immune stress that caused thymus atrophy.

★★★★★

## The issue of the vaccination

## VAERS Search

The Vaccine Adverse Event Reporting System is a joint program of the CDC (Centers for Disease Control and Prevention and the FDA (Federal Drug Administration). Physicians and other health care professionals are constantly urged to report suspected vaccine injury and ill-effects to VAERS. In spite of all efforts, it was estimated by Dr. David Kessler former FDA Director that less than 1% of physicians ever report regularly.

It is reasonable to assume that physicians who diagnose SBS and parents who are accused of injuring their children will not report post-vaccinal events to VAERS.

Information from VAERS reports is frequently used to support CDC, FDA and NIH-initiated studies. It has also been used repeatedly to review and alter vaccination practices such as oral polio vaccination, diphtheria, tetanus and whole cell pertussis (DPT) vaccination and rotavirus vaccination. The infants/children reported below received other vaccines at the same time

DTAP 918A2: 36 reports and 3 deaths, all by "SIDS" (listed first).

Case 151748: 3 ms old male from PA: Died suddenly 26 days after vaccinations.

Case 161853: 2m old male from MS: 6 days after vaccination >Cardio-respiratory arrest.

Case 155423: 3m old male from MI: 2 days after vaccination >unresponsive , pulmonary edema and found to have diffuse lymphocytic pneumonia

Case 152503: 8m old female from MI: Developed convulsions 26 hors after vaccination.

Case 153323: 7m old male from MI: Same evening > hypotonia and stupor > to ER.

Case 156518: 5y old girl from ID: Within minutes > Cyanosis, twitching.

DTAP 956A2:  29 reports and 2 deaths, listed first below and also labeled "SIDS".

Case 166211: 3m old female from WA: 4 days after vaccination she was found dead. She had been fed 1½ hour earlier.

Case 173039: 2m old female: 29 days after vaccination >stupor and death.

20

Case 165257: 2m old female from WA: Within 7 hours the patient developed tachycardia and was hospitalized for 3 days.

Case 165634: 8m old female from KS: One day after vaccination >grand mal seizure and stupor.

Case 166319: 14m old male from KS: Same day >cyanosis, fever and tremors >hospitalized

Case 166729: 2m old WA: Same day>stupor and tachycardia > hospitalized 2 days

**Polio (IPV) R0668**: 71 reports – 1 death: Case 173039-Above

**Polio (IPV) R1433**: 50 reports - 4 deaths: Case 160417 – 2 days -SIDS —
Case 161098 – 1 day Asphyxia — Case 166169 – 1 day SIDS — Case 169932 – 1day SIDS

•••••

**HIB UA510AA**: 6 reports

Case 159136: 7m old female from NY: Stupor for 3 days

Case 168427: 3m old female from VA: Stupor the day after vaccination.

**HIB 468487**: 7 reports and 1 death

Case 168014: 2m old male from IN: Found dead the day after vaccination. SIDS suspected.

   Case: 161848: 2yr old female from IN: Developed high fever and convulsions the day after vaccination

•••••

**Hepatitis B Vaccine 3198A2:** 18 reports

   Case 158586: 6m old female from LA: 6 days after vaccination > agitation, fever, cyanosis, hypotonia, limp, lifeless and stopped breathing for 30 seconds > hospital for 2 days.

   Case161909: 20m old female from ID: 7 days after vaccination >fever and convulsions lasting 2 days

   Case 164430: 15m old female from VT:  One day after vaccination, restless, moaning, shaking, dazed

   Case 173676: 9m old male from ID: Pt received 1st Hep. B vaccine at age 1 week. Within 1 month, his head circumference was noticeably larger. On 10/25/00, he received polio, DTP, HIB and 2nd Hep. B vaccine and developed high pitch screaming and a rash. On

21

12/27/00, he received 2nd polio, DTP and HIB. 7 days later, CT scan showed subdural hemorrhage. Surgery was performed to relieve the pressure. He also had seizures. The baby was in the hospital for 8 days and SBS considered but ruled out.

Case 218912: Newborn male from AL: One week after receiving hepatitis B vaccine alone, the boy developed seizures. He was admitted to the hospital for 30 days. He is retarded and has delayed speech.

***The issue of multiple vaccinations in an infant with an enlarged head:*** A case very similar to Baby Robert's was reported to VAERS in 2003. A 3-month old male infant from Illinois who had a "slightly enlarged head" and was scheduled to get an ultrasound of the head the following day was given DTAP, HIB, IPV and Prevnar. He was found dead 2 ½ hour later.

VAERS ID 211864 Vaccination Date:   2003-10-22

| | | | | | |
|---|---|---|---|---|---|
| Age | 0.3 | Date filed: 2003-11-05 | | | |
| Sex | M | Where Administered: | PUB | | |
| State | IL | Purchased by: | PUB | | |

| Vaccinations | Manufacturer | Lot | Dose | Route | Site | |
|---|---|---|---|---|---|---|
| 1 DTAP | AVENTIS PASTEUR, | C1281AA | 1 | IM | LL | Life Threatening Illness? No<br>Died? Yes (date died: 0000-00-00)<br>Disability? No |
| 2 HIBV | AVENTIS PASTEUR, | UA825AA | 1 | IM | RL | Recovered? No<br>ER or Doctor Visit? No |
| 3 IPV | AVENTIS PASTEUR, | W0907 | 1 | SC | RL | Hospitalized? No<br>Current Illness: NONE |
| 4 PNC | LEDERLE LABORATO | 492-397 | 1 | IM | LL | Diagnostic Lab Data: RECEIVED REPORT OF PENDING PROBABLE SIDS FROM IDPH. |

Onset Date: 2003-10-22   Days since Vaccination: 0

Symptoms: SIDS STUPOR

INFANT SAW DR ON 10-22-03, ULTRASOUND OF HEAD ORDERED FOR 10-23-03, JUST TO BE SURE NOTHING WAS IRREGULAR AS BABY'S HEAD WAS SLIGHTLY LARGER THAN SCALE. NO IMMUNIZATION CONTRAINDICATIONS. IMMUNIZATIONS GIVEN 10-22-03 AT LEE COUNTY HEALTH DEPARTMENT. 2 1/2 HOURS LATER BABY FOUND UNRESPONSIVE IN PLAYPEN. RECEIVED REPORT OF PENDING PROBABLE SIDS.

Previous Vaccinations:

Other Medications: NONE

Preexisting Conditions: NONE KNOWN

Obviously the baby in the report died 2 ½ hours after receiving 4 vaccines because of a vaccine reaction and not because of SIDS.

Unlike the baby in the report, Baby Robert's head was significantly enlarged and he had clearly evident pre-existing subdural hemorrhages when he was vaccinated two weeks before he suffered his cardio-respiratory arrest. He also had pre-existing sinusitis/ mastoiditis and immune difficulties.

22

# Part IV

# Other pertinent facts

## The issue of Vitamin C deficiency and Histaminemia

Vitamin C is an important and essential vitamin. It is an excellent anti-oxidant and it can donate electrons to quench the free-radical inflammatory damage from toxins, injuries and infections. A "free-radical" is a molecular fragment with one or more unpaired electrons in its outer orbital ring that is unstable, highly reactive and can cause serious damage to cell membranes/

Vitamin C is also needed:

- To make collagen, the "glue" that strengthens muscles and blood vessels
- In wound healing and tissue recovery
- As a natural antihistamine, to limit and control sensitivity reactions
- As an aid in the formation of liver bile, a liquid needed for detoxification.

When vitamin C donates electrons to neutralize the free radicals, it becomes depleted of "available" neutralizing electrons. During "stress periods" the usual daily-recommended dose of vitamin C, that is perfectly adequate in health, is just not enough to meet the increased demands of the situation. We all take extra Vitamin C when we have a cold or the flu and people with HIV are on big doses to improve their resistance.

Particularly in infants, the sudden significant stress in response to an infection such as Baby Robert's sinusitis and mastoiditis plus the concomitant administration of multiple antigens (vaccines) is enough to render so-called adequate reserves grossly inadequate as the need for Vitamin C increases exponentially.

Vitamin C deficiency in mice was associated with massive cerebral hemorrhaging in the laboratory. According to research by the National Human Genome Research Institute (NHGRI), subclinical deficiencies of Vitamin C in a mother appear to play a role in the devastating respiratory failure and the massive cerebral bleeding that occur shortly after delivery in very premature children.

A.M. Greco et.al. [Acta Vitaminol Enzymol. 1980;2(1-2):21-5] reported that the blood level of ascorbic acid was significantly lower in 55 patients with hemorrhagic ocular diseases. They then tested albino guinea pigs and showed that an induced hypovitaminosis C (2 weeks of scorbutigenic diet followed by a maintenance dose of 0.5 mg of ascorbic acid) caused the appearance of widespread retinal hemorrhages and a significant decrease of the blood ascorbate levels with respect to the control groups.
Vitamin C deficiency in humans has been associated with bleeding and hemorrhaging.

On April 6, 2004, Professor C. Alan B. Clemetson, Professor Emeritus, Tulane University School of Medicine, New Orleans, LA wrote in a communication with the British Medical Journal (BMJ): "*It is gratifying to know that more and more pediatricians, neurologists,*

23

000192

*ophthalmologists, and pathologists are questioning the tenet that retinal petechiae and subdural haemorrhages are always indicative of child abuse, or shaken-baby syndrome.*
*It is, however, disturbing to note that few, if any, of these physicians seem to be interested in considering the possibility of capillary fragility in these infants. They do not even deem it necessary to estimate blood histamine and plasma ascorbic acid levels, which may often provide the correct diagnosis."* [http://bmj.bmjjournals.com/cgi/eletters/328/7442/719]

Another time (BMJ - December 21, 2004), Professor Clemetson stated: *"The bleeding of scurvy results from capillary fragility due to a toxic histaminaemia, which opens the tight junctions between the vascular endothelial cells. There is, as we know, a collagen deficiency in scurvy ...The swollen, spongy, bleeding gums of classical scurvy are never seen before the eruption of the teeth, so infantile scurvy is not obvious on initial physical examination. Subdural haemorrhages and retinal petechiae may appear alone, or may be accompanied by fractures of the ribs at the costo-chondral junctions, subperiosteal haemorrhages in the long bones, epiphyseal separations, skin bruises, and sores that will not heal ... so blood chemistry analyses are essential in order to make a proper diagnosis".*

Baby Robie's blood histamine and serum Viamin C levels should have been tested when he arrived to the Emergency Room shortly after his arrest and resuscitation. By failing to evaluate those two important levels and correcting them if abnormal, the physicians at SHANDS missed an important opportunity. Essentially, they may have saved the baby's life and proved that Mr. Brian Herlihy never hurt him. Their failure to do so is regrettable.

### The issue of the intact neck tissues

No one can shake a baby and inflict major intra-cerebral injuries leading to death or permanent damage without injuring the soft tissues and/or the bone structures of the neck.

Werner Goldsmith, Ph.D. has stated: *"I am absolutely convinced that in order to do serious or fatal damage to an infant by shaking you have to have soft tissue neck damage... A fall backwards from three feet onto a hard surface, like concrete, can produce nearly 180 Gs of acceleration - 180 times the force of Earth's gravity - enough to cause a subdural hematoma, Goldsmith calculated. Shaking a child once a second through a range of one foot produces only 11 Gs, at the most... There is an order of magnitude difference between shaking and falling... From the point of view of the brain, shaking is a much, much milder form of braking than a fall... To complicate matters, between 5 and 10 percent of children are born with undiagnosed subdural hematomas, and 30 percent are born with retinal bleeding...If you get a rebleed, you may get something that looks like shaken baby syndrome... You should be able to show neck damage to prove shaken baby syndrome"*

Dr. Goldsmith, Former Chair, Head Injury Model Committee, National Institutes of Health was Professor, Graduate School, Department of Mechanical Engineering, University of California, Berkeley and the recipient of the 2001 Distinguished Engineering Alumnus Award.

24

When the occupant of a stopped car is hit from the rear by a truck going at 30 miles an hour, the most likely injury is a whiplash of the neck. Bleeding in the brain and the eyes simply does not occur. Baby Robert Querillo <u>did not have any external or internal injuries of the neck tissues.</u>

<u>The issue of Baby Robert Querillo's retinal hemorrhages</u>

In his admission note (p. 171, 172), Dr. Coleman countersigned by Dr. Dickison states: " Possible retinal hemorrhage on right…Pupils reactive (R pupil↓ reactivity compared to L). No scleral injection-disks not visualized.
**Note: On admission, minor if any retinal hemorrhage noted by admitting resident.**

Lawrence M. Levine MD dictated a clinic letter the chart on September 6. 2000:
Impression: Evaluation for ophthalmologic signs of shaken baby syndrome.
Ophthalmologic exam demonstrated serum retinal hemorrhages and vitreous hemorrhages in both sites, consistent with the diagnosis.
Plan: Discussed with pediatric ICU team. Documented in chart.
Robert Quirello was seen in the pediatric I CU as a pediatric ophthalmology consultation on August 2, 2000. At the time of his exam, he was a four-month-old infant who was comatose and intubated. Dilated ophthalmologic exam demonstrated massive retinal hemorrhages and vitreous hemorrhages. This was noted in both eyes. The examination was absolutely consistent with the presumed diagnosis of shaken baby syndrome.
**Note: Like Dr. Dickison's, Dr. Levine's input led to Brian Herlihy's conviction. In this note, Dr. Levine's bias and prejudicial judgment are evident when he states that his examination was "absolutely" consistent with SBS. As a specialist in ophthalmology, Dr. Levine should have known that retinal hemorrhages are not absolute evidence of shaken baby syndrome-as his own specialty group has attested. In addition, Dr. Levine repeats – weeks after the death and autopsy - that baby Robert had vitreous hemorrhages when Michael D. Bell, MD of the Florida Lions Eye Bank –who <u>dissected</u> and examined the eyes after the autopsy- certified that the vitreous was clear. (p. 271-2)**

**Dr. Levine also testified that he had not seen a case of Terson Syndrome, where retinal hemorrhages occur in association with intracranial hemorrhage and hypertension, two conditions the Baby Robert clearly had.**

<u>Important and Relevant quotes from the Medical Records (Comments in Bold)</u>

p. 26 Gainsville Fire Rescue –EMS incident report: Upon arrival at 09:44 Pulse 190, Respirations 00 BP 70 by palpation. Palpable brachial pulse compared favorably against ECG monitor. Comment: Monitor already in place prior to our arrival. **Someone else was on site and hooked the baby to the monitor prior to the arrival of the Rescue team.**

p. 27: Call received: 09:35 >Dispatched 09:37 >Depart 09:40> Arrive location 09:43. Yet on the same page: 09:35:02 Started call> 09:37:15 Q1 dispatched >09:38:28 Rescue is on

25

scene. One must keep in mind that the baby's mother left the baby with a reliable and composed friend, went down to his truck and drove it across the street to a gas station where she paid for gas by credit car at 09:32. In most gas stations, the credit card has to be scanned and approved prior to the start of fueling. This reduces the time Brian Herlihy was alone with Baby Robert even more. According to his accusers, he lost his mind, hurt the infant, regained his senses and called 911 –all in FIVE minutes.

p. 38: 9:40:32: Baby has no respirations but does have a pulse > 09:40:43: Baby appears to have smothered in between railings of crib >09:46:34: Full arrest. A trained EMT-in his report- states that the infant appears to have smothered between the railings of the crib. Note: He did not say "according to the baby sitter" or "allegedly ..."

p. 656- Dr.Dickison testimony
Question: If you were told that this child had been wedged between the end of a bed and the mattress and his feet were sticking up in the air, would that be consistent with what you saw as far as the brain injury and the retinal hemorrhages in this child?
Answer: No, and neither would be consistent with the laws of physics.
Question: Would plopping Robbie down on a bed and having his head bounce off the bed be of sufficient force to cause the intracranial contusions that you saw on the CAT scans?
Answer: Yes

The impression and observation of the EMT who was on the scene are most reliable. They contradict Dr. Dickison's opinion.

P. 742 –Dr. Dickison testimony
Question: And I have one last question or two. And in fact, it is also your opinion, is it not that the evidence of these multi-generational hematomas in Robbie's brain means to you that what we have here are repeated injuries or repeated bleeds over a period of time, correct?                                        Answer: Correct
Question: And in fact trying to date these older injuries that extend over a period of time is basically impossible, we can't do that?
Answer: Correct

Brian Herlihy's principal accuser testified that Baby Robert had pre-existing intracranial hemorrhages and that it was impossible for her or others to date them. Mr Herlihy only met Crystal Querilio in July 2000 and Baby Robert was with his grandparents and with many children and adults – and no where near Mr. Herlihy-for several days before his ALTE. Brian Herlihy could not have caused the old subdural hemorrhages and certainly not by "plopping" the baby on the crib mattress – 5 minutes before he arrested –the only 5 minutes he was alone with him in sometime.

26

*NOTE: As incredible as it sounds, Baby Robert's head circumference was never measured during the hospital stay. At autopsy on 8/10/2000, the head circumference was 17¼ inches, unchanged from the measurement at the last office visit on 7/19/2000.*

*At age 4 ½ months, in a large baby like Robert, the head and chest circumferences are usually about equal. The fact that at autopsy the head circumference was 1¼ inches larger than the chest denotes that it had abnormally enlarged-before July 19.*

p. 509: Dr. Dickison handwritten note: No bruises or abrasions noted any where on trunk, flanks, buttocks, extremities. A suggestion of L parieto-occipital bogginess was appreciated but was not prominent. No petechiae seen on the face, conjunctiva and palate.No marks on neck to suggest strangulation. CT reviewed with neuroradiology >epidural and subdural hematomas bilaterally L>R. Mr. Herlihy's principal accuser **confirms the absence of any signs of injury. The "suggested" bogginess that she thought she found did not overlie a fracture. There was also no evidence of external injury at autopsy (p. 265).**

p.511: Dr. Dickison reported information she obtained from the investigator to whom she had given questions to ask Crystal and Brian: "...Robbie had fallen off the bed 3 weeks earlier. **This piece of information was also totally overlooked by Dr. Dickison – for reasons unknown- as a possible cause of Robbie's old intracranial hemorrhages.**

p. 558: CT-scan of the head without contrast 8/2/2000: 10:43– Findings: There is no evidence of calvarial fracture. There is significant sinus and mastoid disease, involving mainly the left maxillary atrium, ethmoids slightly, both mastoids and middle ear areas... There are bilateral mid to fairly high convexity bifrontal hygromas which especially on the which especially on the left side suggests slight flattening of gyri as though this is creating mass effect and may have been at one time hemorrhagic. There is fresh hemorrhage present and multiple sites, most notably in the high bifrontal areas where probably most is subdural but a lower component is in part likely epidural, and there is a slight amount of parafalcine, subdural hematoma both anteriorly and posteriorly, or being characterized by quite bright or somewhat mixed density. There is also a high right parietal, somewhat smaller subdural component of hemorrhage. **The described findings indicate that baby Robert had a pre-existing infection in his sinuses and mastoids (discussed earlier), that he had no skull fracture and that the intracranial hemorrhages were both OLD and new.**

p. 561: A head CT scan with contrast was performed on 8/2/2000 at 15:21, five hours after the above study. Findings: There is a new extra axial subdural fluid collection in the right frontal and right parietal occipital areas which likely represents new blood. There is old subdural blood noted bilaterally at the vertex which is multi-generation which has increased since prior study. There are also hygromas noted in just anterior to a temporal horns. There is old blood noted in the parefalcine area. No evidence of herniation. **This second CT scan with contrast clearly demonstrates that baby Robert had fresh hemorrhages in areas where he already had old hemorrhages. This very important finding was never taken seriously by the treating physician because indeed it would**

27

have compromised the argument that Mr. Brian Herlihy had just injured Baby
Robert - a short time prior to admission.

**Testimony Ronald Quisling MD-Neuroradiologist (RQ)**

RQ: " .. I would say 20- 25% is white and 75% to 80% is dark on that scan.
Question: Dark meaning? RQ: that's older fluid. Hypodense is older.
Question: 25% is new, 75% is older     RQ: Is older, that is correct...(p10)
The neuroradiologist is stating under oath that 75% + of Robbie's intracranial
bleeding is old. In other words, it did not occur on 8/2/2000.

Question: If there were other CT scans done in this hospital, we would have it here on
this disk?            RQ we would have it here, yes.
Question: to a knowledge, was there and MRI done at any time?     RQ: To my
knowledge, this was all that's done.
Question: This is it.  Okay. Do you know why on another CAT stand was not done or at
least called for after this fourth one that was done on August 4th .  RQ I don't know why.
Question: Who decides whether or not we're going to have a CAT scan done? (p.18) RQ:
the clinical service.
An MRI was not ordered. An MRI would have clearly differentiated between the
two hemorrhages and shown that baby Robert had PRIOR intracranial
hemorrhages. So why wasn't an MRI done? Dr. Dickison claims that it would have
been risky, that it would have been costly and that she did not need it, *because she
knew what was wrong with the baby.*
...RQ: Generally speaking, it hits that at about seven days to 10 days, sort of in that range
that it's gone through the isodense phase into the lower density, and then it stays that way
onto his it's either resorbed or drained.
Question: (p.20) so you feel comfortable, do you not, in saying that the chronic blood was
there in that location for at least seven to 10 days before the baby was admitted on the
2nd? RQ: Yes, I think that's fair.
Question: And it could be longer than that depending? RQ: Yeah.
Question: This is a significant amount old blood, is it not?  RQ: This is a significant
amount old blood.
Question: And can you tell us your opinion as to whether or not that amount of blood
would accumulate in and injury as opposed to, I guess, a disease or some other-- I mean,
has this got to be from an injury?  RQ: Chronic extra axial fluid does not have to be from
an injury.
Question: What are some of the-- RQ: It can be from an infection.  He could have had
meningitis and we get subdural effusions that stay around.  It could be that the brain has
shrunk from prior injury and is actually-- there is no vacuum in the head so if the brain
shrinks, the fluid spaces increase.  So it could just be a compensatory kind of
accumulation of stuff.  Now, I can't actually tell the difference on a CT scan, I can on an
MR but I can't on a scan (p 21) The neuro-radiologist dates the hemorrhages in
Robbie's head to a period where he was not with Mr. Herlihy and states that they do
not have to be from an injury. Lastly, he states that an MRI would have been a
more accurate study, an MRI that was never ordered.

28

p. 24-9/18/2000: Dr. Nelson to Dr. Hamilton: No dura mater ...spinal cord were received... the leptomeninges and were also somewhat dusky but no frank areas of hemorrhages were identified. The cortical grey matter was intact and unremarkable throughout; specifically, there were no identified cerebral cortical contusions. Impression:
Immature human brain with subarachnoid hemorrhage and hematoma
Cerebral edema, generalized.
Vascular congestion generalized.
**The District Medical Examiner, a neuro- pathologist states that there were no cerebral cortical contusions and that the brain was immature with subarachnoid hemorrhage and hematoma. Generalized cerebral edema and vascular congestion together with subarachnoid hemorrhages are often associated with retinal hemorrhages. Generalized cerebral edema has been described in cases of encephalopathy following vaccination. The findings can clearly be found in many non-traumatic situations. Generalized cerebral edema and vascular congestion are findings often described in cases of vaccine encephalopathies, respiratory arrest and global anoxia.**


**The testimony of Bernard Maria, MD (neurologist)**

p. 1120: I noticed also that his eyes would tend to what we call sunset, that is look downward and fix downward, which is an indication of injury to the highest part of the brain stem called the mid-brain. **The sun-set sign is present in cases of increased intracranial pressure including hydrocephalus.**

p. 1155: Question: All right. And what type of fluid do you believe it was? BM: Both new and old blood. Question: Do you recall that question, series of... BM: Yes I do Question: So the fact is, you observed that there was a chronic subdural hematoma present in this child when he was admitted to the hospital, isn't that true? BM: That's what we were thinking at that time, yes. **The neurologist clearly indicates that Baby Robert had an old pre-existing hemorrhage when he was admitted on August 2, 2000.**

p. 1156: Question: And isn't true that swelling on the brain can cause retinal hemorrhaging? BM: Yes Question: So this child had brain pressure, correct? BM: Yes. **The neurologist confirms that Baby Robert had increased intracranial pressure and agrees that retinal hemorrhages can be due to increased intracranial pressure.**

p. 1162-63: Question: Turning to the second page, the impression, isn't it true that Dr. Nelson we found essentially is an immature human brain with subarachnoid hemorrhage and hematoma, correct? BM: Yes
Question: He also found anoxic ischemic encephalopathy global? BM: He did
Question: Cerebral edema generalized? BM: Edema, right
Question: Anoxic ischemic encephalopathy global means essentially that the brain was denied oxygen which caused him to die; isn't that true? BM: Sort of. It's that the brain

cells suffered from a lack of oxygenation

Question: And anoxic means lack of oxygen, correct? BM: Yes, sir.

Question: Ischemic means lack of blood flow? BM: Yes

Question: Encephalopathy means damage to the brain, correct? BM: It does.

Question call them So basically he's saying this brain died because it wasn't getting enough oxygen through blood flow, correct? BM: Cells weren't getting enough oxygen or using oxygen properly, yes.

Question: He also indicated cerebral edema generalized, correct? BM: Edema, right.

Question: Edema, I'm sorry. Edema means that swelling, isn't that true? BM: It does

Question: So that basically means the brain was swollen, correct? BM: Yes.

**The neurologist concurs again that the main pathological findings in the brain is an ischemic anoxic encephalopathy, a picture often associated with a vaccine reaction rather then simple shaking or throwing the baby on his crib mattress.**

Lastly, a historical note should be added for the sake of completion.

