# EXHIBIT PP

208-1-11939

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

6-18-8 CH

BRIAN PATRICK HERLIHY
Appellant
v.

STATE OF FLORIDA
Appellee

CASE NO. 01-2000-CF-2753-A

APPEAL NO. 1D08-1588

VOLUME III

SUPPLEMENTAL
# RECORD

**HONORABLE MARTHA ANN LOTT**

**APPEAL FROM THE CIRCUIT COURT**
**8th JUDICIAL CIRCUIT FOR**
**ALACHUA COUNTY, FLORIDA**

**FOR APPELLANT**
MARY E. FITZGIBBONS, ESQUIRE
FITZGIBBONS LAW FIRM, P.A.
917 VERONA STREET
KISSIMMEE, FL 34741

**FOR APPELLEE**
HONORABLE BILL MCCOLLUM
ATTORNEY GENERAL
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

I:\public\Appeals\Word\PAM\APPEALS\Circuit Criminal Documents\COV-SH.SUP.FEL.DOC

Created on 6/16/08

IN THE CIRCUIT COURT
OF THE EIGHTH
JUDICIAL CIRCUIT, IN
AND FOR ALACHUA
COUNTY, FLORIDA

BRIAN PATRICK HERLIHY
Appellant

vs.

CASE NO. 01-2000-CF-2753-A
APPEAL NO. 1D08-1588

STATE OF FLORIDA
Appellee

| INDEX INSTRUMENT | DATE FILED | PAGE NO. |
|---|---|---|
| DOCKET LINES | | |
| **VOLUME I** | | |
| MOTION FOR POST-CONVICTION RELIEF | 11-28-2007 | 1-8 |
| NOTICE OF FILING | 11-28-2007 | 9 |
| SUPPLEMENTAL AFFIDAVIT OF DR. SCHEIBNER | 11-27-2007 | 10-28 |
| MOTION FOR LEAVE TO SUPPLEMENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 11-28-2007 | 29-30 |
| HEARING FOR DIVISION I | 01-29-2008 | 31 |
| ORDER GRANTING MOTION FOR LEAVE TO SUPPLEMNENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 02-05-2008 | 32-33 |
| HEARING FOR DIVISION I | 02-14-2008 | 34 |
| NOTICE OF FILING | 03-03-2008 | 35 |

| | | |
|---|---|---|
| AFFIDAVIT OF JENNIFER LEIGH SALTER | 03-03-2008 | 36-41 |
| NOTICE OF FILING | 03-04-2008 | 42-43 |
| AFFIDAVIT OF LOIS HERLIHY | 03-04-2008 | 44-46 |
| FINAL ORDER DENYING MOTION FOR POST-CONVICTION RELIEF | 03-04-2008 | 47-50 |
| NOTICE OF APPEAL | 04-02-2008 | 51-52 |
| **VOLUME II** | | |
| FIRST DISTRICT COURT OF APPEAL ORDER | 06-11-2008 | 53-57 |
| MOTION TO VACATE SENTENCE AND CONVICTION PURSUANT TO FLA.R.CR.P. 3.850 AND MEMORANDUM OF LAW | 08-10-2005 | 58-115 |
| ORDER DENYING MOTION FOR POST-CONVICTION RELIEF | 09-30-2005 | 116-119 |
| RULE 3.850 MOTION FOR POST CONVICTION RELIEF, CONTINUED NEXT VOLUME | 08-25-2006 | 120-253 |
| **VOLUME III** | | |
| CONTINUED FROM PREVIOUS VOLUME, RULE 3.850 MOTION FOR POST CONVICTION RELIEF | 08-25-2006 | 254-289 |
| COLLATERAL RELIEF DETERMINATION MADE FROM MOTION [COMPUTER DOCKET ENTRY, NOT A DOCUMENT] | 08-31-2006 | ----- |
| CASE JUDGE REASSIGNED [COMPUTER DOCKET ENTRY, NOT A DOCUMENT] | 12-31-2006 | ----- |
| CASE LAW | 02-06-2007 | 290-314 |
| ORDER DENYING, IN PART, MOTION FOR POST CONVICTION RELIEF, SCHEDULING AN EVIDENTIARY HEARING, IN PART, AND APPOINTING OFFICE OF THE PUBLIC DEFENDER, CONTINUED NEXT VOLUME | 02-08-2007 | 315-454 |

**VOLUME IV**

| | | |
|---|---|---|
| CONTINUED FROM PREVIOUS VOLUME ORDER DENYING, IN PART, MOTION FOR POST CONVICTION RELIEF, SCHEDULING AN EVIDENTIARY HEARING, IN PART, AND APPOINTING OFFICE OF THE PUBLIC DEFENDER | 02-08-2007 | 455-489 |
| MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF FILED BY STATE OF FLORIDA | 02-13-2007 | 490-505 |
| ORDER DIRECTING STATE TO FILE A WRITTEN RESPONSE | 02-19-2007 | 506 |
| DEFENDANT'S RESPONSE TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF | 05-17-2007 | 507-512 |
| COPY OF ABOVE [NOT INCLUDED HERE BECAUSE IT IS DUPLICATIVE] | 05-21-2007 | ---- |
| STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF, RESPONDING TO DEFENDANT'S RESPONSE OF MAY 16, 2007, CONTINUED NEXT VOLUME | 06-20-2007 | 513-655 |

**VOLUME V**

| | | |
|---|---|---|
| CONTINUED FROM PREVIOUS VOLUME, STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF, RESPONDING TO DEFENDANT'S RESPONSE OF MAY 16, 2007, | 06-20-2007 | 656-752 |
| ORDER SCHEDULING CASE MANAGEMENT CONFERENCE` | 08-20-2007 | 753 |
| HEARING NOTES | 08-30-2007 | 754 |
| ORDER SCHEDULING HEARINGS ON PENDING | | |

| | | |
|---|---|---|
| POST-CONVICTION RELIEF MATTERS | 09-07-2007 | 755-756 |
| DEFENDANT'S RESPONSE TO STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF, RESPONDING TO DEFENDANT'S RESPONSE OF MAY 16, 2007 | 09-14-2007 | 757-760 |
| NOTICE OF FILING - AFFIDAVIT OF VIERA SCHEIBNER | 09-14-2007 | 761-772 |
| NOTICE OF FILING - OATH PAGE | 09-24-2007 | 773-775 |
| NOTICE OF FILING - ATTACHED AFFIDAVITS | 09-26-2007 | 776-779 |
| HEARING NOTES | 09-28-2007 | 780 |
| DEFENDANT'S MOTION FOR LEAVE TO AMEND MOTION FOR POSTCONVICTION RELIEF WITH NOTICE OF FILING AND SUPPLEMENTAL AFFIDAVIT OF LOIS N. HERLIHY ATTACHED | 09-28-2007 | 781-785 |
| MEMO FROM J. SILVERMAN TO M. BECKER, STATE ATTORNEY OFFICE | 10-29-2007 | 786 |
| CASE CITATION | 10-29-2007 | 787-788 |
| COPY OF NOTICE OF FILING AFFIDAVIT OF LOIS N. HERLIHY | 10-29-2007 | 789-791 |
| ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF, CONTINUED NEXT VOLUME | 10-29-2007 | 792-856 |

**VOLUME VI**

| | | |
|---|---|---|
| CONTINUED FROM PREVIOUS VOLUME, ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 10-29-2007 | 857-1057 |

**VOLUME VII**

CONTINUED FROM PREVIOUS VOLUME,
ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF 10-29-2007 1058-1107

**III-B6. Retinal bleed and other lesions observed in Robert's eyes.**

Dr. Lawrence Levine, pediatric ophthalmologist at Shands Hospital examined Robert's eyes on August 2nd, 2000 and found no external injury. The eyelids, front of the eyes, cornea, and lens, were normal. The pupils were reactive which indicated that the intracranial pressure was not extremely elevated. Dr. Levine dilated the baby's pupils and looked inside Robert's eyes. He observed a massive amount of blood in both eyes [27].

Dr. Levine found blood in the center of the eye (vitreous body), the area in front of the retina and in the retina. The baby had two other retinal lesions, which were documented by photography. There were big white spots in the back of his eye, which are referred to as Purtscher's retinopathy. Those big white spots are due to what is believed to be damaged arteries. There was also a crack in the back of the eye, which is known as a choroidal rupture [27].

**III-B7. Treatment given to Baby Robert on August 2nd through the 10th**

Baby Robert was treated with fosphenytoin, versed, and ratindine at high therapeutic levels to control his severe seizure. The baby was given a loading dose of fosphenytoin and then kept on a maintenance dose of fosphenytoin. The baby was also started on a fentanyl drip. The baby had additional seizures on this dose and was given ativan. On the EEG performed on August 4th, Robert continued to show evidence of clinical and subclinical seizures and was maintained on a versed and a fentanyl drip. Blood analysis on August 4th showed the baby's blood level of phenytoin was very high at 29.1 μg/mL. The normal therapeutic levels are between 10 and 20 μg/mL [8].

The baby was also treated with dopamine, Tylenol, potassium chloride, and sodium bicarbonate to increase his blood pressure and to treat his hypokalemia and metabolic acidosis. He was also given normal saline and red blood cells to treat dehydration and anemia. Presented in Table 10 is a partial list of medications given to the baby during his stay in the hospital.

On August 6th, the baby was taken off fentanyl and the versed drip. Seizure activity resumed after approximately six hours. Throughout the hospital stay the baby's head

circumference remained stable at about 45 cm and his anterior fontanel remained full and pulsating. His pupils were equal, round, and reactive to light. Baby Robert had decreased tone in the lower extremities bilaterally, positive doll's eyes, a sluggish corneal reflex, and decreased tone in the upper extremities bilaterally. He did not exhibit any response to pain.

On August 7th, the baby was started on phenobarbital and once the phenobarbital was at a therapeutic level, the fosphenytoin was tapered. The neurologist was consulted on the case and felt that the examination was consistent with irreversible brain damage. There was no mass effect or potential herniation. The baby was extubated on August 9th. Initially, the baby had labored breathing and he was given doses of dexamethasone and racemic epinephrine with mild improvement. The baby was given additional doses of racemic epinephrine and then started on heliox and showed some improvement.

On the morning of August 10th, the baby was noted to have decreased air movement and decreased oxygen saturations into the 90s. The parents had initiated a DNR order and according to this order the baby was not to be reintubated. The baby's heart rate and blood pressure continued to drop and then proceeded quickly into an agonal rhythm of about 20 beats per minute and then into asystole at 0052. This event lasted no longer than ten minutes. It was felt that the baby suffered from respiratory arrest secondary to cardiac arrest due to his brain injury. An autopsy was performed on August 10th, 2000. The next section (IV) contains a detailed description of the autopsy findings.

Table 10. Partial list of medications given to Baby Robert while at Shands Hospital

| Date & Time | Treatment | Actions |
|---|---|---|
| 8/2/2000 | | |
| 1115 | Fosphenytoin 150 mg IV | Anti-epileptic (Anticonvulsant) |
| 1140 | Normal saline, 30 cc/hr | Treat dehydration |
| | Fosphenytoin 20 mg IV | Anti-epileptic (Anticonvulsant) |
| 1400 | Versed 0.4-0.6 mg | Sedative |
| | Dopamine (10 µg/KG/min.) | Increase blood pressure |
| | Vecuronium | Muscle relaxant |
| 1450 | NS + 20 meq KCl/L | Treat dehydration and hypokalemia |
| 1630 | Fentanyl drip | Analgesic |
| 1658 | NS + 20 meq KCl/L | |
| 1800 | Tylenol 100 mg | Analgesic and anti-pyretic |
| 1815 | Ranitidine 10 mg IV | Histamine $H_2$-reseptor antagonist |
| | Fentanyl IV | Analgesic |
| 1830 | 80 cc Red Blood Cells IV | Treat anemia |
| 2020 | Fosphenytoin 40 mg IV | Anti-epileptic (Anticonvulsant) |
| 2230 | Dopamine | Increase blood pressure |
| 2230 | NS + 20 meq KCl/L at 20 cc/hr | Treat dehydration and hypokalemia |
| **8/3/2000** | | |
| 0015 | NS + 20 meq KCl/L | |
| 0025 | Sodium bicarbonate | Treat metabolic acidosis |
| 0225 | Dopamine | Increase blood pressure |
| 1100 | Fosphytoin IV | Anti-epileptic (Anticonvulsant) |
| 1300 | Fosphytoin IV | |
| 8/4/2000 | Fosphenytoin | |
| 8/6/2000 | Fentanyl IV | Analgesic |
| | Versed | Sedative |
| 8/7/2000 | Phenobarbital | Anticonvulsant |
| 8/9/2000 | Dexamethasone | Anti-inflammatory |
| | Epinephrine | Increase cardiac output |

## Section IV. Review of The Medical Examiner's Autopsy Findings and Pathology Reports

Baby Robert died on August 10th at 0052 and Dr. William F. Hamilton performed the autopsy at 1500 (Case # ME00-297). His autopsy was limited to gross examination of the body and selected organs [12]. He sent the brain and eyes to two consultants for gross and microscopic examinations. Dr. Stephen J. Nelson, neuropathologist examined the brain and Dr. Michael D. Bell examined the tissues from the eyes [28, 29].

These physicians concluded that baby Robert's injuries and death were caused by violent shaking. However, the autopsy and pathology findings do not support their conclusions that Baby Robert's injuries resulted from violent shaking or trauma. Below are descriptions of their findings and my analysis of them.

IV-A. External examination of Robert's body did not reveal bruises

Dr. Hamilton examined Robert's body and he did not see any evidence of injury or trauma. He stated that no significant injuries were seen on the front or the back of the body [12]. The scalp was free of traumatic injuries including lacerations, contusions and bruises. The oral cavity was free of trauma or obstruction. The underlying calvarium and skull base were intact. The neck organ block was free of trauma or obstruction.

IV-B. The subdural hemorrhage indicates that the baby had pre-existing condition

The CT scan of Robert's brain taken on August 2nd at 1029 showed that the subdural space contained multi-generation hemorrhage (fresh and old), which indicates that the baby had a pre-existing condition. Dr. Hamilton examined the dural membranes grossly. He observed lightly adherent clots in the subdural spaces over cerebral convexities and a clot attached to the undersurface of the dura overlying the cerebral hemispheres. He concluded that the baby did not have chronic subdural hemorrhage. I believe that Dr. Hamilton's conclusion with regard to the time of the bleed is not scientifically valid because he failed to microscopically examine the dura to date the bleed.

IV-C. The brain lesions indicate that the baby suffered from anoxia and ischemia

The gross and the microscopic examinations of Robert's brain did not indicate that Baby Robert died as a result of trauma but, instead they showed that the baby had pre-existing

chronic brain atrophy and the brain suffered from severe anoxia and ischemia. However, the medical examiner and other physicians who evaluated this case all overlooked these facts.

Dr. Stephen John Nelson examined Robert's brain microscopically and found that the brain was an immature brain and inconsistent with that of a child of four and a half months [28, 30]. The treating physician, Dr. Dickson examined the CT scans of Robert's brain and also determined that he suffered from brain atrophy. She stated that Baby Robert had a smaller brain than normal. That means that there was probably some atrophy or wasting of the surface of the brain or that the brain was not growing as rapidly as it should have been [31, page 754].

The other lesions observed in the brain were edema and cell necrosis, which were caused by severe anoxia and ischemia of the brain. Dr. Hamilton examined Robert's brain grossly and found evidence of edema. The brain substance was quite soft. The gyri were flattened and sulci were narrowed. The brain weight was 826 g, which was about 150% of normal (normal weight about 600 g) [13]. Dr. Hamilton did not see evidence of trauma [12].

Dr. Stephen J. Nelson examined eight glass microscopic slides of the brain that were stained with hemotoxylin and eosin (H & E). He found that the lesions consisted of cell necrosis that resulted from global anoxia and ischemia of the brain. He also stated that Baby Robert's brain was immature and that was due to improper development. Dr. Nelson never stated that these lesions were caused by trauma. He stated that this was an immature human brain with subarachnoid hemorrhage and hematoma, global anoxic-ischemic encephalopathy, and generalized cerebral edema [28].

The slides that were examined by Dr. Nelson included tissue sections from left and right frontal gyri, bilateral hippocampal formations, midbrain, basal ganglia, and cerebellum. He found that the neurons displayed the typical anoxic-ischemic histologic changes. He observed laminar necrosis in the cerebral cortex and he said that these anoxic-ischemic microscopic changes were most prominent in the grayl surfaces, but were also present at the depths of the sulci.

Furthermore, Dr. Nelson stated that both the Sommer's sector and endplate of the hippocampal formation displayed bilateral symmetry, which consisted of acute neuronal

necrosis consisting of cytoplasmic hyperesosinophilia, karyorrhexis and nuclear pyknosis. There was no inflammation other than foamy macrophages. Except for neuronal swelling and parenchymal and leptomeningeal vascular congestion, the midbrain was histologically within normal limits. He also observed acute neuronal necrosis in the basal ganglia.

The cerebellum was remarkable for relative preservation of the external granular neuronal lamina. The internal granular cell layer was also prominent. There was widespread neuronal necrosis with cytoplasmic hypereosinophilia, karyorrhexis and nuclear pyknosis. There was no inflammation, other than foamy macrophages.

Dr. Nelson's findings described above clearly indicate that Baby Robert suffered from brain atrophy, severe anoxia and ischemia and not from physical trauma. Dr. Nelson stated that these gross and microscopic findings are consistent with a multi-day survival after hospitalization. However, Dr. Nelson found a very small cerebral cortical lesion microscopically (8 x 8 x 9 millimeters), that he believed was a contusion caused by trauma [30]. He observed diffuse endothelial cell swelling with extravasated erythrocytes, vacuolation of the neutrophil and foamy macrophages throughout.

It is my opinion that Dr. Nelson's claim that Robert's brain had a contusion resulting from trauma is not supported by medical facts based on the following reasons:

1) Baby Robert was examined by many physicians and no evidence of injuries caused by trauma was observed in the head or neck regions. These facts were confirmed by the medical examiner on August 10th.

2) No laceration or contusion of Robert's brain was observed on the cerebral CT scans taken on 1029 and 1521 on August 2nd. However, a minor cortical lesion in the brain was observed in the third cerebral CT scan taken on August 3rd at 1046, which resulted from the accumulation of blood in the brain. Dr. Ronald G. Quisling read the CT scan and stated that the blood had shifted down over the tentorium and that it had accumulated in the right parietal lobe of the brain. He referred to this lesion as a brain laceration [25].

3) Anoxia and ischemia can cause diffuse endothelial swelling and extravasation of red blood cells and Robert's brain suffered from severe anoxia and ischemia.

IV-D. Bleeding in the eyes

Dr. Hamilton harvested Robert's eyes at autopsy and sent them to Dr. Michael D. Bell for examination. Dr. Bell examined Robert's eyes grossly and microscopically and he observed retinal hemorrhages [29]. Multiple diffuse retinal hemorrhages were observed in the right eye, while the retina of left eye had only multiple focal retinal hemorrhages. The retinal hemorrhages were positive for iron stain in both eyes, which means that the bleed was older than 24 hours. Baby Robert suffered from diabetes and adverse reactions to treatment with corticosteroid. Both of these conditions cause vascular abnormalities and severe bleeding in the retina as described in Section V of this report.

IV-E. Thymus atrophy

Dr. Hamilton stated that Robert's thymus weight was 4 g and its external and sectioned surfaces were unremarkable [12]. Baby Robert was 4 1/2-months old at the time of autopsy and his thymus weight should have been about 22.5 g. The average thymus weight (g) in a white, infant male at three months and six months of age was found to be 20 and 25, respectively [13]. These data indicate that Robert's thymus weight was approximately 20% of normal size.

The baby was treated with corticosteroid because he was born four-weeks premature. The treatment with corticosteroid causes immune depression as measured by the reduction in size and the function of the lymphoid tissues. Dr. Hamilton did not review the baby's medical record; therefore he overlooked the facts that both the baby and his mother developed diabetes as a result of their treatment with corticosteroid.

Furthermore, the use of corticosteroid at high therapeutic doses causes atrophy in the adrenal gland. Dr. Hamilton stated that the combined weight of the right and left adrenal glands was 4 grams, but he did not evaluate their structure microscopically to check for abnormalities. He also did not take tissue samples from other endocrine glands to be examined microscopically and to check for abnormalities. A study conducted in the United States of America showed that dexamethasone therapy in newborns for a period of a week or longer was associated with suppression of the hypothalamic-pituitary-adrenal axis (HPAA) in a substantial number of premature infants [32].

IV-F. Robert's spleen weight appeared less than normal.

Robert's spleen weight at autopsy was 16 g [12]. The average spleen weights for infants at 3 and 6 months of age were found to be 16.3 g and 22 g respectively [13]. Based on these data, the expected weight of the spleen in a 4 ½ month old white baby is 19 g. Furthermore, it is possible that the actual spleen weight in Robert's case was significantly less than 16 g because his organs were congested with blood.

Robert's liver weight was 324 g and the expected liver weight for a 4 1/2-month old baby is about 220 g [12, 13]. His lungs were also heavier than normal (160 g) because of congestion. The normal lungs weight for a baby at Robert's age is about 94 g. The liver and lungs weight were increased by 45% and 70%, respectively because of congestion.

These data indicate that the actual spleen weight in Robert's case may have been a lot less than 16 g; Robert had severe atrophy of the spleen as it happened with the thymus. Dr. Hamilton did not examine the spleen microscopically and gross examination alone is not adequate to detect microscopic abnormalities.

IV-G. Inadequate examination of the heart

The clinical data indicate that Robert suffered from heart problems (Tables 5 & 6). However, Dr. Hamilton did not take tissue samples to microscopically evaluate the structure of Robert's heart. He examined the heart grossly and declared that Robert's heart was normal. I believe that Dr. Hamilton's conclusion is not valid based on the following facts: 1) The emergency teams monitored the baby's heart at 0943 and found that he had sinus tachycardia with a pulse rate of 172-190 per minute (Table 5); 2) blood analysis showed that he had high levels of troponin I, CKMB, and CK total which indicated that the baby was suffering from myocardiac damage (Table 6); 3) the EKG exam taken at 1830 on August 2nd showed the baby's heart suffered from ischemic changes and arrhythmia; 4) some elevation in ST waves was noted indicating acute myocardial injury.

## Section V. Analysis of Clinical Events and Causes That Led to Baby Robert's Respiratory Arrest and Death

The clinical data described in Sections I through IV of this report show that Baby Robert suffered from several chronic illnesses and some of these illnesses led to his respiratory arrest and death in August of 2000. These illnesses include: brain atrophy and other neurological problems, subdural bleed, retinal bleed and other abnormalities, diabetes, heart problems, sinus and ear infections, muscle weakness, atrophy of the lymphoid tissue, and excessive weight gain.

Robert's illnesses resulted from his exposure to high therapeutic doses of corticosteroid (betamethasone). His thymic atrophy was severe and it indicates that the baby was treated with high doses of corticosteroid. His thymus weight at autopsy was about 20% of normal. The thymus is a very sensitive biomarker for the effect of corticosteroid.

