# EXHIBIT

# QQ



208·1·11939

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

6-18·8 C.A.

BRIAN PATRICK HERLIHY  }
    Appellant  }
v.  }
  }
  }
STATE OF FLORIDA  }
    Appellee  }        CASE NO.   01-2000-CF-2753-A
  }
  }
  }
  }        APPEAL NO. 1D08-1588

VOLUME IV

## SUPPLEMENTAL
# RECORD

### HONORABLE MARTHA ANN LOTT

**APPEAL FROM THE CIRCUIT COURT
8th JUDICIAL CIRCUIT FOR
ALACHUA COUNTY, FLORIDA**

FOR APPELLANT              FOR APPELLEE
MARY E. FITZGIBBONS, ESQUIRE    HONORABLE BILL MCCOLLUM
FITZGIBBONS LAW FIRM, P.A.      ATTORNEY GENERAL
917 VERONA STREET             THE CAPITOL
KISSIMMEE, FL 34741          DEPARTMENT OF LEGAL AFFAIRS
                          CRIMINAL APPEAL SECTION
                          TALLAHASSEE, FLORIDA 32399-1050

Created on 6/16/08

IN THE CIRCUIT COURT
OF THE EIGHTH
JUDICIAL CIRCUIT, IN
AND FOR ALACHUA
COUNTY, FLORIDA

BRIAN PATRICK HERLIHY
    Appellant

vs.

CASE NO. 01-2000-CF-2753-A
APPEAL NO. 1D08-1588

STATE OF FLORIDA
    Appellee

| INDEX INSTRUMENT | DATE FILED | PAGE NO. |
|---|---|---|
| DOCKET LINES | | |
| **VOLUME I** | | |
| MOTION FOR POST-CONVICTION RELIEF | 11-28-2007 | 1-8 |
| NOTICE OF FILING | 11-28-2007 | 9 |
| SUPPLEMENTAL AFFIDAVIT OF DR. SCHEIBNER | 11-27-2007 | 10-28 |
| MOTION FOR LEAVE TO SUPPLEMENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 11-28-2007 | 29-30 |
| HEARING FOR DIVISION I | 01-29-2008 | 31 |
| ORDER GRANTING MOTION FOR LEAVE TO SUPPLEMNENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 02-05-2008 | 32-33 |
| HEARING FOR DIVISION I | 02-14-2008 | 34 |
| NOTICE OF FILING | 03-03-2008 | 35 |

1

| AFFIDAVIT OF JENNIFER LEIGH SALTER | 03-03-2008 | 36-41 |
|---|---|---|
| NOTICE OF FILING | 03-04-2008 | 42-43 |
| AFFIDAVIT OF LOIS HERLIHY | 03-04-2008 | 44-46 |
| FINAL ORDER DENYING MOTION FOR POST-CONVICTION RELIEF | 03-04-2008 | 47-50 |
| NOTICE OF APPEAL | 04-02-2008 | 51-52 |

**VOLUME II**

| FIRST DISTRICT COURT OF APPEAL ORDER | 06-11-2008 | 53-57 |
|---|---|---|
| MOTION TO VACATE SENTENCE AND CONVICTION PURSUANT TO FLA.R.CR.P. 3.850 AND MEMORANDUM OF LAW | 08-10-2005 | 58-115 |
| ORDER DENYING MOTION FOR POST-CONVICTION RELIEF | 09-30-2005 | 116-119 |
| RULE 3.850 MOTION FOR POST CONVICTION RELIEF, CONTINUED NEXT VOLUME | 08-25-2006 | 120-253 |

**VOLUME III**

| CONTINUED FROM PREVIOUS VOLUME, RULE 3.850 MOTION FOR POST CONVICTION RELIEF | 08-25-2006 | 254-289 |
|---|---|---|
| COLLATERAL RELIEF DETERMINATION MADE FROM MOTION [COMPUTER DOCKET ENTRY, NOT A DOCUMENT] | 08-31-2006 | ----- |
| CASE JUDGE REASSIGNED [COMPUTER DOCKET ENTRY, NOT A DOCUMENT] | 12-31-2006 | ----- |
| CASE LAW | 02-06-2007 | 290-314 |
| ORDER DENYING, IN PART, MOTION FOR POST CONVICTION RELIEF, SCHEDULING AN EVIDENTIARY HEARING, IN PART, AND APPOINTING OFFICE OF THE PUBLIC DEFENDER, CONTINUED NEXT VOLUME | 02-08-2007 | 315-454 |

Created on 6/16/08

## VOLUME IV

CONTINUED FROM PREVIOUS VOLUME
ORDER DENYING, IN PART, MOTION FOR POST
CONVICTION RELIEF, SCHEDULING AN
EVIDENTIARY HEARING, IN PART, AND APPOINTING
OFFICE OF THE PUBLIC DEFENDER                     02-08-2007            455-489

MOTION TO STRIKE, OR IN THE ALTERNATIVE,
STATE'S RESPONSE TO DEFENDANT'S RULE 3.850
MOTION FOR POST CONVICTION RELIEF FILED
BY STATE OF FLORIDA                               02-13-2007            490-505

ORDER DIRECTING STATE TO FILE A WRITTEN
RESPONSE                                          02-19-2007            506

DEFENDANT'S RESPONSE TO MOTION TO STRIKE,
OR IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF                                 05-17-2007            507-512

COPY OF ABOVE [NOT INCLUDED HERE BECAUSE
IT IS DUPLICATIVE]                               05-21-2007            -----

STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR
IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF, RESPONDING TO
DEFENDANT'S RESPONSE OF MAY 16, 2007,
CONTINUED NEXT VOLUME                             06-20-2007            513-655

## VOLUME V

CONTINUED FROM PREVIOUS VOLUME,
STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR
IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF, RESPONDING TO
DEFENDANT'S RESPONSE OF MAY 16, 2007,            06-20-2007            656-752

ORDER SCHEDULING CASE MANAGEMENT
CONFERENCE`                                       08-20-2007            753

HEARING NOTES                                     08-30-2007            754

ORDER SCHEDULING HEARINGS ON PENDING

| | | |
|---|---|---|
| POST-CONVICTION RELIEF MATTERS | 09-07-2007 | 755-756 |
| DEFENDANT'S RESPONSE TO STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF, RESPONDING TO DEFENDANT'S RESPONSE OF MAY 16, 2007 | 09-14-2007 | 757-760 |
| NOTICE OF FILING – AFFIDAVIT OF VIERA SCHEIBNER | 09-14-2007 | 761-772 |
| NOTICE OF FILING – OATH PAGE | 09-24-2007 | 773-775 |
| NOTICE OF FILING – ATTACHED AFFIDAVITS | 09-26-2007 | 776-779 |
| HEARING NOTES | 09-28-2007 | 780 |
| DEFENDANT'S MOTION FOR LEAVE TO AMEND MOTION FOR POSTCONVICTION RELIEF WITH NOTICE OF FILING AND SUPPLEMENTAL AFFIDAVIT OF LOIS N. HERLIHY ATTACHED | 09-28-2007 | 781-785 |
| MEMO FROM J. SILVERMAN TO M. BECKER, STATE ATTORNEY OFFICE | 10-29-2007 | 786 |
| CASE CITATION | 10-29-2007 | 787-788 |
| COPY OF NOTICE OF FILING AFFIDAVIT OF LOIS N. HERLIHY | 10-29-2007 | 789-791 |
| ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF, CONTINUED NEXT VOLUME | 10-29-2007 | 792-856 |

**VOLUME VI**

| | | |
|---|---|---|
| CONTINUED FROM PREVIOUS VOLUME, ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 10-29-2007 | 857-1057 |

**VOLUME VII**

Created on 6/16/08

CONTINUED FROM PREVIOUS VOLUME,
ORDER GRANTING IN PART, THE STATE'S MOTION
TO STRIKE AND DISMISSING GROUND ONE OF
DEFENDANT'S MOTION FOR POST-CONVICTION
RELIEF                                         10-29-2007              1058-1107

### III-B6. Retinal bleed and other lesions observed in Robert's eyes.

Dr. Lawrence Levine, pediatric ophthalmologist at Shands Hospital examined Robert's eyes on August 2nd, 2000 and found no external injury. The eyelids, front of the eyes, cornea, and lens, were normal. The pupils were reactive which indicated that the intracranial pressure was not extremely elevated. Dr. Levine dilated the baby's pupils and looked inside Robert's eyes. He observed a massive amount of blood in both eyes [27].

Dr. Levine found blood in the center of the eye (vitreous body), the area in front of the retina and in the retina. The baby had two other retinal lesions, which were documented by photography. There were big white spots in the back of his eye, which are referred to as Purtscher's retinopathy. Those big white spots are due to what is believed to be damaged arteries. There was also a crack in the back of the eye, which is known as a choroidal rupture [27].

### III-B7. Treatment given to Baby Robert on August 2nd through the 10th

Baby Robert was treated with fosphenytoin, versed, and ratindine at high therapeutic levels to control his severe seizure. The baby was given a loading dose of fosphenytoin and then kept on a maintenance dose of fosphenytoin. The baby was also started on a fentanyl drip. The baby had additional seizures on this dose and was given ativan. On the EEG performed on August 4th, Robert continued to show evidence of clinical and subclinical seizures and was maintained on a versed and a fentanyl drip. Blood analysis on August 4th showed the baby's blood level of phenytoin was very high at 29.1 µg/mL. The normal therapeutic levels are between 10 and 20 µg/mL [8].

The baby was also treated with dopamine, Tylenol, potassium chloride, and sodium bicarbonate to increase his blood pressure and to treat his hypokalemia and metabolic acidosis. He was also given normal saline and red blood cells to treat dehydration and anemia. Presented in Table 10 is a partial list of medications given to the baby during his stay in the hospital.

On August 6th, the baby was taken off fentanyl and the versed drip. Seizure activity resumed after approximately six hours. Throughout the hospital stay the baby's head

30

000455

circumference remained stable at about 45 cm and his anterior fontanel remained full and pulsating. His pupils were equal, round, and reactive to light. Baby Robert had decreased tone in the lower extremities bilaterally, positive doll's eyes, a sluggish corneal reflex, and decreased tone in the upper extremities bilaterally. He did not exhibit any response to pain.

On August 7th, the baby was started on phenobarbital and once the phenobarbital was at a therapeutic level, the fosphenytoin was tapered. The neurologist was consulted on the case and felt that the examination was consistent with irreversible brain damage. There was no mass effect or potential herniation. The baby was extubated on August 9th. Initially, the baby had labored breathing and he was given doses of dexamethasone and racemic epinephrine with mild improvement. The baby was given additional doses of racemic epinephrine and then started on heliox and showed some improvement.

On the morning of August 10th, the baby was noted to have decreased air movement and decreased oxygen saturations into the 90s. The parents had initiated a DNR order and according to this order the baby was not to be reintubated. The baby's heart rate and blood pressure continued to drop and then proceeded quickly into an agonal rhythm of about 20 beats per minute and then into asystole at 0052. This event lasted no longer than ten minutes. It was felt that the baby suffered from respiratory arrest secondary to cardiac arrest due to his brain injury. An autopsy was performed on August 10th, 2000. The next section (IV) contains a detailed description of the autopsy findings.

31

000456

Table 10. Partial list of medications given to Baby Robert while at Shands Hospital

| Date & Time | Treatment | Actions |
|---|---|---|
| **8/2/2000** | | |
| 1115 | Fosphenytoin 150 mg IV | Anti-epileptic (Anticonvulsant) |
| 1140 | Normal saline, 30 cc/hr | Treat dehydration |
| | Fosphenytoin 20 mg IV | Anti-epileptic (Anticonvulsant) |
| 1400 | Versed  0.4-0.6 mg | Sedative |
| | Dopamine (10 μg/KG/min.) | Increase blood pressure |
| | Vecuronium | Muscle relaxant |
| 1450 | NS + 20 meq KCl/L | Treat dehydration and hypokalemia |
| 1630 | Fentanyl drip | Analgesic |
| 1658 | NS + 20 meq KCl/L | |
| 1800 | Tylenol 100 mg | Analgesic and anti-pyretic |
| 1815 | Ranitidine 10 mg IV | Histamine $H_2$-reseptor antagonist |
| | Fentanyl IV | Analgesic |
| 1830 | 80 cc Red Blood Cells IV | Treat anemia |
| 2020 | Fosphenytoin 40 mg IV | Anti-epileptic (Anticonvulsant) |
| 2230 | Dopamine | Increase blood pressure |
| 2230 | NS + 20 meq KCl/L | Treat dehydration and |
| | at 20 cc/hr | hypokalemia |
| **8/3/2000** | | |
| 0015 | NS + 20 meq KCl/L | |
| 0025 | Sodium bicarbonate | Treat metabolic acidosis |
| 0225 | Dopamine | Increase blood pressure |
| 1100 | Fosphytoin  IV | Anti-epileptic (Anticonvulsant) |
| 1300 | Fosphytoin IV | |
| 8/4/2000 | Fosphenytoin | |
| 8/6/2000 | Fentanyl IV | Analgesic |
| | Versed | Sedative |
| 8/7/2000 | Phenobarbital | Anticonvulsant |
| 8/9/2000 | Dexamethasone | Anti-inflammatory |
| | Epinephrine | Increase cardiac output |

32

## Section IV. Review of The Medical Examiner's Autopsy Findings and Pathology Reports

Baby Robert died on August 10th at 0052 and Dr. William F. Hamilton performed the autopsy at 1500 (Case # ME00-297). His autopsy was limited to gross examination of the body and selected organs [12]. He sent the brain and eyes to two consultants for gross and microscopic examinations. Dr. Stephen J. Nelson, neuropathologist examined the brain and Dr. Michael D. Bell examined the tissues from the eyes [28, 29].

These physicians concluded that baby Robert's injuries and death were caused by violent shaking. However, the autopsy and pathology findings do not support their conclusions that Baby Robert's injuries resulted from violent shaking or trauma. Below are descriptions of their findings and my analysis of them.

### IV-A. External examination of Robert's body did not reveal bruises

Dr. Hamilton examined Robert's body and he did not see any evidence of injury or trauma. He stated that no significant injuries were seen on the front or the back of the body [12]. The scalp was free of traumatic injuries including lacerations, contusions and bruises. The oral cavity was free of trauma or obstruction. The underlying calvarium and skull base were intact. The neck organ block was free of trauma or obstruction.

### IV-B. The subdural hemorrhage indicates that the baby had pre-existing condition

The CT scan of Robert's brain taken on August 2nd at 1029 showed that the subdural space contained multi-generation hemorrhage (fresh and old), which indicates that the baby had a pre-existing condition. Dr. Hamilton examined the dural membranes grossly. He observed lightly adherent clots in the subdural spaces over cerebral convexities and a clot attached to the undersurface of the dura overlying the cerebral hemispheres. He concluded that the baby did not have chronic subdural hemorrhage. I believe that Dr. Hamilton's conclusion with regard to the time of the bleed is not scientifically valid because he failed to microscopically examine the dura to date the bleed.

### IV-C. The brain lesions indicate that the baby suffered from anoxia and ischemia

The gross and the microscopic examinations of Robert's brain did not indicate that Baby Robert died as a result of trauma but, instead they showed that the baby had pre-existing

000458

chronic brain atrophy and the brain suffered from severe anoxia and ischemia. However, the medical examiner and other physicians who evaluated this case all overlooked these facts.

Dr. Stephen John Nelson examined Robert's brain microscopically and found that the brain was an immature brain and inconsistent with that of a child of four and a half months [28, 30]. The treating physician, Dr. Dickson examined the CT scans of Robert's brain and also determined that he suffered from brain atrophy. She stated that Baby Robert had a smaller brain than normal.  That means that there was probably some atrophy or wasting of the surface of the brain or that the brain was not growing as rapidly as it should have been [31, page 754].

The other lesions observed in the brain were edema and cell necrosis, which were caused by severe anoxia and ischemia of the brain. Dr. Hamilton examined Robert's brain grossly and found evidence of edema. The brain substance was quite soft. The gyri were flattened and sulci were narrowed. The brain weight was 826 g, which was about 150% of normal (normal weight about 600 g) [13]. Dr. Hamilton did not see evidence of trauma [12].

Dr. Stephen J. Nelson examined eight glass microscopic slides of the brain that were stained with hemotoxylin and eosin (H & E). He found that the lesions consisted of cell necrosis that resulted from global anoxia and ischemia of the brain. He also stated that Baby Robert's brain was immature and that was due to improper development. Dr. Nelson never stated that these lesions were caused by trauma. He stated that this was an immature human brain with subarachnoid hemorrhage and hematoma, global anoxic-ischemic encephalopathy, and generalized cerebral edema [28].

The slides that were examined by Dr. Nelson included tissue sections from left and right frontal gyri, bilateral hippocampal formations, midbrain, basal ganglia, and cerebellum. He found that the neurons displayed the typical anoxic-ischemic histologic changes. He observed laminar necrosis in the cerebral cortex and he said that these anoxic-ischemic microscopic changes were most prominent in the grayl surfaces, but were also present at the depths of the sulci.

Furthermore, Dr. Nelson stated that both the Sommer's sector and endplate of the hippocampal formation displayed bilateral symmetry, which consisted of acute neuronal

000459

necrosis consisting of cytoplasmic hyperesosinophilia, karyorrhexis and nuclear pyknosis. There was no inflammation other than foamy macrophages. Except for neuronal swelling and parenchymal and leptomeningeal vascular congestion, the midbrain was histologically within normal limits. He also observed acute neuronal necrosis in the basal ganglia.

The cerebellum was remarkable for relative preservation of the external granular neuronal lamina. The internal granular cell layer was also prominent. There was widespread neuronal necrosis with cytoplasmic hypereosinophilia, karyorrhexis and nuclear pyknosis. There was no inflammation, other than foamy macrophages.

Dr. Nelson's findings described above clearly indicate that Baby Robert suffered from brain atrophy, severe anoxia and ischemia and not from physical trauma. Dr. Nelson stated that these gross and microscopic findings are consistent with a multi-day survival after hospitalization. However, Dr. Nelson found a very small cerebral cortical lesion microscopically (8 x 8 x 9 millimeters), that he believed was a contusion caused by trauma [30]. He observed diffuse endothelial cell swelling with extravasated erythrocytes, vacuolation of the neutrophil and foamy macrophages throughout.

It is my opinion that Dr. Nelson's claim that Robert's brain had a contusion resulting from trauma is not supported by medical facts based on the following reasons:

1) Baby Robert was examined by many physicians and no evidence of injuries caused by trauma was observed in the head or neck regions. These facts were confirmed by the medical examiner on August 10th.

2) No laceration or contusion of Robert's brain was observed on the cerebral CT scans taken on 1029 and 1521 on August 2nd. However, a minor cortical lesion in the brain was observed in the third cerebral CT scan taken on August 3rd at 1046, which resulted from the accumulation of blood in the brain. Dr. Ronald G. Quisling read the CT scan and stated that the blood had shifted down over the tentorium and that it had accumulated in the right parietal lobe of the brain. He referred to this lesion as a brain laceration [25].

3) Anoxia and ischemia can cause diffuse endothelial swelling and extravasation of red blood cells and Robert's brain suffered from severe anoxia and ischemia.

35

000460

### IV-D. Bleeding in the eyes

Dr. Hamilton harvested Robert's eyes at autopsy and sent them to Dr. Michael D. Bell for examination. Dr. Bell examined Robert's eyes grossly and microscopically and he observed retinal hemorrhages [29]. Multiple diffuse retinal hemorrhages were observed in the right eye, while the retina of left eye had only multiple focal retinal hemorrhages. The retinal hemorrhages were positive for iron stain in both eyes, which means that the bleed was older than 24 hours. Baby Robert suffered from diabetes and adverse reactions to treatment with corticosteroid. Both of these conditions cause vascular abnormalities and severe bleeding in the retina as described in Section V of this report.

### IV-E. Thymus atrophy

Dr. Hamilton stated that Robert's thymus weight was 4 g and its external and sectioned surfaces were unremarkable [12]. Baby Robert was 4 1/2-months old at the time of autopsy and his thymus weight should have been about 22.5 g. The average thymus weight (g) in a white, infant male at three months and six months of age was found to be 20 and 25, respectively [13]. These data indicate that Robert's thymus weight was approximately 20% of normal size.

The baby was treated with corticosteroid because he was born four-weeks premature. The treatment with corticosteroid causes immune depression as measured by the reduction in size and the function of the lymphoid tissues. Dr. Hamilton did not review the baby's medical record; therefore he overlooked the facts that both the baby and his mother developed diabetes as a result of their treatment with corticosteroid.

Furthermore, the use of corticosteroid at high therapeutic doses causes atrophy in the adrenal gland. Dr. Hamilton stated that the combined weight of the right and left adrenal glands was 4 grams, but he did not evaluate their structure microscopically to check for abnormalities. He also did not take tissue samples from other endocrine glands to be examined microscopically and to check for abnormalities. A study conducted in the United States of America showed that dexamethasone therapy in newborns for a period of a week or longer was associated with suppression of the hypothalamic-pituitary-adrenal axis (HPAA) in a substantial number of premature infants [32].

000461

IV-F. Robert's spleen weight appeared less than normal.

Robert's spleen weight at autopsy was 16 g [12]. The average spleen weights for infants at 3 and 6 months of age were found to be 16.3 g and 22 g respectively [13]. Based on these data, the expected weight of the spleen in a 4 ½ month old white baby is 19 g. Furthermore, it is possible that the actual spleen weight in Robert's case was significantly less than 16 g because his organs were congested with blood.

Robert's liver weight was 324 g and the expected liver weight for a 4 1/2-month old baby is about 220 g [12, 13]. His lungs were also heavier than normal (160 g) because of congestion. The normal lungs weight for a baby at Robert's age is about 94 g. The liver and lungs weight were increased by 45% and 70%, respectively because of congestion.

These data indicate that the actual spleen weight in Robert's case may have been a lot less than 16 g; Robert had severe atrophy of the spleen as it happened with the thymus. Dr. Hamilton did not examine the spleen microscopically and gross examination alone is not adequate to detect microscopic abnormalities.

IV-G.  Inadequate examination of the heart

The clinical data indicate that Robert suffered from heart problems (Tables 5 & 6). However, Dr. Hamilton did not take tissue samples to microscopically evaluate the structure of Robert's heart. He examined the heart grossly and declared that Robert's heart was normal.  I believe that Dr. Hamilton's conclusion is not valid based on the following facts: 1) The emergency teams monitored the baby's heart at 0943 and found that he had sinus tachycardia with a pulse rate of 172-190 per minute (Table 5); 2) blood analysis showed that he had high levels of troponin I, CKMB, and CK total which indicated that the baby was suffering from myocardiac damage (Table 6); 3) the EKG exam taken at 1830 on August 2nd showed the baby's heart suffered from ischemic changes and arrhythmia; 4)  some elevation in ST waves was noted indicating acute myocardial injury.

000462

## Section V. Analysis of Clinical Events and Causes That Led to Baby Robert's Respiratory Arrest and Death

The clinical data described in Sections I through IV of this report show that Baby Robert suffered from several chronic illnesses and some of these illnesses led to his respiratory arrest and death in August of 2000. These illnesses include: brain atrophy and other neurological problems, subdural bleed, retinal bleed and other abnormalities, diabetes, heart problems, sinus and ear infections, muscle weakness, atrophy of the lymphoid tissue, and excessive weight gain.

Robert's illnesses resulted from his exposure to high therapeutic doses of corticosteroid (betamethasone). His thymic atrophy was severe and it indicates that the baby was treated with high doses of corticosteroid. His thymus weight at autopsy was about 20% of normal. The thymus is a very sensitive biomarker for the effect of corticosteroid.

Adverse reactions to corticosteroid have been reported in children. These include: 1) fluid and electrolyte disturbance (sodium retention, fluid retention, potassium loss, and hypokalemic alkalosis); 2) increased capillary fragility; 3) musculoskeletal problems (muscle weakness, steroid myopathy, and loss of muscle mass); 4) cardiovascular problems (congestive heart failure in susceptible patients, cardiac hypertrophy, and hypertension); 5) gastrointestinal problems (peptic ulcer with possible subsequent perforation and hemorrhage, pancreatitis, abdominal distention, ulcerative esophagitis); 6) neurological problems (convulsions and increased intracranial pressure, brain atrophy, and demyelination); 7) manifestations of latent diabetes mellitus and glycosuria; 8) ophthalmic problems (posterior subcapsular cataracts, increased intraocular pressure and glaucoma, exophthalmos, and retinopathy); 9) metabolic problems (negative nitrogen balance due to protein catabolism); 10) abnormal weight gain; 11) decreased functions of the immune systems and increased susceptibility to infections [33, 5].

