1    subdural hematoma as being created --

2         A    That is not correct.  I am not putting it there.

3    I'm saying that it is more than two weeks old and could

4    relate back to birth.

5         Q    If the child had a subdural hematoma more than two

6    weeks old, would not the body form a neomembrane in order to

7    wall off that subdural hematoma and begin the mopping up

8    process?

9         A    It starts to develop a neomembrane, yes.

10        Q    Isn't it true that eventually the body mops up the

11   blood products and what is left is a hygroma?

12        A    Well, that's the shorthand version.  Complete

13   healing would mean that you have nothing left except for

14   staining of the dura caused by the residual inflammatory

15   cells of iron pigment.  If it goes on to develop a hygroma,

16   which is strictly speaking just water on the surface of the

17   brain, that is certainly not healing.  The subdural hygroma

18   by itself may continue to enlarge and may require surgical

19   removal.

20        Q    But a hygroma itself does not bleed, does it,

21   Doctor?

22        A    That's correct.

23        Q    And in premature children, isn't there often

24   evidence of cerebral spinal fluid surrounding the brain?

25        A    Well, all people have evidence for cerebral spinal

1   fluid surrounding their brain.

2       Q    Doesn't cerebral spinal fluid look the same on CT

3   scans as old blood?

4           MR. GROLAND:  Objection, your Honor.  He's already

5       testified he's not a radiologist.  He doesn't read CAT

6       scans.  It's beyond his field of expertise.

7           THE COURT:  Overruled.  If you're able to answer

8       the question, Doctor, you may do so.

9           THE WITNESS:  I agree with Mr. Groland.

10  BY MS. SINGER:

11      Q    So you would defer to a radiologist --

12      A    Yes.

13      Q    -- To make that determination?

14      A    Yes, I would.

15      Q    Now is it your testimony, as I understand it

16  today, that bleeding in the subdural space always results in

17  bleeding in the subarachnoid space?

18      A    Yes.  Well, no, no.  If the cause of the bleeding

19  is rupture of bridging veins, then there must be bleeding in

20  the subarachnoid space.  If the blood in the subdural space

21  is caused by bleeding within the dura itself, what

22  Dr. Geddes calls intradural hemorrhage with break-through

23  bleeding into the subdural space, then you may not see

24  subarachnoid hemorrhage.

25      Q    So you would expect to see bleeding in the

1282

1    subdural space and the subarachnoid space if there was a

2    rupture of the bridging veins?

3         A    That's correct.

4         Q    And isn't it true that rupture of the bridging

5    veins occurs when there is traumatic injury to the brain?

6         A    When there is traumatic injury to the bridging

7    blood vessels, which may occur with no injury of the brain

8    itself.

9         Q    And isn't it true then that if there was an impact

10   injury, there could be rupture of the subdural bridging

11   veins as well as bleeding in the subarachnoid space?

12        A    Yes, there could be.

13        Q    Now you cited and used some photographs from a

14   neuropathologist by the name of Jennian Geddes, correct?

15        A    That's correct.

16        Q    And that article is not published yet, correct?

17        A    No.

18        Q    And the photographs that you were relying on, you

19   indicated were of a 32 week premature child, correct?

20        A    I'm not relying on them.  I'm simply showing the

21   jury what is going to appear in her article for

22   demonstrative purposes.

23        Q    But the photographs were of a 32 week old newborn

24   child?

25        A    That's correct.

1    Q     And not a four and a half month old child?

2    A     That's correct.

3    Q     And also you indicated that there was difficulty

4   in birth and fetal distress, correct?

5    A     That's correct.

6    Q     With poor breathing and the child was

7   resuscitated?

8    A     That's correct.

9    Q     You can't say whether or not forceps were used in

10  that delivery, can you?

11   A     Yes, I can.

12   Q     What is the answer to that, sir?

13   A     No, they were not.  It was a C-section.

14   Q     All right.  But that was after it was discovered

15  that the child was having fetal distress in the womb, is it

16  not?

17   A     That's correct.

18   Q     So the problem with breathing occurred before the

19  baby went through the birth canal?

20   A     That's correct.

21   Q     We don't have that situation here with Robbie

22  Quirello.  He was four and a half months old; is that

23  correct?

24   A     That's correct.

25   Q     You also indicated that when blood is in the brain

1   for four to five days, there is a sign of iron pigment,

2   correct?  Did I understand you correctly on direct

3   examination that you would have some iron staining after

4   four or five days?

5        A     I don't recall if that's what you and I discussed

6   during the deposition or whether I actually said it on

7   direct examination, but it takes about four to five days to

8   be able to see iron pigment when you're looking at a section

9   of the dura under a microscope.

10             When the eyes were examined, iron was seen in the

11  bleeding in the retina.  But Robbie had been in the hospital

12  for eight days.  So the fact that there is iron there does

13  not surprise me at all.  It doesn't tell you whether the

14  initial injury occurred eight days before or eight weeks

15  before.

16       Q     And you agree that the autopsy is the gold

17  standard?

18       A     For what?

19       Q     For making a determination or making a final

20  determination as to cause of death?

21       A     Well, I think that it's gonna depend on the

22  quality of the autopsy and the quality of the person doing

23  the examination.  But the purpose of the autopsy is not to

24  determine the cause of death.  Robbie's cause of death was

25  clear from the hospitalization.  You didn't need to perform

1   an autopsy to determine why Robbie died.  You needed to

2   perform an autopsy in order to document any and all injuries

3   that he had, to document them well so that two years plus

4   later you can come back and reconstruct it.

5        Q    You have corrected radiologists in the past in

6   your own experience?

7        A    What?

8        Q    Have you corrected radiologists in the past?

9        A    Corrected radiologists?

10       Q    Yes.

11       A    I have a brother who's head of radiology at Abbott

12  Northwestern.  I don't think he would take kindly to me

13  correcting him.  I have discussed discrepancies in findings

14  between myself and a radiologist.

15       Q    So you have found that there are discrepancies?

16       A    Yes.

17       Q    Now you keep -- you kept saying on direct

18  examination that you would have wanted to examine the brain

19  stem.

20       A    I didn't keep on saying that.  I would have wanted

21  to examine the dura itself.  I would have wanted to examine

22  the brain stem and the spinal cord for purposes of trying to

23  date the initial injury.  Even with that, I may not have

24  been able to.

25       Q    You were not aware that Dr. Nelson did in fact

1   examine -- the neuropathologist did in fact examine the

2   brain stem?

3        A    Well, he did examine the brain stem because that's

4   part of his examination, but he didn't -- that's part of the

5   brain and there's a description of it in his microscopic

6   report.   But there is no -- there's no description of the

7   spinal cord.

8        Q    Now you were asked quite a bit about lack of

9   oxygen, but the heartbeat of the child still being -- still

10  occurring.

11       A    That's correct.

12       Q    If we can get to that.   It's my understanding that

13  had there been a finding that the heartbeat was still

14  occurring, that the lack of oxygen would have been very

15  short, in your opinion, for the heartbeat to have been

16  continual or have been continuously occurring?

17       A    Less than seven to ten minutes, that's correct.

18       Q    And were you aware that at the time that 911 was

19  called for this child, the child was reported to be

20  breathing?

21       A    Yes, I was.

22       Q    And were you aware of the fact that during the

23  time that 911 was communicating with Brian Herlihy, but

24  before the EMT's got to the house, the child had been

25  gurgling?

```
 1        A    Yes.  Well, I didn't interpret it as gurgling.  I
 2   thought it was vomiting.  That's how I was interpreting it.
 3        Q    You didn't listen to the 911 tape?
 4        A    No, I didn't.
 5        Q    So you did not have that available to you to
 6   determine exactly how the child was described while the
 7   EMT's were on their way to the apartment?
 8        A    No.
 9        Q    So if you were told that the child had been
10   breathing intermittently, had a heart rate and was gurgling
11   during that time, would you not agree the child was showing
12   signs of breathing during that time period?
13        A    No.  That type of intermittent breathing is what's
14   called agonal, A-G-O-N-A-L, breathing.  It's sometimes
15   called kussmahl, K-U-S-S-M-A-H-L, breathing.  It's agonal
16   breathing that occurs sporadically and is not very good at
17   oxygen exchange.  It's a leftover primitive reflex, as best
18   I know, to try to keep you going, but it doesn't work very
19   effectively.
20        Q    Is it your testimony today that the injury that
21   occurred to Robbie Quirello was the result of lack of
22   oxygen?
23        A    His death was as a result of a lack of oxygen.
24        Q    Was the injury to his brain that was seen on
25   August the 2nd due to lack of oxygen, Doctor?
```

1288

1    A    No.

2    Q    Ultimately his brain gave out and he couldn't

3    breathe anymore and he died, correct?

4    A    Well, I don't know if I would characterize it as

5    his brain going out. The parts of the brain that control

6    breathing were damaged and he stopped breathing. It was the

7    stoppage of the breathing that ultimately caused his death.

8    Q    And is it your testimony today that the damage or

9    injury that occurred to Robbie Quirello was due to him being

10   wedged in a bed?

11   A    This injury and subsequent death could have

12   occurred if Robbie was trapped in that bed exactly as

13   stated. The complicating factor is that he has a chronic

14   subdural hematoma that is going to be subject to new

15   bleeding with no trauma or to new bleeding with relative

16   lack of oxygen, because someone with a chronic subdural

17   hematoma does not have a normal brain structure. I just

18   don't know where to put that chronic subdural hematoma into

19   the cause and effect relationship of what happened to

20   Robbie. I don't know where exactly to put it.

21   Q    Dr. Plunkett, do you recall your deposition taken

22   on August 12th of this year?

