# EXHIBIT
# RR

*2o8·l·11939*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

*6-18-8 C.H.*

BRIAN PATRICK HERLIHY }
    Appellant }
v. }
     }
     }
     }
STATE OF FLORIDA }
    Appellee }        CASE NO.   01-2000-CF-2753-A
     }
     }
     }        APPEAL NO. 1D08-1588
     }

VOLUME V

SUPPLEMENTAL
# RECORD

## HONORABLE MARTHA ANN LOTT

**APPEAL FROM THE CIRCUIT COURT**
**8th JUDICIAL CIRCUIT FOR**
**ALACHUA COUNTY, FLORIDA**

**FOR APPELLANT**
MARY E. FITZGIBBONS, ESQUIRE
FITZGIBBONS LAW FIRM, P.A.
917 VERONA STREET
KISSIMMEE, FL 34741

**FOR APPELLEE**
HONORABLE BILL MCCOLLUM
ATTORNEY GENERAL
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

IN THE CIRCUIT COURT
OF THE EIGHTH
JUDICIAL CIRCUIT, IN
AND FOR ALACHUA
COUNTY, FLORIDA

BRIAN PATRICK HERLIHY
    Appellant

vs.

CASE NO. 01-2000-CF-2753-A
APPEAL NO. 1D08-1588

STATE OF FLORIDA
    Appellee

| INDEX INSTRUMENT | DATE FILED | PAGE NO. |
|---|---|---|
| DOCKET LINES | | |
| **VOLUME I** | | |
| MOTION FOR POST-CONVICTION RELIEF | 11-28-2007 | 1-8 |
| NOTICE OF FILING | 11-28-2007 | 9 |
| SUPPLEMENTAL AFFIDAVIT OF DR. SCHEIBNER | 11-27-2007 | 10-28 |
| MOTION FOR LEAVE TO SUPPLEMENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 11-28-2007 | 29-30 |
| HEARING FOR DIVISION I | 01-29-2008 | 31 |
| ORDER GRANTING MOTION FOR LEAVE TO SUPPLEMNENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 02-05-2008 | 32-33 |
| HEARING FOR DIVISION I | 02-14-2008 | 34 |
| NOTICE OF FILING | 03-03-2008 | 35 |

1

| | | |
|---|---|---|
| AFFIDAVIT OF JENNIFER LEIGH SALTER | 03-03-2008 | 36-41 |
| NOTICE OF FILING | 03-04-2008 | 42-43 |
| AFFIDAVIT OF LOIS HERLIHY | 03-04-2008 | 44-46 |
| FINAL ORDER DENYING MOTION FOR POST-CONVICTION RELIEF | 03-04-2008 | 47-50 |
| NOTICE OF APPEAL | 04-02-2008 | 51-52 |

**VOLUME II**

| | | |
|---|---|---|
| FIRST DISTRICT COURT OF APPEAL ORDER | 06-11-2008 | 53-57 |
| MOTION TO VACATE SENTENCE AND CONVICTION PURSUANT TO FLA.R.CR.P. 3.850 AND MEMORANDUM OF LAW | 08-10-2005 | 58-115 |
| ORDER DENYING MOTION FOR POST-CONVICTION RELIEF | 09-30-2005 | 116-119 |
| RULE 3.850 MOTION FOR POST CONVICTION RELIEF, CONTINUED NEXT VOLUME | 08-25-2006 | 120-253 |

**VOLUME III**

| | | |
|---|---|---|
| CONTINUED FROM PREVIOUS VOLUME, RULE 3.850 MOTION FOR POST CONVICTION RELIEF | 08-25-2006 | 254-289 |
| COLLATERAL RELIEF DETERMINATION MADE FROM MOTION [COMPUTER DOCKET ENTRY, NOT A DOCUMENT] | 08-31-2006 | ----- |
| CASE JUDGE REASSIGNED [COMPUTER DOCKET ENTRY, NOT A DOCUMENT] | 12-31-2006 | ----- |
| CASE LAW | 02-06-2007 | 290-314 |
| ORDER DENYING, IN PART, MOTION FOR POST CONVICTION RELIEF, SCHEDULING AN EVIDENTIARY HEARING, IN PART, AND APPOINTING OFFICE OF THE PUBLIC DEFENDER, CONTINUED NEXT VOLUME | 02-08-2007 | 315-454 |

**VOLUME IV**

CONTINUED FROM PREVIOUS VOLUME
ORDER DENYING, IN PART, MOTION FOR POST
CONVICTION RELIEF, SCHEDULING AN
EVIDENTIARY HEARING, IN PART, AND APPOINTING
OFFICE OF THE PUBLIC DEFENDER                      02-08-2007                455-489

MOTION TO STRIKE, OR IN THE ALTERNATIVE,
STATE'S RESPONSE TO DEFENDANT'S RULE 3.850
MOTION FOR POST CONVICTION RELIEF FILED
BY STATE OF FLORIDA                                02-13-2007                490-505

ORDER DIRECTING STATE TO FILE A WRITTEN
RESPONSE                                           02-19-2007                506

DEFENDANT'S RESPONSE TO MOTION TO STRIKE,
OR IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF                                  05-17-2007                507-512

COPY OF ABOVE [NOT INCLUDED HERE BECAUSE
IT IS DUPLICATIVE]                                 05-21-2007                -----

STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR
IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF, RESPONDING TO
DEFENDANT'S RESPONSE OF MAY 16, 2007,
CONTINUED NEXT VOLUME                              06-20-2007                513-655

**VOLUME V**

CONTINUED FROM PREVIOUS VOLUME,
STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR
IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF, RESPONDING TO
DEFENDANT'S RESPONSE OF MAY 16, 2007,             06-20-2007                656-752

ORDER SCHEDULING CASE MANAGEMENT
CONFERENCE                                         08-20-2007                753

HEARING NOTES                                      08-30-2007                754

ORDER SCHEDULING HEARINGS ON PENDING

| | | |
|---|---|---|
| POST-CONVICTION RELIEF MATTERS | 09-07-2007 | 755-756 |
| DEFENDANT'S RESPONSE TO STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF, RESPONDING TO DEFENDANT'S RESPONSE OF MAY 16, 2007 | 09-14-2007 | 757-760 |
| NOTICE OF FILING – AFFIDAVIT OF VIERA SCHEIBNER | 09-14-2007 | 761-772 |
| NOTICE OF FILING – OATH PAGE | 09-24-2007 | 773-775 |
| NOTICE OF FILING – ATTACHED AFFIDAVITS | 09-26-2007 | 776-779 |
| HEARING NOTES | 09-28-2007 | 780 |
| DEFENDANT'S MOTION FOR LEAVE TO AMEND MOTION FOR POSTCONVICTION RELIEF WITH NOTICE OF FILING AND SUPPLEMENTAL AFFIDAVIT OF LOIS N. HERLIHY ATTACHED | 09-28-2007 | 781-785 |
| MEMO FROM J. SILVERMAN TO M. BECKER, STATE ATTORNEY OFFICE | 10-29-2007 | 786 |
| CASE CITATION | 10-29-2007 | 787-788 |
| COPY OF NOTICE OF FILING AFFIDAVIT OF LOIS N. HERLIHY | 10-29-2007 | 789-791 |
| ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF, CONTINUED NEXT VOLUME | 10-29-2007 | 792-856 |

**VOLUME VI**

| | | |
|---|---|---|
| CONTINUED FROM PREVIOUS VOLUME, ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 10-29-2007 | 857-1057 |

**VOLUME VII**

4

CONTINUED FROM PREVIOUS VOLUME,
ORDER GRANTING IN PART, THE STATE'S MOTION
TO STRIKE AND DISMISSING GROUND ONE OF
DEFENDANT'S MOTION FOR POST-CONVICTION
RELIEF                                    10-29-2007                    1058-1107

1    part of it.

2    BY MR. TEDDER:

3        Q    I'm sorry?

4        A    Or part of it.

5        Q    Now you've had an opportunity to review the

6    records in this case, Robbie Quirello's medical records?

7        A    Yes.

8        Q    You're aware of the state's theory of what

9    happened to Robbie Quirello?

10       A    I believe so.

11       Q    Tell the jury what you believe happened to Robbie

12   Quirello based upon your review of the medical records?

13       A    I believe that this, Robbie Quirello, this little

14   baby had a chronic subdural hematoma.  It was undetected.

15   It was bleeding.  It re-bled and he obstructed his airway by

16   one of several mechanisms:  One, he vomited and when he

17   vomited, some of the vomit was lodged in his airway and

18   closed it off; two, the bleeding from the subdural hematoma

19   irritates the surface of the brain.  He had a seizure and

20   wasn't breathing.  And he either vomited after he had a

21   seizure, or vomited and had a seizure.  But in either event,

22   the end point was his airway became obstructed.  When his

23   airway became obstructed, his brain was deprived of oxygen.

24   The brain has an absolute metabolic requirement for oxygen,

25   it's a tracheal environ.  When you deprive the brain of

```
 1   oxygen for four minutes, it starts to die.
 2        Q    Are you aware of the theory known as shaken baby
 3   syndrome?
 4        A    Hypothesis, yes.
 5        Q    Are you aware of any scientific studies that
 6   support it?
 7        A    That support it?  Scientific studies?
 8        Q    Yes, sir?
 9        A    No.
10        Q    Are you aware of any articles regarding it written
11   by Dr. Caffee?
12        A    Caffees, yes.
13        Q    And are you aware of any articles written about it
14   by a Dr. Gutgeltsch.
15        A    Gutgeltsch.
16        Q    Are you aware of articles written by him?
17        A    Yes.
18        Q    What can you tell the jury about those two
19   articles?
20        A    Actually Caffee wrote several articles about it
21   and Gutgeltsch wrote one, what he considered to be a major
22   article.  And they proposed shaking as a hypothesis and
23   nothing more than a hypothesis to explain previously
24   unexplained head injuries in children.  And they based that
25   hypothesis on some experimental work that was done by
```

 1    another neurosurgeon in which this particular neurosurgeon,

 2    the other neurosurgeon, demonstrated that intracranial

 3    injuries could be caused by whiplash injuries in animals,

 4    adult animals, without the head impacting anything.  In

 5    other words, without the head banging against anything.

 6         The idea at the time, and very much today also, is

 7    that you have to have an impact to get a brain injury, or --

 8    and I'm gonna differentiate between a brain injury and what

 9    I'm about to say -- a subdural hematoma.  It might be

10    appropriate to explain what a subdural hematoma is.

11         Q    Please do.

12         A    Okay.  This is not a diversion.  You need to know

13    this.  As I said earlier, the central nervous system is

14    unique because it's the only organ system that's completely

15    surrounded by bone and it is.  The brain is surrounded by

16    bone.  There are little openings in the skull that allow

17    various structures to get in and get out.  For instance, the

18    eyes, the optic nerves you see with, your spinal cord that

19    connects up with the brain.  And there are also structures

20    that allow blood vessels to get in and get out.

21         The very important concept here is that the brain

22    is a biological tissue, is living tissue, and, as living

23    tissue, it has to have sustenance, and it has to have three

24    kinds of sustenance -- actually, two kinds of sustenance,

25    and then something else.  The two kinds of sustenance it has

Stacey K. Bryant, RPR
Judicial Court Reporter

1    to have are that which is necessary for it to metabolize, to

2    work, to do what it does.  It needs glucose; and it needs

3    oxygen.  You're diabetic and your blood sugar goes all the

4    way down, you go into a coma, that's what happens when your

5    brain doesn't get glucose.  If your brain is deprived of the

6    oxygen, you start to die, that's the critical thing.

7              Now, how does the brain get -- and the third

8    thing, by the way, are the nutrients that the brain needs to

9    build itself, the various proteins, and lipids, et cetera,

10   that it needs to synthesize its chemicals.

11             So how does the brain get oxygen and glucose?  It

12   gets it through the circulatory system.  You've got to have

13   blood circulating to the brain and since it's in a closed

14   space, the blood also has to get out.  So you have to have

15   blood vessels supplying the brain, they're called arteries;

16   and you have to have blood vessels draining the brain,

17   called veins.  They all get into and out of the skull.

18             Blood itself belongs inside blood vessels.  It's a

19   carrier mechanism.  It's a transport mechanism, but its

20   effectiveness is true only if it stays inside blood vessels.

21   Once blood gets out of the blood vessels, it's not carrying

22   anything anymore, and there are certain elements in the

23   blood that are actually injurious or can be injurious to the

24   brain.  So the point is blood belongs inside blood vessels.

25             Okay.  We need to concern ourselves now with how

1   the blood gets in; and, more importantly, how it gets out.

2   There are three coverings around the brain.  You may or may

3   not have heard this before.  It's worth reiterating.  The

4   first one is a very tough, leathery, gray structure called

5   the dura mater, D-U-R-A M-A-T-E-R, and that is the outermost

6   covering and that covering is immediately inside the skull.

7   It is intimately attached to the skull.  And the dura mater

8   itself is also living tissue.  All the tissues we're going

9   to talk about are living tissues, which mean they have a

10  blood supply.

11          There is a space between the dura and the inside

12  of the skull, but it's not an actual space, it's a potential

13  space.  If you put something in there and you separate the

14  dura from the inside of the skull, you have now made an

15  actual space.  And we refer to that as the epidural space.

16  You have two pieces of bread together, you got something in

17  between them, you have a potential space.  You separate them

18  and you put peanut butter and jelly in there, and you've got

19  peanut butter and jelly in the epidural space.

20          The second layer is called the arachnoid,

21  A-R-A-C-H-N-O-I-D, and the reason it's called the arachnoid,

22  is there are filaments inside this layer that look like

23  strands of a spider's web, thus the word "arachnoid."  The

24  second layer, the arachnoid layer, is not thick and gray

25  looking, it's actually very thin.  It's completely, just

1    about completely transparent in normal people, and it looks

2    very much like a very thin Saran wrap.

3            The space between the dura and the arachnoid is

4    called the subdural space, and it also is a potential space.

5    We're gonna come back to that space in a few seconds.

6            The space beneath the arachnoid is an actual

7    space.  On the other side of that space is the third layer,

8    called the pia mater, P-I-A  M-A-T-E-R, and that's actually

9    the outer layer of the brain.

10           The space between the dura matter and the pia

11   matter is an actual space and it is filled with a clear

12   watery fluid called cerebrospinal fluid, C-E-R-E-B-R-O-

13   S-P-I-N-A-L, fluid.  Now, cerebrospinal fluid looks exactly

14   like water, because it basically is water.  But it's got --

15   plus it's got a little bit of protein in it and it's got

16   some electrolytes, sodium, potassium, fluorides, chlorine.

17   Anyway, cerebrospinal fluid is manufactured by the brain

18   inside cavities in the brain called ventricles.  There are

19   four of them.  They all communicate with one another.  It

20   gets out through little openings around the base of the

21   brain, it percolates down the spinal canal, comes back up,

22   passively up the spinal canal, and passes through a series

23   of compartments called cisterns, wells, around the surface

24   of the brain, and the cerebral hemispheres, and eventually

25   is absorbed by structures called granulations and up around

1   the vertex of the skull, on either side of the midline.  And

2   cerebrospinal fluid is made and absorbed, it's a dynamic, a

3   dynamic process.  And the brain literally is floating in and

4   buffered by cerebrospinal fluid, so it's a protection.

5            So those are the three layers.

6            I -- let me continue a little bit here.  The blood

7   vessels that supply the brain are four in number.  They all

8   get up through the neck.  There are two in the front, two in

9   the back.  The two in the front are carotid arteries, the

10  two in the back go through the bones in the neck and are

11  called vertebral arteries.  They pass through the base of

12  the skull and they all cross-connect with each other.  And

13  those cross-connects, which is an anatomical circle -- and

14  which we don't need to know the name of it now -- from those

15  cross connects arise the blood vessels that eventually

16  nourish the brain itself.  They nourish, these blood vessels

17  nourish the cerebral hemisphere, the cerebellum, the brain

18  stem, all the structures.  If these blood vessels are

19  plugged up, that part of the brain starts to die.  You call

20  that a stroke.

21           Now, we've traced in the arterial side.  The blood

22  vessels get smaller, and smaller, and smaller, blood flowing

23  through them until they get to single celled, single wall,

24  tiny structures called capillaries and that's where the

25  exchange takes place, the oxygen, nutrients, and taking on

```
 1   of the carbon dioxide, and waste material.  Then the blood
 2   passes through progressively larger venous structures,
 3   veins.  These veins coalesce, larger, larger, larger, and
 4   eventually get up to the surface of the brain and leave the
 5   brain and pass back through the pia, the arachnoid, the dura
 6   and drain into major venous channels called sinuses,
 7   S-I-N-U-S-E-S, which are several in number and which are
 8   anatomically distinct and well documented.  The major one
 9   that we know of is, for today is called the sagittal sinus
10   and it starts just in front of your, between your eyes, and
11   goes right smack in the midline in the dura to the back of
12   your head.  That particular sinus drains the majority of the
13   vertebral hemisphere.  There are also sinuses called the
14   transverse sinuses, which are inside the dura again and
15   travel to either side of the brain from the back of your
16   head to just behind your ears and drain into two large
17   draining channels, which eventually wind up in what's called
18   the jugular veins.
19           There are other sinuses, and I want to make a
20   point here, this is distinct from the paranasal sinuses that
21   you think about when you get a cold.  Those sinuses are
22   little openings in your bone, and they're little air
23   cavities in your bone.  That's not the same kind of thing
24   we're talking about.  The sinuses that I'm talking about
25   here are venous structures, they're not air structures.
```

1       And some of these other sinuses, one in particular

2   called the cavernous sinus, because to the anatomist it

3   looked like a cavern, it's very large, drain some of the

4   anterior parts of the brain, and also the venous drainage

5   from the optic nerves, the central retinal vein goes into

6   the cavernous sinus.

7       Okay.  Now, so you got the arterial and venous

8   system tracked out and you know something about it now.

9       The veins that drain the cerebral hemispheres are

10  anchored at various points.  One of the anchoring points is

11  where they pass through the arachnoid, and another anchoring

12  point is when they pass through the dura.  They actually

13  have some length between the arachnoid and the dura and

14  that's probably left over from when the baby was born,

15  because there's a lot of molding in the skull, and torsion

16  and distortion of the brain.  So there has to be some

17  ability of those veins to withstand that stretching.  It's

18  not a perfect system.  That's how people get subdurals;

19  that's how infants can get subdurals when they're born.

20      But anyway, those two tethering points there are

21  fixed.  If the brain, or those veins, achieve a certain

22  amount of acceleration, they will tear and they tend to tear

23  in the subdural space.  So you get slow seepage of venous

24  structures into the subdural space, and you get a collection

25  of blood.  The medical word for collection of blood is a

1   hematoma, oma is mass, and hemat is blood, it's a mass of

2   blood, and since it's in the subdural space we refer to it

3   as subdural hematoma.  That's how you get hematomas in the

4   subdural space.

5        Q    What sort of problems arise if you have a subdural

6   hematoma?

7        A    The problems that arise have to do with a few

8   factors.  One, the fact that the nervous system is

9   completely surrounded by bone.  If something gets in there

10  and starts taking up space and starts enlarging, it starts

11  moving the brain.  The brain doesn't tolerate being moved

12  very well.  If you move it slowly over a long period of

13  time, it will accommodate.  If it moves rapidly it doesn't

14  accommodate well at all, and what you see clinically is

15  people going into a coma and they become paralyzed.

16            Subdurals tend to occur in two groups of people;

17  the very young and the very old, and for two different

18  reasons.  They occur in the very young because the skull has

19  expansive properties.  The brain about triples its size in

20  the first year of life.  Since the brain is growing, the

21  skull has to accommodate for this, so the skull is capable

22  of growing also.  If you put a mass in there, you can

23  accelerate the growth of the skull to accommodate the mass.

24  So you may not see anything with the child because the size

25  of skull is accommodating the mass, but the head may be too

1   big, or you may see very mild symptoms, or you may see very

2   non-specific symptoms.

3           When you get to older people -- I hate to tell you

4   this but it's the truth -- the skull stays the same size,

5   but your brain gets smaller.  Sorry.  It's the truth.  The

6   brain gets smaller and that leaves a potential space and

7   that potential space allows for those veins to be torn again

8   and you can have blood accumulating again in the subdural

9   space.  Subdural hematomas in older people can actually also

10  achieve quite a large size before it becomes symptomatic,

11  depending upon how much shrinkage there is in the brain.

12  You tend to see subdurals in old people and young people,

13  chronic subdurals that is.

14      Q    Now, if you get blood on the brain, what can that

15  cause?

16      A    Blood on the brain?

17      Q    Yes, sir.

18      A    Well, blood is an irritant.  It belongs in blood

19  vessels, not out of the blood vessels.  And blood on the

20  brain, even though it may be separated by a membrane, the

21  arachnoid, can precipitate seizing.  So blood can cause

22  seizures.

23      Q    If a person has a seizure, can that cause a person

24  to stop breathing?

25      A    Yes.

Stacey K. Bryant, RPR
, Judicial Court Reporter

000666

1    Q    How?

2    A    Well, when you're seizing, you're not exchanging

3    air effectively.  And if you're seizing continuously, you're

4    barely exchanging air at all.  You may not be exchanging air

5    at all.

6    Q    And did you review medical records indicating

7    whether or not Robbie had seized?

8    A    Yes.

9    Q    What did you notice from the records?

10   A    Well, he was seizing, and he was being treated for

11   seizures.

12   Q    Did you see anything in the medical records that

13   indicated he was having trouble breathing?

14   A    I'm sorry?

15   Q    Did you see anything in the records that indicated

16   he was having trouble breathing or not breathing?

17   A    Well, yes, I saw things.  I saw things, I saw

18   factors in the medical records that indicate that his brain

19   had been deprived of oxygen, not only that he was having

20   trouble breathing, but his brain had been deprived of

21   oxygen.

22   Q    What did you see in the records that show that?

23   A    When he was found, he had vomitus around his

24   mouth, and when the CT scan was done, you could see findings

25   in the CT scan that indicated that the brain had been

1   rendered anoxic, in other words the brain had not gotten

2   enough oxygen.

3          Q    How could you see that in the CT scan?

4          A    The CT scan is a radiographic procedure and it's

5   something we've already said I review all the time.   There

6   is a differentiation between gray matter of the brain, which

7   is on the cerebral cortex, which is the cell bodies of the

8   neurons, and the white matter of the brain, which are the

9   nerve fibers, the axons.   This goes into what a neuron and

10  an axon is and I'll be glad to show you if you want.

11         But anyway, the cell bodies tend to be

12  concentrated in the cerebral cortex, the cerebral hemisphere

13  that you're aware of.   The cell bodies tend to concentrated

14  on the surface of the cerebral cortex and they have

15  projections called axons, which some go down the spinal cord

16  and have to do with receiving sensation and motor function,

17  and some communicate with other cell bodies in other parts

18  of the cerebral cortex.   The cell bodies look grayer on the

19  scan and -- to the anatomists who dissect the brains -- and

20  the axons themselves, the cables, look whiter.

21         So the cell bodies are referred to as gray matter

22  and the axons are referred to as white matter.   And you can

23  see, you can differentiate gray matter and white matter on

24  the CT scan.   You can see what's referred to as cortical

25  ribbing, which means that you see definite anatomical

1   structures around the surface of the brain that follows the

2   contours of the brain.

3           When a brain has been rendered anoxic, you lose

4   the gray/white differentiation and the brain looks like a

5   homogeneous mass.

6       Q    Can a subdural hematoma begin to bleed again or

7   have new bleeding?

8       A    Can they?

9       Q    Yes.

10      A    Yes, they certainly can, chronic subdurals, yes.

11      Q    Is that part of the healing process?

12      A    It can be, yes, it is part of the healing process.

13      Q    How long would you expect, if a chronic subdural

14  began to have new bleeding, how long would you expect before

15  a symptom might arise, or is there any way to know?

16      A    I would say it would be a relatively short period

17  of time, probably minutes to hours; probably not more than

18  an hour, maybe two --

19      Q    Okay.

20      A    -- at the outside.

21      Q    Now, if -- explain to the jury why re-bleeding or

22  new bleeding is part of the healing process, or explain the

23  healing process of a subdural hematoma, please.

24      A    Sure.  Blood does not belong outside of blood

25  vessels; and when you get a sub -- now, on subdural

1    hematomas, when you get a subdural hematoma, the body begins

2    to initiate a process of getting rid of this blood.  It does

3    not belong in the subdural space.  So, over the first few

4    days, what happens is, the dura itself becomes part of the

5    healing process, and the dura begins to elaborate cells that

6    begin to surround this hematoma, this collection of blood.

7    Now, at about -- the cells start coming in within a few days

8    and what you see under a microscope is you begin to see

9    little cells begin to proliferate on the inside of the dura

10   against -- Here's the dura, here's the hematoma.  You start

11   to get a layer of cells in there.

