# EXHIBIT
# SS

*208-1-11939*

# In the District Court of Appeal
## FIRST DISTRICT
## of Florida

BRIAN PATRICK HERLIHY  }
    Appellant  }
v.  }
  }
  }
STATE OF FLORIDA  }
    Appellee  }
  }
  }
  }
  }

*6-18-8 C.H.*

CASE NO.   01-2000-CF-2753-A

APPEAL NO.  1D08-1588

VOLUME VI

SUPPLEMENTAL
# RECORD

### HONORABLE MARTHA ANN LOTT

**APPEAL FROM THE CIRCUIT COURT
8th JUDICIAL CIRCUIT FOR
ALACHUA COUNTY, FLORIDA**



**FOR APPELLANT**
MARY E. FITZGIBBONS, ESQUIRE
FITZGIBBONS LAW FIRM, P.A.
917 VERONA STREET
KISSIMMEE, FL 34741

**FOR APPELLEE**
HONORABLE BILL MCCOLLUM
ATTORNEY GENERAL
THE CAPITOL
DEPARTMENT OF LEGAL AFFAIRS
CRIMINAL APPEAL SECTION
TALLAHASSEE, FLORIDA 32399-1050

Created on 6/16/08

IN THE CIRCUIT COURT
OF THE EIGHTH
JUDICIAL CIRCUIT, IN
AND FOR ALACHUA
COUNTY, FLORIDA

BRIAN PATRICK HERLIHY
    Appellant

vs.

CASE NO. 01-2000-CF-2753-A
APPEAL NO. 1D08-1588

STATE OF FLORIDA
    Appellee

| INDEX INSTRUMENT | DATE FILED | PAGE NO. |
|---|---|---|
| DOCKET LINES | | |
| **VOLUME I** | | |
| MOTION FOR POST-CONVICTION RELIEF | 11-28-2007 | 1-8 |
| NOTICE OF FILING | 11-28-2007 | 9 |
| SUPPLEMENTAL AFFIDAVIT OF DR. SCHEIBNER | 11-27-2007 | 10-28 |
| MOTION FOR LEAVE TO SUPPLEMENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 11-28-2007 | 29-30 |
| HEARING FOR DIVISION I | 01-29-2008 | 31 |
| ORDER GRANTING MOTION FOR LEAVE TO SUPPLEMNENT DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 02-05-2008 | 32-33 |
| HEARING FOR DIVISION I | 02-14-2008 | 34 |
| NOTICE OF FILING | 03-03-2008 | 35 |



Created on 6/16/08

AFFIDAVIT OF JENNIFER LEIGH SALTER              03-03-2008              36-41

NOTICE OF FILING                                03-04-2008              42-43

AFFIDAVIT OF LOIS HERLIHY                        03-04-2008              44-46

FINAL ORDER DENYING MOTION FOR                  03-04-2008              47-50
POST-CONVICTION RELIEF

NOTICE OF APPEAL                                04-02-2008              51-52


**VOLUME II**

FIRST DISTRICT COURT OF APPEAL ORDER            06-11-2008              53-57

MOTION TO VACATE SENTENCE AND CONVICTION
PURSUANT TO FLA.R.CR.P. 3.850 AND MEMORANDUM
OF LAW                                          08-10-2005              58-115

ORDER DENYING MOTION FOR POST-CONVICTION
RELIEF                                          09-30-2005              116-119

RULE 3.850 MOTION FOR POST CONVICTION RELIEF,
CONTINUED NEXT VOLUME                           08-25-2006              120-253


**VOLUME III**

CONTINUED FROM PREVIOUS VOLUME,
RULE 3.850 MOTION FOR POST CONVICTION RELIEF   08-25-2006              254-289

COLLATERAL RELIEF DETERMINATION MADE FROM
MOTION [COMPUTER DOCKET ENTRY, NOT A
DOCUMENT]                                       08-31-2006              -----

CASE JUDGE REASSIGNED [COMPUTER DOCKET
ENTRY, NOT A DOCUMENT]                          12-31-2006              -----

CASE LAW                                        02-06-2007              290-314

ORDER DENYING, IN PART, MOTION FOR POST
CONVICTION RELIEF, SCHEDULING AN
EVIDENTIARY HEARING, IN PART, AND APPOINTING
OFFICE OF THE PUBLIC DEFENDER,
CONTINUED NEXT VOLUME                           02-08-2007              315-454

 

Created on 6/16/08

## VOLUME IV

CONTINUED FROM PREVIOUS VOLUME
ORDER DENYING, IN PART, MOTION FOR POST
CONVICTION RELIEF, SCHEDULING AN
EVIDENTIARY HEARING, IN PART, AND APPOINTING
OFFICE OF THE PUBLIC DEFENDER            02-08-2007            455-489

MOTION TO STRIKE, OR IN THE ALTERNATIVE,
STATE'S RESPONSE TO DEFENDANT'S RULE 3.850
MOTION FOR POST CONVICTION RELIEF FILED
BY STATE OF FLORIDA                      02-13-2007            490-505

ORDER DIRECTING STATE TO FILE A WRITTEN
RESPONSE                                 02-19-2007            506

DEFENDANT'S RESPONSE TO MOTION TO STRIKE,
OR IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF                        05-17-2007            507-512

COPY OF ABOVE [NOT INCLUDED HERE BECAUSE
IT IS DUPLICATIVE]                       05-21-2007            -----

STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR
IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF, RESPONDING TO
DEFENDANT'S RESPONSE OF MAY 16, 2007,
CONTINUED NEXT VOLUME                    06-20-2007            513-655

## VOLUME V

CONTINUED FROM PREVIOUS VOLUME,
STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR
IN THE ALTERNATIVE, STATE'S RESPONSE TO
DEFENDANT'S RULE 3.850 MOTION FOR POST
CONVICTION RELIEF, RESPONDING TO
DEFENDANT'S RESPONSE OF MAY 16, 2007,     06-20-2007           656-752

ORDER SCHEDULING CASE MANAGEMENT
CONFERENCE`                               08-20-2007           753

HEARING NOTES                             08-30-2007           754

ORDER SCHEDULING HEARINGS ON PENDING



Created on 6/16/08

| | | |
|---|---|---|
| POST-CONVICTION RELIEF MATTERS | 09-07-2007 | 755-756 |
| DEFENDANT'S RESPONSE TO STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR IN THE ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850 MOTION FOR POST CONVICTION RELIEF, RESPONDING TO DEFENDANT'S RESPONSE OF MAY 16, 2007 | 09-14-2007 | 757-760 |
| NOTICE OF FILING – AFFIDAVIT OF VIERA SCHEIBNER | 09-14-2007 | 761-772 |
| NOTICE OF FILING – OATH PAGE | 09-24-2007 | 773-775 |
| NOTICE OF FILING – ATTACHED AFFIDAVITS | 09-26-2007 | 776-779 |
| HEARING NOTES | 09-28-2007 | 780 |
| DEFENDANT'S MOTION FOR LEAVE TO AMEND MOTION FOR POSTCONVICTION RELIEF WITH NOTICE OF FILING AND SUPPLEMENTAL AFFIDAVIT OF LOIS N. HERLIHY ATTACHED | 09-28-2007 | 781-785 |
| MEMO FROM J. SILVERMAN TO M. BECKER, STATE ATTORNEY OFFICE | 10-29-2007 | 786 |
| CASE CITATION | 10-29-2007 | 787-788 |
| COPY OF NOTICE OF FILING AFFIDAVIT OF LOIS N. HERLIHY | 10-29-2007 | 789-791 |
| ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF, CONTINUED NEXT VOLUME | 10-29-2007 | 792-856 |

**VOLUME VI**

| | | |
|---|---|---|
| CONTINUED FROM PREVIOUS VOLUME, ORDER GRANTING IN PART, THE STATE'S MOTION TO STRIKE AND DISMISSING GROUND ONE OF DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF | 10-29-2007 | 857-1057 |

**VOLUME VII**



Created on 6/16/08

CONTINUED FROM PREVIOUS VOLUME,
ORDER GRANTING IN PART, THE STATE'S MOTION
TO STRIKE AND DISMISSING GROUND ONE OF
DEFENDANT'S MOTION FOR POST-CONVICTION
RELIEF                                      10-29-2007                    1058-1107

5

Shaken Baby Syndrome; he claims that these articles demonstrate that there is no general

acceptance of the syndrome. Even if this Court accepts that criticism exists in the relevant

scientific community, that does not support Defendant's claim that a Frye hearing was therefore

in order. The need for a Frye hearing is not indicated simply because some experts disagree with

a party's theory of medical causation. *See* Gelsthorpe v. Weinstein, 897 So. 2d 504, 511 (Fla. 2d

DCA 2005).

      5.     Here, Defendant alleges ineffective assistance of counsel as a basis for relief;

therefore, he must assert that trial counsel's performance did not comply with prevailing

standards of professionalism. *See* Strickland v. Washington, 466 U.S. 668, 691-92 (1984)

(hereinafter 'Strickland'). In addition, Defendant must be able to show that "there is reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." Strickland at 694.

      6.     Even accepting that trial counsel did not request a Frye hearing on the

admissibility of expert testimony regarding Shaken Baby Syndrome; Defendant fails to raise a

cognizable claim for relief. Counsel did not commit unprofessional error by not requesting a

Frye hearing to examine a diagnosis which courts already approve, and recognize as an accepted

medical diagnosis.

      7.     Furthermore, Defendant does not make a prima facie showing of prejudice for the

same reason that he fails to make a prima facie showing of unprofessional error. Based on the

courts' approval and recognition of Shaken Baby Syndrome, a reasonable probability does not

STATE V. HERLIHY
ORDER DENYING MOTION FOR POST-CONVICTION RELIEF
CASE NO. 01-2000-CF-002753-A
PETER K. SIEG, CIRCUIT JUDGE

exist that but for trial counsel's omission the expert testimony on Shaken Baby Syndrome would

have been excluded.

     8.     Therefore it is **ADJUDGED:**

     Defendant's Motion for Post-Conviction Relief *is denied*. No successive motion

for post-conviction relief will be entertained by this Court. Defendant may appeal this decision

to the First District Court of Appeals within 30 days of this order's effective date.

     **ORDERED** on September 2⁄, 2005.

                    PETER K. SIEG, CIRCUIT JUDGE

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that a true copy of the foregoing Order was furnished by U.S.
Mail/hand delivery, on this _30_ day of September 2005, to the following:

David Mengers, Attorney for Defendant       Mr. Brian Herlihy - DC #G06137
500 NE 8th Ave.       South Bay CF
Ocala, FL 34470       P.O. Box 7171
      600 US Hwy 27
      South Bay, FL 33493

State Attorney's Office
Jeanne Singer, Chief Assistant State Attorney
Pamela K. Brockway, Assistant State Attorney

                    Mary Fortinberry, Judicial Assistant

/dzm

000858     ~~0000063~~

STATE OF FLORIDA *Broward*
COUNTY OF _____

#02-2753-CF-A

I, Lois Herlihy am the mother of the defendant in this cause, Brian Herlihy

On or about *October* 2000 I contacted Gordon Groland and authorized him to request and pay for a report from Dr. Viera Schreiber and requested him to consider the same. Dr. Viera Schreiber did the report dated November 2000 and delivered it directly to Mr. Groland.

I was subsequently informed by Dr. Schreiber that counsel Groland did not contact her regarding the report and her willingness to assist in my son's defense.

Lois Herlihy

## OATH

I hearby swear under the penalty of perjury that the facts and matters setforth herin are true and correct.  Signed and dated this _14_ day _July_ 2006

Notary Name and seal: _____

S. UMPIERRES
MY COMMISSION # DD220050
EXPIRES: June 5, 2007
Bonded Thru Western Surety Co

J.K. "BUDDY" IRBY
CLERK OF COURTS
ALACHUA COUNTY FL.

2006 AUG 25  PM 2: 55

FILED
CK 45



REPORT ON ●CINE INJURIES OF BABY ROBE● QUIRELLO

By Dr Viera Scheibner,
Principal Reasearch Scientist, Retired

The events of the 2nd of August 2000,
based on Mr Herlihy's statements to the police
------------------------------------------------

On 2nd of August 2000, Brian Patrick Herlihy (therafter Brian),
the defendant, was busy with dipping and washing his dogs on the
balcony of his house when Crystal Quirello (thereafter Crystal),
the mother of the diseased baby Robert Quirello (thereafter
Robbie), walked in and asked Brian to look after her baby, while
she was going to attend to some errands.

After washing his hands, Brian took the baby, kissed his forehead
and said "Hey, Buddy, how are you?" Robbie laughed and smiled at
Brian.  During a brief conversation with Crystal, Robbie started
to fuss and Brian asked Crystal when he last ate.  Crystal said
"About 5 minutes ago".

"Robbie had a little spit up on his outfit which was unusual".
Brian then made Robbie's bottle and started feeding him.  Crystal
seemed in a hurry to go.  She also wanted for all of them to go
to Cedar Key for the afternoon.  Brian did not want to go.  When
changing Robbie's nappy, Brian commented how tight Robbie's one-
sy was and Crystal said "take it of him then".  When Brian took
the one-sy off Robbie he noticed "red blotches all over his back,
chest and stomach".  Crystal said "He gets heat rash real bad",
"I've never seen heat rash like that.  Crystal did not seem
alarmed, so I left it go" Brian wrote. During a short discussion
with Crystal about whether Brian should take a shower. Brian
noticed Robbie spitting up and wiped him up.  Brian did not want
to leave Robbie alone while taking the shower. Crystal was in a
hurry and asked Brian to walk her down to his truck which she was
going to use for her errands. When Brian objected, she said "he
[Robbie] will be fine".  When Brian got back to his bedroom after
walking Crystal to his truck, Robbie "had formula all over his
mouth and running along his neckline, so I grabbed his burping
cloth and wiped it up. He seemed a little 'dazed'.  I did not see
Crystal "burp " him after she gave him the rest of the bottle and
wondered if she had.  I picked him up and burped him.  He had a
little one, but spit up a lot of formula.  I played with him
and picked him up and plopped him down on the pillow on his back.
It wasn't rough, I always swing him and play with him like that
and had no problems before".  After propping Robbie up on his
bed, Brian asked Robbie to say "goo" for him, which Robbie did
after a few times being asked, and Brian then went to the toilet.
About five minutes later, Brian was back with Robbie and saw that
he rolled over so that he could only see his feet.  Robbie was
not moving and Brian pulled him up.  He shook him slightly
once to see if he was asleep, and said "Robbie! wake up!  Are you
all right?", then blew in his face to see if his eyes would open.

1

"His arms got r██ relaxed his eyes were clo██ and I heard him gurgling. I felt myself started [sic] t██ panic. I felt his heartbeat, but he wasn't breathing. I couldn't believe this was happening. I craddled him in my left arm and gave him a breath, placing my mouth over his nose and mouth. It was a puff and watched his chest to see if it would rise and fall, but with short puffs like that it's hard to tell. I waited a few seconds and gave him another breath. I got no response. I felt helpless and said "Please, Robbie, don't die baby". I had to call 911, but I don't have a phone in my room" To find the phone, Brian placed Robbie down on the pillow and ran dowstairs and hit the pager button on the cordless phone and heard the phone beeping in the bedroom. Brian ran back and found the phone. He grabbed it and gave Robbie a quick breath and called 911. "I told them I had a 3 and 1/2 months old who was unresponsive and not breathing. They told me to give him rescue breaths, I told them I was and wasn't getting a response. I was crying and they asked me what the address was, I told them and then Robbie began to have formula pouring out of his mouth and nose. I placed him on the floor and laid him on his side so if he started breathing he wouldn't aspirate on it. I saw red in the formula that was coming up of his nose. I told 911 this and they were telling me rescue was on its way. They asked me to do a 'finger sweep' which I did and said to Robbie "Please don't die". Brian also said words to the effect why did this had to happen today? When he saw paramedics going to the wrong building he ran out and directed them to his house. One medic said "I don't have the right stuff" and left and the other was fumbling around and nobody was breathing for Robbie. So, Brian grabbed the resuscitation bag and placed the mask over Robbie's nose and mouth and gave him a breath himself. The medic then tried to put the equipment together to use on Robbie. The bike-patrol medics arrived and pulled Brian out of the room and tried to console him. He told them that Crystal was his girlfriend and Robbie was her son and that she went out to run an errand. Soon after Crystal arrived and when she saw the medics working on Robbie started crying. Brian told her "I'm sorry I left him alone, I failed you and Robbie".

I leave the diary here. It provides a perfectly plausible story. Only an innocent person would communicate this way, including saying the last words about being sorry for leaving Robbie alone while it was clear that the baby was only left alone for about 5 minutes while Brian went to the toilet, and was womiting right after being dropped off by his mother Crystal and nothing that happened or could have happened in those 5 minutes would have caused the observed serious symptoms.

### WHAT CAUSED BABY ROBBIE TO VOMIT AND DEVELOP BRAIN AND RETINAL HAEMORRHAGES?

Robbie was born on March 22, 2000, slightly premature at 36 weeks gestation. There was a birth trauma there: broken clavicle.

However, he seemed to be doing reasonably well and was given his first set of 6 vaccines on May 9, 2000, when 7 weeks old. It was

2



the following vaccines:

DTaP1 (three in one); SKB a918 ac L leg
OPV/IPV1 (undifferentiated Connaught RO668 L leg
Hib1; Connaught VA510AA R leg
HepB1; SKB 3198AZ R leg

On 19 July, 2000, Robbie was given the second set of 6 vaccines
as follows:

DTaP2 SKB 956A2; R thigh
OPV/IPV2 Connaught R1433 R thigh
Hib2 Lederle 468487 L thigh
HepB2 SKB 3198A2 L thigh

There is no record of a dose of hepB at birth. It does not mean
that he was not given this vaccine at or shortly after birth.

The diary of events available to me does not contain any
information about any possible reactions to the first lot of 6
vaccines as above.  This does not mean that there were no
reactions, clinical or subclinical.

The documented symptoms suffered by baby Robbie, appear to have
occurred 14 days after the second lot of 6 vaccines.  This is not
unusual, because the so-called delayed vaccine reactions are a
rule rather than an exception, as documented by Wilkins (1988).
Wilkins (1988) documented that if reactions to vaccines are
triggered by the formation of circulating immune complexes, then
the reactions would not occur immediately.  She stated: "...If
one assumes that the adverse reaction to the DPT vaccine may
result from an immunologic intravascular complexing of
particulate antigen (whole-cell or disrupted pertussis organisms)
with specific antibody to produce a Jarisch-Herxheimer reaction,
then the adverse reaction may not occur within 24 hours of
inoculation...If the postinoculation interval is extended to 2
weeks, an additional 93 case infants (now representing a total of
98 case infants) might have been at risk for an adverse reaction
to DTP vaccine."  And: "The DTP vaccine will not be exhonorated
from causing an infants' sudden death until, tissues from suspect
infants have been examined and shown not to contain insoluble
immune complexes to pertussis antigen."

As demonstrated by Lewis et al. (1986), administration of the DPT
vaccines does result in the formation of vaccine-specific
circulating immune complexes (CIC's). They described petechial
and urticarial rash in a 4-months old baby 5 hours after given
DTP vaccines.  Subsequent antigenic analysis of the CIC's showed
them to be composed of vaccine-specific antigens with
complementary antibodies. They also described the test which
detects such antibodies. The test for these CIC's has not been
done in the case of baby Robbie. As shown by the available
records, baby Robbie had his torso covered with urticaria
(described by Brian as "red blotches") when Brian undressed him
and it is reasonable to conclude that the rash was one of the

3

signs of the C●●s development; moreover, th●●rash could have
developed already after his first dose of 6 vaccines as above,
particularly since his mother told Brian that baby Robbie
suffered what she called "heat rash". It is quite likely that
that's what she was told by a doctor when she inquired about the
persistent rash, namely, that it was only a heat rash.

Torch (1982 and 1986a, and 1986b) demonstrated that DPT vaccines
cause infant deaths and brain encephalopathy which includes brain
haemorrhages. Not only he demonstrated that there are increasing
numbers of deaths with the increasing interval from the DPT
injections, he also described brain oedema and haemorrhages
caused by these vaccines.

