IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

BRIAN PATRICK HERLIHY,

     Petitioner,

v.                                                          CASE NO. 1:09-cv-52-MP-GRJ

SECRETARY, DEPT. OF
CORRECTIONS,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner initiated this case by filing a *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  Doc. 1.  The Petition stems from Petitioner's 2002 Alachua County jury-trial conviction of manslaughter, for which Petitioner is serving a 15-year sentence.  The Respondent filed a response and an appendix with relevant portions of the state-court record.  Doc. 21.  Petitioner was afforded an opportunity to file a reply, but has not done so.  Upon due consideration of the Petition, the Response, and the state-court record, the undersigned recommends that the Petition be denied.[1]

## State-Court Proceedings

The evidence adduced at trial is summarized in Petitioner's initial brief on direct appeal.  App. exh. FF.  The following highlights only the portions of the trial record summary that are relevant to understanding and resolving Petitioner's instant claims.

Petitioner was charged with the first degree murder of Robbie Quirello, the four-

---

[1]Because the Court may resolve the Petition on the basis of the record, the Court has determined that an evidentiary hearing is not warranted.  *See* Rule 8, Rules Governing Habeas Corpus Petitions Under Section 2254.

month old son of John and Crystal Quirello.  Crystal Quirello had a relationship with Petitioner.  On August 2, 2000, Crystal left Robbie with Petitioner while she ran errands.  While she was gone, Petitioner called 911 and reported that he had found Robbie wedged in a bed, vomiting and having trouble breathing.  The child never regained consciousness and life support was removed on August 10.

The State's theory of the case was that Robbie died from being violently shaken by Petitioner, while the defense theory was that the child had a prior brain injury that re-bled and ultimately caused his death.  Prior to trial, the court granted a motion in limine to prevent the State from eliciting testimony that Petitioner had made false statements regarding his employment history.

John Quirello testified that Crystal had a "short fuse" and had behaved erratically in the past.  He learned after Robbie's death that a CAT scan showed a prior injury, which John believed may have been caused when Crystal had a car accident while she was pregnant, or during Robbie's birth.  He also testified that he saw Crystal "plop" the baby on the bed a little roughly when she was angry.

Crystal testified that she left Robbie with Petitioner because she trusted him.  When she returned to pick up Robbie, emergency vehicles were present and Petitioner told her that Robbie had aspirated milk.  On cross-examination, she denied previously throwing Robbie on the bed, or biting John during a fight and going to the hospital twice for injuring herself.  When Crystal was asked whether Petitioner was good with the baby, she stated that she trusted him and never had any suspicion he might want to hurt Robbie.  On redirect, over defense objection, Crystal testified that she trusted Petitioner because he said he was a pediatric nurse.

The 911 call was played for the jury.  Petitioner told the 911 dispatcher that he came out of the shower and found Robbie wedged between the mattress and bed frame, and that he was in the medical field and had never seen this before.  Emergency responders found Robbie in respiratory arrest; he began breathing after a white milky substance was suctioned from his mouth and he was intubated.  One responder testified, over objection, that Petitioner kept repeating that he was a trained firefighter.

Both parties presented extensive medical testimony regarding the competing theories of the cause of death.  On behalf of the State, the Shands ER physician who treated Robbie testified that he had retinal hemorrhages in both eyes, and a CAT scan showed multiple intracranial hemorrhages.  The doctor made a preliminary diagnosis of shaken baby syndrome, though he conceded on cross-examination that he was not an expert in the syndrome.

The head of the Pediatric Intensive Care Unit (PICU) at Shands testified that Robbie was seizing and very distressed, and CAT scan results showed blood above and below the dura; she also noted the retinal hemorrhages.  In her opinion Robbie "probably" died from shaken baby syndrome.  She testified that being wedged between a mattress and bed frame were inconsistent with his injuries, though being "plopped" on a bed so that his head bounced could cause the injuries.  She did not think the injuries were caused by a re-bleeding of a chronic subdural hematoma, because the CAT scan showed subdural, epidural, and subarachnoid bleeding on both sides of the brain.  She presented demonstrative evidence depicting how a child's brain moves when the child is shaken.  On cross-examination, she agreed that Robbie had unexplained hematomoas indicating multiple traumatic events over a period of time.  In her opinion, the new

injuries caused Robbie's death.