According to Lois Herlihy: At the sentencing hearing, ▮▮▮▮▮▮, a Florida Highway Patrol officer from Jacksonville FL and the father of Ms. Crystal Quirello stated : "My daughter ▮▮▮▮ is retarded because at about the same age she had a seizure and did not breathe for quite a few minutes - no oxygen to the brain that is why she made wrong decisions and fell prey to the good looking man although I now forgive him since I am a Christian."'. It was also reported that Crystal was also born with a fractured clavicle.

**If this information is correct, it is obviously quite relevant.**

**It is not known whether Crystal Quirello had received any vaccines shortly before the reported seizures.**

★★★★★

## Discussion and Summary

1. Brian Herlihy only met Crystal Querillo in July 2000
2. Brian Herlihy did not see Baby Robert for several days prior to August 2. During those days, the baby was with other adults and children.
3. Brian Herlihy had no motive to injure Baby Robert Querillo. The claim by some that Crystal Querillo was leaving him was unfounded.
4. Brian Herlihy did not have the opportunity to injure the baby. They were alone for few minutes.
5. The informed and trained EMT on scene did not notice nor report suspicious findings
6. During her pregnancy, Baby Robert's mother was involved in serious car accident, was hospitalized, had some contractions and was given terbutaline.
7. Baby Robert's mother went into premature labor and was treated with terbutaline.
8. Baby Robert had the cord around the neck, was occipito-posterior and had a fractured left clavicle
9. Baby Robert had PRE-EXISTING intracranial hemorrhages that were never considered by his accusers
10. Baby Robert fell out of bed 3 weeks before his respiratory arrest of August 2, 2000
11. Baby Robert's head enlarged from below the 25th percentile to the 60th percentile BEFORE Brian Herlihy ever saw him or his mother
12. Baby Robert's head had reached its maximal size by July 19, 2000 – the day he was seen by his pediatrician and vaccinated. His head circumference did not enlarge on or after August 2, 2000.
13. Baby Robert received four vaccines (one of which was a triple vaccine) two weeks before he went into respiratory arrest, and developed cerebral hypertension and intracranial hemorrhages. An interval of 14 days is not unusual between vaccinations and such vaccination reactions.
14. As seen in the case of baby Robert, respiratory arrest may often be the presenting symptom of a vaccine encephalopathy.
15. Several babies died after receiving a vaccine from the same lot that Baby Robert received.
16. Retinal hemorrhages can be secondary to increased intracranial pressure and vascular fragility and are not pathognomonic of SBS as claimed by the ophthalmology consultant on the case.
17. Baby Robert had a small thymus. He also had sinusitis and mastoiditis on his initial CT-scan. These findings are unusual in a 4-month old infant.
18. It is more than likely that Baby Robert had toxic histaminemia – a serious condition associated with decreased or absent Vitamin C. Failure of the medical staff to test for such condition at the time of admission is lamentable, as such testing could have helped save the baby's life and exonerate Mr. Herlihy.
19. There were problems with the autopsy. The most serious was the fact that the dura mater was not submitted to the neuropathologist and therefore not examined for timing of the hemorrhages.
20. Mr. Herlihy's only fault was that he was alone with the baby for less than five minutes on the ill-fated morning of August 2, 2000. If the baby had crashed or died at home

31

eight hours earlier or at his grandparents eight days earlier, he would have been presumed to have died of SIDS-just like the cases described in the VAERS reports.

21. Like in many other cases of SBS, the medical staff was more interested in "Who did it?" rather than "What happened exactly?" just as Dr. Plunkett said.

22. Mr. Herlihy did not have prior problems with the law

23. Mr. Herlihy has refused to plea-bargain or plead to any charge.

24. Mr. Herlihy has been a model prisoner for 5 years.

25. Mr. Herlihy has always proclaimed that he was innocent.

26. He evidently was.

It is therefore my professional opinion within a degree of medical certainty that Baby Robert Quirello's death was due to medical causes and not to inflicted trauma.

It is my personal opinion - after a thorough and careful review of all circumstances - that Mr. Brian Herlihy has been the victim in this case rather than the culprit, that he never injured Baby Robert and that the accusations against him were unfounded.

I will be happy to discuss the case with any legal or medical authority at any time.

**F. Edward Yazbak, MD, FAAP**                    May 1, 2006

32

M.A. Al-Bayati/Medical Veritas 1 (2004) 179–200

# Analysis of causes that led to Baby Robert's respiratory arrest and death in August of 2000

**Mohammed Ali Al-Bayati, PhD, DABT, DABVT**
Toxicologist & Pathologist
Toxi-Health International
150 Bloom Dr.
Dixon, CA 95620 USA
Phone: +1 707 678 4484    Fax: +1 707 678 8505
Email: maalbayati@toxi-health.com    Website: http://www.toxi-health.com

Submitted: May 24, 2004    Accepted: June 24, 2004

## Abstract

Brian Herlihy is a 32-year-old, white man accused of and arrested for killing Baby Robert by vigorous shaking in August of 2000. Robert was a 4½-month-old infant who suffered from respiratory arrest while at Brian's apartment on the morning of August 2, 2000. That day, Robert's mother arrived at Brian's apartment shortly after 0900 and asked him to watch the baby for a short time. He had cared for the baby on five occasions in the past for a few hours per day. On August 3, 2000 Brian was arrested based on verbal communications between the treating physicians and the police while the baby was still alive in the hospital. The treating physicians told the police that the baby was suffering from injuries caused by shaking. Baby Robert died August 10, 2000. I evaluated the medical evidence in this case using differential diagnosis. My findings clearly show that baby Robert died as a result of adverse reactions to medications and vaccines that were given to him by the healthcare providers. Brian Herlihy is innocent and should be released from prison. Also, the diagnosis of shaken baby syndrome is a theory that should be re-evaluated and is not supported by science in this case.

©Copyright 2004, Pearblossom Private School–Publishing Division. All rights reserved.

*Keywords:* Shaken Baby Syndrome (SBS), adverse vaccine reactions, vaccine-related death

## 1. Introduction

Brian Herlihy is a 32-year-old, white man accused of and arrested for killing Baby Robert by vigorous shaking in August of 2000. Robert was a 4½-month-old infant, who suffered from respiratory arrest while at Brian's apartment on the morning of August 2, 2000. That day, Robert's mother arrived at Brian's apartment shortly after 0900 asked him to watch the baby for a short time. He had cared for the baby on five occasions in the past for a few hours per day. On August 3, 2000 Brian was arrested based on verbal communications between the treating physicians and the police while the baby was still alive in the hospital. The treating physicians told the police that the baby was suffering from injuries caused by shaking. Baby Robert died August 10, 2000.

Brian Herlihy's jury trial was held in the Eighth Judicial Circuit in Alachua County, Florida on September 10, 2002. His trial lasted sixteen days (Case No. 01-2000-CF-2753-A). The State claimed that Baby Robert was perfectly fine and that absolutely nothing was wrong with him when his mother brought him to Brian's shortly after 0900 on August 2, 2000. The State asserted that while Baby Robert was alone with Brian, he suffered from violent shaking which ultimately resulted in fatal neurological damage and his death. The State furthermore claimed that Brian punished Baby Robert because the baby was crying and that had annoyed, maddened, and frustrated him.

In addition, the State alleged that Baby Robert was never lethargic or anxious from the time of his birth until the morning of August 2, 2000. Brian entered a plea of not guilty. He stated that he took very good care of the baby and that he never

harmed him in any way. However, in September of 2002, Brian was convicted of involuntary manslaughter in the death of Baby Robert and sentenced to 15 years in prison.

Brian Herlihy and his family requested that I evaluate the medical evidence in Baby Robert's case in order to find the factual cause(s) that led to Robert's respiratory arrest and death in August of 2000. I evaluated Robert's case by reviewing the following material: (1) the medical records of the mother during her pregnancy with him, (2) Robert's medical records, autopsy report, adverse reactions to medications and vaccines given to Robert, (3) trial documents and testimonies of expert witnesses, and (4) the medical literature pertinent to this case. I used differential diagnosis to evaluate the contribution of agents relevant to this case and the possible synergistic actions among agents in causing Robert's respiratory arrest, bleeding in the subdural space and retina, pathologic changes in the brain and other tissues, and his death.

I present my review of the mother's medical records during her pregnancy with Robert in Section 2. Section 3 contains a review and analysis of Baby Robert's medical records from birth on March 22, 2000 up until the time of his respiratory arrest on August 2, 2000. I also elaborate upon and explain the adverse reactions to vaccines given to Robert in this section. Section 4 illustrates the clinical events that occurred during Robert's eight-day stay in the hospitals following his respiratory arrest, and my analysis of these events.

Furthermore, my review and analysis of the medical examiner's autopsy report are presented in Section 5. In Section 6, I define the pathogenesis of Robert's illnesses and their contributions to his respiratory arrest. I also describe adverse reactions

doi: 10.1588/medver.2004.01.00024

000202

to corticosteroids in infants. My review and analysis of the testimonies given by the State's expert witnesses are presented in Section 7. Section 8 contains my conclusions and recommendations.

Robert's mother was involved in a serious car accident on January 10, 2000 when she was at the 26th week of gestation. Her abdominal region was struck by the steering wheel and she experienced pain in her back, legs, and arms along with severe cramping. She was hospitalized at Alachua General Hospital (AGH) for about one week and released. Then she had premature labor at the 34th week of gestation. She spent eight days in labor and Robert was born four weeks premature with a broken collarbone on March 22, 2000.

Robert's mother was treated with betamethasone (corticosteroid) during the last week of her pregnancy and due to this treatment Robert was exposed to corticosteroid in utero. It seems that Robert's mother developed diabetes as a result of her treatment with corticosteroid because she was treated with the anti-diabetic drug micronase. Micronase is not recommended as a treatment in nursing mothers due to its risk of causing hypoglycemia in infants. However, she breast-fed Robert during her treatment with micronase.

Baby Robert suffered from serious health problems that resulted from his exposure to corticosteroid in utero and after birth. These include: gastrointestinal disturbance and reduction in food intake, polyurea, excessive weight gain, myopathy, neurological problems, brain atrophy, chronic subdural and retinal hemorrhage, vision problems, atrophy of the thymus, diabetes, and sinus and ear infections. These symptoms and lesions have been reported in infants treated with corticosteroids as I describe in Section 6. However, none of the physicians who evaluated this case ever addressed this issue.

Furthermore, Baby Robert was given six vaccines on May 9, 2000 and his vaccination with these six vaccines was repeated on July 19th. Premature babies are usually more susceptible to adverse reaction to vaccines than full term infants. Robert was born four weeks premature. Furthermore, vaccines should not be given to children treated with corticosteroid and other immunosuppressant agents. Robert suffered from severe thymic atrophy as a result of his treatment with corticosteroid and his thymus weight was less than 20% of normal for an infant of his age. Thymus weight is a very sensitive biomarker for exposure to corticosteroid.

The vaccines given to Robert increased his susceptibility to infections. The baby suffered from sinus and ear infections as shown by his cerebral CT scans taken on August 2nd. Also, DTP vaccines have been known to increase children's risk of developing neurological disorders, such as encephalopathy or complicated convulsion(s).

Baby Robert suffered from respiratory arrest on August 2, 2000 between 0920 and 0935 and the events that led to his respiratory arrest can be explained as follows: (1) Baby Robert suffered from a seizure prior to 0935 and his seizure resulted from a neurological problem and brain atrophy caused by his prenatal and postnatal treatment with corticosteroids. In addition, the vaccines received on July 19, 2000 might have also played a role in triggering the seizure. (2) The severe seizure caused the baby to vomit and thereby blocked his airway with fluids, which subsequently led to his respiratory arrest. The

baby vomited a significant amount of formula like fluid. In addition, the paramedic used a vacuum to remove about 10 mL of formula fluid from his mouth and nose. The baby had been fed approximately 8 ounces of formula milk within 30 minutes prior to his seizure.

Baby Robert suffered from respiratory arrest for at least 60 minutes and that led to severe anoxia, which caused brain and cardiac damage. In addition, the baby suffered from a chronic subdural bleed and retinal bleed as a result of his treatment with corticosteroid. Corticosteroid given at high doses induces diabetes, hypertension, brain atrophy, and increases capillary fragility and abnormal vascular growth in the retina. Glucocorticoid causes hypertension and cardiovascular disease due to its capacity to promote sodium retention and increase blood pressure.

The cerebral CT scan taken on August 2, 2000 at 1028 showed that Robert had a multi-generation subdural bleed. The fresh bleed was estimated to be 20-25% of the total bleed. The occurrence of the fresh bleed in the subdural space on August 2nd can be explained by the synergistic actions of several factors that include: (1) the presence of previous vascular injury in the subdura which led to re-bleeding; (2) Robert suffered from a severe seizure that led to an increase in the intracranial pressure; (3) Robert had an elevated heart rate and that led to increased blood pressure. Robert's pulse rate was 172 at 0938 on August 2nd; and (4) Robert was given relatively large volumes of fluid by intravenous route and that can lead to an increase in the blood pressure.

The retinal bleed and other retinal vascular changes observed by Dr. Lawrence Levine on August 2nd can be explained by Robert's treatment with corticosteroid and diabetes. These conditions have been known to cause retinopathy and retinal hemorrhage as described in Section 6.

The medical examiner and the State's expert witnesses alleged that Baby Robert's respiratory arrest, neurological damage, and death were caused by violent shaking while he was at Brian Herlihy's apartment prior to 0937 on August 2, 2000. However, none of these physicians reviewed the baby's prenatal and postnatal medical records to learn about his pre-existing health problems, his treatment with corticosteroid, or his adverse reactions to corticosteroid and vaccines.

Review of the medical evidence in this case revealed that some of these physicians were aware that Baby Robert was suffering from chronic health conditions such as a chronic subdural bleed, brain atrophy, and sinus and ear infections. However, they did not make any attempt to investigate the links between the baby's chronic illnesses and his respiratory arrest on the morning of August 2, 2000. The following is a list of medical evidence that verifies that the State's expert witnesses conducted an incomplete medical investigation in this case and that they rushed to judgment in accusing Brian Herlihy. Their conclusions that the baby died as a result of shaking were based solely upon a theory and not on medical facts.

(1) The emergency teams, several physicians, and the medical examiner examined the baby on August 2-10 and they did not find any sign of injuries on the baby's head or body that was caused by trauma or abuse.

(2) The four cerebral CT scans taken from August 2-4 indicated that Baby Robert was suffering from a chronic subdural

doi: 10.1588/medver.2004.01.00024

000203

*M.A. Al-Bayati/Medical Veritas* 1 (2004) 179–200   181

bleed. However, none of the physicians who testified for the State ever investigated the causes of the bleed. Furthermore, the medical examiner did not take a sample from the dura to be examined under the microscope in order to date the bleed. The data described in Section 6 of this report show that prenatal and postnatal treatments of infants with a corticosteroid have caused hypertension, hyperatrophic cardiomyopathy, encephalopathy, and an increase in capillary fragility; these conditions can lead to subdural bleeding. Robert had been treated with corticosteroid.

(3) The treating physician, Dr. Dickison and the neuropathologist, Dr. Nelson were aware that Baby Robert suffered from brain atrophy but they did not investigate the cause(s) of the atrophy or the link between the atrophy and the baby's seizure and respiratory arrest that occurred on August 2nd. Dr. Dickison stated, "the baby had a smaller brain than the size of the skull, meaning that there was probably some atrophy or wasting of the surface of the brain or that the brain was not growing as rapidly as it should have been." Dr. Nelson also commented, "Robert's brain was an immature brain and it is inconsistent with a brain of a child of four and a half months of age."

It has been reported that premature infants treated with dexamethasone exhibited a 30% reduction in total cerebral tissue volume when compared to both control term infants and premature infants not treated with dexamethasone. Furthermore, dexamethasone administered postnatally to infants has demonstrated increased risk of neurologic impairment, neurodevelopmental disability, and the rate of cerebral palsy in preterm infants and later in survivors. Baby Robert was treated with high therapeutic doses of corticosteroid as indicated by the severity of his thymic atrophy.

(4) At autopsy, the lesions observed in Robert's brain consisted of edema and cell necrosis, which were caused by severe global anoxia and ischemia and not by trauma. The baby was not breathing well for at least 60 minutes. Brian found the baby was not breathing at 0937 on August 2nd. Additionally, Dr. Dickison found the baby was not breathing well at approximately 1100 because the baby was suffering from a severe seizure and his tongue was very stiff blocking the airways.

(5) Dr. John Hellrung, Baby Robert's pediatrician stated during Brian's trial that the baby was normal. However, his examinations showed that the baby suffered from excessive weight gain, polyurea, muscle weakness in the neck region, neurological and possible vision problems. The baby had poor head and neck control, decreased muscle tone in the shoulders and neck, and tight hip flexors. In addition, the baby's tracking with his eyes was not consistent following an object more than a hundred degrees. These symptoms have been reported in infants treated with corticosteroid.

(6) The medical examiner found that the weight of Robert's thymus was 4 grams, which is about 20% of normal. However, he stated that Robert's thymus was normal. The average thymus weight (g) in a white infant male at Robert's age (4-1/2-month old) is expected to be about 22.5g. The treatment with corticosteroid causes immune depression as measured by the reduction in the size and the functions of the lymphoid tissues. It is clear that the medical examiner overlooked an extremely

important biological indicator that showed Baby Robert was suffering from severe adverse reactions to corticosteroid.

(7) Dr. Lawrence Levine examined the baby's eyes and found retinal hemorrhage, white spots in the back of the eye, (which he called "Purtscher's retinopathy"), and a crack in the back of the eye, (which he referred to as a choroidal rupture). He claimed that the above lesions were caused by trauma, but his examination of the eyes and eyelids did not reveal any sign of external injuries caused by trauma.

The findings of several studies in Section 6 show that the treatment of children and adults with corticosteroid caused retinopathy, hypertension, diabetes, and increased capillary fragility. Hypertension and diabetes are also known to cause retinopathy. The baby was treated with high doses of corticosteroid and suffered from diabetes. It is very clear that Dr. Levine overlooked crucial medical evidence that demonstrated the link between the baby's treatment with corticosteroids and the lesions found within the retina.

The extensive medical evidence presented in this report clearly shows that Baby Robert died as a result of adverse reactions to corticosteroid and vaccines. Brian Herlihy is innocent. The evidence also shows that Brian was wrongly convicted and imprisoned as a consequence of sloppy and incomplete medical investigations. I believe that the state of Florida has the responsibility to review the evidence presented in this report. The State should furthermore take immediate action to free him from prison. In addition, Brian should be reimbursed for all incurred legal expenses and he should also be compensated for his pain and suffering.

The objective of the State and physicians should be to focus on determining the factual causes that lead to the illness or death of a child so that they can prevent such problems from happening to other children. Accusing innocent people of abusing and killing children based on a faulty theory that has no medical or scientific evidence to support its claims will not prevent the death of other children by vaccines and adverse reactions to medications. However, it certainly places innocent people in prison and causes great suffering. It also costs taxpayers huge sums of money to pay for unnecessary trials and legal fees.

I spent approximately 280 hours evaluating the medical evidence in this case in order to find the factual causes of injuries and death and to write this detailed report. I have also evaluated three other alleged 'Shaken Baby Syndrome' cases from the US within the last 12-month period involving children who died as a result of adverse reactions to medications and vaccines. In all of these cases, either the parent or caretaker was imprisoned after being falsely accused of killing the baby in their care by shaking.

It is my hope that the state of Florida, the Federal Government, physicians, and our society will take the time to review the evidence presented in these cases. The government and American Medical Association have an obligation to act immediately as the theory behind the Shaken Baby Syndrome diagnosis must be re-evaluated. The theory itself is unsupported by science. Differential diagnosis must be used to solve complicated medical problems, as I have used in these cases in order to determine the factual causes of the presenting symptoms, illnesses and death.

doi: 10.1588/medver.2004.01.00024

000204

182                          *M.A. Al-Bayati/Medical Veritas* 1 (2004) 179–200

**2. Review of Mother's medical records during her pregnancy with Robert and after delivery**

**2.1 Mother's health condition during her pregnancy**

Baby Robert's mother is a white female. She was 20-years old at the time of her pregnancy with Robert in July of 1999. She was born on August 26, 1979. During her pregnancy with Robert, she suffered from severe nausea for several months (September 21, 1999 through January 13, 2000) and she was treated with phenergan (anti-nausea drug). Robert's mother was involved in a serious car accident on January 10, 2000, at the 26th week of gestation. She rear-ended a car that was making a turn in front of her and the front of her car was badly damaged. Her abdominal region was struck by the steering wheel and she experienced pain in her back, legs, and arms along with severe cramping. She was hospitalized at Alachua General Hospital (AGH) for about one week and was released [1,2].

Robert's mother only gained two-and-half-pounds during her entire pregnancy with Robert (Table 1). She reached her highest body weight of 120 pounds at the 34th week of gestation. She lost three pounds between the 34th and 35th week of gestation as a result of problems with her pregnancy, which was the result of her car accident a few weeks earlier (Table 1).

**Table 1. Mother's body weight during her pregnancy with Robert**

| Date (mm/dd/yyyy) | Weeks of Gestation | Weight lbs. (kg) |
|---|---|---|
|  | Pregravid | 115.0 (52.2) |
| 09/13/1999 | 9 | 110.5 (50.1) |
| 09/30/1999 | 11 | 110.5 (50.1) |
| 10/28/1999 | 15 | 107.5 (48.8) |
| 12/27/1999 | 24 | 116.0 (52.6) |
| 01/18/2000 | 27 | 115.0 (52.2) |
| 01/24/2000 | 28 | 117.5 (53.3) |
| 02/07/2000 | 30 | 117.5 (53.3) |
| 02/21/2000 | 32 | 119.0 (54.0) |
| 03/06/2000 | 34 | 120.8 (54.8) |
| 03/14/2000 | 35 | 117.5 (53.3) |

**2.2 Mother's premature labor and her treatment with corticosteroid**

I believe that the mother's car accident on January 10th induced premature labor. At 35 weeks of gestation, the mother had a premature contraction and she was treated with betamethasone (corticosteroid) to mature the baby's lungs [3]. Her labor was induced by medication and she was in labor for eight days. Baby Robert was born premature at the 36th week of gestation on March 22, 2000 with a broken collarbone. His Apgar scores were eight at one minute and nine at five minutes [4]. The baby and his mother stayed in the hospital for three days and were released.

**2.3 Mother's post delivery diabetes and her treatment with micronase**

Based on blood and urine tests performed during the mother's pregnancy on January 24, 2000 and March 3, 2000 respectively, the mother's medical record indicates that she did not suffer from gestational diabetes during her pregnancy. However, her medical record shows that she was treated with an anti-diabetic drug, micronase (glyburide) after delivery. She was advised to stop taking micronase on June 8, 2000 [1]. It seems that Robert's mother developed diabetes following her treatment with corticosteroid. The baby also developed diabetes as a result of the corticosteroid treatment. Robert's mother took micronase during the period when she was breast-feeding Baby Robert.

Micronase (glyburide) is an oral blood-glucose-lowering drug of the sulfonylurea class. Glyburide appears to lower the blood glucose acutely by stimulating the release of insulin from the pancreas, an effect dependent upon functioning beta cells in the pancreatic islets. Single dose studies with micronase tablets in normal subjects demonstrate significant absorption of glyburide within one hour and it reached a high peak level at about four hours. The blood glucose lowering affects generally persist for 24 hours following a single morning dose of micronase in non-fasting diabetic patients [5:2496].

Some sulfonylurea drugs are excreted in human milk. In nursing infants, the potential for developing hypoglycemia exists, therefore, treatment of nursing mothers with micronase is not recommended during the breast-feeding period [6]. In addition, the safety of micronase in children has not yet been established [5].

**3. Review of baby Robert's medical records from his birth on March 22 to August 2, 2000**

**3.1 Robert's treatment with corticosteroid and his exposure to micronase in milk**

Baby Robert was born four weeks premature on March 22, 2000 and his mother was treated with betamethasone (corticosteroid) during the last week of her pregnancy [3]. Betamethasone was given to reduce the baby's risk of developing chronic respiratory disease. Robert's mother was in labor for eight days and the baby was born with a broken collarbone. The baby's birth weight was 5 pounds and 14 ounces. The mother and the baby stayed in the hospital for three days and then were released. The baby was noted to have some difficulty latching onto the mother's breast [1].

Three days following birth, Robert's mother noticed that the baby's lips and the inside of his cheeks were yellow. He suffered from mild jaundice. The baby was breast-fed between March 27 and June 8, 2000 and he was also fed formula milk as a supplement during this period. Robert's mother was taking the anti-diabetic drug, micronase, which is not recommended as a treatment in nursing mothers because of the associated risk of causing hypoglycemia in infants. However, she breast-fed Robert during her treatment with micronase [1]. Robert's mother was also put on the progesterone pill as birth control on May 9, 2000.

doi: 10.1588/medver.2004.01.00024

000205

*M.A. Al-Bayati/Medical Veritas* 1 (2004) 179–200                                                           183

## 3.2 Robert's symptoms induced by his treatment with corticosteroid

My review of Baby Robert's medical records revealed that he suffered from serious health problems that directly resulted from his exposure to corticosteroid in utero and after birth [1, 3]. These health problems are detailed in the following subsections.

### 3.2.1 Polyurea

Baby Robert had polyurea as a consequence of his treatment with corticosteroid. On April 17, 19, and 26, 2000, his grandmother stated that she was changing wet diapers 8-10 times per day. Robert's grandmother was his principle caretaker during most of his life because his parents were working [7]. It is possible that the baby had diabetes at that time. On August 2, 2000 his blood glucose level was 317 mg/dL and he also suffered from glycosuria [8].