Adverse reactions to corticosteroid have been reported in children. These include: 1) fluid and electrolyte disturbance (sodium retention, fluid retention, potassium loss, and hypokalemic alkalosis); 2) increased capillary fragility; 3) musculoskeletal problems (muscle weakness, steroid myopathy, and loss of muscle mass); 4) cardiovascular problems (congestive heart failure in susceptible patients, cardiac hypertrophy, and hypertension); 5) gastrointestinal problems (peptic ulcer with possible subsequent perforation and hemorrhage, pancreatitis, abdominal distention, ulcerative esophagitis); 6) neurological problems (convulsions and increased intracranial pressure, brain atrophy, and demylination); 7) manifestations of latent diabetes mellitus and glycosuria; 8) ophthalmic problems (posterior subcapsular cataracts, increased intraocular pressure and glaucoma, exophthalmos, and retinopathy); 9) metabolic problems (negative nitrogen balance due to protein catabolism); 10) abnormal weight gain; 11) decreased functions of the immune systems and increased susceptibility to infections [33, 5].

Baby Robert was also exposed to micronase (anti-diabetic drug) via milk and this medication should not be given to a nursing mother. It causes hypoglycemia in breast-fed infants. Robert's mother did not suffer from diabetes during her pregnancy. However, her medical record indicates that she was treated with micronase after giving birth and that she stopped taking this medication on June 8th. This indicates that her diabetes was caused by her treatment with corticosteroid during her last week of pregnancy. The baby

also suffered from glycosuria and diabetes as a result of his exposure to corticosteroid [8].

Furthermore, the baby was given vaccines (Tables 3 and 4) when he was suffering from immune depression as a result of his treatment with corticosteroid, which increased his risk of developing ear and sinus infections. Glucocorticoids cause profound and varied metabolic effects. They also modify the body's immune response to diverse stimuli. Immunization procedures should not be undertaken in patients, who are on corticosteroids, especially in high doses, because of the possible hazards of neurological complications and lack of antibody response [5, page 2824]. The cerebral CT scan taken at 1043 on August 2nd showed that Baby Robert suffered from significant sinus and mastoid disease [8].

V-A. Events that led to Robert's respiratory arrest on August 2nd, 2000

Baby Robert suffered from respiratory arrest on August 2nd, 2000 between 0920 and 0935 and the medical evidence indicates that the following events led to his respiratory arrest:

1) Baby Robert suffered from a seizure prior to 0935 and his seizure resulted from neurological problems and brain atrophy caused by his treatment with corticosteroids. Dr. Anne Elizabeth Dickison who treated Baby Robert on the morning of August 2nd stated that the baby was seizing and he was very stiff. She said "he was so stiff you could pick him up by a leg and he would stay stiff". His tongue was so stiff that the physician needed to cause him to relax in order to correctly place the breathing tube without traumatizing him. Dr. Dickison treated Baby Robert with muscle relaxant and anti-seizure medications [26].

2) The severe seizure caused Baby Robert to vomit and led to the blockage of his airways with fluids, which prompted his respiratory arrest. The baby vomited on the bed and the floor near the bed. Brian told the person who took the 911 call that the baby was draining white fluid-like formula milk from his mouth and nose. The baby was also coughing [22, page 445]. The emergency team who arrived on the scene to treat the baby had to clear fluid from his mouth and nose in order to get oxygen into him. The paramedic used a vacuum to suck about 10 mL of formula from his airway. The baby had been fed about 8 ounces of formula milk within 30 minutes prior to his seizure.

3) The movement of the baby from his place on the bed to the end of the bed can be explained by his seizure and his struggle to breath. Robert's mother stated that her baby was able to roll halfway [11].

V-B. The biomechanisms of Robert's injuries

Baby Robert suffered from respiratory arrest for a significant time and that led to brain anoxia and cardiac damage. In addition, the baby suffered from a chronic subdural bleed and retinal bleed as a result of his treatment with corticosteroid. Corticosteroid induces diabetes, hypertension, brain atrophy, and it increases capillary fragility and abnormal vascular growth in the retina. Glucocorticoid causes hypertension and cardiovascular disease due to its capacity to promote sodium retention and increased blood pressure [33].

Baby Robert suffered from polyurea as early as April 19, 2000 when he was four weeks old. On April 17th, 19th, and 26th, 2000, his grandmother stated that she was changing wet diapers 8-10 times per day. This indicates that the baby was suffering from polyurea. The urine and blood analyses performed on August 2nd showed that the baby was suffering from hyperglycemia and glycosurea. His blood glucose level was 317 mg/dl and he had glycosurea (>1000 mg/dL) [8]. These conditions usually cause polyurea.

The cerebral CT scan taken on August 2nd at 1028 showed that Robert had a multi-generation subdural bleed. Dr. Ronald G. Quisling, neuroradiologist estimated the fresh bleed to be 20-25% of the total bleed observed [25]. The fresh bleed increased to 35% of the total at 1521 on August 2nd. The cerebral CT sans taken on August 3rd and 4th showed no change in the status of the bleed observed in the last CT scan taken on August 2nd.

The occurrence of the fresh bleed in the subdural space observed on August 2nd can be explained by the synergistic actions of several factors. These include: 1) the presence of previous vascular injury in the subdura which led to re-bleeding; 2) severe seizure that led to an increase in the intracranial pressure; 3) elevation in heart rate that led to an increase in the blood pressure. The baby's pulse rate was 172 at 0938 on August 2nd; 4) injection of relatively large volumes of therapeutic fluid administered intravenously can cause an increase in the blood pressure.

The retinal bleed observed by Dr. Lawrence Levine on August 2nd can be explained by Robert's treatment with corticosteroid and diabetes. These conditions have been known to cause retinopathy and retinal bleeds. In addition to the retinal bleed, Dr. Levine

observed blood in the vitreous body, big white spots in the back of the eye, (which he referred to as Purtscher's retinopathy), and a crack in the back of the eye, (which he called a choroidal rupture) [27]. These lesions have also been reported in patients suffering from diabetes and/or treatment with high therapeutic doses of corticosteroid [5, 33].

Robert's symptoms and lesions described in this report resemble those that have presented in other infants who have also been treated with corticosteroids. Adverse reactions to corticosteroids in infants have been widely reported in the medical literature. However, none of the physicians or the medical examiner that evaluated this case paid any attention to these facts. Baby Robert was born four weeks premature and he and his mother were treated with corticosteroid. The following are descriptions of selected studies that explain the adverse reactions to corticosteroids in preterm infants and older children.

V-C. Corticosteroids cause neurological problems in children

**V-C1. Treatment with corticosteroids and neurological problems**

Corticosteroid compounds are given to pregnant women who are at risk of delivering premature infants and to preterm infants in order to help in maturation of the infant's lungs. Robert's mother was treated with corticosteroid during her last week of pregnancy. Baby Robert suffered from severe thymic atrophy and other adverse reactions to corticosteroid. His symptoms indicate that he was treated with high therapeutic doses of corticosteroid. Prenatal and postnatal treatments with therapeutic doses of corticosteroid compounds have shown to cause early and delayed neurological problems in infants as described below.

Eighteen premature (23 to 31 weeks) infants (7 treated with dexamethasone and 11 not treated) were studied at term, i.e., 38 to 41 post-conceptional weeks. Advanced quantitative volumetric 3-dimensional magnetic resonance imaging (MRI) technique was used to quantify cerebral tissue volumes in these infants. Fourteen healthy term infants were also studied for comparison. Cerebral cortical gray matter volume in premature infants treated with dexamethasone was reduced by 35% when compared with gray matter volume in premature infants not treated with dexamethasone (mean +/- standard deviation, 130.3 +/- 54.0 vs. 200.6 +/- 35.1 mL, respectively). Premature infants treated with dexamethasone exhibited a reduction (30%) in total cerebral tissue volume

compared with total cerebral tissue volume in both the control term infants and premature infants not treated with dexamethasone (312.7 +/- 43.7 vs. 448.2 +/- 50.2 and 471.6 +/- 36.4 mL respectively) [34].

Furthermore, dexamethasone given postnatally to treat or prevent bronchopulmonary dysplasia (BPD) has also shown to increase the risk of neurologic impairment, neurodevelopmental disability, and the rate of cerebral palsy in preterm infants and later in survivors [35-37]. Nineteen randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth in high-risk preterm infants were reviewed. In the two trials, which have reported late outcomes, several adverse neurological effects were found at follow-up examinations of survivors treated with early steroids. These include: abnormal neurological examination, cerebral palsy, and developmental delay [38, 39].

In addition, twenty-one randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth (early) enrolling a total of 3072 preterm infants were reviewed. In the nine trials that have reported late outcomes, several adverse neurological effects were found at follow-up examinations of survivors treated with early steroids. These include cerebral palsy and other abnormal neurological findings [40]. Also, randomized controlled trials of postnatal corticosteroid treatment initiated at > 3 weeks of age in preterm infants with CLD were reviewed. There were increases in long-term neurologic sequelae including abnormal neurologic examination and cerebral palsy [41].

Yeh et al. evaluated a total of 133 preterm infants (70 in the control group, 63 in the dexamethasone-treated group) who survived the initial study period and lived to 2 years of age. For infants in the treatment group, dexamethasone was started at a mean age of 8.1 hours and given 0.25 mg/kg every 12 hours for one week and then tapered off gradually over a 3-week period. The dexamethasone-treated group had a significantly higher incidence of neuromotor dysfunction (25/63 vs. 12/70) than the control group. Significant handicap was seen in 22 children (31.4%) in the control group and 26 (41.2%) in the dexamethasone-treated group [42].

Furthermore, a study compared a three-day course of dexamethasone (n =132) with a saline placebo (n = 116) administered from before 12 hours of age in preterm infants. Dexamethasone treatment was associated with increased incidence of hypertension, hyperglycemia, and gastrointestinal hemorrhage and no reduction in either the incidence

or severity of chronic lung disease or mortality. A total of 195 infants survived to discharge and five died later [43].

Follow up data were obtained on 159 of 190 survivors at a mean age of 18 months. Dexamethasone treated children had a significantly higher incidence of cerebral palsy than those receiving placebo 49% v.15%, respectively. The most common form of cerebral palsy was spastic diplegia and the incidence rates were 28% v. 6% in dexamethasone and placebo treated infants, respectively. Developmental delay was also significantly more common in the dexamethasone treated group (55%) than in the placebo treated group (29%) [43].

Also, a study evaluated the long-term adverse effects of corticosteroid given to infants on the nervous system. Of the 120 children who received corticosteroids, 98 (81.7%) survived to 5 years of age, compared with 200 (88.5%) of the 226 children who did not receive corticosteroids. At 5 years of age, survivors treated with corticosteroids postnatally had significantly higher rates of cerebral palsy (23%) compared with children not treated (4%).

In addition, the rate of sensorineural disabilities was significantly higher in children treated with postnatal corticosteroids, and the association between adverse sensorineural outcome and postnatal corticosteroids remained the same after adjustments for potentially confounding variables. In a separate case-control analysis of 60 children in each group, the rate of cerebral palsy remained significantly elevated (corticosteroids 22%, no corticosteroids 5%) [44].

Bos et al. studied 37 preterm infants with Prechtl's method for the qualitative assessment of general movements before, during and after dexamethasone therapy and found that the quality of general movements was impaired in 9 of 13 initially normal infants. The quality of fidgety movements at 3 months was abnormal in the majority of the infants and strongly correlated with neurological abnormalities at 2 years of age [45].

**V-C2. The release of high levels of endogenous corticosteroid also causes neurological problems**

The adrenocorticotrophic hormone (ACTH) is released from the pituitary gland to stimulate the cortex of the adrenal glands. This causes an increase in the synthesis and the release of cortisol. It has been shown that the treatment of children with ACTH also

caused neurological problems as a result of the release of endogenous cortisol. For example, eight children with different petit mal epilepsies were systematically treated with ACTH and dexamethasone. Cranial computed tomography (CCT) examinations were performed before, during and after treatment. Severe cerebral changes were observed in all children. Enlargement of ventricles and subarachnoid space was developed during the initial phase of treatment with Depot-ACTH. Similar changes, but to a lesser degree were observed during the phase of dexamethasone therapy thereafter [46].

Furthermore, Riikonen and Donner evaluated 162 children with infantile spasms who were treated with ACTH. In a large proportion (37%) of the children, the treatment caused pronounced side effects, and the mortality rate was 4.9%. At autopsy, fresh intracerebral hemorrhages were observed [47].

**V-C3. Abnormal changes in the nervous system caused by corticosteroid can also be reproduced in experimental animals**

Experimental studies in animals have shown that multiple courses of antenatal corticosteroid cause deleterious effects on lung growth, brain myelination, hypothalamic-pituitary-adrenal function, and retina development [48]. Animal studies have also shown that maternal corticosteroid delays myelination and reduces the growth of all fetal brain areas, particularly the hippocampus [49].

Furthermore, Aghajafari et al. evaluated the results of eighteen studies dealing with the adverse effects of antenatal corticosteroids on the nervous system and fetal growth in experimental animals. Seven studies investigated the effects of repeated doses of antenatal corticosteroids on the brain and nervous system function or growth. All seven studies found adverse effects with repeated doses of antenatal corticosteroids. Eleven studies looked at the effect of repeated doses of antenatal corticosteroids on fetal growth. Nine studies found evidence of fetal growth restriction with repeated doses of antenatal corticosteroids [50].

In addition, pregnant ewes were given saline or betamethasone (0.5 mg/kg) at 104, 111, 118, and 124 days gestation, stages equivalent to the third trimester in humans. Lambs were delivered at 145 days (term), perfused and the corpus callosum examined with light and electron microscopically. Total axon numbers were unaffected ($P>0.05$).

However, myelination was significantly delayed. Myelinated axons were 5.7% in the experimental group and 9.2% in controls ($P<0.05$). Myelinated axon diameter and myelin sheath thickness were also reduced (0.68 vs. 0.94 and 0.11 vs. 0.14 microm, $P<0.05$) [51].

Furthermore, Quinlivan examined the effect of single or repeated injections of maternally administered corticosteroids on fetal growth in sheep. Forty-six date-mated singleton gestation ewes were allocated at random to one of three groups: a single or repeated injection of betamethasone, or a control group, which received saline. On days 125 (preterm) or 145 (term) caesarean section delivery was performed. After the lambs were killed, measures of size and weight were recorded. Significant betamethasone dose dependent reduction in body and organ weights and biometry were found at preterm and term gestational ages ($p < 0.05$). There was little catch up growth in those in whom delivery was delayed until term. Thymus, spleen and liver were particularly targeted [52].

V-D. Corticosteroid causes cardiomyopathy in infants

Yunis et al. reported three cases of newborns whose mothers were treated with betamethasone prenatally at different doses and duration of time. They developed various degrees of hypertrophic cardiomyopathy (HCM), which was diagnosed by echocardiography. They suggested that repeated antenatal maternal steroid intake might cause changes of HCM in the newborn. These changes appear to be dose-and duration-related [53]. In addition, Miranda-Mallea et al. reported two cases of hypertrophic cardiomyopathy in two preterm newborns secondary to dexamethasone treatment [54].

Furthermore, Israel et al. conducted a retrospective review of one preterm infant who received a 26-day course, and 13 preterm infants who received at least one 42-day course of dexamethasone, and who had serial echocardiographic data available. Left ventricular hypertrophy was noted in 8 of 14 (57%) infants; hypertrophy usually was noted near the end of the treatment course. Five of these eight affected infants died; the hypertrophic cardiomyopathy was considered to have contributed to mortality in three of these five infants. They speculate that prolonged dexamethasone treatment for chronic lung disease (CLD) is associated with hypertrophic cardiomyopathy in a significant portion of preterm infants [55].

Also, twenty preterm infants were studied serially with Doppler echocardiography to

document changes in myocardial thickness associated with dexamethasone treatment for chronic lung disease. Ventricular septa and left ventricular posterior wall thickness was increased in all 11 infants in whom it was measured. The median increase was 0.9 and 0.8 mm, respectively. In most infants this increase was small, less than 1 mm, however two infants developed marked septal hypertrophy with Doppler evidence of left ventricular outflow tract obstruction. In addition, myocardial hypertrophy occurs in most infants and in some of them it was severe [56].

Furthermore, eighteen children treated for infantile spasms with high-dose of adenocorticotropin were evaluated for adverse effects of corticosteroid on the heart. Abnormal ventricular hypertrophy occurs in the majority of these patients. Many of these patients developed hypertrophic cardiomyopathy with dramatic asymmetric septal hypertrophy. Abnormal cardiac hypertrophy was seen in 13 (72%) of 18 patients. Five of 18 patients developed hypertrophic cardiomyopathy with asymmetric septal hypertrophy and concentric left ventricular hypertrophy was seen in eight patients [57].

V-E. Corticosteroid causes hypertension, diabetes, and other systemic problems

Dexamethasone treatment of preterm infants started within the first 4 days of life has been shown to cause metabolic disturbances, cardiac hypertrophy, reduced growth and gastrointestinal perforation. Nineteen randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth in high-risk preterm infants were reviewed. Gastrointestinal bleeding and intestinal perforation were important adverse effects and the risks of hyperglycemia and hypertension were also increased [38, 39].

In addition, a multi-center, randomized, placebo controlled, blinded study was carried out in 18 neonatal intensive care units in Israel to study the effect of early postnatal dexamethasone (days 1-3). The study consisted of 248 infants (dexamethasone n = 132; placebo n = 116). Gastrointestinal hemorrhage, hypertension, and hyperglycemia were more common in dexamethasone treated infants [59]. Furthermore, twenty-one randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth (early) enrolling a total of 3072 preterm infants were reviewed. Gastrointestinal bleeding and intestinal perforation were noted adverse effects and the risks of hyperglycemia and hypertension also increased [40].

The magnitude and duration of the effect of dexamethasone on systolic blood

pressure has also been examined in 13 preterm infants (median gestational age 25 weeks). All had chronic lung disease (CLD). To exclude any effect of CLD on blood pressure each infant acted as his or her own control. Systolic blood pressure increased in all infants (P less than 0.01) and remained elevated for at least 48 hours following cessation of therapy. The median maximum increase in blood pressure was 24 mmHg (range 13-49 mmHg) and occurred on day 4 (median, range 2-10) of treatment. One infant also developed hypertensive encephalopathy. These results demonstrate the need to monitor infants with CLD throughout steroid therapy and preferably for some days after treatment has ceased [60].

Furthermore, randomized controlled trials of postnatal corticosteroid treatment from 7-14 days of birth in high-risk preterm infants were reviewed. Adverse effects included: hypertension, hyperglycemia, gastrointestinal bleeding, hypertrophic cardiomyopathy and infection [61]. In addition, nine trials enrolling a total of 562 infants were reviewed to determine the adverse reactions of late (usually > 3 weeks) postnatal corticosteroid treatment vs. control (placebo or nothing). Short-term adverse affects included glycosuria and hypertension. There was also an increase in severe retinopathy of prematurity [62].

Also, randomized controlled trials of postnatal corticosteroid treatment initiated at > 3 weeks of age in preterm infants with CLD were evaluated. Short-term adverse affects included hyperglycemia, glycosuria and hypertension. There was also an increase in severe retinopathy of prematurity [41].

The influence of dexamethasone (0.25 mg kg-1 i.v., twice daily) on diuresis in preterm infants was also studied in 15 preterm infants at risk for chronic lung disease. Urine output, blood glucose, serum urea, serum creatinine, serum sodium and serum potassium, as well as systolic, diastolic and mean arterial pressure were measured on the day before, and on 4 consecutive days after starting treatment with dexamethasone (0.25 mg kg-1 i.v., twice daily). The authors found an increase of diuresis of 30 ml kg -1 d-1, 48-96 hours after starting dexamethasone treatment. This coincided with a gradual but significant increase of serum urea levels and arterial pressure [63].

These findings suggest that the increased urine output following dexamethasone treatment might be caused by two factors: (1) pressure diuresis induced by the increase of arterial pressure and (2) an increase of the osmolar load to the kidney due to an increase

of serum urea. This study demonstrates that a significant increase of diuresis occurs in preterm infants, 48-96 hours after starting dexamethasone [63].

Furthermore, a study conducted in the United States of America showed that dexamethasone therapy in newborns for a period of a week or longer was associated with suppression of the hypothalamic-pituitary-adrenal axis (HPAA) in a substantial number of premature infants [32].

Also, Riikonen and Donner evaluated 162 children with infantile spasms who were treated with ACTH. In a large proportion (37%) of the children, the treatment caused pronounced side effects with a mortality rate of 4.9%. The most common complications were infections: septic infections, pneumonias, and urinary and gastrointestinal infections. Other side effects were arterial hypertension (11), osteoporosis (2), hypokalemic alkalosis (2), and other marked electrolyte disturbances (10) [47].

V-F. Corticosteroid increases the risk for infections in infants

Vermillion et al. performed a non-concurrent prospective analysis of singleton pregnancies delivered between 24 and 34 weeks of gestation after antenatal betamethasone exposure. Patients were categorized into two groups according to betamethasone exposure: (1) two 12-mg doses in a 24-hour interval on admission (single-course group) and (2) repeated dosing after the initial single course (multiple-course group). A total of 453 patients were included, with 267 in the single-course group and 186 in the multiple-course group. Multiple courses of antenatal betamethasone are associated with increased risks of perinatal infectious morbidity and neonatal death [64].

Also, a total of 371 low birth weight infants were enrolled in the trial. For the first 14 days of study, 182 infants received dexamethasone (group I) and 189 infants were given placebo (group II). Infants who received a 14-day course of dexamethasone initiated at 2 weeks of age were more likely to develop a bloodstream or cerebrospinal fluid infection while on dexamethasone therapy than were those who received placebo [65]. In a second study, the medical records of 158 premature infants were evaluated. Seventy-five infants (58%) received antenatal steroids and eighty-eight infants (68%) received postnatal steroids. Sepsis developed in 44 (34%) infants and fungal sepsis in 14 (11%) [66].

Furthermore, potential side effects of antenatal administration of corticosteroids to prevent neonatal respiratory distress syndrome were evaluated in 10 to 12-year-old

children whose mothers had participated in a randomized, double-blind, placebo-controlled trial of betamethasone. In the corticosteroid group, more hospital admissions were reported due to infectious diseases during the first years of life [67].

V-G. Corticosteroid causes retinopathy and other vision problems in patients

Medical records of 158 premature infants were studied. Seventy-five infants (58%) received antenatal steroids and eighty-eight infants (68%) received postnatal steroids. Incidence of retinopathy of prematurity (ROP) was 77% (100/130) and severe ROP (stage > or =3) was reported in 52% (68). Postnatal steroid use is an independent risk factor for development of severe ROP [66].