Baby Robert was also exposed to micronase (anti-diabetic drug) via milk and this medication should not be given to a nursing mother. It causes hypoglycemia in breast-fed infants. Robert's mother did not suffer from diabetes during her pregnancy. However, her medical record indicates that she was treated with micronase after giving birth and that she stopped taking this medication on June 8th. This indicates that her diabetes was caused by her treatment with corticosteroid during her last week of pregnancy. The baby

38

also suffered from glycosuria and diabetes as a result of his exposure to corticosteroid [8].

Furthermore, the baby was given vaccines (Tables 3 and 4) when he was suffering from immune depression as a result of his treatment with corticosteroid, which increased his risk of developing ear and sinus infections. Glucocorticoids cause profound and varied metabolic effects. They also modify the body's immune response to diverse stimuli. Immunization procedures should not be undertaken in patients, who are on corticosteroids, especially in high doses, because of the possible hazards of neurological complications and lack of antibody response [5, page 2824]. The cerebral CT scan taken at 1043 on August 2nd showed that Baby Robert suffered from significant sinus and mastoid disease [8].

### V-A. Events that led to Robert's respiratory arrest on August 2nd, 2000

Baby Robert suffered from respiratory arrest on August 2nd, 2000 between 0920 and 0935 and the medical evidence indicates that the following events led to his respiratory arrest:

1) Baby Robert suffered from a seizure prior to 0935 and his seizure resulted from neurological problems and brain atrophy caused by his treatment with corticosteroids. Dr. Anne Elizabeth Dickison who treated Baby Robert on the morning of August 2nd stated that the baby was seizing and he was very stiff. She said "he was so stiff you could pick him up by a leg and he would stay stiff". His tongue was so stiff that the physician needed to cause him to relax in order to correctly place the breathing tube without traumatizing him. Dr. Dickison treated Baby Robert with muscle relaxant and anti-seizure medications [26].

2) The severe seizure caused Baby Robert to vomit and led to the blockage of his airways with fluids, which prompted his respiratory arrest. The baby vomited on the bed and the floor near the bed. Brian told the person who took the 911 call that the baby was draining white fluid-like formula milk from his mouth and nose. The baby was also coughing [22, page 445]. The emergency team who arrived on the scene to treat the baby had to clear fluid from his mouth and nose in order to get oxygen into him. The paramedic used a vacuum to suck about 10 mL of formula from his airway. The baby had been fed about 8 ounces of formula milk within 30 minutes prior to his seizure.

39

3) The movement of the baby from his place on the bed to the end of the bed can be explained by his seizure and his struggle to breath. Robert's mother stated that her baby was able to roll halfway [11].

## V-B. The biomechanisms of Robert's injuries

Baby Robert suffered from respiratory arrest for a significant time and that led to brain anoxia and cardiac damage. In addition, the baby suffered from a chronic subdural bleed and retinal bleed as a result of his treatment with corticosteroid. Corticosteroid induces diabetes, hypertension, brain atrophy, and it increases capillary fragility and abnormal vascular growth in the retina. Glucocorticoid causes hypertension and cardiovascular disease due to its capacity to promote sodium retention and increased blood pressure [33].

Baby Robert suffered from polyurea as early as April 19, 2000 when he was four weeks old. On April 17th, 19th, and 26th, 2000, his grandmother stated that she was changing wet diapers 8-10 times per day. This indicates that the baby was suffering from polyurea. The urine and blood analyses performed on August 2nd showed that the baby was suffering from hyperglycemia and glycosurea. His blood glucose level was 317 mg/dl and he had glycosurea (>1000 mg/dL) [8]. These conditions usually cause polyurea.

The cerebral CT scan taken on August 2nd at 1028 showed that Robert had a multi-generation subdural bleed. Dr. Ronald G. Quisling, neuroradiologist estimated the fresh bleed to be 20-25% of the total bleed observed [25]. The fresh bleed increased to 35% of the total at 1521 on August 2nd. The cerebral CT sans taken on August 3rd and 4th showed no change in the status of the bleed observed in the last CT scan taken on August 2nd.

The occurrence of the fresh bleed in the subdural space observed on August 2nd can be explained by the synergistic actions of several factors. These include: 1) the presence of previous vascular injury in the subdura which led to re-bleeding; 2) severe seizure that led to an increase in the intracranial pressure; 3) elevation in heart rate that led to an increase in the blood pressure. The baby's pulse rate was 172 at 0938 on August 2nd; 4) injection of relatively large volumes of therapeutic fluid administered intravenously can cause an increase in the blood pressure.

The retinal bleed observed by Dr. Lawrence Levine on August 2nd can be explained by Robert's treatment with corticosteroid and diabetes. These conditions have been known to cause retinopathy and retinal bleeds. In addition to the retinal bleed, Dr. Levine

000465

observed blood in the vitreous body, big white spots in the back of the eye, (which he referred to as Purtscher's retinopathy), and a crack in the back of the eye, (which he called a choroidal rupture) [27]. These lesions have also been reported in patients suffering from diabetes and/or treatment with high therapeutic doses of corticosteroid [5, 33].

Robert's symptoms and lesions described in this report resemble those that have presented in other infants who have also been treated with corticosteroids. Adverse reactions to corticosteroids in infants have been widely reported in the medical literature. However, none of the physicians or the medical examiner that evaluated this case paid any attention to these facts. Baby Robert was born four weeks premature and he and his mother were treated with corticosteroid. The following are descriptions of selected studies that explain the adverse reactions to corticosteroids in preterm infants and older children.

V-C. Corticosteroids cause neurological problems in children

**V-C1. Treatment with corticosteroids and neurological problems**

Corticosteroid compounds are given to pregnant women who are at risk of delivering premature infants and to preterm infants in order to help in maturation of the infant's lungs. Robert's mother was treated with corticosteroid during her last week of pregnancy. Baby Robert suffered from severe thymic atrophy and other adverse reactions to corticosteroid. His symptoms indicate that he was treated with high therapeutic doses of corticosteroid. Prenatal and postnatal treatments with therapeutic doses of corticosteroid compounds have shown to cause early and delayed neurological problems in infants as described below.

Eighteen premature (23 to 31 weeks) infants (7 treated with dexamethasone and 11 not treated) were studied at term, i.e., 38 to 41 post-conceptional weeks. Advanced quantitative volumetric 3-dimensional magnetic resonance imaging (MRI) technique was used to quantify cerebral tissue volumes in these infants. Fourteen healthy term infants were also studied for comparison. Cerebral cortical gray matter volume in premature infants treated with dexamethasone was reduced by 35% when compared with gray matter volume in premature infants not treated with dexamethasone (mean +/- standard deviation, 130.3 +/- 54.0 vs. 200.6 +/- 35.1 mL, respectively). Premature infants treated with dexamethasone exhibited a reduction (30%) in total cerebral tissue volume

41

compared with total cerebral tissue volume in both the control term infants and premature infants not treated with dexamethasone (312.7 +/- 43.7 vs. 448.2 +/- 50.2 and 471.6 +/- 36.4 mL respectively) [34].

Furthermore, dexamethasone given postnatally to treat or prevent bronchopulmonary dysplasia (BPD) has also shown to increase the risk of neurologic impairment, neurodevelopmental disability, and the rate of cerebral palsy in preterm infants and later in survivors [35-37]. Nineteen randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth in high-risk preterm infants were reviewed. In the two trials, which have reported late outcomes, several adverse neurological effects were found at follow-up examinations of survivors treated with early steroids. These include: abnormal neurological examination, cerebral palsy, and developmental delay [38, 39].

In addition, twenty-one randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth (early) enrolling a total of 3072 preterm infants were reviewed. In the nine trials that have reported late outcomes, several adverse neurological effects were found at follow-up examinations of survivors treated with early steroids. These include cerebral palsy and other abnormal neurological findings [40]. Also, randomized controlled trials of postnatal corticosteroid treatment initiated at > 3 weeks of age in preterm infants with CLD were reviewed. There were increases in long-term neurologic sequelae including abnormal neurologic examination and cerebral palsy [41].

Yeh et al. evaluated a total of 133 preterm infants (70 in the control group, 63 in the dexamethasone-treated group) who survived the initial study period and lived to 2 years of age. For infants in the treatment group, dexamethasone was started at a mean age of 8.1 hours and given 0.25 mg/kg every 12 hours for one week and then tapered off gradually over a 3-week period. The dexamethasone-treated group had a significantly higher incidence of neuromotor dysfunction (25/63 vs. 12/70) than the control group. Significant handicap was seen in 22 children (31.4%) in the control group and 26 (41.2%) in the dexamethasone-treated group [42].

Furthermore, a study compared a three-day course of dexamethasone (n =132) with a saline placebo (n = 116) administered from before 12 hours of age in preterm infants. Dexamethasone treatment was associated with increased incidence of hypertension, hyperglycemia, and gastrointestinal hemorrhage and no reduction in either the incidence

000467

or severity of chronic lung disease or mortality. A total of 195 infants survived to discharge and five died later [43].

Follow up data were obtained on 159 of 190 survivors at a mean age of 18 months. Dexamethasone treated children had a significantly higher incidence of cerebral palsy than those receiving placebo 49% v.15%, respectively. The most common form of cerebral palsy was spastic diplegia and the incidence rates were 28% v. 6% in dexamethasone and placebo treated infants, respectively. Developmental delay was also significantly more common in the dexamethasone treated group (55%) than in the placebo treated group (29%) [43].

Also, a study evaluated the long-term adverse effects of corticosteroid given to infants on the nervous system. Of the 120 children who received corticosteroids, 98 (81.7%) survived to 5 years of age, compared with 200 (88.5%) of the 226 children who did not receive corticosteroids. At 5 years of age, survivors treated with corticosteroids postnatally had significantly higher rates of cerebral palsy (23%) compared with children not treated (4%).

In addition, the rate of sensorineural disabilities was significantly higher in children treated with postnatal corticosteroids, and the association between adverse sensorineural outcome and postnatal corticosteroids remained the same after adjustments for potentially confounding variables. In a separate case-control analysis of 60 children in each group, the rate of cerebral palsy remained significantly elevated (corticosteroids 22%, no corticosteroids 5%) [44].

Bos et al. studied 37 preterm infants with Prechtl's method for the qualitative assessment of general movements before, during and after dexamethasone therapy and found that the quality of general movements was impaired in 9 of 13 initially normal infants. The quality of fidgety movements at 3 months was abnormal in the majority of the infants and strongly correlated with neurological abnormalities at 2 years of age [45].

### V-C2. The release of high levels of endogenous corticosteroid also causes neurological problems

The adrenocorticotrophic hormone (ACTH) is released from the pituitary gland to stimulate the cortex of the adrenal glands. This causes an increase in the synthesis and the release of cortisol. It has been shown that the treatment of children with ACTH also

000468

caused neurological problems as a result of the release of endogenous cortisol. For example, eight children with different petit mal epilepsies were systematically treated with ACTH and dexamethasone. Cranial computed tomography (CCT) examinations were performed before, during and after treatment. Severe cerebral changes were observed in all children. Enlargement of ventricles and subarachnoid space was developed during the initial phase of treatment with Depot-ACTH. Similar changes, but to a lesser degree were observed during the phase of dexamethasone therapy thereafter [46].

Furthermore, Riikonen and Donner evaluated 162 children with infantile spasms who were treated with ACTH.  In a large proportion (37%) of the children, the treatment caused pronounced side effects, and the mortality rate was 4.9%. At autopsy, fresh intracerebral hemorrhages were observed [47].

### V-C3. Abnormal changes in the nervous system caused by corticosteroid can also be reproduced in experimental animals

Experimental studies in animals have shown that multiple courses of antenatal corticosteroid cause deleterious effects on lung growth, brain myelination, hypothalamic-pituitary-adrenal function, and retina development [48]. Animal studies have also shown that maternal corticosteroid delays myelination and reduces the growth of all fetal brain areas, particularly the hippocampus [49].

Furthermore, Aghajafari et al. evaluated the results of eighteen studies dealing with the adverse effects of antenatal corticosteroids on the nervous system and fetal growth in experimental animals. Seven studies investigated the effects of repeated doses of antenatal corticosteroids on the brain and nervous system function or growth. All seven studies found adverse effects with repeated doses of antenatal corticosteroids. Eleven studies looked at the effect of repeated doses of antenatal corticosteroids on fetal growth. Nine studies found evidence of fetal growth restriction with repeated doses of antenatal corticosteroids [50].

In addition, pregnant ewes were given saline or betamethasone (0.5 mg/kg) at 104, 111, 118, and 124 days gestation, stages equivalent to the third trimester in humans. Lambs were delivered at 145 days (term), perfused and the corpus callosum examined with light and electron microscopically. Total axon numbers were unaffected (P>0.05).

44

However, myelination was significantly delayed. Myelinated axons were 5.7% in
the experimental group and 9.2% in controls (P<0.05). Myelinated axon diameter and
myelin sheath thickness were also reduced (0.68 vs. 0.94 and 0.11 vs. 0.14 microm,
P<0.05) [51].

Furthermore, Quinlivan examined the effect of single or repeated injections of maternally
administered corticosteroids on fetal growth in sheep. Forty-six date-mated singleton
gestation ewes were allocated at random to one of three groups: a single or repeated
injection of betamethasone, or a control group, which received saline. On days 125
(preterm) or 145 (term) caesarean section delivery was performed. After the lambs were
killed, measures of size and weight were recorded. Significant betamethasone dose
dependent reduction in body and organ weights and biometry were found at preterm and
term gestational ages (p < 0.05). There was little catch up growth in those in whom
delivery was delayed until term. Thymus, spleen and liver were particularly targeted [52].

## V-D. Corticosteroid causes cardiomyopathy in infants

Yunis et al. reported three cases of newborns whose mothers were treated with
betamethasone prenatally at different doses and duration of time. They developed various
degrees of hypertrophic cardiomyopathy (HCM), which was diagnosed by
echocardiography. They suggested that repeated antenatal maternal steroid intake might
cause changes of HCM in the newborn. These changes appear to be dose-and duration-
related [53]. In addition, Miranda-Mallea et al. reported two cases of hypertrophic
cardiomyopathy in two preterm newborns secondary to dexamethasone treatment [54].

Furthermore, Israel et al. conducted a retrospective review of one preterm infant who
received a 26-day course, and 13 preterm infants who received at least one 42-day course
of dexamethasone, and who had serial echocardiographic data available. Left ventricular
hypertrophy was noted in 8 of 14 (57%) infants; hypertrophy usually was noted near the
end of the treatment course. Five of these eight affected infants died; the hypertrophic
cardiomyopathy was considered to have contributed to mortality in three of these
five infants. They speculate that prolonged dexamethasone treatment for chronic lung
disease (CLD) is associated with hypertrophic cardiomyopathy in a significant portion of
preterm infants [55].

Also, twenty preterm infants were studied serially with Doppler echocardiography to

45

000470

document changes in myocardial thickness associated with dexamethasone treatment for chronic lung disease. Ventricular septa and left ventricular posterior wall thickness was increased in all 11 infants in whom it was measured. The median increase was 0.9 and 0.8 mm, respectively. In most infants this increase was small, less than 1 mm, however two infants developed marked septal hypertrophy with Doppler evidence of left ventricular outflow tract obstruction. In addition, myocardial hypertrophy occurs in most infants and in some of them it was severe [56].

Furthermore, eighteen children treated for infantile spasms with high-dose of adenocorticotropin were evaluated for adverse effects of corticosteroid on the heart. Abnormal ventricular hypertrophy occurs in the majority of these patients. Many of these patients developed hypertrophic cardiomyopathy with dramatic asymmetric septal hypertrophy. Abnormal cardiac hypertrophy was seen in 13 (72%) of 18 patients. Five of 18 patients developed hypertrophic cardiomyopathy with asymmetric septal hypertrophy and concentric left ventricular hypertrophy was seen in eight patients [57].

<u>V-E. Corticosteroid causes hypertension, diabetes, and other systemic problems</u>

Dexamethasone treatment of preterm infants started within the first 4 days of life has been shown to cause metabolic disturbances, cardiac hypertrophy, reduced growth and gastrointestinal perforation. Nineteen randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth in high-risk preterm infants were reviewed. Gastrointestinal bleeding and intestinal perforation were important adverse effects and the risks of hyperglycemia and hypertension were also increased [38, 39].

In addition, a multi-center, randomized, placebo controlled, blinded study was carried out in 18 neonatal intensive care units in Israel to study the effect of early postnatal dexamethasone (days 1-3). The study consisted of 248 infants (dexamethasone n = 132; placebo n = 116). Gastrointestinal hemorrhage, hypertension, and hyperglycemia were more common in dexamethasone treated infants [59]. Furthermore, twenty-one randomized controlled trials of postnatal corticosteroid treatment within 96 hours of birth (early) enrolling a total of 3072 preterm infants were reviewed. Gastrointestinal bleeding and intestinal perforation were noted adverse effects and the risks of hyperglycemia and hypertension also increased [40].

The magnitude and duration of the effect of dexamethasone on systolic blood

000471

pressure has also been examined in 13 preterm infants (median gestational age 25 weeks). All had chronic lung disease (CLD). To exclude any effect of CLD on blood pressure each infant acted as his or her own control. Systolic blood pressure increased in all infants (P less than 0.01) and remained elevated for at least 48 hours following cessation of therapy. The median maximum increase in blood pressure was 24 mmHg (range 13-49 mmHg) and occurred on day 4 (median, range 2-10) of treatment. One infant also developed hypertensive encephalopathy. These results demonstrate the need to monitor infants with CLD throughout steroid therapy and preferably for some days after treatment has ceased [60].

Furthermore, randomized controlled trials of postnatal corticosteroid treatment from 7-14 days of birth in high-risk preterm infants were reviewed. Adverse effects included: hypertension, hyperglycemia, gastrointestinal bleeding, hypertrophic cardiomyopathy and infection [61]. In addition, nine trials enrolling a total of 562 infants were reviewed to determine the adverse reactions of late (usually > 3 weeks) postnatal corticosteroid treatment vs. control (placebo or nothing). Short-term adverse affects included glycosuria and hypertension. There was also an increase in severe retinopathy of prematurity [62].

Also, randomized controlled trials of postnatal corticosteroid treatment initiated at > 3 weeks of age in preterm infants with CLD were evaluated. Short-term adverse affects included hyperglycemia, glycosuria and hypertension. There was also an increase in severe retinopathy of prematurity [41].

The influence of dexamethasone (0.25 mg kg-1 i.v., twice daily) on diuresis in preterm infants was also studied in 15 preterm infants at risk for chronic lung disease. Urine output, blood glucose, serum urea, serum creatinine, serum sodium and serum potassium, as well as systolic, diastolic and mean arterial pressure were measured on the day before, and on 4 consecutive days after starting treatment with dexamethasone (0.25 mg kg-1 i.v., twice daily). The authors found an increase of diuresis of 30 ml kg -1 d-1, 48-96 hours after starting dexamethasone treatment. This coincided with a gradual but significant increase of serum urea levels and arterial pressure [63].

These findings suggest that the increased urine output following dexamethasone treatment might be caused by two factors: (1) pressure diuresis induced by the increase of arterial pressure and (2) an increase of the osmolar load to the kidney due to an increase

000472

of serum urea. This study demonstrates that a significant increase of diuresis occurs in preterm infants, 48-96 hours after starting dexamethasone [63].

Furthermore, a study conducted in the United States of America showed that dexamethasone therapy in newborns for a period of a week or longer was associated with suppression of the hypothalamic-pituitary-adrenal axis (HPAA) in a substantial number of premature infants [32].

Also, Riikonen and Donner evaluated 162 children with infantile spasms who were treated with ACTH. In a large proportion (37%) of the children, the treatment caused pronounced side effects with a mortality rate of 4.9%. The most common complications were infections: septic infections, pneumonias, and urinary and gastrointestinal infections. Other side effects were arterial hypertension (11), osteoporosis (2), hypokalemic alkalosis (2), and other marked electrolyte disturbances (10) [47].

### V-F. Corticosteroid increases the risk for infections in infants

Vermillion et al. performed a non-concurrent prospective analysis of singleton pregnancies delivered between 24 and 34 weeks of gestation after antenatal betamethasone exposure. Patients were categorized into two groups according to betamethasone exposure: (1) two 12-mg doses in a 24-hour interval on admission (single-course group) and (2) repeated dosing after the initial single course (multiple-course group). A total of 453 patients were included, with 267 in the single-course group and 186 in the multiple-course group. Multiple courses of antenatal betamethasone are associated with increased risks of perinatal infectious morbidity and neonatal death [64].

Also, a total of 371 low birth weight infants were enrolled in the trial. For the first 14 days of study, 182 infants received dexamethasone (group I) and 189 infants were given placebo (group II). Infants who received a 14-day course of dexamethasone initiated at 2 weeks of age were more likely to develop a bloodstream or cerebrospinal fluid infection while on dexamethasone therapy than were those who received placebo [65]. In a second study, the medical records of 158 premature infants were evaluated. Seventy-five infants (58%) received antenatal steroids and eighty-eight infants (68%) received postnatal steroids. Sepsis developed in 44 (34%) infants and fungal sepsis in 14 (11%) [66].

Furthermore, potential side effects of antenatal administration of corticosteroids to prevent neonatal respiratory distress syndrome were evaluated in 10 to 12-year-old

48

children whose mothers had participated in a randomized, double-blind, placebo-controlled trial of betamethasone. In the corticosteroid group, more hospital admissions were reported due to infectious diseases during the first years of life [67].

V-G. Corticosteroid causes retinopathy and other vision problems in patients

Medical records of 158 premature infants were studied. Seventy-five infants (58%) received antenatal steroids and eighty-eight infants (68%) received postnatal steroids. Incidence of retinopathy of prematurity (ROP) was 77% (100/130) and severe ROP (stage > or =3) was reported in 52% (68). Postnatal steroid use is an independent risk factor for development of severe ROP [66].

Development of central chorioretinopathy (CSC) following the administration of corticosteroids by diverse routes is a well-known fact. Schalenbourg et al. reported acute visual loss after the use of systemic corticosteroids in three patients to treat long-standing ocular inflammatory disorders [68]. Furthermore, Spraul et al. evaluated five patients who developed maculopathy during treatment with systemic corticosteroids. Three patients displayed focal and two patients showed diffuse retinal pigment epithelial changes comparable to the acute and chronic form of central chorioretinopathy, respectively. Four of five patients had a complete visual recovery after decrease or cessation of treatment with corticosteroids. The authors concluded that systemic treatment with corticosteroids may damage the posterior blood-retinal barrier, leading to central chorioretinopathy [69].

In addition, Chaine et al. described fourteen cases of detachment of the macula due to central chorioretinopathy in patients given long-term steroid therapy. None of the patients had hypertension. Detachment occurred between 6 days and 10 years after the start of steroid treatment. The higher the doses, the earlier the onset of ocular disease appeared. All patients were symptomatic, with rapid onset of blurred vision. Detachment was bilateral in two cases [70]. Also, Song et al. reported five patients who were diagnosed as having central chorioretinopathy (CSC) during systemic corticosteroid treatment based on medical records and fluorescein angiography. [71].

49

## Section VI.  Brian Herlihy's Jury Trial and Analysis of The Evidence Presented

Brian Herlihy's jury trial was held in the Eighth Judicial Circuit in Alachua County, Florida on September 10, 2002. Trial lasted sixteen days (Case No. 01-2000-CF-2753-A) and the Honorable Judge Martha Ann Lott presided over this trial. Attorneys Jeanne Singer and Stephen Pennypacker represented the State, and attorneys Gordon Groland and John Tedder represented the defendant [2, 4, 7, 11, 22, 26, 27, 30, 31, 72-82].

The State claimed that Baby Robert Quirello was perfectly fine and that there was absolutely nothing wrong with him when his mother brought him to Brian's apartment shortly after 0900 on August 2nd, 2000.  In addition, the State alleged that Baby Robert was never lethargic or anxious from the time of his birth until the morning of August 2nd, 2000. The State asserted that while Baby Robert was alone with the Brian Herlihy, he suffered from violent shaking which ultimately resulted in fatal neurological damage and his death. The State furthermore claimed that Brian punished Baby Robert because the baby was crying and had annoyed, maddened, and frustrated him [79, page 2226].

Several physicians and the medical examiner examined the baby on August 2nd through August 10th and they did not find any sign of injuries on the baby's head or body that was caused by trauma or abuse. Brian has stated to the police numerous times that he is innocent and that he took very good care of the baby. Brian also had cared for Baby Robert about five times in the past, for several hours per day and the baby had been fine [11].  However, Brian Herlihy was convicted of manslaughter in the death of Robert Benjamin Quirello and sentenced to 15 years in prison.