23   A    I don't recall it at all, but go ahead.

24   Q    All right.

25        THE COURT: Give the Doctor a copy of the

```
 1        deposition.

 2   BY MS. SINGER:

 3        Q    I'm turning now to page 44.  Dr. Plunkett, on line

 4   ten, my question or statement to you was, "The injury that

 5   you see in Robbie's brain, is it your opinion that it is a

 6   result of having been trapped between the bed?"  Answer,

 7   "No, no."  And I finished my question by saying, "Rail and

 8   the mattress?"  Answer, "No, it's not, no."  Do you recall

 9   that question and that answer?

10        A    Yes, I do.

11        Q    Now I can take my deposition back, please.  Thank

12   you, sir.

13        A    Can I read --

14        Q    You'll have an opportunity to explain it on

15   redirect, sir.

16             Now let's talk about the retinal hemorrhaging that

17   you agree was found during the course of the autopsy.  You

18   do agree with that, correct, that there was retinal

19   hemorrhaging?

20        A    Yes, that's correct.

21        Q    Is it my understanding that your testimony is the

22   retinal hemorrhaging was due to brain swelling that occluded

23   the vein that went into the eyes and supplied blood to the

24   retina?

25        A    The retinal hemorrhage was the result of pressure
```

1   within or around the veins exceeding the venous pressure.

2        Q    What -- I'm sorry, sir.

3        A    That can occur as a direct result of an impact, a

4   drastic increase in pressure.  It can occur as a result of

5   structural or functional clotting such as occurs with

6   cortical venous thrombosis.  It can occur as a result of

7   generalized or even localized swelling of the brain.

8        Q    So you agree then that at least in your theory of

9   how the retinal hemorrhages occurred, they could be due to

10  an impact injury to Robbie Quirello?

11       A    Yes.

12       Q    What vein is occluded when there is intracranial

13  pressure that causes retinal hemorrhaging?

14       A    Well, there are a number of veins that can be

15  occluded.  The central retinal vein may be occluded, the

16  peripheral veins that are not directly connected to the

17  central retinal vein may be occluded.  The exact veins that

18  are occluded is unknown.  As a matter of fact,

19  experimentally it's difficult to cause retinal hemorrhage by

20  simply occluding the central retinal vein.  It usually takes

21  contributaries (sic) also.

22       Q    For this intracranial pressure to occur and cause

23  the retinal hemorrhaging, that would have had to occur

24  before Robbie was seen in the emergency room, correct?

25       A    I'm not sure of the time course of documentation

1291

1    of the retinal hemorrhage.

2        Q    Let's assume for a moment that the chart shows

3    that they were documented in the emergency room.

4        A    Sure.

5        Q    All right.  Let's just assume that for a moment.

6    I don't think I'm misleading you here.  I think that's

7    testified to.

8        A    No.  That's fine.

9        Q    For your testimony to explain those retinal

10   hemorrhages, they would have had to occur before they were

11   actually documented in the emergency room, correct?

12       A    That's correct.

13       Q    And that pressure would have been so high to cause

14   the actual pressure to these veins and cause the occlusion

15   that causes the bleeding?

16       A    I'm going to quantify so high for you rather than

17   using it qualitatively.

18       Q    Good.

19       A    Anything above eight or ten millimeters of

20   mercury, it could have occurred days or even weeks prior to

21   the time that Robbie was seen in the emergency room.

22       Q    Or it could have also occurred right before Robbie

23   went into the emergency room?

24       A    That is correct.

25       Q    It could have occurred as a result of an impact

1  injury that occurred right before Robbie went into the

2  emergency room?

3       A    Yes.

4       Q    It could have occurred in conjunction with other

5  injuries sustained to Robbie's brain?

6       A    I'm not sure what you mean by other injuries, but

7  if Robbie had an impact injury, yes, that could cause

8  retinal hemorrhage.

9       Q    Well, we know Robbie was in an unconscious state

10  or a semiconscious state when he was admitted into Shands

11  Teaching Hospital.

12       A    He was unconscious.  I would classify it as

13  unconscious.

14       Q    And we know that that was as a result of a brain

15  injury.

16       A    Yes, that's correct.

17       Q    And you don't disagree that the retinal

18  hemorrhaging could have occurred at the very same time that

19  the brain injury occurred?

20       A    Well, if you're talking about the initial -- Are

21  you talking about the initial injury causing the subdural

22  hematoma?  Is that what you're talking about?

23       Q    I'm talking about the fact that it is indeed

24  possible that this child could have sustained severe brain

25  injury and retinal hemorrhaging shortly before his admission

1293

1    into Shands Teaching Hospital, that it is indeed possible

2    under your theory, is it not, Doctor?

3         A    I mean, I will never say never, but that is a

4    mischaracterization of the actual injury that he has.  What

5    Robbie has is simply a cessation of his breathing.  He

6    doesn't have an impact injury.  He doesn't have a mark on

7    his body.  He doesn't have a skull fracture.  There's no

8    bruise underneath the scalp.  He has a cessation of

9    breathing that's caused his death.

10        Q    Did you not review Dr. Anne Dickison's notes in

11   the chart reflecting that in fact there was a noted bruise

12   to the occipital area of the head of this child?

13        A    Well, I didn't see it.  It was not commented on in

14   the radiology reports and it's not commented on in the

15   autopsy report.  If the autopsy is the gold standard, then

16   where are we?

17        Q    Had there been such a finding, would that be

18   consistent with an impact injury, sir?

19        A    Yes, it would.

20        Q    And would it be consistent with the brain injuries

21   that occurred as a result of an impact injury?

22        A    With the exception that Robbie has an established

23   brain injury at the time he was brought into the hospital on

24   August 2nd.

25        Q    Is it yes or no, sir?  Is it consistent?

1    A    Yes.

2    Q    Now you were talking a little bit about the

3  physics here and I do have some questions about that.  What

4  you said on direct examination is that 1G is 320 feet per

5  second?

6    A    No, I didn't.

7    Q    Well, you did say that on direct examination.  Do

8  you want to correct that?  You did.

9    A    No, I didn't.  I said 1G is 32 feet per second

10  squared.

11    Q    All right.

12    A    Ten G's is 320 feet per second squared.

13    Q    Ten G's is 320 feet per second?

14    A    Squared.  It's acceleration.

15    Q    And 320 feet would be the length of a football

16  field?

17    A    Yes, in Canada.

18    Q    In Canada, right.

19    A    Canada.

20    Q    We only have 300 feet here.

21    A    Right.

22    Q    And it's your testimony that folks have been able

23  to shake or been able to get the acceleration of up to 16

24  G's in biomechanical testing or biomechanical

25  experimentation?

Stacey K. Bryant, RPR
Judicial Court Reporter

1    A    Yes.

2    Q    That's about as high as they can go?

3    A    That's correct.

4    Q    Isn't it correct that eight G's will kill a pilot?

5    A    Actually four G's will, but that's an entirely

6    different mechanism.  It's caused by the lack of blood flow,

7    which causes you to blackout, not a traumatic brain injury.

8    So it's totally different.  Four G's or five G's will do it.

9    Q    So you're saying that ten G's maximum force, which

10   would be 320 feet per second squared, going the force of --

11   going an entire football field squared several times in

12   shaking a baby would not cause injury to this child; is that

13   what you're saying?

14   A    That's correct.  It does not cause the types of

15   brain injuries that you see in Robbie.  Its been well

16   studied and well characterized for the last 60 years.

17   Q    You are in the minority on this issue, are you

18   not, sir?

19   A    Among the pediatricians, certainly.  Among the

20   forensic pathologists, no.

21   Q    And as a result you have gone across the country

22   testifying on behalf of defendants in criminal cases such as

23   this, presenting this minority view?

24   A    You mean as a result of being in the minority,

25   have gone across the country presenting this minority view?

1    No, I don't think that's correct.  I've testified in 15 or

2    16 states.  I'm one of the first people that has been

3    willing to address this issue from a scientific standpoint.

4         Q    And it is your testimony that's offered in these

5    cases that it is not possible to shake a baby the length of

6    a football field in a split second and cause the injuries

7    that are seen in shaken baby syndrome?

8         A    You've just said two different things.  If you're

9    talking about 320 feet per second squared, that's not a

10   split second.  You're talking about motion.  You are able to

11   shake a child; and you can do this as an actual experiment

12   or you can do it as a mind game, you can shake a child at

13   three or four cycles per second, three or four times back

14   and forth a second and you can calculate the maximum

15   acceleration that you achieve.

16             Dancers doing pirouettes, divers going off of a

17   10-millimeter platform generate more rotational acceleration

18   during the pirouette or during the dive than does a human

19   shaking a child.

20        Q    Now, sir --

21        A    I don't think it's a good idea to shake a child,

22   but you do not cause the injuries called the shaken baby

23   syndrome by shaking someone.

24        Q    Now, sir, a diver is not four and a half months

25   old, correct?

1    A    That's correct.

2    Q    A diver is not constructed like a four and a half

3  month old infant, correct?

4    A    That's correct.

5    Q    A diver does not have the same head to body size

6  ratio as an adult, correct?

7    A    Well, as a baby, that's correct.

8    Q    As a baby as an adult would have?

9    A    That's correct.

10    Q    And isn't it true that dancers are not four and a

11  half months old?

12    A    Most of them.

13    Q    All right.  You know one that's four and a half

14  months old?

15    A    My second granddaughter is trying to dance at

16  eight months and she just started walking.

17    Q    But before they start walking?

18    A    No.

19    Q    Unlikely.  And it's your testimony that you can't

20  shake a baby hard enough, I understand that, and my question

21  is this:  You haven't done any experiments shaking babies,

22  have you?