12          After about two weeks, this layer of cells becomes

13   visible to the naked eye.  You know pathologically at an

14   autopsy when these cells start to proliferate because if

15   you're doing an autopsy on a patient, the blood, if the

16   blood is not attached at all to the dura, it should fall

17   right away from the dura by definition.  It's not, it's not

18   gonna be attached to the dura; it's separate.

19          Once the cells start proliferating and growing

20   around the subdural, the blood becomes a little more

21   adherent to the dura.  But here's the important thing:

22   After about two weeks this covering, or membrane, or

23   neomembrane, which is gray in color, and very vascular,

24   becomes visible to the naked eye.  Between two and four

25   weeks, this membrane begins to surround the subdural

1    hematoma on the inside of the hematoma, the part that's up

2    against the arachnoid, as well as the part on the outside.

3         Now, this membrane is biologically active tissue.

4    Again, it's living tissue and it's there for a reason.  It's

5    got different types of cells in it.  One type of cell is the

6    supporting matrix of the membrane.  It's sort of like a

7    skeleton.  The other type of cell, are cells that are

8    referred to as endothelial cells.  They're little, tiny,

9    thin-walled capillaries.

10        Again, the way the subdural is absorbed is by

11   getting this membrane built, getting in substances that are

12   gonna remove the clot and transporting the waste material

13   away.  And the transportation systems are, is the

14   circulatory system and that's why you need these capillary

15   cells.

16        The third type of cell is an important cell.  The

17   third type of cell that was really discovered back in the

18   '70s and it elaborates an enzyme, elaborates enzymes called

19   fibrinolytic enzymes, F-I-B-R-I-N-O-L-Y-T-I-C.  Now, these

20   enzymes do something that's pretty important.  What they do

21   is they dissolve the blood clot.  Fibrin means a blood clot,

22   lysis means dissolve.  So the clotted material, in other

23   words, the subdural hematoma, and the subdural hematoma is

24   gonna have cells in it, red cells mainly, but some white

25   cells, because you have red and white cells in the blood,

Stacey K. Bryant, RPR
Judicial Court Reporter

000671

1    and it's gonna have protein, protein matrix of the clot, and

2    have calcium in there, too, which has to do with the

3    clotting mechanism.

4            These cells begin to break down, and the protein

5    begins to break down.  And it's broken down by these

6    fibrinolytic enzymes.  This protein, the long-chain protein

7    molecules are broken up into shorter chains.  The blood

8    cells are broken down into protein molecules, that are

9    broken down into smaller ones, and this whole mess, which

10   starts out looking red, then becomes purple, then becomes

11   brown, and then becomes sort of brownish-yellow, and becomes

12   more and more liquid, is eventually absorbed by the

13   capillaries out.

14           This is a dynamic process and there is a problem

15   associated with these fibrinolytic enzymes.  The problem is

16   that they stop blood from clotting also, and capillaries are

17   very weak-walled structures.  They're only one cell thick,

18   and they tend to bleed.  The one thing you don't want next

19   to a leaking capillary is another cell that makes

20   fibrinolytic enzymes.

21           There was an experiment done in the 1970s, in

22   which a group of people with chronic subdural hematomas --

23   oh, by the way, the chronic subdural hematoma is the one

24   that's been around for weeks and months.  The acute subdural

25   hematoma is the one that just happened.  Now, by definition,

1424

```
 1   this is a little bit of a digression; but it's a very
 2   important one.  The acute subdural hematoma is the one that
 3   you find immediately.  Why?  Because it's acute.  Why is it
 4   acute?  Because it's come to your attention and the patient
 5   is very sick.
 6           The chronic subdural hematoma is the one that's
 7   been around for weeks or months.  Now, that tells you
 8   something pretty important.  That tells you that the
 9   original injury was missed.  It doesn't mean that the injury
10   was an intentional or non-intentional injury, it means the
11   injury was missed.  And the injury may have been trivial
12   enough to have been overlooked and not recognized with
13   regard to its importance.  I can tell you from personal
14   experience, I've operated on lots of people with chronic
15   subdurals, you're gonna see a video of one in a few minutes
16   where they didn't know where it came from.  They showed up,
17   obviously with a subdural that was several months old, not
18   recalling the original injury.  The chronic subdural
19   hematoma was the acute subdural hematoma once, but one that
20   escaped medical detection.  The reason it escaped medical
21   detection is the injury was not as severe as the person who
22   comes in very ill with an acute subdural.  It's almost a
23   different kind of animal.  That's a very important point,
24   and it's a point that gets missed.
25       Q    All right now.
```

1          Doctor, if you expected that Robbie was not able

2  to breathe, not being properly oxygenated, would you expect

3  to see damage to other organs of his body on autopsy, or

4  through any other means?

5      A    I'm sorry.  Ask the question again.

6      Q    All right.  Because Robbie was not receiving

7  proper oxygen to his brain, would you expect other organs in

8  his body to also be damaged such as the brain was damaged?

9      A    Not at all.

10     Q    Why not?

11     A    Well, think it through.  The brain's a critical

12  organ.  If you're gonna see damage to the brain and other

13  organs, you just ruined the entire transplant industry.

14     Q    What do you mean by that, Doctor?

15     A    The brain dies.  That's why we have brain death,

16  so that you can save the rest of the organs.  The rest of

17  the organs are usually fine.  It's the brain that dies first

18  from lack of oxygen; the other organs can be perfectly okay.

19  That's why we can transport kidneys across the country in 24

20  hours packed in ice.  You can't do that with the brain.  You

21  can't do that with neural tissue.  Neural tissue has an

22  absolute metabolic requirement for oxygen.  Other organs can

23  go for a much longer time without oxygen.

24     Q    So is the brain the only organ that cannot be

25  transplanted from one person to another?

1    A    Not just, not just because of a lack of oxygen,

2    but, yes, you don't transplant neural tissue that easily.

3    Q    You can transplant a heart, right?

4    A    Yes.

5    Q    And other organs?

6    A    Yes.  Their metabolic requirements for oxygen,

7    their metabolic requirements for oxygen are quite different

8    than the brain's.

9    Q    How long after a person is brain dead and is not

10   on any sort of respirator, would you expect other organs to

11   begin to not be suitable for transplant?

12   A    I don't know the answer to the question.  I really

13   don't want to know the answer to the question, to be honest

14   with you, because I get called in to see people who are dead

15   and I don't want to rush that sort of stuff.  But I think it

16   varies from --

17        MR. PENNYPACKER:  Your Honor, I think he said he

18        didn't know the answer, so I don't want him to

19        speculate.

20        THE WITNESS:  No, but I --

21        THE COURT:  The objection is sustained.  You need

22        to rephrase the question.

23   BY MR. TEDDER:

24   Q    What do you believe, or what do you know about,

25   what do you know about other organs and when they die?

1     A     They have -- they have variable time frames

2    through which they're suitable for transplants.  Corneas,

3    for instance, can be taken out after other organs are still

4    used.  Skin, I believe, also can.  Other organs, such as the

5    lungs or the heart, less time.  Liver, I think, also less

6    time.

7            But the brain is the critical one.  That's why we

8    put people on pumps, by the way, when they have cardiac

9    surgery.

10     Q     Have you ever witnessed an autopsy before?

11     A     Yes.

12     Q     Have you ever assisted in an autopsy?

13     A     Yes.

14     Q     Tell the jury what you have done with respect to

15    autopsies.

16     A     Well, I hate to say it, once in awhile one of my

17    patients dies and I want to know what's involved, so I get

18    an autopsy and tell the pathologist:  Look here, this is

19    what I did.  This is what I didn't do.  This is where we

20    need to concentrate, and try to give him some direction.  It

21    helps them.  It helps them.

22     Q     Did you look at the CAT scans that were done on

23    Robbie Quirello in this case?

24     A     Yes, I did.

25     Q     What did you see?

1    A    I saw fresh and old blood in the subdural space.

2    Q    Did you see any blood in the subarachnoid space?

3    A    Possibly.

4    Q    Is there any connection between bleeding in the

5    subdural space and blood appearing in the subarachnoid

6    space?

7    A    True.  Yeah, it's very well known that people

8    harboring chronic subdural hematoma may also have a small

9    amount of blood in the subarachnoid space.

10   Q    Can you explain to the jury why that is?

11   A    Well, it is most likely -- and this is a -- this

12   is an informed opinion -- that once in awhile red cells will

13   get through the arachnoid membrane.  There can also be small

14   tears in the arachnoid membrane that allows a few red cells

15   to escape in there, into the subarachnoid space, the actual

16   space.

17        But there's a characteristic difference between

18   blood in the subarachnoid space and blood in the subdural

19   space.  And that is, blood in the subarachnoid space doesn't

20   clot.  The reason it doesn't clot is that the protein

21   elements that are responsible for clotting are very

22   diffused.  It's real simple to figure it out.  Just take a

23   glass of water.  If you have the courage, prick your finger,

24   let a few drops of blood fall in the water.  What happens to

25   it?  It diffuses.  And if you put enough drops in the water

1    then you see the water is taking on a pinkish tinge.  What

2    happens is that blood is diffusing all through the

3    subarachnoid space.  So, you don't see clotted blood in the

4    subarachnoid space and you don't see local accumulations of

5    blood in the surbarachnoid space, only in the subdural

6    space.

7        Q    Did you have an opportunity to review the

8    pathological report of Dr. Bell, the doctor who did the

9    pathological examination of the eyes in this case?

10       A    I did.

11       Q    And did you see any mention in his report of

12   something known as Purtscher's retinopathy?

13       A    In his report?

14       Q    Yes.

15       A    No.

16       Q    Would you expect it to have been seen on

17   microscopic examination of the eyes?

18            MR. PENNYPACKER:  Objection, your Honor.  It's

19        beyond the scope of this witness's expertise.

20            THE COURT:  Objection sustained.

21            MR. TEDDER:  May we approach, please?

22            (Sidebar conference:)

23            MR. TEDDER:  Your Honor, I would submit that it's

24        not beyond the area of his expertise.  The state can

25        certainly cross-examine him on this.  The state didn't

1    call Dr. Bell, but put us on notice that they intended

2    to have their experts, Dr. Levine, and I believe that

3    other expert, Dr. Nelson, refer to his report during

4    their testimony, which Dr. Levine did yesterday when he

5    referred to Dr. Bell's report and said there was some

6    sort of mention in there of viscous separation,

7    separation of the viscous matter from other portions of

8    the eye.

9         Yesterday, Dr. Levine, as you're well aware, came

10   up with two new findings that he failed to include

11   anywhere in any previous report and said that it was

12   part of the medical record because it was in the

13   photographs.  So I submit that I should be able to

14   present evidence that the microscopic examination of

15   this, these eyes, did not reveal the Purtscher's

16   retinopathy, or whatever that thing is called, and the

17   cut that he indicated he saw, without looking at the,

18   by looking at the photographs.

19        THE COURT:  You should be able to have this

20   witness testify if you have laid the predicate, if you

21   can get to it.  You have not indicated this witness has

22   the expertise to testify to that before.

23        (Sidebar conference concluded.)

24   BY MR. TEDDER:

25        Q    Dr. Uscinski, you indicated you've been present at

1    some autopsies?

2         A    Yes.

3         Q    Roughly how many?

4         A    I don't know, dozens.

5         Q    Have you read autopsy protocols before?

6         A    Autopsy?

7         Q    Protocols or reports?

8         A    Reports, yes.

9         Q    And you read the report Dr. Bell prepared in this

10   case --

11        A    Yes.

12        Q    -- who was the doctor who microscopically examined

13   the eyes?

14        A    Yes.

15        Q    Was there any part of that report that you did not

16   understand?

17        A    I don't believe so.  If you've got it, if you have

18   it, I would like to look at it.

19        Q    Yes, sir.

20             MR. TEDDER:  Sorry.  I forgot to ask if I could

21        approach the witness, your Honor.

22             THE COURT:  That's okay.

23             (Pause while witness examines document.)

24             THE WITNESS:  No, I think I understand.

25   BY MR. TEDDER:

1    Q    The finding that the doctor testified to yesterday

2  was called Pertsher's retinopathy.  It's spelled

3  P-E-R-T-S-H-E-R retinopathy, R-E-T-I-N-O-P-A-T-H-Y (sic).

4  Do you know what that means?

5    A    Roughly, yes.

6    Q    What does it mean?

7         MR. PENNYPACKER:  Roughly, your Honor, does not

8    make him an expert in ophthalmology.  Same objection.

9    I don't believe he is qualified to testify in this

10   area.

11        THE COURT:  The objection is sustained.

12  BY MR. TEDDER:

13   Q    Did you see any mention in Dr. Bell's report of

14  Purtscher's retinopathy?

15        MS. SINGER:  Same objection, your Honor.

16        THE COURT:  The objection is sustained.

17   A    No.

18  BY MR. TEDDER:

19   Q    Is there any part of the Dr. Bell's report you

20  didn't understand?

21        MR. PENNYPACKER:  Asked and answered, your Honor.

22        THE COURT:  Sustained.

23  BY MR. TEDDER:

24   Q    Did you see any mention in the report of any cut

25  in the eye?

1    A    Only the ones that were made by the person doing

2    the examination.

3    Q    Okay.  Would you expect someone who does a report

4    to include everything that they observed?

5    A    Yes, that's why we do reports.

6    Q    Tell the jury how reports should be done in your

7    opinion.

8    A    Well, you're recording information for different

9    reasons.  When I do an operative report I try to describe as

10   accurately what I did, how I did it, and why I did it,

11   because somebody may come, that patient may come to surgery

12   in the future and whoever is operating on that individual

13   the next time around needs to know what I did, how I did it,

14   and why I did it, and as accurately as possible.  You change

15   that person's anatomy.  So one reason for writing a report

16   is to help the other doctors who are taking care of the

17   patient later on.

18        Another reason we do reports nowadays,

19   unfortunately, is to justify what we're doing so we can be

20   reimbursed by HMOs, so we've got to do reports that way.

21        The third way we do reports is because we

22   recognize that somebody's life may hang on our words, and so

23   you want to be as accurate as possible.  You don't want to

24   omit stuff.  You want to include everything that's there.

25   Simple common sense.

1    Q    Now, you indicated earlier that you've actually

2    directed pathologists as to certain things you wanted him to

3    look for on autopsy?

4    A    Yes, sir.

5    Q    How easy would it be to destroy a subdural

6    hematoma, or membrane that surrounds a subdural hematoma?

7    A    Very easy.  If you're not looking for it, or at

8    it, and you throw the dura out, you're gonna throw the

9    membrane out, too.

10   Q    You were aware the dura was thrown out in this

11   case?

12   A    Yes.

13   Q    What would be your opinion as to the fact the dura

14   was thrown out in this case?

15   A    It shouldn't have been thrown out.

16   Q    What portions of Robbie's body would you have

17   expected the medical examiner to look at during this

18   autopsy, knowing they thought they had a theory of shaken

19   baby in this case?  What would you expect him to look at?

20        MR. PENNYPACKER:  Your Honor, I'm gonna object to

21        this area since he is not a pathologist.  He's not a

22        forensic anatomic or neuropathologist.  It's not in his

23        area.  Observing autopsies doesn't make him an expert

24        in that area.

25        MR. TEDDER:  But he knows the theory behind it,

1           your Honor.

2                   MR. PENNYPACKER:  I know the theory behind it.

3                   THE COURT:  The objection is sustained.  Thank you

4           both.

5                   MR. TEDDER:  You're welcome, your Honor.

6       BY MR. TEDDER:

7           Q    Doctor, going back to the studies or -- Scratch

8       that.

9                   Going back to the articles that were written by

10      Drs. Gutgeltsch and Caffee, did they refer to anybody else's

11      scientific studies in those articles?

12          A    There is actually only one scientific study they

13      referred to.

14          Q    What is that?

15          A    That was a study done by a neurosurgeon in 1968

16      named Omaya.

17          Q    Named Dr. Ommaya?

18          A    Yes.

19          Q    Do you personally know Dr. Ommaya?

20          A    Yes, I do.

21          Q    Tell the jury what you know about the study Dr.

22      Omaya did in 1968?

23          A    Sure.  I would be glad to.

24                  At the time, this is back in the late '60s,

25      Dr. Omaya -- who is one of my teachers, and, by the way, is

Stacey K. Bryant, RPR
Judicial Court Reporter

000684

1  covering for me while I'm here -- was interested in the

2  pathology and the physiology of head injury, how heads got

3  injured, how brains got injured, what the mechanisms were,

4  and what happens to the brain; not just anatomically, but

5  how what happened to the brain affected the rest of the

6  body.

7       One of things he was interested in was that on

8  rare occasions people would suffer injury to the brain in

9  motor vehicle accidents where the head had not contacted

10  anything.  In other words, just a pure whiplash, back and

11  forth.  Now, how did he know that people had brain injuries?

12  One, they would complain of double vision.  That's brain

13  function, not a spinal cord function.  Two, they might lose

14  consciousness, that's a concussion, that's brain function.

15  Three, occasionally, on rare occasions, somebody would wind

16  up with a subdural hematoma, usually a chronic one, but a

17  subdural hematoma.

18       So he devised an experiment, and he devised this

19  experiment through the Department of Transportation and

20  that's actually an important point because most of this

21  literature is not in the medical literature, this particular

22  article was however.  What he did was he constructed a

23  chair, and put it on wheels, and he put it on tracks, and he

24  put a piston behind it.  And they strapped monkeys in the

25  chair, Rhesus monkeys and -- adult Rhesus monkeys -- and

1    they hit the chair with a piston.  And that would give the

2    chair an impulse forward, and the animal's head would be

3    whipped back and forth.  And they photographed that action

4    through a high speed camera.

5         Now, they knew the accelerations they were

6    applying to the chair.  They knew the mass of the monkey's

7    head.  After they finished doing the experiment, they

8    examined the monkey for evidence of head injury.  They

9    looked at the pupilar reflexes, the reflexes in the body

10   extremities, and then they sacrificed the animals and looked

11   at the brains.

12        So he had a clinical examination with a known

13   injury, and a pathology examination, a post mortem

14   examination, and he was able to make intracranial injuries

15   in 19 animals.  And he was able to calculate how much of an

16   impulse it would take to cause an animal's head to whip back

17   and forth to give it an injury.  And the number was 40,000

18   radians per second squared.

19        I have an illustration of this which I can show

20   you now if you want or I can show it later.  Maybe I'll just

21   continue with this now and then show the pictures later.

22   Q    How would they know the amount of acceleration

23   they applied to the monkey?

24   A    Two ways:  One, they photographed it and they

25   could calculate the arc through which the monkey's head

1    moved.   Two, they put an instrument on the monkey in other

2    experiments called an accelerometer, which could measure the

3    accelerations.

4         Q    How would they know the weight of the monkey's

5    head?

6         A    Weight or mass?  They massed him.

7         Q    Okay.  The mass?

8         A    They knew the mass of the monkey's head.

9         Q    After the monkey was sacrificed?

10        A    Yes.

11        Q    And then?

12        A    And then they use a simple formula, force equals

13   mass, times acceleration, which is a physics formula.  And

14   since they knew the mass, and they knew the accelerations,

15   they could calculate the force.

16             Now, he did this with a series of animals, and he

17   did it with different animals, different types of monkeys,

18   monkeys of different sizes.  And they developed what's

19   called the "injury threshold," beyond which you would start

20   injuring animals.  And they actually used a lot of animals

21   to do this, but they found out some interesting things.

22             One --

23        Q    Doctor, if we tell that, tell the jury what you

24   mean by injury threshold.  I'm sorry.

25        A    Yes.  Okay.  If you apply an acceleration to an

1   animal with a certain mass of head and you multiply the

2   acceleration and the mass, you get a number, F.  If that

3   number goes up over a certain amount, you're gonna start

4   injuring animals.  If you keep it below that amount, you're

5   not.  That's an injury threshold.

6          Now, if you use a large group of animals, you can

7   use different types of -- you can use different percentages.

8   You're gonna injure five percent of the animals, you'll

9   injure 50 percent, you're gonna injure 90 percent.

10         He was able to produce concussions in 90 percent

11  of the animals with a certain amount of force and certain

12  amount of acceleration.  And the acceleration for the mass

13  of a monkey was 40,000 radians per second squared.  That

14  leads to the next point.  What is a radian, and what does

15  per second squared mean?

16         Okay.  A radian is part of a circle.  If you take

17  the radius of a circle, the radius is the distance from the

18  center of a circle to it's circumference, its periphery.

19         You take that distance and you lay it out along

20  the circumference of the circle and you get a certain arc,

21  and that arc is always the same amount.  I think it's

22  57.3 degrees or something like that.

23         So when an animal passes through one radian, you

24  know exactly how far it's gone, the animal's head passes

25  through one radian.

```
 1              Now, if you've got an animal that's getting a
 2   whiplash injury, it's head is going to be going through an
 3   arc, measuring from the top of the head to the neck, back
 4   and forth, like this.  Theoretically you can spin around in
 5   a perfect circle that way, except you can't, your neck would
 6   break, another important point.  So, they were able to have
 7   an animal go through a certain arc.
 8              Now, that tells you one thing, but you need to
 9   know something else, and that's acceleration, what
10   acceleration means.  In order to understand acceleration,
11   you're gonna do something a little different.  Imagine
12   you're driving in a car, and you're driving along in a
13   straight line at 60 miles an hour.  And you're starting back
14   in infinity and you're winding up in infinity.  You're
15   traveling along at a constant speed.  That's -- the distance
16   that you're traveling per unit in time is called velocity.
17   Now, this is basic physics.  And it's a little bit of a
18   digression, but it's an important digression and you need to
19   know this.
20              You are not accelerating.  You're going in a
21   straight line.  You punch down on the accelerator, something
22   happens.  Whereas previously you would have been going at 60
23   miles an hour, or one mile a minute.  In the space of ten
24   seconds, you accelerate from 60 to 70.  You are accelerating
25   at a rate of one mile per second, per second.  At the end of
```

1   the first second, you're going 61 miles an hour.  At the end

2   of the second second, you're going 62 miles an hour.  At the

3   end of the third second, you're going 63 miles an hour.  So

4   not only are you going faster, but you're going faster over

5   a certain specified rate.  That's acceleration.  It's

6   measured in distance traveled per second, per second, or

7   distance traveled per second squared.

8           Now, I want to keep this comprehensible.  I don't

9   want to get too elaborate, but that's acceleration.  That's

10  why we measure acceleration in terms of distance per second

11  squared, and that's why we measured acceleration in a circle

12  in terms of radians per second squared.

13          Now, Ommaya reasoned that if it took 30,000

14  radians per second squared to reach the injury threshold for

15  a monkey, he also knew something else.  The injury threshold

16  is what's called a biological constant.  And I've got a

17  graph that will explain that to you.  In other words, it

18  crosses species lines.  So if F equals MA, and F is a

19  biological constant, as acceleration goes up, mass has to go

20  down.

21          Let me explain that in a simple way.  Let's say

22  you have a number 20 and that's a constant number.  How many

23  different ways do you have to multiply two numbers to get

24  20, and what does that tell you?  You can multiply 20 by

25  one.  You can multiply 10 by 2.  You can multiply 5 by 4.

1   You can multiply 4 by 5.  You can multiply 40 by one-half.

2   Okay?  So you always get the same answer, 20.  But what that

3   tells you is that one number, as one number goes up, the

4   other number has to go down.

5          So talking in terms of neurological tissue,

6   biological tissue, if F is a constant number -- and he

7   showed that it was -- as acceleration goes down, the mass

8   has to go up; as acceleration goes up, the mass has to go

9   down.  So Ommaya figured it was going to take, since it took

10  40,000 radians per second squared to injure the brain of a

11  little monkey, it was gonna take less to injure the brain of

12  an adult human being.  And he came up with a number,

13  experimentally derived by extension of about 4,000 radians

14  per second squared.  That's to injure the brain of an adult.

15  Now, using what we know now, should it take more

16  acceleration or less acceleration to injure the brain of a

17  baby?  The answer is it should take more, because a baby's

18  got less mass to its brain than an adult.

19         In 1987 -- now, let me backup a little bit.  He

20  published his information and the information was reviewed

21  and it was reviewed by several people, including

22  Dr. Gutgeltsch and Dr. Caffee.  Dr. Gutgeltsch and

23  Dr. Caffee looked at it and they didn't pay attention to the

24  math.  What they saw was that you could injure a brain by

25  something being shaken, by an individual being shaken back

 1   and forth, and that's all they saw.  And they saw that as

 2   the explanation for their unexplained injuries; i.e.,

 3   subdural hematomas, particularly chronic ones.  You look

 4   back at that, you say how could they have done it?  Believe

 5   me, it happened.  And that's part of the birth of the shaken

 6   baby syndrome.  That's the article that I wrote for the

 7   British Journal of Neurosurgery.

 8           Anyway carrying forward to 1987, the -- a

 9   biomedical engineer named Lawrence Tibault questioned this

10   and he says this doesn't make sense.  So he did an

11   experiment.