Acellular pertussis vaccine of the type given to Robbie, is
advertised as less reactogenic than the whole-cell pertussis
vaccine. However, this vaccine caused unexpectedly high level
of neurological reactions, such as the hypotonic-hyporesponsive
episodes in the Swedish babies who participated in the so-called
Swedish Trial of the acellular vaccines. They expected 20 deaths
and experienced 45 (plus one accidental death). None of these
deaths occurred before vaccination, even though a group of
babies was given the first dose at 2 months and another group
at 3 months. I emphasise, not a single death occured before
vaccination. 45 deaths instead of the expected 20 is highly
significant, yet all were judged as unrelated to vaccination
(Olin et al. 1997). Importantly, the trial protocol only allowed
for reactions that occurred wthin 48 hours of vaccination. This
means, that the actual rate of reactions was more in the order of
a rate 50-times that which was recorded and admitted (as
demonstrated by Wilkins 1988; see above).

Retinal haemorrhages caused by hepatitis B vaccines were
described by Devine et al.(1996). They described a case of a
young man who developed retinal haemorhages after both the first
and second injections of this vaccines. The authors concluded
that the causal relationship was indicated by the close proximity
to the vaccine (1 week) and the reappearance of the retinal
haemorrhages after the second dose.

Interestingly, Goldwater et al. (1990) described tests which
clearly differentiate babies who died from trauma from those who
died without any trauma, such as SIDS. They tested sera from
babies who died from trauma and from those who died as SIDS for
cross-linked degradation products (XLFDPs) using D-Di test
(Diagnostica Stago, Asnieres, France) which utilizes a monoclonal
antibody directed against the fibrin degradation product, D-dimer
molecule. The mean XLFDP levels for SIDS sera was 1792 mgL (SD
+-1498) and from controls sera was 56.6mgL (SD=-34.9). The high
levels of XLFDP seen in sera of SIDS cases most probably reflect
a massive consumptive coagulopathy. Even though the authors
admitted that pathogenic mechanism underlying this is uncertain,
they wrote that it is possible that in some cases it may be
related to bacterial toxaemia. This would concur with their
previous findings (Bettelheim et al. 1989) of toxigenic

4

Escherichia coli isolation from the intestinal contents of SIDS
cases. Importantly, intravascular coagulation is known to occur
in other conditions caused by E. coli verotoxins, including
haemolytic uraemic syndrome, the pathogenesis of which involves
platelet aggregation and embolisation (with normal platelet
count), which then results in haemorrhages into internal organs.

Vaccines and antibiotics are known toxic substances which cause
proliferation of toxigenic E. coli in the gut.

Again, such tests for the presence of toxigenic E. coli (the
Limulus test) have not been performed on baby Robbie.

Vaccines contain a number of substances which are toxic, starting
with foreign proteins (antigens): bacteria and viruses or their
protein envelopes) and continuing with formaldehyde, aluminium
phosphate and aluminium hydroxide, mercury compounds and other
toxic substances called adjuvants, which are known to cause
anaphylactic (=hypersensitvity) reactions (Parfentjev 1955;
Gupta et al. 1995 and many others). Far from providing immunity,
vaccine injections actually increase the susceptibility of the
recipients to the disease which the vaccines are supposed to
prevent, and also to other, unrelated, bacterial and viral
infections. This explains the well-documented 300% increase in
the reported cases of whooping cough after 1978 when the
individual US states mandated the DPT vaccines and which affected
mainly the 2 to 6 months old babies, the well-vaccinated age
group, as well as regular epidemics in vaccinated populations
(Hutchins et al. 1988). This also explains the very high
incidence of ear infections, bronchiolitis and other respiratory
infections in the recipients of vaccines (Craighead 1975).

Vaccines, such as the whooping cough (pertussis) vaccine are
actually used in animal experiments to induce the so-called
experimental allergic encephalomyelitis (Levine et al.1966). As
shown by Behan et al.(1973), such encephalomyelitis may be
connected with brain haemorrhaging (=haemorrhagic
encephalomyelitis). There are a number of mechanisms that
explain this process, disseminated vasculomyelinopathy being one
of them (Reik 1980). Also, Reik (1980) stated that the numerous
central nervous system abnormalities which follow antecedent
infections and vaccinations appear to share a common pathogenesis
involving the immune system. Antigen-antibody complexes are
formed following the introduction of foreign antigen by injection
or inoculation cause vascular injury with secondary damage to
myelin.

In 2001 and 2004, I have published two articles in Journal of
Australasian College of Nutritional and Environmental Medicine
(J ACNEM) in which I elaborate on material issues of vaccine
reactions such as suffered by baby Robbie. Both are enclosed with
this report.

5

SUMMARY OF MY FINDINGS OF THE CAUSE OF ROBBIE'S INJURIES

The diary of events as described in detail by Brian Herlihy is
plausible and clearly indicates that there was no shaking of
Robbie that could have caused any injury, neither before or after
the documented serious neurological symptoms appeared.   The
appearance of serious neurological symptoms, preceded by
vomiting, can plausibly and clearly be explained as linked to the
documented vaccine administration and did not require any
physical violence.   Brian only attempted to revive Robbie after
he developed serious neurological signs and gave him competent
resuscitation by gently puffing breaths into him and, when the
medics arrived, by correctly using the bag while one of the
medics was fumbling around.

It is well-documented in medical records that Robbie was given a
multitude of vaccines starting as early as at 7 weeks of his
short life, and, again at about 3 months of his age.   Twelve
vaccines in all.   This represented a potent toxic cocktail, 6ccm,
in short succession, just over 2 months apart.   Most vaccines
given to babies contain merthiolate (a mercury derivate) which
cumulatively may exceed the safe level of such toxic substance.
And this is before we even take into consideration the amount of
foreign proteins (antigens) and other toxic substances which such
vaccines contain.   According to immunological research, vaccine
injections do not immunise; rather they sensitise, make the
recipients more susceptible to the disease which the vaccine is
supposed to prevent and also to a host of unrelated bacterial and
viral infections (Parfentjev 1955, Craighead 1975).   To enhance
the immune response, vaccines contain adjuvants, which are toxic
substances and which further enhance the sensitisation effect of
the foreign antigens in the vaccines.   According to Gupta et al.
(1993), adjuvants in themselves are toxic and cause undesirable
side effects.   Some of the side effects can be ascribed to
unintentional stimulation of different mechanisms of the immune
system, while the others may reflect the known general adverse
pharmacological reactions.   It is a compromise between a
requirement of adjuvanticity and what is considered an acceptable
level of side effects.   However, such compromise does not make
the adjuvants any safer.

This is enough to cause brain and retinal haemorrhages in small
babies such as baby Robbie.   This also explains why the US has
such a high infant mortality rivalling the rates in the Third
World: it is the mandatory vaccination, resulting in some 98% of
all US babies being vaccinated with such toxic substances.   Until
about 1990, the "recommended" (=mandated) vaccines included only
DTP and Polio, vaccines (4 in all) at 2, 4, and 6 months of age.
The pathological findings in the babies who died from such
vaccines were minimal: mostly petechial haemorrhages into the

6

lungs, pericardium, thymus and other organs. Since 1990s, babies are given DTP, Polio, Hib and hepB vaccines. This explains why the pathological findings these days include brain and retinal haemorhages, instead of just the minimal pathological finding of petechial haemorrhages. The Hib vaccine causes meningeal (subdural or subarachnoid) haemorrhages because the Haemophilus influenzae type B bacterium has a predilection for meninges (it causes meningitis). Retinal haemorrhages as a rule accompany such meningeal haemorrhages because of a direct anatomical connection between the brain and the eyes. The HepB vaccine does not make the situation any better, quite to the contrary. Indeed, hepB vaccination of newborns resulted in SIDS moving into the first days of life. That could have been the reason why the American Academy of Pediatrics (AAP) and one stage withdrew the recommendation for hepB vaccination of the newborn babies and changed it instead to a recommendation to start with the hepB vaccine at 6 months. This, of course, would almost completely camouflage the lethal effect of this vaccine.

In conclusion, baby Robbie's injuries and death were caused by the 12 vaccines which he received within his short 3 and a half months life.

The concept of the Shaken baby syndrome as a cause of the type of injuries as experience by Robbie is on shaky ground, indeed. 1 Leadbeater & James (1955) questioned the relevance and strength of the evidence which is supposed to support the concept. They concluded that it seems premature to warn against an act of violence when its precise mechanism of action is not clearly defined, its potential for serious trauma in the absence of concomitant impact is not supported by existing experimental data, and the clinical findings said to result from it are not in themselves specific.

11.07.06

7

References

Wilkins, J. 1988. What is 'significant' and DTP reactions (a letter). Pediatrics; 81(6): 912

Lewis, K., Jordan, S.C., Cherry, J.D., Sakal, R.S., and Le, C.T. 1986. Petechiae and urticaria after DTP vaccination: detection of circulating immune complexes containing vaccine-specific antigens. J Pediatrics; 1009-1012.

Torch, W.C. 1982. Diphtheria-pertussis-tetanus (DPT) immunization: a potential cause of the Sudden-Infant Death Syndrome (SIDS). Neurology; 32(2): A169-170.

Torch, W.C. 1986a. Characteristics of diphtheria-pertussis-tetanus (DPT) postvaccinal deaths and DPT-caused Sudden-Infant-Death Syndrome (SIDS): A review. Neurology; 36: 148.

Torch, W.C. 1986b. Diphtheria-pertussis-tetanus (DPT) immunization may be an unrecognized cause of Sudden-Infant-Death (SIDS) and Near-Miss Syndrome (NMS): 12 case reports. Neurology; 36: 149.

Olin, P., Rasmussen, F., Gustafsson, L., Hallander, H.O. et al. 1997. Randomised controlled trial of two-component, three-component and five-component acellular pertussis vaccines compared with whole-cell pertussis vaccine. Lancet; 350: 1569-1577.

Devin, R., Roques, G., Disdier, P., Rodor, F., and Weiller, P.J. 1996. Occlusion of central retinal vein after hepatitis B vaccination. Lancet; 347: 1626.

Goldwater, P.N., Williams, V., Bourne, A.J., and Byard, R.W. 1990. Sudden infant death syndrome: a possible clue to causation. Med J Australia; 153: 59-60.

Bettelheim, K.A., Smith, D., Goldwater, P.N., and Bourne, A.J. 1989. Toxigenic Escherichia coli associated with sudden infant death syndrome. Med J Australia; 151: 538.

Parfentjev, I.A. 1955. Bacterial allergy increases susceptibility to influenza virus in mice. Proc Soc exp Biol & Med: 373-

Gupta, R.K., Relyved, E.H... Lindblad, E.B., Bizzini, B. et al. 1993. Adjuvants - a balance between toxicity and adjuvanticity. Vaccine; 11(3): 293-306.

Hutchins,S.S., Cochi,S.L., Brink, E.W., Patriarca, P.A. et al. 1988. Current epidemiology of pertussis in the United States. Tokai J exp & clin Med; 13 (Suppl): 103-109.

8

Craighead, J.E. 1975.  Report of a workshop: disease accentuation after immunization with inactivated microbial vaccines.  J Infect Dis; 1312(6): 749-754.

Levine, S., Wenk, E.J., Devlin, H.B., Pieroni, R.E. et al. 1966. Hyperacute allergic encephalomyelitis: adjuvant effect of pertussis vaccine and extracts.  J Immunol; 97(3): 363-368.

Behan, P.O., Moore, M.J., and Lamarche, J.B. 1973.  Acute necrotising hemorrhagic encephalopathy. Postgrad Med; 54: 154-160.

Reik, L. Jr. 1980.  Disseminated vasculomyelinopathy: an immune complex disease.  Ann Neurol; 7: 291-296.

AAP (Committee on infectious diseases and Committee on Environmental Health), 1999. Thimerosal in vaccines - an Interim Report to clinicians.  Pediatrics; 104(3): 570-574.

Leadbeater, S., and James, R. 1955.  The shaken infant syndrome. Shaking alone may not be responsible for damage.  Br med J; 310: 1600.

Scheibner V.  2001.  Diagnosis of shaken baby syndrome on shaky ground.  J ACNEM; 22(2): 5-8 &15.

Scheibner V.  2004.  Dynamics of critical days as part of the dynamics of non-specific stress syndrome discovered during monitoring with Cotwatch breathing monitor.  J ACNEM; 23(3): 10-14.

9

$S\wedge$

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,                          CASE NO: 01-2000-CF-2753-A
        Plaintiff,                      Division II

v.

BRIAN HERLIHY,
        Defendant.
                     /

**STATE'S SUPPLEMENT TO MOTION TO STRIKE, OR IN THE
ALTERNATIVE, STATE'S RESPONSE TO DEFENDANT'S RULE 3.850
MOTION FOR POST CONVICTION RELIEF, RESPONDING TO
DEFENDANT'S RESPONSE OF MAY 16, 2007**

COMES NOW the State of Florida, by and through the undersigned Assistant

State Attorney, pursuant to Florida Rules of Criminal Procedure 3.850, in response to

Defendant's Response to Motion to Strike, or in the Alternative, State's Response to

Defendant's Rule 3.850 Motion for Post Conviction Relief (Defendant's Response) and

moves this Court to deny Defendant's 3.850 Motion without a hearing, and as grounds

states the following:

1.    The Defendant's Response, paragraph 7, states, "However, this contention

        is inapposite as Defendant's claim is not that defense counsel failed to call

        present witnesses; but rather, that defense counsel failed to conduct

        reasonable pretrial investigation, that would have presented evidence of

        causation of death." (emphasis added)

2.    The claim that Defendant's trial counsel failed to present evidence of

        causation of death is refuted by the trial transcript at page 1501, line 21 –

        page 1502, line 2,  Q: Okay. What is your opinion as to the cause of

Robbie Quirello's death?  A: My opinion as to the cause of his death is

that he died from cerebral anoxia.  Q: Caused by what?  A: Either

vomiting with obstruction of his airway, or seizing associated with

vomiting, obstructing his airway.

3.       Defendant's trial counsel's alternate theory of causation of death is also

shown in the trial transcript by:

   A. Testimony of defense expert, Dr. John Plunkett at: page 1218 line 3 –

      page 1219 line 25, page 1222 line 14 – page 1225 line 14, page 1230

      line 7 – 23, page 1245 line 15 – page 1247 line 24, page 1288 line 2 –

      20, page 1319 line 19 – page 1320 line 24, page 1325 line 25 – page

      1327 line 13.  See attached.

   B. Testimony of defense expert, Dr. Ronald Uscinski at: page 1404 line

      20 – page 1405 line 11, page 1407 line 11 – page 1408 line 1, page

      1416 line 5 – page 1424 line 24, page 1447 line 2 – 18, page 1450 line

      11 – 22, page 1486 line 22 – 24, page 1493 line 18 – 19, page 1500

      line 9 – 11.  See attached.

4.       Since the Defendant's claim is refuted by the record, it should be denied

without a hearing.

WHEREFORE, the undersigned counsel respectfully request this Court deny the

Defendant's Motion without a hearing.


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished to Mary Fitzgibbons, Defendant's Attorney, 12 S. Orlando Ave., Kissimmee,

FL 34741 by U. S. mail this 20th day of June, 2007.

Respectfully Submitted,

WILLIAM P. CERVONE
State Attorney

Michael L. Becker
Assistant State Attorney
Florida Bar No. 0270740

SrC
1205



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE CIRCUIT COURT OF FLORIDA
EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY

CASE NO: 01-2000-CF-2753-A

TRANSCRIPT ON APPEAL
VOLUME X
(Pages 1205 - 1368)

STATE OF FLORIDA

vs.

BRIAN PATRICK HERLIHY,

            Defendant.

_____/

Volume XIII
1002-4788

Proceedings:        Jury trial

Before:             The Honorable Martha Ann Lott,
                    Circuit Judge

Date:               September 17, 2002

Time:               1:00 p.m.

Place:              Courtroom 4-A
                    Alachua County Courthouse
                    Gainesville, Florida

Reporter:           Stacey K. Bryant,RPR
                    Judicial Court Reporter

APPEARANCES:

    Jeanne Singer, Assistant State Attorney
    Stephen Pennypacker, Assistant State Attorney
    120 W. University Avenue
    Gainesville, Florida 32608
        Appearing on behalf of the State of Florida

    Gordon Groland, Esquire
    John Tedder, Esquire
    Post Office Box 2848
    Gainesville, Florida 32602
        Attorneys for defendant

03 MAY -1 PM 1:19
CLERK OF CIRCUIT COURT
& COUNTY COURT
ALACHUA COUNTY FL

Stacey K. Bryant, RPR
Judicial Court Reporter

INDEX TO PROCEEDINGS


PRELIMINARY MOTIONS: ............................. 1207


DEFENDANT'S CASE:



DR. JOHN PLUNKETT,

DIRECT EXAMINATION BY TEDDER: .................... 1211
CROSS-EXAMINATION BY SINGER: ..................... 1254
REDIRECT-EXAMINATION BY TEDDER: .................. 1304
RECROSS-EXAMINATION BY SINGER: ................... 1328


STATE'S CASE:



DR. LAWRENCE LEVINE,

DIRECT EXAMINATION BY PENNYPACKER: ............... 1330
CROSS-EXAMINATION BY TEDDER: ..................... 1351
REDIRECT-EXAMINATION BY PENNYPACKER: ............. 1363


INDEX TO EXHIBITS


DEFENSE EXHIBIT NO. 3....MARKED IN EVIDENCE....... 1217

DEFENSE EXHIBIT NOS. F, G..MARKED FOR I.D......... 1226

STATE'S EXHIBIT NO. 64...MARKED IN EVIDENCE....... 1334

STATE'S EXHIBITS G, H, I, AND J..MARKED FOR I.D... 1342

STATE'S EXHIBIT NOS. 65, 66, 67, 68, 69, 70......MARKED

IN EVIDENCE...................................... 1347

1    testifying out of order to accommodate his travel

2    plans.  Mr. Tedder, are you -- Go ahead and call your

3    witness.

4         MR. TEDDER:  Yes, ma'am.  Thank you, your Honor.

5    May it please the Court?  At this time the defense

6    would call a witness to the stand, Dr. John Plunkett.

7                        JOHN PLUNKETT,

8    having been produced and first duly sworn, testified as

9    follows:

10                     DIRECT EXAMINATION

11   BY MR. TEDDER:

12        Q    Good afternoon, Dr. Plunkett.

13        A    Good afternoon, Mr. Tedder.

14        Q    Please tell the jury your name.

15        A    John Plunkett, P-L-U-N-K-E-T-T.

16        Q    Dr. Plunkett, please tell the jury what your

17   educational background is.

18        A    I graduated from the University of Minnesota

19   Medical School.  I then had a one year rotating, a general

20   internship at St. Paul Ramsey Hospital.  When I finished my

21   internship, I had an additional five years of training in

22   general pathology and forensic pathology at Ramsey and at

23   the Hennepin County Medical Examiner's Office.  I finished

24   my training in the spring of 1978, took board certification

25   examinations given by the American Board of Pathology in

1· three areas; anatomic pathology, clinical pathology and

2 forensic pathology.  I passed the exams, which means that

3 I'm board certified and I went to work at Regina Hospital in

4 Hastings on September 1st and I've been there ever since.

5       Hastings is a river town.  The county seat is

6 Dakota County, which is the third largest county in

7 Minnesota and it's approximately 20 miles from downtown St.

8 Paul.

9       Q    I see.  And you say you went to medical school at

10 St. Paul Ramsey?

11       A    No.  University of Minnesota Medical School and

12 then internship and residency at Ramsey and Hennepin.

13       Q    Okay.  And where do you currently work, sir?

14       A    Regina Hospital.  I am the laboratory and medical

15 education director and I'm also the assistant coroner for

16 the Minnesota Regional Coroner's Office.

17       The coroner in Minnesota is required to be a

18 physician and is appointed by the county board.  It's not an

19 elected position.  We cover seven counties with a total

20 population of approximately three-fourths of a million and

21 we have an investigative staff of approximately 40,

22 administrative staff of three.  We actually go out and

23 investigate any sudden or unexpected death.  And as part of

24 that investigation, we will perform an autopsy approximately

25 15 percent of the time.  So we'll investigate about 2000

Stacey K. Bryant, RPR
Judicial Court Reporter

000875

1    deaths this year and perform about 300 autopsies.