The medical examiner testified to the details of the autopsy, and opined that Robbie's injuries were consistent with being violently shaken, and that his death was caused by axonal injury leading to brain stem malfunction and oxygen deprivation.

A forensic neuropathologist testified that he observed blood clotting in the subarachnoid space and brain swelling, and that he saw no evidence of a subdural hematoma suffered at birth.  A pediatric neurologist testified that the injuries were consistent with being shaken and possibly thrown on the bed.  A pediatric opthalmologist testified that Robbie's retinal hemorrhages, which he characterized as one of the three worst cases he had seen, were due to trauma and not intracranial pressure.

The defense presented the testimonies of medical experts who disputed that Robbie's death was caused by being shaken, and posited that Robbie had chronic subdural hematomas which could have caused a seizure which lead him to stop breathing, or he could have vomited, causing an airway obstruction and deprivation of oxygen to the brain.  One expert, Dr. Plunkett, challenged Dr. Davis' exhibits demonstrating what happens to the brain when a child is shaken and described it as "scientific fraud."  He testified that the retinal hemorrhages could have been caused by brain swelling.  Dr. Uscinski also disagreed that shaking could have caused Robbie's injuries, and opined that Robbie could have had a seizure and then gotten wedged in the bed frame.

Gainesville Police Detective Helen Legall interviewed Petitioner, who gave a videotaped statement that was played for the jury.  Petitioner stated that he fed Robbie and put him on a pillow on the bed, face up, and then Petitioner turned on the water in

shower.  When he came out about five minutes later, Robbie was wedged between the mattress and footrail, head down and vomiting.  After giving the statement, he told Legall that he may have shaken Robbie gently while he was giving him CPR, but was careful not to hurt him.  He then told another officer that it was possible he shook him harder. The next night, after his arrest, Petitioner told Legall that he was trying to quiet the baby, who was crying, and in doing so swung him from side to side, which made Robbie laugh, and then Petitioner plopped him "fairly hard" and his head bounced on the pillow. Petitioner thought he may have done something to Robbie's neck, and he told the officer that "you're not supposed to roughhouse with a four-month-old."  Petitioner later stated that when he plopped Robbie on the pillow, his head bounced and he became quiet and his eyes were dazed.  Petitioner left the room to take a shower, and when he returned Robbie was wedged in the bed.

Legall took Petitioner to jail in Detective Weaver's car.  She testified that on the way Petitioner asked Weaver to pull over, Weaver pulled over "for a moment" and then Petitioner told Legall that he remembered bouncing Robbie on the bed, that it was hard, and "I know I was rough with him."  He abruptly put Robbie down and told him he would be okay, and when Petitioner returned he knew something was wrong and he panicked. Officer Weaver did not testify at Petitioner's trial.

Other evidence included testimony for the State regarding a reenactment of the event with Petitioner, which required an investigator to exert "tremendous effort" to place a doll between the mattress and footboard of Petitioner's bed, as Petitioner described the event.  There was testimony that called into question Petitioner's claim that he had been in the shower prior to finding Robbie wedged in the bed.  A search of his apartment

revealed a bag in his closet containing a shirt with vomit on it, a towel with blood on it, and another towel with baby formula, and the State argued that Petitioner had become upset because Robbie spit up on him.  In addition to challenging the State's theory of the cause of death, defense counsel argued that law enforcement improperly targeted Petitioner early in the investigation, and failed to thoroughly investigate evidence that supported Petitioner's version of the events.