### 3.2.2 Gastrointestinal and feeding problems

On April 13 and 19, 2000, Baby Robert's grandmother stated that the baby was spitting formula milk frequently and he did not have a bowel movement from April 13th through the 17th. On June 6th she also stated that the baby was feeding poorly. On July 19th the baby was treated with mylocon to relieve his problem with intestinal gas. Treatment of infants with corticosteroid is known to cause gastrointestinal problems as described in Section 6 of this report.

### 3.2.3 Excessive weight gain

Baby Robert gained excessive weight between April 17th and August 2nd. He gained 10 pounds and 7 ounces (4.73 kg) in 136 days as shown in Table 2. His weight at four months and twelve days was about 3.5 times his birth weight. The approximate weight gain for an infant should be one ounce (28 g) per day and 2 pounds (900 g) per month during the first three months of life and 1.25 pounds (570 g) per month between three to six months of age [9]. The approximate weight gain for Baby Robert should not have been more than 7½ pounds (3.4 kg) during his life.

His abnormal weight gain was very obvious. On April 19th, his pediatrician reported that Robert gained 8 ounces in two days. On May 9, 2000, his body weight indicated that he had gained 23 ounces (652 g) in two weeks, which is twice the normal weight gain for a baby at his age. On May 9th, he was six weeks old. He was average in length, slightly below average weight, and slightly above average in head circumference (75%). However, on July 19, 2002, his height was in the 75th percentile, his weight was in the 80th percentile, and his head size was within the 85th or 90th percentile. He was already larger than the average baby at his age who was not born premature [10, 11].

The baby experienced rapid weight gain in spite of his feeding and gastrointestinal problems described above. His rapid weight gain is one of the signs of corticosteroid toxicity that was due to water and salt retention, and disturbance in fat, pro-

tein, and carbohydrate metabolism. His weight gain was not due to building muscle mass. Robert's serum creatinine values on August 2nd and 3rd 2000 were less than 25% of normal values and they indicated that Baby Robert was suffering from a muscle wasting problem [8]. Muscle wasting and rapid weight gain are signs of adverse reactions of treatment with high therapeutic doses of corticosteroid.

**Table 2. Robert's growth measurements from birth on March 22 through August 2, 2000**

| Date mm/dd | Age months | Weight lbs. + oz. | (kg) | Height in. | Head Circumference cm. |
|---|---|---|---|---|---|
| 03/22 | Birth | 5 lb +14 oz | (2.66) | | |
| 03/27 | | 5 lb + 8 oz | (2.49) | | |
| 04/05 | 0.5 | 6 lb | (2.72) | 20 | 35.5 |
| 04/17 | | 6 lb + 9 oz | (2.98) | | |
| 04/19 | 1.0 | 7 lb + 1 oz | (3.20) | 21.5 | |
| 04/26 | | 7 lb +10 oz | (3.46) | | |
| 05/09 | | 9 lb + 1 oz | (4.11) | 22 | 39.0 |
| 06/06 | | 12 lb | (5.44) | | |
| 07/19 | 4.0 | 15 lb +12 oz | (7.14) | 25.5 | 43.5 |
| 08/02 | | 17 lb + 8 oz | (7.94) | 26.4 | |
| 08/10 | | | | | 43.1 |

### 3.2.4 Muscle weakness

Baby Robert exhibited muscle weakness in the neck region. His doctor's exam on May 9, 2000 revealed that he had poor, floppy neck control. The nurse also noted that the baby had tight hip flexors on June 6th. The baby had decreased muscle tone in the shoulders and neck. He still was not holding his head up in prone position on June 6th and July 19, 2000 [11]. His very low serum creatinine values measured on August 2nd and 3rd confirmed that the baby was suffering from muscle wasting illness.

### 3.2.5 Vision problems

On May 9, 2000 the pediatrician's nurse noted that his tracking with his eyes was not consistent, following an object more than a hundred degrees [11]. Treatment of infants with high therapeutic doses of corticosteroid has been known to cause retinopathy, encephalopathy, diabetes, hypertension, and increased capillary fragility; all of these problems can cause vision problems. At autopsy, Robert's thymus weight was about 20% of the normal weight for a baby at his age. Thymus weight is a very sensitive biomarker for the effect of corticosteroid. Exposure to high levels of corticosteroid causes thymic atrophy as described below (Section 3.3).

### 3.3 Vaccines given to Baby Robert and his thymic atrophy

Baby Robert was given six vaccines on May 9, 2000 and his vaccination with these six vaccines was repeated on July 19th as shown in Table 4. The compositions of these vaccines are presented in Table 4. Premature babies are generally more susceptible to adverse vaccine reactions. Robert was born four weeks

doi: 10.1588/medver.2004.01.00024

000206

premature. Furthermore, vaccines should not be given to children treated with corticosteroid and other immunosuppressant agents. Baby Robert exhibited severe thymic atrophy as described below.

At autopsy, Baby Robert showed severe thymic atrophy. His thymus weight was 4 grams, which was about 20% of normal [12]. The average thymus weight in a white infant male at three months and six months of age were found to be 20 and 25 g, respectively [13]. Baby Robert was 4½-months-old and his thymus weight should have been approximately 22.5 g. Treatment with corticosteroid causes immune depression as measured by the reduction in size and function of the lymphoid tissues.

**Table 3. Robert's vaccination history**

| Date (mm/dd/yyyy) | Age (months) | Vaccines given |
|---|---|---|
| 05/09/2000 | 1.5 | DTaP (Diphtheria & Tetanus Toxoids and acellular Pertussis) OPV/IPV (Oral Polio vaccine) Hib (Haemophilus influenzae B) Hep B (Hepatitis B) |
| 07/19/2000 | 4.0 | DTaP (Diphtheria & Tetanus Toxoids and acellular Pertussis) OPV/IPV (Oral Polio vaccine) Hib (Haemophilus Influenzae B) Hep B (Hepatitis B) |

**Table 4. Compositions of vaccines administered to Baby Robert at two weeks prior to his respiratory arrest and seizure[a]**

| Vaccine | Composition |
|---|---|
| DTaP | Each dose (0.5 mL) contains 0.625 mg aluminum; 25 Lf Diphtheria toxoid; 10 Lf tetanus toxoid; 25 μg pertussis toxin; 25 μg filamentous hemagglutinin; 8 μg pertactin; 2.5 mg 2-phenoxyethanol; 4.5 mg sodium chloride; and 0.1 mg formaldehyde. |
| Hepatitis B | Each dose (0.5 mL) contains 0.25 mg aluminum; 10 :g of hepatitis B antigen; 4.5 mg sodium chloride; 25 μg thimerosal (organic mercury); 0.49 mg disodium phosphate dihydrate; and 0.35 mg sodium dihydrogen phosphate dihydrate. |
| Haemophilus influenzae (Hib) | Each dose (0.5 mL of 0.4% sodium chloride solution) contains 10 μg of purified Haemophilus capsular polysaccharide. |
| Oral Polio Virus (OPV) | Each dose (0.5 mL of buffered solution) contains less than 25 μg of each of the antibiotics (streptomycin and neomycin) and attenuated poliovirus. |

[a]Described in the Physicians' Desk Reference [5].

### 3.4 Adverse reactions to vaccines given to Baby Robert

Serious adverse reactions to the vaccines given to Baby Robert (Tables 3 and 4) requiring medical intervention (such as apnea and cardiac problems) are commonly observed in preterm infants. Baby Robert was born four weeks premature and he was suffering from severe immune depression as indicated by his thymus weight measured on August 10th. Vaccination is

not recommended in children who have been treated with corticosteroids and other immunosuppressant compounds.

Furthermore, the authors of many well-documented studies concluded that the risk and benefit of vaccination in preterm infants should be evaluated prior to administering the vaccines. They also emphasized that preterm infants who receive vaccines should be monitored. The following are descriptions of several selected studies conducted in the USA and other countries that describe adverse vaccine reactions in preterm infants.

(1) Case histories of 45 preterm babies who were vaccinated with DTP/Hib (diphtheria, tetanus toxoids, and pertussis/Haemophilus influenzae type B conjugate vaccine) were studied retrospectively [14]. Apparent adverse events were noted in 17 of 45 (37.8%) babies: 9 (20%) had major events, i.e., apnea, bradycardia or oxygen desaturations, and 8 (17.8%) had minor events, i.e., increased oxygen requirements, temperature instability, poor handling and feeding intolerance. Age at vaccination of 70 days or less was significantly associated with increased risk (p < 0.01). Of 27 babies vaccinated at 70 days or less, 9 (33.3%) developed major events compared with none when vaccinated over day 70.

The authors concluded that vaccine-related cardiorespiratory events are relatively common in preterm babies. Problems were much more common when the vaccine is administered at or before day 70. Therefore, these babies should be monitored post-vaccination. Baby Robert was given six vaccines at 46 days of age and his vaccination with these vaccines was repeated at four months of age (Table 3). At this time the baby was suffering from severe thymic atrophy.

(2) After the occurrence of apnea (a respiratory pause of 20 seconds) in two preterm infants following immunization with DTP and Hib, Sanchez et al. conducted a prospective surveillance of 97 preterm infants (50 girls, 47 boys) younger than 37 weeks of gestation who were immunized with DTP (94 also received Hib at the same time) to assess the frequency of adverse reactions, and, in particular, the occurrence of apnea. For each infant, data were recorded for a 3-day period before and after receipt of the immunization [15]. Their study showed that apneic episodes occurred in 34 infants (34%) after immunization. Twelve infants (12% of total) experienced a recurrence of apnea, and 11 (11%) had at least a 50% increase in the number of apneic and bradycardiac episodes (heart rate less than 80 beats/min) in the 72 hours following immunization. Some of these infants required new medical interventions for the increased episodes [15].

(3) Botham et al. conducted a prospective study of 98 preterm infants (53 males, 45 females), of gestational ages 24-31 weeks who were immunized at approximately 2 months postnatal age with diphtheria-tetanus-whole-cell pertussis vaccine (DTPw). Half the infants also received Haemophilus influenzae type b conjugate vaccine (Hib) simultaneously [16]. All infants were monitored for apnea and bradycardia during the 24-hour pre- and post-immunization periods.

The study showed that only one infant had apnea and/or bradycardia pre-immunization, compared with 17 post-immunization. For 12 infants these events were brief, self-

doi: 10.1588/medver.2004.01.00024

limiting and not associated with desaturations (oxygen saturation < 90%). However, for five infants (30%), these events were associated with oxygen desaturation, and two of these infants required supplemental oxygen. When considering immunization for preterm infants, the benefits of early immunization must be balanced against the risk of apnea and bradycardia [16].

(4) Slack et al. reported that four premature infants developed apnea severe enough to warrant resuscitation after immunization with diphtheria, tetanus, pertussis (DTP), and Haemophilus influenzae B (Hib). One required intubation and ventilation. They also reported that although apnea after immunization are recognized they are not well documented [17].

(5) Botham et al. conducted a prospective study of 97 preterm infants who were immunized with diphtheria-tetanus-pertussis to document respiratory and cardiac events [18]. The mean gestational age at birth was 28.1 weeks (range 24-34) and the mean age at immunization was 80.6 days (range 44-257). They found that nineteen (20%) infants developed apnea or bradycardia within 24 hours of immunization. Two infants who developed concurrent upper respiratory tract infections required additional oxygen, and one of them was treated with oral theophylline.

Adverse reactions of vaccines that were administered to Baby Robert are not limited to preterm infants. They have also been reported in full term infants. Below are brief descriptions of selective studies that describe the incidence of illnesses associated with vaccinations in children. Some of these studies are described in the Physicians' Desk Reference [5].

(1) In the USA, reports submitted to the Vaccine Adverse Event Reporting System (VAERS), concerning infant immunization against pertussis between January 1, 1995 and June 30, 1998 were analyzed. During the study period, there were 285 reports involving death, 971 nonfatal serious reports (defined as events involving initial hospitalization, prolongation of hospitalization, life-threatening illness, or permanent disability), and 4,514 less serious reports after immunization with any pertussis-containing vaccine [19].

(2) Systemic adverse events occurring within 3 days following vaccination of 4,696 Italian infants with DTP at 2, 4, and 6 months of age were recorded. These included fever of more than 100.4°F (38.0°C) in 7% of total; irritability in 36.3%; drowsiness in 34.9%; loss of appetite in 16.5%; vomiting in 5.8%; and crying for 1 hour or more in 3.9% [5:3063].

(3) The whole-cell DTP vaccine has been associated with acute encephalopathy [5]. A large case-control study that included children 2 to 35 months of age that suffered from serious neurological problems was conducted in England. Acute neurological disorders, such as encephalopathy or complicated convulsion(s) occurred in children who were more likely to have received DTP vaccine the 7 days preceding onset than their age-matched controls. Among children presumed to be neurologically normal before entering the study, the relative risk (estimated by odds ratio) of a neurological illness occurring within a 7-day period following receipt of DTP dose, compared to children not receiving DTP vaccine in the 7-day period before onset of their illness, was 3.3 (p < 0.001).

(4) Three hundred sixty-five infants were inoculated with Hib, and some of them developed systemic adverse reactions. The following adverse reactions and their percentages occurred in two-month-old infants during the 48 hours following inoculation: fever > 100.8°F or 38.2°C (0.6%); irritability (12.6%); drowsiness (4.9%); diarrhea (5.2%); and vomiting (2.7%) [5:2318].

(5) The database from the 1994 National Health Interview Survey (NHIS) in the USA that included 6,515 children less than six years of age who received the hepatitis B vaccine were analyzed to evaluate the vaccine related adverse reactions. Hepatitis B vaccine was found to be associated with prevalent arthritis, incident of acute ear infections, and incident of pharyngitis/nasopharangitis [19].

The above selected studies clearly show that serious health problems and even death can result from vaccinating infants and children, especially among premature infants and infants suffering from pre-existing conditions. The authors of these studies emphasized that premature infants should be monitored following the administration of vaccines. Furthermore, the Physicians' Desk Reference states that vaccines should not be given to children treated with corticosteroid compounds [5].

Fourteen days prior to Baby Robert's respiratory arrest on August 2nd, he was given six vaccines. At the time the infant was administered these vaccines on July 19th, he was suffering from severe immune depression as indicated by his thymus weight measured on August 10, 2000. The CT scan taken on August 2nd of the head region showed that Robert had bilateral sinus and ear infections. The vaccines given to Robert on July 19th increased his risk of contracting sinus and ear infections and also predisposed him to have the seizure on August 2nd. Baby Robert additionally suffered from brain atrophy as a result of his treatment with corticosteroid [8].

## 4. Review of baby Robert's Medical Records During His Hospitalization on August 2-10, 2000

### 4.1 Case history and treatments given by the emergency teams on August 2nd

#### 4.1.1 History given by Brian Herlihy

Robert's mother went to Brian Herlihy's apartment with her 4½-month-old Baby Robert shortly after 0900 on August 2, 2000. She fed the baby four ounces of formula milk and left the apartment at about 0920 leaving the baby with Brian. Brian is a white male and in August of 2000, he was 29 years old. He had cared for Baby Robert in the past on five occasions for a few hours each time.

Brian fed the baby approximately four ounces of formula milk. The mother laid the baby on his back between two pillows on the bed, and left the room. After about five minutes, Brian returned to find the infant on his back at the end of the bed with his nose angled towards the floor. Baby Robert's head was lower than his body and his head was wedged between the

doi: 10.1588/medver.2004.01.00024

mattress and the bars of the footboard [20]. He gently tugged on the infant in order to free his head.

The infant vomited formula milk on the floor near the bed and on the bed covering an area of about 4-6 inches in diameter. The baby was not breathing [21]. Brian left the baby on the bed and called 911 at 0935 asking for help. Brian told the person who took the 911 call that the baby was draining white fluid like formula milk from his mouth and his nose. The baby was also coughing [22]. Brian was instructed by 911 personnel to place the baby on the floor and to begin CPR. Brian then proceeded to perform mouth-to-mouth resuscitation. No chest compressions were administered.

### 4.1.2 Treatments given by the emergency teams

The Alachua County Fire Rescue teams (EMTs) arrived on the scene at 0937 and found the baby lying on his back on the bedroom floor. Baby Robert was unconscious, unresponsive, and he was not breathing. His color was ashen gray. The baby was throwing up white milky fluid from his mouth. They bagged the baby and provided him with 100% oxygen and his blood oxygen saturation came up from 84% to 100%.

They then placed a cardiac monitor on the baby and it revealed a sinus tachycardia at the rate of 170 beats per minute. The baby had palpable pulses in all distal extremities.

In addition, the EMTs placed a line in the baby's right tibia and gave him a 100 cc of fluid. The baby's body weight was 6.8 kg. Brian was very upset and he stated that the baby had vomited and aspirated. The EMTs did not see any signs of struggle in the bedroom or elsewhere. No bruises or abrasions were noted on the baby's head, trunk, flank, back or extremities [21].

A second emergency team arrived at Brian's apartment at 0943 and also found the baby not breathing [23]. Kenneth A. Johnson, the firefighter and paramedic responsible for the EMTs stated that the baby was pale, white and unresponsive. He removed about 10 cc of red and clear mixed liquid from the baby's nose and mouth using a suction unit. The baby had a pulse rate of 190 beats/minute and sinus tachycardia [24]. Table 5 shows the baby's vital signs during the rescue on August 2nd.

Seven minutes after arrival, the EMTs managed to improve the baby's condition. The baby started to breathe on his own, but it was not sufficient to sustain his life. At 0955 the baby was placed on a backboard and was transported to the hospital. He showed some improvement on the way to the hospital. His skin color became pinkish and his respiratory efforts increased. The baby made the first audible sounds when he was wheeled into the hospital at 0958 [23, 24].

**Table 5. Baby Robert's vital signs between 0938 and 0958 on August 2, 2000**

| Time | Pulse beats/min. | Blood Pressure | Respiration (rate/min.) | Heart Condition |
|------|------|------|------|------|
| 0938 | 172 | 80 | 0 | Sinus Tachycardia |
| 0944 | 190 | 70 | 0 | Sinus Tachycardia |
| 0955 | 190 | 70 | 5 | Sinus Tachycardia |
| 0955 | 180 | 70 | 12 | Sinus Tachycardia |
| 0958 | 160 | 70 | 20 | Sinus Tachycardia |

### 4.2 Robert's symptoms and treatments given at the hospital on August 2-10, 2000

#### 4.2.1 Treatment at the emergency room

The baby arrived at the hospital emergency room at 1000 [8]. The baby was moving his arms and his legs and he was crying. The ET-tube was extubated because it was not properly placed. The baby's temperature was 36.2°C. His blood pressure and pulse were 70/40 mm Hg and 160 beats per minute, respectively. The baby's fontanel was very tense and pulsating. Retinal hemorrhage was noted bilaterally. No bruises or abrasions were noted on the baby's head, trunk, flank, back or extremities. Blood analysis showed that his lactic acid level was 6.2 mmol/L.

#### 4.2.2 The results of the CT scans for the head and neck regions taken on August 2-4, 2000

After leaving the emergency room, Baby Robert was taken in for CT scans. The CT scan of the head and neck regions taken at 1029 on August 2, 2000 showed a normal skull with no evidence of fracture. A limited lateral view of the cervical spine revealed that the vertebral bodies and the disc spaces were normal down to C5. Furthermore, the cerebral CT scan taken at 1043 on August 2nd showed significant sinus and mastoid disease involving mainly the left maxillary antrum, ethmoids, and both mastoid and middle ear areas [8].

Intracranially, hygromas were observed especially on the left side. The baby was also found to have multi-generation hemorrhage (fresh and old) and bilateral subdural hemorrhage (the left greater than the right) mostly in the superior frontal parietal area. There was trace amount of subarachnoid hemorrhage at several sites most notably the right posterior parietal. Epidural hemorrhage was likely present [8]. The neuroradiologist estimated the fresh bleed that appeared white (hyperdense) on the film to be 20-25% of the total bleed detected. The old bleed (75-80% of the total) appeared dark (hypodense) on the scan [25].

The ventricles were at the upper limits of normal size and essentially non-displaced. There was no evidence of herniation, parenchymal contusion or bleeding. There was a suggestion of at least a right global retinal hemorrhage in the orbits [8].

A second CT scan of the head region was taken at 1521 on August 2nd in order to evaluate the progression of the subdural bleed and other lesions when compared to the prior CT of the head taken at 1028. There was interval worsening in the appearance of the subdural bleed at the vertex of the skull with a new subdural bleed in the right frontal and right parietal-occipital area [8]. The radioneurologist also observed fresh and old bleeds and estimated the fresh bleed to be 35% of the total bleed present. The CT scan taken in the afternoon showed a little more fresh blood along the flax which is the dura that divides the two hemispheres in half [25].

A third cerebral CT scan was taken on August 3rd at 1046 and was compared with the scans taken on August 2nd. The blood had shifted down over the tentorium and it accumulated in the right parietal lobe of the brain and it looked like it was causing a brain laceration as described by the radiologist [25].

doi: 10.1588/medver.2004.01.00024

000209

Case 1:09-cv-00052-MP-GRJ   Document 21-50   Filed 03/22/11   Page 115 of 159

A fourth cerebral CT scan was taken on August 4th and did not show a significant change in the bleed from the August 3rd scan.

### 4.2.3 Robert's symptoms and treatment given at the PICU on the morning of August 2nd

The baby arrived at the PICU at about 1100 on August 2nd at which time he was having a severe seizure. The treating physician stated that Baby Robert was seizing and he was very stiff. She said, "He was so stiff you could pick him up by a leg and he would stay stiff." When the baby was brought to the PICU, the endotracheal tube was not in place. He was trying to cry. His breathing was not normal and his color was gray and ashen. The treating physician also stated that the biggest problem was that the baby was seizing and his tongue was stiff. Therefore, he was not passing air in and out of his mouth or his nose very effectively [26].

The treating physician performed a very thorough physical examination on Baby Robert looking specifically for signs of trauma all over his body (front, back, head, and genitals) and she did not see any bruise or sign of trauma. His neck and mouth were free from any marks or signs of strangulation. His head was normal and nicely shaped. The fontanel (the soft spot on the top of the head) was slightly rounded, but it was still fairly soft and depressible. The baby did not have a significant increase in intracranial pressure at that time [26]. A pediatric neurologist also examined Baby Robert and saw no evidence of red marks or bruising on his body [4].

Following examination, the treating physician treated Baby Robert with muscle relaxant and anti-seizure medications. He was given vecuronium (muscle relaxant) which paralyzes the muscles for a temporary period of time (about a half-hour). The baby was so stiff and his tongue was so swollen that the physician needed him to relax so that the breathing tube could be placed without traumatizing him. The baby was also treated with pentothal which is an anesthetic and anti-convulsant agent [26].

Furthermore, the pediatric neurologist performed an electroencephalograph (EEG) and found that the amount of electrical activity in the brain was deeply suppressed throughout Robert's brain. The waves themselves were very slow, indicating that the process that led to his brain dysfunction was one that involved the whole brain [4]. The clinical tests also revealed that Baby Robert suffered from cardiac damage, hyperglycemia, glycosurea, lactic acidosis, and bilateral retinal hemorrhage. Furthermore, his serum creatinine and protein values were low. Below are descriptions of these health problems and the clinical data.

### 4.2.4 Robert's heart problems

The emergency teams monitored the baby's heart at 0943 on August 2nd and found that he had sinus tachycardia with a pulse rate of 172-190 per minute (Table 5). Blood analysis showed that the baby had high levels of troponin I, CKMB, and CK total, which indicated that the baby was suffering from myocardiac damage (Table 6). The EKG exam at 1830 on August 2nd also demonstrated that the baby's heart had suffered from

ischemic changes and arrhythmia. Some elevation in ST waves was noted indicating acute myocardial injury [8].

After admission to the Pediatric Intensive Care Unit, Baby Robert was started on dopamine 10 mcg/kg/minute and received multiple fluid boluses in addition to the normal saline bolus with improvement in blood pressure. The baby was weaned to 3 mcg/kg/minute of dopamine by August 3rd. The infant remained hemodynamically stable post discontinuation of dopamine until August 8th. However, he suffered from cardiac arrest in relation to his respiratory arrest on August 10th.

**Table 6. Indicators of myocardial infarctions in Baby Robert's blood**

| Date (mm/dd/yyyy) | Time | Troponin I (ng/mL) | CK Total (IU/L) | CK MB (ng/mL) |
|---|---|---|---|---|
| 08/02/2000 | 1225 | 4.7 H | 172 H | 7.7 H |
| 08/03/2000 | 1516 | <0.4 | 289 H | 4.9 H |
| Normal Range | | 0.0-0.04 | 55-170 | <3.1 |

### 4.2.5 Baby Robert's metabolic and hematology values during his hospitalization

The blood analysis performed following Baby Robert's arrival at the emergency room on the morning of August 2nd showed that the baby suffered from hyperglycemia and lactic acidosis. The baby also suffered from glycosurea as shown by a urine analysis performed on August 2nd at 1204. His glucose urine value was > 1000 mg/dL. He was treated with sodium bicarbonate to correct his metabolic acidosis [8].

Furthermore, the baby had low blood potassium levels and was treated with potassium. The serum creatinine values on August 2nd and 3rd were very low. They indicated that Baby Robert was suffering from a muscle-wasting problem. His serum levels of albumin and total protein were also low. The baby's metabolic values are presented in Tables 7 and 8.