Development of central chorioretinopathy (CSC) following the administration of corticosteroids by diverse routes is a well-known fact. Schalenbourg et al. reported acute visual loss after the use of systemic corticosteroids in three patients to treat long-standing ocular inflammatory disorders [68]. Furthermore, Spraul et al. evaluated five patients who developed maculopathy during treatment with systemic corticosteroids. Three patients displayed focal and two patients showed diffuse retinal pigment epithelial changes comparable to the acute and chronic form of central chorioretinopathy, respectively. Four of five patients had a complete visual recovery after decrease or cessation of treatment with corticosteroids. The authors concluded that systemic treatment with corticosteroids may damage the posterior blood-retinal barrier, leading to central chorioretinopathy [69].

In addition, Chaine et al. described fourteen cases of detachment of the macula due to central chorioretinopathy in patients given long-term steroid therapy. None of the patients had hypertension. Detachment occurred between 6 days and 10 years after the start of steroid treatment. The higher the doses, the earlier the onset of ocular disease appeared. All patients were symptomatic, with rapid onset of blurred vision. Detachment was bilateral in two cases [70]. Also, Song et al. reported five patients who were diagnosed as having central chorioretinopathy (CSC) during systemic corticosteroid treatment based on medical records and fluorescein angiography. [71].

## Section VI. Brian Herlihy's Jury Trial and Analysis of The Evidence Presented

Brian Herlihy's jury trial was held in the Eighth Judicial Circuit in Alachua County, Florida on September 10, 2002. Trial lasted sixteen days (Case No. 01-2000-CF-2753-A) and the Honorable Judge Martha Ann Lott presided over this trial. Attorneys Jeanne Singer and Stephen Pennypacker represented the State, and attorneys Gordon Groland and John Tedder represented the defendant [2, 4, 7, 11, 22, 26, 27, 30, 31, 72-82].

The State claimed that Baby Robert Quirello was perfectly fine and that there was absolutely nothing wrong with him when his mother brought him to Brian's apartment shortly after 0900 on August 2nd, 2000. In addition, the State alleged that Baby Robert was never lethargic or anxious from the time of his birth until the morning of August 2nd, 2000. The State asserted that while Baby Robert was alone with the Brian Herlihy, he suffered from violent shaking which ultimately resulted in fatal neurological damage and his death. The State furthermore claimed that Brian punished Baby Robert because the baby was crying and had annoyed, maddened, and frustrated him [79, page 2226].

Several physicians and the medical examiner examined the baby on August 2nd through August 10th and they did not find any sign of injuries on the baby's head or body that was caused by trauma or abuse. Brian has stated to the police numerous times that he is innocent and that he took very good care of the baby. Brian also had cared for Baby Robert about five times in the past, for several hours per day and the baby had been fine [11]. However, Brian Herlihy was convicted of manslaughter in the death of Robert Benjamin Quirello and sentenced to 15 years in prison.

I reviewed the medical evidence and trial documents related to this case. I found that the State did not present any medical evidence that showed Brian Herlihy harmed Baby Robert nor that Robert's injuries were caused by violent shaking and trauma. My investigation furthermore revealed that the baby was suffering from serious health problems prior to August 2nd, 2000 that led to his respiratory arrest, neurological damage, and his death in August of 2000.

Dr. William Frank Hamilton, the medical examiner, and seven physicians testified as expert witnesses for the State. Two physicians testified as experts for the defense. The physicians that testified for the State in this case include: 1) Dr. William Frank Hamilton,

forensic pathologist; 2) Dr. Harvey George Rohlwing, emergency medicine specialist; 3) Dr. Anne Elizabeth Dickison, pediatrician and intensive care specialist; 4) Dr. Stephen John Nelson, neuropathologist; 5) Dr. Bernie Maria, pediatric neurologist; 6) Dr. Lawrence Levine, pediatric ophthalmologist; 7) Dr. John Hellrung, pediatrician; 8) Dr. Richard M. Kreinest, obstetriction/gynecologist. The physicians who testified for the defense are Dr. John Plunkett, forensic pathologist and Dr. Ronald Henry Uscinski, neurosurgeon.

**VI-A. The testimonies given by the State's expert witnesses are based upon theory**

The medical examiner and the State's expert witnesses alleged that Baby Robert's respiratory arrest, neurological damage, and death were caused by violent shaking while he was with Brian Herlihy prior to 0937 on August 2nd, 2000. My review of the medical evidence described in the previous five sections of this report clearly shows that Baby Robert suffered from chronic health problems (chronic subdural bleed, retinal hemorrhage, brain atrophy, atrophy of the thymus, diabetes, muscle weakness, and sinus and ear infections) that led to his seizure and his respiratory arrest on August 2nd, 2000.

Robert's serious health problems were caused by his treatment with corticosteroid. In addition, the vaccines given to Baby Robert contributed to his health problems. I described the adverse reactions to vaccines and corticosteroids in Sections II and V of this report. None of these physicians considered adverse reactions to corticosteroids and vaccines in their evaluation of this case. In addition, none of these physicians reviewed the baby's prenatal and postnatal medical records to learn about Robert's pre-existing chronic health problems.

My review of the medical evidence furthermore revealed that several of these physicians were aware that Baby Robert suffered from chronic health conditions such as a chronic subdural bleed, brain atrophy, and sinus and ear infections. However, they did not make any attempt to investigate the links between the baby's chronic illnesses and his respiratory arrest on the morning of August 2nd, 2000. The following is a list of medical evidence that shows the State's expert witnesses conducted an incomplete medical investigation in this case. They blindly rushed to judgment and their conclusions are invalid and unsupported by the medical facts pertaining to this case.

1) The emergency team, several physicians, and the medical examiner examined the baby on August 2nd through August 10th and they did not find any sign of injuries on the baby's head or body that was caused by trauma or abuse.

2) The four cerebral CT scans taken on August 2nd through August 4th showed that Baby Robert suffered from a chronic subdural bleed. However, none of the physicians who testified for the State ever investigated the causes of the bleed. Furthermore, the medical examiner did not take a sample from the dura to examine microscopically in order to date the bleed. The data described in Section V of this report show that prenatal and postnatal treatments of infants with corticosteroid caused hypertension, hyperatrophic cardiomyopathy, encephalopathy, and increased capillary fragility, which can lead to subdural bleeding.

3) The treating physician, Dr. Dickison and the neuropathologist, Dr. Nelson were both aware that Baby Robert suffered from brain atrophy but they did not investigate the cause(s) of the atrophy or the link between the atrophy and the baby's seizure and his respiratory arrest that occurred on August 2nd. Dr. Dickison stated "the baby had a smaller brain than the size of the skull, meaning that there was probably some atrophy or wasting of the surface of the brain or that the brain was not growing as rapidly as it should have been" [31]. Dr. Nelson said that Robert's brain was an immature brain and it was inconsistent with a brain of a child of four and a half months of age [30].

Baby Robert suffered from severe thymic atrophy, which indicates that he had been treated with high doses of corticosteroid. It has been reported that premature infants treated with dexamethasone exhibited a 30% reduction in total cerebral tissue volume compared with total cerebral tissue volume in both premature infants not treated with dexamethasone and the control term infants [34]. Furthermore, dexamethasone given postnatally to infants has been shown to increase the risk of neurologic impairment, neurodevelopmental disability, and the rate of cerebral palsy in preterm infants and later in survivors [35-37].

4) The lesions observed in the brain were edema and cell necrosis. They were caused by severe global anoxia and ischemia and not by trauma. Brian found the baby was not breathing at 0937 on August 2nd. Dr. Dickison also found the baby

was not breathing well and the endotracheal tube was not in place at about 1100 because the baby was suffering from a severe seizure and his tongue was very stiff. His color was gray and ashen [26]. The baby had been suffering from anoxia for at least 60 minutes. This lack of oxygen also caused heart injury as explained in Section III.

5) Dr. John Hellrung, Baby Robert's pediatrician stated in the trial that the baby was normal. However, his examinations showed that the baby suffered from excessive weight gain, polyurea, muscle weakness in the neck region, neurological problems, and possible vision problems. For example, on April 19th, 2000, Dr. Hellrung reported that the baby gained eight ounces in two days and he would have gained two ounces under normal circumstances. The baby's weight at 4 ½ months was more than 300% his body weight at birth (Table 2).

In addition, the baby's tracking with his eyes was not consistent following an object more than a hundred degrees. The baby also had poor head and neck control, decreased muscle tone in the shoulders and neck, and tight hip flexors [11]. Robert's serum creatinine levels measured on August 2nd and 3rd showed that the baby was suffering from a muscle-wasting problem. His serum creatinine levels were less than 25% of normal (Table 7). It is clear that Robert was suffering from adverse reactions to corticosteroid as described in Section V. However, Dr. Hellrung overlooked the connection between the baby's treatment with corticosteroid and his symptoms.

6) Dr. Hamilton, the medical examiner found that the weight of Robert's thymus was 4 grams, which is about 20% of the normal weight. However, he stated that Robert's thymus was normal. The average thymus weight (g) in a white, infant male at three and six months of age was found to be 20 and 25, respectively [13]. Baby Robert was 4-1/2-months old and his thymus weight should have been about 22.5 g. Treatment with corticosteroid causes immune depression as measured by the reduction in the size and the function of the lymphoid tissues. It is obvious that the medical examiner overlooked an important biological indicator that showed the baby was suffering from a severe adverse reaction to corticosteroid.

7) Dr. Lawrence Levine examined the baby's eyes and found retinal hemorrhage, white spots in the back of the eye, which he called "Purtscher's retinopathy", and

a crack in the back of the eye, which he called a choroidal rupture. He claimed that these lesions were caused by trauma, however his examination of the eyes and eyelids did not reveal any sign of external injuries caused by trauma.

I presented the findings of several studies in Section V of this report that show the treatment of children and adults with corticosteroid caused retinopathy, increased capillary fragility, hypertension, and diabetes. Hypertension and diabetes have also been known to cause retinopathy. The baby suffered from severe thymic atrophy that indicates he was treated with high doses of corticosteroids. In addition, the clinical data presented in Section III show that Baby Robert suffered from diabetes. It is very clear that Dr. Levine overlooked crucial medical evidence that showed the link between the baby's treatment with corticosteroids and the lesions observed in the retina.

## Section VII. Conclusions and Recommendations

Baby Robert suffered from gastrointestinal disturbance, reduction in food intake, polyurea, excessive weight gain, myopathy, neurological problems, brain atrophy, chronic subdural and retinal hemorrhage, vision problems, atrophy of the thymus, diabetes, and sinus and ear infections. These symptoms and lesions have been described in preterm infants treated with high therapeutic doses of corticosteroid (Section V).

Robert was born four weeks premature and his mother was treated with betamethasone (corticosteroid) during the last week of her pregnancy. She developed diabetes as a result of this treatment. Robert's thymus weight at autopsy was less than 20% of normal, which indicates that he was also treated with high doses of corticosteroids. Thymus weight is a very sensitive biomarker for the exposure to corticosteroids.

In addition, Baby Robert was exposed to micronase during his first three months of life. Robert's mother developed diabetes as a result of her treatment with corticosteroid and she was treated with micronase. Micronase is not recommended as a treatment in nursing mothers due to the risk of causing hypoglycemia in infants. However, she breast-fed Robert during her treatment with micronase.

Furthermore, the baby was given six vaccines at two months of age and he was re-vaccinated again with these six vaccines at four months of age. At that time he was suffering from severe immune depression as indicated by his thymus weight. These vaccines increased his susceptibility to develop infections. The baby suffered from sinus and ear infections as shown by his cerebral CT scans taken on August 2nd. Also, DTP vaccines have been known to increase the risk of developing neurological disorders in children, such as encephalopathy or complicated convulsion(s).

Baby Robert suffered from respiratory arrest on August 2nd, 2000 between 0920 and 0935. The events that led to his respiratory arrest can be explained as follows: 1) Baby Robert suffered from a seizure prior to 0935 and his seizure resulted from a neurological problem and brain atrophy caused by his prenatal and postnatal treatment with corticosteroids. In addition, the vaccines received on July 19, 2000 might have played a role in triggering Robert's seizure. 2) The severe seizure caused the baby to vomit and that blocked his airways with fluids, which subsequently led to his respiratory arrest. The baby vomited a significant amount of formula like fluid and the paramedic used a vacuum to suck about 10 mL of formula from his airway. The baby had been fed about 8 ounces of formula milk within 30 minutes prior to his seizure. Baby Robert suffered from respiratory arrest for at least 60 minutes and that led to severe anoxia, which caused brain and cardiac damage.

The cerebral CT scan taken on August 2nd at 1028 showed that Robert had a multi-generation subdural bleed. The fresh bleed was estimated to be 20-25% of the total bleed. The occurrence of the fresh bleed in the subdura on August 2nd can be explained by the synergistic actions of several factors. These include: 1) The presence of previous vascular injury in the subdura which led to re-bleeding. 2) Robert suffered from a severe seizure that caused an increase in intracranial pressure. 3) Robert had an elevated heart rate and that led to an increase in the blood pressure. Robert's pulse rate was 172 at 0938 on August 2nd. 4) Injection of relatively large volumes of fluid intravenously led to an increase in the blood volume and an increase in the blood pressure.

The retinal bleed and other retinal vascular changes that were observed by Dr. Lawrence Levine on August 2nd can be explained by Robert's treatment with corticosteroid and diabetes. These conditions have been known to cause retinopathy and retinal bleeding as described in Section V.

The medical examiner and the State's expert witnesses alleged that Baby Robert's respiratory arrest, neurological damage, and death were caused by violent shaking while he was with Brian Herlihy prior to 0937 on August 2nd, 2000. However, the emergency teams, several physicians, and the medical examiner examined the baby on August 2nd through August 10th and they did not find any sign of injuries on the baby's head or body that was caused by trauma or abuse.

In addition, none of these physicians reviewed the baby's prenatal and postnatal medical records to learn about his pre-existing health problems, his treatment with corticosteroid, or his adverse reactions to vaccines. Also, my review of the evidence in this case has revealed that some of these physicians were aware that Baby Robert suffered from chronic health conditions such as a chronic subdural bleed, brain atrophy, and sinus and ear infections. However, they did not make any attempt to investigate the links between the baby's chronic illnesses and his respiratory arrest on the morning of August 2nd, 2000. Presented in Section VI of this report is a comprehensive list of medical evidence that shows the State's expert witnesses conducted an incomplete medical investigation in this case.

The extensive medical evidence presented in this report clearly shows that Baby Robert died as a result of adverse reactions to corticosteroid and vaccines and that Brian Herlihy is innocent. The evidence also shows that Brian was convicted and imprisoned due to sloppy and incomplete medical investigations. I believe that the State of Florida has the responsibility to review the evidence presented in this report. Furthermore, it is my opinion that the State has the obligation to take immediate action to free Brian from prison. Brian should be reimbursed for all legal expenses incurred in addition to being compensated for his pain and suffering.

The objective of the State and that of physicians should be to focus on determining the factual causes that lead to the illness and death of a child so that they can prevent such problems from happening to other children. Accusing innocent people of abusing and killing children based upon unsupported theory, as it happened in this case, will not prevent the death of other children by vaccines and adverse reactions to medications. However, it certainly places innocent people in prison and causes great suffering. It also costs taxpayers huge sums of money to pay for unnecessary trials and legal fees.

I spent approximately 280 hours evaluating the medical evidence in order to find the factual causes of injuries and death in this case and to write this detailed report. I have

also evaluated three other cases from the USA within a 12-month period involving children, who died as a result of adverse reactions to medications and vaccines. In these cases, either their parents or their caretaker were falsely accused of killing them and imprisoned due to false allegations of Shaken Baby Syndrome.

It is my hope that the State of Florida, our federal government, physicians, and our society will take the time to review the evidence presented in the cases that I have evaluated. It is imperative that prompt action is taken to re-evaluate the Shaken Baby Syndrome theory. This theory is not supported by science. Differential diagnosis should and must be used in order to solve complicated medical problems as I have used in these cases to find the factual causes of the injuries and death.

**References**

[1] Crystal Quirello's medical record from Dr. Richard Kreinest's office, Alliance Medical Practice-Women Health Center, Gainesville, Florida.

[2] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume II, September 10, 2002, pages 108-310.

[3] Elizabeth Talaga's report, CPT medical examination of Robert Quirello (Shands MR # 01244463), Department of Pediatrics, University of Florida, Gainesville, FL, August 14, 2000.

[4] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume IX, September 17, 2002, pages 1099-1204.

[5] Physicians' Desk Reference, Edition 53, 1999. Medical Economics Company, Inc, Montavale, NJ, USA.

[6] Merlob P, Levitt O, and Stahl B. Oral antihyperglycemic agents during pregnancy and lactation: a review. Paediatr Drugs. 2002; 4(11):755-60.

[7] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume I, September 10, 2002, pages 1-107.

[8] Robert Quirello's Medical Records from Shands Hospital and Laboratories at the University of Florida. Gainesville, Florida 32610, August 2-10, 2000.

[9] Nelson Textbook of Pediatrics. Edited by Behrman RE, Kliegman RM, Jenson HB. 16Th Edition, W.B. Saunders Company, Philadelphia, 2000.

[10] Robert Quirello's Medical Records, reported by Dr. John Hellrung, Shands Health Care, Gainesville, Florida.

[11] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume VII, September 13, 2002, pages 835-961.

[12] Postmortem Examination of the body of Robert Quirello (ME00-297) by William F. Hamilton, M.D. on August 10, 2000.

[13] Altman PL and Dittmer DS. Growth including reproduction and morphological development. Federation of American Societies for Experimental Biology, USA, 1962.

[14] Sen S, Cloete Y, and Hassan K, Buss P. Adverse events following vaccination in premature infants. Acta Paediatr 2001; 90(8):916-20.

[15] Sanchez PJ, Laptook AR, Fisher L, Sumner J, Risser RC, and Perlman JM. Apnea after immunization of preterm infants. J Pediatr 1997; 130(5):746-51.

[16] Botham SJ, Isaacs D, and Henderson-Smart DJ. Incidence of apnoea and bradycardia in preterm infants following DTPw and Hib immunization: a prospective study. J Paediatr Child Health 1997; 33(5):418-21.

[17] Slack MH, and Schapira D. Severe apnoeas following immunisation in premature infants. Arch Dis Child Fetal Neonatal Ed. 1999; 81(1):F67-8.

[18] Botham SJ, and Isaacs D. Incidence of apnoea and bradycardia in preterm infants following triple antigen immunization. J Paediatr Child Health 1994; 30(6):533-5.

[19] Braun MM, Mootrey GT, Salive ME, Chen RT, and Ellenberg SS. Infant immunization with acellular pertussis vaccines in the United States: assessment of the first two years' data from the Vaccine Adverse Event Reporting System (VAERS). Pediatrics; 106(4):E51, 2000.

[20] Deposition of Firefighter Dennis Meredith. State of Florida vs. Brian Herlihy, Defendant. In the Circuit Court of the Eight Judicial Circuit, in and for Alachua County, Florida. Case No.: 2000-2753-CFA. February 22nd, 2001. Pages 1-13.

[21] Incident report (# 015394), Alachua County Fire/Rescue's report. Gainesville, FL 32602, August 2nd, 2000.

[22] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida

Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume IV, September 11, 2002, Pages 436-568.

[23] Deposition of Firefighter Kenneth A. Johnson. State of Florida vs. Brian Herlihy, defendant. In the Circuit Court of the Eight Judicial Circuit, in and for Alachua County, Florida. Case No.: 2000-2753-CFA. February 22nd, 2001, Pages 1-20.

[24] Incident Report in Case of Robert Q., Gainesville Fire Rescue Department, 1026 NE 14th Street Building B, Gainesville, FL, August 2, 2002.

[25] Deposition of Ronald G. Quisling, M.D. State of Florida vs. Brian Herlihy, defendant. In the Circuit Court of the Eight Judicial Circuit, in and for Alachua County, Florida. Case No.: 2000-2753-CFA. April 8,2002. Pages 1-45.

[26] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume V, September 12, 2002. Pages 569-674.

[27] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume X, September 17, 2002. Pages 1205-1368.

[28] Stephen J. Nelson, letter to Dr. William F. Hamilton on October 23, 2000. District Medical Examiner, 2145 Marshall Edwards Drive, Bartow, Florida.

[29] Michael D. Bell, M.D., report describing the gross and microscopic lesions in Robert Quirello's eyes. Florida Lions eye bank, Inc. September 7, 2000.

[30] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume VIII, September 13, 2002. Pages 962-1098.

[31] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume VI, September 12, 2002. Pages 675-834.

[32] Alkalay AL, Klein AH, Nagel RA, Pomerance JJ. Evaluation of hypothalamic-pituitary-adrenal axis in premature infants treated with dexamethasone. Am J Perinatol. 1996 Nov;13(8):473-7.

[33] Harrison's Principles of Internal Medicine. 14th edition. Editors: Fauci AS, Braunwald E, Isselbacher KJ, Wilson JD, Martin JB, Kasper DL, Hauser SL, and Longo DL. McGraw-Hill, New York, 1998.

[34] Murphy BP, Inder TE, Huppi PS, Warfield S, Zientara GP, Kikinis R, and Jolesz FA, Volpe JJ. Impaired cerebral cortical gray matter growth after treatment with

dexamethasone for neonatal chronic lung disease. Pediatrics. 2001 Feb;107(2):217-21.

[35] O'Shea TM and Doyle LW. Perinatal glucocorticoid therapy and neurodevelopmental outcome: an epidemiologic perspective. Semin Neonatol. 2001 Aug;6(4):293-307.

[36] Rajadurai VS, and Tan KH]. The use and abuse of steroids in perinatal medicine. Ann Acad Med Singapore. 2003 May;32(3):324-34.

[37] Groneck P. Perinatal glucocorticosteroid therapy: time for reconsideration. Z Geburtshilfe Neonatol. 2001 Nov-Dec; 205(6):231-5.

[38] Halliday HL. The effect of postnatal steroids on growth and development. J Perinat Med. 2001;29(4):281-5.

[39] Halliday HL, Ehrenkranz RA. Early postnatal (<96 hours) corticosteroids for preventing chronic lung disease in preterm infants. Cochrane Database Syst Rev. 2001;(1):CD001146.

[40] Halliday HL, Ehrenkranz RA, and Doyle LW. Early postnatal (<96 hours) corticosteroids for preventing chronic lung disease in preterm infants. Cochrane Database Syst Rev. 2003;(1): CD001146.

[41] Halliday HL and Ehrenkranz RA. Delayed (>3 weeks) postnatal corticosteroids for chronic lung disease in preterm infants. Cochrane Database Syst Rev. 2000;(2): CD001145.

[42] Yeh TF, Lin YJ, Huang CC, Chen YJ, Lin CH, Lin HC, Hsieh WS, Lien YJ. Early dexamethasone therapy in preterm infants: a follow-up study. Pediatrics. 1998 May;101(5):E7.

[43] Shinwell ES, Karplus M, Reich D, Weintraub Z, Blazer S, Bader D, Yurman S, Dolfin T, Kogan A, Dollberg S, Arbel E, Goldberg M, Gur I, Naor N, Sirota L, Mogilner S, Zaritsky A, Barak M, and Gottfried E. Early postnatal dexamethasone treatment and increased incidence of cerebral palsy. Arch Dis Child Fetal Neonatal Ed. 2000 Nov; 83(3): F177-81.