I reviewed the medical evidence and trial documents related to this case. I found that the State did not present any medical evidence that showed Brian Herlihy harmed Baby Robert nor that Robert's injuries were caused by violent shaking and trauma. My investigation furthermore revealed that the baby was suffering from serious health problems prior to August 2nd, 2000 that led to his respiratory arrest, neurological damage, and his death in August of 2000.

Dr. William Frank Hamilton, the medical examiner, and seven physicians testified as expert witnesses for the State. Two physicians testified as experts for the defense. The physicians that testified for the State in this case include: 1) Dr. William Frank Hamilton,

000475

forensic pathologist; 2) Dr. Harvey George Rohlwing, emergency medicine specialist; 3) Dr. Anne Elizabeth Dickison, pediatrician and intensive care specialist; 4) Dr. Stephen John Nelson, neuropathologist; 5) Dr. Bernie Maria, pediatric neurologist; 6) Dr. Lawrence Levine, pediatric ophthalmologist; 7) Dr. John Hellrung, pediatrician; 8) Dr. Richard M. Kreinest, obstetrician/gynecologist. The physicians who testified for the defense are Dr. John Plunkett, forensic pathologist and Dr. Ronald Henry Uscinski, neurosurgeon.

### VI-A. The testimonies given by the State's expert witnesses are based upon theory

The medical examiner and the State's expert witnesses alleged that Baby Robert's respiratory arrest, neurological damage, and death were caused by violent shaking while he was with Brian Herlihy prior to 0937 on August 2nd, 2000. My review of the medical evidence described in the previous five sections of this report clearly shows that Baby Robert suffered from chronic health problems (chronic subdural bleed, retinal hemorrhage, brain atrophy, atrophy of the thymus, diabetes, muscle weakness, and sinus and ear infections) that led to his seizure and his respiratory arrest on August 2nd, 2000.

Robert's serious health problems were caused by his treatment with corticosteroid. In addition, the vaccines given to Baby Robert contributed to his health problems. I described the adverse reactions to vaccines and corticosteroids in Sections II and V of this report. None of these physicians considered adverse reactions to corticosteroids and vaccines in their evaluation of this case. In addition, none of these physicians reviewed the baby's prenatal and postnatal medical records to learn about Robert's pre-existing chronic health problems.

My review of the medical evidence furthermore revealed that several of these physicians were aware that Baby Robert suffered from chronic health conditions such as a chronic subdural bleed, brain atrophy, and sinus and ear infections. However, they did not make any attempt to investigate the links between the baby's chronic illnesses and his respiratory arrest on the morning of August 2nd, 2000. The following is a list of medical evidence that shows the State's expert witnesses conducted an incomplete medical investigation in this case. They blindly rushed to judgment and their conclusions are invalid and unsupported by the medical facts pertaining to this case.

51

1) The emergency team, several physicians, and the medical examiner examined the baby on August 2nd through August 10th and they did not find any sign of injuries on the baby's head or body that was caused by trauma or abuse.

2) The four cerebral CT scans taken on August 2nd through August 4th showed that Baby Robert suffered from a chronic subdural bleed. However, none of the physicians who testified for the State ever investigated the causes of the bleed. Furthermore, the medical examiner did not take a sample from the dura to examine microscopically in order to date the bleed. The data described in Section V of this report show that prenatal and postnatal treatments of infants with corticosteroid caused hypertension, hyperatrophic cardiomyopathy, encephalopathy, and increased capillary fragility, which can lead to subdural bleeding.

3) The treating physician, Dr. Dickison and the neuropathologist, Dr. Nelson were both aware that Baby Robert suffered from brain atrophy but they did not investigate the cause(s) of the atrophy or the link between the atrophy and the baby's seizure and his respiratory arrest that occurred on August 2nd. Dr. Dickison stated "the baby had a smaller brain than the size of the skull, meaning that there was probably some atrophy or wasting of the surface of the brain or that the brain was not growing as rapidly as it should have been" [31]. Dr. Nelson said that Robert's brain was an immature brain and it was inconsistent with a brain of a child of four and a half months of age [30].

Baby Robert suffered from severe thymic atrophy, which indicates that he had been treated with high doses of corticosteroid. It has been reported that premature infants treated with dexamethasone exhibited a 30% reduction in total cerebral tissue volume compared with total cerebral tissue volume in both premature infants not treated with dexamethasone and the control term infants [34]. Furthermore, dexamethasone given postnatally to infants has been shown to increase the risk of neurologic impairment, neurodevelopmental disability, and the rate of cerebral palsy in preterm infants and later in survivors [35-37].

4) The lesions observed in the brain were edema and cell necrosis. They were caused by severe global anoxia and ischemia and not by trauma. Brian found the baby was not breathing at 0937 on August 2nd. Dr. Dickison also found the baby

52

was not breathing well and the endotracheal tube was not in place at about 1100 because the baby was suffering from a severe seizure and his tongue was very stiff. His color was gray and ashen [26]. The baby had been suffering from anoxia for at least 60 minutes. This lack of oxygen also caused heart injury as explained in Section III.

5) Dr. John Hellrung, Baby Robert's pediatrician stated in the trial that the baby was normal. However, his examinations showed that the baby suffered from excessive weight gain, polyurea, muscle weakness in the neck region, neurological problems, and possible vision problems. For example, on April 19th, 2000, Dr. Hellrung reported that the baby gained eight ounces in two days and he would have gained two ounces under normal circumstances. The baby's weight at 4 ½ months was more than 300% his body weight at birth (Table 2).

In addition, the baby's tracking with his eyes was not consistent following an object more than a hundred degrees. The baby also had poor head and neck control, decreased muscle tone in the shoulders and neck, and tight hip flexors [11]. Robert's serum creatinine levels measured on August 2nd and 3rd showed that the baby was suffering from a muscle-wasting problem. His serum creatinine levels were less than 25% of normal (Table 7). It is clear that Robert was suffering from adverse reactions to corticosteroid as described in Section V. However, Dr. Hellrung overlooked the connection between the baby's treatment with corticosteroid and his symptoms.

6) Dr. Hamilton, the medical examiner found that the weight of Robert's thymus was 4 grams, which is about 20% of the normal weight. However, he stated that Robert's thymus was normal. The average thymus weight (g) in a white, infant male at three and six months of age was found to be 20 and 25, respectively [13]. Baby Robert was 4-1/2-months old and his thymus weight should have been about 22.5 g. Treatment with corticosteroid causes immune depression as measured by the reduction in the size and the function of the lymphoid tissues. It is obvious that the medical examiner overlooked an important biological indicator that showed the baby was suffering from a severe adverse reaction to corticosteroid.

7) Dr. Lawrence Levine examined the baby's eyes and found retinal hemorrhage, white spots in the back of the eye, which he called "Purtscher's retinopathy", and

000478

a crack in the back of the eye, which he called a choroidal rupture. He claimed
that these lesions were caused by trauma, however his examination of the eyes
and eyelids did not reveal any sign of external injuries caused by trauma.

I presented the findings of several studies in Section V of this report that show the
treatment of children and adults with corticosteroid caused retinopathy, increased
capillary fragility, hypertension, and diabetes. Hypertension and diabetes have
also been known to cause retinopathy. The baby suffered from severe thymic
atrophy that indicates he was treated with high doses of corticosteroids. In
addition, the clinical data presented in Section III show that Baby Robert suffered
from diabetes. It is very clear that Dr. Levine overlooked crucial medical evidence
that showed the link between the baby's treatment with corticosteroids and the
lesions observed in the retina.

## Section VII. Conclusions and Recommendations

Baby Robert suffered from gastrointestinal disturbance, reduction in food intake,
polyurea, excessive weight gain, myopathy, neurological problems, brain atrophy,
chronic subdural and retinal hemorrhage, vision problems, atrophy of the thymus,
diabetes, and sinus and ear infections. These symptoms and lesions have been described
in preterm infants treated with high therapeutic doses of corticosteroid (Section V).

Robert was born four weeks premature and his mother was treated with betamethasone
(corticosteroid) during the last week of her pregnancy. She developed diabetes as a result
of this treatment. Robert's thymus weight at autopsy was less than 20% of normal, which
indicates that he was also treated with high doses of corticosteroids. Thymus weight is a
very sensitive biomarker for the exposure to corticosteroids.

In addition, Baby Robert was exposed to micronase during his first three months of life.
Robert's mother developed diabetes as a result of her treatment with corticosteroid and
she was treated with micronase. Micronase is not recommended as a treatment in nursing
mothers due to the risk of causing hypoglycemia in infants. However, she breast-fed
Robert during her treatment with micronase.

54

000479

Furthermore, the baby was given six vaccines at two months of age and he was re-vaccinated again with these six vaccines at four months of age. At that time he was suffering from severe immune depression as indicated by his thymus weight. These vaccines increased his susceptibility to develop infections. The baby suffered from sinus and ear infections as shown by his cerebral CT scans taken on August 2nd. Also, DTP vaccines have been known to increase the risk of developing neurological disorders in children, such as encephalopathy or complicated convulsion(s).

Baby Robert suffered from respiratory arrest on August 2nd, 2000 between 0920 and 0935. The events that led to his respiratory arrest can be explained as follows: 1) Baby Robert suffered from a seizure prior to 0935 and his seizure resulted from a neurological problem and brain atrophy caused by his prenatal and postnatal treatment with corticosteroids. In addition, the vaccines received on July 19, 2000 might have played a role in triggering Robert's seizure. 2) The severe seizure caused the baby to vomit and that blocked his airways with fluids, which subsequently led to his respiratory arrest. The baby vomited a significant amount of formula like fluid and the paramedic used a vacuum to suck about 10 mL of formula from his airway. The baby had been fed about 8 ounces of formula milk within 30 minutes prior to his seizure. Baby Robert suffered from respiratory arrest for at least 60 minutes and that led to severe anoxia, which caused brain and cardiac damage.

The cerebral CT scan taken on August 2nd at 1028 showed that Robert had a multi-generation subdural bleed. The fresh bleed was estimated to be 20-25% of the total bleed. The occurrence of the fresh bleed in the subdura on August 2nd can be explained by the synergistic actions of several factors. These include: 1) The presence of previous vascular injury in the subdura which led to re-bleeding. 2) Robert suffered from a severe seizure that caused an increase in intracranial pressure. 3) Robert had an elevated heart rate and that led to an increase in the blood pressure. Robert's pulse rate was 172 at 0938 on August 2nd. 4) Injection of relatively large volumes of fluid intravenously led to an increase in the blood volume and an increase in the blood pressure.

The retinal bleed and other retinal vascular changes that were observed by Dr. Lawrence Levine on August 2nd can be explained by Robert's treatment with corticosteroid and diabetes. These conditions have been known to cause retinopathy and retinal bleeding as described in Section V.

000480

The medical examiner and the State's expert witnesses alleged that Baby Robert's respiratory arrest, neurological damage, and death were caused by violent shaking while he was with Brian Herlihy prior to 0937 on August 2nd, 2000. However, the emergency teams, several physicians, and the medical examiner examined the baby on August 2nd through August 10th and they did not find any sign of injuries on the baby's head or body that was caused by trauma or abuse.

In addition, none of these physicians reviewed the baby's prenatal and postnatal medical records to learn about his pre-existing health problems, his treatment with corticosteroid, or his adverse reactions to vaccines. Also, my review of the evidence in this case has revealed that some of these physicians were aware that Baby Robert suffered from chronic health conditions such as a chronic subdural bleed, brain atrophy, and sinus and ear infections. However, they did not make any attempt to investigate the links between the baby's chronic illnesses and his respiratory arrest on the morning of August 2nd, 2000. Presented in Section VI of this report is a comprehensive list of medical evidence that shows the State's expert witnesses conducted an incomplete medical investigation in this case.

The extensive medical evidence presented in this report clearly shows that Baby Robert died as a result of adverse reactions to corticosteroid and vaccines and that Brian Herlihy is innocent. The evidence also shows that Brian was convicted and imprisoned due to sloppy and incomplete medical investigations. I believe that the State of Florida has the responsibility to review the evidence presented in this report. Furthermore, it is my opinion that the State has the obligation to take immediate action to free Brian from prison. Brian should be reimbursed for all legal expenses incurred in addition to being compensated for his pain and suffering.

The objective of the State and that of physicians should be to focus on determining the factual causes that lead to the illness and death of a child so that they can prevent such problems from happening to other children. Accusing innocent people of abusing and killing children based upon unsupported theory, as it happened in this case, will not prevent the death of other children by vaccines and adverse reactions to medications. However, it certainly places innocent people in prison and causes great suffering. It also costs taxpayers huge sums of money to pay for unnecessary trials and legal fees.

I spent approximately 280 hours evaluating the medical evidence in order to find the factual causes of injuries and death in this case and to write this detailed report. I have

000481

also evaluated three other cases from the USA within a 12-month period involving children, who died as a result of adverse reactions to medications and vaccines. In these cases, either their parents or their caretaker were falsely accused of killing them and imprisoned due to false allegations of Shaken Baby Syndrome.

It is my hope that the State of Florida, our federal government, physicians, and our society will take the time to review the evidence presented in the cases that I have evaluated. It is imperative that prompt action is taken to re-evaluate the Shaken Baby Syndrome theory. This theory is not supported by science. Differential diagnosis should and must be used in order to solve complicated medical problems as I have used in these cases to find the factual causes of the injuries and death.

## References

[1] Crystal Quirello's medical record from Dr. Richard Kreinest's office, Alliance Medical Practice-Women Health Center, Gainesville, Florida.

[2] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume II, September 10, 2002, pages 108-310.

[3] Elizabeth Talaga's report, CPT medical examination of Robert Quirello (Shands MR # 01244463), Department of Pediatrics, University of Florida, Gainesville, FL, August 14, 2000.

[4] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume IX, September 17, 2002, pages 1099-1204.

[5] Physicians' Desk Reference, Edition 53, 1999. Medical Economics Company, Inc, Montavale, NJ, USA.

[6] Merlob P, Levitt O, and Stahl B. Oral antihyperglycemic agents during pregnancy and lactation: a review. Paediatr Drugs. 2002; 4(11):755-60.

[7] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume I, September 10, 2002, pages 1-107.

[8] Robert Quirello's Medical Records from Shands Hospital and Laboratories at the University of Florida. Gainesville, Florida 32610, August 2-10, 2000.

000482

[9] Nelson Textbook of Pediatrics. Edited by Behrman RE, Kliegman RM, Jenson HB. 16Th Edition, W.B. Saunders Company, Philadelphia, 2000.

[10] Robert Quirello's Medical Records, reported by Dr. John Hellrung, Shands Health Care, Gainesville, Florida.

[11] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume VII, September 13, 2002, pages 835-961.

[12] Postmortem Examination of the body of Robert Quirello (ME00-297) by William F. Hamilton, M.D. on August 10, 2000.

[13] Altman PL and Dittmer DS. Growth including reproduction and morphological development. Federation of American Societies for Experimental Biology, USA, 1962.

[14] Sen S, Cloete Y, and Hassan K, Buss P. Adverse events following vaccination in premature infants. Acta Paediatr 2001; 90(8):916-20.

[15] Sanchez PJ, Laptook AR, Fisher L, Sumner J, Risser RC, and Perlman JM. Apnea after immunization of preterm infants. J Pediatr 1997; 130(5):746-51.

[16] Botham SJ, Isaacs D, and Henderson-Smart DJ. Incidence of apnoea and bradycardia in preterm infants following DTPw and Hib immunization: a prospective study. J Paediatr Child Health 1997; 33(5):418-21.

[17] Slack MH, and Schapira D. Severe apnoeas following immunisation in premature infants. Arch Dis Child Fetal Neonatal Ed. 1999; 81(1):F67-8.

[18] Botham SJ, and Isaacs D. Incidence of apnoea and bradycardia in preterm infants following triple antigen immunization. J Paediatr Child Health 1994; 30(6):533-5.

[19] Braun MM, Mootrey GT, Salive ME, Chen RT, and Ellenberg SS. Infant immunization with acellular pertussis vaccines in the United States: assessment of the first two years' data from the Vaccine Adverse Event Reporting System (VAERS). Pediatrics; 106(4):E51, 2000.

[20] Deposition of Firefighter Dennis Meredith. State of Florida vs. Brian Herlihy, Defendant. In the Circuit Court of the Eight Judicial Circuit, in and for Alachua County, Florida. Case No.: 2000-2753-CFA. February 22nd, 2001. Pages 1-13.

[21] Incident report (# 015394), Alachua County Fire/Rescue's report. Gainesville, FL 32602, August 2nd, 2000.

[22] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida

000483

Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume IV, September 11, 2002, Pages 436-568.

[23] Deposition of Firefighter Kenneth A. Johnson. State of Florida vs. Brian Herlihy, defendant. In the Circuit Court of the Eight Judicial Circuit, in and for Alachua County, Florida. Case No.: 2000-2753-CFA. February 22nd, 2001, Pages 1-20.

[24] Incident Report in Case of Robert Q., Gainesville Fire Rescue Department, 1026 NE 14th Street Building B, Gainesville, FL, August 2, 2002.

[25] Deposition of Ronald G. Quisling, M.D. State of Florida vs. Brian Herlihy, defendant. In the Circuit Court of the Eight Judicial Circuit, in and for Alachua County, Florida. Case No.: 2000-2753-CFA. April 8,2002. Pages 1-45.

[26] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume V, September 12, 2002. Pages 569-674.

[27] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume X, September 17, 2002. Pages 1205-1368.

[28] Stephen J. Nelson, letter to Dr. William F. Hamilton on October 23, 2000. District Medical Examiner, 2145 Marshall Edwards Drive, Bartow, Florida.

[29] Michael D. Bell, M.D., report describing the gross and microscopic lesions in Robert Quirello's eyes. Florida Lions eye bank, Inc. September 7, 2000.

[30] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume VIII, September 13, 2002. Pages 962-1098.

[31] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume VI, September 12, 2002. Pages 675-834.

[32] Alkalay AL, Klein AH, Nagel RA, Pomerance JJ. Evaluation of hypothalamic-pituitary-adrenal axis in premature infants treated with dexamethasone. Am J Perinatol. 1996 Nov;13(8):473-7.

[33] Harrison's Principles of Internal Medicine. 14th edition. Editors: Fauci AS, Braunwald E, Isselbacher KJ, Wilson JD, Martin JB, Kasper DL, Hauser SL, and Longo DL. McGraw-Hill, New York, 1998.

[34] Murphy BP, Inder TE, Huppi PS, Warfield S, Zientara GP, Kikinis R, and Jolesz FA, Volpe JJ. Impaired cerebral cortical gray matter growth after treatment with

000484

dexamethasone for neonatal chronic lung disease.
Pediatrics. 2001 Feb;107(2):217-21.

[35] O'Shea TM and Doyle LW. Perinatal glucocorticoid therapy and
neurodevelopmental outcome: an epidemiologic perspective. Semin Neonatol.
2001 Aug;6(4):293-307.

[36] Rajadurai VS, and Tan KH]. The use and abuse of steroids in perinatal medicine.
Ann Acad Med Singapore. 2003 May;32(3):324-34.

[37] Groneck P. Perinatal glucocorticosteroid therapy: time for reconsideration.
Z Geburtshilfe Neonatol. 2001 Nov-Dec; 205(6):231-5.

[38] Halliday HL. The effect of postnatal steroids on growth and development.
J Perinat Med. 2001;29(4):281-5.

[39] Halliday HL, Ehrenkranz RA. Early postnatal (<96 hours) corticosteroids for
preventing chronic lung disease in preterm infants.  Cochrane Database Syst Rev.
2001;(1):CD001146.

[40] Halliday HL, Ehrenkranz RA, and Doyle LW. Early postnatal (<96 hours)
corticosteroids for preventing chronic lung disease in preterm infants.
Cochrane Database Syst Rev. 2003;(1): CD001146.

[41] Halliday HL and Ehrenkranz RA. Delayed (>3 weeks) postnatal corticosteroids for
chronic lung disease in preterm infants. Cochrane Database Syst Rev.
2000;(2): CD001145.

[42] Yeh TF, Lin YJ, Huang CC, Chen YJ, Lin CH, Lin HC, Hsieh WS, Lien YJ.
Early dexamethasone therapy in preterm infants: a follow-up study.
Pediatrics. 1998 May;101(5):E7.

[43] Shinwell ES, Karplus M, Reich D, Weintraub Z, Blazer S, Bader D, Yurman S,
Dolfin T, Kogan A, Dollberg S, Arbel E, Goldberg M, Gur I, Naor N, Sirota L,
Mogilner S, Zaritsky A, Barak M, and Gottfried E.  Early postnatal dexamethasone
treatment and increased incidence of cerebral palsy. Arch Dis Child Fetal
Neonatal Ed. 2000 Nov; 83(3): F177-81.

[44] Postnatal corticosteroids and sensorineural outcome at 5 years of age. J Paediatr
Child Health. 2000 Jun;36(3):256-61.

[45] Bos AF, Dibiasi J, Tiessen AH, Bergman KA.  Treating preterm infants at risk for
chronic lung disease with dexamethasone leads to an impaired quality of general
movements. Biol Neonate. 2002; 82(3):155-8.

[46] Lagenstein I, Willig RP, Kuhne D. Cranial computed tomography (CCT) findings in

000485

children treated with ACTH and dexamethasone: first results.
Neuropadiatrie. 1979 Nov;10(4):370-84.

[47] Riikonen R and Donner M. ACTH therapy in infantile spasms: side effects.
Arch Dis Child. 1980 Sep; 55(9):664-72.

[48] Buonocore G, Perrone S, and De Marco L. Pre- and post-natal corticosteroids: side
effects. Acta Biomed Ateneo Parmense. 2000;71 Suppl 1:413-9.

[49] Whitelaw A, and Thoresen M. Antenatal steroids and the developing brain.
Arch Dis Child Fetal Neonatal Ed. 2000 Sep; 83(2):F154-7.

[50] Aghajafari F, Murphy K, Matthews S, Ohlsson A, Amankwah K, and Hannah M.
Repeated doses of antenatal corticosteroids in animals: a systematic review.
Am J Obstet Gynecol. 2002 Apr; 186(4):843-9.

[51] Huang WL, Harper CG, Evans SF, Newnham JP, and Dunlop SA.
Repeated prenatal corticosteroid administration delays myelination of the corpus
callosum in fetal sheep. Int J Dev Neurosci. 2001 Jul;19(4):415-25.

[52] Quinlivan JA, Archer MA, Dunlop SA, Evans SF, Beazley LD, and Newnham JP.
Fetal growth retardation, particularly within lymphoid organs, following
repeated maternal injections of betamethasone in sheep. J Obstet Gynaecol Res.
1998 Jun; 24(3):173-82.

[53] Yunis KA, Bitar FF, Hayek P, Mroueh SM, and Mikati M. Transient hypertrophic
cardiomyopathy in the newborn following multiple doses of antenatal
corticosteroids. Am J Perinatol. 1999;16(1):17-21.

[54] Miranda-Mallea J, Perez-Verdu J, Gasco-Lacalle B, Saez-Palacios JM,
Fernandez-Gilino C, and Izquierdo-Macian I. Hypertrophic cardiomyopathy in
preterm infants treated with dexamethasone. Eur J Pediatr. 1997 May;156(5):394-6.

[55] Israel BA, Sherman FS, and Guthrie RD. Hypertrophic cardiomyopathy associated
with dexamethasone therapy for chronic lung disease in preterm infants.
Am J Perinatol. 1993 Jul;10(4):307-10.

[56] Evans N. Cardiovascular effects of dexamethasone in the preterm infant.
Arch Dis Child Fetal Neonatal Ed. 1994 Jan;70(1):F25-30.

[57] Bobele GB, Ward KE, and Bodensteiner JB. Hypertrophic cardiomyopathy during
corticotropin therapy for infantile spasms. A clinical and echocardiographic study.
Am J Dis Child. 1993 Feb; 147(2):223-5.

[59] Shinwell ES, Karplus M, Zmora E, Reich D, Rothschild A, Blazer S, Bader D,
Yurman S, Dolfin T, Kuint J, Milbauer B, Kohelet D, Goldberg M, Armon Y,

000486

Davidson S, Sirota L, Amitai M, Zaretsky A, Barak M, and Gottfried S. Failure of early postnatal dexamethasone to prevent chronic lung disease in infants with respiratory distress syndrome. Arch Dis Child Fetal Neonatal Ed. 1996 Jan; 74(1):F33-7.

[60] Greenough A, Emery EF, and Gamsu HR. Dexamethasone and hypertension in preterm infants. Eur J Pediatr. 1992 Feb;151(2):134-5.

[61] Halliday HL and Ehrenkranz RA. Moderately early (7-14 days) postnatal corticosteroids for preventing chronic lung disease in preterm infants. Cochrane Database Syst Rev. 2000;(2):CD001144.