23    A    No, I haven't.

24    Q    Nobody's done any experiments shaking babies, have

25  they?

1298

1   A    No.

2   Q    That's because it would be unethical to shake

3   babies?

4   A    Yes, that's correct.

5   Q    The reason why it would be unethical is because

6   you would cause significant, severe brain damage in an

7   experimentation of this theory that you offer that such

8   injuries cannot occur?

9   A    No.  I think that's the reason that's given.  You

10  also don't find any volunteers who are just taking babies

11  and dropping them three feet to the floor, which I think

12  would be unethical because I know what will happen there.

13  Q    Right.  In fact, sir, you have written articles

14  where a baby can suffer a fall that will result in death by

15  falling merely 33 inches?

16  A    Even less than that.

17  Q    Even less than that.  So impact certainly could

18  cause that?

19  A    Yes.

20  Q    And shaking with impact could cause death?

21  A    Shaking has nothing to do with it.  You can

22  cause -- Shaking and impact are totally different mechanisms

23  of mechanical causes of injury.

24          MS. SINGER:  One moment, your Honor.

25          (Brief pause.)

1   BY MS. SINGER:

2       Q    Dr. Plunkett, you had indicated that those retinal

3   hemorrhages that were seen upon examination in the emergency

4   room could have been there well before August the 2nd; is

5   that correct?  Is that what I understood your testimony to

6   be?

7       A    That's correct, yes.

8       Q    Did you examine the slides that were done at the

9   Alliant Eye Institute during the autopsy, the specific

10  autopsy of the eyes that were done in this case?

11      A    No.  I relied on the report.

12      Q    If the evidence was that those retinal hemorrhages

13  were so severe that this child would be blind, would you

14  contest that at this time?

15      A    No.

16      Q    So Robbie Quirello wouldn't have been playing with

17  his daddy and focusing on his daddy at 9:00 a.m. if he had

18  those retinal hemorrhages and they caused him to be blind

19  before that time; is that correct?

20      A    That is not true.  The retinal hemorrhages that

21  were found at the time of the autopsy are not indicative of

22  the condition of his eyes when he came into the emergency

23  room, anymore than the condition of his brain at the time of

24  the autopsy was indicative of the condition of his brain

25  when he came into the emergency room.

1300

1    MS. SINGER: No further questions, your Honor.

2    THE COURT: All right. Since we've been going an

3    hour again, unless you have only a few questions,

4    Mr. Tedder, we will take another recess.

5    MR. TEDDER: No, ma'am. I have more than a few

6    questions.

7    THE COURT: We'll take a 15 minute recess, ladies

8    and gentlemen.

9    Ms. Singer, Mr. Pennypacker, don't leave yet,

10   please.

11   (Out of the presence of the jury.)

12   THE COURT: Now at sidebar Mr. Tedder had asked

13   that Dr. Plunkett be given another medical report to

14   review prior to redirect, which of course if that is

15   done and if you ask questions regarding that area,

16   that's going to require a recross on that area.

17   MR. TEDDER: Well, I think we have no choice, your

18   Honor. This letter only came to my attention in the

19   middle of the deposition on September the 4th, 2002

20   because I did not have it and Dr. Nelson was referring

21   to his gross examination of the brain. We recessed the

22   deposition. Dr. Nelson faxed me the letter. I thought

23   I had directed someone in our office to send it to

24   Dr. Nelson -- excuse me -- Dr. Plunkett and

25   Dr. Uscinski. I suppose it wasn't done.

THE COURT: What does the state say?

MS. SINGER: I don't have a problem with that, Judge, but I do want the record to be clear on something. Dr. Stephen Nelson's name was provided to defense counsel in October of the year 2000 and there was an opportunity to speak with Dr. Nelson from October 2000 throughout the time that his deposition was taken. I just want the record to be clear on that.

As far as whether or not Mr. Tedder wishes to show this to Dr. Plunkett, I'm not going to oppose that as long as I'm allowed to cross-examine on any new areas that come of it.

THE COURT: You will be. All right. You may utilize the recess as you see fit. Recess for 15 minutes.

MR. TEDDER: Your Honor, I'm just going to hand him this letter, show it to Ms. Singer first. I'm not going to say anything to Dr. Plunkett whatsoever about it.

(Recess 3:51 - 4:04.)

(Out of the presence of the jury.)

MR. TEDDER: Your Honor, as you know before the last recess we provided Dr. Plunkett a copy of the letter dated September 18th, 2000 that Dr. Nelson sent to Dr. Hamilton. He indicated to me that there was

1  something Dr. Plunkett wanted to relay to me about the

2  contents of this letter.  I did not ask him what that

3  was.  We would like to find out what it was prior to

4  bringing the jury out.  I would ask leave of court to

5  speak to Dr. Plunkett with the prosecutors to find out

6  exactly what he found in this letter.

7      MS. SINGER:  We would leave it up to the court.

8      THE COURT:  Have a seat, Dr. Plunkett.

9      MR. TEDDER:  I'll re-hand him the letter again.

10     THE COURT:  And all of these attorneys may speak

11  with Dr. Plunkett simultaneously to find out what this

12  new issue is so long as it doesn't take very long.

13  This does not need to be reported, does it?

14     MR. GROLAND:  No.  This is just an informal --

15     (Brief pause.)

16     THE COURT:  All right.  Are we ready for the jury

17  to come back in?

18     MR. TEDDER:  Yes, ma'am.

19     THE COURT:  Before we do, one of the jurors,

20  Mr. Cartel has requested a new notebook.  Any

21  objection?

22     MS. SINGER:  No, ma'am, but I don't know if I have

23  a new notebook.

24     THE COURT:  The state had already provided 15 as

25  opposed to 14, so we do have one.

1303

1    MS. SINGER:  Oh, great.

2    THE COURT:  However, I'll alert the state and

3    defense just in case other jurors might be running out

4    of room, that you might want to bring more tomorrow.

5    MS. SINGER:  I'll have my investigator go ahead

6    and purchase -- As soon as she comes back, Judge, I'll

7    tell her to go ahead and purchase more notebooks for

8    tomorrow.  Judge, how many do you want?  Should we get

9    a whole set of 12?

10    THE COURT:  I don't want any personally.  It's

11    totally up to you and if the jurors request them, we'll

12    give them one.

13    (The jury is present and seated in the jury box.)

14    THE COURT:  Mr. Cartel, there you are.  You have

15    requested an additional notebook; is that right?

16    JUROR CARTEL:  No.

17    THE COURT:  We got the information wrong.  Did one

18    of the jurors request an additional notebook?  Good

19    enough.  If you need one we can get it.

20    All right.  Go ahead and have a seat, Doctor.

21    And, Mr. Tedder, you may continue with your redirect.

22    MS. SINGER:  Excuse me, your Honor, if I can just

23    move this podium.

24    MR. TEDDER:  Thank you, Ms. Singer.

25    MS. SINGER:  You're welcome, Mr. Tedder.

Stacey K. Bryant, RPR
Judicial Court Reporter

000610

1304

| | |
|---|---|
| 1 | REDIRECT-EXAMINATION |
| 2 | BY MR. TEDDER: |
| 3 | Q    Dr. Plunkett, several times throughout your |
| 4 | testimony you described evidence seen in the photographs, |
| 5 | which you described as a cortical venous thrombosis. |
| 6 | A    Yes. |
| 7 | Q    Tell the jury what that is, please. |
| 8 | A    Cortical venous thrombosis refers to clotting of |
| 9 | the blood vessels on the surface of the brain.  It is part |
| 10 | of a process that can in and of itself kill somebody.  It's |
| 11 | uncommon.  It is frequently misdiagnosed as representing |
| 12 | inflicted trauma and I have seen it misdiagnosed probably a |
| 13 | half a dozen times. |
| 14 | Q    Now in the recess we provided you with a letter |
| 15 | from Dr. Nelson to Dr. Hamilton dated September 18th, 2000, |
| 16 | correct? |
| 17 | A    Yes, that's correct. |
| 18 | Q    We neglected to get that information to you prior |
| 19 | to just now; is that correct? |
| 20 | A    That's correct. |
| 21 | Q    Dr. Plunkett, you had an opportunity to review |
| 22 | that letter from September 18th, 2000? |
| 23 | A    That is correct. |
| 24 | Q    Tell the jury what -- does that -- does what's in |
| 25 | that letter change your opinion in any way in this case? |

1   A   No.  It really confirms what I thought I was

2   looking at with just the photographs of the brain.

3   Dr. Nelson's describing the most prominent area of

4   subarachnoid hematoma.  He describes it as a hematoma, an

5   actual collection of blood, not just bleeding.  It was on

6   the left superior frontal gyri, a clot of blood measured

7   eight by eight by nine millimeters.  That is exactly what

8   you see in the photographs.  It is cortical vein thrombosis.

9   I just don't know if it's cortical vein thrombosis that

10  developed after Robbie was hospitalized, or was in fact the

11  primary event.

12      Q   Now you also indicated there was some concerns you

13  had from the letter dated September 18th, 2000 with respect

14  to the autopsy at the time of this case.  Can you tell the

15  jury what those are?

16      A   Well, it's probably a little bit picky, but the

17  autopsy report is dated August 10th of 2000.  In

18  Dr. Nelson's letter he states that he notes in the protocol,

19  which included for me that the brain weight at autopsy was

20  listed as 1,826 grams.  Well, that's not what the brain

21  weight is listed as in the protocol today.  It's listed as

22  826 grams.  So somebody went back, changed the number

23  without indicating that that number had been changed.  To

24  me, that's not kosher.  When you're making a change in the

25  report based on subsequent information, even if it's a typo,

1306

1    that should be dated and initialed.

2         Q.   Anything else in that letter dated September 18th

3    that you would want to draw to the attention of the jury?