12       Q    What is a biomedical engineer, Doctor?

13       A    What's a biomedical engineer?  That's a very

14   reasonable question.  They're people, they may be doctors,

15   they're usually not M.Ds., they're usually Ph.Ds, but

16   they're interested in what it takes to break tissue, how you

17   disrupt tissue, what kind of energy it takes to break bones,

18   to disrupt skin, and to injure a brain.  And they study this

19   stuff, study in laboratories.  It's the basis for safety

20   belts and head restraints and lots of other things.  And a

21   lot of this information is not in medical journals, it's in

22   the automotive industry journals, because those are the

23   people who have the big interest in safety.  So anyway --

24   and Tibault worked with the automotive industry.

25           He was very interested in this phenomenon of

1  shaking, and he devised an experiment. What they did, what
2  he did was he got dolls that are the size of infants with
3  heads massed to the size of an infant's head. And they put
4  it on a hinged neck, with no neck control, a real weak neck.
5  And then they put a little instrument on top of this called
6  an accelerometer. They had volunteers shake these infants
7  back and forth, and then bang their heads against something,
8  and they measured the accelerations. And they found that in
9  contradistinction to Ommaya's records that are 4,000 radians
10  per second squared for an adult, and therefore more for a
11  child, these people were able to achieve a mean of 1,137
12  radians per second squared, which is nowhere near the injury
13  threshold. I've got graphs to show this, too.
14       The conclusion was the injuries that are
15  attributed to the shaken baby syndrome, that is, the
16  subdural hematomas, you don't seem to be able to get by
17  shaking. You have to have an impact.
18       THE COURT: We're gonna take a recess at this
19       point, unless you want to finish that paragraph,
20       Doctor?
21       THE WITNESS: No. We'll start with impact when we
22       get back. That's great.
23       THE COURT: All right. We'll take a 15-minute
24       recess.
25            (Recess taken.)

```
 1              (Before the jury.)

 2              THE COURT:  Go ahead, Mr. Tedder.

 3              MR. TEDDER:  Your Honor, may it please the Court?

 4   BY MR. TEDDER:

 5       Q    Mr. Uscinski, when we went to the recess, I

 6   believe you were telling the jury about Dr. Tibault's

 7   finding that impact was needed.  Finish up the study.

 8   Impact was needed for what?

 9       A    To reach the acceleration levels necessary to

10   cause injury.

11       Q    And?

12       A    Do you want me to explain that?

13       Q    Yes.

14       A    Okay.  Imagine yourself driving in a car that's

15   50 miles an hour, and you put your brakes on and you stop,

16   and you stop in three seconds.  The reduced, the

17   deceleration from 50 miles an hour down to zero is three

18   seconds.

19              Now, imagine yourself driving in a car 50 miles an

20   hour and driving into a brick wall.  Your deceleration time

21   is probably in the order of 100th of a second, maybe a

22   little more.  Okay?  That kind of deceleration is fatal.

23   You stop that quick, you're gonna disrupt your body, you're

24   gonna disrupt your brain, you're gonna die in the real

25   world.
```

1    In the theoretical world you can conceptualize

2  that, and there have actually been some experiments done

3  with animals in which the animal's head was put in a helmet

4  and the helmet was decelerated that quickly, and a brain

5  injury was made.  In the real world you cannot have that

6  rapid a deceleration without an impact.  So that's the

7  reason that they're saying you have to have an impact.  The

8  reason is, again, you have to have an impact to have that

9  rapid a deceleration.

10    There are really two components to this kind of an

11 injury.  One of them is the focal injury that's generated at

12 the time of impact.  The other one is the diffuse injury

13 that's generated by the abrupt deceleration.  When we're

14 talking about shaking, you're talking about no external

15 injury, i.e., no impact.  But you can't get the kind of

16 decelerations to get the injuries that are being described

17 in shaking without an impact, because you can't get those

18 kinds of decelerations.

19    Q    Now, are you aware of the facts as Brian Herlihy

20 described them as far as what happened to Robbie Quirello to

21 his knowledge?

22    A    I believe so, yes.

23    Q    What is your opinion as to --

24    A    From the medical records.

25    Q    I'm sorry?

1    A    From the medical records, yes.

2    Q    Okay.  And you're aware that he told law

3    enforcement he found the baby pinned between the bed and the

4    footboard?

5    A    Right.

6    Q    What is your opinion regarding whether something

7    like that could have caused the subsequent event that led to

8    Robbie's death?

9    A    Well, I don't know about, I don't think that the

10   baby being pinned between a headboard -- I think it was a

11   headboard and a mattress has any bearing, but I think the

12   vomitus around the mouth has a lot of bearing.

13   Q    Why is that?

14   A    I think his airway was obstructed and he became

15   anoxic.

16   Q    And if you become anoxic, what can that do to your

17   brain?

18   A    It kills it.

19   Q    What does anoxic ischemic encephalopathy mean?

20   A    What does it mean?

21   Q    Yes.

22   A    It means exactly what I just said.  Anoxic

23   ischemic encephalopathy means no oxygen, oxygen deprivation

24   all over the brain.

25   Q    What does cerebral edema mean?

1      A      Cerebral edema?

2      Q      Yes.

3      A      Means swelling of the brain.

4      Q      What does vascular congestion mean?

5      A      It means that the blood vessels in the brain are

6   engorged.

7      Q      Okay.  Now, you are aware that there was also,

8   there's been testimony and evidence of retinal hemorrhaging?

9      A      I'm sorry?

10      Q      There's also been evidence and testimony that

11   Robbie had retinal hemorrhaging?

12      A      Yes.

13      Q      How would you explain to the jury that that could

14   happen to Robbie?

15      A      Retinal hemorrhages is literally bleeding in the

16   retina, which is the lining in the back of the eye.  And

17   among neurosurgeons this has long been known to reflect an

18   abrupt increase in retinal venous pressure, pressure of

19   blood, the pressure of blood in the veins in the retina, as

20   a reflection of an abrupt increase in intracranial pressure.

21   And retinal venous pressure mirrors intracranial pressure,

22   because the retinal vein drains into the cavernous sinus,

23   which is one of the major venous draining sinuses for the

24   head, for the brain, and also passes through the

25   subarachnoid space.  So any change in the pressure in the

Stacey K. Bryant, RPR
Judicial Court Reporter

1    subarachnoid space, that is, any change in the intracranial

2    pressure, will be reflected in a change in the retinal

3    venous pressure.

4           There is actually a test that's been devised

5    recently to use a term called venous

6    ophthalmodynamometry, V-E-N-O-U-S

7    O-P-H-T-H-A-L-M-O-D-Y-N-A-M-O-M-E-T-R-Y, as a way of

8    measuring intracranial pressure.  And I would say that prior

9    to the advent of CT scanning, which was done in the 1970s,

10   and I was around way back then, and even prior to the advent

11   of the shaken baby syndrome, the presence of retinal

12   hemorrhages was used as a diagnostic aid to detect the

13   presence of chronic subdural hematomas in children.  And if

14   you look at the old literature, you'll see that.

15        Q    Do you believe that a person can shake a baby the

16   way the state contends and cause the types of injuries that

17   Robbie had?

18        A    The types of injuries that Robbie had?

19        Q    Yes, sir.

20        A    I don't believe that.

21        Q    Why not?

22        A    Because if one were to shake a baby hard enough to

23   cause intracranial injuries, theoretically -- well,

24   theoretically, you can't do it, you have to have an impact,

25   one would expect to see injuries -- and if injuries existed

1450

1    in the brain at all, one would expect to see injuries in

2    other parts of the brain, that is the brain stem and the

3    upper cervical spinal cord, where most of the movement is

4    gonna take place.

5         Q    Doctor, you're aware in the medical records there

6    was evidence of Robbie's fontanel bulging and pulsating?

7         A    Yes.

8         Q    What is that evidence of?

9         A    That's evidence of increased intracranial

10   pressure.

11        Q    Now, the new bleeding that occurs in chronic

12   subdural hematomas, where does that blood come from?

13        A    The bleeding that occurs from chronic subdurals

14   re-bleeding is generally coming from the membrane itself,

15   because the membrane contains capillaries.  The capillaries

16   are very thin-walled vessels and right next to these

17   capillaries are the cells that elaborate fibrinolytic

18   enzymes.  There is literature to support the fact that

19   proves it.

20        Q    And what could cause those capillaries and

21   membranes to begin to bleed again?

22        A    No trauma, they can bleed spontaneously.

23        Q    Okay.  Has Dr. Ommaya recently published and

24   printed any articles regarding his studies from 1968 in the

25   British Journal of Neurosurgery?

1    A    Well, he has published an article that is in the
2    British Journal of Neurosurgery.  Actually it's the same
3    journal that I published my letter in, and he has reviewed
4    all of his information once again, yes.

5    Q    What was his conclusion in that latest article?

6    A    The conclusions he has are the same as what he had
7    before, that the injuries attributed to shaking, i.e.,
8    subdural hematomas and retinal hemorrhages, do not seem to
9    be caused by shaking.  With regards to the subdural
10   hematomas impact is required, and with regards to the
11   retinal hemorrhages that they are more reflective of an
12   abrupt increase in retinal venous pressure as a reflected,
13   as a reflection of the increase in intracranial pressure.

14   Q    Some of the state's experts have indicated that
15   the baby has an extremely flexible neck and the child's neck
16   is less likely to be injured than an adult's neck.  What is
17   your opinion regarding that?

18   A    If that's true, why would you pick up a newborn
19   baby and support its neck and head?  If there's no, not
20   going to be any injury to the neck, why not let it flop, as
21   everybody does?  You know, babies do have weak necks.  And
22   because babies have weak necks, you would expect they would
23   be even more susceptible to getting an injury to their
24   nervous system by the excessive hypermobility of the neck.

25   Q    Is there any evidence that you've seen -- Go

1   ahead, Doctor.

2       A    By the nervous system, I mean the brain stem and

3   the cervical spinal cord, not the brain.

4       Q    Did you see any evidence in this case of injury to

5   the cervical spinal cord?

6       A    The cervical spinal cord wasn't even examined, but

7   there was no evidence of injury to the brain stem.

8       Q    Doctor, do you want to show the jury the different

9   charts that you have?

10      A    Sure.

11          THE COURT:  Madam Bailiff, will you turn off these

12      overhead lights over the jury?  I think that will make

13      it easier for them to see.  And, of course, any of the

14      jurors that need to shift their position so that you

15      are able to see this screen again, feel free to do so.

16          THE WITNESS:  All right.  Before I start this,

17      these are a few photographs and slides that are taken

18      from a larger presentation which I am not gonna give

19      you today.  I don't think it's totally necessary.  I

20      will if you want, but we don't have to.  Okay?

21          MS. SINGER:  Your Honor, we're going to object to

22      this particular slide at this time.  We were not shown

23      this, and it appears to have writing on it.

24          THE WITNESS:  I've already said it all.

25          MS. SINGER:  Pardon?

1    THE WITNESS:  I've already said everything that's

2    in here.

3        MS. SINGER:  All right.  Well, I'm not arguing

4    with you.  I'm making an objection, sir.

5        THE COURT:  The objection is noted for the record

6    and overruled.  Go ahead.

7        THE WITNESS:  Okay.  This is what I alluded to

8    earlier.  The formula is force equals mass times

9    acceleration.  It's Newton's Second Law.  And this is

10   what I tried to explain:  That if F is a constant

11   number, and F is equal to force, then there has to be a

12   relationship between the other two numbers, mass and

13   acceleration.  As one goes up, the other one goes down;

14   but, conversely, as one goes down, the other one has to

15   go up.  This is a law of physics.  It was made long

16   before any laws in the United States were enacted or

17   the world for that matter.

18       Okay.  We talked about a radian.  This just

19   explains once again what a radian is.  It is an

20   arbitrary unit of measurement, an arc of a circle

21   measured by extending the radius of any given circle

22   along its circumference.  You know this.  There it is.

23   This is taken from my high school physics textbook.

24   This is circumference, that's a radian.

25       Now, you remember this formula, and you know what

1    'a radian is.  And then we're gonna look at the

2    observations that Ommaya made in 1968.  He created

3    injuries in the brain without impact, just with

4    shaking, at 40,000, at an acceleration of 40,000

5    radians per second squared.  Knowing what we know about

6    force equals mass times acceleration, he calculated

7    that with the larger mass of man, which is why he says

8    it's easier to injure the much larger brain in man, it

9    requires less acceleration.  He started out with six to

10   7,000.  He subsequently revised it down to 4,000.

11       This is an example of what's called the tolerance

12   curve.  And if you're on this side of the curve you're

13   not concussed, and if you cross over to this side of

14   the curve, you're concussed.  And this is measured in

15   radians per second squared.

16   BY MR. TEDDER:

17       Q.   What do you mean by concussed, Doctor?

18       A    You're knocked out, you're unconscious.  After a

19   concussion, there are other curves for degeneration of the

20   subdural hematoma and other curves for direct injury to the

21   brain.  That's all been experimentally derived and you'll

22   see that in just a few seconds.

23       This is the experiment he did, he and others did,

24   where they correlated the mass of the brains in grams to

25   rotational accelerations to the brain, and they've got a

1   straight line there.  And they found out a ratio, which I'll

2   be happy to explain to you, but the point is they found out

3   a ratio with a constant through which, beyond which you

4   would get concussions, or later on subdurals, or later on

5   direct parenchymal injury to the brain.

6        I want to call your attention to something here.

7   Some of these are theoretically predicted and some are

8   experimentally derived.  The squirrel monkey as been

9   verified experimentally also, so it fits along this line and

10  you can see where the chimpanzee is quite close here, and

11  here's where a man would be.  Nobody has shaken a man,

12  nobody's banged a man over the head, at least outside of

13  Auschwitz, we don't do those things in this country or this

14  world for that matter, but I would point out to you the mass

15  of an infant's brain is about 450 milligrams at birth.

16        Okay.  This is the paper that was done in 1987 by

17  Tibault and Duhaim and they reached angular accelerations of

18  1,138 radians per second squared, not the 4,000 that Ommaya

19  predicted.  Whereas with impact they got 52,000 radians per

20  second squared.  And the important thing is in this graph

21  here.

22        This graph here predicts -- this graph here

23  illustrates again angular accelerations in radians per

24  second squared with angular velocity radians per second.

25        Now, angular velocity is how fast the head is

Stacey K. Bryant, RPR
Judicial Court Reporter

1   rotating at a certain instant in time, an angular

2   acceleration is how fast the head is either accelerating or

3   decelerating at an instant in time.  And they're peak

4   values.  When it's going its fastest and when it's either

5   accelerating or decelerating at its fastest.  And look at

6   what they've got.  Again, this is experimental data.  This

7   is not anecdotal evidence and I'll explain what anecdotal

8   evidence is before or -- Well, anecdotal evidence.

9           The triangles represent impacts.  The circles

10  represent shakes.  These are the triangles.  These are the

11  circles.  This is injury threshold for concussion, beyond

12  which you should get a concussion.  This is the injury

13  threshold for subdurals.  This is the injury threshold for

14  diffused external injury.

15          At this time, since 1987, this is the only

16  experimental data that's out there.  This shows that you

17  can't reach the acceleration thresholds necessary to cause

18  these injuries by shaking.  You have to have an impact.

19          Okay.  And again, what I said about the impact is,

20  in order to -- when you have an impact, you have the

21  necessary accelerations, or, if you put a minus sign in

22  front of it, decelerations, to give you those injuries in

23  the real world.

24          Okay.  Enough said.

25          THE COURT:  Another question, Mr. Tedder?

1    MR. TEDDER:  Yes, ma'am.

2   BY MR. TEDDER:

3        Q    Dr. Uscinski, if I could, if you could go to the

4   tape that you have regarding the surgery?

5        A    Sure.

6             THE WITNESS:  Okay.  We're having a little

7        technical problem here.  My computer is sleeping.

8             Oh, no, it's not.  Here we go.  We're okay.  Yes,

9        we're okay.

10            (Pause in the proceedings.)

11            THE WITNESS:  We're going to be returning to that

12       presentation in just a few seconds to show you one

13       thing, after I show you this videotape.

14            Where's my buddy?  It's doing the same thing it

15       did before.

16            (Pause in the proceedings.)

17            THE WITNESS:  Okay.

18            THE COURT:  Thank you, Mr. West.

19            THE WITNESS:  Here we go.  All right.

20   BY MR. TEDDER:

21       Q    Explain to the jury what you're showing.

22       A    Yeah.  This is an operation on an adult male with

23   a chronic subdural hematoma.  He's had it for months.  He

24   didn't know how he got it.  We're in the middle of the

25   operation.  This is an operation -- I'm sorry, this tape has

Stacey K. Bryant, RPR
Judicial Court Reporter

000706

 1    been made for teaching purposes.  It demonstrates, it's a

 2    much longer tape than this, but the point is it demonstrates

 3    surgical technique, how to put people to sleep, more

 4    importantly, how to wake them up again, and how to do the

 5    surgery.

 6              I'm just gonna give you some of the anatomy.

 7    Patient's nose is up here where the red pointer is.  His

 8    right ear is down here, the back of his head is down here,

 9    and this is his right side.  The skin has been opened up

10    from the bone, or reflected or folded away from the surgical

11    site, and this is the skull.  You can notice its thickness

12    and underneath it is the dura.  This is in realtime.  This

13    is not a computer graphic.  This is an actual film of an

14    actual operation.  You can actually hear my voice in the

15    background.  I'm the one doing the surgery.

16              All right.  This is the dura.  This is what we

17    mentioned earlier.  What I'm doing is I'm making little

18    incisions in the dura here.

19              THE COURT:  You can go ahead and --

20              THE WITNESS:  We're on again.

21              THE COURT:  Okay.

22              THE WITNESS:  Okay.  We're inside the dura.  I

23         will point out one thing to you here that's not

24         critical, but helpful.  This dura is very vascular.  If

25         you think for a minute, you'll understand why it's

1   vascular.  It has been in the process of constructing

2   the subdural membrane for the past few weeks, so it has

3   a very luxurious blood supply.  It needed it, it still

4   needs it, it's in the process of resorbing, reabsorbing

5   the subdural hematoma.

6        While we're doing this, I will tell you about an

7   experiment that was done back in the 1970s, which has

8   been published in the Journal of Neurosurgery by a

9   group of Japanese neurosurgeons.  They did a very

10   interesting thing.  Neurosurgeons have known when you

11   operate on a patient with chronic subdural hematoma you

12   find fresh blood in it, as well as old blood.

13        Incidentally, we're peeling the dura away here

14   from the membrane.

15        What was done in this experiment is they admitted

16   a group of individuals with chronic, long-standing,

17   with membranes, subdural hematomas.  The day before

18   they operated on them, they took samples of their

19   peripheral blood.  They took the blood samples, and

20   they labeled the blood cells with radioactive chromium,

21   which is an isotope tracer.  It's perfectly harmless,

22   but when you reinject it back into the patient, you can

23   scan them and see where that blood has gone.  The

24   following day they took them to surgery and did this

25   kind of surgery.  They opened up the subdural, as you

1460

1    see being done here, and they saved the blood from the

2    subdural.  In these patients they found 10 percent, by

3    volume, of the blood in the subdural hematoma contained

4    radioactive blood cells.  How did it get there?

5         The next step of the experiment was they analyzed

6    the subdural membrane.  There is a good depiction of a

7    subdural membrane.  You can see his intracranial

8    pressure is a little elevated.  How do we know it's

9    elevated?  Because the membrane is bulging out at you.

10        The dura has been opened up.  As I opened up the

11   dura you can see that there were little tags going from

12   the dura to the surface of the membrane.  Those are the

13   blood vessels that are going from the dura into the

14   membrane.  That's where all the traffic is taking

15   place.  That's where the cells are being moved in,

16   that's where the waste material is coming out.

17        And, if you look very carefully, I don't know if

18   you can see this or not, you're going to see little

19   black spots starting to appear on the surface of this

20   membrane.  Those are those blood cells.  They're

21   bleeding.  They're going to be bleeding on the inside

22   as well as on the outside.  That's what happens with

23   chronic subdurals.

24        The next step of the experiment that I've already

25   told you about, is these, the researchers analyzed

```
 1    these membranes.  That's when they found the three
 2    different types of cells; and, in particular, the types
 3    of cells that elaborate enzymes called fibrinolytic
 4    enzymes, which dissolve blood inside the subdural.
 5    Since those cells are right next to the endothelial
 6    cells where all this blood circulation is taking place,
 7    they're going to be bleeding into the subdurals.
 8    10 percent by volume per day.  Re-bleeding in the
 9    subdurals is a dynamic process.  If it outpaces
10    reabsorption, you get worse.  If reabsorption outpaces
11    re-bleeding, you get better.  If anything happens where
12    you have a lot of re-bleeding all at once, you get very
13    sick.
14         Okay.  We will continue here.  Now this is
15    basically housekeeping, and all we're doing here is
16    just creating exposure.  Now, we're going to open the
17    membrane.  Now, if it's possible to turn the lights out
18    it will might be a good idea.
19         THE COURT:  Turn them down a little bit more.
20         THE WITNESS:  And I'll tell you why.  Things
21    happen very quickly when we open up this thing and
22    you're going to see a gush of fluid coming out.  If you
23    look in one spot the fluid is going to look a little
24    yellowish; if you look below it, it's going to look
25    reddish.  That's old blood and fresh blood all in the
```

1   same subdural.  Then if you look into the depth of the

2   subdural, you're going to see clotted blood.  So you

3   see old blood, fresh blood, clotted blood inside the

4   same subdural hematoma.

5        Now, the little dark spots I told you about.

6   That's fresh bleeding occurring on the outer part of

7   the membrane and you see it's pulsating.  Why is it

8   pulsating?  Because he's alive and he's circulating.

9   We'll aspirate some of those dark spots off here.  You

10  can see the blood pooling right down here.  Some of

11  it's oozing from here.

12       Okay.  Again, this is not theory, you're seeing

13  it.

14       All right.  Now, we're gonna open up the dura.

15  Again, here's the dura, not opening up the dura,

16  opening the membrane.  There is the membrane, and as

17  you can see, it's pretty thin.  You're going to see in

18  a few seconds it's even thinner than you think.  Here

19  comes the gush.  There's dark fluid coming out and

20  there's lighter fluid coming out here.  Look at how

21  thin that membrane is compared to the dura.  Yellow

22  fluid, dark fluid.

23       I could say a better picture now.  All right.

24  We're almost done here.

25       What I'm saying here is we're gonna send this off

1    to the pathologist.  I have just said:  I know it is a

2    membrane.  You know it's a membrane, but I want them to

3    see it.  And the onus is on the pathologist to make

4    sure this stuff gets preserved.  There's the membrane.

5    There's the dura.  We're trimming some of it off; it

6    goes to the pathologist.

7         If you look in the depth of the wound right there

8    you see fresh, clotted blood, right there.  You'll

9    never get a better picture than that.  So you had old

10   yellow fluid, dark fresher fluid, and fresh clotted

11   blood right there, all within the same subdural

12   hematoma.  Now, you're beginning to see the inner

13   membrane on the inside of the subdural right there.

14        There is one other thing I want to show you.

15        Good.  Now I want to call your attention to one

16   more set of slides.

17        (Pause in the proceedings.)

18        THE WITNESS:  All right.  This is what you just

19   saw.  This a chronic subdural hematoma with fluid.  It

20   reflected the dura, there is the membrane.

21        Now, I want you to see something else that

22   probably looks very much like what you just saw on the

23   video.  This is an operation on a patient with a

24   chronic subdural hematoma.  There is the membrane,

25   there is the dura.  There is the surgeon's finger.

1    Note the thickness of the skull.  This skull is a lot

2    thinner than the other one.  Why?  Because this patient

3    is one year old.  This is a child.  You see the same

4    pathologic process, the same pathologic process.

5        The dura is being peeled back.  There is the

6    membrane.  Again, there is the membrane.  Notice it

7    bulging out.  Now, the membrane is opened up same as

8    you saw before, very thin, very diaphanous with blood

9    inside, red blood.

10       Nature is simple.  Biological systems basically

11   stay the same.  You stubbed your toe as a child; you

12   stub your toe as an adult.

13       You get a cut, you get an inflammatory response,

14   you get a scab, and you get a scar.

15       You get an appendicitis as a child or as an adult.

16   You get an inflamed appendix, it either gets better or

17   you get operated on.  They both look the same under the

18   microscope.

19       You get a subdural hematoma as a child, you get a

20   subdural hematoma as an adult, you get the same process

21   of resorption.  You get the same membrane.  You get the

22   same re-bleeding.