2            In the old days until about five years ago, the

3    forensic part was a significant part of my practice.   Today

4    it's primarily medical education and laboratory direction.

5        Q    Now are you currently licensed in any states?

6        A    Yes, sir.  Minnesota and Wisconsin.

7        Q    And have you ever published any articles?

8        A    Yes, sir.

9        Q    Roughly how many?

10        A    Probably five or six actual original articles that

11    I've had and I've had three or four letters to the editor

12    published in the Journal of the American Medical

13    Association, for example.  Actually I think it's probably

14    six or seven letters.

15        Q    And are you a member of any professional

16    organizations?

17        A    A number.  Most of them have sort of evolved into

18    this, but things like the American Medical Association, the

19    American Academy of Forensic Sciences, the National

20    Association of Medical Examiners, and then a number of

21    others that are particularly related to the practice of

22    pathology.

23        Q    Have you ever given any presentations, speeches

24    regarding different medical issues?

25        A    A number.

1   Q   Have you ever been a witness for the prosecution

2   in any criminal cases?

3   A   Yes, sir.

4   Q   How many times roughly?

5   A   Probably more than 200 for the -- at the request

6   of the prosecution and between 50 and 75 at the request of

7   the defense.

8   Q   All right.  Now are you going to be getting paid

9   to testify in this case?

10   A   Indirectly.  I'm a Regina Hospital employee and

11   Regina will send you a bill for my services.  However, I

12   don't see that money directly.  My salary is not dependent

13   on it and I don't get any comp time.

14   Q   All right.

15   A   Regina gets paid.  You know, indirectly I get

16   paid.

17   Q   How many autopsies would you estimate you've done?

18   A   More than 2000.  I've been doing this for 25

19   years.

20   Q   And have you ever been -- ever testified in court

21   as an expert?

22   A   Yes, sir.

23   Q   Do you know how many times?

24   A   More than 200 times.  The overall majority of them

25   criminal cases.  I've probably only testified in half a

1   dozen, ten at the most, civil cases in my life.

2          Q     What were you -- What area did you testify as an

3   expert in?

4          A     The majority of the time when I testified at the

5   request of the prosecution, it has involved deaths that

6   occurred in my own jurisdiction.  Somebody shot somebody

7   else, somebody stabbed somebody else, motor vehicle

8   accident, for example.  The majority of the time when I've

9   testified at the request of the defense, it has been

10   specifically in an issue of head injury in children.

11               MR. TEDDER:  Your Honor, I would tender this

12          witness as an expert in the area of forensic pathology.

13               MS. SINGER:  No objection, your Honor.

14               THE COURT:  The Doctor will be allowed to give his

15          opinion in the area of forensic pathology.

16               MR. TEDDER:  Your Honor, may I approach the

17          witness?

18               THE COURT:  Yes.  Go ahead.

19   BY MR. TEDDER:

20          Q     Dr. Plunkett, what did I just hand you, sir?

21          A     This is a copy of my CV, which I updated in

22   January of 2001.  The previous update had been in the spring

23   of 1994 and there are some changes from January of --

24   January of 2001 that have to do with a couple of relatively

25   minor things.  It lists me as the laboratory director of

1216

1    Saulsiville (phonetic) Medical Center.  Saulsiville is now

2    closed.  I'm no -- Well, I guess that does list -- I was

3    gonna say I'm no longer inspector for the laboratory

4    accreditation program in pathology.  It shows that as

5    stopping in 1994.

6          Q    Other than that, is it accurate?

7          A    Well, there have been some additional letters that

8    I have written that have been published in the American

9    Journal of Forensic Medicine and Pathology, but that's not a

10   substantial difference.

11         Q    Yes, sir.

12              MR. TEDDER:  Your Honor, I would like to submit

13        this to be marked as State's -- excuse me -- Defense'

14        Exhibit 1.  I ask it to be moved into evidence.

15              MS. SINGER:  Your Honor, at this time without

16        viewing it -- I would like to have an opportunity to

17        view it and also if there is a part of this that

18        Dr. Plunkett has indicated by testimony no longer

19        applies, I would ask that it be deleted from or

20        scratched out of the document that he wishes to have

21        entered into evidence at this time and I think we're

22        already past number one for the defense.  Those are my

23        objections.

24              THE COURT:  All right.

25              MR. TEDDER:  Do you have an ink pen, Dr. Plunkett?

Stacey K. Bryant, RPR
Judicial Court Reporter

000879

```
 1          THE COURT:  The objection is overruled.  I'll
 2     allow it into evidence at this time as I believe it's
 3     Defense No. 2 in evidence.  Is that right?
 4          THE CLERK:  Three, your Honor.
 5          THE COURT:  Three in evidence at this time.
 6          (Defense Exhibit No. 3 was received in evidence.)
 7          MR. TEDDER:  Do you want us to delete anything
 8     that no longer applies or scratch through?  No?
 9          THE COURT:  No.
10          MR. TEDDER:  Okay.
11          MS. SINGER:  Then I would just lodge an objection
12     that it's not an accurate curriculum vitae because it
13     does no longer apply.
14          THE COURT:  Good enough.  Noted for the record.
15     BY MR. TEDDER:
16          Q    Dr. Plunkett, have you been sent various medical
17     records regarding Robbie Quirello?
18          A    Yes, sir, I have.
19          Q    Have you had an opportunity to review those prior
20     to coming to testify here today?
21          A    Yes, sir, I did.
22          Q    Would you tell the jury what documents you have
23     reviewed?
24          A    I've reviewed the autopsy report, the
25     neuropathology report completed by Dr. Nelson, the autopsy
```

1    microscopic slides, the autopsy photographs and the -- and

2    Robbie's hospital records, also photos of the home.

3         Q    Are you aware of what the state contends happened

4    to Robbie Quirello in this case?

5         A    Yes, sir, I am.

6         Q    Were you able to reach a conclusion as to what

7    happened to Robbie Quirello based on what you observed and

8    the records?

9         A    Yes, sir, I was.

10        Q    Would you tell the jury what your opinion is

11   regarding what happened to Robbie Quirello?

12        A    Robbie died as a result of lack of oxygen or

13   hypoxia.  His brain did not receive enough oxygen to survive

14   or to function and he died.  He was resuscitated at the

15   hospital.  They were able to keep his heart going and his

16   other organs going for seven or eight days.  After, he was

17   ultimately removed from the respirator.  But his death was

18   caused by the lack of oxygen.

19        Q    Can you tell the jury what caused this lack of

20   oxygen?

21        A    I can't tell specifically what happened to Robbie

22   in this case because I wasn't there.  There are a variety of

23   causes for lack of oxygen.  For example, pneumonia.  Well,

24   Robbie didn't have pneumonia.  Mechanical asphyxiation, in

25   other words, you can't breath because your chest is impeded.

1   You're working on your car and a tire falls on you.  You

2   can't breathe and you die as a result of asphyxiation.

3   Spasm of the airway, such as occurs with an allergic

4   reaction can cause hypoxia and subsequent death.  A

5   prolonged seizure can lead to interference of the brain

6   centers that control breathing and ultimately death.  Brain

7   swelling impeding the brain centers control of breathing can

8   cause death due to lack of oxygen.

9       Q    Were you aware of what Brian Herlihy has told law

10  enforcement regarding where he found Robbie Quirello?

11      A    Yes, I am.

12      Q    Do you believe -- Did you have an opinion as to

13  whether what he has said, the state he found the baby in,

14  could have led to the anoxia to cause this child's death?

15      A    Yes, sir.

16      Q    How?

17      A    It could have.

18      Q    How could that have caused it?  Can you explain

19  that?

20      A    Well, the description, as best as I can

21  reconstruct it from the records, is that Mr. Herlihy found

22  Robbie wedged between the steel rails of the bed frame and

23  the mattress in a head down position with his legs more or

24  less either up in the air or partially against the mattress

25  itself, that he was wedged in that position.



1    Q    Now have you ever seen a child that you believed

2    to have been abused?

3    A    Oh, yes.

4    Q    What types of evidence do you see when you find a

5    child has been abused?

6    A    Well, the simplest scenario would be a child who

7    just has an isolated injury, for example, a cigarette burn

8    or a fracture caused by another human being.  I know the

9    worst case would be a child with multiple injuries of

10   various ages to various parts of the body, including the

11   skin, the organs such as the liver or the kidneys, the brain

12   and even the lungs, fractures of various bones.  So that

13   abuse can -- is really a spectrum of injuries, anything that

14   is inflicted by another human being that we would certainly

15   not find acceptable today.

16   Q    Now did you write an article which was published

17   in the American Journal of Forensic Medicine and Pathology

18   in the spring of 1999 entitled Shaken Baby Syndrome and the

19   Death of Matthew Epan, a Forensic Pathologist's Response?

20   A    Yes, sir, I did.

21   Q    And why did you write that article?

22   A    At that time, specifically in November of 1997, a

23   number of pediatricians and one pathologist wrote a letter

24   to the editor of pediatrics objecting to defense testimony

25   in the Matthew Epan death, stating that the defense experts



1    were misusing evidence, were misstating science and so

2    forth.

3              I knew nothing about the actual Matthew Epan case.

4    I was not involved.  I was not a witness.  I did not review

5    any of the reports, but I did respond to the pediatricians'

6    assertions based on science.  In other words, I took the

7    four points that they had made in their letter and then

8    examined the actual scientific basis for their belief.  And

9    that was the purpose of the article, was to examine the

10   scientific basis for the assertions that the pediatricians

11   were making in the letter.

12        Q    Do you recall the assertions that the

13   pediatricians made in that article, in their letter?  Would

14   it refresh or help you if you can refer to the letter

15   itself?

16              MS. SINGER:  Your Honor, I'm going to lodge an

17        objection to relevance in this particular case.

18              THE COURT:  The objection is sustained.  You're

19        gonna have to rephrase your question.

20   BY MR. TEDDER:

21        Q    Dr. Plunkett, who was Paul Bruissard?

22        A    Paul Bruissard was the chair of forensic medicine

23   at the Sorbonne in Paris in the late 1800s.

24        Q    And do you have a quote from him that was at the

25   beginning of the article we're talking about?

1222

1     A    Yes, sir.

2     Q    Why did you include that quote?

3          MS. SINGER:  Once again, your Honor, I would lodge

4    an objection as to relevancy.

5          THE COURT:  Sustained.

6  BY MR. TEDDER:

7     Q    What would you say is the significance of the

8  quote you included from Paul Bruissard regarding the law of

9  making a witness of a person who is a man of science?

10          MS. SINGER:  Once again, your Honor, I would lodge

11    an objection as to relevancy.

12          THE COURT:  The objection is sustained.

13  BY MR. TEDDER:

14     Q    Dr. Plunkett, can a child receive a subdural

15  hematoma as a result of normal childbirth?

16     A    Yes, sir.

17     Q    Were you aware of the birth Robbie Quirello had in

18  this case?

19     A    Yes, sir.

20     Q    How would you describe that for the jury?

21     A    Difficult.

22     Q    All right.  And what things do you take into

23  consideration as far as saying it was a difficult birth?

24     A    Length of the second stage of the labor, the

25  longer time it takes for the cervix to ripen or become flat



1    so that it can dilate, any evidence for fetal distress that

2    the child might have, difficulty during the delivery or

3    birth process itself...

4         Q    Now if a child was born with a subdural hematoma,

5    would the child necessarily exhibit symptoms at that time?

6         A    No, and most often they do not.  It's actually

7    relatively rare for a child with a subdural hematoma

8    associated with childbirth to develop symptoms.

9         Q    Can you tell the jury why that is?

10        A    No, because I don't know.  What I do know is that

11   the subdural hematoma itself, especially if it is caused by

12   what is called static loading, which is, for example, your

13   head in a vice, not a compliant head like a newborn.  If the

14   pressure is applied very very slowly, there's no traumatic

15   brain injury at all.  You just -- you get rupture of

16   bridging blood vessels and bleeding into the subdural space.

17             So the bleeding into the subdural space by itself

18   does not cause a problem unless the volume is so large, that

19   it starts to compress the rest of the brain and potentially

20   interfere with the breathing centers or cause a seizure.  So

21   unless that happens, a subdural hematoma is not gonna cause

22   signs or symptoms.

23        Q    Did you see CAT scans that were taken of Robbie on

24   August 2nd and 3rd?  Did you see CAT scans that were taken

25   of Robbie Quirello?



1    A    No.  I read the reports.  I'm not a radiologist.

2    Q    What did the reports reflect as exhibited in the

3  CAT scans?

4    A    Robbie had chronic subdural hematomas and was

5  developing new bleeding into those chronic subdural

6  hematomas.

7    Q    Now if a person has a subdural hematoma, can it

8  begin to have a new bleed?

9    A    Yes.

10    Q    Is that part of the healing process?

11    A    It's part of the natural history of a subdural

12  hematoma.  That has been proved in two articles that I'm

13  aware of in which people were followed with serial CT scans

14  or MR scans who were in the hospital, people with subdural

15  hemorrhage.  And over time you get new bleeding, you get

16  resorption of some of the old blood, you get new bleeding,

17  you get resorption or healing of some of the old blood.

18  It's a cycle until you eventually heal the subdural hematoma

19  or the volume becomes so large that it requires surgical

20  removal.

21    Q    Is bleeding on the brain an irritant?

22    A    Bleeding in the subarachnoid space is, but I don't

23  know if bleeding in the subdural space itself is really an

24  irritant.  Almost always when you have subdural hemorrhage,

25  you're gonna have subarachnoid hemorrhage also because the

1    dural blood vessels go through the arachnoid membrane.

2         Q    Can bleeding on the brain cause a seizure?

3         A    Yes.

4         Q    And if someone had a seizure, could that cause

5    them to quit breathing?

6         A    Yes.

7         Q    Can a lack of oxygen cause the brain to begin to

8    bleed?

9         A    It can cause -- Well, yes, it can.  You can cause

10   bleeding in the dural space and it can also cause bleeding

11   on the surface of the brain and at what are called the water

12   shed areas, the area between the gray and white matter where

13   the blood vessel supply is the most tenuous.  So lack of

14   oxygen in itself can cause bleeding.

15        Q    Have you read any articles that deal specifically

16   with lack of oxygen causing subdural hematomas?

17        A    Yes, sir.

18        Q    What article study have you read?

19        A    Dr. Jennian, J-E-N-N-I-A-N, Geddes, G-E-D-D-E-S,

20   is a neuropathologist at Queen Mary Hospital in London.  I

21   know her personally.  She has written a number of articles

22   regarding traumatic head injury in children.  Her most

23   recent article directly addresses the question of lack of

24   oxygen and development of subdural hemorrhage.  It is going

25   to be published either this month or next month in a journal



1  called Neurophysiology and Applied Neurobiology.  It is a

2  peer review journal.  She sent me the pre-print article

3  about four months ago along with the photographs that are

4  going to appear with that article.

5        Q    What does peer review article mean?

6        A    It means that someone, a physician or a nurse or

7  another scientist, has written an article that that person

8  thinks can be some helpful information.  To be published in

9  a number of journals requires that others of your peerage

10  review that article to make sure that at least your methods

11  are correct, that your conclusions are substantiated by your

12  data or evidence and so forth.  The reviewers may not agree

13  with your conclusions and that's not a reason to say that

14  something shouldn't be published, but it at least is

15  methodologically sound in most of the journals that articles

16  are published.

17        Q    Were there some photographs in that article that

18  would assist you in offering testimony regarding this case?

19        A    Yes, sir.

20             MR. TEDDER:  May I have these marked, your Honor,

21        as exhibits?

22             THE COURT:  They'll be marked as demonstrative

23        aids?

24             MR. TEDDER:  Yes, ma'am.

25             THE CLERK:  Defense F and G, your Honor.



1227

1    THE COURT:  Go ahead.

2    MR. TEDDER:  I show these to the state attorney,

3    your Honor.  May I approach the witness, your Honor?

4    THE COURT:  Yes.

5    BY MR. TEDDER:

6    Q    Dr. Plunkett, I'll show you what's been marked as

7    Defense Exhibit F and G.  Do you recognize those?

8    A    F and G are the same photographs.

9    Q    Oh, they're the same photographs?

10   A    Two of the same thing.  These are photographs from

11   Dr. Geddes' study.  They're a photograph of a 34 week, 32

12   week gestation premature child who developed fetal distress,

13   was delivered with poor breathing, actually anoxia, no

14   breathing at that time, was resuscitated and was kept on a

15   respirator for a few hours.  The photographs demonstrate

16   intradural and subdural hemorrhage.

17        In the study that is going to be published, she

18   had either 51 or 53 such cases.  In other words, children

19   who died shortly after birth with hypoxia and almost all of

20   those children had intradural and subdural hemorrhage as a

21   result of the lack of oxygen, not any other extrinsic

22   trauma.

23   Q    Now do you see any subdural hematomas on those

24   photographs?

25   A    Yes, I do.

Stacey K. Bryant, RPR
Judicial Court Reporter

000890



1228

1    Q    Do you see a dura on that photograph?

2    A    Yes, I do.

3    Q    In this bleeding that you saw in those

4    photographs, is that chronic or acute?

5    A    That's acute.

6    Q    What color is acute bleeding?

7    A    Acute bleeding is purple or red purple.

8    Q    What color would chronic bleeding be?

9    A    Well, chronic bleeding would be a yellow or a

10   yellow brown and you would usually be able to see that by

11   looking at the dural membrane itself, not by looking at the

12   bleeding, because you always get new bleeding in subdural

13   hematomas and there's a mixture of blood.  So with just the

14   unaided eye, it's difficult to see.  Your medical imaging

15   studies are actually better for that.

16   Q    Medical imaging studies are what?

17   A    CT or MR scans.

18   Q    Now are you aware of the cause of death listed by

19   Dr. Hamilton in this case?

20   A    Yes, sir, I am.

21   Q    What is it?

22   A    Complications of shaken baby syndrome.

23   Q    Now the impressions that he listed above that,

24   what were those?

25   A    Autopsy findings.

1229

1    Q    Okay.

2    A    Immature human brain with bilateral cerebral

3    subdural hematoma and subarachnoid hemorrhage.

4    Q    What does that mean to you?

5    A    It means that there was bleeding on the surface of

6    the brain on both sides and beneath the lining membrane of

7    the brain, the arachnoid on both sides.

8    Q    All right.  Is there a connection between subdural

9    bleeding and subarachnoid bleeding?

10   A    Yes, sir, there is.

11   Q    Explain to the jury how that is.

12   A    Well, the subdural -- the blood vessels that

13   rupture to allow traumatic subdural hemorrhage communicate

14   with the arachnoid space so that if the bleeding in the

15   dural space is caused by trauma, there will always be

16   bleeding in the subarachnoid space.  There will also be

17   bleeding in the subarachnoid space anytime there is brain

18   swelling and compression of the surface of the brain against

19   the inside of the skull.

20         So in and of itself, subarachnoid hemorrhage means

21   absolutely nothing in terms of causation or relationship to

22   trauma unless it is associated with a ruptured blood vessel

23   and inflammation.  That's the only time it has any

24   significance.

25   Q    Swelling on the brain, would that qualify as

1  trauma?

2      A    Swelling on the brain is a secondary event as a

3  result of either a primary trauma and I'm using the term

4  trauma very generically.  Pneumonia is a trauma.  So if you

5  have pneumonia and lack of oxygen, you're going to get

6  swelling of the brain.

7      Q    What type of trauma would you point to in this

8  case?  Would a seizure be a trauma?

9      A    Well, a seizure isn't a trauma.  A seizure is a

10  result of a prior injury.  Robbie has no trauma.  There are

11  no -- there are no new traumatic injuries that Robbie has.

12  The only primary trauma that he has is the subdural

13  hemorrhage, if it represents trauma at all.

14      I mean, his subdural hemorrhage could be related

15  to birth trauma.  It could be related to a condition called

16  cortical venous thrombosis, which is a clotting off of the

17  blood vessels on the surface of the brain, which has nothing

18  to do with primary trauma.

19      So with the exception of the subdural bleeding,

20  Robbie has no evidence for trauma at all.  He has secondary

21  evidence for trauma in the anoxia.  So the anoxia is a

22  secondary traumatic event, which could have been caused by

23  somebody else or could have occurred inadvertently.