The jury returned a verdict of guilty on the lesser-included offense of manslaughter.  Petitioner appealed, arguing that the trial court erred in allowing evidence of statements Petitioner made regarding his employment history.  The First District Court of Appeal (First DCA) affirmed without opinion November 3, 2004.  *Herlihy v. State*, 887 So.2d 332 (Fla.1st DCA 2004).  On August 10, 2005, Petitioner filed, through counsel, a Fla. R. Crim. P. 3.850 motion arguing that trial counsel rendered ineffective assistance for failing to request a *Frye*[2] hearing to determine the admissibility of opinion testimony on shaken baby syndrom.  App. exh. JJ at 1-59.  The court summarily denied the motion, finding that counsel was not deficient for not requesting a *Frye* hearing because the diagnosis of shaken baby syndrome has been recognized by courts as an accepted medical diagnosis, and Petitioner had not shown prejudice because there was no reasonable probability that the trial court would have excluded the State's expert testimony.  *Id*. at 60-63.  The First DCA affirmed in a written opinion, concluding that a *Frye* hearing was unnecessary when the testimony at issue is based on an expert's personal experience and training, versus a new or novel scientific principle.  *Herlihy v.*

---

[2]*Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).

*State*, 927 So.2d 146 (Fla.1st DCA 2006).

On August 25, 2006, Petitioner filed a *pro se* Rule 3.850 motion, asserting that his trial counsel rendered ineffective assistance by failing to conduct a reasonable pretrial investigation.  As support, Petitioner pointed to a report received by his mother in November 2000, in which a scientist, Viera Scheibner, opined that double vaccination was a key factor in Robbie's death.  As his second ground for relief, Petitioner argued that his trial counsel rendered ineffective assistance by failing to call Detective Weaver to testify and impeach Detective Legall's testimony.  App. exh. OO at 120-59.  The postconviction court summarily denied ground two of the motion, finding from the trial record that defense counsel made a strategic decision not to call Detective Weaver. The court appointed counsel to represent Petitioner.  *Id*. at 315- 454.   The court subsequently dismissed ground one without prejudice to Defendant amending the claim and refiling it, which he did through counsel.  *See* App. exh. NN at 1-38; 47 (counseled Rule 3.850 motion and supplement to motion with affidavits).

On March 3, 2008, the postconviction court denied ground one of Petitioner's motion on the basis that it was successive.  The court also concluded that the ground lacked merit because Petitioner's trial counsel utilized the services of medical experts on shaken baby syndrome at trial, and Scheibner was neither a medical doctor nor did her report express a medical opinion, and therefore counsel was not deficient for failing to present a defense based on Scheibner's opinion.  App. exh. NN at 47-50.   The First DCA affirmed without opinion.  *Herlihy v. State*, 996 So.2d 217 (Fla.1st DCA 2008).  Petitioner's motion to certify was denied January 28, 2009.  App. exh. YY, ZZ.

Petitioner filed the instant federal habeas petition on February 17, 2009.  Doc. 1.

Respondent concedes that the petition is timely.  Petitioner asserts one claim that the trial court erred by allowing testimony regarding statements Petitioner made about his "employment and other areas," and three claims that his trial counsel rendered ineffective assistance by: (1) failing to request a *Frye* hearing; (2) failing to pursue Scheibner's opinion as a defense theory at trial; and (3) failing to call Detective Weaver as a witness to impeach Detective Legall's testimony.  Doc. 1.

### Section 2254 Exhaustion Requirement

Before bringing a habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state post-conviction motion.  28 U.S.C. § 2254(b)(1), (c).  Exhaustion requires that prisoners give the state courts a "full and fair opportunity" to resolve all federal constitutional claims by "invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  To properly exhaust a federal claim, a petitioner must "fairly present" his federal claim in each appropriate state court, thereby affording the state courts a meaningful opportunity to "pass upon and correct alleged violations of its prisoners' federal rights."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quotation omitted).   A petitioner must "do more than scatter some makeshift needles in the haystack of the state court record"; a reasonable reader should be able to understand the factual and legal bases for the federal claim. *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir.2005) (quotations and citations omitted).  A petitioner may raise a federal claim in state court "by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such claim on federal grounds, or by simply labeling the claim 'federal.' " *Baldwin*, 541 U.S. at 32.