**Table 7. Baby Robert's serum chemistry values on August 2 and 3, 2000**

| Date (mm/dd) and Time | Albu-min | Pro-tein | Creatinine (mg/dL) | Urea Nitrogen (mg/dL) |
|---|---|---|---|---|
| 08/02 | | | | |
| 1225 | 2.5 L | 4.6 L | | |
| 2340 | | | 0.3 L | 7 L |
| 08/03 | | | | |
| 0400 | | | 0.2 L | 7 L |
| 1213 | | | 0.2 L | 6 L |
| 1913 | 2.1 L | 4.3 L | 0.2 L | 7 L |
| Normal Range | | | 0.8-1.5 | 9-20 |

000210

188                                                  *M.A. Al-Bayati/Medical Veritas* 1 (2004) 179–200

**Table 8. Baby Robert's metabolic parameters measured following his respiratory arrest**

| Date & Time | pH Arterial | Glucose mg/dL | HCO₃ mmol/L | Lactic Acid mmol/L | Potassium mmol/L |
|---|---|---|---|---|---|
| 08/02/2000 | | | | | |
| 1012 | 7.35 | 317 H | 19.1 L | 6.2 H | 3.7 |
| 1136 | 7.26 L | 235 H | 22.0 | 4.4 H | 3.8 |
| 1243 | 7.32 L | | 19.4 | | |
| 1420 | 7.37 | | 21.2 | 2.1 H | |
| 1705 | 7.38 | | 18.6 L | 1.9 H | 3.8 |
| 2001 | 7.41 | 111 | 19.1 | 1.8 H | |
| 2340 | 7.43 | 109 | 16.2 | 1.3 | 3.4 L |
| 08/03/2000 | | | | | |
| 0147 | 7.44 | | 17.7 L | | 3.3 L |
| 0355 | 7.40 | | 17.1 L | | |
| 0553 | 7.41 | | 17.5 L | | |
| 1026 | 7.38 | | 22.0 | | |
| 1613 | 7.37 | | 23.3 | | |
| 2150 | 7.38 | | 23.2 | | |
| 08/04/2000 | | | | | |
| 0408 | 7.39 | | 23.8 | | |
| 0811 | 7.47 H | | 24.1 | | |
| 08/05/2000 | | | | | |
| 0051 | 7.52 H | | 24.0 | | |
| 0846 | 7.46 H | | 25.1 | | |
| 1627 | 7.46 H | | 26.1 | | |
| 1935 | 7.46 H | | 24.5 | | |
| Normal Range | 7.35–7.45 | 75–115 | 21–28 | 0.3–1.3 | 3.5–5.0 |

**Table 9. Baby Robert's hematology parameters measured following his respiratory arrest**

| Date & Time | RBC x 10⁶/L | Hemoglobin g/dL | Hematocrit % | Platelets x 10³/L |
|---|---|---|---|---|
| 08/02/2000 | | | | |
| 1006 | 4.00 | 10.7 | 32.1 | 392 |
| 1147 | 3.19 | 8.7 | 25.2 | 390 |
| 1706 | 3.78 | 10.6 | 31.0 | 328 |
| 2000 | 4.11 | 12.0 | 33.7 | 238 |
| 2340 | 4.68 | 13.4 | 38.3 | 217 |
| 08/03/2000 | | | | |
| 0400 | 4.49 | 13.2 | 37.0 | 186 |
| 1213 | 4.14 | 11.8 | 34.5 | 180 |
| 1913 | 4.07 | 11.5 | 33.7 | 180 |
| 08/04/2000 | | | | |
| 0400 | 3.85 | 11.3 | 32.3 | 177 |
| 1133 | 3.90 | 11.1 | 32.6 | 194 |
| 08/05/2000 | | | | |
| 0051 | 4.50 | 13.4 | 38.7 | 173 |
| 08/06/2000 | | | | |
| 0050 | 4.81 | 13.8 | 40.6 | 159 |
| 08/07/2000 | | | | |
| 0400 | 4.90 | 14.3 | 41.9 | 218 |
| Normal Range | 2.7–4.9 | 9–14 | 28–42 | 150–450 |

Robert's hematology values are presented in Table 9. From the values measured following the baby's admission at Shands Hospital at 1012 on August 2ⁿᵈ, the platelet count was reduced by 50% on August 3ʳᵈ. These values indicate that the baby suffered from bleeding in tissues following his admission to the hospital. His prothrombin time (10.6 seconds) and partial prothrombin time (25 seconds) measured at 1454 on August 2ⁿᵈ were within normal rages. These values indicate that Robert's bleed observed in the retina and subdura were not caused as a result of vitamin K deficiency or liver problems [8]. Baby Robert received a packed red cell transfusion that improved his hemoglobin and hematocrit levels, which continued to remain stable throughout his hospital stay.

#### 4.2.6 Retinal bleed and other lesions observed in Robert's eyes.

The pediatric ophthalmologist at the hospital examined Robert's eyes on August 2, 2000 and found no external injury. The eyelids, front of the eyes, cornea, and lens, were normal. The pupils were reactive which indicated that the intracranial pressure was not extremely elevated. The pediatric ophthalmologist dilated the baby's pupils and looked inside Robert's eyes. He observed a massive amount of blood in both eyes [27].

The pediatric ophthalmologist found blood in the center of the eye (vitreous body), the area in front of the retina and in the retina. The baby had two other retinal lesions, which were documented by photography. There were big white spots in the back of his eye, which are referred to as Purtscher's retinopathy. Those big white spots are due to what is believed to be damaged arteries. There was also a crack in the back of the eye, which is known as a choroidal rupture [27].

doi: 10.1588/medver.2004.01.00024

000211

#### 4.2.7 Treatment given to Baby Robert on August 2-10, 2000

Baby Robert was treated with fosphenytoin, versed, and ranitidine at high therapeutic levels to control his severe seizure. The baby was given a loading dose of fosphenytoin and then kept on a maintenance dose of fosphenytoin. The baby was also started on a fentanyl drip. The baby had additional seizures on this dose and was given ativan. On the EEG performed on August 4th, Robert continued to show evidence of clinical and subclinical seizures and was maintained on a versed and a fentanyl drip. Blood analysis on August 4th showed the baby's blood level of phenytoin was very high at 29.1 µg/mL. The normal therapeutic levels are between 10 and 20 µg/mL [8].

The baby was also treated with dopamine, Tylenol®, potassium chloride, and sodium bicarbonate to increase his blood pressure and to treat his hypokalemia and metabolic acidosis. He was also given normal saline and red blood cells to treat dehydration and anemia. Presented in Table 10 is a partial list of medications given to the baby during his stay in the hospital.

On August 6th the baby was taken off fentanyl and the versed drip. Seizure activity resumed after approximately six hours. Throughout the hospital stay the baby's head circumference remained stable at about 45 cm and his anterior fontanel remained full and pulsating. His pupils were equal, round, and reactive to light. Baby Robert had decreased tone in the lower extremities bilaterally, positive doll's eyes, a sluggish corneal reflex, and decreased tone in the upper extremities bilaterally. He did not exhibit any response to pain.

On August 7th the baby was started on phenobarbital and once the phenobarbital was at a therapeutic level, the fosphenytoin was tapered. The neurologist was consulted on the case and felt that the examination was consistent with irreversible brain damage. There was no mass effect or potential herniation. The baby was extubated on August 9th. Initially the baby had labored breathing and he was given doses of dexamethasone and racemic epinephrine with mild improvement. The baby was given additional doses of racemic epinephrine and then started on heliox and showed some improvement.

On the morning of August 10th, the baby was noted to have decreased air movement and decreased oxygen saturations into the 90s. The parents had initiated a DNR order and according to this order the baby was not to be reintubated. The baby's heart rate and blood pressure continued to drop and then proceeded quickly into an agonal rhythm of about 20 beats per minute and then into asystole at 0052. This event lasted no longer than ten minutes. It was felt that the baby suffered from respiratory arrest secondary to cardiac arrest due to his brain injury. An autopsy was performed on August 10, 2000. Section 5 contains a detailed description of the autopsy findings.

**Table 10. Partial list of medications given to Baby Robert while at the hospital August 2-9, 2000**

| Date (mm/dd) & Time | Treatment | Actions |
|---|---|---|
| **08/02** | | |
| 1115 | Fosphenytoin 150 mg IV | Anti-epileptic (Anti-convulsant) |
| 1140 | Normal saline, 30 cc/hr | Treat dehydration |
| | Fosphenytoin 20 mg IV | Anti-epileptic (Anti-convulsant) |
| 1400 | Versed 0.4-0.6 mg | Sedative |
| | Dopamine (10:g/KG/min.) | Increase blood pressure |
| 1450 | Vecuronium | Muscle relaxant |
| | NS + 20 meq KCl/L | Treat dehydration & hypokalemia |
| 1630 | Fentanyl drip | Analgesic |
| 1658 | NS + 20 meq KCl/L | |
| 1800 | Tylenol® 100 mg | Analgesic and antipyretic |
| 1815 | Ranitidine 10 mg IV | Histamine H$_2$-receptor antagonist |
| | Fentanyl IV | Analgesic |
| 1830 | 80 cc Red Blood Cells IV | Treat anemia |
| 2020 | Fosphenytoin 40 mg IV | Anti-epileptic (Anti-convulsant) |
| | Dopamine | Increase blood pressure |
| 2230 | NS + 20 meq KCl/L at 20 cc/hr | Treat dehydration and hypokalemia |
| **08/03** | | |
| 0015 | NS + 20 meq KCl/L | |
| 0025 | Sodium bicarbonate | Treat metabolic acidosis |
| 0225 | Dopamine | Increase blood pressure |
| 1100 | Fosphytoin IV | Anti-epileptic (Anti-convulsant) |
| 1300 | Fosphytoin IV | |
| **08/04** | Fosphentoin | |
| **08/06** | Fentanyl IV | Analgesic |
| | Versed | Sedative |
| **08/07** | Phenobarbital | Anti-convulsant |
| **08/09** | Dexamethasone | Anti-inflammatory |
| | Epinephrine | Increase cardiac output |

#### 5. Review of the medical examiner's autopsy findings and pathology reports

Baby Robert died on August 10th at 0052 and the Medical Examiner performed the autopsy at 1500 (Case # ME00-297). His autopsy was limited to gross examination of the body and selected organs [12]. He sent the brain and eyes to two consultants for gross and microscopic examinations. The neuropathologist examined the brain and Dr. Michael D. Bell examined the tissues from the eyes [28, 29].

These physicians concluded that baby Robert's injuries and death were caused by violent shaking. However, the autopsy and pathology findings do not support their conclusions that Baby Robert's injuries resulted from violent shaking or trauma. Below are descriptions of their findings and my analysis of them.

doi: 10.1588/medver.2004.01.00024

### 5.1 External examination of Robert's body did not reveal bruises

The medical examiner/forensic pathologist examined Robert's body and he did not see any evidence of injury or trauma. He stated that no significant injuries were seen on the front or the back of the body [12]. The scalp was free of traumatic injuries including lacerations, contusions and bruises. The oral cavity was free of trauma or obstruction. The underlying calvarium and skull base were intact. The neck organ block was free of trauma or obstruction.

### 5.2 The subdural hemorrhage indicates that the baby had pre-existing condition

The CT scan of Robert's brain taken on August 2nd at 1029 showed that the subdural space contained multi-generation hemorrhage (fresh and old), which indicates that the baby had a pre-existing condition. The medical examiner/forensic pathologist examined the dural membranes grossly. He observed lightly adherent clots in the subdural spaces over cerebral convexities and a clot attached to the undersurface of the dura overlying the cerebral hemispheres. He concluded that the baby did not have chronic subdural hemorrhage. I believe that the medical examiner/forensic pathologist's conclusion with regard to the time of the bleed is not scientifically valid because he failed to microscopically examine the dura to date the bleed.

### 5.3 The brain lesions indicate that the baby suffered from anoxia and ischemia

The gross and the microscopic examinations of Robert's brain did not indicate that Baby Robert died as a result of trauma but, instead they showed that the baby had pre-existing chronic brain atrophy and the brain suffered from severe anoxia and ischemia. However, the medical examiner and other physicians who evaluated this case all overlooked these facts.

The neuropathologist examined Robert's brain microscopically and found that the brain was an immature brain and inconsistent with that of a child of four and a half months [28, 30]. The treating physician examined the CT scans of Robert's brain and also determined that he suffered from brain atrophy. She stated that Baby Robert had a smaller brain than normal. That means that there was probably some atrophy or wasting of the surface of the brain or that the brain was not growing as rapidly as it should have been [31, page 754].

The other lesions observed in the brain were edema and cell necrosis, which were caused by severe anoxia and ischemia of the brain. The medical examiner/forensic pathologist examined Robert's brain grossly and found evidence of edema. The brain substance was quite soft. The gyri were flattened and sulci were narrowed. The brain weight was 826 g, which was about 150% of normal (normal weight about 600 g) [13]. The medical examiner did not see evidence of trauma [12].

The neuropathologist examined eight glass microscopic slides of the brain that were stained with hemotoxylin and eosin (H & E). He found that the lesions consisted of cell necrosis that resulted from global anoxia and ischemia of the brain. He also stated that Baby Robert's brain was immature and that was

due to improper development. The neuropathologist never stated that these lesions were caused by trauma. He stated that this was an immature human brain with subarachnoid hemorrhage and hematoma, global anoxic-ischemic encephalopathy, and generalized cerebral edema [28].

The slides that were examined by the neuropathologist included tissue sections from left and right frontal gyri, bilateral hippocampal formations, midbrain, basal ganglia, and cerebellum. He found that the neurons displayed the typical anoxic-ischemic histologic changes. He observed laminar necrosis in the cerebral cortex and he said that these anoxic-ischemic microscopic changes were most prominent in the gray surfaces, but were also present at the depths of the sulci.

Furthermore, the neuropathologist stated that both the Sommer's sector and endplate of the hippocampal formation displayed bilateral symmetry, which consisted of acute neuronal necrosis consisting of cytoplasmic hyperesosinophilia, karyorrhexis and nuclear pyknosis. There was no inflammation other than foamy macrophages. Except for neuronal swelling and parenchymal and leptomeningeal vascular congestion, the midbrain was histologically within normal limits. He also observed acute neuronal necrosis in the basal ganglia.

The cerebellum was remarkable for relative preservation of the external granular neuronal lamina. The internal granular cell layer was also prominent. There was widespread neuronal necrosis with cytoplasmic hyperesosinophilia, karyorrhexis and nuclear pyknosis. There was no inflammation, other than foamy macrophages.

The neuropathologist's findings described above clearly indicate that Baby Robert suffered from brain atrophy, severe anoxia and ischemia and not from physical trauma. The neuropathologist stated that these gross and microscopic findings are consistent with a multi-day survival after hospitalization. However, the neuropathologist found a very small cerebral cortical lesion microscopically (8 x 8 x 9 millimeters), which he believed was a contusion caused by trauma [30]. He observed diffuse endothelial cell swelling with extravasated erythrocytes, vacuolation of the neutrophil and foamy macrophages throughout.

It is my opinion that the neuropathologist's claim that Robert's brain had a contusion resulting from trauma is not supported by medical facts based on the following reasons:

(1) Baby Robert was examined by many physicians and no evidence of injuries caused by trauma was observed in the head or neck regions. These facts were confirmed by the medical examiner on August 10th.

(2) No laceration or contusion of Robert's brain was observed on the cerebral CT scans taken on 1029 and 1521 on August 2nd. However, a minor cortical lesion in the brain was observed in the third cerebral CT scan taken on August 3rd at 1046, which resulted from the accumulation of blood in the brain. The neuroradiologist read the CT scan and stated that the blood had shifted down over the tentorium and that it had accumulated in the right parietal lobe of the brain. He referred to this lesion as a brain laceration [25].

(3) Anoxia and ischemia can cause diffuse endothelial swelling and extravasation of red blood cells and Robert's brain suffered from severe anoxia and ischemia.

doi: 10.1588/medver.2004.01.00024

M.A. Al-Bayati/Medical Veritas 1 (2004) 179–200                                    191

## 5.4 Bleeding in the eyes

The medical examiner harvested Robert's eyes at autopsy and sent them to Dr. Michael D. Bell for examination. Dr. Bell examined Robert's eyes grossly and microscopically and he observed retinal hemorrhages [29]. Multiple diffuse retinal hemorrhages were observed in the right eye, while the retina of left eye had only multiple focal retinal hemorrhages. The retinal hemorrhages were positive for iron stain in both eyes, which means that the bleed was older than 24 hours. Baby Robert suffered from diabetes and adverse reactions to treatment with corticosteroid. Both of these conditions cause vascular abnormalities and severe bleeding in the retina as described in Section 6 of this report.

## 5.5 Thymus atrophy

The medical examiner stated that Robert's thymus weight was 4 g and its external and sectioned surfaces were unremarkable [12]. Baby Robert was 4½-months old at the time of autopsy and his thymus weight should have been about 22.5 g. The average thymus weight in a white, infant male at three months and six months of age was found to be 20 and 25 g, respectively [13]. These data indicate that Robert's thymus weight was approximately 20% of normal size.

The baby was treated with corticosteroid because he was born four-weeks premature. The treatment with corticosteroid causes immune depression as measured by the reduction in size and the function of the lymphoid tissues. The medical examiner did not review the baby's medical record; therefore he overlooked the facts that both the baby and his mother developed diabetes as a result of their treatment with corticosteroid.

Furthermore, the use of corticosteroid at high therapeutic doses causes atrophy in the adrenal gland. The medical examiner stated that the combined weight of the right and left adrenal glands was 4 grams, but he did not evaluate their structure microscopically to check for abnormalities. He also did not take tissue samples from other endocrine glands to be examined microscopically and to check for abnormalities. A study conducted in the United States of America showed that dexamethasone therapy in newborns for a period of a week or longer was associated with suppression of the hypothalamic-pituitary-adrenal axis (HPAA) in a substantial number of premature infants [32].

## 5.6 Robert's spleen weight appeared less than normal

Robert's spleen weight at autopsy was 16 g [12]. The average spleen weights for infants at 3 and 6 months of age were found to be 16.3 g and 22 g respectively [13]. Based on these data, the expected weight of the spleen in a 4½-month-old white baby is 19 g. Furthermore, it is possible that the actual spleen weight in Robert's case was significantly less than 16 g because his organs were congested with blood.

Robert's liver weight was 324 g and the expected liver weight for a 4½-month-old baby is about 220 g [12, 13]. His lungs were also heavier than normal (160 g) because of congestion. The normal lungs weight for a baby at Robert's age is

about 94 g. The liver and lungs weight were increased by 45% and 70%, respectively because of congestion.

These data indicate that the actual spleen weight in Robert's case may have been much less than 16 g; Robert had severe atrophy of the spleen as it happened with the thymus. The medical examiner did not examine the spleen microscopically and gross examination alone is not adequate to detect microscopic abnormalities.

## 5.7 Inadequate examination of the heart

The clinical data indicate that Robert suffered from heart problems (Tables 5 and 6). However, the Medical Examiner did not take tissue samples to microscopically evaluate the structure of Robert's heart. He examined the heart grossly and declared that Robert's heart was normal. I believe that the Medical Examiner's conclusion is not valid based on the following facts: (1) The emergency teams monitored the baby's heart at 0943 and found that he had sinus tachycardia with a pulse rate of 172-190 per minute (Table 5); (2) blood analysis showed that he had high levels of troponin I, CKMB, and CK total which indicated that the baby was suffering from myocardiac damage (Table 6); (3) the EKG exam taken at 1830 on August 2nd showed the baby's heart suffered from ischemic changes and arrhythmia; (4) some elevation in ST waves was noted indicating acute myocardial injury.

## 6. Analysis of clinical events and causes that led to Baby Robert's respiratory arrest and death

The clinical data described in Sections 2 through 5 of this report show that Baby Robert suffered from several chronic illnesses and some of these illnesses led to his respiratory arrest and death in August of 2000. These illnesses include: brain atrophy and other neurological problems, subdural bleed, retinal bleed and other abnormalities, diabetes, heart problems, sinus and ear infections, muscle weakness, atrophy of the lymphoid tissue, and excessive weight gain.

Robert's illnesses resulted from his exposure to high therapeutic doses of corticosteroid (betamethasone). His thymic atrophy was severe and it indicates that the baby was treated with high doses of corticosteroid. His thymus weight at autopsy was about 20% of normal. The thymus is a very sensitive biomarker for the effect of corticosteroid.

Adverse reactions to corticosteroid have been reported in children. These include: (1) fluid and electrolyte disturbance (sodium retention, fluid retention, potassium loss, and hypokalemic alkalosis); (2) increased capillary fragility; (3) musculoskeletal problems (muscle weakness, steroid myopathy, and loss of muscle mass); (4) cardiovascular problems (congestive heart failure in susceptible patients, cardiac hypertrophy, and hypertension); (5) gastrointestinal problems (peptic ulcer with possible subsequent perforation and hemorrhage, pancreatitis, abdominal distention, ulcerative esophagitis); (6) neurological problems (convulsions and increased intracranial pressure, brain atrophy, and demylination); (7) manifestations of latent diabetes mellitus and glycosuria; (8) ophthalmic problems (posterior subcapsular cataracts, increased intraocular pressure and

doi: 10.1588/medver.2004.01.00024

000214

glaucoma, exophthalmos, and retinopathy); (9) metabolic problems (negative nitrogen balance due to protein catabolism); (10) abnormal weight gain; (11) decreased functions of the immune systems and increased susceptibility to infections [33, 5].

Baby Robert was also exposed to micronase (anti-diabetic drug) via milk and this medication should not be given to a nursing mother. It causes hypoglycemia in breast-fed infants. Robert's mother did not suffer from diabetes during her pregnancy. However, her medical record indicates that she was treated with micronase after giving birth and that she stopped taking this medication on June 8th. This indicates that her diabetes was caused by her treatment with corticosteroid during her last week of pregnancy. The baby also suffered from glycosuria and diabetes as a result of his exposure to corticosteroid [8].

Furthermore, the baby was given vaccines (Tables 3 and 4) when he was suffering from immune depression as a result of his treatment with corticosteroid which increased his risk of developing ear and sinus infections. Glucocorticoids cause profound and varied metabolic effects. They also modify the body's immune response to diverse stimuli. Immunization procedures should not be undertaken in patients who are on corticosteroids, especially in high doses, because of the possible hazards of neurological complications and lack of antibody response [5:2824]. The cerebral CT scan taken at 1043 on August 2nd showed that Baby Robert suffered from significant sinus and mastoid disease [8].

### 6.1 Events that led to Robert's respiratory arrest on August 2, 2000

Baby Robert suffered from respiratory arrest on August 2nd, 2000 between 0920 and 0935 and the medical evidence indicates that the following events led to his respiratory arrest:

(1) Baby Robert suffered from a seizure prior to 0935 and his seizure resulted from neurological problems and brain atrophy caused by his treatment with corticosteroids.

Dr. Anne Elizabeth Dickison who treated Baby Robert on the morning of August 2nd stated that the baby was seizing and he was very stiff. She said, "He was so stiff you could pick him up by a leg and he would stay stiff." His tongue was so stiff that the physician needed to cause him to relax in order to correctly place the breathing tube without traumatizing him. Dr. Dickison treated Baby Robert with muscle relaxant and anti-seizure medications [26].

(2) The severe seizure caused Baby Robert to vomit and led to the blockage of his airways with fluids which prompted his respiratory arrest. The baby vomited on the bed and the floor near the bed. Brian told the person who took the 911 call that the baby was draining white fluid-like formula milk from his mouth and nose. The baby was also coughing [22:445]. The emergency team who arrived on the scene to treat the baby had to clear fluid from his mouth and nose in order to get oxygen into him. The paramedic used a vacuum to suck about 10 mL of formula from his airway. The baby had been fed about 8 ounces of formula milk within 30 minutes prior to his seizure.

(3) The movement of the baby from his place on the bed to the end of the bed can be explained by his seizure and his struggle to breath. Robert's mother stated that her baby was able to roll halfway [11].

### 6.2 The biomechanisms of Robert's injuries

Baby Robert suffered from respiratory arrest for a significant time and that led to brain anoxia and cardiac damage. In addition, the baby suffered from a chronic subdural bleed and retinal bleed as a result of his treatment with corticosteroid. Corticosteroid induces diabetes, hypertension, brain atrophy, and it increases capillary fragility and abnormal vascular growth in the retina. Glucocorticoid causes hypertension and cardiovascular disease due to its capacity to promote sodium retention and increased blood pressure [33].

Baby Robert suffered from polyurea as early as April 19, 2000 when he was four weeks old. On April 17, 19, and 26, 2000 his grandmother stated that she was changing wet diapers 8-10 times per day. This indicates that the baby was suffering from polyurea. The urine and blood analyses performed on August 2nd showed that the baby was suffering from hyperglycemia and glycosurea. His blood glucose level was 317 mg/dl and he had glycosurea (>1000 mg/dL) [8]. These conditions usually cause polyurea.

The cerebral CT scan taken August 2nd at 1028 showed that Robert had a multi-generation subdural bleed. The neuroradiologist estimated the fresh bleed to be 20-25% of the total bleed observed [25]. The fresh bleed increased to 35% of the total at 1521 on August 2nd. The cerebral CT sans taken on August 3rd and 4th showed no change in the status of the bleed observed in the last CT scan taken August 2nd.

The occurrence of the fresh bleed in the subdural space observed August 2nd can be explained by the synergistic actions of several factors that include the following: (1) the presence of previous vascular injury in the subdura which led to re-bleeding; (2) severe seizure that led to an increase in the intracranial pressure; (3) elevation in heart rate that led to an increase in the blood pressure; and (4) the baby's pulse rate was 172 at 0938 on August 2nd and injection of relatively large volumes of therapeutic fluid administered intravenously can cause an increase in the blood pressure.

The retinal bleed observed by the Pediatric Ophthalmologist on August 2nd can be explained by Robert's treatment with corticosteroid and diabetes. These conditions have been known to cause retinopathy and retinal bleeds. In addition to the retinal bleed, the Pediatric Ophthalmologist observed blood in the vitreous body, white spots in the back of the eye, (which he referred to as Purtscher's retinopathy), and a crack in the back of the eye, (which he called a choroidal rupture) [27]. These lesions have also been reported in patients suffering from diabetes and/or treatment with high therapeutic doses of corticosteroid [5, 33].