[44] Postnatal corticosteroids and sensorineural outcome at 5 years of age. J Paediatr Child Health. 2000 Jun;36(3):256-61.

[45] Bos AF, Dibiasi J, Tiessen AH, Bergman KA. Treating preterm infants at risk for chronic lung disease with dexamethasone leads to an impaired quality of general movements. Biol Neonate. 2002; 82(3):155-8.

[46] Lagenstein I, Willig RP, Kuhne D. Cranial computed tomography (CCT) findings in

children treated with ACTH and dexamethasone: first results. Neuropadiatrie. 1979 Nov;10(4):370-84.

[47] Riikonen R and Donner M. ACTH therapy in infantile spasms: side effects. Arch Dis Child. 1980 Sep; 55(9):664-72.

[48] Buonocore G, Perrone S, and De Marco L. Pre- and post-natal corticosteroids: side effects. Acta Biomed Ateneo Parmense. 2000;71 Suppl 1:413-9.

[49] Whitelaw A, and Thoresen M. Antenatal steroids and the developing brain. Arch Dis Child Fetal Neonatal Ed. 2000 Sep; 83(2):F154-7.

[50] Aghajafari F, Murphy K, Matthews S, Ohlsson A, Amankwah K, and Hannah M. Repeated doses of antenatal corticosteroids in animals: a systematic review. Am J Obstet Gynecol. 2002 Apr; 186(4):843-9.

[51] Huang WL, Harper CG, Evans SF, Newnham JP, and Dunlop SA. Repeated prenatal corticosteroid administration delays myelination of the corpus callosum in fetal sheep. Int J Dev Neurosci. 2001 Jul;19(4):415-25.

[52] Quinlivan JA, Archer MA, Dunlop SA, Evans SF, Beazley LD, and Newnham JP. Fetal growth retardation, particularly within lymphoid organs, following repeated maternal injections of betamethasone in sheep. J Obstet Gynaecol Res. 1998 Jun; 24(3):173-82.

[53] Yunis KA, Bitar FF, Hayek P, Mroueh SM, and Mikati M. Transient hypertrophic cardiomyopathy in the newborn following multiple doses of antenatal corticosteroids. Am J Perinatol. 1999;16(1):17-21.

[54] Miranda-Mallea J, Perez-Verdu J, Gasco-Lacalle B, Saez-Palacios JM, Fernandez-Gilino C, and Izquierdo-Macian I. Hypertrophic cardiomyopathy in preterm infants treated with dexamethasone. Eur J Pediatr. 1997 May;156(5):394-6.

[55] Israel BA, Sherman FS, and Guthrie RD. Hypertrophic cardiomyopathy associated with dexamethasone therapy for chronic lung disease in preterm infants. Am J Perinatol. 1993 Jul;10(4):307-10.

[56] Evans N. Cardiovascular effects of dexamethasone in the preterm infant. Arch Dis Child Fetal Neonatal Ed. 1994 Jan;70(1):F25-30.

[57] Bobele GB, Ward KE, and Bodensteiner JB. Hypertrophic cardiomyopathy during corticotropin therapy for infantile spasms. A clinical and echocardiographic study. Am J Dis Child. 1993 Feb; 147(2):223-5.

[59] Shinwell ES, Karplus M, Zmora E, Reich D, Rothschild A, Blazer S, Bader D, Yurman S, Dolfin T, Kuint J, Milbauer B, Kohelet D, Goldberg M, Armon Y,

Davidson S, Sirota L, Amitai M, Zaretsky A, Barak M, and Gottfried S. Failure of early postnatal dexamethasone to prevent chronic lung disease in infants with respiratory distress syndrome. Arch Dis Child Fetal Neonatal Ed. 1996 Jan; 74(1):F33-7.

[60] Greenough A, Emery EF, and Gamsu HR. Dexamethasone and hypertension in preterm infants. Eur J Pediatr. 1992 Feb;151(2):134-5.

[61] Halliday HL and Ehrenkranz RA. Moderately early (7-14 days) postnatal corticosteroids for preventing chronic lung disease in preterm infants. Cochrane Database Syst Rev. 2000;(2):CD001144.

[62] Halliday HL and Ehrenkranz RA, Doyle LW. Delayed (>3 weeks) postnatal corticosteroids for chronic lung disease in preterm infants. Cochrane Database Syst Rev. 2003;(1):CD001145.

[63] Bos AF, van Asselt WA, and Okken A. Dexamethasone treatment and fluid balance in preterm infants at risk for chronic lung disease. Acta Paediatr. 2000 May; 89(5):562-5.

[64] Vermillion ST, Soper DE, and Newman RB. Neonatal sepsis and death after multiple courses of antenatal betamethasone therapy. Am J Obstet Gynecol. 2000 Oct; 183(4):810-4.

[65] Stoll BJ, Temprosa M, Tyson JE, Papile LA, Wright LL, Bauer CR, Donovan EF, Korones SB, Lemons JA, Fanaroff AA, Stevenson DK, Oh W, Ehrenkranz RA, Shankaran S, and Verter J.. Dexamethasone therapy increases infection in very low birth weight infants. Pediatrics. 1999 Nov; 104(5):e63.

[66] Haroon Parupia MF and Dhanireddy R. Association of postnatal dexamethasone use and fungal sepsis in the development of severe retinopathy of prematurity and progression to laser therapy in extremely low-birth-weight infants. J Perinatol. 2001 Jun; 21(4):242-7.

[67] Smolders-de Haas H, Neuvel J, Schmand B, Treffers PE, Koppe JG, and Hoeks J. Physical development and medical history of children who were treated antenatally with corticosteroids to prevent respiratory distress syndrome: a 10- to 12-year follow-up. Pediatrics. 1990 Jul;86(1):65-70.

[68] Schalenbourg A, Leys A, De Courten C, Coutteel C, and Herbort CP. Corticosteroid-induced central serous chorioretinopathy in patients with ocular inflammatory disorders. Klin Monatsbl Augenheilkd. 2002 Apr;219(4):264-7.

[69] Spraul CW, Lang GE, and Lang GK. Central serous chorioretinopathy in systemic therapy with corticosteroids. Ophthalmologe. 1997 Jun;94(6):392-6.

[70] Chaine G, Haouat M, Menard-Molcard C, Favard C, Vignal-Clermont C, Campinchi-Tardy F, Massin P, Gaudric A, Badelon I, Nicolon L, Sabatier P, and Guillevin L. Central serous chorioretinopathy and systemic steroid therapy] J Fr Ophtalmol. 2001 Feb;24(2):139-46.

[71] Song E, Wakakura M, and Ishikawa S. Central serous chorioretinopathy induced by corticosteroids. Nippon Ganka Gakkai Zasshi. 1997 Mar; 101(3):257-64.

[72] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume III, September 11, 2002, pages 311-435.

[73] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XI, September 18, 2002, pages 1369-1503.

[74] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XII, September 18, 2002, pages 1504-1673.

[75] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XIII, September 19, 2002, pages 1674-1787.

[76] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XIV, September 19, 2002, pages 1788-1961.

[77] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XV, September 20, 2002, pages 1962-2088.

[78] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XVI September 20, 2002, pages 2089-2176.

[79] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XVII September 23, 2002, pages 2177-2267.

[80] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XVIII September 23, 2002, pages 2268-2432.

[81] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume

XIX September 24, 2002, pages 2433-2522.

[82] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XX September 25, 2002, pages 2523-2534.



P.O. Box 717
South Bay
33493
U.S. POSTAGE PAID
SOUTH BAY, FL
33493
AUG 23, 06
AMOUNT
$0.00
32601
Ibby,
Clerk of the Court for Alachua County
201 East University Avenue
Gainesville, Florida
32601
LEGAL MAIL
2006 AUG 25 PM 2:50

0000289

000453A

Herlihy, Brian

Henry v. State, 862 So. 2d 679 (Fla. 2003)

- Defendant argued IAC in that his counsel did not present expert testimony from a mental health expert for mitigation purposes.
- This was a retrial – the first conviction had been overturned and ordered for new trial. A mental health expert had testified at the first trial. The retrial counsel stated that he chose not to put on mental health testimony because he believed that the testimony at the original trial had been harmful. Id. at 684-85.
- Court evaluated this claim, not on whether the mental health testimony should have been presented, but whether "counsel's decision not to present such evidence was a reasonably informed, professional judgment." Id. at 685.
- The court found this to be a reasonable strategy decision of the attorney and not ineffective assistance of counsel.

Sliney v. State, 2006 WL 3228813 (Fla. 2006)

- Alleged IAC because both his guilt and penalty phase attorneys failed to investigate and present mitigating evidence. Specifically, defendant alleged that penalty phase counsel failed to present expert testimony as mitigating evidence.
- Reasonable for the attorney not to present this evidence – the evidence would have been unfavorable, the defendant did not show how the testimony would have provided mental mitigation, did not show any problems that the testimony may have mitigated against, and the testimony "would have caused harm that would have outweighed any benefits of such evidence." Id. at 10
- Acceptable defense strategy not to put the expert witnesses on. Id.

Jones v. State

- In *Jones v. State*, 928 So.2d 1178 (Fla.2006), the defendant asserted that penalty-phase counsel was ineffective for failing to present the testimony of a mental health expert who had evaluated the defendant. We held that the failure to present this expert's testimony was not ineffective because his testimony would have been inconsistent with the other mitigation evidence, it would have opened the door to other damaging evidence, and trial counsel's strategy of humanizing the defendant, a strategy with which this expert's testimony would have starkly contrasted, was valid. *Id.* at 1184. Thus, counsel's strategic decision not to call the expert and instead rely for mitigation on lay testimony about the defendant was neither deficient nor prejudicial because we found that the expert's testimony could have actually damaged the defendant's chances for a life sentence. *Id.* at 1186.

McDonald v. State, 2006 WL 3093167 (Fla. 2006)

- Alleged IAC for failing to request a Frye hearing regarding testimony about ethnic structures and population frequencies studies and for failing to obtain a DNA expert.
- Defense counsel's decision not to obtain a DNA test was strategic and therefore not ineffective.

2007 FEB 26 PM 3:30
FILED
CK 44

(76)

- Defense counsel's failure to request a Frye hearing was not error because, at the time of the trial "there was general acceptance in the scientific community for forensic population genetics to permit Agent Vick's testimony, including his population frequency testimony." Id. at 9.

Evans v. State, 2006 WL 2827647 (Fla. 2006)

- Claimed IAC for failing to present expert testimony of diminished capacity at the guilt phase of the trial.
- Defense counsel was not deficient for failing to present this evidence because "diminished capacity" is not a defense in Florida. Id. at 6. It is not ineffective assistance of counsel to present a meritless defense at the guilt phase of a trial. Id.
- Also, presenting evidence of diminished capacity would have been contrary to the defense theory, which was that the shooting was an accident. Id. at 7.

Leonard v. State, 930 So. 2d 749 (Fla. 2d DCA 2006)

- Defendant was charged with home invasion, burglary and sexual assault. The only evidence tying him to the offense was one fingerprint on a candy wrapper and the fact that he pawned a necklace that was similar to one taken from the victim's apartment. The state argued that the necklace was dissimilar only because the defendant had physically altered it. Defendant alleged that counsel was ineffective for failing to procure evidence to rebut the state's theory.
- Court reversed the trial court that denied an evidentiary hearing.
- "We caution that our opinion does not require defense counsel to retain experts in every case to examine every piece of physical evidence. However, when the State's evidence against a defendant is as slim as it was in this case, defense counsel has an obligation to consider every possible avenue for discrediting that evidence. It may be that counsel did so in this case; however, we have no way to making that determination without an evidentiary hearing." Id. at 752.
- *See Flores v. State*, 662 So.2d 1350, 1351 (Fla. 2d DCA 1995) (noting that it is difficult without the benefit of an evidentiary hearing to determine whether or why defense counsel would have failed to explore a particular defense). Accordingly, we remand for an evidentiary hearing on this single issue.

Parker v. State, 904 So. 2d 370 (Fla. 2005)

- Alleged IAC for failing to present expert testimony that the photo evidence had been altered, which changed the color of the bullet in the victim. Defendant had argued that he did not shoot the victim.
- The court remanded this for an evidentiary hearing to find out why counsel did not investigate this. Id. at 377

Westlaw.

H
Briefs and Other Related Documents
Lee v. StateFla.App. 2 Dist.,2005.
District Court of Appeal of Florida,Second District.
Carlos LEE, Appellant,
v.
STATE of Florida, Appellee.
No. 2D03-4584.

March 16, 2005.
Rehearing Denied May 2, 2005.

**Background:** Defendant, who was convicted of three counts of capital sexual battery on a child under the age of 12, brought motion for postconviction relief. The Circuit Court, Highlands County, J. David Langford, J., denied motion. Defendant appealed.

**Holding:** The District Court of Appeal, Casanueva, J., held that trial counsel's failure to investigate medical evidence presented at trial and its relationship to victim's prior allegations of abuse was **ineffective assistance of counsel.**

Reversed and remanded.
West Headnotes
**[1] Criminal Law 110 ⟹1134(3)**

110 Criminal Law
110XXIV Review
110XXIV(L) Scope of Review in General
110k1134 Scope and Extent in General
110k1134(3) k. Questions Considered in General. Most Cited Cases

**Criminal Law 110 ⟹1158(1)**

110 Criminal Law
110XXIV Review
110XXIV(O) Questions of Fact and Findings
110k1158 In General
110k1158(1) k. In General. Most Cited Cases
An appellate court reviews the denial of a motion for postconviction relief alleging **ineffective assistance of counsel** as a mixed question of fact and law; while affording great deference to the trial court's factual findings, the court conducts an independent review of the legal conclusions flowing from those findings. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 ⟹641.13(1)**

110 Criminal Law
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(1) k. In General. Most Cited Cases
An examination of counsel's performance begins with a strong presumption that it is reasonable and is considered from the attorney's perspective under the circumstances at the time of trial. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law 110 ⟹641.13(6)**

110 Criminal Law
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases
To make valid strategic or **tactical** decisions, an attorney has a duty to make reasonable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

investigations or to make a reasonable decision that particular investigations are unnecessary. U.S.C.A. Const.Amend. 6.

**[4] Criminal Law 110 ⇐641.13(6)**

110 Criminal Law
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases

Trial counsel was deficient, as element of claim of ineffective assistance, in failing to reasonably and promptly investigate circumstances surrounding crime and medical evidence supporting state's theory of events, in capital sexual battery prosecution; although no physical evidence directly connected defendant to alleged abuse, examining pediatrician's testimony corroborated victim's version of events, counsel failed to investigate medical evidence presented at trial and its relationship to victim's prior allegations of abuse, and counsel did not come forth with strategic or tactical explanation for failing to begin appropriate investigations more than two weeks before scheduled trial. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110 ⇐641.13(6)**

110 Criminal Law
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases

An attorney has a duty to make reasonable investigations in his or her cases.

**[6] Criminal Law 110 ⇐641.13(6)**

110 Criminal Law
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases

Trial counsel's failure to investigate medical evidence presented at trial and its relationship to victim's prior allegations of abuse was **ineffective assistance of counsel**, in prosecution for capital sexual battery prosecution; there were no eyewitnesses or direct physical evidence of abuse, testimony from physician added weight to victim's story, counsel made insufficient efforts to discover if there were other explanations for victim's condition, and if counsel had made reasonable investigation, he could have been in better position to advise his client on whether to proceed to trial immediately, seek continuance, or agree to plea bargain. U.S.C.A. Const.Amend. 6.

**[7] Criminal Law 110 ⇐1158(1)**

110 Criminal Law
110XXIV Review
110XXIV(O) Questions of Fact and Findings
110k1158 In General
110k1158(1) k. In General. Most Cited Cases

Even though an appellate court must give factual findings of a trial court great deference, the trial court's credibility determinations of witnesses in postconviction motions are more limited when judge is examining whether trial counsel's failure to call a particular witness prejudiced defendant, as would support claim of **ineffective assistance of counsel**. U.S.C.A. Const.Amend. 6.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*349 Diane Buerger of The Buerger Law Firm, P.A., Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Michele Taylor, Assistant Attorney General, Tampa, for Appellee.
CASANUEVA, Judge.
Carlos Lee, convicted of three counts of capital sexual battery on a child under the age of twelve, appeals from orders denying his motion for postconviction relief, both summarily and after an evidentiary hearing. Because Mr. Lee's trial counsel failed to thoroughly investigate the significant medical evidence presented at trial and its relationship to the victim's prior allegations of abuse, we hold that his conduct fell below the standard of reasonable effectiveness. Because this was the classic familial sexual abuse situation, with no eyewitnesses, no direct physical evidence of abuse, nor even similar fact evidence, the defendant was prejudiced by his counsel's failure to understand or to act upon the treating physician's crucial testimony. This court's confidence in the outcome of the proceedings has been undermined. Accordingly, we reverse the order denying postconviction relief and remand for a new trial.

### The Capital Sexual Battery Trial

Mr. Lee was charged with sexual battery on his stepdaughter, K.W., who was approximately ten years old when the crimes allegedly occurred and almost twelve when she testified at the June 1998 trial. K.W. did not provide clear details of the circumstances surrounding the sexual abuse. K.W. testified that on (probably) three occasions her mother went to a nearby grocery and left her in their trailer home with Mr. Lee and her younger brother. Mr. Lee then came into her bedroom and sexually assaulted her by placing her on the floor and putting his "wiener" into her "pee pee." He told her not to tell anyone about what had happened, and she did not do so.

The trial evidence revealed that Mr. Lee's marriage to K.W.'s mother, Marla Lee, was contentious. Several months after the alleged abuse, Mr. Lee left the family for another woman. Soon thereafter, Mrs. Lee was incarcerated, and K.W. and her brother moved in with their grandmother in another town. The children had not seen the grandmother in several years and did not really know her.

K.W. testified that, at her stepsister's urging, she told her grandmother about the abuse in March of 1997. The stepsister found a letter that K.W. had written to her natural mother stating that when Mr. Lee "was there he was doing it with" her. The prosecutor had K.W. read the letter into evidence.
The prosecutor also read a page torn from a diary or notebook where K.W. wrote that she hated Mr. Lee "because he did very bad things" to her. Other prosecution witnesses included K.W.'s grandmother, who provided conflicting testimony regarding how she learned of the allegations and the circumstances leading to the involvement of law enforcement; *350 the Highlands County sergeant who investigated the charges and arrested the defendant; and the investigator from the Department of Children and Family Services.

However, the most influential witness, aside from K.W., was the pediatrician who examined K.W. on March 25, 1997. Dr. Tsao testified that the grandmother reported noticing discharge on K.W.'s panties, after which the child told her that she had been "quote, forced on by a person." Concerned that K.W. had been molested, Dr. Tsao performed a vaginal exam. The grandmother was present for both the history and the examination.

Dr. Tsao's testimony focused on the condition and width of K.W.'s hymenal ring. Of most significance, in Dr. Tsao's opinion, was the presence of a nodule indicating that the hymen had been torn and formed a scar as it healed. Dr. Tsao concluded that K.W.'s hymenal ring was abnormal for a prepubescent girl, that it indicated repeated penetration, and that it was consistent with the history supplied by the child and her grandmother.
When asked whether K.W.'s condition could have resulted from excessive masturbation, the pediatrician acknowledged that anything was possible but virtually excluded that possibility.

The defense case included the testimony from K.W.'s mother, who had caught K.W. masturbating as a young girl and berated her for it. At that time

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

294

K.W. told her mother that a man-not Mr. Lee-had shown her how to do that. Mrs. Lee and some members of the defendant's family also testified that they had never observed anything unusual about the relationship between Mr. Lee and K.W. Mr. Lee testified on his own behalf and maintained his innocence.

The jury returned guilty verdicts on all three counts, and the judge subsequently imposed three concurrent life sentences. Mr. Lee's direct appeal was affirmed.

**The Postconviction Motion**

Mr. Lee's motion pursuant to Florida Rule of Criminal Procedure 3.850 stated eleven claims. The postconviction court (which was also the trial court) initially ruled that the motion was facially insufficient as to some grounds and ordered the State to respond to others. After the State's response, the court ordered an evidentiary hearing on three issues and denied the rest.

At the outset, we note that the court erred when it summarily rejected several claims after reviewing the record and concluding, in agreement with the State's assertions, that the claims were either unsubstantiated or meritless. A decision as to the facial sufficiency of a motion is a legal decision, and ordinarily the evidentiary record will be irrelevant. If, however, the claim is facially sufficient, the court must examine the record to decide whether it conclusively refutes the claim. In that event, the court must attach specific portions of the record demonstrating that the claim is refuted. *See Jacobs v. State,* 880 So.2d 548, 551 (Fla.2004). In this case, however, we have determined that the defendant should be granted a new trial, so further discussion concerning the sufficiency of those grounds is unnecessary.

This court's primary concern is the effectiveness of trial counsel's performance concerning handling of the child's examining pediatrician. In ground seven the defendant claimed that his counsel was ineffective in failing to obtain an expert witness to assist him with defense preparation and rebuttal of the examining physician's testimony. This claim is also relevant to ground one, which the court summarily denied, asserting that counsel *351 was ineffective for failing to object when Dr. Tsao gave opinion testimony that the most likely cause of the victim's physical condition was repeated penetration, consistent with the history given by K.W.

**The Postconviction Evidentiary Hearing and Order**

At the 3.850 evidentiary hearing, the defense presented testimony from a physician with expertise in child sexual battery cases. Dr. Simmons effectively contradicted the testimony of K.W.'s pediatrician that the child's physical condition indicated repeated penetration. According to Dr. Simmons, by the time of the trial and even earlier in the 1990s, experts in sexual abuse no longer accepted the theory that a change in the hymenal rim such as Dr. Tsao had observed was indicative of repeated penetration. Furthermore, the nodule described by Dr. Tsao was considered a normal variance change of a hymen. Finally, Dr. Simmons opined that it was inappropriate procedure for the pediatrician to take the child's history while the grandmother was present. All of this information, while perhaps not known to a general pediatrician, would have been available from medical studies, reports, or articles with which an expert in gynecology would have been familiar.

The issue raised in the 3.850 motion was whether Mr. Lee's trial attorney was ineffective for failing to obtain an expert witness or, at a minimum, investigate the need for one. Mr. Lee argued, both on this appeal and at the evidentiary hearing, that his attorney told him that he had a good trial case because there was no physical evidence of abuse. Although Dr. Tsao did not state that the "abnormalities" she observed in K.W. were caused by repeated penetration by a penis, she did emphatically state that the child's condition was consistent with repeated penetration by something. This presented crucial physical evidence from which the jury could infer that the victim was truthful and that the defendant was lying. *See*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Schwarck v. State,* 568 So.2d 1326, 1327 (Fla. 3d DCA 1990). At the 3.850 hearing, however, the defense attorney insisted that this evidence did not indicate whether a crime was committed at all.