[62] Halliday HL and Ehrenkranz RA, Doyle LW. Delayed (>3 weeks) postnatal corticosteroids for chronic lung disease in preterm infants. Cochrane Database Syst Rev. 2003;(1):CD001145.

[63] Bos AF, van Asselt WA, and Okken A. Dexamethasone treatment and fluid balance in preterm infants at risk for chronic lung disease. Acta Paediatr. 2000 May; 89(5):562-5.

[64] Vermillion ST, Soper DE, and Newman RB. Neonatal sepsis and death after multiple courses of antenatal betamethasone therapy. Am J Obstet Gynecol. 2000 Oct; 183(4):810-4.

[65] Stoll BJ, Temprosa M, Tyson JE, Papile LA, Wright LL, Bauer CR, Donovan EF, Korones SB, Lemons JA, Fanaroff AA, Stevenson DK, Oh W, Ehrenkranz RA, Shankaran S, and Verter J. . Dexamethasone therapy increases infection in very low birth weight infants. Pediatrics. 1999 Nov; 104(5):e63.

[66] Haroon Parupia MF and Dhanireddy R. Association of postnatal dexamethasone use and fungal sepsis in the development of severe retinopathy of prematurity and progression to laser therapy in extremely low-birth-weight infants. J Perinatol. 2001 Jun; 21(4):242-7.

[67] Smolders-de Haas H, Neuvel J, Schmand B, Treffers PE, Koppe JG, and Hoeks J. Physical development and medical history of children who were treated antenatally with corticosteroids to prevent respiratory distress syndrome: a 10- to 12-year follow-up. Pediatrics. 1990 Jul;86(1):65-70.

[68] Schalenbourg A, Leys A, De Courten C, Coutteel C, and Herbort CP. Corticosteroid-induced central serous chorioretinopathy in patients with ocular inflammatory disorders. Klin Monatsbl Augenheilkd. 2002 Apr;219(4):264-7.

[69] Spraul CW, Lang GE, and Lang GK. Central serous chorioretinopathy in systemic therapy with corticosteroids. Ophthalmologe. 1997 Jun;94(6):392-6.

000487

[70] Chaine G, Haouat M, Menard-Molcard C, Favard C, Vignal-Clermont C, Campinchi-Tardy F, Massin P, Gaudric A, Badelon I, Nicolon L, Sabatier P, and Guillevin L. Central serous chorioretinopathy and systemic steroid therapy] J Fr Ophtalmol. 2001 Feb;24(2):139-46.

[71] Song E, Wakakura M, and Ishikawa S. Central serous chorioretinopathy induced by corticosteroids. Nippon Ganka Gakkai Zasshi. 1997 Mar; 101(3):257-64.

[72] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume III, September 11, 2002, pages 311-435.

[73] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XI, September 18, 2002, pages 1369-1503.

[74] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XII, September 18, 2002, pages 1504-1673.

[75] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XIII, September 19, 2002, pages 1674-1787.

[76] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XIV, September 19, 2002, pages 1788-1961.

[77] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XV, September 20, 2002, pages 1962-2088.

[78] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XVI September 20, 2002, pages 2089-2176.

[79] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XVII September 23, 2002, pages 2177-2267.

[80] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume XVIII September 23, 2002, pages 2268-2432.

[81] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume

000488

XIX September 24, 2002, pages 2433-2522.

[82] State of Florida vs. Brian Patrick Herlihy in the Circuit Court of Florida
Eighth Judicial Circuit, Alachua County, Case No. 01-2000-CF-2753-A, Volume
XX September 25, 2002, pages 2523-2534.

64

000489

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                    CASE NO: 01-2000-CF-2753-A
        Plaintiff,             Division II

v.

BRIAN HERLIHY,
        Defendant.
_____/

## MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF

COMES NOW the State of Florida, by and through the undersigned Assistant

State Attorney, pursuant to Florida Rules of Criminal Procedure 3.850, and moves this

Court to strike or deny said Motion and as grounds states the following:

### STRIKE AS FACIALLY DEFICIENT

### Florida Rule of Criminal Procedure 3.850 (c)

1.    The Defendant's Rule 3.850 Motion for Post Conviction Relief

        (Defendant's Motion) is made pursuant to Florida Rules of Criminal

        Procedure 3.850.

2.    On August 10, 2005, the Defendant filed a previous 3.850 motion. That

        motion was denied without hearing, the Defendant appealed, and that

        denial was affirmed on April 24, 2006 by the 1st DCA.

3.    The Defendant's current Motion fails to include the reason or reasons why

        his current claim(s) was not raised in a prior motion.

4.    Fl. R. Cr. Pr. 3.850 (c) (4) requires that, "if a previous motion or motions

        have been filed, the reason or reasons the claim or claims in the present



motion were not raised in the former motion or motions."

5.      Since the Defendant's Motion fails to comply with Fl. R. Cr. Pr. 3.850 (c),

it should be stricken as facially deficient.

Fraud Upon the Court

6.      On page 6 of the Defendant's Motion, and continuing to page 7, the

Defendant states,

> "On or about November 2000, Mrs. Herlihy received
> seven-page report from Dr. Viera Scheibner, Principal Research
> Scientist, retired, providing an opinion to the affect [sic] that the
> child's double vaccination was a key factor in his death. Exh. #2.
>      Mrs. Herlihy provided defense counsel with the report on
> or about October 2000. (sworn affidavit of Mrs. Herlihy Exh. #1)
> counsel [sic] made no effort to contact Dr. Scheibner or consult
> anyone of expertise in the field of toxicology."

7.      The affidavit of Lois Herlihy states, "Dr. Viera Schreiber did the report

dated November 2000 and delivered it directly to Mr. Groland."  See

attachment A, sworn statement by Lois Herlihy.

8.      The Defendant's Exhibit #1 contradicts what the Defendant Motion claims

it purports.

9.      The Defendant's Motion says that Mrs. Herlihy received the report in

November of 2000, but provided the report to defense counsel in October

of 2000.  Mrs. Herlihy could not have provided the report to anyone in

October if she did not receive it until November.

10.      More importantly, the Defendant's Exhibit #2, which the Defendant's

Motion says is the report given to Gordon Groland in October of 2000 is

dated 11-07-06, which is about 6 (six) years later.  See page 7 of Dr.

Scheibner's report, attachment B, report by Dr. Viera Scheibner.

11.    Since the Defendant's Motion is factually deficient, and a fraud upon the

Court, it should be stricken.


### DENY MOTION WITHOUT HEARING

#### Florida Rule of Criminal Procedure 3.850 (f)

12.    Even if the Defendant's Motion were not facially deficient, the Court may

deny the Motion without a hearing pursuant to Fl. R. Cr. Pr. 3.850 (f)

since it is an abuse of the 3.850 procedure.

#### Fl. R. Cr. Pr. 3.850 (f)

**Successive Motions.** A second or successive motion may be
dismissed if the judge finds that it fails to allege new or different
grounds for relief and the prior determination was on the merits or,
if new and different grounds are alleged, the judge finds that the
failure of the movant or the attorney to assert those grounds in a
prior motion constituted an abuse of the procedure governed by
these rules.

13.    The Defendant's Motion is an abuse of the 3.850 procedure because the

Defendant has failed to assert that he did not know and could not have

known about the facts supporting this claim at the time he filed his initial

motion for relief.  In Christopher v. State, 489 So.2d 22 (Fla. 1986) the

Florida Supreme Court stated,

        "Further, the movant must show justification for the failure
to raise the asserted issues in the first motion.". (emphasis added)
"[E]ven if we were to accept Christopher's claim that his
allegations supporting his claim of ineffective assistance of counsel
were not previously decided on the merits, the motion is abusive
because Christopher has failed to assert that he did not know and
could not have known about the facts supporting this claim at the
time he filed his initial motion for relief."

14.    Since the Defendant's prior 3.850 motion alleged ineffective assistance of

counsel, this Court may summarily deny the Defendant's Motion which also alleges ineffective assistance of counsel. "Where an initial motion for post-conviction relief raises the claim of ineffective assistance of counsel, the trial court may summarily deny a successive motion which raises additional grounds for ineffective assistance of counsel." Card v. Dugger, 512 So.2d 829 (Fla. 1987).

15.   The Defendant's Motion should be denied without a hearing because, "he cannot raise claims of ineffective assistance of counsel on a piecemeal basis by filing successive motions." Ragan v. State, 643 So.2d 1175 (Fla. 3rd DCA 1994).

16.   In Frew v. State, 2007 WL 283468 (Fla. 2nd DCA 2007) the 2nd DCA on Feb. 2, 2007, in an unreleased opinion states that, "This discretionary ability does not apply when the previous motion was summarily denied or dismissed for legal insufficiency." Frew relies upon McCrae v. State, 437 So.2d 1388 (Fla. 1983) which was decided prior to the current Fl. R. Cr. Pr. 3.850.

17.   The Florida Supreme Court in Christopher, 489 So.2d 22 (Fla. 1986) recognized that the amended Fl. R. Cr. Pr. 3.850 permitted dismissal of cases that could not be dismissed under McCrae.

   "Thus, rule 3.850 now allows, in certain circumstances, the sentencing court to summarily dismiss a successive motion for post-conviction relief that raises a new ground that was not previously decided on its merits…[T]he doctrine was previously limited to providing for summary dismissal of issues contained in a successive motion that were or could have been raised on direct appeal, and those issues which had previously been decided on their merits. McCrae The abuse of the procedure doctrine, as

recently codified in rule 3.850, is now expanded to allow a court to summarily deny a successive motion for post-conviction relief unless the movant alleges that the asserted grounds were not known and could not have been known to the movant at the time the initial motion was filed." Christopher, 489 So.2d 22 (Fla. 1986).

18. The 4th DCA in Hyacinthe v. State, 940 So.2d 1280 (Fla. 4th DCA 2006), held that, "The abuse of process doctrine does not apply where the trial court has not previously ruled on the merits of a post-conviction claim in the case and the movant seeks to raise new claims in a different motion."

19. Frew and Hyacinthe are factually distinct from the instant case in that the Defendant's prior summarily denied 3.850 motion was reviewed and affirmed by an Appellate Court while Frew and Hyacinthe did not have their denial's appealed.

Availability of Witnesses Not alleged

20. The Defendant's Motion fails to allege that his witness(es) were available for trial as required by the Florida Supreme Court. Nelson v. State, 875 So.2d 579, 584 (Fla. 2004).

21. If the Defendant's Motion is denied for this reason, he should be given a specified time period to amend the Motion.

WHEREFORE, the undersigned counsel respectfully request this Court strike the Defendant's Motion, or in the alternative deny the Defendant's Motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished to John Kearns, Office of the Public Defender, Defendant's Attorney by
interoffice mail this 13th day of February, 2007.

Respectfully Submitted,

WILLIAM P. CERVONE
State Attorney

Michael L. Becker
Assistant State Attorney
Florida Bar No. 0270740

STATE OF FLORIDA
COUNTY OF _____ *Broward*

#02-2753-CF-A

I, Lois Herlihy am the mother of the defendant in this cause, Brian Herlihy

On or about *October*, 2000 I contacted Gordon Groland and authorized him to request and pay for a report from Dr. Viera Schreiber and requested him to consider the same. Dr. Viera Schreiber did the report dated November 2000 and delivered it directly to Mr. Groland.

I was subsequently informed by Dr. Schreiber that counsel Groland did not contact her regarding the report and her willingness to assist in my son's defense.

Lois Herlihy

## OATH

I hearby swear under the penalty of perjury that the facts and matters setforth herin are true and correct. Signed and dated this __14__ day __July__, 2006

Notary Name and seal: _____

S. UMPIERRES
MY COMMISSION # DD220050
EXPIRES: June 5, 2007
Bonded Thru Western Surety Co

J.K. "BUDDY" IRBY
CLERK OF COURTS
ALACHUA COUNTY, FL.

2006 AUG 25 PM 2: 55

FILED
CK 45

000496

# REPORT ON VACCINE INJURIES OF BABY ROBERT QUIRELLO

By Dr Viera Scheibner.
Principal Reasearch Scientist, Retired

The events of the 2nd of August 2000,
based on Mr Herlihy's statements to the police
------------------------------------------------

On 2nd of August 2000, Brian Patrick Herlihy (therafter Brian),
the defendant, was busy with dipping and washing his dogs on the
balcony of his house when Crystal Quirello (thereafter Crystal),
the mother of the diseased baby Robert Quirello (thereafter
Robbie), walked in and asked Brian to look after her baby, while
she was going to attend to some errands.

After washing his hands, Brian took the baby, kissed his forehead
and said "Hey, Buddy, how are you?" Robbie laughed and smiled at
Brian. During a brief conversation with Crystal, Robbie started
to fuss and Brian asked Crystal when he last ate. Crystal said
"About 5 minutes ago".

"Robbie had a little spit up on his outfit which was unusual".
Brian then made Robbie's bottle and started feeding him. Crystal
seemed in a hurry to go. She also wanted for all of them to go
to Cedar Key for the afternoon. Brian did not want to go. When
changing Robbie's nappy, Brian commented how tight Robbie's one-
sy was and Crystal said "take it of him then". When Brian took
the one-sy off Robbie he noticed "red blotches all over his back,
chest and stomach". Crystal said "He gets heat rash real bad".
"I've never seen heat rash like that. Crystal did not seem
alarmed, so I left it go" Brian wrote. During a short discussion
with Crystal about whether Brian should take a shower, Brian
noticed Robbie spitting up and wiped him up. Brian did not want
to leave Robbie alone while taking the shower. Crystal was in a
hurry and asked Brian to walk her down to his truck which she was
going to use for her errands. When Brian objected, she said "he
[Robbie] will be fine". When Brian got back to his bedroom after
walking Crystal to his truck, Robbie "had formula all over his
mouth and running along his neckline, so I grabbed his burping
cloth and wiped it up. He seemed a little 'dazed'. I did not see
Crystal "burp " him after she gave him the rest of the bottle and
wondered if she had. I picked him up and burped him. He had a
little one, but spit up a lot of formula. I played with him
and picked him up and plopped him down on the pillow on his back.
It wasn't rough, I always swing him and play with him like that
and had no problems before". After propping Robbie up on his
bed, Brian asked Robbie to say "goo" for him, which Robbie did
after a few times being asked, and Brian then went to the toilet.
About five minutes later, Brian was back with Robbie and saw that
he rolled over so that he could only see his feet. Robbie was
not moving and Brian pulled him up. He shook him slightly
once to see if he was asleep, and said "Robbie! wake up! Are you
all right?", then blew in his face to see if his eyes would open.

1

000497

"His arms got real relaxed his eyes were closed and I heard him gurgling. I felt myself started [sic] to panic. I felt his heartbeat, but he wasn't breathing. I couldn't believe this was happening. I cradled him in my left arm and gave him a breath, placing my mouth over his nose and mouth. It was a puff and watched his chest to see if it would rise and fall, but with short puffs like that it's hard to tell. I waited a few seconds and gave him another breath. I got no response. I felt helpless and said "Please, Robbie, don't die baby". I had to call 911, but I don't have a phone in my room" To find the phone. Brian placed Robbie down on the pillow and ran dowstairs and hit the pager button on the cordless phone and heard the phone beeping in the bedroom. Brian ran back and found the phone. He grabbed it and gave Robbie a quick breath and called 911. "I told them I had a 3 and 1/2 months old who was unresponsive and not breathing. They told me to give him rescue breaths, I told them I was and wasn't getting a response. I was crying and they asked me what the address was, I told them and then Robbie began to have formula pouring out of his mouth and nose. I placed him on the floor and laid him on his side so if he started breathing he wouldn't aspirate on it. I saw red in the formula that was coming up of his nose. I told 911 this and they were telling me rescue was on its way. They asked me to do a 'finger sweep' which I did and said to Robbie "Please don't die". Brian also said words to the effect why did this had to happen today? When he saw paramedics going to the wrong building he ran out and directed them to his house. One medic said "I don't have the right stuff" and left and the other was fumbling around and nobody was breathing for Robbie. So, Brian grabbed the resuscitation bag and placed the mask over Robbie's nose and mouth and gave him a breath himself. The medic then tried to put the equipment together to use on Robbie. The bike-patrol medics arrived and pulled Brian out of the room and tried to console him. He told them that Crystal was his girlfriend and Robbie was her son and that she went out to run an errand. Soon after Crystal arrived and when she saw the medics working on Robbie started crying. Brian told her "I'm sorry I left him alone, I failed you and Robbie".

I leave the diary here. It provides a perfectly plausible story. Only an innocent person would communicate this way, including saying the last words about being sorry for leaving Robbie alone while it was clear that the baby was only left alone for about 5 minutes while Brian went to the toilet, and was womiting right after being dropped off by his mother Crystal and nothing that happened or could have happened in those 5 minutes would have caused the observed serious symptoms.

### WHAT CAUSED BABY ROBBIE TO VOMIT AND DEVELOP BRAIN AND RETINAL HAEMORRHAGES?

Robbie was born on March 22, 2000, slightly premature at 36 weeks gestation. There was a birth trauma there: broken clavicle.

However, he seemed to be doing reasonably well and was given his first set of 6 vaccines on May 9, 2000, when 7 weeks old. It was

2

the following vaccines:

DTaP1 (three in one); SKB a918 ac L leg
OPV/IPV1 (undifferentiated Connaught RO668 L leg
Hib1; Connaught VA510AA R leg
HepB1; SKB 3198AZ R leg

On 19 July, 2000, Robbie was given the second set of 6 vaccines
as follows:

DTaP2 SKB 956A2; R thigh
OPV/IPV2 Connaught R1433 R thigh
Hib2 Lederle 468487 L thigh
HepB2 SKB 3198A2 L thigh

There is no record of a dose of hepB at birth. It does not mean
that he was not given this vaccine at or shortly after birth.

The diary of events available to me does not contain any
information about any possible reactions to the first lot of 6
vaccines as above. This does not mean that there were no
reactions, clinical or subclinical.

The documented symptoms suffered by baby Robbie, appear to have
occurred 14 days after the second lot of 6 vaccines. This is not
unusual, because the so-called delayed vaccine reactions are a
rule rather than an exception, as documented by Wilkins (1988).
Wilkins (1988) documented that if reactions to vaccines are
triggered by the formation of circulating immune complexes, then
the reactions would not occur immediately. She stated: "...If
one assumes that the adverse reaction to the DPT vaccine may
result from an immunologic intravascular complexing of
particulate antigen (whole-cell or disrupted pertussis organisms)
with specific antibody to produce a Jarisch-Herxheimer reaction,
then the adverse reaction may not occur within 24 hours of
inoculation...If the postinoculation interval is extended to 2
weeks, an additional 93 case infants (now representing a total of
98 case infants) might have been at risk for an adverse reaction
to DTP vaccine." And: "The DTP vaccine will not be exhonorated
from causing an infants' sudden death until, tissues from suspect
infants have been examined and shown not to contain insoluble
immune complexes to pertussis antigen."

As demonstrated by Lewis et al. (1986), administration of the DPT
vaccines does result in the formation of vaccine-specific
circulating immune complexes (CIC's). They described petechial
and urticarial rash in a 4-months old baby 5 hours after given
DTP vaccines. Subsequent antigenic analysis of the CIC's showed
them to be composed of vaccine-specific antigens with
complementary antibodies. They also described the test which
detects such antibodies. The test for these CIC's has not been
done in the case of baby Robbie. As shown by the available
records, baby Robbie had his torso covered with urticaria
(described by Brian as "red blotches") when Brian undressed him
and it is reasonable to conclude that the rash was one of the

3

signs of the CIC's development; moreover, the rash could have developed already after his first dose of 6 vaccines as above, particularly since his mother told Brian that baby Robbie suffered what she called "heat rash". It is quite likely that that's what she was told by a doctor when she inquired about the persistent rash, namely, that it was only a heat rash.

Torch (1982 and 1986a, and 1986b) demonstrated that DPT vaccines cause infant deaths and brain encephalopathy which includes brain haemorrhages. Not only he demonstrated that there are increasing numbers of deaths with the increasing interval from the DPT injections, he also described brain oedema and haemorrhages caused by these vaccines.

Acellular pertussis vaccine of the type given to Robbie, is advertised as less reactogenic than the whole-cell pertussis vaccine. However, this vaccine caused unexpectedly high level of neurological reactions, such as the hypotonic-hyporesponsive episodes in the Swedish babies who participated in the so-called Swedish Trial of the acellular vaccines. They expected 20 deaths and experienced 45 (plus one accidental death). None of these deaths occurred before vaccination, even though a group of babies was given the first dose at 2 months and another group at 3 months. I emphasise, not a single death occured before vaccination. 45 deaths instead of the expected 20 is highly significant, yet all were judged as unrelated to vaccination (Olin et al. 1997). Importantly, the trial protocol only allowed for reactions that occurred wthin 48 hours of vaccination. This means, that the actual rate of reactions was more in the order of a rate 50-times that which was recorded and admitted (as demonstrated by Wilkins 1988; see above).

Retinal haemorrhages caused by hepatitis B vaccines were described by Devine et al.(1996). They described a case of a young man who developed retinal haemorrhages after both the first and second injections of this vaccines. The authors concluded that the causal relationship was indicated by the close proximity to the vaccine (1 week) and the reappearance of the retinal haemorrhages after the second dose.

Interestingly, Goldwater et al. (1990) described tests which clearly differentiate babies who died from trauma from those who died without any trauma, such as SIDS. They tested sera from babies who died from trauma and from those who died as SIDS for cross-linked degradation products (XLFDPs) using D-Di test (Diagnostica Stago, Asnieres, France) which utilizes a monoclonal antibody directed against the fibrin degradation product, D-dimer molecule. The mean XLFDP levels for SIDS sera was 1792 mgL (SD +-1498) and from controls sera was 56.6mgL (SD=-34.9). The high levels of XLFDP seen in sera of SIDS cases most probably reflect a massive consumptive coagulopathy. Even though the authors admitted that pathogenic mechanism underlying this is uncertain, they wrote that it is possible that in some cases it may be related to bacterial toxaemia. This would concur with their previous findings (Bettelheim et al. 1989) of toxigenic

4

Escherichia coli isolation from the intestine contents of SIDS cases. Importantly, intravascular coagulation is known to occur in other conditions caused by E. coli verotoxins, including haemolytic uraemic syndrome, the pathogenesis of which involves platelet aggregation and embolisation (with normal platelet count), which then results in haemorrhages into internal organs.

Vaccines and antibiotics are known toxic substances which cause proliferation of toxigenic E. coli in the gut.

Again, such tests for the presence of toxigenic E. coli (the Limulus test) have not been performed on baby Robbie.

Vaccines contain a number of substances which are toxic, starting with foreign proteins (antigens): bacteria and viruses or their protein envelopes) and continuing with formaldehyde, aluminium phosphate and aluminium hydroxide, mercury compounds and other toxic substances called adjuvants, which are known to cause anaphylactic (=hypersensitvity) reactions (Parfentjev 1955; Gupta et al. 1995 and many others). Far from providing immunity, vaccine injections actually increase the susceptibility of the recipients to the disease which the vaccines are supposed to prevent, and also to other, unrelated, bacterial and viral infections. This explains the well-documented 300% increase in the reported cases of whooping cough after 1978 when the individual US states mandated the DPT vaccines and which affected mainly the 2 to 6 months old babies, the well-vaccinated age group, as well as regular epidemics in vaccinated populations (Hutchins et al. 1988). This also explains the very high incidence of ear infections, bronchiolitis and other respiratory infections in the recipients of vaccines (Craighead 1975).

Vaccines, such as the whooping cough (pertussis) vaccine are actually used in animal experiments to induce the so-called experimental allergic encephalomyelitis (Levine et al.1966). As shown by Behan et al.(1973), such encephalomyelitis may be connected with brain haemorrhaging (=haemorrhagic encephalomyelitis). There are a number of mechanisms that explain this process, disseminated vasculomyelinopathy being one of them (Reik 1980). Also, Reik (1980) stated that the numerous central nervous system abnormalities which follow antecedent infections and vaccinations appear to share a common pathogenesis involving the immune system. Antigen-antibody complexes are formed following the introduction of foreign antigen by injection or inoculation cause vascular injury with secondary damage to myelin.

In 2001 and 2004, I have published two articles in Journal of Australasian College of Nutritional and Environmental Medicine (J ACNEM) in which I elaborate on material issues of vaccine reactions such as suffered by baby Robbie. Both are enclosed with this report.

5

SUMMARY OF MY FINDINGS OF THE CAUSE OF ROBBIE'S INJURIES

The diary of events as described in detail by Brian Herlihy is
plausible and clearly indicates that there was no shaking of
Robbie that could have caused any injury, neither before or after
the documented serious neurological symptoms appeared.   The
appearance of serious neurological symptoms, preceded by
vomiting, can plausibly and clearly be explained as linked to the
documented vaccine administration and did not require any
physical violence.   Brian only attempted to revive Robbie after
he developed serious neurological signs and gave him competent
resuscitation by gently puffing breaths into him and, when the
medics arrived, by correctly using the bag while one of the
medics was fumbling around.