4         A    No, other than I completely agree with

5    Dr. Nelson's diagnoses, which are immature human brain,

6    subarachnoid hemorrhage and hematoma, cerebral edema, which

7    means brain swelling generalized, and vascular congestion

8    generalized.  I completely agree with that.  He doesn't

9    describe any subdural hemorrhage because he can't.  He

10   didn't get the portion of the dura to examine.  So I would

11   agree with his diagnoses, not necessarily the implication of

12   those diagnoses, but the diagnoses themselves, yes, I would.

13        Q    Now during cross-examination the state asked you

14   whether you could kill a baby by shaking the baby.  You

15   indicated it's theoretically impossible.

16        A    Yes.

17        Q    Explain to the jury what you mean by that.

18        A    We don't know failure characteristics of various

19   structures in infants.  We don't know how much stretch the

20   infant mid brain can take before the brain centers fail.  We

21   don't know how much we can stretch the ligaments around the

22   cervical vertebral bodies in infants before they fail.

23             Using adult criteria, which we do have, it would

24   be theoretically possible to stretch those nerve fibers

25   beyond the point where they could recover and cause death by

1   direct stretching of the nerve fibers themselves.  In that

2   case, again using adult criteria, there ought to be

3   relatively massive neck damage because the neck damage

4   failure, whiplash, which is neck injury, whiplash occurs at

5   a lower threshold, a lower level than does the stretching of

6   those brain stem structures, at least on a theoretical

7   basis.  That would be one possible mechanism that shaking

8   could cause death.

9           Second mechanism, you shake a child for so long

10  that the child doesn't breathe for about three or four, five

11  minutes, something like that.  I don't think it's a good

12  idea to shake a child.

13      Q    Now you indicated that there's -- that tossing a

14  child on a bed would not cause the kind of deceleration

15  needed to cause a brain injury seen in this case, but him

16  falling on a carpet could, at least during

17  cross-examination.  Is that what you said?  Is that what you

18  meant to say?

19      A    I'm sorry.  Could you repeat that?

20      Q    Or did I mishear you?  I think the state was

21  cross-examining you about whether or not tossing a baby on a

22  bed could cause the kind of deceleration needed to create

23  the injury present in this child, and you indicated no.

24      A    Yes, that's correct.

25      Q    I think the state tried to say that falling --

1    tossing a baby on the carpet could cause the type of

2    acceleration necessary.

3         A    Yes.

4         Q    Do you agree or disagree with that?

5         A    I agree with that.

6         Q    Why?

7         A    Well, throwing a child onto a bed is not an impact

8    injury at all.  Think about the pillow fights that you've

9    been in.  That's not an impact.  The only thing that flies

10   around is a bunch of feathers or a bunch of foam.

11            To have an impact, you need to have a contact

12   event or a contact phenomena.  You need a bruise, you need a

13   fracture, you need something to move, you need wave

14   propagation or physics.  Those are the essential ingredients

15   of an impact.

16            When you're throwing somebody to the bed and the

17   bed deforms two or three inches and your head doesn't deform

18   at all, that's not even an impact.  It's just -- It's

19   something totally different.  In contrast, if your head hits

20   a non-yielding surface, such as the floor, even if it's a

21   floor with a padded carpet, in that situation you do get a

22   local or contact phenomena.  You do get wave propagation and

23   you may certainly, although not always, get traumatic brain

24   injury.

25        Q    The state -- Quite frequently during your

1   testimony you indicated shaking has nothing to do with it.

2   What do you mean by that?

3        A    The mechanism of shaking -- Shaking is motion at a

4   distance from the applied force.  And by force, I really

5   mean acceleration, but I use the term force.  The best

6   example I can think of is, you shake the trunk or limb on an

7   apple tree and the apple falls off.  That's shaking.  You

8   never touched the apple at all and yet your motions caused

9   something to happen to that apple.

10            In contrast, an impact has the local phenomena

11   that I talked about, which has to be a contact event of some

12   sort, a bruise, a ruptured blood vessel.  It can be really

13   minor.  It can be really minor in wave propagation.

14            So they are two totally distinct mechanisms of

15   injury to living structures and I'm not limiting the living

16   structures to human beings.  These laws also apply to corn

17   plants up in Minnesota.  I mean, these are the bases for the

18   use of biomechanical principles for all living creatures, be

19   they animal or plant.

20        Q    You were asked about contusional tears.  What do

21   you mean by that?

22        A    Contusional tear is a specific type of contusion

23   or bruise that an infant almost always below the age of six

24   months gets as a result of an impact injury.  These are

25   first described by a neuropathologist named Lindenberg, I

1 believe his last name is B-E-R-G, who was a neuropathologist

2 from Baltimore and was a neuropathologist for the Maryland

3 Medical Examiner's Office.  And he described tears

4 principally at the juncture of the gray and white matter of

5 the brain in infants who had impact head injuries and they

6 are very distinct and very different from those seen in

7 older children or adults.

8          Older children and adults get impact injuries on

9 the surface of the prominent part of the cerebral hemisphere

10 called the gyri and they don't get these tears at the

11 juncture of the gray and white matter as children under the

12 age of six months with an impact injury that is significant,

13 yet a different injury pattern.

14      Q    Did you see any evidence of that in this case?

15      A    Robbie has no evidence for contusional tears

16 whatsoever.

17      Q    Now the state tried to characterize your

18 professional testimony as being defense oriented.  How often

19 over your career as a forensic pathologist would you

20 estimate you have testified for state attorneys or

21 prosecutor's office in Minnesota?

22          MS. SINGER:  I'm going to lodge an objection,

23          repetitive.  That was asked and answered on direct

24          examination of this witness.

25          THE COURT:  Sustained.

1311

```
 1   BY MR. TEDDER:

 2        Q    But you have testified for the prosecution?

 3        A    Yes, sir.

 4        Q    And would do so again today; is that correct?

 5        A    That is correct.

 6             MS. SINGER:  Your Honor, once again, I would lodge

 7        an objection, leading and asked and answered.

 8             THE COURT:  Sustained on both bases.

 9   BY MR. TEDDER:

10        Q    Now the state indicates that -- tries to imply

11   that because you did not examine the child personally, that

12   there should be some questions about your ability to form an

13   opinion on what happened to the child.  How would you

14   respond to that point?

15        A    Well, the purpose of an autopsy report is to allow

16   the person who did the autopsy to recall what he or she did

17   or saw six months or even six years later.  If the report --

18   And I would have to rely on what I had photographed and what

19   slides I had and what my report said to reflect -- to

20   refresh my own mind as to what I saw some time before,

21   sometimes even the day before so that -- I mean, that's the

22   purpose.  The purpose of a report is to allow you or someone

23   else to review the materials and at least have a database

24   that is identical to the database of the person that did the

25   autopsy.
```

1312

1    Q    And you indicated in cross-examination that you

2    were not surprised to learn that Dr. Hamilton disagrees with

3    you.  Why not?

4    A    Well, there are certainly a number of forensic

5    pathologists who disagree with me.  If Dr. Hamilton had

6    agreed with me, he would not have come to the conclusion

7    that he did two years ago.

8    Q    You testified during cross-examination, in the

9    past you came to a conclusion of shaken baby one time

10   before.  I believe you said that did exist a long time in

11   the past.  Is that the truth?

12   A    Well, I know of one time for sure because I've got

13   the newspaper article that says, "Plunkett looked at it and

14   he agreed."  There may have been a couple of other times in

15   the early '90s when I did.  I mean, I bought into this whole

16   thing until relatively recently.

17   Q    What caused you to change your mind?

18   A    Understanding the mechanics of the head injury.

19   Q    How did you learn about that?  When did you become

20   concerned about it and begin investigating the mechanics of

21   the head injury?

22   A    When I started to review all of the original

23   source literature regarding head injury from Wayne State

24   University, from the Naval testing in New Orleans, from the

25   Johnson Space Center.  I had to read all of these original

Stacey K. Bryant, RPR
Judicial Court Reporter

000619

1   source documents and I didn't understand what the heck they

2   were saying.  So I had to relearn the physics and I had to

3   relearn the math and then I had to go to people who were

4   actually doing the research and talk to them so that I could

5   understand.

6            I still don't understand all of it.  I mean, those

7   are the people that are doing the work and those are the

8   people that fund me.  So I forced myself to understand the

9   mechanics enough to be able to explain a mechanism of injury

10  to myself so that I can understand it and hopefully to

11  others so they can understand it.  So it was that -- it was

12  the interest in science rather than opinion that drove me.

13       Q    You've indicated that a person can have a chronic

14  subdural hematoma and have no symptoms?

15       A    That's correct.

16       Q    And have a chronic subdural hematoma that is

17  continuing to bleed?

18            MS. SINGER:  I'm going to lodge an objection to

19       the leading nature of these questions, your Honor.

20            THE COURT:  Sustained.

21  BY MR. TEDDER:

22       Q    Can a chronic subdural hematoma bleed?

23            MS. SINGER:  I'm going to lodge an objection,

24       leading and asked and answered.

25            THE COURT:  It will be sustained on the basis that

1     its been asked and answered.

2          MR. TEDDER:  Your Honor, she raised it during

3     cross-examination.

4          THE COURT:  It was already sustained, Mr. Tedder.

5  BY MR. TEDDER:

6     Q    I think you testified during cross-examination

7  that you would agree that a subdural hematoma does not cause

8  an impact on the brain.

9     A    That's correct.

10    Q    Did I get that straight or no?

11    A    I think so.

12    Q    Okay.  What impact, if any, does a subdural

13 hematoma have on the brain?