23       Again, this is not -- well, it's a computer image,

24   but it's not a computer-generated image.  This is

25   reality.

```
 1          This picture, by the way, the reason we don't have
 2     it on video is it was made in 1961, one of my
 3     professors did this operation.  It was not Dr. Ommaya
 4     who did the surgery.
 5  BY MR. TEDDER:
 6     Q    Who was the doctor that did that, Dr. Uscinski?
 7     A    It was a Dr. Stacy Rollins who was one of my,
 8  another of my professors.  When he heard about my
 9  involvement in this business, he called me over his house
10  and gave me those.
11          MR. PENNYPACKER:  I object to the hearsay, your
12     Honor.
13          THE COURT:  Sustained.
14          THE WITNESS:  Okay.  That's it.
15          THE COURT:  Turn the lights back up please, and,
16     Doctor, you want to have a seat?
17          THE WITNESS:  Yes, ma'am.
18  BY MR. TEDDER:
19     Q    Dr. Uscinski, you can have a seat and we'll get
20  back to these photographs in a moment.
21     A    Sure.
22     Q    Dr. Uscinski, was there ever a time when you
23  accepted the notion or theory of shaken baby?
24     A    Yes.
25     Q    What happened to cause you to change that opinion?
```

1    A    For a period of ten years -- I have academic

2    appointments at two universities, Georgetown and George

3    Washington, and I'm on the neurosurgical staff and teaching

4    staff of both of them.  For ten years I did all the

5    pediatric neurosurgery for Georgetown.  That was a fair

6    volume, 1983 to 1993, and they've asked me to come back with

7    them, too.

8         Anyway, I had read about the shaken baby syndrome,

9    and I assumed that it was real, simply because people were

10   writing about it and people were writing a lot about it.  On

11   occasion I would see a patient who was brought in with an

12   alleged history of shaking, specifically shaking.  I've

13   seen, I've seen abused children, and I'm aware of problems,

14   it's horrible.

15        However, I noticed that when it was brought in a

16   child that was alleged to be shaken, there was always a

17   better explanation.  For instance, they brought in a child

18   with a chronic subdural and said this incident happened on

19   this day, because the baby got sick this day.  And I said

20   that's not possible.  This is an old injury and they

21   re-bleed.  Or the patient gets brought in with a history

22   that's -- I'm told is shaking, and you get a history of the

23   parents, they were changing the baby on a changing table and

24   the baby fell down and hit his head and he got a skull

25   fracture.  So how are you going to get a skull fracture by

1   shaking?  You are not.  But you will get one with impact.

2          So the apparent explanation made no sense.  So I

3   had these questions about it.

4          And then in 1997 I was asked to review a murder

5   trial involving shaking, and by the same Dr. Ommaya, and I

6   looked at the scans on the child, and the baby had a chronic

7   subdural, and I had no question in my mind about it.  The

8   baby also had had anoxic insult to his brain.  And I was

9   asked if I would be willing to testify in the case.  And I

10  did.  And in preparation for that trial I read all of the

11  literature on shaking that's out there, everything, every

12  last paper.  I've got stacks of them back home.  And the

13  more I read, the more upset I got, because I've seen the

14  science, the science does not support it.  In fact, the

15  science actually contradicts it.  The literature that

16  supports it is clinical experience and innuendo, or

17  anecdotal experience.

18         Now, with all due respect to the people who are

19  writing this stuff, it's not science.  I will give you a

20  little thought experiment right now that shows you what vast

21  clinical experience really means.  Everybody in this

22  courtroom, including the court reporter, stop and look down

23  at the ground at your feet.  Everybody.  Good.  Do it.  Look

24  down.  Is it flat?  Is there anybody here who thinks it's

25  not flat?  Good.  No hands are up.

1    MS. SINGER:  I'm going to lodge an objection to

2    this type of testimony, asking the jury to participate

3    in a demonstration.  It is totally improper and I ask

4    that it be stricken from the record.

5    THE COURT:  The objection is sustained.

6  BY MR. TEDDER:

7    Q    Well, Doctor, I'll look down at the ground.

8    A    Okay.

9    Q    I see a flat floor.

10   A    Okay.  Good.  So do I.  And we will carry

11  ourselves outside this courtroom into the parking lot and

12  the ground looks flat.

13   Q    Yes.

14   A    We will now transport ourselves to Mojave desert

15  and the ground looks flat.  We're now in the pampas of south

16  America, and the ground looks flat.

17   MS. SINGER:  Objection, your Honor.

18   THE WITNESS:  We are now on the steppes of Europe

19  and the ground looks flat.

20   THE COURT:  Overruled.  Go ahead.

21   THE WITNESS:  We are now in the Outback of

22  Australia and the ground looks flat.  We are now in

23  Antarctica and the ground looks flat.  We are now in

24  the middle of the Atlantic Ocean and the ocean looks

25  flat.  We are now in the Pacific Ocean and the ocean

1    looks flat.  We are now in the Indian Ocean and the

2    ocean looks flat.  Are we not justified in assuming

3    that the earth is flat?  All of our experience shows us

4    that what's around us is flat.  That's anecdotal

5    evidence, that's a very good example of it.

6         However, there are a couple of facts that

7    contradict that.  Here is one fact:  There is a star

8    called the north star.  We know that that star always

9    seems to be in the same place in the sky.  And we know

10   if we go to one point on the earth it's right up above

11   us, up by the North Pole.

12        But there's another fact that makes a little

13   problem here, because we also know that as we get

14   farther, and farther, and farther away from it, at one

15   point it's going to disappear from the horizon.  And

16   that's when we get below the Equator.  And no matter

17   where we go below the Equator you're not gonna see that

18   star.

19        Now, when you think about that for a minute,

20   that's a problem.  Because, if the earth is flat, you

21   should see that star and it should never go below the

22   horizon unless the earth isn't flat.

23        And there is another problem, too.  Let's say that

24   a sailing ship is coming into a harbor and you're

25   standing at the dock watching it, and you've got a spy

1    glass.  The first thing you see on the horizon are the

2    top sails, then you see the main sails, then you see

3    the deck, and finally you see the hull.  And you think

4    about that for a minute and you say:  You know, that

5    doesn't really make sense either, because if the earth

6    is flat we should see everything all the way off in a

7    distance.  It should just get bigger as it will comes

8    to us.  The only explanation is the earth is not flat.

9         Such was the situation in 1491.  So you have

10    experience, the experience that you see in front of

11    you, which is anecdotal experience and facts that

12    contradict that, facts that are reproducible and that

13    will not go away.  That's the difference between vast

14    clinical experience and real facts, real, scientific

15    facts.

16   BY MR. TEDDER:

17        Q    Dr. Uscinski, it just occurred to me we also have

18   the CAT scans available that were taken from Robbie on the

19   day in question?

20        A    Yes, we do.

21        Q    Could you show those to the jury and explain what

22   you saw, please?

23        A    Sure.  Yes.

24             THE WITNESS:  Where is our buddy?

25             MS. SINGER:  Mr. West.  Do you need Mr. West?

1    THE WITNESS:  Yeah.  I think I know what's going

2    on.  We reconfigured the computer to adapt to this

3    projector.

4    MS. SINGER:  If we could wait just a second.  I'll

5    see if he's outside.

6  BY MR. TEDDER:

7    Q    Doctor, while she's searching for, kindly

8  searching for the gentleman who assists us, can you tell the

9  jury a little about CAT scans, how they're done?

10    A    Sure.  Sure.  Basically a CT scan is a very

11  glorified and well done x-ray, and it combines different

12  types of technology.  The first one is computer-generated

13  technology and the second one is highly sensitized x-rays.

14  The concept is that x-rays penetrate different types of,

15  penetrate body tissue.  Some have trouble with bone, for

16  instance, because it's very dense.  Let me show you what's

17  happening.

18    All right.  What a CT scan does is instead of

19  taking an x-ray picture of an individual, it takes an x-ray

20  of a, literally a slice of the body.  And it takes that

21  x-ray and translates it into an equation, a mathematical

22  equation, and then the beam of the x-ray changes slightly,

23  one degree or a half degree, depending upon the sensitivity,

24  and you take another picture, and another picture, and

25  another picture.  And you actually take it through almost

1472

1   180 degrees.  What you get are a set of 180 simultaneous

2   equations, and the computer solves those equations.  What

3   the out product of that is, is that instead of seeing an

4   x-ray, say through my forearm, that's half-an-inch thick,

5   and a series, and an entire series of them, from slightly

6   different angles, it averages them all together and flips

7   them 90 degrees, and you get a picture of my forearm as if

8   it were actually cut and you were looking directly inside

9   it.

10       Now, taking that concept and applying it to the

11  head, you take that same type of series of pictures, images,

12  starting at the base of the skull and working your way up,

13  and you get a whole set, again, a series of simultaneous

14  equations.  And when you translate those equations, you get

15  different images of the head, and its contents, the brain,

16  from one level, to the next level, to the next level, to the

17  next level.  So you're actually able to image the brain that

18  way.

19       One of the problems with x-rays before the advent

20  of CT scanning is that it didn't image soft tissue very

21  well.  It was great for bone.  That's one of the reasons

22  x-rays were developed in the first place.  You can see

23  bones, but you can't see soft tissues.  You can get a hint

24  of them, but not very much.

25       The advantage to CT scanning is that it's so

1    sensitive.  Not only can you image soft tissues, you can

2    image different densities of soft tissues.  So CT scanning

3    can image, not just the skull, but also the brain.  It can

4    image the ventricles, which are cavities in the brain which

5    contain the fluid.  It can image the subarachnoid spaces,

6    which has subarachnoid fluid in it.  If you give somebody a

7    contrast agent, you can actually image the blood vessels,

8    too.  And sometimes you can even see the blood vessels

9    without a contrast agent.  So CT scanning is a huge jump

10    forward for us.  It's an excellent diagnostic tool.

11        Now, it has its limitations.  All it shows you is

12    the anatomy.  It shows you what something looks like.  It

13    doesn't tell you what it's doing.  You can get some

14    indications of what something is doing depending on how the

15    anatomy is structured.  It doesn't tell you how well the

16    brain is working.  It only tells you that it's there.

17        MR. WEST:  It's saying it just can't recognize the

18       drive, I guess.

19        THE WITNESS:  I assure you it was working this

20       morning.

21        (Pause in the proceedings.)

22        MS. SINGER:  We're looking for ours, your Honor.

23        THE WITNESS:  The are some limitations to CT

24       scans.  There's another limitation to CT scanning,

25       which has actually been solved by another type of scan

1    called a magnetic resonance scan, which this child did

2    not have.  And that is, that the problems with x-rays

3    is they don't penetrate bone very well, so there are

4    certain areas where you may not see as accurately as

5    you would like to, particularly around the base of the

6    skull.

7         THE COURT:  I'm sorry, Doctor.  Wait just a

8    second.

9         THE WITNESS:  Yes, ma'am.

10        THE COURT:  I don't think that the court reporter

11   can hear with the other discussions going on.

12        THE WITNESS:  Oh, I'm sorry.

13        THE COURT:  So are you all finished conferring?

14        THE WITNESS:  We're trying another disk.

15        MR. GROLAND:  Thank you, Ms. Singer.

16        MR. WEST:  We're going to try the state's disk.

17        THE COURT:  All right.  If you'll hold up, Doctor.

18   Let Mr. West see if he can assist.

19        MR. PENNYPACKER:  Thank you, sir.

20        THE WITNESS:  This is a CT scan that was made at

21   the time this little boy was admitted to the hospital.

22   Do you want me to continue?

23   BY MR. TEDDER:

24        Q    Yes, sir.  First you indicated the CAT scan,

25   looking at the CAT scan, which side of the child's head is

1    the right versus the left?

2        A    Okay.  All right.  Well, first, this is what's

3    called a scalp tone.  It doesn't image very well here, but

4    this a lateral skull image taken from the side.  What you

5    will see very often when scans are made, you'll see a series

6    of lines going through this image.  Those are the different

7    levels that the scans that you're going to see are being

8    made through.  So it gives you an index of where you are

9    inside the head of the patient.

10       Q    These are first CAT scans of Robbie?

11       A    Yes.  This is a CT scan that was done August 2nd,

12   2000 at 10:28 in the morning.

13       Q    All right.

14       A    You have to be careful you don't get your right

15   sides and left sides confused here.  When a patient is put

16   into a scanner, the feet are toward the radiologist, so the

17   patient's right side is on the radiologist's left side.  So

18   as you look at the scan, the patient's right side is to the

19   left of the scan and the patient's left side is to the right

20   of the scan.  It's very confusing for surgeons, because we

21   operate from the top down.  The patient's right is on our

22   right.  Okay.

23            Now, this is a scan that's through the base of the

24   skull.  It's actually quite well down.  What you're seeing

25   here is the top of the neck and this little, this is an

1   artifact.  This is either nasogastric tube, a tube put into

2   the baby's stomach and, more likely, it's an endotracheal

3   tube, it's a breathing tube that was put into the baby.

4   Again, the brain has an absolute metabolic requirement for

5   oxygen.  And that's why when you take little babies out of

6   the mother, you slap them to get them breathing.  They got

7   to breathe right away, they gotta exchange air right away,

8   they've got to get oxygen up to the brain.  When somebody is

9   seizing, it's unconscious, they don't protect the airway

10  very well, if they've got a mouth full of vomitus and you

11  clean it out, you put a breathing tube in and you try to

12  help them with their respiration.  This is basic life

13  support, airway, breathing, airway and circulation.

14          All right.  Now, we're gonna go a little higher

15  up.  And we're up a little higher in the neck, and a little

16  higher up, and now you're seeing the bottoms of the jaw bone

17  here, and these are the cheeks, or the maxilla, and this is

18  the nasopharynx, and that's that tube.

19      Q    Doctor, do you see any evidence of injury to the

20  neck in these CAT scans?

21      A    No, no.

22      Q    Would you have been able to see it in these scans,

23  do you think?

24      A    You might.  You might see blood on the surrounding

25  soft tissues for instance if there was a neck injury, but

1   no, you don't see anything here, or blood inside the spinal

2   cord, but you don't see anything.  So that's correct.

3             We're up a little higher now.  This is an opening

4   at the bottom of the skull called the foramen magnum, which

5   is Latin for big hole.  And what that does is it allows

6   egress and ingress of the spinal cord and to the blood

7   vessels that supply arterial blood to the brain.

8             Now, a little higher.  Now you're seeing the

9   medulla, which is a structure of the brain and you're seeing

10  on the bottom the two cerebellar hemispheres.  Not the

11  cerebral hemispheres, the cerebellar hemispheres.

12            Again a little higher.  Now you're beginning to

13  see the globes of the eyes, and again, the cerebellar

14  hemispheres, the base of the skull.  This is all whited out

15  again.  This is one of the limitations of scanning of the

16  brain by x-ray.  The image, the x-rays don't pass very

17  easily through the bone, which is exactly why bone looks

18  white.  We're seeing an absence of penetration there.

19            Again, a little higher.  You see the eyeballs.

20  Again a little higher and again a little higher.  And you

21  see two other things here that are interesting pieces of

22  information here.  One, you have this little dark area right

23  there.  That's air and that's air in the eye socket.  And

24  that was reported actually on the radiology report, and the

25  radiologist didn't have an explanation for it, but I believe

1   that I do.  And the reason is that behind your, in your eye

2   socket there is a little tunnel called the nasolacrymal

3   duct.  N-A-S-O-L-A-C-R-Y-M-A-L duct.  That duct goes from

4   the inside of your eyelid down to your nasopharynx.  It's a

5   channel and that's one reason why if you cry your nose gets

6   runny, too.  Some of those tears are leaking down there.

7   It's got a little valve on it.  It's a one-way valve.  It

8   allows tears to go down, but doesn't allow anything to go

9   back up again.  But you can perforate that valve if you have

10  a whole lot of pressure in your pharynx.  For instance,

11  scuba divers when they clear ear passages can sometimes blow

12  that out.  I did.  That's how I know this.

13          If this child's nasal pressure, air pressure in

14  his nasopharynx was increased suddenly and forcibly, such as

15  by bagging him, or trying to breathe for him, you can

16  perforate that and you can wind up getting something very

17  similar to what you're seeing right there.  This is indirect

18  evidence that somebody was trying to breathe for him very

19  vigorously.

20          And, there's something else here.  These white

21  areas that you see here are the lenses for the eye.  And if

22  you look at them -- you've probably never seen any of this

23  before, but in an unconscious patient they should be looking

24  straight up this way.  Now, they're not.  They're deviated

25  to one side.  That you can see in destructive lesions in the

1    brain and with a destructive lesion you should have

2    disruption of neural tissue, which is biological tissue, and

3    with that you should see bleeding inside the substance of

4    the brain, which we don't see here. You can see it.  If

5    this child is looking at somebody, only he was unconscious,

6    so he wasn't looking at anybody, or you can see it if

7    somebody is having a seizure.  And I think that's what

8    you're seeing.  I think you're seeing evidence on this scan

9    that he was seizing at the time the scan was made.  And we

10   know he was seizing throughout a large part of his

11   hospitalization.  So this simply fits.

12           All right.  We're going a little higher now.  Now

13   you're beginning to see the brain.  Now, you can get fooled

14   on this.  This is not all the same part of the brain.  What

15   you're seeing here are the right and left temporal lobes,

16   and what you're seeing here is the cerebellum.  Those are

17   two anatomically distinct structures.  They're separate from

18   one another.  It's just that everything looks homogeneous in

19   this picture.  The reason it looks homogeneous is because

20   there's loss of the gray white interface here and a lot of

21   smudging and that's what you see typically with somebody

22   that's been oxygen deprived.

23      Q    Dr. Uscinski, what's the white portion on the

24   right or the left side of the child?

25      A    Here?

```
 1        Q     Yes.

 2        A     Okay.  The head does not fit perfectly

 3   symmetrically inside the scanner.  It's tilted a little bit

 4   to one side, and what you're seeing here is a bone structure

 5   called the petros pyramid.  You have one on the other side,

 6   too, but since his head is tilted, it hasn't been caught.

 7   Sometimes you can see anatomical variance where the petros

 8   pyramid is a little high on one side also, but I think this,

 9   and this is probably a combination of the other two, because

10   both of the structures are more or less symmetrical.

11   Although if you look carefully, you can see the eyes aren't

12   quite the same size either, or the shape either.  It's no

13   big deal.

14        Okay.  Now, there's something else I want to show

15   you.  Actually we started seeing it earlier and we're seeing

16   it more here, too.  This structure in the center here is

17   called the brain stem and that's part of it called the pons.

18   This is a cavity in the brain called a ventricle.  Here are

19   the two temporal lobes, the left temporal lobe and the right

20   temporal lobe.  And if you notice there is this dark space

21   in front of both temporal lobes, but this dark space has got

22   some gray stuff inside it also.  Gray is density inside it

23   also.

24        Now, the dark space is a combination of cerebral

25   spinal fluid and fluid in the subdural space.  This part is
```

1   cerebral spinal fluid around the pons and it's denser than

2   it should be probably because it's got high protein in it,

3   and probably because this baby's got chronic subdurals.  And

4   this area here around the temporal lobe is fluid in the

5   subdural space.  And I can show you that on this in serial

6   scans.  When you put them all together, there is very little

7   question about it.

8           All right.  We're gonna go up to the next level.

9   Now, from here on I'm gonna try to move a little quickly.

10  And I want you to focus your attention on this area right

11  here, which is at about 10 o'clock and it's around the area

12  of the right temporal lobe.  And as you focus on this, we're

13  gonna be moving higher up the head towards what's called the

14  vertex, which is the top of the child's head.

15      Q    Doctor, where is the right temporal lobe located?

16      A    The right temporal lobe is located -- you can

17  almost figure it out here.  It's just behind your right eye,

18  here is the eyeball.  There's the roof of the orbit on the

19  patient's right side right there.  So the temporal lobe is

20  above your ear and behind your eye.

21      Q    Okay.

22      A    Okay.  Now, watch this area.  You notice that

23  there's some radiodense material inside this area that there

24  isn't supposed to be, not normal.

25          Now, you see a large space there and we're gonna

1   come back to that space in a little bit.

2        Now, we're getting higher up you can see parts of

3   the temporal lobe and the frontal lobe.  Now if you look out

4   along the rim, again at about 10 o'clock right where I'm

5   pointing is that gray material that's right inside the

6   skull, but outside the brain.  Now, just keep an eye on it.

7   There it is again, clearer, clearer, clearer, more of it,

8   clearer, clearer, and it's beginning to lead to that white

9   area that you see right up at the top of the head.  That's

10  fresh blood.  It's nothing -- it's either a brain tumor or

11  fresh blood and we know this baby doesn't have a brain

12  tumor.  So what you have is fresh blood and grayish

13  radiodense material that are continuous with one another.

14  There is nothing else that that can be except a chronic

15  subdural hematoma with fresh blood.

16        You can see elements of that fresh blood in other

17  parts also.  You can see a little bit under the patient's

18  left side right here and you can see it later on along this

19  midline structure, which is radiodense here.  That's called

20  the falx.  That is an in-folding on the dura between the two

21  vertebral hemispheres.  There are two such in-foldings of

22  the dura in the brain.  One of them is the falx, which you

23  had demonstrated here; another one is called the tentorium,

24  which you can't really demonstrate on CT scan, it's a lot

25  better to do it on MRI scan.  And the tentorium is a tent,

1  literally it looks like a pup tent, and it's in-folding of

2  the dura that starts behind your ear and runs to the back of

3  your head on either side, sweeps inward and upward, and it

4  folds the cerebellum underneath, and it supplies supporting

5  structure for the two occipital lobes which sit on top of

6  the cerebellum.  So the tentorium folds upward, meets in the

7  midline, and is joined by the falx as it comes straight back

8  into the midline and it forms a triangular reflection of

9  dura.  And you can't image the tentorium very well with

10 these particular cuts, but you can image the falx.

11        Q    Dr. Uscinski, again, what is it that you see on

12 these CAT scans that shows you fresh blood?

13        A    Fresh and old blood.

14        Q    Yes.

15        A    All right.  We'll continue into this scan and you

16 see fresh blood again.  All right.  Now --

17        Q    Flesh blood reflected in white?

18        A    Yes.  The flesh blood is white and if you think

19 about it for a minute it makes real good sense.  It's the

20 whiter of the two.  You need two elements, you need one

21 element to help clot, and that's calcium.  You see calcium

22 in fresh blood and you see it in bone.  You also see

23 hemoglobin in fresh blood, which has iron in it.

24             Okay.  Let's go to the next segment.  Okay.

25             Now, this study also was done August the 2nd, only

1484

1   this segment was done 1503, 3 o'clock in the afternoon,

2   several hours later; 10'clock to 3 o'clock.  Again, we're

3   starting at the base of the brain and working our way up.

4   Now we're at the orbits and look at the eyes.  They've

5   changed now.  They're looking the way they should, straight

6   ahead.  Okay.  You remember in the previous scan they were

7   deviated towards one side, your left, the patient's right.

8   Now they're looking straight ahead.  They're treating him

9   very heavily with anticonvulsants, but they're still having

10  a problem controlling the seizures.

11      Q    When the eyes were facing to the right in the

12  first CAT scan, what does that indicate to you?

13      A    To me, putting all the information together, the

14  clinical and radiographic information together, it indicates

15  the baby was seizing.  If he's got a destructive lesion in

16  his brain, why isn't he looking straight ahead now?  He's

17  still got a destructive lesion in his brain.  He doesn't.

18  We know that from the autopsy.  But they're loading him up

19  with anticonvulsants and in the record, I think the record

20  reflects that he is still seizing.

21          This is not a criticism of anybody.  I'm not being

22  critical of the treatment or anything like that.  I'm just

23  illustrating that these things really fit together.

24          Okay.  Now we're in the temporal region again

25  where we were a little earlier.  Now, if you look on the

1    right side again, there is more of this stuff and it's a

2    little lighter.

3         Q    What about on the other side?

4         A    It's a little bit on the other side, too.  It's

5    just that it's more clear on that side, so I decided to use

6    that side.  We can sit and pick these things apart for

7    hours.  Maybe you have hours.  I don't know that the Court

8    does.

9         Q    No.

10        A    I'll be happy to do it if you want.

11        Q    But there is evidence --

12             THE COURT:  You just answer the questions, Doctor,

13        and I'll rule on the objections if there are any.

14   BY MR. TEDDER:

15        Q    There is evidence of bilateral --

16        A    Yeah.  Oh, yeah, he's got evidence of bilateral

17   also.  He's got something else that is helpful to see here,

18   too.  I know that you haven't seen normals, but I'm an

19   expert and I can tell you this is not a normal brain.  It

20   has a homogeneous gray appearance.  It's not supposed to

21   look like that.  There is supposed to be a ribbing and a

22   margin of darker matter and lighter matter and gray matter

23   and the light matter.  And you don't see that

24   differentiation here and that's what you see in people who

25   have been anoxic.

1    Q    You see gray if they're anoxic?

2    A    It's all uniform, yeah.

3         Okay.  Now look, now I know you were paying

4    attention before, and you've got more white stuff here, and

5    it's even lighter than it was before, and it's in a space

6    here which would normally be thought of as the subarachnoid

7    space, only you've got fluid in here, only you've got this

8    stuff here.  This is fresh, clotted blood.  Blood does not

9    clot in the subarachnoid space.  Therefore, this is subdural

10   space.  And if that's subdural space, that's subdural

11   hematoma.  And we knew there was some stuff there before and

12   there's more now.  This is chronic subdural hematoma that

13   has continued to bleed.