24      Q    Now Dr. Hamilton listed anoxic ischemic

25  encephalopathy global in his findings.  What does that mean?



1       A     It means that there was lack of oxygen to almost

2   the entirety of the brain and I certainly agree with that.

3       Q     And you agree with that based on what, Doctor?

4       A     The autopsy photographs, the medical records.

5   This is not a surprising finding.  This is what caused

6   Robbie's death.

7       Q     Now he also put cerebral edema -- excuse me --

8   edema and vascular congestion.  What does that mean,

9   Dr. Plunkett?

10      A     Brain swelling and blood vessel congestion as a

11  result of the lack of oxygen, the secondary injury.

12      Q     Did you see any evidence of shearing to the brain

13  in the slides you examined?

14      A     No, there was none.

15      Q     What does shearing mean to you?

16      A     Shearing is one of the components of what is

17  called traumatic axonal injury.  Traumatic axonal injury is

18  a concept that was developed almost in parallel by people in

19  Scotland and by researchers in Philadelphia to explain

20  prolonged unconsciousness in people who have been in motor

21  vehicle accidents or had other accidents and yet did not

22  have a huge skull fracture or a large subdural hematoma.

23            Very simply stated, it means that one part of the

24  brain is moving or more accurately accelerating differently

25  from an adjacent part and it shears.  It breaks apart.

1 | Robbie has no evidence for any shearing injuries anywhere.

2 |     Q    Were you able to examine the dura matter in this

3 | case?

4 |     A    No, sir, I was not.

5 |     Q    Would you have liked to have seen the dura matter?

6 |     A    Yes, sir, I would have.

7 |     Q    Tell the jury why.

8 |     A    If it is important to try to age Robbie's chronic

9 | subdural hematomas, you can do it two ways and the best way

10 | to do it is to use both.  One is using the CAT scan or the

11 | MR scan as the criteria that have been established in trying

12 | to age a subdural hematoma.  And the other way is to look at

13 | the dura under the microscope because the healing process

14 | takes a more or less uniform and known path.  Using those

15 | two things together, you can say, Well, this is all less

16 | than 15 days old or some of it is five days old, some of it

17 | is two or three weeks and some of it is more than two

18 | months.

19 |     But you can't do that in this case because you

20 | don't have the dura.  All you can use is the CT or MR

21 | criteria, which say that at least when Robbie came in, the

22 | majority of the bleeding that he had was what is called

23 | chronic, which is usually taken to mean more than two weeks.

24 | Then he had new bleeding that continued during his

25 | hospitalization in that dural space, but that's just part of



1233

1    the natural history.  I don't think the nurses caused any

2    trauma or the doctors on day two, day four or day six of his

3    hospitalization.

4         Q    If you had done the autopsy in this case and had

5    been aware of the evidence of pre-existing chronic subdural

6    hematomas and acute subdural hematomas, how would you have

7    gone about examining this child?

8         A    I would have saved a number of sections of the

9    brain.  I would have -- actually I would have saved the

10   brain in a fixed state and I would have sent that to a

11   neuropathologist and asked that person to assist me in the

12   evaluation, certainly including the dura and the spinal

13   cord.

14        Q    When the skull cap is removed during the autopsy,

15   how would you -- what efforts would you take to make sure no

16   damage was done to the dura or the area where the chronic

17   subdurals were?

18        A    It's pretty difficult sometimes.  There's a

19   standard way of removing the skull cap.  Some people

20   actually suggest removing the brain and the skull cap with

21   the head under water so that it's really almost floating.

22   Then you don't have the brain moving around artifactually

23   causing tears, for example, on the surface.

24             But sometimes it's difficult to not create

25   artifacts.  For example, when you're cutting across the

1234

1   dura, you have to cut across a structure called the sagittal

2   sinus, which runs from the front to the back of the center.

3   Just as a result of cutting that vein, you're going to get

4   bleeding into the subdural space.  So you have to know that

5   maybe what you're seeing may in fact not be the result of

6   trauma, but something else entirely.

7       Q   Would microscopic examination of the dura have

8   been helpful?

9       A   Well, not only microscopic examination, but a good

10   gross description and good gross photographs.  There's only

11   one or two photographs of the dura in the autopsy that show

12   you anything and that clearly shows that there's a chronic

13   subdural hematoma.  The color is yellow.

14       Q   Did you see any photographs of the cap of the

15   skull?

16       A   I saw -- Well, the cap is there.  It's underneath,

17   but that's the outside.  I don't care about that.

18       Q   Right.

19       MR. TEDDER:  I would like to approach the witness,

20      your Honor.

21       THE COURT:  Go ahead.

22   BY MR. TEDDER:

23       Q   Dr. Plunkett, I want to show you State's Exhibit

24   59, 60 and 61.  If you could, please --

25       MR. TEDDER:  Your Honor, could the witness step

Stacey K. Bryant, RPR
Judicial Court Reporter

000897



1      down in front of the jury to show them this?

2          THE COURT:  Are these -- You want to use the

3      overhead projector?

4          MR. TEDDER:  Well, we could.  I don't know how to

5      set that up.

6          THE WITNESS:  I can show them, your Honor.

7          MR. TEDDER:  He can show them, your Honor, if

8      that's okay with the court?

9          THE COURT:  That's fine.

10  BY MR. TEDDER:

11     Q    Dr. Plunkett, if you could refer to each by the

12  number on the back and then tell the jury what you see on

13  there, please.

14     A    Fifty-nine is the first one we're gonna show.

15  It's a photograph of Robbie's head with the skull cap

16  removed and pushed to the back.  The front of his face is

17  covered with a towel and he's on the right-hand side.  The

18  back of his head is on the left-hand side.

19          On the surface of the brain you can see a blood

20  clot.  It was adherent to the surface of the brain.  On the

21  left-hand side poking up from the skull cap itself is a

22  portion of the dura.  The inside surface of the dura has a

23  yellow or yellow brown color that is very distinct from the

24  areas of the dura that are away from it and very different

25  from the appearance of the inside of the skull.  Behind, the



1  dura has actually been pulled off from the inside surface of

2  the skull from it's location.  So the color is the tip off

3  that there's a chronic subdural hematoma.  That's 59.

4          Sixty is the same thing.  Sixty is a photograph

5  taken from looking down at the top of Robbie's head.  The

6  right is on the right side, the left is on the left side.

7  And again, on the left side this time we see yellow

8  discoloration of the dura indicating a chronic subdural

9  hematoma.

10          Sixty-one is a photograph taken from Robbie's left

11  side.  Again, the left side is his face.  The right side is

12  the back of the skull cap that has been removed.  This shows

13  blood clot actually adherent to the dura on the right-hand

14  side.  Dural adherence takes ten days, two weeks or

15  something like that to occur.  The yellow discoloration

16  takes three weeks, a month to occur.  But that's the best

17  that you can do just looking at it photographically and you

18  have to rely on the CT, MR scans and then what you see under

19  the microscope.

20      Q   Can the dura of the subdural hematomas be aged

21  through microscopic examination or other means?

22      A   It can, but the dating isn't real accurate.  It

23  takes about four or five days to be able to see iron pigment

24  from the breakdown of red blood cells in the inflammatory

25  cells.  There's iron pigment that can be seen and it won't

 

1237

1   stay around for a long long time.  So the finding of iron

2   pigment just tells you, well, it happened at least four or

3   five days ago.  If you see specific types of blood vessels

4   growing into that space, you're talking about two or three

5   weeks.

6       Q    Iron pigment, is that what causes the yellow

7   discoloration?

8       A    Yes, it is.  Well, in part it is.  It's also

9   inflammatory cells containing fat.

10      Q    Okay.

11      A    It's a combination of those two things.

12      Q    Did you see in those photographs any possible

13  evidence of cortical venous thrombosis?

14      A    Well, the photographs really look like cortical --

15  like what you would see with cortical venous thrombosis,

16  clotting of the blood vessels on the surface of the brain

17  with secondary break-through of that blood into the dural

18  space.  I don't know whether that's a primary event.  In

19  other words, the primary injury in quotes that Robbie had

20  was, "Cortical venous thrombosis," or if this is simply a

21  result of the lack of oxygen and secondary clotting within

22  the blood vessels itself.  I can't tell you that, which it

23  is.

24          It certainly looks like cortical venous

25  thrombosis.  It is cortical venous thrombosis.  The question



1    is, is this the primary event or is this the result of the

2    lack of oxygen and just simply developed while he was in the

3    hospital?

4         Q    What causes cortical venous thrombosis?

5         A    Clotting of the blood vessels, the veins, from a

6    number of causes.  Infections, dehydration would be the two

7    that are most often identified.  However, you can identify

8    the cause in less than 50 percent of children who develop it

9    and adults also.  Adults develop cortical venous thrombosis

10   also.

11        Q    What would you have wanted to do to further

12   determine exactly what this was?  Examine microscopically?

13        A    You can examine it microscopically, but it's very

14   difficult when somebody has been on a respirator for eight

15   days to go back in terms of causation.  I mean, if Robbie

16   had died within minutes of the time that he came into the

17   hospital and this is what I saw, I would say that's cortical

18   vein thrombosis, period, because it doesn't develop that

19   rapidly.

20             But really there's nothing that you can do now

21   etiologically, even a radiologist.  One radiologist may say

22   looking at the CT scan when Robbie first came into the

23   hospital, This is cortical venous thrombosis.  Another

24   radiologist may say, No, it's not.  There is no -- The

25   autopsy is still the gold standard.  So that even with your

1239

1  radiographic criteria and so forth, it's not 100 percent and

2  it doesn't even approach 100 percent.

3       Q    What's your professional opinion of the autopsy

4  Dr. Hamilton did in this case?

5            MS. SINGER:  I'm going to lodge an objection at

6       this time.

7            MR. TEDDER:  He's testifying from his expertise,

8       your Honor.

9            THE COURT:  Approach the bench.

10            MS. SINGER:  I think I'm gonna withdraw my

11       objection.  I think it's gonna be easier to just allow

12       the witness to answer.

13            THE COURT:  The objection is withdrawn.

14            MS. SINGER:  I'm sorry, Doctor.  I didn't mean to

15       interrupt.

16            THE WITNESS:  First of all, I don't know

17       Dr. Hamilton.  I hadn't met him.  I don't know his

18       background.

19            If I had done the autopsy, I would have -- I mean,

20       before my format would have been different, but that's

21       personal preference.  That doesn't have anything to do

22       with anything.  But I would have saved the dura.  I

23       would have done a microscopic examination of the dura.

24       I would have fixed the brain for a couple of three

25       weeks and I would have asked somebody to review those

1240

1   CT scans or MR scans with me because clearly there is a

2   discrepancy between what Dr. Hamilton says that he

3   found, which is acute subdural hemorrhage only, and

4   three different radiology reports which say, No, this

5   is a chronic subdural hematoma with new bleeding.

6   That's a significant discrepancy.

7        But the pathologist, at least this pathologist,

8   would not simply say, I'm right and you're wrong.  I

9   would say, Let's look at this stuff and see why we're

10  differing.  But that's it.  I would have done this.

11  BY MR. TEDDER:

12       Q    Would you have liked to have examined the brain

13  stem?

14       A    That's part of what I was talking about, the dura

15  and the spinal cord.  Didn't I mention the spinal cord?

16       Q    I don't think we got there yet, Doctor.

17       A    You asked me what I would have done differently.

18  I said I would have saved the dura and the spinal cord.

19       Q    What would you have been looking for in the brain

20  stem and the spinal cord?

21       A    The spinal cord itself below the level of the

22  neck, nothing.  The spinal cord including the brain stem I

23  would have been looking for evidence of bleeding of whatever

24  ages.

25       Q    Could that have been discovered through

1   microscopic examination?

2       A    Yes, sir.

3       Q    Now are you familiar with a -- I believe it's a

4   computer generated series of photographs or pictures

5   prepared by someone named Dr. Davis?

6       A    Yes, sir, I am.

7       Q    And what is your opinion of that computer

8   generated thing?

9       A    The Davis cartoon is a scientific fraud.  The

10  child's brain does not move that way during any shake that

11  you can subject the child's brain to.  The brain of a human

12  being may move that way if you apply an acceleration to some

13  part of the head or the acceleration does not go through the

14  center of mass at an acceleration in excess of 10,000

15  radians per second squared.

16          A radian is a unit of measurement of circular

17  motion.  A radian is a radius.  There are approximately

18  16 -- approximately six radians in a circle.  A radian is

19  about 59 and a half degrees.  So 10,000 radians per second

20  squared as a unit of acceleration radially or circularly at

21  a radius of one foot, is equivalent to 10,000 feet per

22  second squared.

23          Acceleration due to gravity is 32 feet per second

24  squared.  Ten thousand feet per second squared is

25  approximately 350 times the acceleration due to gravity.  So

1  if you were to accelerate a head at 350 times the

2  acceleration of gravity, and it can be done experimentally,

3  you will have the brain move within the skull case as

4  depicted in the Davis cartoon.

5          However, when you shake a child, the most

6  acceleration that you can generate is approximately ten

7  times the acceleration due to gravity.  Shaking a child is

8  not a good idea.  You can probably kill a child, but it does

9  not cause the brain movement depicted in the Davis cartoon

10  and it does not cause the type of injuries called the shaken

11  baby syndrome.

12      Q    How can you kill a baby by shaking it?

13      A    You can cause -- Well, first of all, if you did it

14  for long enough, a child is not going to be able to breathe

15  while you're shaking the child.  So if you shake the child

16  long enough, say three or four minutes, two or three minutes

17  so that the child is without oxygen for that period of time,

18  the child may die directly as a result of that.

19          You may also stretch the brain stem centers that

20  control breathing causing direct anoxia and death, and in

21  which case you will or should be able to see damage to the

22  brain stem when you look at it under the microscope.

23          You may cause an impact injury during shaking.  In

24  other words, you may cause the head to strike a solid

25  surface such as a wall or the floor, in which case it's not

000905

1   the shaking that causes the injury, but rather the impact

2   against the non-yielding surface.  So there's a number of

3   ways that you can kill a child by shaking them.

4        Q    How long do you think a child or anybody can go

5   without oxygen in the brain before causing irreversible

6   brain damage?

7        A    I have to answer that as almost a three part

8   question.  First of all, differentiating breath holding from

9   lack of oxygen; professional divers, people who live in

10  cultures where they do deep diving for a livelihood have

11  learned to hold their breath for three or four minutes and

12  be able to dive to very great depths.  They've learned to

13  store up enough oxygen and blow off enough carbon dioxide by

14  hyperventilating to be able to do this without causing them

15  to faint from the hyperventilation.

16        People who are just regular folks, with some

17  training you can learn to swim 25 yards in a pool under

18  water or even 50 yards.  So in part it depends, you know, on

19  the training and whether there's breath holding involved or

20  not.

21        Secondly, it depends to a certain extent on the

22  mechanism of lack of oxygen.  If a lack of oxygen is because

23  the hemoglobin molecule is carrying less oxygen than normal,

24  then it can be a long time.  If it's simply because the

25  blood flow is cut off, the heart stops beating, for example,

1244

1  then it's going to be very very quick, thirty seconds or a

2  minute.  If it's because the breathing centers are shut off,

3  but the heart continues to beat, then its gonna be longer.

4       It's probably longer in a child than in an adult.

5  There have been documented cases of kids that have been

6  under water for as long as 45 minutes who have survived and

7  ultimately recovered.  So a case of what's called cold water

8  emersion, cold water drowning where the drowning in cold

9  water is thought to induce some primitive reflex that slows

10 our heart rate way way down to five or ten beats per minute

11 allowing the brain to get enough oxygen and for you to

12 survive.

13      In general, four our five minutes without oxygen,

14 you're dead.  The brain is dead.  The brain is dead.  The

15 heart may continue to beat.  If the heart is stopped, you

16 may be able to get the heart going again.  But most often

17 you do not walk out of the hospital.  The survival rate, for

18 example, of all of the hospital cardiac arrests where

19 somebody is resuscitated, brought into the hospital on a

20 respirator with their heart beating and their lungs and

21 everything else working, is around two percent.  It's not

22 very long.

23      Q    Why would your heart continue to beat after your

24 brain is dead?

25      A    Well, your heart -- The brain does not correct --



1245

1   the brain does not directly control the heartbeat.  There is

2   an indirect control by a nerve from the brain stem that does

3   it, but the heart has it's own beating.  You can cut the

4   heart out, cut all of it's nerve supply off from the outside

5   and it still continues to beat.

6            So, for example, if somebody is on a respirator in

7   the hospital because they were in an automobile accident and

8   had a head injury and the person is going to be an organ

9   donor and you have been breathing for them for a week or ten

10  days or whatever and you take them off the respirator, their

11  heart continues to beat for seven to ten minutes after you

12  have removed them from the respirator.  So the heart

13  function is or at least can be totally independent of the

14  brain function.

15       Q    The state has elicited testimony regarding the

16  lack of damage to other organs in Robbie's body and whether

17  or not there should have been damage to other organs in

18  Robbie's body because of a lack of oxygen.  What is your

19  opinion on that, Dr. Plunkett?

20       A    Well, the fact that there is no evidence for

21  damage to the other organs simply shows you that the amount

22  of time that Robbie's brain was without oxygen is relatively

23  short.  This is one of the criteria that you use for organ

24  donors.  You know, if somebody is on a respirator and most

25  of them, usually when you're able to get the heart going

1  again, the rest of the organs are okay.

2          Now in very young children, I'm talking about

3  premature kids and newborns, it's a little bit different

4  deal because they do develop damage to the bowel, what's

5  called necrotizing intracolitis as a result of the lack of

6  oxygen.  But, in general, if you can get the heart going

7  again, the other organs are gonna be okay.  It's the brain

8  that's the problem.  It's the brain that doesn't come back.

9      Q    There was evidence in this case that Robbie's

10  heart never quit beating, but that he was not breathing when

11  first discovered by paramedics.  What would your opinion be

12  then?

13      A    That the amount of time that he had been without

14  oxygen was very short.

15      Q    Would it have been short enough or long enough to

16  cause some type of brain injury or if you know?

17      A    Yes.

18      Q    Could new bleeding in the subdural hematomas cause

19  anoxia?

20      A    Yes, indirectly by either causing a seizure or by

21  compressing the brain centers that control breathing.  For

22  example, I know that Robbie had brain swelling when he came

23  into the hospital because his fontanel, soft spot on the

24  front center of his head was tense and bulging.

25      Q    Do you believe that shaking Robbie the way the

1   state contends he was shaken could cause the type of brain

2   injury this child suffered?

3       A    Well, it certainly did not cause the initial

4   subdural hematoma.  It did not cause new bleeding in the old

5   subdural hematoma.  Could Robbie have been shaken and that's

6   what caused his death?  Yes, that's a possibility.  But

7   there is no evidence that that's what occurred.

8       Q    What evidence can you point to that shows that is

9   not what occurred?

10      A    Well, I think first and foremost there is an

11  acceptable cause of death for Robbie and that is global

12  hypoxia, lack of oxygen with an acceptable mechanism,

13  getting his head wedged in the bed.

14          Secondly, there is no evidence for any neck damage

15  in Robbie.  There are no fractures.  There are no bruises.

16  There is nothing.  With the exception of the brain, Robbie

17  has no injuries whatsoever.

18          Now you don't always see evidence for those types

19  of injuries in someone that has been abused, but if someone

20  is to be shaken to the point where that is the primary cause

21  of the person's death, at a minimum you would expect

22  evidence for neck damage.

23      Q    There's none of that in this case?

24      A    No evidence for it.

25      Q    Dr. Plunkett, what could cause the retinal




1   hemorrhaging that was present in this baby?

2        A    Retinal hemorrhage is a secondary event.  It

3   simply occurs as a result of the brain swelling.  Anytime

4   there is an obstruction of the return of venous blood from

5   the eyes to the heart, you will get hemorrhage into the

6   retina.  You may also get break-through bleeding from the

7   retina into the vitreous.

8        The pressure of the veins is only slightly higher

9   than the pressure within the cerebral spinal fluid itself.