When a petitioner fails to properly exhaust a federal claim in state court, and it is obvious that the unexhausted claim would now be procedurally barred under state law, the claim is procedurally defaulted.  *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999).  Federal habeas courts are precluded from reviewing the merits of procedurally defaulted claims unless the petitioner can show either (1) cause for the failure to properly present the claim and actual prejudice from the default, or (2) that a fundamental miscarriage of justice would result if the claim were not considered.  *Id*.  at 1302, 1306.  A fundamental miscarriage of justice exists "where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010).  To state a credible claim of actual innocence, a petitioner must present new reliable evidence that was not presented at trial showing that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

**Claim One: State court evidentiary rulings**

Respondent contends that Petitioner's first claim is unexhausted and procedurally defaulted because Petitioner never asserted a federal constitutional claim in his appeal of the trial court's evidentiary ruling.  Doc. 21.  A review of the Petitioner's brief on direct appeal supports a conclusion that no federal constitutional claims were fairly presented to the state court.  Petitioner raised one substantive claim of evidentiary error on direct appeal.  In support of his claim, Petitioner cited only state cases pertaining to state evidentiary rules governing evidence of prior bad acts.  The brief is devoid of any suggestion that Petitioner intended to raise federal constitutional claims as to the

challenged rulings.   *See* App. exh. FF.   Petitioner has not asserted any cause or prejudice for the default, nor does the record suggest that a fundamental miscarriage of justice would result if the claim is not considered.

Further, even if Petitioner had properly exhausted this claim as a federal claim in state court, he has not shown that he is entitled to federal habeas relief.  A state trial court's evidentiary rulings do not provide a basis for federal habeas relief absent a showing that the ruling affected the fundamental fairness of the trial.  *See Sims v. Singletary*, 155 F.3d 1297, 1312 (11th Cir. 1998).  Even if erroneous, a Petitioner must show that the ruling "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'"  *Id*.  (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

In the State's reply brief on direct appeal, the State argued that any error in the trial court's evidentiary ruling was harmless.  App. exh. GG.  The references to Petitioner's claims that he was a pediatric nurse and had trained as a firefighter occurred early in the very lengthy trial, and the case focused primarily on the medical evidence and other evidence that Petitioner's explanation of the child's injuries lacked credibility.  The evidence did not necessarily create an improper inference that Petitioner lied about his employment because there was no evidence adduced during the trial as to Petitioner's actual employment, and the State did not reference the statements in its closing argument.  Viewing the record as a whole, the Court cannot conclude that the challenged statements, even if admitted erroneously, had a substantial and injurious effect or influence on the jury's verdict.  Accordingly, Petitioner is not entitled to relief on this claim.

## <u>Section 2254 Standard of Review</u>

Under 28 U.S.C. § 2254(d)(2), a federal court may not grant a state prisoner's application for a writ of habeas corpus based on a claim already adjudicated on the merits in state court unless that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Under § 2254(e)(1), the petitioner must advance clear and convincing evidence that the state court's factual determination was "objectively unreasonable" to rebut the presumption that the determination was correct. *Gill v. Mecusker*, 633 F.3d 1272, 1287 (11th Cir.2011); see § 2254(e) (1).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court holdings. *Hawkins v. Alabama,* 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted) ("The decisions of other federal circuit courts (and our decisions for that matter) are helpful to the AEDPA inquiry only to the extent that the decisions demonstrate that the Supreme Court's pre-existing, clearly established law compelled the circuit courts (and by implication would compel a state court) to decide in a definite way the case before them."). *See also Carey v. Musladin,* 549 U.S. 70, 74-77 (2006) (§

2254 refers to holdings, rather than *dicta,* of the Supreme Court, collecting circuit cases "[r]eflecting the lack of guidance from this Court," on the issue).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. *Williams v. Taylor,* 529 U.S. 362, 404-406 (2000); *Bell v. Cone,* 535 U.S. 685, 694 (2002) (citing *Williams* ).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 412-13. "Avoiding these pitfalls [described in *Williams v. Taylor* ] does not require citation of our cases-indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8  (2002) (emphasis in original). Further, "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it." *Holland v. Jackson,* 542 U.S. 649, 652  (2004).