Robert's symptoms and lesions described in this report resemble those that have presented in other infants who have also been treated with corticosteroids. Adverse reactions to corticosteroids in infants have been widely reported in the medical literature. However, none of the physicians or the medical exam-

doi: 10.1588/medver.2004.01.00024

000215

iner that evaluated this case paid any attention to these facts. Baby Robert was born four weeks premature and he and his mother were treated with corticosteroid. The following are descriptions of selected studies that explain the adverse reactions to corticosteroids in preterm infants and older children.

## 6.3 Corticosteroids cause neurological problems in children

### 6.3.1 Treatment with corticosteroids and neurological problems

Corticosteroid compounds are given to pregnant women who are at risk of delivering premature infants and to preterm infants in order to help in maturation of the infant's lungs. Robert's mother was treated with corticosteroid during her last week of pregnancy. Baby Robert suffered from severe thymic atrophy and other adverse reactions to corticosteroid. His symptoms indicate that he was treated with high therapeutic doses of corticosteroid. Prenatal and postnatal treatments with therapeutic doses of corticosteroid compounds have shown to cause early and delayed neurological problems in infants as described below.

Eighteen premature (23 to 31 weeks) infants (7 treated with dexamethasone and 11 not treated) were studied at term, i.e., 38 to 41 post-conceptional weeks. Advanced quantitative volumetric 3-dimensional magnetic resonance imaging (MRI) technique was used to quantify cerebral tissue volumes in these infants. Fourteen healthy term infants were also studied for comparison. Cerebral cortical gray matter volume in premature infants treated with dexamethasone was reduced by 35% when compared with gray matter volume in premature infants not treated with dexamethasone (mean $\pm$ standard deviation, 130.3 $\pm$ 54.0 vs. 200.6 $\pm$ 35.1 mL, respectively). Premature infants treated with dexamethasone exhibited a reduction (30%) in total cerebral tissue volume compared with total cerebral tissue volume in both the control term infants and premature infants not treated with dexamethasone (312.7 $\pm$ 43.7 vs. 448.2 $\pm$ 50.2 and 471.6 $\pm$ 36.4 mL respectively) [34].

Furthermore, dexamethasone given postnatally to treat or prevent bronchopulmonary dysplasia (BPD) has also shown to increase the risk of neurologic impairment, neurodevelopmental disability, and the rate of cerebral palsy in preterm infants and later in survivors [35-37]. Nineteen randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth in high-risk preterm infants were reviewed. In the two trials which have reported late outcomes, several adverse neurological effects were found at follow-up examinations of survivors treated with early steroids. These include abnormal neurological examination, cerebral palsy, and developmental delay [38, 39].

In addition, twenty-one randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth (early) enrolling a total of 3072 preterm infants were reviewed. In the nine trials that have reported late outcomes, several adverse neurological effects were found at follow-up examinations of survivors treated with early steroids. These include cerebral palsy and other abnormal neurological findings [40]. Also, ran-

domized controlled trials of postnatal corticosteroid treatment initiated at > 3 weeks of age in preterm infants with CLD were reviewed. There were increases in long-term neurologic sequelae including abnormal neurologic examination and cerebral palsy [41].

Yeh et al. evaluated a total of 133 preterm infants (70 in the control group, 63 in the dexamethasone-treated group) who survived the initial study period and lived to 2 years of age. For infants in the treatment group, dexamethasone was started at a mean age of 8.1 hours and given 0.25 mg/kg every 12 hours for one week and then tapered off gradually over a 3-week period. The dexamethasone-treated group had a significantly higher incidence of neuromotor dysfunction (25/63 vs. 12/70) than the control group. Significant handicap was seen in 22 children (31.4%) in the control group and 26 (41.2%) in the dexamethasone-treated group [42].

Furthermore, a study compared a three-day course of dexamethasone (n =132) with a saline placebo (n = 116) administered from before 12 hours of age in preterm infants. Dexamethasone treatment was associated with increased incidence of hypertension, hyperglycemia, and gastrointestinal hemorrhage and no reduction in either the incidence or severity of chronic lung disease or mortality. A total of 195 infants survived to discharge and five died later [43].

Follow up data were obtained on 159 of 190 survivors at a mean age of 18 months. Dexamethasone treated children had a significantly higher incidence of cerebral palsy than those receiving placebo 49% vs. 15%, respectively. The most common form of cerebral palsy was spastic diplegia and the incidence rates were 28% vs. 6% in dexamethasone and placebo treated infants, respectively. Developmental delay was also significantly more common in the dexamethasone treated group (55%) than in the placebo treated group (29%) [43].

Also, a study evaluated the long-term adverse effects of corticosteroid given to infants on the nervous system. Of the 120 children who received corticosteroids, 98 (81.7%) survived to 5 years of age, compared with 200 (88.5%) of the 226 children who did not receive corticosteroids. At 5 years of age, survivors treated with corticosteroids postnatally had significantly higher rates of cerebral palsy (23%) compared with children not treated (4%).

In addition, the rate of sensorineural disabilities was significantly higher in children treated with postnatal corticosteroids, and the association between adverse sensorineural outcome and postnatal corticosteroids remained the same after adjustments for potentially confounding variables. In a separate case-control analysis of 60 children in each group, the rate of cerebral palsy remained significantly elevated (corticosteroids 22%, no corticosteroids 5%) [44].

Bos et al. studied 37 preterm infants with Prechtl's method for the qualitative assessment of general movements before, during and after dexamethasone therapy and found that the quality of general movements was impaired in 9 of 13 initially normal infants. The quality of fidgety movements at 3 months was abnormal in the majority of the infants and strongly correlated with neurological abnormalities at 2 years of age [45].

doi: 10.1588/medver.2004.01.00024

000216

*M.A. Al-Bayati/Medical Veritas* 1 (2004) 179–200

### 6.3.2 The release of high levels of endogenous corticosteroid also causes neurological problems

The adrenocorticotrophic hormone (ACTH) is released from the pituitary gland to stimulate the cortex of the adrenal glands. This causes an increase in the synthesis and the release of cortisol. It has been shown that the treatment of children with ACTH also caused neurological problems as a result of the release of endogenous cortisol. For example, eight children with different petit mal epilepsies were systematically treated with ACTH and dexamethasone. Cranial computed tomography (CCT) examinations were performed before, during and after treatment. Severe cerebral changes were observed in all children. Enlargement of ventricles and subarachnoid space was developed during the initial phase of treatment with Depot-ACTH. Similar changes, but to a lesser degree were observed during the phase of dexamethasone therapy thereafter [46].

Furthermore, Riikonen and Donner evaluated 162 children with infantile spasms who were treated with ACTH. In a large proportion (37%) of the children, the treatment caused pronounced side effects, and the mortality rate was 4.9%. At autopsy, fresh intracerebral hemorrhages were observed [47].

### 6.3.3 Abnormal changes in the nervous system caused by corticosteroid can also be reproduced in experimental animals

Experimental studies in animals have shown that multiple courses of antenatal corticosteroid cause deleterious effects on lung growth, brain myelination, hypothalamic-pituitary-adrenal function, and retina development [48]. Animal studies have also shown that maternal corticosteroid delays myelination and reduces the growth of all fetal brain areas, particularly the hippocampus [49].

Furthermore, Aghajafari et al. evaluated the results of eighteen studies dealing with the adverse effects of antenatal corticosteroids on the nervous system and fetal growth in experimental animals. Seven studies investigated the effects of repeated doses of antenatal corticosteroids on the brain and nervous system function or growth. All seven studies found adverse effects with repeated doses of antenatal corticosteroids. Eleven studies looked at the effect of repeated doses of antenatal corticosteroids on fetal growth. Nine studies found evidence of fetal growth restriction with repeated doses of antenatal corticosteroids [50].

In addition, pregnant ewes were given saline or betamethasone (0.5 mg/kg) at 104, 111, 118, and 124 days gestation, stages equivalent to the third trimester in humans. Lambs were delivered at 145 days (term), perfused and the corpus callosum examined with light and electron microscopically. Total axon numbers were unaffected (p > 0.05). However, myelination was significantly delayed. Myelinated axons were 5.7% in the experimental group and 9.2% in controls (p < 0.05). Myelinated axon diameter and myelin sheath thickness were also reduced (0.68 vs. 0.94 and 0.11 vs. 0.14 :m, p < 0.05) [51].

Furthermore, Quinlivan examined the effect of single or repeated injections of maternally administered corticosteroids on fetal growth in sheep. Forty-six date-mated singleton gestation ewes were allocated at random to one of three groups: a single or repeated injection of betamethasone, or a control group which received saline. On days 125 (preterm) or 145 (term) caesarean section delivery was performed. After the lambs were killed, measures of size and weight were recorded. Significant betamethasone dose dependent reduction in body and organ weights and biometry were found at preterm and term gestational ages (p < 0.05). There was little catch up growth in those in whom delivery was delayed until term. Thymus, spleen and liver were particularly targeted [52].

### 6.4 Corticosteroid causes cardiomyopathy in infants

Yunis et al. reported three cases of newborns whose mothers were treated with betamethasone prenatally at different doses and duration of time. They developed various degrees of hypertrophic cardiomyopathy (HCM), which was diagnosed by echocardiography. They suggested that repeated antenatal maternal steroid intake might cause changes of HCM in the newborn. These changes appear to be dose- and duration-related [53]. In addition, Miranda-Mallea et al. reported two cases of hypertrophic cardiomyopathy in two preterm newborns secondary to dexamethasone treatment [54].

Furthermore, Israel et al. conducted a retrospective review of one preterm infant who received a 26-day course, and 13 preterm infants who received at least one 42-day course of dexamethasone, and who had serial echocardiographic data available. Left ventricular hypertrophy was noted in 8 (57%) of 14 infants; hypertrophy usually was noted near the end of the treatment course. Five of these eight affected infants died; the hypertrophic cardiomyopathy was considered to have contributed to mortality in three of these five infants. They speculate that prolonged dexamethasone treatment for chronic lung disease (CLD) is associated with hypertrophic cardiomyopathy in a significant portion of preterm infants [55].

Also, twenty preterm infants were studied serially with Doppler echocardiography to document changes in myocardial thickness associated with dexamethasone treatment for chronic lung disease. Ventricular septa and left ventricular posterior wall thickness was increased in all 11 infants in whom it was measured. The median increase was 0.9 and 0.8 mm, respectively. In most infants this increase was small, less than 1 mm, however two infants developed marked septal hypertrophy with Doppler evidence of left ventricular outflow tract obstruction. In addition, myocardial hypertrophy occurs in most infants and in some of them it was severe [56].

Furthermore, eighteen children treated for infantile spasms with high-dose of adenocorticotropin were evaluated for adverse effects of corticosteroid on the heart. Abnormal ventricular hypertrophy occurs in the majority of these patients. Many of these patients developed hypertrophic cardiomyopathy with dramatic asymmetric septal hypertrophy. Abnormal cardiac hypertrophy was seen in 13 (72%) of 18 patients. Five of 18 patients developed hypertrophic cardiomyopathy with asymmetric septal hypertrophy and concentric left ventricular hypertrophy was seen in eight patients [57].

doi: 10.1588/medver.2004.01.00024

000217

*M.A. Al-Bayati/Medical Veritas 1 (2004) 179–200*                195

### 6.5 Corticosteroid causes hypertension, diabetes, and other systemic problems

Dexamethasone treatment of preterm infants started within the first 4 days of life has been shown to cause metabolic disturbances, cardiac hypertrophy, reduced growth and gastrointestinal perforation. Nineteen randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth in high-risk preterm infants were reviewed. Gastrointestinal bleeding and intestinal perforation were important adverse effects and the risks of hyperglycemia and hypertension were also increased [38, 39].

In addition, a multi-center, randomized, placebo controlled, blinded study was carried out in 18 neonatal intensive care units in Israel to study the effect of early postnatal dexamethasone (days 1-3). The study consisted of 248 infants (dexamethasone n = 132; placebo n = 116). Gastrointestinal hemorrhage, hypertension, and hyperglycemia were more common in dexamethasone treated infants [59]. Furthermore, 21 randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth (early) enrolling a total of 3072 preterm infants were reviewed. Gastrointestinal bleeding and intestinal perforation were noted adverse effects and the risks of hyperglycemia and hypertension also increased [40].

The magnitude and duration of the effect of dexamethasone on systolic blood pressure has also been examined in 13 preterm infants (median gestational age 25 weeks). All had chronic lung disease (CLD). To exclude any effect of CLD on blood pressure each infant acted as his or her own control. Systolic blood pressure increased in all infants ($p < 0.01$) and remained elevated for at least 48 hours following cessation of therapy. The median maximum increase in blood pressure was 24 mmHg (range 13-49 mmHg) and occurred on day 4 (median, range 2-10) of treatment. One infant also developed hypertensive encephalopathy. These results demonstrate the need to monitor infants with CLD throughout steroid therapy and preferably for some days after treatment has ceased [60].

Furthermore, randomized controlled trials of postnatal corticosteroid treatment from 7-14 days of birth in high-risk preterm infants were reviewed. Adverse effects included: hypertension, hyperglycemia, gastrointestinal bleeding, hypertrophic cardiomyopathy and infection [61]. In addition, nine trials enrolling a total of 562 infants were reviewed to determine the adverse reactions of late (usually > 3 weeks) postnatal corticosteroid treatment vs. control (placebo or nothing). Short-term adverse affects included glycosuria and hypertension. There was also an increase in severe retinopathy of prematurity [62].

Also, randomized controlled trials of postnatal corticosteroid treatment initiated at > 3 weeks of age in preterm infants with CLD were evaluated. Short-term adverse affects included hyperglycemia, glycosuria and hypertension. There was also an increase in severe retinopathy of prematurity [41].

The influence of dexamethasone (0.25 mg/kg I.V. twice daily) on diuresis in preterm infants was also studied in 15 preterm infants at risk for chronic lung disease. Urine output, blood glucose, serum urea, serum creatinine, serum sodium and serum potassium, as well as systolic, diastolic and mean arterial pressure were measured on the day before, and on 4 consecutive days after starting treatment with dexamethasone (0.25

mg/kg I.V. twice daily). The authors found an increase of diuresis of 30 mL/kg per day, 48-96 hours after starting dexamethasone treatment. This coincided with a gradual but significant increase of serum urea levels and arterial pressure [63].

These findings suggest that the increased urine output following dexamethasone treatment might be caused by two factors: (1) pressure diuresis induced by the increase of arterial pressure and (2) an increase of the osmolar load to the kidney due to an increase of serum urea. This study demonstrates that a significant increase of diuresis occurs in preterm infants, 48-96 hours after starting dexamethasone [63].

Furthermore, a study conducted in the U.S. showed that dexamethasone therapy in newborns for a period of a week or longer was associated with suppression of the hypothalamic-pituitary-adrenal axis (HPAA) in a substantial number of premature infants [32].

Also, Riikonen and Donner evaluated 162 children with infantile spasms who were treated with ACTH. In a large proportion (37%) of the children, the treatment caused pronounced side effects with a mortality rate of 4.9%. The most common complications were infections: septic infections, pneumonias, and urinary and gastrointestinal infections. Other side effects were arterial hypertension (11), osteoporosis (2), hypokalemic alkalosis (2), and other marked electrolyte disturbances (10) [47].

### 6.6 Corticosteroid increases the risk for infections in infants

Vermillion et al. performed a non-concurrent prospective analysis of singleton pregnancies delivered between 24 and 34 weeks of gestation after antenatal betamethasone exposure. Patients were categorized into two groups according to betamethasone exposure: (1) two 12-mg doses in a 24-hour interval on admission (single-course group) and (2) repeated dosing after the initial single course (multiple-course group). A total of 453 patients were included, with 267 in the single-course group and 186 in the multiple-course group. Multiple courses of antenatal betamethasone are associated with increased risks of perinatal infectious morbidity and neonatal death [64].

Also, a total of 371 low birth weight infants were enrolled in the trial. For the first 14 days of study, 182 infants received dexamethasone (group I) and 189 infants were given placebo (group II). Infants who received a 14-day course of dexamethasone initiated at 2 weeks of age were more likely to develop a bloodstream or cerebrospinal fluid infection while on dexamethasone therapy than were those who received placebo [65]. In a second study, the medical records of 158 premature infants were evaluated. Seventy-five infants (58%) received antenatal steroids and 88 infants (68%) received postnatal steroids. Sepsis developed in 44 (34%) infants and fungal sepsis in 14 (11%) [66].

Furthermore, potential side effects of antenatal administration of corticosteroids to prevent neonatal respiratory distress syndrome were evaluated in 10 to 12-year-old children whose mothers had participated in a randomized, double-blind, placebo-controlled trial of betamethasone. In the corticosteroid group, more hospital admissions were reported due to infectious diseases during the first years of life [67].

doi: 10.1588/medver.2004.01.00024

000218

196                                          M.A. Al-Bayati/Medical Veritas 1 (2004) 179–200

### 6.7 Corticosteroid causes retinopathy and other vision problems in patients

Medical records of 158 premature infants were studied. Seventy-five infants (58%) received antenatal steroids and 88 infants (68%) received postnatal steroids. Incidence of retinopathy of prematurity (ROP) was 77% (100/130) and severe ROP (stage $\geq$ 3) was reported in 52% (68). Postnatal steroid use is an independent risk factor for development of severe ROP [66].

Development of central serious chorioretinopathy (CSC) following the administration of corticosteroids by diverse routes is a well-known fact. Schalenbourg et al. reported acute visual loss after the use of systemic corticosteroids in three patients to treat long-standing ocular inflammatory disorders [68]. Furthermore, Spraul et al. evaluated five patients who developed maculopathy during treatment with systemic corticosteroids. Three patients displayed focal and two patients showed diffuse retinal pigment epithelial changes comparable to the acute and chronic form of CSC, respectively. Four of five patients had a complete visual recovery after decrease or cessation of treatment with corticosteroids. The authors concluded that systemic treatment with corticosteroids may damage the posterior blood-retinal barrier, leading to CSC [69].

In addition, Chaine et al. described fourteen cases of detachment of the macula due to CSC in patients given long-term steroid therapy. None of the patients had hypertension. Detachment occurred between 6 days and 10 years after the start of steroid treatment. The higher the doses, the earlier the onset of ocular disease appeared. All patients were symptomatic, with rapid onset of blurred vision. Detachment was bilateral in two cases [70]. Also, Song et al. reported five patients who were diagnosed as having CSC during systemic corticosteroid treatment based on medical records and fluorescein angiography [71].

### 7. Brian Herlihy's jury trial and analysis of the evidence presented

Brian Herlihy's jury trial was held in the Eighth Judicial Circuit in Alachua County, Florida on September 10, 2002. Trial lasted sixteen days (Case No. 01-2000-CF-2753-A) and the Honorable Judge Martha Ann Lott presided over this trial. Attorneys Jeanne Singer and Stephen Pennypacker represented the State, and attorneys Gordon Groland and John Tedder represented the defendant [2; 4; 7; 11; 22; 26; 27; 30; 31; 72:311-435, 1369-1503, 1504-1673, 1674-1787, 1788-1961, 1962-2088, 2089-2176, 2177-2267, 2268-2432, 2433-2522, 2523-2534].

The State claimed that Baby Robert was perfectly fine and that there was absolutely nothing wrong with him when his mother brought him to Brian's apartment shortly after 0900 on August 2, 2000. In addition, the State alleged that Baby Robert was never lethargic or anxious from the time of his birth until the morning of August 2, 2000. The State asserted that while Baby Robert was alone with the Brian Herlihy, the baby suffered from violent shaking which ultimately resulted in fatal neurological damage and his death. The State furthermore claimed that Brian punished Baby Robert because the baby was

crying and had annoyed, maddened, and frustrated him [72:2226].

Several physicians and the medical examiner examined the baby on August 2nd through 10th and they did not find any sign of injuries on the baby's head or body that was caused by trauma or abuse. Brian has stated to the police numerous times that he is innocent and that he took very good care of the baby. Brian also had cared for Baby Robert about five times in the past, for several hours per day and the baby had been fine [11]. However, Brian Herlihy was convicted of manslaughter in the death of baby Robert and sentenced to 15 years in prison.

I reviewed the medical evidence and trial documents related to this case. I found that the State did not present any medical evidence that showed Brian Herlihy harmed Baby Robert nor that Robert's injuries were caused by violent shaking and trauma. My investigation furthermore revealed that the baby was suffering from serious health problems prior to August 2, 2000 that led to his respiratory arrest, neurological damage, and his death in August of 2000.

The medical examiner and seven physicians testified as expert witnesses for the State. Two physicians testified as experts for the defense. The physicians that testified for the State in this case included: (1) a forensic pathologist, (2) an emergency medicine specialist, (3) a pediatrician/intensive care specialist; (4) a neuropathologist, (5) a pediatric neurologist, (6) a pediatric ophthalmologist, (7) a pediatrician, and (8) an obstetrician/gynecologist. The physicians who testified for the defense are Dr. John Plunkett, forensic pathologist and Dr. Ronald Henry Uscinski, neurosurgeon.

### 7.1 The testimonies given by the State's expert witnesses are based upon theory

The medical examiner and the State's expert witnesses alleged that Baby Robert's respiratory arrest, neurological damage, and death were caused by violent shaking while he was with Brian Herlihy prior to 0937 on August 2, 2000. My review of the medical evidence described in the previous five sections of this report clearly shows that Baby Robert suffered from chronic health problems (chronic subdural bleed, retinal hemorrhage, brain atrophy, atrophy of the thymus, diabetes, muscle weakness, and sinus and ear infections) that led to his seizure and his respiratory arrest on August 2, 2000.

Robert's serious health problems were caused by his treatment with corticosteroid. In addition, the vaccines given to Baby Robert contributed to his health problems. I described the adverse reactions to vaccines and corticosteroids in Sections 3 and 6 of this report. None of these physicians considered adverse reactions to corticosteroids and vaccines in their evaluation of this case. In addition, none of these physicians reviewed the baby's prenatal and postnatal medical records to learn about Robert's pre-existing chronic health problems.

My review of the medical evidence furthermore revealed that several of these physicians were aware that Baby Robert suffered from chronic health conditions such as a chronic subdural bleed, brain atrophy, and sinus and ear infections. However, they did not make any attempt to investigate the links between the baby's chronic illnesses and his respiratory arrest on the morning of August 2nd, 2000. The following is a list of

doi: 10.1588/medver.2004.01.00024

000219

Case 1:09-cv-0005   P-GRJ   Document 21-50   Filed   22/11   Page 125 of 159

medical evidence that shows the State's expert witnesses conducted an incomplete medical investigation in this case. They blindly rushed to judgment and their conclusions are invalid and unsupported by the medical facts pertaining to this case.

(1) The emergency team, several physicians, and the medical examiner examined the baby on August 2nd through 10th and they did not find any sign of injuries on the baby's head or body that was caused by trauma or abuse.

(2) The four cerebral CT scans taken on August 2nd through 4th showed that Baby Robert suffered from a chronic subdural bleed. However, none of the physicians who testified for the State ever investigated the causes of the bleed. Furthermore, the medical examiner did not take a sample from the dura to examine microscopically in order to date the bleed. The data described in Section 6 of this report show that prenatal and postnatal treatments of infants with corticosteroid caused hypertension, hyperatrophic cardiomyopathy, encephalopathy, and increased capillary fragility, which can lead to subdural bleeding.

(3) The treating physician and the neuropathologist were both aware that Baby Robert suffered from brain atrophy but they did not investigate the cause(s) of the atrophy or the link between the atrophy and the baby's seizure and his respiratory arrest that occurred on August 2nd. The treating physician stated, "The baby had a smaller brain than the size of the skull, meaning that there was probably some atrophy or wasting of the surface of the brain or that the brain was not growing as rapidly as it should have been [31]." The neuropathologist said that Robert's brain was an immature brain and it was inconsistent with a brain of a child of four and a half months of age [30].

Baby Robert suffered from severe thymic atrophy which indicates that he was treated with high doses of corticosteroid. It has been reported that premature infants treated with dexamethasone exhibited a 30% reduction in total cerebral tissue volume compared with total cerebral tissue volume in both premature infants not treated with dexamethasone and the control term infants [34]. Furthermore, dexamethasone given postnatally to infants has been shown to increase the risk of neurologic impairment, neurodevelopmental disability, and the rate of cerebral palsy in preterm infants and later in survivors [35-37].

(4) The lesions observed in the brain were edema and cell necrosis. They were caused by severe global anoxia and ischemia and not by trauma. Brian found the baby was not breathing at 0937 on August 2nd. The treating physician also found the baby was not breathing well and the endotracheal tube was hot in place at about 1100 because the baby was suffering from a severe seizure and his tongue was very stiff. His color was gray and ashen [26]. The baby had been suffering from anoxia for at least 60 minutes. This lack of oxygen also caused heart injury as explained in Section 4.

(5) Baby Robert's pediatrician stated in the trial that the baby was normal. However, his examinations showed that the baby suffered from excessive weight gain, polyurea, muscle weakness in the neck region, neurological problems, and possible vision problems. For example, on April 19, 2000, the pediatrician reported that the baby gained eight ounces (227 g) in two days and he would have gained two ounces (57 g) under normal circumstances. The baby's weight at 4½ months was more than 300% his body weight at birth (Table 2).

In addition, the baby's tracking with his eyes was not consistent following an object more than one hundred degrees. The baby also had poor head and neck control, decreased muscle tone in the shoulders and neck, and tight hip flexors [11]. Robert's serum creatinine levels measured on August 2nd and 3rd showed that the baby was suffering from a muscle-wasting problem. His serum creatinine levels were less than 25% of normal (Table 7). It is clear that Robert was suffering from adverse reactions to corticosteroid as described in Section 6. However, the pediatrician overlooked the connection between the baby's treatment with corticosteroid and his symptoms.