At the postconviction relief hearing, Mr. Lee's trial counsel testified at length about the adequacy of his preparation for the June 1998 trial. At the time of the trial, he had been with the public defender's office for five years, but this was his first capital sexual battery case. The attorney admitted that he could not read the pediatrician's notes and could not recall whether he could read them at the time. He admitted that he did not know the meaning of certain terms in the notes, and he did not recall whether he understood them at the time. He did not ask Dr. Tsao to read her report into her deposition, which, according to the prosecutor, was a normal and effective request and which might have helped clarify the meaning of some of the medical terms.

Most crucially, however, Mr. Lee's attorney dismissed Dr. Tsao as simply a pediatrician who rendered an opinion of repeated penetration but who was not an expert. He decided that it would have been futile to have an expert review "what little the State had to prove against" Mr. Lee when " there was no physical evidence ... that directly linked Mr. Lee to the crime. Much less that it ever occurred." When asked whether expert testimony that the victim's exam was also consistent with no penetration would suggest that the child might be lying, the attorney admitted that he possibly could have explored that new theory with further investigation.

The trial court made the following factual findings after the postconviction hearing:
***352** The trial began on June 8, 1998, and verdicts were returned by the jury on June 11, 1998. The defendant met with his attorney for two (2) hours on May 20, 1998, to discuss the case and the evidence in regard to the impending trial. Defense counsel wanted the defendant to agree to a request for a continuance so that he could make further discovery. Specifically he wanted to look further into any past abuse of the child victim. Defense counsel also testified he thought about hiring an expert but would have only made the request after completing all other discovery. The defendant did not want a continuance. The defendant by his testimony at the hearing said he wanted to go to trial because he thought he could win at trial because there was no physical evidence and he wanted no more continuances. Defense counsel also testified the defendant couldn't believe the state would proceed on basically one person's word against another. The defendant rejected the state's final plea offer of sixty-eight (68) months Florida State Prison and the case proceeded to trial at the defendant's request.

The trial court then relied upon that factual finding in concluding that the first prong of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), had not been met and that the defendant had failed to show that his counsel made such serious errors as to effectively deprive him of his Sixth Amendment right to counsel. The trial court concluded that defense counsel was not deficient in failing to do further investigation because his client would not agree to an additional continuance: "While other strategies may have been employed in this case based upon further investigation by defense counsel, we will never know if they would have affected the outcome of the case because of the defendant's decision to forego further discovery and proceed to trial."

**Analysis**

[1][2][3] An appellate court reviews the denial of a motion for postconviction relief alleging **ineffective assistance of counsel** as a mixed question of fact and law. While affording great deference to the trial court's factual findings, the court conducts an independent review of the legal conclusions flowing from those findings. As stated in *Stephens v. State,* 748 So.2d 1028 (Fla.1999), "under *Strickland,* both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's *factual* findings." *Id.* at 1033 (citing *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052). An examination of counsel's performance begins with a strong presumption that it is reasonable and is considered from the attorney's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

perspective under the circumstances at the time of trial. *Downs v. State,* 453 So.2d 1102, 1106 (Fla.1984). However, to make valid strategic or **tactical** decisions, an attorney "has a duty to make reasonable investigations or to make a reasonable decision that particular investigations are unnecessary." *Light v. State,* 796 So.2d 610, 616 (Fla. 2d DCA 2001) (citing *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052).

[4] We do not disturb the trial court's factual finding that the defendant insisted on going to trial despite his attorney's desire to do more investigation. However, an examination of the record at the hearing reveals that the defendant did not want a continuance because his attorney had not done any preliminary investigation, well before the date of May 20, 1998, which the court cited in its order. The record supports Mr. Lee's contention that he informed his counsel at the outset of the case that the victim had made allegations *353 of prior sexual abuse by someone else, but his attorney had not explored that avenue of defense. Thus, when the attorney came to him two weeks before trial and urged a continuance, Mr. Lee refused. His attorney's opinion that there was no physical evidence of abuse in this case significantly contributed to Mr. Lee's refusal. Although no physical evidence directly connected Mr. Lee to the alleged abuse, Dr. Tsao's testimony corroborated the victim's version of the events by creating a very strong inference that some kind of abuse had occurred. Without any effective impeachment of Dr. Tsao's outdated medical opinion or any other possible explanation for K.W.'s condition-other than self-infliction, which the doctor rejected as only remotely plausible-the case against Mr. Lee was much stronger than his counsel indicated. Ironically, the circuit court thus held the defendant to a higher standard than his attorney for understanding the significance of the evidence against him.

The circuit court also ignored Mr. Lee's counsel's deficiency in failing to obtain an expert witness, concluding that Mr. Lee's resistance to a continuance foreclosed any opportunity that his attorney might have had in the normal course of events to apply for an expert after discovery had been completed. Capital sexual battery cases are complicated matters, and this was the defense attorney's first such case. The stakes were extremely high. Mr. Lee had the right to an attorney who understood the ramifications of the pediatrician's testimony. His attorney testified at the 3.850 hearing, however, that he told Mr. Lee it would be suicidal to go to trial immediately. Mr. Lee "could not believe that the State could pursue a charge of this magnitude with just the testimony of a victim without corroborating physical evidence. And I told him many times that they could and that they are. And it's going to be his word against this little girl's word at trial." But Dr. Tsao's testimony significantly bolstered K.W.'s word.

The defense attorney testified that he considered hiring an expert medical witness, but because there was no physical evidence linking Mr. Lee to the crime or even suggesting that it ever occurred, he did not think that a doctor's review of the little evidence the State had would have been helpful. He admitted that he did not consider hiring an expert to help him review the doctor's notes, many of which he could not read or understand. He also admitted that his file reflected that Mr. Lee was told, even after the doctor and the HRS investigator had been deposed, that this "was still a good triable case." The attorney relied on the fact that Dr. Tsao admitted that she could not definitely conclude that the victim's hymenal variations occurred from penetration by a penis; rather, the cause could have been a finger or any other object.

Furthermore, the attorney felt there was no need to impeach the pediatrician because she was not an expert. In his view, having a "real" expert testify that Dr. Tsao was wrong would not have clarified anything for the jury. In contrast, even the prosecutor admitted at the postconviction hearing that the doctor's testimony was important as part of the "whole puzzle" because it suggested that K.W.'s allegations could be taken seriously: after the examination her case was referred to law enforcement. Unfortunately, however, the defense attorney underestimated the potential impact of Dr. Tsao's testimony and decided that further investigation was futile.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The trial court's order also failed to address Mr. Lee's allegation and his attorney's admission that Mr. Lee promptly informed the public defender's office that the victim had made prior allegations of *354 sexual abuse. When asked why he had not questioned the victim at her subsequent deposition about the alleged sexual abuse by her biological father, the attorney could not recall if he had done so or not. However, if he had failed to question her on that issue, he did not think it was part of his overall strategy. Yet the trial court's order focuses on the fact that the defendant insisted on going to trial in spite of his attorney's advice to seek a continuance for further investigation. The trial court made no factual findings or legal conclusions about the fact that the attorney had information about previous allegations available to him almost six months before trial and did nothing about it until the eve of trial, despite knowing that his client had been unable to make bond, had been held in jail since his arrest, and was anxious for his case to be concluded. Thus, when Mr. Lee insisted on going to trial, he did so without the benefit of all of the relevant information that a reasonably prompt and thorough investigation by an effective attorney would have revealed. The circuit court erred when it found that Mr. Lee's decision to go forward with the trial negated the deficiencies in his counsel's preparation.

## Conclusion

[5] Considering prevailing professional standards and the circumstances known to trial counsel, we hold that trial counsel failed to reasonably and promptly investigate the circumstances surrounding this extremely serious crime and the medical evidence supporting the State's theory of events. " An attorney has a duty to make reasonable investigations in his or her cases." *Brown v. State,* 892 So.2d 1119, 1119 (Fla. 2d DCA 2004) (citing *Squires v. State,* 558 So.2d 401, 403 (Fla.1990)). As in *Brown,* trial counsel did not come forth with any strategic or tactical explanation for failing to begin the appropriate investigations more than two weeks before the scheduled trial. In *Yarbrough v. State,* 871 So.2d 1026 (Fla. 1st DCA 2004), a defense attorney who had information about a possible witness well before trial and who had investigators at his disposal, only halfheartedly attempted to locate what he admitted might have been a useful witness had she proved credible. The First District held that trial counsel's performance was deficient. 871 So.2d at 1029. Similarly, in this case, Mr. Lee has demonstrated that his counsel's performance fell below an objective standard of reasonableness under the first *Strickland* prong.

[6] Given our holding on the first prong, *Strickland* requires this court to consider whether there is a " reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. A "reasonable probability" is defined as one that is "sufficient to undermine confidence in the outcome." *Id.*

[7] In a case like this one, which turns on counsel's omissions, both the trial and appellate courts must evaluate the circumstances from the standpoint of what might have been. By analogy, in *Light,* 796 So.2d at 610, this court examined trial counsel's failure to investigate and call crime-scene witnesses. We compared the role of the court on postconviction review in that case to the analysis a trial judge must perform when a defendant alleges newly discovered evidence. Even though the appellate court must give the factual findings of the trial court great deference, the trial court's credibility determinations in such cases are "more limited." *Id.* at 617. "That is, the judge is not examining simply whether he or she believes the evidence presented as opposed to contradictory evidence presented at trial, but whether the nature of the evidence is such *355 that a reasonable jury may have believed it." *Id.*

If Mr. Lee's attorney had reasonably and promptly investigated allegations that the child had accused her natural father or another family member of sexual abuse, and if he had a better understanding of the significance of the doctor's testimony, he could have prepared a better defense. He might have discovered evidence that a reasonable jury might have believed. At a minimum, he could have impeached the pediatrician, and the jury would not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have been left with the unchallenged impression that the medical evidence corroborated the State's theory that something of a criminal nature happened to the victim. Had the defense attorney gone further and discovered whether the victim had made prior allegations of abuse, either founded or unfounded, that information could have provided valuable impeachment of the victim's testimony. *See, e.g., McGriff v. State,* 601 So.2d 1320, 1321 (Fla. 2d DCA 1992) ("Evidence of a [child] victim's prior sexual encounters with others is admissible ... for the purpose of attempting to show that the defendant was not the source of the victim's injury where there is testimony about the victim's abnormal genitalia."). As it stood, defense counsel was left with the very difficult job of attempting to demonstrate that a sympathetic young child, crying on the stand, was lying.

Several commentators have noted the special problems in cases of sexual battery that occur in a familial context. Frequently, there is no issue of identity and the victim is the only eyewitness. "The accused either did or did not commit the act.... Therefore, the credibility of the victim is extremely important." Charles W. Ehrhardt, 1 Fla. Prac. *Evidence* § 404.18 (2004 ed.). "In such cases, the child's testimony is the only evidence of the crime, and the child's credibility becomes the pivotal factor in the case." David M. De La Paz, "Sacrificing the Whole Truth: Florida's Deteriorating Admissibility of Similar Fact Evidence in Cases of Child Sexual Abuse," 15 N.Y.L.Sch. J. Hum. Rts. 449, 449-50 (Spring 1999).

As in *Light,* "the minimal preparation that counsel performed should have caused counsel to realize that additional investigation was likely to be fruitful and was essential to a defense...." 796 So.2d at 617. Mr. Lee, although presumed innocent until proven guilty, was left defenseless in combat against a sympathetic child witness whose pediatrician testified that she had been repeatedly vaginally penetrated. His attorney's prompt and reasonable investigation might have revealed other potential perpetrators at which a finger could be pointed; at a minimum, he could have wielded the sword of impeachment.

We conclude that Mr. Lee's counsel rendered ineffective assistance to his client. Crucial testimony from the child's physician added weight to the child's story. Nevertheless, knowing that the physician would testify that the child had been penetrated, Mr. Lee's attorney made insufficient efforts to discover if there were other explanations for K.W.'s condition. Furthermore, if Mr. Lee's attorney had made a timely, reasonable investigation and discovered not only that the child's medical condition did not suggest anything about penetration but also that she had accused others of abusing her in the past, he could have been in a better position to advise his client on whether to proceed to trial immediately, seek a continuance, or agree to a plea bargain.

This opinion should not be interpreted to mean that the evidence was legally insufficient to convict Mr. Lee. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, ***356** even if the errors of counsel cannot be shown by the preponderance of the evidence to have determined the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. But Mr. Lee has carried his burden of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052; *see also Rose v. State,* 675 So.2d 567, 569 n. 4 (Fla.1996). Mr. Lee has prevailed on both *Strickland* prongs.

We reverse the order denying postconviction relief and remand for a new trial.

ALTENBERND, C.J., and THREADGILL, EDWARD F., Senior Judge, Concur.
Fla.App. 2 Dist.,2005.
Lee v. State
899 So.2d 348, 30 Fla. L. Weekly D735

Briefs and Other Related Documents (Back to top)

• 2D03-4584 (Docket) (Oct. 03, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Overton v. StateFla.App. 1 Dist.,1988.
District Court of Appeal of Florida,First District.
Thomas M. OVERTON, Appellant,
v.
STATE of Florida, Appellee.
**No. 87-1207.**

Oct. 7, 1988.

After remand, 494 So.2d 527, the Circuit Court, Escambia County, Ben Gordon, J., denied defendant's motion for postconviction relief. The District Court of Appeal held that defendant had made prima facie showing of entitlement to postconviction relief based on ineffective assistance of counsel for inadequate pretrial investigation and trial preparation, failure to file motion to suppress clothing identification and failure to object to improper prosecutorial conduct and misstatements.

Reversed and remanded.

Joanos, J., concurred specially and filed an opinion.
West Headnotes
**Criminal Law 110 ⇐1618(10)**

110 Criminal Law
110XXX Post-Conviction Relief
110XXX(C) Proceedings
110XXX(C)2 Affidavits and Evidence
110k1616 Sufficiency
110k1618 Particular Issues
110k1618(10) k. Defense Counsel. Most Cited Cases
(Formerly 110k998(17))

Defendant convicted of armed robbery had made prima facie showing of entitlement to postconviction relief based on ineffective assistance of counsel for inadequately conducting pretrial investigation and trial preparation, failing to file motion to suppress clothing identification and failing to object to improper prosecutorial comment and misstatements; defense counsel failed to demonstrate that pair of knit gloves purportedly worn by armed robber were too small to have been worn by defendant, failed to impeach eyewitness who falsely testified that he identified clothing purportedly worn by robber on night of robbery, when witness had identified clothing one week later after having viewed defendant in clothing in suggestive showup shortly after robbery, failed to object to prosecutor's misleading statement that no prints were found on gun, when fingerprints were found on gun that did not belong to defendant. U.S.C.A. Const.Amend. 6.

*1383 Thomas M. Overton, pro se.
Robert A. Butterworth, Atty. Gen., and Elizabeth C. Masters, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Thomas M. Overton appeals the order denying his motion for post-conviction relief, filed pursuant to Florida Rule of Criminal Procedure 3.850. Overton alleges his trial counsel provided ineffective assistance, and also alleges error in the trial court's refusal to consider his amended rule 3.850 motion. We reverse and remand for further proceedings.

This case has a somewhat involved procedural history. On March 10, 1982, Overton was convicted of armed robbery, and sentenced to a 99-year term of incarceration. The conviction and sentence were affirmed on direct appeal. *Overton v. State*, 429 So.2d 722 (Fla. 1st DCA), *review denied*, 440 So.2d 352 (Fla.1983). On May 28, 1985, Overton filed a motion for post-conviction relief. Before ruling on the motion, the trial court issued an order directing the State Attorney's office to respond. Thereafter, the trial court extended the time for the state's response until August 14, 1985.
When the state had not responded by August 26, 1985, Overton filed a motion requesting that the trial court grant relief on the merits of his original motion or grant a new trial. The state's response was filed September 11, 1985, after which the trial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court summarily denied Overton's motion. Overton sought rehearing, which the trial court denied, finding that he had waived his right to an evidentiary hearing. On appeal, this court reversed and remanded with directions to the trial court to consider the state's response, and to determine whether an evidentiary hearing was required. *See Overton v. State,* 494 So.2d 527 (Fla. 1st DCA 1986).

Thereafter, the trial court determined an evidentiary hearing was indicated, and appointed counsel to represent Overton. At the hearing, Overton presented an amended motion containing three new allegations pertaining to prosecutorial misconduct. The amended motion was prepared by Overton's appointed counsel. The trial court refused to consider the amended motion, finding the allegations contained therein were not appropriate to a rule **3.850** motion, but stated that Overton could raise these new grounds in a new motion. Upon conclusion of the presentation of Overton's case, the state's motion for a directed verdict was in effect granted, when the trial court ruled in favor of the state without requiring it to go forward with its case.

We note at the outset that we make no determination at this time concerning the trial court's rulings on each of the points Overton raises in his motion for post-conviction relief. Rather, our discussion is directed to those issues which should be addressed or given further consideration by the trial court on remand. Moreover, we find it unnecessary to address with particularity each discrete ineffective assistance of counsel allegation. To facilitate review, we have grouped these allegations into three general categories: (1) inadequate pretrial investigation and trial preparation; (2) failure to file a motion to suppress ***1384** clothing identification; and (3) failure to object to improper prosecutorial comment and misstatements, and to preserve details of witness misconduct.

With regard to allegations of inadequate investigation and trial preparation, Overton contends his trial counsel was ineffective because, among other things, she failed to demonstrate that a pair of knit gloves purportedly worn by the armed robber, were too small to have been worn by Overton. In addition, Overton urges that had counsel conducted an adequate pretrial investigation, she could have impeached the witness Dorff who identified the knit gloves connected to the robbery, as having been worn by Overton on the same day as the robbery. That is, counsel could have shown that the knit gloves which Dorff identified at trial were not the gloves she had seen Overton wearing earlier on the day of the robbery. FN1 Overton's motion indicates that when he attempted to obtain the trial evidence so that it would be available for the evidentiary hearing, he learned it had been destroyed three weeks earlier.

FN1. The knit gloves introduced at trial were found in a shed close to the scene of the robbery. Affidavits filed in support of Overton's motion for post-conviction relief indicate that he was wearing leather gloves when this witness saw him on the day of the robbery.

As a further example of inadequate preparation, Overton cites counsel's failure to impeach the witness Broussard, one of the clerks on duty when the store was robbed. Broussard's trial testimony concerning his identification of clothing purportedly worn by the robber, was not consistent with his deposition testimony, or with the deposition testimony of the investigating officers. In addition, Overton maintains counsel failed to make the discrepancies between his appearance and Broussard's description of the robber's appearance apparent to the jury. For example, at trial Broussard testified that the robber was five feet eight inches tall; in his motion, Overton points out that he is six feet two inches tall, and weighs 190 pounds.

Next, Overton urges that counsel's failure to investigate resulted in denying him the opportunity to present evidence that would have been exculpatory. According to the allegations of the motion, counsel knew that initially, investigators believed Overton was the "old man robber," i.e., the person who had committed a series of armed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

robberies while wearing an old man rubber mask and carrying a weapon which had been stolen in a prior burglary. The stolen weapon was identified as the one used in the robbery in this case. This weapon was found in a shed, together with the knit gloves and other items linked to the robbery.
When Overton asked his counsel about other charges, thinking he had been charged with the other "old man robberies," counsel advised that the other charges had been dropped. Overton now contends that through proper investigation counsel could have determined that he was out of the state when the gun used in this robbery was stolen, and when the other "old man robberies" were committed, thus casting a reasonable doubt as to his guilt in the instant case.

The second general category of alleged ineffective assistance of counsel concerns counsel's failure to file pretrial motions to suppress the identification of clothing allegedly worn by the robber during the commission of the crime. At trial, Broussard, a clerk working in the store at the time of the robbery, testified that shortly after the robbery, officers brought a vest, a blue jacket, and a blue cowboy hat into the store, which he [Broussard] identified as having been worn by the robber. According to Broussard's trial testimony, he was shown the garments before he was asked whether he could identify Overton. At the evidentiary hearing, Broussard admitted that his trial testimony regarding the clothing identification was false, since in actuality, he did not see the clothing on the night of the robbery. Instead, he was shown the items of clothing at the police station about a week *after* the crime was committed.

The third ineffective assistance of counsel category includes an allegation that counsel failed to object to statements made by the prosecutor in closing argument, which statements could have been construed*1385 both as a comment on Overton's right to remain silent, and as requiring Overton to prove his innocence. In addition, Overton contends counsel was ineffective for failing to object to: (1) misstatements of fact which inferred to the jury that there were no fingerprints on the gun, when in fact there were prints on the gun-but the prints were not Overton's; (2) the prosecutor's rhetorical question, " How would you expect a burglar to act, a robber to act ...," which suggested to the jury that Overton had a prior criminal record; (3) the prosecutor's inaccurate characterization of Overton's prior record, which may have had an effect on the sentence imposed; and (4) the report that the witnesses in this trial discussed their trial testimony with each other, in direct contravention of the trial court's directive.

Overton's amended motion contains allegations that the prosecutor knowingly used perjured testimony at trial, that the prosecutor was guilty of misconduct with regard to certain witnesses testifying at trial, and that investigators failed to investigate a potential suspect and one investigator stated to a state witness that Overton had "failed his lie detector test and was guilty as hell."

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court provided a standard for evaluating ineffective assistance of counsel, as gleaned from a review of various federal and state court decisions dealing with the subject. The standard set forth in *Strickland* states, in part:
The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the proper standard for attorney performance is of reasonably effective assistance.

466 U.S. at 686-687, 104 S.Ct. at 2064, 80 L.Ed.2d at 692-693. *See also Downs v. State,* 453 So.2d 1102 (Fla.1984). In other words, one challenging a conviction on grounds of ineffective assistance of counsel, must do more than show that counsel's performance was deficient-rather, the "[d]efendant must affirmatively prove prejudice." *Downs,* 453 So.2d at 1108. The test for prejudice is-that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; *Downs,* 453 So.2d at 1108. With regard to counsel's duty to investigate, the Court observed:strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland,* 466 U.S. at 690-691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

***1386** We are mindful of the Supreme Court's adjuration to view attorney performance without the "distorting effects of hindsight, ... and to evaluate the conduct from counsel's perspective at the time." *See Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Nevertheless, we express some concern in this case at defense counsel's failure to become better informed with regard to various aspects of the evidence. It appears that counsel's omission in this regard may have denied Overton an opportunity to refute testimony which linked him to evidence involved in the robbery.

The focus of the second allegation regarding the inadequacy of counsel's pretrial investigation relates to counsel's failure to compare Broussard's deposition testimony with the depositions of the arresting officers. Such a comparison would have revealed that Broussard's trial testimony regarding his identification of clothing worn in the robbery was false. Neither of the clerks in the store at the time of the robbery identified Overton as the perpetrator. Thus, two pieces of evidence linking Overton to the crime, i.e., the knit gloves and clothing purportedly worn by the robber, were based on erroneous, hence impeachable, testimony.

Relief from judgment on the basis of newly discovered evidence is available where the evidence, "if taken as true, ... directly invalidate[s] an essential element of the state's case." *O'Callaghan v. State,* 461 So.2d 1354, 1356 (Fla.1984); *Hallman v. State,* 371 So.2d 482, 485 (Fla.1979). We conclude that application of this standard to Broussard's recanted trial testimony, while perhaps not invalidating the state's case, at least casts some doubt upon it.