It is well-documented in medical records that Robbie was given a
multitude of vaccines starting as early as at 7 weeks of his
short life, and, again at about 3 months of his age.   Twelve
vaccines in all.   This represented a potent toxic cocktail, 6ccm,
in short succession, just over 2 months apart.   Most vaccines
given to babies contain merthiolate (a mercury derivate) which
cumulatively may exceed the safe level of such toxic substance.
And this is before we even take into consideration the amount of
foreign proteins (antigens) and other toxic substances which such
vaccines contain.   According to immunological research, vaccine
injections do not immunise: rather they sensitise, make the
recipients more susceptible to the disease which the vaccine is
supposed to prevent and also to a host of unrelated bacterial and
viral infections (Parfentjev 1955, Craighead 1975).   To enhance
the immune response, vaccines contain adjuvants, which are toxic
substances and which further enhance the sensitisation effect of
the foreign antigens in the vaccines.   According to Gupta et al.
(1993), adjuvants in themselves are toxic and cause undesirable
side effects.   Some of the side effects can be ascribed to
unintentional stimulation of different mechanisms of the immune
system, while the others may reflect the known general adverse
pharmacological reactions.   It is a compromise between a
requirement of adjuvanticity and what is considered an acceptable
level of side effects.   However, such compromise does not make
the adjuvants any safer.

This is enough to cause brain and retinal haemorrhages in small
babies such as baby Robbie.   This also explains why the US has
such a high infant mortality rivalling the rates in the Third
World: it is the mandatory vaccination, resulting in some 98% of
all US babies being vaccinated with such toxic substances.   Until
about 1990, the "recommended" (=mandated) vaccines included only
DTP and Polio, vaccines (4 in all) at 2, 4, and 6 months of age.
The pathological findings in the babies who died from such
vaccines were minimal: mostly petechial haemorrhages into the

6

lungs, pericardium, thymus and other organs. Since 1990s, babies are given DTP, Polio, Hib and hepB vaccines. This explains why the pathological findings these days include brain and retinal haemorhages, instead of just the minimal pathological finding of petechial haemorrhages. The Hib vaccine causes meningeal (subdural or subarachnoid) haemorrhages because the Haemophilus influenzae type B bacterium has a predilection for meninges (it causes meningitis). Retinal haemorrhages as a rule accompany such meningeal haemorrhages because of a direct anatomical connection between the brain and the eyes. The HepB vaccine does not make the situation any better, quite to the contrary. Indeed, hepB vaccination of newborns resulted in SIDS moving into the first days of life. That could have been the reason why the American Academy of Pediatrics (AAP) and one stage withdrew the recommendation for hepB vaccination of the newborn babies and changed it instead to a recommendation to start with the hepB vaccine at 6 months. This, of course, would almost completely camouflage the lethal effect of this vaccine.

In conclusion, baby Robbie's injuries and death were caused by the 12 vaccines which he received within his short 3 and a half months life.

The concept of the Shaken baby syndrome as a cause of the type of injuries as experience by Robbie is on shaky ground. Indeed. I Leadbeater & James (1955) questioned the relevance and strength of the evidence which is supposed to support the concept. They concluded that it seems premature to warn against an act of violence when its precise mechanism of action is not clearly defined, its potential for serious trauma in the absence of concomitant impact is not supported by existing experimental data, and the clinical findings said to result from it are not in themselves specific.

11. 67.06

7

000503

References

Wilkins, J. 1988.  What is 'significant' and DTP reactions (a letter).  Pediatrics; 81(6): 912

Lewis, K., Jordan, S.C., Cherry, J.D., Sakal, R.S., and Le, C.T. 1986.  Petechiae and urticaria after DTP vaccination: detection of circulating immune complexes containing vaccine-specific antigens.  J Pediatrics; 1009-1012.

Torch, W.C. 1982.  Diphtheria-pertussis-tetanus (DPT) immunization: a potential cause of the Sudden-Infant Death Syndrome (SIDS).  Neurology; 32(2): A169-170.

Torch, W.C. 1986a.  Characteristics of diphtheria-pertussis-tetanus (DPT) postvaccinal deaths and DPT-caused Sudden-Infant-Death Syndrome (SIDS): A review.  Neurology; 36: 148.

Torch, W.C. 1986b.  Diphtheria-pertussis-tetanus (DPT) immunization may be an unrecognized cause of Sudden-Infant-Death (SIDS) and Near-Miss Syndrome (NMS): 12 case reports.  Neurology; 36: 149.

Olin, P., Rasmussen, F., Gustafsson, L., Hallander, H.O. et al. 1997.  Randomised controlled trial of two-component, three-component and five-component acellular pertussis vaccines compared with whole-cell pertussis vaccine.  Lancet; 350: 1569-1577.

Devin, R., Roques, G., Disdier, P., Rodor, F., and Weiller, P.J. 1996. Occlusion of central retinal vein after hepatitis B vaccination.  Lancet; 347: 1626.

Goldwater, P.N., Williams, V., Bourne, A.J., and Byard, R.W. 1990.  Sudden infant death syndrome: a possible clue to causation.  Med J Australia; 153: 59-60.

Bettelheim, K.A., Smith, D., Goldwater, P.N., and Bourne, A.J. 1989.  Toxigenic Escherichia coli associated with sudden infant death syndrome.  Med J Australia; 151: 538.

Parfentjev, I.A. 1955.  Bacterial allergy increases susceptibility to influenza virus in mice.  Proc Soc exp Biol & Med: 373-

Gupta, R.K., Relyved, E.H.,. Lindblad, E.B., Bizzini, B. et al. 1993.  Adjuvants - a balance between toxicity and adjuvanticity. Vaccine; 11(3): 293-306.

Hutchins,S.S., Cochi,S.L., Brink, E.W., Patriarca, P.A. et al. 1988. Current epidemiology of pertussis in the United States. Tokai J exp & clin Med; 13 (Suppl): 103-109.

8

Craighead, J.E. 1975.  Report of a workshop: disease accentuation after immunization with inactivated microbial vaccines.  J infect Dis; 1312(6): 749-754.

Levine, S., Wenk, E.J., Devlin, H.B., Pieroni, R.E. et al. 1966. Hyperacute allergic encephalomyelitis: adjuvant effect of pertussis vaccine and extracts.  J Immunol; 97(3): 363-368.

Behan, P.O., Moore, M.J., and Lamarche, J.B. 1973.  Acute necrotising hemorrhagic encephalopathy. Postgrad Med; 54: 154-160.

Reik, L. Jr. 1980.  Disseminated vasculomyelinopathy: an immune complex disease.  Ann Neurol; 7: 291-296.

AAP (Committee on infectious diseases and Committee on Environmental Health), 1999. Thimerosal in vaccines - an Interim Report to clinicians.  Pediatrics; 104(3): 570-574.

Leadbeater, S., and James, R. 1955.  The shaken infant syndrome. Shaking alone may not be responsible for damage.  Br med J; 310: 1600.

Scheibner V. 2001.  Diagnosis of shaken baby syndrome on shaky ground.  J ACNEM; 22(2): 5-8 &15.

Scheibner V.  2004.  Dynamics of critical days as part of the dynamics of non-specific stress syndrome discovered during monitoring with Cotwatch breathing monitor.  J ACNEM; 23(3): 10-14.

9

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT,
IN AND FOR ALACHUA COUNTY

STATE OF FLORIDA,          CASE NO.: 01-2000-CF-002753-A
      Plaintiff,         DIVISION: II

vs.

BRIAN PATRICK HERLIHY,
      Defendant.
_____/

## ORDER DIRECTING STATE TO FILE A WRITTEN RESPONSE

THIS CAUSE having come upon the Defendant's Rule 3.850 Motion for Post-Conviction Relief, it is hereby,

ORDERED that the State shall file a written response to the Defendant's Motion within 10 days of the date of this order.

DONE AND ORDERED in Chambers this 13 day of February, 2007, in Gainesville, Alachua County, Florida.

Martha Ann Lott
Circuit Court Judge

Copies to:
Michael Becker, Assistant State Attorney
Brian Herlihy, Defendant

FILED
CK 11
2007 FEB 19 PM 12: 29
J.K. "BUDDY" IRBY
CLERK OF COURTS
ALACHUA COUNTY FL

000506





IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN AND
FOR ALACHUA COUNTY, FLORIDA

CASE NO.: 01-2000-CF-002753-A

DIVISION: II

STATE OF FLORIDA,
        Plaintiff,

vs.

BRIAN PATRICK HERLIHY,
        Defendant.

_____/

### DEFENDANT'S RESPONSE TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF

COMES NOW, the Defendant, BRIAN PATRICK HERLIHY, by and through the undersigned counsel, and hereby files Defendant's Response to Motion to Strike, or in the Alternative, State's Response to Defendant's Rule 3.850 Motion for Post Conviction Relief, and and in support thereof, states as follows:

### RESPONSE TO MOTION TO STRIKE

1.      The State has moved to strike the Defendant's Rule 3.850 Motion for Post Conviction Relief (hereinafter referred to as the "Defendant's Motion"). In so doing, the State contends that Defendant's Motion failed to comply with Fla.R.Crim.P. 3.850(c)(4) insofar as it did not include the reason(s) why the current claim(s) had not been raised in a prior motion. The State's contention is without merit. First, the prior motion did not present a cognizable ground for relief or make a prima facie showing of prejudice, and thus, was facially insufficient. *See* Defendant's Motion at 3. Given that the prior motion was facially insufficient, the State cannot now demand that Defendant's [current] Motion be stricken pursuant to Rule 3.850(c)(4). Also,



Defendant's Motion is effectively based upon a claim of actual innocence and as such, should be afforded a fair hearing. *See* Defendant's Motion at 3-6.

2.    Further, Defendant submits that even assuming *arguendo* it were necessary for Defendant to present reasons why his current claim(s) had not been raised in a prior motion, that he did so sufficiently in Defendant's Motion, especially in light of the *pro se* nature of his filing and the limited amount of practical guidance on point to be found in Florida Supreme Court jurisprudence. As Defendant's Motion was filed *pro se*, he respectfully requests that this Court construe Defendant's Motion liberally, in his favor, as is appropriate in these circumstances. *See e.g.*, Willis v. State, 840 So.2d 1135, 1136 (Fla. 4th DCA 2003). *See also*, Haines v. Kerner, 404 U.S. 519 (1972).

3.    Likewise without merit is the State's argument that Defendant has attempted to commit a fraud upon the Court. Specifically, the State argues that Defendant tried to mislead this Court into thinking that Defendant's mother received a report from Dr. Viera Schreiber on November 2000, and thereafter provided it to defense counsel on or about October, 2000. However, this argument defies credulity and common sense. Surely, no one in their right mind would ever *intentionally* try to convince a learned Judge that a report initially received in November, 2000, thereafter was sent on to defense counsel in October, 2000, prior to its initial receipt. Obviously, this is a scrivener's error. Defendant requests that it be regarded as such and asks that this Court keep in mind the limited rights and resources afforded to him as an inmate in the Florida correctional system. Indeed, Defendant arranged for his Court submission to be typed by a third party, and as a non-lawyer, made a couple of layman's mistakes in putting it together. These include failing to explain how the copy of Dr. Schreiber's report attached as Exhibit #2 came to be redated November 7, 2006, presumably when the doctor had a copy of it

2

re-run for purposes of attaching it to Defendant's Motion, as the incarcerated Defendant did not have direct access to the original report printed out and furnished to his defense counsel many years before. Defendant submits that none of these *pro se-esqe faux pas* rise to the level of a fraud upon the Court, and requests that he be permitted to correct and clarify these matters for the Court to the extent necessary.

4. Accordingly, Defendant requests that this Honorable Court determine, on the face of the record, or after evidentiary hearing, if the Court deems it necessary, that Defendant's Motion, filed pro se, satisfies the requirements of Rule 3.850, and that the State's Motion to Strike should be denied.

## RESPONSE TO STATE'S REQUEST THAT COURT DENY MOTION WITHOUT HEARING

5.. In its response, the State argues that Defendant's Motion should be denied without a hearing as an abuse of the Rule 3.850 procedure. In so doing, the State primarily relies on the same argument(s) refuted by Defendant in Paragraphs 1 and 2, *supra*; for all of the reasons previously discussed therein, the State's argument is without merit. Where, as here, a prior motion is legally insufficient, Defendant should be entitled to Rule 3.850 relief regardless of whether he did not know and could not have known about the facts supporting his claim at the time of filing his initial motion for relief. *See e.g.*, McCrae v. State, 437 So.2d 1388 (Fla. 1983) *and case law cited in* State's Motion to Strike, *etc.* at Paragraph 16. This is consistent with the analogous trend in Florida jurisprudence to recognize that manifest justice supports a defendant's ongoing efforts to obtain Rule 3.850 relief. *Compare* Hunt v. State, 922 So.2d 452 (Fla. 4th DCA 2006). Hence, Defendant should be permitted to proceed under Rule 3.850 in this "actual innocence" case, be it under the regular framework of the Rule and/or in the interest of furthering "manifest justice."

3

6.    In its response, the State acknowledges recent and seemingly authoritative case law on point that is favorable to Defendant on the above issue, including <u>Hyacinthe v. State</u>, 940 So.2d 1280 (Fla. 4th DCA 2006), wherein the Fourth District held that, "The abuse of process standard does not apply where the trial court has not previously ruled on the merits of a post-conviction claim in the case and the movant seeks to raise new claims in a different motion." However, the State makes a feeble attempt to distinguish the case law favorable to Defendant on the grounds that Defendant's prior, facially insufficient motion was appealed, whereas <u>Hyacinthe</u>, *et al.*, did not have their denials appealed. Such a distinction is baseless because no amount of activity in the Court of Appeals can redress the harm done to a Defendant by the submission of a facially insufficient Rule 3.850 motion, to wit:  0 + 0 still equals 0.  Thus, Defendant requests that this Court follow the precedent of <u>Hyacinthe</u> *et al.*, and that the State's argument(s) be soundly rejected by this Court.

7.    Finally, the State contends that Defendant's Motion fails to allege that his witness(es) were available for trial as required by the Florida Supreme Court. *See* <u>Nelson v. State</u>, 875 So.2d 579, 584 (Fla. 2004).  However, this contention is inapposite as Defendant's claim is not that defense counsel failed to call present witnesses; but rather, that defense counsel failed to conduct reasonable pretrial investigation, that would have presented evidence of causation of death. This failure deprived Defendant of a fair trial. Defendant's Motion sets forth the proper standard of review under these circumstances and states a cognizable claim for relief. *See* Defendant's Motion at 38. In the case at bar, Defendant's Motion demonstrated how defense counsel could have discovered exculpatory evidence that would have acquitted Defendant had defense counsel not ignored the report of Dr. Schreiber. Each witness is addressed and a detailed

4

analysis provided. Id.   Accordingly, Defendant's Motion satisfies the requirements of Rule 3.850 in this regard.

8.   To the extent that this Honorable Court may find that Defendant's Motion, submitted *pro se*, is deficient in any manner, Defendant requests that he be given a specified time period to amend.

WHEREFORE, Defendant, BRIAN HERLIHY, respectfully requests that this Honorable Court deny the State's Motion to Strike, and grant Defendant's Motion and/or such other relief as this Court deems just as proper.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via facsimile and U.S. mail on the Office of the Public Defender, P.O. Box 2820, Gainesville FL 32602, and the Office of the State Attorney, 120 W. University Ave., Gainesville FL 32602, on this 16 day of May, 2007.

By _____
Mary Elizabeth Fitzgibbons Esq.
Fitzgibbons Law Firm, P.A.
12 S. Orlando Ave.
Kissimmee, Florida 34741
Phone:  407 343-1777
Fax:     407 343-1677
Fla Bar No.: 0056480
Attorney for Defendant

5

000511

## **OATH**

Under penalties of perjury, I declare that I have read the foregoing response, and that the facts stated in it are true.

Brian Patrick Herlihy

07 MAY 17 PM 12: 59
CLERK OF THE CIRCUIT COURT
& COUNTY COURT
ALACHUA COUNTY FL

6

src

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                          CASE NO: 01-2000-CF-2753-A
        Plaintiff,                          Division II

v.

BRIAN HERLIHY,
        Defendant.

_____/

### STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF, RESPONDING TO DEFENDANT'S RESPONSE OF MAY 16, 2007

COMES NOW the State of Florida, by and through the undersigned Assistant

State Attorney, pursuant to Florida Rules of Criminal Procedure 3.850, in response to

Defendant's Response to Motion to Strike, or in the Alternative, State's Response to

Defendant's Rule 3.850 Motion for Post Conviction Relief (Defendant's Response) and

moves this Court to deny Defendant's 3.850 Motion without a hearing, and as grounds

states the following:

1.      The Defendant's Response, paragraph 7, states, "However, this contention

is inapposite as Defendant's claim is not that defense counsel failed to call

present witnesses; but rather, that defense counsel failed to conduct

reasonable pretrial investigation, that would have presented evidence of

causation of death." (emphasis added)

2.      The claim that Defendant's trial counsel failed to present evidence of

causation of death is refuted by the trial transcript at page 1501, line 21 –

page 1502, line 2, Q: Okay. What is your opinion as to the cause of



3.52

Robbie Quirello's death?  A: My opinion as to the cause of his death is

that he died from cerebral anoxia.  Q: Caused by what?  A: Either

vomiting with obstruction of his airway, or seizing associated with

vomiting, obstructing his airway.

3.    Defendant's trial counsel's alternate theory of causation of death is also

shown in the trial transcript by:

A.   Testimony of defense expert, Dr. John Plunkett at: page 1218 line 3 –

page 1219 line 25, page 1222 line 14 – page 1225 line 14, page 1230

line 7 – 23, page 1245 line 15 – page 1247 line 24, page 1288 line 2 –

20, page 1319 line 19 – page 1320 line 24, page 1325 line 25 – page

1327 line 13.  See attached.

B.   Testimony of defense expert, Dr. Ronald Uscinski at: page 1404 line

20 – page 1405 line 11, page 1407 line 11 – page 1408 line 1, page

1416 line 5 – page 1424 line 24, page 1447 line 2 – 18, page 1450 line

11 – 22, page 1486 line 22 – 24, page 1493 line 18 – 19, page 1500

line 9 – 11.  See attached.

4.    Since the Defendant's claim is refuted by the record, it should be denied

without a hearing.

WHEREFORE, the undersigned counsel respectfully request this Court deny the

Defendant's Motion without a hearing.


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished to Mary Fitzgibbons, Defendant's Attorney, 12 S. Orlando Ave., Kissimmee,

FL 34741 by U. S. mail this 20th day of June, 2007.

Respectfully Submitted,

WILLIAM P. CERVONE
State Attorney

Michael L. Becker
Assistant State Attorney
Florida Bar No. 0270740

1205 Sr̄

1          IN THE CIRCUIT COURT OF FLORIDA
           EIGHTH JUDICAL CIRCUIT
2          IN AND FOR ALACHUA COUNTY

3               CASE NO: 01-2000-CF-2753-A

4          TRANSCRIPT ON APPEAL
                  VOLUME X
5          (Pages 1205 - 1368)

6    STATE OF FLORIDA

7    vs.                          Volume XIII

8    BRIAN PATRICK HERLIHY,       1002-4788

9          Defendant.

10   _____/

11   Proceedings:        Jury trial

12   Before:             The Honorable Martha Ann Lott,
                         Circuit Judge
13
     Date:               September 17, 2002
14
     Time:               1:00 p.m.
15
     Place:              Courtroom 4-A
16                       Alachua County Courthouse
                         Gainesville, Florida
17
     Reporter:           Stacey K. Bryant,RPR
18                       Judicial Court Reporter

19   APPEARANCES:

20       Jeanne Singer, Assistant State Attorney
         Stephen Pennypacker, Assistant State Attorney
21       120 W. University Avenue
         Gainesville, Florida 32608
22          Appearing on behalf of the State of Florida

23       Gordon Groland, Esquire
         John Tedder, Esquire
24       Post Office Box 2848
         Gainesville, Florida 32602
25          Attorneys for defendant

*(stamp, right margin)* CLERK OF CIRCUIT COURT & COUNTY COURT ALACHUA COUNTY FL  03 MAY -1 PH 1:19

Stacey K. Bryant, RPR
Judicial Court Reporter

1206

1 INDEX TO PROCEEDINGS

2

3 PRELIMINARY MOTIONS: .............................. 1207

4

5 DEFENDANT'S CASE:

6

7 DR. JOHN PLUNKETT,

8 DIRECT EXAMINATION BY TEDDER: ..................... 1211
CROSS-EXAMINATION BY SINGER: ...................... 1254
9 REDIRECT-EXAMINATION BY TEDDER: ................... 1304
RECROSS-EXAMINATION BY SINGER: .................... 1328

10

11 STATE'S CASE:

12

13 DR. LAWRENCE LEVINE,

14 DIRECT EXAMINATION BY PENNYPACKER: ............... 1330
CROSS-EXAMINATION BY TEDDER: ...................... 1351
15 REDIRECT-EXAMINATION BY PENNYPACKER: ............. 1363

16

17 INDEX TO EXHIBITS

18

19 DEFENSE EXHIBIT NO. 3....MARKED IN EVIDENCE....... 1217

20 DEFENSE EXHIBIT NOS. F, G..MARKED FOR I.D......... 1226

21 STATE'S EXHIBIT NO. 64...MARKED IN EVIDENCE....... 1334

22 STATE'S EXHIBITS G, H, I, AND J..MARKED FOR I.D... 1342

23 STATE'S EXHIBIT NOS. 65, 66, 67, 68, 69, 70......MARKED

24 IN EVIDENCE.................................... 1347

25

Stacey K. Bryant, RPR
Judicial Court Reporter

000517

1    testifying out of order to accommodate his travel

2    plans.  Mr. Tedder, are you -- Go ahead and call your

3    witness.

4         MR. TEDDER:  Yes, ma'am.  Thank you, your Honor.

5    May it please the Court?  At this time the defense

6    would call a witness to the stand, Dr. John Plunkett.

7              JOHN PLUNKETT,

8    having been produced and first duly sworn, testified as

9    follows:

10             DIRECT EXAMINATION

11   BY MR. TEDDER:

12        Q    Good afternoon, Dr. Plunkett.

13        A    Good afternoon, Mr. Tedder.

14        Q    Please tell the jury your name.

15        A    John Plunkett, P-L-U-N-K-E-T-T.

16        Q    Dr. Plunkett, please tell the jury what your

17   educational background is.

18        A    I graduated from the University of Minnesota

19   Medical School.  I then had a one year rotating, a general

20   internship at St. Paul Ramsey Hospital.  When I finished my

21   internship, I had an additional five years of training in

22   general pathology and forensic pathology at Ramsey and at

23   the Hennepin County Medical Examiner's Office.  I finished

24   my training in the spring of 1978, took board certification

25   examinations given by the American Board of Pathology in

1. three areas; anatomic pathology, clinical pathology and

2. forensic pathology. I passed the exams, which means that

3. I'm board certified and I went to work at Regina Hospital in

4. Hastings on September 1st and I've been there ever since.

5.      Hastings is a river town. The county seat is

6. Dakota County, which is the third largest county in

7. Minnesota and it's approximately 20 miles from downtown St.

8. Paul.

9.     Q   I see. And you say you went to medical school at

10. St. Paul Ramsey?

11.     A   No. University of Minnesota Medical School and

12. then internship and residency at Ramsey and Hennepin.

13.     Q   Okay. And where do you currently work, sir?

14.     A   Regina Hospital. I am the laboratory and medical

15. education director and I'm also the assistant coroner for

16. the Minnesota Regional Coroner's Office.

17.      The coroner in Minnesota is required to be a

18. physician and is appointed by the county board. It's not an

19. elected position. We cover seven counties with a total

20. population of approximately three-fourths of a million and

21. we have an investigative staff of approximately 40,

22. administrative staff of three. We actually go out and

23. investigate any sudden or unexpected death. And as part of

24. that investigation, we will perform an autopsy approximately

25. 15 percent of the time. So we'll investigate about 2000

1213

1    deaths this year and perform about 300 autopsies.

2            In the old days until about five years ago, the

3    forensic part was a significant part of my practice.  Today

4    it's primarily medical education and laboratory direction.

5        Q    Now are you currently licensed in any states?

6        A    Yes, sir.  Minnesota and Wisconsin.

7        Q    And have you ever published any articles?

8        A    Yes, sir.

9        Q    Roughly how many?

10       A    Probably five or six actual original articles that

11   I've had and I've had three or four letters to the editor

12   published in the Journal of the American Medical

13   Association, for example.  Actually I think it's probably

14   six or seven letters.