14    A    Well, it may have none.  If the volume -- I mean,

15 people get subdural hematomas and they have absolutely no

16 signs or symptoms whatsoever.  They develop signs and

17 symptoms if there is actually structural damage to the brain

18 at the time of the impact.  They develop signs or symptoms

19 if the subdural hematoma continues to enlarge and that can

20 be over --

21         For example, Ronald Reagan, about six months after

22 he left the presidency, was rushed from California to the

23 Mayo Clinic because he had a chronic subdural hematoma that

24 had occurred.  The initial injury had occurred some four

25 months earlier when he fell off his horse.  He was

1   asymptomatic as far as anyone knew until just a couple days

2   before they brought him to Mayo.  So it can be the volume of

3   the new bleeding itself that can cause the signs and

4   symptoms.

5        Q    Can you explain to the jury the healing process of

6   the subdural hematoma, please?

7        A    The healing process is somewhat different from the

8   healing process that we have with the rest of our injuries

9   that we get.  You get a bruise, inflammatory cells go into

10  the area of bruising.  They remove the dead cells and new

11  blood vessels start to form.

12            Pretty much the same initial steps take place in

13  the brain with a subdural hematoma.  Unfortunately for

14  reasons that are not understood or at least I don't

15  understand, in some and perhaps many cases the subdural

16  hematoma rather than having that nice clean healing process,

17  continues to enlarge.

18            It can continue to enlarge because of new

19  bleeding, which will then enlarge the edges of the subdural

20  hematoma causing new bridging veins to rupture.  It can

21  continue to enlarge because of collection of fluid that

22  eventually has the consistency of cerebral spinal fluid and

23  is simply called a hygroma.

24            So the healing process is a little bit different

25  and no one really understands why chronic subdural hematomas

1     develop.  Certainly something is different from what happens

2     when you and I get hit with a baseball bat or racket ball or

3     with a car.

4         Q     You indicated on cross-examination that

5     pre-healing of a subdural hematoma leaves a stain on the

6     dura?

7         A     Yes.

8         Q     What kind of stain would it leave?

9         A     Iron pigment.  Iron pigment of old inflammatory

10     cells.  You can sometimes see it with your unaided eye and

11     you can almost always see it under the microscope.

12         Q     So it's not always visible with the naked eye?

13         A     No.  That's correct.  That's correct.

14         Q     Which again is why it would have been so important

15     for the dura to be microscopically examined?

16         A     Well, I think it would have been important if you

17     were gonna try to age and get more specific other than older

18     than 15 days.  So if you wanted to say, Well, you know,

19     parts of this are a couple of months old, then you've got to

20     have the dura.  But if the question is -- the only thing you

21     care about is knowing 15 days or less, you can answer that

22     by looking at the CT and MR scans.

23         Q     You testified on cross-examination about the

24     rupturing of the bridging veins between the dura and the

25     arachnoid space.  What do you mean by that?  What do you

1317

1   mean by the connection between them?

2        A    The dural blood vessels go from the under surface

3   of the dura, through the arachnoid membrane, to the surface

4   of the brain.

5        Q    Okay.  So they're not actually attached to the

6   arachnoid membrane?  They go through the arachnoid membrane?

7        A    They go through the arachnoid membrane and they

8   are attached.  They are attached, but they don't suddenly

9   end at the surface of the arachnoid.  They're on the

10  surface.  It looks like a spider web is the best way I can

11  describe it.

12       Q    All right.  And how are bridging veins injured?

13       A    Tearing.

14       Q    You indicated that the purpose of an autopsy was

15  not to determine cause of death.

16       A    That's correct.

17       Q    Tell the jury what the purpose of an autopsy is.

18       A    The purpose of an autopsy is to document

19  everything that you can about that body, every condition,

20  every possible question that may come up later that needs to

21  be answered; height, weight, weight and appearance of the

22  organs, saving various parts of organs if it becomes

23  important later to go back and do something else in order

24  for you to put the autopsy observations in conjunction with

25  the investigation to determine the cause of death.

1318

```
 1          A forensic pathologist has two tools; a history
 2    and a physical examination, the same two tools that any
 3    other physician has.  Those are the only tools we've got.
 4    And the history is what is most important and as I said
 5    earlier, our office will investigate 2,000 deaths this year
 6    and we're only performing about 300 autopsies.  We are
 7    relying on the investigation to allow us to determine the
 8    cause of death and make an arrest.
 9          But you don't determine causes of death in
10    autopsies.  You develop and document observations, which you
11    then have to put in the data bank with a review of the
12    medical records, for example, with someone like Robbie, to
13    try to figure out what happened.
14    Q    Now the state attorney questioned you about
15    discrepancies arising between folks who read CAT scans and
16    pathologists doing autopsies.  And you indicated that you
17    prefer to defer to the radiologist.
18    A    Yes.
19    Q    What sort of discrepancies have you been aware of?
20    A    Oh, there is -- A radiologist can say cortical
21    vein thrombosis or sagittal sinus thrombosis.  A pathologist
22    says, No, it's really subdural hemorrhage or vice versa.
23    These are two different ways of looking at something and we
24    have decided that the autopsy is the gold standard.  I think
25    it should be the gold standard.  But you still make the
```

1319

1    assumption that the autopsy was done correctly and that the

2    observations are appropriately documented and preserved.

3    Then it becomes the gold standard.

4        Q    Now the state described Robbie's breathing as

5    being intermittent and you called it agonal breathing.  Tell

6    the jury again what you meant by agonal breathing.

7            MS. SINGER:  I'm going to lodge an objection.

8        Tell the jury again, just --

9            THE COURT:  Objection is sustained.

10           MR. TEDDER:  Your Honor, he answered it in

11       cross-examination.

12   BY MR. TEDDER:

13       Q    Explain what agonal breathing is, Doctor.

14           MS. SINGER:  I'm going to lodge the same

15       objection.  He's already explained that on

16       cross-examination.

17           THE COURT:  The objection is sustained.

18   BY MR. TEDDER:

19       Q    You testified during -- I believe you said during

20   cross-examination that the injury to Robbie's brain on

21   August 2nd, 2000 was not due to lack of oxygen.

22       A    That's correct.

23       Q    What was the injury on August the 2nd due to,

24   Dr. Plunkett?

25       A    Well, in the transcript that I was referring to in

1   that testimony, we were talking about the initial injury

2   that Robbie had, which is the initial subdural hematoma.   I

3   said as best as I can determine, that is not due to lack of

4   oxygen.  That's trauma.  It's the most common.  But it

5   didn't occur on August 2nd or even on August 1st or even on

6   July 25th.  It was earlier than that.

7        Q    And you indicated a complicating factor in this

8   case with respect to the injury was the chronic subdural

9   hematoma?

10       A    Well, I think it's a terribly complicating factor

11  because I think if the chronic subdural hematoma hadn't been

12  there and everything else that we have was there, you would

13  come to the conclusion assuming investigation of the

14  circumstances and everything else panned out, that this

15  happened exactly the way Mr. Herlihy stated.

16            But now you've got this complicating factor of the

17  subdural hematoma, a brain injury that significantly

18  predates August 2nd and you're -- at least I'm saying, how

19  does this play a role in his death?  Is it something that's

20  really important or relevant?  Or is it simply that Robbie

21  died as a result of asphyxia and happened to have a chronic

22  subdural hematoma?  I know the chronic subdural hematoma

23  didn't kill him and I just don't know where exactly to put

24  it in in the cause and effect relationship.

25       Q    Dr. Dickison indicated -- Well, on

1    cross-examination they talked to you about G force that

2    could kill a pilot.  You indicated that it would be because

3    the pilot couldn't breathe?

4         A    No.

5         Q    I misunderstood.

6         A    No.  It has to do with redistribution of blood at

7    four G's.  Think of it in reverse.  You know, if you're

8    hanging somebody by his or her heels, they can blackout

9    pretty quickly because of the difference of the blood flow

10   to the head.  So if the pilot's blacking out at four G's,

11   they don't want them flying upside down.  That's the whole

12   deal.

13        So it's a totally different mechanism of brain

14   injury in quotes than it is actual traumatic brain injury.

15   That's just a redistribution of blood flow and it happens to

16   be -- Ms. Singer said eight G's.  It's my understanding it

17   was actually closer to four or five.  It has nothing to do

18   with traumatic brain injury, which is a totally different

19   animal.

20        Q    So, in other words, if you're a pilot and you

21   blackout because of that force, once you decrease that

22   force, you regain consciousness?

23        A    Yes, if you haven't hit the ground first.

24        Q    All right.  And we have permanent brain injury?

25             MS. SINGER:  I'm going to lodge an objection to

1322

```
 1        the leading nature of the questions, your Honor.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  No, you won't have any permanent

 4        brain injury.  You just blackout and come back.  I

 5        mean, it's an all or not.  If you come back, you're

 6        fine.  If you don't come back, you're dead.

 7   BY MR. TEDDER:

 8        Q    Because you blacked out and --

 9        A    Crashed the plane.

10        Q    Explain to the jury again what you mean by 32 feet

11   per second.

12              MS. SINGER:  Your Honor, I'll lodge an objection,

13        asked and answered.

14              THE COURT:  Overruled.

15              THE WITNESS:  That is the acceleration due to

16        gravity.  It is called a kinematic, K-I-N-E-M-A-T-I-C,

17        parameter.  It is one of the parameters that is used

18        when you're measuring biophysical events.  It is a

19        direct result of Newton's hypothesis regarding force.

20              Forces that are used in human and animal

21        experimentation are usually in the form of

22        accelerations that are applied and the numbers that are

23        usually used are in terms of multiples of gravitational

24        acceleration.  So you can talk about ten G's or 100 G's

25        or 1,000 G's and there are various thresholds that have
```

1   been developed that are the failure threshold for

2   various tissues.