14        Now, track that.  We're gonna go higher and we

15   even begin to see some up here in the front.  And higher,

16   and higher, and higher, and look where it's going.  Follow

17   it, follow it, follow it.  Now it's way out there on the

18   periphery again and it's connected to what we saw in the

19   first scan.  So if you put the two scans together,

20   understand the concept of layering them out in your head,

21   and thinking about things in three dimensions, as we're

22   supposed to do as surgeons, this is a chronic subdural

23   hematoma that has not only re-bled, but it's continued to

24   re-bleed.

25        Now, I don't believe anybody shook this baby while

```
 1   he was in the hospital, and I don't believe he had an impact

 2   between the first scan and the second scan either, but this

 3   is what subdurals do.

 4        Q    Continue to re-bleed?

 5        A    Sure.  And they don't necessarily re-bleed from

 6   vessels, they re-bleed from the membrane, as you saw in the

 7   video, only it was on the other side of the membrane rather

 8   than the one I exposed.

 9             Okay.  This study was done the following day,

10   basically it shows you the same thing.

11        Q    We're now on August 3rd?

12        A    Yeah.

13        Q    The one you showed was the afternoon CAT scan?

14        A    The first, the morning and next the afternoon.

15        Q    Okay.

16        A    You can actually see some hemorrhaging in the eye

17   here, too.  You didn't see this before.  These are the

18   retinal hemorrhages that they described, I believe.  And I

19   know you're paying attention, but I also know that you're

20   getting a lot of information.  You didn't see that.

21             MS. SINGER:  I'm going to lodge an objection to

22        the discussion with the jury.

23             THE COURT:  The objection is sustained.  Doctor,

24        you need to just answer the questions.

25             THE WITNESS:  Okay.
```

1    BY MR. TEDDER:

2        Q    What do you see here, Dr. Uscinski?

3        A    You now see radiodense material inside the eye

4    itself, right here.  To a lesser extent on the patient's

5    right side and also, I believe that those are the retinal

6    hemorrhages.  They may have been present at the time the

7    baby came in, I don't have any doubts.  I would expect them

8    to be because I know his intracranial pressure was high.

9    It's just they're becoming a little clearer now.

10       Q    I'm going to ask why you didn't see those on the

11   CAT scans on August the 2nd?

12       A    I don't know.  It may have been that they weren't

13   quite as prominent or as pronounced as they were on that

14   date on the 3rd.  But again, you are dealing with a

15   biological evolving process, even if it's an evolving

16   process towards death.  This is not -- Biological systems

17   are not static systems.  They are dynamic systems.  And you

18   can you get trapped in a CT scan, or any other kind of

19   study, and think this is the way things are.  No.  This is

20   the way things were at that time.  And again, this is the

21   way things looked at that time, not necessarily how well or

22   truly they were working.

23       Q    What else did you see on the CAT scan August 3rd,

24   Doctor?

25       A    Well, unfortunately, it's more of the same stuff.

```
 1   You see a little more blood here that's layered out

 2   backwards on the back of the tentorium.  You can get fluid

 3   on this, too.

 4           What they're looking at here and by "here" I mean

 5   this radiodense area in the back that looks like it's in

 6   back of the cerebellum, is not actually the cerebellum.

 7   What you're seeing is an average of the images and you're

 8   seeing part of the cerebellum below the tentorium, and then

 9   you're seeing the occipital region below the cerebrum.  And

10   the tentorium is coming up in between the two, but you're

11   only seeing something in two dimensions that you're trying

12   to envision in three dimensions.  I can draw that for you if

13   you want.

14       Q   Okay.  Why don't you do that in a second.  Do you

15   see blood on either side bilaterally?

16       A   Yes.  You see things that you didn't see before.

17   You see blood here in the occipital region, and a little

18   more blood in the right temporal region also.  I haven't

19   concentrated on all the organs everywhere, just -- you can

20   see where it's fresh and you can see where it's old.

21       Q   Okay.

22       A   Okay.  Again, now, how do we know that this is in

23   the occipital region?  I will show you.

24           MS. SINGER:  Your Honor, I'm going to lodge an

25       objection to conversational testimony and ask that
```

1    questions be asked of the witness.

2         THE COURT:  The objection is overruled.  Go ahead.

3    BY MR. TEDDER:

4    Q    What do you see here, Dr. Uscinski?

5    A    This is temporal lobe, this is cerebellum.  Again,

6    this is temporal lobe, this is cerebellum.  The reason you

7    see elements of the cerebrum and cerebellum in the same

8    picture is because you've cut through your image, through

9    the tentorium.  Okay?  So you don't actually see the

10   tentorium because it's running in almost the same plane as

11   the scan you're taking, but you can see the differentiation

12   between the cerebral hemispheres and the cerebellum and this

13   stuff here is laying out over the tentorium.  The tentorium

14   is lower posteriorly than anteriorly, so the cerebellum is

15   going to bulge upward into what should be the image of the

16   cerebral hemisphere.

17   Q    All right.

18   A    Again, the same phenomenon, same concept and here

19   again we begin to see the gray material that's outside the

20   cerebral hemispheres in the subdural space that's dried

21   blood.

22   Q    What about on the other side?

23   A    It's probably the same thing, but it doesn't image

24   as well.

25        All right.  There's one other structure that you

1  see in here.  I mentioned earlier the fourth ventricle.

2  This little slit right in the midline here is the third

3  ventricle and there are two lateral ventricles.  I said

4  there were four in total.

5        You begin to see what's called the anterior horns

6  of the two lateral ventricles in this picture here.  And

7  again, you're seeing fresh blood and what we would

8  ordinarily think of as the subarachnoid space, but you're

9  not gonna see fresh clotted blood in the subarachnoid space

10 extending up to the first subdural.  It's got to be the

11 subdural space, it can't be anything else.

12     Q     Can you detect swelling of the brain from the CAT

13 scans?

14     A     You may.  Could there be brain swelling here?

15 Yes, I think there is brain swelling here and I think there

16 may be more here than previously. And the reason I say that

17 is because the ventricles appear smaller here than they do

18 in previous scans.  And the only reason they could be

19 smaller is they're being squeezed by the swelling brain.  I

20 mean it's by no means the worst swelling I've ever seen and

21 I don't think that brain swelling is why this baby died.

22 And actually I can go back to that.

23        Again, you're still seeing elements of fresh blood

24 in the subdural space.  Okay.  The point about the

25 swelling -- let's go to the last scan.  All right.  This is

1   the last scan that was done August the 4th, 2:03 in the

2   afternoon.  Again the breathing tube is in place, which is

3   this tubular-looking artifact there in that scan.  And then

4   we'll come up here.

5          Again it's layers of blood out over the tentorium.

6   Actually, if you look at that, if I try to run those

7   pictures together in sequence fairly rapidly -- I'll run

8   them in the other direction and hope the computer doesn't

9   crash -- you can literally see the layering of the blood

10  over the tentorial surface.  There it is.  I'll run it back

11  the other way.

12         Q    Tentorial surface being the back of the head?

13         A    Yeah, the back -- It's the surface of the

14  tentorium and it's the upper surface of the tentorium that

15  the occipital lobes are resting on.  If you look at all the

16  these scans together and sort of flip them over like cards,

17  you can see you get the three-dimensional concept from a

18  series of two-dimensional images.  There you go.  Okay.

19         Now, that leads us to this area right here and

20  actually you can see some, you can see the falx right here,

21  and maybe a little bit of fresh blood layering on the falx

22  also.  And if you look down here -- well, let me get back a

23  little farther.  Okay.

24         This structure right here, which is darker, and is

25  immediately in front of the cerebellum, and immediately

1   behind the upper brain stem, is one of those cisterns that I

2   alluded to earlier.  It's a collection in the arachnoid,

3   subarachnoid space, of cerebral spinal fluid.  Cistern is a

4   well.  And that cistern is referred to as the ambient

5   cistern.  And when you have pathological brain swelling to

6   the extent that it's going to kill somebody, and the brain

7   swells, the brain gets swollen and you can die from brain

8   swelling, what happens is the intracranial swelling, the

9   swelling goes up, the intracranial pressure goes high.  It

10  exceeds arterial pressure, you don't refresh your brain, and

11  you die, again from lack of oxygen.  But this time not

12  because oxygen is not in the blood stream, it's because

13  oxygen is not getting up in the head to the brain.  But when

14  you get that kind of swelling, then the cistern becomes

15  obliterated because the temporal lobes swell immediately and

16  the cistern disappears radiographically.  This cistern never

17  disappears; it's present on all the scans.  So, he may have

18  had swelling, but swelling was not what killed him.  It was

19  anoxia that killed him.

20      Q    The cistern is where on that, Doctor?

21      A    It's almost in the middle of the head.  It's

22  called the ambient cistern or the cisterna ambiens.

23      Q    It slows the arterial blood flow?

24      A    No, it has nothing to do with arterial blood flow.

25  That cistern and all the cisterns are pockets where cerebral

1    spinal fluid collects as it flows up around the surface of

2    the brain.   There are a lot, there are several different

3    cisterns, the ambient cistern is one.   There's one around

4    each optic nerve, there's one around the carotid artery, and

5    there's one in the fissure called the Sylvian fissure, which

6    is that area that I alluded to earlier where I said you

7    expect to see cerebral spinal fluid in that area, but what

8    you're seeing is fresh clotted blood.   Therefore, the fluid

9    that you're seeing there is really subdural fluid that has

10   pushed the arachnoid in and partially obliterated the

11   Sylvian cistern.

12        Q     Okay.   Thank you.

13        A     Let's see.   Is there anything else?   No.

14             All this area here that you're seeing is a dark

15   area that's outside the light area is in the subdural space.

16   There can be no question about that.   This is subdural

17   fluid.   This, if you would look at it at surgery would

18   either be the yellowish fluid or the dark brown fluid that

19   gushed out of the brain when we opened up the membrane.

20   Then deep inside would be the clotted blood, which is what

21   looks white here, but in reality to the naked eye is going

22   to be dark, clotted blood.

23             All right.   I think we've done enough here.

24        Q     Okay.

25             THE WITNESS:   Do you want me to leave this on?

1    MS. SINGER:  Yes.  I'll have to go find, Mr. West.

2    THE WITNESS:  I shut the computer down.

3    MS. SINGER:  All right.

4    MR. TEDDER:  Dr. Uscinski, I just have a few more

5  questions.

6    THE COURT:  If you'll have a seat again, Doctor.

7    THE WITNESS: ·Yes, ma'am.

8  BY MR. TEDDER:

9    Q    Dr. Uscinski, the patient that you performed the

10  operation on, that you had the videotape of that you showed

11  here, why did that patient first realize he had a problem?

12    A    When?

13    Q    Yeah.  When and why?

14    A    He had headaches.  He was referred to me by a

15  physician because he had persistent headaches and the

16  physician as part of his diagnostic evaluation did a CT scan

17  and found a subdural, surprisingly.  Actually he had

18  bilateral subdurals; he had one on each side.

19    Q    Okay.  And the portion of his brain that you were

20  operating on was where, with respect to his skull that you

21  showed the jury?

22    A    About two inches above his right ear.

23    Q    About here then?

24    A    Right about there.

25    Q    Okay.  Now, Doctor?

1   MS. SINGER:  Mr. Tedder, Mr. West is here to turn

2   that off, if that's okay.

3   MR. TEDDER:  Well, actually I would like to

4   project some photographs here in evidence.

5   MS. SINGER:  All right.

6   BY MR. TEDDER:

7   Q    Dr. Uscinski, while he's getting that set up, I

8   would like to show you what's already been introduced in

9   evidence in the state's case, State's Exhibits 59, 60, and

10  61.  If you could just describe for the jury what those are,

11  if you know.

12  A    These are autopsy photographs.

13  Q    Okay.

14  A    And the calvarium or skull has been opened and

15  reflected backward, and you can see a brain with clotted

16  subdural hematoma over it, and you can see some dura.  You

17  can also see some liquid subdural hematoma in the reflected

18  bowl of the calvaria upside down, and you can see some dura

19  that is preserved there, and you can see the falx actually

20  also.

21  Q    Do you see any evidence of chronic subdural?

22  A    Yes, I do.

23  Q    Okay.

24  MR. TEDDER:  Your Honor, with your permission, if

25  we could, we would like to project these photographs so

1    the jury can see them.

2         THE COURT:  Yes.

3         THE WITNESS:  Do you want these?

4         MR. TEDDER:  Yes, sir.

5    BY MR. TEDDER:

6    Q    Could you look on the back of that exhibit?  Which

7    exhibit is that?  This is State's Exhibit Number 60 that's

8    being projected on the screen.

9         Dr. Uscinski, can you tell the jury what you see?

10   A    If you can dim the lights it may be a little

11   easier to see.  That's good.  That's better.  Okay.

12        This is reflected calvarium, skull, and it's

13   lifted off, lifted off the brain here.  The picture, there's

14   no substitute to the picture, but you can see some of the

15   dura has been peeled away from the front of the skull here,

16   and you can see some of the dura has been peeled away from

17   the back here, and you can see that midline in-folding of

18   dura called the falx.  Now, that midline in-folding actually

19   fits right in here.  This structure that you see, this

20   reflected calvarium like this, belongs up this way.  This is

21   dura.  And if you look here on the inside of the dura, you

22   see a stain.  And that stain is a little yellow on the dura,

23   and I -- you know, if you can project this to the jury, I

24   don't know if you can hand it to them or not, but I think

25   you should, because I believe that this area here is a

Stacey K. Bryant, RPR
Judicial Court Reporter

1   portion of the subdural membrane.  Some of it's been

2   destroyed, and some of it's still there.  And this is

3   subdural fluid.  And I think that's membrane.  And you

4   already know how thin that membrane is because you've seen

5   it in vivo, in life.  This is the same thing here.

6       Q    Okay.  Which exhibit is this?  It would be on the

7   back, Dr. Uscinski.  That was 60?

8       A    This is 60.

9       Q    This one is?

10      A    The next one is 59.  Okay.  You actually see this

11  a little better.  Same thing, same thing.  The inner surface

12  of the dura should be clear and homogenous and you see this

13  structure inside here.  I think that's some of the remnants

14  of a subdural membrane.

15      Q    Doctor, this side over here, is this like the top

16  of the skull, this here?

17      A    Yeah.  This is the occipital region of the skull,

18  this is the frontal region of the skull.  This area here is

19  flipped up and fits there.  This part of the dura here, is

20  flipped up and fits here.  This, as a matter of fact, it's

21  even a little bit of yellow stained, which is exactly what

22  you would expect to see in subdural chronic membrane.  I

23  believe that this tissue that you see right here, which is

24  just inside the dura, but not the dura, it is subdural

25  membrane.  And you can actually see, I believe, a little

1    more clearly when you look at the photograph than this, of

2    this image.

3        Q    This part is the left side of the baby's head?

4        A    Yeah.  That should be the left side of the baby's

5    head.  But it's there.  It's there.

6        Q    All right.  What about the other photograph?

7        A    Well, you can't really see that too well at all.

8    The picture isn't clear enough for me to be able to say

9    anything definitive on this side, but I don't -- I believe

10   that's chronic subdural membrane as on the previous two

11   images.  So you've got -- again to go back to the initial,

12   the second one.

13            MR. PENNYPACKER:  Your Honor, I think he's already

14       explained the photo.  We don't need to see it again.

15            THE WITNESS:  Okay.

16            MR. TEDDER:  She hasn't ruled yet, sir.

17            Your Honor, he has something else he would like to

18       add if the Court will allow it.

19            THE COURT:  The objection is sustained if it is

20       repetitive.

21   BY MR. TEDDER:

22       Q    This is photograph number 60, Doctor?

23       A    Yes.

24       Q    Wrong way.  Now, on this one you can see yellow

25   area over here and is this yellow area over there?

1    A    I'm not sure about the yellow area on the right

2    side, but it, the picture isn't clear enough, but you can

3    certainly see it on the left side.  And putting these two

4    pictures together, and knowing what you know about the laws

5    of gravity, and about the fact that this clot is on an

6    angle, get my pointer straight -- here, and that fresh

7    subdural blood should slip off the surface of the brain.

8    That is obviously not slipping off the surface of the brain.

9    It's adhering.  The only way I think that it could be

10   adherent is that there is a healing process going on, which

11   means this subdural is weeks old, at least.

12       Q    So you're saying that fresh blood, that blood

13   would have just dripped off the brain?

14       A    If it was fresh acute subdural.

15           Now, one of the things that a pathologist does,

16   and I can say that because I've been there, is when they

17   take a brain like this, they wash it.  And the reason they

18   wash it is they're trying to irrigate the clot off to see if

19   it washes off.  If it doesn't wash off and it sticks like

20   that, it's not fresh.

21       Q    How would you characterize those black clots then?

22       A    They're stuck.  There is -- looks to be unless he

23   washed them off afterwards, and we don't know that.  He did

24   not specify on that.  I think he said likely adherent were

25   the words he used.  Likely adherent is like being likely

1    pregnant.  You either are or you aren't.

2        Q    And if it's likely adherent, how old --

3        A    He said adherent.

4        Q    How old would it be?

5        A    It's at least -- Well, it means, it can bleed

6    anywhere from several days to several weeks old.  It's hard

7    to tell how old it would be because again, the subdural is a

8    dynamic, the healing of a subdural is a dynamic process.

9        Q    Anything else we can show the jury on these

10   photographs, Doctor?

11       A    No.  That's enough.

12            THE COURT:  Do you have any other questions,

13   Mr. Tedder?

14            MR. TEDDER:  Yes, ma'am, just a couple.

15   BY MR. TEDDER:

16       Q    Dr. Uscinski, is it your opinion that the injuries

17   that Robbie Quirello suffered were caused by violent

18   shaking?

19       A    It's my opinion that they were not.  It's not my

20   opinion that they were.

21       Q    Okay.  What is your opinion as to the cause of

22   Robbie Quirello's death?

23       A    My opinion as to the cause of his death is that he

24   died from cerebral anoxia.

25       Q    Caused by what?

1    A    Either vomiting with obstruction of his airway, or

2  seizing associated with vomiting, obstructing his airway.

3    Q    Okay.  Doctor Uscinski, do you -- from your

4  examination of records in this case, do you believe any kind

5  of surgery could have been performed to save Robbie

6  Quirello's life?

7    A    I doubt -- I don't believe so.

8    MR. TEDDER:  Your Honor, I tender the witness.

9    THE COURT:  All right.  We are going to, of

10  course, recess for lunch at this time.

11    Ladies and gentlemen, it is approximately 12:30, a

12  little bit after, and we will reconvene the evidence in

13  this case at 2 o'clock.  So if you'll step back into

14  the jury room and put your notebooks in the locker and

15  then the bailiff will escort you to lunch.

16    (Outside the presence of the jury:)

17    THE COURT:  Doctor, you're released until 2

18  o'clock.  Of course, you're allowed to remain in the

19  courtroom.  I just need to check and make sure that

20  there's nothing else, I'm speaking from a legal

21  perspective, that needs to be addressed before we begin

22  again at 2 o'clock.  Is there anything that's gonna

23  have to be addressed before we reconvene at 2:00 for

24  additional evidence?

25    MS. SINGER:  No.  But I would ask that the witness

1   be advised that he is on the stand subject to

2   cross-examination, that he not participate in

3   discussion of this case with counsel or with other

4   witnesses.

5       THE COURT:  The rule has been invoked and, of

6   course, that pertains to every witness throughout the

7   trial.  And, of course, as I'm sure you know, Doctor,

8   that means you must not discuss this case or your

9   testimony with anyone except the four attorneys who are

10  trying this case.  And since you're in the middle of

11  your testimony, you can't confer with them over the

12  lunch recess.

13      MR. GROLAND:  We can have lunch together, though?

14      THE COURT:  You can certainly have lunch together

15  and discuss the weather or any of a number of topics

16  that have nothing to do with this case.

17      MR. GROLAND:  Okay.

18      THE COURT:  Good enough.  We'll be in recess until

19  1:45 for the attorneys.  Thank you.

20      (Lunch recess taken.)

21              *  *  *  *  *

22

23

24

25

THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN AND
FOR ALACHUA COUNTY

STATE OF FLORIDA,

       Plaintiff,

                     CASE NO.   01-2000-CF-2753-A

vs.

BRIAN HERLIHY,

       Defendant.

---

### ORDER SCHEDULING CASE MANAGEMENT CONFERENCE

**THIS CAUSE** came before the court on the review of the pending Post Conviction Relief Motion(s), it is

**ORDERED AND ADJUDGED** that a Case Management Conference has been scheduled for <u>1:30 P.M. on Thursday, August 30, 2007</u>, in Courtroom 3A, Alachua Criminal Justice Center, 220 South Main Street, Gainesville, Florida. Counsel must bring their calendars.

**DONE AND ORDERED** in Chambers at Gainesville, Alachua County, Florida this _20_ day of August, 2007.

                                           MARTHA ANN LOTT, Circuit Judge

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Jan Phillips at the Court Administrator's Office, Alachua County Courthouse, Room 410, 201 East University Avenue, Gainesville, FL 32601 (352-374-3648) within 2 working days of your receipt of this Order; if you are hearing or voice impaired, call 1-800-955-8771.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing Order has been furnished this _20_ day of August, 2007 to:

Michael Becker
Asst State Attorney

Jeanne Singer
Chief Asst State Attorney

_____
Judicial Assistant

Joshua Silverman
Defense Attorney

Mary Elizabeth Fitzgibbons   by mail
Defense Attorney

000753

# HEARINGS FOR DIVISION I

STATE OF FLORIDA

DATE: _August 30, 2007_

-VS-

JUDGE LOTT

S/A: _Michael Becker_

_Brian Herlihy_

D/A: _Joan Silvregnas / Fitzgibbons_

C/R: _Pam Connor_

BAILIFF: _Reynolds_

SPIN # _____

CLERK: _Barinet_

MOTION/HEARING: _Post Conviction Relref for Case management_

_____

_____

CASE NUMBER (S): _01-2000-CF-2753-A_ _RSB_

STATE WITNESSES

DEFENSE WITNESSES

RULING: _Oct. Nov. 1 & 2 For Post Con. Relief hearing_   _900AM_

_Sept. 28, 2007 - Case management_   _at 1:00 pm_

ORDER TO BE PREPARED BY:

___ STATE ATTORNEY   ✓ DEFENSE ATTORNEY ___ J.A.

_& Order to Transport_

JUDGE HAS FILE ___

CLERK HAS RETURNED FILE ___

_△ not present_



000754

( 1 )



IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT,
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA
    Plaintiff,

CASE NO.:   01-2000-CF-002753-A

vs.

DIVISION:   I

BRIAN PATRICK HERLIHY,
    Defendant.
_____/

## ORDER SCHEDULING HEARINGS ON PENDING
## POST-CONVICTION RELIEF MATTERS

    **THIS CAUSE** came before the Court on August 30, 2007 for Case Management
Conference, at which counsel for the State and for the Defendant were present for consultation
regarding scheduling of hearings on pending post-conviction relief matters in the above-styled
case. Based upon that consultation, it is hereby ORDERED AND ADJUDGED that:

1.   The State's "Motion to Strike, or in the Alternative, State's Response to Defendant's
Rule 3.850 Motion for Post-Conviction Relief," as well as all matters related to the
State's Motion to Strike which have been raised in subsequent pleadings by the State
and the Defendant, are scheduled for a hearing before the Court on Friday, September
28, 2007 from 1:00 p.m. – 3:00 p.m. in Courtroom 3A of the Alachua County
Criminal Justice Center, 220 S. Main Street, Gainesville, Florida 32601.

2.   The Defendant's "Motion for Post-Conviction Relief" is scheduled for an evidentiary
hearing before the Court, commencing on Thursday, November 1, 2007, at 9:00 a.m.,
in Courtroom 3A of the Alachua County Criminal Justice Center. Two (2) full days
are reserved for the hearing, and both parties should be prepared to continue the
proceedings on Saturday, November 3, 2007, if necessary. Pursuant to the Court's
February 6, 2007 "Order Denying, In Part, Motion for Post Conviction Relief," the
hearing shall be limited to the Defendant's allegation that trial counsel was ineffective
for failing to conduct an adequate pre-trial investigation.

    DONE AND ORDERED in Chambers at Gainesville, Alachua County, Florida this
_____ day of September, 2007.



State v. Brian Patrick Herlihy
Case No. 01-2000-CF-0002753-A
Order Scheduling Hearings on Post-Conviction Matters
Page 2/2

MARTHA ANN LOTT
CIRCUIT JUDGE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Order has been sent

via U.S. or inter-office mail to Assistant State Attorney Michael Becker; Joshua Silverman, Co-

Counsel for the Defendant; and Mary Elizabeth Fitzgibbons, Co-Counsel for the Defendant, 12

S. Orlando Avenue, Kissimmee, FL 34741 this _7_ day of September, 2007.

JUDICIAL ASSISTANT

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN AND
FOR ALACHUA COUNTY, FLORIDA

CASE NO.: 01-2000-CF-002753-A

DIVISION: II

STATE OF FLORIDA,
Plaintiff,

vs.

BRIAN PATRICK HERLIHY,
Defendant.