10  In a youngster four and a half months old, it's probably in

11  the range of about five millimeters of mercury.  Compare

12  that to an adult diastolic pressure of 80 millimeters of

13  mercury.  The venous pressure in a child is probably about

14  eight or ten.  The arterial pressure is probably about 30

15  for a four and a half month old, maybe 40.

16       So as soon as you exceed -- as soon as the

17  pressure within the brain exceeds the venous pressure,

18  you're gonna get retinal bleeding.

19       Q    In your opinion, is the theory of shaken baby

20  similar to whiplash injury?

21       A    Well, the theory is, yes.

22       Q    Tell the jury about that.

23       A    Well, there was a lot of research, funded research

24  through the National Institutes of Health for the automobile

25  industry and subsequently for the space program and for

1249

1  fighter pilots looking at whiplash because people were

2  concerned that either gravitational forces by themselves

3  that somebody flying to the moon might experience, or

4  gravitational forces that someone might have happen if he or

5  she was in an automobile accident could cause head injury.

6  So they started to research the mechanisms of head injury.

7  It was found that not only can whiplash cause neck

8  injury, but it also under certain controlled conditions also

9  causes primary brain damage.  The primary -- The ability of

10  whiplash to cause primary brain damage depends on a number

11  of factors.  Number one, and probably the most important,

12  the level of acceleration.  Something in the range of a

13  couple hundred times of the acceleration.

14  It's also dependent on the location of the applied

15  force.  Force that is applied front to back or back to front

16  is less likely to cause damage than is acceleration applied

17  side to side.  It's more damaging to have side to side

18  acceleration than it is front to back.

19  What is called the jerk, J-E-R-K, which is the

20  rate of change of acceleration.  Mathematically it's the

21  first derivative of acceleration.  So the rate of change of

22  acceleration is an important fact.

23  The duration of acceleration is important.  Very

24  short durations, for example, five or ten thousands of a

25  second, which would be typical in an impact injury, are more

 

1250

1    likely to cause this type of injury than are long durations,

2    say a twentieth of a second, 15 milliseconds such as what

3    occur in automobile accidents.

4           So all of these factors have been known and known

5    for a long time.  A group of physicians borrowed this

6    knowledge and then applied it to the concept of the shaken

7    baby without understanding that they were misinterpreting

8    and misapplying the fundamental research that had been done.

9           Dr. Caffey (phonetic) was one of the first

10   published on this and Dr. Amiah (phonetic), who had done the

11   research, spoke to Dr. Caffey after he published his first

12   paper and told him that he had gotten it wrong, that

13   Dr. Caffey apparently didn't understand that he had the

14   science wrong and it has persisted for the last 30 years.

15      Q    Are you aware of any studies that have been done

16   to try and determine the amount of acceleration a human

17   being can put on an object roughly the size of a baby?

18       A    You mean in terms of head injury?

19      Q    Yes, sir.  I mean type of acceleration that can be

20   done by shaking.

21      A    Oh, you mean what you can do theoretically, yes.

22      Q    Yes, sir.  What is your knowledge with respect to

23   the maximum amount of force that a human being may be able

24   to generate?

25      A    Well, the maximum acceleration that a person is

1  able to accelerate or do is known experimentally from three

2  different groups.  One is from the bioengineering group in

3  Philadelphia.  An article was published in 1987.  Those

4  people came up with approximately ten G's times the

5  acceleration of the gravity from the shake.

6      Q    Who wrote that study?

7      A    A neurosurgeon named Duhaine, D-U-H-A-I-N-E, and

8  her engineering advisor was named Thibauot, T-H-I-B-A-U-O-T.

9  Thibauot designed the model, showed her how to do the study

10 and told her what the results meant.  He was the engineer

11 and physician.

12          Those studies have been replicated by a woman

13 named Corrina Cory, C-O-R-Y, and Michael Jones, J-O-N-E-S,

14 of the Bioengineering Unit in Dundee.  And they have more

15 recently been replicated by Michael Prange, P-R-A-N-G-E, and

16 Susan Margulies, M-A-R-G-U-L-I-E-S, again in Philadelphia.

17 They're doing studies independent of what the other two are.

18 They all came up with the same answer.  Mike Jones was able

19 to get one person that could actually generate an

20 acceleration of 16 G's and Prange again was like ten or 11

21 G's.

22      Q    G meaning the force of gravity?

23      A    Sixteen times the force of gravity.  So ten G's

24 would be 320 percent squared.  And the threshold for coma

25 is -- or the threshold for concussion is probably a hundred

1252

1    G's.

2         Q    Do you know what the threshold is for a subdural

3    hematoma?

4         A    Approximately 150 G's, but the mechanism -- that's

5    a little bit misleading to try to use those kinds of terms

6    because the mechanism in many cases is actually different

7    from that that's used experimentally to cause subdural

8    hemorrhage.

9         Q    Are you aware of any scientific studies that have

10   been done experimentally on the theory known as shaken baby

11   that support the theory?

12        A    No.   There have been none.

13        Q    What papers that you have read are you aware of in

14   dealing with the theory of shaken baby are merely based on

15   anecdotal stuff or not based on anything?

16        A    Well, they're based on opinion.  No one has ever

17   seen anyone shake a child.  No nanny cams have ever caught

18   somebody shaking a child.  It's pure theory, which has been

19   repeated as accepted fact for at least 30 years and there is

20   no scientific evidence to support it and the scientific

21   evidence says, No, that's not what's happening if you are

22   gonna cause injury by shaking.

23        Q    Have you seen evidence in your experience over the

24   years, have you seen children that you believe suffered from

25   sudden impact injury?



1253

1    A    Yes.

2    Q    And what kind of trauma would they have typically?

3    A    Well, almost always, but not always they're gonna

4    have evidence for an actual impact injury, a bruise on the

5    scalp or skull, which you may not see until you do an

6    autopsy.  They will have evidence for subdural hemorrhage.

7    They will have evidence in some cases of direct brain

8    damage.  In some cases they will have evidence for a skull

9    fracture.  Those are impact injuries and the mechanism of an

10   impact injury is fundamentally different from the mechanism

11   of a shaking.

12           MR. TEDDER:  I tender the witness, your Honor.

13           THE COURT:  All right.

14           MS. SINGER:  Your Honor, my cross-examination is

15       going to be rather lengthy.  Does the court wish to

16       continue at this point?  We've gone for over an hour.

17           THE COURT:  We're gonna take a recess at this

18       time, ladies and gentlemen, for 15 minutes.

19           (The jury is out of hearing of the court.)

20           THE COURT:  We'll be in recess for 15 minutes.

21           (Recess 2:25 - 2:48.)

22           THE COURT:  I was looking for you, Dr. Plunkett.

23       You're still right here.

24           All right.  Is the state ready?

25           MS. SINGER:  We're ready, your Honor.

Stacey K. Bryant, RPR
Judicial Court Reporter

000916.

 

1254

1        THE COURT:  Is the defense ready?

2        MR. TEDDER:  Yes, ma'am.

3        THE COURT:  Go ahead and bring the jury back in.

4     Go ahead and have a seat, Dr. Plunkett.  You all have a

5     seat.  Go ahead, Ms. Singer.

6                    CROSS-EXAMINATION

7   BY MS. SINGER:

8        Q    Dr. Plunkett, before I begin with some of the

9   questions regarding your qualifications, I do want to ask

10  one question regarding your testimony on direct, and that is

11  that you agree, as I understood your testimony, that shaking

12  can kill a baby if it's done long enough, two or three

13  minutes without oxygen, that period of time being shaken the

14  baby would stop breathing and that would explain anoxia?

15       A    I think that's certainly theoretically possible.

16       Q    And you also agree that shaking a baby could

17  stretch the centers of breathing and that could cause death

18  due to anoxia, correct?

19       A    That's correct.

20       Q    And I believe you also agree that if a baby was

21  shaken and then there was some kind of impact, such as being

22  thrown to a bed or a floor, I think you said a wall, that

23  that too could cause the injuries that you see in Robbie

24  Quirello?

25       A    No.

                    Stacey K. Bryant, RPR
                    Judicial Court Reporter

                    000917

 

1255

1    MR. GROLAND:  Your Honor, may I just pose an

2    objection?  She's added some facts in there.  Some of

3    which are in evidence, some of which are not in

4    evidence and I think it's confusing.

5    THE COURT:  Your objection is on the basis it was

6    a compound question?

7    MR. GROLAND:  Yes.

8    THE COURT:  Sustained on that basis.

9    MS. SINGER:  I'll restate it.

10   BY MS. SINGER:

11   Q    Isn't it true, Dr. Plunkett, that you have written

12   articles on impact injuries causing significant brain injury

13   in children?

14   A    Yes, I have.

15   Q    And impact injuries would be where a child would

16   have had his head struck in some way?

17   A    Either struck or his head strikes something else,

18   his or her head strikes something else, correct.

19   Q    That could include being thrown to the floor?

20   A    Correct.

21   Q    Thrown on a bed?

22   A    No.

23   Q    A bed would not meet that consideration?

24   A    No.

25   Q    That would not cause the deceleration that you

1256

1   described in the articles?

2       A    That's correct.

3       Q    But you do agree that falling on a padded carpet

4   would in fact cause conditions?

5       A    Would?

6       Q    Yes, sir.

7       A    Yes, it would.

8       Q    In fact, you testified to that in the Singer case

9   in Canada, did you not?

10      A    Yes, and probably in a number of other cases also.

11      Q    So if there was shaking, plus impact, that is

12  indeed a way that these injuries could be sustained in an

13  infant?

14      A    Well, the shaking has nothing to do with it.  In

15  impact injury, certainly you can slam a child's head into a

16  wall or the floor and you can kill the child.  The shaking

17  has nothing to do with it.

18      Q    Now you had discussed on your direct examination

19  the fact that you are now the medical education coordinator,

20  did you say?

21      A    Director.

22      Q    Director.  And you are also the head of the

23  anatomic laboratory?

24      A    That's correct, anatomic and clinical.

25      Q    I'm sorry.  I missed the other part.

 

1257

1    A    Anatomic and clinical, both the laboratories

2  anatomic and clinical.

3    Q    The anatomic and clinical laboratories are where

4  patients are being seen in that hospital possibly for

5  routine procedures or for diagnosis of certain cancers or

6  tumors and you actually supervise the laboratory in their

7  examination of samples taken during surgery, correct?

8    A    That was sort of a compound question.  It was a

9  compound question.  That part of the laboratory, yes, I

10  supervise all of the people that do the laboratory testing

11  in the hospital.  I also examine biopsies that are done, a

12  breast biopsy, for example, or if your appendix is removed,

13  I will look at those and give it a name or a diagnosis.

14    Q    That is 90 percent of the time that you spend as a

15  pathologist, is it not?

16    A    That was probably true a couple of years ago.  I

17  would say that I probably spend one-fourth of my time right

18  now reviewing these types of cases today.

19    Q    So you spend approximately 75 percent of your time

20  now working in the laboratory and 25 percent of your time

21  testifying in cases where shaken baby syndrome has been

22  alleged as the cause of death?

23    A    No.  I spend approximately 25 percent of my time

24  reviewing cases.  I actually testify on about one out of

25  four or one out of five of the cases that I review.  It

1   takes longer to review than to come to a conclusion than it

2   does to testify.

3        Q.    You are not board certified in pediatrics,

4   correct?

5        A     That's correct.

6        Q     You're not board certified in adult critical care?

7        A     Or infant critical care, that's correct.

8        Q     Pediatric critical care?

9        A     That's correct.

10        Q     You're not board certified in anesthesiology or

11   anesthesia?

12        A     No.

13        Q     You're not board certified in radiology?

14        A     Correct.

15        Q     In fact, your testimony on direct was, I don't

16   read the CT scans because I'm not a radiologist?

17        A     That's correct.

18        Q     So you must depend or defer to the radiologists

19   who in fact do read the CT scans, correct?

20        A     In terms of the objective findings, yes, I do.

21        Q     You're not an ophthalmologist as well?

22        A     That's correct.

23        Q     And you're not a pediatric ophthalmologist?

24        A     No.

25        Q     Which is a specialty of ophthalmology, right?

1   A   That is correct.

2   Q   I know you testified quite a bit about birth and

3   birth trauma, but you are not board certified in obstetrics

4   and gynecology?

5   A   No, I am not.

6   Q   And as such I know you offered a bit of testimony

7   regarding the birth of Robbie Quirello, but as such would

8   you defer to a board certified obstetrician as to whether or

9   not Robbie Querillo's death was -- pardon me -- his birth

10  was difficult?

11  A   Well, I'm not sure.  First of all, you want that

12  person that did the testimony to be the person that actually

13  delivered Robbie, for starters, and then I would want to

14  know that person's specialty.  In other words, if that

15  person is somebody who takes care of high risk infants and

16  mothers, then on that scale Robbie's birth may not have been

17  traumatic.  So it really depends on the perspective of the

18  person that's giving the testimony rather than an objective

19  determination based on the signs and symptoms that Robbie

20  had.

21  Q   In your conclusion that Robbie Quirello suffered

22  from a difficult birth, you indicated that fetal distress

23  was something that you would have considered.

24  A   Yes.

25  Q   What did you review in the records that suggested

 

1    to you that Robbie in any way suffered from fetal distress?

2        A    The statement that I'm relying on is from the

3    birth records which show that he was born one month

4    prematurely, which is not a very big deal, had a broken

5    collarbone, which means that they had to intentionally break

6    his collarbone during the deliverly process.  It's not very

7    common to have an accidental break of a collarbone during

8    birth, which suggests to me that was a difficult delivery.

9        Q    Now would you defer to both a pediatrician and an

10   obstetrician regarding the occurrence of broken collarbones

11   in birth?

12       A    In what respect?  I'm not trying to be

13   argumentative.

14       Q    If the obstetrician and pediatrician were both to

15   say that it is quite common to have broken collarbones at

16   birth, would you defer to their expertise rather than your

17   own in making the conclusion or drawing the opinion that

18   this child had a difficult birth because of some intentional

19   breaking of the collarbone?

20       A    Well, first of all, I would want them to quantify

21   their observation, not just say common, but put it in

22   numbers.  In fact, the incidences are around one or

23   two percent.  Now if somebody wants to say that that's

24   common, fine, but I won't say whether it's common or

25   uncommon.  I'll just tell you what the incidence is and then



1261

1   you can makeup your own mind.

2        Q    Other than the broken collarbone, what other

3   evidence do you have to show this baby had fetal distress?

4        A    He didn't have any evidence for fetal distress as

5   far as I know.

6        Q    Correct.  In fact, the fetal heart monitor shows

7   no evidence of fetal distress, doesn't it?

8        A    That's correct.

9        Q    In fact, there was no use of forceps in this

10  delivery?

11       A    That's correct.

12       Q    There was no suction used in this delivery?

13       A    That's correct.

14       Q    Although it was a sunny side up or face up

15  delivery, other than that, there was no other indication in

16  the birth records that suggested to you that any other

17  extraordinary means needed to be used to have this baby

18  delivered?

19       A    No.

20       Q    So you are relying totally on the fact that this

21  child had a broken clavicle for your opinion that he had a

22  difficult birth?

23       A    Well, that and the duration of the second stage of

24  labor.  I don't have those records right in front of me, but

25  if I remember correctly, it was prolonged.

1262

1    Q    Now you also do not have a board certification in

2    neurology, correct?

3    A    That's correct.

4    Q    And you don't have a board certification in

5    pediatric neurology?

6    A    No, I do not.

7    Q    You don't have a degree in physics?

8    A    No.

9    Q    In fact, you, in other testimony, have had to rely

10   on reviewing your college physics textbook to bring yourself

11   up to date on the laws that you apply in your theory

12   regarding the absence of shaken baby syndrome as a viable

13   diagnosis?

14   A    Well, as of five years ago that was certainly

15   true, even though we should have been taught mechanics as

16   part of our pathology or at least forensic pathology

17   residency.  We use mechanics.  We talk about bullet

18   velocities and energy and accelerations and so forth, but

19   were never really taught it.

20       So I was really forced to relearn classic

21   mechanics at the age of almost 50 and since that time I've

22   had the opportunity to work with and learn some -- learn

23   from the primary neuro researchers really in the world on

24   this topic talking about the mechanics of head injury in

25   adults and children.



1    Q    But you have not returned to an institution of

2    higher learning to obtain any degree in physics, physical

3    engineering or engineering; is that correct?

4    A    No.  I'm not an engineer.  I'm not gonna be an

5    engineer.  I'm not gonna build any bridges.

6    Q    And in the area of pathology, you are not board

7    certified in the specialization, which is neuropathology?

8    A    That is correct.

9    Q    Neuropathology is a specialization in pathology

10   that concentrates solely on the brain and the cervical cord?

11   A    That's correct.

12   Q    And you are not a specialist in that area?

13   A    That is correct.

14   Q    You did review Dr. Stephen Nelson's report, did

15   you not?

16   A    Yes, I did.

17   Q    And he is a neuropathologist?

18   A    That is correct.

19   Q    And in Dr. Stephen Nelson's report, he reports

20   evidence or findings, microscopic findings of cortical

21   cerebral contusions; isn't that correct?

22   A    Correct.

23   Q    And those cortical cerebral contusions are in fact

24   evidence of a traumatic injury to Robbie's brain?

25   A    Only in that they are the result of the swelling

1   of the brain itself and the fact that Robbie was on the

2   respirator.   They are not a separate or independent injury

3   from them.

4        Q    Would that finding of contusions on the brain be

5   consistent with a child suffering from a traumatic injury,

6   such as an impact injury?

7        A    Well, they could be, but Robbie has no evidence

8   from --

9        Q    I'm not asking about Robbie.   I'm asking about a

10  child.

11       A    It would depend on the specific location of those

12  injuries, whether or not they truly represent contusions,

13  which are extremely rare in children under the age of

14  approximately six months.   The types of contusions that they

15  get are fundamentally different.   They're called contusional

16  tears, T-E-A-R-S, and they occur in a very specific part of

17  the brain.   Children under four and a half months don't get

18  traumatic contusions.

19       Q    Unless something happens to them that is

20  intentional in nature to cause those contusions; isn't that

21  correct, Doctor?

22       A    No, that is not correct.   Only if they are in fact

23  what are called contusional tears.   Those can occur

24  accidentally from a fall or they can occur if somebody slams

25  a child's head into a wall.



1    Q    In fact, several years ago you spoke at the annual

2  conference of the public defenders in the State of Florida?

3    A    Yes, I did.

4    Q    And in 2001 you spoke at the annual public

5  defender seminar in Iowa?

6    A    I may have.  I forgot about that, but, yes, I was

7  in Iowa.

8    Q    There have been many other public defender and

9  defense lawyer conferences in which you have provided

10  information regarding your position on shaken baby syndrome;

11  is that correct?

12    A    Let me think about this for a second.  Florida I

13  remember very well.  Iowa I had forgotten about.  I spoke in

14  Reno I believe a year ago at approximately this time.  Let

15  me think for just a minute.  I don't recall any other either

16  public defender or regular defender meetings that I have

17  spoken at.  So over the last 25 years I have spoken three

18  times.  I wish I would be asked and had the time to do it

19  more often.

20    Q    At each of these conferences you have advocated

21  the position that you stated today, that there is no such

22  thing as shaken baby syndrome; is that correct?

23    A    No, that's not what I've said at all.  That's not

24  what I said today.

25    Q    Your testimony today is that this baby could not

1   be shaken in a way that would have caused the injuries that

2   were sustained?

3        A    Well, my testimony was that Robbie was not shaken,

4   that the chronic subdural hematoma that he had was not

5   caused by shaking.  Robbie died with, not because of a

6   subdural hematoma.

7        Q    Did you in fact testify at your deposition taken

8   on August 12th --

9             MS. SINGER:  And I will be providing a copy to

10            counsel -- to the doctor in a moment, your Honor.

11   BY MS. SINGER:

12        Q    -- That you do not believe a baby can suffer death

13   as a result of shaken baby syndrome?

14        A    On August 12th of this year?

15        Q    Yes, sir.

16        A    I certainly did not.  I said that the injuries

17   called the shaken baby syndrome cannot be caused by shaking.

18   There are other injuries that can.

19        Q    And so at this point you're saying that the

20   injuries can be sustained so long as there is an impact

21   involved with the shaking?