In *Gill v. Mecusker*, 633 F.3d 1272 (11th Cir. 2011), the Eleventh Circuit clarified how the federal habeas court should address the "unreasonable application of law" and the "unreasonable determination of facts" tests.  The court acknowledged the well-settled principle that summary affirmances, such as the Florida First District Court of Appeal's in this case, are presumed adjudicated on the merits and warrant deference. *Id*. at 1288 (citing *Harrington v. Richter*, __ U.S. ___, 131 S.Ct. 770, 784–85 (2011), and

*Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1254 (11th Cir.2002)). "A judicial decision and a judicial opinion are not the same thing," and the Supreme Court has confirmed that determining whether the state court unreasonably applied the law or unreasonably determined the facts requires only a decision, not an opinion. *Id*. at 1291 (citing *Harrington*, 131 S.Ct. at 784). Yet, the Supreme Court has never squarely addressed whether under the "unreasonable application" test a federal habeas court "looks exclusively to the objective reasonableness of the state court's ultimate conclusion or must also consider the method by which the state court arrives at its conclusion." *Id*. at 1289 (quoting *Neal v. Puckett*, 286 F.3d 230, 244–45 (5th Cir.2002) (summarizing the emerging circuit split)). The Eleventh Circuit concluded that district courts must apply the plain language of § 2254(d) and answer the "precise question" raised in a claim based on the state court's ultimate legal conclusion, and should not "evaluate or rely upon the correctness of the state court's process of reasoning." *Id.* at 1291. In short, the court stated, "the statutory language focuses on the result, not on the reasoning that led to the result." *Id.*

In light of *Gill,* the "unreasonable determination of facts" standard plays a limited role in habeas review because the district court considers the reasonableness of the trial court's fact finding only to the extent that the state court's ultimate conclusion relied on it. *Id*. at 1292. A federal habeas court can consider the full record before it to answer "the only question that matters[:]" whether the state court's decision was objectively unreasonable. *Gill*, 133 F.3d at 1290.

## Ineffective Assistance of Counsel

Petitioner's claims 2, 3, and 4 assert that his trial counsel rendered ineffective

assistance in several respects.  Under *Strickland v. Washington*, 466 U.S. 668, 677-78

(1984), to prevail on a constitutional claim of ineffective assistance of counsel, a

defendant must demonstrate (1) that his counsel's performance was below an objective

and reasonable professional norm, and (2) that he was prejudiced by this inadequacy.

*Strickland*, 466 U.S. at 686.  The court may dispose of the claim if a defendant fails to

carry his burden of proof on either the performance or the prejudice prong.  *Id*. at 697.

To show counsel's performance was unreasonable, a defendant must establish

that "no competent counsel would have taken the action that his counsel did take."

*Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted).  "The

relevant question is not whether counsel's choices were strategic, but whether they were

reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  There are no "absolute

rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute

rules would interfere with counsel's independence–which is also constitutionally

protected–and would restrict the wide latitude counsel have in making tactical decisions."

*Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).  "To uphold a lawyer's strategy,

[the Court] need not attempt to divine the lawyer's mental processes underlying the

strategy."  *Chandler v. United States*, 218 F.3d 1305, 1314 n.16 (11th Cir. 2000) (en

banc).  "No lawyer can be expected to have considered all of the ways [to provide

effective assistance]."  *Id*.

> If a defense lawyer pursued course A, it is immaterial that some other
> reasonable courses of defense (that the lawyer did not think of at all)
> existed and that the lawyer's pursuit of course A was not a deliberate
> choice between course A, course B, and so on.  The lawyer's strategy was
> course A.  And [the Court's] inquiry is limited to whether this strategy, that
> is, course A, might have been a reasonable one.

*Id*.

        To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.  Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*.

        When, as here, the state courts have denied an ineffective assistance of counsel claim on the merits, the standard a petitioner must meet to obtain federal habeas relief is a difficult one. *Harrington* 131 S.Ct. at 786.  The standard is not whether an error was committed, but whether the state court decision is contrary to or an unreasonable application of federal law that has been clearly established by decisions of the Supreme Court. 28 U.S.C. § 2254(d)(1).  As the Supreme Court explained, error alone is not enough, because "[f]or purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington*, 131 S.Ct. at 785 (quotation marks omitted).  And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 786.