(6) The medical examiner found that the weight of Robert's thymus was 4 grams, which is about 20% of the normal weight. However, he stated that Robert's thymus was normal. The average thymus weight in a white, infant male at three and six months of age was found to be 20 and 25 g, respectively [13]. Baby Robert was 4½ months old and his thymus weight should have been about 22.5 g. Treatment with corticosteroid causes immune depression as measured by the reduction in the size and the function of the lymphoid tissues. It is obvious that the medical examiner overlooked an important biological indicator that showed the baby was suffering from a severe adverse reaction to corticosteroid.

(7) The Pediatric Ophthalmologist examined the baby's eyes and found retinal hemorrhage, white spots in the back of the eye, which he called "Purtscher's retinopathy," and a crack in the back of the eye which he called a choroidal rupture. He claimed that these lesions were caused by trauma, however his examination of the eyes and eyelids did not reveal any sign of external injuries caused by trauma.

I presented the findings of several studies in Section 6 of this report that show the treatment of children and adults with corticosteroid caused retinopathy, increased capillary fragility, hypertension, and diabetes. Hypertension and diabetes have also been known to cause retinopathy. The baby suffered from severe thymic atrophy that indicates he was treated with high doses of corticosteroids. In addition, the clinical data presented in Section 4 show that Baby Robert suffered from diabetes. It is very clear that the Pediatric Ophthalmologist overlooked crucial medical evidence that showed the link between the baby's treatment with corticosteroids and the lesions observed in the retina.

## 8. Conclusions and Recommendations

Baby Robert suffered from gastrointestinal disturbance, reduction in food intake, polyurea, excessive weight gain, myopathy, neurological problems, brain atrophy, chronic subdural and retinal hemorrhage, vision problems, atrophy of the thymus, diabetes, and sinus and ear infections. These symptoms

doi: 10.1588/medver.2004.01.00024

000220

and lesions have been described in preterm infants treated with high therapeutic doses of corticosteroid (Section 6).

Robert was born four weeks premature and his mother was treated with betamethasone (corticosteroid) during the last week of her pregnancy. She developed diabetes as a result of this treatment. Robert's thymus weight at autopsy was less than 20% of normal which indicates that he was also treated with high doses of corticosteroids. Thymus weight is a very sensitive biomarker for the exposure to corticosteroids.

In addition, Baby Robert was exposed to micronase during his first three months of life. Robert's mother developed diabetes as a result of her treatment with corticosteroid and she was treated with micronase. Micronase is not recommended as a treatment in nursing mothers due to the risk of causing hypoglycemia in infants. However, she breast-fed Robert during her treatment with micronase.

Furthermore, the baby was given six vaccines at two months of age and he was re-vaccinated again with these six vaccines at four months of age. At that time he was suffering from severe immune depression as indicated by his thymus weight. These vaccines increased his susceptibility to develop infections. The baby suffered from sinus and ear infections as shown by his cerebral CT scans taken on August. 2nd. Also, DTP vaccines have been known to increase the risk of developing neurological disorders in children, such as encephalopathy or complicated convulsion(s).

Baby Robert suffered from respiratory arrest on August 2, 2000 between 0920 and 0935. The events that led to his respiratory arrest can be explained as follows: (1) Baby Robert suffered from a seizure prior to 0935 and his seizure resulted from a neurological problem and brain atrophy caused by his prenatal and postnatal treatment with corticosteroids. In addition, the vaccines received on July 19, 2000 might have played a role in triggering Robert's seizure. (2) The severe seizure caused the baby to vomit and that blocked his airways with fluids which subsequently led to his respiratory arrest. The baby vomited a significant amount of formula like fluid and the paramedic used a vacuum to suck about 10 mL of formula from his airway. The baby had been fed about 8 ounces of formula milk within 30 minutes prior to his seizure. (3) Baby Robert suffered from respiratory arrest for at least 60 minutes and that led to severe anoxia, which caused brain and cardiac damage.

The cerebral CT scan taken on August 2nd at 1028 showed that Robert had a multi-generation subdural bleed. The fresh bleed was estimated to be 20-25% of the total bleed. The occurrence of the fresh bleed in the subdura on August 2nd can be explained by the synergistic actions of several factors that included the following: (1) the presence of previous vascular injury in the subdura which led to re-bleeding; (2) Robert suffered from a severe seizure that caused an increase in intracranial pressure; (3) Robert had an elevated heart rate and that led to an increase in the blood pressure; and (4) Robert's pulse rate was 172 at 0938 on August 2nd and injection of relatively large volumes of fluid intravenously led to an increase in the blood volume and an increase in the blood pressure.

The retinal bleed and other retinal vascular changes that were observed by the Pediatric Ophthalmologist on August 2nd can be explained by Robert's treatment with corticosteroid and diabetes. These conditions have been known to cause retinopathy and retinal bleeding as described in Section 6.

The medical examiner and the State's expert witnesses alleged that Baby Robert's respiratory arrest, neurological damage, and death were caused by violent shaking during his stay with Brian Herlihy prior to 0937 on August 2, 2000. However, the emergency teams, several physicians, and the medical examiner examined the baby on August 2nd through August 10th and did not find any sign of injuries on the baby's head or body caused by trauma or abuse.

In addition, none of these physicians reviewed the baby's prenatal and postnatal medical records to learn about his pre-existing health problems, his treatment with corticosteroid, or his adverse reactions to vaccines. Also, my review of the evidence in this case has revealed that some of these physicians were aware that Baby Robert suffered from chronic health conditions such as a chronic subdural bleed, brain atrophy, and sinus and ear infections. However, they made no attempt to investigate the links between the baby's chronic illnesses and his respiratory arrest on the morning of August 2, 2000. Presented in Section 7 of this report is a comprehensive list of medical evidence that shows the State's expert witnesses conducted an incomplete medical investigation in this case.

The extensive medical evidence presented in this report clearly shows that Baby Robert died as a result of adverse reactions to corticosteroid and vaccines and that Brian Herlihy is innocent. The evidence also shows that Brian was convicted and imprisoned due to sloppy and incomplete medical investigations. I believe that the State of Florida has the responsibility to review the evidence presented in this report. Furthermore, it is my opinion that the State has the obligation to take immediate action to free Brian from prison. Brian should be reimbursed for all legal expenses incurred in addition to being compensated for his pain and suffering.

The objective of the State and that of physicians should be to focus on determining the factual causes that lead to the illness and death of a child so that they can prevent such problems from happening to other children. Accusing innocent people of abusing and killing children based upon unsupported theory, as it happened in this case, will not prevent the death of other children by vaccines and adverse reactions to medications. However, it certainly places innocent people in prison and causes great suffering. It also costs taxpayers huge sums of money to pay for unnecessary trials and legal fees.

I spent approximately 280 hours evaluating the medical evidence in order to find the factual causes of injuries and death in this case and to write this detailed report. I have also evaluated three other cases from the USA within a 12-month period involving children who died as a result of adverse reactions to medications and vaccines. In these cases, either their parents or their caretakers were falsely accused of killing the children and imprisoned due to false allegations of Shaken Baby Syndrome.

It is my hope that the State of Florida, our federal government, physicians, and our society will take the time to review the evidence presented in the cases that I have evaluated. It is imperative that prompt action is taken to re-evaluate the Shaken Baby Syndrome theory. This theory is not supported by science. Differential diagnosis should and must be used in order to

doi: 10.1588/medver.2004.01.00024

000221

solve complicated medical problems as I have used in these cases to find the factual causes of the injuries and death.

## References

[1] Mother's medical record from Dr. Richard Kreinest's office, Alliance Medical Practice-Women Health Center, Gainesville, Florida.

[2] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume II, September 10, 2002:108-310.

[3] Elizabeth Talaga's report, CPT medical examination of baby Robert (Shands MR # 01244463), Department of Pediatrics, University of Florida, Gainesville, FL, August 14, 2000.

[4] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume IX, September 17, 2002:1099-204.

[5] Physicians' Desk Reference, Edition 53, 1999. Medical Economics Company, Inc, Montavale, NJ, USA.

[6] Merlob P, Levitt O, and Stahl B. Oral antihyperglycemic agents during pregnancy and lactation: a review. Paediatr Drugs. 2002; 4(11):755-60.

[7] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume I, September 10, 2002:1-107.

[8] Baby Robert's Medical Records from Shands Hospital and Laboratories at the University of Florida. Gainesville, Florida 32610, August 2-10, 2000.

[9] Nelson Textbook of Pediatrics. Edited by Behrman RE, Kliegman RM, Jenson HB..16th Edition, W.B. Saunders Company, Philadelphia, 2000.

[10] Baby Robert's Medical Records, reported by Dr. John Helirung, Shands Health Care, Gainesville, Florida.

[11] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume VII, September 13, 2002:835-961.

[12] Postmortem Examination of the body of Baby Robert (ME00-297) by William F. Hamilton, M.D. on August 10, 2000.

[13] Altman PL and Dittmer DS. Growth including reproduction and morphological development. Federation of American Societies for Experimental Biology, USA, 1962.

[14] Sen S, Cloete Y, and Hassan K, Buss P. Adverse events following vaccination in premature infants. Acta Paediatr, 2001;90(8):916-20.

[15] Sanchez PJ, Laptook AR, Fisher L, Sumner J, Risser RC, and Perlman JM. Apnea after immunization of preterm infants. J Pediatr, 1997; 130(5):746-51.

[16] Botham SJ, Isaacs D, and Henderson-Smart DJ. Incidence of apnoea and bradycardia in preterm infants following DTPw and Hib immunization: a prospective study. J Paediatr Child Health, 1997;33(5):418-21.

[17] Slack MH, and Schapira D. Severe apnoeas following immunisation in premature infants. Arch Dis Child Fetal Neonatal Ed. 1999;81(1):F67-8.

[18] Botham SJ, and Isaacs D. Incidence of apnoea and bradycardia in preterm infants following triple antigen immunization. J Paediatr Child Health, 1994;30(6):533-5.

[19] Braun MM, Mootrey GT, Salive ME, Chen RT, and Ellenberg SS. Infant immunization with acellular pertussis vaccines in the United States: assessment of the first two years' data from the Vaccine Adverse Event Reporting System (VAERS). Pediatrics, 2000;106(4):E51.

[20] Deposition of Firefighter Dennis Meredith. State of Florida vs. Brian Herlihy, Defendant. In the Circuit Court of the Eight Judicial Circuit, in and for Alachua County, Florida. Case No.: 2000-2753-CFA. February 22, 2001:1-13.

[21] Incident report (# 015394), Alachua County Fire/Rescue's report. Gainesville, FL 32602, August 2, 2000.

[22] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume IV, September 11, 2002:436-568.

[23] Deposition of Firefighter Kenneth A. Johnson. State of Florida vs. Brian Herlihy, defendant. In the Circuit Court of the Eight Judicial Circuit, in and for Alachua County, Florida. Case No.: 2000-2753-CFA. February 22, 2001:1-20.

[24] Incident Report in Case of Robert Q., Gainesville Fire Rescue Department, 1026 NE 14th Street Building B, Gainesville, FL, August 2, 2002.

[25] Deposition of Ronald G. Quisling, M.D. State of Florida vs. Brian Herlihy, defendant. In the Circuit Court of the Eight Judicial Circuit, in and

for Alachua County, Florida. Case No.: 2000-2753-CFA. April 8, 2002:1-45.

[26] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume V, September 12, 2002:569-674.

[27] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume X, September 17, 2002:1205-368.

[28] Stephen J. Nelson, letter to Dr. William F. Hamilton on October 23, 2000. District Medical Examiner, 2145 Marshall Edwards Drive, Bartow, Florida.

[29] Michael D. Bell, M.D., report describing the gross and microscopic lesions in Baby Robert's eyes. Florida Lions eye bank, Inc. September 7, 2000.

[30] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume VIII, September 13, 2002:962-1098.

[31] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume VI, September 12, 2002:675-834.

[32] Alkalay AL, Klein AH, Nagel RA, Pomerance JJ. Evaluation of hypothalamic-pituitary-adrenal axis in premature infants treated with dexamethasone. Am J Perinatol, 1996 Nov;13(8):473-7.

[33] Harrison's Principles of Internal Medicine. 14th edition. Editors: Fauci AS, Braunwald E, Isselbacher KJ, Wilson JD, Martin JB, Kasper DL, Hauser SL, and Longo DL. McGraw-Hill, New York, 1998.

[34] Murphy BP, Inder TE, Huppi PS, Warfield S, Zientara GP, Kikinis R, and Jolesz FA, Volpe JJ. Impaired cerebral cortical gray matter growth after treatment with dexamethasone for neonatal chronic lung disease. Pediatrics, 2001 Feb;107(2):217-21.

[35] O'Shea TM and Doyle LW. Perinatal glucocorticoid therapy and neurodevelopmental outcome: an epidemiologic perspective. Semin Neonatol, 2001 Aug;6(4):293-307.

[36] Rajadurai VS, and Tan KH]. The use and abuse of steroids in perinatal medicine. Ann Acad Med Singapore, 2003 May;32(3):324-34.

[37] Oroneck P. Perinatal glucocorticosteroid therapy: time for reconsideration. Z Geburtshilfe Neonatol, 2001 Nov-Dec; 205(6):231-5.

[38] Halliday HL. The effect of postnatal steroids on growth and development. J Perinat Med, 2001;29(4):281-5.

[39] Halliday HL, Ehrenkranz RA. Early postnatal (<96 hours) corticosteroids for preventing chronic lung disease in preterm infants. Cochrane Database Syst Rev, 2001;(1):CD001146.

[40] Halliday HL, Ehrenkranz RA, and Doyle LW. Early postnatal (<96 hours) corticosteroids for preventing chronic lung disease in preterm infants. Cochrane Database Syst Rev, 2003;(1):CD001146.

[41] Halliday HL and Ehrenkranz RA. Delayed (>3 weeks) postnatal corticosteroids for chronic lung disease in preterm infants. Cochrane Database Syst Rev, 2000;(2):CD001145.

[42] Yeh TF, Lin YJ, Huang CC, Chen YJ, Lin CH, Lin HC, Hsieh WS, Lien YJ. Early dexamethasone therapy in preterm infants: a follow-up study. Pediatrics, 1998 May;101(5):E7.

[43] Shinwell ES, Karplus M, Reich D, Weintraub Z, Blazer S, Bader D, Yurman S, Dolfin T, Kogan A, Dollberg S, Arbel E, Goldberg M, Gur I, Naor N, Sirota L, Mogilner S, Zaritsky A, Barak M, and Gottfried E. Early postnatal dexamethasone treatment and increased incidence of cerebral palsy. Arch Dis Child Fetal Neonatal Ed, 2000 Nov; 83(3):F177-81.

[44] Postnatal corticosteroids and sensorineural outcome at 5 years of age. J Paediatr Child Health, 2000 Jun;36(3):256-61.

[45] Bos AF, Dibiasi J, Tiessen AH, Bergman KA. Treating preterm infants at risk for chronic lung disease with dexamethasone leads to an impaired quality of general movements. Biol Neonate, 2002;82(3):155-8.

[46] Lagenstein I, Willig RP, Kuhne D. Cranial computed tomography (CCT) findings in children treated with ACTH and dexamethasone: first results. Neuropediatrie, 1979 Nov;10(4):370-84.

[47] Riikonen R and Donner M. ACTH therapy in infantile spasms: side effects. Arch Dis Child, 1980 Sep;55(9):664-72.

[48] Buonocore G, Perrone S, and De Marco L. Pre- and post-natal corticosteroids: side effects. Acta Biomed Ateneo Parmense, 2000;71(Suppl 1):413-9.

[49] Whitelaw A, and Thoresen M. Antenatal steroids and the developing brain. Arch Dis Child Fetal Neonatal Ed, 2000 Sep;83(2):F154-7.

[50] Aghajafari F, Murphy K, Matthews S, Ohlsson A, Amankwah K, and Hannah M. Repeated doses of antenatal corticosteroids in animals: a systematic review. Am J Obstet Gynecol, 2002 Apr;186(4):843-9.

doi: 10.1588/medver.2004.01.00024

200                                                                M.A. Al-Bayati/Medical Veritas 1 (2004) 179–200

[51] Huang WL, Harper CG, Evans SF, Newnham JP, and Dunlop SA. Repeated prenatal corticosteroid administration delays myelination of the corpus callosum in fetal sheep. Int J Dev Neurosci, 2001 Jul;19(4):415–25.

[52] Quinlivan JA, Archer MA, Dunlop SA, Evans SF, Beazley LD, and Newnham JP. Fetal growth retardation, particularly within lymphoid organs, following repeated maternal injections of betamethasone in sheep. J Obstet Gynaecol Res, 1998 Jun;24(3):173–82.

[53] Yunis KA, Bitar FF, Hayek P, Mroueh SM, and Mikati M. Transient hypertrophic cardiomyopathy in the newborn following multiple doses of antenatal corticosteroids. Am J Perinatol, 1999;16(1):17–21.

[54] Miranda-Mallea J, Perez-Verdu J, Gasco-Lacalle B, Saez-Palacios JM, Fernandez-Gilino C, and Izquierdo-Macian I. Hypertrophic cardiomyopathy in preterm infants treated with dexamethasone. Eur J Pediatr, 1997 May;156(5):394–6.

[55] Israel BA, Sherman FS, and Guthrie RD. Hypertrophic cardiomyopathy associated with dexamethasone therapy for chronic lung disease in preterm infants. Am J Perinatol, 1993 Jul;10(4):307–10.

[56] Evans N. Cardiovascular effects of dexamethasone in the preterm infant. Arch Dis Child Fetal Neonatal Ed, 1994 Jan;70(1):F25–30.

[57] Bobele OB, Ward KE, and Bodensteiner JB. Hypertrophic cardiomyopathy during corticotropin therapy for infantile spasms. A clinical and echocardiographic study. Am J Dis Child, 1993 Feb;147(2):223–5.

[59] Shinwell ES, Karplus M, Zmora E, Reich D, Rothschild A, Blazer S, Bader D, Yurman S, Dolfin T, Kuint J, Milbauer B, Kohelet D, Goldberg M, Armon Y, Davidson S, Sirota L, Amitai M, Zaretsky A, Barak M, and Gottfried S. Failure of early postnatal dexamethasone to prevent chronic lung disease in infants with respiratory distress syndrome. Arch Dis Child Fetal Neonatal Ed, 1996 Jan;74(1):F33–7.

[60] Greenough A, Emery EF, and Gamsu HR. Dexamethasone and hypertension in preterm infants. Eur J Pediatr, 1992 Feb;151(2):134–5.

[61] Halliday HL and Ehrenkranz RA. Moderately early (7-14 days) postnatal corticosteroids for preventing chronic lung disease in preterm infants. Cochrane Database Syst Rev, 2000;(2):CD001144.

[62] Halliday HL and Ehrenkranz RA, Doyle LW. Delayed (>3 weeks) postnatal corticosteroids for chronic lung disease in preterm infants. Cochrane Database Syst Rev, 2003;(1):CD001145.

[63] Bos AF, van Asselt WA, and Okken A. Dexamethasone treatment and fluid balance in preterm infants at risk for chronic lung disease. Acta Paediatr, 2000 May;89(5):562–5.

[64] Vermillion ST, Soper DE, and Newman RB. Neonatal sepsis and death after multiple courses of antenatal betamethasone therapy. Am J Obstet Gynecol, 2000 Oct;183(4):810–4.

[65] Stoll BJ, Temprosa M, Tyson JE, Papile LA, Wright LL, Bauer CR, Donovan EF, Korones SB, Lemons JA, Fanaroff AA, Stevenson DK, Oh W, Ehrenkranz RA, Shankaran S, and Verter J. Dexamethasone therapy increases infection in very low birth weight infants. Pediatrics, 1999 Nov; 104(5):e63.

[66] Haroon Parupia MF and Dhanireddy R. Association of postnatal dexamethasone use and fungal sepsis in the development of severe retinopathy of prematurity and progression to laser therapy in extremely low-birth-weight infants. J Perinatol, 2001 Jun;21(4):242–7.

[67] Smolders-de Haas H, Neuvel J, Schmand B, Treffers PE, Koppe JG, and Hoeks J. Physical development and medical history of children who were treated antenatally with corticosteroids to prevent respiratory distress syndrome: a 10- to 12-year follow-up. Pediatrics, 1990 Jul;86(1):65–70.

[68] Schalenbourg A, Leys A, De Courten C, Coutteel C, and Herbort CP. Corticosteroid-induced central serous chorioretinopathy in patients with ocular inflammatory disorders. Klin Monatsbl Augenheilkd. 2002 Apr;219(4):264–7.

[69] Spraul CW, Lang GE, and Lang GK. Central serous chorioretinopathy in systemic therapy with corticosteroids. Ophthalmologe, 1997 Jun; 94(6):392–6.

[70] Chaine G, Haouat M, Menard-Molcard C, Favard C, Vignal-Clermont C, Camplachi-Tardy F, Massin P, Gaudric A, Badelon I, Nicolon L, Sabatier P, and Guillevin L. Central serous chorioretinopathy and systemic steroid therapy] J Fr Ophtalmol., 2001 Feb;24(2):139–46.

[71] Song E, Wakakura M, and Ishikawa S. Central serous chorioretinopathy induced by corticosteroids. Nippon Ganka Gakkai Zasshi, 1997 Mar; 101(3):257–64.

[72] State of Florida vs. Brian Patrick Hertiby in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume III, September 11, 2002:311–435, 1369–2534.

doi: 10.1588/medver.2004.01.00024



# Mohammed A. Al-Bayati
## PhD, DABT, DABVT
## Toxicologist & Pathologist

July 14, 2006

Re: Brian Herlihy's case

**To whom it may concern:**

I attest that I prepared the attached report (64-page) entitled "Analysis of Causes That Led to Baby Robert Benjamin Quirello's Respiratory Arrest and Death in August of 2000". I also attest that this report is accurate to the best of my knowledge.

Sincerely,

*[signature]* 07/14/2006

Mohammed A. Al-Bayati
Ph.D., DABT, DABVT
Toxicologist & Pathologist

2006 AUG 25 PH 3:03
J.K. "BUDDY" IRBY
CLERK OF COURTS
ALACHUA COUNTY FL.
FILED CK 45

---

Toxi-Health International
150 Bloom Dr., Dixon, CA 95620
E-Mail: maalbayati@toxi-health.com

Phone: (707) 678-4484
Fax: (707) 678-8505
http://www.toxi-health.com

000224



**Mohammed A. Al-Bayati**
**PhD, DABT, DABVT**
**Toxicologist & Pathologist**

# Analysis of Causes That Led to Baby Robert Benjamin Quirello's Respiratory Arrest and Death in August of 2000

**Mohammed Ali Al-Bayati**
**Ph.D., DABT, DABVT**
**Toxicologist & Pathologist**

**Toxi-Health International**
**150 Bloom Dr.**
**Dixon, CA 95620**

**Phone: (707) 678-4484**
**Fax: (707) 678-8505**

**maalbayati@toxi-health.com**
**http://www.toxi-health.com**



*Mohammed A.*
*Al-Bayati*
*07/14/2006*

**Date of preparation**

**May 21, 2004**

Toxi-Health International                    Phone: (707) 678-4484
150 Bloom Dr., Dixon, CA 95620              Fax: (707) 678-8505
E-Mail: maalbayati@toxi-health.com          http://www.toxi-health.com

000225

# Table of Contents

Title Page..............................................................................................1
Table of Contents...................................................................................2
List of Tables.........................................................................................4
Summary...............................................................................................5

**Section I. Review of Crystal Dawn Quirello's Medical Records
During Her Pregnancy With Robert and After Delivery.................................12**

I-A. Crystal's health condition during her pregnancy.......................................12
I-B. Crystal's premature labor and her treatment with corticosteroid...................13
I-C. Crystal's post delivery diabetes and her treatment with micronase...............13

**Section II. Review of Robert Quirello's Medical Records From
His Birth on March 22nd to August 2nd, 2000.....................................14**

II-A. Robert's treatment with corticosteroid and his exposure
to micronase in milk..............................................................14
II-B. Robert's symptoms induced by his treatment with
corticosteroid......................................................................14

II-B1. Polyurea......................................................................15
II-B2. Gastrointestinal and feeding problems............................................15
II-B3. Excessive weight gain............................................................15
II-B4. Muscle weakness.................................................................16
II-B5. Vision problems..................................................................17

II-C. Vaccines given to Baby Robert and his thymic atrophy............................17

II-D. Adverse reactions to vaccines given to Baby Robert................................19

**Section III. Review of Robert Quirello's Medical Records During His
Hospitalization on August 2nd Through 10th, 2000...........................22**

III-A. Case history and treatments given by the emergency
teams on August 2nd................................................................22

III-A1. History given by Brian Herlihy....................................22
III-A2. Treatment given by the emergency teams.........................23

III-B. Robert's symptoms and treatments given at Shands
Hospital on 8/2-10/2000.........................................................24

000226

III-B1. Treatment at the emergency room....................................24
III-B2. Head and neck region CT scan results
    taken on August 2nd through August 4th .............................24
III-B3. Robert's symptoms and treatment given
    at the PICU on the morning of August 2nd..........................25
III-B4. Robert's heart problem..............................................26
III-B5. Baby Robert's metabolic and hematology
    values during his hospitalization.....................................27
III-B6. Retinal bleed and other lesions observed in Robert's eyes.........30
III-B7. Treatments given to Baby Robert on
    August 2nd through the 10th ..........................................30

**Section IV. Review of the Medical Examiner's Autopsy Findings and Pathology
    Reports...................................................................33**

IV-A. External examination of Robert's body did not reveal bruises..............33
IV-B. The subdural hemorrhage indicates that the baby had
    pre-existing condition.................................................33
IV-C. The brain lesions indicate that the baby suffered from
    anoxia and ischemia..................................................33

IV-D. Bleeding in the eyes.................................................36
IV-E. Thymus atrophy......................................................36
IV-F. Robert's spleen weight appeared less than normal............................37
IV-G. Inadequate examination of the heart.............................................37

**Section V. Analysis of Clinical Events and Causes That Led to Baby Robert's
    Respiratory Arrest and Death.................................................38**

V-A. Events that led to Robert's respiratory arrest on August 2nd, 2000...........39
V-B. The biomechanisms of Robert's injuries.......................................40
V-C. Corticosteroids cause neurological problems in children.....................41

V-C1. Treatment with corticosteroid and neurological problems..........41
V-C2. The release of high levels of endogenous corticosteroid
    also causes neurological problems.....................................43
V-C3. Abnormal changes in the nervous system caused by
    corticosteroid can also be reproduced in experimental animals....44

V-D. Corticosteroid causes cardiomyopathy in infants..............................45
V-E. Corticosteroid causes hypertension, diabetes,
    and other systemic problems.............................................46
V-F. Corticosteroid increases the risk for infections in infants.....................48
V-G. Corticosteroid causes retinopathy and other vision problems in
    patients.................................................................49

3

000227

**Section VI.  Brian Herlihy's Jury Trial and Analysis of the Evidence Presented....50**

> VI-A. Analysis of the testimonies given by the State's expert witnesses.........51

**Section VII. Conclusions and Recommendations...........................................:..54**
**References..............................................................................................57**

## List of Tables

Table 1. Crystal's body weights during her pregnancy with Robert.........................12

Table 2. Robert's growth measurements from birth through August 2nd, 2000............16

Table 3. Robert's vaccination history..............................................................18

Table 4.  Compositions of vaccines administered to Baby Robert
two weeks prior to his respiratory arrest and seizure..................................18

Table 5. Baby Robert's vital signs between 0938 and 0958 on August 2nd, 2000..........24

Table 6.  Indicators of myocardial infarction in Baby Robert's blood.......................27

Table 7. Baby Robert's serum chemistry values on August 2nd and August 3rd............28

Table 8. Baby Robert's metabolic parameters measured following his
respiratory arrest...................................................................................28

Table 9. Baby Robert's hematology parameters measured following his
respiratory arrest...................................................................................29

Table 10. Partial list of medications given to
Baby Robert in Shands Hospital...................................................32

000228

## SUMMARY

Brian Herlihy is a 32-year-old, white man.  He was accused of, and arrested for killing
Baby Robert Benjamin Quirello by vigorous shaking in August of 2000. Robert was a
four and a half month-old infant, who suffered from respiratory arrest while at Brian's
apartment on the morning of August 2nd, 2000. That day, Robert's mother arrived at
Brian's apartment shortly after 0900. She asked him to watch the baby for a short time.
He had cared for the baby on five occasions in the past, for a few hours per day. On
August 3rd, 2000 Brian was arrested based on verbal communications between the
treating physicians and the police, while the baby was still alive in the hospital. The
treating physicians told the police that the baby was suffering from injuries caused by
shaking. Baby Robert died on August 10th, 2000.