The trial court found that counsel's failure to impeach Broussard and Dorff were tactical decisions, within the bounds of reasonably effective assistance. Again we are mindful that our role as a reviewing court does not allow us to share counsel's "firing line" perspective. Despite the deference due trial counsel's decisions, however, we are constrained to note that in this case the witness Broussard's recanted testimony was ascertained by subsequently appointed counsel, apparently through the exercise of no more than reasonable diligence.

Overton's next allegation concerning **inadequate pre-trial investigation** pertains to counsel's failure to determine the existence of purportedly exculpatory information. In *Havard v. State,* 489 So.2d 875 (Fla. 1st DCA 1986), this court held that an allegation of ineffective assistance predicated on counsel's failure to investigate alibi witnesses who could have substantiated a claim that appellant was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in another state when the crimes were committed stated a facially sufficient claim for relief. *See also Warren v. State,* 504 So.2d 1371, 1372 (Fla. 1st DCA 1987)-an attorney's failure to "interview an identified available witness whose testimony might exonerate her client can constitute ineffective assistance of counsel."

Overton contends that since his counsel knew he was suspected of committing other "old man robberies," she should have ascertained the dates of the other robberies. He urges that had counsel done so, she would have learned that Overton's parole officer issued him a travel permit and that Overton was working out of state when the gun used in this robbery was stolen, and when the old man robberies were committed. Overton further maintains that had counsel adequately questioned the witness Ann Stokes, she would have ascertained that Stokes had given the police the name of another person that she [Stokes] suspected was the perpertrator of the robbery for which Overton stands convicted. The trial court deemed counsel's tactical decision appropriate, concluding that development of these purportedly exculpatory facts would have opened the door to details of Overton's prior criminal record.

The second ineffective assistance category is predicated on counsel's failure to move for suppression of the identification of clothing allegedly worn in the robbery. It is undisputed that nearly all identification procedures are suggestive to some extent, but those procedures do not become *1387 impermissibly suggestive and require suppression unless the totality of the circumstances indicates the identification resulting from the procedure is unreliable. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *See also Carter v. State,* 366 So.2d 54, 57 (Fla. 2d DCA 1978), *cert. denied,* 373 So.2d 461 (Fla.1979); *State v. Sepulvado,* 362 So.2d 324, 326 (Fla. 2d DCA 1978), *cert. denied,* 368 So.2d 1374 (Fla.1979); *Baxter v. State,* 355 So.2d 1234 (Fla. 2d DCA), *cert. denied,* 365 So.2d 709 (Fla.1978).

Although the order does not set forth an express finding that an illegal showing occurred in this case, such finding is implicit in the trial court's determination that Overton failed to show that the clothing identification was predicated on the illegal showing. The record before us reflects that the first view the two store clerks had of Overton occurred while Overton was seated in a police car. Thereafter, Overton was taken inside the store, where he was advised of his rights in the presence of the clerks, and then directed to walk around the store as the robber had done. Neither clerk identified Overton as the armed robber. At trial, Broussard, one of the clerks, testified inaccurately that he identified items of clothing which the officers showed to him on the night of the robbery, before the officers asked him if he could identify Overton. From this testimony, the jury could have inferred that the clothing identification was reliable, since Broussard's identification of the clothing purportedly occurred approximately thirty minutes after the robbery. The record reflects, however, that Broussard testified falsely when he positively identified clothing at trial as the same clothing he had identified *on the night of the robbery.* In fact, Broussard did not identify this clothing, which he said the robber had worn, until a week later when he was asked to go to the police station for that express purpose. *See,* generally, *McDaniel v. State,* 523 So.2d 1225 (Fla. 2d DCA 1988).

The third ineffective assistance category is predicated on numerous instances of counsel's failure to object to allegedly improper and incorrect statements made by the prosecutor, and to allegedly improper conduct of state witnesses. It is an established principle that any comment reasonably susceptible of interpretation as a comment upon the defendant's right to remain silent, or which infers that a defendant has the burden of proving his innocence, is improper. *See Trafficante v. State,* 92 So.2d 811 (Fla.1957); *Dixon v. State,* 430 So.2d 949 (Fla. 3d DCA 1983).

Overton also raises numerous instances of alleged prosecutorial misstatements of fact. One of these statements related to a claimed absence of fingerprints on the gun used in the robbery. Overton maintains that through discovery, counsel knew that fingerprints were found on the gun and that those prints were not Overton's. Since counsel failed to challenge the prosecutor's statement that no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

304

prints were found on the gun, the jury could have inferred there were no fingerprints because the robber wore gloves. Although the appealed order contains no express finding with regard to the fingerprint issue, the hearing transcript reflects the trial court's observation that these statements could have been significant in light of the glove issue as it developed at trial. FN2

FN2. In analogous circumstances, the Fourth District found that appellant was entitled to a post-conviction evidentiary hearing on an ineffective assistance claim predicated on counsel's failure to alert the trial court to the fact that the "weapon" used in the robbery was a starter pistol rather than a firearm. *Fox v. State,* 510 So.2d 310 (Fla. 4th DCA 1986).

In addition to the erroneous representation that no fingerprints were found on the gun used in the robbery, Overton lists numerous allegedly prejudicial statements which the prosecutor made throughout the trial, one of which could be interpreted as a reference to Overton's prior criminal record. For the most part, the trial court characterized these statements as fair comment on the evidence. Nevertheless, the hearing transcript reflects the trial court's concern regarding the reference to other crimes, terming this reference a mistake which ought not have been made.

*1388 Overton also excepts to the inaccurate characterization of his prior record which the prosecutor presented to the trial court at sentencing. At the evidentiary hearing, the trial court observed that consideration would have been given at sentencing to three of the enumerated factors, if the court had been apprised of these particular inaccuracies at sentencing. FN3

FN3. The three unchallenged inaccuracies which the trial court found most troubling were (1) the fact that Overton had not effected an escape from prison as had been represented, but instead had escaped from a hospital before any charges had been filed against him; (2) the subsequent offenses were committed after the escape; and (3) the subsequent offenses were committed within a 4-day period.

The final point raised under the category we have designated "failure to object," concerns counsel's failure to develop the objection she raised with regard to a report that state witnesses discussed their trial testimony with each other, in violation of the trial court's express instruction to the contrary. Counsel was permitted to pursue the matter, but failed to do so. The trial court found the witnesses' conversation improper and a violation of the rules, but held there had been no showing as to what had been said, therefore Overton failed to show that this improper conduct affected the outcome of the trial. FN4

FN4. We agree with Overton that this finding places an impossible burden upon a defendant seeking relief on an ineffective assistance claim. Under this logic, a defendant must show counsel's performance was deficient, and that the deficient performance prejudiced the defense. Yet the very reason the defendant would be unable to show prejudice, would be due to counsel's failure to make the requisite showing on the record.

A similar situation obtained in *Ogden v. State,* 494 So.2d 280 (Fla. 2d DCA 1986). In *Ogden,* defense counsel was advised that a juror was seen leaving the state attorney's office after she had been selected for Ogden's jury, but counsel did not pursue the matter or bring it to the court's attention after the state attorney said he knew of no connection between the juror and anyone in his office. The court held the failure of defense counsel to pursue possible juror improprieties "suggests deficient representation measurably below that of competent counsel likely to have affected the outcome of Ogden's trial." 494 So.2d at 282.

We commend the trial court's attempt to address each of the numerous allegations raised in Overton's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

motion for post-conviction relief. Nevertheless, we find that some significant points, most notably the fingerprint allegations, were not specifically addressed in the order. Therefore, we are unable to determine whether the trial court considered these allegations insignificant, or whether the allegations were overlooked. Given the reasonable inferences that would normally follow the allegations and testimony raised in Overton's motion, we find that he has made a prima facie showing of entitlement to post-conviction relief. Once that showing was made, it was incumbent upon the trial court to find that the burden shifted to the state to refute, if it could do so, the allegations which Overton has raised.

Therefore, this cause is reversed and remanded with directions to the trial court to require the state to go forward with the presentation of its case. On remand, the trial court should make a determination regarding the possibility that prejudice attached to counsel's failure to challenge the misleading statements made by the prosecutor with regard to fingerprint evidence. In addition, the trial court is directed to make a determination regarding the destruction of trial evidence while a motion was pending in the case. Finally, we suggest to the trial court that it consider addressing the amended motion on remand.

Accordingly, the order denying post-conviction relief is reversed and remanded, for further proceedings consistent with this opinion.

SMITH, C.J., and ZEHMER, J., concur.
JOANOS, J., concurs specially with opinion.*1389
JOANOS, Judge, concurring specially.
I concur in the result accomplished by the majority opinion. I also would reverse and remand for continuation of the hearing that was discontinued when the trial judge granted what in effect was a motion for directed verdict by the State. The motion was made at the end of Overton's presentation of evidence and the ruling terminated the hearing before the State put on its case.

In reviewing the granting of a motion for directed verdict we are required to view the evidence in a manner most favorable to the defendant giving defendant the benefit of all favorable inferences. After doing that in this case, I would also find that the evidence so far presented under the circumstances of this case does make out a prima facie case of ineffective assistance of counsel. The burden of going forward has now shifted to the State. However, I do not believe that we should go any further in evaluating the merit of the evidence at this time. After the State has presented its case it will be up to the trial judge to evaluate all of the evidence.

Fla.App. 1 Dist.,1988.
Overton v. State
531 So.2d 1382, 13 Fla. L. Weekly 2290

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

**H**

Briefs and Other Related Documents
Jacobs v. StateFla.,2004.

Supreme Court of Florida.
Alwin J. JACOBS, Petitioner,
v.
STATE of Florida, Respondent.
**No. SC02-107.**

June 24, 2004.

**Background:** Defendant appealed the order of the Circuit Court, Miami-DadeCounty, Lawrence A. Schwartz, J., summarily denied his motion for postconviction relief. The District Court of Appeal, 800 So.2d 322, affirmed. Review was granted.

**Holdings:** The Supreme Court held that:

(1) when determining the facial sufficiency of a motion for postconviction relief, the court does not examine the record for evidence refuting the claim, disapproving of *Cooley v. State*, 642 So.2d 108, and

(2) defendant pled a facially sufficient postconviction relief claim, that trial counsel was ineffective in failing to call alibi witnesses at trial.

Decision of District Court of Appeal quashed; remanded.

Bell, J., filed a specially concurring opinion, in which Wells, J., concurred.

West Headnotes

**[1] Criminal Law 110 ⇐1575**

110 Criminal Law
110XXX Post-Conviction Relief
110XXX(C) Proceedings
110XXX(C)1 In General
110k1574 Petition or Motion
110k1575 k. In General. Most Cited Cases

If a movant for postconviction relief properly and timely alleges a valid legal claim with sufficient factual support, and complies with the oath and contents requirement for the motion, then he will ordinarily have stated a facially sufficient postconviction motion. West's F.S.A. RCrP Rule 3.850.

**[2] Criminal Law 110 ⇐1652**

110 Criminal Law
110XXX Post-Conviction Relief
110XXX(C) Proceedings
110XXX(C)3 Hearing and Determination
110k1651 Necessity for Hearing
110k1652 k. In General. Most Cited Cases

If the postconviction trial court finds that the motion for postconviction relief is facially sufficient, that the claim asserted in the motion is not conclusively refuted by the record, and that the claim is not otherwise procedurally barred, the trial court should hold an evidentiary hearing to resolve the claim. West's F.S.A. RCrP Rule 3.850.

**[3] Criminal Law 110 ⇐1575**

110 Criminal Law
110XXX Post-Conviction Relief
110XXX(C) Proceedings
110XXX(C)1 In General
110k1574 Petition or Motion
110k1575 k. In General. Most Cited Cases

Because the determination of the facial sufficiency of a motion for postconviction relief is one of law, and involves an evaluation of the legal sufficiency of the claim alleged in the motion, the evidence in the record will ordinarily be irrelevant to such an evaluation, and thus, the examination of the record

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

will ordinarily come only after a claim is found to be facially sufficient, and the purpose of that examination will be solely to determine whether the record conclusively refutes the claim; disapproving of *Cooley v. State*, 642 So.2d 108. West's F.S.A. RCrP Rule 3.850.

**[4] Criminal Law 110 ⟹1519(10)**

110 Criminal Law
110XXX Post-Conviction Relief
110XXX(B) Grounds for Relief
110k1511 Counsel
110k1519 Effectiveness of Counsel
110k1519(10) k. Evidence and Witnesses. Most Cited Cases

Defendant pled a facially sufficient postconviction relief claim, that trial counsel was ineffective in failing to call alibi witnesses at trial, in prosecution for burglary; the postconviction relief motion included the names of two potential alibi witnesses who had been previously listed in trial court record as alibi witnesses, it included the witnesses' telephone numbers, and it included a rather specific factual recitation of their proposed alibi testimony. U.S.C.A. Const.Amend. 6; West's F.S.A. RCrP Rule 3.850.

*549 R. Mitchell Prugh of Middleton & Prugh, P.A., Melrose, FL, for Petitioner.

Charles J. Crist, Jr., Attorney General, Michael J. Neimand, Bureau Chief, and Meredith L. Balo and John D. Barker, Assistant Attorneys General, Miami, FL, for Respondent.

PER CURIAM.

We have for review *Jacobs v. State*, 800 So.2d 322 (Fla. 3d DCA 2001), based on conflict with the decision in *Smith v. State*, 481 So.2d 988 (Fla. 5th DCA 1986). We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const. We quash *Jacobs*, and hold that the district court erred in affirming the trial court's summary denial of petitioner's postconviction claim of ineffectiveness of counsel as facially insufficient.

PROCEEDINGS TO DATE

In the trial court Jacobs was charged, tried, and found guilty by a jury of burglary, petit theft, and criminal mischief. Before trial, Jacobs' counsel filed a notice of alibi, stating: "At the exact date and time of the alleged offense, the defendant was at: 3638 Percipal Avenue, Coconut Grove, Florida." The notice expressly listed Mike Lee and Nika Lee as alibi witnesses. However, these alibi witnesses were not called at trial and Jacobs was subsequently convicted on all charges.

After his conviction, Jacobs filed a motion for postconviction relief pursuant to rule 3.850 of the Florida Rules of Criminal Procedure. Among his eight claims for relief, Jacobs asserted that his trial counsel was ineffective for failing to call at trial the alibi witnesses listed in his notice of alibi. He further asserted that these witnesses were available, known to counsel, and would have testified that at the time of the alleged crimes Jacobs was with them and not at the scene of the crimes. The trial court expressly found this claim to be facially insufficient and summarily denied Jacobs' postconviction motion in its entirety.

On appeal, the Third District agreed and affirmed the trial court's summary denial of relief. *See Jacobs v. State*, 800 So.2d 322 (Fla. 3d DCA 2001). Judge Cope concurred with the denial of all of Jacobs' postconviction claims except for the ineffective assistance of counsel (IAC) claim regarding the failure to call alibi witnesses. *Jacobs*, 800 So.2d at 324 (Cope, J., concurring in part and dissenting in part). In his partial dissent, Judge Cope noted that a notice of alibi was filed in this case, and that the notice listed the two alibi witnesses by name and address.

Jacobs now seeks review of the Third District's decision, asserting that he set out a facially sufficient claim of ineffectiveness of counsel regarding defense counsel's failure to call alibi witnesses at trial, and that he is entitled to an evidentiary hearing on this claim.

*550 PROCEDURE UNDER RULE 3.850

[1] Florida's rule for postconviction relief is largely

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

self-explanatory as to its procedure. Florida Rule of Criminal Procedure 3.850(a)-(c) sets forth the criteria for filing a facially sufficient postconviction motion. The rule requires the movant to include "a brief statement of the facts (and other conditions) relied on in support of the motion." Fla. R.Crim. P. 3.850(c)(6). Hence, if a movant properly and timely alleges a valid legal claim with sufficient factual support, and complies with the oath and contents requirement, then he will ordinarily have stated a facially sufficient postconviction motion.

After a determination of facial sufficiency, rule 3.850(d) directs the course of further proceedings:

On filing of a rule 3.850 motion, the clerk shall forward the motion and file to the court. If the motion, files, and records in the case conclusively show that the movant is entitled to no relief, the motion shall be denied without a hearing. In those instances when the denial is not predicated on the legal insufficiency of the motion on its face, a copy of that portion of the files and records that conclusively shows that the movant is entitled to no relief shall be attached to the order. Unless the motion, files, and records of the case conclusively show that the movant is entitled to no relief, the court shall order the state attorney to file an answer or other pleading within the period of time fixed by the court or to take such other action as the judge deems appropriate. The answer shall respond to the allegations of the motion. In addition it shall state whether the movant has used any other available state remedies including any other postconviction motion under this rule. The answer shall also state whether an evidentiary hearing was accorded the movant. If the motion has not been denied at a previous stage in the proceedings, the judge, after the answer is filed, shall determine whether an evidentiary hearing is required. If an evidentiary hearing is not required, the judge shall make appropriate disposition of the motion. If an evidentiary hearing is required, the court shall grant a prompt hearing thereon and shall cause notice thereof to be served on the state attorney, determine the issues, and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, that the sentence imposed was not authorized by law or is otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the movant as to render the judgment vulnerable to collateral attack, the court shall vacate and set aside the judgment and shall discharge or resentence the movant, grant a new trial, or correct the sentence as may appear appropriate.

Fla. R.Crim. P. 3.850(d).

[2] Under these comprehensive provisions a trial court's consideration of a motion under rule 3.850 involves a number of possible steps: First, a trial court must determine whether the motion is facially sufficient, i.e., whether it sets out a cognizable claim for relief based upon the legal and factual grounds asserted. It would logically follow that if no valid claim is alleged, the court may deny the motion outright, and the court need not examine the record. Second, if the court determines that the motion is facially sufficient, the court may then review the record. If the record *conclusively* refutes the alleged claim, the claim may be denied.

In doing so, the court is required to attach those portions of the record that conclusively refute the claim to its order of denial. Third, if the court determines that the motion is facially sufficient and that *551 there are no files or records conclusively showing that the movant is *not* entitled to relief, the court may order the state attorney's office to file a response to the defendant's motion. The state attorney must respond to the allegations of the motion, state whether the movant has pursued any other available remedies (including any other postconviction motions), and state whether the defendant received an evidentiary hearing. Fourth, after the state attorney has filed the required response, the trial judge must determine whether the claims alleged in the motion have been denied at a previous stage in the proceedings. Finally, if the claims presented in the motion have not been denied previously, the judge shall then determine whether an evidentiary hearing is required in order to resolve the claims alleged in the motion. Thus, if the trial court finds that the motion is facially sufficient, that the claim is not conclusively refuted by the record, and that the claim is not otherwise procedurally barred, the trial court should hold an evidentiary hearing to resolve the claim.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[3] Thus, rule 3.850 distinguishes between claims that are facially insufficient and those that are facially sufficient but are also conclusively refuted by the record. A determination of facial sufficiency will rest upon an examination of the face, or contents, of the postconviction motion. Because the determination of facial sufficiency under rule 3.850 is one of law and involves an evaluation of the legal sufficiency of the claim alleged, the evidence in the record will ordinarily be irrelevant to such an evaluation. The examination of the record will ordinarily come only *after* a claim is found to be facially sufficient, and the purpose of that examination will be solely to determine whether the record conclusively refutes the claim.

FACIAL SUFFICIENCY

Both the trial court and the district court in this case appear to have mixed the first two procedural stages of rule 3.850, i.e., they have combined the issue of a claim's facial sufficiency with the issue of whether the claim is conclusively refuted by the record. In addressing the defendant's claim of ineffective assistance of counsel based on the failure to call alibi witnesses, the trial court expressly denied the motion based on facial insufficiency. In doing so, however, the court relied upon the "overwhelming evidence against the defendant"-a clear indication that the court had reviewed not only facial sufficiency of the claim itself, but also the record of the trial. The court also cited *Cooley v. State*, 642 So.2d 108 (Fla. 3d DCA 1994), for the proposition that counsel is not ineffective where there is "ample evidence contradicting the testimony the witness would have given"-another sign that the court was relying on the contents of the record, rather than the facial sufficiency of the claim, to deny the motion. FN1

FN1. *Cooley* is distinguishable from the circumstances here because it did not involve a claim based upon counsel's failure to call alibi witnesses. Rather, it is unclear from the brief opinion in *Cooley* how the alleged witnesses may have affected the case. Under those circumstances, the Third District concluded that Cooley had failed to demonstrate that there was "a likelihood that the alleged erroneous decision affected the outcome of the trial." *Cooley*, 642 So.2d at 109. However, we disapprove *Cooley* to the extent it may be construed to hold that the facial sufficiency of the motion may be determined based on an examination of the record to refute the claim.

The Third District's opinion appears to have repeated the trial court's mistake in its analysis. In holding that the defendant's claim was facially insufficient, the district court stated that "[a]lthough the defendant claims these witnesses would *552 have testified that he was in their home at the time of the crime, other eyewitness testimony placed the defendant at the scene of the crime and there was overwhelming evidence of the defendant's burglary of the unoccupied dwelling." *Jacobs v. State*, 800 So.2d 322, 323 (Fla. 3d DCA 2001). The court also noted the "abundance of evidence contradicting [the witnesses'] testimony." *Id.* at 324. These statements indicate the district court, too, looked not at the legal sufficiency of the allegations of the motion, but to the record to refute the claim.

CASE LAW

Jacobs claims that the Third District's decision conflicts with case law from the other district courts of appeal. Most of the cases cited for conflict hold that a facially sufficient claim is stated when a movant alleges that trial counsel was ineffective for failing to call known alibi witnesses, and, in such instances, the trial court must either attach portions of the record that conclusively refute the IAC claim to its order, or require the State to respond before making the decision to hold an evidentiary hearing.