15       Q    And are you a member of any professional

16   organizations?

17       A    A number.  Most of them have sort of evolved into

18   this, but things like the American Medical Association, the

19   American Academy of Forensic Sciences, the National

20   Association of Medical Examiners, and then a number of

21   others that are particularly related to the practice of

22   pathology.

23       Q    Have you ever given any presentations, speeches

24   regarding different medical issues?

25       A    A number.

Stacey K. Bryant, RPR
Judicial Court Reporter

000520

1214

1   Q   Have you ever been a witness for the prosecution
2   in any criminal cases?
3   A   Yes, sir.
4   Q   How many times roughly?
5   A   Probably more than 200 for the -- at the request
6   of the prosecution and between 50 and 75 at the request of
7   the defense.
8   Q   All right.  Now are you going to be getting paid
9   to testify in this case?
10   A   Indirectly.  I'm a Regina Hospital employee and
11   Regina will send you a bill for my services.  However, I
12   don't see that money directly.  My salary is not dependent
13   on it and I don't get any comp time.
14   Q   All right.
15   A   Regina gets paid.  You know, indirectly I get
16   paid.
17   Q   How many autopsies would you estimate you've done?
18   A   More than 2000.  I've been doing this for 25
19   years.
20   Q   And have you ever been -- ever testified in court
21   as an expert?
22   A   Yes, sir.
23   Q   Do you know how many times?
24   A   More than 200 times.  The overall majority of them
25   criminal cases.  I've probably only testified in half a

1215

1    dozen, ten at the most, civil cases in my life.

2         Q    What were you -- What area did you testify as an

3    expert in?

4         A    The majority of the time when I testified at the

5    request of the prosecution, it has involved deaths that

6    occurred in my own jurisdiction.  Somebody shot somebody

7    else, somebody stabbed somebody else, motor vehicle

8    accident, for example.  The majority of the time when I've

9    testified at the request of the defense, it has been

10   specifically in an issue of head injury in children.

11            MR. TEDDER:  Your Honor, I would tender this

12       witness as an expert in the area of forensic pathology.

13            MS. SINGER:  No objection, your Honor.

14            THE COURT:  The Doctor will be allowed to give his

15       opinion in the area of forensic pathology.

16            MR. TEDDER:  Your Honor, may I approach the

17       witness?

18            THE COURT:  Yes.  Go ahead.

19   BY MR. TEDDER:

20        Q    Dr. Plunkett, what did I just hand you, sir?

21        A    This is a copy of my CV, which I updated in

22   January of 2001.  The previous update had been in the spring

23   of 1994 and there are some changes from January of --

24   January of 2001 that have to do with a couple of relatively

25   minor things.  It lists me as the laboratory director of

1216

1    Saulsiville (phonetic) Medical Center.  Saulsiville is now

2    closed.  I'm no -- Well, I guess that does list -- I was

3    gonna say I'm no longer inspector for the laboratory

4    accreditation program in pathology.  It shows that as

5    stopping in 1994.

6        Q    Other than that, is it accurate?

7        A    Well, there have been some additional letters that

8    I have written that have been published in the American

9    Journal of Forensic Medicine and Pathology, but that's not a

10   substantial difference.

11       Q    Yes, sir.

12            MR. TEDDER:  Your Honor, I would like to submit

13       this to be marked as State's -- excuse me -- Defense'

14       Exhibit 1.  I ask it to be moved into evidence.

15            MS. SINGER:  Your Honor, at this time without

16       viewing it -- I would like to have an opportunity to

17       view it and also if there is a part of this that

18       Dr. Plunkett has indicated by testimony no longer

19       applies, I would ask that it be deleted from or

20       scratched out of the document that he wishes to have

21       entered into evidence at this time and I think we're

22       already past number one for the defense.  Those are my

23       objections.

24            THE COURT:  All right.

25            MR. TEDDER:  Do you have an ink pen, Dr. Plunkett?

Stacey K. Bryant, RPR
Judicial Court Reporter

000523

```
 1          THE COURT:  The objection is overruled.  I'll
 2     allow it into evidence at this time as I believe it's
 3     Defense No. 2 in evidence.  Is that right?
 4          THE CLERK:  Three, your Honor.
 5          THE COURT:  Three in evidence at this time.
 6          (Defense Exhibit No. 3 was received in evidence.)
 7          MR. TEDDER:  Do you want us to delete anything
 8     that no longer applies or scratch through?  No?
 9          THE COURT:  No.
10          MR. TEDDER:  Okay.
11          MS. SINGER:  Then I would just lodge an objection
12     that it's not an accurate curriculum vitae because it
13     does no longer apply.
14          THE COURT:  Good enough.  Noted for the record.
15 BY MR. TEDDER:
16     Q    Dr. Plunkett, have you been sent various medical
17 records regarding Robbie Quirello?
18     A    Yes, sir, I have.
19     Q    Have you had an opportunity to review those prior
20 to coming to testify here today?
21     A    Yes, sir, I did.
22     Q    Would you tell the jury what documents you have
23 reviewed?
24     A    I've reviewed the autopsy report, the
25 neuropathology report completed by Dr. Nelson, the autopsy
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1   microscopic slides, the autopsy photographs and the -- and

2   Robbie's hospital records, also photos of the home.

3       Q    Are you aware of what the state contends happened

4   to Robbie Quirello in this case?

5       A    Yes, sir, I am.

6       Q    Were you able to reach a conclusion as to what

7   happened to Robbie Quirello based on what you observed and

8   the records?

9       A    Yes, sir, I was.

10      Q    Would you tell the jury what your opinion is

11  regarding what happened to Robbie Quirello?

12      A    Robbie died as a result of lack of oxygen or

13  hypoxia.  His brain did not receive enough oxygen to survive

14  or to function and he died.  He was resuscitated at the

15  hospital.  They were able to keep his heart going and his

16  other organs going for seven or eight days.  After, he was

17  ultimately removed from the respirator.  But his death was

18  caused by the lack of oxygen.

19      Q    Can you tell the jury what caused this lack of

20  oxygen?

21      A    I can't tell specifically what happened to Robbie

22  in this case because I wasn't there.  There are a variety of

23  causes for lack of oxygen.  For example, pneumonia.  Well,

24  Robbie didn't have pneumonia.  Mechanical asphyxiation, in

25  other words, you can't breath because your chest is impeded.

1219

1   You're working on your car and a tire falls on you.  You

2   can't breathe and you die as a result of asphyxiation.

3   Spasm of the airway, such as occurs with an allergic

4   reaction can cause hypoxia and subsequent death.  A

5   prolonged seizure can lead to interference of the brain

6   centers that control breathing and ultimately death.  Brain

7   swelling impeding the brain centers control of breathing can

8   cause death due to lack of oxygen.

9        Q    Were you aware of what Brian Herlihy has told law

10  enforcement regarding where he found Robbie Quirello?

11       A    Yes, I am.

12       Q    Do you believe -- Did you have an opinion as to

13  whether what he has said, the state he found the baby in,

14  could have led to the anoxia to cause this child's death?

15       A    Yes, sir.

16       Q    How?

17       A    It could have.

18       Q    How could that have caused it?  Can you explain

19  that?

20       A    Well, the description, as best as I can

21  reconstruct it from the records, is that Mr. Herlihy found

22  Robbie wedged between the steel rails of the bed frame and

23  the mattress in a head down position with his legs more or

24  less either up in the air or partially against the mattress

25  itself, that he was wedged in that position.

1      Q    Now have you ever seen a child that you believed

2  to have been abused?

3      A    Oh, yes.

4      Q    What types of evidence do you see when you find a

5  child has been abused?

6      A    Well, the simplest scenario would be a child who

7  just has an isolated injury, for example, a cigarette burn

8  or a fracture caused by another human being.  I know the

9  worst case would be a child with multiple injuries of

10  various ages to various parts of the body, including the

11  skin, the organs such as the liver or the kidneys, the brain

12  and even the lungs, fractures of various bones.  So that

13  abuse can -- is really a spectrum of injuries, anything that

14  is inflicted by another human being that we would certainly

15  not find acceptable today.

16      Q    Now did you write an article which was published

17  in the American Journal of Forensic Medicine and Pathology

18  in the spring of 1999 entitled Shaken Baby Syndrome and the

19  Death of Matthew Epan, a Forensic Pathologist's Response?

20      A    Yes, sir, I did.

21      Q    And why did you write that article?

22      A    At that time, specifically in November of 1997, a

23  number of pediatricians and one pathologist wrote a letter

24  to the editor of pediatrics objecting to defense testimony

25  in the Matthew Epan death, stating that the defense experts

1   were misusing evidence, were misstating science and so

2   forth.

3          I knew nothing about the actual Matthew Epan case.

4   I was not involved.  I was not a witness.  I did not review

5   any of the reports, but I did respond to the pediatricians'

6   assertions based on science.  In other words, I took the

7   four points that they had made in their letter and then

8   examined the actual scientific basis for their belief.  And

9   that was the purpose of the article, was to examine the

10  scientific basis for the assertions that the pediatricians

11  were making in the letter.

12         Q.  Do you recall the assertions that the

13  pediatricians made in that article, in their letter?  Would

14  it refresh or help you if you can refer to the letter

15  itself?

16         MS. SINGER:  Your Honor, I'm going to lodge an

17      objection to relevance in this particular case.

18         THE COURT:  The objection is sustained.  You're

19      gonna have to rephrase your question.

20  BY MR. TEDDER:

21         Q.  Dr. Plunkett, who was Paul Bruissard?

22         A.  Paul Bruissard was the chair of forensic medicine

23  at the Sorbonne in Paris in the late 1800s.

24         Q.  And do you have a quote from him that was at the

25  beginning of the article we're talking about?

1       A       Yes, sir.

2       Q       Why did you include that quote?

3               MS. SINGER:  Once again, your Honor, I would lodge

4       an objection as to relevancy.

5               THE COURT:  Sustained.

6   BY MR. TEDDER:

7       Q       What would you say is the significance of the

8   quote you included from Paul Bruissard regarding the law of

9   making a witness of a person who is a man of science?

10              MS. SINGER:  Once again, your Honor, I would lodge

11      an objection as to relevancy.

12              THE COURT:  The objection is sustained.

13  BY MR. TEDDER:

14      Q       Dr. Plunkett, can a child receive a subdural

15  hematoma as a result of normal childbirth?

16      A       Yes, sir.

17      Q       Were you aware of the birth Robbie Quirello had in

18  this case?

19      A       Yes, sir.

20      Q       How would you describe that for the jury?

21      A       Difficult.

22      Q       All right.  And what things do you take into

23  consideration as far as saying it was a difficult birth?

24      A       Length of the second stage of the labor, the

25  longer time it takes for the cervix to ripen or become flat

1    so that it can dilate, any evidence for fetal distress that

2    the child might have, difficulty during the delivery or

3    birth process itself.

4         Q.   Now if a child was born with a subdural hematoma,

5    would the child necessarily exhibit symptoms at that time?

6         A    No, and most often they do not.  It's actually

7    relatively rare for a child with a subdural hematoma

8    associated with childbirth to develop symptoms.

9         Q    Can you tell the jury why that is?

10        A    No, because I don't know.  What I do know is that

11   the subdural hematoma itself, especially if it is caused by

12   what is called static loading, which is, for example, your

13   head in a vice, not a compliant head like a newborn.  If the

14   pressure is applied very very slowly, there's no traumatic

15   brain injury at all.  You just -- you get rupture of

16   bridging blood vessels and bleeding into the subdural space.

17             So the bleeding into the subdural space by itself

18   does not cause a problem unless the volume is so large, that

19   it starts to compress the rest of the brain and potentially

20   interfere with the breathing centers or cause a seizure.  So

21   unless that happens, a subdural hematoma is not gonna cause

22   signs or symptoms.

23        Q    Did you see CAT scans that were taken of Robbie on

24   August 2nd and 3rd?  Did you see CAT scans that were taken

25   of Robbie Quirello?



1    A    No.   I read the reports.   I'm not a radiologist.

2    Q    What did the reports reflect as exhibited in the

3   CAT scans?

4    A    Robbie had chronic subdural hematomas and was

5   developing new bleeding into those chronic subdural

6   hematomas.

7    Q    Now if a person has a subdural hematoma, can it

8   begin to have a new bleed?

9    A    Yes.

10    Q    Is that part of the healing process?

11    A    It's part of the natural history of a subdural

12   hematoma.   That has been proved in two articles that I'm

13   aware of in which people were followed with serial CT scans

14   or MR scans who were in the hospital, people with subdural

15   hemorrhage.   And over time you get new bleeding, you get

16   resorption of some of the old blood, you get new bleeding,

17   you get resorption or healing of some of the old blood.

18   It's a cycle until you eventually heal the subdural hematoma

19   or the volume becomes so large that it requires surgical

20   removal.

21    Q    Is bleeding on the brain an irritant?

22    A    Bleeding in the subarachnoid space is, but I don't

23   know if bleeding in the subdural space itself is really an

24   irritant.   Almost always when you have subdural hemorrhage,

25   you're gonna have subarachnoid hemorrhage also because the



1   dural blood vessels go through the arachnoid membrane.

2       Q    Can bleeding on the brain cause a seizure?

3       A    Yes.

4       Q    And if someone had a seizure, could that cause

5   them to quit breathing?

6       A    Yes.

7       Q    Can a lack of oxygen cause the brain to begin to

8   bleed?

9       A    It can cause -- Well, yes, it can.  You can cause

10   bleeding in the dural space and it can also cause bleeding

11   on the surface of the brain and at what are called the water

12   shed areas, the area between the gray and white matter where

13   the blood vessel supply is the most tenuous.  So lack of

14   oxygen in itself can cause bleeding.

15       Q    Have you read any articles that deal specifically

16   with lack of oxygen causing subdural hematomas?

17       A    Yes, sir.

18       Q    What article study have you read?

19       A    Dr. Jennian, J-E-N-N-I-A-N, Geddes, G-E-D-D-E-S,

20   is a neuropathologist at Queen Mary Hospital in London.  I

21   know her personally.  She has written a number of articles

22   regarding traumatic head injury in children.  Her most

23   recent article directly addresses the question of lack of

24   oxygen and development of subdural hemorrhage.  It is going

25   to be published either this month or next month in a journal

1   called Neurophysiology and Applied Neurobiology.  It is a

2   peer review journal.  She sent me the pre-print article

3   about four months ago along with the photographs that are

4   going to appear with that article.

5       Q    What does peer review article mean?

6       A    It means that someone, a physician or a nurse or

7   another scientist, has written an article that that person

8   thinks can be some helpful information.  To be published in

9   a number of journals requires that others of your peerage

10  review that article to make sure that at least your methods

11  are correct, that your conclusions are substantiated by your

12  data or evidence and so forth.  The reviewers may not agree

13  with your conclusions and that's not a reason to say that

14  something shouldn't be published, but it at least is

15  methodologically sound in most of the journals that articles

16  are published.

17      Q    Were there some photographs in that article that

18  would assist you in offering testimony regarding this case?

19      A    Yes, sir.

20          MR. TEDDER:  May I have these marked, your Honor,

21      as exhibits?

22          THE COURT:  They'll be marked as demonstrative

23      aids?

24          MR. TEDDER:  Yes, ma'am.

25          THE CLERK:  Defense F and G, your Honor.

1    THE COURT:  Go ahead.

2    MR. TEDDER:  I show these to the state attorney,

3  your Honor.  May I approach the witness, your Honor?

4    THE COURT:  Yes.

5  BY MR. TEDDER:

6    Q    Dr. Plunkett, I'll show you what's been marked as

7  Defense Exhibit F and G.  Do you recognize those?

8    A    F and G are the same photographs.

9    Q    Oh, they're the same photographs?

10   A    Two of the same thing.  These are photographs from

11 Dr. Geddes' study.  They're a photograph of a 34 week, 32

12 week gestation premature child who developed fetal distress,

13 was delivered with poor breathing, actually anoxia, no

14 breathing at that time, was resuscitated and was kept on a

15 respirator for a few hours.  The photographs demonstrate

16 intradural and subdural hemorrhage.

17        In the study that is going to be published, she

18 had either 51 or 53 such cases.  In other words, children

19 who died shortly after birth with hypoxia and almost all of

20 those children had intradural and subdural hemorrhage as a

21 result of the lack of oxygen, not any other extrinsic

22 trauma.

23   Q    Now do you see any subdural hematomas on those

24 photographs?

25   A    Yes, I do.

1228

1    Q    Do you see a dura on that photograph?

2    A    Yes, I do.

3    Q    In this bleeding that you saw in those

4    photographs, is that chronic or acute?

5    A    That's acute.

6    Q    What color is acute bleeding?

7    A    Acute bleeding is purple or red purple.

8    Q    What color would chronic bleeding be?

9    A    Well, chronic bleeding would be a yellow or a

10   yellow brown and you would usually be able to see that by

11   looking at the dural membrane itself, not by looking at the

12   bleeding, because you always get new bleeding in subdural

13   hematomas and there's a mixture of blood.  So with just the

14   unaided eye, it's difficult to see.  Your medical imaging

15   studies are actually better for that.

16   Q    Medical imaging studies are what?

17   A    CT or MR scans.

18   Q    Now are you aware of the cause of death listed by

19   Dr. Hamilton in this case?

20   A    Yes, sir, I am.

21   Q    What is it?

22   A    Complications of shaken baby syndrome.

23   Q    Now the impressions that he listed above that,

24   what were those?

25   A    Autopsy findings.

Stacey K. Bryant, RPR
Judicial Court Reporter

000535

1      Q    Okay.

2      A    Immature human brain with bilateral cerebral

3  subdural hematoma and subarachnoid hemorrhage.

4      Q    What does that mean to you?

5      A    It means that there was bleeding on the surface of

6  the brain on both sides and beneath the lining membrane of

7  the brain, the arachnoid on both sides.

8      Q    All right.  Is there a connection between subdural

9  bleeding and subarachnoid bleeding?

10     A    Yes, sir, there is.

11     Q    Explain to the jury how that is.

12     A    Well, the subdural -- the blood vessels that

13  rupture to allow traumatic subdural hemorrhage communicate

14  with the arachnoid space so that if the bleeding in the

15  dural space is caused by trauma, there will always be

16  bleeding in the subarachnoid space.  There will also be

17  bleeding in the subarachnoid space anytime there is brain

18  swelling and compression of the surface of the brain against

19  the inside of the skull.

20          So in and of itself, subarachnoid hemorrhage means

21  absolutely nothing in terms of causation or relationship to

22  trauma unless it is associated with a ruptured blood vessel

23  and inflammation.  That's the only time it has any

24  significance.

25     Q    Swelling on the brain, would that qualify as

Stacey K. Bryant, RPR
Judicial Court Reporter

1   trauma?

2       A     Swelling on the brain is a secondary event as a

3   result of either a primary trauma and I'm using the term

4   trauma very generically.  Pneumonia is a trauma.  So if you

5   have pneumonia and lack of oxygen, you're going to get

6   swelling of the brain.

7       Q     What type of trauma would you point to in this

8   case?  Would a seizure be a trauma?

9       A     Well, a seizure isn't a trauma.  A seizure is a

10  result of a prior injury.  Robbie has no trauma.  There are

11  no -- there are no new traumatic injuries that Robbie has.

12  The only primary trauma that he has is the subdural

13  hemorrhage, if it represents trauma at all.

14          I mean, his subdural hemorrhage could be related

15  to birth trauma.  It could be related to a condition called

16  cortical venous thrombosis, which is a clotting off of the

17  blood vessels on the surface of the brain, which has nothing

18  to do with primary trauma.

19          So with the exception of the subdural bleeding,

20  Robbie has no evidence for trauma at all.  He has secondary

21  evidence for trauma in the anoxia.  So the anoxia is a

22  secondary traumatic event, which could have been caused by

23  somebody else or could have occurred inadvertently.

24      Q     Now Dr. Hamilton listed anoxic ischemic

25  encephalopathy global in his findings.  What does that mean?

1    A    It means that there was lack of oxygen to almost

2    the entirety of the brain and I certainly agree with that.

3    Q    And you agree with that based on what, Doctor?

4    A    The autopsy photographs, the medical records.

5    This is not a surprising finding.  This is what caused

6    Robbie's death.

7    Q    Now he also put cerebral edema -- excuse me --

8    edema and vascular congestion.  What does that mean,

9    Dr. Plunkett?

10    A    Brain swelling and blood vessel congestion as a

11    result of the lack of oxygen, the secondary injury.

12    Q    Did you see any evidence of shearing to the brain

13    in the slides you examined?

14    A    No, there was none.

15    Q    What does shearing mean to you?

16    A    Shearing is one of the components of what is

17    called traumatic axonal injury.  Traumatic axonal injury is

18    a concept that was developed almost in parallel by people in

19    Scotland and by researchers in Philadelphia to explain

20    prolonged unconsciousness in people who have been in motor

21    vehicle accidents or had other accidents and yet did not

22    have a huge skull fracture or a large subdural hematoma.

23    Very simply stated, it means that one part of the

24    brain is moving or more accurately accelerating differently

25    from an adjacent part and it shears.  It breaks apart.

Stacey K. Bryant, RPR
Judicial Court Reporter

1    Robbie has no evidence for any shearing injuries anywhere.

2         Q    Were you able to examine the dura matter in this

3    case?

4         A    No, sir, I was not.

5         Q    Would you have liked to have seen the dura matter?

6         A    Yes, sir, I would have.

7         Q    Tell the jury why.

8         A    If it is important to try to age Robbie's chronic

9    subdural hematomas, you can do it two ways and the best way

10   to do it is to use both.  One is using the CAT scan or the

11   MR scan as the criteria that have been established in trying

12   to age a subdural hematoma.  And the other way is to look at

13   the dura under the microscope because the healing process

14   takes a more or less uniform and known path.  Using those

15   two things together, you can say, Well, this is all less

16   than 15 days old or some of it is five days old, some of it

17   is two or three weeks and some of it is more than two

18   months.

19         But you can't do that in this case because you

20   don't have the dura.  All you can use is the CT or MR

21   criteria, which say that at least when Robbie came in, the

22   majority of the bleeding that he had was what is called

23   chronic, which is usually taken to mean more than two weeks.

24   Then he had new bleeding that continued during his

25   hospitalization in that dural space, but that's just part of

1233

1    the natural history.  I don't think the nurses caused any

2    trauma or the doctors on day two, day four or day six of his

3    hospitalization.

4         Q    If you had done the autopsy in this case and had

5    been aware of the evidence of pre-existing chronic subdural

6    hematomas and acute subdural hematomas, how would you have

7    gone about examining this child?

8         A    I would have saved a number of sections of the

9    brain.  I would have -- actually I would have saved the

10   brain in a fixed state and I would have sent that to a

11   neuropathologist and asked that person to assist me in the

12   evaluation, certainly including the dura and the spinal

13   cord.

14        Q    When the skull cap is removed during the autopsy,

15   how would you -- what efforts would you take to make sure no

16   damage was done to the dura or the area where the chronic

17   subdurals were?

18        A    It's pretty difficult sometimes.  There's a

19   standard way of removing the skull cap.  Some people

20   actually suggest removing the brain and the skull cap with

21   the head under water so that it's really almost floating.

22   Then you don't have the brain moving around artifactually

23   causing tears, for example, on the surface.

24             But sometimes it's difficult to not create

25   artifacts.  For example, when you're cutting across the

1234

1      dura, you have to cut across a structure called the sagittal

2      sinus, which runs from the front to the back of the center.

3      Just as a result of cutting that vein, you're going to get

4      bleeding into the subdural space.  So you have to know that

5      maybe what you're seeing may in fact not be the result of

6      trauma, but something else entirely.

7          Q    Would microscopic examination of the dura have

8      been helpful?

9          A    Well, not only microscopic examination, but a good

10     gross description and good gross photographs.  There's only

11     one or two photographs of the dura in the autopsy that show

12     you anything and that clearly shows that there's a chronic

13     subdural hematoma.  The color is yellow.

14         Q    Did you see any photographs of the cap of the

15     skull?

16         A    I saw -- Well, the cap is there.  It's underneath,

17     but that's the outside.  I don't care about that.

18         Q    Right.

19              MR. TEDDER:  I would like to approach the witness,

20         your Honor.

21              THE COURT:  Go ahead.

22     BY MR. TEDDER:

23         Q    Dr. Plunkett, I want to show you State's Exhibit

24     59, 60 and 61.  If you could, please --

25              MR. TEDDER:  Your Honor, could the witness step

Stacey K. Bryant, RPR
Judicial Court Reporter

000541

1    down in front of the jury to show them this?

2        THE COURT:  Are these -- You want to use the

3    overhead projector?

4        MR. TEDDER:  Well, we could.  I don't know how to

5    set that up.

6        THE WITNESS:  I can show them, your Honor.

7        MR. TEDDER:  He can show them, your Honor, if

8    that's okay with the court?

9        THE COURT:  That's fine.

10   BY MR. TEDDER:

11       Q    Dr. Plunkett, if you could refer to each by the

12   number on the back and then tell the jury what you see on

13   there, please.

14       A    Fifty-nine is the first one we're gonna show.

15   It's a photograph of Robbie's head with the skull cap

16   removed and pushed to the back.  The front of his face is

17   covered with a towel and he's on the right-hand side.  The

18   back of his head is on the left-hand side.

19       On the surface of the brain you can see a blood

20   clot.  It was adherent to the surface of the brain.  On the

21   left-hand side poking up from the skull cap itself is a

22   portion of the dura.  The inside surface of the dura has a

23   yellow or yellow brown color that is very distinct from the

24   areas of the dura that are away from it and very different

25   from the appearance of the inside of the skull.  Behind, the

1  dura has actually been pulled off from the inside surface of

2  the skull from it's location.  So the color is the tip off

3  that there's a chronic subdural hematoma.  That's 59.

4        Sixty is the same thing.  Sixty is a photograph

5  taken from looking down at the top of Robbie's head.  The

6  right is on the right side, the left is on the left side.

7  And again, on the left side this time we see yellow

8  discoloration of the dura indicating a chronic subdural

9  hematoma.

10       Sixty-one is a photograph taken from Robbie's left

11  side.  Again, the left side is his face.  The right side is

12  the back of the skull cap that has been removed.  This shows

13  blood clot actually adherent to the dura on the right-hand

14  side.  Dural adherence takes ten days, two weeks or

15  something like that to occur.  The yellow discoloration

16  takes three weeks, a month to occur.  But that's the best

17  that you can do just looking at it photographically and you

18  have to rely on the CT, MR scans and then what you see under

19  the microscope.

20       Q    Can the dura of the subdural hematomas be aged

21  through microscopic examination or other means?

22       A    It can, but the dating isn't real accurate.  It

23  takes about four or five days to be able to see iron pigment

24  from the breakdown of red blood cells in the inflammatory

25  cells.  There's iron pigment that can be seen and it won't

1237

1    stay around for a long long time.  So the finding of iron

2    pigment just tells you, well, it happened at least four or

3    five days ago.  If you see specific types of blood vessels

4    growing into that space, you're talking about two or three

5    weeks.

6        Q    Iron pigment, is that what causes the yellow

7    discoloration?

8        A    Yes, it is.  Well, in part it is.  It's also

9    inflammatory cells containing fat.

10       Q    Okay.

11       A    It's a combination of those two things.

12       Q    Did you see in those photographs any possible

13   evidence of cortical venous thrombosis?

14       A    Well, the photographs really look like cortical --

15   like what you would see with cortical venous thrombosis,

16   clotting of the blood vessels on the surface of the brain

17   with secondary break-through of that blood into the dural

18   space.  I don't know whether that's a primary event.  In

19   other words, the primary injury in quotes that Robbie had

20   was, "Cortical venous thrombosis," or if this is simply a

21   result of the lack of oxygen and secondary clotting within

22   the blood vessels itself.  I can't tell you that, which it

23   is.

24            It certainly looks like cortical venous

25   thrombosis.  It is cortical venous thrombosis.  The question

1   is, is this the primary event or is this the result of the

2   lack of oxygen and just simply developed while he was in the

3   hospital?

4        Q    What causes cortical venous thrombosis?

5        A    Clotting of the blood vessels, the veins, from a

6   number of causes.  Infections, dehydration would be the two

7   that are most often identified.  However, you can identify

8   the cause in less than 50 percent of children who develop it

9   and adults also.  Adults develop cortical venous thrombosis

10  also.

11       Q    What would you have wanted to do to further

12  determine exactly what this was?  Examine microscopically?

13       A    You can examine it microscopically, but it's very

14  difficult when somebody has been on a respirator for eight

15  days to go back in terms of causation.  I mean, if Robbie

16  had died within minutes of the time that he came into the

17  hospital and this is what I saw, I would say that's cortical

18  vein thrombosis, period, because it doesn't develop that

19  rapidly.

20            But really there's nothing that you can do now

21  etiologically, even a radiologist.  One radiologist may say

22  looking at the CT scan when Robbie first came into the

23  hospital, This is cortical venous thrombosis.  Another

24  radiologist may say, No, it's not.  There is no -- The

25  autopsy is still the gold standard.  So that even with your

1   radiographic criteria and so forth, it's not 100 percent and

2   it doesn't even approach 100 percent.

3        Q    What's your professional opinion of the autopsy

4   Dr. Hamilton did in this case?

5             MS. SINGER:  I'm going to lodge an objection at

6        this time.

7             MR. TEDDER:  He's testifying from his expertise,

8        your Honor.

9             THE COURT:  Approach the bench.

10            MS. SINGER:  I think I'm gonna withdraw my

11       objection.  I think it's gonna be easier to just allow

12       the witness to answer.

13            THE COURT:  The objection is withdrawn.

14            MS. SINGER:  I'm sorry, Doctor.  I didn't mean to

15       interrupt.

16            THE WITNESS:  First of all, I don't know

17       Dr. Hamilton.  I hadn't met him.  I don't know his

18       background.

19            If I had done the autopsy, I would have -- I mean,

20       before my format would have been different, but that's

21       personal preference.  That doesn't have anything to do

22       with anything.  But I would have saved the dura.  I

23       would have done a microscopic examination of the dura.

24       I would have fixed the brain for a couple of three

25       weeks and I would have asked somebody to review those

1240

1   CT scans or MR scans with me because clearly there is a

2   discrepancy between what Dr. Hamilton says that he

3   found, which is acute subdural hemorrhage only, and

4   three different radiology reports which say, No, this

5   is a chronic subdural hematoma with new bleeding.

6   That's a significant discrepancy.

7        But the pathologist, at least this pathologist,

8   would not simply say, I'm right and you're wrong.  I

9   would say, Let's look at this stuff and see why we're

10  differing.  But that's it.  I would have done this.

11  BY MR. TEDDER:

12      Q   Would you have liked to have examined the brain

13  stem?

14      A   That's part of what I was talking about, the dura

15  and the spinal cord.  Didn't I mention the spinal cord?

16      Q   I don't think we got there yet, Doctor.

17      A   You asked me what I would have done differently.

18  I said I would have saved the dura and the spinal cord.

19      Q   What would you have been looking for in the brain

20  stem and the spinal cord?

21      A   The spinal cord itself below the level of the

22  neck, nothing.  The spinal cord including the brain stem I

23  would have been looking for evidence of bleeding of whatever

24  ages.

25      Q   Could that have been discovered through

Stacey K. Bryant, RPR
Judicial Court Reporter

000547

1    microscopic examination?

2        A    Yes, sir.

3        Q    Now are you familiar with a -- I believe it's a

4    computer generated series of photographs or pictures

5    prepared by someone named Dr. Davis?

6        A    Yes, sir, I am.

7        Q    And what is your opinion of that computer

8    generated thing?

9        A    The Davis cartoon is a scientific fraud.  The

10   child's brain does not move that way during any shake that

11   you can subject the child's brain to.  The brain of a human

12   being may move that way if you apply an acceleration to some

13   part of the head or the acceleration does not go through the

14   center of mass at an acceleration in excess of 10,000

15   radians per second squared.

16            A radian is a unit of measurement of circular

17   motion.  A radian is a radius.  There are approximately

18   16 -- approximately six radians in a circle.  A radian is

19   about 59 and a half degrees.  So 10,000 radians per second

20   squared as a unit of acceleration radially or circularly at

21   a radius of one foot, is equivalent to 10,000 feet per

22   second squared.

23            Acceleration due to gravity is 32 feet per second

24   squared.  Ten thousand feet per second squared is

25   approximately 350 times the acceleration due to gravity.  So