3           You can say I can apply a force of such and such

4   to the brain at a certain direction for a certain

5   period of time and I'll get this.  I can do something

6   different to another part of the brain and I get a

7   different injury.  This stuff has actually been

8   remarkably remarkably mapped out.  I mean, that's the

9   basis for the structural safety features of cars, car

10  seats, I mean, everything we use in everyday life, the

11  surfaces we walk on are all based on these kinds of

12  studies.

13  BY MR. TEDDER:

14      Q   Now, Dr. Plunkett, the state indicates there have

15  been no experiments done with babies.  In your opinion, what

16  is the best way to do comparable experimentation?

17      A   Try to determine as best we can the structural

18  properties of the human infant and those kind of studies are

19  being done.  Unfortunately, it's usually with cadavers of

20  people whose baby has died.  Some of those studies have been

21  done, but they've been done on dead infants.

22          In Pennsylvania, for example, the next best way is

23  to use animal models to determine those failure

24  characteristics.  There have been a few animal studies that

25  have been done, not many.  There was one done, for example,

1   on baby rats trying to replicate the shaken baby syndrome.

2   The author of that study, who was working under a contract

3   for a pharmaceutical firm, was not able to do it, could not

4   cause what is called the shaken baby syndrome at all under

5   any circumstances with those rats.  It was published in the

6   Journal of Neuro Trauma, which is a peer review journal, I

7   believe in either 1999 or 2000.

8          But that's what we need to do.  We need to develop

9   models as best we can, then test them and validate them,

10  validate the models based on more experimentation.

11  Q     Now I believe you indicated during

12  cross-examination that a short fall can cause death.

13  A     Yes.

14  Q     How is that?

15  A     Well, a short fall is going to have a contact time

16  of approximately five or ten thousandths of a second.  By

17  contact time, I mean the time over which your head goes from

18  a certain impact velocity, say 15 feet per second, which is

19  what it would be in about a 3-foot fall, down to zero.

20         So you have a very very short contact time.  You

21  have a relatively large -- and 15 feet per second is

22  relatively large.  It's ten miles an hour.  That's what I

23  can do a 100-yard dash in if I do it in 20 seconds.

24         So imagine doing a 100-yard dash at ten miles an

25  hour and having a brick wall at the end of it and running

1325

1   into it.  That type of a very simple impact can generate a

2   force and acceleration well in excess of 100 times

3   deceleration of gravity and can kill you and does kill you.

4          Not so often in Florida because you don't have

5   much ice, but we see slips and falls in Minnesota in the

6   wintertime where somebody slips and falls, hits the back of

7   his or her head and dies.  It can happen.

8      Q    You indicated during cross-examination the autopsy

9   of the eyes would be different or the appearance of the eyes

10  at autopsy would be different than the way Robbie's eyes

11  appeared on admission to the hospital.

12     A    Well, certainly.

13     Q    In what ways, Doctor?

14     A    Well, I mean, the whole thing, the appearance of

15  everything in Robbie's autopsy is different from what it

16  would have been in terms of the brain, different from what

17  it was when he was admitted to the hospital.  I mean, it's

18  clear from the neuropathology report that Dr. Nelson is

19  describing a brain that has been on a respirator for eight

20  days, not one day, eight days.

21         The brain is dead.  Its been -- It's decomposing.

22  The eyes are dead.  There continues to be bleeding in those

23  eyes because of hypoxia because the brain is dead.  The

24  veins can't empty correctly.

25     Q    Now the state attorney also cross-examined you

```
 1    regarding your testimony at deposition regarding
 2    Mr. Herlihy's statement that Robbie was trapped between the
 3    bed and the rail, the footboard of the bed.  And they asked
 4    you the question, "The injury that you see in Robbie's
 5    brain, is it your opinion that it is the result of having
 6    been trapped between the bed?"  Answer, "No, no."  Question,
 7    "Rail and mattress?"  Answer, "No, it's not, no."  You
 8    attempted to follow-up on that response and the state didn't
 9    allow you to do that as to what you meant.
10          When she questioned you about being trapped
11    between the bed and the mattress and you were indicating
12    that the injury to his brain was not as a result of being
13    trapped, what did you mean by that?
14      A     Could I refer to the transcript so I can just
15    simply continue to read that paragraph to finish the
16    paragraph to put it into the context in which it was given?
17      Q     Yes, sir.
18          MS. SINGER:  I'm going to lodge an objection to
19          that form of testimony, your Honor.  He did finish the
20          question and answer that I read.  If he needs to
21          refresh his recollection in order to expand, that's
22          fine.  But to read from the deposition I think would be
23          improper.
24          THE COURT:  The objection as phrased is sustained.
25          Doctor, you can use the deposition to refresh your
```

1327

1    recollection and then you can explain your previous

2    answer.

3         THE WITNESS:  Okay.

4  BY MR. TEDDER:

5    Q    Explain to the jury.

6    A    My statement regarding injury referred to the

7  initial injury, the initial subdural hematoma.  My statement

8  was that the initial subdural hematoma was not caused by

9  being trapped in that bed.  Being trapped between the rail

10 and the mattress may have aggravated a pre-existing brain

11 injury, a subdural hematoma, causing it to become

12 symptomatic.  But the trapping itself did not cause the

13 initial injury.

14        MR. TEDDER:  Thank you.  Your Honor, I have no

15   further questions.

16        THE COURT:  Ms. Singer, do you have any recross?

17        MR. GROLAND:  Your Honor, excuse me.

18        MR. TEDDER:  Oh, I'm sorry.  I would ask a chance

19   to talk to Mr. Groland, please.  I'm sorry.

20        (Brief pause.)

21 BY MR. TEDDER:

22   Q    Dr. Plunkett, regarding the cortical venous

23 thrombosis, could it have been a primary event in this case?

24   A    Yes, it could have been.

25   Q    How?

Stacey K. Bryant, RPR
Judicial Court Reporter

000634

1328

1    A    Well, Robbie could have had cortical venous

2  thrombosis as the cause of what was apparently an acute and

3  chronic subdural hematoma.  It is very very difficult

4  radiographically to distinguish those many times and

5  unfortunately Robbie's on a respirator for eight days.

6          So when you're looking at cortical venous

7  thrombosis in the autopsy photographs, which he has, you

8  just don't know if it's a primary event or not.  I don't

9  think that it is.  I don't think that it is.  I think it's

10  due to the fact that he's on a respirator, but I don't know

11  that for sure.

12          MR. TEDDER:  Thank you.  No further questions.

13          MS. SINGER:  I understand, your Honor, that my

14      recross is only as to the letter and the report; is

15      that correct?

16          THE COURT:  Correct.

17                 RECROSS-EXAMINATION

18  BY MS. SINGER:

19      Q    Dr. Plunkett, I only have one question then

20  because I cannot ask any other questions except on the new

21  matter.  I don't know if you need to have the new matter in

22  front of you.  I see you're gathering it up.

23      A    Probably not.

24      Q    As to your comment that the report was generated

25  on August 10th, 2000 and that the weight, the typographical

Src
1369

*(handwritten)* Dr. Lonald Uscinski
Chronic Subdural Hematoma

IN THE CIRCUIT COURT OF FLORIDA
EIGHTH JUDICAL CIRCUIT
IN AND FOR ALACHUA COUNTY

CASE NO: 01-2000-CF-2753-A

TRANSCRIPT ON APPEAL
VOLUME XI
(Pages 1369 - 1503)

STATE OF FLORIDA

vs.

BRIAN PATRICK HERLIHY,

                    Defendant.

_____/

*(handwritten)* Volume XIV
1002-4788

| | |
|---|---|
| Proceedings: | Jury trial |
| Before: | The Honorable Martha Ann Lott, Circuit Judge |
| Date: | September 18, 2002 |
| Time: | 9:00 a.m. |
| Place: | Courtroom 4-A Alachua County Courthouse Gainesville, Florida |
| Reporter: | Stacey K. Bryant, RPR Judicial Court Reporter |

APPEARANCES:

        Jeanne Singer, Assistant State Attorney
        Stephen Pennypacker, Assistant State Attorney
        120 W. University Avenue
        Gainesville, Florida 32608
            Appearing on behalf of the State of Florida

        Gordon Groland, Esquire
        John Tedder, Esquire
        Post Office Box 2848
        Gainesville, Florida 32602
            Attorneys for defendant

1370

1    INDEX TO PROCEEDINGS

2

3    PRELIMINARY MOTIONS: ............................. 1371

4

5    STATE'S CASE:

6

7              DR. RONALD USCINSKI;

8    DIRECT EXAMINATION BY TEDDER: .................... 1389

9

10

11

12

13            INDEX TO EXHIBITS

14

15   DEFENSE EXHBIIT NO. 4.......MARKED IN EVIDENCE.... 1394

16

17

18

19

20

21

22

23

24

25

Stacey K. Bryant, RPR
Judicial Court Reporter

1389

1          his travel plans.

2              Mr. Tedder, you may go ahead and call your

3          witness.

4              MR. TEDDER:  Thank you, your Honor.

5              May it please the Court?  Defense would call

6          Dr. Ronald Uscinski.

7                     DR. RONALD HENRY USCINSKI,

8   having been produced and first duly sworn, testified as

9   follows:

10                    DIRECT EXAMINATION

11  BY MR. TEDDER:

12      Q    Good morning, Dr. Uscinski.

13      A    Good morning.

14      Q    Would you please tell the jury your name, sir?

15      A    Yes.  My name is Ronald Henry Uscinski,

16  U-S-C-I-N --

17              THE COURT:  Would you mind spelling it?  You're

18          going to anyway.  If you'll spell your last name for

19          the court reporter.  Thank you.