_____/

### DEFENDANT'S RESPONSE TO STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF, RESPONDING TO DEFENDANT'S RESPONSE OF MAY 16, 2007

COMES NOW, the Defendant, BRIAN PATRICK HERLIHY, by and through the undersigned counsel, and hereby files Defendant's Response to State's Supplement to Motion to Strike, etc. (hereinafter also referred to as the "State's Supplement"), and in support thereof, states as follows:

1.    In the State's Supplement, the State contends that Defendant's pending Rule 3.850 Motion should be denied without a hearing because at trial Defendant presented some evidence of causation of the death of Baby Robert, including causation evidence that disagreed with the State's theory.

2.    The State's contention is meritless.    In the case at bar, Defendant's Rule 3.850 Motion is premised on the failure of defense counsel to conduct reasonable pretrial investigation, to wit:  failing to consult Dr. Viera Scheibner, who had furnished an opinion to the effect that Baby Robert's multiple vaccinations were a key factor in his death.  *See* Defendant's Rule 3.850 Motion at 6.  As Defendant argues in his Rule 3.850 Motion, defense counsel's grave error in



000757

judgment prevented the discovery of facts, which if explored, would have illustrated that Baby Robert's death was not due to inflicted injury, but rather to toxic poisoning exacerbated by other medical causes. That is the missing "evidence of causation of death" the defense refers to in detail throughout Pages 6-34 of Defendant's Rule 3.850 Motion, as well as in Paragraph 7 of Defendant's Response to Motion to Strike, or in the Alternative, State's Response to Defendant's Rule 3.850 Motion for Post Conviction Relief.

3.    During trial, it was a linchpin of the State's case that Defendant lacked proof of causation for the prior brain injuries and seizure that brought about Baby Robert's death. Defendant's Rule 3.850 Motion at 4. At Defendant's trial, "[t]he jury was forced to determine whether or not the child's birth was traumatic & then whether or not the same produced the injuries" when "[t]he State's experts all testified that the birth was not traumatic." Id. at 33. Disregarding Dr. Scheibner's report cost Defendant the development of a critical defense and a rational explanation of the causation of Baby Robert's prior injuries, seizure and tragic death. Had the jury been presented with this information at trial there was a reasonable likelihood of an acquittal in this case.

4.    The State's Supplement includes a quantity of citations to the trial transcript involving repeated attempts by defense experts to explain the causation of Baby Robert's death during trial. However, the existence of a *quantity* of citations (be it in a State's Supplement or any other legal memorandum) in no way guarantees their *quality*. The defense does not, and indeed cannot, dispute that its experts made a quantity of attempts at trial to explain what caused Baby Robert's death. But during trial, the defense experts were hamstrung in their efforts to effectively present a non-violent causation of Baby Robert's death to the jury because they lacked the benefit of Dr. Scheibner's report and a full understanding  *i.e.*, that the infant had

2

09/14/2007  09:59  561-992-9551                  SOUTH BAY C F                    PAGE  05/06
          RECEIVED  09/12/2007 15:27   561-992-9551         SOUTH BAY C F
    Sep.13. 2007  4:20PM                                    No.7418  P. 4

suffered toxic poisoning from multiple vaccinations in conjunction with his other medical problems.

5.   None of the record citations presented in the State's Supplement successfully refute the portion of Defendant's Rule 3.850 Motion concerning defense counsel's failure to conduct a reasonable pre-trial investigation in his criminal case based upon Dr. Scheibner's report.

6.   Thus, the defense respectfully requests that this Court proceed to set this matter for a full and fair hearing on the issue.

WHEREFORE, Defendant, BRIAN HERLIHY, respectfully requests that this Honorable Court deny the State's Motion to Strike, and grant Defendant's Motion and/or such other relief as this Court deems just as proper.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via facsimile and U.S. mail on the Office of the Public Defender, P.O. Box 2820, Gainesville FL 32602, and the Office of the State Attorney, 120 W. University Ave., Gainesville FL 32602, on this _14_ day of September, 2007.

FBN 0524891

FOR:

By _____
Mary Elizabeth Fitzgibbons Esq.
Fitzgibbons Law Firm, P.A.
12 S. Orlando Ave.
Kissimmee, Florida 34741
Phone: 407 343-1777
Fax:    407 343-1677
Fla Bar No.: 0056480
Attorney for Defendant

000759

No.7425  P. 4/11                              Sep.14. 2007 10:24AM

## OATH

Under penalties of perjury, I declare that I have read the foregoing response, and that the facts stated in it are true.

Brian Patrick Herlihy

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN AND
FOR ALACHUA COUNTY, FLORIDA

CASE NO.: 01-2000-CF-002753-A

DIVISION: II

STATE OF FLORIDA,
    Plaintiff,

vs.

BRIAN PATRICK HERLIHY,
    Defendant.

_____/

## NOTICE OF FILING

    COMES NOW, the Defendant, BRIAN PATRICK HERLIHY, by and through the undersigned counsel, and hereby files in support of his pending Motion for Post-Conviction Relief under Fla.R.Crim.P. 3.850 the following supplemental document:  (1) a copy of the Affidavit of Dr. Viera Scheibner dated September 14, 2007.

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via facsimile and U.S. mail on the Office of the Public Defender, P.O. Box 2820, Gainesville FL 32602, and the Office of the State Attorney, 120 W. University Ave., Gainesville FL 32602, on this _14_ day of September, 2007.

By _____
Mary Elizabeth Fitzgibbons Esq.
Fitzgibbons Law Firm, P.A.
12 S. Orlando Ave.
Kissimmee, Florida 34741
Phone:  407 343-1777
Fax:    407 343-1677
Fla Bar No.: 0056480
Attorney for Defendant

FBN  0524891

J.K. "BUDDY" IREY
CLERK OF COURTS
ALACHUA COUNTY FL

FILED
CK 35

2007 SEP 14  PM 4: 18

## AFFIDAVIT OF DR. VIERA SCHEIBNER

STATE OF New South Wales )

COUNTY OF ___ n/a ___ )

THE AFFIANT upon being duly sworn deposes and states:

1.     My name is DR. VIERA SCHEIBNER.  I am over 21 years of age and competent to testify in this case.

2.     I understand that I am swearing under oath to the accuracy of this Affidavit, under penalty of perjury, and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

3.     In or about October, 2000, I was contacted on behalf of Defendant Brian Herlihy in connection with the criminal case of State v. Herlihy in the Circuit Court in and for Alachua County, Florida, Case No.: 01-2000-CF-2753-A.  Specifically, I was asked to review the circumstances surrounding the death of three and a half month old Baby Robert Quirello.

4.     Thereafter, I reviewed the case as requested, prepared and transmitted in or about November, 2000, a "Report on Vaccine Injuries of Baby Robert Quirello" (hereinafter also referred to as the "Report").  The Report, inter alia, summarized my findings and concluded that the cause of Baby Robert's injuries and death were caused by vaccinations.

5.     Once again, during 2006, I was contacted on behalf of Mr. Herlihy and asked to transmit an additional copy of my Report from 2000.  In response, I generated an

additional copy of my Report and transmitted it as requested. In so doing, I placed my initials on each page of the Report and indicated that the date of the copy was July 11, 2006 (written in my handwriting as 11 . 07 . 06). A true and correct copy of this document (except for the FILED stamp on page 1 and any fax transmission markings that may have resulted in connection with the preparation of this Affidavit) is attached as Exhibit "A" hereto. In all material respects, the substance of the copy attached as Exhibit "A" hereto was identical to the substance of the original Report I transmitted on behalf of Mr. Herlihy in 2000.

6.     It appears that my initialing and dating the copy of the Report in this manner has caused confusion in Mr. Herlihy's case. I regret any confusion that may have resulted from this practice. However, it should be kept in mind that the method of writing dates in the United States (e.g., 07 / 11 / 06 for July 11, 2006) does not reflect the standard business practice of other parts of the world, where it is common to write first the day, then the month and then the year (e.g., 11 . 07 . 06) as I did in dating the copy of the Report in this case.

Further affiant says not,

DR. VIERA SCHEIBNER

Sworn to and subscribed before me this 14ᵗʰ day of September, 2007.

_Lynnette Anne Gawthorpe_

Notary Public, or other person
Authorized to administer an oath

Personally known ✓ or produced identification ✓

Type of identification produced: N.S.W. Drivers Licence - 1451PK

My commission expires: 5 September 2011

Lynnette Anne Gawthorpe
15697
1/22 Govetts Leap Road
Blackheath
Justice of the Peace.

2

REPORT ON VACCINE INJURIES OF BABY ROBERT QUIRELLO

By Dr Viera Scheibner
Principal Reasearch Scientist, Retired

**EXHIBIT A**

The events of the 2nd of August 2000,
based on Mr Herlihy's statements to the police
-----------------------------------------------

On 2nd of August 2000, Brian Patrick Herlihy (therafter Brian),
the defendant, was busy with dipping and washing his dogs on the
balcony of his house when Crystal Quirello (thereafter Crystal),
the mother of the diseased baby Robert Quirello (thereafter
Robbie), walked in and asked Brian to look after her baby, while
she was going to attend to some errands.

After washing his hands, Brian took the baby, kissed his forehead
and said "Hey, Buddy, how are you?" Robbie laughed and smiled at
Brian. During a brief conversation with Crystal, Robbie started
to fuss and Brian asked Crystal when he last ate. Crystal said
"About 5 minutes ago".

"Robbie had a little spit up on his outfit which was unusual".
Brian then made Robbie's bottle and started feeding him. Crystal
seemed in a hurry to go. She also wanted for all of them to go
to Cedar Key for the afternoon. Brian did not want to go. When
changing Robbie's nappy, Brian commented how tight Robbie's one-
sy was and Crystal said "take it of him then". When Brian took
the one-sy off Robbie he noticed "red blotches all over his back,
chest and stomach". Crystal said "He gets heat rash real bad".
"I've never seen heat rash like that. Crystal did not seem
alarmed, so I left it go" Brian wrote. During a short discussion
with Crystal about whether Brian should take a shower, Brian
noticed Robbie spitting up and wiped him up. Brian did not want
to leave Robbie alone while taking the shower. Crystal was in a
hurry and asked Brian to walk her down to his truck which she was
going to use for her errands. When Brian objected, she said "he
[Robbie] will be fine". When Brian got back to his bedroom after
walking Crystal to his truck, Robbie "had formula all over his
mouth and running along his neckline, so I grabbed his burping
cloth and wiped it up. He seemed a little 'dazed'. I did not see
Crystal "burp " him after she gave him the rest of the bottle and
wondered if she had. I picked him up and burped him. He had a
little one, but spit up a lot of formula. I played with him
and picked him up and plopped him down on the pillow on his back.
It wasn't rough, I always swing him and play with him like that
and had no problems before". After propping Robbie up on his
bed, Brian asked Robbie to say "goo" for him, which Robbie did
after a few times being asked, and Brian then went to the toilet.
About five minutes later, Brian was back with Robbie and saw that
he rolled over so that he could only see his feet. Robbie was
not moving and Brian pulled him up. He shook him slightly
once to see if he was asleep, and said "Robbie! wake up! Are you
all right?", then blew in his face to see if his eyes would open.

1

Sep.14. 2007  10:24AM        No.7425  p. 9/17

"His arms got real relaxed his eyes were closed and I heard
him gurgling.  I felt myself started [sic] to panic.  I felt his
heartbeat, but he wasn't breathing.  I couldn't believe this was
happening.  I cradled him in my left arm and gave him a breath,
placing my mouth over his nose and mouth.  It was a puff and
watched his chest to see if it would rise and fall, but with
short puffs like that it's hard to tell.  I waited a few seconds
and gave him another breath.  I got no response.  I felt helpless
and said "Please, Robbie, don't die baby".  I had to call 911,
but I don't have a phone in my room.  To find the phone. Brian
placed Robbie down on the pillow and ran dowstairs and hit the
pager button on the cordless phone and heard the phone beeping in
the bedroom.  Brian ran back and found the phone.  He grabbed it
and gave Robbie a quick breath and called 911.  "I told them I
had a 3 and 1/2 months old who was unresponsive and not
breathing.  They told me to give him rescue breaths.  I told them
I was and wasn't getting a response.  I was crying and they asked
me what the address was.  I told them and then Robbie began to
have formula pouring out of his mouth and nose.  I placed him
on the floor and laid him on his side so if he started breathing
he wouldn't aspirate on it.  I saw red in the formula that was
coming up of his nose.  I told 911 this and they were telling me
rescue was on its way.  They asked me to do a 'finger sweep'
which I did and said to Robbie "Please don't die".  Brian also
said words to the effect why did this had to happen today?  When
he saw paramedics going to the wrong building he ran out and
directed them to his house.  One medic said "I don't have the
right stuff" and left and the other was fumbling around and
nobody was breathing for Robbie.  So, Brian grabbed the
resuscitation bag and placed the mask over Robbie's nose and
mouth and gave him a breath himself.  The medic then tried to
put the equipment together to use on Robbie.  The bike-patrol
medics arrived and pulled Brian out of the room and tried to
console him.  He told them that Crystal was his girlfriend and
Robbie was her son and that she went out to run an errand.  Soon
after Crystal arrived and when she saw the medics working on
Robbie started crying.  Brian told her "I'm sorry I left him
alone, I failed you and Robbie".

I leave the diary here.  It provides a perfectly plausible story.
Only an innocent person would communicate this way, including
saying the last words about being sorry for leaving Robbie alone
while it was clear that the baby was only left alone for about 5
minutes while Brian went to the toilet, and was vomiting right
after being dropped off by his mother Crystal and nothing that
happened or could have happened in those 5 minutes would have
caused the observed serious symptoms.

### WHAT CAUSED BABY ROBBIE TO VOMIT AND DEVELOP BRAIN AND RETINAL HAEMORRHAGES?

Robbie was born on March 22, 2000, slightly premature at 38 weeks
gestation.  There was a birth trauma there: broken clavicle.

However, he seemed to be doing reasonably well and was given his
first set of 6 vaccines on May 9, 2000, when 7 weeks old.  It was

2

000765

the following vaccines:

DTaP1 (three in one); SKB a918 ac L leg
OPV/IPV1 (undifferentiated Connaught RO668 L leg
Hib1; Connaught VAB10AA R leg
HepB1; SKB 3198AZ R leg

On 19 July, 2000, Robbie was given the second set of 6 vaccines
as follows:

DTaP2 SKB 956A2; R thigh
OPV/IPV2 Connaught R1433 R thigh
Hib2 Lederle 468487 L thigh
HepB2 SKB 3198A2 L thigh

There is no record of a dose of hepB at birth. It does not mean
that he was not given this vaccine at or shortly after birth.

The diary of events available to me does not contain any
information about any possible reactions to the first lot of 6
vaccines as above. This does not mean that there were no
reactions, clinical or subclinical.

The documented symptoms suffered by baby Robbie, appear to have
occurred 14 days after the second lot of 6 vaccines. This is not
unusual, because the so-called delayed vaccine reactions are a
rule rather than an exception, as documented by Wilkins (1988).
Wilkins (1988) documented that if reactions to vaccines are
triggered by the formation of circulating immune complexes, then
the reactions would not occur immediately. She stated: "...If
one assumes that the adverse reaction to the DPT vaccine may
result from an immunologic intravascular complexing of
particulate antigen (whole-cell or disrupted pertussis organisms)
with specific antibody to produce a Jarisch-Herxheimer reaction,
then the adverse reaction may not occur within 24 hours of
inoculation...If the postinoculation interval is extended to 2
weeks, an additional 93 case infants (now representing a total of
98 case infants) might have been at risk for an adverse reaction
to DTP vaccine." And: "The DTP vaccine will not be exhonorated
from causing an infants' sudden death until, tissues from suspect
infants have been examined and shown not to contain insoluble
immune complexes to pertussis antigen."

As demonstrated by Lewis et al. (1986), administration of the DPT
vaccines does result in the formation of vaccine-specific
circulating immune complexes (CIC's). They described petechial
and urticarial rash in a 4-months old baby 5 hours after given
DTP vaccines. Subsequent antigenic analysis of the CIC's showed
them to be composed of vaccine-specific antigens with
complementary antibodies. They also described the test which
detects such antibodies. The test for these CIC's has not been
done in the case of baby Robbie. As shown by the available
records, baby Robbie had his torso covered with urticaria
(described by Brian as "red blotches") when Brian undressed him
and it is reasonable to conclude that the rash was one of the

3

signs of the CIC's development; moreover, the rash could have
developed already after his first dose of 6 vaccines as above,
particularly since his mother told Brian that baby Robbie
suffered what she called "heat rash". It is quite likely that
that's what she was told by a doctor when she inquired about the
persistent rash, namely, that it was only a heat rash.

Torch (1982 and 1986a, and 1986b) demonstrated that DPT vaccines
cause infant deaths and brain encephalopathy which includes brain
haemorrhages. Not only he demonstrated that there are increasing
numbers of deaths with the increasing interval from the DPT
injections, he also described brain oedema and haemorrhages
caused by these vaccines.

Acellular pertussis vaccine of the type given to Robbie, is
advertised as less reactogenic than the whole-cell pertussis
vaccine. However, this vaccine caused unexpectedly high level
of neurological reactions, such as the hypotonic-hyporesponsive
episodes in the Swedish babies who participated in the so-called
Swedish Trial of the acellular vaccines. They expected 20 deaths
and experienced 45 (plus one accidental death). None of these
deaths occurred before vaccination, even though a group of
babies was given the first dose at 2 months and another group
at 3 months. I emphasize, not a single death occured before
vaccination. 45 deaths instead of the expected 20 is highly
significant, yet all were judged as unrelated to vaccination
(Olin et al. 1997). Importantly, the trial protocol only allowed
for reactions that occurred wthin 48 hours of vaccination. This
means, that the actual rate of reactions was more in the order of
a rate 50-times that which was recorded and admitted (as
demonstrated by Wilkins 1988; see above).

Retinal haemorrhages caused by hepatitis B vaccines were
described by Devine et al.(1995). They described a case of a
young man who developed retinal haemorrhages after both the first
and second injections of this vaccines. The authors concluded
that the causal relationship was indicated by the close proximity
to the vaccine (1 week) and the reappearance of the retinal
haemorrhages after the second dose.

Interestingly, Goldwater et al. (1990) described tests which
clearly differentiate babies who died from trauma from those who
died without any trauma, such as SIDS. They tested sera from
babies who died from trauma and from those who died as SIDS for
cross-linked degradation products (XLFDPs) using D-Di test
(Diagnostica Stago, Asnieres, France) which utilizes a monoclonal
antibody directed against the fibrin degradation product, D-dimer
molecule. The mean XLFDP levels for SIDS sera was X792 mgL (SD
+-1498) and from controls sera was 56.6mgL (SD=-34.9). The high
levels of XLFDP seen in sera of SIDS cases most probably reflect
a massive consumptive coagulopathy. Even though the authors
admitted that pathogenic mechanism underlying this is uncertain,
they wrote that it is possible that in some cases it may be
related to bacterial toxaemia. This would concur with their
previous findings (Bettelheim et al. 1989) of toxigenic

4

Escherichia coli isolation from the intestine contents of SIDS cases. Importantly, intravascular coagulation is known to occur in other conditions caused by E. coli verotoxins, including haemolytic uraemic syndrome, the pathogenesis of which involves platelet aggregation and embolisation (with normal platelet count), which then results in haemorrhages into internal organs.

Vaccines and antibiotics are known toxic substances which cause proliferation of toxigenic E. coli in the gut.

Again, such tests for the presence of toxigenic E. coli (the Limulus test) have not been performed on baby Robbie.

Vaccines contain a number of substances which are toxic, starting with foreign proteins (antigens): bacteria and viruses or their protein envelopes) and continuing with formaldehyde, aluminium phosphate and aluminium hydroxide, mercury compounds and other toxic substances called adjuvants, which are known to cause anaphylactic (=hypersensitvity) reactions (Parfentjev 1955; Gupta et al. 1995 and many others). Far from providing immunity, vaccine injections actually increase the susceptibility of the recipients to the disease which the vaccines are supposed to prevent, and also to other, unrelated, bacterial and viral infections. This explains the well-documented 300% increase in the reported cases of whooping cough after 1978 when the individual US states mandated the DPT vaccines and which affected mainly the 2 to 6 months old babies, the well-vaccinated age group, as well as regular epidemics in vaccinated populations (Hutchins et al. 1988). This also explains the very high incidence of ear infections, bronchiolitis and other respiratory infections in the recipients of vaccines (Craighead 1975).

Vaccines, such as the whooping cough (pertussis) vaccine are actually used in animal experiments to induce the so-called experimental allergic encephalomyelitis (Levine et al.1966). As shown by Behan et al.(1973), such encephalomyelitis may be connected with brain haemorrhaging (=haemorrhagic encephalomyelitis). There are a number of mechanisms that explain this process, disseminated vasculomyelinopathy being one of them (Reik 1980). Also, Reik (1980) stated that the numerous central nervous system abnormalities which follow antecedent infections and vaccinations appear to share a common pathogenesis involving the immune system. Antigen-antibody complexes are formed following the introduction of foreign antigen by injection or inoculation cause vascular injury with secondary damage to myelin.

In 2001 and 2004, I have published two articles in Journal of Australasian College of Nutritional and Environmental Medicine (J ACNEM) in which I elaborate on material issues of vaccine reactions such as suffered by baby Robbie. Both are enclosed with this report.

5

## SUMMARY OF MY FINDINGS OF THE CAUSE OF ROBBIE'S INJURIES

The diary of events as described in detail by Brian Herlihy is
plausible and clearly indicates that there was no shaking of
Robbie that could have caused any injury, neither before or after
the documented serious neurological symptoms appeared.  The
appearance of serious neurological symptoms, preceded by
vomiting, can plausibly and clearly be explained as linked to the
documented vaccine administration and did not require any
physical violence.  Brian only attempted to revive Robbie after
he developed serious neurological signs and gave him competent
resuscitation by gently puffing breaths into him and, when the
medics arrived, by correctly using the bag while one of the
medics was fumbling around.

It is well-documented in medical records that Robbie was given a
multitude of vaccines starting as early as at 7 weeks of his
short life, and, again at about 3 months of his age.  Twelve
vaccines in all.  This represented a potent toxic cocktail, 6ccm,
in short succession, just over 2 months apart.  Most vaccines
given to babies contain merthiolate (a mercury derivate) which
cumulatively may exceed the safe level of such toxic substance.
And this is before we even take into consideration the amount of
foreign proteins (antigens) and other toxic substances which such
vaccines contain.  According to immunological.research, vaccine
injections do not immunise: rather they sensitise, make the
recipients more susceptible to the disease which the vaccine is
supposed to prevent and also to a host of unrelated bacterial and
viral infections (Parfentjev 1955, Craighead 1975). To enhance
the immune response, vaccines contain adjuvants, which are toxic
substances and which further enhance the sensitisation effect of
the foreign antigens in the vaccines.  According to Gupta et al.
(1993), adjuvants in themselves are toxic and cause undesirable
side effects.  Some of the side effects can be ascribed to
unintentional stimulation of different mechanisms of the immune
system, while the others may reflect the known general adverse
pharmacological reactions.  It is a compromise between a
requirement of adjuvanticity and what is considered an acceptable
level of side effects.  However, such compromise does not make
the adjuvants any safer.

This is enough to cause brain and retinal haemorrhages in small
babies such as baby Robbie.  This also explains why the US has
such a high infant mortality rivalling the rates in the Third
World: it is the mandatory vaccination. resulting in some 98% of
all US babies being vaccinated with such toxic substances.  Until
about 1990, the "recommended" (=mandated) vaccines included only
DTP and Polio. vaccines (4 in all) at 2. 4. and 6 months of age.
The pathological findings in the babies who died from such
vaccines were minimal: mostly petechial haemorrhages into the

6

lungs, pericardium, thymus and other organs. Since 1990s, babies are given DTP, Polio, Hib and hepB vaccines. This explains why the pathological findings these days include brain and retinal haemorrhages, instead of just the minimal pathological finding of petechial haemorrhages. The Hib vaccine causes meningeal (subdural or subarachnoid) haemorrhages because the Haemophilus influenzae type B bacterium has a predilection for meninges (it causes meningitis). Retinal haemorrhages as a rule accompany such meningeal haemorrhages because of a direct anatomical connection between the brain and the eyes. The HepB vaccine does not make the situation any better, quite to the contrary. Indeed, hepB vaccination of newborns resulted in SIDS moving into the first days of life. That could have been the reason why the American Academy of Pediatrics (AAP) and one stage withdrew the recommendation for hepB vaccination of the newborn babies and changed it instead to a recommendation to start with the hepB vaccine at 6 months. This, of course, would almost completely camouflage the lethal effect of this vaccine.

In conclusion, baby Robbie's injuries and death were caused by the 12 vaccines which he received within his short 3 and a half months life.