22        A    The shaking has nothing to do with it.  If you

23   have an impact injury to a child's head, the child may die.

24   You may kill a child by shaking it.  But adding shaking to

25   impact or impact to shaking does not change the mechanics of

1   the injury or the mechanism of injury.  They are two

2   fundamentally different concepts.

3       Q    Are you now scheduled to testify in another case

4   tomorrow?

5       A    What day is today?

6       Q    Today is -- That's a good question.  I think today

7   is the 17th of September.

8       A    What day of the week?

9       Q    Today is Tuesday.

10      A    Tuesday.  I'm scheduled to testify in Iowa on

11  Thursday.  I believe I fly to Des Moines.  It's at the

12  request of a woman who has been in prison for 13 years.

13  It's a post-conviction relief hearing and I'm going there

14  for the cost of a plane ticket that they're buying.

15      Q    And isn't it true that after your deposition on

16  August 12th of this year, you were scheduled to be in

17  Orlando on behalf of the defendant on August 19th of this

18  year?

19      A    Yes.

20      Q    And weren't you scheduled to be in Wisconsin the

21  week of August 26th on behalf of the defendant?

22      A    Yes.  That was in -- That was not an infant case

23  and that case settled.  I did not testify.

24      Q    And isn't it true you were also scheduled to be in

25  Reno, Nevada the week of September 9th on behalf of the

1    defendant?

2         A    That case also did not go.

3         Q    And you're also scheduled to be in Iowa the week

4    of September 23rd?  That was on your calendar in fact on

5    August 12th?

6         A    Oh, that was the Rodie (phonetic) case.  That was

7    all part of the same thing.  I think I had it listed over a

8    week's time.  I wasn't sure what date.

9         Q    Isn't it true you were also double booked to be in

10   British Columbia during the same week to testify on behalf

11   of the defendant?

12        A    I'm actually triple booked.  British Columbia is

13   at the request of the prosecutor.  I think I'm also

14   scheduled to be in two other places at the same time, but

15   that won't happen again.

16        Q    Well, of course there's no question here that you

17   did not personally treat Robbie Quirello?

18        A    That is correct.

19        Q    Did you not examine him or make any clinical

20   findings on his behalf before you rendered your opinion in

21   this case?

22        A    That is correct.

23        Q    And as a forensic consultant in this case, you did

24   not perform an autopsy yourself?

25        A    That is correct.

1    Q    Dr. Hamilton performed the autopsy and you

2  reviewed what written material and slides and photographs

3  that were provided to you by defense counsel?

4    A    Yes, that is correct.

5    Q    And before your deposition that was taken on

6  August 12th, you spent a total of approximately two or three

7  hours reviewing the records and other data before reaching

8  your opinion?

9    A    That's correct.

10   Q    You have not spoken to Brian Herlihy, the

11  defendant, in this case regarding what occurred on August

12  the 2nd, correct?

13   A    That's correct.  I haven't even met him.

14   Q    And you were provided the CT scans of Robbie

15  Quirello along with the EEG's and blood work and the chart,

16  the medical chart that outlined his clinical progression?

17  You were provided that record for review at the time you

18  rendered your opinion?

19   A    I was provided the record, but if I received the

20  CT and MR scans, I would have sent them back because I don't

21  look at them.

22   Q    Do you also not read EEG's?

23   A    That's correct.

24   Q    So you would not be able to render any opinion on

25  what the EEG showed regarding Robbie's brain damage?

1271

1    A    That's correct.

2    Q    And you would have to defer to the pediatric

3  neurologist, who in fact did read the EEG's in the course of

4  his diagnosis?

5    A    Well, I would certainly defer to somebody other

6  than myself.  Who that person would be, I don't know, but I

7  wouldn't do it.

8    Q    Now you did not speak with Dr. Bernard Maria, the

9  pediatric neurologist who attended to Robbie Quirello, did

10  you?

11    A    No, I did not.

12    Q    So you did not get any updated information from

13  him regarding his clinical impressions or his clinical

14  examination?

15    A    You mean something different from what is in the

16  medical records?

17    Q    Yes.  You did not get any additional information?

18    A    Well, if there's something different from what is

19  in the medical records, then, no, I didn't.

20    Q    You did not personally speak with Dr. Lawrence

21  Levine, who's the pediatric ophthalmologist who attended to

22  Robbie Quirello?

23    A .   That is correct.

24    Q    And I understand although you find Dr. Hamilton's

25  autopsy not to be up to par, you did not personally speak

1    with Dr. Hamilton, the District Medical Examiner for the

2    Eighth District here in Florida to discuss his findings with

3    him, did you?

4        A    No.   There is no point in discussing the findings

5    with somebody where an incident occurred some time later

6    because I have to -- everyone has to rely on your written

7    report and your photographs and your slides.   There's

8    nothing else that is reliable.   Your memory is not reliable.

9        Q    If you had a concern --

10           MR. TEDDER:  Your Honor, my objection is he was

11       still answering the question when he was interrupted.

12           THE COURT:  All right.  Don't interrupt the

13       witness, Ms. Singer.

14           MS. SINGER:  I'm sorry.

15           THE COURT:  Go ahead.

16           THE WITNESS:  Your memory, at least my memory is

17       not reliable.  I have to rely on what I have written

18       and what I have photographed and what I have on the

19       microscopic slides.  I can't remember next week what I

20       did today.

21   BY MS. SINGER:

22       Q    You did not speak with Dr. Hamilton about what he

23   saw upon his examination of Robbie Querillo's brain and

24   skull, did you?

25           MR. GROLAND:  Objection, asked and answered.  He

1    said he did not talk to Dr. Hamilton and that meant

2    ever.

3         THE COURT:  The objection is sustained.

4  BY MS. SINGER:

5         Q    Doctor, did you voice a concern to Dr. Hamilton

6  regarding your inability to view the dura?

7         A    No.  It's a little late.

8         Q    Did you personally contact your peer,

9  Dr. Hamilton, to discuss with him what he may have seen when

10 he viewed the dura?

11        A    No.

12        Q    Does it surprise you to know that Dr. Hamilton

13 does not agree with your findings regarding the photographs

14 of the dura?

15        A    No, it doesn't.

16        Q    And in fact does it surprise you that neither

17 Dr. Hamilton, nor Dr. Nelson agree with you regarding your

18 findings on the dura?

19        A    Well, I don't know how Dr. Nelson can disagree.

20 He didn't get any dura either and he didn't get any spinal

21 cord either.

22        Q    But he did get the photographs, though.

23        A    Yes, he did.

24        Q    You did not personally speak with Dr. Nelson, did

25 you?

1    A    No, I did not.

2    Q    Now he was the neuropathologist that actually

3    dissected the brain and viewed the cortical contusions; is

4    that correct?

5    A    To the best of my knowledge Dr. Nelson did not

6    examine the brain.  Dr. Nelson did not receive the brain.

7    Dr. Nelson received eight microscopic slides.  There is no

8    description that I have been able to find of the examination

9    of the brain performed by Dr. Nelson if he in fact performed

10   an examination of the brain other than the microscopic

11   slides.

12             MR. TEDDER:  May we approach, your Honor?

13             THE COURT:  Yes.

14         BENCH CONFERENCE HELD:

15             MR. TEDDER:  Your Honor, I became aware of the

16         fact that Dr. Nelson had grossly examined the child's

17         brain during the course of his deposition in a letter

18         which he sent to Dr. Hamilton.  It was then transmitted

19         to me via fax from Dr. Nelson's office in Lakeland,

20         Florida.  We did not have it in our file before then.

21         I had asked that that be sent to Dr. Plunkett and

22         apparently he's not received it.  So I would ask for a

23         recess and he be given an opportunity to review that

24         letter dated September 18th.  The only letter we have

25         is a letter dated October 23rd, which does deal with

1      the microscopic slides.

2          THE COURT:  I'm not going to interrupt

3      cross-examination to address this issue.  I'll be glad

4      to revisit it before your redirect.

5      BENCH CONFERENCE CONCLUDED.

6  BY MS. SINGER:

7      Q    So, Dr. Plunkett, you did not receive in the

8  packet that defense provided to you a letter dated September

9  18th, 2002 to Dr. William Hamilton from Dr. Stephen Nelson

10  stating, "Thank you for sending me the decedent's brain to

11  examine in consultation.  It arrived a couple of weeks ago.

12  And in an abundance of caution, the formula was changed and

13  it was allowed to fix for the additional couple of weeks"?

14  You have not seen that letter?

15      A    No, I haven't.

16      Q    And you were not aware of the fact that Dr. Nelson

17  did examine this brain?

18      A    I assumed that Dr. Nelson had examined the

19  microscopic slides and that Dr. Hamilton had examined the

20  brain.

21      Q    In fact, the neuropathologist, the expert in the

22  area of the brain at autopsy, did examine this brain, did he

23  not?

24      A    I would like to see the report.

25      Q    That report was provided to you after examination

1   in a letter dated October -- I believe it's the 23rd, 2000.

2   Do you have that letter, Doctor?

3        A    Yes, I do.

4        Q    And you've had more than sufficient time to review

5   that letter.  That letter was in fact provided to you, was

6   it not?

7        A    Yes.  That's a description of the microscopic

8   examination.

9        Q    And so your testimony is that you were not

10  provided with the information regarding the gross inspection

11  of the brain; is that correct?

12       A    I have seen no report of the gross inspection of

13  the brain.

14       Q    And your opinion is based on not reviewing that

15  particular letter; is that correct?

16       A    Well, Dr. Nelson has diagnoses or impressions and

17  I happen --

18       Q    You did not personally speak -- I'm sorry, sir.

19       A    -- I happen to agree with his diagnoses or

20  impressions.

21       Q    You have not personally spoken with Dr. Nelson?

22       A    No.

23       Q    Personally, Dr. Plunkett, in terms of head trauma,

24  you have only done two autopsies on children whose deaths

25  were exclusively due to head trauma; is that correct?

1277

```
1        A      That's correct.

2        Q      You did one back in 1975?

3        A      It's either '75 or '76.  It was while I was only a

4   fellow.

5        Q      And the second one was in the early '90s?

6        A      That's correct.

7        Q      And you have not done one since then?

8        A      That's correct.

9        Q      So over 25 years as a pathologist you have done

10  only two out of the many thousands of autopsies you've done

11  as both assistant coroner and coroner for the various

12  counties in which you've been employed, correct?

13       A      In children who died exclusively as a result of

14  head trauma.  Other children had head trauma as part of a

15  battered child syndrome with other organ injuries and so

16  forth.

17       Q      You have never arrived at an opinion in a case for

18  which you have been assigned or reviewed that a child was

19  the victim of shaken baby syndrome?

20       A      Well, actually I have.  I came to that conclusion

21  in a Ramsey County case and in an Iowa case -- No.  In a

22  Wisconsin case in the early '90s.  Today I would not have

23  come to that conclusion.  As a matter of fact, I've got the

24  newspaper article of the one from Ramsey County saying that

25  a person subsequently pleaded and they said, well, I had
```

Stacey K. Bryant, RPR
Judicial Court Reporter

1    reviewed it and they concurred that it was a shaken baby

2    syndrome.  Today I wouldn't.

3        Q    Your testimony today is that Robbie had an old

4    subdural hematoma that bled, correct?

5        A    Well, the words are correct.  I'm not sure the

6    context or the implication is.

7        Q    That he had an old subdural hematoma that bled?

8        A    Well, he had a chronic subdural hematoma that was

9    bleeding.

10       Q    That was bleeding on August the 2nd of 2000?

11       A    Yes.

12       Q    The day that he entered into the hospital?

13       A    That's correct.

14       Q    And what signs would you expect to see in a child

15   with a bleeding subdural hematoma?

16       A    Well, first of all, you may see none because

17   bleeding is part of the subdural hematoma, it's part of the

18   natural history.  Certainly Robbie had been bleeding for a

19   long time into that subdural hematoma prior to August 2nd

20   and as far as I know, he didn't have any signs or symptoms

21   whatsoever.  So the first thing that you may see is nothing.

22           The second thing that you may see is a seizure as

23   a result of it.  The third thing that you may see is

24   irritability, change in eating patterns, fussiness and so

25   forth caused by pressure on the brain from the volume of the

1279

1    subdural hematoma.  You may see an increase in the head

2    size.

3         Q    Isn't it true that if there was pressure on the

4    brain as a result of the hematoma, that that would be noted

5    in the CT scans that were done upon his admission?

6         A    Well, there was no herniation, but his fontanel is

7    described as tense and bulging.  That means there was

8    pressure.

9              MR. GROLAND:  Objection, your Honor.  Same

10             objection.

11             MS. SINGER:  I think he was nonresponsive to the

12             question, your Honor.  Should I ask for him to respond

13             every time he's nonresponsive to the question?

14             THE COURT:  Yes, ma'am, you should.

15   BY MS. SINGER:

16        Q    I don't believe you were responsive to the

17   question, Doctor.  On the CT scans that were done upon

18   admission, isn't it true that there was no evidence that the

19   subdural hematomas that you say were in existence were in

20   fact affecting the brain?

21        A    Oh, I agree.  The subdural hematoma in and of

22   itself was not of sufficient volume to cause signs and

23   symptoms.

24        Q    Isn't it true that an old subdural hematoma, let's

25   say at birth, which is where I believe you're putting the

1280

1   subdural hematoma as being created --

2       A    That is not correct.  I am not putting it there.

3   I'm saying that it is more than two weeks old and could

4   relate back to birth.

5       Q    If the child had a subdural hematoma more than two

6   weeks old, would not the body form a neomembrane in order to

7   wall off that subdural hematoma and begin the mopping up

8   process?

9       A    It starts to develop a neomembrane, yes.

10      Q    Isn't it true that eventually the body mops up the

11  blood products and what is left is a hygroma?

12      A    Well, that's the shorthand version.  Complete

13  healing would mean that you have nothing left except for

14  staining of the dura caused by the residual inflammatory

15  cells of iron pigment.  If it goes on to develop a hygroma,

16  which is strictly speaking just water on the surface of the

17  brain, that is certainly not healing.  The subdural hygroma

18  by itself may continue to enlarge and may require surgical

19  removal.

20      Q    But a hygroma itself does not bleed, does it,

21  Doctor?

22      A    That's correct.

23      Q    And in premature children, isn't there often

24  evidence of cerebral spinal fluid surrounding the brain?

25      A    Well, all people have evidence for cerebral spinal

1   fluid surrounding their brain.

2        Q    Doesn't cerebral spinal fluid look the same on CT

3   scans as old blood?

4             MR. GROLAND:  Objection, your Honor.  He's already

5        testified he's not a radiologist.  He doesn't read CAT

6        scans.  It's beyond his field of expertise.

7             THE COURT:  Overruled.  If you're able to answer

8        the question, Doctor, you may do so.

9             THE WITNESS:  I agree with Mr. Groland.

10  BY MS. SINGER:

11       Q    So you would defer to a radiologist --

12       A    Yes.

13       Q    -- To make that determination?

14       A    Yes, I would.

15       Q    Now is it your testimony, as I understand it

16  today, that bleeding in the subdural space always results in

17  bleeding in the subarachnoid space?

18       A    Yes.  Well, no, no.  If the cause of the bleeding

19  is rupture of bridging veins, then there must be bleeding in

20  the subarachnoid space.  If the blood in the subdural space

21  is caused by bleeding within the dura itself, what

22  Dr. Geddes calls intradural hemorrhage with break-through

23  bleeding into the subdural space, then you may not see

24  subarachnoid hemorrhage.

25       Q    So you would expect to see bleeding in the

1282

1    subdural space and the subarachnoid space if there was a

2    rupture of the bridging veins?

3         A    That's correct.

4         Q    And isn't it true that rupture of the bridging

5    veins occurs when there is traumatic injury to the brain?

6         A    When there is traumatic injury to the bridging

7    blood vessels, which may occur with no injury of the brain

8    itself.

9         Q    And isn't it true then that if there was an impact

10   injury, there could be rupture of the subdural bridging

11   veins as well as bleeding in the subarachnoid space?

12        A    Yes, there could be.

13        Q    Now you cited and used some photographs from a

14   neuropathologist by the name of Jennian Geddes, correct?

15        A    That's correct.

16        Q    And that article is not published yet, correct?

17        A    No.

18        Q    And the photographs that you were relying on, you

19   indicated were of a 32 week premature child, correct?

20        A    I'm not relying on them.  I'm simply showing the

21   jury what is going to appear in her article for

22   demonstrative purposes.

23        Q    But the photographs were of a 32 week old newborn

24   child?

25        A    That's correct.

1    Q    And not a four and a half month old child?

2    A    That's correct.

3    Q    And also you indicated that there was difficulty

4    in birth and fetal distress, correct?

5    A    That's correct.

6    Q    With poor breathing and the child was

7    resuscitated?

8    A    That's correct.

9    Q    You can't say whether or not forceps were used in

10   that delivery, can you?

11   A    Yes, I can.

12   Q    What is the answer to that, sir?

13   A    No, they were not.  It was a C-section.

14   Q    All right.  But that was after it was discovered

15   that the child was having fetal distress in the womb, is it

16   not?

17   A    That's correct.

18   Q    So the problem with breathing occurred before the

19   baby went through the birth canal?

20   A    That's correct.

21   Q    We don't have that situation here with Robbie

22   Quirello.  He was four and a half months old; is that

23   correct?

24   A    That's correct.

25   Q    You also indicated that when blood is in the brain

```
 1  for four to five days, there is a sign of iron pigment,

 2  correct?  Did I understand you correctly on direct

 3  examination that you would have some iron staining after

 4  four or five days?

 5      A   I don't recall if that's what you and I discussed

 6  during the deposition or whether I actually said it on

 7  direct examination, but it takes about four to five days to

 8  be able to see iron pigment when you're looking at a section

 9  of the dura under a microscope.

10          When the eyes were examined, iron was seen in the

11  bleeding in the retina.  But Robbie had been in the hospital

12  for eight days.  So the fact that there is iron there does

13  not surprise me at all.  It doesn't tell you whether the

14  initial injury occurred eight days before or eight weeks

15  before.

16      Q   And you agree that the autopsy is the gold

17  standard?

18      A   For what?

19      Q   For making a determination or making a final

20  determination as to cause of death?

21      A   Well, I think that it's gonna depend on the

22  quality of the autopsy and the quality of the person doing

23  the examination.  But the purpose of the autopsy is not to

24  determine the cause of death.  Robbie's cause of death was

25  clear from the hospitalization.  You didn't need to perform
```

an autopsy to determine why Robbie died. You needed to perform an autopsy in order to document any and all injuries that he had, to document them well so that two years plus later you can come back and reconstruct it.

Q You have corrected radiologists in the past in your own experience?

A What?

Q Have you corrected radiologists in the past?

A Corrected radiologists?

Q Yes.

A I have a brother who's head of radiology at Abbott Northwestern. I don't think he would take kindly to me correcting him. I have discussed discrepancies in findings between myself and a radiologist.

Q So you have found that there are discrepancies?

A Yes.

Q Now you keep -- you kept saying on direct examination that you would have wanted to examine the brain stem.

A I didn't keep on saying that. I would have wanted to examine the dura itself. I would have wanted to examine the brain stem and the spinal cord for purposes of trying to date the initial injury. Even with that, I may not have been able to.

Q You were not aware that Dr. Nelson did in fact

1   examine -- the neuropathologist did in fact examine the

2   brain stem?

3       A     Well, he did examine the brain stem because that's

4   part of his examination, but he didn't -- that's part of the

5   brain and there's a description of it in his microscopic

6   report.   But there is no -- there's no description of the

7   spinal cord.

8       Q     Now you were asked quite a bit about lack of

9   oxygen, but the heartbeat of the child still being -- still

10  occurring.

11      A     That's correct.

12      Q     If we can get to that.   It's my understanding that

13  had there been a finding that the heartbeat was still

14  occurring, that the lack of oxygen would have been very

15  short, in your opinion, for the heartbeat to have been

16  continual or have been continuously occurring?

17      A     Less than seven to ten minutes, that's correct.

18      Q     And were you aware that at the time that 911 was

19  called for this child, the child was reported to be

20  breathing?

21      A     Yes, I was.

22      Q     And were you aware of the fact that during the

23  time that 911 was communicating with Brian Herlihy, but

24  before the EMT's got to the house, the child had been

25  gurgling?