        When faced with an ineffective assistance of counsel claim that was denied on the merits by the state courts, a federal habeas court "must determine what arguments or theories supported or, [if none were stated], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id*.  So long as fairminded jurists could disagree about whether

the state court's denial of the claim was inconsistent with an earlier Supreme Court decision, federal habeas relief must be denied. *Id*.  Stated the other way, only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents" may relief be granted. *Id*.

Even without the deference due under § 2254, the *Strickland* standard for judging the performance of counsel "is a most deferential one." *Id*. at 788.  When combined with the extra layer of deference that § 2254 provides, the result is double deference and the question becomes whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.  Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.

### Claim 2: Counsel's failure to request a Frye hearing

Petitioner contends that his trial counsel was ineffective for failing to request a *Frye* hearing on the admissibility of the State's medical evidence that shaken baby syndrome was the cause of death.  Doc. 1.

The *Frye* court held that while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923).  As opposed to the federal courts where *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589 (1993) is controlling, Florida courts utilize the *Frye* test to determine if expert scientific opinion is admissible. *See Flanagan v.*

*State*, 625 So.2d 827, 829 (Fla.1993); *Hadden v. State*, 690 So.2d 573, 576 (Fla.1997)

(stating that "[t]his test requires that the scientific principles undergirding this evidence

be found by the trial court to be generally accepted by the relevant members of its

particular field.").  In Florida, the courts will only utilize the *Frye* test in cases where an

expert attempts to render an opinion that is based upon new or novel scientific evidence

or techniques. *See, e.g., U.S. Sugar Corp. v. Henson*, 823 So.2d 104, 109 (Fla.2002);

*Brim v. State*, 695 So.2d 268, 271–72 (Fla.1997).

In rejecting this ineffective-assistance claim in the appeal of the denial of

Petitioner's Rule 3.850 motion, the First DCA explained:

> A *Frye* hearing is appropriate to determine the admissibility of a "new or
> novel" scientific principle. *See Zack v. State*, 911 So.2d 1190, 1197-98
> (Fla. 2005) (citing to [*Brim* ]). However, expert opinion testimony "which is
> based on an 'expert's personal experience and training' " is not subject to
> *Frye* testing. *Gelsthorpe v. Weinstein, M.D.*, 897 So.2d 504, 509 (Fla. 2d
> DCA 2005) (citing to [*Flanagan]*). Therefore, a diagnosis based on an
> expert's opinion and experience, versus a specific scientific test, would not
> be subject to a *Frye* hearing. *Id.* at 510 (stating that expert "testimony
> concerning the causation of a medical condition will be considered pure
> opinion testimony-and thus not subject to *Frye* analysis").

*Herlihy v. State*, 927 So.2d 146, 147-8 (Fla.1st DCA 2006).  The First DCA concluded

that because the State's medical evidence relating to a diagnosis of shaken baby

syndrome was based on pure opinion testimony derived from the experts' experience,

counsel was not deficient for failing to request an "inappropriate" *Frye* hearing.  *Id*. at

148.

Petitioner has not shown that the state court's rejection of this claim was contrary

to, or an unreasonable application of, *Strickland*.  Counsel cannot be found to have

performed deficiently for failing to assert what was plainly a non-meritorious motion

under state law.  Petitioner was not prejudiced by counsel's performance, because it is clear that the testimony of the State's experts was admitted in accordance with state law.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### Claim 3: Counsel's failure to investigate a defense based on Scheibner's opinion

Petitioner contends that counsel rendered ineffective assistance by failing to pursue a defense theory that vaccinations played a key role in Robbie's death, as opined by Viera Scheibner.  Doc. 1.

The state postconviction court rejected this claim as successive and procedurally barred and on the merits.  Rule 3.850(f) of the Florida Rules of Criminal Procedure provides:

> **(f) Successive Motions.** A second or successive motion may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the movant or the attorney to assert those grounds in a prior motion constituted an abuse of the procedure governed by these rules. FLA. R. CRIM. P. 3.850(f) (bold in original).