Brian Herlihy's jury trial was held in the Eighth Judicial Circuit in Alachua County,
Florida on September 10th, 2002. His trial lasted sixteen days (Case No. 01-2000-CF-
2753-A). The State claimed that Baby Robert Quirello was perfectly fine and that
absolutely nothing was wrong with him when his mother brought him to Brian's shortly
after 0900 on August 2nd, 2000. The State asserted that while Baby Robert was alone with
Brian, he suffered from violent shaking which ultimately resulted in fatal neurological
damage and his death. The State furthermore claimed that Brian punished Baby Robert
because the baby was crying and that had annoyed, maddened, and frustrated him.

In addition, the State alleged that Baby Robert was never lethargic or anxious from the
time of his birth until the morning of August 2nd, 2000. Brian entered a plea of not guilty.
He stated that he took very good care of the baby and that he never harmed him in any
way. However, in September of 2002, Brian was convicted of involuntary manslaughter
in the death of Baby Robert and sentenced to 15 years in prison.

Brian Herlihy and his family requested that I evaluate the medical evidence in Baby
Robert's case in order to find the factual cause(s) that led to Robert's respiratory arrest
and death in August of 2000.  I evaluated Robert's case by reviewing: The medical
records of the mother during her pregnancy with him, Robert's medical records, autopsy
report, adverse reactions to medications and vaccines given to Robert, trial documents
and testimonies of expert witnesses, and the medical literature pertinent to this case.  I
used differential diagnosis to evaluate the contribution of agents relevant to this case and

5

the possible synergistic actions among agents in causing Robert's respiratory arrest, bleeding in the subdural space and retina, pathologic changes in the brain and other tissues, and his death.

I present my review of the mother's medical records during her pregnancy with Robert in Section I. Section II contains a review and analysis of Baby Robert's medical records from birth on March 22nd, 2000 up until the time of his respiratory arrest on August 2nd, 2000. I also elaborate upon and explain the adverse reactions to vaccines given to Robert in this section. In Section III, I illustrate the clinical events that occurred during Robert's eight-day stay in the hospitals following his respiratory arrest, and my analysis of these events.

Furthermore, my review and analysis of the medical examiner's autopsy report are presented in Section IV. In Section V, I define the pathogenesis of Robert's illnesses and their contributions to his respiratory arrest. I also describe adverse reactions to corticosteroids in infants. My review and analysis of the testimonies given by the State's expert witnesses are presented in Section VI. Section VII contains my conclusions and recommendations.

Robert's mother, Crystal Dawn Quirello was involved in a serious car accident on January 10th, 2000 when she was at 26th weeks of gestation. Her abdominal region was struck by the steering wheel and she experienced pain in her back, legs, and arms along with severe cramping. She was hospitalized at Alachua General Hospital (AGH) for about one week and released. Then she had premature labor at the 34th week of gestation. She spent eight days in labor and Robert was born four weeks premature on March 22nd, 2000 with a broken collarbone.

Robert's mother was treated with betamethasone (corticosteroid) during the last week of her pregnancy and due to this treatment Robert was exposed to corticosteroid in utero. It seems that Crystal developed diabetes as a result of her treatment with corticosteroid because she was treated with the anti-diabetic drug, micronase. Micronase is not recommended as a treatment in nursing mothers due to its risk of causing hypoglycemia in infants. However, she breast-fed Robert during her treatment with micronase.

6

Baby Robert suffered from serious health problems that resulted from his exposure to corticosteroid in utero and after birth. These include: gastrointestinal disturbance and reduction in food intake, polyurea, excessive weight gain, myopathy, neurological problems, brain atrophy, chronic subdural and retinal hemorrhage, vision problems, atrophy of the thymus, diabetes, and sinus and ear infections. These symptoms and lesions have been reported in infants treated with corticosteroids as I describe in Section V. However, none of the physicians who evaluated this case ever addressed this issue.

Furthermore, Baby Robert was given six vaccines on May 9th, 2000 and his vaccination with these six vaccines was repeated on July 19th. Premature babies are usually more susceptible to adverse reaction to vaccines than full term infants. Robert was born four weeks premature. Furthermore, vaccines should not be given to children treated with corticosteroid and other immunosuppressant agents. Robert suffered from severe thymic atrophy as a result of his treatment with corticosteroid and his thymus weight was less than 20% of normal for an infant of his age. Thymus weight is a very sensitive biomarker for exposure to corticosteroid.

The vaccines given to Robert increased his susceptibility to infections. The baby suffered from sinus and ear infections as shown by his cerebral CT scans taken on August 2nd. Also, DTP vaccines have been known to increase children's risk of developing neurological disorders, such as encephalopathy or complicated convulsion(s).

Baby Robert suffered from respiratory arrest on August 2nd, 2000 between 0920 and 0935 and the events that led to his respiratory arrest can be explained as follows: 1) Baby Robert suffered from a seizure prior to 0935 and his seizure resulted from a neurological problem and brain atrophy caused by his prenatal and postnatal treatment with corticosteroids. In addition, the vaccines received on July 19th, 2000 might have also played a role in triggering the seizure. 2) The severe seizure caused the baby to vomit and thereby blocked his airway with fluids, which subsequently led to his respiratory arrest. The baby vomited a significant amount of formula like fluid. In addition, the paramedic used a vacuum to remove about 10 mL of formula fluid from his mouth and nose. The baby had been fed approximately 8 ounces of formula milk within 30 minutes prior to his seizure.

Baby Robert suffered from respiratory arrest for at least 60 minutes and that led to severe anoxia, which caused brain and cardiac damage. In addition, the baby suffered from a chronic subdural bleed and retinal bleed as a result of his treatment with corticosteroid.

7

Corticosteroid given at high doses induces diabetes, hypertension, brain atrophy, and increases capillary fragility and abnormal vascular growth in the retina. Glucocorticoid causes hypertension and cardiovascular disease due to its capacity to promote sodium retention and increase blood pressure.

The cerebral CT scan taken on August 2nd, 2000 at 1028 showed that Robert had a multi-generation subdural bleed. The fresh bleed was estimated to be 20-25% of the total bleed. The occurrence of the fresh bleed in the subdural space on August 2nd can be explained by the synergistic actions of several factors. These include: 1) the presence of previous vascular injury in the subdura which led to re-bleeding. 2) Robert suffered from a severe seizure that led to an increase in the intracranial pressure. 3) Robert had an elevated heart rate and that led to increased blood pressure. Robert's pulse rate was 172 at 0938 on August 2nd. 4) Robert was given relatively large volumes of fluid by intravenous route and that can lead to an increase in the blood pressure.

The retinal bleed and other retinal vascular changes observed by Dr. Lawrence Levine on August 2nd can be explained by Robert's treatment with corticosteroid and diabetes. These conditions have been known to cause retinopathy and retinal hemorrhage as described in Section V.

The medical examiner and the State's expert witnesses alleged that Baby Robert's respiratory arrest, neurological damage, and death were caused by violent shaking while he was at Brian Herlihy's apartment prior to 0937 on August 2nd, 2000. However, none of these physicians reviewed the baby's prenatal and postnatal medical records to learn about his pre-existing health problems, his treatment with corticosteroid, or his adverse reactions to corticosteroid and vaccines.

Review of the medical evidence in this case revealed that some of these physicians were aware that Baby Robert was suffering from chronic health conditions such as a chronic subdural bleed, brain atrophy, and sinus and ear infections. However, they did not make any attempt to investigate the links between the baby's chronic illnesses and his respiratory arrest on the morning of August 2nd, 2000. The following is a list of medical evidence that verifies that the State's expert witnesses conducted an incomplete medical investigation in this case and that they rushed to judgment in accusing Brian. Their conclusions that the baby died as a result of shaking were based solely upon a theory and not on medical facts.

8

1) The emergency teams, several physicians, and the medical examiner examined the baby on August 2nd through August 10th and they did not find any sign of injuries on the baby's head or body that was caused by trauma or abuse.

2) The four cerebral CT scans taken from August 2nd through August 4th indicated that Baby Robert was suffering from a chronic subdural bleed. However, none of the physicians who testified for the State ever investigated the causes of the bleed. Furthermore, the medical examiner did not take a sample from the dura to be examined under the microscope in order to date the bleed. The data described in Section V of this report shows that prenatal and postnatal treatments of infants with corticosteroid have caused hypertension, hyperatrophic cardiomyopathy, encephalopathy, and an increase in capillary fragility; these conditions can lead to subdural bleeding. Robert had been treated with corticosteroid.

3) The treating physician, Dr. Dickison and the neuropathologist, Dr. Nelson were aware that Baby Robert suffered from brain atrophy but they did not investigate the cause(s) of the atrophy or the link between the atrophy and the baby's seizure and respiratory arrest that occurred on August 2nd. Dr. Dickison stated that "the baby had a smaller brain than the size of the skull, meaning that there was probably some atrophy or wasting of the surface of the brain or that the brain was not growing as rapidly as it should have been". Dr. Nelson also commented that "Robert's brain was an immature brain and it is inconsistent with a brain of a child of four and a half months of age".

It has been reported that premature infants treated with dexamethasone exhibited a 30% reduction in total cerebral tissue volume when compared to both control term infants and premature infants not treated with dexamethasone. Furthermore, dexamethasone administered postnatally to infants has demonstrated increased risk of neurologic impairment, neurodevelopmental disability, and the rate of cerebral palsy in preterm infants and later in survivors. Baby Robert was treated with high therapeutic doses of corticosteroid as indicated by the severity of his thymic atrophy.

9

4) At autopsy, the lesions observed in Robert's brain consisted of edema and cell necrosis, which were caused by severe global anoxia and ischemia and not by trauma. The baby was not breathing well for at least 60 minutes. Brian found the baby was not breathing at 0937 on August 2nd. Additionally, Dr. Dickison found the baby was not breathing well at approximately 1100 because the baby was suffering from a severe seizure and his tongue was very stiff blocking the airways.

5) Dr. John Hellrung, Baby Robert's pediatrician stated during Brian's trial that the baby was normal. However, his examinations showed that the baby suffered from excessive weight gain, polyurea, muscle weakness in the neck region, neurological and possible vision problems. The baby had poor head and neck control, decreased muscle tone in the shoulders and neck, and tight hip flexors. In addition, the baby's tracking with his eyes was not consistent following an object more than a hundred degrees. These symptoms have been reported in infants treated with corticosteroid.

6) Dr. Hamilton, the medical examiner found that the weight of Robert's thymus was 4 grams, which is about 20% of normal. However, he stated that Robert's thymus was normal. The average thymus weight (g) in a white infant male at Robert's age (4-1/2-month old) is expected to be about 22.5g. The treatment with corticosteroid causes immune depression as measured by the reduction in the size and the functions of the lymphoid tissues. It is clear that the medical examiner overlooked an extremely important biological indicator that showed Baby Robert was suffering from severe adverse reactions to corticosteroid.

7) Dr. Lawrence Levine examined the baby's eyes and found retinal hemorrhage, white spots in the back of the eye, (which he called "Purtscher's retinopathy"), and a crack in the back of the eye, (which he referred to as a choroidal rupture). He claimed that the above lesions were caused by trauma, but his examination of the eyes and eyelids did not reveal any sign of external injuries caused by trauma.

The findings of several studies in Section V show that the treatment of children and adults with corticosteroid caused retinopathy, hypertension, diabetes, and increased capillary fragility. Hypertension and diabetes are also known to cause retinopathy. The baby was treated with high doses of corticosteroid and suffered from diabetes. It is very clear that Dr. Levine overlooked crucial medical evidence

10

that demonstrated the link between the baby's treatment with corticosteroids and the lesions found within the retina.

The extensive medical evidence presented in this report clearly shows that Baby Robert died as a result of adverse reactions to corticosteroid and vaccines. Brian Herlihy is innocent. The evidence also shows that Brian was wrongly convicted and imprisoned as a consequence of sloppy and incomplete medical investigations. I believe that the state of Florida has the responsibility to review the evidence presented in this report. The State should furthermore take immediate action to free him from prison. In addition, Brian should be reimbursed for all incurred legal expenses and he should also be compensated for his pain and suffering.

The objective of the State and physicians should be to focus on determining the factual causes that lead to the illness or death of a child so that they can prevent such problems from happening to other children. Accusing innocent people of abusing and killing children based on a faulty theory that has no medical or scientific evidence to support its claims will not prevent the death of other children by vaccines and adverse reactions to medications. However, it certainly places innocent people in prison and causes great suffering. It also costs taxpayers huge sums of money to pay for unnecessary trials and legal fees.

I spent approximately 280 hours evaluating the medical evidence in this case in order to find the factual causes of injuries and death and to write this detailed report. I have also evaluated three other alleged 'Shaken Baby Syndrome' cases from the USA within the last 12-month period involving children, who died as a result of adverse reactions to medications and vaccines. In all of these cases, either the parent or caretaker was falsely accused of killing them by shaking and consequently imprisoned.

It is my hope that the state of Florida, the Federal Government, physicians, and our society will take the time to review the evidence presented in these cases. The government and American Medical Association have an obligation to act immediately as the theory behind the Shaken Baby Syndrome diagnosis must be re-evaluated. The theory itself is unsupported by science. Differential diagnosis must be used to solve complicated medical problems, as I have used in these cases in order to determine the factual causes of the presenting symptoms, illnesses and death.

11

## Section I. Review of Crystal Dawn Quirello's Medical Records During Her Pregnancy With Robert and After Delivery

### I-A. Crystal's health condition during her pregnancy

Baby Robert's mother, Crystal Dawn Quirello is a white female. She was 20-years old at the time of her pregnancy with Robert in July of 1999. She was born on August 26th, 1979. During her pregnancy with Robert, Crystal suffered from severe nausea for several months (September 21st, 1999 through January 13th, 2000) and she was treated with phenergan, (anti-nausea drug). Crystal was involved in a serious car accident on January 10th, 2000, at 26th weeks of gestation. She rear-ended a car that was making a turn in front of her and the front of her car was badly damaged. Her abdominal region was struck by the steering wheel and she experienced pain in her back, legs, and arms along with severe cramping. She was hospitalized at Alachua General Hospital (AGH) for about one week and was released [1,2].

Crystal only gained two-and-half-pounds during her entire pregnancy with Robert (Table 1). She reached her highest body weight of 120 pounds at the 34th week of gestation. She lost three pounds between the 34th and 35th week of gestation as a result of problems with her pregnancy, which was the result of her car accident a few weeks earlier (Table 1).

Table 1. Crystal's body weights during her pregnancy with Robert

| Date | Weeks of gestation | Weight (lb) |
|------|--------------------|-------------|
|  | Pregravid | 115.0 |
| 9/13/1999 | 9 | 110.5 |
| 9/30/1999 | 11 | 110.5 |
| 10/28/1999 | 15 | 107.5 |
| 12/27/1999 | 24 | 116.0 |
| 1/18/2000 | 27 | 115.0 |
| 1/24/2000 | 28 | 117.5 |
| 2/7/2000 | 30 | 117.5 |
| 2/21/2000 | 32 | 119.0 |
| 3/6/2000 | 34 | 120.8 |
| 3/14/2000 | 35 | 117.5 |

12

000236

## I-B. Crystal's premature labor and her treatment with corticosteroid

I believe that Crystal's car accident on January 10th induced premature labor. At 35 weeks of gestation, Crystal had a premature contraction and she was treated with btamethasone (corticosteroid) to mature the baby's lungs [3]. Her labor was induced by medication and she was in labor for eight days. Baby Robert was born premature at the 36th week of gestation on March 22nd, 2000 with a broken collarbone. His Apgar scores were eight at one minute and nine at five minutes [4]. The baby and his mother stayed in the hospital for three days and were released.

## I-C. Crystal's post delivery diabetes and her treatment with micronase

Based on blood and urine tests performed during Crystal's pregnancy on January 24th, 2000 and March 3rd, 2000 respectively, Crystal's medical record indicates that she did not suffer from gestational diabetes during her pregnancy. However, her medical record shows that she was treated with an anti-diabetic drug, micronase (glyburide) after delivery. She was advised to stop taking micronase on June 8th, 2000 [1]. It seems that Crystal developed diabetes following her treatment with corticosteroid. The baby also developed diabetes as a result of the corticosteroid treatment. Crystal took micronase during the period when she was breast-feeding Baby Robert.

Micronase (glyburide) is an oral blood-glucose-lowering drug of the sulfonylurea class. Glyburide appears to lower the blood glucose acutely by stimulating the release of insulin from the pancreas, an effect dependent upon functioning beta cells in the pancreatic islets. Single dose studies with micronase tablets in normal subjects demonstrate significant absorption of glyburide within one hour and it reached a high peak level at about four hours. The blood glucose lowering affects generally persist for 24 hours following a single morning dose of micronase in non-fasting diabetic patients [5, page 2496].

13

000237

Some sulfonylurea drugs are excreted in human milk. In nursing infants, the potential for developing hypoglycemia exists, therefore, treatment of nursing mothers with micronase is not recommended during the breast-feeding period [6]. In addition, the safety of micronase in children has not yet been established [5].

## Section II. Review of Robert Quirello's Medical Records From His Birth on March 22nd to August 2nd, 2000

### II-A. Robert's treatment with corticosteroid and his exposure to micronase in milk

Baby Robert was born four weeks premature on March 22nd, 2000 and his mother was treated with betamethasone (corticosteroid) during the last week of her pregnancy [3]. Betamethasone was given to reduce the baby's risk of developing chronic respiratory disease. Robert's mother was in labor for eight days and the baby was born with a broken collarbone. The baby's birth weight was 5 pounds and 14 ounces. The mother and the baby stayed in the hospital for three days and then were released. The baby was noted to have some difficulty latching onto the mother's breast [1].

Three days following birth, Robert's mother noticed that the baby's lips and the inside of his cheeks were yellow. He suffered from mild jaundice. The baby was breast-fed between March 27th and June 8th, 2000 and he was also fed formula milk as a supplement during this period. Robert's mother was taking the anti-diabetic drug, micronase, which is not recommended as a treatment in nursing mothers because of the associated risk of causing hypoglycemia in infants. However, she breast-fed Robert during her treatment with micronase [1]. Robert's mother was also put on the progesterone pill as birth control on May 9th, 2000.

### II-B. Robert's symptoms induced by his treatment with corticosteroid

My review of Baby Robert's medical records revealed that he suffered from serious health problems that directly resulted from his exposure to corticosteroid in utero and after birth [1, 3]. These include:

14

### II-B1. Polyurea

Baby Robert had polyurea as a consequence of his treatment with corticosteroid. On April 17th, 19th, and 26th, 2000, his grandmother stated that she was changing wet diapers 8-10 times per day. Robert's grandmother was his principle caretaker during most of his life because his parents were working [7]. It is possible that the baby had diabetes at that time. On August 2nd, 2000, his blood glucose level was 317 mg/dL and he also suffered from glycosuria [8].

### II-B2. Gastrointestinal and feeding problems

On April 13th and 19th, 2000, Baby Robert's grandmother stated that the baby was spitting formula milk frequently and he did not have a bowel movement from April 13th through the 17th. On June 6th, she also stated that the baby was feeding poorly. On July 19th, the baby was treated with mylocon to relieve his problem with intestinal gas. Treatment of infants with corticosteroid is known to cause gastrointestinal problems as described in Section V of this report.

### II-B3. Excessive weight gain

Baby Robert gained excessive weight between April 17th and August 2nd. He gained 10 pounds and 7 ounces in 136 days as shown in Table 2. His weight at four months and twelve days was about 3.5 times his birth weight. The approximate weight gain for an infant should be one ounce per day and 2 pounds per month during the first three months of life and 1 and ¼ pound per month between three to six months of age [9]. The approximate weight gain for Baby Robert should not have been more than 7 and ½ pounds during his life.

His abnormal weight gain was very obvious. On April 19th, his pediatrician reported that Robert gained 8 ounces in two days. On May 9th, 2000, his body weight indicated that he had gained 23 ounces in two weeks, which is twice the normal weight gain for a baby at his age. On May 9th, he was six weeks old. He was average in length, slightly below average weight, and slightly above average in head circumference (75%). However, on July 19th, 2002, his height was in the 75th percentile, his weight was in the 80th percentile,

15

and his head size was within the 85th or 90th percentile. He was already larger than the average baby at his age who was not born premature [10, 11].

The baby experienced rapid weight gain in spite of his feeding and gastrointestinal problems described above. His rapid weight gain is one of the signs of corticosteroid toxicity that was due to water and salt retention, and disturbance in fat, protein, and carbohydrate metabolism. His weight gain was not due to building muscle mass. Robert's serum creatinine values on August 2nd and 3rd, 2000 were less than 25% of normal values and they indicated that Baby Robert was suffering from a muscle wasting problem [8]. Muscle wasting and rapid weight gain are signs of adverse reactions of treatment with high therapeutic doses of corticosteroid.

Table 2. Robert's growth measurements from birth through August 2nd, 2000

| Date | Age Months | Weight | Height Inches | Head Circumference (cm) |
|---|---|---|---|---|
| 3/22/2000 | birth | 5 lb and 14 oz | | |
| 3/27/2000 | | 5 lb & 8 oz | | |
| 4/5/2000 | 0.5 | 6 lb | 20 | 35.5 |
| 4/17/2000 | | 6 lb and 9 oz | | |
| 4/19/2000 | 1.0 | 7 lb & 1 oz | 21.5 | |
| 4/26/2000 | | 7 lb & 10 oz | | |
| 5/9/2000 | | 9 lb & 1 oz | 22 | 39.0 |
| 6/6/2000 | | 12 lb | | |
| 7/19/2000 | 4 | 15 lb & 12 oz | 25.5 | 43.5 |
| 8/2/2000 | | 17 lb 8 oz | 26.4 | |
| 8/10/2000 | | | | 43.1 |

**II-B4. Muscle weakness**

Baby Robert exhibited muscle weakness in the neck region. His doctor's exam on May 9th, 2000 revealed that he had poor, floppy neck control. The nurse also noted that the baby had tight hip flexors on June 6th. The baby had decreased muscle tone in the shoulders and neck. He still was not holding his head up in prone position on June 6th and July 19th, 2000 [11]. His very low serum creatinine values measured on August 2nd and 3rd confirmed that the baby was suffering from muscle wasting illness.

16

000240

## II-B5. Vision problems

On May 9th, 2000, the pediatrician's nurse noted that his tracking with his eyes was not consistent, following an object more than a hundred degrees [11]. Treatment of infants with high therapeutic doses of corticosteroid has been known to cause retinopathy, encephalopathy, diabetes, hypertension, and increased capillary fragility; all of these problems can cause vision problems. At autopsy, Robert's thymus weight was about 20% of the normal weight for a baby at his age. Thymus weight is a very sensitive biomarker for the effect of corticosteroid. Exposure to high levels of corticosteroid causes thymic atrophy as described below (II-C).