In *Smith v. State*, 481 So.2d 988 (Fla. 5th DCA 1986), the Fifth District expressly found that an IAC claim similar to the one asserted here was facially sufficient, despite the fact that the defendant did not list "the complete names of the potential witnesses or their addresses," because he *did*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

factually describe how the witnesses would have supported his alibi. *Id.* at 989. Hence, the Fifth District concluded that a facially sufficient claim was alleged. On the other hand, in *Robinson v. State,* 516 So.2d 20 (Fla. 1st DCA 1987), the First District held that an IAC claim regarding the failure to call alibi witnesses was facially insufficient when the defendant fails to support it with "facts such as the identity of such witnesses, what they would testify to if called, or their availability." *Id.* at 21. *See also Baker v. State,* 839 So.2d 851, 852 (Fla. 1st DCA 2003) (reversing the trial court's summary denial of the IAC alibi witness claim because the trial court "failed to attach portions of the record conclusively refuting the appellant's claim that counsel was ineffective for failing to interview and call alibi witnesses"); *Cohens v. State,* 775 So.2d 336, 337 (Fla. 2d DCA 2000) (finding that the trial court erred in finding the IAC alibi witness claim facially insufficient because a notice of alibi was filed in the case); *Stringer v. State,* 757 So.2d 1226, 1226 (Fla. 4th DCA 2000) (remanding the case for the trial court to either hold a hearing or attach further record excerpts because the exhibits incorporated in the trial court's order did not conclusively refute the IAC alibi witness claim); *Reid v. State,* 745 So.2d 1114, 1114-15 (Fla. 1st DCA 1999) (finding that the IAC claim was facially sufficient, but that the trial court failed to attach the portion of the record that "refutes, or even addresses, the defendant's claim that counsel failed to call an alibi witness"); *Beatty v. State,* 647 So.2d 266, 267 (Fla. 4th DCA 1994) (remanding the case on several IAC claims, including counsel's failure to call an alibi witness, directing the trial court to either hold a hearing or "attach portions of the files and records conclusively showing that appellant is not entitled to relief on each ground"); *Mallory v. State,* 577 So.2d 987, 988 (Fla. 4th DCA 1991) (remanding the case because the defendant's motion stated a facially sufficient IAC claim regarding the failure to investigate alibi witnesses); *Harrell v. State,* 443 So.2d 1080, 1080 (Fla. 2d DCA 1984) (remanding the case on the IAC claim that defense counsel failed to contact potential alibi witnesses after the defendant provided their names and addresses because the trial court summarily denied the claim and failed to attach*553 portions of the record refuting the allegations).

[4] The provisions of rule 3.850 and the decisions discussed above support a conclusion that Jacobs set out a facially sufficient claim here, because, in accord with the provisions of the rule and the holdings of the cases, he specifically identified the alibi witnesses, stated the substance of their exculpatory evidence, and averred that they were known to counsel. We conclude that Jacobs' IAC claim was pled sufficiently in accordance with rule 3.850 because in the motion Jacobs expressly provided (1) the names of the two potential alibi witnesses who had been previously listed in the trial court record as alibi witnesses; (2) the witnesses' phone numbers; and (3) a rather specific factual recitation of their proposed alibi testimony supporting his alibi defense.[FN2] The petitioner's motion contained both a legal claim of ineffective assistance of counsel, i.e., an unexplained failure to present a valid defense, that, if accepted, would have supported a not guilty verdict, and a detailed factual predicate for the claim, i.e., the availability of identified witnesses known to counsel who would have supported the defense. The rule does not require more. Therefore, we find that both the trial court and the Third District erred by finding the instant claim to be facially insufficient.

FN2. Although Mike Lee and Nika Lee's exact address is not listed in the postconviction motion, their home is referenced as being in "Coconut Grove," which is consistent with the address given in the notice of alibi.

EVIDENTIARY HEARING

While we acknowledge that the denial of relief in this case was expressly predicated upon rulings of law by both the trial court and the district court that the claim was facially insufficient, we also consider whether the claimant was entitled to an evidentiary hearing. As noted above, the Third District's ruling actually relied upon the contents of the record rather than the facial sufficiency of the motion:

The defendant's claim that counsel was ineffective for failing to call two proposed alibi witnesses at trial is facially insufficient. Although the defendant claims these witnesses would have testified he was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in their home at the time of the crime, other eyewitness testimony placed the defendant at the scene of the crime and there was overwhelming evidence of the defendant's burglary of the unoccupied dwelling. We agree with the State that the failure to call these witnesses where there was an abundance of evidence contradicting their testimony constituted a sound tactical decision and not ineffectiveness of counsel. *See Jones v. State,* 747 So.2d 982 (Fla. 3d DCA 1999), *quashed in part on other grounds,* 759 So.2d 681 (Fla.2000).
Under rule 3.850, a defendant is entitled to an evidentiary hearing unless the motion and record conclusively show the defendant is not entitled to relief. *See Harich v. State,* 484 So.2d 1239, 1240 (Fla.1986). Since the defendant's motion is facially insufficient, no error has been shown in the trial court's summary denial. *See State v. Pelham,* 737 So.2d 572 (Fla. 1st DCA 1999) (affirming summary denial of ineffective assistance claim as to alibi witnesses since arguments were facially insufficient). Accordingly, no evidentiary hearing is required and the order below is affirmed in all respects.

*Jacobs,* 800 So.2d at 323-24. On the other hand, in his partial dissent, Judge Cope explained his reasoning for concluding that an evidentiary hearing was necessary:*554 The record reflects that counsel had filed a notice of alibi listing two alibi witnesses by name and address. Defendant alleged that the witnesses "were prepared to testify on behalf of the Defendant." Motion for Postconviction Relief, at 8. Defendant says the witnesses would have testified he was in their home at the time of the crime.
However, the alibi witnesses were not called to testify at trial.
Defendant contends that he would have testified at trial that he was at the home of the two alibi witnesses at the time of the crime. However, he says that counsel advised him that if he testified, the details of his prior record could be placed before the jury. In reality, the State would only be able to bring out the number of the defendant's prior convictions, but not the details. See § 90.610, Fla. Stat. (1997); Charles W. Ehrhardt, *Florida Evidence,* § 610.5 (2001).
"On appeal from the denial of relief [without an evidentiary hearing], unless the record shows conclusively that the appellant is entitled to no relief, the order shall be reversed and the cause remanded for an evidentiary hearing or other appropriate relief." Fla. R.App. P. 9.141(b)(2)(D).
In my view, the record does not conclusively refute the defendant's claim. The identification in this case was by a single witness who had never seen defendant before. We cannot say on this record what the effect would have been had the alibi witnesses, and the defendant, testified. Defendant's allegations are sufficient to call for an evidentiary hearing on his motion.

*Id.* at 324 (Cope, J., concurring in part and dissenting in part). This analysis is consistent with the analysis set out above explaining the procedural framework for rule 3.850.

In addition to the district court case law discussed above, our recent decision in *Ford v. State,* 825 So.2d 358 (Fla.2002), is instructive on the issue of the need for an evidentiary hearing in this case.
Although not dealing specifically with alibi witnesses, we granted review in *Ford* "to resolve the issue of whether the trial court was required to hold an evidentiary hearing based upon the allegations in petitioner's 3.850 motion concerning ineffective assistance of trial counsel for a failure to investigate and call witnesses." *Id.* at 360. In *Ford,* we concluded that the trial court had erred in summarily denying a claim that trial counsel was ineffective for failing to call certain witnesses. We explained:
Without an evidentiary hearing or any record attachments refuting petitioner's allegations, the trial court was bound to assume that the allegations in petitioner's 3.850 motion were true. *See Edwards v. State,* 652 So.2d 1276, 1276-77 (Fla. 5th DCA 1995). We conclude that the Fifth District, by affirming the trial court's order on the basis that " defense counsel could have well decided that calling them would not have been beneficial," *Ford,* 776 So.2d at 374, erroneously allowed the trial court to deviate from this rule. The Fifth District's statement in *Ford* resolved, without either a clear trial record basis identified by the trial court or an evidentiary hearing, the factual issue involving the reason why counsel did not call the witnesses identified by the petitioner. We conclude that, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the instant case, to determine the reason why trial counsel did not call the witnesses it was necessary to grant petitioner an opportunity to present evidence. *See Williams v. State,* 601 So.2d 596, 598-99 (Fla. 1st DCA 1992) (reversing trial court's finding without benefit of evidentiary hearing that trial counsel's*555 decision not to call witnesses was tactical because such an allegation raised question of fact).

825 So.2d at 361. We conclude that the reasoning in our opinion in *Ford* applies here as well. Under the provisions of rule 3.850, the defendant's allegations, which we have determined to be facially sufficient and not conclusively refuted by the record, now require the trial court to order the State to respond. The trial court must then consider (pursuant to the considerations specified in rule 3.850(d)) holding an evidentiary hearing to resolve the issue of counsel's effectiveness concerning the use of the alleged alibi witnesses at trial.

In essence, both the trial court and the district court relied upon other evidence presented by the State of defendant's presence at the scene of the crime and his guilt as a basis for denying an evidentiary hearing. However, a claim of ineffectiveness in failing to present important exculpatory evidence cannot be resolved on the basis of the mere existence of conflicting evidence in the record. Rather, the record evidence must *conclusively* rebut the claim if the claim is to be resolved without a hearing. For example, if the record demonstrated that these witnesses had actually testified, the claim would obviously be conclusively rebutted.

However, the mere existence of evidence of guilt is insufficient to conclusively rebut a claim of ineffectiveness in failing to present evidence of innocence in the form of known and available alibi witnesses. Rather, such a claim involves an assertion that a defendant is entitled to have counsel act reasonably and effectively, in determining whether to present exculpatory evidence in support of the defense. And, where it is facially asserted that such evidence exists, but was not presented, a State response must be ordered and considered before determining if a hearing is required unless the record demonstrates a reasonable explanation or otherwise conclusively refutes the claim. Upon a trial court ordering a hearing, the burden will remain on the defendant at such an evidentiary hearing to demonstrate a valid claim of ineffective assistance of counsel under the two-pronged analysis contained in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Accordingly, we quash the decision of the Third District and remand for further proceedings in accord with this opinion.

It is so ordered.

ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
BELL, J., concurs specially with an opinion, in which WELLS, J., concurs.BELL, J., specially concurring.
I agree with the majority that Jacobs' motion sets forth a facially sufficient claim of ineffective assistance of counsel. However, I am concerned about the consequences of reading the majority opinion too broadly. In almost every trial, counsel makes a decision not to call one or more witnesses for a variety of reasons. The failure of counsel to call witnesses is a very common claim of ineffective assistance of counsel. Rarely does the typical trial record contain sufficient evidence to explain a decision not to call a particular witness. Without a reasonable application of rule 3.850 in respect to counsel not calling a witness, this inevitable gap in the typical record will easily result in an enormous, imprudent expenditure of limited judicial resources on unnecessary hearings. Therefore, we should continue to adhere to the sound view that absent extraordinary circumstances, the simple failure of counsel to call a witness is not sufficient grounds for collateral attack. *556*Cooley v. State,* 642 So.2d 108 (Fla. 3d DCA 1994). In this case, I concur in the result of the majority opinion because the failure to call previously noticed alibi witnesses is exactly such an extraordinary circumstance that should prohibit a summary denial based upon the record before us.

Additionally, it is important to reiterate the importance of making an adequate record if one

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

wishes to minimize evidentiary hearings on meritless collateral attacks. Florida law imposes no duty upon counsel to obtain a client's on-the-record consent to counsel's tactical decision regarding trial strategy. *See Jones v. State,* 484 So.2d 577, 579-80 (Fla.1986). And the attorney-client privilege limits the scope of a trial judge's inquiry.
However, if a record is developed to make it clear that a defendant has given free, voluntary, and knowing consent to the strategy advocated by counsel, it logically follows that no later claim for ineffective assistance of counsel can prevail. In this case, the trial court had a brief dialogue with defense counsel and Jacobs when counsel informed the court that the defense was not going to present any evidence. The entire exchange went as follows:
THE COURT: I have just been told by [counsel] that you have chosen not to testify or present any defenses in this case.
THE DEFENDANT: Yes, sir.
THE COURT: Have you had an opportunity to discuss that tactical decision with [counsel]?
THE DEFENDANT: Yes.
THE COURT: They have explained to you their reasons for doing that?
THE DEFENDANT: Yes, sir.
THE COURT: And you have concurred with their reasons for doing that?
THE DEFENDANT: Yes, I have.
THE COURT: You believe it's in your best interest not to testify or present any defenses at this time?
PETITIONER: Yes, I do.

Neither the trial court nor the Third District relied on this colloquy to justify the underlying summary denial of the motion. However, such colloquies, when sufficiently thorough, provide a sufficient basis on the record to rule on postconviction motions without the need for an evidentiary hearing. If this colloquy had adequately reflected that the defendant knew of his right not only to present his own testimony but also to call witnesses and that he was freely and knowingly consenting to the strategy of counsel not to present a defense, there might be sufficient on-the-record consent to trial counsel's decision not to call witnesses, thereby precluding a later objection to this strategy.

The colloquy with this defendant was not sufficient to rebut the claim of ineffectiveness. The subject of agreeing not to call other witnesses, particularly important alibi witnesses, was not adequately covered. Without such a thorough colloquy, I concur with the majority that there is insufficient evidence in the record before us to rebut the allegations made in an otherwise facially sufficient motion, and the case should be remanded to require the State to answer the motion and then for further proceedings in accordance with the rule.

WELLS, J., concurs.
Fla.,2004.
Jacobs v. State
880 So.2d 548, 29 Fla. L. Weekly S319

Briefs and Other Related Documents (Back to top)

• 2002 WL 32131737 (Appellate Brief) Petitioner's Initial Brief on the Merits (Dec. 16, 2002)
• 2002 WL 32131859 (Appellate Brief) Petitioner's Initial Brief on the Merits (Dec. 16, 2002)
• SC02-107 (Docket) (Jan. 15, 2002)
• 2002 WL 32131736 (Appellate Brief) Brief of Respondent (2002)
• 2002 WL 32131858 (Appellate Brief) Brief of Respondent (2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA**

**STATE OF FLORIDA,**

**Plaintiff,**

**CASE NO.: 01-2000-CF-002753-A**

**DIVISION: II**

**vs.**

**BRIAN PATRICK HERLIHY,**

**Defendant.**

---

**ORDER DENYING, IN PART, MOTION FOR POST-CONVICTION RELIEF, SCHEDULING AN EVIDENTIARY HEARING, IN PART, AND APPOINTING OFFICE OF THE PUBLIC DEFENDER**

**THIS CAUSE** comes before the Court upon Defendant's "Rule 3.850 Motion for Post Conviction Relief," filed August 25, 2006, pursuant to Florida Rule of Criminal Procedure 3.850 (2006). The motion alleges two counts of ineffective assistance of counsel stemming from counsel's representation of Defendant at a criminal trial that took place in September 2002. Appeal was taken of the decision rendered by the Court, and the same was affirmed by the First District Court of Appeal on November 3, 2004. *See* Mandate. Upon consideration of the motion and the record, this Court finds and concludes as follows:

2007 FEB -8 AM 11:44
J.K. "BUDDY" IRBY
CLERK OF COURTS
ALACHUA COUNTY, FL
FILED
CK 11

1. Defendant alleges that trial counsel was ineffective for:

    (A) failure to conduct adequate pretrial investigation; and

    (B) failure to impeach a State witness at trial;

2. In order to make out a prima facie case for ineffective assistance of counsel, Defendant must assert that trial counsel's performance did not comply with the prevailing standards of professionalism, and that the deficiency proved detrimental to the defendant. *See Strickland v. Washington*, 466 U.S. 668, 691-92 (1984) (hereinafter "Strickland"). The court

ORDER ON MOTION FOR POST CONVICTION RELIEF
State v. Brian Patrick Herlihy
Case No.: 01-2000-CF-002753-A
Martha A. Lott, Circuit Judge

need not consider the claim that an attorney's performance was deficient if prejudice is not properly alleged by the movant. *Johnson v. State*, 593 So.2d 206, 209 (Fla. 1992). When alleging ineffective assistance of counsel, the movant must plead both the unprofessional error and prejudice prongs with specificity. *See Smith v. State*, 445 So.2d 323,325 (Fla. 1983) (citing *Knight v. State*, 394 So.2d 997, 1001 (Fla. 1981) (when alleging legally incompetent performance, "the specific omission or overt act upon which the claim of ineffective assistance of counsel is based must be detailed in the appropriate pleading."). *See also Cunningham v. State*, 748 So.2d 328, 330 (Fla. 4th DCA 2000) (reasoning that "[a] hearing is reserved for those cases where a defendant can articulate a basis for one."). It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. *Strickland*, 466 U.S. at 693. The defendant must show that there is a reasonable probability that, but for counsel's errors, the results of the proceeding would have been different. *Id.* at 698.

3. As to Ground (A), Defendant alleges that counsel was ineffective for failing to conduct an adequate pre-trial investigation. Specifically, Defendant alleges that counsel failed to investigate information contained in a medical report prepared by a doctor hired by Defendant's family to investigate the cause of death of the victim in this case. Defendant argues that, had counsel investigated the medical opinions contained in the report, counsel would have discovered viable medical defenses likely to change the outcome of the trial.

Defendant provides an affidavit signed by his mother, Lois Herlihy, indicating that she made available to counsel a report authored by Dr. Viera Scheibner, in October of 2000. *See* Affidavit of Lois Herlihy (dated July 14, 2006). The report, also provided by Defendant, contains the opinion that a key factor in the victim's death was his exposure to a double vaccination. *See* Report on Vaccine Injuries of Baby Robert Quirello. Two additional reports

Page 2 of 6

000316

ORDER ON MOTION FOR POST CONVICTION RELIEF
State v. Brian Patrick Herlihy
Case No.: 01-2000-CF-002753-A
Martha A. Lott, Circuit Judge

authored after the conclusion of the trial, by Dr. F. Edward Yazbak and Dr. Mohammed Ali Al-Bayati, also contain the opinion that the cause of the victim's death was medical. Some of the findings include: (1) that the baby's mother had been treated with Corticosteroid, a muscle relaxer administered to slow down pre-term contractions experienced after the mother was in a car accident in the last trimester of her pregnancy; (2) that the mother was treated with Micronase, a drug used to treat diabetes, and that the baby was exposed to the drug through breastfeeding; and, (3) the child suffered from a number of "old" brain injuries which contributed to his death.

Defendant argues that, had counsel presented the testimony of a toxicologist such as Dr. Scheibner at trial, the jury would have been educated as to other possible causes of death, apart from Shaken Baby Syndrome. In essence, Defendant alleges that counsel failed to call a witness whose testimony might have aided in exonerating him. This claim presents a prima facie case of ineffective assistance of counsel, requiring an evidentiary hearing. *Overton v. State*, 531 So.2d 1382, 1385 (Fla. 1st DCA 1988). A claim of inadequate pre-trial investigation must be balanced against counsel's duty to make responsible tactical decisions during the course of the trial: "In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Overton v. State*, 531 So.2d 1382, 1385 (Fla. 1st DCA 1988) (citing *Strickland*, 466 U.S. at 691). *See also Yarbrough v. State*, 871 So.2d 1026, 1031 (Fla. 1st DCA 2004); *Lee v. State*, 899 So.2d 348, 352 (Fla. 2d DCA 2005).

Defendant's motion is facially sufficient, and is not conclusively refuted by the record. Therefore, this Court finds that the Defendant is entitled to an evidentiary hearing to address the merits of this claim. *See Jacobs v. State*, 880 So.2d 548, 553-54 (Fla. 2004).

Page 3 of 6

000317

ORDER ON MOTION FOR POST CONVICTION RELIEF
State v. Brian Patrick Herlihy
Case No.: 01-2000-CF-002753-A
Martha A. Lott, Circuit Judge

4. As to Count (B), Defendant alleges that Counsel was ineffective for failing to impeach a state witness. Specifically, Defendant alleges that Detective Michael Weaver would have testified, if called to the stand, that Defendant did not make inculpatory statements during the trip to jail immediately following his arrest, as testified to by Detective Helen Legall. Defendant alleges that, if Counsel had called Detective Weaver, the jury would have disregarded the impeached statements of Detective Legall, and the outcome of the trial would have been different.

The record reflects that Counsel's decision not to call Detective Weaver was a deliberate decision reflecting trial strategy. Counsel's decisions regarding trial strategy must be given wide deference. *Strickland*, 466 U.S. at 689. The Defendant has not overcome the presumption, supported by the record, that the decision not to call Detective Weaver was a tactical one. *See id.* The record reflects that Counsel told the jury during his closing argument why he had not called Detective Weaver to the stand, and incorporated it specifically into his theory of the case.

> The state's gonna get up and they're gonna tell you, Well, I could have called him [Detective Weaver]. Well, let me tell you something, I don't call any police witness unless I know what they're gonna say in trial in that chair in that witness stand, and that's why I didn't call him. On the other hand, the state knows exactly what a police officer is gonna say before he comes to court. They did not call – not only didn't they tape it, they didn't call the witness who was right there when Brian is alleged to have made those incriminating statements. That has to do with their credibility as a witness just like any other witness in the case ...

*See* Transcript at 2351. While Defendant's claim does present a prima facie case of ineffective assistance of counsel, the claim is conclusively refuted by the record. Therefore, Count (B) is denied.

Page 4 of 6

000318

ORDER ON MOTION FOR POST CONVICTION RELIEF
State v. Brian Patrick Herlihy
Case No.: 01-2000-CF-002753-A
Martha A. Lott, Circuit Judge

Based on the foregoing, it is **ORDERED AND ADJUDGED** that:

I. Defendant's "Motion for Post-Conviction Relief" is hereby **DENIED** as to Ground (B). No subsequent motion raising this ground will be entertained by this Court. Defendant may appeal this decision to the First District Court of Appeal within (30) days of the Court's ruling as to the remaining claim.

II. An evidentiary hearing ~~is~~ may be scheduled to determine whether Defendant is entitled to relief on Ground (A). The hearing will proceed as follows: After the court has reviewed the state's written response

1. Date: ______
2. Time: ______ TBA
3. Expected Duration: ______
4. Location: ______

II. __The Office of the Public Defender__ is hereby appointed to represent Defendant in further proceedings in this matter.

III. The transport of Defendant to and from the evidentiary hearing will be addressed in a separate order.

**DONE AND ORDERED** at Chambers in Gainesville, Alachua County, Florida, on this 6 day of February 2007.

[signature]
MARTHA A. LOTT, CIRCUIT JUDGE

Page 5 of 6

000319

ORDER ON MOTION FOR POST CONVICTION RELIEF
State v. Brian Patrick Herlihy
Case No.: 01-2000-CF-002753-A
Martha A. Lott, Circuit Judge

**ATTACHMENTS:**

1. Mandate, filed November 23, 2004.
2. Trial Transcript, page 2351, filed May 2, 2003.
3. Motion for Post-Conviction Relief, filed August 25, 2006.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing Order and Attachments was furnished by U.S. Mail/hand delivery, on this 8 day of February 2007, to the following:

Mr. Brian Patrick Herlihy - DC# G06137
South Bay Correctional Facility
600 U.S. Highway 27 S
South Bay, FL 33493
(copy of motion not attached)

John Kearns, Assistant Public Defender
Office of the Public Defender

Jeanne Singer, Chief Assistant State Attorney
(order only – no attachments)
Michael Becker, Assistant State Attorney
State Attorney's Office

MKP

Kim Parramore, Judicial Assistant

/bnl

Page 6 of 6

000320

9

2 src

# M A N D A T E

From

## DISTRICT COURT OF APPEAL OF FLORIDA
## FIRST DISTRICT

FILED CK 23
04 NOV 23 PM 1:51
J.K. "BUDDY" IRBY CLERK OF COURTS ALACHUA COUNTY FL

To the Honorable Judges of the Circuit Court for Alachua County

WHEREAS, in that certain cause filed in this Court styled:

BRIAN PATRICK HERLIHY Case No : 1D02-4788

v. Lower Tribunal Case No : 2000-2753-CFA

STATE OF FLORIDA

The attached opinion was issued on November 3, 2004.