```
 1    if you were to accelerate a head at 350 times the
 2    acceleration of gravity, and it can be done experimentally,
 3    you will have the brain move within the skull case as
 4    depicted in the Davis cartoon.
 5            However, when you shake a child, the most
 6    acceleration that you can generate is approximately ten
 7    times the acceleration due to gravity.  Shaking a child is
 8    not a good idea.  You can probably kill a child, but it does
 9    not cause the brain movement depicted in the Davis cartoon
10    and it does not cause the type of injuries called the shaken
11    baby syndrome.
12        Q    How can you kill a baby by shaking it?
13        A    You can cause -- Well, first of all, if you did it
14    for long enough, a child is not going to be able to breathe
15    while you're shaking the child.  So if you shake the child
16    long enough, say three or four minutes, two or three minutes
17    so that the child is without oxygen for that period of time,
18    the child may die directly as a result of that.
19            You may also stretch the brain stem centers that
20    control breathing causing direct anoxia and death, and in
21    which case you will or should be able to see damage to the
22    brain stem when you look at it under the microscope.
23            You may cause an impact injury during shaking.  In
24    other words, you may cause the head to strike a solid
25    surface such as a wall or the floor, in which case it's not
```

1  the shaking that causes the injury, but rather the impact

2  against the non-yielding surface.  So there's a number of

3  ways that you can kill a child by shaking them.

4      Q    How long do you think a child or anybody can go

5  without oxygen in the brain before causing irreversible

6  brain damage?

7      A    I have to answer that as almost a three part

8  question.  First of all, differentiating breath holding from

9  lack of oxygen; professional divers, people who live in

10 cultures where they do deep diving for a livelihood have

11 learned to hold their breath for three or four minutes and

12 be able to dive to very great depths.  They've learned to

13 store up enough oxygen and blow off enough carbon dioxide by

14 hyperventilating to be able to do this without causing them

15 to faint from the hyperventilation.

16      People who are just regular folks, with some

17 training you can learn to swim 25 yards in a pool under

18 water or even 50 yards.  So in part it depends, you know, on

19 the training and whether there's breath holding involved or

20 not.

21      Secondly, it depends to a certain extent on the

22 mechanism of lack of oxygen.  If a lack of oxygen is because

23 the hemoglobin molecule is carrying less oxygen than normal,

24 then it can be a long time.  If it's simply because the

25 blood flow is cut off, the heart stops beating, for example,

1   then it's going to be very very quick, thirty seconds or a

2   minute.  If it's because the breathing centers are shut off,

3   but the heart continues to beat, then its gonna be longer.

4            It's probably longer in a child than in an adult.

5   There have been documented cases of kids that have been

6   under water for as long as 45 minutes who have survived and

7   ultimately recovered.  So a case of what's called cold water

8   emersion, cold water drowning where the drowning in cold

9   water is thought to induce some primitive reflex that slows

10  our heart rate way way down to five or ten beats per minute

11  allowing the brain to get enough oxygen and for you to

12  survive.

13           In general, four our five minutes without oxygen,

14  you're dead.  The brain is dead.  The brain is dead.  The

15  heart may continue to beat.  If the heart is stopped, you

16  may be able to get the heart going again.  But most often

17  you do not walk out of the hospital.  The survival rate, for

18  example, of all of the hospital cardiac arrests where

19  somebody is resuscitated, brought into the hospital on a

20  respirator with their heart beating and their lungs and

21  everything else working, is around two percent.  It's not

22  very long.

23      Q    Why would your heart continue to beat after your

24  brain is dead?

25      A    Well, your heart -- The brain does not correct --

1    the brain does not directly control the heartbeat.  There is

2    an indirect control by a nerve from the brain stem that does

3    it, but the heart has it's own beating.  You can cut the

4    heart out, cut all of it's nerve supply off from the outside

5    and it still continues to beat.

6          So, for example, if somebody is on a respirator in

7    the hospital because they were in an automobile accident and

8    had a head injury and the person is going to be an organ

9    donor and you have been breathing for them for a week or ten

10    days or whatever and you take them off the respirator, their

11    heart continues to beat for seven to ten minutes after you

12    have removed them from the respirator.  So the heart

13    function is or at least can be totally independent of the

14    brain function.

15    Q    The state has elicited testimony regarding the

16    lack of damage to other organs in Robbie's body and whether

17    or not there should have been damage to other organs in

18    Robbie's body because of a lack of oxygen.  What is your

19    opinion on that, Dr. Plunkett?

20    A    Well, the fact that there is no evidence for

21    damage to the other organs simply shows you that the amount

22    of time that Robbie's brain was without oxygen is relatively

23    short.  This is one of the criteria that you use for organ

24    donors.  You know, if somebody is on a respirator and most

25    of them, usually when you're able to get the heart going

1246

1  again, the rest of the organs are okay.

2  Now in very young children, I'm talking about

3  premature kids and newborns, it's a little bit different

4  deal because they do develop damage to the bowel, what's

5  called necrotizing intracolitis as a result of the lack of

6  oxygen.  But, in general, if you can get the heart going

7  again, the other organs are gonna be okay.  It's the brain

8  that's the problem.  It's the brain that doesn't come back.

9      Q    There was evidence in this case that Robbie's

10  heart never quit beating, but that he was not breathing when

11  first discovered by paramedics.  What would your opinion be

12  then?

13      A    That the amount of time that he had been without

14  oxygen was very short.

15      Q    Would it have been short enough or long enough to

16  cause some type of brain injury or if you know?

17      A    Yes.

18      Q    Could new bleeding in the subdural hematomas cause

19  anoxia?

20      A    Yes, indirectly by either causing a seizure or by

21  compressing the brain centers that control breathing.  For

22  example, I know that Robbie had brain swelling when he came

23  into the hospital because his fontanel, soft spot on the

24  front center of his head was tense and bulging.

25      Q    Do you believe that shaking Robbie the way the

1247

1    state contends he was shaken could cause the type of brain

2    injury this child suffered?

3        A    Well, it certainly did not cause the initial

4    subdural hematoma.  It did not cause new bleeding in the old

5    subdural hematoma.  Could Robbie have been shaken and that's

6    what caused his death?  Yes, that's a possibility.  But

7    there is no evidence that that's what occurred.

8        Q    What evidence can you point to that shows that is

9    not what occurred?

10       A    Well, I think first and foremost there is an

11   acceptable cause of death for Robbie and that is global

12   hypoxia, lack of oxygen with an acceptable mechanism,

13   getting his head wedged in the bed.

14           Secondly, there is no evidence for any neck damage

15   in Robbie.  There are no fractures.  There are no bruises.

16   There is nothing.  With the exception of the brain, Robbie

17   has no injuries whatsoever.

18           Now you don't always see evidence for those types

19   of injuries in someone that has been abused, but if someone

20   is to be shaken to the point where that is the primary cause

21   of the person's death, at a minimum you would expect

22   evidence for neck damage.

23       Q    There's none of that in this case?

24       A    No evidence for it.

25       Q    Dr. Plunkett, what could cause the retinal



1   hemorrhaging that was present in this baby?

2       A     Retinal hemorrhage is a secondary event.  It

3   simply occurs as a result of the brain swelling.  Anytime

4   there is an obstruction of the return of venous blood from

5   the eyes to the heart, you will get hemorrhage into the

6   retina.  You may also get break-through bleeding from the

7   retina into the vitreous.

8           The pressure of the veins is only slightly higher

9   than the pressure within the cerebral spinal fluid itself.

10  In a youngster four and a half months old, it's probably in

11  the range of about five millimeters of mercury.  Compare

12  that to an adult diastolic pressure of 80 millimeters of

13  mercury.  The venous pressure in a child is probably about

14  eight or ten.  The arterial pressure is probably about 30

15  for a four and a half month old, maybe 40.

16          So as soon as you exceed -- as soon as the

17  pressure within the brain exceeds the venous pressure,

18  you're gonna get retinal bleeding.

19      Q     In your opinion, is the theory of shaken baby

20  similar to whiplash injury?

21      A     Well, the theory is, yes.

22      Q     Tell the jury about that.

23      A     Well, there was a lot of research, funded research

24  through the National Institutes of Health for the automobile

25  industry and subsequently for the space program and for



1   fighter pilots looking at whiplash because people were

2   concerned that either gravitational forces by themselves

3   that somebody flying to the moon might experience, or

4   gravitational forces that someone might have happen if he or

5   she was in an automobile accident could cause head injury.

6   So they started to research the mechanisms of head injury.

7        It was found that not only can whiplash cause neck

8   injury, but it also under certain controlled conditions also

9   causes primary brain damage.  The primary -- The ability of

10  whiplash to cause primary brain damage depends on a number

11  of factors.  Number one, and probably the most important,

12  the level of acceleration.  Something in the range of a

13  couple hundred times of the acceleration.

14       It's also dependent on the location of the applied

15  force.  Force that is applied front to back or back to front

16  is less likely to cause damage than is acceleration applied

17  side to side.  It's more damaging to have side to side

18  acceleration than it is front to back.

19       What is called the jerk, J-E-R-K, which is the

20  rate of change of acceleration.  Mathematically it's the

21  first derivative of acceleration.  So the rate of change of

22  acceleration is an important fact.

23       The duration of acceleration is important.  Very

24  short durations, for example, five or ten thousands of a

25  second, which would be typical in an impact injury, are more



1250

1   likely to cause this type of injury than are long durations,

2   say a twentieth of a second, 15 milliseconds such as what

3   occur in automobile accidents.

4           So all of these factors have been known and known

5   for a long time.  A group of physicians borrowed this

6   knowledge and then applied it to the concept of the shaken

7   baby without understanding that they were misinterpreting

8   and misapplying the fundamental research that had been done.

9           Dr. Caffey (phonetic) was one of the first

10  published on this and Dr. Amiah (phonetic), who had done the

11  research, spoke to Dr. Caffey after he published his first

12  paper and told him that he had gotten it wrong, that

13  Dr. Caffey apparently didn't understand that he had the

14  science wrong and it has persisted for the last 30 years.

15      Q    Are you aware of any studies that have been done

16  to try and determine the amount of acceleration a human

17  being can put on an object roughly the size of a baby?

18      A    You mean in terms of head injury?

19      Q    Yes, sir.  I mean type of acceleration that can be

20  done by shaking.

21      A    Oh, you mean what you can do theoretically, yes.

22      Q    Yes, sir.  What is your knowledge with respect to

23  the maximum amount of force that a human being may be able

24  to generate?

25      A    Well, the maximum acceleration that a person is

1    able to accelerate or do is known experimentally from three

2    different groups.  One is from the bioengineering group in

3    Philadelphia.  An article was published in 1987.  Those

4    people came up with approximately ten G's times the

5    acceleration of the gravity from the shake.

6        Q    Who wrote that study?

7        A    A neurosurgeon named Duhaine, D-U-H-A-I-N-E, and

8    her engineering advisor was named Thibauot, T-H-I-B-A-U-O-T.

9    Thibauot designed the model, showed her how to do the study

10   and told her what the results meant.  He was the engineer

11   and physician.

12          Those studies have been replicated by a woman

13   named Corrina Cory, C-O-R-Y, and Michael Jones, J-O-N-E-S,

14   of the Bioengineering Unit in Dundee.  And they have more

15   recently been replicated by Michael Prange, P-R-A-N-G-E, and

16   Susan Margulies, M-A-R-G-U-L-I-E-S, again in Philadelphia.

17   They're doing studies independent of what the other two are.

18   They all came up with the same answer.  Mike Jones was able

19   to get one person that could actually generate an

20   acceleration of 16 G's and Prange again was like ten or 11

21   G's.

22       Q    G meaning the force of gravity?

23       A    Sixteen times the force of gravity.  So ten G's

24   would be 320 percent squared.  And the threshold for coma

25   is -- or the threshold for concussion is probably a hundred

1   G's.

2       Q    Do you know what the threshold is for a subdural

3   hematoma?

4       A    Approximately 150 G's, but the mechanism -- that's

5   a little bit misleading to try to use those kinds of terms

6   because the mechanism in many cases is actually different

7   from that that's used experimentally to cause subdural

8   hemorrhage.

9       Q    Are you aware of any scientific studies that have

10  been done experimentally on the theory known as shaken baby

11  that support the theory?

12      A    No.  There have been none.

13      Q    What papers that you have read are you aware of in

14  dealing with the theory of shaken baby are merely based on

15  anecdotal stuff or not based on anything?

16      A    Well, they're based on opinion.  No one has ever

17  seen anyone shake a child.  No nanny cams have ever caught

18  somebody shaking a child.  It's pure theory, which has been

19  repeated as accepted fact for at least 30 years and there is

20  no scientific evidence to support it and the scientific

21  evidence says, No, that's not what's happening if you are

22  gonna cause injury by shaking.

23      Q    Have you seen evidence in your experience over the

24  years, have you seen children that you believe suffered from

25  sudden impact injury?



1    A    Yes.

2    Q    And what kind of trauma would they have typically?

3    A    Well, almost always, but not always they're gonna

4    have evidence for an actual impact injury, a bruise on the

5    scalp or skull, which you may not see until you do an

6    autopsy.  They will have evidence for subdural hemorrhage.

7    They will have evidence in some cases of direct brain

8    damage.  In some cases they will have evidence for a skull

9    fracture.  Those are impact injuries and the mechanism of an

10   impact injury is fundamentally different from the mechanism

11   of a shaking.

12            MR. TEDDER:  I tender the witness, your Honor.

13            THE COURT:  All right.

14            MS. SINGER:  Your Honor, my cross-examination is

15       going to be rather lengthy.  Does the court wish to

16       continue at this point?  We've gone for over an hour.

17            THE COURT:  We're gonna take a recess at this

18       time, ladies and gentlemen, for 15 minutes.

19            (The jury is out of hearing of the court.)

20            THE COURT:  We'll be in recess for 15 minutes.

21            (Recess 2:25 - 2:48.)

22            THE COURT:  I was looking for you, Dr. Plunkett.

23       You're still right here.

24            All right.  Is the state ready?

25            MS. SINGER:  We're ready, your Honor.

1    THE COURT:  Is the defense ready?

2    MR. TEDDER:  Yes, ma'am.

3    THE COURT:  Go ahead and bring the jury back in.

4    Go ahead and have a seat, Dr. Plunkett.  You all have a

5    seat.  Go ahead, Ms. Singer.

CROSS-EXAMINATION

7    BY MS. SINGER:

8    Q    Dr. Plunkett, before I begin with some of the

9    questions regarding your qualifications, I do want to ask

10   one question regarding your testimony on direct, and that is

11   that you agree, as I understood your testimony, that shaking

12   can kill a baby if it's done long enough, two or three

13   minutes without oxygen, that period of time being shaken the

14   baby would stop breathing and that would explain anoxia?

15   A    I think that's certainly theoretically possible.

16   Q    And you also agree that shaking a baby could

17   stretch the centers of breathing and that could cause death

18   due to anoxia, correct?

19   A    That's correct.

20   Q    And I believe you also agree that if a baby was

21   shaken and then there was some kind of impact, such as being

22   thrown to a bed or a floor, I think you said a wall, that

23   that too could cause the injuries that you see in Robbie

24   Quirello?

25   A    No.

```
 1          MR. GROLAND:  Your Honor, may I just pose an

 2     objection?  She's added some facts in there.  Some of

 3     which are in evidence, some of which are not in

 4     evidence and I think it's confusing.

 5          THE COURT:  Your objection is on the basis it was

 6     a compound question?

 7          MR. GROLAND:  Yes.

 8          THE COURT:  Sustained on that basis.

 9          MS. SINGER:  I'll restate it.

10   BY MS. SINGER:

11     Q    Isn't it true, Dr. Plunkett, that you have written

12   articles on impact injuries causing significant brain injury

13   in children?

14     A    Yes, I have.

15     Q    And impact injuries would be where a child would

16   have had his head struck in some way?

17     A    Either struck or his head strikes something else,

18   his or her head strikes something else, correct.