20              THE WITNESS:  S-K-I.

21  BY MR. TEDDER:

22      Q    U-S-C-I-N-S-K-I.

23              Dr. Uscinski, where do you live?

24      A    I live in Virginia.  I live in Great Falls,

25  Virginia.

1    Q    What do you -- How are you employed?

2    A    I'm self-employed.

3    Q    Self-employed.  What do you do, Doctor?

4    A    I'm a physician.

5    Q    Do you have any area of specialty?

6    A    Yes, I do.

7    Q    And what is that?

8    A    I'm a neurosurgeon, clinical neurosurgeon.

9    Q    Tell the jury where you went to undergraduate

10   school, please, sir?

11   A    Sure.  I graduated from North Babylon High School

12   in Long Island, New York, 1960.  Entered Fordham University

13   in 1960 to 1964 and was awarded a B.S.

14         1964 to 1968 I attended Georgetown University

15   Medical School and received an M.D. in 1968.

16         From 1968 to middle of 1969 I interned at the

17   Bronx Municipal Hospital Center, which is part of the Albert

18   Einstein University College of Medicine in New York.

19         From 1969 to 1971 I was a medical officer in the

20   United States Navy.

21         From 1971 through 1975 I was a resident in

22   neurosurgery at Georgetown University and affiliated

23   hospitals.

24         From 1975 till the end of 1976 I was a research

25   associate and consultant to neurosurgery at the National

1  Institute of Health, it's what was called the National

2  Institute of Neurologic and Communicative Disease and

3  Stroke.

4          And from 1977 on, until this date, I've been in

5  the practice of neurosurgery.

6      Q    Currently you still continue to practice

7  neurosurgery?

8      A    Yes, indeed.

9      Q    And have you ever had any articles that you've

10 written published?

11     A    Yes.

12     Q    Okay.  Can you tell us just briefly what kind of

13 articles you've had published?

14     A    Yes, they're very few.  I coauthored some articles

15 way back in the '80s about a phenomenon called

16 periventricular leukomalacia, P-E-R-I-V-E-N-T-R-I-C-U-L-A-R

17 L-E-U-K-O-M-A-L-A-C-I-A, which is a dysfunction of the

18 nervous system that affects neonates.

19          And I recently published, not exactly an article,

20 but a letter to the Editor for Debate in the British Journal

21 of Neurosurgery regarding the shaken baby syndrome.

22     Q    Now, you're licensed to practice medicine where,

23 sir?

24     A    Currently licensed in Washington, D.C., Maryland,

25 and Virginia.

1392

```
 1        Q    Are you board certified?

 2        A    Yes.

 3        Q    In what area?

 4        A    In neurosurgery.

 5        Q    Now, as part of your professional experience in

 6    your residency, practice, or any of your training for

 7    medicine, did you ever receive training in neurology?

 8        A    Neurology?

 9        Q    Yes, sir.

10        A    Yes.  It wasn't formal training, but that's an

11    integral part of the training in neurosurgery and the

12    practice of neurosurgery.

13        Q    Do you keep yourself familiar with various

14    neurological articles?

15        A    Mainly neurosurgical articles.  There's lots and

16    lots of literature out there and the majority of my readings

17    nowadays are articles that are directly pertinent to

18    neurosurgery, as opposed to neurology, but I occasionally

19    look at articles in neurology also.

20        Q    And you have training in radiology, reading CAT

21    scans?

22        A    Same thing, same thing.

23        Q    How often do you read CAT scans?

24        A    Daily.

25        Q    Daily.  Okay.  And why do you read CAT scans?
```

Stacey K. Bryant, RPR
Judicial Court Reporter

000641

1393

1    A   Well, as part of it being, part of being a

2 neurosurgeon involves understanding the anatomy of the

3 structure you're going to be dealing with in a very direct

4 fashion, operating on it, and its physiology, how it's

5 working.

6         The discipline of radiology affords the surgeon

7 the opportunity to enhance his or her awareness of the

8 anatomy and physiology of the individual he's treating.  And

9 the central nervous system itself is unique, because it's

10 the only organ system involving bone.  So you can't actually

11 look at it.

12        What we try to do is image it and understand what

13 those images are doing in real life, and how what those

14 images are doing are affecting that particular individual.

15 So radiology is an integral part of the practice of

16 neurosurgery.

17    Q   Have you ever testified as an expert?

18    A   Yes.

19    Q   Can you tell us how many times?

20    A   In my entire career in court probably less than

21 50.

22        MR. TEDDER:  Your Honor, I would like to tender

23     Dr. Uscinski as an expert in the area of neurosurgery.

24        THE COURT:  Any objection?

25        MR. PENNYPACKER:  No objection, your Honor.

Stacey K. Bryant, RPR
Judicial Court Reporter

000642

1394

1    THE COURT:  Dr. Uscinski will be allowed to give

2    his opinion testimony in the area of neurosurgery.

3    MR. TEDDER:  Your Honor, may I approach the

4    witness?

5    THE COURT:  Yes.

6    BY MR. TEDDER:

7    Q    Dr. Uscinski, what is that that I just handed to

8    you?

9    A    That is a copy of my CV and it's not a current

10   one, but it's a copy of my CV.

11   Q    How old is it?

12   A    It's as of February of last year.

13   Q    Okay.  Is it accurate?

14   A    2001 it is.

15   Q    Is it accurate other than the fact it's not

16   completely up to date?

17   A    Yes.

18   MR. TEDDER:  Your Honor, I would like to offer --

19   have that marked and offered into evidence.

20   MR. PENNYPACKER:  No objection.

21   THE COURT:  It will be admitted as number?

22   THE CLERK:  That's 4, your Honor.

23   THE COURT:  4 in evidence for the defense.

24   (Defense Exhibit No. 4 was received in evidence.)

25   BY MR. TEDDER:

1    Q    Now, Dr. Uscinski, did coming down here to testify

2    affect your practice in any way?

3    A    Yes.

4    Q    How does it affect your practice?

5    A    I have four operations to do before the week is

6    out.

7    Q    Four operations to do?

8    A    Two tomorrow and two Friday.

9    Q    All right.  And how much do you charge to come and

10   testify in this case?

11   A    My fee for testifying out of state is $10,000 a

12   day.

13   Q    And is that because of your interruption to your

14   practice?

15   A    Yes.  Yes, I have to reschedule things.  I have to

16   trade off emergency calls with other physicians -- you

17   accumulate a load when you're out of town that way --

18   reschedule the patients, lose patients who are coming in to

19   see you for surgery if it's on those times, yes.

20   Q    Are you on call at various hospitals in the

21   Washington, D.C. area?

22   A    Yes.

23   Q    Emergency rooms?

24   A    Yes.

25   Q    And do you get called out in the middle of the

1396

1    night for emergencies?

2         A    Not as much as I used to, but yes.

3         Q    Dr. Uscinski, do you think it's important to keep

4    an open mind as a doctor?

5         A    It's important to keep an open mind as a human

6    being.

7         Q    Do you look for new developments in medicine?

8         A    Yes.

9         Q    Do you know of any medical beliefs that were once

10   held to be true that are no longer held to be true?

11        A    True, yes.

12        Q    Can you give the jury an example of one?

13        A    Taking out tonsils in children.  That was done

14   universally in the '40s and '50s.  I had it done myself.

15   And you don't see very much of it anymore.  It's falling out

16   of favor.  It turns out the reasons for taking out tonsils

17   weren't really valid reasons.  They were afraid that the

18   tonsils would obstruct the airway and they don't actually do

19   that.

20        Q    I was going to ask you why tonsils used to be

21   taken out, you're saying because of what reason now?

22        A    Well, there were several reasons.  One of them was

23   if they got very enlarged they would obstruct the child's

24   airway.  They were called kissing tonsils.  That really

25   isn't the case.  Your tonsils are basically lymph glands and

```
 1    if you get an infection in your arm sometimes you feel those
 2    little lymph nodes underneath your armpits, or if you get a
 3    scalp infection, you can feel them behind your head.  Lymph
 4    glands are one of the things that we use to detect breast
 5    and lung cancer.  That's when they get infiltrated with
 6    tumor tissue, those being inflamed or infected, and the
 7    lymphatic system is one of the body's mechanisms for
 8    fighting off infection.
 9            Little kids get a lot of sore throats.  When they
10    do, the tonsils get inflamed.  It turns out the tonsils are
11    fighting off the infection.  The fact that they're getting
12    enlarged is not necessarily a bad thing.  By taking away the
13    tonsils we're depriving the body of one of its immune
14    responses, and so we don't do it anymore.  That's one of the
15    arguments that we will use; little kids get lots of
16    infections, we got to take out the tonsils.  That has
17    nothing to do with getting infection.  They're actually
18    helping in this fighting off the infection.  Secondarily,
19    tonsils getting large you say, gee, they're gonna obstruct
20    the airway.  Well, they don't obstruct the airway.  You
21    breathe behind your tonsils.  So, those two reasons turned
22    out to be not very good reasons, so it's not done so much
23    anymore.
24        Q    About how long did it take for medicine to realize
25    it's not a good idea to take out tonsils?
```

1    A    A few decades.  It's still done occasionally,

2  usually for very good reasons, for instance if you get an

3  abscess in the tonsils you may have to drain the abscess.

4  It's called peritonsil abscess.  But, as far as taking out

5  tonsils, we don't see very much of that anymore, I would say

6  for over 30 years now.

7    Q    Okay.  Dr. Uscinski, are you aware of various

8  tests that a neurologist might do to test motor tract injury

9  to a person?