The concept of the Shaken baby syndrome as a cause of the type of injuries as experience by Robbie is on shaky ground, indeed. I Leadbeater & James (1985) questioned the relevance and strength of the evidence which is supposed to support the concept. They concluded that it seems premature to warn against an act of violence when its precise mechanism of action is not clearly defined, its potential for serious trauma in the absence of concomitant impact is not supported by existing experimental data, and the clinical findings said to result from it are not in themselves specific.

11.07.06

7

References

Wilkins, J. 1988. What is 'significant' and DTP reactions (a letter). Pediatrics; 81(6): 912

Lewis, K., Jordan, S.C., Cherry, J.D., Sakai, R.S., and Le, C.T. 1986. Petechiae and urticaria after DTP vaccination: detection of circulating immune complexes containing vaccine-specific antigens. J Pediatrics; 1009-1012.

Torch, W.C. 1982. Diphtheria-pertussis-tetanus (DPT) immunization: a potential cause of the Sudden-Infant Death Syndrome (SIDS). Neurology; 32(2): A169-170.

Torch, W.C. 1986a. Characteristics of diphtheria-pertussis-tetanus (DPT) postvaccinal deaths and DPT-caused Sudden-Infant-Death Syndrome (SIDS): A review. Neurology: 36: 148.

Torch, W.C. 1986b. Diphtheria-pertussis-tetanus (DPT) immunization may be an unrecognized cause of Sudden-Infant-Death (SIDS) and Near-Miss Syndrome (NMS): 12 case reports. Neurology; 36: 149.

Olin, P., Rasmussen, F., Gustafsson, L., Hallander, H.O. et al. 1997. Randomised controlled trial of two-component, three-component and five-component acellular pertussis vaccines compared with whole-cell pertussis vaccine. Lancet; 350: 1569-1577.

Devin, R., Roques, G., Disdier, P., Rodor, F., and Weiller, P.J. 1996. Occlusion of central retinal vein after hepatitis B vaccination. Lancet; 347: 1626.

Goldwater, P.N., Williams, V., Bourne, A.J., and Byard, R.W. 1990. Sudden infant death syndrome: a possible clue to causation. Med J Australia; 153: 59-60.

Bettelheim, K.A., Smith, D., Goldwater, P.N., and Bourne, A.J. 1989. Toxigenic Escherichia coli associated with sudden infant death syndrome. Med J Australia; 151: 538.

Parfentjev, I.A. 1955. Bacterial allergy increases susceptibility to influenza virus in mice. Proc Soc exp Biol & Med: 373-

Gupta, R.K., Relyved, E.H.,. Lindblad, E.B., Bizzini, B. et al. 1993. Adjuvants - a balance between toxicity and adjuvanticity. Vaccine; 11(3): 293-306.

Hutchins,S.S., Cochi,S.L., Brink, E.W., Patriarca, P.A. et al. 1988. Current epidemiology of pertussis in the United States. Tokai J exp & clin Med; 13 (Suppl): 103-109.

8

Sep. 14. 2007 10:26AM

No.7425  P. 16/17

Craighead, J.E. 1975.  Report of a workshop: disease accentuation after immunization with inactivated microbial vaccines.  J Infect Dis; 131(6): 749-754.

Levine. S., Wenk, E.J., Devlin, H.B., Pieroni, R.E. et al. 1966. Hyperacute allergic encephalomyelitis: adjuvant effect of pertussis vaccine and extracts.  J Immunol: 97(3): 363-368.

Behan, P.O., Moore, M.J., and Lamarche, J.B. 1973.  Acute necrotising hemorrhagic encephalopathy. Postgrad Med; 54: 154-160.

Reik, L. Jr. 1980.  Disseminated vasculomyelinopathy: an immune complex disease.  Ann Neurol; 7: 291-296.

AAP (Committee on infectious diseases and Committee on Environmental Health), 1999. Thimerosal in vaccines - an Interim Report to clinicians.  Pediatrics; 104(3): 570-574.

Leadbeater, S., and James, R. 1995.  The shaken infant syndrome. Shaking alone may not be responsible for damage.  Br med J; 310: 1600.

Scheibner V.  2001.  Diagnosis of shaken baby syndrome on shaky ground.  J ACNEM; 22(2): 5-8 &15.

Scheibner V.  2004.  Dynamics of critical days as part of the dynamics of non-specific stress syndrome discovered during monitoring with Cotwatch breathing monitor.  J ACNEM; 23(3): 10-14.

9

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN AND
FOR ALACHUA COUNTY, FLORIDA

CASE NO.: 01-2000-CF-002753-A

DIVISION: II

STATE OF FLORIDA,
    Plaintiff,

vs.

BRIAN PATRICK HERLIHY,
    Defendant.

_____/

## NOTICE OF FILING

COMES NOW, the Defendant, BRIAN PATRICK HERLIHY, by and through the
undersigned counsel, and hereby files in support of his pending Motion for Post-Conviction
Relief under Fla.R.Crim.P. 3.850 the following document: original Oath page for Defendant's
Response to State's Supplement to Motion to Strike, or in the Alternative, State's Response to
Defendant's Rule 3.850 Motion for Post Conviction Relief, Responding to Defendant's
Response of May 16, 2007.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via
facsimile and U.S. mail on the Office of the State Attorney, 120 W. University Ave., Gainesville
FL 32602, on this 20th day of September, 2007.

By _____
Mary Elizabeth Fitzgibbons Esq.
Fitzgibbons Law Firm, P.A.
12 S. Orlando Ave.
Kissimmee, Florida 34741
Phone: 407 343-1777
Fax:    407 343-1677
Fla Bar No.: 0056480
Attorney for Defendant





Sep.13. 2007  4:20PM   RECEIVED  09/13/2007 16:27  561-992-9551   SOUTH BAY C F   No.7418  P. 5

## OATH

Under penalties of perjury, I declare that I have read the foregoing response, and that the

facts stated in it are true.

Brian Patrick Herlihy

2007 SEP 24  PM 1: 03

FILED

4





# EXPRESS MAIL
## UNITED STATES POSTAL SERVICE

**ATTENTION-DELIVERY PERSONNEL**
**SENDER HAS WAIVED SIGNATURE REQUIREMENT**
PLEASE DELIVER PER DMM 800.3.3
WE DELIVER ☒ EXPRESS MAIL

www.usps

0000



**PRESS HARD. YOU ARE MAKING 3 COPIES.**

E84038007572US

### EXPRESS MAIL
#### UNITED STATES POSTAL SERVICE ®

Addressee C
Label 11-B, March

**Post Office To Address**

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt | Time | AM PM | Employee Signature |
| Mo.   Day | | | |
| Delivery Attempt | Time | AM PM | Employee Signature |
| Mo.   Day | | | |
| Delivery Date | Time | AM PM | Employee Signature |
| Mo.   Day | | | |

**CUSTOMER USE ONLY**

☐ Waiver   ☐ Holiday   ☐ Mail Signature

**ORIGIN (POSTAL SERVICE USE ONLY)**

| PO ZIP Code | Day of Delivery | Postage |
| | ☐ Next ☐ 2nd ☐ 2nd Del. Day | $ |
| Date Accepted | Scheduled Date of Delivery | Return Receipt Fee |
| | Month   Day | $ |
| Mo.   Day   Year | Scheduled Time of Delivery | COD Fee / Insurance Fee |
| Time Accepted   ☐ AM ☐ PM | ☐ Noon ☐ 3 PM | $ / $ |
| | Military | Total Postage & Fees |
| Flat Rate ☐ or Weight | ☐ 2nd Day ☐ 3rd Day | $ |
| lbs.   ozs. | Int'l Alpha Country Code | Acceptance Emp. Initials |

**FROM:** (PLEASE PRINT)   PHONE (

**TO:** (PLEASE PRINT)   PHONE (

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES.)

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

**FOR PICKUP OR TRACKING**
Visit **www.usps.com**
Call 1-800-222-1811

EMS

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN AND
FOR ALACHUA COUNTY, FLORIDA

CASE NO.: 01-2000-CF-002753-A

DIVISION: II

STATE OF FLORIDA,
    Plaintiff,

vs.

BRIAN PATRICK HERLIHY,
    Defendant.

_____/

## NOTICE OF FILING

    COMES NOW, the Defendant, BRIAN PATRICK HERLIHY, by and through the undersigned counsel, and hereby files in support of his pending Motion for Post-Conviction Relief under Fla.R.Crim.P. 3.850 the following document: original signed and witnessed pages 1 and 2 of Affidavit of Dr. Viera Scheibner.

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via U.S. mail, postage pre-paid on the Office of the State Attorney, 120 W. University Ave., Gainesville FL 32602, on this 24th day of September, 2007.

By _____
Mary Elizabeth Fitzgibbons Esq.
Fitzgibbons Law Firm, P.A.
12 S. Orlando Ave.
Kissimmee, Florida 34741
Phone: 407 343-1777
Fax:    407 343-1677
Fla Bar No.: 0056480
Attorney for Defendant



000776

4

## AFFIDAVIT OF DR. VIERA SCHEIBNER

STATE OF New South Wales )

COUNTY OF ____ n/a ____ )

THE AFFIANT upon being duly sworn deposes and states:

1.      My name is DR. VIERA SCHEIBNER.  I am over 21 years of age and competent to testify in this case.

2.      I understand that I am swearing under oath to the accuracy of this Affidavit, under penalty of perjury, and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

3.      In or about October, 2000, I was contacted on behalf of Defendant Brian Herlihy in connection with the criminal case of State v. Herlihy in the Circuit Court in and for Alachua County, Florida, Case No.: 01-2000-CF-2753-A.  Specifically, I was asked to review the circumstances surrounding the death of three and a half month old Baby Robert Quirello.

4.      Thereafter, I reviewed the case as requested, prepared and transmitted, in or about November, 2000, a "Report on Vaccine Injuries of Baby Robert Quirello" (hereinafter also referred to as the "Report").  The Report, inter alia, summarized my findings and concluded that the cause of Baby Robert's injuries and death were caused by vaccinations.

5.      Once again, during 2006, I was contacted on behalf of Mr. Herlihy and asked to transmit an additional copy of my Report from 2000.  In response, I generated an

000777

additional copy of my Report and transmitted it as requested.  In so doing, I placed my initials on each page of the Report and indicated that the date of the copy was July 11, 2006 (written in my handwriting as 11 . 07 . 06).  A true and correct copy of this document (except for the FILED stamp on page 1 and any fax transmission markings that may have resulted in connection with the preparation of this Affidavit) is attached as Exhibit "A" hereto.  In all material respects, the substance of the copy attached as Exhibit "A" hereto was identical to the substance of the original Report I transmitted on behalf of Mr. Herlihy in 2000.

6.    It appears that my initialing and dating the copy of the Report in this manner has caused confusion in Mr. Herlihy's case.  I regret any confusion that may have resulted from this practice.  However, it should be kept in mind that the method of writing dates in the United States (e.g., 07 / 11 / 06 for July 11, 2006) does not reflect the standard business practice of other parts of the world, where it is common to write first the day, then the month and then the year (e.g., 11 . 07 . 06) as I did in dating the copy of the Report in this case.

Further affiant says not,

DR. VIERA SCHEIBNER

Sworn to and subscribed before me this 14ᵗʰ day of September, 2007.

Lacpwouthope Jr.

Notary Public, or other person          Lynnette Anne Gawthope
Authorized to administer an oath                 15697
Personally known ✓ or produced identification ✓.   1/22 Govetts leap Road
                                                   Blackheath the Peace
Type of identification produced: NSW Drivers Licence - 1451PK   Justice of the Peace

My commission expires: 5 September 2011



**CALL 1-800-222-1811 FOR PICKUP OR TRAC**



USPS
CPU

$ 1

Mailed From 34741
09/24/2007
031A 0003191155

# EXPRESS MAIL
ES POSTAL SERVICE

www.usps.com

POSTAGE
DOMESTI

E840380077 4US

**EXPRESS MAIL**

UNITED STATES POSTAL SERVICE®

Addressee Copy
Label 11-B, March 2004

**Post Office To Addressee**

| DELIVERY (POSTAL USE ONLY) | | | |
|---|---|---|---|
| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
| Mo.    Day | | | |
| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
| Mo.    Day | | | |
| Delivery Date | Time | ☐ AM ☐ PM | Employee Signature |
| Mo.    Day  25 | 1:01 | | |

CUSTOMER USE ONLY

| ORIGIN (POSTAL SERVICE USE ONLY) | | |
|---|---|---|
| PO ZIP Code | Day of Delivery ☐Next ☐2nd ☐3rd Del Day | Postage $ |
| Date Accepted | Scheduled Date of Delivery | Return Receipt Fee |
| Mo.  Day  Year | Day | |
| Time Accepted ☐ AM ☐ PM | Scheduled Time of Delivery ☐Noon ☐3 PM | COD Fee $   Insurance Fee $ |
| Flat Rate ☐ or Weight  lbs.  ozs. | Military ☐2nd Day ☐3rd Day | Total Postage & Fees $ |
| | Int'l Alpha Country Code | Acceptance Emp. Initials |

PRESS HARD. YOU ARE MAKING 3 COPIES.

FROM: (PLEASE PRINT)   PHONE (

TO: (PLEASE PRINT)   PHONE (

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES.)

☐ ☐ ☐ ☐ ☐ + ☐ ☐ ☐ ☐

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

**FOR PICKUP OR TRACKING**
**www.usps.com**
Call 1-800-222-1811

EMS

_Cw_

# HEARINGS FOR DIVISION I

STATE OF FLORIDA

DATE: September 28, 2007

**JUDGE LOTT**

-VS-

**Brian Healthy**

SPIN # 1993-969

S/A: Becker
D/A: Fitzgibbons - Silverman
C/R: _____
BAILIFF: Hamilton
CLERK: _____

MOTION/HEARING: PcR

Motion To strike

CASE NUMBER (S): 01-2000-CF-2753-A

STATE WITNESSES

_____

_____

_____

_____

DEFENSE WITNESSES

_____

_____

_____

_____

RULING: Granted w/o pred To strike

ORDER TO BE PREPARED BY:
___ STATE ATTORNEY   ___ DEFENSE ATTORNEY   ✓ J.A. ne folson

JUDGE HAS FILE____    CLERK HAS RETURNED FILE _____







IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN AND
FOR ALACHUA COUNTY, FLORIDA

CASE NO.: 01-2000-CF-002753-A

DIVISION: II

STATE OF FLORIDA,
    Plaintiff,

vs.

FILED IN OPEN COURT
4-28 2007
        C.O.
          D.C.

BRIAN PATRICK HERLIHY,
    Defendant.

                    /

## DEFENDANT'S MOTION FOR LEAVE TO AMEND
## MOTION FOR POSTCONVICTION RELIEF

    COMES NOW, the Defendant, BRIAN PATRICK HERLIHY, by and through the

undersigned counsel, and hereby files Defendant's Motion for Leave to Amend Motion for

Postconviction Relief and in support thereof, states as follows:

    1.    In his pending motion for post conviction relief, Defendant addresses the failure

of defense counsel to investigate the report of Dr. Viera Scheibner.

    2.    Defendant submits it is unnecessary for him to assert in his motion that Dr.

Scheibner herself would have been available to testify at trial as Defendant's claim involves the

failure of defense counsel to investigate the contents of her available report and thereby properly

prepare his testifying experts, *inter alia*, for trial.

    3.    Notwithstanding this, in an excess of caution, it should be noted that Defendant

has been made aware of a conversation between his mother, Lois N. Herlihy and Dr. Scheibner

wherein it was made clear that the doctor would appear in Court on his behalf, if needed.

Accordingly, it is requested that a single sentence be added to the bottom of Page 6 of the

Defendant's motion: "Per Mrs. Herlihy, there was consensus whereby Dr. Scheibner was willing



000781

5

to appear in Court on the behalf of Defendant, if needed. *See* Supplemental Affidavit of Lois N. Herlihy."

4.      Defendant moves that leave to amend in this instance be freely given so that he may further clarify and supplement his pending postconviction motion.

WHEREFORE, Defendant, BRIAN HERLIHY, respectfully requests that this Honorable Court grant his Motion for Leave to Amend and grant such other relief as this Court deems just as proper.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via facsimile and U.S. mail on the Office of the State Attorney, 120 W. University Ave., Gainesville FL 32602, on this _28_ day of September, 2007.

By _____  0524891
for : Mary Elizabeth Fitzgibbons Esq.
Fitzgibbons Law Firm, P.A.
12 S. Orlando Ave.
Kissimmee, Florida 34741
Phone: 407 343-1777
Fax:    407 343-1677
Fla Bar No.: 0056480
Attorney for Defendant

2

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN AND
FOR ALACHUA COUNTY, FLORIDA

CASE NO.: 01-2000-CF-002753-A

DIVISION:  II

STATE OF FLORIDA,
    Plaintiff,

vs.

BRIAN PATRICK HERLIHY,
    Defendant.

_____/

## NOTICE OF FILING

COMES NOW, the Defendant, BRIAN PATRICK HERLIHY, by and through the

undersigned counsel, and hereby files in support of his pending Motion for Post-Conviction

Relief under Fla.R.Crim.P. 3.850 the following document: Supplemental Affidavit of Lois N.

Herlihy attached as Exhibit "A" hereto.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via

facsimile and U.S. mail on the Office of the State Attorney, 120 W. University Ave., Gainesville

FL 32602, on this _28_ day of September, 2007.

                 By _____
                 Mary Elizabeth Fitzgibbons Esq.
                 Fitzgibbons Law Firm, P.A.
                 12 S. Orlando Ave.
                 Kissimmee, Florida 34741
                 Phone: 407-343-1777
                 Fax:    407 343-1677
                 Fla Bar No.: 0056480
                 Attorney for Defendant

Ø002/003

## SUPPLEMENTAL AFFIDAVIT OF LOIS N. HERLIHY

STATE OF _Florida_ )

COUNTY OF _Alachua_ )

THE AFFIANT upon being duly sworn deposes and states:

1.     My name is LOIS N. HERLIHY.  I am over 21 years of age and competent to testify in this case.

2.     I understand that I am swearing under oath to the accuracy of this Affidavit, under penalty of perjury, and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

3.     This is to follow up on my prior affidavit on behalf of my son, Defendant Brian Herlihy in connection with the criminal case of State v. Herlihy in the Circuit Court in and for Alachua County, Florida, Case No.: 01-2000-CF-2753-A.

4.     As reflected in my prior Affidavit, I asked Dr. Viera Scheibner if she would review the circumstances surrounding the death of Baby Robert Quirello and coordinate matters directly with defense counsel.

1

5. In my conversation with Dr. Scheibner, there was consensus between the doctor and myself that she would be willing to testify in a Court of law about any report she completed, if it was necessary.

Further affiant says not,

*[signature]* Lois N. Herlihy
LOIS N. HERLIHY

Sworn to and subscribed before me this  28  day of September, 2007.

Notary Public State of Florida
Arrie Stacey
My Commission DD527459
Expires 03/12/2010

*[signature]* Arrie Stacey
Notary Public, or other person
Authorized to administer an oath

Personally known _____ or produced identification _____

Type of identification produced:  D/L  H-640-534-48-886-0

My commission expires:

000785

| From: | "Joshua M. Silverman" <joshua@lawgainesville.com> |
|-------|--------------------------------------------------|
| To: | Michael Becker <beckerm@sao8.org>, Kim Parramor... |
| Date: | 09/28/07 10:56 am |
| Subject: | Brian Herlihy, 01-2000-CF-002753-A |

CC:          Lois Lehning <lehninglo@sao8.org>
Michael & Kim:

Attached please find the following documents:


1.   Defendant's Motion for Leave to Amend Motion for Postconviction Relief

2.   Supplemental Affidavit of Lois Herlihy (and Notice of Filing)

Ms. Fitzgibbons faxed these documents to my office this morning, and asked me to sign and file them
ASAP.  Rather than put the originals in the run, I intend to file them in court this afternoon at our hearing.


Joshua M. Silverman
The Law Office of Silverman and Vorhis
joshua@lawgainesville.com


.-*** Message Scanned by Alachua County McAfee Webshield Appliance ***-.

2007 OCT 29   AM 11:11

JK
CLERK OF COURTS   BY
ALACHUA COUNTY, FL.


Case: 2000 CF 002753 A

000786

Westlaw.

850 So.2d 676                                                                Page 1
850 So.2d 676, 28 Fla. L. Weekly D1769
**(Cite as: 850 So.2d 676)**

C
Mullins v. State
Fla.App. 4 Dist.,2003.

District Court of Appeal of Florida,Fourth District.
Jeffrey Kevin MULLINS, Appellant,
v.
STATE of Florida, Appellee.
**No. 4D02-4242.**

July 30, 2003.

Defendant filed motion for postconviction relief, seeking to withdraw guilty pleas. The Fifteenth Judicial Circuit Court, Palm Beach County, Richard I. Wennet, J., summarily struck motion. Defendant appealed. The District Court of Appeal held that trial court could not summarily strike motion on ground that motion was based upon false allegations of fact.

Reversed and remanded.
West Headnotes
**[1] Criminal Law 110 ☞1652**

110 Criminal Law
  110XXX Post-Conviction Relief
    110XXX(C) Proceedings
      110XXX(C)3 Hearing and Determination
        110k1651 Necessity for Hearing
          110k1652 k. In General. Most Cited
Cases

**Criminal Law 110 ☞1661**

110 Criminal Law
  110XXX Post-Conviction Relief
    110XXX(C) Proceedings
      110XXX(C)3 Hearing and Determination
        110k1661 k. Decision or Order. Most Cited Cases
Trial court could not summarily strike motion for postconviction relief on ground that motion was based upon false allegations of fact, where court did not attach to its order any portions of the record to establish that defendant's allegations were un-

true. West's F.S.A. RCrP Rule 3.850.

**[2] Criminal Law 110 ☞1652**

110 Criminal Law
  110XXX Post-Conviction Relief
    110XXX(C) Proceedings
      110XXX(C)3 Hearing and Determination
        110k1651 Necessity for Hearing
          110k1652 k. In General. Most Cited
Cases
The making of perjurious statements in a motion for postconviction relief does not constitute a procedural defect that obviates the need for an evidentiary hearing or record attachments before motion is dismissed; instead, when the trial court does not hold an evidentiary hearing, it must accept the movant's factual allegations as true to the extent they are not refuted by the record. West's F.S.A. RCrP Rule 3.850.

**\*677** Jeffrey Kevin Mullins, Coleman, pro se.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Donna M. Hoffmann, Assistant Attorney General, West Palm Beach, for appellee.
PER CURIAM.
**[1]** Jeffrey Kevin Mullins appeals an order summarily *striking* his motion for postconviction relief, filed pursuant to rule 3.850, Florida Rules of Criminal Procedure. Appellant sought to withdraw three pleas entered in five different cases in 1986, 1987, and 1988, alleging under oath a veritable laundry list of reasons for the withdrawal of all the pleas. The state had filed a response below, giving cogent reasons why summary denial of the motion was appropriate. The trial court, without an evidentiary hearing or any record attachments whatsoever,[FN1] declined to consider the state's reasons for denial but instead struck the motion because it concluded that the motion was based upon false allegations of fact. The trial court noted in its order that not only had Appellant alleged the same exact unlikely factual scenarios surrounded all three of his plea colloquies, but six other defendants incarcerated in the same federal prison had filed motions challenging a



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

000787

850 So.2d 676
850 So.2d 676, 28 Fla. L. Weekly D1769
**(Cite as: 850 So.2d 676)**

total of thirty other pleas, also based on the exact same factual allegations.

> FN1. If a rule 3.850 motion is not denied for *legal* insufficiency on its face, the trial court must attach the portions of the files and records showing conclusively that the movant is entitled to no relief. *See*Fla. R.Crim. P. 3.850(d).

[2] In response to this court's order to show cause, the state reargues the merits, which were never ruled on below, and cites *Davis v. State*, 257 So.2d 79 (Fla. 2d DCA 1972), in which the court noted that when *the record* establishes that the allegations that support a motion for postconviction relief are untrue, then it is proper to deny the motion without a hearing. Here, however, the trial court did not attach to its order any portions of the record to establish that Mullins' allegations were untrue. The state takes the position that neither an evidentiary hearing nor record attachments were necessary because the motion was "procedurally defective." We disagree that the making of perjurious statements in a rule 3.850 motion constitutes a "procedural defect." Instead, when the trial court does not hold an evidentiary hearing, it *must* accept the movant's factual allegations as true to the extent they are not refuted by the record. *See Valle v. State*, 705 So.2d 1331, 1333 (Fla.1997). *Compare Bogan v. State*, 211 So.2d 74 (Fla. 2d DCA 1968) (noting that, when a trial court finds after a full hearing that the defendant's sworn statement was untrue, then the trial court should consider instituting contempt proceedings against the movant, or prosecuting the movant for perjury).

Accordingly, we reverse the order striking the motion and direct the trial court on remand to rule on the motion.

KLEIN, STEVENSON and TAYLOR, JJ., concur.
Fla.App. 4 Dist.,2003.
Mullins v. State
850 So.2d 676, 28 Fla. L. Weekly D1769

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

000788

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT, IN AND
FOR ALACHUA COUNTY, FLORIDA

CASE NO.: 01-2000-CF-002753-A

DIVISION: II

STATE OF FLORIDA,
     Plaintiff,

vs.