1287

1     A     Yes.  Well, I didn't interpret it as gurgling.  I

2  thought it was vomiting.  That's how I was interpreting it.

3     Q     You didn't listen to the 911 tape?

4     A     No, I didn't.

5     Q     So you did not have that available to you to

6  determine exactly how the child was described while the

7  EMT's were on their way to the apartment?

8     A     No.

9     Q     So if you were told that the child had been

10  breathing intermittently, had a heart rate and was gurgling

11  during that time, would you not agree the child was showing

12  signs of breathing during that time period?

13     A     No.  That type of intermittent breathing is what's

14  called agonal, A-G-O-N-A-L, breathing.  It's sometimes

15  called kussmahl, K-U-S-S-M-A-H-L, breathing.  It's agonal

16  breathing that occurs sporadically and is not very good at

17  oxygen exchange.  It's a leftover primitive reflex, as best

18  I know, to try to keep you going, but it doesn't work very

19  effectively.

20     Q     Is it your testimony today that the injury that

21  occurred to Robbie Quirello was the result of lack of

22  oxygen?

23     A     His death was as a result of a lack of oxygen.

24     Q     Was the injury to his brain that was seen on

25  August the 2nd due to lack of oxygen, Doctor?

1288

1    A    No.

2    Q    Ultimately his brain gave out and he couldn't

3    breathe anymore and he died, correct?

4    A    Well, I don't know if I would characterize it as

5    his brain going out.  The parts of the brain that control

6    breathing were damaged and he stopped breathing.  It was the

7    stoppage of the breathing that ultimately caused his death.

8    Q    And is it your testimony today that the damage or

9    injury that occurred to Robbie Quirello was due to him being

10    wedged in a bed?

11    A    This injury and subsequent death could have

12    occurred if Robbie was trapped in that bed exactly as

13    stated.  The complicating factor is that he has a chronic

14    subdural hematoma that is going to be subject to new

15    bleeding with no trauma or to new bleeding with relative

16    lack of oxygen, because someone with a chronic subdural

17    hematoma does not have a normal brain structure.  I just

18    don't know where to put that chronic subdural hematoma into

19    the cause and effect relationship of what happened to

20    Robbie.  I don't know where exactly to put it.

21    Q    Dr. Plunkett, do you recall your deposition taken

22    on August 12th of this year?

23    A    I don't recall it at all, but go ahead.

24    Q    All right.

25        THE COURT:  Give the Doctor a copy of the

1       deposition.

2   BY MS. SINGER:

3       Q     I'm turning now to page 44.  Dr. Plunkett, on line

4   ten, my question or statement to you was, "The injury that

5   you see in Robbie's brain, is it your opinion that it is a

6   result of having been trapped between the bed?"  Answer,

7   "No, no."  And I finished my question by saying, "Rail and

8   the mattress?"  Answer, "No, it's not, no."  Do you recall

9   that question and that answer?

10      A     Yes, I do.

11      Q     Now I can take my deposition back, please.  Thank

12  you, sir.

13      A     Can I read --

14      Q     You'll have an opportunity to explain it on

15  redirect, sir.

16            Now let's talk about the retinal hemorrhaging that

17  you agree was found during the course of the autopsy.  You

18  do agree with that, correct, that there was retinal

19  hemorrhaging?

20      A     Yes, that's correct.

21      Q     Is it my understanding that your testimony is the

22  retinal hemorrhaging was due to brain swelling that occluded

23  the vein that went into the eyes and supplied blood to the

24  retina?

25      A     The retinal hemorrhage was the result of pressure



1    within or around the veins exceeding the venous pressure.

2        Q    What -- I'm sorry, sir.

3        A    That can occur as a direct result of an impact, a

4    drastic increase in pressure.  It can occur as a result of

5    structural or functional clotting such as occurs with

6    cortical venous thrombosis.  It can occur as a result of

7    generalized or even localized swelling of the brain.

8        Q    So you agree then that at least in your theory of

9    how the retinal hemorrhages occurred, they could be due to

10   an impact injury to Robbie Quirello?

11       A    Yes.

12       Q    What vein is occluded when there is intracranial

13   pressure that causes retinal hemorrhaging?

14       A    Well, there are a number of veins that can be

15   occluded.  The central retinal vein may be occluded, the

16   peripheral veins that are not directly connected to the

17   central retinal vein may be occluded.  The exact veins that

18   are occluded is unknown.  As a matter of fact,

19   experimentally it's difficult to cause retinal hemorrhage by

20   simply occluding the central retinal vein.  It usually takes

21   contributaries (sic) also.

22       Q    For this intracranial pressure to occur and cause

23   the retinal hemorrhaging, that would have had to occur

24   before Robbie was seen in the emergency room, correct?

25       A    I'm not sure of the time course of documentation

1    of the retinal hemorrhage.

2         Q    Let's assume for a moment that the chart shows

3    that they were documented in the emergency room.

4         A    Sure.

5         Q    All right.  Let's just assume that for a moment.

6    I don't think I'm misleading you here.  I think that's

7    testified to.

8         A    No.  That's fine.

9         Q    For your testimony to explain those retinal

10   hemorrhages, they would have had to occur before they were

11   actually documented in the emergency room, correct?

12        A    That's correct.

13        Q    And that pressure would have been so high to cause

14   the actual pressure to these veins and cause the occlusion

15   that causes the bleeding?

16        A    I'm going to quantify so high for you rather than

17   using it qualitatively.

18        Q    Good.

19        A    Anything above eight or ten millimeters of

20   mercury, it could have occurred days or even weeks prior to

21   the time that Robbie was seen in the emergency room.

22        Q    Or it could have also occurred right before Robbie

23   went into the emergency room?

24        A    That is correct.

25        Q    It could have occurred as a result of an impact



1    injury that occurred right before Robbie went into the

2    emergency room?

3         A    Yes.

4         Q    It could have occurred in conjunction with other

5    injuries sustained to Robbie's brain?

6         A    I'm not sure what you mean by other injuries, but

7    if Robbie had an impact injury, yes, that could cause

8    retinal hemorrhage.

9         Q    Well, we know Robbie was in an unconscious state

10   or a semiconscious state when he was admitted into Shands

11   Teaching Hospital.

12        A    He was unconscious.  I would classify it as

13   unconscious.

14        Q    And we know that that was as a result of a brain

15   injury.

16        A    Yes, that's correct.

17        Q    And you don't disagree that the retinal

18   hemorrhaging could have occurred at the very same time that

19   the brain injury occurred?

20        A    Well, if you're talking about the initial -- Are

21   you talking about the initial injury causing the subdural

22   hematoma?  Is that what you're talking about?

23        Q    I'm talking about the fact that it is indeed

24   possible that this child could have sustained severe brain

25   injury and retinal hemorrhaging shortly before his admission



1  into Shands Teaching Hospital, that it is indeed possible

2  under your theory, is it not, Doctor?

3       A    I mean, I will never say never, but that is a

4  mischaracterization of the actual injury that he has.  What

5  Robbie has is simply a cessation of his breathing.  He

6  doesn't have an impact injury.  He doesn't have a mark on

7  his body.  He doesn't have a skull fracture.  There's no

8  bruise underneath the scalp.  He has a cessation of

9  breathing that's caused his death.

10      Q    Did you not review Dr. Anne Dickison's notes in

11 the chart reflecting that in fact there was a noted bruise

12 to the occipital area of the head of this child?

13      A    Well, I didn't see it.  It was not commented on in

14 the radiology reports and it's not commented on in the

15 autopsy report.  If the autopsy is the gold standard, then

16 where are we?

17      Q    Had there been such a finding, would that be

18 consistent with an impact injury, sir?

19      A    Yes, it would.

20      Q    And would it be consistent with the brain injuries

21 that occurred as a result of an impact injury?

22      A    With the exception that Robbie has an established

23 brain injury at the time he was brought into the hospital on

24 August 2nd.

25      Q    Is it yes or no, sir?  Is it consistent?

1294



1    A    Yes.

2    Q    Now you were talking a little bit about the

3    physics here and I do have some questions about that.  What

4    you said on direct examination is that 1G is 320 feet per

5    second?

6    A    No, I didn't.

7    Q    Well, you did say that on direct examination.  Do

8    you want to correct that?  You did.

9    A    No, I didn't.  I said 1G is 32 feet per second

10   squared.

11   Q    All right.

12   A    Ten G's is 320 feet per second squared.

13   Q    Ten G's is 320 feet per second?

14   A    Squared.  It's acceleration.

15   Q    And 320 feet would be the length of a football

16   field?

17   A    Yes, in Canada.

18   Q    In Canada, right.

19   A    Canada.

20   Q    We only have 300 feet here.

21   A    Right.

22   Q    And it's your testimony that folks have been able

23   to shake or been able to get the acceleration of up to 16

24   G's in biomechanical testing or biomechanical

25   experimentation?

1295

1   A   Yes.

2   Q   That's about as high as they can go?

3   A   That's correct.

4   Q   Isn't it correct that eight G's will kill a pilot?

5   A   Actually four G's will, but that's an entirely

6   different mechanism.  It's caused by the lack of blood flow,

7   which causes you to blackout, not a traumatic brain injury.

8   So it's totally different.  Four G's or five G's will do it.

9   Q   So you're saying that ten G's maximum force, which

10  would be 320 feet per second squared, going the force of --

11  going an entire football field squared several times in

12  shaking a baby would not cause injury to this child; is that

13  what you're saying?

14  A   That's correct.  It does not cause the types of

15  brain injuries that you see in Robbie.  Its been well

16  studied and well characterized for the last 60 years.

17  Q   You are in the minority on this issue, are you

18  not, sir?

19  A   Among the pediatricians, certainly.  Among the

20  forensic pathologists, no.

21  Q   And as a result you have gone across the country

22  testifying on behalf of defendants in criminal cases such as

23  this, presenting this minority view?

24  A   You mean as a result of being in the minority,

25  have gone across the country presenting this minority view?

Stacey K. Bryant, RPR
Judicial Court Reporter

000957



1296

1 | No, I don't think that's correct.  I've testified in 15 or

2 | 16 states.  I'm one of the first people that has been

3 | willing to address this issue from a scientific standpoint.

4 |        Q     And it is your testimony that's offered in these

5 | cases that it is not possible to shake a baby the length of

6 | a football field in a split second and cause the injuries

7 | that are seen in shaken baby syndrome?

8 |        A     You've just said two different things.  If you're

9 | talking about 320 feet per second squared, that's not a

10 | split second.  You're talking about motion.  You are able to

11 | shake a child; and you can do this as an actual experiment

12 | or you can do it as a mind game, you can shake a child at

13 | three or four cycles per second, three or four times back

14 | and forth a second and you can calculate the maximum

15 | acceleration that you achieve.

16 |        Dancers doing pirouettes, divers going off of a

17 | 10-millimeter platform generate more rotational acceleration

18 | during the pirouette or during the dive than does a human

19 | shaking a child.

20 |        Q     Now, sir --

21 |        A     I don't think it's a good idea to shake a child,

22 | but you do not cause the injuries called the shaken baby

23 | syndrome by shaking someone.

24 |        Q     Now, sir, a diver is not four and a half months

25 | old, correct?

 

1297

1    A    That's correct.

2    Q    A diver is not constructed like a four and a half

3  month old infant, correct?

4    A    That's correct.

5    Q    A diver does not have the same head to body size

6  ratio as an adult, correct?

7    A    Well, as a baby, that's correct.

8    Q    As a baby as an adult would have?

9    A    That's correct.

10   Q    And isn't it true that dancers are not four and a

11  half months old?

12   A    Most of them.

13   Q    All right.  You know one that's four and a half

14  months old?

15   A    My second granddaughter is trying to dance at

16  eight months and she just started walking.

17   Q    But before they start walking?

18   A    No.

19   Q    Unlikely.  And it's your testimony that you can't

20  shake a baby hard enough, I understand that, and my question

21  is this:  You haven't done any experiments shaking babies,

22  have you?

23   A    No, I haven't.

24   Q    Nobody's done any experiments shaking babies, have

25  they?

1298

1   A   No.

2   Q   That's because it would be unethical to shake

3   babies?

4   A   Yes, that's correct.

5   Q   The reason why it would be unethical is because

6   you would cause significant, severe brain damage in an

7   experimentation of this theory that you offer that such

8   injuries cannot occur?

9   A   No.  I think that's the reason that's given.  You

10  also don't find any volunteers who are just taking babies

11  and dropping them three feet to the floor, which I think

12  would be unethical because I know what will happen there.

13  Q   Right.  In fact, sir, you have written articles

14  where a baby can suffer a fall that will result in death by

15  falling merely 33 inches?

16  A   Even less than that.

17  Q   Even less than that.  So impact certainly could

18  cause that?

19  A   Yes.

20  Q   And shaking with impact could cause death?

21  A   Shaking has nothing to do with it.  You can

22  cause -- Shaking and impact are totally different mechanisms

23  of mechanical causes of injury.

24          MS. SINGER:  One moment, your Honor.

25          (Brief pause.)

1299

BY MS. SINGER:

    Q   Dr. Plunkett, you had indicated that those retinal hemorrhages that were seen upon examination in the emergency room could have been there well before August the 2nd; is that correct?  Is that what I understood your testimony to be?

    A   That's correct, yes.

    Q   Did you examine the slides that were done at the Alliant Eye Institute during the autopsy, the specific autopsy of the eyes that were done in this case?

    A   No.  I relied on the report.

    Q   If the evidence was that those retinal hemorrhages were so severe that this child would be blind, would you contest that at this time?

    A   No.

    Q   So Robbie Quirello wouldn't have been playing with his daddy and focusing on his daddy at 9:00 a.m. if he had those retinal hemorrhages and they caused him to be blind before that time; is that correct?

    A   That is not true.  The retinal hemorrhages that were found at the time of the autopsy are not indicative of the condition of his eyes when he came into the emergency room, anymore than the condition of his brain at the time of the autopsy was indicative of the condition of his brain when he came into the emergency room.

1    MS. SINGER:  No further questions, your Honor.

2    THE COURT:  All right.  Since we've been going an

3  hour again, unless you have only a few questions,

4  Mr. Tedder, we will take another recess.

5    MR. TEDDER:  No, ma'am.  I have more than a few

6  questions.

7    THE COURT:  We'll take a 15 minute recess, ladies

8  and gentlemen.

9    Ms. Singer, Mr. Pennypacker, don't leave yet,

10  please.

11    (Out of the presence of the jury.)

12    THE COURT:  Now at sidebar Mr. Tedder had asked

13  that Dr. Plunkett be given another medical report to

14  review prior to redirect, which of course if that is

15  done and if you ask questions regarding that area,

16  that's going to require a recross on that area.

17    MR. TEDDER:  Well, I think we have no choice, your

18  Honor.  This letter only came to my attention in the

19  middle of the deposition on September the 4th, 2002

20  because I did not have it and Dr. Nelson was referring

21  to his gross examination of the brain.  We recessed the

22  deposition.  Dr. Nelson faxed me the letter.  I thought

23  I had directed someone in our office to send it to

24  Dr. Nelson -- excuse me -- Dr. Plunkett and

25  Dr. Uscinski.  I suppose it wasn't done.



1301

1    THE COURT:  What does the state say?

2    MS. SINGER:  I don't have a problem with that,

3    Judge, but I do want the record to be clear on

4    something.  Dr. Stephen Nelson's name was provided to

5    defense counsel in October of the year 2000 and there

6    was an opportunity to speak with Dr. Nelson from

7    October 2000 throughout the time that his deposition

8    was taken.  I just want the record to be clear on that.

9    As far as whether or not Mr. Tedder wishes to show

10   this to Dr. Plunkett, I'm not going to oppose that as

11   long as I'm allowed to cross-examine on any new areas

12   that come of it.

13   THE COURT:  You will be.  All right.  You may

14   utilize the recess as you see fit.  Recess for 15

15   minutes.

16   MR. TEDDER:  Your Honor, I'm just going to hand

17   him this letter, show it to Ms. Singer first.  I'm not

18   going to say anything to Dr. Plunkett whatsoever about

19   it.

20   (Recess 3:51 - 4:04.)

21   (Out of the presence of the jury.)

22   MR. TEDDER:  Your Honor, as you know before the

23   last recess we provided Dr. Plunkett a copy of the

24   letter dated September 18th, 2000 that Dr. Nelson sent

25   to Dr. Hamilton.  He indicated to me that there was

1    something Dr. Plunkett wanted to relay to me about the

2    contents of this letter.  I did not ask him what that

3    was.  We would like to find out what it was prior to

4    bringing the jury out.  I would ask leave of court to

5    speak to Dr. Plunkett with the prosecutors to find out

6    exactly what he found in this letter.

7         MS. SINGER:  We would leave it up to the court.

8         THE COURT:  Have a seat, Dr. Plunkett.

9         MR. TEDDER:  I'll re-hand him the letter again.

10        THE COURT:  And all of these attorneys may speak

11   with Dr. Plunkett simultaneously to find out what this

12   new issue is so long as it doesn't take very long.

13   This does not need to be reported, does it?

14        MR. GROLAND:  No.  This is just an informal --

15        (Brief pause.)

16        THE COURT:  All right.  Are we ready for the jury

17   to come back in?

18        MR. TEDDER:  Yes, ma'am.

19        THE COURT:  Before we do, one of the jurors,

20   Mr. Cartel has requested a new notebook.  Any

21   objection?

22        MS. SINGER:  No, ma'am, but I don't know if I have

23   a new notebook.

24        THE COURT:  The state had already provided 15 as

25   opposed to 14, so we do have one.

1    MS. SINGER:  Oh, great.

2    THE COURT:  However, I'll alert the state and

3    defense just in case other jurors might be running out

4    of room, that you might want to bring more tomorrow.

5    MS. SINGER:  I'll have my investigator go ahead

6    and purchase -- As soon as she comes back, Judge, I'll

7    tell her to go ahead and purchase more notebooks for

8    tomorrow.  Judge, how many do you want?  Should we get

9    a whole set of 12?

10   THE COURT:  I don't want any personally.  It's

11   totally up to you and if the jurors request them, we'll

12   give them one.

13   (The jury is present and seated in the jury box.)

14   THE COURT:  Mr. Cartel, there you are.  You have

15   requested an additional notebook; is that right?

16   JUROR CARTEL:  No.

17   THE COURT:  We got the information wrong.  Did one

18   of the jurors request an additional notebook?  Good

19   enough.  If you need one we can get it.

20   All right.  Go ahead and have a seat, Doctor.

21   And, Mr. Tedder, you may continue with your redirect.

22   MS. SINGER:  Excuse me, your Honor, if I can just

23   move this podium.

24   MR. TEDDER:  Thank you, Ms. Singer.

25   MS. SINGER:  You're welcome, Mr. Tedder.

1304

1    REDIRECT-EXAMINATION

2    BY MR. TEDDER:

3        Q    Dr. Plunkett, several times throughout your

4    testimony you described evidence seen in the photographs,

5    which you described as a cortical venous thrombosis.

6        A    Yes.

7        Q    Tell the jury what that is, please.

8        A    Cortical venous thrombosis refers to clotting of

9    the blood vessels on the surface of the brain.  It is part

10   of a process that can in and of itself kill somebody.  It's

11   uncommon.  It is frequently misdiagnosed as representing

12   inflicted trauma and I have seen it misdiagnosed probably a

13   half a dozen times.

14       Q    Now in the recess we provided you with a letter

15   from Dr. Nelson to Dr. Hamilton dated September 18th, 2000,

16   correct?

17       A    Yes, that's correct.

18       Q    We neglected to get that information to you prior

19   to just now; is that correct?

20       A    That's correct.

21       Q    Dr. Plunkett, you had an opportunity to review

22   that letter from September 18th, 2000?

23       A    That is correct.

24       Q    Tell the jury what -- does that -- does what's in

25   that letter change your opinion in any way in this case?



1    A    No.  It really confirms what I thought I was

2    looking at with just the photographs of the brain.

3    Dr. Nelson's describing the most prominent area of

4    subarachnoid hematoma.  He describes it as a hematoma, an

5    actual collection of blood, not just bleeding.  It was on

6    the left superior frontal gyri, a clot of blood measured

7    eight by eight by nine millimeters.  That is exactly what

8    you see in the photographs.  It is cortical vein thrombosis.