"When a state court addresses both the independent state procedural ground and the merits of the federal constitutional claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim."  *Cloud v. DeLoach*  147 Fed.Appx. 817, 818-819 (11th Cir. 2005) (citing *Marek v. Singletary*, 62 F.3d 1295, 1301-02 (11th Cir. 1995); *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir.1994) ("However, as here, where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim.")).  Petitioner

has not demonstrated cause and prejudice for the procedural default, nor does the record suggest that a fundamental miscarriage of justice would occur if the Court does not reach the merits of these claims.

Further, even if this claim was not procedurally defaulted, Petitioner has failed to establish that the state court's assessment of the merits of the claim on state-law grounds was contrary to, or an unreasonable application of, Federal law for purposes of federal habeas review.  Based on the evidence submitted by counsel in support of the motion, the state court concluded that Petitioner's trial counsel did contact Scheibner about the report.  The court observed that, in contrast to the prominent and recognized authorities presented by defense counsel at trial, Scheibner was neither a medical doctor, nor did her report express a medical opinion.  The court concluded that Petitioner had failed to show any error in counsel's decision to present a defense based on the recognized medical experts rather than Scheibner's opinion.  App. exh. NN at 48-49.

"Complaints concerning uncalled witnesses impose a heavy showing since the presentation of testimonial evidence is a matter of trial strategy and often allegations of what a witness would have testified to are largely speculative."  *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980).  In view of the deference that must be afforded to counsel's strategic decisions in regard to the highly complex medical evidence underlying Petitioner's case, this Court agrees that Petitioner has failed to demonstrate any error by counsel.

### Claim Four: Failure to call Detective Weaver as impeachment witness

Petitioner alleges that his trial counsel rendered ineffective assistance for failing

to call Detective Weaver to testify.  Petitioner asserts that if called to testify Detective Weaver would have impeached Detective Legall's testimony, because in his deposition Weaver said that he was not asked to pull over while transporting Legall and Petitioner to the jail, and he did not overhear a conversation between Legall and Petitioner.  Doc. 1.

In summarily rejecting this claim on postconviction review, the state court observed that the record supported a conclusion that defense counsel's decision not to call Weaver was a deliberate decision reflecting trial strategy.  App. exh. PP at 13.  In closing argument, defense counsel questioned the accuracy of Legall's account of Petitioner's statements, and explained to the jury why he did not call Weaver to testify:

> The State's gonna get up and they're gonna tell you, well, I could have called [Weaver].  Well, let me tell you something, I don't call any police witness unless I know what they're gonna say in trial in that chair in that witness stand, and that's why I didn't call him.  On the other hand, the State knows exactly what a police officer is gonna say before he comes to court.  They did not call – not only didn't they tape [Petitioner's statement], they didn't call the witness who was right there when [Petitioner] is alleged to have made those incriminating statements.  That has to do with her credibility as a witness just like any other witness in the case[.]

App. exh U at 2351.

As the state court found, the record reflects that counsel made a reasoned decision after weighing the pros and cons of calling Weaver, and decided not to call him, notwithstanding what Weaver may have said in his deposition.[3]  Further, defense counsel clearly made a tactical decision to use the State's failure to call Weaver as

---

[3]It does not appear that Weaver's deposition was made part of the record on postconviction review.  Petitioner did not attach the alleged testimony to his Rule 3.850 motion.  *See* App. exh. OO, PP, at 120-313.

another basis for challenging Legall's testimony.  *See id*.  Petitioner's assertion that Weaver's testimony would have "thoroughly impeached" Legall's testimony is wholly speculative.  On the basis of this record, Petitioner has failed to establish that the state court's conclusion that counsel made a reasonable tactical decision, and therefore did not perform deficiently, was contrary to or an unreasonable application of Federal law.

For the foregoing reasons, the Petition should be denied.

## Certificate of Appealability

Section 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

Rule 11(a) also provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED:**

1. That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

2. That a certificate of appealability be **DENIED.**

**IN CHAMBERS**  this 29th day of February 2012.


*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge


**NOTICE TO THE PARTIES**

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.