## II-C. Vaccines given to Baby Robert and his thymic atrophy

Baby Robert was given six vaccines on May 9th, 2000 and his vaccination with these six vaccines was repeated on July 19th as shown in Table 3. The compositions of these vaccines are presented in Table 4. Premature babies are generally more susceptible to adverse vaccine reactions. Robert was born four weeks premature. Furthermore, vaccines should not be given to children treated with corticosteroid and other immunosuppressant agents. Baby Robert exhibited severe thymic atrophy as described below.

At autopsy, Baby Robert showed severe thymic atrophy. His thymus weight was 4 grams, which was about 20% of normal [12]. The average thymus weight (g) in a white infant male at three months and six months of age were found to be 20 and 25, respectively [13]. Baby Robert was 4-1/2-months-old and his thymus weight should have been approximately 22.5 g. Treatment with corticosteroid causes immune depression as measured by the reduction in size and function of the lymphoid tissues.

17

000241

Table 3. Robert's vaccination history

| Date | Age (months) | Vaccines given |
|------|--------------|----------------|
| 5-9-2000 | 1.5 | DTaP (Diphtheria & Tetanus Toxoids and acellular Pertussis) |
| | | OPV/IPV (Oral Polio vaccine) |
| | | Hib (Haemophilus Influenzae B) |
| | | Hep B (Hepatitis B) |
| 7/19/2000 | 4.0 | DTaP (Diphtheria & Tetanus Toxoids and acellular Pertussis) |
| | | OPV/IPV (Oral Polio vaccine) |
| | | Hib (Haemophilus Influenzae B) |
| | | Hep B (Hepatitis B) |

**Table 4. Compositions of vaccines administered to Baby Robert at two weeks prior to his respiratory arrest and seizure***

| Vaccine | Compositions |
|---------|--------------|
| DTaP | Each dose (0.5 mL) contains 0.625 mg aluminum; 25 Diphtheria toxoid; 10 tetanus toxoid; 25 $\mu$g pertussis toxin; 25 $\mu$g filamentous hemagglutinin; 8 $\mu$g pertacin; 2.5 mg 2-phenoxyethanol; 4.5 mg sodium chloride; and 0.1 mg formaldehyde. |
| Hepatitis B | Each dose (0.5 mL) contains 0.25 mg aluminum; 10 $\mu$g of hepatitis B antigen; 4.5 mg sodium chloride; 25 $\mu$g thimerosal (organic mercury); 0.49 mg disodium phosphate dihydrate; and 0.35 mg sodium dihydrogen phosphate dihydrate. |
| HIB | Each dose (0.5 mL of 0.4% sodium chloride solution) contains 10 $\mu$g of purified Haemophilus capsular polysaccharide. |
| OPV | Each dose (0.5 mL of buffered solution) contains less than 25 $\mu$g of each of the antibiotics (streptomycin and neomycin) and attenuated poliovirus. |

*Described in the Physicians' Desk Reference [5].

18

## II-D. Adverse reactions to vaccines given to Baby Robert

Serious adverse reactions to the vaccines given to Baby Robert (Tables 3 and 4) requiring medical intervention (such as apnea and cardiac problems) are commonly observed in preterm infants. Baby Robert was born four weeks premature and he was suffering from severe immune depression as indicated by his thymus weight measured on August 10th. Vaccination is not recommended in children who have been treated with corticosteroids and other immunosuppressant compounds.

Furthermore, the authors of many well-documented studies concluded that the risk and benefit of vaccination in preterm infants should be evaluated prior to administering the vaccines. They also emphasized that preterm infants who receive vaccines should be monitored. The following are descriptions of several selected studies conducted in the USA and other countries that describe adverse vaccine reactions in preterm infants.

1) Case histories of 45 preterm babies who were vaccinated with DTP/Hib (diphtheria, tetanus toxoids, and pertussis/Haemophilus influenzae type B conjugate were studied retrospectively [14]. Apparent adverse events were noted in 17 of 45 (37.8%) babies: 9 (20%) had major events, i.e., apnea, bradycardia or oxygen desaturations, and 8 (17.8%) had minor events, i.e., increased oxygen requirements, temperature instability, poor handling and feeding intolerance. Age at vaccination of 70 days or less was significantly associated with increased risk (p < 0.01). Of 27 babies vaccinated at 70 days or less, 9 (33.3%) developed major events compared with none when vaccinated over day 70.

The authors concluded that vaccine-related cardiorespiratory events are relatively common in preterm babies. Problems were much more common when the vaccine is administered at or before day 70. Therefore, these babies should be monitored post-vaccination. Baby Robert was given six vaccines at 46 days of age and his vaccination with these vaccines was repeated at four months of age (Table 3). At this time the baby was suffering from severe thymic atrophy.

2) After the occurrence of apnea (a respiratory pause of 20 seconds) in two preterm infants following immunization with DTP and Hib, Sanchez et al. conducted a prospective surveillance of 97 preterm infants (50 girls, 47 boys) younger than 37

weeks of gestation who were immunized with DTP (94 also received Hib at the same time) to assess the frequency of adverse reactions, and, in particular, the occurrence of apnea. For each infant, data were recorded for a 3-day period before and after receipt of the immunization [15]. Their study showed that apneic episodes occurred in 34 infants (34%) after immunization. Twelve infants (12% of total) experienced a recurrence of apnea, and 11 (11%) had at least a 50% increase in the number of apneic and bradycardiac episodes (heart rate less than 80 beats/min) in the 72 hours following immunization. Some of these infants required new medical interventions for the increased episodes [15].

3) Botham et al. conducted a prospective study of 98 preterm infants (53 males, 45 females), of gestational age 24-31 weeks who were immunized at approximately 2 months postnatal age with diphtheria-tetanus-whole-cell pertussis vaccine (DTPw). Half the infants also received Haemophilus influenzae type b conjugate vaccine (Hib) simultaneously [16]. All infants were monitored for apnea and bradycardia during the 24-hour pre- and post-immunization periods.

The study showed that only one infant had apnea and/or bradycardia pre-immunization, compared with 17 post-immunization. For 12 infants these events were brief, self-limiting and not associated with desaturations (oxygen saturation < 90%). However, for five infants (30%), these events were associated with oxygen desaturation, and two of these infants required supplemental oxygen. When considering immunization for preterm infants, the benefits of early immunization must be balanced against the risk of apnea and bradycardia [16].

4) Slack et al. reported that four premature infants developed apnea severe enough to warrant resuscitation after immunization with diphtheria, tetanus, pertussis (DTP), and Haemophilus influenzae B (Hib). One required intubation and ventilation. They also reported that although apnea after immunization are recognized they are not well documented [17].

5) Botham et al. conducted a prospective study of 97 preterm infants who were immunized with diphtheria-tetanus-pertussis to document respiratory and cardiac events [18]. The mean gestational age at birth was 28.1 weeks (range 24-34) and the mean age at immunization was 80.6 days (range 44-257). They found that nineteen (20%) infants developed apnea or bradycardia within 24 hours of immunization. Two infants who developed concurrent upper respiratory tract infections required additional oxygen, and one of them was treated with oral theophylline.

20

Adverse reactions of vaccines that were administered to Baby Robert are not limited to preterm infants. They have also been reported in full term infants. Below are brief descriptions of selective studies that describe the incidence of illnesses associated with vaccinations in children. Some of these studies are described in the Physicians' Desk Reference [5].

1) In the USA, reports submitted to the Vaccine Adverse Event Reporting System (VAERS), concerning infant immunization against pertussis between January 1, 1995 and June 30, 1998 were analyzed. During the study period, there were 285 reports involving death, 971 nonfatal serious reports (defined as events involving initial hospitalization, prolongation of hospitalization, life-threatening illness, or permanent disability), and 4,514 less serious reports after immunization with any pertussis-containing vaccine [19].

2) Systemic adverse events occurring within 3 days following vaccination of 4,696 Italian infants with DTP at 2, 4, and 6 months of age were recorded. These included fever of more than 100.4 F in 7% of total; irritability in 36.3%; drowsiness in 34.9%; loss of appetite in 16.5%; vomiting in 5.8%; and crying for 1 hour or more in 3.9% [5, p. 3063].

3) The whole-cell DTP vaccine has been associated with acute encephalopathy [5]. A large case-control study that included children 2 to 35 months of age that suffered from serious neurological problems was conducted in England. Acute neurological disorders, such as encephalopathy or complicated convulsion(s) occurred in children who were more likely to have received DTP vaccine the 7 days preceding onset than their age-matched controls. Among children presumed to be neurologically normal before entering the study, the relative risk (estimated by odds ratio) of a neurological illness occurring within a 7-day period following receipt of DTP dose, compared to children not receiving DTP vaccine in the 7-day period before onset of their illness, was 3.3 (p< 0.001).

4) Three hundred sixty-five infants were inoculated with Hib, and some of them developed systemic adverse reactions. The following adverse reactions and their percentages occurred in two-month-old infants during the 48 hours following inoculation: Fever > 100.8 F (0.6%); irritability (12.6%); drowsiness (4.9%); diarrhea (5.2%); and vomiting (2.7%) [5, p. 2318].

5) The database from the 1994 National Health Interview Survey (NHIS) in the USA that included 6,515 children less than six years of age who received the hepatitis B vaccine were analyzed to evaluate the vaccine related adverse reactions. Hepatitis B

21

vaccine was found to be associated with prevalent arthritis, incident of acute ear infections, and incident of pharyngitis/nasopharangitis [19].

The above selected studies clearly show that serious health problems and even death can result from vaccinating infants and children, especially among premature infants and infants suffering from pre-existing conditions. The authors of these studies emphasized that premature infants should be monitored following the administration of vaccines. Furthermore, the Physicians' Desk Reference states that vaccines should not be given to children treated with corticosteroid compounds [5].

Fourteen days prior to Baby Robert's respiratory arrest on August 2nd, he was given six vaccines. At the time the infant was administered these vaccines on July 19th, he was suffering from severe immune depression as indicated by his thymus weight measured on August 10th, 2000. The CT scan taken on August 2nd of the head region showed that Robert had bilateral sinus and ear infections. The vaccines given to Robert on July 19th increased his risk of contracting sinus and ear infections and also predisposed him to have the seizure on August 2nd. Baby Robert additionally suffered from brain atrophy as a result of his treatment with corticosteroid [8].

## Section III. Review of Robert Quirello's Medical Records During His Hospitalization on August 2nd Through 10th, 2000

### III-A. Case history and treatments given by the emergency teams on August 2nd

#### III-A1. History given by Brian Herlihy

Robert's mother, Crystal went to Brian Herlihy's apartment with her 4 ½ month old, Baby Robert shortly after 0900 on August 2nd, 2000.  She fed the baby four ounces of formula milk and left the apartment at about 0920 leaving the baby with Brian. Brian is a white male and in August of 2000, he was 29 years old. He had cared for Baby Robert in the past on five occasions, for a few hours each time.

Brian fed the baby approximately four ounces of formula milk. The mother laid the baby on his back between two pillows on the bed, and left the room. After about five minutes, Brian returned to find the infant on his back at the end of the bed with his nose angled towards the floor. Baby Robert's head was lower than his body and his head was wedged

000246

between the mattress and the bars of the footboard [20]. He gently tugged on the infant in order to free his head.

The infant vomited formula milk on the floor near the bed and on the bed covering an area of about 4-6 inches in diameter. The baby was not breathing [21]. Brian left the baby on the bed and called 911 at 0935 asking for help. Brian told the person who took the 911 call that the baby was draining white fluid like formula milk from his mouth and his nose. The baby was also coughing [22]. Brian was instructed by 911 personnel to place the baby on the floor and to begin CPR. Brian then proceeded to perform mouth-to-mouth resuscitation. No chest compressions were administered.

### III-A2. Treatments given by the Emergency Teams

The Alachua County Fire Rescue teams (EMTs) arrived on the scene at 0937 and found the baby lying on his back on the bedroom floor. Baby Robert was unconscious, unresponsive, and he was not breathing. His color was ashen gray. The baby was throwing up white milky fluid from his mouth. They bagged the baby and provided him with 100% oxygen and his blood oxygen saturation came up from 84% to 100%. They then placed a cardiac monitor on the baby and it revealed a sinus tachycardia at the rate of 170 beats per minute. The baby had palpable pulses in all distal extremities.

In addition, the EMTs placed a line in the baby's right tibia and gave him a 100 cc of fluid. The baby's body weight was 6.8 kg. Brian was very upset and he stated that the baby had vomited and aspirated. The EMTs did not see any signs of struggle in the bedroom or elsewhere. No bruises or abrasions were noted on the baby's head, trunk, flank, back or extremities [21].

A second emergency team from the Gainesville Fire Department arrived at Brian's apartment at 0943 and also found the baby not breathing [23]. Kenneth A. Johnson, the firefighter and paramedic responsible for the EMTs, stated that the baby was pale, white and unresponsive. He removed about 10 cc of red and clear mixed liquid from the baby's nose and mouth using a suction unit. The baby had a pulse rate of 190 per minute and sinus tachycardia [24]. Table 5 shows the baby's vital signs during the rescue on August 2nd.

23

000247

Seven minutes after arrival, the EMTs managed to improve the baby's condition. The baby started to breathe on his own, but it was not sufficient to sustain his life. At 0955 the baby was placed on a backboard and was transported to the hospital. He showed some improvement on the way to the hospital. His skin color became pinkish and his respiratory efforts increased. The baby made the first audible sounds when he was wheeled into Shands Hospital at 0958 [23, 24].

Table 5. Baby Robert's vital signs between 0938 and 0958 on August 2nd, 2000

| Time | Pulse | Blood Pressure | Respiration Rate/min. | Heart condition |
|------|-------|----------------|-----------------------|-----------------|
| 0938 | 172 | 80 | 0 | Sinus Tachycardia |
| 0944 | 190 | 70 | 0 | Sinus Tachycardia |
| 0955 | 190 | 70 | 5 | Sinus Tachycardia |
| 0955 | 180 | 70 | 12 | Sinus Tachycardia |
| 0958 | 160 | 70 | 20 | Sinus Tachycardia |

III-B. Robert's symptoms and treatments given at Shands Hospital on 8/2-8/10 of 2000

**III-B1. Treatment at the emergency room**

The baby arrived at the University of Florida Shands Hospital Emergency Room at 1000 [8]. The baby was moving his arms and his legs and he was crying. The ET-tube was extubated because it was not properly placed. The baby's temperature was 36.2°C. His blood pressure and pulse were 70/40 mm Hg and 160 per minute, respectively. The baby's fontanel was very tense and pulsating. Retinal hemorrhage was noted bilaterally. No bruises or abrasions were noted on the baby's head, trunk, flank, back or extremities. Blood analysis showed that his lactic acid level was 6.2 mmol/L.

**III-B2. The results of the CT scans for the head and neck regions taken on August 2nd through August 4th**

After leaving the emergency room, Baby Robert was taken in for CT scans. The CT scan of the head and neck regions taken at 1029 on August 2nd, 2000 showed a normal skull with no evidence of fracture. A limited lateral view of the cervical spine revealed that the vertebral bodies and the disc spaces were normal down to C5. Furthermore, the cerebral CT scan taken at 1043 on August 2nd showed significant sinus and mastoid disease,

24

involving mainly the left maxillary antrum, ethmoids, and both mastoid and middle ear areas [8].

Intracranially, hygromas were observed, especially on the left side. The baby was also found to have multi-generation hemorrhage (fresh and old) and bilateral subdural hemorrhage, (the left greater than the right) mostly in the superior frontal parietal area. There was trace amount of subarachnoid hemorrhage at several sites most notably the right posterior parietal. Epidural hemorrhage was likely present [8]. Dr. Ronald G. Quisling, neuroradiologist estimated the fresh bleed that appeared white (hyperdense) on the film to be 20-25% of the total bleed detected. The old bleed (75-80% of the total) appeared dark (hypodense) on the scan [25].

The ventricles were at the upper limits of normal size and essentially non-displaced. There was no evidence of herniation, parenchymal contusion or bleeding. There was a suggestion of at least a right global retinal hemorrhage in the orbits [8].

A second CT scan of the head region was taken at 1521 on August 2nd in order to evaluate the progression of the subdural bleed and other lesions when compared to the prior CT of the head taken at 1028. There was interval worsening in the appearance of the subdural bleed at the vertex of the skull with a new subdural bleed in the right frontal and right parietal-occipital area [8]. The radioneurologist also observed fresh and old bleeds and estimated the fresh bleed to be 35% of the total bleed present. The CT scan taken in the afternoon showed a little more fresh blood along the flax, which is the dura that divides the two hemispheres in half [25].

A third cerebral CT scan was taken on August 3rd at 1046 and was compared with the scans taken on August 2nd. The blood had shifted down over the tentorium and it accumulated in the right parietal lobe of the brain and it looked like it was causing a brain laceration as described by the radiologist [25]. A fourth cerebral CT scan was taken on August 4th and did not show a significant change in the bleed from the August 3rd scan.

### III-B3. Robert's symptoms and treatment given at the PICU on the morning of August 2nd

The baby arrived at the PICU at about 1100 on August 2nd at which time he was having a severe seizure. The treating physician, Dr. Anne Elizabeth Dickison stated that Baby Robert was seizing and he was very stiff. She said "he was so stiff you could pick him up

25

by a leg and he would stay stiff". When the baby was brought to the PICU, the endotracheal tube was not in place. He was trying to cry. His breathing was not normal and his color was gray and ashen. Dr. Dickison also stated that the biggest problem was that the baby was seizing and his tongue was stiff. Therefore, he was not passing air in and out of his mouth or his nose very effectively [26].

Dr. Dickison performed a very thorough physical examination on Baby Robert looking specifically for signs of trauma all over his body (front, back, head, and genitals) and she did not see any bruise or sign of trauma. His neck and mouth were free from any marks or signs of strangulation. His head was normal and nicely shaped. The fontanel (the soft spot on the top of the head) was slightly rounded, but it was still fairly soft and depressible. The baby did not have a significant increase in intracranial pressure at that time [26]. Dr. Bernie Maria also examined Baby Robert and saw no evidence of red marks or bruising on his body [4].

Following examination, Dr. Dickison treated Baby Robert with muscle relaxant and anti-seizure medications. He was given vecuronium (muscle relaxant), which paralyzes the muscles for a temporary period of time (about a half-hour). The baby was so stiff and his tongue was so swollen that the physician needed him to relax so that the breathing tube could be placed without traumatizing him. The baby was also treated with pentothal, which is an anesthetic and anti-convulsant agent [26].

Furthermore, Dr. Bernie Maria performed an electroencephalography (EEG) and found that the amount of electrical activity in the brain was deeply suppressed throughout Robert's brain. The waves themselves were very slow, indicating that the process that led to his brain dysfunction was one that involved the whole brain [4]. The clinical tests also revealed that Baby Robert suffered from cardiac damage, hyperglycemia, glycosurea, lactic acidosis, and bilateral retinal hemorrhage. Furthermore, his serum creatinine and protein values were low. Below are descriptions of these health problems and the clinical data.

### III-B4. Robert's heart problems

The emergency teams monitored the baby's heart at 0943 on August 2nd and found that he had sinus tachycardia with a pulse rate of 172-190 per minute (Table 5). Blood analysis showed that the baby had high levels of troponin I, CKMB, and CK total, which

26

indicated that the baby was suffering from myocardiac damage (Table 6). The EKG exam at 1830 on August 2nd also demonstrated that the baby's heart had suffered from ischemic changes and arrhythmia. Some elevation in ST waves was noted indicating acute myocardial injury [8].

After admission to the Pediatric Intensive Care Unit, Baby Robert was started on dopamine 10 mcg/kg/minute and received multiple fluid boluses in addition to the normal saline bolus with improvement in blood pressure. The baby was weaned to 3mcg/kg/minute of dopamine by August 3rd. The infant remained hemodynamically stable post discontinuation of dopamine until August 8th. However, he suffered from cardiac arrest in relation to his respiratory arrest on August 10th.

Table 6.  Indicators of myocardial infarctions in Baby Robert's blood

| Date & Time | Troponin I (ng/mL) | CK Total (IU/L) | CK MB (ng/mL) |
|---|---|---|---|
| 8/02/2000 (1225) | 4.7 H | 172 H | 7.7 H |
| 8/03/2000 (1516) | <0.4 | 289 H | 4.9 H |
| **Normal Range** | 0.0-0.04 | 55-170 | <3.1 |

### III-B5. Baby Robert's metabolic and hematology values during his hospitalization

The blood analysis performed following Baby Robert's arrival at the emergency room on the morning of August 2nd showed that the baby suffered from hyperglycemia and lactic acidosis. The baby also suffered from glycosurea as shown by a urine analysis performed on August 2nd at 1204. His glucose urine value was > 1000 mg/dL. He was treated with sodium bicarbonate to correct his metabolic acidosis [8].

Furthermore, the baby had low blood potassium levels and was treated with potassium. The serum creatinine values on August 2nd and 3rd were very low. They indicated that Baby Robert was suffering from a muscle-wasting problem. His serum levels of albumin and total protein were also low. The baby's metabolic values are presented in Tables 7 and 8.

27

Table 7. Baby Robert's serum chemistry values on August 2nd and 3rd

| Date & Time | Albumin | Protein | Creatinine mg/dL | Urea Nitrogen mg/dL |
|---|---|---|---|---|
| 8/02/2000 | | | | |
| 1225 | 2.5 L | 4.6 L | | |
| 2340 | | | 0.3 L | 7 L |
| 8/03/2000 | | | | |
| 400 | | | 0.2 L | 7 L |
| 1213 | | | 0.2 L | 6 L |
| 1913 | 2.1 L | 4.3 L | 0.2 L | 7 L |
| Normal Range | | | 0.8-1.5 | 9-20 |

Table 8. Baby Robert's metabolic parameters measured following his respiratory arrest

| Date & Time | pH Arterial | Glucose mg/dL | HCO3 mmol/L | Lactic Acid mmol/L | Potassium mmol/L |
|---|---|---|---|---|---|
| 8/02/2000 | | | | | |
| 1012 | 7.35 | 317 H | 19.1 L | 6.2 H | 3.7 |
| 1136 | 7.26 L | 235 H | 22.0 | 4.4 H | 3.8 |
| 1243 | 7.32 L | | 19.4 | | |
| 1420 | 7.37 | | 21.2 | 2.1 H | |
| 1705 | 7.38 | | 18.6 L | 1.9 H | 3.8 |
| 2001 | 7.41 | 111 | 19.1 L | 1.8 H | |
| 2340 | 7.43 | 109 | 16.2 L | 1.3 | 3.4 L |
| 8/3/2000 | | | | | |
| 0147 | 7.44 | | 17.7 L | | |
| 0355 | 7.40 | | 17.1 L | | 3.3 L |
| 0553 | 7.41 | | 17.5 L | | |
| 1026 | 7.38 | | 22.0 | | |
| 1613 | 7.37 | | 23.3 | | |
| 2150 | 7.38 | | 23.2 | | |
| 8/4/2000 | | | | | |
| 0408 | 7.39 | | 23.8 | | |
| 0811 | 7.47 H | | 24.1 | | |
| 8/5/2000 | | | | | |
| 0051 | 7.52 H | | 24.0 | | |
| 846 | 7.46 H | | 25.1 | | |
| 1627 | 7.46H | | 26.1 | | |
| 1935 | 7.46 H | | 24.5 | | |
| Normal Range | 7.35-7.45 | 75-115 | 21-28 | 0.3-1.3 | 3.5-5.0 |

000252

Robert's hematology values are presented in Table 9. From the values measured following the baby's admission at Shands Hospital at 1012 on August 2nd, the platelet count was reduced by 50% on August 3rd. These values indicate that the baby suffered from bleeding in tissues following his admission to the hospital. His prothrombin time (10.6 seconds) and partial prothrombin time (25 seconds) measured at 1454 on August 2nd were within normal rages. These values indicate that Robert's bleed observed in the retina and subdura were not caused as a result of vitamin K deficiency or liver problems [8]. Baby Robert received a packed red cell transfusion that improved his hemoglobin and hematocrit levels, which continued to remain stable throughout his hospital stay.

Table 9. Baby Robert's hematology parameters measured following his respiratory arrest.

| Date & Time | RBC x $10^6$/μL | Hemoglobin g/dL | Hematocrit % | Platelets x $10^3$/μL |
|---|---|---|---|---|
| 8/02/2000 | | | | |
| 1006 | 4.00 | 10.7 | 32.1 | 392 |
| 1147 | 3.19 | 8.7 | 25.2 | 390 |
| 1706 | 3.78 | 10.6 | 31.0 | 328 |
| 2000 | 4.11 | 12.0 | 33.7 | 238 |
| 2340 | 4.68 | 13.4 | 38.3 | 217 |
| 8/3/2000 | | | | |
| 0400 | 4.49 | 13.2 | 37.0 | 186 |
| 1213 | 4.14 | 11.8 | 34.5 | 180 |
| 1913 | 4.07 | 11.5 | 33.7 | 180 |
| 8/4/2000 | | | | |
| 0400 | 3.85 | 11.3 | 32.3 | 177 |
| 1133 | 3.90 | 11.1 | 32.6 | 194 |
| 8/5/2000 | | | | |
| 0051 | 4.50 | 13.4 | 38.7 | 173 |
| 8/6/2000 | | | | |
| 0050 | 4.81 | 13.8 | 40.6 | 159 |
| 8/7/2000 | | | | |
| 0400 | 4.90 | 14.3 | 41.9 | 218 |
| Normal Range | 2.7-4.9 | 9-14 | 28-42 | 150-450 |

000253

# Continued
# Next
# Volume