YOU ARE HEREBY COMMANDED that further proceedings, if required, be had in accordance with said opinion, the rules of Court, and the laws of the State of Florida.

WITNESS the Honorable JAMES R. WOLF, Chief Judge

of the District Court of Appeal of Florida, First District,

and the Seal of said Court done at Tallahassee, Florida,

on this 19th day of November 2004.

DISTRICT COURT OF APPEAL STATE OF FLORIDA FIRST DISTRICT

Jon S. Wheeler
JON S. WHEELER, Clerk
District Court of Appeal of Florida, First District

IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

BRIAN PATRICK HERLIHY,

Appellant/Cross-Appellee,

v.

STATE OF FLORIDA,

Appellee/Cross-Appellant.

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING AND DISPOSITION THEREOF, IF FILED.

CASE NO. 1D02-4788

FILED CK 23
04 NOV 23 PM 1:51
J.K. "BUDDY" IRBY
CLERK OF COURTS
ALACHUA COUNTY, FL

Opinion filed November 3, 2004.

An appeal and cross-appeal from an order from the Circuit Court for Alachua County. Martha Ann Lott, Judge.

Nancy A. Daniels, Public Defender, and Nada M. Carey, Assistant Public Defender, Tallahassee, Attorneys for Appellant.

Charles J. Crist, Jr., Attorney General, and Charlie McCoy, Senior Assistant Attorney General, Tallahassee, Attorneys for Appellee.

PER CURIAM.

AFFIRMED.

BOOTH, VAN NORTWICK and PADOVANO, JJ., CONCUR.

I CERTIFY THE ABOVE TO BE A TRUE COPY
JON S. WHEELER
CLERK DISTRICT COURT OF APPEAL, FIRST DISTRICT

DISTRICT COURT OF APPEAL FIRST DISTRICT STATE OF FLORIDA

Src

IN THE CIRCUIT COURT OF FLORIDA
EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY

CASE NO: 01-2000-CF-2753-A

TRANSCRIPT ON APPEAL
VOLUME XVIII
(Pages 2268 - 2432)

STATE OF FLORIDA

Volume XXI
1002-4788

vs.

BRIAN PATRICK HERLIHY,

Defendant.

ORIGINAL

______________________________/

Proceedings: Jury trial

Before: The Honorable Martha Ann Lott, Circuit Judge

Date: September 23, 2002

Time: 1:00 p.m.

Place: Courtroom 4-A
Alachua County Courthouse
Gainesville, Florida

03 MAY -2 PM 4:17
CLERK OF CIRCUIT COURT & COUNTY COURT ALACHUA COUNTY FL

Reporter: Stacey K. Bryant, RPR
Judicial Court Reporter

APPEARANCES:

Jeanne Singer, Assistant State Attorney
Stephen Pennypacker, Assistant State Attorney
120 W. University Avenue
Gainesville, Florida 32608
Appearing on behalf of the State of Florida

Gordon Groland, Esquire
John Tedder, Esquire
Post Office Box 2848
Gainesville, Florida 32602
Attorneys for defendant

tell you -- I guess I'm gonna talk about this now. The state's gonna get up and they're gonna tell you, Well, I could have called him. Well, let me tell you something, I don't call any police witness unless I know what they're gonna say in trial in that chair in that witness stand, and that's why I didn't call him.

On the other hand, the state knows exactly what a police officer is gonna say before he comes to court. They did not call -- not only didn't they tape it, they didn't call the witness who was right there when Brian is alleged to have made those incriminating statements. That has to do with her credibility as a witness just like any other witness in the case, and that's why we're going through what she said to you about him not being a suspect, and being on a fact finding mission, and that's why she didn't advise him.

So he gets in the car with two police officers, in a police car. Everybody else was at the hospital, she said, the father, and the mother of the child, and the baby was sick and certainly we can understand that. I'm not taking issue with that and I'm not saying that Crystal should have been dragged down there, too. But she didn't get around to talking to Crystal until seven days later, way after Brian Herlihy was already in the can, in jail. And she didn't talk to John Quirello



IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

60CF2753A

STATE OF FLORIDA,

vs. Case No: # 02-2753-CF-A

BRIAN HERLIHY,

Defendant.

______________/

FILED CK 45 2005 AUG 2_ PM 2: 5_ J.K. "BUDDY" IRBY CLERK OF COURTS ALACHUA COUNTY, FL

## RULE 3.850 MOTION FOR POST CONVICTION RELIEF

Comes now defendant, Brian Herlihy, pro-se and respectfully moves this Honorable Court to vacate the conviction in this cause and in support thereof does state:

1.) On or about August 4, 2000, defendant was arrested for the offense of aggravated child abuse.

2.) On or about August 10, 2000, the child victim died and on August 29, 2000, defendant was indicted for first-degree murder.

3.) After trial by jury, defendant was convicted of manslaughter on September 25, 2002 and sentenced to 15-years in prison on November 8, 2002.

4.) Timely notice of appeal was filed on December 30, 2002. Plenary appeal from the same was affirmed without opinion by the First District Court of Appeals on November 3, 2004, mandate issued on November 19, 2004.

5.) The offense arose and trial was conducted in Alachua County, Eighth Judicial Circuit. Trial was conducted before Honorable Judge Martha Ann Lott.

6.) A prior Rule 3.850 was filed in this cause on or about August 10, 2005, via counsel Mr. David Mengers. One ground for relief was presented, trial counsel's failure to request a Frye hearing to determine admissibility of medical diagnosis of Shaken Baby Syndrome, (SBS).

**Frye v. United States**, 293 F.1013 (D.C. Cir. 1923)

7.) Said motion was denied without order to show cause by Honorable Judge Peter R. Sieg on September 29, 2005. Notice of appeal was filed, brief of appellant was submitted and the First District Court of Appeal affirmed without opinion on or about May 10, 2006.

8.) Defendant was represented at trial by Gordon Groland & John Tedder. Defendant's plenary appeal was represented by Office of the Public Defender, Ms. Nada M. Carey, DCA # 1D02-4788. Defendant was represented by Mr. David Mengers on his previous Rule 3.850 Motion and Appeal therefrom.

**I. Timeliness**

This motion is timely submitted as mandate from plenary appeal issued on November 19, 2004.

**II. This Motion is not impermissibly successive**

Defendant respectfully submits that this Honorable Court has discretion to entertain this motion, defendant's second Rule 3.850. While "Second Tries" at postconviction are disfavored, they are permissible if required by the interests of justice. This motion is made in good faith and not intended to abuse the judicial process.

A circuit court has the authority to deny as successive on Second Rule 3.850 motion presenting new grounds, if there is no reason for not having presented the grounds in the prior

motion. **Owen v. Crosby**, 854 So.2d 182 (Fla. 2003) citing **Pope v. State**, 702 So.2d 221, 223 (Fla. 1997). See also **Baker v. State**, 878 So.2d 1236 (Fla. 2004).

While the aforecited authorities reference Section (F) of Rule 3.850, no clear examples of permissible reasons for a second motion are set forth. Of course a second motion is per-se permissible if the prior motion was found to be facially or legally insufficient and or summarily denied.

In accordance with the aforecited authorities, defendant sets forth the following reasons, urging the Court not to bar this pleading as impermissibly successive.

**(a) The prior motion failed to present a cognizable ground for relief.**

Honorable Judge Seig's order denying relief, rendered without response from the State, determined inter alia: "Even accepting that trial counsel did not request a Frye hearing on the admissibility of expert testimony regarding Shaken Baby Syndrome; defendant fails to raise a cognizable claim for relief. Counsel did not commit unprofessional error by not requesting a Frye hearing to examine a diagnosis which courts already approve, and recognize as an accepted medical diagnosis." Id. at pg. # 3, paragraph # 6.

Defendant respectfully submits that a motion that fails to present a cognizable ground for relief, is legally insufficient.

Moreover, the Order Denying Relief notes that the motion fails to make a prima facie showing or prejudice. A claim of ineffective assistance of trial counsel that fails to demonstrate such a showing, is legally insufficient. Id supra at paragraph # 7.

**(b) Defendant is actually innocent**

Defendant respectfully submits that he is actually innocent of the death of the deceased, then 4 months old Robert Quirello. Review of the trial transcripts evidences that defendant refused all plea offers and maintained his innocence at sentencing.

All ten expert witnesses in this cause agreed that death resulted from lack of oxygen to the brain.[1] Dispute arose as to whether the child had previous brain injury and whether the same brought about a seizure that resulted in additional injury and death. The State argued that no prior brain injury existed and that death resulted from defendant shaking the child and bouncing the child's head on a mattress.

It was conceded at trial that the initial autopsy report contained several oversights and that a vascular brain membrane known as the dura mater, was improperly disposed of. The significance of which was contested.

Two facets of the State's case were the linchpins of this conviction:

(i) That defendant lacked proof of causation for the prior brain injuries and seizure that brought about the child's death, and (ii) That defendant made inculpatory remarks to Detective Helen Legall, unrecorded & unwitnessed.

Defendant submits that Grounds One & Two herein, demonstrate that both the aforementioned are a direct result of trial counsel's error. Specifically, that quite some time prior to trial, defense counsel Mr. Groland received a report from Dr. Viera Scheibner <presented as Exhibit # 2 & incorporated by reference in Ground # 1, infra>. In sum, the same explains that the child was vaccinated twice with a complete series of six vaccines, some of which are listed as "hot lots". The same are described by Dr. Scheibner as "a potent toxic cocktail."

[1] Defendant references the trial transcripts and setsforth in detail these allegations in Ground One of this motion infra.

Moreover, that post-trial examination of the medical records of the mother revealed that she was treated with a medication known as a Corticosteroid. As such, the child was exposed to the same in utero.

The Corticosteroid resulted in inter alia, both mother & child becoming diabetic. Additionally, that the mother was treated with the diabetes medication Micronase & breastfed the child, exposing the infant to the same.

Lastly, the child suffered from host of documented medical infirmities unknown to the jury. Had the report of Dr. Scheibner not been ignored, the child's poor health would have been discovered.

In Ground # 2, defendant submits that counsel failed to call Detective Weaver to testify that Weaver drove defendant & Detective Legall to the jail at the time the second unrecorded inculpatory statements were allegedly made. Detective Weaver did not pull the car over to the side of the road so defendant could confess, as alleged by Detective Legall. Detective Weaver would have substantially impeached Detective Legall and negated the purported statements, key evidence resulting in the manslaughter conviction. Detective Weaver was deposed by defense counsel and was available to testify.

As explained infra, these errors completely undermined defendant's defense and resulted in this conviction. Absent these errors, defendant could have proved his actual innocence and would have been acquitted.

(c) To bar this motion as impermissibly successive would constitute suspension of the Writ of Habeas Corpus.

Defendant respectfully contends that this Court has the authority to entertain this pleading pursuant to both Rule 3.850 (b) & Section (h) of the same.

Because this Motion is timely, and makes a prima facie showing of actual innocence, imposing a successive motion bar would constitute suspension of the Writ of Habeas Corpus. Such a bar, if otherwise applicable, should give way to defendant's showing of actual innocence. **Schlup v. Delo,** 115 S.Ct. 851 (1995).

To bar defendant from presenting the grounds set forth herein, as a result of post conviction counsel's error, would constitute a grave injustice, where defendant is actually innocent. See for example **James v. State,** 747 So.2d 462 (2nd DCA 1999), **Newman v. State,** 782 So.2d 925 (2nd DCA 2001), indicating that Section (h) is permissible when the error is attributable to post conviction counsel and timeliness is not an issue.

Based upon the reasons set forth above, defendant prays that he be permitted this opportunity to prove his innocence and bring closure to the tragedy that resulted in the child's death.

**Ground One**

Failure of defense counsel to conduct reasonable pretrial investigation, which would have presented evidence of causation of death, deprived defendant of a fair trial.

Defendant submits that reasonable medical evidence of causation of death was provided to defense counsel, Gordon Groland on November 2000. Specifically, believing in the defendant's innocence, Mrs. Lois Herlihy, mother of defendant, sought consultation in the form of professional review of medical records of the mother and the child.

On or about November 2000, Mrs. Herlihy received seven-page report from Dr. Viera Scheibner, Principal Research Scientist, retired, providing an opinion to the affect that the child's double vaccination was a key factor in his death. Exh. # 2.

Mrs. Herlihy provided defense counsel with the report on or about _____ October, 2000. (sworn affidavit of Mrs. Herlihy Exh. # 1) counsel made no effort to contact Dr. Scheibner or consult anyone of expertise in the field of toxicology.

This error in judgment prevented counsel from discovering facts, which if explored, would have illustrated the following: *2

(a) State's expert witness Dr. Krienest, testified that the birth of the deceased was without incident, with the exception of having been born brow up, with the umbilical cord around his neck & a broken collarbone and was born approximately 4 weeks premature, what was not explained/discovered, was that Crystal Dawn Quirello (mother) was in labor eight days prior to delivery. (Exh. # 3, Dr. A., pg. # 6). It was uncontested that the mother was hospitalized as a result of an auto accident for about a week during her 26th week of gestation. The child was born during the 34th week of gestation.

(b) The mother was treated with Betamethasone (Corticosteroid) during the last week of pregnancy. As such, the deceased was exposed to corticosteroid in utero. (Exh. # 3, Dr. Al-Bayati, pg. # 6) & after birth via breastfeeding.

(c) As a result of the Corticosteroid, both mother & child developed diabetes. Blood & urine tests performed on the mother on 1-24-2000 & 3-3-2000, indicate that she did not suffer from gestational diabetes during pregnancy. Her medical record shows that she was treated with the anti-diabetic drug Micronase (glyburide) after delivery. She was advised to stop taking Micronase on 6-8-2000. The mother took Micronase during the period she was breastfeeding the deceased. (Exh. # 3 Dr. Al-Bayati, pg. # 13).

---

*2 The factual information is derived from the post-trial reviews conducted by Dr. Mohammed Ali Al-Bayati, PhD, DABT, DABVT, Toxicologist-Pathologist & Dr. F. Edward Yazbak, Md, FAAP. Both reports contain cover statements stating a professional opinion within a degree of medical certainty, that death was due to medical causes & not inflicted injury.

(d) The child's symptoms were induced by Corticosteroid. These are evidenced by (1) polyurea, chronic urination, (2) gastrointestinal & feeding problems (3) excessive weight gain, (4) muscle weakness, (5) vision Problems, (6) severe thymic atrophy. (Exh. # 3 Dr. Al-Bayati, pgs. 15-17).

(e) The child was not a well child as portrayed by the State.

State's witness Dr. Hellrung testified that he was the baby's pediatrician. (TT. 113). In sum, while the child evidenced some signs of possible neurological deficit the same was ruled out. Specifically, that the child spit up formula frequently (TT. 122), that his head circumference was slightly above average (TT. 125), had poor neck & head control (TT. 126) & poor eye tracking. (id., TT. 128). On his four-month check up, it was determined that the child was bigger then average for a baby not born premature. At that visit, the child was still spitting up. (TT. 130). In Dr. Hellrung's medical opinion, he didn't believe the child was suffering from a chronic subdural hematoma. (TT. 133). Dr. Hellrung was not aware that the radiologists found earlier generations of hematomas in the child's brain, existing prior to August 2, 2000, the date of incident. (TT. 134). Dr. Hellrung was not aware of the mother's auto accident & hospitalization during her pregnancy. (TT. 135). As such, Dr. Hellrung was equally unaware of the mother's treatment with Corticosteroids & Micronase. There is no indication of Dr. Hellrung ever being aware of the diabetes of mother or child. As a result of the same, the jury know not.

**ANALYSIS**

Had defense counsel consulted Dr. Scheibner, the information presented in the reports of Dr. Al-Bayati & Dr. Yazbak would have been easily discoverable.

For example, no mention of the child's double vaccination was mentioned. There was no mention of the child's extensive sinusitis (maxillary & ethmoid) or his bilateral mastoiditis.

These findings are distinct, serious & unusual for a child that young. They were obviously long-standing indicating the child had two major pre-existing pathological processes in his head. (Exh. # 4, Dr. Yazbak, pg. # 18).

Additionally, as a result of the aforementioned pathology, the stress of the vaccinations of 5-19-2000 accentuated by vitamin C requirements of the same, resulted in a major increase in blood histamine. The same started a cascade of problems including; vascular fragility, cerebral & retinal hemorrhages. (Exh. # 4, Dr. Yazbak pgs. # 18, 20-23. Exh. # 3, Dr. Al-Bayati, pgs. # 17-22).

Not responding to Dr. Scheibner closed the door of opportunity to develop the existing facts as noted by Dr. Al-Bayati & Dr. Yazbak, Exh. # 3, Exh. # 4. Page six of Dr. Scheibner's report alone should have excited an interest in a case such as this, where "what done it" should have been the focal point as opposed to "who done it." Page six reads in part: "It is well documented in medical records that Robbie (the child) was given a multitude of vaccines starting as early as 7 weeks of his short life, and again at about 3 months of his age. Twelve vaccines in all. This represents a potent toxic cocktail, in small babies such as baby Robbie." (Exh. # 2, Dr. Scheibner, pg. # 6).

State expert Dr. Richard M. Kreinest testified that he first examined Crystal D. Quirello on August 31, 1999 at the crisis pregnancy center where at he practiced as a obstetrician/gynecologist. (TT. 376). Dr. Kreinest stated that after Crystal's auto accident of 1-10-2000, she began to have preterm contractions. (TT. 388). To prevent preterm delivery, medication known as Terbutaline was administered to relax the muscle of the uterus preventing contractions. According to Dr. Kreinest, Terbutaline has been used for at least 20 years & no evidence exists that it results in any significant harm to the fetus. (TT. 389).

## ANALYSIS

Dr Kreinest made no mention that Crystal was treated with Betamethasone (a corticosteroid) to mature the baby's lungs prior to birth. Defense counsel simply didn't have a clue as to what to examine the medical record for, as relates to toxicology, i.e. Corticosteroids. Counsel did not know that Crystal was treated with the Corticosteroid during her last month of pregnancy. Counsel was totally unaware of the scientific data related to the harm caused by the drug. Moreover, as briefly set forth infra, the Corticosteroid plus the "vaccine toxic cocktail," plus the child's diabetes all evidenced in the symptoms that brought about this child's death.

Defendant submits that Dr. Hellrung had a direct interest in not discussing the double vaccination of the child, as well as the child's 100.7-degree fever on 4-26-2000.

That Dr. Krienest also had a direct interest in not discussing Crystal's treatment with any Corticosteroid & Micronase.

As a result of the same, only pretrial review by a skilled expert would have discovered these documented medical facts. Having ignored Dr. Scheibner's report, defense counsel foreclosed development of crucial evidence to support defendant's only defense, e.g. that the child died of causes not related to defendant's care.

FILED CFJ 4
2006 AUG 23 PM 2:52
JK BUDDY IRBY
CLERK OF COURTS
ALACHUA COUNTY, FL

Dr. Bernard Maria testified as an expert for the State as a pediatric neurologist with 21 years experience. (TT. 1115). Dr. Maria was called upon to examine the child on August 2, 2000, by Dr. Dickinson. (TT. 1117). According to Dr. Maria, he examined the CT scans of the child, laboratory tests & a physical examination. (TT. 1118-1119). Dr. Maria utilized a device known as an ophthalmoscope to examine the eyes of the child. The same revealed bleeding in the fluid of the eye (vitreous), retina & multiple hemorrhages. (TT. 1120). The child had abnormal reflective movements & the soft spot in the child's head was tense, pulsatile, abnormal.

(TT. 1121). Dr Maria concluded that the child was being treated with an anti-seizure medication, & that the injuries were a direct result of the child having been shaken. (TT. 1122). Dr. Maria testified that an EEG scan of the child's brain demonstrated that the waves were very slow meaning the brain dysfunction involved the entire brain. (TT. 1126). Putting all the pieces together, known as unifying diagnosis; the conclusion was that the injuries resulted from traumatic shaking of the child. (TT. 1127). According to Dr. Maria, the shaking had to of occurred in a 30 minute window from 9:00 a.m. (TT. 1128). Dr. Maria opined that blood on the child's brain was an irritation & coupled with brain cell damage, which resulted in a seizure (TT. 1130). Dr. Maria testified that it's unusual for swelling of the brain to occur from seizures, it's almost always that something else causes the seizures & brain swelling. (TT. 1131). According to Dr. Maria, if the child had a subdural hematoma at birth, within two months the child's head would be significantly larger than normal. (TT. 1134). Dr. Maria stated that the child's injuries were not caused by a lack of oxygen & that a lack of oxygen would not explain the retinal hemorrhaging. (TT. 1134-1135).

On cross examination, Dr. Maria testified that injuries such as those suffered by this child, could not occur if the child went 3-4 minutes without air. (TT. 1148). Dr. Maria explained that brain death is a very specific ordeal & although the child's brainstem was still working, the child had no chance of meaningful recovery. (TT. 1153). Dr. Maria agreed that the CAT scans of the child possibly revealed an older injury, a chronic subdural hematoma. (TT. 1154). Apparently, the existence of the same was suspected to exist at the time of the CAT scans. (TT. 1155). Dr. Maria agreed that swelling of the brain could cause pressure on the optic nerve. (TT. 1156). That such swelling can cause retinal hemorrhaging & that maybe the child had a chronic subdural hematoma (id.). Dr. Maria agreed that a chronic subdural hematoma is

impossible to date without microscopic examination. (TT. 1156-1157). Dr. Maria testified that Dr. Nelson's autopsy report essentially found that the child had an immature brain with a subarachnoid hemorrhage & hematoma. (TT. 1162). Dr. Maria agreed that the child's brain cells suffered from a lack of oxygen. (TT. 1163). Dr. Maria testified that Dr. Nelson's autopsy report made no mention of any tearing of the brain nerves (TT. 1164). Dr. Maria agreed that in SBS injuries the brain nerves are torn (as testified to on direct) but that the same is not evidenced by the autopsy report. (TT. 1165-1166). Dr. Maria agreed that weak neck muscles & not eating properly can be an indication of neurological damage and that he was not aware of the existence of these in this child. (TT. 1168). Dr. Maria testified that he was aware that Dr. Dickinson noted a small bruise on the child's head, but that after examining the child, Dr. Maria found none. (TT. 1173-1174).

Defense counsel questioned Dr. Maria regarding the physics of SBS, the lack of neck injury in this case & several medical journal articles discrediting the theory. (TT. 1177-1184). The questioning centered upon the SBS theory as it relates to whiplash, a vigorous back & forth involuntary movement of the head. Dr. Maria testified that the child was the worst case of SBS he'd seen in over 20 years. (TT. 1184-1185). However, apparently there wasn't any damage to the child's neck. Also, that the child's neck wasn't examined & the neck usually isn't examined. (TT. 1185).

On redirect, Dr. Maria testified that if he was advised that the baby had been shaken & then thrown on a bed that yes, that would be the answer. (TT. 1192).

Dr. Maria testified that from day one to day two of the child's hospitalization that the child's fontanel (soft spot of the skull) was "full like it had been on day one but then had