19     Q    That could include being thrown to the floor?

20     A    Correct.

21     Q    Thrown on a bed?

22     A    No.

23     Q    A bed would not meet that consideration?

24     A    No.

25     Q    That would not cause the deceleration that you
```

1  described in the articles?

2      A    That's correct.

3      Q    But you do agree that falling on a padded carpet

4  would in fact cause conditions?

5      A    Would?

6      Q    Yes, sir.

7      A    Yes, it would.

8      Q    In fact, you testified to that in the Singer case

9  in Canada, did you not?

10      A    Yes, and probably in a number of other cases also.

11      Q    So if there was shaking, plus impact, that is

12  indeed a way that these injuries could be sustained in an

13  infant?

14      A    Well, the shaking has nothing to do with it.  In

15  impact injury, certainly you can slam a child's head into a

16  wall or the floor and you can kill the child.  The shaking

17  has nothing to do with it.

18      Q    Now you had discussed on your direct examination

19  the fact that you are now the medical education coordinator,

20  did you say?

21      A    Director.

22      Q    Director.  And you are also the head of the

23  anatomic laboratory?

24      A    That's correct, anatomic and clinical.

25      Q    I'm sorry.  I missed the other part.

1       A       Anatomic and clinical, both the laboratories

2   anatomic and clinical.

3       Q       The anatomic and clinical laboratories are where

4   patients are being seen in that hospital possibly for

5   routine procedures or for diagnosis of certain cancers or

6   tumors and you actually supervise the laboratory in their

7   examination of samples taken during surgery, correct?

8       A       That was sort of a compound question.  It was a

9   compound question.  That part of the laboratory, yes, I

10  supervise all of the people that do the laboratory testing

11  in the hospital.  I also examine biopsies that are done, a

12  breast biopsy, for example, or if your appendix is removed,

13  I will look at those and give it a name or a diagnosis.

14      Q       That is 90 percent of the time that you spend as a

15  pathologist, is it not?

16      A       That was probably true a couple of years ago.  I

17  would say that I probably spend one-fourth of my time right

18  now reviewing these types of cases today.

19      Q       So you spend approximately 75 percent of your time

20  now working in the laboratory and 25 percent of your time

21  testifying in cases where shaken baby syndrome has been

22  alleged as the cause of death?

23      A       No.  I spend approximately 25 percent of my time

24  reviewing cases.  I actually testify on about one out of

25  four or one out of five of the cases that I review.  It

1258

1    takes longer to review than to come to a conclusion than it

2    does to testify.

3         Q    You are not board certified in pediatrics,

4    correct?

5         A    That's correct.

6         Q    You're not board certified in adult critical care?

7         A    Or infant critical care, that's correct.

8         Q    Pediatric critical care?

9         A    That's correct.

10        Q    You're not board certified in anesthesiology or

11   anesthesia?

12        A    No.

13        Q    You're not board certified in radiology?

14        A    Correct.

15        Q    In fact, your testimony on direct was, I don't

16   read the CT scans because I'm not a radiologist?

17        A    That's correct.

18        Q    So you must depend or defer to the radiologists

19   who in fact do read the CT scans, correct?

20        A    In terms of the objective findings, yes, I do.

21        Q    You're not an ophthalmologist as well?

22        A    That's correct.

23        Q    And you're not a pediatric ophthalmologist?

24        A    No.

25        Q    Which is a specialty of ophthalmology, right?

1   A   That is correct.

2   Q   I know you testified quite a bit about birth and

3   birth trauma, but you are not board certified in obstetrics

4   and gynecology?

5   A   No, I am not.

6   Q   And as such I know you offered a bit of testimony

7   regarding the birth of Robbie Quirello, but as such would

8   you defer to a board certified obstetrician as to whether or

9   not Robbie Querillo's death was -- pardon me -- his birth

10  was difficult?

11  A   Well, I'm not sure.  First of all, you want that

12  person that did the testimony to be the person that actually

13  delivered Robbie, for starters, and then I would want to

14  know that person's specialty.  In other words, if that

15  person is somebody who takes care of high risk infants and

16  mothers, then on that scale Robbie's birth may not have been

17  traumatic.  So it really depends on the perspective of the

18  person that's giving the testimony rather than an objective

19  determination based on the signs and symptoms that Robbie

20  had.

21  Q   In your conclusion that Robbie Quirello suffered

22  from a difficult birth, you indicated that fetal distress

23  was something that you would have considered.

24  A   Yes.

25  Q   What did you review in the records that suggested

1   to you that Robbie in any way suffered from fetal distress?

2       A    The statement that I'm relying on is from the

3   birth records which show that he was born one month

4   prematurely, which is not a very big deal, had a broken

5   collarbone, which means that they had to intentionally break

6   his collarbone during the deliverly process.  It's not very

7   common to have an accidental break of a collarbone during

8   birth, which suggests to me that was a difficult delivery.

9       Q    Now would you defer to both a pediatrician and an

10  obstetrician regarding the occurrence of broken collarbones

11  in birth?

12      A    In what respect?  I'm not trying to be

13  argumentative.

14      Q    If the obstetrician and pediatrician were both to

15  say that it is quite common to have broken collarbones at

16  birth, would you defer to their expertise rather than your

17  own in making the conclusion or drawing the opinion that

18  this child had a difficult birth because of some intentional

19  breaking of the collarbone?

20      A    Well, first of all, I would want them to quantify

21  their observation, not just say common, but put it in

22  numbers.  In fact, the incidences are around one or

23  two percent.  Now if somebody wants to say that that's

24  common, fine, but I won't say whether it's common or

25  uncommon.  I'll just tell you what the incidence is and then

1   you can makeup your own mind.

2       Q    Other than the broken collarbone, what other

3   evidence do you have to show this baby had fetal distress?

4       A    He didn't have any evidence for fetal distress as

5   far as I know.

6       Q    Correct.  In fact, the fetal heart monitor shows

7   no evidence of fetal distress, doesn't it?

8       A    That's correct.

9       Q    In fact, there was no use of forceps in this

10  delivery?

11      A    That's correct.

12      Q    There was no suction used in this delivery?

13      A    That's correct.

14      Q    Although it was a sunny side up or face up

15  delivery, other than that, there was no other indication in

16  the birth records that suggested to you that any other

17  extraordinary means needed to be used to have this baby

18  delivered?

19      A    No.

20      Q    So you are relying totally on the fact that this

21  child had a broken clavicle for your opinion that he had a

22  difficult birth?

23      A    Well, that and the duration of the second stage of

24  labor.  I don't have those records right in front of me, but

25  if I remember correctly, it was prolonged.

1    Q    Now you also do not have a board certification in

2 neurology, correct?

3    A    That's correct.

4    Q    And you don't have a board certification in

5 pediatric neurology?

6    A    No, I do not.

7    Q    You don't have a degree in physics?

8    A    No.

9    Q    In fact, you, in other testimony, have had to rely

10 on reviewing your college physics textbook to bring yourself

11 up to date on the laws that you apply in your theory

12 regarding the absence of shaken baby syndrome as a viable

13 diagnosis?

14    A    Well, as of five years ago that was certainly

15 true, even though we should have been taught mechanics as

16 part of our pathology or at least forensic pathology

17 residency.  We use mechanics.  We talk about bullet

18 velocities and energy and accelerations and so forth, but

19 were never really taught it.

20         So I was really forced to relearn classic

21 mechanics at the age of almost 50 and since that time I've

22 had the opportunity to work with and learn some -- learn

23 from the primary neuro researchers really in the world on

24 this topic talking about the mechanics of head injury in

25 adults and children.

1263

1    Q    But you have not returned to an institution of

2    higher learning to obtain any degree in physics, physical

3    engineering or engineering; is that correct?

4    A    No.  I'm not an engineer.  I'm not gonna be an

5    engineer.  I'm not gonna build any bridges.

6    Q    And in the area of pathology, you are not board

7    certified in the specialization, which is neuropathology?

8    A    That is correct.

9    Q    Neuropathology is a specialization in pathology

10   that concentrates solely on the brain and the cervical cord?

11   A    That's correct.

12   Q    And you are not a specialist in that area?

13   A    That is correct.

14   Q    You did review Dr. Stephen Nelson's report, did

15   you not?

16   A    Yes, I did.

17   Q    And he is a neuropathologist?

18   A    That is correct.

19   Q    And in Dr. Stephen Nelson's report, he reports

20   evidence or findings, microscopic findings of cortical

21   cerebral contusions; isn't that correct?

22   A    Correct.

23   Q    And those cortical cerebral contusions are in fact

24   evidence of a traumatic injury to Robbie's brain?

25   A    Only in that they are the result of the swelling

1  of the brain itself and the fact that Robbie was on the

2  respirator.  They are not a separate or independent injury

3  from them.

4      Q    Would that finding of contusions on the brain be

5  consistent with a child suffering from a traumatic injury,

6  such as an impact injury?

7      A    Well, they could be, but Robbie has no evidence

8  from --

9      Q    I'm not asking about Robbie.  I'm asking about a

10  child.

11     A    It would depend on the specific location of those

12  injuries, whether or not they truly represent contusions,

13  which are extremely rare in children under the age of

14  approximately six months.  The types of contusions that they

15  get are fundamentally different.  They're called contusional

16  tears, T-E-A-R-S, and they occur in a very specific part of

17  the brain.  Children under four and a half months don't get

18  traumatic contusions.

19     Q    Unless something happens to them that is

20  intentional in nature to cause those contusions; isn't that

21  correct, Doctor?

22     A    No, that is not correct.  Only if they are in fact

23  what are called contusional tears.  Those can occur

24  accidentally from a fall or they can occur if somebody slams

25  a child's head into a wall.

1    Q    So you agree with me then?

2    A    Well, you said only indicative of intentional

3    abuse and I'm perhaps paraphrasing.  And I said, No, I

4    disagree with that.

5    Q    So it can be a fall or intentional abuse?

6    A    To cause contusional tears, yes.  Robbie does not

7    have contusional tears.

8    Q    There is no allegation that this child fell.

9    A    That's correct.

10    Q    Now your consultation, is that part of you being

11    the medical director -- pardon me -- the education director

12    for Regina Medical Center, the fact that you go across the

13    country testifying in cases such as this?

14    A    Well, it's part of my job as a pathologist, the

15    same as you would have a surgeon on your staff who might see

16    patients from a different city or even go to a different

17    city to have a clinic or do whatever.  It's part of my

18    responsibilities as a pathologist at the hospital.

19    Q    You've been retained by defense counsel in at

20    least 300 cases alleging that children have died or suffered

21    injury as a result of shaken baby syndrome, have you not?

22    A    Goodness, no, not even close.

23    Q    You've spoken at conferences for public defenders

24    and criminal defense attorneys?

25    A    Yes, I have.

1    Q    In fact, several years ago you spoke at the annual

2  conference of the public defenders in the State of Florida?

3    A    Yes, I did.

4    Q    And in 2001 you spoke at the annual public

5  defender seminar in Iowa?

6    A    I may have.  I forgot about that, but, yes, I was

7  in Iowa.

8    Q    There have been many other public defender and

9  defense lawyer conferences in which you have provided

10  information regarding your position on shaken baby syndrome;

11  is that correct?

12    A    Let me think about this for a second.  Florida I

13  remember very well.  Iowa I had forgotten about.  I spoke in

14  Reno I believe a year ago at approximately this time.  Let

15  me think for just a minute.  I don't recall any other either

16  public defender or regular defender meetings that I have

17  spoken at.  So over the last 25 years I have spoken three

18  times.  I wish I would be asked and had the time to do it

19  more often.

20    Q    At each of these conferences you have advocated

21  the position that you stated today, that there is no such

22  thing as shaken baby syndrome; is that correct?

23    A    No, that's not what I've said at all.  That's not

24  what I said today.

25    Q    Your testimony today is that this baby could not

1   be shaken in a way that would have caused the injuries that

2   were sustained?

3        A    Well, my testimony was that Robbie was not shaken,

4   that the chronic subdural hematoma that he had was not

5   caused by shaking.  Robbie died with, not because of a

6   subdural hematoma.

7        Q    Did you in fact testify at your deposition taken

8   on August 12th --

9             MS. SINGER:  And I will be providing a copy to

10            counsel -- to the doctor in a moment, your Honor.

11  BY MS. SINGER:

12       Q    -- That you do not believe a baby can suffer death

13  as a result of shaken baby syndrome?

14       A    On August 12th of this year?

15       Q    Yes, sir.

16       A    I certainly did not.  I said that the injuries

17  called the shaken baby syndrome cannot be caused by shaking.

18  There are other injuries that can.

19       Q    And so at this point you're saying that the

20  injuries can be sustained so long as there is an impact

21  involved with the shaking?

22       A    The shaking has nothing to do with it.  If you

23  have an impact injury to a child's head, the child may die.

24  You may kill a child by shaking it.  But adding shaking to

25  impact or impact to shaking does not change the mechanics of

1   the injury or the mechanism of injury.  They are two

2   fundamentally different concepts.

3        Q    Are you now scheduled to testify in another case

4   tomorrow?

5        A    What day is today?

6        Q    Today is -- That's a good question.  I think today

7   is the 17th of September.

8        A    What day of the week?

9        Q    Today is Tuesday.

10       A    Tuesday.  I'm scheduled to testify in Iowa on

11  Thursday.  I believe I fly to Des Moines.  It's at the

12  request of a woman who has been in prison for 13 years.

13  It's a post-conviction relief hearing and I'm going there

14  for the cost of a plane ticket that they're buying.

15       Q    And isn't it true that after your deposition on

16  August 12th of this year, you were scheduled to be in

17  Orlando on behalf of the defendant on August 19th of this

18  year?

19       A    Yes.

20       Q    And weren't you scheduled to be in Wisconsin the

21  week of August 26th on behalf of the defendant?

22       A    Yes.  That was in -- That was not an infant case

23  and that case settled.  I did not testify.

24       Q    And isn't it true you were also scheduled to be in

25  Reno, Nevada the week of September 9th on behalf of the

1    defendant?

2         A    That case also did not go.

3         Q    And you're also scheduled to be in Iowa the week

4    of September 23rd?  That was on your calendar in fact on

5    August 12th?

6         A    Oh, that was the Rodie (phonetic) case.  That was

7    all part of the same thing.  I think I had it listed over a

8    week's time.  I wasn't sure what date.

9         Q    Isn't it true you were also double booked to be in

10   British Columbia during the same week to testify on behalf

11   of the defendant?

12        A    I'm actually triple booked.  British Columbia is

13   at the request of the prosecutor.  I think I'm also

14   scheduled to be in two other places at the same time, but

15   that won't happen again.

16        Q    Well, of course there's no question here that you

17   did not personally treat Robbie Quirello?

18        A    That is correct.

19        Q    Did you not examine him or make any clinical

20   findings on his behalf before you rendered your opinion in

21   this case?

22        A    That is correct.

23        Q    And as a forensic consultant in this case, you did

24   not perform an autopsy yourself?

25        A    That is correct.

1    Q    Dr. Hamilton performed the autopsy and you

2    reviewed what written material and slides and photographs

3    that were provided to you by defense counsel?

4    A    Yes, that is correct.

5    Q    And before your deposition that was taken on

6    August 12th, you spent a total of approximately two or three

7    hours reviewing the records and other data before reaching

8    your opinion?

9    A    That's correct.

10    Q    You have not spoken to Brian Herlihy, the

11    defendant, in this case regarding what occurred on August

12    the 2nd, correct?

13    A    That's correct.  I haven't even met him.

14    Q    And you were provided the CT scans of Robbie

15    Quirello along with the EEG's and blood work and the chart,

16    the medical chart that outlined his clinical progression?

17    You were provided that record for review at the time you

18    rendered your opinion?

19    A    I was provided the record, but if I received the

20    CT and MR scans, I would have sent them back because I don't

21    look at them.

22    Q    Do you also not read EEG's?

23    A    That's correct.

24    Q    So you would not be able to render any opinion on

25    what the EEG showed regarding Robbie's brain damage?

1    A    That's correct.

2    Q    And you would have to defer to the pediatric

3    neurologist, who in fact did read the EEG's in the course of

4    his diagnosis?

5    A    Well, I would certainly defer to somebody other

6    than myself.  Who that person would be, I don't know, but I

7    wouldn't do it.

8    Q    Now you did not speak with Dr. Bernard Maria, the

9    pediatric neurologist who attended to Robbie Quirello, did

10   you?

11   A    No, I did not.

12   Q    So you did not get any updated information from

13   him regarding his clinical impressions or his clinical

14   examination?

15   A    You mean something different from what is in the

16   medical records?

17   Q    Yes.  You did not get any additional information?

18   A    Well, if there's something different from what is

19   in the medical records, then, no, I didn't.

20   Q    You did not personally speak with Dr. Lawrence

21   Levine, who's the pediatric ophthalmologist who attended to

22   Robbie Quirello?

23   A    That is correct.

24   Q    And I understand although you find Dr. Hamilton's

25   autopsy not to be up to par, you did not personally speak

1   with Dr. Hamilton, the District Medical Examiner for the

2   Eighth District here in Florida to discuss his findings with

3   him, did you?

4        A    No.  There is no point in discussing the findings

5   with somebody where an incident occurred some time later

6   because I have to -- everyone has to rely on your written

7   report and your photographs and your slides.  There's

8   nothing else that is reliable.  Your memory is not reliable.

9        Q    If you had a concern --

10           MR. TEDDER:  Your Honor, my objection is he was

11        still answering the question when he was interrupted.

12           THE COURT:  All right.  Don't interrupt the

13        witness, Ms. Singer.

14           MS. SINGER:  I'm sorry.

15           THE COURT:  Go ahead.

16           THE WITNESS:  Your memory, at least my memory is

17        not reliable.  I have to rely on what I have written

18        and what I have photographed and what I have on the

19        microscopic slides.  I can't remember next week what I

20        did today.

21   BY MS. SINGER:

22        Q    You did not speak with Dr. Hamilton about what he

23   saw upon his examination of Robbie Querillo's brain and

24   skull, did you?

25           MR. GROLAND:  Objection, asked and answered.  He

1273

1      said he did not talk to Dr. Hamilton and that meant

2      ever.

3          THE COURT:  The objection is sustained.

4  BY MS. SINGER:

5      Q    Doctor, did you voice a concern to Dr. Hamilton

6  regarding your inability to view the dura?

7      A    No.  It's a little late.

8      Q    Did you personally contact your peer,

9  Dr. Hamilton, to discuss with him what he may have seen when

10  he viewed the dura?

11     A    No.

12     Q    Does it surprise you to know that Dr. Hamilton

13  does not agree with your findings regarding the photographs

14  of the dura?

15     A    No, it doesn't.

16     Q    And in fact does it surprise you that neither

17  Dr. Hamilton, nor Dr. Nelson agree with you regarding your

18  findings on the dura?

19     A    Well, I don't know how Dr. Nelson can disagree.

20  He didn't get any dura either and he didn't get any spinal

21  cord either.

22     Q    But he did get the photographs, though.

23     A    Yes, he did.

24     Q    You did not personally speak with Dr. Nelson, did

25  you?

1     A     No, I did not.

2     Q     Now he was the neuropathologist that actually

3   dissected the brain and viewed the cortical contusions; is

4   that correct?

5     A     To the best of my knowledge Dr. Nelson did not

6   examine the brain.  Dr. Nelson did not receive the brain.

7   Dr. Nelson received eight microscopic slides.  There is no

8   description that I have been able to find of the examination

9   of the brain performed by Dr. Nelson if he in fact performed

10  an examination of the brain other than the microscopic

11  slides.

12          MR. TEDDER:  May we approach, your Honor?

13          THE COURT:  Yes.

14      BENCH CONFERENCE HELD:

15          MR. TEDDER:  Your Honor, I became aware of the

16      fact that Dr. Nelson had grossly examined the child's

17      brain during the course of his deposition in a letter

18      which he sent to Dr. Hamilton.  It was then transmitted

19      to me via fax from Dr. Nelson's office in Lakeland,

20      Florida.  We did not have it in our file before then.

21      I had asked that that be sent to Dr. Plunkett and

22      apparently he's not received it.  So I would ask for a

23      recess and he be given an opportunity to review that

24      letter dated September 18th.  The only letter we have

25      is a letter dated October 23rd, which does deal with

1       the microscopic slides.

2              THE COURT:  I'm not going to interrupt

3       cross-examination to address this issue.  I'll be glad

4       to revisit it before your redirect.

5       BENCH CONFERENCE CONCLUDED.

6   BY MS. SINGER:

7       Q    So, Dr. Plunkett, you did not receive in the

8   packet that defense provided to you a letter dated September

9   18th, 2002 to Dr. William Hamilton from Dr. Stephen Nelson

10  stating, "Thank you for sending me the decedent's brain to

11  examine in consultation.  It arrived a couple of weeks ago.

12  And in an abundance of caution, the formula was changed and

13  it was allowed to fix for the additional couple of weeks"?

14  You have not seen that letter?

15      A    No, I haven't.

16      Q    And you were not aware of the fact that Dr. Nelson

17  did examine this brain?

18      A    I assumed that Dr. Nelson had examined the

19  microscopic slides and that Dr. Hamilton had examined the

20  brain.

21      Q    In fact, the neuropathologist, the expert in the

22  area of the brain at autopsy, did examine this brain, did he

23  not?

24      A    I would like to see the report.

25      Q    That report was provided to you after examination

1    in a letter dated October -- I believe it's the 23rd, 2000.

2    Do you have that letter, Doctor?

3        A    Yes, I do.

4        Q    And you've had more than sufficient time to review

5    that letter.  That letter was in fact provided to you, was

6    it not?

7        A    Yes.  That's a description of the microscopic

8    examination.

9        Q    And so your testimony is that you were not

10    provided with the information regarding the gross inspection

11    of the brain; is that correct?

12       A    I have seen no report of the gross inspection of

13    the brain.

14       Q    And your opinion is based on not reviewing that

15    particular letter; is that correct?

16       A    Well, Dr. Nelson has diagnoses or impressions and

17    I happen --

18       Q    You did not personally speak -- I'm sorry, sir.

19       A    -- I happen to agree with his diagnoses or

20    impressions.

21       Q    You have not personally spoken with Dr. Nelson?

22       A    No.

23       Q    Personally, Dr. Plunkett, in terms of head trauma,

24    you have only done two autopsies on children whose deaths

25    were exclusively due to head trauma; is that correct?

1    A    That's correct.

2    Q    You did one back in 1975?

3    A    It's either '75 or '76.  It was while I was only a

4  fellow.

5    Q    And the second one was in the early '90s?

6    A    That's correct.

7    Q    And you have not done one since then?

8    A    That's correct.

9    Q    So over 25 years as a pathologist you have done

10  only two out of the many thousands of autopsies you've done

11  as both assistant coroner and coroner for the various

12  counties in which you've been employed, correct?

13    A    In children who died exclusively as a result of

14  head trauma.  Other children had head trauma as part of a

15  battered child syndrome with other organ injuries and so

16  forth.

17    Q    You have never arrived at an opinion in a case for

18  which you have been assigned or reviewed that a child was

19  the victim of shaken baby syndrome?

20    A    Well, actually I have.  I came to that conclusion

21  in a Ramsey County case and in an Iowa case -- No.  In a

22  Wisconsin case in the early '90s.  Today I would not have

23  come to that conclusion.  As a matter of fact, I've got the

24  newspaper article of the one from Ramsey County saying that

25  a person subsequently pleaded and they said, well, I had

1   reviewed it and they concurred that it was a shaken baby

2   syndrome.  Today I wouldn't.

3       Q    Your testimony today is that Robbie had an old

4   subdural hematoma that bled, correct?

5       A    Well, the words are correct.  I'm not sure the

6   context or the implication is.

7       Q    That he had an old subdural hematoma that bled?

8       A    Well, he had a chronic subdural hematoma that was

9   bleeding.

10      Q    That was bleeding on August the 2nd of 2000?

11      A    Yes.

12      Q    The day that he entered into the hospital?

13      A    That's correct.

14      Q    And what signs would you expect to see in a child

15  with a bleeding subdural hematoma?

16      A    Well, first of all, you may see none because

17  bleeding is part of the subdural hematoma, it's part of the

18  natural history.  Certainly Robbie had been bleeding for a

19  long time into that subdural hematoma prior to August 2nd

20  and as far as I know, he didn't have any signs or symptoms

21  whatsoever.  So the first thing that you may see is nothing.

22           The second thing that you may see is a seizure as

23  a result of it.  The third thing that you may see is

24  irritability, change in eating patterns, fussiness and so

25  forth caused by pressure on the brain from the volume of the

1279

1    subdural hematoma.  You may see an increase in the head

2    size.

3         Q    Isn't it true that if there was pressure on the

4    brain as a result of the hematoma, that that would be noted

5    in the CT scans that were done upon his admission?

6         A    Well, there was no herniation, but his fontanel is

7    described as tense and bulging.  That means there was

8    pressure.

9              MR. GROLAND:  Objection, your Honor.  Same

10        objection.

11             MS. SINGER:  I think he was nonresponsive to the

12        question, your Honor.  Should I ask for him to respond

13        every time he's nonresponsive to the question?

14             THE COURT:  Yes, ma'am, you should.

15   BY MS. SINGER:

16        Q    I don't believe you were responsive to the

17   question, Doctor.  On the CT scans that were done upon

18   admission, isn't it true that there was no evidence that the

19   subdural hematomas that you say were in existence were in

20   fact affecting the brain?

21        A    Oh, I agree.  The subdural hematoma in and of

22   itself was not of sufficient volume to cause signs and

23   symptoms.

24        Q    Isn't it true that an old subdural hematoma, let's

25   say at birth, which is where I believe you're putting the