10    A    Sure, you do the same things.

11    Q    Tell the jury is one of those known as the

12  Babinski response?

13    A    Yes.

14    Q    Explain to the jury what that is?

15    A    Sure.  Felix Babinski was a 19th Century anatomist

16  and neurologist and basically when you're examining somebody

17  with respect to how their nervous system is working, one of

18  the things you do is basically testing out electrical

19  circuits.  You tap on a knee, you get a response.  You shine

20  the lights in the eye, you get a pupilar response.  You talk

21  to somebody, they answer you.  That tells you about how the

22  nervous system is working.

23        What Professor Babinski noticed is that if you

24  stroke the sole of someone's foot, an adult, the soles curl

25  downward and the foot flexes forward a little bit in the

1   norm.  In the abnormal, you get almost the opposite

2   response, the foot pulls -- instead of going downward, the

3   foot pulls upward, the toes fan apart and the first toe

4   comes upward.  And that's called an extensive Babinski

5   response.  And in an adult that's a pathologic response,

6   it's an abnormal response.

7          In an infant, before they walk, it's a normal

8   response and there are reasons for that.  The Babinski

9   response is a non-specific response on the part of the

10  nervous system to a stimulus.  That part of the nervous

11  system is operating in infants before they walk.  As the

12  child develops the ability to walk, meaning stands up,

13  starts taking steps, the area that's responsible for that

14  response becomes suppressed and superseded by a higher area

15  of cortical function.  That's the area that's responsible

16  for the child being able to walk.  So the Babinski response

17  changes from an extensor response in the infant, the neonate

18  to a flexor response in the toddler or a child who's getting

19  up and walking.

20      Q   Now, you're aware that Robbie Quirello in this

21  case was four-and-a-half-months old when he passed away?

22      A   Yes.

23      Q   And that Babinski test was done on Robbie when he

24  was in the hospital?

25      A   Yes.

1    Q    Are you aware of what the results were of that

2  examination?

3    A    Yes.

4    Q    Tell the jury what they were and what your opinion

5  is on this.

6    A    Sure.  The Babinski response was an extensor

7  response, which is exactly what you would expect to see in a

8  four month old.  It's a normal response.

9    Q    So the baby's toe extended upward?

10    A    Yes, that doesn't mean there was nothing wrong

11  with the baby, but what it does mean is that's the exact

12  response you would expect to find in a four month old who is

13  perfectly normal and healthy.

14    Q    What time did you expect that response to change

15  in the child?  What's their response, is that what you said?

16  That's where somebody strokes the bottom of your foot and

17  you kind of turn your toe downward?

18    A    Right.

19    Q    Is that like a reaction to tickling?

20    A    Uh-huh.

21    Q    What rough age would you expect the child to

22  develop that?

23    A    Well, you're exactly right in your question, rough

24  age.  There is an age frame and it may vary from child to

25  child.  The point is, that when the Babinski response in an

```
 1    individual child becomes a flexor response when the child is

 2    up and walking independently, because that means that that

 3    part of the nervous system has now developed enough so that

 4    it can suppress the pathological response.

 5         Q    If you would, please, describe cranial caudal

 6    development for the jury, please.

 7         A    Sure.  Cranial caudal development, the concept of

 8    the cranial caudal development is a device that's used as a

 9    teaching aid for people to understand how the nervous system

10    develops in infants.  And cranial caudal development refers

11    to what we see.  In a young baby, a young baby a few weeks

12    old, you really don't see very much because they're not

13    using their cerebrums.  They're using a part of the brain

14    called the brain stem, which is a very primitive part of the

15    brain.  When they turn their head around, their eyes may

16    move conjointly.  They may have some facial expressions.

17    Their arms flail all over the place.  Anybody that's had

18    children can see that.  That's not the cerebral cortex, of

19    course, those are lower structures.

20              The next thing you start to see is the baby starts

21    to focus, maybe follow a light with its eyes.  And that

22    happens usually several weeks after the baby is born.  Then

23    you'll see the baby start trying to turn his head and follow

24    a light.  You know, what's happening is the neck muscles are

25    becoming integrated with the muscles that allow you to
```

```
 1   track.  The baby will start picking its head up and trying
 2   to look around, and that occurs anywhere from around two,
 3.  three to five months, let's say.  Then you see them starting
 4   to try to sit up a little bit, and they start getting
 5   control over their upper extremities, and they can balance
 6   themselves a little bit.  Then you start seeing them to
 7   develop more fine motor movements with their hands.  They
 8   can try to pick things up, fine objects, small objects off
 9   the floor instead of using -- a little baby, when he tries
10   to pick something up first will use his fingers to grab
11   something up.  Later on they develop what's called an
12   opposable thumb, which usually happens somewhere after five
13   to seven months.  When they're able to oppose their thumb,
14   they develop what's called prehension and they pick
15   something up this way.  You don't see little babies use
16   their hands like this, but, you see, three to four or five
17   months old.  They may try to grab something, they will grab
18   it with their finger.  Later on when they can oppose their
19   thumb; that's when they become like little human beings.
20        Then after that they develop more truncal
21   stability, so they can try to pull themselves up into a
22   standing position.  Then they try to walk.  And finally the
23   last, but not least, which occurs later on, develop control
24   over their bowels and bladders because that's actually the
25   lowest part of the spinal cord.  When you develop, you
```

1    develop from the top of the spinal cord on down.  That's why

2    it takes kids longest to get toilet trained.  This has

3    nothing to do with thinking, and learning, and articulating.

4    That's why the cortical function is also a process of

5    learning, and integration.  The neurons are there, but

6    they're not -- they're there and they're active, but they

7    haven't necessarily absorbed all the information.  I'm

8    talking here about learning, speech, communication, et

9    cetera.

10        Q    Doctor, are you also aware that a cortical thumb

11   test was done?

12        A    Yes.

13        Q    And what is that designed to measure?

14        A    Actually, it's what I just described.  The

15   cortical thumb is the thumb that does not have what's called

16   prehension.  Prehension is one of the things that

17   distinguishes us from other primates.  We can take our thumb

18   and oppose it.  That's what allows us to pick up a hammer,

19   write with a pen, play the piano, and shoot a gun.  It's one

20   of the factors that distinguishes us as human beings, and

21   you don't start seeing the cortical thumb until somewhere

22   between six and eight months of age at the time the baby

23   starts being able to pick up small objects.

24        Q    So would it have been unusual for a

25   four-and-a-half-month-old baby to not have a cortical thumb?

1    A    No, it would be usual.  What happens is that a

2  child -- when a little baby makes a fist before they have a

3  cortical thumb, the thumb goes into the fingers like this.

4  And again, if you look at little kids, and we've probably

5  all looked at little kids and I've said this, you can see

6  this.  When they start using their hands for prehension,

7  that's when you start seeing the thumb come out.

8         Actually, there's a movie 2001 that came out in

9  the 1960's, and there's a very telling scene -- I don't know

10  if you've seen it -- but it's got a bunch of apes --

11         MR. PENNYPACKER:  Your Honor, I would object to

12     the relevance of this I would really like to get on to

13     Robbie at some point if we can.

14         THE COURT:  Objection sustained.

15  BY MR. TEDDER:

16    Q    Just for the record you indicated when you said

17  the cortical thumb, you were wrapping your other fingers

18  around your thumb, correct?

19    A    Yes.

20    Q    Now, was there ever -- Let me ask you this:  Would

21  you agree or can a child suffer a subdural, an injury that

22  would cause a subdural hematoma during childbirth?

23    A    Sure.

24    Q    And if that happens, would you expect it to always

25  be immediately detected?

1    A    No.

2    Q    When, if ever, could it be detected?

3    A    You may never detect it.  You might not detect it

4    for several days, several weeks, several months, or never.

5    Q    Are you aware of the birth that Robbie Quirello

6    had in this case?

7    A    I'm sorry?

8    Q    Were you aware of what kind of childbirth Robbie

9    Quirello had in this case?

10   A    From what I understand of the medical records,

11   yes, it was a difficult childbirth.

12   Q    Now, were you aware of the Apgar scores that were

13   given to Robbie on his birth?

14   A    Yes.

15   Q    What do the Apgar scores mean to you?

16   A    They're a rough index of the ability of a baby to

17   sustain it's vital functions, blood pressure, pulse,

18   respiration, and respond in a baby's way, which is a

19   primitive way, but a way appropriate for a baby to exist in

20   the environment.  It does not tell you that the baby is

21   entirely healthy or whole.  It just tells you the baby is

22   functioning at a certain level.

23   Q    I believe Robbie was born with first zero Apgar

24   score as to his color, what would that mean to you?

25   A    It would mean that he was not exchanging air

```
 1    adequately enough to oxygenate his blood.
 2         Q    And I believe he had a one score after five
 3    minutes, what would that mean?
 4         A    I'm sorry?
 5         Q    He had a one score after five minutes; what would
 6    that mean?
 7         A    It means he was getting better at it.
 8         Q    Are there any neurological signs that you might
 9    expect to see if a child had suffered an injury that caused
10    a subdural hematoma at birth?
11         A    You might not see anything at all.  Number one,
12    you might see a patient, you might see a child with a
13    subdural after a perfectly normal birth.  Number two, if a
14    child has a subdural, it might not be detected.
15         Q    The fact that -- were you aware that Robbie
16    Quirello had weak neck muscles?
17              MR. PENNYPACKER:  I would object to the leading
18         nature of the question.
19              THE COURT:  Overruled.
20              THE WITNESS:  By definition all babies have weak
21         neck muscles for two reasons.  It isn't just that
22         they're not developed.  It's that they're not getting
23         signals from the brain to do what they're supposed to
24         do.  That's part of the cranial caudal development.
25         That's why little babies can't get their heads up, or
```

# Continued
# Next
# Volume