BRIAN PATRICK HERLIHY,
     Defendant.
_____/

### NOTICE OF FILING

COMES NOW, the Defendant, BRIAN PATRICK HERLIHY, by and through the

undersigned counsel, and hereby files in support of his pending Motion for Post-Conviction

Relief under Fla.R.Crim.P. 3.850 the following document: Supplemental Affidavit of Lois N.

Herlihy attached as Exhibit "A" hereto.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via

facsimile and U.S. mail on the Office of the State Attorney, 120 W. University Ave., Gainesville

FL 32602, on this _28_ day of September, 2007.

By _____
Mary Elizabeth Fitzgibbons Esq.
Fitzgibbons Law Firm, P.A.
12 S. Orlando Ave.
Kissimmee, Florida 34741
Phone: 407 343-1777
Fax:    407 343-1677
Fla Bar No.: 0056480
Attorney for Defendant

Filed _Oct 29 2007_ 2 11:11 am

By _____ 10/29/07

## SUPPLEMENTAL AFFIDAVIT OF LOIS N. HERLIHY

STATE OF _Florida_ )

COUNTY OF _Alachua_ )

THE AFFIANT upon being duly sworn deposes and states:

1.  My name is LOIS N. HERLIHY. I am over 21 years of age and competent to testify in this case.

2.  I understand that I am swearing under oath to the accuracy of this Affidavit, under penalty of perjury, and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

3.  This is to follow up on my prior affidavit on behalf of my son, Defendant Brian Herlihy in connection with the criminal case of State v. Herlihy in the Circuit Court in and for Alachua County, Florida, Case No.: 01-2000-CF-2753-A.

4.  As reflected in my prior Affidavit, I asked Dr. Viera Scheibner if she would review the circumstances surrounding the death of Baby Robert Quirello and coordinate matters directly with defense counsel.

1

5.    In my conversation with Dr. Scheibner, there was consensus between the doctor and myself that she would be willing to testify in a Court of law about any report she completed, if it was necessary.

Further affiant says not,

*Lois N. Herlihy*

LOIS N. HERLIHY

Sworn to and subscribed before me this __28__ day of September, 2007.

Notary Public State of Florida
Arrie Stacey
My Commission DD527459
Expires 03/12/2010

*Arrie Stacey*

Notary Public, or other person
Authorized to administer an oath

Personally known _____ or produced identification _____

Type of identification produced:  D/L  H-640-534-48-886-0

My commission expires:

2



IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,

    Plaintiff,

vs.

BRIAN PATRICK HERLIHY,

    Defendant.

CASE NO.:   01-2000-CF-002753-A

DIVISION:   II

---

## ORDER GRANTING, IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF

**THIS CAUSE** comes before the Court upon the State's "Motion to Strike, or in the Alternative, State's Response to Defendant's Rule 3.850 Motion for Post-Conviction Relief," filed February 13, 2007. The motion responds to Defendant's "Rule 3.850 Motion for Post Conviction Relief," filed August 25, 2006, pursuant to Florida Rule of Criminal Procedure 3.850 (2006). A hearing was held on September 28, 2007, to consider the State's motion. Upon consideration of the State's motion; Defendant's response; the supplemental responses of the parties; the oral argument at the hearing; and the record, this Court finds and concludes as follows:

1.    "A defendant may not raise claims of ineffective assistance of counsel on a piecemeal basis by filing successive motions." *Jones v. State*, 591 So. 2d 911, 913 (Fla. 1991). On August 10, 2005, Defendant filed a motion for post-conviction relief alleging ineffective assistance of counsel for failure to request a *Frye* hearing prior to the admission of opinion evidence on "Shaken Baby Syndrome." *See* Motion for Post-Conviction Relief. On September 28, 2005, this Court entered an order denying Defendant's motion *on the merits*. *See* Order



000792

31(e

Denying Motion for Post-Conviction Relief. Defendant appealed the denial order. On April 24,

2006, the First District Court of Appeal *per curiam* affirmed the denial with a written opinion.

*Herlihy v. State*, 927 So. 2d 146 (Fla. 1st DCA 2006). For the reasons stated below, this Court

finds that Defendant fails to sufficiently allege why the instant claim was not raised in the prior

rule 3.850 motion.

      2.    Ground One of Defendant's motion alleges that trial counsel was ineffective for

"failure to conduct reasonable pretrial investigation, which would have presented evidence of

causation of death." In making his claim, Defendant relies upon a report prepared by Dr. Viera

Scheibner. According to the affidavit attached to his motion, Defendant's mother "contacted

Gordon Groland [trial counsel] and authorized him to request and pay for a report from Viera

Schreiber [*sic*] and requested him to consider the same. Dr. Viera Schreiber [*sic*] did the report

dated November 2000 and delivered it directly to Mr. Groland." *See* Affidavit of Lois Herlihy.

Defendant alleges that trial counsel erred by not contacting Dr. Scheibner before trial; and, in not

using, at trial, Dr. Scheibner, her report, or her opinion that the victim died solely due to

vaccinations.

      Based on Defendant's allegation, there are three undisputed facts: (1) trial counsel

had Dr. Scheibner's report in November 2000; (2) Defendant was aware, in November 2000, of

the content of Dr. Scheibner's report and that counsel possessed it; and, (3) at Defendant's trial

on September 25, 2002, trial counsel did not use Dr. Scheibner's opinion as part of the defense.

Defendant was aware of these facts when he filed his first motion for post-conviction relief on

August 10, 2005. Both that prior motion and the instant claim contain a similar allegation: trial

counsel did not prepare an adequate defense to the State's theory that the victim died due to

ORDER GRANTING, IN PART, THE STATE'S MOTION TO STRIKE
AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF
STATE V. BRIAN PATRICK HERLIHY
CASE NO. 01-2000-CF-002753-A
PAGE 3

"Shaken Baby Syndrome." The portions of the trial transcript cited to by the State, in its

supplement to the motion to strike, reflect that trial counsel did present the testimony of medical

experts who disputed the State's theory. *See* State's Supplement to Motion to Strike. In fact, in

his previous motion, Defendant himself cited to the trial testimony of his experts to attack the

validity of "Shaken Baby Syndrome." Thus, it is clear that the issue of whether the victim died

from "Shaken Baby Syndrome" or a pre-existing, but undiagnosed, medical condition was

addressed not only at trial, but also in the previous motion for post-conviction relief.

Defendant is entitled to refile the instant claim with the reason(s) why it was not

filed in his prior motion. *See* Fla. R. Crim. P. 3.850(c)(4).

3.    Based on the foregoing, it is **ORDERED AND ADJUDGED** that:

I.    The State's "Motion to Strike" is hereby **GRANTED** as to the dismissal
of Ground One without prejudice.

II.   Ground One of Defendant's "Rule 3.850 Motion for Post-Conviction
Relief" is hereby **DISMISSED** without prejudice. Defendant may amend
this claim and refile it within thirty (30) days of this Order's effective date.

III.  Ground Two of Defendant's "Rule 3.850 Motion for Post-Conviction
Relief" was previously **DENIED** by this Court's Order dated February 8,
2007. Defendant may appeal this decision to the First District Court of
Appeal within (30) days of this Order's effective date if Defendant does
not intend to refile Ground One. If Defendant does intend to refile Ground
One, Defendant may appeal the denial of Ground Two within thirty (30)
days of this Court's ruling on Ground One.

ORDER GRANTING, IN PART, THE STATE'S MOTION TO STRIKE
AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF
STATE V. BRIAN PATRICK HERLIHY
CASE NO. 01-2000-CF-002753-A
PAGE 4

**DONE AND ORDERED** in Chambers on this ___29___ day of October 2007.


_____
**MARTHA ANN LOTT**,
CIRCUIT JUDGE


**ATTACHMENTS**:
Motion for Post-Conviction Relief, filed August 10, 2005.
Order Denying Motion for Post-Conviction Relief, filed September 28, 2005.
Affidavit of Lois Herlihy, filed August 25, 2006.
Report of Vaccine Injuries of Baby Robert Quirello, filed August 25, 2006.
State's Supplement to Motion to Strike, filed June 20, 2007.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Order and Attachments was furnished by U.S. Mail/hand delivery, on this ___ day of October 2007, to the following:

Mary Fitzgibbons, Esquire
Fitzgibbons Law Firm, P.A.
12 South Orlando Drive
Kissimmee, FL 34741

Michael Becker, Assistant State Attorney
State Attorney's Office

Joshua Silverman, Esquire
The Law Office of Silverman & Vorhis
20 West University Avenue, Ste. 202
Gainesville, FL 32601


_____
Kim Parramore, Judicial Assistant


/ref

000795·

2000-CF-2753-A

IN THE CIRCUIT COURT OF
THE EIGHTH JUDICIAL
CIRCUIT IN AND FOR ALACHUA
COUNTY, FLORIDA

STATE OF FLORIDA,                              CASE NO.   02-2753-CF-A

vs.

BRIAN HERLIHY,
    Defendant.
_____/

## MOTION TO VACATE SENTENCE AND CONVICTION
## PURSUANT TO FLA.R.CR.P. 3.850 AND MEMORANDUM OF LAW

COMES NOW the Defendant, Brian Herlihy, by and through his undersigned attorney, pursuant to Fla.R.Cr.P. 3.850, and moves to vacate the Judgment and Sentence for the offense of Manslaughter entered by the Circuit Court of the Eighth Judicial Circuit, in and for Alachua County, Florida, on the grounds that the Defendant was denied effective assistance of counsel as guaranteed by the Sixth Amendment of the Constitution of the United States and Article I, §§9 and 16 of the Constitution of the State of Florida, and in support thereof avers as follows:

1.    Defendant was charged with the offense of first degree murder.

2.    The essence of the accusation was that a child left in his care was killed by shaking, consistent with the so-called "Shaken Baby Syndrome."

3.    The Defendant was found guilty of manslaughter on September 25, 2002.

4.    The Defendant was sentenced to fifteen years in prison for said offense on November 8, 2002.

5.    The Defendant filed a Notice of Appeal on December 30, 2002.

6.    The Judgment was affirmed by the First Circuit Court of Appeal on November 3, 2004.

7.    There has been no previous Motion for Post-Conviction Relief.

8.    In violation of the Sixth Amendment of the Constitution of the United

1

States and Article I, §§ 9 and 16 of the Constitution of the State of Florida, the Defendant was deprived of effective assistance of counsel, as hereafter averred:

    A.    Counsel was ineffective for failing to request a Frye Hearing prior to the admission of opinion evidence on the controversial theory of the so-called "Shaken Baby Syndrome."

    B.    Significant disputed scientific evidence was presented at trial explaining the theory of the "Shaken Baby Syndrome."

9.    The introduction of expert proof concerning a new or novel scientific principle or process requires that the trial judge must decide whether the expert's testimony is based on a scientific principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs," Matos v. State, 30 Fla. L. Weekly D859a (Fla.App. 4 Dist. 2005) *quoting* Frye v. United States, 293 F. 1013 at 1014 (D.C. Cir. 1923).

10.    Florida courts require both the basic underlying principals and the methodology of scientific evidence be "sufficiently tested and accepted by the relevant scientific community." Brim v. State, 695 So2d. 268, 272 (Fla. 1997) *citing* Frye.

11.    The issue of general acceptance is an issue to be addressed *de novo*. *See* Bevil v. State, 875 So.2d 1265 (Fla.App. 1 Dist. 2004), holding that on appeal, general acceptance is considered as of the time of the appeal. In determining the issue of general acceptance, the court "may examine expert testimony, scientific and legal writings, and judicial opinions." Id. at 1268.

12.    Any doubt as to admissibility of evidence under Frye should be resolved

2

0000002 000797

in a manner that minimizes the chance of a wrongful conviction." Id. at 1268.

13.    "Shaken Baby Syndrome" is not a theory based on a scientific principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs," nor is it "sufficiently tested and accepted by the relevant scientific community."

14.    Testimony elicited at trial established that the "Shaken Baby Syndrome" theory is not generally accepted among the relevant scientific community. Specifically:

    A.    State Witness Dr. Anne Dickinson recognized the existence of the Duhaime scientific study which concluded that the amount of force that could be created by shaking did not come anywhere near the force that would be needed to create damage to the brain. Transcript, Page 722, lines 10-14.

    B.    State Witness Dr. William Hamilton recognized that "Some people do not believe it (shaken baby syndrome) exists. Some people believe that what we call shaken baby syndrome is really due to blunt impact injury to the head."[1]  Transcript, Page 1021, line 13-15.    Dr. Hamilton also acknowledged the Duhaime study. Transcript, Page 1022-1023, lines 24, 25, and 1.

    C.    State Witness Dr. Bernard Maria acknowledged the findings of the Duhaime study, which found that it is impossible for a human being to shake a child hard enough to cause the kind of force that's necessary to cause the brain injury in this case.   Transcript,

---

[1] There was no indication of any trauma to the decedent.

3

Page 1176, line 3-12. Dr. Maria also testified that there was no evidence of any external blow to the decedent.  Transcript, Page 1176, line 18.

D.    Defense Witness Dr. Plunkett testified about the Duhaime study, Trancript PP. 1250-1252, and that the  computer animation used by the state was a fraud, Transcript P. 1241, Line 9.  He further testified that the type of force necessary to cause brain injury would also cause neck trauma.[2]  Transcript P. 1247, Line 21-22.

E.    Dr. Ronald Uscinski testified about various scientific articles discrediting the premises of the "Shaken Baby Syndrome" theory, including the Omaya study of 1968, Transcript P. 1435, -1443, 1451, and the Duhaime/Thibault study of 1987, Transcript P. 1443-1444, .

15.  A review of the scientific literature shows that there is no general acceptance of the "Shaken Baby Syndrome" Theory.    Specifically:

A.    John Caffey, the originator of the "Shaken Baby Syndrome" theory in 1972 (then called "Shaken Whiplash Syndrome"), originally concluded that brain injury was associated with long bone fractures and/or bilateral symmetrical fractures of the arms and legs.[3]  He also associated retinal hemorrhages with the Syndrome, but acknowledged that retinal hemorrhaging could be caused by ordinary events such as coughing, vigorous burping, CPR, bouncing a child on one's knee, throwing a baby into the

---

[2]Absent here.

[3]Absent here.

4



air, crossing rough roads, and from flipping a toddler head over heels to his or her feet. Caffey, "On the Theory and Practice of Shaking Infants," 124 American Journal of Diseases in Children; pp. 161-169 (1972).

B.  In 1974, Dr. Caffey wrote that infantile whiplash shaking syndrome was "associated with traction lesions of the periosteums of the long bones."[4]  Caffey, J. "The Whiplash Shaken Infant Syndrome: Manual Shaking by the extremities with whiplash-induced intraocular bleedings, linked with residual permanent brain damage and mental retardation." 54 *Pediatrics*; pp.396-403 (1974), attached and incorporated as Exhibit A.  Dr. Caffey specifically conceded that current evidence was "manifestly incomplete and largely circumstantial," Id. at 403, but nevertheless proposed a nationwide educational campaign with the following proposed doggerel:

> Guard well your baby's precious head,
> Shake, jerk and slap it never.
> Lest you bruise his brain and twist his mind,
> Or whiplash him dead forever.    Id. at 403.[5]

C.  In 1987 Duhaime, Genarelli, Thibault, Bruce, Marguiles, and Wiser

---

[4]Absent in this case.

[5]Counsel respectfully suggests that Dr. Caffey's poetry is better than his science, which is not saying much.

5

-0000005  000800



conducted an experiment by placing an accelerometer on a model of an infant and measuring the results of shaking versus impact. The peak acceleration for shaking was found to be between 10 and 12 G's. The study found that impact increased the force of shaking by up to 40 times. The experts concluded that shaking alone of an otherwise healthy infant could not cause the constellation of injuries generally associated with SBS. They determined that an impact was needed. Duhaime, Genarelli, Thibault, Bruce, Marguiles, & Wiser. ""The Shaken Baby Syndrome."" J Neurosurg. 66: 409-415 (1987), attached and incorporated as Exhibit B.

D.   In the British Medical Journal, Dr. Patrick Lantz reported his review of evidence of Shaken Baby Syndrome as it relates to perimacular retinal folds in childhood abusive head trauma. Lantz, Patrick, 28 BMJ 754 (March 2004), attached and incorporated as Exhibit C.   He found that "the references cited to support statements about the specificity or causal mechanism of perimacular retinal folds and abusive head injury are all non-comparative observational reports, unsystematic review articles, and book chapters." Id. at 755 and found that "(s)tatements in the medical literature that perimacular retinal folds are diagnostic of shaken baby syndrome are not supported by scientific evidence." Id. at 756.

E.   In a letter to the editor in the same issue of the British Medical Journal, Dr. James LeFanu wrote that:

6

"These three patterns of clinical events [minor trauma, birth injury, and respiratory arrest][6]–in the absence of other circumstantial evidence for non-accidental injury–offer a more credible explanation than shaken baby syndrome for the presence of subdural and retinal hemorrhages. It should be noted that shaking has never been directly observed or proved to cause such injuries but is rather an inference based on (contested) theories of biomechanics."   328 BMJ (March 27, 2004), attached and incorporated as attached and incorporated as Exhibit D.

F.   Dr. Mark Donohue did a review of the studies on Shaken Baby Syndrome based on principles of evidence-based medicine and concluded that "(t)here was no evidence on the subject of SBS [Shaken Baby Syndrome] that exceeded QER III-2by the end of 1998, which means that there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS." Donohue, Mark, "Evidence-Based Medicine and Shaken Baby Syndrome," American Journal of Forensic Medicine and Pathology, Vol. 24, No. 3, p. 239-242, 241 (September 2003), attached and incorporated as Exhibit E. Dr. Donohue further concluded that:

"(b)efore 1999, there existed serious data gaps, flaws of logic, inconsistency of case definition, and a serious lack of tests capable of discriminating NAI [Non-Accidental Injury] cases from natural injuries. By 1999, there was an urgent need for properly controlled, prospective trials into SBS [Shaken Baby Syndrome], using a variety of controls. Without published and replicated studies of that type, the commonly held opinion that the finding of SDH

---

[6]All present in the instant case.

7

[Subdural hematoma] and RH [retinal hemorrhage] in an infant was unsustainable, at least from the medical literature." Id. at 241.

G.   Dr. Susan Elner, in a study published in 1990, noted that "(t)he forensic literature and experimental models of head injury indicate that blunt head trauma, in addition to whiplash shaking, may be necessary to produce lesions of sufficient severity to cause death. Elner, Susan G., "Ocular and Associated Systemic Findings in Suspected Child Abuse," Arch. Opthalmol. Vol. 108 (August 1990), attached and incorporated as Exhibit F.

H.   Retinal Hemorrhages–a keystone of the State's argument that the Decedent in Mr. Herlihy's case died of shaking–are often associated with the following alternative causes:

   i.   Vaginal deliveries in up to 30-40% of all vaginal births. Kaur, B. & Taylor, D. (1990).   "Current Topic: Retinal Hemorrhages," Arch. Dis. Child 65: 1369-1372 (1990).

   ii.   Cardio respiratory resuscitation (CPR).  Goetting, M.G., Sowa B.   Retinal "Hemorrhage after Cardiopulmonary Resuscitation in Children:   An Etiologic Reevaluation," Pediatrics 85: 585-588 (1990).

   iii.   Accidents and Accidental Trauma.  Elner, S.G., "Occular and Associated Systemic Findings in Suspected Child Abuse.   A Necropsy Study,"   Arch Ophthal 108: 1094-1101,

I.   In 2003, Geddes, J.F. and H.L. Whitwell, in a study of 53 fatally

8

injured children, found that:

i.   "In the so-called 'shaken baby syndrome' it has never been shown that the retinal bleeding is the result of direct trauma to retinal vessels; rather, it has been widely assumed to be so, despite the fact that an authoritative recent review of the biomechanics of paediatric head injury has described the hypothesis as 'biomechanically improbable' and suggests there is compelling evidence that rapidly rising intracranial pressure is responsible." Geddes, J.F. and H.L. Whitwell, "Inflicted head Injury in Infants," Forensic Science International 146 (2004) 83-88, 86.

ii.   A critical survey of the literature reveals that there have been no systematic formal neuropathological studies of infant head injury, accidental or non-accidental, merely a few series looking at specific aspects, that the evidence base for DAI [diffuse axonal injury[7]] being a common finding in infant head injury is poor. Id. at 83.

iii.   Subdural and retinal bleeding in these types of cases may well have a physiological aetiology, rather than being caused by trauma. Id at 83.

J.   An editorial in Pediatric Neurosurgery in 2003 noted that "injuries thought to be pathognomic of abuse are not so thought of in other parts of the world.  Indeed, there is a perception that in the United

---

[7]Diffuse axonal injury is the essence of the type of injury which the so-called "Shaken Baby Syndrome" purports to explain.

9

States the diagnosis of non-accidental injury is made too frequently." Pittman, Thomas, "Significance of a Subdural Hematoma in a Child with External Hydrocephalus," Pediatric Neurosurg 2003: 39: 57-58, attached and Incorporated as Exhibit G.

K.   There is no evidence that clearly establishes that retinal hemorrhages, be they intraretinal, subretinal, or subhyaloid, are indicative of nonaccidental trauma.   Evidence does exist, however, that retinal hemorrhages in all layers of the retina occur in experimental as well as clinical situations that are not related to child abuse. Tongue, Andrea, "The Ophthalmologist's Role in Diagnosing Child Abuse," Ophthalmology, Vol 98, No. 7 (July 1991).

L.   A histological review of dura matter taken from a post-mortem series of 50 paediatric cases suggests that a combination of severe hypoxia, brain swelling and raised central venous pressure causes blood to leak from intracranial veins into the subdural space, and that the cause of the subdural bleeding in some cases of infant head injury is therefore not traumatic rupture of bridging veins, but a phenomenon of immaturity. Further, hypoxia with brain swelling would also account for retinal hemorrhages, and so provide a unified hypotheses for the clinical and neuropathological findings in cases of infant head injury, without impact or considerable force being necessary. Geddes, J.F., R.C. Tasker, A.K. Hackshaw, C.D. Nickols, G.G.W. Adams, H.L. Whitwell,

10

and I. Schelmberg, "Dural Haemorrhage in Non-Traumatic Infant Deaths:   Does It Explain the Bleeding in 'Shaken Baby Syndrome?' Neuropathology and Applied Neurobiology 29, 14-22 (2003).

M.   Statements in the medical literature that perimacular retinal folds are diagnostic of shaken baby syndrome are not supported by objective scientific evidence.   Lantz, P.E. "Perimacular Retinal Folds,"   BMJ Vol. 328, 754-760 (2004), attached and incorporated as Exhibit H.

N.   An editorial in the British Medical Journal noted that recent studies "make disturbing reading, because they reveal major shortcomings in the literature" and further stated that "We need to reconsider the diagnostic criteria, in not the existence, of shaken baby syndrome." Geddes, J.F "The Evidence Base for Shaken Baby Syndrome," BMJ Vol 328, 270 (March 27, 2004), attached and incorporated as Exhibit I.

16.   Trial Counsel never requested a Frye Hearing to determine the admissibility of opinion testimony regarding the "Shaken Baby Syndrome." Had trial counsel done so, the testimony likely would not have been admitted and the Defendant would likely have been acquitted.

17.   By failing to request a Frye hearing, counsel for the Defendant failed to provide effective assistance as required by the respective constitutional provisions of the Florida and United States Constitutions.

18.   Trial Counsel's performance was deficient.  By failing to require a Frye hearing, trial counsel allowed the jury to consider purported scientific

11

evidence not generally accepted by the relevant scientific community, resulting in conviction for manslaughter. Trial counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Counsel's errors were so serious as to deprive the defendant of a fair trial.

Wherefore, the Defendant respectfully moves this Honorable Court to vacate the Judgment and Sentences for the offense Manslaughter on the grounds that the Defendant was denied effective assistance of counsel as guaranteed by the Sixth Amendment of the Constitution of the United States and Article I, §§9 and 16 of the Constitution of the State of Florida.

I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this Motion and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

Brian Herlihy
G06137
South Bay CF
POST OFFICE BOX 7171
600 US Highway 27
South Bay, Fl 33493

Sworn to and subscribed before me on this **3** day of *August*, by Brian Herlihy, who produced identification. Type of identification produced: *Facility* .

STATE OF FLORIDA
COUNTY OF *Palm Beach*
Notary Public -- State of Florida
*Donna Poling* .
(Seal)



Donna Poling
My Commission DD112258
Expires April 26, 2006

12

Respectfully submitted this _8_ day of _August_, 2005.

_____
DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the Office of the State Attorney, 120 W. University Avenue, Gainesville, FL 32601 by hand/mail/fax delivery this _8_ day of _August_, 2005.

_____
DAVID MENGERS
Attorney for Defendant
Florida Bar No. 0562394
500 NE 8th Avenue
Ocala, Florida 34470
(352) 622-5514

13

0000013

000808