9    I just don't know if it's cortical vein thrombosis that

10   developed after Robbie was hospitalized, or was in fact the

11   primary event.

12       Q    Now you also indicated there was some concerns you

13   had from the letter dated September 18th, 2000 with respect

14   to the autopsy at the time of this case.  Can you tell the

15   jury what those are?

16       A    Well, it's probably a little bit picky, but the

17   autopsy report is dated August 10th of 2000.  In

18   Dr. Nelson's letter he states that he notes in the protocol,

19   which included for me that the brain weight at autopsy was

20   listed as 1,826 grams.  Well, that's not what the brain

21   weight is listed as in the protocol today.  It's listed as

22   826 grams.  So somebody went back, changed the number

23   without indicating that that number had been changed.  To

24   me, that's not kosher.  When you're making a change in the

25   report based on subsequent information, even if it's a typo,

1.      that should be dated and initialed.

2          Q.      Anything else in that letter dated September 18th

3      that you would want to draw to the attention of the jury?

4          A       No, other than I completely agree with

5      Dr. Nelson's diagnoses, which are immature human brain,

6      subarachnoid hemorrhage and hematoma, cerebral edema, which

7      means brain swelling generalized, and vascular congestion

8      generalized.  I completely agree with that.  He doesn't

9      describe any subdural hemorrhage because he can't.  He

10      didn't get the portion of the dura to examine.  So I would

11      agree with his diagnoses, not necessarily the implication of

12      those diagnoses, but the diagnoses themselves, yes, I would.

13         Q       Now during cross-examination the state asked you

14      whether you could kill a baby by shaking the baby.  You

15      indicated it's theoretically impossible.

16         A       Yes.

17         Q       Explain to the jury what you mean by that.

18         A       We don't know failure characteristics of various

19      structures in infants.  We don't know how much stretch the

20      infant mid brain can take before the brain centers fail.  We

21      don't know how much we can stretch the ligaments around the

22      cervical vertebral bodies in infants before they fail.

23              Using adult criteria, which we do have, it would

24      be theoretically possible to stretch those nerve fibers

25      beyond the point where they could recover and cause death by

1307

```
 1   direct stretching of the nerve fibers themselves.  In that

 2   case, again using adult criteria, there ought to be

 3   relatively massive neck damage because the neck damage

 4   failure, whiplash, which is neck injury, whiplash occurs at

 5   a lower threshold, a lower level than does the stretching of

 6   those brain stem structures, at least on a theoretical

 7   basis.  That would be one possible mechanism that shaking

 8   could cause death.

 9           Second mechanism, you shake a child for so long

10   that the child doesn't breathe for about three or four, five

11   minutes, something like that.  I don't think it's a good

12   idea to shake a child.

13      Q    Now you indicated that there's -- that tossing a

14   child on a bed would not cause the kind of deceleration

15   needed to cause a brain injury seen in this case, but him

16   falling on a carpet could, at least during

17   cross-examination.  Is that what you said?  Is that what you

18   meant to say?

19      A    I'm sorry.  Could you repeat that?

20      Q    Or did I mishear you?  I think the state was

21   cross-examining you about whether or not tossing a baby on a

22   bed could cause the kind of deceleration needed to create

23   the injury present in this child, and you indicated no.

24      A    Yes, that's correct.

25      Q    I think the state tried to say that falling --
```

1308

1    tossing a baby on the carpet could cause the type of

2    acceleration necessary.

3         A    Yes.

4         Q    Do you agree or disagree with that?

5         A    I agree with that.

6         Q    Why?

7         A    Well, throwing a child onto a bed is not an impact

8    injury at all.  Think about the pillow fights that you've

9    been in.  That's not an impact.  The only thing that flies

10   around is a bunch of feathers or a bunch of foam.

11            To have an impact, you need to have a contact

12   event or a contact phenomena.  You need a bruise, you need a

13   fracture, you need something to move, you need wave

14   propagation or physics.  Those are the essential ingredients

15   of an impact.

16            When you're throwing somebody to the bed and the

17   bed deforms two or three inches and your head doesn't deform

18   at all, that's not even an impact.  It's just -- It's

19   something totally different.  In contrast, if your head hits

20   a non-yielding surface, such as the floor, even if it's a

21   floor with a padded carpet, in that situation you do get a

22   local or contact phenomena.  You do get wave propagation and

23   you may certainly, although not always, get traumatic brain

24   injury.

25        Q    The state -- Quite frequently during your



1309

1    testimony you indicated shaking has nothing to do with it.

2    What do you mean by that?

3        A    The mechanism of shaking -- Shaking is motion at a

4    distance from the applied force.  And by force, I really

5    mean acceleration, but I use the term force.  The best

6    example I can think of is, you shake the trunk or limb on an

7    apple tree and the apple falls off.  That's shaking.  You

8    never touched the apple at all and yet your motions caused

9    something to happen to that apple.

10            In contrast, an impact has the local phenomena

11   that I talked about, which has to be a contact event of some

12   sort, a bruise, a ruptured blood vessel.  It can be really

13   minor.  It can be really minor in wave propagation.

14            So they are two totally distinct mechanisms of

15   injury to living structures and I'm not limiting the living

16   structures to human beings.  These laws also apply to corn

17   plants up in Minnesota.  I mean, these are the bases for the

18   use of biomechanical principles for all living creatures, be

19   they animal or plant.

20       Q    You were asked about contusional tears.  What do

21   you mean by that?

22       A    Contusional tear is a specific type of contusion

23   or bruise that an infant almost always below the age of six

24   months gets as a result of an impact injury.  These are

25   first described by a neuropathologist named Lindenberg, I

1   believe his last name is B-E-R-G, who was a neuropathologist

2   from Baltimore and was a neuropathologist for the Maryland

3   Medical Examiner's Office.  And he described tears

4   principally at the juncture of the gray and white matter of

5   the brain in infants who had impact head injuries and they

6   are very distinct and very different from those seen in

7   older children or adults.

8           Older children and adults get impact injuries on

9   the surface of the prominent part of the cerebral hemisphere

10  called the gyri and they don't get these tears at the

11  juncture of the gray and white matter as children under the

12  age of six months with an impact injury that is significant,

13  yet a different injury pattern.

14      Q    Did you see any evidence of that in this case?

15      A    Robbie has no evidence for contusional tears

16  whatsoever.

17      Q    Now the state tried to characterize your

18  professional testimony as being defense oriented.  How often

19  over your career as a forensic pathologist would you

20  estimate you have testified for state attorneys or

21  prosecutor's office in Minnesota?

22          MS. SINGER:  I'm going to lodge an objection,

23          repetitive.  That was asked and answered on direct

24          examination of this witness.

25          THE COURT:  Sustained.

1    BY MR. TEDDER:

2        Q    But you have testified for the prosecution?

3        A    Yes, sir.

4        Q    And would do so again today; is that correct?

5        A    That is correct.

6             MS. SINGER:  Your Honor, once again, I would lodge

7        an objection, leading and asked and answered.

8             THE COURT:  Sustained on both bases.

9    BY MR. TEDDER:

10       Q    Now the state indicates that -- tries to imply

11   that because you did not examine the child personally, that

12   there should be some questions about your ability to form an

13   opinion on what happened to the child.  How would you

14   respond to that point?

15       A    Well, the purpose of an autopsy report is to allow

16   the person who did the autopsy to recall what he or she did

17   or saw six months or even six years later.  If the report --

18   And I would have to rely on what I had photographed and what

19   slides I had and what my report said to reflect -- to

20   refresh my own mind as to what I saw some time before,

21   sometimes even the day before so that -- I mean, that's the

22   purpose.  The purpose of a report is to allow you or someone

23   else to review the materials and at least have a database

24   that is identical to the database of the person that did the

25   autopsy.

1    Q    And you indicated in cross-examination that you

2    were not surprised to learn that Dr. Hamilton disagrees with

3    you.  Why not?

4    A    Well, there are certainly a number of forensic

5    pathologists who disagree with me.  If Dr. Hamilton had

6    agreed with me, he would not have come to the conclusion

7    that he did two years ago.

8    Q    You testified during cross-examination, in the

9    past you came to a conclusion of shaken baby one time

10   before.  I believe you said that did exist a long time in

11   the past.  Is that the truth?

12   A    Well, I know of one time for sure because I've got

13   the newspaper article that says, "Plunkett looked at it and

14   he agreed."  There may have been a couple of other times in

15   the early '90s when I did.  I mean, I bought into this whole

16   thing until relatively recently.

17   Q    What caused you to change your mind?

18   A    Understanding the mechanics of the head injury.

19   Q    How did you learn about that?  When did you become

20   concerned about it and begin investigating the mechanics of

21   the head injury?

22   A    When I started to review all of the original

23   source literature regarding head injury from Wayne State

24   University, from the Naval testing in New Orleans, from the

25   Johnson Space Center.  I had to read all of these original

 

1   source documents and I didn't understand what the heck they

2   were saying.  So I had to relearn the physics and I had to

3   relearn the math and then I had to go to people who were

4   actually doing the research and talk to them so that I could

5   understand.

6          I still don't understand all of it.  I mean, those

7   are the people that are doing the work and those are the

8   people that fund me.  So I forced myself to understand the

9   mechanics enough to be able to explain a mechanism of injury

10  to myself so that I can understand it and hopefully to

11  others so they can understand it.  So it was that -- it was

12  the interest in science rather than opinion that drove me.

13      Q    You've indicated that a person can have a chronic

14  subdural hematoma and have no symptoms?

15      A    That's correct.

16      Q    And have a chronic subdural hematoma that is

17  continuing to bleed?

18          MS. SINGER:  I'm going to lodge an objection to

19      the leading nature of these questions, your Honor.

20          THE COURT:  Sustained.

21  BY MR. TEDDER:

22      Q    Can a chronic subdural hematoma bleed?

23          MS. SINGER:  I'm going to lodge an objection,

24      leading and asked and answered.

25          THE COURT:  It will be sustained on the basis that



1314

```
 1        its been asked and answered.

 2            MR. TEDDER:  Your Honor, she raised it during

 3        cross-examination.

 4            THE COURT:  It was already sustained, Mr. Tedder.

 5    BY MR. TEDDER:

 6        Q    I think you testified during cross-examination

 7    that you would agree that a subdural hematoma does not cause

 8    an impact on the brain.

 9        A    That's correct.

10        Q    Did I get that straight or no?

11        A    I think so.

12        Q    Okay.  What impact, if any, does a subdural

13    hematoma have on the brain?

14        A    Well, it may have none.  If the volume -- I mean,

15    people get subdural hematomas and they have absolutely no

16    signs or symptoms whatsoever.  They develop signs and

17    symptoms if there is actually structural damage to the brain

18    at the time of the impact.  They develop signs or symptoms

19    if the subdural hematoma continues to enlarge and that can

20    be over --

21            For example, Ronald Reagan, about six months after

22    he left the presidency, was rushed from California to the

23    Mayo Clinic because he had a chronic subdural hematoma that

24    had occurred.  The initial injury had occurred some four

25    months earlier when he fell off his horse.  He was
```




1   asymptomatic as far as anyone knew until just a couple days

2   before they brought him to Mayo.  So it can be the volume of

3   the new bleeding itself that can cause the signs and

4   symptoms.

5       Q    Can you explain to the jury the healing process of

6   the subdural hematoma, please?

7       A    The healing process is somewhat different from the

8   healing process that we have with the rest of our injuries

9   that we get.  You get a bruise, inflammatory cells go into

10   the area of bruising.  They remove the dead cells and new

11   blood vessels start to form.

12          Pretty much the same initial steps take place in

13   the brain with a subdural hematoma.  Unfortunately for

14   reasons that are not understood or at least I don't

15   understand, in some and perhaps many cases the subdural

16   hematoma rather than having that nice clean healing process,

17   continues to enlarge.

18          It can continue to enlarge because of new

19   bleeding, which will then enlarge the edges of the subdural

20   hematoma causing new bridging veins to rupture.  It can

21   continue to enlarge because of collection of fluid that

22   eventually has the consistency of cerebral spinal fluid and

23   is simply called a hygroma.

24          So the healing process is a little bit different

25   and no one really understands why chronic subdural hematomas

1    develop.   Certainly something is different from what happens

2    when you and I get hit with a baseball bat or racket ball or

3    with a car.

4        Q    You indicated on cross-examination that

5    pre-healing of a subdural hematoma leaves a stain on the

6    dura?

7        A    Yes.

8        Q    What kind of stain would it leave?

9        A    Iron pigment.   Iron pigment of old inflammatory

10   cells.   You can sometimes see it with your unaided eye and

11   you can almost always see it under the microscope.

12       Q    So it's not always visible with the naked eye?

13       A    No.   That's correct.   That's correct.

14       Q    Which again is why it would have been so important

15   for the dura to be microscopically examined?

16       A    Well, I think it would have been important if you

17   were gonna try to age and get more specific other than older

18   than 15 days.   So if you wanted to say, Well, you know,

19   parts of this are a couple of months old, then you've got to

20   have the dura.   But if the question is -- the only thing you

21   care about is knowing 15 days or less, you can answer that

22   by looking at the CT and MR scans.

23       Q    You testified on cross-examination about the

24   rupturing of the bridging veins between the dura and the

25   arachnoid space.   What do you mean by that?   What do you

Stacey K. Bryant, RPR
Judicial Court Reporter



1317

1    mean by the connection between them?

2        A    The dural blood vessels go from the under surface

3    of the dura, through the arachnoid membrane, to the surface

4    of the brain.

5        Q    Okay.  So they're not actually attached to the

6    arachnoid membrane?  They go through the arachnoid membrane?

7        A    They go through the arachnoid membrane and they

8    are attached.  They are attached, but they don't suddenly

9    end at the surface of the arachnoid.  They're on the

10   surface.  It looks like a spider web is the best way I can

11   describe it.

12       Q    All right.  And how are bridging veins injured?

13       A    Tearing.

14       Q    You indicated that the purpose of an autopsy was

15   not to determine cause of death.

16       A    That's correct.

17       Q    Tell the jury what the purpose of an autopsy is.

18       A    The purpose of an autopsy is to document

19   everything that you can about that body, every condition,

20   every possible question that may come up later that needs to

21   be answered; height, weight, weight and appearance of the

22   organs, saving various parts of organs if it becomes

23   important later to go back and do something else in order

24   for you to put the autopsy observations in conjunction with

25   the investigation to determine the cause of death.

1    A forensic pathologist has two tools; a history

2  and a physical examination, the same two tools that any

3  other physician has.  Those are the only tools we've got.

4  And the history is what is most important and as I said

5  earlier, our office will investigate 2,000 deaths this year

6  and we're only performing about 300 autopsies.  We are

7  relying on the investigation to allow us to determine the

8  cause of death and make an arrest.

9      But you don't determine causes of death in

10  autopsies.  You develop and document observations, which you

11  then have to put in the data bank with a review of the

12  medical records, for example, with someone like Robbie, to

13  try to figure out what happened.

14    Q    Now the state attorney questioned you about

15  discrepancies arising between folks who read CAT scans and

16  pathologists doing autopsies.  And you indicated that you

17  prefer to defer to the radiologist.

18    A    Yes.

19    Q    What sort of discrepancies have you been aware of?

20    A    Oh, there is -- A radiologist can say cortical

21  vein thrombosis or sagittal sinus thrombosis.  A pathologist

22  says, No, it's really subdural hemorrhage or vice versa.

23  These are two different ways of looking at something and we

24  have decided that the autopsy is the gold standard.  I think

25  it should be the gold standard.  But you still make the

 

1   assumption that the autopsy was done correctly and that the

2   observations are appropriately documented and preserved.

3   Then it becomes the gold standard.

4       Q    Now the state described Robbie's breathing as

5   being intermittent and you called it agonal breathing.  Tell

6   the jury again what you meant by agonal breathing.

7           MS. SINGER:  I'm going to lodge an objection.

8       Tell the jury again, just --

9           THE COURT:  Objection is sustained.

10          MR. TEDDER:  Your Honor, he answered it in

11      cross-examination.

12  BY MR. TEDDER:

13      Q    Explain what agonal breathing is, Doctor.

14          MS. SINGER:  I'm going to lodge the same

15      objection.  He's already explained that on

16      cross-examination.

17          THE COURT:  The objection is sustained.

18  BY MR. TEDDER:

19      Q    You testified during -- I believe you said during

20  cross-examination that the injury to Robbie's brain on

21  August 2nd, 2000 was not due to lack of oxygen.

22      A    That's correct.

23      Q    What was the injury on August the 2nd due to,

24  Dr. Plunkett?

25      A    Well, in the transcript that I was referring to in

1    that testimony, we were talking about the initial injury

2    that Robbie had, which is the initial subdural hematoma.  I

3    said as best as I can determine, that is not due to lack of

4    oxygen.  That's trauma.  It's the most common.  But it

5    didn't occur on August 2nd or even on August 1st or even on

6    July 25th.  It was earlier than that.

7         Q    And you indicated a complicating factor in this

8    case with respect to the injury was the chronic subdural

9    hematoma?

10        A    Well, I think it's a terribly complicating factor

11   because I think if the chronic subdural hematoma hadn't been

12   there and everything else that we have was there, you would

13   come to the conclusion assuming investigation of the

14   circumstances and everything else panned out, that this

15   happened exactly the way Mr. Herlihy stated.

16             But now you've got this complicating factor of the

17   subdural hematoma, a brain injury that significantly

18   predates August 2nd and you're -- at least I'm saying, how

19   does this play a role in his death?  Is it something that's

20   really important or relevant?  Or is it simply that Robbie

21   died as a result of asphyxia and happened to have a chronic

22   subdural hematoma?  I know the chronic subdural hematoma

23   didn't kill him and I just don't know where exactly to put

24   it in in the cause and effect relationship.

25        Q    Dr. Dickison indicated -- Well, on

1    cross-examination they talked to you about G force that

2    could kill a pilot.  You indicated that it would be because

3    the pilot couldn't breathe?

4         A    No.

5         Q    I misunderstood.

6         A    No.  It has to do with redistribution of blood at

7    four G's.  Think of it in reverse.  You know, if you're

8    hanging somebody by his or her heels, they can blackout

9    pretty quickly because of the difference of the blood flow

10   to the head.  So if the pilot's blacking out at four G's,

11   they don't want them flying upside down.  That's the whole

12   deal.

13             So it's a totally different mechanism of brain

14   injury in quotes than it is actual traumatic brain injury.

15   That's just a redistribution of blood flow and it happens to

16   be -- Ms. Singer said eight G's.  It's my understanding it

17   was actually closer to four or five.  It has nothing to do

18   with traumatic brain injury, which is a totally different

19   animal.

20        Q    So, in other words, if you're a pilot and you

21   blackout because of that force, once you decrease that

22   force, you regain consciousness?

23        A    Yes, if you haven't hit the ground first.

24        Q    All right.  And we have permanent brain injury?

25             MS. SINGER:  I'm going to lodge an objection to

Stacey K. Bryant, RPR
Judicial Court Reporter

000983



1322

1    the leading nature of the questions, your Honor.

2         THE COURT:  Overruled.

3         THE WITNESS:  No, you won't have any permanent

4    brain injury.  You just blackout and come back.  I

5    mean, it's an all or not.  If you come back, you're

6    fine.  If you don't come back, you're dead.

7  BY MR. TEDDER:

8    Q    Because you blacked out and --

9    A    Crashed the plane.

10   Q    Explain to the jury again what you mean by 32 feet

11 per second.

12        MS. SINGER:  Your Honor, I'll lodge an objection,

13   asked and answered.

14        THE COURT:  Overruled.

15        THE WITNESS:  That is the acceleration due to

16   gravity.  It is called a kinematic, K-I-N-E-M-A-T-I-C,

17   parameter.  It is one of the parameters that is used

18   when you're measuring biophysical events.  It is a

19   direct result of Newton's hypothesis regarding force.

20        Forces that are used in human and animal

21   experimentation are usually in the form of

22   accelerations that are applied and the numbers that are

23   usually used are in terms of multiples of gravitational

24   acceleration.  So you can talk about ten G's or 100 G's

25   or 1,000 G's and there are various thresholds that have